# EX. 248

# Manual for Complex Litigation, Fourth

Federal Judicial Center 2004

Cite as

Manual for Complex Litigation,

Fourth, § _____

or

MCL 4th § _____

# Manual for Complex Litigation, Fourth

*Board of Editors*

Judge Stanley Marcus (Ct. of App., 11th Cir.), *chair*

Judge John G. Koeltl (S.D.N.Y.)          Judge Barefoot Sanders (N.D. Tex.)

Judge J. Frederick Motz (D. Md.)         Sheila Birnbaum, Esq. (N.Y., N.Y.)

Judge Lee H. Rosenthal (S.D. Tex.)       Frank A. Ray, Esq. (Columbus, Ohio)

Judge Fern M. Smith (N.D. Cal.),
*director, Federal Judicial Center 1999–2003*

Federal Judicial Center 2004

The *Manual for Complex Litigation, Fourth* has been produced under the auspices of the Federal Judicial Center. The analyses and recommendations are those of the *Manual*'s Board of Editors.

Blank page inserted for correct pagination
when printing double-sided copies.

# Contents

Preface  xvii

Acknowledgments  xix

Introduction  1

Part I:  Overview  5
  10. General Principles  7
    .1 Judicial Supervision  8
      .11 Early Identification and Control  9
      .12 Assignment Plan  9
        .121 Recusal/Disqualification  10
        .122 Other Judges  11
        .123 Related Litigation  11
      .13 Effective Management  12
      .14 Supervisory Referrals to Magistrate Judges and Special Masters  13
      .15 Sanctions  15
        .151 General Principles  15
        .152 Sources of Authority  16
        .153 Considerations in Imposing  17
        .154 Types  18
        .155 Procedure  21
    .2 Role of Counsel  22
      .21 Responsibilities in Complex Litigation  22
      .22 Coordination in Multiparty Litigation—Lead/Liaison Counsel and Committees  24
        .221 Organizational Structures  24
        .222 Powers and Responsibilities  26
        .223 Compensation  26
        .224 Court's Responsibilities  26
        .225 Related Litigation  28
      .23 Withdrawal and Disqualification  28

  11. Pretrial Procedures  31
    .1 Preliminary Matters  32
      .11 Scheduling the Initial Conference  32
      .12 Interim Measures  33
      .13 Prediscovery Disclosure  34
    .2 Conferences  36
      .21 Initial Conference and Orders  36
        .211 Case-Management Plan  36
        .212 Scheduling Order  39
        .213 Class Actions  40
        .214 Settlement  40
      .22 Subsequent Conferences  40
      .23 Attendance  41
    .3 Management of Issues  42
      .31 Relationship to Discovery  42
      .32 Pleading and Motion Practice  43
      .33 Identifying, Defining, and Resolving Issues  44
      .34 Summary Judgment  46

*Manual for Complex Litigation, Fourth*

.4 Discovery  49
  .41 Relationship to Issues  50
  .42 Planning and Control  51
    .421 Discovery Plan/Scheduling Conference  51
    .422 Limitations  53
    .423 Other Practices to Save Time and Expense  56
    .424 Resolution of Discovery Disputes  59
  .43 Privilege Claims and Protective Orders  62
    .431 Claims of Privilege/Full Protection  63
    .432 Limited Disclosure/Protective Orders  64
    .433 Allocation of Costs  69
  .44 Documents  71
    .441 Identification System  71
    .442 Preservation  72
    .443 Rule 34 Requests/Procedures for Responding  74
    .444 Document Depositories  75
    .445 Evidentiary Foundation for Documents  77
    .446 Discovery of Computerized Data  77
    .447 Discovery from Nonparties  82
  .45 Depositions  83
    .451 Limitations and Controls  83
    .452 Cost-Saving Measures  85
    .453 Deferred Supplemental Depositions  87
    .454 Scheduling  88
    .455 Coordination with Related Litigation  89
    .456 Control of Abusive Conduct  89
  .46 Interrogatories  90
    .461 Purposes  90
    .462 Limitations  91
    .463 Responses  92
    .464 Other Practices to Save Time and Expense  92
  .47 Stipulations of Fact/Requests for Admission  94
    .471 Stipulations of Fact  94
    .472 Requests for Admission  95
    .473 Statements of Contentions and Proof  96
    .474 Requests for Judicial Notice  97
  .48 Disclosure and Discovery of Expert Opinions  97
    .481 Trial Experts  97
    .482 Consulting Experts  99
    .483 Court-Appointed Experts  100
  .49 Special Problems  100
    .491 Government Investigations/Grand Jury Materials  100
    .492 Summaries  101
    .493 Sampling/Opinion Surveys  102
    .494 Extraterritorial Discovery  104
.5 Special Referrals  111
  .51 Court-Appointed Experts and Technical Advisors 111
  .52 Special Masters  114
  .53 Magistrate Judges Under 28 U.S.C. § 636(b)(1)  117
  .54 Other Referrals  118
.6 Final Pretrial Conference/Preparation for Trial  118
  .61 Date and Place of Trial  119
  .62 Reevaluation of Jury Demands  120
  .63 Structure of Trial  121
    .631 Consolidation  121

*Contents*

.632 Separate Trials  122
.633 Special Verdicts and Interrogatories  123
.64 Procedures to Expedite Presentation of Evidence  124
.641 Statements of Facts and Evidence  124
.642 Pretrial Rulings on Objections  124
.643 Disclosure of and Objections to Digital Evidence and Illustrative Aids  126
.644 Limits on Evidence  127
.645 Use of Courtroom Technology to Facilitate Evidence Presentation  127
.65 Proposed Jury Instructions  128
.66 Briefs and Final Pretrial Motions  129
.67 Final Pretrial Order  129

12. Trial  131
.1 Administration  132
.11 Trial Schedule  132
.12 Courthouse Facilities  133
.13 Managing Exhibits  134
.14 Transcripts  135
.15 Conferences During Trial  135
.2 Conduct of Trial  136
.21 Opening Statements  136
.22 Special Procedures for Multiparty Cases  137
.23 Advance Notice of Evidence and Order of Proof/Preclusion Orders  138
.24 The Judge's Role  139
.3 Presentation of Evidence  139
.31 Glossaries/Indexes/Demonstrative Aids  140
.32 Use of Exhibits  141
.33 Depositions  143
.331 Summaries  143
.332 Editing, Designations, and Extracts  143
.333 Presentation/Videotaped Depositions  144
.334 Alternative Means of Presenting Testimony  145
.34 Sequencing of Evidence and Arguments  146
.35 Judicial Control/Time Limits  147
.4 Jury Trials  150
.41 Impaneling the Jury  150
.411 Size of the Venire and Panel  150
.412 Voir Dire  151
.413 Peremptory Challenges  152
.42 Juror Note Taking/Notebooks/Questions  152
.421 Note Taking  152
.422 Juror Notebooks  153
.423 Juror Questions  153
.43 Jury Instructions  154
.431 General Principles  154
.432 Preliminary Instructions  154
.433 Interim and Limiting Instructions  156
.434 Final Instructions  156
.435 Jurors' Use of Exhibits During Deliberations  158
.436 Supplemental Instructions and Readbacks  158
.44 Avoiding Mistrial  159
.45 Verdicts  160
.451 Special Verdicts and General Verdicts with Interrogatories  160
.452 Judgment as a Matter of Law  162
.453 Return of Verdict  163

*Manual for Complex Litigation, Fourth*

.5 Nonjury Trials  164
    .51 Adopted Prepared Statements of Direct Testimony  164
    .52 Findings of Fact and Conclusions of Law  165
    .53 Procedures When Combined with Jury Trial  166
.6 Inability of Judge to Proceed  166

13. Settlement  167
  .1 Trial Judge's Role  167
    .11 General Principles  167
    .12 Timing/Relationship to Discovery  169
    .13 Specific Techniques to Promote Settlement  169
    .14 Review and Approval  172
    .15 Alternative Processes to Encourage Settlement  174
  .2 Special Problems  174
    .21 Partial Settlements  174
    .22 Agreements Affecting Discovery  176
    .23 Side Agreements  176
    .24 Ethical Considerations  180

14. Attorney Fees  183
  .1 Eligibility for Court-Awarded Fees  184
    .11 Types of Cases—Overview  184
    .12 Common-Fund Cases  186
      .121 Percentage-Fee Awards  186
      .122 Lodestar-Fee Awards  193
    .13 Statutory-Fee Cases  196
  .2 Proceedings to Award Fees  199
    .21 Setting Guidelines and Ground Rules  199
      .211 Selecting Counsel and Establishing Fee Guidelines  200
      .212 Staffing  201
      .213 Maintaining Adequate and Comprehensible Records  202
      .214 Submission of Periodic Reports  202
      .215 Compensation for Designated Counsel  202
      .216 Reimbursement of Expenses  203
    .22 Motion for Attorney Fees  203
      .221 Contents of the Fee Motion  203
      .222 Timing  204
      .223 Supporting Documentation and Evidence  204
      .224 Discovery  205
    .23 Judicial Review/Hearing and Order  205
      .231 Judicial Review  205
      .232 Hearing and Order  207

15. Judgments and Appeals  208
  .1 Interlocutory Appeals  208
    .11 When Permitted  208
    .12 Proceedings While Appeal Pending  212
  .2 Entry of Final Judgment  212
  .3 Disposition of Materials  213

Part II:  Special Problems  215

20. Multiple Jurisdiction Litigation  217
  .1 Related Federal Civil Cases  218
    .11 Cases in Same Court  218

*Contents*

.12 Cases in Different Federal Courts  219
.13 Multidistrict Transfers Under Section 1407  219
    .131 Requests for Transfer  219
    .132 During Period of Transfer  221
    .133 Remand  225
.14 Coordination Between Courts  227
.2 Related Criminal and Civil Cases  228
.3 Related State and Federal Cases  229
.31 Coordination  229
    .311 Identifying the Need and Opportunity  231
    .312 Threshold Steps  232
    .313 Specific Forms of Coordination  235
.32 Jurisdictional Conflicts  238

21. Class Actions  242
.1 Precertification Case Management  245
    .11 Initial Case-Management Orders  245
    .12 Precertification Communications with the Proposed Class  247
    .13 Standards for Class Certification and Precertification Discovery  250
        .131 Certifying a Litigation Class  250
        .132 Certifying a Settlement Class  250
        .133 Timing of the Certification Decision  252
    .14 Precertification Discovery  255
        .141 Precertification Discovery into the Rule 23(a) Requirements  257
        .142 Precertification Discovery into the Rule 23(b) Requirements  260
    .15 Relationship with Other Cases Pending During the Precertification Period  263
.2 Deciding the Certification Motion  266
    .21 Certification Hearings and Orders  266
    .22 Type and Definition of Class  268
        .221 Type of Class  268
        .222 Definition of Class  270
    .23 Role of Subclasses  272
    .24 Role of Issues Classes  272
    .25 Multiple Cases and Classes: The Effect on Certification  274
    .26 Appointment of the Class Representatives  276
    .27 Appointment of Class Counsel  278
        .271 Criteria for Appointment  278
        .272 Approaches to Selecting Counsel  279
        .273 Procedures for Appointment  282
    .28 Interlocutory Appeals of Certification Decisions  282
.3 Postcertification Communications with Class Members  284
    .31 Notices from the Court to the Class  285
        .311 Certification Notice  287
        .312 Settlement Notice  293
        .313 Other Court Notices  296
    .32 Communications from Class Members  298
        .321 Class Members' Right to Elect Exclusion  298
        .322 Communications Relating to Damage or Benefit Claims  299
        .323 Other Communications from Class Members  299
    .33 Communications Among Parties, Counsel, and Class Members  300
.4 Postcertification Case Management  302
    .41 Discovery from Class Members  302
    .42 Relationship with Other Cases  303
.5 Trials  306

*Manual for Complex Litigation, Fourth*

.6 Settlements  308
    .61 Judicial Role in Reviewing a Proposed Class Action Settlement  308
        .611 Issues Relating to Cases Certified for Trial and Later Settled  312
        .612 Issues Relating to Cases Certified and Settled at the Same Time  313
    .62 Criteria for Evaluating a Proposed Settlement  315
    .63 Procedures for Reviewing a Proposed Settlement  318
        .631 Obtaining Information  318
        .632 Preliminary Fairness Review  320
        .633 Notice of Fairness Hearing  321
        .634 Fairness Hearing  322
        .635 Findings and Conclusions  322
    .64 Role of Other Participants in Settlement Review  323
        .641 Role of Class Counsel in Settlement  323
        .642 Role of Class Representatives in Settlement  325
        .643 Role of Objectors in Settlement  326
        .644 Role of Magistrate Judges, Special Masters, and Other Judicial Adjuncts in
            Settlement  329
    .65 Issues Raised by Partial or Conditional Settlements  329
        .651 Partial Settlements  329
        .652 Conditional Settlements  330
    .66 Settlement Administration  331
        .661 Claims Administrator or Special Master  332
        .662 Undistributed Funds  333
.7 Attorney Fee Awards  334
    .71 Criteria for Approval  336
    .72 Procedure for Reviewing Fee Requests  338
        .721 Motions  338
        .722 Notice  338
        .723 Objections  338
        .724 Information Supporting Request and Discovery for Fee Requests  338
        .725 Required Disclosures  339
        .726 Hearing and Findings  339
        .727 Use of Special Masters or Magistrate Judges  340

22. Mass Torts  341
    .1 Introduction  342
    .2 Initial Issues in Mass Tort Suits  348
    .3 Multiple Filings in Federal District Courts  355
        .31 Aggregating Claims  355
            .311 Criteria  357
            .312 Advantages and Disadvantages of Aggregation  357
            .313 Timing of Aggregation Decisions  358
            .314 Obtaining Information About Common Issues and Case Values  358
            .315 Test Cases  360
            .316 Case Characteristics  360
            .317 Role of Different State Laws  361
            .318 Trial Plans  362
        .32 Intradistrict Assignment to a Single Judge  362
        .33 Interdistrict Transfer (Including MDL)  366
        .34 Denial of Transfer  368
            .341 Insufficient Common Facts  368
            .342 Procedural Alternatives  369
            .343 Geographical Diversity and Economy  369
            .344 Maturity of Litigation  370
        .35 Authority of a Judge Pending Decision by the MDL Panel  371

*Contents*

    .36 The Tasks of an MDL Transferee Judge  372
    .37 The Task of the Transferor Judge Following Remand After MDL Proceedings  376
 .4 Multiple Filings in State and Federal Courts  376
 .5 Multiple Filings in District and Bankruptcy Courts  378
    .51 Venue, Transfer, and Consolidation  380
        .511 Venue and Transfer  380
        .512 Consolidation and Reassignment  380
    .52 Withdrawing the Reference  381
    .53 Dividing the Labor Among Judges  383
        .531 MDL Transferee Judge  383
        .532 Other Judges  384
        .533 Bankruptcy Appeals  384
    .54 Coordinating and Consolidating Tort Claims and Related Cases  385
        .541 Claims Against the Debtor  386
        .542 Claims Against Other Defendants  388
        .543 Consolidation of Cases  388
        .544 Transfer of Related Cases of Nondebtor Defendants  389
        .545 Expanding the Automatic Stay or Enjoining Related Cases  391
    .55 Providing Representation for Future Mass Tort Claimants  393
    .56 Estimating the Value of Mass Tort Claims  397
    .57 Negotiating a Reorganization Plan  398
    .58 Discharging Future Claims  399
    .59 Confirming a Reorganization Plan  401
 .6 Case-Management Orders  403
    .61 Initial Orders  403
    .62 Organization of Counsel  405
    .63 Subsequent Case-Management Orders  408
        .631 Adding Parties  408
        .632 Pleadings and Motions  409
        .633 Deferred Docketing  410
        .634 Issue Identification and Development  410
        .635 Electronic Communications  413
 .7 Class Actions in Mass Tort Cases  413
    .71 Background  414
    .72 Post-*Amchem* Class Certification  416
    .73 Post-*Ortiz* Mandatory Limited Fund Class Settlements  421
    .74 Medical Monitoring Class Actions  424
    .75 Issues Classes  429
        .751 Identify the Issues  430
        .752 Determine Applicable Law  431
        .753 Identify a Limited Set of Laws  432
        .754 Subclasses to Reflect Differences in State Law  432
        .755 Determine Separability of Common Issue  433
        .756 Establish a Trial Plan  434
        .757 Assess the Overall Impact  435
 .8 Discovery  435
    .81 Sampling  436
    .82 Initial Disclosures  437
    .83 Interrogatories  438
    .84 Depositions: New Parties  438
    .85 Documents  439
    .86 Physical Evidence  439
    .87 Experts and Scientific Evidence  440
 .9 Settlement and Trial  446
    .91 Judicial Role and Settlement  446

*Manual for Complex Litigation, Fourth*

.92 Review of Settlement in Mass Tort Class Actions  449
    .921 Class Certification in a Settlement Context  450
    .922 Fairness, Adequacy, and Reasonableness of the Settlement  453
    .923 Criteria for Evaluating the Merits of a Proposed Settlement  454
    .924 Gathering Information and Conducting a Fairness Hearing  456
    .925 Evaluating Nonmonetary Benefits  460
    .926 Presenting the Decision  460
    .927 Awarding and Allocating Attorney Fees  461
.93 Trial  463

23. Expert Scientific Evidence  469
.1 Introduction  469
.2 The Use of Scientific Evidence in Complex Litigation  472
    .21 The Federal Rules of Evidence  472
    .22 The *Daubert* Trilogy  474
    .23 The *Daubert* Criteria  476
    .24 Opinions and Conclusions Under *Daubert*  478
    .25 The *Daubert* "Fit" Test  480
    .26 The Scope of Appellate Review  482
    .27 Emerging Issues in the Use of Scientific Evidence  484
        .271 The Validity of Toxicological Evidence Versus Epidemiological Evidence  485
        .272 Aggregation of Scientific Evidence  485
        .273 Clinical Medical Judgment  487
        .274 Research as a Result of Litigation  489
.3 Case Management  491
    .31 Preliminary Considerations in Assessing Expert Testimony  491
    .32 The Initial Conference  494
    .33 Disclosures  499
    .34 Discovery Control and Management  503
        .341 Discovery of Testifying Experts  503
        .342 Discovery of Nontestifying Experts  504
        .343 Discovery of Nonretained Experts  504
        .344 Discovery of Court-Appointed Experts  505
        .345 Use of Videotaped Depositions  505
    .35 Motion Practice  506
        .351 Initiating a *Daubert* Inquiry  507
        .352 Timing of Challenges to Expert Testimony  508
        .353 Handling a Challenge to Expert Testimony  509
        .354 Summary Judgment  512
    .36 Final Pretrial Conference  513
    .37 Trial  514

Part III:  Particular Types of Litigation  517

30. Antitrust  519
.1 Managing the Issues  519
.2 Transactional and Economic Data, and Expert Opinions  522
.3 Conflicts of Interest  524
.4 Related Proceedings  524

31. Securities  527
.1 Introduction  527
.2 Statutory Framework  528
.3 The Private Securities Litigation Reform Act  529
    .31 Class Representatives and Lead Plaintiffs  531

*Contents*

    .32 Pleading Requirements  540
    .33 Safe Harbor  543
    .34 Discovery Stays  544
  .4 Initial Pretrial Conference  545
  .5 Class Actions and Derivative Actions  550
  .6 Discovery  553
  .7 Takeover Litigation  554
    .71 Initial Conference  554
    .72 Injunctive Relief  556
    .73 Discovery  558
  .8 Trial and Settlement  558

## 32. Employment Discrimination  561
  .1 Introduction  561
  .2 The Statutory Framework  562
    .21 Title VII: Discrimination in Employee Hiring and Advancement  564
    .22 The Civil Rights Act of 1964: Discrimination in Contracting  567
    .23 Age Discrimination in Employment Act  568
    .24 Americans with Disabilities Act  570
    .25 Family and Medical Leave Act  571
  .3 Developments in the Law of Employment Discrimination  572
  .4 Case Management  576
    .41 Initial Pretrial Conference  576
    .42 Class Actions  579
    .43 Discovery  586
      .431 Identification of Source Materials  586
      .432 Computerized Records  587
      .433 Confidential Information  588
      .434 Preservation of Records  589
      .435 Statistical Evidence and Expert Testimony  589
      .436 Discovery from Class Members  590
    .44 Summary Judgment  591
    .45 Trial  592
    .46 Settlement  596
      .461 Timing  596
      .462 Affirmative Relief  596
      .463 Attorney Fees  597
      .464 Settlement Hearing  597
      .465 Implementation  597

## 33. Intellectual Property  599
  .1 Introduction  599
  .2 Patent Law  600
    .21 The Statutory Framework  600
    .22 Claim Construction Under *Markman v. Westview Instruments*  602
      .221 Holding a *Markman* Hearing  604
      .222 Structuring the *Markman* Hearing  606
      .223 Timing the *Markman* Hearing  607
      .224 Requesting a *Markman* Hearing  610
      .225 Appeal  611
    .23 Defining the Issues in Patent Litigation  611
    .24 Injunctive Relief  619
    .25 Discovery  622
    .26 Experts  625
    .27 Trial  627

*Manual for Complex Litigation, Fourth*

.3 Copyright and Trademark Law  628
    .31 Copyright  628
        .311 Discovery  637
        .312 Motions  639
        .313 Experts  640
    .32 Trademarks  640

## 34. CERCLA (Superfund)  643
.1 Introduction  643
    .11 Statutory Framework  646
    .12 The Three Phases of CERCLA Litigation  650
.2 Case Management  654
    .21 Setting Up the Case  662
    .22 Special Masters and Magistrate Judges  664
    .23 Related Litigation  665
    .24 Organizing Counsel  667
    .25 Centralized Document Management  669
    .26 Narrowing the Issues  670
    .27 Joinder  672
    .28 Managing Discovery  674
    .29 Scientific and Technical Expert Testimony  676
.3 Settlement and Trial  677
    .31 Allocation  677
    .32 Settlement  682
    .33 Approval of Consent Decrees  686
    .34 Structuring the Trial  687

## 35. Civil RICO  689
.1 Introduction  689
.2 Statutory Framework  692
.3 Case Management  702
    .31 Pleadings  702
    .32 Initial Conference  708
    .33 Discovery  720
    .34 Motion Practice  721
    .35 Trial  722

## Part IV: Sample Orders  725

## 40. Sample Orders  727
.1 Order Setting Initial Conference  730
.2 Sample Case-Management Orders  734
    .21 General  734
    .22 Responsibilities of Designated Counsel  741
    .23 Attorneys' Time and Expense Records  743
    .24 Scheduling Order  744
    .25 Preservation of Documents, Data, and Tangible Things  746
    .26 Document Depositories  749
        .261 Order to Meet and Confer to Establish Joint Document Depository  749
        .262 Order to Establish Separate Document Depositories  751
    .27 Confidentiality Order  752
    .28 Referral of Privilege Claims to Special Master  754
    .29 Deposition Guidelines  756
.3 Order Creating a Web Site  762

*Contents*

.4 Class Actions Orders  763
   .41 Order Certifying Class  763
   .42 Order Setting Hearing on Proposed Class Settlement  765
   .43 Combined Certification and Proposed Settlement Order  766
   .44 Order Approving Settlement/Claims Procedure  768
.5 Orders in Special Cases  770
   .51 Coordinating Proceedings in Different Courts  770
   .52 Mass Tort Case-Management Order  773
   .53 CERCLA Case-Management Order  779
   .54 Civil RICO Case-Statement Order  783
.6 Sample Final Pretrial Orders  786
.7 Jury Questionnaire  786

Index  787

Blank page inserted for correct pagination
when printing double-sided copies.

# Preface

This fourth edition of the *Manual for Complex Litigation* stands on the shoulders of the three previous editions and in the debt of the following: Judge William W Schwarzer, director of the Federal Judicial Center from 1990 to 1995, and primarily responsible for the third edition (1995); Judge Sam C. Pointer, who chaired the Board of Editors for the second edition (1985); Judge Alfred P. Murrah, the Center director who was the driving force behind the inaugural edition; Judge Thomas J. Clary, the chair of the initial Board of Editors; and the members of that Board.

The fourth edition of the *Manual* is adapted to new conditions and demands of federal litigation and reflects the work, experience, and insight of its Board of Editors. The Chief Justice, as chairman of the Board of the Federal Judicial Center, appointed the Board of Editors in 1999. He asked Judge Stanley Marcus, then a member of the Center's Board, to chair the Board of Editors. Judge Marcus has continued to oversee the *Manual*'s completion even though his term as a Center Board member ended in 2002. His insight and experience as a federal district judge and now as a member of the court of appeals are reflected on every page of the *Manual*. So, too, does this edition reflect the many hours dedicated to the project by individual members of the Board of Editors. A complete list of individuals who worked on the *Manual* can be found at Acknowledgments, page xix.

This *Manual* is one of the flagship services of the Federal Judicial Center. It has been my pleasure, as director of the Center, to have worked with Judge Marcus and the Board of Editors, and with the staff of the Center and others, to bring this fourth edition into being.

Fern M. Smith
*Director, Federal Judicial Center 1999–2003*

Blank page inserted for correct pagination
when printing double-sided copies.

# Acknowledgments

As with all Federal Judicial Center publications, this work is a tribute to the teamwork of its staff. In particular, thanks go to Meghan A. Dunn, Jill E. Evans, Elizabeth C. Wiggins, Thomas E. Willging, and Kenneth J. Withers for substantial assistance in drafting portions of the *Manual*. In addition, thanks go to the following: Linda Beavers, Joe Cecil, James Eaglin, Geoffrey Erwin, Richard Gibson, Jason Gilbert, Kristina Gill, Linda B. Gill, David Guth, Andrea Henson-Armstrong, Laural Hooper, Gil Hopenstand, Ilisa Horowitz, Martha Kendall, Gregory Langadinos, Marie Leary, Angelia N. Levy, Preston Manning, David Marshall, Dean Miletich, and Russell Wheeler.

We greatly appreciate the work of the many judges, professors, practitioners, and law clerks who offered their enthusiastic review and helpful comments: John Aldock, Esq., Hon. William Alsup, David Aman, John E. Ballow, Esq., David Barkan, Hon. Louis C. Bechtle, Hon. Edward R. Becker, John Beisner, Esq., Professor Margaret Berger, Kenneth J. Brown, Hon. Robert J. Bryan, Arthur Bryant, Esq., Professor Stephen B. Burbank, Elisabeth Cabraser, Esq., Professor Dan Capra, Stanley Chesley, Esq., Edward Cloutman, Esq., Professor Edward H. Cooper, Professor Jill Fisch, Hon. James C. Francis IV, Theodore L. Garrett, Esq., Professor S. Elizabeth Gibson, Hon. John F. Grady, Hon. Wm. Terrell Hodges (Judicial Panel on Multidistrict Litigation), Gregory P. Joseph, Esq., Terrence M. Kalahurka, Esq., Bruce Keller, Esq., Professor Kenneth Kreiling, Michael C. LeVine, Professor Richard L. Marcus, Hon. Jed S. Rakoff, Deborah Reyher, Paul Rheingold, Esq., Anthony Z. Roisman, Esq., Hon. Barbara Jacobs Rothstein, Hon. Patti B. Saris, Hon. Shira Scheindlin, Hon. William W Schwarzer, Hon. Milton Shadur, Hon. Walter K. Stapleton, Hon. Ben F. Tennile, North Carolina Business Court, Rebecca Tushnet, Esq., Melvyn I. Weiss, Esq., and Brian Wolfman, Esq.

Blank page inserted for correct pagination
when printing double-sided copies.

# Introduction

The impetus for this fourth edition of the *Manual for Complex Litigation* was, as with the previous editions, significant change in the landscape of federal litigation and the increasing responsibilities of federal trial judges. A recommendation of the Mass Tort Working Group, appointed by the Chief Justice, served as a catalyst for this project.[1] Major changes include, but are hardly limited to, the growth in class action and mass tort litigation, and the trial judge's heightened role imposed by *Daubert v. Merrell Dow Pharmaceuticals*[2] and cases following it, and by *Markman v. Westview Instruments, Inc.*[3] The *Manual*'s orientation, however, differs little from the first incarnation. It "contains neither a simplified outline for the easy disposition of complex litigation nor an inflexible formula or mold into which all trial or pretrial procedure must be cast."[4]

Users should keep in mind several things about this edition. First, it is not, and should not be cited as, authoritative legal or administrative policy. As noted at page iii, it contains analyses and recommendations of the Board of Editors, but each member of the Board does not necessarily subscribe to all parts of the *Manual.* It was produced under the auspices of the Federal Judicial Center, but the Center has no authority to prescribe practices for federal judges. The *Manual*'s recommendations and suggestions are merely that. As always, the management of any matter is within the discretion of the trial judge.

Second, although federal trial judges are the *Manual*'s primary audience, the techniques and procedures discussed may be useful in state courts as well, particularly in view of the convergence that is occurring in related litigation pending in both state and federal court systems. Reference to the *Manual* may assist in the coordination of such litigation. The *Manual* will also assist lawyers, who share with judges the responsibility for managing complex litigation in which they are involved.

Third, as with the previous editions, this edition's "organization . . . belies the fact that its subject matter is not neatly divisible into distinct topics."[5] Nor is the term "complex litigation" susceptible to any bright-line definition. Part I

---

1. Mass Tort Working Group, Report on Mass Tort Litigation, 187 F.R.D. 293, 324 (1999).

2. 509 U.S. 579 (1993).

3. 517 U.S. 370 (1996).

4. Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351, 355 (1960) (quoted in Manual for Complex Litigation, Second, § 10 (1985)).

5. Manual for Complex Litigation, Third, § 10.2 (1995).

treats generic topics in complex (and other) litigation, such as pretrial and trial procedures and attorney fees. Part II analyzes special problems in complex litigation, such as class actions and expert scientific evidence. Part III has separate sections on complex litigation in various subject areas, such as antitrust and intellectual property. Part IV includes sample orders and forms. As the *Manual for Complex Litigation, Third* said, however, "[a] topic, such as settlement or class actions, will be relevant to the discussion at different points."[6] Thus, this edition too contains extensive cross-references. This fourth edition contains much new and revised material and has a somewhat different format and numbering system than that of the *MCL 3d*. However, because civil and criminal case management differ significantly, and in order to keep this volume to a manageable size, this edition deals only with civil litigation.

Finally, it could go without saying that changes in statutes, case law, regulations, and technology will quickly date some specific references in the *Manual*, and users need to exercise standard research practices when using the *Manual*. For example, prospective legislative changes in class action rules remained pending as the *Manual* went to press, and the precise changes could not be forecast. Before this edition went to press, significant changes in Federal Rules of Civil Procedure 23 and 53 were approved by the Supreme Court[7] and were before Congress pursuant to the Rules Enabling Act.[8] Because congressional acceptance of the amendments seemed likely, and the amended rules differed significantly from those in effect prior to December 1, 2003, the *Manual*, when treating class actions, uses the amended rules and the committee notes about those amendments.

In offering an array of litigation management techniques and procedures, the *Manual* does not recommend that every complex litigation necessarily employ any such procedures or follow a standard pattern. Choices will depend on the needs of the litigation and many other considerations. What the *Manual* does urge is that choices be made, and that they be made starting early in the litigation. While those decisions are largely the responsibility of the court, the judge should not take the case from the lawyers, but rather provide guidance and direction, setting limits and applying controls as needed. Additional Center publications on litigation management can be found at http://www.fjc.gov.

Complex litigation should not be viewed as monolithic. In some areas of law, such as antitrust and securities litigation, substantive and procedural rules

---

6. *Id.*

7. See letters of the Chief Justice to the Speaker of the House and the President of the Senate, March 27, 2003, and amendments adopted by the Supreme Court, in "2002 Term Court Orders," at http://www.supremecourtus.gov (last visited Nov. 10, 2003).

8. 28 U.S.C. § 2074 (2000).

*Introduction*

are relatively well settled, as are management techniques. In others, such as environmental, civil rights, and mass tort litigation, rules are still emerging or undergoing change. While all complex litigation challenges courts, the unsettled areas present the greatest challenges.

Much complex litigation, therefore, will take the judge and counsel into sparsely charted terrain with little guidance on how to respond to pressing needs for effective management. Practices and principles that served in the past may not be adequate, their adaptation may be difficult and controversial, and novel and innovative ways may have to be found. While this *Manual for Complex Litigation, Fourth* should be helpful within the limits of its mission, it should be viewed as open-ended, and judges are encouraged to be innovative and creative to meet the needs of their cases while remaining mindful of the bounds of existing law and any variations within their own circuits.

Blank page inserted for correct pagination
when printing double-sided copies.

# Part I

# Overview

---

10. General Principles  7

11. Pretrial Procedures  31

12. Trial  131

13. Settlement  167

14. Attorney Fees  183

15. Judgments and Appeals  208

Blank page inserted for correct pagination
when printing double-sided copies.

# 10. General Principles

.1 Judicial Supervision  8
  .11 Early Identification and Control  9
  .12 Assignment Plan  9
    .121 Recusal/Disqualification  10
    .122 Other Judges  11
    .123 Related Litigation  11
  .13 Effective Management  12
  .14 Supervisory Referrals to Magistrate Judges and Special Masters  13
  .15 Sanctions  15
    .151 General Principles  15
    .152 Sources of Authority  16
    .153 Considerations in Imposing  17
    .154 Types  18
    .155 Procedure  21
.2 Role of Counsel  22
  .21 Responsibilities in Complex Litigation  22
  .22 Coordination in Multiparty Litigation—Lead/Liaison Counsel and Committees  24
    .221 Organizational Structures  24
    .222 Powers and Responsibilities  26
    .223 Compensation  26
    .224 Court's Responsibilities  26
    .225 Related Litigation  28
  .23 Withdrawal and Disqualification  28

Fair and efficient resolution of complex litigation requires at least that (1) the court exercise early and effective supervision (and, where necessary, control); (2) counsel act cooperatively and professionally; and (3) the judge and counsel collaborate to develop and carry out a comprehensive plan for the conduct of pretrial and trial proceedings. The generic principles of pretrial and trial management are covered in sections 11 and 12 and are applied to specific types of litigation in Part III. Section 10 discusses matters that cut across all phases of complex litigation.

# 10.1   Judicial Supervision

.11 Early Identification and Control  9
.12 Assignment Plan  9
    .121 Recusal/Disqualification  10
    .122 Other Judges  11
    .123 Related Litigation  11
.13 Effective Management  12
.14 Supervisory Referrals to Magistrate Judges and Special Masters  13
.15 Sanctions  15
    .151 General Principles  15
    .152 Sources of Authority  16
    .153 Considerations in Imposing  17
    .154 Types  18
    .155 Procedure  21

Although not without limits, the court's express and inherent powers enable the judge to exercise extensive supervision and control of litigation. The Federal Rules of Civil Procedure, particularly Rules 16, 26, 37, 42, and 83, contain numerous grants of authority that supplement the court's inherent power[9] to manage litigation. Federal Rule of Civil Procedure 16(c)(12) specifically addresses complex litigation, authorizing the judge to adopt "special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems."

In planning and implementing case management, the court should keep in mind the goal of bringing about a just resolution as speedily, inexpensively, and fairly as possible. Judges should tailor case-management procedures to the needs of the particular litigation and to the resources available from the parties and the judicial system. Judicial time is the scarcest resource of all: Judges should use their time wisely and efficiently and make use of all available help. Time pressures may lead some judges to believe that they should not devote time to civil case management. Investing time in the early stages of the litigation, however, will lead to earlier dispositions, less wasteful activity, shorter trials, and, in the long run, economies of judicial time and fewer judicial burdens.

---

9. *See, e.g.*, Chambers v. NASCO, Inc., 501 U.S. 32, 42–51 (1991); Pedroza v. Cintas Corp., No. 6-013247-CV, 2003 WL 828237, at *1 (W.D. Mo. Jan. 9, 2003). References to "Rule(s)" refer to the Federal Rules of Civil Procedure.

## 10.11  Early Identification and Control

Judicial supervision is most needed and productive early in the litigation. To this end, courts should have a method of advising the assigned judge immediately that a case is likely to be complex; courts should also instruct lawyers to alert the judge in such a case. A case that needs increased supervision may not be apparent from the docket sheet.

The judge should hold an initial pretrial conference under Rule 16[10] as soon as practical (many judges hold the conference within thirty to sixty days of filing), even if some parties have not yet appeared or even been served. Special procedures sometimes are needed even before the initial conference (for example, it may be necessary to take immediate action to preserve evidence).

Rule 16(b) requires the judge, usually after holding a scheduling conference, to issue a scheduling order[11] "as soon as practicable but in any event within 90 days after the appearance of a defendant and within 120 days after the complaint has been served on a defendant" (local rules may establish different deadlines). The initial pretrial conference may be used for this purpose unless a separate scheduling conference is needed. Many judges use standing case orders—sometimes tailored to specific types of litigation—to elicit specific information before the conference and to inform counsel of the matters they must be prepared to discuss.[12]

## 10.12  Assignment Plan

.121 Recusal/Disqualification  10
.122 Other Judges  11
.123 Related Litigation  11

Each multijudge court should determine for itself how assignment of complex litigation should be made: according to the court's regular case-assignment plan, under a special rotation for complex cases, or to judges particularly qualified by reason of prior experience. Courts that do not assign actions automatically to a specific judge upon filing should nevertheless make an individual assignment as soon as a case is identified as complex or a part of

---

10. For discussion of the matters that should or may be covered in this and subsequent conferences, see *infra* section 11.2 (pretrial conferences). Special procedures may be needed even before the initial conference; for example, it may be necessary to take immediate action to preserve evidence. *See infra* section 11.442 (documents preservation).

11. For a sample scheduling order, see *infra* section 40.24.

12. For a sample order, see *infra* section 40.54 (civil RICO case-statement order); see also Civil Litigation Management Manual app. A, at 213–15 (Federal Judicial Center 2001) [hereinafter Litigation Manual] (Sample Form 12).

complex litigation. In unusual situations, the demands of complex litigation may be great enough to justify relieving the assigned judge from some or all other case assignments for a period of time or giving the judge assistance on aspects of the litigation from other judges.

## 10.121 Recusal/Disqualification

Title 28, section 455(c) of the U.S. Code directs judges to inform themselves about their personal and fiduciary financial interests and to make a "reasonable effort" to inform themselves about the personal financial interests of their spouse and any minor children residing in their household. Sections 455(b) and (f) designate when the judge must recuse and when parties may waive recusal. Upon assignment or reassignment of a complex case, the court should promptly review the pleadings and other papers in the case, the identities of parties and attorneys, and the nature of interests affected by the litigation for possible conflicts that may require recusal or disqualification. Counsel should submit a list, for review by the judge, of all entities affiliated with the parties and all attorneys and firms associated in the litigation. This review must be conducted at the outset, but the judge needs to consider both present and potential conflicts that may arise as a result of the joinder of additional parties, the identification of class members, or the assignment of related cases with the resultant involvement of additional litigants and counsel.[13] As the case progresses, conflicts may continue to arise as additional persons and interests enter the litigation or as the judge's staff changes.[14] It is important that law clerks avoid having a relationship (including a pending offer) with any party or counsel.

Reassignment, when warranted, should be effected as promptly as possible, and the judge to whom the litigation is to be reassigned should make a similar inquiry into potential grounds for recusal before accepting the reassignment and notifying the parties.

---

13. *See, e.g.,* Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 859–62 (1988) (holding that "scienter is not an element of a violation of § 455(a); advancement of the purpose of the provision—to promote public confidence in the integrity of the judicial process—does not depend upon whether or not the judge actually knew" of the conflict, but rather what the public might reasonably expect the judge to know); *In re* Cement Antitrust Litig., 688 F.2d 1297 (9th Cir. 1982), *aff'd under 28 U.S.C. § 2109 sub nom.* Ariz. v. United States Dist. Court, 459 U.S. 1191 (1983) (disqualification of judge, five years after suit instituted, upon discovery that spouse owned stock in a few of the more than 200,000 class members).

14. *See, e.g.,* Linda S. Mullenix, *Beyond Consolidation*, 32 Wm. & Mary L. Rev. 475, 539–40 (1991) (discussing complex case in which magistrate judge recused when law clerk was offered employment with firm of counsel representing party).

## 10.122 Other Judges

Although one judge should supervise the litigation, he or she may request other judges to perform special duties, such as conducting settlement discussions (see section 13.11). Moreover, in the course of consolidated or coordinated pretrial proceedings, severable claims or cases may appear that could be assigned to other judges.

## 10.123 Related Litigation

Complex litigation frequently involves two or more separate but related cases. All pending related cases or cases that may later be filed in the same court, whether or not in the same division, should be assigned at least initially to the same judge. Pretrial proceedings in these cases should be coordinated or consolidated under Federal Rule of Civil Procedure 42(a), even if the cases are filed in more than one division of the court.[15] It may be necessary to transfer to the district judge related adversary proceedings in bankruptcy court, including proceedings to determine the dischargeability of debts.[16] Counsel should be directed to inform the assigned judge of any pending related cases (as many local rules require). Sometimes related cases are identified on the face of the complaint. The judge to whom the complex litigation has been assigned should also ask whether related cases are pending in that district.

Assignment of related criminal and civil cases to a single judge will improve efficiency and coordination, especially when the cases are pending at the same time. Other factors, however, may suggest that the cases be handled by different judges—for example, extensive judicial supervision of pretrial proceedings in the civil litigation may be needed while the criminal trial is being conducted. See generally section 20.2.

Consolidation may be possible even when related cases are filed in different courts. Other courts can transfer cases under 28 U.S.C. § 1404(a) or § 1406 to the consolidation court, but only if personal jurisdiction and venue lie in the transferee forum.[17] Pretrial proceedings in related cases may also be consolidated in a single district by the Judicial Panel on Multidistrict Litigation under 28 U.S.C. § 1407. See section 20.13. State court cases may be removed to fed-

---

15. Under 28 U.S.C. § 1404(b) the court may, upon motion, transfer cases, motions, or hearings pending in the same district to a single division.

16. *See, e.g., In re* Flight Trans. Corp. Sec. Litig., 730 F.2d 1128 (8th Cir. 1984).

17. *See, e.g.,* Nat'l Union Fire Ins. Co. v. Turtur, 743 F. Supp. 260, 263 (S.D.N.Y. 1990); Shutte v. Armco Steel Corp., 431 F.2d 22, 24 (3d Cir. 1970) (citing 28 U.S.C. § 1404(a)); Cote v. Wadel, 796 F.2d 981, 984 (7th Cir. 1986); Dubin v. United States, 380 F.2d 813 (5th Cir. 1967) (citing 28 U.S.C. § 1406). If personal jurisdiction and venue do not lie in the transferee forum, transfer is improper even if plaintiffs consent. Hoffman v. Blaski, 363 U.S. 335 (1960).

eral court.[18] They may also be transferred to or refiled in the consolidating district court following voluntary dismissal or dismissal based on *forum non conveniens*.

When transfer of all cases to a single court for centralized management is not possible the affected courts can still use informal means to coordinate proceedings to the extent practicable. Coordination methods include arrangements made by counsel, communications between judges, joint pretrial conferences and hearings at which all involved judges preside, and parallel orders. Another coordination method is to designate a "lead" case in the litigation; rulings in the lead case would presumptively apply to the other coordinated cases, and the judges in those cases may stay pretrial proceedings in those cases pending resolution of the lead case. Section 20.14 (cases in different federal courts) and section 20.31 (cases in federal and state courts) discuss coordination of related litigation more fully.

## 10.13  Effective Management

Effective judicial management generally has the following characteristics:

- *It is active.* The judge anticipates problems before they arise rather than waiting passively for counsel to present them. Because the attorneys may become immersed in the details of the case, innovation and creativity in formulating a litigation plan frequently will depend on the judge.
- *It is substantive.* The judge becomes familiar at an early stage with the substantive issues in order to make informed rulings on issue definition and narrowing, and on related matters, such as scheduling, bifurcation and consolidation, and discovery control.
- *It is timely.* The judge decides disputes promptly, particularly those that may substantially affect the course or scope of further proceedings. Delayed rulings may be costly and burdensome for litigants and will often delay other litigation events. The parties may prefer that a ruling be timely rather than perfect.
- *It is continuing.* The judge periodically monitors the progress of the litigation to see that schedules are being followed and to consider necessary modifications of the litigation plan. Interim reports may be ordered between scheduled conferences.
- *It is firm, but fair.* Time limits and other controls and requirements are not imposed arbitrarily or without considering the views of counsel,

---

18. *See* 28 U.S.C. §§ 1441–1452 (2000).

and they are revised when warranted. Once established, however, schedules are met, and, when necessary, appropriate sanctions are imposed (see section 10.15) for derelictions and dilatory tactics.

- *It is careful.* An early display of careful preparation sets the proper tone and enhances the court's credibility and effectiveness with counsel.

The judge's role is crucial in developing and monitoring an effective plan for the orderly conduct of pretrial and trial proceedings. Although elements and details of the plan will vary with the circumstances of the particular case, each plan must include an appropriate schedule for bringing the case to resolution. Case-management plans ordinarily prescribe a series of procedural steps with firm dates to give direction and order to the case as it progresses through pretrial proceedings to summary disposition or trial. In some cases, the court can establish an overall plan for the conduct of the litigation at the outset; in others, the plan must be developed and refined in successive stages. It is better to err on the side of overinclusiveness initially and subsequently modify plan components that prove impractical than to omit critical elements. Nevertheless, in litigation involving experienced attorneys working cooperatively, a firm but realistic trial date may suffice if coupled with immediate access to the court for disputes that counsel cannot resolve.

The attorneys—who will be more familiar than the judge with the facts and issues in the case—should play a significant part in developing the litigation plan and should have primary responsibility for its execution. Court supervision and control should recognize the burdens placed on counsel by complex litigation and should foster mutual respect and cooperation between the court and the attorneys and among the attorneys.

## 10.14  Supervisory Referrals to Magistrate Judges and Special Masters

The judge should decide early in the litigation whether to refer all or any part of pretrial supervision and control to a magistrate judge. The judge should consider a number of factors:

- the law of the circuit (see section 11.53);
- the experience and qualifications of the available magistrate judges;
- the relationship among and attitude of the attorneys;
- the extent to which a district judge's authority may be required;
- the time the judge has to devote to the litigation;
- the novelty of the issues and the need for innovation; and
- the judge's personal preferences.

Some judges prefer to supervise complex litigation personally, even in courts that routinely refer discovery or other pretrial procedures to magistrate judges. Referrals in complex cases may cause additional costs and delays when the parties seek judicial review, diminish supervisory consistency and coherence as the case proceeds to trial, create greater reluctance to try innovative procedures that might aid in resolution of the case, and cause the judge to be unfamiliar with the case at the time of trial. Other judges believe that such referrals provide effective case management during the pretrial stage, enabling the judge to devote time to more urgent matters.

Even without general referral to a magistrate judge, referral of particular matters may be helpful. Such matters include supervision of all discovery matters or supervision of particular discovery issues or disputes, particularly those that may be time-consuming or require an immediate ruling (including resolving deposition disputes by telephone; ruling on claims of privilege and motions for protective orders; and conducting hearings on procedural matters, such as personal jurisdiction). Magistrate judges may also help counsel formulate stipulations and statements of contentions, and may facilitate settlement discussions. See generally section 11.53.

Referral of pretrial management to a special master (not a magistrate judge) is not advisable for several reasons. Rule 53(a)(1) permits referrals for trial proceedings only in nonjury cases involving "some exceptional conditions" or in an accounting or difficult computation of damages. Because pretrial management calls for the exercise of judicial authority, its exercise by someone other than a district or magistrate judge is particularly inappropriate.[19] The additional expense imposed on parties also militates strongly against such appointment.[20] Appointment of a special master (or of an expert under Federal Rule of Evidence 706) for limited purposes requiring special expertise may sometimes be appropriate (e.g., when a complex program for settlement needs to be devised).[21] See sections 11.51–11.52.

Orders of referral should follow the guidance offered in Rule 53(b) and specifically describe what is being referred, the authority being delegated to the

---

19. *See* LaBuy v. Howes Leather Co., 352 U.S. 249 (1957) (the length and complexity of a case and the congestion of the court's docket do not alone justify a comprehensive reference to a special master). *See also* Maldonado v. Administracion de Correccion del Estado Libre Asociado, No. 90-2186, 1992 U.S. Dist. LEXIS 16393 (D.P.R. Sept. 30, 1992); *infra* section 11.52. *Cf.* McLee v. Chrysler Corp., 38 F.3d 67 (2d Cir. 1994).

20. Prudential Ins. Co. of Am. v. United States Gypsum Co., 991 F.2d 1080 (3d Cir. 1993) (writ of mandamus issued overturning appointment of master to hear merits of a claim for cost of testing, monitoring, and removing asbestos-containing products at thirty-nine sites).

21. *See* Litigation Manual, *supra* note 12, at 123–24. *See generally* Wayne D. Brazil et al., Managing Complex Litigation: A Practical Guide to the Use of Special Masters (1983).

magistrate judge or special master, and the procedure for review by the judge. Regular progress reports from the magistrate judge or special master are advisable.

## 10.15  Sanctions

.151 General Principles  15
.152 Sources of Authority  16
.153 Considerations in Imposing  17
.154 Types  18
.155 Procedure  21

## 10.151  General Principles

The rules and principles governing the imposition of sanctions in complex litigation require special care because misconduct may have more severe consequences. Sanctions proceedings can be disruptive, costly, and may create personal antagonism inimical to an atmosphere of cooperation. Moreover, a resort to sanctions may reflect a breakdown of case management. Close judicial oversight and a clear, specific, and reasonable management program, developed with the participation of counsel, will reduce the potential for sanctionable conduct because the parties will know what the judge expects of them. On the other hand, the stakes involved in and the pressures generated by complex litigation may lead some parties to violate the rules. Although sanctions should not generally be a management tool, a willingness to resort to sanctions, sua sponte if necessary, may ensure compliance with the management program.[22]

In designing the case-management program, the judge should anticipate compliance problems and include prophylactic procedures, such as requiring parties to meet and confer promptly in the event of disputes and providing ready access to the judge if the parties cannot resolve their differences. In addition, it helps if the court informs counsel at the outset of the court's expectations about cooperation and professionalism. Perceptions of the limits of legitimate advocacy differ, and advance guidance can reduce the need for sanctions later.

Although sanctions should be a last resort, they are sometimes unavoidable and may be imposed for general or specific deterrence, to punish, or to remedy the consequences of misconduct. If sanctions are imposed, the court should explain on the record or in an order the basis and purpose of its action.

22. *See* Fed. R. Civ. P. 11(c)(1)(B); Chambers v. NASCO, Inc., 501 U.S. 32, 42 n.8 (1991).

## 10.152 Sources of Authority

A number of federal statutes allow the court, in its discretion, to award costs, including attorneys' and sometimes experts' fees to prevailing parties.[23] The primary codified sources of authority to impose sanctions in civil litigation are 28 U.S.C. § 1927 and Federal Rules of Civil Procedure 11, 16, 41, and 56(g). Sanctions relating to discovery are authorized by Rules 26, 30, 32(d), 33(b)(3)–(4), 34(b), 35(b)(1), 36(a), and, most prominently, 37. Note that Rule 11 is expressly made inapplicable to discovery.[24] Under limited circumstances sanctions may also be imposed under local rules.[25]

Sanctions may also be imposed under the court's inherent power,[26] even where the conduct at issue could be sanctioned under a statute or rule. Use of inherent power, however, should be avoided if the statute or rule is directly applicable and adequate to support the intended sanction.[27] The court may assess attorneys' fees pursuant to its inherent power, but when sitting in diversity should not do so in contravention of applicable state law embodying a substantive policy, such as a statute permitting prevailing parties to recover fees in certain classes of litigation.[28]

Choice of authority for sanctions should be clear in the order, because the applicable standards and procedures and the available sanctions will vary depending on the authority under which the court proceeds. For example, 28 U.S.C. § 1927 authorizes the assessment of costs and fees against an attorney only—it provides no authority to sanction a party.

---

23. *See, e.g.,* 42 U.S.C.A. §§ 1988(b), 1988(c), 2000e-5(k) (West 1994 & Supp. 2002); 15 U.S.C. §§ 78i(e), 78r(a) (2000). Such statutes may expressly predicate such an award on a finding that the action (or defense) was meritless, *see, e.g.,* 15 U.S.C. § 77k(e), and common law may impose the same requirement when awards under such statutes are sought by defendants. *See* Christansburg Garment Co. v. EEOC, 434 U.S. 412, 416 (1978) (prevailing plaintiff qualifies for fee award absent "special circumstances," but prevailing defendant qualifies for fee award only if plaintiff's suit is "frivolous, unreasonable, or without foundation"). *But see* Fogerty v. Fantasy Inc.*, 510 U.S. 517, 525 n.12 (1994) (same standard applies to plaintiffs and defendants seeking fees in copyright, patent, and trademark cases). Such awards may therefore be considered a sanction for meritless litigation.

24. Fed. R. Civ. P. 11(d).

25. *See, e.g.,* E.D. Mich. Civ. R. 11.1; Miranda v. S. Pac. Transp. Co., 710 F.2d 516 (9th Cir. 1983).

26. *See Chambers*, 501 U.S. at 43–45, and cases cited therein; Pedroza v. Cinatas Corp. No. 6-01-3247-CV, 2003 WL 828237, at *1 (W.D. Mo. Jan. 9, 2003).

27. *Id.* at 49–50 & n.14 (distinguishing Societe Internationale v. Rogers, 357 U.S. 197 (1958) (Rule 37)); United States v. One 1987 BMW 325, 985 F.2d 655, 661 (1st Cir. 1993) (where civil rule limits sanction that may be imposed, court may not circumvent by resorting to inherent power).

28. *Chambers*, 501 U.S. at 50–53.

### 10.153 Considerations in Imposing

Factors to consider as to imposing sanctions include the following:

- the nature and consequences of the dereliction or misconduct;
- the person(s) responsible;
- the court's discretion under the applicable source of authority to impose sanctions and to choose which sanctions to impose;
- the purposes to be served by imposing sanctions, and the least severe sanction that will achieve those purposes; and
- the appropriate time for conducting sanctions proceedings.

Factors to consider as to the nature and consequences of the dereliction or misconduct include the following:

- whether the act or omission was willful or negligent;
- whether it directly violated a court order or a federal or local rule;
- its effect on the litigation and the trial participants;
- whether it was isolated or part of a course of misconduct or dereliction;[29] and
- any extenuating circumstances.

Rule 11 substantially limits the authority to impose monetary sanctions, but they may still be available in unusual cases or under other rules or powers. Generally, they are imposed only on the person(s) responsible for the misconduct; if assessed against counsel, they should be accompanied by a direction not to pass the cost on to the client. It may sometimes be appropriate for the court to sanction the client or the client and attorney jointly. Pitting attorney against client, however, can create a conflict of interest[30] and may require inquiry into potentially privileged communications. Though it may be ethically permissible for an attorney to reveal client confidences to the extent necessary in this context,[31] this does not resolve the privilege issue. The least disruptive alternative may be for the court to impose joint and several liability on both

---

29. *See* Fed. R. Civ. P. 11(b) & (c) committee note (listing these and other considerations).

30. *See* Healey v. Chelsea Res., Ltd., 947 F.2d 611, 623 (2d Cir. 1991); White v. Gen. Motors Corp., 908 F.2d 675, 685 (10th Cir.), *cert. denied*, 498 U.S. 1069 (1991).

31. *See* Model Rules of Prof'l Conduct R. 1.6(b)(2) (2002); Model Code of Prof'l Responsibility DR 4-101(c) (1981).

counsel and client[32] or to defer the matter of sanctions until the end of the litigation.[33]

Some types of nonmonetary sanctions may affect the litigation's outcome. A judge should impose dismissal, default, or preclusion of a claim or evidence only in egregious circumstances and only after consideration of the following factors:

- the policy favoring trial on the merits;
- whether the sanction will further the just, speedy, and inexpensive determination of the action;
- the degree to which the sanctioned party acted deliberately and knew or should have known of the possible consequences;
- the degree of responsibility of the affected client;
- the merits and importance of the claim(s) affected;
- the impact on other parties or the public interest; and
- the availability of less severe sanctions.

## 10.154 Types

In imposing the least severe sanction adequate to accomplish the intended purpose, the court can select from a broad range of options:[34]

- *Reprimand.* An oral reprimand will suffice for most minor violations, particularly a first infraction. A written reprimand may be appropriate in more serious cases.
- *Cost shifting.* The purpose of Federal Rule of Civil Procedure 11 sanctions is deterrence rather than compensation; the rule therefore permits cost shifting only in "unusual circumstances."[35] In contrast, many of the discovery rules (primarily Rules 26(g) and 37) and Rule 16(f) (dealing with pretrial conferences) require or permit cost shifting in specified situations. See generally section 11.433. Under 28 U.S.C. § 1927, and Federal Rule of Civil Procedure 56(g) and its inherent

---

32. *See* Martin v. Am. Kennel Club, Inc., No. 87C2151, 1989 U.S. Dist. LEXIS 201, at *22–23 (N.D. Ill. Jan. 6, 1989) ("[a]bsent a clear indication of sole responsibility," liability should be joint and several).

33. *See, e.g.,* O'Neil v. Ret. Plan for Salaried Employees of RKO Gen. Inc., No. 88 Civ. 8498, 1992 U.S. Dist. LEXIS 237, at *12–13 (S.D.N.Y. Jan. 10, 1992); Fed. R. Civ. P. 11 committee note.

34. *See* Chambers v. NASCO, Inc., 501 U.S. 32, 44–45 (1991) ("A primary aspect" of the court's discretion to invoke its inherent sanction power "is the ability to fashion an appropriate sanction" for abuse of judicial process.).

35. *See* Fed. R. Civ. P. 11 committee note (monetary sanctions ordinarily paid into court, but may be directed to those injured if deterrence would otherwise be ineffective).

power, the court may order cost-shifting sanctions for actions taken in bad faith.

- *Denial of fees or expenses.* When attorneys' fees and expenses are incurred through dilatory or otherwise improper conduct or in proceedings brought on by such conduct, the court may decline to award such fees and expenses or may order counsel not to charge them to their clients.

- *Remedial action.* Counsel and parties may be required to remedy a negligent or wrongful act at their own expense, as by reconstructing materials improperly destroyed or erased.

- *Grant/denial of time.* Improper delay may justify awarding opposing parties additional time for discovery or other matters,[36] or denying otherwise proper requests for extension of time.

More serious sanctions, reserved for egregious circumstances, include the following:

- *Demotion/removal of counsel.* An attorney may be removed from a position as lead, liaison, or class counsel, or (in an extreme case) from further participation in the case entirely. Such a sanction, however, may disrupt the litigation, may cause significant harm to the client's case and the reputation of the attorney or law firm, and can conflict with a party's right to counsel of its choosing.

- *Removal of party as class representative.* Before imposing this sanction, the court should consider ordering that notice be given to the class under Rule 23(d)(2) to enable class members to express their views concerning their representation or to intervene in the action.[37]

- *Enjoining party from commencing other litigation.* While there is a strong policy against denying access to the courts, a party may be enjoined from commencing other actions until it has complied with all orders in the current action, or from bringing, without court approval, other actions involving the same or similar facts or claims.

- *Preclusion/waiver/striking.* Failure to timely make required disclosures or production, raise objections, or file motions may constitute sufficient grounds for the court to preclude the introduction of related evidence, deem certain facts admitted and objections waived, strike

---

36. *See, e.g.*, Fed. R. Civ. P. 30(d)(2).
37. *See* Fed. R. Civ. P. 23(d)(2) & committee note.

claims or defenses, or deny the motions, including those seeking to amend pleadings or join parties.[38]

· *Dismissal.* This severe sanction should generally not be imposed until the affected party has been warned and given a chance to take remedial action, and then only when lesser sanctions, such as dismissal without prejudice and assessment of costs, would be ineffective.

· *Vacation of judgment.* The court may vacate a judgment it has rendered if procured by fraud.[39]

· *Suspension/disbarment.* The court has inherent power to suspend or disbar attorneys, but should follow applicable local rules.[40]

· *Fine.* Even without a finding of contempt, the court may assess monetary sanctions apart from or in addition to cost shifting. The amount should be the minimum necessary to achieve the deterrent or punitive goal, considering the resources of the person or entity fined.[41]

· *Contempt.* The court may issue a contempt order under its inherent authority,[42] statute,[43] or rule,[44] and should indicate clearly whether the contempt is civil or criminal. The procedure and possible penalties will depend on that determination and the nature and timing of the contemptuous act.[45]

· *Referral for possible criminal prosecution.* Where the misconduct rises to the level of a criminal offense,[46] the matter may be referred to the U.S. Attorney's Office.

---

38. *See, e.g.,* Fed. R. Civ. P. 37(b)(2), (c)(1).

39. *Chambers,* 501 U.S. at 44 (inherent power); Fed. R. Civ. P. 60(b).

40. *See In re* Snyder, 472 U.S. 634, 643 & n.4 (1985). For discussion of the standard for taking such action, see *id.* at 643–47 (refusal to supplement fee petition or accept Civil Justice Act assignment coupled with single instance of discourtesy insufficient to support suspension).

41. *See, e.g.,* Fed. R. Civ. P. 11(c)(2).

42. *See Chambers,* 501 U.S. at 44; Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980).

43. *See, e.g.,* 18 U.S.C. §§ 401–403 (2000); 28 U.S.C. § 1784 (West 2002); Fed. R. Crim. P. 42 committee note (statutes cited therein).

44. *See, e.g.,* Fed. R. Civ. P. 37(b)(2)(D), 45(e); Fed. R. Crim. P. 17(g).

45. *See* Benchbook for U.S. District Court Judges §§ 7.01–7.02 (Federal Judicial Center, 4th ed. 2000) (criminal and civil contempt) [hereinafter Benchbook]; 18 U.S.C. § 3691 (2000) (jury trial of criminal contempts), § 3692 (jury trial for contempt in labor dispute cases), § 3693 (summary disposition or jury trial; notice); Fed. R. Crim. P. 42 (criminal contempt). Since there is no federal rule establishing a procedure for civil contempt, the court should follow the procedures of Fed. R. Crim. P. 42 to the extent applicable.

46. *See* 18 U.S.C. §§ 1501–1518 (2000) (obstruction of justice).

## 10.155  Procedure

The appropriate timing for imposing sanctions depends on the basis for the sanctions; the timing can be more problematic in complex litigation. Sanctions are often most effective when imposed promptly after the improper conduct has occurred[47] because this may maximize their deterrent effect in the litigation.

Sometimes, the frivolous nature of a paper may not be immediately apparent. Moreover, some misconduct or the extent of its consequences may not become apparent until the litigation has developed further. Some sanctions are, therefore, expressly conditioned on later developments.[48] Certain facts may have to be established before the court can decide the sanctions issue, which could delay the litigation unless sanctions are deferred until its conclusion. Similarly, sanctions should be deferred where the decision may require inquiry into potentially privileged communications and create a conflict of interest between counsel and client. Delaying rulings on sanctions also may allow the court more dispassionate consideration; however, applying the wisdom of hindsight should be avoided.

The assessment of sanctions should be preceded by notice and an opportunity to be heard.[49] The extent of the process afforded depends on the circumstances, primarily the type and severity of sanction under consideration.[50] An oral or evidentiary hearing may not be necessary for relatively minor sanctions.[51] To provide notice when acting sua sponte, the court should issue an order for counsel or parties to show cause why sanctions should not be imposed, specifying the alleged misconduct.[52] To avoid disrupting a settlement,

---

47. *See* Thomas v. Capital Sec. Servs., Inc., 836 F.2d 866, 881 (5th Cir. 1988). *Cf.* Chambers v. NASCO, Inc., 501 U.S. 32, 55 (1991) (explaining exception to imposing prompt sanctions).

48. *See, e.g.,* Fed. R. Civ. P. 37(c)(2) (recovery of expenses for failure to admit depends on later proof of matter not admitted); Fed. R. Civ. P. 68 (assessment of costs incurred after settlement offer refused depends on failure to obtain more favorable judgment).

49. United States v. 4003–4005 5th Ave., 55 F.3d 85 (2d Cir. 1995); Roadway Express, Inc. v. Piper, 447 U.S. 752, 767 (1980). Some rules expressly require this. *See, e.g.,* Fed. R. Civ. P. 11(c).

50. *See, e.g.,* United States v. Kouri-Perez, 187 F.3d 1, 10 & n.4 (1st Cir. 1999); Media Duplication Servs. v. HDG Software, Inc., 928 F.2d 1228, 1238 (1st Cir. 1991) (citing *Roadway*, 447 U.S. at 767 n.14 (due process concerns raised by dismissal are greater than those presented by assessment of attorneys' fees)); G.J.B. & Assocs., Inc. v. Singleton, 913 F.2d 824, 830 (10th Cir. 1990) (same); Fed. R. Civ. P. 11 committee note.

51. *See, e.g., In re* Edmond, 934 F.2d 1304, 1313 (4th Cir. 1991); Hudson v. Moore Bus. Forms, Inc., 898 F.2d 684, 686 (9th Cir. 1990); Fed. R. Civ. P. 11 committee note.

52. El Paso v. Socorro, 917 F.2d. 7 (5th Cir. 1990); Maisonville v. F2 Am., Inc., 902 F.2d 746 (9th Cir. 1990); Fed. R. Civ. P. 11(c)(1)(B) & committee note.

avoid assessing monetary sanctions sua sponte once the parties have reached agreement.[53]

Unless the sanction is minor and the misconduct obvious, it is advisable to put findings and reasons on the record or issue a written order.[54] The findings should clearly identify the objectionable conduct, state the factual and legal reasons for the action (including the need for the particular sanction imposed and the inadequacy of less severe measures), and cite the authority relied on. If the sanctions are appealed, such a record will facilitate appellate review and help the appellate court understand the basis for the court's exercise of its discretion.[55] There is normally no need to explain a denial of sanctions.[56]

## 10.2   Role of Counsel

.21 Responsibilities in Complex Litigation 22
.22 Coordination in Multiparty Litigation—Lead/Liaison Counsel and Committees  24
   .221 Organizational Structures  24
   .222 Powers and Responsibilities  26
   .223 Compensation  26
   .224 Court's Responsibilities  26
   .225 Related Litigation  28
.23 Withdrawal and Disqualification  28

## 10.21  Responsibilities in Complex Litigation

Judicial involvement in managing complex litigation does not lessen the duties and responsibilities of the attorneys. To the contrary, complex litigation places greater demands on counsel in their dual roles as advocates and officers of the court. The complexity of legal and factual issues makes judges especially dependent on the assistance of counsel.

Greater demands on counsel also arise from the following:

   • the amounts of money or importance of the interests at stake;

   • the length and complexity of the proceedings;

---

53. *See* Fed. R. Civ. P. 11(c)(2)(B) & committee note.

54. *See* Fed. R. Civ. P. 11(c)(3).

55. The standard of review is abuse of discretion. Buford v. United States, 532 U.S. 59, 64 (2001); Chambers v. NASCO, Inc., 501 U.S. 32, 55 (1991) (inherent power); Cooter & Gel v. Hartmax Corp., 496 U.S. 384, 405 (1990) (Rule 11); Blue v. United States Dep't of the Army, 914 F.2d 525, 539 (4th Cir. 1990) (28 U.S.C. § 1927).

56. Fed. R. Civ. P. 11 committee note. Only the First Circuit has held to the contrary. *See* Metrocorps, Inc. v. E. Mass. Junior Drum & Bugle Corps Ass'n, 912 F.2d 1, 3 (1st Cir. 1990); Morgan v. Mass. Gen. Hosp., 901 F.2d 186, 195 (1st Cir. 1990).

- the difficulties of having to communicate and establish effective working relationships with numerous attorneys (many of whom may be strangers to each other);
- the need to accommodate professional and personal schedules;
- the problems of having to appear in courts with which counsel are unfamiliar;
- the burdens of extensive travel often required; and
- the complexities of having to act as designated representative of parties who are not their clients (see section 10.22).

The added demands and burdens of complex litigation place a premium on attorney professionalism, and the judge should encourage counsel to act responsibly. The certification requirements of Federal Rules of Civil Procedure 11 and 26(g) reflect some of the attorneys' obligations as officers of the court. By presenting a paper to the court, an attorney certifies in essence that he or she, based on reasonable inquiry, has not filed the paper to delay, harass, or increase costs.[57] A signature on a discovery request, response, or objection certifies that the filing is not "unreasonable or unduly burdensome or expensive" under the circumstances of the case.[58] These provisions encourage attorneys to "stop and think" before taking action.

Counsel need to fulfill their obligations as advocates in a manner that will foster and sustain good working relations among fellow counsel and with the court. They need to communicate constructively and civilly with one another and attempt to resolve disputes informally as often as possible. Even where the stakes are high, counsel should avoid unnecessary contentiousness and limit the controversy to material issues genuinely in dispute. Model Rule of Professional Conduct 3.2 requires lawyers to make "reasonable efforts to expedite litigation consistent with the interests of the client."[59]

---

57. Fed. R. Civ. P. 11(b)(1). Fed. R. Civ. P. 26(g) contains substantially similar language. Case law in the circuit interpreting these provisions should be considered.

58. Fed. R. Civ. P. 26(g)(C).

59. *See also* Model Rules of Prof'l Conduct R. 3.1 (2002) (meritorious claims and contentions); Model Code of Prof'l Responsibility DR 7-102(A)(1) (1981) (action taken merely to harass).

## 10.22  Coordination in Multiparty Litigation—Lead/Liaison Counsel and Committees

.221 Organizational Structures  24
.222 Powers and Responsibilities  26
.223 Compensation  26
.224 Court's Responsibilities  26
.225 Related Litigation  28

Complex litigation often involves numerous parties with common or similar interests but separate counsel. Traditional procedures in which all papers and documents are served on all attorneys, and each attorney files motions, presents arguments, and examines witnesses, may waste time and money, confuse and misdirect the litigation, and burden the court unnecessarily. Instituting special procedures for coordination of counsel early in the litigation will help to avoid these problems.

In some cases the attorneys coordinate their activities without the court's assistance, and such efforts should be encouraged. More often, however, the court will need to institute procedures under which one or more attorneys are selected and authorized to act on behalf of other counsel and their clients with respect to specified aspects of the litigation. To do so, invite submissions and suggestions from all counsel and conduct an independent review (usually a hearing is advisable) to ensure that counsel appointed to leading roles are qualified and responsible, that they will fairly and adequately represent all of the parties on their side, and that their charges will be reasonable. Counsel designated by the court also assume a responsibility to the court and an obligation to act fairly, efficiently, and economically in the interests of all parties and parties' counsel.

### 10.221  Organizational Structures

Attorneys designated by the court to act on behalf of other counsel and parties in addition to their own clients (referred to collectively as "designated counsel") generally fall into one of the following categories:

- *Liaison counsel.* Charged with essentially administrative matters, such as communications between the court and other counsel (including receiving and distributing notices, orders, motions, and briefs on behalf of the group), convening meetings of counsel, advising parties of developments, and otherwise assisting in the coordination of activities and positions. Such counsel may act for the group in managing document depositories and in resolving scheduling conflicts. Liaison counsel will usually have offices in the same locality as the court. The court may appoint (or the parties may select) a liaison for each side,

and if their functions are strictly limited to administrative matters, they need not be attorneys.[60]

- *Lead counsel.* Charged with formulating (in consultation with other counsel) and presenting positions on substantive and procedural issues during the litigation. Typically they act for the group—either personally or by coordinating the efforts of others—in presenting written and oral arguments and suggestions to the court, working with opposing counsel in developing and implementing a litigation plan, initiating and organizing discovery requests and responses, conducting the principal examination of deponents, employing experts, arranging for support services, and seeing that schedules are met.

- *Trial counsel.* Serve as principal attorneys at trial for the group and organize and coordinate the work of the other attorneys on the trial team.

- *Committees of counsel.* Often called steering committees, coordinating committees, management committees, executive committees, discovery committees, or trial teams. Committees are most commonly needed when group members' interests and positions are sufficiently dissimilar to justify giving them representation in decision making. The court or lead counsel may task committees with preparing briefs or conducting portions of the discovery program if one lawyer cannot do so adequately. Committees of counsel can sometimes lead to substantially increased costs, and they should try to avoid unnecessary duplication of efforts and control fees and expenses. See section 14.21 on controlling attorneys' fees.

The types of appointments and assignments of responsibilities will depend on many factors. The most important is achieving efficiency and economy without jeopardizing fairness to the parties. Depending on the number and complexity of different interests represented, both lead and liaison counsel may be appointed for one side, with only liaison counsel appointed for the other. One attorney or several may serve as liaison, lead, and trial counsel. The functions of lead counsel may be divided among several attorneys, but the number should not be so large as to defeat the purpose of making such appointments.

---

60. *See In re* San Juan Dupont Plaza Hotel Fire Litig., MDL No. 721, 1989 WL 168401, at *19–20 (D.P.R. Dec. 2, 1988) (defining duties of "liaison persons" for plaintiffs and defendants).

## 10.222 Powers and Responsibilities

The functions of lead, liaison, and trial counsel, and of each committee, should be stated in either a court order or a separate document drafted by counsel for judicial review and approval.[61] This document will inform other counsel and parties of the scope of designated counsel's authority and define responsibilities within the group. However, it is usually impractical and unwise for the court to spell out in detail the functions assigned or to specify the particular decisions that designated counsel may make unilaterally and those that require an affected party's concurrence. To avoid controversy over the interpretation of the terms of the court's appointment order, designated counsel should seek consensus among the attorneys (and any unrepresented parties) when making decisions that may have a critical impact on the litigation.

Counsel in leadership positions should keep the other attorneys in the group advised of the progress of the litigation and consult them about decisions significantly affecting their clients. Counsel must use their judgment about limits on this communication; too much communication may defeat the objectives of efficiency and economy, while too little may prejudice the interests of the parties. Communication among the various allied counsel and their respective clients should not be treated as waiving work-product protection or the attorney–client privilege, and a specific court order on this point may be helpful.[62]

## 10.223 Compensation

See section 14.215 for guidance on determining compensation and establishing terms and procedures for it early in the litigation.

## 10.224 Court's Responsibilities

Few decisions by the court in complex litigation are as difficult and sensitive as the appointment of designated counsel. There is often intense competition for appointment by the court as designated counsel, an appointment that may implicitly promise large fees and a prominent role in the litigation. Side agreements among attorneys also may have a significant effect on positions taken in the proceedings. At the same time, because appointment of designated counsel will alter the usual dynamics of client representation in important ways, attorneys will have legitimate concerns that their clients' interests be adequately represented.

---

61. *See* Sample Order *infra* section 40.22.
62. *See id.* ¶ 5.

For these reasons, the judge is advised to take an active part in the decision on the appointment of counsel. Deferring to proposals by counsel without independent examination, even those that seem to have the concurrence of a majority of those affected, invites problems down the road if designated counsel turn out to be unwilling or unable to discharge their responsibilities satisfactorily or if they incur excessive costs. It is important to assess the following factors:

- qualifications, functions, organization, and compensation of designated counsel;
- whether there has been full disclosure of all agreements and understandings among counsel;
- would-be designated attorneys' competence for assignments;
- whether there are clear and satisfactory guidelines for compensation and reimbursement, and whether the arrangements for coordination among counsel are fair, reasonable, and efficient;
- whether designated counsel fairly represent the various interests in the litigation—where diverse interests exist among the parties, the court may designate a committee of counsel representing different interests;
- the attorneys' resources, commitment, and qualifications to accomplish the assigned tasks; and
- the attorneys' ability to command the respect of their colleagues and work cooperatively with opposing counsel and the court—experience in similar roles in other litigation may be useful, but an attorney may have generated personal antagonisms during prior proceedings that will undermine his or her effectiveness in the present case.

Although the court should move expeditiously and avoid unnecessary delay, an evidentiary hearing may be needed to bring all relevant facts to light or to allow counsel to state their case for appointment and answer questions from the court about their qualifications (the court may call for the submission of résumés and other relevant information). Such a hearing is particularly appropriate when the court is unfamiliar with the attorneys seeking appointment. The court should inquire as to normal or anticipated billing rates, define record-keeping requirements, and establish guidelines, methods, or limitations to govern the award of fees.[63] While it may be appropriate and possibly even beneficial for several firms to divide work among themselves,[64] such an ar-

---

63. *See infra* section 14.21.
64. *See In re* Auction Houses Antitrust Litig., 197 F.R.D. 71, 77 (S.D.N.Y. 2000); *In re* Fine Paper Antitrust Litig., 751 F.2d 562, 584 (3d Cir. 1984).

rangement should be necessary, not simply the result of a bargain among the attorneys.[65]

The court's responsibilities are heightened in class action litigation, where the judge must approve counsel for the class (see section 21.27). In litigation involving both class and individual claims, class and individual counsel will need to coordinate.

### 10.225 Related Litigation

If related litigation is pending in other federal or state courts, consider the feasibility of coordination among counsel in the various cases. See sections 20.14, 20.31. Consultation with other judges may bring about the designation of common committees or of counsel and joint or parallel orders governing their function and compensation.[66] Where that is not feasible, the judge may direct counsel to coordinate with the attorneys in the other cases to reduce duplication and potential conflicts and to coordinate and share resources. In any event, the judges involved should exchange information and copies of orders that might affect proceedings in their courts. See generally section 20, multiple jurisdiction litigation.

In approaching these matters, consider also the status of the respective actions (some may be close to trial while others are in their early stages). Counsel seeking a more prominent and lucrative role may have filed actions in other courts.

## 10.23  Withdrawal and Disqualification

In view of the number and dispersion of parties and interests in complex litigation, the court should remind counsel to be alert to present or potential conflicts of interest.[67]

It is advisable to deny motions for disqualification that claim the attorney may be called as a witness if such testimony probably will not be necessary and prejudice to the client will probably be minor. Disqualification on the ground that an attorney is also a witness may sometimes be denied where it would cause "substantial hardship" to the client. This exception is generally invoked

---

65. *See, e.g., In re* Auction Houses Antitrust Litig., 197 F.R.D. 71 (S.D.N.Y. 2000); Smiley v. Sincoff, 958 F.2d 498 (2d Cir. 1992); *In re* Fine Paper Antitrust Litig., 98 F.R.D. 48 (E.D. Pa. 1983), *aff'd in part and rev'd in part*, 751 F.2d 562 (3d Cir. 1984).

66. *See infra* section 40.51.

67. *See* Model Rules of Prof'l Conduct R. 1.7–1.9 (2002); Model Code of Prof'l Responsibility DR 5-101(A), 5-104(A), 5-105(A) (1981); *see also* Model Rules of Prof'l Conduct R. 3.7 (2002); Model Code of Prof'l Responsibility DR 5-102 (1981) (lawyer as witness).

when disqualification is sought late in the litigation, and it requires the court to balance the interests of the client and the opposing party. The motion may also be denied when the likelihood that the attorney would have to testify should have been anticipated earlier in the case.[68] Motions for disqualification should be reviewed carefully to ensure that they are not being used merely to harass,[69] and disqualification should be ordered only when the motion demonstrates a reasonable likelihood of a prohibited conflict.[70]

The court should promptly resolve ancillary legal issues requiring research into applicable circuit law, because uncertainty as to the status of counsel hampers the progress of the litigation. Additional delays may result if counsel seeks appellate review[71] or if replacement counsel are precluded from using the work product of the disqualified firm. While disqualified counsel usually must turn over their work product to new counsel upon request, it is possible that counsel will deny the request when there is a danger that confidential information will be disclosed.[72] Issues raised by disqualification motions include whether disqualification of counsel extends to the entire firm,[73] whether co-

---

68. Model Rules of Prof'l Conduct R. 3.7(a)(3) (2002); Model Code of Prof'l Responsibility DR 5-10(B)(4) (1981). *See* General Mill Supply Co. v. SCA Servs., Inc., 697 F.2d 704 (6th Cir. 1982).

69. Harker v. Comm'r, 82 F.3d 806, 808 (8th Cir. 1996); Richardson-Merrell, Inc. v. Koller, 472 U.S. 424, 433–36 (1985); Optyl Eyewear Fashion Int'l Corp. v. Style Cos., 760 F.2d 1045, 1050–51 (9th Cir. 1985); Panduit Corp. v. All States Plastic Mfg. Co., 744 F.2d 1564, 1577–80 (Fed. Cir. 1984).

70. Though often premised on violations of state disciplinary rules, disqualification in federal court is a question of federal law. *In re* Am. Airlines, Inc., 972 F.2d 605, 615 (5th Cir. 1992); *In re* Dresser Indus., Inc., 972 F.2d 540, 543 (5th Cir. 1992).

71. The denial of a motion to disqualify counsel in a civil case is not immediately appealable as a matter of right. Cunningham v. Hamilton County, 527 U.S. 198, 207 (1999); Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368 (1981). Nor is an order granting such a motion in a criminal case, *Flanagan v. United States*, 465 U.S. 259 (1984), or in a civil case, *Richardson–Merrell, Inc. v. Koller*, 472 U.S. 424 (1985). A petition for a writ of mandamus may be filed even if there is no right of appeal, see Fed. R. App. P. 21, but the standard of review may be more stringent. *See In re Dresser*, 972 F.2d at 542–43.

72. *See* First Wis. Mortgage Trust v. First Wis. Corp., 584 F.2d 201, 207–11 (7th Cir. 1978) (en banc), *and* Int'l Bus. Machs. Corp. v. Levin, 579 F.2d 271, 283 (3d Cir. 1978) (the request to turn over work product may be denied when there is a danger that confidential information will be disclosed (EZ Paintr Corp. v. Padco, Inc., 746 F.2d 1459, 1463–64 (Fed. Cir. 1984))).

73. *See* Model Rules of Prof'l Conduct R. 1.10 (2002) (imputation of conflicts of interest); Model Code of Prof'l Responsibility DR 5-105(D) (1981). *Compare Panduit*, 744 F.2d at 1577–80, *with* United States v. Moscony, 927 F.2d 742, 747–48 (3d Cir. 1991), *and* Atasi Corp. v. Seagate Tech., 847 F.2d 826, 830–32 (Fed. Cir. 1988). Timely erection of a "Chinese wall" to screen other firm members from the attorney(s) possessing confidential information may avoid imputed disqualification. *See, e.g.*, Blair v. Armontrout, 916 F.2d 1310, 1333 (8th Cir. 1990);

counsel will also be disqualified,[74] and whether counsel may avoid disqualification based on consent,[75] substantial hardship,[76] or express or implied waiver.[77] If a disqualification motion is filed in order to harass, delay, or deprive a party of chosen counsel, sanctions may be appropriate under 28 U.S.C. § 1927 or Federal Rule of Civil Procedure 11 (see section 10.15).

Kennecott Corp. v. Kyocera Int'l, Inc., 899 F.2d 1228 (Fed. Cir. 1990) (per curiam) (unpublished table decision); United States v. Goot, 894 F.2d 231, 235 (7th Cir. 1990); Manning v. Waring, James, Sklar & Allen, 849 F.2d 222 (6th Cir. 1988); *Atasi*, 847 F.2d at 831 & n.5; *Panduit*, 744 F.2d at 1580–82; LaSalle Nat'l Bank v. County of Lake, 703 F.2d 252, 257–59 (7th Cir. 1983) (screening not timely). Disqualification of an attorney on the ground that he or she will be called as a witness generally does not require disqualification of the attorney's firm. *See Optyl Eyewear*, 760 F.2d at 1048–50; Bottaro v. Hatton Assocs., 680 F.2d 895, 898 (2d Cir. 1982).

74. Disqualification of counsel generally does not extend to cocounsel. *See, e.g.*, Brennan's, Inc. v. Brennan's Rests., Inc., 590 F.2d 168, 174 (5th Cir. 1979); Fred Weber, Inc. v. Shell Oil Co., 566 F.2d 602, 607–10 (8th Cir. 1977); Akerly v. Red Barn Sys., Inc., 551 F.2d 539, 543–44 (3d Cir. 1977); Am. Can Co. v. Citrus Feed Co., 436 F.2d 1125, 1129 (5th Cir. 1971). But disqualification is proper when information has been disclosed to cocounsel with an expectation of confidentiality. *See* Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225, 235 (2d Cir. 1977); *cf.* Arkansas v. Dean Food Prods. Co., 605 F.2d 380, 387–88 (8th Cir. 1979); *Brennan's*, 590 F.2d at 174.

75. *See, e.g.*, Unified Sewerage Agency v. Jelco, Inc., 646 F.2d 1339, 1345–46 (9th Cir. 1981); Interstate Props. v. Pyramid Co., 547 F. Supp. 178 (S.D.N.Y. 1982); *cf.* Westinghouse Elec. Corp. v. Gulf Oil Corp., 588 F.2d 221 (7th Cir. 1978).

76. Disqualification on the ground that an attorney is also a witness may be denied where it would cause "substantial hardship" to the client. Model Rules of Prof'l Conduct R. 3.7(a)(3) (2002); Model Code of Prof'l Responsibility DR 5-101(B)(4) (1981). This exception is generally invoked when disqualification is sought late in the litigation, and it requires the court to balance the interests of the client and those of the opposing party. Model Rules of Prof'l Conduct R. 3.7 cmt. ¶ 4 (2002). It may be rejected when the likelihood that the attorney would have to testify should have been anticipated earlier in the case. *See* Gen. Mill Supply Co. v. SCA Servs., Inc., 697 F.2d 704 (6th Cir. 1982).

77. *See, e.g.*, United States v. Wheat, 486 U.S. 153, 162–64 (1988) (court in criminal case may decline waiver of conflict); Melamed v. ITT Cont'l Baking Co., 592 F.2d 290, 292–94 (6th Cir. 1979) (waiver found); City of Cleveland v. Cleveland Elec. Illuminating Co., 440 F. Supp. 193, 205 (N.D. Ohio), *aff'd*, 573 F.2d 1310 (6th Cir. 1977) (same); *cf. In re* Yarn Processing Patent Validity Litig., 530 F.2d 83, 88–90 (5th Cir. 1976) (waiver and consent).

# 11. Pretrial Procedures

.1 Preliminary Matters  32
    .11 Scheduling the Initial Conference  32
    .12 Interim Measures  33
    .13 Prediscovery Disclosure  34
.2 Conferences  36
    .21 Initial Conference and Orders  36
        .211 Case-Management Plan  36
        .212 Scheduling Order  39
        .213 Class Actions  40
        .214 Settlement  40
    .22 Subsequent Conferences  40
    .23 Attendance  41
.3 Management of Issues  42
    .31 Relationship to Discovery  42
    .32 Pleading and Motion Practice  43
    .33 Identifying, Defining, and Resolving Issues  44
    .34 Summary Judgment  46
.4 Discovery  49
    .41 Relationship to Issues  50
    .42 Planning and Control  51
        .421 Discovery Plan/Scheduling Conference  51
        .422 Limitations  53
        .423 Other Practices to Save Time and Expense  56
        .424 Resolution of Discovery Disputes  59
    .43 Privilege Claims and Protective Orders  62
        .431 Claims of Privilege/Full Protection  63
        .432 Limited Disclosure/Protective Orders  64
        .433 Allocation of Costs  69
    .44 Documents  71
        .441 Identification System  71
        .442 Preservation  72
        .443 Rule 34 Requests/Procedures for Responding  74
        .444 Document Depositories  75
        .445 Evidentiary Foundation for Documents  77
        .446 Discovery of Computerized Data  77
        .447 Discovery from Nonparties  82
    .45 Depositions  83
        .451 Limitations and Controls  83
        .452 Cost-Saving Measures  85
        .453 Deferred Supplemental Depositions  87
        .454 Scheduling  88
        .455 Coordination with Related Litigation  89
        .456 Control of Abusive Conduct  89
    .46 Interrogatories  90
        .461 Purposes  90
        .462 Limitations  91
        .463 Responses  92
        .464 Other Practices to Save Time and Expense  92
    .47 Stipulations of Fact/Requests for Admission  94
        .471 Stipulations of Fact  94
        .472 Requests for Admission  95

.473 Statements of Contentions and Proof  96
.474 Requests for Judicial Notice  97
.48 Disclosure and Discovery of Expert Opinions  97
.481 Trial Experts  97
.482 Consulting Experts  99
.483 Court-Appointed Experts  100
.49 Special Problems  100
.491 Government Investigations/Grand Jury Materials  100
.492 Summaries  101
.493 Sampling/Opinion Surveys  102
.494 Extraterritorial Discovery  104
.5 Special Referrals  111
.51 Court-Appointed Experts and Technical Advisors 111
.52 Special Masters  114
.53 Magistrate Judges Under 28 U.S.C. § 636(b)(1)  117
.54 Other Referrals  118
.6 Final Pretrial Conference/Preparation for Trial  118
.61 Date and Place of Trial  119
.62 Reevaluation of Jury Demands  120
.63 Structure of Trial  121
.631 Consolidation  121
.632 Separate Trials  122
.633 Special Verdicts and Interrogatories  123
.64 Procedures to Expedite Presentation of Evidence  124
.641 Statements of Facts and Evidence  124
.642 Pretrial Rulings on Objections  124
.643 Disclosure of and Objections to Digital Evidence and Illustrative Aids  126
.644 Limits on Evidence  127
.645 Use of Courtroom Technology to Facilitate Evidence Presentation  127
.65 Proposed Jury Instructions  128
.66 Briefs and Final Pretrial Motions  129
.67 Final Pretrial Order  129

# 11.1  Preliminary Matters

.11 Scheduling the Initial Conference  32
.12 Interim Measures  33
.13 Prediscovery Disclosure  34

## 11.11  Scheduling the Initial Conference

The court's first step in establishing control of the litigation is promptly scheduling the initial conference with counsel, generally within 30 to 60 days of filing, but with sufficient time for counsel to become familiar with the litigation and prepare for the conference. The judge should hold the conference before any adversary activity begins, such as filing of motions or discovery requests, and the order setting the conference may require that all such activity be deferred. Although Federal Rule of Civil Procedure 4(m) allows 120 days from filing to effect service, earlier service or appearance should be encouraged in order to give notice of the conference and of any interim administrative

measures even before responsive pleadings are filed. The court need not wait for service to be made on every party, once the primary parties have been notified.

The order scheduling the conference[78] generally refers to Federal Rule of Civil Procedure 16(c), which lists subjects for consideration at such a conference. Also worth considering are the following:

- requiring counsel in advance to discuss claims and defenses, a plan for disclosure and discovery, and possible settlement;[79]
- listing specific topics that the court intends to address at the conference;
- inviting suggestions from counsel for additional topics;
- directing counsel to submit a tentative statement, joint if possible, identifying disputed issues as specifically as possible;
- directing counsel to submit a proposed schedule for the conduct of the litigation, including a discovery plan (see section 11.421);
- calling on counsel to submit brief factual statements to assist the court in understanding the background, setting, and likely dimensions of the litigation;
- suspending all discovery and motion activity pending further order;
- specifying that responses to the order will not be treated as admissions or otherwise bind the parties; and
- directing counsel to provide information about all related litigation pending in other courts.

See also section 22.6 (mass torts, case-management orders).

## 11.12  Interim Measures

At the outset of the case, pending the initial conference, the judge can *sua sponte* initiate special procedures, including the following:[80]

- ordering joint briefs and limits on briefs' length and appendices;
- suspending some local rules, such as those requiring the appearance or association of local counsel or limiting the time for joining new parties;[81]

---

78. *See* sample order *infra* section 40.1.

79. Such a conference of counsel prior to discovery and the Rule 16 conference is required by Federal Rule of Civil Procedure 26(f).

80. *See infra* sections 22.6 (case-management orders in mass tort litigation) and 40.2 (sample orders).

- creating a single master file for the litigation, eliminating the need for multiple filings of similar documents when related cases have common parties;
- extending time for filing responses to the complaint until after the initial conference, making unnecessary individual requests for extensions;
- reducing under Federal Rule of Civil Procedure 5 the number of parties upon whom service of documents must be made—liaison counsel may be appointed to receive service of all papers and distribute copies to cocounsel (see section 10.221);
- modifying the timing of the initial disclosures required by Federal Rule of Civil Procedure 26(a)(1) (see section 11.13);
- permitting limited discovery, prior to Rule 26(a)(1) initial disclosure, of information helpful or necessary in formulating a discovery plan, such as Rule 30(b)(6) depositions of records keepers and computer personnel knowledgeable of the parties' data holdings and systems;
- ordering that paper and electronic records, files, and documents, and other potential evidence, not be destroyed without leave of court—preservation orders may impose undue burdens on parties and be difficult to implement; therefore, holding an early conference or hearing to work out appropriate terms for such orders should be encouraged (see section 11.442); and
- appointing interim liaison counsel or committees of plaintiffs' or defense counsel.

## 11.13 Prediscovery Disclosure

Federal Rule of Civil Procedure 26(a)(1) requires parties to exchange certain core information within fourteen days after their initial discovery planning conference[82] without awaiting a discovery request.

Prediscovery disclosure avoids the cost of unnecessary formal discovery and accelerates the exchange of basic information to plan and conduct discovery and settlement negotiations. The judge should administer Rule 26(a)(1) to

81. Rule 1.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation provides that parties in actions transferred under 28 U.S.C. § 1407 may continue to be represented in the transferee district by existing counsel, without being required to obtain local counsel.

82. For discussion of the discovery planning conference see *infra* section 11.421. *See* Fed. R. Civ. P. 26(f) (discovery planning conference). Rule 26(g)(3) and Rule 37 provide for the imposition of sanctions for violation of Rule 26(a)(1).

serve those purposes; disclosure should not place unreasonable or unnecessary burdens on the parties (and should not require disclosure of any information that would not have to be disclosed in response to formal discovery requests). In complex litigation, this rule may need modification or suspension.

The scope of disputed issues and relevant facts in a complex case may not be sufficiently clear from the pleadings to enable parties to make the requisite disclosure. One purpose of Rule 26(f)'s requirement that counsel confer is to identify issues and reach agreement on the content and timing of the initial disclosures. To the extent the parties cannot agree during their conference, it sometimes helps to defer disclosure and fashion an order at the Rule 16 conference, defining and narrowing the factual and legal issues in dispute and establishing the scope of disclosure. This will require suspending, by stipulation or order, Rule 26(f)'s presumptive ten-day deadline for making disclosure.

Although Rule 26(a)(1) defines certain information that must be disclosed, it does not limit the scope of prediscovery disclosure and exchange of information. The parties have a duty to conduct a reasonable investigation pursuant to disclosure, particularly when a party possesses extensive computerized data, which may be subject to disclosure or later discovery.[83] The rule does not require actual production (except for damage computations and insurance agreements), but only identification of relevant information and materials. The judge may nevertheless direct the parties to produce and exchange materials in advance of discovery, subject to appropriate objections. Effective use of this device without excessive and unnecessary burdens on the parties can streamline the litigation.

Rule 26(e)(1) requires parties to correct or supplement disclosures at appropriate intervals if they learn that the information (even if correct when supplied) is materially incomplete or incorrect, unless they have already informed the other party of the corrective or additional information during discovery or in writing. The court should set a schedule for such supplementation and qualify or clarify the scope of the obligation to supplement in order to fit the particular litigation.

83. *See, e.g.*, Danis v. USN Communications, Inc., No. 98 C 7482, 2000 WL 1694325, at *25 (N.D. Ill. Oct. 23, 2000) (noting that litigation of the discovery issues could have been avoided if the defendants had not "failed to conduct a sufficiently thorough search" pursuant to court-ordered mandatory disclosure under Federal Rule of Civil Procedure 26(a)(1)).

## 11.2  Conferences

.21 Initial Conference and Orders  36
    .211 Case-Management Plan  36
    .212 Scheduling Order  39
    .213 Class Actions  40
    .214 Settlement  40
.22 Subsequent Conferences  40
.23 Attendance  41

Federal Rule of Civil Procedure 16 authorizes the court to hold pretrial conferences in civil cases. These conferences are the principal means of implementing judicial management of litigation. Rules 16(a) and (c) suggest appropriate purposes for these conferences and subjects to discuss, but they are not exhaustive.

## 11.21  Initial Conference and Orders

.211 Case-Management Plan  36
.212 Scheduling Order  39
.213 Class Actions  40
.214 Settlement  40

The initial conference launches the process of managing the litigation. It generally provides the first opportunity to meet counsel, hear their views of the factual and legal issues, and begin to structure the litigation and establish a management plan. It is therefore crucial that the judge be prepared to address the range of topics that the conference should cover. The principal topics include

- the nature and potential dimensions of the litigation;
- the major procedural and substantive problems likely to be encountered; and
- the procedures for efficient management.

The conference is not a perfunctory exercise, and its success depends on establishing effective communication and coordination among counsel and between counsel and the court (see section 11.22).

### 11.211  Case-Management Plan

The primary objective of the conference is to develop an initial plan for the "just, speedy, and inexpensive determination" of the litigation. This plan should include procedures for identifying and resolving disputed issues of law, identifying and narrowing disputed issues of fact, carrying out disclosure and

conducting discovery efficiently and economically, and preparing for trial in the absence of settlement or summary disposition. The agenda should be shaped by the needs of the particular litigation. The following checklist of procedures could help in the development of case-management plans (see also section 22.6):

- identifying and narrowing issues of fact and law (see section 11.33);
- establishing deadlines and limits on joinder of parties and amended or additional pleadings (see section 11.32);
- coordinating with related litigation in federal and state courts, including later filings, removals, or transfers (see section 20);
- effecting early resolution of jurisdictional issues;
- severing issues for trial (see section 11.632);
- consolidating trials (see section 11.631);
- referring, if possible, some matters to magistrate judges, special masters, or other judges (see sections 10.122, 10.14, and 11.5);
- appointing liaison, lead, and trial counsel and special committees, and maintaining time and expense records by counsel (see sections 10.22 and 14.21);
- reducing filing and service requirements through a master file and orders under Federal Rule of Civil Procedure 5 (see sections 11.12 and 20);
- exempting parties from or modifying local rules or standing orders (see section 11.12);
- applying and enforcing arbitration clauses;[84]
- planning for prompt determination of class action questions, including a schedule for discovery and briefing on class issues (see sections 11.213, 21.11);
- managing disclosure and discovery, including establishing
  - a process for preserving evidence (see section 11.442);
  - document depositories and computerized storage (see section 11.444);
  - a uniform numbering system for documents (see section 11.441);

---

84. *See, e.g.,* EEOC v. Waffle House, Inc., 534 U.S. 279 (2002); Circuit City Stores, Inc. v. Adams, 532 U.S. 105 (2001); Volt Info. Scis., Inc. v. Bd. of Trs., 489 U.S. 468 (1989); Perry v. Thomas, 482 U.S. 483 (1987); Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc., 473 U.S. 614 (1985); Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213 (1985); Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1 (1983).

- procedures for the exchange of documents, photographs, videos, and other materials in digital format;[85]
- procedures for the exchange of digital-format materials, such as databases, fax server files, PDA (personal digital assistant) files, E-mail, and digital voicemail;[86]
- informal discovery and other cost-reduction measures (see sections 11.13 (prediscovery disclosure) and 11.423);
- procedures for resolving discovery disputes (see sections 11.424, 11.456);
- protective orders and procedures for handling claims of confidentiality and privilege (see section 11.43); and
- sequencing and limitations, including specific scheduling and deadlines (see sections 11.212, 11.421–11.422, 11.451, 11.462);

- planning for the presentation of electronic or computer-based evidence at trial, including the use of any audiovisual or digital technology in the courtroom;
- setting guidelines and schedules for the disclosure and exchange of digital evidentiary exhibits and illustrative aids (see section 11.643);
- establishing procedures for managing expert testimony (see sections 11.48, 11.51 (court-appointed experts and technical advisors), and 23.34 (expert scientific evidence, discovery control and management);
- creating schedules and deadlines for various pretrial phases of the case and setting a tentative or firm trial date (see section 11.212);
- discussing any unresolved issues of recusal or disqualification (see section 10.121);
- evaluating prospects for settlement (see section 13.1) or possible referral to mediation or other procedures (see section 13.15); and
- instituting any other special procedures to facilitate management of the litigation.

Federal Rule of Civil Procedure 16(e) directs the court to enter an order reciting any action taken at the conference. The order should address the various matters on the agenda and other matters conducive to the effective management of the litigation (section 22.6 has an illustrative list of items). The order should memorialize all rulings, agreements, or other actions taken, and set

---

85. *See* Effective Use of Courtroom Technology: A Judge's Guide to Pretrial and Trial 61–97 (Federal Judicial Center 2d prtg. 2002) [hereinafter Effective Use of Courtroom Technology].
86. *Id*. at 93–97.

a date for the next conference or other event in the litigation. Counsel should promptly submit a proposed order.

## 11.212 Scheduling Order

Scheduling orders are a critical element of case management. They help ensure that counsel will timely complete the work called for by the management plan. Rule 16(b) requires that a scheduling order issue early in every case, setting deadlines for joinder of parties, amendment of pleadings, filing of motions, and completion of discovery. Scheduling orders in complex cases should also cover other important steps in the litigation, in particular discovery activities and motion practice. Scheduling orders should be informed by the parties' discovery plan submitted pursuant to Rule 26(f) (see section 11.421).[87] The order may also

- modify the time set by Rule 26(a)(1) for initial disclosure and set dates for its supplementation under Rule 26(e)(1) (see section 11.13);[88]
- establish a schedule for amending discovery responses as required by Rule 26(e)(2), which requires parties to amend most discovery responses "seasonally" if they learn that the response is materially "incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing"; to maintain order and clarify counsel's responsibilities, the scheduling order may specify a series of dates on which the parties must provide any amendment required;
- set dates for future conferences (see section 11.22), the final pretrial conference (see section 11.6), and trial; and
- provide for any other matters appropriate in the circumstances of the case.[89]

To allow additional information to be gathered, some judges defer the scheduling conference until after the initial conference. The scheduling conference is best held soon after the initial conference, however, both to maintain momentum and to comply with the rule requiring the scheduling order to issue "as soon as practicable" and within 90 days of a defendant's appearance and within 120 days of service. In any event, the judge should base the scheduling order on information and recommendations from the parties, rather

---

87. Fed. R. Civ. P. 16(d).
88. Fed. R. Civ. P. 16(b)(4).
89. Fed. R. Civ. P. 16(b)(6).

than on a standard form. Developments in the litigation may call for subsequent modification of a scheduling order entered early in the litigation.

### 11.213 Class Actions

Claims by or against a class require a procedure for dealing with the certification issues. A schedule for an early ruling on class certification typically should be set at the initial conference. Class certification or its denial will have a substantial impact on further proceedings, including the scope of discovery, the definition of issues, the length and complexity of trial, and the opportunities for settlement. Denial of class certification may effectively end the litigation. The court should ascertain what discovery on class questions is needed for a certification ruling and how to conduct it efficiently and economically. Consider also staying other discovery if resolution of the certification issue may obviate some or all further proceedings. Discovery may proceed concurrently if bifurcating class discovery from merits discovery would result in significant duplication of effort and expense to the parties.

See section 21 regarding principles and procedures involved in the management of class actions. For discussion of discovery in class actions, see section 21.14.

### 11.214 Settlement

At each conference, the judge should explore the settlement posture of the parties and the techniques, methods, and mechanisms that may help resolve the litigation short of trial. While settlement is most advantageous early in the litigation, meaningful negotiations may require specific critical discovery so that the parties have a fuller understanding of the strengths and weaknesses of their respective cases. Discovery may be targeted for this purpose, but settlement discussions should not delay or sidetrack the pretrial process. See section 13.11 for a general discussion of the judge's role in settlement. Judges should remind counsel to advise the court promptly when an agreement is imminent or has been reached.

## 11.22 Subsequent Conferences

Conferences following the initial conference help the judge to monitor the progress of the case and to address problems as they arise. Scheduling the conferences well in advance helps ensure maximum attendance. Some judges schedule conferences only as the need arises, and others schedule them at regular and frequent intervals, with agendas composed of items suggested by the parties or designated by the court. Directing parties to confer and submit

written reports before each conference helps avoid unnecessary conferences. Conferences may also be held in conjunction with motion hearings.

It is best not to adjourn a conference without setting the date for the next conference or the next report from counsel. Written status reports or conference calls can keep the court advised of the progress of the case between conferences. When a conference is scheduled, the court should distribute to counsel an agenda of items to be addressed, perhaps after calling for suggestions from counsel.

On-the-record conferences will minimize later disagreements, particularly if the judge anticipates issuing oral directions or rulings. Many judges hold all conferences on the record, particularly where numerous attorneys are in the courtroom. Nevertheless, an informal off-the-record conference held in chambers or by telephone can sometimes be more productive; a reporter can later be brought in to record the results of the conference. (28 U.S.C. § 753(b) sets forth the requirements for recording various proceedings.) Rule 16 requires (and sound practice dictates) that all matters decided at pretrial conferences be memorialized on the record or in a written order. Counsel may be directed to submit proposed orders incorporating the court's oral rulings.

The Federal Rules of Civil Procedure require a final pretrial conference when discovery and other pretrial matters are substantially complete[90] and a firm trial date has been set, usually about thirty to sixty days before the trial. More than one such conference may be needed, particularly if there will be more than one trial. See section 11.6.

## 11.23  Attendance

All attorneys and unrepresented parties should attend the initial pretrial conference. Requirements for attendance at subsequent conferences depend on the purposes of each conference. Costs can be reduced by relieving counsel from attending if their clients have no substantial interest in the matters to be discussed or if their interests will be fully represented by designated counsel, or by allowing them to attend by video or telephone conference, particularly if they have only a peripheral interest in the matters to be discussed. The judge should generally not bar any attorney's attendance, but might consider excluding attorneys who appear unnecessarily in order to claim court-awarded fees for that time. Authorizing compensation for one attorney per party only at routine conferences will also minimize attorneys' fees. Rule 16(c) requires that each party participating in a conference be represented by an attorney with

---

90. *See* Fed. R. Civ. P. 16(d).

authority to enter into stipulations and make admissions as to all matters the participants may reasonably anticipate will be discussed at that conference. Lead trial counsel should always attend the final pretrial conference. Rule 16(f) allows the court to impose sanctions for unexcused nonattendance at any conference. See section 40.1, ¶ 2.

Rule 16 also authorizes the court to require attendance or telephone availability of persons with authority to settle, including insurance carriers or their representatives when their interests are implicated and their presence will facilitate settlement. It may also be beneficial to invite counsel involved in related litigation and the magistrate judge or special master to whom matters to be discussed at the conference have been or may be referred. Judges should always consider the cost versus the benefits of such invitations.

## 11.3   Management of Issues

.31 Relationship to Discovery  42
.32 Pleading and Motion Practice  43
.33 Identifying, Defining, and Resolving Issues  44
.34 Summary Judgment  46

## 11.31   Relationship to Discovery

The *sine qua non* of managing complex litigation is defining the issues in the litigation. The materiality of facts and the scope of discovery (and the trial) cannot be determined without identification and definition of the controverted issues. The pleadings, however, will often fail to define the issues clearly, and the parties may lack sufficient information at the outset of the case to arrive at definitions with certainty. Probably the judge's most important function in the early stages of litigation management is to press the parties to identify, define, and narrow the issues. The initial conference should start this process.

Plaintiffs may assert that substantial discovery must precede issue definition, and defendants may contend that plaintiffs must first refine their claims. Nonetheless, the judge must start the process of defining and structuring the issues, albeit tentatively, to establish the appropriate sequence and limits for discovery.

The controlling factual and legal issues can almost always be identified by a thorough and candid discussion with counsel at the initial conference, prior to discovery. The judge should construct the discovery plan after identifying the primary issues, at least preliminarily, based on the pleadings and the parties' positions at the initial conference. Discovery may then provide information for further defining and narrowing issues, which may in turn lead to revision and refinement of the discovery plan.

## 11.32  Pleading and Motion Practice

Finalizing pleadings and resolving emergency legal issues will help to define and narrow issues.

The judge should consider establishing a schedule for filing all pleadings, including counterclaims, cross-claims, third-party complaints, and amendments to pleadings that add parties, claims, or defenses. This avoids later enlargement of issues and expansion or duplication of discovery. The judge should also consider suspending filing of certain pleadings if statutes of limitations present no problems and should consider ordering that specified pleadings, motions, and other court orders (unless specifically disavowed by a party) are "deemed" filed in cases later brought, transferred, or removed, without actually filing the documents (see Sample Order, section 40.42).

The pleadings may disclose issues of law that can be resolved by a motion to dismiss, to strike, or for judgment on the pleadings. Challenges to the court's personal or subject-matter jurisdiction should take priority. The legal insufficiency of a claim or defense may be raised by motion for failure to state a claim or for partial judgment on the pleadings. If the court considers evidence in connection with such a motion, the motion must be treated as one for summary judgment.[91] Insufficient defenses and irrelevant or duplicative matter can be stricken under Federal Rule of Civil Procedure 12(f). If a motion concerns a pivotal issue that may materially advance the termination of the litigation, the ruling may be certified for interlocutory appeal under 28 U.S.C. § 1292(b) if there is "substantial ground for difference of opinion." The judge may also provide for appellate review by entering final judgment as to a particular claim or party under Rule 54(b). See section 15.1.

Motion practice can be a source of substantial cost and delay. Following are some points the judge might consider:

- A Rule 12 motion can cause unnecessary expense if the asserted defect can be cured by amendment; therefore, instruct counsel to notify the opposing party and the court before filing such a motion in order to ascertain whether it will serve to narrow the issues in the case.
- Some motions can be decided based on oral presentations and reference to controlling authority, without briefs.
- Limiting the length of briefs and of appendices, affidavits, declarations, and other supporting materials, and requiring joint briefs whenever feasible, will expedite the litigation.

---

91. Fed. R. Civ. P. 12(b), (c). For discussion of summary judgment, see *infra* section 11.34.

- Prefiling conferences and requiring leave of court for filing of reply or supplemental briefs, or motions for reconsideration, will help avoid useless or unnecessary briefing.

- Prompt rulings from the bench will often help avoid unnecessary litigation activity.

- Some judges issue tentative rulings on motions in advance of the motion hearing. If the parties reject the rulings, they can direct their arguments at the hearing to specific issues.

- Multiparty litigation requires particular attention to scheduling. Counsel should inform the court as soon as possible of any motion to be filed, with sufficient time for opposing counsel to respond and the court to review submissions in advance. Discourage expedited motions unless they concern matters that will delay further proceedings if not resolved. It is sometimes best to specially set multiparty motions rather than schedule them as part of a regular motion docket or calendar call of the court; such motions also may be combined with other status conferences in the litigation.

## 11.33  Identifying, Defining, and Resolving Issues

The process of identifying, defining, and resolving issues begins at the initial conference. The attorneys should confer and submit a tentative statement of disputed issues in advance, agreed on to the extent possible (see section 11.11). The conference is an opportunity for the judge to learn about the material facts and legal issues and for counsel to learn about the opponent's case and gain a better perspective on their own. The judge should be willing to admit ignorance and ask even basic questions. Questions should probe into the parties' claims and defenses and seek *specific* information. Rather than accept a statement that defendant "was negligent" or "breached the contract," the judge should require the attorneys to describe the material facts they intend to prove and how they intend to prove them.

The judge should also inquire into the amount of damages claimed and the proposed proof and manner of computation, including the evidence of causation and the specific nature of any other relief sought (data that may also be subject to mandatory prediscovery disclosure, see section 11.13). The defense should identify the specific allegations and claims it disputes, the specific defenses it will raise, and the proof it will offer. This process helps identify the genuine disputes and may facilitate admissions and stipulations between the parties. The parties may, for example, be able to stipulate to the authenticity of documents or the accuracy of underlying statistical or technical data while reserving the right to dispute assumptions, interpretations, or inferences drawn

from the evidence. The judge may take judicial notice of facts after the opposing party has had an opportunity to proffer contradictory evidence.[92]

A variety of actions can help to identify, define, and resolve issues in complex litigation, including the following:

- requiring nonbinding statements of counsel, such as those that may be required at the initial conference (see section 11.11)—such statements can be updated periodically by written reports or oral statements at later conferences;

- encouraging voluntary abandonment of tenuous claims or defenses by the parties, often after the court's probing into the likelihood of success and the potential disadvantages of pursuing them;

- requiring counsel to list the essential elements of the cause of action—this exercise, designed to clarify the claims, may help identify elements in dispute and result in abandonment of essentially duplicative theories of recovery;

- incorporating formal amendments to the pleadings, including those resulting from an order under Federal Rule of Civil Procedure 12 striking allegations or requiring a more definite statement;

- using the authority in Rule 16(c)(1) to eliminate insubstantial claims or defenses;[93]

- allowing contention interrogatories (see section 11.461) and requests for admission (see section 11.472), especially when served after adequate opportunity for relevant discovery;

---

92. *See* Fed. R. Evid. 201; Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 332 (1949); William J. Flittie, *Judicial Notice in the Trial of Complex Cases,* 31 Sw. L.J. 819, 829–39 (1978).

93. *See, e.g.,* Fed. R. Civ. P. 16(c) committee note; McLean Contracting Co. v. Waterman S.S. Corp., 277 F.3d 477 (4th Cir. 2002) (citing the interest of efficient judicial administration as a basis for 16(c)(1)); Huey v. United Parcel Serv., Inc., 165 F.3d 1084, 1085 (7th Cir. 1999) (holding that a local rule requiring the party to identify disputed issues of material fact or waive arguments related to those issues "contributes to the efficient management of judicial business"); Morro v. City of Birmingham, 117 F.3d 508, 515 (11th Cir. 1997) (noting the importance of narrowing and defining the issues before trial); Lexington Ins. Co. v. Cooke's Seafood, 835 F.2d 1364, 1368 (11th Cir. 1988) ("Given the vast number of details competing for the attention of a federal district judge, reducing all issues to writing before the pretrial conference substantially assists the trial court in its ability to understand the issues and to prepare for trial."); Diaz v. Schwerman Trucking Co., 709 F.2d 1371, 1375 n.6 (11th Cir. 1983) (noting trial court's power under Rule 16 to summarily decide matters where no issue of fact exists); Holcomb v. Aetna Life Ins. Co., 255 F.2d 577, 580–81 (10th Cir. 1958) (trial court may enter judgment at Rule 16 pretrial conference if no issue of fact); *cf.* Fox v. Taylor Diving & Salvage Co., 694 F.2d 1349, 1356–57 (5th Cir. 1983) (judge may summarily dispose of unsupportable claim after Rule 16 conference held during recess in trial).

- ruling promptly on motions for full or partial summary judgment (see section 11.34);
- issuing sanctions for violations of Rules 16, 26, and 37 in the form of orders precluding certain contentions or proof (see section 10.15);
- requiring, with respect to one or more issues, that the parties present a detailed statement of their contentions, with supporting facts and evidence (see section 11.641)—the statements may be exchanged, with each party marking those parts it disputes; the order directing this procedure should provide that other issues or contentions are then precluded and no additional evidence may be offered absent good cause;
- requiring the parties to present, in advance of trial, proposed instructions in jury cases (see sections 11.65, 12.43) or proposed findings of fact and conclusions of law in nonjury cases (see section 12.52);
- conducting preliminary hearings under Federal Rule of Evidence 104 on objections to evidence (see section 11.642); and
- conducting a separate trial under Federal Rule of Civil Procedure 42(b) of issues that may render unnecessary or substantially alter the scope of further discovery or trial (see section 11.632)—special verdicts and interrogatories (see section 11.633) may be helpful, and on some issues the parties may waive jury trial (see section 11.62).

## 11.34  Summary Judgment

Summary judgment motions can help identify, define, and resolve issues. As the Supreme Court has stated, summary judgment is "not . . . a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules."[94] Summary judgment may eliminate the need for further proceedings or at least reduce the scope of discovery or trial. Even if denied, the parties' formulations of their positions may help clarify and define issues and the scope of further discovery. In addition, under Federal Rule of Civil Procedure 56(d), the court may issue an order specifying those facts that "appear without substantial controversy" and shall be "deemed established" for trial purposes.

Despite their benefits, summary-judgment proceedings can be costly and time-consuming. To avoid the filing of unproductive motions, the court may require a prefiling conference to ascertain whether issues are appropriate for summary judgment, whether there are disputed issues of fact, and whether the motion, even if granted, would expedite the termination of the litigation. A

---

94. Celotex v. Catrett, 477 U.S. 317, 329 (1986).

separate trial of an issue bifurcated under Rule 42(b) may sometimes be a preferable alternative.

Summary judgment is as appropriate in complex litigation as in routine cases[95]—and, as a general proposition, the standard for deciding a summary judgment motion is the same in all cases.[96] Complex litigation, however, may present complicated issues not as susceptible to resolution as issues in more familiar settings. More extensive discovery may be necessary to create an adequate record for decision.[97] However, the party opposing summary judgment should make the necessary showing under Rule 56(f) in support of its request.[98]

To avoid pretrial activities that may be unnecessary if the summary-judgment motion is granted, the schedule should call for filing the motion as early in the litigation as possible. This will maximize the potential benefits from its disposition while affording the parties an adequate opportunity to conduct discovery relevant to the issues raised, obtain needed evidence, and develop a sufficient record for decision.[99] Allowing adequate time for preparation before the motion is filed should reduce the opposing party's need for granting a continuance under Rule 56(f) to obtain affidavits or conduct further discovery to oppose the motion. Under Rule 56(f), the party requesting a continuance must specify (1) the discovery it proposes to take, (2) the evidence

95. *See* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) (approving grant of summary judgment in complex antitrust case).

96. *See* William W Schwarzer et al., The Analysis and Decision of Summary Judgment Motions (Federal Judicial Center 1991), *reprinted in* 139 F.R.D. 441 (1992) [hereinafter Summary Judgment]. For U.S. Supreme Court cases discussing the standard and the parties' respective burdens, see *Eastman Kodak Co. v. Image Technical Servs. Inc.*, 504 U.S. 451 (1992); *Celotex,* 477 U.S. at 317; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita*, 475 U.S. at 574.

97. *See* William W Schwarzer & Alan Hirsch, *Summary Judgment After Eastman Kodak*, 45 Hastings L.J. 1 (1993).

98. *See, e.g.,* Harrods Ltd. v. Sixty Internet Domain Names, No. 00-2414, 2002 U.S. App. LEXIS 17530, at *77 (4th Cir. Aug. 23, 2002); Fennell v. First Step Designs, Ltd., 83 F.3d 526 (1st Cir. 1996); Keebler Co. v. Murray Bakery Prods., 866 F.2d 1386, 1388–90 (Fed. Cir. 1989); Dowling v. City of Philadelphia, 855 F.2d 136, 139–40 (3d Cir. 1988); VISA Int'l Serv. Ass'n v. Bankcard Holders of Am., 784 F.2d 1472, 1475 (9th Cir. 1986); Madrid v. Chronicle Books, 209 F. Supp. 2d 1227, 1232–33 (D. Wyo. 2002); Nicholson v. Doe, 185 F.R.D. 134, 136–37 (N.D.N.Y. 1999).

99. *See Celotex*, 477 U.S. at 327 (court must allow "adequate time" for discovery); *Anderson*, 477 U.S. at 250 n.5 (nonmoving party must have opportunity to discover information "essential to [its] opposition"). The court must use its discretion to determine what constitutes "adequate time" and what information is "essential" in opposition; requiring all discovery to be completed before entertaining the motion defeats the purpose of summary judgment.

likely to be uncovered, and (3) the material fact issues that evidence will support.

Rule 56(c) directs the court to rule on a summary-judgment motion on the basis of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits."[100] The affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."[101] Because of the volume of discovery materials in complex litigation and the potential for disputes over admissibility, these provisions can be a particular source of problems. The court may either direct the moving party to specify the material facts claimed to be undisputed or direct the opposing party to specify the evidence upon which a claimed factual dispute is based.[102] Objections to evidence may be resolved by a hearing under Federal Rule of Evidence 104.[103] Each party should also submit a clear and unambiguous statement of the theories of its case. Such statements in the motion and the opposition will minimize the risk of error, as will a tentative ruling before hearing the motion.

The ruling on the motion should be in writing or read into the record, and it should lay out the court's reasoning. It is important to decide such motions promptly; deferring rulings on summary judgment motions until the final pretrial conference defeats their purpose of expediting the disposition of issues.

---

100. Fed. R. Civ. P. 56(c). The court may also hold an evidentiary hearing under Rule 43(e), but when the motion cannot be decided because the parties' submissions are unclear, the court may instead simply require additional, clarifying submissions.

101. Fed. R. Civ. P. 56(e). The requirements of personal knowledge and admissibility in evidence presumably apply also to the use of depositions and interrogatory answers. *See* 10A Charles A. Wright et al., Federal Practice and Procedure: Civil 3d § 2722 (3d ed. 1998).

102. For example, the parties should identify relevant deposition evidence by deponent, date, place of deposition, and page numbers; similarly detailed information should be provided for all other evidence submitted. Copies of relevant materials should be included with the moving and opposing papers. *See* Summary Judgment, *supra* note 96, at 480–81 & n.221; Schneider v. TRW, Inc., 938 F.2d 986, 990 n.2 (9th Cir. 1991).

103. *See In re* Japanese Elec. Prods. Antitrust Litig., 723 F.2d 238, 260 (3d Cir. 1983), *rev'd on other grounds sub. nom.* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

# 11.4 Discovery

.41 Relationship to Issues  50
.42 Planning and Control  51
   .421 Discovery Plan/Scheduling Conference  51
   .422 Limitations  53
   .423 Other Practices to Save Time and Expense  56
   .424 Resolution of Discovery Disputes  59
.43 Privilege Claims and Protective Orders  62
   .431 Claims of Privilege/Full Protection  63
   .432 Limited Disclosure/Protective Orders  64
   .433 Allocation of Costs  69
.44 Documents  71
   .441 Identification System  71
   .442 Preservation  72
   .443 Rule 34 Requests/Procedures for Responding  74
   .444 Document Depositories  75
   .445 Evidentiary Foundation for Documents  77
   .446 Discovery of Computerized Data  77
   .447 Discovery from Nonparties  82
.45 Depositions  83
   .451 Limitations and Controls  83
   .452 Cost-Saving Measures  85
   .453 Deferred Supplemental Depositions  87
   .454 Scheduling  88
   .455 Coordination with Related Litigation  89
   .456 Control of Abusive Conduct  89
.46 Interrogatories  90
   .461 Purposes  90
   .462 Limitations  91
   .463 Responses  92
   .464 Other Practices to Save Time and Expense  92
.47 Stipulations of Fact/Requests for Admission  94
   .471 Stipulations of Fact  94
   .472 Requests for Admission  95
   .473 Statements of Contentions and Proof  96
   .474 Requests for Judicial Notice  97
.48 Disclosure and Discovery of Expert Opinions  97
   .481 Trial Experts  97
   .482 Consulting Experts  99
   .483 Court-Appointed Experts  100
.49 Special Problems  100
   .491 Government Investigations/Grand Jury Materials  100
   .492 Summaries  101
   .493 Sampling/Opinion Surveys  102
   .494 Extraterritorial Discovery  104

The Federal Rules of Civil Procedure, along with the court's inherent power, provide ample authority[104] for early and ongoing control of discovery in complex litigation.

## 11.41  Relationship to Issues

Fundamental to controlling discovery is directing it at the material issues in controversy. The general principle governing the scope of discovery stated in Rule 26(b)(1) permits discovery of matters, not privileged, "relevant to the claim or defense of any party." The court has discretion to expand that to "any matter relevant to the subject matter involved in the action."[105] But Rule 26(b)(2) directs the court to limit the frequency and extent of use of the discovery methods permitted by the rules in order to prevent "unreasonably cumulative or duplicative" discovery and discovery for which "the burden or expense . . . outweighs its likely benefit, taking into account the needs of the case . . . the importance of the issues at stake . . . and the importance of the proposed discovery in resolving the issues." This underlying principle of proportionality means that even in complex litigation, discovery does not require leaving no stone unturned.

Early identification and clarification of issues (see section 11.3) is essential to discovery control. It enables the court to assess the materiality and relevance of proposed discovery and provides the basis for a fair and effective discovery plan. A plan established early in the litigation needs to take into account the possibility of revisions based on information gained through discovery. Alternative approaches to the sequencing of discovery have different costs and benefits. For example, deferring discovery on damages until liability has been decided may result in savings, but may also lead to duplicative discovery if resumed. Conversely, conducting discovery on damages before discovery on liability will sometimes facilitate early settlement by informing the parties of their potential exposure, but may be rendered unnecessary if the defendant is found not liable.

---

104. *See* Herbert v. Lando, 441 U.S. 153, 177 (1979); Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 350–54 (1978).

105. Fed. R. Civ. P. 26(b)(1).

## 11.42  Planning and Control

.421 Discovery Plan/Scheduling Conference  51
.422 Limitations  53
.423 Other Practices to Save Time and Expense  56
.424 Resolution of Discovery Disputes  59

A discovery plan should facilitate the orderly and cost-effective acquisition of relevant information and materials and the prompt resolution of discovery disputes. The plan should reflect the circumstances of the litigation, and its development and implementation must be a collaborative effort with counsel. The judge should ask the lawyers initially to propose a plan, but should not accept joint recommendations uncritically. Limits may be necessary even regarding discovery on which counsel agree. The judge's role is to oversee the plan and provide guidance and control. In performing that role, even with limited familiarity with the case, the judge must retain responsibility for control of discovery. The judge should not hesitate to ask why particular discovery is needed and whether information can be obtained more efficiently and economically by other means. Regular contact with counsel through periodic conferences will enable the judge to monitor the progress of the plan, ensure that it is operating fairly and effectively, and adjust it as needed.

## 11.421  Discovery Plan/Scheduling Conference

Adoption of a discovery plan is a principal purpose of the initial conference.[106] The initial conference should be preceded by a conference of counsel to develop a discovery plan for submission to the court.[107] Rule 26(f) requires such conferring and places joint responsibility on the attorneys of record and all unrepresented parties to arrange, attend (or be represented at), and participate in good faith in the conference. Rule 26(d) bars discovery, absent stipulation or court order, before that conference. An exception is found in Rule 30(a)(2)(C), which allows a deposition to be taken before the discovery conference if the notice contains a certification, with supporting facts, that the deponent is expected to leave the United States and be unavailable for examination in this country unless deposed before that time. Such a deposition may

---

106.  *See* Fed. R. Civ. P. 16(c)(6). *See also supra* sections 11.11, 11.33.

107.  For a discussion of the factors to be considered in formulating a discovery plan, see William W Schwarzer et al., Civil Discovery and Mandatory Disclosure: A Guide to Efficient Practice (2d ed. 1994).

not be used against a party who demonstrates that it was unable through diligence to obtain counsel to represent it at the deposition.[108]

Within fourteen days after conferring the parties must submit to the court a written report outlining their discovery plan.[109] The plan should address

- the form and timing of disclosure;
- the subjects of and completion date for discovery; and
- the possibility of phasing, limiting, or focusing discovery in light of the issues.

The parties' submission will be the starting point for developing the plan. If necessary, the court should direct the parties to resume discussion to prepare a more useful and reasonable plan. Rule 37(g) allows the court, after opportunity for hearing, to assess reasonable costs, including attorneys' fees, against a party or attorney failing to participate in good faith in the development and submission of a proposed discovery plan as required by Rule 26(f). It is ordinarily best to defer commencement of discovery until after a plan has been adopted.

Actions taken at the conference bearing on the discovery plan may include the following:

- examining the specifics of proposed discovery in light of Rule 26(b)(2), which calls for
  - limiting discovery that is cumulative or duplicative, or that is more convenient, less burdensome, or less expensive to obtain from another source, or that seeks information the party has had ample opportunity to obtain; and
  - balancing the burden and expense of any discovery sought against its benefit, after considering the need for the discovery, the importance of the amount or issues at stake, and the parties' resources;
- directing disclosure of core information where appropriate to avoid the cost and delay of formal discovery (see section 11.13);
- discussing issues related to the format, compression, resolution, and alteration of documents, photographs, videotapes, and other materials to be exchanged in digital form;[110]
- reminding counsel of their professional obligations in conducting discovery and the implications of the certification under Rule 26(g) that

---

108. Fed. R. Civ. P. 32(a)(3).

109. For a sample report, see Federal Rule of Civil Procedure appendix of forms (form 35).

110. *See* Effective Use of Courtroom Technology, *supra* note 85, at 61–97. Also see the material regarding form of production in *infra* section 11.446.

all disclosures and discovery responses are complete and correct when made, and that requests, objections, and responses conform to the requirements of the Federal Rules;

- providing for compliance with the supplementation requirements of Rules 26(e)(1) and (2)[111] by setting periodic dates for additional reports;

- requiring periodic status reports to monitor the progress of discovery (which can be informal, by letter or telephone); and

- issuing an order, which may be a part of the scheduling order required by Rule 16(b) (see section 11.212), which incorporates the discovery plan (for a sample order, see section 40.24).

## 11.422 Limitations

Discovery control in complex litigation may take a variety of forms, including time limits, restrictions on scope and quantity, and sequencing. The Federal Rules and the court's inherent power provide the court with broad authority. Among other provisions, Federal Rule of Civil Procedure 16(b) directs the court to limit the time for discovery, and Rule 26(b) empowers the court to limit the "frequency or extent of use of the discovery methods" under the rules, including the length of depositions. Rule 30(a) imposes a presumptive limit of ten depositions per side. Rule 30(d) has a presumptive durational limit of one 7-hour day for any deposition. Rule 33 establishes a presumptive limit of twenty-five interrogatories per party (see sections 11.451, 11.462). Rule 26(f)(3) requires the parties to address discovery limits in their proposed discovery plan.

Presumptive limits should be set early in the litigation, before discovery has begun. Information about the litigation will be limited at that time, so limits may need to be revised in the light of later developments. But they should be imposed on the basis of the best information available at the time, after full consultation with counsel, and with the understanding that they will remain binding until further order. In determining appropriate limits, the court will need to balance efficiency and economy against the parties' need to develop an adequate record for summary judgment or trial. This task further underlines the importance of clarifying and understanding the issues in the case before

---

111. Rule 26(e)(2) does not apply to deposition testimony, but when the deposition of an expert from whom a report was required under Rule 26(a)(2)(B) reveals changes in the expert's opinion, it triggers the duty of supplementation imposed by Rule 26(e)(1). *See* Fed. R. Civ. P. 26 committee note; Fed. R. Civ. P. 26(a)(2)(C).

imposing limits.[112] The following are examples of discovery limits that a judge might consider:

- *Time limits and schedules.* The discovery plan should include a schedule for the completion of specified discovery, affording a basis for judicial monitoring of progress. Setting a discovery cutoff date[113] is an important objective, but may not be feasible at the initial conference in complex litigation. The discovery cutoff should not be so far in advance of the anticipated trial date that the product of discovery becomes stale and the parties' preparation outdated. Time limits impose valuable discipline on attorneys, forcing them to be selective and helping to move the case expeditiously, but standing alone they may be insufficient to control discovery costs. Unless time limits are complemented by other limitations, attorneys may simply conduct multi-track discovery, thereby increasing expense and prejudicing parties with limited resources. To prevent time limits from being frustrated, the judge should rule promptly on disputes so that further discovery is not delayed or hampered while a ruling is pending. Although attorneys will sometimes argue over "priorities," the rules provide for no such presumptive standing.

- *Limits on quantity.* Time limits may be complemented by limits on the number and length of depositions, on the number of interrogatories, and on the volume of requests for production. Imposing such limitations only after hearing from the attorneys makes possible a reasonably informed judgment about the needs of the case. Limitations are best applied sequentially to particular phases of the litigation, rather than as aggregate limitations. When limits are placed on discovery of voluminous transactions or other events, consider using statistical sampling techniques to measure whether the results of the discovery fairly represent what unrestricted discovery would have been expected to produce (section 11.493 discusses statistical sampling).

- *Phased, sequenced, or targeted discovery.* Counsel and the judge will rarely be able to determine conclusively early in the litigation what discovery will be necessary; some discovery of potential relevance at the outset may be rendered irrelevant as the litigation proceeds, and the need for other discovery may become known only through later developments. For effective discovery control, initial discovery should focus on matters—witnesses, documents, information—that appear

---

112. *See* Schwarzer & Hirsch, *supra* note 97.
113. *See In re* Fine Paper Antitrust Litig., 685 F.2d 810 (3d Cir. 1982).

pivotal. As the litigation proceeds, this initial discovery may render other discovery unnecessary or provide leads for further necessary discovery. Initial discovery may also be targeted at information that might facilitate settlement negotiations or provide the foundation for a dispositive motion; a discovery plan may call for limited discovery to lay the foundation for early settlement discussions. Targeted discovery may be nonexhaustive, conducted to produce critical information rapidly on one or more specific issues. In permitting this kind of discovery, it is important to balance the potential savings against the risk of later duplicative discovery should it be necessary to resume the deposition of a witness or the production of documents. Targeted discovery may in some cases be appropriate in connection with a motion for class certification; however, matters relevant to such a motion may be so intertwined with the merits that targeting discovery would be inefficient. See sections 11.41 and 21.2.

- *Subject-matter priorities.* Where the scope of the litigation is in doubt at the outset—as, for example, in antitrust litigation—the court should consider limiting discovery to particular time periods or geographical areas, until the relevance of expanded discovery has been established. See section 11.41.

- *Sequencing by parties.* Although discovery by all parties ordinarily proceeds concurrently, sometimes one or more parties should be allowed to proceed first. For example, if a party needs discovery to respond to an early summary judgment motion, that party may be given priority. Some judges establish periods in which particular parties have exclusive or preferential rights to take depositions, and in multiple litigation, those judges direct that discovery be conducted in some cases before others. Sometimes judges order "common" discovery to proceed in a specified sequence, without similarly limiting "individual" discovery in the various cases.

- *Forms of discovery.* Some judges prescribe a sequence for particular types of discovery—for example, interrogatories may be used to identify needed discovery and documents, followed by requests for production of documents, depositions, and finally requests for admission.

If the court directs that discovery be conducted in a specified sequence, it should grant leave to vary the order for good cause, as when emergency depositions are needed for witnesses in ill health or about to leave the country.

## 11.423 Other Practices to Save Time and Expense

Various other practices can help minimize the cost, delay, and burden associated with discovery. Consider reminding counsel of the following:

- *Stipulations under Federal Rule of Civil Procedure 29.* The rule gives parties authority to alter procedures, limitations, and time limits on discovery so long as they do not interfere with times set by court order. Thus, the parties can facilitate discovery by stipulating with respect to notice and manner of taking depositions and adopting various informal procedures. The court may, however, require that it be kept advised of such agreements to ensure compliance with the discovery plan and may by order preclude stipulations on particular matters.

- *Informal discovery.* The court should encourage counsel to exchange information, particularly relevant documents, without resort to formal discovery (see section 11.13). Early exchanges can make later depositions more efficient. Informal interviews with potential witnesses can help determine whether a deposition is needed, inform later discovery, and provide the basis for requests for admissions through which the results of informal discovery are made admissible at trial.

- *Automatic disclosure.* Rule 26(a)(1) and many local rules and standing orders require the parties to identify relevant witnesses and categories of documents early in the litigation, without waiting for discovery requests. By stipulation or court order, the timing and content of this disclosure may be tailored to the needs of the particular case. See section 11.13.

- *Reduction of deposition costs.* Depositions taken by telephone, videoconference, electronic recording devices, or having deponents come to central locations sometimes save money. Likewise, parties may forgo attending a deposition in which they have only a minor interest if a procedure is established for supplemental questions—by telephone, videoconference, written questions, or resumption of examination in person—in the event that, after a review of the transcript, they find further inquiry necessary. Section 11.45 has additional discussion of deposition practices.

- *Information from other litigation and sources.* When information is available from public records (such as government studies or reports),

from other litigation,[114] or from discovery conducted by others in the same litigation, consider requiring the parties to review those materials before undertaking additional discovery. The court may limit the parties to supplemental discovery if those materials will be usable as evidence in the present litigation. Interrogatory answers, depositions, and testimony given in another action ordinarily are admissible if made by and offered against a party in the current action. Similarly, they may be admissible for certain purposes if made by a witness in the current action.[115] Coordination of "common" discovery in related litigation may also save costs, even if the litigation is pending in other courts. If related cases are pending in more than one court, coordinated common discovery can prevent duplication and conflicts. A joint discovery plan can be formulated for all cases, with agreement among parties that one of the cases will be treated as the lead case (with its discovery plan serving as the starting point for development of supplemental plans in the other courts), or with the use of joint deposition notices. See section 20. Counsel may also agree that discovery taken in one proceeding can be used in related proceedings as though taken there.

- *Joint discovery requests and responses.* In multiparty cases with no designated lead counsel, judges sometimes require parties with similar positions to submit a combined set of interrogatories, requests for production, or requests for admission. If voluminous materials are to be produced in response, the responding party may be relieved of the requirement of furnishing copies to each discovering party. Section 11.44 has further discussion of document discovery, including use of document depositories.

- *Modified discovery responses.* When a response to a discovery request can be provided in a form somewhat different from that requested, but with substantially the same information and with less time and expense, the responding party should make that fact known and seek agreement from the requesting party. For example, information sought on a calendar year basis may be readily and inexpensively available on a fiscal year basis. Similarly, if some requested information can be produced promptly but additional time will be needed for other items, the responding party should produce the information presently

---

114. Access to materials and testimony given in other cases may be impeded because of confidentiality orders, restrictions on release of grand jury materials, and other limitations. *See infra* sections 11.43 and 20.

115. *See* Fed. R. Evid. 801(d). The parties may stipulate to the admissibility of other information.

available and indicate when the remainder will be produced. Preferably, formal discovery requests should be prepared only after counsel have informally discussed what information is needed and how it can be produced most efficiently.

• *Phased or sequenced discovery of computerized data.* Sections 11.41 and 11.422 have discussed phasing discovery by issue. Computerized data, however, are often not accessible by date, author, addressee, or subject matter without costly review and indexing. Therefore, it may be appropriate for the court to phase or sequence discovery of computerized data by accessibility. At the outset, allowing discovery of relevant, nonprivileged data available to the respondent in the routine course of business is appropriate and should be treated as a conventional document request. If the requesting party requests more computerized data, consider additional sources in ascending order of cost and burden to the responding party, e.g., metadata or system data, archived data, backup data, and legacy data.[116] The judge should encourage the parties to agree to phased discovery of computerized data as part of the discovery plan. But with or without a prior agreement, the judge may engage in benefit-and-burden analysis under Rule 26(b)(2)(iii) at each stage and enter an appropriate order under Rule 26(c), which may include cost sharing between the parties or cost shifting to the requesting party.[117] See section 11.433.

• *Computerized data produced in agreed-on formats.* Information subject to discovery increasingly exists in digital or computer-readable form. The judge should encourage counsel to produce requested data in formats and on media that reduce transport and conversion costs, maximize the ability of all parties to organize and analyze the data during pretrial preparation, and ensure usability at trial. Wholesale conversion of computerized data to paper form for production, only to be reconverted into computerized data by the receiving party, is costly and wasteful. Particularly in multiparty cases, data production on CD-ROM or by Internet-based data transfer can increase efficiency. Section 11.444 discusses "virtual" document depositories.

---

116. For explanations of these terms, see Kenneth J. Withers, *Computer-Based Discovery in Federal Civil Litigation*, 2000 Fed. Cts. L. Rev. 2, *at* http://www.fclr.org/2000fedctslrev2.htm (last visited Nov. 3, 2003); see also *infra* section 11.446.

117. *See* Zubulake v. UBS Warburg LLC, 2003 U.S. Dist. LEXIS 7939 (S.D.N.Y.) (defining five common categories of data accessibility, proposing sampling of backup data, and applying a seven-factor test in considering cost sharing or cost shifting).

- *Sampling of computer data.* Parties may have vast collections of computerized data, such as stored E-mail messages or backup files containing routine business information kept for disaster recovery purposes. Unlike collections of paper documents, these data are not normally organized for retrieval by date, author, addressee, or subject matter, and may be very costly and time-consuming to investigate thoroughly. Under such circumstances, judges have ordered that random samples of data storage media be restored and analyzed to determine if further discovery is warranted under the benefit versus burden considerations of Rule 26(b)(2)(iii).[118]

- *Combined discovery requests.* Several forms of discovery can be combined into a single request. Ordinarily, more time should be allowed for parties responding to a combined discovery request, even though such responses sometimes consume less overall time than do responses to traditional separate discovery requests. Because the rules impose no limits on requests for admission as they do on interrogatories, an order enlarging the number of permissible interrogatories may be necessary.

- *Conference depositions.* If knowledge of a subject is divided among several people and credibility is not an issue, a "conference deposition" may be feasible (see, e.g., Rule 26(b)(6)). Each witness is sworn, and the questions are then directed to the group or those having the information sought. Persons in other locations who may also be needed to provide information may be scheduled to be "on call" during the conference deposition. This procedure may be useful in obtaining background information, identifying and explaining documents, and examining reports compiled by several persons.

- *Subpoenas.* Under Rule 45, an attorney may subpoena documents or other tangibles from nonparties, avoiding unnecessary depositions. The rule also provides for subpoenas to permit inspection of premises possessed by nonparties, rendering unnecessary the commencement of an independent proceeding. See section 11.447.

## 11.424 Resolution of Discovery Disputes

Discovery disputes, with their potential for breeding satellite litigation, are a major source of cost and delay. Few aspects of litigation management are more important than the prompt and inexpensive resolution of such controversies. Procedures such as those described here take little judicial time but

118. *Id.*

result in substantial improvements in the conduct of discovery by deterring counsel from obstructive conduct. Such procedures are equally effective when a magistrate judge manages discovery.

A discovery plan should include specific provisions, such as the following, for the fair and efficient resolution of discovery disputes.

*Presubmission conference of counsel.* Submission of a dispute or a request for relief should be disallowed until the parties have met and attempted to resolve it. Rules 37(a) and 26(c) condition the right to make a motion to compel or for a protective order upon certification that the movant has in good faith conferred or attempted to confer with the opponent to resolve the matter without court action. Most local rules require such a conference before counsel may bring a discovery dispute to the court (some judges require the participation of local counsel in this conference).[119] The discovery plan or scheduling order, however, should specify the ground rules for such conferences, such as requiring that the party requesting the conference send the opponent a clear and concise statement of the asserted deficiencies or objections and the requested action. Having to narrow and define the dispute and the requested relief should cause counsel to prepare for the conference, consult with clients, and seek a resolution that will avoid the need for judicial intervention. Any resulting resolution should be put in writing.

*Submission to the court.* Many judges believe that making themselves available to resolve discovery disputes informally discourages disputes and encourages quick resolution of those that are submitted. Some judges direct counsel to present disputes by conference call. Others direct submission by letter. A brief excerpt of the transcript containing relevant proceedings, either in writing or read by the reporter over the phone, will help the decision maker. The availability of a speedy resolution process, particularly during the course of a deposition, tends to deter unreasonable and obstructive conduct. The incentive for unreasonable behavior is reduced when the judge (or magistrate judge) is readily available by telephone and the opponent can obtain prompt relief (see section 11.456).

Avoiding formal motions in discovery disputes also forces attorneys to narrow and simplify the dispute rather than to elaborate on it as they would in a brief. Questions from the judge will further narrow and clarify the dispute. Often, the appropriate resolution becomes self-evident during the course of the conference. Even if informal presentation does not resolve a dispute, it can help to define and narrow it for further proceedings.

---

119. *See, e.g.,* William W Schwarzer, *Guidelines for Discovery, Motion Practice and Trial,* 117 F.R.D. 273 (1987).

If informal procedures fail or are rejected, it helps to adopt procedures that minimize the activity needed to resolve the dispute. These procedures include restricting the length of motions, memoranda, and supporting materials, barring replies generally, and setting time limits for submission. Discovery disputes involving issues having a significant impact on the litigation—such as rulings on privilege—may require substantial proceedings. The judge should avoid discovery with respect to the discovery dispute itself except in extraordinary circumstances.

Special masters can successfully oversee discovery, particularly where there are numerous issues—such as claims of privilege—to resolve or where the parties are extraordinarily contentious. Appointing special masters, however, can increase substantially the cost of litigation, although the resulting efficiencies could result in offsetting savings. In any event, the court should avoid such appointments where the parties object with good cause or cannot afford the cost.[120]

Counsel sometimes may submit certain discovery disputes to a judge outside of the district. Lawyers sometimes submit a motion, for example, to compel or terminate a deposition held outside the district where the action is pending, or a motion for a protective order, either to the judge before whom it is pending or to a judge in the district where the deposition is being held.[121] In complex litigation, however, particularly if procedures have already been established for expedited consideration, consider requiring all such matters to be presented to the assigned judge. Federal Rule of Civil Procedure 37(a)(1) requires counsel to present a motion to compel to the court in which the action is pending if directed at a party; only if directed at a nonparty must it be presented to a court in the district where the discovery is taken. When a dispute is presented to a deposition-district court, however, the assigned judge may have or be able to obtain authority to act also as deposition judge in that district, and may be able to exercise those powers by telephone.[122] In multidistrict litigation under 28 U.S.C. § 1407(b), "the judge or judges to whom such actions are assigned, the members of the judicial panel on multidistrict litigation, and other circuit and district judges designated when needed by the panel may exercise the powers of a district judge in any district for the purpose of conduct-

---

120. *See infra* section 11.52; Brazil et al., *supra* note 21 (based on experience in United States v. Am. Tel. & Tel. Co., 461 F. Supp. 1314 (D.D.C. 1978), 552 F. Supp. 131 (D.D.C. 1982), *aff'd mem. sub nom.* Md. v. United States, 460 U.S. 1001 (1983)).

121. Fed. R. Civ. P. 26(c), 30(d).

122. *See In re* Corrugated Container Antitrust Litig., 662 F.2d 875, 877, 879 (D.C. Cir. 1981); *In re* Corrugated Container Antitrust Litig., 644 F.2d 70 (2d Cir. 1981) (tacitly assuming power); *In re* Corrugated Container Antitrust Litig., 620 F.2d 1086, 1089 (5th Cir. 1980).

ing pretrial depositions." In other cases, an interdistrict or intercircuit assignment may enable the judge to whom the case is assigned to act as deposition judge in another district. In such cases, the deposition-district judge can always confer with the forum-district judge by telephone and thereby expedite a ruling.

*Rulings.* The judge should try to expedite the resolution of discovery disputes by whatever procedure is adopted. Pending disputes disrupt the discovery program and result in additional cost and delay. It is generally more important to the parties that the dispute be decided promptly than that it be decided perfectly, and it is best to memorialize the resolution on the record or by written order. Thus, consider directing prevailing counsel to prepare a proposed order and submit it to the opponent for review and then to the court. If the order is made at a conference during a deposition, the conference and order can be transcribed as part of the deposition transcript.

## 11.43  Privilege Claims and Protective Orders

.431 Claims of Privilege/Full Protection  63
.432 Limited Disclosure/Protective Orders  64
.433 Allocation of Costs  69

Attention should be given at an early conference, preferably before discovery begins, to any need for procedures to accommodate claims of privilege or for protection of materials from discovery as trial preparation materials,[123] as trade secrets, or on privacy grounds.[124] If not addressed early, these matters may later disrupt the discovery schedule. The court should consider not only the rights and needs of the parties but also the existing or potential interests of those not involved in the litigation.[125]

---

123. "Trial preparation materials" include, but are not limited to, traditional "work product." *See* Fed. R. Civ. P. 26(b)(3) & committee note.

124. Although there is no privacy privilege, maintenance of privacy can be the ground for a protective order. *See* Seattle Times Co. v. Rhinehart, 467 U.S. 20, 30, 35 n.21 (1984).

125. For a thorough discussion of the issues raised by protective orders, see Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 529 F. Supp. 866 (E.D. Pa. 1981). *See also Seattle Times,* 467 U.S. 20; Richard L. Marcus, *The Discovery Confidentiality Controversy,* 1991 U. Ill. L. Rev. 457 (1991).

### 11.431 Claims of Privilege/Full Protection

Certain materials may qualify for full protection against disclosure or discovery as privileged,[126] as trial preparation material,[127] or as incriminating under the Fifth Amendment.[128] It helps to minimize their potentially disruptive effects on discovery, by addressing the possibility of such claims at an early conference and establishing a procedure for their resolution or for avoidance through appropriate sequencing of discovery. Parties sometimes try to facilitate discovery by agreeing that the disclosure of a privileged document will not be deemed a waiver with respect to that document or other documents involving the same subject matter. Some courts, however, have refused to enforce such agreements.[129]

A claim for protection against disclosure based on privilege or protection of trial preparation materials must be made "expressly" and describe the nature of the allegedly protected information sufficiently to enable opposing parties to assess the merits of the claim.[130] This is usually accomplished by counsel submitting a log (frequently called a "*Vaughn Index*"[131]) identifying documents or other communications by date and by the names of the author(s) and recipient(s), and describing their general subject matter (without revealing the privileged or protected material).[132] Unresolved claims of privilege should be presented directly to the judge for a ruling; if necessary, the judge can review the disputed information *in camera.*

Parties seeking protection, however, sometimes request that the trial judge not see the document, especially in a nonjury case. In such circumstances, the judge should consider referring the matter to another judge, a magistrate

---

126.  Rulings on claims of privilege in diversity cases are governed by Federal Rule of Evidence 501, which provides that privilege is determined by state law where state law supplies the rule of decision.

127.  See Fed. R. Civ. P. 26(b)(3), which extends qualified protection to such materials.

128.  Potential Fifth Amendment claims are one reason why discovery in civil litigation may be stayed, in whole or in part, until termination of related criminal proceedings. *See infra* section 20.2. Conclusion of the criminal case, however, will not necessarily avoid further assertions of the privilege against self-incrimination.

129.  *See In re* Chrysler Motors Corp. Overnight Evaluation Program Litig., 860 F.2d 844, 846–47 (8th Cir. 1988); Khandji v. Keystone Resorts Mgmt., Inc., 140 F.R.D. 697, 700 (D. Colo. 1992); Chubb Integrated Sys. v. Nat'l Bank, 103 F.R.D. 52, 67–68 (D.D.C. 1984).

130.  Fed. R. Civ. P. 26(b)(5), 45(d)(2). Withholding materials otherwise subject to disclosure without such notice may subject a party to Rule 37 sanctions and waive the privilege or protection. *See* Fed. R. Civ. P. 26 committee note.

131.  *See* Vaughn v. Rosen, 484 F.2d 820, 827 (D.C. Cir. 1973).

132.  Rule 26(b)(5) does not specify the information that must be provided, which may depend on the nature and amount of material withheld. *See* Fed. R. Civ. P. 26 committee note.

judge, or a special master. Judges, however, are accustomed to reviewing matters that may not be admissible; therefore, counsel should restrict such requests to the most sensitive, potentially prejudicial materials and be prepared to indicate, at least in general terms, the basis for the request.

In complex litigation involving voluminous documents, privileged materials are occasionally produced inadvertently. The parties may stipulate, or an order may provide, that such production shall not be considered a waiver of privilege and that the party receiving such a document shall return it promptly without making a copy.[133]

## 11.432 Limited Disclosure/Protective Orders

Complex litigation will frequently involve information or documents that a party considers sensitive. There are two approaches to seeking protection for such material: (1) one or more parties may seek "umbrella" protective orders, usually by stipulation, or (2) the claim to protection may be litigated document by document.

*Umbrella orders.* When the volume of potentially protected materials is large, an umbrella order will expedite production, reduce costs, and avoid the burden on the court of document-by-document adjudication. Umbrella orders provide that all assertedly confidential material disclosed (and appropriately identified, usually by stamp) is presumptively protected unless challenged. Such orders typically are made without a particularized showing to support the claim for protection, but such a showing must be made whenever a claim under an order is challenged. Some courts have therefore found that umbrella orders simply postpone, rather than eliminate, the need for close scrutiny of discovery material to determine whether protection is justified, thereby delaying rather than expediting the litigation.[134]

---

133. *See In re* Bridgestone/Firestone, Inc., 129 F. Supp. 2d 1207, 1219 (S.D. Ind. 2001) (Case Management Order dated Jan. 30, 2001).

134. *See* John Does I–VI v. Yogi, 110 F.R.D. 629, 632 (D.D.C. 1986). The problems of preserving protection for documents produced under umbrella orders are aggravated by the understandable tendency of counsel to err on the side of caution by designating any possibly sensitive documents as confidential under the order. The time saved by excessive designations, however, may be more than offset by the difficulties of later opposing some request for access or disclosure. Although the judge, in the interest of reducing the time and expense of the discovery process, should be somewhat tolerant of this practice, counsel should not mark documents as protected under the order without a good-faith belief that they are entitled to protection. Counsel should also be cautioned against objecting to document requests without first ascertaining that the requested documents exist. The designation of a document as confidential should be viewed as equivalent to a motion for a protective order and subject to the sanctions of Federal Rule of Civil Procedure 37(a)(4), as provided by Rule 26(c).

Applications for umbrella orders, usually presented to the court by stipulation of the parties, should specify the following matters:[135]

- the categories of information subject to the order;
- the procedure for determining which particular documents are within protected categories;[136]
- the procedure for designating and identifying material subject to the confidentiality order;[137]
- the persons who may have access to protected materials;
- the litigation support providers' access to protected materials (support providers include consulting experts, document indexers, and technicians who prepare courtroom exhibits and demonstrative aids);
- the extent to which protected materials may be used in related litigation;[138]
- the procedures for maintaining security; for example, information may be sealed or exempted from filing with the court under Federal Rule of Civil Procedure 5(d) or 26(a)(4), and copying or computerization of particularly sensitive documents may be prohibited or tightly controlled;[139]
- the procedures for challenging particular claims of confidentiality—a common procedure is for the producing party to mark all assertedly protected material "confidential"; the opposing party then has a specified period, usually about two weeks, within which to contest the designation;[140]

---

135.  *See* sample orders *infra* section 40.27.

136.  Umbrella orders do not eliminate the burden on the person seeking protection of justifying the relief sought as to every item, but simply facilitate rulings on disputed claims of confidentiality. *See* Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1122 (3d Cir. 1986).

137.  Items produced under a claim of confidentiality should be identified with some special marking at the time of production to ensure that all persons know exactly what materials have been designated as confidential throughout the litigation. Specific portions of deposition transcripts may be marked as confidential through a written designation procedure; see sample order *infra* section 40.27, ¶ (g). If numerous documents are involved, a log may be maintained describing the documents and identifying the persons having access to them.

138.  Restrictions on use in other litigation may not provide complete protection. *See, e.g., In re* Dual-Deck Video Cassette Recorder Antitrust Litig., 10 F.3d 693 (9th Cir. 1993) (reversing contempt order where party used confidential information but did not reveal trade secrets).

139.  *See* sample order *infra* section 40.27.

140.  *See* Poliquin v. Garden Way, Inc., 989 F.2d 527, 529 (1st Cir. 1993). The burden remains on the party seeking protection; the opposing party need not offer affidavits to support a challenge. *See id.* at 531.

- the exceptions, if any, to the general prohibitions on disclosure; for example, the order may allow otherwise protected information to be shown to a witness at or in preparation for a deposition; the order usually provides that if a party desires to make a disclosure not clearly permitted, advance notice will be given to the other parties and the dispute, if not resolved by agreement, may be presented to the court for a ruling before disclosure;
- the termination of the order after the litigation or at another time;
- the return or destruction of materials received; and
- the court's authority to modify the order, both during and after conclusion of the litigation.

*Particularized protective orders.* A person from whom discovery is sought may move under Rule 26(c) for a protective order limiting disclosure or providing for the confidentiality of information produced. As with other discovery motions, the movant must first make a good-faith attempt to resolve the dispute without court action;[141] the parties should address the subject of protective orders in their proposed discovery plan.[142] Rule 26(c) allows the court to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The court should enter a protective order only when the movant makes a particularized showing of "good cause," by affidavit or testimony of a witness with personal knowledge, of the specific harm that would result from disclosure or loss of confidentiality—generalities and unsupported contentions do not suffice.[143] When directed solely at discovery materials, protective orders are not subject to the high level of scrutiny required by the Constitution to justify prior restraints; rather, courts have broad discretion at the discovery stage to decide when a protective order is appropriate and what degree of protection is required.[144]

In fashioning the order, it is important to balance the movants' legitimate concerns about confidentiality against the legitimate needs of the litigation, individual privacy, or the commercial value of information.[145] Protecting only material for which a clear and significant need for confidentiality has been

---

141. Fed. R. Civ. P. 26(c).

142. Fed. R. Civ. P. 26(f)(4).

143. *See* Cipollone v. Liggett Group Inc., 785 F.2d 1108, 1121 (3d Cir. 1986), and cases cited therein; *see also* Smith v. BIC Corp., 869 F.2d 194 (3d Cir. 1989).

144. Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36–37 (1984).

145. *See* Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv. L. Rev. 428, 476 (1991).

shown[146] will reduce the burdensomeness of the order and render it less vulnerable to later challenge.

*Modification and release.* A protective order is always subject to modification or termination for good cause.[147] Even where the parties have consented to entry of a protective order, they may later seek its modification to allow dissemination of information received. Nonparties, including the media, government investigators, public interest groups, and parties in other litigation, may seek modification to allow access to protected information. In assessing such requests, courts balance the potential harm to the party seeking protection against the requesting party's need for the information and the public interest served by its release. Also relevant may be the disclosing party's degree of reliance on the protective order when disclosure was made. If a party freely disclosed information without contest based on the premise that it would remain confidential, subsequent dissemination may be unfair and may, in the long run, reduce other litigants' confidence in protective orders, rendering them less useful as a tool for preventing discovery abuse and encouraging more strenuous objections to discovery requests.[148] Courts of appeals apply different standards in balancing the continuing need for protection against the gains in efficiency and judicial economy that may result from release.[149] If the latter factors support release of otherwise confidential material, the court might consider redacting the material, allowing access only to that information necessary to serve the purpose for which release was granted. In addition, it is helpful to define the terms of the release, including precisely who may have access to the information and for what purpose.

A common basis for nonparty requests for release is the need for the information in related litigation. Conversely, the parties may seek discovery of information subject to a protective order in other litigation. Generally, the

---

146. *See* Poliquin v. Garden Way, Inc., 989 F.2d 527, 532 (1st Cir. 1993) (citing Francis H. Hare Jr. et al., Confidentiality Orders § 4.10 (1988)).

147. *See* Public Citizen v. Liggett Group, Inc., 858 F.2d 775, 782–83 (1st Cir. 1988), and cases cited therein; *see also In re* "Agent Orange" Prod. Liab. Litig., 821 F.2d 139, 145 (2d Cir. 1987). Even without modification, a protective order may fail to prevent disclosure of information as required by law. *See, e.g.,* 15 U.S.C. § 1312(c)(2) (2000) (requiring access to discovery materials pursuant to a civil investigative demand despite protective order).

148. *See* Miller, *supra* note 145, at 499–500; *cf.* Pansy v. Borough of Stroudsberg, 23 F.3d 772, 778 (3d Cir. 1994); Meyer Goldberg, Inc. v. Fisher Foods, Inc., 823 F.2d 159, 163 (6th Cir. 1987); Palmieri v. New York, 779 F.2d 861, 863 (2d Cir. 1985).

149. *See* SEC v. TheStreet.com, 273 F.3d 222, 231 (2d Cir. 2001); United Nuclear Corp. v. Cranford Ins. Co., 905 F.2d 1424, 1428 (10th Cir. 1990) (citing cases). If the party seeking information would be entitled to obtain it in the other litigation, there is little need to require redundant discovery proceedings. *See id.* (citing Wilk v. Am. Med. Ass'n, 635 F.2d 1295, 1299 (7th Cir. 1980)).

party seeking discovery should first establish its right to discovery in the court in which it will be used. If that court permits discovery, it should normally determine the effect this will have given the earlier protective order issued by the other court. Section 11.423 discusses the use of documents from other litigation. Even where the protective order contains a provision prohibiting such use, the court that entered the order is permitted to require such disclosure, subject to appropriate restrictions on further use and disclosure.[150] In making this determination, the court should balance the continuing need for protection against the efficiency and judicial economy that may result from release. The court should consider the following questions:

- Was the disclosing party under an unqualified obligation to produce the material sought?
- Will the material be discoverable in subsequent litigation involving other parties?
- Does the other litigation appear to have merit?
- Would granting release save significant time and expense?
- Can the material be released in redacted form so as to aid legitimate discovery while minimizing the loss of confidentiality?
- Will modification of the protective order disrupt settlement of the case in which it was entered?
- Did the person providing discovery do so in reliance on the protective order?
- Would informal communication between the two judges be productive in arriving at an accommodation that gives appropriate consideration to the interests of all involved?

Even if designated as confidential under a protective order, discovery materials will lose confidential status (absent a showing of "most compelling" reasons) if introduced at trial or filed in connection with a motion for summary judgment.[151] Confidential materials filed solely in connection with pre-

---

150. *See United Nuclear Corp.,* 905 F.2d at 1427–28; *Wilk,* 635 F.2d at 1299–1301 (protective orders should ordinarily be modified on request from other litigants, subject to appropriate conditions as to further use and cost); Am. Tel. & Tel. Co. v. Grady, 594 F.2d 594, 597 (7th Cir. 1978) (confidentiality order modified to permit nonparty U.S. government to obtain discovery); *but see Palmieri,* 779 F.2d at 865–66 (denying modification to allow state to gain access to settlement agreement).

151. *See, e.g.,* Poliquin v. Garden Way, Inc., 989 F.2d 527, 532–33 (1st Cir. 1993); Littlejohn v. BIC Corp., 851 F.2d 673, 677–78, 684 (3d Cir. 1988); FTC v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 410 (1st Cir. 1987); Meyer Goldberg, Inc. v. Fisher Foods, Inc., 823 F.2d 159, 163 (6th Cir. 1987); *In re* Knoxville News-Sentinel Co., 723 F.2d 470, 476 (6th Cir. 1983); Joy v. North,

trial discovery, however, remain protected as long as the "good cause" requirement of Rule 26(c) is satisfied.[152] The general rule announced by the Supreme Court is that a public right of access to material produced in connection with a particular pretrial or trial proceeding arises when (1) the proceeding has historically been open and (2) public access plays a significant role in the proper functioning of the process.[153] To ensure continued protection, counsel sometimes stipulate to material nonconfidential facts to avoid the need to introduce confidential material into evidence. Counsel may also move to have confidential material excluded from evidence as prejudicial and of low probative value under Federal Rule of Evidence 403.[154]

The administration of protective orders does not necessarily end with the disposition of the case. While it is common for protective orders to include provisions for posttrial protection, an order remains subject to modification after judgment or settlement, even if it was entered by consent of the parties.[155]

## 11.433 Allocation of Costs

The cost of seeking and responding to discovery is a part of the cost of litigation that each party normally must bear, subject only to specific provisions for cost-shifting contained in statutes or rules. But Federal Rule of Civil Procedure 26(b)(2) directs the judge to take into account the cost of particular discovery in exercising the authority to control discovery. Among other things to consider are whether the information sought "is obtainable from some other source that is more convenient, less burdensome, or less expensive," and whether to limit discovery if, in the circumstances of the case, the discovery's "expense . . . outweighs its likely benefits." Protective orders are a means of implementing the proportionality principle underlying the discovery rules. Rule 26(c) permits the court to issue orders "to protect a party or person from . . . undue burden or expense," including an order "that the discovery . . . may be had only on specified terms or conditions . . . [or] only by a method of discovery other than that selected by the party seeking discovery."

---

692 F.2d 880, 893 (2d Cir. 1982). *See also* Leucadia, Inc. v. Applied Extrusion Techs., Inc., 998 F.2d 157, 161–65 (3d Cir. 1993) (protection lost if material filed with any nondiscovery motion).

152. *See* Seattle Times Co. v. Rhinehart, 467 U.S. 20, 37 (1984); *Leucadia,* 998 F.2d at 161–65; Anderson v. Cryovac, Inc., 805 F.2d 1, 5–7, 10–13 (1st Cir. 1986).

153. Press-Enter. Co. v. Superior Court, 478 U.S. 1, 8 (1986); Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 605–06 (1982).

154. *See Poliquin*, 989 F.2d at 535.

155. *See id.*; United Nuclear Corp. v. Cranford Ins. Co., 905 F.2d 1424, 1427 (10th Cir. 1990); Public Citizen v. Liggett Group, Inc., 858 F.2d 775, 781–82 (1st Cir. 1988); *Meyer Goldberg,* 823 F.2d at 161–62.

Taken together, these provisions confer broad authority to control the cost of discovery by imposing limits and conditions. The judge can implement the cost–benefit rationale of the rule by conditioning particular discovery on payment of its costs by the party seeking it. Short of barring a party from conducting certain costly or marginally necessary discovery, the judge can require the party to pay all or part of the cost as a condition to permitting it to proceed. Similarly, where a party insists on certain discovery to elicit information that may be available through less expensive methods, that discovery may be conditioned on the payment of the costs incurred by other parties. Such a cost-shifting order may require payment at the time or may simply designate certain costs as taxable costs to be awarded after final judgment.[156]

Reference to the court's authority to shift costs will give the parties an incentive to use cost-effective means of obtaining information and a disincentive to engage in wasteful and costly discovery activity. For example, where production is to be made of data maintained on computers, and the producing party is able to search for and produce the data more efficiently and economically than the discovering party, they may agree to use the former's capabilities subject to appropriate reimbursement for costs. Where it is less expensive for a witness to travel to a deposition site than for several attorneys to travel to the witness's residence, the party seeking discovery may agree to pay the witness's travel expenses.

Cost allocation may also be an appropriate means to limit unduly burdensome or expensive discovery. Rule 26's purpose is not to equalize the burdens on the parties, but Rule 26(b)(2)(iii) expressly requires the court to take the parties' resources into account in balancing the burden or expense of particular discovery against its benefit. Thus, where the parties' resources are grossly disproportionate, the judge can condition discovery that would be unduly burdensome on one of them upon a fair allocation of costs.

Considerations of cost allocation are not based on relative resources alone. Rule 26(b)(2)(iii) allows the court to allocate costs based on considerations of benefits, burdens, and overall case efficiency. Courts have articulated as many as eight factors relevant to cost allocation:

- the specificity of the discovery requests;
- the likelihood of discovering critical information;
- the availability of such information from other sources;
- the purposes for which the responding party maintains the requested data;
- the relative benefit to the parties of obtaining the information;

---

156. *See* 28 U.S.C. § 1920 (West 2002); Fed. R. Civ. P. 54(d).

- the total cost associated with the production;
- the relative ability of each party to control costs and its incentive to do so; and
- the resources available to each party.[157]

## 11.44  Documents

.441 Identification System  71
.442 Preservation  72
.443 Rule 34 Requests/Procedures for Responding  74
.444 Document Depositories  75
.445 Evidentiary Foundation for Documents  77
.446 Discovery of Computerized Data  77
.447 Discovery from Nonparties  82

Complex litigation usually involves the production and handling of voluminous documents. Efficient management during discovery and trial requires planning and attention to the documentary phase of the litigation by the attorneys and the judge from the outset.

## 11.441  Identification System

Document production under the rules may occur in a variety of ways. Production may be voluntary and informal. It may occur under Federal Rule of Civil Procedure 34 (see section 11.443) or under Rule 33(d) by making documents available for inspection.[158] Alternatively, deponents may be required to produce documents by a subpoena *duces tecum*,[159] and nonparties may be commanded to produce documents by a subpoena issued under Rule 45.[160] Before any documents are produced or used in depositions, the judge should direct counsel to establish a single system for identifying all documents

---

157. Rowe Entm't, Inc. v. William Morris Agencies, Inc., 205 F.R.D. 421, 429 (S.D.N.Y. 2002) (discussing factors to consider in shifting discovery costs), *appeal denied*, No. 98 CIV. 8272, 2002 WL 975713 (S.D.N.Y. May 9, 2002); *see also* Murphy Oil U.S.A., Inc. v. Fluor Daniel, Inc., 52 Fed. R. Serv. 3d (Callaghan) 168 (E.D. La. 2002). *Cf.* Zubulake v. UBS Warburg LLC, 2003 U.S. Dist. LEXIS 7939 (S.D.N.Y. May 13, 2002) (questioning the eight factors considered in *Rowe* and proposing seven weighted factors).

158. Under Rule 33(d) the party may "specify the records from which the answer may be derived or ascertained . . . in sufficient detail to permit the interrogating party to locate and identify, as readily as can the party served, the records from which the answer may be ascertained." If the information sought exists in the form of compilations, abstracts, or summaries, these should be made available to the interrogating party. Fed. R. Civ. P. 33 committee note.

159. *See* Fed. R. Civ. P. 30(b)(1).

160. Fed. R. Civ. P. 34(c).

produced (by any procedure) or used in the litigation. To reduce the risk of confusion, each document should be assigned a single identifying designation for use by all parties for all purposes throughout the case, including depositions and trial.

Counsel should be informed that consecutive numbering is usually the most practicable; blocks of numbers are assigned to each party in advance to make the source of each document immediately apparent. Every page of every document is Bates-stamped consecutively. The document's number may be later used to designate it; if the document is identified differently in the course of a deposition or on an exhibit list, the stamped number should be included as a cross-reference. If other means of designation are used, no designation should be assigned to more than one document, and the same document should not receive more than one designation unless counsel have reason to refer to different copies of the same document. In multitrack depositions, a block of numbers should be assigned to each deposition in advance. To avoid later disputes, a log should record each document produced and should indicate by, to whom, and on what date production was made. A record of the documents produced by a party and copied by an opposing party may also be useful.

The court can also order an identification system for computerized data that complements or integrates into the system adopted for paper documents. At a minimum, computer tapes, disks, or files containing numerous E-mail messages or word-processed documents should be broken down into their component documents for identification. However, databases containing millions of data elements, none of which are meaningful alone, can be difficult or impossible to break down and organize in a way directly analogous to conventional document collections. Special consideration should be given to their identification and handling.

Courts have traditionally given new designations to documents marked as exhibits for trial, often by assigning sequential numbers to one side and sequential letters to the other. Duplicate designations of documents, however, can be confusing; exhibits can readily be marked for trial by their discovery designations. If desired, a supplemental designation can be used to identify the offering party.

## 11.442 Preservation

Before discovery starts, and perhaps before the initial conference, the court should consider whether to enter an order requiring the parties to preserve and retain documents, files, data, and records that may be relevant to the litiga-

tion.[161] Because such an order may interfere with the normal operations of the parties and impose unforeseen burdens, it is advisable to discuss with counsel at the first opportunity the need for a preservation order and, if one is needed, the scope, duration, method of data preservation, and other terms that will best preserve relevant matter without imposing undue burdens.

A blanket preservation order may be prohibitively expensive and unduly burdensome for parties dependent on computer systems for their day-to-day operations. In addition, a preservation order will likely be ineffective if it is formulated without reliable information from the responding party regarding what data-management systems are already in place, the volume of data affected, and the costs and technical feasibility of implementation. The following are among the points to consider in formulating an effective data-preservation order:

- Continued operation of computers and computer networks in the routine course of business may alter or destroy existing data, but a data preservation order prohibiting operation of the computers absolutely would effectively shut down the responding party's business operations. Such an order requires the parties to define the scope of contemplated discovery as narrowly as possible, identify the particular computers or network servers affected, and agree on a method for data preservation, such as creating an image of the hard drive or duplicating particular data on removable media, thereby minimizing cost and intrusiveness and the downtime of the computers involved.

- Routine system backups for disaster recovery purposes may incidentally preserve data subject to discovery, but recovery of relevant data from nonarchival backups is costly and inefficient, and a data-preservation order that requires the accumulation of such backups beyond their usual short retention period may needlessly increase the scope and cost of discovery. An order for the preservation of backup data obliges the parties to define the scope of contemplated discovery narrowly to minimize the number of backups that need to be retained and eventually restored for discovery purposes.

---

161. *See infra* section 40.25 (order for preservation of records). For examples from recent complex multidistrict litigation, see *In re Propulsid Prods. Liab. Litig.*, MDL No. 1355 (E.D. La. Apr. 19, 2001) (Pretrial Order No. 10: Production and Preservation of Defendants' Electronic Data), at http://propulsid.laed.uscourts.gov/Orders/order10.pdf (last visited Nov. 10, 2003). *See also In re* Bridgestone/Firestone, Inc. ATX, ATX II & Wilderness Tires Prods. Liab. Litig., MDL No. 1373 (S.D. Ind. Mar. 15, 2001) (Order Regarding Ford's Preservation of Electronic Data), *at* http://www.insd.uscourts.gov/Firestone/bf_docs/93730738.pdf (last visited Nov. 10, 2003).

- A preservation order may be difficult to implement perfectly and may cause hardship when the records are stored in data-processing systems that automatically control the period of retention. Revision of existing computer programs to provide for longer retention, even if possible, may be prohibitively expensive. Consider alternatives, such as having parties duplicate relevant data on removable media or retaining periodic backups.

Any preservation order should ordinarily permit destruction after reasonable notice to opposing counsel; if opposing counsel objects, the party seeking destruction should be required to show good cause before destruction is permitted. The order may also exclude specified categories of documents or data whose cost of preservation outweighs substantially their relevance in the litigation, particularly if copies of the documents or data are filed in a document depository (see section 11.444) or if there are alternative sources for the information. The court can defer destruction if relevance cannot be fairly evaluated until the litigation progresses. As issues in the case are narrowed, the court may reduce the scope of the order. The same considerations apply to the alteration or destruction of physical evidence.

## 11.443 Rule 34 Requests/Procedures for Responding

In litigation with voluminous documents, requests for production and the required responses can become mired in confusion. The discovery plan should anticipate the possibility of overlooked requests, costly responses, obscured failures to respond, and uncertainty about the specifics of requests and production.

The discovery plan should call for strict observance of Rule 34's requirements that requests to produce documents for inspection and copying specify the items sought individually or by category and describe each with "reasonable particularity."[162] Each request must specify a reasonable time, place, and manner for inspection and copying.[163] A party served with a request must respond in writing within thirty days, stating for each item or category either that inspection and copying will be permitted as requested or that the party objects to the request; in the latter case, the reasons for the objection must be stated. If the responding party objects to only part of an item or category, it must permit inspection of the remaining parts. Documents must be produced for inspection "as they are kept in the usual course of business" or organized and labeled "to correspond with the categories in the request." In many cases, the volume

---

162. Fed. R. Civ. P. 34(b).
163. *Id.*

of computer data produced will far exceed the volume of paper documentation, and conventional procedures for "inspection and copying" are not applicable. Section 11.446 describes practices for the production of computer data in complex litigation.

The discovery plan should establish a schedule for submitting requests and responses and for subsequent supplementation of responses under Rule 26(e). In developing the plan, the court should consider counsel's proposals for document discovery and imposing limits based on Rule 26(b)(2). The court may initially limit production to the most relevant files or may require a preliminary exchange of lists identifying files and documents from which the requesting party may then make selections. The court may also require, even if lead counsel or committees of counsel have not been appointed, that similarly situated parties confer and present joint Rule 34 requests and conduct their examinations at the same time and place. Parties can also be required to share extensive copies to save money.

In overseeing document production, the court should

- ensure that the burdens are fairly allocated between the parties;
- prevent indiscriminate, overly broad, or unduly burdensome demands—in general, forbid sweeping requests, such as those for "all documents relating or referring to" an issue, party, or claim, and direct counsel to frame requests for production of the fewest documents possible (this may be facilitated by prediscovery conferences or discovery devices to identify relevant files before the request is made);
- prevent the parties from filing overwhelming or confusing responses; and
- guard against the parties tampering with files and other abusive practices.

## 11.444 Document Depositories

Central document depositories can promote efficient and economical management of voluminous documents in multiparty litigation.[164] Requiring the production of all discovery materials in common, computer-readable formats and insisting that these materials be made available on centrally generated computer-readable media (such as CD-ROM or DVD) or through a secure Internet Web site or a dial-in computer network may reduce substantially the expense and burden of document production and inspection. A depository

---

164. *See In re* Bridgestone/Firestone, Inc., 129 F. Supp. 2d 1207, 1213 (S.D. Ind. 2001) (Case Management Order dated Jan. 30, 2001).

also facilitates determination of which documents have been produced and what information is in them, minimizing the risk of later disputes.

On the other hand, the cost of establishing and maintaining either a paper or computerized central document depository may be substantial; before ordering or approving one, the court must be sure that the cost is justified by the anticipated savings and other benefits. In consultation with counsel, the court should allocate costs fairly among the parties, considering their resources, the extent of their use of the depository, and the benefit derived from it. The cost of establishing and maintaining a central document depository is not a "taxable cost" under 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54(d).[165] One way of allocating costs is to charge parties for each use of the depository. The charge should be set no higher than what is necessary to cover costs; a depository should not be a profit-making enterprise. The judge may consider special arrangements for less affluent or less technologically sophisticated parties to ensure fair access.

It may be necessary to appoint an administrator to operate the depository, with the cost allocated among the parties.[166] If document depositories have been established in related cases in other courts, counsel may be able to arrange for the depositories' joint use, sharing the expense; likewise, the judge should consider the requests of litigants in other cases, wherever pending, to use a depository established in the case before the court. Where significant costs are involved, periodic assessments to fund operations might be necessary, usually beginning with the order establishing the depository.

To create and operate a depository, counsel and the judge should collaborate in establishing procedures for acquiring, formatting, numbering, indexing, and maintaining discovery materials, and they should establish rules governing when and by whom documents may be accessed for examination or copying. If a party objects to placing documents in a central depository or to making them available on-line, the judge can issue an order under Rule 26(c)(2) directing production at the depository (or the place designated by the requesting parties) or permit the producing party at its expense to furnish copies to all parties.

---

165. *In re* Two Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig., 994 F.2d 956, 964 (1st Cir. 1993). Counsel should also be aware that expenses incurred during discovery, which would ordinarily be taxable costs, may not be recoverable if the party could have avoided them by using the depository. *See In re* San Juan Dupont Plaza Hotel Fire Litig., 142 F.R.D. 41, 46–47 (D.P.R. 1992).

166. For a list of possible duties for the administrator, see the amended case-management order in *In re San Juan Dupont Plaza Hotel Fire Litig.*, MDL No. 721, 1989 WL 168401, at *21 (D.P.R. Dec. 2, 1988).

Counsel and the judge must agree on a computer service provider to administer the depository, although technologies such as CD-ROM and the Internet reduce the need for physical storage facilities, inspection, and copying. Most discovery material can be produced by the parties to the depository in computer-readable form. For the remaining paper documents, the court may direct that some or all be "imaged" or scanned and made available either on disks or on-line (special provision for the retention of originals, if they carry independent legal significance, may be necessary).[167]

## 11.445 Evidentiary Foundation for Documents

The production of documents, either in the traditional manner or in a document depository, will not necessarily provide the foundation for admission of those documents into evidence at trial or for use in a motion for summary judgment. In managing documents, the court should therefore also take into account the need for effective and efficient procedures to establish the foundation for admission, which can be accomplished by stipulation, requests for admission, interrogatories, or depositions (particularly Rule 31 depositions on written questions).[168] While admissions are only binding on the party making them, authenticity (as opposed to admissibility) may be established by the testimony of any person having personal knowledge that the proffered item is what the proponent claims it to be.[169] This is particularly true when discovery involves computerized data (see section 11.446) that must be retrieved from computer systems or storage media, imaged, converted to a common format, or handled by a third-party expert or court-appointed neutral in the process of production. The judge should advise parties to agree on handling because admissibility will depend on the efficacy of these procedures.

## 11.446 Discovery of Computerized Data

Computerized data have become commonplace in litigation. The sheer volume of such data, when compared with conventional paper documentation, can be staggering. A floppy disk, with 1.44 megabytes, is the equivalent of 720 typewritten pages of plain text. A CD-ROM, with 650 megabytes, can hold up to 325,000 typewritten pages. One gigabyte is the equivalent of 500,000 typewritten pages. Large corporate computer networks create backup data meas-

---

167. For more on this technology, see *Effective Use of Courtroom Technology, supra* note 85 at 97–98.

168. *See* Fed. R. Civ. P. 36.

169. *See In re* Japanese Elec. Prods. Antitrust Litig., 723 F.2d 238, 285 (3d Cir. 1983), *rev'd on other grounds sub. nom.* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

ured in terabytes, or 1,000,000 megabytes; each terabyte represents the equivalent of 500 billion typewritten pages of plain text.

Digital or electronic information can be stored in any of the following: mainframe computers, network servers, personal computers, hand-held devices, automobiles, or household appliances; or it can be accessible via the Internet, from private networks, or from third parties. Any discovery plan must address issues relating to such information, including the search for it and its location, retrieval, form of production, inspection, preservation, and use at trial.

For the most part, such data will reflect information generated and maintained in the ordinary course of business. As such, discovery of relevant and nonprivileged data is routine and within the commonly understood scope of Rules 26 and 34. Other data are generated and stored as a byproduct of the various information technologies commonly employed by parties in the ordinary course of business, but not routinely retrieved and used for business purposes. Such data include the following:

- *Metadata, or "information about information."* This includes the information embedded in a routine computer file reflecting the file creation date, when it was last accessed or edited, by whom, and sometimes previous versions or editorial changes. This information is not apparent on a screen or in a normal printout of the file, and it is often generated and maintained without the knowledge of the file user.

- *System data, or information generated and maintained by the computer itself.* The computer records a variety of routine transactions and functions, including password access requests, the creation or deletion of files and directories, maintenance functions, and access to and from other computers, printers, or communication devices.

- *Backup data, generally stored off-line on tapes or disks.* Backup data are created and maintained for short-term disaster recovery, not for retrieving particular files, databases, or programs. These tapes or disks must be restored to the system from which they were recorded, or to a similar hardware and software environment, before any data can be accessed.

- *Files purposely deleted by a computer user.* Deleted files are seldom actually deleted from the computer hard drive. The operating system renames and marks them for eventual overwriting, should that particular space on the computer hard drive be needed. The files are recoverable only with expert intervention.

- *Residual data that exist in bits and pieces throughout a computer hard drive.* Analogous to the data on crumpled newspapers used to pack

shipping boxes, these data are also recoverable with expert intervention.

Each of these categories of computer data may contain information within the scope of discovery. The above categories are listed by order of potential relevance and in ascending order of cost and burden to recover and produce. The judge should encourage the parties to discuss the scope of proposed computer-based discovery early in the case, particularly any discovery of data beyond that available to the responding parties in the ordinary course of business. The requesting parties should identify the information they require as narrowly and precisely as possible, and the responding parties should be forthcoming and explicit in identifying what data are available from what sources, to allow formulation of a realistic computer-based discovery plan. Rule 26(b)(2)(iii) allows the court to limit or modify the extent of otherwise allowable discovery if the burdens outweigh the likely benefit—the rule should be used to discourage costly, speculative, duplicative, or unduly burdensome discovery of computer data and systems. Additionally, some computerized data may have been compiled in anticipation of or for use in the litigation and may therefore be entitled to protection as trial preparation materials.

There are several reasons to encourage parties to produce and exchange data in electronic form:

- discovery requests may themselves be transmitted in computer-accessible form—interrogatories served on computer disks, for example, could then be answered using the same disk, avoiding the need to retype them;
- production of computer data on disks, CD-ROMs, or by file transfers significantly reduces the costs of copying, transport, storage, and management—protocols may be established by the parties to facilitate the handling of documents from initial production to use in depositions and pretrial procedures to presentation at trial;
- computerized data are far more easily searched, located, and organized than paper data; and
- computerized data may form the contents for a common document depository (see section 11.444).

The goal is to maximize these potential advantages while minimizing the potential problems of incompatibility among various computer systems, programs, and data, and minimizing problems with intrusiveness, data integrity, and information overload.

Below are some of the relevant issues to be considered in reaching an optimal balance.

*Form of production.* Rule 34 provides for the production, inspection, and copying of computerized data, i.e., "data compilations from which informa-

tion can be obtained, translated, if necessary, by the respondent through de-tection devices into reasonably usable form." Rule 33(d) permits parties to answer interrogatories by making business records available for inspection and copying, including "compilations," where "the burden of deriving or ascer-taining the answer is substantially the same for the party serving the inter-rogatory as for the party served."

Conventional "warehouse" productions of paper documents often were costly and time-consuming, but the burdens and expense were kept in check by the time and resources available to the requesting parties to review and photocopy the documents. In a computerized environment, the relative bur-dens and expense shift dramatically to the responding party. The cost of searching and copying electronic data is insignificant. Meanwhile, the tremen-dously increased volume of computer data and a lack of fully developed elec-tronic records-management procedures have driven up the cost of locating, organizing, and screening data for relevance and privilege prior to production. Allowing requesting parties access to the responding parties' computer systems to conduct their own searches, which is in one sense analogous to the conven-tional warehouse paper production, would compromise legally recognized privileges, trade secrets, and often the personal privacy of employees and cus-tomers.

Evolving procedures use document-management technologies to minimize cost and exposure and, with time, parties and technology will likely continue to become more and more sophisticated. The judge should encourage the par-ties to discuss the issues of production forms early in litigation, preferably prior to any production, to avoid the waste and duplication of producing the same data in different formats. The relatively inexpensive production of com-puter-readable images may suffice for the vast majority of requested data. Dy-namic data may need to be produced in native format, or in a modified format in which the integrity of the data can be maintained while the data can be ma-nipulated for analysis. If raw data are produced, appropriate applications, file structures, manuals, and other tools necessary for the proper translation and use of the data must be provided. Files (such as E-mail) for which metadata is essential to the understanding of the primary data should be identified and produced in an appropriate format. There may even be rare instances in which paper printouts (hard copy) are appropriate. No one form of production will be appropriate for all types of data in all cases.[170]

The court should consider how to minimize and allocate the costs of pro-duction. Narrowing the overall scope of electronic discovery is the most effec-

---

170. *See* Effective Use of Courtroom Technology, *supra* note 85, at 61–97; *see also supra* section 11.421.

tive method of reducing costs. Early agreement between the parties regarding the forms of production will help eliminate waste and duplication. More expensive forms of production, such as production of word-processing files with all associated metadata or production of data in a specified nonstandard format, should be conditioned upon a showing of need or sharing of expenses.[171]

*Search and retrieval.* Computer-stored data and other information responsive to a production request will not necessarily be in an appropriately labeled file. Broad database searches may be necessary, requiring safeguards against exposing confidential or irrelevant data to the opponent's scrutiny. A responding party's screening of vast quantities of unorganized computer data for privilege prior to production can be particularly onerous in those jurisdictions in which inadvertent production of privileged data may constitute a waiver of privilege as to a particular item of information, items related to the relevant issue, or the entire data collection. Fear of the consequences of inadvertent waiver may add cost and delay to the discovery process for all parties. Thus, judges often encourage counsel to stipulate at the outset of discovery to a "nonwaiver" agreement, which they can adopt as a case-management order. Such agreements protect responding parties from the most dire consequences of inadvertent waiver by allowing them to "take back" inadvertently produced privileged materials if discovered within a reasonable period, perhaps thirty days from production.

Some data may be maintained in compilations that are themselves entitled to trade-secret protection or that reflect attorney work product (e.g., data compiled for studies and tabulations) for use at trial or as a basis for expert opinions. Generally, claims of trade-secret or work-product privilege for computer data should be treated the same as similar claims for conventional data. The difference is that discovery respondents may be able to produce computer-data compilations containing confidential or privileged data, structures, or relationships in such a fashion as to suppress or eliminate the confidential or privileged data. For example, a computerized litigation support database containing the thoughts and impressions of counsel may be modified to reveal only "ordinary" attorney work product. Production of such ordinary work product would still be subject to the showings of substantial need and undue hardship under Rule 26(b)(3), as well as possible sharing of costs. If both parties plan to use litigation support databases to prepare their cases, encourage them to share the expense of preparing "ordinary" work product, such as document indexes, to which each party can add privileged data for their own

---

171. *See* Sattar v. Motorola, Inc., 138 F.3d 1164, 1171 (7th Cir. 1998) (affirming a trial court order that the parties bear half the cost of copying 210,000 pages of E-mails as a "reasonable resolution of [the] problem" and "far from an abuse of discretion").

trial preparation use. Such arrangements often facilitate the production of large databases of imaged documents and are necessary for the establishment of a document depository.

*Use at trial.* In general, the Federal Rules of Evidence apply to computerized data as they do to other types of evidence.[172] Computerized data, however, raise unique issues concerning accuracy and authenticity. Accuracy may be impaired by incomplete data entry, mistakes in output instructions, programming errors, damage and contamination of storage media, power outages, and equipment malfunctions. The integrity of data may also be compromised in the course of discovery by improper search and retrieval techniques, data conversion, or mishandling. The proponent of computerized evidence has the burden of laying a proper foundation by establishing its accuracy.

The judge should therefore consider the accuracy and reliability of computerized evidence, including any necessary discovery during pretrial proceedings, so that challenges to the evidence are not made for the first time at trial. When the data are voluminous, verification and correction of all items may not be feasible. In such cases, verification may be made of a sample of the data. Instead of correcting the errors detected in the sample—which might lead to the erroneous representation that the compilation is free from error—evidence may be offered (or stipulations made), by way of extrapolation from the sample, of the effect of the observed errors on the entire compilation. Alternatively, it may be feasible to use statistical methods to determine the probability and range of error.

*Computer experts.* The complexity and rapidly changing character of technology for the management of computerized materials may make it appropriate for the judge to seek the assistance of a special master or neutral expert, or call on the parties to provide the judge with expert assistance, in the form of briefings on the relevant technological issues.

## 11.447 Discovery from Nonparties

Under Federal Rule of Civil Procedure 34(c), a nonparty may be compelled to produce and allow copying of documents and other tangibles or submit to an inspection by service of a subpoena under Rule 45; the producing person need not be deposed or even appear personally.[173] A party seeking such production has a duty to take reasonable steps to avoid imposing undue bur-

---

172. *See* Gregory P. Joseph, *A Simplified Approach to Computer-Generated Evidence and Animations,* 43 N.Y.L. Sch. L. Rev. 875 (1999–2000).

173. Fed. R. Civ. P. 45(c)(2)(A). Despite the absence of a deposition, notice must be given to other parties. Fed. R. Civ. P. 45(b)(1).

den or expense on the person subpoenaed.[174] Objections to production must be made in writing by the subpoenaed person; the requesting party must then move for an order to compel production.[175] If granted, the order must protect the nonparty from significant expense resulting from the inspection or copying[176]—the order may also protect against disclosure of privileged, confidential, or otherwise protected material and undue burden.[177]

## 11.45  Depositions

.451 Limitations and Controls  83
.452 Cost-Saving Measures  85
.453 Deferred Supplemental Depositions  87
.454 Scheduling  88
.455 Coordination with Related Litigation  89
.456 Control of Abusive Conduct  89

Depositions are often overused and conducted inefficiently, and thus tend to be the most costly and time-consuming activity in complex litigation. The judge should manage the litigation so as to avoid unnecessary depositions, limit the number and length of those that are taken, and ensure that the process of taking depositions is as fair and efficient as possible.

### 11.451  Limitations and Controls

The court has broad authority to limit depositions. Federal Rules of Civil Procedure 30(a)(2)(A) and 31(a)(2)(A) impose a presumptive limit of ten depositions each for plaintiffs, defendants, and third-party defendants (local rules may also restrict the number of depositions). Rule 30(d)(2) presumptively limits a deposition to one 7-hour day. While the parties may stipulate around the presumptive limit (unless prohibited to do so by the court), the court always has final authority under Rule 26(b)(2) to limit the number and length of depositions. Limits on depositions may also be imposed indirectly by the setting of the trial date or a discovery cutoff date. In large-stake cases, such limits can be evaded by multitrack discovery (concurrent depositions) in the absence of a further order by the court. Despite their cost and the potential for unfairness, such multitrack depositions may be a practical necessity to expedite cases in which time is of the essence. See section 11.454.

---

174. Fed. R. Civ. P. 45(c)(1).
175. Fed. R. Civ. P. 45(c)(2)(B).
176. *Id.*
177. Fed. R. Civ. P. 45(c)(3).

In exercising its authority to limit depositions, the court should use the information provided by the parties about the need for the proposed depositions, the subject matter to be covered, and the available alternatives. The extent to which the judge considers each particular deposition, categories of depositions, or only the deposition program as a whole will depend on the circumstances of the litigation. The judge may, for example, condition the taking of certain depositions, such as those of putative class members, on prior court approval. The judge's involvement in the development of this phase of the discovery plan should be sufficient to establish meaningful control over the time and resources to be expended. Aside from setting appropriate limits, the judge should also be concerned with the time and place of the depositions, including proposed travel and the recording methods.[178]

To ensure that abusive practices do not frustrate the limits placed on depositions in the discovery plan, the judge should insist on observance of rules for the fair and efficient conduct of depositions. Rule 30(d)(1) requires that objections be stated "concisely and in a non-argumentative and non-suggestive manner"; local rules or standing orders may also establish guidelines for objections.[179] Under Rule 30(d)(1), counsel may instruct a deponent to not answer only for the purpose of enforcing a court-imposed limitation on evidence, or if preparing a motion under Rule 30(d)(3) to limit or terminate the examination for bad faith or harassment or to preserve a privilege (to the extent possible, disputed claims of privilege should be resolved in advance of the deposition). More stringent limitations may be imposed by local rule or by court order when necessary.[180] In addition, some judges issue guidelines covering the following matters:

- who may attend depositions;
- where the depositions are to be taken;
- who may question the witness;

---

178. Authority for judicial management of deposition discovery can be found in the federal rules. *E.g.*, Fed. R. Civ. P. 30(d) committee note (2000 amendment); Fed. R. Civ. P. 30(b), 30(d) committee notes (1993 amendment). For an example of comprehensive guidelines for deposition discovery not having the force of local rules or orders, but strongly encouraged by the court, see Civil Practice Fed. Court Comm., *Introduction to Civil Discovery Practice in the Southern District of Alabama* 11–16 (S.D. Ala. 1998), at http://www.als.uscourts.gov/district-court/forms/ discprat.pdf (last visited Jan. 7, 2004).

179. *See, e.g.*, D.S.C. Civ. R. 30.04; N.D. Ohio Civ. R. 30.1. For a discussion of attorney conduct in depositions and citations to a number of cases construing local rules and standing orders, see *Hall v. Clifton Precision*, 150 F.R.D. 525, 527 (E.D. Pa. 1993). *But see In re* Stratosphere Corp. Sec. Litig., 182 F.R.D. 614, 621 (D. Nev. 1998) (noting that deposition conduct orders should be narrowly drawn to avoid interfering with the deponent's right to counsel).

180. *See* Hall v. Clifton Precision, 150 F.R.D. 525 (E.D. Pa. 1993).

- how the parties are to allocate the costs; and
- how the attorneys are to conduct themselves.[181]

Rule 30(d)(3) expressly authorizes sanctions for "impediment, delay or other conduct that has frustrated the fair examination of the deponent."

Inefficient management of documents at a deposition can interfere with the deposition's proper conduct. The discovery plan should establish procedures for marking deposition exhibits, handling copies and originals, and exchanging in advance all papers about which the examining party intends to question the witness (except those to be used for genuine impeachment).[182]

## 11.452 Cost-Saving Measures

In addition to the general discovery practices discussed in section 11.42, there are numerous techniques used to streamline deposition discovery:

- *Informal interviews.* Informal interviews of potential witnesses may be arranged with the agreement of counsel. However, an attorney may not communicate with a represented party without the consent of that party's counsel. If the represented party is an organization, the prohibition extends to persons with managerial responsibility and any other person whose act or omission may be imputed to the organization or whose statement may constitute an admission on the part of the organization.[183] The prohibition does not extend to former corporate employees.[184] Informal interviews may be useful for persons who have only limited knowledge or involvement and who are unlikely to be called as witnesses at trial. The witness may be sworn and the interview recorded electronically for possible use later in the case; by agreement or court order, the interview may also be converted into a nonstenographic deposition.

- *Nonstenographic depositions.* The party taking a deposition may record it on audio or videotape instead of stenographically without having it transcribed. With prior notice to the deponent and other parties, any other party may make its own recording of the deposition.[185] Videotaped depositions offer a number of advantages: They help deter mis-

---

181.  *See* sample order *infra* section 40.22.

182.  *See, e.g., In re* San Juan Dupont Plaza Hotel Fire Litig., MDL No. 721, 1989 WL 168401, at *43–44 (D.P.R. Dec. 2, 1988) (five days' advance notice).

183.  Model Rules of Prof'l Conduct R. 4.2 & cmt. (2002).

184.  ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 91-359 (1991). The law of the circuit should be consulted for recent developments in this area of the law.

185.  Fed. R. Civ. P. 30(b)(3).

conduct by counsel at the deposition; they can preserve the testimony of witnesses who may be unavailable to testify at trial (such as experts with scheduling conflicts or persons suffering from an infirmity) and in dispersed litigation can avoid multiple live appearances by the same witness; they tend to hold a jury's attention better than reading a deposition transcript; they help the jury assess the witness's demeanor and credibility; and they are more effective in helping clients considering settlement to evaluate the quality of the opposition's case. Moreover, if the video recording is digital, it can be edited easily and exactly to eliminate objectionable and irrelevant material.

Measures to safeguard the accuracy of the recording may be necessary, such as having (1) the videotape operator, after being sworn, certify the correctness and completeness of the recording; (2) the deponent sworn on tape; (3) the recording device run continuously throughout the deposition; and (4) counsel agree to (or having the court order) standard technical procedures to avoid distortion. These procedures might cover such matters as the use of a zoom lens, lighting, background, and camera angle.[186] Both sides may record a deposition, each bearing its own expense.

- *Telephonic and videoconference depositions.* Telephonic or videoconferenced depositions can reduce travel costs. Federal Rule of Civil Procedure 30(b)(7) allows the court to order or the parties to stipulate to taking a deposition "by telephone or other remote electronic means." Supplemental examination by parties not present when a person was first deposed may be conducted effectively by telephone or videoconference. Through use of speaker phones, conference calls, or videoconference, distant witnesses may be examined by counsel from counsel's offices, with the court reporter located with the witness or, by stipulation, at one of the attorneys' offices (see section 11.494, extraterritorial discovery). A remote deposition may also be recorded nonstenographically. Remote depositions are most often used for relatively brief examinations that do not involve numerous documents, but may also be used to reduce travel costs or to avoid last-minute continuances or trial interruptions when deposition testimony becomes unexpectedly necessary. To ensure that deponents are not

---

186. *See* Michael J. Henke, *The Taking and Use of Videotaped Depositions*, 16 Am. J. Trial Advoc., 151, 158 (1992). Rule 30(b)(4) requires that "[t]he appearance or demeanor of deponents or attorneys shall not be distorted through camera or sound-recording techniques."

coached, ground rules should specify who may be present with the deponent during the examination.

- *Conference depositions.* In special situations, such as a Rule 30(b)(6) deposition of an organization, several persons may be deposed simultaneously (in person, by telephone, or by videoconference) in a conference setting.[187]

- *Representative depositions.* Where there are many potential nonparty witnesses, typically in the case of eyewitnesses, counsel may agree on a few representative depositions and stipulate that the testimony of other named witnesses would be the same.

- *Written questions.* In some circumstances, the rarely used procedures of Federal Rule of Civil Procedure 31 for depositions on written questions may be a cost-effective means of obtaining trial evidence. For example, Rule 31 deposition questions—unlike interrogatories—may be directed to nonparties and the answers used at trial to provide evidentiary foundation for documents. Rule 31 questions may also be useful in follow-up examinations by absent or later-added parties of persons whose depositions have been taken earlier.

- *Reduction in copies.* Costs can be controlled by (1) limiting the number of copies of deposition transcripts ordered, particularly if a document depository is established; (2) waiving filing of the original with the court; and (3) not having transcripts prepared of depositions that turn out to be of no value.

- *Limited attendance.* Limits may be set on the number of attorneys for each party or each side who may attend depositions, particularly in cases in which fees may be awarded or approved by the court.

## 11.453 Deferred Supplemental Depositions

In multiparty cases, the court should consider issuing an order relieving parties of the risks in not attending a deposition in which they have only a peripheral interest.[188] Such an order may direct that a copy of the deposition transcript be made available promptly to nonattending parties, who within a specified period thereafter may conduct supplemental examination of the deponent, either by appearing in person at a designated time and place for resumption of the deposition or by presenting questions in written form under Rule 31 or in a telephonic deposition under Rule 30(b)(7). A stipulation or

---

187. *See supra* section 11.423.
188. *See infra* section 40.29.

court order will be required to depose a person who already has been deposed in the case.[189] The order should specify whether the absent party has the right to require resumption of the adjourned deposition or—as is usually preferable—whether it must show cause why resumption is necessary. The order should also state whether the initial examination is admissible at trial if the deponent later becomes unavailable for supplemental examination.

These procedures can relieve parties, particularly those with limited financial resources, from the expense of attending depositions in which their interest is minimal or will likely be adequately protected by others in attendance. Such procedures should not be used as a tactical device to harass witnesses or to inconvenience other parties. Counsel for litigants with a substantial interest in a deposition should attend or be represented by other counsel.

The judge should provide for the use of depositions against persons who may become parties to the litigation by later amendment of the pleadings or the filing, removal, or transfer of related cases. The pretrial order may state that all previously taken depositions will be deemed binding on new parties unless, within a specified period after their appearance in the litigation, the new parties show cause to the contrary. Even in the absence of such an order, it is best for the court to limit the resumption of earlier depositions to questioning relevant to the new parties. Like other parties who have not attended a deposition, the new parties should have a specified period of time to conduct supplemental examination of the deponents, although the court may require a showing of some need for additional questioning. Permitting repetition of earlier examinations is rarely advisable.

## 11.454 Scheduling

Scheduling depositions involves sequencing them in relation to other discovery, fixing the order in which witnesses are to be deposed, and setting times and places that are feasible for all of the attorneys and witnesses. Absent stipulation or court order, depositions may not be taken before the Rule 26(f) discovery conference unless the notice is accompanied by "a certification, with supporting facts, that the person to be examined is expected to leave the country and be unavailable for examination in this country unless deposed before that time."[190]

Ordinarily, discovery by all parties proceeds concurrently. The rules do not give priority to any party or side. One purpose of a discovery plan is to establish an orderly procedure and to avoid indiscriminate noticing of depositions,

---

189.  Fed. R. Civ. P. 30(a)(2)(B).
190.  Fed. R. Civ. P. 30(a)(2)(C), 26(d).

which may result in inconvenience, harassment, and inefficiency. Depositions should be scheduled to accomplish the objectives of the discovery plan while minimizing travel and other expense, and reasonably accommodating parties, counsel, and witnesses. A plan might set specific dates for specific witnesses or set aside specified time periods during which designated parties are given either exclusive or preferential rights to schedule depositions, subject to exceptions for emergencies.

When depositions cannot be scheduled at times or places convenient to all counsel, attorneys should try to arrange for participation by others from their offices or counsel representing litigants with similar interests. Moreover, to meet discovery deadlines it may be necessary to conduct depositions on a multitrack basis, with depositions of several different witnesses being taken at the same time in one or more locations. Parties should be expected to work out these arrangements with little involvement by the court.

## 11.455 Coordination with Related Litigation

In related cases pending before the same judge, it is best to coordinate discovery plans to avoid conflicts and duplication. If the cases are pending before different judges, the judges should attempt to coordinate the depositions of common witnesses and other common discovery. Examination regarding subjects of interest only to a particular case may be deferred until the conclusion of direct and cross-examination on matters of common interest. Parties in related cases may also stipulate to the use of depositions taken in one particular case.

It may also be economical for the judges to afford parties in the present litigation access to depositions previously taken in other litigation (see section 11.423)—the judges can deem depositions of opposing parties and their employees admissible against parties involved in related litigation under Federal Rule of Evidence 801(d)(2). Depositions of other witnesses may be usable for impeachment under Federal Rule of Evidence 801(d)(1)(A). In other situations, such as those involving nonparties or a party's own witnesses, a new deposition may be necessary, but (with advance notice) the answers given at the earlier deposition may be adopted as the current testimony of the witness, subject to supplementation; telephonic nonstenographic depositions may be used for this purpose at little cost to either side.

See section 20 on coordination with related litigation.

## 11.456 Control of Abusive Conduct

To prevent frustration of the discovery plan, counsel must observe the rules for the fair and efficient conduct of depositions. See section 11.451. Those rules include Federal Rules of Civil Procedure 30(d)(1) and (4), local rules, and

the judge's standing orders. The court can inform counsel at the outset of the litigation, preferably by written guidelines, of the court's expectations with respect to the conduct of depositions, thereby reducing the likelihood of problematic conduct such as speaking and argumentative objections, instructions not to answer, coaching of witnesses (including restrictions during recesses in the deposition),[191] and evasive or obstructive conduct by witnesses (see sections 11.451, 40.29). A speedy and efficient procedure to resolve discovery disputes also helps (see section 11.424).

Where abuses are rampant, the court might require that depositions be videotaped for judicial review or require counsel expeditiously to deliver a copy of the transcript of each deposition for judicial review. Alternatively, the court could direct that one or more depositions be supervised in person by a judicial officer or special master. The judge or special master may need to be present only briefly, setting the tone and making a few early rulings, and then remain on call. Even where a special master exercises continuous oversight, avoiding disputes and satellite litigation may justify the cost. Some judges have required that depositions be taken in court to allow periodic monitoring.

In rare cases, sanctions may be needed. Although sanctions may have a prophylactic effect for later depositions, they will do little to cure the damage that has already occurred and may further poison relations between counsel and should therefore be a last resort. See section 10.15.

## 11.46 Interrogatories

.461 Purposes  90
.462 Limitations  91
.463 Responses  92
.464 Other Practices to Save Time and Expense  92

Because interrogatories are often poorly drafted, misused, or employed to burden and harass an opponent, courts generally restrict the number permitted, forcing counsel to make the best use of the limited number of interrogatories through skillful and thoughtful drafting designed to accomplish a legitimate purpose.

## 11.461 Purposes

Primarily, interrogatories help determine the existence, identity, and location of witnesses, documents, and other tangible evidence as a prerequisite to planning further discovery. Much of this information is subject to prediscovery

---

191. *See* Hall v. Clifton Precision, 150 F.R.D. 525 (E.D. Pa. 1993).

disclosure under the national or local rules. If not, the court's discovery order can require it. See sections 11.13, 11.423. Interrogatories may help fill gaps, ensure full compliance with informal requests, and obtain information dispersed among a number of persons under the opponent's control. They may also help to gather technical information when the requesting party may need an expert's assistance in formulating precise questions and the answering party may need time and special assistance to respond (e.g., when discovery is sought concerning systems and programs for the storage and retrieval of computerized data).

Contention interrogatories may sometimes help define issues, though the procedures discussed in section 11.33 are usually more productive in clarifying and narrowing issues and the contentions of the parties. Rule 33(c) permits interrogatories that call for "an opinion or contention that relates to fact or the application of law to fact," but permits the court to defer an answer "until after designated discovery has been completed or until a pretrial conference or other later time." Before allowing contention interrogatories, consider whether they are likely to be useful at that stage of the proceeding and ensure that they will not be argumentative.

Interrogatories may also be used, either alone or in conjunction with requests for admission under Federal Rule of Civil Procedure 36 (see section 11.47), to provide the foundation for a summary judgment motion. Whether certain facts are genuinely in dispute may be difficult to ascertain from depositions and affidavits, and even in response to Rule 36 requests, the opposing party may state that although reasonable inquiry has been made, it can neither admit nor deny the truth of particular matters that depend on the credibility of third persons. Interrogatories are a means of requiring a party to disclose any facts that it believes raise a triable issue with respect to particular elements of a claim or defense.

## 11.462 Limitations

Rule 33(a) imposes a presumptive limit of twenty-five interrogatories (including subparts) per party, and many local rules also restrict the number of interrogatories that may be propounded without stipulation or a court order. In complex litigation, with a great number of potentially relevant facts, a large amount of noncontroversial background information may be counterproductive. Nevertheless, it is best to retain some control over the use of interrogatories and, in considering requests to file additional interrogatories, to be guided

by the principles of Rule 26(b)(2). A basic question is whether the resulting benefits will outweigh the burdens.[192]

## 11.463 Responses

Federal Rule of Civil Procedure 33(b)(3) requires that answers and objections be served within thirty days of the interrogatory unless the parties stipulate otherwise. The court may establish a different period by order and should consider doing so after determining, in consultation with counsel, how much time is truly needed to respond to specific interrogatories. Fed. R. Civ. P. 33(b)(1), (4). Any ground not stated in a timely objection will be deemed waived in the absence of good cause. Fed. R. Civ. P. 33(b)(4). Rule 26(e)(2) requires parties to reasonably amend interrogatory responses if, as new information comes to light, the responding party learns that a response—even if complete and correct when made—has become incomplete or incorrect (unless this information has otherwise been made known to opposing parties during discovery or in writing). The discovery plan should schedule periodic dates for review and amendment of interrogatory responses (see section 11.421). If an answer is withheld on privilege grounds, the claim must be accompanied by a description of the information withheld sufficient to enable other parties to assess the applicability of the privilege.[193] Answers must be signed by the person making them, and objections must be signed by counsel, subject to the certification required by Rule 26(g) when propounding and responding to interrogatories.[194] Some judges require that responses to contention interrogatories be signed by counsel; others permit a party to sign, stating in substance, "I have been advised by my attorneys that . . . ." Such a statement, however, may waive attorney–client privilege.

## 11.464 Other Practices to Save Time and Expense

Use of the following techniques may increase the effectiveness and efficiency of interrogatories:

- *Master interrogatories; precluding duplicate requests.* The court should consider requiring similarly situated parties to confer and develop a single or master set of interrogatories to be served on an opposing party. If interrogatories have already been served by one party, other parties should be prohibited from asking the same questions, because

---

192. *See* Fed. R. Civ. P. 33(a).
193. Fed. R. Civ. P. 26(b)(5). *See supra* section 11.431.
194. The requirements of Rule 26(g) are described in *supra* section 11.421.

any party may use the answers to interrogatories served by another re-
gardless of who propounded the interrogatory.[195]

- *Use of interrogatories from other litigation.* Parties may also be barred
  from propounding interrogatories that an adversary has already an-
  swered in other litigation, when such answers are available or may be
  made available by the adversary.[196]

- *Successive responses.* If some questions will require substantially more
  investigation than others, counsel may stipulate that the responding
  party will provide answers in stages as the information is obtained,
  rather than seek additional time for the first response. Federal Rule of
  Civil Procedure 29(2) requires court approval of stipulations extend-
  ing the time to respond to interrogatories only if such stipulations
  would interfere with court-ordered time limits (see section 11.423).

- *Modified responses.* When interrogatories seek information that the
  responding party lacks or can obtain only with significant expenditure
  of time and money, and the information can be provided in a different
  form, that party should not object but rather advise the opponent and
  attempt to reach agreement on an acceptable form of response. For
  example, information requested on a calendar-year basis may be read-
  ily available on a fiscal-year basis, or information on overtime hours
  may be derived from records of compensation rates and overtime
  paid.

- *Early resolution of disputes.* The judge may require parties to object to
  interrogatories before expiration of the time for filing answers, par-
  ticularly in cases where more than the standard thirty-day period is
  allowed for filing answers. If the parties cannot resolve the objections
  by modifying or clarifying the troublesome interrogatories, they
  should present their dispute to the court in a clear and concise man-
  ner, avoiding lengthy motions and briefs, and the court should rule
  promptly to avoid disruption of the progress of the litigation (see sec-
  tion 11.424).

- *Rule 30(b)(6) depositions.* When a party seeks discovery from an orga-
  nization but does not know the identity of the individuals with rele-
  vant knowledge, the party may name the organization as the depo-
  nent, requiring it to designate persons to testify in response. This
  avoids the need for the two-step process of using an interrogatory to

195. *See* Fed. R. Evid. 801(d)(2).
196. *See id.*

discover the identity of knowledgeable individuals and then deposing them individually.

## 11.47  Stipulations of Fact/Requests for Admission

.471 Stipulations of Fact  94
.472 Requests for Admission  95
.473 Statements of Contentions and Proof  96
.474 Requests for Judicial Notice  97

### 11.471  Stipulations of Fact

Federal Rule of Civil Procedure 16(c)(1) provides that at any pretrial conference, the court "may take appropriate action, with respect to . . . the possibility of obtaining admissions of fact . . . which will avoid unnecessary proof . . . ." Although premature efforts to obtain stipulations may be counterproductive, judges might consider the early use of the combined discovery request described in section 11.423, in which a party may admit that particular facts are true in lieu of proceeding with other discovery regarding those matters. The judge can also encourage stipulations of facts that, after an appropriate opportunity for discovery has been afforded, should no longer be genuinely in doubt. Admission should be expected not only of facts of which each party has personal knowledge, but also of those that can be established by evidence from other sources. If the parties insist, facts of the latter type may be shown as "uncontested," "uncontroverted," or "conceded" rather than shown as "admitted," but the legal effect is identical. Stipulations may be sought with respect both to the facts of the case and to matters that affect the admissibility of other evidence, such as the authenticity of records and the foundation requirements for exceptions to the hearsay rule under Federal Rule of Evidence 803(6) and similar provisions. Parties may be more willing to enter into stipulations for specified limited purposes, such as an injunction proceeding, motion for summary judgment, or bifurcated trial of an issue. They may be willing to enter early stipulations if there is provision analogous to that in Federal Rule of Civil Procedure 36(b) for timely withdrawal from an incorrect stipulation on the basis of newly discovered evidence when no substantial prejudice to other parties would result.

The court can assist the stipulation process by stressing the distinction between conceding the truth of some fact or agreeing not to contest it, and conceding its admissibility or weight. Counsel's admission of the truth of an uncontroverted fact does not affect the right to object to its admissibility or to contest its probative value. Indeed, if a party contends that some fact is irrelevant or otherwise inadmissible, there is more reason to admit to its truth without the exhaustive investigation and discovery that might be warranted for an obviously critical fact. A party may stipulate to the accuracy of tabulations and

compilations, the significance of which it intends to dispute. The court should be cautious, however, of requiring a party to admit the accuracy of voluminous data or summaries of the same. As discussed in section 11.446, a response based on some limited study may be more appropriate even though this results in a summary with known errors.

The court should also remind parties of the tactical disadvantages of contesting at trial some matter on which their opponents will certainly prevail, or of being confronted at trial with an earlier denial of some matter that could not have been fairly disputed. Since an angry client, rather than the attorney, is often the person responsible for an "admit nothing" posture in the litigation, consider directing the clients themselves to attend a conference at which the desirability of early stipulations is discussed. Special masters can sometimes assist the parties in arriving at stipulations.

## 11.472 Requests for Admission

When voluntary means of narrowing factual disputes have been exhausted, admissions may be obtained under Federal Rule of Civil Procedure 36. This rule has its limitations, however. As discussed in section 11.463, complementary or supplementary interrogatories may be needed if a party in apparent good faith declines to admit the truth of some fact that depends on the credibility of other witnesses. In addition, like interrogatories, Rule 36 admissions are usable only against the party who made them and only in the action in which they were made. In multiparty litigation, therefore, requests may have to be directed to each party in each related action. Rule 36 requests answered by a party in prior or related litigation should be renewed; a straightforward new request that asks the party to admit each matter previously admitted should suffice.

Because parties often deny a requested admission on the basis of a trivial disagreement with a statement or without indicating the portions of the stated fact that are true, the court can urge the parties to observe their obligation under the rule to respond in good faith and point out the availability of sanctions for failure to do so.[197]

---

197. "[W]hen good faith requires that a party qualify his answer or deny only a part of the matter of which an admission is requested, he shall specify so much of it as is true and qualify or deny the remainder." Fed. R. Civ. P. 36(a). Sanctions are available under Rule 37(c)(2). Marchand v. Mercy Med. Ctr., 22 F.3d 933 (9th Cir. 1994) (affirming award of attorney fees incurred at trial based on failure to admit).

11.473  Statements of Contentions and Proof

The limitations of Rule 36 and the difficulties often encountered when attorneys attempt, even in good faith, to negotiate stipulations of fact have led to a third method for arriving at stipulations and admissions: the court orders counsel for one side, typically the plaintiff's, to draft a series of numbered, narrative statements of objective facts that they believe can be established, avoiding argumentative language, labels, and legal conclusions.[198] Opposing counsel must then indicate which of the proposed facts are admitted (or will not be contested) and which are disputed, specifying the nature of the disagreement by appropriate interlineation or deletion, as well as drafting narrative statements of additional facts that they believe can be established. The newly added statements are then returned to the first party for admission (or nondenial) or for specific disagreement. The parties then file a consolidated statement reflecting what is agreed and what remains in dispute as a stipulation of the parties. Judges sometimes incorporate the stipulation in a pretrial order, specifically providing that all (or only specified) objections to admissibility at trial are reserved.

This procedure for narrowing factual issues can be one of the final steps before trial, coupled with a provision precluding a party from offering at trial evidence of any fact not included in the narrative listing, except for good cause shown. It could also be used earlier in the litigation (after adequate opportunity for discovery) with respect to specified proceedings, such as a class certification hearing or a Rule 56 motion. The circumstances of the case will dictate whether all facts that the party proposes to prove must be listed—or only those that may possibly be admitted and, if admitted, would reduce the scope of evidence presented. The more extensive the required listing, the greater the opportunity to narrow the facts that remain for proof at trial; the judge should, however, weigh the potential for reduction in the length and cost of trial against the time and expense expended in identifying facts that will probably remain in dispute.

The degree to which stipulations can be obtained may depend not so much on the procedures used as on the attitude of the parties. Attorneys are sometimes reluctant to make any concessions on behalf of their clients. In such cases, the judge may be able to persuade counsel that, in addition to fulfilling their responsibilities as officers of the court, they will serve their clients' interests by streamlining the litigation through appropriate concessions and admissions. The refusal by counsel to stipulate to provable facts almost never results

---

198. *See* Manual for Complex Litigation, Third, 515 (Federal Judicial Center 1995).

in an advantage through a failure of proof and usually imposes additional costs on both sides in discovery, at trial, or both.

## 11.474 Requests for Judicial Notice

The judicial notice procedure provided by Federal Rule of Evidence 201 may also be used to eliminate the need for some fact-finding at trial. With respect to matters "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," an appropriate request may be filed under Rule 201 requiring opposing counsel to justify their refusal to stipulate.

## 11.48  Disclosure and Discovery of Expert Opinions[199]

.481 Trial Experts  97
.482 Consulting Experts  99
.483 Court-Appointed Experts  100

Effective litigation management requires reasonable judicial control over the use of expert witnesses.[200] Some judges confer with counsel before testifying experts are retained, to determine whether the proposed testimony will be necessary and appropriate, and to establish limits on the number of expert witnesses and the subjects they will cover.

Management of the disclosure and discovery of expert opinions is also essential to ensure adequate preparation by the parties, avoid surprise at trial, and facilitate rulings on the admissibility of expert evidence.

## 11.481  Trial Experts

Federal Rule of Civil Procedure 26(a)(2) requires the prediscovery disclosure, by the parties, of the identity of expert witnesses to be called at trial and of extensive additional information, including the following:

- a signed written report stating all opinions to which the expert will testify;
- the bases for those opinions;
- the data or information *considered* in forming the opinions—according to the 1993 committee note on Rule 26, this requirement substan-

---

199. For more detailed discussion of the management of expert testimony, see generally William W Schwarzer & Joe S. Cecil, *Management of Expert Evidence, in* Reference Manual on Scientific Evidence 39 (Federal Judicial Center 2d ed. 2000). *See also infra* section 23 (expert scientific evidence).

200. *See infra* sections 22.87, 23.22, 23.27, 23.35, 23.37.

tially eliminates work product protection from communications be-tween counsel and the expert; the court may conduct an *in camera* inspection if necessary to redact irrelevant material;[201]

- exhibits to be introduced as a summary or in support of the opinions;

- the expert's qualifications (including a list of all publications authored in the last ten years);

- the compensation the expert is to receive; and

- a list of other cases in which the expert has testified within the last four years.[202]

Local rules or standing orders may contain similar requirements, and the judge may enter an order adapting these requirements to meet the needs of the liti-gation. Rule 26(a)(2) applies only to experts "retained or specially employed" to give expert testimony or "whose duties as an employee of the party regularly involve giving expert testimony," but the judge may extend the rule to other experts (e.g., treating physicians) or, conversely, waive it as to certain ex-perts.[203]

At the initial conference, establish a timetable for expert disclosure and procedures to implement it. Absent stipulation or a court order, these disclo-sures must be made at least ninety days before trial or, if the evidence is in-tended solely for rebuttal, thirty days from the opposing party's disclosure. Supplementation under Rule 26(e) is also required.[204]

Scheduling should take into account that the parties may lack sufficient information to select expert witnesses until the issues have been further defined and certain discovery is completed; a party's decision may also await the disclosure of the opinions of experts selected by other parties. Rule 26's committee note states that the party with the burden of proof on an issue should normally be required to disclose its expert testimony on that issue be-fore the other parties.

Disclosure must be made sufficiently in advance of trial for the parties to take depositions if necessary and for the court to conduct appropriate pretrial proceedings, such as hearing motions under Federal Rule of Evidence 104(a) directed at expert evidence and motions for summary judgment.[205] Expert depositions are authorized by Rule 26(b)(4)(A); Rule 26(b)(4)(C) normally

---

201. *See* Bogosian v. Gulf Oil Corp., 738 F.2d 587, 595–96 (3d Cir. 1984).

202. Fed. R. Civ. P. 26(a)(2)(A), (B).

203. Fed. R. Civ. P. 26 committee note.

204. *See* Fed. R. Civ. P. 26(a)(2)(C).

205. The court at that time may also want to consider appointment of an expert under Fed. R. Evid. 706. *See infra* section 11.51.

requires the discovering party to pay the expert's reasonable fees for responding. (The Rule 26 committee note advises that disclosure may reduce the need for expert discovery, however, and warrant substantial limitations on it.)

Experts may wish to modify or refine their disclosed opinions in the light of further studies, opinions expressed by other experts, or other developments in the litigation. Although Rule 26(e)(1) requires that opposing counsel be advised of these changes, the judge should set a final cutoff date by which all additions and revisions must be disclosed in order to be admissible at trial.[206]

Early and full disclosure of expert evidence can help define and narrow issues. Although experts often seem hopelessly at odds, revealing the assumptions and underlying data on which they have relied in reaching their opinions often makes the bases for their differences clearer and enables substantial simplification of the issues. In addition, disclosure can facilitate rulings well in advance of trial on objections to the qualifications of an expert, the relevance and reliability of opinions to be offered, and the reasonableness of reliance on particular data.[207] Judges use various procedures to identify and narrow the grounds for disagreement between opposing experts, such as asking them to explain the reasons for their disagreement.

## 11.482 Consulting Experts

Discovery with respect to nontestifying experts is much more limited. Such experts are not covered by Rule 26(a)(2) and may be deposed only upon a showing of "exceptional circumstances under which it is impractical . . . to obtain facts or opinions on the same subject by other means."[208] If such a deposition is allowed, consider imposing time limits and requiring the party seeking discovery to pay an appropriate share of the cost reasonably incurred in obtaining the expert's testimony (cost shifting under Rule 26(b)(4)(C) is mandatory "unless manifest injustice would result").

The stringent disclosure requirements applicable to testifying experts may lead parties to rely on consulting experts, deferring a decision whether to designate them as trial experts. The judge should address this matter at the initial conference and establish a cutoff date for designation of trial experts and compliance with disclosure requirements.

---

206. *See* Fed. R. Civ. P. 37(c)(1) (failure to make Rule 26(a) disclosures "without substantial justification" precludes introduction of nondisclosed witnesses or information at trial).

207. *See generally* Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592 (1993) (rejecting "general acceptance" test of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)).

208. Fed. R. Civ. P. 26(b)(4)(B). When a physical or mental examination is made under Fed. R. Civ. P. 35, a party may obtain the examiner's report even if the examiner is not testifying.

### 11.483 Court-Appointed Experts[209]

Although Federal Rule of Evidence 706 provides that an expert appointed by the court may be deposed, judges should establish the terms on which an expert serves and the nature of the functions the expert is to perform. When such an appointment is made, the extent of discovery permitted should be determined at the outset. This may depend on whether the expert is to testify and on the issues the expert is to address.[210]

## 11.49  Special Problems

.491 Government Investigations/Grand Jury Materials  100
.492 Summaries  101
.493 Sampling/Opinion Surveys  102
.494 Extraterritorial Discovery  104

### 11.491 Government Investigations/Grand Jury Materials

Early in the litigation, the court should inquire about relevant government reports and other materials. Access to such materials can reduce the need for discovery and assist in defining and narrowing issues. If not a matter of public record, these materials can sometimes be obtained by agreement with the agency, by subpoena, or by requests under the Freedom of Information Act.[211]

Factual findings of a government agency may be admissible under Federal Rule of Evidence 803(8)(C), but some discovery may be needed to determine whether the information meets the rule's "trustworthiness" standard. The rule provides a hearsay exception, in civil cases and against the government in criminal cases, for "[r]ecords, reports, statements, or data compilations . . . of public offices and agencies, setting forth . . . factual findings resulting from an investigation conducted pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Objections to the admissibility of the findings may be addressed in a pretrial hearing under Federal Rule of Evidence 104, if necessary.[212]

Grand jury materials can sometimes be used to reduce discovery in related civil litigation. Federal Rules of Criminal Procedure 6(e)(3)(D) and (E) set out the procedures for seeking disclosure of grand jury materials. Grand jury pro-

---

209. *See infra* section 11.51.

210. *See generally* Reference Manual on Scientific Evidence, *supra* note 199.

211. 5 U.S.C. § 552 (2000).

212. *See In re* Japanese Elec. Prods. Antitrust Litig., 723 F.2d 238, 260 (3d Cir. 1983), *rev'd on other grounds sub nom.* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

ceedings are presumptively secret, but the court may order disclosure upon a showing of a particularized need.[213] Although disclosure may be ordered of testimony given before the grand jury and of documents subpoenaed or otherwise obtained for its use,[214] a person may invoke the Fifth Amendment privilege against self-incrimination and refuse to answer questions about such testimony even if it was given under a grant of immunity.[215] The production to a grand jury of otherwise discoverable material does not, however, entitle it to Federal Rule of Civil Procedure 6 protection.[216] Copies of material produced to a grand jury are subject to discovery.

Requests for disclosure of grand jury materials are generally addressed to the judge who supervised the grand jury proceedings.[217] Nevertheless, because that court may not be able to assess the "particularized need" for the materials in the litigation for which the materials are sought, the court should consult with the trial judge assigned to the litigation.[218] If disclosure is ordered, the court may include in the order protective limitations on the materials' use.[219]

## 11.492 Summaries

Whenever possible, voluminous or complicated data at trial should be presented by counsel through summaries, including compilations, tabulations, charts, graphs, and extracts. Federal Rule of Evidence 1006 creates an exception to the "best evidence" rule, allowing writings, recordings, or photographs that cannot conveniently be examined in court to be presented in the form of "charts, summaries or calculations." The rule does not affect the requirement that the originals be admissible. While counsel in jury cases usually recognize the need for summaries, they may overlook their utility in nonjury cases; the

213. *See* Fed. R. Crim. P. 6(e)(2), (3)(C)(i). The "particularized need" requirement derives from case law and is described in detail in *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222–23 (1979). *See also* United States v. Sells Eng'g, Inc., 463 U.S. 418, 443 (1983); Ill. v. Abbott & Assocs., Inc., 460 U.S. 557, 567 & n.14 (1983).

214. Some courts give greater protection to transcripts of testimony than to documentary evidence. *See, e.g., In re* Grand Jury Proceedings (Miller Brewing Co.), 717 F.2d 1136 (7th Cir. 1983). Production under Fed. R. Civ. P. 33(d) or 34 of documents previously subpoenaed by a grand jury may be facilitated if the producing party has retained copies.

215. United States v. Balsys, 524 U.S. 666, 683 (1998); Pillsbury Co. v. Conboy, 459 U.S. 248 (1983).

216. *See* Finn v. Schiller, 72 F.3d 1182, 1187 (4th Cir. 1996); Blalock v. United States, 844 F.2d 1546, 1551 (11th Cir. 1988).

217. *Douglas Oil*, 441 U.S. at 226.

218. *Id*. at 226–31.

219. *Id*. at 223.

trial judge should not be expected to "wad[e] through a sea of uninterpreted raw evidence."[220]

Summaries may be offered under Federal Rule of Evidence 611(a) solely as an aid to understanding, with the underlying evidence separately admitted into the record. Whenever possible, however, summaries should be received as substantive evidence under Rule 1006, in lieu of the underlying data. When summaries are so used, opposing parties must be given an adequate opportunity to examine the underlying data in advance of trial and raise objections in time to enable the proponent of the summary to make necessary corrections. As noted in section 11.446, the use of sampling techniques to verify summaries and quantify possible errors may be adequate and preferable to an item-by-item examination of the underlying data. When the summary is received as substantive evidence of the data it contains, the underlying data will not become part of the record, although receipt of a few examples of the source materials may be helpful in illustrating the nature of the underlying data summarized.

## 11.493 Sampling/Opinion Surveys

Statistical methods can often estimate, to specified levels of accuracy, the characteristics of a "population" or "universe" of events, transactions, attitudes, or opinions by observing those characteristics in a relatively small segment, or sample, of the population. Acceptable sampling techniques, in lieu of discovery and presentation of voluminous data from the entire population, can save substantial time and expense, and in some cases provide the only practicable means to collect and present relevant data. In one case, for example, a statistical expert profiled the compensatory damage claims of the class members to assist the jury in fixing the amount of punitive damages.[221]

The choice of appropriate sampling methods will depend on the objective. There is a difference between sampling to generate data about a population so the data will be verified or declared true and sampling, like polling, to measure opinions, attitudes, and actions by a population. In the case of the former, the reliability and validity of estimates about the population derived from sampling are critical.

---

220. Crawford v. W. Elec. Co., 614 F.2d 1300, 1319 (5th Cir. 1980).

221. *In re* Shell Oil Refinery, 136 F.R.D. 588 (E.D. La. 1991), *affirmed sub nom.* Watson v. Shell Oil Co., 979 F.2d 1014 (5th Cir. 1992), *reh'g granted*, 990 F.2d 805 (5th Cir. 1993), *other reh'g*, 53 F.3d 663 (5th Cir. 1994) (case settled before rehearing).

The sampling methods used must conform to generally recognized statistical standards. Relevant factors include whether

- the population was properly chosen and defined;
- the sample chosen was representative of that population;
- the data gathered were accurately reported; and
- the data were analyzed in accordance with accepted statistical principles.

Laying the foundation for such evidence will ordinarily involve expert testimony and, along with disclosure of the underlying data and documentation, should be taken up by the court well in advance of trial. Even if the court finds deficiencies in the proponent's showing, the court may receive the evidence subject to argument going to its weight and probative value.[222]

By contrast, questioning a sample of individuals by opinion polls or surveys about such matters as their observations, actions, attitudes, beliefs, or motivations provides evidence of public perceptions. The four factors listed above are relevant to assessing the admissibility of a survey, but need to be applied in light of the particular purpose for which the survey is offered. In addition, in assessing the validity of a survey, the judge should take into account the following factors:

- whether the questions asked were clear and not leading;
- whether the survey was conducted by qualified persons following proper interview procedures; and
- whether the process was conducted so as to ensure objectivity (e.g., determine if the survey was conducted in anticipation of litigation and by persons connected with the parties or counsel or by persons aware of its purpose in the litigation).

Parties who propose to offer sampling or survey evidence may want to consider whether to disclose details of the proposed sampling or survey methods to the opposing parties before the work is done (including the specific questions that will be asked, the introductory statements or instructions that will be given, and other controls to be used in the interrogation process). Objections can then be raised promptly and corrective measures taken before the survey is completed. A meeting of the parties' experts can expedite the resolution of problems affecting admissibility.

Parties sometimes object that an opinion survey, although conducted according to generally accepted statistical methods, involves impermissible

---

222. *See* E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1292 (9th Cir. 1992); McNeilab, Inc. v. Am. Home Prods. Corp., 848 F.2d 34, 38 (2d Cir. 1988).

hearsay. When the purpose of a survey is to show what people believe—but not the truth of what they believe—the results are not hearsay.[223] In the rare situation where an opinion survey involves inadmissible hearsay, Federal Rule of Evidence 703 nevertheless allows experts to express opinions based on the results of the survey.[224]

## 11.494 Extraterritorial Discovery

Discovery directed at witnesses, documents, or other evidence located outside the United States will often create problems, since many countries view American pretrial discovery as inconsistent with or contrary to their laws, customs, and national interests. For example, in civil-law jurisdictions where courts control the gathering and presentation of evidence, taking a deposition may be viewed as a judicial act performed by another sovereign. In addition, many common-law jurisdictions disfavor discovery requests directed at obtaining material other than evidence to be presented at trial.[225] The need for evidence located outside the United States should be explored early in the proceedings to allow for the extra time that may be required to obtain it. Consider ways to minimize cost and delay, or to develop alternate methods of proof when the evidence cannot be obtained. For example, the parties may achieve substantial savings by paying a willing deponent to come to the United States or, if permitted by the laws of the host country, conducting short depositions telephonically.

The following factors may affect foreign discovery:

- *Laws of the United States.* The procedures for obtaining evidence from other countries are prescribed by
  - the Federal Rules of Civil Procedure, particularly Rule 28(b) (depositions in a foreign country);[226]
  - statutes, particularly 28 U.S.C. § 1781 (transmittal of letter rogatory or request), § 1783 (subpoena of person in a foreign country), and § 1784 (contempt); and

---

223. *See* Fed. R. Evid. 801(c), 803(3).

224. *See* Fed. R. Evid. 703.

225. *See, e.g.,* Soc'y of Lloyd's v. Ashenden, 233 F.3d 473, 480 (7th Cir. 2000); Rio Tinto Zinc Corp. v. Westinghouse Elec. Corp., [1978] A.C. 547 (H.L.); S. Seidel, Extraterritorial Discovery in International Litigation 24 (PLI 1984).

226. *See also* Fed. R. Civ. P. 44(a)(2) (authentication of foreign official record). Rule 28(b) must be read in conjunction with the Hague Convention Abolishing the Requirement of Legalisation for Foreign Public Documents, *done* Oct. 5, 1961, T.I.A.S. No. 10072, 527 U.N.T.S. 189 (entered into force for the United States on Oct. 15, 1981), *reprinted in* Fed. R. Civ. P. 44; *see also* 28 U.S.C. §§ 1740, 1741, 1745 (West 2002).

    – international agreements, particularly the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention");[227] attention must also be given to applicable decisional law[228] and the Federal Rules of Evidence.[229]

- *Laws and attitude of the foreign country.* The extent and form of pretrial discovery that other sovereigns will compel or even permit vary widely. Even within a particular country, the rules may differ depending on the nature and identity of the person or body from which the discovery is sought and on the type of information (e.g., the breadth of discovery may depend on whether the evidence is testimonial or documentary).[230] Some countries not only refuse to compel a witness to provide evidence, but also prohibit even the voluntary production of some items of evidence. The attitude of the other country may also be affected by its current diplomatic relations with the United States and by the nature of the litigation. This latter factor is particularly important if the American litigation involves claims (such as antitrust) that conflict with the law or policies of the foreign country.

- *Position of the person or body from which discovery is sought.* Foreign discovery rules may vary depending on whether discovery is sought from

    – a national of the United States, of the country in which the discovery is to be conducted, or of another country;

    – a person or entity party to the American litigation or otherwise subject to the jurisdiction of the American courts—where the entity or person from whom discovery is sought is subject to the court's jurisdiction, it will often be faster and less costly to use the Federal Rules' standard discovery methods;[231] and

---

227. *Opened for signature* Mar. 18, 1970, 23 U.S.T. 2555 (entered into force for the United States on Oct. 7, 1972), *reprinted in* 28 U.S.C. § 1781 (West 2002) [hereinafter Hague Convention]. As its title implies, the convention does not apply to criminal cases. *See* Obtaining Discovery Abroad 9 (ABA 1990).

228. *See, e.g.,* Breard v. Greene, 523 U.S. 371, 375 (1998); Societe Nationale Industrielle Aerospatiale v. United States Dist. Court, 482 U.S. 522 (1987); Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee, 456 U.S. 694 (1982); Societe Internationale v. Rogers, 357 U.S. 197 (1958); *In re* Westinghouse Elec. Corp. Uranium Contracts Litig., 563 F.2d 992 (10th Cir. 1977).

229. *See, e.g.,* Fed. R. Evid. 902(3) (self-authentication of foreign public documents).

230. For example, most countries party to the Hague Convention will not execute letters of request for the purpose of obtaining pretrial disclosure of documents. *See* Hague Convention, *supra* note 227, art. 23.

231. *See* Obtaining Discovery Abroad, *supra* note 227, at 2; *Societe Nationale,* 482 U.S. at 549.

    – an instrumentality or arm of a foreign country, or a person or entity willing to provide the information.

- *Posture of the litigant.* Extraterritorial discovery will be expedited if the parties to the litigation cooperate by entering into stipulations under Federal Rule of Civil Procedure 29 as to the manner and location of discovery. Stipulations for nonstenographic and telephonic depositions under Rule 30(b)(2), (7) also may be valuable (the court may also order the use of these procedures; see section 11.452), but such procedures may violate foreign law. Stipulations as to admissibility are particularly important because the discovery may not be in the question-and-answer form traditional in American litigation. The refusal of a party with foreign connections or interests to enter into stipulations may not necessarily reflect an uncooperative attitude but may be compelled by the laws or customs of the foreign country. In this regard, the court should note that under Rule 28(b), "[e]vidence obtained in response to a letter of request need not be excluded merely because it is not a verbatim transcript, because the testimony was not taken under oath, or because of any similar departure from the requirements for depositions taken within the United States under these rules."

    Because procedures for obtaining foreign discovery vary from country to country and are often complex, it is generally advisable for the attorneys to associate with local counsel. The Department of State and the appropriate United States embassy or consulate can also provide assistance in planning discovery in foreign countries.[232] The Department of State's Office of Citizens Consular Services can provide lists of local counsel and current information regarding such matters as reservations and declarations under the Hague Convention, practices in nonsignatory countries, the procedures to be followed in particular countries, and actual results of discovery efforts in specific countries.[233]

    *Depositions.* Federal Rule of Civil Procedure 28(b) establishes four alternative procedures for taking depositions in other countries.[234] Under Rule 28(b)(1), when the country where discovery is sought is a signatory to the

---

    232. For the U.S. State Department's regulations on foreign discovery, see 22 C.F.R. § 92 (1993).

    233. Inquiries should be directed to the Office of Citizens Consular Services, Dept. of State, 2201 C Street, N.W., Washington, DC 20520.

    234. *See also* Restatement (Third) of the Foreign Relations Law of the United States § 474(2) (1987).

Hague Convention,[235] depositions may be taken in accordance with the convention, as described below, though resort to the Convention is not mandatory.[236] When the country is not a signatory, counsel may use one of the procedures in Rule 28(b)(2)–(4). Under Rule 28(b)(2), the American court may issue a "letter of request" (formerly called a "letter rogatory") seeking the voluntary assistance of the court or other agency of the foreign country to compel the deponent to provide evidence.[237] There may be a long delay, perhaps as much as two years, between the issuance of a letter of request and receipt of the evidence. The Department of State's Office of Citizens Consular Services often can provide information about recent experiences in particular countries.

The foreign country ultimately decides whether to honor and execute the letter of request. Many countries not party to the Convention, such as Canada, routinely execute letters of request from United States courts.[238] When the deponent is willing to give evidence, the parties may use the "notice" or "commission" methods of Rule 28(b)(3) and (4), respectively, if not prohibited by foreign law. For example, in Japan and Turkey a deposition on notice is permissible only of an American citizen, while Swiss law makes it a crime to take any deposition in that country without governmental authorization. The "notice" method is essentially the same used for a typical domestic deposition. Under the "commission" method, the American court appoints a per-

---

235. The rule refers to "any applicable treaty or convention," but the intended reference is to the Hague Convention. *See* Fed. R. Civ. P. 28 committee note.

236. *See* Societe Nationale Industrielle Aerospatiale v. United States Dist. Court, 482 U.S. 522, 529–40 (1987); *see also* Restatement (Third) of the Foreign Relations Law of the United States, *supra* note 234, § 473.

237. For a thorough discussion of the issues and procedures involved in obtaining judicial assistance from a foreign country, see Bruno Ristau, International Judicial Assistance Part IV (1990). For the form and substance of a letter of request, see Hague Convention, *supra* note 227, arts. 1–14.

238. Currently, the U.S. State Department's Web site lists more than thirty nations in which the Hague Convention is in force. *See* Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, *at* http://travel.state.gov/hague_evidence.html (last visited Nov. 10, 2003). The Hague Convention's official Web site lists additional states in which the Hague Convention is in force by "accession," but not all of these necessarily have reciprocal arrangements with the United States. *See* Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, http://www.hcch.net/e/status/evidshte.html (last visited Nov. 10, 2003). The situation is fluid, as former territories become independent nations and other nations experience fundamental political changes. For current information about a specific nation, consult the Department of Justice, Civil Division, Office of International Judicial Assistance, 1100 L Street, N.W., Room 11006, Washington, DC 20530; tel: (202) 307-0983; fax: (202) 514-6584.

son—typically an American consular officer[239]—to administer the oath and preside over the deposition.

Much foreign discovery will occur in the numerous countries that are contracting states to the Hague Convention.[240] The Convention generally allows evidence to be taken compulsorily pursuant to a letter of request or voluntarily before a diplomatic officer or consular agent or any person "commissioned" for the purpose.[241] (Issuance of both a commission and a letter of request, as authorized by Rule 28(b), may be a useful measure to guard against the risk that a deponent may not remain willing to testify voluntarily.) Although the judicial authority executing the request will apply its own procedures, Article 9 of the Convention states that special requests—for example, for a verbatim transcript or for answers in writing and under oath—are to be honored unless incompatible with the law of the executing state or otherwise impossible or impracticable. In practice, though, such requests are commonly not complied with. Under the Convention, letters of request must be sent to a "central authority" designated by the receiving country; the identities of the authorities designated are given in notifications appended to the treaty.[242] The Convention must, however, be read in light of the numerous reservations and declarations made by the contracting states, through which they have modified or declined to adopt various provisions. Many countries, for example, require that a judicial officer conduct depositions, and a majority will not execute letters of request issued for the purpose of obtaining documents related solely to pretrial discovery. Each country's declarations and reservations are listed in the notifications at the end of the convention.[243] These create variances among the discovery rules applicable in the contracting countries and may be complex.

When "necessary in the interest of justice," a United States national or resident in a foreign country may be subpoenaed to testify or produce documents.[244] Failure to comply may subject the person to punishment for contempt.[245]

*Blocking laws.* Efforts to obtain or compel production of documents located outside the United States may be impeded by one of the increasing num-

---

239.  *See* 22 C.F.R. § 92.4(a) (2001).

240.  For a list of contracting states, see Hague Convention, *supra* note 227.

241.  Hague Convention, *supra* note 227, arts. 16–17.

242.  *See* 28 U.S.C.A. § 1781 at 125–41 (West Supp. 1993). For discussion of the procedures and problems associated with letters of request, see Spencer W. Waller, International Trade and U.S. Antitrust Law § 7.08 (1992).

243.  *See* 28 U.S.C.A. § 1781 at 125–41 (West Supp. 1993).

244.  28 U.S.C. § 1783 (West 2002).

245.  *Id.* § 1784.

ber of foreign nondisclosure (or "blocking") laws.[246] These laws take the form of general commercial and bank secrecy laws, as well as more specific and discretionary blocking statutes aimed at combating perceived excesses in American discovery.[247] The fact that certain discovery is prohibited under foreign law, however, does not prevent the court from requiring a party to comply with a demand for it,[248] though the prohibition may be relevant in determining the sanctions to be imposed for noncompliance.[249] Where a party fails to comply with a discovery order because of a blocking statute, the court may impose any of the sanctions set forth in Federal Rule of Civil Procedure 37(b), though it may also consider factors such as the party's good faith efforts to comply in declining to impose them.[250]

*Judicial control.* The Supreme Court has cautioned federal courts to exercise special vigilance to protect foreign litigants from unnecessary or unduly burdensome discovery and to supervise pretrial proceedings particularly closely to prevent discovery abuses.[251] The additional cost of foreign discovery may increase the danger that it will be used for an improper purpose, such as to burden or harass; objections to abusive discovery advanced by foreign litigants should therefore receive the court's "most careful consideration."[252] In deciding whether to order production of information abroad, and in framing such an order, the following are worth considering:

- the importance to the litigation of the discovery requested;
- the degree of specificity of the request;
- whether the information sought originated in the United States;
- the availability of alternative means to secure the information;
- the extent to which noncompliance with the request would undermine important U.S. interests; and
- the extent to which compliance would undermine important interests of the country in which the information is located.[253]

---

246. *See* Obtaining Discovery Abroad, *supra* note 227, *passim.*

247. *See* Waller, *supra* note 242, § 7.09.

248. Societe Nationale Industrielle Aerospatiale v. United States Dist. Court, 482 U.S. 522, 544 n.29 (1987).

249. Societe Nationale v. Rogers, 357 U.S. 197, 204–06 (1958).

250. *See* Obtaining Discovery Abroad, *supra* note 227, at 18–22.

251. *Societe Nationale,* 482 U.S. at 546.

252. *Id.*

253. Restatement (Third) of the Foreign Relations Law of the United States, *supra* note 234, § 442(1)(c); *see also Societe Nationale,* 482 U.S. at 544 n.28 (citing earlier draft of the restatement).

Comity also dictates that American courts take into account special problems confronted by the foreign litigant because of its nationality or location and any sovereign interests expressed by a foreign state.[254] An order requiring that *all* extraterritorial discovery be conducted using the procedures in the Hague Convention when available may serve this purpose.

Careful drafting can reduce the risk that a foreign country will refuse to execute a letter of request. In most cases, the request should be directed at evidence for use at trial and should be as specific as possible. Hague Convention countries that have executed a reservation under Article 23[255] will ordinarily not execute general requests for broad categories of documents for use in discovery.[256] The letter should include no unnecessary information, and the language should be simple and nontechnical.[257] The court should incorporate findings as to the extent of discovery to be permitted and the need therefore in a separate order that can be presented to foreign authorities, even if letters of request are not being issued.

Federal judges are not authorized to travel abroad to control the conduct of depositions, at least in the absence of specific approval by the Judicial Conference of the United States.[258] For this reason, it is best to adopt in advance appropriate guidelines to govern such depositions consistent with the laws of the other country.[259] Moreover, if permissible under the laws and customs of that country, the judge may be available by telephone to resolve disputes or may appoint a special master to supervise the deposition personally.[260] Before employing either of these procedures, the judge should seek advice from the Department of State's Office of Citizens Consular Services.

254. *Societe Nationale,* 482 U.S. at 546.

255. *See supra* note 227.

256. *See* Waller, *supra* note 242, § 7.08[3].

257. U.S. Dept. of State Circular, Preparation of Letters Rogatory (Mar. 1992).

258. Report of the Proceedings of the Judicial Conference of the United States 4–5 (March 1978).

259. For suggested deposition guidelines, see *supra* section 11.45.

260. *See supra* sections 11.424, 11.456.

# 11.5  Special Referrals

.51 Court-Appointed Experts and Technical Advisors  111
.52 Special Masters  114
.53 Magistrate Judges Under 28 U.S.C. § 636(b)(1) 117
.54 Other Referrals  118

Complex litigation often involves extensive fact-finding in preparation for trial, or in aid of settlement. Referrals to a neutral arbiter or special master may at times be helpful, either by relieving the judge of time-consuming proceedings or by bringing to bear special expertise. The authority to make such referrals is circumscribed and conditioned, and the costs and benefits must be balanced.

## 11.51  Court-Appointed Experts and Technical Advisors

Court-appointed experts serve a number of purposes: to advise the judge on technical issues, to provide the jury with background information to aid comprehension, or to offer a neutral opinion on disputed technical issues.[261] The court has broad discretion to appoint such an expert, *sua sponte* or on request of the parties, but should consider whether there are adequate alternatives to such an appointment, such as directing the parties to clarify, simplify, and narrow the differences between them.[262] Below are some of the problems and implications of appointing an expert:

- *Cost.* Court appointment of an expert increases the already high cost of complex litigation. Except in the rare cases where such funding is provided by statute, Federal Rule of Evidence 706(b) requires the parties to pay the expert's compensation. The judge allocates this expense among the parties and determines the time of payment (usually periodic deposits in court during the litigation, subject to reapportionment at the outcome). Courts often decline to appoint an expert when one party is indigent to avoid the unfairness of requiring the other side to pay all of the expert's compensation. The court has the authority, however, to order the nonindigent party to pay this expense in compelling circumstances (e.g., when the indigent party's claim has merit that cannot viably be presented absent such expert assistance). The

---

261. For an extensive discussion of the various aspects of using court-appointed experts, see Joe S. Cecil & Thomas E. Willging, Court-Appointed Experts: Defining the Role of Experts Appointed Under Federal Rule of Evidence 706 (Federal Judicial Center 1993); see also Schwarzer & Cecil *supra* note 199, at 59–63.

262. *See supra* section 11.48; Cecil & Willging, *supra* note 261, at 67–78.

judge should provide for payment at the time of appointment to ensure that the expert will be compensated.[263]

- *Neutrality of the expert.* Truly neutral experts are difficult to find. Though they will have no commitment to any party, most experts do not come to the case free of experience and opinions that will predispose—or may be perceived to predispose—them in some fashion on disputed issues relevant to the case.

- *Undue influence.* Experts are typically appointed in cases that are extraordinarily difficult, and their independence relative to the parties' experts may cause the jury to give their opinions undue weight. For this reason, the testimony of the expert must be limited to those issues specified by the court. Disclosure to the jury of the expert's court-appointed status is discretionary.[264]

- *Delay.* The testimony of a court-appointed expert may lengthen the trial, although there may be offsetting savings by narrowing the issues, reducing the scope of the controversy, and perhaps promoting settlement.

- *Timing of the appointment.* The need for an appointment will not always be clear early in the litigation. By the time it becomes clear, the case may be at or about to go to trial, when introduction of a court-appointed expert would cause delay.

Nevertheless, in appropriate cases, appointment of a neutral expert, even at an advanced stage of the proceedings, can be beneficial:

- court-appointed experts can have "a great tranquilizing effect"[265] on the parties' experts, reducing adversariness and potentially clarifying and narrowing disputed issues;

- they can help the court and jury comprehend the issues and the evidence;

- they can suggest acceptable procedures and ground rules for preserving and exchanging digital-format materials relevant to the case, and assist in settling disputes regarding electronic evidence; and

- they may facilitate settlement or at least stipulations.

---

263. *See* McKinney v. Anderson, 924 F.2d 1500, 1510–11 (9th Cir. 1991); United States Marshals Serv. v. Means, 741 F.2d 1053, 1057–59 (8th Cir. 1984) (en banc); Cecil & Willging, *supra* note 261, at 62–65.

264. Fed. R. Evid. 706(c).

265. E. Barrett Prettyman, *Proceedings of the Seminar on Protracted Cases for United States Circuit and District Judges*, 21 F.R.D. 395, 469 (1957).

The order of appointment should clearly specify whether the expert is appointed under authority of Rule 706 or as a technical advisor under the inherent authority of the court, along with the assigned duties, functions, and compensation.[266] A court-appointed expert, when forming opinions, is not limited to information presented by the parties at a hearing. Furthermore, testifying experts are subject to discovery with respect to their opinions; therefore, the order should specify the ground rules for depositions and other discovery directed at the expert, including the extent to which materials used or considered by the expert will be subject to discovery. The order should also specify whether the expert is to provide a written report to the parties before trial, and whether ex parte communications with the judge will be permitted. The order may also state how the jury should be instructed. Generally the jury would be told that the opinions of a court-appointed expert should be treated the same as those of other expert witnesses—the opinions are entitled to only such weight as is warranted by the witness's knowledge, expertise, and preparation.

Judges sometimes appoint an expert to render assistance other than testifying at trial, such as analyzing and evaluating reports prepared by the parties' experts or attorneys.[267] In such situations, ex parte communications regarding matters of substance may be necessary but should be subjected to procedural safeguards. Such safeguards might include (1) giving the parties notice of the expert's identity and precise function; (2) providing written instructions detailing the expert's duties; and (3) requiring the expert to submit a written report or otherwise advising the parties of the substance of the advice given.[268] Ex parte communications are always suspect and should be allowed only in exceptional circumstances.

When the court is selecting an expert witness for appointment, the best candidate is one whose fairness and expertise in the field cannot reasonably be questioned and who can communicate effectively as a witness. The court should make every effort to select a person acceptable to the litigants. First, the parties should be asked to submit a list of proposed experts; they may be able, with the assistance of their own experts, to agree on one or more candidates. The court may also call on professional organizations and academic groups to provide lists of qualified and available persons (though not delegating the selection to any such organization), giving the parties an opportunity to com-

---

266.  *See* Cecil & Willging, *supra* note 261, at 59, 63.

267.  *See, e.g.*, Webster v. Sowders, 846 F.2d 1032, 1035, 1039 (6th Cir. 1988) (asbestos).

268.  *See* Reilly v. United States, 863 F.2d 149, 158–59 (1st Cir. 1988); Schwarzer & Cecil, *supra* note 199, at 62; Cecil & Willging, *supra* note 261, at 41 & nn.83–84.

ment. In making appointments, judges must avoid even the appearance of patronage or favoritism.[269]

## 11.52  Special Masters

Federal Rule of Civil Procedure 53 authorizes judges to appoint special masters to aid in handling pretrial and posttrial matters tried without a jury "that cannot be addressed effectively and timely by an available district court judge or magistrate judge of the district."[270] Reference to a special master must be the exception and not the rule. The Supreme Court held in *La Buy v. Howes Leather Co., Inc.*[271] that the general complexity of the litigation, the projected length of trial, and the congestion of the court's calendar do not constitute the exceptional circumstances that would justify appointment of a trial-level special master. These considerations, however, do not preclude more limited references, such as those regarding resolution of pretrial or nondispositive matters,[272] mediation of settlement negotiations (see section 13.13), or posttrial implementation of a decree.[273]

Whether to appoint a special master involves largely the same considerations discussed in section 11.51 with respect to court-appointed experts and technical advisors. Appointment of a magistrate judge makes it unnecessary to worry about imposing extra expense[274] on parties or about the question of neutrality. It may be particularly difficult to appoint a completely disinterested

---

269.  *See* 28 U.S.C. § 458 (West 2002).

270.  Rule 53(a)(1)(C). For an examination of the changes in practices that documented a basis for the rule change, see Thomas E. Willging, Laural L. Hooper, Marie Leary, Dean Miletich, Robert Timothy Reagan, & John Shapard, Special Masters' Incidence and Activity: Report to the Judicial Conference's Advisory Committee on Civil Rules and Its Subcommittee on Special Masters (Federal Judicial Center 2000).

271.  352 U.S. 249, 259 (1957).

272.  *See In re* Bituminous Coal Operators Ass'n, Inc., 949 F.2d 1165, 1168–69 (D.C. Cir. 1991) (improper to refer dispositive matters, but proper to refer pretrial preparation or calculation of damages); *In re* United States, 816 F.2d 1083, 1091 (6th Cir. 1987) (improper to refer dispositive matters, proper to refer nondispositive matters); *In re* Armco, 770 F.2d 103 (8th Cir. 1985) (per curiam) (improper to refer trial on merits, though proper to refer all pretrial matters, including dispositive motions). The court in *Stauble*, while making a similar distinction, noted that the reference would not have violated Article III if the judge had afforded de novo review of the special master's determination. Stauble v. Warrob, Inc., 977 F.2d 690, 698 n.13 (1st Cir. 1992).

273.  *See* Fed. R. Civ. P. 53(a)(1)(C) & (b)(2)(A).

274.  *See* Fed. R. Civ. P. 53(a); Prudential Ins. Co. of Am. v. United States Gypsum Co., 991 F.2d 1080, 1085, 1087 (3d Cir. 1993) (disqualifying special master, in part because of availability of magistrate judges).

special master with no prior relationship to any of the parties, since special masters are often practicing attorneys and tend to have substantial experience with similar disputes. Rule 53(a)(2) requires that a master "not have a relationship to the parties, counsel, action, or court that would require disqualification of a judge under 28 U.S.C. § 445 unless the parties consent with the court's approval to appointment of a particular person after disclosure of any potential grounds for disqualification."

Also, appointment of a magistrate judge pursuant to statute may be appropriate where the purpose is to collect, assemble, and distill voluminous data presented by the parties and where the primary qualifications are objectivity and familiarity with evidentiary hearings rather than expertise in some technical field. Appointment of a special master to supervise discovery may be appropriate where the financial stakes justify imposing the expense on the parties and where the amount of activity required would impose undue burdens on a judge. It is generally preferable to appoint special masters with the parties' consent, and either to permit the parties to agree on the selection or to make the appointment from a list submitted by the parties. The clerk and deputy clerks of court may not be appointed as special masters "unless there are special reasons requiring such appointment which are recited in the order of appointment."[275]

Special masters have increasingly been appointed for their expertise in particular fields, such as accounting, finance, science, and technology.[276] Accordingly, the distinction between special masters under Federal Rule of Civil Procedure 53 and court-appointed experts under Federal Rule of Evidence 706 has become blurred in the context of appointments to serve in nonjury trial settings. The court may make an appointment under the latter rule without Rule 53's restrictions. Although Rule 706 speaks of a "witness," it also specifically permits the appointed expert to make "findings." Thus, when the court is calling on a neutral for that person's "scientific, technical, or other specialized knowledge," as contemplated by Federal Rule of Evidence 702, it may consider making the appointment under Rule 706 even though the master will not testify. Presumptively, however, a person appointed under Rule 706 would be subject to discovery and cross-examination; Rule 53 makes no provision for discovery or cross-examination of special masters, but the parties have access to the special master's report. Rule 53(g)(1), however, requires the court to allow the parties "an opportunity to be heard" and allows the court to

---

275. 28 U.S.C. § 957 (West 2002).

276. For discussion of the roles played by special masters and magistrate judges, see e.g., FJC Study, Special Masters, *supra* note 270; Linda Silberman, *Judicial Adjuncts Revisited: The Proliferation of Ad Hoc Procedure*, 137 U. Pa. L. Rev. 2131 (1989).

"receive evidence" before deciding whether to adopt, modify, reject, or resubmit a special master's report.

In jury matters, amended Rule 53 eliminates any blurring of functions. Appointment of a Rule 706 expert becomes the only option for bringing in an independent expert to assist the jury. Any expert appointed under Rule 706 is, of course, subject to discovery and cross-examination.

An order of reference to a special master should specify the scope of the reference, the issues to be investigated, the circumstances under which ex parte communication with the court or a party will be appropriate, the time and format for delivering the master's record of activities, the compensation, and the delegated powers.[277] Subject to the terms of that order, a special master may take all appropriate measures to perform the special master's duties,[278] including requiring production of tangible evidence and examining witnesses under oath. The special master may call parties to testify (see Rule 53(d)), and other witnesses may be subpoenaed by the parties.[279] Under Rule 53(b), the order of reference may direct a special master to make findings of fact, but due process requires that the findings be based on evidence presented at an adversarial hearing. Unless otherwise directed by the order of reference, the special master may evaluate and rule on the admissibility of evidence. Unlike a court-appointed expert, however, a special master is not authorized to conduct a private investigation into the matter referred. The order should also provide arrangements to ensure that the special master's fees will be paid.

Ordinarily, the special master must produce a report on the matters submitted by the order of reference, including any findings of fact or conclusions of law.[280] The parties may stipulate that the special master's findings of fact are to be accepted as final, leaving only questions of law for review, which is on a de novo basis.[281] Otherwise, the court must decide de novo all objections to a special master's findings of fact.[282] The judge should keep in mind that the special master's findings may carry undue weight with the jury.

---

277. *See* Fed. R. Civ. P. 53(b).
278. Fed. R. Civ. P. 53(c).
279. Fed. R. Civ. P. 53(c) & (d).
280. Fed. R. Civ. P. 53(f).
281. Fed. R. Civ. P. 53(g)(4).
282. Fed. R. Civ. P. 53(g)(3).

## 11.53  Magistrate Judges Under 28 U.S.C. § 636(b)(1)

Referrals may also be made to magistrate judges, pursuant to 28 U.S.C. § 636(b)(1), Federal Rules of Civil Procedure 53(f) and 72, and local rules[283] (apart from referrals of supervision of pretrial proceedings as discussed in section 10.14). Like a special master, a magistrate judge acting under these provisions makes factual determinations based on evidence presented at an adversarial hearing and submits a disposition or recommended disposition, along with proposed findings of fact when appropriate, by written report filed with the court and served on the parties.[284] The parties have no right to engage in discovery from, or to cross-examine, the magistrate judge. Under Federal Rule of Civil Procedure 72, the magistrate judge's rulings on nondispositive matters may, if objected to within ten days of service, be modified or set aside only if "clearly erroneous or contrary to law."[285]

On matters dispositive of a claim or defense, the magistrate judge's recommended disposition is, on timely, specific, written objection by a party,[286] subject to de novo determination by the district judge, who may, but need not, take further evidence.[287] This distinction is clarified by 28 U.S.C. § 636(b)(1), which allows the designation of a magistrate judge only to provide proposed findings of fact and recommendations for disposition of motions for injunctive relief, judgment on the pleadings, summary judgment, dismissal of indictment, suppression of evidence in a criminal case, class certification, dismissal for failure to state a claim, or involuntary dismissal.[288] Section 636(b)(1)(A) allows determination of any other pretrial matter subject to reconsideration only if "clearly erroneous or contrary to law." There is no explicit authority (as there is in Rule 53(e)(4)) for the parties stipulating to be bound by the magistrate judge's findings. This situation must be distinguished from that in which a magistrate judge acts as a district judge under 28 U.S.C. § 636(c).

In considering whether to make a referral to a magistrate judge, the court must balance the advantages of obtaining the magistrate judge's assistance against the risk of delay from requests for review of the magistrate judge's order, proposed findings, or recommendations.

---

283. *See also* Mag. Judges Div., Admin. Office of the U.S. Courts, *A Constitutional Analysis of Magistrate Judge Authority*, 150 F.R.D. 247 (1993).

284. 28 U.S.C. § 636(b)(1)(C) (West 2002).

285. Fed. R. Civ. P. 72(a).

286. Even in the absence of an objection, the judge should review the report for "clear error." Fed. R. Civ. P. 72 committee note.

287. Fed. R. Civ. P. 72(b) and committee note.

288. 28 U.S.C. § 636(b)(1)(B) (West 2002).

## 11.54  Other Referrals

Other possible resources in complex litigation include referral to a private or public technical agency, use of an advisory jury of experts in a nonjury case, and consultation with a confidential advisor to the court.[289] Caution is recommended in experimenting with such procedures—absent statutory authorization or a party's stipulation—in cases in which, if the court of appeals finds reversible error, a lengthy and costly retrial might be required. Referrals to court-appointed experts, special masters, and magistrate judges authorized by statute or rule are adequate in most cases to provide the needed assistance. The judge should consider innovative uses of recognized procedures to make the process more fair and efficient when complicated issues are involved, such as appointing a team of experts to serve under Rule 706, but not to the extent of displacing the parties' right to a resolution of disputes through the adversary process.[290]

## 11.6   Final Pretrial Conference/Preparation for Trial

.61 Date and Place of Trial  119
.62 Reevaluation of Jury Demands  120
.63 Structure of Trial  121
    .631 Consolidation  121
    .632 Separate Trials  122
    .633 Special Verdicts and Interrogatories  123
.64 Procedures to Expedite Presentation of Evidence  124
    .641 Statements of Facts and Evidence  124
    .642 Pretrial Rulings on Objections  124
    .643 Disclosure of and Objections to Digital Evidence and Illustrative Aids  126
    .644 Limits on Evidence  127
    .645 Use of Courtroom Technology to Facilitate Evidence Presentation  127
.65 Proposed Jury Instructions  128
.66 Briefs and Final Pretrial Motions  129
.67 Final Pretrial Order  129

The purposes of the final pretrial conference, explicated in Federal Rule of Civil Procedure 16(a), are to "improv[e] the quality of the trial through more thorough preparation" and to "facilitat[e] the settlement of the case." These ends take on special importance in complex litigation and are embodied in Rule 16(d), which requires that

---

289. *See* Cecil & Willging, *supra* note 261, at 40–41.

290. For a discussion of the use of outside neutral persons in facilitating settlement, see *infra* section 13.13.

- the final pretrial conference be held as close to the time of trial as is reasonable under the circumstances;
- the parties formulate a plan for trial, including a program for facilitating the admission of evidence; and
- the attorneys who will conduct the trial attend the conference.

The order setting the conference should specify the items to be taken up. It should also maximize the utility of the conference by deciding summary judgment motions and (to the extent feasible) motions *in limine* well in advance (see section 11.34, summary judgment). The judge should tailor preparation for the final pretrial conference to accomplish the purposes of Rule 16. Essential agenda items include exchange and discussion of the following:[291]

- a final list identifying the witnesses to be called and the subject of their testimony, including a designation of deposition excerpts to be read;
- copies of all proposed exhibits and visual aids, including illustrative exhibits and computer-generated evidence;
- a list of all equipment and software to be used at trial, and suggestions as to possible shared use of equipment and operators;
- proposed questions for voir dire;
- concise memoranda on important unresolved legal issues;
- nonargumentative statements of facts believed to be undisputed;
- proposed jury instructions, including any special instructions needed regarding computerized evidence or equipment (see section 11.65);
- proposed verdict forms, including special verdicts or interrogatories;[292] and
- in nonjury cases, proposed findings of fact and conclusions of law.[293]

## 11.61  Date and Place of Trial

Although civil trial dates are problematic in many courts because of criminal dockets, a trial date for complex litigation should be firm, given the number of people involved and the expense incurred in preparation. The trial date needs to take into account the commitments of the court and counsel and should permit an uninterrupted trial. The judge should advise counsel in advance that once the date is set, there will be no continuances. Some judges set a

---

291.  For a comprehensive list of potential agenda items, see *Litigation Manual, supra* note 12, at 79–85.

292.  *See* Fed. R. Civ. P. 49. *See also infra* sections 11.633, 12.451.

293.  *See* Litigation Manual, *supra* note 12, app. A, at 188, 206–07 (Sample Form 9).

deadline after which they will not permit partial settlements that might necessitate a continuance of the trial (see section 13.21).

Where litigation includes cases filed in other districts and transferred to the court for coordinated or consolidated pretrial proceedings under 28 U.S.C. § 1407, those cases must be remanded at or before the conclusion of the pretrial proceedings to the districts from which they were transferred.[294] Consider whether to pursue alternatives that would allow a transferee judge to obtain authority (e.g., by action of the parties, the transferor court, or the committee on intercircuit assignments) to retain a role that is consistent with *Lexecon*. See section 20.132. Venue motions that may have been deferred should be decided. In referring cases back to the MDL Panel, it is helpful to indicate the nature and expected duration of remaining discovery, the estimated time before the case will be ready for trial, and the major rulings that, if not revised, will affect further proceedings. The court can also make appropriate recommendations for further proceedings. In most cases transferred under 28 U.S.C. § 1407, substantially all discovery will be completed before remand. In some cases, however, such as mass tort litigation, discovery regarding individual damages may have been deferred and must be conducted in the transferor district after remand. Section 20.133 has a fuller discussion of remand.

## 11.62  Reevaluation of Jury Demands

Although a general demand for a jury trial may have been made early in the litigation,[295] the final pretrial conference is an appropriate time to consider whether the parties are entitled to a jury trial on particular issues and, if not, whether those issues should be decided in a separate trial (which may be concurrent with the jury trial), decided by motion,[296] or submitted to an advisory jury.[297] If both jury and nonjury issues are to be tried, the judge should determine whether *Beacon Theatres, Inc. v. Westover*[298] requires that the jury issues be decided first. Even if so, it is possible to hear evidence during the jury trial on related nonjury issues, provided that the parties are later afforded opportunity to supplement the record with evidence relevant only to the nonjury issues and that a decision on the nonjury issues is deferred until after the verdict has been returned. In mass tort cases, some judges ask the parties to consider whether to try liability and lump sum damage issues to the jury, leaving the

---

294. *See* Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998).
295. *See* Fed. R. Civ. P. 38.
296. *See* Fed. R. Civ. P. 39(a).
297. *See* Fed. R. Civ. P. 39(c).
298. 359 U.S. 500 (1959).

resolution of individual damage claims to special agreed procedures (see section 22.93, mass tort litigation, trial).

## 11.63  Structure of Trial

.631 Consolidation  121
.632 Separate Trials  122
.633 Special Verdicts and Interrogatories  123

The judge should seek suggestions from counsel for approaches to structuring the trial that will improve the trial process. In addition to the devices discussed below, consider trying one or more test cases, with appropriate provision concerning the estoppel effect of a judgment. The interplay of these various devices can have a significant effect on the fair and efficient resolution of complex litigation.[299] In considering any of these devices, keep in mind the devices' potentially disparate impact on the parties (given the parties' respective trial burdens and possibly unequal resources), their effect on the right to trial by jury, the possibilities of settlement, and the interests of the court and the public.

### 11.631  Consolidation[300]

Federal Rule of Civil Procedure 42(a) authorizes the judge to consolidate, for trial or pretrial, actions pending in the same court involving common questions of law or fact if it will avoid unnecessary cost or delay. Consolidation may be for trial of the entire case or only for separable common issues. Moreover, it may be appropriate even if some issues or cases are to be tried before a jury and others before the court; the same evidence must be presented only once even though the judge may consider it in some of the cases and the jury may consider it in others. Class actions may be consolidated with cases brought by opt-outs or other individual plaintiffs. When this occurs, the judge must ensure that counsel for parties in the non–class actions have a fair opportunity to participate in the presentation of evidence and arguments at trial, particularly when their clients are primarily affected.

Whether consolidation is permissible or desirable depends largely on the amount of common evidence among the cases. Unless common evidence predominates, consolidated trials may confuse the jury rather than promote efficiency. To avoid this problem, the judge may consider severing for a joint trial those issues on which common evidence predominates, reserving noncommon

---

299.  For an illustration, see *In re Plywood Antitrust Litig.*, 655 F.2d 627 (5th Cir. 1981).

300.  *See also supra* section 10.123 and *infra* section 22.54.

issues for subsequent individual trials. For example, in mass tort litigation, liability issues could be consolidated for joint trial and damage issues reserved for later individual trials. If most of the proof will be common but some evidence admissible in one case should not be heard in others, consider a multiple-jury format. However, cases with major conflicts between the basic trial positions of parties should not be consolidated, at least not without ensuring that no prejudice results. Consolidation is also inappropriate where its principal effect will be to magnify unnecessarily the dimensions of the litigation.[301]

## 11.632 Separate Trials

Whether the litigation involves a single case or many cases, severance of certain issues for separate trial under Federal Rule of Civil Procedure 42(b) can reduce the length of trial, particularly if the severed issue is dispositive of the case, and can also improve comprehension of the issues and evidence. Severance may permit trial of an issue early in the litigation, which can affect settlement negotiations as well as the scope of discovery. The court should balance the advantages of separate trials, however, against the potential for increased cost, delay (including delay in reaching settlement), and inconvenience, particularly if the same witnesses may be needed to testify at both trials. There is also the potential for unfairness if the result is to prevent a litigant from presenting a coherent picture to the trier of fact.[302]

The court should take care when deciding which issues may and should be severed for separate trial and the order in which to try them. Under *Beacon Theatres*, the right to trial by jury on legal claims may not (except under "the most imperative circumstances") be lost by a prior determination of equitable claims; this may require trial of legal claims before deciding related claims in equity, or trying them concurrently.[303] In addition, issues for trial should not be severed if they are so intertwined that they cannot fairly be adjudicated in isolation[304] or when severance would create a risk of inconsistent adjudication.

Generally, when issues are severed for separate trials, they should be tried before the same jury unless they are entirely unrelated. Severance may take the form of having evidence on discrete issues presented sequentially, with the jury returning a verdict on an issue before the trial moves on to the next issue (see section 12.34).

301. *See In re* Repetitive Stress Injury Litig., 11 F.3d 368 (2d Cir. 1993).

302. *See In re* Bendectin Litig., 857 F.2d 290 (6th Cir. 1988) (severed trial creates risk of "sterile or laboratory atmosphere").

303. *See* Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 510–11 (1959).

304. *See* Gasoline Prods. Co. v. Champlin Ref. Co., 283 U.S. 494, 500 (1931) (antitrust).

## 11.633 Special Verdicts and Interrogatories

Special verdict forms or interrogatories accompanying a general verdict form may help the jury focus on the issues, reduce the length and complexity of the instructions, and minimize the need for, or scope of, retrial in the event of reversible error.[305] They can provide posttrial guidance in conducting additional discovery, ruling on nonjury issues (possibly with some issues presented to the jury while others are reserved for decision by the court) or motions for summary judgment,[306] trying remaining issues, or negotiating settlement. Having counsel submit proposed verdict forms along with jury instructions at the pretrial conference will help focus counsel's attention on the specific issues in dispute and will help inform the court.

Special verdict forms and interrogatories can help the jury understand and decide the issues while minimizing the risk of inconsistent verdicts. It is best for the court to arrange the questions on the form in a logical and comprehensible manner; for example, asking questions common to several causes of action or defenses only once and grouping related questions together. Where the legal standards applicable to similar claims or defenses differ (for example, where different laws may apply to different parties), careful drafting of questions on a special verdict form can ease problems that consolidation could otherwise cause. Issues not in dispute should be excluded.

Special verdict forms may also be used in connection with a procedure by which issues are submitted to the jury sequentially. The jury may be asked to consider a threshold or dispositive issue and return its verdict before submission of other issues, which may be rendered moot by the verdict.

Some judges and attorneys are reluctant to use these devices out of fear of inconsistent verdicts and jury confusion, but these problems can be avoided by good drafting. Parties' views on the desirability of special verdict forms or interrogatories will differ, however, if these devices are seen as advantageous to one side; the court will have to evaluate the arguments for and against them in the particular case.

The court may also suggest that the parties stipulate to accept a majority verdict if the jury is not unanimous[307] or to waive a verdict and accept a decision by the judge based on the trial evidence. Although such stipulations may be obtained after the case has gone to trial, the parties may be more amenable before trial begins.

---

305. Fed. R. Civ. P. 49. *See infra* section 12.451.

306. *See In re* Plywood Antitrust Litig., 655 F.2d 627 (5th Cir. 1981) (special verdicts following a joint trial of all cases (including "opt-out" cases) on all issues except individual amounts of damages provided foundation for summary judgment motions regarding damages).

307. *See* Fed. R. Civ. P. 48.

## 11.64  Procedures to Expedite Presentation of Evidence

.641 Statements of Facts and Evidence  124
.642 Pretrial Rulings on Objections  124
.643 Disclosure of and Objections to Digital Evidence and Illustrative Aids  126
.644 Limits on Evidence  127
.645 Use of Courtroom Technology to Facilitate Evidence Presentation  127

The principal purpose of the final pretrial conference is the "formulat[ion of] a plan for trial, including a program for facilitating the admission of evidence."[308] The plan should eliminate, to the extent possible, irrelevant, immaterial, cumulative, and redundant evidence, and should further the clear and efficient presentation of evidence. Essential to accomplishing this purpose is a final definition of the issues to be tried. The process of defining and narrowing issues begun at the initial conference and discussed in section 11.3 should reach completion at the final pretrial conference, which can then turn to the proof the parties expect to offer at trial. Fair, effective, and innovative ways of presenting that proof may include presenting voluminous data through summaries or sampling (see sections 11.492–11.493); presenting summaries of deposition testimony; and presenting expert testimony by reports on videotape or by videoconferencing.[309] Other techniques to expedite the presentation of evidence are discussed below and in section 12.3.

### 11.641  Statements of Facts and Evidence

One method used by judges to ensure adequate preparation, streamline the evidence, and prevent unfair surprise is to have each party prepare and submit a statement listing the facts it intends to establish at trial and the supporting evidence. The statement should be informative and complete, but free of argument and conclusions. If adopted, evidence not included in the statement should not be permitted at trial. Exchanging such statements may help narrow factual disputes and expedite the trial (also see generally section 11.47). Such statements should not be required routinely, however, because the substantial amount of work required for their preparation may outweigh the benefits.

### 11.642  Pretrial Rulings on Objections

Judges should strive to resolve objections to evidence and cure technical defects (such as lack of foundation) before trial. Where the admissibility of evidence turns on other facts, the facts should be established where possible

---

308. Fed. R. Civ. P. 16(d).

309. *Effective Use of Courtroom Technology, supra* note 85, at 168–74, discusses videoconferencing witness testimony.

before trial—by stipulation if there is no basis for serious dispute (see section 11.445). Parties should be required, to the extent feasible, to raise their objections to admissibility in advance of trial (usually by motions *in limine*), with all other objections (except those based on relevance or prejudice) deemed waived. Under Federal Rule of Civil Procedure 26(a)(3), objections (other than under Federal Rule of Evidence 402 or 403) to the admissibility of proposed exhibits disclosed as required by Rule 26(a)(3)(C) or to the use of depositions designated as required by Rule 26(a)(3)(B) are waived unless made within fourteen days of disclosure or excused by the court. Pretrial rulings on admissibility save time at trial and may enable parties to overcome technical objections by eliminating inadmissible material, obtaining alternative sources of proof, or presenting necessary foundation evidence. In addition, such rulings may narrow the issues and enable counsel to plan more effectively for trial. Receiving exhibits into the record during the final pretrial conference can also save time by avoiding the need for formal offers at trial.

Opposing counsel may indicate their objections to documentary evidence in a response to the pretrial listing of such evidence by opposing counsel. Objections to deposition testimony can be noted in the margin of the deposition where the objectionable matter appears, and the court's ruling can be indicated in the same place. Objections to other types of evidence can be made by means of a separate motion or other written requests describing the nature of the proposed evidence and the grounds of the objection.

The court should weigh the benefits of advance rulings on objections against the potential for wasteful pretrial efforts by the court and counsel. For example, ruling on objections in a deposition may require the judge to read it before trial, despite the fact that the deposition or the objections to it may be partially or entirely mooted or withdrawn because of developments during trial. Some judges prefer to make pretrial rulings only on those objections that counsel consider sufficiently important, either because of their significance to the outcome of the case or because of their effect on the scope or form of other evidence.

Pretrial rulings are also advisable with respect to proffered expert testimony that may be pivotal. The judge may rule on the basis of written submissions, but an evidentiary hearing under Federal Rule of Evidence 104(a) may be necessary to determine whether the evidence is admissible under Rules 702 and 703.[310]

---

310. The subject is discussed at length in Schwarzer & Cecil, *supra* note 199, at 53–54. *See also infra* sections 23.2, 23.35.

## 11.643 Disclosure of and Objections to Digital Evidence and Illustrative Aids

The court should consider requiring disclosure of all digital materials that will be shown to the jury. The timing of the disclosure may differ for evidentiary exhibits, illustrative aids, and expert materials. The timing may also vary according to the type of digital materials (e.g., digital photos versus animations) and whether they will be used in opening statements, direct examination, cross-examination, or closing arguments.[311] Such disclosure will help expedite the pretrial and trial processes, assist the court in making pretrial and otherwise timely rulings on admissibility, and minimize surprising the court and parties.

Disclosure should ordinarily be in the same format to be used at trial. For example, paper copies may not adequately represent documents and photos to be presented with a computer because the paper copies cannot reveal any sound, motion, or alteration that may be involved. Computer animations and simulations should be disclosed in the format to be used at trial, which is typically digital or analog videotape; in addition, however, the opposing party needs the computer files that constitute the actual animation or simulation in order to expose underlying assumptions and construct an effective cross-examination.[312] The disclosure of digital materials raises a number of issues that must be resolved during pretrial, or at least before the materials are shown to the jury.[313] For example, the phrase "digital alteration" means different things to different people, so some ground rules are needed about the alteration of photographs, documents, videotapes, and other materials at a fairly early point in the pretrial proceedings.[314] The planned use of an animation or simulation also raises issues for pretrial consideration, including the treatment of any narration (possibly including hearsay statements), the need for limiting instructions (such as to clarify the specific purpose for which the evidence is being offered), the authenticity and reliability of the underlying data, and the assumptions on which the exhibit is based.[315] It may be advisable for a party to obtain at least a preliminary ruling or guidance concerning the admissibility of an animation or simulation (or any other expensive and elaborate exhibit) be-

---

311. *See* Effective Use of Courtroom Technology, *supra* note 85, at 105–06, and the additional pages referenced therein.

312. *Id.* at 113–14.

313. For a discussion of possible objections to digital evidentiary exhibits and illustrative aids, see *id.* at 180–209.

314. *See id.* at 106–13.

315. *See* Joseph, *supra* note 172, at 890–93; Effective Use of Courtroom Technology, *supra* note 85, at 205–09.

fore substantial expense is incurred in its preparation (e.g., at the storyboard stage of a computer animation).

## 11.644 Limits on Evidence

Some attorneys understand the advantages of selectively presenting evidence, but others leave no stone unturned, resulting in trials of excessive length unless limited by the judge. Where the parties' pretrial estimates suggest that trial will be excessively long, the judge should discuss the possibility of voluntary, self-imposed limits with the lawyers, perhaps suggesting exhibits or testimony that could be eliminated and inviting further suggestions.

If this approach is not productive, consider imposing limits in some form, using the authority under Federal Rule of Civil Procedure 16(c)(4) and Federal Rules of Evidence 403 and 611. Announcing an intention to impose such limits may suffice to motivate counsel to exercise the discipline necessary to expedite the case. Before imposing limits, the judge should be sufficiently familiar with the litigation to form a reasonable judgment about the time necessary for trial and the scope of the necessary evidence.

Limits may be imposed in a variety of ways:

- by limiting the number of witnesses or exhibits to be offered on a particular issue or in the aggregate;
- by controlling the length of examination and cross-examination of particular witnesses;
- by limiting the total time allowed to each side for all direct and cross-examination; and
- by narrowing issues, by order or stipulation.

Limits need not hamper counsel's ability to present their case; indeed, counsel often welcome them. At the same time, limits should not jeopardize the fairness of the trial. In designing limits, consider the respective evidentiary burdens of the parties. Generally, limits are best imposed before trial begins so that the parties can plan accordingly, but the need for limits may not become apparent until trial is underway. Limits must be firm so that one side cannot take advantage of the other, but it is sometimes necessary to extend the limits. If a party requests, the judge may advise the jury of any limits imposed in order to prevent unwarranted inferences from a party's failure to call all possible witnesses.

## 11.645 Use of Courtroom Technology to Facilitate Evidence Presentation

Trials in a technologically advanced courtroom usually move faster and take less time than a traditional trial. This faster pace puts a premium on law-

yers' preparation and a clear and well-defined case theory. All exhibits must be identified and organized before trial so that digital files can be assembled and stored on a laptop computer to be taken to court. Most of the illustrative aids to be used with the opening statement and the direct examination of witnesses need to be prepared before trial so that they are consistent with and support the case theory. Judges may more confidently impose time limits on lawyers because technology assists in making presentations move along more quickly and predictably.

Each piece of equipment should contribute to efficiency. For example, presenting an exhibit with the help of an evidence camera or laptop computer eliminates the sometimes-lengthy pauses for approaching the bench, handing copies of exhibits to opposing counsel, and passing the exhibit hand-to-hand among the jurors. Documents on a CD or a laptop can be accessed and displayed almost instantly, resulting in time savings that can be quite significant in trials involving a significant number of documents. Computer presentations can also be accessed very quickly, as well as altered on the spot, if necessary, in case of an objection. Real-time transcription frees judges from detailed note taking and enables them to focus on what is taking place with the witnesses, lawyers, and jurors. In the event of a contested objection, it also allows the judge to look at the pending question or just-uttered answer to see exactly what was said. Videoconferencing gives judges the flexibility to conduct pretrial hearings from remote locations or to schedule the testimony of witnesses at remote locations to fit the trial schedule.

## 11.65  Proposed Jury Instructions

The final pretrial conference should complete the pretrial process of identifying and narrowing issues. To that end, the parties should submit and exchange proposed substantive jury instructions (both preliminary and final) before the conference; some judges require counsel to confer and submit a single set of those instructions on which there is no disagreement.[316] This process compels counsel to analyze the elements of their claims and defenses and the supporting and opposing evidence. Many judges then use the parties' submissions as a starting point for preparing their own substantive instructions and find that they are generally accepted by counsel with little argument. Proposed instructions can be submitted electronically to enable the judge to make revisions on chambers computers. This also helps those judges who want to pre-

---

316. For more on jury instructions, see *infra* section 12.43.

sent preliminary and final jury instructions on monitors or a projection screen. Many judges provide their own standard instructions to counsel for comment.

## 11.66  Briefs and Final Pretrial Motions

If legal issues remain to be resolved, counsel should submit briefs before the final pretrial conference. Early submission will assist the court and counsel in preparing for the conference and make the conference more productive.

With discovery complete and critical evidentiary rulings made, some additional issues may be ready for summary judgment. Motions for summary judgment should be presented and decided no later than the final conference, absent special circumstances. Deferring such motions and their resolution to the eve of trial may cause unnecessary expense and inconvenience to counsel, witnesses, jurors, and the court, and may interfere with trial preparation.

## 11.67  Final Pretrial Order[317]

At the conclusion of the final pretrial conference, the judge should enter an order reciting all actions taken and rulings made, whether at the conference or earlier. The order should provide that it will govern the conduct of the trial and will not be modified except "to prevent manifest injustice."[318]

Below are some of the things that should be stated in the order:

- the starting date of the trial and the schedule to be followed;
- the issues to be tried;
- if separate trials are to be held, the issues to be tried at the initial trial;
- the witnesses to be called and the exhibits to be offered by each side (other than for impeachment);
- whether additional undisclosed or other specified evidence is precluded;[319]
- which objections are to be deemed waived;[320]
- procedures for consolidation or severance or transfer of cases;
- procedures for the presentation of testimony and exhibits;
- procedures regarding the use of technology at trial; and
- other housekeeping matters to expedite the trial.

---

317.  *See infra* section 40.6.
318.  Fed. R. Civ. P. 16(e).
319.  Fed. R. Civ. P. 26(a)(3).
320.  *Id.*

No single format can be prescribed for a final pretrial order that will be suitable for all complex litigation. The judge and attorneys must tailor the trial according to the circumstances of the specific litigation.

# 12. Trial

.1 Administration  132
   .11 Trial Schedule  132
   .12 Courthouse Facilities  133
   .13 Managing Exhibits  134
   .14 Transcripts  135
   .15 Conferences During Trial  135
.2 Conduct of Trial  136
   .21 Opening Statements  136
   .22 Special Procedures for Multiparty Cases  137
   .23 Advance Notice of Evidence and Order of Proof/Preclusion Orders  138
   .24 The Judge's Role  139
.3 Presentation of Evidence  139
   .31 Glossaries/Indexes/Demonstrative Aids  140
   .32 Use of Exhibits  141
   .33 Depositions  143
     .331 Summaries  143
     .332 Editing, Designations, and Extracts  143
     .333 Presentation/Videotaped Depositions  144
     .334 Alternative Means of Presenting Testimony  145
   .34 Sequencing of Evidence and Arguments  146
   .35 Judicial Control/Time Limits  147
.4 Jury Trials  150
   .41 Impaneling the Jury  150
     .411 Size of the Venire and Panel  150
     .412 Voir Dire  151
     .413 Peremptory Challenges  152
   .42 Juror Note Taking/Notebooks/Questions  152
     .421 Note Taking  152
     .422 Juror Notebooks  153
     .423 Juror Questions  153
   .43 Jury Instructions  154
     .431 General Principles  154
     .432 Preliminary Instructions  154
     .433 Interim and Limiting Instructions  156
     .434 Final Instructions  156
     .435 Jurors' Use of Exhibits During Deliberations  158
     .436 Supplemental Instructions and Readbacks  158
   .44 Avoiding Mistrial  159
   .45 Verdicts  160
     .451 Special Verdicts and General Verdicts with Interrogatories  160
     .452 Judgment as a Matter of Law  162
     .453 Return of Verdict  163
.5 Nonjury Trials  164
   .51 Adopted Prepared Statements of Direct Testimony  164
   .52 Findings of Fact and Conclusions of Law  165
   .53 Procedures When Combined with Jury Trial  166
.6 Inability of Judge to Proceed  166

Judicial management can reduce complexity, cost, and trial time, and can improve the quality of the trial. Its effectiveness depends on the design and

implementation of flexible and creative plans that take into account the specific needs of particular litigation and permit the attorneys to try their case in an orderly fashion.

Although judicial management is equally important in civil and criminal litigation, the two frequently pose different problems and considerations. This section deals with civil trials.

# 12.1  Administration

.11 Trial Schedule  132
.12 Courthouse Facilities  133
.13 Managing Exhibits  134
.14 Transcripts  135
.15 Conferences During Trial  135

## 12.11  Trial Schedule

A trial schedule is essential to the orderly conduct of a trial. The schedule may, but need not, limit the length of the trial itself or the time allotted to each side for examination and cross-examination (see section 12.35). Whether or not it imposes time limits, the schedule should specify the days of the week and the hours each day that the trial will be held, as well as holidays and other recess days (such as for a weekly motions day). It is appropriate to set the trial schedule only after consultation with counsel and after making appropriate accommodations for other time demands of the participants. The schedule ordinarily should be modified only in urgent situations. Very lengthy trials may require periodic review and adjustment of the schedule.

Adherence to the schedule requires all trial participants to make appropriate arrangements for their other activities. Jurors should be informed of the schedule at the time of voir dire; any who are unable to commit to it should be excused, if possible. The judge should inform them of any changes in the trial schedule and advise them of the trial's progress so that they can alter their own arrangements. If unforeseen events arise during a trial affecting a juror's availability, accepting minor delays is generally preferable to losing a juror who may later be needed for a verdict.

All trial participants should be punctual and prepared to proceed on schedule. To minimize interruptions, attorneys may be permitted to enter and leave the courtroom discretely during the proceedings. Informing the jury will avoid any perception of discourtesy.

To expedite the trial and avoid keeping the jury waiting, it is advisable to devote the trial day to the uninterrupted presentation of evidence. Objections, motions, and other matters that may interrupt generally should be raised at a time set aside for the purpose, before the jury arrives or after it leaves for the

day. Any matter that must be raised during the presentation of evidence should be stated briefly without argument and ruled on promptly. If an objection is too complex for an immediate ruling, consider deferring the matter until it can be resolved without taking the jury's time, and proceeding with the presentation of evidence, possibly directing counsel to pursue a different line of questioning for the moment. In managing the trial, the judge should not hesitate to use the authority of Federal Rule of Evidence 611(a) to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence."

Judges employ different approaches to the scheduling of trial:

- *Six-day week.* An extended trial week can expedite a lengthy trial, but may take too great a toll on trial participants and leave insufficient time for other activities.
- *Four-and-a-half-day week.* With this commonly used schedule, one half day each week is reserved for administrative matters, hearings outside the presence of the jury, and other nontrial matters.
- *Short-day schedule.* Holding trial from 9 a.m. to noon for a short day or from 8 a.m. to 2 p.m. for a longer day permits jurors time for their personal commitments during the trial (which can reduce requests to be excused) and allows the court and counsel substantial time to keep up with other work.

## 12.12  Courthouse Facilities

A trial with a large number of attorneys, parties, witnesses, exhibits, and documents requires advance planning for appropriate accommodations. Such a trial may require the following:

- a larger courtroom, in the courthouse or elsewhere;
- a courtroom that is technologically equipped;
- installation of case-specific technology in the courtroom for the case at hand;
- physical modifications to the courtroom, such as additional space for counsel, parties, files, exhibits, or persons whose presence may be needed, such as experts or consultants;
- jury accommodations, particularly in a lengthy trial;
- witness and attorney conference rooms; and
- courtroom security and access during nontrial hours.

The judge should alert those responsible for courthouse facilities of the trial needs as far in advance as possible. Allowing the parties access before trial to the courtroom and other areas as necessary helps them to prepare and to

advise the court of potential problems. Preparation is particularly important (and may require more time and effort than usual) if attorneys plan to bring evidence presentation equipment into a courtroom that is not technologically advanced or to supplement the court-provided equipment.[321] Most courts designate court personnel with whom the parties may coordinate these activities.

## 12.13  Managing Exhibits

Trial efficiency increases if each document or other item to be offered in evidence or used at trial (other than for impeachment) is

- premarked with an identification number, preferably in advance of trial but at least one day before it is to be offered or referred to at trial (preferably a single identification designation should be used for pretrial discovery and trial) (see section 11.441)—the numbering system should accommodate and differentiate between evidentiary exhibits and illustrative aids;[322]
- listed on the form used by the court to record such evidence—counsel should obtain in advance of trial copies of the court's form or, subject to the judge's approval, create a form for use in the particular case;
- made available to opposing counsel and the court before trial begins;
- copied, enlarged, or imaged[323] as necessary for use at trial; and
- redacted, if lengthy, to eliminate irrelevant matter.

As discussed in section 11.64, the judge should consider requiring pretrial disclosure of proposed exhibits and objections thereto, and ruling at that time on admissibility to the extent feasible. The following procedures expedite the trial and help avoid interruptions:

- admitting into evidence exhibits not objected to, or to which pretrial objections were overruled, without formal offer and ruling;
- issuing pretrial rulings on objections to evidence—this should preclude the parties from renewing the offer or objection at trial, absent a substantial basis for reconsideration;[324]

---

321. The use of technology at trial is discussed in *infra* section 12.3; see also *Effective Use of Courtroom Technology*, *supra* note 85, at 1–59, 137–216.

322. *Id.* at 123–28.

323. Imaging of documents for computerized storage and retrieval is discussed in *supra* section 11.444.

- ruling on objections made at trial from the bench without argument, deferring any necessary argument to the next scheduled recess, and having counsel proceed with other matters (see section 12.15); and
- alternatively, permitting attorneys not needed in the courtroom to present objections and arguments to a magistrate judge while the trial is proceeding, and receiving unresolved objections, along with the magistrate judge's summary of the arguments, for resolution after the jury has been excused.[325]

## 12.14 Transcripts

The benefits of expedited, daily, or hourly transcripts should be balanced against the costs they add to the litigation. Ultimately, the decision whether to incur the extra costs of such transcripts is for counsel. Under 28 U.S.C. § 1920(2), the court may tax as costs "fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case." Courts do not ordinarily include in taxable costs the additional fees for expedited or daily transcripts.[326]

Having a transcript available can speed readbacks requested by the jury during deliberations, but the transcript, if given to the jury, may overshadow the jurors' mental impression of witness demeanor and credibility. Many judges advise jurors at the outset of the trial to be prepared to rely on their recollection rather than a transcript.

Real-time court reporting permits transcription on a monitor as the verbal exchange takes place. The more common practice is to provide a monitor only for the judge, but monitors may be provided in other locations in the courtroom[327] (e.g., counsel tables).

## 12.15 Conferences During Trial

The court should consider scheduling a conference with counsel at the end of each trial day, after the jury has been excused. The conference may be brief,

---

324. Counsel should, however, consult local law to determine whether renewal of the objection is required to prevent waiver. *See United States v. Rutkowski*, 814 F.2d 594, 598 (11th Cir. 1987).

325. *See* Harry M. Reasoner & Betty R. Owens, *Innovative Judicial Techniques in Managing Complex Litigation*, 19 Fed. Litig. Guide 603, 605–06 (1989) (discussing ETSI Pipeline Project v. Burlington N., Inc., No. B-84-979-CA (E.D. Tex.)).

326. *See* 10 Wright et al., *supra* note 101, § 2677 and cases cited therein.

327. For further discussion of this technology, see *Effective Use of Courtroom Technology*, *supra* note 85, at 29–32 and 164–68.

but should generally be on the record to avoid later misunderstandings. Such a conference helps avoid bench conferences and other trial interruptions. It can be used to plan the next day's proceedings and to fix the order of witnesses and exhibits, avoiding surprises and ensuring that the parties will not run out of witnesses. Counsel can raise anticipated problems, and the judge may hear offers of proof and arguments. The judge may, in light of other evidence previously presented, determine that further evidence on a point would be cumulative. In large litigation, attorneys working on the case but not directly engaged in the courtroom can prepare motions for consideration at the conference. The judge can provide guidance to attorneys without the stigma of courtroom admonitions, remind them, when necessary, of appropriate standards of conduct, and cool antagonism generated in the heat of trial. A short conference before the jury arrives in the morning can address last-minute changes in the order of witnesses or exhibits or follow up on matters raised at the previous day's conference.

## 12.2  Conduct of Trial

.21 Opening Statements  136
.22 Special Procedures for Multiparty Cases  137
.23 Advance Notice of Evidence and Order of Proof/Preclusion Orders  138
.24 The Judge's Role  139

## 12.21  Opening Statements

Opening statements are of particular importance in complex litigation. To maximize their utility, consider some of the following points:

- the effectiveness of opening statements is often enhanced if preceded by preliminary instructions from the judge outlining the principal issues in the case;

- opening statements should be brief—perhaps subject to a time limit;

- it may be beneficial to set ground rules in advance for dealing with sensitive issues, such as punitive damages and evidence that may yet be ruled inadmissible;

- in long trials, it may be useful to allow each side time to make supplementary opening statements during trial to help the jury understand evidence as it is presented;

- it is helpful to set rules for the use of charts and other demonstrative aids not then in evidence—the court should encourage the use of such aids at this stage to aid jury comprehension, but should give opposing counsel an opportunity to review and object to them in advance of trial;

- it is best to review all computer-driven graphics (particularly those with motion or sound) to be used in opening statements;[328]
- in multiparty cases, a decision should be made whether to permit each party to present an opening statement to establish its separate identity with the jury and, if this is the case, how to minimize repetition and limit time; and
- opening statements in nonjury cases are still useful in informing the court of each party's contentions and proposed order of proof, but they may be brief.

## 12.22  Special Procedures for Multiparty Cases

Appropriate procedures to minimize delay and confusion from the proliferation of counsel in multiparty cases can include the following:

- assigning primary responsibility for the conduct of trial to a limited number of attorneys, either by formal designation of trial counsel (see section 10.22) or by encouraging informal arrangement among the attorneys, taking into account legitimate needs for individual representation of parties;
- in cases in which the court will award or apportion attorneys' fees, overseeing the arrangements for trial preparation, clarifying the extent to which attorneys in subsidiary roles will be entitled to compensation, and ensuring that attorneys will not claim compensation for time unnecessarily spent at trial (see section 14.213);
- providing that objections made by one party will be deemed made by all similarly situated parties unless expressly disclaimed;
- permitting other counsel to add further grounds of objection, again on behalf of all similarly situated parties unless disclaimed;
- minimizing repeated objections by ordering that objections to a particular line of examination will be deemed "continuing" until its completion, without the need for further objection unless new grounds arise as the examination proceeds; and
- in cases alleging collusion or conspiracy, allowing counsel reasonable leeway to demonstrate their independence from one another and, if requested, giving cautionary instructions.

---

328. *See id.* at 153–64.

## 12.23  Advance Notice of Evidence and Order of Proof/Preclusion Orders

Counsel should exchange lists (with copies if not previously supplied) for each trial day indicating the order in which expected witnesses and exhibits will be called or offered. The lists should identify those portions of depositions to be read. The court should specify the amount of advance notice required, balancing opposing counsel's need for time to prepare against the possibility that intervening developments will require changes. Some judges require a tentative listing of the order of witnesses and exhibits a week or more in advance, with instructions to communicate changes as soon as known, and give a final list at a conference at the close of the preceding day.

Absent unusual circumstances, counsel should also indicate in advance when adverse parties or their employees will be called to testify. Counsel should try to accommodate personal and business conflicts and, to avoid surprise and possible embarrassment, not call on the opponent to produce a person without warning. If numerous employees are called, the judge should require counsel to order them so as to avoid disrupting the adversary's affairs unnecessarily. When plaintiffs call significant defense witnesses, consider permitting defendants to offer their case on redirect examination. The court can encourage counsel for the adverse party, upon sufficient advance notice, to arrange for the presence of witnesses under the party's control at the agreed-on time without the need for a subpoena (and even if not subject to subpoena). Ordinarily, it is best when witnesses, whether or not subpoenaed, are allowed to report on timely request rather than remain in continuous attendance.

If a party will not make available an employee who is beyond the court's subpoena power, any party may offer that witness's deposition for any purpose "unless it appears that the absence of the witness was procured by the party offering the deposition."[329] Though the court probably lacks authority to compel the appearance, it may encourage cooperation by precluding the uncooperative party from later calling such a witness. The court may similarly preclude witnesses who have earlier successfully resisted testifying for the opposing side on privilege or other grounds; an effective procedure is to enter an order requiring witnesses to elect between testifying or asserting a privilege at least forty-five days prior to trial.

---

329. Fed. R. Civ. P. 32(a)(3)(B).

## 12.24  The Judge's Role

This section sets out general principles relating to the judge's role at trial; for specific actions the judge may take to control the presentation of evidence at trial, see section 12.35.

Judges can control the courtroom and proceedings without frustrating the adversary process, and still remain humane and considerate. Such control provides the parties, counsel, and jurors with prompt, firm, and fair rulings. It keeps the trial moving in an orderly and expeditious fashion, bars cumulative and unnecessary evidence, and holds all participants to high professional standards (see section 12.35 for discussion of judicial control of time and proof). It also helps reduce the stress and tension of a long trial.

Counsel appreciate a judge's sensitivity to counsel's rights in the adversarial process to employ accepted strategies and tactics that serve their clients' interests. Counsel should understand courtroom procedures, such as the location from which to examine witnesses and the mechanics for submitting exhibits to witnesses, the clerk, or the jury. Written guidelines may be helpful, particularly to attorneys unfamiliar with local customs.

In jury trials, judicial restraint in questioning witnesses minimizes both the appearance of partiality and the disruption of counsel's presentation. The court should generally refrain from asking questions until counsel have finished their examination and even then limit questions to matters requiring clarification. See section 12.35.

## 12.3   Presentation of Evidence

.31 Glossaries/Indexes/Demonstrative Aids  140
.32 Use of Exhibits  141
.33 Depositions  143
   .331 Summaries  143
   .332 Editing, Designations, and Extracts  143
   .333 Presentation/Videotaped Depositions  144
   .334 Alternative Means of Presenting Testimony  145
.34 Sequencing of Evidence and Arguments  146
.35 Judicial Control/Time Limits  147

Although presentation of evidence is normally controlled by counsel's strategies and tactics, complex litigation presents other concerns, primarily jury comprehension and the length of the trial. These are not unrelated: A shorter trial promotes jury comprehension, and effective presentation of evidence saves time. Moreover, many jurors expect information to be presented succinctly, even where it deals with complex matters.

The judge should encourage or even direct the use of techniques to facilitate comprehension and expedition—primarily simplification of facts and evidence, use of plain language, and use of visual and other aids. Some techniques are time-tested; others are more innovative, but can improve the trial process without risking error.

## 12.31  Glossaries/Indexes/Demonstrative Aids

Aids that organize massive quantities of evidence and familiarize jurors with the relevant vocabulary can significantly enhance jury comprehension. Such aids include glossaries of important terms, names, dates, and events; informative indexes of exhibits to assist in identification and retrieval; and time lines of important events in the case. To the extent feasible, the judge should encourage or direct the parties to develop glossaries, indexes, and time lines as joint exhibits. They may be prepared using the procedure suggested for developing statements of agreed and disputed facts (see section 11.471); if necessary, the court can refer disputes to a magistrate judge. Stipulated facts should be presented in the form of a logically organized statement.

Jurors understand better and remember more when information is presented both visually and verbally. Graphics, such as charts and diagrams, are common demonstrative aids.[330] Demonstrative evidence may be admitted, whatever its source, if it will help the trier of fact understand other evidence;[331] however, the court should prohibit misleading representations, such as physical representation of data (e.g., the area occupied on a chart) that is disproportionate to the ratio of the numbers represented, distorted representation of data (e.g., representing one-dimensional data by three-dimensional bars), showing amounts of money in nonconstant dollars, or graphs taking figures out of context or using different scales that may distort large or small differences in data.[332] The judge should try to rectify such problems pretrial.

---

330. See *supra* section 12.21 on the use of demonstrative aids during opening statements and *Effective Use of Courtroom Technology*, *supra* note 85, at 137, on computer-generated graphics.

331. *See* 2 McCormick on Evidence § 212, at 9–10 (John William Strong et al. eds., 4th ed. 1992).

332. *See* Edward R. Tufte, Visual Explanations: Images and Quantities, Evidence and Narrative (1997); Envisioning Information (1990); *and* The Visual Display of Quantitative Information (1983).

## 12.32  Use of Exhibits

Counsel should present exhibits in a manner that will communicate some significant fact (except when an exhibit is simply a link in a chain of proof). Thus, documentary proof should be redacted to eliminate irrelevant matter, and its contents offered, whenever possible, by way of summary or other streamlined procedure that will focus the jury's attention on the material portions. See section 11.492.

It is time-consuming when counsel circulate exhibits among the jurors, and it disrupts the examination of witnesses, except where the physical qualities of an object are themselves relevant. It is helpful, however, to display exhibits so that the jurors, the judge, and counsel can view them while hearing related testimony. Below are some options to consider:

- *Enlargements.* They may be posted, or projected on a screen easily visible to the witness, judge, and jurors; counsel can direct attention to particular portions of an exhibit during examination.

- *Evidence presentation systems.* Such systems display evidence electronically and simultaneously to everyone in the courtroom and may significantly assist jury involvement and comprehension and expedite trial. The most basic use is for the retrieval and display of documentary exhibits. Evidence presentation systems can also be used to create and display illustrative aids by combining an exhibit with enhancements that make the content of the exhibit easier to understand—for example, by highlighting and enlarging relevant portions of documents and photos, juxtaposing text from two or more pages, adding explanatory labels and text, displaying digitized videotaped transcripts of depositions, playing digitized audio files, and presenting complex animations and simulations. The following should be considered with respect to evidence presentation systems:

  - providing counsel with an orientation to the courtroom evidence presentation system;[333]

  - having counsel practice using the technology, overcoming the problem that some lawyers may have had little or no experience with these valuable resources;[334]

  - permitting attorneys to bring their own evidence presentation equipment into a courtroom that is not technologically advanced

---

333.  *See* Effective Use of Courtroom Technology, *supra* note 85, at 49–50.
334.  *Id.* at 51.

and allowing them to practice on the equipment in the courtroom before trial (an increasing number of courts have evidence presentation systems installed in at least one courtroom, although attorneys typically must provide their own laptop computer, if one is to be used);[335]

    – determining whether counsel, the court, or a combination of the two will control the equipment at trial;[336]

    – determining whether the use of the system will be optional or mandatory for attorneys;[337] and

    – requiring attorneys to state for the record the backup plan in case of equipment failures.[338]

• *Copies and exhibit books.* In some cases it may be cost-effective for counsel simply to provide jurors with individual binders containing indexed copies of selected exhibits central to the presentation at trial, updated as needed, with separate pages summarizing counsel's contentions concerning their significance. If juror note taking is allowed (see the discussion of juror notebooks in sections 12.421–12.422), there should be space for their notes about each exhibit. Other less important exhibits may be distributed and collected by the courtroom clerk on a daily basis, with jurors instructed not to make notes on their copies.

To avoid cumbersome and time-consuming handling of exhibits, exhibits should be premarked and received into evidence pretrial. Copies of exhibits to be used should be available to a witness on the stand and in the hands of counsel before an examination begins. If voluminous, relevant exhibits can be kept in tabbed notebooks stacked on a cart located within easy reach of the witness, counsel can direct the witness to the volume and tab number of exhibits as needed.

---

335. *Id.* at 44.
336. *Id.* at 45–46.
337. *Id.* at 44–45.
338. *Id.* at 141–42.

## 12.33  Depositions

.331 Summaries  143
.332 Editing, Designations, and Extracts  143
.333 Presentation/Videotaped Depositions  144
.334 Alternative Means of Presenting Testimony  145

The court should encourage counsel to avoid reading depositions at trial and to consider the techniques detailed in the following subsections.

### 12.331  Summaries

If the contents of a deposition are a necessary element of a party's proof, the preferred mode of presentation is a succinct stipulated statement or summary of the material facts that can be read to the jury. Most of the contents of pretrial depositions are irrelevant or at least unnecessary at trial; the material portions rarely exceed a few lines or pages. The judge should encourage the parties to agree on a fair statement of the substance of the testimony, possibly with the assistance of a magistrate judge. Video presentation may increase the effectiveness of summaries, as discussed below.

### 12.332  Editing, Designations, and Extracts

A fair presentation of the contents of a deposition may, however, also require presenting a colloquy with the witness. The portions read should be limited to the essential testimony of the witness, but may include not only the deponent's "final" answer but also testimony that reflects demeanor, attitude, recollection, and other matters affecting credibility. Rather than going through a deposition to eliminate unnecessary portions, the judge can direct counsel to select for designation only the genuinely material parts that cannot be presented by way of summary. Background information, such as that bearing on the qualifications of an expert, may be covered by a brief stipulation read to the jury in advance.

Before trial, each party should designate those portions of depositions it intends to read at trial. Using this information, other counsel can designate additional portions, if any, to be read. Under Federal Rule of Civil Procedure 32(a)(4), if only a part of a deposition is offered, "an adverse party may require the offeror to introduce any other part which ought in fairness to be considered with the part introduced, and any party may introduce any other part."[339] The parties should repeat this series of exchanges until they have designated

---

339.  *See also* Fed. R. Evid. 106.

the portions to be offered. Those portions usually will be introduced at trial in the same sequence in which they appear in the deposition, although another sequence can be adopted to improve comprehension.

A common and convenient method for making designations is for the parties to bracket the portions to be offered on the pages of the deposition, each using a different color. Other parties may indicate objections in abbreviated language opposite the brackets (e.g., "D obj. hearsay, not best evidence"). The court's rulings may be indicated in a similar fashion, enabling counsel to read only the admitted portions from the original deposition.

Developments during trial may change the parts of depositions that the parties want to offer. Ordinarily, the court should permit parties to change their designations as long as other parties are advised promptly of such changes and have sufficient notice to revise their counterdesignations.

## 12.333 Presentation/Videotaped Depositions

In nonjury cases, relevant excerpts of depositions or summaries can be prepared and offered as exhibits, usually without being read at trial and transcribed by the court reporter. The judge can later read these excerpts along with other exhibits in the record. The judge, however, should hear the testimony if a ruling from the bench is expected. The same procedure can be used in jury trials; it reduces the volume of deposition evidence but increases the number of exhibits.

In jury cases, attorneys or paralegals usually read deposition testimony. The court should discourage or prohibit using actors and ensure that the reader's pauses, inflection, and tone do not unfairly distort the witness's deposition testimony. If a tape recording (e.g., made by court reporters during depositions as a backup) is available, it may be played for the jury when necessary. Under Federal Rule of Civil Procedure 32(c), deposition testimony may be offered at trial in nonstenographic form if the offering party provides a transcript of the pertinent portions to the court and, under Rule 26(a)(3)(B), to other parties (indeed, in a jury trial, on a party's request it must be so presented if available unless the court for good cause orders otherwise). Recordings may, however, be difficult to hear and understand.

Videotape is generally more effective for the presentation of deposition testimony, for impeachment and rebuttal, and for reference during argument.[340] Videotaped depositions may be used routinely or for key witnesses

---

340. For discussion of the use of videotaped depositions during argument, see Henke, *supra* note 186, at 165 (citing Gregory P. Joseph, Modern Visual Evidence § 3.03[2][f] (1984)). *See also* Effective Use of Courtroom Technology, *supra* note 85, at 187, 191–92 (discussing possible objections to the use of videotapes at trial).

only; any party may videotape a deposition without court order.[341] To avoid an unfair difference in emphasis, however, testimony should not be presented by different means on direct and cross-examination.[342] As with all depositions, videotaped depositions should be purged of irrelevant and inadmissible matter.

Digitized video (made with a digital video camera) is easier to edit and use in the courtroom than analog video because specific portions can be identified more readily. When appropriate, consider requiring counsel to exchange analog video for a digitized version to minimize expense and to ensure that all copies of the recording to be used at trial are of the same quality.

As with written depositions, when edited versions of videotaped depositions are offered, other parties may request introduction of deleted portions.[343] Counsel should provide other parties access to recordings in their entirety before trial, allowing them to designate the portions they contend should be shown and to present unresolved disputes promptly to the court.

The process for determining the admissibility of videotape testimony should be addressed early in the litigation before the parties have made extensive investments. The persuasive power of visual presentation carries with it the potential for prejudice, a risk heightened by the opportunities for manipulation. Rulings on objections are critical. Unless the parties can reach substantial agreement on the form and content of the videotape to be shown to the jury, the process of passing on objections can be so burdensome and time-consuming as to be impractical for the court.

## 12.334 Alternative Means of Presenting Testimony

Videoconferencing[344] makes it possible to present the testimony of absent witnesses, including witnesses recalled for only brief testimony, without the

---

341. Fed. R. Civ. P. 30(b)(2), (3).

342. *See* Traylor v. Husqvarna Motor, 988 F.2d 729, 734 (7th Cir. 1993) (disapproving presentation of live direct testimony and videotaped cross).

343. *See* Fed. R. Civ. P. 32(a)(4); Fed. R. Evid. 106.

344. This technique was used in *San Juan Dupont Plaza Hotel Fire Litigation*, MDL 721, and in *In re Washington Public Power Supply System Securities Litigation*, MDL 551. In both cases, the court held that witnesses (at least if under a party's control) may be compelled to testify by such means despite being beyond the court's subpoena power, reasoning that the limits on that power are intended only to protect witnesses from undue inconvenience. *See San Juan*, 129 F.R.D. at 426 (approving Judge Browning's reasoning in *Washington Public*). For considerations related to the videoconferencing of witness testimony, see *Effective Use of Courtroom Technology, supra* note 85, at 168–74.

cost and other disadvantages of depositions.[345] In some instances, the cost and burden of obtaining the physical presence of a witness will be disproportionate to the importance of the expected testimony. For videoconferencing, the procedure for examination is similar to that in the courtroom—the witness is sworn and examined on direct and cross—though additional safeguards may be needed.[346] The cost should generally be borne by the party calling the witness, though a portion may be allocated to other parties who prolong examination by extensive cross-examination or objections.[347]

Federal Rule of Civil Procedure 43(a) permits presentation of witness testimony by videoconference "for good cause shown in compelling circumstances and upon appropriate safeguards." The Rule 43(a) committee notes point out that the appearance of a witness by videoconference "cannot be justified by a showing that it is inconvenient for the witness to attend the trial." More is required, unless both parties consent. Courts have found good cause shown in instances where it was necessary to obtain the testimony of witnesses who are incarcerated, medically incapacitated, or otherwise unable to travel to the courtroom, or who are located at a distance and are only peripherally involved in the trial. A peripheral fact witness or a witness who supplies a part of the foundation for an exhibit might be inconvenienced considerably by traveling a significant distance to participate in a trial for only a brief interval. Judges also have allowed child witnesses to appear by videoconference to avoid emotional distress the child might experience from a courtroom appearance.

## 12.34  Sequencing of Evidence and Arguments

Jury recollection and comprehension in lengthy and complex trials may be enhanced by altering the traditional order of trial. Sequencing techniques include the following:

- *Evidence presented by issues.* Organizing the trial in logical order, issue by issue, with both sides presenting their opening statements and evidence on a particular issue before moving to the next, can help the jury deal with complex issues and voluminous evidence, but may result in inefficiencies if witnesses must be recalled and evidence re-

---

345. *See In re* San Juan Dupont Plaza Hotel Fire Litig., 129 F.R.D. 424, 425–26 (D.P.R. 1989).

346. For a sample protocol, see *id.*, 129 F.R.D. at 427–30 (adapted from protocol used in *Washington Public*). For example, it is necessary to control the presence of other persons in the room in which the witness is being interrogated by remote means.

347. *See id.* at 428.

peated. See section 12.21. This procedure is roughly equivalent to severance of issues for trials under Federal Rule of Civil Procedure 42(b).

• *Arguments presented by issues/sequential verdicts.* If it is impractical to arrange the entire trial in an issue-by-issue format, it may still be helpful to arrange closing arguments by issue, with both sides making their closings on an issue before moving to the next. The entire case may be submitted to the jury at the conclusion of all argument, or the issues may be submitted sequentially (see section 12.451 (special verdicts and general verdicts with interrogatories) and section 35.35 (civil RICO trials)). The latter procedure may be advantageous if a decision on one issue will render others moot or if the early resolution of pivotal issues will facilitate settlement; on the other hand, it can lengthen the total time for deliberations and requires recurrent recesses while the jury deliberates.

• *Interim statements and arguments.* In a lengthy trial, it can be helpful if counsel can intermittently summarize the evidence that has been presented or can outline forthcoming evidence. Such statements may be scheduled periodically (for example, at the start of each trial week) or as the judge and counsel think appropriate, with each side allotted a fixed amount of time. Some judges, in patent and other scientifically complex cases, have permitted counsel to explain to the jury how the testimony of an expert will assist them in deciding an issue. Although such procedures are often described as "interim arguments," it may be more accurate to consider them "supplementary opening statements," since the purpose is to aid the trier of fact in understanding and remembering the evidence and not to argue the case.[348] (Interim jury instructions, discussed in section 12.433, and reminders to the jury of the difference between evidence and counsel's statements[349] may also be helpful.)

## 12.35 Judicial Control/Time Limits

Limits on time and evidence are ordinarily set at the pretrial conference so that counsel can plan accordingly before the trial begins. See section 11.644. Judicial intervention may become necessary, however, if evidence exceeds reasonable bounds and does not contribute to resolving the issues presented.

---

348. *See, e.g., In re* Visa Check/Mastermoney Antitrust Litig., 96-CV-5238, 2003 WL 1712567 (E.D.N.Y. Apr. 1, 2003) (order addressing jury selection and conduct of upcoming trial).

349. *See* Robert M. Parker, *Streamlining Complex Cases,* 10 Rev. Litig. 547, 553–54 (1991).

One judicial alternative is to limit or bar the examination of witnesses whose testimony is unnecessary or cumulative and to call for stipulations where a number of witnesses would testify to the same facts. Judges can review the order in which witnesses are to be called to determine if it would interfere with an orderly trial. For example, counsel may try to call an adversary's expert witness before critical evidence has been presented and before the party's own expert has testified. When particular, clearly defined subject matter requiring the testimony of two or more persons is involved, it may be efficient to examine the witnesses simultaneously, allowing the more knowledgeable witness to answer. This may require consent of counsel, in view of the parties' right under Federal Rule of Evidence 615 to have witnesses excluded. Expert witnesses needed to advise counsel are not subject to exclusion.[350] Opposing expert witnesses may be examined seriatim in order to clearly frame their agreements and disagreements for the trier of fact.

The judge should ordinarily refrain from interfering with counsel's mode of questioning, except when ruling on objections. However, the judge should consider limiting the examination when the questioning is confusing, repetitive, or irrelevant and threatens to delay the trial. Federal Rules of Evidence 611(a) and 403 permit exclusion even of relevant testimony "if its probative value is substantially outweighed by . . . considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The judge may intervene, even without objection, in order to

- bar testimony on undisputed or clearly cumulative facts—testimony may be disallowed as cumulative if it relates to evidence to be covered in later testimony, or matters beyond the scope of the examination;
- clarify confusing questions or answers;
- prohibit repeated paraphrasing of answers into new, duplicative questions (e.g., "Do I understand you to mean that . . ."; "Is it your testimony then that . . ."; "Is it fair to say that . . ."; and the like); and
- encourage stipulations by opposing counsel to avoid routine testimony, such as the date of a document.

It is helpful for the court to issue guidelines providing, among other things, that it will

- not instruct witnesses to answer "yes or no" to questions that (1) are compound, (2) require a witness to make or accept a characterization rather than testify to a fact, or (3) are argumentative in form or substance;

---

350. Fed. R. Evid. 615(3) committee note.

- bar questions framed as arguments rather than requests for testimony that the witness is competent to give;
- prohibit questions asking one witness to comment on the credibility of another, unless prior request is made outside of the jury's presence; and
- sustain objections that an answer is nonresponsive only when made by interrogating counsel.

As noted in section 11.644, time limits generally should be established before trial. The burdens of an unduly long trial on jurors and on the public's access to the court may, however, require setting limits during trial. Such limits should not prejudice either side, but the mere threat of such limits may cause counsel to expedite the trial. Limits may grant each party a specified number of hours for all direct and cross-examination, restrict the time for specific arguments, or limit the time for examination of particular witnesses. Once limits have been imposed, the court should grant extensions only for good cause, taking into account the requesting party's good-faith efforts to stay within the limits and the degree of prejudice that would result from the denial of an extension.

It occasionally may be appropriate for the judge to use Federal Rule of Evidence 614's authority to question parties' witnesses. However, such questions should avoid the appearance of partiality or interference with counsel's trial strategy and should be limited to clarifying matters on which the jury may be confused. Rule 614's committee note states that "the authority [to question witnesses] is . . . abused when the judge abandons his proper role and assumes that of advocate." Such abuse may be grounds for reversal.

Rule 614 also allows the court to call its own witnesses (subject to cross-examination by the parties); however, that authority is rarely used, other than with respect to an expert under Rule 706 (see section 11.51). An alternative approach is for the judge to suggest questions to counsel outside the hearing of the jury, or inquire whether the matter will be clarified or addressed by another witness.

# 12.4 Jury Trials

.41 Impaneling the Jury  150
    .411 Size of the Venire and Panel  150
    .412 Voir Dire  151
    .413 Peremptory Challenges  152
.42 Juror Note Taking/Notebooks/Questions  152
    .421 Note Taking  152
    .422 Juror Notebooks  153
    .423 Juror Questions  153
.43 Jury Instructions  154
    .431 General Principles  154
    .432 Preliminary Instructions  154
    .433 Interim and Limiting Instructions  156
    .434 Final Instructions  156
    .435 Jurors' Use of Exhibits During Deliberations  158
    .436 Supplemental Instructions and Readbacks  158
.44 Avoiding Mistrial  159
.45 Verdicts  160
    .451 Special Verdicts and General Verdicts with Interrogatories  160
    .452 Judgment as a Matter of Law  162
    .453 Return of Verdict  163

Jury trials in complex cases place a heavy responsibility on the judge, who must ensure not only that the parties receive a fair trial but also that the jurors are treated with courtesy and consideration by counsel, staff, and the court itself.  Although the jurors are the decision makers, they too often are in the dark about much of what is happening in court and are left to wait while the judge and counsel discuss matters outside their presence.

## 12.41  Impaneling the Jury[351]

.411 Size of the Venire and Panel  150
.412 Voir Dire  151
.413 Peremptory Challenges  152

### 12.411  Size of the Venire and Panel

Federal Rule of Civil Procedure 48 requires between six and twelve jurors for a civil trial. Local rules may also address jury size. Rule 47(c) allows the judge to excuse jurors during trial for good cause, but federal courts no longer seat alternates in civil trials—all jurors not excused participate in deliberations. A verdict from a jury of less than six requires a stipulation. The committee note to Rule 48, however, suggests avoiding verdicts of fewer than six, even

---

351.  *See generally* Benchbook, *supra* note 45, §§ 2.05–6.03.

with a stipulation, because smaller juries may be less reliable. For similar reasons, many judges prefer seating twelve jurors, especially in complex cases.

The court should seat enough jurors to minimize the risk of a mistrial, considering the probability of incapacity, disqualification, or other developments requiring the excuse of jurors during trial. This is especially important in complex cases. The primary factor is the expected length of trial. One rule of thumb is to select eight jurors for a trial expected to last up to two months, ten jurors for a trial to last four months, and twelve jurors for a longer trial. In determining appropriate jury size, consider asking the parties if they will stipulate, in the event of a hung jury, to accept a verdict from a less-than-unanimous jury[352] or to allow the case to be decided on the record by the court.[353] The parties may be more amenable to entering such agreements before voir dire than after the jury has been selected.

## 12.412 Voir Dire

The court may examine prospective jurors itself or allow the parties to do so.[354] The judge who conducts the examination must "permit the parties or their attorneys to supplement the examination by such further inquiry as it [the court] deems proper or . . . submit to the prospective jurors such additional questions of the parties or their attorneys as 'it [the court] deems proper.'"[355] The judge should invite the attorneys to submit proposed questions in advance of trial and to conduct reasonable follow-up questioning of the jurors after the judge has finished.

In cases involving potentially large jury venires, judges often mail pre–voir dire jury questionnaires to prospective jurors for basic information and to identify prospective jurors unable to serve. This avoids unnecessary trips to court, but may lead to many requests by potential jurors to be excused and to inappropriate inquiries about the case. An alternative is to have prospective jurors complete a questionnaire in court before voir dire begins.[356]

During voir dire, the court should inform prospective jurors of the expected length of trial, the trial schedule, and other facts that may bear on a juror's ability and qualifications to serve. The prospect of a long trial may produce many requests to be excused, and may generate the risk of a jury consisting solely of persons who are retired or otherwise not employed outside their

---

352.  *See* Fed. R. Civ. P. 48.

353.  *See* Fed. R. Civ. P. 39(a)(1).

354.  Fed. R. Civ. P. 47(a); Fed. R. Crim. P. 24(a).

355.  Fed. R. Civ. P. 47(a). Federal Rule of Criminal Procedure 24(a) is similar, but applies to the defendant, defense counsel, and the government's attorney.

356.  *See infra* section 40.7.

home. Introductory comments can reduce requests for excuses—these comments should emphasize the responsibilities of citizenship and the importance of representative juries, and describe the challenge of litigation and the opportunity to learn more about the judicial process.

Some judges permit counsel to deliver opening statements to the entire venire so that prospective jurors can respond to voir dire questions more intelligently.

### 12.413 Peremptory Challenges

In civil cases, each party is allowed three peremptory challenges.[357] Several plaintiffs or several defendants may be considered a single party for that purpose, but the court may allow additional challenges, depending on whether parties' interests conflict or diverge significantly. The court should grant additional challenges sparingly because they will increase the size of the venire and lengthen voir dire and the jury-selection process. Presumptively, each side should have the same number of challenges. Some judges have used unconventional methods of jury selection in complex cases to increase the participation of relatively more experienced and educated jurors. Such techniques are best used with the consent and cooperation of counsel.[358]

## 12.42  Juror Note Taking/Notebooks/Questions

.421 Note Taking  152
.422 Juror Notebooks  153
.423 Juror Questions  153

### 12.421 Note Taking

Arguments for juror note taking are particularly compelling in long and complicated trials.[359] Many jurors will not take notes, but denial of permission to do so may be inconsistent with the large measure of responsibility the system places on jurors, and it may hamper their performance. If note taking is permitted, the court should provide jurors with paper (or notebooks with space for notes, see section 12.422) and pens. Jurors should be told that notes are only for their individual use and not to be shown or read to others, that

---

357. 28 U.S.C. § 1870 (West 2002); Fed. R. Civ. P. 47(b). In felony cases, defendants are allowed ten challenges jointly and the government six (with additional challenges for alternates, if selected); the court may allow additional defense challenges if there are multiple defendants. Fed. R. Crim. P. 24(b).

358. *See* William W Schwarzer, *Reforming Jury Trials,* 132 F.R.D. 575, 580–81 (1991).

359. *See id.* at 590–91.

note taking should not distract them from observing the witnesses, and to leave their notes in the jury room during recesses.

### 12.422 Juror Notebooks

Individual notebooks can hold exhibits (see section 12.32) and provide assistance to help jurors organize and retain information (witness and exhibit lists, pictures of witnesses, chronologies and timelines, glossaries (see section 12.31), and excerpts from instructions).[360] The amount of material in the notebooks should be controlled to ensure that the notebooks remain clear and useful.

### 12.423 Juror Questions

Some judges allow jurors to ask questions in open court in civil cases. Others require them to submit questions in writing for consideration by the judge and counsel. Still others disallow juror questions. Some judges say nothing on this subject; others inform jurors that questions are permitted at the conclusion of a witness's examination to help them understand the evidence. Jurors, however, should be cautioned that it is for the lawyers to try the case and that matters occurring to them during one witness's examination may later be covered by another's[361] or may be inadmissible under the Federal Rules of Evidence.

---

360.  *See* Parker, *supra* note 349, at 550. Preliminary and interim instructions are discussed in *infra* sections 12.432–12.433.

361.  The pros and cons of juror questioning, and the procedures to follow if it is allowed, are discussed in *United States v. Cassiere*, 4 F.3d 1006, 1016–18 (1st Cir. 1993); *United States v. Johnson*, 914 F.2d 136, 137–39 (8th Cir. 1990) (criminal); *DeBenedetto v. Goodyear Tire & Rubber Co.*, 754 F.2d 512, 513–17 (4th Cir. 1985); Schwarzer, *supra* note 358, at 591–93 (also providing sample instruction).

## 12.43  Jury Instructions[362]

.431 General Principles  154
.432 Preliminary Instructions  154
.433 Interim and Limiting Instructions  156
.434 Final Instructions  156
.435 Jurors' Use of Exhibits During Deliberations  158
.436 Supplemental Instructions and Readbacks  158

## 12.431  General Principles

A complex and protracted trial makes understandable jury instructions particularly important. Instructions should use language that laypersons can understand—instructions should be concise, concrete, and simple, be in the active voice, avoid negatives and double-negatives, and be organized in logical sequence. Counsel should submit proposed instructions at the final pretrial conference to focus the judge's and lawyers' attention on the issues to be tried (see section 11.65).

Substantive instructions should be tailored to the particular case, and the judge should avoid a generalized pattern of instructions. The judge should explain propositions of law with reference to the facts and parties in the case; illustrations familiar to jurors may also help. Instructions using the language of appellate opinions are rarely meaningful to jurors. Most judges reword—or at least edit—counsel's proposed instructions, which are often argumentative and one-sided. Combining the proposals submitted by counsel for each side rarely produces sound and intelligible instructions. Instructions should be read to the jury in a manner that enhances comprehension and retention; rarely should the reading take more than thirty minutes. Some judges use the court's evidence presentation system to put the jury instructions on a screen or monitors in the courtroom so that jurors can read along as the instructions are given orally.[363] Jurors usually like to have one or more copies of the instructions in the jury room (see section 12.434). In complex cases with long verdict forms, it is helpful for each juror to have an individual copy of the verdict form.

## 12.432  Preliminary Instructions

Jurors can deal more effectively with the evidence in a lengthy trial if they are provided with a factual and legal framework to give structure to what they see and hear. Moreover, jurors should understand the trial process in which

---

362. *See generally* Benchbook, *supra* note 45, §§ 2.07–2.08, 6.05–6.06 (jury instructions in criminal and civil cases, respectively).

363. See *Effective Use of Courtroom Technology*, *supra* note 85, at 149–53, for related discussion and suggestions.

they are about to participate and what they can expect. Preliminary instructions provide context and basic guidance for the jurors' conduct. These instructions typically contain or delineate the following:

- *Preliminary statement of legal principles and factual issues.* The instructions should summarize the key factual issues, including the undisputed facts and the parties' major contentions (which may be drafted jointly by the parties), and explain briefly the basic legal issues and principles, such as the elements of claims and defenses to be proved. The court should emphasize that these instructions are preliminary—they don't cover all the issues or principles—and that instructions given at the conclusion of the case will govern deliberations. Since one purpose of these instructions is to prepare jurors for opening statements, they are usually given first, permitting counsel to refer to them in opening statements. The judge may, however, defer instructions until after opening statements or give supplemental preliminary instructions at that time.

- *The conduct of the trial.* The judge should inform jurors of the anticipated course of the trial from opening statements to verdict, the methods for presenting evidence, and the procedure for raising and resolving objections. It is also useful to introduce court personnel—the clerks, bailiffs, and reporters—and to provide a short orientation to the equipment in the courtroom.[364]

- *Schedule.* Jurors should be informed of the hourly and daily trial schedule and any holidays or other recesses.

- *Precautions to prevent mistrial.*[365] The judge should direct jurors not to discuss the case or communicate with trial participants. It is also important that they be warned against exposure to publicity and attempts at independent fact-finding, such as viewing the scene of some occurrence or undertaking experiments or research.

- *Pretrial procedures.* The instructions should briefly describe the various discovery devices used during the pretrial stage of the litigation, such as depositions, document production, and interrogatories. This information will be helpful when the evidence is introduced, and it explains how the parties learned the facts of the case.

- *The functions and duties of the jury.* The judge should describe the jury's role as fact-finder; the burden of proof; assessing the credibility of witnesses; the nature of evidence, including circumstantial evidence

---

364. *See id.* at 146–49 (suggesting language for explaining courtroom technology to jurors).
365. *See also infra* section 12.44 (avoiding mistrial).

and the purpose of rules of evidence; and the jurors' need to rely on their recollection of testimony (including any special instructions about the use of juror notebooks, note taking, or questions). Most of these instructions should be repeated in the final jury charge, supplemented by any special explanations (such as use of convictions to impeach credibility) warranted by developments at trial, or the use of special verdicts or interrogatories.[366]

## 12.433 Interim and Limiting Instructions

Developments in the course of trial may require additional instructions. Under Federal Rule of Evidence 105, when evidence is admitted that is admissible as to some but not all parties or for a limited purpose only, the court must, upon request, instruct the jury accordingly. At counsel's request, the judge may repeat such limiting instructions at the close of trial. Counsel should be advised that when they contemplate offering such evidence, they should raise the issue promptly (if possible, before trial) and submit proposed instructions.

The judge may also give instructions at any point in the trial where they might be helpful to the jury. An explanation of applicable legal principles may be more helpful when the issue arises than if deferred until the close of trial, but counsel should be permitted to comment or object before an instruction is given. As with preliminary instructions, the judge should caution the jury that these are only interim explanations, and that the final, complete instructions on which they will base their verdict will come at the close of trial. If the parties are presenting their evidence according to a prescribed sequence of issues (see section 12.34), the instructions should be structured accordingly.

## 12.434 Final Instructions

Although proposed instructions should generally be submitted to the court in connection with the final pretrial conference, developments during the trial may require their revision or supplementation. Counsel are entitled to file written requests for instructions "at the close of the evidence or at such earlier time as the court reasonably directs," and are entitled to notice of the judge's proposed action before closing arguments.[367] Most judges, rather than responding to particular requests, provide counsel with the entire charge they propose to give and then hold a charge conference to consider counsel's objections and requests; generally there will be little controversy if the judge has

---

366. *See infra* sections 12.436, 12.45 (supplemental instructions and verdicts, respectively).
367. Fed. R. Civ. P. 51; Fed. R. Crim. P. 30.

prepared instructions.[368] Having proposed instructions submitted electronically can expedite the editing process.

Final instructions may be given before or after closing arguments, or both.[369] Though traditionally instructions have been given after counsel's closings, there are advantages to giving the bulk of the instructions before argument.[370] Instructions on the law may make closing arguments easier to understand, and counsel can refer to instructions already given in arguing their application to the facts. At a minimum, counsel should know before closing arguments what final instructions will be given. This may help them structure their arguments. The judge should reserve the final closing instructions, however, until after arguments, reminding the jury of the instructions previously given and instructing them about the procedures to follow in deliberations.[371]

Most judges give jurors copies of the instructions to use during deliberations. Because jurors are unlikely to remember lengthy and complex legal terms, define these terms in advance so that they can listen to the charge for a general understanding rather than try to memorize it. Some judges keep the written charge from jurors while they deliver the instructions, to focus attention on the delivery. Others permit the jurors to follow the text in hard copy or on a monitor, or at least give them a brief topical outline to follow as the instructions are given. Jurors should have any special verdict forms or interrogatories for use during deliberations.

The oral charge, which the court reporter transcribes, should be complete within itself (i.e., not merely refer to writings that the jury may be given). The judge should instruct jurors that, in the event of any variations between the oral and written charges, the oral charge controls and governs their deliberations. Some judges have experimented with providing jurors with a tape recording of the charge for use during deliberations. Access to specific passages may be facilitated by recording designated portions on separate tapes, or maintaining a record of the counter number where different portions begin.[372] The charge should focus on helping the jurors understand the law and their responsibilities.

368. For a general discussion of procedures and options, see *Benchbook*, *supra* note 45, §§ 2.08, 6.06.

369. Fed. R. Civ. P. 51; Fed. R. Crim. P. 30.

370. *See* Fed. R. Civ. P. 51 committee note.

371. *See* Stonehocker v. Gen. Motors Corp., 587 F.2d 151, 157 (4th Cir. 1978); Babson v. United States, 320 F.2d 662, 666 (9th Cir. 1964).

372. *See* Leonard B. Sand & Steven A. Reiss, *A Report on Seven Experiments Conducted by District Judges in the Second Circuit*, 60 N.Y.U. L. Rev. 423, 456–69 (1985).

In complex litigation, some judges comment on evidence in order to explain subject matter foreign to jurors and to keep them from being confused or misled by adversarial presentations. Such comments should be impartial and assist comprehension only. Before commenting on the evidence, however, consider submitting the proposed language to counsel for comment and objections. The judge's comments may be included with the written instructions given to the jury, but it may be preferable not to do so to avoid giving the comments undue weight. A judge's expression of a personal opinion on disputed facts can be problematic.[373]

After the judge has given all instructions, and before the jury retires, counsel are entitled to record any objections to the charge outside the presence of the jury.[374] It is helpful to remind counsel that objections and the grounds must be stated distinctly or be deemed waived.[375] The judge can then give corrective or supplemental instructions (see section 12.436) before deliberations begin.

## 12.435 Jurors' Use of Exhibits During Deliberation

Some judges send all exhibits received in evidence (except items such as currency, narcotics, weapons, and explosive devices) directly to the jury room for reference during deliberations. Other judges await requests from the jury, or withhold some items—such as those received for impeachment or another limited purpose—until and unless requested by the jury, when they repeat the limiting instructions. If the exhibits are voluminous, jurors should be given an index or other aids to assist their examination (see section 12.31).

## 12.436 Supplemental Instructions and Readbacks

Requests by the jury for supplemental instructions during deliberations are handled in much the same manner as final instructions, i.e., the appropriate response is determined after consulting with counsel and allowing them to object to the proposed response on the record. The instructions should be given orally in open court, with a reminder to the jury to consider the instructions as a part of those previously given, which remain binding.

The final instructions should advise the jurors that in deliberating on their verdict, they will not have a transcript available but will have to rely on the ex-

---

373. *See* Quercia v. United States, 289 U.S. 466, 469 (1933). *Quercia*, in which Chief Justice Hughes discusses judicial comments on evidence in detail, is still cited as the leading case on the issue. *See, e.g.,* United States v. Beard, 960 F.2d 965, 970 (11th Cir. 1992).

374. Fed. R. Civ. P. 51; Fed. R. Crim. P. 30.

375. Fed. R. Civ. P. 51; Fed. R. Crim. P. 30.

hibits and their recollection of the testimony. Nevertheless, after long and complex trials, most juries will request readbacks of testimony. The court should instruct the jury to make requests as specific and narrow as possible to avoid excessively long readbacks, then should confer with the attorneys to seek agreement on the portions of the testimony to be read. Counsel should state any objections on the record.

Readbacks should not unduly emphasize any part of the evidence.[376] Some judges decline readback requests altogether, to save time and to avoid potentially unfair distortions of the record. This approach can sometimes make the jury's task more difficult. Some readbacks can be avoided, however, by an agreed-on statement of the parties' positions on the matter at issue. Readbacks should never be authorized absent counsel's consent or, at least, absent an opportunity to be heard.

## 12.44  Avoiding Mistrial

Complex trials increase the potential and consequences of mistrials. Accordingly, the judge might consider the following precautions to minimize the most obvious risk, the jury's failure to reach a verdict:

- *Evidence and instructions.* Trials and charges should present the facts and the law so as to maximize jury comprehension.
- *Stipulations on verdict.* In advance of trial, the judge should encourage the parties to stipulate under Federal Rule of Civil Procedure 48[377] to accept a nonunanimous verdict, or under Rule 39(a)(1) to accept a nonjury decision on the same evidence if a jury verdict cannot be obtained (see section 11.62). Such stipulations may be made during trial or deliberations—indeed, the parties may not seriously consider them until actually faced with the possibility of mistrial caused by the need to remove a juror—but are generally easier to obtain in advance.
- *Partial verdicts.* Permit juries to return a partial verdict on issues on which they can agree.
- *Cautionary instructions.* As discussed in section 12.432, the jurors, at the outset and periodically during the trial, should be given appropriate instructions regarding improper conduct. The final instructions may also include a brief explanation of the consequences of a mistrial.
- *Special verdicts and interrogatories.* These are discussed in section 12.451.

---

376.  *See* United States v. Hernandez, 27 F.3d 1403, 1408–10 (9th Cir. 1994).
377.  *See* section 12.411.

- *The jury room.* The jury deliberation room should be "sanitized" before the jury retires, and all counsel should review all material before it is sent into the room, to ensure that it includes nothing extraneous.
- *Sequestration.* The judge should consider sequestration only in extraordinary cases where public interest and media coverage are so intense as to jeopardize the fairness of the trial.
- *Seating a sufficient number of jurors.* If a juror is excused or disqualified during deliberations, it need have no effect as long as six jurors remain. If the loss of one or more jurors would reduce the jury to fewer than six members, however, the court cannot accept the resulting verdict (absent the stipulation described above). Seating a sufficient number of jurors helps to avoid this situation (see section 12.411).

## 12.45  Verdicts

.451 Special Verdicts and General Verdicts with Interrogatories  160
.452 Judgment as a Matter of Law  162
.453 Return of Verdict  163

## 12.451  Special Verdicts and General Verdicts with Interrogatories

Special verdicts and interrogatories are common in complex trials. As discussed in section 11.633, they simplify instructions, help jurors organize their deliberations, facilitate partial verdicts, isolate issues for possible appellate review, and reduce the costs and burdens of a retrial. A general verdict form should at least require separate verdicts on each claim and on damages, but be drafted so as to prevent duplicate damage awards. Counsel and the court should consider the form of verdict during pretrial.

Special verdicts may require the jury to return findings on each issue of fact, leaving the court to apply the law to the jury's findings. Some courts have held that the court may also amend special verdict responses to conform to the jury's obvious intention or to correct a manifest error.[378] The preparation of special verdict forms can be complicated. Federal Rule of Civil Procedure 49(a) suggests the court submit "written questions susceptible of categorical or other brief answer," or "written forms of the several special findings which might properly be made under the pleadings and evidence." Alternatively, the rule

---

378. *See* Aquachem Co. v. Olin Corp., 699 F.2d 516, 520 (11th Cir. 1983); Shaffer v. Great Am. Indem. Co., 147 F.2d 981 (5th Cir. 1945), *but cf.* Austin-Westshore Constr. Co. v. Federated Dep't Stores, Inc., 934 F.2d 1217, 1224 (11th Cir. 1991) (*Aquachem* does not apply to general verdicts with interrogatories).

permits any "method of submitting the issues and requiring the written findings thereon as [the judge] deems most appropriate."

The verdict form should be concise, clear, and comprehensive. If any issue of fact raised by the pleadings is omitted, the parties must demand its submission before the jury retires or they will waive their right to a jury trial on that issue. The court may make its own findings on issues omitted without such demand.[379]

Inconsistent verdicts are a concern even with standard verdict forms, but careful structuring and instructions should minimize the risk of inconsistency. Rule 49 requires the court to instruct the jury on how to complete the verdict form properly, including both the procedure for rendering special verdicts and the specific substantive issues to be decided. Consider having the jury return partial verdicts seriatim, instructing on each issue individually before the jury deliberates on it.

Alternatively, the court could submit a general verdict form with interrogatories. The jury both determines the facts and applies the law; it also makes findings on "issues of fact the decision of which is necessary to a verdict."[380] Some consider this procedure an attractive compromise between a simple general verdict and special verdicts. It maintains the traditional role of the jury while diminishing the need to relitigate factual issues if an error of law taints the general verdict. On the other hand, interrogatories increase the length and complexity of deliberations and are more likely to produce inconsistencies. When the interrogatory answers are consistent with each other but inconsistent with the general verdict, the court may simply enter judgment according to the *answers*, or may return the jury for further deliberation or order a new trial.[381] The court may not accept the verdict if the answers are inconsistent with each other and at least one is also inconsistent with the general verdict; it must first try to reconcile the answers, ordering further deliberations or a new trial if it cannot.[382] After the return of special verdicts or a general verdict with interrogatories, it is important to allow counsel to be heard before discharging the jury. That will allow further deliberations to cure inconsistencies following supplemental instructions, and, perhaps, amendment of the verdict form.[383]

---

379.  Fed. R. Civ. P. 49(a).

380.  Fed. R. Civ. P. 49(b).

381.  *Id.*

382.  *See id.*; Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364 (1962).

383.  Case law on the court's authority to amend or supplement verdict forms after the jury has returned a verdict is scarce; for a case holding it permissible to amend interrogatories, see *United States v. 0.78 Acres of Land*, 81 F.R.D. 618, 622 (E.D. Pa.) (mem.), *aff'd*, 609 F.2d 504 (3d Cir. 1979).

## 12.452 Judgment as a Matter of Law

The court may grant judgment as a matter of law (formerly directed verdict) on a claim or defense during the trial. Federal Rule of Civil Procedure 50(a)(1) lets the judge, once a party has been fully heard on an issue, determine the issue against that party if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." The court may grant a motion for judgment as a matter of law on any "claim or defense that cannot . . . be maintained or defeated without a favorable finding on that issue." The motion must "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment," in order to allow the opposing party an opportunity to correct any deficiencies in its proof. If meritorious, it will reduce costs to grant such motions as soon as a party has completed presentation on a fact essential to one or more of its claims or defenses. Such motions should not be granted, however, before the party has been apprised of the materiality of the fact and afforded an opportunity to supplement its evidence on that fact.[384]

Counsel must move for judgment as a matter of law before submission of the case to the jury. Judges sometimes deny or defer such motions initially, even those with merit, until the jury renders a verdict. In this way, if the jury "gets it right" the judge need not disturb the verdict; any question of invading the province of the jury is avoided, and the verdict will be more difficult to overturn on appeal than would a judgment rendered on motion. If the jury instead renders a verdict lacking sufficient evidentiary support, the judge may then grant the motion upon its renewal. Rule 50(b) permits the judge to order a new trial or enter judgment as a matter of law. If the latter, Rule 50(c)(1) still requires the judge to rule on the motion (if any) for a new trial, to assist the appellate court in determining the type of relief to grant if the judgment is reversed. Thus, there will be a jury verdict for the appellate court to reinstate if it chooses.

Motions for judgment as a matter of law may effectively be combined with the procedure discussed in section 12.34 for sequencing issues for trial. If issues likely to be dispositive are scheduled first, a ruling may reduce or obviate further proceedings. Thus, the judge may choose to deny a pivotal summary judgment motion during pretrial if its correct resolution is doubtful, while scheduling the trial to begin with presentation of the facts in issue (or scheduling a separate trial).[385] Even if not dispositive, early judicial resolution of issues unsubstantiated by facts or law may significantly reduce the scope of evi-

---

384.  Fed. R. Civ. P. 50 committee note.
385.  *Id.*

dence, argument, and instructions. An order granting a motion for judgment as a matter of law should be in writing or read into the record, with stated reasons.

## 12.453  Return of Verdict[386]

When the jury has returned a special verdict or a general verdict with interrogatories, the judge and counsel should promptly review it for inconsistencies so as to permit appropriate steps before the jury is discharged. After consultation with counsel, the judge should promptly approve a form of judgment for entry by the clerk.[387] If the judgment does not resolve all aspects of the litigation, entering final judgments as to some claims or parties allows an appeal to be taken.[388]

Where issues have been bifurcated or submitted to the jury for seriatim verdicts, the jury may need to resume hearing evidence and receive further instructions or begin deliberations on other issues.[389] If a recess is called, the judge should instruct the jurors that they remain under the restrictions originally imposed; if the recess extends more than a few days, a supplementary examination of jurors may be necessary on their return to determine whether grounds for disqualification have arisen in the interim.

If the jury is deadlocked, the judge will need to consider appropriate inquiries and instructions. Although the large investment in a long trial makes a mistrial costly, there should not be undue pressure on jurors to reach agreement. The incorrect use of an *Allen* charge may trigger a reversal.[390]

---

386. For general procedures for receipt of civil verdicts, see *Benchbook, supra* note 45, § 6.07.

387. *See* Fed. R. Civ. P. 58.

388. *See* Fed. R. Civ. P. 54(b); *see also* 28 U.S.C. § 1291 (West 2002); *infra* section 15.1.

389. *See supra* sections 11.632 (separate trials), 12.34 (sequencing of evidence and arguments).

390. Darks v. Mullin, No. 01-6308, 2003 U.S. App. LEXIS 6977, at *288 (10th Cir. Apr. 11, 2003) (prohibiting use of *Allen* charge if found to impermissibly coerce the jury); United States v. Brennan, No. 01-3148, 2003 U.S. App. LEXIS 6546, at *37 (3d Cir. Apr. 7, 2003) (noting that the circuit has "developed a prophylactic rule prohibiting the use of such an *Allen* charge because of its power to coerce," but allowing a modified *Allen* charge with noncoercive language); *but cf.* Mason v. Mitchell, 320 F.3d 604, 642 (6th Cir. 2003) (holding that *Allen* charge was not so coercive as to deny due process rights); United States v. Walrath, No. 02-2824, 2003 U.S. App. LEXIS 6359, at *7–*10 (8th Cir. Apr. 3, 2003) (reviewing challenged jury instruction for abuse of discretion); United States v. Crispo, 306 F.3d 71, 76–78 (2d Cir. 2002) (reviewing *Allen* charge under an abuse of discretion standard); United States v. Weymouth, 45 Fed. Appx. 311, 312 (4th Cir. 2002) (per curiam) (same).

# 12.5  Nonjury Trials

.51 Adopted Prepared Statements of Direct Testimony  164
.52 Findings of Fact and Conclusions of Law  165
.53 Procedures When Combined with Jury Trial  166

Nonjury trials may take less trial time than jury trials do, but, unless well managed, may take longer to decide. Although nonjury trials require less formality, procedures to promote clarity and expedition are still important. In fact, the judge has greater freedom to control the conduct and shape of a bench trial than he or she does a jury trial. For example, rather than receive vast volumes of documents to be sorted out during the decision-making process following trial, the court can use redaction, summaries, sampling, and other helpful techniques.

## 12.51  Adopted Prepared Statements of Direct Testimony

Where credibility or recollection is not at issue, and particularly when the evidence is complicated or technical, a court may consider ordering witnesses under the parties' control to present their direct testimony in substantial part through written statements prepared and submitted in advance of trial.[391] At trial, the witness is sworn, adopts the statement, may supplement the written statement orally, and is then cross-examined by opposing counsel and perhaps questioned by the judge. The statement is received as an exhibit and is not read into the record. As with all exhibits, objections should be resolved before trial. Because the witness adopts the statement orally in open court, Rule 43 is not violated.[392]

This procedure—which may be particularly appropriate for expert witnesses, witnesses called to supply factual background, or those needing an interpreter—has several advantages. The proponent can ensure that it has made a clear and complete record; the judge and opposing counsel, having read the statement, are better able to understand and evaluate the witness's testimony; opposing counsel can prepare for more effective cross-examination; and the reduction in live testimony saves time.

---

391. *See* Charles. R. Richey, *Requiring Direct Testimony to be Submitted in Written Form Before Trial*, 72 Geo. L.J. 73 (1983). Circuit law should be consulted on whether the consent of parties is required.

392. *See In re* Adair, 965 F.2d 777 (9th Cir. 1992).

## 12.52  Findings of Fact and Conclusions of Law[393]

The court might consider directing each party to submit proposed findings of fact and counterfindings responding to opposing counsel's submissions, unless the pretrial briefs and statements of agreed on and disputed facts serve this purpose. Some judges require counsel to exchange proposed findings and conclusions before submitting them to the court, marking for the court the portions disputed. Counsel should draft findings in neutral language, avoiding argument and conclusions, and identify the evidence expected to establish each finding. Proposed findings allow the judge to follow the evidence during trial, and to adopt, modify, or reject findings as trial proceeds. This process simplifies the court's final preparation of findings of fact, which along with its conclusions of law are required by Federal Rule of Civil Procedure 52 (also see section 12.452 and Rule 52(c), judgment on partial findings). Some judges require parties to submit proposed findings electronically for ease of adoption, but appellate courts frown on verbatim use of the parties' submissions.[394]

Under Rule 52(a), the court's findings of fact and conclusions may be filed as an opinion or memorandum of decision or read into the record in open court. The latter procedure produces a quick decision while enabling the court to refine its opinion later as needed. The court may defer the decision until after receiving posttrial briefs. However, adequate pretrial memoranda may make posttrial briefs unnecessary. Some judges call for closing arguments immediately after the close of evidence, as in jury trials, and render their decisions promptly following the arguments.

Whatever time savings may be realized by a bench trial can easily be lost if the case is not decided promptly. Decisions become more difficult as the record grows cold, and a long-delayed decision undermines public confidence in the justice system and must be included in the public reports required by 28 U.S.C. § 476. Many judges avoid this problem by ruling from the bench whenever possible (preparing their ruling as the trial progresses) or by setting a deadline for their decision (forcing themselves to arrange their calendar to allow sufficient time).

---

393. For general guidance, see *Benchbook*, *supra* note 45, §§ 2.04, 6.02.

394. *See* Falcon Constr. Co. v. Econ. Forms Corp., 805 F.2d 1229, 1232 (5th Cir. 1986) (a court that adopts findings verbatim leaves doubt whether it has discharged its duty to review the evidence itself and reached its decision on the basis of its own evaluation of evidence). Verbatim adoption of proposed findings may lead to more searching review at the appellate level. *See, e.g.,* Andre v. Bendix Corp., 774 F.2d 786, 800 (7th Cir. 1985); *In re* Las Colinas, Inc., 426 F.2d 1005, 1010 (1st Cir. 1970). Compare the Seventh Circuit's opinion in *Andre* with that in *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1429 (7th Cir. 1985) (despite verbatim adoption, no special scrutiny required where judge paid careful attention to evidence and wrote own opinion).

## 12.53  Procedures When Combined with Jury Trial

As discussed in section 11.63, some judges try jury and nonjury issues concurrently (occasionally with an advisory jury, whose verdict is not binding). Evidence admissible only on a nonjury issue may have to be presented without the jury present. The proper sequencing of the jury and nonjury decisions must comply with *Beacon Theatres, Inc. v. Westover*, under which the right to a jury trial on legal claims may not be lost by a prior determination of equitable claims, except under "the most imperative circumstances."[395]

## 12.6  Inability of Judge to Proceed

Should the judge become unable to proceed after trial has begun, Rule 63 permits any other judge to proceed with the trial upon certifying familiarity with the record and determining that the parties will not be prejudiced. Of course, this will require the prompt availability of a transcript or other record of the prior trial proceedings and any associated video recordings; otherwise, it may be impossible to avoid prejudicing one or more parties.[396]

The rule requires the successor judge in a civil nonjury trial, upon request, to recall any witness whose testimony is material and disputed, and who is available to testify again without "undue burden." The rule also permits the recall of any other witness.[397] It is unlikely that a successor judge will wish to decide a complex case without having heard all the direct and cross-examination of witnesses, unless the parties stipulate to a decision on the record.

Whether a judge unable to proceed in a complex jury trial should be replaced to avoid mistrial is a difficult question, and the answer depends in part on how close the trial is to completion. If the disability occurs near the start of the trial, declaring a mistrial may be the preferable course. On the other hand, if a large investment of resources (not only the parties' but also the jurors' time) has been made in the trial, a mistrial should be avoided if the replacement judge has confidence that the trial can go forward without sacrificing fairness. Note that one of the reasons for the 1991 amendment liberalizing Rule 63 was "the increasing length of federal trials."[398]

---

395. 359 U.S. 500, 510–11 (1959).
396. Fed. R. Civ. P. 63 committee note.
397. Fed. R. Civ. P. 63 & committee note.
398. Fed. R. Civ. P. 63 committee note.

# 13. Settlement

.1 Trial Judge's Role  167
    .11 General Principles  167
    .12 Timing/Relationship to Discovery  169
    .13 Specific Techniques to Promote Settlement  169
    .14 Review and Approval  172
    .15 Alternative Processes to Encourage Settlement  174
.2 Special Problems  174
    .21 Partial Settlements  174
    .22 Agreements Affecting Discovery  176
    .23 Side Agreements  176
    .24 Ethical Considerations  180

The high stakes in complex cases increase the incentive to avoid the risk of trial, and the burgeoning cost of pretrial activity places a premium on settling early in the litigation. At the same time, however, the large sums involved, the high number of parties and counsel, and the complexity of the issues magnify the difficulty of achieving settlement. This section discusses the role of the trial judge, general principles and techniques to promote settlement, and special problems that may arise. Settlement of specific types of litigation is covered in section 21.6 (class actions), section 22.9 (mass tort litigation), section 31.8 (securities litigation), and section 32.46 (employment discrimination).

## 13.1   Trial Judge's Role

.11 General Principles  167
.12 Timing/Relationship to Discovery  169
.13 Specific Techniques to Promote Settlement  169
.14 Review and Approval  172
.15 Alternative Processes to Encourage Settlement  174

## 13.11   General Principles

Some cases involve important questions of law or public policy that are best resolved by public, official adjudication. Other times, however, resistance to settlement arises from unreasonable or unrealistic attitudes of parties and counsel, in which case the judge can help them reexamine their premises and assess their cases realistically. The judge can encourage the settlement process by asking at the first pretrial conference whether settlement discussions have occurred or might be scheduled. As the case progresses, the judge occasionally can suggest that the parties reexamine their positions in light of current or anticipated developments.

The judge can then facilitate negotiations by removing obstacles to compromise and can help overcome the intransigence or militance of clients.

Without touching on the merits, the judge can focus the parties' attention on the likely cost of litigating the case to conclusion, in fees, expenses, time, and other resources. Other helpful measures include scheduling settlement conferences, directing or encouraging reluctant parties, insurers, and other potential contributors to participate, suggesting and arranging for a neutral person to assist negotiations, targeting discovery at information needed for settlement, and promptly deciding motions whose resolution will lay the groundwork for settlement.[399]

Judges may be particularly helpful in identifying and encouraging consideration of nonmonetary solutions. Where, for example, the parties contemplate a continuing relationship, the court can stimulate thought about innovative and mutually beneficial arrangements for the future that may pave the way for agreement on monetary terms. Drawing on experience and common sense, a judge may see opportunities for compromise not apparent to the parties and guide their negotiations toward solutions they might not otherwise discover.

Settlement efforts, however, should not delay or divert the pretrial process; both can and should operate effectively on parallel tracks. Nor should settlement efforts be permitted to impair the parties' perception of judicial fairness and impartiality. Some judges participate actively in settlement discussions of a case, as well as handling pretrial activity and trial if the case does not settle. Others are uncomfortable in what they view as a dual role. Occasionally, the parties request that the assigned judge participate in settlement discussions, waiving the right to seek recusal.[400] Such involvement, however, might affect the parties' confidence in the judge's ability to try the case impartially. Thus, many judges rarely engage in substantive settlement negotiations in cases they are expected to try, particularly by bench trial.[401] Instead, they bring in another judge or other neutral person for settlement purposes. In some large litigation, the parties are willing to pay for the services of a skilled mediator. See section 13.15.

Judicial participation in settlement negotiations demands patience and a willingness to listen. One obstacle may be removed only to reveal another. The judge should not become, or allow counsel and the parties to become, discouraged, but should seek openings and opportunities not readily apparent. Parties may signal their expectations and limits in subtle ways. Often their true objectives remain hidden from all but the most attentive listener. An observant judge can open channels for effective communication.

---

399. *See* Litigation Manual, *supra* note 12, at 58–64.

400. *See id.* at 58.

401. *See* D. Marie Provine, Settlement Strategies for Federal District Judges 28 (Federal Judicial Center 1986).

## 13.12  Timing/Relationship to Discovery

Many judges broach settlement at the initial scheduling conference.[402] Counsel should prepare by discussing the possibility of settlement during the Federal Rule of Civil Procedure 26(f) conference, as the rule requires, and becoming familiar with their clients' positions. Though the parties may lack sufficient information for serious discussions, the court can use the conference to explore the prospects for settlement, as well as the possibility of reference to extrajudicial procedures (see section 13.15). Consider scheduling negotiations and periodic progress reports and assisting counsel in developing a format for them.[403] Counsel should attend settlement conferences with full settlement authority or with immediate access to their client.[404] Any impending or finalized settlement should be disclosed to the court promptly (see also section 13.23).

Although settlement should be explored early in the case, the parties may be unwilling or unable to settle until they have conducted some discovery. The benefits of settlement are diminished, however, if it is postponed until discovery is completed. A better approach may be to target early discovery at information needed for settlement negotiations.[405] Most judges do not stay discovery or other pretrial proceedings based on the pendency of settlement discussions, because the momentum of the litigation and trial preparation can create a powerful impetus for settlement. A short, judicially monitored extension may be appropriate, however, if the parties are close to agreement, and if a particular activity or deadline could affect their positions. Avoiding the expense of imminent discovery can be an inducement to settle, but a possible settlement should not preclude or limit further discovery needed by other parties (see section 13.22).

## 13.13  Specific Techniques to Promote Settlement

A number of techniques have proven successful in promoting settlement. The list below is not exhaustive, and creativity in this aspect of the litigation has few risks. The following techniques may be productive:

- *Firm trial date.* Setting a firm trial date is generally the most effective means to motivate parties to settle. To keep the date credible, ensure

---

402.  *See* Fed. R. Civ. P. 16(a)(5), (c)(9) (pretrial conferences may be used to consider settlement).

403.  *See* Litigation Manual, *supra* note 12, at 21.

404.  *See* Fed. R. Civ. P. 16(c).

405.  Targeted discovery is discussed in *supra* section 11.422.

that the case proceeds on schedule through pretrial; early settlement discussions generally should not be allowed to delay pretrial proceedings.

- *Reference to another judge or magistrate judge.* One way to avoid the appearance of partiality is to refer the parties to another judge or magistrate judge for settlement negotiations. Many courts have reciprocal arrangements by which judges assist in settlement negotiations in cases assigned to other judges.

- *Participation by parties.* Requesting or requiring that the parties or representatives attend settlement conferences[406] may expedite negotiations and help avoid the delays involved in seeking authority. In any event, the attending parties will become better informed of the strengths and weaknesses of each side's case and the costs and risks of pursuing the litigation. The parties' presence can, however, inhibit frank discussion by counsel, who may feel obliged to keep up appearances for the benefit of their clients.

- *Confidential discussions with judge.* A judicial meeting with each party (or side) separately for confidential discussions, with their mutual consent, may help the parties find common ground. The parties may be more willing to speak candidly outside of the adversarial setting, and the judge can point out weaknesses without fear of compromising a party's position in the eyes of opposing counsel. The judge may also ask counsel to submit confidential memoranda outlining their settlement posture. After such discussions, the judge may be able to suggest areas of possible agreement, without revealing confidences.

- *Settlement counsel, special masters, or experts.* The litigating attorneys may not be suited to conduct settlement discussions and may be hampered by personal antagonisms developed in the course of the litigation. In such cases, consider suggesting that one or more of the parties engage or designate special settlement counsel separate from lead and liaison counsel (see section 10.222). Judges have also used special masters to assist in settlement of complex litigation and in post-settlement claims-resolution proceedings. The judge can arrange for the special master's compensation with the agreement of the parties and select an individual from a list provided by the parties (see section 11.52).

---

406. *See* Fed. R. Civ. P. 16(c) (court may require party or its representative to be present or available by telephone).

- *Contribution bar orders.* To facilitate partial settlements in multiparty cases, the court may (unless prohibited by the underlying statute) approve as a term of the settlement an order barring claims for contribution or indemnification by nonsettling defendants. To ensure binding effect, the affected parties or their representatives should be before the court, and their rights should be protected.[407] Such orders typically contain a formula for calculating a setoff for nonsettling defendants based on the settlement amount or the settlors' adjudged proportion of fault.[408]

- *Offer of judgment.* Federal Rule of Civil Procedure 68 allows a party defending against a claim to serve an offer of judgment on the adverse party at any time up to ten days before trial (or proceedings to determine damages if liability has already been adjudged). The party served has ten days to accept or be liable for all costs incurred after the offer is made, unless it obtains a more favorable judgment.[409] The court's invoking this procedure can create an added incentive to accept a reasonable offer in litigation (such as antitrust) where taxable costs may be high, particularly where the underlying statute defines costs to include attorneys' fees.[410] Local or state rules may include similar, possibly harsher provisions than Rule 68. In deciding whether such state rules or statutes apply in diversity cases, consider *Burlington Northern Railroad Co. v. Woods*,[411] which held inapplicable an Alabama statute imposing a mandatory penalty against appellants obtaining a stay pending an unsuccessful appeal, on the ground that it conflicted with Federal Rule of Appellate Procedure 39.

- *Representative case(s).* The results of a trial of one or a few representative lead cases can provide information and motivation helpful to settlement of related cases.

- *Severance.* The early resolution of one or more issues by separate trial may provide a basis for settlement of others. The resolution of liability,

---

407. *See, e.g., In re* Masters Mates & Pilots Pension Plan & IRAP Litig., 957 F.2d 1020, 1031 (2d Cir. 1992); *In re* Jiffy Lube Sec. Litig., 927 F.2d 155, 160 (4th Cir. 1991); Franklin v. Kaypro Corp., 884 F.2d 1222, 1229 (9th Cir. 1989); McDonald v. Union Carbide Corp., 734 F.2d 182, 184 (5th Cir. 1984) (per curiam).

408. *See* McDermott, Inc. v. AmClyde, 511 U.S. 202 (1994) (admiralty).

409. *See* Yohannon v. Keene Corp., 924 F.2d 1255, 1263–69 (3d Cir. 1991) (upholding application of Pennsylvania Rule of Civil Procedure 238, which predicates penalty, *inter alia,* on failure to obtain judgment of more than 125% of offer).

410. *See* Marek v. Chesny, 473 U.S. 1, 7–12 (1985).

411. 480 U.S. 1 (1987).

damages, or other pivotal issues can provide the parties with the information or incentive needed for a comprehensive settlement. A federal court, however, cannot enforce agreements settling claims lacking an independent basis for federal subject-matter jurisdiction unless the court embodies the settlement in the dismissal order at the request of the parties.[412]

## 13.14  Review and Approval

Ordinarily, settlement does not require judicial review and approval.[413] Many of the exceptions to this rule, however, are of particular relevance to complex litigation. The Federal Rules require court approval of settlements in class actions (including actions brought by or against an unincorporated association as a class),[414] shareholder derivative actions,[415] and actions in which a receiver has been appointed.[416] The antitrust laws require court approval of consent judgments proposed by the United States in actions it has instituted.[417] Common law may call for review and approval in a variety of contexts where the settlement requires court action, particularly if it affects the rights of nonparties or nonsettling parties,[418] or where the settlement is executed by a party acting in a representative capacity.[419]

Although the standards and procedures for review and approval of settlements vary, in general the judge is required to scrutinize the proposed settlement to ensure that it is fair to the persons whose interests the court is to protect. Those affected may be entitled to notice[420] and an opportunity to be

---

412. Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375 (1994).

413. *In re Masters,* 957 F.2d at 1025–26; *see* Fed. R. Civ. P. 41(a)(1)(ii) (voluntary dismissal by stipulation signed by all parties).

414. Fed. R. Civ. P. 23, 23.2. Settlement in class actions is discussed in *infra* section 21.6.

415. Fed. R. Civ. P. 23.1.

416. Fed. R. Civ. P. 66.

417. 15 U.S.C. § 16(e) (2000) (review of proposed antitrust consent judgment to determine if in the public interest).

418. *See, e.g., In re Masters,* 957 F.2d at 1025–26 (parties unwilling to settle unless the court enforced the terms); TBG Inc. v. Bendis, 811 F. Supp. 596, 600 (D. Kan. 1992) (settlement required bar order affecting rights of nonsettling parties).

419. *See, e.g.,* Gaxiola v. Schmidt, 508 F. Supp. 401 (E.D. Tenn. 1980) (action brought on behalf of minors). State law, when applicable in a diversity case, may require approval in similar contexts. *See, e.g.,* Owen v. United States, 713 F.2d 1461, 1464–68 (9th Cir. 1983) (applying California law requiring approval of certain settlements in cases involving joint tortfeasors); Soares v. McCloskey, 466 F. Supp. 703 (E.D. Pa. 1979) (applying Pennsylvania estate statute).

420. *See, e.g.,* Fed. R. Civ. P. 23(c)(2).

heard.[421] This usually involves a two-stage procedure. First, the judge reviews the proposal preliminarily to determine whether it is sufficient to warrant public notice and a hearing. If so, the final decision on approval is made after the hearing.

The judge must have information sufficient to consider the proposed settlement fully and fairly. All terms must be disclosed, so that the judge can understand the agreement's effect on those not party to the settlement and help prevent collusion and favoritism.[422] Because the parties or attorneys often have conflicts of interest, the proponents should explain why the proposed settlement is preferable, for those not a party to it, to continuation of the litigation. The proponents should respond to any objections raised. When settlement is proposed early in the litigation, the judge may need additional information necessary for a full review.

The judge must guard against the temptation to become an advocate—either in favor of the settlement because of a desire to conclude the litigation, or against the settlement because of the responsibility to protect the rights of those not party to it. Judges should be open to the views of those who may be affected by the settlement, whether or not they have legal standing to be heard. This may include providing notice to absent parties even if not required by governing law, and appointing an expert under Federal Rule of Evidence 706 to provide a neutral assessment, or special counsel to represent the interests of persons who are absent or under a legal disability.

The trial court may not rewrite a settlement agreement; if it is unacceptable the court must disapprove it,[423] but it may suggest changes.[424] An order rejecting a proposed settlement or consent decree is generally not immediately appealable, but may be appealed if the proposal includes injunctive relief.[425] The proponents may revise their agreement to overcome the court's objections and resubmit it; if the changes are substantial, it may be necessary for the court to begin the notice and review process anew. An order approving a settlement should be supported by a statement of the court's reasoning so as to create a record for appellate review.[426]

---

421. *See, e.g.,* Michaud v. Michaud, 932 F.2d 77, 81 (1st Cir. 1991); Garabedian v. Allstates Eng'g Co., 811 F.2d 802 (3d Cir. 1987).

422. *See In re* Warner Communications. Sec. Litig., 798 F.2d 35, 37 (2d Cir. 1986).

423. *See* Evans v. Jeff D., 475 U.S. 717, 727 (1986); Jeff D. v. Andrus, 899 F.2d 753, 758 (9th Cir. 1989); *In re Warner,* 798 F.2d at 37.

424. *See* Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977) (discussing process of reviewing proposed settlement).

425. *See* Carson v. Am. Brands, Inc., 450 U.S. 79 (1981); *see also* 28 U.S.C. § 1292(a)(1) (West 2002).

426. *See Cotton,* 559 F.2d at 1331.

## 13.15  Alternative Processes to Encourage Settlement

A number of processes outside of the traditional litigation process have proved effective in helping parties reach settlement. The Federal Judicial Center's *Guide to Judicial Management of Cases in ADR* (2001) discusses such processes and how to use them.

# 13.2  Special Problems

.21 Partial Settlements  174
.22 Agreements Affecting Discovery  176
.23 Side Agreements  176
.24 Ethical Considerations  180

## 13.21  Partial Settlements

In litigation involving numerous claims and parties, litigants sometimes seek settlement limited to particular claims, defenses, or issues, or a settlement with less than all of the parties. Such partial settlements may provide funds needed to pursue the litigation, limit the extent of exposure, reduce the scope of discovery or trial, aid the parties in obtaining evidence, and facilitate later settlements on other issues and with other parties. On the other hand, the timing or terms of partial settlements can interfere with the ultimate resolution of the litigation. A partial settlement on terms that prove too generous, for example, may create resistance to later, more reasonable settlement offers. To avoid such problems, settling parties may adopt a general formula for all settlements; if adhered to, this may discourage adverse parties from prolonging litigation to get better terms.

Late partial settlements in multiparty cases present a number of potential problems.[427] Attorneys with assigned responsibilities at trial may drop out when their client's case has been settled, requiring reorganization of counsel and disrupting trial planning. Although it is a common and legitimate litigation strategy to settle with one adverse party to weaken another's position, doing so on the eve of trial may seriously disrupt the progress of the case. The power to shift costs for such conduct, and the desirability of doing so, are both unclear, but the judge can discourage belated and potentially disruptive settlements. If necessary to reduce the prejudice to nonsettling parties, the judge can grant a continuance. The judge can also remind lead counsel, members of a trial team, and other attorneys who have accepted responsibilities on behalf of

---

427. Partial settlements in class actions are discussed in *infra* section 21.651.

other parties and attorneys that their fiduciary obligations may survive the dismissal of their own clients.

Partial settlements can affect the issues and parties not covered. A partial settlement may (by law) release certain nonsettling parties or entitle them to a setoff for amounts received in settlement from coparties; in some areas of law, this may depend on the settling parties' intention.[428] The agreement must therefore indicate clearly which parties and claims it covers, making plain the relationship between the damage items covered and those that may later be awarded by judgment. The court needs to consider whether and in what manner payments made under the settlement agreement will be treated as offsets against future awards,[429] and how the settlement will be treated at trial.

The parties may attempt to apportion the settlement among different claims, sometimes for tax purposes[430] and sometimes to enhance their position against nonsettling parties. When partial settlements are submitted for judicial approval, apportionment clauses should be reviewed for their effect on further proceedings and other parties. Agreements that do not permit appropriate modification of such clauses if justified by later developments should not be approved.

Evidence of the settlement of a claim is inadmissible at trial "to prove liability for or invalidity of the claim or its amount," though not for other purposes. Though federal law disfavors admission, in diversity cases the court may be obliged to apply state law to the contrary.[431] There is disagreement over whether Federal Rule of Evidence 408 prohibits the introduction of evidence of a partial settlement for the purpose of allowing the jury, in determining damages, to consider the amount already recovered from other sources.[432] An alternative approach is for the court to make an appropriate reduction in any

428. *See* Zenith Radio Corp. v. Hazeltine Research, 401 U.S. 321, 343–47 (1971) (discussing subject generally and adopting "intention of parties" rule for release of antitrust coconspirators).

429. *See* McDermott, Inc. v. AmClyde, 511 U.S. 202 (1994) (admiralty).

430. Several U.S. Tax Court decisions hold that agreements apportioning liability solely to create a tax deduction should not be approved. *See, e.g.,* Fed. Paper Bd. Co. v. Comm'r, 90 T.C. 1011, 1024 n.33 (1988); Metzger v. Comm'r, 88 T.C. 834, 849–50 (1987); Fisher Cos. v. Comm'r, 84 T.C. 1319, 1340 (1985).

431. Fed. R. Evid. 408.

432. *See, e.g.,* Carota v. Johns Manville Corp., 893 F.2d 448 (1st Cir. 1990); *see also* McHann v. Firestone Tire & Rubber Co., 713 F.2d 161, 166 n.10 (5th Cir. 1983). If such evidence is received, the court should give appropriate limiting instructions.

judgment recovered against nonsettling parties,[433] informing the jury of the fact (not the amount) of settlement where necessary to explain a party's absence.[434]

## 13.22  Agreements Affecting Discovery

One of the major incentives to settle is to avoid the cost and burden of further discovery. Settlement provisions that relieve a settling party from further discovery (at least in part) may be problematic if other parties need discovery from a settling party, particularly in light of the limits on nonparty discovery. Such provisions should therefore be drafted to take into account other parties' continuing need for discovery. Though nonsettling defendants usually lack standing to appeal orders approving partial settlements, they may appeal if they suffer formal legal prejudice. [435]

A settlement agreement may also purport to require a party not to disclose its terms, or to return, destroy, or keep confidential discovery materials previously obtained. The effect, if not the purpose, of such an agreement may be to forestall or frustrate other litigation, pending or anticipated. For this and other public policy reasons, including the protection of First Amendment interests (not to mention problems under state law), such agreements may be invalid, unenforceable, or simply not entitled to approval. Where such an agreement may be appropriate (e.g., to protect trade secrets), consider requiring that the materials be preserved for a reasonable period of time. The relevant analysis is similar to that employed when considering issuance of a protective order (see section 11.43).

## 13.23  Side Agreements

Agreements allocating financial responsibility among persons or entities are common—contracts of insurance and indemnification are prime examples. Occasionally, however, litigants try to apportion damages through side agreements that supplement their formal settlement agreements but are not intended to be disclosed to others. These agreements may not of themselves be unlawful or unethical, and on occasion there may be legitimate reasons for not

---

433.  *See, e.g.,* Jackson v. Johns-Manville Sales Corp., 727 F.2d 506, 531–32 (5th Cir. 1984), *modified on other grounds,* 757 F.2d 614 (1985) (en banc); *McHann,* 713 F.2d at 166.

434.  *Jackson,* 727 F.2d at 531.

435.  *See, e.g.,* Zupnik v. Fogel, 989 F.2d 93, 98 (2d Cir. 1993); Mayfield v. Barr, 985 F.2d 1090, 1092–93 (D.C. Cir. 1993); Agretti v. ANR Freight Sys. Inc., 982 F.2d 242, 247 (7th Cir. 1992) (defining "formal legal prejudice"); Alumax Mill Prods., Inc. v. Cong. Fin. Corp., 912 F.2d 996, 1002 (8th Cir. 1990), and cases cited therein.

disclosing them to other parties. In presenting settlement agreements for judicial approval, however, the parties are obliged to make full disclosure of all terms and understandings, including any side agreements. The settling parties may request that certain terms not be disclosed to other parties, but must justify this to the court.[436]

Common types of side agreements include the following:

- *"Mary Carter" agreements.*[437] In return for a settlement payment, the plaintiff may agree to release a particular defendant from liability, even though the defendant remains party to the suit, with the further provision that the defendant will be reimbursed in some specified manner out of any recovery against other defendants.[438] Many varieties of such agreements have developed, including loan-receipt agreements and agreements to dismiss during the case or not to execute a judgment if the defendant does not take an aggressive posture against the plaintiff's claims.[439] These agreements have been criticized as unfair to nonsettling defendants,[440] because they align the interests of the "settling" defendant, who remains in the litigation, with those of the plaintiff (usually covertly), eliminating their normal adversarial relationship.[441] Nevertheless, courts have rarely rejected a settlement on this basis,[442] although it is advisable for the court to give such agreements particular scrutiny.[443]

   The primary problem raised by Mary Carter agreements is disclosure. Typically, parties enter them secretly or request that the court not disclose the terms of the agreement. Nondisclosure, however, mag-

---

436. *See, e.g., In re* Braniff, Inc., No. 91-03325-BKC-6Cl, 1992 WL 261641, at *5 (Bankr. M.D. Fla. Oct. 2, 1992) (parties must disclose to court and, unless good cause shown, other parties all agreements settling or limiting liability, whether "formal or informal, absolute or conditional").

437. Booth v. Mary Carter Paint Co., 202 So.2d 8 (Fla. Dist. Ct. App. 1967).

438. *See* Robertson v. White, 81 F.3d 752, 754 n.1 (8th Cir. 1996); Marathon Oil Co. v. Mid-Continent Underwriters, 786 F.2d 1301, 1303 n.1 (5th Cir. 1986); Wilkins v. P.M.B. Sys. Eng'g, Inc., 741 F.2d 795, 798 n.2 (5th Cir. 1984); Quad/Graphics, Inc. v. Fass, 724 F.2d 1230, 1236 (7th Cir. 1983). For other definitions, see materials cited in *Hoops v. Watermelon City Trucking, Inc.*, 846 F.2d 637, 640 n.3 (10th Cir. 1988).

439. *See* Frank D. Wagner, Annotation, *Validity and Effect of Agreement with One Cotortfeasor Setting His Maximum Liability and Providing for Reduction or Extinguishment Thereof Relative to Recovery Against Nonagreeing Cotortfeasor*, 65 A.L.R.3d 602 (1975).

440. *See* Bass v. Phoenix Seadrill/78, Ltd., 562 F. Supp. 790, 796 (E.D. Tex. 1983).

441. *See Hoops*, 846 F.2d at 640.

442. *Bass*, 562 F. Supp. at 796.

443. *See* Wilkins v. P.M.B. Sys. Eng'g, Inc., 741 F.2d 795, 798 n.2 (5th Cir. 1984).

nifies the prejudice to other parties, since neither the jury nor the defense can take the agreement into account when considering the testimony of the settling defendant; the agreement may therefore be ground for a new trial.[444] For this reason, case law favors requiring disclosure of such agreements to the court, parties, and jury.[445] Thus, at the outset of the litigation, the court should impose a continuing duty on counsel to promptly disclose all such agreements without need for a motion or discovery request.

- *Sharing agreements.* Defendants sometimes agree in advance to allocate responsibility for damages among themselves according to an agreed formula (often based on market share). These agreements serve the legitimate purposes of controlling parties' exposure and preventing plaintiffs from forcing an unfair settlement by threats to show favoritism in the collection of any judgment that may be recovered. They may, however, expressly prohibit or indirectly discourage individual settlements. They also create a disincentive for defendants to make available evidence indicating liability on the part of codefendants. Therefore, although they are generally appropriate, the court may refuse to approve or enforce agreements that violate public policy or unfairly prejudice other parties.[446]

     Sharing agreements should be discoverable. Once the agreement is made known, it may be possible to structure partial settlements to take its terms into account. It is less clear when and whether such agreements should be admissible in evidence. Since Federal Rule of Evidence 408 does not require exclusion of settlement agreements when offered for purposes such as proving bias, they may be admitted to attack a witness's credibility or demonstrate that formally opposing parties are not in fact adverse, accompanied by a limiting instruction that the agreement is not to be considered proof or disproof of liability or damages.[447] Settlement agreements should not be admitted, however, when they are of little relevance and may be prejudicial[448] (e.g., by suggesting a conspiracy to the jury).

---

444. *See* Leger v. Drilling Well Control, Inc., 69 F.R.D. 358, 361 (W.D. La. 1976), *aff'd*, 592 F.2d 1246 (5th Cir. 1979); *cf.* Reichenbach v. Smith, 528 F.2d 1072 (5th Cir. 1976) (error found harmless).

445. *See, e.g., Hoops*, 846 F.2d at 640; *Reichenbach*, 528 F.2d at 1076 (dictum).

446. *See In re* San Juan Dupont Plaza Hotel Fire Litig., MDL No. 721, 1993 U.S. Dist. LEXIS 14191 (D.P.R. Sept. 14, 1993).

447. *See* Brocklesby v. United States, 767 F.2d 1288, 1292–93 (9th Cir. 1985).

448. *See* Fed. R. Evid. 403.

- *"Most-favored nation" clauses.* Settlement agreements proposed early in the litigation often contain a "most-favored nation" clause to encourage early settlement by protecting all parties against being prejudiced by later, more favorable settlements with others. Such clauses typically obligate a signatory plaintiff to give signatory defendants a proportionate refund if the former settles with other defendants for less, or a signatory defendant to make additional payments to signatory plaintiffs if the former settles with other plaintiffs for more.

   Such clauses have several drawbacks: (1) the potential liability under them is indeterminate, making them risky; (2) the additional recovery they may produce for some plaintiffs without any effort by their attorneys makes it difficult to fix fees; and (3) the factors that induce parties to settle with different parties for different amounts, such as the time of settlement and the relative strength of claims, are nullified. Such clauses can provide an incentive for early settlement as well as an obstacle to later settlements. To limit their prejudicial impact, such clauses should terminate after a specified length of time (to prevent one or more holdouts from delaying final implementation), impose ceilings on payments, and allow flexibility to deal with changed circumstances or with parties financially unable to contribute proportionately.[449] The judge may have to consider voiding or limiting them if enforcement becomes inequitable. If this determination involves disputed questions of fact, an evidentiary hearing and possibly additional discovery may be necessary.[450]

- *Tolling agreements.* Parties may enter into agreements under which one side promises not to assert a statute-of-limitations defense in return for some consideration. Parties should disclose these agreements to the court and other parties to avoid disruption of the case-management plan and frustration of the goals of court-imposed deadlines.

---

449. *See In re* Corrugated Container Antitrust Litig., 752 F.2d 137, 139 n.3 (5th Cir. 1985); Fisher Bros. v. Phelps Dodge Indus., Inc., 614 F. Supp. 377, 381–82 (E.D. Pa. 1985), *aff'd mem.* 791 F.2d 917 (3d Cir. 1986).

450. *See In re Corrugated Container,* 752 F.2d at 142–43; *Fisher Bros.,* 614 F. Supp. at 381 & n.8.

## 13.24 Ethical Considerations

A number of ethical issues can confound settlement agreements even if not kept secret:

- *Communications with represented parties.* State rules of professional responsibility bar attorneys from communicating directly with a party represented by counsel (absent that counsel's presence or consent).[451] These rules prohibit attorneys from directly negotiating settlement with adverse parties.[452] The parties themselves are free to engage in direct settlement discussions without their attorneys. It may be an ethical violation, however, for an attorney to use a client or a third party to violate the prohibition on direct communication with represented parties.[453]

- *Agreements foreclosing other representation.* Defendants have attempted to condition settlement on an agreement that plaintiff's counsel will not represent other persons with similar claims, but it is an ethical violation for an attorney to enter into or propose such an agreement.[454] "Futures deals" are an ethically dubious variation, in which the settling attorney agrees to process similar claims of future clients according to the settlement terms or to advise clients to accept those terms.

- *Negotiations regarding attorney fees.* In routine nonclass litigation, in which each party is responsible for its own attorneys' fees, settling defendants customarily pay a negotiated sum, leaving counsel and their clients to settle their fees. Problems may arise, however, in cases where the court must approve settlements containing provisions for attorneys' fees, as in class actions (see section 21.7) or in cases, such as civil

---

451. Model Rules of Prof'l Conduct R. 4.2 (2002); Model Code of Prof'l Responsibility DR 7-104(A)(1) (1981). For the purposes of this rule, class members are considered parties represented by class counsel. For further discussion and citations, see *infra* section 21.33.

452. *See* Walker v. Kotzen, 567 F. Supp. 424, 426–27 (E.D. Pa. 1983), *appeal dismissed*, 734 F.2d 9 (3d Cir. 1984). For settlement and related communications in class actions, see *infra* sections 21.3, 21.6.

453. Model Rules of Prof'l Conduct R. 8.4(a) & cmt. (2002) (it is professional misconduct for a lawyer to attempt to violate rule through another person).

454. Model Rules of Prof'l Conduct R. 5.6(b) & cmt. (2002); Model Code of Prof'l Responsibility DR 2-108(B) (1981); ABA Comm. on Ethics and Prof'l Responsibility, Informal Op. 1039 (1968).

rights actions, in which the losing side is liable for the adversary's attorneys' fees.

It is problematic when settlement negotiations involving attorney fees are conducted simultaneously with negotiations on the merits. When a defendant offers to settle for a lump sum covering both damages and fees, negotiating the allocation may create a conflict of interest for the plaintiff's attorney.[455] The problem is acute when the plaintiffs are represented by legal aid or another nonprofit group that has agreed with the clients to seek fees only from the opposing parties.[456] The Supreme Court, while recognizing that "such situations may raise difficult ethical issues for a plaintiff's attorney," has declined to prohibit this practice, reasoning that "a defendant may have good reason to demand to know his total liability."[457] Indeed, the Court has stated that settlement of civil rights cases would be impeded by rules prohibiting simultaneous negotiations of fees.[458]

Proposed settlements arising out of such negotiations need not be rejected out of hand, but should be reviewed for fairness of the allocation between damages and attorneys' fees.[459] The ethical problem will be eased if the parties agree to have the court make the allocation.

A further problem is presented if a defendant conditions a settlement favorable to plaintiffs on an agreement to waive attorney fees, particularly if the relief sought is primarily or entirely nonmonetary. Plaintiffs' attorney has an ethical obligation to obtain the most favorable relief for the client without regard to the attorney's interest in a fee, and may thereby be coerced into giving up all fees.[460] This practice may discourage other attorneys from representing civil rights claimants.[461] Some bar associations have ruled it unethical for defendants to request fee waivers in exchange for relief on the merits.[462] The Supreme Court, however, has approved the practice, reasoning that a prohibition on fee waivers would discourage settlement. Because of the "potentially large and typically uncertain magnitude" of fee awards,

---

455. *See* White v. N.H. Dep't of Employment Sec., 455 U.S. 445, 453 n.15 (1982).

456. *See* Evans v. Jeff D., 475 U.S. 717, 721 (1986).

457. *White*, 455 U.S. at 453 n.15; *see Evans*, 475 U.S. at 732–34; Marek v. Chesny, 473 U.S. 1, 6–7 (1985).

458. *Evans*, 475 U.S. at 736–37 & nn.28–29.

459. *See id*. at 754, 765 (Brennan, J., dissenting); *but see id*. at 738 n.30.

460. *See id*. at 727–30 & nn.14, 16.

461. *Id*. at 754–59 (Brennan, J., dissenting).

462. *Id*. at 728 n.15.

defendants are unlikely to settle until the issue of fees has been resolved.[463] The judge is therefore free—but not required—to approve such settlements. The Supreme Court suggested that disapproval might be appropriate if the defendant had no realistic defense on the merits or if the waiver was a "vindictive" act designed to discourage counsel from bringing such cases.[464] Counsel, though, may be prohibited by state rules from proposing such settlements.

- *Failure to submit offers to client.* Attorneys have an obligation promptly to submit nonfrivolous offers of settlement to the client, unless prior discussions have made clear that the proposal will be unacceptable.[465] Breach of this duty is egregious if counsel will be compensated in whole or in part on the basis of the number of hours expended in the litigation, as in the case of defense counsel or when fees are awarded or approved by the court on a lodestar basis.

---

463. *See id.* at 732–38.

464. *Id.* at 739–40 & n.32.

465. *See* Model Rules of Prof'l Conduct R. 1.2(a) & cmt., 1.4 & cmt. (2002); ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 326 (1970); Deadwyler v. Volkswagen of Am. Inc., 134 F.R.D. 128, 140 (W.D.N.C. 1991), *aff'd,* 966 F.2d 1443 (4th Cir. 1992).

# 14. Attorney Fees[466]

.1 Eligibility for Court-Awarded Fees  184
    .11 Types of Cases—Overview  184
    .12 Common-Fund Cases  186
        .121 Percentage-Fee Awards  186
        .122 Lodestar-Fee Awards  193
    .13 Statutory-Fee Cases  196
.2 Proceedings to Award Fees  199
    .21 Setting Guidelines and Ground Rules  199
        .211 Selecting Counsel and Establishing Fee Guidelines  200
        .212 Staffing  201
        .213 Maintaining Adequate and Comprehensible Records  202
        .214 Submission of Periodic Reports  202
        .215 Compensation for Designated Counsel  202
        .216 Reimbursement of Expenses  203
    .22 Motion for Attorney Fees  203
        .221 Contents of the Fee Motion  203
        .222 Timing  204
        .223 Supporting Documentation and Evidence  204
        .224 Discovery  205
    .23 Judicial Review/Hearing and Order  205
        .231 Judicial Review  205
        .232 Hearing and Order  207

Regulating and awarding attorneys' fees presents the court with an opportunity and a mechanism for managing class actions and other forms of complex litigation. Under the "American Rule," parties generally bear their own costs of litigation,[467] and the attorneys and client ordinarily negotiate the rate at which attorneys are to be paid and the scope of their work. In complex litigation, however, there is often no traditional client with the authority to negotiate the terms of the representation or the rate for compensating counsel. In class actions involving monetary stakes, the natural conflict that arises between lawyers and class members necessarily draws the judge into the role of regulating and awarding attorney fees.[468] Unless the judge protects the interests of absentee class members, those interests may go unrepresented.

---

466. The subject is treated at length in Alan Hirsch & Diane Sheehey, Awarding Attorneys' Fees and Managing Fee Litigation (Federal Judicial Center 1994). *See also supra* section 13.24 (negotiation of fees and settlement); *infra* section 21.27 (appointment of class counsel); *infra* section 21.7 (fee awards in class actions).

467. *See, e.g.,* Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975).

468. *See, e.g.,* Rawlings v. Prudential-Bache Props, Inc., 9 F.3d 513, 516 (6th Cir. 1993) ("The interest of class counsel in obtaining fees is adverse to the interest of the class in obtaining recovery because the fees come out of the common fund set up for the benefit of the class.").

Judicial involvement can have a major impact on the reasonableness of fee requests and on the management of the litigation. The court has considerable discretion to use fees as a tool in a class action or a multidistrict consolidation. Calibrating the amount of attorney fees to a reasonable share of the benefits of a class settlement or award is an appropriate and effective means of managing class action litigation and preventing abuses of the class action device.[469] For example, a fee award that is limited to a reasonable percentage of the coupons actually redeemed in a "coupon settlement" may eliminate the worst coupon settlement abuses.[470] An announcement at the outset by the judge of the intention to apply such a rule will motivate attorneys to ensure that class benefits have a real value to the class.

Because of the sums involved, the calculation of fee awards often is complex, burdensome, bitterly contested, and a precursor to satellite litigation. Establishing guidelines and ground rules—even establishing budgets or rates for payment—early in the litigation helps ease the judge's burden and helps prevent later disputes. To facilitate the hearing and resolution of fee petitions, Rule 54(d)(2)(D) explicitly authorizes district courts to adopt local rules by which fees issues "may be resolved without extensive evidentiary hearings" and authorizes judges to refer fee matters to special masters or magistrate judges.

## 14.1   Eligibility for Court-Awarded Fees

.11 Types of Cases—Overview  184
.12 Common-Fund Cases  186
   .121 Percentage-Fee Awards  186
   .122 Lodestar-Fee Awards  193
.13 Statutory-Fee Cases  196

## 14.11  Types of Cases—Overview

An initial determination should be made by the court early in the case as to whether the prevailing party is entitled to court-awarded fees. The nature of an

---

469.  Deborah R. Hensler et al., Class Action Dilemmas: Pursuing Public Goals for Private Gain 490 (2000) ("The single most important action that judges can take to support the public goals of class action litigation is to reward class action attorneys only for lawsuits that actually accomplish something of value to class members and society.") (emphasis omitted); *see also* Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 524 (1st Cir. 1991).

470.  *See* Duhaime v. John Hancock Mut. Life Ins. Co., 989 F. Supp. 375, 377–80 (D. Mass. 1997); *see also In re* Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 801–02, 819–20 (3d Cir. 1995).

award depends on the type of case and fund as well as applicable local rules and circuit law.

Below are the principal types of cases and situations in which courts may award attorney fees:

- *Common-fund cases.* If attorneys' efforts create or preserve a fund or benefit for others in addition to their own clients, the court is empowered to award fees from the fund.[471] The award may be made from recoveries obtained by settlement or by trial. Common-fund cases are predominantly, but not exclusively, class actions; some class actions may also be brought under fee-shifting statutes. Federal Rule of Civil Procedure 23 limits attorney fees in class actions to those that are "reasonable."[472]

    A variant on the traditional common-fund case occurs frequently in mass tort litigation—in both class actions and large consolidations—where a separate fund to pay attorney fees is created as a part of a settlement. The court must distribute the fund among the various plaintiffs' attorneys, which may include class counsel, court-designated lead and liaison counsel, and individual plaintiff's counsel.[473]

- *Statutory-fees cases.* Over 150 statutes, covering actions ranging from antitrust and civil rights to little known types of claims, authorize courts to depart from the American Rule and award attorney fees to a prevailing party.[474] Whether the award is mandatory or permissive depends on the particular statute and applicable case law and may depend on whether the prevailing party is the plaintiff or the defendant.[475]

---

471. *See, e.g.,* Boeing Co. v. Van Gemert, 444 U.S. 472 (1980); Mills v. Elec. Auto-Lite Co., 396 U.S. 375 (1970); Sprague v. Ticonic Nat'l Bank, 307 U.S. 161 (1939); Cent. R.R. & Banking Co. v. Pettus, 113 U.S. 116 (1885); Trs. of the Internal Improvement Fund v. Greenough, 105 U.S. 527 (1882).

472. Rule 23(h) restates the existing law in its provision that "the court may award reasonable attorney fees."

473. *See In re* Nineteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig., 982 F.2d 603 (1st Cir. 1992).

474. *See* Ruckelshaus v. Sierra Club, 463 U.S. 680, 684 (1983); *see also* Hirsch & Sheehey, *supra* note 466, at 1–3.

475. Hensley v. Eckerhart, 461 U.S. 424, 429 n.2 (1983) ("A prevailing defendant may recover an attorney's fee only where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant."). *See also* Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421 (1978); *but cf.* Fogerty v. Fantasy, Inc., 510 U.S. 517, 522 (1994).

- *Designated counsel.* The court may award fees to lead counsel, liaison counsel, and other attorneys designated to perform tasks on behalf of a group of litigants (see section 10.22).[476]

- *Objectors.* The court may award fees to objectors who provided services that contributed to an increase in the common fund available to a class, that aided the court's review of a class-action settlement, or that otherwise advanced the interests of the class or assisted the court.[477]

- *Special parties.* Under the common law and many state statutes, court approval is required for the payment of fees charged by counsel for minors, incompetents, and trusts.

- *Sanctions.* The court has inherent power to award fees against a litigant who conducts litigation in bad faith or vexatiously.[478] A statutory counterpart, 28 U.S.C. § 1927, provides for awards against an offending attorney. Various provisions of the Federal Rules of Civil Procedure authorize the award of fees against parties who have failed to comply with rules or orders with respect to discovery and other pretrial proceedings. Section 10.15 has a detailed discussion of sanctions.

## 14.12  Common-Fund Cases

.121 Percentage-Fee Awards  186
.122 Lodestar-Fee Awards  193

## 14.121  Percentage-Fee Awards

The common-fund exception to the American Rule is grounded in the equitable powers of the courts under the doctrines of *quantum meruit* and unjust enrichment.[479] The exception applies where a common fund has been created by the efforts of a plaintiff's attorney[480] and rests on the principle that "persons

---

476. *In re* Air Crash Disaster, 549 F.2d 1006, 1016 (5th Cir. 1977) (relying on "common-fund" principles and inherent management powers of court in complex litigation); *see also infra* section 20.312 and text accompanying notes 700–05 (discussing the relationship between fee allocations in multidistrict litigation and state–federal cooperation).

477. *See* Fed. R. Civ. P. 23(e)(4), 23(h) & committee notes; *infra* sections 21.723 (role of objectors), 21.71 (criteria for approval of fee requests).

478. Chambers v. NASCO, Inc., 501 U.S. 32 (1991); *see also* Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258–59 (1975); Ellingson v. Burlington N., Inc., 653 F.2d 1327, 1332 (9th Cir. 1981).

479. Trs. of the Internal Improvement Fund v. Greenough, 105 U.S. 527, 536 (1882).

480. *Compare* Blum v. Stenson, 465 U.S. 886, 900 n.16 (1984), *and* Camden I Condo. Ass'n v. Dunkle, 946 F.2d 768 (11th Cir. 1991), *and Court Awarded Attorney Fees: Report of the Third Circuit Task Force*, 108 F.R.D. 237 (1985) [hereinafter *Third Circuit 1985 Task Force Report*], *with*

who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense."[481] Historically, attorney fees were awarded from a common fund based on a percentage of that fund.[482] After a period of experimentation with the lodestar method (based on the number of hours reasonably expended multiplied by the applicable market rate for the lawyer's services), the vast majority of courts of appeals now permit[483] or direct[484] district courts to use the percentage-fee method in common-fund cases. The only court of appeals that has not explicitly adopted the percentage method seems to allow considerable flexibility in approving combined percentage and lodestar approaches.[485]

Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973), *appeal following remand*, 540 F.2d 102 (3d Cir. 1976).

481. Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980). *See also* Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 392 (1970).

482. *See, e.g.*, Sprague v. Ticonic Nat'l Bank, 307 U.S. 161 (1939); Cent. R.R. & Banking Co. v. Pettus, 113 U.S. 116 (1885). The rationale differs significantly from that on which statutory-fee awards rest. *See* Brown v. Phillips Petroleum Co., 838 F.2d 451, 454 (10th Cir. 1988) ("[S]tatutory fees are intended to further a legislative purpose by punishing the nonprevailing party and encouraging private parties to enforce substantive statutory rights."). *See also In re* SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525, 532 (E.D. Pa. 1990).

483. For a circuit-by-circuit review, see Alba Conte, Newburg on Class Actions app. 14-1 (Supp. June 2002). The following seven courts of appeals permit awarding fees by either the percentage-fee or lodestar method or both (generally using the lodestar as a cross-check): *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000); *Johnston v. Comerica Mortgage Corp.*, 83 F.3d 241, 246 (8th Cir. 1996); *In re Thirteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1295 (9th Cir. 1994); *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) (fee award simulating "what the market in fact pays not for the individual hours but for the ensemble of services rendered in a case of this character" would be appropriate); *Brown*, 838 F.2d at 454 (Tenth Circuit case).

484. The following three courts of appeals direct district courts to use the percentage-fee method, sometimes supplemented with a lodestar "check": *In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821–22 (3d Cir. 1995); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993); *Camden I*, 946 F.2d at 774. *See also In re* Cendant Corp. Prides Litig., 243 F.3d 722, 742 (3d Cir. 2001) (directing the district court to apply a lodestar cross-check and to award fees with a multiplier no greater than three); *cf. In re* Cendant Corp. Litig., 264 F.3d 201, 285 (3d Cir. 2001) (stating that the "lodestar cross-check . . . is very time consuming" but the district court may use it "if necessary").

485. Longden v. Sunderman, 979 F.2d 1095, 1099–1100 (5th Cir. 1992) (indicating that the circuit "has yet to adopt this [percentage of common-fund] method" and affirming a district judge's use of a combined lodestar and percentage-of-fund approach). *See also* Strong v. Bell-South Telecomms., Inc. 137 F.3d 844, 852–53 (5th Cir. 1998) (approving application of lodestar and stating that application of a percentage-of-fund approach could be restricted to a percentage of claims actually made by class members and not the total amount that might be claimed). The

In practice, the lodestar method is difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation. In addition, the lodestar creates inherent incentive to prolong the litigation until sufficient hours have been expended.[486] The percentage method also has been criticized as arbitrary, especially "when applied by courts in an automatic fashion."[487] Attorney fees awarded under the percentage method are often between 25% and 30% of the fund.[488] Several courts have established benchmarks, either a specific figure or a range, subject to upward or downward adjustment depending on the circumstances of the case. Awarding attorneys 25% of a common fund represents a typical benchmark.[489] Any single rate, however, is arbitrary and cannot capture variations in class actions' characteristics. A fixed benchmark will often yield fee awards that are excessive for certified class actions in which the risk of non-recovery is relatively small.[490]

Accordingly, in "mega-cases" in which large settlements or awards serve as the basis for calculating a percentage, courts have often found considerably lower percentages of recovery to be appropriate.[491] One court's survey of fee

---

practice of many district judges in the Fifth Circuit appears to be to use either the percentage approach or both methods. *See, e.g., In re* Catfish Antitrust Litig., 939 F. Supp. 493, 500 (N.D. Miss. 1996), and cases cited therein (applying a percentage-of-fund method and discussing the *Johnson* factors that courts in the Fifth Circuit typically apply in lodestar analyses). For further discussion of the *Johnson* factors, see *infra* note 509.

486. *Third Circuit 1985 Task Force Report, supra* note 480, at 248 (finding that "there appears to be a conscious, or perhaps unconscious, desire to keep the litigation alive despite a reasonable prospect of settlement, to maximize the number of hours to be included in computing the lodestar").

487. *Third Circuit 2001 Task Force Report on Selection of Class Counsel*, 74 Temp. L. Rev. 689, 707 (2001) [hereinafter *Third Circuit 2001 Task Force Report*].

488. Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 69, 146–47 figs.67 & 68 (Federal Judicial Center 1996) [hereinafter FJC Empirical Study of Class Actions]; *see also, e.g., In re* Pac. Enters. Sec. Litig., 47 F.3d 373, 379 (9th Cir. 1995) (25% with adjustments up to 33% for complexity, risk, and nonmonetary results).

489. *See* Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir. 1989) (adopting 25% benchmark). Several other courts of appeals have endorsed variations of the 25% benchmark. *See, e.g., Swedish Hosp.*, 1 F.3d at 1272 (affirming that a 20% award is within the range of reasonable fees in common-fund cases, since the majority fall between 20% and 30%); *see also* cases cited *infra* note 498.

490. FJC Empirical Study of Class Actions, *supra* note 488, at 60 (finding settlement rates for certified class actions ranging from 62% to 100% in four federal district courts).

491. *See, e.g., In re* Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 339–40 (3d Cir. 1998), and cases cited therein (award constituting 6.7% of common fund remanded "for a more thorough examination and explication of the proper percentage to be awarded to class counsel . . . in light of the magnitude of the recovery").

awards in class actions with recoveries exceeding $100 million found fee percentages ranging from 4.1% to 17.92%.[492] Likewise, judges who have used competitive bidding to select counsel and establish the terms for attorney fee awards have produced percentage-of-recovery awards considerably lower than the 20%–30% average award reported above.[493]

Two courts of appeals have rejected benchmark percentages, preferring more qualitative standards.[494] Benchmarks are subject to considerable fluctuation and should be applied, if at all, with the caveat that "[t]he benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors."[495] The Third Circuit 2001 Task Force on Selection of Class Counsel recommended that courts "avoid rigid adherence to a 'benchmark'" and concluded that "a percentage fee, tailored to the realities of the particular case, remains superior to any other means of determining a reasonable fee for class counsel."[496]

The application of a benchmark percentage for unusually large funds may result in a windfall.[497] In that circumstance, some courts have used a sliding scale, with the percentage decreasing as the magnitude of the fund increases,[498]

---

492. *Id.* at 339.

493. *See* Laural L. Hooper & Marie Leary, Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study pt. VII (Federal Judicial Center Aug. 29, 2001), *reprinted in* 209 F.R.D. 519, 595–97 tbl.4, 598 (2001) (finding in nine terminated bidding cases that the fee awards ranged from 5% to 22%, with 8% being the median award).

494. *In re* Cendant Corp. Prides Litig., 243 F.3d 722, 736–37 (3d Cir. 2001) (district court may not rely on a formulaic application of the appropriate range in awarding attorney fees under the percentage-of-fund method in a class action, but must consider the relevant circumstances of the particular case, including the size of the settlement); Goldberger v. Integrated Res., Inc., 209 F.3d 43, 51–52 (2d Cir. 2000) ("We are nonetheless disturbed by the essential notion of a benchmark. . . . [M]arket rates, where available, are the ideal proxy for [attorney] compensation.").

495. Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990).

496. *Third Circuit 2001 Task Force Report*, *supra* note 487, at 705.

497. *See In re* Washington Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1297–98 (9th Cir. 1994); *see also In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 350–51 & nn.75, 76 (N.D. Ga. 1993), and cases cited therein (listing declining percentages based on case law).

498. *See In re* First Fid. Bancorporation Sec. Litig., 750 F. Supp. 160 (D.N.J. 1990) (30% of first $10 million, 20% of next $10 million, 10% of any recovery greater than $20 million); Sala v. Nat'l R.R. Passenger Corp., 128 F.R.D. 210 (E.D. Pa. 1989) (33% of first $1 million, 30% of amount between $1 million and $2 million); *Third Circuit 1985 Task Force Report*, *supra* note 480, at 256. *But see In re* Auction Houses Antitrust Litig., 197 F.R.D. 71, 79–81, 84 (S.D.N.Y. 2000) (discussing decreasing and increasing fee scales and choosing a fee scale with a single increment, from 0% below a certain recovery—the "X factor"—to 25% for all amounts above that

or they have used the lodestar method.[499] Where the fund is unusually small or where actual common benefits are difficult to determine and possibly illusory, a benchmark (or any award based on a percentage of recovery) may likewise be inapplicable. Particularly where the common benefits are in the form of discounts, coupons, options, or declaratory or injunctive relief, estimates of the value or even the existence of a common fund may be unreliable, rendering application of any percentage-of-recovery approach inappropriate.[500] Where there is no secondary market for coupon redemption, the judge can conclude that the stated value of the coupons is misleading and does not provide a sufficiently firm foundation to support a fee award. Awarding fees in the form of a percentage of the coupons themselves may give attorneys an incentive to ensure that a secondary market becomes available to convert the benefits into cash.[501] Alternatively, courts can award fees as a percentage of coupons actually redeemed by class members.[502] Where payment of a common benefit is scheduled to take place in the future, consider linking the attorney-fee award to that future payment.[503]

---

level); *In re* Am. Cont'l Corp. Lincoln Sav. & Loan Sec. Litig., MDL No. 834 (D. Ariz. July 24, 1990) (25% of first $150 million, 29% of any recovery greater than $150 million plus additional incentives for prompt resolution of case); Milton I. Shadur, *Response: Task Force Report: "Against the Manifest Weight of the Evidence,"* 74 Temp. L. Rev. 799, 803 (2001) (discussing use of an absolute cap on fees). The Third Circuit 2001 Task Force identified adherents of both decreasing and increasing percentages and concluded that either approach might reasonably be used. *Third Circuit 2001 Task Force Report*, *supra* note 487, at 719.

499. *In re* Wash. Pub. Power, 19 F.3d 1291 (9th Cir. 1994).

500. *See, e.g.*, Strong v. BellSouth Telecomms., Inc., 137 F.3d 844, 851–52 (5th Cir. 1998) (upholding district court's use of lodestar based on finding "insignificant benefit" to class member in "phantom" common fund asserted to be worth $64 million); *In re* Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 821 (3d Cir. 1995) (stating that "the lodestar rationale has appeal where as here, the nature of the [coupon] settlement evades the precise evaluation needed for the percentage of recovery method"); Weinberger v. Great N. Nekoosa Corp. 925 F.2d 518, 526 n.10 (1st Cir. 1991) (upholding the "district court's implied premise that the lodestar is the soundest available alternative").

501. *See, e.g.*, *In re* Auction Houses Antitrust Litig., No. 00 Civ. 0648, 2001 WL 170792, at *3–*5, *15–*17 (S.D.N.Y. Feb. 22, 2001) (discussing initial agreement on coupons and changes made after court-appointed experts reported on value of coupons; counsel fees paid in same proportion of cash and coupons as class benefits paid).

502. *Third Circuit 2001 Task Force Report*, *supra* note 487, at 693 n.12 (quoting Brian Wolfman's testimony that "'[b]y tying counsel's fate to that of their clients, the typical coupon settlement would become a thing of the past'").

503. *See, e.g.*, Bowling v. Pfizer, 132 F.3d 1147, 1152 (6th Cir. 1998) (portion of fees related to future funding to be determined and paid after the fund is created, over a ten-year period, using lodestar method).

A number of courts favor the lodestar as a backup or cross-check on the percentage method when fees might be excessive.[504] To use the lodestar method, the court should give the attorneys early notice that they should keep track of their time. (At least one court has discontinued using the lodestar as a check on the reasonableness of percentage awards because of the lodestar method's perceived faults.[505])

In securities fraud and other types of cases in which a large fund is likely, some district judges have used competitive bidding to aid in selecting class counsel and determining a proposed percentage fee.[506] See section 21.27. Others, however, have concluded that competitive bidding is incompatible with the Private Securities Litigation Reform Act of 1995. See section 31.31. In addition, one court of appeals has minimized one advantage of competitive bidding by ruling that a fee percentage established at the outset of the case must be reviewed at the conclusion of the case, using traditional factors governing such awards. Section 14.211 further discusses bidding.

The decision of an award of attorney fees in a common-fund case is committed to the sound discretion of the trial court, which must consider the unique contours of the case.[507] Reasons for the selection of a given percentage must be sufficiently articulated for appellate review. The court should identify relevant factors and how these factors helped determine the percentage awarded.[508] The factors used in making the award will vary,[509] but may include one or more of the following:

---

504. Goldberger v. Integrated Res., Inc., 209 F.3d 43, 50 (2d Cir. 2000) ("encourag[ing] the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage"); United States v. 8.0 Acres of Land, 197 F.3d 24, 33 (1st Cir. 1999) (holding that a lodestar-calculated fee amounted to a reasonable percentage of the common fund); Bowling v. Pfizer, Inc., 102 F.3d 777, 780 (6th Cir. 1996) (upholding a district court fee award based on a percentage of the common fund and then cross-checked against the class counsel's lodestar); *In re Gen. Motors Corp.*, 55 F.3d at 820 (finding it "sensible for a court to use a second method of fee approval to cross check its conclusion under the first method").

505. Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1266–67 & n.3 (D.C. Cir 1993) (citing *Third Circuit 1985 Task Force Report, supra* note 480, at 246–49).

506. For a description of the characteristics of the cases in which competitive bidding has been used to date, see Hooper & Leary, *supra* note 493, pt. III, *reprinted in* 209 F.R.D. at 529–38 & tbl.1.

507. Camden I Condo. Ass'n v. Dunkle, 946 F.2d 768, 774 (11th Cir. 1991); Brown v. Phillips Petroleum Co., 838 F.2d 451, 453 (10th Cir. 1988). For an overview of factors to consider in determining the amount of attorney fees to award in class-action litigation, see Fed. R. Civ. P. 23(h) committee note; *see also infra* section 21.7.

508. *Camden I*, 946 F.2d at 775. *See also* Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272–73 (9th Cir. 1989).

- the size of the fund and the number of persons who actually receive monetary benefits;[510]
- any understandings reached with counsel at the time of appointment concerning the amount or rate for calculating fees; any budget set for the litigation; or other terms proposed by counsel or ordered by the court;
- any agreements or understandings, including side agreements, between attorneys and their clients or other counsel involved in the litigation;[511]
- any substantial objections to the settlement terms or fees requested by counsel for the class by class members (it is, however, a court's duty to scrutinize applications for fees, independently of any objection")[512]—in the appropriate case, a court has authority to award fees to an objector that assists the court in scrutinizing the settlement, the fee requests, or both;[513]
- the skill and efficiency of the attorneys;
- the complexity and duration of the litigation;
- the risks of nonrecovery and nonpayment;

---

509. In *Brown*, the Tenth Circuit endorsed the use of the *Johnson* factors in determining a reasonable percentage fee. 838 F.2d at 454–55 (citing Johnson v. Ga. Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974)). Similarly, the Eleventh Circuit instructed the district courts within that circuit to apply the *Johnson* factors plus other pertinent factors. *Camden I*, 946 F.2d at 775. In contrast, the Ninth Circuit established a 25% benchmark for such awards, subject to upward or downward adjustment "to account for any unusual circumstances involved in [the] case." *Graulty*, 886 F.2d at 272. *See also In re* RJR Nabisco, Inc. Sec. Litig., MDL No. 818, 1992 WL 210138, at *7 (S.D.N.Y. Aug. 24, 1992) ("What should govern such awards is . . . what the market pays in similar cases.").

510. *See* cases cited *supra* notes 500, 503 (*Strong, General Motors, Weinberger*, and *Bowling*). In *Strong*, the district court examined the actual value of telephone usage credits requested under the settlement and found them to be $1.7 million, far below the parties' valuation of $64 million. *Strong*, 137 F.3d at 851. For approaches to reviewing and determining the value of in-kind settlements, see generally Note, *In-Kind Class Action Settlements*, 109 Harv. L. Rev. 810, 823–26 (1996). *See also* the Private Securities Litigation Reform Act, 15 U.S.C. §§ 77z-1(a)(6), 78u-4(a)(6) (2000) (fee award should not exceed a "reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class").

511. Rule 23(e)(2); *see infra* section 21.631; Fed. R. Civ. P. 54(d)(2)(B).

512. Zucker v. Occidental Petroleum Corp., 192 F.3d 1323, 1328–29 (9th Cir. 1999). *See In re* Cendant Corp. Prides Litig., 243 F.3d 722, 743–44 (3d Cir. 2001) (directing district court to evaluate the objector's contribution to the ultimate fee and to award compensation to that extent); Bowling v. Pfizer, Inc., 922 F. Supp. 1261, 1285 (S.D. Ohio 1996) (awarding $105,037.46 to a public interest group that objected to the settlement and provided "extensive" and "invaluable" objections to the fee applications).

513. *In re Cendant Corp.*, 243 F.3d at 743–44.

- the amount of time reasonably devoted to the case by counsel; even where fees are to be awarded on a percentage-of-fund basis, some judges cross-check the percentage by conducting a modified lodestar analysis;[514] and
- the awards in similar cases.

Unlike a statutory-fee analysis, where the lodestar is generally determinative,[515] a percentage-fee award sometimes gives little weight to the amount of time expended. Attorneys' hours may be one of many factors to consider.[516] Indeed, one purpose of the percentage method is to encourage early settlements by not penalizing efficient counsel, thus ensuring that competent counsel continue to be willing to undertake risky, complex, and novel litigation.[517] Generally, the factor given the greatest emphasis is the size of the fund created, because "a common fund is itself the measure of success . . . [and] represents the benchmark from which a reasonable fee will be awarded."[518]

## 14.122 Lodestar-Fee Awards

Judges award attorney fees in some common-fund cases based on the lodestar or a combination of the percentage-of-fund and other methods. The lodestar is at least useful as a cross-check on the percentage method by estimating the number of hours spent on the litigation and the hourly rate, using affidavits and other information provided by the fee applicant. The total lodestar estimate is then divided into the proposed fee calculated under the percentage method. The resulting figure represents the lodestar multiplier to compare to multipliers in other cases.[519]

---

514.  *See id.* at 735.

515.  *See* Hensley v. Eckerhart, 461 U.S. 424, 434 (1983); *see also infra* section 14.122.

516.  Brown v. Phillips Petroleum Co., 838 F.2d 451, 456 (10th Cir. 1988).

517.  *See* Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 338–39 (1980) (recognizing the importance of a financial incentive to entice qualified attorneys to devote their time to complex, time-consuming cases in which they risk nonpayment); *Third Circuit 1985 Task Force Report*, *supra* note 480, at 248.

518.  4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 14:6, at 547, 550 (4th ed. 2002). *See also* Camden I Condo. Ass'n v. Dunkle, 946 F.2d 768, 774 (11th Cir. 1991); *Brown*, 838 F.2d at 456.

519.  *See, e.g., In re Cendant Corp.*, 243 F.3d at 724, 742 (finding multipliers ranging from 1.35 to 2.99 in past years compared with a multiplier of 7–10 in a common-fund case in which counsel was selected by bidding); *cf. In re* Comdisco Sec. Litig., 150 F. Supp. 2d 943, 947 (N.D. Ill. 2001) (criticizing the use of lodestar for cross-checking to reduce the fee of counsel selected by bidding).

When the fund is unusually large, the lodestar may be more appropriate than the percentage method.[520] In these unique mega-cases, selection of percentage figures, even on a sliding scale, may be arbitrary because of the absence of comparable cases.[521] As with percentage fees, an award of attorney fees under the lodestar method should fairly compensate the attorney for the reasonable value of services rendered, given the circumstances of the particular case.[522]

The lodestar method may also be appropriate for distributing fees out of a common fund created to compensate attorneys, e.g., payment of lead counsel in a multidistrict consolidation or a nationwide settlement of mass tort litigation. Some cases may call for allocation of fees among different sets of plaintiffs' lawyers, such as those designated to serve on a steering committee (and entitled to compensation for that service) and those who represent individual plaintiffs. Because compensation directed to any group of attorneys will reduce the amount available to satisfy other contingent fee arrangements, the court should attempt to resolve conflicts between these groups in determining a fair allocation.[523]

The lodestar calculation begins with multiplying the number of hours reasonably expended by a reasonable hourly rate.[524] The number of hours reasonably expended and the reasonable hourly rate must be supported by adequate records and other appropriate evidence; therefore, counsel intending to seek a fee award should maintain specific and adequate time records.[525] Failure to keep contemporaneous time records may justify an appropriate reduction in

---

520. *See In re* Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1297 (9th Cir. 1994).

521. *See, e.g., In re* Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 340 (3d Cir. 1998) (indicating that hypothetical percentage-fee arrangements do not "provide much guidance in cases involving the aggregation of over 8 million plaintiffs and a potential recovery exceeding $1 billion").

522. *See* Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973).

523. *See In re* Nineteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig., 982 F.2d 603 (1st Cir. 1992).

524. Blum v. Stenson, 465 U.S. 886, 897 (1984); Hensley v. Eckerhart, 461 U.S. 424, 430 (1983). A number of the additional factors set forth in *Johnson* will usually be subsumed in the determination of the reasonableness of the time spent and the hourly rate.

525. *See, e.g., In re* Cont'l Ill. Sec. Litig., 572 F. Supp. 931, 934 (N.D. Ill. 1983) (requiring in a pretrial order that attorneys organize and report their time by activity, not by attorney), *rev'd on other grounds*, 962 F.2d 566 (7th Cir. 1992); *see also* Hirsch & Sheehey, *supra* note 466, at 103–04; Thomas E. Willging, Judicial Regulation of Attorneys' Fees: Beginning the Process at Pretrial 30–32 (Federal Judicial Center 1984) [hereinafter Judicial Regulation] (reporting outside attorneys' enthusiastic support for this aspect of the district judge's order).

the award.[526] In especially large cases, consider seeking additional staff to review fee petitions and uncover duplicative, excessive, or unproductive efforts,[527] or appointing a special master under Rule 54(d)(2)(D).

What constitutes a reasonable hourly rate varies according to geographic area and the attorney's experience, reputation, practice, qualifications, and customary charge. The rate should reflect what the attorney would normally command in the relevant marketplace.[528] In exceptionally complex national litigation, the court should consider establishing a national rate for all the attorneys.[529] Federal Rule of Civil Procedure 54(d)(2)(D) allows establishment of "special procedures to resolve fee issues without extensive evidentiary hearings." Such procedures might include "a schedule reflecting customary fees or factors affecting fees within the community."[530]

The lodestar figure may be adjusted, either upward or downward,[531] to account for several factors including, *inter alia*, the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues pre-

---

526. *Hensley*, 461 U.S. at 433. Some circuits require contemporaneous time records as a condition to an award of fees. *See* 5th Cir. R. 47.8.1 (absent contemporaneous records, fee based on minimum time necessary); N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136 (2d Cir. 1983); Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319 (D.C. Cir. 1982).

527. *See, e.g.*, *In re* "Agent Orange" Prod. Liab. Litig., 611 F. Supp. 1296, 1319 (E.D.N.Y. 1985) (describing work of three temporary law clerks); Hirsch & Sheehey, *supra* note 466, at 114–15. For a study of the use of professional staff to review attorney fee vouchers and occasionally to negotiate budgets with attorneys, see Tim Reagan et al., The CJA Supervising Attorney: A Possible Tool in Criminal Justice Act Administration (Federal Judicial Center Apr. 2001) (unpublished report, on file with the Federal Judicial Center). *See also* Alan J. Tomkins & Thomas E. Willging, Taxation of Attorneys' Fees: Practices in English, Alaskan, and Federal Courts (Federal Judicial Center 1986).

528. *Blum*, 465 U.S. at 895 ("'[R]easonable fees' . . . are to be calculated according to the prevailing market rates in the relevant community . . . ."); Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp., 487 F.2d 161, 167 (3d Cir. 1973).

529. *In re* "Agent Orange" Prod. Liab. Litig., 818 F.2d 226, 232 (2d Cir. 1987) (holding that "in an exceptional multiparty case . . . public policy and administrative concerns call for the district court to be given the necessary flexibility to impose a national hourly rate when an adequate factual basis for calculating the rate exists"); *cf. In re* Fine Paper Antitrust Litig., 751 F.2d 562, 591 (3d Cir. 1984) (rejecting national rates as incompatible with a lodestar approach to fees). *See also Third Circuit 1985 Task Force Report*, *supra* note 480, at 261 (recommending use of national rates in exceptional cases).

530. Fed. R. Civ. P. 54(d)(2)(D) committee note (1993 amendments); *see also Third Circuit 1985 Task Force Report*, *supra* note 480, at 260–62 (advocating steps to create uniform districtwide fee schedules).

531. *See* Conte & Newberg, *supra* note 518, § 14:5, at 541–42.

sented, the risk of nonpayment,[532] and any delay in payment.[533] Accurate computation requires an adjustment for the loss of the use of the money up to the time of the award,[534] and perhaps an award of interest.[535] Historic interest rates generally are a more accurate starting point than current rates,[536] but it is permissible to use current rates as a rough approximation of the adjustment needed to compensate for delay in payment.[537] Whether enhancements for the risks assumed by plaintiffs' attorneys are permissible in common-fund cases was unresolved as of publication of this manual.[538]

## 14.13  Statutory-Fee Cases

The analysis of attorney fees in a statutory-fee (or fee-shifting) case differs from that in a common-fund case.[539] Shifting fees in a statutory-fee case serves the public policy of encouraging private enforcement of statutory or constitutional rights. Under most fee-shifting statutes, fees are available to a "prevailing party." In *Buckhannon*, the Supreme Court said a prevailing party is a party that has altered its legal relationship with its adversary through a judgment or consent decree entered by the court.[540] (A litigant's status as the beneficiary of an out-of-court settlement, or as the beneficiary of an adversary's voluntary action mooting a case, does not by itself entitle that litigant to an award of at-

---

532.  *See In re* Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291 (9th Cir. 1994).

533.  *See generally* Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973), *appeal following remand*, 540 F.2d 102 (3d Cir. 1976). *But see* Burlington v. Dague, 505 U.S. 557 (1992) (barring use of multiplier in statutory-fee case). Some courts have held this bar to be inapplicable in common-fund cases. *In re Wash. Pub. Power*, 19 F.3d at 1299–1300.

534.  Missouri v. Jenkins, 491 U.S. 274, 283–84 (1989). For a comprehensive study of the *Jenkins* case and a case-based formula for achieving an integrated approach to the issues of prejudgment and postjudgment interest, see Russell E. Lovell II, Court-Awarded Attorneys' Fees: Examining Issues of Delay, Payment, and Risk (1999*).*

535.  *In re* Cont'l Ill. Sec. Litig., 962 F.2d 566, 571 (7th Cir. 1992).

536.  Lovell, *supra* note 534, at 88–92.

537.  *Jenkins*, 491 U.S. at 283–84.

538.  *See Burlington*, 505 U.S. at 561, 567 (no enhancement in statutory-fee cases).

539.  *See* Blum v. Stenson, 465 U.S. 886, 900 n.16 (1984).

540.  Buckhannon Bd. & Care Home, Inc. v. W. Va. Dept. of Health & Human Res., 532 U.S. 598, 604 (2001) ("enforceable judgments on the merits and court-ordered consent decrees create the 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees" (quoting Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792–93 (1989))).

torney fees as a prevailing party.[541]) If the *Buckhannon* test has been met, the lodestar is the appropriate method to use in calculating a fee award.[542]

The lodestar calculation—reasonable hours multiplied by a reasonable rate—usually provides an appropriate estimate of the value of a lawyer's services.[543] Enhancements available in common-fund cases, such as for results obtained,[544] novelty and complexity of the issues presented,[545] and the contingent nature of the litigation, are not appropriate enhancements in a statutory-fee award case.[546] Only in the rare statutory-fee award case may exceptional results or quality of representation warrant an upward adjustment.[547] A delay in payment may be taken into account by applying current rates or factoring in an interest adjustment.[548]

A downward adjustment of the lodestar figure may be appropriate when the prevailing party achieves only "limited success."[549] Where the plaintiff recovers only nominal damages and no other indicia of success, for example, the court can award "low fees or no fees."[550] It is a good idea to examine not only the amount of recovery but also "the significance of the legal issue on which the plaintiff prevailed and the public purpose the litigation served."[551] Courts

---

541. *Id.* at 605 (rejecting the claim that a plaintiff could be a prevailing party if its actions served as a catalyst for defendant to voluntarily change its allegedly illegal conduct).

542. Blanchard v. Bergeron, 489 U.S. 87, 94 (1989) (lodestar approach is the centerpiece of attorney fee awards).

543. Pa. v. Del. Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986); *Blum*, 465 U.S. at 897.

544. *Blum*, 465 U.S. at 900 ("Because acknowledgment of the results obtained generally will be subsumed within other factors used to calculate a reasonable fee, it normally should not provide an independent basis for increasing the fee award.").

545. *Id.* at 898–99 (novelty and complexity will be reflected either in an increase in the number of hours or, for especially experienced attorneys who would thus expend fewer hours, in an increased hourly rate).

546. Burlington v. Dague, 505 U.S. 557, 561, 567 (1992).

547. *Blum*, 465 U.S. at 898 (the quality of representation is usually reflected in an attorney's hourly rate).

548. Mo. v. Jenkins, 491 U.S. 274, 283–84 (1989). *See also* Pa. v. Del. Valley Citizens' Council for Clean Air, 483 U.S. 711 (1987); *see also supra* notes 533–37 and accompanying text.

549. Hensley v. Eckerhart, 461 U.S. 424, 436 (1983).

550. Farrar v. Hobby, 506 U.S. 103, 115 (1992). "[T]he relevant indicia of success [are] the extent of relief, the significance of the legal issue on which the plaintiff prevailed, and the public purpose served . . . ." *Id.* at 122 (O'Connor, J., concurring). *See also* Phelps v. Hamilton, 120 F.3d 1126, 1131–32 (10th Cir. 1997) (applying Justice O'Connor's *Farrar* factors), and cases cited therein.

551. Morales v. City of San Rafael, 96 F.3d 359, 364–65 (9th Cir. 1996) (awarding fees because plaintiff's nonmonetary success significantly advanced public purpose of deterring un-

have found public purposes in the deterrence arising from jury findings of liability,[552] in the broad applicability of nonmonetary relief,[553] and in the public significance of the issues on which plaintiffs prevailed.[554]

Awards should not be more than an amount "reasonable in relation to the results obtained."[555] In public interest cases, however, the fact that the lodestar amount exceeded the damages awarded does not by itself justify adjusting the lodestar downward.[556] In applying the lodestar, therefore, the court must consider counsel's level of effort given the issues at stake, its degree of success in the litigation, including the public ramifications of any success, and the efficiency and economy with which it handled the litigation.

lawful arrests), *amended on other grounds on denial of hearing and reh'g en banc* 108 F.3d 981 (9th Cir. 1997).

552. Brandau v. Kan., 168 F.3d 1179, 1183 (10th Cir.) (concluding that "while Plaintiff's litigation did not achieve significant monetary benefits, it served a larger public purpose" of deterring future sexual harassment and putting defendant on notice about the need to educate its employees about sexual harassment), *cert. denied*, 526 U.S. 1133 (1999).

553. LeBlanc-Sternberg v. Fletcher, 143 F.3d 748 (2d Cir. 1998) (upholding fee award based on significance of injunction entered and jury finding of statutory civil rights violation).

554. *Phelps*, 120 F.3d at 1132 (examining "whether the judgment vindicates important rights and deters future lawless conduct"); O'Connor v. Huard, 117 F.3d 12, 18 (1st Cir. 1997) (basing fee award on vindicating rights of pretrial detainees despite $1 damage award).

555. Hensley v. Eckerhart, 461 U.S. 424, 440 (1983). However, fees should not be reduced simply because the plaintiff was not successful on every contention in the litigation. *Id.* at 435. The "most critical factor is the degree of success obtained." *Id.* at 436. *See also* Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 790–91 (1989) (rejecting test that would focus on the "central issue" in the litigation); Hirsch & Sheehey, *supra* note 466, at 27–33.

556. City of Riverside v. Rivera, 477 U.S. 561 (1986) (affirming award of $245,456.25 in attorney's fees in civil rights litigation in which plaintiff received $13,300 in damages after prevailing against the city and police officers); *Morales*, 96 F.3d at 363–65 (ordering lodestar application where attorneys submitted bills totaling $139,783.25 and jury had awarded damages of $17,500); *see also* Hirsch & Sheehey, *supra* note 466, at 33–35.

# 14.2  Proceedings to Award Fees

.21 Setting Guidelines and Ground Rules  199
    .211 Selecting Counsel and Establishing Fee Guidelines  200
    .212 Staffing  201
    .213 Maintaining Adequate and Comprehensible Records  202
    .214 Submission of Periodic Reports  202
    .215 Compensation for Designated Counsel  202
    .216 Reimbursement of Expenses  203
.22 Motion for Attorney Fees  203
    .221 Contents of the Fee Motion  203
    .222 Timing  204
    .223 Supporting Documentation and Evidence  204
    .224 Discovery  205
.23 Judicial Review/Hearing and Order  205
    .231 Judicial Review  205
    .232 Hearing and Order  207

# 14.21  Setting Guidelines and Ground Rules

.211 Selecting Counsel and Establishing Fee Guidelines  200
.212 Staffing  201
.213 Maintaining Adequate and Comprehensible Records  202
.214 Submission of Periodic Reports  202
.215 Compensation for Designated Counsel  202
.216 Reimbursement of Expenses  203

The judge should encourage agreement by the parties on the fee,[557] but also should keep in mind the potential conflict of interest for the attorney seeking damages for the client and fees for itself.[558] Also, an agreement will not be binding in a class-action settlement or other common-fund litigation.[559] In many instances, there will be no agreement and the judge must determine the fees.

---

557. Blum v. Stenson, 465 U.S. 886, 902 n.19 (1984); *Hensley*, 461 U.S. at 437. *See, e.g.*, White v. N.H. Dep't of Employment Sec., 455 U.S. 445, 453–54 n.15 (1982); *In re* Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 801–04 (3d Cir. 1995); Cheng v. GAF Corp., 713 F.2d 886, 889–90 (2d Cir. 1983); Mendoza v. United States, 623 F.2d 1338, 1352–53 & n.19 (9th Cir. 1980); Prandini v. Nat'l Tea Co., 557 F.2d 1015, 1017 (3d Cir. 1977). *See also supra* section 13.24.

558. *See, e.g.*, Evans v. Jeff D., 475 U.S. 717, 725, 728 n.14 (1986) (describing the attorney's duty to evaluate a settlement offer based on the client's interest without regard to the attorney's interest in obtaining a fee).

559. *See In re Gen. Motors Corp.*, 55 F.3d at 801–04 (examining adequacy of attorneys to represent settlement class); Cent. R.R. & Banking Co. v. Pettus, 113 U.S. 116, 126–27 (1885); *see also infra* sections 21.6–21.7.

## 14.211  Selecting Counsel and Establishing Fee Guidelines

In class-action litigation—and generally in multidistrict consolidated litigation—the judge has the opportunity and the obligation to appoint counsel who will represent the beneficiaries of any common fund. See Rule 23(g). As discussed more fully in sections 21.27 (class actions) and 31.5 (securities class actions), judges have used four distinct approaches to the selection of counsel: (1) reviewing the recommendations of lawyers who have filed related actions and appointing the recommended lawyers if they are adequate to represent the interests of the class ("private ordering"); (2) selecting among counsel who have filed related actions but are unable to reach an agreement and who compete for the appointment; (3) inviting bids from counsel who may or may not have filed a related action ("competitive bidding"); and (4) allowing the most adequate plaintiff to select counsel, subject to review by the court ("empowered-plaintiff" approach)—this technique is mandated by the Private Securities Litigation Reform Act for securities class actions. See section 31.31.[560] There will frequently be a number of law firms interested in serving as lead counsel, so judicial involvement is often necessary in selecting counsel and setting guidelines for future fee applications in the case.[561] Procedures for selection or designation of counsel in class-action settings pursuant to Rule 23(g) are discussed in section 21.27, which also presents criteria and procedures that courts have used in considering selection of counsel by competitive bidding.[562]

There are alternatives to bidding. A discussion about fees at an early stage of the litigation can simulate the type of uncertainty a client faces in negotiating a fee.[563] Judges should consider advising the parties at the outset of the litigation about the method to be used for calculating fees and, if using the percentage method, about the likely range of percentages.[564] At an early conference or in an early pretrial order after consultation with counsel, it is helpful to es-

---

560. Pub. L. No. 104-67, § 27(a)(3)(B)(v), 109 Stat. 737, 740 (codified as amended at 15 U.S.C. §§ 77z-1(a)(3)(B)(v), 78u-4(a)(3)(B)(v) (2000)).

561. *See, e.g., In re* Synthroid Mktg. Litig., 264 F.3d 712, 720–21 (7th Cir. 2001) (calling for district courts to use competitive bidding or other *ex ante* procedures to approximate a market rate for legal services in a class action).

562. For a discussion of the bidding process, see *Third Circuit 2001 Task Force Report*, *supra* note 487; Symposium, *Third Circuit Task Force Report on Selection of Class Counsel*, 74 Temp. L. Rev. 685 (2001); Hooper & Leary, *supra* note 493.

563. *See In re Synthroid*, 264 F.3d at 718 (remanding a case in which the district court had used a percentage method and indicating that "[t]he best time to determine [a market] rate is the beginning of the case").

564. Some judges have reported success using this approach. *See* Hirsch & Sheehey, *supra* note 466, at 100–01 & n.444.

tablish guidelines and procedures that will lighten the burdens on the partici-pants, clarify expectations, and reduce the opportunities for disputes.[565] Matters such as those discussed in the following paragraphs should be covered. Although most of these factors are relevant primarily to the lodestar method, they may aid in regulating percentage awards as well. Judges have an independent duty to review fees and specifically determine if they are reasonable, applying traditional legal tests.[566]

## 14.212 Staffing

A major issue in determining fees is the appropriate level of staffing for the particular litigation. Consider setting at least presumptive guidelines at the outset of the litigation, after discussion with counsel. Some judges find that appointing a single law firm, not a committee, to represent the class helps to keep fees reasonable. Setting guidelines at the outset, subject to revision, can reduce the potential for later conflict and facilitate judicial review of fee applications. Guidelines can cover the number of attorneys who may charge for time spent attending depositions, court hearings, office and court conferences, and trial.[567] Guidelines may also caution against using senior attorneys on projects suitable for less senior (and less costly) attorneys.[568] Finally, guidelines may set forth the range of hourly charges for particular attorneys on the case and permissible charges for travel time.[569] In setting such guidelines, there is a need for some symmetry between the staffing levels of plaintiffs and defendants.

---

565. *See In re* Cont'l Ill. Sec. Litig., 572 F. Supp. 931 (N.D. Ill. 1983) (pretrial order establishing fee guidelines and record-keeping responsibilities), *rev'd on other grounds*, 962 F.2d 566 (7th Cir. 1992); Hirsch & Sheehey, *supra* note 466, at 97–98, 109–11; Judicial Regulation, *supra* note 525, at 11–34 (presenting attorneys' reactions to the pretrial order concerning fees in the *Continental Illinois* litigation); Administrative Order re Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases (Bankr. S.D.N.Y. June 24, 1991), *reprinted in* 3 Bankr. Local Ct. R. Serv. (CBC) N.Y., 98.14–98.19 (1996). *See also* Bennett Feigenbaum, *How to Examine Legal Bills*, 177 J. Acct. 84 (May 1994) (listing criteria for testing reasonableness).

566. *See generally* Cendant Corp. Prides Litig., 243 F.3d 722 (3d Cir. 2001), and cases cited therein.

567. *See, e.g., In re* Cont'l Ill., 572 F. Supp. at 933–34 (emphasizing individual responsibility and establishing staffing guidelines for depositions and legal research and criteria for compensating document review); *see also* Judicial Regulation, *supra* note 525, at 15–26.

568. *In re* Cont'l Ill., 572 F. Supp. at 933 (directing that "[s]enior partner rates will be paid only for work that warrants the attention of a senior partner").

569. *Id.* at 934 (travel limited; airfare to be reimbursed at tourist rates).

### 14.213 Maintaining Adequate and Comprehensible Records

Complete time records are critical when fees are based on a lodestar and are advisable in any large litigation. Such records may be used as a cross-check on the percentage-of-fund method. Sometimes, however, these records may be too voluminous for effective judicial analysis. The judge should address this issue early in the case by directing counsel to develop record-keeping procedures to facilitate review.[570] Counsel should maintain contemporaneous records that show the name of the attorney, the time spent on each discrete activity, and the nature of the work performed. Consider recommending that attorneys use computer programs to facilitate analysis of billings and of fee requests. Agreed-on forms of summaries may be used to achieve similar results.

### 14.214 Submission of Periodic Reports

Some judges require periodic reports in anticipation of an award at the end of the litigation (it may be necessary to submit some of the information under seal or *in camera*).[571] This practice encourages lawyers to maintain records adequate for the court's purposes and enables the court to spot developing problems. Periodic review of time charges sometimes leads the judge to establish a tentative budget for the case, acceptable billing ranges for attorneys, or at least limits on recoverable fees for particular activities.

### 14.215 Compensation for Designated Counsel

Lead and liaison counsel may have been appointed by the court to perform functions necessary for the management of the case but not appropriately charged to their clients. Early in the litigation, the court should define designated counsel's functions, determine the method of compensation, specify the records to be kept, and establish the arrangements for their compensation, including setting up a fund to which designated parties should contribute in specified proportions. Guidelines should cover staffing, hourly rates, and estimated charges for services and expenses.

---

570. For a discussion of various approaches that judges use to accomplish this goal, see Hirsch & Sheehey, *supra* note 466, at 103–05. *See also* Judicial Regulation, *supra* note 525, at 30–32.

571. *See* Hirsch & Sheehey, *supra* note 466, at 104–05.

### 14.216 Reimbursement of Expenses

Rules and practices vary widely with respect to reimbursement of lawyers' expenses out of the fee award.[572] Charges for paralegals and law clerks at market rates[573] and the fees of necessary experts are generally reimbursable while secretarial assistance is not. Courts have differed over whether overtime is reimbursable, as well as such items as computer-assisted legal research, copy and printing costs, certain meals and travel, and fax, telephone, and delivery charges. The court should establish ground rules at the outset for determination of such claims.

In some litigation, parties may incur substantial costs for various litigation support or services, such as special computer installations, costly expert services, or elaborate trial exhibits or demonstrations. Counsel who expect to treat such items as reimbursable expenses or taxable costs should advise the court and opposing counsel and obtain clearance before incurring the expenses. This should also be done when there are questions relating to taxation of costs.

## 14.22  Motion for Attorney Fees

.221 Contents of the Fee Motion  203
.222 Timing  204
.223 Supporting Documentation and Evidence  204
.224 Discovery  205

### 14.221  Contents of the Fee Motion

Federal Rule of Civil Procedure 23(h) establishes procedures in class actions for ruling on motions for attorney fees, notifying the class, holding hearings, making findings, and using special masters or magistrate judges to assist in the process. See generally section 21.72. In non–class-action cases, Rule 54(d)(2) and any rules specifying the requirements of motions for fees in other cases should be the primary source of procedures governing fee motions. If counsel is advised early in the case of the possibility of departure, they can prepare and maintain records that will facilitate the later preparation of the motion. The judge should give timely notice to counsel of a decision to bifurcate the determination of liability for fees from that of the amount under Rule 54(d)(2)(C).

Where multiple counsel in the case expect to submit separate fee motions, consider requiring them to coordinate their submissions, avoid duplication,

---

572. *See generally* 1 Alba Conte, Attorney Fee Awards §§ 2.19, 4.41–4.43 (2d ed. 1993 & Supp. Nov. 2002) (discussing cost reimbursement in common-fund and statutory-fee cases).

573. Mo. v. Jenkins, 491 U.S. 274, 288 (1989).

and perhaps attempt to resolve disputes among themselves before submission. Lead counsel can be made responsible for overseeing this process.[574]

## 14.222 Timing

For nonclass litigation, Rule 54(d)(2)(B) requires that motions for attorney fees be filed and served no later than fourteen days after entry of judgment unless otherwise provided by statute or order of the court. Prompt filing of the motion gives the opponent and other interested parties notice of the claim before the time for appeal has expired, affords the court an opportunity to rule on the application while the services are still fresh in mind, and allows an appeal to be taken at the same time as an appeal on the merits.

Although such motions are ordinarily made at the end of the case, an interim award of fees and expenses will sometimes be appropriate.[575] For discussion of the Rule 23(h)(1) requirement that notice of a motion for attorney fees in a class action be given to class members, see section 21.722.

## 14.223 Supporting Documentation and Evidence

In advance of any fee-award hearing, counsel should submit time and expense records, to the extent not previously submitted with the motion and in manageable and comprehensible form, to encourage parties to reach agreements where possible and to streamline the hearing. Where different claims were litigated, the records should identify the claims to which particular services relate.[576] Counsel should also submit the evidence on which they will rely in urging particular rates for certain lawyers, or a particular percentage when that method is to be used. The direct testimony of witnesses in support of the application can be in the form of declarations, with the witnesses available at the hearing for cross-examination if requested.[577]

---

574. For a description of one district judge's approach to using lead counsel to coordinate interim and final submissions of multiple requests for fees, see Hirsch & Sheehey, *supra* note 466, at 117.

575. *See* Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 790–92 (1989).

576. Hensley v. Eckerhart, 461 U.S. 424, 437 & n.12 (1983).

577. *See generally* Charles Richey, *A Modern Management Technique for Trial Courts to Improve the Quality of Justice: Requiring Direct Testimony To Be Submitted in Written Form Prior to Trial*, 72 Geo. L.J. 73 (1983). For a discussion about applying this technique to fee hearings, see Hirsch & Sheehey, *supra* note 466, at 107–08.

In class actions, all agreements or understandings made in connection with a settlement must be described in writing and may have to be disclosed.[578] See section 21.725. In any type of case, the judge may wish to direct the movant to disclose any agreement with a client in which the terms deal with "fees to be paid for the services for which the claim is made."[579]

## 14.224 Discovery

For discussion of discovery regarding fee requests in class actions, see section 21.724. Discovery in connection with fee motions should rarely be permitted, but may be advisable where attorneys make competing claims to a settlement fund designated for the payment of fees.[580] With appropriate guidelines and ground rules, the materials submitted should normally meet the needs of the court and other parties. If a party or an objector to a settlement requests clarification of material submitted in support of the fee motion, or requests additional material, the court should determine what information is genuinely needed and arrange for its informal production.

## 14.23  Judicial Review/Hearing and Order

.231 Judicial Review  205
.232 Hearing and Order  207

## 14.231 Judicial Review

Exacting judicial review of fee applications, burdensome though it may be, is necessary to discharge the obligation to award fees that are reasonable and consistent with governing law. In common-fund litigation, class counsel may be competing with class members for a share of the fund, thus placing a special fiduciary obligation on the judge because class members are unrepresented as

---

578.  Fed. R. Civ. P. 23(e)(2) & committee note; *see also* Smiley v. Sincoff, 958 F.2d 498, 501 (2d Cir. 1992) (discussing the district court's power to review and invalidate private fee agreements); *In re* "Agent Orange" Prod. Liab. Litig., 818 F.2d 216, 218, 222–24 (2d Cir. 1987); 7B Charles Alan Wright et al., Federal Practice & Procedure Civil 2d § 1803 (Supp. 2002) (discussing *Agent Orange*). *But see* Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990) (counsel free to divide lump sum award as they see fit without disclosure). *See generally supra* section 13.23 (full disclosure of all side agreements must be made to the court in presenting a related settlement agreement for judicial approval).

579.  Fed. R. Civ. P. 54(d)(2)(B).

580.  *See In re* Nineteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig., 982 F.2d 603, 614 n.20 (1st Cir. 1992) (discovery not required, but is one way to afford competing claimants due process). *See also* Fed. R. Civ. P. 23(h)(2) committee note ("If the motion provides thorough information, the burden should be on the objector to justify discovery . . . .").

to this issue.[581] If there are no objectors to the fee request, consider whether to appoint counsel to represent the class on this issue, balancing the additional cost an appointment will likely entail against the possible benefit to the class.[582]

Standards for reviewing common-fund attorney fee requests are discussed in section 14.12, and standards for reviewing statutory attorney fee requests are discussed in section 14.13. The following is a summary of several techniques judges have developed to expedite the review process, primarily relevant to application of the lodestar approach:

- *Establishing at the outset of the case the method of compensation and, if possible, any percentage formula that will be used.* Innovative methods used in this connection have included competitive bidding procedures for the selection of class counsel[583] and appointment of an outside attorney to negotiate a fee arrangement for the class.[584]

- *Sampling.* The judge can select certain blocks of time, at random, examining them closely to determine the reasonableness of the hours charged and apply the results to the entire fee application by extrapolation.[585]

- *Evaluating the request in light of a budget submitted by counsel at the beginning of the case.*[586] Counsel must justify substantial departures from the budget.

- *Using computer programs to facilitate analysis of fee requests.*[587] See section 14.213.

- *Having defendants submit billing records.* Records showing defendants' attorney fees may provide a reference for determining the reasonableness of fees where defendants oppose plaintiff's counsel's fee request.[588]

---

581. *In re* Cendant Corp. Prides Litig., 243 F.3d 722, 730–31 (3d Cir. 2001); *In re* Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1302 (9th Cir. 1994).

582. *In re Wash. Pub. Power*, 19 F.3d at 1302.

583. *See supra* section 14.211.

584. *See Third Circuit 1985 Task Force Report*, *supra* note 480, at 256; *see also* Hirsch & Sheehey, *supra* note 466, at 101 n.444.

585. Evans v. City of Evanston, 941 F.2d 473, 477 (7th Cir. 1991) (approving the sampling technique employed as reasonable); *see also* Hirsch & Sheehey, *supra* note 466, at 96–97 (reporting interviews with judges who have used sampling).

586. Hirsch & Sheehey, *supra* note 466, at 97–98.

587. *Id.* at 101–02. A bankruptcy judge reported creating and maintaining a database of local attorney billing rates, which she shares with other judges. *Id.* at 102.

588. *Id.* at 105–06.

- *Delegating discrete tasks to law clerks and secretaries.* Law clerks can compare the billing request with the product of the billing as shown in the case file.[589]
- *Using magistrate judges, special masters, or experts.*[590] Before calling on outside assistance, the judge should take all reasonable steps to simplify and streamline the process. The trial judge has a familiarity with the case that cannot be matched by any judicial adjunct.

## 14.232 Hearing and Order

Rule 54(d)(2)(C) requires the court, on request of a party or class member, to "afford an opportunity for adversary submissions with respect to [a] motion" for attorney fees. An evidentiary hearing may be required in some cases, but Rule 54(d)(2)(D) permits the court to "establish special procedures by which issues relating to such fees may be resolved without extensive evidentiary hearings." Due process may require affording claimants a meaningful opportunity to be heard concerning competing applications for fees payable from a common fund.[591] A hearing must be held in a class action in which a settlement would bind the class,[592] and that hearing should ordinarily encompass attorney fee petitions. If a hearing is anticipated, the judge should hold a preliminary conference to narrow the issues and resolve as many disputes as possible. Techniques to expedite bench trials should be used, such as exchange and submission of direct testimony subject to cross-examination of the witness at the hearing when requested (see section 12.51).[593]

Rule 54(c)(2)(C) requires the court to "find the facts and state its conclusions of law as provided in Rule 52(a)" and to issue its judgment in a separate document under Rule 58. The order, which should be made public, must "provide a concise but clear explanation of its reasons for the fee award."

---

589. *Id.* at 114–15.

590. Fed. R. Civ. P. 54(d)(2)(D). *But see* Estate of Conners v. O'Connor, 6 F.3d 656, 658–59 (9th Cir. 1993) (magistrate judge cannot enter final, appealable order). *See also* Hirsch & Sheehey, *supra* note 466, at 107 (discussing threat to appoint auditor to resolve fee dispute at the loser's expense), 115–17 (discussing use of magistrate judges, special masters, experts, and settlement judges in managing fee applications).

591. *In re* Nineteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig., 982 F.2d 603, 616 (1st Cir. 1992). For discussion of the hearing procedures for class-action settlements, see *infra* section 21.634.

592. Fed. R. Civ. P. 23(e)(1)(C) (requiring a hearing before approving a settlement, voluntary dismissal, or a compromise that would bind class members).

593. *See In re* Fine Paper Antitrust Litig., 751 F.2d 562, 572 (3d Cir. 1984).

# 15. Judgments and Appeals

.1 Interlocutory Appeals   208
   .11 When Permitted   208
   .12 Proceedings While Appeal Pending  212
.2 Entry of Final Judgment  212
.3 Disposition of Materials  213

## 15.1  Interlocutory Appeals

.11 When Permitted   208
.12 Proceedings While Appeal Pending  212

## 15.11  When Permitted

The principal occasions on which an appellate court may permit inter-locutory appeal are these:

- *Orders granting, continuing, modifying, dissolving, or refusing to dissolve or modify injunctions.* Appeals as of right from such orders are author-ized by 28 U.S.C. § 1292(a)(1),[594] and an appellate court may treat an order as an injunction even if the district court has labeled it other-wise.[595] Interlocutory appeals are also authorized from certain orders relating to receiverships and decrees in admiralty. An interlocutory or-der that merely has the practical *effect* of denying an injunction is ap-pealable as of right under 28 U.S.C. § 1292(a)(1) upon a showing that the order would have "serious, perhaps irreparable" consequences and can be effectively challenged only by appeal.[596] Section 1292(a)(1) gen-erally does not, however, permit interlocutory appeals from orders granting or refusing to grant stays.[597] Failure to take an interlocutory

---

594.  28 U.S.C. § 1291 (West 2002).

595.  Sierra Club v. Marsh, 907 F.2d 210, 214 (1st Cir. 1990); Cohen v. Bd. of Trs., 867 F.2d 1455, 1466 (3d Cir. 1989) (en banc). *See also* Hershey Foods Corp. v. Hershey Creamery Co., 945 F.2d 1272, 1277 (3d Cir. 1991) (to be deemed an injunction, order must be directed to party, enforceable by contempt, and designed to protect some or all of the substantive relief sought).

596.  Carson v. Am. Brands, Inc., 450 U.S. 79, 84 (1981). *See also* Gulfstream Aerospace Corp. v. Maycamas Corp., 485 U.S. 271, 287–88 (1988); Sierra Rutile, Ltd. v. Katz, 937 F.2d 743, 749 (2d Cir. 1991). Under Title 9, an order refusing a stay to permit arbitration pursuant to a written arbitration agreement is immediately appealable, but one granting such a stay is not. 9 U.S.C. §§ 16(a)(1)(A), 16(b)(1) (2000).

597.  *Gulfstream,* 485 U.S. at 279–88 (overruling the *Enelow-Ettleson* doctrine).

appeal does not waive the right to appeal an order after final judgment.[598]

- *Orders not otherwise appealable that "involve a controlling question of law as to which there is substantial ground for difference of opinion . . . [if] an immediate appeal from the order may materially advance the ultimate termination of the litigation."*[599] Some judges give a party an opportunity to seek interlocutory review of an order by issuing a written order finding that this standard is met. Such an order should clearly articulate the reasons and factors underlying the court's decision.[600] The court of appeals has discretion to hear or decline the appeal.[601] Adopted with complex litigation in mind,[602] 28 U.S.C. § 1292(b) provides a mechanism for obtaining early review of crucial orders where an appellate ruling may simplify or shorten the litigation.[603] Examples include orders certifying or refusing to certify a class or allocating the cost of notice, granting or denying motions disposing of pivotal claims or defenses, finding a lack of subject-matter jurisdiction,[604] or determining the applicable substantive law. The appellant has ten days from entry of the district court's order to petition the court of appeals for permission to appeal.[605]

- *Orders constituting a clear abuse of discretion in circumstances where the court's legal duty is plainly established.* Review may be available by way of extraordinary writ.[606] Appellate courts grant these writs rarely, limiting them to situations where the trial court has clearly committed le-

---

598. *See, e.g.*, Clark v. Merrill Lynch, Pierce, Fenner & Smith Inc., 924 F.2d 550, 553 (4th Cir. 1991). The issue may, of course, become moot after final judgment.

599. 28 U.S.C. § 1292(b) (West 2002).

600. Metro Transp. Co. v. N. Star Reinsurance Co., 912 F.2d 672, 677 (3d Cir. 1990).

601. Coopers & Lybrand v. Livesay, 437 U.S. 463, 475 (1978) (appeal may be denied for any reason, including docket congestion).

602. *See* 16 Wright et al., *supra* note 578, § 3929.

603. *See, e.g.*, Watson v. Shell Oil Co., 979 F.2d 1014, 1016 (5th Cir. 1992) (orders defining class and class issues, designating class representatives, and setting a class trial plan), *reh'g granted*, 990 F.2d 805 (5th Cir. 1993), *other reh'g*, 53 F.3d 663 (5th Cir. 1994) (case settled before rehearing).

604. *See In re* TMI Litig. Cases Consol. II, 940 F.2d 832 (3d Cir. 1991) (order remanding cases to state court upon finding that the federal statute providing federal jurisdictional predicate was unconstitutional).

605. 28 U.S.C. § 1292(b) (West 2002); Fed. R. App. P. 5(a). Failure to meet this deadline is a jurisdictional defect and is strictly enforced. *See, e.g.*, Tranello v. Frey, 962 F.2d 244, 247–48 (2d Cir. 1992).

606. *See* 28 U.S.C. § 1651 (West 2002); Fed. R. App. P. 21.

gal error, and a party is entitled to relief but cannot obtain it through other means.[607] Writs have been granted to require that a demand for trial by jury be honored,[608] to vacate orders restricting communications with class members,[609] to uphold claims of sovereign immunity,[610] to vacate orders appointing special masters,[611] and to enforce claims of privilege[612] or work-product protection.[613] A writ may be sought as an alternative ground for interlocutory review where review is denied under section 1292(b).[614]

- *Collateral orders that finally determine claims separable from rights asserted in the action and that would be effectively unreviewable on appeal from final judgment.* Under the "collateral order" doctrine, certain nonfinal orders may be considered final decisions for purposes of 28 U.S.C. § 1291.[615] Examples are orders denying immunity,[616] preventing intervention,[617] or modifying a protective order.[618] Courts have construed this doctrine narrowly.[619] As an alternative, a writ may be

---

607. Kerr v. United States Dist. Court, 426 U.S. 394, 402–03 (1976).

608. *See, e.g.*, Dairy Queen, Inc. v. Wood, 369 U.S. 469 (1962); Beacon Theatres, Inc. v. Westover, 359 U.S. 500 (1959).

609. *See, e.g.*, Coles v. Marsh, 560 F.2d 186 (3d Cir. 1977).

610. *See, e.g.*, Spacil v. Crowe, 489 F.2d 614 (5th Cir. 1974).

611. *See, e.g.*, La Buy v. Howes Leather Co., 352 U.S. 249 (1957).

612. Jenkins v. Weinshienk, 670 F.2d 915 (10th Cir. 1982); Rowley v. Macmillan, 502 F.2d 1326 (4th Cir. 1974); Harper & Row Publishers, Inc. v. Decker, 423 F.2d 487 (7th Cir. 1970), *aff'd per curiam*, 400 U.S. 348 (1971).

613. *See, e.g.*, Bogosian v. Gulf Oil Corp., 738 F.2d 587 (3d Cir. 1984).

614. *See, e.g.*, *In re* Cement Antitrust Litig., 673 F.2d 1020 (9th Cir. 1982) (judge's recusal reviewable by mandamus, but not under section 1292(b)), *aff'd under 28 U.S.C. § 2109 sub nom.* Ariz. v. Ash Grove Cement Co., 459 U.S. 1190 (1983).

615. *See* Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949). *See also* Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974) (order directing defendants to bear part of cost of class notice held immediately appealable).

616. *See* P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 143 (1993); Mitchell v. Forsyth, 472 U.S. 511, 524–30 (1985).

617. *See* Stringfellow v. Concerned Neighbors in Action, 480 U.S. 370, 377 (1987).

618. *See* Beckman Indus., Inc. v. Int'l Ins. Co., 966 F.2d 470, 472 (9th Cir. 1992) (cases cited therein).

619. *See* Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 (1978) (order denying class certification held not immediately appealable). Mindful of the constraints of *Coopers*, appellate courts have declined to review interlocutory orders restricting communications with class members, *Lewis v. Bloomsburg Mills, Inc.*, 608 F.2d 971 (4th Cir. 1979), awarding interim attorneys' fees, *Hillery v. Rushen*, 702 F.2d 848 (9th Cir. 1983), directing class counsel to create a list of class members at their own expense, *Judd v. First Federal Savings & Loan Ass'n*, 599 F.2d 820 (7th Cir. 1979), and transferring the action to another district court because of a forum selection clause,

sought.[620] It is unclear whether the right to appeal a collateral order is lost if the appeal is not taken immediately.[621]

• *Orders granting or denying class action certification.* See section 21.28.

• *Where a claim has been resolved while others remain pending, or the rights or liabilities of one party have been determined while others remain in the litigation.* Review may be available under Federal Rule of Civil Procedure 54(b) if the district court, in its discretion, makes "an express determination that there is no just cause for delay" and has given "an express direction for the entry of judgment." The order should state the court's reasons. The district court has discretion to direct entry of judgment only for those decisions that are "final" within the meaning of 28 U.S.C. § 1291.[622] Unlike 28 U.S.C. § 1292(b), Rule 54(b) does not provide for certification of issues.[623] Once judgment has been entered and the certification made, the party affected must perfect its appeal or it is waived.[624] A Rule 54(b) appeal with respect to a particular party or a discrete claim may be appropriate to speed the final resolution of the litigation. On the other hand, such appeals sometimes result in duplication of work for the court of appeals by having to hear separate appeals on the same or similar issues.[625]

• *Reference of controlling questions of state law to a state appellate court.* A number of state appellate courts entertain references from federal courts of unsettled questions of state law.

*Nascone v. Spudnuts*, 735 F.2d 763 (3d Cir. 1984). *But cf.* Coastal Steel Corp. v. Tilghman Wheelabrator Ltd., 709 F.2d 190 (3d Cir. 1983) (order refusing to enforce contractual forum selection clause held immediately appealable). For cases on interlocutory appeals of orders on motions to disqualify counsel, see *supra* note 71.

620. Some appellate courts will treat appeals outside the scope of the collateral order doctrine as petitions for special writs. *See, e.g.,* Cheyney State Coll. Faculty v. Hufstedler, 703 F.2d 732, 736 (3d Cir. 1983) (discretionary with court of appeals).

621. *See* Exc. Nat'l Bank v. Daniels, 763 F.2d 286, 290–92 (7th Cir. 1985).

622. Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. 737, 742–44 (1976); Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 437–38 (1956).

623. Bogosian v. Gulf Oil Corp., 561 F.2d 434, 443 (3d Cir. 1977).

624. *See, e.g.,* Local P-171, Amalgamated Meat Cutters & Butchers Workmen v. Thompson Farms Co., 642 F.2d 1065, 1071 n.7 (7th Cir. 1981).

625. *See* Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 8 (1980); *Sears, Roebuck & Co.*, 351 U.S. at 441–44 (Frankfurter, J., dissenting).

## 15.12  Proceedings While Appeal Pending

An interlocutory appeal, whether by right or by permission, does not ordinarily deprive the trial court of jurisdiction except with respect to the matter that is the subject of the appeal.[626] Notwithstanding the pendency of an interlocutory appeal, the litigation usually proceeds as scheduled through discovery and other pretrial steps toward trial. However, depending on the nature of the issue before the appellate court, it may be appropriate for the trial judge to suspend some portion of the proceedings or alter the sequence in which further activities in the litigation are conducted.

## 15.2  Entry of Final Judgment

Federal Rule of Civil Procedure 58 directs the district judge to set forth the final judgment on a separate document identified as such, separate from any order, memorandum, or opinion. If the final judgment will run to several pages, consider preparing for signature a single cover sheet that refers to and adopts the provisions set forth in an attached appendix. The judgment is effective only when entered by the clerk in accordance with Rule 79(a).[627] The time for appeal does not begin to run until the conditions set by Rules 58 and 79(a) have been met.[628] Though notice of the entry is not required to start the time for appeal running,[629] failure to receive notice may support such a motion for reopening the time to appeal.[630] Prevailing parties should therefore send their own notice as a supplement to that expected from the clerk.[631] A notice filed before disposition of such motion becomes effective upon the motion's disposition.[632] The pendency of a motion for costs or attorneys' fees tolls the time to appeal if the court on timely application delays entry of the underlying judgment.[633]

If a party timely files a motion under Rule 50(b) for judgment as a matter of law, under Rule 52(b) to amend or make additional findings of fact, or under Rule 59 for a new trial or to amend the judgment, the time to appeal runs

---

626. *See* Taylor v. Sterrett, 640 F.2d 663, 667–68 (5th Cir. 1981); 19 James Wm. Moore et al., Moore's Federal Practice § 203.11 (3d ed. 1997).

627. Bankers Trust Co. v. Mallis, 435 U.S. 381, 384 (1978).

628. Fed. R. App. P. 4(a)(7); United States v. Indrelunas, 411 U.S. 216 (1973).

629. *See* Fed. R. App. P. 4(a)(1).

630. *See* Fed. R. App. P. 4(a)(6).

631. *See* Fed. R. App. P. 4(a)(6) committee note.

632. *See* Fed. R. App. P. 4 committee note on the 1993 amendments.

633. *See* Fed. R. Civ. P. 58 committee note.

instead from entry of the order denying a new trial or granting or denying any of the other motions.[634] These postjudgment motions should, therefore, be acted on promptly. Postjudgment motions may affect the appealability of other cases consolidated for trial.

The final judgment in a class action must describe the class with sufficient specificity to identify those bound by the decision.[635] In actions maintained under Rule 23(b)(3), the court should compile—and refer in the judgment to—a list that identifies the persons who were sent individual notice and did not timely elect to be excluded from the class.

## 15.3   Disposition of Materials

Most courts by local rule or order direct or permit the parties, after the time for appeal has expired, to remove many of the documents and other exhibits.

The parties, however, may need those materials—often gathered or compiled at great expense—in other litigation, pending or not. Therefore, the court should be reluctant to authorize immediate destruction of documents and other exhibits. Items permitted to be withdrawn from the court should usually be retained by the parties for a reasonable period of time so that, if shown to be needed in other litigation, they can be produced without undue expense or delay.

---

634. Fed. R. App. P. 4(a)(4).
635. Fed. R. Civ. P. 23(c)(3).

Blank page inserted for correct pagination
when printing double-sided copies.

# Part II

# Special Problems

————————

20. Multiple Jurisdiction Litigation  217

21. Class Actions  242

22. Mass Torts  341

23. Expert Scientific Evidence  469

Blank page inserted for correct pagination
when printing double-sided copies.

# 20. Multiple Jurisdiction Litigation

.1 Related Federal Civil Cases  218
    .11 Cases in Same Court  218
    .12 Cases in Different Federal Courts  219
    .13 Multidistrict Transfers Under Section 1407  219
      .131 Requests for Transfer  219
      .132 During Period of Transfer  221
      .133 Remand  225
    .14 Coordination Between Courts  227
.2 Related Criminal and Civil Cases  228
.3 Related State and Federal Cases  229
    .31 Coordination  229
      .311 Identifying the Need and Opportunity  231
      .312 Threshold Steps  232
      .313 Specific Forms of Coordination  235
    .32 Jurisdictional Conflicts  238

Multiplication of cases within the federal system or across the federal and state systems is a common characteristic of complex litigation. Multiple claims may be aggregated in a single class action if the prerequisites of Federal Rule of Civil Procedure 23 are met. Frequently, though, separate lawsuits asserting similar claims are initiated; multiple, overlapping class actions are filed in federal and state courts; or class members opt out to file their own cases. Occasionally, peripheral claims in complex litigation will lead to multiple cases, as in the case of insurance coverage litigation or reactive litigation motivated by forum preferences. Control over the proliferation of cases and coordination of multiple claims is crucial to effective management of complex litigation. When the limitations of federal jurisdiction preclude such control, voluntary means may be available to achieve coordination and thereby reduce duplicative activity, minimize the risks of conflict, and avoid unnecessary expense.

The most powerful device for aggregating multiple litigation pending in federal and state courts—the bankruptcy law[636]—is, except for the mass tort context, beyond the scope of this manual. Where related adversary proceedings are pending in bankruptcy court, however, the bankruptcy judge should consider having them reassigned, at least tentatively, to the district judge handling related litigation.[637] When related bankruptcy reorganization pro-

---

636.  *See* A.H. Robins Co. v. Piccinin, 788 F.2d 994 (4th Cir. 1986). *See generally* section 22.5.
637.  *See generally* section 22.54.

ceedings are pending in different districts, judges should consider methods of consolidating those proceedings before a single judge.[638]

# 20.1   Related Federal Civil Cases

.11 Cases in Same Court  218
.12 Cases in Different Federal Courts  219
.13 Multidistrict Transfers Under Section 1407  219
   .131 Requests for Transfer  219
   .132 During Period of Transfer  221
   .133 Remand  225
.14 Coordination Between Courts  227

## 20.11  Cases in Same Court

All related civil cases pending in the same court should initially be assigned to a single judge to determine whether consolidation, or at least coordination of pretrial proceedings, is feasible and is likely to reduce conflicts and duplication (see section 10.12). If the cases appear to involve common questions of law or fact, and consolidation may tend to reduce cost and delay, the cases may be consolidated under Federal Rule of Civil Procedure 42(a) (see section 11.631). Cases pending in different divisions of the court may be transferred upon request under 28 U.S.C. § 1404(b). Cases should not be consolidated if it would result in increased delay and other unnecessary burdens on parties, such as having to participate in discovery irrelevant to their cases.[639]

At the initial conference, consider whether cases should be coordinated or consolidated for pretrial proceedings or for all purposes even if the final decision must be deferred pending the development of additional information. When cases are coordinated or consolidated, the court should enter an order establishing a master file for the litigation in the clerk's office, relieving the parties from multiple filings of the same pleadings, motions, notices, orders, and discovery materials, and providing that documents need not be filed separately in an individual case file unless uniquely applicable to that particular case.

---

638. *See* Order of Chief Judge Edward H. Becker, Designation of a District Judge for Service in Another District Within the Circuit (3d Cir. Nov. 27, 2001). The order was based on authority granted the chief judge in 28 U.S.C. § 292(b), which permits such reassignments "in the public interest."

639. *In re* Repetitive Stress Injury Litig., 11 F.3d 368 (2d Cir. 1993).

## 20.12 Cases in Different Federal Courts

Related cases pending in different federal courts may be consolidated in a single district by a transfer of venue. Under 28 U.S.C. § 1404(a), the court may, "[f]or the convenience of parties and witnesses, in the interest of justice . . . transfer any civil action to any other district or division where it might have been brought."[640] Plaintiffs' choice of forum is, however, entitled to substantial deference.[641]

## 20.13 Multidistrict Transfers Under Section 1407

.131 Requests for Transfer  219
.132 During Period of Transfer  221
.133 Remand  225

The Judicial Panel on Multidistrict Litigation ("the Panel") is authorized to transfer civil actions pending in more than one district involving one or more common questions of fact to any district for coordinated or consolidated pretrial proceedings upon the Panel's determination that transfer "will be for the convenience of the parties and witnesses and will promote the just and efficient conduct of such actions."[642] The Panel's authority is not subject to venue restrictions[643]—it extends to most civil actions[644] and, with one statutory exception, only to transfer for pretrial proceedings (as of December 2003).[645]

### 20.131 Requests for Transfer

Transfer proceedings may be initiated by one of the parties or by the Panel itself, although the latter procedure is ordinarily used only for "tag-along" cases (transfer on the request of a person not a party in one or more of the

---

640. For the implications of the phrase "where it might have been brought," see *infra* note 649.

641. *See Gulf Oil Co. v. Gilbert*, 330 U.S. 501, 508 (1947).

642. 28 U.S.C. § 1407 (West 2003).

643. *In re* N.Y. City Mun. Sec. Litig., 572 F.2d 49 (2d Cir. 1978).

644. Antitrust actions brought by the United States are exempt from the Panel's power, 28 U.S.C. § 1407(g) (West 2002), as are injunctive actions instituted by the Securities and Exchange Commission unless the SEC consents to consolidation, 15 U.S.C. § 78u(g) (2000).

645. *See infra* section 20.132 and text accompanying notes 666–71. *Parens patriae* antitrust actions brought by states under 15 U.S.C. § 15c(a)(1) may be transferred by the Panel for both pretrial and trial. 28 U.S.C. § 1407(h) (West 2002). The Panel can also designate the circuit court to hear appeals of federal agency rulings in certain instances in which petitions for review have been filed in multiple circuits. *Id*. § 2112(a)(3).

cases).[646] The Panel evaluates each group of cases proposed for multidistrict treatment on the cases' own facts in light of the statutory criteria. The objective of transfer is to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts.[647] As few as two cases may warrant multidistrict treatment,[648] although those advocating transfer bear a heavy burden of persuasion when there are only a few actions, particularly those involving the same parties and counsel.[649]

Occasionally, only certain claims in an action are related to multidistrict proceedings, or an action contains claims relating to more than one multidistrict docket (e.g., a plaintiff suing its broker over purchases of stock in two different companies, each of which is the subject of a separate multidistrict docket). Section 1407(a) authorizes the Panel to transfer only "civil actions," not claims; however, section 1407(a) also empowers the Panel to accomplish "partial" transfer by (1) transferring an action in its entirety to the transferee district, and (2) simultaneously remanding to the transferor district any claims for which transfer was not deemed appropriate, such as cross-claims, counterclaims, or third-party claims. If the "new" action containing the remanded claim in the transferor district is also appropriate for inclusion in a second transferee docket, the process can proceed one step further with simultaneous retransfer to the second docket's transferee district.

A transfer under section 1407 becomes effective when the order granting the transfer is filed in the office of the clerk of the transferee court. At that point, the jurisdiction of the transferor court ceases and the transferee court has exclusive jurisdiction.[650] During the pendency of a motion (or show cause order) for transfer, however, the court in which the action was filed retains jurisdiction over the case.[651]

The transferor court should not automatically stay discovery; it needs to consider provisions in local rules that may mandate early commencement of discovery, and an order modifying such provisions' impact on the litigation may be necessary. Nor should the court automatically postpone rulings on pending motions, or generally suspend further proceedings. When notified of

---

646. The Panel may order transfer on the request of a person not a party in one or more of the cases. *See, e.g., In re* Equity Funding Corp. Sec. Litig., 375 F. Supp. 1379, 1390 n.4 (J.P.M.L. 1974).

647. *See In re* Plumbing Fixture Cases, 298 F. Supp. 484 (J.P.M.L. 1968).

648. *See, e.g., In re* Clark Oil & Ref. Corp. Antitrust Litig., 364 F. Supp. 458 (J.P.M.L. 1973).

649. *See, e.g., In re* Scotch Whiskey, 299 F. Supp. 543 (J.P.M.L. 1969).

650. *In re Plumbing Fixture*, 298 F. Supp. 484. Unless altered by the transferee court, orders entered by the transferor court remain in effect.

651. J.P.M.L. R.P. 1.5; *In re* Four Seasons Sec. Laws Litig., 362 F. Supp. 574 (J.P.M.L. 1973).

the filing of a motion for transfer,[652] therefore, matters such as motions to dismiss or to remand, raising issues unique to the particular case, may be particularly appropriate for resolution before the Panel acts on the motion to transfer. The Panel has sometimes delayed ruling on transfer to permit the court in which the case is pending to decide critical, fully briefed and argued motions. At the same time, it may be advisable to defer certain matters until the Panel has the opportunity to rule on transfer. For example, there would be little purpose in entering a scheduling order while a conditional order of transfer is pending. The court should, however, modify any previously scheduled dates for pretrial proceedings or trial as may be necessary to avoid giving the Panel a misleading picture of the status of the case.

More often, however, the Panel has held that the pendency of potentially dispositive motions is not an impediment to transfer of actions, because such motions can be addressed to the transferee judge for resolution after transfer. Furthermore, the pendency of motions raising questions common to related actions can itself be an additional justification for transfer.[653]

The Panel uses no single factor to select the transferee district,[654] but the Panel does consider where the largest number of cases is pending, where discovery has occurred, where cases have progressed furthest, the site of the occurrence of the common facts, where the cost and inconvenience will be minimized, and the experience, skill, and caseloads of available judges. Based on these factors, the Panel will designate a judge (on rare occasions, two judges) to whom the cases are then transferred for pretrial proceedings. The judge is usually a member of the transferee court, but occasionally the Panel selects a judge designated to sit specially in the transferee district on an intracircuit or intercircuit assignment.

## 20.132  During Period of Transfer

After the transfer, the transferee judge[655] exercises not only the judicial powers in the transferee district but also "the powers of a district judge in any district for the purpose of conducting pretrial depositions in such coordinated or consolidated proceedings."[656] The Panel has no authority to direct transferee judges in the exercise of their powers and discretion in supervising multidis-

---

652. A copy of the motion is to be filed with the court where the action is pending. *See* J.P.M.L. R.P. 5.12(c).

653. *See, e.g., In re* Ivy, 901 F.2d 7, 9 (2d Cir. 1990).

654. *See* Robert A. Cahn, *A Look at the Judicial Panel on Multidistrict Litigation*, 72 F.R.D. 211, 214–215 (1977).

655. *In re Plumbing Fixture*, 298 F. Supp. at 489.

656. 28 U.S.C. § 1407(b) (West 2003).

trict proceedings.[657] This supervisory power over depositions in other districts may be exercised in person or by telephone.[658] The transferee judge may vacate or modify any order of a transferor court, including protective orders;[659] unless altered, however, the transferor court's orders remain in effect.[660]

Although the transferee judge has no jurisdiction to conduct a trial in cases transferred solely for pretrial proceedings, the judge may terminate actions by ruling on motions to dismiss, for summary judgment, or pursuant to settlement, and may enter consent decrees.[661] Complexities may arise where the rulings turn on questions of substantive law. In diversity cases, the law of the transferor district follows the case to the transferee district.[662] Where the claim or defense arises under federal law, however, the transferee judge should consider whether to apply the law of the transferee circuit or that of the transferor court's circuit,[663] keeping in mind that statutes of limitations may present unique problems.[664] An action is closed by appropriate orders entered in the transferee court, without further involvement by the Panel or the original transferor court.

The transferee judge's management plan for the litigation should include provisions for handling tag-along actions transferred by the Panel after the initial transfer. Panel Rules 7.2(I) and 7.5(e) impose an affirmative obligation on parties in cases in which a motion to transfer is pending, or that previously have been transferred by the Panel, to promptly notify the Panel of any potential tag-along action in which the party is also named. This obligation also is imposed on counsel with respect to any action in which the counsel appears. Ordinarily, it is advisable to order that (1) tag-along actions shall be automatically made part of the centralized proceedings upon transfer to, or filing in, the transferee court; (2) rulings on common issues—for example, on the statute of limitations—shall be deemed to have been made in the tag-along

---

657. *Id.*

658. *See In re* Corrugated Container Antitrust Litig., 662 F.2d 875 (D.C. Cir. 1981); *In re* Corrugated Container Antitrust Litig., 644 F.2d 70 (2d Cir. 1981); *In re* Corrugated Container Antitrust Litig., 620 F.2d 1086 (5th Cir. 1980).

659. *See, e.g., In re* Upjohn Co. Antibiotic Cleocin Prods. Liab. Litig., 664 F.2d 114 (6th Cir. 1981).

660. *See In re* Master Key Antitrust Litig., 320 F. Supp. 1404 (J.P.M.L. 1971).

661. *See, e.g., In re* Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 367–68 (3d Cir. 1993).

662. Van Dusen v. Barrack, 376 U.S. 612 (1964); *In re* Dow Co. "Sarabond" Prods. Liab. Litig., 666 F. Supp. 1466, 1468 (D. Colo. 1987).

663. *Compare In re* Korean Air Lines Disaster, 829 F.2d 1171 (D.C. Cir. 1987), *aff'd on other grounds sub nom.* Chan v. Korean Air Lines Ltd., 490 U.S. 122 (1989), *with* Dow "Sarabond," 666 F. Supp. 1466 (D. Colo. 1987), and cases cited therein.

664. *See, e.g.,* Berry Petroleum Co. v. Adams & Peck, 518 F.2d 402, 406 (2d Cir. 1975).

action without the need for separate motions and orders; and (3) discovery already taken shall be available and usable in the tag-along cases.[665] Consider other means of reducing duplicative discovery activity and expediting later trials by measures such as videotaping key depositions or testimony given in bellwether trials, particularly of expert witnesses, for use at subsequent trials in the transferor courts after remand.

One of the values of multidistrict proceedings is that they bring before a single judge all of the federal cases, parties, and counsel comprising the litigation. They therefore afford a unique opportunity for the negotiation of a global settlement. Few cases are remanded for trial; most multidistrict litigation is settled in the transferee court. As a transferee judge, it is advisable to make the most of this opportunity and facilitate the settlement of the federal and any related state cases. See section 20.31.

Until 1998, actions based on section 1407 proceedings and not settled or otherwise dismissed in the transferee districts during their pretrial stages often remained in the transferee districts for trial. Transferee judges entered orders effecting transfer for trial, pursuant to 28 U.S.C. § 1404 or 1406, of cases previously transferred to them for pretrial under section 1407.

In 1998, the U.S. Supreme Court held that a district court has no authority to invoke section 1404(a) to assign a transferred case to itself for trial, because section 1407(a) "uncondition[ally]" commands the Panel to remand, at the end of pretrial proceedings, each action transferred by the Panel that has not been terminated in the transferee district.[666] However, the policy reasons for the pre-1998 practice remain: (1) during the often protracted time of the section 1407 assignment, the transferee judge gains a solid understanding of the case, and it makes sense for trial to be conducted by the judge with the greatest understanding of the litigation; (2) the transferee judge may already be trying the constituent centralized action(s), and there may be efficiencies in adjudicating related actions or portions thereof in one trial; and (3) the transferee judge, if empowered to try the centralized actions, may have a greater ability to facilitate a global settlement.

---

665. For a discussion of the use of supplemental depositions, see *supra* section 11.453. *See also infra* sample order at section 40.29.

666. *In re* Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998). The Court infers that MDL transferee judges may not use section 1404(a) to transfer to any district at all, neither to a third district or back to the section 1407 transferor district. *Id.* at 41 n.4. By analogy and further inference, an MDL transferee judge likewise now may not transfer under section 1406. *See id.*

Accordingly, evolving alternatives, such as those below, permit the transferee court to resolve multidistrict litigation through trial while remaining faithful to the *Lexecon* limitations:

- Prior to recommending remand, the transferee court could conduct a bellwether trial of a centralized action or actions originally filed in the transferee district, the results of which (1) may, upon the consent of parties to constituent actions not filed in the transferee district, be binding on those parties and actions,[667] or (2) may otherwise promote settlement in the remaining actions.

- Soon after transfer, the plaintiffs in an action transferred for pretrial from another district may seek or be encouraged (1) to dismiss their action and refile the action in the transferee district, provided venue lies there, and the defendant(s) agree, if the ruling can only be accomplished in conjunction with a tolling of the statute of limitations or a waiver of venue objections, or (2) to file an amended complaint asserting venue in the transferee district,[668] or (3) to otherwise consent to remain in the transferee district for trial.[669]

---

667. *See, e.g., In re* Air Crash Near Cali, Colombia on Dec. 20, 1995, MDL No. 1125, Order No. 1522 (S.D. Fla. Jan. 12, 2000) (noting that parties in some of the actions transferred under section 1407 had agreed to be bound by the results of a consolidated liability trial and had been instructed to file appropriate motions after the completion of the trial, seeking a ruling that effectuated such agreements).

668. Often in multidistrict litigation the transferee court will consider establishing a master file with standard pleadings, motions, and orders. This file may include a single amended consolidated complaint, alleging that venue is proper in the transferee district. If such a document is used, the court and parties should take care to ensure a common understanding of the document's intent and significance—that is, whether it is being used as a device simply to facilitate ease of the docket's administration, or whether the filing in the transferee district constitutes the inception of a new "case or controversy" in that district, thereby superseding and rendering moot the pending separate actions that had been transferred to that district for pretrial proceedings by the Panel under section 1407.

669. *See, e.g.,* State v. Liquid Air Corp. (*In re* Carbon Dioxide Indus. Antitrust Litig.), 229 F.3d 1321 (11th Cir. 2000) (ruling that *Lexecon* does not prohibit parties from waiving venue objections in centralized actions where transferee court otherwise had subject-matter jurisdiction); *In re* Dippin' Dots Patent Litig., MDL No. 1377, Docket No. 1:00-CV-907 (N.D. Ga. July 23, 2001) (transferee court ordered all parties to file a pleading stating whether they consented to trial in the transferee district); *In re* Research Corp. Techs., Inc. Patent Litig., Docket No. 97-2836 (D.N.J. Dec. 3, 1999) (order entering final judgment and staying further pretrial proceedings; transferee court found it reasonable to conclude that final judgment may be entered following trial proceedings consented to by the parties that resulted in termination of the actions).

- After an action has been remanded to the originating transferor court at the end of section 1407 pretrial proceedings, the transferor court could transfer the action,[670] pursuant to 28 U.S.C. § 1404 or 1406, back to the transferee court for trial by the transferee judge.[671]
- The transferee judge could seek an intercircuit or intracircuit assignment pursuant to 28 U.S.C. § 292 or 294 and follow a remanded action, presiding over the trial of that action in that originating district.

## 20.133 Remand

Section 1407 directs the Panel to remand, after appropriate pretrial proceedings, actions not filed or terminated in the transferee court to the respective transferor courts for further proceedings and trial. When this should be done will depend on the circumstances of the litigation. In some cases, remands have been ordered relatively early, while substantial discovery remained to be done; in others, virtually all discovery had been completed and the cases were ready for trial at the time of remand to the transferor districts. Some of the constituent cases may be remanded, while others are retained for further centralized pretrial proceedings.

The Panel looks to the transferee court to suggest when it should order remand, but that court has no independent authority to order section 1407 remand.[672] The transferee court should consider when remand will best serve the expeditious disposition of the litigation. The Panel may also order remand on its own initiative or on the motion of a party.[673] Although authorized to "separate any claim, cross claim, counter-claim, or third-party claim and remand any of such claims before the remainder of the action is remanded," the Panel has rejected most requests to exclude portions of a case from transfer

---

670. *Lexecon*, 523 U.S. at 19.

671. *See, e.g.,* Kenwin Shops, Inc. v. Bank of La., 97 Civ. 907, 1999 WL 294800, at *11 (S.D.N.Y. May 11, 1999). The transferee court might also facilitate such a transfer by expressly recommending it either in its suggestion of remand to the Panel or in its final pretrial order. *See, e.g., In re* Air Crash at Dubrovnik, Croatia on Apr. 3, 1996, MDL No. 1180 (Letter from Alfred V. Covello, Chief Judge, U.S. District Court, D. Conn., to Michael J. Beck, Clerk of the Panel, Judicial Panel on Multidistrict Litigation, suggesting that four remanded cases be transferred back to the court and consolidated for trial (Jan. 4, 2002) (on file with the Judicial Panel on Multidistrict Litigation)).

672. *See In re* Roberts, 178 F.3d 181 (3d Cir. 1999).

673. J.P.M.L. R.P. 7.6(c). Great deference is given to the views of the transferee judge. *See, e.g., In re* IBM Peripheral EDP Devices Antitrust Litig., 407 F. Supp. 254, 256 (J.P.M.L. 1976). Efforts by parties to use the Panel as a substitute for appellate review, by seeking premature remand, have been uniformly rejected.

under section 1407.[674] The transferee court may give such matters individualized treatment if warranted, and the transferee judge (who will develop a greater familiarity with the nuances of the litigation) can suggest remand of claims in any constituent action whenever the judge deems it appropriate.[675] The Panel has further concluded that it has no power to transfer (or sever and remand) particular "issues," as distinguished from particular "claims."[676]

After remand, the transferor court has exclusive jurisdiction, and further proceedings in the transferee court with respect to a remanded case are not authorized absent a new transfer order by the Panel.[677] The transferor court conducts further pretrial proceedings, as needed, and thus all cases remanded to the same court for additional proceedings and trial should be assigned at least initially to a single judge for coordination or consolidation. Although the transferor judge has the power to vacate or modify rulings made by the transferee judge, subject to comity and "law of the case" considerations, doing so in the absence of a significant change of circumstances would frustrate the purposes of centralized pretrial proceedings.[678]

The complete pretrial record is sent to the transferor court upon remand of the case. One of the final actions of the transferee court should be a pretrial order that fully chronicles the proceedings, summarizes the rulings that will affect further proceedings, outlines the issues remaining for discovery and trial, and indicates the nature and expected duration of further pretrial proceedings.[679] Transferee courts typically do not provide transferor courts with status reports during the pretrial proceedings, so this order will help the transferor

---

674. *But see In re* Hotel Tel. Charge Antitrust Litig., 341 F. Supp. 771 (J.P.M.L. 1972); *cf. In re* Midwest Milk Monopolization Litig., 386 F. Supp. 1401 (J.P.M.L. 1975).

675. *See, e.g., In re* Collins, 233 F.3d 809 (3d Cir. 2000), *cert. denied sub nom.* Collins v. MacMillan Bloedel, Inc., 532 U.S. 1066 (2001) (upholding severance of punitive damage claims by the transferee court in actions where the rest of the claims were suggested for remand); *In re* Patenaude, 210 F.3d 135, 143 (3d Cir. 2000) (ruling that the phrase "coordinated or consolidated pretrial proceedings" in section 1407(a) is to be interpreted broadly, here in the context of the transferee judge's wide leeway regarding when to suggest remand).

676. *In re* Plumbing Fixture Case, 298 F. Supp. 484, 489–90 (J.P.M.L. 1968).

677. *See, e.g., In re* The Upjohn Co. Antibiotic Cleocin Prods. Liab. Litig., 508 F. Supp. 1020 (E.D. Mich. 1981). In unusual circumstances, the Panel has by a new order again transferred a remanded case to the transferee district or transferred it to a new district as part of another multidistrict proceeding.

678. *See* Stanley A. Weigel, *The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts*, 78 F.R.D. 575, 577 (1978).

679. *See In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, Order No. 1962, 2001 WL 497313 (E.D. Pa. May 9, 2001), *available at* http://www.fenphen.verilaw.com/search_common.icl (last visited Nov. 10, 2003) (final pretrial order establishing a process for the remand of transferred cases that have completed the pretrial process).

courts plan further proceedings and trial. Transferee judges have occasionally received intracircuit or intercircuit assignments under 28 U.S.C. §§ 292(b) and 292(d) to preside at trials of cases remanded to the transferor courts.

## 20.14  Coordination Between Courts

Even when related cases pending in different districts cannot be transferred to a single district, judges can coordinate proceedings in their respective courts to avoid or minimize duplicative activity and conflicts. Coordination requires effective communication between judges and among judges and counsel.

Steps that may be taken include the following:

- *Special assignment of judge.* All cases may be assigned to a single judge designated by the chief justice or the chief circuit judge under 28 U.S.C. §§ 292–294 to sit temporarily in the district where the cases are pending (either within or outside of the assigned judge's own circuit).

- *Lead case.* Counsel in the various cases may agree with the judge to treat one case as the "lead case." The agreement may provide for staying proceedings in the other cases pending resolution of the lead case, or rulings in the lead case may be given presumptive, though not conclusive, effect in the other courts.

- *Joint conferences and orders.* All judges may attend joint hearings or conferences, in person or by telephone. Federal Rule of Civil Procedure 77(b) requires consent of the parties for trials or hearings to be conducted outside the district; consent is not required for other proceedings, such as conferences. The joint proceedings may be followed by joint or parallel orders by the several courts in which the cases are pending.

- *Joint appointments.* The several courts may coordinate the appointment of joint experts under Federal Rule of Evidence 706, or special masters under Federal Rule of Civil Procedure 53, to avoid duplicate activity and inconsistencies. The appointments may help resolve claims of privilege made in a number of cases on similar facts, or where global settlement negotiations are undertaken. The courts may also coordinate in appointing lead or liaison counsel.

- *Avoiding duplicative discovery.* Judges should encourage techniques that coordinate discovery and avoid duplication, such as those discussed in sections 11.423, 11.443, 11.452, and 11.464. Filing or cross-filing deposition notices, interrogatories, and requests for production in related cases will make the product of discovery usable in all cases

and avoid duplicative activity. Relevant discovery already completed should ordinarily be made available to litigants in the other cases.[680] If the material is subject to a protective order, the court usually may accommodate legitimate privacy interests by amending the order to include the new litigants within the order's restrictions,[681] and the party seeking the discovery may be required to bear a portion of the cost incurred in initially obtaining the information. Document production should be coordinated and joint depositories established.[682] The resolution of discovery disputes can also be coordinated to some degree (e.g., by referring them to a single magistrate judge or special master).

- *Clarifying class definitions.* Conflicts between class actions, or between a class action and individual actions, can be avoided by coordinating the drafting of class definitions when actions are certified. See section 20.32.

- *Stays.* In appropriate cases, a judge may order an action stayed pending resolution of a related case in a federal court.

## 20.2   Related Criminal and Civil Cases

Major management problems arise in concurrent criminal and civil cases involving the same persons. Witnesses may claim a Fifth Amendment privilege in the civil actions, especially if examined prior to final resolution of the criminal proceedings.[683] Serious questions may arise as to requiring an accused, during the pendency of criminal charges, to produce in civil proceedings either adverse (although nonprivileged) evidence or exculpatory evidence to which

---

680. *See* Wilk v. Am. Med. Ass'n, 635 F.2d 1295, 1299 (7th Cir. 1980) ("Where an appropriate modification of a protective order can place private litigants in a position they would otherwise reach only after repetition of another's discovery, such modification can be denied only where it would tangibly prejudice substantial rights of the party opposing modification. . . . Once such prejudice is demonstrated, however, the district court has broad discretion in judging whether that injury outweighs the benefits of any possible modification of the protective order.").

681. *Id.* at 1301.

682. *See* Fed. R. Civ. P. 26(b)(2) ("The frequency or extent of use of [discovery] . . . shall be limited by the court if it determines that: (i) the discovery is unreasonably . . . duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive . . . .").

683. Termination of the criminal case will not necessarily result in testimony becoming available. *See* Pillsbury Co. v. Conboy, 459 U.S. 248 (1983) (witness compelled by grant of "use immunity" to give testimony to grand jury does not waive right to claim Fifth Amendment in subsequent civil litigation).

the prosecution would not be entitled under Federal Rule of Criminal Procedure 16. The criminal proceeding ordinarily has first priority because of the short pretrial period allowed under the Speedy Trial Act[684] and because of the potential impact of a conviction. Even if conviction will not preclude relitigation of issues in a subsequent civil proceeding, it may be admissible in the civil case as substantive evidence of the essential elements of the offense under Federal Rule of Evidence 803(22) or as impeachment evidence under Federal Rule of Evidence 609. Suspending all pretrial activities in civil litigation until the end of the criminal proceeding, however, may be inadvisable, since it may be possible to conduct major portions of the civil case's discovery program without prejudice before completion of the criminal proceedings.[685]

To facilitate coordination, related criminal and civil cases should be assigned, if possible, to the same judge (though, as noted in section 10.12, circumstances may make assignment to the same judge inadvisable). Although the MDL Panel has no authority to transfer criminal cases, it has frequently ordered transfer of civil actions to the location of related criminal proceedings. If the cases are assigned to different judges, the judges should at least communicate and coordinate informally. If grand jury materials from another court are sought, the two-step procedure described in *Douglas Oil Co. of California v. Petrol Stops Northwest*[686] must be followed.

# 20.3   Related State and Federal Cases

.31 Coordination  229
    .311 Identifying the Need and Opportunity  231
    .312 Threshold Steps  232
    .313 Specific Forms of Coordination  235
.32 Jurisdictional Conflicts  238

# 20.31   Coordination

.311 Identifying the Need and Opportunity  231
.312 Threshold Steps  232
.313 Specific Forms of Coordination  235

Increasingly, complex litigation involves related cases brought in both federal and state courts. Such litigation often involves mass torts (see section

---

684. The complexity of the case may be a ground for extending the statutory time limits. 18 U.S.C. § 3161(h)(8)(B) (2000). *See infra* section 30.4.

685. *See* Landis v. N. Am. Co., 299 U.S. 248, 254–55 (1936); Texaco, Inc. v. Borda, 383 F.2d 607 (3d Cir. 1967).

686. 441 U.S. 211 (1979).

22.2). Some sets of cases may involve numerous claims arising from a single event, confined to a single locale (such as a plane crash or a hotel fire). Other more-complicated litigations may arise from widespread exposure to harmful products or substances dispersed over time and place.

No single forum has jurisdiction over these groups of cases. Unless the defendant files for bankruptcy, no legal basis exists for exercising exclusive federal control over state litigation. Interdistrict, intradistrict, and multidistrict transfer statutes and rules apply only to cases filed in, or removable to, federal court (see sections 22.32 and 22.33).

State and federal judges, faced with the lack of a comprehensive statutory scheme, have undertaken innovative efforts to coordinate parallel or related litigation[687] so as to reduce the costs, delays, and duplication of effort that often stem from such dispersed litigation. State judges, for example, can bring additional resources that might enable an MDL transferee court to implement a nationwide discovery plan or a coordinated national calendar.[688] There are, however, potential disadvantages of cooperative activity. Coordination can delay or otherwise affect pending litigation, conferring an advantage to one side in contentious, high-stakes cases.[689] Such litigation activates strategic maneuvering by plaintiffs and defendants. For example, plaintiffs may seek early trial dates in jurisdictions with favorable discovery rules.[690]

---

687. *See generally* William W Schwarzer et al., *Judicial Federalism in Action: Coordination of Litigation in State and Federal Courts*, 78 Va. L. Rev. 1689 (1992) (reporting on a study of eleven notable instances of state–federal coordination in litigation arising from (1) 1972 Federal Everglades air crash, (2) 1977 Beverly Hills Supper Club fire, (3) 1979 Chicago air crash, (4) 1980 MGM Grand Hotel fire, (5) 1981 Hyatt skywalk cases, (6) 1986 technical equities fraud, (7) 1987 L'Ambience Plaza collapse, (8) 1989 Exxon Valdez oil spill, (9) 1989 Sioux City air crash, (10) Ohio asbestos litigation, and (11) Brooklyn Navy Yard asbestos litigation). *See infra* section 33.23.

688. *See* Sam C. Pointer, Jr., *Reflections by a Federal Judge: A Comment on Judicial Federalism: A Proposal to Amend the Multidistrict Litigation Statute*, 73 Tex. L. Rev. 1569, 1571 (1995) (discussing state judges taking primary responsibility for portions of common discovery and other aspects of the silicone gel breast implant MDL process). *See also* E. Norman Veasey, *A Response to Professor Francis E. McGovern's Paper Entitled Toward a Cooperative Strategy for Federal and State Judges in Mass Tort Litigation*, 148 U. Pa. L. Rev. 1897, 1898 (2000) ("Over 95% of all litigation and roughly the same percentage of resources are in the state courts.").

689. *See generally* Mark Herrmann, *To MDL or Not to MDL: A Defense Perspective*, 24 Litig. 43 (1998).

690. Paul D. Rheingold, *Symposium: National Mass Torts Conference: Comment on Judicial Federalism: A Proposal to Amend the Multidistrict Litigation Statute*, 73 Tex. L. Rev. 1581, 1582–83 (1995). Defendants may have concerns about state cases being resolved before federal cases consolidated under the MDL procedure. *See* Francis E. McGovern, *Rethinking Cooperation Among Judges in Mass Tort Litigation*, 44 UCLA L. Rev. 1851, 1858 (1997) [hereinafter McGovern, *Rethinking Cooperation*] ("[P]laintiffs' attorneys rush to their favorite judges and demand

State and federal judges also have initiated state–federal cooperation between jurisdictions to minimize conflicts that distract from the primary goal of resolving the parties' disputes.

## 20.311 Identifying the Need and Opportunity

Coordination approaches differ depending on the nature of the litigation. Coordination is relatively easy if all of the cases are pending in a single state. States increasingly have adopted procedures for assigning complex multiparty litigation to a single judge or judicial panel or have created courts to deal with complex business cases,[691] facilitating coordination between state and federal courts. Federal judges should learn about their own state or local courts' practices and procedures for consolidating cases.

The Judicial Panel on Multidistrict Litigation has no power over cases pending in state courts, but has facilitated coordination by transferring federal cases to a district where related cases are pending in the state courts.[692]

Coordination is easier when counsel for some or all of the parties in the related actions have the same counsel. In appointing lead or liaison counsel or otherwise organizing counsel (see section 10.22 (general) and section 22.62 (mass torts) and 21.27 (class actions)), consider including attorneys from jurisdictions with cases that may need to be coordinated with either class action or multidistrict litigation.

The need to coordinate is especially acute where overlapping or multiple identical class actions are filed in more than one court (see section 21.15). It is best to communicate with state and federal judicial counterparts at an early stage to begin coordinating such cases. Unilateral action by any judge to certify a class or assert nationwide jurisdiction can fatally undermine future coordination efforts.

Coordination becomes much more complex when cases are dispersed across a number of states, even where the federal cases are all centered in a

---

draconian procedures to pressure defendants to make block settlements . . . Defendants seek the opposite—delay is their nirvana.").

691. Alexander B. Aikman, Managing Mass Tort Cases: A Resource Book for State Trial Court Judges § 3.11 (December 1995). For examples of such rules, see *id.* at app. C. *See also* Helen E. Freedman, *Product Liability Issues In Mass Torts—View From the Bench*, 15 Touro L. Rev. 685, 687, n.8 (1999), and cases cited therein; Paul D. Rheingold, Mass Tort Litigation §§ 6:3, 6:7 (1996) (discussing statewide systems in California, New York, and elsewhere). *See also, e.g.,* N.C. Rules of Prac. for Sup. & Dist. Cts. R. 2.1 (West 2003). See www.ncbusinesscourt.net for a history and overview of the workings of the North Carolina Business Court.

692. Cahn, *A Look at the Judicial Panel on Multidistrict Litigation*, *supra* note 654, at 215.

single MDL transferee court. Electronic media—e.g., Internet Web sites and list-servs—can improve communication in such circumstances.

Reciprocity and cooperation create trust and mutual respect so that attempts to coordinate are not perceived as attempts to dominate. The special master who facilitated state–federal coordination in the silicone gel breast implant litigation observed that the more transparent, formal, even-handed, and administrative the proposed cooperative venture is, the more acceptable it will be to other judges.[693]

## 20.312 Threshold Steps

The nature and extent of multiple filings related to the same subject matter in different courts should be clarified, so as to minimize conflicts. The court should direct counsel to identify the names of all similar cases in other courts, their stage of pretrial preparation, and the assigned judges. Such a direction should be part of the initial case-management order in any case with related litigation pending in other courts,[694] and many courts have local rules requiring disclosure of similar information.[695]

Dispersed litigation makes essential an information network, perhaps formalized as a judicial advisory committee,[696] which can serve as a catalyst for some degree of state–federal coordination. If the litigation warrants it, a meeting of a judicial advisory committee can help to develop relationships

---

693. McGovern, *Rethinking Cooperation, supra* note 690, at 1870.

694. *See, e.g., In re* Silicone Gel Breast Implant Prods. Liab. Litig., MDL No. 926, Order No. 1 (N.D. Ala. June 26, 1992), *at* http://www.fjc.gov/BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003).

695. *See, e.g.,* Alaska U.S. Dist. Ct. L.R. 40.2 ("Whenever counsel has reason to believe that an action or proceeding on file or about to be filed in this court is related to another action or proceeding in this or any other federal or state court, whether pending, dismissed or otherwise terminated, counsel shall promptly file and serve a Notice of Related Case."); Ohio N.D., Civ. L.R. 16.3 ("An attorney who represents a party in Complex Litigation, as defined above, shall, with the filing of the complaint, answer, motion, or other pleading, serve and file a Case Information Statement which briefly describes the nature of the case, identifies by title and case number all other related case(s) filed in this and any other jurisdiction (federal or state) . . . .").

696. *See, e.g., In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, Order No. 1014 (E.D. Pa. Dec. 7, 1999), *at* http://www.fenphen.verilaw.com/search_common.icl (last visited Nov. 10, 2003). Judge Bechtle, the MDL judge, had earlier communicated with and established an informal network of state judges to coordinate the litigation. The settlement agreement with American Home Products expressly provided for the creation of a State Court Judicial Advisory Committee to assist in administering the settlement agreement. *In re Diet Drugs*, MDL No. 1203, Nationwide Class Action Settlement Agreement with Am. Home Prods., at § VIII(B)(3)–(6) (E.D. Pa. Nov. 18, 1999), *at* http://www.fenphen.verilaw.com/mdl_settle/settleagree.pdf (last visited Nov. 10, 2003).

among the judges and ease coordination efforts.[697] An Internet list-serv is another economical way to foster communications among geographically dispersed attorneys and judges. In some mass torts litigation, the National Conference of State Chief Justices, the National Center for State Courts, and the State Justice Institute have helped create and fund coordinating committees of state court judges with significant mass tort assignments. Federal judges with mass tort responsibilities have sometimes participated in person or by presenting written or telephonic reports and updates of federal activities. Such committees help identify specific types of coordination that can be recommended to other state and federal judges assigned to the same type of litigation. It may also be helpful to organize attorneys from states with significant numbers of cases into an advisory committee, to be a channel of communication between the judges and other attorneys.[698]

Federal judges should communicate personally with state court judges who have a significant number of cases in order to discuss mutual concerns and suggestions, such as designating a liaison attorney and judge to communicate with federal counterparts. These communications provide an opportunity to exchange pretrial orders and proposed schedules that help avoid potential conflicts. One special master has concluded that "[t]he earlier and more comprehensive the cooperative intervention occurs in the litigation cycle, the greater the benefits and the less the resistance."[699]

Class counsel generally have the benefit of the common fund doctrine to support payment for their efforts on behalf of the class or consolidated litigants.[700] MDL judges generally issue orders directing that defendants who settle MDL-related cases contribute a fixed percentage of the settlement to a general fund to pay national counsel.[701] Without special provisions to com-

---

697. *See, e.g., In re* Baycol Prods. Liab. Litig., 180 F. Supp. 2d 1378 (J.P.M.L. 2001). The transferee judge convened a conference from June 6–8, 2002, that included twenty-three state judges. Notably, the meeting was held in New Orleans, La., not in the transferee district. The agenda of the conference is available online at http://www.mnd.uscourts.gov/Baycol_Mdl (last visited Nov. 10, 2003).

698. *See, e.g., In re Diet Drugs*, MDL No. 1203, Order No. 39 (E.D. Pa. Apr. 21, 1998), *available at* http://www.fenphen.verilaw.com/search_common.icl (last visited Nov. 10, 2003) (appointing twenty lawyers from fourteen states to serve as members of the plaintiffs' state liaison committee).

699. McGovern, *Rethinking Cooperation*, *supra* note 690, at 1870.

700. *See supra* section 14.12. *See also* Paul D. Rheingold, Mass Tort Litigation § 7:33 (1996 & Supp. 2000).

701. *See, e.g., In re Diet Drugs*, MDL No. 1203, Order No. 467 (E.D. Pa. Feb. 10, 1999), *at* http://www.fenphen.verilaw.com/search_common.icl (last visited Nov. 10, 2003) (ordering defendants to withhold a fixed portion of settlements and pay into a common fund). *See also In re* Silicone Gel Breast Implants Prods. Liab. Litig., MDL No. 926, unnumbered order (N.D. Ala.

pensate state attorneys who cooperate with federal MDL-funded attorneys, the MDL fee structure presents an obstacle to cooperation. State attorneys and judges may realistically perceive that state attorneys' legal work might not be rewarded appropriately even though it advances the national litigation.

There are various ways to handle these fee issues.[702] It is important to allay the coordinating state lawyers' concerns about being fairly compensated. In the diet drug litigation, discovery proceedings were coordinated between the MDL court and the judge presiding over California's statewide consolidated diet drug litigation. The federal and state judges entered orders establishing rates of contribution for lawyers who settled cases using coordinated state–federal discovery.[703] The state judge controlled the fund, eliminating concerns about federal dominance and providing a direct financial link between the state and federal common-benefit activities. In other mass tort litigation, judges have permitted state attorneys who were not part of the MDL plaintiffs' attorneys' steering committee to make claims for MDL-managed funds. In the silicone gel breast implant litigation, the MDL transferee judge appointed a former state judge to rule on attorneys' disputed claims for common fund fees.[704] Lawyers should be encouraged to resolve fee disputes among themselves and to seek judicial intervention only if necessary. It may be helpful to appoint a

---

Oct. 7, 1998), *at* http://www.fjc.gov/BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003) (denying attorneys' motions for relief from Order No. 13, which required payment of 6% of settlements into a "common benefit" fund). Judge Pointer carefully tailored Order No. 13, entered on July 23, 1993, to comply with the Fourth Circuit ruling that fee orders in MDL cases cannot be applied to cases that were not within the jurisdiction of the MDL transferee court. *See In re* Showa Denko K.K. L-Tryptophan Prods. Liab. Litig. II, 953 F.2d 162 (4th Cir. 1992). To comply with this jurisdictional limit, Judge Pointer applied the assessment to cases that were in MDL No. 926 at any time, except those that were remanded because they were improperly removed from state court. He also extended the obligation to counsel who agreed to it and to "cases in a state court to the extent so ordered by the presiding judge of that court." *Silicone Gel*, MDL No. 926, Order No. 13, § 2(c), *at* http://www.fjc.gov/BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003).

702. For an extensive discussion of mechanisms for allocating fees in mass tort litigation, including case summaries discussing the orders in the silicone gel breast implant and diet drug litigations, see Rheingold, *supra* note 691, §§ 7:33, 7:36, 7:40.

703. *In re Diet Drugs,* MDL No. 1203, Order No. 467 (establishing a deduction of 9% from all settlements of MDL cases transferred from California federal district courts and 6% from all settlements in California state court actions, and creating a coordinated discovery plan). *See also* Rheingold, *supra* note 691, § 7:40 (discussing PTO 467).

704. Thomas E. Willging, Laural L. Hooper, Marie Leary, Dean Miletich, Robert Timothy Reagan, & John Shapard, Special Masters' Incidence and Activity: Report to the Judicial Conference's Advisory Committee on Civil Rules and Its Subcommittee on Special Masters 26–27 (Federal Judicial Center 2000) [hereinafter FJC Study, Special Masters].

special master to coordinate proceedings among the state and federal courts,[705] reducing to manageable proportions the challenge of communicating and coordinating with dozens of judges.

In the silicone gel breast implant and diet drug litigations, state and federal judges created working relationships that came close to achieving a comprehensive approach to state–federal cooperation.[706] Extending that approach to other mass torts "could build upon generally accepted models for resolving local mass torts, such as the use of test plaintiffs for discovery, with settlement discussions based upon the results of the test cases."[707] In the diet drug and silicone gel breast implant litigations, the federal MDL transferee judge took the lead in implementing a comprehensive state–federal discovery plan while state judges presided over individual trials and settlements. The parties achieved the economies of consolidated discovery and developed information about the value of individual cases, providing a basis for aggregated settlements and judgments.

## 20.313 Specific Forms of Coordination

*Aggregation and consolidation decisions.* Discussions between state and federal judges about the timing of class certification hearings and decisions have a beneficial effect on other aspects of cooperation. The prospect that one judge might unilaterally certify a nationwide class and enter a binding national judgment has a chilling effect on cooperative relationships. Joint deferral of decisions on certification and perhaps joint hearings on motions to certify a class enhance the chances that both sets of courts will find appropriate roles in managing the litigation. Judges might agree that the court with most of the cases or the strongest interest should take the lead in certain proceedings, such as class certification.[708]

The court should also consider staying cases until actions in the other tribunal have been tried. Important factors in making that decision include the

---

705. In *In re Silicone Gel Breast Implants Product Liability Litigation*, the MDL transferee judge appointed a special master to serve as liaison between the federal and state judges and to facilitate coordination. *See* Francis E. McGovern, *Toward a Cooperative Strategy for Federal and State Judges in Mass Tort Litigation*, 148 U. Pa. L. Rev. 1867, 1886–87 (2000) [hereinafter McGovern, *Cooperative Strategy*]. *See also* Francis E. McGovern, *An Analysis of Mass Torts for Judges*, 73 Tex. L. Rev. 1821, 1839 (1995) [hereinafter McGovern, *Mass Torts for Judges*].

706. For a discussion of mechanisms for coordinating cases that are dispersed nationwide among state and federal courts, including a brief history of the Mass Tort Litigation Committee (MTLC), which was funded by the State Justice Institute, see *supra* section 20.31.

707. McGovern, *Cooperative Strategy*, *supra* note 705, at 1886.

708. *See, e.g.,* Union Light, Heat, & Power Co. v. United States Dist. Court, 588 F.2d 543 (6th Cir. 1978) (discussing Beverly Hill Supper Club fire class action proceedings on common issues).

extent of pretrial discovery and motions activities in the various jurisdictions, the typicality of the claims, the likelihood that verdicts will provide useful information about the values of other pending cases, and the impact that delay may have on the parties.

*Pretrial motions and hearings.* State and federal judges have often worked together during the pretrial process.[709] They have jointly presided over hearings on pretrial motions, based on a joint motions schedule, sometimes alternating between state and federal courthouses. Joint hearings have used coordinated briefs so that one set of briefs can be used in both state and federal courts, with supplements for variations in the applicable laws and choice-of-law questions.

Cooperative approaches might also include jointly appointing a special master, court-appointed expert, or other adjunct to assist the courts with some aspect of the litigation. Some state courts are not authorized to appoint such adjuncts and may wish to share the benefits of the federal authority.

At a minimum, judges should exchange case-management orders, master pleadings, questionnaires, and discovery protocols. This simple step can encourage judges to adopt the same or similar approaches to discovery and pretrial management.

Also, consider joint appointments of lead counsel, committees of counsel, or liaison counsel to coordinate activities between the courts. Having some overlapping membership among counsel in state and federal cases facilitates cooperation by establishing channels of communication.

*Pretrial discovery.* State and federal judges have considerable experience coordinating and managing nationwide discovery.[710] For example, courts may issue joint orders for the preservation of tangible, documentary, and electronic evidence and for coordinating the examination of evidence by experts in both state and federal proceedings. Early attention to questions concerning expert evidence may be necessary to take advantage of various options for managing such evidence, including the possibility of appointing common experts.[711]

Coordination could involve inviting state judges to participate in a coordinated national discovery program while retaining control of local discovery. Depending on the progress of the state litigation, some aspects of discovery in state cases may in some instances serve as the basis for national

---

709. *See generally*, Schwarzer et al., *Judicial Federalism in Action*, *supra* note 687, at 1690.

710. *See, e.g., In re Diet Drugs*, MDL No. 1203, Order No. 467, 1999 WL 124414, at *4–*6 (order granting, in part, plaintiff's petition for management committee).

711. Joe S. Cecil & Thomas E. Willging, *Accepting Daubert's Invitation: Defining a Role for Court-Appointed Experts in Assessing Scientific Validity,* 43 Emory L.J. 995, 1058–62 (1994) (describing a pretrial procedure designed to identify issues regarding expert evidence and any need for special assistance).

discovery. For example, in the silicone gel breast implant litigation, state judges in Texas had progressed further in discovery than had federal courts at the time the MDL cases were assigned to Judge Pointer. Recognizing the state court's advantage, Judge Pointer "agreed to designate certain Texas depositions as official ones for the entire multidistrict litigation (MDL)."[712] Procedures to minimize duplicative discovery activity include consolidating depositions of experts who will testify in numerous cases and maintaining document depositories. It is important to remember that the rulings of a single court can become preemptive; for example, the first court to reject a particular privilege claim likely will cause the material sought to be protected to become discoverable for the entire litigation.[713]

Specific elements of discovery coordination have included

- creating joint federal–state, plaintiff–defendant document depositories, accessible to attorneys in all states;[714]

- ordering coordinated document production and arrangements for electronic discovery;

- ordering discovery materials from prior state and federal cases to be included in the document depository;

- scheduling and cross-noticing joint federal–state depositions;[715]

- designating state-conducted depositions as official MDL depositions;[716]

- enjoining attorneys conducting federal discovery from objecting to use of that discovery in state courts on the grounds that it originated in federal court;

- adopting standard interrogatories developed by state judges for litigation in their cases; and

712. Sandra Mazer Moss, *Response to Judicial Federalism: A Proposal to Amend the Multidistrict Litigation Statute from a State Judge's Perspective*, 73 Tex. L. Rev. 1573, 1574 (1995).

713. *Supra* section 22.6 discusses relevant provisions of case-management orders in the silicone breast implant and diet drugs litigations implementing state–federal coordination of multiple actions in many states. See also *supra* section 22.4 for suggestions about eliciting information that may be useful in planning for state–federal coordination.

714. *See, e.g., In re Diet Drugs*, MDL No. 1203, Order No. 22, ¶ 6 (E.D. Pa. Mar. 23, 1998), *at* http://www.fenphen.verilaw.com/search_common.icl (last visited Nov. 10, 2003) (establishing plaintiffs' document depository).

715. *In re Diet Drugs*, MDL No. 1203, Order No. 467, 1999 WL 124414, at *4–*6.

716. *Id.* (separating the portion of the deposition to be used in the MDL proceedings from portions designed to be admissible in state proceedings).

- coordinating rulings on discovery disputes, such as the assertion of privilege, and using parallel orders to promote uniformity to the extent possible.[717]

*Settlement.* State and federal judges should consider conducting joint comprehensive settlement negotiations, hearings, and alternative dispute resolution procedures to establish case values.[718] Insurance coverage disputes may require special attention and coordination because resolution of the primary litigation may depend on resolution of the coverage dispute.

*Trial.* State and federal judges have developed coordinated management plans for an entire litigation.[719] Joint trials, where separate state and federal juries sit in the same courtroom and hear common evidence, present substantial procedural and practical difficulties,[720] but differences in state and federal procedures have not been insurmountable barriers to useful coordination. Any coordination must be flexible because cases in some state courts will reach trial sooner than those in others. State and federal courts should establish a mechanism to coordinate trial dates so that they do not unduly burden parties or their attorneys with multiple conflicting trial settings. Judges may also set the order and location of trials cooperatively to provide better information as to the diverse range of value of the cases included in the mass tort.

## 20.32  Jurisdictional Conflicts

The pendency of related state and federal actions can cause jurisdictional complexities and conflicts, leading to requests that the federal court either stay or dismiss its proceeding or enjoin state court proceedings. Such injunctions should be a last resort, invoked only after voluntary coordination efforts have failed. An injunction against pending state proceedings, even if authorized by federal statutes and case law (see below, this section, and see also section 21.15), can have a detrimental effect on future efforts to work cooperatively and should be used only as a last resort, if at all.

Federal courts have a duty to exercise their jurisdiction, notwithstanding the mere pendency of parallel or related litigation in state court. Discretion to stay or dismiss the federal proceedings exists, however, in the following circumstances: (1) where a pending state proceeding may decide a pivotal question of state law, the decision of which may remove the need for the

---

717.  *See* Coordinating Proceedings in Different Courts, *infra* section 40.41.

718.  Schwarzer et al., *Judicial Federalism in Action*, *supra* note 687, at 1714–21.

719.  *See, e.g., id.* at 1702–03 (describing the Ohio asbestos litigation).

720.  *See id.* at 1727–32.

federal court to decide a constitutional issue before it;[721] (2) where state law claims are alleged and federal court litigation would impair a comprehensive state regulatory scheme;[722] and (3) in order to avoid piecemeal litigation where the state court has previously acquired jurisdiction of the res and is the more convenient forum.[723]

Where the action alleges both federal claims and related state law claims joined on the basis of supplemental jurisdiction, 28 U.S.C. § 1367(c) permits the district court to decline to exercise jurisdiction over a state law claim if the claim raises a novel or complex issue of state law, if it substantially predominates over the federal claims, if the district court has dismissed all federal claims, or, in exceptional circumstances, if there are compelling reasons for declining jurisdiction. In some circuits, the court's discretion to dismiss claims entertained under its supplemental jurisdiction has been held to be considerably narrower than under the former doctrine of pendent jurisdiction.[724] In deciding whether to entertain the state law claims, the court should consider whether dismissal or remand will result in substantially duplicative litigation and unnecessary burdens on parties, witnesses, or the courts.

The federal court's power to interfere with parallel or related proceedings in state court is limited by the Anti-Injunction Act, which prohibits federal

---

721. R.R. Comm'n v. Pullman, 312 U.S. 496 (1941).

722. Burford v. Sun Oil Co., 319 U.S. 315 (1942).

723. Colo. River Water Conservation Dist. v. United States, 424 U.S. 800 (1976); *see also* Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1 (1983).

724. Some courts have emphasized that discretionary dismissals are limited to exceptional circumstances that are as compelling as the circumstances specified in 28 U.S.C. § 1367(c)(1)–(3) (West 2003) and have held that the statute does not authorize a court to decline jurisdiction based on the amount of judicial time required to adjudicate the state claim. *See* Itar–Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 446–48 (2d Cir. 1998) and cases cited therein; Executive Software N. Am., Inc. v. United States Dist. Court, 24 F.3d 1545, 1555–62 (9th Cir. 1994). But other circuits have taken a different view of what constitutes "exceptional circumstances" under section 1367(c). *See* Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1177 (1st Cir. 1995) ("[T]he district court, in reaching its discretionary determination on the jurisdictional question, will have to assess the totality of the attendant circumstances."); Borough of W. Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995) ("Section 1367(c) . . . was intended simply to codify the preexisting pendent jurisdiction law, enunciated in *Gibbs* and its progeny . . . ."). Where a case has been removed under 28 U.S.C. § 1441(c) (West 2003), discretion to remand the separate and independent state law claim may be broader. *See* Moralez v. Meat Cutters Local 539, 778 F. Supp. 368 (D. Mich. 1991) (remanding federal and state claims removed under 28 U.S.C. § 1441(c) on the grounds that the separate and independent state law claims predominate). *See also* Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611 (4th Cir. 2001) (finding inherent authority to remand state law statutory claims after federal claims involving some plaintiffs settled, based on finding that state law claims predominated).

courts from enjoining or staying state court proceedings[725] except as expressly authorized by an act of Congress,[726] or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments. The exceptions under the Act are narrowly construed.

The pendency of a parallel state court action does not by itself warrant an injunction, even though an impending judgment in that action would be *res judicata* in the federal action.[727] Similarly, the fact that persons who fall within the scope of a class certified in a federal court action have filed parallel actions in state court does not afford a basis for interfering with the state court actions during the pendency of the federal action. Accordingly, when defining a proposed class, a federal court should consider whether a class can be defined so as to avoid unnecessary conflict with state court actions.[728] However, where a class has been certified under Federal Rule of Civil Procedure 23(b)(3), and where class members have failed to avail themselves of their right to opt out and litigate their claims independently in state or federal court, a district judge may enjoin those members from initiating or proceeding with civil actions in other state or federal courts.[729]

In limited circumstances, federal courts have used the All Writs Act[730] and the necessary-in-aid-of-jurisdiction exception to the Anti-Injunction Act[731] to protect their exercise of jurisdiction. The Anti-Injunction Act enables a judge to issue orders directed to nonparties in the pending litigation.[732] Generally, those statutes have been used to effectuate global settlements in large scale litigation by enjoining or removing to federal court parallel state court litigation that would otherwise frustrate the adoption or implementation of comprehensive class settlements approved by the federal court as binding on

---

725. 28 U.S.C. § 2283 (West 2002). *See also* Younger v. Harris, 401 U.S. 37 (1971). Note, however, that *Younger* abstentions have been applied to civil cases only in limited circumstances involving significant state interests. *See, e.g.*, Pennzoil v. Texaco, 481 U.S. 1 (1987).

726. The prime example of such authorizing legislation is 42 U.S.C. § 1983 (2000). *See* Mitchum v. Foster, 407 U.S. 225 (1972).

727. Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 642 (1977).

728. Where the class is certified under Fed. R. Civ. P. 23(b)(3), class members have the right to opt out and litigate their claims independently in state or federal court.

729. *See infra* section 21.42 at notes 934–42.

730. 28 U.S.C. § 1651(a) (West 2002) authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

731. The Anti-Injunction Act bars federal courts from granting "an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283 (West 2003).

732. *See* United States v. N.Y. Tel. Co., 434 U.S. 159 (1977).

the parties to the state court litigation,[733] or that would require relitigation in state court of a matter finally decided in federal court.[734] Courts have also enjoined state court stay orders that would otherwise prevent a federal court from proceeding with pretrial aspects of the litigation.[735]

---

733. *In re* "Agent Orange" Prod. Liab. Litig., 996 F.2d 1425 (2d Cir. 1993), *cert. denied sub nom.* Ivy v. Diamond Shamrock Chems. Co., 510 U.S. 1140 (1994); *In re* Baldwin-United Corp., 770 F.2d 328 (2d Cir. 1985). *But cf.* Brown v. Ticor Title Ins. Co., 982 F.2d 386 (9th Cir. 1992), *cert. dismissed as improvidently granted*, 511 U.S. 117 (1994) (due process requires that plaintiffs with monetary claims be given right to opt out of class action settlement); *In re* Real Estate Title & Settlement Servs. Antitrust Litig., 869 F.2d 760 (3d Cir. 1989).

734. *See* Kelly v. Merrill Lynch, Pierce, Fenner & Smith, 985 F.2d 1067 (11th Cir. 1993).

735. *See, e.g.,* Winkler v. Eli Lilly & Co., 101 F.3d 1196, 1202–03 (7th Cir. 1996) (holding that an MDL transferee judge had authority to issue an injunction to protect the integrity of an order barring discovery of a particular matter); *In re* Columbia/HCA Healthcare Corp., Billing Practices Litig., 93 F. Supp. 2d 876 (M.D. Tenn. 2000) (issuing injunction under All Writs Act against competing motion to compel discovery filed in state court).

# 21. Class Actions

.1 Precertification Case Management  245
    .11 Initial Case-Management Orders  245
    .12 Precertification Communications with the Proposed Class  247
    .13 Standards for Class Certification and Precertification Discovery  250
        .131 Certifying a Litigation Class  250
        .132 Certifying a Settlement Class  250
        .133 Timing of the Certification Decision  252
    .14 Precertification Discovery  255
        .141 Precertification Discovery into the Rule 23(a) Requirements  257
        .142 Precertification Discovery into the Rule 23(b) Requirements  260
    .15 Relationship with Other Cases Pending During the Precertification Period  263
.2 Deciding the Certification Motion  266
    .21 Certification Hearings and Orders  266
    .22 Type and Definition of Class  268
        .221 Type of Class  268
        .222 Definition of Class  270
    .23 Role of Subclasses  272
    .24 Role of Issues Classes  272
    .25 Multiple Cases and Classes: The Effect on Certification  274
    .26 Appointment of the Class Representatives  276
    .27 Appointment of Class Counsel  278
        .271 Criteria for Appointment  278
        .272 Approaches to Selecting Counsel  279
        .273 Procedures for Appointment  282
    .28 Interlocutory Appeals of Certification Decisions  282
.3 Postcertification Communications with Class Members  284
    .31 Notices from the Court to the Class  285
        .311 Certification Notice  287
        .312 Settlement Notice  293
        .313 Other Court Notices  296
    .32 Communications from Class Members  298
        .321 Class Members' Right to Elect Exclusion  298
        .322 Communications Relating to Damage or Benefit Claims  299
        .323 Other Communications from Class Members  299
    .33 Communications Among Parties, Counsel, and Class Members  300
.4 Postcertification Case Management  302
    .41 Discovery from Class Members  302
    .42 Relationship with Other Cases  303
.5 Trials  306
.6 Settlements  308
    .61 Judicial Role in Reviewing a Proposed Class Action Settlement  308
        .611 Issues Relating to Cases Certified for Trial and Later Settled  312
        .612 Issues Relating to Cases Certified and Settled at the Same Time  313
    .62 Criteria for Evaluating a Proposed Settlement  315
    .63 Procedures for Reviewing a Proposed Settlement  318
        .631 Obtaining Information  318
        .632 Preliminary Fairness Review  320
        .633 Notice of Fairness Hearing  321
        .634 Fairness Hearing  322
        .635 Findings and Conclusions  322
    .64 Role of Other Participants in Settlement Review  323

.641 Role of Class Counsel in Settlement  323
.642 Role of Class Representatives in Settlement  325
.643 Role of Objectors in Settlement  326
.644 Role of Magistrate Judges, Special Masters, and Other Judicial Adjuncts in Settlement  329
.65 Issues Raised by Partial or Conditional Settlements  329
.651 Partial Settlements  329
.652 Conditional Settlements  330
.66 Settlement Administration  331
.661 Claims Administrator or Special Master  332
.662 Undistributed Funds  333
.7 Attorney Fee Awards  334
.71 Criteria for Approval  336
.72 Procedure for Reviewing Fee Requests  338
.721 Motions  338
.722 Notice  338
.723 Objections  338
.724 Information Supporting Request and Discovery for Fee Requests  338
.725 Required Disclosures  339
.726 Hearing and Findings  339
.727 Use of Special Masters or Magistrate Judges  340

Equity courts created class action procedures to manage group litigation fairly and efficiently. Since 1966, when Federal Rule of Civil Procedure 23[736] was amended to add the damages class action under Rule 23(b)(3), class action litigation has greatly expanded. Class actions range from claims involving very small individual recoveries (such as consumer claims) that would otherwise likely not be litigated because no individual has a stake sufficient to justify individual litigation, to claims in which individual damages are high but the volume of claims creates advantages in group resolution. Because the stakes and scope of class action litigation can be great, class actions often require closer judicial oversight and more active judicial management than other types of litigation. Class action suits present many of the same problems and issues inherent in other types of complex litigation. The aggregation of a large number of claims and the ability to bind people who are not individual litigants tend to magnify those problems and issues, increase the stakes for the named parties, and create potential risks of prejudice or unfairness for absent class members.[737] This imposes unique responsibilities on the court and

736. Rule 23's predecessor was Federal Equity Rule 38, which provided that one or more may sue or defend for the whole when the question is "one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court." Fed. R. Civ. P. 23(a) committee note (1937 adoption).

737. *See generally* Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999); Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997). For a discussion of problems in class action litigation, see Deborah R. Hensler et al., Class Action Dilemmas: Pursuing Public Goals for Private Gain

counsel. Once class allegations are made, decisions such as whether to settle and on what terms are no longer wholly within the litigants' control. Rather, the attorneys and named plaintiffs assume responsibilities to represent the class. The court must protect the interests of absent class members, and Rule 23(d) gives the judge broad administrative powers to do so, reflecting the equity origins of class actions.[738]

This section applies to a broad spectrum of subject areas, including statutory and common-law causes of action involving personal injury, property damage, consumer, civil rights, antitrust, environmental, and employment-related claims. This section also covers various types of relief, including injunctions, declaratory judgments, common resolution of particular issues in a case, and damages.[739] The various aspects of managing class action litigation discussed in this section are closely intertwined with other *MCL, 4th* sections, including those on mass tort litigation, attorney fees, and multiple jurisdiction litigation. Other sections of the *MCL, 4th* describe three types of class actions that have unusual features and procedural requirements: mass torts (see section 22.7); private securities litigation, including shareholder derivative actions under Rule 23.1 (see section 31.5); and employment discrimination (see section 32.42).

Occasionally, a plaintiff or other party seeks to have a defendant class certified. Such requests are unusual. The rules discussed in this section, which focus on plaintiffs' classes, must be specifically tailored to the issues defendant classes raise.[740] Additionally, conflicts of interest between an unwilling class

---

(2000); John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev. 1343, 1367–82 (1995) (discussing incentives for collusion in settlement class actions); Note, *In-Kind Class Action Settlements*, 109 Harv. L. Rev. 810 (1996).

738. *See Ortiz*, 527 U.S. at 832–33; Blanchard v. Edgemark Fin. Corp., 175 F.R.D. 293, 298–300 (N.D. Ill. 1997) (holding that any individual settlement with a certified class representative must be submitted to the court for approval because the representative has voluntarily undertaken a fiduciary responsibility toward the class as a whole and the court has a commensurate duty to protect absent class members); 7A Charles Alan Wright et al., Federal Practice and Procedure: Civil 2d § 1751 (1986 & Supp. 2002).

739. For reference to the law of class actions, see generally Alba Conte & Herbert B. Newberg, Newberg on Class Actions (4th ed. 2002); 5 James Wm. Moore et al., Moore's Federal Practice (3d ed. 1997 & Supp. 2002); 7A & 7B Wright et al., *supra* note 738. The case-management requirements imposed by the Private Securities Litigation Reform Act of 1995 are discussed in *infra* section 31.33.

740. *See* 2 Conte & Newberg, *supra* note 739, § 4:46, at 339 (indicating that "[d]efendant class actions must meet all the Rule 23 criteria" and that "[d]efendant classes pose unique problems in the application of Rule 23 criteria" and raise distinct due process concerns). For examples of Rule 23 analysis in the defendant class certification context, see *CBS, Inc. v. Smith*, 681 F. Supp. 794 (S.D. Fla. 1988); *In re LILCO Sec. Litig.*, 111 F.R.D. 663 (E.D.N.Y. 1986). *See*

representative and the class warrant special attention when a defendant class certification motion is made.[741] Plans for compensating counsel for a defendant class representative need to be addressed at the certification stage. A class settlement that provides for a defendant class representative's attorney fees also may demand special scrutiny.

## 21.1  Precertification Case Management

.11 Initial Case-Management Orders  245
.12 Precertification Communications with the Proposed Class  247
.13 Standards for Class Certification and Precertification Discovery  250
  .131 Certifying a Litigation Class  250
  .132 Certifying a Settlement Class  250
  .133 Timing of the Certification Decision  252
.14 Precertification Discovery  255
  .141 Precertification Discovery into the Rule 23(a) Requirements  257
  .142 Precertification Discovery into the Rule 23(b) Requirements  260
.15 Relationship with Other Cases Pending During the Precertification Period  263

## 21.11  Initial Case-Management Orders

Initial case-management orders in a class action guide the parties in presenting the judge with the information necessary to make the certification decision and permit the orderly and efficient development of the case.

---

*also* Scott D. Miller, Note, *Certification of Defendant Classes Under Rule 23(b)(2)*, 84 Colum. L. Rev. 1371, 1387–89 (1984) (discussing potential burdens defendant classes may impose on courts). Defendant classes may also raise questions about ascertaining the identity of class members that differ from plaintiff classes. S. Ute Indian Tribe v. Amoco Prod. Co., 2 F.3d 1023, 1029–30 (10th Cir. 1993). There is a split among courts of appeals concerning whether Rule 23(b)(2) applies to defendant cases. *See* Henson v. E. Lincoln Township, 814 F.2d 410 (7th Cir. 1987) (affirming district court's order denying certification of a defendant class); *cf.* Marcera v. Chinlund, 595 F.2d 1231, 1238 (2d Cir.), *vacated on other grounds sub nom.* Lombard v. Marcera, 442 U.S. 915 (1979); Luyando v. Bowen, 124 F.R.D. 52, 59 (S.D.N.Y. 1989) (certifying a defendant class). Protecting absent members of a defendant class may require special effort on the part of court and counsel. *In re* Integra Realty Res., Inc., 262 F.3d 1089, 1105 (10th Cir. 2001) (stating that "defendant class actions create a special need to be attentive to the due process rights of absent parties").

741. Courts should give greater scrutiny to the adequacy of representation in defendant class actions "because of the risk that plaintiff[s] will seek out weak adversaries to represent the class." 7A Wright et al., *supra* note 738, § 1770. *See, e.g., In re Integra Realty*, 262 F.3d at 1111–13 (finding representation by unwilling mutual fund with largest losses to be adequate and noting that a settlement providing compensation for attorney fees was potentially troubling). For further commentary on *Integra*, see 15A Charles Alan Wright et al., Federal Practice and Procedure: Jurisdiction 2d § 3902.1, at 53–54 (Supp. 2002).

Whether a class is certified and how its membership is defined affects case management as well as outcome. Certification and class membership determine not only the stakes involved, but also the scope and timing of discovery and motion practice, the structure of trial and methods of proof, and the length and cost of the litigation. Certification decisions are critical and should be made only after consideration of all relevant information and arguments presented by the parties.[742]

Before ruling on class certification, a judge should address the following matters at an early stage in the case, typically in initial case-management conferences under Rule 16:

- *Whether to hear and determine threshold dispositive motions, particularly motions that do not require extensive discovery, before hearing and determining class certification motions.* Motions such as challenges to jurisdiction and venue, motions to dismiss for failure to state a claim, and motions for summary judgment may be decided before a motion to certify the class, although such precertification rulings bind only the named parties. If the judge decides to hear such threshold motions before ruling on class certification, the initial scheduling order should set a timetable for the submission of motions for briefs and for any necessary discovery.

- *Whether to appoint interim class counsel during the period before class certification is decided.*[743] If the lawyer who filed the suit is likely to be the only lawyer seeking appointment as class counsel, appointing interim class counsel may be unnecessary. If, however, there are a number of overlapping, duplicative, or competing suits pending in other courts, and some or all of those suits may be consolidated, a number of lawyers may compete for class counsel appointment. In such cases, designation of interim counsel clarifies responsibility for protecting the interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement. In cases

---

742. A court may act on its own initiative in deciding whether to certify a class. McGowan v. Faulkner Concrete Pipe Co., 659 F.2d 554, 559 (5th Cir. 1981) ("The trial court has an independent obligation to decide whether an action was properly brought as a class action, even where neither party moves for a ruling on class certification."). A court may not, however, act on its own initiative to expand an individual complaint into a class action. Newsom v. Norris, 888 F.2d 371, 380–82 (6th Cir. 1989) (vacating district court order converting an individual action into a class action and certifying the class).

743. *See* Fed. R. Civ. P. 23(g)(2)(A) committee note (permitting the designation of interim counsel before determining whether to certify a class).

involving overlapping, duplicative, or competing suits in other federal courts or in state courts, the lawyers may stipulate to the appointment of a lead interim counsel and a steering committee to act for the proposed class. Such a stipulation leaves the court with the tasks of determining that the chosen counsel is adequate to serve as interim class counsel and making a formal order of appointment. Absent a stipulation, the court may need to select interim class counsel from lawyers competing for the role and formally designate the lawyer selected.

· *Whether and how to obtain information from parties and their counsel about the status of all related cases pending in state or federal courts, including pretrial preparation, schedules and orders, and the need for any coordinated activity.* Section 20.31 discusses coordination and other approaches to pending parallel litigation with state judges.

· *Whether any discovery is needed to decide whether to certify the proposed class.* See section 21.13. Precertification discovery permits the parties to "gather information necessary to make the certification decision," which "often includes information required to identify the nature of the issues that actually will be presented at trial."[744] To define the need for and appropriate limits on precertification discovery, it is useful to direct the parties to discuss these and related problems at the Rule 26(f) conference and to present a plan to the court at an early Rule 16 hearing. The judge can then put into place a schedule for determining the scope of discovery necessary to decide certification, as opposed to merits discovery. At such hearings, the judge should also inquire whether the parties contemplate precertification discovery from the potential class members, determine whether such proposed discovery fills a legitimate need, and make appropriate plans for the most cost-effective means of conducting it.

## 21.12 Precertification Communications with the Proposed Class

Rule 23(d) authorizes the court to regulate communications with potential class members, even before certification.[745] Such regulations, however, could

---

744. *See* Fed. R. Civ. P. 23(c)(1) committee note (setting a flexible time standard by providing that certification decisions should be made "at an early practicable time").

745. *In re* Sch. Asbestos Litig., 842 F.2d 671, 680 (3d Cir. 1988) ("Rule 23 specifically empowers district courts to issue orders to prevent abuse of the class action process.").

implicate the First Amendment.[746] Moreover, restrictions of this type may be difficult to implement given the ease and speed of communicating with dispersed groups. For example, many class actions attorneys establish Internet Web sites for specific class actions, in addition to using conventional means of communication, such as newspapers. Most judges are reluctant to restrict communications between the parties or their counsel and potential class members, except when necessary to prevent serious misconduct.[747]

Direct communications with class members, however, whether by plaintiffs or defendants, can lead to abuse.[748] For example, defendants might attempt to obtain releases from class members without informing them that a proposed class action complaint has been filed. If defendants are in an ongoing business relationship with members of a putative class, the court might consider requiring production of communications relating to the case. In appropriate cases, courts have informed counsel that communications during an ongoing business relationship, including individual releases or waivers, must be accompanied by notification to the members of the proposed class that the litigation is pending.[749]

Judicial intervention is generally justified only on a clear record and with specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties. Such intervention "should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances."[750] Even if the court finds that there has been an abuse, less burdensome remedies may suffice, such as requiring parties to initiate communication with potential class members

746.  *See* Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626 (1985).

747.  Gulf Oil Co. v. Bernard, 452 U.S. 89, 101–02 (1981).

748.  *See id.* at 99–100 & n.12; Kleiner v. First Nat'l Bank, 751 F.2d 1193 (11th Cir. 1985); Keystone Tobacco Co. v. U.S. Tobacco Co., 238 F. Supp. 2d 151 (D.D.C. 2002), *reconsideration denied*, 2003 U.S. District LEXIS 14653 (2003); Hampton Hardware Inc. v. Cotter & Co., 156 F.R.D. 630 (N.D. Tex. 1994).

749.  Ralph Oldsmobile, Inc. v. Gen. Motors Corp., No. 99 Civ. 4567, 2001 WL 1035132, at *7 (S.D.N.Y. Sept. 7, 2001); *see also* 2 Geoffrey C. Hazard & W. William Hodes, The Law of Lawyering § 38.4, at 38-6 (3d ed. 2002) (copies of communications sent by defendants who have ongoing business relationships with potential class members relating to pending litigation should be given to opposing counsel).

750.  *Gulf Oil*, 452 U.S. at 101–02. For an example of a limited ban on communications between a defendant and class members, see *Rankin v. Board of Education of Wichita Public Schools*, 174 F.R.D. 695, 697 (D. Kan. 1997) (ordering that "defendants and their counsel shall not make any contact or communication with [prospective class members] which expressly refers to this litigation"). Generally, more than just the potential for abuse is required to support issuance of a protective order. Basco v. Wal-Mart Stores, Inc., No. CIV.A.00-3184, 2002 WL 272384, at 3–4 (E.D. La. Feb. 25, 2002).

only in writing or to file copies of all nonprivileged communications with class members.[751] If class members have received inaccurate precertification communications, the judge can take action to cure the miscommunication and to prevent similar problems in the future.[752] Rule 23 and the case law make clear that, even before certification or a formal attorney–client relationship, an attorney acting on behalf of a putative class must act in the best interests of the class as a whole.[753]

Misrepresentations or other misconduct in communicating with the class may impair the fairness and adequacy of representation under Rule 23(a)(4), may affect the decision whether to appoint counsel under proposed Rule 23(g), and may be prohibited and penalized under the court's Rule 23(d)(2) plenary protective authority. Defendants and their counsel generally may communicate with potential class members in the ordinary course of business, including discussing settlement before certification,[754] but may not give false, misleading, or intimidating information, conceal material information, or attempt to influence the decision about whether to request exclusion from a class certified under Rule 23(b)(3). Ethics rules restricting communications with individuals represented by counsel may apply to restrict a defendant's communications contract with the named plaintiffs.[755]

---

751. *See Gulf Oil*, 452 U.S. at 104 n.20.

752. E.E.O.C. v. Mitsubishi Motor Mfg. of Am., Inc., 102 F.3d 869, 870–71 (7th Cir. 1996) (reciting district court action to cure precertification miscommunication regarding communications between employees and employer and to require prior notice to prevent future miscommunications); *Ralph Oldsmobile*, 2001 WL 1035132, at *7 (curative notice sent to members of the proposed class at the expense of defendant).

753. *See* Fed. R. Civ. P. 23(g)(2)(A) committee note; *cf.* 2 Hazard & Hodes, *supra* note 749, § 38.4, at 38-7 (indicating that the lawyer for the proposed class has a fiduciary obligation and owes class members "duties of loyalty and care").

754. *See Gulf Oil*, 452 U.S. 95 (after a class action had been commenced but before certification, defendant continued to deal directly with potential class members concerning an offer of settlement that had been earlier negotiated with the Equal Employment Opportunity Commission (EEOC)).

755. *See Ralph Oldsmobile*, 2001 WL 1035132, at *4, *7 (finding that defendant's failure to inform independent dealers about pending class actions was misleading and ordering defendant to send corrective notice to potential members of the proposed class); Hampton Hardware v. Cotter & Co., 156 F.R.D. 630, 634–35 (N.D. Tex. 1994) (court found abuse and issued protective order limiting communications after defendant contacted potential class members and encouraged them not to participate in the class action by stating that such participation would negatively impact the parties' ongoing business relationship); *see also infra* section 21.323 (other communications from class members). *See generally* Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193, 1202 (11th Cir. 1985) ("If the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent may be coercive.") (quoting Note, *Developments in the Law—Class Actions*, 89 Harv. L. Rev. 1318, 1600 (1976)).

## 21.13  Standards for Class Certification and Precertification Discovery

.131 Certifying a Litigation Class  250
.132 Certifying a Settlement Class  250
.133 Timing of the Certification Decision  252

### 21.131  Certifying a Litigation Class

To obtain an order to prevail in their efforts to certify a class, proponents must satisfy two sets of requirements: those set forth in Rule 23(a) and those contained in Rule 23(b). Rule 23(a) requires that (1) the proposed class be sufficiently numerous; (2) there is at least one common question of fact or law; (3) the named plaintiff's claims are typical of the class as a whole; and (4) the named plaintiff will adequately represent the class.[756]

Rule 23(b) permits maintenance as a class action if the action satisfies Rule 23(a)'s prerequisites and meets one of three alternative criteria for maintainability. First, Rule 23(b)(1)(A) permits certification to prevent inconsistent rulings regarding defendants' required conduct. Standards for certifying a class under Rule 23(b)(1)(B) relate primarily to limited fund settlements and are discussed below in section 21.132. Second, Rule 23(b)(2) permits a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Third, Rule 23(b)(3) permits a class action if "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Section 21.141 elaborates on the requirements for certifying a litigation class.

### 21.132  Certifying a Settlement Class

Parties frequently settle before the judge has decided whether to certify a class.[757] Some settle before a motion to certify or even a class action complaint has been filed. Such settlements typically stipulate that the court may certify a class as defined in the agreement, but only for the purpose of settlement. When a case settles as a class action before certification, the parties must present the

---

756. Fed. R. Civ. P. 23(a).

757. *See, e.g., In re* Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283 (3d Cir. 1998); Hanlon v. Chrysler Corp., 150 F.3d 1011 (9th Cir. 1998); *In re* Inter-Op Hip Prosthesis Liab. Litig., 204 F.R.D. 330 (N.D. Ohio 2001); *In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000); *In re* Lease Oil Antitrust Litig., 186 F.R.D. 403 (S.D. Tex. 1999).

court a plan for notifying the class and, if Rule 23(b)(3) applies, providing an opportunity to opt out, along with the motions for certification and preliminary approval of the settlement. If the case settles after it has been certified as a litigation class, different notice requirements apply (see section 21.312).

Rule 23(a) and (b) standards apply equally to certifying a class action for settlement or for trial, with one exception. In *Amchem Products, Inc. v. Windsor*, the Supreme Court held that because a settlement class action obviates a trial, a district judge faced with a request to certify a settlement class action "need not inquire whether the case, if tried, would present intractable management problems"[758] under Rule 23(b)(3)(D). The Court added, however, "that the settlement context demands undiluted, even heightened attention to unwarranted or overbroad class definitions."[759]

Post-*Amchem* courts have emphasized that a settlement class must be cohesive. This means, according to one court of appeals, that there should be a common nucleus of facts and potential legal remedies among all class members,[760] and that the class and any necessary subclasses must be definable and defined for the judge. In a nationwide or multistate settlement class, counsel should be ready at the class certification hearing to explain the common elements of the substantive law that are applicable to all class members so that choice of law issues will not defeat predominance and the manageability component of superiority.[761] As in a litigation class, counsel seeking certification of a settlement class must address variations in applicable state law. The court must determine whether the variations or conflicts defeat commonality, predominance, and superiority and the extent to which the creation of subclasses removes such conflicts so as to permit certification. As in a litigation class, counsel seeking certification of a settlement class must show that there are no actual conflicts among the anticipated claims of class members[762] or must show that conflicts can be avoided or ameliorated by proposing subclasses or by providing a plan for distributing benefits based on objective

---

758. 521 U.S. 591, 620 (1997).

759. *Id.*

760. *Hanlon*, 150 F.3d at 1022 (affirming certification of a settlement class).

761. *Id.*

762. *Id.* at 1021 (finding "no structural conflict of interest based on variations in state law [in part, because] . . . the differences in state remedies are not sufficiently substantial so as to warrant the creation of subclasses"); *see also In re* Mex. Money Transfer Litig., 267 F.3d 743, 747 (7th Cir. 2001) (affirming a nationwide class action settlement against objections that class members from certain states had superior remedies not reflected in the settlement terms and noting that class representatives avoided the "pitfall" of state law variations by confining their theories to "federal law plus aspects of state law that are uniform" and by asking for "certification of a class for settlement only"); *In re Prudential*, 148 F.3d at 314–15.

criteria. The court must determine whether the process for presenting claims and awarding relief to individual class members is manageable and takes account of differences among class members without creating conflicting interests.[763] Counsel seeking class certification must also present a plan for communicating adequate notice of a settlement to individual class members, an important factor in the court's determination that the proposed settlement class is manageable.[764]

A proposed settlement of a mandatory "limited fund" class[765] under Rule 23(b)(1)(B) must meet the exacting standards articulated by the Supreme Court in *Ortiz v. Fibreboard Corp.*[766] Because limited-fund classes do not permit opt-outs, certification for settlement imposes particularly stringent standards.

In any certification for settlement, the court must examine adequacy of representation and predominance of common issues to be sure that the settlement does not mask either conflicts within classes or the overwhelming presence of individual issues. Section 21.61 discusses determining whether to approve the terms of proposed settlements in class actions, which involves a separate set of issues from deciding whether to certify a proposed settlement action. The particular problems raised by proposed class and other settlements in mass torts cases are discussed in section 22.9.

## 21.133 Timing of the Certification Decision

Federal Rule of Civil Procedure 23(c)(1) directs the court to determine "at an early practicable time"[767] whether to certify an action as a class action. The "early practicable time" is when the court has sufficient information to decide

---

763. *In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, 2000 WL 1222042, at \*43, \*51–\*52 (E.D. Pa. Aug. 28, 2000) (certifying a settlement class based on objective national standards for claims); *cf.* Walker v. Liggett Group, Inc., 175 F.R.D. 226, 232–33 (S.D. W. Va. 1997) (denying certification of a settlement class and citing need to ascertain variations in state law, to decide how millions of class members could offer input during the comment period, to create subclasses, and to appoint representatives to an already difficult to define class).

764. Thomas v. NCO Fin. Sys., Inc., No. CIV.A.00-5118, 2002 WL 1773035, at \*5–\*7 (E.D. Pa. July 31, 2002) (denying certification of a settlement class where parties proposed notice in two newspapers and failed to introduce evidence that the individual names of class members were available).

765. Class actions certified under Rule 23(b)(1) or (b)(2) are often referred to as "mandatory" class actions because Rule 23 does not expressly require that members be permitted to opt out; some courts, however, have granted limited opt-out rights in so-called "mandatory" class actions, recognizing this act as being within the court's discretion and equity jurisdiction. *See, e.g.*, County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1302–03 (2d Cir. 1990).

766. 527 U.S. 815, 838–53 (1999).

767. Fed. R. Civ. P. 23(c)(1)(A).

whether the action meets the certification criteria of Rules 23(a) and (b). The timing of the certification decision deserves discussion early in the case, often at the initial scheduling conference where the judge and counsel can address the issues bearing on certification and can establish a schedule for the work necessary to permit an informed ruling on the class certification motion. Appropriate timing will vary with the circumstances of the case, although an early resolution is generally desirable.

Precertification discovery may be necessary. The court may rule on motions pursuant to Rule 12, Rule 56, or other threshold issues before deciding on certification; however, such rulings bind only the named parties.[768] Most courts agree, and Rule 23(c)(1)(A) reflects, that such precertification rulings on threshold dispositive motions are proper, and one study found a substantial rate of precertification rulings on motions to dismiss or for summary judgment.[769] Precertification rulings frequently dispose of all or part of the litigation.[770]

Efficiency and economy are strong reasons for a court to resolve challenges to personal or subject-matter jurisdiction before ruling on certification. The judge should direct counsel to raise such challenges before filing motions to certify. Similarly, courts should rule early on motions to dismiss, challenging whether the plaintiffs have stated a cause of action. Early resolution of these questions may avoid expense for the parties and burdens for the court and may minimize use of the class action process for cases that are weak on the merits.[771] In unusual cases, involuntary precertification dismissal may unfairly

---

768. Dismissal before certification is *res judicata* only as to the class representatives, not class members. Wright v. Schock, 742 F.2d 541, 544 (9th Cir. 1984); *see also* Schwarzchild v. Tse, 69 F.3d 293, 297 (9th Cir. 1995) (moving for and obtaining summary judgment after class certification but before notice to the class implicitly waives defendant's interest in notifying the class). A grant of summary judgment dismissing the claims of class representatives often has the effect of mooting the class certification issue. Cowen v. Bank United of Tex., 70 F.3d 937, 941 (7th Cir. 1995).

769. Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 29–32 (Federal Judicial Center 1996) [hereinafter FJC Empirical Study of Class Actions] (finding that the rate of precertification rulings on motions to dismiss was about 80% in three of four districts studied and about 60% in the other district).

770. *Id.* at 33 (finding that "[a]pproximately three out of ten cases in each district were terminated as a direct result of a ruling on a motion to dismiss or for summary judgment").

771. *See, e.g.*, Curtin v. United Airlines, Inc., 275 F.3d 88, 93 (D.C. Cir. 2001) (holding that "where . . . the plaintiffs' claims can be readily resolved on summary judgment, where the defendant seeks an early disposition of those claims, and where the plaintiffs are not prejudiced thereby, a district court does not abuse its discretion by resolving the merits before considering the question of class certification"); Mira v. Nuclear Measurements Corp., 107 F.3d 466, 474–76

affect the interests of members of the proposed class. For example, in a case in which the filing was accompanied by extensive publicity, but where the dismissal had little publicity, individual members of the proposed class may rely on the pendency of the class action to toll limitations. If the risk of unfair prejudice is present, some form of notice under Rule 23(d)(2) may be appropriate.

Some local rules specify a short period within which the plaintiff must file a motion to certify a class action. Such rules, however, may be inconsistent with Rule 23(c)(1)(A)'s emphasis on the parties' obligation to present the court with sufficient information to support an informed decision on certification. Parties need sufficient time to develop an adequate record.

Rule 23(c)(1)(C) makes clear that an action should be certified only if it meets Rule 23's requirements. However, Rule 23(c)(1)(C) permits later alteration or amendment of an order granting or denying class certification. Nevertheless, decertifying or redefining an expansive class, certified on insufficient information, may unnecessarily cost the parties substantial time and expense and add to the court's load. In a federal question case, the pendency of class action allegations tolls the statute of limitations.[772] Individuals removed from a narrowed class after receiving notice that they were included may be entitled to notice that the statute of limitations has now begun to run against them.[773] If the judge expands a class definition in a Rule 23(b)(3) case, those added members must receive notice and an opportunity to opt out, adding expense and effort.

---

(7th Cir. 1997) (asserting that deciding summary judgment before ruling on class certification was an appropriate way to deal with meritless litigation).

772. Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 553 (1974).

773. For those excluded from the class, the statute of limitations, which was tolled by the filing of the class complaint, begins to run again when the opt-out form is filed. *See, e.g.*, Chardon v. Fumero Soto, 462 U.S. 650 (1983); Crown, Cork & Seal Co. v. Parker, 462 U.S. 345 (1983); *Am. Pipe*, 414 U.S. at 561. In diversity cases, state rules on equitable and cross-jurisdictional tolling may or may not toll the statute of limitations for individual claims filed subsequent to the denial of certification of a class action. *See, e.g.*, Wade v. Danek Med., Inc., 182 F.3d 281, 290 (4th Cir. 1999) (affirming that statute of limitations for state law claims was not tolled during the pendency of a diversity-based class action in federal court); Vaught v. Showa Denko K.K., 107 F.3d 1137, 1147 (5th Cir. 1997) (same).

## 21.14  Precertification Discovery

.141 Precertification Discovery into the Rule 23(a) Requirements  257
.142 Precertification Discovery into the Rule 23(b) Requirements  260

A judge faced with a motion for class certification must decide whether the record is sufficient to determine if the prerequisites of Rule 23 have been met and, if so, how to define the class.

A threshold question is whether precertification discovery is needed. Discovery may not be necessary when claims for relief rest on readily available and undisputed facts or raise only issues of law (such as a challenge to the legality of a statute or regulation). Some discovery may be necessary, however, when the facts relevant to any of the certification requirements are disputed (see sections 21.141 and 21.142), or when the opposing party contends that proof of the claims or defenses unavoidably raises individual issues. Generally, application of the Rule 23 criteria requires the judge to examine the elements of the parties' substantive claims and defenses[774] in order to analyze commonality, typicality, and adequacy of representation under Rule 23(a), as well as the satisfaction of Rule 23(b)'s maintainability requirements.[775]

At this stage, the court should not decide or even attempt to predict the weight or outcome of the underlying claims and defenses,[776] but it need not rely only on the bare allegations of the pleadings. A preliminary inquiry into the merits may be required to decide whether the claims and defenses can be presented and resolved on a class-wide basis.[777] Some precertification discovery

---

774. *See* Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 & n.12 (1978) (reasoning that "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action'" and that "'[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims'" (quoting Mercantile Nat'l Bank v. Langdeau, 371 U.S. 555, 558 (1963) and 15 Charles Wright et al., Federal Practice and Procedure § 3911, at 485 n.45 (1976))); *see also* Castano v. Am. Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996) (ruling that "[g]oing beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues" (citing Manual for Complex Litigation, Third, § 30.11 (1995))). For consideration of how examination of the merits has evolved in the context of mass tort class actions and other forms of aggregation, see *infra* sections 22.2 and 22.31.

775. Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 676 (7th Cir.) ("Before deciding whether to allow a case to proceed as a class action, therefore, a judge should make whatever factual and legal inquiries are necessary under Rule 23."), *cert. denied*, 534 U.S. 951 (2001).

776. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177–79 (1974) (reversing order requiring defendant to pay for class notice based on preliminary assessment of probabilities of plaintiff's success).

777. *Szabo*, 249 F.3d at 676.

may be necessary if the allegations in the pleadings—with affidavits, declarations, and arguments or representations of counsel—do not provide sufficient, reliable information.[778] To make this decision, the court should encourage counsel to confer and stipulate as to relevant facts that are not genuinely disputed, to reduce the extent of precertification discovery, and to refine the pertinent issues for deciding class certification.

Discovery relevant only to the merits delays the certification decision and may ultimately be unnecessary. Courts often bifurcate discovery between certification issues and those related to the merits of the allegations. Generally, discovery into certification issues pertains to the requirements of Rule 23 and tests whether the claims and defenses are susceptible to class-wide proof; discovery into the merits pertains to the strength or weaknesses of the claims or defenses and tests whether they are likely to succeed. There is not always a bright line between the two. Courts have recognized that information about the nature of the claims on the merits and the proof that they require is important to deciding certification. Arbitrary insistence on the merits/class discovery distinction sometimes thwarts the informed judicial assessment that current class certification practice emphasizes.

Allowing some merits discovery during the precertification period is generally more appropriate for cases that are large and likely to continue even if not certified. On the other hand, in cases that are unlikely to continue if not certified, discovery into aspects of the merits unrelated to certification delays the certification decision and can create extraordinary and unnecessary expense and burden. If merits discovery is stayed during the precertification period, the judge should provide for lifting the stay after deciding the certification motion.

It is often useful under Rule 26(f) to require a specific and detailed precertification discovery plan from the parties. The plan should identify the depositions and other discovery contemplated, as well as the subject matter to be covered and the reason it is material to determining the certification inquiry under Rule 23. Discovery relevant to certification should generally be directed to the named parties. Discovery of unnamed members of a proposed class requires a demonstration of need.[779] If precertification discovery of unnamed class members is appropriate, the court should consider imposing limits beyond those contemplated by the Federal Rules of Civil Procedure. Such limits might include the scope, subject matter, number, and time allowed for depositions, interrogatories, or other discovery directed to class representatives

---

778. *Id.* (referring to use of affidavits and inquiries from judges); Sirota v. Solitron Devices, Inc., 673 F.2d 566, 571–72 (2d Cir. 1982).

779. *See* Baldwin & Flynn v. Nat'l Safety Assocs., 149 F.R.D. 598 (N.D. Cal. 1993).

or unnamed class members, and might limit the period for completing certification-related discovery. Section 21.41 discusses postcertification discovery from unnamed class members. If some merits discovery is permitted during the precertification period, consider limits that minimize the time and effort involved, such as requiring the use of questionnaires or interrogatories rather than depositions, and consider limiting discovery to a certain number or a sample of proposed class members.[780]

## 21.141 Precertification Discovery into the Rule 23(a) Requirements

*Numerosity.* Determining whether the proposed class is sufficiently numerous for certification is usually straightforward. Affidavits, declarations, or even reasonable estimates in briefs are often sufficient to establish the approximate size of the class and whether joinder might be a practical and manageable alternative to class action litigation.

*Commonality.* Identifying common questions typically requires examining the parties' claims and defenses, identifying the type of proof the parties expect to present, and deciding the extent to which there is a need for individual, as opposed to common, proof. Courts have come to varying results in applying such tests, particularly in the mass tort context. See section 22.7.

A trial plan often assists in identifying the relationship between individual and common elements of proof, but Rule 23 does not operate in a vacuum. Bifurcation and severance under Rule 42 are available as tools that might make a case more manageable by separating out discrete issues for a phased or sequenced decision by the judge or at trial. In making such decisions, the judge must decide whether certification of issues classes, bifurcation, or severance are fair and workable ways to achieve class certification, or whether they would merely mask the predominance of individual issues and result in prejudice

---

780. Transamerican Ref. Corp. v. Dravo Corp., 139 F.R.D. 619, 621–22 (S.D. Tex. 1991) (approving interrogatories relevant to common issues and limiting their service to 50 of 6,000 absent class members); *cf.* Schwartz v. Celestial Seasonings, Inc., 185 F.R.D. 313 (D. Colo. 1999) (allowing after class certification, brief, nonmandatory questionnaire relating to common issues); McCarthy v. Paine Webber Group, Inc., 164 F.R.D. 309 (D. Conn. 1995). On the other hand, courts have declined to limit discovery conducted on behalf of a class to a sample selected by the defendant. *See* Buycks-Roberson v. Citibank Fed. Sav. Bank, 162 F.R.D. 338, 343 (N.D. Ill. 1995) (noting that "[t]he Federal Rules and this [c]ourt do not countenance self-selecting discovery by either party"). Accordingly, the court should assure that any use of sampling in the context of class-related discovery provides a meaningful random, or at least objective, sample of data.

from presenting claims or defenses out of context.[781] Issues classes are discussed further at section 21.24.

*Typicality.* Deciding typicality requires determining whether the named plaintiff's claim arises from the same course of events and involves legal arguments similar to those of each class member.[782] The court must also establish that the proposed class representative's claims are not subject to defenses that do not apply to other members of the class.[783] Discovery may be necessary to determine if the plaintiff's claim is atypical, although discovery may not be necessary if the pleadings or readily available information reveals that a named plaintiff's claim is idiosyncratic.

*Adequacy of representation.* The named plaintiffs must show that the proposed action will fairly and adequately protect the interests of the class. They must first demonstrate that class counsel is qualified, experienced, and able to conduct the litigation in the interests of the class. That also is part of the showing required for appointment of class counsel under Rule 23(g). See section 21.27.

Plaintiffs also must show that the named representatives have no substantial interests antagonistic to those of proposed class members and that the representatives share the desire to prosecute the action vigorously. A trial plan can help to identify distinct claims that may demand separate representation or a denial of certification. If the motion to certify is for a litigation class or for a settlement class that is opposed, as contrasted with a jointly submitted motion to certify a class for settlement, the adversaries may help to identify the range and divergence of claims. In a jointly submitted motion to certify a settlement class, the judge may need to press the parties to identify differences in the positions or interests of class members. Proposed class members' interests may differ from those of the named representatives for a variety of

---

781. *See, e.g.*, *In re* Hanford Nuclear Reservation Litig., 292 F.3d 1124, 1139 (9th Cir. 2002) (remanding with recommendation that the trial court consider "[class] certification only for questions of generic causation common to plaintiffs who suffer from the same or a materially similar disease"); *In re* Bendectin Litig., 857 F.2d 290 (6th Cir. 1988) (upholding constitutionality of aggregate phase I trial on common issues of generic causation); Jenkins v. Raymark Indus., Inc., 782 F.2d 468 (5th Cir. 1986) (dividing trial into phases dealing with common and individual issues separately); *see also* Simon v. Philip Morris, Inc., 200 F.R.D. 21 (E.D.N.Y. 2001) (discussing severance and consolidation of issues for phased trials in class action); *but cf. In re* Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1303 (7th Cir. 1995) (discussing difficulty of having multiple juries decide comparative negligence and proximate causation).

782. *See generally* Gen. Tel. Co. v. Falcon, 457 U.S. 147 (1982) (rejecting claim of employee denied promotion as not typical of claims of applicants for work).

783. *See* Chateau de Ville Prods., Inc. v. Tams-Witmark Music Library, Inc., 586 F.2d 962, 966 (2d Cir. 1978); Douglas M. Towns, Note, *Merit-Based Class Action Certification: Old Wine in a New Bottle*, 78 Va. L. Rev. 1001, 1032–33 (1992).

reasons. Different state law may apply to different class members.[784] In a mass tort case, those with present injuries have different interests than those who have been exposed to the injurious substance but have not yet manifested injury.[785] Those with severe injuries may have different interests than those with slight injuries.

The proponents of certification sometimes attempt to meet Rule 23's adequacy-of-representation requirements by suing for only one type of relief, such as an injunction, on behalf of the class. In that case, the named plaintiffs may be inadequate representatives for class members who also have existing damage claims.[786] Discovery may be needed to identify any appropriate remedies not included in the proposed class claims.

Under the Private Securities Litigation Reform Act (PSLRA), courts must select as "lead plaintiff" the most knowledgeable and sophisticated investor who is willing to serve.[787] Note that the court may or may not select the lead plaintiff to serve as a Rule 23(a) "class representative" if the court decides to certify a class. Even without such a statutory requirement, the proposed class representative should be willing to participate in discovery[788] and demonstrate familiarity with the claims asserted and the role of the class representative.[789]

---

784. *See generally In re* Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig., 288 F.3d 1012 (7th Cir. 2002); Spence v. Glock, 227 F.3d 308 (5th Cir. 2000).

785. Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997).

786. *In re* Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 209 F.R.D. 323, 338–40 (S.D.N.Y. 2002) (actual conflicts between proposed class representatives who seek injunctive relief and members of the proposed class who have already experienced personal injuries render the representatives inadequate under Rule 23(a)); *see also* Thompson v. Am. Tobacco Co., 189 F.R.D. 544, 550–51 (D. Minn. 1999) (same).

787. 15 U.S.C. § 78u-4(a)(2)(A) (2000); Berger v. Compaq Computer Corp., 257 F.3d 475, 483 (5th Cir. 2001) (noting that the PSLRA raises the adequacy of representation standard by requiring that "securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation"), *reh'g denied*, 279 F.3d 313 (2002) (noting that the Rule 23 standard remains the same).

788. *In re* Storage Tech. Corp. Sec. Litig., 113 F.R.D. 113, 118 (D. Colo. 1986) (holding that "failure to comply with proper discovery is a sufficient basis . . . to conclude that these plaintiffs would not adequately represent the class").

789. Morris v. Transouth Fin. Corp., 175 F.R.D. 694, 698 (M.D. Ala. 1997) (finding that adequate class representatives need only "have a basic understanding about the nature of [the] lawsuit" and "need not be intimately familiar with every factual and legal aspect" of the litigation). A named plaintiff who shows no understanding of the complaint and proceedings is inadequate. Kelley v. Mid-America Racing Stables, Inc., 139 F.R.D. 405, 409 (W.D. Okla. 1990) (finding named plaintiffs inadequate because of "their almost total lack of familiarity with the facts of their case"); *In re Storage Tech.*, 113 F.R.D. at 118 (disqualifying one plaintiff who was "unaware of even the most material aspects of this action" and another who was "too passive to assure vigorous prosecution").

Precertification inquiries into the named parties' finances or the financial arrangements between the class representatives and their counsel are rarely appropriate, except to obtain information necessary to determine whether the parties and their counsel have the resources to represent the class adequately. Ethics rules permit attorneys to advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter.[790] Such arrangements may later become relevant when awarding fees. See section 14.12.

## 21.142 Precertification Discovery into the Rule 23(b) Requirements

*Rule 23(b)(1)(B).* In addition to satisfying the Rule 23(a) criteria, a Rule 23(b)(1)(B) non-opt-out "limited fund" class must overcome a high threshold set by the Supreme Court.[791] Indeed, the Court has questioned whether a mass tort class action could ever be certified as a limited-fund class action.[792] First, the judge must find that there is a limited fund. The evidence must prove that the value of class claims exceeds the proven value of the fund.[793] Next, the judge must find that there would be equitable treatment of all claimants,[794] which may require the creation of subclasses for differing interests or, if the interests are too numerous and too conflicting, may defeat certification.[795] Finally, the judge must find that payment of the claims would exhaust the limited fund or that failure to exhaust the fund would be justified.[796] Efforts to certify limited-fund class actions after *Ortiz* have not been successful.[797]

---

790. Model Rules of Prof'l Conduct R. 1.8(e)(1) (2002). *See* Rand v. Monsanto Co., 926 F.2d 596, 599 (7th Cir. 1991) (indicating that class representatives are not responsible to underwrite class-wide costs and that class counsel who are compensated based on class benefits are more appropriate underwriters); Paul E. Iacono Structural Eng'r, Inc. v. Humphrey, 722 F.2d 435 (9th Cir. 1983); *In re* Workers' Comp., 130 F.R.D. 99, 108 (D. Minn. 1990).

791. Ortiz v. Fibreboard Corp., 527 U.S. 815, 838–53 (1999).

792. *Id.* at 842, 844, 864. *See also* S. Elizabeth Gibson, Case Studies of Mass Tort Limited Fund Class Action Settlements & Bankruptcy Reorganizations 37 (Federal Judicial Center 2000) (indicating that the Supreme Court reserved "[t]he larger question . . . whether a mass tort case could ever qualify for mandatory class treatment under Rule 23(b)(1)(B)").

793. *Ortiz*, 527 U.S. at 849.

794. *Id.* at 841.

795. *Id.* at 856–57.

796. *Id.* at 841, 858–60.

797. *See, e.g., In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 221 F.3d 870, 873 (6th Cir. 2000) (decertifying a limited fund settlement class because parties did not have a "limited fund"); *In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 137 F. Supp. 2d 985, 1029 (S.D. Ohio 2001) (a renegotiated Rule 23(b)(3) opt-out settlement was granted final approval). *See also In re* River City Towing Servs., Inc., 204 F.R.D. 94, 96 (E.D. La. 2001) (finding that the "kind of limited fund necessary to certify a (b)(1)

Certifying a Rule 23(b)(1)(B) class ordinarily will call for extensive factual findings showing that the standards have been met,[798] which may require extensive discovery.

*Rule 23(b)(2).* The Rule 23(b)(2) class action applies when class-wide injunctive or declaratory relief is necessary to redress group injuries, such as infringements on civil rights, and is commonly relied on by litigants seeking institutional reform through injunctive relief.[799] Because a Rule 23(b)(2) class action does not permit opting out, it presumes that the class is homogeneous and therefore cohesive. That presumption can be destroyed by showing individualized issues as to liability or remedy.

The grant of Rule 23(b)(2) certification in the tort context depends on factors such as whether state law recognizes medical monitoring claims, and, if so, treats them as calling for injunctive relief rather than money damages. Discovery may be necessary to show the existence of underlying state law preconditions for such claims as medical monitoring. Section 22.74 further

---

class action" was not determined); Doe v. Karadzic, 192 F.R.D. 133, 144 (S.D.N.Y. 2000) (decertifying after reconsideration because plaintiffs could not provide evidence of a limited fund); *In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, 1999 WL 782560, at *10 (E.D. Pa. Sept. 27, 1999) (vacating a conditionally certified settlement because the parties could not provide evidence of a true limited fund). *Cf. In re* Inter-Op Hip Prosthesis Liab. Litig., 204 F.R.D. 359, 378, 383 (N.D. Ohio) (preliminarily approving a Rule 23(b)(3) class in which participants in settlement would be given prior liens on defendant's assets over opt outs), *later proceeding at* 174 F. Supp. 2d 648, 653–55 (N.D. Ohio) (granting injunctive relief by enjoining the initiation of claims against defendants), *and injunction stayed*, No. 01-4039, 2001 WL 1774017, at *1 (6th Cir. Oct. 29, 2001) (ruling that "financial disincentives on the right to opt out of the settlement class . . . raise the due process concerns addressed in Ortiz").

798. *See In re* Phenylpropanolamine (PPA) Prods. Liab. Litig., 208 F.R.D. 625, 634 (W.D. Wash. 2002) (stating that "to certify such a class in the context of a limited fund claim, the court must have before it, at a minimum, evidence as to the assets and potential insolvency of the defendants involved in these cases").

799. Baby Neal *ex rel.* Kanter v. Casey, 43 F.3d 48, 58 (3d Cir. 1994). *See also* Daniels v. City of New York, 198 F.R.D. 409, 422 (S.D.N.Y. 2001) (certifying class of African-American and Latino men who were allegedly stopped and frisked by police street crimes unit without reasonable suspicion); Arnold v. United Artists Theatre Circuit, Inc., 158 F.R.D. 439, 451–52 (N.D. Cal. 1994) (certifying class of disabled theatergoers who sought movie theaters' compliance with the Americans with Disabilities Act). In addition to its frequent application to civil rights cases, some courts have extended this provision to, *inter alia*, classes alleging systemic failure of child welfare services, *see, e.g., Baby Neal*, 43 F.3d at 58–59 *and* LaShawn A. v. Dixon, 762 F. Supp. 959, 960 (D.D.C. 1991), as well as suits alleging miscalculation of Social Security benefits. *See* Forbush v. J.C. Penney Co., 994 F.2d 1101, 1106 (5th Cir. 1993); Gilchrist v. Human Res. Admin., No. 87 CV 7820, 1989 U.S. Dist. LEXIS 7850, at *10 (S.D.N.Y. July 13, 1989). Indeed, its drafters stated expressly that "[s]ubdivision (b)(2) is not limited to civil-rights cases." Fed. R. Civ. P. 23(b)(2) committee note (1966 amendment).

discusses medical monitoring claims and the factors affecting whether they may be certified as class actions under either Rule 23(b)(2) or Rule 23(b)(3).

When a proposed class seeks both injunctive relief and damages, the judge may have to make findings as to the relative importance of the damage claims and decide whether to provide class members notice and an opportunity to opt out. Rule 23(c)(4)(A) permits certification under the appropriate subsection of the rule to be made on a claim-by-claim basis. Some claims justify Rule 23(b)(3) certification, others will justify Rule 23(b)(2) treatment, and other claims should not be certified at all.

*Rule 23(b)(3).* Rule 23(b)(3) maintainability requires the judge to determine that common questions predominate over individualized ones and that class action treatment is superior to other available methods for the fair and efficient adjudication of the controversy.

To analyze predominance, the judge must determine whether there are individualized issues of fact and how they relate to the common issues, and then examine how the class action process compares to available alternatives (either alone or in combination): individual suits or joinder; consolidation, intervention, or other nonrepresentational forms of aggregate litigation; test cases; more narrowly defined class actions, perhaps filed in different courts; and agency enforcement. The Supreme Court has emphasized that judges should consider, in cases involving small claims, the access to court that the class mechanism provides.[800]

Precertification discovery may be needed to assist the judge in distinguishing the individual from the common elements of the claims, issues, and defenses, and in deciding the extent to which the need for individual proof outweighs the economy of receiving common proof. A trial plan addressing each element of the claims can help to identify the nature and extent of the individualized proof required.

To analyze superiority, the judge will need information from the parties about alternative approaches to the claims of the proposed class and the defenses they will face. Discovery may be needed to determine the extent to which individual potential class members have an interest in separate actions, inconsistent with class treatment. For example, discovery may be necessary to determine whether some class members are likely to assert individual claims for damages that could support individual suits, while other class members have claims for small amounts that would not justify individual litigation.

---

800. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997) (stating that "'[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights'" (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997))).

The judge must decide whether the proposed Rule 23(b)(3) class will be manageable. For the most part, courts determine manageability by reviewing affidavits, declarations, trial plans, and choice-of-law analyses that counsel present.[801] Discovery may be needed to determine whether a need for individual proof will hinder the fair presentation of common questions to the finder of fact[802] and whether class members can be identified without making numerous fact-intensive inquiries. In unusual circumstances, judges have used test cases or alternative dispute resolution (ADR) approaches to test the manageability of a class trial. See section 21.5.

An important aspect of precertification discovery is coordination with any discovery underway or anticipated in cases involving parallel suits simultaneously pending in other federal or state courts. The following section discusses the precertification relationship with other cases.

## 21.15   Relationship with Other Cases Pending During the Precertification Period

There may be other class actions, consolidated cases, or individual lawsuits in other courts or before other judges in the same division or district that arise out of the same legal and factual basis as the class action proposed for certification. These cases may purport to bind overlapping or duplicative groups. A federal district judge asked to certify a class action that overlaps with, duplicates, or competes with cases pending in other federal or state courts may face conflicts involving rulings on discovery or substantive motions, timetables for discovery, selection of class counsel, certification rulings, trial, and settlement, and may also face duplicative work and expense. The judge should obtain complete information from the parties about other pending or terminated actions in federal or state courts relating to the claims, defenses, and issues presented.

If multiple cases are pending in federal courts, the Judicial Panel on Multidistrict Litigation has the authority to transfer related federal cases to one district court for consolidated and coordinated pretrial proceedings[803] in order to prevent inconsistent rulings and to minimize duplicative discovery. See

---

801. *See, e.g.*, Zinser v. Accufix Research Inst., 253 F.3d 1180, 1187–90 (9th Cir. 2001) (discussing plaintiff's proposals for managing variations in state laws); *cf.* Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 676 (7th Cir. 2001) (stating that a judge should "receive evidence (if only by affidavit) and resolve the disputes before deciding whether to certify the class").

802. *See Szabo*, 253 F.3d at 676 (indicating that determining manageability required making a choice-of-law decision that in turn required resolving a factual issue on the merits).

803. 28 U.S.C. § 1407(a) (West 2002).

section 20.1. Prior to overlapping federal cases being transferred, or if the federal cases are not transferred at all, coordination among the judges handling the cases may be critical. Such coordination can be informal, consisting of telephone calls or other communication to minimize conflicts in scheduling and to arrange for the results of discovery to be used in all or most of the related cases. Some judges prefer more formal procedures, such as orders entered in the related cases that establish a coordinated schedule and arrangements for discovery and motions practice.

If the overlapping or duplicative cases are pending in both state and federal courts, there is no formal mechanism for global consolidation. If the federal cases have been transferred to one judge, the transferee court can then contact the other courts to discuss cooperation and coordination. Section 20.31 discusses in more detail approaches to coordination with state courts, particularly after a class action has been certified in the federal court.

Courts rely on a variety of techniques to coordinate overlapping or duplicative cases, such as establishing coordinated schedules for discovery and the filing and briefing of motions. Federal and state judges sometimes jointly hold hearings or arguments on the motions and establish coordinated discovery schedules.

The pendency of overlapping or duplicative cases in other courts may affect the timing of the certification decision. If transfer to a multidistrict litigation (MDL) proceeding is likely, it is usually best to defer certification until the MDL Panel acts (see generally section 20.31). A delay in deciding certification might also be appropriate if other cases in state or federal court are at a more advanced stage in the litigation.

A court may want to defer to other courts that have developed the record necessary to decide certification or are about to decide threshold dispositive motions to dismiss or for summary judgment.[804] Judges sometimes defer certification decisions pending the results of individual actions that are in or nearing trial or summary judgment. For example, in a mass tort case the trial of individual claims might inform a judge considering class certification about the nature of the claims and defenses and whether class certification is proper.[805] On the other hand, if the federal case is more advanced, the judge

---

804. *See, e.g.*, Nolan v. Cooper Tire & Rubber Co., No. CIV.A.01-83, 2001 WL 253865 (E.D. Pa. Mar. 14, 2001) (remanding nationwide class action to state court based in part on conduct originating in New Jersey).

805. *See In re* Norplant Contraceptive Prods. Liab. Litig., 955 F. Supp. 700 (E.D. Tex. 1997) (ruling on first set of bellwether plaintiffs' complaints); *infra* section 22.31 (criteria for aggregating mass tort claims); *see also* Thomas E. Willging, *Beyond Maturity: Mass Tort Case Management in the Manual for Complex Litigation*, 148 U. Pa. L. Rev. 2225, 2253–61 (2000)

may want to accelerate action on certification to protect against inconsistent rulings on class certification, appointment of class counsel, discovery motions, choice of law, and dispositive motions.

Competing class actions may produce a race to certification in different courts for the perceived advantages of a given forum. Such efforts should not influence the timing of the certification decision, and, through coordination with other courts, the judge should avoid facilitating such adversarial contests.

When informal efforts at cooperation and coordination prove unsuccessful, federal courts have on occasion felt it necessary to resort to efforts to stay parallel suits pending in other fora. The Anti-Injunction Act[806] and the All Writs Act[807] define federal court authority to stay or enjoin state court proceedings. Under these statutes, a federal court may enjoin actions in state courts, but only when necessary to aid its jurisdiction.[808] For example, a federal court may enjoin parallel state court actions to protect a class action settlement preliminarily or finally approved in the federal court.[809] Less clear is federal court authority to issue such orders outside the context of a pending settlement and before a class is certified.[810] A federal court considering an injunction

(discussing a multidimensional approach to mass tort case management that includes, among other factors, the concept of maturity). *See generally* McGovern, *Mass Torts for Judges, supra* note 705, at 1841–45 (presenting the concept of maturity, i.e., the idea that individual cases should be adjudicated and evaluated before courts consider certifying a class or otherwise aggregating claims).

806. 28 U.S.C. § 2283 (West 2002).

807. *Id.* § 1651.

808. At least four federal courts of appeals have approved such an injunction in "consolidated multidistrict litigation, where a parallel state court action threatens to frustrate proceedings and disrupt the orderly resolution of the federal litigation." Winkler v. Eli Lilly & Co., 101 F.3d 1196, 1202 (7th Cir. 1996) (citing Carlough v. Amchem Prods., Inc., 10 F.3d 189, 197 (3d Cir. 1993); *In re* Baldwin-United Corp., 770 F.2d 328, 336 (2d Cir. 1985); *In re* Corrugated Container Antitrust Litig., 659 F.2d 1332, 1334–35 (5th Cir. 1981)); *see also, e.g.*, Hanlon v. Chrysler Corp., 150 F.3d 1011, 1025 (9th Cir. 1998) (affirming the district court's injunction of state court proceedings where it had preliminarily approved a nationwide class settlement); White v. Nat'l Football League, 41 F.3d 402, 409 (8th Cir. 1994) (affirming injunction of related proceedings where district court had given final approval to a nationwide class settlement); Carlough v. Amchem Prods., Inc., 10 F.3d 189, 197 (3d Cir. 1993) (same).

809. *Hanlon*, 150 F.3d at 1025; *White*, 41 F.3d at 409; *Carlough*, 10 F.3d at 197; *In re* Baldwin-United Corp., 770 F.2d 328, 336 (2d Cir. 1985); *In re* Corrugated Container Antitrust Litig., 659 F.2d 1332, 1334–35 (5th Cir. 1981).

810. *See In re* Bridgestone/Firestone Tires Prods. Liab. Litig., Nos. 03-1-1399 & 03-1564 (7th Cir. June 20, 2003) (once federal appellate court held nationwide class action improper, federal district courts required to enjoin members of the putative national classes and their lawyers to have nationwide classes certified over defendants opposition with respect to same claims). *See also* Newby v. Enron Corp., 302 F.3d 295, 300 (5th Cir. 2002) (indicating *in dicta* that a district

or similar action directed toward parallel state court actions, before the federal court has certified a class or preliminarily approved a settlement, should be cautious in doing so; it is critical that the court be clear and precise in identifying the legal and factual basis for the injunction and the parties against whom the injunction operates.

## 21.2  Deciding the Certification Motion

.21 Certification Hearings and Orders  266
.22 Type and Definition of Class  268
   .221 Type of Class  268
   .222 Definition of Class  270
.23 Role of Subclasses  272
.24 Role of Issues Classes  272
.25 Multiple Cases and Classes: The Effect on Certification  274
.26 Appointment of the Class Representatives  276
.27 Appointment of Class Counsel  278
   .271 Criteria for Appointment  278
   .272 Approaches to Selecting Counsel  279
   .273 Procedures for Appointment  282
.28 Interlocutory Appeals of Certification Decisions  282

## 21.21  Certification Hearings and Orders

A hearing under Federal Rule of Civil Procedure 23(c) is a routine part of the certification decision. The nature and scope of the disputed issues relating to class certification bear on the kind of hearing[811] the judge should conduct. An evidentiary hearing may be necessary in a challenge to the factual basis for a

---

judge could not issue an injunction restraining a lawyer from filing related state court proceedings absent a pattern of abuse); *In re* Inter-Op Hip Prosthesis Prod. Liab. Litig., No. 01-4039, 2001 WL 1774017, at *2 (6th Cir. Oct. 29, 2001) (staying injunction against members of the proposed class in conditionally certified class "[b]ecause the validity of the proposed settlement is questionable"). *See also infra* section 31.32.

811. Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 676 (7th Cir. 2001) ("Before deciding whether to allow a case to proceed as a class action, therefore, a judge should make whatever factual and legal inquiries are necessary under Rule 23."); Marisol A. *ex rel.* Forbes v. Giuliani, 126 F.3d 372, 379 (2d Cir. 1997) (affirming certification but ordering the district court to create subclasses and "[i]f necessary, . . . allow additional discovery and hold evidentiary hearings in order to determine which classifications may be appropriate"); Morrison v. Booth, 730 F.2d 642, 644 (11th Cir. 1984) (remanding and holding that an evidentiary hearing on class certification is required unless clear grounds for denying certification exist); *cf. In re* Domestic Air Transp. Antitrust Litig., 137 F.R.D. 677, 682 n.4 (N.D. Ga. 1991) (holding that discretionary evidentiary hearing need not afford defendants unlimited opportunity to examine or cross-examine witnesses opposing class certification and addressing the merits).

class action.[812] Disputed facts material to deciding certification may be narrowed or eliminated by stipulations, requests for admission, affidavits, or declarations. The parties should submit a statement of stipulated facts and identify disputed facts relevant to Rule 23 issues using the general procedure described in section 11.47. When there is disagreement over the legal standards but not over the facts material to the certification decision, the court may rely on the parties' stipulations of fact, affidavits, declarations, and relevant documents to establish the factual record. In such a case, a hearing may be limited to argument over whether the certification requirements are met. A hearing is appropriate, even if the parties jointly move for certification of a class for settlement and for approval of the settlement class. A hearing ensures a full record, particularly if it is unclear that the certification standards are met or if there are likely to be objections to the settlement.

An evidentiary hearing to resolve disputed facts relevant to the certification decision should not be a minitrial on the merits of the class or individual claims.[813] Instead, the parties should present facts and arguments to let the judge determine the nature of the claims and defenses and how they will be presented at trial, whether there are common issues that can be tried on a class-wide basis, and whether those common issues predominate and class treatment is a superior method of resolving them. The judge may limit the number of witnesses, require depositions to be summarized, call for written statements of the direct evidence, and use other techniques described in section 12.5 for nonjury proceedings.[814]

If the parties have submitted a trial plan to aid the judge in determining whether certification standards are met, the certification hearing provides an opportunity to examine the plan and its feasibility.

Expert witnesses play a limited role in class certification hearings; some courts admit testimony on whether Rule 23 standards, such as predominance and superiority, have been met.[815] The judge need not decide at the certification stage whether such expert testimony satisfies standards for admissibility at

---

812. *See* Gen. Tel. Co. v. Falcon, 457 U.S. 147, 157–60 (1982).

813. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177–78 (1974).

814. *In re Domestic Air*, 137 F.R.D. at 682 (allowing each side to use written statements of expert witnesses).

815. *See, e.g.*, *In re* Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 134–35 (2d Cir. 2001) (affirming district court's reliance on plaintiff's expert testimony to support its decision to certify a class), *cert. denied*, 536 U.S. 917 (2002); *In re* Linerboard Antitrust Litig., 203 F.R.D. 197, 214–18 (E.D. Pa. 2001) (relying on an econometrics expert to show that issues relating to common impact and common damages predominate and are susceptible to class-wide proof); *In re* Cardizem CD Antitrust Litig., 200 F.R.D. 297, 321–26 (E.D. Mich. 2001) (using expert testimony to show a plausible method of proving class-wide damages).

trial. Courts have applied a high threshold for assessing the need for expert testimony at the certification stage.[816] A judge should not be drawn prematurely into a battle of competing experts.[817]

After the hearing, the court should enter findings of fact and conclusions of law addressing each of the applicable criteria of Rule 23. Failure to make such findings may result in reversal or remand for further proceedings after interlocutory appeal under Rule 23(f).[818]

Rule 23(c)(1)(B) specifies that an order certifying a class must define the class membership and identify the class claims, issues, or defenses. It also requires that the order appoint class counsel under Rule 23(g). An order certifying a Rule 23(b)(3) class must inform the members of the proposed class when and how they may elect to opt out.[819]

## 21.22  Type and Definition of Class

.221 Type of Class  268
.222 Definition of Class  270

### 21.221  Type of Class

The certification order must specify whether Rule 23(b)(1), (b)(2), or (b)(3) forms the basis for certification. Members of a Rule 23(b)(3) class are entitled to individual notice and an opportunity to opt out.[820] Rules 23(b)(1)

---

816.  *See, e.g.*, *In re Visa*, 280 F.3d at 135 ("A district court must ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law." (citing Cruz v. Coach Stores, Inc., 96 Civ. 8099, 1998 U.S. Dist. LEXIS 18051, at *13 n.3 (S.D.N.Y. Nov. 18, 1998))); Vickers v. Gen. Motors Corp., 204 F.R.D. 476, 479 (D. Kan. 2001) (same).

817.  *See, e.g.*, *In re Visa*, 280 F.3d at 135 ("[A] district court may not weigh conflicting expert evidence or engage in 'statistical dueling' of experts." (citing Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 292 (2d Cir. 1999))); *In re Linerboard*, 203 F.R.D. at 217 n.13 (same); *see also In re* Polypropylene Carpet Antitrust Litig., 996 F. Supp. 18, 30 (N.D. Ga. 1997) (noting that "the evidence relied upon . . . has not been subjected to the adjudicative process" and that class certification "'should not be viewed as a prediction that Plaintiffs will ultimately prevail on the merits'" (quoting Diaz v. Hillsborough County Hosp. Auth., 165 F.R.D. 689, 692 (M.D. Fla. 1996))).

818.  *See* Consol. Edison Co. of N.Y. v. Richardson, 233 F.3d 1376, 1384 (Fed. Cir. 2000) (remanding issue of certification because district court provided no reasons for its denial), *amended by* No. 99-1436, 2000 U.S. App. LEXIS 35446, at *22–*23 (Fed. Cir. Feb. 27, 2001); *see also* Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 149–50 (4th Cir. 2001) (vacating and remanding for determination of factual issue); Prado-Steiman *ex rel.* Prado v. Bush, 221 F.3d 1266, 1276 (11th Cir. 2000) (noting "a limited or insufficient record may adversely affect the appellate court's ability to evaluate fully and fairly the class certification decision").

819.  Fed. R. Civ. P. 23(c)(2)(B).

820.  *Id.*

and (b)(2) do not mandate notice or an opt-out opportunity, but amended Rule 23(c)(2)(A) recognizes a court's discretion to require notice of class certification in such cases. See section 21.311.[821]

A class action seeking injunctive and declaratory relief may also include a claim for monetary relief, and the judge must decide whether a class should be certified under Rule 23(b)(2) or (b)(3).[822] Courts have held that where money damages constitute the primary relief requested, even though injunctive relief is also sought, the class must be certified under Rule 23(b)(3) and must meet due process requirements.[823] In such cases, the notice and opt-out requirements of that subsection apply, even if the class also qualifies for certification under Rule 23(b)(1) or (b)(2).[824] On the other hand, where the damages flow directly from the equitable remedy, without the need for individual calculation, some courts have held that Rule 23(b)(2) is the only standard that must be met.[825] The circuits have divided on the resolution of this issue, which arises most often in employment discrimination class actions.

---

821. A court has discretion under Rules 23(d)(2) and (d)(5) to permit a class member to exclude itself from a Rule 23(b)(1)(B) class. County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1304–05 (2d Cir. 1990). A court is not precluded from defining a class under Rule 23(b)(1) or (b)(2) to include only those potential class members who do not opt out of the litigation. Such a definition may be appropriate in some Rule 23(b)(2) cases or in a Rule 23(b)(1)(B) case in which the class was formed merely because separate actions by class members might impede their ability to protect their interests. *See, e.g.*, Penson v. Terminal Transp. Co., 634 F.2d 989, 993 (5th Cir. 1981).

822. Eubanks v. Billington, 110 F.3d 87, 91–92 (D.C. Cir. 1997). The above cases deal with employment discrimination actions. Courts have similarly divided over whom to certify in proposed mass tort medical monitoring class actions, and whether under Rule 23(b)(2) or (b)(3). *See infra* section 22.74 (medical monitoring class actions).

823. Allison v. Citgo Petroleum Corp., 151 F.3d 402 (5th Cir. 1998); *see also* Molski v. Gleich, 318 F.3d 937, 947–48 (9th Cir. 2003) (holding in a case primarily seeking injunctive relief that release in settlement of claims for individual damages triggers applicability of Rule 23(b)(3) requirements of individual notice and the right to opt out); Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894 (7th Cir. 1999).

824. *In re* Ikon Office Solutions, Inc. Sec. Litig., 209 F.R.D. 94, 101–02 (E.D. Pa. 2002) (certifying Rule 23(b)(1) and (b)(3) settlement classes with first-class mail notice supplemented by publication and Internet posting); Wilson v. United Int'l Investigative Servs. 401(k) Sav. Plan, No. CIV.A.01-CV-6126, 2002 WL 734339, at *6–*7 (E.D. Pa. Apr. 23, 2002) (certifying Rule 23(b)(2) and (b)(3) class with individual notice pursuant to Rule 23(c)(2)).

825. *See Allison*, 151 F.3d at 414–15, and cases cited therein. Damages would be incidental to an injunction when a statute serving as the basis for an injunction also establishes a fixed sum as damages. Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 164 (2d Cir. 2001) (holding that Rule 23(b)(2) certification is permissible if the district court finds that "'the positive weight or value [to the plaintiffs] of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed'" and that "class treatment would be

### 21.222 Definition of Class

Defining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the "best notice practicable" in a Rule 23(b)(3) action. The definition must be precise, objective, and presently ascertainable. For example, the class may consist of those persons and companies that purchased specified products or securities from the defendants during a specified period, or it may consist of all persons who sought employment or who were employed by the defendant during a fixed period.

Although the identity of individual class members need not be ascertained before class certification, the membership of the class must be ascertainable. Because individual class members must receive the best notice practicable and have an opportunity to opt out, and because individual damage claims are likely, Rule 23(b)(3) actions require a class definition that will permit identification of individual class members, while Rule 23(b)(1) or (b)(2) actions may not.[826] An identifiable class exists if its members can be ascertained by reference to objective criteria. The order defining the class should avoid subjective standards (e.g., a plaintiff's state of mind) or terms that depend on resolution of the merits (e.g., persons who were discriminated against).[827] The order should use objective terms in defining persons to be excluded from the class, such as affiliates of the defendants, residents of particular states, persons who have filed their own actions, or members of another class.

A class may be defined to include individuals who may not become part of the class until later. Such "future claimants" are primarily a feature of those mass tort actions involving latent injury. Section 22.1 defines the three types of mass tort future claimants. Apart from mass tort cases, membership in a Rule 23(b)(3) class ordinarily should be ascertainable when the court enters judgment. There is no need to identify every individual member at the time of certification of a Rule 23(b)(2) class action for injunctive relief as long as the court can determine at any given time whether a particular individual is a

---

efficient and manageable" (quoting *Allison*, 151 F.3d at 430 (Dennis, J., dissenting))), *cert. denied*, 535 U.S. 951 (2002).

826. *Garrish v. United Auto., Aerospace, & Agric. Implement Workers*, 149 F. Supp. 2d 326, 331 (E.D. Mich. 2001) (finding that the plaintiff's definition of the Rule 23(b)(3) class is "readily ascertainable by reference to objective criteria"); *see generally* 5 Moore et al., *supra* note 626, §§ 23.21[1] & 23.21[3] (discussing how a precise class definition allows courts to determine whether a particular individual is a member of the proposed class and who is entitled to notice).

827. *See, e.g.*, *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D. Pa. 1995) ("defining the purported class as 'all residents and businesses who have received unsolicited facsimile advertisements' requires addressing the central issue of liability" and "[d]etermining a membership in the class would essentially require a mini-hearing on the merits of each case").

member of the class.[828] See section 21.24 for a discussion of issues classes certified under Rule 23(c)(4).

The court should also consider whether the class definition captures all members necessary for efficient and fair resolution of common questions of fact and law in a single proceeding. If the definition fails to include a substantial number of persons with claims similar to those of the class members, the definition of the class may be questionable. A broader class action definition or separate class might be more appropriate. If the class definition includes people with similar claims but divergent interests or positions, subclasses with separate class representatives and counsel might suffice.

The applicable substantive law and choice-of-law considerations may also affect the appropriate scope of the class.[829] The difficulties posed by these considerations are likely to be compounded in nationwide or multistate class action litigation raising state law claims or defenses. Differences in applicable law and the number of divergent interests may lead a court to decline to certify a class.[830]

The class definition should describe the operative claims, issues, or defenses, such as injury resulting from securities fraud or denial of employment on account of race.[831] The relevant time should be included in the class definition. The relevant time, often referred to as the "class period," is, for example, the period during which members of the proposed class incurred the claimed injury. The order should delineate how the class representatives meet the commonality and typicality requirements of Rule 23(a).[832] In a Rule 23(b)(3) case, defining the class and the class claims in the order helps confirm

---

828.  Robertson v. Nat'l Basketball Ass'n, 389 F. Supp. 867, 897 (S.D.N.Y. 1975).

829.  A court to which cases have been transferred, through multidistrict proceedings or otherwise, is obliged to apply the choice-of-law rules of the transferor court. Van Dusen v. Barrack, 376 U.S. 612 (1964). Courts have applied *Van Dusen* to proceedings under the multidistrict litigation statute. *See* Larry Kramer, *Choice of Law in Complex Litigation*, 71 N.Y.U. L. Rev. 547, 552 n.14 (1996) (citing case law).

830.  *In re* Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig., 288 F.3d 1012 (7th Cir. 2002); Spence v. Glock, 227 F.3d 308, 313 (5th Cir. 2000); Castano v. Am. Tobacco Co., 84 F.3d 734, 741 (5th Cir. 1996).

831.  Fed. R. Civ. P. 23(c)(2)(B). A description of the claims made on behalf of or against the class will be useful if questions relating to preclusive effects arise in later litigation. *See* Collins v. E.I. Dupont de Nemours & Co., 34 F.3d 172, 179–80 (3d Cir. 1994); *cf.* Cooper v. Fed. Reserve Bank, 467 U.S. 867, 880–81 (1984) (judgment against class in Title VII action bars only "class claims" and individual claims actually tried).

832.  Gen. Tel. Co. v. Falcon, 457 U.S. 147 (1982) (meritorious individual claim of employment discrimination in promotion could not serve as a basis for certifying a class claim relating to "across the board" hiring practices).

that class treatment is superior to other available methods for the fair and efficient adjudication of the controversy.[833]

## 21.23  Role of Subclasses

Subclasses must be created when differences in the positions of class members require separate representatives and separate counsel. Those differences may arise from a variety of sources. Subclassing sometimes represents a workable solution to differences in substantive law and for choice-of-law difficulties. For example, in tort cases class members may have different levels of exposure to the same allegedly toxic substance, allege different types and degrees of injury, or seek different relief. Class members who have been exposed to a toxic substance but have no present injury (so-called future claimants) have an interest in ensuring that they will receive adequate compensation if an injury manifests itself in the future; those whose exposure has already resulted in injury have a conflicting interest in maximizing the present recovery for the damage they have already sustained. In securities fraud cases, class members may have received different information or communications at different times, requiring the creation of subclasses.

Each class or subclass must independently satisfy all the prerequisites of Rules 23(a) and (b).[834] The necessity of a large number of subclasses may indicate that common questions do not predominate. The creation of a number of subclasses may result in some that are too small to satisfy the numerosity requirement, may make the case unmanageable, or, in a Rule 23(b)(3) suit, may defeat the superiority requirement. Denial of class status in such circumstances is appropriate; if conflicts and differences among class members are so sharp that a number of small subclasses result, class treatment may not be justified in the first place.

## 21.24  Role of Issues Classes

Rule 23(c)(4)(A) permits a class to be certified for specific issues or elements of claims raised in the litigation.[835] Selectively used, this provision

---

833. Fed. R. Civ. P. 23(b)(3); *see also In re* Fibreboard Corp., 893 F.2d 706 (5th Cir. 1990); Cimino v. Raymark Indus., Inc., 751 F. Supp. 649 (E.D. Tex. 1990), *vacated in part*, 151 F.3d 297 (5th Cir. 1998). *See infra* section 22.

834. Fed. R. Civ. P. 23(c)(4)(B); *see, e.g., In re* Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 209 F.R.D. 323, 351 (S.D.N.Y. 2002).

835. *See, e.g.,* Cent. Wesleyan Coll. v. W.R. Grace & Co., 6 F.3d 177, 184 (4th Cir. 1993) (class certified for eight common issues); Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 472–73

may enable a court to achieve the economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action.[836] A court may certify a Rule 23(b)(3) class for certain claims, allowing class members to opt out, while creating a non-opt-out Rule 23(b)(1) or (b)(2) class for other claims.[837] Certification of an issues class is appropriate only if it permits fair presentation of the claims and defenses and materially advances the disposition of the litigation as a whole.[838] If the resolution of an issues class leaves a large number of issues requiring individual decisions, the certification may not meet this test. In product-liability cases, there is a split of authority as to whether questions relating to product defects should be certified in an issues class.[839]

(5th Cir. 1986) (class action to adjudicate "state of the art" defense); Weathers v. Peters Realty Corp., 499 F.2d 1197 (6th Cir. 1974) (class for injunctive relief).

836. *See, e.g.*, Halderman v. Pennhurst State Sch. & Hosp., 612 F.2d 84 (3d Cir. 1979) (dictum), *rev'd on other grounds*, 451 U.S. 1 (1981). This appears to have been the intention of the drafters of the clause. *See* Fed. R. Civ. P. 23(c)(4) committee note (1966 amendment). Courts have, for example, considered the propriety of post-verdict proceedings in class actions under the securities acts in which, after the jury has determined liability, individual plaintiffs could seek recovery for qualifying shares. *See* Biben v. Card, 789 F. Supp. 1001, 1003 (W.D. Mo. 1992) (bifurcating trial proceeding into liability determination phase and individual claims for damages phase); Jaroslawicz v. Engelhard Corp., 724 F. Supp. 294, 302–03 (D.N.J. 1989) ("[I]t is well settled that the issue of liability may be tried separately from the damage claims of individual class members."). If filing a claim is the only way for class members to recover individual damages, this process amounts to a "claims class," that is, one in which liability has been determined on a class-wide basis, and individual damages are based on reviewing individual claims from class members.

837. *In re* Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 147 (2d Cir. 2001); *see also* Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147 (2d Cir. 2001), *cert. denied*, 535 U.S. 951 (2002).

838. *Robinson*, 267 F.3d at 167 n.12 ("'the issues covered by the request be such that their resolution (as a class matter) will materially advance a disposition of the litigation as a whole'" (quoting *In re* Tetracycline Cases, 107 F.R.D. 719, 727 (W.D. Mo. 1985))). *See also MTBE*, 209 F.R.D. at 352–53.

839. *See infra* section 22.75. *Compare In re* Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1302–03 (7th Cir. 1995) (rejecting the use of an issues class in product liability case because of individual liability issues), *and* Castano v. Am. Tobacco Co., 84 F.3d 734, 745 n.21 (5th Cir. 1996) (same), *with* Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996) (indicating that even "if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues"). *See also* Bolin v. Sears, Roebuck & Co., 231 F.3d 970, 976 (5th Cir. 2000) (reciting the advantages of claim-by-claim certification and remanding case for determination of whether certification of a modified class with respect to some of the claims under Rule 23(b)(2) or (b)(3) would be proper).

An issues-class approach contemplates a bifurcated trial where the common issues are tried first, followed by individual trials on questions such as proximate causation and damages. A bifurcated trial must adequately present to the jury applicable defenses and be solely a class trial on liability.[840] There is a split of authority on whether the Seventh Amendment is violated by asking different juries to decide separate elements of a single claim.[841]

Before certifying an issues class under Rule 23(d), the judge should be satisfied that common questions are sufficiently separate from other issues and that a severed trial will not infringe any party's constitutional right to a jury trial and will permit all the parties fairly to present the claims and defenses.[842]

## 21.25  Multiple Cases and Classes: The Effect on Certification

The broad range of venues available in class actions means that competing, conflicting, or overlapping suits are often simultaneously pending in state and federal courts. Any of the following circumstances or combinations of circumstances may exist:

- multiple cases with similar class allegations, each of which might be appropriately certified under Rule 23 but which may overlap or conflict if more than one is certified;
- cases alleging a nationwide class and cases seeking multistate or single-state class certification pending in different courts at the same time;
- cases filed as class actions in federal and state courts relating to the same type of transactions and involving some or all of the same parties;
- cases filed by the same lawyers seeking to represent an overlapping or duplicative class of plaintiffs in order to obtain the most favorable forum;
- cases filed by different lawyers competing for the fastest and most favorable rulings on class certification and appointment as class counsel;

840. *In re Rhone-Poulenc*, 51 F.3d at 1299.

841. *Compare In re Rhone-Poulenc*, 51 F.3d at 1303 (holding that the Seventh Amendment includes "a right to have juriable issues determined by the first jury impaneled to hear them"), *with Robinson*, 267 F.3d at 169 ("Trying a bifurcated claim before separate juries does not run afoul of the Seventh Amendment" as long as a single factual issue is not "tried by different, successive juries."). *See also* Steven S. Gensler, *Bifurcation Unbound*, 75 Wash. L. Rev. 705, 736–37 (2000); Patrick Woolley, *Mass Tort Litigation and the Seventh Amendment Reexamination Clause*, 83 Iowa L. Rev. 499 (1998).

842. *See* Gasoline Prods. Co. v. Champlin Ref. Co., 283 U.S. 494, 500 (1931); Alabama v. Blue Bird Body Co., 573 F.2d 309, 318 (5th Cir. 1978). *See also supra* section 21.132.

- multiple individual actions or other forms of aggregate litigation pending in state and federal courts, raising the same issues and involving some or all of the same parties; or

- prior unsuccessful class certification efforts in state or federal courts.

A judge should be mindful of the various possibilities in deciding the best approach to precertification case management, in deciding whether and for what purpose to certify a class action, and in determining how to define the class. The first step is to obtain complete information from the parties about other pending or terminated actions in federal or state courts relating to the claims presented.

If all the cases are pending in federal court and have been centralized by an MDL proceeding, the transferee court can order consolidated pleadings and motions to decide how to resolve competing claims for certification, appointment of class counsel, and appointment of lead class counsel. See section 21.27. Counsel sometimes request certification of multiple classes and subclasses primarily to gain appointment to positions of leadership in the litigation. The court should attempt to distinguish such requests from competing certification motions that reflect more significant differences.

If multiple class actions or individual actions are pending at the same time in one or more federal and state courts, the certification decision requires the judge to consider the relationship among the cases. Federal class actions may encompass plaintiffs who are parties to individual cases or members of proposed class actions pending in other federal courts. If the MDL Panel has not been asked to centralize those cases, a court that has gathered information about the cases' status might discuss with counsel whether MDL status should be sought. In order to enable and facilitate essential intercourt communication and as an ongoing duty of candor to the tribunal, the court should, at an early date, call on counsel to disclose all related actions in other courts (state or federal) that may involve multiple, overlapping, or competing class allegations. Whether the related cases are pending in other federal or state courts, the federal judge asked to certify a class action that will overlap with or duplicate parallel cases should communicate with the judges handling the other proceedings and coordinate approaches to the class certification issues, including precertification discovery, motions, arguments, and proposed class definitions. See sections 20.14 and 20.31.

If each case meets the Rule 23 requirements, the judge has broad discretion in deciding which of several related cases to certify as a class action. A number of factors are relevant to this decision:

- the extent and nature of other litigation;[843]
- choice-of-law consequences (see section 21.23);
- whether persons who are class members under the allegations of one complaint are also included as members of other classes pleaded in other courts; and
- the existence of parallel state court actions.

If a state court class action has proceeded to certification before the federal action, there may be no need for the federal action. If the federal court finds that a certifiable class exists, it might define that class so as to exclude the members of a certified state class,[844] thus preventing needless conflicts between state and federal proceedings.

To the extent that these problems relate to differences in pleadings in different cases, they may be solved by ordering or allowing the filing of a consolidated complaint that amends existing complaints to add the necessary or appropriate claims and parties. A single pleading, in a single action, can then serve as the vehicle for defining the proposed class and deciding class certification.

A federal class action may include plaintiffs who are members of state classes. Because a prior resolution of the federal action may have a preclusive effect on claims pending in state courts, it is important to give adequate notice to enable individual state plaintiffs[845] to decide whether to opt out. Note, however, that a judgment in a federal non-opt-out Rule 23(b)(1) or (b)(2) class case has the practical effect of an injunction against the state court proceeding.[846] See section 21.3.

## 21.26  Appointment of the Class Representatives

The judge must appoint one or more representatives of the class and any subclass. The Private Securities Litigation Reform Act (PSLRA) requires that a class representative act independently of counsel, be familiar with the subject

---

843. *See* Califano v. Yamasaki, 442 U.S. 682, 703 (1979) (need to consider whether proposed nationwide class would improperly interfere with similar pending litigation in other courts).

844. *See, e.g.*, *In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, 1999 U.S. Dist. LEXIS 13228, at *49–*50 (E.D. Pa. Aug. 26, 1999) (conditionally certifying nationwide medical monitoring class that excludes members of certified state medical monitoring classes).

845. Due process for individual class members requires that the decision whether or not to opt out rests with the individual and not be made by a class representative or class counsel. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1024–25 (9th Cir. 1998); *see also* Conte & Newberg *supra* note 739, § 16.16 at 210.

846. *See In re* Fed. Skywalk Cases, 680 F.2d 1175 (8th Cir. 1982).

matter of the complaint, and authorize initiation of the action.[847] In other kinds of class actions as well, courts have required that representatives be knowledgeable about the issues in the case. This does not necessarily require legal experience or expertise on the part of the representative, who is usually a layperson. No particular level of education or sophistication is required.[848] In all cases, the representatives must be free of conflicts and must represent the class adequately throughout the litigation. The judge must ensure that the representatives understand their responsibility to remain free of conflicts and to vigorously pursue the litigation in the interests of the class,[849] including subjecting themselves to discovery.

Later replacement of a class representative may become necessary if, for example, the representative's individual claim has been mooted or otherwise significantly altered. Replacement also may be appropriate if a representative has engaged in conduct inconsistent with the interests of the class or is no longer pursuing the litigation.[850] In such circumstances, courts generally allow class counsel time to make reasonable efforts to recruit and identify a new representative who meets the Rule 23(a) requirements. The court may permit intervention by a new representative or may simply designate that person as a representative in the order granting class certification.[851]

---

847. 15 U.S.C. § 78u-4(a)(2)(A) (2000). *See generally* Berger v. Compaq Computer Corp., 257 F.3d 475 (5th Cir. 2001), *reh'g denied*, 279 F.3d 313 (2002); *see also In re* Cell Pathways, Inc., Sec. Litig. II, 203 F.R.D. 189, 193–94 (E.D. Pa. 2001) (granting a post-PSLRA motion of a group of four businessmen to serve as lead plaintiffs indicating that they were all "sophisticated businessmen who share a substantial and compelling interest in vigorously prosecuting the claims on behalf of the class"). In a nonsecurities context, courts have commented that demanding a high degree of sophistication from class representatives is inconsistent with allegations in consumer cases that defendants' conduct targets those who are not sophisticated. *See* Dienese v. McKenzie Check Advance of Wis., L.L.C., No. 99-C-50, 2000 U.S. Dist. LEXIS 20389, at *20 (E.D. Wis. Dec. 11, 2000); *see also* Morris v. Transouth Fin. Corp., 175 F.R.D. 694, 698 (M.D. Ala. 1997) (holding that an unsophisticated consumer's reliance on counsel to investigate and litigate the case does not make this plaintiff an inadequate class representative).

848. *See* cases cited *supra* note 789.

849. *See In re* Storage Tech. Corp. Sec. Litig., 113 F.R.D. 113, 118 (D. Colo. 1986) (disqualifying named plaintiffs who failed to appear at depositions and another who appeared too passive to prosecute the case vigorously); 1 Conte & Newberg, *supra* note 739, § 3:22, at 409–14.

850. *See* Greenfield v. U.S. Healthcare, Inc., 146 F.R.D. 118 (E.D. Pa. 1993).

851. *See In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 172 F.R.D. 271, 283 (S.D. Ohio 1997) (court named substitute new class representative without formal intervention joinder); *see also* Shankroff v. Advest, Inc., 112 F.R.D. 190, 194 (S.D.N.Y. 1986) (sole proposed representative found inadequate, although other class certification criteria were met; plaintiff's counsel were given thirty days to propose at least one substitute representative).

Aside from the need to replace a class representative, formal intervention by class members is infrequent. Intervention is not necessary for a class member to pursue an appeal after objecting to a class settlement.[852] Class members in Rule 23(b)(3) actions may, however, appear by their own attorneys, subject to the court's power to adopt appropriate controls regarding the organization of counsel.

## 21.27  Appointment of Class Counsel

.271 Criteria for Appointment  278
.272 Approaches to Selecting Counsel  279
.273 Procedures for Appointment  282

Rules 23(c)(1)(B) and 23(g) recognize that the certification decision and order require judicial appointment of counsel for the class and any subclasses. This section deals with that process. Sections 21.7 and 14 discuss the procedures for reviewing and awarding attorney fees for class counsel.

Unlike other civil litigation, many class action suits do not involve a client who chooses a lawyer, negotiates the terms of the engagement, and monitors the lawyer's performance. Those tasks, by default, fall to the judge, who creates the class by certifying it and must supervise those who conduct the litigation on behalf of the class. The judge must ensure that the lawyer seeking appointment as class counsel will fairly and adequately represent the interests of the class.[853] If the certification decision includes the creation of subclasses reflecting divergent interests among class members, each subclass must have separate counsel to represent its interests.[854]

### 21.271  Criteria for Appointment

Rule 23(g) sets out the criteria and procedures for appointment of class counsel. In every case, the judge must inquire into the work counsel has done in investigating and identifying the particular case; counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; counsel's knowledge of the applicable law; the resources counsel will commit to representing the class; and any other factors that bear on the attorney's ability to represent the class fairly and adequately. This last category may include the ability to coordinate the litigation with other state and federal

---

852.  Devlin v. Scardelletti, 536 U.S. 1, 14 (2002) (holding that "nonnamed class members . . . who have objected in a timely manner to approval of the settlement at the fairness hearing have the power to bring an appeal without first intervening").

853.  Fed. R. Civ. P. 23(g)(1)(B).

854.  Fed. R. Civ. P. 23(g)(1)(A) committee note.

class and individual actions involving the same subject matter. Those seeking appointment as class counsel must identify related litigation in which they are participating. It is important for the judge to ensure that counsel does not have a conflict with class interests.[855]

In many cases, the lawyers who filed the suit will be the obvious or only choice to be appointed counsel for the class. In such cases, the judge's task is to determine whether the applicant is able to provide adequate representation for the class in light of the Rule 23(g)(1)(C) factors.

The judge must choose the class counsel when more than one class action has been filed and consolidated or centralized, or more than one lawyer seeks the appointment. The term "appoint" here means to "select" as well as to "designate" the lawyer as class counsel. If there are multiple applicants, the court's task is to select the applicant best able to represent the interests of the class. No single factor is dispositive in evaluating prospective class counsel. In addition to those listed above, relevant considerations might include

- involvement in parallel cases in other courts;
- any existing attorney–client relationship with a named party; and
- fee and expense arrangements that may accompany the proposed appointment.

## 21.272 Approaches to Selecting Counsel

There are several methods for selecting among competing applicants. By far the most common is the so-called "private ordering" approach: The lawyers agree who should be lead class counsel and the court approves the selection after a review to ensure that the counsel selected is adequate to represent the class interests.[856] Counsel may agree to designate a particular lead class counsel in exchange for commitments to share the legal work and fees. To guard against overstaffing and unnecessary fees,[857] the court should order the attorneys to produce for court examination any agreements they have made relating to fees or costs.[858] See section 21.631.

---

855. For an overview of possible conflicts of interest and other abuses (such as the "reverse auction" settlement in which defendant seeks to settle with counsel willing to accept the lowest offer), see sources cited *supra* note 737 and see *infra* sections 21.611–21.612.

856. *See* Third Circuit Task Force Report on Selection of Class Counsel, 74 Temp. L. Rev. 689, 693–94 (2001) [hereinafter Third Circuit 2001 Task Force Report]; *see generally supra* section 14.

857. *See, e.g.*, *In re* Fine Paper Antitrust Litig., 98 F.R.D. 48 (E.D. Pa. 1983), *modified*, 751 F.2d 562 (3d Cir. 1984).

858. *See* Fed. R. Civ. P. 23(h) committee note; *see also* Fed. R. Civ. P. 23(e)(2) (settlement approval); Fed. R. Civ. P. 54(d)(2)(B) (attorney fees motions).

In the "selection from competing counsel" approach, the judge selects from counsel who have filed actions, are unable to agree on a lead class counsel, and are competing for appointment. The lawyer best able to represent the class's interests may emerge from an examination of the factors listed in Rule 23(g)(1)(C), as well as other factors, such as those delineated above.

A third and relatively novel approach, competitive bidding, entails inviting applicants for appointment as class counsel to submit competing bids. The fees to be awarded are one of the many factors in the selection.[859] Rules 23(g)(1)(iii) and 23(g)(2)(C) expressly permit the court to consider fee arrangements in appointing counsel. Some judges propose a fee structure as a framework for comparing bids for different percentages at different levels of recovery.[860]

Judges in antitrust and securities class actions have used competitive bidding to select counsel and to establish in advance a rate or formula for calculating attorney fees. Studies suggest that bidding may be more appropriate when

- prospective damages are relatively high;
- the chances of success are relatively predictable;
- prefiling investigative work was conducted by governmental agencies or others, so that the lawyers' foundational work is minimal; and
- the bidding process does not directly conflict with statutory or policy goals.

Bidding remains an experimental approach to selecting counsel and establishing presumptive fee levels.[861]

---

859. *See* Third Circuit 2001 Task Force Report, *supra* note 856, at 715–22; Laural L. Hooper & Marie Leary, Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study (Federal Judicial Center Aug. 29, 2001), *reprinted in* 209 F.R.D. 519 (2002); *see also In re* Auction Houses Antitrust Litig., 197 F.R.D. 71 (S.D.N.Y. 2000); *In re* Amino Acid Lysine Antitrust Litig., 918 F. Supp. 1190 (N.D. Ill. 1996); *In re* Wells Fargo Sec. Litig., 156 F.R.D. 223 (N.D. Cal.), *later proceedings at* 157 F.R.D. 467 (N.D. Cal. 1994); *In re* Oracle Sec. Litig., 131 F.R.D. 688 (N.D. Cal.), *later proceedings at* 132 F.R.D. 538 (N.D. Cal. 1990), *and* 136 F.R.D. 639 (N.D. Cal. 1991); *supra* section 10.224. *See generally* Alan Hirsch & Diane Sheehey, Awarding Attorneys' Fees and Managing Fee Litigation 99–101 (Federal Judicial Center 1994); Steven A. Burns, Note, *Setting Class Action Attorneys' Fees: Reform Efforts Raise Ethical Concerns*, 6 Geo. J. Legal Ethics 1161 (1993).

860. For examples of fee structures that were used in the bidding cases, see Hooper & Leary, *supra* note 859, at 34–45, reprinted in 209 F.R.D. at 561–73 (documenting key features of the various bidding approaches used in all twelve bidding cases identified in this descriptive study).

861. *See generally* Hooper & Leary, *supra* note 859; Third Circuit 2001 Task Force Report, *supra* note 856.

Cases in which liability is relatively clear and the amount of damages relatively predictable may be particularly good candidates for *ex ante* fee setting. Even if there is no court-ordered competition, a court may consider asking counsel to submit fee proposals to help analyze which application is best able to represent the class. In any case in which the judge does not appoint as class counsel the attorneys who investigated and filed the case, those attorneys may be entitled to compensation based on work performed. See section 14.12.

The Private Securities Litigation Reform Act of 1995 mandates an "empowered-plaintiff" approach to appointment of counsel in securities class actions.[862] This statute-based model provides that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."[863] Section 31.3 provides a useful analogy for similar class actions brought by sophisticated plaintiffs with large losses or sizeable claims.

The order that appoints counsel might specify some of the criteria the judge expects to use in determining a fee award. The order can include provisions that will affect the fees *ex ante*[864] as part of the appointment process, even in jurisdictions that require a searching and detailed *ex post* review of the fee award at the end of the case. For example, the court can clarify whether it will use the percentage or lodestar method or a combination of the two in calculating fees. The judge can also specify terms that may reduce duplicative work, unnecessary hours, and unnecessary costs, such as agreements on the numbers of lawyers who may appear at depositions or agreements on the types of permissible expenses. See section 14.211. With the percentage-of-fund method for calculating attorney fee awards, such detailed limitations are less important since the maximum fee award is fixed at a reasonable percentage of the class recovery, no matter how many lawyers work to produce it. Even under a percentage-of-fund approach, however, consider controlling litigation

---

862. Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified as amended at 15 U.S.C. §§ 77z-1, 78u-4 to 78u-5 (2000)). For a discussion of the underpinnings of the empowered plaintiff model, see generally Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale L.J. 2053 (1995).

863. 15 U.S.C. §§ 77z-1(a)(3)(B)(v), 78u-4(a)(3)(B)(v) (2000).

864. At least one court of appeals has expressed a preference for establishing the terms of appointment *ex ante*. *See In re* Synthroid Mktg. Litig., 264 F.3d 712, 718–19 (7th Cir. 2001) ("The best time to determine [a market] rate is the beginning of the case, not the end . . . ."). Another court of appeals has ruled that *ex ante* consideration of the terms of appointing counsel is not a substitute for *ex post* review of fees that were calculated using a formula established at the outset of the litigation. *In re* Cendant Corp. Prides Litig., 243 F.3d 722, 736–37 (3d Cir. 2001).

expenses that would ordinarily be deducted from the award to the class before fees are calculated. Many courts use the lodestar method as a cross-check on the reasonableness of the fee awarded under a percentage-of-fund approach. See section 14.122.

If no applicant would provide adequate representation, the judge may refuse to certify the class. If the class appears otherwise certifiable, however, refusal to certify solely on a finding of inadequate representation is very problematic. One alternative is to allow a reasonable time period for other attorneys to seek appointment.

### 21.273  Procedures for Appointment

If only one lawyer seeks appointment as class counsel, or if the parties agree who should be class counsel or lead class counsel, the application is generally submitted as part of the certification motion. If competing applications are likely, a reasonable period after commencement of the action should be allowed for attorneys to file class counsel applications. Competing applications are likely where more than one class action has been filed or other attorneys have filed individual actions on behalf of members of the proposed class. To facilitate comparison among applications, consider ordering applicants to follow a common format designed to elicit information about the court's appointment criterion. Any order of appointment should include a statement of the reasons for the appointment. Section 10.2 considers appointment of liaison counsel and committees of counsel in complex class action cases or cases resulting from the consolidation of different classes or subclasses.

## 21.28  Interlocutory Appeals of Certification Decisions

Rule 23(f) provides that a court of appeals may permit parties to appeal a district court order granting or denying class certification if application to the court of appeals is made within ten days after entry of the order. An appeal does not stay proceedings in the district court unless the district judge or court of appeals so orders. Whether to grant an interlocutory appeal lies within the discretion of the court of appeals. The reported opinions produce a rough consensus[865] that interlocutory review should not be granted unless one or

---

865. *See* Prado-Steiman *ex rel.* Prado v. Bush, 221 F.3d 1266 (11th Cir. 2000); Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288 (1st Cir. 2000); Blair v. Equifax Check Servs., Inc., 181 F.3d 832 (7th Cir. 1999); *but cf.* Isaacs v. Sprint Corp., 261 F.3d 679 (7th Cir. 2001). Other courts, however, have indicated a more expansive standard for granting interlocutory appeals. *See, e.g.*, *Isaacs*, 261 F.3d at 681 (expressing doubt that creating an exhaustive list of factors to

more of the following factors are evident: (1) the certification order represents the death knell of the litigation for either the plaintiffs (who may not be able to proceed without certification) or defendant (who may be compelled to settle after certification); (2) the certification decision shows a substantial weakness, amounting to an abuse of discretion; or (3) an interlocutory appeal will resolve an unsettled legal issue that is central to the case and intrinsically important to other cases but is otherwise likely to escape review.[866]

Rule 23(f) differs from other interlocutory review provisions in that it does not call for the district judge to recommend whether the appellate court accept the interlocutory appeal. Rule 23(f) also does not automatically impose a stay, either during the pendency of the petition or during any appeal that the court of appeals permits.[867] A party seeking a stay should file an application in the trial court in the first instance.[868] Interlocutory appeals can disrupt and delay the litigation without necessarily changing the outcome of what are often familiar and almost routine issues.[869] Granting a stay depends, in the language of one early decision applying the amended rule, on "a demonstration that the probability of error in the class certification decision is high enough that the costs of pressing ahead in the district court exceed the cost of waiting."[870] In deciding whether to enter a stay, the effect of the certification decision on the statute of limitations is a consideration.[871] A stay of an order denying certifica-

---

consider in deciding whether to allow an interlocutory appeal would be desirable); Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 165 (3d Cir. 2001) (an "erroneous ruling" by the trial court or "'any consideration that the court of appeals finds persuasive'" justifies granting an interlocutory appeal (quoting Fed. R. Civ. P. 23(f) committee note (1998 amendment))).

866. *Prado-Steiman*, 221 F.3d at 1274–75. The court also indicated that the pretrial posture of the case, the state of the record, and future events, such as an impending settlement or bankruptcy, could have a substantial impact on the decision of whether to allow an interlocutory appeal. *Id.* at 1276.

867. Fed. R. Civ. P. 23(f) committee note ("Permission to appeal does not stay trial court proceedings.").

868. *Newton*, 259 F.3d at 165.

869. Fed. R. Civ. P. 23(f) committee note (referring to FJC Empirical Study of Class Actions, *supra* note 769); *see also In re* Sumitomo Copper Litig., 262 F.3d 134, 140 (2d Cir. 2001) (noting that "parties should not view Rule 23(f) as a vehicle to delay proceedings in the district court"); *Newton*, 259 F.3d at 165; *Prado-Steiman*, 221 F.3d at 1272 (citing Fed. R. Civ. P. 23(f) committee note).

870. *Blair*, 181 F.3d at 835 (noting that "Rule 23(f) is drafted to avoid delay"); *see also In re Sumitomo*, 262 F.3d at 140 (holding that "a stay will not issue unless the likelihood of error on the part of the district court tips the balance of hardships in favor of the party seeking the stay").

871. *See* Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc., No. 98 CV 1492, 2000 U.S. Dist. LEXIS 13910 (E.D.N.Y. Sept. 26, 2000); *see also In re* Silicone Gel Breast Implant Prods. Liab. Litig., MDL No. 926, 1994 WL 114580, at *4, *7 (N.D. Ala. Apr. 1, 1994) (extending

tion may continue to toll the statute of limitations and thereby discourage the filing of individual cases that might otherwise follow denial of class certification, particularly where the stakes for an individual are large enough to support litigation.[872] In general, a court considering whether to grant a stay pending interlocutory appeal should consider possible prejudice to the parties that may arise from delaying the proceedings. If the appeal is from a grant of certification, the district court should ordinarily stay the dissemination of class notice to avoid the confusion and the substantial expense of renotification that may result from appellate reversal or modification after notice dissemination.[873] The ten-day rule for filing appeals is applied strictly.[874]

## 21.3   Postcertification Communications with Class Members

.31 Notices from the Court to the Class 285
.311 Certification Notice  287
.312 Settlement Notice  293
.313 Other Court Notices  296
.32 Communications from Class Members  298
.321 Class Members' Right to Elect Exclusion  298
.322 Communications Relating to Damage or Benefit Claims  299
.323 Other Communications from Class Members  299
.33 Communications Among Parties, Counsel, and Class Members  300

Communication by the court and counsel with the class is a major concern in the management of class actions. It is important to develop appropriate means for providing information to, and obtaining information from, class

---

indefinitely the time for opting out of a provisionally certified class action and stating that the pendency of that action would toll the statute of limitations for members of that class). Ordinarily, the tolling effect of a proposed class action ceases when a court denies class certification. Armstrong v. Martin Marietta Corp., 138 F.3d 1374, 1378 (11th Cir. 1998).

872.  *Nat'l Asbestos Workers*, 2000 U.S. Dist. LEXIS 13910, at *8. *See also Armstrong*, 138 F.3d at 1380, 1389–90 (a pre-Rule 23(f) decision in which appellants did not seek to certify an interlocutory appeal under 28 U.S.C. § 1292(b); stating test for tolling as whether it is reasonable for members of the proposed class to rely on the possibility of reconsideration, or reversal through an interlocutory appeal, and holding that it was not reasonable in that case).

873.  *See* Ramirez v. DeCoster, 203 F.R.D. 30, 40 (D. Me. 2001) (ordering a fairness hearing if no Rule 23(f) appeal filed, staying proceedings if appeal filed).

874.  *See, e.g.*, Richardson Elecs., Ltd. v. Panache Broad. of Pa., Inc., 202 F.3d 957, 958–59 (7th Cir. 2000) (denying inexcusably late Rule 23(f) petition to appeal and rebuffing attempt to treat such a petition as an interlocutory appeal under 28 U.S.C. § 1292(b)); Gary v. Sheahan, 188 F.3d 891, 893 (7th Cir. 1999) (ruling that to extend the ten-day rule, a motion for reconsideration must be filed within ten days of the certification decision).

members, and for handling inquiries from potential or actual class members. It is equally necessary to avoid communications that might interfere with or burden the litigation. Rule 23(c)(2) provides significant guidance on the form and content of notices to the class. A committee note to that rule urges courts to "work unremittingly at the difficult task of communicating with class members" in plain language.[875]

## 21.31  Notices from the Court to the Class

.311 Certification Notice  287
.312 Settlement Notice  293
.313 Other Court Notices  296

Notice to class members is required in three circumstances: (1) when a Rule 23(b)(3) class is certified; (2) when the parties propose a settlement or voluntary dismissal that would be binding on the class; and (3) when an attorney or party makes a claim for an attorney fee award. Rule 23(c)(2)(A) expressly grants the court discretion to require certification notice in Rule 23(b)(1) and (b)(2) classes in appropriate circumstances. Notice of settlement is required in all class actions. Rule 23(h)(1) requires that the court direct notice to the class members "in a reasonable manner" when an attorney or party files a motion for an award of attorney fees.[876] A judge who simultaneously certifies a class action and preliminarily approves a class-wide settlement (see section 21.612) typically combines notice of certification with notice of settlement and ordinarily includes notice of an application for an award of attorney fees. A case that is certified as a class action and has notice issue at that point, then settles at a later date (see section 21.611) requires a separate notice of the settlement.

Notice is a critical part of class action practice. It provides the structural assurance of fairness that permits representative parties to bind absent class members.[877] In a Rule 23(b)(3) class, notice conveys the information absent class members need to decide whether to opt out and the opportunity to do so. In all class actions, notice provides an opportunity for class members to participate in the litigation, to monitor the performance of class representatives and class counsel, and to ensure that the predictions of adequate representation made at the time of certification are fulfilled. Proper notice also

---

875.  Fed. R. Civ. P. 23(c)(2)(B) committee note.

876.  Fed. R. Civ. P. 23(h)(1).

877.  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 627 (1997).

lessens the vulnerability of the final judgment to collateral attack by class members.[878]

Rule 23(c)(2)(B) specifies information that must be included in a notice, such as the nature of the action, the definition of the class, and the claims, issues, and defenses to be litigated. The rule requires that notices state essential terms "concisely and clearly . . . in plain, easily understood language." In addition, the court can require notice to be given when needed for the protection of class members or for the fair conduct of the action.[879] Notice generally is given in the name of the court, although one of the parties typically prepares and distributes it.

The Federal Judicial Center has produced illustrative forms of notice that combine notice of class certification and settlement in two types of class actions: a securities case and a products liability case in which both monetary damages and medical monitoring are provided. These forms can be adapted to specific cases. The Center has also drafted a form illustrating certification notice in an employment discrimination case. The form notices can be downloaded from the Center's Web site.[880]

Published notice should be designed to catch the attention of the class members to whom it applies. In many cases, a one-page summary of the salient points is useful, leaving fuller explanation for a separate document. Headlines and formatting should draw the reader's attention to key features of the notice. A short, informative blurb ("If you were exposed to ___, you may have a claim in a proposed class action settlement") on the outside of a mailing envelope serves a similar purpose.

Question-and-answer formats help to make information accessible and can guide the reader through each step of a complicated certification or settlement explanation. Counsel should logically order the information that will assist the class member in making important decisions, such as whether to opt out of the class, object to a settlement, or file a claim. Counsel should discuss with the court whether class members are likely to require notice in a language other than English or delivery by a means other than mail. Lists of class members usually provide the best source of information for deciding how to deliver notice. In some cases, the cohesiveness of a class (for example, employees of a single plant) or the existence of a common gathering place (for

---

878.  *See* 7B Wright et al., *supra* note 738, §§ 1789, 1793.

879.  Fed. R. Civ. P. 23(d).

880.  The FJC has tested the form notices for comprehension and identified some principles that will be of value to those drafting such notices. Forms and discussion of plain language drafting principles are on the Center's Web page at http://www.fjc.gov (last visited Nov. 10, 2003).

example, shelters or food kitchens for a case involving the homeless) may suggest reliable and efficient ways to communicate notice.[881]

## 21.311 Certification Notice

Rule 23(c)(2)(A) and Rule 23(d) authorize the court to direct notice that a case has been certified as a Rule 23(b)(1) or (b)(2) class action. The court must provide notice for Rule 23(b)(3) classes. Notice in Rule 23(b)(1) and (b)(2) actions is within the district judge's discretion. Rule 23(c)(2)(A) recognizes the court's authority to direct "appropriate" notice in Rule 23(b)(1) and (b)(2) class actions, but contemplates different and more flexible standards for those cases than for Rule 23(b)(3) actions. Notice to members of classes certified under Rule 23(b)(1) or (b)(2) serves limited but important interests, such as monitoring the conduct of the action. This more flexible role of notice recognizes that in some cases, such as public interest organizations' civil rights class action suits, the costs of a wide-reaching notice might prove crippling and the benefits may be relatively small.

A court must decide whether and how to provide notice in Rule 23(b)(1) and (b)(2) actions. It may be preferable in some cases to forego ordering notice if there is a risk that notice costs could outweigh the benefits of notice, deterring the pursuit of class relief. If notice is appropriate, it need not be individual notice because, unlike a Rule 23(b)(3) class, there is no right to request exclusion from Rule 23(b)(1) and (b)(2) classes.

*Who is to receive notice and how is notice to be delivered?* Individual members in a Rule 23(b)(3) action have a right to opt out of the class proceedings. Rule 23(c)(2)(B) requires that individual notice in 23(b)(3) actions be given to class members who can be identified through reasonable effort. Those who cannot be readily identified must be given "the best notice practicable under the circumstances."[882] When the names and addresses of most class members are known, notice by mail[883] usually is preferred.

---

881. For a description of a case involving communication of notice on a worldwide basis to disparate groups, see *In re Holocaust Victims Assets Litigation*, 105 F. Supp. 2d 139, 144 (E.D.N.Y. 2000) ("Swiss Banks" litigation). Under the notice plan approved by the court, notice went to forty-eight countries under a "multi-faceted notice plan, involving, in addition to direct mail utilizing existing lists covering segments of the settlement classes, worldwide publication, public relations (i.e., 'earned media'), Internet and grass roots community outreach." *Id.*

882. Fed. R. Civ. P. 23(c)(2)(B); *In re Holocaust Victims*, 105 F. Supp. 2d at 144. Historically, due process has not required actual notice to parties who cannot reasonably be identified. *See* Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313–19 (1950); Silber v. Mabon, 18 F.3d 1449 (9th Cir. 1994); *but see Amchem*, 521 U.S. at 595. *See also In re* Orthopedic Bone Screw Prods. Liab. Litig., 246 F.3d 315, 327 n.11 (3d Cir. 2001) (listing recommended practices for expanding the pool of names of class members for actual notice); *In re Holocaust Victims*, 105 F.

Posting notices on dedicated Internet sites, likely to be visited by class members and linked to more detailed certification information, is a useful supplement to individual notice, might be provided at a relatively low cost, and will become increasingly useful as the percentage of the population that regularly relies on the Internet for information increases. An advantage of Internet notice is that follow-up information can easily be added, and lists can be created to notify class members of changes that may occur during the litigation. Similarly, referring class members to an Internet site for further information can provide complete access to a wide range of information about a class settlement.[884] Many courts include the Internet as a component of class certification and class settlement notice programs.

Publication in magazines, newspapers, or trade journals may be necessary if individual class members are not identifiable after reasonable effort or as a supplement to other notice efforts. For example, if no records were kept of sales of an allegedly defective product from retailers to consumers, publication notice may be necessary. Financial and legal journals or financial sections of broad circulation newspapers, while useful to a degree, might not be read by many members of the general public. Such publications may, however, be useful in certain kinds of cases, such as securities fraud suits. Determination of whether a given notification is reasonable under the circumstances of the case is discretionary. The sufficiency of the effort made might become an issue if the preclusive effect of the class action judgment is later challenged. Section 21.22–21.23 discusses class certification under Rule 23(b)(3) in conjunction with Rule 23(b)(2).

*When should notice be given?* Ordinarily, notice to class members should be given promptly after the certification order is issued. When the parties are nearing settlement, however, a reasonable delay in notice might increase incentives to settle and avoid the need for separate class notices of certification and settlement. Delaying notice of certification until after settlement apparently is a common practice in such cases.[885]

Notice to the added class members is required if the certification order is amended to expand the class definition. If the certification order is amended to

Supp. 2d at 144–45; *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000).

883. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 356 n.22 (1978), speaks favorably of the use of mail, without specifying the class of mail.

884. See, for example, the notice and forms published on a Web site created for the diet drugs class action settlement in *In re Diet Drugs Products Liability Litigation*. The site can be visited at http://www.settlementdietdrugs.com/dhome.php3#forms (last visited Nov. 10, 2003).

885. FJC Empirical Study of Class Actions, *supra* note 769, at 62.

eliminate previously included class members, consider whether notice is necessary to inform affected individuals who might have relied on the class action to protect their rights. If repetitive notice and frequent orders affect class interests, ordering the parties to use the Internet—especially a specific Web site dedicated to the litigation—may be a particularly cost-effective means to provide current information in a rapidly evolving situation.

*What must the notice include?* If a class is certified and settled simultaneously, a single notice is generally used. Rule 23(c)(2)(B) requires that a class certification notice advise class members of the following:

- the nature of the action;
- the definition of the class and any subclasses;
- the claims, issues, and defenses for which the class has been certified;
- the right of a potential class member to be excluded or to opt out from the class;
- the right of a class member to enter an appearance by counsel; and
- the binding effect of a class judgment.

In Rule 23(b)(3) actions, the notice also must describe when and how a class member may opt out of the class.

Sufficient information about the case should be provided to enable class members to make an informed decision about their participation. The notice should

- describe succinctly the positions of the parties;
- identify the opposing parties, class representatives, and counsel;
- describe the relief sought; and
- explain any risks and benefits of retaining class membership and opting out, while emphasizing that the court has not ruled on the merits of any claims or defenses.

A simple and clear form for opting out is often included with the notice. If the certification notice is combined with a settlement notice, it should identify specific benefits for class or subclass members (or a formula for calculating such benefits), the choices available to class members, and any other information a class member reasonably would need to make an informed judgment about whether to remain in the class.[886] In a combined notice of certification and settlement, the opt-out form should be distinguished from a claims form

---

886. *Ravens v. Iftikar*, 174 F.R.D. 651, 655 (N.D. Cal. 1997) (citing *In re* Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1104–05 (5th Cir. 1977)).

or a notice of appearance. Color coding or similar approaches may be appropriate.

Notice may be published in more than one language if appropriate to the demographics of the class.[887] The Federal Judicial Center's illustrative notices offer guidance in meeting the plain language requirement.[888]

*Who pays for the notice?* In a Rule 23(b)(3) class, the parties seeking class certification must initially bear the cost of preparing and distributing the certification notice,[889] including the expense of identifying the class members.[890] Individual class representatives, however, are responsible only for their pro rata share of notice costs (and other class action costs).[891] Class counsel may properly advance such costs with repayment contingent on recovery.[892] Class counsel should keep accurate and complete records of the steps taken to provide notice. Those records will be useful for assessing costs and for responding to any post-judgment attacks on the adequacy of notice.

There is no clear rule regarding who should pay the initial cost of preparing and distributing certification notice when it is ordered in Rule 23(b)(1) and (b)(2) actions. Some judges have required class representatives to pay this cost.[893] Others have required the defendant to bear these costs, particularly

---

887. *See, e.g.*, Montelongo v. Meese, 803 F.2d 1341, 1352 (5th Cir. 1986) (finding notice with English and Spanish language mailings, announcements on Spanish radio, and notice in Spanish newspapers to be sufficient); S.F. NAACP v. S.F. Unified Sch. Dist., No. C-78-1445, 2001 WL 1922333, at *4 (N.D. Cal. Oct. 24, 2001) (finding notice requirements met because of publication and postings in English, Chinese, and Spanish); *In re* Mex. Money Transfer Litig., 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) (reporting "notice was provided via television, radio, and newspaper advertising in the Untied States and Mexico").

888. See the Center's Web page at http://www.fjc.gov (last visited Nov. 10, 2003).

889. *See* Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177–79 (1974) (interpreting Rule 23).

890. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 356 (1978).

891. Rand v. Monsanto Co., 926 F.2d 596, 601 (7th Cir. 1991) (holding that "a district court may not establish a per se rule that the representative plaintiff must be willing to bear all (as opposed to a pro rata share) of the costs of the action").

892. Model Rules of Prof'l Conduct R. 1.8(e)(1) (2002).

893. Coalition for Econ. Equity v. Wilson, No. C 96-4024, 1996 WL 788376, at *4 (N.D. Cal. Dec. 16, 1996); Lynch Corp. v. MII Liquidating Co., 82 F.R.D. 478, 483 (D.S.D. 1979).

when the defendant requested the notice[894] or where notice follows a finding of liability and the granting of injunctive relief.[895]

In Rule 23(b)(3) class actions, determining how and to whom notice should be delivered can be controversial. The mode and extent of notice implicates issues of cost and fairness to the parties and class members, and raises the potential for prejudice to one side or the other. In securities cases, for example, brokers or financial institutions might hold the shares of many class members, but giving notice to these agents for class members alone may not always suffice to give notice to the class members.[896] In that case, however, the class representatives usually are able to make arrangements with the nominees to forward the notices to class members, or at least to provide a list of the names and addresses of the beneficial owners. If the nominees are not willing to do so and are not parties to the litigation, the court can issue a subpoena *duces tecum* directing them to produce the records from which the class representatives can compile a mailing list. If the litigation eventually is terminated favorably to the class, the representatives might be entitled to reimbursement for these expenses, either from the entire fund recovered for the class, from that part of the fund recovered on behalf of security holders whose shares were held by brokers, or perhaps from the defendants.[897]

Similar problems may arise in consumer class actions on behalf of individual purchasers of goods or services. Sales records might be lost, incomplete, or unreliable, making identification and notification of individual class members difficult. A program to publish notice is especially useful in such cases. The

---

894. *See generally* 7B Wright et al., *supra* note 738, § 1788; *see also* S. Ute Indian Tribe v. Amoco Prod. Co., 2 F.3d 1023, 1030 (10th Cir. 1993) (observing that one of two issues certified would only benefit a class of defendants and reversing an order that plaintiffs pay a portion of the costs that representative defendant had previously incurred in compiling a list of defendants).

895. *See* Barahona-Gomez v. Reno, 167 F.3d 1228, 1236–37 (9th Cir. 1999) (upholding notice of preliminary injunction based in part on finding that notice would not impose a burden on defendant).

896. *Compare* Silber v. Mabon, 18 F.3d 1449, 1454, n.3 (9th Cir. 1994) (approving method of notice where brokerage house forwards notice to shareholders and affirming that class member's notice was sufficient even though not actually received until after the opt-out period expired), *and In re* Victor Tech. Sec. Litig., 792 F.2d 862, 866 (9th Cir. 1986) (affirming order requiring plaintiffs to pay, in advance, record owners for costs related to forwarding notice to shareholders), *with* Blum v. BankAtlantic Fin. Corp., 925 F.2d 1357, 1362, n.10 (11th Cir. 1991) (noting that evidence of industry practice of record owners not forwarding notice may "sustain a Rule 23(c)(2) challenge" but appellants presented no current evidence of this practice).

897. *See* Zuckerman v. Smart Choice Auto. Group, Inc., No. 6:99-CV-237, 2001 WL 686879, at *2 (M.D. Fla. May 3, 2001).

published notice should give class members access to more detailed and ongoing information by providing telephone numbers and Internet addresses.

Individual notice generally is preferable. If individual names or addresses cannot be obtained through reasonable efforts, the court must, with counsel's assistance, determine how to provide the best notice practicable under the circumstances. Alternative techniques for providing notice include

- publication notice;[898]
- Internet notice;[899] and
- posting notice in public places likely to be frequented by class members.[900]

Plaintiffs may propose distributing notice with a defendant company's routine mailings when, for example, the class members consist of, or overlap with, shareholders, credit card holders, customers, or employees.[901] Defendant may object that requiring it to use its own mailings to announce the certification of

---

898. *In re* Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 327 (3d Cir. 1998) (notice published in newspapers in all fifty states and the District of Columbia); Fry v. Hayt, Hayt & Landau, 198 F.R.D. 461, 475 (E.D. Pa. 2000) (notice published one time in national newspaper); *In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, 2000 WL 1222042, at *35 (E.D. Pa. Aug. 28, 2000) (notice published in largest newspapers across the country including those that targeted the Hispanic market).

899. *Fry*, 198 F.R.D. at 475 (Internet notice published on news Web site); *In re Diet Drugs*, 2000 WL 1222042, at *35 (Web site provided detailed notice package to class members who registered); *In re* Holocaust Victim Assets Litig., 105 F. Supp. 2d 139, 144 (E.D.N.Y. 2000) (extensive notice package was "successfully implemented," which included world-wide publication, press coverage, extensive community outreach, direct mail to 1.4 million people in forty-eight countries, and Internet notice).

900. *In re* Domestic Air Transp. Antitrust Litig., 141 F.R.D. 534, 549 (N.D. Ga. 1992) (notice posters sent to "approximately 36,000 travel agencies in the United States"); *cf. In re* Ariz. Dairy Prods. Litig., No. Civ. 74-569A, 1975 WL 966, at *1 (D. Ariz. Oct. 7, 1975) (notice printed on milk cartons).

901. *See* Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 356 n.22 (1978) (noting that "a number of courts have required defendants in Rule 23(b)(3) class actions to enclose class notices in their own periodic mailings to class members in order to reduce the expense of sending the notice"); *In re* Nasdaq Market-Makers Antitrust Litig., 169 F.R.D. 493, 515 n.19 (S.D.N.Y. 1996) (requiring notice sent to subclass be inserted in defendants' mailings); Kan. Hosp. Ass'n v. Whiteman, 167 F.R.D. 144, 145–46 (D. Kan. 1996) (requiring defendants to insert notice of the "proposed disposition" of case into monthly mailings); Sollenbarger v. Mountain States Tel. & Tel. Co., 121 F.R.D. 417, 437 (D.N.M. 1988) (allowing plaintiffs to provide individual notice to class members by enclosing an insert in defendant's monthly billing statements to current customers).

a class against it may be prejudicial[902] and may even deprive it of First Amendment rights.[903] It is important to balance any efficiencies that might be gained by this approach against the burden such mailings can impose. Before requiring a defendant to use its own mailings to provide certification notice, the court should require class counsel to show the absence of feasible alternatives.

## 21.312 Settlement Notice

Rule 23(e)(1)(B) requires the court to "direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise" regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3). Certification and settlement notices are subject to many of the same considerations.[904]

*When is a settlement notice required?* Rule 23(e) requires notice of a settlement only if it would bind the class. If individual members settle individual claims before class certification, notice to the class is not required even if the class claims have been dismissed without prejudice or withdrawn. When a proposed class has not been certified, however, special circumstances might lead a court to impose terms to prevent abuse of the class action procedure. Section 21.61 discusses potential abuses, especially the filing and voluntary dismissal of class allegations for strategic purposes; section 21.62 discusses criteria for reviewing proposed settlements, especially when named plaintiffs receive relief that is disproportionately large. The judge might also require notice directed to the absent members of the proposed class under Rule 23(d)(2).[905] However, requiring such notice is unusual. The court should

---

902. Katz v. Carte Blanche Corp., 496 F.2d 747, 757 (3d Cir. 1974) (en banc) (noting that credit card customers might refuse to pay their regular bills as a result of a notice including information about statutory damages).

903. *See* Pac. Gas & Elec. Co. v. Public Util. Comm'n, 475 U.S. 1 (1986) (plurality opinion in nonclass action context).

904. *See supra* note 880. *See, e.g., In re* Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1105 (5th Cir. 1977).

905. The cases cited in this note were all decided under the pre-2003 version of Rule 23(e). *See, e.g.,* Diaz v. Trust Territory of Pac. Islands, 876 F.2d 1401, 1409 (9th Cir. 1989) (notice of a precertification voluntary dismissal of a complaint with class action allegations should be given to protect members of the proposed class from "prejudice [they] would otherwise suffer if class members have refrained from filing suit because of knowledge of the pending class action"; notice not required in Diaz case); *see also* Glidden v. Chromalloy Am. Corp., 808 F.2d 621, 627 (7th Cir. 1986) (dicta that notice of a settlement or summary judgment dismissal of a case before deciding on certification should be given because the settlement or dismissal "creates obvious dangers; the representative may have been a poor negotiator or may even be in cahoots with the defendant"); *In re* Nazi Era Cases Against German Defendants Litig., 198 F.R.D. 429, 439 (D.N.J.

weigh the costs and consequences of such notices against the need for the protection it may provide in a given case.[906]

*Who is to receive settlement notice and how is notice to be delivered?* Rule 23(e)(1)(B) requires notice in a reasonable manner to "all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." Even if a class member has opted out after receiving a certification notice, the parties might direct notice to such opt outs to give them an opportunity to opt back into the class and participate in the proposed settlement.

In general, settlement notices should be delivered or communicated to class members in the same manner as certification notices (see section 21.311). As with certification notices, individual notice is required, where practicable, in Rule 23(b)(3) actions. Posting notices and other information on the Internet, publishing short, attention-getting notices in newspapers and magazines, and issuing public service announcements may be viable substitutes for, or more often supplements to, individual notice if that is not reasonably practicable.

*When should the notice be given?* In an order preliminarily approving the settlement under Rule 23(e), the judge sets the date for providing notice of the proposed settlement. This order, as well as the notice, should establish the time and place of a public hearing on the proposed settlement and specify the procedure and timetable for opting out, filing objections, and appearing at the settlement hearing. If problems or questions concerning the terms of the settlement are identified at the preliminary approval stage, notice to the class ordinarily is deferred until there has been an opportunity to resolve those issues.

*What must the notice include?* The notice should announce the terms of a proposed settlement and state that, if approved, it will bind all class members. If the class has been certified only for settlement purposes, that fact should be disclosed. Even though a settlement is proposed, the notice should outline the original claims, relief sought, and defenses so class members can make an informed decision about whether to opt out.[907]

---

2000) (stating that "a district court should make a 'proper inquiry' to determine whether a proposed settlement and dismissal are tainted by collusion or will prejudice absent members of the putative class"); Gassie v. SMH, Ltd., Civ. A. No. 97-1786, 1997 U.S. Dist. LEXIS 13687, at *4–*5 (E.D. La. Sept. 9, 1997) (same).

906. *Diaz*, 876 F.2d at 1411.

907. If the class had been certified previously under Rule 23(b)(3), and if the parties propose a class settlement after expiration of the opportunity for class members to opt out, Rule 23(e)(3) authorizes the court, in its discretion, to refuse to approve a settlement unless the parties provide a second opportunity to opt out. *See infra* section 21.611.

The notice should

- define the class and any subclasses;
- describe clearly the options open to the class members and the deadlines for taking action;
- describe the essential terms of the proposed settlement;
- disclose any special benefits provided to the class representatives;
- provide information regarding attorney fees (see section 14);
- indicate the time and place of the hearing to consider approval of the settlement;
- describe the method for objecting to (or, if permitted, for opting out of) the settlement;
- explain the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, clearly set forth those variations;
- explain the basis for valuation of nonmonetary benefits if the settlement includes them;
- provide information that will enable class members to calculate or at least estimate their individual recoveries, including estimates of the size of the class and any subclasses;[908] and
- prominently display the address and phone number of class counsel and how to make inquiries.

In a Rule 23(b)(3) class, the notice and any Internet Web site should include opt-out forms. The notice must clearly explain the options available to a class member and the difference between opting out and claiming benefits.[909] If the details of a claims procedure have been determined, and there is little

---

908. *See, e.g.,* Grunin v. Int'l House of Pancakes, 513 F.2d 114, 122 (8th Cir. 1975) (stating "the notice may consist of a very general description of the proposed settlement, including a summary of the monetary and other benefits that the class would receive and an estimation of attorneys' fees and other expenses"); Boggess v. Hogan, 410 F. Supp. 433, 442 (N.D. Ill. 1975) (stating "the notice should . . . include . . . an estimated range of unitary recovery"). *Cf.* 3 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 8:32, at 265 (4th ed. 2002) (indicating that "[i]t is unnecessary for the settlement distribution formula to specify precisely the amount that each individual class member may expect to recover").

909. *But see In re* Domestic Air Transp. Antitrust Litig., 141 F.R.D. 534, 554 (N.D. Ga. 1992) (refusing to include opt-out form with notice to class because of "possible confusion resulting from inclusion of such a form" (citing Roberts v. Heim, 130 F.R.D. 416, 423 (N.D. Cal. 1988) (disallowing opt-out form with class notice on the basis that "on balance, such a separate form will engender confusion and encourage investors to unwittingly opt out of the class"))); *see also* 3 Conte & Newberg, *supra* note 908, § 8:31, at 257–59 (describing use of forms for class members to notify court of desire to be excluded).

indication of any serious challenge to or problems with the settlement, claims forms might be included with the settlement notice. Often, however, the outcome of objections to or concerns over the settlement terms and the details of allocation and distribution are not established until after the settlement is approved. In that situation, claims forms are distributed after the approval.[910] The court can direct class counsel or their agents (such as settlement claims administrators) to communicate with class members whose intentions are unclear in order to help ensure that they make an informed election or exclusion of class membership and that the outcome (claimant status or opt-out status) is what they intended. Rule 23(d)(2) permits the court to revoke inadvertent opt outs to protect class members' interests and advance "the fair conduct of the action."

In most instances, the notice does not include the full text of the proposed settlement. If the agreement itself is not distributed, however, the notice must contain a clear, accurate description of the key terms of the settlement and inform class members where they can examine or obtain a copy, such as from the Internet, the clerk's office, class counsel, or another readily accessible source. For example, in an employment discrimination case, the agreement may be obtained from a defendant's employer's office.

*Who pays for the notice?* The parties generally use the settlement agreement to allocate the cost of settlement notices. The costs are often assessed against a fund created by the defendants or to the defendant, in addition to any funds paid to the class.

## 21.313  Other Court Notices

Rule 23(d)(2) authorizes the court to require that notice be given

> for the protection of the members of the class . . . of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action.

---

910. For example, in *In re Holocaust Victim Assets Litigation ("Swiss Banks")*, the pre-fairness hearing on worldwide notice did not include a detailed plan of allocation; instead, the notice program was actively used to solicit allocation proposals and preferences from the class members themselves. These were submitted to a court-appointed special master, who in turn considered the suggestions and prepared a detailed plan of allocation, after final settlement approval, that the court ultimately approved and implemented. *See In re* Holocaust Victim Assets Litig., No. CV 96-4849, 2000 U.S. Dist. LEXIS 20817, at *13 (E.D.N.Y. Nov. 22, 2000).

There are a number of circumstances under which notice is appropriate to protect the class or proposed class or for the fair conduct of the action. For example, if a decision is made to decertify a previously certified class or to exclude previously included members of the class after certification notice has been issued and after the time for opting out has expired, the judge should consider whether to inform the affected class members of the change in their status and any effect on the statute of limitations.[911]

The type and contents of any notice and who should bear the cost depend on the circumstances surrounding the notice, including what prompted the notice, who should be notified, whose duties are discharged, and when the notice is given. The court may consider using means less costly than personal notice. For example, if there was little or no publicity about the filing of a proposed class action, posting or publishing a notice of the court's denial of certification may suffice.

In Rule 23(b)(3) actions in which liability issues are adjudicated on a class-wide basis and individual damages claims are left for separate resolution, the class members must be provided notice of the results of the liability adjudication and an opportunity to file claims for individual relief in a later phase of the proceedings. See, e.g., section 21.322.

The judge also can require notice to correct misinformation or misrepresentations made by one of the parties or by parties' attorneys.[912] See section 21.33. Those who made the misstatements should bear the cost of a notice to correct misstatements. Curative notices generally should be disseminated in the same form as was the misinformation to be corrected.

If the notice of settlement does not establish a claims procedure, subsequent notice will be necessary to advise the class about when, where, and how to file claims, and the notice should also provide claims forms. This notice should be sent to all known members of the class and is generally part of the cost of administering the settlement, paid out of a settlement fund.

---

911. *See* Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 354 (1983); Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 561 (1974); *see also* Culver v. City of Milwaukee, 277 F.3d 908, 915 (7th Cir. 2002) (notice of decertification of class required unless "it is plain that there is no prejudice"); Crawford v. F. Hoffman-La Roche Ltd., 267 F.3d 760, 764–65 (8th Cir. 2001) (when class has not been certified, notice of voluntary dismissal is not required unless there is prejudice).

912. Georgine v. Amchem Prods., Inc., 160 F.R.D. 498, 518 (E.D. Pa. 1995) (finding objectors' communications about settlement misleading and inaccurate and ordering curative action).

# 21.32  Communications from Class Members

.321 Class Members' Right to Elect Exclusion  298
.322 Communications Relating to Damage or Benefit Claims  299
.323 Other Communications from Class Members  299

Important types of communications from class members include solicited responses (such as returns of opt-out forms or claim benefit forms) and unsolicited communications initiated by class members.

## 21.321 Class Members' Right to Elect Exclusion

In Rule 23(b)(3) actions, class members must have the opportunity to exclude themselves from the litigation; this opportunity is discretionary in other types of class actions. See section 21.311. The opt-out procedure should be simple and should afford class members a reasonable time in which to exercise their option. Courts usually establish a period of thirty to sixty days (or longer if appropriate) following mailing or publication of the notice for class members to opt out. If the case involves a complex settlement or significant individual claims, a class member might need more time to consult with attorneys or financial advisors before making an informed opt-out decision. A form for members of the proposed class who wish to opt out might be included with the notice; it should clearly and concisely explain the available alternatives and their consequences. Typically, opt-out forms are filed with the clerk, although in large class actions the court can arrange for a special mailing address and designate an administrator retained by counsel and accountable to the court to assume responsibility for receiving, time-stamping, tabulating, and entering into a database the information from responses (such as name, address, and social security number).

The judge may treat as effective a tardy election to opt out. Factors affecting this decision include the reasons for the delay, whether there was excusable neglect, and whether prejudice resulted.[913] Relief from deadlines, however, should be granted only if the delinquency is not substantial or if there is good cause shown. The state of the class at the end of the opt-out period should be fixed enough to allow parties to conduct their affairs. A general extension of time for making the election may be appropriate if logistical or other problems require further mailings or publications.

Counsel should maintain careful records of who has opted out and when, both to comply with Rule 23(c)(3) and for use in allocating and distributing

---

913.  Silber v. Mabon, 18 F.3d 1449, 1455 (9th Cir. 1994).

funds obtained in the litigation for the class. Computer databases are routinely used and are critical if the class is large. For a discussion of settlement opt-out opportunities, see section 21.611.

### 21.322 Communications Relating to Damage or Benefit Claims

Class members are sometimes asked for information regarding their individual claims. This may be appropriate in connection with preparation for the second stage of a bifurcated trial (with adequate time allowed for discovery) or the determination of entitlement to individual relief under a judgment or settlement. See section 21.66.

### 21.323 Other Communications from Class Members

The court can expect to receive inquiries about the litigation from class members and the public and should establish procedures for responding to such inquiries. Notices and other communications to the class should instruct class members to communicate directly with counsel through mechanisms developed for the case, including communications addressed to the court at a post office box number maintained by counsel. A Web site, a voicemail system providing scripted answers to frequently asked questions, or a toll-free telephone number with an automated menu or support staff can provide information efficiently without placing demands on court personnel. The court can establish a routine procedure, using the clerk's office, to refer inquiries to class counsel or another appropriate source of information. If the clerk's office has procedures to handle such matters efficiently and fairly, there should rarely be cause for judicial involvement.

If communications from the class—such as assertions that counsel have refused to respond to their inquiries—indicate the possibility of inadequate representation, the judge should take appropriate steps, including holding a hearing, ordering additional information directed to the class, or, in unusual cases, substituting new class counsel. See section 21.27. If misleading communications have contaminated the notice period, the judge should consider necessary action to correct the misinformation.[914]

---

914. *See, e.g.*, Kleiner v. First Nat'l Bank, 751 F.2d 1193, 1209–11 (11th Cir. 1985) (trial court found that defendants violated court order limiting communication with class members by initiating a surreptitious telephone campaign to solicit potential class members to opt out; trial court ordered defendant's lead trial counsel disqualified and issued a $50,000 fine against defendants; on appeal, order and fine upheld, but disqualification order remanded for notice and hearing); *Georgine*, 160 F.R.D. at 518–19 (objectors to settlement sent misleading communications and advertisements to absent class members encouraging them to opt out of settlement agreement; court ordered second notice and opt-out period); Impervious Paint Indus., Inc. v.

## 21.33  Communications Among Parties, Counsel, and Class Members

Once a class has been certified, the rules governing communications apply as though each class member is a client of the class counsel.[915] (Section 21.12 discusses precertification communication between interim class counsel and potential class members.) Defendants' attorneys, and defendants acting in collaboration with their attorneys, may only communicate through class counsel with class members on matters regarding the litigation.[916] Communications with class members in the ordinary course of business, unrelated to the litigation, remain permitted.

Where appropriate, the court should authorize defendants' counsel to answer inquiries from class members about a proposed class settlement. Such inquiries are expected in cases in which the class members have an ongoing relationship with the defendant, such as policyholders in a class action against an insurance company, account holders in a class action against a bank, customers in a class action against a telephone company, or employees in a class action against an employer. To avoid problems over such communication, the courts often channel class members' requests for information to a "hotline." Such a telephone line can be staffed by individuals who use agreed-on scripts to respond to questions. Another technique is to include a list of "frequently asked questions" on a Web site or in a notice (or both), with answers prepared jointly by the parties and approved by the court. An interactive Web site can also be used.

The judge has ultimate control over communications among the parties, third parties, or their agents and class members on the subject matter of the litigation to ensure the integrity of the proceedings and the protection of the class.[917] Objectors to a class settlement or their attorneys may not communi-

---

Ashland Oil, 508 F. Supp. 720, 723–24 (W.D. Ky. 1981) (finding that defendant contacted class members during opt-out period with the intent of sabotaging the class and ordering corrective notice).

915.  *See In re* Sch. Asbestos Litig., 842 F.2d 671, 679–83 (3d Cir. 1988) (indicating that court had authority under Rule 23(d) to require defendants' affiliate prominently to display a proscribed court-approved notice whenever it communicated directly with the members of the class); Erhardt v. Prudential Group, Inc., 629 F.2d 843, 845 (2d Cir. 1980) (detailing defendants' compliance with district court's contempt order enjoining them from further communicating with class members without prior court approval).

916.  *Kleiner*, 751 F.2d at 1207 n.28; Blanchard v. Edgemark Fin. Corp., 175 F.R.D. 293, 300–02 (N.D. Ill. 1997); Resnick v. Am. Dental Ass'n, 95 F.R.D. 372, 376–77 (N.D. Ill. 1982); *see also* Gulf Oil Co. v. Bernard, 452 U.S. 89, 104 n.21 (1981).

917.  Corrective or prophylactic notice to potential class members may be ordered under Rule 23(d)(2)at any stage of the proceedings, including the precertification stage. Ralph

cate misleading or inaccurate statements to class members about the terms of a settlement to induce them to file objections or to opt out.[918]

If improper communications occur, curative action might be necessary, such as extending deadlines for opting out, intervening, or responding to a proposed settlement, or voiding improperly solicited opt outs and providing a new opportunity to opt out.[919] Other sanctions may be justified, such as exclusion of information gained in violation of the attorney–client relationship,[920] contempt and fines,[921] assessment of fees, or, in the most egregious situations, the replacement of counsel or a class representative.[922]

Restrictions on communications with the class can create problems. For example, in employment discrimination class actions, key individuals in supervisory positions might be members of the class. Barring direct communications would seriously handicap the employer's defense because the employer must rely on those individuals for evidence and for assisting its attorneys. In such circumstances, the court can consider certification under Rule 23(b)(3) (enabling class members to opt out), exclusion of such persons from the class

---

Oldsmobile, Inc. v. Gen. Motors Corp., No. 99 Civ. 4567, 2001 WL 1035132, at *7 (S.D.N.Y. Sept. 7, 2001) (ordering curative notice for improper precertification communications). The issuance of corrective or protective notice under Rule 23(d)(2) is considered an exercise of the court's case-management authority. The "district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil*, 452 U.S. at 100. Courts need not issue a formal injunction requiring the party to meet the procedural requirements of Federal Rule of Civil Procedure 65. *See Kleiner*, 751 F.2d at 1201; *cf. In re* Domestic Air Transp. Antitrust Litig., MDL No. 861, 1992 WL 357433, at *1 (N.D. Ga. Nov. 2, 1992) (finding "injunctive relief requested by plaintiffs" is appropriate under Rule 23(d)(2), which "gives to the certifying court specific authority to devise and issue appropriate orders necessary for the protection of class members").

918. *Georgine*, 160 F.R.D. at 518.

919. *Id.* at 502–08 (invalidating previous opt outs, mandating curative notice limited to opt outs, and creating a new four week opt-out period for them); *cf. In re* Potash Antitrust Litig., 896 F. Supp. 916, 919–21 (D. Minn. 1995) (rejecting request for gag order and ordering defendants to gather communications and submit for in camera review).

920. Hammond v. City of Junction City, 167 F. Supp. 2d 1271, 1293 (D. Kan. 2001) (excluding evidence gained from improper communications).

921. *Ralph Oldsmobile*, 2001 WL 1035132, at *7 (ordering corrective notice be sent at the expense of the party at fault); *Hammond*, 167 F. Supp. 2d at 1293–94 (ordering party at fault to pay attorneys' fees and costs incurred by opposing party to file protective orders); *In re* McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1239, 1247 (N.D. Cal. 2000) (ordering printing and mailing costs of curative notice to be paid by party at fault).

922. *See Hammond*, 167 F. Supp. 2d at 1289 (disqualifying plaintiff's counsel and their firm because of improper communications); *see also Kleiner*, 751 F.2d at 1210–11 (holding that due process requires notice and a hearing before any disqualification of counsel).

if they have no genuine claims, or certification of a subclass for which the court could permit limited communication with the defendant.

## 21.4   Postcertification Case Management

.41 Discovery from Class Members  302
.42 Relationship with Other Cases  303

## 21.41   Discovery from Class Members

Postcertification discovery directed at individual class members (other than named plaintiffs) should be conditioned on a showing that it serves a legitimate purpose. See section 21.14. One of the principal advantages of class actions over massive joinder or consolidation would be lost if all class members were routinely subjected to discovery. Most courts limit discovery against unnamed class members, but do not forbid it altogether.[923] In setting appropriate limits, a judge should inquire whether the information sought from absent class members is available from other sources[924] and whether the proposed discovery will require class members to obtain personal legal counsel or technical advice from an expert.[925] Some courts have held that class members are not parties for the purpose of discovery by interrogatories,[926] but may be required to respond to a questionnaire approved by the court. Others have

---

923. 8A Charles Alan Wright et al., Federal Practice and Procedure: Civil 2d § 2171, at 277 (1994).

924. *See* Redmond v. Moody's Investor Serv., No. 92 CIV. 9161, 1995 WL 276150, at *2 (S.D.N.Y. May 10, 1995) (granting plaintiff's motion for protective order under Rule 26(c) to restrict interrogatories and document requests); *see also* Dellums v. Powell, 566 F.2d 167, 187 (D.C. Cir. 1977).

925. *See, e.g.*, Collins v. Int'l Dairy Queen, 190 F.R.D. 629, 632–33 (M.D. Ga. 1999) (denying discovery motion allowing defendant opportunity to ask absent class members questions that would "require the assistance of an accountant or an attorney"); Kline v. First W. Gov't Sec., Inc., No. CIV.A.83-1076, 1996 WL 122717, at *5 (E.D. Pa. Mar. 11, 1996) (denying defendant's motion for discovery of absent class members and noting discovery would be impractical as class members would need to consult an attorney or accountant).

926. *See, e.g.*, Schwartz v. Celestial Seasonings, Inc., 185 F.R.D. 313, 319 (D. Colo. 1999) (holding that while "class members are not considered parties for purposes of traditional discovery measures," limited discovery of class members will be allowed "in the form of questionnaires"); McCarthy v. Paine Webber Group, Inc., 164 F.R.D. 309, 313 (D. Conn. 1995) (holding that questionnaire directed at absent class members was essentially a "proof of claim" form and would not be allowed); *cf.* Krueger v. N.Y. Tel. Co., 163 F.R.D. 446, 451 (S.D.N.Y. 1995) (allowing defendant to send to all members of a small class a questionnaire limited to individual damage questions).

permitted limited numbers of interrogatories upon a showing of need,[927] limited the number of class members to whom interrogatories may be directed,[928] limited the scope of the discovery to a brief, nonmandatory questionnaire relating to common issues,[929] or have imposed on defendants the added cost of mailing otherwise permissible interrogatories to absent members of a plaintiff class.[930] Deposing absent class members requires greater justification than written discovery.[931]

## 21.42 Relationship with Other Cases

Claims identical or similar to those in a federal class action might be the subject of other litigation in the same court, in other federal district or bankruptcy courts, or in state courts. Once the federal class action has been certified, the issues involving cases pending in other courts are somewhat different than those arising before certification (discussed in section 21.15).

When the claims asserted in a certified Rule 23(b)(3) class action overlap with claims in individual cases pending in other federal courts, in bankruptcy court,[932] or in state courts, the claimants ordinarily will have opted out of the federal class action or will be pursuing related individual actions. Persons who are members of a certified federal court class might pursue their own separate

---

927. *See* Long v. Trans World Airlines Inc., 761 F. Supp. 1320, 1329 (N.D. Ill. 1991) (finding discovery of absent class members by sampling necessary and appropriate in determining damage claims).

928. Transamerican Ref. Corp. v. Dravo Corp., 139 F.R.D. 619, 622 (S.D. Tex. 1991) (permitting discovery from 50 of 6,000 absent class members); *Long*, 761 F. Supp. at 1333 (allowing discovery of absent class members "only on a random sample basis"); *cf.* Buycks-Roberson v. Citibank Fed. Sav. Bank, 162 F.R.D. 338, 341–42 (N.D. Ill. 1995) (declining to limit discovery conducted on behalf of a class to a sample selected by the defendant). *See also supra* note 780 and accompanying text.

929. *Schwartz*, 185 F.R.D. at 316–17, 319; *see also* Wayne D. Brazil, *Special Masters in Complex Cases: Extending the Judiciary or Reshaping Adjudication?*, 53 U. Chi. L. Rev. 394, 403–04 (1986) (describing the use of a survey interview protocol by specially trained college students to elicit information from 9,000 claimants).

930. Alexander v. Burrus, Cootes & Burrus, 24 Fed. R. Serv. 2d (Callaghan) 1313, 1314 (4th Cir. 1978) (per curiam) (unpublished opinion) (allowing defendant accounting firm to use contact information furnished by plaintiffs to mail its interrogatories to class members at its own expense); *cf. Schwartz*, 185 F.R.D. at 320 (requiring plaintiffs and defendants to share the costs of mailing to absent class members a questionnaire that aids both sides); *In re* Airline Ticket Comm'n Antitrust Litig., 918 F. Supp. 283, 288 (D. Minn. 1996) (ordering defendants to pay 75% of costs relating to survey of absent class members).

931. *See* Redmond v. Moody's Investor Serv., No. 92 CIV. 9161, 1995 WL 276150, at *2 (S.D.N.Y. May 10, 1995).

932. *See, e.g., In re* Flight Trans. Corp. Sec. Litig., 730 F.2d 1128 (8th Cir. 1984).

actions in the same court or in other courts even if they have not elected to be excluded from the class. A member of a certified Rule 23(b)(2) class in a civil rights action might, for example, wish to pursue a damage claim not encompassed in the 23(b)(2) action.[933] Much of the discovery in those parallel cases might be related to the class action and many of the witnesses will overlap. The judges involved should coordinate to avoid undue burden, expense, and conflict. If a federal court has certified a class action that overlaps with individual lawsuits or class actions pending in other federal courts, coordinated action or consolidation can be accomplished through reassignment of cases pending in the same division (see section 20.11); through informal coordination between the judges (see section 2014); by invoking 28 U.S.C. § 1404, the statutory provision for change of venue (see section 20.12); or through multidistrict transfers under 28 U.S.C. § 1407 (see section 20.13).

If the federal court has certified a class action that duplicates or overlaps with individual suits or class actions pending in state courts, the federal court should consider coordinating the litigation with state courts. Appropriate techniques may include coordinating motions, briefing schedules, and trial schedules setting simultaneous arguments before the different judges, and coordinating the timetable for, and use of, discovery in the different proceedings. See section 20.3.

If informal coordination is unsuccessful, the court may entertain a motion to enjoin the related state cases on the ground that the state cases conflict with, or threaten the integrity of, the federal class action.[934] Some of the constraints

---

933. *See, e.g.*, Hiser v. Franklin, 94 F.3d 1287, 1290–92 (9th Cir. 1996) (issue not resolved in injunctive action and plaintiff's claim had not arisen before the injunction); Fortner v. Thomas, 983 F.2d 1024, 1031 (11th Cir. 1993) (stating "[i]t is clear that a prisoner's claim for monetary damages or other particularized relief is not barred if the class representative sought only declaratory and injunctive relief, even if the prisoner is a member of a pending class action"); *but see In re* Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 209 F.R.D. 323, 339–40 (S.D.N.Y. 2002) (holding that claims for equitable relief and damages for personal injuries related to groundwater contamination could not be split and distinguishing Hiser and Fortner that allow claims splitting).

934. *See In re* Diet Drugs Prods. Liab. Litig., 282 F.3d 220, 235 (3d Cir. 2002) (holding that "a federal court entertaining complex litigation, especially when it involves a substantial class of persons from multiple states, or represents a consolidation of cases from multiple districts, may appropriately enjoin state court proceedings in order to protect its jurisdiction" (citing Carlough v. Amchem Prods., Inc., 10 F.3d 189, 202–04 (3d Cir. 1993))); Winkler v. Eli Lilly & Co., 101 F.3d 1196, 1202 (7th Cir. 1996) (injunction may be issued where "the state court action threatens to frustrate proceedings and disrupt the orderly resolution of the federal litigation"); *see also* Newby v. Enron Corp., 302 F.3d 295, 301 (5th Cir. 2002) (affirming injunction restraining a lawyer from filing related state court proceedings without the federal district judge's approval and seeking *ex parte* relief dealing with matters previously adjudicated in

that limit the federal court's authority to issue such injunctions before certification are not present once the class certification order has issued.[935] For example, the federal court might not have jurisdiction to enjoin state actions before certification[936] because the Anti-Injunction Act, 28 U.S.C. § 2283, limits the power of federal courts to enjoin state proceedings, with certain narrow exceptions. After certification, the federal court is authorized to issue an injunction "when necessary in aid of its jurisdiction,"[937] which may make it possible to enjoin pending state litigation if settlement in the certified federal class action is completed or imminent and the need to protect the class settlement is shown.[938] Another exception allows for an injunction "when

federal court); *In re* Prudential Ins. Co. of Am. Sales Practice Litig., 261 F.3d 355, 364–65 (3d Cir. 2001) (injunction appropriate to prevent relitigation of claims settled in federal class action). *But see In re* Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 134 F.3d 133, 145 (3d Cir. 1998) (declining to invoke the All Writs Act to interfere with the state court settlement of a revised version of a proposed settlement a federal court had previously rejected). *See generally* Southeastern Pa. Transp. Auth. v. Pa. Pub. Util. Comm'n, 210 F. Supp. 2d 689 (E.D. Pa. 2002); *In re* Briarpatch Film Corp., 281 B.R. 820 (Bankr. S.D.N.Y. 2002).

935. *See generally In re Diet Drugs*, 282 F.3d at 236–36; Carlough v. Amchem Prods., Inc., 10 F.3d 189, 203 (3d Cir. 1993).

936. *In re Diet Drugs*, 282 F.3d at 236 (noting that the "threat to the federal court's jurisdiction posed by parallel state actions is particularly significant where there are conditional class certifications and impending settlements in federal actions"); *cf. In re* Inter-Op Hip Prosthesis Prod. Liab. Litig., No. 01-4039, 2001 WL 1774017, at *2 (6th Cir. Oct. 29, 2001) (staying injunction against members of the proposed class in a conditionally certified class from opting out or pursuing litigation in state court pending review of a class settlement). *See also* sources cited *supra* notes 806–810.

937. 28 U.S.C. § 2283 (West 2002). The exception overlaps with the provision in the All Writs Act allowing federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions." *Id.* § 1651(a). The All Writs Act's use of the term "appropriate" suggests a broader authority than the reference to "necessary" in both the All Writs Act and the Anti-Injunction Act. *In re Diet Drugs*, 282 F.3d at 239.

938. *See* Hanlon v. Chrysler Corp., 150 F.3d 1011, 1025 (9th Cir. 1998); *Carlough*, 10 F.3d at 201–04; *In re* Baldwin-United Corp., 770 F.2d 328, 336–38 (2d Cir. 1985); *In re* Corrugated Container Antitrust Litig., 659 F.2d 1332 (5th Cir. 1981); *supra* notes 808–09 and accompanying text. *See also infra* section 20.32. An extraordinary writ staying or otherwise limiting other litigation involving the same claims or parties may also be warranted. *In re* Lease Oil Litig., 200 F.3d 317 (5th Cir. 2000). In *In re Lease Oil*, the district judge framed an injunction to bar the parties from settling federal claims in other related cases without its approval, and the court of appeals affirmed the injunction. *Id.* at 319; *see also In re Diet Drugs*, 282 F.3d at 242 (affirming order enjoining a mass opt out of the consolidated federal litigation by a statewide subclass); *Carlough*, 10 F.3d at 202–04 (affirming injunction enjoining state court proceedings pursuant to the "necessary in aid of jurisdiction" exception under the Anti-Injunction Act and All Writs Act).

expressly authorized by Act of Congress."[939] An injunction or extraordinary writ might also be available to protect the settlement during the period between conditional approval of the class action settlement and the Rule 23(e) fairness hearing.[940]

The binding effect of a judgment in an individual or class action on other related actions depends on principles of claim and issue preclusion. A judgment in the class action adverse to the class will, however, bar only class claims or individual claims actually litigated and resolved in the class action.[941] Questions concerning the court's ability to bind class members outside of its jurisdiction and the adequacy of the notice given might raise complex due process issues that affect the binding effect of a class action judgment.[942]

## 21.5  Trials

Trial techniques applicable to other forms of complex litigation will also be useful for class actions. Section 12.4 discusses jury notebooks, preliminary instructions, and special verdicts, all of which might help jurors organize the volume of complex information that is likely to be involved in a class action trial. Sections 21.141 and 21.21 discuss trial plans submitted as part of the certification process. In nonjury class action trials, the judge can limit the number of witnesses, require depositions to be summarized, call for the presentation of the direct evidence of witnesses by written statements, and use other techniques (described in section 12.5).

In jury cases, the court may consider trying common issues first, preserving individual issues for later determination. Such orders must be carefully drawn to protect the parties' right to a fair and balanced presentation of their claims and defenses and their right to have the same jury determine separate claims.[943] Approaches that have been tried in mass tort litigation might apply

---

939. 28 U.S.C. § 2283 (West 2002); *see also, e.g., In re* BankAmerica Corp. Sec. Litig., 263 F.3d 795, 801 (8th Cir. 2001) (injunction authorized where a federal statute, the Private Securities Litigation Reform Act of 1995, "create[d] a federal right or remedy that can only be given its intended scope by such an injunction").

940. *See* cases cited *supra* note 934.

941. *See* Cooper v. Fed. Res. Bank, 467 U.S. 867, 880–81 (1984).

942. *See* Phillips Petroleum Co. v. Shutts, 472 U.S. 797 (1985).

943. *See In re* Exxon Valdez, 270 F.3d 1215 (9th Cir. 2001) (describing multiphase class-wide trial of claims arising from the Exxon Valdez oil spill; affirming class-wide compensatory damages award, and vacating and remanding for district court recalculation the punitive damages verdict); Hilao v. Estate of Marcos, 103 F.3d 767 (9th Cir. 1996) (describing and affirming three-phase class-wide trial of punitive damages, liability, and compensatory damages of 10,000 member class of victims of alleged atrocities by the Marcos regime); *In re* Bendectin

(see section 22.93). Judges can encourage parties to stipulate to a test case approach, in which a sufficient number of individual or consolidated cases are tried in order to test the merits of the litigation. Such an approach is particularly useful if the claim is novel or otherwise "immature." See section 22.315. Some courts have used summary jury trials, an alternative dispute resolution (ADR) technique,[944] to determine the manageability of a class-wide trial of common issues. For example, in the *Telectronics* litigation, summary jury trial demonstrated the manageability of a common-issues trial and, as a result, facilitated informed settlement discussions.[945]

Although not accepted as mainstream, the following approaches have occasionally been suggested as ways to facilitate class action trials: using court-appointed experts to examine cases and report their findings to a jury, subject to cross-examination by the parties;[946] or adopting administrative models to administer damage awards, to the extent that such administrative models meet Seventh Amendment standards.[947] There is no consensus on the use of such procedures, however, and appellate review is scant.

---

Litig., 857 F.2d 290 (6th Cir. 1988) (describing and upholding constitutionality of trial to verdict of generic causation issue in aggregate proceedings); *see also In re* Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 141 (2d Cir. 2001) (suggesting "bifurcating liability and damage trials with the same or different juries" as one alternative for trial of antitrust action).

944. *See* Robert J. Niemic, Donna Stienstra & Randall E. Ravitz, Guide to Judicial Management of Cases in ADR 8–9, 44–45 (Federal Judicial Center 2001).

945. *See In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 137 F. Supp. 2d 985 (S.D. Ohio 2001).

946. *Hilao,* 103 F.3d at 782–84 (describing district court's use of a special master as a court-appointed expert); *see also* Sol Schreiber & Laura D. Weissbach, *In re Estate of Ferdinand E. Marcos Human Rights Litigation: A Personal Account of the Role of the Special Master,* 31 Loy. L.A. L. Rev. 475 (1998).

947. *See* Samuel Issacharoff, *Administering Damage Awards in Mass-Tort Litigation,* 10 Rev. Litig. 463, 471–80 (1991) (discussing administrative models for determining damage awards in mass contract, Title VII, and tort cases); *see also In re Visa,* 280 F.3d at 141 (listing five alternatives for district court to consider in approaching any need for individualized damages determinations).

# 21.6  Settlements

.61 Judicial Role in Reviewing a Proposed Class Action Settlement  308
  .611 Issues Relating to Cases Certified for Trial and Later Settled  312
  .612 Issues Relating to Cases Certified and Settled at the Same Time  313
.62 Criteria for Evaluating a Proposed Settlement  315
.63 Procedures for Reviewing a Proposed Settlement  318
  .631 Obtaining Information  318
  .632 Preliminary Fairness Review  320
  .633 Notice of Fairness Hearing  321
  .634 Fairness Hearing  322
  .635 Findings and Conclusions  322
.64 Role of Other Participants in Settlement Review  323
  .641 Role of Class Counsel in Settlement  323
  .642 Role of Class Representatives in Settlement  325
  .643 Role of Objectors in Settlement  326
  .644 Role of Magistrate Judges, Special Masters, and Other Judicial Adjuncts in
      Settlement  329
.65 Issues Raised by Partial or Conditional Settlements  329
  .651 Partial Settlements  329
  .652 Conditional Settlements  330
.66 Settlement Administration  331
  .661 Claims Administrator or Special Master  332
  .662 Undistributed Funds  333

## 21.61  Judicial Role in Reviewing a Proposed Class Action Settlement

.611 Issues Relating to Cases Certified for Trial and Later Settled  312
.612 Issues Relating to Cases Certified and Settled at the Same Time  313

This section deals with judicial review of the fairness, reasonableness, and adequacy of proposed settlements in class actions. (Section 13 discusses settlement in complex litigation generally; section 22.9 discusses settlement in the context of mass tort litigation; and section 31.8 discusses settlement in the context of securities class action litigation. Section 21.132 discusses issues relating to certification standards for settlement classes.)

Whether a class action is certified for settlement or certified for trial and later settled, the judge must determine that the settlement terms are fair, adequate, and reasonable. Rule 23(e)(1)(A) mandates judicial review of any "settlement, voluntary dismissal, or compromise of the claims, issues, or

defenses of a certified class."[948] Rule 23.1 contains a similar directive for shareholder derivative actions.

The judicial role in reviewing a proposed settlement is critical, but limited to approving the proposed settlement, disapproving it, or imposing conditions on it. The judge cannot rewrite the agreement.[949] A judge's statement of conditions for approval, reasons for disapproval, or discussion of reservations about proposed settlement terms, however, might lead the parties to revise the agreement. See section 13.14. The parties might be willing to make changes before the notice of the settlement agreement is sent to the class members if the judge makes such suggestions at the preliminary approval stage.[950] Even after notice of a proposed settlement is sent, a judge's statement of concerns about the settlement during the fairness hearing might stimulate the parties to renegotiate in order to avoid possible rejection by the judge.[951] If the fairness hearing leads to substantial changes adversely affecting some members of the class, additional notice, followed by an opportunity to be heard, might be necessary.

To determine whether a proposed settlement is fair, reasonable, and adequate, the court must examine whether the interests of the class are better served by the settlement than by further litigation. Judicial review must be exacting and thorough. The task is demanding because the adversariness of litigation is often lost after the agreement to settle. The settling parties frequently make a joint presentation of the benefits of the settlement without significant information about any drawbacks. If objectors do not emerge, there may be no lawyers or litigants criticizing the settlement or seeking to expose flaws or abuses. Even if objectors are present, they might simply seek to be treated differently than the class as a whole, rather than advocating for class-

---

948. Rule 23(e) does not require court approval when the parties voluntarily dismiss class allegations before certification. However, in certain situations in which a voluntary dismissal might represent an abuse of the class action process, the court should inquire into the circumstances behind the dismissal. *See* discussion *supra* section 21.312 and text accompanying notes 905–06.

949. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998) ("The settlement must stand or fall in its entirety."); *but cf. In re* Auction Houses Antitrust Litig., No. 00 Civ. 0648, 2001 WL 170792, at *18 (S.D.N.Y. Feb. 22, 2001) (conditioning approval of a settlement on parties' adopting changes specified by the district court).

950. Romstadt v. Apple Computer, Inc., 948 F. Supp. 701, 707 (N.D. Ohio 1996) (noting that a "proposed agreement is more readily alterable" and that "[t]he choice facing the court and parties is not limited to the binary alternatives of approval or rejection").

951. *See, e.g.,* Bowling v. Pfizer, Inc. 143 F.R.D. 138 (S.D. Ohio 1992) (raising questions about proposed settlement and continuing fairness hearing); Bowling v. Pfizer, Inc., 143 F.R.D. 141, 146 (S.D. Ohio 1992) (approving revised settlement); *see also* Jay Tidmarsh, Mass Tort Settlement Class Actions: Five Case Studies 35, 38 (Federal Judicial Center 1998).

wide interests. The lack of significant opposition may mean that the settlement meets the requirements of fairness, reasonableness, and adequacy. On the other hand, it might signify no more than inertia by class members or it may indicate success on counsel's part in obtaining, from likely opponents and critics, agreements not to object. Whether or not there are objectors or opponents to the proposed settlement, the court must make an independent analysis of the settlement terms.

Factors that moved the parties to settle can impede the judge's efforts to evaluate the terms of the proposed settlement, to appraise the strength of the class's position, and to understand the nature of the negotiations. Because there is typically no client with the motivation, knowledge, and resources to protect its own interests, the judge must adopt the role of a skeptical client and critically examine the class certification elements, the proposed settlement terms, and procedures for implementation.

There are a number of recurring potential abuses in class action litigation that judges should be wary of as they review proposed settlements:

- conducting a "reverse auction," in which a defendant selects among attorneys for competing classes and negotiates an agreement with the attorneys who are willing to accept the lowest class recovery (typically in exchange for generous attorney fees);[952]
- granting class members illusory nonmonetary benefits, such as discount coupons for more of defendants' product, while granting substantial monetary attorney fee awards;[953]
- filing or voluntarily dismissing class allegations for strategic purposes (for example, to facilitate shopping for a favorable forum or to obtain a settlement for the named plaintiffs and their attorneys that is disproportionate to the merits of their respective claims);[954]

---

952. *Coffee*, *supra* note 737, at 1354, 1370–73; *see, e.g.*, Blair v. Equifax Check Servs., Inc., 181 F.3d 832, 839 (7th Cir. 1999) (suggesting that "[p]erhaps [defendant] found a plaintiff (or lawyer) willing to sell out the class"); *see also* Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 283 (7th Cir. 2002) (finding that "[a]lthough there is no proof that the settlement was actually collusive in the reverse-auction sense, the circumstances demanded closer scrutiny than the district judge gave it"); Crawford v. Equifax Payment Servs., Inc., 201 F.3d 877, 882 (7th Cir. 2000) (rejecting class settlement because "Crawford and his attorney were paid handsomely to go away; the other class members received nothing").

953. *See, e.g.*, *In re* Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 818–19 (3d Cir. 1995) (rejecting as unfair a settlement based on $1,000 nontransferable coupon redeemable only upon purchase of new GM truck); *see generally* FJC Empirical Study of Class Actions, *supra* note 769, at 77–78, 183–85; Note, *supra* note 737, at 816–17.

954. Diaz v. Trust Territory of Pac. Islands, 876 F.2d 1401, 1408 (9th Cir. 1989); Shelton v. Pargo, Inc., 582 F.2d 1298, 1303, 1314 (4th Cir. 1978) (holding that the Rule 23(e) notice

- imposing such strict eligibility conditions or cumbersome claims procedures that many members will be unlikely to claim benefits, particularly if the settlement provides that the unclaimed portions of the fund will revert to the defendants;[955]

- treating similarly situated class members differently (for example, by settling objectors' claims at significantly higher rates than class members' claims);[956]

- releasing claims against parties who did not contribute to the class settlement;[957]

- releasing claims of parties who received no compensation in the settlement;[958]

- setting attorney fees based on a very high value ascribed to nonmonetary relief awarded to the class, such as medical monitoring injunctions or coupons, or calculating the fee based on the allocated settle-

requirement does not apply to a precertification dismissal that does not bind the class, but that "the court must, after a careful hearing, determine what 'claims are being compromised' between the plaintiff and defendant and whether the settling plaintiff has used the class action claim for unfair personal aggrandizement in the settlement, with prejudice to absent putative class members"); 3 Conte & Newberg, *supra* note 908, § 8:19. In many instances, notice and court approval of a voluntary dismissal will not be given or obtainable because the members of the proposed class will not yet have been determined. *Shelton*, 582 F.2d at 1303.

955. *See, e.g.*, Reynolds, 288 F.3d at 282–83; *see also* Deborah R. Hensler et al., Class Action Dilemmas: Pursuing Public Goals for Private Gain 427–30 (2000) [hereinafter RAND Class Action Report] (reporting actual distribution of benefits in ten case studies, in three of which class members claimed less than half the funds).

956. Gibson, *supra* note 792, at 154–55 (payment for dismissal of objectors' appeal regarding Rule 23(b)(1)(B) mandatory class); Tidmarsh, *supra* note 951, at 40–41 (objectors entered into private fee-sharing arrangements; opt-out cases settled for much higher sums than class members received).

957. *See, e.g.*, *In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 221 F.3d 870, 873 (6th Cir. 2000) (decertifying a limited fund settlement class because some of the released parties did not qualify for "limited fund" certification); *see also In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 137 F. Supp. 2d 985 (S.D. Ohio 2001) (approving a Rule 23(b)(3) opt-out settlement).

958. Molski v. Gleich, 318 F.3d 937 (9th Cir. 2003) (finding that settlement released individual damage claims without compensating class members other than class representative); Crawford v. Equifax Payment Servs., Inc., 201 F.3d 877, 882 (7th Cir. 2000) (finding that only the class representative received compensation); Bowling v. Pfizer, Inc., 143 F.R.D. 141, 169–70 (S.D. Ohio 1992) (concluding that objection concerning lack of compensation for release of claims for loss of consortium became moot by addition of $10 million fund for spouses of class members).

  ment funds, rather than the funds actually claimed by and distributed to class members;[959] and

- assessing class members for attorney fees in excess of the amount of damages awarded to each individual.[960]

In addition, although Rule 23(e) no longer requires court approval of a settlement or voluntary dismissal of individual claims as long as the settlement does not bind the class, the settlement of individual claims can represent an abuse of the class action process. For example, a party might plead class allegations to promote forum-shopping or to extract an unreasonably high settlement for the sole benefit of potential class representatives and their attorneys. Use of the court's supervisory authority to police the conduct of proposed class actions under Rule 23(d) may be appropriate in such circumstances.[961]

## 21.611 Issues Relating to Cases Certified for Trial and Later Settled

  When a Rule 23(b)(3) class is certified for trial, the decision whether to opt out might have to be made well before the nature and scope of liability and damages are understood. Settlement may be reached only after the opportunity to request exclusion has expired and after changes in class members' circumstances and other aspects of the litigation have occurred. Rule 23(e)(3) permits the court to refuse to approve a settlement unless it affords a new opportunity to request exclusion at a time when class members can make an informed decision based on the proposed settlement terms.[962]

  This second opt-out opportunity helps to provide the supervising court the "structural assurance of fairness," called for in *Amchem Products Inc.* This part of Rule 23(e)(3) affects only cases in which the class is certified and the

---

959.  *See supra* section 14.121.

960.  The only reported example of this egregious practice is *Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348, 1349 (7th Cir. 1996) (Easterbrook, J., dissenting from denial of rehearing en banc) (class member received an award of $2.19, but $91.33 was deducted from class member's bank account for attorney fees).

961.  *See supra* notes 904–10 and accompanying text. Prior to the change on this issue in Rule 23(e), some courts subjected precertification requests for dismissal to rigorous review. For an example of the Rule 23(e) analysis of the district court in the dismissal (pursuant to diplomatic settlement) of major German Holocaust-related litigation, see *In re Nazi Era Cases Against German Defendants Litigation*, 198 F.R.D. 429 (D.N.J. 2000).

962.  Providing a second opportunity to opt out may be appropriate "if the earlier opportunity . . . provided with the certification notice has expired by the time of the settlement notice" and if there have been "changes in the information available to class members since expiration of the first opportunity to elect exclusion." Rule 23(e)(3) committee note. See also text at note 238 for a description of an organized opt-out campaign.

initial opt-out period expires before a settlement agreement is reached. The rule provides a court with broad discretion to determine whether, in the particular circumstances, a second opt-out opportunity is warranted before approving a settlement.

## 21.612 Issues Relating to Cases Certified and Settled at the Same Time

Parties quite frequently enter into settlement agreements before a decision has been reached whether to certify a class.[963] Section 21.132 discusses the standards for certifying such a class. This section is about reviewing a proposed settlement in such a context.

Settlement classes—cases certified as class actions solely for settlement—can provide significant benefits to class members and enable the defendants to achieve final resolution of multiple suits. See section 22.921. Settlement classes also permit defendants to settle while preserving the right to contest the propriety and scope of the class allegations if the settlement is not approved and, in Rule 23(b)(3) actions, to withdraw from the settlement if too many class members opt out. An early settlement produces certainty for the plaintiffs and defendants and greatly reduces litigation expenses.[964]

Class actions certified solely for settlement, particularly early in the case, sometimes make meaningful judicial review more difficult and more important. Courts have held that approval of settlement class actions under Rule 23(e) requires closer judicial scrutiny than approval of settlements reached only after class certification has been litigated through the adversary process.[965] See section 22.9. Extended litigation between or among adversaries might

---

963. FJC Empirical Study of Class Actions, *supra* note 769, at 35.

964. *See supra* section 14.12 (noting the desirability of fee arrangements that reward counsel for efficiency, such as percentage of recovery fees). *See also* Hirsch & Sheehey, *supra* note 859, at 65–66.

965. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998) (calling for "a higher standard of fairness" in reviewing a settlement negotiated before class certification), and cases cited therein. *Cf.* Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997) (calling for "undiluted, even heightened, attention" to class certification requirements in a settlement class context). *Cf. also In re* PaineWebber Ltd. P'ships Litig., 171 F.R.D. 104, 122 (S.D.N.Y.) (holding that close scrutiny need not be given when class was certified for settlement purposes long before an agreement was reached), *aff'd*, 117 F.3d 721 (2d Cir. 1997). *See generally* Roger C. Cramton, *Individualized Justice, Mass Torts, and "Settlement Class Actions": An Introduction*, 80 Cornell L. Rev. 811, 826–35 (1995) (discussing problems relating to adequacy of representation in settlement class involving claims relating to future injuries and setting forth principles for reviewing settlement class actions); *Coffee, supra* note 737, at 1367–82, 1461–65 (discussing incentives for collusion in settlement class actions and possible antidotes). *See also* John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370 (2000).

bolster confidence that the settlement negotiations were at arm's length. If, by contrast, the case is filed as a settlement class action or certified for settlement with little or no discovery, it may be more difficult to assess the strengths and weaknesses of the parties' claims and defenses, to determine the appropriate definition of the class, and to consider how class members will actually benefit from the proposed settlement. The court should ask questions about the settlement and provide an adequate opportunity for settlement opponents to be fully heard.

Recurring issues raised by settlement classes include the following:

- *Conflicts between class counsel and counsel for individual plaintiffs.* Approval of the class settlement will, for the most part, take responsibility for providing relief to individual claimants from their individual attorneys and shift it to class counsel. Settlement will also effectively terminate other pending individual and class actions subsumed in the certified settlement class. Divergent interests must be taken into account and fairly accommodated before the parties negotiate a final settlement. Consider whether the counsel who have negotiated the settlement have fairly represented the interests of all class members. (This concern appears to be one of the major reasons the Court rejected the proposed settlement in *Amchem*.[966]) If the parties have not anticipated the need for subclasses, the court may decide to certify subclasses, appoint attorneys to represent the subclasses, and send the parties back to the negotiating table.

- *Future claimants.* In some mass tort cases, the court should consider whether a settlement purports to bind persons who might know that they were exposed to an allegedly harmful substance but are not yet injured, and persons who might not even be aware that they were exposed. The opt-out rights of those in the first category can be illusory in a Rule 23(b)(3)[967] action unless they are protected by "back-end opt-out" rights that permit individuals to decide whether to remain in the class after they become aware that they are injured, may have a claim, and understand the severity of their injury. (Rule 23(e)(3) gives a trial judge discretion to provide class members an opportunity to opt out of a Rule 23(b)(3) class settlement even though they had an earlier opportunity to opt out of the class after it was certified.) Because those in the second category, those who might not even know that they have been exposed or injured, cannot be given meaningful notice, an effort

---

966. 521 U.S. at 620.
967. *See generally id.*

to include them in the class can raise constitutional and due process issues.[968] See section 22.72. In some settlements, parties have negotiated terms that allow certain class members to defer choosing between accepting the benefits of a class settlement or litigating the class member's claim until after the claim arises.[969]

- *Administration of claims procedure.* The court should determine whether the persons chosen to administer the procedure are disinterested and free from conflicts arising from representing individual claimants.
- *Review of attorney fee applications*. See section 21.7.

## 21.62  Criteria for Evaluating a Proposed Settlement

Rule 23(e)(1)(C) establishes that the settlement must be fair, reasonable, and adequate. Fairness calls for a comparative analysis of the treatment of class members vis-à-vis each other and vis-à-vis similar individuals with similar claims who are not in the class. Reasonableness depends on an analysis of the class allegations and claims and the responsiveness of the settlement to those claims. Adequacy of the settlement involves a comparison of the relief granted relative to what class members might have obtained without using the class action process.

A number of factors are used to apply those criteria and evaluate a proposed settlement. Deciding which factors apply and what weight to give them depends on a number of variables: (1) the merits of the substantive class claims, issues, or defenses; (2) whether the class is mandatory or opt-out; and (3) the mix of claims that can support individual litigation, such as personal injury claims, and claims that are only viable within a class action, such as small economic loss claims. A class involving small claims may provide the only opportunity for relief and pose little risk that the settlement terms will sacrifice the interests of individual class members. A class involving many claims that can support individual suits—ranging from claims of severe injury or death to relatively slight harms, as for example a mass torts personal-injury class—might require more scrutiny by the court to fairness.

---

968. *See id.* at 628 (questioning whether proper notice could ever be given to "legions so unselfconscious and amorphous").

969. *See, e.g., In re* Diet Drugs, MDL No. 1203, 2000 WL 1222042, at *21 (E.D. Pa. Aug. 28, 2000) (approving second opt-out opportunity to pursue individual claim for compensatory (but not punitive) damages if injury worsens); Bowling v. Pfizer, Inc., 143 F.R.D. 141, 170 (S.D. Ohio 1992) (approving settlement in which class members retain rights to sue, pursue arbitration, or accept a guaranteed settlement amount for a future heart valve fracture).

Some factors that may bear on review of a settlement are set out below:[970]

1. the advantages of the proposed settlement versus the probable outcome of a trial on the merits of liability and damages as to the claims, issues, or defenses of the class and individual class members;

2. the probable time, duration, and cost of trial;

3. the probability that the class claims, issues, or defenses could be maintained through trial on a class basis;

4. the maturity of the underlying substantive issues, as measured by the information and experience gained through adjudicating individual actions, the development of scientific knowledge, and other factors that bear on the probable outcome of a trial on the merits;

5. the extent of participation in the settlement negotiations by class members or class representatives, and by a judge, a magistrate judge, or a special master;

6. the number and force of objections by class members;

7. the probable resources and ability of the parties to pay, collect, or enforce the settlement compared with enforcement of the probable judgment predicted under above paragraph 1 or 4;

8. the effect of the settlement on other pending actions;

9. similar claims by other classes and subclasses and their probable outcome;

10. the comparison of the results achieved for individual class or subclass members by the settlement or compromise and the results achieved or likely to be achieved for other claimants pressing similar claims;

11. whether class or subclass members have the right to request exclusion from the settlement, and, if so, the number exercising that right;

12. the reasonableness of any provisions for attorney fees, including agreements on the division of fees among attorneys and the terms of any agreements affecting the fees to be charged for representing individual claimants or objectors;

13. the fairness and reasonableness of the procedure for processing individual claims under the settlement;

---

970. The list is not exclusive and is subject to change depending on common-law development, including evolving interpretation of the 2003 amendments to Rule 23(e) and any legislation affecting class action or other mass tort suits. A helpful review of many factors that may deserve consideration is provided by *In re Prudential Insurance Co. America Sales Practice Litigation Agent Actions*, 148 F.3d 283, 316–24 (3d Cir. 1998).

14. whether another court has rejected a substantially similar settlement for a similar class; and

15. the apparent intrinsic fairness of the settlement terms.

In determining the weight accorded these and other factors, courts have examined whether

- other courts have rejected similar settlements for competing or overlapping classes;

- the named plaintiffs are the only class members to receive monetary relief or are to receive relief that is disproportionately large (differentials are not necessarily improper, but may call for judicial scrutiny);[971]

- the settlement amount is much less than the estimated damages incurred by members of the class as indicated by preliminary discovery or other objective measures, including settlements or verdicts in individual cases;

- the settlement was completed at an early stage of the litigation without substantial discovery and with significant uncertainties remaining;

- nonmonetary relief, such as coupons or discounts, is unlikely to have much, if any, market or other value to the class;[972]

- significant components of the settlement provide illusory benefits because of strict eligibility conditions;

- some defendants have incentives to restrict payment of claims because they may reclaim residual funds;

- major claims or types of relief sought in the complaint have been omitted from the settlement;

- particular segments of the class are treated significantly differently from others;

- claimants who are not members of the class (e.g., opt outs) or objectors receive better settlements than the class to resolve similar claims against the same defendants;

- attorney fees are so high in relation to the actual or probable class recovery that they suggest a strong possibility of collusion;

971. Compensation for class representatives may sometimes be merited for time spent meeting with class members, monitoring cases, or responding to discovery. *In re* Dun & Bradstreet Credit Servs. Customer Litig., 130 F.R.D. 366, 374 (S.D. Ohio 1990).

972. *See, e.g., In re* Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 818–19 (3d Cir. 1995) (rejecting as unfair a settlement based on $1,000 nontransferable coupon redeemable only upon purchase of new GM vehicles); *see generally* Note, *supra* note 737.

- defendants appear to have selected, without court involvement, a ne-gotiator from among a number of plaintiffs' counsel; and
- a significant number of class members raise apparently cogent objections to the settlement. (The court should interpret the number of objectors in light of the individual monetary stakes involved in the litigation. When the recovery for each class member is small, the paucity of objections may reflect apathy rather than satisfaction. When the recovery for each class member is high enough to support individual litigation, the percentage of class members who object may be an accurate measure of the class' sentiments toward the settlement. However, an apparently high number of objections may reflect an organized campaign, rather than the sentiments of the class at large. A similar phenomenon is the organized opt-out campaign.)[973]

A settlement will occasionally cover a class different from that certified. Review of the terms of the settlement or objections might reveal a need to redefine the class or to create subclasses based on the revelation of conflicts among class members. Frequently, the parties propose to enlarge the class or the claims of the class to give the settling defendants greater protection against future litigation. The court faced with a request for an expanded class definition should require the parties to explain in detail what new facts, changed circumstances, or earlier errors support the alteration of the original definition. If a Rule 23(b)(3) class is enlarged, notice must be given to the newly added members of their right to opt out; if a class is reduced, those being excluded should receive notice under Rule 23(d) if they previously received notice that they were included in the class and did not opt out.

## 21.63  Procedures for Reviewing a Proposed Settlement

.631 Obtaining Information  318
.632 Preliminary Fairness Review  320
.633 Notice of Fairness Hearing  321
.634 Fairness Hearing  322
.635 Findings and Conclusions  322

## 21.631  Obtaining Information

*Required disclosures.* Counsel for the class and the other settling parties bear the burden of persuasion that the proposed settlement is fair, reasonable, and adequate. In discharging that burden, counsel must submit to the court certain required disclosures, such as the terms of the settlement. Rule 23(e)(2)

---

973. *See* Carlough v. Amchem Prods., Inc., 10 F.3d 189 (3d Cir. 1993).

also requires a statement identifying any agreement made in connection with the settlement, including all agreements and undertakings "that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others. Doubts should be resolved in favor of identification."[974]

Separate side agreements or understandings may encompass such matters as resolution of claims outside the class settlement, positions to be taken on later fee applications, division of fees among counsel, or restrictions on counsel's ability to bring related actions in the future. The reference to agreements or undertakings related to the proposed settlement is necessarily open-ended. It is intended to reach agreements that accompany settlement but are not reflected in formal settlement documents and, perhaps, not even reduced to writing. The spirit of Rule 23(e)(2) is to compel identification of any agreement or understanding that might have affected the interests of class members by altering what they may be receiving or foregoing. Side agreements might indicate, for example, that the settlement is not reasonable because they may reveal additional funds that might have been paid to the class that are instead paid to selected claimants or their attorneys.

The court should, after reviewing the statement identifying related agreements and undertakings, decide whether to require specified agreements to be revealed and whether to require filing complete copies or only summaries of the agreements. Requiring the parties to file the complete agreement might elicit comments from class members and facilitate judicial review. A judge might consider acting in steps, calling first for a summary of any agreement that might have affected the settlement and then for a complete version if the summary does not provide an adequate basis for review.

A direction to disclose a summary or copy of an agreement might raise confidentiality concerns, as with agreements that include information that merits protection against general disclosure. The parties should be given an opportunity to claim work-product or other protections. Opt-out agreements, in which a defendant conditions its agreement on a limit on the number or value of opt outs, may warrant confidential treatment. Knowledge of the specific number of opt outs that will vitiate a settlement might encourage third parties to solicit class members to opt out. A common practice is to receive information about such agreements *in camera*.

Agreements between a liability insurer and a defendant may require balancing the need to know the terms of the agreement with the potential impact of making such terms public. The amount of insurance coverage

---

974. Fed. R. Civ. P. 23(e)(2) committee note.

available to compensate class members can bear on the reasonableness of the settlement, and identification of such agreements sometimes provides insufficient information. Unrestricted access to the details of such agreements, on the other hand, might impede resolution of important coverage disputes.

Rule 23(e)(2) does not specify sanctions for failure to identify an agreement or an understanding connected with the settlement. One possible sanction is reopening the settlement if the agreements or understandings not identified bear significantly on the settlement's reasonableness.

*Requests for additional information.* The judge may direct counsel to provide additional information necessary to evaluate the proposed settlement. Where settlement is proposed early in the litigation, for example, consider asking counsel to provide complete and detailed information about the factors that indicate the value of the settlement. Such factors include[975]

- likelihood of success at trial;
- likelihood of class certification;
- status of competing or overlapping actions;
- claimant's damages and value of claims;
- total present value of monetary and nonmonetary terms;
- attorney fees;
- cost of litigation; and
- defendant's ability to pay.

Discovery in parallel litigation may supply additional information. The outcomes of parallel litigation may also inform the court and objecting class members about the fairness, reasonableness, and adequacy of the proposed settlement.

## 21.632 Preliminary Fairness Review

Review of a proposed class action settlement generally involves two hearings.[976] First, counsel submit the proposed terms of settlement and the judge makes a preliminary fairness evaluation. In some cases, this initial evaluation can be made on the basis of information already known, supple-

---

975. The enumeration of issues and factors affecting the evaluation of settlements in this section draws on the opinion in *In re Prudential Insurance Co. America Sales Practice Litigation Agent Actions*, 148 F.3d 283 (3d Cir. 1998), and William W Schwarzer, *Settlement of Mass Tort Class Actions: Order Out of Chaos*, 80 Cornell L. Rev. 837, 843–44 (1995). *See also* RAND Class Action Report, *supra* note 955, at 486–90.

976. *See, e.g.*, *In re* Amino Acid Lysine Antitrust Litig., MDL No. 1083, 1996 U.S. Dist. LEXIS 5308, at *11 (N.D. Ill. Apr. 22, 1996) (conducting a preliminary review of whether a proposed settlement is within the range of reasonableness and raising questions for the fairness hearing).

mented as necessary by briefs, motions, or informal presentations by parties. If the case is presented for both class certification and settlement approval, the certification hearing and preliminary fairness evaluation can usually be combined. The judge should make a preliminary determination that the proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b). See section 21.22. If there is a need for subclasses, the judge must define them and appoint counsel to represent them. The judge must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the certification, proposed settlement, and date of the final fairness hearing. In settlement classes, however, it is often prudent to hear not only from counsel but also from the named plaintiffs, from other parties, and from attorneys who represent individual class members but did not participate in the settlement negotiations.

Whether the case has been certified as a class at an earlier stage or presented for certification and settlement approval at the same time, the judge can have a court-appointed expert or special master review the proposed settlement terms, gather information necessary to understand how those terms affect the absent class members, and assist the judge in determining whether the fairness, reasonableness, and adequacy requirements for approval are met. Individuals sometimes provide expert testimony regarding the valuation of the settlement or even of its legal validity. Given the nonadversarial posture of these experts, it is important to evaluate such testimony under Federal Rules of Evidence 701, 702, and 703 and question whether the proffered expert testimony will "assist the trier of fact to understand the evidence or determine a fact in issue."[977] The judge should raise questions at the preliminary hearing and perhaps seek an independent review if there are reservations about the settlement, such as unduly preferential treatment of class representatives or segments of the class, inadequate compensation or harms to the classes, the need for subclasses, or excessive compensation for attorneys. The parties then have an opportunity to resume negotiations in an effort to remove potential obstacles to court approval.

## 21.633 Notice of Fairness Hearing

Once the judge is satisfied as to the certifiability of the class and the results of the initial inquiry into the fairness, reasonableness, and adequacy of the settlement, notice of a formal Rule 23(e) fairness hearing is given to the class members. For economy, the notice under Rule 23(c)(2) and the Rule 23(e)

---

977. Fed. R. Evid. 702.

notice are sometimes combined. The fairness hearing notice should alert the class that the hearing will provide class members an opportunity to present their views on the proposed settlement and to hear arguments and evidence for and against the terms.

The notice of the fairness hearing should tell objectors to file written statements of their objections with the clerk of court by a specified date in advance of the hearing and to give notice if they intend to appear at the fairness hearing. Despite such ground rules, people who have not filed a written statement may be allowed to present objections at the hearing.[978]

## 21.634 Fairness Hearing

At the fairness hearing, the proponents of the settlement must show that the proposed settlement is "'fair, reasonable, and adequate.'"[979] The parties may present witnesses, experts, and affidavits or declarations. Objectors and class members may also appear and testify. Time limits on the arguments of objectors are appropriate, as is refusal to hear the same objections more than once. An extended hearing may be necessary.[980]

## 21.635 Findings and Conclusions

Even if there are no or few objections or adverse appearances before or at the fairness hearing, the judge must ensure that there is a sufficient record as to the basis and justification for the settlement. Rule 23 and good practice both require specific findings as to how the settlement meets or fails to meet the statutory requirements. The record and findings must demonstrate to a reviewing court that the judge has made the requisite inquiry and has consid-

---

978. *See, e.g., In re* Ford Motor Co. Bronco II Prods. Liab. Litig., MDL No. 991, 1994 U.S. Dist. LEXIS 15790 (E.D. La. Nov. 1, 1994) (permitting testimony by objectors who had not filed written statements, subject to inclusion of such objectors on witness lists and to limitation by the judge based on weight and significance of arguments); *In re* Prudential-Bache Energy Income P'ships Sec. Litig., 815 F. Supp. 177, 179 (E.D. La. 1993) (allowing objectors to submit evidence and testimony and to cross examine plaintiffs' experts). *See also* Tidmarsh, *supra* note 951, at 56, 68 (observing that two mass tort settlement class actions used trial-like procedure at the fairness hearing).

979. *In re* Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 316 (3d Cir. 1998) (quoting *In re* Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 785 (3d Cir. 1995)); *see also* Fed. R. Civ. P. 23(e)(1)(C).

980. *In re* Silicone Gel Breast Implant Prods. Liab. Litig., MDL No. 926, 1994 WL 578353 (N.D. Ala. Sept. 1, 1994) (reporting hearing from breast implant recipients during three days of hearings); *In re* "Agent Orange" Prod. Liab. Litig., 597 F. Supp. 740, 746–47 (E.D.N.Y. 1984) (reporting on national hearings involving numerous veterans and their families), *aff'd*, 818 F.2d 226 (2d Cir. 1987).

ered the diverse interests and the requisite factors in determining the settlement's fairness, reasonableness, and adequacy.

## 21.64  Role of Other Participants in Settlement Review

.641 Role of Class Counsel in Settlement  323
.642 Role of Class Representatives in Settlement  325
.643 Role of Objectors in Settlement  326
.644 Role of Magistrate Judges, Special Masters, and Other Judicial Adjuncts in
     Settlement  329

## 21.641  Role of Class Counsel in Settlement

Attorneys representing a class are responsible for communicating a settlement offer to the class representatives and ultimately to the members of the class. But the attorneys are also responsible for protecting the interests of the class as a whole, even in circumstances where the class representatives take a position that counsel consider contrary to the interests of absent class members.[981] Class counsel must discuss with the class representatives the terms of any settlement offered to the class.[982] Approval or rejection of the offer by the representatives, however, does not end the attorneys' obligations, because they must act in the best interests of the class as a whole.[983] Similarly, class counsel should bring to the court's attention any settlement offer that the class representatives approve, even if, as attorneys for the entire class, they believe it should not receive court approval.

Class counsel must be available to answer questions from class members in the interval between notice of the settlement and the settlement hearing. Counsel for the parties can create a Web site to convey factual information

---

981. *See, e.g.*, Flinn v. FMC Corp., 528 F.2d 1169, 1174–76 (4th Cir. 1975); *cf.* Parker v. Anderson, 667 F.2d 1204, 1211 (5th Cir. 1982); Saylor v. Lindsley, 456 F.2d 896, 899–900 (2d Cir. 1972). In the Diet Drugs litigation, several of the subclass representatives opposed approval of a settlement that had been negotiated on their behalf; the trial court discussed adequacy of representation requirements under these circumstances, and the fulfillment of *Amchem* criteria. *In re* Diet Drugs Prods. Liab. Litig., 2000 WL 1222042, at *50–*53 (E.D. Pa. Aug. 28, 2000).

982. Byes v. Telecheck Recovery Servs., Inc., 173 F.R.D. 421, 428–29 (E.D. La. 1997) (finding inadequacy of representation, based in part on counsel's failure to communicate with named plaintiff about settlement offers); Deadwyler v. Volkswagen of Am., Inc., 134 F.R.D. 128, 140–41 (W.D.N.C. 1991) (ordering sanctions because class counsel failed to communicate settlement offers to class representatives).

983. *See, e.g.*, Kincade v. Gen. Tire & Rubber Co., 635 F.2d 501, 508 (5th Cir. 1981) (indicating that "the 'client' in a class action consists of numerous unnamed class members as well as the class representative"); *see also* Heit v. Van Ochten, 126 F. Supp. 2d 487, 494–95 (W.D. Mich. 2001) (approving proposed settlement and approving class counsel's motion to withdraw from representing named representative who filed objection to the settlement).

about the settlement, including a complete copy of the agreement, and to give jointly prepared and court-approved answers to frequently asked questions.[984] Counsel for the parties may also arrange for a toll-free telephone number that provides information and an opportunity for class members to speak with personnel who have been trained to follow prearranged scripts in responding to various types of questions. In addition to or in lieu of an automated system, the notice may tell members to direct questions to class counsel and give a mailing address, a fax number, an E-mail address, or a telephone number. When most of the class members reside in the same locale (for example, in employment discrimination cases involving a single plant or facility), class attorneys and class representatives can meet with members to explain the terms and consequences of the proposed settlement.

Counsel for the parties are the main court's source of information about the settlement. The judge should ensure that counsel meet their obligations to disclose fully all agreements and understandings, including side agreements with attorneys or class members (see section 21.631) and be prepared to explain how the settlement was reached and why it is fair and reasonable. Counsel must also disclose any facet of the settlement that may adversely affect any member of the class or may result in unequal treatment of class members.

Ordinarily, counsel should confer with the judge to develop an appropriate review process. See section 21.61. Counsel should submit the settlement documents and a draft order setting a hearing date, prescribing the notice to be given to class members, and fixing the procedure for objections. Counsel may also be asked for statements about the status of discovery, the identity of those involved in the settlement discussions, the arrangements and understandings about attorney fees, and the reasons the settlement is in the best interests of the class. Counsel should be required to disclose and explain any incentive awards or other benefits to be received only by the class representatives.

At the hearing to consider final approval of the proposed settlement, counsel for the settling parties must make an appropriate showing on the record as to why the settlement should be approved. The nature and extent of that showing depends on the circumstances of the case—e.g., the importance of individual class members' stakes, the extent of disapproval within the class with regard to the settlement, whether relief to the class is in-kind only,

---

984. *See, e.g.*, *In re* Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig., No. 1:01-CV-9000, 2001 WL 1842315, at *16 (N.D. Ohio Oct. 20, 2001) (notice of class action and proposed settlement can be found at http://www.sulzerimplantsettlement.com (last visited Nov. 10, 2003)); *In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, 2000 WL 1222042, at *35 (E.D. Pa. Aug. 28, 2000) (additional information available at http://www.settlementdietdrugs.com (last visited Nov. 10, 2003)).

whether individual cases are being settled concurrently, and any varying allocations among groups of claimants and attorneys.

Counsel owe a duty of candor to the court to disclose all information relevant to the fairness of the settlement. If the class was certified in adversary proceedings, counsel must take into account their ongoing obligation to their clients and the need to protect their clients' positions should the settlement fail. In evaluating the settlement, the court should take into account not only the presentations of counsel but also information from other sources, such as comments from class representatives and class members, presentations by objections, the court's own knowledge of the case obtained during pretrial proceedings, and information provided by special masters or experts appointed by the court to assess the settlement.

## 21.642 Role of Class Representatives in Settlement

The court should examine closely any opposition by class representatives to a proposed settlement; those objections might be symptomatic of strained attorney–client relations. Notice of the settlement hearing might indicate any terms about which class counsel and class representatives differ.

Although rejection of a proposed settlement by a class representative may influence class counsel not to present the settlement to the court, a class representative cannot alone veto a settlement, especially one that has been presented to and approved by the court.[985] If the judge concludes that class representatives have placed individual interests ahead of the class's and impeded a settlement that is advantageous to the class as a whole, the judge should take appropriate action, such as notifying the class of the proposed settlement or removing the class representatives, or both.

When class representatives favor acceptance of a settlement offer that class counsel believe is inadequate or unfair, the representatives should be permitted to submit it to the court for preliminary approval and, if the court so orders, a fairness hearing. Although the court will ordinarily not approve a settlement that counsel do not recommend, class counsel, like class representatives, have no veto power over settlement of class actions.

---

985. *See, e.g.*, Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 591 (3d Cir. 1999) (affirming order approving settlement of class action and denying lead plaintiff's objections and motions for certification of subclass and disqualification of class counsel); *see also* Maywalt v. Parker & Parsley Petroleum Co., 864 F. Supp. 1422, 1429–30 (S.D.N.Y. 1994) (holding that settlement was fair, adequate, and reasonable despite objections from class representatives and some class members).

### 21.643  Role of Objectors in Settlement

Objectors can play a useful role in the court's evaluation of the proposed settlement terms. They might, however, have interests and motivations vastly different from other attorneys and parties.

Objectors can provide important information regarding the fairness, adequacy, and reasonableness of settlements. Objectors can also play a beneficial role in opening a proposed settlement to scrutiny and identifying areas that need improvement. For example, an organization's objection in one case transformed a settlement from one in which the lawyers received a majority of the funds to one that primarily benefited class members.[986]

Some objections, however, are made for improper purposes, and benefit only the objectors and their attorneys (e.g., by seeking additional compensation to withdraw even ill-founded objections). An objection, even of little merit, can be costly and significantly delay implementation of a class settlement. Even a weak objection may have more influence than its merits justify in light of the inherent difficulties that surround review and approval of a class settlement. Objections may be motivated by self-interest rather than a desire to win significant improvements in the class settlement. A challenge for the judge is to distinguish between meritorious objections and those advanced for improper purposes.[987] An objector who wins changes in the settlement that benefit the class may be entitled to attorney fees, either under a fee-shifting statute or under the "common-fund" theory. Fee awards made on the basis of insignificant or cosmetic changes in the settlement serve to condone and encourage improper use of the objection process. Federal Rule of Civil Procedure 11 applies to objectors and their attorneys and should be invoked in appropriate cases.

*Who may object?* Any class member who does not opt out may object to a settlement, voluntary dismissal, or compromise that would bind the class. Any party to the settlement may also object (for example, a shareholder of a corporation involved in the settlement).[988]

---

986. RAND Class Action Report, *supra* note 955, at 461–62. For a detailed discussion of the objections and the settlement discussions in that case, see *id.* at 201–05. *See also id.* at 355–60 (discussing objections, the fairness hearing, and a renegotiated settlement in the *Oriented Strand Board Home Siding Litigation*).

987. *See In re* Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297 (N.D. Ga. 1993).

988. *See* 4 Conte & Newberg, *supra* note 908, § 11:55, at 168 ("Any party to the settlement proceeding has standing to object to the proposed settlement."). *See also id.* at 176–77 ("[A]n objection may be registered by . . . any settling defendant, or any shareholder whose corporation is involved in settlement" (footnote call number omitted)).

*Individually based objections.* Objectors sometimes act individually, arguing that the objector should not be included in the class definition or is entitled to terms different than the terms afforded other class members. Unless a number of class members raise similar objections, individual objectors rarely provide much information about the overall reasonableness of the settlement. Individual terms more favorable than those applicable to other class members should be approved *only* on a showing of a reasonable relationship to facts or law that distinguish the objector's position from other class members.

If a complaint about differential treatment reflects genuine distinctions between the objector's position and the positions of other class members, the court should consider whether that distinction requires a subclass or otherwise uncovers an imperfection in the class definition or the settlement terms. Any modification to the settlement agreement generally should benefit other members of the class or subclass in addition to the objector. In the context of a certified class, different treatment of an individual objector must be based on a finding that the objector shares the common characteristics of the class yet possesses distinct attributes that are so unique as not to call for a subclass.

*Class-based objections.* Objections also may be made in terms common to class members or that seem to invoke both individual and class interests. So long as an objector is acting at least in part on behalf of the class, it is appropriate to impose on the objector a duty to the class similar to the duty assumed by a named class representative. In order to guard against an objector who is using the strategic power of objecting for private advantage, the court should examine and consider disapproving the proposed withdrawal of an objection if the objector is receiving payment or other benefits more favorable than those available to other similarly situated class members.[989]

*Discovery and other procedural support.* The important role some objectors play might justify additional discovery, access to information obtained by class counsel and class representatives, and the right to participate in the fairness hearing.[990] Parties to the settlement agreement should generally provide access

---

989. *See, e.g.*, Duhaime v. John Hancock Mut. Life Ins. Co., 183 F.3d 1 (1st Cir. 1999).

990. *See* Scardelletti v. Debarr, 265 F.3d 195, 204 n.10 (4th Cir. 2001) (affirming denial of motion to intervene and stating "'while [the court] should extend to any objector to the settlement leave to be heard, to examine witnesses and to submit evidence on the fairness of the settlement, it is entirely in order for the trial court to limit its proceedings to whatever is necessary to aid it in reaching an informed, just and reasoned decision'" (quoting Flinn v. FMC Corp., 528 F.2d 1169, 1173 (4th Cir. 1975) (internal quotation marks in original omitted))), *rev'd on other grounds sub nom.* Devlin v. Scardelletti, 536 U.S. 1 (2002); *In re* Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 24, 26 (D.D.C. 2001) (holding that "[c]lass members who object to a class action settlement do not have an absolute right to discovery; the Court may

to discovery produced during the litigation phases of the class action (if any) as a means of facilitating appraisal of the strengths of the class positions on the merits.

Objectors might seek intervention and discovery to demonstrate the inadequacy of the settlement. Discovery should be minimal and conditioned on a showing of need, because it will delay settlement, introduce uncertainty, and might be undertaken primarily to justify an award of attorney fees to the objector's counsel. A court should monitor postsettlement discovery by objectors and limit it to providing objectors with information central to the fairness of the proposed settlement. A court should not allow discovery into the settlement-negotiation process unless the objector makes a preliminary showing of collusion or other improper behavior.[991]

An opportunity to opt out after the settlement terms are known, either at the initial opportunity or a second opportunity, might reduce the need to provide procedural support to objectors or to rely on objectors to reveal deficiencies in a proposed settlement. Class members who find the settlement unattractive can protect their own interests by opting out of the class.

*Withdrawal of objections.* Court approval is necessary for withdrawal of objections to settlements binding on the class.[992] If objections are withdrawn but result in modifications to the class settlement terms, the withdrawal is reviewed as part of the class settlement. If the objector simply abandons pursuit of the objection, the judge should inquire into the circumstances, asking the parties and the objector to identify any benefit conveyed or promised to the objector or objector's counsel in connection with the withdrawal. Although an objector cannot ordinarily be required to pursue objections, judicial inquiry into—and potential disapproval of—so-called side agreements or tacit understandings can discourage improper uses of objections.

*Intervention and appeal.* A class member may appear at the settlement hearing and object without seeking intervention. Objectors need not formally intervene to appeal matters to which they objected during the fairness hearing.[993] Once an objector appeals, control of the proceeding lies in the court of appeals.

in its discretion allow discovery if it will help the Court determine whether the settlement is fair, reasonable, and adequate" and allowing limited discovery).

991.  Bowling v. Pfizer, 143 F.R.D. 141, 153 & n.10 (S.D. Ohio 1992).

992.  Fed. R. Civ. P. 23(e)(4)(B).

993.  Devlin v. Scardelletti, 536 U.S. 1 (2002).

### 21.644 Role of Magistrate Judges, Special Masters, and Other Judicial Adjuncts in Settlement

Reviewing a proposed class settlement for fairness, reasonableness, and adequacy is a time-consuming and demanding task, but it is essential and must be done by the judge. Typically, the parties and their attorneys will be primarily interested in upholding the settlement and may present information in a way that supports their position. In cases with a sparse record, the judge may appoint an adjunct: a magistrate judge, guardian *ad litem*, special master, court-appointed expert, or technical advisor, to help obtain or analyze information relevant to the proposed settlement.[994] For example, a judge might retain a special master or a magistrate judge to examine issues regarding the value of nonmonetary benefits to the class and their fairness, reasonableness, and adequacy.[995] Even in that context, however, the judge generally has to identify the issues and the procedures needed to address and resolve them.

## 21.65 Issues Raised by Partial or Conditional Settlements

.651 Partial Settlements  329
.652 Conditional Settlements  330

### 21.651 Partial Settlements

Settlement classes present special problems when they involve partial settlements, such as a settlement with one of several defendants. The settling defendant might be liable to the class as a whole or only to certain members of the class, and members of the settlement class might have difficulty understanding their position in the litigation. Because they may not know whether they will be members of a class with respect to claims against nonsettling defendants, they might be unable to make an informed decision regarding the adequacy of the settlement.

Given that the litigation might continue against other defendants, the parties may be reluctant to disclose fully and candidly their assessment of the proposed settlement's strengths and weaknesses that led them to settle separately. The adequacy of the settlement depends in part on the relative exposure and resources of other parties. An informed evaluation is extremely difficult if

---

994. For examples of such appointments in a mass tort context, see *infra* notes 1344–46 and accompanying text. Expert testimony may assist the court in making its evaluation. *See In re* Corrugated Container Antitrust Litig., 643 F.2d 195, 215 n.30 (5th Cir.), *on second appeal*, 659 F.2d 1322 (5th Cir. 1981).

995. *See, e.g.*, Gibson, *supra* note 792, at 22–23.

discovery is incomplete or has been conducted against only a few of the defendants.

Partial settlements are nevertheless not unusual. If several such settlements are being negotiated, it is ordinarily wise to defer consideration until all are submitted, thereby saving the time and expense of successive notices and hearings and allowing the judge and class members to assess the adequacy of the settlements as a whole. In the interest of fairness, a partial settlement should be brought to the attention of all parties. The judge may wish to defer ruling on temporary approval if a nonsettling party so requests and shows substantial progress in negotiating a settlement of its own. Funds from the settlements typically are placed in income-producing trusts established by class counsel for the benefit of the class and held until the case is fully resolved.

Partial settlements shortly before trial can disrupt the trial, resulting, for example, in the departure of a lead counsel. The court should set a deadline for the presentation of partial settlements sufficiently in advance of trial so that fairness hearings may be completed while still allowing the parties sufficient time to prepare for trial. See section 13.21.

Partial settlements containing provisions that might interfere with further proceedings, such as those attempting to limit further discovery, should rarely be approved. See section 13.22. A provision under which the class agrees to a refund if it later settles on terms more favorable to other defendants is particularly inappropriate, because the adequacy of such a proposed settlement cannot be fairly determined. Similarly, a defendant's agreement to increase the settlement fund if individual plaintiffs later settle for a greater amount does not diminish the court's responsibility to evaluate the adequacy of the amount offered to the class. See section 13.23. Although the court can give some deference to provisions purporting to allocate a settlement fund according to particular theories of recovery, claims, or time periods, it should reserve the power to make modifications when warranted. See section 13.21.

## 21.652 Conditional Settlements

The parties sometimes propose a precertification settlement that permits the settling parties to withdraw from the settlement if a specified number of persons opt out of the class or settlement. Although doing so might promote settlement by giving a defendant greater assurance of ending the controversy and avoiding the expense of litigating numerous individual claims, it might delay a final settlement. A reasonable cut-off date for the defendant's election, such as thirty days after the opt-out period, should keep any delays to a minimum. An alternative approach is to provide that the benefits paid to the class will be reduced in proportion to the number of opt outs or the total amount of their claims. If the reduction in benefits is substantial, fairness might require providing class members another opportunity to opt out.

Some settlements, particularly in securities and consumer litigation, are conditioned on class members waiving claims for additional periods not covered by the pleadings or are conditioned on waiving additional potential claims against the settling defendants. Often such waivers take the form of changing the definition of the class (e.g., by adding spouses or children). Review of such waivers will ensure that notice of them is clear, conspicuous, and not abusive.

## 21.66 Settlement Administration

.661 Claims Administrator or Special Master  332
.662 Undistributed Funds  333

Class settlements are rarely self-executing and various problems may arise in their administration. Sometimes a settlement fund is to be divided equally among all class members who meet specified criteria (for example, employees who sought promotion during a certain time period) or allocated in proportion to some measure of damage or injury (for example, the price paid for particular securities). In such cases, the class members are in potentially conflicting roles, because increasing one claimant's benefits will reduce another's recovery. Where the settlement provides that each qualifying class member receive a specified payment, either a flat sum or an amount determined according to a formula, settling defendants may have an interest in maximizing the extent to which class members are disqualified or have their claims reduced.

Class members must usually file claims forms providing details about their claims and other information needed to administer the settlement.[996] In larger class actions, forms and instructions might be provided on the Internet, and an E-mail address or a toll-free telephone number may be established for handling questions. In any event, class members should receive some means of personal communication. Verification of claims forms by oath or affirmation under 28 U.S.C. § 1746 may be required, and it may be appropriate to require substantiation of the claims (e.g., through invoices, confirmations, or brokers' records).

Completion and documentation of the claims forms should be no more burdensome than necessary. Nor, for purposes of administering a settlement, should the court require the same amount and specificity of evidence needed

---

996. For examples of claims forms, see *In re Diet Drugs Products Liability Litigation*, AHP Diet Drug Settlement Forms, available at http://www.settlementdietdrugs.com/d.home.php3 #forms (last visited Nov. 10, 2003).

to establish damages at a trial; secondary forms of proof and estimates are generally acceptable. A default award may be appropriate for those who can establish membership in the class but cannot, or prefer not to, submit detailed claims. Typically, such an award would be at the low end of the range of expected claims. The parties will usually have negotiated the amount and nature of proof necessary for a class member to recover under the settlement. To achieve the intended distribution to beneficiaries, additional mailings, telephone calls, and investigative searches might be needed if notices to class members are returned or if class members fail to submit claim forms. There may be no need to require action by class members, as where the defendants' records provide a satisfactory, inexpensive, and accurate method for determining the distribution of a settlement fund.

Class counsel should establish a procedure for recording receipt of the claims forms and tabulating their contents, with arrangements subject to court approval. If the class is large, forms are customarily sent to a separate mailing address and the essential information is recorded on computers. Judges sometimes require class counsel to use follow-up procedures to contact class members where only a few have filed claims.[997] Form letters can answer common inquiries from class members and deal with recurring errors in completing the claims forms. These procedures should be made part of the record to minimize subsequent disputes.

Audit and review procedures will depend on the nature of the case. Claims for modest amounts are frequently accepted solely on the basis of the verified claim forms.[998] Medium-sized claims or a portion of such claims selected by random sampling may be subjected to telephone audit inquiries or cross-checks against other records. Large claims might warrant a field audit to check for inaccuracies or fraud.[999]

## 21.661 Claims Administrator or Special Master

Judges often appoint a claims administrator or special master and describe the duties assigned in the order approving the settlement agreement. Duties may include taking custody of settlement funds, administering the distribution procedures, and overseeing implementation of an injunction. The adminis-

---

997. *See* Fed. R. Civ. P. 23(d)(2); *In re* Orthopedic Bone Screw Prods. Liab. Litig., 246 F.3d 315, 327–28, n.11 (3d Cir. 2001) (listing recommended practices for identifying class members entitled to actual notice).

998. *See infra* section 40.44.

999. *See, e.g., In re* Diet Drugs Prods. Liab. Litig., 236 F. Supp. 2d 445, 462, 464 (E.D. Pa. 2002) (order increasing field audits for doctors and law firms that had submitted medically unreasonable claims).

trator or special master may be charged with reviewing the claims and deciding whether to allow claims that are late, deficient in documentation, or questionable for other reasons.[1000] The specific procedure for reviewing claims may be limited to the materials submitted or may include a hearing at which the claimant and other interested parties may present information bearing on the claim. The claims procedure may allow appeal of a decision to disallow a claim. That appeal may involve review by a disinterested individual or panel or, in some instances, by the court.

The administrator should make periodic reports to the court. These reports should include information about distributions made, interest earned, allowance and disallowance of claims, the progress of the distribution process, administrative claims for fees and expenses, and other matters involving the status of administration. Section 32.39 discusses the use of special masters and magistrate judges in implementing class settlements in employment discrimination cases.

### 21.662 Undistributed Funds

The settlement might provide for disposition of undistributed or unclaimed funds.[1001] Judicial approval is required for such disposition, and the parties may want the funds to be returned to the settling defendant, paid to other class members, or distributed to a charitable or nonprofit institution. The court should allow adequate time for late claims before any refund or other disposition of settlement funds occurs,[1002] and might consider ordering a reserve for late claims.

---

1000.  *See, e.g., In re* Crazy Eddie Sec. Litig., 906 F. Supp. 840, 844–47 (E.D.N.Y. 1995) (reviewing criteria for deciding whether to allow late claims).

1001.  Although disfavored in a fully tried class action, "fluid recovery," in which damages are paid in the aggregate without individual proof, may be permissible in a settlement. *See In re* "Agent Orange" Prod. Liab. Litig., 818 F.2d 179, 185–86 (2d Cir. 1987) (finding "some 'fluidity' is permissible in the distribution of settlement proceeds" and holding that the district court must supervise the programs that will consume such proceeds). *Compare* Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1305 (9th Cir. 1990) (noting "[f]ederal courts have frequently approved this remedy [fluid recovery for distribution of unclaimed funds] in the settlement of class actions where the proof of individual claims would be burdensome or distribution of damages costly"), *with* Daly v. Harris, 209 F.R.D. 180, 197 n.5 (D. Haw. 2002) (noting "fluid recovery system, as a method of aggregating damages as opposed to a distribution method, would not be appropriate here since Section 1983 requires proof of actual damages").

1002.  *In re Crazy Eddie*, 906 F. Supp. at 845 (noting "there is an implicit recognition that late claims should ordinarily be considered in the administration of a settlement" (citing Manual for Complex Litigation, Third, § 30.47 (Federal Judicial Center 1995))).

The court's equitable powers may be necessary to deal with other problems that commonly arise during administration of settlement but might not be covered by the terms of the agreement. Such problems include

- the impact of divorce, death, incompetence, claims by minors, and dissolution of business entities or other organizations;
- investment of settlement funds (security of settlement funds is critical—the court should permit these funds to be held in only the most secure investments unless prudent investment of long-term holdings (e.g., to administer a trust for a mass tort settlement involving latent claims) calls for a balance between maintaining security and gaining returns on the investment);
- interim distributions and partial payments of fees and expenses; and
- procedures for handling lost or returned checks (although checks should ordinarily be stamped with a legend requiring deposit or negotiation within ninety days, counsel should be authorized to grant additional time).

The court and counsel should be alert to the possibility of persons soliciting class members after the settlement and offering to provide "collection services" for a percentage of the claims. Such activities might fraudulently deprive class members of benefits provided by the settlement and impinge on the court's responsibility to control fees in class actions.[1003]

## 21.7   Attorney Fee Awards

.71 Criteria for Approval  336
.72 Procedure for Reviewing Fee Requests  338
   .721 Motions  338
   .722 Notice  338
   .723 Objections  338
   .724 Information Supporting Request and Discovery for Fee Requests  338
   .725 Required Disclosures  339
   .726 Hearing and Findings  339
   .727 Use of Special Masters or Magistrate Judges  340

Attorney fee applications may arise as part of the settlement of a class award or after litigation of the class proceedings. The request may be based on a percentage of a common fund that the class action has produced or may be based on a statutory fee award. Statutory awards are generally calculated using the lodestar method (number of hours reasonably spent on the litigation

---

1003.  Jack Faucett Assocs., Inc. v. Am. Tel. & Tel. Co., 1985-2 Trade Cas. (CCH) ¶ 66,830 (D.D.C. 1985).

multiplied by the hourly rate, enhanced in some circumstances by a multiplier), subject to any applicable statutory ceiling on the hourly rate. Some courts use a lodestar method as a crosscheck to ensure that the percentage method does not result in an excessive award. See section 14.122.

The court's settlement review should include provisions for the payment of class counsel. In class actions whose primary objective is to recover money damages, settlements may be negotiated on the basis of a lump sum that covers both class claims and attorney fees. Although there is no bar to such arrangements,[1004] the simultaneous negotiation of class relief and attorney fees creates a potential conflict.[1005] Separate negotiation of the class settlement before an agreement on fees is generally preferable. See generally sections 14.22, 14.23 (court-awarded attorney fees), and 32.463 (employment discrimination, attorney fees). This procedure does not entirely eliminate the risk of conflict, and, if negotiations are to be conducted in stages, counsel must scrupulously avoid making concessions affecting the class for personal advantage. If an agreement is reached on the amount of a settlement fund and a separate amount for attorney fees and expenses, both amounts must be disclosed to the class. Moreover, the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel. The total fund could be used to measure whether the portion allocated to the class and to attorney fees is reasonable. Although the court may not rewrite the parties' agreement, it can find the proposed funds for the class inadequate and the proposed attorney fees excessive, and can allow the parties to renegotiate their agreement. The judge can condition approval of the settlement on a separate review of the proposed attorneys' compensation.

---

1004. *See* Evans v. Jeff D., 475 U.S. 717, 733–34 (1986); Marek v. Chesny, 473 U.S. 1, 5–7 (1985).

1005. *See, e.g., In re* Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 334–35 (3d Cir. 1998) (approving a settlement in which parties sought permission of the court to negotiate fees after the merits had been resolved); Malchman v. Davis, 761 F.2d 893, 904–05 (2d Cir. 1985) (rejecting, for lack of factual support, appellant's argument that simultaneous negotiation of the merits and fees had tainted the settlement); Manchaca v. Chater, 927 F. Supp. 962, 966 (E.D. Tex. 1996) ("The decision by plaintiffs to pursue attorneys' fees and costs subsequent to judicial approval of a settlement agreement demonstrates their commitment to arms-length negotiations."). *See also* Court Awarded Attorney Fees: Report of the Third Circuit Task Force, 108 F.R.D. 237, 269 (1985) (calling for, among other things, allowing parties to enter into a conditional settlement pending resolution of fees and for parties to seek the court's permission before discussing fees).

## 21.71  Criteria for Approval

Compensating counsel for the actual benefits conferred on the class members is the basis for awarding attorney fees. The "fundamental focus is the result actually achieved for class members."[1006] That approach is premised on finding a tangible benefit actually obtained by the class members. See section 14.11. In comparing the fees sought by the lawyers to the benefits conferred on the class, the court's task is easiest when class members are all provided cash benefits that are distributed. It is more complicated when class members receive nonmonetary or delayed benefits. In such cases, the judge must determine the value of those benefits.

Nonmonetary benefits can take a number of forms. In a Rule 23(b)(3) case, nonmonetary benefits can include coupons, discounts, or securities, or other forms. In a Rule 23(b)(2) case, the benefits may include different forms of injunctive relief, or relief that may mix injunctive and damages elements. A court may need to determine the dollar value of medical monitoring programs or warranty programs. A civil rights case may require evaluating an injunction redressing employment or other forms of discrimination. The court's evaluation and review of such benefits as part of the settlement review process (see section 21.62) is important for its review of fee applications. If a settlement provides only speculative, uncertain, or amorphous benefits to the class, that resists valuation in dollar terms.

The court should carefully scrutinize any agreement providing that attorneys for the class receive a noncontingent cash award.[1007] The court should refuse to allow attorneys to receive fees based on an inflated or arbitrary evaluation of the benefits to be delivered to class members. It might be appropriate to require attorneys to share in the risk of fluctuations in the value of an in-kind settlement, either by taking all or part of its counsel fees in in-kind benefits or by deferring collection of fees and making them contingent on the value of in-kind benefits that are actually delivered to the class members.[1008]

---

1006. Fed. R. Civ. P. 23(h) committee note. *See also* 15 U.S.C. § 77z-1(a)(6) (2000) (limiting fee award to a "reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class"); RAND Class Action Report, *supra* note 955, at 490 (concluding that the "single most important action that judges can take to support the public goals of class action litigation is to reward class action attorneys only for lawsuits that actually accomplish something of value to class members and society") (emphasis omitted).

1007. *See* RAND Class Action Report, *supra* note 955, at 429 ("In at least three instances [among 10 cases studied in depth], class members claimed less than half of the funds set aside for compensation.").

1008. *See supra* section 24.121; *see also, e.g.,* Bowling v. Pfizer, Inc., 132 F.3d 1147 (6th Cir. 1998) (reserving decisions on fees related to future funding until the class receives its benefits over a ten-year period); *In re* Auction Houses Antitrust Litig., No. 00 Civ. 0648, 2001 WL

In some instances, the court might find the benefit to the class so specula-tive that it will use the lodestar method rather than the common-fund method to determine the amount of fees to which the attorneys are entitled.[1009] In other instances, the court may greatly reduce the parties' estimates of the dollar value of the benefits delivered to the class members and base the attorney fee award on the reduced amount. In cases involving a claims procedure or a distribution of benefits over time, the court should not base the attorney fee award on the amount of money set aside to satisfy potential claims. Rather, the fee awards should be based only on the benefits actually delivered. It is common to delay a final assessment of the fee award and to withhold all or a substantial part of the fee until the distribution process is complete.

If a case is primarily concerned with injunctive or declaratory relief, exclusive concern with monetary benefits may not be appropriate.[1010] If the value of such relief cannot be reliably determined or estimated, consider using the lodestar method, including any appropriate multiplier, to calculate fee awards.

The common-fund theory may call for awarding attorney fees to counsel other than class counsel. If the court has appointed as class counsel attorneys who did not file one of the original complaints (see section 21.27), attorneys who investigated and filed the case might be entitled to a fee award. Attorneys for objectors to the settlement or to class counsel's fee application might also have provided sufficient benefits to a class to justify an award.[1011]

Rule 23(h) also authorizes the award of nontaxable costs in class action litigation and settlements.

170792, at *3–*5, *15–*17 (S.D.N.Y. Feb. 22, 2001) (counsel fees for cash and coupon compo-nents of settlement to be paid in same proportion of cash and coupons as class benefits paid).

1009.  Strong v. BellSouth Telecomms., Inc., 137 F.3d 844, 851–52 (5th Cir. 1998) (uphold-ing use of lodestar method of calculating fees in relation to a "phantom" common fund); *In re* Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 821 (3d Cir. 1995) (calling for lodestar calculation where common benefit "evades the precise evaluation needed for the percentage of recovery method").

1010.  Fed. R. Civ. P. 23(h) committee note (citing an individual civil rights action for the proposition that placing an "'undesirable emphasis' on 'the importance of the recovery of damages in civil rights litigation' . . . might 'shortchange efforts to seek effective injunctive or declaratory relief'" (quoting Blanchard v. Bergeron, 489 U.S. 87, 95 (1989))).

1011.  *Id.*

## 21.72  Procedure for Reviewing Fee Requests

.721 Motions  338
.722 Notice  338
.723 Objections  338
.724 Information Supporting Request and Discovery for Fee Requests  338
.725 Required Disclosures  339
.726 Hearing and Findings  339
.727 Use of Special Masters or Magistrate Judges  340

### 21.721  Motions

Rule 23(h)(1) calls for the court to fix a time for submission of motions for attorney fees in class actions. For a discussion of procedures applicable in other types of cases, see section 14.22. Rule 23(h) does not contemplate application of the fourteen-day rule specified in Rule 54(d)(2)(B) unless the court chooses to set that time. In general, parties should be prepared to submit such motions as soon as possible after announcing a settlement so that the required Rule 23(h)(1) notice of the fee request can be combined with the required Rule 23(e) notice of settlement and sent to the class at the same time.

### 21.722  Notice

Rule 23(h)(1) requires that notice of fee requests be "directed to class members in a reasonable manner." The rule contemplates that, in cases involving settlement review under Rule 23(e), "notice of class counsel's fees motion should be combined with notice of the proposed settlement" and afforded the same notice as Rule 23(e) requires.[1012] In adjudicated class actions, "the court can calibrate the notice to avoid undue expense."[1013]

### 21.723  Objections

Rule 23(h)(2) limits the right to object to class members or parties from whom payment is sought. Specifically, nonsettling defendants who will not be contributing to the fee payment sought may not object to the motion for a fee award.[1014]

### 21.724  Information Supporting Request and Discovery for Fee Requests

The party seeking fees has the burden of submitting sufficient information to justify the requested fees and taxable costs. Even in common fund cases, judges frequently call for an estimate of the number of hours spent on the

---

1012. Fed. R. Civ. P. 23(h)(1) committee note.
1013. *Id.*
1014. Fed. R. Civ. P. 23(h)(2) committee note.

litigation and a statement of the hourly rates for all attorneys and paralegals who worked on the litigation. Such information can serve as a "cross-check" on the determination of the percentage of the common fund that should be awarded to counsel. See section 14.122. In lodestar or statutory fee award cases, applicants must provide full documentation of hours and rates. To facilitate meaningful review of fee petitions, the court may specify the categories that attorneys should use to group their fee requests (e.g., by motion, brief, or other product) and establish other guidelines for any requests.[1015]

If there is a request for discovery to support an objection to a motion for attorney fees, the court should consider "the completeness of the material submitted in support of the fee motion, which depends in part on the fee measurement standard."[1016] If "the motion provides thorough information, the burden should be on the objector to justify discovery to obtain further information."[1017] As provided in Rule 23(e)(2), objectors should usually have access to the parties' statement about "any agreement made in connection with the proposed settlement." Whether the actual agreement will be discoverable depends on the extent to which the parties demonstrate a legitimate interest in confidentiality. See section 21.631.

## 21.725  Required Disclosures

Side agreements provide information relevant to the allocation of fees among counsel for various parties and interests. Any concurrent settlements of individual plaintiffs' cases by class counsel may be of particular interest. The court should examine the fee arrangements and the terms of individual settlements to avoid some plaintiffs' being favored over similarly situated class members.[1018]

## 21.726  Hearing and Findings

Rule 23(h)(3) permits the court to hold a hearing on a fee motion and directs the court to find the facts and state its conclusions of law. The circumstances and needs of the case will dictate the form of any hearing. For example, where the fee request depends on an evaluation of the relief earned for the class, a hearing may be necessary to provide evidence of such an appraisal. Usually, evidence of the value of the settlement will have been presented at the

---

1015.  *See* Hirsch & Sheehey, *supra* note 859, at 103–05; *see also supra* section 14.21.

1016.  Fed. R. Civ. P. 23(h)(2) committee note.

1017.  *Id.*

1018.  Georgine v. Amchem Prods., Inc., 157 F.R.D. 246, 258, 260, 307–09 (E.D. Pa. 1994), *vacated on other grounds*, 83 F.3d 610 (3d Cir. 1996), *and aff'd sub nom.* Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997).

hearing on settlement review. In many instances, hearings on settlement review and fees can be conducted at the same time.

## 21.727  Use of Special Masters or Magistrate Judges

Rule 23(h)(4) provides broad authority to refer issues related to the amount of a request for fees to a special master or magistrate judge. In this context, as in other posttrial contexts, Rule 53(a)(1)(C) does not require a finding of exceptional circumstances before making such a referral. Considerations of timing and cost, however, might affect a decision to refer the matter.

# 22. Mass Torts

.1 Introduction  342
.2 Initial Issues in Mass Tort Suits  348
.3 Multiple Filings in Federal District Courts  355
    .31 Aggregating Claims  355
        .311 Criteria  357
        .312 Advantages and Disadvantages of Aggregation  357
        .313 Timing of Aggregation Decisions  358
        .314 Obtaining Information About Common Issues and Case Values  358
        .315 Test Cases  360
        .316 Case Characteristics  360
        .317 Role of Different State Laws  361
        .318 Trial Plans  362
    .32 Intradistrict Assignment to a Single Judge  362
    .33 Interdistrict Transfer (Including MDL)  366
    .34 Denial of Transfer  368
        .341 Insufficient Common Facts  368
        .342 Procedural Alternatives  369
        .343 Geographical Diversity and Economy  369
        .344 Maturity of Litigation  370
    .35 Authority of a Judge Pending Decision by the MDL Panel  371
    .36 The Tasks of an MDL Transferee Judge  372
    .37 The Task of the Transferor Judge Following Remand After MDL Proceedings  376
.4 Multiple Filings in State and Federal Courts  376
.5 Multiple Filings in District and Bankruptcy Courts  378
    .51 Venue, Transfer, and Consolidation  380
        .511 Venue and Transfer  380
        .512 Consolidation and Reassignment  380
    .52 Withdrawing the Reference  381
    .53 Dividing the Labor Among Judges  383
        .531 MDL Transferee Judge  383
        .532 Other Judges  384
        .533 Bankruptcy Appeals  384
    .54 Coordinating and Consolidating Tort Claims and Related Cases  385
        .541 Claims Against the Debtor  386
        .542 Claims Against Other Defendants  388
        .543 Consolidation of Cases  388
        .544 Transfer of Related Cases of Nondebtor Defendants  389
        .545 Expanding the Automatic Stay or Enjoining Related Cases  391
    .55 Providing Representation for Future Mass Tort Claimants  393
    .56 Estimating the Value of Mass Tort Claims  397
    .57 Negotiating a Reorganization Plan  398
    .58 Discharging Future Claims  399
    .59 Confirming a Reorganization Plan  401
.6 Case-Management Orders  403
    .61 Initial Orders  403
    .62 Organization of Counsel  405
    .63 Subsequent Case-Management Orders  408
        .631 Adding Parties  408
        .632 Pleadings and Motions  409
        .633 Deferred Docketing  410

      .634 Issue Identification and Development  410
      .635 Electronic Communications  413
  .7 Class Actions in Mass Tort Cases  413
      .71 Background  414
      .72 Post-*Amchem* Class Certification  416
      .73 Post-*Ortiz* Mandatory Limited Fund Class Settlements  421
      .74 Medical Monitoring Class Actions  424
      .75 Issues Classes  429
          .751 Identify the Issues  430
          .752 Determine Applicable Law  431
          .753 Identify a Limited Set of Laws  432
          .754 Subclasses to Reflect Differences in State Law  432
          .755 Determine Separability of Common Issue  433
          .756 Establish a Trial Plan  434
          .757 Assess the Overall Impact  435
  .8 Discovery  435
      .81 Sampling  436
      .82 Initial Disclosures  437
      .83 Interrogatories  438
      .84 Depositions: New Parties  438
      .85 Documents  439
      .86 Physical Evidence  439
      .87 Experts and Scientific Evidence  440
  .9 Settlement and Trial  446
      .91 Judicial Role and Settlement  446
      .92 Review of Settlement in Mass Tort Class Actions  449
          .921 Class Certification in a Settlement Context  450
          .922 Fairness, Adequacy, and Reasonableness of the Settlement  453
          .923 Criteria for Evaluating the Merits of a Proposed Settlement  454
          .924 Gathering Information and Conducting a Fairness Hearing  456
          .925 Evaluating Nonmonetary Benefits  460
          .926 Presenting the Decision  460
          .927 Awarding and Allocating Attorney Fees  461
      .93 Trial  463

## 22.1  Introduction

This section provides a general definition of mass torts and distinguishes between multiple tort claims arising out of a single incident and dispersed mass tort claims. Section 22.2 identifies categories of information helpful to a judge managing mass tort suits. Section 22.3 analyzes a threshold issue in mass tort litigation—whether and when to aggregate related cases filed in different federal district courts, in federal and state courts, and in federal district courts, bankruptcy courts, and state courts. Throughout this section, "aggregated treatment" refers to various devices that bring claims and cases together for pretrial management, settlement, or trial. These devices include intradistrict consolidation under Federal Rule of Civil Procedure 42, class certification under Rule 23, multidistrict transfer under 28 U.S.C. § 1407, and the assembling of tort claims that automatically accompanies a bankruptcy filing. Section 22.31 focuses on aggregated treatment of related cases for pretrial case

management, criteria for deciding whether consolidation for trial is appropriate, and coordination techniques for nonaggregated cases. Subsequent sections focus on the particulars of mass tort case management and problems that can arise when class certification is sought in mass tort cases.

Mass torts litigation "emerges when an event or series of related events injure a large number of people or damage their property."[1019] A mass tort is defined by both the nature and number of claims; the claims must arise out of an identifiable event or product, affecting a very large number of people and causing a large number of lawsuits asserting personal injury or property damage to be filed. Some argue that 10,000 claims represent a threshold for mass torts that require special management;[1020] others argue that 100 suits will suffice. A 1999 report by the Working Group on Mass Torts considered fifty distinct groups of mass tort cases, representing a spectrum ranging from hundreds to hundreds of thousands of claims.[1021] The central question is whether the group of claims, whatever its size, calls for special management.

The need for special judicial management of mass torts arises from the sheer volume of the litigation generated. Judges must efficiently and fairly manage hundreds, even thousands, of related cases without unduly disrupting the court's other work. Mass tort cases are often characterized by a combination of issues, some that may lend themselves to group litigation (such as the history of a product's design) and others that require individualized presentation (such as the circumstances of individual exposure, causation, and damages). Because these factors vary from tort to tort, and case to case, generalized rules about handling mass tort cases are difficult to formulate.

State substantive law usually governs mass tort cases, making multistate aggregations of cases even more complex. Some products, like asbestos and diethylstilbestrol (DES), were produced by a substantial number of companies, and allocating responsibility among defendants and their insurers introduces additional complications. The trial judge ordinarily should distinguish between issues appropriate for aggregate determination and issues that require individualized determinations before making any decision about whether or how to aggregate claims for pretrial management or final resolution.

Courts have long recognized the need for special case-management practices in single incident mass torts, such as a hotel fire, the collapse of a structure, the crash of a commercial airliner, a major chemical discharge or

---

1019.  Advisory Comm. on Civil Rules and Working Group on Mass Torts, Report on Mass Tort Litigation 10 (Feb. 15, 1999), *reprinted without appendices in* 187 F.R.D. 293, 300 [hereinafter, Working Group Report].

1020.  *Id.* at 300 n.1 and sources cited therein.

1021.  Working Group Report, *supra* note 1019, app. D, at 1.

explosion, or an oil spill. Since the early 1980s, however, there has been a rapid increase in litigation involving dispersed mass torts, which typically arise from widespread use of, or exposures to, widely distributed products or substances, often over an extended time.[1022] Prominent examples include litigation involving asbestos, Dalkon Shield intrauterine devices, silicone gel breast implants, and diet drugs. Key elements of such claims are a high volume of repetitive litigation involving the same or similar product or substance, and an evolving and uncertain group of potential claimants and potential defendants. In a dispersed mass tort, "the universe of potential plaintiffs is unknown and many times is seemingly unlimited, and the number of potential tortfeasors is equally obtuse . . . ."[1023] By contrast, with single incident mass torts, "the universe of potential claimants is either known or . . . capable of ascertainment and the event or course of conduct . . . occurred over a known time period and is traceable to an identified entity or entities."[1024]

   Some dispersed mass tort cases involve only claims by individuals who know that they consumed a certain product or were exposed to a certain substance and who sustained a present injury of predictable severity within a relatively short period. Examples of such cases include a pharmaceutical drug or a medical device that is withdrawn from the market within a year or two after introduction, such as the Baycol (antistatin drug)[1025] and Sulzer Inter-Op Hip Prosthesis[1026] litigations. In other cases, the product or substance exposure can occur over years and produce latent injury that may take decades or more to appear and even longer for the extent or severity of injury to become clear. Such cases are often termed latent dispersed mass torts. Examples of latent injury claims include those related to asbestos,[1027] intrauterine devices,[1028]

---

1022. *See generally* American Law Institute, Complex Litigation: Statutory Recommendations and Analysis § 6.01, at 340–41 (1994) [hereinafter ALI, Complex Litigation] (a succinct history of some major events in the history of mass torts); *see also* Francis E. McGovern, *Resolving Mature Mass Tort Litigation*, 69 B.U. L. Rev. 659 (1989) [hereinafter McGovern, *Mature Mass Tort*].

1023. *In re* Chevron U.S.A., Inc., 109 F.3d 1016, 1018 (5th Cir. 1997) (claims of personal injury and property damage related to alleged contamination of property and groundwater by dumping hazardous wastes).

1024. *Id. See also* McGovern, *Mass Torts for Judges*, *supra* note 705, at 1827–38 (analyzing various factors related to the volume or elasticity of some mass torts).

1025. *See In re* Baycol Prods. Liab. Litig., 180 F. Supp. 2d 1378 (J.P.M.L. 2001).

1026. *In re* Inter-Op Hip Prosthesis Prods. Liab. Litig., 149 F. Supp. 2d 931 (J.P.M.L. 2001).

1027. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 598 (1997) ("[L]atency period that may last as long as 40 years for some asbestos related diseases . . . .").

1028. *See* Richard B. Sobol, Bending the Law: The Story of the Dalkon Shield Bankruptcy 107 (1991) ("The discovery of infertility related to the use of the Dalkon Shield frequently occurred long after the removal of the device.").

silicone gel breast implants,[1029] radiation exposure,[1030] and pharmaceutical products, such as morning sickness remedies.[1031] Some potential claimants will know that they have been exposed to a harmful product or substance, even absent present injury. Other individuals, however, may not be aware that they have been exposed to a potentially injurious product or substance (e.g., the female children of women who took DES during pregnancy[1032] or individuals who have unknowingly been exposed to asbestos[1033]). Some individuals may not yet have been exposed to products such as asbestos, lead, or other harmful substances, but may be exposed later. Justice Ginsburg described such categories of potential claimants as "unselfconscious and amorphous,"[1034] a characterization that underscores the difficulty of providing notice to them in a class action.

Those who have been exposed to a potentially harmful product or substance but have no discovered injury are sometimes referred to as future claimants or present future claimants. People who have not yet been exposed to the product or substance but who are in the future are sometimes referred to as future future claimants. Some question exists whether future claimants, of whatever type, can receive class action notice that is sufficient under the Constitution and Rule 23.[1035] Some cases present allegations of both present injury and latent injury, adding to the variability among the claims. Breast implant and asbestos claims exemplify this latter category.[1036]

1029. *In re* Silicone Gel Breast Implant Prods. Liab. Litig., MDL No. 926, No. CV92-P-10000-S, Civ. A. No. CV 94-P-11558-S, 1994 WL 578353, at *8 (N.D. Ala. Sept. 1, 1994) (approving ongoing disease compensation program for thirty years that provides for potentially adding illnesses of children of women with implants).

1030. *In re* TMI Litig., 193 F.3d 613, 643 (3d Cir. 1999) (finding that latency period for exposure to radiation may vary, depending on disease, from eight to ten years).

1031. *In re* DES Cases, 789 F. Supp. 552, 558 (E.D.N.Y. 1992) (noting that babies exposed to DES in womb may have latent diseases in adult years); *cf. In re* Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig., MDL No. 1203, No. 99-20593, 2000 WL 1222042, at *46 (E.D. Pa. Aug. 28, 2000) (finding no real latency period from time of discontinued use of diet drug).

1032. *DES Cases*, 789 F. Supp. at 558 ("Women exposed to DES *in utero* may develop adenosis, a pre-cancerous cell change . . . .").

1033. *Amchem*, 521 U.S. at 628 (noting that many persons may not know they were exposed, including children and spouses of claimants).

1034. *DES Cases*, 789 F. Supp. at 558. *See generally, Amchem*, 521 U.S. at 628.

1035. Jay Tidmarsh, Mass Tort Settlement Class Actions 29 n.72 (Federal Judicial Center 1998) (dividing "future plaintiffs" into "present futures" and "future futures"); Working Group Report, *supra* note 1019, at 302 (referring to "future claimants").

1036. *See, e.g., Amchem*, 521 U.S. at 626–27 (discussing "currently injured" and future claimants); *In re* Silicone Gel Breast Implant Prods. Liab. Litig., MDL No. 926, 1994 WL 578353, at *8 (N.D. Ala. Sept. 1, 1994) (alleging wide range of injuries).

These different categories of potential claimants may create conflicts of interest. Those with present injuries want to maximize present recoveries; those who may reveal no injury for years want to ensure that sufficient assets are available in the future to provide compensation if and as needed.[1037] Those who have not yet been exposed or are unaware of exposure may not be identifiable. Including such individuals in a binding resolution, as in a global settlement, raises issues of notice and fairness.

Identifying the differences between single incident and dispersed mass torts does not necessarily indicate how specific cases should be managed. Some single incidents, such as accidental discharges of pollutants, can also lead to claims that are widely dispersed over time and place.[1038] Even single event torts with a strong local nexus, such as a plant emission or a spill of toxic materials, may include latent exposure effects or be affected by individual variables, such as smoking. The "common distinction between 'single event' and 'dispersed' mass torts identifies prototypes," but does not neatly divide mass torts "into two tidy categories that can be managed by separate or distinctive means."[1039] The "crucial point is not whether the underlying tort itself is a single event, but whether its consequences are dispersed."[1040]

Toxic tort and defective product cases are often filed throughout the state and federal court systems, including the bankruptcy courts. The sheer number of cases can create enormous pressure to aggregate or combine them in order to reduce delay and docket congestion and to avoid the costs of repetitive litigation that can drain potential compensation funds. That pressure has led to creative and experimental procedures by attorneys and judges. A "process of common law evolution" and "a growing corps of experienced litigators" have helped "state and federal courts continue to experiment with existing procedures and allocations of jurisdiction."[1041] District judges have exercised their broad discretion to create some of the innovations described in this section. The purpose of these innovations, often stimulated by necessity, was to implement the goals of Rule 42 or 28 U.S.C. § 1407. Although appellate courts have not reviewed many of the innovative techniques, several of these techniques are clearly within the district court's discretionary power to manage the

---

1037. *Amchem*, 521 U.S. at 626–27.

1038. *See, e.g., In re* TMI Litig., 193 F.3d 613, 624, 625 n.8 (3d Cir. 1999) (personal injury claims were filed from the early eighties to mid-nineties); Allen v. United States, 588 F. Supp. 247, 257–58 (D. Utah 1984) (discussing personal injury claims related to radioactive fallout from nuclear test site where pollutants were dispersed over parts of Nevada, Utah, and Arizona).

1039. Working Group Report, *supra* note 1019, at 301.

1040. *Id.* at 302.

1041. *Id.* at 316.

litigation. However, some approaches, especially those that aggregate large numbers of claims with significant variations, may not comply with the underlying substantive law or may be unfair to some litigants.[1042] Nevertheless, courts recognize that the complexity, diversity, and volume of mass tort claims require adapting traditional procedures to new contexts, to achieve both fairness and efficiency. Effective management of mass tort cases typically requires early and regular meetings with the lawyers, identifying the nature of the claims, making decisions on pretrial or trial aggregation or coordination, and entering detailed orders necessary to the orderly development of the case.[1043] This management role should begin early in the litigation.

Procedures to aggregate claims sometimes encourage the filing of questionable claims, accelerate the rate at which claims are presented,[1044] or even create a mass tort out of what otherwise might simply have been a flurry of similar cases that would have quickly faded away. For example, in the repetitive stress injury litigation, the Judicial Panel on Multidistrict Litigation (MDL Panel) (see section 20.13) rejected plaintiffs' request for consolidation because the Panel was "not persuaded . . . that the degree of common questions of fact among these actions rises to the level" required under 28 U.S.C. § 1407.[1045] Subsequently, plaintiffs failed to succeed on the merits in trials in seven different jurisdictions and such claims disappeared from the mass tort landscape.[1046]

---

1042. For a case study discussing the appropriate use of mass tort innovations discussed in this manual, see Thomas E. Willging, *Beyond Maturity: Mass Tort Case Management in the* Manual for Complex Litigation, 148 U. Pa. L. Rev. 2225 (2000) (focusing on use of *MCL, 3d*'s treatment of the maturity concept in nationwide tobacco class action) [hereinafter Willging, *Beyond Maturity*]; see also ALI, Complex Litigation, *supra* note 1022, § 3.01, at 41–51 (discussing efficiency and fairness in deciding whether to aggregate claims).

1043. *See generally* Jack B. Weinstein, *Ethical Dilemmas in Mass Torts Litigation*, 88 Nw. U. L. Rev. 469 (1994); Geoffrey C. Hazard, Jr., *Reflections on Judge Weinstein's Ethical Dilemmas in Mass Torts Litigation*, 88 Nw. U. L. Rev. 569 (1994).

1044. *See* McGovern, *Mass Torts for Judges*, *supra* note 705, at 1822 ("The more successful judges become at dealing 'fairly and efficiently' with mass torts, the more and larger the mass tort filings become."); *see also id.* at 1841–45 (discussing different case-management approaches for different levels of maturity of mass tort litigation).

1045. *In re* Repetitive Stress Injury Prods. Liab. Litig., No. 955, 1992 WL 403023, at *1 (J.P.M.L. Nov. 27, 1992). *See also In re* Repetitive Stress Injury Litig., 11 F.3d 368, 374 (2d Cir. 1993) (vacating a pretrial consolidation order under Rule 42; approving assignment of cases to a single judge).

1046. *See* George M. Newcombe, *RSI Defendants Fight for Due Process: "Mass Torts" Needn't Always Be Massive*, 63 Def. Couns. J. 36, 39–40 (1996). A prominent plaintiffs' attorney had described RSI cases as "the mass tort of the nineties" (see Stanley J. Levy, *Repetitive Trauma: The Mass Tort of the Nineties, in* Proving or Defending Repetitive Stress Injury, Medical Device, Lead,

Although the "just, speedy, and inexpensive determination of every action"[1047] requirement applies to all cases, the difficult and sometimes contradictory demands posed by mass torts make case management both challenging and critical. The absence of precedent or of legislative or rule-making solutions should not foreclose innovation and creativity. Such creativity must be carefully applied, accompanied by an examination of the specific issues raised in each case, the legal authority for and against the procedures devised, and other factors that might affect fairness and efficiency.

## 22.2   Initial Issues in Mass Tort Suits

The goals of mass tort case management parallel the goals of Federal Rule of Civil Procedure 1 and include the following:

- providing a forum for all parties to have a fair test of the merits of their claims and defenses;
- avoiding inefficient and duplicative litigation of similar issues of law or fact;
- effecting the statutory and common-law goals of compensating those injured by tortious conduct and deterring such conduct; and
- affording similar treatment to similar cases in order to promote public confidence in the courts through consistent, predictable, and cost-effective outcomes.

These goals sometimes require the court to marshal limited assets for the protection of present and future claimants not yet before the court.

Mass tort case management must keep the litigation moving efficiently, without truncating necessary pretrial preparation or distorting the presentation of issues. Cases involving a large volume and variety of claims and parties, and the presence of individualized issues, often create conflicting demands for speedy adjudication and fairness to all parties. The challenge for the judge is to avoid excessive delay while preserving the right to a fair trial. For example, the court may need to establish priorities by considering claims involving serious impairment before claims that appear to involve little or no impairment. (This section later discusses types and varieties of claims; section 22.633 discusses deferred docketing.)

The paradox of mass torts is that all of the claims share some common attributes, and all present similar challenges, but each particular case has some

---

Pharmaceutical and Closed Head Trauma Cases 167 (PLI Comm. Law & Practice Course, Handbook Series No. 723, 1995)).

1047. Fed. R. Civ. P. 1.

unique features. A judge must gather information that affects the threshold decisions for organizing the litigation and for setting a timetable for pretrial discovery, preliminary or dispositive motions, and trial. A critical question often is whether to aggregate cases for pretrial and trial management or to proceed on a case-by-case basis. Important factors to consider include the following:

- *What is the number of potential claims?* Mass production and widespread distribution of potentially harmful products or broad exposure to harmful substances is at the core of most mass torts. The volume of sales or the extent of public exposure to the products or substances at issue can help the court approximate the potential size of a mass tort. Information about the number of cases already filed in state and federal courts and the number of people exposed may provide a basis for predicting the number of cases likely to be filed in the future and the likely rate of filings. The number of actual and potential claimants affects decisions about whether to aggregate a group of cases, when aggregation is appropriate, and what form aggregation should take. A court should be cautious before aggregating claims or cases, particularly for trial, learning first about the nature of the litigation and whether the issues are appropriate even for pretrial aggregation or consolidation. Premature aggregation might be unworkable, unfair, or even accelerate the number and rate of filings and increase the size of the mass tort.

- *What are the types and varieties of claims involved?* Considering the following will help inform case-management decisions:

  – whether there is mixed severity among injury claims and whether any alleged diseases are latent (if a latent disease, the length of the latency period—that is, the period between exposure and manifestation of injury);

  – whether there are claims for personal injury, property damage, economic damage, or combinations of these elements;

  – whether claims for personal injuries involve imminent death, disability, chronic illness, or fear of future injury;

  – if an increased risk of future injuries is at issue, whether medical monitoring is an available cause of action or remedy under applicable law; and

  – whether the mix of injuries suggests a need to establish priorities for the most serious claims and a correlative need to defer consid-

eration of claims with little or no present impairment.[1048] Section 40.52 has a sample order. Section 22.633 discusses deferred docketing. Judges have also devised ways to screen claims that appear to have no factual basis.[1049]

   A latency period raises the issue of future claimants and their relationship to those already manifestly injured. A long latency period complicates the identification and resolution of future claims, particularly claims by those who are still unaware that they have been exposed to a dangerous product or substance, or who may not yet have been exposed. The likelihood of future claims, and the number of those claims, may be difficult or impossible to determine.

   •   *What is the strength and reliability of the scientific evidence?* Is statistically significant and reliable information to support general causation available or likely to become available? Epidemiological evidence may not be available when the exposed population is relatively small, the disease or injury at issue is relatively rare, or both.[1050] Is other reliable evidence available or likely to become available from which a causal relationship might be proven—for example, findings from toxicology or medicine?[1051] These issues are often raised in challenges to the sufficiency and reliability of expert evidence.

---

   1048. *See, e.g.*, *In re* Asbestos Prods. Liab. Litig. (No. VI), No. 875, 2002 U.S. Dist. LEXIS 16590, at *1 (E.D. Pa. Jan. 16, 2002) (order ruling that "priority will be given to the malignancy and other serious health cases over the asymptomatic claims," administratively dismissing cases based on mass screenings, and tolling the statute of limitations for such cases). See generally 28 U.S.C. § 1657 (West 2003) and Fed. R. Civ. P. 40 for statutory and rule-based authority of courts to set priorities for civil cases; see also *In re Joint Eastern & Southern Districts Asbestos Litigation*, 237 F. Supp. 2d 297, 319–24, 336 (E.D.N.Y. & Bankr. S.D.N.Y. 2002) (approving amended trust terms that modify disease categories, criteria, and values to increase compensation to claimants with severe impairments).

   1049. *See, e.g.*, *In re* Diet Drugs Prods. Liab. Litig., 236 F. Supp. 2d 445, 462–64 (E.D. Pa. 2002) (finding echocardiograms and claims forms submitted by two cardiologists and two law firms to have been medically unreasonable and authorizing the settlement trust to audit all claims submitted by those law firms and all reports by those cardiologists).

   1050. *See generally* Michael D. Green et al., *Reference Guide on Epidemiology, in* Reference Manual on Scientific Evidence 333, 343 (Federal Judicial Center 2d ed. 2000) (indicating that for a rare disease, a cohort study may not be possible because "an extremely large group would have to be studied in order to observe the development of a sufficient number of cases for analysis); *see also id.* at 356 ("Common sense leads one to believe that a large enough sample of individuals must be studied if the study is to identify a relationship between exposure to an agent and disease that truly exists.").

   1051. *See* Bernard D. Goldstein & Mary Sue Henifin, *Reference Guide on Toxicology, in* Reference Manual on Scientific Evidence 401–37 (Federal Judicial Center 2d ed. 2000), *and*

• *Do the basic elements of the mass tort present issues common to all claim-ants?* Is the proof of those basic issues common to enough claimants to warrant common treatment? Common factual issues may arise from the development, manufacturing, or marketing of an allegedly defective product. The evidence as to whether a product was defective, whether there is general causation, and the presence and extent of damages must all be analyzed to determine whether it is common to all claimants or primarily dependent on individual circumstances.

Causation must be analyzed to determine whether it can be established on a group-wide basis. Proof of causation requires evidence of exposure to the allegedly defective product or substance, the amount and duration of exposure, the alleged causal mechanism, and the role of alternative causal agents. In some cases, judges have treated general causation as suitable for aggregation through consolidation or certification of an issues class;[1052] in other cases, judges have found the issue too intertwined with individual questions to permit such an approach.[1053] Some products leave a signature injury, such as mesothelioma from asbestos. Even in those cases, however, proof of individual exposure to the causal agent is essential. An identifiable agent that consistently causes a particular injury may make it easier to prove causation on a group-wide basis. Without a signature injury or a readily identifiable agent, evidence as to the amount of exposure and the role of alternative causal agents is more individualized and may make aggregation of the claims questionable.

Alleged product defects must also be analyzed to determine whether they can be established by proof common to the group. Such proof may relate to a single version of a product or to variations among similar products. The number and extent of the variations will affect

---

Mary Sue Henifin et al., *Reference Guide on Medical Testimony, in* Reference Manual on Scientific Evidence 439–84 (Federal Judicial Center 2d ed. 2002).

1052. *See In re* Hanford Nuclear Reservation Litig., 292 F.3d 1124, 1139 (9th Cir. 2002) (distinguishing between nature of expert testimony and proof required for individual as opposed to generic causation, and remanding with recommendation that the trial court consider "[class] certification only for questions of generic causation common to plaintiffs who suffer from the same or materially similar disease"); *In re* Bendectin Litig., 857 F.2d 290, 308–09 (6th Cir. 1988) (constitutionality of separate common issues trial of generic causation upheld); Sterling v. Velsicol Chem. Corp., 855 F.2d 1188 (6th Cir. 1988) (severing, and granting class certification on, issues of generic causation).

1053. *In re* Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1302–03 (7th Cir. 1995) (rejecting the use of an issues class in product liability case because of individual liability issues); Castano v. Am. Tobacco Co., 84 F.3d 734, 745 n.21 (5th Cir. 1996) (same).

the extent to which proof of deficiencies applies across a substantial group of claimants. Similarly, claims for punitive damages may be affected by the number of products involved and variations in their production and marketing.

Proof of individual, compensatory damages will typically be specific to each claimant. Accordingly, individual decisions on actual damages are usually required.

- *How many defendants are there and what is the relationship among them?* The number of defendants that designed, manufactured, or marketed the suspect product is an important consideration. The claims among codefendants or third-party defendants may affect not only the type and extent of discovery, but also whether all necessary parties are before the court for comprehensive adjudication or settlement. In appropriate cases, the court should encourage defendants to present joint defenses or to coordinate motions and eliminate repetitive arguments. Early in the litigation, the court should determine whether other parties, such as insurers, are appropriately and usefully included in the litigation. If there are related insurance coverage actions pending, the court should consider whether those actions should be coordinated or consolidated with the litigation. Treatment of coverage issues in conjunction with personal injury litigation has generally occurred in limited fund class action or bankruptcy contexts.[1054] Whether any of the defendants are judgment-proof or seeking protection under the Bankruptcy Code are also important considerations. If the funds available appear inadequate to satisfy likely claims, the court should assess whether some identifiable plaintiffs are so disabled or critically ill as to warrant priority consideration, such as expedited trial dates.[1055] For example, the MDL asbestos court severed punitive damages claims and delayed their consideration until compensatory damages had been paid.[1056]

- *Have numerous cases presenting the same issues been filed in other courts?* Courts routinely order counsel to disclose, on an ongoing basis past, and pending related cases in state and federal courts and to report on their status and results. This information is necessary to case-management decisions, including the appropriate level of communi-

---

1054. *See generally, e.g.,* Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999) (asbestos-related limited fund class action); *In re* Dow Corning Corp., 113 F.3d 565 (6th Cir. 1997) (bankruptcy).

1055. *See* discussion of Tidmarsh and *Working Group Report*, *supra* note 1035.

1056. *See In re* Asbestos Prod. Liab. Cases (No. VI), MDL No. 875, Suggestion of Remand Order (E.D. Pa. Feb. 26, 2003) (ordering punitive damages severed).

cation, cooperation, or coordination with other courts. If similar cases are dispersed among federal courts, the Judicial Panel on Multidistrict Litigation may order the cases transferred to a single court for coordinated or consolidated pretrial purposes. See section 22.33. If similar cases are pending in state courts as well as federal courts, the judge should inquire whether any of the state cases have been considered, and, if so, in what courts. Formal and informal techniques to coordinate discovery, pretrial motions, rulings on class certification, trial schedules, and other matters should be considered. See section 22.4.

- *What is the impact of different state laws that may apply?* State law usually governs tort claims, even when filed in federal court. The judge, early in the litigation, should consider the applicable conflicts and choice-of-law rules. Consider which state laws and defenses apply and how they affect whether issues of defect, causation, or damages are subject to common proof. The judge should examine whether any claims or defenses create individual issues or make aggregate treatment appropriate only for certain parts of the case, or for limited purposes, such as pretrial discovery. And consider whether there are conflicts among the applicable state laws that might present significant obstacles to any aggregate treatment.

- *What are the experiences of other courts with similar claims?* The court might inquire whether similar cases have been tried or settled, and, if so, with what results; whether other courts have ruled on dispositive motions or on the limits of appropriate discovery; and what information is available as to the value of a particular set of cases, based on prior trials or prior settlements.[1057] Consider whether there is a need for more trials of individual cases to determine whether claims should be aggregated and on what terms. Also, determine if trials of test cases, common issues trials, or summary jury trials should be used.[1058]

1057. For an example of an order for counsel to submit preliminary reports summarizing the status of litigation pending in state courts, see *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, MDL No. 926, Order No. 1 (N.D. Ala. June 26, 1992), *at* http://www.fjc.gov/BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003).

1058. For discussion of summary jury trials as an ADR technique, see Robert J. Niemic, Donna Stienstra & Randall E. Ravitz, Guide to Judicial Management of Cases in ADR 44 (Federal Judicial Center 2001); see also *In re Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig.*, 137 F. Supp. 2d 985, 993 (S.D. Ohio 2001).

- *Would a court-appointed expert, panel of experts, technical advisor, or special master be of assistance to the trier of fact?*[1059] Determine whether there are less costly methods or alternative ways for the court to manage the expert testimony, such as joint meetings of the parties' experts to identify the sources of differences in their approaches to the same questions.

The information discussed above will help in devising a plan for managing the litigation. A threshold question is whether to aggregate cases for pretrial management or to proceed on a case-by-case basis.

---

1059. *See generally* Laural L. Hooper, Joe S. Cecil & Thomas E. Willging, Neutral Science Panels: Two Examples of Panels of Court-Appointed Experts in the Breast Implants Product Liability Litigation (Federal Judicial Center 2001) [hereinafter FJC Study, Neutral Science Panels] (comparison of methods two judges used to appoint scientific experts to assist in resolving mass tort litigation); FJC Study, Special Masters, *supra* note 704 (reporting empirical findings about the incidence of using special master in various types of cases and describing the appointment and use of such masters); Ellen E. Deason, *Court-Appointed Expert Witnesses: Scientific Positivism Meets Bias and Deference,* 77 Or. L. Rev. 59 (1998) (examining the uses and pitfalls of appointing experts, especially difficulties in assuring neutrality and counteracting the tendency to defer to an appointed expert); Joe S. Cecil & Thomas E. Willging, *Accepting* Daubert's *Invitation: Defining a Role for Court-Appointed Experts in Assessing Scientific Validity,* 43 Emory L.J. 995 (1994) (reporting results of an empirical study of judicial use of court-appointed experts, identifying purposes and problems relating to the appointments, and describing a pretrial procedure to identify expert issues early in the litigation).

# 22.3  Multiple Filings in Federal District Courts

.31 Aggregating Claims  355
    .311 Criteria  357
    .312 Advantages and Disadvantages of Aggregation  357
    .313 Timing of Aggregation Decisions  358
    .314 Obtaining Information About Common Issues and Case Values  358
    .315 Test Cases  360
    .316 Case Characteristics  360
    .317 Role of Different State Laws  361
    .318 Trial Plans  362
.32 Intradistrict Assignment to a Single Judge  362
.33 Interdistrict Transfer (Including MDL)  366
.34 Denial of Transfer  368
    .341 Insufficient Common Facts  368
    .342 Procedural Alternatives  369
    .343 Geographical Diversity and Economy  369
    .344 Maturity of Litigation  370
.35 Authority of a Judge Pending Decision by the MDL Panel  371
.36 The Tasks of an MDL Transferee Judge  372
.37 The Task of the Transferor Judge Following Remand After MDL Proceedings  376

## 22.31  Aggregating Claims

.311 Criteria  357
.312 Advantages and Disadvantages of Aggregation  357
.313 Timing of Aggregation Decisions  358
.314 Obtaining Information About Common Issues and Case Values  358
.315 Test Cases  360
.316 Case Characteristics  360
.317 Role of Different State Laws  361
.318 Trial Plans  362

Aggregation—bringing together hundreds or even thousands of similar claims into a single unit—is among the most important decisions a judge faces in mass tort litigation.[1060] The decision whether to aggregate related mass tort cases is very different when made for the purpose of pretrial case management only, as opposed to trial. This section discusses the criteria and factors applicable to both of these decisions.

Aggregation of mass tort cases can take different forms: assigning cases filed within a district to a single judge in that district and entering consolida-

---

1060.  For an overview of the range of informed opinions on whether and when aggregation should be used in mass tort litigation, see Thomas E. Willging, *Appendix C, Mass Torts Problems and Proposals: A Report to the Mass Torts Working Group* (1999), *in* Working Group Report, *supra* note 1019, at app. C.

tion orders under Federal Rule of Civil Procedure 42[1061] for pretrial or trial management; transferring cases filed in different districts for coordinated or consolidated treatment by a single judge under the multidistrict litigation (MDL) statute;[1062] and certifying similar cases as a class action for litigation or settlement purposes. Sections 22.3 and 20.13 discuss MDL transfers and section 22.7 discusses class actions. The recent trend in federal courts, with a few notable exceptions,[1063] has been to reject certification of nationwide mass tort personal injury class actions,[1064] particularly outside the settlement context. This trend makes the search for other tools of aggregation and coordination even more important.

1061. For a discussion of the structural differences between class actions and consolidations, see Charles Silver, *Comparing Class Actions and Consolidations,* 10 Rev. Litig. 495 (1991). Occasionally, cases are consolidated among districts within the same state, but such consolidations do not warrant separate discussion beyond noting the possibility that judges can be designated to handle cases filed in another district. *See In re* Joint E. & S. Dists. Asbestos Litig., 769 F. Supp. 85 (E.D.N.Y. & Bankr. S.D.N.Y. 1991); *In re* Johns-Manville Corp., 1990 Bankr. LEXIS 1940 (Bankr. S.D.N.Y. Aug. 21, 1990) (consolidated cases 82 B 11656 (BRL) through 82 B 11676); *In re* Joint E. & S. Dists. Asbestos Litig., 120 B.R. 648, 652–53 (E.D.N.Y. & Bankr. S.D.N.Y. 1990) (discussing Order of James L. Oakes, Chief Judge, dated January 23, 1990, and July 20, 1990; Order of Charles L. Brieant, Chief Judge, United States District Court S.D.N.Y., dated July 20, 1990, assigning responsibility for pending asbestos cases).

1062. 28 U.S.C. § 1407 (West 2003). If a motion to transfer pursuant to the MDL is not filed, there may be motions to transfer the venue of related cases to permit assignment before a single judge. *Id.* § 1404(a).

1063. Federal trial courts certified nationwide classes for specified common liability-related issues in the following cases: *In re Telectronics Pacing System, Inc., Products Liability Litigation,* 172 F.R.D. 271 (S.D. Ohio 1997); *In re Copley Pharmaceutical, Inc., "Albuterol" Products Liability Litigation,* 161 F.R.D. 456 (D. Wyo. 1995), *In re Copley Pharmaceutical, Inc., "Albuterol" Products Liability Litigation,* 158 F.R.D. 485 (D. Wyo. 1994) (manufacturing defect in batch of pharmaceutical product); see also *Lewis Tree Service Inc. v. Lucent Technologies, Inc.,* 211 F.R.D. 228 (S.D.N.Y. 2002). In *Valentino v. Carter-Wallace, Inc.,* the Ninth Circuit vacated the district court's class certification order and remanded for adequate findings, holding that "the law of this circuit . . . does not create any absolute bar to the certification of a multi-state plaintiff class action in the medical products liability context." 97 F.3d 1227, 1230 (9th Cir. 1996). In *In re Estate of Marcos Human Rights Litigation,* 910 F. Supp. 1460 (D. Haw. 1995), the Court discusses a litigation class of personal injury, wrongful death, and torture claimants that was certified for purposes of a three-phase class-wide trial on liability, punitive damages, and compensatory damages, under the Alien Tort Claims Act, 28 U.S.C. § 1350 (West 2003).

1064. *See, e.g., In re* Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig., 288 F.3d 1012, 1018 (7th Cir. 2002) (holding that because the claims would have to "be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable"); Castano v. Am. Tobacco Co., 84 F.3d 734, 743–44, 749–52 (5th Cir. 1996).

## 22.311 Criteria

The criteria for aggregation of mass tort cases for trial are more stringent than for more limited purposes, such as pretrial discovery, motions, or settlement. Aggregation of related cases for pretrial preparation often promotes efficiency in discovery, even when the cases cannot be aggregated for all phases of pretrial preparation or for trial.

The key factor in deciding to aggregate cases for pretrial is the presence of common issues that can be discovered and litigated efficiently and fairly, through motions or otherwise, in coordinated or consolidated proceedings. A common issue is one that is susceptible to common proof. Decisions about whether to aggregate cases, and for what purposes, should be based on the presence of common issues critical to liability determinations. In general, product-based mass torts in which the evidence of exposure and general causation is clear may be candidates for some form of aggregation.[1065] When the circumstances of exposure vary widely, or where causation is uncertain or varying, aggregation for trial is inappropriate. In such cases, aggregation for pretrial discovery and motions may provide some efficiencies but will require careful management to protect some parties from unfair burden.[1066]

## 22.312 Advantages and Disadvantages of Aggregation

Aggregation of similar claims can maximize fair and efficient case management, minimize duplication, reduce cost and delay, enhance the prospect of settlement, promote consistent outcomes, and increase procedural fairness.[1067] Without aggregation, some types of tort or tort-like claims, such as consumer claims asserting economic loss or property damage but not personal injury, may simply be foreclosed or delayed for reasons unrelated to the merits.[1068] On the other hand, aggregation can increase the complexity of cases and introduce

---

1065. In a report to the Mass Tort Working Group, Federal Judicial Center staff identified the following mass torts areas as having clear causation and identifiable exposure: asbestos, Dalkon Shield, heart valves, HIV blood factors, tobacco, TMJ implants, J-pacemaker leads, and Thalidomide. Working Group Report, *supra* note 1019, app. D, at 10 tbl. 3.

1066. *See, e.g., In re* Repetitive Stress Injury Litig., 11 F.3d 368, 374 (2d Cir. 1993) (vacating consolidation order and noting party pursuing aggregation should not do so to increase costs for adversary).

1067. *See* Helen E. Freedman, *Product Liability Issues in Mass Torts—View from the Bench*, 15 Touro L. Rev. 685, 686–88 (1999).

1068. In *Amchem Products, Inc. v. Windsor*, the Court noted the intent of Rule 23's drafters to vindicate the rights of those who might not be able to use the courts at all without a class action device. 521 U.S. at 617.

additional cost and delay associated with individualized issue resolution. In such instances, aggregation can be unfair to plaintiffs and defendants.[1069]

## 22.313 Timing of Aggregation Decisions

Judges have broad discretion as to the timing of aggregation decisions. Federal Rule of Civil Procedure 42 permits consolidation whenever "actions involving a common question of law or fact are pending before the court." Rule 23(c)(1) directs the court to decide class certification "at an early practicable time." The statute governing multidistrict litigation, 28 U.S.C. § 1407, simply refers to "pretrial" proceedings. The MDL Panel sometimes decides to defer or reject consolidation because one or more of the component cases is approaching trial.[1070] On the other hand, MDL consolidation can occur long after a substantial number of similar cases have been resolved by trials or settlements.[1071] In most cases, timing depends on the availability of reliable and sufficient information about whether there are common issues that can be determined fairly and efficiently across a large number of claims and whether the nature and value of the claims makes aggregation useful.

## 22.314 Obtaining Information About Common Issues and Case Values

A "mature" mass tort is one that rests on clearly established law and tested and accepted evidence. In a mature mass tort, the cases have a predictable range of values produced through a number of trials and settlements in a variety of tribunals. Maturity exists on a continuum and resists clear definition. Determining whether a particular mass tort is mature requires scrutinizing the merits of the litigation—merits which may become evident in pretrial rulings

---

1069. *See, e.g., In re* Repetitive Stress Injury Litig., 11 F.3d 368, 373 (2d Cir. 1993) ("'The systematic urge to aggregate litigation must not be allowed to trump our dedication to individual justice, and we must take care that each individual plaintiff's—and defendant's—cause not be lost in the shadow of a towering mass litigation.'" (quoting *In re* Brooklyn Navy Yard Asbestos Litig., 971 F.2d 831, 853 (2d Cir. 1992))); Malcolm v. Nat'l Gypsum Co., 995 F.2d 346, 354 (2d Cir. 1993) (disapproving a consolidated trial and cautioning "that it is possible to go too far in the interests of expediency and to sacrifice basic fairness in the process"); *see also* Irwin A. Horowitz & Kenneth S. Bordens, *The Consolidation of Plaintiffs: the Effects of Number of Plaintiffs on Jurors' Liability Decisions, Damage Awards, and Cognitive Processing of Evidence*, 85 J. Applied Psychol. 909 (2001) (experimental research on jury decision making found that aggregations of up to ten cases—when compared with single trials or smaller aggregations—increased the likelihood that defendant would be found liable, but reduced the average damage award per plaintiff).

1070. *See In re* Asbestos & Asbestos Insulation Materials Prods. Liab. Litig., 431 F. Supp. 906, 909–10 (J.P.M.L. 1977).

1071. *See In re* Asbestos Prods. Liab. Litig. (No. VI), 771 F. Supp. 415 (J.P.M.L. 1991).

on discovery and motions in the first case filed—to decide whether core issues of liability remain unsettled.[1072] Litigation is generally considered mature if through previous cases (1) discovery has been thorough, producing a consensus that the available important information has been provided, (2) a number of verdicts have been received indicating the value of claims, and (3) plaintiffs' contentions have been shown to have merit.[1073] In a typical mature mass tort, little or no new evidence is likely, appellate review of novel legal issues has been completed, and a full cycle of trial strategies has been explored.[1074]

Cases with extensive history or development in other litigation generally allow a judge to decide whether to aggregate claims, and for what purposes, with little additional information. Perhaps the best example of a mature mass tort is the asbestos litigation where discovery has been exhaustively conducted into many of the issues common to asbestos claims, including factors affecting causation; the many asbestos verdicts and settlements provide information as to the value of a particular claim; and repeated litigation in a variety of tribunals has proven specific causation for certain types of injury. The issues in newly filed asbestos claims focus on whether a particular plaintiff has the injury claimed and, if so, whether it was caused by asbestos exposure or by alternative causes, such as using tobacco.

In less mature mass tort cases, aggregation decisions may be more difficult and may require the judge to obtain additional information. If the injuries allegedly arise from new products or substances, or liability is predicated on novel legal claims, causation may be disputed or scientific evidence may be conflicting. If there are few prior verdicts, judgments, or settlements, additional information may be needed to determine whether aggregation is appropriate. The need for such information may lead a judge to require a number of single-plaintiff, single-defendant trials, or other small trials. These trials would test the claims of causation and damages and whether the evidence applies across groups, in order to provide the necessary information as to whether aggregation is appropriate, the form and extent of aggregation, and the likely range of values of the various claims.

A variety of case-management techniques are available when there is insufficient information as to the nature, strength, or value of the claims.

---

1072. *See generally infra* section 22.2 *and* Thomas E. Willging, *Beyond Maturity: Mass Tort Case Management in the Manual for Complex Litigation*, 148 U. Pa. L. Rev. 2225, 2254–55 and sources cited therein (2000); *see also* George L. Priest, *Procedural Versus Substantive Controls of Mass Tort Class Actions*, 26 J. Legal Stud. 521 (1997) (presenting the view that substantive review of the merits of a claim is essential to effective management of mass tort class actions).

1073. *See* McGovern, *Mature Mass Tort*, *supra* note 1022, at 659.

1074. *Id.*

Before making aggregation decisions, the judge should order the parties to identify other, pending, related cases and their status. The judge also might consider setting several individual cases on a schedule for pretrial motions, discovery, and trial as test cases, while holding other cases or claims in abeyance. As another technique, a court may stay or defer decisions in the cases before it until more advanced cases or dispositive motions pending in other courts are concluded. Identifying and implementing such approaches promptly will avoid unnecessary delay.

## 22.315  Test Cases

If individual trials, sometimes referred to as bellwether trials or test cases, are to produce reliable information about other mass tort cases, the specific plaintiffs and their claims should be representative of the range of cases. Some judges permit the plaintiffs and defendants to choose which cases to try initially, but this technique may skew the information that is produced.[1075] To obtain the most representative cases from the available pool, a judge should direct the parties to select test cases randomly or limit the selection to cases that the parties agree are typical of the mix of cases.[1076]

Test cases should produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis' and what range of values the cases may have if resolution is attempted on a group basis. The more representative the test cases, the more reliable the information about similar cases will be.

## 22.316  Case Characteristics

In litigation with numerous plaintiffs, the judge may direct the parties or a special master to identify relevant characteristics of the parties affecting pretrial organization,[1077] discovery, settlement, or trial. For example, in litigation

---

1075. *In re* Chevron U.S.A., Inc., 109 F.3d 1016, 1019 (5th Cir. 1997) (noting that trial of cases selected by each side separately "is not a bellwether trial. It is simply a trial of fifteen (15) of the 'best' and fifteen (15) of the 'worst' cases contained in the universe of claims involved in this litigation.").

1076. *Id.* ("A bellwether trial designed to achieve its value ascertainment function for settlement purposes or to answer troubling causation or liability issues common to a universe of claimants has as a core element representativeness—that is, the sample must be a randomly selected one of sufficient size so as to achieve statistical significance to the desired level of confidence . . . .").

1077. *See* Johnson v. Celotex Corp., 899 F.2d 1281, 1285 (2d Cir. 1990) (affirming consolidation of two cases with similar characteristics and specifying criteria for identifying common

involving allegedly harmful products or substances, the parties might be directed to organize information such as (1) the circumstances of exposure to the toxic product (e.g., the place, time span, and amount of exposure), (2) the types of diseases or injuries attributable to the exposure (e.g., in the diet drug litigation, heart-valve disease and primary pulmonary hypertension), (3) relevant and distinguishing characteristics of multiple products, including manufacturing and distribution information (e.g., prescription from a doctor or over-the-counter distribution through specific retailers), and (4) the types of occupations or other roles of the plaintiffs (e.g., asbestos factory worker, installer, consumer, bystander, exposed spouse). Emerging patterns may assist the court in organizing and managing the litigation, whether by aggregated treatment or otherwise.

Also relevant is whether the cases have the same counsel on one or both sides and whether the cases are at similar stages of pretrial development. Cases having substantially similar evidence from the same expert or percipient witnesses sometimes benefit from some form of aggregation.

## 22.317  Role of Different State Laws

When different state laws apply, a judge might ask the parties to research the feasibility of organizing cases based on the similarity of the applicable laws.[1078] If the cases are consolidated for pretrial purposes, lead counsel can file "core" briefs on dispositive motions based on the most widely applicable or otherwise most significant state substantive law. Variations in state laws can be addressed separately through supplemental briefs, which can be prepared by lawyers whose clients assert that a different law applies to some or all of their cases.

Differences in the applicable substantive law do not necessarily preclude aggregation for pretrial proceedings, but may create substantial obstacles to consolidation for trial, even if the underlying facts on liability are the same.[1079]

---

issues); *see also* Hendrix v. Raybestos-Manhattan, Inc., 776 F.2d 1492, 1495–97 (11th Cir. 1985) (discussing bases for consolidation); *cf. In re* Repetitive Stress Injury Litig., 11 F.3d 368 (2d Cir. 1993) (vacating a pretrial consolidation order under Rule 42 while approving assignment of cases to a single judge), *and* Malcolm v. Nat'l Gypsum Co., 995 F.2d 346 (2d Cir. 1993) (reversing a jury verdict after trial of forty-eight consolidated cases involving asbestos workers whose various occupations, worksites, time of exposure, disease types, and injuries were not sufficiently common to support a consolidated trial); *see also* Jay Tidmarsh & Roger H. Transgrud, Complex Litigation and the Adversary System 473–87 (1998); Thomas E. Willging, Trends in Asbestos Litigation 104–07 (Federal Judicial Center 1987) [hereinafter Trends].

1078.  *See In re* School Asbestos Litig., 789 F.2d 996, 1010–11 (3d Cir. 1986).

1079.  *See, e.g., In re* Bendectin Litig., 857 F.2d 290, 293–94 (6th Cir. 1988) (noting differences in the complaints and finding "most are virtually identical, requesting relief on grounds of

Differences in affirmative defenses, such as statute of limitations defenses, sometimes create a need for separate discovery and motions practice.

### 22.318 Trial Plans

Trial plans can assist in determining whether common issues justify aggregating related cases for trial and the extent and nature of the appropriate aggregation. Plans should address whether to try cases on a traditional case-by-case basis, on a test case basis, in a bifurcated or multifurcated organization of issues, in a consolidated or class format, or on some other basis. See section 22.32. The parties should point to evidence that will prove the elements of the claims and defenses in issue. Such information enables the judge to test whether common issues support some form of aggregation and whether to limit aggregation to particular issues. One court tested the manageability of a class action trial in a multidistrict medical-device proceeding by designing a plan for a summary jury trial conducted over approximately a one-week period.[1080] Other courts have rejected class certification after the trial plans exposed an inability to try proof of causation or other elements of liability on a class-wide basis.[1081]

## 22.32  Intradistrict Assignment to a Single Judge

A single judge's supervision of related mass tort cases filed in a single district provides centralized management of the cases pending in that district and also can facilitate coordination of related cases in other districts. Efficiency is increased if all related cases pending in the same division or district—including actions regarding insurance coverage, suits for indemnification, and adversary proceedings in bankruptcy—are assigned to the same judge, at least for pretrial management (see sections 20.11 and 10.12).

---

negligence, breach of warranty, strict liability, fraud, and gross negligence"); *In re* Copley Pharm., Inc., "Albuterol" Prods. Liab. Litig., 161 F.R.D. 456, 468–69 (D. Wyo. 1995) (presenting trial plan to deal with differences in state laws).

1080.  *In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 137 F. Supp. 985, 993 n.8 (S.D. Ohio 2001) (noting that "utilization of the summary jury trial technique in these cases assisted the Court and these Parties in determining whether a trial on the merits was manageable").

1081.  *In re* Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1299 (7th Cir. 1995) (finding the use of multiple juries deciding comparative negligence and proximate causation would violate the Seventh Amendment's reexamination clause); *In re* Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 209 F.R.D. 323, 334, 351–53 (S.D.N.Y. 2002) (denying plaintiffs' motion for class certification because trial plan could not resolve individual issues of causation).

The district court may withdraw the references to bankruptcy judges of proceedings to determine the dischargeability of tort claims and assign those proceedings to the judge presiding over the underlying claims. 28 U.S.C. § 157(d). See section 22.52. The judges of a district court in which the bankruptcy proceeding is pending may also decide to defer transfer of multiple claims for personal injury or wrongful death under 28 U.S.C. § 157(b)(5), which provides for trial of such claims in the district court in which the bankruptcy case is pending or in the district in which the claim arose, until after a period of centralized pretrial management. In some mass tort cases, district judges and bankruptcy judges have presided jointly and issued joint opinions and orders.[1082] Bankruptcy courts sometimes grant relief from the automatic stay to save time and conserve resources by enabling distinct claims, such as insurance coverage or ERISA claims, to proceed simultaneously in other districts.[1083] See section 22.54.

If several cases are remanded to transferor courts in a single district for trial after a period of multidistrict supervision under 28 U.S.C. § 1407,[1084] judges in that district should consider whether the remanded cases are most efficiently handled by assignment to one judge, at least initially. If so, that judge may coordinate further discovery as needed and determine the most appropriate trial structure and schedule.

Local rules sometimes authorize transfer to a single judge of related mass tort cases filed before different judges in the same division of a district, or in multiple divisions of the same district. For example, one local rule defines related cases as those in which "a substantial saving of judicial resources is likely to result" by assigning them to the same judge "because of the similarity of facts and legal issues or because the cases arise from the same transactions or events."[1085] Such local rules generally provide a random or objective basis for selecting the transferee judge—for example, assignment to the judge who initially received the lowest-numbered case.[1086] Another court's local rule directs the clerk to seek the guidance of the judges in the division in the event

1082. *See, e.g., In re* A.H. Robins Co., 158 B.R. 640 (Bankr. E.D. Va. 1993); *In re* Joint E. & S. Dist. Asbestos Litig., No. CV90-3973, 1993 WL 207565 (E.D.N.Y. & Bankr. S.D.N.Y. June 10, 1993).

1083. *In re* Enron Corp., No. 01-16034, 2002 WL 1008240, at *1 (Bankr. S.D.N.Y. May 17, 2002) (order lifting automatic stay to permit payments under insurance policies).

1084. *See infra* section 22.33 and *supra* section 20.13.

1085. U.S. Dist. Ct. R. 50.3(a) (E.D.N.Y Westlaw, current as of Oct. 15, 2003); *cf.* U.S. Dist. Ct. R. 40.1 (E.D. Pa. Westlaw, current as of Oct. 15, 2003) (defining a related case as one that "relates to property included in another suit, or involves the same issue of fact or grows out of the same transaction as another suit").

1086. U.S. Dist. Ct. R. 50.3(e) (E.D.N.Y. 2002).

of multiple related filings, defined as five or more related cases.[1087] Courts have applied intradistrict assignments to a variety of mass tort cases. In one instance, two courts combined and consolidated their asbestos caseloads before a single judge designated by the chief judge of the court of appeals.[1088]

Once cases have been assigned to a single judge, that judge can determine the nature, extent, and purpose of the coordination or consolidation. Federal Rule of Civil Procedure 42(a) permits consolidation when the cases involve "a common question of law or fact." Such consolidation may be of "any or all of the matters in issue in the actions." In single incident mass tort litigation, early aggregation and pretrial consolidation of all or most of the individual cases generally has proved to be feasible and efficient.[1089] In such cases, consolidation under Rule 42 for trial purposes as well is often fair and efficient. If there are some variations among cases within a single district, subdividing them into groups or clusters of cases that raise similar issues or present similar case-management needs can also be an efficient approach.

In dispersed mass tort litigation, by contrast, coordinated discovery and pretrial motions may be feasible, but differences in facts relevant to exposure, causation, and damages, as well as in the applicable law, often make consolidation for trial purposes both inefficient and unfair.[1090] A court should avoid ordering even pretrial aggregation until it is sufficiently clear that there are common questions of fact and law.

Judges in a single division or district sometimes defer any transfer and intradistrict assignment until some of the cases have been discovered or tried on an individual basis. If the cases are assigned to a single judge in the district, that judge often defers the decision on whether to aggregate some or all of the cases for trial until after discovery and motions practice in cases coordinated for pretrial purposes have narrowed the claims, issues, and defenses and illuminated the extent to which they can fairly and efficiently be tried on an aggregated basis.[1091]

---

1087. *In re* Div. of Cases Among Dist. Judges (Standing Order) (W.D. Va. Jan. 30, 2001), *at* http://www.vawd.uscourts.gov/storders/contents.asp (last visited Nov. 10, 2003).

1088. *In re* Joint E. & S. Dists. Asbestos Litig., 769 F. Supp. 85 (E.D.N.Y. & Bankr. S.D.N.Y. 1991).

1089. *See generally* Working Group Report, 187 F.R.D. 293, 301–02, *supra* note 1019, at 11–14 (exploring similarities and differences between single incident and dispersed mass torts); *see also In re* Exxon Valdez, 270 F.3d 1215 (9th Cir. 2001) (describing consolidation of oil spill-related claims and multiphase class action trial in single federal court; affirming class-wide compensatory damages verdict, and vacating and remanding class-wide punitive damages verdict to district court for recalculation).

1090. *See In re* Repetitive Stress Injury Litig., 11 F.3d 368, 373–74 (2d Cir. 1993).

1091. Fed. R. Civ. P. 42(a). *See also* cases cited at *supra* note 1079.

The extent and duration of supervision by one judge, and whether to consolidate some or all of the cases for trial, will depend on the facts. A court should, for example, examine whether any common issues are central to the litigation,[1092] whether the common issues are separable from individual issues,[1093] and whether there is a feasible plan for dealing with any individual issues that remain after a verdict on the common issues.[1094] A key factor is whether the claims originated from a single incident. Section 22.32 has further discussion of trial structures. In dispersed mass tort cases, judges often require separate trials of individual actions, or of groups of individual actions, and arrange for assignments or remand to a number of judges after completion of common discovery.[1095]

Intradistrict aggregation sometimes leads to adverse consequences. Assignment to a single judge might delay disposition if that judge has other major cases to handle.[1096] Requiring each party to participate in tangentially related cases brought by or against other parties may increase costs unnecessarily.[1097] Case-management orders should tailor specific discovery to the parties affected, relieving other parties of that expense and burden. Even in a single district, aggregation ordered before it is clear that the cases actually

---

1092. *See, e.g., In re* Bendectin Litig., 857 F.2d 290, 295–96 (6th Cir. 1988) (reciting district court finding of common issues relating to causation and liability); *see also In re* Copley Pharm., Inc., "Albuterol" Prods. Liab. Litig., 158 F.R.D. 485, 488–89 (D. Wyo. 1994) (finding common issues based on contamination of product sold across the country).

1093. *See infra* text accompanying notes 1395–99, discussing *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 499 (1931) (holding that "where the requirement of a jury trial has been satisfied by a verdict according to law upon one issue of fact, that requirement does not compel a new trial of that issue even though another and separable issue must be tried again") and *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995).

1094. *See infra* text at notes 1400–02 (discussing trial plans for issues classes).

1095. *See, e.g., In re* Orthopedic Bone Screw Prods. Liab. Litig., MDL No. 1014, 1998 WL 118060, at *1 (E.D. Pa. Jan. 12, 1998) (remanding case after managing all aspects of civil procedure and discovery); *In re* Silicone Gel Breast Implants Prods. Liab. Litig., MDL No. 926, Order 30 (N.D. Ala. Mar. 25, 1996, with app. B (Apr. 2, 1996)), *at* http://www.fjc.gov/ BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003) (remanding cases back to transferor courts with summary of significant rulings, an "outline of issues remaining for discovery and trial," and indicating "the nature and expected duration of further pretrial proceedings that are likely to be needed after remand or transfer").

1096. Sam C. Pointer, Jr., *Reflections by a Federal Judge: A Comment on Judicial Federalism: A Proposal to Amend the Multidistrict Litigation Statute*, 73 Tex. L. Rev. 1569, 1571 (1995) ("formal assignment of all cases to one court may result in the loss of valuable judicial resources").

1097. *See, e.g., In re* Repetitive Stress Injury Litig., 11 F.3d 368, 374 (2d Cir. 1993) ("A party may not use aggregation as a method of increasing the costs of its adversaries—whether plaintiffs or defendants—by forcing them to participate in discovery or other proceedings that are irrelevant to their case.").

represent a mass tort litigation, as opposed to a short-lived filing of similar claims, might "encourage additional filings and provide an overly hospitable atmosphere for weak cases," thereby "render[ing] the label 'mass tort' into a self-fulfilling prophecy."[1098]

## 22.33  Interdistrict Transfer (Including MDL)

Aggregating cases from multiple federal districts can be addressed on a case-by-case basis through motions to transfer[1099] or on a national basis through the MDL Panel. The Panel has transferred a significant number of dispersed products liability and other mass torts cases "for coordinated or consolidated pretrial proceedings" (sometimes referred to as "centralized proceedings") in a single district.[1100] In one instance, the Panel transferred a single district's asbestos cases to an adjoining district for centralized management.[1101] Later, the Panel transferred all federal asbestos cases, which were by then mature mass tort cases, to a single district for nationwide centralized management.[1102]

The Panel applies a threshold set of criteria for transfer to a single district. The first issue is whether the underlying actions present common questions of fact.[1103] The common questions of fact must be complex, numerous, and incapable of resolution through other available procedures such as informal coordination.[1104] Next, the Panel looks to prudential and procedural factors

---

1098.  Freedman, *supra* note 1067, at 688.

1099.  "For the convenience of the parties and witnesses, in the interest of justice, a district judge may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a) (West 2003). *See also id.* § 1406.

1100.  28 U.S.C. § 1407(a) (West 2003). *See, e.g., In re* Meridia Prods. Liab. Litig., 217 F. Supp. 2d 1377 (J.P.M.L. 2002); *In re* Phenylpropanolamine (PPA) Prods. Liab. Litig., 173 F. Supp. 2d 1377 (J.P.M.L. 2001); *In re* Propulsid Prods. Liab. Litig., No. 1355, 2000 U.S. Dist. LEXIS 11651 (J.P.M.L. Aug. 7, 2000); *In re* Diet Drugs Prods. Liab. Litig., 990 F. Supp. 834 (J.P.M.L. 1998); *In re* Silicone Gel Breast Implants Prods. Liab. Litig., 793 F. Supp. 1098 (J.P.M.L. 1992).

1101.  *In re* Joint E. & S. Dists. Asbestos Litig., 769 F. Supp. 85 (E.D.N.Y. & Bankr. S.D.N.Y. 1991).

1102.  *In re* Asbestos Prods. Liab. Litig. (No. VI), 771 F. Supp. 415 (J.P.M.L. 1991).

1103.  *In re* Serzone Prods. Liab. Litig., 217 F. Supp. 2d 1372 (J.P.M.L. 2002); *In re* Baycol Prods. Liab. Litig., 180 F. Supp. 2d 1378 (J.P.M.L. 2001); *Silicone Gel Breast Implants*, 793 F. Supp. at 1098.

1104.  *See, e.g., In re* DaimlerChrysler Corp. Seat Belt Buckle Prods. Liab. Litig., 217 F. Supp. 2d 1376 (J.P.M.L. 2002); *In re* Unitrin, Inc., Ins. Sales Practices Litig., 217 F. Supp. 2d 1371 (J.P.M.L. 2002); *In re* Chromated Copper Arsenate (CCA) Treated Wood Prods. Liab. Litig., 188 F. Supp. 2d 1380 (J.P.M.L. 2002); *In re* Amino Acid Lysine Antitrust Litig., 910 F. Supp. 696

supporting the necessity of centralization under section 1407. Centralization serves judicial economy by avoiding duplication of discovery, preventing inconsistent or repetitive rulings, and conserving the financial resources of the parties, their counsel, and the judiciary.[1105] The Panel will not grant such a motion unless transfer ultimately will serve the convenience of the parties and the courts. Finally, the Panel looks for an available and convenient transfer forum, usually one that (1) is not overtaxed with other MDL cases,[1106] (2) has a related action pending on its docket,[1107] (3) has a judge with some degree of expertise in handling the issues presented,[1108] and (4) is convenient to the parties.[1109]

Typically, MDL orders do not provide elaborate explanations or justifications for granting transfer in product liability cases; the Panel merely provides a short description of the criteria and concludes that the pending litigation satisfies them. For example:

> Common factual questions arise because all actions focus on alleged side effects of Meridia, a widely-prescribed weight loss drug, and whether defendants knew of these side effects and either concealed, misrepresented or failed to warn of them. Centralization under Section 1407 is thus necessary in order to avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings (such as those regarding class certification), and conserve the resources of the parties, their counsel and the judiciary.[1110]

(J.P.M.L. 1995); *In re* Repetitive Stress Injury Prods. Liab. Litig., No. 955, 1992 WL 403023, at *1 (J.P.M.L Nov. 27, 1992).

1105. For a representative example of the standard language used in nearly all of these grants, see *Baycol*, 180 F. Supp. 2d at 1380 (arguing that "Centralization under Section 1407 is thus necessary in order to eliminate duplicative discovery; prevent inconsistent pretrial rulings, including with respect to class certification; and conserve the resources of the parties, their counsel and the judiciary").

1106. *In re* Inter-Op Hip Prosthesis Prods. Liab. Litig., 149 F. Supp. 2d 931, 933–34 (J.P.M.L. 2001).

1107. *In re* Lupron Mktg. & Sales Practices Litig., 180 F. Supp. 2d 1376, 1378 (J.P.M.L. 2001). Though frequently a condition, this factor appears not to be essential. *See In re* Silicone Gel Breast Implants Prods. Liab. Litig., 793 F. Supp. 1098, 1100–01 (J.P.M.L. 1992) (appointing transferee judge from the "universe of federal district judges," based on comprehensive complex litigation experience).

1108. *In re* Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig., 170 F. Supp. 2d 1356, 1358 (J.P.M.L. 2001).

1109. *In re* Diet Drugs Prods. Liab. Litig., 990 F. Supp. 834, 835–36 (J.P.M.L. 1998).

1110. *In re* Meridia Prods. Liab. Litig., 217 F. Supp. 2d 1377, 1378 (J.P.M.L. 2002).

## 22.34  Denial of Transfer

.341 Insufficient Common Facts  368
.342 Procedural Alternatives  369
.343 Geographical Diversity and Economy  369
.344 Maturity of Litigation  370

The Panel tends to offer more detailed justifications when denying transfer. It has generally declined to order transfer if one or more of the following are present.

## 22.341  Insufficient Common Facts

The most common reason for denial is that the cases or the common questions of fact are not sufficiently complex or numerous.[1111] For example, in the DaimlerChrysler seat belt buckle litigation, the Panel held that the number of actions on the docket was insufficient to justify the inconvenience that would be caused by the transfer.[1112] Even if the number of cases is substantial, the Panel may find that the cases involve significantly different claims that do not raise common questions of fact.[1113] Section 1407, however, does not require a complete identity of factual and legal issues as a prerequisite to centralization."[1114] The Panel has centralized cases where the presence of core common questions of fact outweighed the existence of individual factual questions or varying legal arguments.[1115] In such cases, the transferee court generally allows concurrent discovery of noncommon and common issues.[1116]

Where it has found common issues, the Panel typically has rejected arguments against transfer that are based solely on the special interests of the parties. For example, in the Starlink corn products liability litigation, a class of farmers argued against section 1407 centralization based on significant

1111.  *In re* DaimlerChrysler Corp. Seat Belt Buckle Prods. Liab. Litig., 217 F. Supp. 2d 1376 (J.P.M.L. 2002). *See also, e.g., In re* First Union Mortgage Corp. Yield Spread Premium Litig., 215 F. Supp. 2d 1360 (J.P.M.L. 2002); *In re* Chromated Copper Arsenate (CCA) Treated Wood Prods. Liab. Litig., 188 F. Supp. 2d 1380 (J.P.M.L. 2002); *In re* Amino Acid Lysine Antitrust Litig., 910 F. Supp. 696 (J.P.M.L. 1995); *In re* Repetitive Stress Injury Prods. Liab. Litig., No. 955, 1992 WL 403023, at *1 (J.P.M.L. Nov. 27, 1992).

1112.  *DaimlerChrysler*, 217 F. Supp. 2d at 1377.

1113.  *Amino Acid*, 910 F. Supp. at 701.

1114.  *In re* Phenylpropanolamine (PPA) Prods. Liab. Litig., 173 F. Supp. 2d 1377, 1379 (J.P.M.L. 2001).

1115.  *In re* Immunex Corp. Average Wholesale Price Litig., 201 F. Supp. 2d 1378, 1380–81 (J.P.M.L. 2002); *In re* Inter-Op Hip Prosthesis Prods. Liab. Litig., 149 F. Supp. 2d 931, 933 (J.P.M.L. 2001); *In re* Bridgestone/Firestone Tires Prods. Liab. Litig., No. 1373, 2000 WL 33416573, at *2 (J.P.M.L. Oct. 24, 2000).

1116.  *PPA*, 173 F. Supp. 2d at 1379.

differences between their interests and the interests of a class of consumers.[1117] In granting the defendants' motion for transfer, the Panel concluded that the farmer actions and the consumer actions were not different enough to warrant separate pretrial proceedings.[1118] The Panel cited the availability of concurrent discovery of common and divergent issues as its primary justification for granting transfer.[1119]

## 22.342 Procedural Alternatives

Another reason for denying MDL centralization is the existence of other procedural alternatives, such as consolidation or cooperative management.[1120] In the CCA treated wood products liability case, the Panel observed that numerous alternatives to transfer exist for less complex actions.[1121] The Panel also has refused to grant centralization where the resolution of an interlocutory appeal may obviate the need for transfer.[1122]

## 22.343 Geographical Diversity and Economy

The Panel also has cited lack of geographic diversity between parties as a reason for denying transfer. Where all actions are pending in adjacent federal districts, the Panel has found that the similarity of actions and the ready availability of cooperative management minimize the necessity for section 1407 centralization.[1123]

Conversely, where similar cases are widely dispersed, economic burden or inconvenience arguments are usually rejected as a reason for delaying or

---

1117.   *In re* Starlink Corn Prods. Liab. Litig., 152 F. Supp. 2d 1378, 1380 (J.P.M.L. 2001).

1118.   *Id.*

1119.   *Id.*

1120.   *In re* Unitrin, Inc. Ins. Sales Practices Litig., 217 F. Supp. 2d 1371, 1372 (J.P.M.L. 2002); *In re* Chromated Copper Arsenate (CCA) Treated Wood Prods. Liab. Litig., 188 F. Supp. 2d 1380, 1381 (J.P.M.L. 2002).

1121.   *CCA*, 188 F. Supp. 2d at 1381 (finding that "alternatives to transfer exist that can minimize whatever possibilities there might be of duplicative discovery and/or inconsistent pretrial rulings" (citing *In re* Eli Lilly & Co. (Cephalexin Monohydrate) Patent Litig., 446 F. Supp. 242 (J.P.M.L. 1978) *and* Manual for Complex Litigation, Third, § 31.14 (1995))). In *In re Eli Lilly*, the Panel identified a number of alternatives for dealing with three cases that involved the validity of the same patent: One or more courts could order that discovery in each case would apply in the others; the parties could stipulate to coordinated discovery and pretrial approaches; the courts could coordinate pretrial rulings to avoid duplicative activity; a court could stay the litigation pending action in the other courts; or collateral estoppel could dispose of the issues. *In re Eli Lilly,* 446 F. Supp. at 244.

1122.   *In re* First Union Mortgage Corp. Yield Spread Premium Litig., 215 F. Supp. 2d 1360, 1361 (J.P.M.L. 2002).

1123.   *Unitrin*, 217 F. Supp. 2d at 1372.

denying transfer.[1124] The Panel has noted that after section 1407 centralization, the appointment of lead counsel may reduce the need for large numbers of lawyers to travel to the transferee district.[1125]

## 22.344 Maturity of Litigation

The Panel sometimes rejects a motion for MDL transfer filed late in the litigation when centralization may delay the progress of cases approaching trial and it is too late to avoid duplicative judicial efforts.[1126] In the Propulsid case, the Panel rejected the idea that it should wait until the litigation matured before ordering transfer:

> If the Panel were to adopt the defendants' concept of maturity, many of the judges assigned to the various actions would be required to need-lessly replicate other judges' work on such matters as class action certifi-cations, medical monitoring claims, the structuring of confidentiality and other discovery orders, the scheduling of depositions and other dis-covery, rulings on motions to dismiss, and so forth. Only when such common pretrial matters had been repetitiously resolved in an undeter-mined number of federal actions would defendants concede that Section 1407 centralization might then become appropriate. We conclude that such an approach would defeat the very purposes leading to the enact-ment of Section 1407.[1127]

In a later opinion, the Panel again rejected the maturity argument by refusing to delay centralization where several actions were subject to pending motions to remand to state court.[1128] Finally, an early transfer affords the Panel flexibil-ity in choosing the best forum for the common questions of fact.

---

1124. *In re* Phenylpropanolamine (PPA) Prods. Liab. Litig., 173 F. Supp. 2d 1377, 1379 (J.P.M.L. 2001).

1125. *Id.* at 1379. *See also In re* Nissan Motor Corp. Antitrust Litig., 385 F. Supp. 1253, 1255 (J.P.M.L. 1974).

1126. *In re* Asbestos Sch. Prods. Liab. Litig., 606 F. Supp. 713, 714 (J.P.M.L. 1985) (denying motion to transfer based on several factors including the fact that several "actions [were] scheduled for trial within the next six months"). *See generally In re* Grand Funk Railroad Trademark Litig., 371 F. Supp. 1084, 1086 (J.P.M.L. 1974) (denying motion to transfer because the case was close to trial and "transfer of these actions at this time will neither serve the convenience of the majority of the parties and witness nor promote the just and efficient conduct of the litigation").

1127. *In re* Propulsid Prods. Liab. Litig., No. 1355, 2000 U.S. Dist. LEXIS 11651, at *3–*4 (J.P.M.L. Aug. 7, 2000).

1128. *In re* Bridgestone/Firestone, Inc., ATX, ATX II, & Wilderness Tires Prods. Liab. Litig., No. 1373, 2000 WL 33416573, at *2 (J.P.M.L. Oct. 24, 2000).

## 22.35  Authority of a Judge Pending Decision by the MDL Panel

In many cases, a court with one or more cases that are part of a mass tort may anticipate transfer by the MDL Panel. That court may, however, have motions to remand, motions to dismiss, or motions relating to discovery filed before the MDL Panel rules. A court in that position has the authority to grant or deny a motion or to stay the cases before it, pending the Panel's decision on transfer. If the case is transferred, the transferee court then decides unresolved motions after transfer.[1129]

A stay pending the Panel's decision can increase efficiency and consistency, particularly when the transferor court believes that a transfer order is likely and when the pending motions raise issues likely to be raised in other cases as well.[1130] The reasons for a stay diminish, however, if the pending motions raise issues relating to the law of a single state that are unlikely to arise in other related cases, if MDL transfer appears unlikely, or if the absence of federal jurisdiction is clear.[1131] Judicial economy may then be served by resolving specific issues and declining to stay the proceedings.[1132] Similarly, if the case is far along in discovery or motions practice, and there is an urgent need to have that case resolved, the court may decide not to stay the proceedings.[1133] For example, if the case involves a critically ill plaintiff who cannot wait an ex-

---

1129. The rules of the Judicial Panel on Multidistrict Litigation expressly provide that the pendency of a proceeding before the Panel to transfer a case "does not affect or suspend orders or pretrial proceedings in the district court in which the action is pending." J.P.M.L. R. P. 1.5 (West 2003); *see also In re* Asbestos Prods. Liab. Litig., 170 F. Supp. 2d 1348, 1349 n.1 (J.P.M.L. 2001) (citing Rule 1.5 and noting that proceedings for transferring tag-along actions experience "a lag time of at least three or four months from the filing of an action . . . and the issuance of the Panel's subsequent order").

1130. Moore v. Wyeth-Ayerst Labs., 236 F. Supp. 2d 509, 510–11 (D. Md. 2002) (observing that the MDL transferee judge had faced multiple motions to remand cases removed from state courts).

1131. *See, e.g.,* Caldwell v. Am. Home Prods. Corp., 210 F. Supp. 2d 809, 811 (S.D. Miss. 2002) (stating "the law in this circuit is clear that the *All Writs Act* does not provide an independent basis for federal jurisdiction").

1132. McGrew v. Schering-Plough Corp., No. CIV.A.01-2311, 2001 WL 950790, at *3 (D. Kan. Aug. 6, 2001) ("For purposes of judicial economy, the jurisdictional issue should be resolved immediately," before action by the MDL panel.).

1133. *See, e.g.,* Carden v. Bridgestone/Firestone, Inc., No. CIV.00-3017, 2000 WL 33520302, at *4 (S.D. Fla. Oct. 18, 2000) (denying stay and remanding case seeking injunctive relief to state court); *see also* Naquin v. Nokia Mobile Phones, Inc., No. CIV.A.00-2023, 2001 WL 1242253, at *1 (E.D. La. June 20, 2001) (denying motions to stay because "the prior substantial rulings in this case and continuing efforts by counsel may in fact aid the multidistrict litigation").

tended period for trial, the court may decide to proceed rather than wait for MDL action.

## 22.36  The Tasks of an MDL Transferee Judge

Aside from deciding any threshold motion to remand, the initial tasks of the MDL transferee judge include coordinating or consolidating the cases previously pending in a number of different districts; identifying differences in applicable law; and seeking information from the parties as to the status of the cases in order to determine how to proceed with pretrial discovery and motions. See sections 22.2 and 22.61. As to remand motions, the Panel's policy is not to delay a transfer decision because a remand motion is pending. The transferor court may rule on such a motion—or any other motion—while the Panel considers transfer. If the transferor courts have not decided remand motions before the MDL Panel order is issued, the transferee court should try to resolve the remand motions promptly because they invariably affect federal subject-matter jurisdiction, and the failure to rule on them until a case is returned to the transferor court may result in unnecessary and prejudicial delay.

An MDL transferee judge has authority to dispose of cases on the merits—for example, by ruling on motions for summary judgment[1134] or trying test cases that had been originally filed in the transferee district or refiled in or transferred to that district. If summary judgment motions are pending, the transferee judge must consider whether to decide the motions or to transfer the cases back to the transferor districts. If the summary judgment motion pertains to one or few cases, or rests on application of the transferor court's conflicts-of-law and substantive law rules, the transferor judge may be able to decide the motions most efficiently.[1135] If the summary judgment motions involve issues common to all the cases centralized before the MDL court, however, the transferee judge may be in the best position to rule.[1136]

---

1134. *See, e.g., In re* Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 113 F.3d 1484, 1488 (8th Cir. 1997) (affirming grant of summary judgment for defendant Dow Chemical in relation to liability for the use of silicone gel in TMJ implants).

1135. *See In re* Orthopedic Bone Screw Prods. Liab. Litig., MDL No. 1014, 1997 WL 109595, at *2 (E.D. Pa. Mar. 7, 1997) (ruling on motions for partial summary judgment would not advance the litigation and would serve no useful purpose (citing Manual for Complex Litigation, Third, § 21.34 (1995))); *see also* Francis E. McGovern, *Judicial Centralization and Devolution in Mass Torts*, 95 Mich. L. Rev. 2077 (1997) (citing *In re* Silicone Gel Breast Implants Prods. Liab. Litig., 887 F. Supp. 1455 (N.D. Ala. 1995)) [hereinafter McGovern, *Judicial Centralization*].

1136. *See, e.g., In re* Norplant Contraceptive Prods. Liab. Litig., 215 F. Supp. 2d 795, 810, 835 (E.D. Tex. 2002) (granting summary judgment terminating "nearly all remaining non-settling

MDL transferee judges cannot try cases that were not filed in their districts or refiled or transferred to their districts by the court of origin, absent consent of the parties.[1137] Some courts and parties, however, have attempted to adopt techniques to facilitate trials in MDL transferee courts—for example, by the filing of a consolidated amended class action complaint, or master complaint, as an original action in the transferee forum. That complaint then may serve as the vehicle for determination of common issues, including trial.[1138] Section 20.132 describes other circumstances in which the transferee court may have authority to retain cases for trial.

Even if the transferee court has authority, by consent or otherwise, to try transferred cases, the court may decide to use a decentralized approach in which authority to decide individual cases remains with or returns to the non-MDL judges.[1139] If, however, there are summary judgment motions that might resolve all of the issues for all of the parties, or if there are common issues that might be tried, either on a test-case basis or otherwise, the transferee judge may find it more efficient to address the merits in a centralized manner.[1140]

---

Plaintiffs and their claims in the Norplant multidistrict litigation proceedings" based in part on the common-law application of the learned intermediary doctrine); *see also In re* Norplant Contraceptive Prods. Liab. Litig., 165 F.3d 374, 378 (5th Cir. 1999) (affirming district court's summary judgment ruling applying learned intermediary doctrine); *cf. In re* Norplant Contraceptive Prods. Liab. Litig., 961 F. Supp. 163, 169 (E.D. Tex. 1997) (denying defendants' motion for partial summary judgment based on statute-of-limitations grounds).

1137.  Lexecon, Inc. v. Milberg, Weiss, Bershad, Hynes & Lerach, 523 U.S. 26 (1998) (interpreting 28 U.S.C. § 1407 as limiting authority of transferee judge to transfer action to itself for trial). Legislation has been proposed to amend section 1407 and remove the limitation on transfers for trial.

1138.  For example, in *In re Bridgestone/Firestone Inc., ATX, ATX II, & Wilderness Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069 (S.D. Ind. 2001), the parties filed a master complaint as an original proceeding in the MDL transferee court and the court used this complaint to support applying Indiana's choice-of-law rules to determine defendants' motions to dismiss. The district court subsequently certified a nationwide class, which order was reversed *sub nom* in *In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, 288 F.3d 1012 (7th Cir. 2002), on grounds, *inter alia*, that the district court had misapplied Indiana's choice-of-law doctrine.

1139.  *See* McGovern, *Judicial Centralization*, *supra* note 1135, at 2079–81 (describing the approach used in the silicone gel litigation); *In re* Silicone Gel Breast Implant Prods. Liab. Litig., MDL No. 926, Order No. 60A (N.D. Ala. May 30, 2000), *at* http://www.fjc.gov/BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003) (remanding thirteen cases).

1140.  *See, e.g., Norplant*, 215 F. Supp. 2d at 835 (granting partial summary judgment terminating "nearly all remaining non-settling plaintiffs and their claims" in the MDL); *In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, 2001 WL 497313, at *3 (E.D. Pa. May 9, 2001) (noting special master's dismissal of defendants "for lack of product identification"); *In re* MasterCard Int'l, Inc. Internet Gambling Litig., 132 F. Supp. 2d 468, 497 (E.D. La. 2001) (dismissing two test cases); *In re* Honda Am. Motor Co. Dealership Relations Litig., 979 F. Supp. 365, 368–69 (D. Md. 1997) (rejecting test case approach in favor of limited issues class ap-

In a number of recent MDL centralizations, transferee judges have exercised their discretion to select test cases for discovery, motions, and trial, and to coordinate their dockets with state courts handling similar cases.[1141] Courts have also carved out issues classes to resolve common issues.[1142] Section 22.315 discusses the selection of test cases and implementation of a test-case strategy beginning at the pretrial stage, while section 22.93 discusses the use of a test-case strategy at the trial stage. Section 22.75 discusses issues classes, and section 22.4 discusses state–federal coordination.

Two RICO cases illustrate some advantages and disadvantages of using a test-case approach as compared with using a class action approach. In one case—alleging that credit card companies had facilitated use of the Internet to support illegal gambling—the court determined that a test case was the best approach to resolve the RICO issues that the plaintiffs' claims raised.[1143] In the other case—involving allegations of fraud and bribery in dealings between an automobile franchisor and its franchisee dealerships—the court expressly rejected a test-case approach and elected to deal with RICO and non-RICO issues by managing the case through a bifurcated limited issues class trial.[1144] In both contexts, the case-management approaches focused on whether the RICO claims could establish liability. In context, each approach appears to have adjudicated the validity of plaintiffs' claims in an efficient, fair, and balanced manner.

An advantage of using the test-case approach in the Internet gambling MDL proceeding was that it allowed the court to isolate and resolve a disputed and dispositive threshold issue: whether plaintiffs' best cases could survive a motion to dismiss for failure to state a claim for relief.[1145] Other advantages of using test cases might include litigating and trying all of the claims in the test cases, which would allow the litigation to mature through trials. If the MDL

---

proach); *In re* Silicone Gel Breast Implant Prods. Liab. Litig., MDL. No. 926, Order No. 31 (N.D. Ala. May 31, 1996), *at* http://www.fjc.gov/BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003) (appointing national science panel).

1141.  McGovern, *Cooperative Strategy, supra* note 705, at 1886–92 (2000) (describing the "de facto" strategy implemented in the diet drug, Norplant, and California silicone gel breast implant litigations).

1142.  *See, e.g., In re* Honda Am. Motor Co. Dealership Relations Litig., 979 F. Supp. 365 (D. Md. 1997).

1143.  *In re* MasterCard Int'l Inc., Internet Gambling Litig., 132 F. Supp. 2d 468 (E.D. La. 2001).

1144.  *Honda*, 979 F. Supp. at 366.

1145.  *MasterCard,* 132 F. Supp. 2d at 497 (holding that plaintiffs failed to plead several elements of a RICO case, dismissing Rule 19 motions as moot, and statistically closing the remaining MDL cases for administrative purposes).

cases include class allegations, the test-case approach resolves the claims as to the named parties, ends the tolling of the statute of limitations, and requires potential litigants to file lawsuits if they wish to pursue claims.[1146]

Potential disadvantages of using test cases include the lack of any clear preclusive effect of a judgment for defendants, possible limits on the preclusive effects of judgments for the plaintiffs, and the possibility of creating "chaos among plaintiffs' counsel"—that is, lead counsel appointed to represent plaintiffs in the MDL proceedings.[1147] On the other hand, the *Honda American* MDL transferee court decided that an issues class action approach would yield a mutual preclusive effect and would "serve to keep the leadership structure among plaintiffs' counsel in place."[1148]

The transferee judge usually supervises discovery, decides motions, and, if called for, decides whether to certify a class action.[1149] Under the decentralized approach, the transferee judge would then remand the cases to their original districts for trial, as in the breast implant and orthopedic bone screw litigations.[1150] In other cases, grants of summary judgment or approvals of settlement have obviated remand to the transferee courts.[1151]

---

1146.  *Honda*, 979 F. Supp. at 368.

1147.  *Id.*

1148.  *Id.* at 368–69. The disadvantage of continued tolling of the statute the limitations could be ameliorated by ending the tolling for damage claims, which were not included among the issues to be adjudicated on a class-wide basis. *Id.* at 370–71.

1149.  *See, e.g., Bridgestone/Firestone*, 288 F.3d at 1018 (holding that the certified class was not manageable). The court noted that the transferee court had certified a nationwide class that "would make all other suits [MDL transferred cases] redundant." *Id.* at 1015. The court did not decide, however, whether certification of a class action meeting Rule 23 requirements would authorize the transferee court to retain the class action (and all the underlying cases) for trial, effectively bypassing the *Lexecon* restriction on trial of transferred cases by the transferee court. As of mid-2003, that question has not been the subject of an appellate ruling.

1150.  *See, e.g., In re* Orthopedic Bone Screw Prods. Liab. Litig., MDL No. 1014, Order No. 1507, 1998 WL 411380, at *1 (E.D. Pa. June 30, 1998); *In re* Silicone Gel Breast Implants Prods. Liab. Litig., MDL No. 926, Revised Order No. 30 (N.D. Ala. Mar. 25, 1996), *at* http://www.fjc.gov/BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003).

1151.  *In re* Norplant Contraceptive Prods. Liab. Litig., 165 F.3d 374 (5th Cir. 1999) (affirming summary judgment of test cases); *In re* Inter-Op Hip Prosthesis Liab. Litig., 204 F.R.D. 330 (N.D. Ohio 2001) (certifying settlement class); *In re* Diet Drugs Prods. Liab. Litig., 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) (same).

## 22.37  The Task of the Transferor Judge Following Remand After MDL Proceedings

When the MDL pretrial proceedings are concluded and individual cases are remanded to the transferor courts, the transferor judge must decide whether additional discovery and other pretrial work require completion, including deciding dispositive motions.[1152] In some remanded cases, the cases are assigned to a single judge in a district for coordinated final pretrial proceedings and trial. If the remanded cases raise individual questions of exposure, causation, injury, or damages, such aggregated proceedings may not be useful.

## 22.4  Multiple Filings in State and Federal Courts

Mass tort litigation frequently involves filings in both federal and state courts. As discussed in section 22.33, multidistrict treatment of the federal cases under 28 U.S.C. § 1407 may be possible,[1153] but some state court cases may not have been removed—or may not be removable—and will not be subject to section 1407 transfer. Although it is likely that the Panel will transfer federal cases alleging the same mass tort to a single federal district judge for pretrial proceedings, there will likely be numerous state court cases raising similar allegations. Absent certification of a national class (which is unlikely in a mass tort case alleging personal injuries or property damages based on state

---

1152. *In re* Silicone Gel Breast Implants Prods. Liab. Litig, MDL No. 926, Pretrial Order No. 30, at ¶ 1 (summarizing the MDL proceedings and significant rulings), ¶ 4(c) (detailing remaining discovery), and ¶ 7(c) (specifying further pretrial proceedings likely to be needed in the remand courts) (N.D. Ala. Mar. 25, 1996), *and id.*, app. B (Apr. 2, 1996), *at* http://www.fjc.gov/BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003). *See also* Recent Developments in the Silicone Gel Breast Implant Products Liability Litigation: A Briefing for Federal and State Court Judges (Federal Judicial Center 1996) (FJC Media Catalog No. 3095-V/96) (videotape supplementing Judge Pointer's order in the silicone gel breast implant litigation instructing judges on the background of the litigation and other pretrial issues).

1153. *See supra* section 20.13. The Judicial Panel on Multidistrict Litigation has centralized a number of mass tort cases for pretrial management. *See supra* section 22.33. After initially rejecting applications to centralize asbestos personal injury actions, *see, e.g.*, *In re* Asbestos & Asbestos Insulation Material Prods. Liab. Litig., 431 F. Supp. 906 (J.P.M.L. 1977), the panel later transferred all pending federal asbestos personal-injury claims in the Eastern District of Pennsylvania. *In re* Asbestos Prods. Liab. Litig., 771 F. Supp. 415 (J.P.M.L. 1991). For other examples of centralization of mass tort litigation, see *In re Diet Drugs Products Liability Litigation*, 990 F. Supp. 834 (J.P.M.L. 1998), *In re Temporomandibular Joint (TMJ) Implants Products Liability Litigation*, 844 F. Supp. 1553 (J.P.M.L. 1994), and *In re Silicone Gel Breast Implant Products Liability Litigation*, 793 F. Supp. 1098 (J.P.M.L. 1992).

law causes of action), there is no procedural mechanism analogous to the Multidistrict Litigation Panel's transfer under section 1407 for formal coordination or consolidation of state and federal cases.

Federal and state court judges frequently cooperate informally and effectively to coordinate discovery and pretrial proceedings in mass tort cases. For example, in the PPA litigation, the MDL transferee judge coordinated the discovery and *Daubert* hearing schedules with state judges.[1154] In the diet drug litigation, a state judge, the MDL transferee judge, and counsel worked out a formula for compensating the lawyers handling the state court cases who had conducted discovery that was useful in the MDL cases.[1155] These and other approaches to state–federal coordination are discussed extensively in section 20.3, which emphasizes cooperative efforts that have taken place in the mass tort context.

In the absence of a class certification and a pending settlement, the authority of federal courts to enjoin state court proceedings is limited. Read together, the Anti-Injunction Act[1156] and the All Writs Act[1157] allow injunctions against state proceedings only when necessary to aid a federal court's jurisdiction. For example, in a case in which the MDL transferee judge issued a pretrial order that barred discovery of certain matters and applied to discovery conducted in state court cases involving the same subject matter, the court of appeals held that "the Anti-Injunction Act does not bar courts with jurisdiction over complex multidistrict litigation from issuing injunctions to protect the integrity of their rulings, including pretrial rulings like discovery orders."[1158] Such an order must be "narrowly crafted to prevent specific abuses which threaten the court's ability to manage the litigation effectively and responsibly."[1159] Section 21.15 discusses the authority of a federal court to

---

1154. *See In re* Phenylpropanolamine (PPA) Prods. Liab. Litig., MDL No. 1407, Order Granting in part and Denying in part Manufacturing Defendants Motion to Accelerate Daubert Hearing (W.D. Wash. Sept. 19, 2002), *at* http://www.wawd.uscourts.gov/wawd/mdl.nsf/main/page (last visited Nov. 10, 2003) (adjusting calendar for *Daubert* proceedings to coordinate with similar proceedings in state courts); *id.*, MDL No. 1407, Order No. 1 (W.D. Wash. Jan. 29, 2002), *at* http://www.wawd.uscourts.gov/wawd/mdl.nsf/main/page (last visited Nov. 10, 2003) ("This Court has taken into consideration the present status and progress of discovery against various groups of defendants in fashioning a discovery schedule that will aid in fostering state and federal court coordination of PPA cases, and completing the tasks undertaken in this MDL 1407 with reasonable dispatch in keeping with the needs and expectations of litigants.").

1155. *See supra* section 20.31 and text accompanying notes 702–04.

1156. 28 U.S.C. § 2283 (West 2003).

1157. *Id.* § 1651.

1158. Winkler v. Eli Lilly & Co., 101 F.3d 1196, 1203 (7th Cir. 1996).

1159. *Id. See also In re* Inter-Op Hip Prosthesis Prod. Liab. Litig., 2001 WL 1774017, at *1 (6th Cir. Oct. 29, 2001) (rejecting order enjoining all litigation pending settlement review).

enjoin state court proceedings before class certification. Section 21.42 discusses such authority in relation to certified class actions. Section 20.32 discusses state–federal jurisdictional conflicts in general and the variety of means of addressing them, including injunctive relief. The limits on a federal court's authority to enjoin overlapping and duplicative proceedings in state courts makes cooperative efforts at coordination critical to minimize conflicts and duplication unrelated to the strengths or weaknesses of the merits.

## 22.5   Multiple Filings in District and Bankruptcy Courts[1160]

.51 Venue, Transfer, and Consolidation  380
    .511 Venue and Transfer  380
    .512 Consolidation and Reassignment  380
.52 Withdrawing the Reference  381
.53 Dividing the Labor Among Judges  383
    .531 MDL Transferee Judge  383
    .532 Other Judges  384
    .533 Bankruptcy Appeals  384
.54 Coordinating and Consolidating Tort Claims and Related Cases  385
    .541 Claims Against the Debtor  386
    .542 Claims Against Other Defendants  388
    .543 Consolidation of Cases  388
    .544 Transfer of Related Cases of Nondebtor Defendants  389
    .545 Expanding the Automatic Stay or Enjoining Related Cases  391
.55 Providing Representation for Future Mass Tort Claimants  393
.56 Estimating the Value of Mass Tort Claims  397
.57 Negotiating a Reorganization Plan  398
.58 Discharging Future Claims  399
.59 Confirming a Reorganization Plan  401

Corporate defendants in mass tort litigation sometimes file for relief under the Bankruptcy Code to attempt a global resolution of pending and threatened mass tort claims. The constraints on certification of some settlement classes imposed by the Supreme Court's decisions in *Amchem* and *Ortiz* appear to have increased the use of the bankruptcy courts for this purpose,

---

1160.  This subsection draws heavily on a preliminary draft of Professor S. Elizabeth Gibson's work on a Federal Judicial Center manual on case management of bankruptcy proceedings in cases involving mass torts. S. Elizabeth Gibson, Judicial Management of Mass Tort Bankruptcy Cases (Federal Judicial Center forthcoming; title is tentative) [hereinafter Gibson, Judicial Management]. *See also* S. Elizabeth Gibson, Case Studies of Mass Tort Limited Fund Class Action Settlements & Bankruptcy Reorganizations (Federal Judicial Center 2000) [hereinafter Gibson, Case Studies].

particularly in asbestos cases.[1161] Generally, such defendant-debtors seek confirmation of a reorganization plan under Chapter 11 that will provide adjusted payments to creditors, including tort claimants. Such a plan allows the reorganized business to emerge from bankruptcy free of the obligations to creditors, including tort claimants, that led to the reorganization. On rare occasions debtors liquidate their businesses under Chapter 7. Bankruptcy filings can dramatically alter the scope and direction of a pending mass tort litigation and can alter the claims and cases directly or indirectly related to the bankrupt debtor's activities.

When a defendant in mass tort litigation files for bankruptcy, all the pending litigation in all state and federal courts against that party is automatically stayed as of the petition date.[1162] The automatic stay, combined with the bankruptcy court's exclusive control of the debtor's assets, effectively centralizes that defendant's state and federal mass tort cases into a single federal court. The bankruptcy filing and resulting centralization raise questions relating to the venue of the cases, the division of labor among various judges (including considerations relating to withdrawing the reference to the bankruptcy judge), the coordination and consolidation of the tort claims with other related cases (including cases involving codefendants that are not in bankruptcy), the representation of future mass tort claimants, the process for estimating the value of mass tort claims, and, finally, the process for negotiating a reorganization plan that includes provisions for payment of present and future claims. This section addresses those questions in summary fashion, focusing on issues that involve district as well as bankruptcy judges.[1163]

1161. Stephen Carroll et al., Asbestos Litigation Costs and Compensation: An Interim Report (2002), *available at* http://www.rand.org/publications/DB/DB397 (last visited Dec. 2, 2003). *See generally* ALI-ABA, Asbestos Litigation in the 21st Century (Sept. 19–20, 2002). *See infra* section 22.71 for discussion of the *Amchem* and *Ortiz* decisions.

1162.  11 U.S.C. § 362(a)(1) (2003). The Bankruptcy Code also bars the bringing of new suits on claims that arose before the petition was filed. *Id.*

1163.  *See generally* Gibson, Judicial Management, *supra* note 1160. That manual will also cover topics primarily relevant to the operation of the bankruptcy system, such as the appointment of committees, the compensation of professionals, and procedures for voting on and confirming reorganization plans.

## 22.51  Venue, Transfer, and Consolidation

.511 Venue and Transfer  380
.512 Consolidation and Reassignment  380

### 22.511  Venue and Transfer

The defendant-debtor makes the initial decision about where to file the bankruptcy petition.[1164] Where the MDL Panel has centralized the tort claims in a given district, the bankruptcy petition can be filed in that district if other venue requirements are met.[1165] If the debtor files the bankruptcy case in a district other than the transferee district, the bankruptcy court may, under certain conditions, "transfer a case or proceeding . . . to a district court for another district, in the interest of justice or for the convenience of the parties."[1166] Although this procedure has not been invoked in any mass tort bankruptcy case to date, a retrospective analysis of the proceedings in the Dow Corning reorganization indicated that "prospects for [bankruptcy/MDL] coordination can be enhanced if the [MDL] transferee judge sits in the district where the bankruptcy proceedings are pending."[1167] Accordingly, the debtor, other parties, and judges in the district in which the bankruptcy is filed should consider this and other options to centralize MDL and bankruptcy case management in a single district.

### 22.512  Consolidation and Reassignment

In an innovative approach to coordinate asbestos-related bankruptcies, the Third Circuit Court of Appeals found that five asbestos-related Chapter 11 cases that had been filed in the District of Delaware needed "to be consolidated before a single judge so that a coordinated plan for management [could] be developed and implemented."[1168] Courts may also want to consider consoli-

---

1164.  *See generally* Gordon Bermant, Arlene Jorgensen Hillestad & Aaron Kerry, Chapter 11 Venue Choice by Large Public Companies: Report to the Judicial Conference Committee on the Administration of the Bankruptcy System (Federal Judicial Center 1997).

1165.  *See* 28 U.S.C. § 1408(1) (West 2003) (specifying as key factors the entity's domicile, residence, principal place of business, or principal location of assets).

1166.  28 U.S.C. § 1412 (West 2003). For a discussion of the considerations involved in such a transfer, see John F. Nangle, *Bankruptcy's Impact on Multidistrict Litigation: Legislative Reform as an Alternative to Existing Mechanisms,* 31 Ga. L. Rev. 1093, 1103–04 (1997) (Nangle is the former chair of the JPML).

1167.  Nangle, *supra* note 1166, at 1102. See generally Judge Nangle's article for consideration of the advantages and disadvantages of various options for achieving coordination of bankruptcy and MDL proceedings.

1168.  Order of Chief Judge Edward H. Becker, *cited in In re* Federal-Mogul Global, Inc., 300 F.3d 368 (3d Cir. 2002) (designation of a district judge for service in another district within the

dating bankruptcy cases dealing with the same or similar products to achieve any efficiencies that might be associated with consolidated case management and with the linkage of claims-resolution facilities. Such consolidated procedures are novel. It remains unclear that they will achieve such efficiencies and at what cost.

## 22.52  Withdrawing the Reference

A mass tort bankruptcy brings new judges into a mass tort litigation, including the bankruptcy judge to whom the case is assigned and district judges who will hear appeals from the bankruptcy judge. The district court of the district where the case is filed has the authority to withdraw the reference of jurisdiction to the bankruptcy court in whole or in part.[1169] Throughout the bankruptcy case, the district and bankruptcy judges involved should consider whether some aspects of that case should or must be resolved by judges other than the assigned bankruptcy judge and whether and how knowledge and expertise already accumulated by other judges can be used in the bankruptcy proceedings.

A district judge might partially withdraw the reference in a mass tort bankruptcy case for a number of reasons, including prior familiarity with the tort claims involved, greater expertise as to the legal issues raised, desire to avoid duplication of effort, jurisdictional limitations on the bankruptcy court's authority, and statutory command.[1170] Once the withdrawal occurs, it will be especially important for the bankruptcy and district judges handling the various aspects of the bankruptcy case to have frequent communications so that the matters can proceed in a coordinated fashion.

In several mass tort cases, district judges have withdrawn the reference with respect to various proceedings relating to the personal-injury and

circuit). The order was based on authority granted the chief judge in 28 U.S.C. § 292(b) (West 2003), which permits such reassignments "in the public interest."

1169.  District courts are authorized by 28 U.S.C. § 157(d) to, "for cause," withdraw the reference of any bankruptcy case or proceeding from the bankruptcy court and to exercise original jurisdiction over the withdrawn matter. The district court may take this action on its own motion or on a party's motion. 28 U.S.C. § 157(d) (West 2003).

1170.  *See* 28 U.S.C. § 157(d) (West 2003) (requiring a district court, upon timely motion of a party, to withdraw the reference of jurisdiction to a bankruptcy judge with respect to a proceeding if resolution of that proceeding "requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce"). Because mass tort personal-injury claims are typically governed by state law, they will rarely trigger the mandatory withdrawal provision. Their liquidation or estimation for purposes of distribution, however, will have to take place in the district court. *Id.* § 157(b)(2)(B)(5).

wrongful-death tort claims against the debtor. Perhaps the broadest example occurred in the *A.H. Robins* case where the district judge, who had been presiding over a large group of Dalkon Shield cases against Robins, partially withdrew the reference of jurisdiction from the bankruptcy court at the debtor's request on the day the debtor filed its petition. The district court specified seventeen categories of proceedings and motions that it would resolve, including all "[p]roceedings involving the estimation or liquidation of any personal injury tort or wrongful death claims against the estate."[1171] Included within this category of withdrawn matters were the following: motions to establish procedures for filing and resolving the tort claims, including the establishment of bar dates; motions concerning procedures for and discovery in proceedings relating to the estimation or liquidation of the tort claims; requests for declaratory relief concerning the debtor's liability for the tort claims; the estimation or liquidation of the tort claims for purposes of allowance, confirmation, or distribution; motions concerning the automatic stay's application to tort claims; and requests for relief under 11 U.S.C. § 105 with respect to a tort claim. Other matters withdrawn for the district court's determination included motions for conversion or dismissal, appointment of committees, extensions of exclusivity, approval of disclosure statements, confirmation, appointment of a trustee, compensation for services, and enforcement of the automatic stay.[1172]

In other mass tort bankruptcies, district judges have withdrawn the reference with respect to a narrower set of proceedings. In *In re Dow Corning Corp.*,[1173] for example, the district judge withdrew from the bankruptcy court jurisdiction to decide the debtor's "omnibus objection to disease claims" that sought a determination that the tort plaintiffs lacked proof that the debtor's product caused their alleged diseases.[1174] Another district judge acting in a mass tort case withdrew the reference with regard to the validity of the personal injury claims against the debtor, specifically including, within the withdrawn proceedings, motions for the following: setting a bar date for filing claims,

---

1171. *In re* A.H. Robins Co., 59 B.R. 99, 105 (Bankr. E.D. Va. 1986).

1172. *Id.* at 105–07.

1173. *In re* Dow Corning Corp., 215 B.R. 526 (Bankr. E.D. Mich. 1997).

1174. The bankruptcy judge recommended withdrawal of the reference because a similar issue was likely to be raised in cases against the debtor's shareholders already pending in the district court, *id.* at 527–29, and because a ruling on the debtor's objection depended largely on application of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), on which the bankruptcy court believed the district court possessed greater expertise. *In re Dow Corning,* 215 B.R. at 530.

concerning notice to claimants, relating to the form to be used for proofs of claim, and for summary judgment based on threshold liability issues.[1175]

## 22.53  Dividing the Labor Among Judges

.531 MDL Transferee Judge  383
.532 Other Judges  384
.533 Bankruptcy Appeals  384

Withdrawals often retain in the district court matters relating to the estimation and resolution of mass tort liability. Conversely, matters that relate exclusively to the administration of the bankruptcy estate and the supervision of the ongoing business of the debtor have been generally retained in the bankruptcy court. In some bankruptcy cases, following a partial withdrawal of the reference, the bankruptcy and district judges have held hearings at which they presided jointly and after which they issued joint rulings.[1176] In such situations, the judges and the parties should have a clear understanding of their respective roles and responsibilities.

### 22.531  MDL Transferee Judge

In addition to matters relating to withdrawal of the reference, district and bankruptcy judges should consider drawing on the knowledge and experience of other judges who have presided over all or part of the mass tort litigation. The transferee judge assigned to coordinate the multidistrict litigation represents a primary, and in many cases an indispensable, source of such expertise.[1177] When the bankruptcy has been filed in a district other than the MDL transferee district and not transferred to that district, the MDL transferee judge can be assigned to handle portions of a bankruptcy case, but only with the cooperation of the bankruptcy and district judges presiding over the case.[1178]

---

1175. *In re* Babcock & Wilcox Co., No. CIV.A.00-0558, 2000 WL 422372, at *3–*4 (E.D. La. Apr. 17, 2000). The court based its decision on the fact that the law was unresolved within its circuit as to whether a bankruptcy judge has authority to decide dispositive pretrial motions concerning personal injury and wrongful death claims against a bankruptcy estate. *Id*. at *4.

1176. *See, e.g., In re* A.H. Robins Co., 88 B.R. 742, 743 (E.D. Va. 1988) (memorandum in re confirmation order jointly issued by district judge Merhige and bankruptcy judge Shelley, noting that "[b]y agreement, the undersigned, with few exceptions, conducted all proceedings jointly").

1177. *See generally* Nangle, *supra* note 1166.

1178. *Id.* at 1111 ("It must be remembered, of course, that mere assignment of the multidistrict judge or judges to the district in which the bankruptcy is pending will be of limited utility in the absence of cooperation from that district's bankruptcy and district judges.").

Such an assignment should be initiated by judges of the bankruptcy district rather than one of the parties.

The mere existence of an MDL proceeding does not mean that the MDL transferee judge should be assigned automatically to the bankruptcy district. Such an assignment should be sought only when the MDL transferee judge can play a specific and useful role. If causation is not seriously in issue and the bankruptcy court believes the parties will successfully attempt to negotiate a resolution of the tort claims, there may be no need for the MDL transferee judge's involvement. In some bankruptcy cases, however, there may be a need for a ruling on causation or other global liability issues, or for judicial estimation of the tort claims; the MDL transferee judge is often well suited to preside over such matters. There also may be cases in which the participation of the MDL transferee judge facilitates the settlement of claims involving multiple defendants or the establishment of joint claims resolution facilities.

## 22.532 Other Judges

Litigation pending in other courts may be important to the bankruptcy proceedings, even if the pending litigation does not involve tort claims. For example, the debtor may have previously filed suit against one or more of its insurers seeking a declaration of coverage. A declaratory judgment action against an insurer is not an action against the debtor and would not ordinarily be stayed automatically by the debtor's bankruptcy filing. Unless the parties obtain a transfer of the litigation to the bankruptcy court, or the debtor dismisses the suit and refiles it in the bankruptcy court, the insurance litigation can proceed where originally filed. The bankruptcy judge should stay informed of the progress of that litigation by requiring counsel to submit periodic status reports or through informal consultation with the judge handling the case.[1179] Should it appear that the resolution of the litigation in the nonbankruptcy court will frustrate or delay progress in the bankruptcy case, the bankruptcy judge should encourage the parties to seek a change of venue to the bankruptcy court or initiate a new adversary proceeding there.

## 22.533 Bankruptcy Appeals

A mass tort bankruptcy case will always involve judges who will hear appeals from the bankruptcy judge. Such appeals may be to district judges,

---

1179. *See* McGovern, *Rethinking Cooperation*, *supra* note 690, at 1868 (noting that cooperation among judges in the form of "[s]uccessful coordination of pretrial activities by reconciling overlapping schedules and eliminating redundancies in case development" and "the reduction of duplication" rarely presents problems).

bankruptcy appellate panel judges,[1180] or circuit judges.[1181] The assignment of a single district judge to hear all appeals in a mass tort bankruptcy case will enable that judge to learn about the case, thereby expediting decision making and facilitating consistent rulings. For similar reasons, some courts of appeals have assigned all appeals from a single mass tort bankruptcy case to the same appellate panel.[1182] This approach should also be considered in courts with bankruptcy appellate panels.

## 22.54  Coordinating and Consolidating Tort Claims and Related Cases

.541 Claims Against the Debtor  386
.542 Claims Against Other Defendants  388
.543 Consolidation of Cases  388
.544 Transfer of Related Cases of Nondebtor Defendants  389
.545 Expanding the Automatic Stay or Enjoining Related Cases  391

A principal advantage of using a bankruptcy court to resolve mass tort litigation is that it consolidates all pending mass tort litigation in the district in which the bankruptcy case is filed.[1183] The bankruptcy filing itself largely accomplishes this consolidation. Parties may also ask the bankruptcy court to transfer the tort suits pending against the debtor to the district in which the bankruptcy is pending and to expand the scope of this consolidation to include claims against nondebtor parties. Despite possible advantages, a number of legal and practical questions will present themselves to the bankruptcy or district judges who are asked to approve such a consolidation. An important question is what steps, if any, should be taken to resolve the multitude of personal injury tort cases pending against the debtor and others in state and federal courts around the country at the time the bankruptcy petition is filed.

---

1180.  *See* 28 U.S.C. §§ 158(a), (b)(1) (West 2003).

1181.  *See id.* § 158(d).

1182.  *See, e.g.,* Official Comm. of Tort Claimants v. Dow Corning Corp. (*In re* Dow Corning Corp.), 142 F.3d 433 (6th Cir. 1998); Lindsey v. Dow Chem. Co. (*In re* Dow Corning Corp.), 113 F.3d 565 (6th Cir. 1997); Tort Claimants' Comm. v. Dow Corning Corp. (*In re* Dow Corning Corp.), 103 F.3d 129 (6th Cir. 1996); Lindsey v. O'Brien, Tanski, Tanzer & Young Health Care Providers (*In re* Dow Corning Corp.), 86 F.3d 482 (6th Cir. 1996) (appeals all decided by a panel of the same three judges).

1183.  *See, e.g.,* Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise-Threatening Mass Tort Liability*, 148 U. Pa. L. Rev. 2045, 2050–54 (2000); Barbara J. Houser, *Chapter 11 as a Mass Tort Solution*, 31 Loy. L.A. L. Rev. 451, 457 (1998).

## 22.541 Claims Against the Debtor

Consolidation of the mass tort litigation is achieved by virtue of the automatic stay and the bankruptcy court's exclusive jurisdiction over the property of the debtor and of the estate.[1184] The bankruptcy court itself, however, does not have jurisdiction to hear and determine personal injury and wrongful death claims.[1185] Those claims must be adjudicated by the district court, either in the district of the bankruptcy case or the district where the tort claim arose.[1186] Any jury trial rights that exist outside of bankruptcy are statutorily preserved in bankruptcy.[1187] This does not mean, however, that all of the thousands of personal injury and wrongful death claims against the debtor will have to be tried to a jury in district court. A right to jury trial may be waived by a tort claimant who accepts a reorganization plan's provisions for settlement or for alternative dispute resolution methods.[1188] Moreover, most courts have concluded that the bankruptcy court has authority to estimate the value of the mass tort claims for purposes of voting and confirmation and for determining the feasibility of the reorganization plan.[1189]

A practical question is whether there is good reason to transfer the mass tort case files from the federal and state courts around the country to the district in which the bankruptcy case is filed. The district court has authority to do so.[1190] In both the *Dow Corning* and the *A.H. Robins* bankruptcies, courts

---

1184.  *See* 28 U.S.C. § 1334(e) (West 2003).

1185.  *Id.* § 157(b)(5) (excluding the determination of personal injury tort and wrongful death claims for purposes of distribution through bankruptcy from the definition of core bankruptcy proceedings).

1186.  *Id.*

1187.  *Id.* § 1411(a); *see also id.* § 157(b)(5).

1188.  *See, e.g., A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1013 n.17 (4th Cir. 1986); *In re Dow Corning Corp.,* 187 B.R. 919, 929–30 (Bankr. E.D. Mich. 1995), *rev'd in part on other grounds,* 86 F.3d 482 (6th Cir. 1996); *In re UNR Indus., Inc.,* 45 B.R. 322, 326 (Bankr. N.D. Ill. 1984); Resnick, *supra* note 1183, at 2053.

1189.  *See, e.g., A.H. Robins Co.,* 788 F.2d at 1012 (citing Roberts v. Johns-Manville Corp., 45 B.R. 823, 825–26 (S.D.N.Y. 1984)); *UNR Indus.,* 45 B.R. at 326–27; Resnick, *supra* note 1183, at 2052–53. Courts are divided, however, over whether a bankruptcy judge is authorized to rule on dispositive motions seeking to disallow personal injury and wrongful death claims against the debtor. *Compare In re* U.S. Lines, Inc. v. U.S. Lines Reorganization Trust, 262 B.R. 223 (S.D.N.Y. 2001), *and In re* Dow Corning Corp., 215 B.R. 346 (Bankr. E.D. Mich. 1997), *with* Pettibone Corp. v. Easley, 935 F.2d 120 (7th Cir. 1991), *and In re* UNR Indus., Inc., 74 B.R. 146 (N.D. Ill. 1987).

1190.  Courts have consistently read 28 U.S.C. § 157(b)(5) as authorizing the district court in the district of the bankruptcy case to transfer personal injury tort and wrongful death claims to its district. *See, e.g., In re* Dow Corning Corp., 86 F.3d 482, 496 (7th Cir. 1996); *In re* Pan Am. Corp., 16 F.3d 513, 516 (2d Cir. 1994); *A.H. Robins Co.,* 788 F.2d at 1010–11.

concluded that transfers were warranted[1191] but stopped short of requiring the physical shipment of case files to the district in which the bankruptcy case was filed.[1192] In fact, in the *Dow Corning* case, the court ordered that the files for all removed cases continue to be transferred to the MDL judge for pretrial purposes.[1193] In asbestos-related mass tort bankruptcies, actions pending against the debtors have generally not been transferred to the bankruptcy district. In at least one of those cases, the bankruptcy court was able to estimate the value of the tort claims without having the pending cases transferred to its district,[1194] and in other cases the parties were able to negotiate a value of the relevant tort claims without having all of the underlying actions against the debtor consolidated in the district in which the bankruptcy case was pending.[1195]

After the reorganization plans have been confirmed, individual tort claims generally will be resolved according to the terms of the plans. Those terms typically include the establishment of trusts from which all present and future asbestos claims for payment are paid, under so-called channeling injunctions.[1196]

1191. *See Dow Corning*, 187 B.R. at 929 (discussing the advantage of transferring because "one or more causation trials held during the estimation process for the purpose of assuring a more accurate estimation" might "best be accomplished if all cases pending against the Debtor are before one court"); *A.H. Robins Co.*, 788 F.2d at 1014 (concluding that "[n]o progress along estimating these contingent claims . . . can be made until all Dalkon Shield claims and suits are centralized before a single forum where all interests can be heard and in which the interests of all claimants with one another may be harmonized").

1192. In the *Dow Corning* case, the district court found that "no physical transfer of case files or case records to the Eastern District of Michigan is necessary at this time." *Dow Corning Corp.*, 187 B.R. at 932. In the *A.H. Robins* case, physical transfer of the case files to the Eastern District of Virginia was contemplated, but the Fourth Circuit held that no actual transfer of the case files should take place until the individual plaintiff in each case was given notice and an opportunity to object. *A.H. Robins Co.*, 788 F.2d at 1016.

1193. *Id. But see* Maritime Asbestosis Legal Clinic v. U.S. Lines, Inc. (*In re U.S. Lines, Inc.*), 216 F.3d 228, 236 (2d Cir. 2000) (holding that the district court lacked authority under section 157(b)(5) to transfer personal injury or wrongful death claims against the debtor to the MDL district unless the claims arose there).

1194. *See, e.g., In re* Eagle-Picher Indus., 189 B.R. 681 (Bankr. S.D. Ohio 1995).

1195. *See, e.g., In re* UNR Indus., No. 82B9841–45, 1996 Bankr. LEXIS 1455, at *11 (Bankr. N.D. Ill. Aug. 13, 1996) (quoting disclosure statement explanation of how the value of asbestos claims was negotiated).

1196. *See, e.g., In re* Eagle-Picher Indus., 203 B.R. 256, 279, 282 (S.D. Ohio 1996); *In re* UNR Indus., 143 B.R. 506, 514–15 (Bankr. N.D. Ill. 1992).

## 22.542 Claims Against Other Defendants

The provisions of the Bankruptcy Code that allow consolidation and coordination of the mass tort litigation against the debtor are not explicitly applicable to the debtor's nonbankrupt codefendants.[1197] Parties may, however, seek rulings to permit the litigation against these nondebtor parties to be consolidated in the district in which the debtor's bankruptcy case is pending. Nondebtor defendants may also ask the district court to extend the automatic stay to include related claims against them. The motivations for such requests may be any of the following: to achieve the efficiencies of a unified resolution; to prevent the potential unfairness resulting from the continued prosecution of actions against derivative defendants, while the actions against the major defendant, the debtor, are stayed; to prevent the dissipation of a jointly held asset; or to achieve delay. Whatever the reason, a motion to transfer the actions against these nondebtor parties to the district in which the debtor's bankruptcy case is located raises a number of difficult and uncertain legal issues.

## 22.543 Consolidation of Cases

Although the structure of the bankruptcy laws might theoretically permit a nationwide consolidation and resolution of all related claims against all defendants, no mass tort case to date has attempted globally to resolve claims against unaffiliated nondebtor manufacturers as part of a debtor's bankruptcy case. Mass tort litigation against nondebtor parties falls within bankruptcy jurisdiction, if at all, only if it is related to a bankruptcy case. The district court (and by reference the bankruptcy court) is granted subject-matter jurisdiction over cases and all civil proceedings arising under or related to cases arising under title 11. 28 U.S.C. §§ 1334(a) & (b).[1198] The most far-reaching decision regarding mass tort litigation against nondebtor codefendants held that claims against breast implant manufacturers other than the debtor fell within "related

---

1197. The automatic stay prohibits the "commencement or continuation . . . of a judicial . . . proceeding[] against the *debtor* that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the *debtor* that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1) (West 2003) (emphasis added). Bankruptcy courts are granted exclusive jurisdiction over "all of the property, wherever located, of the *debtor* as of the commencement of such case, and of property of the *estate*." 28 U.S.C. § 1334(e) (West 2003) (emphasis added).

1198. In *Pacor, Inc. v. Higgins*, a proceeding is related to a bankruptcy case, and thus falls within federal subject-matter jurisdiction under section 1334(b), if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." 743 F.2d 984, 994 (3d Cir. 1984) (emphasis omitted). *See also In re* Federal-Mogul Global, Inc., 300 F.3d 368, 381 (3d Cir. 2002) (noting "the widespread acceptance of *Pacor*").

to" jurisdiction because the prosecution of such claims could lead to claims for contribution or indemnity against the debtor.[1199] The district court abstained from exercising that jurisdiction,[1200] and the Sixth Circuit denied the petitions for mandamus.[1201] Other courts have not read the jurisdictional statute this broadly.[1202] The bankruptcy of one defendant has not yet achieved a global resolution of a mass tort litigation against an entire industry.[1203] However, courts have allowed some claims against some nondebtor parties to be resolved in the bankruptcy proceedings. Some of the debtor's codefendants with such close relationships to the debtor as officers, directors, shareholders, and related entities with joint insurance coverage, are more likely to be found within "related to" jurisdiction than other nondebtor parties.[1204]

## 22.544  Transfer of Related Cases of Nondebtor Defendants

A judge who determines that mass tort claims against some or all of the debtor's codefendants come within bankruptcy jurisdiction must then determine whether the district court in the district of the bankruptcy case has authority to transfer all of those claims from state and federal courts to the bankruptcy district. Section 157(b)(5) authorizes the district court where the bankruptcy case is pending to determine the place of trial of "personal injury tort and wrongful death claims." Other parts of that same statute refer more specifically to "personal injury tort or wrongful death claims *against the estate*" (emphasis added). Two courts of appeals have concluded that section 157(b)(5) allows the district court in the district where the bankruptcy is filed

---

1199. Lindsey v. O'Brien, Tanski, Tanzer & Young Health Care Providers (*In re* Dow Corning Corp.), 86 F.3d 482, 494 (6th Cir. 1996).

1200. *In re* Dow Corning Corp., No. 95-CV-72397, 1996 WL 511646, at *4 (E.D. Mich. July 30, 1996).

1201. *In re* Dow Corning Corp., 113 F.3d 565, 572 (6th Cir. 1997).

1202. *See, e.g., In re* Federal-Mogul Global, Inc. 300 F.3d 368 (3d Cir. 2002); Pacor, Inc. v. Higgins, 743 F.2d 984 (3d Cir. 1984); *cf.* GAF Corp. v. Johns-Manville Corp. (*In re* Johns-Manville Corp.), 26 B.R. 405 (Bankr. S.D.N.Y. 1983) (declining to extend scope of automatic stay to cover suits against nondebtor codefendants).

1203. *Federal-Mogul Global*, 300 F.3d at 379–84 (rejecting codefendants' argument that claims are related to the debtor's claims because of the possibility that debtor may have to indemnify codefendants); *cf. In re* Johns-Manville Corp., 26 B.R. 405, 409 (Bankr. S.D.N.Y 1983) (rejecting codefendant manufacturer's proposal for "an industry-wide solution of the entire asbestos health-related problem," despite finding it "tempting").

1204. *See, e.g., Lindsey*, 86 F.3d at 490–95; *cf.* A.H. Robins v. Piccinin, 788 F.2d 994, 1007 (4th Cir. 1986) (affirming district court's exercise of bankruptcy jurisdiction to stay mass tort actions against officers, directors, and employees of the debtor). Direct claims against a debtor's insurers have also been found to come within "related to" jurisdiction. *See, e.g.,* Coar v. Nat'l Union Fire Ins. Co., 19 F.3d 247 (5th Cir. 1994).

to fix venue for cases pending against nondebtor defendants that are related to a debtor's bankruptcy proceedings, pursuant to section 1334(b).[1205] In both of those cases, however, only claims against certain closely affiliated nondebtor defendants were part of the overall resolution of the tort claims in the debtor's plan of reorganization.[1206] Because those nondebtor parties were released from further liability after confirmation of the debtor's plan, the claims against them were never litigated.

The fact that a district court determines that it has authority under section 157(b)(5) to transfer personal injury tort litigation pending against a debtor's codefendants does not necessarily mean that the court will choose to exercise that authority, especially at the outset of the bankruptcy case. If the goal of the transfer is to coordinate and consolidate all the mass tort cases pending against the debtor and related parties, a favorable ruling by the court on a motion to expand the stay to cover the nondebtor parties (see section 22.545) may make transfer of the litigation to the bankruptcy district unnecessary.[1207]

Claims against nondebtor defendants do not necessarily have to be tried in the bankruptcy district. Courts have held that in addition to the venue options expressly included in section 157(b)(5)—the district where the bankruptcy case is pending and the district where the personal injury claim arose—the district court has the option of abstaining and allowing the personal injury tort cases to remain in the courts in which they are pending.[1208] Other courts, however, may find that the factors governing abstention lend themselves to a categorical analysis when applied to a large number of similar cases against nondebtor defendants. Before making a final decision to transfer personal injury cases to the bankruptcy district, the district court must give an opportunity for the individual plaintiffs in each case to object.[1209]

---

1205. *Lindsey*, 86 F.3d at 497; *A.H. Robins*, 788 F.2d at 1014.

1206. *See, e.g., In re* Dow Corning Corp., 255 B.R. 445, 475 (E.D. Mich. 2000); Georgene M. Vairo, *The Dalkon Shield Claimants Trust: Paradigm Lost (or Found)?*, 61 Fordham L. Rev. 617, 629–30 (1982) (describing provisions of *A.H. Robins* reorganization plan that released nondebtor parties from liability).

1207. *See In re* Johns-Manville Corp., 45 B.R. 823, 825 (S.D.N.Y. 1984) (Section 157(b)(5) "does not mandate that all personal injury and wrongful death claims be tried. It merely sets forth the procedure by which the forum for trial shall be designated for those . . . claimants who do not agree to another procedure for settling their claims.").

1208. *In re* Dow Corning Corp., 86 F.3d 482, 497 (6th Cir. 1996); *In re* Pan Am. Corp., 950 F.2d 839, 844 (2d Cir. 1991); *In re* White Motor Credit, 761 F.2d 270, 271, 273 (6th Cir. 1985). The Sixth Circuit has held that the abstention decision must be made on a case-by-case basis, rather than globally. *In re* Dow Corning, Corp., 113 F.3d 565, 569–70 (6th Cir. 1997).

1209. *A.H. Robins*, 788 F.2d at 1014 ("[D]ue process requires some form of notice and an opportunity for a hearing before there can be a change of venue and before trial of a personal

22.545  Expanding the Automatic Stay or Enjoining Related Cases

Just as nondebtor parties may seek the transfer of mass tort litigation against them to the bankruptcy district, they may also attempt to use the debtor's bankruptcy to gain a stay of the litigation against them by virtue of 11 U.S.C. § 362. Alternatively, nondebtor parties may seek an order under to 11 U.S.C. § 105 temporarily enjoining the prosecution of the litigation against them. A court asked to stay litigation pending before it may also be asked to declare that the automatic stay applies to nondebtors or to stay litigation pending in other courts against nondebtors. Courts presented with such requests have concluded that they have authority to enter the requested relief, but only with respect to the cases before them.[1210] A bankruptcy court, however, has authority to enjoin litigation against nondebtors pending in other courts so long as that litigation is at least related to the bankruptcy case.[1211]

*Expanding the automatic stay.* Although only the debtor itself is generally entitled to the benefit of the automatic stay in Chapter 11 cases,[1212] several courts have found circumstances in mass tort bankruptcies that justify expanding the scope of that protection.[1213] The primary considerations in deciding whether to stay related litigation are whether it is tantamount to litigation against the debtor and whether it constitutes an effort to obtain possession of, or exercise control over, property of the estate. The focus must be on the litigation's impact on the debtor and its bankruptcy estate, rather than on the possible impact on the nondebtor parties.[1214]

injury tort cause of action against a debtor may be transferred finally from the court in which the cause was initially filed to the district where the bankruptcy proceedings are pending.").

1210. *See, e.g.,* Wedgeworth v. Fibreboard Corp., 706 F.2d 541 (5th Cir. 1983); *In re* Related Asbestos Cases, 23 B.R. 523 (N.D. Cal. 1982); *see also* G. Hisae Ishii-Chang, *Litigation and Bankruptcy: The Dilemma of the Codefendant Stay*, 63 Am. Bankr. L.J. 257, 277–79 (1989).

1211. Celotex Corp. v. Edwards, 514 U.S. 300, 307–10 (1995).

1212. *See, e.g.,* Lynch v. Johns-Manville Sales Corp., 710 F.2d 1194, 1197 (6th Cir. 1983); *Wedgeworth*, 706 F.2d at 544; *In re* Sunbeam Sec. Litig., 261 B.R. 534, 536 (Bankr. S.D. Fla. 2001). In limiting the benefit of the automatic stay to debtors in Chapter 11 cases, courts have sometimes contrasted the expanded scope of the automatic stay in Chapter 13 cases, where it is expressly made applicable to persons liable with the debtor on a debt. *See, e.g., Wedgeworth*, 706 F.2d at 544 (citing 11 U.S.C. § 1301(a) (West 2003)).

1213. *See, e.g., In re* Eagle-Picher Indus., 963 F.2d 855 (6th Cir. 1992); A.H. Robins v. Piccinin, 788 F.2d 994 (6th Cir. 1986); *In re* Johns-Manville Corp., 40 B.R. 219 (Bankr. S.D.N.Y. 1984).

1214. *See, e.g., Eagle-Picher Indus.*, 963 F.2d at 862 ("[I]t is for the protection of Eagle-Picher's numerous *creditors*, not for [nondebtor defendants] Hall and Ralston, that AISI is properly prohibited from proceeding with its action against Hall and Ralston . . . .") (emphasis in original); *In re* Johns-Manville Corp., 26 B.R. 420, 430 (Bankr. S.D.N.Y. 1983) (enjoining under sections 362 and 105 suit against nondebtors because it "threatens adversely to impact on

In *A.H. Robins Co. v. Piccinin*,[1215] the Fourth Circuit affirmed the district court's stay under sections 362(a)(1) and (3) of personal injury suits against various individual defendants who were closely associated with the debtor—its chairman of the board, president, chief medical officer, and the inventor of the Dalkon Shield, whom the debtor had agreed to indemnify—and litigation against the debtor's insurer.[1216] The Fourth Circuit concluded that the interests of the individual defendants were "so intimately intertwined with those of the debtor that the latter may be said to be the real party in interest."[1217] The court emphasized that the individual defendants had an absolute right to be indemnified by the debtor for any judgments rendered against them.[1218]

Courts have not, however, been willing to read the automatic stay provision as extending to unrelated nondebtor codefendants who have merely a joint tortfeasor relationship with the debtor. In several asbestos bankruptcies, for example, courts have rejected codefendant manufacturers' attempts to bring themselves within the scope of the debtor's automatic stay.[1219]

*Enjoining proceedings under section 105.* Most courts that have extended the automatic stay to nondebtor parties have done so under section 105 rather than by an expansive application of section 362. These courts have entered preliminary injunctions temporarily staying litigation against the protected parties, rather than holding that the debtor's filing of its Chapter 11 petition automatically accomplished this result.[1220] Similar to the Fourth Circuit's

---

property of the debtor's estate as well as disrupt the reorganization proceedings and frustrate Manville's efforts to achieve financial rehabilitation"), *aff'd*, 40 B.R. 219 (Bankr. S.D.N.Y. 1984); Charles Jordan Tabb, The Law of Bankruptcy 170–71 (1997) (discussing the "very limited circumstances" under which actions against nondebtors may be stayed under section 362 in Chapter 11 cases).

1215.  788 F.2d 994 (4th Cir. 1986).

1216.  *Id.* at 1007; *see also id.* at 999 (application of the automatic stay to nondebtors was appropriate only in "unusual circumstances"—such unusual circumstances exist "when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor").

1217.  *Id.* at 1001.

1218.  *Id.* at 1007.

1219.  *See, e.g.,* Lynch v. Johns-Manville Sales Corp., 710 F.2d 1194 (6th Cir. 1983); Wedgeworth v. Fibreboard Corp., 706 F.2d 541 (5th Cir. 1983); *In re* Johns-Manville Corp., 26 B.R. 405 (Bankr. S.D.N.Y. 1983).

1220.  *See, e.g., In re* Eagle-Picher Indus., 963 F.2d 855 (6th Cir. 1992) (affirming grant of preliminary injunction pursuant to section 105 enjoining prosecution of civil action against debtor's officers); A.H. Robins v. Piccinin, 788 F.2d 994 (4th Cir. 1986) (affirming grant of preliminary injunction pursuant to section 105 enjoining litigation against debtor's insurers, corporate officers, and other indemnified persons, in addition to relying on section 362 as basis for the stay); *In re* Johns-Manville Corp., 33 B.R. 254, 263 (Bankr. S.D.N.Y. 1983) (granting

interpretation of section 362(a), however, courts have read section 105 as providing authority to extend the stay to nondebtor parties only if the acts to be enjoined "would frustrate the statutory scheme or impact adversely on a debtor's ability to formulate a plan or on the debtor's property."[1221] Accordingly, courts ruling on requests for extension of the stay to protect nondebtor parties in mass tort cases have generally restricted such relief to key officers and employees of the debtor, persons covered by the debtor's insurance policy, and in some instances the debtor's liability insurers.[1222] Courts generally have declined to grant this relief under section 105 to alleged joint tortfeasors who are merely codefendants of the debtor.[1223]

## 22.55  Providing Representation for Future Mass Tort Claimants

As discussed below in section 22.7 and in sections 21.1 and 21.2 of the class actions section, a challenging aspect of managing mass or class litigation is the need to give fair and consistent treatment to claimants who present widely disparate claims. A lesson of the *Amchem* and *Ortiz* (see section 22.71) decisions is that before resolving claims in an aggregated fashion, courts must find a fair mechanism for representing the different interests of present and future claimants. Because the decisions invoked due process principles as well as the limits of Federal Rule of Civil Procedure 23, the concerns that they raise affect bankruptcy proceedings. See section 22.58.

The need for fair treatment of future claimants is heightened in the bankruptcy context because the very act of filing for bankruptcy usually signals that the defendant does not have sufficient assets fully to compensate all claimants. Because most mass tort bankruptcies are precipitated by the debtor's desire to achieve a global resolution of all the tort claims that have

---

preliminary injunction enjoining litigation against officers, directors, and employees of debtor "[b]ased upon the broad grant of power contained in Section 105(a)").

1221.  *In re* Johns-Manville Corp., 26 B.R. 420, 427 (Bankr. S.D.N.Y. 1983); *see also* Johns-Manville Corp. v. Asbestos Litig. Group (*In re* Johns-Manville Corp.), 40 B.R. 219, 225 (Bankr. S.D.N.Y. 1984) (holding that "to issue a stay under § 105, the court must determine that such relief is at least appropriate to achieve the goals of a Chapter 11 reorganization, and is necessary to protect the debtor").

1222.  *See In re* Forty-Eight Insulations, Inc., 54 B.R. 905, 909 (Bankr. N.D. Ill. 1985); David G. Epstein et al., Bankruptcy 126 (1993) (listing factors increasing chances of obtaining a stay of litigation against a nondebtor).

1223.  *See, e.g.,* Lynch v. Johns-Manville Sales Corp., 710 F.2d 1194 (6th Cir. 1983); Wedgeworth v. Fibreboard Corp., 706 F.2d 541 (5th Cir. 1983); *Johns-Manville Corp.,* 26 B.R. 405 (Bankr. S.D.N.Y. 1983).

been or will be asserted against it, the debtor will seek to discharge not only the claims of persons who are presently sick or injured but also the claims of persons who have been exposed to the offending product but have not yet manifested any injury (i.e., present-future claimants). A debtor may also attempt to discharge the claims of persons who have not yet been exposed to the debtor's product but who will be exposed in the future and will suffer injury as a result (i.e., future-future claimants).

Judges presiding over the early mass tort bankruptcy cases struggled over the question whether persons who had not yet manifested any injury from exposure to the debtor's product could be dealt with in the bankruptcy proceedings.[1224] These doubts arose from an uncertainty whether such persons had a "right to payment" as required by the statutory definition of "claim."[1225] Doubts also arose from the due process concerns raised by adjudicating such persons' rights in the bankruptcy without the persons' notice of and opportunity to participate in the proceedings.[1226] Most courts eventually concluded that future mass tort claims could not be ignored.[1227] At the very least, these future claimants were "parties in interest" who had a right to be heard in the proceedings and were entitled to representation.[1228] As a result, courts began

---

1224. *See, e.g., In re* Amatex Corp., 755 F.2d 1034 (3d Cir. 1985) (reversing denial by bankruptcy court, affirmed by district court, of request for appointment of representative for future asbestos claimants); *In re* Johns-Manville Corp., 36 B.R. 743 (Bankr. S.D.N.Y. 1984) (granting motion for appointment of future claims representative); *In re* UNR Indus., Inc., 29 B.R. 741 (N.D. Ill. 1983) (denying application for appointment of a future claims representative), *appeal dismissed,* 725 F.2d 1111 (7th Cir. 1984). The specific legal issue presented in the above cases was whether such future claimants were "creditors" who held "claims," within the meaning of the Bankruptcy Code, that could be discharged at the end of the case.

1225. 11 U.S.C. § 101(10)(A) (2000).

1226. *See, e.g., UNR Indus.,* 29 B.R. at 745 ("[T]he putative claimants—who have been exposed to asbestos some time in their lives but do not now have or do not know that they have an asbestos-related disease—have no claims under state law, and therefore do not have claims cognizable under the Code."); *id.* at 747 ("It would be impossible for one legal representative to represent adequately the claims of tens of thousands of future claimants. . . . The practical and legal problems of notifying those who the legal representative would be able to bind . . . are insurmountable.").

1227. *See, e.g., In re* UNR Indus., 725 F.2d 1111, 1119 (7th Cir. 1984) ("If future claims cannot be discharged before they ripen, UNR may not be able to emerge from bankruptcy with reasonable prospects for continued existence as a going concern."); *Johns-Manville Corp.,* 36 B.R. at 749 ("Any plan not dealing with their interests precludes a meaningful and effective reorganization and thus inures to the detriment of the reorganization body politic.").

1228. *See, e.g., UNR Indus.,* 725 F.2d at 1120; *In re* Forty-Eight Insulations, Inc., 58 B.R. 476, 478 (Bankr. N.D. Ill. 1986); *Johns-Manville Corp.,* 36 B.R. at 749. *See, e.g., In re* Forty-Eight Insulations, Inc., 58 B.R. 476, 478 (Bankr. N.D. Ill. 1986); *In re* Johns-Manville Corp., 36 B.R. 743, 749 (Bankr. S.D.N.Y. 1984).

appointing future claims representatives to represent, in the bankruptcy proceedings, the interests of those persons who would be injured by the debtor's product sometime in the future. Congress ratified this judicial practice in the context of asbestos bankruptcies by amending the Bankruptcy Code to make appointment of a future claims representative a condition for a court's statutory authority to issue a channeling injunction directing that claimants may seek payment only from a trust created under a reorganization plan.[1229] Section 22.58 further discusses statutory provisions for discharging future asbestos claims.

Neither the Bankruptcy Code nor the bankruptcy rules set forth procedures for the appointment of a future claims representative. The courts have had to devise such procedures. Typically the debtor files a motion to have the court appoint a future claims representative.[1230] Occasionally other participants in the bankruptcy have requested the appointment.[1231] In Chapter 11 reorganization cases in which the debtor likely faces significant long-term tort liability, the appointment of a future claims representative has become standard. On the other hand, the request for such an appointment in a mass tort liquidation[1232] or where the existence of future tort liability is disputed[1233] is likely to provoke opposition from some of the existing parties. Courts routinely grant a hearing in such circumstances. The decision whether to appoint a future claims representative should be based on an assessment of the likelihood of future claimants, the number, nature, and variety of their claims, and the impact that the bankruptcy will have on these claims.

The court necessarily selects and appoints the future claims representative without the consent of the class of persons represented; the representative is

---

1229. 11 U.S.C. § 524(g)(4)(B)(i) (West 2003).

1230. *See, e.g., In re* Amatex Corp., 755 F.2d 1034, 1036 (3d Cir. 1985) (referring to debtor's application for the appointment of a guardian *ad litem* to represent future asbestos claimants on all issues before the court); *In re* UNR Indus., 46 B.R. 671, 673 (Bankr. N.D. Ill. 1985) (referring to debtors' application for a legal representative for unknown putative asbestos-related claimants).

1231. *See, e.g.,* Locks v. U.S. Trustee, 157 B.R. 89, 90 (Bankr. W.D. Pa. 1993) (referring to motion for the appointment of a future claims representative filed by a plaintiff's attorney who was a member of the unsecured creditors' committee); *Johns-Manville Corp.,* 36 B.R. at 744 (referring to motion filed by Keene Corp., a codefendant of the debtor, to appoint a legal representative for asbestos-exposed future claimants).

1232. *See Locks,* 157 B.R. at 91; *In re* H.K. Porter Co., 156 B.R. 16, 17–18 (Bankr. W.D. Pa. 1993).

1233. *See In re* Dow Corning Corp., 211 B.R. 545, 598 n.55 (Bankr. E.D. Mich. 1997) (discussing the denial of a motion to appoint a representative for future breast implant claimants on the ground that all such claimants were aware of their implants and thus were present, not future, claimants).

not a true agent of those represented.[1234] Unlike the named plaintiffs in a class action, the representative is not a member of the class being represented. Instead, the future claims representative is invariably a lawyer and does not claim the same potential injury that the future claimants face. Because there is no shared or common interest to ensure "'that the interests of the class members will be fairly and adequately protected in their absence, courts look to other bases for such assurance.'"[1235]

Future claims representatives are appointees of the court, and are thus viewed by some as neutral brokers seeking consensual reorganizations rather than as zealous advocates for the interests of future claimants.[1236] A judge appointing a future claims representative can diminish concerns about adequacy of representation in the following ways:[1237]

- Weight should be given to qualifications and experience as an effective advocate when appointing the representative. When a potential future claims representative has previously served in that capacity, the court should consider the results achieved.
- The class of persons represented must be defined as clearly as possible. For example, determine whether the future claims representative is expected to act on behalf of persons injured only by a certain type of product (e.g., those containing asbestos) manufactured by the debtor or on behalf of those injured by multiple products (e.g., lead-based products); on behalf of only persons exposed to the product(s) prior to confirmation or on behalf of those exposed post-bankruptcy as well; or on behalf of those who will suffer only slight or questionable injury as well as those who will be able to demonstrate serious injury.
- The representative needs supporting resources with the same degree of expertise as the creditors' committees possess. The future claims representative should be authorized to hire counsel and financial experts when shown to be necessary.

1234. *See* Frederick Tung, *The Future Claims Representative in Mass Tort Bankruptcy: A Preliminary Inquiry*, 3 Chap. L. Rev. 43, 59 (2000).

1235. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 626 n.20 (1997) (quoting Gen. Tel. Co. of S.W. v. Falcon, 457 U.S. 147, 157–58 n.13 (1982)).

1236. *See* Tung, *supra* note 1234, at 70–71 ("A judge—and certainly parties in interest—might be less interested in finding a person to provide zealous representation for future claimants than one who understands the paramount goal of reorganization.").

1237. *See* Gibson, Case Studies, *supra* note 792, at 91–93. For the *UNR* reorganization, see *id.* at 161–67, 180–81; for the *Dalkon Shield* reorganization, see *id.* at 207–09.

## 22.56  Estimating the Value of Mass Tort Claims

Most courts have found that the bankruptcy court has the authority to estimate the value of mass tort claims for purposes of determining the feasibility of a reorganization plan, confirming a plan, or establishing a framework for voting on a proposed plan.[1238] However, district judges with experience in handling mass tort claims involving the debtor, particularly an MDL transferee judge, may be able to bring a special knowledge and expertise to the estimation process and should ordinarily be invited into the process. See section 22.53.

Although courts have generally allowed the parties to negotiate a plan without judicial estimation proceedings, such proceedings can clarify the extent and value of potential tort claims against the debtor. Knowing the extent of the potential liability in relation to the debtor's assets may determine whether there is any value in the company for equity shareholders.[1239] That information might propel the negotiations and produce a basis for agreement about a reorganization plan.[1240]

If the parties are unable to reach agreement on the value of the claims, evidentiary hearings can assist the judge in resolving this difficult issue.[1241] Along with any unsecured creditors' committee, tort claimants committee, equity committee, and the debtor, future claims representatives have participated in claims estimation hearings by presenting their own experts on the value of the future claims.[1242] In such cases, the judge should consider whether appointment of an expert under Federal Rule of Evidence 706 or appointment of a special master might be appropriate.

---

1238.  The court's authority to estimate the value of tort claims does not, however, include the authority to use those estimates to determine the final value of any individual claim, *see* 28 U.S.C. § 157(b)(5) (West 2003), or a consensual reorganization plan. *See infra* section 22.57.

1239.  See, e.g., the discussion of the effect of the estimation order in *Eagle-Picher*, in Gibson, Case Studies, *supra* note 1160, at 80 ("Given the court's estimation order, the writing was on the wall.").

1240.  See, e.g., the discussion of the *A.H. Robins* reorganization in Gibson, Case Studies, *supra* note 1160, at 196 ("Within a week of Judge Mehige's estimation ruling, American Home Products (AHP) made an offer to merge with Robins. . . . This offer became the heart of the reorganization plan soon agreed to by Robins."); *see also id.* at 91 (discussing the effect of the estimation order on *Eagle-Picher* negotiations).

1241.  *See* Gibson, Case Studies, *supra* note 1160, at 78–79 (describing the testimony in the *Eagle-Picher* estimation hearing), *and id.* at 195–96 (describing the testimony in the *A.H. Robins* estimation hearing).

1242.  *See, e.g., In re* A.H. Robins Co., 88 B.R. 742, 747 (E.D. Va. 1988) (describing the evidence presented at the claims estimation hearing by the expert for the future claims representative), *aff'd*, 880 F.2d 694 (4th Cir. 1989); *In re* Eagle-Picher Indus., 189 B.R. 681, 687–88 (Bankr. S.D. Ohio 1995) (same).

A district judge with experience in the mass tort litigation can help lay the groundwork for estimating the tort claims by using different techniques, including the following:

- conducting trials of representative bellwether cases as discussed in section 22.93;
- conducting trials of specific issues to resolve a disputed common issue (e.g., general causation), as discussed in sections 21.24 and 22.75; and
- mediating or otherwise assisting in negotiation of a consensual reorganization plan once any estimation process has been completed.

## 22.57  Negotiating a Reorganization Plan

The traditional practice in mass tort bankruptcies involving future claimants has been for the court to appoint a representative for those interests (see section 22.55). The representative then participates in plan negotiations with the debtor and representatives of other committees, appears in court, and raises objections on behalf of the future claimants.

The primary role of the future claims representative has been that of a negotiator. Typically negotiations take place among the debtor, the tort claimants' committee, the future claims representative, and the unsecured creditors' committee, in varying combinations. These entities try to arrive at an agreement on the ratio of tort debt to other unsecured debt, the division of tort debt between present and future claims, the terms for liquidation and payment of the tort claims, the percentage of payment for unsecured claims, and the amount, if any, to be provided to equity.[1243] Although there is authority for the court to appoint a mediator to facilitate the negotiations of a reorganization plan,[1244] the expense should be considered.

The future claims representative does not have a formal veto over a proposed reorganization plan, but gaining the representative's assent has proven essential for arriving at a consensual plan of reorganization. A representative's influence is based on the concerns of other parties about the feasibility and legitimacy of confirming a plan to which the future claims representative objects, as well as the persuasive abilities of the representative (both in court and in negotiations). The cases provide examples of how the

---

1243. *See, e.g., In re* UNR Indus., 212 B.R. 295, 298 (Bankr. N.D. Ill. 1997) (describing the negotiation history of the UNR asbestos bankruptcy); Gibson, Case Studies, *supra* note 1160, at 90–91 (describing the negotiation history of the Eagle-Picher asbestos bankruptcy).

1244. *See, e.g.,* Gibson, Case Studies, *supra* note 1160, at 75–76 (describing the use of mediation in the *Eagle-Picher* reorganization).

future claims representative's implicit veto power and advocacy in court results in the improved treatment of future claimants in the reorganization plans.[1245]

Judges should monitor and evaluate the quality of the future claimants' representation and whether it furthers future claimants' ability to receive a fair and adequate recovery. One way to do so compares the recoveries provided in the reorganization plan for future claimants with recoveries provided to present claimants both in the reorganization plan and in settlements immediately before the reorganization. Another measure of the future claims representative's efficacy is the strength and fairness of any mechanisms established to deal with a possible shortfall of funds for the trust. Consider whether procedures are in place to distribute the burden of such shortfalls across the spectrum of claims, and whether monies have been reserved to deal with anticipated future claims.

## 22.58  Discharging Future Claims

At the end of the bankruptcy, the parties generally negotiate a plan requiring future claimants to proceed against a trust established to pay both present and future tort claims, rather than against the reorganized debtor and related entities. Judicial decisions about future claims have recognized, but not clearly resolved, issues concerning the means of discharging such claims.[1246]

Congress to some extent validated the trust concept in 1984 when it added subsections (g) and (h) to section 524 of the Bankruptcy Code.[1247] This amendment, limited to Chapter 11 asbestos cases, authorizes courts in connection with an order confirming a reorganization plan to issue a channeling injunction requiring claimants—present and future—to proceed only against the tort claimant trust established by the plan.[1248] Section 524(g) requires,

---

1245. *See, e.g., In re* Nat'l Gypsum Co., 219 F.3d 478, 481 (5th Cir. 2000) (referring to the future claims representative's successful objection to a permanent injunction that would have prevented future claimants from seeking recovery from the debtor's successor); Gibson, Case Studies, *supra* note 1160, at 208–09 (describing the successful efforts of the future claims representative in the *A.H. Robins* bankruptcy to amend the proposed plan to allow payment for future claimants who did not file a claim in the bankruptcy proceedings by the bar date).

1246. *See, e.g., In re* Amatex Corp., 755 F.2d 1034, 1043 (1985) ("At this juncture . . . we do not know whether future claimants can or should be considered 'creditors' under the Code . . . and how best to solve a whole host of other problems which have not been briefed."); *In re* Johns-Manville Corp., 36 B.R. 743, 754 (Bankr. S.D.N.Y. 1984) ("[I]t is unnecessary for this Court to face the dischargeability issue at this time in order to decide whether these claimants are parties in interest.").

1247. *See* Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 111, 108 Stat. 4106, 4113–17 (codified as amended at 11 U.S.C. §§ 524(g), (h) (West 2003)).

1248. 11 U.S.C. § 524(g)(1)(A) (West 2003).

among other things, that the court appoint during the bankruptcy proceedings "a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands of such kind."[1249] The statute, however, does not address future claims in the following: mass tort bankruptcies involving a product other than asbestos; Chapter 7 liquidations; or cases creating a payment mechanism other than a trust having the characteristics described in that provision. Nor does the statute address whether future claimants may participate in the bankruptcy proceedings, either directly or through a court-appointed representative; whether the rights of such persons may be dealt with by a reorganization plan; whether such persons are entitled to payment in a liquidation distribution; or whether the rights of such persons to proceed against the reorganized debtor and related entities may be terminated by the plan or court-issued injunction.[1250] Even in Chapter 11 asbestos cases, it is unclear whether section 524(g) provides the exclusive method for dealing with future claims or whether other methods may be used. The act amending section 524 included a provision stating that the amendment "shall not be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization."[1251] Uncertainties remain concerning the existence of any other authority to enjoin future claimants.

Despite the courts' reliance on future claims representatives and the analogy to the conditions that Congress found essential to a fair resolution of asbestos mass tort claims under section 524(g), uncertainty as to the constitutionality of binding future claimants remains. One unresolved issue is whether constitutionally adequate notice can be provided to future claimants. The Supreme Court has given conflicting signals. In 1950, the Court held that notice by publication in a single newspaper was sufficient with respect to "beneficiaries whose interests or addresses are unknown to the trustee,"[1252] because "notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any objection sustained would inure to the benefit of all."[1253] Often, though, no form of notice will be

---

1249. *Id.* § 524(g)(4)(B)(i).

1250. *See* Nat'l Bankr. Rev. Comm'n, Bankruptcy: The Next Twenty Years: National Bankruptcy Review Commission Final Report 320–22 (1997) [hereinafter NBRC Report].

1251. Pub. L. No. 103-394, § 111(b), 108 Stat. 4106, 4117 (codified as amended at 11 U.S.C. § 524 (West 2003), committee note).

1252. Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 318 (1950).

1253. *Id.* at 319. Most authorities that have supported the treatment of future claims in mass tort bankruptcies have relied on the appointment of a future claims representative, not merely notice, as the key to satisfying due process. *See, e.g.,* NBRC Report, *supra* note 1250, at 329–34;

"reasonably certain to reach most" future mass tort claimants. As the Court stated in *Amchem Products, Inc. v. Windsor,* "[m]any persons in the exposure-only category . . . may not even know of their exposure, or realize the extent of the harm they may incur."[1254]

The Court "recognize[d] the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous."[1255] Whether it is possible to provide constitutionally adequate notice to future claimants in the bankruptcy context similarly remains open to question.

Due process concerns also attend possible conflicts of interest within the class of future claimants. In other representational situations, the Supreme Court has insisted on a careful alignment of interests between the representative and those represented and has prohibited grouping of class members with divergent interests.[1256] A similar insistence in the bankruptcy context might require appointment of more than one future claims representative. For example, separate representatives might be necessary for seriously injured future claimants and for those future claimants who will suffer only minor injury.[1257] Given the lack of clear precedent on the resolution of future claims in the bankruptcy context, courts should proceed with caution, recognizing the constitutional, statutory, and practical questions that remain unresolved. Courts should draw on the practices that have been developed to provide procedural protections for future claimants.

## 22.59  Confirming a Reorganization Plan

The Bankruptcy Code provides that "[a]fter notice, the court shall hold a hearing on confirmation of a plan"[1258] and that "[a] party in interest may object to confirmation of a plan."[1259] Judicial review of the plan must take place

---

Kathryn R. Heidt, *Future Claims in Bankruptcy: The NBC Amendments Do Not Go Far Enough,* 69 Am. Bankr. L.J. 515 (1995); Resnick, *supra* note 1183, at 2076.

1254.  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 628 (1997).

1255.  *Id.*

1256.  *See* Ortiz v. Fibreboard Corp., 527 U.S. 815, 856–57 (1999); *Amchem,* 521 U.S. at 625–28.

1257.  *See* S. Elizabeth Gibson, *A Response to Professor Resnick: Will This Vehicle Pass Inspection?,* 148 U. Pa. L. Rev. 2095, 2114–15 (2000).

1258.  11 U.S.C. § 1128(a) (2000).

1259.  *Id.* § 1128(b).

even if every impaired class of claims or interests has affirmatively accepted the plan.[1260]

Before confirming a plan, the Bankruptcy Code requires the court to determine whether the plan satisfies thirteen statutory requirements. For example, the Code explicitly requires that a Chapter 11 reorganization plan identify and designate separate classes of creditors' claims and equity holders' interests, specify the treatment to be afforded each class of claims or interests affected by the plan, provide equal treatment for each claim or interest within a particular class, and avoid benefiting directors, officers, and trustees at the expense of creditors and interest holders.[1261]

It is generally efficient to have the bankruptcy judge and a district judge sit jointly to decide whether a proposed plan should be confirmed. In an asbestos bankruptcy (or one following the asbestos statutory model), this approach streamlines the process because, under the statute, the district judge has to either issue or affirm the confirmation order for a channeling injunction to become valid and enforceable.[1262] In circuits without a bankruptcy appeals panel, a joint sitting may also bypass what would otherwise be an appeal of right from a bankruptcy judge's ruling to a judge of the district court.[1263] Instead, an appeal of the joint decision would proceed directly to the court of appeals.[1264]

---

1260.  *See* Gerald F. Munitz & Karen M. Gebbia, *The Chapter 11 Plan, Confirmation and Cramdown*, *in* Basics of Bankruptcy and Reorganization 339, 355 (1992).

1261.  *See* 11 U.S.C. § 1129(a)(1)–(13) (West 2003). For additional requirements, see *id.* § 1129(b)–(d); for requirements relating to the contents of a reorganization plan, see *id.* § 1123. For an example of a confirmation ruling and order, see *In re Eagle-Picher Industries*, 203 B.R. 256 (Bankr. S.D. Ohio 1996).

1262.  11 U.S.C. § 524(g)(3)(A) (West 2003).

1263.  28 U.S.C. § 158(a) (West 2003). *See, e.g., In re* Eagle-Picher Indus., 203 B.R. 256 (Bankr. S.D. Ohio 1996). In the *A.H. Robins* reorganization, the district judge and bankruptcy judge sat jointly throughout the bankruptcy proceedings. Gibson, Case Studies, *supra* note 1160, at 190. Because a bankruptcy appellate panel serves as a substitute for appeal to a district court, *see* 28 U.S.C. § 158 (b)(1) (West 2003), a joint hearing with a bankruptcy judge and a district judge would not save a step in the process. Appeal from that joint decision would lie with a three-judge bankruptcy appellate panel and then with the court of appeals. 28 U.S.C. §§ 158(c) & (d) (West 2003).

1264.  *Id.* § 158(d).

## 22.6  Case-Management Orders

.61 Initial Orders  403
.62 Organization of Counsel  405
.63 Subsequent Case-Management Orders  408
   .631 Adding Parties  408
   .632 Pleadings and Motions  409
   .633 Deferred Docketing  410
   .634 Issue Identification and Development  410
   .635 Electronic Communications  413

When responsibility for numerous related cases pending in the federal courts is centralized early with a single judge, active case management is imperative. The judge must promptly develop case-management plans and orders, updating and modifying them as the litigation unfolds. An initial case-management order will set the stage for the ongoing management process. That order should start to organize the cases and counsel; address discovery issues, including preservation of documents, electronic data, and other evidence; set priorities for pretrial pleadings and defer unnecessary pleadings; identify preliminarily the critical threshold legal and factual issues; outline preliminary discovery and motions and, if possible, set a timetable; and direct counsel to coordinate the implementation of the order. The order should coordinate discovery and threshold pretrial motions with discovery and motions in related cases pending in state and other federal courts. The order should also take into account the proposals of counsel and encourage continuing collaboration among counsel and the parties in the cases pending in different courts.[1265]

## 22.61  Initial Orders

Items that might be covered in initial and follow-up case-management orders in mass tort litigation are illustrated by the orders issued in the MDL-centralized silicone gel product liability litigation, the fen-phen diet drug litigation, the phenypropanolamine (PPA) litigation, and other mass tort litigations. Section 40.52 contains a composite of those orders, which typically are used to accomplish the following tasks:[1266]

---

1265.  *See generally supra* sections 21.2 & 21.3.

1266.  *See In re* Silicone Gel Breast Implant Prods. Liab. Litig., No. CV 92-P-1000-S, Order No. 1 (N.D. Ala. June 26, 1992), *at* http://www.fjc.gov/BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003); *see also In re* Diet Drugs Prods. Liab. Litig., MDL No. 1421 (E.D. Pa.), *at* http://www.fenphen.verilaw.com/ (last visited Nov. 10, 2003); *In re* Phenylpropanolamine (PPA)

- set the agenda and ground rules for the initial conference and notify parties that attendance by each party or attorney is not necessary and that parties with similar interests are expected to agree to be represented at the conference by a single attorney;

- establish an initial service list of counsel, which can later be modified to include a statement that defendants authorized listed counsel to accept service of process or service of other papers and motions by certified mail or by electronic means;

- urge counsel to familiarize themselves with the *Manual for Complex Litigation* and "be prepared at the conference to suggest procedures to facilitate the expeditious, economical, and just resolution of this litigation";

- direct counsel for each side to meet, confer, and seek consensus on all agenda items and, specifically, to propose a discovery plan, including methods to obtain expert discovery and a timetable for considering motions, including any class certification motions;

- call for (1) preliminary reports on the critical factual and legal issues, (2) lists of all affiliated companies and counsel (to assist the court in addressing recusal or disqualification questions), (3) lists of pending motions, and (4) summaries of the nature and status of similar litigation pending in state courts;

- direct attorneys interested in serving as lead, liaison, or coordinating counsel to "submit information showing how and at what rates they will be expected to be compensated" and to disclose any "agreements or commitments they have made respecting the role and responsibility of other attorneys in conducting pretrial proceedings, discovery, and trial";[1267]

- consolidate cases for pretrial proceedings, create a master docket and file, and establish a case-caption format;

- bar motions under Rule 11 or 56 without leave of court and order that counsel meet and attempt to resolve other motions (except Rule 12 motions to dismiss), an approach that should be reaffirmed and applied throughout the litigation;

---

Prods. Liab. Litig., MDL No. 1407 (W.D. Wash.), *at* http://www.wawd.uscourts.gov/wawd/mdl.nsf/main/page (last visited Nov. 10, 2003).

1267. *Id. See also In re* Diet Drug Prods. Liab. Litig., MDL No. 1203, Order No. 16 (E.D. Pa. Mar. 13, 1998), *at* http://www.fenphen.verilaw.com/all_court.icl (last visited Nov. 10, 2003) (establishing guidelines for attorneys' common benefit fund time and expense reports, including time categories and limitations on expenses).

- order the parties to preserve all documents and records containing relevant information, establish ground rules for any routine purges of computer records, and address other issues relating to electronic data likely to be the subject of discovery (see sections 11.432 and 40.26);
- stay formal discovery and grant extensions of time for responding to complaints and motions, pending establishment of a schedule; and
- announce whether the judge intends to handle all matters personally and, if applicable, designate a magistrate judge to handle matters requiring immediate judicial attention when the district judge is unavailable.

Similar orders have been used by judges handling a variety of dispersed mass tort personal injury and property damage cases[1268] and single incident mass tort litigation.[1269]

## 22.62  Organization of Counsel[1270]

Early organization of the counsel who have filed the various cases transferred or consolidated for pretrial purposes is a critical case-management task. The judge will often need to appoint lead counsel or a committee of counsel to

---

1268. *See, e.g., In re* Baycol Prods. Litig., MDL No. 1431, Order No. 4 (D. Minn. Mar. 4, 2002), *at* http://www.mnd.uscourts.gov/Baycol_Mdl/pretrial.htm (last visited Nov. 10, 2003) (pretrial order, issued after initial conference, dealing with docketing, service, conferences, refinement of pleadings, discovery, and attorneys' time records); *In re* Phenylpropanolamine (PPA) Prods. Liab. Litig., MDL No. 1407, Order No. 1 (W.D. Wash. Jan. 29, 2002), *at* http://www.wawd.uscourts.gov/wawd/mdl.nsf/main/page (last visited Nov. 10, 2003) (order, issued after initial case-management conference, dealing with discovery, experts, use of technology, class actions, and state–federal coordination); *In re* Inter-Op Prosthesis Prod. Liab. Litig., MDL No. 01-CV-9000, Case Management Order (N.D. Ohio Sept. 13, 2001), *at* http://www.ohnd.uscourts.gov/Clerk_s_Office/Notable_Cases/index.html (last visited Nov. 10, 2003) (pretrial order including statements of responsibilities of counsel and participation of state court counsel; extensive treatment of discovery); *In re* Propulsid Prods. Liab. Litig., MDL No. 1355, Order No. 2 (E.D. La. Oct. 2, 2000), *at* http://propulsid.laed.uscourts.gov/orders.htm (last visited Nov. 10, 2003) (pretrial case-management plan including detailed organization of counsel).

1269. *See, e.g., In re* Exxon Valdez, 270 F.3d 1215 (9th Cir. 2001); *In re* San Juan Dupont Plaza Hotel Fire Litig., MDL No. 721, 1989 WL 168401 (D.P.R. Dec. 2, 1988) (case-management order).

1270. For a general outline of factors for the court to consider in selecting, providing compensation for, and monitoring the performance of lead counsel in coordinated or consolidated litigation, see *supra* section 10.22. For more specific discussion of the factors relevant to selecting counsel and establishing an initial understanding about attorney fees, see *infra* section 14.211.

coordinate discovery and other pretrial preparation. Lead counsel and committees of counsel for the plaintiffs in mass tort litigation perform a host of functions. They develop proof of liability and anticipate defenses; gather the expertise necessary to prove causation and other elements of plaintiffs' cases; trace patterns of exposure; manage discovery; coordinate the various filings; and communicate with counsel for plaintiffs, counsel for defendants, and the court.[1271] In cases involving numerous defendants, liaison counsel for defendants generally play an important coordinating role in the mass tort litigation. As the appointing authority, the judge has the opportunity and obligation to monitor the activities of counsel and to implement the litigation management plan. Many judges monitor the activities of the parties and counsel through regularly scheduled status conferences and hearings on pretrial motions and discovery. Section 21.27 discusses the rule provision that applies to appointing counsel in class actions.

Where several counsel are competing to be lead counsel or to serve on a key liaison committee, the court should establish a procedure for attorneys to present their qualifications, including their experience in managing complex litigation and knowledge of the subject matter, their efforts in researching and investigating the claims before the court, and the resources that they can contribute to the litigation.[1272] Often counsel will agree among themselves as to who should serve as lead counsel or assume responsible positions on counsel committees; but the judge must be satisfied that counsel can perform the assigned roles and that they have not entered into improper arrangements to secure such positions.[1273] Including plaintiffs' attorneys with different perspectives and experience in lead or liaison counsel or as committee members can be helpful. Consider also including counsel handling significant numbers of state cases to facilitate coordination among state and federal cases. Section 20.31 discusses steps that judges can take in organizing counsel to help coordinate cases among state and federal courts, emphasizing the need to include attorneys involved in cases needing coordinated efforts.[1274]

---

1271.  *See* Paul D. Rheingold, Mass Tort Litigation §§ 7:20 to 7:28 (1996 & Supp. 2002).

1272.  *See infra* section 14.211; *see also* Fed. R. Civ. P. 23(h)(2) & committee notes.

1273.  *See, e.g., In re* Fine Paper Antitrust Litig., 98 F.R.D. 48, 70–75 (E.D. Pa. 1983) (describing agreements among attorneys to influence the organizational structure of the Plaintiffs Steering Committee and the Executive Committee), *aff'd in part, rev'd in part,* 751 F.2d 562 (3d Cir. 1984).

1274.  *See also, e.g., In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, Order No. 39 (E.D. Pa. Apr. 21, 1998), *at* http://www.fenphen.verilaw.com/pto.icl (last visited Nov. 10, 2003) (creating Plaintiff's State Liaison Committee with twenty lawyers from fourteen states).

During the selection process, judges should explicitly articulate their expectations about attorney compensation.[1275] For example, the judge can establish guidelines on the number of attorneys who can be present for or involved in specific tasks, the use of paralegals and associates, record keeping and reporting of time and expenses, ranges of allowable expenses, and similar requirements. See section 14.21.

The cost of the legal services may be apportioned among all parties who benefit from the services.[1276] Fees, however, may not be imposed by an MDL transferee judge on attorneys in cases that are not within the jurisdiction of the MDL courts.[1277] In general, those attorneys who provide a common benefit to a group of litigants may also receive compensation from a common fund—even if the attorneys who provide the benefit are not part of an official committee.[1278]

At a minimum, the judge should consider designating one or more attorneys for the plaintiffs and defendants to conduct common discovery and to present motions and arguments during coordinated pretrial proceedings. To minimize repetitious or marginal presentations, lawyers should be encouraged to consult with such designated or liaison counsel before presenting motions or arguments to the court.

Disagreements among the parties and counsel should not prevent designation of an attorney to act as liaison counsel in distributing documents, developing joint discovery requests, and otherwise assisting in the coordination of the litigation.

---

1275. *See* Fed. R. Civ. P. 23(g)(2)(B) & committee notes.

1276. *See* Smiley v. Sincoff, 958 F.2d 498 (2d Cir. 1992); *In re* Air Crash Disaster at Fla. Everglades on Dec. 29, 1992, 549 F.2d 1006 (5th Cir. 1977); *In re* Silicone Gel Breast Implant Prods. Liab. Litig., MDL No. 926, Order No. 13 (N.D. Ala. July 23, 1992), *at* http://ww.fjc.gov/BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003).

1277. *In re* Showa Denko K.K. L-Tryptophan Prods. Liab. Litig., 953 F.2d 162 (4th Cir. 1992).

1278. *See supra* section 20.31; *see also Diet Drugs*, Order No. 467 (E.D. Pa. Feb. 10, 1999) (establishing fund for MDL lawyers and corresponding fund for cooperating state lawyers working on common discovery).

## 22.63  Subsequent Case-Management Orders

.631 Adding Parties  408
.632 Pleadings and Motions  409
.633 Deferred Docketing  410
.634 Issue Identification and Development  410
.635 Electronic Communications  413

### 22.631  Adding Parties

New actions will likely be commenced throughout the course of the litigation, particularly in cases involving latent toxic torts. As discovery progresses, additional defendants can be joined by amendments to plaintiffs' complaints or by a succession of third-party complaints. Under Federal Rule of Civil Procedure 16(b)(1), the judge should establish at the initial pretrial conference a schedule for joinder of additional parties and for amendment of pleadings. The schedule should provide the parties a reasonable opportunity for discovery before the deadline for adding parties or amending pleadings and should not be modified without a showing of good cause. A presumptive period for later-added parties to join—usually sixty days from service—should be included, subject to the right to seek additional time.[1279]

It is helpful to develop a system for adding new plaintiffs into the structure of the litigation[1280]—for example, a system for assigning new cases to existing groups, or for creating new groups if prior cases have been categorized by worksite, disease, or some other feature. Such a system may entail collecting information about the characteristics of each new case. Necessary data about each new case can be collected at filing and used to create a current database of the information needed to manage the litigation.

Consider directing the defendants to compile information, such as the dates on which and areas in which each defendant marketed a particular product, so that plaintiffs can identify the proper defendants.[1281] Such records might forestall claims being filed against improperly named defendants.

Ordinarily, discovery should not be postponed until all parties have been joined; indeed, some discovery is necessary to identify the proper parties.

---

1279. *See, e.g., Diet Drugs*, Pretrial Order No. 807 (E.D. Pa. July 20, 1999) (establishing a bar date for cross-claims and third-party claims).

1280. *See, e.g., Silicone Gel* (Revised Case Management Order), Pretrial Order No. 5 at ¶ 4(c) (N.D. Ala. Sept. 15, 1992) (granting leave for plaintiffs' counsel to add, without further motion or order, additional plaintiffs from the same state as parties with pending claims against defendants).

1281. *See, e.g., Diet Drugs*, Pretrial Order No. 418 (E.D. Pa. Jan. 6, 1999) (requiring defendants to prepare lists of products and for plaintiffs to provide notice regarding product identification).

Interrogatories may be served on the existing parties, and the judge can order their answers available to, and usable by, parties later added to the litigation. Similarly, new parties may use documents produced in response to requests by others and be given access to document depositories.[1282] Newly added parties may use depositions taken earlier, supplemented as necessary by later, limited depositions. See section 11.453 (deferred supplemental depositions).

## 22.632 Pleadings and Motions

Establishing a master file with standard pleadings, motions, and orders can be particularly helpful if the litigation will involve a number of actions filed, removed, or transferred over an extended period.[1283] Answers, third-party complaints, and motions contained in the master file may be deemed automatically filed in each new case to the extent applicable.[1284] A pretrial order establishing a standard plan and schedule for discovery can also be deemed to apply automatically. Rulings on motions under Federal Rules of Civil Procedure 12 and 56 may be deemed to apply in the newly filed cases unless an objecting party can show good cause.[1285] If the parties have already filed separate motions, consider consolidating related motions that affect the structure of the litigation, such as motions for consolidation for class certification[1286] or to establish a trial plan.

These procedures will expedite proceedings in the later-filed cases while preserving the parties' rights to claim error from adverse rulings. The parties should not, however, be automatically precluded from presenting special issues or requests in individual cases by supplemental pleadings, motions, and arguments.

---

1282. *See supra* section 11.444.

1283. *See infra* section 40.52.

1284. *See supra* section 11.32 (pleading and motion practice).

1285. *See, e.g., In re* Silicone Gel Breast Implants Prods. Liab. Litig., MDL No. 926, Order No. 1 (N.D. Ala. June 26, 1992), *at* http://www.fjc.gov/BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003) (deeming that any motion, brief, response, and corresponding order applies to each similarly situated party unless that party expressly disavows it).

1286. *See, e.g., In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, Order No. 419 (E.D. Pa. Jan. 6, 1999), *at* http://www.fenphen.verilaw.com/pto.icl (last visited Nov. 10, 2003) (scheduling a hearing on motions to certify classes, requiring each side to specify facts they intend to prove, and calling for stipulations of uncontested facts and briefs); *id.,* Order No. 252 (E.D. Pa. Aug. 13, 1998) (establishing deadlines for class certification motions and requiring parties to confer with the Plaintiffs' Management Committee and seek to consolidate such motions); *id.,* Order No. 4 (E.D. Pa. Jan. 16, 1998) (suspending filing and consideration of motions for class certification).

## 22.633 Deferred Docketing

In latent toxic tort cases, exposure to the product may precede manifestation of injuries by a number of years. The presence, nature, and extent of injury or harm may not be known for years or even decades after exposure. Nevertheless, parties may file cases to prevent statutes of limitation or statutes of repose from extinguishing their claims. Some judges, generally with the consent of the parties affected, have established deferred dockets, sometimes referred to as dormant or inactive dockets, to register such claims with the court and toll the running of statutes of limitation or repose while deferring their consideration until any injuries become manifest.[1287]

Other means are available to defer decisions on mass tort claims that are not ready to be adjudicated. For example, judges severed and deferred cases involving claims of systemic injuries resulting from exposure to the silicone gel in breast implants until a national panel of scientific experts appointed under Federal Rule of Evidence 706 issued its report in the multidistrict litigation on the causation issues. Cases involving allegations of localized injuries were not deferred because those causation issues did not raise the same scientific questions or require the same scientific evidence.[1288] Another judge entered an interim order granting in limine motions to exclude plaintiffs' experts, subject to reexamination when the Rule 706 panel issued its report.[1289] Yet another judge deferred claims by tolling the statute of limitations and maintaining a class action relating to those claims on the court's docket.[1290]

## 22.634 Issue Identification and Development

Identifying the issues—and the governing statutory or decisional law—is critical to developing a plan for efficiently resolving complex tort litigation. Multiple tort cases frequently involve claims and defenses asserted under

---

1287. *See, e.g., In re* Asbestos II Consolidated Pretrial, 142 F.R.D. 152 (N.D. Ill. 1991); Freedman, *supra* note 1067, at 688–89. *See generally,* Peter H. Schuck, *The Worst Should Go First: Deferral Registries in Asbestos Litigation,* 75 Judicature 318 (1992); *see also In re* Asbestos Prods. Liab. Litig. (No. VI), MDL No. 875, 2002 U.S. Dist. LEXIS 16590 (E.D. Pa. Jan. 14, 2002) and the discussion of priorities, *supra* note 1048; *see also infra* section 40.52, ¶ 9.

1288. *In re* Breast Implant Cases, 942 F. Supp. 958 (E.D.N.Y. & S.D.N.Y. 1996). For a discussion of the process of appointing and receiving the report of the national panel see FJC Study, Neutral Science Panels, *supra* note 1059.

1289. Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387, 1394–95 (D. Or. 1998).

1290. *See, e.g., In re* Silicone Gel Breast Implants Prods. Liab. Litig., MDL No. 926, Order No. 5 (N.D. Ala. Sept. 15, 1992), *at* http://www.fjc.gov/BREIMLIT/ORDERS.htm (last visited Nov. 10, 2003) (extending indefinitely the time for opting out of a provisionally certified class action and stating that the pendency of that action would toll the statute of limitations for members of that class).

various federal and state laws. In early Federal Rule of Civil Procedure 16 conferences and status conferences, the judge and counsel should work to narrow the issues, claims, and defenses. Such conferences should explore, for example, whether stipulations are feasible to determine what law applies to certain groups of claims or claimants, or to determine what products were distributed during certain periods or in certain geographic areas.

Issues to be taken up early in the litigation may include the following:

- whether the facts and expert evidence support a finding that the products or acts in question have the capacity to cause the type of injuries alleged;

- whether plaintiffs' claims of causation are generally applicable and susceptible to proof across large groups of individuals and over time;

- what law applies and whether there are material differences among the applicable laws;

- whether plaintiffs' claims are barred by statutes of limitations or other legal bars;

- whether plaintiffs can pursue punitive damages;[1291]

- whether one or more classes should be certified and, if so, how to define the class and whether it should be limited to particular claims or issues;[1292] and

- whether to consolidate groups of cases under Federal Rule of Civil Procedure 42(a) for pretrial management.

Some legal issues may be susceptible to resolution and review on interlocutory appeal relatively early in the litigation.[1293] Examples include whether claims are cognizable under federal common law,[1294] barred by the statute of limitations,[1295] subject to issue or claim preclusion,[1296] or covered by insurance.

---

1291. *See generally In re* Exxon Valdez, 270 F.3d 1215 (9th Cir. 2001) (reviewing punitive damages award); *In re* TMI, 67 F.3d 1119, 1127–28 (3d Cir. 1995) (affirming order allowing punitive damage award based on state law); *In re* Simon II Litig., 211 F.R.D. 86, 158–63 (E.D.N.Y. 2002) (discussing punitive damages). *See also* State Farm Mut. Auto. Ins. Co., 123 S. Ct. 1513 (2003).

1292. *See supra* section 21.1; *see also* Fed. R. Civ. P. 23(c)(4)(A). Recent decisions have called into question the applicability of Rule 23(c)(4)(A) in the mass tort context. *See infra* section 22.75.

1293. *See supra* sections 15.11–15.12.

1294. *See In re* Agent Orange Prod. Liab. Litig., 635 F.2d 987 (2d Cir. 1980).

1295. *See* Neubauer v. Owens-Corning Fiberglas Corp., 686 F.2d 570 (7th Cir. 1982).

1296. *See In re* Air Crash at Dallas/Ft. Worth Airport, 861 F.2d 814 (5th Cir. 1988); *In re* Asbestos Litig., 829 F.2d 1233, 1242 (3d Cir. 1987); Hardy v. Johns-Manville Sales Corp., 681 F.2d 334 (5th Cir. 1982); Ezagui v. Dow Chem. Corp., 598 F.2d 727 (2d Cir. 1979); *see also*

Interlocutory certification of controlling but unresolved questions of state law to state courts may also be feasible.[1297]

   Differences in the substantive law governing liability and damages may substantially affect discovery, trial, and settlement. In all mass tort litigation, the judge must analyze applicable choice-of-law rules and determine what state law will govern particular issues.[1298] In single incident mass tort cases, the applicable choice-of-law rules may indicate that only one state's law applies.[1299] In dispersed, multistate toxic tort and defective products litigation, choice-of-law issues may be more problematic because there may be a wide range of applicable state laws, and the state in which the action is pending may not have a significant relationship with many of the class members, with the defendants, or with the activities that are subject to the litigation.[1300] If the choice-of-law and subsequent analysis show little relevant difference in the governing law, or that the law of only a few jurisdictions applies, the court might address these differences by creating subclasses or by other appropriate grouping of claims.[1301] See sections 22.72 and 22.75.

Michael D. Green, *The Inability of Offensive Collateral Estoppel to Fulfill Its Promise: An Examination of Estoppel in Asbestos Litigation,* 70 Iowa L. Rev. 141 (1984).

   1297.  *See supra* section 15.1.

   1298.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). In a case transferred under 28 U.S.C. § 1404(a), the transferee court must apply the choice-of-law rules that would have governed in the transferor court. Ferens v. John Deere Co., 494 U.S. 516 (1990); Van Dusen v. Barrack, 376 U.S. 612 (1964).

   1299.  As a threshold matter, there "can be no injury in applying [the forum state's law] if it is not in conflict with that of any other jurisdiction" connected with the litigation. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 816 (1985). *See also, e.g., In re* Air Crash Disaster near Chicago, Ill. on May 25, 1979, 644 F.2d 594 (7th Cir. 1981) (punitive damages); *In re* Air Crash Disaster near Chicago, Ill. on May 25, 1979, 644 F.2d 633 (7th Cir. 1981) (prejudgment interest).

   1300.  *Phillips Petroleum,* 472 U.S. at 821–22 (where a state does not have significant contacts with the claims asserted by each member of the plaintiff class, the application of that state's law to all members of the class is arbitrary, unfair, and hence unconstitutional). *See also In re* Real Estate Title & Settlement Servs. Antitrust Litig., 869 F.2d 760, 769 (3d Cir. 1989) ("[I]f the [proposed class] member has not been given the opportunity to opt out in a class action involving both important injunctive relief and damage claims, the member must have either minimum contacts with the forum or consent to jurisdiction" to be precluded from litigating its claims in its own forum.).

   1301.  *In re* Sch. Asbestos Litig., 977 F.2d 764, 796–98 (3d Cir. 1992) (division of state laws into four categories that encompass the variations in the product liability laws of the states may prove successful; plaintiff's proposal to pursue the strictest state standards of liability would raise constitutional issues about whether class members from a state with a less strict law could be precluded from challenging an adverse decision based on another state's stricter standard). *See also In re* Exxon Valdez, 270 F.3d 1215 (9th Cir. 2001); *In re* Telectronics Pacing Sys., Inc. Accufix Atrial "J" Leads Prods. Liab. Litig., 221 F.3d 870, 880 (6th Cir. 2000); Watson v. Shell Oil

### 22.635 Electronic Communications[1302]

Effective management requires constant attention to developments in the litigation. The judge must promptly identify and resolve problems, such as difficulties in implementing current orders. Soliciting frequent feedback on the operation of the case-management plan usually yields the information necessary to adjust procedures. Establishing an electronic mechanism for ongoing communication among the lawyers and the court during the course of complex mass tort litigation has become essential.[1303]

# 22.7  Class Actions in Mass Tort Cases

.71 Background  414
.72 Post-*Amchem* Class Certification  416
.73 Post-*Ortiz* Mandatory Limited Fund Class Settlements  421
.74 Medical Monitoring Class Actions  424
.75 Issues Classes  429
    .751 Identify the Issues  430
    .752 Determine Applicable Law  431
    .753 Identify a Limited Set of Laws  432
    .754 Subclasses to Reflect Differences in State Law  432
    .755 Determine Separability of Common Issue  433
    .756 Establish a Trial Plan  434
    .757 Assess the Overall Impact  435

Federal courts have "ordinarily" disfavored—but not ruled out entirely—using class actions in dispersed mass tort cases.[1304] After experimenta-

---

Co., 979 F.2d 1014 (5th Cir. 1992), *reh'g granted*, 990 F.2d 805 (5th Cir. 1993), *other reh'g*, 53 F.3d 663 (5th Cir. 1994) (case settled before rehearing).

1302.  *See, e.g., In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, Order No. 173 (E.D. Pa. July 13, 1998), *at* http://www.fenphen.verilaw.com/search_common.icl (last visited Nov. 10, 2003) (setting up Web site); *see also In re* Baycol Prods. Litig., MDL No. 1431, Order No. 18 (D. Minn. May 9, 2002), *at* http://www.mnd.uscourts.gov/Baycol_Mdl/pretrial.htm (last visited Dec. 2, 2003) (setting up electronic filing, service, storage, and delivery of documents via Web site); *id.*, Order No. 19 (D. Minn. May 9, 2002) (setting up protocol for production of documents from electronic storage); *In re* Propulsid Prods. Liab. Litig., MDL No. 1355, Order No. 4 (E.D. La. Nov. 21, 2000), *at* http://propulsid.laed.uscourts.gov/orders.htm (last visited Nov. 10, 2003) (setting up electronic records protocols).

1303.  *In re* Silicone Gel Breast Implants Prods. Liab. Litig., MDL No. 926, Order No. 7 (N.D. Ala. Oct. 6, 1992), *at* http://www.fjc.gov/BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003) (establishing an electronic bulletin board). The court also established a Web site located on the Federal Judicial Center's homepage at http://www.fjc.gov/BREIMLIT/mdl926.htm (last visited Nov. 10, 2003).

1304.  "A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of

tion with class treatment of some mass torts during the 1980s and 1990s,[1305] the courts have greatly restricted its use in mass torts litigation.[1306] Mass tort personal injury cases are rarely appropriate for class certification for trial. In a settlement context, the proposed class must meet Rule 23 requirements, with the exception of trial manageability, and the court must carefully review the proposed settlement terms to ensure that they are fair, reasonable, and adequate.[1307] The trend appears to be that cases involving significant personal injuries should not be certified for trial, particularly on a nationwide or multistate basis, because individual issues of causation and individual damages often predominate and state law often varies. Property damage claims may be different—if the amounts at issue in each individual claim are too small, individual litigation may not be a superior, or even feasible, alternative for resolution, especially when the proposed mass tort rests on a novel or untested scientific or legal claim. Some courts have addressed these difficulties by certifying some, but not all, issues for class treatment, and by structuring subclasses under Federal Rule of Civil Procedure 23(c)(4) to reflect state law differences.[1308] This section examines the case-management challenges presented by mass tort litigation and settlement class actions.

## 22.71 Background[1309]

In the 1980s and 1990s, some district courts certified mass tort class actions on an opt-out basis under Rule 23(b)(3) for litigation arising both

---

damages but also of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried." Fed. R. Civ. P. 23 committee note, *reprinted in* 39 F.R.D. 69, 103 (1966). For a detailed discussion of a relatively brief trend away from this view, see *In re A.H. Robins Co.*, 880 F.2d 709, 729–38 (4th Cir. 1989).

1305. *See* Manual for Complex Litigation, Third, § 33.262 (1995).

1306. *See, e.g.*, Castano v. Am. Tobacco Co., 84 F.3d 734 (5th Cir. 1996); *In re* Am. Med. Sys., Inc., 75 F.3d 1069 (6th Cir. 1996); *In re* Rhone-Poulenc Rorer, Inc., 51 F.3d 1293 (7th Cir. 1995). *But see* Valentino v. Carter-Wallace, 97 F.3d 1227 (9th Cir. 1996) (declining to adopt across-the-board rejection of class treatment in pharmaceutical injury mass tort claim).

1307. Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999); Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997).

1308. *See* Simon v. Philip Morris, 200 F.R.D. 21 (E.D.N.Y. 2001) (appeal pending); *In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 172 F.R.D. 271 (S.D. Ohio 1997); *In re* Copley Pharm., Inc., "Albuterol" Prods. Liab. Litig., 161 F.R.D. 456 (D. Wyo. 1995); *In re* Copley Pharm., Inc., "Albuterol" Prods. Liab. Litig., 158 F.R.D. 485 (D. Wyo. 1994).

1309. For a comprehensive review of class action activity in mass tort litigation, see Rheingold, *supra* note 1271, §§ 3:13 to 3:43.

from single incident mass disasters[1310] and dispersed mass torts.[1311] Opinions in those earlier cases should be read with caution in light of subsequent rulings of the Supreme Court and courts of appeals. For an instructive approach, see that taken by the district and appellate courts that have determined or reviewed class certification requests in the mass tort context after the *Amchem* and *Ortiz* decisions.[1312]

As mass tort litigation expanded and became more prevalent, the phenomenon of a settlement class action emerged—that is, a class certified for settlement purposes only, that may not meet all the requirements for class certification for trial. Sections 22.72 and 22.73 discuss the various types of settlement classes and the important differences among them.

In some mass tort cases, judges focus on common issues of fact or law and carve out issues classes for certification under Rule 23(c)(4)(A),[1313] expressly

1310.  Watson v. Shell Oil Co., 979 F.2d 1014, 1020–21 (5th Cir. 1992) (personal injury and property damage claims arising from oil refinery explosion), *reh'g granted*, 990 F.2d 805 (5th Cir. 1993), *other reh'g*, 53 F.3d 663 (5th Cir. 1994) (case settled before rehearing); Sterling v. Velsicol Chem. Corp., 855 F.2d 1188 (6th Cir. 1988) (opt-out class of water-contamination victims in vicinity of a landfill); *In re* Fed. Skywalk Cases, 95 F.R.D. 483 (W.D. Mo. 1982) (certifying opt-out class of business invitees injured in collapse of hotel skywalk after mandatory class was vacated); Coburn v. 4-R Corp., 77 F.R.D. 43 (E.D. Ky. 1977) (Beverly Hills Supper Club fire), *mandamus denied sub nom.* Union Light, Heat & Power Co. v. U.S. Dist. Ct., 588 F.2d 543 (6th Cir. 1978).

1311.  *In re* Sch. Asbestos Litig., 789 F.2d 996 (3d Cir. 1986) (nationwide Rule 23(b)(3) class of schools presenting property damage claims associated with asbestos-containing building materials used in the schools); Jenkins v. Raymark Indus., 782 F.2d 468, 473 (5th Cir. 1986) (districtwide class of asbestos personal injury claimants to resolve specific issues, including the "state-of-the-art" defense); *Albuterol*, 158 F.R.D. at 485 (wrongful death and personal injury claims relating to a contaminated batch of drugs); *In re* Agent Orange Prods. Liab. Litig., 100 F.R.D. 718 (E.D.N.Y. 1983) (nationwide class of Vietnam veterans exposed to dioxins certified under Rule 23(b)(3) for compensatory relief and under Rule 23(b)(1)(B) for punitive damages), *aff'd*, 818 F.2d 145, 163–67 (2d Cir. 1987).

1312.  *See, e.g., In re* The Exxon Valdez, 270 F.3d 1215 (9th Cir. 2001) (affirming class-wide compensatory damages verdict, vacating class-wide punitive damages verdict on review of judgment from multiphase class-wide trial in single incident mass tort certified under "limited punishment" theory as mandatory litigation class action); *see also In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 221 F.3d 870 (6th Cir. 2000) (reversing mandatory settlement-purposes class certification pursuant to *Ortiz*). The Sixth Circuit *Telectronics* decision left undisturbed the earlier decision granting a Rule 23(b)(3) litigation class, and the case was later settled on a Rule 23(b)(3) basis. *See In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 137 F. Supp. 2d 985 (S.D. Ohio 2001).

1313.  See *infra* section 22.75 for a discussion of issues classes in light of the decision in *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995) (issues class to determine negligence liability for infected blood decertified on mandamus); *cf. Jenkins*, 782 F.2d at 473 (certifying asbestos personal injury claimant class to resolve common issues, including the "state of the art"

providing for the resolution of individual issues through nonclass procedures, such as individual hearings or alternative dispute resolution. Recently, questions have been raised about the constitutionality, fairness, and usefulness of issues classes in the mass tort context.[1314] Section 22.75 discusses issues classes.

The Supreme Court in *Amchem* and *Ortiz* examined class certification standards in the dispersed mass tort context. The Court focused on settlement classes, but identified principles that apply generally to class certification issues. After *Amchem*, cases can still be certified for settlement purposes only, but they must meet all of Rule 23(a)'s certification standards and all of those in Rule 23(b)(3) except manageability for trial. *Ortiz* has greatly restricted the use of Rule 23(b)(1) to certify mass tort settlement classes on a limited fund theory. Section 22.74 discusses the specific issues in using Rule 23(b)(2) to certify medical monitoring settlement class actions.

## 22.72  Post-*Amchem* Class Certification

After the 1997 *Amchem* decision, a court reviewing a proposed mass tort settlement class action faces two questions: Can the case be certified for settlement? And can the settlement be approved as fair, reasonable, and adequate to the absent class members? This section considers the first question; section 22.92 considers the second, and quite separate, question. The *Amchem* Court unequivocally held that a finding that a proposed settlement is fair does not resolve whether a settlement class can be certified under Rules 23(a) and 23(b).[1315]

In *Amchem,* the Supreme Court ruled that, in order to be certified, a settlement class must meet the requirements in Federal Rules of Civil Procedure 23(a) and (b), even though the parties do not intend to try the case. A court may take the settlement into account in deciding whether Rules 23(a) and (b) are met in that the court need not find that trial manageability is satisfied.[1316] The Court noted, however, that those portions of Rule 23 that are

---

defense where law of only one state applied); *Albuterol*, 158 F.R.D. at 491–92 (certifying issues class for negligence and breach of warranty claims related to contamination of bronchodilator).

1314. *See, e.g.,* Castano v. Am. Tobacco Co., 84 F.3d 734, 748–51 (5th Cir. 1996) (decertifying issues class, citing Seventh Amendment and fairness grounds); *Rhone-Poulenc*, 51 F.3d at 1298–1304 (same).

1315. *Amchem*, 521 U.S. at 622 ("Federal courts, in any case, lack authority to substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is 'fair' then certification is proper.").

1316. *Id.* at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial.").

"designed to protect absentees by blocking unwarranted or overbroad class definitions . . . demand undiluted, even heightened, attention in the settlement context."[1317]

The Court rejected the parties' proposed nationwide settlement in *Amchem* involving hundreds of thousands of class members and twenty asbestos manufacturers because the proposed class was "sprawling" and because common issues failed to predominate over individual issues, as required for an opt-out class action under Rule 23(b)(3).[1318] The class's sprawl or lack of cohesiveness also implicated Rule 23(a)(4)'s adequacy-of-representation requirement because the interests of some class members and representatives conflicted with those of other members and representatives. In particular, the interest of present claimants asserting asbestos-related injuries conflicted with the interests of future claimants, both those who knew they had been exposed but had not manifested any injury, and those who had no manifest injury and did not even know that they had been exposed.[1319] The Court also noted with concern—but did not rule on—the difficulties of providing adequate notice to future claimants, particularly those who might not know that they had been exposed to asbestos dust or injured by it. The court pointed out "the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous."[1320]

After *Amchem*, judges asked to certify mass tort class actions for settlement purposes only must scrutinize the cohesiveness, adequacy of representation, and predominance of common issues presented in the proposed class. In *Amchem* itself, indications of the lack of cohesiveness included the nationwide dispersal of cases and the wide range of differences in the asbestos products, claimants' exposures to varied asbestos products, medical histories, severity of injuries, and the presence of alternative causal agents, particularly smoking history.[1321] Judges have also applied *Amchem's* teachings to mass tort litigation outside of the asbestos context, finding deficiencies under Rule 23 that preclude certification.[1322]

---

1317.  *Id.*

1318.  *Id.* at 622–25.

1319.  *Id.* at 625–28.

1320.  *Id.* at 628.

1321.  *See* John D. Aldock & Richard M. Wyner, *The Use of Settlement Class Actions to Resolve Mass Tort Claims After Amchem Products, Inc. v. Windsor,* 33 Tort & Ins. L.J. 905, 913 (1998) ("[O]ther, unnamed Rule 23 criteria warranted undiluted or even heightened scrutiny—presumably, the criteria that relate to the 'cohesiveness' of the class.").

1322.  *See* text accompanying *infra* notes 1328–29.

Courts have created subclasses to respond to concerns about adequacy of representation, providing separate representation for each.[1323] Each subclass, however, must also meet all the applicable certification criteria of Rule 23.[1324] The individual nature of many exposure, causation, and damages issues may predominate even within a proposed subclass. Such differences can extend far beyond conflicts between present and future claimants and can defeat certification even if there are no future claimants involved.

Two post-*Amchem* mass tort exposure cases illustrate the importance of subclassing. Both involve claims related to defective pacemaker leads. In the first case, a district judge certified subclasses for medical monitoring, negligence, and strict liability claims, but rejected a subclass for punitive damages. Where the laws of various states differed, the judge created subclasses for each of the major groups of state laws, and later approved a settlement of an opt-out class based on the subclasses previously created.[1325] The other case involved a similar product manufactured by the same defendant. The district judge denied plaintiffs' motion to certify a class to litigate claims for negligence,

---

1323. Aldock & Wyner, *supra* note 1321, at 914 ("[A] prudent reading of *Amchem* would suggest that subclasses, with separate representatives and counsel, should be established where a strong case can be made that groups of class members have conflicting settlement goals."); Stephen A. Saltzburg (moderator), *The Future of Class Actions in Mass Tort Cases: A Roundtable Discussion,* 66 Fordham L. Rev. 1657, 1681–82 (1998) (Judge Weinstein recounts his experience in the *Manville* litigation in which the first settlement was "properly reversed" for lack of subclasses and then resettled "on a different basis"); Roger C. Cramton, *Individualized Justice, Mass Torts, and "Settlement Class Actions": An Introduction,* 80 Cornell L. Rev. 811, 828 (1995) ("Adequate representation of a huge class of future tort claimants is possible, if at all, only if the lawyers negotiating for the class are representative of all the major divisions and groups within the class.").

1324. Walker v. Liggett Group, Inc., 175 F.R.D. 226, 233 (S.D. W. Va. 1997) (holding that a proposed class of past and present cigarette smokers, their families and estates, those exposed to secondhand smoke, and those who paid medical claims was "of such diversity and enormity that adequacy of representation cannot be achieved even with separate representatives and subclasses").

1325. *In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 172 F.R.D. 271 (S.D. Ohio 1997) (certifying a mandatory class pursuant to Rule 23(b)(1)(B) and approving a settlement creating a "limited fund" and releasing the parent corporations as well as the subsidiary from further liability). The court of appeals rejected the settlement and the certification of a Rule 23(b)(1)(B) class and held that "bootstrapping of a Rule 23(b)(3) class into a Rule 23(b)(1)(B) class is impermissible and highlights the problem with defining and certifying class actions by reference to a proposed settlement." *In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 221 F.3d 870, 880 (6th Cir. 2000). After remand, the district court approved a revised settlement providing opt-out rights. *In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 137 F. Supp. 2d 985 (S.D. Ohio 2001).

products liability, and medical monitoring. The court of appeals affirmed,[1326] holding that the common issues did not predominate, in part because plaintiffs had not submitted a plan for designating subclasses that would satisfy Rule 23.[1327]

*Amchem* does not categorically preclude certification of a mass tort personal injury or property damage settlement class action. Since *Amchem,* however, a number of district courts have refused to certify dispersed personal injury or property damage mass tort class actions for the purpose of trial, or have decertified them,[1328] finding that varying state laws and individual issues of exposure, causation, and damages defeat the predominance requirement of Rule 23(b)(3), making trial unmanageable. Another basis for rejecting certification is that such variations make class representatives inadequate or atypical of the interests of the absent class members.[1329]

Since *Amchem,* a number of district courts have also refused to certify, or have decertified, mass tort class actions proposed for settlements, or have refused to approve the settlement terms. For example, in a case dealing with a proposed settlement arising out of alleged intentional exposure of workers to radioactive isotopes, the judge rejected a proposed settlement in part because it favored the interests of current employees over the interests of past employees and retirees.[1330] In a case dealing with the alleged exposure of cancer patients to high doses of radiation without their consent, the judge declined to review a proposed settlement because the proposed class did not satisfy the requirements of either Rule 23(a) or (b).[1331] In the former case, the judge reviewed and rejected the entire settlement before ruling on the certification motion. In the

---

1326.  Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1198 (9th Cir. 2001) (Fletcher, B., dissenting). The dissent concluded that common issues predominate and that "representative subclasses based on state law commonalities" would satisfy Rule 23's superiority requirement. *Id.* at 1199.

1327.  *Id.* at 1190.

1328.  *See, e.g., In re* Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig., 288 F.3d 1012 (7th Cir. 2002); Spence v. Glock, 227 F.3d 308 (5th Cir. 2000); Barnes v. Am. Tobacco Co., 161 F.3d 127 (3d Cir. 1998); *In re* Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 209 F.R.D. 323 (S.D.N.Y. 2002); Walker v. Liggett Group, 175 F.R.D. 226 (S.D. W. Va. 1997).

1329.  *See, e.g., MTBE,* 209 F.R.D. at 338–41.

1330.  Levell v. Monsanto Research Corp., 191 F.R.D. 543, 548–49 (S.D. Ohio 2000) (noting that, after *Amchem,* "if class certification is not appropriate under Rule 23(a) and (b), then the Court *cannot* approve the proposed Agreement"). The court also noted that the parties had up until the proposed settlement disputed the issue whether a class could be certified. *Id.*

1331.  *In re* Cincinnati Radiation Litig., No. C-1-94-126, 1997 WL 1433832 (S.D. Ohio Aug. 4, 1997). Two years later, the same judge reviewed and approved a revised settlement and certified a hybrid opt-out class under Rules 23(b)(2) and (d)(2). *In re* Cincinnati Radiation Litig., 187 F.R.D. 549 (S.D. Ohio 1999).

latter case, the judge denied certification at the preliminary approval stage and thereby avoided the need to conduct a full review of the settlement. See section 21.63. The better practice is to determine class certification at the preliminary approval stage, thus resolving the central issue of class certification before investing the significant resources required in reviewing what is often a complex settlement agreement and the considerable costs of providing notice to the class.[1332]

In a number of cases, however, judges have continued to certify settlement class actions in the mass tort context, particularly when there are no unknown future claimants and the absent class members are readily identifiable and can be given notice and an opportunity to opt out.[1333] Those judges have emphasized that because the case will be settled rather than tried, differing state laws that might make a class-wide trial unmanageable do not defeat certification for settlement purposes only. The judges address the differences among state laws by certifying subclasses and appointing separate class representatives and counsel for each subclass.[1334] In evaluating the proposed settlements, judges have taken differing state laws into account to ensure that similarly situated claimants do not receive disparate treatment.[1335] In other settlements dealing with the laws of more than one state, parties and judges have avoided choice-of-law and adequacy-of-representation problems by framing settlement

---

1332. For an example of a case in which the court combined a ruling on certification of a proposed settlement class with a ruling preliminarily approving a proposed settlement, see *In re Inter-Op Hip Prosthesis Liability Litigation*, 204 F.R.D. 330 (N.D. Ohio 2001).

1333. *See, e.g., In re* Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig., No. 1:01-CV-9000, 2001 WL 1842315, at *7 n.9, *14 (N.D. Ohio Oct. 20, 2001) (conditionally certifying settlement class and noting that a "'single set of operative facts establishes liability'" and a "single proximate cause applies to each potential class member"); *In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, 2000 WL 1222042, at *41, *69 (E.D. Pa. Aug. 28, 2000) (certifying settlement class and finding claimants shared single product and common injury).

1334. *See, e.g., Diet Drugs,* 2000 WL 1222042, at *50–*53 (discussing the differences in benefits for different groups of claimants and the role of counsel for subclasses in the negotiations).

1335. *In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 137 F. Supp. 2d 985, 1022–24 (S.D. Ohio 2001). *See also* Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1146–47 (8th Cir. 1999) (analyzing differences in settlement amounts for property damage claims in different zones and finding sufficient "'structural assurance' of adequate representation" required by *Amchem*); *Diet Drugs,* 2000 WL 1222042, at *47–*49 (discussing the reasons for the different treatment of neurotoxic injuries, which received no benefits but were released in the settlement); *id.* at *50–*53 (discussing the differences in benefits for different groups of claimants and the role of counsel for subclasses in the negotiations); *Levell,* 191 F.R.D. at 551 (rejecting settlement because "it disparately benefits current employees, who are represented by nearly all of the named class members, at the expense of former employees and retirees").

allocations in terms of matrices of benefits based on differences in the severity and impact of various injuries.[1336]

## 22.73  Post-*Ortiz* Mandatory Limited Fund Class Settlements

In *Ortiz v. Fibreboard Corp.*, the Court summarized the traditional and "presumptively necessary" characteristics of a limited-fund class action under Rule 23(b)(1)(B) as "[1] a 'fund' with a definitely ascertained limit, [2] all of which would be distributed to satisfy all those with liquidated claims based on a common theory of liability, [3] by an equitable, pro rata distribution."[1337] The Court refused to recognize an amount of insurance proceeds that the parties had agreed to make available as a limited fund, despite recognition that without the settlement the insurance would be subject to competing claims, and in any event fell below the amounts of projected claims.

Before *Ortiz*, judges had occasionally certified mandatory (i.e., non-opt-out) settlement classes under Rule 23(b)(1) in mass tort cases.[1338] Parties invoked such limited-fund class actions typically as settlement class actions in situations in which "a defendant's potential tort liability . . . threatens to overwhelm the company's assets."[1339] The limited-fund class action usually represented an effort to resolve mass tort liability without forcing a company to file for reorganization under the bankruptcy laws.[1340] *Ortiz* put in doubt the viability of limited-fund class actions in mass tort cases. The requirements are so difficult to meet that a number of companies have turned to Chapter 11 reorganization as a means of limiting mass tort suits and attempting a global resolution of the claims rather than asserting that their assets can be consid-

---

1336. *See, e.g., Sulzer*, 2001 WL 1842315, at *11 n.15, *14 (N.D. Ohio Oct. 20, 2001) (conditionally certifying settlement class and finding "parties' tentative identification of appropriate factors to include in the matrix" supports a preliminary finding of fairness); *Diet Drugs*, 2000 WL 1222042, at *19–*29, *68 (certifying settlement class and approving matrix compensation benefits).

1337. Ortiz v. Fibreboard Corp., 527 U.S. 815, 841–42 (1999).

1338. *See In re* A.H. Robins Co., 880 F.2d 709, 738–40 (4th Cir. 1989) (discussing trend of certifying mass torts for settlement). *But see In re* Joint E. & S. Dists. Asbestos Litig. Corp., 982 F.2d 721, 735–45 (2d Cir. 1992) (vacating district court approval of a settlement class in which competing interests of subgroups of personal injury claimants and codefendants were combined and represented collectively); *see also infra* section 22.9 (settlement). For a post-*Amchem*, pre-*Ortiz* limited fund certification, see *In re Orthopedic Bone Screw Products Liability Litigation*, 176 F.R.D. 158 (E.D. Pa. 1997). For a detailed discussion of the orthopedic bone screw litigation, see Gibson, Case Studies, *supra* note 1160, at 127–58.

1339. Gibson, Case Studies, *supra* note 1160, at 7.

1340. For an in-depth comparison of limited fund procedures under Rule 23 with comparable procedures under the Bankruptcy Code, see Gibson, Case Studies, *supra* note 1160.

ered a limited fund.[1341] Section 22.5 discusses the management of bankruptcies involving mass tort claims. This section discusses the conditions the Court imposed in *Ortiz.* Note that satisfaction of those conditions for a limited fund does not necessarily require the court to approve a mandatory limited fund action under Rule 23(b)(1)(B), either for settlement or for litigation. The Supreme Court in *Ortiz* announced that it could not, in the context of that case, "decide the ultimate question whether settlements of multitudes of related tort actions are amenable to mandatory class treatment."[1342] The court said that "the applicability of Rule 23(b)(1)(B) to a fund and plan purporting to liquidate actual and potential tort claims is subject to question . . . ."[1343]

*Ortiz* provides guidance for district judges to follow in reviewing proposed limited fund class settlements under Rule 23(b)(1)(B). A court must

- undertake an independent investigation as to whether the valuation of the assets comprising the proposed fund has been set at the upper limit;[1344]

- determine on the record the value of present and future tort claims against the limited fund and whether the fund is adequate to meet those claims;[1345]

- analyze any side agreements, such as the contingent settlement of present claims, that might affect the incentives of attorneys for the class;[1346]

---

1341. According to the Rand Institute for Civil Justice, twenty-two companies filed asbestos-related bankruptcies between January 2000 and July 2002. Carroll, *supra* note 1161.

1342. Ortiz v. Fibreboard Corp., 527 U.S. 815, 842 (1999). The court specifically raised questions about limitations that might inhere in the Rules Enabling Act, 28 U.S.C. § 2072(b) (requiring that federal rules of procedure "not abridge, enlarge or modify any substantive right"), and the Seventh Amendment rights of absent class members, including future claimants, to trial by jury and due process. *Ortiz*, 527 U.S. at 845–47.

1343. *Id.* at 864.

1344. *Id.* at 852 (referring to the general assets of the company plus any insurance coverage and calling for an independent valuation repeatedly in this section of the opinion). A trial court has numerous options, such as directing the parties to present evidence and argument on specific issues, including those in the text following this note, or appointing a magistrate judge, special master, Federal Rule of Evidence 706 expert, or a technical advisor. *See generally supra* section 20.14.

1345. *Ortiz*, 527 U.S. at 849 ("Thus, in an action such as this the settling parties must present not only their agreement, but evidence on which the district court may ascertain the limit and the insufficiency of the fund, with support in findings of fact following a proceeding in which the evidence is subject to challenge.").

1346. *Id.* at 852–53.

- compare the interests of different claimants who are included in the class, such as present versus future claimants, and consider whether those differing interests were adequately represented in the negotiations;[1347]

- compare the interests of those in the class with those not in the class, such as present claimants who settled before the class was certified or claimants who opt out of the settlement;[1348] and

- consider who should get the savings of "transaction costs" in settlement agreements, plaintiffs or defendants (which the Supreme Court found to be "at least a legitimate question, which we leave for another day").[1349]

Based on *Ortiz,* several judges have invalidated limited fund settlements approved before the Court's decision.[1350] Some commentators have expressed doubts as to whether a limited-fund class action is ever appropriate in a mass tort[1351] and whether a class action provides structural fairness equivalent to the

---

1347. *Id.* at 856 ("[I]t is obvious after *Amchem* that a class divided between holders of present and future claims (some of the latter involving no physical injury and to claimants not yet born) requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel. *See Amchem,* 521 U.S. at 627.").

1348. *Id.* at 854–55. *Cf. In re* Inter-Op Hip Prosthesis Prod. Liab. Litig., No. 01-4039, 2001 WL 1774017, at *1 (6th Cir. Oct. 29, 2001) (staying an injunction against pursuing claims in other forums that "imposes significant financial disincentives on the right to opt out of a proposed class action settlement").

1349. *Id.* at 861. For further discussion of the allocation of savings in a "going concern" settlement, see Matthew C. Stiegler, Note, *The Uncertain Future of Limited Fund Settlement Class Actions in Mass Tort Litigation After* Ortiz v. Fibreboard Corporation, 78 N.C. L. Rev. 856, 895–99 (2000).

1350. *In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 221 F.3d 870, 877 (6th Cir. 2000) (mandatory limited fund class settlement approved by district court before *Ortiz* held invalid for failure to satisfy the *Ortiz* criteria, noting that "the applicability of Rule 23(b)(1)(B) to a fund purporting to liquidate actual and potential tort claims is 'subject to question'"); *In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, 1999 WL 782560, at *6–*12, *14 (E.D. Pa. Sept. 27, 1999) (district court disapproved a mandatory limited fund proposed for a Rule 23(b)(1)(B) settlement class that the court had conditionally certified before *Ortiz,* holding that the proposed settlement did not satisfy any of the three criteria in *Ortiz's* historical model). *But cf.* Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1143–48 (8th Cir. 1999) (affirming mandatory settlement for pollution damages and injunctive relief, distinguishing *Ortiz,* and ruling that differences in damages among class members do not necessarily create conflicts of interest that require subclasses).

1351. *See* Gibson, Case Studies, *supra* note 1160, at 37–38 ("[t]he larger question, repeatedly raised but not answered by [the *Ortiz* opinion] was whether a mass tort could ever qualify for mandatory class treatment under Rule 23(b)(1)(B)"); Stiegler, *supra* note 1349, at 900 ("[O]rtiz

---

Bankruptcy Code.[1352] Others have declared that bankruptcy is the only recourse for companies facing tort claims exposure that may last for years and ultimately prove overwhelming.[1353] The *Ortiz* decision itself did not go this far,[1354] and the Court expressly recognized that an undetermined portion of a company's limited funds may go back into the business.[1355]

## 22.74  Medical Monitoring Class Actions

In cases involving exposure to allegedly toxic substances in which resulting injury might be latent, plaintiffs may seek certification of a class to provide medical monitoring for the members. Such claims typically seek relief in the form of either a court-administered fund to establish and pay for specific diagnostic testing and research or to prepay for testing or reimburse the class members for costs incurred if and when they obtain such testing on their own.

Medical monitoring has evolved predominantly under state common law[1356] but can also arise under federal[1357] or state statutes.[1358] The elements of

has made limited fund class certification substantially, perhaps prohibitively, more difficult and uncertain.").

1352.  Gibson, Case Studies, *supra* note 1160, at 5–6 (concluding that "bankruptcy comes out ahead of limited fund class action settlements with respect to the fairness of the resolution process and the effectiveness of judicial review" while limited fund class action settlements come out ahead . . . with regard to the efficiency of the resolution process and the likelihood that defendant will invoke that resolution method").

1353.  *See, e.g.*, *Telectronics*, 221 F.3d at 880 (ruling that imminent threat of bankruptcy does not provide a good reason to approve a limited-fund class action settlement).

1354.  *Ortiz*, 527 U.S. at 860 (no inherent conflict between a limited-fund class action under Rule 23(b)(1)(B) and the Bankruptcy Code).

1355.  *Id.* at 860 n.34 ("We need not decide here how close to insolvency a limited fund defendant must be brought as a condition of class certification.").

1356.  *See, e.g.*, *In re* Paoli R.R. Yard PCB Litig., 35 F.3d 717, 787–88 (3d Cir. 1994) (discussing elements of medical monitoring claim and remedy that Pennsylvania would recognize) [hereinafter Paoli II]; Friends For All Children, Inc. v. Lockheed Aircraft Corp., 746 F.2d 816, 824–25 (D.C. Cir. 1984) (examining "general principles of tort law, the Restatement (Second) of Torts, and the law of other jurisdictions," the court found that the District of Columbia Court of Appeals would recognize a medical monitoring claim and remedy in a case brought on behalf of children who were at risk of future neurological disorders because they were exposed to severe decompression and loss of oxygen during an airplane flight); Bower v. Westinghouse Elec. Corp., 522 S.E.2d 424, 431–32 (W. Va. 1999) (on certification from federal district court, state court finds a common-law cause of action for medical monitoring in the context of plaintiffs' exposure to allegedly toxic substances in a pile of debris from the manufacture of light bulbs); Hansen v. Mountain Fuel Supply Co., 858 P.2d 970, 979–80 (Utah 1993) (workers exposed to asbestos in the course of renovating an office have a state common-law cause of action to the extent that monitoring is "medically advisable"); Ayers v. Jackson, 525 A.2d 287, 291 (N.J. 1987)

state law claims for medical monitoring typically include exposure to a harmful substance or product that the defendant marketed or wrongfully released into the environment and that has significantly increased the plaintiffs' risk of developing a serious latent disease. Plaintiffs must show that the defendant caused the exposure to the substance and the consequent increase in risk. Courts generally require plaintiffs to show that diagnostic tests exist, that the increased risk has made testing reasonably necessary, and that early detection can significantly improve medical treatment of the disease.[1359] However, courts have not, to date, required plaintiffs to show that the increase in risk constitutes the proximate cause of any injury that might follow, leaving that issue for any personal injury damage actions that might ensue. Some courts have adopted a lesser standard for evaluating how much of an increase in risk plaintiffs must show to trigger the medical monitoring remedy.[1360]

(residents of an area near a landfill that allegedly leaked contaminants into nearby well sought medical monitoring based on their increased risk of developing cancer).

1357. In *Metro-North Commuter Railroad Co. v. Buckley*, 521 U.S. 424 (1997), the Court refused to recognize an individual claim under the Federal Employers' Liability Act (FELA) for lump-sum economic damages for future medical testing required as a result of plaintiffs' exposure to asbestos. The Court, however, avoided ruling out "medical cost recovery rules more finely tailored than the rule we have considered [lump sum damages]," *id.* at 444, and noted that courts recognizing a medical monitoring remedy often imposed limitations on that remedy, such as channeling payments through a court-supervised fund. *Id.* at 440–41. *See also In re Marine Asbestos Cases*, 265 F.3d 861, 866–67 (9th Cir. 2001) (discussing Jones Act claim and concluding that *Metro-North* left the medical monitoring question unresolved as to a similar FELA claim).

1358. *See, e.g.,* Redland Soccer Club, Inc. v. Dept. of the Army, 696 A.2d 137, 142 (Pa. 1997) (holding that plaintiffs' claims for medical monitoring based on alleged exposure to toxic chemicals in a park built over a landfill state a cause of action arising under Pennsylvania Hazardous Sites Cleanup Act because medical testing qualifies as a statutory "cost of response" to the release of a hazardous substance), *dismissed on jurisdictional grounds after remand aff'd sub nom.* O'Neil v. Dept. of the Army, 742 A.2d 1095 (Pa. Super. Ct. 1999).

1359. The elements of a medical monitoring claim, as described above in the text, are set out in *In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829, 852 (3d Cir. 1990) [hereinafter Paoli I]. *See also Marine Asbestos Cases*, 265 F.3d at 866; Arch v. Am. Tobacco Co., 175 F.R.D. 469, 481 (E.D. Pa. 1997); *Redland Soccer Club*, 696 A.2d at 143–45.

1360. *See, e.g., Paoli I*, 916 F.2d at 851 ("[T]he appropriate inquiry is not whether it is reasonably probable that plaintiffs will suffer harm in the future but rather whether medical monitoring is, to a degree of medical certainty, necessary in order to diagnose properly the warning signs of disease."); Ayers v. Twp. of Jackson, 525 A.2d 287, 312 (N.J. 1987) ("Even if the likelihood that these plaintiffs would contract cancer were only slightly higher than the national average, medical intervention may be completely appropriate in view of the attendant circumstances."); *cf.* Donald L. DeVries & Ian Gallacher, *Medical Monitoring in Drug and Medical Device Cases: Taking the Temperature of a New Theory,* 68 Def. Couns. J. 163, 173 (2001)

Some courts have found that the applicable state law precludes medical monitoring claims if the claimants have no present injury.[1361] Still others have held that medical monitoring is "a separate and distinct cause of action."[1362] Many state courts have not addressed whether there is a cause of action or remedy for medical monitoring. A federal district judge managing mass tort diversity litigation might thus consider certifying to the relevant state courts the question whether there is a cause of action for medical monitoring or a medical monitoring remedy.[1363]

Certifying a class action for medical monitoring raises the same threshold issues that apply to all mass torts, see section 22.72, and that apply to class actions generally, see section 21.2. If state law recognizes medical monitoring, either as a cause of action or as a remedy, a judge must still decide whether the proposed class action satisfies the criteria set out in Federal Rule of Civil Procedure 23(a) and the criteria of at least one of the Rule 23(b) types of classes.[1364] The typicality of the class representatives' claims and possible conflicts of interest among class representatives and class members remain critical.[1365] See sections 21.141 (adequacy of representation) and 22.72.

(arguing that plaintiffs should have to show a probability of future harm and citing cases requiring such a showing as well as cases not requiring that level of proof).

1361. *See, e.g.,* Potter v. Firestone Tire & Rubber Co., 863 P.2d 795 (Cal. 1993) (indicating that medical monitoring is a remedy available to a plaintiff who proves defendant's liability); *see also* Crooks v. Metro. Life Ins. Co., 785 So. 2d 810, 811 (La. 2001) (applying statute requiring actual physical harm as a prerequisite to medical monitoring damages).

1362. *Arch*, 175 F.R.D. at 481, and cases cited therein.

1363. *See, e.g.,* Bower v. Westinghouse Elec. Corp., 522 S.E.2d 424, 428 (W. Va. 1999) (district judge certified question to state supreme court); *but cf. Paoli II*, 35 F.3d 717, 785 (3d Cir. 1994) (summarizing the judges' role in *Paoli I* as "predict[ing] the holding of Pennsylvania courts on a claim for medical monitoring"); Friends For All Children, Inc. v. Lockheed Aircraft Corp., 746 F.2d 816, 824–25 (D.C. Cir. 1984) (looking to local tort law and general principles of tort law in the Restatement, Second).

1364. See *In re Diet Drugs Products Liability Litigation*, No. CIV.A.98-20626, 1999 WL 673066, at *14–*19 (E.D. Pa. Aug. 26, 1999), for a thorough discussion of procedure and of cases applicable to a court's analysis of Rule 23(a) factors in the context of a proposed medical monitoring class. Note that "'a single common question is sufficient to satisfy Rule 23(a)(2).'" *In re Diet Drugs*, 1999 WL 673066, at *8 (quoting Lake v. First Nationwide Bank, 156 F.R.D. 615, 624 (E.D. Pa. 1994)).

1365. *See generally* Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997); *see also* Barnes v. Am. Tobacco Co., 161 F.3d 127, 141 (3d Cir. 1998) ("The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals.").

   Courts are divided over whether Rule 23(b)(2) or Rule 23(b)(3) is the appropriate vehicle for certifying a mass tort class for medical monitoring.[1366] A key question is whether the primary type of relief plaintiffs seek is for money damages. Rule 23(b)(2) generally applies when the relief sought is a court-supervised program for periodic medical examination and research to detect diseases attributable to the product in question.[1367] If money damages are the primary relief sought in a medical monitoring class, as in programs that pay class members but leave it to the members to arrange for and obtain tests, certification generally must meet the Rule 23(b)(3) standards.[1368] Judges who applied Rule 23(b)(3) have generally found that common issues did not predominate and that differing state laws controlled the claims for medical monitoring. These judges concluded that nationwide or multistate class certification was not a superior method of resolving such claims.[1369]

   The choice between application of Federal Rules of Civil Procedure 23(b)(2) and (b)(3) revolves around whether the complaint is seeking predominantly money damages or equitable relief.[1370] That determination requires

---

1366. *Barnes*, 161 F.3d at 142–44 (affirming decertification); *Diet Drugs*, 1999 WL 673066, at *19 (class certified); Day v. NLO, 851 F. Supp. 869, 885–87 (S.D. Ohio 1999) (certification granted). *But cf.* Cook v. Rockwell Int'l Corp., 181 F.R.D. 473, 478–80 (D. Colo. 1998) (decertifying a Rule 23(b)(2) medical monitoring class because the underlying claims are for damages for personal injuries).

1367. *Barnes*, 161 F.3d at 132 (stating that a court-supervised program to detect diseases caused by smoking is a "paradigmatic request for injunctive relief"; certification denied on other grounds); *Diet Drugs*, 1999 WL 673066, at *6 (finding the "request for relief in this action is equitable in nature"); Katz v. Warner-Lambert Co., 9 F. Supp. 2d 363, 364 (S.D.N.Y. 1998) (stating that "[a] claim for a medical monitoring and research fund is injunctive in nature"); Day v. NLO, Inc., 144 F.R.D. 330, 335–36 (S.D. Ohio 1992) (certifying a Rule 23(b)(2) class for medical monitoring in the form of a court's program, managed by court-appointed, court-supervised trustees, and using monitoring data for group studies and distinguishing programs seeking monetary relief).

1368. *See* Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180 (9th Cir. 2001) (holding that establishment of reserve fund for past and future damages and compensation for future medical treatment was primarily a claim for money damages; claim for research into alternative methodologies to uncover remedies for class members' conditions amounted to incidental injunctive relief); Arch v. Am. Tobacco Co., 175 F.R.D. 469 (E.D. Pa. 1997) (claims for relief are primarily for treatment, hence primarily for damages, not injunctive relief).

1369. *See In re* Rezulin Prods. Liab. Litig., 210 F.R.D. 61, 70–71 (S.D.N.Y. 2002) (denying certification because choice-of-law issues defeat superiority); *In re* Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 209 F.R.D. 323, 350 (S.D.N.Y. 2002) (concluding that "the class action device in this case is not superior to a combination of individual suits and state agency relief").

1370. *Zinser*, 253 F.3d at 1195 (rejecting plaintiffs' argument that their complaint called for equitable relief and stating "[a] request for medical monitoring cannot be characterized as primarily equitable or injunctive *per se*"); *Arch*, 175 F.R.D. at 483 ("The court . . . may properly

an informed understanding of the essential nature of the medical monitoring relief that plaintiffs prove to be necessary in the particular case.

If medical monitoring is available under the applicable state law and the nature of the relief sought is equitable, the court must then decide whether the proposed class meets Rule 23(b)(2)'s requirement that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." In general, Rule 23(b)(2) requires that the class be "cohesive"[1371] in that "the defendant is alleged to have acted in some uniform way toward the class . . . and that the injunctive relief requested is applicable to the entire class."[1372] In cases seeking multistate class certification, the court must determine whether applicable state laws are uniform or whether significant differences can be addressed by certification of subclasses.[1373]

Also important is whether the diagnostic procedures requested are reasonably necessary and likely to provide benefits to the class.[1374] One court has framed the test as whether "informed physicians . . . would recommend routine monitoring on the basis of" former use of the product in question.[1375] Another court examined whether plaintiffs can prove "the existence of accepted medical monitoring regimes that make early detection of [the diseases in question] possible and beneficial."[1376] State and federal medical monitoring case law development remains dynamic and variable.[1377]

---

certify a medical monitoring claim under Rule 23(b)(2) when the plaintiffs seek such specific relief which can be properly characterized as invoking the court's equitable powers.").

1371. *Barnes*, 161 F.3d at 143.

1372. *Diet Drugs*, 1999 WL 673066, at *6 (holding that request for medical monitoring relief "in this action is equitable in nature"). Applicability to the entire class does not mean that the class definition or the use of subclasses cannot further define or limit the scope of the class to achieve cohesiveness. *Id.* at *11–*12 (establishing subclasses and defining the class to exclude, for example, those who used diet drugs for fewer than thirty days).

1373. *See, e.g., id.*

1374. *See* text accompanying *supra* notes 1357–60.

1375. *In re* Rezulin Prods. Liab. Litig., 210 F.R.D. 61, 73–74 (S.D.N.Y. 2002).

1376. Carey v. Kerr-McGee Chem. Corp., 60 F. Supp. 2d 800, 811 (N.D. Ill. 1999).

1377. *See, e.g., Rezulin*, 210 F.R.D. at 75 (denying certification of medical monitoring Rule 23(b)(2) class, finding the proposed class lacked cohesion and individual issues, making it unmanageable); *In re* Propulsid Prods. Liab. Litig., 208 F.R.D. 133, 143–47 (E.D. La. 2002) (denying certification of the proposed class and noting variations in state recognition of medical monitoring as a claim or remedy).

## 22.75  Issues Classes

.751 Identify the Issues  430
.752 Determine Applicable Law  431
.753 Identify a Limited Set of Laws  432
.754 Subclasses to Reflect Differences in State Law  432
.755 Determine Separability of Common Issue  433
.756 Establish a Trial Plan  434
.757 Assess the Overall Impact  435

Rule 23 provides that "an action may be brought and maintained as a class action with respect to particular issues" under Rule 23(c)(4)(A),[1378] but courts have held that the proponent must show that issue certification "will materially advance a disposition of the litigation as a whole."[1379] Section 21.24 discusses the role of issues classes in class actions generally.

In deciding whether an issues class will materially advance the disposition of a set of mass tort cases, courts often consider the following factors:

- the issue(s) to be resolved on a class-wide basis;

- the applicable law, based in part on whether the cases arise from a single incident or a series of dispersed activities;[1380]

---

1378.  Fed. R. Civ. P. 23(c)(4)(A). The rule was intended to recognize that "an action may be maintained as to particular issues only," for example, by separating class adjudication of liability from individual adjudication of damages. *Id.*, committee note to 1966 Amendment, subdivision (c)(4). *See also* Simon v. Philip Morris, Inc., 200 F.R.D. 21 (E.D.N.Y. 2001) (analyzing Rule 23(c)(4)(A) in the historical context of the Seventh Amendment) (appeal pending).

1379.  Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 167 n.12 (2d Cir. 2001). *See also In re* Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 209 F.R.D. 323, 351–53 (S.D.N.Y. 2002); Sprague v. Gen. Motors Corp. 133 F.3d 388, 397 (6th Cir. 1998) (stating that the court is looking for a common issue that will advance and resolve the litigation); Harding v. Tambrands, Inc., 165 F.R.D. 623, 630 (D. Kan. 1996) ("[c]ertification [of 'general causation'] would not materially advance the disposition of the litigation as a whole" where individual issues of causation and damages under the laws of fifty states would remain); *cf. In re* Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332, 352 (D.N.J. 1997) ("If there were certain basic issues (such as defect) to which only one state's laws applied and concerning which class-wide issues predominated, the court could consider certifying a class with respect to those issues only.") (citing Fed. R. Civ. P. 23(c)(4)).

1380.  *See, e.g., MTBE*, 209 F.R.D. at 330 (alleging widespread dispersed groundwater contamination by petroleum companies as a result of a gasoline additive); *cf.* Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 623 (5th Cir. 1999) (casino employees claiming they developed respiratory illness caused by the casino's "defective and/or improperly maintained air-conditioning"); Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1229 (9th Cir. 1996) (claiming side effects arising from taking a single drug by a single manufacturer for a relatively short period); *In re* Copley Pharm., Inc., "Albuterol" Prods. Liab. Litig., 161 F.R.D. 456, 457 (D. Wyo. 1995) (claims arising from a nationwide recall of a bronchodilator prescription pharmaceutical following alleged incident of contamination).

- in dispersed mass tort cases, whether a limited and manageable set of state or federal substantive laws would apply in a trial of specific issues;

- if there are differences in applicable state laws, whether subclasses can be used to organize the applicable laws into manageable categories;

- whether each common issue is sufficiently separable from the individual issues so that it need not be "reexamined" in individual trials that may follow;

- whether the remaining issues of liability or damages will be resolved, an analysis often aided by trial plans that the parties submit; and

- the impact that determining the common issues will have on advancing the litigation as a whole.

## 22.751 Identify the Issues

The threshold question is whether there is a separate common issue that can be certified under Rule 23(c)(4)(A). In mass tort litigation, issues classes have been used to establish liability elements, such as general causation, negligence, or breach of warranty.[1381] Judges have also certified issues classes to establish class-wide affirmative defenses, such as the state of the art,[1382] the defendant's status as a government contractor,[1383] and medical monitoring claims (see section 22.74). Issues of specific causation and resulting damages to exposed individuals, however, cannot fairly or realistically be decided on a class-wide basis. As discussed in section 22.756, the judge and parties need to design other appropriate structures for resolving individual issues if adjudication of common issues establishes entitlement to damages upon proof of injury. The fact that such procedures will eventually be required does not

---

1381.  *See, e.g.,* Mejdrech v. Met-Coil Sys. Corp., 319 F.3d 910, 912 (7th Cir. 2003) (identifying as common issues leakage of contaminant by defendant and the geographical limits of the leakage); *In re* Hanford Nuclear Reservation Litig., 292 F.3d 1124 (9th Cir. 2002) (identifying general causation as potential issue for class treatment, approving certification of Price-Anderson Act common liability issues as issues class, and approving bifurcated trial with common issues trial followed by individual trials of causation and damages issues); Jenkins v. Raymark Indus., 782 F.2d 468, 473 (5th Cir. 1986) (affirming certification of asbestos personal injury claimant class to resolve common liability issues and the "state of the art" defense); *Albuterol*, 161 F.R.D. at 467 (certifying issues classes for negligence and breach of warranty claims relating to contamination of bronchodilator).

1382.  *Jenkins*, 782 F.2d at 473.

1383.  *In re* Agent Orange Prod. Liab. Litig., 818 F.2d 145, 166–67 (2d Cir. 1987).

necessarily defeat the predominance or superiority requirements of Rule 23(b)(3).[1384]

## 22.752 Determine Applicable Law

The choice of applicable law is critical. It often turns on whether the mass tort in question derives from a single incident in a confined locale or from a series of events dispersed by geography or time, or both. For example, a court addressing a Jones Act case dealing with occupational respiratory illnesses allegedly caused by a defective ventilation system on board a ship found that certification of an issues class was appropriate.[1385] The discrete issue presented in that case was very different from the "'Frankenstein Monster'" later described by the same court in rejecting an issues class for a nationwide group of millions claiming damages for tobacco addiction.[1386]

The dichotomy between a single incident and a dispersed mass tort is not always so clear. In a case involving a contaminated product that was distributed nationally before its recall, a judge certified an issues class as to liability. The judge found that defendant's admission of liability for some of the contamination, the widespread use of strict liability concepts by the states involved, and the improbability that comparative negligence would apply to use of a contaminated product, made the applicable law and proof consistent across the class.[1387] At the other end of the spectrum, in the Methyl Tertiary Butyl Ether (MTBE) multidistrict litigation, a group of plaintiff ground well owners complained of contamination from MTBE, a product used as a gasoline additive that had allegedly leaked into groundwater sources. The district court rejected an effort to certify "the appropriateness of injunctive relief" or "general liability" as issues classes under Rule 23(c)(4). The court also held that the proposed injunctive issues class failed to meet Rule 23(b)(2) criteria: The well owners were not a cohesive class because of the differences in the levels of any contamination, in the sources of any contamination, in the effects on each plaintiff, and in the extent and nature of relief required.[1388] The

---

1384. *See Jenkins*, 782 F.2d at 472–73.

1385. *Mullen*, 186 F.3d at 620 (approving certification of Jones Act common liability issues as issues class and approving bifurcated trial with common issues trial of negligence and seaworthiness followed by individual trials of causation and damages issues); *see also Mejdrech*, 319 F.3d at 911 (all class members in groundwater pollution case proceeding under same state and federal laws).

1386. Castano v. Am. Tobacco Co., 84 F.3d 734, 745 n.19 (5th Cir. 1996).

1387. *In re* Copley Pharm., Inc., "Albuterol" Prods. Liab. Litig., 161 F.R.D. 456, 464–65 (D. Wyo. 1995).

1388. *In re* Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 209 F.R.D. 323, 341–44 (S.D.N.Y. 2002).

court also held that the general liability issues class would not materially advance the litigation and would be subject to the individual differences among plaintiffs, requiring countless individual trials.[1389]

## 22.753 Identify a Limited Set of Laws[1390]

Where the cases are derived from activities with dispersed origins, an issues class will advance the litigation only if it can proceed to jury trial with clear instructions relating to a common legal standard or a small group of standards. Drafting sample jury instructions may help to clarify whether an issues class will work. Where liability relates to an allegedly defective product, Restatement of Law principles may be applicable and an issues class may be viable.[1391] With regard to negligence claims that are strongly disputed, courts could face the ungainly prospect of a "single trial before a single jury instructed in accordance with no actual law of any jurisdiction—a jury that will receive a kind of Esperanto instruction, merging the negligence standards of the fifty states and the District of Columbia."[1392] An issues class is rarely viable in such circumstances.

## 22.754 Subclasses to Reflect Differences in State Law

Determining whether the applicable laws can be grouped into a few sets that are very similar may help determine whether common issues are sufficiently present.[1393] If subclasses are proposed based on different categories of

---

1389.  *Id.* at 344–46.

1390.  *See supra* section 22.317. The process of classifying and grouping the pertinent states' laws is a task that has been described as "not . . . fun, but . . . far from impossible." Larry Kramer, *Choice-of-Law in Complex Litigation*, 71 N.Y.U. L. Rev. 547, 582 (1996). As Professor Kramer observed, "surveying state laws is not the problem that could make mass consolidation unmanageable. Determining the law in many states is not easy, to be sure. But every practicing lawyer has done a fifty-state search at some time in his or her career and this is certainly manageable. Moreover, the time and expense required to ascertain the content of the laws, even in a fifty-state search, are a drop in the bucket compared to the other costs of litigating a mass tort." *Id.*

1391.  *See Albuterol,* 161 F.R.D. at 465 (citing *In re* Asbestos Sch. Litig., 104 F.R.D. 422, 434 (E.D. Pa. 1984), *modified,* 789 F.2d 996 (3d Cir. 1986)) (observing that "51 jurisdictions are in virtual agreement in that they apply the Restatement (Second) of Torts § 388" and "forty seven jurisdictions have adopted strict liability and all of them start with the concept of a defective product," and holding that "substantial duplication" of negligence and strict liability laws in fifty-one jurisdictions make a nationwide class manageable).

1392.  *In re* Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1300 (7th Cir. 1995).

1393.  *See In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 172 F.R.D. 271, 293–94 (S.D. Ohio 1997) (finding that four subclasses "sufficiently take into account state law variations in the law of strict liability"); *Albuterol,* 161 F.R.D. at 465 (directing

applicable state law, each subclass must independently meet all the require-
ments of Rule 23(a) and at least one of the categories specified in Rule 23(b).
See sections 22.72, 21.22, and 21.23.

## 22.755 Determine Separability of Common Issue

The Reexamination Clause of the Seventh Amendment of the U.S. Con-
stitution provides: "[N]o fact tried by a jury, shall be otherwise reexamined in
any Court of the United States, than according to the rules of the common
law." The courts have divided over the application of this clause to issues
classes when two or more trials, with separate juries, will be required.[1394] See
section 21.24. In the *Gasoline Products* case, the Supreme Court held that it is
consistent with the Seventh Amendment to allow separate juries to hear
different issues in the same case, as long as the issues tried to separate juries are
so "distinct and separable" that the second jury will not revisit issues deter-
mined by the first, and separate trials may be "had without injustice."[1395] See
section 21.24. In *Rhone-Poulenc*, the Seventh Circuit concluded that a trial plan
under which one jury would first determine the common issue of negligence
and subsequent juries would determine comparative negligence and proximate
causation violated the Reexamination Clause.[1396] Other courts have concluded
that the Seventh Amendment is not offended by a bifurcation of the proceed-
ings into class-wide claims and individual claims, on the ground that the
second phase would not involve the "same issues" as the first phase.[1397] See
section 22.751. Unless the decision of the first jury will "provide sufficient
guidance to allow later juries to implement the first jury's formal findings

---

that "if an individual state's law is at variance with the general law on a relevant point of law, its
residents may be removed from the class"). *Cf.* Zinser v. Accufix Research Inst., Inc., 253 F.3d
1180 (9th Cir. 2001) (rejecting the use of subclasses).

1394. *Compare In re* Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1303 (7th Cir. 1995), *with*
Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 169 (2d Cir. 2001). *See supra*
section 21.24; *see also* Castano v. Am. Tobacco Co., 84 F.3d 734, 750–51 (5th Cir. 1996) (ruling
that "if separate juries are allowed to pass on issues involving overlapping legal and factual
questions the verdicts rendered by each jury could be inconsistent"); *cf.* Mullen v. Treasure
Chest Casino, LLC, 186 F.3d 620, 628–29 (5th Cir. 1999) (distinguishing *Castano* and *Rhone-
Poulenc*).

1395. Gasoline Prods. Co. v. Champlin Ref. Co., 283 U.S. 494, 500 (1931). *See also* Ala. v.
Blue Bird Body Co., 573 F.2d 309 (5th Cir. 1978) (approving a bifurcated statewide class trial of
an antitrust action and disapproving a nationwide class action trial plan).

1396. *Rhone-Poulenc*, 51 F.3d at 1303–04.

1397. *See In re* Asbestos Sch. Litig., 789 F.2d 996 (3d Cir. 1986); *see also Albuterol*, 161 F.R.D.
at 456.

without confusion or uncertainty, issues cannot be certified."[1398] Use of special verdict forms can provide the specificity necessary for instructing a second jury as to the aspects of the litigation previously resolved. The forms should clearly distinguish among the possible interpretations of the first jury's findings, to allow later juries to understand and apply those findings.[1399]

## 22.756  Establish a Trial Plan

A trial plan for the proposed common issues class will help determine whether a trial will be manageable and meet all the Rule 23 certification standards. Section 22.93 discusses mass tort trial plans. Any plan should also address individual issues, such as specific causation and damages, and defenses such as comparative negligence or limitations.[1400] Some judges have used trial plans that rely on representative plaintiffs to present test cases, followed by a procedure for determining remaining issues.[1401]

A trial on general liability can impose unfair burdens on parties forced to litigate issues out of context—for example, by trying liability on a class-wide basis without reference to statute of limitations defenses. One concern is that a "composite" issues class is often much stronger than any plaintiff's individual action would be.[1402] A trial plan should identify such risks and propose ways to avoid or minimize them.

---

1398.  Patrick Woolley, *Mass Tort Litigation and the Seventh Amendment Reexamination Clause,* 83 Iowa L. Rev. 499, 531 (1998). *See also* Steven S. Gensler, *Bifurcation Unbound,* 75 Wash. L. Rev. 705, 736–37 (2000).

1399.  *See, e.g.,* Henley v. FMC Corp, 20 Fed. Appx. 108, 118–20 (4th Cir. 2001) (finding an inability to distinguish whether jury finding applied to representative parties or the class as a whole, reversing and remanding).

1400.  Jenkins v. Raymark Indus., 782 F.2d 468, 471 (5th Cir. 1986) (affirming district court's determination that a bifurcated trial plan would best address specific causation and damage issues); *In re* Copley Pharm., Inc., "Albuterol" Prods. Liab. Litig., 158 F.R.D. 485, 492 (D. Wyo. 1994) (outlining a bifurcated trial plan to determine class-wide liability and individual causation/damages).

1401.  *See, e.g., In re* Shell Oil Refinery, 136 F.R.D. 588, 593–97 (E.D. La. 1991), *affirmed sub nom.* Watson v. Shell Oil Co., 979 F.2d 1014, 1017–20 (5th Cir. 1992), *reh'g granted,* 990 F.2d 805 (5th Cir. 1993), *other reh'g,* 53 F.3d 663 (5th Cir. 1994) (case settled before rehearing); *see also* Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 623 (5th Cir. 1999) (providing for hearing individual issues in groups of approximately five class members at a time).

1402.  *In re* Rhone-Poulenc Rorer Inc., 51 F.3d 1293, 1299–1301 (7th Cir. 1995); *In re* Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 209 F.R.D. 323, 352–53 (S.D.N.Y. 2002).

### 22.757  Assess the Overall Impact[1403]

When one or more issues classes are proposed, a judge should do the following: weigh whether the issues are sufficiently distinct and separate to comply with the Seventh Amendment under the *Gasoline Products* test;[1404] consider the delays that might be occasioned by separate trials; balance the need for individualized determinations, even apart from damages, on issues such as the type or duration of exposure, proximate causation, comparative causation, or the applicability of different defenses; and, ultimately, determine whether certification of an issues class or case-by-case adjudication represents the fairest response to the demands of the Seventh Amendment and due process of law. One court of appeals identified three primary considerations in deciding whether issues could be separately tried in consolidated mass tort litigation: "(1) whether the issue was indeed a separate issue; (2) whether it could be tried separately without injustice or prejudice; and (3) whether the separate trial would be conducive to judicial economy, especially if a decision regarding that question would be dispositive of the case and would obviate the necessity to trying any other issues."[1405]

## 22.8  Discovery

.81 Sampling  436
.82 Initial Disclosures  437
.83 Interrogatories  438
.84 Depositions: New Parties  438
.85 Documents  439
.86 Physical Evidence  439
.87 Experts and Scientific Evidence  440

Discovery in mass tort cases generally has two distinct dimensions: one involving the conduct of the defendants, and another relating to the individual plaintiffs' conduct, causation, and injuries. Sometimes—particularly in multidistrict litigation—judges direct initial discovery toward matters bearing on the defendants' liability to all plaintiffs.[1406] This approach may be appropriate when liability is seriously disputed. In other cases, however, particularly

---

1403. For an exploration of the difficulties of applying prior findings in later trials in a mass tort context, see Green, *supra* note 1296.

1404. Gasoline Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 500 (1931).

1405. *In re* Bendectin Litig., 857 F.2d 290, 320 (6th Cir. 1988) (affirming constitutionality of bifurcated trial plan).

1406. Videotaped depositions are particularly useful in multidistrict litigation where the testimony of key witnesses may have to be presented at trial in numerous, geographically dispersed transferor (or state) courts after remand. *See generally supra* section 11.452.

those involving "mature" mass torts, the judge and parties prefer at the outset to discover plaintiff-specific information or to conduct discovery from plaintiffs concurrently with discovery from the defendants. Interrogatories inquiring into the extent of the plaintiffs' damages may be useful early in the litigation even if depositions of the plaintiffs are to be delayed. Answers to such interrogatories may be prepared without disrupting the schedule for discovery from the defendants and may be a valuable starting point for settlement discussions. For example, in the Ohio asbestos litigation, special masters worked with the parties to develop standard forms disclosing information that would be relevant to both settlement and trial. [1407]

The volume and complexity of discovery in dispersed mass tort litigation might warrant appointing a special master to assist the court. In the breast implant litigation, the MDL transferee judge resolved discovery disputes without such assistance, but did appoint a special master to coordinate discovery and case management with state court judges handling large numbers of related cases. In the diet drug litigation, the MDL transferee judge appointed a special master to resolve discovery disputes and to help coordinate state and federal litigation.[1408] Other steps to organize discovery and divide work into manageable categories include organizing discovery in waves, as in the diet drug litigation,[1409] or dividing discovery into national, regional, and case-specific categories, as in the breast implant litigation.[1410]

## 22.81 Sampling

In some cases that involve a massive number of claims for damages for similar injuries and in which causation is not in doubt, sampling techniques can streamline discovery relating to individual plaintiffs' conduct and injuries.[1411] Sampling and surveying by questionnaires can provide information for

---

1407. *See* Francis E. McGovern, *Toward a Functional Approach for Managing Complex Litigation*, 53 U. Chi. L. Rev. 440, 478–91 (1986); Wayne D. Brazil, *Special Masters in Complex Case: Expanding the Judiciary or Reshaping Adjudication?*, 53 U. Chi. L. Rev. 394, 399–402 (1986); Trends, *supra* note 1077, at 60–69.

1408. *In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, Order No. 26 (E.D. Pa. Mar. 30, 1998), *at* http://www.fenphen.verilaw.com/search_common.icl (last visited Nov. 10, 2003).

1409. *Id.,* Order No. 22 (E.D. Pa. Mar. 23, 1998).

1410. *In re* Silicone Gel Breast Implant Prods. Liab. Litig., MDL No. 926, Order No. 5 (N.D. Ala. Sept. 15, 1992), *at* http://www.fjc.gov/BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003).

1411. *See supra* section 11.493; *see also* Hilao v. Estate of Marcos, 103 F.3d 767, 782–87 (9th Cir. 1996) (describing sampling for discovery and aggregated trial of damages issues).

settlement discussions and for test case selection for individual trials.[1412] For example, in a case involving thousands of claimants seeking damages for injuries allegedly caused by eating fish contaminated with DDT, the parties agreed to limit formal discovery to a sample of the claimants randomly selected by a special master.[1413] Responses to questionnaires provided information about the remaining claimants and served as the basis for screening out a substantial number of claims.[1414] In the absence of consent or a settlement, however, litigants are entitled to full discovery and to adjudication consistent with the U.S. Constitution.[1415] Whether the aim is discovery, settlement, or a test-case trial, any sample should be representative of the claims and claimants, taking into account relevant factors such as the severity of the injuries, the circumstances of exposure to the product or accident, the mechanisms of causation, the products and defendants alleged to be responsible, any affirmative defenses, and the applicable state law.[1416] If sampling does not lead to a global settlement, individual discovery of all plaintiffs will likely be needed.

## 22.82 Initial Disclosures

Federal Rule of Civil Procedure 26(a) specifies information that must be disclosed in advance of discovery. Such disclosures are often inappropriate to mass tort cases because they require repetitive disclosures of the same information to the same attorneys.[1417] The rule permits the judge to order or the parties to stipulate that these requirements do not apply to the particular litigation.[1418] See also section 22.61.

---

1412.  *See supra* sections 11.422, 11.423, 11.464, and *infra* section 22.9. *See also* Brazil, *supra* note 1407, at 402–06 (discussing sampling and surveying techniques used by special master as settlement aid in Alabama DDT case); *In re* Chevron U.S.A., Inc., 109 F.3d 1016 (5th Cir. 1997) (ruling that cases selected for a bellwether trial need to be representative of all cases).

1413.  Willhoite v. Olin Corp., No. CV-83-C-5021-NE (N.D. Ala. 1983) (discussed in Brazil, *supra* note 1407, at 402 n.32, 403–06). Use of random sampling apparently quelled defendants' fears that plaintiffs' counsel would otherwise select "a disproportionately small or unrepresentative sample." Brazil, *supra* note 1407, at 403. The size of the sample was twenty. *Id.*

1414.  *Id.* at 403.

1415.  *See* Cimino v. Raymark Indus., 151 F.3d 297, 320 (5th Cir. 1998) (holding that nonconsensual statistical extrapolation violated the defendant's "Seventh Amendment right to have the amount of legally recoverable damages fixed and determined by a jury").

1416.  *See, e.g., Chevron U.S.A.*, 109 F.3d at 1020.

1417.  *See* Fed. R. Civ. P. 26(a)(1) committee note ("Case-specific orders remain proper" and "are expressly required if a party objects that initial disclosure is not appropriate to the circumstances of the action."); *see also supra* section 11.13 (prediscovery disclosure).

1418.  Fed. R. Civ. P. 26(a)(1).

## 22.83 Interrogatories

Encouraging or requiring parties with similar interests to confer and fashion joint interrogatories supplemented as necessary can help prevent multiple requests for the same information.[1419] In lieu of interrogatories, questionnaires directed to individual plaintiffs in standard, agreed-on forms were used successfully in the breast implant and diet drug litigations.[1420] Answers to interrogatories should generally be made available to other litigants, who in turn might then be permitted to ask only supplemental questions.

## 22.84 Depositions: New Parties

Standard discovery requests can be deemed filed automatically as new parties are joined or new actions filed. Consider instituting procedures to facilitate the use of depositions against similarly situated parties later added to the litigation[1421] and to provide counsel in related cases in other courts with access to relevant confidential materials covered by protective orders.[1422] Courts routinely establish preliminary guidelines for conducting depositions and create a system for resolving disputes that arise during depositions.[1423]

Limiting repetitive depositions of some witnesses promotes efficiency, as does using videotaped depositions for witnesses likely to testify more than once.[1424] Parties with different interests must be allowed fair discovery, but discovery that has already been competently conducted need not be reopened for later-added parties, absent a showing of a specific need. Judges may wish to

---

1419. Trends, *supra* note 1077, at 47–50. Alternative sets of interrogatories might be drafted to deal with variations, such as differences in the use of a toxic product or in the measure of damages for various plaintiffs.

1420. *In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, Order No. 22 (E.D. Pa. Mar. 23, 1998), *at* http://www.fenphen.verilaw.com/search_common.icl (last visited Nov. 10, 2003) (including "Plaintiff Fact Sheet" and medical authorizations in "First Wave Discovery"); *In re* Silicone Gel Breast Implants Prods. Liab. Litig., MDL No. 926, Order No. 30 (N.D. Ala. Mar. 25, 1996), *at* http://www.fjc.gov/BREIMLIT/ORDERS/orders.htm (approving the use of MDL questionnaire "which is treated as the plaintiff's answer to interrogatories and requests for production") (last visited Nov. 10, 2003).

1421. *See supra* sections 11.453, 11.445.

1422. *See supra* section 11.43.

1423. *See, e.g., In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, Order No. 21 (E.D. Pa. Mar. 16, 1998), *at* http://www.fenphen.verilaw.com/search_common.icl (last visited Nov. 10, 2003) (deposition guidelines). In *Diet Drugs*, the court appointed a special master to supervise discovery and rule initially on any disputes. *Id.,* Order No. 26, filed Mar. 30, 1998. *See also, e.g., Silicone Gel*, Order No. 11 (N.D. Ala. June 30, 1993) (deposition guidelines).

1424. *See, e.g., Silicone Gel*, Order No. 5, at ¶¶ 7(f)(1)(A)–(d) (N.D. Ala. Sept. 15, 1992).

consider vacating any protective orders issued in individual cases before their consolidation and taking other actions to promote access to materials from other litigation.[1425] See section 11.452 for discussion of technology to enable broad remote participation in depositions conducted by a few lawyers physically present and other lawyers participating by electronic access, perhaps with a magistrate judge or other discovery "master" available to handle objections. In mass tort litigation, such approaches may avoid the need for repetitive depositions of significant decision makers, defendants, or experts.

## 22.85  Documents

The volume of discovery in a mass tort often warrants creation of a document depository, a Web site or sites, and other physical and electronic means of making discovery materials available to all parties. The goal is to have as much discovery material as possible readily accessible to litigants in federal and state courts. Generally, documents relating to scientific studies, public records, and public reports would be included at such a site, as well as responses to written discovery requests, copies of deposition transcripts, and documents discovered by the parties. Requests for documents can be coordinated and handled by using an electronic or physical depository for the collection and storage of the requested documents. The parties and court reporters should provide depositions and other discoverable documents in an electronic format so that the court and the parties can use electronic search tools to locate relevant information. Procedures should permit a party easily and quickly to request the return of inadvertently disclosed privileged or confidential information or documents without waiving attorney–client or work-product privilege or protection against discovery.[1426]

## 22.86  Physical Evidence

In a single-event mass tort case, such as an airplane crash or other accident simultaneously affecting a number of persons, it may be advisable to order the

---

1425.  *See, e.g., id.*, at ¶ 7(e)(5). In that order the court indicated that it expected parties to the litigation to waive rights under protective orders issued in cases that were not centralized under the MDL order. The court also required applications for protective orders to specify the materials to be protected and the terms and conditions of any proposed limits to the protection.

1426.  *See, e.g., Diet Drugs*, Order No. 41 (E.D. Pa. Apr. 23, 1998) (providing that inadvertent disclosure of privileged documents does not constitute a waiver of the privilege generally or in relation to the specific document in question); *id.*, Order No. 27 (E.D. Pa. Mar. 31, 1998) (last visited Nov. 10, 2003) (establishing ground rules for making and preserving claims of confidentiality during the discovery process).

preservation of physical evidence, to set conditions on its handling, testing, and custody, and to establish ground rules for access to and examination of the accident site. This type of discovery may require participation by experts from both sides—and perhaps a court-appointed expert or special master—to sift through evidence at the site, preserve and document samples for common testing and use at trial, and videotape and photograph the scene.[1427] A judge might appoint a joint committee of experts to coordinate collecting, recording, and testing evidence,[1428] thereby reducing disputes over testing procedures. As soon as practicable, the court should establish a central location, accessible to all parties, for storage and preservation of evidence. In mass accidents occurring on a defendant's property or involving a mechanical product, it may be necessary for the defendant to produce blueprints or other technical drawings to enable plaintiffs to investigate the site or product adequately.

Dispersed mass tort cases may also require steps to ensure the retention and preservation of physical evidence. In cases alleging product design or manufacturing defects in models, makes, or lots that may have changed over time, such orders should be entered early in the case. For example, in the *Bridgestone/Firestone* MDL proceedings, the judge ordered a detailed system for the parties to identify, inspect, retain, and store—and, in the case of new salable models, share the cost of obtaining—the extensive range of recalled and new tires that were in issue.[1429] If the case involves a number of product makes, models, or lots, the parties should work toward a joint proposed order setting procedures to collect, store, and inspect or test a sampling of such products. Although the need for joint testing might be less critical than in single-incident torts where there may be only a single product or remnant to be tested, joint testing may still be advisable to minimize unnecessary disputes.

## 22.87  Experts and Scientific Evidence

Section 23.2 discusses management of expert evidence in complex litigation generally. Because expert opinions play a vital role in many mass tort cases, both during the discovery process and at trial, judges often establish at an early pretrial conference a schedule for disclosing expert opinions in a

---

1427.  *See In re* Shell Oil Refinery, 132 F.R.D. 437, 439–40 (E.D. La. 1990).

1428.  *See infra* section 34.25 (discussing use of databases in Superfund litigation); *see also infra* section 40.52, at ¶¶ 3, 4 (mass tort case-management order).

1429.  *See In re* Bridgestone/Firestone, Inc., ATX, ATXII, & Wilderness Tires Prods. Liab. Litig., No. IP00-9373, 2001 WL 219858, at *1 (S.D. Ind. Mar. 6, 2001) (Tire Preservation Order); *see also In re* Bridgestone/Firestone, Inc., ATX, ATXII, & Wilderness Tires Prods. Liab. Litig., 129 F. Supp. 2d 1207, 1213 (S.D. Ind. 2001) (ordering parties to jointly prepare a preservation order).

written report, for deposing the experts, and for resolving *Daubert* motions.[1430] In deciding the timing of expert disclosures, depositions, and *Daubert* hearings, courts should consider whether and to what extent

- scientific or technical issues are novel, developing, or settled;

- scientific or technical issues are central to the claims and defenses and whether resolution of the admissibility of such evidence will as a practical matter be dispositive of the litigation;

- parties and their experts disagree about crucial scientific evidence;

- underlying scientific issues are complex and require extensive time for discovery and for experts to prepare the reports required by Rule 26(a)(2)(B); and

- scientific issues need to be sequenced or staged in a particular order to promote economy and efficiency in the litigation.

Generally, the more novel, complex, and central the scientific or technical issues, the more time the parties will need to conduct discovery, prepare expert reports, and brief the issues for a *Daubert* hearing. Although an evidentiary hearing is not always required to resolve *Daubert* issues, having the witnesses testify may allow the judge to test the underlying assumptions and reasoning employed by the experts and to compare various approaches to the same subject.[1431]

Where causation issues dominate litigation, it may be appropriate for the transferee court in an MDL proceeding to conduct a *Daubert* hearing on general causation issues, leaving specific causation issues for the transferor courts on remand.[1432] Such a division in the appropriate case efficiently separates the role of the MDL court from that of the trial courts after re-

---

1430. *See infra* section 23.32 (outlining expert evidence questions for the initial conference) & *supra* section 11.48 (disclosure and discovery of expert opinions); *see also, e.g., In re* Phenyl-propanolamine (PPA) Prod. Liab. Litig., MDL No. 1407, Order No. 6 (W.D. Wash. Mar. 22, 2002), *at* http://www.wawd.uscourts.gov/wawd/mdl.nsf/main/page (last visited Nov. 10, 2003) (Expert Discovery Schedule).

1431. *See In re* Hanford Nuclear Reservation Litig., 292 F.3d 1124, 1138 (9th Cir. 2002) ("[W]e encourage the court to hold a hearing on remand to provide plaintiffs with an opportunity to respond to the defendants' challenges . . . ."); *see also infra* section 23.33 (discussion of using a post-disclosure Rule 16 conference to identify the bases for disagreements among the experts).

1432. *Hanford Nuclear*, 292 F.3d at 1129; *see also* Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1200 (6th Cir. 1988).

mand.[1433] In scheduling *Daubert* proceedings in a dispersed mass tort case, an MDL judge should explore opportunities to coordinate scheduling with state courts handling parallel cases.[1434] Federal and state judges have successfully conducted joint *Daubert* hearings creating a record that other judges might use.

Early consideration of expert disclosure and discovery also assists a court in deciding whether to appoint an independent expert or panel of experts under Federal Rule of Evidence 706.[1435] Court-appointed experts or panels of experts under Rule 706 occasionally have been used in mass tort litigation to help resolve disputed causation issues.[1436] Such experts have also been used to screen cases to determine whether individual plaintiffs or groups of plaintiffs can establish a threshold level of injury.[1437] The experience with Rule 706 experts in the silicone gel breast implant litigation indicates that the benefits must be weighed against the cost[1438] and delay[1439] involved. Before appointing a Rule 706 expert or a panel of experts in mass tort litigation, a judge should determine at an early stage of the litigation whether the cases sufficiently demonstrate the following features:

- a highly disputed subject in which strong evidence appears to support the contentions of both sides of the litigation;
- a technical complexity that taxes the capacity of the adversary system;[1440]

---

1433.  *See PPA*, Order Clarifying Expert Discovery Order (filed Aug. 13, 2002) (finding that issues relating to substantial subsets of the general population "constitute issues of general applicability" suitable for resolution by an MDL transferee court).

1434.  *See PPA*, Order Granting in Part and Denying in Part Defendants' Motion to Accelerate *Daubert* Hearing (filed Sept. 19, 2002) (altering *Daubert* discovery schedule to coordinate with state court schedule). *See also id.*, Order Granting in Part and Denying in Part Defendants' Motion to Preclude Plaintiffs' Expert Witnesses as to General Causation (June 18, 2003).

1435.  *See generally supra* section 11.51. For a discussion of a pretrial procedure to assist in determining the need for a court-appointed expert, see Joe S. Cecil & Thomas E. Willging, Court-Appointed Experts: Defining the Role of Experts Appointed Under Federal Rule of Evidence 706, at 83–95 (Federal Judicial Center 1993).

1436.  FJC Study, Neutral Science Panels, *supra* note 1059 (comparison of methods two judges used to appoint scientific experts to assist in resolving mass tort litigation).

1437.  Carl B. Rubin & Laura Ringenbach, *The Use of Court Experts in Asbestos Litigation*, 137 F.R.D. 35 (1991) (appointment of experts from a roster compiled by a district court to perform pulmonary function analyses in asbestos litigation in a single district).

1438.  FJC Study, Neutral Science Panels, *supra* note 1059, at 3.

1439.  *Id.*

1440.  *See* FJC Study, Court-Appointed Experts, *supra* note 1435, at 12–14.

- a likelihood that scientific evidence will determine the course of the litigation;[1441]
- sufficient homogeneity among the parties that the findings of court-appointed experts will have a significant impact on other claims;
- a need to develop criteria to decide the admissibility of evidence, as in cases involving novel claims;[1442]
- a sufficiently large number of cases to support the costs of an expert or panel of experts; and
- the availability of neutral experts to serve under Rule 706.[1443]

Appointing an expert without unduly delaying the litigation requires establishing procedures for previewing proposed expert testimony at an early stage.[1444]

In cases involving disputed scientific evidence on causation, there will often be ongoing scientific studies addressing the disputed issue. The court may need to establish procedures for discovery of information regarding such studies. Generally, courts have afforded protection to researchers from disclosure of data or opinions relating to an ongoing unpublished study.[1445] By

---

1441. *See* FJC Study, Neutral Science Panels, *supra* note 1059, at 87–92 (finding mixed but generally positive early assessments of the impact of the expert panel appointed in the silicone gel breast implant litigation).

1442. *See* Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387, 1391–93 (D. Or. 1996) (acting "in its role as 'gatekeeper'" in about seventy statewide consolidated silicone gel breast implant cases, the court appointed a technical advisor).

1443. There are programs available that help judges identify and obtain expert assistance. *See* American Association for the Advancement of Science (AAAS), *Court Appointed Scientific Experts: A Demonstration Project of the AAAS, a t* http://www.aaas.org/spp/case/case.htm (last visited Nov. 10, 2003).

1444. For the series of orders addressing matters related to the work of the science panel in the breast implant litigation, see *In re Silicone Gel Breast Implant Products Liability Litigation*, MDL No. 926, Order No. 31 (N.D. Ala. May 30, 1996) and subsequent orders using the number 31 and a letter, at http://www.fjc.gov/BREIMLIT/mdl926.htm (last visited Nov. 10, 2003).

1445. *See, e.g., In re* Am. Tobacco Co., 880 F.2d 1520, 1529 (2d Cir. 1989) (stating, *in dicta*, that the "principal legitimate chilling effect on scientific research . . . is the possibility that research results discovered prior to their publication would be vulnerable to preemptive or predatory publication by others"); Deitchman v. E.R. Squibb & Sons, Inc., 740 F.2d 556, 565 (7th Cir. 1984) (indicating that "[n]o discovery should be allowed of any material reflecting development of [the researcher's] ideas or stating his or others' conclusions not yet published"); Dow Chem. Co. v. Allen, 672 F.2d 1262, 1276 (7th Cir. 1982), *aff'g sub nom.* United States v. Allen, 494 F. Supp. 107, 113 (W.D. Wis. 1980) (referring to a possible "chilling effect" on academic research by subjecting it to premature criticism); *see also* Elizabeth C. Wiggins & Judith A. McKenna, *Researchers' Reactions to Compelled Disclosure of Scientific Information*, 59 Law & Contemp. Probs. 67, 86–88 (1996).

contrast, courts generally allow some discovery into party-sponsored studies.[1446] For completed party-sponsored studies, courts generally require production of all data; for pending studies, courts often require disclosure of the written protocol, the statistical plan, sample data entry forms, and a specific description of the progress of the study until it is completed.[1447]

In some cases, one or both of the parties will attempt to subpoena raw data and other information regarding scientific studies that were not sponsored by a party from researchers who were not retained by a party. Subpoenas issued to discover ongoing or completed research conducted by scientists independent of the parties raise a number of considerations. A paradigmatic case would involve a subpoena directed at an academic researcher whose studies examine whether a causal link exists between a product and plaintiffs' alleged injuries.[1448] A court faced with a challenge to such a subpoena must balance the researcher's claim for protection of confidentiality, intellectual property rights, research privilege, and the integrity of the research with opposing claims that the information is necessary and cannot be obtained from any alternative source.[1449] The burden of compliance with repetitive subpoenas in mass tort litigation may need to be considered.[1450]

Federal Rule of Civil Procedure 45(c)(3)(B)(ii) permits enforcement of subpoenas on a showing of "substantial need for the testimony that cannot be otherwise met without undue hardship," and on assurance that third parties

---

1446. *In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, Order No. 420 (E.D. Pa. Jan. 6, 1999), *at* http://www.fenphen.verilaw.com/search_common.icl (last visited Nov. 10, 2003) (defining an ongoing study as one in which data-collection activity occurred within the last 150 days). *See also id.*, Order No. 580, filed Apr. 23, 1999 (modifying Order 420 in context of a request for international judicial assistance regarding studies by a foreign defendant); *Silicone Gel*, Order No. 36 (E.D. Pa. Nov. 27, 1996) & Order No. 36A (E.D. Pa. May 9, 1997) (ordering reciprocal exchange of information regarding ongoing studies funded by a party), *at* http://www.fjc.gov/BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003).

1447. *Diet Drugs,* Order No. 420, at ¶ 4 (E.D. Pa. Jan. 6, 1999).

1448. *See, e.g., Deitchman*, 740 F.2d at 562 (involving research showing a statistical relationship between diethylstilbestrol (DES) and certain cancers); *see also Am. Tobacco*, 880 F.2d at 1522–23 (seeking raw data from studies examining the effects of asbestos and smoking). *See generally* Barbara B. Crabb, *Judicially Compelled Disclosure of Researchers' Data: A Judge's View,* 59 Law & Contemp. Probs. 9, 10–16 (1996) (discussing *Deitchman*).

1449. *See generally* Crabb, *supra* note 1448.

1450. *See Am. Tobacco*, 880 F.2d at 1530 (discussing a report that forty subpoenas had been served seeking the same data and suggesting district court consider establishing a central repository or consider seeking a centralized MDL response); *see also* Anker v. G.D. Searle & Co., 126 F.R.D. 515, 521 (M.D.N.C. 1989) (discussing a requirement that the party who discovers the records make them available to other litigants); Wiggins & McKenna, *supra* note 1445, at 90–91 (reporting that one tobacco company "agreed to serve as a central depository for the information" involved in *American Tobacco*).

subject to the subpoena "will be reasonably compensated." Judges have recognized litigants' need to examine data underlying research studies used to support claims or defenses asserted against them.[1451] The court has discretion to impose additional conditions on enforcement of a subpoena.[1452] Judges have generally crafted orders that enforce the subpoena while imposing restrictions to protect the researchers' interests. For example, the judge may redact information that would divulge the identity of research subjects who have been promised confidentiality;[1453] the judge may also consider other ways of protecting the identity of subjects.[1454] Claims of excessive burden on researchers have been accommodated by financial reimbursement, use of temporary workers to prepare data for production, or extending the response time to allow a researcher to continue working with minimal disruption.[1455]

1451.  *Deitchman*, 740 F.2d at 563 (concluding that for defendant "to prepare properly a defense on the causation issue, access to the Registry data to analyze its accuracy and methodology is absolutely essential"). Consider also Judge Crabb's summary of the balancing test courts apply. Crabb, *supra* note 1448, at 28.

1452.  For a thorough discussion of the issues involved in enforcing such subpoenas, see generally Joe S. Cecil & Gerald T. Wetherington, *Court-Ordered Disclosure of Academic Research: A Clash of Values of Science and Law*, 59 Law & Contemp. Probs. 1 (1996).

1453.  Crabb, *supra* note 1448, at 28–29. *See also Am. Tobacco*, 880 F.2d at 1530 (affirming a protective order allowing redaction of research participants' names, addresses, social security numbers, employers, and union registration numbers).

1454.  Crabb, *supra* note 1448, at 28–29. *See also Am. Tobacco*, 880 F.2d at 1530 (affirming a protective order binding party and subsequent users not to determine the identity of research participants, under penalty of contempt); *Deitchman*, 740 F.2d at 564 (suggesting review by an independent third party).

1455.  *See* Crabb, *supra* note 1448, at 28.

# 22.9  Settlement and Trial

.91 Judicial Role and Settlement  446
.92 Review of Settlement in Mass Tort Class Actions  449
   .921 Class Certification in a Settlement Context  450
   .922 Fairness, Adequacy, and Reasonableness of the Settlement  453
   .923 Criteria for Evaluating the Merits of a Proposed Settlement  454
   .924 Gathering Information and Conducting a Fairness Hearing  456
   .925 Evaluating Nonmonetary Benefits  460
   .926 Presenting the Decision  460
   .927 Awarding and Allocating Attorney Fees  461
.93 Trial  463

## 22.91  Judicial Role and Settlement[1456]

In mass torts, as in other types of complex litigation, questions regarding the appropriate extent of judicial involvement in settlement negotiations are important because the costs associated with recusing a judge familiar with the litigation are high.[1457] Although some judges participate actively in settlement negotiations,[1458] others insulate themselves from the negotiations, leaving this activity to a magistrate judge, a special master, or a settlement judge.[1459] Judges who have been involved in unsuccessful settlement negotiations sometimes turn over to another judge the responsibility for trying the case because they have been privy to information on the merits of the case or on issues that

---

1456. *See generally supra* sections 13 (settlement), 13.14 (judicial review and approval of settlements), 21.61 (judicial review of class action settlements), & 21.66 (administration of class action settlements). *See also* D. Marie Provine, Settlement Strategies for Federal District Judges (Federal Judicial Center 1986).

1457. *See supra* section 13.11. *See, e.g., In re* Sch. Asbestos Litig. Pfizer, Inc., 977 F.2d 764, 784–85 (3d Cir. 1992) (ordering the judge to disqualify himself and noting that the "newly assigned district judge will face a gargantuan task in becoming familiar with the case" and additional delay that may "disadvantage the plaintiffs").

1458. *See, e.g., In re* Agent Orange Prod. Liab. Litig., 597 F. Supp. 740 (2d Cir. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987). For an assessment of the risks of such judicial involvement in settlement, see Peter H. Schuck, *The Role of Judges in Settling Complex Cases: The Agent Orange Example*, 53 U. Chi. L. Rev. 337, 359–65 (1986).

1459. *See, e.g., In re* Silicone Gel Breast Implants Prods. Liab. Litig., MDL No. 926, Order: Opinion & Final Judgment Approving Global Settlement (N.D. Ala. Sept. 1, 1994), *at* http://www.fjc.gov/BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003) (in which the transferee judge appointed three judges to act as mediators to assist in discussing a global settlement); *In re* MGM Grand Hotel Fire Litig., 570 F. Supp. 913, 918 (D. Nev. 1983) (special master appointed as "settlement coordinator"); *id.* at 924–26. In *In re San Juan Dupont Plaza Hotel Fire Litigation*, MDL No. 721, 1988 U.S. Dist. LEXIS 17332, at *201 (D.P.R. Dec. 2, 1988), the transferee judge appointed the former transferee judge from the *MGM Grand* litigation to serve as settlement coordinator while the transferee judge managed the litigation.

would otherwise not have been revealed. Judges who have been involved in successful settlement negotiations may transfer to another judge judicial review of the settlement to avoid having to rule on the fairness, reasonableness, and adequacy of a settlement they helped to craft.[1460]

In some cases, a judge can facilitate settlement negotiations by establishing a system to collect information about past, pending, and likely future claims.[1461] In some MDL mass tort centralizations, courts have ordered claimants to complete questionnaires eliciting a wide range of information, such as the circumstances of their exposures and the severity of their injuries, to facilitate settlement negotiations or improve claim administration following settlement.[1462] In many cases, the parties themselves provide the data for entry into a centralized electronic database. Judges have occasionally appointed special masters to assemble databases documenting essential information concerning the thousands of personal injury claims that may be pending. Special masters have sometimes used electronic data to compare individual pending cases against closed cases having similar characteristics to produce a range of settlement values.[1463]

The judge may assist the parties to achieve a "global" settlement resolving not only the defendants' potential liability to the plaintiffs, but also their

---

1460. Carlough v. Amchem Prods., Inc., 834 F. Supp. 1437, 1445 (E.D. Pa. 1993) (order appointing second district judge to conduct hearings on fairness of class settlement), *settlement approved sub nom.* Georgine v. Amchem Prods., 157 F.R.D. 246 (E.D. Pa. 1994), *vacated and remanded,* 83 F.3d 610 (3d Cir. 1996), *aff'd sub nom.* Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997). *See also* Flanagan v. Ahearn, 90 F.3d 963, 994 (5th Cir. 1996) (Smith, J., dissenting) (noting, in dissent, that "the district judge presided at the fairness hearing on the very settlement he had helped to craft"), *reversed sub nom.* Ortiz v. Fibreboard, 527 U.S. 815 (1999); *and* Hon. S. Arthur Spiegel, *Settling Class Actions*, 62 U. Cin. L. Rev. 1565 (1994) (discussing the advantages and disadvantages of having a judge participate in and review the same settlement).

1461. In *Jenkins v. Raymark*, the special master used the same database to support settlement discussions and to demonstrate to a jury the array of claims in the class action. McGovern, *Mature Mass Tort, supra* note 1022, at 669–70, 674. *See also id.* at 682–88 (describing the $5 million data-collection process established to estimate the value of Dalkon Shield personal injury claims under section 502(c) of the Bankruptcy Code).

1462. *In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, Order No. 22 (E.D. Pa. Mar. 23, 1998), *at* http://www.fenphen.verilaw.com/search_common.icl (last visited Nov. 10, 2003); *In re* Orthopedic Bone Screw Prods. Liab. Litig., MDL No. 1014, 1995 WL 925678 (E.D. Pa. Feb. 1, 1995); *see also* Brazil, *supra* note 1407, at 402–06 (describing the use of questionnaires to obtain claims-related information from thousands of claimants alleging damages from DDT contamination).

1463. *See* Brazil, *supra* note 1407, at 399–402 (describing the computer-based data-collection procedures used by special masters Francis McGovern and Eric Green in the Ohio asbestos litigation); *see also* Trends, *supra* note 1077, at 60–69 (discussing and evaluating the use of computer data in the Ohio asbestos litigation).

liability to one another for indemnification or contribution. Efforts to achieve global settlements through class certification, however, may not pass muster under Rule 23 or the due process clause. See discussion at sections 22.72, 22.73, 22.922. The parties may be able to resolve discrete sets of claims that significantly reduce or limit the scope of the litigation through a series of case-by-case, party-by-party settlements.[1464]

District judges have approved settlements affecting the rights of "future claimants" who have no present injury, even after *Amchem* and *Ortiz*. However, they have done so only in cases involving claimants who could be identified and given notice, and after scrutiny to ensure that Rule 23 was satisfied, including the requirement of adequate representation both to those presently injured and to those exposed but not presently injured. Courts have approved settlements that included protections for those who knew that they had been exposed to a potentially injurious substance but did not know if injury would result or whether it would be disabling or much less severe. Such protections have included the opportunity to opt out if and when injury is manifested or its extent is apparent. See discussion of back-end opt outs in section 22.922 and the discussion of future claimants in section 21.612.

Parties that are unable to agree on a global settlement may still be able to agree on a process for resolving the litigation. For example, in cases involving immature torts, the parties may agree to use test-case trials to establish a range of values for resolving similar claims. Alternatively, they may agree to draw a representative sample of claims and resolve the sample through mediation, arbitration, or another form of alternative dispute resolution.[1465] Information generated through trials or ADR processes might enable the parties to arrive at a reasonable estimate of the value of the aggregate claims from which they drew the sample. Alternative dispute resolution techniques (e.g., summary jury trials) may assist the parties in valuing cases for settlement purposes and give the court and parties information about the viability of various trial options.[1466] Yet another approach is to appoint a special master to facilitate settlement by reviewing information on liability and damages and placing an estimated value

---

1464. *See, e.g., Ortiz*, 527 U.S. at 822–28 (reciting the history of asbestos litigation and *Fibreboard*'s settlements). The hazards of partial settlements are discussed in *supra* sections 13.21 and 21.651.

1465. *See* Brazil, *supra* note 1407, at 403, nn.37–38.

1466. *See, e.g., In re* Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig., 137 F. Supp. 2d 985, 993–94 (S.D. Ohio 2001) (illustrating the advantage of a summary jury trial).

on each claim. Judges have used this approach with considerable success in both single-incident and dispersed mass tort litigation.[1467]

Approaches to resolving presently identifiable future claims on a class-wide basis must meet the Supreme Court's standards for opt-out or limited fund settlement class actions. See sections 22.72 and 22.73.[1468] In some cases, litigants have invoked the bankruptcy process as a settlement vehicle for mass tort litigation. See section 22.5. The issues presented by the need for court approval of settlement classes in mass tort cases are fully discussed in the following section.

## 22.92  Review of Settlement in Mass Tort Class Actions

.921 Class Certification in a Settlement Context  450
.922 Fairness, Adequacy, and Reasonableness of the Settlement  453
.923 Criteria for Evaluating the Merits of a Proposed Settlement  454
.924 Gathering Information and Conducting a Fairness Hearing  456
.925 Evaluating Nonmonetary Benefits  460
.926 Presenting the Decision  460
.927 Awarding and Allocating Attorney Fees  461

Federal Rule of Civil Procedure 23(e) calls for the court to review "any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class" and to "direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." Judicial review requires two separate determinations: first, whether the proposed settlement class satisfies the criteria for

---

1467. *See* William W Schwarzer, Nancy E. Weiss, & Alan Hirsch, *Judicial Federalism in Action: Coordination of Litigation in State and Federal Courts,* 78 Va. L. Rev. 1689, 1715–20 (1992) (discussing settlement techniques used in the L'Ambience Plaza building collapse litigation and in the MGM Grand Hotel fire litigation).

1468. Cases involving future claimants in narrow contexts, such as single-incident torts involving a small number of claims, do not appear to raise the problems of adequacy of representation or due process of law that were present in *Amchem.* For example, the court in one case set aside a portion of settlement funds to purchase an annuity, to fund a trust to pay future benefits, or to provide diagnostic services to cover future injuries to known plaintiffs. The fund allowed the parties to accommodate such contingencies as medical developments, expenses, and economic losses after the date of the settlement. Friends for All Children, Inc. v. Lockheed Aircraft Corp., 746 F.2d 816 (D.C. Cir. 1984) (affirming preliminary injunction requiring a corporate defendant that had conceded liability and settled some cases to provide funds for diagnostic, treatment, and educational services for plaintiffs awaiting trial). Similarly, to deal with concerns about the possibility of actions being instituted after the settlement—for example, by minors with respect to whom the statute of limitations may have tolled—a court reserved settlement funds to pay such claims when asserted later. *See, e.g., In re* MGM Grand Fire Hotel Litig., 570 F. Supp. 913, 929 (D. Nev. 1983).

certification under Rules 23(a) and (b);[1469] and second, whether the proposed settlement terms are fair, reasonable, and adequate. Rule 23(e)(1)(C) requires the court to make such determinations "only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate." This subsection analyzes the Rule 23(a) and (b) criteria for certifying a settlement class, the process of gathering information and conducting a Rule 23(e) hearing on the fairness of a proposed settlement, and the criteria for evaluating the merits of a proposed settlement.[1470]

## 22.921 Class Certification in a Settlement Context

Even if the parties have agreed to settle a case on a class-wide basis, the court must determine whether the proposed class satisfies all the requirements of Rule 23(a) (numerosity, typicality, commonality, and adequacy of representation) and either Rule 23(b)(1), (2), or (3).[1471] As discussed in sections 21.6 and 22.71, a settlement in a class action can arise in several ways: (1) a class action may have previously been certified as a litigation class and a settlement reached after certification; (2) a proposed class action may be presented for certification as a settlement class after pretrial discovery has taken place and certain motions have been decided; or (3) a proposed class action may be filed simultaneously with motions to certify the class for settlement and to approve the settlement terms. In the third category, there may or may not have been litigation before the settlement and certification motions were presented.

Each of the three categories raises different issues. If the case has been filed as a settlement class, with little or no prior litigation, there may be insufficient information to determine whether the class can properly be certified under Rules 23(a) and (b) and whether the settlement terms can properly be approved as fair, adequate, and reasonable. Judicial review should be proactive. The parties who support the settlement may have previously reached agreements with potential objectors, calling for them to refrain from objecting or to withdraw objections previously filed. If individual damages are small, there may be insufficient incentive for objectors to participate. The judge may have little or no adversarial presentation to assist in exploring the settlement terms and determining whether the terms are fair to the absent class members.

---

1469. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997) (finding that "the 'class action' to which Rule 23(e) refers is one qualified for certification under Rule 23(a) and (b)").

1470. For an example of a trial court's post-*Amchem* evaluation of a personal injury class settlement, see *In re Diet Drugs Products Liability Litigation*, MDL No. 1203, 2000 U.S. Dist. LEXIS 12275 (E.D. Pa. Aug. 28, 2000).

1471. *Amchem*, 521 U.S. at 613–14.

If the case has been litigated extensively, the judge may have sufficient reliable information to determine whether the class should be certified and whether the settlement terms are the fair, reasonable, and adequate result of arms-length negotiations. Mass torts rarely come before a court for class settlement without extensive pre-settlement litigation; lack of information about the issues and the litigants is usually not a problem for the court. Nonetheless, it is important to have an informed understanding of the dynamics of the settlement discussions and negotiations, the participants, and the steps taken by those negotiating on the plaintiffs' behalf to protect the procedural and substantive rights and interests of those whose claims they propose to settle. A judge should consider conducting such an inquiry in chambers if necessary to preserve confidential aspects of the negotiations.

If, however, the parties have reached settlement simultaneously with or shortly after filing the case and there is little prior related litigation, the parties must provide sufficient information to support their contentions regarding each applicable element of Rules 23(a) and (b) and the settlement's fairness, adequacy, and reasonableness. The judge must make specific findings on certification and settlement approval and must ensure that there is a record to support those findings.

In considering the Rule 23(a) factors, the Court in *Amchem* and *Ortiz* gave paramount importance to the district court's assessment of the adequacy of class representation.[1472] Accordingly, the judge should examine the interests of all groups, including any future claimants, and make affirmative findings that each group is adequately represented by claimants and counsel who have no conflicting interests.[1473] Sometimes it is necessary to create subclasses to accommodate divergent interests.[1474] For a discussion of numerosity, typicality, and commonality under Rule 23(a), see section 21.141.

Even if the proposed settlement class action meets all four Rule 23(a) requirements, it must also meet the requirements of at least one of the subsections of Rule 23(b), with the exception of trial manageability. Section 22.73 discusses whether a proposed mass tort class action meets the post-*Ortiz* standards for certification under Rule 23(b)(2) as a "limited fund" class. Section 22.74 discusses whether a proposed mass tort class action meets the standards for certification as a medical monitoring class under Rule 23(b)(2).

---

1472. *See supra* section 21.26; Ortiz v. Fibreboard Corp., 527 U.S. 815, 831–32 (1999) (noting that the lower court fell short of its duty to apply *Amchem* when it failed "to ensure that the potentially conflicting interests of easily identifiable categories of claimants be protected by provisional certification of subclasses under Rule 23(c)(4)").

1473. *See Amchem,* 521 U.S. at 625–27.

1474. *Id.* at 627.

In evaluating whether common questions of law or fact predominate over individual issues, the court should

- determine whether the alleged injuries arose from a single incident and therefore might be more likely to have common issues predominate than in a dispersed mass tort;[1475]

- focus "on the legal or factual questions that qualify each class member's case as a genuine controversy";[1476]

- look for variations in individual factual issues that may arise out of different levels and timing of exposure, different types of injuries and levels of damages, and different issues of causation; and

- consider whether "[d]ifferences in state law . . . compound [any] disparities."[1477]

In evaluating whether a proposed settlement class action is "superior to other available means for the fair and efficient adjudication of the controversy,"[1478] the judge must consider the following factors:

- whether the proposed settlement[1479] is manageable;[1480]

- whether, given the individual stakes for members of the proposed class, potential class members have an interest in "individually controlling the prosecution . . . of separate actions," recognizing that as the amount of damages at stake increases, a class member's interest in individual control typically increases;[1481] and

---

1475. *Id.* at 625 (referring to the 1966 advisory committee note to Rule 23(b)(3) where the Court stated a "mass accident" resulting in injuries to numerous persons is "ordinarily not appropriate for a class treatment").

1476. *Id.* at 623. The court explicitly held that a common interest in a fair settlement cannot be used to satisfy the predominance test. *Id.*

1477. *Id.* at 624. Because the case is to be settled and not tried, variations in state laws that might make a class-wide trial unmanageable might not defeat certification for settlement purposes. *Id.* at 620, 636. See also *In re Diet Drugs Products Liability Litigation*, MDL No. 1203, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000), describing the litigation and ultimate settlement of claims for medical monitoring, economic loss, and present and future personal injuries arising from ingesting diet drugs.

1478. Fed. R. Civ. P. 23(b)(3). The rule lists four factors that might affect superiority. *Id.*

1479. *Amchem,* 521 U.S. at 620 ("a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial").

1480. *See, e.g., Diet Drugs,* 2000 WL 1222042, at *43, *49 (settlement approval opinion discussing the fact that the settlement contemplates a national matrix based on the type of injury and does not require variable treatment based on state law).

1481. *Amchem,* 521 U.S. at 616–17 (quoting the advisory committee's reporter, Benjamin Kaplan, to the effect that the "interest [in individual control] can be high where the stake of each member bulks large and his will and ability to take care of himself are strong; the interest may be

- whether other settlements have been presented to other courts, and, if so, the status of those actions and whether any determinations in other courts might preclude certification of the class proposed.

## 22.922 Fairness, Adequacy, and Reasonableness of the Settlement

Claimants in many personal injury dispersed mass torts may range from those with severe present injuries to those with minor present injury to those with no present injury whatsoever. A variety of techniques acknowledge these differences and still achieve broad settlements that courts have found to be fair, reasonable, and adequate. Some of these techniques are listed below:

- *Back-end opt-outs*. This is a deferred opportunity for an absent class member to request exclusion from the class until a certain point in the future. A class member who does not have a present injury may postpone the decision on whether to remain in the class and accept the settlement or opt out to pursue separate litigation.

  This decision may be deferred until the class member discovers that the past exposure has resulted in an injury.[1482] This differs from a front-end decision to opt out because the back-end opt-out class member may be bound by an agreement to give up certain rights, such as any right to punitive damages.[1483] This type of opt-out depends on identifying the class members and giving them adequate notice of their right to accept a present settlement, opt out, or, if they have no present injury, defer the decision. Individuals who ingested an identified prescription drug can, for example, be readily identified and provided such notice. A back-end opt-out provision may not be appropriate if the absent class members cannot be identified or provided notice of the deferred right to request exclusion.

no more than theoretic where the individual stake is so small as to make a separate action impracticable" and that "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'" (citation omitted)).

1482. *See, e.g., Diet Drugs*, 2000 WL 1222042, at *20–*21, *26, *39 (E.D. Pa. Aug. 28, 2000) (describing back-end opt-out provisions and concluding that they contribute to resolving potential notice problems).

1483. *Id.* at *20. In a settlement involving an allegedly defective heart valve, class members who did not opt out of a settlement retained their right to sue the manufacturer, subject to all defenses, in the event that a heart valve fractured at any time. Bowling v. Pfizer, Inc., 143 F.R.D. 141, 170 (S.D. Ohio 1992). In those cases, class members also had the option of accepting an amount specified in the settlement or proceeding to arbitration against the defendant who waived all defenses to proceeding in arbitration. *Id.*

- *Limits on opt-outs.* Defendants often condition a settlement in a Rule 23(b)(3) class on having the number of opt-outs remain at or below a certain percentage or number of absent class members, commonly known as a "blow-out" clause. This is particularly significant in cases with a large number of claims that might support individual litigation. In the event the number of opt-outs exceeds the parties' expectations, the parties may attempt to renegotiate the settlement terms. In that event, there may be a need for additional notice to the class members.[1484]

- *Using claims facilities.* Where the value of the personal injury claims varies, courts have approved settlements that establish fixed amounts for injuries that meet defined criteria and create claims facilities to administer the claims process.[1485] The parties may establish an administrative appeal process, an auditing process, or both, to review the claims of those dissatisfied with the application of the criteria. At least one court has found that such review processes help satisfy the fairness prong of Rule 23(e).[1486]

### 22.923 Criteria for Evaluating the Merits of a Proposed Settlement

For the most part, the judge's role in evaluating the merits of a proposed mass tort class settlement parallels the review of any other class action settlement. A judge examines the proposed settlement terms and determines "whether the compensation for loss and damage provided by the settlement is within the range of reason, taking into account the balance of costs to defendant and benefits to class members,"[1487] and "whether the claims process under the settlement is likely to be fair and equitable in its operation."[1488] Section 21.61 to 21.66 discusses standards and issues relating to review and administration of class action settlements generally. The following guidelines may

---

1484. *In re* Silicone Gel Breast Implant Prods. Liab. Litig., MDL No. 926, Order No. 27 (N.D. Ala. Dec. 22, 1995), *at* http://www.fjc.gov/BREIMLIT/ORDERS/orders.htm (last visited Nov. 10, 2003).

1485. *Diet Drugs*, 2000 WL 1222042, at *23–*24.

1486. *Id.* at *63.

1487. *In re* Prudential Ins. Co. Am. Sales Practices Litig., 148 F.3d 283, 324 n.73 (3d Cir. 1998) (citing William W Schwarzer, *Settlement of Mass Tort Class Actions: Order Out of Chaos*, 80 Cornell L. Rev. 837, 843–44 (1995)). *See also* Tidmarsh, *supra* note 951, at 6 (observing that courts generally examined mass tort settlement class actions for "the strength of the plaintiff's case in relation to the settlement, the maturity of the litigation, the complexity of the case, and the objections to the settlement").

1488. *Prudential Ins.*, 148 F.3d at 324 n.73 (citing Schwarzer, *Mass Tort Class Actions, supra* note 1487, at 843–44).

help the judge to bring to light any serious defect in the settlement terms and ensure that a mass torts class settlement is fair, reasonable, and adequate.

A meaningful review of a proposed class settlement in a mass tort case requires an accurate understanding of what benefits the class members will actually receive and on what terms. Rule 23(e)(2) requires disclosure of any side agreements. See section 21.631. In a mass tort context, the parties must identify to the overseeing court any agreements that relate to the proposed settlement, such as agreements to settle "inventories" of individual cases in addition to the class settlement;[1489] agreements by lawyers not to bring certain types of cases in the future; collateral agreements that affect attorney fees;[1490] or other agreements relating to the factors discussed below.[1491] Active judicial oversight of the settlement process helps "prevent collusion between counsel for the class and defendant" and minimize the potential for unfair settlements.[1492]

Courts have identified certain features of settlement terms that, if uncorrected, should bar approval. Section 21.62 discusses factors that may affect class action settlements generally. Sections 21.631 discusses things to avoid in mass tort settlement, including the following:

- providing dissimilar treatment to persons with similar claims;[1493]

---

1489.  Unless the court makes a special effort, the clients in these "inventory settlements" have none of the formal procedural rights enjoyed by absent class members in litigation or settlement classes. Georgine v. Amchem Prods., Inc., 157 F.R.D. 246 (E.D. Pa. 1994) (appointing special master and comparing inventory settlements with class settlement), *vacated on other grounds*, 83 F.3d 610 (3d Cir. 1996), *aff'd sub nom.* Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997). *See, e.g.,* Tidmarsh, *supra* note 951, at 40–41 (discussing the "cloud of secrecy [that] hung over the negotiation process" in the Bjork–Shiley heart valve litigation and the settlement of large inventories of cases for greater sums than class members received).

1490.  *See, e.g., In re* Fine Paper Antitrust Litig., 98 F.R.D. 48, 70–75 (E.D. Pa. 1983) (describing agreements among attorneys regarding the structure and composition of committees to represent a class of plaintiffs), *aff'd in part, rev'd in part,* 751 F.2d 562 (3d Cir. 1984).

1491.  John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action,* 95 Colum. L. Rev. 1343, 1367–79 (1995). For a post-*Amchem* analysis of the structural and procedural alternatives for the protection of class members' interests in the mass tort settlement context, see John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370 (2000).

1492.  Manuel L. Real, *What Evil Have We Wrought: Class Action, Mass Torts, and Settlement,* 31 Loy. L.A. L. Rev. 437, 449 (1998); *see also* Tidmarsh, *supra* note 951, at 6 ("[c]ollusion was also frequently mentioned" by judges in reviewing mass tort settlement class actions).

1493.  *See, e.g.,* Georgine v. Amchem Prods., Inc., 83 F.3d 610, 630–31 (3d Cir. 1996) (comparing class settlement's treatment of various types of present and future claimants), *aff'd sub nom.* Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997).

- splitting claims of class members for injuries or losses arising out of the same or related occurrences and excluding some claims from the settlement (e.g., potentially precluding personal injury claims when settling medical monitoring claims or economic claims for breach of warranty);[1494]

- settling an inventory of pending cases at a premium level and future cases at lesser amounts;[1495]

- allowing duplicative or overlapping attorney fees both for serving as class counsel and for representing individual plaintiffs;

- using strict eligibility criteria for receipt of settlement proceeds to mask the fact that the settlement benefits that will be distributed are far less than the stated value of the settlement fund made available;

- permitting defendants to select certain plaintiffs' counsel with whom to negotiate a precertification and perhaps prefiling a settlement class action, resulting in a settlement with the lowest bid (a so-called reverse auction);

- restricting the ability of individuals to opt out of a settlement;

- providing illusory benefits, such as coupons, to class members while providing attorneys with fees calculated by valuing illusory class benefits at an unrealistically high level (see section 22.925); and

- calculating attorney fees on the basis of the maximum value of benefits set aside for the class members, rather than on the amounts actually distributed, particularly when an elaborate claims procedure reduces or minimizes the amounts distributed and the settlement provides that unclaimed benefits revert to the defendants.

## 22.924 Gathering Information and Conducting a Fairness Hearing

Reviewing a settlement consists of (1) a hearing and preliminary findings on the fairness, reasonableness, and adequacy of the proposed settlement; (2) review of any notice to the class; and (3) a final fairness hearing to make a final determination. Section 21.63 discusses the process.

---

1494. *See generally,* Schwarzer, *Mass Tort Class Actions, supra* note 975, at 843–44. For an example and discussion of the possible effects of this type of claim-splitting, see *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation,* 209 F.R.D. 323, 339–41 (S.D.N.Y. 2002).

1495. *See, e.g.,* Georgine v. Amchem Prods., Inc., 157 F.R.D. 246, 295–304 (E.D. Pa. 1994) (discussing relation of inventory settlement and class settlement), *vacated on other grounds,* 83 F.3d 610 (3d Cir. 1996), *aff'd sub nom.* Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997).

Reviewing a proposed settlement requires objective information about factors related to class certification and to the fairness and reasonableness of the proposed settlement.[1496] The parties will be advocates for the settlement they have crafted; without direction from the court, they may not volunteer all the information the court needs to understand fully the settlement terms and their effect. Settlement class actions pose special challenges because they may not include an underlying record of discovery or other adversarial activity bearing on the merits of the dispute.

In some cases, objectors may provide an adversarial scrutiny of the proposed certification and settlement terms. Section 21.643 discusses the role of objectors in class actions generally and the differences between class-based objections and individually based objections. At their best, objectors may speak out on behalf of class interests that have not been fully represented or accounted for in the proposed settlement. On the other hand, some objectors may represent narrow self-interests and seek to impede or delay a settlement until those interests are accommodated.

To fulfill their role under Rule 23(e),[1497] judges may find it helpful to undertake the following steps:

- Identify and require the parties to provide information useful for evaluating the proposed settlement, particularly information relating to the merits of the claims and defenses and the historic values of cases involving the same or similar claims and defenses. See section 21.631.[1498]

- Require disclosure of side agreements among the parties or lawyers relating to the terms or implementation of the settlement, including eligibility for, or amounts and allocation of, attorney fees.[1499]

- Permit focused discovery by objectors on a showing of need. In considering such discovery requests, consider whether the objectors represent a large and potentially discrete group whose interests were not

---

1496. *See* Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform,* 58 U. Chi. L. Rev. 1, 46 (1991) (asserting that "trial courts may simply lack information to make an informed evaluation of the fairness of the settlement").

1497. *See supra* section 21.61. For a descriptive case study discussing ways that judges evaluated settlements and attorney fees in a select group of substantial cases, see Deborah Hensler et al., Class Actions Dilemmas: Pursuing Public Goals for Private Gain 460–66 (2000).

1498. *See also* Bowling v. Pfizer, Inc., 143 F.R.D. 138, 140 (S.D. Ohio 1992) (requesting information, including *in camera* disclosure of all prior settlements involving the Bjork-Shiley heart valve).

1499. *See, e.g., In re* Chambers Dev. Sec. Litig., 912 F. Supp. 852, 867 (W.D. Pa. 1995) (ordering counsel to disclose side agreements pertaining to attorney fees).

*Manual for Complex Litigation, Fourth*

accommodated in the settlement. It is important to distinguish between objectors' discovery into the merits of the claims and defenses in relationship to the fairness, reasonableness, and adequacy of the proposed settlement,[1500] and discovery into the settlement negotiations, which courts have refused to permit absent evidence of collusion.[1501]

· Consider establishing a special settlement discovery court to be convened on a regular basis during the period leading up to the final fairness hearing.[1502]

· List specific issues and concerns that bring into question the fairness, reasonableness, and adequacy of the proposed settlement, and give the parties an opportunity to explain or renegotiate the settlement before the court rules.[1503]

· Appoint one or more adjuncts, such as a magistrate judge, guardian *ad litem*,[1504] special master,[1505] or court-appointed expert[1506] to assist in gathering information and in evaluating the proposed settlement.

1500.  *See, e.g.,* Georgine v. Amchem Prods., Inc., 157 F.R.D. 246, 260 n.9 ("Objectors were given the opportunity to probe into facts surrounding the proposed settlement through depositions of relevant persons. . . . In all, thousands of pages of documents were produced and over thirty depositions took place during the discovery period."); *see also* Tidmarsh, *supra* note 951, at 5, 12 (finding that "[t]wo of the [five] cases (*Georgine* and *Ahearn*) permitted broad rights of discovery to objecting parties").

1501.  *See* Bowling v. Pfizer, Inc., 143 F.R.D. 141, 153 n.10 (S.D. Ohio 1992); *see also* Charles Alan Wright et al., Federal Practice and Procedure § 1797.1, at 413 (2d ed. 1986).

1502.  *See, e.g., In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, Order No. 1071 (E.D. Pa. Jan. 28, 2000), *at* http://www.fenphen.verilaw.com/search_common.icl (last visited Nov. 10, 2003) (establishing a special discovery court to meet weekly prior to the fairness hearing).

1503.  *See* Bowling v. Pfizer, Inc., 143 F.R.D. 138, 140–41 (S.D. Ohio 1992) (listing six concerns, continuing the fairness hearing after three days, and directing the parties to report on any changes in the proposed settlement when the hearings resume).

1504.  *See, e.g.,* Ortiz v. Fibreboard Corp., 527 U.S. 815, 827, 854 (1999) (noting the appointment by the district court of a law professor as guardian *ad litem* and citing the guardian's report on a factual matter). The district judge requested the guardian *ad litem* in *Ortiz* "to review the settlement from the point of view of members of the class and thereby to afford the class additional assurance that their interest will be adequately protected." *In re* Asbestos Litig., 90 F.3d 963, 972 (5th Cir. 1996), *rev'd sub nom* Ortiz v. Fibreboard, 527 U.S. 815 (1999). *See also* Miller v. Mackey Int'l, Inc., 70 F.R.D. 533, 535–36 (S.D. Fla. 1976) (using its residual authority under Rule 23(d)(5), the district court appointed a guardian *ad litem* to represent the interests of the class in responding to plaintiffs' attorneys' requests for fees). *See generally* Macey & Miller, *supra* note 1496, at 47–48 (suggesting that judicial review of class action settlements could be improved by the use of guardians *ad litem* to represent the interest of the class).

1505.  *See, e.g.,* Georgine v. Amchem Prods., Inc., 157 F.R.D. 246, 257–58 (E.D. Pa. 1994) (indicating that the parties "filed a joint motion for appointment of a special master to assist the

- In a limited fund settlement, permit additional discovery by objectors or an independent evaluator to examine whether a limited fund exists and meets the standards set forth in Rule 23(b)(1) and *Ortiz*.[1507]
- Allow some trial-type procedures for the fairness hearing, such as the receipt of sworn testimony subject to cross-examination.[1508] Whether an evidentiary hearing is necessary will depend on the facts and circumstances of the case, including the extent to which there are objections to the settlement or reasons for the court to be skeptical of its fairness.[1509]

A court should also consider whether class members who did not opt out initially should receive a second opportunity to opt out after a settlement is reached. Rule 23(e)(3) grants the court authority to refuse to approve a settlement that does not afford an opportunity for members of the proposed class to opt out after the parties announce the settlement terms. See section

court during the discovery process, and to review sensitive and confidential information relevant to these proceedings"), *vacated on other grounds*, 83 F.3d 610 (3d Cir. 1996), *aff'd sub nom* Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997). *See generally* FJC Study, Special Masters, *supra* note 704 (reporting empirical findings about the use of special masters at pretrial and posttrial stages of civil litigation).

1506.  *See, e.g.,* Williams v. City of New Orleans, 543 F. Supp. 662 (E.D. La. 1982) (evaluation of a consent decree in the face of objections from intervenors); Ohio Pub. Interest Campaign v. Fisher Foods, Inc., 546 F. Supp. 1, 4, 11 (N.D. Ohio 1982) (court-appointed expert who played "key role in the lengthy, protracted, and heated negotiations" testified that the resulting settlement was "fair, reasonable, and adequate"); *but cf. In re* Armored Car Antitrust Litig., 472 F. Supp. 1357, 1375 (N.D. Ga. 1979) (court-appointed expert on damages was unnecessary because "educated estimate[s]" of the parties were sufficient to support evaluation of proposed settlement). *See also* Real, *supra* note 1492, at 448–49 (advocating that judges "know the details of how a settlement has been reached," which "may require consultation with independent experts—available under Rule 706 of the Federal Rules of Evidence—who have knowledge of the business or industry that gave rise to the injury or damages").

1507.  *Ortiz,* 527 U.S. at 853–54; *see also id.* at 864 ("[I]t would be essential that the fund be shown to be limited independently of the agreement of the parties to the action . . . ."). *See also* section 22.73.

1508.  *See, e.g., In re* The Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 325 (3d Cir. 1998) ("Objectors are 'entitled to an opportunity to develop a record in support of [their] contentions by means of cross-examination and argument to the court.'" (quoting Greenfield v. Villager Indus., Inc., 483 F.2d 824, 833 (3d Cir. 1973))); *see also* Tidmarsh, *supra* note 951, at 5, 12 (finding that "[t]wo of the [five] cases (*Georgine* and *Ahearn*) . . . used trial-like procedures at the fairness hearing.").

1509.  *See* Wright, *supra* note 1501, § 1797, at 354, and cases cited therein (stating "whether an evidentiary hearing is necessary before the approval of a proposed settlement and the extent of the testimony that may be allowed at any hearing that is held depends on the circumstances of each case").

21.611 for a discussion conditioning settlement approval on the extension of a second opt-out opportunity.

### 22.925 Evaluating Nonmonetary Benefits

Determining the fairness, adequacy, and reasonableness of a settlement, and determining the reasonableness of attorney fees, presupposes that the court can place a value on the parties' settlement terms. Establishing a value for nonmonetary benefits, such as coupons, stock, or other contingent promises to pay a benefit of uncertain value, represents a special challenge. Experts sometimes can assist in determining a market value for coupons or other nonmonetary settlement proceeds.[1510]

Establishing a value of medical monitoring remedies for individual class members may present a particularly difficult challenge. If the law of the state supports medical monitoring in the form of payments for monitoring examinations, the value will depend on the number of people who actually use the monitoring made available, which may require the court to defer valuation.[1511]

If the judge assigned to the case has actively assisted the parties in crafting a proposed settlement, transferring the case to another district judge to review the settlement may be appropriate.[1512] Some judges who have participated in settlement negotiations, however, believe that they are better equipped to review the settlement because they know its provisions and the compromises that went into its creation.[1513] One judge, for example, suggests that judicial oversight of the settlement process allows the judge to "[a]ssess fairness and reasonableness of the settlement to all class members, and make findings as to the value to each individual plaintiff."[1514]

### 22.926 Presenting the Decision

The fairness hearing should create a record sufficient to determine whether the proposed settlement is fair, reasonable, and adequate to the class and to

---

1510. *See, e.g., In re* Auction Houses Antitrust Litig., No. 00-0648, 2001 WL 170792, at *10 (S.D.N.Y. Feb. 22, 2001).

1511. *In re* Diet Drugs Prods. Liab. Litig., No. CIV.A. 98-20626, 1999 WL 673066, at *18–*19 (E.D. Pa. Aug. 26, 1999) ("Absent class treatment, the class members will be unable to obtain the benefit of collection and research of medical data and thereby better understand issues such as latency periods and techniques of diagnosis of the diseases . . . .").

1512. *See, e.g.,* Georgine v. Amchem Prods., Inc., 157 F.R.D. 246, 258 (E.D. Pa. 1994).

1513. *See* Hon. S. Arthur Spiegel, *Settling Class Actions*, 62 U. Cin. L. Rev. 1565, 1569 (1994) (indicating that "the judge who was involved in the settlement negotiations will be in a better position to consider objections at the fairness hearing, particularly in a complex case").

1514. Real, *supra* note 1492, at 450.

support findings of fact and conclusions of law. See section 21.635. Section 21.66 discusses issues that may arise during the administration of a class action settlement.

Occasionally, a proposed settlement will directly affect cases that are pending in other courts. The parties may, for example, agree to dismiss related cases pending in a state court or another federal court.[1515] It is important to communicate clearly and directly with the other courts to prevent any misunderstandings. Section 20.31 discusses state–federal coordination. If counsel are charged with communicating with the other courts, it is helpful to specify that responsibility and to follow up, if necessary, to enforce counsel's duty.[1516] If proceedings in other courts threaten the integrity of the certified class settlement and the ability of the court to enforce the approved class action settlement terms, the court presiding over the class action should consider whether to enjoin the parties from proceeding further in derogation of the certified class action, as discussed in section 21.42.

## 22.927  Awarding and Allocating Attorney Fees

Section 14.12 discusses standards for reviewing attorney fee petitions in common fund class actions. Section 14.21 discusses techniques for simplifying and expediting the review of attorney fee applications.

Linking attorney fees to the value of the settlement benefits actually received by class members is especially important in mass tort litigation. Settlements that call for nonmonetary or deferred payments—such as medical monitoring, the contingent payment of future claims, or coupons for repair or replacement of allegedly defective products—should either be assigned an accurate present value or the payment of attorney fees should be delayed until benefits are in fact distributed to class members and the court knows how much they actually received.[1517]

A major difference between mass torts and other class actions is that class members in mass tort litigation are often represented by individually retained

---

1515. *See, e.g.,* Syngenta Crop Protection, Inc. v. Henson, 537 U.S. 28, 30–31 (2002) (describing setting in which parties agreed to dismiss stayed state case and plaintiff informed court that agreement was limited to some claims). The Court held that the All Writs Act did not provide an independent source of federal jurisdiction and could not be used to remove a diversity case to federal court. *Id.* at 33–35.

1516. *Id.* at 31–32 (imposing sanctions that were upheld on appeal).

1517. *See generally,* Bowling v. Pfizer, Inc., 132 F.3d 1147 (6th Cir. 1998) (overarching principle is to compensate counsel for benefits actually conferred on the class).

plaintiffs' attorneys.[1518] In a class action or in federal litigation that has been centralized by the Judicial Panel on Multidistrict Litigation, the transferee judge generally appoints class counsel to litigate common issues and prepare the case for trial or settlement.[1519] Individually retained attorneys may conduct discovery, motions practice, and settlement negotiations on behalf of individual clients. If an MDL case proceeds to trial in federal court, individual attorneys may handle aspects of the trial, such as individual exposure and damages.[1520] If a related case proceeds to trial in state court, individual attorneys represent their clients, with or without the use of discovery conducted in the MDL proceedings. Individually retained counsel have contingent fee arrangements, and counsel for the class or the MDL counsel steering committee may represent individual class members under such agreements.

Absent agreement among the attorneys, the court will have to allocate fees among the attorneys, a task that involves placing a value on the services provided by different attorneys.[1521] The judge can protect members of the class from excessive fees by limiting the amount of contingent fees awarded for pursuing individual claims in a common-fund settlement.[1522] If there is a combination of individual settlements and a class-wide settlement, the judge sometimes orders individual plaintiffs' lawyers to pay a certain percentage of

---

1518. *In re* Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295 (1st Cir. 1995). *See generally* Judith Resnik et al., *Individuals Within the Aggregate: Relationships, Representation, and Fees*, 71 N.Y.U. L. Rev. 296, 300 (1996). *See also* Dennis E. Curtis & Judith Resnik, *Contingency Fees in Mass Torts: Access, Risk, and the Provision of Legal Services When Layers of Lawyers Work for Individuals and Collectives of Clients*, 47 DePaul L. Rev. 425 (1998).

1519. *See, e.g., Thirteen Appeals,* 56 F.3d at 300 ("The PSC [Plaintiffs' Steering Committee] members looked after the big picture: mapping the overarching discovery, trial, and settlement strategies and coordinating the implementation of those strategies.").

1520. *See, e.g., id.* ("The IRPAs [Individually-Retained Plaintiffs' Attorneys] handled individual client communication and other case-specific tasks such as answering interrogatories addressed to particular plaintiffs, preparing and attending the depositions of their clients, and taking depositions which bore on damages."). IRPAs also worked with a settlement judge to negotiate appropriate settlement values for individual claims and collaborated with PSC members in the trial of twelve representative claims.

1521. *See generally, Thirteen Appeals*, 56 F.3d at 309–11.

1522. *See, e.g., In re* Rio Hair Naturalizer Prods. Liab. Litig., MDL No. 1055, 1996 WL 780512, at *20–*21 (E.D. Mich. Dec. 20, 1996) (limiting contingency fee contracts with individual class members to 5% of limited fund class settlement); *In re* A.H. Robins Co., 86 F.3d 364, 377–78 (4th Cir. 1996) (upholding district court's limit of 10% on contingent fees for supplemental payments from settlement trust); *In re* Joint E. & S. Dists. Asbestos Litig., 878 F. Supp. 473, 561–62 (E.D.N.Y. & S.D.N.Y. 1995) (contingency fee contracts reduced from 33.3% to 25%); *In re* Beverly Hills Fire Litig., 639 F. Supp. 915, 924–25 (E.D. Ky. 1986) (class members' individual attorneys' contingency fees limited to 6.3% of the individual client's award).

the fees they received into a common fund to contribute to the fees of the class counsel, whose work in discovery and trial preparation contributed to the settlement of the individual cases as well.[1523] Section 20.31 discusses some state–federal considerations in setting such fees. Typically courts have also limited the percentage of a mass settlement allocated to attorneys representing the class or the MDL aggregate. See section 14.121.[1524]

## 22.93 Trial[1525]

For cases transferred to a court by the MDL Panel, the initial question is whether the transferee court has authority to conduct trials of the cases at all. The Supreme Court ruled in *Lexecon* that a transferee court did not have the authority to transfer cases from another district to itself by ruling on a pretrial motion for change of venue.[1526] Nothing in that decision, however, precludes the transferee judge from presiding over cases that litigants filed in the transferee district originally, that transferor courts transferred by ruling on motions change venue, or that the parties consented to have tried in the transferee district. Section 20.132 discusses these and other practices relating to the trial of cases in transferee courts.

The structure of the trial should be addressed as early in the pretrial process as is feasible. Judges often require the parties to submit detailed trial plans early in the case and to modify the plans as the case develops. Such plans assist the court and the parties in determining what issues, claims, and defenses

---

1523. *See, e.g., In re* Diet Drugs Prods. Liab. Litig., MDL No. 1203, Order No. 467 (E.D. Pa. Feb. 10, 1999), *at* http://www.fenphen.verialw.com/search_common.icl (last visited Nov. 10, 2003) (ordering defendants to withhold a fixed percentage from settlements and pay those amounts into a common fund); *see also In re* Silicone Gel Breast Implants Prods. Liab. Litig., MDL No. 926, unnumbered order (N.D. Ala. Oct. 7, 1998), *at* http://www.fjc.gov/BREIMLIT/ ORDERS/orders.htm (last visited Nov. 10, 2003) (denying attorneys' motions for relief from Order No. 13, requiring payment of 6% of settlements into a "common benefit" fund); *see also In re* Showa Denko K.K. L-Tryptophan Prods. Liab. Litig. II, 953 F.2d 162, 166 (4th Cir. 1992) (holding that fee-withholding orders in MDL cases can only be applied to cases that were within the jurisdiction of the MDL transferee court).

1524. *See also* Tidmarsh, *supra* note 951, at 14 (documenting class counsel fees in mass tort settlement class actions ranging from 3% (*Georgine/Amchem* and *Ahearn*) to 6% (silicone gel breast implants) to 10% (Bjork–Shiley heart valve litigation) and stating limits on fees to attorneys for individual class members). *See also* Rheingold, *supra* note 1271, §§ 7:40 to 7:47 (detailing fee arrangements in L-Tryptophan, swine flu vaccine, breast implant, Neptune Society, Shell Oil (Watson), MGM Grand, and Bjork–Shiley cases, a mixture of class action and MDL litigations).

1525. For discussion of complex trials generally, see *supra* section 12.

1526. Lexecon, Inc. v. Milberg, Weiss, Bershad, Hynes & Lerach, 523 U.S. 26 (1998).

may apply across groups and how to present the proof to a jury. If a mass tort litigation is to proceed by first adjudicating individual test cases, identification of those plaintiffs and discovery into their exposure and injury should occur at the earliest opportunity. If the trial is to be of consolidated groups of claimants with comparable exposure or injuries, the composition of those groups should be defined during discovery and pretrial motions stages.

In general, a consolidated or aggregated trial must take into account defenses and the measure of damages. A joint trial of common issues may be feasible, followed by separate trials of remaining issues.[1527] To avoid inconsistent adjudications and duplicative presentation of evidence, punitive damage claims should ordinarily be tried to the same jury that determined liability and overall compensatory damages, although in most cases the issue of punitive damages is bifurcated.[1528]

Test case trials of mass torts can draw on many of the standard practices for managing complex trials. See section 12. Similarities among the cases tried and cases pending trial may allow use of a standard pretrial order and application of rulings on evidentiary and trial issues. Videotaped expert testimony and use of a standard set of exhibits can streamline presentation of evidence. See sections 12.13 and 23.345.

---

1527. *See, e.g.,* Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1194–97 (6th Cir. 1988) (describing class trial of common liability issues, compensatory damages for representative plaintiffs, and punitive damages for class as a whole); Jenkins v. Raymark Indus., 782 F.2d 468, 470–71 (5th Cir. 1986) (describing asbestos intradistrict class trial plan for resolving liability issues, for punitive-damages liability and amount, and for state-of-the-art defense to be followed by consolidated minitrials of seven to ten plaintiffs); *cf. In re* Copley Pharm., Inc., "Albuterol" Prod. Liab. Litig., 161 F.R.D. 456, 468–70 (D. Wyo. 1995) (discussing class trial of common liability issues followed by individual trials in transferor courts to establish individual causation, damages, and punitive damages). *See also In re* Hanford Nuclear Reservation Litig., 292 F.3d 1124, 1139 (9th Cir. 2002) (recommending that court "resolve the pending motions for class certification as soon as possible, and . . . consider such certification only for questions of generic causation common to plaintiffs who suffer from the same or a materially similar disease"). *See also supra* section 22.75.

1528. *See, e.g., In re* The Exxon Valdez, 270 F.3d 1215, 1225 (9th Cir. 2001) (describing trial structure starting with a stipulation of negligence and providing separate phases for jury findings regarding liability for punitive damages, class compensatory damages, and class punitive damages, followed by individual compensatory damages); *Jenkins*, 782 F.2d at 470–71; *In re* Simon II Litig., 211 F.R.D. 86, 193 (E.D.N.Y. Oct. 22, 2002) (ordering three-stage trial: (1) determination of fraud and conspiracy claims and "estimated total compensatory claims" followed by (2) punitive liability issues followed by (3) "evidence of amount of harm suffered by the class [as result of conduct warranting punitive damages]") (appeal pending); *but cf. Albuterol*, 161 F.R.D. at 467–68 (rejecting inclusion of punitive damages in common issues trial because "punitive damages and punitive conduct should be determined on an individual basis").

In pursuing traditional or test case trials, the judge may conduct a unitary trial, bifurcate liability and damages,[1529] or create other helpful trial structures. A court must identify and minimize any risk of unfairness in requiring litigants to present claims or defenses in a piecemeal fashion. For example, the judge in the Bendectin litigation found the use of a trifurcated trial plan (causation, liability, damages) to be troubling yet concluded that, on balance, the procedure served overriding purposes of efficiency and fairness.[1530] Courts have recognized "a danger that bifurcation may deprive plaintiffs of their legitimate right to place before the jury the circumstances and atmosphere of the entire cause of action."[1531] In litigation concerning HIV contamination of the blood supply, one court held that a bifurcated trial plan calling for more than one jury interfered with the right of a defendant to present comparative negligence defenses against individual plaintiffs.[1532] In general, the Seventh Amendment entitles parties to have facts decided by one jury and prohibits a second jury from reexamining those facts.[1533] The test is whether the issues can be presented separately to different juries without generating "confusion" and "uncertainty."[1534]

Another approach is reverse bifurcation or reverse trifurcation, starting with individual damages. This is generally appropriate only when the degree of injury and the amount of damages are the primary issues in dispute.[1535]

Courts have found some approaches inappropriate. For example, one court rejected nonconsensual sampling and extrapolation of causation and damages in personal injury cases because these procedures contravened

---

1529.  *See, e.g.,* cases discussed in *supra* notes 1394–1405.

1530.  *In re* Bendectin Litig., 857 F.2d 290, 306–09, 315 (6th Cir. 1988).

1531.  *In re* Beverly Hills Fire Litig., 695 F.2d 207, 217 (6th Cir. 1982). *See also Bendectin*, 857 F.2d at 314–16.

1532.  *In re* Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1303 (7th Cir. 1995) (holding that a trial plan to determine defendant's negligence first while leaving determination of comparative negligence and proximate causation for a later jury would violate the Reexamination Clause of the Constitution); *see also In re* Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 209 F.R.D. 323, 334–35 (S.D.N.Y. 2002).

1533.  Castano v. Am. Tobacco Co., 84 F.3d 734, 750 (5th Cir. 1996).

1534.  *See* Gasoline Prods. Co. v. Champlin Ref. Co., 283 U.S. 494, 500 (1931) (a new trial on the single issue of damages could not be conducted "unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice"). *See* discussion at *supra* section 22.75 and text accompanying notes 1394–99.

1535.  *See, e.g.,* Angelo v. Armstrong World Indus., 11 F.3d 957 (10th Cir. 1993) (finding no abuse of discretion in trying issue of whether plaintiff had incurred an asbestos-related disease before liability issues); *see also Trends, supra* note 1077, at 102–04 (discussing use of various forms of bifurcation and trifurcation in asbestos litigation).

litigants' right to a jury trial under the Seventh Amendment and violated due process.[1536]

Courts and litigants have experimented with various trial structures to achieve greater efficiency and expedition in resolving mass tort cases. Some approaches are described below:

- *A series of individual trials against one or more defendants on all issues.* The verdicts in representative cases inform the parties as to a likely range of verdicts in other similar cases. For the most part, the silicone gel breast implant litigation and the diet drug litigation have followed this model, with most of the individual trials conducted at the state level.

- *A series of consolidated trials on all issues, if they are sufficiently common.*[1537] Each trial involves defined groups of similarly situated plaintiffs (e.g., a manageable number of coworkers from the same job site or homeowners who had the same type of siding installed by the same contractor) against one or more defendants,[1538] with special procedures, if necessary, to assist the jury in comprehending multiple claims against multiple parties. See section 12.42.

---

1536. *See* Cimino v. Raymark Indus., 151 F.3d 297, 319–22 (5th Cir. 1998) (holding that individual jury determinations of liability, injury, and damages are required by the Seventh Amendment in an asbestos mass tort personal injury context); *see also In re* Fibreboard, 893 F.2d 706, 711–12 (5th Cir. 1990) (holding that, as a matter of Texas product liability law, plaintiffs must show specific causation and individual injuries to establish a claim); *cf.* Hilao v. Estate of Marcos, 103 F.3d 767, 786–87 (9th Cir. 1996) (holding that, on balance, in an "extraordinarily unusual" case involving 10,000 injury claims, the use of statistical sampling and extrapolation to determine individual personal injury recoveries did not violate due process); *In re* Simon II Litig., 211 F.R.D. 86, 146–59 (E.D.N.Y. 2002) (discussing use of statistical extrapolation to establish class-wide liability and damages and concluding that statistical extrapolation comports with due process and the Seventh Amendment) (appeal pending).

1537. *See* Malcolm v. Nat'l Gypsum Co., 995 F.2d 346 (2d Cir. 1993) (reversing joint trial of forty-eight asbestos cases on ground that lack of commonality resulted in jury confusion). Consolidation of fewer than ten cases has been called "extremely effective." *See* McGovern, *Mature Mass Tort, supra* note 1022, at 688.

1538. *See, e.g.,* Michael J. Saks & Peter David Blanck, *Justice Improved: The Unrecognized Benefits of Aggregation and Sampling in the Trial of Mass Torts*, 44 Stan. L. Rev. 815 (1992). Statistical sampling, however, can be expected to yield accurate results only when the set of cases being tried is homogenous (i.e., similar injuries to similar plaintiffs under similar circumstances) and the sample is representative of the whole. Kenneth S. Bordens & Irwin A. Horowitz, *The Limits of Sampling and Consolidation in Mass Tort Trials: Justice Improved or Justice Altered?*, 22 Law & Psychol. Rev. 43, 47 (1998). In addition, where there is a serious question as to liability, a jury's knowledge that more than one plaintiff was injured can be expected to affect a jury's decision on liability. *Id.* at 59–60.

- *A consolidated common issues trial with some plaintiffs presenting their claims against defendants on all issues, yielding findings on common issues.* This works in a single-incident mass tort case,[1539] a property damage case,[1540] or a narrowly defined aspect of a dispersed mass tort (e.g., a case involving a single product and injuries allegedly incurred in a single work site or in a single state, within a limited time period).[1541] The remaining plaintiffs would have to prove specific causation and damages in later proceedings in which the findings on common issues from the first trial would apply. The individual issues may also be resolved through the procedures discussed immediately below involving trials of representative cases. Certain issues relating to liability may be severed under Federal Rule of Civil Procedure 42(b) from issues relating to causation or damages, and then consolidated as to multiple parties under Rule 42(a) for a joint trial.[1542] Federal courts have frequently concluded that dispersed mass tort personal injury

---

1539. *See, e.g., In re* The Exxon Valdez, 270 F.3d 1215 (9th Cir. 2001).

1540. *See, e.g.,* Mejdrech v. Met-Coil Sys. Corp., 319 F.3d 910 (7th Cir. 2003) (groundwater pollution claims); *In re* Sch. Asbestos Litig., 789 F.2d 996 (3d Cir. 1986); *but cf. In re* Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig., 288 F.3d 1012 (7th Cir. 2002).

1541. *See, e.g.,* Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620 (5th Cir. 1999) (approving certification of Jones Act common-liability issues as issues class and approving bifurcated trial with common issues trial followed by individual trials of causation and damages issues); Jenkins v. Raymark Indus., 782 F.2d 468 (5th Cir. 1986) (single class action trial of punitive damages and state-of-the-art defense followed by joint trials on individual issues with seven to ten plaintiffs); *see also* Watson v. Shell Oil Co., 979 F.2d 1014, 1017–20 (5th Cir. 1992), *reh'g granted,* 990 F.2d 805 (5th Cir. 1993), *other reh'g,* 53 F.3d 663 (5th Cir. 1994) (case settled before rehearing; panel affirmed a trial plan for determination of liability and punitive damages in conjunction with compensatory damages in twenty fully tried sample cases to be followed by full trials of other individual claims by a different jury). In that case, the first stage of the trial plan included the apportionment of liability between the two primary defendants. *See supra* section 11.632 and discussion at notes 1529–34. State laws precluding bifurcation may not be binding on the federal courts. *See* Rosales v. Honda Motor Co., Ltd., 726 F.2d 259 (5th Cir. 1984).

1542. *See, e.g., In re* Copley Pharm., Inc., "Albuterol" Prods. Liab. Litig., 161 F.R.D. 456, 468–70 (D. Wyo. 1995) (discussing trial plan in which class representatives' individual strict liability, negligence, and breach of warranty claims would be tried along with common issues relating to general causation, followed by individual trials in transferor courts on issues of individual causation, damages, and punitive damages); *see also* Foster v. Detroit, 254 F. Supp. 655 (E.D. Mich. 1966) (treating the post-liability condemnation claims of class members as not involving new issues of law or fact and delegating their resolution to a special master presiding over claims of class members), *aff'd,* 405 F.2d 138 (6th Cir. 1968); Samuel Issacharoff, *Administering Damage Awards in Mass Tort Litigation,* 10 Rev. Litig. 463, 471–80 (1991) (discussing administrative models for apportioning damage awards in mass contract, Title VII, and tort cases).

claims, particularly those involving the law of different states, cannot generally be tried on a consolidated or aggregated basis.[1543]

- *A consolidated trial on common issues followed by a stipulated binding procedure (such as arbitration or mediation) agreed to by the parties to resolve individual issues.*[1544] This type of approach to the individual issues encompasses possible test-case trials or special master adjudications. Such an approach is more feasible in a single incident mass tort than in a dispersed mass tort.

- *A stipulated resolution of all elements of individual claims according to a formula or by a hearing before an arbitrator, special master, or magistrate judge.* The court should ensure that the parties' waiver of the right to a jury trial is knowing and intelligent.

---

1543. *See generally* Castano v. Am. Tobacco Co., 84 F.3d 734 (5th Cir. 1996) (nationwide class action decertified); *In re* Rhone-Poulenc Rorer, Inc., 51 F.3d 1293 (7th Cir. 1995) (also class action decertified); *In re* Repetitive Stress Injury Litig., 11 F.3d 368 (2d Cir. 1993) (consolidation of cases reversed). *Cf. In re* Bendectin Litig., 857 F.2d 290 (6th Cir. 1988) (consolidation for bifurcated trial upheld); Jenkins v. Raymark Indus., 782 F.2d 468 (5th Cir. 1986) (district-wide class action trial of common issues approved).

1544. After the settlement of the class claims in *Jenkins* (discussed above), the court created a voluntary alternative dispute resolution procedure to handle future claims. The program had some initial success, but the court later judged it to be ineffective. Cimino v. Raymark Indus., 751 F. Supp. 649, 651 (E.D. Tex. 1990), *rev'd on other grounds*, 151 F.3d 297 (5th Cir. 1998).

# 23.  Expert Scientific Evidence

.1 Introduction   469
.2 The Use of Scientific Evidence in Complex Litigation  472
   .21 The Federal Rules of Evidence  472
   .22 The *Daubert* Trilogy  474
   .23 The *Daubert* Criteria  476
   .24 Opinions and Conclusions Under *Daubert*  478
   .25 The *Daubert* "Fit" Test  480
   .26 The Scope of Appellate Review  482
   .27 Emerging Issues in the Use of Scientific Evidence  484
     .271 The Validity of Toxicological Evidence Versus Epidemiological Evidence  485
     .272 Aggregation of Scientific Evidence  485
     .273 Clinical Medical Judgment  487
     .274 Research as a Result of Litigation  489
.3 Case Management  491
   .31 Preliminary Considerations in Assessing Expert Testimony  491
   .32 The Initial Conference  494
   .33 Disclosures  499
   .34 Discovery Control and Management  503
     .341 Discovery of Testifying Experts  503
     .342 Discovery of Nontestifying Experts  504
     .343 Discovery of Nonretained Experts  504
     .344 Discovery of Court-Appointed Experts  505
     .345 Use of Videotaped Depositions  505
   .35 Motion Practice  506
     .351 Initiating a *Daubert* Inquiry  507
     .352 Timing of Challenges to Expert Testimony  508
     .353 Handling a Challenge to Expert Testimony  509
     .354 Summary Judgment  512
   .36 Final Pretrial Conference  513
   .37 Trial  514

## 23.1  Introduction

A significant issue in many complex cases—particularly in areas of law such as mass tort, antitrust, environmental, and intellectual property, but increasingly appearing in other areas as well—is the admission and use of expert scientific or technical testimony. "Scientific evidence encompasses so-called hard sciences (such as physics, chemistry, mathematics, and biology) as well as soft sciences (such as economics, psychology, and sociology), and it may be offered by persons with scientific, technical, or other specialized knowledge whose skill, experience, training, or education may assist the trier of

fact in understanding the evidence or determining a fact in issue."[1545] Expert scientific testimony can add additional layers of complexity to already complex cases, and scientific and technical evidence often plays a pivotal role in litigation. In toxic tort cases, for example, excluding scientific evidence can prevent the plaintiff from establishing the prima facie elements of his or her case, thereby entitling the defendant to summary disposition.[1546] Judicial findings on the relevance of toxicological studies and their weight in relation to epidemiological studies may also significantly affect the ability of mass or toxic tort plaintiffs to prevail.[1547] Superfund cases, usually brought many years after the release of hazardous contaminants, rely heavily on scientific and toxicological evidence to establish the liability of potentially responsible parties and to evaluate remedial actions and the imminent threat presented to human health and the environment.[1548] Statistical evidence is routinely introduced and

---

1545. William W Schwarzer & Joe S. Cecil, *Management of Expert Evidence* [hereinafter *Expert Evidence*], *in* Reference Manual on Scientific Evidence 39, 42 (Federal Judicial Center, 2d ed. 2000). In a survey of federal judges conducted by the Federal Judicial Center examining recent trials involving expert witnesses, tort cases represented the greatest percentage (45%) of cases reported. Carol Krafka, Meghan A. Dunn, Molly Treadway Johnson, Joe S. Cecil & Dean Miletich, *Judge and Attorney Experiences, Practices, and Concerns Regarding Expert Testimony in Federal Civil Trials*, 8 Psychol. Pub. Pol'y & L. 309, 318 (2002) [hereinafter *FJC Survey on Expert Testimony*]. This survey also provides, among other things, a breakdown of experts appearing in federal courts. *Id.* at 319–20 & tbl.2. For a breakdown of experts appearing in state courts, see Anthony Champagne et al., *Expert Witnesses in the Courts: An Empirical Examination*, 76 Judicature 5 (1992); Samuel R. Gross, *Expert Evidence*, 1991 Wis. L. Rev. 1113.

1546. *See, e.g.,* Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1314, 1321–22 (9th Cir. 1995) (affirming grant of summary judgment where plaintiff's expert testimony found inadmissible); Wheat v. Sofamor, S.N.C., 46 F. Supp. 2d 1351, 1360–61 (N.D. Ga. 1999) (with the exclusion of plaintiff's expert, insufficient evidence of defect existed to preclude entry of summary judgment for defendant).

1547. *See, e.g.,* Gen. Elec. Co. v. Joiner, 522 U.S. 136, 144–45 (1997) (animal studies relied on by expert "were so dissimilar to the facts presented in this litigation" that district court did not abuse its discretion in excluding them). The introduction of scientific evidence in toxic tort cases, however, encompasses more than testimony by medical experts. Expert witnesses can range from experts on sampling, Trail v. Civil Engineer Corps, 849 F. Supp. 766 (W.D. Wash. 1994), to atmospheric dispersion, *In re* Hanford Nuclear Reservation Litig. (Hanford II), No. CY-91-3015, 1998 WL 775340 (E.D. Wash. Aug. 21, 1998), to fisheries, *In re* Hanford Nuclear Reservation Litig. (Hanford I), 894 F. Supp. 1436 (E.D. Wash. 1995).

1548. *See generally supra* section 34. *See also* Freeport-McMoran Res. Partners Ltd. P'ship v. B-B Paint Corp., 56 F. Supp. 2d 823, 833–34 (E.D. Mich. 1999) (rejecting plaintiff's argument that *Daubert* requirements should be inapplicable to CERCLA cases and excluding expert testimony where none of the *Daubert* indicia of reliability are met). *See, e.g.,* Burns Philp Food, Inc. v. Cavalea Cont'l Freight, Inc., 135 F.3d 526, 530–31 (7th Cir. 1998) (affirming exclusion of testimony of environmental consultant as failing to reliably link petroleum distillates on property with defendants' actions); Keum J. Park, Note, *Judicial Utilization of Scientific Evidence*

explained by experts in antitrust litigation, employment litigation, and other areas,[1549] and proof of damages suffered by plaintiffs in these cases also may rest heavily on expert testimony.[1550] The decision to admit or exclude scientific evidence and testimony thus strongly affects the ability of a party to prevail.

This section can assist judges in effectively managing expert evidence that involves scientific or technical subject matter. Part I discusses the current standards under which expert testimony is to be judged in light of *Daubert v. Merrill Dow Pharmaceuticals*[1551] and its progeny and the Federal Rules of Evidence. It examines some issues that can arise in the application of these standards and then addresses case-management issues specific to expert testimony. The discussion focuses principally on expert testimony that is scientific or technical in nature, but is equally applicable to expert testimony in Federal Rule of Evidence 702's "other specialized knowledge" category. The discussion does not address some of the issues that have frequently arisen in criminal cases, such as those surrounding DNA and fingerprint evidence.

---

*in Complex Environmental Torts: Redefining Litigation Driven Research*, 7 Fordham Envtl. L.J. 483, 492–93 (1996) (noting that the Oil Pollution Liability and Compensation Act of 1990 established "procedures for natural resource trustees to determine resource injuries").

1549.  *See, e.g.*, Munoz v. Orr, 200 F.3d 291, 300–02 (5th Cir. 2000) (affirming exclusion of statistical testimony of plaintiff's expert in Title VII disparate impact claim as unreliable); City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 564–67 (11th Cir. 1998) (expert testimony of statistician admissible in antitrust case); Bean v. S.W. Waste Mgmt. Corp., 482 F. Supp. 673, 677–80 (S.D. Tex. 1979) (statistical evidence showing disparate impact insufficient to prove intentional discrimination under Equal Protection Clause in environmental justice case), *aff'd without opinion*, 782 F.2d 1038 (5th Cir. 1986).

1550.  For example, in employment cases, forensic psychiatrists may be called to testify on the relationship between a plaintiff's emotional harm and his or her work environment, and psychological testimony has been found probative on the question of damages and causation. *See, e.g.*, Blakey v. Cont'l Airlines, Inc., 992 F. Supp. 731, 735–39 (D.N.J. 1998). *See* EFCO Corp. v. Symons Corp., 219 F.3d 734, 739 (8th Cir. 2000) (expert testimony admissible on damages); Hurley v. Atl. City Police Dept., 933 F. Supp. 396, 408–09, 424 (D.N.J. 1996) (expert testimony on mental harm to employee resulting from sexual harassment); Bottomly v. Leucadia Nat'l Corp., 163 F.R.D. 617, 619–20 (D. Utah 1995) (expert testimony admissible on issue of damages and causation). Expert testimony relating to the amount of damages occurred in almost half of the reported trials examined in a recent Federal Judicial Center survey. *See FJC Survey on Expert Testimony*, *supra* note 1545, at 321.

1551.  509 U.S. 579 (1993).

## 23.2 The Use of Scientific Evidence in Complex Litigation

.21 The Federal Rules of Evidence  472
.22 The *Daubert* Trilogy  474
.23 The *Daubert* Criteria  476
.24 Opinions and Conclusions Under *Daubert*  478
.25 The *Daubert* "Fit" Test  480
.26 The Scope of Appellate Review  482
.27 Emerging Issues in the Use of Scientific Evidence  484
  .271 The Validity of Toxicological Evidence Versus Epidemiological Evidence  485
  .272 Aggregation of Scientific Evidence   485
  .273 Clinical Medical Judgment  487
  .274 Research as a Result of Litigation  489

## 23.21 The Federal Rules of Evidence

*Daubert v. Merrell Dow Pharmaceuticals, Inc., General Electric Co. v. Joiner*,[1552] and *Kumho Tire Co. v. Carmichael*,[1553] the "*Daubert* trilogy," have made management of expert evidence an integral part of proper case management.[1554] Those decisions make the district judge the gatekeeper who must pass on the reliability and relevance of proffered evidence pursuant to Federal Rule of Evidence 702.

Rule 702, amended in 2000 with the italicized language, takes account of the trilogy:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experiences, training, or education, may testify thereto in the form of an opinion or otherwise *if (1) the testimony is based upon sufficient facts or data, (2) the testimony is*

---

1552.  522 U.S. 136 (1997).

1553.  526 U.S. 137 (1999).

1554.  The judge's performance of the gatekeeper function will be intertwined with his or her implementation of Federal Rule of Civil Procedure 16. *See Joiner*, 522 U.S. at 149 (Breyer, J., concurring):

> [J]udges have increasingly found in the Rules of Evidence and Civil Procedure ways to help them overcome the inherent difficulty of making determinations about complicated scientific or otherwise technical evidence. Among these techniques are an increased use of Rule 16's pretrial conference authority to narrow the scientific issues in dispute, pretrial hearings where potential experts are subject to examination by the court, and the appointment of special masters and specially trained law clerks.

> the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[1555]

An extensive committee note provides guidance to courts in assessing the admissibility of expert evidence. It emphasizes the breadth of the standards set forth in the rule and reiterates that its purpose is to ensure the reliability of the proffered testimony. For example, "The amendment specifically provides that the trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case."[1556] Federal Rules of Evidence 701 and 703 also were amended in conjunction with the amendments to Rule 702. Rule 701 seeks to ensure that the gatekeeping requirements of Rule 702 not be circumvented through "proffering an expert in lay witness clothing,"[1557] stating that opinions and inferences of lay witnesses may not be based on "scientific, technical or other specialized knowledge within the scope of Rule 702."[1558] Rule 703 clarifies the circumstances under which inadmissible evidence relied on by an expert witness in forming his or her opinion can be disclosed to a jury.[1559]

---

1555.  Fed. R. Evid. 702 (emphasis added). *See also* Hon. Lee H. Rosenthal, *Strategies for Handling Expert Challenges in Federal Court*, App. Law., at 1, 8 (Houston Bar Ass'n Spring 1999) ("Counsel should . . . familiarize themselves with the recent proposed amendments to Rule 702 [which] largely codify the two major holdings of the Supreme Court's *Kumho Tire* decision.").

1556.  Fed. R. Evid. 702 committee note. *See* Zic v. Italian Gov't Travel Office, 130 F. Supp. 2d 991, 999 (N.D. Ill. 2001) (amendments to Rule 702 added "three new 'reliability' requirements: reliable data, reliable methodology, and reliable application of the methodology").

1557.  Fed. R. Evid. 701 committee note. Rule 701 provides the following:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue . . . .

1558.  Fed. R. Evid. 701 committee note.

1559.  Rule 703 directs the court to apply a balancing test when deciding whether to let the jury hear otherwise inadmissible information to assist the jury in evaluating the expert's opinion by weighing the probative value of the evidence against its prejudicial effect. Unless the probative value substantially outweighs its prejudicial effect, the evidence should not be disclosed to the jury. Unlike the balancing test in Rule 403, the test established in Rule 703 places the presumption against admission, and the committee note to Rule 703 further emphasizes that, to the extent the information is disclosed, it is not admissible for substantive purposes, and a limiting instruction should be given to the jury to that effect.

## 23.22  The *Daubert* Trilogy[1560]

Expert scientific evidence in the courtroom has grown in tandem with the increasing reliance on technological and scientific advances in virtually every facet of American life.[1561] This convergence of science and law has inevitably placed judges in the position of assessing the admissibility of such evidence using standards that many charged were too ill-defined to realistically separate valid scientific endeavors from science lacking any real empirical support.[1562] Prior to *Daubert*,[1563] scientific evidence was often judged according to the standard set forth in *Frye v. United States*.[1564] *Frye* set forth a test for the admission of expert testimony as one of "general acceptance," with admissibility premised on whether the scientific principle or discovery from which the testimony derived was generally accepted in the pertinent scientific community.[1565] Despite criticisms of the *Frye* test, the general acceptance criterion

---

1560.  For an excellent discussion of the *Daubert* trilogy, see Margaret A. Berger, *The Supreme Court's Trilogy on the Admissibility of Expert Testimony* [hereinafter *Supreme Court's Trilogy*], *in* Reference Manual on Scientific Evidence 9 (Federal Judicial Center, 2d ed. 2000).

1561.  *See* David L. Faigman et al., *Check Your Crystal Ball at the Courthouse Door, Please: Exploring the Past, Understanding the Present, and Worrying About the Future of Scientific Evidence*, 15 Cardozo L. Rev. 1799, 1802 n.6 (1994) (citing William L. Foster, *Expert Testimony,—Prevalent Complaints and Proposed Remedies*, 11 Harv. L. Rev. 169, 176 (1897–98) (quoting unattributed comments that "the scientific expert is a product of an advanced and rapidly advancing civilization . . . [and has acquired] a far greater frequency of employment by the recent marvelous advances in the applications of science,—applications which have increased the sphere of things to be litigated about")); Joseph Sanders, *Scientifically Complex Cases, Trial by Jury, and the Erosion of Adversarial Processes*, 48 DePaul L. Rev. 355, 357–58 (1998) (citing statistics from several studies reflecting growth in number of cases in which experts testify as well as the number of testifying experts).

1562.  *See, e.g.*, 1 David L. Faigman et al., Modern Scientific Evidence: The Law and Science of Expert Testimony § 1-2.4, at 9–10 (2d ed. 2002).

1563.  509 U.S. 579 (1993). *See also* Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1314 & n.2 (9th Cir. 1995) (noting that prior standard for admissibility in Ninth Circuit was *Frye* test of general acceptance); Christopherson v. Allied-Signal Corp., 939 F.2d 1106 (5th Cir. 1991) (overruled by *Daubert*).

1564.  293 F. 1013 (D.C. Cir. 1923). The *Frye* test initially was applied almost exclusively in criminal cases and was not relied on in federal civil litigation until 1984. Paul C. Giannelli, *Daubert: Interpreting the Federal Rules of Evidence*, 15 Cardozo L. Rev. 1999, 2008 (1994).

1565.  293 F. at 1014. *Frye* has been described as simply a relocation of the marketplace test, where expertise is judged by the success of the expert in his or her profession. "In effect, the marketplace determined whether valid knowledge existed by endowing it with commercial value." 1 Faigman et al., *supra* note 1562, § 1-2.1, at 4. However, *Frye* is also argued to have recognized a distinction between the expert and the expertise, and to have placed the assessment of the value of the expertise offered in the hands of "the people who produced the knowledge and offered it, and themselves, to the courts." *Id.* § 1-2.2, at 7.

became the most common standard for assessing the admissibility of expert testimony,[1566] even after the advent of the Federal Rules of Evidence in 1975, and in particular Rule 702.

*Daubert, Joiner,* and *Kumho Tire,* however, changed the way in which courts assess the admissibility of scientific evidence.[1567] *Daubert* explicitly rejected the *Frye* test, holding that the admissibility of expert testimony was governed by Rule 702, and that nothing in the language of the rule reflected an intent to incorporate "general acceptance" as a precondition to admission.[1568] "The drafting history makes no mention of *Frye,* and a rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.'"[1569] Rather, *Daubert* established that Rule 702 mandates federal courts to serve as gatekeepers, ensuring (1) that the subject of the expert testimony is scientific "knowledge" grounded "in the methods and procedures of science"[1570] and (2) that the testimony is relevant, i.e., it will assist the trier of fact in understanding the evidence or determining an issue in the case.[1571] According to *Daubert,* "[t]his entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue."[1572]

---

1566. 1 Faigman et al., *supra* note 1562, § 1-2.4, at 10. Among these criticisms were that the general acceptance standard precluded the admission of reliable evidence, it left to the scientific community the determination of validity, and it rested on the invalid assumption that jurors were unable to handle scientific evidence. 1 Paul C. Giannelli & Edward J. Imwinkelried, Scientific Evidence § 1-5(G), at 28–29 (3d ed. 1999). Other criticisms included that the general acceptance standard was vague and easily manipulated, was overly conservative, provided no clear demarcation or other guideline as to the point at which a proposition became "generally acceptable," lacked standards for defining the "particular field," and, more importantly, left "the law at the mercy of the practitioners of the respective fields" who may differ in degree of rigorousness. 1 Faigman et al., *supra* note 1562, § 1-2.4, at 8–9, 10.

1567. *But see* United States v. Downing, 753 F.2d 1224, 1232 (3d Cir. 1985) (foreshadowing *Daubert* by concluding that "the status of the *Frye* test under Rule 702 is somewhat uncertain").

1568. *Daubert,* 509 U.S. at 588–89. The Court noted that the rules occupied the field, and that the inability to find any reference to the common-law doctrine in Rule 702 or its drafting history clearly indicated that Rule 702 superceded *Frye.* "Given the Rules' permissive backdrop and their inclusion of a specific rule on expert testimony that does not mention 'general acceptance,' the assertion that the Rules somehow assimilated *Frye* is unconvincing." *Id.* at 589.

1569. *Id.* at 588 (quoting Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169 (1988)).

1570. *Id.* at 589–90.

1571. *Id.* at 591.

1572. *Id.* at 592–93. *See* Brasher v. Sandoz Pharms. Corp., 160 F. Supp. 2d 1291, 1295 (N.D. Ala. 2001) ("The point of the gatekeeping role is to separate opinion evidence based on 'good grounds' from simple subjective speculation masquerading as scientific knowledge.").

## 23.23  The *Daubert* Criteria

Central to any determination of admissibility is the finding, as a threshold matter, that the witness is qualified to testify as an expert under Rule 702. The courts generally have interpreted this requirement liberally.[1573] In many fields of expertise, for example, neither formal education nor training may be necessary. It is the inquiry into the scientific validity of the underlying reasoning or methodology that presents the greatest challenge to judges. Rule 702 establishes the general standards against which expert testimony is to be judged, relying on criteria delineated in *Daubert*, as well as others that might be appropriate. It is for the trial judge to then determine whether those standards have been met.

*Daubert* identifies several considerations that might bear on the trial court's determination whether given testimony is scientifically valid and therefore "trustworthy": (1) whether the theory or technique had been tested; (2) whether the theory or technique can be or has been peer reviewed or published; (3) the known or potential error rate; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) the general acceptance by the relevant scientific community and the testimony's degree of acceptance therein.[1574] These considerations, however, are neither a checklist nor exhaustive, and the trial court's inquiry should be a "flexible

---

1573. *See, e.g.*, Alvarado v. Weinberger, 511 F.2d 1046, 1048–49 (1st Cir. 1975). Some cases decided since the *Daubert* trilogy seem to reflect a tightening of the standard against which expert qualifications are judged, a trend that may become more prominent in light of the amendments to Rule 702. *See, e.g.*, Kumho Tire Co. v. Carmichael, 526 U.S. 137, 156 (1999) ("The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'" (quoting 4 Joseph McLaughlin, Weinstein's Federal Evidence ¶ 702.05[1] (2d ed. 1998))); Smelser v. Norfolk S. Ry., 105 F.3d 299, 303 (6th Cir. 1997) (court to examine "'not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question'" (quoting Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir. 1994))). Professor Edward Imwinkelried has suggested that the former liberality of the courts in qualifying experts as only needing to have knowledge or skill beyond the average layperson is disappearing in favor of a standard that requires a showing "that the witness has expertise highly relevant to the precise issue before the court." Edward J. Imwinkelried, *An Unheralded Change*, Nat'l L.J., Feb. 5, 2001, at A10. Professor Imwinkelried argues that recent decisions reflect a trend away from qualifying experts who are not specialists in the area relevant to the subject matter of the testimony. *Id. See, e.g.*, Berry v. Crown Equip. Corp., 108 F. Supp. 2d 743, 752–53 (E.D. Mich. 2000) (excluding testimony of plaintiff's expert witness because he was not qualified to render an opinion on defective forklift design).

1574. *Daubert*, 509 U.S. at 593–94 (1993).

one," consistent with the "permissive backdrop" of the Federal Rules.[1575] The committee note similarly states that there may be circumstances in which the *Daubert* factors are inapplicable and other criteria more probative; however, in each case the court is to use criteria to achieve the standards set forth in the rule.[1576] Once the judge determines that proposed scientific testimony is valid (i.e., trustworthy or reliable), the inquiry turns to whether the evidence is relevant to the facts of the case, or its "fit."[1577]

*Daubert* dealt specifically with scientific expert testimony. In response to the conflict among the lower courts as to *Daubert*'s reach, *Kumho Tire* clarified that the gatekeeping obligation of Rule 702 applied not just to expert scientific testimony but to all expert testimony: "This language makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge . . . Hence, as a matter of language, the Rule applies its reliability standard to all 'scientific,' 'technical,' or 'other specialized' matters within its scope."[1578] The Court further held that it was proper, where appropriate, to apply the *Daubert* factors to nonscientific evidence, recognizing, however, that other factors might be of greater assistance in light of the "many different kinds of experts, and many different kinds of expertise."[1579] The Court expressly declined to establish a definitive list of factors that would apply to all cases.[1580] Instead, it remains for the district court to apply those factors it deems appropriate in order to ensure that the expert "employs in the court-

1575. *Id.* at 593. "[Rule 702's] overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of principles that underlie a proposed submission." *Id.* at 594–95. *See also* Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3d Cir. 1999) ("[N]ot only must each stage of the expert's testimony be reliable, but each stage must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.").

1576. Fed. R. Evid. 702 committee note.

1577. *See, e.g.*, Clark v. Takata Corp., 192 F.3d 750, 757 (7th Cir. 1999) (noting that "an expert does not assist the trier of fact in determining whether a product failed if he starts his analysis based upon the assumption that the product failed (the very question he was called upon to resolve)").

1578. *Kumho Tire*, 526 U.S. at 147.

1579. *Id.* at 150. The Court cited to the amicus brief filed by the United States referencing a wide variety of cases in which nonscientific expert testimony had been offered, from handwriting analysis, to agricultural practice, to attorney fee valuation. *See also* Elcock v. Kmart Corp., 233 F.3d 734, 747 (3d Cir. 2000) (analogizing two of the *Daubert* factors in reviewing testimony of vocational rehabilitation expert, noting "[v]ocational rehabilitation is a social science that does not exactly mirror the fundamental precepts of the so-called harder sciences"); Ohio *ex rel.* Montgomery v. Louis Trauth Dairy, Inc., 925 F. Supp. 1247, 1252 (S.D. Ohio 1996) (noting reasoning and general framework of *Daubert* applied to economic and statistical evidence).

1580. *Kumho Tire*, 526 U.S. at 150–51.

room the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[1581]

## 23.24 Opinions and Conclusions Under *Daubert*

One issue that has caused debate is the appropriate degree of inquiry into the conclusions of an expert. In making the *Daubert* inquiry, some courts have examined not only the appropriateness and reliability of the methodology used by the expert,[1582] but whether the expert's conclusions are supported by the methodology used.[1583] The *Daubert* Court cautioned that the focus of the inquiry under Rule 702 is not on the conclusions reached by the expert but on the principles adduced and methodologies used.[1584] *Joiner*, decided several years later, blurred *Daubert*'s distinction between methodology and conclusion, stating that "conclusions and methodology are not entirely distinct from one another."[1585] Indeed, *Joiner* implies that to find an expert's proffered testimony reliable, the district court must not only conclude the expert followed proper methodology for the science, but also that the conclusion reached was supported by the methodology used. The *Joiner* Court noted that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district

---

1581. *Id.* at 151–53.

1582. Allen v. Pa. Eng'g Corp., 102 F.3d 194 (5th Cir. 1996).

1583. Jahn v. Equine Servs., PSC, 233 F.3d 382, 393 (6th Cir. 2000) (expert methodology can be reliable even where matter might be in debate because of other testimony); Smith v. Ford Motor Co., 215 F.3d 713, 720–21 (7th Cir. 2000) (district court abused discretion in relying on single, potentially irrelevant criterion in finding expert conclusions were based on unreliable methodologies, did not consider other factors, and failed to explain connection between factor selected by court and reliability under the circumstances); McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1043–44 (2d Cir. 1995); United States v. Martinez, 3 F.3d 1191, 1197–98 (8th Cir. 1993); Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co., 128 F. Supp. 2d 1148, 1150 (N.D. Ill. 2001) (court's gatekeeping function focuses on methodology, leaving the correctness of expert's conclusion or soundness of facts on which conclusion is based to fact-finder).

1584. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 595 (1993). *See* NutraSweet Co. v. X-L Eng'g Co., 227 F.3d 776, 788–89 (7th Cir. 2000) ("The district court did not abuse its discretion in concluding that the common and official acceptance of photographic analysis made it sufficiently reliable."); Clark v. Takata Corp., 192 F.3d 750, 758–59 (7th Cir. 1999) (expert opinion properly excluded where based only on experience or training with no scientific data or supporting research material or other rigorous methodology).

1585. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Justice Stevens, concurring in part and dissenting in part in *Joiner*, questioned "When qualified experts have reached relevant conclusions on the basis of an acceptable methodology, why are their opinions inadmissible?" *Id.* at 154.

court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."[1586]

The amendment to Rule 702, which became effective after *Daubert*, *Joiner*, and *Kumho Tire*, provides some guidance. The rule contemplates, among other things, that in making a reliability determination, the court will "scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case."[1587] In light of *Joiner* and Rule 702, *Daubert*'s caution against inquiring into the expert's conclusion appears to have lost some of its authority, although the degree to which the conclusion must be supported by the methodology and supporting reasoning remains unclear.[1588] Where the expert's conclusion is drawn from a reliable methodology, however, the correctness of that conclusion is still an issue for the finder of fact. The original intent of Rule 702 in 1975 was to liberalize, not restrict, the admission of expert evidence.[1589] Accordingly, a judge must be cognizant of the constraints imposed by the Seventh Amendment and not preclude the jury from hearing an opinion that, although in the minority, is nonetheless responsibly grounded in the science and reliable even if the judge does not believe the conclusion to be "correct."[1590] Presumably, cross-examination and presentation of contrary evidence by the opposing party, as suggested in *Daubert*, would identify for the jury the shakiness of the foundation on which the conclusion is based.

---

1586.  *Id.* at 146.

1587.  Fed. R. Evid. 702 committee note. *See, e.g.*, Pride v. BIC Corp., 218 F.3d 566, 578 (6th Cir. 2000) (excluding testimony where, among other things, experts failed to timely conduct replicable experiments); Moore v. Ashland Chem., Inc., 151 F.3d 269, 279 (5th Cir. 1998) (where wide analytical gap existed between expert opinion and scientific knowledge, opinion would be excluded as unreliable).

1588.  Ruiz-Troche v. Pepsi Cola of P.R., 161 F.3d 77, 81 (1st Cir. 1998) ("[W]hile methodology remains the central focus of a *Daubert* inquiry, this focus need not completely pretermit judicial consideration of an expert's conclusions.").

1589.  *See* Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (courts should be mindful of the intent to liberalize the introduction of expert testimony while also recognizing the potential of expert witnesses to "'be both powerful and quite misleading'" (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 595 (1993))).

1590.  *See, e.g.*, Bonner v. ISP Techs., Inc., 259 F.3d 924, 929 (8th Cir. 2001) (evidence should be admitted where there are good grounds for the expert's conclusions, even though the judge may believe there are better grounds for alternative conclusions); Jahn v. Equine Servs., PSC, 233 F.3d 382, 391 (6th Cir. 2000) (district court improperly weighed testimony of expert against pathologist testimony in finding expert's opinion suspect).

## 23.25  The *Daubert* "Fit" Test

Rule 702 has always required that expert testimony "assist the trier of fact" to understand evidence or resolve issues in the case, and the second prong of the *Daubert* test reiterates the necessity of such a determination. The *Daubert* Court discussed this inquiry as one of relevance, noting that if "it is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."[1591] Since *Daubert*, however, courts have differed on their interpretation of "fit" in assessing expert scientific evidence. This disagreement has turned in part on whether the inquiry under Rule 702 looks only at the admissibility of the expert evidence (whether it is reliable and relevant) separate from any inquiry into its sufficiency.[1592] In some cases the courts have excluded expert testimony as lacking relevance where it was insufficient to prove the matter for which the party sought its introduction.[1593] Other courts have held that the evidence need only meet a low threshold of "relevance" to be admissible.[1594] These decisions limit the trial court, once the methodology underlying expert testimony is found to be appropriate or reliable, to determining whether the testimony is pertinent to an issue in the case in order to be admissible.[1595] Courts adhering to this latter view have

---

1591.  *Daubert*, 509 U.S. at 591. *See also* Amorgianos v. Nat'l R.R. Passenger Corp., 137 F. Supp. 2d 147 (E.D.N.Y. 2001).

1592.  *See, e.g.*, *In re* Joint E. & S. Dists. Asbestos Litig., 52 F.3d 1124, 1132 (2d Cir. 1995) (stating that admissibility is a threshold inquiry as to whether a certain piece of evidence ought to be admitted at trial, whereas a "sufficiency inquiry, which asks whether the collective weight of a litigant's evidence is adequate to present a jury question, lies further down the litigational road").

1593.  *See, e.g.*, Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 319–20 (7th Cir. 1996) (expert opinion excluded where it failed to establish how nicotine overdose can precipitate a heart attack in person with heart disease). *See also* Blevins v. New Holland N. Am., Inc., 128 F. Supp. 2d 952, 957–59 (W.D. Va. 2001) (seemingly conflating both admissibility and sufficiency inquiries). For example, in some toxic tort cases, if the expert's evidence, considered by itself, did not meet the legal standard of causation, it would be inadmissible as lacking relevance. *See, e.g.*, Wheat v. Sofamor S.N.C., 46 F. Supp. 2d 1351, 1357–58 (N.D. Ga. 1999) (where expert could not state to reasonable degree of medical certainty as to either a general or specific causal relationship between product and harm, testimony "is unhelpful and irrelevant").

1594.  *See, e.g.*, Adams v. Ameritech Servs., Inc., 231 F.3d 414, 425 (7th Cir. 2000) ("First, the question before us is not whether the reports proffered by the plaintiffs prove the entire case; it is whether they were prepared in a reliable and statistically sound way, such that they contained relevant evidence that a trier of fact would have been entitled to consider."); Md. Cas. Co. v. Therm-O-Disc, Inc., 137 F.3d 780, 783 (4th Cir. 1998) ("prescribing fluid and general standards for the admission of scientific testimony"); Ambrosini v. Labarraque, 101 F.3d 129, 135–36 (D.C. Cir. 1996).

1595.  Smith v. Ford Motor Co., 215 F.3d 713, 719 (7th Cir. 2000).

maintained that litigants need only "demonstrate by a preponderance of the evidence that their opinions are reliable,"[1596] and they are not required to "prove their case twice . . . ."[1597] Under this view of the fit test, an expert's testimony, even though insufficient to prove causation when viewed alone, would be admissible for consideration by the jury collectively with all the other evidence in the case.[1598]

In addition to the conflict in the circuits on the proper interpretation of *Daubert*'s second prong, the fit test has also been used to exclude evidence based on the nature of the science at issue or the degree to which the science sought to be introduced differs from the facts at issue in the case.[1599] In some instances, the very unreliability of the expert testimony has supported the conclusion that the evidence therefore did not fit the case.[1600] *Daubert* articulated the relevant inquiry as whether the testimony offered is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute,"[1601]

---

1596.  *See* City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562–63 (11th Cir. 1998).

1597.  *In re* Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994); *see, e.g.*, *In re* TMI Litig., 193 F.3d 613, 665 (3d Cir. 1999) (quoting *In re Paoli*, 35 F.3d at 744). The *TMI* court noted that there was a distinction between the evidentiary requirement of reliability and the higher standard of whether the expert's conclusions were correct on the merits, commenting, "The distinction is indeed significant as it preserves the fact finding role of the jury." *In re TMI Litig.*, at 665 n.90.

1598.  *See, e.g.*, Bonner v. ISP Techs., Inc., 259 F.3d 924, 929 (8th Cir. 2001) ("[N]either Rule 702 nor *Daubert* requires that an expert opinion resolve an ultimate issue of fact to a scientific absolute in order to be admissible."); *City of Tuscaloosa*, 158 F.3d at 565 ("As circumstantial evidence, McClave's data and testimony need not prove the plaintiffs' case by themselves; they must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble before the jury.").

1599.  *See, e.g.*, Savage v. Union Pac. R.R. Co., 67 F. Supp. 2d 1021, 1035–39 (E.D. Ark. 1999) (excluding expert testimony where no scientific evidence was introduced as to whether the chemicals to which plaintiff was exposed were implicated in the type of cancer suffered by plaintiff). One issue of significance is the threshold necessary to maintain a science-based claim. This conflict is probably most prominent in mass and toxic tort cases, where the ability to prove causation typically relies on inferences and hypotheses about an unknown causal mechanism, but arises in other areas as well. *See* Michael D. Green et al., *Reference Guide on Epidemiology* [hereinafter *Epidemiology*], *in* Reference Manual on Scientific Evidence 333–400 (Federal Judicial Center, 2d ed. 2000).

1600.  *See, e.g.*, Bourne v. E.I. DuPont De Nemours & Co., 189 F. Supp. 2d 482, 499 (S.D. W. Va. 2002) (finding methodologies used by experts in extrapolating from animal studies to humans was unsound and therefore "a poor 'fit' for the facts of the case").

1601.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 591 (1993) (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)). *But see* Mattis v. Carlon Elec. Prods., 114 F. Supp. 2d 888, 895 (D.S.D. 2000) (examining whether testimony demonstrates level of exposure hazardous to humans and plaintiff's actual level of exposure in terms of "fit" under *Daubert*).

with the determination as to what constitutes a "sufficient" relationship clearly left to judicial discretion.[1602]

## 23.26  The Scope of Appellate Review

*Joiner* addressed the scope of the district court's discretion in applying Rule 702. The Court held that the standard of review of evidentiary rulings by the district court, including rulings pursuant to Rule 702, is abuse of discretion.[1603] *Kumho Tire* clarified the extent of the trial court's discretion, holding that the abuse-of-discretion standard applied not just to the ultimate conclusion on admissibility, but to all of the findings on admissibility. Thus the district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."[1604] This includes determinations on the best way to proceed as well as what factors are reasonable measures of reliability of the particular expert testimony proffered.[1605] *Kumho Tire* rejected any suggestion that specific criteria must be

---

1602.  *See, e.g.*, Textron, Inc. *ex rel.* Homelite Div. v. Barber-Colman Co. (Textron I), 903 F. Supp. 1546, 1558 (W.D.N.C. 1995) (The court rejected expert testimony that relied on studies of household solid waste, concluding that such substances were hazardous where the expert was unable to demonstrate that the "studies relied upon [were] sufficiently similar to the households connected to Burlington's wastewater system to merit comparison."). *See also* Mitchell v. Gencorp., Inc., 165 F.3d 778, 782 (10th Cir. 1999) (affirming exclusion of expert testimony as unreliable: "[W]ithout scientific data supporting their conclusions that chemicals similar to benzene caused the same problems as benzene, the analytical gap in the expert's testimony is simply too wide . . . ."); Bradley v. Armstrong Rubber Co., 130 F.3d 168, 176–78 (5th Cir. 1997) (court considering admissibility under Rule 703 found expert opinion could be properly excluded as irrelevant where facts on which opinion was based were wrong); Textron, Inc. *ex rel.* Homelite Div. Co. v. Barber-Colman Co. (Textron II), 903 F. Supp. 1558, 1568–69 (W.D.N.C. 1995).

1603.  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997). A *de novo* standard of review applies, however, to the initial inquiry into whether the district court properly followed *Daubert*'s framework. *See* Walker v. Soo Line R.R. Co., 208 F.3d 581, 590 (7th Cir. 2000) ("We review de novo 'whether the district court properly followed the framework set forth in *Daubert.*'" (quoting United States v. Hall, 165 F.3d 1095, 1101 (7th Cir. 1999))); United States v. Call, 129 F.3d 1402, 1405 (10th Cir. 1997).

1604.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

1605.  *Id.* at 152–53. *See also* Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333 (11th Cir. 2003) (holding that (1) witness qualified as an expert by virtue of extensive education, training, and experience; (2) expert's methods and results were discernible and rooted in real science, and therefore were empirically testable; and (3) expert's testimony was relevant and would assist the jury); Bourelle v. Crown Equip. Corp., 220 F.3d 532, 537–38 (7th Cir. 2000) (district court did not abuse its discretion in excluding testimony of expert who failed to test or observe vehicle, conduct computer analysis, or otherwise satisfy *Daubert*); Clay v. Ford Motor Co., 215 F.3d 663, 668 (6th Cir. 2000) ("The District Court, in its discretion, could have

applied to certain types of expert testimony;[1606] however, Justice Scalia emphasized in a concurring opinion that although the *Daubert* factors "are not holy writ, in a particular case the failure to apply one or another of them may be unreasonable, and hence an abuse of discretion."[1607]

   In addition, the Supreme Court in *Weisgram v. Marley Co.*[1608] resolved any uncertainty surrounding the scope of appellate courts' authority to enter judgment as a matter of law under Federal Rule of Civil Procedure 50 where expert testimony has been improperly admitted. The Court held that an appellate court, upon concluding that the district court abused its discretion in admitting expert testimony at trial, has the authority to overturn a jury verdict and enter judgment as a matter of law where the exclusion of the evidence renders the proof legally insufficient.[1609] The Court commented that "[s]ince *Daubert*, parties relying on expert evidence have had notice of the exacting standards of reliability such evidence must meet. It is implausible to suggest, post-*Daubert*, that parties will initially present less than their best expert evidence in the expectation of a second chance should their first try fail."[1610]

decided that [the expert's] failure to test his theories went to the weight of his testimony regarding defects in the *Bronco II*, not to its admissibility.").

   1606.  "[W]e can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert*, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue." 526 U.S. at 150. The Court also rejected any interpretation of Rule 702 that would "[map] certain kinds of questions to certain kinds of experts." *Id.* at 151.

   1607.  *Id.* at 159 (Scalia, J., concurring). *See* Black v. Food Lion, Inc., 171 F.3d 308, 311–12 (5th Cir. 1999) (stating "[I]n the vast majority of cases, the district court first should decide whether the [*Daubert* factors] are appropriate . . . . [It] then can consider whether other factors . . . are relevant to the case at hand," and suggesting failure to apply *Daubert* factors may be an abuse of discretion). The danger of establishing criteria that must be applied is that the validity of the science turns on being shoehorned into the correlative criteria, regardless of whether the science involved was amenable to such a qualification, rather than being measured against scientific work outside the courtroom.

   1608.  528 U.S. 440 (2000).

   1609.  *Id.*

   1610.  *Id.* at 455 (citations and footnote omitted). Although the Court's decision in *Weisgram* and its earlier decision in *Neely v. Martin K. Elby Construction Co.* recognized that the authority to enter judgment on appeal was afforded by Rule 50, the Court did caution that in exercising its discretion, the court of appeals should take into consideration the rights of the verdict winner as well as the trial judge's firsthand knowledge of the case. "'Part of the Court's concern has been to protect the rights of the party whose jury verdict has been set aside on appeal and who may have valid grounds for a new trial, some or all of which should be passed upon by the district court, rather than the court of appeals, because of the trial judge's first-hand knowledge of witnesses, testimony, and issues—because of his 'feel' for the overall case.'" *Weisgram*, 528 U.S. at 451 (quoting Neely v. Martin K. Elby Construction Co., 386 U.S. 317, 325 (1967)).

Subsequent circuit court decisions, following the rationale in *Weisgram*, have entered judgment under Rule 50 where expert testimony was admitted in error.[1611] Accordingly, the *Daubert* trilogy, together with *Weisgram*, clearly indicates not only the significance of the gatekeeping inquiry, but the potential prejudice to a party should that inquiry be superficial or inadequate and expert testimony subsequently deemed unreliable and therefore inadmissible on appeal. At the same time, parties are placed on notice that borderline expert testimony may be excised on appeal to their detriment. One possible effect of *Weisgram* is that parties might attempt to identify extra experts to minimize the negative impact on their case should an appellate court find the testimony of one expert was erroneously admitted—with extra experts, the subsequent excision of one would not be fatal to the verdict. Such an approach would result in increased time and costs, both to the parties as well as the trial court, and the court should discourage multiple expert identification.

## 23.27  Emerging Issues in the Use of Scientific Evidence

.271 The Validity of Toxicological Evidence Versus Epidemiological Evidence  485
.272 Aggregation of Scientific Evidence   485
.273 Clinical Medical Judgment  487
.274 Research as a Result of Litigation  489

As amended, Federal Rule of Evidence 702 establishes general standards for the judge to use in determining the reliability of expert testimony. Rule 702 not only requires that the testimony be relevant, but also that it be based on sufficient facts or data, that it be the product of reliable principles and methods, and that the witness applied those principles and methods reliably to the facts of the case. The rule contemplates judicial analysis of various factors, including but not limited to those set forth in *Daubert*, to assess whether the proposed testimony meets these standards. However, the court should avoid interpreting these factors (and others deemed appropriate) so rigidly that valid science is excluded because it does not neatly fit within the confines of the criteria selected by the court as indicia of reliability.

There are several issues that have emerged as the district courts have wrestled with their role as gatekeeper, including the issues discussed below.

---

1611. *See, e.g.*, Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir. 2000) ("It cannot be said that the verdict would have been the same without the expert testimony, and its admission affected Brunswick's substantial rights.").

## 23.271 The Validity of Toxicological Evidence Versus Epidemiological Evidence

The courts have had little difficulty admitting expert testimony based on epidemiological studies.[1612] In order for toxicological studies to be admissible to prove causation in humans, however, a number of courts have required that sufficient grounds exist to support the extrapolation from animals to humans, "just as the methodology of the studies must constitute good grounds to reach conclusions about the animals themselves."[1613] As a result, and particularly in cases where either no epidemiological evidence is offered by the proposing party or epidemiological evidence is unavailable, some courts have been inclined to exclude toxicological evidence based on lack of "fit."[1614]

## 23.272 Aggregation of Scientific Evidence

Another concern is whether the aggregation of scientific evidence undermines the reliability of expert testimony based on such evidence. For example, epidemiological studies are often small and lack sufficient independent

---

1612.  Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1115 (5th Cir. 1991) ("[O]nly when . . . critically inaccurate or incomplete, as determined by what other experts would or would not be willing to base opinions upon, would the facts and data lack the necessary requisites of Rule 703."); DeLuca *ex rel.* Deluca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 953 (3d Cir. 1990), *aff'd*, 8 F.3d 778 (3d Cir. 1993); *In re* Agent Orange Prod. Liab. Litig., 611 F. Supp. 1223, 1240 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (2d Cir. 1987); Cook v. United States, 545 F. Supp. 306, 307–16 (N.D. Cal. 1982) (whether swine flue vaccine led to Guillain-Barre disease). *See also* Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 593 (D.N.J. 2002) ("[A]nimal bioassays are of limited use in determining whether a particular chemical causes a particular disease, or type of cancer, in humans."); Bourne v. E.I. DuPont De Nemours, 189 F. Supp. 2d 482, 496 (S.D. W. Va. 2002) (noting jurisdictions where extrapolating human teratogenicity from in vivo animal studies and in vivo test found unreliable). *But see* Villari v. Terminix Int'l, Inc., 692 F. Supp. 568, 570–71 (E.D. Pa. 1988) (finding substantial portion of scientific community relied on animal studies of the type offered by plaintiff to assess human health risks). *See also* Brock v. Merrell Dow Pharms., Inc., 874 F.2d 307, 313 (5th Cir.) ("This circuit has previously realized the very limited usefulness of animal studies when confronted with questions of toxicity."), *modified*, 884 F.2d 166, 167 (5th Cir. 1989) (court changing its holding that the plaintiffs' case was undermined by "the lack of conclusive epidemiological proof" to a "failure to present statistically significant epidemiological proof").

1613.  *In re* Paoli R.R. Yard PCB Litig., 35 F.3d 717, 743 (3d Cir. 1994).

1614.  *See, e.g.*, Allen v. Pa. Eng'g Corp., 102 F.3d 194, 197 (5th Cir. 1996) ("In the absence of scientifically valid reasoning, methodology and evidence supporting these experts' opinions, the district court properly excluded them."); Turpin v. Merrell Dow Pharms., Inc., 959 F.2d 1349, 1360–61 (6th Cir. 1992).

statistical significance to support definitive conclusions.[1615] Furthermore, several studies may differ or disagree in whether or not an association is found or in the magnitude of the association.[1616] As a result, a formal technique ("meta-analysis") was developed to aggregate these studies, which would derive a single figure to represent the totality of the studies reviewed.[1617] At issue is whether this technique renders the conclusion "unreliable" for purposes of *Daubert* if the individual studies alone would not satisfy a *Daubert* inquiry. There are valid concerns with the aggregation of empirical studies under these circumstances.[1618] At the same time, the mere fact that the studies have been aggregated to make an assessment should not automatically disqualify the conclusion or serve as the basis for excluding epidemiological evidence.[1619]

Questions regarding the reliability of aggregated evidence can arise in more informal contexts as well, such as where the expert considers several studies, none of which would support the expert's conclusions by itself, but when taken together form the basis for the proffered opinion.[1620] This "weight of the evidence" methodology was rejected as unreliable by the district court in *Joiner*, at least as presented by the proffered experts, but the court of appeals

1615. *See, e.g.*, Moore v. Ashland Chem., 151 F.3d 269, 281 (5th Cir. 1998) (en banc) (Dennis J., dissenting) (noting that "[t]he quantity of persons who sustain this type of exposure was simply too small for a plaintiff to be able to provide epidemiological, animal testing or other hard scientific evidence linking the particular chemical compound to reactive airways disease").

1616. *Epidemiology*, *supra* note 1599, at 380. The criteria used to determine whether an observed association is causal are known as the Hill criteria, after their author Sir Austin Bradford Hill. For a list of these criteria, see, e.g., *Magistrini*, 180 F. Supp. 2d at 592–93 (D.N.J. 2002).

1617. "In meta-analysis, studies are given different weights in proportion to the sizes of their study populations and other characteristics." *Epidemiology*, *supra* note 1599, at 380.

1618. *Id.* In many instances, the "differences among the individual studies included in the meta-analysis and the reasons for the differences are important in themselves and need to be understood." *Id.* at 381. And, as meta-analysis generates a single estimate of risk, it could "lead to a false sense of security regarding the certainty of the estimate." *Id.* at 381 (citing John C. Bailar III, *Assessing Assessments*, 277 Science 528, 529 (1997)).

1619. *See id.* at 381 (discussing criteria that may be more appropriate in assessing the reliability of meta-analysis).

1620. *See* Brasher v. Sandoz Pharms. Corp., 160 F. Supp. 2d 1291, 1296 (N.D. Ala. 2001) (noting that although evidence of animal studies, medical texts, and a limited number of case reports do not "establish conclusively that Parlodel can cause [injury], taken together they present a compelling picture, one which can support a scientific inference"). A variation of this approach would occur where information from different kinds of studies across different fields is considered in reaching the expert's conclusion. *Supreme Court's Trilogy*, *supra* note 1560, at 33.

found the approach scientifically acceptable.[1621] Justice Stevens, in a concurring and dissenting opinion in *Joiner*, commented that "[i]t is not intrinsically 'unscientific' for experienced professionals to arrive at a conclusion by weighing all available scientific evidence—this is not the sort of 'junk science' with which *Daubert* was concerned."[1622] Some courts, however, have required experts to use a "weight of the evidence" methodology to demonstrate how each study or piece of evidence was valued by the expert and the methodological basis upon which the expert may have discounted some pieces of evidence while relying more heavily on others in reaching his or her conclusion.[1623] The uncertainty surrounding the reliability of aggregated studies or evidence is inextricably tied to the debate on the distinction between methodology and conclusion,[1624] as well as the disagreement among the courts on the admissibility versus the sufficiency of expert evidence under the second prong of *Daubert*.[1625]

## 23.273 Clinical Medical Judgment

Many tort cases involve the introduction of expert evidence through the use of clinical treating physicians, relying on a methodology referred to as

---

1621. Joiner v. Gen. Elec. Co., 864 F. Supp. 1310, 1320–26 (N.D. Ga. 1994), *rev'd*, 78 F.3d 524, 532 (11th Cir. 1996) (according to the Eleventh Circuit, "opinions of any kind are derived from individual pieces of evidence, each of which by itself might not be conclusive, but when viewed in their entirety are the building blocks of a perfectly reasonable conclusion, one reliable enough to be submitted to a jury along with the tests and criticisms cross-examination and contrary evidence would supply"). *See also* Gen. Elec. Co. v. Joiner, 522 U.S. 136, 153–54 (1997) (Stevens, J., concurring in part and dissenting in part) (noting approvingly the court of appeal's acceptance of the "'weight of the evidence' methodology"). Where the data permit a reasonable scientist to make a probabilistic statement with regard to effect, even though lacking statistical significance, these judgments should not be automatically discarded as legally insufficient simply because of epistemological or proof problems as long as they can be expressed with a level of confidence that meets or exceeds the demands of Federal Rule of Evidence 104(a). The court should allow consideration of all methodically sound studies with the focus on whether the studies reliably permit the inference sought to be drawn.

1622. 522 U.S. at 153. In *Joiner*, the district court had examined various animal studies offered by the plaintiff and found that none of them supported the experts' conclusions that the plaintiff's cancer was caused by PCB exposure. The majority opinion did not specifically address whether the experts properly could have aggregated these studies to reach their conclusion that there was a causal relationship between the plaintiff's cancer and PCB exposure. Rather, the Court pointed to *Joiner*'s failure to explain "how and why the experts could have extrapolated their opinions from these seemingly far-removed animal studies . . . ." *Id.* at 144.

1623. *See, e.g.*, Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 602 (D.N.J. 2002).

1624. *See supra* section 23.24.

1625. *See id.*

"differential diagnosis" to establish a causal relationship between the plaintiff's harm and an allegedly injurious substance.[1626] Differential diagnosis seeks to establish specific causation by ruling out other causative factors, leaving the exposure to the harmful agent as the likely explanation for plaintiff's harm. Although a number of judges have permitted expert testimony based on differential diagnosis, others have held such testimony to be inadmissible where the expert was unable to show general causation or otherwise rule out alternative causes that might also explain all of the plaintiff's symptoms.[1627] This has hampered the ability of plaintiffs to prove causation through clinical physicians in cases where, for example, the relevant science has not clearly established a known etiology for the disease in question.[1628] The apparent split in approach is based in part on a disagreement regarding the degree to which the expert must rely on more than the traditional methodology of clinical medical reasoning to support his or her opinion, and the extent of the court's inquiry into the evidence forming the basis for the clinical medical judg-

---

1626. For a discussion of medical testimony and differential diagnosis, see Mary Sue Henifin et al., *Reference Guide on Medical Testimony* [hereinafter *Medical Testimony*], *in* Reference Manual on Scientific Evidence 441–84 (Federal Judicial Center, 2d ed. 2000).

1627. *Compare* Glastetter v. Novartis Pharms. Corp., 252 F.3d 986 (8th Cir. 2001) (finding differential diagnosis presumptively admissible and only those diagnoses that are scientifically invalid should be excluded), *and* Heller v. Shaw Indus., Inc., 167 F.3d 146, 154–57 (3d Cir. 1999) (discussing the different components to differential analysis and stating, where properly done, that it will support expert medical opinion on causation), *and* McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995) (differential analysis requires "listing possible causes, then eliminating all causes but one"), *with* Raynor v. Merrell Pharms., Inc., 104 F.3d 1371, 1374–76 (D.C. Cir. 1997) (where contradictory epidemiological evidence was "overwhelming" relating to Bendectin, and expert opinion on causation based in part on differential diagnosis was inadmissible). *See also* Mattis v. Carlon Elec. Prods., 114 F. Supp. 2d 888, 893 (D.S.D. 2000) (noting that a number of cases have accepted differential diagnosis as reliable, but that "[d]ifferential diagnosis of RADS . . . have not fared so well in the federal courts"); Gary Sloboda, *Differential Diagnosis or Distortion?*, 35 U.S.F. L. Rev. 301 (2001) (discussing differential diagnosis and issues of causation).

1628. *See, e.g.*, Mitchell v. Gencorp, Inc., 165 F.3d 778, 781 (10th Cir. 1999); Black v. Food Lion, Inc., 171 F.3d 308, 314 (5th Cir. 1999); Allen v. Pa. Eng'g Corp., 102 F.3d 194, 199 (5th Cir. 1996); Wright v. Willamette Indus., Inc., 91 F.3d 1105, 1106 (8th Cir. 1996) (plaintiffs have burden of proving "the levels of exposure that are hazardous to human beings generally as well as plaintiff's actual level of exposure"); Siharth v. Sandoz Pharm. Corp., 131 F. Supp. 2d 1347 (N.D. Ga. 2001). *But see* Meister v. Med. Eng'g Corp., 267 F.3d 1123 (D.C. Cir. 2001) (overwhelming epidemiological evidence finding no causal relationship between breast implants and scleroderma overcame plaintiff's evidence to the contrary based on asserted differential diagnosis). *See also Supreme Court's Trilogy, supra* note 1560, at 26; Joseph Sanders & Julie Machal-Fulks, *The Admissibility of Differential Diagnosis Testimony to Prove Causation in Toxic Tort Cases: The Interplay of Adjective and Substantive Law*, 64 Law & Contemp. Probs. 107 (2001); *Sloboda, supra* note 1627.

ment.[1629] A lack of epidemiological or other studies demonstrating an objective, scientifically established association between the disease and the causative agent has led some circuits to reject some clinical medical testimony as unreliable.[1630] However, all methodologically sound studies should be considered, with the focus on whether the studies reasonably permit the inference or conclusion sought to be drawn. "While an epidemiological study may be the best or ideal evidence, *Daubert* requires only that reliable evidence be presented . . . ."[1631] It is unclear whether *Kumho Tire*'s admonition that no specified set of factors will apply to every case, and that each case must be considered in light of the circumstances, will affect how the circuits consider clinical medical evidence.[1632]

## 23.274 Research as a Result of Litigation

Another area of concern is whether an inordinate focus on independent research and peer review as indicia of reliability may lead to the exclusion of research conducted as a result of litigation, even though the science is valid. The committee note to Rule 702 offers as a possible relevant factor whether the

---

1629. Westberry v. Gislaved Gummi AB, 178 F.3d 257, 264 (4th Cir. 1999) (evidence of exposure and temporal proximity to plaintiff's injury was sufficient to "rule in" talc as a causal agent, even though physician had no scientific literature upon which to rely); Ruiz-Troche v. Pepsi Cola of P.R., 161 F.3d 77, 86 (1st Cir. 1998) (finding district court had improperly imposed requirement that expert be able to "declare that a precise quantity of cocaine in the bloodstream produces an equally precise degree of impairment"); Brasher v. Sandoz Pharms. Corp., 160 F. Supp. 2d 1291 (N.D. Ala. 2001) (finding that "animal studies, the medical literature reviews, the ADRs reported to the FDA, and the 'general acceptance' of the association between stroke and Parlodel, reflected in several neurology and toxicology textbooks and treatises" constituted reliable evidence on which a conclusion could be drawn); Hollander v. Sandoz Pharms. Corp., 95 F. Supp. 2d 1230 (W.D. Okla. 2000) (lack of controlled epidemiological studies reflecting association between stroke and Parlodel, reliance on anecdotal case reports, and the dissimilarity of the animal studies and the experts' methodologies failed to establish reliability of methods used by plaintiffs' experts); Savage v. Union Pac. R.R. Co., 67 F. Supp. 2d 1021, 1033–34 (E.D. Ark. 1999) (expert testimony excluded where plaintiff introduced no evidence of the nature of creosote exposure necessary to lead to basal cell carcinoma, the level of exposure needed, or the level of his own exposure with any degree of scientific certainty). *Compare* Heller v. Shaw Indus., Inc., 167 F.3d 146 (3d Cir. 1999), *with* Black v. Food Lion, Inc., 171 F.3d 308 (5th Cir. 1999), *and* Moore v. Ashland Chems., Inc., 151 F.3d 269 (5th Cir. 1998).

1630. *See, e.g.*, Hollander v. Sandoz Pharms. Corp., 95 F. Supp. 2d 1230 (W.D. Okla. 2000); *Black*, 171 F.3d at 313–14. *But see* Nat'l Bank of Commerce v. Associated Milk Producers, Inc., 191 F.3d 858, 864 (8th Cir. 1999) (affirming exclusion of expert testimony based on differential diagnosis in absence of scientific studies correlating aflatoxin M-1 with laryngeal cancer).

1631. *Brasher*, 160 F. Supp. 2d at 1298.

1632. For an example of an opinion issued after *Kumho Tire*, see *Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999).

expert is proposing to testify about matters growing naturally and directly out of research independent of litigation, and the Ninth Circuit on remand in *Daubert* stated "If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'"[1633] The Supreme Court in *Daubert* said that a corollary indicator of reliability could be whether the research had been subject to peer review or published.[1634] Although in some instances a failure to satisfy these two criteria may justifiably call into question the reliability of the science, in other cases there may be a dearth of scientific evidence as to the existence of a causal relationship between exposure to a chemical, product, or contaminant and adverse health effects, because the relationship has not been sufficiently tested or because the substance is new.[1635] The Court noted in *Kumho Tire* that the "particular application at issue may never previously have interested any scientist,"[1636] or the issue may not have been one to generate any interest among editors of scientific publications. In such cases there are no established studies on which experts can rely, and often it is the harm which gave rise to the litigation that spurred whatever research exists.[1637] Such research may be both credible and reliable, even though it has neither grown "naturally and directly out of research independent of litigation,"[1638] nor yet been published. Rigid application of these criteria might preclude a party's ability to prove causation simply because the question as to whether there was a causal relationship had never arisen before.

---

1633.  Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1317–18 (9th Cir. 1995).

1634.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593–94 (1993); *Ruiz-Troche*, 161 F.3d at 84 ("The publication of these pieces and their exposure to peer review serve as independent indicia of the reliability of the . . . technique . . . [and] also demonstrate a measure of acceptance of the methodology within the scientific community.").

1635.  *See* Wendy E. Wagner, *The Science Charade in Toxic Risk Regulation*, 95 Colum. L. Rev. 1613 (1995).

1636.  526 U.S. at 151. *See, e.g.*, Lauzon v. Senco Prods. Inc., 270 F.3d 681, 691 (8th Cir. 2001) (lack of peer reviewed information on dangers associated with pneumatic nailers a result of the fact that only recently had there been an increase in popularity of pneumatic-fire nailers and concomitant increase in injuries).

1637.  The Bendectin litigation seems to provide an example of research spurred by litigation. *See* Joseph Sanders, *The Bendectin Litigation: A Case Study in the Life Cycle of Mass Torts*, 43 Hastings L.J. 301 (1992). *See also* Bourne v. E.I. DuPont De Nemours, 189 F. Supp. 2d 482, 484 n.2 (S.D. W. Va. 2002) (parties engaged in studies of benomyl and its relationship to plaintiff's birth defects during pendency of case).

1638.  *Daubert*, 43 F.3d at 1317.

## 23.3  Case Management[1639]

.31 Preliminary Considerations in Assessing Expert Testimony  491
.32 The Initial Conference  494
.33 Disclosures  499
.34 Discovery Control and Management  503
    .341 Discovery of Testifying Experts  503
    .342 Discovery of Nontestifying Experts  504
    .343 Discovery of Nonretained Experts  504
    .344 Discovery of Court-Appointed Experts  505
    .345 Use of Videotaped Depositions  505
.35 Motion Practice  506
    .351 Initiating a *Daubert* Inquiry  507
    .352 Timing of Challenges to Expert Testimony  508
    .353 Handling a Challenge to Expert Testimony  509
    .354 Summary Judgment  512
.36 Final Pretrial Conference  513
.37 Trial  514

## 23.31  Preliminary Considerations in Assessing Expert Testimony

Although *Kumho Tire* clarified that the gatekeeping requirement extends to "technical or other specialized knowledge" and reemphasized that the test for determining reliability is a flexible one, nuances of *Daubert* and its proper interpretation remain a subject of debate.[1640] In ruling on the admissibility of scientific evidence under the *Daubert* standard, and in light of the amendments to Rule 702, the court must still consider the following questions:

*What factors should apply to ensure the reliability of expert testimony?* The *Daubert* Court set out several factors as indicia of scientific reliability, but also recognized that these factors might not be pertinent in every case. Rather, different types of expert scientific evidence might require application of different indicia of reliability.[1641] Moreover, *Kumho Tire* did not set forth any factors that would be more appropriate than others in assessing expert evi-

---

1639.  Portions of the following subsections were adapted from and substantially incorporate the text of *Management of Expert Evidence*, *supra* note 1545, at 39.

1640.  526 U.S. at 147 (quoting Fed. R. Evid. 702). *See, e.g.*, Ned Miltenberg, *Step Out of the Fryeing Pan and into the Fire, and Out Back Again—or "Back to the Future,"* 2 Ann. 2000 ATLA-CLE 2645, § I (2000) ("Although nearly a decade has passed since *Daubert* was decided, its meaning is still sufficiently unclear that each year it inspires scores of precedent-setting interpretations and new law review articles . . . . Thus, *Daubert* and its progeny have been the subject of nearly 2,800 published opinions and 3,300 law review articles.").

1641.  *See, e.g.*, City of Tuscaloosa v. Harcros Chem., Inc., 158 F.3d 548, 566 n.25 (11th Cir. 1998) (factors other than "testability" may have more bearing on methodologies employed by economic and statistical experts).

dence that fell under the rubric of "technological or other specialized knowledge."[1642] The possible fields of such nonscientific evidence were simply considered too diverse. As a practical matter, as it relates to testimony to which the *Daubert* factors do not easily apply, the selection of criteria appropriate to judge the reliability of a particular type of expert testimony will be a coordinated effort between the judge and the parties. Even nonscientific testimony, however, must be measured against the standards reflected in the amendments to Rule 702. Thus, underlying any *Daubert* inquiry is the manner or method by which the court determines first the appropriate criteria necessary to fulfill its gatekeeping role, and then how the testimony is judged against those criteria. Commentators have expressed varying views on when, and how, *Daubert's* gatekeeping obligation is triggered.[1643]

The *Reference Manual on Scientific Evidence* provides a good starting place for determining how to structure an inquiry into the process and methods used by an expert in order to establish whether the testimony or evidence is sufficiently reliable to be admitted.[1644] In addition, the committee note to amended Rule 702 details additional factors beyond the *Daubert* criteria that may be relevant in making reliability determinations in various types of cases. Below are some examples:

- whether the expert is proposing to testify about matters growing naturally and directly out of research independent of litigation (a matter discussed immediately above);

---

1642. *See* Robert J. Goodwin, *Roadblocks to Achieving "Reliability" for Non-Scientific Expert Testimony: A Response to Professor Edward J. Imwinkelried*, 30 Cumb. L. Rev. 215 (1999–2000) (asserting that cases involving hard sciences are more likely to include testability as factor, and that soft science or nonscientific evidence might not be subject to similar constraints); *see also* McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1043 (2d Cir. 1995) (concluding that the consulting engineer's "background and practical experience qualif[ied] as 'specialized knowledge'" and that expert had practical experience and necessary academic training to reach conclusion).

1643. *See, e.g.*, Andrew I. Gavil, *Defining Reliable Forensic Economics in the Post-Daubert/Kumho Tire Era: Case Studies from Antitrust*, 57 Wash. & Lee L. Rev. 831, 849 (2000) (The party seeking exclusion bears the initial burden of demonstrating the unreliability of the evidence, presumably utilizing *Daubert*, which would then shift the burden to the proponent to provide a "defense" of the testimony by proffering alternative factors as the "right" criteria and that his or her expert's testimony is reliable when judged by that criteria.). *See also* Blevins v. New Holland N.A., Inc., 128 F. Supp. 2d 952, 956–57 (W.D. Va. 2001) (noting that all of the *Daubert* factors will not apply in every case and finding expert's testimony admissible based on all the circumstances).

1644. *Expert Evidence*, *supra* note 1545, at 39–66.

- whether the expert has engaged in improper extrapolation (i.e., drawing an unsupported conclusion from an accepted premise);[1645]
- whether the expert took into account possible alternative explanations (for example, an important element of differential diagnosis is that the expert take into account other potential causes);[1646]
- whether the expert is being as careful as he or she would be in regular professional work, outside of paid litigation consulting; and
- whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Courts also have considered

- whether the expert relied on anecdotal evidence, basing an opinion solely on personal experience with patients or a few case studies—this issue can arise when considering expert testimony based on clinical medical judgment or differential diagnosis;[1647]
- whether there is a temporal relationship between the exposure to the event and the subsequent injury—this factor is premised on requiring a conclusion as to causation to be based on more than just temporal proximity;[1648]

---

1645. *See, e.g.*, Black v. Food Lion, Inc., 171 F.3d 308, 313–14 (5th Cir. 1999) (expert opinion based in "fallacy of post-hoc propter-hoc reasoning" was unsupported by specific reliable methodology and contradicted by general level of medical knowledge); Moore v. Ashland Chem., Inc., 151 F.3d 269, 279 (5th Cir. 1998) (expert testimony would be excluded where expert drew unsupported extrapolations).

1646. Westberry v. Gislaved Gummi AB, 178 F.3d 257, 265 (4th Cir. 1999) (alternative causes affect weight, not admissibility of the testimony unless the expert cannot explain why she concluded that a proffered alternative was not the sole cause). *See also* Fed. R. Evid. 702 committee note; Claar v. Burlington N. R.R. Co., 29 F.3d 499, 502 (9th Cir. 1994) (expert opinion excluded for failing to "rule out other possible causes for" plaintiffs' injuries); *In re* Paoli R.R. Yard PCB Litig., 35 F.3d 717, 764–65 (3d Cir. 1994) (expert opinion based on differential diagnosis not inadmissible where it failed to account for all possible causes, as long as the expert considered alternative causes and can explain the soundness of the opinion in the face of alternative causes proposed by the opposing party).

1647. *See, e.g.*, Antoine-Tubbs v. Local 513, 50 F. Supp. 2d 601, 609–11 (N.D. Tex. 1998) (testimony of physician practicing less than two years, who had seen only one case of preeclampsia and had not seen medical literature or studies on whether work-related stress can cause illness, was unreliable and not grounded in traditional clinical medical knowledge).

1648. *See, e.g.*, Mattis v. Carlon Elec. Prods., 114 F. Supp. 2d 888, 894 (D.S.D. 2000) ("[O]pinion based solely on the temporal relationship between exposure and the onset of symptoms is not generally enough to qualify as scientifically valid under *Daubert*."). Although temporal proximity can be considered, there also must be some established connection between the injury-producing substance and illness. Temporal proximity can then be used to confirm the causal connection but, although there are some exceptions, it is generally considered unreliable

- the relationship of the technique used by the expert to established methodologies;[1649]
- the qualifications of the expert witness to use the methodology;[1650] and
- the nonlitigation uses to which the method has been put.[1651]

*Is there consistency within the circuit, as well as the district, on the factors used to assess similar types of expert evidence?* One of the questions surrounding *Daubert* inquiries is whether there is a need to ensure consistency and predictability in the factors applied to different types of expert evidence, both in the district and within the circuit. *Kumho Tire*'s admonition regarding the deference afforded trial court's determination as to the appropriate factors to apply in a given case could result in one court within a district applying different factors than another court applies to similar expert testimony.[1652] Variation across the circuit is also likely.

## 23.32  The Initial Conference

The probability that expert testimony will play a prominent role in a case often is apparent from the face of the complaint. Where the expert evidence promises to be protracted or controversial, or to address novel subjects that will challenge the comprehension of the judge and the jury, management of expert testimony should be part of a coordinated case-management strategy. The initial conference presents a good opportunity to explore preliminarily the nature and extent of the need for judicial management of expert evidence in

---

to explain the result in a particular case. *Moore*, 151 F.3d at 278 ("In the absence of an established scientific connection . . . or compelling circumstances . . . the temporal connection between exposure to chemicals and an onset of symptoms, standing alone, it is entitled to little weight in determining causation."). *But see Westberry*, 178 F.3d at 265 ("[D]epending on the circumstances, a temporal relationship between exposure to a substance and the onset of a disease or a worsening of symptoms can provide compelling evidence of causation.").

1649.  Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000) *and In re* TMI Litig., 193 F.3d 613, 665 (3d Cir. 1999) (both cases citing *In re* Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d Cir. 1994)). *See* Braun v. Lorillard, Inc., 84 F.3d 230, 234–35 (7th Cir. 1996) (excluding testimony of expert with no previous experience testing human or animal tissue for asbestos fibers before being hired by plaintiff and who, to test such tissues, used test method that was designed for use on building materials).

1650.  *In re* TMI Litig., 193 F.3d at 665. "However, 'the level of expertise may affect the reliability of the expert's opinion.'" *Id.* at 664 (quoting *In re Paoli*, 35 F.3d at 741).

1651.  *In re* TMI Litig., 193 F.3d at 665.

1652.  Justice Breyer emphasized that "[t]oo much depends on the particular circumstances of the particular case at issue" and declined to identify factors that would be applicable to all cases or "subsets of cases categorized by category of expert or by kind of evidence." 526 U.S. 137, 150 (1999).

the case.[1653] Areas that can be explored, either at the initial conference or, depending on the complexity of the litigation, in subsequent case-management conferences once the issues have been more refined, include the kinds of evidence likely to be offered, the technical and scientific subject matter, and anticipated areas of controversy. The court should inquire into whether the science involved is novel and still in development, or whether the scientific issues for which expert testimony will be offered are well settled.[1654] To the extent the conference discloses that a particular scientific issue is relevant but not in dispute, such as whether exposure to asbestos is capable of causing lung cancer and mesothelioma (i.e., general causation), the court should encourage the parties to stipulate to its admission. (Judges take different positions on use of collateral estoppel to preclude relitigation of facts based on scientific evidence.[1655])

   One approach to handling the issue of expert evidence at the initial pretrial conference is to advise counsel in advance to be prepared to respond to inquiries into the nature of the claims and defenses together with any underlying assumptions, into the nature of expert evidence expected to be offered, and, if known, into the areas of disagreement among experts.[1656] Additional areas that may be appropriate for discussion during the initial conference, depending on the complexity of the case, include the following:

---

1653.  The committee note states that the rule is intended to "clarify that in advance of trial the court may address the need for, and possible limitations on, the use of expert testimony . . . ." Fed. R. Civ. P. 16(c)(4) committee note. *See also* Med. Consultants Network, Inc. v. Cantor & Johnson, P.C., No. CIV.A. 99-0528, 2001 WL 10788 *3 (E.D. Pa. Dec. 27, 2000) (expert accounting testimony unnecessary where all accountant did was multiply each employee's hours by his or her hourly rate, which does not require accounting expertise).

1654.  The court may also want to determine whether the scientific issues in the case before it are also pending in other litigation.

1655.  *Compare* Ezagui v. Dow Chem. Corp., 598 F.2d 727, 732–33 (2d Cir. 1979) (estopping litigation on the issue that vaccination package inserts inadequately apprised doctors of known hazards), *with* Hardy v. Johns-Manville Sales Corp., 681 F.2d 334, 341–48 (5th Cir. 1982) (disallowing collateral estoppel to preclude relitigation of the fact that asbestos products are unreasonably dangerous and that asbestos dust causes mesothelioma). For an interesting discussion of the application of collateral estoppel, see *Bertrand v. Johns-Manville Sales Corp.*, 529 F. Supp. 539, 544–45 (D. Minn. 1982) (holding it is "clear" that the court should collaterally estop litigation on the specific fact that "asbestos dust can cause diseases such as asbestosis and mesothelioma . . . ." because "[t]his proposition is so firmly entrenched in the medical and legal literature that it is not subject to serious dispute," but declining to apply collateral estoppel to the more disputable use of the "state of the art" defense and the claim that asbestos is "unreasonably dangerous").

1656.  The object of this exercise should be education, not argument; all participants should be given an opportunity to learn about the case. By infusing the conference with a spirit of inquiry, the court can set the tone for the litigation, encouraging clarity, candor, and civility.

- *Do the parties anticipate retaining testifying experts?* In cases where settlement is likely, the parties may wish to defer retaining experts and thereby avoid unnecessary expense.[1657] Where the case can make progress toward settlement without early identification of experts (for example, if nonexpert discovery could provide a basis for settlement), consider deferring expert evidence issues for some period.[1658] In more complex cases, the resolution of a conflict over expert testimony may be dispositive and deferral of expert discovery might impede, rather than facilitate, resolution of the case. In cases where discovery is proceeding in phases, consider discussing with the parties the feasibility of identifying experts in a similarly staged fashion, or whether the case would best be served by delaying all expert discovery until all other discovery has been completed.

- *Should there be a limit on the number of expert witnesses?* Some judges limit parties to one expert per scientific discipline. Ordinarily this is sufficient; however, as a science increases in sophistication, subspecialties develop. In addition, experts in a single specialty may bring to bear a variety of experiences or perspectives relevant to the case. If a party anticipates offering testimony from more than one expert in what appears to be a distinct discipline, it is advisable for the court to inquire whether multiple experts are warranted. Discourage efforts by attorneys to try to bolster the weight of their case by cumulative expert testimony, even where multiple parties are represented on one or both sides.[1659] Consider whether to impose a set limit on the number of expert witnesses that may be offered by a party, subject to modification as the case develops should it appear that multiple experts are necessary.

- *When should the parties exchange experts' reports?* Federal Rule of Civil Procedure 26(a)(2) provides that the timing and sequencing of expert disclosures is at the discretion of the trial court. The rule generally requires that expert disclosures be made not less than ninety days before

---

1657. Deferral may be inappropriate, however, in class-action contexts.

1658. On the other hand, deferring identification of experts until the eve of trial can be costly. In a medical malpractice case, for example, expert evidence is essential to resolve the threshold issue whether the defendant conformed to the applicable standard of practice; without such evidence, the plaintiff has no case.

1659. *In re* Factor VIII or IX Concentrate Blood Prods. Litig., 169 F.R.D. 632, 637 (N.D. Ill. 1996) (transferee court in multidistrict litigation has authority to limit the number of expert witnesses who may be called at trial). *See supra* section 23.26 for a discussion of *Weisgram v. Marley Co.*, 528 U.S. 440 (2000).

trial or at such other time as the judge may order.[1660] The parties are to make detailed written disclosures with respect to each expert retained to testify at trial, including a complete statement of all opinions to be expressed, the basis and reasons supporting the opinions, and the data or other information considered by the witness in forming the opinions.[1661] Although experts' reports obviously will be helpful in identifying issues, financial considerations generally mandate that they not be required until issues have been narrowed to the greatest extent possible. In some cases, however, consider scheduling disclosures in accordance with the sequence in which issues are addressed. For example, in patent cases, expert disclosures relating to claims construction[1662] may be called for early in the case, whereas disclosures relating to infringement and damages may be deferred. In toxic tort cases, submission of expert reports may not be appropriate until factual discovery has been completed. It is best to discuss at the conference when and in what sequence these disclosures should be made.

- *Is the case appropriate for referral to a magistrate judge?* Many district judges routinely refer the pretrial management of civil cases to magistrate judges.[1663] Others believe that there are advantages in having the judge who will try the case manage its pretrial stages to promote familiarity with the issues and avoid delay caused by appeals of the magistrate judge's rulings.[1664]

- *Should the court appoint a special master or an outside expert?*[1665] In many cases it may be helpful for the court to be educated at the outset about the science or technology involved, particularly where the expert evidence will involve science and technology that use language foreign to the uninitiated. Arrangements for initial education can be made pursuant to court order or by stipulation between the parties. In addition, the court should establish whether any tutorials should be

---

1660. Fed. R. Civ. P. 26(a)(2)(B).

1661. *Id.* Usually the party bearing the burden at trial should make the first disclosure, and the other party should respond.

1662. *See infra* section 33.22; Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).

1663. Rule 16(c)(8) makes the referral of matters to a magistrate judge or a special master a subject for consideration at the initial pretrial conference.

1664. *See supra* section 11.53.

1665. The American Association for the Advancement of Science's "Scientific Freedom, Responsibility and Law" program launched a demonstration program, "Court-Appointed Scientific Experts," to help federal judges locate qualified individuals to serve as court-appointed experts. More information is available at http://www.aaas.org/spp/case/case.htm (last visited Nov. 10, 2003).

videotaped or transcribed for review by the judge as the litigation proceeds. If there is a need for judicial education, consider raising the matter at the initial conference and discussing the available options with the parties (e.g., the use of tutorials or neutral court-appointed advisors).[1666] The techniques discussed by Justice Breyer in his concurring opinion in *Joiner* may be appropriate in some cases to help the court meet its gatekeeping obligations: using court-appointed experts, special masters, and specially trained law clerks.[1667] These appointed experts could be asked to assess the methodology used by the testifying experts and whether the conclusion reached is supported by that methodology, short of any inquiry into the validity or "correctness" of that conclusion. The primary focus is on determining what mechanisms would assist the court in its gatekeeping function under Rule 702.[1668] The utility of outside advisors or experts depends on their ability to maintain objectivity and neutrality in their presentation. Among other things, the elements of the advisor's relationship to the judge should be defined, such as prohibitions on *ex parte* communications, if any, and limits on discovery. Always consider the costs and additional time associated with these procedures.[1669] In addition to this discussion, more information can be found at sections 11.51–11.54 and in several Federal Judicial Center publications on the use of special masters and court-appointed experts.[1670]

1666. For a discussion of considerations involved in the appointment of special masters and neutral expert witnesses, see *supra* section 11.5.

1667. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 148–50 (1997). For excellent discussions of the issue, see also Ellen E. Deason, *Court-Appointed Expert Witnesses: Scientific Positivism Meets Bias and Deference*, 77 Or. L. Rev. 59 (1998); Karen Butler Reisinger, Note, *Court-Appointed Expert Panels: A Comparison of Two Models*, 32 Ind. L. Rev. 225 (1998); Joe S. Cecil & Thomas E. Willging, *Accepting Daubert's Invitation: Defining a Role for Court-Appointed Experts in Assessing Scientific Validity*, 43 Emory L.J. 995 (1994).

1668. *See, e.g.*, Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1243 (10th Cir. 2000) ("The purpose of *Daubert* gatekeeping function is not to measure every expert by an inflexible set of criteria . . . ."); Hall v. Baxter Healthcare, 947 F. Supp. 1387, 1392–93 (D. Or. 1996) (In view of the complicated scientific and medical issues involved, the court appointed independent advisors in "epidemiology, immunology/toxicology, rheumatology, and chemistry" to assist in "evaluating the reliability and relevance of the scientific evidence.").

1669. Expert compensation should also be discussed and appropriate fee-sharing arrangements made.

1670. FJC Study, Neutral Science Panels, *supra* note 1059; FJC Study, Special Masters, *supra* note 704; Cecil & Willging, *supra* note 1435.

## 23.33 Disclosures

Federal Rule of Civil Procedure 26(a)(2) sets out required disclosures for parties presenting expert testimony and requires disclosure not only of the data and materials on which the expert relied but also those that the expert "considered . . . in forming the opinions."[1671] Parties need adequate time for experts to be retained and to prepare their reports before the required disclosures are due. The court should impress on counsel the critical importance of Rule 26(a)(2)(B) requirements to the judge's gatekeeping obligations, and the seriousness of the disclosure requirement and any accompanying deadlines.[1672] Counsel should be informed that opinions and supporting facts not included in the disclosure may be excluded at trial, even if they were testified to on deposition.[1673] The judge should remind the parties that destruction of materials furnished to or produced by an expert in the course of the litigation (such as test results, correspondence, or draft memoranda) may lead to sanctions[1674] and that an expert's disclosure must be supplemented if it turns out that any information disclosed was, or has become, incomplete or incorrect.[1675] Failure of a party to comply with the disclosure requirements of Rule 26(a)(2) may

---

1671. Fed. R. Civ. P. 26(a)(2)(B). Litigants may therefore no longer assume that materials furnished to an expert by counsel or the party will be protected from discovery. Fed. R. Civ. P. 26(a)(2)(B) committee note. Courts are divided on the extent to which they require disclosure of attorney work product provided to a testifying expert. *Compare* Karn v. Ingersoll-Rand Co., 168 F.R.D. 633, 639 (N.D. Ind. 1996) (holding that work-product protection does not apply to documents related to the subject matter of litigation provided by counsel to testifying experts), *with* Magee v. Paul Revere Life Ins. Co., 172 F.R.D. 627, 642 (E.D.N.Y. 1997) (holding that "data or other information" considered by the expert, which is subject to disclosure, includes only factual materials and not core attorney work product considered by the expert).

1672. *See, e.g.*, Dura Automotive Sys. v. CTS Corp., 285 F.3d 609 (7th Cir. 2002) (affirming trial court's exclusion of untimely filed disclosure of additional expert witnesses); Nutrasweet Co. v. X-L Eng'g Co., 227 F.3d 776, 786 (7th Cir. 2000) (district court did not abuse its discretion in excluding expert testimony on supplemental report where party failed to timely file the report under Rule 26); *In re* Hanford Nuclear Reservation Litig., No. CY-91-3015, 1998 WL 775340, *172–*73 (E.D. Wash. Aug. 21, 1998) (expert who discovered flaw in model should not change model to conform to estimate after deadline for submission of expert reports).

1673. Santiago v. Furniture Chauffeurs, Piano Movers, Packers & Handlers Local 705, No. 99C 2886G, 2001 WL 11058, *5 (N.D. Ill. 2001) (damage expert barred from testifying on lost goodwill where report was limited to lost profits).

1674. Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 81 (3d Cir. 1994) (sanctions for spoilation of evidence arising from inspection by an expert must be commensurate with the fault and prejudice arising in the case).

1675. Fed. R. Civ. P. 26(e)(1).

lead to exclusion of the expert's testimony at trial, unless such failure is harmless.[1676]

Once the disclosures are in hand, a follow-up Rule 16 conference may help further identify and narrow disputed issues. The court should attempt to identify the bases for any disagreements that disclosure reveals between experts on critical points. Frequently, differences between experts rest on tacit assumptions, such as choices among policies, selection of statistical data or databases, judgments about the level of reasonable risk, or the existence of particular facts. In addition to narrowing the substantive issues, consider the need to address the process by which the expert reached his or her conclusions or the purpose for which the testimony is being offered. The conclusions of a witness offering scientific testimony generally will be the product of multistep reasoning. By breaking down the process, the judge may be able to narrow disputes relating to the testimony to a particular step in the process, and thereby facilitate a resolution.[1677]

---

1676. Rule 37(c)(1) provides: "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) or to amend a prior response to discovery as required by Rule 26(e)(2) is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." *See, e.g.,* S.W. Whey, Inc. v. Nutrition 101, Inc., 126 F. Supp. 2d 1143, 1148–49 (C.D. Ill. 2001) (declining to impose sanction of exclusion under Rule 37 for failure to timely disclose expert report where exclusion would result in large monetary loss that was disproportionate to circumstances surrounding violation and where failure to comply was harmless); *In re* Brand Name Prescription Drugs Antitrust Litig., MDL No. 997, Docket No. 94C897, 2001 WL 30454 (N.D. Ill. Jan. 11, 2001) (precluding plaintiffs from introducing expert evidence of any kind under Rule 37 in light of failure to comply with Rule 26); Bastys v. Rothschild, No. 97 Civ. 5154, 2000 WL 1810107, *26–*27 (S.D.N.Y. 2000) (finding plaintiff's failure to identify and disclose expert warranted sanction under Rule 37 striking affidavits of plaintiff's experts submitted in response to defendant's motion). *See also* Pride v. BIC Corp., 218 F.3d 566, 578 (6th Cir. 2000) ("District courts have broad discretion to exclude untimely disclosed expert-witness testimony."); Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 719 (3d Cir. 1997) (expert testimony would be excluded where there was a violation of pretrial discovery order); Coastal Fuels, Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 202–03 (1st Cir. 1996) (finding no abuse of discretion in district court's exclusion of expert testimony in price discrimination and monopolization case where party failed to produce expert report in accordance with the court's scheduling order). Appellate courts seem cautious about precluding expert testimony where such testimony is an essential element of the case. *See* Freeland v. Amigo, 103 F.3d 1271, 1276 (6th Cir. 1997) (district court abused its discretion by precluding expert testimony in a medical malpractice case as a sanction for failing to comply with a pretrial order setting the deadline for discovery where such preclusion would amount to a dismissal of the case).

1677. For example, proffered survey research may be subject to a hearsay objection. *See* Shari Seidman Diamond, *Reference Guide on Survey Research* [hereinafter *Survey Research*], *in* Reference Manual on Scientific Evidence 233 n.12 (Federal Judicial Center, 2d ed. 2000). Thus, it

   The Federal Judicial Center's *Reference Manual on Scientific Evidence* includes subject-specific reference guides to assist the court in narrowing issues and understanding the applicable scientific criteria within the context of scientific, as opposed to legal, conclusions.[1678] The *Reference Guide on Survey Research*, for example, facilitates narrowing a dispute over proffered evidence by breaking the inquiry into a series of questions about the following topics: the purpose of the survey; identification of the appropriate population and sample frame; the structure of the questions; the recording of data; and reporting.[1679] The *Reference Guide on DNA Evidence* summarizes scientific principles that underlie DNA testing; basic methods used in such testing; characteristics of DNA samples necessary for adequate testing; laboratory standards necessary for reliable analysis; interpretation of results, including the likelihood of a coincidental match; and emerging applications of DNA testing in forensic settings.[1680] Other reference guides in the *Reference Manual on Scientific Evidence* deal with statistics,[1681] multiple regression,[1682] estimation of

is critical to determine whether the purpose of the particular survey is to prove the truth of the matter asserted or only the fact of its assertion.

   1678.  The reference guides are not primers on substantive issues of scientific proof or normative statements on the merits of scientific proof. *See Preface, in* Reference Manual on Scientific Evidence v–vii (Federal Judicial Center, 2d ed. 2000).

   1679.  Each of these issues is then broken into a series of suggested questions that will enable the judge to explore the methodology and reasoning underlying the expert's opinion. For example, the questions concerning identification of the appropriate population and sample frame are as follows: "Was an appropriate universe or population identified?"; "Did the sampling frame approximate the population?"; "How was the sample selected to approximate the relevant characteristics of the population?"; "Was the level of nonresponse sufficient to raise questions about the representativeness of the sample?"; "What procedures were used to reduce the likelihood of a biased sample?"; and "What precautions were taken to ensure that only qualified respondents were included in the survey?" *Survey Research, supra* note 1677, at 239–48.

   1680.  David H. Kaye & George F. Sensabaugh, Jr., *Reference Guide on DNA Testing, in* Reference Manual on Scientific Evidence 485–576 (Federal Judicial Center, 2d ed. 2000).

   1681.  The guide identifies three major issues in the field of statistics: the design of the data-collection process; the extraction and presentation of relevant data; and the drawing of appropriate inferences. David H. Kaye & David A. Freedman, *Reference Guide on Statistics, in* Reference Manual on Scientific Evidence 85 (Federal Judicial Center, 2d ed. 2000).

   1682.  This section deals with issues concerning the analysis of data bearing on the relationship of two or more variables, the presentation of such evidence, the research design, and the interpretation of the regression results. Daniel L. Rubinfeld, *Reference Guide on Multiple Regression, in* Reference Manual on Scientific Evidence 179–227 (Federal Judicial Center, 2d ed. 2000).

economic losses in damages awards,[1683] epidemiology,[1684] medical testimony,[1685] and engineering practice and methods.[1686]

These reference guides, although limited in scope, suggest analytical approaches and opportunities that judges can use in identifying issues. For example, following the general outline of the reference guides, a judge could ask counsel for both sides to exchange and provide to the court a step-by-step outline of the experts' reasoning processes for use at the Rule 16 conference at which issue definition and narrowing is discussed. In addition, after the exchange of written statements of expert opinions (required by Federal Rule of Civil Procedure 26(a)(2)), the judge could direct each side to identify each part of the opposing expert's opinion that is disputed and to state the specific basis for the dispute. To facilitate later *Daubert* inquiries, consider having the parties submit a written critique of the reasoning and methodology utilized by opposing experts prior to beginning expert depositions. Any supplemental submissions necessary to respond to the critique offered by the opposing party could then be disclosed, reducing the need for a second round of depositions that normally would be sought when supplemental reports are disclosed after depositions have occurred.

---

1683.  This guide identifies issues concerning expert qualification, characterization of the harmful event, measurement of loss of earnings before trial and future loss, prejudgment interest, and related issues generally and as they arise in particular kinds of litigation. Robert E. Hall & Victoria E. Lazear, *Reference Guide on Estimation of Economic Losses in Damages Awards*, *in* Reference Manual on Scientific Evidence 277–332 (Federal Judicial Center, 2d ed. 2000).

1684.  This guide identifies issues concerning the appropriateness of the research design, the definition and selection of the research population, the measurement of exposure to the putative agent, the measurement of the association between exposure and the disease, and the assessment of the causal association between exposure and the disease. *Epidemiology*, *supra* note 1050, at 333–400.

1685.  This section describes the various roles of physicians, the kinds of information that physicians consider, and how this information is used in reaching a diagnosis and attributing causation. *Medical Testimony*, *supra* note 1051, at 439–84.

1686.  This section describes the nature of engineering, including the issues that must be considered in developing a design, the evolution of subsequent design modifications, and the manner in which failure influences subsequent design. Henry Petroski, *Reference Guide on Engineering Practice and Methods*, *in* Reference Manual on Scientific Evidence 577–624 (Federal Judicial Center, 2d ed. 2000).

## 23.34  Discovery Control and Management

.341 Discovery of Testifying Experts  503
.342 Discovery of Nontestifying Experts  504
.343 Discovery of Nonretained Experts  504
.344 Discovery of Court-Appointed Experts  505
.345 Use of Videotaped Depositions  505

### 23.341  Discovery of Testifying Experts

Parties may depose experts who have been identified as trial witnesses under Federal Rule of Civil Procedure 26(b)(4)(A), but only after those experts make their disclosure required under Rule 26(a)(2)(B).[1687] Although the judge may relieve the parties of the obligation to exchange these disclosures, it will rarely be advisable to do so; it is also inadvisable to permit the parties to stipulate around the obligation, for a number of reasons:

- Preparation and exchange of the expert disclosures compels parties to focus on the issues and the evidence supporting or refuting their positions. Moreover, the cost and burden of preparing disclosures forces parties to consider whether to designate a particular person as an expert witness and may discourage or limit the use of excessive numbers of experts.

- Exchange of the disclosures may lead the parties to dispense with the opposing experts' depositions. Some attorneys believe that depositions tend to educate the expert more than the attorney when disclosures have been made as required by the rule.

- The disclosures will inform the consideration of any limitations and restrictions on expert evidence.

- The disclosures will compel an expert's proponent to be prepared for trial. Because the proponent must disclose all opinions to be expressed and their bases, surprise at trial will be eliminated, the opponent's trial

---

1687. Fed. R. Civ. P. 26(b)(4)(A). The report under Rule 26(a)(2)(B) is presumptively required of any "witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). This would normally exclude a treating physician, but the rule extends to other areas of expertise. Riddick v. Wash. Hosp. Ctr., 183 F.R.D. 327, 330 (D.D.C. 1998). Courts have looked to the nature of the testimony rather than to the employment status of the witness to determine if such a report is required. Sullivan v. Glock, Inc., 175 F.R.D. 497, 500 (D. Md. 1997). The court may by order, or the parties may by stipulation, exempt a case from this requirement. Rule 26(a)(2)(B) also gives the parties the right to modify, without court order, the procedures or limitations governing discovery, except for stipulations that would interfere with any time set for completion of discovery, hearing of a motion, or trial.

preparation will be improved, and cross-examination will be more effective and efficient.

- The disclosures will aid in identifying evidentiary issues early so that they can be resolved in advance of trial.
- The disclosures may encourage early settlement.

## 23.342  Discovery of Nontestifying Experts

Under Federal Rule of Civil Procedure 26(b)(4)(B), the court may permit discovery by interrogatory or deposition of consulting nontestifying experts "upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means."[1688] Exceptional circumstances may exist where a party has conducted destructive testing,[1689] the results of which may be material, or where the opponent has retained all available qualified experts.[1690] In the absence of such circumstances, a party should not be penalized for having sought expert assistance early in the litigation, and its opponent should not benefit from the party's diligence.[1691]

## 23.343  Discovery of Nonretained Experts

Parties may seek the opinions and expertise of persons not retained in the litigation. However, Federal Rule of Civil Procedure 45(c)(3)(B)(ii) authorizes the court to quash a subpoena requiring "disclosure of an unretained expert's

---

1688.  *See generally* Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co., 128 F. Supp. 2d 1148, 1151–52 (N.D. Ill 2001) ("[C]ourts have consistently held that a party may not discover the identity of, facts know by, or opinions held by an informally consulted expert.").

1689.  Deterioration in the evidence may occur through other means than destructive testing. *See* Delacastor, Inc. v. Vail Assoc., 108 F.R.D. 405 (D. Colo. 1985) (expert who observed site the day after a mudslide was subject to discovery).

1690.  *See Spearman Indus.*, 128 F. Supp. 2d at 1152 (restating and applying the "destructive testing" and "available experts" tests); Disidore v. Mail Contractors, Inc., 196 F.R.D. 410, 417 (D. Kan. 2000) ("Plaintiff has failed to show exceptional circumstances justifying discovery of Defendant's non-testifying expert."); Bank Brussels Lambert v. Chase Manhattan Bank, N.A., 175 F.R.D. 34, 44 (S.D.N.Y. 1997) ("Courts and commentators have commonly identified two situations where the exceptional circumstances standard has been met."); Queen's Univ. at Kingston v. Kinedyne Corp., 161 F.R.D. 443, 447 (D. Kan. 1995) (parties have to meet heavy burden to demonstrate existence of exceptional circumstances (quoting Ager v. Jane Stormont Hosp. & Training Sch. for Nurses, 622 F.2d 496, 502 (10th Cir. 1980))); exceptional circumstances have also been found to exist when the costs of replacing the testimony are "judicially prohibitive." *Bank Brussels Lambert*, 175 F.R.D. at 44.

1691.  *See Spearman Indus.*, 128 F. Supp. 2d at 1152 (rule regarding nontestifying experts designed to protect party from having its experts' testimony used by the opponent).

opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party."[1692] In ruling on such a motion to quash, consider whether the party seeking discovery has shown a substantial need that cannot be otherwise met without undue hardship, whether party will reasonably compensate the subpoenaed person, and whether to impose appropriate conditions on discovery.[1693]

## 23.344 Discovery of Court-Appointed Experts

Federal Rule of Evidence 706 contemplates that the deposition of a court-appointed expert witness may be taken by any party. Technical advisors or other nontestifying experts appointed under the inherent authority of the courts are not necessarily subject to the discovery requirements of Rule 706, permitting the court greater discretion in structuring the terms and conditions for access to such experts for discovery.[1694] The order appointing the expert should discuss the extent to which the parties may seek such discovery from the expert.

## 23.345 Use of Videotaped Depositions

Videotaping expert depositions is particularly appropriate for several reasons: It preserves the testimony of an expert who may be unavailable for trial or whose testimony may be used in more than one trial or in different

---

1692. Fed. R. Civ. P. 45(c)(3)(B)(ii). *See also Spearman Indus.*, 128 F. Supp. 2d at 1152 (exceptional-circumstances standard similarly applies to discovery of notes, reports, and records of nontestifying expert developed in anticipation of litigation).

1693. The committee notes on Rule 45(c)(3)(B)(ii) point out that this provision was intended to protect the intellectual property of nonretained experts:

> The rule establishes the right of such persons to withhold their expertise, at least unless the party seeking it makes the kind of showing required for a conditional denial of a motion to quash…; that requirement is the same as that necessary to secure work product under Rule 26(b)(3) and gives assurance of reasonable compensation.

For a discussion of issues arising with a subpoena for research data from unretained scholars, see *In re American Tobacco Co.*, 880 F.2d 1520, 1527–30 (2d Cir. 1989); see also Paul D. Carrington & Traci L. Jones, *Reluctant Experts*, 59 Law & Contemp. Probs. 51 (1996); Richard L. Marcus, *Discovery Along the Litigation/Science Interface*, 57 Brook. L. Rev. 381 (1991); Mark Labaton, Note, *Discovery and Testimony of Unretained Experts: Creating a Clear and Equitable Standard to Govern Compliance with Subpoenas*, 1987 Duke L.J. 140.

1694. Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387, 1393 n.8 (D. Or. 1996) ("To keep the advisors independent of any ongoing proceedings, I appointed them under FRE 104, not FRE 706, which requires court-appointed experts, in effect, to act as additional witnesses subject to depositions and testifying at trial.").

phases of a single trial; it also permits demonstrations (for example, of tests or of large machinery not feasible in the courtroom); and it provides a more lively and interesting presentation than reading a transcript at trial. Federal Rule of Civil Procedure 30(b)(2) permits a party to videotape a deposition unless otherwise ordered by the court. The judge should establish in advance the ground rules for videotaping, such as the placement and operation of the camera, off-camera breaks, lighting, procedures for objections, and review in advance of use at trial.[1695]

## 23.35  Motion Practice

.351 Initiating a *Daubert* Inquiry  507
.352 Timing of Challenges to Expert Testimony  508
.353 Handling a Challenge to Expert Testimony  509
.354 Summary Judgment  512

Challenges to expert testimony are likely.[1696] The court can take several approaches to them. Rule 26 requires the disclosure of not only the full opinions to be offered by certain experts, but also the bases for the opinions.[1697] The right to depose experts further allows for the exploration by the parties of the bases for opinion, thereby allowing the parties to identify weaknesses in the methodologies employed in order to raise objections to the admissibility of the testimony or evidence. Consider making some preliminary determinations during the initial pretrial conference, not just on the timing of expert discovery and disclosures, but also on appropriate deadlines for any challenges to the reliability and credibility of proposed testimony once disclosures are made. It is helpful to decide objections to expert evidence relating to admissibility, qualifications of a witness, or existence of a privilege in advance of trial whenever possible.[1698] Exclusion of evidence may in some cases remove an essential element of a party's proof, providing the basis for summary judg-

---

1695.  *See* William W Schwarzer et al., Civil Discovery and Mandatory Disclosure: A Guide to Efficient Practice 3-15 to 3-17, app. 79 (2d ed. 1994).

1696.  A Federal Judicial Center survey determined that the admissibility of expert testimony was not disputed in 46% of the reported cases. *FJC Survey on Expert Testimony*, *supra* note 1545, at 4.

1697.  *See* Fed. R. Civ. P. 26(a)(2).

1698.  *See* Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592–93 (1993) (Before admitting expert testimony, the trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid.").

ment.[1699] In other cases, the ruling on an objection may permit the proponent to cure a technical deficiency before trial, such as clarifying an expert's qualifications.

## 23.351 Initiating a *Daubert* Inquiry

Rule 702 directs a court faced with a proffer of expert testimony to determine preliminarily whether the testimony is reliable and scientifically valid. Most courts agree that these gatekeeping obligations do not require a formal Federal Rule of Evidence 104(a) hearing.[1700] Rule 702 requires only that the determination as to the reliability of expert testimony be made prior to its admission into evidence. Some courts have required expert challenges to be made early in the litigation. Failure to raise an objection could be considered a waiver, although *Daubert* suggests the court may still have an obligation to ensure the reliability of the testimony prior to its admission, even in the absence of a formal challenge. At least one court permitted a party whose expert witness was stricken following an early *Daubert* hearing to hire a new expert, although other judges disagree with that approach.[1701] *Kumho Tire* noted that a trial court could "avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted,"[1702] which suggests that the trial court is to engage in at least a cursory assessment, however minimal, to ensure reliability.[1703] At the same time, however, *Kumho Tire* also stated that "where such testimony's factual basis, data, principles, methods, or their application are *called sufficiently into question*,"[1704] the trial judge should determine whether that testimony is reliable. *Kumho Tire* does not specify whether that challenge must come from a party or may be raised *sua sponte*. Thus, despite the "broad latitude" it provided judges in determining how to test reliability, *Kumho Tire* provided no real guidance as to when the court's gatekeeping obligations attach. As a result,

---

1699. *See, e.g.*, Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 319–20 (7th Cir. 1996); Wheat v. Sofamor, S.N.C., 46 F. Supp. 2d 1351, 1357–58 (N.D. Ga. 1999) (expert testimony excluded because it was not relevant).

1700. *See* Goebel v. Denver & Rio Grande W. R.R. Co., 215 F.3d 1083, 1087 (10th Cir. 2000); United States v. Nichols, 169 F.3d 1255, 1263 (10th Cir. 1999); Kirstein v. Parks Corp., 159 F.3d 1065, 1067 (7th Cir. 1998).

1701. *See* Summers v. Mo. Pac. R.R. Sys., 132 F.3d 599, 605 (10th Cir. 1997) (permitting plaintiff to locate new experts after first expert stricken).

1702. 526 U.S. 137, 152 (1999).

1703. "Indeed, the Rules seek to avoid 'unjustifiable expense and delay' as part of their search for 'truth' and the 'jus[t] determin[ation]' of proceedings." *Id.* at 152–53 (citing Fed. R. Evid. 102).

1704. *Id.* at 152 (emphasis added).

there is disagreement as to whether such a preliminary assessment is triggered by the proffer of expert testimony, or only on an objection from the opposing party that calls the testimony sufficiently into question. Considering *Daubert*'s mandate for trial judges to exercise their obligation as gatekeeper, the better view is that judges have an independent duty to challenge expert testimony whenever questions of validity and reliability exist.

## 23.352  Timing of Challenges to Expert Testimony

The judge can require the parties to present objections to expert testimony at any point during the case. One option is to require challenges to be made shortly after the close of expert discovery. At that time, the parties will have had an opportunity to depose opposing experts and determine whether there are any weaknesses in the experts' qualifications or methodologies. This approach facilitates the disposition of summary-judgment motions, to the extent those motions rely in whole or in part on expert evidence. A second option is to require that motions seeking to strike or limit expert testimony be made shortly before trial. Many cases settle before trial, thereby obviating the need to hold a hearing at all. A third option is to require any challenges to expert testimony to be presented during trial.[1705] Holding a *Daubert* hearing during trial, following formal objection, helps minimize the expense of bringing the expert to court twice, and the judge is likely to better understand the testimony in the context of the case. Reserving consideration of the reliability of expert testimony until trial, however, probably carries more disadvantages than advantages. Cases that could have been resolved at the summary-judgment stage instead proceed to trial, with its attendant time and expense. In addition, because of the demands of trial, the judge may not have as full an opportunity to consider the merits of the motion.[1706] On balance, the best approach is to require that challenges to expert testimony be made during pretrial proceedings, either at the close of expert discovery or through in

---

1705.  *See* United States v. Alatorre, 222 F.3d 1098, 1103–04 (9th Cir. 2000) (district court did not abuse discretion in reserving ruling on admissibility of expert testimony until voir dire at trial); United States v. Nichols, 169 F.3d 1255, 1262–64 (10th Cir. 1999) (affirming district court decision to reserve ruling on expert evidence until trial). *But see* Alfred v. Caterpillar, Inc., 262 F.3d 1083, 1087 (10th Cir. 2001) (characterizing *Daubert* objections made at the close of evidence as litigation by "ambush," but finding it unnecessary to reach the issue of the timing of the objection).

1706.  Other disadvantages include keeping the jury waiting while the *Daubert* issues are resolved and, should the expert be stricken, "judicial resources, taxpayer money, and juror time may be wasted because the striking of an expert will in some cases be tantamount to a directed verdict." Judge Harvey Brown, *Procedural Issues Under Daubert*, 36 Hous. L. Rev. 1133, 1144 (1999). *See* Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 133 (11th Cir. 2003).

limine or other motion immediately prior to trial. In cases involving multistage discovery, motions challenging expert witnesses can be presented in a similarly staged manner, if necessary.

## 23.353  Handling a Challenge to Expert Testimony

As discussed previously, *Kumho Tire* affords trial judges wide discretion in deciding "whether or when [a] special briefing or other proceedings are needed to investigate reliability."[1707] The challenge may take the form of a motion to strike or exclude evidence during any pretrial phases or a motion in limine immediately before or during trial, although the failure to correctly characterize a motion should not necessarily preclude its consideration or otherwise impact its disposition.[1708] Such motions often will be accompanied by a motion for summary judgment. Regardless of the form, the movant should set forth specific deficiencies in the expert's report or proposed evidence so that the motion may be handled in an economic and expeditious fashion.[1709] Consider requiring that any expert affidavits or declarations supporting dispositive motions include specific facts that would help to determine the reliability and validity of the data relied on in reaching the opinions and conclusions contained in the declaration. The court can either rule on the motions on the basis of the papers submitted[1710] and the argument by counsel or hold a *Daubert* hearing under Federal Rule of Evidence 104(a) where those issues can be more

---

1707.  *Kumho Tire*, 526 U.S. at 152. *See supra* section 23.351. *See also Expert Evidence*, *supra* note 1545, at 53.54.

1708.  *See, e.g., Kumho Tire*, 526 U.S. at 145 (motion to exclude expert testimony accompanied by summary-judgment motion); Ruiz-Troche v. Pepsi Cola of P.R., 161 F.3d 77, 82 (1st Cir. 1998) (motions in limine to exclude expert testimony filed immediately before trial). Typically these motions are presented as in limine motions. The type of motion presented may, however, effect whether objections are preserved for appeal or must be reasserted during trial. Blevins v. New Holland N. Am., Inc., 128 F. Supp. 2d 952, 954 (W.D. Va. 2001) (motion in limine); Zic v. Italian Gov't Travel Office, 130 F. Supp. 2d 991, 994 (N.D. Ill. 2001) (motion to strike damages expert); Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387, 1392 (D. Or. 1996) (defendants filed motions in limine to exclude testimony on silicone gel breast implants after initial trial dates set). *See Brown, Procedural Issues, supra* note 1706, at 1145–48 (discussing cases where parties failed to preserve objection for appeal).

1709.  *See generally Supreme Court's Trilogy, supra* note 1560, at 9–38; Margaret A. Berger, *Procedural Paradigms for Applying the Daubert Test*, 78 Minn. L. Rev. 1345 (1994) [hereinafter *Procedural Paradigms*]; Goodwin, *supra* note 1642; *see also Kumho Tire*, 526 U.S. at 152–53 (the Federal Rules of Evidence "seek to avoid 'unjustifiable expense and delay' as part of their search for truth and the 'just determination' of proceedings" (quoting Fed. R. Evid. 102)).

1710.  *See Procedural Paradigms, supra* note 1709, at 1373–75.

fully explored.[1711] Where the case-management order requires the parties to provide written critiques of the reasoning and methodology of opposing experts that would form a basis for a *Daubert* challenge prior to the beginning of expert depositions, the parties have the opportunity to explore—and the challenged expert to defend—whether *Daubert* requirements have been met, perhaps facilitating resolution of any subsequent *Daubert* motions on written materials and eliminating the need for an evidentiary hearing.

The *Daubert* Court noted that a Rule 104(a) hearing is necessary only where the opposing party, in response to a prima facie showing of admissibility, can point to a material dispute as to the expert's methodology. The Third Circuit, for example, has held that "when the ruling on admissibility turns on factual issues, . . . at least in the summary judgment context, failure to hold [an in limine] hearing may be an abuse of discretion."[1712] Although a number of judges have provided for extensive *Daubert* hearings in some cases, the general consensus seems to be that neither the party proffering the testimony nor the party opposing it is entitled to a Rule 104(a) hearing.[1713] One alternative is to hold an evidentiary hearing only where, despite the affidavits and evidence submitted by the parties, there are still questions that have not been addressed.[1714]

There is some disagreement as to whether a full-blown evidentiary hearing is ever appropriate. Some courts have afforded an expanded *Daubert* hearing that has taken the form of a minitrial, focused solely on the question of expert admissibility. The Third Circuit has stated that the decision to grant a hearing does not entitle the party to "an open-ended and never-ending opportunity to meet a *Daubert* challenge until [the party] 'gets it right.'"[1715] If an evidentiary

---

1711.  *See, e.g.*, Oddi v. Ford Motor Co., 234 F.3d 143, 154 (3d Cir. 2000) (the most efficient procedure is an in limine hearing, but where evidentiary record is well developed it is within court's discretion to conclude hearing may not be necessary). "The facts of the case and the consequences of losing the in limine motion will determine the extent of the opportunity the proponent of the expert must be given to present its case. When a hearing is held, it is important that its limits be well defined and its progress carefully controlled." *Supreme Court's Trilogy*, *supra* note 1560, at 29.

1712.  Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999); *see also In re* TMI Litig., 199 F.3d 158, 159 (3d Cir. 2000) (in limine hearing is important where evidentiary challenge is in context of summary judgment or where exclusion will eventually result in summary judgment being granted). For a more thorough discussion of the interplay between a Rule 104(a) hearing and a motion for summary judgment, see William W Schwarzer & Joe S. Cecil, *Management of Expert Evidence, in* Reference Manual on Scientific Evidence 39, 54–56 (Federal Judicial Center 2d ed. 2000).

1713.  *See Oddi*, 234 F.3d at 154–55.

1714.  *See, e.g.*, *Padillas*, 186 F.3d at 418.

1715.  *In re TMI Litig.*, 199 F.3d at 159.

hearing is necessary, the extensiveness of the hearing will be determined by the nature of the case and the type of expert testimony being offered. Obviously, expanded proceedings can consider a broader range of issues and delve more deeply into the underpinnings of expert testimony. However, the court should take care to avoid assessing the credibility of expert testimony and should ensure that it is not encroaching into the province of the jury in deciding factual disputes among the parties.[1716] In all cases, consider whether extensive *Daubert* hearings are an effective use of both judicial and party resources.

When a hearing is appropriate, the court should precisely define the hearing's scope and control its progress; otherwise, hearings may take on a life of their own, resulting in a lengthy, expensive, and unnecessary preview of the trial. It is best to rule on motions by written order or on the record, stating specifically the effect of the ruling and the grounds for it.[1717] It is also advisable to indicate whether the ruling is final or might be revisited at trial. Parties are entitled to know whether they have preserved the issue for appeal or whether an offer or objection at trial is necessary. It is helpful if the judge indicates whether the ruling might be affected by evidence received at trial.[1718]

---

1716. "This gatekeeping role is simply to guard the jury from considering as proof pure speculation presented in the guise of legitimate scientifically-based expert opinion. It is not intended to turn judges into jurors or surrogate scientists." Joiner v. Gen. Elec. Co., 78 F.3d 524, 530 (11th Cir. 1996), *rev'd*, 522 U.S. 136 (1997). *See* Jahn v. Equine Servs., PSC, 233 F.3d 382, 393 (6th Cir. 2000) ("[T]he district court erred by mischaracterizing the methodology employed by Jahn's experts and by weighing their testimony against that of pathologists . . . ."); *see also* Anthony Z. Roisman, *The Courts, Daubert, and Environmental Torts: Gatekeepers or Auditors*, 14 Pace Envtl. L. Rev. 545 (1997).

1717. *Jahn*, 233 F.3d at 393 ("A district court should not make a *Daubert* ruling prematurely, but should only do so where the record is complete enough to measure the proffered testimony against the proper standards of reliability and relevance."); United States v. Call, 129 F.3d 1402, 1405 (10th Cir. 1997) (although *Daubert* does not require a hearing, the district court should ensure the record is sufficiently developed to allow appellate "determination of whether the district court properly applied the relevant law").

1718. *See In re* Paoli R.R. Yard PCB Litig., 916 F.2d 829, 854–55 (3d Cir. 1990) (proponent of expert witness entitled to notice of grounds for exclusion and opportunity to remedy deficiency); *see also Padillas*, 186 F.3d at 418 (court abused its discretion in entering summary judgment after excluding expert evidence without holding an in limine hearing to consider shortcomings of the expert's report); Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387, 1392–95 (D. Or. 1996) (convening Rule 104(a) hearing to determine admissibility of evidence of harmful effects of silicone gel breast implants); *Procedural Paradigms, supra* note 1709, at 1380–81 (calling for fully developed record in challenges to scientific evidence to permit a basis for trial court ruling on summary-judgment motion and for appellate court review). Federal Rule of Evidence 103(a) was recently amended to preserve a claim of error for appeal once the court makes a definitive ruling on the record admitting or excluding evidence either at or before trial without the party's renewing the objection. Fed. R. Evid. 103(a) committee note.

## 23.354 Summary Judgment

When a ruling excludes expert evidence offered to meet an essential element of a party's case,[1719] or where the court rules that expert evidence is too conclusory to raise a genuine issue of fact,[1720] the ruling may provide a basis for summary judgment. Summary-judgment motions frequently will be submitted in conjunction with motions under Federal Rule of Evidence 104(a). Issues determinative of admissibility under Rule 104(a), however, will not necessarily be dispositive of the issues under Federal Rule of Civil Procedure 56 (i.e., the absence of a genuine issue of material fact), although they may lay the foundation for summary judgment. The judge is advised to discuss with counsel their intentions with respect to such motions at an early Rule 16 conference and to consider whether there are likely to be grounds for a meritorious motion.[1721] However, it is best to discourage the filing of proposed motions where triable issues clearly appear to be present; voluminous and complex motions unlikely to succeed simply delay the litigation and impose unjustified burdens on the court and parties.[1722]

Declarations filed in opposition to summary-judgment motions must present specific facts that would be admissible in evidence and that show a genuine issue for trial.[1723] At trial an expert is permitted to state an opinion

---

1719. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 320 (1986) (district court excluded plaintiff's submitted evidence in defense of summary judgment regarding her deceased husband's exposure to defendant corporation's asbestos products).

1720. In his dissenting opinion in *American International Adjustment Co. v. Galvin*, Judge Posner stated the following:

> [A] party cannot assure himself of a trial merely by trotting out in response to a motion for summary judgment his expert's naked conclusion about the ultimate issue . . . The fact that a party opposing summary judgment has some admissible evidence does not preclude summary judgment. We and other courts have so held with specific reference to an expert's conclusional statements . . . The Federal Rules of Evidence permit 'experts to present naked opinions,' but 'admissibility does not imply utility . . . An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process,' and his 'naked opinion' does not preclude summary judgment.

86 F.3d 1455, 1464 (7th Cir. 1996) (Posner, C.J., dissenting).

Parties must be given an adequate opportunity for discovery to develop the evidence necessary to oppose a summary-judgment motion. *See Celotex*, 477 U.S. at 322 (the opponent of the motion is entitled to "adequate time for discovery" needed to oppose the motion); William W Schwarzer & Alan Hirsch, *Summary Judgment After Eastman Kodak*, 45 Hastings L.J. 1, 17 (1993). The disclosures required under Rule 26(a)(2) should help in developing an adequate record.

1721. *See* Fed. R. Civ. P. 16(c)(5).

1722. *See generally Procedural Paradigms*, *supra* note 1709, at 1376–81; Edward Brunet, *The Use and Misuse of Expert Testimony in Summary Judgment*, 22 U.C. Davis L. Rev. 93 (1988).

1723. *See* Fed. R. Civ. P. 56(e).

without first testifying to the underlying data. (Federal Rule of Evidence 705, as amended in 1993, permits an expert "to testify in terms of opinion or inference and give reasons therefore without first testifying to the underlying facts or data, unless the court requires otherwise." This eliminated the much criticized practice of asking experts hypothetical questions, leaving it to cross-examination at trial to bring out relevant facts.[1724]) A declaration containing conclusory statements of opinion by an expert, however, unsupported by facts, is insufficient to raise a triable issue.[1725] The sufficiency of an expert's declaration is logically intertwined with the admissibility of the expert's testimony at trial. Thus, it makes sense, as noted above, to combine the Rule 104(a) and Rule 56 proceedings. The reliability and validity of the expert evidence should be assessed prior to resolving the issues presented on summary judgment.

## 23.36  Final Pretrial Conference

The goal of the final pretrial conference is to formulate the plan for trial, including a program for facilitating the admission of evidence.[1726] Issues should at this point be defined with precision and finality to the extent they can be resolved prior to trial. This includes ruling on pending objections to expert testimony by motions in limine or otherwise, and trying to arrive at stipulations of facts and other matters to streamline the trial. The following techniques can aid this process:

- direct the parties to submit statements identifying the disputed portions of the opposing experts' reports;
- require the submission of a joint statement specifying the matters on which the experts disagree and the bases for each disagreement;
- rule on the admissibility of all exhibits and demonstrations to be offered by experts at trial, such as films, videos, simulations, or mod-

1724. Fed. R. Evid. 705 committee note; *see also id.* 703 (requiring court to balance the probative value of inadmissible evidence relied on by an expert in forming his or her opinion, with its prejudicial effect if it were to be disclosed to the jury).

1725. *See* First United Fin. Corp. v. United States Fid. & Guar. Co., 96 F.3d 135, 140–41 (5th Cir. 1996) (according to circuit precedent, expert affidavits should include some indication of the reasoning process underlying the expert's opinion); Mendes-Silva v. United States, 980 F.2d 1482, 1488 (D.C. Cir. 1993). *But see* Bulthuis v. Rexall Corp., 789 F.2d 1315, 1318 (9th Cir. 1985) (per curiam) (holding that expert opinion is admissible and may defeat a summary-judgment motion if it appears that the affiant is competent to give expert opinion and the factual basis for the opinion is stated in the affidavit, even though the underlying factual details and reasoning on which the opinion is based are not).

1726. Fed. R. Civ. P. 16(d).

els—the judge should give opposing parties a full opportunity to re-
view them in advance of trial and to raise any objections;

- encourage cooperation in presenting scientific or technical evidence,
  such as joint use of courtroom electronics, stipulated models, charts or
  displays, tutorials, and a glossary of technical terms for the court and
  jury; and

- encourage stipulations on relevant background facts and other non-
  controversial matters.

## 23.37  Trial

Attorneys and witnesses in scientific and technological cases tend to use
the jargon of the discipline, which is a language foreign to others. From the
outset, it is advisable to require the attorneys and the witnesses to use plain
English to describe the subject matter and present evidence so that it can be
understood by laypersons. Consider reminding experts from time to time that
they are not talking to each other, but are there to communicate with the jury
and the judge.[1727] The court also may explore at the pretrial conference the use
of techniques to facilitate presentation of evidence so that the trier of fact can
understand the subject matter and make informed decisions. Practices that,
singly or in combination, are worthy of consideration include the following:[1728]

- *Structuring the trial.* One of the main obstacles to comprehension is an
  excessively lengthy trial. The court may limit the trial's length by lim-
  iting the scope of the issues, the number of witnesses and documents,
  and the time for each side to conduct direct examination and cross-
  examination. Some cases can be bifurcated, and some can be seg-
  mented by issues so that the jury retires at the conclusion of the evi-
  dence on each issue to deliberate on a special verdict.[1729] Such sequen-
  tial approaches to the presentation of a case to the jury may be useful
  for the trial of severable issues, such as punitive damages, general
  causation, exposure to a product, and certain affirmative defenses. On
  the other hand, such approaches make it more difficult to predict for
  the jurors how long the trial will last.

- *Jury management.* Consider giving preliminary instructions that ex-
  plain what the case is about and what issues the jury will have to de-

---

1727. *See generally supra* sections 11.6, 12.2–12.4; William W Schwarzer, *Reforming Jury
Trials*, 1990 U. Chi. Legal F. 119.

1728. *See also* 1998 ABA Civ. Trial Prac. Stand. 26.

1729. *See* Fed. R. Civ. P. 42(b).

cide. Jurors may be permitted to take notes, and they may be given notebooks with key exhibits, glossaries of complex terms, stipulations, lists of witnesses, and timelines or chronologies. Permitting jurors to ask questions, usually submitted through the court, can also aid their comprehension. Some judges have found interim summations (or interim opening statements) helpful to juror comprehension; the attorneys are allotted a certain amount of time to introduce witnesses and point out the expected significance of their testimony (e.g., "The next witness will be Dr. X, who will explain how the fracture should have been set. He will give you his opinion about the proper use of screws.").

- *Tutorials.* A neutral expert can be retained to present a tutorial for the judge and jury before the presentation of expert evidence at trial begins, outlining the fundamentals of the relevant science or technology without touching on disputed issues. Consider having the parties' experts testify back-to-back at trial so that jurors can get the complete picture of a particular issue at one time rather than getting bits and pieces at various times during the trial.

- *Presentation of evidence.* Various technologies can facilitate the presentation of exhibits. Some technologies are computer based and some simply facilitate projection of documents on a screen, which allows all jurors to follow testimony about a document. Counsel should be advised to use summaries of voluminous data; stipulated summaries of depositions in lieu of a reading of the transcript are helpful. Charts, models, pictures, videos, and demonstrations can all assist juror comprehension.

Blank page inserted for correct pagination
when printing double-sided copies.

# Part III

# Particular Types of Litigation

———————————

30. Antitrust  519

31. Securities  527

32. Employment Discrimination  561

33. Intellectual Property  599

34. CERCLA (Superfund)  643

35. Civil RICO  689

Blank page inserted for correct pagination
when printing double-sided copies.

# 30. Antitrust

.1 Managing the Issues  519
.2 Transactional and Economic Data, and Expert Opinions  522
.3 Conflicts of Interest  524
.4 Related Proceedings  524

Claims or defenses arising under the antitrust laws do not invariably require treatment as complex litigation. Antitrust litigation can, however, involve voluminous documentary and testimonial evidence, extensive discovery, complicated legal, factual, and technical (particularly economic) questions, numerous parties and attorneys, and substantial sums of money, calling for the application of techniques and procedures for the management of complex litigation.[1730] Antitrust claims are not limited to complaints: They are also frequently raised in counterclaims, particularly in patent litigation. Antitrust claims are often brought as class actions and may be filed in several federal and state courts concurrently with or following criminal or administrative proceedings. Antitrust trials usually are long, and there often are controversies over settlements and attorney fees. The earlier sections of this manual will therefore be relevant to many of the issues that arise in the management of complex antitrust litigation, both civil and criminal. In particular, some of the procedures used to manage mass tort and securities cases (see sections 22, 31) may also be of value in multiparty antitrust cases.

## 30.1  Managing the Issues

Effective management of antitrust litigation requires identifying, clarifying, and narrowing pivotal factual and legal issues as soon as practicable (see generally section 11.3). Unless the judge and the attorneys give early attention to these issues, substantial time may be wasted on claims subject to summary dismissal, on class action disputes not critical to the class-certification ruling, and on discovery not relevant to the later-refined issues regarding liability or damages. Defining the issues at an early stage may enable the court to structure

---

1730. Many of the principles and practices of judicial management and of the procedures discussed in this manual were initially developed in antitrust litigation. *See* William W Schwarzer, Managing Antitrust and Other Complex Litigation (1982); ABA Antitrust Section, Monograph No. 3, Expediting Pretrial and Trial of Antitrust Cases (1979); National Commission for the Review of Antitrust Laws and Procedures, Antitrust Commission Report, 80 F.R.D. 509 (1979). *See also* ABA Section of Antitrust Law, Antitrust Law Developments (5th ed. 2002).

the litigation so as to limit the scope and volume of discovery, reduce cost and delay, facilitate the prospects of settlement, and improve the trial.

The procedures for pretrial management of complex litigation discussed in section 11 apply generally to antitrust litigation. General principles relevant to structuring trials apply to antitrust litigation, although the judge should take particular care when considering severance of damage issues from other elements of the claim (see sections 11.631–11.632).[1731]

Issues that may arise in antitrust litigation and may be appropriate for pretrial resolution include the following:

- *Subject-matter jurisdiction.* Jurisdictional issues that may be capable of summary resolution under Federal Rule of Civil Procedure 56 or by a separate Rule 42 evidentiary hearing are (1) whether the requisite effect on interstate commerce can be established[1732] and (2) whether the claim is within the reach of the antitrust laws.[1733]

- *Standing.* A motion under Rule 12 or 56 or by a separate trial under Rule 42 can sometimes resolve the legal issues of whether the claimant enjoys standing to maintain a claim for damages[1734] and whether injury to competition can be demonstrated.

- *Exemptions, immunities.* The application of antitrust laws may be barred or limited by statutory exemptions or immunities, such as

---

1731. *Compare* Ala. v. Blue Bird Body Co., 573 F.2d 309, 318–19, 328 (5th Cir. 1978) (disapproving of bifurcation of liability and damages), *and* Windham v. Am. Brands, Inc., 565 F.2d 59, 70–72 (4th Cir. 1977) (upholding denial of bifurcation), *with In re* Plywood Antitrust Litig., 655 F.2d 627, 631–36 (5th Cir. 1981) (permissible to try issue of statutory violation, including existence of injury and method of calculating damages, separately from amount of individual damages), *and* Franklin Music Co. v. Am. Broad. Cos., 616 F.2d 528, 538 (3d Cir. 1979) (upholding bifurcation of liability and damages phases of trial). Bifurcation of liability and damages issues "must be approached with trepidation." Response of Carolina, Inc. v. Leasco Response, Inc., 537 F.2d 1307, 1324 (5th Cir. 1976).

1732. *See, e.g.*, McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232 (1980).

1733. *Compare* Hunt v. Mobil Oil Corp., 550 F.2d 68, 73, 79 (2d Cir. 1977) (pretrial dismissal based on "act of state" doctrine), *with* Int'l Ass'n of Machinists & Aerospace Workers v. Org. of the Petroleum Exporting Countries, 649 F.2d 1354, 1361–62 (9th Cir. 1981) ("act of state" doctrine applied after trial).

1734. *See, e.g.*, Kansas v. Utilicorp. United, Inc., 497 U.S. 199 (1990) (actions by states and utilities consolidated after summary judgment as to standing); Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519 (1983) (standing requires analysis of relationship between defendants' conduct and plaintiff's injury); Ill. Brick Co. v. Ill., 431 U.S. 720 (1977) (no federal antitrust damages for "indirect" purchases); Brunswick v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977) ("antitrust injury" requirement); Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100 (1969) ("direct injury" requirement).

those applicable to the insurance industry[1735] or organized labor,[1736] where restraints are imposed or authorized by state action,[1737] or where collective solicitation of governmental action has occurred.[1738] The application of the antitrust laws may also be circumscribed by the primary or exclusive jurisdiction of a regulatory agency.

- *Statute of limitations.* Whether an action or claim is time-barred may be appropriate for early resolution by summary judgment.[1739]

- *Market definition.* The definition of the relevant geographic and product market may be critical, and it may determine the existence of market power requisite to prove liability and may also determine the scope of relevant evidence. The parties may be willing to stipulate to, or narrow, the range of dispute over the facts, and at least some facts may be subject to judicial notice. The dispute over the market may be susceptible to resolution under Rule 56 in the absence of disputed evidentiary facts (see section 11.34), or through a separate bench or jury trial under Rule 42. Where extensive fact finding is required, the issue may be referred to a special master, magistrate judge, or court-appointed expert for a report and recommendation (see section 11.5).

- *Theory and proof of damages.* Attention to liability issues in antitrust cases may lead to neglect of injury and damage issues. Early consideration of the proposed theory of damages and proof of cognizable injury may significantly affect the conduct of the litigation. The alleged injury may not qualify as antitrust injury, or the damages claimed may, in whole or in part, not be recoverable under the antitrust laws; if so, claims may be subject to dismissal, the scope of discovery may be reduced, or the method for proving damages may be altered. The extent to which injury and damages will require individualized proof can be critical in determining whether to certify a class of antitrust claim-

---

1735. *See* 15 U.S.C. §§ 1011–1015 (2000); Group Life and Health Ins. Co. v. Royal Drug Co., 440 U.S. 205 (1979) (narrow construction of insurance exception).

1736. 29 U.S.C. §§ 101–110, 113–115 (2000); United States v. Hutcheson, 312 U.S. 219 (1941).

1737. *See* FTC v. Ticor Title Ins. Co., 504 U.S. 621 (1992); Patrick v. Burget, 486 U.S. 94 (1988); S. Motor Carriers Rate Conf., Inc. v. United States, 471 U.S. 48 (1985); Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97 (1980); Parker v. Brown, 317 U.S. 341 (1943).

1738. United Mine Workers v. Pennington, 381 U.S. 657 (1965); E. R.R. Presidents' Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961).

1739. *See, e.g.,* Norton-Children's Hosps. v. James E. Smith & Sons, 658 F.2d 440 (6th Cir. 1981); Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389 (6th Cir. 1975).

ants or whether a consolidated trial of separate but related claims is feasible.

Early scrutiny of the claimed damages can facilitate settlement, either because of the magnitude of the potential exposure or because provable damages are too small to justify the cost of pursuing the litigation. Indeed, in some cases the court may conclude that the initial discovery should focus on the existence and amount of damages. Such discovery may lead to a separate trial on damages issues prior to conducting extensive discovery and a trial on liability issues, such as the existence of a conspiracy (see discussion of sequencing discovery in section 11.422). If relatively little time would be needed for discovery and trial of the issues of impact and damages caused by a particular practice, substantial savings may be effected by postponing significant discovery on liability issues, since any damage verdict could pave the way to an early settlement. If the practice in question is well defined in scope and time, such "reverse bifurcation" may be feasible, subject to the substantive rules of antitrust law. In any event, the pretrial exchange of expert reports, computations, and exhibits regarding injury and damages should be required (see section 11.48), whether a separate trial is held or not.

Consider establishing a schedule for early completion of motion-related discovery and the submission and decision of motions. Merits discovery should be stayed only to the extent that the outcome of a motion will significantly affect the scope of that discovery.

## 30.2 Transactional and Economic Data, and Expert Opinions

Antitrust cases often involve the collection, assimilation, and evaluation of vast amounts of evidence regarding numerous transactions and other economic data. Some of this material may be entitled to protection as trade secrets or confidential commercial information. Effective management of such cases depends on pretrial procedures that facilitate the production and utilization of this material and its efficient presentation at trial as well as the early resolution of privilege claims. The following are among the measures that may be useful:

- *Limiting scope of discovery.* Early attention to the issues may make feasible reasonable limits on the scope of discovery. Limits may be fixed with reference to the transactions alleged to be the subject matter of the case, to the relevant products or services, or to geographical areas and time periods. Limits should be subject to modification if a need for broader discovery later arises. See generally section 11.423.

- *Confidentiality orders.* Protective orders may facilitate the expeditious discovery of materials entitled to protection as trade secrets or other confidential commercial information (see section 11.432). Especially if the parties are competitors, provisions may preclude or restrict disclosure by the attorneys to their clients. Particularly sensitive information, such as customer names and pricing instructions, may be masked by excision, codes, or summaries without impairing the utility of the information in the litigation.

- *Summaries and computerized data.* The court should encourage the parties to work out arrangements for the efficient and economical exchange of voluminous data. Where feasible, data in computerized form should be produced in computer-readable format. Identification of computerized data may lead to agreement on a single database on which all expert and other witnesses will rely in their testimony. Other voluminous data can be produced by way of summaries or tabulations—subject to appropriate verification procedures to minimize and quickly resolve disputes about accuracy—obviating extensive discovery of source documents. Counsel should produce such exhibits well in advance of trial. See generally sections 11.446 (discovery of computerized data) and 11.492 (summaries).

- *Other sources.* Relevant economic data may be available from government or industry sources more quickly and cheaply than through discovery from the litigants. Accordingly, consider making an early determination regarding the admissibility of such evidence under Federal Rules of Evidence 803(8), (17), and (18).

- *Expert opinions.* Parties may plan to retain economists to study such topics as relevant markets, the concentration of economic power, pricing structures, elasticity of demand, barriers to entry, marginal costs, and the effect of the challenged practices on competition and the claimants. Early in the litigation, it is advisable to call for an identification of the subjects on which expert testimony will likely be offered, determine whether such testimony is necessary, rule at least preliminarily on the appropriate scope of expert testimony, and establish a schedule for disclosure of experts' reports, recognizing that some studies may require considerable time to prepare and review. Agreement on a common database for all experts to use is desirable, and the court can require the parties to agree on methodology and form before

conducting surveys or polls (see section 11.493).[1740] Under Federal Rule of Evidence 104(a),[1741] the judge must hear and decide, before trial, objections to the admissibility of experts' opinions. If significant conflicts exist between the parties' experts on matters of theory, an expert may be appointed by the court under Federal Rule of Evidence 706 (see section 11.51). See generally section 11.48.

## 30.3   Conflicts of Interest

The judge should identify, early in the litigation, possible conflicts of interest that may lead to disqualification of attorneys[1742] (see section 10.23) or recusal of the judge (see section 10.121). These problems may be acute in antitrust actions brought on behalf of large classes of purchasers, because the identification of class members—which can result in disqualification of the judge under 28 U.S.C. § 455[1743]—usually may not occur until after substantial proceedings have taken place. Accordingly, it is wise to consider the feasibility of asking the parties to provide a list of known class members.

## 30.4   Related Proceedings

Antitrust litigation sometimes involves a number of individual and class actions for damages filed in several federal and state courts, and may involve criminal or administrative proceedings as well. Such parallel or related proceedings should be taken into account when developing and implementing a management plan for the litigation.

Recognizing the desirability of centralized management, the Judicial Panel on Multidistrict Litigation commonly transfers civil antitrust cases for pretrial purposes under 28 U.S.C. § 1407, usually to a district in which related civil cases, and sometimes also criminal or civil proceedings brought by the United

---

1740. *See also* Reference Manual on Scientific Evidence (Federal Judicial Center, 2d ed. 2000).

1741. *See, e.g.*, Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579 (1993).

1742. *See, e.g.*, Westinghouse Elec. Corp. v. Gulf Oil Corp., 588 F.2d 221 (7th Cir. 1978); Westinghouse Elec. Corp. v. Kerr-McGee Corp., 580 F.2d 1311 (7th Cir. 1978).

1743. *See In re* Cement Antitrust Litig., 688 F.2d 1297 (9th Cir. 1982), *aff'd sub nom.* Ariz. v. United States Dist. Court, 459 U.S. 1191 (1983) (affirming under 28 U.S.C. § 2109). Note that 28 U.S.C. § 455(f) (added following this decision) allows a judicial officer who discovers a financial interest after devoting "substantial judicial time" to a case to avoid recusal by divestment, unless the interest "could be substantially affected by the outcome." 28 U.S.C. § 455(f) (West 2002).

States, are pending (section 1407 does not apply to criminal cases or civil antitrust actions brought by the United States[1744]). If centralized management of the entire litigation is impossible or impractical, the affected courts should nevertheless attempt to coordinate proceedings through procedures such as those described in sections 10.123 and 20.14. Injunctions against or stays of parallel actions generally are not available (see section 20.32).

Special problems are presented when conduct that is the basis for civil antitrust claims is also the subject of criminal or administrative proceedings. Indeed, disclosure of a criminal or administrative investigation frequently triggers the filing of civil actions (see section 20.2). Ordinarily, the criminal charges should be tried first, not only because of the requirements of the Speedy Trial Act but also because Fifth Amendment claims tend to disrupt civil discovery. (Completion of a witness's testimony in the criminal case will not necessarily preclude that witness from invoking the Fifth Amendment in subsequent civil proceedings.[1745]) However, a general stay of all activities in the civil litigation pending completion of the criminal case will rarely be appropriate.[1746] Similarly, although a decision by the Federal Trade Commission or some other agency may narrow the issues or reduce the scope of discovery, the judge should weigh the rights and interests of all parties before deciding whether to defer any of the proceedings in the civil actions. For example, enforcement proceedings may result in collateral estoppel.[1747]

Special problems are also presented where parallel litigation is brought in federal and state courts (see section 20.3) alleging violations of federal and state antitrust laws arising out of substantially the same conduct. Although state and federal claims may substantially overlap, federal antitrust law does not preempt state law.[1748] Removal is not permissible except in the unusual case where the court finds that the claim asserted is simply a disguised federal claim,[1749] and an

---

1744. 28 U.S.C. § 1407(g) (West 2002).

1745. *See* Pillsbury Co. v. Conboy, 459 U.S. 248 (1983).

1746. *See* Landis v. N. Am. Co., 299 U.S. 248, 254–55 (1936); Texaco, Inc. v. Borda, 383 F.2d 607 (3d Cir. 1967).

1747. *See, e.g.,* Parklane Hosiery Co. v. Shore, 439 U.S. 322 (1979). Moreover, the findings of an agency may be admissible under Federal Rule of Evidence 803(8)(C), perhaps eliminating the need for certain discovery. *See, e.g., In re* Japanese Elec. Prods. Antitrust Litig., 723 F.2d 238 (3d Cir. 1983), *rev'd on other grounds sub nom.* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986); *In re* Plywood Antitrust Litig., 655 F.2d 527 (5th Cir. 1981).

1748. *See* Cal. v. ARC Am. Corp., 490 U.S. 93 (1989).

1749. *See* Federated Dep't Stores v. Moitie, 452 U.S. 394, 397 n.2 (1981) (reaching merits of defense in antitrust action removed from state court).

injunction is rarely available.[1750] The judges involved, however, may coordinate the proceedings informally. See section 20.31.

The availability to different classes of purchasers of separate and distinct remedies in state and federal court, along with the general unavailability of injunctions against state proceedings, can create serious problems in achieving global settlements. Antitrust claims are frequently brought under state antitrust laws that permit indirect purchasers to recover or provide a more favorable measure of damages.[1751] Thus, a settlement with the federal plaintiffs (direct purchasers) will not bar later state law claims by indirect purchasers.[1752] In some circumstances, however, a court may enjoin state proceedings under the All Writs Act[1753] to effectuate a global settlement in a complex litigation.[1754]

---

1750. *See* 28 U.S.C. § 2283 (West 2002) (Anti-Injunction Act); Younger v. Harris, 401 U.S. 37 (1971) (federal courts should ordinarily not enjoin pending state criminal proceedings).

1751. *See, e.g.,* Alton Box Bd. Co. v. Esprit De Corp., 682 F.2d 1267 (9th Cir. 1982); *In re* Corrugated Container Antitrust Litig., 659 F.2d 1332, 1336 (5th Cir. 1981). *See* Antitrust Law Developments, *supra* note 1730, at 811–12 ("nineteen states and the District of Columbia have statutes that specifically permit indirect purchasers (who could not recover damages under federal law) to recover damages for state antitrust violations"); 14 Herbert Hovenkamp, Antitrust Law ¶ 2412d (1999) (indirect purchasers under federal and state law); 2 Phillip E. Areeda et al., Antitrust Law ¶ 317f (2d ed. 2000) (res judicata and state law).

1752. Cal. v. ARC Am. Corp., 490 U.S. 93 (1989).

1753. 28 U.S.C. § 1651 (West 2002). *See supra* sections 21.15 & 21.42. *See also* FTC v. Dean Foods Co., 384 U.S. 597, 603–04 (1966) (citing cases interpreting the Act).

1754. *See, e.g.,* Battle v. Liberty Nat'l Life Ins. Co., 877 F.2d 877 (11th Cir. 1989), *aff'g* 660 F. Supp. 1449 (N.D. Ala. 1987); *In re* Corrugated Container, 659 F.2d 1332 (5th Cir. 1981). *Cf. In re* Real Estate Title & Settlement Services Antitrust Litig., 869 F.2d 760 (3d Cir. 1989) (directing lower court to vacate injunction for lack of personal jurisdiction); *Alton Box*, 682 F.2d at 1270–73 (upholding denial of injunction sought against nonparty to federal action in different court). *See supra* section 20.32 (jurisdictional conflicts in related state and federal cases).

# 31. Securities

.1 Introduction  527
.2 Statutory Framework  528
.3 The Private Securities Litigation Reform Act  529
    .31 Class Representatives and Lead Plaintiffs  531
    .32 Pleading Requirements  540
    .33 Safe Harbor  543
    .34 Discovery Stays  544
.4 Initial Pretrial Conference  545
.5 Class Actions and Derivative Actions  550
.6 Discovery  553
.7 Takeover Litigation  554
    .71 Initial Conference  554
    .72 Injunctive Relief  556
    .73 Discovery  558
.8 Trial and Settlement  558

## 31.1  Introduction

The goal of the Securities Act of 1933[1755] (1933 Act) and the Securities Exchange Act of 1934[1756] (1934 Exchange Act) is to ensure that issuers of public securities provide all necessary and accurate information to investors. The statutes prohibit the sale or purchase of securities through false or misleading statements. Most litigation in the securities area centers on these two statutes and is based on allegations of fraud or misstatements in the purchase, sale, or offering of securities and other alleged market or management abuses. Causes of action also exist under sections 77k, 77l(a), and 77o of the 1933 Act and section 78t(a) of the 1934 Exchange Act. Private rights of action, both express and implied, are available under the statutes,[1757] although the Supreme Court in recent years has narrowed the availability of implied remedies through cases

---

1755.  15 U.S.C. §§ 77a–77aa (2000).

1756.  *Id.* §§ 78a–78mm.

1757.  Most notably, there is the implied remedy under Securities and Exchange Commission (SEC) Rule 10b-5 for fraud in connection with the purchase or sale of securities and the remedy for fraud in connection with the solicitation of shareholder votes. These two remedies have been so firmly entrenched in the federal jurisprudence that they have survived the general cutback in the recognition of private remedies. Thomas Lee Hazen, The Law of Securities Regulation § 1.7, at 65 (3d ed. 1996). *See also* Herman & MacLean v. Huddleston, 459 U.S. 375 (1983).

such as *Central Bank of Denver v. First Interstate Bank of Denver*,[1758] which eliminated an implied private right of action against aiders and abettors.[1759]

Cases alleging securities fraud can present problems similar to those that arise in mass tort litigation. Many cases are brought as class actions, triggering the requirements of Federal Rule of Civil Procedure 23 as well as limitations imposed by the Private Securities Litigation Reform Act (PSLRA).[1760] This section discusses some of the issues and problems peculiar to securities litigation, and particularly securities fraud class actions.

## 31.2  Statutory Framework

The 1933 Act prohibits offering securities to the public for sale or purchase unless they have been registered with the Securities and Exchange Commission (SEC).[1761] Companies are required to file registration statements that fully disclose all of the information required by the statute and by SEC rules prior to such sale. These registration and disclosure provisions apply to the issuance or distribution of securities, and the statute's protection extends only to the purchaser.[1762] Civil liability can be imposed for misrepresentations and omissions in registration statements or where securities are sold in violation of the registration requirements, as well as under the general antifraud provisions of section 77q(a).[1763] The 1934 Exchange Act regulates the public trading of securities. The statute requires that any securities traded on a national exchange must be registered with the SEC, with full disclosure of relevant information about the company. Unlike the 1933 Act, the 1934 Exchange Act protects both sellers and purchasers.

---

1758.  511 U.S. 164 (1994).

1759.  The Supreme Court had previously noted the absence of "aiding and abetting" language in section 10(b) of the Exchange Act and in 17 C.F.R. § 240.10b-5 (1995), but it was not until the decision in *Central Bank of Denver* that the Court held aiding and abetting liability in private actions could not be imposed. As a consequence, civil actions based on theories of aiding and abetting may only be brought by the SEC and then, only where the defendant acts knowingly. *See* Melissa Harrison, *The Assault on the Liability of Outside Professionals: Are Lawyers and Accountants Off the Hook?*, 65 U. Cin. L. Rev. 473, 505 (1997); *see also* Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified as amended at 15 U.S.C. §§ 77z-1, 78u-4 to -5 (2000)) (citations to the PSLRA hereafter will refer to the amendments to the 1934 Exchange Act, although parallel provisions were added to the 1933 Act except where noted).

1760.  15 U.S.C. § 78u-4 (2000).

1761.  *Id.* § 77e.

1762.  Express remedies are provided for in 15 U.S.C. §§ 77k, 77*l*(a), 77o (2000).

1763.  *See* Hazen, *supra* note 1757, at 7.

Most securities actions under the 1934 Exchange Act allege either violations of section 10(b),[1764] which prohibits using any manipulative or deceptive device in connection with the purchase or sale of securities, or violations of SEC Rule 10b-5,[1765] which extends liability to include misstatements and omissions, or both. These actions typically take the form of securities fraud class actions. The 1934 Exchange Act also created the SEC to administer and enforce the securities statutes.[1766] Both the 1933 Act and the 1934 Exchange Act rely heavily on self-regulation by affected companies, with the SEC providing the necessary oversight. The SEC has the authority to promulgate rules and regulations, investigate potential violations, impose fines, and seek equitable or other relief.[1767] In addition to instituting enforcement actions and levying administrative sanctions,[1768] however, the SEC can refer conduct to the Department of Justice for criminal prosecution.

## 31.3   The Private Securities Litigation Reform Act

.31 Class Representatives and Lead Plaintiffs  531
.32 Pleading Requirements  540
.33 Safe Harbor  543
.34 Discovery Stays  544

The Private Securities Litigation Reform Act of 1995 (PSLRA) sought to prevent frivolous and unmeritorious securities class actions through broad-based legislation reaching both substantive and procedural law, as well as by instituting other reforms in securities actions. The legislation was targeted towards certain perceived abuses of securities class actions arising out of lawsuits brought on behalf of "professional plaintiffs" or plaintiffs with at best a nominal interest in the securities at issue.[1769] The PSLRA directs the court to appoint

---

1764.  15 U.S.C. § 78j(b) (2000).

1765.  17 C.F.R. § 240.10b-5 (1995).

1766.  The SEC is composed of five members, appointed by the President with the approval of the Senate, who function as a bipartisan, quasi-judicial agency. 15 U.S.C. § 78d(a) (2000); *see also* 1 Hazen, *supra* note 1757, §§ 1.3–1.3[3].

1767.  The SEC also functions as an original and appellate tribunal in connection with licensing and disciplinary charges.

1768.  The SEC can, among other things, issue civil fines in administrative proceedings, freeze assets, and seek forfeiture. *See, e.g.,* SEC v. Gonzales de Castilla, 170 F. Supp. 2d 427 (S.D.N.Y. 2001) (SEC issued freeze order on defendant's assets in insider trading case).

1769.  "In place of that practice—a practice wherein the class lawyer selected the class plaintiff—Congress sought to substitute a new model . . . . Under the new model, the court would appoint the lead plaintiff who, in turn, would select and direct class counsel." *In re* Network Assocs., Inc. Sec. Litig., 76 F. Supp. 2d 1017, 1020 (N.D. Cal. 1999). *See also* Greebel v. FTP

as lead plaintiffs the "person or group of persons" with the greatest financial interest in order to encourage institutional investors, who are more likely to have significant financial holdings at stake as well as greater sophistication and experience in securities matters, to exercise control over the litigation and over counsel.[1770] The PSLRA changed the selection criteria for lead plaintiffs from the first to file to the adequacy of the proposed class representative. The PSLRA has had the greatest impact on class actions alleging corporate fraud under 15 U.S.C. § 78j(b) and SEC Rule 10b-5, and its provisions are found in 15 U.S.C. §§ 77z-1 and 77z-2 of the 1933 Act and 15 U.S.C. §§ 78u-4 and 78u-5 of the 1934 Exchange Act.

Efforts by plaintiffs to circumvent the statutory reforms of the PSLRA by filing securities fraud class actions in state court were rebuffed with the passage of the Securities Litigation Uniform Standards Act in 1998 (Uniform Standards Act).[1771] The Uniform Standards Act preempted state law securities fraud class

---

Software, Inc., 939 F. Supp. 57, 58 (D. Mass. 1996) (The PSLRA arose from a belief "that the plaintiff's bar had seized control of class action suits, bringing frivolous suits on behalf of only nominally interested plaintiffs in the hope of obtaining a quick settlement." (citing S. Rep. No. 104-98, at 8–11 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 687–90)); *In re* Party City Sec. Litig., 189 F.R.D. 91, 103 (D.N.J. 1999) ("Prior to the enactment of the PSLRA, plaintiffs in securities fraud cases tended to profit irrespective of the culpability of the defendants, most of whom chose settlement over prolonged and expensive litigation." (citing H.R. Conf. Rep. No. 104-369, at 31–35 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 730–34)).

1770. *In re* USEC Sec. Litig., 168 F. Supp. 2d 560, 560–64 (D. Md. 2001); *see In re* Donnkenny Inc. Sec. Litig., 171 F.R.D. 156, 157 (S.D.N.Y. 1997) (The PSLRA serves to "ensure that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers." (citing H.R. Conf. Rep. No. 104-369, at 31–35 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 730–34)); Gluck v. CellStar Corp., 976 F. Supp. 542, 548 (N.D. Tex. 1997) (institutional investors likely to have largest financial interest, and Congress intended institutional investors to play greater role in directing securities fraud litigation); *Greebel*, 939 F. Supp. at 63 (PSLRA creates presumption in favor of institutional investors). *See also In re* Horizon/CMS Healthcare Corp. Sec. Litig., 3 F. Supp. 2d 1208, 1212 (D.N.M. 1998) (The PSLRA "appears to reflect a congressional intent to transfer power from counsel who win the race to the courthouse to those shareholders who possess a sufficient financial interest in the outcome to maintain some supervisory responsibility over both the litigation and their counsel." (citing Michael Y. Scudder, Comment, *The Implications of Market-Based Damages Caps in Securities Class Actions*, 92 Nw. U. L. Rev. 435, 437 (1997))).

1771. 15 U.S.C. §§ 77p, 78bb (2000). The statute exempts four categories of actions: (1) exclusively derivative actions; (2) actions pursuant to contractual agreements between issuers and indenture trustees; (3) actions by states or political subdivisions or pension plans; and (4) certain other actions brought under the corporate laws of the state of incorporation. *Id.* §§ 77p(f), 78bb(f). *See, e.g.,* Derdiger v. Tallman, 75 F. Supp. 2d 322, 324 (D. Del. 1999) (case involving claims under Delaware law by issuer to shareholders not subject to Uniform Standards Act provisions).

actions,[1772] granted federal courts the authority to stay discovery in private state-court actions[1773] and mandated removal to federal court of state-court securities class actions that fell within the purview of the statute, followed by their automatic dismissal.[1774] The enactment of the Uniform Standards Act effectively placed exclusive jurisdiction over fraud-based securities class actions in federal court.

The PSLRA has had a significant impact on case management of securities litigation, including procedures for the appointment of class representatives and counsel, heightened pleading requirements on claims alleging fraud, provisions for discovery stays, and a "safe harbor" for forward-looking statements. Other changes include the adoption of a "90-Day Look-Back Period" in calculating damages under 17 Code of Federal Regulations (C.F.R.) § 10b-5, limiting attorney fees in class actions to a reasonable percentage of the class recovery, and limiting defendants' liability in section 10(b) cases to their proportionate share (with certain exceptions where joint and several liability may still apply). Much of the case law interpreting the PSLRA obligations has focused on the lead plaintiff and pleading provisions.

## 31.31  Class Representatives and Lead Plaintiffs

The PSLRA does not establish specific procedures for courts in implementing the lead plaintiff provisions, nor does it identify selection criteria other than financial interest and the traditional adequacy and typicality requirements of Federal Rule of Civil Procedure 23. As a result, the courts have wrestled with the interpretation of the lead plaintiff provisions in light of the legislative goal to remedy lawyer-driven lawsuits. The statute imposes certain preliminary procedural requirements on plaintiffs at the time the complaint is filed. It requires a plaintiff seeking to represent a securities class to file, along with the complaint,[1775] a certification that (1) confirms the plaintiff did not purchase the securities at issue at the direction of counsel; (2) shows the plain-

---

1772.  15 U.S.C. §§ 77p(b), 78bb(f)(1) (2000).

1773.  *Id.* § 77z-1(4).

1774.  *Id.* § 78bb(f)(2). *See, e.g.,* Green v. Ameritrade, Inc., 279 F.3d 590 (8th Cir. 2002) (district court properly remanded case following removal under Uniform Standards Act where plaintiff filed amended complaint eliminating any securities causes of action, leaving only state-law claims). State-court jurisdiction was preserved over certain covered class actions, such as actions based on the statutory or common law of the state in which the issuer is incorporated and that involve purchases or sales by issuers to equity holders, 15 U.S.C. § 78bb(f)(3)(A) (2000), or actions by a state, political subdivision, or pension plan. *Id.* § 78bb(f)(3)(B).

1775.  However, a movant need not file a complaint to seek lead plaintiff status. *See* Aronson v. McKesson HBOC, Inc., 79 F. Supp. 2d 1146, 1155 (N.D. Cal. 1999).

tiff is willing to serve as a representative party on behalf of the class; (3) identifies all transactions by the plaintiff in the security at issue during the relevant time period; (4) identifies all other actions filed during the preceding three years in which the plaintiff served or sought to serve as a representative party; and (5) certifies that the plaintiff's recovery will be limited to his or her pro rata share, except as ordered by the court.[1776] The PSLRA (or "the statute") creates a presumption precluding any plaintiff seeking to serve as lead plaintiff who has been a lead plaintiff in more than five securities class actions during any three-year period.[1777] There is a split of authority over whether and when the presumption should be rebutted if an institutional investor is seeking lead plaintiff status.[1778]

The PSLRA also directs the plaintiff, shortly after filing, to comply with detailed notice provisions informing potential class members of the existence of the securities class action.[1779] The PSLRA specifically provides, however, that notices required under the statute "shall be in addition to any notice required pursuant to the Federal Rules of Civil Procedure."[1780] The plaintiff must pub-

---

1776. 15 U.S.C. § 78u-4(a)(2)(A) (2000). The Northern District of California held in *Aronson* that the certification requirement only applied to plaintiffs filing the complaint, and its provisions did not attach to non-initiating movants for lead plaintiff status. *Aronson*, 79 F. Supp. 2d at 1155–56. *But see* Chill v. Green Tree Fin. Corp., 181 F.R.D. 398 (D. Minn. 1998) (imposing certification requirements on plaintiffs seeking lead plaintiff status, even though they did not file the complaint). The *Aronson* court noted, however, that the local rules for the Northern District of California provide that although not required to file a certification, a plaintiff seeking lead plaintiff status must at the time of its initial appearance state it has reviewed the complaint and adopted the complaint's allegations or identify additional allegations it intends to assert. *Aronson*, 79 F. Supp. 2d at 1155–56 (citing N.D. Cal. Civ. L.R. 3-7(c)).

1777. 15 U.S.C. § 78u-4(a)(3)(B)(vi) (2000).

1778. *Compare In re* Enron Corp. Sec. Litig., 206 F.R.D. 427 (S.D. Tex. 2002) (discussing whether it would be proper to appoint Florida State Board of Administration (FSBA) as lead plaintiff where it was serving as or seeking lead plaintiff status in nine cases), *and In re* Telxon Corp. Sec. Litig., 67 F. Supp. 2d 803 (N.D. Ohio 1999) (FSBA would be barred from serving as lead plaintiff where it had served or was serving as lead plaintiff in five other securities class actions in three years), *and* Aronson v. McKesson HBOC, Inc., 79 F. Supp. 2d 1146 (N.D. Cal. 1999) (FSBA disqualified as lead plaintiff where it was serving as lead plaintiff in six other securities class actions), *with* Piven v. Sykes Enters., Inc., 137 F. Supp. 2d 1295 (M.D. Fla. 2000) (finding presumptive bar against serving as lead plaintiff created by lead plaintiff status in five other cases could be overcome); *In re* Critical Path, Inc. Sec. Litig., 156 F. Supp. 2d 1102 (N.D. Cal. 2001); *In re* Network Assocs., Inc. Sec. Litig., 76 F. Supp. 2d 1017 (N.D. Cal. 1999). *See* Melanie M. Piech, *Was the Selection of Lead Plaintiff and Lead Counsel in Enron Correct?*, 13 Sec. Reform Act Litig. Rep. 6 (Apr. 2002).

1779. *See* Greebel v. FTP Software, Inc., 939 F. Supp. 57, 60 (D. Mass. 1996) (suggesting that failure to comply with the PSLRA notice provisions would be fatal to maintaining the action as a proposed class action).

1780. 15 U.S.C. §§ 77z-1(a)(3)(A)(iii), 78u-4(a)(3)(A)(iii) (2000).

lish notice of the action in "a widely circulated national business-oriented publication or wire service" within twenty days of the filing of the complaint, advising of the action, the claims asserted therein, and the class period.[1781] The notice must also state that any purported class member may move to serve as lead plaintiff within sixty days of the date of the notice.[1782] Several courts have held that the sixty-day notice requirement is mandatory and precludes consideration of untimely filed motions for lead plaintiff appointment.[1783]

Where multiple actions alleging substantially the same claims have been filed by more than one plaintiff, the statute imposes the obligation to provide early notification on the plaintiff who was the first to file. One of the effects of the notice provisions, however, has been to help some attorneys to continue to exert control over securities class actions, a result contrary to the goals of the PSLRA. One court observed that notices have been filed by attorneys on multiple occasions in related cases "over and again, all in an effort to compile the largest portfolio [of clients]" who are then presented by the firm as a "group" for purposes of appointment under the lead plaintiff provisions.[1784] The SEC has also cautioned that the notice provisions afford an opportunity to continue the very abuses the PSLRA sought to redress.[1785] Scrutiny of the early notices the plaintiff proposes to disseminate, with a critical eye towards any language that "extols" the virtue of the firm or otherwise solicits support for the lawyer-proposed lead plaintiff, may assist in reducing the incidence of these tactics. In

1781. *Id.* §§ 77z-1(a)(3)(A)(i), 78u-4(a)(3)(A)(i). *See* Yousefi v. Lockheed Martin Corp., 70 F. Supp. 2d 1061, 1067 (C.D. Cal. 1999) (finding that plaintiffs met notice requirements of PSLRA by announcing class action suit in national wire service); *Greebel*, 939 F. Supp. at 63 (*Business Wire* met requirements for widely circulated national business wire service).

1782. *But see* Chill v. Green Tree Fin. Corp., 181 F.R.D. 398, 404 (D. Minn. 1998) (where several notices were published, court would extend the sixty-day notice period beyond original publication date where to do otherwise "would deprive injured investors of any opportunity to seek to be selected as [l]ead [p]laintiff").

1783. *See* Skwortz v. Crayfish Co., No. 00 Civ. 6766, 2001 WL 1160745, at *5 (S.D.N.Y. Sept. 28, 2001) (finding motion for appointment as lead plaintiff filed beyond the sixty-day period was untimely, thereby eliminating movant as a candidate for lead plaintiff); *In re* MicroStrategy Inc. Sec. Litig., 110 F. Supp. 2d 427, 439–40 (E.D. Va. 2000) (rejecting party's application for lead plaintiff for procedural failure to file timely motion for appointment). *But see Chill*, 181 F.R.D. at 404.

1784. *See In re* Network Assocs., Inc. Sec. Litig., 76 F. Supp. 2d 1017, 1021 (N.D. Cal. 1999) (detailing method used by law firms to accumulate clients for the purpose of aggregating claims and claiming overwhelming support for the lawyer-created "group" as lead plaintiff and the firm as lead counsel). The court in *Network Associates* rejected a motion by 1,725 members collected by attorneys to appoint a subgroup of 10, also chosen by the attorneys, noting there was "no organized decisionmaking apparatus, no coherency, no common ground other than the lawyer. They [the subgroup] too are simply disparate, unlinked, and unrelated investors." *Id.* at 1023.

1785. *In re* Baan Co. Sec. Litig., 186 F.R.D. 214 (D.D.C. 1999).

addition, the judge should try to ensure that these early communications to class members encourage them to serve as lead plaintiffs and do not mislead them into believing that they are filling out claims forms. In many cases, however, plaintiffs will publish notice of the action concurrently with the filing of the complaint in order to comply with the twenty-day deadline for publication imposed by the PSLRA. To the extent the court requires judicial approval of the proposed notices prior to publication, perhaps through a standing order, the court will need to complete its review prior to the expiration of the twenty-day period.

The PSLRA contemplates that the court will appoint a lead plaintiff within ninety days of the date on which notice is published. In certain circumstances, such as when a defendant is facing possible bankruptcy, the court should make the lead plaintiff determination as quickly as possible. These time constraints are modified, however, where a motion to consolidate multiple actions has been filed. In such cases, the statute directs the court to appoint the lead plaintiff "as soon as practicable" after resolving the motion to consolidate. Indeed, 15 U.S.C. § 78u-4(a)(3)(B)(ii) directs the court to address and resolve the motion to consolidate prior to rendering a decision on the appointment of lead plaintiffs.[1786] The statute further creates a rebuttable presumption that the plaintiff most capable of adequately representing the class is the person or group of persons with the largest financial interest in the relief sought, who also satisfies the requirements of Federal Rule of Civil Procedure 23.[1787] The showing under Rule 23 is considered a preliminary inquiry into whether the plaintiff has made a prima facie showing that the adequacy and typicality requirements have been met.[1788] This presumption can be rebutted upon proof that the plaintiff either "will not fairly and adequately protect the interests of the class" or is subject to unique defenses that impair the plaintiff's ability to do so.[1789] In most cases, the plaintiff filing the action will also seek appointment

---

1786. *See* Vincelli v. Nat'l Home Health Care Corp., 112 F. Supp. 2d 1309 (M.D. Fla. 2000); *Chill*, 181 F.R.D. at 405–08 (considering motion to consolidate, followed by motion to appoint lead plaintiff).

1787. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) (2000).

1788. *In re* Advanced Tissue Scis. Sec. Litig., 184 F.R.D. 346 (S.D. Cal. 1998).

1789. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (2000). The PSLRA only permits purported class members to challenge the adequacy of the presumptive lead plaintiff. *Id.* § 78u-4(a)(3(B)(i); Gluck v. CellStar Corp., 976 F. Supp. 542 (N.D. Tex. 1997). *See In re* Cendant Corp. Litig., 264 F.3d 201, 262 (3d Cir. 2001) ("The Reform Act establishes a two-step process for appointing a lead plaintiff: the court first identifies the presumptive lead plaintiff and then determines whether any member of the putative class has rebutted the presumption."). However, defendants may challenge whether the lead plaintiff meets Rule 23 requirements at the class certification stage. *See In re* Lucent Techs., Inc. Sec. Litig., 194 F.R.D. 137, 150 n.17 (D.N.J. 2000) ("The

as lead plaintiff, although once the statutory early notification is published, other investors may file competing motions.

The PSLRA does not require courts to hold a hearing on lead plaintiff motions. Courts have approached the decision-making process in various ways, ranging from requiring movants to respond to a written questionnaire prepared by the court, to conducting interviews of the candidates and their counsel at hearings on motions for appointment,[1790] to simply considering the parties' submissions and oral argument.[1791] Although some decisions have allowed discovery as part of the appointment process,[1792] the PSLRA severely restricts discovery into the adequacy of the representation by the proposed lead plaintiff.[1793] A member of the proposed plaintiff class can challenge the adequacy of lead plaintiff's representation only by demonstrating "a reasonable basis for a finding that the presumptively most adequate plaintiff is incapable of adequately representing the class."[1794] Absent such a showing, a class member objecting to the presumptive lead plaintiff will not be entitled to discovery.

Where the movant is a single investor or institution, the court's task is fairly straightforward. In identifying the plaintiff with the largest financial interest, courts have considered factors such as the number of shares purchased or sold during the class period,[1795] the net number of shares purchased, the net funds spent, and approximate losses suffered by the plaintiff.[1796] These factors courts have found helpful "because they look to relatively objective indicators . . . rather than to the ultimate question of damages."[1797] One option in assessing the merits of competing lead plaintiff petitions is to have those parties seeking lead plaintiff status file a joint submission setting forth their claimed financial interests and comparing their financial stakes in the litigation, preferably through an agreed on method. Such an approach allows the court to assess the merits of competing parties' positions without expending significant

---

determination, however, that . . . [l]ead [p]laintiffs meet the requirements of Rule 23 does not preclude revisiting the issue at the class certification stage.").

1790.  *See In re* Network Assocs., Inc. Sec. Litig., 76 F. Supp. 2d 1017, 1027 (N.D. Cal. 1999).

1791.  *In re* Cell Pathways, Inc. Sec. Litig. II, 203 F.R.D. 189 (E.D. Pa. 2001).

1792.  *In re Network Assocs.*, 76 F. Supp. 2d at 1027 (permitting four-hour depositions of each of the main candidate representatives).

1793.  15 U.S.C. § 78u-4(a)(3)(B)(iv) (2000).

1794.  *Gluck*, 976 F. Supp. at 547.

1795.  *In re Network Assocs.*, 76 F. Supp. 2d at 1027 ("At least as a first approximation, the candidate with the most net shares purchased will normally have the largest potential damage recovery.").

1796.  *See In re* Cendant Corp. Litig., 264 F.3d 201, 263 (3d Cir. 2001); *In re* Critical Path, Inc. Sec. Litig., 156 F. Supp. 2d 1102, 1107 (N.D. Cal. 2001).

1797.  Aronson v. McKesson HBOC, Inc., 79 F. Supp. 2d 1146, 1158 (N.D. Cal. 1999).

judicial resources wading through or reconstructing underlying figures on which the calculations are based. In addition, the court may find it difficult to reconcile damage calculations based on differing methodologies.

Complications arise where a group seeks appointment as lead plaintiff. Although the PSLRA contemplates that more than one class member may be appointed as lead plaintiff, courts disagree as to whether and when a group will qualify as the presumptively most adequate plaintiff. One issue the courts have struggled with is whether the claims of unrelated investors can be aggregated to meet the financial interest requirement of the PSLRA.[1798] Several courts have held that aggregation of claims was proper,[1799] although some decisions have allowed groups to serve as lead plaintiff simply because there was no opposition by individual class members, or the only opposition presented was by a competing group.[1800] Other courts have concluded that aggregation of numerous unrelated plaintiffs defeats the purpose of the PSLRA's lead plaintiff provisions.[1801] Those courts permitting groups to be appointed have looked to whether the proposed group demonstrates the ability to control the litigation and the lawyers.[1802] The size of the group also has been a determinative fac-

---

1798. *See, e.g., In re Cendant Corp.*, 264 F.3d at 266 ("The [PSLRA] contains no requirement mandating that the members of a proper group be 'related' in some manner."); *Aronson*, 79 F. Supp. 2d at 1159.

1799. *See, e.g., In re* Rent-Way Sec. Litig., 209 F. Supp. 2d 493, 518 (W.D. Pa. 2002) ("We see no reason to find that group pled allegations *per se* cannot meet the heightened pleading standards of Rule 9(b) or the PSLRA, and rather will consider the allegations individually."); Weltz v. Lee, 199 F.R.D. 129, 132–33 (S.D.N.Y. 2001) (permitting aggregation); *In re* Advanced Tissue Scis. Sec. Litig., 184 F.R.D. 346, 352–53 (S.D. Cal. 1998) (rejecting proposal to appoint entire 250-member group as lead plaintiff and approving alternative proposal to appoint six designated group members).

1800. *See, e.g.,* Yousefi v. Lockheed Martin Corp., 70 F. Supp. 2d 1061, 1067–68 (C.D. Cal. 1999); *In re Advanced Tissue*, 184 F.R.D. at 352–53; *In re* Milestone Scientific Sec. Litig., 183 F.R.D. 404 (D.N.J. 1998); *In re* Oxford Health Plans, Inc. Sec. Litig., 182 F.R.D. 42 (S.D.N.Y. 1998); *In re* Horizon/CMS Healthcare Corp. Sec. Litig, 3 F. Supp. 2d 1208 (D.N.M. 1998); Greebel v. FTP Software, Inc., 939 F. Supp. 57, 64 (D. Mass. 1996) (no opposition to motion for group to serve as lead plaintiff).

1801. *See, e.g.,* Donnkenny Inc. Sec. Litig., 171 F.R.D. 156, 157–58 (S.D.N.Y. 1997) ("To allow lawyers to designate unrelated plaintiffs as a 'group' and aggregate their financial stakes would allow and encourage lawyers to direct the litigation."); *see also In re* Bank One S'holders Class Actions, 96 F. Supp. 2d 780, 783 (N.D. Ill. 2000); *In re* Network Assocs., Inc. Sec. Litig, 76 F. Supp. 2d 1017, 1023–24 (N.D. Cal. 1999) (cannot aggregate unrelated investors to satisfy lead plaintiff); *Aronson*, 79 F. Supp. 2d at 1153–54; *In re Advanced Tissue*, 184 F.R.D. at 352 (rejecting appointment of 250 unrelated individual investors).

1802. *See In re Network Assocs.*, 76 F. Supp. 2d at 1025–26 (citing SEC memoranda discussing meaning of "group of persons" under PSLRA and that the agency's interpretation was entitled to great deference).

tor.[1803] The SEC has suggested that groups of three to five plaintiffs are permissible.[1804] Additional relevant factors have included (1) the prior experience of group members; (2) the structure of the group; (3) communication mechanisms both within the group and with counsel; (4) how the group was formed;[1805] (5) the ability of the group to oversee the litigation; (6) the ability of the group to work together; and (7) the existence of a prelitigation relationship among group members.[1806] Courts also have been presented with motions for appointment of co-lead plaintiffs. These requests have raised similar, but less troublesome, issues regarding the number of proposed co-leads and whether appointment of a large group of co-lead plaintiffs would impede their ability to control the litigation and supervise counsel.[1807]

1803. The district court in *In re Baan Co. Securities Litigation*, for example, shared the SEC's view that a group should consist of "no more than three to five persons, a number that will facilitate joint decisionmaking and also help to assure that each group member has a sufficiently large stake in the litigation." *In re* Baan Co. Sec. Litig., 186 F.R.D. 214, 217 (D.D.C. 1999) (citing Memorandum of the Securities and Exchange Commission, Amicus Curiae, at 16–17). *See In re* Gemstar-TV Guide Int'l, Inc. Sec. Litig., 209 F.R.D. 447, 450 (C.D. Cal. 2002) (holding that a group of three institutional investors and four individual investors was too large and diverse to represent the class); *In re Network Assocs.*, 76 F. Supp. 2d at 1023, 1026–27 (refusing to consider group of 1,725 members and rejecting 10-member subgroup); Chill v. Green Tree Fin. Corp., 181 F.R.D. 398, 408 (D. Minn. 1998) (approval of proposed group comprised of 300 plaintiffs "would threaten the interests of the class, would subvert the intent of Congress, and would be too unwieldy to allow for the just, speedy and inexpensive determination of this action"); Gluck v. CellStar Corp., 976 F. Supp. 542 (N.D. Tex. 1997); *see also In re* Tyco Int'l, Ltd. Sec. Litig., MDL No. 1335, 2000 WL 1513772, at *4 (D.N.H. Aug. 17, 2000) (mem.) ("[A] group that consists of a small number of large shareholders should be capable of managing [the] litigation and providing direction to class counsel."); Aronson v. McKesson HBOC, Inc., 79 F. Supp. 2d 1146, 1152–54 (N.D. Cal. 1999) (defining group as "a small number of members that share such an identity of characteristics, distinct from those of almost all other class members, that they can almost be seen as being the same person").

1804. *In re Baan Co.*, 186 F.R.D. at 216–17. *See also In re* Cendant Corp. Litig., 264 F.3d 201, 267 (3d Cir. 2001) (noting that groups of "more than five members are too large to work effectively").

1805. The *Cendant* court included an additional factor where the presumptive lead plaintiff was a group: an inquiry into whether the way in which the group was formed "preclude[d] it from fulfilling the tasks assigned to a lead plaintiff." *In re Cendant Corp.*, 264 F.3d at 266.

1806. *In re* Waste Mgmt., Inc. Sec. Litig., 128 F. Supp. 2d 401, 413, 432 (S.D. Tex. 2000) (requiring, among other things, a prelitigation relationship other than the loss); *In re Network Assocs.*, 76 F. Supp. 2d at 1026.

1807. *See, e.g.,* D'Hondt v. Digi Int'l Inc., Civ. No. 97-5, 1997 WL 405668, at *5 (D. Minn. Apr. 3, 1997) (mem.) (appointing twenty-one plaintiffs as "co-lead" plaintiffs); *In re* Cephalon Sec. Litig., No. 96-CV-0633, 1996 WL 515203, at *1 (E.D. Pa. Aug. 27, 1996) (mem.) (finding that PSLRA "does not preclude appointing more than one lead plaintiff"); *but see In re*

The presumptive lead plaintiff must also make a *prima facie* showing that it satisfies the adequacy and typicality requirements of Rule 23.[1808] Drawing on the PSLRA, the Third Circuit in *In re Cendant Corp. Securities Litigation*[1809] expanded the traditional Rule 23 inquiry into "adequacy" and "typicality" to include whether the presumptive lead plaintiff "has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel."[1810] Information about the firm selected and its ability to conduct the litigation, as well as the manner in which the fee structure was derived, were found to be indicia of whether the lead plaintiff was capable of representing the class.

Thus, a court might conclude that the movant with the largest losses could not surmount the threshold adequacy inquiry if it lacked legal experience or sophistication, intended to select as lead counsel a firm that was plainly incapable of undertaking the representation, or had negotiated a clearly unreasonable fee agreement with its chosen counsel.[1811]

The PSLRA places the selection of lead counsel in the hands of the lead plaintiff, subject to the approval of the court,[1812] although some courts have held that lead counsel be selected through a competitive bidding process, sometimes referred to as an auction.[1813] When determining whether to approve lead counsel proffered by the lead plaintiff, courts focus on the selection process used by the lead plaintiff to choose counsel, the proposed fee structure, whether the firm has adequate resources, and the extent of the firm's (and lead attorney's) experience in class action securities cases. On some occasions, the appointment of more than one firm as lead counsel may be appropriate in order to protect the interests of the class.[1814] Courts that have approved the ap-

---

Donnkenny Inc. Sec. Litig., 171 F.R.D. 156, 157–58 (S.D.N.Y. 1997) (co-lead plaintiffs not permitted by PSLRA).

1808.  *See In re Cendant Corp.*, 264 F.3d at 263.

1809.  264 F.3d 201 (3d Cir. 2001).

1810.  *Id.* at 265.

1811.  *Id.* at 265–66.

1812.  15 U.S.C. § 78u-4(a)(3)(B)(v) (2000). *See* Vincelli v. Nat'l Home Health Care Corp., 112 F. Supp. 2d 1309, 1315 (M.D. Fla. 2000) ("The decision to approve counsel selected by the lead plaintiff is a matter within the discretion of the district court.").

1813.  *See, e.g., In re* Quintus Sec. Litig., 148 F. Supp. 2d 967, 969 (N.D. Cal. 2001); *In re* Bank One S'holders Class Actions, 96 F. Supp. 2d 780, 784 (N.D. Ill. 2000); *In re* Lucent Techs., Inc. Sec. Litig., 194 F.R.D. 137, 156–57 (D.N.J. 2000); Wenderhold v. Cylink Corp., 188 F.R.D. 577, 587 (N.D. Cal. 1999); In *re* Cendant Corp. Litig., 182 F.R.D. 144, 150–51 (D.N.J. 1998).

1814.  *In re* Lernout & Hauspie Sec. Litig., 138 F. Supp. 2d 39, 46–47 (D. Mass. 2001) (appointing three law firms as co-lead counsel and noting factors warranting appointment of more than one firm including the large amount of monies at stake and pending bankruptcy proceeding of defendant corporation). *But see In re* Wells Fargo Sec. Litig., 156 F.R.D. 223, 226 (N.D.

pointment of co-lead plaintiffs often have been willing to approve the appointment of more than one counsel to serve as co-lead counsel.[1815] The sharing of resources and expertise in costly cases may favor the appointment of multiple counsel.[1816]

Factors disfavoring more than one firm include the potential for duplicative services, absence of coordination, the risk of increased litigation time and expense, and the potential for the attorneys to take over or control the litigation—a particular concern of the PSLRA.[1817] The court in *In re Milestone Scientific Securities Litigation*[1818] required that before multiple counsel would be appointed, there must be a showing that "the lead plaintiff will be able to withstand any limitation on, or usurpation of, control, and effectively supervise the several law firms acting as lead counsel."[1819] Review of the proposed organizational structure of lead counsel may reveal potential conflicts among firms, as well as whether the independence and ability of the lead plaintiff to manage the litigation will be impaired.[1820] In cases where the court has determined that the appointment of multiple law firms as lead counsel is ill-advised, the court can still encourage lead counsel to seek the assistance of other firms where appropriate.[1821]

Cal. 1994) (finding joint appointment of co-class counsel unwarranted and posing a "'dangerous probability' of lessened competition" where the firms seeking joint appointment were large and dominant players).

1815. Sakhrani v. Brightpoint, Inc., 78 F. Supp. 2d 845, 854 (S.D. Ind. 1999) (approving selection of two law firms as co-lead counsel and a third firm as local counsel); *In re* Oxford Health Plans, Inc. Sec. Litig., 182 F.R.D. 42, 50 (S.D.N.Y. 1998) (appointing three law firms as co-lead counsel); *In re* Advanced Tissue Scis. Sec. Litig., 184 F.R.D. 346, 353 (S.D. Cal. 1998) (granting plaintiff's motion to approve selection of two firms as co-lead counsel).

1816. *See, e.g., Vincelli*, 112 F. Supp. 2d at 1315; *In re* Milestone Scientific Sec. Litig., 187 F.R.D. 165, 176 (D.N.J. 1999); *In re Oxford Health Plans*, 182 F.R.D. at 49–50.

1817. *See Vincelli*, 112 F. Supp. 2d at 1315–16; *In re Advanced Tissue*, 184 F.R.D. at 351.

1818. 187 F.R.D. 165 (D.N.J. 1999).

1819. *Id.* at 177. *See also In re* Sprint Corp. Sec. Litig., 164 F. Supp. 2d 1240, 1246 (D. Kan. 2001) (approving co-lead counsel but warning that "the court will not approve any possible award of fees and expenses that reflects duplication, inefficiency, or the costs of coordinating the efforts of the two firms . . . [and] will not tolerate co-lead counsel speaking with a divided voice").

1820. *See In re Milestone Scientific*, 187 F.R.D. at 179.

1821. *See, e.g., id.* at 181 & n.10; *In re* Horizons/CMS Healthcare Corp. Sec. Litig., 3 F. Supp. 2d 1208, 1211 (D.N.M. 1998) (appointing firm as lead counsel and two local attorneys as liaison counsel).

## 31.32 Pleading Requirements

Fraud claims, including allegations of securities fraud, must meet the requirements of Federal Rule of Civil Procedure 9(b), which requires that fraud be pleaded with particularity.[1822] The PSLRA reinforced the pleading requirements for securities fraud claims[1823] by specifically mandating that where these pleading requirements are not met, the district court "shall, on the motion of any defendant, dismiss the complaint."[1824] Under the PSLRA, the complaint now must include each allegedly misleading statement together with reasons why it is misleading. Any allegations regarding statements or omissions that are made on information and belief must be supported by a particularized statement of facts supporting such belief.[1825] The courts have disagreed as to whether the group pleading doctrine survives the PSLRA. Some have interpreted the PSLRA to preclude plaintiffs from grouping all defendants together in order to survive a motion to dismiss, requiring instead identification of the specific misrepresentations made by each.[1826] Others have adhered to a narrow interpretation of the doctrine, holding that in appropriate circumstances it may still apply.[1827] Some courts have required the plaintiff to plead with par-

---

1822. Fed. R. Civ. P. 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally."

1823. The enhanced pleading requirements were not included in the PSLRA provisions of the 1933 Act.

1824. 15 U.S.C. § 78u-4(b)(3)(A) (2000). *See* San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 812–13, 815 (2d Cir. 1996) (affirming lower court's ruling that plaintiffs did not allege fraud with sufficient particularity). *But cf.* Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000) (vacating and remanding lower court's dismissal of the case for failure to allege fraud with particularity).

1825. 15 U.S.C. § 78u-4(b)(1) (2000). *See* Liberty Ridge LLC v. Realtech Sys. Corp., 173 F. Supp. 2d 129 (S.D.N.Y. 2001).

1826. *See, e.g., In re* U.S. Interactive, Inc., No. 01-CV-522, 2002 WL 1971252, at *4 (E.D. Pa. Aug. 23, 2002) (finding group pleading doctrine could be applied to corporate officers where it was clear, given their high level positions and the nature of writing at issue, that the officer would have been involved directly with its writing, approval of its contents, or privy to information concerning its accuracy); Allison v. Brooktree Corp., 999 F. Supp. 1342, 1350 (S.D. Cal. 1998) ("[T]he continued vitality of the judicially created group-published doctrine is suspect since the PSLRA specifically requires that the untrue statements or omissions be set forth with particularity as to 'the defendant' . . . .").

1827. *See e.g., In re* Raytheon Securities Litig., 157 F. Supp. 2d 131, 152–53 (D. Mass. 2001) ("this Court agrees with the majority of courts that have held that the rationale behind the group pleading doctrine remains sound in the wake of the passage of the PSLRA"); *In re* Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1108 (D. Nev. 1998) (declining to adopt defendant's proposition that "group pleading has been sub silentio abolished by the PSLRA").

ticularity each defendant's specific statements supporting the plaintiff's claim against that defendant.[1828]

The degree of specificity required has varied.[1829] Courts have required the plaintiff to identify how the plaintiff learned of the conduct for the basis for its allegations, including confidential sources underlying allegations on information and belief.[1830] To the extent such sources are documentary, courts also have required plaintiffs to identify the document, its author, its date, and its recipient, and to describe the document's contents.[1831] Other courts have held the PSLRA's heightened pleading standard does not "require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based."[1832] One option is to require plaintiffs (in all cases subject to the provisions of the PSLRA) to file, along with a complaint alleging securities fraud, a "case statement" modeled after those often utilized in Racketeer Influenced and Corrupt Organizations Act (RICO) litigation.[1833] For example, a judge ordered plaintiffs filing an amended complaint to include, with respect to each false or misleading statement, the following information:[1834]

- whether the statements were written or oral;
- the title, author, date of preparation, and persons reviewing any written statements;
- when, where, and the circumstances under which oral statements were made;

---

1828. *See, e.g.,* Coates v. Heartland Wireless Communications, Inc., 26 F. Supp. 2d 910, 915–16 (N.D. Tex. 1998) (holding group pleading banned by PSLRA); *Allison*, 999 F. Supp. at 1350 (questioning continued vitality of group pleading doctrine); Zuckerman v. Foxmeyer Health Corp., 4 F. Supp. 2d 618, 626–27 & n.4 (N.D. Tex. 1998).

1829. *See, e.g., In re* Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970 (9th Cir. 1999); *In re* McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248 (N.D. Cal. 2000); *In re* Eng'g Animation Sec. Litig., 110 F. Supp. 2d 1183 (S.D. Iowa 2000).

1830. *In re* Green Tree Fin. Corp. Stock. Litig., 61 F. Supp. 2d 860 (D. Minn. 1999); *In re* Silicon Graphics, Inc. Sec. Litig., 970 F. Supp. 746 (N.D. Cal. 1997), *aff'd*, 183 F.3d 970 (9th Cir. 1999).

1831. *In re* Guess?, Inc. Sec. Litig., 174 F. Supp. 2d 1067 (C.D. Cal. 2001). *Compare In re* Silicon Graphics, Inc. Sec. Litig., 970 F. Supp. 746 (N.D. Cal. 1997), *aff'd*, 183 F.3d 970 (9th Cir. 1999), *and In re* Green Tree Fin. Corp. Stock Litig., 61 F. Supp. 2d 860 (D. Minn. 1999), *with* Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000); *see also In re* Digi Int'l Inc. Sec. Litig., 6 F. Supp. 2d 1089 (D. Minn. 1998).

1832. *Novak*, 216 F.3d at 313.

1833. *See infra* § 35.

1834. *In re Guess?*, 174 F. Supp. 2d at 1079–80.

- all facts supporting the claim that the statement was false or misleading when made;
- details regarding any reports or other sources that plaintiffs allege support or demonstrate the falsity of the statements; and
- all facts giving rise to a strong inference of recklessness, and detailed information regarding any documents or other sources supporting such an inference.

Such statements can be designed to detail both the factual and legal basis for the plaintiff's claim. These statements may prove helpful in assisting a plaintiff with a meritorious case to comply with the PSLRA pleading requirements as interpreted within the jurisdiction, and they may assist the court when ruling on motions brought pursuant to Federal Rule of Civil Procedure 12. The PSLRA requires a plaintiff to have a detailed factual basis for the allegations at the time suit is filed. This suggests that the normal liberality of amendment provided by the Federal Rules may be inappropriate in shareholder class actions. Where it is apparent that repeated amendment of the complaint cannot correct the deficiencies, dismissal with prejudice may be appropriate.

The PSLRA also imposes a uniform standard for pleading scienter in order to survive a motion to dismiss.[1835] Prior to the PSLRA, the Second Circuit, for example, had held that a plaintiff must plead a strong inference of scienter either by (1) alleging facts establishing a motive and opportunity to commit fraud, or (2) presenting circumstantial evidence of recklessness or conscious misbehavior.[1836] Other circuits held that compliance with Federal Rule of Civil Procedure 9(b), permitting general averments of scienter, was sufficient.[1837] Although the PSLRA incorporated language from Second Circuit jurisprudence requiring the plaintiff to allege with particularity all "facts giving rise to a strong inference that the defendant acted with the required state of mind,"[1838] Congress declined to expressly codify the Second Circuit standard.[1839] Nor did

---

1835. "[T]he PSLRA did not change the scienter that a plaintiff must prove to prevail in a securities fraud case but instead changed what a plaintiff must plead in his complaint in order to survive a motion to dismiss." *In re* Comshare, Inc. Sec. Litig., 183 F.3d 542, 548–49 (6th Cir. 1999).

1836. *In re* Time Warner Inc. Sec. Litig., 9 F.3d 259, 268–69 (2d Cir. 1993).

1837. *See In re* GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1545 (9th Cir. 1994) (en banc).

1838. S. Rep. No. 104-98, at 26 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 705; *see also id.* at 15, *reprinted in* 1995 U.S.C.C.A.N at 694 (choosing "a uniform standard modeled upon the pleading standard of the Second Circuit"); H.R. Conf. Rep. No. 104-369, at 41 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 740 ("The Conference Committee language is based in part on the pleading standard of the Second Circuit.").

1839. *See* Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 (11th Cir. 1999) (questioning whether Congress "merely borrow[ed] the Second Circuit's 'strong inference' language without

Congress define the "required state of mind" or change the scienter plaintiffs must prove.[1840] The courts construing the PSLRA, however, have split on whether a "strong inference" of scienter can be shown by motive and opportunity alone or whether the statute heightens the Second Circuit standard and more is required.[1841]

## 31.33  Safe Harbor

The PSLRA's statutory "safe-harbor" provision protects statements defined as "forward looking" in section 78u-5(i)(1). However, the Act specifically excludes certain statements from the definition of forward-looking and also withdraws the safe-harbor protections from any person convicted of securities violations within the previous three years.[1842] Under this provision, liability will not attach to forward-looking statements that are accompanied by appropriate

---

adopting its motive and opportunity test"); *In re* Boeing Sec. Litig., 40 F. Supp. 2d 1160, 1173 (W.D. Wash. 1998) (Although modeled after the Second Circuit standard, "'[t]he Committee does not intend to codify the Second Circuit's caselaw interpreting this pleading standard, although courts may find this body of law instructive.'" (emphasis omitted) (quoting S. Rep. No. 104-98, at 15 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 694 (citations omitted))).

1840.  *In re* SmarTalk Teleservices, Inc. Sec. Litig., 124 F. Supp. 2d 505, 512 (S.D. Ohio 2000); *In re* Glenayre Techs., Inc. Sec. Litig., 982 F. Supp. 294, 298 (S.D.N.Y. 1997).

1841.  15 U.S.C. § 78u-4(b)(2) (2000). *See, e.g.,* Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) (adhering to traditional test of motive and opportunity and strong inference); *Bryant*, 187 F.3d at 1283, 1285 (holding that "[PSLRA] does not codify the 'motive and opportunity' test formulated by the Second Circuit" and that allegations of motive and opportunity alone are insufficient); *In re* Comshare, Inc. Sec. Litig., 183 F.3d 542, 551 (6th Cir. 1999) (rejecting motive and opportunity alone as sufficient evidence of scienter); *In re* Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999) ("In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity."); *In re* Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3d Cir. 1999) (following Second Circuit test but barring "catch-all" allegations and adhering to heightened pleading); Williams v. WMX Techs., Inc., 112 F.3d 175, 177–78 (5th Cir. 1997) (Second Circuit test still viable after PSLRA); *In re Boeing*, 40 F. Supp. 2d at 1174 (finding motive and opportunity alone, while usually insufficient, may be sufficient to plead scienter "if the totality of the circumstances creates a strong inference of fraud"); *In re* Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1107–08 (D. Nev. 1998) (finding motive and opportunity alone not presumed to be sufficient); *In re Glenayre*, 982 F. Supp. at 297–98 (motive and opportunity relevant, but insufficient on own); *In re* Health Mgmt., Inc. Sec. Litig., 970 F. Supp. 192, 201 (E.D.N.Y. 1997) (Second Circuit test still viable); Friedberg v. Discreet Logic Inc., 959 F. Supp. 42, 48 (D. Mass. 1997) (Reform Act heightened Second Circuit pleading standard); Marksman Partners L.P. v. Chantal Pharm. Corp., 927 F. Supp. 1297, 1308–11 (C.D. Cal. 1996) (Second Circuit test still viable). *See also* Greebel v. FTP Software, Inc., 194 F.3d 185 (1st Cir. 1999).

1842.  15 U.S.C. § 78u-5(b) (2000).

cautionary statements[1843] tailored to the particular risks.[1844] The provision, however, does not apply to statements included in financial or registration statements.[1845] Also, it will not protect statements that are knowingly false when made, even if such statements otherwise would fall within the scope of section 78u-5(i)(1).[1846] Early review of the complaint may disclose that the statements complained of fall within the safe-harbor provisions and that the claims consequently are subject to dismissal under Federal Rule of Civil Procedure 12 or 56.

## 31.34  Discovery Stays

The PSLRA provides that all discovery and other proceedings "shall be stayed during the pendency of any motion to dismiss" absent a showing of "undue prejudice"[1847] or a showing that "particularized discovery is necessary to preserve evidence."[1848] The safe harbor provisions exempting forward-looking statements from liability also permit a stay of discovery pending resolution of summary judgment motions,[1849] although limited discovery targeted towards the applicability of the safe-harbor provisions may be permitted. The discovery stay provisions were designed to protect defendants from fishing expeditions and unnecessary costs of discovery where the legal sufficiency of the

---

1843. The statute protects individuals making forward-looking statements if accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially . . . ." *Id.* § 78u-5(c)(1)(A)(i).

1844. *See* EP Medsystems, Inc. v. Echocath, Inc., 30 F. Supp. 2d 726 (D.N.J. 1998) (representations effectively "bespeak caution").

1845. 15 U.S.C. § 78u-5(b)(2)(A)–(B) (2000).

1846. Fugman v. Aprogenex, Inc., 961 F. Supp. 1190, 1196–97 (N.D. Ill. 1997).

1847. *See* SG Cowen Sec. Corp. v. United States Dist. Court, 189 F.3d 909, 913 (9th Cir. 1999) ("[F]ailure to muster facts sufficient to meet the Act's pleading requirements cannot constitute the requisite 'under prejudice' to the plaintiff . . . ."); Anderson v. First Sec. Corp., 157 F. Supp. 2d 1230, 1242 (D. Utah 2001) (existence of confidentiality agreement between defendant and third-party merger candidate precluded plaintiffs from obtaining specific information and therefore plaintiffs would be unduly prejudiced unless afforded limited discovery); *In re* Carnegie Int'l Corp. Sec. Litig., 107 F. Supp. 2d 676, 684 (D. Md. 2000) (defendants failed to show undue prejudice); Med. Imaging Ctrs. of Am., Inc. v. Lichtenstein, 917 F. Supp. 717, 720–22 (S.D. Cal. 1996) (failing to show undue prejudice standard).

1848. 15 U.S.C. § 78u-4(b)(3)(B) (2000). *See also* Berckeley Inv. Group, Ltd. v. Colkitt, 984 F. Supp. 827, 828 (M.D. Pa. 1997) (stay applies where motion to dismiss is directed towards counterclaim asserting claims under the securities laws). "Congress clearly intended that complaints in these securities actions should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed." Medhekar v. United States Dist. Court, 99 F.3d 325, 328 (9th Cir. 1996) (per curiam).

1849. 15 U.S.C. §§ 77z-2(f), 78u-5(f) (2000).

complaint had not been determined.[1850] The provisions apply to both party and nonparty discovery[1851] and preempt the mandatory disclosure provisions of Rule 26.[1852]

The courts have disagreed on whether the discovery stay provisions apply even though a motion to dismiss has not yet been filed. Several courts have held that the stay provisions are triggered once the defendant indicates an intent to file a motion to dismiss.[1853] The court, in *In re Carnegie International Corp. Securities Litigation,* commented that the defendant had to be given an *opportunity* to challenge the complaint and "[a]ny other interpretation would encourage unseemly gamesmanship, i.e., a race to serve subpoenas for discovery before a defendant had the opportunity to test the sufficiency of the complaint."[1854] Other courts have required an actual motion to be filed before imposing a stay.[1855] Application of the discovery stay provisions does not, however, automatically apply to all claims asserted in the complaint. Where the complaint contains separate state law claims that are distinct from the securities claims, some courts have allowed discovery to proceed on those claims; staying the entire case, however, generally is more efficient.[1856]

## 31.4  Initial Pretrial Conference

Securities claims can arise under both federal and state statutes, as well as the common law, and can involve numerous parties. Complaints typically assert numerous claims against various defendants, ranging from companies and securities professionals to accountants and lawyers, with the latter defendants

---

1850. *See, e.g.,* Angell Invs., L.L.C. v. Purizer Corp., No. 01-C-6359, 2001 WL 1345996, at *2 (N.D. Ill. Oct. 30, 2001).

1851. *In re Carnegie*, 107 F. Supp. 2d at 679–81 (quashing subpoena duces tecum issued to third parties).

1852. *Medhekar*, 99 F.3d at 327–28 (holding that "initial disclosures are a subset of discovery, and that, as such, they are included in the Act's stay provision").

1853. *See, e.g., In re Carnegie*, 107 F. Supp. 2d at 683.

1854. *Id. See also In re* Trump Hotel S'holder Derivative Litig., No. 96-CIV-7820, 1997 WL 442135, at *2 (S.D.N.Y. Aug. 5, 1997) (staying discovery even though motion to dismiss had not been filed where lack of dismissal motion was result of agreed on schedule).

1855. *See, e.g.,* Novak v. Kasaks, No. 96-CIV-3073, 1996 WL 467534, at *1 (S.D.N.Y. Aug. 16, 1996).

1856. *See* Tobias Holdings, Inc. v. Bank United Corp., 177 F. Supp. 2d 162, 167 (S.D.N.Y. 2001) (allowing discovery to proceed on plaintiff's state law claims, where "separate and distinct" from federal securities claims "would not represent an impermissible 'end run' around the PSLRA's automatic stay provisions"); Angell Invs., L.L.C. v. Purizer Corp., No. 01-C-6359, 2001 WL 1345996, at *2 (N.D. Ill. Oct. 30, 2001). *But see In re Trump Hotel*, 1997 WL 442135, at *2 (staying discovery).

implicating issues of privilege and confidentiality.[1857] Complaints also may be lengthy, in part as a result of the requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA that fraud be pleaded with particularity.[1858] Failure to comply with Rule 9(b) and the more stringent pleading standards of the PSLRA provide a basis for dismissal of securities actions.[1859] Defendants frequently seek substantial time to respond to the complaint and to decide whether to file counterclaims, cross-claims, and third-party complaints. Immediately after assignment of the litigation, the judge should consider entering an order suspending the time for all defendants to respond to the complaint in cases where a motion to consolidate is pending or a lead plaintiff has not been selected, as the initial complaint is likely to be amended. The initial conference offers an opportunity to learn about the potential size and complexity of the litigation; set a schedule for amendments, motions, and responsive pleadings; and schedule discovery accordingly.

Early institution of an initial case-management order will help to organize the case and preliminarily identify key legal and factual issues. Of particular significance in assessing securities litigation is early determination of the following issues:

- *The likely size and scope of the case.* Complaints will often name as defendants the company whose securities are involved, its officers, directors, independent accountants, attorneys, and brokerage firms. Standards for both pleading and liability may differ depending on the type of defendant. In addition, many securities cases are brought as class actions, raising issues under Federal Rule of Civil Procedure 23 and the PSLRA.

- *Pending or expected related litigation.* In addition to private actions, the SEC or other administrative agencies may institute proceedings. In some instances, related criminal proceedings may also be pending, which may lead the government to request staying the litigation.[1860] A

---

1857. In addition to claims under the 1933 Act and the 1934 Exchange Act, plaintiffs may include claims under the RICO Act, 18 U.S.C. §§ 1961–1968 (2000), as well as claims for common-law fraud, negligent misrepresentation, and breach of fiduciary duty, among others.

1858. *See, e.g.,* Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992); Whalen v. Carter, 954 F.2d 1087, 1097–98 (5th Cir. 1992).

1859. *See, e.g.,* Parnes v. Gateway 2000, Inc., 122 F.3d 539, 549–50 (8th Cir. 1997) (holding that lower court properly dismissed claims for failing to meet particularity requirements); Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1021 (5th Cir. 1996) (holding lower court properly dismissed claims based on failing to adequately plead scienter under Rule 9(b)).

1860. *See, e.g., In re* Aid Auto Stores, Inc. Sec. Litig., No. CV-98-7395, 2001 WL 1478803, at *1 (E.D.N.Y. July 13, 2001) (order granting government's motion to intervene and staying discovery pending resolution of criminal proceeding).

party may also be a debtor in bankruptcy, which may result in automatic stays with respect to that party, removal of cases, related adversary proceedings, and objections to the discharge of debts. In addition, separate actions may have been filed regarding fidelity bonds and other insurance coverage issues, or to prevent foreclosure of security interests. All related litigation in the same court, including pertinent aspects of bankruptcy proceedings, ordinarily should be assigned or transferred to one judge for initial supervision and planning.[1861] The extent to which these cases should be formally consolidated for further pretrial proceedings and trial will depend on the circumstances[1862] and, after a period of centralized management, some cases may be appropriately reassigned to other judges. In class actions, the PSLRA provides that the court should consolidate multiple actions where appropriate.[1863] Related cases may also have been filed in different jurisdictions, as the conduct alleged in securities fraud litigation often affects persons in many states. Centralized pretrial management of the federal litigation may be possible through motions to transfer, or through transfer by the Judicial Panel on Multidistrict Litigation under 28 U.S.C. § 1407.[1864] In general, the optimal venue for a shareholder class action is the district in which the defendant company is headquartered. To the extent that cases remain in different courts, each court should consider whether formal or informal coordination is possible to minimize the risk of conflict.[1865]

- *Takeover litigation.* Takeover litigation—actions brought in connection with the attempted acquisition or transfer of control of a corporation by obtaining securities, assets, or stockholder support—often will involve several actions filed almost simultaneously in different

---

1861. *See, e.g.,* Aronson v. McKesson HBOC, Inc., 79 F. Supp. 2d 1146, 1150 (N.D. Cal. 1999) (fifty-four related class actions assigned to the court by the District Reassignment Committee).

1862. *See* Fed. R. Civ. P. 42(a).

1863. *See Aronson,* 79 F. Supp. 2d at 1152 (consolidating all cases except shareholder derivative suit, which was deferred for full briefing); Chill v. Green Tree Fin. Corp., 181 F.R.D. 398, 405–07 (D. Minn. 1998) (granting motion to consolidate and consolidating actions into two class actions).

1864. *See, e.g., In re* Enron Corp. Sec., Derivative & "ERISA" Litig., 196 F. Supp. 2d 1375, 1376 (J.P.M.L. 2002) (transferring all related cases outside the Southern District of Texas to that forum "for centralized pretrial proceedings" pursuant to 28 U.S.C. § 1407); *In re* Wash. Pub. Power Supply Sys. Sec. Litig., 568 F. Supp. 1250 (J.P.M.L. 1983) (section 1407 transfer order).

1865. For example, coordination may be possible on decisions regarding lead plaintiffs or class notification.

courts seeking a preliminary injunction against violation of the federal antitrust and securities laws. Takeover litigation can be extremely time sensitive, requiring the court's attention to the need for quick resolution of many issues and the impact on the market of even the timing of rulings and hearings. See section 31.7 regarding special problems in takeover litigation.

- *Parties seeking protective orders.* Discovery in securities actions can result in the disclosure of sensitive information, the dissemination of which is potentially detrimental, particularly to corporate defendants.[1866] Securities claims can also implicate attorney–client privileges.

- *Referral to a special master.* Securities cases can present complex factual disputes over matters of accounting, corporate finance, market analyses, or the negotiation or implementation of complex settlements.

- *Potential for settlement.* The parties may be amenable to settlement before substantial time and expense is wasted in litigation, and the court may want to explore the possibilities of early settlement.[1867]

Several foundational issues may preclude the action altogether, and thereby render it subject to early resolution under Federal Rule of Civil Procedure 12(b) or 56. Examples of such issues include

- whether an instrument constitutes a security subject to registration for purposes of liability under the securities laws;[1868]

- whether the alleged misstatements are material;[1869]

- whether the conduct falls within the PSLRA's statutory safe-harbor provisions, or the "bespeaks caution" doctrine;[1870]

- whether a claim is barred by the statute of limitations;[1871]

---

1866. *See, e.g.,* SEC v. TheStreet.com, 273 F.3d 222, 230–31 (2d Cir. 2001) (discussing circumstances under which modification of protective order was appropriate); *In re* Cephalon Sec. Litig., No. 96-0633, 1998 WL 744067 (E.D. Pa. Oct. 22, 1998) (mem.).

1867. *See, e.g., In re* Horizon/CMS Healthcare Corp. Sec. Litig., 3 F. Supp. 2d 1208, 1211 (D.N.M. 1998) (settlement reached where litigation stood in the way of acquisition of the defendant by major healthcare provider).

1868. *See, e.g.,* Assocs. in Adolescent Psychiatry v. Home Life Ins. Co., 941 F.2d 561, 564–66 (7th Cir. 1991).

1869. *See* Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997).

1870. *See* Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276 n.7 (11th Cir. 1999) (describing the safe-harbor provision and the bespeaks caution doctrine). The bespeaks caution doctrine appears to remain viable after the PSLRA. *See In re* Boeing Sec. Litig., 40 F. Supp. 2d 1160, 1170 (W.D. Wash. 1998) ("The PSLRA's safe harbor provisions do not supplant the 'bespeaks caution' doctrine.").

- whether a demand must be made on a corporation's directors;[1872]
- whether the "business judgment" rule allows the directors, or a committee they have established, to dismiss or settle the action;[1873]
- whether the defendant is a "controlling person" on whom liability may be imposed;[1874]
- whether and when a "sale" or "purchase" occurred;[1875]
- whether public availability of material information excuses nondisclosure in an action relying on the "fraud-on-the-market" theory;[1876]
- whether loss causation can be established—the PSLRA places the burden of proving loss causation on the plaintiff;[1877]
- whether scienter has been properly alleged and can be established;[1878] and

---

1871. Litigation pursuant to section 10(b) and Rule 10b-5 must be commenced within one year from the discovery of a violation and no more than three years from the date the violation occurred. 15 U.S.C. §§ 77m, 78i(e) (2000); Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991). The one-year period begins to run when plaintiffs are on inquiry or constructive notice of the facts giving rise to the claims. Berry v. Valence Tech., Inc., 175 F.3d 699, 703–04 (9th Cir. 1999); Liberty Ridge LLC v. Realtech Sys. Corp., 173 F. Supp. 2d 129, 135 (S.D.N.Y. 2001); Reisman v. KPMG Peat Marwick LLP, 965 F. Supp. 165, 170 (D. Mass. 1997). The Supreme Court in *Lampf* established a uniform federal statute of limitations for such claims and further held the doctrine of equitable tolling would not apply. 501 U.S. at 361–62, 363. In some cases, plaintiffs must affirmatively plead compliance with the statute of limitations, with supporting facts. *See, e.g., In re* Chaus Sec. Litig., 801 F. Supp. 1257, 1265 (S.D.N.Y. 1992).

1872. *See, e.g.,* Daily Income Fund, Inc. v. Fox, 464 U.S. 523 (1984).

1873. *See* Burks v. Lasker, 441 U.S. 471, 486 (1979) (state law controls issue of board's power to discontinue derivative action on federal claim); *see also* RCM Sec. Fund, Inc. v. Stanton, 928 F.2d 1318 (2d Cir. 1991); Joy v. North, 692 F.2d 880 (2d Cir. 1982); Clark v. Lomas & Nettleton Fin. Corp., 625 F.2d 49 (5th Cir. 1980).

1874. *See, e.g.,* Martin v. Shearson Lehman Hutton, Inc., 986 F.2d 242, 244 (8th Cir. 1993); Hollinger v. Tital Capital Corp., 914 F.2d 1564, 1572–76 (9th Cir. 1990) (en banc); *In re* Indep. Energy Holdings PLC Sec. Litig., 154 F. Supp. 2d 741, 772 (S.D.N.Y. 2001); *In re* Xerox Corp. Sec. Litig., 165 F. Supp. 2d 208, 220 (D. Conn. 2001); *In re* Sirrom Capital Corp. Sec. Litig., 84 F. Supp. 2d 933, 940 (M.D. Tenn. 1999) (denying motion to dismiss).

1875. *See, e.g.,* Frankel v. Slotkin, 984 F.2d 1328, 1333 & n.3, 1337–38 (2d Cir. 1993); Colan v. Mesa Petroleum Co., 951 F.2d 1512, 1522–25 (9th Cir. 1991); Freeman v. Decio, 584 F.2d 186, 200 (7th Cir. 1978).

1876. *See In re* Apple Computer Sec. Litig., 886 F.2d 1109, 1115 (9th Cir. 1989).

1877. 15 U.S.C. § 78u-4(b)(4) (2000). *See* EP MedSystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 883–85 (3d Cir. 2000); McGonigle v. Combs, 968 F.2d 810, 819–20 (9th Cir. 1991); Norwood Venture Corp. v. Converse Inc., 959 F. Supp. 205, 209–10 (S.D.N.Y. 1997). Loss causation requires plaintiffs to do more than allege that "they would not have bought . . . stock had they known the truth; they must allege that they would not have suffered the loss" but for defendant's actions. Miller v. New Am. High Income Fund, 755 F. Supp. 1099, 1108 (D. Mass. 1991).

• whether the defendant may be held liable as a "seller."[1879]

In addition, the resolution of various issues—for example, whether the plaintiffs may proceed on a fraud-on-the-market theory[1880]—will be relevant to whether individual cases may be consolidated for joint trial or should proceed as a class action.[1881]

## 31.5  Class Actions and Derivative Actions

Where appropriate, the court can use the initial pretrial conference to set a schedule for determining whether one or more of the cases should proceed as a class action under Federal Rule of Civil Procedure 23, or a derivative action under Rule 23.1. In addition to ensuring that the notice and pleading requirements of the PSLRA have been met, the following can be assessed as an initial matter:

• whether there has been more than one class action filed, and the parties' intent to seek consolidation or transfer;

• if the action has been removed pursuant to the Uniform Standards Act, whether removal was appropriate;[1882]

• whether there have been or will be challenges to lead plaintiff certification;

• whether there has been a demonstrable need for limited discovery regarding lead plaintiff certification—in addition to showing a significant financial interest in the relief sought by the class, the plaintiff must also satisfy the typicality and adequacy requirements of Rule 23(a);

• whether appropriate discovery stays pending resolution of any motions to dismiss have been instituted;

• whether lead plaintiff has been selected;

• whether lead counsel has been identified and approved by the court; and

---

1878.  *See* Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976). *See also Hollinger*, 914 F.2d at 1568–72.

1879.  *See* Pinter v. Dahl, 486 U.S. 622, 641–47 (1988).

1880.  *See* Basic Inc. v. Levinson, 485 U.S. 224, 241–49 (1988).

1881.  *See, e.g., In re* LTV Sec. Litig., 88 F.R.D. 134 (N.D. Tex. 1980); Mirkin v. Wasserman, 858 P.2d 568 (Cal. 1993).

1882.  Derdiger v. Tallman, 75 F. Supp. 2d 322, 325 (D. Del. 1999) (finding remand required where claims fell within savings clause of 15 U.S.C. § 78bb(f)(3)(A)(ii)).

- whether the complaint alleges claims that are not susceptible to class treatment.

Other matters must be resolved before a class can be defined. The initial complaint occasionally will include some claims (e.g., reliance on oral misrepresentations or the breach of a "suitability" standard) that rarely would be susceptible to class action treatment, along with other claims (e.g., an omission of a material fact from a proxy statement) that may well be presented on behalf of a class. The dates when plaintiffs bought or sold the securities, and what information they possessed on those dates, may not be clear from the complaint, yet may be critical to a decision regarding the class of persons they might properly represent. Whether the plaintiffs may proceed on a fraud-on-the-market theory may depend both on matters developed during discovery and on what claims will be pursued in the case. The court may need to determine whether a particular claim is made derivatively or individually[1883] and whether the same plaintiff may assert both derivative and class claims.[1884] In deciding whether a class should be certified, consider what class the plaintiffs may represent, and whether multiple classes or subclasses should be formed. It is advisable to consider sources of potential conflict and their effect, such as

- whether the class members are holders of different types of securities;[1885]
- whether some class members took certain key actions while others did not;[1886]
- whether some class members bought or sold before the alleged misconduct and others did so afterwards (or continued to hold the security);[1887]
- whether some class members had inside information;[1888]

1883. *See* Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 527–34 (1984).

1884. *Compare* Hawk Indus., Inc. v. Bausch & Lomb, Inc., 59 F.R.D. 619, 623–24 (S.D.N.Y. 1973), *and* Ruggiero v. Am. Bioculture, Inc., 56 F.R.D. 93, 95 (S.D.N.Y. 1972), *with* Keyser v. Commonwealth Nat'l Fin. Corp., 120 F.R.D. 489, 492–93 (M.D. Pa. 1988), *and In re* Dayco Corp. Derivative Sec. Litig., 102 F.R.D. 624, 629–31 (S.D. Ohio 1984). The court may choose to address any actual conflict arising between the claims at the remedy stage. *Keyser*, 120 F.R.D. at 492 n.8 (citing Bertozzi v. King Louie Int'l, Inc., 420 F. Supp. 1166 (D.R.I. 1976)).

1885. *See, e.g.,* Margolis v. Caterpillar, Inc., 815 F. Supp. 1150, 1157 (C.D. Ill. 1991) (buyers of call options and sellers of put options); Deutschman v. Beneficial Corp., 761 F. Supp. 1080, 1082–83 (D. Del. 1991) (common stock and call options).

1886. *See, e.g., In re* Bally Mfg. Sec. Corp. Litig., 141 F.R.D. 262, 270 (N.D. Ill. 1992) (those who sold during the class period and those who did not).

1887. *See, e.g.,* Kovaleff v. Piano, 142 F.R.D. 406, 408 (S.D.N.Y. 1992); Deutschman v. Beneficial Corp., 132 F.R.D. 359, 382–83 (D. Del. 1990); *In re* LTV Sec. Litig., 88 F.R.D. 134, 149 (N.D. Tex. 1980).

- whether class members purchased or sold securities at different times based on different information;[1889] and
- whether class members are seeking damages or rescission.[1890]

These differences in the various groups of plaintiffs and proposed class members require the court's early attention. Defendants may raise these differences when opposing class treatment, and in some cases opposing positions may justify denial of class certification. In many instances, however, differences may be resolved by limiting the definition of the class or classes that the plaintiffs may represent, by creating additional classes or subclasses, or by tailoring the relief afforded to different plaintiffs. For example, the court may define a class to exclude (or treat as a subclass) those who, as often occurs in complex securities litigation, are also defendants in the class action or in related litigation. If a subclass should be formed and no representative of that subclass is a party, the court may direct notice to the unrepresented class members, to afford them time to have a representative intervene.[1891] Although, as discussed in section 21.23, unnecessary classes generally should be avoided, in some securities cases multiple classes or subclasses may be needed to ensure that the interests of all class members are fairly and adequately protected, particularly during settlement negotiations. Occasionally a mandatory class under Federal Rule of Civil Procedure 23(b)(1) or (b)(2) may be proper, but generally classes in securities litigation will be certified under Rule 23(b)(3), with members enjoying the right to notice and an opportunity to opt out. Class members' opting out of a 23(b)(3) class, if adequately disclosed, may cure some conflicts.

Although the PSLRA provides for early notice to class members by the plaintiff who first files a securities class action, class representatives must also comply with Rule 23(c)(2)'s notice provisions. Absent special circumstances, the class representatives must bear not only the cost of providing Rule 23(c)(2) notice, but also the expense of obtaining class members' names and addresses, which frequently are in the possession of the defendants or a transfer agent.[1892] When securities are registered in "street" names with brokerage houses or fi-

---

1888. *See, e.g.,* Dubin v. Miller, 132 F.R.D. 269, 274–75 (D. Colo. 1990).

1889. *See, e.g.,* Hoexter v. Simmons, 140 F.R.D. 416, 421–22 (D. Ariz. 1991); Alfus v. Pyramid Tech. Corp., 764 F. Supp. 598, 605–06 (N.D. Cal. 1991).

1890. *See, e.g.,* Larson v. Dumke, 900 F.2d 1363, 1366–68 (9th Cir. 1990); Davis v. Comed, Inc., 619 F.2d 588, 592–98 (6th Cir. 1980).

1891. *See* Fed. R. Civ. P. 23(d)(2).

1892. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340 (1978).

nancial institutions, these nominees' assistance will be needed.[1893] Class representatives should make arrangements with nominees to provide the necessary names and addresses or to forward notices where appropriate, or, where necessary, issue a *subpoena duces tecum*.[1894] Sometimes—for example, in a class action on behalf of holders of bearer bonds—the identity of class members may not be ascertainable. In such a case, the plaintiffs' attorneys should give notice by publication in media likely to be seen by the class members.

## 31.6 Discovery

The principles and procedures discussed in section 11.4 for controlling discovery are generally applicable to securities litigation, subject to the discovery stay provisions of the PSLRA where class action litigation is involved. As an initial matter, the judge should consider what information will be needed from the parties to determine whether the litigation should proceed as a derivative action or class action. In cases that do not raise class issues, the parties are subject to Rule 26 disclosures and the court should further ascertain at the initial pretrial conference the scope of discovery likely to be sought by the parties and tailor a discovery schedule accordingly. Additional reciprocal prediscovery disclosures may expedite and reduce the amount of discovery needed. Similarly, deferral of depositions until the completion of document discovery may help facilitate and expedite the depositions, reducing the burden and cost on the parties. In class actions, the discovery process can begin once the court has resolved any outstanding motions to dismiss; therefore, it is helpful to set a discovery schedule that includes dates for Rule 26 disclosures (which would have been preempted by any stay of discovery) prior to permitting the parties to begin the formal discovery process. Staged discovery may be appropriate, such as where there are certain factual issues that may be key to summary judgment or settlement. Discovery into these areas first may facilitate early resolution or, at minimum, identify areas that remain in dispute.

To avoid duplicative discovery in multiple litigation, it is best to require plaintiffs in related cases to prepare a single set of interrogatories to be propounded to each defendant, and require the parties to coordinate discovery plans. Consider also establishing a common document depository, perhaps online, cross-noticing depositions of common witnesses for use in all cases. Whether claims of attorney–client privilege or other requests for protective

---

1893. *See* Silber v. Mabon, 18 F.3d 1449, 1453–55 (9th Cir. 1994) (no due process violation where notice mailed to broker holding stock in street name was not sent to class member until after opt-out period, but court should have considered allowing late opt out).

1894. *See, e.g., In re* Penn Cent. Sec. Litig., 560 F.2d 1138 (3d Cir. 1977).

orders are likely to arise during the course of discovery can be ascertained at the initial conference, and efforts can be made to resolve such issues before they can disrupt the discovery schedule. The court can also establish a schedule for exchanging expert reports and taking depositions early in the litigation and can adopt procedures to facilitate discovery and use at trial of summaries and computerized data. As in other cases, counsel should be expected to stipulate to facts not genuinely in controversy and directed to develop a joint statement of agreed-on (or uncontroverted) facts.

## 31.7  Takeover Litigation

.71 Initial Conference  554
.72 Injunctive Relief  556
.73 Discovery  558

Takeover litigation presents special problems. Several actions and counteractions may be filed almost simultaneously in different courts to enjoin or remedy alleged violations of federal antitrust laws, federal securities laws, and state statutes. Major decisions must often be made rapidly about complex factual, legal, and economic issues that involve large amounts of money and would ordinarily take months or even years to resolve. Fortunately, such litigation typically involves only a few parties, represented by experienced attorneys accustomed to working under severe time constraints and other pressures. The existence of state statutes and corporate defenses, such as shareholders' rights plans ("poison pills"), may render time constraints less severe than suggested by the Williams Act.[1895]

## 31.71  Initial Conference

It is wise to hold a preliminary conference with counsel as soon as possible after the commencement of takeover litigation—preferably within a day or two after the complaint is filed. Plaintiff's counsel usually will know or be able to ascertain the identity of counsel for the defendants. The judge should consider whether attorneys for other companies with an interest in the litigation, either as potential intervenors or parties in related cases, should participate. Consider also inviting counsel for government enforcement agencies, such as the Securities and Exchange Commission or the Antitrust Division of the Department

---

1895. Pub. L. No. 90-439, 82 Stat. 454 (1968) (codified as amended at 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(f) (2000)).

of Justice. Telephone conferences can accommodate attorneys who are not available on short notice for a conference in chambers.

Procedures can be established—such as telephone conference calls or setting aside a period before or after normal office hours for an in-person conference—for emergency or other matters that may arise and require an immediate ruling. The parties should be cautioned, however, that unnecessary "emergency" motions, whose primary purpose may be to influence the market, may subject offending counsel or their clients to appropriate sanctions. All orders in takeover litigation involving entities with publicly traded securities should, to the extent feasible, be announced after the stock market closes. These rulings may have a substantial impact on the stock market for both plaintiffs' and defendants' stock and are sometimes monitored by securities professionals in an attempt to take immediate action in response to the court's actions, often to the disadvantage of less sophisticated market participants. In unusual situations involving important confidential information, consider holding certain proceedings in camera or receiving some evidence under seal. Although the court may order counsel to defer disclosing the results of a court conference, the court will need to examine whether such an order could conflict with the disclosure requirements of the federal securities laws. Because of the limited time within which rulings must be made, the need for the judge to be personally involved in management and supervision is greater here than in other complex litigation. For this reason, some judges avoid referral to a magistrate judge or special master, which may result in critical delays while rulings are reviewed.

A schedule should be established at the initial conference for filing responsive pleadings and motions, defining and narrowing issues, conducting necessary discovery, and holding the next conference. The schedule usually will be substantially compressed compared with those typical of other litigation. For example, the court may require that the answer be combined with any motions and filed well before the twenty-day period prescribed by Federal Rule of Civil Procedure 12(a), and parties may also be required to serve papers by personal delivery rather than through the mail. In setting the schedule, the suggestions and requests of counsel should be considered. Although the schedule should be regarded as firm, unforeseen events may dictate revisions. The attorneys should confer in advance of each conference, seeking through discussion and compromise to narrow, if not eliminate, disagreements as to matters to be considered by the court. If counsel has not done so, the court might consider adjourning the conference for a day or two to permit counsel to develop more detailed proposals for management of the case.

Additional agenda items that may be appropriate for consideration at this initial conference, whether the conference is held in person or by telephone, include whether the parties anticipate filing threshold motions and the exis-

tence and status of any related cases. The parties may contemplate challenging standing, personal jurisdiction, venue, or other threshold matters that, if resolved promptly, might reduce or eliminate the need for discovery. If so, the judge should establish a schedule for expedited resolution of these issues. This is also an appropriate time to ascertain, or direct counsel to ascertain, the status of other related cases, including times set for hearings, and make plans to coordinate the proceedings to the extent possible. If jurisdiction and venue will not be contested, consider requiring the parties to include any related claims that may arise and enjoining them from instituting new litigation in other courts. Because of time constraints, multidistrict transfer under 28 U.S.C. § 1407 is rarely feasible. Transfer of cases to a single district under 28 U.S.C. § 1404 or 1406 may, however, be appropriate; if so, such transfers should be ordered as expeditiously as possible. If the cases remain in separate courts, the judges should confer and attempt to avoid conflicts in schedules.

## 31.72  Injunctive Relief

The most significant hearing in takeover litigation usually is that on the preliminary injunction. The court's ruling may moot or resolve other issues. Although the complaint typically will include a request for a temporary restraining order (TRO) and an application for a preliminary injunction, a TRO—or any order in takeover litigation—should almost never be granted ex parte, particularly given the opportunity for a telephone conference. Ordinarily, any pending request for a TRO should be resolved at the initial conference, and a date should be set for hearing the motion for injunctive relief. Depending on the date of the hearing, the court may, under Federal Rule of Civil Procedure 65(a)(2), order the trial on the merits to be advanced and consolidated with the hearing. In some cases, it is advisable to refuse hearing a motion for preliminary injunction if a hearing on a permanent injunction can be held expeditiously. Before deciding when or whether to hear the application for a preliminary injunction, the court should determine whether a ruling on the application must be rendered by an identifiable date. It is also wise to ascertain from counsel all dates important to the litigation, including those on which any statutory waiting periods expire or significant events (such as a stockholders meeting, or the commencement of acquisition of shares by a competing offeror) are scheduled to occur. The federal statutory waiting period may not be controlling, because of the prevalence of state statutes, such as control share acquisition acts and business combination statutes, as well as shareholders' rights plans (poison pills). Counsel should be questioned about the interplay of such laws and corporate defenses and the effect they will have on the date to be set for the hearing. If the deadline for a ruling cannot be met because of requirements of the litigation, such as criminal proceedings subject to the Speedy

Trial Act, consider reassigning the case to another judge. Counsel's views about the minimum time needed to conduct essential discovery and to conduct the hearing itself should be considered. The court may make a tentative determination on the form of the hearing—for example, whether the motion will be decided on affidavits, depositions, and documents alone, or whether witnesses will be heard in person and, if so, whether their direct testimony will be presented by prepared statements and reports.

One or two additional case-management conferences usually will be needed before the hearing. A meeting (or conference call) among counsel should precede each conference. The primary purposes of these case-management conferences are to ensure that schedules are being met, to narrow or revise the issues based on intervening circumstances (such as an offer being made by another company for the target company's stock, or other defensive measures adopted or proposed to be adopted by the "target" company), and to make final preparations for any scheduled hearing.

Complaints in takeover litigation frequently include a number of claims that the plaintiffs may be willing to eliminate, after further exploration, at least for purposes of the preliminary injunction. Similarly, defenses and counterclaims may be abandoned as the hearing date approaches. The judge can encourage the parties to narrow the scope of the case to the most important issues, setting a date by which they are to specify those allegations the parties will press at the hearing.

Various steps may be taken to expedite and streamline the hearing, including the following:

- holding the hearing on only the affidavits, where no substantial factual disputes exist;
- directing the parties to submit statements of undisputed facts or requests for admission to narrow the scope of the hearing;
- directing counsel to identify any witnesses in advance along with the substance of their testimony and the exhibits they will sponsor;
- requiring that direct testimony be offered in the form of adopted narrative statements, exchanged in advance and subject to motions to strike, to cross-examination, and to redirect at the hearing if issues of credibility are presented;
- directing counsel to exchange proposed exhibits in advance of the hearing, and giving notice that objections may be treated as waived if not made in writing in advance of the hearing;
- resolving objections to foundation before the hearing;
- directing counsel to present stipulated summaries or extracts of any deposition testimony to be used in lieu of lengthy readings of transcripts;

- directing counsel to submit briefs in advance of the hearing, along with proposed findings of fact and conclusions of law; and
- where time is of the essence, ruling from the bench at the conclusion of the hearing, dictating findings and conclusions into the record, and requiring counsel to state immediately, at the hearing, any motions for modified or additional findings and conclusions based on the record.

## 31.73  Discovery

The court should encourage counsel to submit a jointly agreed on discovery plan for approval. The potential scope of disputed issues in takeover litigation can lead to excessive discovery demands, both for documents and depositions, creating unreasonable burdens on the parties in view of the brief time usually available for compliance. The need to identify and narrow the disputed issues and tailor the discovery plan narrowly in light of those issues should be stressed.

Discovery should begin with an expedited procedure for the production of relevant files, records, and documents necessary for the resolution of the issues. Where the initial conference is held within days of the filing of the complaint, the parties will have been unable to comply with early disclosure mandates of Federal Rule of Civil Procedure 26. The judge should discuss with the parties how to effectuate the goals of Rule 26 within the time pressures imposed by takeover litigation and take steps to avoid excessively voluminous production that will burden rather than assist the parties. The following may be helpful:

- limiting the relevant periods of time for discovery requests;
- requiring the parties to minimize objections and to redact documents and files to eliminate extraneous matter;
- encouraging counsel and the parties to consider alternative means of obtaining testimony in the limited time available, such as through statements from interviews of witnesses or discovery in related litigation; and
- encouraging and approving stipulated protective orders.

## 31.8  Trial and Settlement

The court should always be prepared for the possibility of trial, even though complex securities cases seldom proceed that far. Procedures similar to

those used for trial and settlement of mass tort litigation[1896] may be appropriate for securities litigation. For example, consider consolidating related cases for a joint trial on specified issues, such as the defendants' respective liabilities for alleged misrepresentations and omissions, while leaving for subsequent separate trials other issues, such as damages and individual defenses. In cases subject to the PSLRA, the defendant is entitled, upon request, to have a written interrogatory submitted to the jury on the "defendant's state of mind at the time the alleged violation occurred."[1897] The PSLRA further requires that special interrogatories be submitted in jury cases (or findings of fact in bench trials) as to each covered person or each person alleged to have caused or contributed to the plaintiff's loss, regarding (1) whether such person violated the securities laws; (2) the person's percentage of responsibility; and (3) whether the securities violation was committed knowingly.[1898] In selected cases, the court may direct the parties to confer with the court about the precise text of appropriate special questions to a jury.

Securities cases typically involve experienced and sophisticated lawyers, as well as large sums of money. It is best to refer settlements to another judge, a special master, or a court-appointed expert with comparable experience and skills. Counsel need court approval to settle class or derivative actions, and when such approval is sought, the court should apply the principles and procedures governing settlements of class actions in general. The PSLRA contains specific provisions relating to settlement of covered class actions, including statements that must be included in proposed or final settlement agreements disseminated to the class[1899] and restrictions on settlements under seal.[1900] The PSLRA also provides for the discharge of all contribution claims against a covered person who settles before final judgment.[1901] In derivative actions, non-monetary benefits—such as a change in corporate management or policies—may play a significant role.[1902]

The PSLRA provides for the court's mandatory review of the parties' conduct and that of their counsel during the course of the action, and upon final adjudication it requires the court to "include in the record specific findings regarding compliance by each party and each attorney representing any party

---

1896. *See supra* section 22.9.

1897. 15 U.S.C. § 78u-4(d) (2000).

1898. *Id.* § 78u-4(f)(3)(A). The statute sets out factors to be considered by the trier of fact in determining the percentage of responsibility. *Id.* § 78u-4(f)(3)(C).

1899. *Id.* § 78u-4(a)(7).

1900. *Id.* § 78u-4(a)(5).

1901. *Id.* § 78u-4(f)(7).

1902. *See* Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1310–12 (3d Cir. 1993), and cases cited therein.

with each requirement of Rule 11(b) . . . as to any complaint, responsive pleading, or dispositive motion."[1903] The parties should be afforded an opportunity to be heard on the issue before any such finding is made. Sanctions are mandatory, however, once a finding of noncompliance has been made.

1903. 15 U.S.C. § 78u-4(c)(1) (2000).

# 32. Employment Discrimination

.1 Introduction  561
.2 The Statutory Framework  562
    .21 Title VII: Discrimination in Employee Hiring and Advancement  564
    .22 The Civil Rights Act of 1964: Discrimination in Contracting  567
    .23 Age Discrimination in Employment Act  568
    .24 Americans with Disabilities Act  570
    .25 Family and Medical Leave Act  571
.3 Developments in the Law of Employment Discrimination  572
.4 Case Management  576
    .41 Initial Pretrial Conference  576
    .42 Class Actions  579
    .43 Discovery  586
        .431 Identification of Source Materials  586
        .432 Computerized Records  587
        .433 Confidential Information  588
        .434 Preservation of Records  589
        .435 Statistical Evidence and Expert Testimony  589
        .436 Discovery from Class Members  590
    .44 Summary Judgment  591
    .45 Trial  592
    .46 Settlement  596
        .461 Timing  596
        .462 Affirmative Relief  596
        .463 Attorney Fees  597
        .464 Settlement Hearing  597
        .465 Implementation  597

## 32.1  Introduction

Employment discrimination litigation[1904] can arise in a number of contexts and include both statutory and common-law claims. Individual actions alleging employment discrimination are generally not factually complex. Nonetheless, complexity can be introduced into employment discrimination suits by class action allegations, questions regarding the scope of discovery, the technical nature of expert testimony, and issues relating to the granting of relief, whether by way of judgment or consent decree.

---

1904. This section is designed to highlight some of the areas in which case-management issues may arise under the most commonly litigated statutes and does not purport to afford comprehensive coverage of all of the issues that may arise in employment discrimination law.

## 32.2  The Statutory Framework

.21 Title VII: Discrimination in Employee Hiring and Advancement  564
.22 The Civil Rights Act of 1964: Discrimination in Contracting  567
.23 Age Discrimination in Employment Act  568
.24 Americans with Disabilities Act  570
.25 Family and Medical Leave Act  571

The main federal statutes governing employment discrimination litigation are Title VII of the Civil Rights Act of 1964,[1905] the Civil Rights Acts of 1866 and 1871 (sections 1981 and 1985(c)),[1906] the Age Discrimination in Employment Act of 1967 (ADEA),[1907] and the Americans with Disabilities Act of 1990 (ADA).[1908] Other federal statutes also afford a basis for employment discrimination claims. These include, but are not limited to, the Equal Pay Act of 1963,[1909] the Uniformed Services Employment and Reemployment Rights Act (USERRA),[1910] the Fair Labor Standards Act,[1911] Title IX of the Educational Amendments of 1972,[1912] the Family and Medical Leave Act (FMLA),[1913] and 42 U.S.C. § 1983.[1914] These statutes afford a panoply of remedies covering a wide variety of conduct.

---

1905. 42 U.S.C. § 2000e (2000).

1906. *Id.* § 1981(a) (section 1981 prohibits, among other things, discrimination in employment contracting); *Id.* § 1985 (prohibits conspiracy to interfere with civil rights).

1907. 29 U.S.C. § 623(a) (2000) (the ADEA prohibits discrimination based on age).

1908. 42 U.S.C. § 12112(a) (2000) (the ADA affords protection against employment discrimination based on disability).

1909. 29 U.S.C.A. § 206(d) (2000). The Equal Pay Act prohibits only discrimination based on sex and requires equal pay "for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions . . . ." *Id.* § 206(d)(1). The statute authorizes both public and private actions against employers, but limits a private individual's right to sue only if there has been no public action filed on the individual's behalf or the individual has accepted no prior remedies. *Id.* § 216(b).

1910. 38 U.S.C. § 4301 (2000).

1911. 29 U.S.C. § 201 (2000).

1912. 20 U.S.C. § 1681 (2000) (Title IX prohibits discrimination on the basis of sex in federally funded programs or activities).

1913. 29 U.S.C. § 2615 (2000).

1914. *See* Evans v. Avery, 100 F.3d 1033, 1036 (1st Cir. 1996) ("Section 1983 supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law."); *see also* Morris v. Oldham County Fiscal Court, 201 F.3d 784, 794 (6th Cir. 2000) ("The showing a plaintiff must make to recover on an employment discrimination claim under Title VII mirrors that which must be made to recover on an equal protection claim under section 1983."). Section 1983 is the vehicle for suits against federal officials under other sources of federal statutory law prohibiting discrimination.

A plaintiff can establish a prima facie case of employment discrimination through "direct" evidence of a defendant's discriminatory intent.[1915] When the plaintiff relies only on inferential or circumstantial evidence of discriminatory intent, however, it is common to apply some variation of the four-factor test set out in *McDonnell Douglas Corp. v. Green*.[1916] In *McDonnell Douglas*, the Supreme Court, in addressing a claim under Title VII, held that to establish a prima facie case of employment discrimination in cases where the plaintiff lacks direct evidence of discriminatory intent, a plaintiff must prove (1) that the plaintiff is a member of a protected class, (2) who applied and was qualified for a job for which the employer was seeking applicants, (3) that, despite plaintiff's qualifications, he or she was rejected, and (4) that, after the plaintiff was rejected, the position remained open and the employer continued to seek applications from persons of plaintiff's qualifications.[1917]

*McDonnell Douglas* also "'established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.'"[1918] Once the plaintiff has established a prima facie case under the *McDonnell Douglas* standard, the plaintiff creates a rebuttable presumption that the employer engaged in unlawful discrimination.[1919] The burden of production then shifts to the defendant to produce evidence that its challenged employment decision was based on factors other than the protected status of the plaintiff and based on a legitimate, nondiscriminatory reason.[1920] The pre-

---

1915. *See, e.g.,* Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 433 (6th Cir. 2002); *see also* Costa v. Desert Palace, Inc., 299 F.3d 838, 852–53 (9th Cir. 2002) (discussing approaches among the circuits to "direct evidence"), *aff'd*, 123 S. Ct. 2148 (2003); Harold S. Lewis, Jr. & Elizabeth J. Norman, Employment Discrimination Law and Practice 115–123 (2001) (discussing modes of proof for Title VII claim).

1916. 411 U.S. 792 (1973). In addition to claims brought under Title VII, the *McDonnell Douglas* test applies to claims for employment discrimination brought under §§ 1981 and 1983 of the Civil Rights Act, and under the ADEA. *See, e.g.,* Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (noting that the issue had not squarely come before the Court but assumed arguendo that the *McDonnell Douglas* burden-shifting standard applied where the parties did not dispute its application), and cases cited therein; *see also* Fairchild v. Forma Scientific, Inc., 147 F.3d 567, 571 (7th Cir. 1998) (variant of *McDonnell Douglas* test applies to ADEA case).

1917. 411 U.S. at 802.

1918. *Reeves*, 530 U.S. at 142 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)).

1919. *Reeves*, 530 U.S. at 142; Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253–54 (1981). The court in *Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 742 (7th Cir. 2002) noted that "[t]he need to establish a prima facie case does not always arise; frequently employers concede the prima facie case and simply offer a non-discriminatory justification." *See also* Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 428 (6th Cir. 2002) (employer conceded prima facie case).

1920. *Reeves*, 530 U.S. at 142 (citing *Burdine*, 450 U.S. at 254); *Hicks*, 509 U.S. at 506–07.

sumptions created by the *McDonnell Douglas* framework then disappear, and the plaintiff must prove that the employer's proffered reasons were simply a pretext for discrimination.[1921] The defendant's burden is one of production only, however, and "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"[1922] The Supreme Court, in *Reeves v. Sanderson*, held that a plaintiff can satisfy this burden through proof of "a *prima facie* case, combined with sufficient evidence to find the employer's asserted justification is false."[1923] The plaintiff is not required to present independent proof of discrimination.[1924]

## 32.21  Title VII: Discrimination in Employee Hiring and Advancement

Title VII has been referred to as the "centerpiece of employment discrimination law,"[1925] prohibiting discrimination based on sex (including sexual harassment),[1926] race,[1927] religion, and national origin.[1928] Title VII further prohibits retaliation against employees who exercise their rights under the statute. Title VII applies to employers (of fifteen or more employees),[1929] employment agencies,[1930] and labor organizations,[1931] as well as state and federal entities.

---

1921.  *See, e.g.,* Waterhouse v. District of Columbia, 298 F.3d 989, 994 (D.C. Cir. 2002) (plaintiff failed to establish employer's proffered explanation lacked credence where plaintiff admitted deficiencies cited by employer concerning her performance).

1922.  *Hicks*, 509 U.S. at 507 (quoting *Burdine*, 450 U.S. at 253).

1923.  530 U.S. at 148 (emphasis added).

1924.  *Id.* at 149; *see also Hopson*, 306 F.3d at 434–35 ("It strains credulity to conclude that, not once, but five times, the other employees who applied for the open positions were so significantly more qualified than Hopson that he was not even worthy of an interview.").

1925.  Mack A. Player, Federal Law of Employment Discrimination in a Nutshell 12 (3d ed. 1992).

1926.  *See* Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 853 (2001) (holding that front pay was not an element of compensatory damages to a claim of sexual harassment under Title VII); Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 531 (1999) (gender); Faragher v. City of Boca Raton, 524 U.S. 775, 777 (1998) (holding that employers may be vicariously liable for sexual harassment by their employees); Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79 (1998) (recognizing discrimination under Title VII applies to sexual harassment by those of the same sex); Harris v. Forklift Sys., Inc., 510 U.S. 17, 19–20 (1993) (alleging abusive work environment from sexual harassment).

1927.  *See* Loum v. Houston's Rests., Inc., 985 F. Supp. 1315, 1317 (D. Kan. 1997).

1928.  42 U.S.C. § 2000e-2(a) (2000) (plaintiff may bring Title VII claims based on national origin discrimination). *See* Swierkiewicz v. Sorema, 534 U.S. 506 (2002).

1929.  42 U.S.C. § 2000e-2(a) (2000).

1930.  *Id.* § 2000e-2(b).

When the plaintiff has direct evidence of discrimination, plaintiff's prima facie case is met through proof that the employer took an adverse employment action against him or her because of race, age, sex, or religion. The *McDonnell Douglas* standard typically will govern the pretrial evidentiary burdens if direct evidence of discrimination is unavailable. Remedies include both compensatory and punitive damages,[1932] injunctive relief, reinstatement, back pay, attorney fees, and lost profits.[1933]

Title VII established the Equal Employment Opportunity Commission (EEOC),[1934] which also enforces provisions of the ADA and ADEA.[1935] The EEOC functions as an "institution of first-resort" for claims under Title VII. The statute also authorizes the EEOC itself to bring suit against the employer.[1936] Prior to seeking judicial relief, a plaintiff must timely file his or her claim with a regional EEOC office.[1937] The EEOC may grant the plaintiff

---

1931. *Id.* § 2000e-2(c).

1932. 42 U.S.C. § 1981a(a)(1) (2000). However, both compensatory and punitive damages are subject to the statutory limitations provided in 42 U.S.C. § 1981a(b)(3), limitations that are based on the number of employees of the defendant. *See* Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 848 (2001) (holding that front pay is not subject to the statutory limitations provided in § 1981a). Punitive damages are not available against a public employer. 42 U.S.C. § 1981a(b)(1) (2000).

1933. *Pollard*, 532 U.S. at 847. Other recoverable damages may include "consequential losses, such as humiliation, economic dislocations, and loss of credit." Player, *supra* note 1925, at 222.

1934. 42 U.S.C. § 2000e-5(a), (e) (2000).

1935. *Id.* The EEOC is comprised of five members appointed by the President, with regional offices throughout the country. Player, *supra* note 1925, at 40.

1936. *See* EEOC v. Waffle House, Inc., 534 U.S. 279, 291 (2002) (where the EEOC files suit, "the employee has no independent cause of action, although the employee may intervene in the EEOC's suit" (discussing 42 U.S.C. § 2000e-5(f)(1))).

1937. 42 U.S.C. § 2000e-5(a), (e) (2000). When the charge must be filed with the EEOC depends on whether the state affords administrative remedies for unlawful employment practices. Where no such legislation exists, the charge must be filed with the EEOC within 180 days of the unlawful practice. Where the state has enacted equal employment legislation and maintains agencies to enforce such laws, however, the charge must first be filed with the state agency. The state agency has 60 days to review the charge and seek to resolve the plaintiff's complaint. The plaintiff then has 30 days from receipt of a notice of dismissal or notice of a right-to-sue letter from the state agency, or 300 days from the unlawful practice complained of, whichever is sooner, to file a charge with the EEOC. See Lewis & Norman, *supra* note 1915, § 4.2, at 199–204, for a discussion of the notice provisions and work-sharing arrangements between the state and federal agencies, noting "although Sec 706 appears to require that the state or local filing precede the filing of a charge with EEOC, it is apparent from the Court's approval of deferral and work-sharing agreements that in practice EEOC is often the first, and sometimes the only agency to investigate and conciliate charges, even in deferral states." *See also* Tewksbury v. Ottoway Newspapers, 192 F.3d 322, 324–26 (2d Cir. 1999) (discussing relationship between EEOC and defer-

"statutory notice of the right to sue,"[1938] following an investigation. Alternatively, regardless of whether the EEOC has found the charge to be supported by reasonable cause, the plaintiff may request a right-to-sue letter after 180 days and abandon further EEOC proceedings. Title VII does not restrict a complainant's right to sue on charges that the commission has found unsupported by reasonable cause.[1939]

Congress enacted The Civil Rights Act of 1991 (CRA) in response to Supreme Court decisions that, in Congress's view, diminished Title VII and section 1981 protections.[1940] The CRA gives plaintiffs a right to a jury trial and the right to seek compensatory and punitive damages for claims of intentional discrimination under Title VII.[1941] "The 1991 Act's enhanced damages provisions were designed to compensate victims of discrimination for humiliation, trauma, physical distress, medical expenses, and other economic and non-economic harms caused by workplace discrimination."[1942] The 1991 Act also expressly designates claims for disparate impact as within the scope of Title VII relief.[1943] Other changes include requiring employers to demonstrate that a challenged employment practice is "job related for the position in question and consistent with business necessity,"[1944] and allowing the award of attorney fees and costs where the plaintiff successfully shows that an employment decision was motivated by an impermissible factor (even though other factors may have been involved). The 1991 Act allows for the recovery of expert fees in all cases where attorney fees are recoverable. In addition, the Act limits the remedies available against an employer who is able to show that it would have taken the

---

ral-state agency and whether claim is timely filed where EEOC forwards charges to state agency under work-sharing agreement).

1938. *See* 42 U.S.C. § 2000e-5(f)(1) (2000); *see also* Smith v. HealthSouth Rehab. Ctr., 234 F. Supp. 2d 812, 814 (W.D. Tenn. 2002) (quoting Marquis v. Tecumseh Prods. Co., 206 F.R.D. 132, 151 (E.D. Mich. 2002)).

1939. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798 (1973).

1940. Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1992).

1941. Title VII initially provided only for declaratory or equitable relief, typically either injunctive or an award of front or back pay. Damages are also now available for discrimination based on sex, religion, or disability. Damages are limited to $50,000–$300,000 for claims brought under Title VII; however, states cannot be liable for punitive damages. *See, e.g.*, *Waffle House*, 534 U.S. at 287 (CRA added compensatory and punitive damages to remedies available under ADA).

1942. Daniel F. Piar, *The Uncertain Future of Title VII Class Actions After the Civil Rights Act of 1991*, 2001 BYU L. Rev. 301, 307 (2001).

1943. Civil Rights Act of 1991, Pub. L. No. 102-166, § 105, 105 Stat. 1071 (1992) (codified as amended at 42 U.S.C. § 2000e-2(k)(1)(A) to (3)).

1944. *Id.*

same action even in the absence of the impermissible motivating factor.[1945] The employer may still have liability for the unlawful employment practice, but it has a defense against the award of certain types of relief.[1946] Remedies include injunctive or declaratory relief, but not reinstatement, hiring, or promotion. Attorney fees and costs directly attributable to pursuit of the plaintiff's Title VII claim may be awarded, but damages may not.

## 32.22  The Civil Rights Act of 1964: Discrimination in Contracting

Section 1981 of Title 42 of the U.S. Code prohibits, among other things, racial discrimination in employment contracting.[1947] The Supreme Court has interpreted the statute to reach discrimination based on ethnicity,[1948] and courts have interpreted the Act to prohibit discrimination on the basis of alienage.[1949] There is no minimum employer size requirement as there is under other antidiscrimination statutes.[1950] In order to maintain a claim under section 1981, the record must show that plaintiff (1) is a member of a protected class; (2) was qualified for the position; (3) was terminated; and (4) was replaced by someone outside the protected class.[1951] Plaintiffs suing under section 1981 are not required to exhaust administrative avenues.[1952] Damages under section 1981 are unlimited and include both compensatory and punitive damages.[1953]

The scope of 42 U.S.C. § 1981 was also clarified in the CRA. Prior decisions by the Supreme Court had limited application of the statute to discrimination in the actual *formation* of contracts.[1954] The CRA amended section 1981

---

1945. 42 U.S.C. § 2000e-5(g)(2)(b) (2000).

1946. *Id.*

1947. 42 U.S.C. § 1981 (2000).

1948. St. Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (1987) (section 1981 applies to discrimination based on ancestry or ethnic characteristics).

1949. Duane v. GEICO, 37 F.3d 1036, 1040 (4th Cir. 1994) (discrimination against aliens is prohibited by both public and private persons).

1950. *See, e.g.*, 42 U.S.C. § 2000e(b) (2000) ("fifteen or more employees").

1951. LaPierre v. Benson Nissan, Inc., 86 F.3d 444, 448 (5th Cir. 1996). "Claims of racial discrimination brought under § 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII." *Id.* at 448 n.2.

1952. *See, e.g.*, Walker v. Thompson, 214 F.3d 615, 624–25 (5th Cir. 2000) (discussing dissimilarity in administrative filing requirements between Title VII and section 1981 claims).

1953. 42 U.S.C. § 1981a(a)(1), (b)(1) (2000). Compensatory damages under section 1981(b)(1) do not include back pay or interest on back pay. *Id.* § 1981(b)(2).

1954. Patterson v. Mclean Credit Union, 491 U.S. 164, 176 (1989) ("Section 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations,

to extend to all aspects of the contractual relationship, including the performance and termination of contracts, as well as "benefits, privileges, terms and conditions of contractual relationship."[1955] Whether the Supreme Court's decision in *Jett v. Dallas Independent School District*[1956] (which held that a municipality may not be held liable for its employees' violations of the plaintiff's "right to make contracts" as protected by section 1981 under *respondeat superior*) was overruled by the CRA is unresolved.[1957]

## 32.23  Age Discrimination in Employment Act

The Age Discrimination in Employment Act (ADEA) prohibits discrimination on the basis of age against anyone who is at least forty years old[1958] and covers employers and employment agencies with at least twenty employees, labor organizations, and the federal government.[1959] The EEOC is charged with enforcement of the ADEA. As with Title VII, the plaintiff must file a charge with the EEOC and, if applicable, the state-deferral agency. The Supreme

---

for it expressly prohibits discrimination only in the making and enforcement of contracts."); *see also* Ford v. City of Rockford, No. 88 C 20323, 1992 WL 309603, at *2 (N.D. Ill. Oct. 15, 1992) (citing *Patterson* and stating that section 1981 does not provide relief unless the plaintiff was discriminated against in the making and formation of contracts).

1955. 42 U.S.C. § 1981(b) (2000); *see also* Keller v. City of Portland, No. CV-98-263, 1998 WL 1060222, at *13–14 (D. Or. Nov. 13, 1998) (section 1981 not limited to contractual matters and includes discrimination that deprives individuals of "equal benefits").

1956. 491 U.S. 701 (1989).

1957. *See* George Rutherglen, Major Issues in the Federal Law of Employment Discrimination 102 (Federal Judicial Center 3d ed. 1996). *See, e.g., Ford*, 1992 WL 309603, at *2 (stating Congress overruled *Jett* in enactment of CRA by extending section 1981 to state actors but further holding section 1981 only applies to making and formation of contracts); *Keller*, 1998 WL 1060222, at *14 (1991 amendments to CRA overrule *Jett* and allow suits against municipality directly under section 1981); Villanueva v. City of Fort Pierce, 24 F. Supp. 2d 1364, 1368 (S.D. Fla. 1998) (noting that CRA amendments to section 1981 "have created some confusion among the circuits as to whether the CRA overruled the *Jett* rule against simultaneous § 1981 and § 1983 claims" and holding CRA did not overrule *Jett*). *Compare* Fed. of African Am. Contractors v. Oakland, 96 F.3d 1204 (9th Cir. 1996), *and* Jackson v. City of Chi., No. 96 C 3636, 1996 WL 734701, at *8 (N.D. Ill. Dec. 18, 1996), *with* Dennis v. Cmty. of Fairfax, 55 F.3d 151, 156 n.1 (1995).

1958. 29 U.S.C. §§ 623(a), (a)(1) (2000). *See* O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996) (holding that 56-year-old plaintiff who was replaced by 40-year-old could still maintain an action under ADEA, which simply limits the protected class to plaintiffs over 40).

1959. 29 U.S.C. §§ 623(a)–(c) (2000) (sections 623(b) and (c) provide that it shall be unlawful for employment agencies and labor organizations to discriminate based on age); *see also id.* § 630(b) (confining "employer" to "a person . . . who has twenty or more employees").

Court in *Kimel v. Florida Board of Regents*[1960] held that ADEA claims are unavailable against state employers.[1961]

A prima facie case of age discrimination under *McDonnell Douglas* is shown if the plaintiff (1) is 40 years or older, (2) had satisfactory job performance, and (3) has suffered an adverse employment action because of age.[1962] Some courts have held that the plaintiff must show that he or she was replaced by or treated differently than a younger employee.[1963] Others, however, have interpreted the Act as requiring only that the plaintiff demonstrate that he or she is a member of the protected class (employees over 40 years old) and was discriminated against on the basis of age, even if the beneficiary of the discriminatory acts was older than the plaintiff.[1964] As with Title VII and section 1981, if an employer presents nondiscriminatory reasons for the adverse actions, the presumption created by the prima facie case drops out and the plaintiff must bear the ultimate burden of proving that age was a mitigating factor in the adverse employment decision.[1965] Specifically, employers can defend themselves by showing that the challenged employment decision was based on "reasonable factors other than age," that the employee was disciplined or discharged for good cause,[1966] or that the employment decision related to a bona fide occupational qualification.[1967] Although ADEA plaintiffs cannot recover compensatory or punitive damages, the Act incorporates the remedies available under the Fair Labor Standards Act, as well as other relief,

---

1960. 528 U.S. 62 (2000).

1961. *Id.* at 66 ("The ADEA does not validly abrogate the state's sovereign immunity.").

1962. Fairchild v. Forma Scientific, Inc., 147 F.3d 567, 571 (7th Cir. 1998).

1963. Franzoni v. Hartmarx Corp., 300 F.3d 767, 772 (7th Cir. 2002); *see also O'Connor*, 517 U.S. at 308 (56-year-old plaintiff replaced by a 40-year-old).

1964. *See, e.g.,* Cline v. Gen. Dynamics Land Sys., Inc., 296 F.3d 466, 469–70 (6th Cir. 2002).

1965. *Fairchild*, 147 F.3d at 572 (employer defendant presented evidence that employee plaintiff was terminated based on legitimate financial reasons, overcoming the presumption of discrimination, and plaintiff failed to show employer's reason was pretextual).

1966. 29 U.S.C. § 623(f)(1) (2000). In addition, defenses exist where seniority systems are involved. *See* Rutherglen, *supra* note 1957, at 110 ("The ADEA also contains an exception for certain executives over age sixty-five; and it authorizes the EEOC to create further exceptions in the public interest . . . .") (footnote omitted); EEOC v. Francis W. Parker Sch., 41 F.3d 1073, 1078 (7th Cir. 1994) (noting ADEA contains safe-harbor provision permitting use of seniority system); *see also* Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993) ("[T]here is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age."), *and id.* at 618 (Kennedy, J., concurring) ("[N]othing in the Court's opinion should be read as incorporating in the ADEA context the so-called 'disparate impact' theory of Title VII . . . and there are substantial arguments that it is improper to carry over disparate impact analysis from Title VII to the ADEA." (citation omitted)).

1967. *See* Rutherglen, *supra* note 1957, at 111.

such as injunctive relief, promotion, reinstatement, back and front pay, and attorney fees.[1968] Defendants also can be liable for liquidated damages where the plaintiff proves "willful violation" of the Act.[1969]

It is unclear whether disparate impact claims are available under the ADEA, and the Supreme Court in *Hazen Paper Co. v. Biggins*[1970] questioned the use of a disparate impact theory. The CRA amendments expressly codified disparate impact claims only for Title VII.[1971]

## 32.24 Americans with Disabilities Act

The Americans with Disabilities Act (ADA) prohibits, among other things, employment discrimination against "qualified persons with a disability."[1972] Liability under the ADA is limited to employers with fifteen or more employees.[1973] Although employers are permitted to establish physical criteria necessary for a position, or to prefer some physical attributes over others, the employer "runs afoul of the ADA when its makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as sub-

---

1968. 29 U.S.C. § 626(b) (2000). *See* Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 74–75 (2000).

1969. *See* Meacham v. Knolls Atomic Power Lab., 185 F. Supp. 2d 193, 218 (N.D.N.Y. 2002) (awards of damages for back pay and front pay and punitive damages for willful conduct are authorized under ADEA, but damages for emotional distress are unavailable).

1970. 507 U.S. 604, 610 (1993) (stating "[d]isparate treatment, thus defined, captured the essence of what Congress sought to prohibit in the ADEA" and noting that court had not addressed question of whether a plaintiff could proceed on a disparate impact theory under the ADEA). *But see* Smith v. City of Des Moines, 99 F.3d 1466, 1470 (8th Cir. 1996) (disparate impact claims cognizable under ADEA); Mangold v. Cal. Pub. Utilities Comm'n, 67 F.3d 1470, 1474 (9th Cir. 1995) (plaintiff may pursue disparate impact theory under ADEA); *Francis W. Parker*, 41 F.3d 1073, 1077 (7th Cir. 1994) ("[D]ecisions based on criteria which merely tend to affect workers over the age of forty more adversely than workers under forty are not prohibited.").

1971. *See Francis W. Parker*, 41 F.3d at 1073, 1076–77 (rejecting disparate impact theory).

1972. 42 U.S.C. § 12112(a) (2000) (section 12112(a) provides that no employer may "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment"). "Disability" is defined as a "physical or mental impairment that substantially limits one or more . . . major life activities . . . ." 29 C.F.R. § 1630.2(g)(1) (1999). Thus, the ADA is violated where the employee is able to perform the essential functions of the job "with or without reasonable accommodation which does not impose an undue hardship on the employer." *Id.*

1973. 42 U.S.C. § 12111(5)(a) (2000).

stantially limiting a major life activity."[1974] Employers are required to make reasonable accommodations for employees or applicants with disabilities. As with other employment discrimination claims, the employer may rebut a claim of ADA discrimination by providing "evidence of a 'legitimate, nondiscriminatory reason' for its action."[1975]

The provisions of the ADA are enforced by the EEOC in the same manner as Title VII claims.[1976] Thus, under the ADA, the EEOC "may bring suit to enjoin an employer from engaging in unlawful employment practices, and to pursue reinstatement, back pay, and compensatory or punitive damages."[1977]

## 32.25  Family and Medical Leave Act

The Family and Medical Leave Act (FMLA) entitles an eligible employee[1978] to up to twelve weeks of leave for absences resulting from a disabling health problem, serious illness of a family member or the employee, or the birth or adoption of a child.[1979] Actions brought under the FMLA are generally brought in the context of retaliation claims arising out of the employee's exercise of his or her leave rights.[1980] In addition to showing the exercise of leave rights, the plaintiff must have suffered an adverse employment action, and further demonstrate a causal relationship between the exercise of leave rights and the chal-

1974. Sutton v. United Airlines, Inc., 527 U.S. 471, 490 (1999). Major life activity is defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (1999). The term "substantially limits" means "(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii) [s]ignificantly restricted as to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Id.* § 1630.2(j). *See Sutton*, 527 U.S. at 492–93 (holding that the petitioners "failed to allege adequately that their poor eyesight is regarded as an impairment that substantially limits them in the major life activity of working"). *But see* Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197–98 (2002).

1975. Adreani v. First Colonial Bankshares Corp., 154 F.3d 389, 394 (7th Cir. 1998).

1976. EEOC v. Waffle House, 534 U.S. 279, 285 (2002) ("Congress has directed the EEOC to exercise the same enforcement powers, remedies, and procedures that are set forth in Title VII of the Civil Rights Act of 1964 when it is enforcing the ADA's prohibitions against employment discrimination on the basis of disability.").

1977. *Id.*

1978. As defined by the FMLA, an eligible employee is someone who has worked at least 1,250 hours a year at a company employing fifty or more employees at least twenty weeks of the year. 29 U.S.C. §§ 2611(2)(a) (2000).

1979. 29 U.S.C. § 2612(a)(1) (2000).

1980. *But see* Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81 (2002) (holding regulation requiring employer to designate leave as FMLA leave in order for it to count against an employee's FMLA entitlement was contrary to FMLA).

lenged employment action. Courts have applied the *McDonnell Douglas* burden-shifting standard to FMLA claims.[1981]

## 32.3  Developments in the Law of Employment Discrimination

   Supreme Court decisions have addressed such diverse issues as when punitive damages may be awarded,[1982] the intersection of the employment discrimination statutes and the First Amendment,[1983] and the sovereign immunity of the states under the Eleventh Amendment.[1984] Several decisions have resolved splits among the circuits. In *Burlington Industries Inc. v. Ellerth*[1985] and *Faragher v. City of Boca Raton*,[1986] the Supreme Court held that employers who meet a two-factor affirmative defense can avoid liability for acts of supervisors that create a hostile work environment. If an employer can show that it exercised reasonable care to prevent and promptly correct harassing behavior, and the employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer, no liability will exist.[1987] Same-sex harassment was held actionable under Title VII in *Oncale v. Sundowner Offshore Services Inc.*,[1988] which overruled prior precedent in the Fifth Circuit rejecting such claims. "If our precedents leave any doubt on the question, we hold that nothing in Title VII necessarily bars the claim of discrimination because of sex merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex."[1989] In order to prevail, plaintiffs in same-sex harassment cases must show, as must plaintiffs in opposite-sex harassment cases, that the harassment they suffered was due to sex, and that it was sufficiently severe and persistent to create a hostile or abusive work environment.

---

   1981.  *See, e.g.*, Smith v. Allen Health Sys., Inc., 2002 WL 31015648 (8th Cir. 2002); Bylsma v. Bailey, 127 F. Supp. 2d 1211 (M.D. Ala. 2001); Miranda v. BBII Acquisition Corp., 120 F. Supp. 2d 157 (D.P.R. 2000).

   1982.  Kolstad v. Am. Dental Ass'n, 527 U.S. 526 (1999).

   1983.  Boy Scouts of Am. v. Dale, 530 U.S. 640 (2000).

   1984.  Bd. of Trustees of University of Ala. v. Garrett, 531 U.S. 356 (2001) (holding ADA did not abrogate state's immunity under the Eleventh Amendment); Kimel v. Fla. Bd. of Regents, 528 U.S. 62 (2000) (same with respect to ADEA).

   1985.  524 U.S. 742 (1998).

   1986.  524 U.S. 775 (1998).

   1987.  Although the defendant may avoid liability under the federal statutes, liability may still exist under state law in ancillary claims.

   1988.  523 U.S. 75 (1998).

   1989.  *Id.* at 79.

In *Desert Palace, Inc. v. Costa*,[1990] the Court resolved a split among the circuits as to whether a plaintiff seeking relief pursuant to Title VII was required to prove by direct evidence that an impermissible motive was a motivating factor in an adverse employment decision in order to establish liability under section 2000e-2(m).[1991] Noting that the language of Title VII did not impose special evidentiary burdens, the Court held that a plaintiff in a mixed-motive case was required to prove that the employment action was motivated by an impermissible factor only by a preponderance of the evidence, which could be met through either direct or circumstantial evidence. "Section 2000e-2(m) unambiguously states that a plaintiff need only 'demonstrat[e]' that an employer used a forbidden consideration with respect to 'any employment practice.' On its face, the statute does not mention, much less require, that a plaintiff make a heightened showing through direct evidence."[1992]

Addressing cases arising under other employment statutes, the Court in *Gebser v. Lago Vista Independent School District*[1993] held that, under Title IX, a school district's liability for the sexual harassment of a student by a teacher required a showing that a school district official with authority to take corrective action had actual notice of the harassment or was deliberately indifferent to it.

The Court declined to hold a school district liable based on a theory of constructive notice, stating "[w]hen Congress attaches conditions to the award of federal funds under its spending power, U.S. Const., Art. I, § 8, cl. 1, as it has in Title IX and Title VI, we examine closely the propriety of private actions holding the recipient liable in monetary damages for noncompliance with the condition . . . Our central concern in that regard is with ensuring that 'the receiving entity of federal funds [has] notice that it will be liable for a monetary award.'"[1994] Imposition of liability based on constructive notice or respondeat superior was inconsistent with the enforcement mechanism of Title IX, which assumed actual notice of the violation by the recipient and an opportunity to remedy noncompliance. In *Nevada Department of Human Resources v. Hibbs*,[1995] the Court held that state employees could recover damages where the state violated the family-care provisions of the FMLA. Addressing whether Congress had acted within its authority in abrogating state immunity under the Eleventh Amendment, the Court noted that "the States' record of uncon-

---

1990. 123 S. Ct. 2148 (2003).
1991. *See* 42 U.S.C. § 2000e-2(m).
1992. *Desert Palace*, 123 S. Ct. at 2149–50.
1993. 524 U.S. 274 (1998).
1994. *Id.* at 287 (quoting Franklin v. Guinnett County Pub. Sch., 503 U.S. 60, 74 (1992)).
1995. 123 S. Ct. 1972 (2003).

stitutional participation in, and fostering of, gender-based discrimination in the administration of leave benefits is weighty enough to justify the enactment of prophylactic § 5 legislation."[1996]

The Court also has addressed the standard for determining when an individual is substantially limited in performing manual tasks within the meaning of the Americans with Disabilities Act (ADA) (see *Toyota Mfg., Kentucky, Inc. v. Williams*[1997]), holding that the terms "major life activity" and "substantial impairment" should be strictly interpreted.[1998] Accordingly, in order for a plaintiff to prove that he or she suffers from a substantial limitation of a major life activity in performing manual tasks, the plaintiff must show that he or she suffers from an impairment "that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."[1999] This determination must be made on a case-by-case basis.[2000] In examining whether the plaintiff had shown a substantial limitation in performing manual tasks, the Court rejected a focus limited only to whether the plaintiff was able to perform her specific job as proof of a substantial limitation.[2001] "When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job."[2002] Thus, a plaintiff seeking to establish such an impairment must show substantial impairment in both job-related and non–job-related manual tasks.

Several Supreme Court decisions have addressed procedural issues relevant to employment discrimination claims. For example, the Court resolved a split among the circuits as to the proper pleading standard in such cases. Several circuits had imposed a heightened pleading standard on plaintiffs, requiring them to plead facts in support of each element of the prima facie *McDonnell*

---

1996. *Id*. at 1981.

1997. 534 U.S. 184 (2002).

1998. *Id.* at 691 ("If Congress intended everyone with a physical impairment that precluded the performance of some isolated, unimportant, or particularly difficult manual task to qualify as disabled, the number of disabled Americans would surely have been much higher.").

1999. *Id.* at 185.

2000. *Id.* at 198. The Court found that it was not sufficient for the plaintiff to show that her manual disability implicated a class of manual activities, as held by the Sixth Circuit. *Id.* at 199–200.

2001. *Id.* at 200.

2002. *Id.* at 200–01.

*Douglas* case in order to survive a motion to dismiss.[2003] The Court rejected this heightened pleading standard in *Swierkiewicz v. Sorema,*[2004] however, stating "[t]his court has never indicated that the requirements for establishing a prima facie case . . . also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss."[2005] Rather, the complaint is governed by the general notice pleading requirements of Federal Rule of Civil Procedure 8(a).[2006]

Acts falling outside of the statutory time period for filing charges,[2007] although no longer actionable themselves as discrete acts of discrimination or unlawful practice, may be used to support a claim based on allegations of a hostile work environment. The Court stated in *National Railroad Passenger Corp. v. Morgan*[2008] "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered . . . ."[2009]

Finally, the scope and effect of arbitration agreements in employment contracts was discussed in *Circuit City Stores Inc. v. Adams*[2010] and *EEOC v. Waffle House, Inc.*[2011] The Court in *Circuit City* rejected a Ninth Circuit decision excluding employment contracts from the scope of the Federal Arbitration Act (FAA). The Court held that section 1 of the FAA contained a limited exclusion applicable only to transportation workers, agreeing with the majority of circuits that employment discrimination claims brought by nontransportation workers could be subject to arbitration.[2012] The scope of the FAA was also addressed in *Waffle House,* resolving a split among the circuits as to whether

---

2003.  411 U.S. 792 (1973). *See, e.g.,* Tarshis v. Riese Org., 211 F.3d 30 (2d Cir. 2000); Jackson v. Columbus, 194 F.3d 737 (6th Cir. 1999); *cf.* Sparrow v. United Air Lines, Inc., 216 F.3d 1111 (D.C. Cir. 2000); Bennett v. Schmidt, 153 F.3d 516 (7th Cir. 1998).

2004.  534 U.S. 506 (2002).

2005.  *Id.* at 511. The Court further cautioned that while the *McDonnell Douglas* standard applies in many cases, it does not always control an employment discrimination claim. "For instance, if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case." *Id.*

2006.  *Id.* at 512–13.

2007.  *See* 42 U.S.C. § 2000e-5(e) (2000) (providing that claims must be filed within 180 or 300 days).

2008.  536 U.S. 101 (2002).

2009.  *Id.* at 103.

2010.  532 U.S. 105 (2001); *see also* Carter v. Countrywide Credit Indus., Inc., 189 F. Supp. 2d 606 (N.D. Tex. 2002).

2011.  534 U.S. 279 (2002).

2012.  *Circuit City*, 532 U.S. at 113–15.

the Equal Employment Opportunity Commission (EEOC) could seek victim-specific relief in addition to injunctive relief for discrimination claims brought under Title VII and the ADA. The Court held that the EEOC was not a party to any agreements to arbitrate between the employer and employee and that an employee's agreement to arbitrate did not limit the remedies available to the EEOC.[2013]

## 32.4   Case Management

.41 Initial Pretrial Conference  576
.42 Class Actions  579
.43 Discovery  586
    .431 Identification of Source Materials  586
    .432 Computerized Records  587
    .433 Confidential Information  588
    .434 Preservation of Records  589
    .435 Statistical Evidence and Expert Testimony  589
    .436 Discovery from Class Members  590
.44 Summary Judgment  591
.45 Trial  592
.46 Settlement  596
    .461 Timing  596
    .462 Affirmative Relief  596
    .463 Attorney Fees  597
    .464 Settlement Hearing  597
    .465 Implementation  597

## 32.41  Initial Pretrial Conference

Efficient management of employment discrimination litigation requires that the disputed legal and factual issues be identified and, if possible, narrowed early in the case. The pleadings often will reveal jurisdictional issues that must be addressed at the outset. In some cases, discovery may be necessary on factual issues underpinning a motion to dismiss for lack of subject-matter jurisdiction.[2014] The complaint can be dismissed after notice and hearing, where it is apparent that jurisdiction is improper.[2015] At the initial pretrial conference,

---

2013. *Waffle House,* 534 U.S. at 297–98.

2014. *See, e.g.,* Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1326 (10th Cir. 2002) ("Although a district court has discretion in the manner by which it resolves an issue of subject matter jurisdiction . . . a refusal to grant discovery constitutes an abuse of discretion if the denial results in prejudice to a litigant." (citations omitted)).

2015. *See, e.g.,* Tang v. State of R.I., Dep't of Elderly Affairs, 904 F. Supp. 55, 58–59 (D.R.I. 1995) (courts have held that the receipt of a right-to-sue letter is a statutory prerequisite, not a jurisdictional prerequisite).

the court should attempt to identify the specific acts of discrimination that each plaintiff claims to have suffered, as well as the particular relief sought. Many employment discrimination claims are brought as class actions, and early identification of the specific claims being pursued in such cases is necessary for determining whether they qualify for class certification,[2016] as well as for developing an appropriate plan for discovery and trial. The court also should ascertain whether plaintiffs have timely satisfied any administrative prerequisites to the filing of the action.[2017] Inquiry into the following areas, either before or in conjunction with the initial Rule 16 conference, will help identify possible jurisdictional problems:

- Is the case barred by the statute of limitations?[2018]
- Has the plaintiff exhausted administrative remedies?[2019]
- Do any pending parallel state or agency actions involving the same parties and issues warrant consolidation or a stay of proceedings?[2020]

---

2016. *See* Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147 (1982).

2017. Harriss v. Pan Am. World Airways, Inc., 74 F.R.D. 24 (N.D. Cal. 1977). Although claims under Title VII require the prior filing by the individual claimant of a charge with the EEOC, claims under 42 U.S.C. § 1981 (racial discrimination) and 42 U.S.C. § 1983 (discrimination by government employers) do not require filing of an administrative charge, but are subject to state statutes of limitations. *See also Sizova*, 282 F.3d at 1325 (noting that although failure to file a charge with the EEOC is a jurisdictional bar to suit, failure to timely file an administrative charge is not jurisdictional).

2018. *See, e.g.,* Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 108–10 (2002). Courts generally treat discrete employment decisions that occur over a period of time as individual violations for limitations purposes, although a series of adverse actions can constitute a single continuing violation if the plaintiff was unaware he or she was a victim of discrimination until a pattern emerged. *See, e.g.,* Jones v. Merchs. Nat'l Bank & Trust Co., 42 F.3d 1054, 1058 (7th Cir. 1994) (discussing three scenarios under which continuing violation can be shown).

2019. A plaintiff must file a timely charge of discrimination with the EEOC as a prerequisite to maintaining a Title VII, Age Discrimination in Employment Act (ADEA), or Americans with Disabilities Act (ADA) claim. *See* 42 U.S.C. § 2000e-5(e)(1), (f)(1) (2000) (Title VII); 42 U.S.C. § 12117(a) (2000) (ADA); 29 U.S.C. § 626(d) (2000) (ADEA); *see also* Jackson v. City of Chi., No. 96 C 3636, 1996 WL 734701, at *2 (N.D. Ill. Dec. 18, 1996). A plaintiff's failure to file a charge with the EEOC in a Title VII claim can result in a dismissal of the complaint. *See, e.g., Sizova*, 282 F.3d at 1325 (stating that "exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII"); *Tang*, 904 F. Supp. at 58–59.

2020. *See, e.g.,* Currie v. Group Ins. Comm'n, 290 F.3d 1, 12 (1st Cir. 2002) (holding "there is no danger that the plaintiff will be prejudiced by ineffective prosecution of the state law claim. Nor will the defendant be prejudiced by our staying the action . . . ."); Murphy v. Uncle Ben's, Inc., 168 F.3d 734, 740 (5th Cir. 1999) (ADEA "does not constitute express Congressional authorization for federal courts to enter injunctions staying state judicial proceedings involving parallel state law age discrimination claims").

- Is the claim subject to arbitration?[2021]
- Is the plaintiff seeking to pursue claims against unnamed parties?[2022]

Issues usually can be narrowed initially without discovery, and disputed juris-dictional facts—such as when a plaintiff received a "right to sue" letter—can be resolved through an expedited hearing if necessary.

Plaintiffs often seek relief that might adversely affect other employees or proposed employees of the defendant. Where potentially affected employees are represented by a labor organization, even if only the employer was named in the administrative charges or is alleged to have engaged in discrimination, consider joining the organization as a necessary party or having it intervene in order to make any decree binding should the plaintiffs prevail.[2023] Similarly, in some cases joinder or intervention of other employees who would be adversely affected by the plaintiffs' success may be warranted to ensure that all competing interests are adequately represented and to protect against subsequent claims of reverse discrimination.[2024]

---

2021. *See, e.g.,* EEOC v. Waffle House, Inc., 534 U.S. 279, 289 (2002) ("The FAA provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, and for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement."); Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26–27 (1991) (ADEA claims arbitrable under FAA); Carter v. Countrywide Credit Indus., Inc., 189 F. Supp. 2d 606, 612–14 (N.D. Tex. 2002) (Fair Labor Standards Act claims arbitrable under FAA).

2022. In some instances, plaintiffs may seek to bring claims against defendants who were not named in the EEOC charge. The courts have liberally construed the requirement, focusing on whether the party had adequate notice of the charge and an opportunity to participate in the conciliation process. *See* Fernandez Molinary v. Industrias La Famosa, Inc., 203 F. Supp. 2d 111, 116–17 (D.P.R. 2002) (plaintiff failed to exhaust administrative remedies where plaintiff failed to name respondents in EEOC complaint); Frazier v. Smith, 12 F. Supp. 2d 1362, 1369 (S.D. Ga. 1998) (sheriff should have had notice of claim from plaintiff's naming of Camden County sheriff's department and allegations of particular events naming sheriff specifically); Afande v. Nat'l Lutheran Home for the Aged, 868 F. Supp. 795, 800 (D. Md. 1994) (plaintiff properly named defendant in EEOC charge where plaintiff identified defendant as plaintiff's supervisor in attached affidavit and defendant availed self of opportunity to participate in EEOC's resolution and conciliation).

2023. *See* Fed. R. Civ. P. 19, 24 (West 2003).

2024. *See, e.g.,* Martin v. Wilks, 490 U.S. 755, 762–65 (1989) (white firefighters challenge to actions taken pursuant to consent decree as reverse discrimination not impermissible collateral attack (superseded in part by statute 42 U.S.C. § 2000e-2(n)(1) (2000))); Rafferty v. City of Youngstown, 54 F.3d 278, 282 (6th Cir. 1995) (denying leave to intervene to attack 1996 consent decree where court found union was represented in negotiations that led to consent decree); EEOC v. United Ass'n of Journeymen, 235 F.3d 244, 254–55 (6th Cir. 2000) (joinder).

## 32.42  Class Actions

Many employment discrimination cases, particularly Title VII cases, are brought on behalf of a proposed class. For such actions to proceed, a named representative must have filed a timely charge with the EEOC. Plaintiffs must have exhausted administrative remedies on behalf of the class "and with respect to any claim that was the subject of or could reasonably have been expected to grow out of the EEOC's investigation."[2025] The statutory basis for the claim can also affect how a class action proceeds. The provisions of Rule 23 will apply to most employment discrimination class actions, but not all. For example, Rule 23's opt-out provisions do not apply where proposed class claims are brought pursuant to the ADEA or the Fair Labor Standards Act (FLSA).[2026] Collective actions under the ADEA are authorized by 29 U.S.C. § 626(b), which adopts the opt-in class mechanism of section 216 of the FLSA. Section 216 of the FLSA, in turn, provides that plaintiffs must affirmatively opt into a collective action in order to be considered a class member.[2027] "Rule 23 and § 216(b) class actions are 'mutually exclusive and irreconcilable' and those who choose not to opt-in to a class action under § 216(b) are not bound by and may not benefit from the judgment."[2028] There is discretion to authorize notice of the class to similarly situated employees in order to afford them an opportunity to opt in.[2029]

---

2025. Rutherglen, *supra* note 1957, at 81–82. *But see* Winbush v. State of Iowa, 66 F.3d 1471, 1478 (8th Cir. 1995) (district court properly allowed intervention without requiring a separate EEOC filing by each intervenor where there was a "similar and sufficient factual basis" between the intervenors and the original plaintiffs).

2026. *See* 29 U.S.C. § 216(b) (West 2003) (providing that "[n]o employee shall be a party plaintiff . . . unless he gives his consent in writing to become such"); *see also* Lewis & Norman, *supra* note 1915, § 4.9, at 246.

2027. *See, e.g.,* Grayson v. Kmart Corp., 79 F.3d 1086, 1106 (11th Cir. 1996); Anson v. Univ. of Tex. Health Sci. Ctr., 962 F.2d 539 (5th Cir. 1992). While all included plaintiffs need to be similarly situated in order to maintain an opt-in class action under section 216(b), the possibility of varying defenses does not vitiate a collective action. *See* Lockhart v. Westinghouse Credit Corp., 879 F.2d 43, 52 (3d Cir. 1989) ("While the potential for problems with respect to class management may arise from the assertion of individualized defenses, a district court has the discretion to determine whether such problems would make manageability of the class impossible."), *overruled on other grounds*, Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089 (3d Cir. 1995).

2028. Hall v. Burk, No. 301CV2487H, 2002 WL 413901, at *2 (N.D. Tex. Mar. 11, 2002) (citation omitted). *See* Owens v. Bethlehem Mines Corp., 108 F.R.D. 207, 209–10 (S.D. W. Va. 1985) (Rule 23 is not applicable to collective actions under ADEA).

2029. *See* Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 169 (1989); *Hall*, 2002 WL 413901, at *2. In order to serve as the basis for an ADEA class action, the underlying EEOC

In class actions subject to Rule 23, deciding whether the action should be maintained under Rule 23(b)(2) or (b)(3) will make a significant difference with respect to various aspects of the class litigation, in particular the definition of the class, entitlement to damages, class notice, and opt-out rights. Employment discrimination cases that meet the prerequisites of Rule 23(a) may qualify as class actions under Rule 23(b)(2) where the defendant "has acted . . . on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole."[2030] They may also qualify under Rule 23(b)(3) on the ground that a common question of fact or law predominates; indeed, where monetary relief is sought, a (b)(3) class is generally the appropriate vehicle.

Class action certification of disparate treatment claims under Rule 23(b) has become more complicated since the 1991 amendments to Title VII.[2031] Members of a Rule 23(b)(2) class generally are not entitled to recover anything other than incidental damages (i.e., damages to which the plaintiffs would be automatically entitled once liability is established). The 1991 amendments, however, permit plaintiffs alleging intentional discrimination to seek monetary relief in the form of compensatory or punitive damages. These damages would otherwise not be considered "incidental" to the relief sought,[2032] making certification under Rule 23(b)(2) inappropriate. At the same time, certification may still be improper under Rule 23(b)(3) because individual concerns may outweigh legal questions common to the class.[2033] In *Allison v. Citgo Petroleum Corp.*,[2034] the Fifth Circuit rejected certification under both Rules 23(b)(2) and (b)(3), noting that "the predominance of individual-specific issues relating to the plaintiffs' claims for compensatory and punitive damages in turn detracts from the superiority of the class action device in resolving these claims."[2035] The court viewed the issue as one of manageability, particularly in light of the

---

charge must give adequate notice of the scope of the class. *See, e.g.,* Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1224–25 (11th Cir. 2001).

2030.  Fed. R. Civ. P. 23(b)(2) (West 2003).

2031.  *See* Robinson v. Metro-North Commuter R.R. Co, 267 F.3d 147, 157 (2d Cir. 2001) ("Prior to the passage of the 1991 Act, a plaintiff seeking a monetary award for disparate treatment . . . and disparate impact claims under Title VII could recover only back pay and front pay. Because back pay and front pay have historically been recognized as equitable relief under Title VII, neither party was entitled to a jury trial; both disparate treatment and disparate impact claims were tried to the bench." (footnote omitted)).

2032.  Allison v. Citgo Petroleum Corp., 151 F.3d 402, 410 (5th Cir. 1998).

2033.  *See, e.g., id.* at 417–18.

2034.  151 F.3d 402 (5th Cir. 1998).

2035.  *Id.* at 419 (holding damage claims were not incidental to the class claims for injunctive relief).

number of potential plaintiffs, the length of time over which the discrimination was alleged to have occurred, and the number of departments involved in the alleged discrimination.[2036]

Other courts have declined to follow the reasoning in *Allison*, or have found that the decision did not establish a bright-line rule that a class seeking compensatory and punitive damages in a jury trial can never be certified.[2037] In *Robinson v. Metro-North Commuter Railroad Co.*,[2038] for example, the Second Circuit declined to follow *Allison*, holding that the district court should "assess whether Rule 23(b)(2) certification is appropriate in light of 'the relative importance of the remedies sought, given all of the facts and circumstances of the case.'"[2039] In particular, the Second Circuit instructed the district court to ensure that the value to the plaintiffs of the equitable relief sought was predominant (i.e., plaintiffs would still bring the action for injunctive relief even if monetary damages were unavailable) and that class treatment would be "efficient and manageable."[2040]

Rule 23(c)(4) permits maintaining an action as a class action with respect to particular issues. Several courts have suggested a "hybrid" approach in discrimination cases to deal with the problems created by the enhanced-damages provision of the Civil Rights Act. Hybrid options include a Rule 23(b)(2) class with an opt-out provision[2041] or certifying a Rule 23(b)(2) class with respect to the injunctive aspects of the suit and a Rule 23(b)(3) class to consider the claims for monetary relief.[2042] Other alternatives include certification of a Rule 23(b)(2) class for class-wide damages and severing the issue of individual dam-

---

2036.  *Id.* at 419–20; *see also* Jefferson v. Ingersoll Int'l, 195 F.3d 894 (7th Cir. 1999); Faulk v. Home Oil Co., 184 F.R.D. 645 (M.D. Ala. 1999).

2037.  *See, e.g.,* Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147 (2d Cir. 2001); Smith v. Texaco, Inc., 88 F. Supp. 2d 663, 678 (E.D. Tex. 2000); Hoffman v. Honda of Am. Mfg. Inc., 191 F.R.D. 530, 536 (S.D. Ohio 1999); Stewart v. Rubin, 948 F. Supp. 1077, 1090 (D.D.C. 1996).

2038.  267 F.3d 147 (2d Cir. 2001).

2039.  *Id.* at 164 (quoting *Hoffman*, 191 F.R.D. at 536).

2040.  *Id.* at 164.

2041.  Lemon v. Int'l Union of Operating Eng'r, Local No. 139, 216 F.3d 577, 580–81 (7th Cir. 2000); Jefferson v. Ingersoll Int'l, Inc., 195 F.3d 894, 898–99 (7th Cir. 1999); Eubanks v. Billington, 110 F.3d 87, 96 (D.C. Cir. 1997); *Smith*, 88 F. Supp. 2d at 679–80.

2042.  *See* Beck v. Boeing Co., 203 F.R.D. 459, 465–68 (W.D. Wash. 2001); *Eubanks*, 110 F.3d at 96; *see also Lemon*, 216 F.3d at 581–82 ("Since the Civil Rights Act of 1991 entitles the parties to a jury trial on claims of intentional discrimination . . . a district court that proceeds with divided certification must adjudicate the damages claims first before a jury to preserve the Seventh Amendment right to a jury trial, even if adjudication of these claims decides the equitable claims as well." (citation omitted)).

ages to be considered later in the suit.[2043] Consider whether one of these approaches would be useful and, specifically, whether a Rule 23(b)(3) or (b)(2) class should be certified for bifurcated adjudication of a common issue (Phase I), to be followed by separate trials (coordinated or consolidated as may be appropriate) to adjudicate individual damage claims (Phase II). Once there has been a finding in Phase I of a class-wide violation, "the court should decide the issue of class-wide relief, typically in the form of an injunction prospectively prohibiting the discriminatory practice."[2044] There are cases, however, where injunctive relief would not remedy the challenged employment practice, such as where the practice has been discontinued or the plaintiff is no longer employed by the defendant.[2045] The court can then determine what individual relief is appropriate for class members.

In a motion for class certification, consider whether the complaint challenges an employment practice affecting a class of employees as opposed to challenging the individual treatment of employees. In general, disparate impact cases are more suitable to class treatment, because they arise out of a neutral policy or practice that plaintiffs say has a disproportionate impact on a protected class.[2046] As a result, plaintiffs can more easily satisfy the typicality and commonality requirements of Rule 23 in such cases.[2047] Class certification of actions based on disparate treatment claims, however, is more complicated.[2048]

---

2043. Kernan Holiday Universal, Inc., No. JH90-971, 1990 WL 289505, at *5–7 (D. Md. Aug. 14, 1990); Morgan v. United Parcel Serv. of Am., Inc., 169 F.R.D. 349, 358 (E.D. Mo. 1996). *See also Beck*, 203 F.R.D. at 465–68 (W.D. Wash. 2001) (certifying the liability phase under Rule 23(b)(2) and the damages phase under Rule 23(b)(3), but excluding from the class certification individual claims for back pay).

2044. Rutherglen, *supra* note 1957, at 90. Injunctive relief will almost invariably be appropriate where Title VII has been violated. *See, e.g.*, Int'l Bd. of Teamsters v. United States, 431 U.S. 324, 361 (1977).

2045. *See, e.g.*, Cardenas v. Massey, 269 F.3d 251, 265 (3d Cir. 2001) (holding injunctive relief would not remedy plaintiff's wrongful treatment where defendant no longer employed plaintiff); Webb v. Mo. Pac. R.R. Co., 98 F.3d 1067, 1068 (8th Cir. 1996) (injunctive relief not appropriate where no discrimination complaints filed and affidavit exhibited effective implementation of antidiscrimination and affirmative action programs since the close of the liability phase of the trial); *see, e.g.*, Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126 (4th Cir. 1995) (since plaintiff was no longer employed by defendant, equitable relief would be unavailable on harassment claim unless plaintiff prevailed on his constructive discharge claim).

2046. *See, e.g.*, Griggs v. Duke Power Co., 401 U.S. 424 (1971) (discussing whether Title VII prohibits hiring prerequisites and aptitude tests as conditions of employment).

2047. *See* Gen. Tel. Co. v. Falcon, 457 U.S. 147, 159 n.15 (1982); *see, e.g.*, McKenzie v. Sawyer, 684 F.2d 62 (D.C. Cir. 1982).

2048. Swanson v. Perry, No. 4:01-CV-0258-A, 2002 WL 324283, at *3 (N.D. Tex. Feb. 27, 2002) (noting that disparate treatment claims are necessarily individual, but can still support class action treatment where appropriate).

Where disparate treatment forms the basis of the action, individual issues are more likely to predominate and class certification may not be warranted.[2049] Plaintiffs seeking class-wide relief on the basis of the impact of a policy on their individual employment conditions must show that their claims are sufficiently similar to those of the proposed class members that they meet the requirements of commonality and typicality for the class.[2050] The commonality requirement is rarely satisfied by broad allegations of discrimination.[2051] Courts have refused to certify classes where, for example, the named plaintiffs worked in different groups and job types;[2052] the proposed class included current, past, and present employees in both supervisory and non-supervisory positions in addition to job applicants;[2053] or the employees worked in different facilities or

---

2049. *See, e.g.,* Donaldson v. Microsoft Corp., 205 F.R.D. 558, 565 (W.D. Wash. 2001) ("The mere allegation of individualized discrimination on the basis of race, coupled with proof that other people of color work in the same environment, is insufficient to establish commonality."); Zachery v. Texaco Exploration & Prod., Inc., 185 F.R.D. 230, 239 (W.D. Tex. 1999) (proposed class was spread across fifteen states in seventeen separate business units, each with varying degrees of autonomy over evaluation and promotion decisions involving 523 autonomous supervisors); Reyes v. Walt Disney World Co., 176 F.R.D. 654, 658 (M.D. Fla. 1998) (disparate treatment claims by their nature "are highly individualized" and plaintiffs were employed by three separate divisions, presumably with a different hierarchy of decision makers, and therefore each plaintiff was subject to "own set of unique circumstances surrounding the adverse employment action about which they now attempt to collectively complain").

2050. *Gen. Tel. Co.*, 457 U.S. at 156–57 (emphasizing the need for careful attention to the requirements of Rule 23 in the light of the legal and factual issues underlying plaintiff's cause of action and rejecting proposition that plaintiff's injury from ethnic discrimination automatically qualifies plaintiff to represent all members of that ethnic class allegedly adversely affected by some manifestation of discrimination). *See also Donaldson*, 205 F.R.D. at 567 ("Courts have recognized that it is not possible to make a finding of commonality where putative class involves extensive diversity in terms of geography, job requirements, and/or managerial responsibilities."); *Swanson*, 2002 WL 324283, at *3 ("[T]he central problem with the proposed class action [is that it] is composed of individuals with widely varying job classifications, pay scales, supervisory responsibility, and histories of discrimination.").

2051. *See Zachery*, 185 F.R.D. at 238–39 (geographic dispersion of facilities and localized employment decisions precluded finding of commonality); Appleton v. Deloitte & Touche L.L.P., 168 F.R.D. 221, 231–32 (M.D. Tenn. 1996) (noting class encompassed varying job levels with different criteria used for decision making for each job level); *Swanson*, 2002 WL 324283, at *2–3.

2052. Kresefky v. Panasonic Communications & Sys. Co., 169 F.R.D. 54, 60 & 62–63 (D.N.J. 1996).

2053. Troupe v. Randall's Food & Drug, Inc., No. CIV.A. 3:98-CV-2462, 1999 WL 552727, at *5 (N.D. Tex. July 28, 1999) (noting proposed class also covered at least "fifty separate stores spread over two large cities and their outlying suburbs" with "management practices vary[ing] widely according to stores across the division").

geographical locations.[2054] In *General Telephone v. Falcon*,[2055] however, the Supreme Court noted that commonality may be satisfied where the plaintiffs can demonstrate that "an employer operated under a general policy of discrimination . . . [that] manifested itself . . . in the same general fashion, such as through entirely subjective decisionmaking processes."[2056] Inquiry into whether the practice or conduct complained of involves the entire operation of the employer, or only a specific facility, department, or individual supervisor, will assist in determining whether the requirements of Rule 23 are met.

To ascertain the precise nature of the class claim and determine whether it meets the prerequisites of Rule 23(a), the court should probe beneath the pleadings at an early stage to identify the particular practice or procedure complained of and the extent to which the evidence to be offered in support of the named plaintiffs' claims will also support the claims of other class members. Some discovery may be needed, although precertification discovery should be held to a minimum.[2057] Occasionally, the class claims will be consolidated with individual claims, and there may be reasons for proceeding with merits discovery on the latter. If so, the attorneys should be instructed to organize discovery so as to avoid duplication. A ruling that the class representatives' individual claims have merit will not determine whether class certification is appropriate. The court will still need to determine if common issues predominate. A named plaintiff with a claim that lacks merit, however, will not be an adequate class representative.

Less precision is required in the definition of a Rule 23(b)(2) class. Members of a Rule 23(b)(2) class generally are limited to equitable relief (and appropriate incidental damages), and *res judicata* considerations with respect to individual claims are not significant. On the other hand, in a Rule 23(b)(3) action, plaintiffs' primary claim is for damages. Thus, the class must be defined with more specificity, and the court must satisfy itself that the determination of individual claims does not preclude the existence of a predominant common question. The ruling on certification should describe the class (and any subclasses) as precisely as possible, both to facilitate planning for discovery, trial,

---

2054. *Zachery*, 185 F.R.D. at 239 (proposed class spread across fifteen states and involved seventeen business units).

2055. 457 U.S. 147 (1982).

2056. *Id.* at 159 n.15. *But see Appleton*, 168 F.R.D. at 221 ("In applying Footnote 15 [of *General Telephone*], the courts have required plaintiffs to show that a defendant's decisionmaking process is *entirely* subjective before permitting an across the board attack.").

2057. *But see* Zapata v. IBP, Inc., No. CIV.A. 93-2366, 1994 WL 649322, at *1 (D. Kan. Nov. 10, 1994) (staying discovery on merits until after plaintiff moved for certification but permitting discovery relevant to certification and noting that discovery relevant to certification may also be relevant to the merits).

and settlement and to define the persons (and claims) that will be entitled to relief under, or barred by, a final judgment in the action.[2058] To the extent feasible, this definition should be stated in objective terms: e.g., all female applicants during a specified time who, like the plaintiffs, failed to meet the employer's height and weight requirements. If unclear from the description of the class itself, the ruling should indicate the nature of the claimed class discrimination: e.g., all persons of color employed by the defendant during a specified period who allege that they were denied promotion during that period on account of their race. Criteria that are subjective or depend on the merits of the claim should be excluded. Although Rule 23(c)(1) authorizes a conditional order of certification and modification of that order prior to final judgment, such modification can be prejudicial to class members and interfere with the effective management of the action.[2059] In cases brought pursuant to the FLSA or ADEA, however, a determination whether similarly situated employees exist will help to determine whether notice of a right to opt in should be given and whether to conditionally certify the class. Once notice has been given and the time for opting in has expired, the judge can reexamine whether the class should be decertified.

Rule 23(c)(2) entitles each class member in a class certified under Rule 23(b)(3) to personal notice and an opportunity to opt out of the class.[2060] Rule 23 does not provide for opt-out by members of a (b)(2) class. If certain members of the class should be excluded, perhaps because their interests are aligned with management or to avoid conflicts within a class, the class definition should be tailored to reflect their exclusion or to create one or more subclasses.[2061]

Notice to class members must be given when a Rule 23(b)(3) class is certified.[2062] Although not required for a (b)(2) class, notice may still be advisable for a number of reasons, such as to bring to light possible conflicts and to ensure the *res judicata* effect of a judgment. The form of notice—individual mailing, posting on bulletin boards, or inclusion in pay envelopes—will depend on the circumstances of the case. While the cost of notice generally is

---

2058. *See* Cooper v. Fed. Res. Bank of Richmond, 467 U.S. 867, 876–78 (1984) (related individual claims of discrimination not precluded by a finding of no class discrimination); Kernan v. Holiday Universal, Inc., No. JH90-971, 1990 WL 289505, at *2, 6 (D. Md. Aug. 14, 1990).

2059. Hall v. Burk, No. CIV.A. 301CV2487, 2002 WL 413901, at *2–3 (N.D. Tex. Mar. 11, 2002).

2060. Fed. R. Civ. P. 23(c)(2) (West 2003); *see also* Ortiz v. Fibreboard Corp., 527 U.S. 815, 844 (1999). Rule 23 does not provide for opt-out by members of a (b)(2) class. *See supra* section 21.311 [certification notice].

2061. *See* Penson v. Terminal Transp. Co., 634 F.2d 989, 993–94 (5th Cir. 1981).

2062. Fed. R. Civ. P. 23(c)(2) (West 2003).

borne by the plaintiffs,[2063] relatively cost-free methods of reaching at least current employees usually are available. Moreover, where notice is being given in a (b)(2) action at the employer's request, the employer may be required to bear the cost.

## 32.43 Discovery

.431 Identification of Source Materials  586
.432 Computerized Records  587
.433 Confidential Information  588
.434 Preservation of Records  589
.435 Statistical Evidence and Expert Testimony  589
.436 Discovery from Class Members  590

Five considerations are important in planning the discovery program for employment discrimination litigation:

1. Many aspects of the company's employment practices and its workforce may be potentially relevant as circumstantial evidence.
2. Most of the information will be within the control of the employer, often in computerized form.
3. Except for the government, plaintiffs usually have limited resources.
4. Expert testimony and complex statistical evidence will play an important role at trial.
5. Trial often will be conducted in stages.

### 32.431  Identification of Source Materials

The judge can simplify and expedite discovery by directing the parties to exchange core information before discovery begins. Core information includes information required under Rule 26 or local rules. It also includes potentially relevant documentary materials, such as statements of employment policies, policy manuals and guides, and an identification and general explanation (perhaps with samples) of the types of records that contain data that may be relevant to the issues in the case. After obtaining this information, plaintiffs may need to depose the personnel director or other individuals responsible for maintaining such records in order to clarify the nature of the information contained in the records, how the information is coded or compiled, and how data may be extracted from the various sources.

Employers frequently maintain the same or similar information in different forms. For example, earnings information may be in a personnel file, in tax

---

2063. *See* Eisen v. Carlisle & Jaquelin, 417 U.S. 156, 177 (1974).

records, and in payroll records. Job histories of employees may be determined from periodic transfer and promotion records, from individual work record cards, or from personnel files. The company may also have compiled relevant data regarding its workforce and employment practices for reporting to governmental agencies or for use in other litigation. Many aspects of the company's employment practices may have some potential relevance as circumstantial evidence, and various records may contain information about these practices. The parties can determine the most efficient and economical method for the employer to produce, and for plaintiffs to obtain, the most relevant information. Federal Rule of Civil Procedure 26(g) directs counsel to weigh the potential value of particular discovery against the time and expense of production, and Rule 26(b)(2) expects the judge to limit discovery to avoid duplication and unjustified expense.[2064]

### 32.432 Computerized Records

The time and expense of discovery may sometimes be substantially reduced if pertinent information can be retrieved from existing computerized records. Moreover, production in computer-readable form of relevant files and fields (or even of an entire database) can reduce disputes over the accuracy of compilations made from such data and enable experts for both sides to conduct studies using a common set of data.[2065] On the other hand, accessing and

---

2064. *See* Aramburu v. Boeing Co., 885 F. Supp. 1434, 1444–45 (D. Kan. 1995) (holding that production of 1,700 personnel files would unduly burdensome in light of information already produced by defendant and relevance appeared negligible in light of burden, but giving plaintiff leave to seek reconsideration should additional discovery prove necessary); Zapata v. IBP, Inc., No. CIV.A. 93-2366, 1994 WL 649322, at *3 (D. Kan. Nov. 10, 1994) (requiring defendant to produce computerized records and noting that all discovery is burdensome and burden is on party resisting discovery to demonstrate it would be unduly burdened by the discovery request); Couglin v. Lee, 946 F.2d 1152, 1160 (5th Cir. 1991) (district court abused discretion in limiting plaintiff's access to personnel files, and although some limitations can be imposed on ground of burdensomeness, the "more important the information sought in discovery is to the case, the greater the burden the opposing party can be legitimately required to shoulder"). In *Sattar v. Motorola*, for example, the district court denied plaintiff's discovery request for hard copies of over 200,000 pages of E-mail messages. The court instead ordered the defendant to accommodate the plaintiff in one of several alternative ways, such as downloading the data onto diskettes (as opposed to submitting the tapes on which the information was maintained), permitting the plaintiff to use the software needed to read the tapes, or giving the plaintiff access to the defendant's computer system, elsewise the parties would be required to split the costs of hard copies. 138 F.3d 1164, 1171 (7th Cir. 1998).

2065. *See* Hines v. Widnall, 183 F.R.D. 596, 601 (N.D. Fla. 1998) (requiring defendant to produce computer images to plaintiffs even though defendant computerized records after litigation began).

using computer-generated evidence is subject to numerous pitfalls. For a more complete discussion see section 11.446. The parties' computer experts should informally discuss, in person or by telephone, procedures to facilitate retrieval and production of computerized information; the attorneys can then confirm these arrangements in writing.

## 32.433 Confidential Information

Employees' privacy interests may be protected by excluding from production records or portions of records irrelevant to the litigation (employees' medical histories, for example, are rarely of significance in a discrimination case) or by masking the names of individuals in particular compilations.[2066] If the company fears exposure to privacy claims were it to disclose personal information voluntarily, consider issuing a protective order barring unnecessary disclosure of sensitive items to facilitate the production of sensitive information. The protective order may identify information regarding the employee, such as names or social security numbers, and may limit the persons to whom plaintiffs' counsel will be permitted to disclose confidential materials. For example, counsel might be allowed to disclose some sensitive information to the plaintiffs or even to class members, but permitted to disclose information about tests only to an expert.

Discovery sought by the defendant employer often targets private information regarding the plaintiffs or nonparty witnesses. In sexual harassment cases, defendants may seek discovery as to the plaintiff's emotional well-being, including medical and psychological records, or the plaintiff's sexual history.[2067] As always, the plaintiff's (and nonparty witness's) privacy interests

---

2066. Some jurisdictions have held that employees' tax returns were subject to a quasi-privilege and not generally discoverable in civil actions. *See, e.g.,* Gattegno v. PriceWaterhouseCoopers, LLP, 205 F.R.D. 70, 71–72 (D. Conn. 2001) (discussing discoverability of tax returns and approaches taken by different jurisdictions and holding tax returns subject to a quasi-privilege).

2067. *See, e.g.,* Gatewood v. Stone Container Corp., 170 F.R.D. 455, 460 (S.D. Iowa 1996) ("[A] defendant is entitled to discover whether there have been other stressors relating to plaintiff's mental and physical health during the relevant time period which may have contributed to the claimed emotional distress."); Fox v. Gates Corp., 179 F.R.D. 303, 305–06 (D. Colo. 1998) (plaintiff claiming emotional distress as element of claim waived psychotherapist–patient privilege for communications within applicable time period); Butler v. Burroughs Wellcome, Inc., 920 F. Supp. 90, 92 (E.D.N.C. 1996) (plaintiff's entire medical history is relevant in ADA action and defendant also entitled to inquire into history of sexual abuse and sexual dysfunction, since claim predicated upon mental state arising out of these issues). *But see* Burger v. Litton Indus. Inc., No. 91 CIV. 0918, 1995 WL 476712, at *2–3 (S.D.N.Y. Aug. 10, 1995) (defendants failed to show that the need for information relating to sex life of nonparty witness outweighed witness's privacy interests and noting that although Federal Rule of Evidence 412 did not apply to civil

should be balanced against the probative value of the information sought.[2068] Determinations as to whether the plaintiff may have waived any physician–patient privilege also may be required.[2069]

## 32.434 Preservation of Records

When a charge of discrimination or a civil action has been filed, EEOC regulations require that employers "shall preserve all personnel records relevant to the charge or action until final disposition of the charge or action."[2070] The parties may disagree on which records are covered by this mandate, particularly with respect to computerized data that may be periodically erased as new information is electronically stored. A separate order may be needed to clarify what records must be preserved and to provide relief from unduly burdensome retention requirements.

## 32.435 Statistical Evidence and Expert Testimony

Employment discrimination litigation frequently involves the collection and presentation of voluminous data regarding characteristics of the company's workforce and its employment practices. In addition to using data already computerized by the company, the parties often prepare new databases, electronically storing information manually extracted from other records. Disagreements may arise about the accuracy of these new databases, and preparing and verifying separate databases involves time and expense. Consider encouraging the parties to agree on joint development of a common database on which their respective experts will conduct their studies. If they cannot agree on a common database, the court should direct them to use pretrial verification procedures to eliminate (or quantify) errors in the different databases. Whenever possible, complex data should be presented at trial through summaries, charts, and other tabulations.[2071]

---

actions, "[i]n order not to undermine the rationale of Rule 412 . . . courts should enter appropriate orders pursuant to Fed. R. Civ. P. 26(c) to protect the victim against unwarranted inquiries and to ensure confidentiality").

2068. *Gatewood*, 170 F.R.D. at 460 (noting defendant did not have "carte blanche" to "peruse plaintiff's medical history").

2069. *See, e.g., Fox*, 179 F.R.D. at 305–06; Vann v. Lone Star Steakhouse & Saloon, 967 F. Supp. 346, 349–50 (C.D. Ill. 1997).

2070. 29 C.F.R. § 1602.14 (1999).

2071. In discrimination cases, the parties sometimes attempt to introduce in bulk numerous personnel files, work history cards, and other similar documents. *See, e.g.,* Crawford v. W. Elec. Co., 614 F.2d 1300, 1319 (5th Cir. 1980) (the court may insist on compilations and is not required to "[wade] through a sea of uninterpreted raw evidence").

Adopting pretrial procedures to facilitate this presentation will reduce disputes over the accuracy of the underlying data and the compilations derived from such data. Indeed, to the extent practicable, disputes at trial regarding statistical evidence should be limited to its interpretation, relevance, and weight, not its accuracy. Experts submitting statistical studies in the form of written reports should include, among other things, the data and information considered in arriving at their conclusions. Such information includes the applicable labor or employment pool, historical data, and other characteristics.[2072] After reviewing these reports and considering the comments of counsel, it may be appropriate to appoint an independent statistical expert under Federal Rule of Evidence 706. The court should be wary of making such an appointment, however, if the plaintiffs will be able to pay their share of any assessed fees only if they prevail.[2073]

## 32.436 Discovery from Class Members

The extent of permissible discovery from class members, as well as its timing and form, will depend on the circumstances of the case. The judge should require the parties to obtain court approval before taking any discovery from class members and should limit that discovery to what is genuinely needed. Depositions of a limited number of proposed class members are sometimes needed prior to a ruling on class certification. In some cases, limited discovery from class members may be conducted in a bifurcated case in the liability phase of the pretrial proceedings, with any remaining discovery deferred.[2074] Each party ordinarily should be permitted to depose any class member whom the other party plans to call as a witness. Discovery of a class member whose employment history will be used as evidence to show the existence (or nonexistence) of the alleged discrimination may also be appropriate. Whether anecdotal experiences of individual class members are relevant at a Phase I trial will depend on the circumstances of the case. Consider deferring discovery from those class members if such evidence will become relevant at subsequent proceedings only if liability to the class is established. Similarly, class members on whose behalf claims for individual relief are presented after a finding of class-wide liability may be treated as subject to discovery.

---

2072. Fed. R. Civ. P. 26(a)(2) (2000).

2073. *See generally*, Joe S. Cecil & Thomas E. Willging, Court-Appointed Experts: Defining the Role of Experts Appointed Under Federal Rule of Evidence 706 (Federal Judicial Center 1993).

2074. *See, e.g.,* W. Elec. Co. v. Stern, 544 F.2d 1196, 1198–99 (3d Cir. 1976).

## 32.44 Summary Judgment

Summary judgment can be an effective tool in employment discrimination cases. Although typically brought by one of the parties, some courts have approved the use of summary judgment *sua sponte* in appropriate cases.[2075] The courts have consistently held that the *McDonnell Douglas* burden-shifting framework, applicable where the plaintiff's case rests on circumstantial evidence of discrimination, governs summary judgment but should not be introduced to the jury.[2076] The Ninth Circuit noted in *Costa v. Desert Palace Inc.*[2077] that the presumption of discrimination may be relevant at trial where the employer does not rebut the prima facie case, but factual disputes remain. In most cases, however, "[r]egardless of the method chosen to arrive at trial, it is not normally appropriate to introduce the *McDonnell Douglas* burden-shifting framework to the jury."[2078] Accordingly, once the employer proffers a nondiscriminatory reason for the employment practice at issue, the plaintiff must offer evidence to show that the defendant's asserted reason is pretextual in order to defeat summary judgment in favor of the employer.[2079] It may be enough for the plaintiff to establish a prima facie case, together with sufficient evidence to challenge the credibility of the employer's proffered explanation, in order to create a triable issue of fact.[2080] The plaintiff is not required to introduce independent evidence of discrimination in order to avoid summary judgment. Rather, once the plaintiff adequately challenges the credibility of the explana-

2075.  *See, e.g.,* Jones v. Union Pac. R.R. Co, 302 F.3d 735, 740 (7th Cir. 2002).

2076.  *See, e.g.,* Costa v. Desert Palace, Inc., 299 F.3d 838, 854–55 (9th Cir. 2002), *aff'd*, 123 S. Ct. 2148 (2003); Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1216 (10th Cir. 2002); *see also* Crone v. United Parcel Serv., 301 F.3d 942, 944 (8th Cir. 2002) (stating summary judgment would be analyzed under *McDonnell Douglas* burden-shifting standard).

2077.  299 F.3d 838 (9th Cir. 2002), *aff'd*, 123 S. Ct. 2148 (2003).

2078.  *Id.* at 855.

2079.  Heap v. County of Schenectady, 214 F. Supp. 2d 263, 269 (N.D.N.Y. 2002); *Crone*, 301 F.3d at 942, 944–45 (affirming grant of summary judgment for employer where plaintiff failed to demonstrate reason for nonpromotion was pretext).

2080.  Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 148 (2000) ("This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."). The Seventh Circuit in *Jones v. Union Pacific Railroad Co.*, noted that with respect to the issue of pretext, the "question is not whether the employer's reasons for a decision are 'right but whether the employer's description of its reasons is honest.'" 302 F.3d 735, 744 (7th Cir. 2002) (quoting Kariotis v. Navistar Int'l Transp. Co., 131 F.3d 672, 677 (7th Cir. 1997)). However, the court also seemed to require the plaintiff to provide admissible evidence that the employer's reason was pretextual "and that the actual reason was discriminatory." *Id.* at 743.

tion, it is within the province of the fact-finder at trial to look at the totality of the evidence and then determine whether such evidence creates an inference of discrimination.

## 32.45 Trial

Employment discrimination class actions have commonly been tried in separate stages under Rule 42(b).[2081] In some cases the class issues may themselves be severed, with the Phase I trials of different class issues conducted separately. The Phase I trial determines whether the defendants have discriminated against the class. Whether the merits of the individual claims of the class representatives should be tried in Phase I depends on whether proof of those claims is essential to establishing liability on the class claim. If class-wide discrimination is found, issues of relief are tried in Phase II. The 1991 CRA entitles parties in disparate treatment cases to request a jury trial. If a jury is requested, the bifurcation of class actions will be substantially more complicated. Although the class-wide issue of discrimination is readily tried to a jury in Phase I, the trial of individual damage claims to a jury in Phase II will result in potentially lengthy trials. In some cases, Title VII permits recovery of front and back pay as well as compensatory damages, including future loss, and pain and suffering. Consider whether fairness to the parties requires that both liability and relief be tried to a single jury.[2082]

Where the case is tried to the court, the judge should determine, in Phase I, the appropriateness of class-wide injunctive relief. Injunctive relief commonly ordered in employment discrimination cases includes the following: establishing goals to diversify the workforce; implementing mandatory hiring or promotion of specified individuals or groups of individuals; abolishing or restricting testing procedures; instituting training programs; establishing or modifying recruitment policies; or imposing an affirmative action plan in one form or another.[2083] Reinstatement may also be a viable remedy depending on the circumstances of the case.[2084] An immediate appeal of the ruling on injunc-

---

2081. *See* Gen. Bldg. Contractors Ass'n v. Pa., 458 U.S. 375, 380 (1982); Kernan Holiday Universal, Inc., No. JH90-971, 1990 WL 289505, at *4–5 (D. Md. Aug. 14, 1990); United States v. United States Steel Corp., 520 F.2d 1043 (5th Cir. 1975).

2082. *See, e.g.,* Allison v. Citgo Petroleum Corp., 151 F.3d 402, 423–24 (5th Cir. 1998) (expressing concern that consideration of overlapping issues by different juries would violate the Seventh Amendment).

2083. John F. Buckley, IV & Michael R. Lindsay, Defense of Equal Employment Claims § 14.18, at 14–17 (2d ed. 1995 & Supp. 2000).

2084. Hostility between the parties may militate against consideration of reinstatement. Simpson v. Ernst & Young, 100 F.3d 436, 445 (6th Cir. 1996) (amount of award of front pay

tive relief is permissible under 28 U.S.C. § 1292(a). Because resolution of claims for injunctive relief can be an expensive and time-consuming process, such an appeal may be desirable as a means for obtaining early appellate review of a finding of liability. If an appeal under 28 U.S.C. § 1292(a) is unavailable, consider certifying the ruling on class liability for appeal under section 1292(b). The award of attorneys' fees may be deferred until completion of proceedings for individual relief; an interim award, however, frequently is made after a grant of injunctive relief.[2085]

The individual damage claims of the class members should be resolved in Phase II. In some instances, a period of additional discovery may be necessary. In this second stage, the claimants—who, by proof of their membership in the class, are presumed to have been subjected to the discrimination practiced against the class[2086]—are permitted to present their individual claims of injury,[2087] subject to the right of the employer to raise defenses to those claims that were not resolved during the Phase I proceedings. Further severance may be useful at the individual remedy stage. For example, consider identifying those entitled to relief before the parties proceed with discovery and possible trial regarding the amount of damages. One approach is to require class members to complete information forms disclosing the critical facts on which their claims of individual injury is based (e.g., the job bids that they assert were discriminatorily rejected by the company). It may also be feasible to establish a claims resolution procedure administered by a magistrate judge or special master under Rule 53.[2088] In some cases, class-wide monetary relief may be ap-

---

"supplemented by evidence that disclosed the underlying hostility that existed between defendant and Simpson, making reinstatement highly impractical and improbable"); Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1231 (7th Cir. 1995) (noting that courts should not compel reinstatement "where such debilitating frictions between employer and employee can be anticipated that the court might have to exercise continuing supervision over the employment relationship for many years"). In addition, where reinstatement would require the removal of another employee from the desired position, reinstatement may not be feasible. *See Avitia*, 49 F.3d at 1231–32.

2085. *See* Fed. R. Civ. P. 54(d) (2000).

2086. Cox v. Am. Case Iron Pipe Co., 784 F.2d 1546 (11th Cir. 1986); King v. Trans World Airlines, Inc., 738 F.2d 255 (8th Cir. 1984); McKenzie v. Sawyer, 684 F.2d 62 (D.C. Cir. 1982); Pettway v. Am. Cast Iron Pipe, 494 F.2d 211 (5th Cir. 1974).

2087. As to whether the amount of damages each class member has sustained must be individually determined or whether damages may be assessed on a class-wide basis, compare *Mitchell v. Mid-Continent Spring Co.*, 583 F.2d 175, 283–84 (6th Cir. 1978), with *Pettway*, 494 F.2d at 259–63 (class-wide formula permissible).

2088. *See, e.g.,* Bridgeport Guardians, Inc. v. Delmonte, 248 F.3d 66, 70–72 (2d Cir. 2001); Ass'n of Mexican-Am. Educators v. State of Cal., 231 F.3d 572, 590–91 (9th Cir. 2000); Reynolds v. Roberts, 207 F.3d 1288, 1295 n.9 (11th Cir. 2000); Berger v. Iron Workers Reinforced Rod-

propriate.[2089] Where calculation of the pecuniary effects of the discrimination would be nothing more than guesswork based on hypothetical analyses, an individualized determination of the amount a particular class member should recover may not be possible.[2090] Other factors that may weigh on the appropriateness of class-wide relief include the size of the class, whether the promotion or hiring practices are ambiguous, and the length of time the challenged practices continued.[2091]

When the trial of the action is bifurcated, the court should define precisely the issues to be resolved at each stage of the trial. This delineation will not eliminate all duplicative evidence. For example, anecdotal testimony may be admissible as circumstantial evidence at the first trial and, if liability is established, be offered as direct evidence on individual claims in later proceedings. The delineation, however, will enable counsel to prepare more effectively for both stages of the litigation. Issues generally are separated according to the extent they depend on the particular circumstances of individual employers; for example, defenses such as "business necessity"[2092] and "bonafide occupation qualification"[2093] usually are resolved in the first phase, while the issue of whether employees may be excused from applying for a position is typically reserved for decision in later proceedings.

Statistical evidence and expert testimony typically play a significant role in the liability phase of the trial,[2094] especially where the plaintiff is alleging dispa-

---

men, Local 201, 170 F.3d 1111, 1117–18 (D.C. Cir. 1999); Jensen v. Eveleth Taconite Co., 130 F.3d 1287, 1289–91 (8th Cir. 1997).

2089. *See, e.g.,* EEOC v. O & G Spring & Wire Forms Specialty Co., 38 F.3d 872 (7th Cir. 1994); Catlett v. Mo. Highway & Transp. Comm'n, 828 F.2d 1260, 1267–68 (8th Cir. 1987) (noting class-wide relief in form of award of back pay appropriate but remanding district court's grant of a class-wide hiring preference for further review). *But see* Shipes v. Trinity Indus., 987 F.2d 311, 317 (5th Cir. 1993) (stating that "fashioning a class-wide back pay award is exceedingly complex and difficult, and the process is fraught with uncertainty").

2090. *See* Stewart v. Gen. Motors Corp., 542 F.2d 445, 452 (7th Cir. 1976) ("subjectivity of defendant's method of filling job vacancies renders impossible anything like a precise calculation of the pecuniary effects of discrimination").

2091. *See Shipes,* 987 F.2d at 318.

2092. 42 U.S.C. § 2000e-2(k)(1)(A)(I) (2000).

2093. 29 U.S.C. § 623(f)(1) (2000).

2094. *See, e.g.,* Hemmings v. Tidyman's Inc., 285 F.3d 1174 (9th Cir. 2002); Coleman v. Quaker Oats Co., 232 F.3d 1271 (9th Cir. 2000); Bell v. EPA, 232 F.3d 546, 553 (7th Cir. 2000) ("In a pattern and practice disparate treatment case, statistical evidence constitutes the core of a plaintiff's prima facie case."); Meacham v. Knolls Atomic Power Lab., 185 F. Supp. 2d 193, 208 (N.D.N.Y. 2002) (plaintiff in ADEA case must "demonstrate, generally through statistical data, that the employment practice caused a significant disparity in outcome between older employees and younger employees"); *O & G Spring & Wire,* 38 F.3d at 876 (statistical proof alone can establish discrimination case).

rate impact as opposed to intentional discrimination. The probative value of statistical evidence offered by the parties will depend on, among other things, the relevant labor pool,[2095] the geographic area, and other comparison pools.[2096] The court must ensure that such evidence meets the requirements of *Daubert v. Merrel Dow Pharmaceuticals.*[2097] The "Reference Guide on Statistics" in the *Reference Manual on Scientific Evidence*[2098] may be helpful in assessing statistical evidence in employment discrimination cases.

Judges routinely admit expert testimony regarding statistical evidence, but disagree about the need or value of expert testimony on other issues.[2099] It is helpful to consider in the pretrial planning stage the extent to which "anecdotal" evidence regarding the individual experiences of various employees, union stewards, supervisors, and managers will be admitted. Plaintiffs or defendants may offer to provide illustrative support for their respective positions and for the studies conducted by their experts.[2100] Some limits on the number of witnesses may be appropriate. To avoid unnecessary duplication, the court should require pretrial disclosure of witnesses' names and the general subject matter of their expected testimony.[2101]

---

2095. *See, e.g.,* EEOC v. Turtle Creek Mansion Corp., No. 3:93-CV-1649, 1995 WL 478833, at *7–9 (N.D. Tex. May 18, 1995); *see also* McKenzie v. Sawyer, 684 F.2d 62, 71 (D.C. Cir. 1982) ("A showing that few if any blacks were hired for a given kind of job is not probative of discrimination without a showing of the numbers of blacks available in the appropriate labor pool.").

2096. *See, e.g.,* Aiken v. Memphis, 37 F.3d 1155 (6th Cir. 1994).

2097. 509 U.S. 579 (1993). *See* Wyche v. Marine Midland Bank, No. 94 CIV. 4022, 1997 WL 109564, at *1 (S.D.N.Y. Mar. 11, 1997).

2098. David H. Kaye & David A. Freedman, *Reference Guide on Statistics, in* Reference Manual on Scientific Evidence (Federal Judicial Center, 2d ed. 2000) at 83–178.

2099. Sherbert v. Alcan Aluminum Corp., 66 F.3d 965, 967 (8th Cir. 1995) (operation of forklift within the common knowledge of the jury); Karibian v. Columbia Univ., 930 F. Supp. 143, 144 (S.D.N.Y. 1996) (expert testimony as to plaintiff's emotional state unnecessary); Skidmore v. Precision Printing & Packaging, Inc., 188 F.3d 606, 618 (5th Cir. 1999) (testimony of psychologist on plaintiff's emotional distress admissible); Harper v. S.E. Ala. Med. Ctr., 998 F. Supp. 1289, 1297 (M.D. Ala. 1998) (permitting expert testimony on inadequacy of discrimination policy).

2100. *See, e.g., Turtle Creek Mansion*, 1995 WL 478833, at *2–6.

2101. Fed. R. Civ. P. 26(a)(3) (West 2003).

## 32.46  Settlement

.461 Timing  596
.462 Affirmative Relief  596
.463 Attorney Fees  597
.464 Settlement Hearing  597
.465 Implementation  597

### 32.461  Timing

Precertification settlements of discrimination cases brought as class actions present special problems. If the parties propose settlement of only the individual claims of the named plaintiffs and abandonment of the class claim, the judge should ensure that members of the proposed class are not prejudiced. It is appropriate to consider whether the proposed class should be notified of the proposed settlement and given an opportunity to intervene to pursue the class claims. Although the parties should be encouraged to engage in settlement negotiations early in the litigation, formal settlement negotiations in class actions ordinarily should be deferred until there is a certification ruling. In employment discrimination litigation, the parties should explore settlement possibilities as the case proceeds toward trial after the certification ruling and, if those initial efforts are unsuccessful, they should renew their discussions after the liability phase of the trial.

### 32.462  Affirmative Relief

Many employment discrimination cases terminate in consent decrees or in litigated judgments that order implementation of certain employment practices that may be seen as constituting affirmative action.[2102] Such provisions raise difficult issues concerning their effect on groups of employees that may be adversely affected by the provisions and their vulnerability to subsequent legal challenge. The Civil Rights Act establishes procedures for precluding subsequent challenge by persons (1) who, prior to entry of the order, had actual notice of the potential adverse effect and an opportunity to object, or (2) who were adequately represented.[2103] Parties to the decree may also seek to intervene or join persons who may claim to be adversely affected.

---

2102. *See, e.g.,* Thigpen v. Bibb County, Ga., Sheriff's Dept., 223 F.3d 1231 (11th Cir. 2000); Bishop v. Gainer, 272 F.3d 1009 (7th Cir. 2001); Maitland v. Univ. of Minn., 155 F.3d 1013 (8th Cir. 1998).

2103.  42 U.S.C. § 2000e-2(n) (2000).

### 32.463 Attorney Fees

The court should be wary of parties' attempts to settle claims for attorney fees before a settlement of the class claims has been effected or where the defendants offer to settle class claims by payment of a lump sum on condition that attorney fees be waived. The parties should be encouraged to settle claims regarding attorney fees, but these negotiations preferably should not be commenced until the class claims have been resolved by trial or settlement.

### 32.464 Settlement Hearing

Hearings on approval of class action settlements in employment discrimination litigation may generate vigorous objections. Opposition often stems from misunderstandings about the terms of the proposed settlement and will be mitigated if the notice of settlement provides full information in comprehensible form. Class counsel may also schedule, in advance of the hearing, meetings with the class at which counsel and the class representatives can explain in person the terms of the agreement and can answer questions. At the outset of the hearing, before the judge hears objections from class members or others, counsel should again describe in plain language the key features of the settlement, clarify misunderstandings, and indicate why they believe it to be advantageous to the class. The judge may also explain portions of the proposed settlement that may have been confusing to class members. The judge's notice to the class of the proposed settlement typically should require that any objections or requests to be heard be filed in writing by a specified date. It is prudent, however, to permit persons who have not filed timely objections to express their views at the hearing, including representatives of employees who, while not members of the class, claim they will be adversely affected by the settlement.

### 32.465 Implementation

Settlements of employment discrimination cases sometimes specify the persons to whom awards will be made and the amount each person is to be paid. More frequently, however, settlements provide only the basic principles for determining these awards, contemplating further proceedings to ascertain the factual matters on which the awards depend. The settlement may, for example, establish one or more funds to be shared by persons satisfying prescribed criteria; in this situation, class counsel may be required after the settlement to preliminarily identify those class members eligible to participate in distribution, and provide those found ineligible an opportunity to present their claims to the court or a special master. The settlement may provide for a specified payment—whether a flat sum or an amount determined under a formula—to each class member meeting specified criteria. If so, the defendants

may have a financial interest in challenging the claims of class members, and referral to a magistrate judge or special master may be necessary in order to conduct individual hearings. Also, a special master appointed under Federal Rule of Civil Procedure 53 can monitor future implementation of injunctive features of the settlement. Although Rule 53 contemplates that the appointment of a special master "shall be the exception and not the rule,"[2104] Title VII cases have a relaxed standard for assessing whether there are exceptional circumstances that warrant reference to a special master.[2105] The statute authorizes the appointment of a special master where necessary to ensure compliance with Title VII's mandate to expedite discrimination cases, even though the circumstances might otherwise be unexceptional.[2106]

---

2104. *See also* La Buy v. Howes Leather Co., 352 U.S. 249, 254 n.4 (1957); Sierra Club v. Clifford, 257 F.3d 444, 447 (5th Cir. 2001) ("The fact that a case has been pending for two years is not so exceptional as to require the reference of dispositive matters . . . to a special master."); United States v. Microsoft Corp., 147 F.3d 935, 955–56 (D.C. Cir. 1998).

2105. *See* Goins v. Hitchcock, 191 F. Supp. 2d 860, 867 (S.D. Tex. 2002) (citing Hackley v. Roudebush, 520 F.2d 108 (D.C. Cir. 1975)).

2106. 42 U.S.C. § 2000e-5(f)(5) (2000); *see also Hackley*, 520 F.2d at 154 n.181 (D.C. Cir. 1975) ("That provision was merely included so that the test of Rule 53, which only permits masters to be appointed in exceptional circumstances, would be somewhat relaxed in the area of Title VII, 'where justice delayed is very often justice denied.'" (quoting House Comm. on Educ. & Labor, 92d Cong., Legislative History of the Equal Employment Opportunity Act 1731 (Comm. Print 1972)).

# 33. Intellectual Property

.1 Introduction  599
.2 Patent Law  600
    .21 The Statutory Framework  600
    .22 Claim Construction Under *Markman v. Westview Instruments*  602
        .221 Holding a *Markman* Hearing  604
        .222 Structuring the *Markman* Hearing  606
        .223 Timing the *Markman* Hearing  607
        .224 Requesting a *Markman* Hearing  610
        .225 Appeal  611
    .23 Defining the Issues in Patent Litigation  611
    .24 Injunctive Relief  619
    .25 Discovery  622
    .26 Experts  625
    .27 Trial  627
.3 Copyright and Trademark Law  628
    .31 Copyright  628
        .311 Discovery  637
        .312 Motions  639
        .313 Experts  640
    .32 Trademarks  640

## 33.1  Introduction

Intellectual property litigation comprises three related areas of the law: patent, copyright, and trademark. Trade secret claims—seeking to protect state-law-based rights in information—can appear under supplemental jurisdiction and often are related to patent issues (e.g., inventorship, ownership, "best mode").[2107] Copyright actions arise out of the unauthorized copying or exploitation of the "pattern of expression" reflected by writings, music, and art.[2108] Trademark cases, on the other hand, do not involve the protection per se of an invention or original work, but involve disputes over the unauthorized use of those "marks" of a product or service that are associated in the public's mind with that product or service.[2109] Intellectual property litigation has grown increasingly more complicated as technology, biology, and communications have advanced, expanding claims beyond the traditional mechanical processes originally contemplated by the various statutes in each area. Motions for temporary and permanent injunctive relief, frequently filed on an expedited basis,

---

2107.  James Pooley, Trade Secrets § 3.01[2]–[3] (2003) (discussing statutory requirements for patentability of an invention).

2108.  Robert A. Gorman, Copyright Law 4 (Federal Judicial Center 1991).

2109.  *Id.* at 5.

create additional complexities. This section focuses primarily on patent litigation, but also discusses issues peculiar to copyright and trademark cases that may increase the complexity of otherwise straightforward litigation.

## 33.2   Patent Law

.21 The Statutory Framework  600
.22 Claim Construction Under *Markman v. Westview Instruments*  602
   .221 Holding a *Markman* Hearing  604
   .222 Structuring the *Markman* Hearing  606
   .223 Timing the *Markman* Hearing  607
   .224 Requesting a *Markman* Hearing  610
   .225 Appeal  611
.23 Defining the Issues in Patent Litigation  611
.24 Injunctive Relief  619
.25 Discovery  622
.26 Experts  625
.27 Trial  627

## 33.21   The Statutory Framework

Patent law derives from Article 1, section 8 of the U.S. Constitution, which authorizes Congress "[t]o promote the progress of . . . useful arts, by securing for limited times to . . . inventors the exclusive right to their . . . discoveries." Congress exercised this authority through the 1793 Patent Act, most recently revised in 1952 and codified at 35 U.S.C. § 101.[2110] Patent law grants the inventor of a product or process, together with its useful improvements, exclusive right to the use and marketing of the invention, and protects the underlying concept or system as "usefully embodied."[2111] Obtaining a patent can be lengthy and involved. The applicant must satisfy certain statutory conditions: the invention must be (1) useful;[2112] (2) novel;[2113] and (3) non-obvious.[2114] The patent document itself contains a set of claims to identify the bounds of the

---

2110.  *See* Graham v. John Deere Co., 383 U.S. 1, 3 (1966) (discussing constitutional grant of authority and history of Patent Act).

2111.  Section 101 of the Patent Act provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101 (2000).

2112.  *Id.*

2113.  35 U.S.C. §§ 101 & 102 (2000). In order to satisfy the requirement of novelty, the invention cannot be anticipated by a product or process that is already in the public domain, or cannot have an insignificant enough difference from that existing in the public domain that it would have been obvious to a person skilled in the art of the invention.

2114.  35 U.S.C. § 102 (2000).

patent owner's monopoly. These claims define the limits of the invention and serve to set the bounds for the patentee's rights. Typically they are the result of a back and forth negotiation between the patent applicant and the U.S. Patent and Trademark Office (PTO). "Because others look to the patent claims to determine what cannot be done without the patent owner's permission, the inventor must present claims that particularly point out and distinctly claim the invention."[2115] To further the Act's goals of promoting the "progress of the useful arts,"[2116] it also requires the patentee to make certain disclosures as to the best mode of practicing the invention and to include a description sufficient to enable a person of ordinary skill in the art of the invention to do so. Once the patent has been issued, the owner of the patent has the exclusive right to make, use, or sell the invention for twenty years from the date of the original patent application, at which time the patent expires and the invention becomes part of the public domain. Extensions of the patent may be granted under limited circumstances.

Patent litigation typically arises out of the patent owner's assertions of infringement of the patent resulting from unauthorized use of the patented product or process.[2117] Actions may also be brought by others to challenge the validity of the patent itself, either through the PTO or by way of a declaratory judgment action in federal court.[2118] In addition, appeals from proceedings or decisions of the Patent Office Board of Appeals, such as the denial of a patent, can be brought in the district court for the District of Columbia. Patent appeals from any of the ninety-four district courts go to the Court of Appeals for the Federal Circuit.

Patent cases can and often do involve a number of separate, but related, claims and defenses. In addition to seeking injunctive relief and damages for alleged infringement, plaintiffs may assert causes of action for unfair competition, antitrust, interference with business or contractual relations, and other related claims.[2119] Plaintiffs almost always allege willful infringement in order

---

2115. Herbert F. Schwartz, Patent Law & Practice 95 (Federal Judicial Center, 3d ed. 2001). The Supreme Court, in *Markman v. Westview Instruments, Inc.*, commented that "[t]he limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others and the assurance that the subject of the patent will be dedicated ultimately to the public." 517 U.S. 370, 389 (1996) (citing Gen. Elec. Co. v. Wabash Appliance Corp., 304 U.S. 364, 369 (1938)).

2116. Patent Act, ch. 11, 1 Stat. 318 (1793) (current version at 35 U.S.C. § 101 (2000)).

2117. Schwartz, *supra* note 2115, at 40–42.

2118. *Id.* at 42–44.

2119. Eastman Kodak Co v. Goodyear Tire & Rubber Co., 114 F.3d 1547 (Fed. Cir. 1997). Most defendants also include a counterclaim for declaratory relief on essentially the same grounds as their affirmative defenses.

to increase the damages potentially available should their claim prevail or as an avenue to collect attorneys' fees. Most defendants assert defenses of noninfringement, invalidity based on the prior art, and invalidity based on other defects.[2120] Defendants may plead several of the statutory bars under 35 U.S.C. §§ 102 and 103 or other sections of Title 35, as well as assert misuse of the patent or various equitable defenses. Equitable defenses include laches, unclean hands, estoppel, patent misuse, and inequitable conduct before the PTO.[2121] Just as plaintiffs often allege willful infringement, defendants will often raise a defense of inequitable conduct based on a patentee's failure to satisfy its obligations of full disclosure and candor to the PTO during prosecution of the patent application.[2122]

## 33.22  Claim Construction Under *Markman v. Westview Instruments*

.221 Holding a *Markman* Hearing  604
.222 Structuring the *Markman* Hearing  606
.223 Timing the *Markman* Hearing  607
.224 Requesting a *Markman* Hearing  610
.225 Appeal  611

The construction of patent claims is pivotal to infringement actions (or those challenging the validity of a patent), because the patent claims define the patentee's rights. It is only after the claims have been properly construed by the court that the trier of fact can determine whether each element of the claim is present, either literally or under the doctrine of equivalents, in the allegedly infringing product or process.[2123] The doctrine of equivalents extends patent

---

2120. Allegations of invalidity challenge whether the invention met the statutory requirements for patentability, such as novelty or non-obviousness. Section 103(a) of Title 35 precludes issuance of a patent "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which such subject matter pertains." Section 103(b) excepts biotechnological processes under certain circumstances from the operation of (a). Several primary considerations were identified by the Supreme Court in *Graham v. John Deere Co.*, as relevant to a determination of nonobviousness, such as the scope and content of the prior art, as well as inquiry into "objective" considerations relating to economic success or social need. 383 U.S. 1, 17–18 (1966). *See also* Schwartz, *supra* note 2115, at 79–82 (discussing various secondary considerations applied by the courts).

2121. *See* Schwartz, *supra* note 2115, at 155–68.

2122. *See id.* at 155–61; *see also* Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 326 F.3d 1226, 1233–34 (2d Cir. 2003).

2123. *See, e.g.*, Loral Fairchild Corp. v. Sony Corp., 181 F.3d 1313, 1321 (Fed. Cir. 1999) ("An infringement analysis entails two steps: (1) the claims must be construed; and (2) the

protection to include accused products or processes that, although not infringing on the literal meaning of the claims, are not substantially different from the patented device.[2124] In a significant development, the Federal Circuit foreclosed all resort to the doctrine of equivalents for any amendments narrowing a patent claim during prosecution, but the Supreme Court vacated the appellate decision, rejecting the absolute bar rule adopted by the Federal Circuit. The Court, however, held the burden was on the patentee to prove that the amendment should not give rise to estoppel.[2125]

Construing claims may also reveal whether the claim is novel or whether it is obvious in light of the prior art, and the court applies the same claim construction for purposes of analyzing both infringement and validity. As a result, claim construction can be, and often is, outcome determinative.

*Markman v. Westview Instruments*[2126] reflected a significant development in the construction of patent claims. The Court held that the interpretation of a patent is exclusively a question of law for the court.[2127] Likening claim construction to the interpretation of other written documents, the Court stated "[t]he judge, from his training and discipline, is more likely to give a proper interpretation to such instruments than a jury; and he is, therefore, more likely to be right in performing such a duty, than a jury can be expected to be."[2128] Removing the issue of claim construction from the jury, it said, would also contribute to certainty and uniformity in patent litigation.[2129] Claim construction is now subject to de novo review by the Federal Circuit, even where construction involves determination of underlying factual issues.[2130]

As a result, many patent cases are resolved once the claim construction is decided, either through summary judgment or settlement, with substantial savings in judicial time and resources that would otherwise be spent in a

---

properly construed claims must be compared to the allegedly infringing device."); NEC Corp. v. Hyundai Elecs. Indus. Co., 30 F. Supp. 2d 560, 565 (E.D. Va. 1998) (infringement analysis is a two-step determination).

2124. Schwartz, *supra* note 2115, at 141.

2125. Festo Corp. v. Soketasu Kinsoku Kogyo Kabushiki Co., 535 U.S. 722, 740 (2002).

2126. 517 U.S. 370 (1996).

2127. Markman v. Westview Instruments, 52 F.3d 967, 970–71 (Fed. Cir. 1995).

2128. *Markman*, 517 U.S. at 388–89.

2129. *Id.* at 391 ("[W]hereas issue preclusion could not be asserted against new and independent infringement defendants even within a given jurisdiction, treating interpretive issues as purely legal will promote . . . intrajurisdictional certainty through the application of stare decisis . . . .").

2130. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (stating court would "review claim construction de novo on appeal including any alleged fact-based questions relating to claim construction"). The determination of whether the patent has been infringed, however, remains a question of fact for the jury.

lengthy, often complicated trial.[2131] Claim construction also puts the court and the parties in a better position to determine what issues remain in the case in light of the court's construction and to tailor the remaining course of the litigation accordingly.

There is no consistent approach among the courts as to the procedural boundaries of claim-construction proceedings. *Markman* did not establish when or how a patent was to be construed, only that it must be done prior to submission of the case to the jury.[2132] At least one jurisdiction has adopted a special set of "Patent Local Rules" that dictate a prescribed series of disclosures by each party that help to define the claim-construction issues in dispute and lead directly to briefing on claim construction and a *Markman* hearing.[2133] Accordingly, decisions on how to structure claim-construction proceedings involve several interrelated questions, the answers to which can affect subsequent case-management strategies:

- Is a *Markman* hearing necessary? If so, what claim terms need to be construed?
- How should the hearing be structured, and what submissions should be considered?
- When should the hearing be held?
- What is the procedural vehicle through which claim-construction issues are raised?
- What happens if the claim construction is reversed on appeal?

### 33.221 Holding a *Markman* Hearing

There is no requirement that the court conduct a formal hearing to interpret the patent. Whether a hearing is warranted often turns on the degree of ambiguity in the patent claim. Where the language of the patent claim is clear the judge may be able to construe the claim based solely on the paper record.[2134] If the language is truly unambiguous, the judge should not resort to the use of extrinsic evidence or testimony.[2135] The degree of ambiguity not-

---

2131. *See* William F. Lee & Anita K. Krug, *Still Adjusting to Markman: A Prescription for the Timing of Claims Construction Hearings*, 13 Harv. J.L. & Tech. 55, 59 (1999); *see also* K-2 Corp. v. Salomen S.A., 191 F.3d 1356, 1362 (Fed. Cir. 1999).

2132. *See generally Markman*, 517 U.S. 370 (1996).

2133. *See, e.g.*, N.D. Cal. Patent L.R. (2002).

2134. *See* Schwartz, *supra* note 2115, at 102–14 (discussing meaning of claim language).

2135. *See* Vitronics Corp. v. Conceptronics, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996); Biovail Corp. Int'l v. Andrx Pharms., Inc., 239 F.3d 1297, 1300 (Fed. Cir. 2001) ("When intrinsic evidence unambiguously describes the scope of a patented invention, reliance on extrinsic evi-

withstanding, the court has the discretion to consider both intrinsic and extrinsic evidence, including expert testimony, in interpreting the claims.[2136] As a consequence, some courts routinely conduct *Markman* hearings before construing the claim.[2137] *Markman* hearings offer the court the opportunity to question any expert or other witnesses offered (such as the inventor) on issues related to the patent process and the technology. This enables the judge to gain a better understanding of the claims as a whole and the meaning of the patent's terms from the perspective of a person "skilled in the relevant art." The Federal Circuit has cautioned, however, that such extrinsic evidence may not be used for any purpose other than to assist the court in understanding the science and what "one skilled in the art" would understand. Conversely, conducting a *Markman* hearing may require the parties to produce their experts twice, both

---

dence is improper."); ADC Telecomm., Inc. v. Siecor Corp., 954 F. Supp. 820, 831 (D. Del. 1997); Ekchian v. Home Depot, Inc., 104 F.3d 1299, 1302 (Fed. Cir. 1997). This "intrinsic" evidence has been held to include the language of the patent, its specifications, the prosecution history, and the written description. *See, e.g.,* Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 976–77 (Fed. Cir. 1999); NEC Corp. v. Hyundai Elecs. Indus. Co., 30 F. Supp. 2d 561, 565 (E.D. Va. 1998) (court will look to claims, written description portion of the specification, and the prosecution history in construing claim and resort to extrinsic evidence only where the intrinsic evidence is insufficient to resolve ambiguities in the claim language). However, in *Pitney Bowes, Inc. v. Hewlett Packard Co.,* the Federal Circuit commented that there were circumstances where the prohibition against consideration of *Vitronics* might properly be relaxed. 182 F.3d 1298, 1309 (Fed. Cir. 1999) ("[C]onsultation of extrinsic evidence is particularly appropriate to ensure that [the judge's] understanding of the technical aspects of the patent is not entirely at variance with the understanding of one skilled in the art.").

2136. *See Pitney Bowes,* 182 F.3d at 1308; ARG Indus., Inc. v. Cardinal IG Co., 239 F.3d 1239, 1249 (Fed. Cir. 2001) (noting times when "extrinsic evidence can and should be used to inform a court's claim construction" and trial court should have considered testimony offered by scientific experts); *see, e.g.,* Chad Indus., Inc. v. Automation Tooling Sys., Inc., 938 F. Supp. 601, 608 (C.D. Cal. 1996) (expert and inventor testimony as well as testimony of patent law expert); Eastman Kodak Co. v. Goodyear Tire & Rubber Co., 144 F.3d 1547, 1555 (Fed. Cir. 1997) (expert testimony considered where language of claim remained ambiguous after looking at intrinsic evidence); Genentech, Inc. v. Boehringer Mannheim GmbH, 989 F. Supp. 359, 363 (D. Mass. 1999) (resorting to extrinsic evidence where claim terms were unclear); *see also* Schwartz, *supra* note 2115, at 116–19 (discussing examples of extrinsic evidence) and cases cited therein.

2137. *See, e.g.,* Bernhardt L.L.C. v. Collezione Europa USA, Inc., No. CIV. 1:01CV00957, slip op. at 1 (M.D.N.C. May 30, 2003) ("Claim interpretation is a matter of law and is usually accomplished with the assistance of a *Markman* hearing."); S.S. White Burs, Inc. v. Neo-Flo, Inc., No. CIV.A. 02-3656, slip op. at 1 (E.D. Pa. May 2, 2003) (stating claim construction "typically occurs following a '*Markman* hearing'"); Ill. Tool Works, Inc. v. Powers Fasteners, Inc., No. 01C7019, 2002 WL 1998300, at *2 (N.D. Ill. Aug. 28, 2002) (deciding "claim construction is more properly left to a *Markman* hearing"). *But see* J.G. Peta, Inc. v. Club Protector, Inc., No. 02-1127, 1128, slip op. at 6 n.2 (Fed. Cir. 2003) (saying district courts not required to "conduct evidentiary hearings as part of the claim construction process").

at the hearing on claim construction and again at trial, thereby increasing litigation costs. The court should determine, based on the disputed claim terms and the complexity of technology, whether a hearing is appropriate and what type of evidence will aid the court in construing the claims.

In constructing procedural devices, two practical realities are likely to arise at trial. First, no matter how well considered the court's claim-construction ruling, the parties are likely to "construe the construction"—i.e., disputes will arise regarding the exact meaning of the court's ruling. Second, the meaning of a term previously thought to be undisputed may suddenly become disputed at trial, perhaps because the term's meaning was not considered to be significant at the time of the *Markman* hearing. This typically occurs when both parties initially agree that a term should be given its "usual meaning," and the parties then discover at trial that they disagree on the usual meaning of a previously insignificant claim term.

## 33.222 Structuring the *Markman* Hearing

Claim construction hearings have "run the gamut from mid-trial sidebar conferences that undergird relevance rulings . . . to virtual mini-trials extending over several days and generating extensive evidentiary records."[2138] The length of the hearing, the evidence permitted, and the scope of the hearing are all within the discretion of the trial court. Prior to holding a hearing, however, consider requiring the parties to submit, in addition to any briefs, statements setting forth each side's proposed construction of the claims in dispute. Courts have required parties to exchange proposed claim-construction statements that include (1) any contentions regarding specialized meaning to be given claim language; (2) a description of each element of the claim together with supporting specifications or material in the prosecution history; and (3) extrinsic evidence that supports the parties' proposed construction.

Parties also have been required to meet and confer in an effort to narrow the issues and to prepare and submit a joint statement[2139] that identifies (1) the

---

2138. MediaCom Corp. v. Rates Tech., Inc., 4 F. Supp. 2d 17, 21 (D. Mass. 1998) (citations omitted). *See also* Schering Corp. v. Amgen, 25 F. Supp. 2d 293, 294 (D. Del. 1998) (one day); *Automation Tooling Sys.*, 938 F. Supp. at 604 (allocating two days to hearing, although only one became necessary); Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp., 93 F.3d 1572, 1577 (Fed. Cir. 1996) (five days); Loral Fairchild Corp. v. Victor Co. of Japan, Ltd., 906 F. Supp. 798, 802 (E.D.N.Y. 1995).

2139. *See, e.g.,* N.D. Cal. Patent L.R. 3-1 (2002); *see also* Genentech, Inc. v. Amgen, Inc., 289 F.3d 761 (Fed. Cir. 2002) (district court did not abuse discretion in precluding Genentech from amending its claim chart to include theory of infringement under doctrine of equivalents in light of local rule); Precision Shooting Equip., Inc. v. High Country Archery, 1 F. Supp. 2d 1041, 1042 (D. Ariz. 1998) (stating that Northern District of California's local rules "promote judicial effi-

construction of the claims and terms to which the parties agree; (2) each side's construction of disputed claims and terms; (3) each side's rebuttal to the proposed construction submitted by the opposing party; and (4) each proposed witness at the claim-construction hearing together with a description of the witness's testimony.[2140] These procedures apprise the judge of those portions of the patent actually in dispute, helping the judge understand the relevant technology and determine the need, if any, for tutorials or the assistance of court-appointed experts prior to the hearing.[2141] These procedures also force the parties to state definitively their competing positions, thereby avoiding the "shifting sands"[2142] approach to claim construction.

## 33.223  Timing the *Markman* Hearing

Timing is one of the more problematic issues. Claim construction involves interpreting the words of the claim from the perspective of one skilled in the art, construed in light of the patent documents and the prosecution history.[2143] Theoretically, claim construction can occur at virtually any point in the case: prior to discovery, pursuant to motions for summary judgment,[2144] or following the close of evidence at trial.[2145] Nevertheless, the timing of the *Markman* hearing can significantly affect the pretrial proceedings. Several courts and commentators agree that early *Markman* hearings are preferable to delaying claim construction until after the evidence has been heard at trial.[2146] Although

---

ciency by presenting to the Court clearly delineated disputes of claim construction and clearly defined issues of infringement and validity prior to any *Markman* hearing or trial").

2140. *Precision Shooting Equip.*, 1 F. Supp. 2d at 1042–43 (using local rules adopted by the Northern District of California as guide); Pioneer Hi-Bred Int'l, Inc. v. Seed Co., No. CIV. 4-98-CV-90577, 90578, 2000 WL 33363188, at *4 (S.D. La. May 5, 2000) (adopting structure of Northern District of California's local rules); *Automation Tooling Sys.*, 938 F. Supp. at 604 (parties submitted statement of issues, exhibit list, and expected testimony).

2141. *See, e.g.,* Biovail Corp. Int'l v. Andrx Pharms., Inc., 239 F.3d 1297, 1301 (Fed. Cir. 2001) (noting it was unnecessary to construe claim terms that were not relevant to the outcome of the case).

2142. LG Elecs. Inc. v. Q-Lity Computer Inc., 211 F.R.D. 360, 367 (N.D. Cal. 2002) (citing Atmel Corp. v. Info. Storage Devices, Inc., No. C. 95-1987, 1998 WL 775115, at *3 (N.D. Cal. Nov. 5, 1998)).

2143. Schwartz, *supra* note 2115, at 101–02 ("Claim construction 'begins and ends' with the actual words of the claims.").

2144. *MediaCom*, 4 F. Supp. 2d at 22.

2145. *See* Sofamor Danek Group Inc. v. DePuy-Motech Inc., 74 F.3d 1216 (Fed. Cir. 1996).

2146. *MediaCom*, 4 F. Supp. 2d at 22 ("Questions regarding the construction of patents can now safely be addressed in many circumstances prior to the completion of fact discovery, and certainly before trial."); MacNeill Eng'g Co. v. Trisport, Ltd., 126 F. Supp. 2d 51, 54 (D. Mass. 2001) ("It has now become generally accepted that . . . the best time to hold a *Markman* hearing

construing the claim after trial will permit the judge to hear all of the evidence in the case, and thereby better understand the background of the patent and any prior art,[2147] there are several disadvantages:

- causing delay in submitting the case to the jury while the claim is being construed, thereby making the evidence less fresh;[2148]
- requiring the jury to disregard evidence and testimony relating to alternative claim interpretations;[2149] and
- forcing the parties to try the case presenting alternative claim constructions—parties will not likely base their case on a claim construction that has yet to be determined.

Holding *Markman* hearings prior to trial allows the court and the parties to narrow the issues and, in some cases, provides an opportunity to focus discovery.[2150] Early claim construction may also facilitate settlement and may permit resolution, either in whole or in part, through dispositive motions, thereby reducing litigation costs.[2151] More importantly, once aware of the interpretation being given to the patent, the parties can plan their cases accordingly,

---

is at the summary judgment stage of the litigation . . . ."); Loral Fairchild Corp. v. Victor Co. of Japan, Ltd., 906 F. Supp. 798 (E.D.N.Y. 1995). "With most aspects of the trial hinging on [claim construction]—'now strictly a question of law of the court'—a conservative court will generally endeavor to make this ruling before trial . . . As in this case, this proceeding to assist the court in ascertaining the law is likely to occur after discovery in which the parties have exchanged information relevant to their understanding of the claims." Loral Fairchild Corp. v. Victor Co. of Japan, Ltd., 911 F. Supp. 76, 79 (E.D.N.Y. 1996); *see also* Mark L. Austrian & Shaun Mohler, *Timing is Everything in Patent Litigation—Fulfilling the Purpose of Markman*, 9 Fed. Cir. B.J. 227 (1999).

2147. Lee & Krug, *supra* note 2131, at 75; *see also* York Prods., Inc. v. Cent. Tractor Farm & Family Ctr., 99 F.3d 1568, 1571 (Fed. Cir. 1996) (claims construction after trial before jury instructed); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1580 (Fed. Cir. 1996) (noting district court delayed construing claim until all evidence was heard at trial).

2148. Lee & Krug, *supra* note 2131, at 75–76; *see also* Thorn EMI N. Am., Inc. v. Intel Corp., 936 F. Supp. 1186, 1189 (D. Del. 1996) (ruling on claims construction immediately before trial and dismissing jury pending resolution of summary judgment motion sought upon issuance of ruling).

2149. Lee & Krug, *supra* note 2131, at 77.

2150. *See* MediaCom Corp. v. Rates Tech, Inc., 4 F. Supp. 2d 17, 22 (D. Mass. 1998).

2151. MacNeill Eng'g Co. v. Trisport Ltd., 126 F. Supp. 2d 51, 52 (D. Mass. 2001) (noting *Markman* hearings "now required as a practical matter in virtually every patent case before serious settlement negotiations take place"). However, some commentators argue that *Markman* hampers settlement and prolongs the litigation because of the large percentage of reversals on appeal, leading to intransigence by defendants losing on the issue of claim construction and forcing trial in order to have another opportunity at the appellate level. Lee & Krug, *supra* note 2131, at 69–70.

eliminating the need to propose alternative claim constructions to the jury and reducing the expense and complexity of the trial.[2152]

A number of scheduling options are available within the various pretrial phases, such as holding the hearing before discovery, after expert discovery but before concluding fact discovery, or after all discovery. There are advantages and disadvantages to each. In most cases, the optimal time for a *Markman* hearing will depend on the court's assessment of which approach will best utilize judicial resources in the specific case before it.[2153] Construing claims at the close of discovery is advisable if the parties have all relevant and necessary information to articulate the issues or terms in dispute; parties must also be able to provide the court with a full factual background within which to construe the claim.[2154] In addition, should the case settle during discovery or as a result of information developed during discovery, a potentially lengthy and expensive hearing can be avoided.

One option is to permit the parties initially to conduct limited discovery, including that of experts, only on issues relevant to claim construction. The burden would be on the parties to conduct sufficient discovery to reveal all relevant information not considered during the prosecution of the patent that may affect the interpretation of the claim, as well as information bearing on which claims are important to resolution of the dispute. The parties would also have the burden of assisting the judge in understanding the technology and technical language, through the use of tutorials or by consenting to a special master or neutral expert. Once the claims have been construed, general discovery can proceed on the remaining issues, including questions related to validity, infringement, and other matters.

It is often difficult, however, to attempt to separate the discovery needed for claim construction from fact discovery in general, and attempts to do so can increase the number of discovery disputes. It may be advisable, therefore, for the court to focus on the timing of the *Markman* hearing and allow the

---

2152. Austrian & Mohler, *supra* note 2146, at 228 ("Pretrial discovery, the selection of experts, and the content of their testimony on the issues of validity and infringement will depend almost entirely on claim construction."). However, the claim construction may be subject to modification following trial and prior to the submission to the jury, where the court concludes after listening to all the evidence presented, and considering the claim in context, that its previous construction was erroneous. *See MacNeill Eng'g Co.*, 126 F. Supp. 2d at 57 (claim construction done during resolution of summary-judgment motions remained open to clarification or modification for jury at trial).

2153. *See, e.g.,* Toter, Inc. v. City of Visalia, No. CVF96-6234, 1997 WL 715459, at *3 (E.D. Cal. July 14, 1997) (court finding that in case before it, "an early *Markman* hearing would not promote the interest of judicial economy").

2154. *Id.* at *2–3.

parties to proceed with fact and expert discovery in accordance with the set schedule, so long as there is sufficient time for necessary discovery to be completed prior to the *Markman* hearing.

## 33.224 Requesting a *Markman* Hearing

Inextricably tied to the question of when a *Markman* hearing should be held is the court's determination of how counsel should raise the issue procedurally. Some judges have incorporated dates for hearings in early scheduling orders or resorted to the promulgated local rules to address claim construction issues, including timing.[2155] Others have addressed claim construction upon motion by the parties, such as a motion for claim construction or for a *Markman* hearing, or alternatively within the context of summary-judgment motions.[2156] The advantage of claim construction in the context of a motion for summary judgment is that only those elements of the claims that are truly in dispute will be presented for construction. Claim construction can also arise in the context of motions for injunctive relief, although the patent need not be definitively construed in such instances.[2157] When construing claims in conjunction with dispositive motions, however, it is important to separate the question of claim construction from other legal issues in the case. One judge noted the need not to conflate "the legal explication required by *Markman*

---

[2155]. *See, e.g.,* Ill. Tool Works, Inc. v. Powers Fasteners, Inc., No. 01C7019, 2002 WL 1160087, at *1 (N.D. Ill. May 23, 2002) (scheduling order). See generally N.D. Cal. Patent L.R. (2002) for examples of local rules governing claim construction.

[2156]. *See, e.g.,* Precision Shooting Equip., Inc. v. High Country Archery, 1 F. Supp. 2d 1041, 1042 (D. Ariz. 1998) (motion filed by defendant seeking a *Markman* hearing); *Toter*, 1997 WL 715459, at *1 (defendant moved for *Markman* hearing pursuant to Fed. R. Civ. P. 42 or the *Markman* decision); Ahlstrom Mach., Inc. v. Clement, 13 F. Supp. 2d 45, 46 (D.D.C. 1998) (hearing argument supporting claim construction during hearing on motion for summary judgment); *MediaCom*, 4 F. Supp. 2d at 22 (concluding claim construction should take place within conventional motion practice and that "[f]ree-standing Markman hearings are of little use in actual litigation"); Schwartz, *supra* note 2115, at 121 ("The claim construction ruling can be made in a number of different contexts, including the resolution of (1) a motion for preliminary injunction, (2) a motion for summary judgment . . . , (3) a motion for judgment as a matter of law, or (4) requests for jury instructions.") (footnotes omitted). Those courts favoring early *Markman* hearings generally have held them at the close of discovery or used summary judgment as the procedural vehicle through which the claims were construed. *But see* Control Res., Inc. v. Delta Elecs., Inc., 133 F. Supp. 2d 121, 126 (D. Mass. 2001) (conducting *Markman* hearing "prior to and entirely independently of the summary judgment hearing").

[2157]. *See, e.g.,* Int'l Communication Material, Inc. v. Ricoh Co., 108 F.3d 316, 318 (Fed. Cir. 1997); Sofamor Danek Group, Inc. v. DePuy-Motech, Inc., 74 F.3d 1216, 1221 (Fed. Cir. 1996) ("*Markman* does not obligate the trial court to conclusively interpret claims at an early stage in the case.").

with the fact finding that the Seventh Amendment ultimately reserves for the American jury."[2158]

### 33.225 Appeal

*Markman* implicates case management beyond when or how to conduct a hearing. One significant implication stems from the de novo standard of review applied on appeal to the court's interpretation of the patent claim.[2159] The Federal Circuit has reversed a significant number of claim constructions since *Markman*.[2160] The parties can be assured of the certainty of the claim interpretation only after proceeding from the *Markman* hearing through discovery, trial, and posttrial motions to the Federal Circuit.[2161] Reversal of the district court's claim construction may result in a new trial, efforts to reopen discovery and revise expert reports, and efforts by the parties to change their theory of infringement.[2162] The impact on judicial time and resources can be substantial. Although interlocutory appeal of the court's claim construction is theoretically available, the Federal Circuit has been disinclined to grant such petitions. Another alternative is to submit claim construction issues to the jury through special verdicts or interrogatories for an "advisory determination," which the court can either accept or reject.[2163] As discussed in section 33.223, however, delaying claim construction until after the trial can carry several disadvantages.

## 33.23  Defining the Issues in Patent Litigation

Patent cases often involve only one party, or a few interrelated parties, on each side of a case, but can involve more than one patent or claim and multiple allegedly infringing products, and can also include antitrust claims and con-

---

2158. *Control Res.*, 133 F. Supp. 2d at 126 (quoting Amgen, Inc. v. Hoechst Marion Roussel, Inc., 126 F. Supp. 2d 69, 80 (D. Mass. 2001)).

2159. Although the issue of what standard of review applied on appeal was not addressed by the Supreme Court in *Markman*, the Federal Circuit in the appellate opinion held that the standard of review was de novo.

2160. Cybor Corp. v. FAS Tech., Inc., 138 F.3d 1448, 1476 n.4 (Fed. Cir. 1998) (Rader, J., dissenting and concurring) (noting Federal Circuit's rate of reversal of claim interpretations was high, reversing 53% of cases in whole or in part, and citing study reporting 40% rate of reversal of claim interpretations by Federal Circuit).

2161. *Id.* at 1476.

2162. *See, e.g.*, *Cybor Corp.*, 138 F.3d at 1475 n.2.

2163. Laitram Corp. v. NEC Corp., 62 F.3d 1388, 1394 (Fed. Cir. 1995) (treating jury's decision on issue of claim construction, submitted by way of special interrogatories, as an advisory determination and finding that jury's interpretation of claim was correct). *See* Fed. R. Civ. P. 39(c) (West 2003).

sumer class actions. The technical nature of the subject matter further complicates the action. Litigation over a patent or a series of related patents sometimes proliferates and leads to multiforum federal litigation requiring coordination through MDL proceedings, the imposition of stays on redundant actions, or informal cooperative arrangements. Discovery delays can be lengthy without court management. Some of the obstacles in managing patent litigation can be avoided through consideration of the following issues before or at the initial pretrial conference:

- Is there any related litigation pending in other federal courts that would warrant transfer, dismissal, consolidation, or a stay of proceedings? In many cases, the owner of the patent has filed infringement suits against other defendants in other jurisdictions, or is defending challenges to the validity of the patent elsewhere. Piecemeal litigation in patent cases generally is disfavored.[2164] The initial case-management order should direct counsel to identify other cases relating to infringement of the patent, their status, and the judges to whom they are assigned. Consolidation often is warranted where more than one action involving or related to the patent is pending before the same court.[2165] The judge should review the cases to determine common questions of law,[2166] and also to ascertain whether to exercise the court's discretion to transfer pursuant to section 1404(a)[2167] or whether Judicial Panel on Multidistrict Litigation transfer is appropriate under 28 U.S.C. § 1407 for centralized pretrial proceedings. The MDL panel may decline to order such transfers, however, on the ground that coordination can be achieved through the cooperative efforts of the affected courts and counsel. Often the real parties in interest and the attorneys are the same, or at least related, in all of the cases.

     The court also has the discretion to dismiss the case in favor of litigation pending in another jurisdiction "for reasons of wise judicial

---

2164. Smiths Indus. Med. Sys., Inc. v. Ballard Med. Prods., Inc., 728 F. Supp. 6, 7 (D.D.C. 1989) ("Piecemeal litigation in the complex and technical area of patent and trademark law is especially undesirable. Rather, all of the parties' related patent and trademark infringement claims should be decided in the same court.").

2165. *See, e.g.,* Biochem Pharma, Inc. v. Emory Univ., 148 F. Supp. 2d 11, 12 (D.D.C. 2001) (separate actions filed in same court by both plaintiff and defendants challenging decision of Patent Appeal Board would be consolidated and then transferred).

2166. Fed. R. Civ. P. 42(a) (West 2003).

2167. *See Biochem Pharma*, 148 F. Supp. 2d at 13 (D.D.C. 2001) (transferring case to Georgia where "first-filed, well-advanced, related patent infringement action involving the same patent" was pending).

administration."[2168] The general rule is that the first-filed suit will proceed while other pending litigation is dismissed or stayed.[2169] In some instances (such as where the identity of the parties is not the same or jurisdiction is unavailable over all necessary parties), the priority rule is not followed and other considerations take precedence.[2170] Related proceedings also may be pending before the Patent and Trademark Office, and a stay may be warranted while those proceedings are resolved.[2171]

- *Have there been any past decisions by other courts involving the same patent?* A final decision holding the patent invalid will preclude further efforts to enforce the patent against others, provided the patentee "had a full and fair chance to litigate" its validity[2172] and regardless of any earlier decisions upholding the patent.[2173] In such circumstances, however, the patentee must have the opportunity to demonstrate under the factors outlined in *Blonder-Tongue Laboratories v. University of Illinois Foundation*[2174] that "in justice and equity"[2175] it should not be

---

2168. Schnadig Corp. v. Collezione Europa U.S.A., No. 01C1697, 2001 WL 766898, at *1 (N.D. Ill. July 5, 2001); *see also* Abbott Labs. v. Selfcare, Inc., No. 98C7102, 1999 WL 162805, at *2 (N.D. Ill. 1999) (granting motion to transfer to district where related action pending).

2169. *See, e.g.,* Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp., 190 F.R.D. 644, 645 n.1 (N.D. Cal. 2000) (noting case had been stayed for six months pending resolution of arbitration demand in related litigation).

2170. Genentech, Inc. v. Eli Lilly & Co., 998 F.2d 931, 938 (Fed. Cir. 1993) ("There must, however, be sound reason that would make it unjust or inefficient to continue the first-filed action. Such reason may be the convenience and availability of witnesses, or absence of jurisdiction over all necessary or desirable parties, or the possibility of consolidation with related litigation, or considerations relating to the real party in interest."); *see also* Kahn v. Gen. Motors Corp., 889 F.2d 1078, 1081–83 (Fed. Cir. 1989) (discussing exceptions to first-filed rule); William Gluckin & Co. v. Int'l Playtex, 407 F.2d 177, 178 (2d Cir. 1969) (priority given to second-filed suit where defendant in first suit was customer and balance favored letting second suit proceed); *Schnadig*, 2001 WL 766898, at *1–2 (denying motion to transfer and staying action pending resolution of motion to dismiss for lack of jurisdiction and to transfer in related action filed in another jurisdiction).

2171. Reexamination and reissues are proceedings where stays may be sought pending resolution of the PTO proceedings.

2172. Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 333 (1971).

2173. Miss. Chem. Corp. v. Swift Agric. Chems. Corp., 717 F.2d 1374, 1378 (Fed. Cir. 1983). Although a finding of validity does not preclude subsequent challenges to the patent, it is entitled to some weight. The rationale behind the rule that a single finding of invalidity is fatal to the patent but a finding upholding the patent does not rule the patent valid as against all others, is that although one challenger may be unable to introduce clear evidence of invalidity, another challenger may be able to do so.

2174. 402 U.S. 313, 334 (1971).

collaterally estopped by the adverse decision. On the other hand, a decision upholding the validity of the patent will not bar a new defendant from attacking the patent, and such a decision is not necessarily binding even on the same court under the doctrine of *stare decisis.*

· *Are there multiple patents or claims at issue in the case, and has the plaintiff identified all of the defendant's allegedly infringing products or processes?* Cases involving multiple patents, each with multiple claims, can be a source of confusion, resulting in unduly lengthened and expanded pretrial and trial proceedings. Consider encouraging the parties to agree to proceed on a limited number of representative claims and disputed models, so that findings regarding infringement on the representative claims will apply to all claims.[2176] This may simplify the action and reduce jury confusion.

· *Is venue appropriate?* Section 1400(b) of Title 28 of the U.S. Code governs venue determinations in patent infringement cases. A corporate defendant "is said to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced."[2177] Thus, in many cases the determination of proper venue and personal jurisdiction coalesce into a single inquiry.[2178] In cases involving multiple defendants, venue must be proper as to each defendant.[2179] Venue relating to other causes of action involving a patent are subject to the general venue statute.[2180]

· *Is the case subject to arbitration?* Section 294 of Title 35 provides for voluntary arbitration in patent cases. Agreements to arbitrate must be in writing and usually will be found in license agreements or technology transfer agreements. Issues that can arise include choice of law provisions, whether any arbitration award will be *res judicata* as to issues that were or could have been raised in arbitration, and whether

---

2175. *Id.*

2176. *See, e.g.,* Thomson, S.A. v. Quixote Corp., 166 F.3d 1172, 1173 (Fed. Cir. 1999) (parties agreed to base outcome of trial on three representative claims); Renishaw PLC v. Marposs Societa' Per Azioni, 974 F. Supp. 1056, 1061 (E.D. Mich. 1997) (parties agreed to try case on basis of representative claims, and resolution of those claims would "constitute a final resolution of all the asserted patents as if the case had been tried without representative claims"). *See also* James M. Amend, Patent Law: A Primer for Federal District Court Judges 21–22 (1998).

2177. 28 U.S.C. § 1391(c) (West 2003).

2178. *See, e.g.,* VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1584 (Fed. Cir. 1990); Cook Group, Inc. v. Purdue Res. Found., No. IP02-0406-C-M/S, 2002 WL 1610951, at *1, 2 (S.D. Ind. June 24, 2002).

2179. *Cook Group*, 2002 WL 1610951, at *2 n.1.

2180. 28 U.S.C. § 1391 (West 2003).

collateral estoppel will apply (although section 294 may limit any pre-
clusive effect against nonparties).

- *Is there a need for judicial education?* The judge often will need some
  general explanation of the substance and terminology of the science or
  technology addressed by the patent before dealing with the issues in
  the case or developing a plan for discovery and trial. Some judges ask
  counsel to provide a concise and objective overview—orally, in writ-
  ing, or on tape or CD—of these technical matters, including a defini-
  tion of key terms and concepts, at or before the initial conference. To
  encourage candor, consider directing that these statements not bind
  the parties and not be used later in the proceedings. Increasingly,
  judges are seeking additional pretrial briefing on relevant technologi-
  cal or scientific issues.[2181] Although experts will address those issues in
  their trial testimony, the court may find it more helpful to learn the
  fundamentals—the vocabulary and general intellectual framework of
  the subject matter—in a setting with less immediate time constraints
  in order to deal more intelligently with issues during the trial. Re-
  questing that tutorials be videotaped will allow the court to review the
  technology behind the patent as often as necessary over the course of
  the litigation.

- *Is referral to a magistrate judge, special master, or court-appointed expert
  warranted?* Use of a magistrate judge or court-appointed expert may
  be warranted in handling discovery in patent cases or in assisting the
  judge in understanding the technology involved.[2182] Courts also have
  appointed special masters, with technological expertise in the area, to
  provide a report and recommendation on technical issues or claim
  construction in patent cases.[2183]

---

2181. *See, e.g.,* Affymetrix, Inc. v. Hyseq, Inc., 132 F. Supp. 2d 1212, 1216 (N.D. Cal. 2001)
(tutorial and hearing to assist in claims construction); Xilinx, Inc. v Altera Corp., No. 93-
20409SW, 1997 WL 581426, at *1 (N.D. Cal. 1997) (scheduling order issued by court included
dates for tutorial and claim-construction hearing).

2182. *See, e.g.,* TechSearch, L.L.C. v. Intel Corp., 286 F.3d 1360, 1368 (Fed. Cir. 2002)
(technical advisor); *In re* Omerprazole Patent Litig., No. MDL 1291, 2001 WL 394843, at *1
(S.D.N.Y. May 18, 2001) (referral to special master for scheduling discovery and protective or-
ders).

2183. *See, e.g.,* Festo Corp v. Soketasu Kinsoku Kogyo Kabushiki Co., 72 F.3d 857, 865
(Fed. Cir. 1995) (noting district court found case "sufficiently complicated to be referred to a
special master for hearing and recommendations on the issues of patent validity and infringe-
ment"), *vacated on other grounds*, 520 U.S. 1111 (1997); Rohm & Haas Co. v. Lonza Inc., 997 F.
Supp. 635, 638 n.1 (E.D. Pa. 1998) (retaining independent expert to act as technical adviser to

- *Has the plaintiff alleged willful infringement or is the defendant claiming inequitable conduct?* Whether the defendant engaged in willful infringement is an issue for the jury, while issues relating to the plaintiff's inequitable conduct usually require a separate bench trial. Assertions of the defendant's willful infringement or of the patentee's inequitable conduct or fraud on the PTO[2184] may further complicate discovery and trial by opening the door to discovery into matters otherwise protected by attorney–client privilege. Where these assertions have substance, discovery into matters normally protected by attorney–client privilege may be warranted and can undermine the effectiveness of litigation counsel.[2185] Relevant issues include whether litigation counsel was involved in the prosecution of the patent before the PTO or provided pre-litigation advice regarding validity in cases where the patentee is alleged to have acted with unclean hands. A willful infringement claim may require inquiry into whether the defendant continued to market a product after notice of a patent, and whether the defendant received advice of counsel.[2186]

- *Should the case be bifurcated?* Consider whether to bifurcate, or even trifurcate, issues for purposes of discovery and for trial. Federal Rule of Civil Procedure 42(b) states "[t]he Court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial . . . of any issue . . . ." Bifurcation is appropriate where determination of one issue could wholly eliminate the need to try another complicated or time-consuming issue, where used to negate prejudice to a party, and where the need to examine the same witnesses in both phases of the sepa-

court); *Xilinx*, 1997 WL 581426, at *1 (appointing independent technical advisor to assist in understanding the relevant technology).

2184. An assertion that the patentee acted with unclean hands, which is typically based on an alleged misrepresentation or failure to disclose pertinent prior art or test results, merits attention by the court. Fraud may be asserted not only as a defense to the infringement claim, but also as part of the foundation for an antitrust counterclaim. *See* Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 173–74 (1965).

2185. *See, e.g.,* Clintec Nutrition Co. v. Baxa Corp., No. 94C7050, 1998 WL 560284, at *4, 5 (N.D. Ill. Aug. 26, 1998) (granting protective order preventing defendant from calling plaintiff's lead trial counsel in proving willful infringement where other witnesses could testify to the meeting at issue).

2186. Fromson v. W. Litho Plate & Supply Co., 853 F.2d 1568, 1572–73 (Fed. Cir. 1988); Underwater Devices, Inc. v. Morrison-Knudsen Co., 717 F.2d 1380, 1389–90 (Fed. Cir. 1983).

rated trial would be minimal.[2187] The most common type of bifurca-
tion in patent cases involves separating issues of liability from dam-
ages. In many patent cases, severing damages from other issues will
simplify the fact-finder's task.[2188] Bifurcation of the damages issue may
be particularly appropriate where multiple patents are involved.[2189]
Issues of willfulness[2190] or equitable defenses[2191] are potential candi-
dates for bifurcation,[2192] and separating antitrust counterclaims also is
common. Deferral of claims asserting unfair competition or antitrust
until resolution of the patent issues frequently results in the claims'
voluntary dismissal or settlement. In determining whether bifurcation
is appropriate, the judge in *THK America Inc. v. NSK Co.*[2193] cited these

2187. HCC, Inc. v. R H & M Mach. Co., No. 96 CIV. 4920, 1998 WL 849417, at *1
(S.D.N.Y. Dec. 4, 1998) (finding that bifurcation of liability and damages in case before it would
result in duplicative testimony and would be inefficient) (citations omitted).

2188. *See, e.g.,* Pioneer Hi-Bred Int'l, Inc. v. Asgrow Seed Co., No. CIV. 4-98-CV-90577,
90578, 2000 WL 33363188, at *3 (S.D. La. May 5, 2000) (concluding the bifurcation of patent
and nonpatent issues was not appropriate "due to the complexity of, and inter-relationship
among, the issues," but finding bifurcation of liability and damages warranted). Trifurcation of
the statutory issues, equitable defenses, and damages may be advisable. *But see* T.S. Ellis, *Judicial
Management of Patent Litigation in the United States: Expected Procedures and Their Effects,* 9 Fed.
Cir. B.J. 541, 545 n.11 (2000) (commenting that "[i]n my experience, more often than not, bi-
furcating the liability and damages issues in the typical patent case does not result in the speedy
and efficient resolution of the entire case").

2189. *See* Ellis, *supra* note 2188, at 545 n.11 ("In such cases bifurcation can lead to a more
expeditious and efficient resolution of the case, especially where there are substantial validity and
infringement issues and damages proof may vary depending on which, and how many, of a
group of patents are held valid and infringed.").

2190. The Federal Circuit has recommended that the willfulness issue be bifurcated for
later trial to avoid unfairness. *See, e.g.,* Quantum Corp. v. Tandon Corp., 940 F.2d 642, 643–44
(Fed. Cir. 1991). *But see* Belmont Textile Mach. Co. v. Superba, S.A., 48 F. Supp. 2d 521, 526
(W.D.N.C. 1999) (stating that bifurcation of trial on issues of willfulness and liability "would
cause greater delay and might complicate the proceedings by creating a piecemeal quality to the
trial, making it harder for the trier of fact to see the case as a whole").

2191. *See, e.g.,* Herman v. William Brooks Shoe Co., No. 95 CIV. 1324, 1998 WL 832609, at
*1 (S.D.N.Y. Dec. 1, 1998) (granting motion to reconsider prior order bifurcating trial on issue
of inequitable conduct from trial on issue of validity and infringement).

2192. *See, e.g., In re* Recombinant DNA Tech. Patent & Contract Litig., 850 F. Supp. 769
(S.D. Ind. 1993, 1994) (bifurcation of liability and damages warranted where case involved "ex-
tremely complicated technology" in both patent and genetics); Lemelson v. Apple Computer,
Inc., 28 U.S.P.Q.2d (BNA) 1412, 1421–24 (D. Nev. June 3, 1993); THK Am., Inc. v. NSK Co.,
151 F.R.D. 625, 632–34 (N.D. Ill. 1993) (affirming magistrate order denying bifurcation, and
noting defendant's motion seeking bifurcation with two separate trials and two discovery peri-
ods was too broad and bifurcation would be costly and duplicative).

2193. 151 F.R.D. 625 (N.D. Ill. 1993).

factors as relevant: "(1) convenience; (2) prejudice; (3) expedi-tion; (4) economy; (5) whether the issues sought to be tried separately are significantly different; (6) whether they are triable by jury or the court; (7) whether discovery has been directed to a single trial of all issues; (8) whether the evidence required for each issue is substantially differ-ent; (9) whether one party would gain some unfair advantage from separate trials; (10) whether a single trial of all issues would create the potential for jury bias or confusion; and (11) whether bifurcation would enhance or reduce the possibility of a pretrial settlement."[2194]

Complaints in patent infringement usually consist of broadly drafted, gen-eralized claims of infringement sufficient to satisfy Federal Rule of Civil Proce-dure 8, but are otherwise of little assistance to the court or the parties. Rule 9(b) governs allegations of fraud and may afford a basis for early dismissal of inadequately pleaded fraud claims. Although an adequate basis for these alle-gations may exist for purposes of Rule 11, many may prove to be without merit. In addition, answers tend to be pleaded generally—for example, by al-leging noninfringement and invalidity without specifying more than the appli-cable statutory section. In many cases, defendants probably cannot provide an answer in substantial detail if the lawsuit is the first notice regarding alleged infringement of the patent. As a preliminary matter, the defendant will need to order the file history for the patent from the PTO, which often takes several weeks even if a request is made to expedite handling. The defendant also will need to search for prior art, which, depending on the technology, may take months of diligent searching.

Of course, the nature of a patent infringement claim or invalidity defense encourages strategies to delay producing information through discovery or otherwise until the opposing side has disclosed the basis for its claims, contrib-uting to lengthy delays and high costs. One approach is to require the parties to submit detailed statements of their claims and defenses early in the litigation, either at the outset of the case, as part of a discovery scheduling order, or, where the accused product is unavailable or otherwise not subject to examina-tion, following limited discovery.[2195] The plaintiff's statement is generally ex-pected to contain a detailed explanation of the infringement contentions, per-haps through an element-by-element claims chart for each infringement claim asserted. The claims chart's purpose is to specify how each element of a claim is present in or "reads on" the allegedly infringing product or process. The de-

---

2194. *Id.* at 632.

2195. *See, e.g.*, N.D. Cal. Patent L.R. 3.1 (2002) (Disclosure of Asserted Claims and Pre-liminary Infringement Conditions).

fendant similarly would be required to respond in a corresponding level of detail, including disclosures of all prior art relied upon to support challenges to the patent's validity.[2196] Because claims of infringement and validity are closely intertwined, the parties may seek to avoid disclosures, or they may provide disclosures that lack sufficient detail. "First, the plaintiff does not want to be pinned down to a claim construction until it knows what prior art exists . . . [T]he defendant does not want to disclose the prior art it knows of, or its contentions as to how this art invalidates the claims asserted against it, until after plaintiff announces its claim construction."[2197] Accordingly, the court should scrutinize actions by the parties that are designed to delay disclosures (such as requests for additional discovery); the court should also balance the competing interests in setting disclosure dates.

With judicial encouragement, counsel may be willing to drop marginal claims or defenses at the time of the initial conference, or at least agree that discovery on those issues should be deferred. Consider at the initial pretrial conference whether multi-staged discovery is appropriate, and then set a discovery schedule that affords sufficient time at each stage to permit the parties to obtain factual support for their claims. Depending on how discovery is structured, it may be helpful to set a date at the initial conference by which time the defendant will be required to state those defenses it expects to litigate. The court might also require disclosure of all prior art that the defendant will use to challenge the patent. Under 35 U.S.C. § 282, disclosure of prior art must be made "at least thirty days before the trial." In order to permit adequate time for trial preparation, however, generally it is wise to fix an earlier deadline.

## 33.24 Injunctive Relief

Intellectual property cases often are candidates for requests for injunctive relief.[2198] Preliminary injunctive relief in patent cases protects the value of the statutory right to exclude, which cannot always be compensated through money damages.[2199] Under the traditional test, followed by the Federal Circuit,[2200] a plaintiff seeking a preliminary injunction must demonstrate that

---

2196. *Id.* at 3.3.

2197. Amend, *supra* note 2176, at 19.

2198. 35 U.S.C. § 283 (2000) authorizes injunctive relief in patent cases.

2199. *See, e.g.,* Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1456–57 (Fed. Cir. 1988) ("[B]ecause the principal value of the patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole.").

2200. *See, e.g.,* High Tech. Med. Instrumentation Inc. v. New Image Indus., Inc., 49 F.3d 1551 (Fed. Cir. 1995).

(1) it will suffer irreparable injury absent the injunction, (2) its injury will outweigh the harm imposed upon the defendant if the injunction is granted,[2201] (3) it is likely to succeed on the merits of the case,[2202] and (4) issuance of an injunction will not adversely affect the public interest. This four-factor test applies to temporary restraining orders as well. To carry its burden of proving a likelihood of success at trial, the plaintiff must show that the patent is valid[2203] and that it has been infringed. A showing of reasonable likelihood of success and irreparable injury are crucial factors supporting issuance of an injunction in patent cases. Failure to meet either will result in an injunction's denial regardless of findings on the remaining factors,[2204] although the court must consider all four factors in granting an injunction.[2205] The Federal Circuit has held, however, that where the defendant raises a "substantial question of invalidity," the plaintiff has not met its burden on the validity of the patent and a preliminary injunction will be denied.[2206] In addition, although irreparable injury will be presumed upon "a strong showing of likelihood of success on the merits coupled with continuing infringement,"[2207] this presumption can be rebutted

---

2201. *See, e.g.,* A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1025 (9th Cir. 2001) ("Any destruction of Napster, Inc. by a preliminary injunction is speculative compared to the statistical evidence of massive, unauthorized downloading and uploading of plaintiffs' copyrighted works—as many as 10,000 files per second by defendant's own admission.").

2202. Schwartz, *supra* note 2115, at 173 ("[A] patent owner will show a reasonable likelihood of success on the merits if, in light of the presumptions and burdens that apply during trial, the patent owner clearly shows that (a) it will likely prove infringement and (b) its claim will likely withstand a challenge to the validity and enforceability of the patent . . . ."). As part of their burden of showing a likelihood of success on the merits, plaintiffs must show the likelihood that they will prevail against any affirmative defenses. *See, e.g.,* Dr. Seuss Enters. v. Penguin Books USA, 924 F. Supp. 1559, 1562 (S.D. Cal. 1996) ("The plaintiff's burden of showing a likelihood of success on the merits includes the burden of showing a likelihood that it would prevail against any affirmative defenses raised by the defendant." (copyright/trademark case)), *aff'd*, 109 F.3d 1394 (9th Cir. 1997).

2203. Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1359 (Fed. Cir. 2001) ("The patentee must, however, present a clear case supporting the validity of the patent in suit . . . Such a case might be supported, for example, by showing that the patent in suit had successfully withstood previous validity challenges in other proceedings. Further support for such a clear case might come from a long period of industry acquiescence in the patent's validity.") (citation omitted).

2204. Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994).

2205. *Id.* at 1556 (Fed. Cir. 1994) ("a district court must consider all four factors before granting a preliminary injunction to determine whether the moving party has carried its burden of establishing each of the four").

2206. *Amazon.com,* 239 F.3d at 1362–63.

2207. *Reebok Int'l,* 32 F.3d at 1556.

by the defendant.[2208] For example, a showing that the plaintiff delayed in seeking an injunction is evidence that the plaintiff has not suffered irreparable harm.[2209]

*Markman* hearings are sometimes held in conjunction with preliminary injunction motions, because a determination of reasonable likelihood of success can require construction of the patent in order to assess whether the patent has been infringed by the defendant's product or process. Claims construction conducted at injunction proceedings is not always definitive, however, and the court might change its interpretation of the patent as the litigation progresses. In addition, the parties sometimes request expedited discovery prior to a hearing on injunctive relief.[2210] In some instances, granting a motion for expedited discovery may be appropriate: more developed records prior to the preliminary injunction hearing will better enable the court to judge the parties' interests and respective chances for success on the merits. In such cases, discovery should be limited in scope to information needed to respond to the motion for injunctive relief.[2211] The parties should be encouraged to reach an agreement prior to a hearing. To this end, consider requiring the parties to meet and confer to determine whether resolution of the issues raised in the motion for injunctive relief is feasible through a stipulated order, eliminating the need for court intervention.

Federal Rule of Civil Procedure 65(c) requires successful plaintiffs to post a bond for damages incurred by the enjoined party in the event that the injunction was wrongfully issued. The enjoined party also may request a stay of the

---

2208. Roper Corp. v. Litton Sys., Inc., 757 F.2d 1266, 1272 (Fed. Cir. 1985). *See, e.g., Reebok Int'l*, 32 F.3d at 1557–58 (holding that defendant successfully rebutted presumption of irreparable harm by showing the product allegedly infringed is no longer produced or available for sale by plaintiff and money damages adequate to compensate); Ill. Tool Works v. Grip-Pak, Inc., 906 F.2d 679, 681–82 (Fed. Cir. 1990).

2209. *See, e.g.*, Hybritech Inc. v. Abbott Labs, 849 F.2d 1446, 1457 (Fed. Cir. 1988).

2210. Phila. Newspapers, Inc. v. Gannett Satellite Info. Network, Inc., No. CIV.A. 98-CV-2782, 1998 WL 404820, at *1–2 (E.D. Pa. July 15, 1998); Jay's Custom Stringing, Inc. v. Yu, No. 01CIV.1690, 2001 WL 761067, at *1 (S.D.N.Y. July 6, 2001) (denying temporary restraining order (TRO) and granting expedited discovery and accelerated briefing on the motion for preliminary injunction (not an intellectual property case)); Chere Amie, Inc. v. Windstar Apparel, Corp., 191 F. Supp. 2d 343, 344 (S.D.N.Y. 2001) (expedited discovery pursuant to motion for preliminary injunction). Sega Enters. Ltd. v. Accolade, Inc., 977 F.2d 1510, 1516 (9th Cir. 1992); Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co., 916 F.2d 76, 78 (2d Cir. 1990) (declining to order expedited discovery). Motions for TROs are often accompanied by motions for expedited discovery.

2211. *See, e.g., Phila. Newspapers*, 1998 WL 404820, *2 (E.D. Pa. 1998) (noting that "courts generally deny motions for expedited discovery when the movant's discovery requests are overly broad").

injunction pending appellate review. (Appellate review of the grant or denial of a preliminary injunction is for abuse of discretion.) In such instances, the court may conclude that although a stay is not warranted, some additional time is appropriate before the injunction becomes effective.[2212]

## 33.25 Discovery

Discovery sometimes can be conducted according to a prescribed sequence of issues, particularly if severed trials are contemplated under Federal Rule of Civil Procedure 42(b).[2213] At the pretrial conference, however, it is helpful to discuss with the parties whether discovery on priority issues will involve examination of the same witnesses and exhibits as discovery on the subsequent issues, causing unnecessary expense and delay,[2214] and whether deferral of discovery regarding damages may complicate efforts to evaluate the litigation for settlement.

Limitations on the scope of discovery may be appropriate where the court already has construed the patent claims. Regardless of the timing of the claim construction, however, the parties should be prohibited from offering alternative constructions throughout the litigation and thereby expanding the scope of discovery. Where the court has determined that a *Markman* hearing will be held post-discovery, one option is to offer a window of additional and narrowly prescribed discovery post-claim construction, to take into account the judge's interpretation and minimize prejudice to one of the parties arising out of an unexpected interpretation of the claim.

The large number of motions to compel in patent cases may result from legitimate differences of opinion between the parties as to the interpretation to be given terms of art used in discovery requests, thereby causing disputes over whether information falls within the scope of the request. In other instances, the responding party may be using differing definitions to avoid producing information that may be harmful to its case. Instructing the parties that all terms of art used in discovery are to be read broadly, inclusive of all applicable

---

2212. *See* Schwartz, *supra* note 2115, at 176–78 (noting that four factors similar to those considered in granting or denying the injunction are considered in deciding whether the injunction should be stayed).

2213. *See, e.g.,* Pioneer Hi-Bred Int'l, Inc. v. Asgrow Seed Co., No. CIV. 4-98-CV-90577, 90578, 2000 WL 33363188, at *1–3 (S.D. La. May 5, 2000) (considering whether discovery should be staged).

2214. *Pioneer*, 2000 WL 33363188, at *3 (granting motion to stay discovery on issue of damages until after liability is determined).

definitions, will minimize motions to compel and accompanying requests for sanctions.[2215]

Allegations of willful infringement present thorny discovery disputes. It is best to ascertain at the initial pretrial conference the extent to which discovery will be sought of matters that may be protected by the attorney–client privilege or work-product doctrine and, if so, whether disclosure will be resisted. Reliance on opinions of counsel is the only prudent course for a defendant to follow in litigation. However, once the defendant asserts reliance on the advice of counsel, the defendant voluntarily waives privilege over the opinion itself, and straightforward application of the general case law regarding voluntary privilege waivers can lead to unanticipated results.[2216] For example, application of "subject–matter waiver" would require the defendant to disclose all privileged communications on the subject of the opinion—typically infringement and validity. On its face, this approach would require disclosure of all communications with counsel, including trial counsel, regarding infringement and validity.[2217] If treated also as a traditional waiver of work-product immunity, the waiver would result in disclosure of all of trial counsel's internal communication and trial preparation materials. Recognizing this dilemma, courts have tended toward practical solutions that balance a plaintiff's reasonable inquiry into the circumstances surrounding the opinion of counsel and the defendant's right to mount a defense and maintain confidential communications with trial counsel.[2218] Consider whether the privilege has been waived and the need to control the scope of discovery from counsel or clients to ensure that the privilege is respected. Particularly in nonjury cases, the trial judge may conclude that it is feasible to call on another judicial officer to conduct any in camera inspections necessary to determine whether sufficient evidence of fraud exists for the privilege to be waived. Use of a special master may be warranted if such

---

2215.  *See* Amend, *supra* note 2176, at 25–26.

2216.  In *Novartis Pharm. Corp. v. Eon Labs. Mfg., Inc.*, 206 F.R.D. 396, 399 (D. Del. 2002), Judge Farnan held that the alleged infringer waived privilege to withhold from discovery any documents or material related to counsel's noninfringement opinion, including work product.

2217.  VLT, Inc. v. Artesyn Tech., Inc., 198 F. Supp. 2d 56, 57 (D. Mass. 2002) (stating that "opinion of counsel letter as part of a defense to a claim of willful infringement operates as a subject matter waiver").

2218.  For example, in situations where the opinion of counsel was prepared by a lawyer at a firm different from trial counsel, courts will limit the waiver to communications with "opinion counsel." Where the opinion of counsel was prepared by the same firm as the firm serving as trial counsel, but by a lawyer not actively involved in the litigation or a part of the litigation team, courts again often limit disclosure to communications between the opinion writer and the client representative who received the opinion. However, the thorniest issues arise where the opinion writer is an active part of the trial team, although this circumstance is becoming exceedingly rare, in part because of the potential for the opinion writer to be a witness at trial.

disputes will be extensive and cannot be resolved by considering a few specimen documents.

It is helpful to inquire early about use of out-of-court "tests" of allegedly infringing products (including software in copyright actions) or in-court demonstrations. If tests are contemplated, protocols should be established at an early conference with respect to whom may attend or observe, criteria to permit use of the results in court, and when to disclose the results. It is also advisable to set a deadline for pretrial disclosure of any such tests or proposed demonstrations and indicate when objections to the admissibility of such evidence will be considered.

Discovery delays may be eliminated by entering protective orders prior to initial discovery being served. Some courts have incorporated standing protective orders as part of the initial pretrial conference;[2219] however, the particular patent case may dictate a more tailored order. The parties may prefer restricting disclosure of particularly sensitive information—such as production processes and customer information—to counsel and their experts. This procedure is acceptable, but counsel should be cautioned to exercise restraint in designating materials as confidential.[2220] Issues may also arise where a party's patent counsel or in-house counsel is also counsel of record in the litigation. In such cases, consider "the nature and extent of the risk involved and the efficacy of protective measures that have been or can be imposed"[2221] in determining whether to permit access to the opposing party's confidential information. Relevant considerations might include whether counsel is in-house or at an outside firm, as well as his or her activities, including any involvement in matters relating to product design or related competitive decisions.[2222] To the extent access is permitted, also consider including a provision in the protective order that restricts any participation in the prosecution of patent applications in the technical area at issue for a designated period of time.[2223] It is best to address early the identification of experts who will review confidential materials.

---

2219. See *infra* section 40.25 for a sample order regarding preservation of documents, data, and tangible things.

2220. *See also In re* Omerprazole Patent Litig., No. MDL 1291, 2001 WL 394843, at *1 (S.D.N.Y. Apr. 18, 2001) (protective order would contain safeguards that avoided inadvertent disclosure of "attorney confidential" information).

2221. Pooley, *supra* note 2107, § 11.03[3] ("[T]hose who object to house counsel access will make an argument . . . [that] no matter the saintly good faith of the individual, there are circumstances in which one's information is put in jeopardy because of influential, indirect use that may not only be undetectable after the fact by the owner, but may occur beyond the awareness of the person to whom it was entrusted.").

2222. *Id.*

2223. *Id.* § 11.03[4].

In some cases the parties may prefer to have review of such information done by a court-appointed expert or special master, rather than by someone associated with their adversary. For further protection, filing of sensitive documents may either be waived under Federal Rule of Civil Procedure 5(d) or be made under seal. Finally, consider circumstances under which a party may seek modification of the order and whether, and to what extent, any protective orders should provide for the protection of confidential information that may be sought from third parties.

## 33.26  Experts

Expert witnesses in patent cases typically fall into one of two categories: (1) technical and damage experts; and (2) patent law experts. Technical experts are those whose special training or experience in the applicable technology or science qualifies them to express opinions bearing on

- the validity or invalidity of the patent, such as the scope and content of the prior art, the level of skill in the art, and the obviousness or nonobviousness of the claimed invention in view of the prior art; and
- whether with respect to the alleged infringement the elements of the claim are met by the accused product or process.

Technical experts include both experts retained by the parties, as well as experts appointed by the court pursuant to Federal Rule of Evidence 706. Damages experts usually will have training in accounting, patent licensing, and economics, and will testify about such issues as reasonable royalty, lost profits, price erosion, convoyed sales, and the proper definition of the relevant market. Patent law experts—patent attorneys, patent law professors, or former officials of the PTO—are frequently offered to express background in the form of opinions on the patent process, the duty of disclosure to the PTO, and whether or not that duty has been violated by particular acts or omissions during the prosecution of the patent. The use of patent law experts is controversial and their acceptance varies widely from court to court.[2224]

---

2224. *See, e.g.,* Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd., 122 F.3d 1040, 1042 (Fed. Cir. 1997) (stating "this court has on numerous occasions noted the impropriety of patent lawyers testifying as expert witnesses and giving their opinion regarding the proper interpretation of a claim as a matter of law, the ultimate issue for the court to decide"); Talarico v. Marathon Shoe Co., 182 F. Supp. 2d 102, 113–14 (D. Me. 2002) (patent attorney's testimony helped to articulate defendant's defense); Neupak, Inc. v. Ideal Mfg., Sales Corp., 168 F. Supp. 2d 1012, 1016–17 (D. Minn. 2001) (patent attorney allowed to testify); Biomedical Polymers, Inc. v. Evergreen Indus., Inc., 976 F. Supp. 98, 100 (D. Mass. 1997) (noting court has discretion whether it will adopt expert legal opinion as own, use it for guidance, or ignore or exclude it).

The Supreme Court's decision in *Markman* has affected the role of expert testimony in patent cases. Although expert testimony remains admissible in a *Markman* hearing—to aid the court's understanding of the technology involved where the patent claim is ambiguous, or to explain the meaning of terms of art within the relevant field as one skilled in the art would understand them—the Court cautioned that the trial court is "not, however, obliged to blindly follow such testimony."[2225] Accordingly, consider the purpose for which expert testimony is being offered and whether, in light of the claim language, such testimony is necessary or would aid in understanding the technology or terms of art as needed to construe the claim.[2226]

Setting rules to govern the scope of expert discovery is advisable. Expert reports in patent cases are often extremely complex, and a lengthy report typically will require significant back and forth between expert and counsel. Consider what types of expert material should be produced—for example, technical documents that the expert relied on in forming opinions—and whether draft reports should be excluded from production. At trial, expert testimony should be monitored to ensure that testimony regarding construction or interpretation of the claim is not offered. Expert testimony remains appropriate, however, to explain the technology to the jury. Expert testimony may be appropriate to assist the jury in assessing the accused product or process in light of the claim construction by the court, so that the jury can determine whether the accused product has infringed the claims, either literally or under the doctrine of equivalents. Examples of other areas where expert testimony may prove helpful include the patent examination process and the qualifications of a person of ordinary skill in the art.[2227] Testimony by patent law experts should be avoided where the testimony seeks to give legal opinions or attempts to address "reasonable reliance" by the client on advice of counsel.[2228]

The court may also conclude that an independent expert should be appointed under Federal Rule of Evidence 706, particularly if the subject matter is complex and the differences between the experts offered by the parties are

---

2225. Markman v. Westview Instruments, Inc., 517 U.S. 370, 387 (1996) (quoting A. Walker, Patent Laws § 189, at 173 (3d ed. 1895)).

2226. *See, e.g.,* Chad Indus., Inc. v. Automation Tooling Sys., Inc., 938 F. Supp. 601, 605 (C.D. Cal. 1996).

2227. Amend, *supra* note 2176, at 28. As this is usually stipulated to or established as a predicate fact in the *Markman* hearing, such testimony may be unnecessary.

2228. *See, e.g.,* Clintec Nutrition Co. v. Baxa Corp., No. 94C7050, 1998 WL 560284, at *9 (N.D. Ill. Apr. 26, 1998) (rejecting proposed expert testimony during the *Markman* hearing "as to what the law is" and stating that the expert may only "help interpret the patent and the meaning of its claims, discuss scientific principles, and define terms").

not attributable to factual disputes that a trial can readily resolve.[2229] For example, such an expert may be helpful if the parties' facilities or processes need to be inspected and they are reluctant to permit access by the opposing experts. A number of issues, including the timing, selection, discovery, and compensation of court-appointed experts, their specific duties, and the handling of expert communications, all require consideration by the court. Limiting the use of court-appointed experts to explaining the general subject matter, without becoming involved in the disputes of the parties, will make it easier to maintain neutrality. The court-appointed expert should generally have no ex parte communications with the judge. Finally, consideration may also be given to referral of the patent for reexamination by the PTO under 35 U.S.C. § 302, with citations of prior art furnished under 35 U.S.C. § 301. In some cases, the court may conclude that reference to a special master under Federal Rule of Civil Procedure 53 is warranted.

## 33.27  Trial

To ensure a fair trial, whether it is a bench trial or a jury trial, the fact-finder's comprehension of the issues and of the evidence is critical. Bifurcation of a patent jury trial or a phased trial considering major issues separately can sometimes assist in properly focusing the jury's attention.[2230] For example, issues of infringement can be tried prior to other issues in the case, with the issue of remedies, including damages, often deferred.[2231] On the other hand, bifurcation sometimes results in a "piecemeal" trial, making it harder for the jury to see the case as a whole.[2232] Additional techniques designed to improve juror comprehension, as well as to assist in reducing the complexity of patent trials, are discussed in *Patent Law & Practice*,[2233] published by the Federal Judicial Center. These techniques include

---

2229. *See, e.g.,* MediaCom Corp. v. Rates Tech., Inc., 4 F. Supp. 2d 17, 23–24 (D. Mass. 1998); Genentech, Inc. v. Buehringer Mannheim GmbH, 989 F. Supp. 359, 361 (D. Mass. 1997); Rodime PLC v. Seagate Tech., Inc., No. CV92-6855, 1997 WL 813016, at *1 (S.D. Cal. July 3, 1997) (using court-appointed expert and special master in assessing scope of patent under doctrine of equivalents).

2230. *See also* Schwartz, *supra* note 2115, at 217 (noting that "jurors may benefit from being able to: (a) consider different patents separately, (b) consider different claims of the same patent separately, or (c) separate method claims from apparatus claims").

2231. Even where infringement has not occurred, the court must still try the issue of the validity of the patent. *See* Stevenson v. Sears, Roebuck & Co., 713 F.2d 705 (Fed. Cir. 1983).

2232. Schwartz, *supra* note 2115, at 216.

2233. *Id.*

- imposing reasonable time limits on the length of a trial;[2234]
- conducting a multiphase trial of the issues before the same jury;[2235]
- encouraging the use of juror tutorials at the outset of or during the trial;
- imposing limits on the number of expert witnesses and duplicative fact witnesses;
- encouraging the use of charts, diagrams, models, and other visual aids;
- providing the jurors with exhibit notebooks containing, in addition to the principal exhibits, the patent, any stipulations, preliminary instructions, claim construction (if done at the pretrial phase) and a glossary of technical terms; and
- allowing the parties to provide periodic nonargumentative summations to the jury.

# 33.3   Copyright and Trademark Law

.31 Copyright  628
    .311 Discovery  637
    .312 Motions  639
    .313 Experts  640
.32 Trademarks  640

# 33.31  Copyright

.311 Discovery  637
.312 Motions  639
.313 Experts  640

Section 102 of the Copyright Act provides specifically that copyright protection is accorded to "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."[2236] Under the Act, the work itself must originate with the author, even though the idea itself may have originated elsewhere. The

---

2234. *See, e.g.,* Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 609 (3d Cir. 1995). Under Fed. R. Evid. 611(a) (West 2003), the court is to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . avoid needless consumption of time . . . ." However, the court should avoid imposing rigid hour limits.

2235. *See, e.g.,* Belmont Textile Mach. Co. v. Superba, S.A., 48 F. Supp. 2d 521, 526 (W.D.N.C. 1999).

2236. 17 U.S.C. § 102(a) (2000).

"originality" required is fairly minimal: There must be some element of creativity reflected in the work, and the work must be independently created by the author.[2237] Protected works include, although are not limited to, literary, dramatic, and musical works, audiovisuals, movies, recordings, and art, without regard to their level of value or subjective view of artistry.[2238] The Visual Artists Rights Act of 1990[2239] extends protection to single or limited editions of visual art, such as paintings, sculpture, and photography. The statutory rights accorded under the Copyright Act do not attach until the work has been "fixed," at which point state common-law rights against copying and related injuries are preempted.[2240]

Copyright protection is limited to the expression of the idea, not the idea itself.[2241] "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."[2242] Copyright protection further will not extend to purely utilitarian works,[2243] or to forms,[2244] compilations such as ordinary telephone directories,[2245] or where the subject matter necessarily has limited forms of expression.[2246] The creative selection, coordi-

---

2237.  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991). For a further discussion of the originality requirement under section 102 of the Act, see Gorman, *supra* note 2108, at 9–15.

2238.  Section 102(a) categorizes works of authorship to include literary, musical, and dramatic works, pantomime, choreographs, pictorials, graphics, sculpture, motion pictures, audiovisual works, sound recordings, and architectural works.

2239.  17 U.S.C. § 106A (2000). Authors of works of visual arts have rights to claim authorship and prevent the use of their names with works of visual arts they did not create, or with works of visual art that have been distorted, mutilated, or otherwise modified in a way that harms the author's honor or reputation. They can also prevent certain intentional distortion, mutilation, or other prejudicial modification and intentional or grossly negligent destruction of their works.

2240.  17 U.S.C. § 102(a) (2000).

2241.  Gorman, *supra* note 2108, at 15–23.

2242.  17 U.S.C. § 102(b) (2000).

2243.  *See, e.g.*, Mazer v. Stein, 347 U.S. 201, 218 (1954).

2244.  Baker v. Selden, 101 U.S. 99, 101 (1879).

2245.  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 341 (1991). "In order to qualify for copyright protection, a compilation must meet three requirements: '(1) the collection and assembly of preexisting data; (2) the selection, coordination, or arrangement of that data; and (3) a resulting work that is original, by virtue of the selection, coordination, or arrangement of the data contained in the work.'" Lynx Ventures, LLC v. Miller, 190 F. Supp. 2d 652, 658 (D. Vt. 2002) (quoting Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc., 945 F.2d 509, 514 (2d Cir. 1991)).

2246.  Morrissey v. Proctor & Gamble Co., 379 F.2d 675, 678 (1st Cir. 1967).

nation, or arrangement of unprotected facts or ideas, however, can be protected as long as the work meets the "minimal degree of creativity" standard established by the Supreme Court in *Feist Publications, Inc. v. Rural Telephone Service Co.*[2247]

The Copyright Act confers certain protection on the owner of a copyright, whether such ownership is vested in the original author, joint authors, employers where the work was created pursuant to employment, or persons to whom a copyright has been transferred or licensed.[2248] The Act accords to copyright owners six exclusive rights, which are set forth in section 106: (1) reproduction; (2) derivative works; (3) distribution; (4) performance; (5) display; and (6) digital transmission.[2249] A copyright is infringed by the unauthorized exercise of any of these exclusive rights by another. Although the facts in many copyright cases are not necessarily complex, the legal analysis often involves subtle concepts regarding whether section 106 rights have been infringed and whether that infringement was direct or contributory.[2250] Infringement can be innocent or intentional, and a plaintiff is permitted under copyright law to assert a claim for contributory or vicarious infringement as long as the plaintiff can also demonstrate an underlying act of direct infringement.[2251]

To prevail in a copyright infringement claim, the plaintiff must prove (1) ownership of a valid copyright; and (2) that at least one of the exclusive rights under section 106 has been violated.[2252] The plaintiff must demonstrate either actual copying (as opposed to independent creation) or proof of access to the copyrighted work and that the copied work is "substantially similar" to the original, to prove a violation of section 106.[2253] Equitable remedies in the form of injunctive relief are available in addition to money damages, reflecting either actual damages or, at the plaintiff's election, statutory damages.[2254] Reg-

---

2247. 499 U.S. at 348.

2248. *See* 17 U.S.C. § 201 (2000). Section 201(d) establishes rights upon transfer of a copyright. Where the right has been transferred, the person to whom it is transferred "is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title." *Id.* § 201(d)(2). Any such exclusive transfer or license can be terminated, *id.* § 203, and must be in writing. *Id.* § 204(a).

2249. *Id.* § 106.

2250. 17 U.S.C. § 501 (2000).

2251. Gershwin Pub'lg Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1161–62 (2d Cir. 1971).

2252. Ellison v. Robertson, 189 F. Supp. 2d 1051, 1056 (C.D. Cal. 2002).

2253. *See, e.g.,* Laureyssens v. Idea Group, Inc., 964 F.2d 131, 139–40 (2d Cir. 1992).

2254. 17 U.S.C. § 504 (2000); *see also Gorman, supra* note 2108, at 108 (discussing available damages and profits under 17 U.S.C. § 504).

istration is a prerequisite to maintaining a suit for infringement and in order to obtain statutory damages, the copyright must have been registered under the Act prior to infringement.[2255]

Among the defenses to an infringement claim is a common law doctrine commonly referred to as the "fair use" doctrine, which has now been codified in 17 U.S.C. § 107 to preserve the use of creative artistic works for purposes of teaching, research, criticism, and news reporting.[2256] Section 107 sets out several factors to be considered in assessing whether the defendant's use was "fair," which are then balanced against the interest in protecting the exclusive rights of copyright owners. These factors include (1) the purpose and character of the defendant's use, such as whether the use is commercial or private; (2) the nature of the copyrighted work; (3) the amount and substance of the portion of the copyrighted work used in relation to the whole of the copyrighted work; and (4) the effect of the use on the market for the copyright owner's rights.[2257] Congress also has created a statutory "safe harbor" for "providers of online services or network access, or the operator of facilities therefore"[2258] through the Digital Millennium Copyright Act (DMCA).[2259] The DMCA protects service providers who do not control the content transmitted via their servers, as well as search engines that merely provide links to allegedly infringing content.[2260] "The DMCA's protection of an innocent service provider disappears 'at the moment the service provider loses its innocence, i.e., at the moment it becomes aware that a third party is using its system to infringe.'"[2261]

---

2255.  17 U.S.C. §§ 411, 412 (2000).

2256.  Kelly v. Arriba Soft Corp., 280 F.3d 934, 942 (9th Cir. 2002).

2257.  17 U.S.C. § 107 (2000); Harper & Row Publ'g Inc. v. Nation Enter., 105 S. Ct. 2218 (1986).

2258.  17 U.S.C. § 512(k)(1)(B) (2000); *see also* Semiconductor Chip Prot. Act of 1984, 17 U.S.C. § 901 (affording protection to computer chips and thereby their codes).

2259.  17 U.S.C. § 512 (2000); *see also* Religious Tech. Ctr. v. Netcom On-Line Communication Serv., Inc., 907 F. Supp. 1361 (N.D. Cal. 1995).

2260.  *See* Ellison v. Robertson, 189 F. Supp. 2d 1051, 1070–72 (C.D. Cal. 2002); *see also* ALS Scan, Inc. v. RemarQ Communities, Inc., 239 F.3d 619, 622 (4th Cir. 2001) ("As to direct infringement, liability is ruled out for passive, automatic acts engaged in through a technological process initiated by another." (discussing H.R. Rep. No. 105-551(I), at 11 (1998))). Although the DMCA protects service providers from money damages arising from posting or transmitting infringing content, in most cases injunctive relief will still be available. To avail themselves of the protection of the DMCA safe harbor, however, the defendant service providers must have, and communicate to users, a policy for removing allegedly infringing material. *ALS Scan*, 239 F.3d at 625.

2261.  *In re* Aimster Copyright Litig., 252 F. Supp. 2d 634, 657 (N.D. Ill. 2002) (quoting *ALS Scan*, 239 F.3d at 625).

"At that point, the Act then shifts responsibility to the service provider to disable the infringing matter . . . ."[2262]

Many of the complexities accompanying copyright litigation arise out of the growth and development of new technologies and transmissions, particularly on-line dissemination.[2263] Works can now be easily replicated and accessed by numerous users, and new categories of works (such as hypertext) have developed.[2264] On-line linking and framing can create the potential for copyright infringement, although the mere use of a copyrighted work in a search engine may be a fair use.[2265] The increasing use of the Internet as a means of communication, and the ease with which material can be copied, create difficulties in copyright application and protection not contemplated by the current Act and have spawned new legislation targeting these issues.[2266] Other developments in copyright law, many attributable to changing technology, are designed either to protect the right in the work itself, such as performance rights in digital transmissions, or to protect the measures used to prevent the copying of works available in digital and other advanced technologies, such as encryption and other programs.[2267] The courts have continued to struggle with the challenges presented by computer technologies and computer networks and the role that copyright protection should play. These complexities will vary from case to case, and inquiry into the following areas at the initial pretrial conference will help to assess the need for close supervision:

- *Has the copyright been registered?* Before an action for copyright infringement can be instituted, the copyright must have been registered

---

2262. CoStar Group v. Loopnet Inc., 164 F. Supp. 2d 688, 700 (D. Md. 2001).

2263. The court in *eBay Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1067 n.16 (N.D. Cal. 2000), noted that "applying traditional legal principles to the Internet can be troublesome . . . ." *See also* ImOn, Inc. v. ImaginOn, Inc., 90 F. Supp. 2d 345, 346 (S.D.N.Y. 2000) (noting that the Internet "is one of the most fluid, rapidly developing, and virtually daily changing areas of commerce that the law has had to focus upon and endeavor to apply established principles to").

2264. *See, e.g.*, ILOG, Inc. v. Bell Logic, LLC, 181 F. Supp. 2d 3, 13–14 (D. Mass. 2002) (software programs).

2265. *See, e.g.*, Kelly v. Arriba Soft Corp., 280 F.3d 934, 945–47 (9th Cir. 2002) (finding on-line linking and framing violated copyright owner's public display right). *See* Ticketmaster Corp. v. Tickets.Com, Inc., No. CV99-7654, 2000 WL 5253909, at *2 (C.D. Cal. Mar. 27, 2000) (hyper-linking did not constitute violation of Copyright Act).

2266. *See, e.g.*, Digital Millenium & Copyright Act, 17 U.S.C. § 512 (2000); Visual Artists Rights Act of 1990, 17 U.S.C. § 106(A) (2000).

2267. *See, e.g.*, Intellectual Prop. & Communications Omnibus Reform Act of 1999, 17 U.S.C. § 1201 (2000).

in the Copyright Office.[2268] Registration timing, however, affects the types of damages available. Where the copyright was not registered prior to the infringing activity or within ninety days of the date the work was first published, the plaintiff is precluded from seeking attorney fees or statutory damages.[2269]

- *Where did the activity take place?* Where the allegedly infringing activity takes place is an important question, in determining personal jurisdiction and venue, and also in determining whom the plaintiff can sue. Plaintiffs may base claims on actions by foreign defendants that occurred outside the United States, or interrelated activities involving both U.S. corporations and foreign affiliates.[2270] Foreign defendants add additional complexity to the management of discovery and other pretrial issues.[2271] Jurisdictional issues may be more complicated where the infringing activity took place over the Internet.[2272] The courts have held that where infringing material is posted on a Web site, the infringing acts occurred in the place where the Web site is created and maintained.[2273] Courts have looked to the "nature and quality of commercial activity that an entity conducts over the Internet" in assessing whether personal jurisdiction can be exercised.[2274] A relevant inquiry is whether the defendant's activity was active or passive. "A passive Web site that does little more than make information available

---

2268. 17 U.S.C. § 411(a) (2000). The Act excepts from its requirements infringement actions "brought for a violation of the rights of the author under Section106(A)(a) . . . ." *Id.* However, if registration is refused, the plaintiff can bring an action for infringement and also challenge the propriety of the refusal to register in that action. *Id.*

2269. *Id.* § 412(2); *see also* Gerig v. Krause Publ'ns, Inc., 58 F. Supp. 2d 1261, 1268–69 (D. Kan. 1999).

2270. *See, e.g.*, Palmieri v. Estifan, 793 F. Supp. 1182 (S.D.N.Y. 1992).

2271. *See, e.g.*, Byrne v. British Broad. Corp., 132 F. Supp. 2d 229, 237–39 (S.D.N.Y. 2001) (denying motion to dismiss based on *forum non conveniens*).

2272. *See, e.g.*, Colt Studio, Inc. v. Badpuppy Enter., 75 F. Supp. 2d 1104, 1109–10 (C.D. Cal. 1999) (personal jurisdiction created from on-line membership subscriptions with consumers in California; subscriptions were continuing in nature); Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997); Cybersell, Inc. v. Cybersell, Inc., 130 F.3d 414 (9th Cir. 1997).

2273. Cable News Network, L.P. v. GoSMS.com, Inc., No. 00CIV.4812, 2000 WL 1678039, at *3 (S.D.N.Y. Nov. 6, 2000) (noting that to find that the acts occurred where the Web site could be seen would include "literally anywhere the internet can be accessed").

2274. *Zippo Mfg.*, 952 F. Supp. at 1124 (distinguishing cases of knowing and repeated transmission of files over the Internet from situations where the defendant has posted information on a Web site that is simply accessible to users in other jurisdictions); Citigroup Inc. v. City Holding Co., 97 F. Supp. 2d 549, 565 (S.D.N.Y. 2000).

to those who are interested in it is not grounds for the exercise of personal jurisdiction."[2275]

• *Does the dispute raise issues of international law?* One or more of the various treaties that address copyright issues may become relevant if international components are involved.[2276] Plaintiffs may be alleging infringement of foreign copyrights, as well as infringement under the Copyright Act.[2277] In addition, conflicts may result in the application of foreign copyright law to resolve disputes.[2278]

• *Are there any other actions pending in the same or other jurisdictions?* Copyright cases rarely involve infringements sufficient to trigger multidistrict litigation or class actions,[2279] but the Internet has created the potential for multiple infringements in numerous jurisdictions. For example, in *In re Aimster Copyright Litigation*,[2280] nine actions involving whether the distribution of MP3 music files through a Web site operated by Aimster constituted copyright infringement were transferred for coordinated and consolidated pretrial proceedings by the Judicial Panel on Multidistrict Litigation. Declaratory judgment actions seeking a determination of noninfringement can raise questions of jurisdiction and whether the action should be transferred or stayed.[2281] In some instances, the action reflects simply a "race to the courthouse."[2282] Finally, issues of collateral estoppel may arise where multiple infringements have occurred.[2283]

---

2275. *Zippo Mfg.*, 952 F. Supp. at 1124.

2276. *See, e.g.,* Uniform Copyright Convention, NAFTA, Berne Convention for the Protection of Literary and Artistic Works, and the Trade Related Aspects of Intellectual Property Rights.

2277. Boosey & Hawkes Music Publishers, Ltd. v. The Walt Disney Co., 145 F.3d 481, 485 (2d Cir. 1998); Dam Things from Denmark v. Russ Berrie & Co., 290 F.3d 548, 554 (3d Cir. 2002).

2278. *See, e.g.,* Itar-Tass Russian News Agency v. Russian Kurier, Inc., 153 F.3d 82, 91–92 (2d Cir. 1998) (finding Russian law would apply to issues of copyright ownership and nature of copyright as to Russian plaintiffs, and U.S. copyright law would be applied to determine issue of whether copyrights were infringed in the U.S. by defendant Russian language newspaper which was published and available in New York).

2279. *See, e.g., In re* Literary Works in Elec. Databases Copyright Litig., MDL No. 1379, 2001 WL 204212, at *1 (S.D.N.Y. Mar. 1, 2001) (consolidated class action); *In re* "The Exorcist" Copyright Infringement Litig., 411 F. Supp. 793 (J.P.M.L. 1976).

2280. 177 F. Supp. 2d 1380 (J.P.M.L. 2001).

2281. MP3Board v. Recording Indus. Ass'n of Am., No. C-00-20606, 2001 WL 804502, at *3 (N.D. Cal. Feb. 27, 2001) (staying action in light of similar action pending in New York).

2282. *See MP3Board*, 2001 WL 804502, at *2 (stating "'even if this action were deemed to have been filed first, this action was filed as an anticipatory suit and therefore MP3Board would

- *Are there any criminal proceedings pending or matters under criminal investigation?* The Copyright Act provides for criminal penalties, including imprisonment and a fine, for willful copyright infringement,[2284] as well as penalties if the defendant engaged in fraud.[2285] The Act provides additional remedies in the form of mandatory seizure and forfeiture or destruction.[2286] If there is a pending criminal investigation, a motion to stay the civil action pending resolution of the criminal case may occur.

- *Are there any agreements to arbitrate?* The Federal Arbitration Act requires parties to arbitration agreements to arbitrate all matters covered under the agreement "save upon such grounds as exist at law or in equity for the revocation of any contract."[2287] Arbitration clauses are to be broadly construed and will be presumed to apply to all disputes arising under the contract, barring limiting language.[2288] Doubts are resolved in favor of arbitration. The courts have held that arbitration agreements arising out of the Copyright Act are enforceable. "Congress has not asserted any 'policy against arbitration of [a] claim for the infringement of a valid copyright.'"[2289] Arbitration agreements are especially common in licensing agreements. The court should inquire into the existence of any agreement that may underlie the claims and whether any or all claims are subject to arbitration. In cases where a portion of the case may be subject to arbitration, consider whether the remainder of the action should be stayed.

---

not be entitled to rely on the first to file rule'" (quoting MP3Board v. Recording Indus. Ass'n of Am., No. C-00-20606, at 6:27 to 7:1 (N.D. Cal. Sept. 26, 2000) (unpublished court order denying plaintiff's motion for preliminary injunction to prohibit defendants from proceeding in related action before another district court))); Citigroup, Inc. v. City Holding Co., 97 F. Supp. 2d 549, 555 (S.D.N.Y. 2000) (discussing first-filed rule).

2283. *See, e.g.,* Teevee Toons v. MP3.Com, Inc., 134 F. Supp. 2d 546, 546–47 (S.D.N.Y. 2001).

2284. 17 U.S.C. § 506(a) (2000).

2285. *See id.* §§ 506(c)–506(e).

2286. *Id.* § 506(b).

2287. 9 U.S.C. § 2 (2000).

2288. JVN Music, Inc. v. Rodriguez, No. 99CIV.11889, 2000 WL 827702, at *3 (S.D.N.Y. June 27, 2000) ("Where there is a broad contractual arbitration clause, it is presumed that all disputes under the agreement are arbitrable unless the clause is in no way susceptible to an interpretation that it covers the particular dispute.").

2289. *JVN Music,* 2000 WL 827702, at *4 (finding copyright infringement clause arising out of music contract to record exclusively for the plaintiff music company (quoting Kamakazi Music Corp. v. Robbins Music Corp., 684 F.2d 228, 231 (2d Cir. 1982))).

- *Is the plaintiff seeking impoundment as one of the remedies sought?* The plaintiff may be seeking impoundment of the allegedly infringing material pursuant to section 503 of the Copyright Act.[2290] Seizure can be ex parte where the plaintiff shows a likelihood the allegedly infringing goods may be destroyed or hidden, although the defendant can request a post-seizure hearing.[2291] There is judicial discretion under section 503(b) to permanently dispose of the infringing material after final judgment, although destruction is not mandatory, as it is where the defendant is criminally convicted of willful infringement.[2292]

- *What is the duration of the copyright?* The 1976 Copyright Act extended the 1909 Copyright Act term from twenty-eight years with an additional renewal term if the author remained alive at the end of the first term to the life of the author plus fifty years.[2293] With the passage of the 1976 Act, "Congress altered the way the term of a copyright is computed so as to conform with the Berne Convention and with international practice."[2294] The Copyright Term Extension Act of 1998[2295] extended the term for works created after 1978 an additional twenty years to the author's life plus seventy years.[2296] For a work created before 1978, where the initial term was twenty-eight years, the renewal term was extended to sixty-seven years.[2297]

- *Has the plaintiff raised state causes of action that are preempted by the Copyright Act?* Jurisdiction is exclusively in the federal courts for actions arising under the Copyright Act.[2298] State law claims pertaining to the subject matter of copyrights are preempted,[2299] unless there is a qualitative difference between the causes of action and the rights ad-

---

2290. Section 503 provides for impoundment "of all copies or phonorecords . . . and of all plates, molds, matrices, masters, tapes, film negatives, or other articles by means of which such copies or phonorecords may be reproduced."

2291. Pepe (U.K.) Ltd. v. Ocean View Factory Outlet, 770 F. Supp. 754, 760 (D.P.R. 1991) (ex parte seizure of allegedly counterfeit goods under section 1116(d)); Paramount Pictures Corp. v. Doe, 821 F. Supp. 82, 84 (E.D.N.Y. 1993) (impoundment of allegedly pirated films).

2292. 17 U.S.C. § 506(b) (2000).

2293. Gorman, *supra* note 2108, at 37.

2294. Eldred v. Reno, 239 F.3d 372 (D.C. Cir. 2001) (citing H.R. Rep. No. 94-1476, at 135 (1976) (reprinted in 1976 U.S.C.C.A.N. 5659, 5751)).

2295. 17 U.S.C. § 302(a) (2000).

2296. *See Eldred*, 239 F.3d at 373–74.

2297. 17 U.S.C. § 304(a) (2000).

2298. 28 U.S.C. § 1338(a) (West 2003).

2299. 17 U.S.C. § 301(a) (2000).

dressed by the Copyright Act.[2300] However, state law claims preempted by the Copyright Act are converted into copyright infringement claims under the federal statute.[2301]

- *Do the parties anticipate seeking protective orders?* Motions for protective orders are common in copyright actions.[2302]
- *Does the plaintiff assert vicarious or contributory infringement?* The scope of discovery will be affected by assertions of vicarious or contributory infringement.

## 33.311 Discovery

Two central issues in copyright cases are whether the copyright was infringed and the nature of the infringement. As a result, discovery may be merits based, looking at the infringement itself, or jurisdictional, seeking information on where and how the infringement occurred.[2303] Complex damages calculations often become necessary, and discovery into the defendant's finances, including costs of production, overhead, and cost and expense allocation, among other matters, can be extensive. Protective orders may be sought where discovery pertains to the parties' financial affairs.

Much of the information sought during discovery will be maintained in electronic form. Discovery orders may be necessary to ensure that the form in which information is maintained is not utilized by the parties to hinder or obstruct the discovery process.[2304] Consider whether the parties should be re-

---

2300.  *See* Tech. Based Solutions, Inc. v. The Elecs. Coll., Inc., 168 F. Supp. 2d 375, 380 n.3 (E.D. Pa. 2001) (holding allegations of misappropriation, unfair competition, and unjust enrichment preempted by the Copyright Act but breach of contract claim appeared qualitatively different and would not be preempted); eBay, Inc. v. Bidder's Edge, Inc., 100 F. Supp. 2d 1058, 1072 (N.D. Cal. 2000) (trespass); Ticketmaster Corp. v. Tickets.Com., Inc., No. CV99-7654, 2000 WL 525390, at *3–4 (C.D. Cal. Mar. 27, 2000) (contract, unfair business practices).

2301.  28 U.S.C. § 1338(b) (West 2003).

2302.  Damiano v. Sony Music Entm't, Inc., No. CIV.A. 95-4795, 2000 WL 1689081, at *1 (D.N.J. Nov. 13, 2000) (entering protective orders protecting confidentiality over discovery and depositions); David J. Frank Landscape Contracting, Inc. v. La Rosa Landscape, 199 F.R.D. 314, 315 (E.D. Wis. 2001) (denying entry of broad protective order where parties failed to explain why materials should be protected from disclosure); Apple Computer, Inc. v. Micro Team, No. C98-20164, 2000 WL 1897354, at *1 (N.D. Cal. Dec. 21, 2000) (stipulated protective order); Kleiner v. Burns, No. 00-2160, 2000 WL 1909470, at *3–4 (D. Kan. Dec. 15, 2000) (stipulated protective order).

2303.  Nat'l Football League v. Miller, 54 U.S.P.Q.2d (BNA) 1574 (S.D.N.Y. 2000); Citigroup, Inc. v. City Holding Co., 97 F. Supp. 549 (S.D.N.Y. 2000).

2304.  *See, e.g.,* Williams v. E.I. du Pont de Nemours & Co., 119 F.R.D. 648, 650–51 (W.D. Ky. 1987) (permitting discovery of computerized database and encoding in Title VII action).

quired to provide print versions of extensive databases as opposed to transmitting the data in an electronic format. To the extent that print versions are supplied from electronic data, the court should address whether a party will be permitted to provide print versions that contain less information than their electronic counterparts. Additional information available in electronic format may include, for example, hidden notations (metadata) indicating changes or authors. The expense of access or production is also a factor. For example, in cases where reconstruction of data or recovery from obsolete formats is at issue, allocating the costs of electronic discovery may be appropriate.[2305] The committee note to Federal Rule of Civil Procedure 34 recognizes that the burden "will vary from case to case, and the courts have ample power under Rule 26(c) to protect respondent against undue burden or expense, either by restricting discovery or requiring that the discovering party pay costs."

Data retention (or destruction) policies can also be an issue, and different computer back-up procedures may affect the availability, as well as the expense, of discovery. It is advisable to prohibit the routine deletion of relevant documents, particularly E-mail,[2306] and determine whether forensic analysis or mirroring of computer hard drives is appropriate. Where the risk of spoliation is high, ex parte seizure and forensic analysis of the offending party's computer equipment and data-storage facilities may be warranted. However, these measures should not be undertaken lightly, as the economic impact of such measures could be substantial. To the extent a party is permitted access to the source of the electronic information, the court should address how the hard drive contents and data storage facilities will be analyzed for relevant materials. Trade secret and other sensitive or confidential information that is either undiscoverable or otherwise not relevant should be protected from disclosure, and retained computer forensic experts should be closely supervised. One approach is to utilize a court-appointed computer expert, who would be subject to a protective order precluding the disclosure of confidential information and otherwise protecting the privacy rights of the parties. In one case, the court-appointed computer specialist provided a mirror image of the defendant's hard drive to the defendant's counsel, who was then to review all recovered documents and produce those that were responsive to prior discovery requests. The defendant's attorney was to be the "sole custodian" of both the mirror image disk and copies of documents retrieved from it over the course of the litigation.[2307]

---

2305. *See Williams*, 119 F.R.D. at 651.

2306. Playboy Enters., Inc. v. Welles, 60 F. Supp. 2d 1050, 1053 (S.D. Cal. 1999) (granting plaintiff's request to search hard drive for deleted E-mail).

2307. *Id.* at 1055.

### 33.312 Motions

Motions for injunctive relief are frequently sought in copyright cases. The Copyright Act provides for a preliminary injunction "to prevent or restrain infringement of a copyright"[2308] and, although not automatic, injunctions are commonly granted where infringement is found.[2309] In copyright cases, irreparable harm will be presumed where a likelihood of success in the copyright claim has been shown.[2310] The fact that money damages may be quantifiable will not, in itself, preclude a finding of irreparable harm.[2311] Similar to the analysis under patent law, however, a finding of delay or laches on the part of the party in seeking injunctive relief can rebut a showing of irreparable harm.[2312] In addition to enjoining further infringing conduct, the court may order the defendant to recall the infringing products as part of the injunction.[2313] The circuits have adopted varying tests in analyzing whether injunctive relief is appropriate.

Summary judgment may be appropriate in cases where copying is not in dispute. Many copyright infringement cases, however, turn on the issue of substantial similarity, which usually must be resolved by the fact-finder.[2314] Summary judgment is available where the works are "so dissimilar as to protectible elements that no reasonable jury could find for the plaintiff on the question of substantial similarity."[2315] In other cases, the similarities relate to nonprotected portions of the work, precluding infringement.[2316] Summary judgment is also warranted where preliminary issues, unrelated to "substantial similarity," are dispositive, such as whether the plaintiff obtained a valid copyright[2317] or the rights of a licensee.[2318]

---

2308.  17 U.S.C. § 502(a) (2000).

2309.  *See, e.g.,* eBay, Inc. v. Bidder's Edge, Inc., 100 F. Supp. 2d 1058 (N.D. Cal. 2000).

2310.  Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 611 (1st Cir. 1988).

2311.  *Id.* at 611 ("[C]opyright protects the unique and somewhat intangible interest of creative expression. Unlike most property rights, the value of this interest is often fleeting.").

2312.  *See, e.g.,* Nutrition 21 v. United States, 930 F.2d 867, 872 (Fed. Cir. 1991) (substantial delay in period of time before seeking injunction sufficient to negate finding of irreparable harm).

2313.  CyberMedia, Inc. v. Symantec Corp., 19 F. Supp. 2d 1070, 1079 (N.D. Cal. 1998).

2314.  Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980).

2315.  Sturdza v. U.A.E., 281 F.3d 1287, 1297 (D.C. Cir. 2002).

2316.  *See, e.g.,* Ets-Hokin v. Skyy Spirits, Inc., 323 F.3d 763 (9th Cir. 2003); Cavalier v. Random House, Inc., 297 F.3d 815 (9th Cir. 2002).

2317.  Coles v. Wonder, 283 F.3d 798, 801–02 (6th Cir. 2002).

2318.  Gardner v. Nike, Inc., 279 F.3d 774, 780–81 (9th Cir. 2002).

### 33.313 Experts

Expert testimony in copyright cases is primarily focused on whether actual copying has occurred. "Copying may be established either by direct evidence of copying or by indirect evidence, including access to the copyrighted works, similarities that are probative of copying between the works, and expert testimony."[2319] Thus, for example, in *Repp v. Webber*,[2320] expert testimony was probative on the similarities between two musical works, although a determination of whether in light of those similarities infringement had occurred was a question for the fact-finder.[2321] Similarly, "the opinions of experts may be called upon in determining whether there is sufficient similarity between the works so as to conclude that the alleged infringer 'copied' the work."[2322] Once actual copying is established, the inquiry turns to whether the copying was "actionable."[2323] Expert testimony may also be appropriate to explain technology or related processes,[2324] but it is generally not admissible on liability.

## 33.32 Trademarks

Trademark claims are governed by the Lanham Act.[2325] A trademark is "any word, name, symbol or device" used to "identify and distinguish" goods.[2326] Trademarks identify the source or origin of a product. To be accorded protection, the trademark must be "distinctive" or have become identified with a particular source through its use in "commerce."[2327] The protec-

---

2319. Laureyssens v. Idea Group Inc., 964 F.2d 131, 140 (2d Cir. 1992).

2320. 132 F.3d 882 (2d Cir. 1997).

2321. *See also Laureyssens*, 964 F.2d at 141 n.9 (noting that there had been no expert testimony as to the ability to create the challenged puzzle based on a visual inspection of the copyrighted puzzle "which would help to resolve whether a question of actual copying has been shown").

2322. Dam Things from Denmark v. Russ Berrie & Co. Inc., 290 F.3d 548, 562 (3d Cir. 2002).

2323. *Id.*; *see also* Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 62 (1st Cir. 2000) ("'The test is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value.'" (quoting Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 607 (1st Cir. 1988))).

2324. *See, e.g.*, ILOG, Inc. v. Bell Logic, LLC, 181 F. Supp. 2d 3, 11 (D. Mass. 2002) (noting that expert testimony would be "helpful to organize a particular program into various levels of abstraction").

2325. 15 U.S.C. § 1051 (2000). The Lanham Act also covers service marks, which distinguish services of one person from another, and trade names. *See id.* § 1127.

2326. *Id.* § 1127.

2327. *Id.* § 1052(f).

tions offered by trademark law are less than those accorded copyright or patents. For instance, unlike owners of patents or copyrights, trademark owners do not have exclusive use of a mark. Protection extends only to prevent the mark from being used by others in a manner likely to cause confusion, mistake, or deception among consumers as to the source of the goods or services. For a discussion of survey research methods applicable to trademark litigation, see section 11.493. Courts have applied a number of factors to assess whether an allegedly infringing use is likely to cause consumer confusion. These factors include the similarity of the marks, the similarity of the parties' products and services, the strength of the plaintiff's mark, evidence of actual consumer confusion, the markets involved, likelihood of confusion, and the sophistication of buyers.[2328]

Trademarks are valid and enforceable as long as the mark is used in commerce, the owner adequately seeks to protect its rights to the mark, and the mark has not been abandoned or become generic.[2329] A mark need not be registered with the Patent and Trademark Office, although registration can be considered conclusive evidence of validity and ownership. Where the owner has met the incontestability requirements of section 1065 of the Lanham Act, an allegedly infringing defendant is limited to the defenses set forth in section 1115(b) of the Act.[2330] In addition, a federal trademark registration also affords the owner nationwide rights, well beyond the local geographic market where the mark is used. This attribute of federal registration affords wider protection than state registration. To enforce a trademark in a foreign country, however, the owner must comply with the trademark requirements of that country.

Many of the case-management considerations in a copyright case also apply to trademark cases. Similar issues arise relating to arbitrability, remedies sought, and the scope and issuance of protective orders. Motions for injunctive relief are common in trademark litigation and can be accompanied by requests for seizure of the allegedly infringing goods.[2331] The owner of a mark can also seek to freeze the assets of the defendant under certain circumstances.[2332] Damage to the goodwill associated with a trademark will usually meet the require-

---

2328. *In re* E.I. DuPont de Nemours Co., 476 F.2d 1357, 1361 (C.C.P.A. 1973).

2329. *See, e.g.,* Barcamerica Int'l USA Trust v. Tyfield Imps., Inc., 289 F.3d 589, 595–98 (9th Cir. 2002).

2330. *Id.* § 1115(b).

2331. *Id.* § 1116(a). Seizure is usually available only where the infringing goods are counterfeits, and the Act sets forth certain requirements that must be met before a seizure order will issue. *Id.* § 1116(d); *see also* Ironclad, L.P. v. Poly Am., Inc., No. CIV.A. 3:98-CV-2600, 2000 WL 1400762, at *10 (N.D. Tex. July 28, 2000) (courts "routinely grant injunctive relief in trademark infringement actions").

2332. *See* Reebok Int'l Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 588–61 (1992).

ments for irreparable injury, and a showing of the likelihood of consumer confusion together with evidence of prior rights in the mark are significant factors in demonstrating a likelihood of success on the merits.

Technological advances also affect the application of trademark law. Infringement of trademarks in cyberspace complicate issues of origin, affiliation, or sponsorship, as well as the extent of protection accorded trademark use in metatags,[2333] hyperlinks, and caching. Other considerations include the following:

- Is foreign commerce involved and extraterritorial jurisdiction sought?[2334]

- Are the issues presented purely equitable or do they include distinct legal claims that will require a jury trial? For example, whether the plaintiff is entitled to money damages upon a finding of infringement is a jury question. Where the jury awards no damages, leaving only equitable issues, courts have considered whether the jury verdict may be treated as advisory and enter a contrary verdict.[2335]

- Where the Internet forms the vehicle for the infringing activity, is the defendant subject to personal jurisdiction? Personal jurisdiction over nonresident owners of Web sites often turns on whether the site is active or passive.

- If the action is *in rem* against an infringing domain name, has the plaintiff met the requirements to bring an *in rem* action pursuant to the Anticybersquatting Consumer Protection Act?[2336]

- Has there been a request for expedited discovery?[2337]

---

2333. Metatags are index words in Web pages that identify the page to browsers.

2334. *Reebok Int'l*, 970 F.2d at 554–55.

2335. *See, e.g., Ironclad*, 2000 WL 1400762, at *2–3.

2336. 15 U.S.C. § 1125(d)(2)(A) (2000).

2337. *See, e.g.*, Phila. Newspapers, Inc. v. Gannett Satellite Info. Network, Inc., No. CIV.A. 98-CV-2782, 1998 WL 404820, at *3 (E.D. Pa. 1998) (denying motion for expedited discovery filed in conjunction with preliminary injunction motion where discovery sought was broad and voluminous and "without reasonable boundaries").

# 34. CERCLA (Superfund)

.1 Introduction  643
   .11 Statutory Framework  646
   .12 The Three Phases of CERCLA Litigation  650
.2 Case Management  654
   .21 Setting Up the Case  662
   .22 Special Masters and Magistrate Judges  664
   .23 Related Litigation  665
   .24 Organizing Counsel  667
   .25 Centralized Document Management  669
   .26 Narrowing the Issues  670
   .27 Joinder  672
   .28 Managing Discovery  674
   .29 Scientific and Technical Expert Testimony  676
.3 Settlement and Trial  677
   .31 Allocation  677
   .32 Settlement  682
   .33 Approval of Consent Decrees  686
   .34 Structuring the Trial  687

## 34.1 Introduction

.11 Statutory Framework  646
.12 The Three Phases of CERCLA Litigation  650

In 1980, Congress passed the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9626 (1994), to respond to the growing problem presented by abandoned or inactive hazardous waste sites.[2338] CERCLA, often referred to as the Superfund, is premised on the "polluter pays" principle.[2339] It permits quick government response to

---

2338. Estimates of clean-up costs just for sites that were candidates for listing on the Environmental Protection Agency's National Priorities List (NPL), and excluding Department of Energy facilities, have ranged from $500 billion to $750 billion. *See, e.g.,* United States v. A & N Cleaners & Launderers, Inc., 854 F. Supp. 229, 236 (S.D.N.Y. 1994) (citing Office of Tech. Assessment, *Assessing Contractor Use in Superfund, reprinted in* 17 Chem. Waste Litig. Rep. (Law Reps.) 715 (1989)). "[A]ccording to a survey of state hazardous waste officials conducted in 1998 by the Environmental Law Institute, states identified 69,000 'known and suspected sites.' GAO and others have estimated the number of contaminated sites in the country to range from 150,000 to 500,000, although only a small percentage of these sites are likely to warrant placement on the NPL." Katherine Probst & David Konisky, Superfund's Future: What Will It Cost?: A Report to Congress 85 (2001).

2339. S. Rep. No. 96-848, at 13 (1980) (reflecting adoption of the principle that the polluter should pay for hazardous waste remediation).

threats presented by hazardous contaminants and seeks to place the ultimate cost of cleanup of hazardous sites directly on those responsible for the contaminants.[2340]

CERCLA's primary goal is to address threats to human health and the environment from the release or threatened release of hazardous substances.[2341] CERCLA directs the Environmental Protection Agency (EPA) to create and maintain, based on certain criteria, a prioritized list[2342] of hazardous sites eligible for cleanup under the Superfund. These sites form the basis for most CERCLA claims. Once the site has been listed, EPA undertakes a Remedial Investigation/Feasibility Study (RI/FS) to develop, among other things, alternative cleanup strategies and determine the scope of the remedial action. In the remedial investigation phase, EPA conducts a detailed investigation at the site, seeking information regarding all site operations, and the extent of contamination at the site.[2343] The feasibility study looks at remedial goals and alterna-

---

2340. *See, e.g.*, Tippins Inc. v. USX Corp., 37 F.3d 87, 92 (3d Cir. 1994) ("CERCLA . . . has its 'bite' in holding responsible parties financially accountable for the costs associated with a remedial action at hazardous waste facilities.").

2341. Although CERCLA authorizes the President to undertake response actions, much of this authority has been delegated to EPA to function as the lead federal agency with responsibility for site cleanup pursuant to Exec. Order No. 12580, 52 Fed. Reg. 2923 (Jan. 23, 1987). The authority to conduct certain response actions at certain sites under the jurisdiction, custody, or control of other federal agencies, however, has been delegated to those agencies. *Id.*

2342. This list is referred to as the National Priorities List (NPL). *See* 42 U.S.C. § 9601 (West 2003). If a site is not listed on the NPL, EPA may only undertake removal, not remedial, efforts using the Superfund. *See, e.g.*, SCA Servs., Inc. v. Thomas, 634 F. Supp. 1355, 1382 (N.D. Ind. 1986). A removal action is considered a short-term cleanup and typically is undertaken to deal with an imminent threatened release. Expenditures by EPA are "limited by law to $2 million and a duration of one year (unless a waiver is issued)." Probst & Konisky, *supra* note 2338, at 33.

2343. Section 104(e) of CERCLA grants EPA broad information-gathering authority, including access to information from persons who might know about the presence of hazardous wastes at the site, and it permits imposition of a civil penalty against anyone who unreasonably fails to comply with a section 104(e) information request. 42 U.S.C. §§ 9604(e), 9604(e)(5) (West 2003). *See* United States v. Martin, No. 99 C 1130, 2000 WL 1029188, at *10 (N.D. Ill. July 26, 2000) (assessing a civil penalty of "$75 per day for each of the 607 days the defendant unreasonably delayed" in responding to government information requests under section 104); United States v. Barkman, 784 F. Supp. 1181, 1190 (E.D. Pa. 1992) ("[The defendant's] delay of over 700 days in answering completely the Information Requests of the EPA constitutes, by virtue of the duration itself, an unreasonable delay."); United States v. Tannery, No. 99 C 1130, 1992 WL 1458802, at *1 (N.D. Tex. Dec. 7, 1992) (imposing maximum penalty of $13,452,324 on the defendant who failed to comply with the government's information request). EPA will also have done extensive sampling and testing and may, in some instances, have undertaken a removal action to remedy an immediate hazard. 42 U.S.C. § 9604 (West 2003).

tives. EPA then prepares a record of decision (ROD), which sets forth the remedy selected and the anticipated costs.[2344]

The cleanup then moves into an engineering phase to design the remedy, called remedial design, and finally into the remedial action phase, where the remedy is actually implemented. Depending on the nature and extent of the contamination and the cleanup technology selected, it can take many years—an average of 11.4 years—to complete a cleanup at an NPL site, especially a site involving contaminated groundwater.[2345] Complicating this process, EPA often initially divides a site into more than one "operable unit" corresponding "to different physical areas at a site or different environmental media (such as soil or groundwater)."[2346] To the extent that the site includes more than one operable unit, each unit goes through the process described above, although multiple operable units sometimes proceed through the process simultaneously.

EPA can bring a CERCLA action at almost any point in the remedial process with respect to any operable unit or the site as a whole. Remediation need

---

2344. *See* 40 C.F.R. § 300.430(c)(5)(I), (f)(4), (f)(5) (1990). The selection of the remedy in the ROD is governed by the National Contingency Plan (NCP) and is solely determined by EPA. EPA is required to publish a proposed plan for remediation in the Federal Register for public comment and then issue a ROD selecting the response action once public comments on the proposed plan have been considered. United States v. Rohm and Haas, 721 F. Supp. 666, 674, n.8 (D.N.J. 1989) ("The ROD presents the remedy in general terms and an estimate of its costs. The figure may change during the remedial design phase when detailed engineering plans are developed to implement the general remedial concept."). Remedies must be in compliance with all applicable or relevant and appropriate requirements (ARARs), which include any federal and state cleanup standards or laws relating to a hazardous substance or remedial action (where more stringent than any federal requirement or contained in a program authorized by EPA). Probst & Konisky, *supra* note 2338, at 34; 42 U.S.C. § 9621(d)(2)(A)(i), (ii) (West 2003).

2345. U.S. GAO Rep. 97-20, Superfund Times to Complete the Assessment and Cleanup of Hazardous Waste Sites 3 (Mar. 31, 1997). Completion of the remedy is assessed as of the date of completion of construction. EPA considers "remedial action complete when a system for pumping and treating contaminated groundwater has been installed, even though the system may have to operate for years before the contamination is reduced to acceptable levels." *Id.* at 7. However, "[r]egardless of whether a site is on the NPL, and regardless of whether the EPA undertakes to clean it up or to order the PRPs [potentially responsible parties] to clean it up, a CERCLA site may be cleaned up by *any* party, including but not limited to a state, a locality, a corporation or an individual, who may then sue the PRPs for reimbursement directly under CERCLA § 107(a)(4)(A) [for states] or (B) [any other party] and/or § 113(f)." Maxine Lipeles, Hazardous Wastes 277 (3d ed. 1997).

2346. U.S. GAO Rep., *supra* note 2345, at 7, 8. *See, e.g.,* United States v. Occidental Chem. Corp., 200 F.3d 143 (3d Cir. 1999) (EPA divided remediation into two operable units); Kalamazoo River Study Group v. Rockwell Int'l, 107 F. Supp. 2d 817, 819 (W.D. Mich. 2000) ("four Operable Units consisting of five disposal areas").

not be complete before EPA acts. CERCLA requires only that there be an imminent release or threatened release of hazardous contaminants to initiate a governmental response, or that the government (or a private plaintiff undertaking cleanup) has incurred response costs.[2347] Many of the general principles applicable to complex litigation apply to CERCLA actions.[2348] A CERCLA case demands "the attention of the judge as an administrator, adjudicator and mediator like no other civil litigation . . . [C]ourts are called upon to employ procedures in the multi-party Superfund site cases to foster economy and fairness in a process which cannot be economical and often cannot be fair to all participants."[2349] This subsection addresses some of the special features of CERCLA and discusses issues and problems peculiar to this type of litigation.[2350]

## 34.11  Statutory Framework

CERCLA cases often arise differently from most other complex litigation and can take several forms. Typically, the process begins after the government (usually EPA) has determined the need for a response action at the site. As part of its investigation, EPA may seek information regarding the identity of all persons or entities that may have owned or operated the site, or generated or transported hazardous substances found at the site. These persons or entities are statutorily liable under CERCLA and considered potentially responsible parties, or PRPs.[2351] CERCLA affords EPA (and, to a limited extent, private parties that undertake a cleanup effort) several options, the choice of which can shape the subsequent action:

- *Section 107 cost recovery actions.* Section 104 of CERCLA authorizes EPA to conduct certain response actions using monies from the Superfund. Removal actions are considered interim actions and defined

---

2347.  *See, e.g.,* Romeo v. Gen. Chem. Corp., 922 F. Supp. 287, 289 (N.D. Cal. 1994) (suit may be filed once a party has incurred some recoverable response cost).

2348.  *See infra* section 10.

2349.  Stanley S. Brotman & Jerome B. Simandle, *Superfund Case Management and Settlement Processes,* C352 ALI-ABA 175, 177 Superfund and Toxic Substances (Dec. 1, 1988). For an excellent overview, see Ridgway M. Hall, Jr., et al., *Superfund Response Cost Allocation: The Law, the Science, and the Practice,* 49 Bus. Law. 1489 (1994).

2350.  A number of useful resources provide a good overview of CERCLA and how it has been interpreted and applied by the courts, as well as by EPA. *See* Lipeles, *supra* note 2345; Robert V. Percival et al., Environmental Regulation: Law, Science, and Policy (4th ed. 2003); William H. Rodgers, Environmental Law (2d ed. 1994); Allan J. Topol & Rebecca Snow, Superfund Law & Procedure (1992 & Supp. 2003).

2351.  42 U.S.C. § 9607(a)(2) (West 2003).

as those necessary to prevent the release of a hazardous substance,[2352] while remedial actions are defined as actions consistent with a permanent remedy "taken instead of or in addition to removal actions."[2353] After EPA has incurred costs at the site and remedial actions are completed, the government can file a cost-recovery action against the PRPs under section 107 to recover those costs. Section 107 also permits innocent plaintiffs, i.e., persons who are not also responsible or potentially responsible parties, to file a cost-recovery action against responsible parties to recover all monies expended in cleaning up a hazardous facility. Liability to the government (as well as to "innocent plaintiffs") under section 107 is typically joint and several; the appropriate allocation of responsibility among PRPs is typically addressed in private actions for contribution under section 113. These claims for contribution are often asserted as cross-claims or third-party claims by defendants in section 107 actions initiated by the government.

- *Issuance of a section 106 administrative order.* CERCLA section 106(a) authorizes the government to seek injunctive relief or to issue an administrative order compelling responsible parties to clean up, abate, or otherwise remediate contamination at a site where EPA has determined that there is an "imminent and substantial endangerment to the public health or welfare."[2354] Incentives for cooperation are fairly strong: Failure to comply with an administrative order carries civil penalties up to $27,500 per day for each violation occurring on or after January 30, 1997.[2355] PRPs who incur response costs in complying with an administrative order may seek contribution from other liable parties pursuant to section 113(9f)(1) of CERCLA, described below. Section 106 orders issued by EPA can name as few as one and as many as all PRPs at a site, and PRPs who refuse to comply with a section 106 order without "sufficient cause"[2356] do so at their peril.

---

2352. *Id.* § 9601(23).

2353. *Id.* § 9601(24).

2354. *Id.* § 9406(a).

2355. *Id.* § 9604(e)(5), amended by Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, and Civil Monetary Penalty Inflation Adjustment Rule, 61 Fed. Reg. 69360 (Dec. 31, 1996) (to be codified at 40 C.F.R. pts. 19, 27). Penalties for violation of a section 106 order and treble damages under section 107(c)(3) are cumulative. 42 U.S.C. § 9607(c)(3) (West 2003).

2356. 42 U.S.C. § 9606(b)(1) (West 2003); *see* United States v. LeCarreaux, Civ. No. 90-1672, 1991 WL 341191, at *25–27 (D.N.J. July 30, 1991) (financial condition not sufficient cause for failure to comply).

CERCLA explicitly precludes jurisdiction to review section 106 orders, except in an action by EPA to enforce an order or to recover penalties for its violation, in an action for reimbursement by participating PRPs under section 106(b)(2), or pursuant to a cost recovery action under section 107.[2357] Typically, EPA will first notify all identified PRPs of its intent to issue a section 106 order in an effort to encourage the PRPs collectively to undertake a remedial action.[2358] CERCLA encourages EPA to minimize litigation by facilitating agreements with PRPs.[2359] To the extent that the PRPs agree to a cleanup effort, the government will enter into a consent decree with cooperating parties, setting forth the work to be performed and the liabilities assumed.[2360] Even in cases where agreement has been reached and a consent order signed, judicial review may nonetheless arise where the PRPs subsequently challenge EPA actions (such as the remedy selected[2361]), oversight costs, consistency with the National Contingency Plan (NCP),[2362] or proposed set-

---

2357. 42 U.S.C. § 9613(h) (West 2003).

2358. *See id.* § 9622(d)(1)(A), (B). In 1995, EPA issued a new model consent decree, which eliminated a provision in its predecessor that "required defendants to commit to performing additional remedy actions in the event the original remedy failed." Press Release, Dept. of Justice, EPA Announces Model Superfund Consent Decree Designed to Improve Superfund Settlements and Cleanups (July 14, 1995), 1995 WL 414063, at *1 [hereinafter Model Superfund Consent Decree].

2359. 42 U.S.C. § 9622(a) (West 2003). *See also id.* § 9622(g)(1) (EPA will also negotiate settlements with de minimis PRPs (PRPs with extremely small volumetric contributions)); United States v. Occidental Chem. Corp., 200 F.3d 143, 147 (3d Cir. 1999) ("It is through § 122 that PRPs may agree, as opposed to being ordered under § 106(a), to do the remedial work at a site in the first instance."). Any sums recovered will be applied to reduce cleanup costs at the site. *See* United States v. Cannons Eng'g Corp., 899 F.2d 79, 91 (1st Cir. 1990) ("The statute immunizes settling parties from liability for contribution and provides that only the amount of the settlement—not the pro rata share attributable to the settling party—shall be subtracted from the liability of the non-settlors.").

2360. *See* CERCLA §§ 122(d)(1)(A) & (B). It is not unusual for EPA to have reached agreement with PRPs to conduct an RI/FS. However, the PRPs' failure to agree to undertake any other additional work at the site presents a challenge for subsequent efforts at settlement negotiation during litigation, as well as uncertainty as to total cleanup costs. *See* Model Superfund Consent Decree, *supra* note 2358.

2361. *See, e.g., In re* Bell Petroleum Servs., Inc., 3 F.3d 889, 904–05 (5th Cir. 1993) (holding EPA could not recover costs for implementation of interim measure found to be "arbitrary and capricious").

2362. United States v. N.E. Pharm. & Chem. Co., 810 F.2d 726, 747–48 (8th Cir. 1986), *cert. denied*, 484 U.S. 848 (1987); United States v. Am. Cyanamid Co., 786 F. Supp. 152, 158 (D.R.I. 1992); United States v. Kramer, 757 F. Supp. 397, 436 (D.N.J. 1991). The NCP is codified at 40 C.F.R. § 300 and specifies the procedures and requirements that apply to removal and remedial actions under CERCLA. Response actions by the government under section 107 must be

tlement agreements between EPA and other PRPs.[2363] In some cases, the primary PRP group may have reached a settlement and entered into a consent decree with the government on removal or remediation efforts, but failed to agree on reimbursement of past costs, which may trigger an action under section 107 by the government on that unresolved portion. Those PRPs that refuse to participate in cleanup actions or otherwise settle with EPA face issuance of the section 106 order, a possible enforcement action, or, if EPA has expended any monies at the site, a cost-recovery action under section 107.[2364]

• *Section 113 contribution actions.* Private-party PRPs may themselves incur response costs a number of different ways, including by reimbursing the government for its response costs through a judgment or settlement of a section 107 cost-recovery action; by performing actions pursuant to a section 106(a) administrative order; by performing response actions pursuant to a settlement agreement with the government; or even by performing a voluntary cleanup. Private-party PRPs generally will seek to recover an equitable portion of such costs from other PRPs through a contribution action under section 113(f)(a) of

consistent with the NCP. United States v. Hardage, 982 F.2d 1436, 1444 (10th Cir. 1992) ("Costs, by themselves, cannot be inconsistent with the NCP . . . As long as the government's choice of response action is not inconsistent with the NCP, its costs are presumed to be reasonable and therefore recoverable."). Response costs must be "consistent with" the NCP, as well, for actions by private parties under section 113. *See* 42 U.S.C. §§ 9607(4)(A) & (B) (West 2003). *See also* Trimble v. Asarco, Inc., 232 F.3d 946, 956–57 (8th Cir. 2000) (where plaintiffs had no existing obligation to reimburse attorneys for response costs incurred on their behalf, they did not have a viable cost recovery claim); Romeo v. Gen. Chem. Corp., 922 F. Supp. 287 (N.D. Cal. 1994) (response costs must be cognizable under CERCLA in order to make out prima facie case (citing Ascon Props., Inc. v. Mobil Co., 866 F.2d 1149, 1153–54 (9th Cir. 1989))).

2363.  *See, e.g.,* United States v. Am. Cyanimid Co., No. 2:93-0654, 1997 U.S. Dist. LEXIS 4413 (S.D. W. Va. Jan. 27, 1997) (summary judgment granted in part and denied in part for claims against sole PRP who refused to sign on to consent decree). *See also* United States v. Ottati & Goss, Inc., 900 F.2d 429, 443–45 (1st Cir. 1990) (raising issue of whether EPA overhead costs could be reduced because EPA was at fault in delaying the litigation).

2364.  *See, e.g., Occidental Chem. Corp.,* 200 F.3d at 153 (issuing of a section 106 order against the defendant after settlement negotiations failed); United States v. LeCarreaux, Civ. No. 90-1672, 1991 WL 341191 (D.N.J. July 30, 1991) (recalcitrant PRPs held liable for EPA response costs and treble damages in EPA enforcement action). Often PRP groups that have agreed to undertake a cleanup and enter into a consent order will have negotiated with EPA an agreement that nonparticipating PRPs be named in a section 106 order. EPA further has determined that "one important measure to encourage settlement is to maintain aggressive use of Section 106 administrative and judicial enforcement authorities to compel private party response." *Memorandum: Interim Guidance: Streamlining the CERCLA Settlement Decision Process*, 17 Envtl. L. Rep. (Envtl. L. Inst.) 35014 (1987) [hereinafter *Streamlining*].

CERCLA. These actions are brought either as original claims or, where the original PRPs are defendants in a cost-recovery action, as third-party claims.[2365] In addition, PRPs that have settled with the government (e.g., pursuant to a consent order) or have otherwise undertaken a removal or remedial effort can file an action for contribution or indemnity under section 113 against nonsettling or nonparticipating PRPs. Where EPA allegedly failed to follow regulations and to perform nondiscretionary acts, section 113(h)(4) also permits citizen suits brought pursuant to section 310.[2366]

## 34.12 The Three Phases of CERCLA Litigation

Generally, CERCLA litigation will comprise three interrelated phases, each of which have case-management implications: (1) liability; (2) determination of remedy and recoverable costs, including challenges to response actions for which costs were incurred; and (3) equitable allocation of response costs among defendants. Cases that also involve government claims for damages for destruction, injury, or loss of natural resources may require an additional phase or may considerably complicate the first and second phases. In practice, issues may cut across these phases:

1.  *Liability.* CERCLA imposes liability on four classes of defendants for cleanup of a site or facility: (1) past or present owners; (2) past or present operators; (3) generators; and (4) transporters.[2367] In order to make out a prima facie case, a plaintiff must show only that the defendant is a responsible party under section 107(a) (i.e., owner, operator, generator, or transporter) and that there has been a release or threatened release of a hazardous substance[2368] from a "facility"[2369]

---

2365. *But see* Aviall Servs., Inc. v. Cooper Indus., Inc., 263 F.3d 134, 137–38 (5th Cir. 2001) (costs incurred for voluntary cleanup not recoverable in contribution action in the absence of a federal or state action under CERCLA § 106 or § 107(a)).

2366. 42 U.S.C. § 9613(h)(4) (West 2003). *See* Schalk v. Reilly, 900 F.2d 1091, 1095 (7th Cir. 1990) (in order to prevent unnecessary delay, a citizen suit may not challenge a cleanup prior to completion of the remedy); Ala. v. United States EPA, 871 F.2d 1548, 1557 (11th Cir. 1989).

2367. 42 U.S.C. § 9607(a) (West 2003).

2368. *Id.* § 9601(22) defines a "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharge, injecting, escaping, leaching, dumping, or disposing into the environment."

2369. *Id.* § 9601(9) defines a "facility" as

  (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment,

that has caused the plaintiff to incur "response costs." It is not necessary for the plaintiff to prove that the defendant "caused" the release, improperly disposed of the waste, or was otherwise "at fault."[2370] Indeed, the plaintiff need only prove that some amount of response cost has been incurred in response to a release or threatened release of a hazardous substance.[2371] Moreover, where hazardous substances from multiple parties are commingled, the government need not establish that a particular defendant's release caused the incurrence of response costs.[2372] CERCLA defenses are limited and, although disputes about whether a particular defendant qualifies as a responsible party under section 107(a) may require factual development, defendants have usually found it difficult to avoid liability.[2373] Some equitable defenses do exist in an action for contribution under section 113, however, and defenses that negate an element of liability are occasionally successful.[2374] Resolution of a PRP's liability as soon as practicable can facilitate negotiations on allocation and settlement.

Liability is joint and several in government actions under CERCLA unless the defendant can prove that the environmental

---

ditch, landfill, storage container, motor vehicle, rolling stock or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or in any vessel.

2370. *See, e.g.,* Acushnet Co. v. Mohasco Corp., 191 F.3d 69, 77 (1st Cir. 1999) ("To satisfy the causal element, it is usually enough to show that a defendant was a responsible party within the meaning of [section] 9607(a); that cleanup efforts were undertaken . . . and that reasonable costs were expended during the operation.").

2371. United States v. Kramer, 757 F. Supp. 397, 417 (D.N.J. 1991); United States v. W. Processing Co., 734 F. Supp. 930, 936–37 (W.D. Wash. 1990).

2372. United States v. Alcan Aluminum Corp., 990 F.2d 711, 721 (2d Cir. 1993); United States v. Rohm & Haas Co., 939 F. Supp. 1142, 1150 (D.N.J. 1996). ("[F]inding a causal connection between [defendant's] wastes and USA-EPA's costs is not required by statute.").

2373. CERCLA § 107(b) provides a defense to liability for releases caused solely by acts of God, acts of war, or certain acts or omissions of unrelated third parties. 42 U.S.C. § 9607 (West 2003).

2374. *See, e.g.,* Gould, Inc. v. A & M Battery & Tire Serv., 232 F.3d 162, 170 (3d Cir. 2000) (Under the Superfund Recycling Equity Act, section 107(a) liability will not attach to persons "who arranged for recycling of a recycling material."); RSR Corp. v. Avanti Dev., Inc., 69 F. Supp. 2d 1119, 1126 (S.D. Ind. 1999) ("[A]rranger liability may be defeated when a defendant . . . was not disposing of, or delivering for treatment, a hazardous substance, but was selling a useful product."); *but see* United States v. A & N Cleaners & Launderers, Inc., 854 F. Supp. 229 (S.D.N.Y. 1994) (third-party defense and innocent landowner defense unavailable to PRP defendants when they failed to show they satisfied due care and precautionary requirements).

harm is divisible.[2375] In determining divisibility of harms, many courts have looked to section 433A of the Restatement (Second) of Torts (1965), which provides that "[d]amages for harm are to be apportioned among two or more causes where (a) there are distinct harms; or (b) there is a reasonable basis for determining the contribution of each cause to a single harm."[2376] This is a narrower inquiry than that undertaken in allocating costs in contribution claims. However, factual issues relating to the divisibility of harm or apportionment may be closely related to factual issues concerning allocation. Even where these issues prove insufficient to defeat joint and several liability, they may be of critical importance in allocation.

2. *Determination of remedy and damages.* Under section 121(a) and (b)(1), remedies must be "cost effective."[2377] EPA administrative action in selecting a remedy is likely to be determinative in a cost-recovery action by the government seeking to recover "response costs" incurred in a full or partial remediation at the site. In fact, CERCLA precludes judicial challenge of a selected remedy prior to its implementation.[2378] Any judicial review of the government's choice of remedy is limited to the administrative record.[2379] However, parties can and do challenge, among other things, whether the

---

2375. *See, e.g.,* Centerior Serv. Co. v. Acme Scrap Iron & Metal Co., 153 F.3d 344, 348 (6th Cir. 1998) ("Given the nature of hazardous waste disposal, rarely if ever will a PRP be able to demonstrate divisibility of harm, and therefore joint and several liability is the norm."). The legislative history of the Superfund Amendments and Reauthorization Act (SARA) reflects that Congress intended liability under CERCLA to be joint and several where appropriate. H.R. Rep. No. 99-253(I) (1985), at 74–75, *reprinted in* 1986 U.S.C.C.A.N. 2835, 2856.

2376. Restatement (Second) of Torts § 433A (1965). *See In re* Bell Petroleum Servs., Inc., 3 F.3d 889, 895 (5th Cir. 1993); *Alcan Aluminum Corp.,* 990 F.2d at 722. *See also* United States v. R.W. Meyer, Inc., 889 F.2d 1497, 1507 (6th Cir. 1989) (discussing liability requirements under Restatement (Second) of Torts § 875.).

2377. 42 U.S.C. §§ 9621(a), (b)(1) (West 2003). *See, e.g.,* United States v. Am. Cyanamid Co., 786 F. Supp. 152, 161 (D.R.I. 1992) ("As long as the actions taken by the government fit within the NCP, the costs are presumed reasonable.").

2378. 42 U.S.C. § 9613(h) (West 2003).

2379. *Id.* § 9613(j). *See* United States v. Akzo Coatings of Am., Inc., 949 F.2d 1409, 1423–34 (6th Cir. 1991); *In re* Acushnet River & New Bedford Harbor, 722 F. Supp. 888, 890–92 (D. Mass. 1989); United States v. Wastecontrol of Fla., Inc., 730 F. Supp. 401, 404 (M.D. Fla. 1989) ("Limiting judicial review of response actions to the administrative record also expedites the process of review, avoids the need for time-consuming and burdensome discovery, reduces litigation costs and ensures that the reviewing court's attention is focused on the information and criteria used in selecting the response . . . ." (quoting H.R. Rep. No. 99-253, at 81 (1985), *reprinted in* 1986 U.S.C.C.A.N. 2835, 2863)); United States v. Rohm & Haas Co., 669 F. Supp. 672, 676–77 (D.N.J. 1987).

costs sought by EPA were "response costs"[2380] and whether the remedy was consistent with the NCP.[2381] When a private party brings a cost-recovery action, the burden is on the plaintiff[2382] to prove that the costs incurred were "necessary" at the time the remedial effort was undertaken (i.e., an actual threat existed) and that the costs were consistent with the NCP.[2383] In an action brought by the government, the burden is on the defendant.

3. *Allocation of response costs.* Allocation issues center on equitably apportioning the costs of cleanup among the defendants. Section 113(f)(1) provides that the court "may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." Because allocation decisions require the application of a host of factors to a complex factual record involving a

---

2380. Recoverable response costs include (1) the costs of investigating and monitoring releases of hazardous substances and costs incurred in planning and undertaking response actions, including health assessment costs incurred by the Agency for Toxic Substances and Disease Registry (Folino v. Hampden Color & Chem. Co., 832 F. Supp. 757, 763 (D. Vt. 1993)); (2) the costs of administration, including the response agency's indirect costs associated with cleanups and related enforcement efforts (United States v. Am. Cyanamid Co., 786 F. Supp. 152, 157 (D.R.I. 1992)); (3) the costs of contractors that perform or support response actions on behalf of the response agency (United States v. Lowe, 118 F.3d 399, 404 (5th Cir. 1997)); (4) the costs of attorney time and other litigation expenses incurred by the response agency and the Department of Justice (DOJ) (United States v. Gurley, 43 F.3d 1188, 1200 (8th Cir. 1994)); (5) DOJ indirect costs (United States v. Findett Corp., 75 F. Supp. 2d 982, 989–90 (E.D. Mo. 1999)); and (6) prejudgment interest (United States v. Mottolo, 695 F. Supp. 615, 631 (D.N.H. 1988)). Oversight costs, site security costs and actual costs for implementing a remedy also are recoverable. *See* United States v. Ottati & Goss, Inc., 900 F.2d 429, 443–45 (1st Cir. 1990) (challenging EPA overhead costs because EPA was at fault in delaying the litigation); Kelley v. Thomas Solvent Co., 790 F. Supp. 719 (W.D. Mich. 1990). Response costs have also been held to include natural resource damages that result from a release. 42 U.S.C. § 9607(a)(4)(C) (West 2003). A private plaintiff cannot recover natural resource damages, and any monies recovered by the government for natural resource damages are to be used to "restore, replace, or acquire the equivalent of such natural resources." 42 U.S.C. § 9607(f)(1) (West 2003). *But see* Struhar v. City of Cleveland, 7 F. Supp. 2d 948, 951 (N.D. Ohio 1998) (response costs did not include medical monitoring).

2381. *See, e.g.,* United States v. Chapman, 146 F.3d 1166, 1169 (9th Cir. 1998) (government must show that it incurred response costs); United States v. Hardage, 982 F.2d 1436, 1443–44 (10th Cir. 1992) (PRP could not show costs were inconsistent with the NCP simply by showing individual costs were excessive or unreasonable); United States v. N.E. Pharm. & Chem. Co., 810 F.2d 726, 747–48 (8th Cir. 1986) (holding that defendants could not dispute costs as unreasonable when they were consistent with the NCP).

2382. *See* Carson Harbor Vill., Ltd. v. Unocal Corp., 990 F. Supp. 1188, 1193 (C.D. Cal. 1997), *aff'd in part and rev'd in part,* 227 F.3d 1196 (9th Cir. 2000).

2383. *See* Mass. v. Blackstone Valley Elec. Co., 867 F. Supp. 76 (D. Mass. 1994).

large number of parties, such decisions often represent the most challenging aspects of CERCLA cases.

## 34.2 Case Management

.21 Setting Up the Case  662
.22 Special Masters and Magistrate Judges  664
.23 Related Litigation  665
.24 Organizing Counsel  667
.25 Centralized Document Management  669
.26 Narrowing the Issues  670
.27 Joinder  672
.28 Managing Discovery  674
.29 Scientific and Technical Expert Testimony  676

CERCLA has been roundly criticized as being draconian, inefficient, and costly, with millions of dollars spent on litigation and attorney fees rather than site cleanup. CERCLA liability virtually ensures that litigation will be complex and protracted for a number of reasons. The scope of liability is extremely broad, reaching a wide range of affected parties, from individuals and corporations, both domestic and foreign, to federal, state, and municipal governments, among others.[2384] CERCLA draws within its net not only current and past owners and operators of a contaminated facility, but also generators and transporters of any hazardous material that was sent to the site. The quality and quantity of the waste are not factors in assessing CERCLA liability and provide no grounds for PRPs to avoid liability.[2385] In addition, the courts have consistently construed CERCLA provisions expansively to "avoid frustrating [its] legislative purposes."[2386] For example, "owner" or "operator" liability under section 107(a) has been extended to include, among others, shareholders,

---

2384. 42 U.S.C. § 9601(21) defines "person" as an "individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body."

2385. *See* Acushnet Co. v. Mohasco Corp., 191 F.3d 69, 76 (1st Cir. 1999) (CERCLA does not require that there be some minimal quantity of hazardous waste before liability will attach); B.F. Goodrich v. Betkoski, 99 F.3d 505, 517 (2d Cir. 1996) (CERCLA's "'hazardous substance' definition includes even minimal amounts"). However, the *Acushnet* court, following in the footsteps of the Second Circuit, stated that, in apportioning costs, fairness and equity could allow "a defendant [to] avoid joint and several liability for response costs in a contribution action under § 9613(f) if it demonstrates that its share of hazardous waste . . . constitutes no more than background amounts of such substances in the environment and cannot concentrate with other wastes to produce higher amounts." *Acushnet Co.*, 191 F.3d at 77.

2386. Anspec Co. v. Johnson Controls, Inc., 922 F.2d 1240, 1247 (6th Cir. 1991).

officers, employees, easement holders, lenders, and contractors.[2387] Issues surrounding the liability of parent companies for activities of their subsidiaries[2388] and of the liability of successor corporations[2389] are still being vigorously contested,[2390] as are issues related to liability for passive contamination. The issue centers on whether there is a distinction between "release" and "disposal," and whether passive movement of contaminants is sufficient for PRP liability to attach under section 107(a).[2391] Commonly the problem, many sites targeted by

2387. *See, e.g.,* United States v. Fleet Factors Corp., 901 F.2d 1550 (11th Cir. 1990). This decision imposed lender liability and subsequently led to the clarification of CERCLA applicability to lenders in the Superfund Amendments and Reauthorization Act (SARA) amendments and the Asset Conservation, Lender Liab., and Deposit Ins. Prot. Act of 1996. H.R. 3610, 104th Cong. (1996). *See also* Minyard Enter., Inc. v. Southeastern Chem. & Solvent Co., 184 F.3d 373, 380–81 (4th Cir. 1999) (contractor liable under CERCLA for contamination caused after rupturing underground storage tank during the process of removing it); Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489, 1512 (11th Cir. 1996) ("[A] 'disposal' may occur when a party disperses contaminated soil during the course of grading and filling a construction site."); United States v. USX Corp., 68 F.3d 811, 822 (3d Cir. 1995) ("[CERCLA] § 107(a)(4) plainly imposes liability on corporate officers and shareholders if they participate in the liability-creating conduct."); Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund, 25 F.3d 417 (7th Cir. 1994) (officer or shareholder may be liable under CERCLA when actually participating in operation of the facility); Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp., 976 F.2d 1338 (9th Cir. 1992) (contractor who spread contaminated soil over uncontaminated portions of property "disposed" of hazardous waste under CERCLA); Tanglewood E. Homeowners v. Charles-Thomas, Inc., 849 F.2d 1568 (5th Cir. 1988) (person who moves contaminated soil can be a responsible party under CERCLA).

2388. *See, e.g.,* United States v. Bestfoods, 524 U.S. 51 (1998) (limiting operator liability of parent company for subsidiary activity to active participation or control or misuse of corporate form); United States v. Township of Brighton, 153 F.3d 307 (6th Cir. 1998) (municipality may be operator of waste dump where it made repeated and substantial appropriations to fund maintenance and to remedy substandard conditions); Schiavone v. Pearce, 79 F.3d 248, 253 (2d Cir. 1996) (The imposition of operator liability on a corporate parent for a subsidiary's activity based on the parent's control is supported by CERCLA's statutory scheme, even though it may be inconsistent with "traditional rules of corporate liability."); United States v. TIC Inv. Corp., 68 F.3d 1082, 1091 (8th Cir. 1995) (parent corporation independently liable for activities of subsidiary); *USX Corp.,* 68 F.3d at 822 (liability compatible with goals of CERCLA). *See also* Richard B. Stewart & Bradley M. Campbell, *Lessons from Parent Liability Under CERCLA,* 6 Natural Res. & Env't 7, 9 (1992).

2389. *See* United States v. Mex. Feed & Seed Co., 980 F.2d 478 (8th Cir. 1992).

2390. *See* Burlington N. & Santa Fe R.R. Co. v. Consolidated Fibers, Inc., No. Civ. A. 5:97-CV-219-C, 1998 WL 460285, at *2 (N.D. Tex. July 24, 1998) (addressing issue of whether corporation was "dead and buried" and not amenable to suit at time CERCLA action filed).

2391. *See* United States v. 150 Acres of Land, 204 F.3d 698, 705 (6th Cir. 2000) ("Although early CERCLA decisions interpreted 'disposal' to include passive movement of substances (i.e., with no human activity), two circuits have recently limited 'disposal' to spills occurring by human intervention."). *Compare* Carson Harbor Vill., Ltd. v. Unocal Corp., 227 F.3d 1196,

CERCLA are former hazardous waste disposal sites to which numerous companies may have sent waste over many years. Liability under CERCLA has been held to be retroactive and will attach for disposal or contamination that may have occurred in years prior to the statute's 1980 enactment.[2392] Indeed, one case considered whether CERCLA applied to a plant that had operated from 1886 to 1954.[2393] Consequently, the number of PRPs at a given site, and involved in the litigation, can number in the hundreds. These parties usually will be geographically dispersed, although CERCLA provides for nationwide service of process to ensure that these parties do not avoid, on jurisdictional grounds, responsibility for cleanup costs.[2394]

A CERCLA case also can be complicated because liability is strict, and CERCLA imposes liability without fault, as well as joint and several liability.[2395]

---

1205–06, *and* Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 844–47 (4th Cir. 1992), *with* United States v. CDMG Realty, 96 F.3d 706, 710–11 (3d Cir. 1996), *and* United States v. Petersen Sand & Gravel, Inc., 806 F. Supp. 1346, 1350–52 (N.D. Ill. 1992). Also unsettled is whether the disruption or movement of contaminated earth constitutes a "disposal." *Compare* Tanglewood E. Homeowners v. Charles-Thomas, Inc., 849 F.2d 1568, 1573 (5th Cir. 1988) (landfilling and grading by developer constitutes disposal), *with* Alcan-Toyo Am., Inc. v. N. Ill. Gas Co., 881 F. Supp. 342, 345–46 (N.D. Ill. 1995) (owners' excavation and stockpiling, which did not contribute to the preexisting contamination, did not constitute disposal). *See also* Geraghty & Miller, Inc. v. Conoco, Inc., 234 F.3d 917, 929 (5th Cir. 2000) (possibility that environmental contractors caused migration of hazardous substances precludes summary judgment that contractors are not liable as generators); Blasland, Bouck & Lee, Inc. v. N. Miami, 96 F. Supp. 2d 1375, 1380 (S.D. Fla. 2000) (absent negligence, response-action contractor cannot be held liable for failing to remedy contamination but not worsening it).

2392.  *See, e.g.*, Gould, Inc. v. A & M Battery & Tire Serv., 232 F.3d 162, 169 (3d Cir. 2000) (Superfund Recycling Equity Act applied retroactively); *In re* Penn Cent. Transp. Co., 944 F.2d 164, 166 (3d Cir. 1991); United States v. Monsanto Co., 858 F.2d 160, 166–74 (4th Cir. 1988); United States v. N.E. Pharm. & Chem. Co., 810 F.2d 726, 734 (8th Cir. 1986); HRW Sys. v. Wash. Gas Light Co., 823 F. Supp. 318, 329 (D. Md. 1993); City of Phila. v. Stepan Chem. Co., 748 F. Supp. 283, 289 (E.D. Pa. 1990); Kelley v. Thomas Solvent Co., 714 F. Supp. 1439, 1443–45 (W.D. Mich. 1989); O'Neil v. Picillo, 682 F. Supp. 706, 729 (D.R.I. 1988), *aff'd*, 883 F.2d 176 (1st Cir. 1989). *But see* United States v. Olin, 927 F. Supp. 1502 (S.D. Ala. 1996), *rev'd*, 107 F.3d 1506 (11th Cir. 1997) (the sole exception to a uniform holding by the courts that the purpose and history of CERCLA reflected Congress's intent that it be applied retroactively; the decision was reversed on appeal by the Eleventh Circuit).

2393.  *See* Fishbein Family P'ship v. PPG Indus., Inc., 871 F. Supp. 764 (D.N.J. 1994). *See also* Allied Corp. v. Acme Solvents Reclaiming, Inc., 691 F. Supp. 1100, 1103 (N.D. Ill. 1988) (the relevant conduct spans nearly thirty years, and the operation had been closed for over fifteen years before the court's ruling).

2394.  42 U.S.C. § 9613(e) (West 2003). Section 9613(e), however, does not authorize service of process in foreign countries. United States v. Ivey, 747 F. Supp. 1235 (E.D. Mich. 1990).

2395.  *See* United States v. Monsanto Co., 858 F.2d 160 (4th Cir. 1988); O'Neil, 682 F. Supp. at 724–26; United States v. Chem-Dyne, 572 F. Supp. 802 (S.D. Ohio 1983). *But see* United

Often, in cost-recovery actions brought under section 107, the government will name a limited number of PRPs as defendants, usually targeting those considered to have been the largest volumetric contributors of waste to the site. A defendant can avoid the imposition of joint and several liability only where it is able to show that the harm is divisible and can be reasonably apportioned.[2396] Defendants seeking to avoid joint and several liability bear the burden of proof on both divisibility and apportionment.[2397] As CERCLA liability can be extremely expensive, with site remedial costs averaging over $26 million,[2398] the

States v. A & F Materials Co., 578 F. Supp. 1249, 1252–57 (S.D. Ill. 1984) (adopting moderate approach based on Restatement (Second) of Torts, § 443(A), § 881 (1976), but vesting the court with discretion to impose joint and several liability, even where injury is indivisible, if a fair apportionment method is available). In actions for contribution brought under CERCLA § 113, courts have held that there is no joint and several liability among defendants. Instead, the court is to equitably "allocate response costs among liable parties." 42 U.S.C. § 9613(f)(1) (West 2003). *See* Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489, 1514 (11th Cir. 1996).

2396. *See Redwing Carriers, Inc.,* 94 F.3d at 1513 ("Recognizing Congress' intent that 'traditional and evolving common law principles' should define the scope of liability under CERCLA, courts have looked to the Restatement (Second) of Torts, particularly § 433A, for guidance." (citing *In re* Bell Petroleum Servs., Inc., 3 F.3d 889, 895 (5th Cir. 1993))); United States v. Alcan Aluminum Corp., 990 F.2d 711, 721–24 (2d Cir. 1993); *In re Bell Petroleum,* 3 F.3d at 894; United States v. Alcan Aluminum Corp., 964 F.2d 252, 269 (3d Cir. 1992). In *Kamb v. U.S. Coast Guard,* 869 F. Supp. 793, 799 (N.D. Cal. 1994), the court held that CERCLA liability could be apportioned where lead contamination at the site was divided into two discrete sections, one of which had not been used by defendants. Other courts have found imposition of joint and several liability appropriate where the site was geographically divisible. *See* Pneumo Abex Corp. v. Bessemer & Lake Erie R.R. Co., 936 F. Supp. 1250 (E.D. Va. 1996) (reasonable basis for apportionment); *cf.* United States v. Broderick Inv. Co., 862 F. Supp. 272, 277 (D. Colo. 1994) (defendant not jointly and severally liable where the harm was geographically divisible, contamination from one area has not merged or migrated to others, and defendant had no ownership interest in the land associated with one portion of site). However, although defendants have had some limited success in showing divisibility, more commonly defendants, even if able to prove the exact amount of waste they contributed to the site, find it difficult to prove the resulting proportionate harm to soil or groundwater. *See* O'Neil v. Picillo, 883 F.2d 176, 182 (1st Cir. 1989) (where, of 10,000 barrels excavated, only 300–400 could be attributed to any given defendant, defendants had burden of accounting for uncertainty); United States v. Ottati & Goss, Inc., 630 F. Supp. 1361, 1396 (D.N.H. 1985) ("the exact amount or quantity of deleterious chemicals or other noxious matter" couldn't be pinpointed to each defendant); *Chem-Dyne Corp.,* 572 F. Supp. at 811 (defendants failed to meet burden as to divisibility of harm).

2397. New Castle County v. Halliburton NUS Corp., 111 F.3d 1116, 1121 n.4 (3d Cir. 1997); United States v. Colo. & E. R.R., 50 F.3d 1530, 1535 (10th Cir. 1995). *See also In re Bell Petroleum,* 3 F.3d at 903 ("[W]hether there is a reasonable basis for apportionment depends on whether there is sufficient evidence from which the court can determine the amount of harm caused by each defendant.").

2398. *See* GAO Rep. 96-125, Superfund—Barriers to Brownfield Redevelopment 3 (June 26, 1996) ("EPA estimates that the average cost to clean up a site on the [NPL] . . . is $26 mil-

specter of joint and several liability spread among only the few named PRPs, and the inclusion in section 113 of a right to contribution, encourage named PRPs to search out all other potential defendants in order to reduce the PRPs' own portion of the response costs.[2399] As a result, CERCLA actions can involve scores of defendants and third-party defendants, as well as multiple claims for indemnification and contribution.[2400]

Although CERCLA affords a right to contribution and indemnity, there is no consensus as to the statutory provision under which PRPs must proceed or the method of determining each PRP's share of liability. Circuits have generally found that non-innocent PRPs (i.e., PRPs who have liability at the site) cannot proceed under section 107 for cost recovery but are limited to bringing an action for contribution under section 113.[2401] The distinction is significant. Whereas there is a six-year statute for cost-recovery actions under section 107,[2402] actions under section 113 are subject to a three-year limitation period. Further, under section 107 a defendant sued for cost recovery may be jointly and severally liable, but would be only severally liable under section 113 where costs would be apportioned equitably by the court.[2403] Under either provision, however, there is no specified method of fair apportionment or factors to be considered, and models of apportionment or allocation vary widely and can result in complex technical inquiries.

Some CERCLA cases brought by the government become complex because the action may have been filed at the early stages of cleanup while administra-

---

lion."); Katherine Probst, *Footing the Bill for Superfund Cleanups: Who Pays and How?* 1 (1995) (citing the average cost at $29.1 million). Some site remedial costs have exceeded $100 million. William D. Evans, Jr., *CERCLA's Third-Party Practice: Its "Cape Fear" Features,* 9-4 Mealey's Litig. Rep. Superfund 14 (May 24, 1996).

2399. Evans, *supra* note 2398, at 14 ("In April, 1996, the U.S. Environmental Protection Agency (EPA) announced that 56 PRPs had agreed to pay up to $109 million to settle cleanup claims at the Fike/Artel Superfund Site in Nitro, West Virginia.").

2400. *See, e.g.,* New York v. Exxon Corp., 744 F. Supp. 474 (S.D.N.Y. 1990) (including 15 primary corporate defendants and approximately 300 third-party defendants); United States v. Stringfellow, 661 F. Supp. 1053 (C.D. Cal. 1987) (with more than 100 parties).

2401. *See, e.g., New Castle County,* 111 F.3d at 1121; Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298, 1301–06 (9th Cir. 1997); *Redwing Carriers, Inc.,* 94 F.3d at 1497 n.4; *Colo. & E. R.R. Co.,* 50 F.3d at 1535–37; Akzo Coatings, Inc. v. Aigner Corp., 30 F.3d 761, 764 (7th Cir. 1994); United Techs. Corp. v. Brown-Ferris Indus., Inc., 33 F.3d 96, 98 (1st Cir. 1994). *But see* Town of Wallkill v. Tesa Tape, Inc., 891 F. Supp. 955, 959–60 (S.D.N.Y. 1995) (both private and governmental PRPs can maintain claims under both section 107 and section 113); United States v. SCA Servs., Inc., 849 F. Supp. 1264 (N.D. Ind. 1994).

2402. 42 U.S.C. § 9613(g)(2) (West 2003).

2403. Hope Whitney, *Cities and Superfund: Encouraging Brownfield Redevelopment,* 30 Ecology L.Q. 59, 76–77 (2003).

tive proceedings are still ongoing. In such instances, "the litigation in the courthouse proceeds in a clumsy pas de deux with the administrative process before the agency."[2404] The status of the cleanup at the time the action is filed can significantly affect both the progress of the litigation and any settlement efforts. Full information regarding the extent of contamination, including scope as well as composition, may not be available. Similarly, estimates of the total cost of remediation, central to allocation and settlement decisions, will not have been made or may still be in the early stages of development, hindering the possibility of a global settlement. Where administrative proceedings are ongoing, it is imperative that the court be informed early on of the administrative status in order to assess its likely effect on the progress of the litigation and on allocation and settlement efforts.

Efficient management of CERCLA litigation helps prevent it from overwhelming the court and the parties and assists in reducing delay. Case-management strategies differ depending on whether the case is brought by the government or by private parties and under which provision of the statute. A critical factor is the number of PRPs. Fairly small sites with a small number of PRPs will not require the oversight necessary in actions arising from larger sites. Cost-recovery and contribution actions that involve numerous parties expand the factual and legal issues. PRPs look for any avenue of escape in an attempt to either avoid or minimize CERCLA exposure, and a court can expect challenges raising a variety of issues.[2405]

---

2404. Brotman & Simandle, *supra* note 2349, at 188. "Discovery is being taken in the courthouse to identify new parties while the agency propounds section 104 information requests. The Record of Decision (ROD) for Phase I of a cleanup may be under judicial review while the parties battle before the agency in the Phase II RI/FS process; settlement of Phase I issues in court may also depend on the Phase II administrative process coming into focus. Efforts by PRPs in court to allocate liability shares among themselves may deter the agency from preparing a 'nonbinding preliminary allocation of responsibility' (NBAR) under SARA § 122(e)(3)." *Id.*

2405. *See, e.g.,* United States v. Alcan Aluminum, 964 F.2d 252 (3d Cir. 1992) (also holding that CERCLA liability does not require the presence of a "threshold quantity of a hazardous substance"); United States v. Alcan Aluminum, 755 F. Supp. 531, 537 (N.D.N.Y. 1991) (presence of a hazardous substance in waste sufficient for CERCLA liability); United States v. Carolawn Co., 21 Envt. Rep. (BNA) 2124, 2126 (D.S.C. 1984) (rejecting defendant's argument that hazardous constituents in waste in negligible amounts were not sufficient to meet CERCLA's "hazardous waste" definition). *See also* Textron, Inc. v. Barber-Coleman Co., 903 F. Supp. 1570, 1581 (W.D.N.C. 1995) (rejecting argument that hazardous substances had biodegraded over time and therefore did not cause contamination that required remediation); United States v. Conservation Chem. Co., 619 F. Supp. 162, 238–41 (W.D. Mo. 1985) (rejecting defendants' argument that their provision of lime slurry and fly ash for cleanup of an environmental site could not expose them to CERCLA liability); New York v. Gen. Elec. Co., 592 F. Supp. 291, 297 (N.D.N.Y.

There are several questions that recur in CERCLA litigation:

- *What is the status of site cleanup and the impact on the litigation of the process?* For example, have any consent decrees been entered in the case, and what do they cover? Nonsettling PRPs may also challenge proposed settlement consent decrees between the government and other parties.[2406] Has the action been brought by the government to recover the costs of early response actions at the site, while remedial decisions remain pending?[2407] Is the remedy for the site appropriate and consistent with the NCP, eliminating those challenges from the litigation?[2408] What is the history of settlement negotiations and the best way to structure a settlement process?[2409] In cases where remedial decisions have yet to be made, is a stay of the litigation appropriate?

---

1984) (rejecting argument that used transformer oil, sold to control dust, was a product not subject to CERCLA); United States v. A & F Materials Co., 582 F. Supp. 842, 844–45 (S.D. Ill. 1984) (sale of spent "caustic solution" could be a waste for purposes of CERCLA). *But see* 3550 Stevens Creek Assoc. v. Barclays Bank, 915 F.2d 1355 (9th Cir. 1990) (use of asbestos as a building material did not constitute hazardous waste for purposes of CERCLA).

2406.  *See, e.g.,* United States v. Kramer, 19 F. Supp. 2d 273, 276 (D.N.J. 1998) (non-settling defendants raised numerous objections to a proposed consent decree between the government and settling defendants).

2407.  *See, e.g., id.* (cost-recovery action filed by government because of imminent expiration of statute of limitations on an initial removal action, although remedy had not yet been implemented).

2408.  In most cases the remedy (i.e., how the site is to be cleaned up) has been administratively selected by EPA. PRPs can and do raise challenges to the appropriateness of the remedy, as well as to costs that EPA (or private parties) are seeking to recover. An example of a challenge to the remedy might be that EPA is demanding the groundwater be made "drinking water" safe where the water table is not used for residential purposes. Challenges to costs being sought by EPA are typically based on the assertion that the costs were incurred pursuant to response actions inconsistent with the NCP. United States v. Kramer, 757 F. Supp. 397, 436 (D.N.J. 1991). However, arguments that costs are the result of response actions inconsistent with the NCP are not defenses to liability, but only to the recovery of specific costs. Ill. v. Grigoleit Co., 104 F. Supp. 2d 967, 980 (C.D. Ill. 2000); United States v. Cantrell, 92 F. Supp. 2d 704, 717 (S.D. Ohio 2000). Where the action involves private parties seeking cost recovery, the burden is on the plaintiff to prove that the response actions for which the costs were incurred were "necessary" and "consistent with" the NCP. 42 U.S.C. § 9607(a)(4)(B) (West 2003); City of Heath v. Ashland Oil, Inc., 834 F. Supp. 971, 976 (S.D. Ohio 1993). Response actions "carried out in compliance with the terms of an order issued by EPA pursuant to section 106 of CERCLA, or a consent decree entered into pursuant to section 122 of CERCLA will be considered 'consistent with the NCP.'" 40 C.F.R. § 300.700(c)(3)(ii) (2003). Other response actions must be in "substantial compliance" with the NCP to allow for private cost recovery. *Id.* § 300.700(c)(3), (c)(5)–(6).

2409.  Defendants may seek a global settlement of the litigation, which may be difficult to achieve where remedial decisions remain.

- *What is the likely size and scope of the case?* Is referral to a magistrate judge, special master, or allocation consultant warranted in light of the likely size of the case? Are there sizeable groups of *de minimis* or *de micromis* litigants, and is it possible to settle these groups out early in the litigation? What is the feasibility of exercising supplemental jurisdiction over state law claims given the size and posture of the case? Can the case be segmented and phased and, if so, what sequence will best facilitate resolution?

- *What costs are being sought and what is the best structure for achieving a fair allocation among the PRPs?* Relevant to this inquiry is whether the plaintiff can prove causation and whether any PRP will be able to show divisibility of harm given the characteristics of the site and the contamination. Although CERCLA is a strict liability statute, PRPs nonetheless frequently challenge causation. Most courts have held that proof of liability under CERCLA requires only that the plaintiff prove the PRP deposited waste at a site from which there was a release or threatened release, and the government, particularly, is not required to "fingerprint" waste.[2410] Other factors that can affect the costs recovered by the government, or equitable allocation among the PRPs in contribution claims, include the size of the "orphan shares" and how they are handled. Orphan shares are the shares of companies that are out of business, bankrupt, or dissolved and therefore cannot be assigned a share of responsibility.

---

2410. *See, e.g.,* Kalamazoo River Study Group v. Menasha Corp., 228 F.3d 648, 654 (6th Cir. 2000); *Alcan Aluminum Corp.,* 964 F.2d at 266. *But see* Idaho v. Bunker Hill Co., 635 F. Supp. 665, 674 (D. Idaho 1986) (finding damage for which recovery is sought must still be causally linked to the act of the defendant where plaintiff is seeking recovery for injury to natural resources). Actual contamination of the plaintiff's property is unnecessary. Dedham Water Co. v. Cumberland Farms Dairy, Inc., 889 F.2d 1146, 1154 (1st Cir. 1989). Moreover, a plaintiff is not required to prove either that the specific defendant's waste was "released" at the site or that it caused actual contamination, to establish liability. United States v. Alcan Aluminum, 990 F.2d 711, 721 (2d Cir. 1993); United States v. Monsanto Co., 858 F.2d 160, 169 (4th Cir. 1988); Artesian Water Co. v. New Castle County, 659 F. Supp. 1269, 1281–82, *aff'd,* 851 F.2d 643 (3d Cir. 1988) (neighboring owners may recover response costs incurred as the result of the threat that wastes from a hazardous site could migrate into their wells). However, several courts have held that defendant's waste must have caused the plaintiff to incur response costs before liability can be imposed. *See* Acushnet Co. v. Coaters, Inc., 937 F. Supp. 988, 994–96 (D. Mass. 1996) (where plaintiffs were unable to prove that the defendant's creosote-treated utility pole butts contributed to response costs incurred by the plaintiffs, defendant would be absolved of CERCLA liability); *Dedham Water Co.,* 889 F.2d at 1152–54 (defendant's waste must have caused the plaintiff to incur response costs through either release or threatened release before liability can be imposed). In addition, causation is a major player in pendent state tort claims for negligence.

## 34.21 Setting Up the Case

Early institution of an initial case-management order will help organize the case, provide a preliminary identification of legal and factual issues, and educate the court as to the potential size and complexity of the litigation. The case-management order can then be revised as the case progresses. Counsel will welcome a detailed agenda in advance of the conference. It is also helpful to caution the parties to anticipate schedules with firm deadlines for the filing of third-party claims or cross-claims for contribution and indemnity, amendment of the pleadings, the filing and hearing of motions, and the joinder of additional PRPs identified as the litigation progresses. Timely joinder of all PRPs is an important facet of judicial management in a CERCLA case. The court should closely monitor identification of PRPs as discovery progresses. Discuss with counsel the feasibility of an on-line depository for docket information, orders, opinions, or other information that the court or the parties may want to disseminate.

In addition to items recommended in section 11, the following actions are worth considering early on in the case and can be effected either through an order *sua sponte* or through a case-management order issued in conjunction with the initial Federal Rule of Civil Procedure 16 conference:

- consider whether the case is appropriate for liaison or joint counsel, soliciting views of the parties in the method of selecting such counsel, and establishing litigation committees or subcommittees to facilitate communications between various groups of parties, liaison counsel, and the court;
- consider whether the case should be bifurcated or trifurcated into two or more phases, such as liability, amount, and recoverability of response costs and allocation;
- order the early exchange of information between the parties regarding the identity of all known PRPs, including those documents reflecting a party's relationship with the site, and the production by the government to PRPs of all files relating to the site, including documents reflecting the history, operation, investigation, sampling, monitoring, and remedial actions at the site—where EPA is a party, it can be ordered to produce the data it has collected through its site investigation as well as the PRP responses to information requests under section 104(e), and its official record of decision created to determine the appropriate response under section 113(k);
- identify separate private party or government cases regarding the same site, and any pending state or administrative actions at the site, and

consider whether to consolidate private party and/or government cases;

- identify any other proceedings arguably related to the CERCLA case (e.g., toxic tort, insurance, bankruptcy);

- require parties to disclose the settlement history, if any, and inquire into the existence of nonbinding allocation agreements or other preliminary allocation attempts—section 122(e)(3) encourages the government to provide a nonbinding preliminary allocation of responsibility (NBAR) to facilitate settlement negotiations (NBARs are not admissible);

- if the action is based on a settlement consent decree, establish the type of consent decree, whether the decree includes all PRPs, and whether the parties anticipate objecting to or opposing the consent decree or the existence of any other procedural or substantive issue; persons or entities seeking to oppose the entry of the consent decree may seek leave to intervene during the public notice period triggered by the notice of lodging of the consent decree;

- determine whether the case would benefit from a stay of litigation to allow the parties to engage in serious settlement negotiations or, alternatively, whether the use of alternative dispute resolution strategies would be helpful;[2411]

- encourage early discussions for *de minimis* settlements to minimize the transaction costs incurred by small contributors—one commentator has estimated that "those costs can easily reach $200,000–$300,000 every six months for small groups of *de minimis* or mid-volume PRPs";[2412]

- create a schedule for the identification, discovery, and coordination of experts—a case-management order can promote cordial discussion, providing that discussions among groups of litigants will not constitute evidence of a conspiracy and that an expert's inadvertent disclosure of confidential information during such discussion will not waive trade-secret or attorney work-product protections (in cases brought by the government, the nature and scope of permissible expert testimony may be more limited than expert testimony relevant in private party contribution actions. (For example, in government cost-recovery

---

2411. *See, e.g.,* Lauren Stiller Rikleen, *Managing Complex Environmental Disputes: From Superfund to Brownfields—A Model Still Evolving*, 31 Urb. Law. 591, 598–99 (1999).

2412. Martin A. McCrory, *The Equitable Solution to Superfund Liability: Creating a Viable Allocation Procedure for Businesses at Superfund Sites*, 23 Vt. L. Rev. 59, 83 (1993).

cases, expert testimony might be limited to liability issues, divisibility questions, and cost-accounting matters. Consider the schedule of expert identification and discovery in conjunction with the various phases of the litigation. For example, expert testimony or allocation issues in private party contribution cases will not be necessary until the contribution claims are prepared and tried, which, in a case initiated by a government cost-recovery action, is often in the third phase of litigation.);

- establish a schedule for filing and hearing of motions;
- require each side to meet and agree on a statement of the factual and legal issues in dispute, including defenses being asserted to liability and any challenges to government action, particularly challenges to the selection of remedy; stipulations as to liability, or to elements of liability, are useful in streamlining the case, particularly where the parties can agree that such issues are not seriously in dispute; and
- determine the need for a document repository and other shared databases.

## 34.22 Special Masters and Magistrate Judges

Generally, the use of special masters in CERCLA cases has been approved only for limited pretrial purposes. Several circuits have specifically rejected reference to a special master to make recommendations on dispositive motions or to preside at trial in CERCLA cases.[2413] Circuits have approved reference where there is a need for extraordinary pretrial management as a result of the large number of parties and vast amounts of evidence, in light of the significant technical issues that pervade CERCLA litigation.[2414] Special masters may also prove helpful in analyzing the database and assisting in the development of an allocation model.[2415] Allocation inquiries typically involve technically complex

---

2413. *In re* United States, 816 F.2d 1083 (6th Cir. 1987) (reference rejected for dispositive motions and trial even though there were over 200 defendants and over 600 third-party defendants in the case); *In re* Armco, Inc., 770 F.2d 103 (8th Cir. 1985). *But see* Washington v. United States, 930 F. Supp. 474 (W.D. Wash. 1996) (objections to the magistrate judge's report and recommendation sustained on summary-judgment motion).

2414. *See generally* Thomas E. Willging, Laural L. Hooper, Marie Leary, Dean Miletich, Robert Timothy Reagan & John Shapard, Special Masters' Incidence and Activity: Report to the Judicial Conference's Advisory Committee on Civil Rules and Its Subcommittee on Special Masters (Federal Judicial Center 2000).

2415. *See, e.g.*, Chem-Nuclear Sys., Inc. v. Clinton, No. CIVA96-1233, 2000 WL 1898476, at *1 (D.D.C. Sept. 18, 2000) (magistrate judge appointed as special master "for the purpose of recommending findings of fact and conclusions of law on all issues presented" to the court).

issues and review of sampling data, waste synergies, migration, and toxicity, as well as the remedial measures proposed. Reference to a magistrate judge may be appropriate for discovery, particularly to ensure the identification of all necessary PRPs. Reference also may facilitate settlement negotiations, thereby limiting the district judge's involvement and preserving the ability to preside on dispositive motions and at trial.[2416]

## 34.23 Related Litigation

The court and parties may need to make special efforts to identify cases and claims that are related to the CERCLA case. Such proceedings may include actions under other federal environmental statutes, such as the Resource Conservation Recovery Act (RCRA) or the Clean Water Act (CWA), as well as state judicial or administrative proceedings to enforce CERCLA-type laws. The degree of federal–state cooperation will vary. In many instances, however, both federal and state agencies are involved in cleanup enforcement actions and will be working together. In addition, CERCLA requires that any remedies comply with "all applicable or relevant and appropriate requirements" of state environmental laws, potentially adding additional issues to the CERCLA suit.[2417] States also may proceed under state-administered RCRA programs.[2418] In some instances, state requirements may be more stringent than comparable RCRA provisions.[2419] CERCLA also provides for citizen suits under certain circumstances, which could arise in separate actions. Superfund Amendments and Reauthorization Act (SARA) § 310(a) allows citizen suits against any person (including the government) "alleged to be in violation of any standard, regulation, condition, requirement, or order which has become effective" or against the government where it has failed "to perform any act or duty [under CERCLA] . . . which is not discretionary."[2420] Because SARA also contains provisions limiting preenforcement review, the courts have split over how to handle citizen enforcement, including enforcement of other federal laws.[2421]

---

2416. For an example of a case where a magistrate judge was used both to manage discovery matters and to serve as settlement judge, see *United States v. Kramer*, 19 F. Supp. 2d 273, 278 nn.7 & 9 (D.N.J. 1998).

2417. 42 U.S.C. § 9621(d)(2), (3) (West 2003).

2418. *See id.* § 9626(b).

2419. *Id. See also* Lipeles, *supra* note 2345, at 100.

2420. 42 U.S.C. § 9659(a)(1) (West 2003).

2421. *See* Topol & Snow, *supra* note 2350, § 2.7 and cases cited in supplement ("[C]ourts have shown a reluctance to permit the citizen suit provisions to serve as the basis for avoiding SARA's prohibition against pre-enforcement review."); Marianne Dugan, *Are Citizen Suits CERCLA § 113(h)'s Unintended Victims?*, 27 Envtl. L. Rep. (Envtl. L. Inst.) 10003 (Jan. 1997).

Further, although CERCLA cases are statutory and do not involve personal injuries, the same release of hazardous substances into the environment that triggers a statutory action may also be the basis for toxic tort cases, implicating the same defendants and raising similar issues. Other private state law claims, filed in state court or in federal court based on diversity, include insurance coverage disputes and tort claims for personal injury or property damage, typically based on negligence, nuisance, trespass, or strict liability. Finally, one or more PRPs may be in bankruptcy, introducing yet another layer of complexity.[2422]

If there is related litigation, consider whether coordination with the CERCLA litigation is feasible. For example, coordination of insurance coverage litigation with a CERCLA case could enhance the prospect of settlement of both groups of cases. Discovery of insurance information, however, should proceed as permitted under Rule 26(b). The same group of insurers often will have carried the policies for many of the PRPs. The court may want to avoid any formal consolidation, however, because the principal issues in these actions are distinct. Insurance litigation turns on contractual arrangements.[2423] Incorporating coverage questions into a larger CERCLA action can involve numerous insurers located across the country and can require application of the laws of different states. As noted by one jurist, not only are state courts "better prepared" to decide coverage cases, but "even if similar insureds were grouped together into 'omnibus' declaratory judgment motion practice, individual situations might not be congruent."[2424] In addition, coverage litigation can involve more than one waste site at which the insured is a PRP, and therefore involve facts and issues not relevant to the CERCLA litigation at hand. Consider, however, whether an early order requiring production of documents and depositions produced during discovery in related cases would assist in streamlining discovery in the CERCLA case.[2425]

---

2422. Generally, governmental regulatory actions, such as EPA actions under CERCLA, are exempt from the automatic stay provisions of the Bankruptcy Act, but a money judgment obtained in a CERCLA proceeding cannot be executed without approval from the bankruptcy court. 11 U.S.C. § 362(b)(4) (West 2003). *See, e.g.,* United States v. Nicolet, Inc., 857 F.2d 202, 209–10 (3d Cir. 1988). *See also* Topol & Snow, *supra* note 2350, § 7.7.

2423. *But see* City of New Orleans v. Kernan, 933 F. Supp. 565, 568 (E.D. La. 1996) (holding that the district court "can and should exercise" supplemental jurisdiction over state insurance claims arising out of CERCLA litigation to effect an orderly resolution of the case).

2424. Brotman & Simandle, *supra* note 2349, at 187.

2425. For a consideration of the factors involved in obtaining orders placing the case file under seal, *see infra* § 11.432.

The court should also consider whether it is appropriate to exercise supplemental jurisdiction over state law claims[2426] or whether to reject such jurisdiction to avoid unduly complicating the litigation.[2427] In cases involving out-of-state defendants, typical in CERCLA actions, constitutional, statutory, and fairness issues arise when nationwide service of process is used to obtain personal jurisdiction over parties to supplemental state law claims lacking an independent basis for federal jurisdiction.[2428] Such issues include whether state law claims introduce a right to a jury trial in a case that otherwise would be a bench trial, and whether the jury's findings of fact affect the outcome of what would otherwise be nonjury issues.[2429]

## 34.24  Organizing Counsel[2430]

CERCLA cases are strong candidates for the appointment of liaison or lead counsel, in light of the number of parties usually involved in such cases. Counsel should (1) be sensitive to conflicts between their role as liaison counsel and the representation of their individual client; (2) keep all other counsel informed and encourage their participation in the direction of the group's strategy; and (3) ensure that a balance is maintained between the "common needs of the group and the divergent needs of an individual member . . . ."[2431]

Organization of counsel is essential in order for the court and the parties to be able to communicate effectively. It minimizes duplicative discovery and

---

2426. *See* 28 U.S.C. § 1367(a) (West 2003) (creating supplemental jurisdiction for claims related to federal question actions). *See also* New York v. Shore Realty Corp., 759 F.2d 1032, 1050 (2d Cir. 1985) (upholding supplemental jurisdiction over a state law nuisance claim in a CERCLA suit); *Kernan*, 933 F. Supp. at 568 (exercising supplemental jurisdiction over insurance claims); N.J. Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt. Servs., Inc., 719 F. Supp. 325, 334–35 (D.N.J. 1989) (court exercised jurisdiction over state claims even after EPA, which had removed case from state court, was dismissed from the litigation).

2427. *See, e.g.,* Struhar v. Cleveland, 7 F. Supp. 2d 948, 954 (N.D. Ohio 1998) (refusing to exercise pendent jurisdiction over plaintiff's state claims after granting summary judgment to defendant on the federal claims arising under CERCLA); Commerce Holding Co. v. Buckstone, 749 F. Supp. 441, 446–47 (E.D.N.Y. 1990) (differences in legal issues, standards of proof, a right to jury trial, and remedies warrant exercise of discretion to dismiss pendent state claims without prejudice). *See generally* Topol & Snow, *supra* note 2350, § 7.3, n.29.

2428. *See* Jon Heller, *Note, Pendent Personal Jurisdiction and Nationwide Service of Process,* 64 N.Y.U. L. Rev. 113 (1989); James J. Connors, *Note, Nationwide Service of Process Under the Comprehensive Environmental Response, Compensation, and Liability Act: The Need for Effective Fairness Constraints,* 73 Va. L. Rev. 631 (1987).

2429. Lytle v. Household Mfg., Inc., 494 U.S. 545, 550–55 (1990); Dollar Sys. v. Avcar Leasing Sys., 890 F.2d 165, 170–71 (9th Cir. 1989).

2430. *See generally supra* section 10.22.

2431. Brotman & Simandle, *supra* note 2349, at 182.

motion practice and provides the court with an individual liaison for each group to contact about scheduling and other nonsubstantive matters. It also limits the number of attorneys seeking to argue motions or file papers. Counsel should be advised of relevant guidelines, such as the avoidance of duplicative efforts (e.g., providing in a case-management order that a party waives its right to raise an issue unless it is first presented to a committee of counsel). Subject-matter subcommittees can be created to work on what are likely to be common issues relating to defenses, liability (e.g., standards for successor liability), joinder of parties, jurisdiction, discovery, remediation, and allocation. These committees can be delegated authority to represent the parties in that group for purposes of litigation, management, and trial preparation. To do this, the court will need to determine a fair and efficient grouping of the parties. Lead or liaison counsel then can be selected after consultation with the groups of parties as to method and manner of selection, as well as compensation.

At the outset, it is useful to become familiar with the parties' own efforts to organize themselves in response to EPA's prelitigation investigation at the site. Often the primary PRPs will have formed a group that was represented in negotiations with EPA by common or joint counsel, and this same counsel may also be representing the PRP group in the subsequent litigation. These PRPs are also likely to have grouped themselves (usually by size) in a manner they have already determined to be fair and effective—at least for administrative purposes and for remediating the site—and that may be effective for the litigation as well. In such cases, the primary PRPs also may have established a binding allocation agreement among themselves and reached agreement on how any monies will be distributed, thus minimizing conflicts and cross-claims. The focus would then shift to an effective organization of the remaining parties, usually third-party defendants. In these third-party matters and in cases where no agreement exists within the primary PRP group, conflicting interests are common, and the court and the parties will need to be sensitive to the problems that can arise from grouping parties that may have adverse claims.

The method of organization may vary. One approach is to allow the parties to organize themselves, nominate lead and liaison counsel, propose a mode of payment, define the authority of lead and liaison counsel, and define a committee structure. It may be sufficient for the court to suggest these topics as an agenda for a meeting of counsel. The judicial role would then be simply to evaluate any proposal to ensure that it meets the court's litigation management needs, and to issue an appropriate order for its implementation with any necessary modifications. The judge, of course, retains the final authority over whether to enter an order adopting the parties' recommendations.

Another alternative is to organize the parties based on similar interests with respect to the legal issues, such as using the statutory classifications for liability set out in section 107(a): owners, operators, generators, and transport-

ers.[2432] A third approach is to organize the parties by volumetric share of waste sent to the site, thus separating large generators from small or *de minimis* participants.[2433] This is a particularly useful classification for settlement purposes. In fact, the court may establish a separate "settlement committee" of counsel that focuses solely on settlement.[2434] Other relevant communities of interest for facilitating settlement may be defined by the type of substance a group of PRPs sent to the site, its toxicity, or where it is located on the site.[2435] Regardless of how the parties are organized, the court should ensure that they have agreed to a method of funding (typically pro rata) of group activities or other joint services, as well as the method of compensation of liaison counsel, and that this agreement is put in writing. For example, the parties may undertake joint expert studies, retain an allocation consultant, or engage in private mediation.[2436]

## 34.25  Centralized Document Management

CERCLA litigation involves large numbers of documents. Consider the feasibility, in light of the number of parties typically involved, of a central document depository or shared database of documents produced during discovery. The document depository can be managed through an independent entity, with the costs shared pro rata among the parties. Alternatively, to avoid the costs of establishing and maintaining a separate and independent depository, the parties may be willing to vest lead counsel with the responsibility of establishing and maintaining a uniform system of organization for all documents produced. Counsel would also be responsible for providing access for the inspection and copying of documents to all parties, with the parties paying the cost through the agreed on fee arrangement. Document databases can significantly reduce the associated cost and expense of discovery. Large volumes of documents can be copied and distributed economically to the parties. They then can be inspected and copied by interested parties, reducing the burden of production on the producing party and the associated costs for all parties. However the depository is set up, its custodian should be charged with keeping

---

2432.  *See, e.g.,* N.J. Dep't of Envtl. Prot. v. Gloucester Env't Mgmt. Servs., Inc., 668 F. Supp. 404 (D.N.J. 1987) (case-management order appointing five liaison counsel for the plaintiff, the owner, the alleged operators, the alleged generators, and the alleged transporters); United States v. Kramer, 757 F. Supp. 397, 410 (D.N.J. 1991).

2433.  *See, e.g.,* Denver v. Adolph Coors Co., 829 F. Supp. 340 (D. Colo. 1993) (order regarding approval of *de minimis* and mid-tier settlements).

2434.  *See* Brotman & Simandle, *supra* note 2349, at 181 (suggesting negotiation process might benefit from choosing negotiators who are not also serving as lead counsel).

2435.  *See, e.g.,* Kamb v. U.S. Coast Guard, 869 F. Supp. 793, 799 (N.D. Cal. 1994).

2436.  *See* Brotman & Simandle, *supra* note 2349, at 181.

a copy of all documents produced in the case, from whatever source, as well as other litigation documents (such as responses to interrogatories, document requests, and deposition transcripts). Creating a central document depository or a computerized document storage system can help ensure that newly joined parties have access to the product of prior discovery and can hold demands for additional discovery to a minimum. The benefits and detriments of using a document depository are explored more fully in section 11.444.

## 34.26  Narrowing the Issues[2437]

Parties often plead defenses that they do not intend to pursue seriously or that fly in the face of settled law. The initial conference can be designed to eliminate such unmeritorious arguments. Requiring each side or group to meet and develop an agreed-on statement of the factual and legal issues in dispute, as well as using the Rule 16 conference to clarify any ambiguities, should help identify the genuinely controverted issues and force abandonment, or quick disposition, of marginal issues. Pressing the lawyers to identify facts supporting each element of each claim or defense and to tie the claim or defense to the legal framework of CERCLA may also help reveal the strengths and weaknesses of parties' positions. Issues can then be outlined in a logical and practical sequence, to facilitate management of motions that might result, for example, in the dismissal of parties to the litigation (e.g., if a party falls within section 107(a) or if one of the narrow statutory defenses applies), or even of the entire litigation (e.g., if the government's remedy is consistent with the NCP). Secondary issues can then be identified and incorporated into the case-management plan, which may also include a proposed structure for settlement discussions and trial. Organizing issues in terms of the liability, the amount and recoverability of costs, and the allocation phases of CERCLA litigation is helpful.

Using the Rule 16 statements, the judge can group types of motions and schedule filing of consolidated motions on similar issues according to a time schedule to avoid duplicative and piecemeal motions. For example, the court may establish a brief window within which particular types of motions may be filed, such as motions under Rule 12 or Rule 56. Certain motions and third-party complaints can be deemed to include all defendants, and answers to third-party complaints can be deemed to include all cross-claims and counter-claims against the third-party plaintiffs. There is sometimes, however, an impact of deeming cross-claims and counterclaims to encompass parties whose

---

2437.  *See also infra* section 11.33.

liability is determined to be *de minimis*. Exempting such parties from a deeming order avoids imposing disproportionate risks of extensive liability on them. Another option is to defer the time for filing cross-claims until after *de minimis* parties have settled the claims against them and generally obtained the benefit of a bar against contribution claims as permitted under sections 122(g)(2) and (5).[2438]

Summary judgment is a particularly effective tool for eliminating tenuous claims and defenses in CERCLA cases.[2439] Over the years, many issues raised by defendants in CERCLA litigation have been resolved, including retroactivity, joint and several liability, and whether CERCLA violates the Commerce Clause or Due Process Clause.[2440] In addition, the courts have interpreted CERCLA broadly in order to effectuate the statute's remedial purpose,[2441] and well-settled case law, particularly on the scope of CERCLA liability, allows courts to dispose summarily of a number of challenges.[2442] Summary judgment on the issue of liability is common, often leaving only issues of allocation remaining

---

2438.  *See also infra* section 40.42.

2439.  *E.g.*, whether a harm is capable of apportionment among multiple defendants. *In re* Bell Petroleum Servs., Inc., 3 F.3d 889, 896 (5th Cir. 1993). *See also* United States v. Wade, 577 F. Supp. 1326, 1330 (E.D. Pa. 1983) (granting summary judgment on the liability under CERCLA of certain defendants, but requiring a trial on the issue of joint and several liability and allocation).

2440.  *See* Solid States Circuits, Inc. v. EPA, 812 F.2d 383 (8th Cir. 1987); United States v. Alcan Aluminum Corp., 49 F. Supp. 2d 96 (N.D.N.Y. 1999) (addressing challenges based on the Takings Clause, Due Process Clause, and Ex Post Facto Clause); United States v. Dico, 189 F.R.D. 536, 544 (S.D. Iowa 1999) (rejecting defendant's due process and takings arguments on motion for judgment on the pleadings).

2441.  *See, e.g.*, Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 845 (4th Cir. 1992) (disposal not limited to "active participation" and includes passive migration). One commentator summarizes that federal courts "are shaping CERCLA by judicial interpretation to a degree rarely if ever seen for any other statute." In the first ten years after the enactment of the Superfund, more than 1,000 reported decisions were handed down that bear on Superfund issues. Topol & Snow, *supra* note 2350, § 3.8.E.2.

2442.  However, some issues believed to have been resolved have been reexamined, while other cases have suggested a reluctance toward any further or continued expansion of CERCLA. *See, e.g.*, United States v. Bestfoods, 524 U.S. 51 (1998) (nothing in CERCLA suggests "that the entire corpus of state corporation law is to be replaced" and holding parent corporation cannot be held liable unless corporate veil pierced); ABB Indus. Sys., Inc. v. Prime Tech., Inc., 120 F.3d 351, 358 (2d Cir. 1997) (former owners and operators not liable for passive migration of contaminants); *Dico, Inc.*, 189 F.R.D. at 543 (finding that the Supreme Court decision in *E. Enters. v. Apfel*, 524 U.S. 498 (1998), had no impact on CERCLA retroactivity). *See also New York Court Rules CERCLA Can Be Applied Retroactively, Rejects Eastern Defense*, 12-9 Mealey's Litig. Rep. Superfund 5 (June 11, 1999) (citing United States v. Alcan Aluminum, 49 F. Supp. 2d 96 (N.D.N.Y. 1999)).

to be decided.[2443] Summary judgment may also be appropriate to determine the amount of the government's costs in government-initiated cost-recovery actions. Consider using evidentiary hearings under Rule 43(e) to determine the existence of a genuine issue of material fact. It may sometimes be appropriate not only to determine liability through summary judgment, but also to allocate responsibility for paying the response costs.[2444]

Particularly important in CERCLA litigation are prompt rulings on all motions, which can help clarify liability and clear the path for the parties to allocate damages among themselves. Where a primary party's liability turns on a legal issue of first impression, the court should balance the advantages of certifying the questions for interlocutory appeal before allocating damages against the disadvantages of delaying the progress of the case.[2445]

## 34.27  Joinder

Incentives for locating all possible PRPs can lead to a continuous parade of new parties. The pretrial conference can assist the court in assessing the likely number of additional PRPs that the parties may seek to add and help ensure control over the size and shape of the litigation.[2446] Where EPA's investigation

---

2443. *See, e.g.,* NutraSweet Co. v. X-L Eng'g Co., 227 F.3d 776 (7th Cir. 2000) (partial summary judgment granted on issue of liability, and trial ordered for amount for which defendant was responsible). The biggest statutory area in which liability is disputed, and which is often difficult to resolve on summary judgment, is "arranger" liability. *See, e.g.,* Mainline Contracting Corp. v. Chopra-Lee, Inc., 109 F. Supp. 2d 110, 188 (W.D.N.Y. 2000); RSR Corp. v. Avanti Dev., Inc., 69 F. Supp. 2d 1119, 1126 (S.D. Ind. 1999); Freeport-McMoran Res. Partners Ltd. P'ship v. B-B Paint Corp., 56 F. Supp. 823, 853 (E.D. Mich. 1999).

2444. *See* United States v. R.W. Meyer, Inc., 932 F.2d 568 (6th Cir. 1991) (affirming summary judgment allocating response costs among three entities). However, resolution of equitable allocation issues may not be possible where the court has yet to determine the criteria it will use for this process in order to permit the parties to determine what facts are relevant and not in dispute.

2445. *See* United States v. Fleet Factors Corp., 901 F.2d 1550 (11th Cir. 1990) (interlocutory appeal taken to obtain ruling on whether district court correctly interpreted and applied CERCLA provision in denying motion for summary judgment by holder of a security interest in contaminated real property). When the subject of the interlocutory appeal is not central to the entire case, the court may decide to continue with other aspects of the litigation while the appeal is pending. *See supra* section 15.12.

2446. *See, e.g.,* City of Wichita v. Aero Holdings, Inc., No. 98-1360-MLB, 2000 WL 1480490, at *2 (D. Kan. Apr. 7, 2000) (allowing plaintiffs to add over 700 third-party defendants would cause case to "'mushroom' in all directions and greatly delay resolution of the principal case"). The court can guard against indiscriminate and fragmented joinder by requiring the parties to set forth in detail the factual basis for each joinder motion. *See, e.g.,* Brotman & Simandle, *supra* note 2349, at 183–84 (suggesting party seeking joinder be required to respond to a

has been exhaustive, the number of unidentified PRPs remaining will be significantly less. Similarly, a primary PRP group that has undertaken remediation at the site will often have retained an outside investigator who will have identified most other locatable PRPs, again reducing the number of parties likely to be joined at a later date. The judge is advised to discourage joinder of insignificant parties, or parties with no more than *de micromis* liability. Discussions with counsel about the feasibility of joinder of very small or *de micromis* parties will also assist in ensuring that the parties and the court have a realistic view of the scope of the case. Each new party will likely want to catch up with discovery and motion practice, thereby delaying the progress of the action.[2447] Furthermore, entry of a new party may create a conflict of interest for counsel or grounds for recusal by the judge.[2448]

Targeting the first phase of discovery at identifying all PRPs and developing information about the quantity and quality of waste produced by each PRP during the history of the site can minimize complications arising from joinder issues. Moreover, discovery targeted at site owners and operators, and at transporters, often generates information concerning other PRPs. A reasonable but firm deadline, which might be as long as a year, is advisable for adding parties or cross-claims, absent special issues in individual instances. Once the deadline for joinder is reached, the parties and the court will have an overview of the size and scope of the litigation. At that point, pretrial, settlement, and trial plans can proceed, addressing issues relating to all the parties, while consideration of late presented claims is deferred. This approach may be conducive to a global disposition of the entire litigation. General discovery and other proceedings are sometimes stayed until the joinder deadline. In the interest of avoiding unnecessary paper, the case-management order can provide that all parties joined will be deemed to have denied the claim, obviating the need for a formal pleading. Rulings on Rule 12 motions can also be deemed to apply to new parties absent special circumstances.[2449]

standard set of interrogatories as to factual basis for joining new party as, among other things, "an augment to Rule 11 concerning the integrity of the pleading" and to reduce "the risk of misjoinder or baseless joinder").

2447. *See, e.g., City of Wichita*, 2000 WL 1480490, at *2 (where court stated that "[c]ase management of more than 700 parties would unequivocally require the implementation of new orders, some of which would necessarily impose arbitrary discovery limitations . . . [which] would be unfair . . . when the current defendants have enjoyed liberal discovery").

2448. *See* United States v. New Castle County, 116 F.R.D. 19, 24 (D. Del. 1987) (denying motion to name and realign various parties; court noted that adding new parties after deadline would likely produce conflicts of interest for current counsel, would interfere with pretrial and trial case-management plans, and would likely disrupt settlement efforts).

2449. *See supra* section 11.32.

Another approach is to postpone or stay joinder issues, contribution claims, and other cross-claims until the litigation against the initial defendants has been resolved. In cases with large numbers of PRPs, this keeps the organization relatively simple while a plan to remedy the site or to determine the costs of the remedy is devised. The primary PRPs may also be more inclined to reach out-of-court settlements with third parties without the expense of litigation. The disadvantage is that parties joined later may wish to relitigate those issues or reopen discovery. This phased approach is more feasible where the government has initiated the case, or in some contested consent decrees, but it does not work well where the government is not involved in the litigation and the primary PRP group has filed a separate action for contribution.

A third approach is to schedule rolling joinder dates. Rather than permitting motions for joinder at any time, rolling dates give the parties windows within which to file joinder motions, permitting a consolidated hearing on all joinder motions filed during that window, and lessening the burden on the court as well as the parties. Similar orders regarding responsive pleadings and discovery would apply as well. Whatever the approach to the joinder of new parties, possible statute-of-limitations issues, both federal and state, should be considered.

## 34.28 Managing Discovery

The preservation of evidence is critical in CERCLA cases. In some instances, only a few invoices or the recollection of one or two persons can connect a company to a site, while other cases may involve over a million documents.[2450] Because relevant evidence may be decades old, PRPs may seek to preserve evidence before filing a complaint. In such cases, Federal Rule of Civil Procedure 27 authorizes prefiling depositions of percipient witnesses (and, when feasible, the production or preservation of documents and other tangible things).[2451]

---

2450. *See, e.g.,* Fike Chemical Superfund Site, Panel Discussion and Perspectives on Multi-Party CERCLA Litigation, Federal Judicial Center, Conference on Environmental Law and Natural Resources at 2 (Oct. 7, 1997) (when operator of site went out of business there were over 1.2 million business records "reflecting tens, if not hundreds of thousands of transactions with dozens of customers").

2451. *See In re* Bay County Middlegrounds Landfill Site v. Kuhlman Elec. Corp., 171 F.3d 1044 (6th Cir. 1999) (district court did not abuse discretion in granting petition to take prefiling deposition); *In re* Petition of Delta Quarries & Disposal Inc., 139 F.R.D. 68 (M.D. Pa. 1991) (granting petition to depose ailing witness alleged to have personal knowledge of identity of companies that disposed hazardous substances at landfill fifteen years earlier).

Once the action has been initiated, CERCLA cases generally require a well-thought-out, structured discovery plan to avoid duplicative discovery, to minimize the burden to the litigants and to the court, and to create a credible database. Multiple, independent waves of discovery should be discouraged in favor of a coordinated approach. Initially, the parties can be required to engage in an informal exchange of information with appropriate protective orders for sensitive relevant information. A number of parties may have responded to EPA information requests under section 104(e), and EPA will have amassed a vast amount of documents, reports, studies, and other information regarding the site, all of which can proceed without a formal request if EPA is a party, or through a coordinated request if EPA is not a litigant. Similarly, the site owner and/or operator, almost always a party, can informally produce any records reflecting transportation and shipment of waste sent to the site, including volume and type of material.

Included among effective discovery tools, particularly in cases where joint or liaison counsel have been appointed, are the development and use of a master set of interrogatories and requests for production for each side or group. An early set of agreed-on interrogatories seeking information from PRPs as to where and how records relating to the generation and disposal of wastes were maintained, as well as identifying those persons with knowledge of generation and disposal practices, can streamline document production and make depositions more efficient. Potential areas of inquiry include the following: site investigations done by any party, including any statements taken; records of any sampling, testing, removal, or remediation conducted at the site; documents in the possession of the parties reflecting materials, hazardous and nonhazardous, shipped to the site; and contracts or other agreements relating to disposal of waste material. Depositions should also be coordinated to preclude multiple depositions of the same party, with designated counsel responsible for conducting the depositions representing their respective sides or groups of parties. One alternative is to require that all document discovery be completed prior to taking any depositions except custodial depositions. Efforts should be made to minimize discovery imposed on *de minimis* parties at the early stages, where it is highly likely that they will settle out of the litigation.

The need for data concerning the parties' respective contributions to the contamination at the site coincides with the need to identify PRPs promptly, but newly joined parties should not be permitted to delay the discovery process while they are getting up to speed in the case. Towards this end, the discovery plan can provide that, except upon a showing of good cause, new parties will be deemed to have accepted the discovery previously propounded or depositions by counsel on behalf of their "group." This would not preclude a party with an individual interest not addressed by previous discovery from obtaining this information. Further, coordinating deadlines for joinder of parties with

the schedule set forth in the discovery plan will help ensure that all parties, including those newly joined, have a fair opportunity to conduct adequate discovery. As discussed earlier, a centralized document repository and computerized data storage and retrieval can facilitate access to all available documents and reduce discovery disputes at the same time that it creates a credible database. Without a credible database, the parties and the court cannot determine whether the proposed remedy is based on faulty assumptions about the nature of the problems, and the parties are not likely to accept proposed settlement allocations. All phases of discovery should be coordinated with plans for resolving motions and for structuring the trial (e.g., on a bifurcated or trifurcated basis).

## 34.29  Scientific and Technical Expert Testimony

CERCLA cases are prone to battles of experts in highly technical areas, such as chemistry, hydrology, and geology. Environmental experts testify on aspects such as site conditions, migration of contaminants, geological conditions, and toxicity. Continuous testing and sampling of soil and groundwater at a given site, as well as analyzing the synergistic and migratory capacities of contaminants, are often necessary. At a minimum, procedures should be adopted to produce a common database for the experts to analyze. The judge, to reduce unproductive contentiousness and keep the focus on genuine issues, may also encourage creation of an experts' committee with responsibility for defining issues, testing soil and allegedly hazardous materials, creating joint databases, developing proposed factual stipulations, and splitting samples.[2452] Some judges have directed the parties to have their experts meet without counsel to identify and consider the technical issues relating to the proposed remedial design.[2453] Such a meeting can uncover erroneous assumptions and avoid wasting resources on a remedy that might be technically flawed. In addition, such expert assistance may prove helpful in the settlement or allocation process. Where the case appears to be headed for trial, or where motions for summary judgment rely in part on scientific evidence, consider how best to handle *Daubert* issues.[2454]

---

2452.  *See* United States v. Price, 14 Envtl. L. Rep. (Envtl. L. Inst.) 20, 501 (D.N.J. 1984).

2453.  *See* Jerome B. Simandle, *Resolving Multi-Party Hazardous Waste Litigation*, 2 Vill. Envtl. L.J. 111 (1991).

2454.  *See* Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and discussion *infra* section 23.2.

# 34.3  Settlement and Trial

.31 Allocation  677
.32 Settlement  682
.33 Approval of Consent Decrees  686
.34 Structuring the Trial  687

## 34.31  Allocation

Allocation bears significantly on both settlement and trial. Once liability is established, allocation is usually the most hotly contested issue in CERCLA litigation. Defendants try to prove the harm is divisible in order to avert imposition of joint and several liability in cost-recovery cases by the government, as well as challenging the method for equitable apportionment in private party actions. Other arguments raised by PRPs seeking to avoid joint and several liability include (1) that the material was a product, not a waste; (2) that the amount of hazardous constituents in the waste was negligible; and (3) that the configuration of the waste was such that no hazardous constituents could escape.

A determination as to the divisibility of harm has been held to be "intensely factual,"[2455] raising technically complex issues, such as relative toxicity, migratory potential, synergistic capacities, and degree of migration of a particular waste, and these issues require the testimony of various technical experts. Apportionment based on equitable principles implicates these as well as other considerations.[2456] The statutory status of the PRP also can affect decisions on allocation. For example, under section 107(a), both generators and transporters are liable for waste sent to the site. In addition to the liability of the corporation, officers can be liable as individuals. This could mean that two parties are responsible for the same waste. Equity suggests that an apportionment scheme take this into account in assessing the amount to be paid by each.

One of the major stumbling blocks in the allocation process is determining the allocation method and the factors to consider. CERCLA § 113(f)(1) gives the court broad discretion in adopting factors to be weighed among PRPs.[2457]

---

2455.  United States v. Alcan Aluminum Corp., 990 F.2d 711, 722 (2d Cir. 1993).

2456.  For a discussion of some of the "equities" balanced by a court in rejecting toxicity as a basis for allocation, see *Akzo Nobel Coatings, Inc. v. Aigner Corp.*, 197 F.3d 302, 305 (7th Cir. 1999).

2457.  CERCLA § 113(f)(1) provides that "in resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 96113(f)(1) (West 2003). *See also* Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 326 (7th Cir. 1994) (court may consider factors such as the relative fault of the parties, relevant "Gore factors," *see infra* note 2460, and any contracts

The simplest form of allocation is a volumetric allocation, basing apportionment on the amount of waste shipped to a site relative to the total amount of waste.[2458] Another basis for apportionment is to assign the parties to "tiers," again typically determined by volume, and then apportion liability by tier, with each PRP in that tier assuming a pro rata share. The courts have also looked at factors such as the volume and toxicity of each party's hazardous waste,[2459] the degree of involvement and the degree of care exercised by a party, and the extent to which a party cooperated with public officials to prevent harm to the public. These are known as the Gore factors[2460] and are perceived as providing a good but not exhaustive starting point for apportionment.[2461] Other relevant factors have included the economic status of the parties, traditional equitable defenses such as mitigation, and the expense of doing cleanup work, among

between the parties regarding allocation); Env't Transp. Sys. v. Ensco, Inc., 969 F.2d 503, 509 (7th Cir. 1992) (court has "power to weigh and consider relevant factors, including [relative] fault").

2458. Boeing Co. v. Cascade Corp., 207 F.3d 1177, 1187 (9th Cir. 2000) (allocation by volume is reasonable basis for allocation); Acushnet Co. v. Mohasco Corp., 191 F.3d 69, 78 (1st Cir. 1999) ("[T]here is nothing to suggest that Congress intended to impose far-reaching liability on every party who is responsible for only trace levels of waste."); Bancamerica Commercial Corp. v. Mosher Steel, Inc., 100 F.3d 792 (10th Cir. 1996); Kalamazoo River Study Group v. Rockwell Int'l, 107 F. Supp. 2d 817, 840 (W.D. Mich. 2000) (finding quantity of PCBs released was most important Gore factor under circumstances). Although pro rata apportionment is also a very simple method of apportionment and may be appropriate in some cases, courts have held that it was "at the very least, Congress's intent that courts should equitably allocate costs of cleanup according to the relative culpability of the parties rather than an automatic equal shares rule." *Env't Transp. Sys.*, 969 F.2d at 508.

2459. EPA considers toxicity to be "causally related to the cost of cleanup for only a few substances (e.g., PCBs, dioxin)." Superfund Program: Non-Binding Preliminary Allocations of Responsibility (NBAR), 52 Fed. Reg. 19,919, 19,920 (May 28, 1987) [hereinafter NBAR]. EPA has further noted that the scientific community disagrees about degrees of toxicity and synergistic effects. *Id.*

2460. These factors originally appeared in section 3071(a) of House Bill 7020, which was passed by the House in 1980 but not enacted as part of CERCLA. CERCLA, H.R. 7020, 96th Cong. § 3071(a) (2d Sess. 1980). *See* 126 Cong. Rec. 26, 781 (1980); *see also* United States v. R.W. Meyer, Inc., 932 F.2d 568, 571 (6th Cir. 1991); Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 672–73 (5th Cir. 1989).

2461. *See generally* Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp., 153 F.3d 344, 354 (6th Cir. 1998); Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930, 935 (8th Cir. 1995); *Env't Transp. Sys.*, 969 F.2d at 509 (noting that the "Gore factors are neither an exhaustive or exclusive list" of the factors to be considered); *Kalamazoo River Study Group*, 107 F. Supp. 2d at 822 (noting that the Gore factors are a non-exhaustive list enabling the court to "take into account more varying circumstances than common law contribution").

others.[2462] Several courts have also used a fault-based approach to apportionment.[2463] Sometimes, zero allocation might be appropriate with respect to certain PRPs, as where, for example, the PRP's disposal was "too inconsequential to affect the cost of cleaning up significantly."[2464] In short, the court can consider "several factors, a few factors, or only one determining factor . . . depending on the totality of the circumstances presented."[2465] A preliminary determination as to the relevant factors can streamline both discovery and trial. Alternatively, the court can permit the introduction of all evidence deemed relevant to the issue by the parties and then make a determination as to which factors have the most bearing on apportionment under the particular circumstances.

Orphan shares—shares of companies that are bankrupt or no longer in business—can complicate the allocation process. Related issues arising in conjunction with these now-defunct companies include whether or when a corporation is "dead and buried" for purposes of CERCLA, the liability of successor corporations, and the impact of a discharge in bankruptcy on a CERCLA claim. In the allocation process these shares must be borne by someone, and the "determination of who absorbs liability for orphan shares can have significant consequences for PRPs, because the unattributable amount of

2462. Akzo Nobel Coatings, Inc. v. Aigner Corp., 197 F.3d 302 (7th Cir. 1999); United States v. Davis, 31 F. Supp. 2d 45, 63 (D.R.I. 1998). For example, EPA, in preparing an NBAR under CERCLA § 122(e), in addition to looking at volume and toxicity, also looks at criteria included in the interim settlement policy, such as the "strength of evidence tracing the wastes at a site to PRPs, ability of PRPs to pay, . . . public interest consideration, . . . [and] inequities and aggravating factors . . . ." NBAR, *supra* note 2459, at 19,919. EPA rejected allocation models based on toxicity, concluding instead that the use of volume and settlement criteria was more desirable for "simplicity and other practical reasons." *Id.* at 19,920.

2463. *See, e.g.,* Browning-Ferris Indus. v. Ter Maat, 195 F.3d 953 (7th Cir. 1999) (affirming an allocation by the district court that looked to the blameworthiness of the polluter as relevant to an equitable allocation); United States v. Di Biase, 45 F.3d 541, 545 (1st Cir. 1995) (although on notice of a potentially dangerous condition, PRP "twiddled his thumbs"); Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321 (7th Cir. 1994); *Env't Transp. Sys.*, 969 F.2d at 510–12.

2464. PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610, 616 (7th Cir. 1998). *See also* Acushnet Co. v. Mohasco Corp., 191 F.3d 69, 78 (1st Cir. 1999) (zero liability may be appropriate in some circumstances); Kalamazoo River Study Group v. Rockwell Int'l, 107 F. Supp. 2d 817, 839 (W.D. Mich. 2000) (holding defendant's PCB contribution to total PCB was minimal and defendant would not be required to contribute to cleanup).

2465. *Akzo Nobel Coatings, Inc.,* 197 F.3d at 305 (rejecting toxicity as means for apportionment); *Env't Transp. Sys.*, 969 F.2d at 509; United States v. Pesses, 120 F. Supp. 2d 503 (W.D. Pa. 2000) (basing allocation on Gore factors).

liability . . . can be quite substantial."[2466] A number of options are available, including apportionment among economically viable defendants only,[2467] allocation among all liable defendants,[2468] and apportionment among all viable parties, plaintiffs, and defendants.[2469]

Another allocation determination issue is how to account for partial settlements. Many CERCLA actions will involve multiple settlement agreements. Where the plaintiff is the government, the SARA amendments provide that any settlement received "reduces the potential liability of the others by the amount of the settlement."[2470] In government-initiated actions, this translates into a dollar-for-dollar reduction in liability for nonsettlors.[2471] A *pro tanto* approach requires conducting a fairness hearing before the court approves a partial settlement.[2472] Unresolved is how partial settlements should be credited in private party actions. Some courts have applied the *pro tanto* approach to partial settlement credits in private CERCLA cases. A second method uses a "proportionate share" approach whereby nonsettlor liability is reduced by the proportionate share of fault of the settling defendants.[2473] Usually, this approach re-

---

2466. David Sive & Daniel Riesel, *Although Many Courts Provide for the Equitable Apportionment of Orphan Shares Under CERCLA, the Issue Is Not Yet Settled*, Nat'l L.J., Mar. 3, 1997, at B5.

2467. *See, e.g.*, Unif. Comparative Fault Act § 2(d), 12 U.L.A. 37 (2002); Charter Township of Oshtemo v. Am. Cyanamid Co., 898 F. Supp. 506, 509 (W.D. Mich. 1995) ("Equity . . . dictates that the shares that would have been attributed to parties that are now insolvent should be apportioned among all the solvent PRPs.").

2468. United States v. Kramer, 953 F. Supp. 592, 598 (D.N.J. 1997); Pneumo Abex Corp. v. Bessemer & Lake Erie R.R. Co., 921 F. Supp. 336, 348 (E.D. Va. 1996) (plaintiff would have no liability for orphan shares); *Charter Township of Oshtemo,* 898 F. Supp. at 509.

2469. *See* Allied Corp. v. ACME Solvent Reclaiming, Inc., 771 F. Supp. 219, 223 (N.D. Ill. 1990). *See also* Sive & Riesel, *supra* note 2466, at B5.

2470. 42 U.S.C. § 9613(f)(2) (West 2003). *See* United States v. Burlington N. R.R. Co., 200 F.3d 679, 697 (10th Cir. 2000) (PRP's liability would be reduced by government settlement with other PRPs).

2471. This approach, called *pro tanto*, is codified in the Uniform Contribution Among Tortfeasors Act (UCATA), 12 U.L.A. 98 (2002). *See In re* Acushnet River & New Bedford Harbor, 712 F. Supp. 1019, 1027 (D. Mass. 1989) ("[T]he words of the statute are clear: the potential liability of the others is reduced 'by the amount of settlement,' not by the settlor's proportionate share of . . . damages . . . ."); United States v. Cannons Eng'g Corp., 720 F. Supp. 1027, 1048 (D. Mass. 1989), *aff'd,* 899 F.2d 79 (1st Cir. 1990); United States v. Rohm & Haas Co., 721 F. Supp. 666, 675 (D.N.J. 1989).

2472. *See* City of New York v. Exxon, 697 F. Supp. 677, 691 (S.D.N.Y. 1988) ("Before approving a CERCLA settlement, the Court must be convinced that it is fair, adequate, and reasonable, and consistent with the Constitution.").

2473. The proportionate share approach is found in the Uniform Comparative Fault Act (UCFA), 12 U.L.A. 57 (2002). For cases that have applied the proportionate approach in private

quires the settling defendant's percentage of fault be determined at trial in order to reduce the total damages to be attributed to the nonsettlor.[2474] One practical advantage of a proportionate share approach over a *pro tanto* approach is that extensive fairness hearings are not required.[2475] The plaintiff, however, would still have to litigate the responsibility of the settling party in order to determine the amount recoverable from nonsettlors, arguably negating some of the benefits of settlement.[2476] The majority of courts considering the issue of partial settlement credits have adopted the proportionate share approach.[2477] Others have held that the choice of approaches is within the sound discretion of the court, to be determined on a case-by-case basis.[2478]

There are several alternatives to consider in approaching allocation. One is to encourage the retention of an allocation consultant or expert, with costs apportioned among the parties and with possible settlement as a goal.[2479] The use of allocation experts has grown in CERCLA cases, and their function is to assist in estimating PRP shares, taking into account volume, toxicity, contribution to the cost of remediation, and similar factors. Second, the court can encourage the use of joint experts to share data and information. Often, the original PRP group will have established a preliminary allocation among themselves in order to apportion the immediate costs of cleanup,[2480] may have agreed to a process to determine binding allocation and distribution of any

---

party actions, see, e.g., *United States v. W. Processing Co., Inc.*, 756 F. Supp. 1424, 1430 (W.D. Wash. 1990); *Lyncott Corp. v. Chem. Waste Mgmt.*, 690 F. Supp. 1409, 1419 (E.D. Pa. 1988).

2474.  *See* Atl. Richfield Co. v. Am. Airlines, Inc., 836 F. Supp. 763 (N.D. Okla. 1993).

2475.  *See, e.g.,* Allied Corp. v. Acme Solvent Reclaiming Inc., 771 F. Supp. 219, 223 (N.D. Ill. 1990) ("In a complex case such as this one, a fairness hearing would be long and arduous."). For a good discussion of the two approaches and their pros and cons from several perspectives, *see* Marc L. Frohman, *Rethinking the Partial Settlement Credit Rule in Private Party CERCLA Actions: An Argument in Support of the Pro Tanto Credit Rule*, 66 U. Colo. L. Rev. 711 (1995).

2476.  *See, e.g., Rohm & Haas Co.*, 721 F. Supp. at 678.

2477.  Frohman, *supra* note 2475, at 748.  "The analysis underlying these decisions concludes that, notwithstanding the pro tanto rule's potential advantage in promoting settlement, the proportionate rule is more consistent with CERCLA because of its incorporation of principles of comparative fault, with resultant greater equity, and its alleged greater judicial economy." *Id*. at 748–49. *See* McDermott, Inc. v. AmClyde, 511 U.S. 202, 207–08 (1994).

2478.  *Atl. Richfield Co.*, 836 F. Supp. at 765.

2479.  *See* United States v. Kramer, 19 F. Supp. 2d 273, 278 (D.N.J. 1998) (parties retained Clean Sites Inc., an outside environmental litigation support firm, as an allocation consultant). The allocation process may be appropriate for the appointment of a special master.

2480.  *See, e.g.,* Kalamazoo River Study Group v. Rockwell Int'l, 107 F. Supp. 2d 817, 821 (W.D. Mich. 2000) ("Plaintiff's individual group members have allocated among themselves their percentage shares for response costs at the Site . . . .").

monies received from litigation,[2481] and may have already retained an independent consultant or arbiter. This process may be proceeding in tandem with the litigation. EPA may also have established an informal allocation, based on its investigation, or may have prepared a nonbinding allocation report (NBAR) under section 122(e)(3), either of which can provide a good starting point for a final allocation.[2482]

## 34.32  Settlement

CERCLA cases present unique settlement challenges, and settlement plays an ongoing role in most such cases, regardless of their posture. EPA has recognized the importance of locating as many PRPs as possible as the first step in the settlement process, noting that this step is "one of the most critical to success."[2483] CERCLA expressly encourages settlement and was designed "so that the threat of disproportionate liability would encourage parties to settle early with the United States and discourage dilatory and strategic behavior."[2484] The SARA amendments authorize EPA to pursue settlements, and section 122 provides specific procedures and provisions to encourage settlement.[2485] Section 122 also contains provisions governing the scope of the covenants that can be provided. For example, except in "extraordinary circumstances," settlement agreements must include "reopeners" for future liability arising from "un-

---

2481. *See* United States v. Amoco Chem. Co., 212 F.3d 274, 277 (5th Cir. 2000) (Although not previously obligated to execute a specific trust agreement, and having objected to trust agreement setting forth allocation, the defendant's signature on amended consent decree, by its terms, created an obligation to "negotiate with the other settling defendants and agree to some system of allocation.").

2482. An NBAR, once issued, acts in effect as an offer of settlement. If the NBAR is accepted by the PRPs, EPA must provide a written explanation for rejecting the PRPs' offer. 42 U.S.C. § 9622(e)(3)(E) (West 2003).

2483. *Streamlining*, *supra* note 2364. *See, e.g.,* United States v. Cannons Eng'g Corp., 899 F.2d 79, 83 (1st Cir. 1990) (EPA notified 671 PRPs of possible liability).

2484. United States v. BASF Corp., 990 F. Supp. 907, 912 (E.D. Mich. 1998).

2485. *See* 42 U.S.C. § 9622 (West 2003); *Streamlining*, *supra* note 2364 ("The new provisions [of SARA] related to special notice, information sharing and negotiating moratoria are particularly important. They attempt to strike a balance between the competing demands of prompting more settlements, conserving limited government resources, and minimizing the delay in the clean-up process."). *See, e.g.,* United States v. SCA Servs., Inc., 827 F. Supp. 526, 530 (N.D. Ind. 1993); Am. Cyanamid Co. v. King Indus., Inc., 814 F. Supp. 215, 218 (D.R.I. 1993); Commercial Bank-Detroit v. Allen Indus., Inc., 769 F. Supp. 1408 (E.D. Mich. 1991).  CERCLA § 122 includes, among others, provisions for mixed funding and *de minimis* settlements that seek to ameliorate the harshness of the Act's strict joint and several liability. 42 U.S.C. §§ 9622(b)(1), 9622(g) (West 2003).

known conditions."[2486] EPA has issued numerous policies and guidance documents to inform PRPs of its approach as to these settlement provisions. For example, EPA has issued guidelines to govern settlements with *de minimis* and *de micromis* parties and to offer those parties as much finality as possible.[2487] Where EPA has not identified *de minimis* parties or at least a *de minimis* volume of disposal, consider encouraging the agency or the parties to do so. Similarly, at a site where a significant amount of waste is attributable to PRPs that are insolvent or defunct, EPA can provide up to a specified amount of "orphan share" funding as a settlement incentive.[2488] EPA also enters into settlements with major PRPs (typically consent decrees with the United States), which can include agreements to perform all site cleanup, to undertake only certain work at the site, and to pay for all or only a part of past costs at the site, leaving the remaining issues for further negotiations.[2489] In virtually every instance, however, some form of allocation will have to be agreed to or developed by the PRPs for any real progress on settlement, whether in an enforcement action by the government or a private action for contribution.

2486. *Id.* §§ 9622(c)(1), 9622(f)(2)(6).

2487. *Id.* § 9622(g)(1). The statutory goal is to release such parties before transaction costs accumulate. *De minimis* settlement decrees can also include reopeners, although the DOJ rarely will include a reopener in a *de minimis* settlement. Typically, however, *de minimis* settlements include a premium to account for the possibility that costs were underestimated, and in case the *de minimis* parties have obtained finality. *See, e.g., Cannons Eng'g Corp.*, 899 F.2d 79, at 88.

2488. Orphan share funding is in effect a form of compromise that reflects the shares of defunct PRPs and results in the government recovering less than 100% of its claim from the settling defendants. *See* Office of Enforcement Compliance & Assurance, EPA, Interim Guidance on Orphan Share Compensation for Settlors of Remedial Design/Remedial Action and Non-Time-Critical Removals (1996), *available at* http://cfpub.epa.gov/compliance/resources/policies/cleanup/superfund/ (last visited Oct. 21, 2003); Office of Enforcement Compliance & Assurance, EPA, Addendum to the "Interim CERCLA Settlement Policy" Issued on Dec. 5, 1984 (1997), *available at* http://cfpub.epa.gov/compliance/resources/policies/cleanup/superfund/ (last visited Oct. 21, 2003). EPA has also issued guidance interpreting section 122(b)(3), which allows EPA to set up "special accounts" to hold money that is collected from PRPs to be used at that site. This allows the government, for example, to settle with certain parties for money and to give some or all of that money, as appropriate, to other parties who will perform site cleanup. *See* EPA, Consolidated Guidance on the Establishment, Management and Use of CERCLA Special Accounts (2002), *available at* http://www.epa.gov/compliance/resources/policies/cleanup/superfund/congui-estmgt-specacct.pdf (last visited Oct. 21, 2003). In addition to issuing these and other policies and guidance, EPA has developed numerous model consent decrees to streamline and speed up the settlement process. *See, e.g.,* Office of Solid Waste & Emergency Response, EPA, Model CERCLA RD/RA Consent Decree (2001), *available at* http://www.epa.gov/compliance/resources/policies/cleanup/superfund/mod-rdra-cd.pdf (last visited Oct. 21, 2003).

2489. CERCLA § 122 and EPA's Model CERCLA RD/RA Consent Decree largely guide the terms, and especially the covenants, of such consent decrees. 42 U.S.C. § 9722 (West 2003); Model CERCLA RD/RA Consent Decree, *supra* note 2488.

Judicial involvement may be desirable to structure cases for settlement. When organizing counsel, consider whether to create a committee solely for settlement issues, with the parties in agreement on the authority of the settlement representatives.[2490] Some courts have referred settlement negotiations to a magistrate judge or special master.[2491] The magnitude of these cases and the possibility that recusal would impose a serious hardship on the entire court suggest that the trial judge should not be directly involved in settlement negotiations.[2492] It is advisable to assess (1) whether a global settlement is possible, or whether the parties are willing to agree to settlement of only certain portions of liability; (2) which parties are interested in settlement; (3) the level at which *de minimis* and *de micromis* buyouts will occur; (4) which parties are willing to participate in good faith in settlement negotiations; and (5) what role the court should play.[2493] In some cases, the parties are very interested in initiating settlement discussions. Consider establishing a "settlement track," with firm deadlines, followed by a "litigation track" if settlement efforts fail. Under such an approach the litigation aspects of the case would be stayed while the parties pursued settlement, letting the parties avoid substantial transaction costs while exploring resolution of the case. Although discovery may be necessary to further settlement negotiations and to undertake an allocation, it can occur on a less formal and narrower basis than if full-blown litigation were underway, and disagreements can be resolved without resort to motion practice. In enforcement cases brought by the government, where liability is not seriously disputed, settlements can often be achieved once the government produces its cost documents (which is often done in prefiling negotiations) and after resolution of the validity of any asserted defenses on appropriate motions. Close supervision of the settlement process can be essential. In one case where the parties agreed to a settlement process protocol, the settlement judge found that monitoring the process through biweekly conferences, insisting on adherence to the protocol, and ensuring that the attorneys did their "homework" (e.g., submitting the names of consultants by a specific date) in accordance with timeframes set during conferences substantially contributed

---

2490.  Simandle, *supra* note 2453, at 121 (1991). Judge Simandle suggests that the parties be "afforded the opportunity to consider whether they wish to use their existing liaison counsel as the settlement representative, or whether they wish to choose a new settlement liaison counsel whose roles and duties would be confined to the group's settlement processes." *Id.* at 122.

2491.  *See, e.g.,* United States v. Kramer, 19 F. Supp. 2d 273 (D.N.J. 1998) (referral of settlement to magistrate judge).

2492.  *See supra* section 13.11.

2493.  *See generally* Brotman & Simandle, *supra* note 2349, at 190–91.

to a global settlement of the action.[2494] In many CERCLA cases, however, the parties will also be actively involved in continuous settlement negotiations outside of any judicially structured schedule.

Pending administrative proceedings and the site's status may affect the settlement process, and the court may find it easier to conduct the settlement negotiations in phases (e.g., with the first phase addressing past costs). Settlement negotiations will falter without a credible scientific and technical database and a reliable estimate as to the total cost of remediation. The court may also consider having the parties' experts involved in the settlement negotiations.[2495] In addition, it may be helpful to explore with the parties the use of alternative dispute resolution (ADR) strategies and techniques in designing an approach to settlement.

One judge's settlement process for CERCLA cases includes four major elements:[2496]

1. *Setting the stage.* The initial question is whether the parties have sufficient interest in pursuing settlement. If the parties "agree to seek to agree," they can produce a written good-faith agreement to pursue settlement of specified issues.

2. *Organizing counsel and defining a timetable.* Groups are created along the lines discussed earlier under "Organizing Counsel" (see section 34.24) (i.e., by selecting a settlement liaison for each group of defendants and defining the authority of the liaisons). The initial task of the liaison and the groups is to define a timetable for the process. The timetable should be coordinated with the pretrial process and should adapt the discovery program to settlement needs. A threshold issue for the group is whether to participate in EPA's formulation of the remedial design or to devise an alternative design.

3. *Joining additional parties and creating a database.* The database would consist primarily of data about the contributions of each party to the site. Here, the emphasis is on identifying and joining parties who contributed substantially to the problems and can be expected to contribute substantially to a financial settlement. The parties would then provide necessary information and develop the structure of a database, perhaps with the help of consultants hired

---

2494. Telephone Interview with U.S. Magistrate Judge Mary Feinberg, Southern District of West Virginia (Nov. 14, 2000) (on file with the Federal Judicial Center) (discussing United States v. Am. Cyanimid Co., No. 2:93-0654, 1997 U.S. Dist. LEXIS 4413 (D. W. Va. Jan. 27, 1997)).

2495. Simandle, *supra* note 2453, at 132.

2496. *Id.* at 119–32.

jointly by the parties. Generally, information about insurance would also be collected.

4. *Allocating responsibility.* This stage involves the hard negotiations and should rely on outside assistance—a special master, a court-appointed mediator, or a consultant hired by the parties—to analyze the data and recommend allocation models.

The role of the district court in the process is to rule promptly on those motions that define the liability of the parties and the contours of the issues. The district judge who remains insulated from settlement discussions can more appropriately preside at a bench trial, if necessary.

## 34.33  Approval of Consent Decrees

Consent decrees between the government and the parties must receive public notice and comment. The United States "lodges" the consent decree with the court, and notice of the decree's availability is published in the Federal Register. The government must consider any comments received and may withdraw the decree if the comments disclose facts or considerations that indicate the proposed decree is "inappropriate, improper, or inadequate."[2497] If the government continues to support the decree, it will file with the court any comments received, along with a motion for entry of the decree once the public comment period has concluded. Often, nonsettling parties will challenge entry of the consent decree because of the contribution protection it affords to settling parties. Other common challenges are that the settling parties are not bearing their proportionate share of the costs of remediation, that the remedy selected is arbitrary and capricious, or that it is substantively or procedurally unfair."[2498] Another issue tied to settlement is the manner in which settlement monies will be allocated.[2499]

The court must then decide whether it is necessary or appropriate to hold a hearing on the decree prior to making a decision to enter or reject it. Although it may be appropriate to hold an evidentiary hearing, the cost and expense of a hearing often obviate some of the benefits of settlement, particularly where the parties are *de minimis.* As a result, courts will usually review the administrative record and the papers submitted and determine whether the set-

---

2497.  42 U.S.C. § 9622(d)(2) (West 2003).

2498.  *See, e.g.,* Topol & Snow, *supra* note 2350, § 7.15. "Thus, according to these courts, in order for a settlement to be substantively fair, each settling party must be required to bear cleanup responsibility in an amount that has some relationship to its relative contribution to the adverse environmental conditions at the site." *Id.* at 160.

2499.  *See supra* section 34.12 at ¶ 3, "Allocation of response costs."

tlement is "fair, reasonable and consistent with the Constitution and the mandate of Congress."[2500] Settlements of private contribution or cost-recovery actions are not subject to the same statutory constraints as settlements with the government, and they do not carry the same deferential standard of review.[2501] However, courts have made similar "fair and reasonable" evaluations prior to approving them, and it is good practice to look at various aspects of the settlement negotiations.

## 34.34  Structuring the Trial

CERCLA cases rarely go to trial, but when they do the trial is likely to be complicated.[2502] Most parties typically will have settled before trial, leaving only a few parties remaining. A number of third-party claims may also have been resolved.

Consider holding separate trials on liability, damages, and allocation of response costs pursuant to Federal Rule of Civil Procedure 42. Alternatively, consider bifurcating or trifurcating the trial into phases—liability, damages (remediation plans), and allocation.[2503] The order of trial (and of the corresponding settlement discussions) can be varied to address dispositive issues first. Addressing challenges to the proposed remedy may crystallize issues relating to response costs and how they should be allocated. EPA ordinarily has to determine the scope of proposed cleanup efforts before the court can allocate responsibility for remediation.

Except for natural resource damage claims, there is no right to a jury trial in CERCLA cases.[2504] One judge's approach to a case involving damages to

---

2500.  New York v. Exxon, 697 F. Supp. 677, 692 (S.D.N.Y. 1988); Topol & Snow, *supra* note 2350, § 7.15. *See* Best Foods v. Aerojet-Gen. Corp., No. 1:89-CV-503, 961, 2000 WL 1238910 (W.D. Mich. Aug. 24, 2000) (evaluating whether settlement apportionment was fair). Accordingly, a court is not "empowered to rewrite the settlement agreed upon by the parties" or to "delete, modify, or substitute certain provisions of the consent decree." Officers for Justice v. Civil Serv. Comm'n, 688 F.2d 615, 630 (9th Cir. 1982).

2501.  Topol & Snow, *supra* note 2350, at 162.

2502.  *See, e.g.,* United States v. Ottati & Goss, Inc., 694 F. Supp. 977 (D.N.H. 1988) (addressing the remedy and allocation), *aff'd in part, vacated in part,* 900 F.2d 429 (1st Cir. 1990); United States v. Ottati & Goss, Inc., 630 F. Supp. 1361 (D.N.H. 1985) (dealing with liability); *Ottati & Goss, Inc.,* 694 F. Supp at 988–1000 (addressing the remedy and allocation).

2503.  *See, e.g.,* Kalamazoo River Study Group v. Rockwell Int'l, 107 F. Supp. 2d 817 (W.D. Mich. 2000) (liability and allocation); United States v. Vertac Chem. Corp., 79 F. Supp. 2d 1034 (E.D. Ark. 1999) (liability and allocation).

2504.  *See* United States v. N.E. Pharm. & Chem. Co., 810 F.2d 726, 749 (8th Cir. 1986); United States v. Northernaire Plating Co., 685 F. Supp. 1410, 1413 (W.D. Mich. 1988) (citing *N.E. Pharm. & Chem. Co.*).

natural resources was to focus case management on preparing a single case involving a primary defendant for a jury trial.[2505] To ascertain the universe of facts at issue, the judge ordered the litigants to request admission of any fact on which they intended to offer evidence and they were precluded from offering any evidence that was not subject to such a request. Each request had to be detailed "to the level of specificity of a patent claim."[2506]

Special verdict forms (see section 12.451), jury notebooks (see section 12.42), time limits for each side (see section 12.35), interim instructions (see section 12.433), and other jury aids may be appropriate. Setting firm trial dates and using other trial-management procedures are presumed.[2507]

2505. The district court in *In re Acushnet River & New Bedford Harbor*, 712 F. Supp. 994 (D. Mass. 1989), held that there is a right to trial by jury in cases involving recovery of damages to natural resources because such cases are a form of statutory tort.

2506. *In re* Acushnet River & New Bedford Harbor, 712 F. Supp. 1019, 1030–31 (D. Mass. 1989). As the case settled on the eve of trial, the degree to which this procedure would have simplified the trial was never tested. It did, however, lead some of the parties to propound innumerable requests for admission lest an important fact inadvertently be excluded from the "universe." *Id.*

2507.  *See generally supra* sections 11.212, 12.

# 35.  Civil RICO

.1 Introduction  689
.2 Statutory Framework  692
.3 Case Management  702
    .31 Pleadings  702
    .32 Initial Conference  708
    .33 Discovery  720
    .34 Motion Practice  721
    .35 Trial  722

## 35.1  Introduction

Congress enacted the 1920 Racketeer Influenced and Corrupt Organizations Act[2508] (RICO) to respond to the "infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce."[2509] Congress targeted organized crime through a broad statutory scheme that included severe criminal penalties, fines, imprisonment, asset forfeiture,[2510] and civil remedies in an effort to undermine the economic power of racketeering organizations.[2511] The statute further enabled private litigants to act, in effect, as private attorneys general[2512] to sue for injury to their businesses or property caused by a RICO violation.

Civil RICO claims have alleged wrongs actionable under state and common law, as well as other federal statutes.[2513] Although the statute was targeted

---

2508.  18 U.S.C. §§ 1961–1968 (West 2003).

2509.  Comm'n on the Judiciary, U.S. Senate, Organized Crime Control Act of 1969, S. Rep. No. 91-617, at 76 (1969). In 1969, the President's Commission on Law Enforcement and Administration of Justice reported that organized crime was extensively involved in legitimate business organizations and utilized tactics such as monopolization, terrorism, extortion, and tax evasion "to drive out and control lawful ownership and leadership." President's Comm'n on Law Enforcement & Admin. of Justice, The Challenge of Crime in a Free Society (1969).

2510.  18 U.S.C. § 1963(a) (West 2003).

2511.  *Id.* § 1964(c). RICO also provides for equitable relief, including divestiture of defendant's interest in the enterprise, restrictions on future activities, reorganization, or dissolution. *Id.* § 1964(a). *See* Paul B. O'Neill, "*Mother of Mercy, Is This the Beginning of RICO?*": *The Proper Point of Accrual of a Private Civil RICO Action*, 65 N.Y.U. L. Rev. 172, 180 (1990).

2512. 18 U.S.C. § 1964(c) (West 2003). *See* Rotella v. Wood, 528 U.S. 549, 557 (2000) ("The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity.").

2513.  For example, until the enactment of the Private Securities Litigation Reform Act, RICO claims were frequently asserted in cases alleging securities violations. *See, e.g.,* Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258 (1992); Powers v. British Vita, 57 F.3d 176 (2d Cir. 1995).

at organized crime, courts have broadly construed RICO's provisions, and its scope has extended well beyond its original aim. Early efforts by lower courts to restrict claims that appeared to exceed RICO's original goals were overruled by Supreme Court decisions that broadened the statute's reach.[2514] RICO claims can now be found in a variety of contexts, including insurance and business disputes, antiabortion and other protests,[2515] consumer financial services litigation,[2516] family law,[2517] and whistle-blower actions.[2518] Although the nontraditional uses of RICO have continued to expand despite significant criticism by commentators and the courts, Congress has shown little inclination to narrow the statute's focus or reach.[2519]

---

2514.  Sedima S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985). *See* United States v. Turkette, 452 U.S. 576, 581 (1981) (Congress intended RICO to reach criminal as well as legitimate organization and breadth of statute signaled congressional intent to supersede authority of courts to restrict its provisions). However, the Supreme Court has acknowledged that the statute does have some limits. *See* Reves v. Ernst & Young, 507 U.S. 170, 184 (1993) ("Congress did not intend to extend RICO liability under § 1962(c) beyond those who participate in the operation or management of an enterprise through a pattern of racketeering activity."); H.J. Inc. v. N.W. Bell Tel. Co., 492 U.S. 229, 239 (1989) (continuity required).

2515.  *See, e.g.,* NOW v. Scheidler, 510 U.S. 249 (1994).

2516.  Robert M. Hatch et al., *RICO Theories, Cases and Strategies in Consumer Litigation: Strategies for Defending Section 1962 Claims*, 53 Consumer Fin. L. Q. Rep. 140 (1999).

2517.  *See* DeMauro v. DeMauro, 115 F.3d 94, 97 (1st Cir. 1997) (alleging RICO claims for fraudulent concealment of marital assets by wife against husband arising out of divorce proceedings); *see also* Erin Alexander, Comment, *The Honeymoon Is Definitely Over: The Use of Civil RICO in Divorce*, 37 San Diego L. Rev. 541 (2000).

2518.  Beck v. Prupis, 162 F.3d 1090 (11th Cir. 1998), *aff'd*, 529 U.S. 494 (1999).

2519.  "The 'extraordinary' uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of 'pattern.'" *Sedima*, 473 U.S. at 500. The Private Securities Litigation Reform Act of 1995 (PSLRA) eliminated conduct actionable as securities fraud as a predicate act, reflecting the only time to date that Congress has restricted the reach of civil RICO. 15 U.S.C. § 78u-4(a) (2000). *See, e.g.,* Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321, 330 (3d Cir. 1999) (A RICO plaintiff "cannot avoid the RICO Amendment's bar . . . if the conduct giving rise to [the] [RICO] predicate offenses amounts to securities fraud."); Mathews v. Kidder, Peabody & Co., Inc., 161 F.3d 156, 164 (3d Cir. 1998) ("It is clear from the legislative history that the intention behind the RICO Amendment was 'to address a significant number of frivolous actions based on alleged securities law violations.'" (quoting 141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995) (statement of Rep. Cox))); Krear v. Malek, 961 F. Supp. 1065, 1076 (E.D. Mich. 1997) (PSLRA applies retroactively to RICO claims). The PSLRA retains a narrow exception permitting RICO allegations against defendants who had been criminally convicted of securities fraud. *See* Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, § 107, 109 Stat. 737, 758 (codified as amended at 18 U.S.C. § 1964(c) (West 2003)).

RICO has been called "arcane,"[2520] "tormented,"[2521] "complicated,"[2522] and "agonizingly difficult."[2523] Litigation under the statute is often time-consuming and burdensome, both because RICO's inadequately defined scope has resulted in conflicting legal doctrine and because of the breadth of the supporting allegations. RICO litigation can involve multiple defendants and multi-count complaints where each count alleges a separate enterprise and a multitude of predicate acts.[2524] In addition, RICO cases are often brought as class actions, which can introduce additional complexities.[2525]

2520. Bryant v. Yellow Freight Sys., 989 F. Supp. 966, 968 (N.D. Ill. 1997) (RICO "fraught with arcane mysteries"); Macy's E., Inc. v. Emergency Envtl. Servs., Inc., 925 F. Supp. 191, 193 (S.D.N.Y. 1996) ("arcane eccentricities of RICO jurisprudence").

2521. Combs v. Bakker, 886 F.2d 673, 677 (4th Cir. 1989) (characterizing RICO as a "tormented statute"); Sadighi v. Daghighfekr, 36 F. Supp. 2d 267 (D.S.C. 1999) (noting statute's "torment" was evident in courts' interpretations of section 1965).

2522. Tafflin v. Levitt, 493 U.S. 455, 465 (1990); Cent. Distribs. of Beer Inc. v. Conn., 5 F.3d 181, 184 (6th Cir. 1993) (stating that RICO is "one of the most complex statutes ever enacted by Congress"); Jennings v. Emry, 910 F.2d 1434, 1435 (7th Cir. 1990) (noting RICO is a complex statute); Murray v. Midwest Real Estate Inv. Co., No. 98C1569, 1998 WL 919694, at *2 (N.D. Ill. Dec. 30, 1998) (calling RICO "exceedingly complicated"); Brooks v. Bank of Boulder, 891 F. Supp. 1469, 1477 (D. Colo. 1995) ("complicated").

2523. Sun Sav. & Loan Ass'n v. Dierdorff, 825 F.2d 187, 196 (9th Cir. 1987) (Burns, J., concurring).

2524. Chapman & Cole v. Itel Container Int'l B.V., 865 F.2d 676, 685 (5th Cir. 1989) ("A RICO cause of action by definition involves complex litigation and high legal costs.").

2525. *See* Smith v. Berg, 247 F.3d 532, 534 (3d Cir. 2001) (putative class action against real estate developer for misleading plaintiffs to purchase homes they couldn't afford); VanDenBroeck v. CommonPoint Mortgage Co., 210 F.3d 696, 698 (6th Cir. 2001) (class action by borrowers against lenders); Maio v. Aetna Inc., 221 F.3d 472, 474 (3d Cir. 2000) (class action complaint alleging RICO violations against HMO); Stachon v. United Consumers Club, Inc., 229 F.3d 673, 674 (7th Cir. 2000) (class action suit against buying club); Moore v. Am. Fed. of Television & Radio Artists, 216 F.3d 1236, 1243 (11th Cir. 2000) (denying motion for class certification on RICO count where there were only a few common questions of law, and facts and plaintiffs could not satisfy the requirements of Rule 23); Fogie v. Thorn Ams., Inc., 190 F.3d 889, 892 (8th Cir. 1999) (class action alleging violation of RICO in operation of rent-to-own business); Hamm v. Rhone-Poulenc Rorer Pharms., Inc., 187 F.3d 941, 951 (8th Cir. 1999) (finding district court treated case as class action although no class had been certified at the time of ruling on the summary-judgment motion), *cert. denied*, 528 U.S. 1117 (2000); Price v. Pinnacle Brands, Inc., 138 F.3d 602, 604–05 (5th Cir. 1998) (class action alleging claims arising out of purchase of trading cards).

## 35.2  Statutory Framework

RICO liability hinges on whether the defendant "person"[2526] engaged in a pattern of racketeering activity through specific designated offenses, referred to as predicate acts. The specific elements necessary to state a claim vary according to whether the claim is brought under 18 U.S.C. § 1962(a), (b), (c) or (d). The plaintiff must show that the racketeering activity adversely affected an interstate enterprise,[2527] and that this adverse impact proximately caused injury to the plaintiff's business or property.[2528] Racketeering activity is defined in section 1961 to include activities that could be charged under a broad array of federal and state criminal offenses.[2529] To establish a pattern of racketeering, a plaintiff must show that the defendant was responsible for at least two acts of racketeering within ten years of each other, and that the predicate acts had a common relationship and continuity.[2530] Further, to establish the requisite predicate acts, the plaintiff must plead and prove each element of the racketeering offense.[2531]

---

2526. "Person" is defined in section 1961(3) as including "any individual or entity capable of holding a legal or beneficial interest in property." The term has been liberally construed. *See* Jund v. Town of Hempstead, 941 F.2d 1271, 1282 (2d Cir. 1991) (unincorporated political association); Pine Ridge Recycling, Inc. v. Butts County, 855 F. Supp. 1264, 1273 (M.D. Ga. 1994) (counties and solid waste authorities).

2527. RICO: Civil and Criminal Law and Strategy § 7.04[2][e], at 7-45 to 7-47 (Jed S. Rakoff & Howard W. Goldstein eds., 2002).

2528. *See id.* §§ 7.04[2][f], 7.04[2][g].

2529. Section 1961(1) defines "racketeering activity" as "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance which is chargeable under state law and punishable by imprisonment for more than one year," or which is indictable under a wide variety of enumerated offenses under Title 18 of the U.S. Code. It also covers any act indictable under Title 29, any federal offense involving fraud in connection with Title 11, the sale of securities or controlled substances, as well as any acts indictable under the Currency and Foreign Transaction and Reporting Act or the Immigration and Naturalization Act.

2530. Section 1961(5) defines a "pattern of racketeering" as requiring "at least two acts of racketeering activity, one of which occurred after the effective date of this section and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." Acts of terrorism were recently added to RICO under section 1961(1)(g), which provides for the inclusion of any act under 18 U.S.C. §§ 2332b(g)(5)(B) & 2332b(a)(1)(B) ("[A]ttempting or conspiring to destroy or damage any structure . . . within the United States . . . .").

2531. *See* Rakoff & Goldstein, *supra* note 2527, § 7.04[2][c], at 7-41 to 7-44.

The following substantive provisions of RICO (18 U.S.C. § 1962) apply to any "person":

- Section 1962(a) prohibits the investment of income or of the proceeds of income derived from a pattern of racketeering activity or through the collection of an unlawful debt, in an enterprise engaged in or whose activities affect interstate or foreign commerce. It specifically exempts from its scope the purchase of securities for purposes of investment and purchases "without the intention of controlling or participating in the control of the issuer," as long as the securities do not exceed 1% of the outstanding shares of any one class of securities and do not confer the power to elect directors.

- Section 1962(b) makes it unlawful to acquire an interest in or control of an enterprise engaged in or whose activities affect interstate or foreign commerce through a pattern of racketeering activity or the collection of an unlawful debt.

- Section 1962(c) prohibits anyone employed by or associated with an enterprise engaged in or whose activities affect interstate or foreign commerce from participating in its affairs through a pattern of racketeering activity or the collection of an unlawful debt.

- Section 1962(d) prohibits conspiracies to violate section 1962(a), (b), or (c).[2532]

---

2532. To state a claim under section 1962(d), a plaintiff must plead that defendants agreed to join the conspiracy, agreed to commit predicate acts, and knew that those acts were part of a pattern of racketeering activity. *See* United States v. Patrick, 248 F.3d 11, 20 (1st Cir. 2001) (conspiracy can be shown by tacit agreement); Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1140–41 (5th Cir. 1992); Glessner v. Kenny, 952 F.2d 702, 714 (3d Cir. 1991); Reddy v. Litton Indus., Inc., 912 F.2d 291, 294–95 (9th Cir. 1990). Absent sufficient allegations of the substantive violation of subsection (a), (b), or (c), the plaintiff's claim under section 1962(d) will be dismissed. *See* Salinas v. United States, 522 U.S. 52, 63 (1997). The circuits had split on the issue of whether the defendant must have personally participated in or agreed to participate in the commission of predicate acts. Some courts had required that a defendant agree to commit at least two predicate acts, *see, e.g., Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 47–48 (1st Cir. 1991), while others had held that it was sufficient if a defendant agreed that some member of the enterprise would commit the predicate acts, *see, e.g., United States v. Pryba*, 900 F.2d 748, 760 (4th Cir. 1990). *See also* United States v. Kragness, 830 F.2d 842, 860 (8th Cir. 1987). Following the Supreme Court's decision in *Salinas*, however, the courts have held that a defendant does not need to personally commit predicate acts, or agree to commit them, in order to be liable under section 1962(d). *See, e.g., Patrick*, 248 F.3d at 20; Smith v. Berg, 247 F.3d 532, 538 (3d Cir. 2001); Lachmund v. ADM Inv. Servs., Inc., 191 F.3d 777, 784–85 (7th Cir. 1999); United States v. Frega, 179 F.3d 793, 810 n.21 (9th Cir. 1999), *cert. denied*, 528 U.S. 1191 (2000).

There has been significant litigation over the proper interpretation of several of the statutory elements common across sections 1962(a), (b), (c), and (d)—such as "enterprise" or "pattern"—as well as conflicts among the circuits over the interpretation of certain elements peculiar to section 1962(c),[2533] such as "conduct or participate."[2534] Although sometimes referred to as "terms of art,"[2535] their interpretation remains a matter of debate and has varied among the circuits. Despite the confusion as to the appropriate scope of these elements, a plaintiff's failure to include factual allegations sufficient to satisfy basic components of each element, at least as that component has been interpreted within the relevant circuit, may result in dismissal.[2536] Some of the most litigated statutory terms are discussed below:

- *Enterprise.* Section 1961(4) broadly defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[2537] In *United States v. Turkette*,[2538] the Court held that RICO's enterprise element encompassed both legitimate and illegitimate businesses. *Turkette* has been interpreted as establishing that an "enterprise" must exhibit several basic characteristics: (1) there must be a common or shared purpose among the members of the enterprise; (2) there must be some degree of continuity of organizational

2533. Section 1962(c) forms the basis for most of the civil RICO claims. In *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985), the Supreme Court set out the four primary elements of a § 1962(c) claim. The plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id.* at 496 (footnote omitted).

2534. *See* Rakoff & Goldstein, *supra* note 2527, § 2.03[1], at 2-38 ("Post-*Sedima* RICO jurisprudence has been notable for confusion and inconsistency.").

2535. Elliott v. Foufas, 867 F.2d 877, 880 (5th Cir. 1989) (each concept "is a term of art which carries its own inherent requirements of particularity").

2536. Jennings v. Emry, 910 F.2d 1434 (7th Cir. 1990); Schmidt v. Fleet Bank, 16 F. Supp. 2d 340 (S.D.N.Y. 1998).

2537. The Supreme Court has noted in *United States v. Turkette* that "[t]here is no restriction upon the associations embraced by the definition: an enterprise includes any union or group of individuals associated in fact." 452 U.S. 576, 580 (1981). The courts generally have broadly construed the definition of "enterprise" to include various types of organizations, both legitimate and criminal, as well as combinations of different entities as "associations in fact." *See, e.g.,* DeFalco v. Bernas, 244 F.3d 286 (2d Cir. 2001) (town); United States v. Patrick, 248 F.3d 11, 17 (1st Cir. 2000) (gang); Bachman v. Bear, Stearns & Co., 178 F.3d 930, 931 (7th Cir. 1999) ("RICO statute reaches informal as well as formal organizations."); United States v. Beasley, 72 F.3d 1518, 1525 (11th Cir. 1996) (religious cult); Cox v. Adm'r United States Steel & Carnegie, 30 F.3d 1347, 1349 (11th Cir.) (pension fund), *modifying on reh'g*, 17 F.3d 1386 (11th Cir. 1994); Am. Mfrs. Mut. Ins. Co. v. Townson, 912 F. Supp. 291, 295 (E.D. Tenn. 1995) (marriage as enterprise).

2538. 452 U.S. 576, 580–81 (1981).

structure and members; and (3) the enterprise must be separate from the pattern of racketeering activity.[2539] The Court further held that to satisfy the enterprise requirement, a plaintiff must show "evidence of an ongoing organization, formal or informal, and . . . that the various associates function as a continuing unit."[2540] These requirements are easily met where the enterprise has a legal existence, such as a corporation or partnership.[2541] Where the enterprise is an "association in fact," however, proof of the various elements becomes more difficult and proof that demonstrates continuity or organizational structure often overlaps with the proof relied on to show a pattern of racketeering activity. The courts have disagreed on the extent to which the same evidence used to prove a pattern of racketeering activity can also be

---

2539.  *Id.* at 583.

2540.  *Id. See* VanDenBroeck v. CommonPoint Mortgage Co., 210 F.3d 696, 700 (6th Cir. 2001) (alleged enterprise of mortgage lender and secondary lender market "too unstable and fluid an entity to constitute a RICO enterprise"); Stachon v. United Consumers Club, Inc., 229 F.3d 673, 676 (7th Cir. 2000) (enterprise of defendant, its franchisees, officers, directors, members, participating wholesalers, and participating manufacturers lacked distinct structure and function); United States v. Gray, 137 F.3d 765, 772 (4th Cir. 1998) (government evidence showed defendant ran a drug distribution ring that had identifiable structure from the existence of a leader, an assistant, stash house workers, and a system of stash houses used to distribute drugs); United States v. Parise, 159 F.3d 790, 795 (3d Cir. 1998) (continuity requirement met even though each member of enterprise didn't participate in it from beginning to end, and government needed only to show "alleged members who participated at one time or another were part of an ongoing enterprise with a shared 'organizational pattern' and 'system of authority'"); United States v. Davidson, 122 F.3d 531, 535 (8th Cir. 1997) (The number and variety of crimes, defendant's financial support of his "underlings," and defendant's continued leadership of the criminal organization, among other things, "demonstrate[d] an ongoing association with a common purpose to reap the economic rewards flowing from the crimes, rather than a series of ad hoc relationships."); Amsterdam Tobacco Inc. v. Philip Morris, Inc., 107 F. Supp. 2d 210, 215 (S.D.N.Y. 2000) ("The vertical group described by plaintiff here is merely a reiteration of the (alleged) racketeering activity."). In addition, the RICO enterprise must be separate and distinct from the RICO "person." *See, e.g.,* Brannon v. Boatmen's First Nat'l Bank of Okla., 153 F.3d 1144, 1147–48 & n.4 (10th Cir. 1998).

2541.  *See, e.g.,* United States v. Kirk, 844 F.2d 660, 664 (9th Cir. 1988) ("Although the circuits are divided on the requirements for proof of an enterprise . . . under either test, the existence of a corporation fulfills the requirements of an ascertainable structure apart from the predicate racketeering activity.") (citation omitted); Bennett v. Berg, 685 F.2d 1053, 1061 n.9 (8th Cir. 1982) ("Where a legal entity is alleged as the RICO enterprise, this entity is likely to be clearly distinct from the acts of racketeering."), *aff'd in part, rev'd in part in reh'g en banc,* 710 F.2d 1361 (8th Cir. 1983).

used to prove the existence of an enterprise.[2542] Note, however, that evidence satisfying the requirement of "continuity" of the organization may also satisfy the continuity required to show a pattern of racketeering activity. The circuits have varied in whether a plaintiff may prove the existence of an enterprise through proof of a pattern of racketeering activity.[2543] Some circuits have interpreted the "separateness" criteria more strictly and have required varying degrees of proof that an organization has a structure independent from that inherent in the pattern of racketeering activity.[2544] These courts have expressed the concern that to permit proof of the enterprise to be inferred from the pattern of racketeering activity would essentially make "'every pattern of racketeering activity [become] an enterprise whose affairs are conducted through the pattern of racketeering.'"[2545]

In addition, to the extent that the claim is brought under section 1962(c), a plaintiff must also plead and prove that the "enterprise" is distinct from the defendant "person" against whom damages are sought.[2546] It is unclear whether this requirement exists for claims

---

2542. *Turkette*, 452 U.S. at 583 (1981) ("While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other.").

2543. *See, e.g.*, United States v. Indelicato, 865 F.2d 1370, 1384 (2d Cir. 1989) (although "enterprise" and "pattern" requirements are distinct elements of the claim, same evidence could be used to prove both elements); United States v. Perez, No. 3:97CR48, 1999 WL 200696, at *2 (D. Conn. Feb. 23, 1999) (elements of relatedness and continuity necessary to establish pattern can be proven through nature of RICO enterprise), *aff'd*, 242 F.3d 369 (2000), *cert. denied*, 532 U.S. 989 (2001).

2544. *See, e.g.*, United States v. Darden, 70 F.3d 1507, 1521 (8th Cir. 1995) (proof must show enterprise has existence beyond the association necessary to commit the predicate acts); *Amsterdam Tobacco*, 107 F. Supp. 2d at 215 (enterprise would likely not exist were the predicate acts removed from the equation (citing Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 349 (S.D.N.Y. 1998))); Zola v. Gordon, 685 F. Supp. 354, 373 (S.D.N.Y 1988) (enterprise must have an existence beyond that which is merely to commit each of the acts charged as predicated racketeering offenses); United States v. Riccobene, 709 F.2d 214, 223–24 (3d Cir. 1983) (same).

2545. Chang v. Chen, 80 F.3d 1293, 1298 (9th Cir. 1996) (quoting Arlington v. Carpenter, 619 F. Supp. 474, 479 (C.D. Cal. 1985)); *see also* United States v. Bledsoe, 674 F.2d 647, 664 (8th Cir.) (An enterprise cannot be proved absent "proof of some structure . . . separate from the racketeering activity and distinct from the organization which is a necessary incident to the racketeering. The Act simply punishes the commission of two of the specified crimes with a 10-year period."), *cert. denied sub nom.* Phillips v. United States, 459 U.S. 1040 (1982).

2546. Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 158 (2001) (holding that RICO applies "when . . . a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority"); *see also* Fogie v. Thorn Americas, Inc., 190 F.3d 889, 898–99

brought under section 1962(a) or (b). Several cases have held that it is not necessary to show that the "enterprise" is separate and distinct from the "person" where the case arises under other provisions of section 1962.[2547] Similarly, the courts have disagreed on whether an intracorporate conspiracy can be alleged under section 1962(d).[2548] Most courts have ruled that section 1962(c) was designed to punish only the persons who run an enterprise illegally and not the enterprise itself, which often will be an innocent victim of the racketeering activity.[2549] Plaintiffs have nonetheless attempted to circumvent this requirement by alleging, for example, that the defendant is an affiliate or parent corporation.[2550] Thus, in the situation where corporate employees are alleged to have conducted the affairs of the corporate enterprise through a pattern of racketeering activity, the courts generally have

---

(8th Cir. 1999) (finding parent and wholly owned subsidiary cannot be both the enterprise and person, and allegations failed to satisfy distinctiveness requirement); Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258, 264 (3d Cir. 1995) (officers or employees of legitimate corporation properly named as "persons," with corporation serving as the "enterprise").

2547. *See, e.g.,* New Beckley Mining Corp. v. Int'l Union, United Mine Workers, 18 F.3d 1161, 1163 (4th Cir. 1994); Landry v. Airline Pilots Ass'n Int'l, 901 F.2d 404, 425–26 (5th Cir.), *cert. denied,* 498 U.S. 895 (1990); Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639, 883 F.2d 132, 140 (D.C. Cir. 1989) (noting cases where courts have held corporation can be both person and enterprise under section 1962(a)), *rev'd in part on other grounds,* 913 F.2d 948 (D.C. Cir. 1990).

2548. *Compare Fogie,* 190 F.3d at 898–99 (no conspiracy can exist between a corporation and a wholly owned subsidiary), *with* Webster v. Omnitrition Int'l, Inc., 79 F.3d 776, 787 (9th Cir.) (conspiracy under section 1962(d) could extend to intracorporate conspiracy), *cert. denied,* 519 U.S. 865 (1996).

2549. *See* Hatch et al., *supra* note 2516, at 142–43.

2550. *See, e.g.,* Bd. of County Comm'rs v. Liberty Group, 965 F.2d 879, 885 (10th Cir. 1992); *Yellow Bus Lines,* 883 F.2d at 139–40; Schofield v. First Commodity Corp., 793 F.2d 28, 29–30 (1st Cir. 1986); Bennett v. United States Trust Co., 770 F.2d 308, 315 (2d Cir. 1985). *See* Hatch et al., *supra* note 2516, at 143–44 and cases cited therein; *see also* VanDenBroeck v. CommonPoint Mortgage Co., 210 F.3d 696, 701 (6th Cir. 2001) (sole shareholder of corporate "enterprise" can be "person" for purposes of RICO, and is sufficiently distinct from corporation to satisfy separateness requirement); Brannon v. Boatmen's First Nat'l Bank of Okla., 153 F.3d 1144, 1149 (10th Cir. 1998) (wholly owned subsidiary will be deemed distinct for purposes of section 1962(c) where parent and subsidiary had distinct roles in common course of wrongful conduct); Emery v. Am. Gen. Fin., Inc., 134 F.3d 1321, 1324–25 (7th Cir. 1998) (plaintiff failed to state claim under RICO where parent corporation was alleged as "person" and its only involvement in racketeering scheme was limited to its status as parent of its subsidiary "enterprise"); *Yellow Bus Lines,* 883 F.2d at 141 ("[A]llowing plaintiffs to generate such 'contrived partnerships' consisting of an umbrella organization and its subsidiary parts, would render the non-identity requirements of section 1962(c) meaningless. We decline to permit such an 'end run' around the statutory requirements.").

rejected plaintiffs' efforts to hold the corporation liable as a defendant, either directly or vicariously.[2551] Note, however, that some courts permit vicarious liability where an employer is benefited by its employee's section 1962(c) violations if the employer is distinct from the enterprise.[2552] Claims brought under other subsections have not been subject to similar limitations, and courts have applied general principles of vicarious liability depending on the circumstances and whether the corporation was a victim.[2553] Claims alleging association-in-fact enterprises have been dismissed on pretrial motions for failure to identify an enterprise that is more than a corporate entity and its agents conducting their regular business.[2554]

- *Pattern of racketeering activity.* Section 1961(5) defines "pattern" as "at least two acts of racketeering activity within a ten year period." In *H.J. Inc. v. Northwestern Bell Telephone Co.,*[2555] the Supreme Court addressed the meaning of the pattern requirement, holding a plaintiff must show that the predicate acts "are related and that they are or pose a threat of continued criminal activity."[2556] A pattern cannot be satis-

---

2551. *See, e.g.,* DeFalco v. Bernas, 244 F.3d 286 (2d Cir. 2001); Cedric Kushner Promotions, Ltd. v. King, 219 F.3d 115, 116–17 (2d Cir. 2000) (affirming district court dismissal where defendant alleged as RICO person was an employee of the RICO enterprise acting within the scope of his authority); Parker & Parsley Petroleum Co. v. Dresser Indus., 972 F.2d 580, 584 (5th Cir. 1992); Miranda v. Ponce Fed. Bank, 948 F.2d 41, 45 (1st Cir. 1991). *Contra* Cox v. Adm'r United States Steel & Carnegie, 17 F.3d 1386, 1398 (11th Cir. 1994) (person and enterprise not required to be distinct under section 1962(c)), *modified*, 30 F.3d 1347 (11th Cir.), *cert. denied*, 513 U.S. 1110 (1995).

2552. *See, e.g.,* Brady v. Dairy Fresh Prods. Co., 974 F.2d 1149 (9th Cir. 1992).

2553. Rakoff & Goldstein, *supra* note 2527, § 1.03(2), at 1-13 to 1-18, and cases cited therein; Quick v. Peoples Bank of Cullman County, 993 F.2d 793, 797–98 (11th Cir. 1993) (section 1962(b)); Brannon v. Boatmen's First Nat'l Bank of Okla., 153 F.3d 1144, 1149 (10th Cir. 1998) (section 1962(c)).

2554. *See, e.g., Parker & Parsley*, 972 F.2d at 583; Brittingham v. Mobil Corp., 943 F.2d 297, 300–03 (3d Cir. 1991) ("[A] § 1962(c) enterprise must be more than an association of individuals or entities conducting the normal affairs of a defendant corporation."); *Yellow Bus Lines*, 883 F.2d at 141; Atkinson v. Anadarko Bank & Trust Co., 808 F.2d 438, 439 (5th Cir. 1987).

2555. 492 U.S. 229 (1989). *Northwestern Bell* resolved two conflicts among the circuits: (1) whether the pattern requirement could be met by a showing of only a single scheme, or whether separate multiple schemes must be alleged; and (2) whether a showing of two predicate acts, by themselves, would satisfy the pattern requirement.

2556. *Id.* at 239. As with other provisions of the statute, the Court noted that in defining a pattern of racketeering activity, Congress had intended "to take a flexible approach." *Id.* at 238; *see also* Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497 n.14 (1985) (referring to the "continuity plus relationship" language of the Senate Report in attempting to describe a pattern). The circuit decisions following *Sedima* reflected differing views among the circuits as to when a pattern did

fied by sporadic and isolated activity.[2557] Rather, to satisfy the relatedness requirement, there must be some showing of acts with similar "purposes, results, participants, victims or methods of commission or [that] are otherwise interrelated . . . ."[2558] Continuity can be established where the predicate acts have extended over a substantial period of time (typically at least a year) or, alternatively, where the activity threatens to continue into the future.[2559] The Court offered examples of several ways in which the continuity prong of the pattern requirement could be satisfied, such as where the racketeering activity is a regular way of conducting an ongoing legitimate business, but emphasized that these were only illustrative of the innumerable possibilities and each case should be considered in light of its particular facts and circumstances.[2560] Circuit decisions following *Northwestern Bell* have developed varying tests for determining whether the relationship or continuity prongs have been established. For example, several circuits have adopted multifactor tests that consider such things as the nature, number, and temporal relationship of the predicate acts; whether the activity constituted a single scheme as opposed to several schemes; the number of putative victims; and the presence of distinct injuries to establish continuity.[2561] Other courts have broadly con-

or did not exist. *See, e.g.,* United States v. Polanco, 145 F.3d 536, 541 (2d Cir. 1998) ("Predicate acts 'must be related to each other ("horizontal relatedness") and they must be related to the enterprise ("vertical relatedness").'" (quoting United States v. Minicone, 960 F.2d 1099, 1106 (2d Cir. 1992))), *cert. denied,* 525 U.S. 1071 (1999); Morgan v. Bank of Waukegan, 804 F.2d 970, 975 (7th Cir. 1986) (pattern requires predicate acts involving separate transactions); Superior Oil Co. v. Fulmer, 785 F.2d 252, 257 (8th Cir. 1986) (pattern not met where all predicate acts are pursuant to one scheme); R.A.G.S. Couture, Inc. v. Hyatt, 774 F.2d 1350, 1355 (5th Cir. 1985) (single scheme sufficient).

2557.  *Sedima,* 473 U.S. at 497 n.14.

2558.  *Northwestern Bell,* 492 U.S. at 240. *See, e.g.,* Combs v. Bakker, 886 F.2d 673 (4th Cir. 1989) (vacating district court decision and holding that pattern requirement did not require different types of predicate acts, or objective).

2559.  *Northwestern Bell,* 492 U.S. at 242.

2560.  *Id.*

2561.  *See, e.g.,* W. Assocs. Ltd. P'ship v. Market Square Assocs., 235 F.3d 629, 634 (D.C. Cir. 2001) (six-factor test was "flexible guide for analyzing RICO allegations on a case by case basis"); Tabas v. Tabas, 47 F.3d 1280, 1296 (3d Cir. 1995) (noting that six factors established before decision in *Northwestern Bell* remained relevant in determining whether a pattern existed, although court was not required to apply them in every case); Wade v. Hopper, 993 F.2d 1246, 1251 (7th Cir.) (four-factor test), *cert. denied,* 510 U.S. 868 (1993); Prof'ls, Inc. v. Berry, 959 F.2d 231 (4th Cir. 1992); 420 East Ohio Ltd. P'ship v. Cocose, 980 F.2d 1122, 1124 (7th Cir. 1992) (retaining five-factor test but assessing pattern requirement in light of *Northwestern Bell* and looking at the specific facts of each case).

strued *Northwestern Bell* to mean that isolated acts of criminal activity would not give rise to a RICO violation, rather than as establishing a "determinative two-pronged test."[2562]

Conversely, several courts have dismissed RICO claims for failure to satisfy the pattern requirement where (1) the allegations involve completed or "close-ended" conduct lasting twelve months or less, where there is no threat of future criminal conduct;[2563] or (2) the claims involve only a single (or a few) victims, even though the conduct may have lasted for many months or even years.[2564] In the latter case, most courts have held that criminal activity directed at only a single victim does not pose a threat of long-term criminal conduct sufficient to satisfy the "continuity" requirement.[2565] Several courts have noted that particularly where the predicate acts of mail and wire fraud are alleged,

---

2562.  Sun Sav. & Loan Ass'n v. Dierdorff, 825 F.2d 187, 192 (9th Cir. 1987). Still others focus on certain factors, such as duration. Cofacredit v. Windsor Plumbing Supply Co., 187 F.3d 229, 241 (2d Cir. 1999) ("Although closed-ended continuity is primarily a temporal concept, other factors . . . are also relevant . . . ."); *Tabas*, 47 F.3d at 1294; Rakoff & Goldstein, *supra* note 2527, § 1.04[2], at 1-35 to 1-48.

2563.  *See, e.g.,* Efron v. Embassy Suites, Inc., 223 F.3d 12, 19 (1st Cir. 2000) (acts comprising single effort over period of twenty-one months was not a pattern), *cert. denied*, 532 U.S. 905 (2001); *Cofacredit*, 187 F.3d at 243–44 (noting closed-ended continuity is not met where conduct occurred over less than two years); Word of Faith World Outreach Ctr. Church v. Sawyer, 90 F.3d 118, 123 (5th Cir. 1996) (where alleged acts "were part of a single, lawful endeavor," acts would not constitute continuing or threat of continued racketeering activity); *Tabas*, 47 F.3d. at 1294; Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1024 (7th Cir. 1992); Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 922 (7th Cir. 1992); Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1140 (5th Cir. 1992); Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1412–13 (3d Cir. 1991); Am. Eagle Credit Corp. v. Gaskins, 920 F.2d 352, 354 (6th Cir. 1990); Emcore Corp. v. PricewaterhouseCoopers, LLP, 102 F. Supp. 2d 237, 252 (D.N.J. 2000) (closed-ended continuity cannot exist where allegations relate to schemes lasting less than fourteen months); KNK Medical-Dental Specialties, Ltd. v. Tanex, No. CIV.A. 99-5265, 2000 WL 1470665, at *7 (E.D. Pa. Sept. 28, 2000) (plaintiff failed to allege acts sufficient to show "closed-ended" continuity or threat of continued criminal activity).

2564.  *See, e.g., Wade*, 993 F.2d at 1252; Boone v. Carlsbad Bancorporation, Inc., 972 F.2d 1545, 1556 (10th Cir. 1992); Hindes v. Castle, 937 F.2d 868, 872–76 (3d Cir. 1991) ("[I]t remains an open question whether RICO liability is ever appropriate for a single-scheme, single-victim conduct threatening no future harm."); Lange v. Hocker, 940 F.2d 359, 362 (8th Cir. 1991). *But see Tabas*, 47 F.3d at 1295 (inquiry is not whether there was only one victim or scheme but how long the scheme lasted, the frequency of predicate acts, and whether there is a threat of continuing racketeering activity).

2565.  *But see Cocose*, 980 F.2d at 1124 (the fact that no more than a single scheme is present does not automatically bar the requisite continuity, but the presence of a single scheme is still relevant to our inquiry).

the pattern requirement "helps to prevent ordinary commercial fraud from being transformed into a federal RICO claim."[2566]

• *Conducting or participating in the affairs of an enterprise.* Section 1962(c) prohibits participating in or conducting the affairs of an enterprise through a pattern of racketeering activity. The liability for participating in the conduct of the enterprise through a pattern of racketeering extends only to those who "play some part in directing the enterprise's affairs."[2567] The Supreme Court has made it clear that the defendant need not be in upper management, nor is liability limited only to those with primary responsibility for the affairs of the enterprise.[2568] The "operation or management" test is not easily satisfied. The courts have held that there is a "difference between actual control over an enterprise and association with an enterprise in ways that do not involve control."[2569] For example, the provision of goods or services, including those by outside professionals such as accountants or lawyers, will not, in itself, satisfy the test even though the enterprise may benefit in some way.[2570] Liability may also extend to lower-level employees who play some material role under the direction of upper

---

2566. Menasco, Inc. v. Wasserman, 886 F.2d 681, 685 (4th Cir. 1989). *See also W. Assoc.*, 235 F.3d at 637.

2567. Reves v. Ernst & Young, 507 U.S. 170, 179 (1993) ("Once we understand the word 'conduct' to require some degree of direction and the word 'participate' to require some part in that direction, the meaning of § 1962(c) comes into focus.").

2568. *See also* United States v. Parise, 159 F.3d 790, 796 (3d Cir. 1998) (where defendant participated in conduct of enterprise's affairs and was deeply involved in its operation, fact that he held no formal title or role did not preclude finding that he participated within the meaning of section 1962(c)). *See* Amsterdam Tobacco Inc. v. Philip Morris Inc., 107 F. Supp. 2d 210, 217 (S.D.N.Y. 2000) (the provision of goods subsequently illegally transported "does not constitute operation or management sufficient to establish a RICO enterprise"); Bowdoin Constr. Corp. v. R.I. Hosp. Trust Nat'l Bank, 869 F. Supp. 1004, 1009 (D. Mass. 1994) (dismissing claims against law firms, even though they had knowledge of fraud and counseled concealment, as insufficient to constitute control over operation and management), *aff'd*, 94 F.3d 721 (1st Cir. 1996). *But see* DeFalco v. Bernas, 244 F.3d 286, 311 (2d Cir. 2001) (even though defendant had no role in management of town, evidence reflected his influence over town's affairs and that he exerted some control through threats and other actions); *In re* Sumitomo Copper Litig., 104 F. Supp. 2d 314, 325 (S.D.N.Y. 2000) (finding allegations of reciprocal assistance between defendants sufficient to allege substantial assistance by defendant to satisfy operation and management test of *Reves*); Clark v. Milam, 847 F. Supp. 409, 418 (S.D. W. Va. 1994) (known concealment can constitute participation in control of enterprise).

2569. Redtail Leasing, Inc. v. Bellezza, No. 95 CIV. 5191, 2001 WL 863556, at *4 (S.D.N.Y. July 31, 2001) (citing Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998)).

2570. Univ. of Md. v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1539 (3d Cir. 1993).

management,[2571] although it is unclear whether liability will attach to lower-level employees where they do not also play some management or "directing" role.[2572] The courts have differed in their approach to this issue.[2573] Finally, liability can extend to outsiders who are associated with the enterprise and exert control over it (for example, by bribery), or who participate in the operation or management of the enterprise; however, it generally will not extend to outside accountants and counsel who render assistance but no control.

## 35.3  Case Management

.31 Pleadings  702
.32 Initial Conference  708
.33 Discovery  720
.34 Motion Practice  721
.35 Trial  722

## 35.31  Pleadings

Under Federal Rule of Civil Procedure 8(a)(2), the complaint is to contain "a short and plain statement of the claim showing the pleader is entitled to relief." The allegations are to be "simple, concise, and direct"[2574] in order to assist the defendant in understanding the claims alleged against it and the court in conducting the litigation in an orderly fashion.[2575] Compliance with Rule 8 conserves judicial and party resources that otherwise would be expended in

---

2571. *Reves*, 507 U.S. at 179; *see, e.g.,* United States v. Viola, 35 F.3d 37, 43 (2d Cir. 1994) (noting that *Reves* attached liability to those down "ladder of operation" and defendant "was not on the ladder at all, but rather . . . was sweeping up the floor underneath it").

2572. *See, e.g.,* Goren v. New Vision Int'l, Inc., 156 F.3d 721, 728 (7th Cir. 1998) ("[S]imply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability under § 1962(c) . . . ." (referring to non-employees hired to perform specific tasks)).

2573. *See, e.g.,* MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc. 62 F.3d 967, 978–79 (7th Cir. 1995) ("'[D]irection' requirement includes both those who direct, as well as those who take direction.") (citation omitted); *Viola*, 35 F.3d at 41 ("[I]t is plain that the simple taking of directions and performance of tasks that are 'necessary or helpful' to the enterprise, without more, is insufficient . . . ."); *Peat*, 996 F.2d at 1538–39 ("[N]ot even action involving some degree of decision making constitutes participation in the affairs of an enterprise.").

2574. Fed. R. Civ. P. 8(e)(1).

2575. *See, e.g.,* Michaelis v. Neb. State Bar Ass'n, 717 F.2d 437, 439 (8th Cir. 1983) (amended complaint with 98 pages and 144 numbered paragraphs justified dismissal with prejudice, where plaintiff repeatedly violated Rule 8 and "style and prolixity of pleadings would have made an orderly trial impossible").

deciphering prolix or confusing allegations.[2576] The length and complexity of RICO complaints are sometimes related to the requirement to plead fraud with particularity in claims alleging mail and wire fraud as predicate acts, while in other circumstances they derive from an attempt to obscure non-compliance with Rule 8 and the inclusion of irrelevant or conclusory allegations.[2577] The court should consider reviewing a RICO complaint shortly after filing to determine whether it satisfies Rule 8. Some courts faced with a RICO complaint that is unintelligible, confusing, or otherwise violative of Rule 8 have dismissed the complaint *sua sponte* and required the plaintiff to file a "RICO case statement"[2578] along with an amended complaint.[2579] Such an approach conserves both judicial and party resources, and precludes the court, upon undertaking review of the sufficiency of a complaint, from having to "forever sift through its pages."[2580] Consider also dismissal with prejudice where the plaintiff has been given the opportunity to file an amended complaint and persists in filing a lengthy and confusing document. Although dismissal of a complaint for failure to comply with Rule 8 ordinarily should be with leave to amend,[2581] where the party either fails or is unable to rectify the problem, dismissal with prejudice might be appropriate.[2582]

---

2576. *See, e.g.,* Nevigel v. N. Coast Life Ins. Co., 651 F.2d 671, 675 (9th Cir. 1981) (affirming dismissal with prejudice, noting that appellees "had to spend a large amount of time and money" defending against poorly drafted proceedings and that proper consideration was the right of appellees to be free from "costly and harassing litigation and the rights of litigants awaiting their turns to have other matters resolved"); Gordon v. Green, 602 F.2d 743, 745 (5th Cir. 1979) (compliance with Rule 8 conserves judicial resources).

2577. *See, e.g.,* Vicom, Inc. v. Harbridge Merchant Servs., Inc., 20 F.3d 771, 776 (7th Cir. 1994) (stating "although RICO complaints often might need to be somewhat longer than many complaints, RICO complaints must meet the requirements of Rule 8(a)(2) and Rule 8(e)(1)").

2578. *See infra* section 40.44.

2579. Bryant v. Yellow Freight Sys., 989 F. Supp. 966 app. 5 (N.D. Ill. 1997); Richmond v. Nationwide Cassel L.P., No. 93 C 6107, 1993 WL 433794, at *2 (N.D. Ill. Oct. 22, 1993).

2580. Jennings v. Emry, 910 F.2d 1434, 1436 (7th Cir. 1990); *see also Vicom*, 20 F.3d at 776 ("But given the fact that Vicom had already amended its complaint once, we think the district court should have given more serious consideration to dismissing Vicom's amended complaint with prejudice" under Rule 8.); Hartz v. Friedman, 919 F.2d 469, 471 (7th Cir. 1990) (district court could properly have dismissed RICO complaint as "egregious" violation of Rule 8); *Gordon*, 602 F.2d at 745 (declining to "struggle" through 4,000 pages of pleadings to determine if dismissal for lack of jurisdiction was proper, court vacated and remanded for dismissal of complaint for violation of Rule 8).

2581. *See, e.g., Richmond*, 1993 WL 433794, at *2; Gould v. Nat'l Westminster Bank, U.S.A., No. 3:99-CV-01892, 2000 WL 1339292 at *5 (D. Conn. Aug. 2, 2000) ("plaintiff is ordinarily allowed to replead his complaint following the granting of a motion to dismiss").

2582. *Vicom, Inc.*, 20 F.3d at 776; Michaelis v. Neb. State Bar Ass'n, 717 F.2d 437, 439 (8th Cir. 1983).

Rule 9(b) also plays a prominent role in RICO cases that allege predicate acts of fraud. In such cases, Rule 9(b) governs the specificity required to plead both the overall RICO elements and the elements of the predicate offenses, as well as the elements of the RICO claim.[2583] The impact of RICO allegations on a defendant's reputation makes it important to ensure that the claim is solidly based.[2584] Courts have varied in the level of specificity the plaintiff must plead to survive a Rule 9(b) motion. Some judges have required the plaintiff to detail the specific fraudulent acts committed by each defendant, where multiple defendants are involved.[2585] Others insist that the plaintiff detail not only the specific fraudulent statements, but where, when, and how they were communicated.[2586] The goal is to ensure that complaints sounding in fraud entail more than general and vague statements of alleged misrepresentation, and plaintiffs who fail to plead the underlying predicate acts with the specificity demanded by Rule 9(b) risk dismissal of their RICO claims.[2587]

---

2583. Brooks v. Bank of Boulder, 891 F. Supp. 1469, 1476 (D. Colo. 1995). A number of courts have held that non-fraud RICO claims are governed by Rule 8. *See* MCM v. Andrews-Bartlett & Assocs., Inc., 62 F.3d 967 (7th Cir. 1995); McLaughlin v. Anderson, 962 F.2d 187, 194 (2d Cir. 1992) (holding that the district court should have evaluated plaintiff's extortion claim against the "more lenient pleading standards" of Rule 8(a)); Mendoza v. Zirkle Fruit Co., No. CS-00-3024, 2000 WL 33225470, at *4 (E.D. Wa. Sept. 27, 2000); *see also* Rakoff & Goldstein, *supra* note 2527, § 1.04[1], at 1-32 to 1-35. Some question remains, however, as to whether the requirement of a RICO case statement effectively heightens the pleading standard of Rule 8. *See, e.g., Mendoza*, 2000 WL 33225470, at *5 (noting that plaintiffs raised valid issue but its resolution was not necessary for purposes of court's ruling).

2584. Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998); *see also Brooks*, 891 F. Supp. at 1477 ("A charge of racketeering, with its implications of links to organized crime [and attendant consequences to a person's reputation and goodwill], should not be easier to make than accusations of fraud.").

2585. Rakoff & Goldstein, *supra* note 2527, § 7.04[1] at 7-30 to 7-33.

2586. *Id. See* Anatian v. Coutts Bank of Switz., 193 F.3d 85, 88 (2d Cir. 1999) (plaintiff failed to allege how communications were fraudulent), *cert. denied*, 528 U.S. 1188 (2000); Moore v. PaineWebber, Inc., 189 F.3d 165, 173 (2d Cir. 1999) (plaintiff also must identify purpose of mailing within the fraudulent scheme, and facts showing fraudulent intent); Ahmed v. Rosenblatt, 118 F.3d 886, 889 (1st Cir. 1997) (plaintiff required to state time, place, and content of allegedly fraudulent communications).

2587. Allen v. New World Coffee, Inc., No. 00 CIV. 2610, 2001 WL 293683, at *3–4 (S.D.N.Y. Mar. 27, 2001) (dismissing plaintiff's RICO claims where plaintiff failed to plead with specificity); Poling v. K. Hovnanian Enters., 99 F. Supp. 2d 502, 509 (D.N.J. 2000) (dismissing RICO claims for repeated failure to meet Rule 9(b)); Gottstein v. Nat'l Ass'n for the Self Employed, 53 F. Supp. 2d 1212, 1218 (D. Kan. 1999) (dismissing RICO claim for failure to set out predicate acts with particularity); Elliott v. Foufas, 867 F.2d 877, 882 (5th Cir. 1989) (affirming dismissal of complaint where plaintiff failed to plead with sufficient specificity to state a RICO claim). The courts generally have relaxed Rule 9(b)'s strict pleading requirements where the information needed to plead with the requisite particularity is in the exclusive control of the

The RICO case statement has proven useful in RICO litigation.[2588] This statement details both the factual and legal basis for the plaintiff's claim.[2589] One judge's order required, among other things, that the plaintiff do the following:[2590]

- state whether the alleged unlawful conduct violated 18 U.S.C. § 1962(a), (b), (c), or (d);
- list each defendant, and state the alleged misconduct as to each;
- list each victim and state the manner in which they were allegedly injured;
- describe in detail the pattern of racketeering activity (or collection of wrongful debt) alleged for each RICO claim, including the alleged predicate acts, the dates, the participants, and the surrounding facts;
- describe the time, place, and content of each alleged misrepresentation where the RICO claim is based on predicate offenses of mail or wire fraud, as well as the identity of the persons to whom and by whom it was made;
- state whether there had been a criminal conviction for violation of the predicate acts, or if civil litigation had resulted in a judgment with respect to the predicate acts;
- describe the manner in which the predicate acts formed a pattern of racketeering activity, whether they related to each other as part of a common plan, and if so, to describe the plan in detail;
- describe in detail the alleged enterprise, including the names of the persons or entities allegedly constituting the enterprise, its structure and purpose, and the relationship and association of the defendants to the enterprise;
- describe the relationship between the activities of the enterprise and the pattern of racketeering activity, whether the pattern of racketeering

---

defendant. *Ahmed*, 118 F.3d at 890 (holding the district court was not required to make a second determination of whether additional discovery was needed to permit the plaintiff to make the specific allegations needed to support fraud claim where plaintiff failed to show such information was in the exclusive possession of the defendant).

2588. *See, e.g.,* Northland Ins. Co. v. Shell Oil Co., 930 F. Supp. 1069, 1076 (D.N.J. 1996) (RICO case statement is a case-management tool).

2589. *See, e.g.,* Carne v. Dunn, No. Civ. A. 99-2776, 2000 WL 1134394, at *2 (E.D. La. Aug. 10, 2000) (plaintiff filed thirty-nine page RICO case statement).

2590. *See* Bryant v. Yellow Freight Sys., 989 F. Supp. 966 app. 5 (N.D. Ill. 1997); *see also* Int'l Bhd. of Teamsters v. Carey, No. 00 CIV. 2952, 2001 WL 88210, at *2–3 (S.D.N.Y. Oct. 1, 2001) (order detailing content to be included in case statement); Darocha v. Crusader Sav. Bank, No. CIV.A. 92-7264, 1995 WL 118208, at *3–4 (E.D. Pa. May 10, 1995).

> activity and the enterprise are separate or merged into one, and what benefits the enterprise receives from the pattern of racketeering;
>
> • describe the direct causal relationship between the alleged injury and the violation of the RICO statute; and
>
> • set forth the facts that support the elements with respect to claims under 18 U.S.C. §§ 1962(a), (b), (c), and (d).

Courts generally have considered the RICO case statement as part of the pleadings. Requiring the plaintiff to file a RICO case statement will assist the court when ruling on motions under Rule 12 and Rule 9(b), in addition to summary-judgment motions under Rule 56. In ruling on motions under Rule 12, courts have considered the facts stated in the RICO case statement in conjunction with the allegations of the complaint[2591] The RICO case statement, together with a reading of the complaint, will help narrow the issues and identify claims that lack merit, which can then be dismissed (with or without prejudice) before significant time and effort is spent. Finally, these statements can also help to "focus discovery . . . and provide a blueprint for trial."[2592]

Some districts have adopted standing orders requiring the filing of a RICO case statement within a certain period of time once the complaint is filed.[2593] Other districts, however, only require the plaintiff to file a case statement

---

2591. *See, e.g.,* McLaughlin v. Anderson, 962 F.2d 187, 195 (2d Cir. 1992) (noting district court dismissed complaint after considering both complaint and RICO case statement); Allen Neurosurgical Assocs., Inc. v. Lehigh Valley Health Network, No. CIV.A. 99-4653, 2001 WL 41143, at *3 n.1 (E.D. Pa. Jan. 18, 2001) ("The RICO case statement is a pleading that may be considered part of the operative complaint for purposes of a motion to dismiss."); Sadighi v. Daghighfekr, 36 F. Supp. 2d 279, 288 (D.S.C. 1999) (considering both complaint and the second amended RICO case statement on motion to dismiss); R.C.M. Executive Gallery Corp. v. Rols Capital Co., 901 F. Supp. 630, 639 n.8 (S.D.N.Y. 1995) ("On a motion to dismiss, the Court must take as true the allegations contained in the RICO case statements, along with those contained in the complaint."). *But see Carne*, 2000 WL 1134394, at *2 n.1 ("The case statement provides the plaintiff's claims of fraud in even more detail than their complaint, though the Court does not rely on these allegations in its rulings.").

2592. Northland Ins. Co. v. Shell Oil Co., 930 F. Supp. 1069, 1075 (D.N.J. 1996) (citing *RICO Case Statements*, [Nov. 1988–June 1990] RICO Bus. Disputes Guide (CCH) ¶ 7453, at 10,273 (1990)).

2593. Price v. Pinnacle Brands, Inc., 138 F.3d 602, 605 (5th Cir. 1998) (noting plaintiffs had been ordered to file RICO case statement); Elliott v. Foufas, 867 F.2d 877, 880 (5th Cir. 1989) (RICO standing order); *Carne*, 2000 WL 1134394, at *2 n.1 (standing order); Dixon v. Ford Motor Credit, No. CIV.A. 98-2456, 2000 WL 713259, at *2 (E.D. La. May, 31, 2000); Poling v. K. Hounanian Enters., 99 F. Supp. 2d 502, 508 (D.N.J. 2000) (plaintiff failed to file adequate RICO case statement); *Northland Ins.*, 930 F. Supp. at 1073 (adopting RICO case statement as part of local rules); Lui Ciro, Inc. v. Ciro Inc., 895 F. Supp. 1365, 1377 (D. Haw. 1995) (plaintiffs must file RICO case statement within thirty days of filing complaint).

where he or she "has demonstrated a real lack of understanding of the elements [of RICO]"[2594] or where the court otherwise determines that such a statement is necessary.[2595] The failure to timely file a RICO case statement has been grounds for dismissal, as has the filing of a statement that is deficient or otherwise fails to provide the information requested.[2596] The authority of a court to order a RICO case statement has not been definitively established in most jurisdictions. Nonetheless, while there have been occasional challenges to orders requiring the filing of a RICO case statement as imposing heightened pleading requirements contrary to Federal Rule of Civil Procedure 8(a), these challenges generally have been rejected.[2597] The courts have found implicit authority for RICO case statements in federal and local rules, as well as federal statutes.[2598]

---

2594. Bryant v. Yellow Freight Sys., 989 F. Supp. 966, 969 (N.D. Ill. 1997).

2595. *See, e.g.,* Int'l Bhd. of Teamsters v. Carey, No. 00 CIV. 2952, 2001 WL 88210, at *1 (S.D.N.Y. Feb. 1, 2001) (plaintiff required to file case statement upon amending complaint); Office Outfitters, Inc. v. AB Dick Co., Inc., 83 F. Supp. 2d 772, 775 (E.D. Tex. 2000) (noting, after hearing on defendant's motion to dismiss, magistrate judge recommended plaintiffs file RICO case statement and defendants be allowed to renew their motions once the statement was filed).

2596. Pierce v. Ritter, Chusid, Bivonia & Cohen, 133 F. Supp. 2d 1344, 1346 (S.D. Fla. 2001) ("[F]ailure to include a RICO statement as required by Local Rule 2.1 is grounds for dismissing both the Federal and State RICO counts."); Gould v. Nat'l Westminster Bank, No. 3:99-CV-01892, 2000 WL 1339292, at *5 (D. Conn. Aug. 2, 2000) (dismissing RICO claim "for complete non-compliance" with standing order); Paddlewheel Props., Inc. v. Waste Mgmt. of Miss., Inc., 23 F. Supp. 2d 670, 674 (S.D. Miss. 1997) (plaintiff's filing of RICO case statement two weeks after date due under court's order did not warrant sanction of dismissal of complaint); *Lui Ciro*, 895 F. Supp. at 1377–78 (under circumstances where it appeared plaintiff had no notice of standing order requiring filing of RICO case statement, court would not dismiss complaint under Rule 41(b)).

2597. *See, e.g.,* Mendoza v. Zirkle Fruit Co., No. CS-00-3024–FVS, 2000 WL 33225470, at *5 (E.D. Wash. Sept. 27, 2000) (declining to decide whether requiring RICO case statement conflicted with Rule 8(a)).

2598. *See, e.g.,* Elliott v. Foufas, 867 F.2d 877, 880 (5th Cir. 1989) (RICO Standing Order was consistent with requirement of Rule 8 and highlighted for plaintiff particular requirements for pleading RICO claim); Northland Ins. Co. v. Shell Oil Co., 930 F. Supp. 1069, 1071–75 (D.N.J. 1996) (finding support for RICO case statement in Judicial Improvements Act, the Civil Justice Reform Act of 1990, Fed. R. Civ. P. 83 and 16, and court local rules, and stating that it "does not constitute a heightened pleading standard"). *But see* Rakoff & Goldstein, RICO, *supra* note 2527, § 1.04[1], at 1-35 ("Going further still (although perhaps beyond their authority), some federal districts now require plaintiffs in private civil RICO actions to automatically file 'RICO statements' particularizing their allegations, regardless of whether or not the claims are predicated on fraud."). One court has noted that the strongest authority for RICO case statements is afforded under Rule 16. *Northland Ins.*, 930 F. Supp. at 1075.

## 35.32  Initial Conference

Efficient management of RICO litigation requires early identification and narrowing of the disputed legal and factual issues and identification of the precise statutory violations alleged. For example, some categories of damages, such as claims for personal injury, usually are not allowed under RICO, and one issue that can be addressed at the initial conference is the propriety of the damage claims asserted by the plaintiff.[2599] The pleadings often will reveal jurisdictional issues that will need to be addressed at the outset. After notice and hearing, the complaint can be dismissed *sua sponte,* either in whole or in part, where jurisdiction is clearly improper.[2600] State and federal courts have concurrent jurisdiction over RICO claims,[2601] and the court may also find it appropriate in some circumstances (e.g. where the predicate acts involve issues of state law) to refrain from allowing the case to proceed in federal court. In addition, where RICO provides the only basis for subject-matter jurisdiction in federal court, the dismissal of the RICO claims may also warrant dismissal of supplemental state claims under 28 U.S.C. § 1367(a).[2602] Absent unusual circumstances warranting the exercise of jurisdiction over supplemental state law claims, they can be dismissed without prejudice.[2603]

Certain issues persistently appear in RICO litigation and can significantly affect the viability of the claim. Addressing these issues early in the case can reveal the presence of fatal flaws in the complaint before the court or the parties expend significant resources. Inquiry into the following areas either before or in conjunction with the initial Rule 16 conference will assist the court and the parties in identifying possible jurisdictional problems:

- *Does the plaintiff have standing?* In order to have standing to pursue a RICO claim, a plaintiff must have "been injured in his business or property by the conduct constituting the violation."[2604] The injury to

---

2599.  Genty v. RTC, 937 F.2d 899, 918 (3d Cir. 1991); Grogan v. Platt, 835 F.2d 844, 847 (11th Cir. 1988).

2600.  Bryant v. Yellow Freight Sys., 989 F. Supp. 966, 968 (N.D. Ill. 1997) ("[J]urisdiction is not called into play by a litigant's mere thoughtless incantation of the RICO acronym."). *See also* Michaelis v. Neb. State Bar Ass'n, 717 F.2d 437, 439 (8th Cir. 1983); Fed. R. Civ. P. 12(h)(3) (West 2003).

2601.  Tafflin v. Levitt, 493 U.S. 455, 458 (1990).

2602.  *See, e.g.,* Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998).

2603.  *See, e.g., id.* (the district court "erred in retaining jurisdiction over the state law claims after it dismissed the federal claims on which jurisdiction was based").

2604.  Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 495 (1985) (rejecting barriers to bringing a claim erected by lower courts as unsupported by the statutory language and contrary to the plain meaning of section 1964(c)); 18 U.S.C. § 1964(c) (West 2003); *see also* LaBabera v. Angel, 95 F. Supp. 656, 663 (E.D. Tex. 2000) (plaintiff's cause of action will not accrue until the amount

business or property can be, but is not limited to, competitive injury.[2605] It does not, however, extend to personal injury, emotional distress or associated economic losses,[2606] nor can a plaintiff recover where, although injured, he or she ultimately suffered no pecuniary loss.[2607] In addition, the injury must arise from, and be proximately caused by, the unlawful conduct.[2608] Most courts have ruled that the only injury compensable under section 1962(a), for example, is that

of damages is clear and definite, and damage assessment is currently premature and speculative). There is some disagreement among the circuits on whether a plaintiff has standing under section 1962(a) only if he or she has been injured by the use or investment of racketeering income, as opposed to where the injuries simply flow from the predicate acts. *Compare* Fogie v. Thorn Ams., Inc., 190 F.3d 889, 895 (8th Cir. 1999) (standing under section 1962(a) exists only for plaintiffs who are injured in the use or investment of racketeering income) *and* Office Outfitters, Inc. v. AB Dick Co., 83 F. Supp. 2d 772, 778 (E.D. Tex. 2000) (plaintiff's injury must flow "from 'the investment of racketeering income into the [RICO] enterprise'") (quoting Crowe v. Henry, 43 F.3d 198, 205 (5th Cir. 1995)), *with* Busby v. Crown Supply, Inc., 896 F.2d 833, 837 (4th Cir. 1990) (plaintiffs injured as a result of the predicate actions also have standing). The majority of courts limit standing to persons injured by the use or investment of racketeering proceeds. *See* Fogie, 190 F.3d at 895 (noting that seven of eight circuits addressing the issue limit standing to use and investment).

2605.  *Sedima*, 473 U.S. at 497 n.15.

2606.  Berg v. First State Ins. Co., 915 F.2d 460, 464 (9th Cir. 1990) (denying RICO recovery for personal injury, including emotional distress resulting in pecuniary losses, arising from cancellation of liability policy); James v. Meow Media, Inc., 90 F. Supp. 2d 798, 814 (W.D. Ky. 2000) ("Personal injuries and mental suffering do not confer a person with standing to bring a RICO claim because those types of damages are not injuries to 'business or property.'"); Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris, Inc., 23 F. Supp. 2d 771, 790 (N.D. Ohio 1998) ("RICO excludes from its ambit damages for personal injury [and] [c]laims for personal property injuries."); City and County of S.F. v. Philip Morris, Inc., 957 F. Supp. 1130, 1138 (N.D. Cal. 1997) (physical injuries not recoverable). The courts have imposed some limitations on when economic losses are compensable. *See, e.g.,* Mario v. Aetna, Inc., 221 F.3d 472, 483–84 (3d Cir. 2000) (injury to business and property means financial loss); Imagineering, Inc. v. Kiewit Pac. Co., 976 F.2d 1303, 1310 (9th Cir. 1992) (holding that "injury" requires proof of concrete financial loss); Fleischhauer v. Feltner, 879 F.2d 1290, 1300 (6th Cir. 1989) (plaintiffs could recover only their direct investment in a fraudulent scheme and were not entitled to expectancy damages or lost tax benefits); Stationary Eng'rs Local 39 Health & Welfare Trust Fund v. Philip Morris, Inc., No. C-97-01519, 1998 WL 476265, at *5 (N.D. Cal. Apr. 30, 1998) (financial losses flowing from personal injuries resulting from smoking are not recoverable under RICO).

2607.  Steele v. Hosp. Corp. of Am., 36 F.3d 69, 70–71 (9th Cir. 1994) (where plaintiffs did not pay excessive charges out of their own pockets, they did not suffer financial loss); Dornberger v. Metro. Life Ins. Co., 961 F. Supp. 506, 521 (S.D.N.Y. 1997) (plaintiffs must have incurred some out-of-pocket financial loss).

2608.  Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 267–68 (1992).

*Manual for Complex Litigation, Fourth*

resulting from a defendant's investment of racketeering income.[2609] Claims under section 1962(a) alleging injury resulting from racketeering activity alone, rather than from the use or investment of racketeering income, may thus be subject to early dismissal.[2610] Similar interpretations have been accorded the injury component under section 1962(b). Most courts have required that the alleged injury to the plaintiff proximately result from the defendant's interest in, or control over, an enterprise.[2611] On the other hand, a plaintiff suing under section 1962(c) need not prove any kind of special "racketeering injury" but only that at least one of the predicate acts proximately caused the requisite injury to the plaintiff.[2612] Still unclear is whether the plaintiff, to have standing under RICO, must also satisfy any special standing requirement that may relate to the underlying predicate acts.[2613] In *Beck v. Prupis*, the Supreme Court resolved whether a suit can be maintained under section 1962(d) for conspiracy where the alleged injury results from wrongful acts that do not fall within the offenses

---

2609. *See, e.g.,* Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1063 (2d Cir. 1996) (plaintiff must "allege a 'use or investment' injury that is distinct from the injuries resulting from predicate acts"); Parker & Parsley Petroleum Co. v. Dresser Indus., 972 F.2d 580, 584 (5th Cir. 1992) ("[T]he causal language of section 1964(c) requires that the compensable injury stem from the violation of the RICO section in question, so any injury under section 1962(a) must flow from the use or investment of racketeering income."); Danielsen v. Burnside-Ott Aviation Training Ctr., Inc., 941 F.2d 1220, 1229 (D.C. Cir. 1991) ("[A] plaintiff . . . must plead and prove that his injury flowed from the defendant's use or investment of racketeering income."); Falise v. Am. Tobacco Co., 94 F. Supp. 2d 316, 349 (E.D.N.Y. 2000) (reinvestment of racketeering proceeds into same enterprise is insufficient to satisfy "use or investment" requirement of section 1962(a)). *But see* Sadighi v. Daghighfekr, 36 F. Supp. 2d 279, 289 n.9 (D. S.C. 1999) ("[P]laintiffs have standing to allege a 1962(a) claim when their injuries were proximately caused by either the underlying predicate acts or the investment and use of the income derived from the predicate acts.") (citing Busby v. Crown Supply, Inc., 896 F.2d 833, 837–40 (4th Cir. 1990)).

2610. Hatch et al., *supra* note 2516, at 141–42.

2611. In claims under section 1962(b), *see, e.g., Danielsen*, 941 F.2d at 1229–30; Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1411 (3d Cir. 1991); Airlines Reporting Corp v. Barry, 666 F. Supp. 1311, 1315 (D. Minn. 1987). In *Beck v. Prupis*, 529 U.S. 494, 506 n.9 (2000), the Court noted "[a]lthough we express no view on this issue, arguably a plaintiff suing for a violation of 1962(d) based on an agreement to violate 1962(a) is required to allege injury from the 'use or invest[ment]' of illicit proceeds."

2612. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 495–96 (1985).

2613. *See, e.g.,* Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 275–76 (1992) (court declined to address issue); Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 286 (3d Cir. 1991) ("[T]he standing inquiry in any civil RICO case depends solely on demonstrating injury to business or property, and not on satisfying any standing requirement attached to the predicate act."); *see also* Gregory P. Joseph, Civil RICO, A Definitive Guide 40–43 (2d ed. 2000).

set forth in section 1961(1).[2614] Although some courts had held that a RICO conspiracy claim may be stated where a plaintiff is injured by any actions that further a RICO conspiracy,[2615] those circuits following the majority rule precluded a plaintiff from maintaining a section 1962(d) conspiracy claim where the overt acts causing the injury do not constitute racketeering activity.[2616] The decision in *Beck v. Prupis* clarified that "consistency with the common law requires that a RICO conspiracy plaintiff allege injury from an act that is analogous to an 'ac[t] of a tortious character . . . .'"[2617]

- *Is the case barred by the statute of limitations?* Three Supreme Court decisions are relevant in this context. In *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,[2618] the Court held that a private civil RICO action was subject to a four-year statute of limitations period, drawing largely on the limitations period governing the Clayton Act,[2619] upon which RICO's civil enforcement provisions were modeled.[2620] The Court did not say, however, when a civil RICO claim would accrue. The circuits split on the issue, adopting three distinct rules: (1) the injury and pattern discovery rule;[2621] (2) the injury discovery rule;[2622] and (3) the "last predicate act" rule.[2623] In *Klehr v. A.O. Smith Corp.*,[2624] the Court

---

2614. 529 U.S. 494 (2000).

2615. Schiffels v. Kemper Fin. Servs., Inc., 978 F.2d 344, 348–51 (7th Cir. 1992); Shearin v. E.F. Hutton Group Inc., 885 F.2d 1162, 1169 (3d Cir. 1989) (abrogated by Beck v. Prupis, 529 U.S. 494 (2000)).

2616. *See, e.g.,* Beck v. Prupis, 162 F.3d 1090, 1098–99 (11th Cir. 1998); Miranda v. Ponce Fed. Bank, 948 F.2d 41, 48 (1st Cir 1991); Reddy v. Litton Indus., Inc., 912 F.2d 291, 294–95 (9th Cir. 1990), *cert. denied*, 502 U.S. 921 (1991).

2617. 529 U.S. 494, 505 (2000).

2618. 483 U.S. 143 (1987).

2619. 15 U.S.C. § 15 (2000).

2620. *Agency Holding,* 483 U.S. at 150. "Even a cursory comparison of the two statutes reveals that the civil action provision of RICO was patterned after the Clayton Act." *Id.* The Court noted that criminal prosecutions would be subject to a five-year limitations period "only because Congress has provided such a criminal limitations period when no other period is specified." *Id.* at 151–52.

2621. *See, e.g.,* Annulli v. Panikkar, 200 F.3d 189, 192 (3d Cir. 1998) (adopting injury and pattern discovery rule after *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997)).

2622. *See, e.g.,* Grimmet v. Brown, 75 F.3d 506, 512 (9th Cir. 1996); McCool v. Strata Oil Co., 972 F.2d 1452, 1464 (7th Cir. 1992); Rodriguez v. Banco Central, 917 F.2d 664, 666 (1st Cir. 1990); *see also* Joseph, *supra* note 2613, at 175–76 for discussion and cases cited therein.

2623. *See* Keystone Ins. Co. v. Houghton, 863 F.2d 1125 (3d Cir. 1988) (claim accrued when plaintiff knew each element of RICO claim existed, and period began anew with each new injury and new predicate act that were part of the same pattern) (abrogated by *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997)).

rejected the last predicate act rule to determine when the statute was triggered, but did not resolve what accrual rule *did* apply to RICO claims.[2625] *Rotella v. Wood*[2626] eliminated the "injury and pattern discovery" rule (whereby "a civil RICO claim accrues only when the claimant discovers, or should discover, both an injury and a pattern of RICO activity"[2627]). The rejection of the "injury and pattern discovery" rule left intact the rule preferred by the majority of the circuits, under which the limitations period begins to run once the plaintiff knew or should have known of the injury.[2628] The Court warned, however, that its decision should not be read as establishing a final rule.[2629]

· *Are there any pending parallel state or federal civil actions involving the same parties and issues that would warrant consolidation, a stay of proceedings, or abstention?* The "pattern" pleaded in a RICO complaint can involve activities in several states, and related RICO actions may have been filed in other jurisdictions.[2630] The court is advised to require the parties to identify and report the status of any related civil

---

2624. 521 U.S. 179 (1997).

2625. *Id.* at 186–88 (under the "last predicate act" rule, a plaintiff would be able to recover for both the injury caused by the last predicate act and all the injuries caused by all of the racketeering activity, even where that activity fell outside the limitations period; the Supreme Court found that the last predicate act rule was inconsistent with the Clayton Act rule, whereby the statute begins to run when the defendant commits the injurious act).

2626. 528 U.S. 549 (2000).

2627. *Id.* at 553.

2628. *See, e.g.,* Love v. Nat'l Med. Enters., 230 F.3d 765, 774 (5th Cir. 2000) (adopting "separate accrual" rule where separate cause of action accrues at the time of each injury); The Lares Group, II v. Tobin, 221 F.3d 41, 44 (1st Cir. 2000) (adopting injury discovery rule and holding cause of action accrued at the time of discovery of each violation of section 1962); Forbes v. Eagleson, 228 F.3d 471, 484 (3d Cir. 2000) (adopting injury discovery rule over injury occurrence rule following *Rotella*); Poling v. K. Hovnanian Enters., 99 F. Supp. 2d 502, 511 (D.N.J. 2000) (cause of action does not accrue until all elements of RICO claim exist).

2629. *Rotella*, 528 U.S. at 554 n.2 ("In addition to the possibilities entertained in the Courts of Appeals, Justice Scalia has espoused an 'injury occurrence' rule, under which discovery would be irrelevant . . . and our decision in *Klehr* leaves open the possibility of a straight injury occurrence rule."). *But see Forbes*, 228 F.3d at 484 (declining to adopt "injury occurrence" rule in favor of "injury discovery" rule).

2630. *See, e.g.,* DeMauro v. DeMauro, 115 F.3d 94, 95 (1st Cir. 1997) (RICO claim involved property that was subject of pending divorce); Metro Riverboat Assocs., Inc. v. Bally's La., Inc., 142 F. Supp. 2d 765, 766–67 (E.D. La. 2001) (state court and administrative proceeding also pending relating to gaming license dispute); *see also* Slaney v. Int'l Amateur Athletic Fed'n, 244 F.3d 580, 591–92 (7th Cir. 2000) (dismissal of RICO claims against one defendant appropriate where plaintiff participated in valid arbitration, which decision would be enforced under the New York Convention).

proceedings in state courts or other districts. In some instances, consolidation of these cases may be appropriate.[2631] In others, abstention or a stay of proceedings pending resolution of the related litigation may be warranted.[2632] In *Colorado River Water Conservation District v. United States*,[2633] the Supreme Court held that federal courts may stay proceedings in extraordinary circumstances in deference to duplicative parallel state actions. The Court set out several factors for determining whether abstention was appropriate, including (1) inconvenience of the federal forum; (2) avoiding piecemeal litigation; and (3) the order in which jurisdiction was obtained by the federal and state courts.[2634] Courts have considered additional criteria, such as whether the federal plaintiff's rights will be sufficiently protected by the state action and which court first assumed jurisdiction over relevant property.[2635] The *Colorado River Water* Court emphasized, however, that abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it."[2636] Other abstention doctrines may also come into play.[2637] For example, efficiency and

---

2631.  *See generally supra* section 20.

2632.  *See, e.g.,* Humana, Inc. v. Forsyth, 525 U.S. 299, 307–08 (1999) (McCarran-Ferguson Act did not block suit under RICO by HMO beneficiaries, and RICO's application to beneficiaries' claims would not "invalidate, impair, or supersede" state regulation of insurance). *See also* Rakoff & Goldstein, *supra* note 2527, § 11.03[3] at 11-13 to 11-17.

2633.  424 U.S. 800 (1976).

2634.  *Id.* at 818

2635.  *See* Rycoline Prod. Inc. v. C & W Unlimited, 109 F.3d 883, 890 (3d Cir. 1997) ("The factors the court must consider are: which court first assumed jurisdiction over a relevant res, if any; whether the federal court is inconvenient; whether abstention would aid in avoiding piecemeal litigation; which court first obtained jurisdiction; whether federal or state law applies; and whether the state action is sufficient to protect the federal plaintiff's rights.").

2636.  *Colorado River Water*, 424 U.S. at 813 (citing County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188–89 (1959)). Other circumstances where abstention may be appropriate include where federal court intervention would have "an impermissibly disruptive effect on state policies." *Metro Riverboat Assocs.*, 142 F. Supp. 2d at 767. In addition, the constitutional issues involved might be "presented in a different posture by a state court determination of pertinent state law" or a "difficult question of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." *Colorado River Water*, 424 U.S. at 814; *see also* New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 361 (1989); *In re* Managed Care Litig., 135 F. Supp. 2d 1253, 1260 (S.D. Fla. 2001) ("Burford abstention, also know as the 'primary jurisdiction doctrine' is of dubious applicability where the claim is brought under federal law and the remedy would be left to a state agency.").

2637.  *See, e.g.,* Burford v. Sun Oil Co., 319 U.S. 315, 331–32 (1943); Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 727 (1996) (Burford abstention looks at whether plaintiff's claim

fairness considerations may warrant entry of a stay "pursuant to [the court's] power to control its docket and to provide for a just determination of the cases pending before it."[2638] In such cases the courts balance the benefits that might accrue from a stay, such as simplification and narrowing of the issues, against the possible burdens or hardships that would be suffered by the parties if the stay were granted.[2639]

• *Was the case removed from state court pursuant to 28 U.S.C. § 1441, and is remand appropriate?* Section 1441(c) affords the court discretion to remand cases "in which state law predominates." Recent cases have interpreted section 1441(c) as permitting remand only where the state law claims are separate and independent of the federal claim, and then the court may remand only the state law claims.[2640]

• *Should the court exercise supplemental jurisdiction over state law claims?* Section 1367(a) of Title 28 of the U.S. Code gives federal courts exercising original jurisdiction over federal claims supplemental jurisdiction over claims "that are so related to the claims in the [federal] action that they form part of the same case or controversy . . . ." The court can decline to exercise supplemental jurisdiction over state law claims under certain circumstances.[2641]

• *Are there any pending criminal proceedings against one or more of the parties?* Criminal racketeering activity is an element of civil RICO liability, and civil RICO defendants often will be, or have been, the subject of criminal investigation or prosecution. The court should determine the existence and status of any related criminal proceedings,

---

may be "in any way entangled in a skein of state law that must be untangled before the federal case can proceed" (citing *New Orleans Pub. Serv.*, 491 U.S. at 361)).

2638. Leyva v. Certified Grocers of Cal., Ltd., 593 F.2d 857, 864 (9th Cir.), *cert. denied*, 444 U.S. 827 (1979).

2639. Morris v. Am. Fed. of State, County and Mun. Employees, No. 99 CIV. 5125, 2001 WL 123886, at *2 (discussing five factors to be considered by courts in deciding whether to grant stay); Cohen v. Carreo, 94 F. Supp. 2d 1112, 1118–19 (D. Or. 2000) (where claims in related cases were similar, where plaintiff would suffer little harm if stay was granted and defendant would be overly burdened if the case proceeded, and where stay would assist in narrowing issues, stay should be granted).

2640. *See, e.g.,* Mincy v. Staff Leasing, L.P., 100 F. Supp. 2d 1050, 1056 (D. Ariz. 2000); Doll v. United States W. Communications, Inc., 85 F. Supp. 2d 1038, 1042 (D. Colo. 2000); Friedman v. Bd. of Educ. Niles Township High Sch. Dist. 219, No. 97 C 9001, 1998 WL 102698, at *3 (N.D. Ill. Feb. 27, 1998).

2641. *See, e.g., Friedman*, 1998 WL 102698, at *3 (declining to exercise supplemental jurisdiction where state law claims would require determination of novel issues of Illinois constitution).

as they may affect pretrial and trial planning. Where criminal and civil RICO cases are proceeding concurrently, the criminal charges ordinarily should be tried first. Although in some instances a stay of the civil litigation may be appropriate,[2642] in other cases major portions of discovery and other pretrial activity can proceed without prejudice to the criminal case.[2643] The judge should always consider the ongoing criminal proceedings in managing the civil litigation.[2644]

· *Are there any existing agreements to arbitrate that would preclude the case from proceeding in federal court?* Inquire into whether any arbitration agreement may govern the dispute, which would warrant referral of the case to arbitration. The Federal Arbitration Act[2645] provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[2646] The court can issue an order compelling arbitration where there has been a failure or refusal to comply with an arbitration agreement.[2647] The Act provides for a stay of proceedings in the district court where it determines that the case is subject to arbitration.[2648] In *Shearson/American Express, Inc. v. McMahon*,[2649] the Supreme Court held that nothing in the text of RICO or the statute's legislative history "even arguably evinces congressional intent to ex-

---

2642. *Morris*, 2001 WL 123886, at *2 (staying action on motion of district attorney pending disposition of criminal indictment). "Denying a stay motion may undermine a defendant's Fifth Amendment privilege against self-incrimination[,] . . . expand the rights of criminal discovery beyond its limits, and expose the basis of the defense to the prosecution in advance of trial." *Id.*

2643. *See supra* section 20.2. It may be appropriate in such instances to consider whether a protective order is warranted, protecting civil discovery from government prosecutors. *See* Rakoff & Goldstein, *supra* note 2527, § 8.03[2], at 8-8 to 8-9 ("However, there is no automatic protection from government prosecutors for testimony sealed pursuant to a civil lawsuit.").

2644. Madanes v. Madanes, 199 F.R.D. 135, 140 (S.D.N.Y. 2001) (privilege against self-incrimination warranted protective order "to place tight restrictions on the dissemination of potentially incriminating information produced in discovery").

2645. 9 U.S.C. § 1 (2000).

2646. *Id.* § 2.

2647. *Id.* § 4. "The Arbitration Act thus establishes a 'federal policy favoring arbitration,' . . . requiring that 'we rigorously enforce agreements to arbitrate.'" Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 226 (1987) (citations omitted).

2648. 9 U.S.C. § 3 (2000). Although the district court will still have jurisdiction over the claim, the scope of review of an arbitrator's award may be very narrow. Arbitration clauses covering other claims, but excluding claims pursuant to RICO, may nonetheless also be subject to a stay. *See, e.g.,* Rakoff & Goldstein, *supra* note 2527, § 8.03[1], at 8-5 to 8-7 and cases cited therein.

2649. 482 U.S. 220 (1987).

clude civil RICO claims from the dictates of the Arbitration Act,"[2650] and the Court rejected any claim of irreconcilable conflict between arbitration and RICO's underlying purposes, which might have permitted overriding the provisions of the Arbitration Act.[2651] An "overlap" between the civil and criminal provisions does not preclude civil claims from being arbitrated.[2652]

- *Has the plaintiff adequately alleged proximate cause?* Frequently considered in tandem with the standing analysis, the plaintiff further must plead and prove that the injury suffered is direct, as opposed to derivative.[2653] Section 1964(c) requires that the injury to the plaintiff's business or property be "by reason of" the defendant's conduct, which requires that the plaintiff show the injuries were proximately caused by the misconduct of the defendant.[2654] In *Holmes v. Securities Investor Protection Corp.*, the Court found that the primary focus in assessing proximate cause was the directness of the relationship between the plaintiff's injury and the conduct alleged.[2655] The circuits have imposed

---

2650. *Id.* at 238.

2651. *Id.* at 239–42.

2652. Citing its decision in *Sedima, S.P.R.L. v. Imrex Co.*, wherein the Court had held that simply because the same conduct "'can result in both criminal liability and treble damages does not mean that there is not a bona fide civil action.'" *McMahon*, 482 U.S. at 239–40. The Court also rejected arguments that the RICO statute was too complex or that public interest in RICO enforcement precluded arbitration. *Id.; see also* Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991) (noting that arbitration agreements were enforceable claims under RICO).

2653. *See, e.g.*, Amsterdam Tobacco, Inc. v. Philip Morris, Inc., 107 F. Supp. 2d 210, 219 (S.D.N.Y. 2000) (there is no standing for indirectly injured parties and here plaintiff's injuries were "secondary to the alleged primary purpose of tax avoidance"). Factors considered include whether the RICO offense targeted the plaintiff, whether there existed any intervening causes, whether the harm was a direct result of the racketeering activity, and whether the consequences were foreseeable and specifically intended. *In re* Am. Express Co. S'holder Litig., 39 F.3d 395, 399–400 (2d Cir. 1994).

2654. Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268–69 (1992); *see also* BCCI Holdings, S.A. v. Khalil, 214 F.3d 168, 174 (D.C. Cir. 2000); Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 235 (2d Cir. 1999) (examining principles behind proximate cause); Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 920–21 (3d Cir. 1999). The Court reasoned that the "by reason of" language in RICO should be given the same construction applied by the Court in previously interpreting identical language in the Clayton Act, and that Congress had intended this construction in using the phrase in RICO. *Holmes*, 503 U.S. at 267–68.

2655. *Holmes*, 503 U.S. at 269.

varying requirements on plaintiffs' efforts to meet the proximate cause element.[2656]

• *Are the plaintiff's claims subject to issue or claim preclusion?* If related cases have been concluded, the trial judge must consider potential claim and issue preclusion. RICO provides that a final judgment in favor of the United States in a criminal proceeding estops the defendant from denying the essential allegations of the criminal offense in any civil proceeding brought by the United States.[2657] Although the statute is silent on the use of such convictions in cases brought by private parties, courts have applied claim and issue preclusion in civil RICO litigation.[2658] Preclusion may arise from prior civil litigation in federal or state court,[2659] as well as prior administrative proceedings[2660] or arbitration awards.[2661] Considerations common to RICO cases, however, may bar application of these doctrines in some cases, including differing burdens of proof,[2662] an inability to litigate the issue in the prior

---

2656. *See, e.g.,* Tex. Carpenters Health Benefit Fund v. Philip Morris, Inc., 199 F.3d 788, 789 (5th Cir. 2000) (injuries asserted by health maintenance organizations and insurance plans too attenuated to satisfy proximate cause requirement); Newton v. Tyson Foods, Inc., 207 F.3d 444, 447 (8th Cir. 2000) (injuries alleged by cattle producers too attenuated to confer standing where there were "many intermediaries and many potential causes of the reduced demand for beef in the chain of causation"); Moore v. PaineWebber, Inc., 189 F.3d 165, 169–70 (2d Cir. 1999) (where predicate acts based on fraud, plaintiff must prove transaction and loss causation); Camelio v. Am. Fed'n, 137 F.3d 666, 670 (1st Cir. 1998) (although plaintiff who was terminated from employment alleged defendant committed predicate acts, the connection between plaintiff's injury and the predicate offenses was too far removed from plaintiff's loss of employment); Bieter Co. v. Blomquist, 987 F.2d 1319, 1326 (8th Cir. 1993) (proximate cause requirement should not be interpreted as "too narrow").

2657. 18 U.S.C. § 1964(d) (West 2003).

2658. *See, e.g.,* Appley v. West, 832 F.2d 1021, 1025–26 (7th Cir. 1987); Anderson v. Jonovich, 543 F. Supp. 1124, 1132 (W.D. Wa. 1982).

2659. *See, e.g.,* Saud v. Bank of N.Y., 929 F.2d 916, 919 (2d Cir. 1991); Polur v. Raffe, 912 F.2d 52, 56–57 (2d Cir. 1990); Evans v. Dale, 896 F.2d 975, 977–78 (5th Cir. 1990).

2660. *See* Fry v. Gen. Motors Corp., 728 F. Supp. 455, 459–60 (E.D. Mich. 1989).

2661. *See, e.g.,* Cent. Transp., Inc. v. Four Phase Sys., Inc., 936 F.2d 256, 260 (6th Cir. 1991); Benjamin v. Traffic Executive Ass'n E.R.R., 869 F.2d 107, 110–11 (2d Cir. 1989); Rudell v. Comprehensive Acct. Corp., 802 F.2d 926, 931–32 (7th Cir. 1986). Some courts, however, have held that prior adjudications in bankruptcy court will not bar subsequent civil RICO actions based on claims which could have been raised in bankruptcy. Barnett v. Stern, 909 F.2d 973, 978–82 (7th Cir. 1990); Howell Hydrocarbons, Inc. v. Adams, 897 F.2d 183, 188–89 (5th Cir. 1990).

2662. *See, e.g.,* Wilcox v. First Interstate Bank, 815 F.2d 522, 531 (9th Cir. 1987).

proceeding,[2663] and lack of knowledge regarding the facts required to allege a RICO violation.[2664]

- *Are there any other miscellaneous defenses that may warrant dismissal?* In addition to theories of abstention, and although not frequently raised, dismissal may be appropriate under doctrines of primary jurisdiction,[2665] act of state,[2666] or exclusive jurisdiction in the bankruptcy court.[2667]

- *Is the plaintiff seeking equitable relief?* The failure to allege an injury compensable under RICO may subject the claim to early dismissal. It is unclear whether equitable relief is available to private litigants under civil RICO.[2668] Although many courts have held that a private civil plaintiff is not entitled to injunctive relief, the right to seek other equitable remedies is less clear.[2669]

The pleadings play an important role in other ways as well. Where the underlying predicate offenses sound in fraud, Federal Rule of Civil Procedure 9(b)'s strict pleading requirements may result in extensive motion practice directed at dismissing all or parts of the complaint. Motions pursuant to Rule 12 are all but certain. The outcome of these motions can affect the scope of the litigation by obviating discovery and other proceedings related to dismissed

---

2663. *See, e.g.,* George v. United Ky. Bank, Inc., 753 F.2d 50, 53 (6th Cir. 1985).

2664. *See, e.g.,* Norris v. Wirtz, 703 F. Supp. 1322, 1327 (N.D. Ill. 1989).

2665. *See, e.g.,* H.J., Inc. v. N.W. Bell Tel. Co., 734 F. Supp. 879, 882 (D. Minn. 1990) (finding agency had primary jurisdiction over reasonableness of rates, and holding it would undermine congressional scheme of uniform rate regulation if plaintiff could obtain damages based on a rate never found to be reasonable by agency), *aff'd*, 954 F.2d 485 (8th Cir.), *cert. denied*, 504 U.S. 957 (1992).

2666. W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l, 493 U.S. 400 (1990).

2667. Walls v. Wells Fargo Bank, 255 B.R. 38, 46–47 (E.D. Cal. 2000) (dismissing plaintiff's RICO claims on basis that they were premised only on alleged violation of automatic stay provisions of Bankruptcy Code, which provides exclusive remedy for such violations); Mendoza v. Zirkle Fruit Co., No. CS-00-3024, 2000 WL 33225470, at *10 (E.D. Wash. Sept. 27, 2000) (noting Immigration Reform and Control Act did not preempt claims under RICO).

2668. *See, e.g.,* Price v. Pinnacle Brands, Inc., 138 F.3d 602, 605 (5th Cir. 1998) (stating "[t]here is some question whether RICO affords private litigants the option of equitable remedies"); Bennett v. Berg, 685 F.2d 1053, 1064 (8th Cir. 1982) (noting injunctive relief might be available as a remedy), *aff'd in part, rev'd in part in reh'g en banc*, 710 F.2d 1361 (1983).

2669. Johnson v. Collins Ent. Co., 199 F.3d 710, 726 (4th Cir. 1999) ("'[T]here is substantial doubt whether RICO grants private parties . . . a cause of action for equitable relief.'" (quoting Dan River, Inc. v. Icahn, 701 F.2d 278, 290 (4th Cir. 1983))). *Compare In re* Fredeman Litig., 843 F.2d 821, 828 (5th Cir. 1988), *and* Religious Tech. Ctr. v. Wollersheim, 796 F.2d 1076, 1082–83 (9th Cir. 1986), *with* Aetna Cas. & Sur. Co. v. Liebowitz, 570 F. Supp. 908, 910 (E.D.N.Y. 1983), *aff'd on other grounds*, 730 F.2d 905 (2d Cir. 1984).

claims and possibly by removing the jurisdictional predicate for supplemental state law claims, allowing for their dismissal as well.[2670] Consider procedures to test the sufficiency of the pleadings early on, before significant litigation activity commences. As in most complex litigation, early institution of an initial case-management order will help to organize the case, provide a preliminary identification of legal and factual issues, and educate the court as to the issues likely to increase the complexity of the litigation. Helpful strategies may include the following:

- Review the complaint upon assignment of the litigation to determine the existence of any jurisdictional or other defects apparent on its face.
- Require the plaintiff to file a RICO case statement, amplifying and clarifying the allegations in the complaint prior to receipt of responsive motions or pleadings. This case statement can require the plaintiff to detail the factual basis for each allegation with specificity, as well as the legal basis supporting the plaintiff's theory on various elements of the RICO claim.[2671]
- Require each side to develop an agreed-on statement of the factual and legal issues in dispute, including damages claimed by the plaintiff and defenses to liability being asserted.
- Require the defendant to advise the court and the opposing party of its intention to file a motion under Federal Rules of Civil Procedure 9(b) and 12, and whether the asserted defects can be cured through amendment of the complaint.
- Establish a firm schedule for the filing and hearing of responsive pleadings, including motions under Rules 9(b), 12, and 56.
- Stay formal discovery pending resolution of motions challenging jurisdiction and deficiencies in the complaint.

Where the complaint alleges additional claims not subject to a Rule 12 motion, consider whether discovery should proceed on those claims, pending resolution of any motions seeking dismissal of the RICO claims. The court may also assess whether such an approach would require duplicative discovery or impose additional costs on the parties should the RICO claims survive.

---

2670. *See* 28 U.S.C. § 1367 (West 2003); *see also* Parker & Parsley Petroleum Co. v. Dresser Indus., 972 F.2d 580, 584–90 (5th Cir. 1992); Spiegel v. Cont'l Ill. Nat'l Bank, 790 F.2d 638, 649–50 (7th Cir. 1986).

2671. *See* Darocha v. Crusader Sav. Bank, No. CIV.A. 94-7264 1995 WL 118208, at *3 (E.D. Pa. May 10, 1995) (dismissing RICO counts and requiring plaintiff to file RICO case statement with any amended complaint). For an example of a RICO case statement used by the Northern District of Illinois, see *Bryant v. Yellow Freight Sys., Inc.*, 989 F. Supp. 966, app. 5 (N.D. Ill. 1997).

## 35.33 Discovery

The RICO case statement can help weed out transactions and allegations that are tangential or unrelated to alleged racketeering activity and can thereby reduce the scope of discovery. The court should remind the parties of limits on discovery found in the Federal Rules and require them to fully support any requests for additional discovery beyond that permitted by the rules. Consider also whether there is a need for limitations on the scope of discovery. Discovery issues may arise where related criminal proceedings are ongoing, triggering the defendant's Fifth Amendment privilege against self-incrimination and disputes regarding the discoverability of grand jury material. Unduly curtailing a plaintiff's discovery into alleged wrongdoing should be avoided. Ordinarily, discovery into unrelated alleged criminal acts is disallowed,[2672] but discovery that relates to other alleged victims of the same pattern of racketeering activity or to acts within the exclusive knowledge of the defendant may be warranted.[2673]

The specific elements necessary to prove a RICO violation can also pose special problems in discovery. For example, the "pattern" requirement often will involve discovery into a RICO defendant's conduct and practices over an extended period of time and with respect to numerous transactions. Similarly, a plaintiff seeking to show an association-in-fact enterprise will be seeking information on the relationships between the participants and also their communications, activities, and other contacts in an effort to show the structure and continuity of the enterprise. In some circuits, the plaintiff may be unable to use proof of the racketeering activity to prove also the structure and continuity of the enterprise, substantially increasing the plaintiff's discovery burden. In deciding whether to put any limits on discovery, consider the nature of the allegations and the complexity of the case. To the extent possible, it is best to address potential discovery issues early in the litigation, well before depositions begin, in order to avoid unnecessary conflict and discovery motions.

2672. *See, e.g.,* Jolley v. Welch, 904 F.2d 988, 992–93 (5th Cir. 1990); Olive Can Co. v. Martin, 906 F.2d 1147, 1152–53 (7th Cir. 1990); Zerman v. E.F. Hutton & Co., 628 F. Supp. 1509, 1512 (S.D.N.Y. 1986).

2673. *See, e.g.,* Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679–81 (6th Cir. 1988); Halperin v. Berlandi, 114 F.R.D. 8, 11–13 (D. Mass. 1986). However, the breadth of discovery permitted under Rule 26(b)(1) should be given careful consideration prior to any decision to limit areas of inquiry.

## 35.34 Motion Practice

The threat of treble damages and attorney fee awards, combined with the potential damage to reputation, usually spur a defendant aggressively to pursue early dismissal of RICO claims. Motions attacking the plaintiff's standing to bring the claim or other jurisdictional defects are common and often combined with motions challenging the sufficiency of the complaint on various grounds.[2674] In addition to Rule 12 and 9(b) motions, procedural motions often play a significant role. Typical procedural motions include motions (1) to stay discovery pending resolution of non-RICO claims, arbitration, or completion of criminal proceeding; (2) for a protective order; and (3) to sever.[2675] Also consider asking at the initial pretrial conference whether the defendant plans to file motions challenging jurisdiction and, if so, on what grounds. Depending on the length and complexity of the complaint, it may be more efficient to set a schedule that requires that these motions be filed and decided prior to the filing of motions challenging the sufficiency of the allegations.

It may be impossible to determine the sufficiency of some RICO claims until the parties have concluded discovery. Accordingly, consider scheduling a pretrial conference immediately following the close of discovery to determine what claims and defenses remain viable. One alternative is to require the parties to file statements setting out all claims and defenses together with their factual and legal bases. The judge may encourage the parties to reach stipulations. Moreover, in cases where disagreements remain, but where it appears that material facts may be undisputed or without adequate support, encourage the parties to file summary-judgment motions. Alternatively, the court can exercise its Rule 16 power to dispose summarily of a claim or claims as to which no facts remain in dispute.[2676] Prior to entry of summary judgment *sua sponte*, however, the parties should be given an opportunity to present arguments as to why judgment should not be entered.[2677] If the elimination of RICO removes the jurisdictional basis for supplemental state law claims, it is

---

2674. *See, e.g.,* Combs v. Baker, 886 F.2d 673, 674 (4th Cir. 1989) (plaintiffs challenged personal jurisdiction as well as subject-matter jurisdiction, venue, sufficiency of the complaint and failure to join an indispensable party).

2675. Rakoff & Goldstein, *supra* note 2527, § 8.03[1]–[3], at 8-5 to 8-9.

2676. *Cf.* Diaz v. Schwerman Trucking Co., 709 F.2d 1371, 1375 n.6 (11th Cir. 1983); Holcomb v. Aetna Life Ins. Co., 255 F.2d 577, 580 (10th Cir. 1958) ("[T]he court has the power [at the pretrial conference] to compel the parties to agree to all facts concerning which there can be no real issue.").

2677. *See* St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 435 (5th Cir. 2000) ("The district court may enter summary judgment sua sponte if the parties are provided with reasonable notice and an opportunity to present arguments opposing the judgment.")

wise for the court to reevaluate whether it will retain jurisdiction over those claims.[2678] Factors to be considered in determining whether to retain jurisdiction include comity, judicial economy, convenience, and fairness.[2679]

## 35.35 Trial

RICO trials typically are not conducive to bifurcation. Moreover, some of the technical issues in civil RICO trials may be particularly confusing to lay jurors. Consider whether any or all of the following would assist the jury in understanding some of these complexities:

- allowing joint presentation by the attorneys of a preliminary statement, either during *voir dire* or prior to the opening statements, to explain the general nature of the claims and some of the characteristics and elements of a civil RICO case (e.g., that the case is a civil, not criminal action; that the burden of proof is by a preponderance of the evidence, not beyond a reasonable doubt; and that the use of the term "racketeer" does not mean that the defendant is associated with "organized crime");
- explaining to the jury that although the plaintiff must prove that the defendant committed the underlying predicate act, proof of the commission of that act does not in itself constitute proof that the defendant violated RICO;
- permitting the parties to make mini-opening statements or summaries of the relevant portions of witnesses' testimony—for example, capsulizing for the jury that certain witnesses are being called to establish the elements of a particular predicate act; and
- permitting the jurors to take notes.

2678. Guidry v. Bank of La Place, 954 F.2d 278, 285 (5th Cir. 1992) (in cases where federal claims have been dismissed and no basis exists for federal jurisdiction, district courts are "to decide whether to retain jurisdiction [over state claims] based on considerations of judicial economy, convenience, fairness and comity"); Scottsdale Ins. Co. v. Dorman, 153 F. Supp. 2d 852, 858 (E.D. La. 2001) (declining to retain jurisdiction over state law fraud claim after dismissal of RICO cause of action, because plaintiff would not be unduly prejudiced, matter had not proceeded past pleading stage, plaintiff could refile claim in state court, and activity to date in the case had focused on RICO).

2679. Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998) ("[T]he balance of competing factors ordinarily will weigh strongly in favor of declining jurisdiction over state law claims where the foundational federal claims have been dismissed at an early stage of the litigation.").

Special verdicts or a general verdict with interrogatories may help avoid confusion. Consider directing the jurors' attention to the sufficiency of each separate statutory and common-law claim submitted for their decision. Issues may be submitted to the jury for decision sequentially, both to simplify deliberations and to obviate deliberation on issues rendered moot by an earlier verdict. Note that some courts have held that the jury should not be informed of the treble damages provision.[2680]

---

2680. *See* Pollock & Riley, Inc. v. Pearl Brewing Co., 498 F.2d 1240, 1242 (5th Cir. 1974) (antitrust).

Blank page inserted for correct pagination
when printing double-sided copies.

*Part IV*

*Sample Orders*

_____

40. Sample Orders  727

Blank page inserted for correct pagination
when printing double-sided copies.

# 40. Sample Orders

.1 Order Setting Initial Conference  730
.2 Sample Case-Management Orders  734
    .21 General  734
    .22 Responsibilities of Designated Counsel  741
    .23 Attorneys' Time and Expense Records  743
    .24 Scheduling Order  744
    .25 Preservation of Documents, Data, and Tangible Things  746
    .26 Document Depositories  749
      .261 Order to Meet and Confer to Establish Joint Document Depository  749
      .262 Order to Establish Separate Document Depositories  751
    .27 Confidentiality Order  752
    .28 Referral of Privilege Claims to Special Master  754
    .29 Deposition Guidelines  756
.3 Order Creating a Web Site  762
.4 Class Actions Orders  763
    .41 Order Certifying Class  763
    .42 Order Setting Hearing on Proposed Class Settlement  765
    .43 Combined Certification and Proposed Settlement Order  766
    .44 Order Approving Settlement/Claims Procedure  768
.5 Orders in Special Cases  770
    .51 Coordinating Proceedings in Different Courts  770
    .52 Mass Tort Case-Management Order  773
    .53 CERCLA Case-Management Order  779
    .54 Civil RICO Case-Statement Order  783
.6 Sample Final Pretrial Orders  786
.7 Jury Questionnaire  786

Complex litigation generally has its own unique demands, and it calls for counsel and the court to adapt any proposed order to those complexities. The orders and forms that follow represent only a starting point for the court to consider in structuring its approach to managing a particular set of complex cases. Judges generally expect that experienced counsel will propose forms that will deal with the unique features of the litigation at hand.

Although the orders presented below generally are composites of several orders or revisions of a single order, we have not attempted to document the origin of each provision of each order or the authority to issue such orders. While judges have used variations and portions of these orders to manage complex litigation, the authority to issue such orders may or may not have been tested.

Additional sample orders and forms may be found in the United States Judicial Conference's *Civil Litigation Management Manual* (2001) (available from the Federal Judicial Center), in the *Federal Rules of Civil Procedure Appendix of Forms*, and on various Internet sites created for specific complex cases or MDL proceedings, some of which are listed below:

*In re* BankAmerica Corp. Securities Litigation, MDL No. 1264 (E.D. Mo.), *at* http://www.bankofamericasettlement.com/ (last visited Nov. 10, 2003)

*In re* Baycol Products Litigation, MDL No. 1431 (D. Minn.), *at* http://www.mnd.uscourts.gov/Baycol_Mdl/ (last visited Nov. 10, 2003)

*In re* Bridgestone/Firestone Tires, Inc., Products Liability Litigation, MDL No. 1373 (S.D. Ind.), *at* http://www.insd.uscourts.gov/Firestone/default.htm (last visited Nov. 10, 2003)

*In re* Diet Drugs Products Liability Litigation, MDL No. 1421 (E.D. Pa.), *at* http://www.fenphen.verilaw.com/ (last visited Nov. 10, 2003)

*In re* Holocaust Victim Assets Litigation, No. CV 96-4849 (E.D.N.Y.), *at* http://www.nyed.uscourts.gov/Decisions_of_Interest/DOI_Archive/doi_ archive.html (decisions of interest archive, years 2000–2003) (last visited Nov. 10, 2003)

*In re* Holocaust Victim Assets Litigation, *at* http://www.swissbankclaims.com/ index.asp (official settlement Web site) (last visited Nov. 10, 2003)

*In re* Inter-Op Hip Prosthesis Liability Litigation, MDL No. 1401 (N.D. Ohio), *at* http://www.ohnd.uscourts.gov/Clerk_s_Office/Notable_ Cases/index.html (last visited Nov. 10, 2003)

*In re* Latex Gloves Products Liability Litigation, MDL No. 1148 (E.D. Pa.), *at* http://www.paed.uscourts.gov/usmdl.asp (last visited Nov. 10, 2003)

*In re* Lorazepam & Clorazepate Antitrust Litigation, MDL No. 1290 (D.D.C.), *at* http://www.dcd.uscourts.gov/district-court.html (last visited Nov. 10, 2003)

*In re* Merrill Lynch & Co., Inc., Research Reports Securities Litigation, MDL No. 1484 (S.D.N.Y.), *at* http://www.nysd.uscourts.gov/ConsolidatedCases. htm#15a (last visited Dec. 2, 2003)

*In re* Microsoft Corp. Antitrust Litigation, MDL No. 1332 (D. Md.), *at* http://www.mdd.uscourts.gov/Opinions152/DisplayMDLCom.asp (last visited Nov. 10, 2003)

*In re* Norplant Contraceptive Products Liability Litigation, MDL No. 1038 (E.D. Tex.), *at* http://www.txed.uscourts.gov/tableofc.htm (last visited Nov. 10, 2003)

*In re* Phenylpropanolamine (PPA) Products Liability Litigation, MDL No. 1407 (W.D. Wash.), *at* http://www.wawd.uscourts.gov/wawd/ mdl.nsf/main/page (last visited Nov. 10, 2003)

*In re* Propulsid Prod. Liability Litigation, MDL No. 1355 (E.D. La.), *at* http://propulsid.laed.uscourts.gov (last visited Nov. 10, 2003)

*In re* Rezulin Products Liability Litigation, MDL No. 1348 (S.D.N.Y.), *at* http://www.nysd.uscourts.gov/rezulin.htm (last visited Nov. 10, 2003)

*In re* Serzone Products Liability Litigation, MDL No. 1477 (S.D. W. Va.), *at* http://www.wvsd.uscourts.gov/serzone/ (last visited Nov. 10, 2003)

*In re* Silicone Gel Breast Implant Products Liability Litigation, MDL No. 926 (N.D. Ala.), *at* http://www.fjc.gov/BREIMLIT/mdl926.htm (last visited Nov. 10, 2003)

*In re* Simon II Litigation (E.D.N.Y.), *at* http://www.nyed.uscourts.gov/ Decisions_of_Interest/DOI_Archive/DOI_2002/doi_2002.html (last visited Nov. 10, 2003)

*In re* St. Jude Med., Inc. Silzone Heart Valves Products Liability Litigation, MDL No. 01-1396 (D. Minn.), *at* http://www.mnd.uscourts.gov/ Tunheim_Mdl/index.htm (last visited Nov. 10, 2003)

*In re* Vitamins Antitrust, MDL No. 1285 (D.D.C.), *at* http://www.dcd.uscourts. gov/99ms197-2003.html (last visited Dec. 2, 2003)

*In re* Wireless Telephone Radio Frequency Emissions Products Liability Litigation, MDL No. 1421 (D. Md.), *at* http://www.mdd.uscourts.gov/ Opinions152/DisplayMDLCom.asp (last visited Nov. 10, 2003)

*In re* World Trade Center Disaster Site Litigation, (S.D.N.Y.), *at* http://www.nysd.uscourts.gov/Sept11Litigation.htm (last visited Nov. 10, 2003)

# 40.1  Order Setting Initial Conference

UNITED STATES DISTRICT COURT
_____ DISTRICT OF _____

| | | |
|---|---|---|
| In re: | ) | Master File No. _____ [1] |
| | ) | |
| _____ [2] LITIGATION | ) | |
| | ) | This Document Relates To: |
| | ) | [All Cases] |

Order No. _____ [3]

*Preamble.* [4] The court wishes to express clearly its expectation that professionalism, courtesy, and civility will endure throughout these proceedings. The *Manual for Complex Litigation, Fourth* at section 10.21 captures the spirit in these terms:

> The added demands and burdens of complex litigation place a premium on attorney professionalism, and the judge should encourage counsel to act responsibly. The certification requirements of Federal Rules of Civil Procedure 11 and 26(g) reflect some of the attorneys' obligations as officers of the court.

Because of the high level of competence and experience that attorneys ordinarily bring to this type of litigation, the court is confident that this objective will be achieved without judicial intervention.

It appearing that [the above styled case(s)] [the cases listed on Attachment _____] may merit special attention as complex litigation, the court ORDERS:

1.  *Initial Conference.* All parties shall appear for a conference with the undersigned on the _____ day of _____[date]_____, at ____ a.m./p.m. in [Court]room _____, United States Courthouse _____.

    (a)  *Attendance.* To minimize costs and facilitate a manageable conference, parties are not required to attend the conference, and parties with similar interests are expected to agree to the extent practicable on a single attorney to act on their joint behalf at the conference. A party will not, by designating an attorney to represent its interests at the conference, be precluded from other representation during the litigation; and attendance at the conference will not waive objections to jurisdiction, venue, or service. [5]

    (b)  *Service List.* This order is being mailed to the persons shown on Attachment _____, which has been prepared from the list of counsel making appearances with the Judicial Panel on Multidistrict Litigation. Counsel on this list are requested to forward a copy of the order to other attorneys who should be

notified of the conference. A corrected service list will be prepared after the conference.

(c) *Other Participants.* Persons who are not named as parties in this litigation but may later be joined as parties or are parties in related litigation pending in other federal and state courts are invited to attend in person or by counsel.

2. *Purposes and Agenda.* The conference will be held for the purposes specified in Fed. R. Civ. P. 16(a), 16(b), 16(c), and 26(f) and subject to the sanctions prescribed in Rule 16(f). A tentative agenda is appended as Attachment _____.[6] Counsel are encouraged to advise the court as soon as possible of any items that should be added to the agenda.

3. *Preparations for Conference*

(a) *Procedures for Complex Litigation.* Counsel are expected to familiarize themselves with the *Manual for Complex Litigation, Fourth* and be prepared at the conference to suggest procedures that will facilitate the just, speedy, and inexpensive resolution of this litigation.

(b) *Initial Conference of Counsel.* Before the conference, counsel shall confer and seek consensus to the extent possible with respect to the items on the agenda, including a proposed discovery plan under Rule 26(f) and a suggested schedule under Rule 16(b) for joinder of parties, amendment of pleadings, consideration of any class action allegations, motions, and trial. [The court designates _____ and _____ to arrange the initial meetings of plaintiffs' and defendants' counsel, respectively.][7]

(c) *Preliminary Reports.* Counsel will submit to the court by ___[date]___, a brief written statement indicating their preliminary understanding of the facts involved in the litigation and the critical factual and legal issues. These statements will not be filed with the clerk, will not be binding, will not waive claims or defenses, and may not be offered into evidence against a party in later proceedings.

(d) *List of Affiliated Companies and Counsel.* To assist the court in identifying any problems of recusal or disqualification, counsel will submit to the court by _____[date]_____, a list of all companies affiliated with the parties and all counsel associated in the litigation.

(e) *List of Pending Motions.* Counsel's statement shall list all pending motions.

(f) *List of Related Cases.* Counsel's statement shall list all related cases pending in state or federal court and their current status, to the extent known.

4. *Interim Measures.* Until otherwise ordered by the court:

(a) *Admission of Counsel.* Attorneys admitted to practice and in good standing in any United States District Court are admitted *pro hac vice* in this litigation. Association of local cocounsel is not required.

(b) *Pleadings.* Each defendant is granted an extension of time for responding by motion or answer to the complaint(s) until a date to be set at the conference.

(c) *Pending and New Discovery.* Pending the conference, all outstanding disclosure and discovery proceedings are stayed and no further discovery shall be initiated. This order does not (1) preclude voluntary informal discovery regarding the identification and location of relevant documents and witnesses; (2) preclude parties from stipulating to the conduct of a deposition that has already been scheduled; (3) prevent a party from voluntarily making disclosures, responding to an outstanding discovery request under Federal Rule of Civil Procedure 33, 34, or 36; or (4) authorize a party to suspend its efforts in gathering information needed to respond to a request under Rule 33, 34, or 36. Relief from this stay may be granted for good cause shown, such as the ill health of a proposed deponent.

(d) *Preservation of Records.* [See section 40.25.]

(e) *Motions.* No motion shall be filed under Rule 11, 12, or 56 without leave of court and unless it includes a certificate that the movant has conferred with opposing counsel in a good-faith effort to resolve the matter without court action.

[(f) *Orders of Transferor Courts.* All orders by transferor courts imposing dates for pleading or discovery are vacated.]

5. *Later Filed Cases.* This order shall also apply to related cases later filed in, removed to, or transferred to this court.

6. *Applications for Lead and Liaison Counsel Appointments.* The court intends to appoint plaintiffs' lead counsel and/or a plaintiffs' steering committee, as well as plaintiffs' liaison counsel. Applications for these positions  must be filed with the clerk's office on or before   [insert date in advance of initial pretrial conference]  . The court will only consider attorneys who have filed a civil action in this litigation. The main criteria for these appointments are (1) willingness and ability to commit to a time-consuming process; (2) ability to work cooperatively with others; (3) professional experience in this type of litigation; and (4) access to sufficient resources to advance the litigation in a timely manner. [Applications should also set forth attorney fee proposals, rates, and percentages that applicants expect to seek if the litigation succeeds in creating a common fund.]

7. *Other Provisions.* [Include any special instructions, such as procedures for presenting emergency matters prior to conference.]


Dated: _____          _____

United States District Judge


Attachments[8]


*Notes:*

1. In its order establishing a master case file—a decision that is frequently deferred until the initial conference—the court should include provisions such as those contained in *infra* section 40.21, ¶ 1, and specify a master file number. The multidistrict litigation (MDL) number is used

if the litigation includes cases transferred under 28 U.S.C. § 1407. Documents that apply generally to all constituent cases are so identified; those that apply only to particular cases should specify in their captions or by a separate list the style of case or case number that they apply to.

2. Courts frequently assign multiple litigation a descriptive name, both to serve as an abbreviated caption in orders, pleadings, and other documents, and to minimize confusion if parties are changed or cases are dismissed. In multidistrict proceedings under 28 U.S.C. § 1407, the name given by the Judicial Panel on Multidistrict Litigation is used.

3. If many orders may be entered during the litigation, the court should number its major orders sequentially for convenient reference. An explanatory description of the nature of the order is often added in parentheses. Transcripts of conferences at which rulings are made should be included in the numerical sequence if no separate order incorporating these rulings will be prepared.

4. The court may wish to use these or similar words to set a tone for the litigation. *Supra* section 10.21 may provide further ideas along these lines.

5. In some cases the court may decide that the parties themselves should attend the conference with their counsel. *See supra* section 11.23.

6. As an alternative, the clause might read, "The items listed in the *MCL 4th*, section 11.21, shall, to the extent applicable, constitute a tentative agenda."

7. Designation of attorneys to organize these initial meetings may be useful both to fix responsibility and to reduce early factionalism among those interested in becoming lead or liaison counsel. The attorneys designated by the court need not be persons who would be considered for appointment as lead or liaison counsel.

8. For ease of drafting, as well as reference, append lists and lengthy directives (e.g., a protective order for confidential documents) as attachments rather than include them within the body of an order. Sample orders and other materials from the *MCL 4th* may be incorporated by reference.

# 40.2  Sample Case-Management Orders

.21 General  734
.22 Responsibilities of Designated Counsel  741
.23 Attorneys' Time and Expense Records  743
.24 Scheduling Order  744
.25 Preservation of Documents, Data, and Tangible Things  746
.26 Document Depositories  749
    .261 Order to Meet and Confer to Establish Joint Document Depository  749
    .262 Order to Establish Separate Document Depositories  751
.27 Confidentiality Order  752
.28 Referral of Privilege Claims to Special Master  754
.29 Deposition Guidelines  756

## 40.21  General

[caption]

Order No. _____
(Initial Case-Management Order)

Having considered the comments and proposals of the parties presented at the initial conference held _____[date]_____, the court ORDERS:

1. *Pretrial Consolidation.* The cases listed on Attachment _____ are, until further order, consolidated for pretrial purposes. This order does not constitute a determination that these actions should be consolidated for trial, nor does it have the effect of making any entity a party to an action in which it has not been joined and served in accordance with the Federal Rules of Civil Procedure.

   (a) *Master Docket and File.* The clerk will maintain a master docket and case file under the style "*In re* _____ LITIGATION," master file number _____. All orders, pleadings, motions, and other documents will, when filed and docketed in the master case file, be deemed filed and docketed in each individual case to the extent applicable.

   (b) *Captions; Separate Filing.* Orders, pleadings, motions, and other documents will bear a caption similar to that of this order.[1] If generally applicable to all consolidated actions, they shall include in their caption the notation that they relate to "ALL CASES" and be filed and docketed only in the master file. Documents intended to apply only to particular cases will indicate in their caption the case number of the case(s) to which they apply, and extra copies shall be provided to the clerk to facilitate filing and docketing both in the master case file and the specified individual case files.

   (c) *Discovery Requests and Responses.* Pursuant to Fed. R. Civ. P. 5(d), discovery requests and responses will not be filed with the court except when specifically ordered by the court or to the extent offered in connection with a motion.[2]

[(d) *Coordinated Actions.* The actions listed on Attachment _____ are not consolidated for pretrial purposes at the present time, but discovery in such cases shall be coordinated with that in the consolidated actions to prevent duplication and conflicts.[3]]

2.  *Organization of Counsel*[4]

   (a)  *Plaintiffs.* To act on behalf of plaintiffs with the responsibilities prescribed in [Attachment _____] [see section 40.22], the court designates—

     (1) as Liaison Counsel: _____ [name, address, telephone number] _____

     (2) as Lead Counsel: _____ [name, address, telephone number] _____

     (3) as additional members of Plaintiffs' Steering Committee:

     _____ [names, addresses, telephone numbers] _____

     _____

     _____

   (b)  *Defendants.* To act as liaison counsel on behalf of all defendants [except defendant(s) _____ ] with the responsibilities prescribed in [Attachment _____] [see section 40.22, ¶4], the court designates _____ [name, address, telephone number] _____.

   (c)  *Reimbursement.* If agreement cannot be reached on a method for periodically reimbursing attorneys for expenses incurred and paying them for services rendered as lead or liaison counsel, the matter will be presented to the court for resolution.

   (d)  *Time Records.* Counsel who anticipate seeking an award of attorney fees from the court shall comply with the directives contained in [Attachment _____] [see section 40.23] regarding the maintenance and filing of contemporaneous records reflecting the services performed and the expenses incurred.

3.  *Service of Documents*

   (a)  *Orders.* A copy of each order will be provided to plaintiffs' liaison counsel and defendants' liaison counsel for distribution as appropriate to other counsel and parties. [A copy shall also be provided to counsel for defendant(s)_____ _____.]

   (b)  *Pleadings, Motions, and Other Documents.* Plaintiffs' liaison counsel will be provided with _____ copies of each pleading, motion, or other document filed by a party; defendants' liaison counsel will be provided with ___ copies of each such document. [Pursuant to Fed. R. Civ. P. 5(b), service on liaison counsel constitutes service on other attorneys and parties for whom liaison counsel is acting.[5]]

   [(c) *Service of Original Complaints; Amendments Adding Parties.* To eliminate disputes about service of process and to reduce the expense of such service, defendants _____[name]_____ and _____[name]_____ have agreed to waive service of process for claims filed in federal court that fall within the scope of the _____[above-captioned]__ litigation, subject to the provisions of Rule 4(d). The

notice required by Rule 4(d) should be sent to _____[name and ad-
dress of representative/counsel to receive service] and _____[name and ad-
dress of representative/counsel to receive service]   . Plaintiffs have 30 days
from the date of this order or the date of filing, whichever is later, to provide
notice of the original complaint or an amendment adding one or more of the
above defendants to the complaint.[6]]

4.  *Status Conferences*

   (a)  *Regularly Scheduled Conferences.* The court will convene a status conference in
        this litigation every ___[insert scheduled time]   , subject to the court's calen-
        dar. Except for emergencies, motions should not be brought for hearing at
        any time other than a regularly scheduled status conference. To be heard at a
        status conference, motions must be fully briefed at least _____[insert time
        period]   . Lead counsel for the parties shall (1) confer at least __[insert time
        period]___ before each scheduled conference and attempt to resolve out-
        standing disputes and (2) provide the court at least _[insert time period]_ prior
        to the hearing a joint letter listing all motions and other matters the parties
        anticipate addressing at the conference. Parties should make every effort not
        to notice depositions for days on which status conferences are scheduled, and
        no deposition shall go forward on such days without prior leave of court.

   (b)  *Telephone Conferences.* Telephone conferences may be scheduled at the
        court's discretion by prior arrangement through the court's chambers, if all
        necessary parties are available and receive at least 24 hours notice.

5.  *Refinement of Issues*

   (a)  *General Briefing Requirements.* Briefs in support of, or in opposition to, any
        motions may not exceed _[number of]_ pages without leave of court. Reply
        briefs must be limited to _[number of]_ pages without leave of court.

   (b)  *Rule 12 Motions.* [Include rulings on pending Rule 12 motions if appropriate,
        or establish dates for filing, briefs, and arguments. For example, "The motions
        of defendants A.B. and C.D. to dismiss the complaint of plaintiff E.F. for fail-
        ure to state a claim on which relief may be granted are, upon consideration,
        DENIED. A similar motion is hereby deemed filed by each other defendant,
        and the same order deemed made on each such motion."]

   (c)  *Pleadings.* Each defendant shall have until _____[date]_____, to file
        its answer to the complaint, including any cross-claims or counterclaims.
        Answers to any cross-claims or counterclaims will be filed by _____[date]_____.
        Except for good cause shown, no additional parties may be joined as plaintiff,
        defendant, or third-party defendant after _____[date]_____.

   (d)  *Summary Judgment.* The following issues may be submitted for early resolu-
        tion on motions under Fed. R. Civ. P. 56: _____

        _____

        _____.

        Subject to further order of the court, motions seeking summary judgment on
        these issues will be filed with supporting affidavits and briefs by ___[date]___.

Opposing affidavits and briefs will be filed by \_\_\_\_[date]\_\_\_\_, and any reply briefs by \_\_\_\_[date]\_\_\_\_.

(e) *Class Action.* Attorney \_\_\_\_[name]\_\_\_\_ will serve as interim counsel to represent the proposed class until the court determines whether to certify the action as a class action. To pursue class action treatment, plaintiffs must file by \_\_\_\_[date]\_\_\_\_, a single, consolidated, special master amended complaint.

[Note: In an MDL proceeding, the consolidated class action complaints should ordinarily be filed in the transferee district.] The parties shall meet and confer to determine what, if any, expedited discovery needs to be conducted to address the class issues and specify the date by which plaintiffs will file a motion seeking class certification.[7]

A motion for class certification must do the following: identify the class(es) and any subclass(es) for which they seek certification; detail the facts that show satisfaction of the requirements of Fed. R. Civ. P. 23(a) and (b), including the identity of named plaintiff(s) to represent each class and subclass, the qualifications of counsel for each class and subclass, and the rate, percentage, or other formula for calculating the amount of attorney fees counsel expect to request for representing the proposed class; present a plan for managing the litigation for trial; describe the forms, methods, and financing to be used to give notice to class members; and identify and include reports and affidavits of any experts to be used to support class certification.

Defendants will file by \_\_\_\_[date]\_\_\_\_, any objections to class certification, specifying with particularity the factual and legal basis of their objection and identifying any facts on which an evidentiary dispute exists. Defendants must identify and include reports and affidavits of any experts to be used in opposition to class certification.

[Optional] A hearing will be conducted by the court, under Rule 23(c), on _____[date]_____, at which time the parties may present affidavits and declarations, extracts of depositions, responses to interrogatories, and documentary evidence relevant to any factual disputes. Only on a showing of good cause will a party be permitted to call a witness to testify in person at the hearing. In any event, only an expert whose report has been provided in the motion or opposition will be permitted to testify.

6. *Discovery*

(a) *Approval of Expedited Discovery.* Permission to take expedited discovery of a plaintiff and a plaintiff's health care provider is granted if all of the following conditions are present:

(1) plaintiff or a member of plaintiff's family is terminally ill;

(2) there is an urgent need to record and preserve the testimony because of the gravity of the illness; and

(3) [if applicable] plaintiff has completed the Plaintiff Fact Sheet and provided the medical authorizations required by the fact sheet and defen-

dants have had an opportunity to conduct a reasonable amount of informal discovery prior to the taking of any deposition.

(b) *Initial Disclosures.* Initial disclosures under Rule 26(a) shall be made unless a party objects prior to or during the Rule 26(f) conference that disclosures are inappropriate in the context of the litigation and the court reviews the objection and agrees not to require such disclosure. [Alternative, if agreed or the court orders: The parties have agreed:/The court orders: that in light of the discovery plan set forth below, the parties are relieved of the responsibility to provide initial disclosures under Rule 26(a)(1).]

(c) *Schedule.* Discovery shall be conducted according to the schedule at Attachment _____ [see section 40.24]. All discovery [other than on the issue(s) of _____] shall be completed by ___[date]___.

(d) *General Limitations.* All discovery requests and responses are subject to the requirements of Fed. R. Civ. P. 26(b)(1), 26(b)(2), and 26(g). Discovery shall not, without prior approval of the court, be taken of members of the proposed class or of persons in countries outside the United States; and any request for such discovery shall indicate why the discovery is needed and the specific information or documents sought.

(e) *Confidentiality Order.* See Attachment _____ [see section 40.27].

(f) *Documents*

(1) *Preservation.* See Attachment _____ [see section 40.25].

(2) *Numbering System.* Counsel shall develop and use a system for identifying by a unique number or symbol each document produced or referred to during the course of this litigation. All copies of the same document should ordinarily be assigned the same identification number.

(3) *Rolling Production.* The parties must produce documents to which they have not raised an objection on a rolling basis rather than waiting until all documents responsive to a request have been gathered. The parties must meet and confer regarding a schedule for the orderly production of different categories of documents.

(4) *Document Depositories.* See Attachment _____ [see section 40.26].

(5) *Avoidance of Multiple Requests and Coordination of Document Production with Other Courts.* Counsel shall, to the extent possible, coordinate and consolidate their requests for production and examination of documents to eliminate duplicative requests from the same party in this proceeding or in similar proceedings in other courts. No party shall request documents available to it at a document depository or from its own liaison counsel.

[Alternative: Defendants have agreed [or "The court orders the parties"] to produce in these proceedings all documents and information that they produce in related litigation dealing with the same ___[insert the product, event, or set of transactions that define the litigation]___ in other state and

federal courts, on the same schedule or as close to the same schedule as practicable. Plaintiffs have agreed [or "The court orders"] that the sequence in which defendants produce the documents need not conform to the requirements of Rule 34(b).]

(6) *Privilege.* A party who, relying on any privilege or on the work product doctrine, does not produce all relevant or requested documents in response to a request for production of documents or a subpoena must state that it is invoking a privilege and must specify which privilege or doctrine it is invoking. The parties are to confer to determine the format and time for production of privilege logs.

Where courts in other jurisdictions have ordered the production of any document initially withheld by defendant as privileged or work product, the party shall either produce the document in these proceedings or timely move for a protective order.

(g) *Interrogatories.* Counsel shall, to the extent possible, combine their interrogatories to any party into a single set of questions. No question shall be asked that has already been answered in response to interrogatories filed by another party [or in response to a "fact sheet" submitted by the same party (as provided in section 40.52)] unless there is reason to believe that a different answer will be given. [Without leave of court, interrogatories shall not include more than _____ separate questions, including subparts.] Pursuant to Rule 26(e)(2), the parties must promptly amend answers to interrogatories to provide complete additional or corrective information.

(h) *Depositions.* See Attachment _____ [see section 40.29].

(i) *Special Agreements.* All parties shall be under a continuing duty to make prompt disclosure to the court (and, unless excused by the court for good cause shown, to other parties) of the existence and terms of all agreements and understandings, formal or informal, absolute or conditional, settling or limiting their rights or liabilities in this litigation. This obligation includes not only settlements, but also such matters as "loan receipt" and "Mary Carter" agreements, and insurance, indemnification, contribution, and damage-sharing agreements.

7. *Trial.* Subject to further order of the court, the parties are directed to be ready for trial on all issues [except _____ ] by _____[date]_____.

[Counsel are advised that the court will require a listing in advance of trial of the factual contentions each party expects to prove at the trial, identifying the witnesses and documents to be presented in support of each such contention, and the court may preclude the presentation of any contention, witness, or document not so identified.]

8. [Optional: *Next Conference.* The next pretrial conference is [tentatively] scheduled for _____[date]_____. See ¶ 4(a) above.]

9. *Later Filed Cases.* The terms of this order, including pretrial consolidation, shall apply automatically to actions later instituted in, removed to, or transferred to this

court (including cases transferred for pretrial purposes under 28 U.S.C. § 1407) that involve claims of _____.

Objections to such consolidation or other terms of this order shall promptly be filed, with a copy served on liaison counsel for plaintiffs and defendants.

Dated: _____     _____
United States District Judge

Attachments: [Attachments to this order can be found from sections 40.22 to 40.3.]

*Notes:*

1.  *See supra* section 40.1.

2.  As a means of keeping advised of the progress of discovery without unnecessarily burdening the clerks' offices, the court may wish to add this provision: "At the time of requesting or responding to discovery, the parties shall file with the clerk a one-page notice indicating the nature of the discovery request or response."

3.  Coordination of discovery, including use of joint notices for common depositions, is often appropriate even if consolidation is not warranted.

4.  This order provides for appointment of only liaison counsel for defendants while providing for appointment of liaison counsel, lead counsel, and a steering committee for plaintiffs. In many cases, of course, the same organizational structure for both plaintiffs and defendants will be appropriate.

5.  To ensure that each liaison counsel has a complete file, copies of all documents should be served on both liaison counsel even if individual service is also to be made on other attorneys and parties. If the court directs under Fed. R. Civ. P. 5 that service on all opposing counsel may be made by serving liaison counsel, some additional time should be provided for liaison counsel to make distribution among those counsel and parties interested in a particular document.

6.  The court should encourage the parties to discuss waiver of service of process as contemplated by Rule 4(d). If the parties agree, the court should include a version of the bracketed clause in an order.

7.  Note that Rule 23(c)(1) provides that the class certification decision need only be made at "an early practicable time." The revised rule contemplates that the decision may come after rulings on Rule 12 motions and early motions for summary judgment.

# 40.22 Responsibilities of Designated Counsel

It is ORDERED:

1. *Plaintiffs' Lead Counsel.* Plaintiffs' lead counsel[1] shall be generally responsible for coordinating the activities of plaintiffs during pretrial proceedings and shall

    (a) determine (after such consultation with other members of Plaintiffs' Steering Committee and other cocounsel as may be appropriate) and present (in briefs, oral argument, or such other fashion as may be appropriate, personally or by a designee) to the court and opposing parties the position of the plaintiffs on all matters arising during pretrial proceedings;

    (b) coordinate the initiation and conduct of discovery on behalf of plaintiffs consistent with the requirements of Fed. R. Civ. P. 26(b)(1), 26(2), and 26(g), including the preparation of joint interrogatories and requests for production of documents and the examination of witnesses in depositions;

    (c) conduct settlement negotiations on behalf of plaintiffs, but not enter binding agreements except to the extent expressly authorized;

    (d) delegate specific tasks to other counsel or committees of counsel,[2] as authorized by the court, in a manner to ensure that pretrial preparation for the plaintiffs is conducted efficiently and effectively;

    (e) enter into stipulations with opposing counsel as necessary for the conduct of the litigation;

    (f) prepare and distribute periodic status reports to the parties;

    (g) maintain adequate time and disbursement records covering services as lead counsel;

    (h) monitor the activities of cocounsel to ensure that schedules are met and unnecessary expenditures of time and funds are avoided; and

    (i) perform such other duties as may be incidental to proper coordination of plaintiffs' pretrial activities or authorized by further order of the court.

    Counsel for plaintiffs who disagree with lead counsel (or those acting on behalf of lead counsel) or who have individual or divergent positions may present written and oral arguments, conduct examinations of deponents, and otherwise act separately on behalf of their clients as appropriate, provided that in doing so they do not repeat arguments, questions, or actions of lead counsel.

2. *Plaintiffs' Liaison Counsel.* Plaintiffs' liaison counsel shall

    (a) maintain and distribute to cocounsel and to defendants' liaison counsel an up-to-date service list;

    (b) receive and, as appropriate, distribute to cocounsel orders from the court [and documents from opposing parties and counsel];

    (c)  maintain and make available to cocounsel at reasonable hours a complete file of all documents served by or upon each party [except such documents as may be available at a document depository]; and

    (d)  establish and maintain a document depository [see section 40.261].

3.   *Plaintiffs' Steering Committee.* The other members of plaintiffs' steering committee shall from time to time consult with plaintiffs' lead and liaison counsel in coordinating the plaintiffs' pretrial activities and in planning for trial.

4.   *Defendants' Liaison Counsel.* Defendants' liaison counsel shall

    (a)  maintain and distribute to cocounsel and to plaintiffs' liaison counsel an up-to-date service list;

    (b)  receive and, as appropriate, distribute to cocounsel orders from the court [and documents from opposing parties and counsel];

    (c)  maintain and make available to cocounsel at reasonable hours a complete file of all documents served by or upon each party [except such documents as may be available at a document depository];

    (d)  establish and maintain a document depository [see section 40.261]; and

    (e)  call meetings of cocounsel for the purpose of coordinating discovery, presentations at pretrial conferences, and other pretrial activities.

5.   *Privileges Preserved.* No communication among plaintiffs' counsel or among defendants' counsel shall be taken as a waiver of any privilege or protection to which they would otherwise be entitled.

Dated: _____     _____
                                                  United States District Judge

*Notes:*

   1.  In litigation involving different types of claims, such as economic injury and personal injury claims, the court and counsel may wish to create parallel structures for the cases.

   2.  In litigation involving cases in state and federal courts, the court and counsel should consider appointing a state–federal liaison committee to coordinate pretrial and trial activity, particularly discovery.

## 40.23 Attorneys' Time and Expense Records

It is ORDERED:

1.  *Maintenance of Contemporaneous Records.* All counsel shall keep a daily record of their time spent and expenses incurred in connection with this litigation, indicating with specificity the hours, location, and particular activity (such as "conduct of deposition of A.B."). The failure to maintain such records will be grounds for denying court-awarded attorney fees, as will an insufficient description of the activity (such as "research" or "review of correspondence").[1]

2.  *Filing.*[2] By the fifteenth day of each month, each firm that may seek an award (or approval) of a fee by the court shall file [under seal with the clerk] [with lead counsel or a budget/record/compensation committee established by lead counsel and the court] a report summarizing, according to each separate activity, the time and expenses spent by its members or associates during the preceding month (and the ordinary billing rates of such attorneys in effect during the month) and the accumulated total of the firm's time, hourly rates, and expenses to date. [Lead Counsel shall file under seal with the clerk by the last day of the month a report summarizing, for all participating counsel, such time and expenses reports, arranged according to the particular activities.]

Dated: _____        _____
                                                United States District Judge

*Notes:*

    1.  The court may wish to include more specific guidelines concerning staffing, hourly rates, reimbursable expenses, and required documentation. *See supra* sections 14.21–14.22.

    2.  In cases in which the court may award fees, time and expense records should ordinarily be submitted through lead counsel, if one has been appointed, in order to assist lead counsel in monitoring the activities of cocounsel and in preparing a single, consolidated report for filing with the court. *See supra* section 14.212.

# 40.24 Scheduling Order

It is ORDERED:

1.   Discovery[1] shall be conducted according to the following schedule:

| Discovery | Time[2] |
|---|---|
| Interrogatories by all parties to ascertain identity and location of witnesses and documents, including computerized records | _____ |
| Document production by all parties | _____ |
| Lay-witness depositions<br>　• noticed by plaintiffs<br>　• noticed by defendants | <br>_____<br>_____ |
| Expert(s):<br>　• plaintiffs:<br>　　– submission of reports<br>　　– depositions<br>　• defendants:<br>　　– submission of reports<br>　　– depositions | <br><br>_____<br>_____<br><br>_____<br>_____ |
| Production of proposed computerized summaries and samples:<br>　• by plaintiffs<br>　• by defendants | <br><br>_____<br>_____ |

2.   Except for good cause shown—

   (a)  relief from the above schedule shall not be granted and all discovery shall be completed by _____ [date] _____ ;[3]

   (b)  discovery shall be limited to matters occurring after _____ [date] _____ [and before _____ [date] _____ ];

   (c)  no more than _____ interrogatories (including subparts) may be propounded to any party (exclusive of interrogatories seeking the identity and location of witnesses and documents);

   [(d)  no more than _____ depositions may be taken by either plaintiffs or defendants, and no single deposition (other than of _____) may take more than _____ hours/days;[4] and

   (e)  no amendment of pleadings may be made after     [date]   , and no addi-
tional parties may be joined as plaintiff, defendant, or third-party defendant
after     [date]    .

3.   The parties are expected to be prepared for trial on all issues [except         ]
by    [date]   .

Dated: _____         _____

                                   United States District Judge

*Notes:*

   1.  Where initial disclosure is appropriate, provision should be made in the order. *See also supra* section 40.21, ¶ 6(b). Note that the 2000 amendments to Rule 26(a)(1) contemplate that a party in a complex case may object during the Rule 26(f) conference that initial disclosures are "not appropriate in the circumstances of the action" and by such objection call for a judicial ruling on the question.

   2.  The time for undertaking or completing some aspect of discovery may be stated either by using specific dates or by reference to completion of discovery that should precede it. The listing in this sample order of certain forms of discovery is not intended to suggest that they should be undertaken in this sequence or that each item should be completed before other discovery is undertaken. For example, in many cases, depositions should be conducted by both sides during the same period of time, during which the parties may also be involved in preparing answers to interrogatories and responses to requests for admission.

   3.  The extent to which a schedule for all discovery can be established at the initial conference will depend on the circumstances of the litigation. In some complex cases it may be feasible to establish a timetable only for certain portions of discovery, leaving for subsequent conferences the setting of a schedule for other discovery and a final cutoff date for all discovery. In other cases, a comprehensive discovery schedule—which may even include dates for preparation and submission of a joint statement of contested and uncontested facts, and for identification of trial witnesses and documents—can be established at the initial conference.

   4.  Other restrictions on discovery may be added.

## 40.25 Preservation of Documents, Data, and Tangible Things

[Caption]

### Interim Order Regarding Preservation

[The primary purpose of this order is to have the parties meet and confer to develop their own preservation plan. If the court determines that such a conference is unnecessary or undesirable, paragraph 3, Duty to Preserve, may be modified to serve as a stand-alone preservation order.]

### 1. Order to Meet and Confer

To further the just, speedy, and economical management of discovery, the parties are ORDERED to meet and confer as soon as practicable, no later than 30 days after the date of this order, to develop a plan for the preservation of documents, data, and tangible things reasonably anticipated to be subject to discovery in this action. The parties may conduct this conference as part of the Rule 26(f) conference if it is scheduled to take place within 30 days of the date of this order. The resulting preservation plan may be submitted to this Court as a proposed order under Rule 16(e).

### 2. Subjects for Consideration

The parties should attempt to reach agreement on all issues regarding the preservation of documents, data, and tangible things. These issues include, but are not necessarily limited to:

(a) the extent of the preservation obligation, identifying the types of material to be preserved, the subject matter, time frame, the authors and addressees, and key words to be used in identifying responsive materials;

(b) the identification of persons responsible for carrying out preservation obligations on behalf of each party;

(c) the form and method of providing notice of the duty to preserve to persons identified as custodians of documents, data, and tangible things;

(d) mechanisms for monitoring, certifying, or auditing custodian compliance with preservation obligations;

(e) whether preservation will require suspending or modifying any routine business processes or procedures, with special attention to document-management programs and the recycling of computer data storage media;

(f) the methods to preserve any volatile but potentially discoverable material, such as voicemail, active data in databases, or electronic messages;

(g) the anticipated costs of preservation and ways to reduce or share these costs; and

(h) a mechanism to review and modify the preservation obligation as discovery proceeds, eliminating or adding particular categories of documents, data, and tangible things.

## 3. Duty to Preserve

(a) Until the parties reach agreement on a preservation plan, all parties and their counsel are reminded of their duty to preserve evidence that may be relevant to this action. The duty extends to documents, data, and tangible things in the possession, custody and control of the parties to this action, and any employees, agents, contractors, carriers, bailees, or other nonparties who possess materials reasonably anticipated to be subject to discovery in this action. Counsel is under an obligation to exercise reasonable efforts to identify and notify such nonparties, including employees of corporate or institutional parties.

(b) "Documents, data, and tangible things" is to be interpreted broadly to include writings; records; files; correspondence; reports; memoranda; calendars; diaries; minutes; electronic messages; voicemail; E-mail; telephone message records or logs; computer and network activity logs; hard drives; backup data; removable computer storage media such as tapes, disks, and cards; printouts; document image files; Web pages; databases; spreadsheets; software; books; ledgers; journals; orders; invoices; bills; vouchers; checks; statements; worksheets; summaries; compilations; computations; charts; diagrams; graphic presentations; drawings; films; charts; digital or chemical process photographs; video, phonographic, tape, or digital recordings or transcripts thereof; drafts; jottings; and notes. Information that serves to identify, locate, or link such material, such as file inventories, file folders, indices, and metadata, is also included in this definition.

(c) "Preservation" is to be interpreted broadly to accomplish the goal of maintaining the integrity of all documents, data, and tangible things reasonably anticipated to be subject to discovery under Fed. R. Civ. P. 26, 45, and 56(e) in this action. Preservation includes taking reasonable steps to prevent the partial or full destruction, alteration, testing, deletion, shredding, incineration, wiping, relocation, migration, theft, or mutation of such material, as well as negligent or intentional handling that would make material incomplete or inaccessible.

(d) If the business practices of any party involve the routine destruction, recycling, relocation, or mutation of such materials, the party must, to the extent practicable for the pendency of this order, either

   (1) halt such business processes;

   (2) sequester or remove such material from the business process; or

   (3) arrange for the preservation of complete and accurate duplicates or copies of such material, suitable for later discovery if requested.

(e) Before the conference to develop a preservation plan, a party may apply to the court for further instructions regarding the duty to preserve specific categories of documents, data, or tangible things. A party may seek permission to resume routine business processes relating to the storage or destruction of specific categories of documents, data, or tangible things, upon a showing of undue cost, burden, or overbreadth.

## 4. Procedure in the Event No Agreement Is Reached

If, after conferring to develop a preservation plan, counsel do not reach agreement on the subjects listed under paragraph 2 of this order or on other material aspects of preservation, the parties are to submit to the court within three days of the conference a statement of the unresolved issues together with each party's proposal for their resolution of the issues. In framing an order regarding the preservation of documents, data, and tangible things, the court will consider those statements as well as any statements made in any applications under paragraph 3(e) of this order.

Entered this ____ day of ____, 20____      _____

United States District Court Judge

# 40.26 Document Depositories

.261 Order to Meet and Confer to Establish Joint Document Depository  749
.262 Order to Establish Separate Document Depositories  751

## 40.261  Order to Meet and Confer to Establish Joint Document Depository

[Caption]

It is ORDERED:[1]

1. Defendants, in consultation with plaintiffs, shall establish and maintain a document depository program (a "depository") in a manner to be agreed on by the parties and/or ordered by the Court. The parties will propose to the court a formula for sharing the cost of maintaining the facility. The depository shall store all materials produced by parties and third-parties in this proceeding that may be needed for more than a single case, including documents, interrogatories, requests for admission, requests for production of documents, deposition transcripts, and similar materials. These materials shall be made available to any litigants in any case in the above-captioned litigation [and to any litigants in any related state court litigation].

2. Counsel must agree on computer hardware and software systems for scanning, viewing, downloading, and printing documents from remote locations. The parties must agree about allocating fees to operate the depository. The document depository must not be operated as a profit center. Each attorney/party seeking access to the depository must sign the agreement regarding rules of usage, protection of confidential documents, and payment of fees.

3. A party fully satisfies its obligation to produce documents to the parties in all cases in this litigation by placing those documents in the depository and serving notice of this placement on counsel in all affected cases. Such notice shall identify the documents produced, using a unique alphanumeric identifier, and notice shall be produced as documents are kept in the usual course of business or documents shall be organized and labeled to correspond with the categories in the request set forth in Fed. R. Civ. P. 34(b). This provision may be revised based on the parties' submissions pursuant to paragraph 4 below.

4. Within _____ days of this order, plaintiffs' lead counsel (or a designated representative) shall meet with defendants' lead counsel (or a designated representative) to confer about the creation, financing, design, and operation of the depository and shall endeavor to present to the court a stipulation outlining a protocol for the depository, as well as the organization, categorization, and/or indexing of the defendants' responses to plaintiffs' document requests. The parties shall present to the

court by _____[date]_____ a proposed stipulation regarding the depository protocol and, if necessary, a statement of any matters on which they disagree. In developing this protocol, the parties shall consider potential protocols that would efficiently use technologies (such as CD-ROM or Internet-based production) and that would facilitate the parties' prompt and effective access to the contents of the depository and reduce parties' need to travel to examine documents. Any technology used must permit a hard copy of the document to be produced by the recipient.

5.  Each party shall be responsible for delivering to the depository any documents produced in this proceeding pursuant to Fed. R. Civ. P. 45. The party noticing a deposition shall be responsible for delivering to the depository any transcription (including videotape) of any deposition taken in any of the consolidated cases. The party serving any objection, answer, or response to an interrogatory, Rule 34 request, or request for admission in any of the consolidated cases shall be responsible for delivering a copy to the depository.

6.  Plaintiffs' liaison counsel (or a designated representative) shall be responsible for monitoring the content of the depository and shall provide periodic notification to all plaintiffs' counsel of the addition of materials to the depository, with a basic description of the newly added materials.

7.  Parties to the litigation may establish at their own expense private document depositories at other locations and make arrangements for obtaining documents for inclusion in those depositories as they see fit. The depository established pursuant to this order, however, shall be the official document depository for all consolidated cases.

*Notes:*

1.  This order is derived primarily from an order issued in *In re Bridgestone/Firestone, Inc. ATX, ATX II, & Wilderness Tires Products Liability Litigation*, MDL No. 1373 (S.D. Ind. Jan. 2001). Paragraph 2 is derived from an order issued in *In re Serzone Products Liability Litigation*, MDL No. 1477 (S.D. W. Va. Oct. 17, 2002).

## 40.262  Order to Establish Separate Document Depositories

It is ORDERED:

1. *Establishment of Depositories.*[1] Document depositories shall be established in ____[specify city]____ at such locations as the parties may agree on. In the absence of agreement, the court upon motion shall designate such locations. Documents produced by plaintiffs pursuant to formal or informal request shall be placed in a plaintiff's depository maintained at the expense of plaintiffs; those produced by defendants pursuant to formal or informal request shall be placed in a defendant's depository maintained at the expense of defendants. Each depository will contain equipment for producing copies and separately counting the copies that are made for each party.

2. *Filing System.* The filing party shall place the documents in the depository in sequential order according to the document numbers, and the documents shall be organized in groups in accordance with the document identification prefixes. Documents without identification numbers shall be organized in an orderly and logical fashion. Existing English translations of all foreign-language documents shall be filed with the documents.[2]

3. *Access, Copying, Log.* Counsel appearing for any party in this litigation and the staffs of their respective law firms working on these cases shall have reasonable access during business hours to each document in any such depository and may copy or obtain copies at the inspecting party's expense. Such inspection shall not be subject to monitoring by any party. A log will be kept of all persons who enter and leave the depository, and only duplicate copies of documents may be removed from the depository except by leave of court. [Access to, and copying of, confidential documents is subject to the limitations and requirements of the order protecting against unauthorized disclosure of such documents.]

4. *Subsequent Filings.* After the initial deposit of documents in the depository, notice of all subsequent deposits shall be given to both liaison counsel.

Dated: _____        _____
                                              United States District Judge

*Notes:*

 1.  This order contemplates creation of separate depositories for each side of the litigation. Consider whether the needs of the parties for separate facilities can also be accomplished through electronic means within a single facility. *See* order at *supra* section 40.261.

 2.  Provision may be made for use of the most appropriate technology for storage, retrieval, and distribution of the documents, including electronic materials. *See supra* section 11.444.

## 40.27 Confidentiality Order

It is hereby ordered that the following provisions shall govern claims of confidentiality in these proceedings:

(a) Review of the confidential documents and information by counsel, experts, or consultants for the litigants in the litigation shall not waive the confidentiality of the documents or objections to production.

(b) The inadvertent, unintentional, or *in camera* disclosure of a confidential document and information shall not generally be deemed a waiver, in whole or in part, of any party's claims of confidentiality.

(c) Only documents containing trade secrets, special formulas, company security matters, customer lists, financial data, projected sales data, production data, matters relating to mergers and acquisitions, and data which touch upon the topic of price may be designated confidential, provided such documents have not previously been disclosed by the producing party to anyone except those in its employment or those retained by it. Such documents or parts thereof will be designated after review by an attorney for the producing party by stamping the word confidential on each page. [Alternative for an MDL relating to product liability litigation: Discovery material containing trade secrets, or other confidential or proprietary research, development, manufacturing, or commercial or business information, may be designated as confidential. Without prejudice to a party's right to seek production of the following information or of a party to object to its production, the information subject to a confidentiality designation may include the following: customer names; proprietary licensing, distribution, marketing, design, development, research, and manufacturing information—not publicly filed with any federal or state regulatory authority—regarding products and medicines, whether currently marketed or under development; clinical studies not publicly filed with any federal or state regulatory authority; information concerning competitors; production information; personnel records and information; and financial information not publicly filed with any federal or state regulatory authority.]

(d) If any party believes a document not described in the above paragraph should nevertheless be considered confidential, it may make application to the court or special master. Such application shall only be granted for reasons shown and for extraordinary grounds.

(e) Documents designated confidential shall be shown only to the attorneys, the parties, parties' experts, actual or proposed witnesses, and other persons whom the attorneys deem necessary to review the documents for the prosecution or defense of this lawsuit. Each person who is permitted to see confidential documents shall first be shown a copy of this order and shall further be advised of the obligation to honor the confidentiality designation. The parties agree that any discovery material produced in this litigation may be used in all actions encompassed by this [insert product or other litigation

name]_  [MDL/class action] litigation and in any other action brought by or
on behalf of any other ___[insert product name]___  user who agrees to be
bound by the terms of this order.

(f)  If a party believes that a document designated or sought to be designated
confidential by the producing party does not warrant such designation, the
party shall first make a good-faith effort to resolve such a dispute with op-
posing counsel. In the event that such a dispute cannot be resolved by the
parties, either party may apply to the court or special master for a determina-
tion as to whether the designation is appropriate. The burden rests on the
party seeking confidentiality to demonstrate that such designation is proper.

(g)  At the time of deposition or within 10 days after receipt of the deposition
transcript, a party may designate as confidential specific portions of the tran-
script which contain confidential matters under the standards set forth in
paragraph (a) above. This designation shall be in writing and served upon all
counsel. No objection shall be interposed at deposition that an answer would
elicit confidential information. Transcripts will be treated as confidential for
this 10-day period. Any portions of a transcript designated confidential shall
thereafter be treated as confidential in accordance with this order. In filing
materials with the court in pretrial proceedings, counsel shall file under seal
only those specific documents and that deposition testimony designated con-
fidential, and only those specific portions of briefs, applications, and other
filings that contain verbatim confidential data, or that set forth the substance
of such confidential information.

(h)  In any application to the court or special master referred to or permitted by
this order, the court or special master may exercise discretion in determining
whether the prevailing party in such a dispute may recover the costs incurred
by it and, if so, the amount to be awarded.

Dated: _____          _____
                                                             United States District Judge

# 40.28 Referral of Privilege Claims to Special Master

It appearing that submission of claims of privilege to a special master[1] appointed under Fed. R. Civ. P. 53 is warranted by the expected volume of such claims and by the likelihood that *in camera* inspection may be needed to rule on these claims and should be accomplished, to the extent possible, by someone other than the judge to whom this litigation has been assigned, the court hereby ["with the consent of the parties" or "having notified the parties and provided an opportunity to be heard"] ORDERS:

1. *Appointment.* _____ is appointed under Rule 53 as special master for the purpose of considering all claims of privilege (including claims of protection against disclosure for trial preparation materials) that may be asserted during the course of discovery in this litigation and for such other matters as may be referred to such special master by the court, such as resolution of disputes under the Confidentiality Order.

2. *Procedures.* The special master shall have the rights, powers, and duties provided in Rule 53 and may adopt such procedures as are not inconsistent with that rule or with this or other orders of the court. Until directed otherwise by the special master or the court, any person asserting a privilege shall create a privilege log that will specifically identify the document or other communication sought to be protected from disclosure, including the date, the person making the statement, the persons to whom or in whose presence the statement was made, other persons to whom the contents were or have been revealed, the general subject matter of the communication (unless itself claimed to be privileged), the particular privilege(s) or doctrine(s) upon which protection against disclosure is based, and any other circumstances affecting the existence, extent, or waiver of the privilege. When appropriate, the special master may require that this documentation of claims of privilege be verified.

3. *Reports.* The special master shall make findings of fact and conclusions of law with respect to the matters presented by the parties and shall report expeditiously to the court pursuant to Rule 53(f) as applicable in nonjury actions. Unless directed by the court or believed advisable by the special master, the report shall not be accompanied by a transcript of the proceedings, the evidence, or the exhibits. Such parts of the report, if any, that may be confidential shall be filed under seal pending further order of the court.

4. *Fees and Expenses.* Compensation, at rates mutually agreeable to the special master and the parties, shall be paid to the special master on a periodic basis by the parties, together with reimbursement for reasonable expenses incurred by the special master. The special master may employ other persons to provide clerical and secretarial assistance; such persons shall be under the supervision and control of the special master, who shall take appropriate action to ensure that such persons preserve the confidentiality of matters submitted to the special master for review. Fi-

nal allocation of these amounts shall be subject to taxation as costs at the conclusion of the case at the discretion of the court.[2]

5.  *Distribution.* A copy of this order shall be mailed by the clerk to the special master and to liaison counsel for the parties.


Dated: _____          _____

                                                          United States District Judge


*Notes:*

1.  *See supra* section 11.52.

2.  The order may provide the specific compensation payable to the special master and specify the reimbursable expenses.

## 40.29 Deposition Guidelines

It is ORDERED[1] that depositions be conducted in accordance with the following rules:

1. *Cooperation.* Counsel are expected to cooperate with, and be courteous to, each other and deponents.

2. *Stipulations.* Unless contrary to an order of the court, the parties (and when appropriate, a nonparty witness) may stipulate in any suitable writing to alter, amend, or modify any practice relating to noticing, conducting, or filing a deposition. Stipulations for the extension of discovery cutoffs set by the court are not valid, however, until approved by the court.

3. *Scheduling.* All depositions in this litigation may be cross-noticed in any related action pending in state court. Liaison counsel representing the side initiating a deposition shall provide to all known state liaison counsel at least ___ days notice of all depositions filed by plaintiffs and defendants, respectively. Absent extraordinary circumstances, counsel shall consult in advance with opposing counsel and unrepresented-proposed deponents in an effort to schedule depositions at mutually convenient times and places. [That some counsel may be unavailable shall not, however, in view of the number of attorneys involved in this litigation, be grounds for deferring or postponing a deposition if another attorney from the same firm or who represents a party with similar interests is able to attend.]

   Scheduling should take into account (a) the availability of documents from among those produced by the parties and third parties, (b) the objective of avoiding the need to subject any person to repeated depositions, and (c) the need to preserve relevant testimony. As a general rule, no witness should be deposed on the same subject more than once in this litigation. A party seeking to take a second deposition of a witness shall provide the opposing party its basis for an exception and a listing of the subjects for which it seeks to depose the witness. Second depositions on new subject matter shall be permitted only upon consent of the parties or an order of this Court issued for good cause shown.

4. *Location.* The location of depositions should be as consistent as possible within each city so that any videotape, videoconferencing, or other equipment can be left in place.

5. *Attendance*

   (a) *Who May Be Present.* Unless otherwise ordered under Fed. R. Civ. P. 26(c), depositions may be attended by counsel of record, members and employees of their firms, attorneys specially engaged by a party for purposes of the deposition, the parties or the representative of a party, counsel for the deponent, and potential witnesses. While a deponent is being examined about any stamped confidential document or the confidential information contained therein, persons to whom disclosure is not authorized under the Confidentiality Order shall be excluded.

(b) *Unnecessary Attendance.* Unnecessary attendance by counsel is discouraged and may not be compensated in any fee application to the court. Counsel who have only marginal interest in a proposed deposition or who expect their interests to be adequately represented by other counsel may elect not to attend and to conduct, pursuant to paragraph 13 of this order, supplemental interrogation of the deponent should a review of the deposition reveal the need for such examination.

(c) *Notice of Intent to Attend a Deposition.* To allow counsel to make arrangements for adequate deposition space, counsel who intend to attend a deposition noticed in the above-captioned  litigation should advise counsel for the noticing party at least three days prior to the deposition, if feasible.

6. *Conduct*

(a) *Examination.* Each side should ordinarily designate one attorney to conduct the principal examination of the deponent, and examination by other attorneys should be limited to matters not previously covered. Counsel should cooperate so examinations by multiple attorneys do not exceed the allotted time.

(b) *Transmittal of Copies.* The attorney who conducts the principal examination for the noticing party is responsible for assuring that a copy of the deposition transcript, diskettes, and any videotapes are provided to the document depository and to liaison counsel.

(c) *Objections and Directions Not to Answer.* Counsel shall comply with Fed. R. Civ. P. 30(d)(1). When a privilege is claimed, the witness should nevertheless answer questions relevant to the existence, extent, or waiver of the privilege, such as the date of a communication, who made the statement, to whom and in whose presence the statement was made, other persons to whom the contents of the statement have been disclosed, and the general subject matter of the statement, unless such information is itself privileged.

   *Any objection made at a deposition shall be deemed to have been made on behalf of all other parties. All objections, except those relating to form and foundation, are preserved.*

(d) *Private Consultation.* Private conferences between deponents and their attorneys in the course of interrogation are improper except for the purpose of determining whether a privilege should be asserted. Unless prohibited by the court for good cause shown, such conferences may be held during normal recesses and adjournments.

(e) *Continuation of Deposition.* If a deposition is not finished on Friday of a deposition week, it will continue on the following Monday, subject to the availability of the witness. If the witness is unavailable, it will resume on a newly noticed date.

7. *Documents*

(a) *Production of Documents.* Witnesses subpoenaed to produce documents should ordinarily be served at least 30 days before the scheduled deposition.

Arrangements should be made to permit inspection of the documents before the interrogation commences.

(b) *Confidentiality Order.* A copy of the confidentiality order shall be provided to the deponent before the deposition commences if the deponent is to produce or may be asked about documents that may contain confidential information. [Counsel shall comply with the provisions of the confidentiality order when examining a deponent about confidential information.]

(c) *Copies.* Extra copies of documents about which counsel expect to examine the deponent should ordinarily be provided to opposing counsel and the deponent. Deponents should be shown a document before being examined about it except when counsel seek to impeach or test the deponent's recollection.

(d) *Marking of Deposition Exhibits.* Documents shall be referred to by the unique alpha-numeric identifier assigned by the document depository.

8. *Depositions of Witnesses Who Have No Knowledge of the Facts.* An officer, director, or managing agent of a corporation or a government official served with a notice of a deposition or subpoena regarding a matter about which such person has no knowledge may submit to the noticing party, a reasonable time before the date noticed, an affidavit so stating and identifying a person within the corporation or government entity believed to have such knowledge. Notwithstanding such affidavit, the noticing party may proceed with the deposition, subject to the right of the witness to seek a protective order.

9. *Recording Depositions by Nonstenographic Means*

(a) *Tape-Recorded Depositions.* By so indicating in its notice of a deposition, a party may record the deposition by tape recording in lieu of stenographic recording pursuant to Fed. R. Civ. P. 30(b)(2) and (3). Other parties may at their own expense arrange for stenographic recording of the deposition, may obtain a copy of the tape and transcript upon payment of a pro rata share of the noticing party's actual costs, and may prepare and file their own version of the transcript of the tape recording.

(b) *Videotaped Depositions.* By so indicating in its notice of a deposition, a party may record the deposition by videotape pursuant to Fed. R. Civ. P. 30(b)(2) and (3).

(1) *Rules for Videotaped Reporting*

(i) *Video Operator.* The operator(s) of the videotape recording equipment shall be subject to the provisions of Fed. R. Civ. P. 28(c). At the commencement of the deposition the operator(s) shall swear or affirm to record the proceedings fairly and accurately.

(ii) *Attendance.* Each witness, attorney, and other person attending the deposition shall be identified on camera at the commencement of the deposition. Thereafter, only the deponent (and demonstrative materials used during the deposition) will be videotaped.

(iii) *Standards.* The deposition will be conducted in a manner to replicate, to the extent feasible, the presentation of evidence at a trial. Unless physically incapacitated, the deponent shall be seated at a table or in a witness box except when reviewing or presenting demonstrative materials for which a change in position is needed. To the extent practicable, the deposition will be conducted in a neutral setting, against a solid background, with only such lighting as is required for accurate video recording. Lighting, camera angle, lens setting, and field of view will be changed only as necessary to record accurately the natural body movements of the deponent or to portray exhibits and materials used during the deposition. Sound levels will be altered only as necessary to record satisfactorily the voices of counsel and the deponent. Eating and smoking by deponents or counsel during the deposition will not be permitted.

(iv) *Interruptions.* [The videotape shall run continuously throughout the active conduct of the deposition.] [Videotape recording will be suspended during all "off the record" discussions.]²

(v) *Index.* The videotape operator shall use a counter on the recording equipment and after completion of the deposition shall prepare a log, cross-referenced to counter numbers, that identifies the positions on the tape at which examination by different counsel begins and ends, objections are made and examination resumes at which exhibits are identified, and any interruption of continuous tape recording occurs, whether for recesses, "off the record" discussions, mechanical failure, or otherwise.

(vi) *Filing.* [The operator shall preserve custody of the original videotape in its original condition until further order of the court.] [Subject to the provisions of paragraph 10 of this order, the original of the tape recording, together with the operator's log index and a certificate of the operator attesting to the accuracy of the tape, shall be filed with the clerk.] No part of a videotaped deposition shall be released or made available to any member of the public unless authorized by the court.

(vii) *Objections.* Requests for pretrial rulings on the admissibility of evidence obtained during a videotaped deposition shall be accompanied by appropriate pages of the written transcript. If needed for an informed ruling, a copy of the videotape and equipment for viewing the tape shall also be provided to the court.

(viii) *Use at Trial; Purged Tapes.* A party desiring to offer a videotape deposition at trial shall be responsible for having available appropriate playback equipment and a trained operator. After the designation by all parties of the portions of a videotape to be used at trial, an edited copy of the tape, purged of unnecessary portions (and any portions to which objections have been sustained), [may] [shall] be pre-

759

pared by the offering party to facilitate continuous playback; but a copy of the edited tape shall be made available to other parties at least _____ days before it is used, and the unedited original of the tape shall also be available at the trial.

10. *Telephonic Depositions.* By indicating in its notice of a deposition that it wishes to conduct the deposition by telephone, a party shall be deemed to have moved for such an order under Fed. R. Civ. P. 30(b)(7). Unless an objection is filed and served within _____ days after such notice is received, the court shall be deemed to have granted the motion. Other parties may examine the deponent telephonically or in person. However, all persons present with the deponent shall be identified in the deposition and shall not, by word, sign, or otherwise, coach or suggest answers to the deponent.

11. *Waiver of Transcription and Filing.* The parties and deponents are authorized and encouraged to waive transcription and filing of depositions that prove to be of little or no usefulness in the litigation or to agree to defer transcription and filing until the need for using the deposition arises.

12. *Use.* Depositions conducted in this litigation may be used in related cases in any state court to the extent permitted by that state's laws and rules. Depositions may, under the conditions prescribed in Fed. R. Civ. P. 32(a)(1)–(4) or as otherwise permitted by the Federal Rules of Evidence, be used against any party (including parties later added and parties in cases subsequently filed in, removed to, or transferred to this court as part of this litigation):

    (a)  who was present or represented at the deposition;

    (b)  who had reasonable notice thereof; or

    (c)  who, within 30 days after the filing of the deposition (or, if later, within 60 days after becoming a party in this court in any action that is a part of this litigation), fails to show just cause why such deposition should not be usable against such party.

13. *Supplemental Depositions.* Each party not present or represented at a deposition (including parties later added and parties in cases subsequently filed in, removed to, or transferred to this court) may, within 30 days after the filing of the deposition (or, if later, within 60 days after becoming a party in this court in any action that is a part of this litigation), request permission to conduct a supplemental deposition of the deponent, including the right to take such deposition telephonically and by nonstenographic means. If permitted, the deposition shall be treated as the resumption of the deposition originally noticed; and each deponent shall, at the conclusion of the initial deposition, be advised of the opportunity of nonattending parties to request a resumption of such deposition, subject to the right of the deponent to seek a protective order. Such examination shall not be repetitive of the prior interrogation.

14. *Disputes During Depositions*

    (a)  Disputes between the parties that arise during a deposition should be addressed to this [MDL] court rather than the district court in which the depo-

sition is being conducted. The undersigned will exercise by telephone the authority granted under 28 U.S.C. § 1407(b) to act as district judge in the district in which the deposition is taken.[2]

(b) *Immediate Presentation.* Disputes arising during depositions that cannot be resolved by agreement and that, if not immediately resolved, will significantly disrupt the discovery schedule or require a rescheduling of the deposition, should be presented by telephone to the court. If the judge is not available during the period while the deposition is being conducted, the dispute may be submitted to Magistrate Judge _____ by telephone or as the judge may direct.[3] The presentation of the issue and the court's ruling will be recorded as part of the deposition.[4]

Dated: _____        _____

United States District Judge

*Notes:*

1. *See supra* section 11.45.

2. The power to exercise authority over nonparty deponents outside the district is available only in multidistrict litigation, unless the judge has been given an intracircuit or intercircuit assignment.

3. *See supra* section 11.456.

4. If a simultaneous stenographic transcript is being made, the court may prefer that "off the record" discussions be eliminated from the videotape.

# 40.3 Order Creating a Web Site

Order No. _____

[Lead and Liaison Counsel for Plaintiffs and Defendants are directed to meet and confer for the purpose of establishing] [The Court will create and maintain] a Web site devoted solely to the [insert MDL name or caption] litigation. The site will contain sections through which the parties, counsel, and the public may access court orders, court opinions, court minutes, court calendars, frequently asked questions, court transcripts, court docket, current developments, information about plaintiffs' and defendants' lead and liaison counsel, and other information to be identified by the parties or the court and its staff.

Plaintiffs' and defendants' lead and liaison counsel should meet and confer to identify other information that might be included on the Web site, including

   • documents stored in a document depository, or electronic links to such documents;
   • notices and schedules of depositions and other discovery requests;
   • announcements relating to proceedings and events in this litigation;
   • listings of related cases in the state courts and information about how to contact judges and attorneys involved in such cases;
   • documents, orders, or opinions in related cases that are of significant importance in this litigation; and
   • any other materials the parties find to be important to facilitating the fair and efficient conduct of this litigation.

Counsel need to ensure that the Web site is compatible with the Case Management/Electronic Case Filing (CM/ECF) system in place [or to be developed] in this court. The Web site should contain appropriate linkages to information available through the CM/ECF system.

Counsel may recommend, by motion, that a portion of the Web site be accessible only to counsel for plaintiffs, counsel for defendants, or both. Any limitations, however, should be restricted to (1) matters that represent the work product of attorneys for plaintiffs or defendants and are not otherwise available to other persons, and (2) matters that are confidential under a protective order issued by this court. The Web site should be established so that it is compatible with most communications software, with a view toward making it publicly available.

Counsel are expected to use computers to prepare documents sent to the clerk or to the judge's chambers and to provide electronic versions of all documents.

Dated: _____       _____
                                          United States District Judge

# 40.4 Class Actions Orders

.41 Order Certifying Class  763
.42 Order Setting Hearing on Proposed Class Settlement  765
.43 Combined Certification and Proposed Settlement Order  766
.44 Order Approving Settlement/Claims Procedure  768

*Note:* These class action forms have been adapted from antitrust litigation for illustrative purposes and may be adapted for other litigation by appropriate changes.

## 40.41 Order Certifying Class

[caption]

Order No. _____

In accordance with the findings and conclusions contained in the Opinion [omitted] filed concurrently with this order, it is, ORDERED:

1. *Class Certification.* Civil Action No. _____, styled _____ _____ shall be maintained as a class action on behalf of the following class of plaintiffs:

   [Describe class in objective terms to the extent possible. For example, "All persons and entities throughout the United States and its territories (other than widget manufacturers and entities owned or controlled by them) that, since _____[date]_____, have purchased widgets directly from any of the defendants or from any other widget manufacturer."]

   with respect to the following cause(s) of action:

   [Describe class claims as precisely as possible. For example, "Any claims for damages or injunctive relief under federal antitrust laws premised upon an alleged conspiracy among the defendants and other widget manufacturers to restrict competition in the manufacture, distribution, and sale of widgets by setting the minimum prices charged for widgets after _____[date]_____."]

2. *Class Representative; Class Counsel.* Subject to further order of the court, [A.B. Co.] is designated as class representative and [X.Y.] is designated as counsel for the class.

3. *Notice.*[1]

   (a) Class counsel shall by _____[date]_____, cause to be mailed in the name of the clerk by first class mail, postage prepaid, to all class members who can be identified through reasonable efforts, a notice written in

plain language and approved by the court. For illustrative examples of the form of such notices, see the Federal Judicial Center's Web site (www.fjc.gov) and go to the "Class Action Notices" page. In addition to class members identified through an examination of defendants' records, this notice will also be mailed to persons who are members of [National Widget Dealers Trade Association].

(b) Class counsel shall cause to be published in the _____ by _____[date]_____, a notice in substantially the same style and format as the illustrative summary notices posted on the "Class Action Notices" page of the Federal Judicial Center's Web site (www.fjc.gov).

4. *Exclusion.* The notice to class members must inform them as to how they may exclude themselves from the class.

5. *List of Class Members.* Class counsel will file with the clerk by _____[date]_____, an affidavit identifying the persons to whom notice has been mailed and who have not timely requested exclusion.

Dated: _____          _____
                                           United States District Judge

*Note:*

1. *See supra* section 21.311.

## 40.42 Order Setting Hearing on Proposed Class Settlement

[caption]

Order No. _____

    The court having preliminarily reviewed the proposed settlement of this action, it is ORDERED:

1. *Proposed Settlement.* The proposed settlement between the plaintiff class and the defendants appears to be within the range of reasonableness and accordingly shall be submitted to the class members for their consideration and for a hearing under Fed. R. Civ. P. 23(e).

2. *Hearing.* A hearing shall be held in Courtroom _____, United States Courthouse, _____[address]_____, at ____ a.m./p.m., on ____[date]____, to consider whether the settlement is fair, reasonable, and adequate and should receive the court's final approval.

    (a) Objections by class members to the proposed settlement will be considered if filed in writing with the clerk on or before _____[date]_____.

    (b) At the hearing, class members may be heard orally in support of or in opposition to the settlement, provided such persons file with the clerk by ___[date]___, a written notification of their desire to appear personally, indicating (if in opposition to the settlement) briefly the nature of the objection.

    (c) Counsel for the class and for the defendants should be prepared at the hearing to respond to objections filed by class members and to provide other information, as appropriate, bearing on whether or not the settlement should be approved.

3. *Notice.* The parties to the proposed settlement shall by _____[date]_____, cause to be mailed in the name of the clerk, by first class mail, postage prepaid, to members of the class [who did not timely elect to be excluded from litigation] a notice in plain language and in substantially the form of the Federal Judicial Center's Illustrative Notices, which can be found on the Class Action Notices page of the Center's Web site (www.fjc.gov). [Notice of the proposed settlement (and of the rights of class members to object to or opt out of the proposed settlement) shall also be given by publication in a summary form as illustrated on the Class Action Notices page of the Center's Web site.

        The notice should include information about attorney fees sought by attorneys for the class.[1]

Dated: _____        _____

                                       United States District Judge

*Note:*

    1. *See* Fed. R. Civ. P. 23(h)(1).

## 40.43  Combined Certification and Proposed Settlement Order

[caption]

Order No. _____

   In accordance with the findings and conclusions contained in the Opinion [omitted] filed concurrently, it is ORDERED:

1.  *Class Certification.*[1] Civil Action No. _____, styled _____ _____, shall be maintained as a class action on behalf of the following class of plaintiffs:

> [Describe class in objective terms to the extent possible. For example, "All persons and entities throughout the United States and its territories (other than [widget] manufacturers and entities owned or controlled by them) that, between _____[date]_____, and _____[date]_____, have purchased [widgets] directly from any of the defendants or any other [widget] manufacturer."]

with respect to the following cause(s) of action:

> [Describe class claims as precisely as possible. For example, "Any claims for damages or injunctive relief under federal antitrust laws premised upon an alleged conspiracy among [widget] manufacturers to restrict competition in the manufacture, distribution, and sale of [widgets] by setting the minimum prices charged for [widgets] between ____[date]____, and ___[date]___."]

2.  *Class Representative; Class Counsel.* [A.B. Co.] is designated as class representative and [X.Y.] is designated as counsel for the class.

3.  *Exclusion.* The notice to class members must inform them as to how they may exclude themselves from the class.

4.  *Proposed Settlement.* The proposed settlement between the plaintiff class and the defendants appears, upon preliminary review, to be within the range of reasonableness and accordingly shall be submitted to the class members for their consideration and for a hearing under Federal Rule of Civil Procedure 23(e). The terms of the settlement are as follows:

> _____[describe terms in clear, nontechnical manner]_____
> _____
> _____.

5.  *Hearing.* A hearing shall be held in Courtroom _____, United States Courthouse _____, at _____ a.m./p.m., on ____[date]____, to consider whether the settlement should be given final approval.

(a)  Objections by class members (who do not timely elect to exclude themselves from the class) to the proposed settlement should be considered if filed in writing with the clerk on or before _____[date]_____.

(b)  At the hearing, class members (who do not timely elect to exclude themselves from the class) may be heard orally in support of or in opposition to the settlement, provided such persons file with the clerk by _____[date]_____, a written notification of the desire to appear personally, indicating (if in opposition to the settlement) briefly the nature of the objection.

(c)  Counsel for the class and for the defendants should be prepared at the hearing to respond to objections filed by such class members and to provide other information, as appropriate, bearing on whether or not the settlement should be approved.

6.  *Notice*

(a)  Class counsel shall by _____[date]_____, cause to be mailed in the name of the clerk by first class mail, postage prepaid, to all class members who can be identified through reasonable efforts, a notice written in plain language and approved by the court. For illustrative examples of the form of such notices, see the Federal Judicial Center's Web site (www.fjc.gov) and go to the Class Action Notices page. A copy of a full notice combining certification and a proposed settlement and using asbestos litigation as an example (as it appeared on May 5, 2003) is reproduced as Attachment A.

In addition to class members identified through an examination of defendants' records, this notice will also be mailed to persons who are members of [National Widget Dealers Trade Association].

(b)  Class counsel shall cause to be published in the _____[publication]_____ by ____[date]____, a notice in substantially the same style and format as the illustrative summary notices posted on the Class Action Notices page of the Federal Judicial Center's Web site (www.fjc.gov). A copy of a summary publication notice using asbestos litigation as an example (as it appeared on May 5, 2003) is reproduced as Attachment B.

7.  *List of Class Members.* Class counsel will file with the clerk by ____[date]____, an affidavit identifying the persons to whom notice has been mailed and who have not timely requested exclusion.

Dated: _____          _____
                                                  United States District Judge

Attachments A & B: [See full asbestos notice and publication notice on the FJC Web page (www.fjc.gov).]

*Notes:*

   1.  When the parties propose a settlement before a class has been certified, the court should ordinarily determine whether the proposed class satisfies the requirements of Federal Rules of Civil Procedure 23(a) and (b) before directing notice to be sent to the class. *See supra* section 21.632.

## 40.44 Order Approving Settlement/Claims Procedure

[caption]

Order No. _____

   In accordance with the findings and conclusions contained in the Opinion [omitted] filed concurrently, it is ORDERED:

1.  *Approval of Settlement.* The settlement is, after hearing, determined to be fair, reasonable, and adequate. It is, therefore, approved.

2.  *Award of Fees and Expenses.* In accordance with the findings and conclusions contained in the Opinion [omitted], [X.Y.] is awarded $_____ as compensation and $_____ as reimbursement for expenses, to be paid [from the settlement fund] [by the defendants].[1] [Application for an award from the settlement fund of additional fees and expenses in connection with further proceedings, including administration and distribution of the settlement fund, may be made to the court.]

3.  *Administration and Distribution of Settlement Fund*

    (a)  *Investment.* [After payment of counsel fees and expenses as awarded by the court,] the settlement fund shall, pending distribution to class members, be held in interest-bearing investments to be approved by the court from time to time.

    (b)  *Allocation.* The [net] settlement fund shall be allocated among the class members in proportion to their "qualified purchase," which means the net price (after discounts and allowances) paid by them to [widget] manufacturers for [widgets] from _____[date]_____, to _____[date]_____.

    (c)  *Claims; proof of purchases.* Unless extended by the court (or the special master) class members shall have until _____[date]_____, to submit claims detailing, with appropriate supporting proof, their "qualified purchases."

    (d)  *Special master.*[2] _____ is appointed as special master under Fed. R. Civ. P. 53 to review, tabulate, and (as appropriate) audit claims made by class members. The special master shall establish procedures to resolve disputes regarding eligibility of persons to be members of the class and regarding the amount of "qualified purchases" by such persons. The findings and conclusions of the special master identifying the class members, their respective "qualified purchases," and their allocable shares of the settlement fund shall be reported to the court under Fed. R. Civ. P. 53(f) as soon as is practicable. Compensation and expenses of the special master will be paid from the settlement fund in such amount as the court may determine to be fair and reasonable.

    (e)  *Distribution.* The net settlement fund, with interest, shall be distributed to class members as soon as practicable after the amount to which each member

768

is entitled has been determined. Any funds remaining after distribution has been completed may be distributed as the court directs.

4. *Notice.* Class counsel shall by _____[date]_____, cause to be mailed in the name of the clerk by first class mail, postage prepaid, to members of the class [who did not timely elect to be excluded from litigation] a notice in plain language and in substantially the form of the Federal Judicial Center's Illustrative Notices, which can be found on the Class Action Notices page of the Center's Web site (www.fjc.gov). [Notice of the proposed settlement (and of the rights of class members to object to or opt out of the proposed settlement) shall also be given by publication in a summary form as illustrated on the Class Action Notices page of the Center's Web site.

The notice should include information about attorney fees sought by attorneys for the class.

5. *Reserved Jurisdiction of Court.* The court retains jurisdiction over the settlement of this case and may enter additional orders to effectuate the fair and orderly administration of the settlement as may from time to time be appropriate, including the determination of persons to whom payment should be made in the event of death or dissolution and the right to set aside a portion of the net settlement fund not exceeding [$_____] [_____% of the net fund] as a reserve for late claims and other contingencies and to determine the appropriate disposition of any portion of the reserve not distributed to the class members.

Dated: _____        _____
                                        United States District Judge

*Notes:*

1. This assumes that an application for attorneys' fees was heard concurrently with the hearing on approval of the settlement. A joint hearing is recommended as an efficient and economical way to satisfy the notice requirement of Fed. R. Civ. P. 23(h)(1).

2. These sample forms contain provisions generally suitable if a special master is appointed to administer the settlement. In other cases, use of a claims committee or magistrate judge may be appropriate.

# 40.5  Orders in Special Cases

.51 Coordinating Proceedings in Different Courts  770
.52 Mass Tort Case-Management Order  773
.53 CERCLA Case-Management Order  779
.54 Civil RICO Case-Statement Order  783

## 40.51  Coordinating Proceedings in Different Courts

[caption]

Order No. _____

It appearing that [the above-styled cases] [the cases listed on Attachment _____] share common issues with, and will involve common discovery with, certain cases pending in _____[list other court(s)]_____ (the "related actions"), and that pretrial proceedings in all these cases should be coordinated to avoid unnecessary conflicts and expense, conserve judicial resources, and expedite the disposition of all the cases, this court, after having consulted with counsel [and being advised that similar orders will be entered in such other court(s)[1]], ORDERS:

1.  Designated Counsel[2]

    (a)  *Plaintiffs' Lead and Liaison Counsel.* _____ and _____ are designated as plaintiffs' lead counsel and plaintiffs' liaison counsel, respectively, in this court, with the responsibilities prescribed in [Attachment _____] [see section 40.21, paragraphs 1 and 2]. They may serve in similar capacities in the related cases if so authorized or permitted by the courts in which such cases are pending and, in any event, shall endeavor to coordinate activities in these cases with those in the related cases.

    (b)  *Defendants' Liaison Counsel.* _____ is designated to serve as defendants' liaison counsel with the responsibilities prescribed in [Attachment _____] [see section 40.21, paragraph 4]. Defendants' liaison counsel may serve in a similar capacity in the related cases if so authorized or permitted by such courts and, in any event, shall endeavor to coordinate activities in these cases with those in the related cases.

    (c)  *Compensation.* Attorneys designated as lead or liaison counsel by this court and the other courts shall be entitled to reasonable compensation and reimbursement of expenses for services performed in such capacities, equitably apportioned among the parties in these and the related cases benefiting from such services. This court will cooperate with the other courts in making appropriate orders for such compensation and reimbursement if agreement

cannot be reached between such counsel and the parties for whom they are acting.

2. Discovery[3]

    (a) *Joint Document Depositories.* The document depositories prescribed in [Exhibit _____] [see section 40.261] shall be established for the joint use of parties in these related cases. [Subject to agreement regarding the sharing of expenses,] counsel in the related cases shall have access to the documents in such depositories to the same extent as counsel in the cases in this court. Parties will not make new requests for production of documents in these proceedings if such documents have already been produced and are available to them in the related cases.

    (b) *Confidential Documents.* Counsel in the related cases shall have access to confidential documents produced under the confidentiality order entered in this court [see, e.g., section 40.27] on the same terms and conditions as counsel in the cases in this court. Counsel in the cases in this court obtaining access to documents marked confidential under similar orders entered in other courts shall be subject to the terms and conditions of such orders.

    (c) *Depositions.* Depositions of persons whose testimony will likely be relevant both in these cases and in the related cases should ordinarily be cross-noticed for use in all such cases. [The parties in the cases before this court are directed to show cause within 60 days why the depositions previously taken in the related cases should not be usable in this court, subject to the right to conduct supplemental examination on a showing of need.]

3. *Consistency of Rulings.* To avoid unnecessary conflicts and inconsistencies in the rulings of this and the other courts on matters such as discovery disputes and scheduling conflicts,

[Alternate 1—Deferral to Prior Rulings]

This court will adopt a ruling already made on such matters by another court in a related case unless a different ruling is shown to be mandated by the laws and rules governing this court or justified by particular circumstances of the cases before this court.

[Alternate 2—Lead Case]

Such disputes will initially be presented in case no. _____, pending in _____[name of court]_____, and the ruling made in that case will be given effect in all [other] cases in this court unless a different ruling is shown to be [mandated by the laws and rules governing this court or] justified by particular circumstances of such cases.

[Alternate 3—Joint Special Master]

_____ is appointed under Fed. R. Civ. P. 53(a)(1)(C) to serve as Special Master in these cases (and, under similar appointments by the other courts, in the related cases) (1) to assist the respective courts in preparing and monitoring schedules and plans for coordinated conduct of discovery and

other pretrial proceedings; (2) to recommend to the respective courts appropriate resolution of discovery disputes, including controversies regarding limitations on the scope or form of discovery and questions regarding claims of privilege and confidentiality; and (3) to facilitate proper cooperation and coordination among counsel.

[Alternate 4—Joint Hearings]

This court will be prepared to conduct consolidated hearings and pretrial conferences with judges of the courts where related cases are pending and to enter joint rulings (except to the extent differences may be mandated by different laws or rules governing the courts or justified by special circumstances in the various cases).

4.  *Other Litigation.* Upon application, these provisions may be ordered applicable to cases involving the same common issues subsequently filed in other courts.


Dated: _____        _____
                                         United States District Judge

Attachments [omitted]

*Notes:*

   1.  The terms of coordination between the affected courts should ordinarily be arranged—either by direct consultation between the judges of the courts or indirectly through counsel—before this type of order is entered, and, if feasible, parallel orders should be entered by the various courts. *See supra* sections 20.14, 20.31. References to coordinated proceedings have also been incorporated in several forms. *See, e.g., supra* sections 40.29 and 40.3.

   2.  This form provides for appointment of lead counsel and liaison counsel for plaintiffs, but only liaison counsel for defendants. In some cases, the same organizational structure will be appropriate both for plaintiffs and for defendants.

   3.  Depending on the circumstances, it may be appropriate to condition access to discovery materials either on a reciprocal obligation or on payment of fair compensation for a share of the services involved in gathering the information. See section 20.312 for a discussion of mechanisms for allocating compensation among federal and state litigants. For examples of orders allocating fees among federal and state attorneys based on a coordinated approach, see *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation*, Pretrial Order No. 467 (E.D. Pa. Feb. 10, 1999). *See also In re* Baycol Prods. Liab. Litig., MDL No. 1431, Pretrial Order No. 25 (D. Minn. June 5, 2002).

# 40.52 Mass Tort Case-Management Order

[caption]

Order No. _____
(Standard Procedures)[1]

It appearing that [the above-styled cases] [cases listed in Attachment _____] involve claims of death, personal injury, economic damages, punitive damages, and other claims of damage arising as a result of [exposure to] [use of] [_____ products] [the incident occurring at _____ on ____[date]____] and that other similar actions may be filed in or transferred to this court in the future, the court ORDERS:

1. *Filing of Order.* A copy of this order shall be filed in each such case. In cases subsequently filed, a copy will be provided by the clerk to each plaintiff at the time of the filing of the complaint and will be served with the complaint on any defendant not previously a party in these cases. [In cases subsequently removed or transferred to this court, a copy will be provided by the clerk to each new party upon removal or transfer.]

2. *Pretrial Consolidation.* All cases in this litigation are consolidated for pretrial purposes. This is not a determination that any of these actions should be consolidated for trial.

3. *Types of Cases.* By order of the Judicial Panel on Multidistrict Litigation (MDL Panel), numerous proposed class actions to remedy economic injuries alleged to have been caused by __[insert product name]__ have been transferred to this court for coordinated pretrial proceedings. These cases and any proposed class actions that are subsequently filed or transferred to or filed in this proceeding are referenced as Class Action Cases.

   Numerous individual personal injury and wrongful death cases have also been transferred to this court for coordinated pretrial proceedings. These cases and any additional personal injury/wrongful death cases, brought on behalf of individual claimants, filed in or transferred to this court are referenced as "Personal Injury Cases." [Insert and define any additional types of cases that are distinct and may call for separate management.]

4. *Presentation of Test Case Remand Motions.* Plaintiffs' liaison counsel  in personal injury cases shall consult with plaintiffs' counsel and identify for the court no more than _____ [e.g., five] cases in which motions for remand to state court based on an arguable absence of federal subject-matter jurisdiction have been filed or are expected to be filed. These remand motions should, as nearly as possible, be representative of the various remand issues raised in the personal injury cases in this MDL litigation. In addition, plaintiffs' counsel may identify one case in which a motion to remand the case to the transferor court for trial has been made. Plaintiffs' Liaison Counsel  shall submit to the court by ___[date]___ the names and indi-

vidual case docket numbers of the cases identified as representative of the remand issues in this MDL proceeding. The court will set a schedule for briefing or supplemental briefing of the remand motions in those cases and place these motions on an expedited schedule for decision.

5. *Filing Papers with the Court.* The purpose of the following instructions is to reduce the time and expense of duplicate filings of documents through use of a master case file, while at the same time not congesting the master case with miscellaneous pleadings and orders that are of interest only to the parties directly affected by them. It is not intended that a party lose any rights based on a failure to follow these instructions.

   (a) *Master Docket and File.* The clerk will maintain a master docket and case file under the style "*In re* _____ Product Liability Litigation (MDL-XXXX)" as master file number [CV NN-1000-X]. Orders, pleadings, motions, and other documents bearing a caption similar to that of this order will, when docketed and filed in the master case, be deemed to have been docketed and filed in each individual case to the extent applicable and will not ordinarily be separately docketed or physically filed in such individual cases. However, the caption may also contain a notation indicating whether the document relates to all cases or only to specified cases.

   (b) *Separate Filing.* A document that relates only to a specific case and would not be of interest except to the parties directly affected by it—such as an amended complaint adding a party or a motion to dismiss a party—should bear the caption and case number of that case rather than of the master case file. Such a document will be docketed and filed in that case and not in the master case file. Please note that cases removed or transferred to this court are assigned a new case number in this court.

   (c) *Leave to Add Parties.* Until otherwise directed, plaintiffs are granted leave, without need for any special motion or order, to add other plaintiffs to any pending (or subsequently filed, removed, or transferred) case if all plaintiffs in the case (1) will be represented by the same counsel (or if counsel for existing plaintiffs consent to the intervention), (2) are suing the same defendants, and (3) [were exposed to defendants' products] in the same state. The purpose of this authorization is to avoid unnecessary filing fees and the delays inherent in 28 U.S.C. § 1407 transfers. The joinder of such parties will not be viewed as affecting subsequent motions by either plaintiffs or defendants for separate trials under Federal Rule of Civil Procedure 42(b).

6. *Master Pleadings, Motions, and Orders*

   (a) *Master/Sample Complaints.* Plaintiffs' steering committee has filed in this district [CV NN-10000-X]:

      (1) a master complaint containing allegations that would be suitable for adoption by reference in individual cases,

      (2) a sample complaint illustrating how allegations from the master complaint can be incorporated into an individual case, and

(3)   a master class action complaint containing allegations that encompass
the entire range of allegations and types of proposed class actions con-
tained in individual cases filed in this court or transferred to this court by
the MDL panel.

The allegations of the master complaint and the master class action complaint
are not deemed automatically included in any particular case. However, in
order to avoid possible problems with statutes of limitations or doctrines of
repose, it shall be deemed (except to the extent a plaintiff thereafter files an
amended complaint disavowing such claims and theories or limits its claims
and theories to those contained in an amended complaint) that, as of this
date, for cases now pending in this court (or as of the date other cases are filed
in, removed to, or transferred to this court) a motion is filed in each such case
to amend the complaint to add any potentially applicable claims and theories
from the master complaint not contained in the complaint actually filed in
that case.

(b)   *Master Answers.* By _____, each entity listed below will file in
[CV NN-1000-X] a master answer that incorporates its defenses in law or fact
to claims made against it in the various actions that are presently pending in
this litigation, including any cross-claims it makes against other defendants.
The answer will not attempt to provide a cross-reference to particular para-
graphs or counts of the various complaints. The answer will, however, in a
"generic" manner admit or deny (including denials based on lack of informa-
tion and belief) the allegations typically included in claims or cross-claims
made against it as well as make such additional allegations as are appropriate
to its defenses or cross-claims. This may be done through allegations such as
"It alleges that it is incorporated in State A; that it has its principal place of
business in State B; that during the period from (date) to (date) it manufac-
tured, sold, and distributed products intended to be used in _____; that
these products were intended to be used only by trained, knowledgeable
_____ and were accompanied by warnings and instructions that ade-
quately explained such risks as were inherent and unavoidable in the prod-
ucts; that these products were not unreasonably dangerous, were suitable for
the purposes for which they were intended, and were distributed with ade-
quate and sufficient warnings; that it is without knowledge or information at
this time sufficient to form a belief as to any averment that one of its products
was used in the procedure on which the plaintiff's complaint is based; that to
the extent the plaintiff makes a claim for X (or under statute Y) it is not liable
because _____; etc."

(1)   When so filed in [CV NN-1000-X], these answers constitute an answer in
each constituent case now pending or when hereafter filed in, removed
to, or transferred to this court except to the extent the defendant later
files a separate answer in an individual case.

    (2)  A defendant not listed below may also file a master answer in [CV NN-1000-X] by ___[date]___, or within 45 days after the first case in which it is named as a defendant is filed in, removed to, or transferred to this court.

  (c)  *Refinement of Pleadings.* It is anticipated that an amended, more specific complaint and answer may be required before a case is scheduled for trial or remanded to a transferor court, but amendments of pleadings prior to that time should generally be avoided.

  (d)  *Motions; Orders.* A motion, brief, or response that has a potential effect on multiple parties (e.g., documents submitted in connection with a motion for partial summary judgment asserting that punitive damages are not recoverable with respect to [the product's use] in State A) will be deemed made in all similar cases on behalf of, and against, all parties similarly situated except to the extent such other parties timely disavow such a position. Additional motions, briefs, or responses addressed to such issues should not be filed or submitted by other parties except to the extent needed because of inadequacy of the original papers, to present unique facts, or because of a difference in positions. Orders resolving such motions will likewise be deemed as made with respect to all parties similarly situated unless the order indicates otherwise.

7.  *Service of Original Complaints; Amendments Adding Parties*

  (a)  *Acceptable Service.* Exhibit _____ is a list of the "National Defendants"—that is, those entities that have frequently been named as defendants in these cases filed throughout the United States—with the name and address of their national counsel and information provided by national counsel indicating the state(s) in which they are incorporated, in which they have their principal place of doing business, and in which they will or may contest personal jurisdiction. To eliminate disputes over service of process and reduce the expense of such service, these defendants [have agreed] [shall inform the court within ____ days as to whether or not they agree] to accept service of process in these cases (without, however, waiving any objections to personal jurisdiction or venue) if a copy of the summons and complaint is sent, by certified mail, return receipt requested, to the person or address shown in Exhibit _____. Defendants' agreement [report to the court] should indicate whether it applies to any case involving __[insert product]__ claims filed in any federal district court or in any state court of general jurisdiction.

  (b)  *Extension of Time to Serve.* Notwithstanding Fed. R. Civ. P. 4(m), plaintiffs shall have thirty days after the date of this order (or, if later, thirty days after the date a case is subsequently filed in, removed to, or transferred to this court) in which to effect service on defendants.

8.  *Motions*

  (a)  *Meet and Confer.* To avoid unnecessary litigation concerning motions, including motions relating to discovery disputes, counsel are directed to meet and confer before filing a motion. In any motion filed, counsel for the moving party must certify that a good-faith effort was made to resolve the dispute.

(b) *Motions Under Federal Rules of Civil Procedure 11, 12, and 56.* No motion shall be filed under Rule 11, 12, or 56 without leave of court.

9. *Inactive [Product] [Incident] Docket.* The purpose of this paragraph is to establish a procedure for separating cases in which the plaintiff has little or no physical impairment from cases with more serious impairments to assist the court in establishing priorities for managing its docket. The intent is to toll the operation of any applicable statutes of limitation or repose while a case is listed as inactive. The clerk shall establish a separate file called the "Inactive [product] [incident] Docket," which shall consist of (1) cases voluntarily dismissed pursuant to a general stipulation prepared by plaintiffs and defendants that sets forth their agreement that such cases can be revived if specific conditions are met, and (2) claims initiated by a "Notice of Claim" procedure. To invoke the notice procedure, a claimant must file an "Affidavit of Notice of Claim" that includes (1) the name(s), address(es), and marital status of the claimant(s); (2) a brief statement of circumstances of claimant's exposure(s) to the [product] [incident giving rise to the common claims]; (3) a statement of the nature of the injury, disease, or condition alleged to have been caused by the [product] [incident]; and (4) the names of the entities to be given notice and whom the claimant proposes to serve.

Upon certification of the claimant(s) that notices have been sent to all listed defendants in the manner set forth in the stipulation of agreement signed by plaintiffs' and defendants' representatives, the claims shall be recorded on the inactive docket.

The filing of the Notice of Claim or the voluntary dismissal pursuant to the stipulation shall toll all applicable statutes of limitation or repose regarding any claims of the plaintiff or plaintiff's spouse, children, dependents, heirs, or estates arising relating to the exposure to [product] [incident]. Claims may be removed from the inactive docket at any time by the filing and serving of a complaint. Signing the stipulation referred to above signifies the consent of each signing party to this procedure and to the tolling of the statutes of limitations or repose as described above.

10. *Settlement*

[Insert any special provisions to facilitate settlement, such as appointment of a settlement judge or special master to assist the parties, a timetable for scheduling settlement conferences, or procedures for using arbitration, minitrials, or summary jury trials. Also include any provision for contributions by later-settling parties to compensate designated counsel for services previously rendered.]

11. *Discovery*

[In addition to the orders presented below, see separate discovery orders in section 40.25 through 40.29.]

(a) *Plaintiff Fact Sheets.*[2] Each plaintiff whose case has been transferred to this court shall have _____ days from the entry of this order to complete and serve on defendants a plaintiff fact sheet and an authorization for release of medical records. Counsel shall meet and confer to agree on an electronic format for completion of the Fact Sheet. Transferred plaintiffs shall have ___ days from

the date of this order to produce all documents requested in the fact sheet. When defendants notify the MDL panel of additional cases for transfer to this court, defendants shall serve plaintiffs in those cases with a copy of this order. The information contained in the plaintiff fact sheet must be verified under oath. Plaintiffs' responses will be treated as answers to interrogatories under Fed. R. Civ. P. 33 and requests for production of documents under Fed. R. Civ. P. 34 and must be supplemented in accordance with Fed. R. Civ. P. 26.

(b) *Document Requests.* Within _____ days of entry of this order, plaintiffs must serve on defendants a master set of requests for production of documents. Any objections [that have not been dealt with in other cases in this litigation] to those document requests must be served within _____ days after receipt of the requests. Defendants will begin producing documents not subject to objection on a rolling basis upon entry of this order. The parties will meet and confer regarding a schedule for the orderly production of different categories of documents. The parties will seek to coordinate this schedule with document productions in pending state court proceedings.

(c) *Expedited Discovery.* Expedited discovery of plaintiffs and plaintiffs' health care providers will be allowed when all of the following condition exist:

1. the plaintiff or a member of plaintiff's immediate family is terminally ill;

2. there is an urgent need to record and preserve the testimony because of the gravity of the illness; and

3. plaintiff has fully completed the plaintiff fact sheet and provided the execution of medical authorizations required in the fact sheet and defendants have had a reasonable opportunity to conduct informal discovery prior to the taking of a deposition.

Dated: _____        _____

United States District Judge

*Notes:*

1. *See supra* section 22.2.

2. For examples of plaintiff fact sheets, see *In re Baycol Products Litigation*, MDL 1431, Pretrial Order No. 10 (D. Minn. Mar. 18, 2002) and *In re Phenylpropanolamine (PPA) Products Liability Litigation*, MDL No. 1407, Case Management Order No. 6 (W.D. Wash. Mar. 21, 2002).

## 40.53 CERCLA Case-Management Order

[caption]

Order No. _____

It is ORDERED:

1. *Limited Consolidation.* Until further order of the court, the above-captioned actions, Civil Action No. _____ and Civil Action No. _____ (collectively, the "Actions"), are consolidated before the undersigned for the limited purposes of coordinated case management and discovery.

2. *Lodging of the Administrative Record; Stay of Administrative Record Discovery.* On or before _____[date]_____, plaintiff, the United States of America, will lodge with the court the administrative record developed by the Environmental Protection Agency ("EPA") in connection with the initial Remedial Investigations and Feasibility Studies (RI/FS) for the _____
Landfill (the "Landfill"); on or before _____[date]_____, _____ _____ plaintiff, the United States of America, will lodge with the court the administrative record developed by the EPA in connection with the record of decision (including the Supplemental Feasibility Study). No discovery shall be permitted at this time as to what documents constitute or will constitute these administrative records until further Order of the court.

3. *Temporary Stay of Counterclaims, Cross-Claims, and Third-Party Claims.* Until _____[date]_____, the date established herein for the second case-management conference, no counterclaims, cross-claims, or third-party claims in either of the Actions, and no claims related to the Landfill by defendants in one of the Actions against defendants in the other of the Actions, shall be filed. The stay as to counterclaims and third-party claims shall be addressed at the second case-management conference. All counterclaims, cross-claims, or third-party claims filed prior to the entry of this order are stayed until the second case-management conference.

4. *Filing of Claims.* At the second case-management conference, scheduled herein, the court will establish a schedule for filing of the claims referred to in paragraph 3. Nothing in this order shall prejudice the right of any defendant in either of the Actions to assert any such claims, nor shall any such claims be barred by laches or by any statute of limitations by virtue of the delay in filing such claims required by this order.

5. *Realignment of Pleadings.* The United States of America, in Civil No. _____, and the State Department of Environmental Protection, in Civil No. _____, are hereby granted leave to file amended complaints, not later than _____[date]_____,without the necessity of a motion. The purposes of these amended complaints are to cure misnomer problems; to add defendants; to dismiss defendants already named, without prejudice; to conform the defendants named in the two amended com-

plaints to the degree that the plaintiffs deem appropriate; and to clarify the causes of action, demands, and relief sought in the amended complaints to the degree that the plaintiffs deem appropriate. Existing defendants who have already answered or otherwise responded to the complaint need not answer or otherwise respond to the amended complaint unless they choose to do so. All other defendants shall answer or otherwise respond within the time provided in the Rules.

6.  *Joinder of New Parties.* Except as provided herein or by subsequent order, no party may join an additional party in this case. The joinder of new parties may occur through the amendment of the complaints (see _____ above), or by the coordinated efforts of the defense litigation committee to be formalized by the defendants. The defense litigation committee will serve as a clearinghouse for information pertinent to identifying new parties through coordinated discovery efforts. Discovery with respect to joining new parties is discussed in paragraphs _____ below. No later than _____[date]_____, the defense litigation committee shall have assembled a list of new parties whose joinder will be considered at the second case-management conference on _____[date]_____.

    To the extent feasible, this listing shall be selective, seeking joinder of parties with a relatively higher degree of alleged responsibility and continuing viability, and avoiding joinder of parties with a relatively lower degree of alleged responsibility or which are of doubtful viability. It is anticipated that leave to file a consolidated third-party complaint joining the new parties in an orderly fashion, and leave for individual defendants to file contractual indemnification claims, will be granted at the second case-management conference. [There will be an additional opportunity to join further new parties in the future as the cases unfold.]

7.  *Amendments.* The goal of the amended complaints and the consolidated third-party complaint is to have a more unified and orderly set of pleadings and joinders so that these Actions may go forward expeditiously.

8.  *Scope of Discovery.* Discovery shall be limited at present to the following issues:

    (a)  Identification of new parties.

    (b)  Quantity, quality, and nexus of parties' wastes to the _____ _____ Landfill.

    [It is anticipated that parties providing full discovery on these issues and believing themselves to have no nexus of hazardous wastes to the Landfill will be permitted to seek summary judgment in the near future.]

    No discovery is permitted at this time regarding issues of "release or threatened release" at the Landfill, or of "the incurring of response costs consistent with the NCP at the Landfill." Enlarging discovery to these issues, and the precise extent, timing, and appropriateness of summary judgment motion practice relating to some or all liability issues, will be considered at the second case-management conference, following lodging of the administrative records under _____, above.

Forms of Discovery

9.  *Document Production.* Production of documents shall be coordinated and go forward promptly and responses shall be served within _____ days of service. The deposition of representatives of the EPA, the DEP [State Department of Environmental Protection], or a defendant shall not go forward until that party has responded to the document production request upon it.

10. *Depositions.* Depositions are permitted at this time only with respect to the issues of identification of new parties and quantity, quality, and nexus. Such depositions may be taken, on these issues, of existing parties and nonparties, except that no depositions of representatives of the EPA or the DEP or of a defendant are permitted until that party has timely responded to the document production request upon it. Scheduling of depositions on behalf of defendants will be coordinated between the plaintiffs and the defense litigation committee, endeavoring to conduct not more than one deposition at a time.

11. *Procedure for Scheduling Depositions*

    ***

12. *Interrogatories to Plaintiffs.* The plaintiffs shall serve certified responses to a common set of interrogatories, derived from the set of interrogatories served by _____ on behalf of fourteen defendants, pertaining to quantity, quality, nexus, and identification of additional parties, within _____ days after service, to the same extent as if served on behalf of all _____ defendants in the United States case and all _____ defendants in the state case. All other interrogatories are stricken, without prejudice, and need not be answered.

13. *Interrogatories to Defendants.* The plaintiffs may propound a set of common interrogatories on the above issues upon each of the defendants, each of whom shall serve certified responses to same within ____ days after service.

14. *Requests for Admission.* Requests for admission shall not be served until further order of the court, to be discussed at the second case-management conference.

15. *Liaison Counsel for Defendants.* The court recognizes the defendants' selection of _____, _____, as liaison counsel for defendants with respect to communications from the court to the defendants.

16. *Service List.* Liaison counsel for the defendants shall prepare and promptly file with the clerk the service list containing the names, addresses, and telephone and facsimile numbers of attorneys appearing in this case and of unrepresented parties.

17. *Cooperation Among Defendants; Defense Litigation Committee.* Cooperation efforts among defendants in the Actions for the purpose of coordinating discovery, trial, counsel, or otherwise minimizing expenses in the Actions are being conducted at the direction of the court for its convenience in the resolution of the Actions and they shall not constitute evidence of conspiracy, concerted action, or any other wrongful conduct in this or any other proceeding. The defendants are hereby directed to take reasonable steps to eliminate duplication of effort and redundant

781

discovery. The defendants have also informed the court that they have selected and will continue to organize a defense litigation committee, the duties of which shall be better defined before the interim status conference on _____[date]_____ at _____.

18. *Privileges Preserved.* All information and/or documents exchanged among the defendants in the Actions shall be communicated for the limited purpose of assisting in a common defense in this litigation only, and such exchange shall not constitute a waiver of any attorney–client work product, trade secret, or other privilege. All discussions will be treated as not admissible into evidence in accordance with the terms of Fed. R. Evid. 408.

19. *Cooperation Between Plaintiffs and Exchange of Information.* Exchange of information and/or documents between the plaintiffs relating to the prosecution of these actions is communication for the limited purpose of assisting in a common cause and shall not constitute a waiver of whatever attorney–client, work product, enforcement-sensitive, or any other privilege, if any, may apply.

20. *Preservation of Documents.* All parties and their counsel are hereby directed to preserve any information in their possession, custody, or control that constitutes or contains material or information that may be relevant in these Actions. All parties and their counsel are directed to take all reasonable steps to communicate the requirements of this provision to the individuals employed by that party who must know of this provision in order for it to be effective. Plaintiffs shall instruct their RI/FS contractors and subcontractors (and any other of plaintiffs' contractors and subcontractors) to preserve all such information.

Dated: _____            _____
                                                    United States District Judge

# 40.54 Civil RICO Case-Statement Order[1]

[caption]

Order No. _____

It is ORDERED:

The proponent of the civil RICO claim shall file and serve [within _____ days of _____] a case statement that shall include the facts relied on to initiate the RICO claim. In particular, the statement shall use the numbers and letters set forth below, unless filed as part of an amended and restated pleading (in which latter case, the allegations of the amended and restated pleading shall reasonably follow the organization set out below), and shall state in detail and with specificity the following information:

1.  State whether the alleged unlawful conduct is in violation of 18 U.S.C. §§ 1962(a), (b), (c), and/or (d). If you allege violations of more than one section 1962 subsection, treat each as a separate RICO claim.

2.  List each defendant, and state the alleged misconduct and basis of alleged liability of each defendant.

3.  List the alleged wrongdoers, other than the defendants listed above, and state the alleged misconduct of each wrongdoer.

4.  List the alleged victims, and state how each victim allegedly was injured.

5.  Describe in detail the pattern of racketeering activity or collection of an unlawful debt alleged for each RICO claim. A description of the pattern of racketeering activity shall:

    (a)  list the alleged predicate acts and the specific statutes allegedly violated by each predicate act;

    (b)  state the dates of the predicate acts, the participants in the predicate acts, and a description of the facts surrounding each predicate act;

    (c)  if the RICO claim is based on the predicate offenses of wire fraud, mail fraud, fraud in the sale of securities, or fraud in connection with a case under Title 11 of the U.S. Code, the "circumstances constituting fraud or mistake shall be stated with particularity," Fed. R. Civ. P. 9(b) (identify the time, place, and contents of the alleged misrepresentation or omissions, and the identity of persons to whom and by whom the alleged misrepresentations or omissions were made);

    (d)  describe in detail the perceived relationship that the predicate acts bear to each other or to some external organizing principle that renders them "ordered" or "arranged" or "part of a common plan"; and

(e)   explain how the predicate acts amount to or pose a threat of continued criminal activity.

6.   Describe in detail the alleged enterprise for each RICO claim. A description of the enterprise shall

(a)   state the names of the individuals, partnerships, corporations, associations, or other entities allegedly constituting the enterprise;

(b)   describe the structure, purpose, roles, function, and course of conduct of the enterprise;

(c)   state whether any defendants are employees, officers, or directors of the alleged enterprise;

(d)   state whether any defendants are associated with the alleged enterprise, and, if so, how;

(e)   explain how each defendant participated in the direction of the affairs of the enterprise;

(f)   state whether you allege [(i) that the defendants are individuals or entities separate from the alleged enterprise, or (ii) that the defendants are the enterprise itself, or (iii) that the defendants are members of the enterprise]; and

(g)   explain, if you allege any defendants to be the enterprise itself or members of the enterprise, whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.

7.   State whether you allege, and describe in detail, how the pattern of racketeering activity and the enterprise are separate or have merged into one entity.

8.   Describe the alleged relationship between the activities and the pattern of racketeering activity. Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.

9.   Describe what benefits, if any, the alleged enterprise and each defendant received from the alleged pattern of racketeering activity.

10.   Describe the effect of the activities of the enterprise on interstate or foreign commerce.

11.   If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:

(a)   state who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and

(b)   describe the use or investment of such income.

12.   If the complaint alleges a violation of 18 U.S.C. § 1962(b), provide the following information:

(a)   describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise; and

(b)   state whether the same entity is both the liable "person" and the "enterprise" under section 1962(b).

13. If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:

    (a) state who is employed by or associated with the enterprise; and

    (b) state whether the same entity is both the liable "person" and the "enterprise" under section 1962(c).

14. If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe in detail the alleged conspiracy.

15. Describe the alleged injury to business or property.

16. Describe the relationship between the alleged injury and violation of the RICO statute.

17. List the damages sustained by reason of the violation of section 1962, indicating the amount for which each defendant allegedly is liable.

18. Provide any additional information you feel would be helpful to the court in processing your RICO claim.

Dated: _____          _____
                                              United States District Judge

*Note:*

   1.  This order has been designed to establish a uniform and efficient procedure for deciding civil actions containing claims made pursuant to 18 U.S.C. §§ 1961–1968 ("civil RICO").

## 40.6  Sample Final Pretrial Orders

For examples of comprehensive pretrial orders and final pretrial orders, see Judicial Conference of the United States, *Civil Litigation Management Manual* 188–207 (Sample Form 9); 257–68 (Sample Form 25); 299–357 (Sample Forms 35–41; and 361–75 (Sample Form 44) (2001). The *Civil Litigation Management Manual* and all of the forms are available at http://www.fjc.gov (last visited Nov. 10, 2003).

## 40.7  Jury Questionnaire

For examples of jury questionnaires and orders relating to jury management, see Judicial Conference of the United States, *Civil Litigation Management Manual* 358–60 (Sample Forms 42 & 43) and 376–82 (Sample Forms 45 & 46) (2001). The *Civil Litigation Management Manual* and all of the forms are available at http://www.fjc.gov (last visited Nov. 10, 2003).

# Index

(All references in index are to section numbers.)

admissibility
  computerized data, 11.446, 32.43
  depositions, 11.445, 11.455
  early hearings, 11.34, 11.642
  exhibits/documentary evidence, 11.445, 11.642
  expert opinions, 11.48
  foundation for, 11.445
  governmental investigations, 11.491
  requests for admissions, 11.445
  stipulations of authenticity, 11.445
  stipulations of fact, 11.471

affidavits
  limits on length, 11.32
  summary judgment, 11.34

alternative dispute resolution, 13.15, 20.313, 21.142, 21.5, 22.541, 22.71, 22.91, 34.21, 34.292

"American Rule," *see* attorney fees

antitrust, 30
  conflicts of interest, 30.3
  data gathering, 30.2
  expert opinion, 30.2
  related proceedings, 30.4

appeals, *see* judgments and appeals

attorney–client privilege, *see* privileges

attorney fees, 14
  "American Rule," 14.11, 14.121
  class actions,  21.7
  common-fund, 14.12
  discovery, 14.224
  documentation and evidence supporting, 14.223
  eligibility, 14.1
  guidelines and ground rules, 14.21
  hearings, 14.232
  lodestar, 14.122
  mass torts, 22.927
  motion for, 14.22
  motions, content of, 14.221
  percentage-fee, 14.121
  records, maintaining, 14.213
  review
    court of appeals, 14.121
    district court, 14.231
  staffing, 14.212

*Manual for Complex Litigation, Fourth*

attorney fees *(continued)*
    statutory-fee, 14.13
    timing, 14.222

attorneys, *see* counsel

bankruptcy
    adversary proceedings, 10.123, 20
    coordination with related litigation, 10.123
    mass tort litigation, 22.5
        appeals, 22.533
        automatic stay, 22.541, 22.545
        consolidation of claims, 22.512, 22.54
        estimating the value of tort claims, 22.56
        future claimant representation, 22.55
        MDL transferee judge's role, 22.511, 22.531
        roles of district and bankruptcy judges, 22.52, 22.53
        withdrawing the reference, 22.52

bellwether/test trial, *see* trial

CERCLA (Superfund), 34
    allocation, 34.291
    case management, 34.2
    consent decrees, 34.293
    costs, response, 34.12
    counsel, organizing, 34.24
    damages, 34.12
    discovery, 34.28
    document management, centralized, 34.25
    experts, 34.29
    issues, narrowing, 34.26
    joinder, 34.27
    liability, 34.12
    magistrate judges, 34.22
    related cases, 34.23
    remedy, 34.12
    response costs, 34.12
    settlement, 34.292
    special masters, 34.22
    statutory framework, 34.11
    trial, 34.294

civil RICO, 35
    case management, 35.3
    discovery, 35.33
    initial conference, 35.32
    motion practice, 35.34
    pleadings, 35.31
    statutory framework, 35.2
    trial, 35.35

*Index*

class actions, 21
    attorney fee awards
        approval criteria, 21.71
        reviewing fee requests, 21.72
    case management, 11.213, 21.4
        discovery, 21.41
        relationship with other cases, 21.42
    certification
        deciding motion, 21.2
        effect of multiple cases, classes, 21.25
        hearings, orders, 21.21
        interlocutory appeals of, 21.28
        timing, 21.133
    certification standards, 21.13
        litigation class, 21.131
        settlement class, 21.132
    class counsel
        criteria for appointment, 21.271
        procedures for appointment, 21.273
        selecting, 21.272
    class representatives, appointing, 21.26
    communications with class members
        among parties, counsel, class members, 21.33
        from class members, 21.32
        notices, 21.31
        precertification, 21.12
    conference, initial, 11.213
    defining class, 21.22
    discovery, precertification, 21.14
        Rule 23(a) requirements, 21.141
        Rule 23(b) requirements, 21.142
    discovery, postcertification, 21.41
    in particular types of cases
        civil RICO, 35.1
        employment discrimination, 32.42
        securities, 31.31, 31.5
    initial case-management orders, 21.11
    issues classes, 21.24
    limited fund settlement, 21.132
    notices
        class certification, 21.311
        settlement, 21.312
    relationship with pending cases, precertification, 21.15
    settlements
        claims administrator, 21.661
        class counsel, 21.641
        class representatives, 21.642
        conditional settlements, 21.652
        criteria for evaluating, 21.62
        judicial review, 21.61

*Manual for Complex Litigation, Fourth*

class actions, settlements *(continued)*
>> limited fund settlements, 22.73
>> magistrate judges, 21.644
>> objectors, 21.643
>> partial settlements, 21.651
>> reviewing proposed settlements, 21.63
>> special masters, 21.644, 21.661
>> undistributed funds, 21.662
> subclasses, role of, 21.23
> trials, 21.5

copyright, *see* intellectual property

counsel
> class counsel, *see* class actions
> committees of counsel, 10.221
> compensation, 10.223
> coordination in multiparty litigation, 10.22
> disqualification, 10.23
> lead counsel, 10.221
> liaison counsel, 10.221
> responsibilities, 10.21, 10.222
> withdrawal, 10.23

court-appointed experts, 11.51
> class action settlement review, 21.644
> disclosure and discovery, 11.483, 23.344
> mass tort litigation, 22.87
> patent litigation, 33.26

courtroom technology
> courthouse facilities, 12.12
> digitized video depositions, 12.333
> evidence presentation systems, 12.32
> facilitating evidence presentation, 11.645
> videoconferencing, 12.334

depositions
> admissibility, 11.445, 11.455
> discovery, 11.45
> managing at trial, 12.33
> managing pretrial, 11.45
> pretrial, 11.45
> videotaped from scientific experts, 23.345

discovery
> business records, 11.446
> computerized data, 11.446
> depositions, 11.45
> documents, 11.44
> expert opinions, 11.48
> foreign (extraterritorial), 11.494
> governmental and grand jury investigations, 11.491

discovery *(continued)*
    in particular types of cases
        CERCLA (Superfund), 34.28
        civil RICO, 35.33
        class actions, 21.14, 21.41
        copyright cases, 33.311
        employment discrimination, 32.43
        mass torts, 22.8
        patent, 33.25
        securities, 31.6
    interrogatories, 11.46
    planning and control, 11.42
    privilege claims, 11.43
    protective orders, 11.43
    relationship to issues, 11.41
    requests for admissions, 11.47
    sampling/opinion surveys, 11.493
    special problems, 11.49
    stipulations of fact, 11.47

electronic discovery, *see* discovery, computerized data

employment discrimination, 32
    ADA, 32.24
    ADEA, 32.23
    case management, 32.4
    Civil Rights Act of 1964, 32.22
    class actions, 32.42
    developments in the law, 32.3
    discovery,  32.43
        computerized records, 32.432
        confidential information, 32.433
        expert testimony, 32.435
        from class members, 32.436
        preservation of records, 32.434
        statistical evidence, 32.435
    FMLA, 32.25
    initial pretrial conference, 32.41
    settlement,  32.46
        affirmative relief, 32.462
        attorney fees, 32.463
        hearing, 32.464
        implementation, 32.465
        timing, 32.461
    statutory framework, 32.2
    summary judgment, 32.44
    Title VII, 32.21
    trial, 32.45

evidence
    *see also* expert scientific evidence
    expediting presentation, 11.64

*Manual for Complex Litigation, Fourth*

evidence *(continued)*
>    limits on, 11.644
>    pretrial rulings on objections, 11.642
>    technology, using to present, 11.645

expert scientific evidence, 23
>    *see also* court-appointed experts
>    aggregation of, 23.272
>    assessing, preliminary considerations, 23.31
>    case management, 23.2
>    clinical medical judgment, 23.273
>    *Daubert* issues
>    >    criteria, 23.23
>    >    "fit" test, 23.25
>    >    initiating an inquiry, 23.351
>    >    the trilogy, 23.22
>    disclosures, 23.33
>    discovery
>    >    court-appointed experts, 23.344
>    >    nonretained experts, 23.343
>    >    nontestifying experts, 23.342
>    >    testifying experts, 23.341
>    >    videotaped depositions, 23.345
>    Federal Rules of Evidence, 23.21
>    final pretrial conference, 23.36
>    initial conference, 23.32
>    motion practice
>    >    handling challenges, 23.353
>    >    summary judgment, 23.354
>    >    timing of challenges, 23.352
>    research, 23.274
>    scope of appellate review, 23.26
>    trial, 23.37
>    toxicological vs. epidemiological, 23.271

experts
>    *see also* expert scientific evidence, court-appointed experts
>    in particular types of cases
>    >    antitrust, 30.2
>    >    CERCLA (Superfund), 34.29
>    >    copyright, 33.313
>    >    employment discrimination, 32.435
>    >    patent, 33.26

federal–state coordination, *see* multiple jurisdiction litigation

final pretrial conference, *see* pretrial procedures, conferences

initial conferences, *see* pretrial procedures, conferences

intellectual property
>    copyright law, 33.31
>    >    discovery, 33.311
>    >    experts, 33.313

*Index*

intellectual property, copyright law *(continued)*
      motions, 33.312
   patent law, 33.2
      discovery, 33.25
      experts, 33.26
      injunctive relief, 33.24
      issues, defining, 33.23
      *Markman* hearing, 33.22
      statutory framework, 33.21
      trial, 33.27
   trademark law, 33.32

judgments and appeals, 15
   disposition of materials, 15.3
   entry of final judgment, 15.2
   interlocutory appeal, 15.1

jury instructions, *see* pretrial procedures, trial

litigation in multiple jurisdictions, *see* multiple jurisdiction litigation

magistrate judges, 10.14, 11.53
   CERCLA (Superfund) cases, 34.22
   class action settlement, 21.644
   mass tort settlement, 22.91
   referral of scientific evidence matters, 23.32
   reviewing fee requests, 14.231, 21.727

mass torts, 22
   assignment, intradistrict to single judge, 22.32
   bankruptcy appeals, 22.533
   case-management orders, 22.6
      adding parties, 22.631
      deferred docketing, 22.633
      electronic communications, 22.635
      issue identification and development, 22.634
      pleadings and motions, 22.632
      initial, 22.61
      subsequent, 22.63
   class actions, 22.7
      certification, post-*Amchen*, 22.72
      determining applicable law, 22.752
      issues, identifying, 22.751
      limited fund settlements, post-*Ortiz,* 21.132, 21.142, 22.73
      medical monitoring, 22.74
   discovery, 22.8
      depositions, 22.84
      documents, 22.85
      experts, 22.87
      initial disclosures, 22.82
      interrogatories, 22.83
      physical evidence, 22.86
      sampling, 22.81

*Manual for Complex Litigation, Fourth*

mass torts, discovery *(continued)*
    scientific evidence, 22.87
  division of labor among judges, 22.53
  estimating value, 22.56
  future claimants, representation for, 22.55
  future claims, discharging, 22.58
  initial issues, 22.2
  MDL transferee judge, 22.35, 22.531
  multiple filings in federal district courts, 22.3
    aggregating claims,  22.311–22.318
  multiple filings in state and federal courts, 22.4
  multiple filings in trial and bankruptcy courts, 22.5
    consolidation, 22.51
    transfer, 22.51
    venue, 22.51
  reference, withdrawing, 22.52
  reorganization plan, confirming, 22.59
  reorganization plan, negotiating, 22.57
  settlement
    attorney fees, 22.927
    class certification, 22.921
    evaluating merits, 22.923
    fairness hearing, conducting, 22.924
    fairness, adequacy, reasonableness, 22.922
    information gathering, 22.924
    judicial role, 22.91
    nonmonetary benefits, evaluating, 22.925
    presenting decision, 22.926
    review, 22.92
  tort claims
    against debtors, 22.541
    against other defendants, 22.542
    automatic stay, expanding, 22.545
    consolidation, 22.543
    enjoining related cases, 22.545
    transferring related nondebtor cases, 22.544
  transfer, denial of, 22.34
  transfer, interdistrict (including MDL), 22.33
  trial, 22.93
multiple jurisdiction litigation, 10.225, 20
  mass tort district and bankruptcy courts, 22.5
  multidistrict transfers under section 1407, 20.13
  related civil cases in different courts, 20.12
  related civil cases in same court, 20.11
  related criminal and civil cases, 20.2
  related state and federal cases
    identifying need for coordination, 20.311
    jurisdictional conflicts, 20.32
    specific forms of coordination, 20.313
    threshold steps for coordinating, 20.312

*Index*

patent law, *see* intellectual property

pendent jurisdiction, 20.32

pretrial procedures, 11
    conferences, 11.2
        attendance, 11.23
        case-management planning, 11.211
        final pretrial, 11.6
        initial, 11.11, 11.211
        scheduling order, 11.212
        scientific evidence, 23.32
        settlement, 11.214
        subsequent, 11.22
    conferences in particular types of cases
        civil RICO, 35.32
        class actions, 11.213, 21.11
        mass torts, 22.61
        securities, takeover litigation, 31.71
    discovery, 11.4
        depositions, 11.45
        documents, 11.44
        expert opinions, 11.48
        interrogatories, 11.46
        planning and control, 11.42
        privilege claims, 11.43
        protective orders, 11.43
        requests for admission, 11.47
        stipulations of fact, 11.47
    jury instructions, 11.65
    pleading and motion practice, 11.32
    prediscovery disclosure, 11.13
    special referrals, 11.5
        experts, 11.51
        magistrate judges, 11.53
        special masters, 11.52
    summary judgment, 11.34
    trial preparation
        briefs, 11.66
        date and place, 11.61
        evidence presentation, 11.64
        final motions, 11.66
        final order, 11.67
        jury demands, 11.62
        jury instructions, 11.65
        structure, 11.63

privileges
    privilege claims, 11.43
    umbrella protective orders, 11.432
    "Vaughn Index," 11.431

*Manual for Complex Litigation, Fourth*

questionnaires
    exchanging, 20.313
    in lieu of interrogatories,  22.83
    prospective jurors, 12.412
    requiring instead of depositions, 21.14
    requiring of class members,  21.41, 31.31
    sampling tool, 22.81

recusal, 10.121, 13.11, 34.27

RICO, *see* civil RICO

sanctions
    authority for, 10.152
    considerations, 10.153
    principles for, 10.151
    procedure for, 10.155
    types, 10.154

securities, 31
    class actions, 31.31, 31.5
    discovery, 31.6
    initial pretrial conference, 31.4
    Private Securities Litigation Reform Act, 31.3
        discovery stays, 31.34
        pleading requirements, 31.32
        safe harbor, 31.33
    statutory framework, 31.2
    takeover litigation, 31.7
        discovery, 31.73
        initial conference, 31.71
        injunctive relief, 31.73
    trial and settlement, 31.8

settlement, 13
    agreements affecting discovery, 13.22
    encouraging, 13.15
    ethical considerations, 13.24
    general principles, 13.11
    in particular types of cases
        CERCLA (Superfund), 34.292
        class actions, 21.6
        employment discrimination, 32.46
        mass tort bankruptcy reorganizations, 22.57
        securities, 31.8
    partial settlements, 13.21
    relationship to discovery, 13.12
    review and approval, 13.14
    side agreements, 13.24
    timing, 13.12
    techniques to promote, 13.13

*Index*

special masters, 10.14, 11.52
    attorney fee review, 14.221, 14.231
    computer experts, 11.446
    deposition abuses, 11.456
    discovery disputes, 11.424
    federal–state coordination, 20.312
    in particular types of cases,
        class actions, 21.661 (administration), 21.727 (attorney fees), 21.644 (settle-
        ment review)
        CERCLA (Superfund), 34.22 (case management), 34.292 (settlement)
        employment, 32.465
        mass tort litigation, 22.8 (discovery), 22.91 (settlement), 22.924 (settlement
        review)
        patent litigation, 33.23
    scientific evidence, 23.32
    settlement facilitation, 13.13

Superfund, *see* CERCLA (Superfund)

trademark, *see* intellectual property

trial, 12
    administration, 12.1
    bellwether/test, 20.132, 22.315, 22.56, 22.93
    judge's role in conduct, 12.24
    conferences, 12.15
    courthouse facilities, 12.12
    demonstrative aids, 12.31
    depositions, 12.33
        alternatives, 12.334
        editing, 12.332
        presentation/videotaped, 12.333
        summaries, 12.331
    exhibits, 12.13, 12.32
    evidence
        advance notice, 12.23
        presenting, 12.3
        sequencing, 12.34
    glossaries, 12.31
    in particular types of cases
        CERCLA (Superfund), 34.294
        civil RICO, 35.35
        class actions, 21.5
        employment discrimination, 32.45
        mass tort, 22.93
        patent, 33.27
        securities, 31.8
    indexes, 12.31
    judge unable to proceed, 12.6
    judicial control, 12.35

*Manual for Complex Litigation, Fourth*

trial *(continued)*
>    jury trials, 12.4
>    >    exhibits, 12.435
>    >    final instructions, 12.434
>    >    impaneling jury, 12.41
>    >    interim and limiting instructions, 12.433
>    >    mistrial, avoiding, 12.44
>    >    notebooks, 12.422
>    >    notetaking, 12.421
>    >    peremptory challenges, 12.413
>    >    preliminary instructions, 12.432
>    >    questions from jurors, 12.423
>    >    readbacks, 12.436
>    >    supplemental instructions, 12.436
>    >    venire size, 12.411
>    >    voir dire, 12.412
>    multiparty cases, special procedures, 12.22
>    nonjury trials, 12.5
>    >    combined with jury trial, 12.53
>    >    findings of fact, conclusions of law, 12.52
>    >    prepared statements, 12.51
>    opening statements, 12.21
>    schedule, 12.11
>    time limits, 12.35
>    transcripts, 12.14
>    verdicts, 12.45
>    >    as matter of law, 12.452
>    >    general with interrogatories, 12.451
>    >    return of, 12.453
>    >    special, 12.451

**The Federal Judicial Center**

**Board**
The Chief Justice of the United States, *Chair*
Judge Pierre N. Leval, U.S. Court of Appeals for the Second Circuit
Judge Pauline Newman, U.S. Court of Appeals for the Federal Circuit
Judge Robert J. Bryan, U.S. District Court for the Western District of Washington
Judge James A. Parker, U.S. District Court for the District of New Mexico
Judge Sarah S. Vance, U.S. District Court for the Eastern District of Louisiana
Chief Judge Robert F. Hershner, Jr., U.S. Bankruptcy Court for the Middle District of
Georgia
Magistrate Judge Robert B. Collings, U.S. District Court for the District of Massachusetts
Leonidas Ralph Mecham, Director of the Administrative Office of the U.S. Courts

**Director**
Judge Barbara J. Rothstein

**Deputy Director**
Russell R. Wheeler

**About the Federal Judicial Center**

The Federal Judicial Center is the research and education agency of the federal judicial
system. It was established by Congress in 1967 (28 U.S.C. §§ 620–629), on the recom-
mendation of the Judicial Conference of the United States.

By statute, the Chief Justice of the United States chairs the Center's Board, which also
includes the director of the Administrative Office of the U.S. Courts and seven judges
elected by the Judicial Conference.

The Director's Office is responsible for the Center's overall management and its rela-
tions with other organizations. Its Systems Innovation & Development Office provides
technical support for Center education and research. Communications Policy & Design
edits, produces, and distributes all Center print and electronic publications, operates the
Federal Judicial Television Network, and through the Information Services Office main-
tains a specialized library collection of materials on judicial administration.

The Judicial Education Division develops and administers education programs and
services for judges, career court attorneys, and federal defender office personnel. These
include orientation seminars, continuing education programs, and special-focus work-
shops.

The Court Education Division develops and administers education and training pro-
grams and services for nonjudicial court personnel, such as those in clerks' offices and
probation and pretrial services offices, and management training programs for court
teams of judges and managers.

The Research Division undertakes empirical and exploratory research on federal judi-
cial processes, court management, and sentencing and its consequences, often at the re-
quest of the Judicial Conference and its committees, the courts themselves, or other
groups in the federal system.

The Federal Judicial History Office develops programs relating to the history of the
judicial branch and assists courts with their own judicial history programs.

The Interjudicial Affairs Office provides information about judicial improvement to
judges and others from foreign countries and identifies international legal developments
of importance to personnel of the federal courts.