# EX. 249

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | ) ) ) | No. 11-cv-10230 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) | |
| Defendant. | ) ) | |
| ARNOLD HENRIQUEZ, *et al.*, | ) ) | No. 11-cv-12049 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, | ) ) ) ) | |
| Defendants. | ) ) | |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, *et al.*, | ) ) ) | No. 12-cv-11698 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) | |
| Defendant. | ) ) | |

**LABATON SUCHAROW LLP'S RESPONSE TO SPECIAL MASTER HONORABLE GERALD E. ROSEN'S (RET.) FIRST SET OF INTERROGATORIES TO LABATON SUCHAROW LLP – JUNE 1 RESPONSE**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Labaton Sucharow LLP ("Labaton Sucharow" or the "Firm") responds as follows to the Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories to Labaton Sucharow LLP ("First Interrogatories"). This response addresses those interrogatories that, following conferral with counsel to the Special Master, are to be provided on June 1, 2017. The remaining interrogatories that have not been stricken will be answered on later, applicable due dates (June 9 and July 10).

Labaton Sucharow's answers are based solely on the facts and contentions presently known. To the extent Labaton Sucharow answers any Interrogatory, it does so without waiving any rights or objections and expressly reserves all rights and objections. Labaton Sucharow's answers to the Interrogatories are made without waiving the right to: (i) amend, modify or supplement the answers and objections stated herein, if necessary; (ii) rely on any facts, documents or other evidence which may develop or come to Labaton Sucharow's attention at a later date; and (iii) rely upon, reference or put into evidence additional expert information, testimony or reports.

## GENERAL OBJECTIONS

The following General Objections are incorporated by reference into each response to the First Interrogatories, whether or not they are referenced in a specific response below.

1.      Labaton Sucharow objects to Definition No. 1 as overbroad, irrelevant, and lacking in proportionality. Per agreement of counsel to the Special Master, Labaton Sucharow will construe the term "you", "your", "the Firm", and "the Law Firm" to refer to Labaton Sucharow, LLP, and its employees.

2.      Labaton Sucharow objects to the First Interrogatories to the extent they seek information protected by the attorney-client privilege, the work product doctrine, or information

that otherwise is privileged, protected or exempt from discovery. To the extent that Labaton Sucharow has provided any answers below that may include information that is privileged or protected as work product, the Firm provides such answers pursuant to the Limited Protective Order of the Special Master Relating to Attorney/Client Privileged and Work Product Documents and Information Being Provided to the Special Master (ECF No. 191). Pursuant to this protective order, the provision of information to the Special Master does not constitute a waiver of the attorney-client privilege or work product protection.

3.      Labaton Sucharow objects to the First Interrogatories to the extent they purport to impose obligations that differ from or exceed those imposed by the Federal Rules of Civil Procedure, particularly Rule 33, and by any court decisions interpreting those Rules.

4.      Labaton Sucharow objects to the First Interrogatories to the extent they seek information beyond the scope of, or not relevant to, the Courts' February 6, 2017 Memorandum and Order in the above-referenced cases.

5.      In responding to the First Interrogatories, Labaton Sucharow has made reasonable efforts to respond based on its understanding and interpretation of each Interrogatory. If the Special Master subsequently asserts a reasonable interpretation of an Interrogatory which differs from that of Labaton Sucharow, Labaton Sucharow reserves the right to supplement its responses.

6.      Labaton Sucharow reserves the right to supplement its answers should additional responsive information be discovered following the designated dates for responses.

7.      Capitalized terms shall have the meanings set forth in the First Interrogatories, subject to any objections asserted herein. All other capitalized but undefined terms used in this

response have the same meanings as set forth in the Stipulation and Agreement of Settlement (ECF No. 89).

## LABATON SUCHAROW'S OBJECTIONS AND ANSWERS

### INTERROGATORY 1:

Describe each of the Law Firm's practice area(s), including areas of specialty, special services offered, the total number of attorneys and staff, and a brief description of any representative matters.

### RESPONSE TO INTERROGATORY 1:

The Firm incorporates the General Objections set forth above. Subject to and without waiving the foregoing objections, the Firm states that its primary area of practice is securities class action litigation. Since a year after the passage of the Private Securities Litigation Reform Act of 1995, the Firm has specialized in assisting institutional investors with every phase of securities litigation, from monitoring and investigating fraud-related losses in client portfolios to prosecuting claims through trial and on appeal. The Firm also prosecutes securities opt-out and direct actions as well as sophisticated financial, transactional, derivative, and antitrust litigation. In addition, the Firm represents whistleblowers who report securities fraud.

The Firm currently has 66 attorneys, 44 staff attorneys, and 75 other staff, which includes a number of professional investigators and other professional staff to assist in complex litigation matters. The following is a representative list of cases the Firm has litigated:

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-07789 (S.D.N.Y.)

Labaton Sucharow represents a plaintiff, Boston Retirement System, in this action against major foreign exchange (FX) dealer banks for anticompetitive conduct in setting key FX benchmark rates. By engaging in these improprieties, the dealer banks enhanced their profits and reduced the value of their customers' FX transactions. The FX dealers, including Barclays Bank plc, Citigroup, Inc., Deutsche Bank AG, HSBC Holdings plc. JPMorgan Chase & Co., Royal Bank of Scotland Group plc, and UBS AG, are alleged to have coordinated their trading strategies through the use of online, electronic chat-rooms where they discussed client orders and aligned their trading strategies in order to effectuate the manipulation of the FX benchmarks. To date,

this action has recovered more than $2 billion as a result of partial settlements, all of which have included cooperation agreements.

### *In re Air Cargo Shipping Services Antitrust Litigation*, No. 06-md-01775 (E.D.N.Y.)

Labaton Sucharow served as co-lead counsel in this antitrust litigation for a nationwide class of direct purchasers of air freight shipping services. The action alleged violations of the Sherman Antitrust Act through a global price-fixing conspiracy for shipping goods by air among major U.S. and international airlines that persisted for more than five years. The Firm prosecuted more than 40 defendants across six continents, prosecuting this action for a decade, and recovered more than $1.2 billion for class members.

### *In re American International Group, Inc. Securities Litigation*, No. 04-cv-8141 (S.D.N.Y.)

Labaton Sucharow served as co-lead counsel and prosecuted this action with assistance from the Attorney General of the State of Ohio on behalf of lead plaintiff the Ohio Public Employees Retirement System, the State Teachers Retirement System of Ohio, and the Ohio Police and Fire Pension Fund. The case alleged numerous securities violations against AIG and 21 other defendants, including PricewaterhouseCoopers, the Company's outside auditor, and General Reinsurance Corp. ("Gen Re"), a Berkshire Hathaway subsidiary. The case focused on AIG's involvement in a market division scheme that included payment of allegedly improper contingent commissions, illegal insurance bid-rigging, and accounting fraud, and alleged numerous securities violations against the defendants. The Firm recovered more than $1 billion for investors through this litigation, which included a $725 million settlement resolving claims against AIG and certain individual AIG directors and officers, a $97.5 million settlement with AIG's outside auditor, PricewaterhouseCoopers, a $115 million settlement with former AIG officers and related defendants, and a $72 million settlement with Gen Re.

### *In re Countrywide Financial Corp. Securities Litigation*, No. 07-cv-5295 (C.D. Cal.)

Labaton Sucharow served as sole lead counsel representing lead plaintiffs the New York State Common Retirement Fund and the five New York City public pension funds and the class in this action. Lead plaintiffs alleged that the defendants made false and misleading statements concerning Countrywide's business as an issuer of residential mortgages, the creditworthiness of borrowers, underwriting and loan origination practices, and loan loss and other accounting provisions, and misrepresented high-risk low documentation loans as being "prime." During the period that the price of Countrywide stock was artificially inflated by the defendants' false representations, insiders received millions of dollars from Countrywide stock sales. The Firm recovered $624 million for the class.

### *In re Schering-Plough Corp./ENHANCE Securities Litigation*, No. 08-cv-397 (D.N.J.)

Labaton Sucharow served as co-lead counsel representing the Commonwealth of Massachusetts Pension Reserves Investment Management Board and the class. The action alleged that the defendants published a series of materially false and misleading statements concerning the commercial viability of two prescription drug products, ZETIA and VYTORIN, during the period July 24, 2006 to March 28, 2008. The case survived motions to dismiss and motions for summary judgment. The Firm secured a $473 million recovery for investors.

### *In re Bear Stearns Cos., Inc. Securities, Derivative & ERISA Litigation*, No. 08-cv-2793 (S.D.N.Y.)

Labaton Sucharow served as co-lead counsel, representing lead plaintiff, the State of Michigan Retirement System, and the class. The action alleged that Bear Stearns and certain officers and directors made misstatements and omissions in connection with Bear Stearns' financial condition, including losses in the value of its mortgage-backed assets and Bear Stearns' risk profile and liquidity. The action further claimed that Bear Stearns' outside auditor, Deloitte & Touche LLP, made misstatements and omissions in connection with its audits of Bear Stearns' financial statements for fiscal years 2006 and 2007. After surviving motions to dismiss, Labaton Sucharow secured a recovery of $294.9 million from the company and related defendants and Deloitte.

### *In re Massey Energy Co. Securities Litigation*, No. 10-cv-0689 (S.D.W. Va.)

Labaton Sucharow served as co-lead counsel representing lead plaintiff the Commonwealth of Massachusetts Pension Reserves Investment Management Board and the class in this action against the fourth largest producer of coal in the United States at the time. The case arose from one of the most egregious mining disasters in U.S. history, the April 2010 explosion at West Virginia's Upper Big Branch Mine, which killed 29 miners. The action alleged that Massey had misrepresented to investors its commitment to safety and compliance with safety regulations, and falsely claimed that it had embarked on safety improvement initiatives in the months leading up to the explosion. Following four years of litigation, Labaton Sucharow achieved a $265 million recovery for investors.

### *In re Fannie Mae 2008 Securities Litigation*, No. 08-cv-7831 (S.D.N.Y.)

Labaton Sucharow served as co-lead counsel on behalf of co-lead plaintiff Boston Retirement System and the class in this securities class action against Fannie Mae and certain of its current and former senior officers. The action alleged that the defendants made false and misleading statements concerning the company's internal controls and risk management with respect to Alt-A and subprime mortgages, as well as misstatements with respect to its core capital, deferred tax assets, other-than-temporary losses, and loss reserves. Although the Second Circuit Court of Appeals affirmed dismissal of a very similar securities class action against Fannie Mae's sibling company, Freddie Mac, on loss causation grounds, the Firm was able to demonstrate that that the materialization of the undisclosed risks concealed by the alleged fraud—rather than the 2008 housing and credit crisis—caused shareholders' alleged damages. Labaton Sucharow secured a $170 million recovery following seven years of litigation.

### **INTERROGATORY 4:**

Explain how and when the Law Firm became involved in the SST Litigation, including any conversations between and among the Firm and ARTRS, the Plaintiffs' Law Firms, and/or the ERISA firms.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**RESPONSE TO INTERROGATORY 4**:

The Firm incorporates the General Objections set forth above. Subject to and without waiving the foregoing objections, the Firm states the following: The SST Litigation has its origin in a *qui tam* complaint filed under seal on April 14, 2008 by Associates Against FX Insider Trading, a Relator represented by Thornton and Lieff Cabraser, on behalf of California public pension funds. That lawsuit was unsealed on October 20, 2009, when the Attorney General of California filed a Complaint-in-Intervention charging State Street with misappropriating more than $56 million from California's two largest public pension funds, the California Public Employees' Retirement System (CalPERS) and the California State Teachers' Retirement System (CalSTRS). The Complaint-in-Intervention was the first public indication of State Street's allegedly unfair and deceptive acts and practices concerning Indirect FX.

Because ARTRS has been a custodial client of State Street since 1998, and commencing litigation against one's custodian is not a routine matter, ARTRS undertook a great deal of due diligence before commencing any litigation.

On September 9, 2010, ARTRS met with Ennis Knupp & Associates ("Ennis Knupp"), a consultant engaged by ARTRS to oversee its investment managers and the performance of its investment portfolios, to discuss FX issues and potential claims against State Street.

ARTRS also sought to meet with State Street before filing an action. On December 20, 2010, the Firm, Thornton, and George Hopkins, the Executive Director of ARTRS, met in Boston with State Street's outside counsel and in-house legal and business personnel. The meeting was ultimately unproductive, and ARTRS, after considering several potential firms, authorized the Firm to commence this action. ARTRS selected Labaton Sucharow to pursue the

case specifically because it believed that it had the resources and experience to produce a good result for the Class.

ARTRS retained the Firm to investigate potential class and individual claims against State Street shortly thereafter. With ARTRS's approval, the Firm chose to associate with Thornton and Lieff Cabraser, two firms with whom it has had long relationships, and began an investigation. The decision to associate these additional firms was based on, among other considerations, their unique knowledge arising from their representation of the relator in the California public pension fund case described above. Thornton and Lieff Cabraser also represented the relator in an unrelated *qui tam* action filed under seal in or about October 2009 against The Bank of New York Mellon ("BNYM"), a major U.S. custody bank and State Street's primary competitor, concerning similar Indirect FX issues. The first government intervention and unsealing in connection with BNYM occurred in January 2011.

The Class Action Complaint (ECF No. 1), commencing the SST Litigation, was filed by the Firm, Thornton, and Lieff Cabraser on behalf of ARTRS and a proposed Class on February 10, 2011. The operative Amended Class Action Complaint (ECF No. 10) was filed on April 15, 2011. On January 12, 2012, the Court issued an order appointing the Firm as Interim Lead Counsel and designating Thornton and Lieff Cabraser as liaison and additional counsel. ECF No. 28.

The *Henriquez* and *Andover Companies* actions (together, the "ERISA Actions"), which asserted claims under ERISA on behalf of a class of State Street custody clients that were ERISA plans, were filed in the U.S. District Court for the District of Massachusetts on November 18, 2011 and September 12, 2012, respectively, and ultimately assigned to Judge Wolf. On November 2, 2012, ARTRS and State Street filed a Joint Status Report advising that they had

attended a mediation with a private mediator on October 22-23, 2012, and were unable to settle

the case. ARTRS and State Street further advised that they agreed, subject to the Court's

approval, on a framework for conducting discovery and managing the case, and requested a

status conference to discuss their proposed plan. ECF No. 50. The Firm arranged for ERISA

Counsel to attend this October 2012 mediation session and to be included in the mediation

process generally. State Street's transmittal letter filed with the Joint Status Report accordingly

requested that a status conference include the ERISA Plaintiffs as well as ARTRS (ECF No.

50). The Court granted this request, and following a status conference held jointly in the *ARTRS*

and ERISA Actions on November 13, 2012, the Court issued several orders consolidating the

three Actions for pretrial purposes and approving the Parties' framework for discovery and

mediation going forward. ECF Nos. 61-63.

**INTERROGATORY 5:**

Describe the role played by the Law Firm in filing the substantive claims alleged in the
SST Litigation, including the filing of the Complaint (Docket #1) and/or the Amended
Complaint (Docket #10), a description of any legal or factual research performed, consultations
with State Street, legal drafting and/or review of pleadings.

**RESPONSE TO INTERROGATORY 5:**

The Firm incorporates the General Objections set forth above. Subject to and without

waiving the foregoing objections, the Firm states the following: The Firm had a leading role in

investigating ARTRS's potential individual and class claims and researching and drafting the

original and amended Complaints (ECF Nos. 1 and 10), as explained in detail in the Fee Petition,

and other filings in connection with the Settlement.

These activities, which broadly took place between October 2009 and April 2011,

comprised numerous tasks. The Firm had to educate itself about the essentials of currency

trading, and the nature of negotiated (or direct) and non-negotiated (or standing-instruction or indirect) FX trades, and how they work in the context of custody banking.

FX Transparency LLC ("FX Transparency"), a Massachusetts-based currency trading expert, was engaged to consult regarding the FX markets and to assist in extracting and analyzing ARTRS's global trading data. FX Transparency conducted several preliminary and final analyses as counsel's investigation proceeded. Ultimately, FX Transparency identified more than 4,200 indirect FX trades executed by State Street for ARTRS's account during 2000-2010, with an aggregate trading volume of more than $1.2 billion. FX Transparency compared these trades to other FX trades logged and tracked in a comprehensive database of more than 2 million buy-side currency trades. By comparing ARTRS's trades in certain currencies with the same currency pair trades in the database, FX Transparency estimated the trading cost of ARTRS's indirect FX trades in relation to trades made worldwide.

Further, the Firm, together with Thornton and Lieff Cabraser, reviewed an array of pertinent documents, including ARTRS's Custodian Contracts and Fee Schedules, monthly custodial reports and invoices received from State Street, other communications from State Street, and State Street's periodically updated Investment Manager Guides.

Additionally, the Firm, together with Thornton and Lieff Cabraser, researched the applicable law on Chapter 93A of the Massachusetts Consumer Protection Act, fiduciary duty, and negligent misrepresentation, and also reviewed various *qui tam* lawsuits that had been unsealed against BNYM concerning BNYM's indirect FX practices.

**INTERROGATORY 7:**

Describe the Firm's theory of damages, including an estimate of total damages to the customer and/or ERISA classes, whether this theory changed throughout the course of the SST Litigation, and if so, what factors affected the Firm's theory and total calculation of estimated damages.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**RESPONSE TO INTERROGATORY 7:**

The Firm incorporates the General Objections set forth above.  Subject to and without waiving the foregoing objections, the Firm states the following:  The essential theory of damages was that Class Members were damaged when they were overcharged on Indirect FX Trades that State Street executed on their behalf, such that Class Members were entitled to pricing at exchange rates that were no less advantageous than those State Street itself received (*i.e.*, interbank rates) or, at a minimum, those they would have received on comparable Direct FX Trades.  This essential damages theory did not change during the course of the SST Litigation.

Plaintiffs' Counsel used the following basic methodology to estimate aggregate classwide damages.  There were two types of Indirect FX Trades during the Class Period:  Securities Settlement and Handling ("SSH") and Automated Income Repatriation ("AIR").  SSH trades converted U.S. Dollars (USD) to foreign currency to facilitate purchases of foreign-denominated securities, or repatriated foreign currency to USD when foreign-denominated securities were sold.  AIR trades repatriated periodic dividend and income payments to USD.

State Street applied fixed markups or markdowns, measured by basis points, to its SSH and AIR Indirect FX Trades during the Class Period.  The application of the fixed spreads was limited in two circumstances.  *First*, State Street would "net" all of a given Investment Manager's SSH trades in a given currency prior to execution, reducing the amount of currency traded, and, therefore, the total markup or markdown applied to that Investment Manager's clients' trades.  *Second*, for SSH trades, the fixed spread markups and markdowns were limited by the high or low of the range of the day.  (The "range of the day" is the difference between the high and low trades in a given currency pair during the course of the FX trading day by FX market participants worldwide.)  Thus, if the difference between the starting point of the indirect

pricing process and the high or low of the day was less than the fixed spread, State Street only applied a markup or markdown to the extent of the high or low rate and not beyond. State Street referred to the spread achieved on Indirect FX Trades after the application of such "netting" and "capping" as the "effective" spread.

In assessing damages, Plaintiffs' Counsel began with the dollar volume of SSH Indirect FX Trades for each year for 1998 through 2009. The average effective markup across all currency pairs for SSH trades for 2009 was a narrow basis point range. Plaintiffs' Counsel multiplied the sum total of SSH volume for 1998-2009 by the high end of State Street's stated range of effective markups, to estimate damages on SSH trades at approximately $1.177 billion.

Plaintiffs' Counsel then took the dollar volume of AIR Indirect FX Trades for each year for 1998 through 2009. The volume is a small fraction of the SSH volume. Plaintiffs' Counsel multiplied the annual AIR volume for 1998-2009 by the known markups for each year to estimate damages on AIR trades at approximately $314.49 million.

Plaintiffs' Counsel thus estimated the maximum total damages, assuming all of Plaintiffs' contentions with respect to not allowing State Street any effective markup on SSH trades and no markup on AIR Indirect FX Trades were to be accepted by a jury, at approximately $1.49 billion. Throughout the litigation, State Street contended that the total damages was zero and that they were entitled to a reasonable markup on FX Trades.

## INTERROGATORY 8:

Identify and describe all risk factors you considered prior to getting involved in the SST Litigation, including any "bad facts," meritorious defenses and/or unsettled legal issues, or other circumstances that affected the potential outcome and total damages recoverable in the case.

**RESPONSE TO INTERROGATORY 8:**

The Firm incorporates the General Objections set forth above. Subject to and without waiving the foregoing objections, the Firm identifies and describes the following principal "risk factors" considered by the Firm when deciding to commence the SST Litigation on behalf of ARTRS and a proposed Class and, later, in deciding to enter into the Settlement on behalf of Plaintiffs and the Class:

The Firm undertook the SST Litigation with no assurance of compensation or recovery of costs, and faced substantial risk from the outset. This case was atypical with respect to the nature of the defendant, the subject matter, and the application of the statutory claims, and was in many respects a hybrid between a consumer, securities, and ERISA action.

The case was also complex. State Street's alleged unfair and deceptive acts and practices, breaches of fiduciary duty, negligent misrepresentations, and violations of ERISA occurred over a 12-year Class Period in multiple locations, and concerned an opaque market and a little-understood area of the financial services industry.

ARTRS's initial Complaint was the first complaint publicly filed against a custody bank concerning Indirect FX. Besides State Street, there are only four major U.S. custody banks: BNYM, JPMorgan Chase, Citibank, and Northern Trust. These banks were rarely, if ever, sued in relation to their custody businesses before these Indirect FX pricing issues first began to surface. Accordingly, when the Firm, Thornton, and Lieff Cabraser investigated ARTRS's claims and commenced the action, they were working essentially from a clean slate in terms of analyzing ARTRS's FX trades for prima facie evidence of excessive markups, researching the applicability of Chapter 93A to State Street's Indirect FX Methods, analyzing whether a custody bank owes a fiduciary duty to its clients in connection with Indirect FX services, and analyzing

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

whether a nationwide class of custody clients can be certified and on what claims.

Further, neither the litigation nor the Settlement received any benefit from preexisting government enforcement actions or investigations. Private plaintiffs led the charge against State Street. The SEC, DOL, and DOJ have not issued any public allegations, factual findings, or consent orders.

The Firm and other Plaintiffs' Counsel brought about this Settlement in the face of an array of litigation risks. For example, the Court could have found at summary judgment or at trial that Chapter 93A does not reach the Indirect FX conduct at issue. State Street would have argued that the facts do not show that Plaintiffs or other Class Members were deceived by the alleged misconduct, and would have pointed to, among other things, the fact that ARTRS and other Class Members continued to engage in Indirect FX Transactions with State Street after its allegedly improper Indirect FX Methods were publicly revealed. Indeed, while this litigation was pending, a district court dismissed a similar action challenging JPMorgan's automated FX practices. *See Louisiana Mun. Police Emps. Ret. Sys. v. JPMorgan Chase & Co.*, No. 12 Civ. 6659 (DLC), 2013 WL 3357173, at *17 (S.D.N.Y. July 3, 2013) ("It distorts the [New York consumer-protection] law beyond recognition . . . to suggest that an ancillary service that is provided in connection with a contract for custodial banking services offered to institutional investors and that explicitly gives clients the option to negotiate specific rates or to issue 'Standing Instructions' for automated FX transactions is a 'consumer-oriented' service.").

State Street also would have pointed to the fact that ARTRS, and presumably many other Class Members, continued to use State Street as their sole custody bank after its allegedly improper Indirect FX Methods were publicly revealed and throughout the pendency of the SST Litigation.

In ruling on State Street's motion to dismiss, the Court reserved judgment as to whether ARTRS's Chapter 93A claims could proceed under Section 9 or Section 11, pending development of a factual record as to whether ARTRS was a "consumer" or a "business" for purposes of the statute. Section 11, which would apply in a "business-to-business" context, likely requires a greater showing to establish a violation. Had the Court ruled that Section 11 applied, ARTRS and the Class would have faced greater risk on the Chapter 93A claims.

Plaintiffs' common law fiduciary-duty claim, arising from an agent's duty of trust or obligation to provide full disclosure to its beneficiaries, raised challenging questions of law. Plaintiffs would have had to prove both that State Street served as a fiduciary to its custody clients, and that in its fiduciary capacity, State Street had a duty to fully disclose its Indirect FX practices to them. Those prerequisites to liability carried risk for Plaintiffs and other Class Members.

With respect to negligent misrepresentation, State Street no doubt would have asserted that Plaintiffs could not prove that (1) State Street made any actionable misrepresentations, (2) they relied on any alleged misrepresentations, or (3) the alleged misrepresentations were material. State Street likely would have further contended that Plaintiffs could not prove they suffered any injury, because (in State Street's view) they could have used information readily available to them to determine at any time during the Class Period how much they were allegedly being overcharged for Indirect FX Transactions. State Street also would have likely challenged Plaintiffs' negligent misrepresentation and other claims on statute of limitations grounds.

Likewise, litigation of Plaintiffs' ERISA claims presented certain risks. State Street does business using numerous wholly owned subsidiaries and operating entities, allowing it to argue that even if one State Street entity is an ERISA fiduciary, other State Street entities are not. Even

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

within a single entity, State Street sometimes offers different products and services, allowing it to argue that even if it acts as a fiduciary for certain purposes, it is not a fiduciary for other purposes. These different corporate relationships can lead to confusion and litigation risk. In addition, State Street's liability depends on a number of highly technical theories, including prohibited transactions under ERISA § 406(b), 29 U.S.C. § 1106(b), prohibited party-in-interest transactions under ERISA § 406(a), 29 U.S.C. § 1106(a), exceptions to the prohibited transaction rules under ERISA § 408(18), 29 U.S.C. § 1108(18), Prohibited Transaction Exemptions 94-20 and 98-54, and basic fiduciary obligations of loyalty, care, prudence, diligence, and monitoring under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

Class certification also presented complexities, which would have entailed a more extensive Rule 23 inquiry—and thus greater uncertainty and risk—than cases brought, for example, under the federal securities laws. In fact, in mediation, State Street contended that Plaintiffs would face insuperable hurdles to class certification because, in State Street's view, among other things, (1) Massachusetts law, in particular Chapter 93A, could not be applied to a nationwide class; and (2) State Street would be able to demonstrate that Class Members possessed varying levels of knowledge with respect to the Indirect FX Methods, precluding a showing of predominance under Rule 23(b)(3). Regarding the first point, Plaintiffs would have to show either that (i) Massachusetts law should generally apply to Class Members' claims, or (ii) if the laws of various states were to apply, a trial would be manageable. Presenting sufficient evidence to demonstrate the manageability of a trial under the laws of several states would have required Plaintiffs to detail the relevant states' laws, including any material differences among them, and prepare a trial plan. While Plaintiffs believed a multistate class or subclasses could have been certified, obtaining certification would have been challenging and time-consuming.

Additionally, Plaintiffs would have devoted significant time and resources to refuting State Street's argument that individual issues predominated because (in State Street's view) Class Members had disparate levels of knowledge regarding the Indirect FX Methods. State Street likely would have sought to depose numerous Class Members and their agents, as BNYM did in the BNYM FX customer class cases. The parties also likely would present conflicting expert analysis on customer expectations within the FX market, heightening the costs and risks of litigation. Class certification is often granted in ERISA litigation, but State Street certainly would have waged a vigorous opposition. Success could never be assumed, and certification of the ERISA claims alone would have provided no relief to a majority of Class Members. Even were Plaintiffs to obtain class certification in whole or in part, the class might have been decertified before or during trial, or on appeal. The risk of decertification was real where, as here, the Court might have needed to assess the manageability of a trial involving the laws of at least several states.

Further contributing to the risks Plaintiffs faced, the appropriate measure of damages was contested during the Parties' lengthy mediation process and would have been a focus of the litigation. Plaintiffs thus faced the risk that the damages now forming the basis of Class Members' recovery through this Settlement could never be proven at trial or would be greatly offset. State Street no doubt would have disputed Plaintiffs' Counsel's $1.49 billion damages estimate (the basis for which is described in the Answer to Interrogatory No. 7 above), contending, among other things, that it (a) materially overstates the effective spread for each year during a long Class Period, (b) assumes that every fraction of penny of markup is an improper overcharge where custody clients willingly pay a spread on direct FX trades, and (c) ignores the actual costs to State Street of providing Indirect FX services.

These risks did not evaporate once Plaintiffs entered into mediation. To the contrary, State Street brought these arguments to bear throughout the extended mediation process, pressing its contentions on, for example, the individualized nature of Class Members' written agreements and oral communications with State Street; the implicit (and sometimes explicit) awareness and acceptance of indirect FX pricing practices by Class Members and their IMs; cost accounting issues that supported the markups applied to Indirect FX Transactions; and the changing "real" interbank FX rates on a given currency pair at a given point in time.

In sum, the complexities relating to liability, class certification, and damages, as well as the sheer volume of evidence, virtually ensured that continuing to litigate would have entailed millions more dollars in lodestar and expenses for the Firm and other Plaintiffs' Counsel, with an uncertain outcome for Plaintiffs and the Class.

## INTERROGATORY 17:

Describe in detail the nature and the scope of the SST Document Review, including the total number of pages and/or size of the productions, the nature and date of each document production(s) received from State Street, all other document production(s) received in connection with the Litigation, and a general description of the information contained in each production.

## RESPONSE TO INTERROGATORY 17:

The Firm incorporates the General Objections set forth above. Subject to and without waiving the foregoing objections, the Firm states that the document review in this case related both to productions by ARTRS and productions by State Street.

On December 26, 2012, ARTRS made an initial production to defendants totaling 15,591 pages of documents. On March 1, 2013, Lead Plaintiff followed with four additional productions totaling 46,571 pages of documents. Two additional productions were made by ARTRS on March 15, 2013, amounting to 7,469 pages of documents. On March 26, 2013, ARTRS produced an additional 2,301 pages of documents to defendants. Finally, on November

17, 2013, ARTRS produced 1,631 pages of documents. Lead Plaintiff's entire production to defendants totaled 73,563 pages of documents. Documents within this production included investment management agreements and professional services contracts entered into between ARTRS and its investment managers and outside consultants as well as amendments thereto; responses to ARTRS's Requests for Proposals; internal and external emails in which ARTRS discussed its investment philosophies and results; spreadsheets containing data compilations reflecting Lead Plaintiff's investments; monthly portfolio reviews; and trade notifications.

In connection with all five of these productions, the Firm's Staff Attorneys reviewed ARTRS documents for responsiveness and privilege. Todd Kussin conducted a second level review of those materials that the Staff Attorneys had culled (via applying search terms and selected names). Finally, both Mr. Rogers and Mr. Goldsmith personally reviewed a sample of the documents Mr. Kussin had proposed be produced (*i.e.*, reviewed small sets of representative documents, such as RFPs, spreadsheets, or emails).

As to those documents produced by State Street, the Firm's Staff Attorneys (including those for which the cost was invoiced to Thornton) reviewed approximately 210,809 documents, amounting to 3,340,701 pages. These totals reflect documents from both the California and Hill[1]

---

[1] The "Hill" action is *Hill v. State Street Corp.*, Master Dkt. No. 09 CV 12146-NG (D. Mass.), a consolidated securities and ERISA class action. The Securities Act and Exchange Act claims, brought on behalf of a class of purchasers of State Street stock, asserted essentially that State Street made false and misleading statements about its FX practices. The ERISA claims, brought on behalf of all participants in the State Street Corp. Salary Savings Plan, asserted essentially that the fiduciaries of the Plan breached their fiduciary duties by offering State Street stock as an investment option, because the stock was artificially inflated and overvalued by reason of the misstatements concerning FX. The case settled for $60 million.

The "California" action is *California ex rel. Brown v. State Street Corp.*, No. 34-2008-00008457-CU-MC-GDS (Cal. Super. Ct. Sacramento Cnty.). This is the Complaint-in-Intervention filed by

matters, produced to Plaintiff in January 2013 and approximately September 2013, respectively. Among the documents contained in these productions were: RFP Responses; fee schedules; foreign exchange pricing reports; client profiles; internal and external emails discussing matters such as foreign exchange rate calculations, custody services, pricing arrangements, customer complaints, and automated income repatriation; excel documents reflecting pending payments for sale proceeds; trading data; client pitch presentations; State Street investment manager guidelines; and periodic consultant reports.

In October of 2013, Lead Plaintiff received a CD containing 4,053 pages of documents originally produced to the SEC by State Street on May 6, 2011. This production consisted of custodial contracts entered into between ARTRS and State Street, ARTRS pro forma fee analyses, ARTRS and State Street fee schedules and fee agreements, State Street investment management guides, and email exchanges discussing State street's foreign exchange services.

**INTERROGATORY 18:**

Describe in detail how the Law Firm conducted the SST Document Review, including how it selected and/or staffed Staff Attorneys, a description of all training binders/protocols or search terms used for Document Review, and a brief description of the tasks assigned to Staff Attorneys and any other individuals who participated, and how those tasks furthered the Firm's overall litigation strategy.

**RESPONSE TO INTERROGATORY 18:**

The Firm incorporates the General Objections set forth above. Subject to and without waiving the foregoing objections, the Firm states that in February, 2013, five initial Staff Attorneys were transferred to State Street from another class action case upon completion of

---

the California Attorney General on October 20, 2009, unsealing the Thornton/Lieff qui tam complaint against State Street, which is discussed in the Answer to Interrogatory No. 4. *supra.* This action was the first public "news" of State Street's improper FX practices, and has now settled for an undisclosed amount.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

discovery in that matter (the "Initial Labaton Staff Attorney Team").  Due to their experience in that other action (which included analyzing documents produced by defendants, producing plaintiff-client documents, and preparing for depositions), the Firm felt that these attorneys would be prepared to analyze and review the documents produced by State Street.  In addition, the Firm was confident these attorneys would be able to handle client productions as well as engage in substantive tasks such as deposition preparation and drafting of factual memoranda.

On April 18, 2013, a conference call was held among attorneys from the Plaintiffs' Law
Firms to discuss some of the most relevant documents identified as of that date.  Partners,
associates, and the Initial Labaton Staff Attorney Team participated in this call.

On January 15, 2015, when the Initial Labaton Staff Attorney Team was expanded by
approximately ten Staff Attorneys (this group of Staff Attorneys now included five Staff
Attorneys for which the cost was invoiced to Thornton; this group of fifteen, and the group after
subsequent additions. is referred to as the "140 Broadway Labaton-Supervised Staff Attorney
Team"), Mr. Goldsmith, Mr. Rogers. and Mr. Kussin held a meeting with the new members
similar in nature and substance to that held with the initial review team in February, 2013. As

additional Staff Attorneys joined the 140 Broadway Labaton-Supervised Staff Attorney Team in smaller groups, Mr. Kussin took the lead in holding such meetings, providing an overview of the issues in the case.  In Spring of 2015, ███████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

Staff Attorneys conducted initial analyses of documents provided to Plaintiffs by State Street in both the Hill and California productions. ███████████████████

████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████

█████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████  ████████████████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████.

## INTERROGATORY 19:

Describe how the Law Firm utilized the Catalyst database, including all persons who had access to the database, any electronic and/or technical training provided to those individuals, and a description of the information maintained in the Catalyst database during the course of the SST Document Review.

## RESPONSE TO INTERROGATORY 19:

The Firm incorporates the General Objections set forth above. Subject to and without waiving the foregoing objections, the Firm states that in the initial stages of the SST Document Review in February of 2013, Catalyst login credentials were supplied to Partner David Goldsmith, then Associate (now Partner) Michael Rogers, Case Manager Stacy Auer, Staff Attorney Team Leader Todd Kussin, and the five initial Staff Attorneys assigned to the litigation. As the case expanded in size and scope, additional Staff Attorneys joining the review were provided such credentials.

On February 13, 2013, Catalyst Technical Trainer Raquel Guzman hosted a web conference to provide initial training on the technical uses of the Catalyst review platform to Mr. Kussin and the Staff Attorneys. Catalyst Project Manager and Senior Consultant Chris Lisciandro helped organize this training and made himself available for any follow-up questions from the Labaton Sucharow review team as it began its review of documents. On March 13, 2013, after an initial set of documents had been batched out to each of the five Staff Attorneys by Mr. Lisciandro, another training session was held to review the technical aspects of the platform.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

The following day, Mr. Lisciandro provided answers via email to a number of questions posed by the reviewers during this second training session but not initially answered, generally pertaining to the system of electronic folders to be used by each reviewer as well as the recognition of documents produced as native files. The following day, the reviewers compiled via email another list of specific questions for Mr. Lisciandro regarding the organization of the platform and its documents, pertaining to topics such as beginning and ending control numbers, related documents, and the organization of document families. These questions were promptly answered by Mr. Lisciandro the same day.

As the review progressed, Mr. Lisciandro also provided the reviewers guidance, when requested, on such issues as printing tiff images, tracking the totals of documents and pages coded during a given period, and saving searches. As additional Staff Attorneys joined the review team, existing members, including Mr. Kussin, given their familiarity with Catalyst, were able to quickly advise them on the platform's use.

**INTERROGATORY 20:**   .

Describe in detail all documents destroyed and/or deleted from the Catalyst database, including the date, and explain why each document was deleted/destroyed.

**RESPONSE TO INTERROGATORY 20:**

The Firm incorporates the General Objections set forth above. Subject to and without waiving the foregoing objections, the Firm states that approximately at the end of July, 2015, all materials that had been hosted on Catalyst were exported to an external drive for archiving (*i.e.*, rendered not-readily-accessible, but available for retrieval, if needed). Included in the material exported was metadata and all Staff Attorney coding (from all three Plaintiffs' Law Firms) with a load file, comprising about 500 gigabytes of data. These documents were archived so as to save monthly expenses incurred by full-time hosting of documents.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**INTERROGATORY 21:**

Identify and describe any training the Firm provided to Staff Attorneys relating to the substantive allegations in the SST Litigation/SST Document Review, including addressing all legal issues, key witnesses, theories of liability, damages, and critical topics raised in the case.

**RESPONSE TO INTERROGATORY 21:**

The Firm incorporates the General Objections set forth above.  Subject to and without waiving the foregoing objections, the Firm incorporates by reference the Objections and Answers to Interrogatory No. 18.

**INTERROGATORY 25:**

Identify any other individuals who worked on the SST Document review who were not Staff Attorneys and explain their affiliation with the Law Firm, their employment status, and how they were compensated for their time.

**RESPONSE TO INTERROGATORY 25:**

The Firm incorporates the General Objections set forth above.  Subject to and without waiving the foregoing objections, the Firm states the following:  David Goldsmith and Michael Rogers, partners of the Firm, supervised the SST Document Review and reviewed relevant or "hot" documents provided to them from time to time by the Staff Attorneys.  They also communicated regularly with Todd Kussin regarding hot documents, substantive factual memoranda drafting, preparing presentations for mediation sessions, and the review and production of ARTRS documents.  In the beginning of the litigation, Mr. Rogers was compensated according to his full-time employment status at the Firm; Mr. Goldsmith and Mr. Rogers (once elevated to partner) were compensated pursuant to the Firm's partnership agreement.

At various times, Case Manager, Stacy Auer, and paralegals Reka Vizcian and Shella Mundo engaged in short-term administrative tasks associated with printing and binding of hot

docs selected by the Staff Attorneys. Ms. Auer, Ms. Vizcian, and Ms. Mundo were also

compensated according to their full-time employment status at the Firm.

### INTERROGATORY 27:

Explain how the Firm supervised and/or performed quality control of the work performed by the Staff Attorneys and others who participated in the SST Document Review, including the name, title, and tasks performed by any supervising individual.

### RESPONSE TO INTERROGATORY 27:

The Firm incorporates the General Objections set forth above. Subject to and without

waiving the foregoing objections, the Firm states the following: Throughout the SST Document

Review, Staff Attorney Team Leader Todd Kussin periodically logged onto the Catalyst review

platform and performed a secondary review/quality check of the documents reviewed by the

Staff Attorneys, assessing not only their productivity in terms of quantity of documents reviewed

over a certain period of time, but also their accuracy with respect to identifying both document

types and facts supportive of the allegations in the operative complaint. In addition, Mr. Kussin

performed a review to ensure that the Staff Attorneys followed the guidelines in the SST coding

protocol as they pertained to such issues as the requirement that attorneys' comments accompany

any document designated "hot," as well as the requirement that all members of a document

family be coded consistently regarding designations of relevancy.

Mr. Kussin regularly conferred with Staff Attorneys when he observed any patterns of

questionable coding, whether it be for logistical reasons such as providing inconsistent priority

designations for documents contained in the same family, or for substantive reasons such as

designating a document not relevant when it appeared, in Mr. Kussin's view, to rise to the level

of "relevant" or even "hot." Explanations were given to the Staff Attorneys as to why their

decisions needed to be addressed, and Mr. Kussin followed up by paying specific attention to the

designations provided by specific Staff Attorneys in the reporting periods following such conferences. It was Mr. Kussin's goal to make sure that the Staff Attorneys provided an accurate picture as to whether or not, and how each document they reviewed lent support to the allegations in the operative complaint, and therefore whether such documents added value to lead plaintiff's information base.

Each week, Mr. Kussin then prepared a productivity report outlining the number of documents and pages reviewed by each Staff Attorney over the previous reporting period, also detailing any issues with the accuracy of their designations. Mr. Kussin additionally identified both the "high" and "low" productivity reviewers for the week in terms of both documents and pages, and particular attention was paid to the quality of the coding of these individuals for the given period. In each report, Mr. Kussin further provided a running total of the number of documents and pages reviewed by the team to date, as well as a total of the remaining number of documents and pages yet to be reviewed. The productivity reports were provided to Danette McKenzie-Moreau, HR Administrator for Staff Attorneys, and copied to Chief Operating Officer Ray Politano, Partner David Goldsmith, and then Associate, now Partner, Michael Rogers.

## INTERROGATORY 28:

Explain in detail the job responsibilities and tasks performed by the Staff Attorneys assigned to the SST Document Review, including those Staff Attorneys allocated to Thornton. including but not limited to, coding, deposition preparation, creation of witness kits and similar work.

## RESPONSE TO INTERROGATORY 28:

The Firm incorporates the General Objections set forth above. Subject to and without waiving the foregoing objections. the Firm incorporates its Answers and Objections to Interrogatory No. 18.

**INTERROGATORY 29**:

Describe the process for assigning and reviewing factual, legal, and/or discursive memoranda prepared by Staff Attorneys, including how such memoranda were relevant to, used as part of the SST Litigation, and/or shared among counsel.

**RESPONSE TO INTERROGATORY 29:**

The Firm incorporates the General Objections set forth above. Subject to and without waiving the foregoing objections, the Firm states that the partners and associates from each of the three Plaintiffs' Law Firms developed a composite list of factual research and analysis topics narrowly-designed to address the issues involved in the SST litigation. Such topics were reflective of the allegations contained in the operative complaint. Throughout the litigation and mediation process, State Street's attorneys raised a number of defenses, each asserted to undercut, if not undermine, Plaintiff's claims. Counsel from all three of the Plaintiffs' Law Firms felt it was important in assessing any proposed settlement number that they knew the true strengths (and weaknesses) of defendants' arguments. The factual research and analysis memoranda were intended to supply a greater level of factual granularity and support (or lack of support) in making these assessments.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



**INTERROGATORY 32:**

Explain the origin of the cost-sharing agreement with Thornton through which the Firm agreed to allocate the costs associated with a certain number of Staff Attorneys to Thornton, including the names and descriptions of all other matters in which the Firm entered into similar arrangements (whether or not documented) to share costs with other firms, prior to or after the SST Litigation.

**RESPONSE TO INTERROGATORY 32:**

The Firm incorporates the General Objections set forth above.  Subject to and without

waiving the foregoing objections, the Firm states that the agreement to have Labaton Sucharow

and Lieff host staff attorneys sponsored by Thornton began with an oral discussion between Eric Belfi and Garrett Bradley in late 2014 or early 2015. That discussion is referenced in an email that has been produced. *See* LBS001367.

While Belfi does not recall the conversation specifically, he believes it may have been on a business trip he and Bradley were on together. The existence of this hosting arrangement (but not the precise nature of any underlying agreement) was also known to Mike Rogers and David Goldsmith. *See* LBS001367.

The concept was that there would be 15 staff attorneys at Labaton Sucharow's office in New York and another 15 at Lieff Cabreser's office in New York. At both locations, the cost of ten attorneys would be paid by the host firm and the cost of five attorneys would be paid by Thornton, such that each firm would have a total of ten staff attorneys working on the review. Mike Rogers recalls that the arrangement "made sense" to him because it was a fair way to share costs associated with the review.

The Firm has identified the following other matters in which costs for Staff Attorneys employed by Labaton Sucharow were paid for by another Plaintiffs' firm).

| Matter Name | Type of Matter |
|---|---|
| ███████████████ | ████████ |
| ███████████ | ████████ |
| ████████████████ | ████████ |
| ███████████████ █ | ████████ |
| ████████████ | ████████ |
| ███████████████ | ████████ |
| ████████ █ █████ | ████████ |
| ███████ █ ████████ | ████████ |
| ███████████ | ████████ |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Matter Name | Type of Matter |
|---|---|
| ████████ | |
| █ █ ████████████████████████ | ████████████ |
| ████████████████████████ | ███████ |
| ██████████████████████ | ████████████ |
| ██████████████████████ | ████████████ |
| █████████████████████████ | ██████████ |
| █ █ █████████████ | ████████████ |
| █████████████████ | ████████████ |
| ███████ | ████████████ |

### INTERROGATORY 33:

Describe the Firm's understanding, in or about early 2015, as to how Thornton would account for the allocation/sharing of costs for certain of the Firm's Staff Attorneys in its Fee Petition, including the Firm's understanding as to which firm was responsible for reporting the total number of hours worked by those Staff Attorneys on its Fee Petition and/or Lodestar calculation.

### RESPONSE TO INTERROGATORY 33:

The Firm incorporates the General Objections set forth above. Subject to and without

waiving the foregoing objections, the Firm states that there was notable ambiguity among

Labaton Sucharow lawyers as to how the hours attributed to Thornton staff attorneys would

ultimately be accounted for and reported. David Goldsmith does not know if it was even decided

early on whether, in the event of a successful result in the litigation, Thornton would claim the

time spent for Staff Attorneys on its own lodestar. Mr. Goldsmith explained that it would

surprise him if such an issue were decided three years in advance. Michael Rodgers does not

recall a specific discussion. at the time it was agreed that the cost of some Staff Attorneys would

be paid by Thornton. regarding how their hours would be reported. He assumed. however, that

Thornton would take credit for the hours spent by the Staff Attorneys for which it paid on its

own lodestar. Eric Belfi explained that at the time he and Garret Bradley had the initial

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

conversation about allocating Staff Attorneys to Thornton, he did not consider how the time

spent by the Staff Attorneys would be accounted for in any fee petition. If he had been asked at

the time, however, he likely would have assumed that Thornton would report the time spent by

Staff Attorneys for whom it was paying on a Thornton lodestar.

## INTERROGATORY 37:

Describe in detail the process through which the Law Firm invoiced or otherwise sought reimbursement from Thornton for costs of those Staff Attorneys allocated to Thornton as part of the SST Litigation/Document Review.

## RESPONSE TO INTERROGATORY 37:

The Firm incorporates the General Objections set forth above. Subject to and without

waiving the foregoing objections, the Firm states that beginning in February of 2015 and

continuing through July of 2015, Cindy Ng forwarded on approximately a monthly basis

invoices to Garrett Bradley of Thornton & Naumes reflecting fees and expenses associated with

the staff attorneys allocated to Thornton & Naumes. These invoices were promptly paid by the

Thornton & Naumes Firm to Labaton Sucharow.

The amount invoiced to Thornton represented the cost associated with the wages for each

of the Thorton document reviewers plus an amount representing a pro-rata share of other

overhead costs associated with their employment.

Dated: June 1, 2017

Joan A. Lukey (BBO No. 307340)
Justin J. Wolosz (BBO No. 643543)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tel: (617) 248-5000
joan.lukey@choate.com
jwolosz@choate.com

*Attorneys for Labaton Sucharow LLP*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## VERIFICATION

On behalf of Labaton Sucharow LLP, I have read Labaton Sucharow LLP's Response to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories to Labaton Sucharow LLP – June 1 Response. The Response was prepared with the assistance of the employees, representatives, and counsel of Labaton Sucharow LLP, and the information provided is not fully within my personal knowledge. I reserve the right to make changes or additions to these responses if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available. To the extent that these responses are within my personal knowledge, I certify them to be true. To the extent that these responses are not within my personal knowledge, I have no reason to believe that they are not true.

Signed under oath under the penalties of perjury this 1st day of June, 2017.

Sucharow
CHAIRMAN

- 36 -

## CERTIFICATE OF SERVICE

I, Justin J. Wolosz, hereby certify that on this First day of June I have caused a copy of the foregoing Labaton Sucharow LLP's Response To Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories to Labaton Sucharow LLP – June 1 Response to be served via email and overnight mail upon William F. Sinnott, Donoghue Barrett & Singal, P.C., One Beacon Street, Suite 1320, Boston, MA 02108.

Justin J. Wolosz

8127050

- 37 -