# EX. 252

**Camille Sarrouf**

1

Volume:  1

Pages:  1-163

Exhibits:  1-3

JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW


------------------------------------

In Re:  STATE STREET ATTORNEYS FEES

------------------------------------




BEFORE: Special Master Honorable Gerald Rosen,

United States District Court, Retired




DEPOSITION of CAMILLE F. SARROUF

March 21, 2018, 8:44 a.m.-12:38 p.m.

JAMS

One Beacon Street

Boston, Massachusetts




Court Reporter:  Paulette Cook, RPR/RMR

In Re:  State Street Attorneys Fees

Page 2

```
 1  A P P E A R A N C E S:

 2

 3      DONOGHUE BARRETT & SINGAL

 4      By William F. Sinnott, Esq.

 5      Elizabeth J. McEvoy, Esq.

 6      One Beacon Street, Suite 1320

 7      Boston, Massachusetts 02108-3106

 8      617-720-5090/wsinnott@dbslawfirm.com

 9              and

10      JAMS

11      By Linda Hylenski, Esq. (via teleconference)

12      150 West Jefferson

13      Detroit, Michigan 48226

14      313-872-1100

15      Counsel for the Special Master

16

17      NIXON PEABODY, LLP

18      By Brian T. Kelly, Esq.

19      Joshua C. Sharp, Esq.

20      100 Summer Street

21      Boston, Massachusetts 02110-2131

22      617-345-1065/bkelly@nixonpeabody.com

23              and

24
```

Page 3

```
 1      (via teleconference)

 2      By Emily Crandall Harlan, Esq.

 3      799 Ninth Street, NW, Suite 500

 4      Washington, D.C. 20001

 5      202-585-8217/eharlan@nixonpeabody.com

 6      Counsel for the Thornton Law Firm

 7

 8      LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

 9      By Richard M. Heimann, Esq.

10      Robert L. Lieff, Esq. (via teleconference)

11      275 Battery Street, 29th Floor

12      San Francisco, California 94111

13      415-956-1000/rheimann@lchb.com

14      Counsel for Leiff Cabraser

15

16      CHOATE HALL & STEWART, LLP

17      Joan A. Lukey, Esq.

18      Kevin Finnerty, Esq.

19      Two International Place

20      Boston, Massachusetts 02110

21      617-248-5000/jwolosz@choate.com

22              and

23

24
```

Page 4

```
 1  LABATON SUCHAROW, LLP

 2  By Michael Canty, Esq. (via teleconference)

 3  140 Broadway

 4  New York, New York 10005

 5  212-907-0882/mcanty@labaton.com

 6  Counsel for Labaton Sucharow, LLP

 7

 8  KELLER ROHRBACK, LLP

 9  By Lynn Sarko, Esq. (via teleconference)

10  1201 Third Avenue, Suite 3200

11  Seattle, Washington 98101-3052

12  206-623-1900/lsarko@kellerrohrback.com

13  Counsel for the Andover Companies Plaintiffs

14

15      ALSO PRESENT: Professor Stephen Gillers

16

17

18

19

20

21

22

23

24
```

Page 5

```
 1              I N D E X

 2

 3  Examination of:                      Page

 4  CAMILLE F. SARROUF

 5   By Mr. Sinnott                         7

 6

 7

 8

 9          E X H I B I T S

10  No.                                  Page

11  Exhibit 1    Camille F. Sarrouf        93

12               Curriculum Vitae

13  Exhibit 2    Expert Declaration of     95

14               Camille F. Sarrouf

15  Exhibit 3    Document TLF-SST-012272  114

16

17

18

19

20

21

22

23

24
```

Page 6

PROCEEDINGS

MR. SINNOTT: For the record, this is the special master's investigation, and the case number for this is number 11-CV-10230-MLW.

My name is William Sinnott, S-I-N-N-O-T-T, from the firm of Donoghue, Barrett & Singal. I'm counsel to the special master, Gerald T. Rosen, who is present and to my left. He's retired from the United States District Court in Detroit.

To my right is Attorney Elizabeth McEvoy also of Donoghue, Barrett & Singal, and also to my left is Professor Stephen Gillers of New York University Law School who testified for, I think, nine-and-a-half hours yesterday, and we'll resume his testimony today but not just yet.

Professor -- Attorney Camille Sarrouf is present, and he will be testifying, and we're going to start with him for reasons that have been disclosed to all parties, and all parties are in agreement that we will interrupt the testimony of Professor Gillers in order to start with Attorney Sarrouf, and that's the plan. And, hopefully, we

Page 7

can finish with him and get him on his way in a reasonably prompt fashion.

If I could ask the other attorneys in the room to identify themselves beginning with Josh.

MR. SHARP: Joshua Sharp of Nixon Peabody for Thornton Law Firm.

MR. KELLY: Good morning. Brian Kelly of Nixon Peabody for the Thornton Law Firm as well.

MS. LUKEY: Joan Lukey from Choate Hall for Labaton Sucharow.

MR. FINNERTY: And Kevin Finnerty from Choate Hall for Labaton.

MR. HEIMMAN: Richard Heimann for Lieff Cabraser.

MR. SINNOTT: Okay, thank you. And if the witness can be sworn, Madam Court Reporter.

(Witness sworn.)

DIRECT EXAMINATION
BY MR. SINNOTT:

Q. Good morning, sir.
A. Good morning.
Q. Sir, as you heard, my name is Bill Sinnott and I represent -- I'm counsel to the special

Page 8

master, and I will be conducting most of the examination.

The special master, of course, will ask questions as well, but thank you for being here. And I understand you've got some things of an emergency nature going on. So we appreciate your patience and your willingness to stay here and be examined.

Professor -- Attorney Sarrouf --
A. I was a professor once.
Q. You were?
A. Adjunct.
Q. So if I stumble again, I won't feel bad about it. It'll be somewhat accurate.

Sir, we've received a CV that was attached to your expert declaration, and it was signed on October 31, 2017. I believe that's been premarked as Exhibit 1 for our convenience.

MR. SINNOTT: Do you have that yet?
THE REPORTER: I don't.
Q. We'll get that to you in a moment. Ms. McEvoy has it. Sir, you have your CV in front of you?
A. I do.

Page 9

Q. All right, sir. If I could direct your attention to that. Sir, looking at your CV, are there any positions or roles that you've had not appearing on this CV that qualify you to render opinions in your -- the opinions in your expert declaration?
A. I don't believe there is.
Q. All right.
A. I may have forgotten, as I do from time to time, but I think it's complete as I could make it at the time.
Q. All right, sir. Thank you.

Sir, just to touch on a few things, you served as president of the Massachusetts Bar Association from 1998 to 1999; is that correct?
A. It is.
Q. And as president of the MBA, did you have occasion to review or comment on the Rules of Professional Conduct in Massachusetts in effect at the time?
A. I did.
Q. All right. And specifically did you --
PHONE LINE CONFERENCE: The following participant has entered the conference? Hylenski.

Page 10

1  **MR. SINNOTT:** Good morning, Linda.

2  **THE SPECIAL MASTER:** Good morning,

3  Linda.

4  **MS. HYLENSKI:** Good morning.  I was --

5  **THE SPECIAL MASTER:** Okay, we're

6  started.

7  **MR. SINNOTT:** We're examining Linda.

8  **MS. HYLENSKI:** Okay.

9  **BY MR. SINNOTT:**

10 Q.  Specifically, sir, did you comment on Rule

11 1.5(e)?

12 **A.  I believe I did at the time.**

13 Q.  All right.

14 **A.  That is within the scope of the committee**

15 **from the MBA that was involved.**

16 Q.  All right.  And what was the committee --

17 and I would imagine by extension -- what were you

18 asked to do with respect to Rule 1.5(e)?

19 **A.  I think we discussed the rule and expressed**

20 **our opinion with regard to it.**

21 Q.  All right.  And do you recall specifically

22 what your comments or opinion were with respect to

23 1.5(e)?

24 **A.  I don't.**

Page 11

1  Q.  All right.  And, sir, you were part of a

2  committee.

3  Was this an official role in your

4  capacity as president of the Mass. Bar Association,

5  or was this a committee that you had formed?

6  How did you end up being part of this

7  committee that was commenting on --

8  **A.  The president of the MBA at anytime is**

9  **really a part of every committee that the MBA has**

10 **and looks in on matters.**

11 **This was a particular interest to me**

12 **because I know that when it was previously a matter**

13 **of changes, I was also president back in the**

14 **eighties of the Massachusetts Academy of Trial**

15 **Attorneys, and at that time I had filed -- when**

16 **there was a proposal with regards to the particular**

17 **rule, I did file with the Supreme Judicial Court a**

18 **motion that if they were to consider the -- at that**

19 **time it was that referring attorneys would be paid**

20 **only upon the basis of the effort or hours they put**

21 **into the case and not on the basis of a percentage,**

22 **and I had filed a motion to be heard in the Supreme**

23 **Judicial Court on behalf of the Mass. Academy, and**

24 **it stated that with -- if any rule was to be in**

Page 12

1  **force, that it ought to include the origination**

2  **credits that a lawyer gets in the big firms for**

3  **simply bringing a case in, and then it's turned over**

4  **to someone else.**

5  Q.  All right, sir.  And what year was that?

6  **A.  I believe -- I think in the mid eighties.**

7  Q.  All right.  And, sir, did you have any role

8  in reviewing the Rules of Professional Conduct in

9  2005?

10 **A.  No.**

11 Q.  Do you recall the Saggese --

12 **A.  Well, other than Arnie Rosenfeld did, and we**

13 **may have talked about it.  But I had no --**

14 Q.  All right.  And you recall the Saggese case,

15 correct?

16 **A.  Yes.**

17 Q.  All right.  And --

18 **A.  That's Judge Spina's opinion?**

19 Q.  The SJC opinion.

20 **A.  Yes.**

21 Q.  And that case didn't prompt any comment or

22 activity on your part, did it, with respect to the

23 professional rules?

24 **A.  No.**

Page 13

1  Q.  Do you have any knowledge outside of what's

2  written in Saggese as to what the intent of the SJC

3  was in rendering their opinion?

4  **A.  I believe that they set it out very**

5  **carefully, and I think -- and I was in full**

6  **agreement with it.  I know Judge Spina very well.  I**

7  **knew him before he was on the court out in**

8  **Pittsfield because I used to go out there often, and**

9  **he was involved in some of the cases I did try.**

10 **And I thought that the statements that**

11 **were made with regards to the rule and the**

12 **protection of the client were appropriate.**

13 Q.  All right.  But outside of the opinion

14 itself, did you have any other resources from which

15 you discerned the intent of the Supreme Judicial

16 Court?

17 **A.  No.**

18 Q.  And, Attorney Sarrouf, did you have any role

19 in December 2010 when the Supreme Judicial Court

20 adopted changes to Rule 1.5(e)?

21 **A.  I had no role.**

22 Q.  And is it fair to say that you did not have

23 any firsthand involvement in the revision of the

24 Mass. Rules of Professional Conduct?

Page 14

1    **MS. LUKEY:** At that time?
2    **MR. SINNOTT:** At that time.
3    A.   **In 2010?**
4    Q.   Yes, sir.
5    A.   No.
6    **MS. LUKEY:** Objection.  It was actually
7    2011.
8    Q.   All right.  In 2011 did you?
9    A.   No.
10   Q.   And I'm referring with respect to Rule
11   1.5(e).
12   A.   **(Nods head.)**
13   Q.   But your answer is you did not?
14   A.   **I do not -- I did not at that time.**
15   Q.   You did not.  All right, sir.
16       And, counsel, your CV lists several
17   positions relating to reviewing the conduct of
18   judges in Massachusetts, correct?
19   A.   **Are you talking about Judicial Conduct**
20   **Commission?**
21   Q.   Yes, sir.
22   A.   **Yes.  I was on that by appointment of the**
23   **chief justices of the trial court for six years.**
24   Q.   All right.  And that was from 1990 to 1996?

Page 15

1    A.   **I believe so, yes.**
2    Q.   And that's the Massachusetts Commission on
3    Judicial Conduct, correct?
4    A.   **Yes, it is.**
5    Q.   And what was your role in that capacity?
6    A.   **Well, the commission is made up of three**
7    **appointments, usually civilians by the governor,**
8    **three judges by appointment of the Supreme Judicial**
9    **Court and three lawyers by appointment of the chief**
10   **justice of the trial court.**
11   Q.   All right, sir.
12   A.   **And for the most part everyone was given at**
13   **different times certain investigatory**
14   **responsibilities and then discussions, and then,**
15   **where necessary, the judge who might be the subject**
16   **of an investigation or a hearing is given a hearing;**
17   **and then it depended upon the vote of the nine**
18   **members together with advice from the then**
19   **administrator, and you were given different roles**
20   **very often to go speak to the judge, sometimes to go**
21   **with a judge to recommend a retirement or things**
22   **like that.**
23   Q.   All right, sir.
24       And in the course of those duties, were

Page 16

1    you ever asked to address issues relating to
2    disclosure of fee agreements?
3    A.   **Never.**
4    Q.   And were you ever asked to address the scope
5    of information that should be disclosed to a judge
6    in a proceeding in which the payment of a fee was
7    being awarded in a class action case?
8    A.   **I have no memory of that issue ever coming**
9    **before -- in the six years that I served coming**
10   **before the commission.**
11   Q.   During your service on that commission were
12   you ever asked to review Federal Rule of Civil
13   Procedure 23?
14   A.   **I have no memory of that.**
15   Q.   Okay.  Were you ever asked to review the
16   obligations of attorneys under Federal Rule of Civil
17   Procedure 54?
18   A.   **Within the scope of the board?**
19   Q.   Yes, sir.
20   A.   **No.**
21   Q.   And is it fair to say that while on that
22   board -- that your experience while on that board
23   had no bearing on your opinions in your declaration
24   in this case?

Page 17

1    A.   **I can remember none.**
2    Q.   All right, sir.  Do you consider yourself an
3    expert in legal ethics?
4    A.   **I consider myself a very ethical lawyer who**
5    **has really been I believe very attentive to the**
6    **rules that are applied to lawyers in this**
7    **Commonwealth, and when I felt necessary would**
8    **express my opinion.**
9    Q.   I'd like to think all of the counsel in this
10   room would consider themselves to be ethical lawyers
11   and attentive to the rules, but let me ask you again
12   do you consider yourself to be an expert in legal
13   ethics?
14   A.   **Yes.**
15   Q.   And what do you base that on?
16   A.   **Fifty-seven years of practicing law in this**
17   **Commonwealth, and in the positions that I've held in**
18   **various leadership positions and in accordance with**
19   **the various cases that I've brought before the**
20   **courts -- hundreds of them that I've tried, I think**
21   **that I have certainly a knowledge of what has been**
22   **and is today the rules by which lawyers should**
23   **conduct themselves from.**
24   Q.   All right, sir.  And it would be fair to say

Page 18

1 that every practicing attorney is operating in court
2 in trying to be ethical and observing ethical
3 conduct and sometimes, unfortunately, unethical
4 conduct, correct?
5 A.  Unfortunately, yes.
6 Q.   And many of those attorneys have long and
7 distinguished careers like yourself, correct?
8 A.  I believe so.
9 Q.  Would you consider all of those attorneys to
10 be experts on ethics?
11     MS. LUKEY: Objection.
12 A.  I don't know what you mean by that.
13 Q.  Well, by virtue of the years of experience
14 and their practices in the courts of the
15 Commonwealth, do they become experts?
16     MS. LUKEY: Objection.
17 A.  It would have to be looked at on a
18 case-by-case basis.
19 Q.  All right, sir.
20 A.  What cases they had tried, what was their
21 experience before the courts.  That's what counts I
22 believe in establishing whether or not you have some
23 expertise that would be helpful to any tribunal.
24 Q.  What was your most recent case where ethics

Page 19

1 were the issue before the Court?
2 A.  I don't think it was a question of ethics,
3 but I believe the Patriots case from time to time,
4 depending on which one -- there were three -- I was
5 involved with all three of them, the two in the
6 state courts and the one in the federal court.
7 Q.   And what were the Patriots cases?
8 A.  The three of them were there was a case
9 under the rules of Massachusetts under the statutes
10 for an appraisal of the value of shares of stock
11 that were being claimed in a reorganization of a
12 corporation.
13     There was the Coggins case.  That was a
14 Sarrouf -- well, the Sarrouf case versus New England
15 Patriots under the statute was the leading case
16 chosen by the Court to go forward.  There were ten
17 other cases that were brought by various lawyers
18 throughout the state.
19     MS. LUKEY: He's not a plaintiff.  That
20 was how the Court was designating him among the
21 cases so no confusion.  So different lawyers.
22     MR. SINNOTT: All right.
23     BY MR. SINNOTT:
24 Q.  What was the specific legal ethical point

Page 20

1 that was being litigated in that matter?
2 A.  The ethical point I think was more in the
3 federal court case because in the -- it was a -- the
4 Sarrouf case, which is my case in which I
5 represented myself, my wife and my four children,
6 each of them had a hundred shares, I had filed
7 simply a re-appraisal.  There were ten other cases.
8     Then the superior court had to choose
9 which one of the eleven would go forward, and the
10 others would simply -- the Court chose my case.
11     There was also a case brought known as
12 the Coggins --
13 Q.  Can I ask you about that case though?  What
14 was the ethical issue at issue in the Sarrouf versus
15 the New England Patriots?
16 A.  There was no ethical issue.
17 Q.   My question was what was the last case
18 that --
19 A.  Well --
20 Q.  -- you worked on where ethics were the issue
21 at hand, and it sounds like that that case was not
22 it.  Can you recall --
23 A.  No.
24 Q.  -- the last case you worked on?

Page 21

1 A.  There was a question that arose in the
2 federal case that I later came into before the
3 ethical question or after the ethical questions may
4 have been answered, and I was asked to come in.
5 That was the case before Judge Skinner, and that was
6 the -- let's see.  Sarrouf, Coggins.  Pavledis case.
7 Q.  What was the ethical issue being decided in
8 that case?
9 A.  There were two I think.  One was who had the
10 capability of representing a class then undetermined
11 of non-voting shareholders, and the second point was
12 in the allocation of fees how that should be
13 handled.
14     And, again, those were decisions that
15 eventually were made by Judge Skinner.  I think
16 there were three of them.  And they are in the
17 federal supplement.
18 Q.  And you were the advocate for -- on one side
19 of those ethical issues?
20 A.  I was the lawyer involved -- the lead lawyer
21 after the other lawyers had dropped out.
22 Q.  Okay.
23 A.  And then the case went up to the first
24 circuit.  It was -- the Court's rulings were

Page 22

1  approved as to the federal SEC claims, and it was
2  then remanded as to the evaluations to be applied to
3  the other shareholders -- non-voting shareholders,
4  and the direction by the first circuit that the
5  Court must await the rulings in the cases in the
6  state court.
7      THE SPECIAL MASTER: Mr. Sarrouf, could
8  I -- I'm trying to understand your answer.  I think
9  Mr. Sinnott's questions, to put a finer point on it,
10  goes to the issue of cases that you were involved in
11  which required or raised the issues of conduct of
12  lawyers under the Massachusetts Rules of
13  Professional Conduct.
14      I'm not hearing in your answer that I --
15      THE WITNESS: Then I misunderstood his
16  question.
17      THE SPECIAL MASTER: Yeah, that's why
18  I'd like to just sharpen the question a little bit
19  and limit it to your involvement in cases which
20  raised questions under either the Massachusetts
21  Rules of Professional Conduct or perhaps other
22  state's Rules of Professional Conduct or, by an
23  analogy, the ABA model rules.
24      MS. LUKEY: May I ask a clarifying

Page 23

1  question?  Are you asking him whether he was
2  litigating ethical issues or --
3      THE SPECIAL MASTER: Either litigating,
4  consulting.  Any involvement that he's had in those
5  cases, Joan.
6      MS. LUKEY: Would that include the cases
7  where there were issues that are at issue here like
8  1.5(e) divisions, even if he wasn't litigating the
9  issue per se, but he was there as counsel --
10      THE SPECIAL MASTER: Well, if he was
11  involved in it.  If he was consulting.  If he served
12  as an expert.
13      Any involvement -- what we're looking
14  for here is his background either as an expert, as a
15  consultant or as an attorney in cases in which the
16  conduct of lawyers under the Massachusetts Rules of
17  Professional Conduct were at issue --
18      MS. LUKEY: Okay.
19      BY MR. SINNOTT:
20  Q.  With that clarification, sir, can you answer
21  that question?
22  A.  I have never been asked by any Court in all
23  the cases that I've tried in this state, in Federal
24  Court of Vermont, in the Federal Court of Maine ever

Page 24

1  a question on a matter of ethics.
2      THE SPECIAL MASTER: Have you ever --
3  A.  Nobody's ever asked me what my referral fee
4  was in any case ever.  Never became an issue.
5  Q.  Well, we weren't asking about whether your
6  conduct was an issue, sir.
7      The question was whether in your
8  professional experience you've litigated or
9  participated in proceedings where that was the issue
10  in the case?
11      THE SPECIAL MASTER: Well, broader
12  still, whether the Massachusetts Rules of
13  Professional Conduct or any other Rules of
14  Professional Conduct were raised in the case and the
15  extent of your involvement in those.
16  A.  None.
17  Q.  Do you consider yourself --
18  A.  The Court has never asked ever -- any of the
19  courts -- as to what was the division of fees.
20      MS. LUKEY: The problem is what he's
21  offered on, the standard of practice.  He's not an
22  academic.
23      THE SPECIAL MASTER: I will get there,
24  Joan.  Can I ask my questions?  I will get there I

Page 25

1  promise.
2      MS. LUKEY: I don't want there to be
3  confusion or him to be embarrassed.  We didn't
4  tender him to rebut Professor Gillers.  He's on the
5  standard of practice in Massachusetts.
6      THE SPECIAL MASTER: I understand, Joan.
7      MS. LUKEY: Thank you.
8      THE SPECIAL MASTER: We're entitled to
9  inquire -- I need to know -- if I'm being asked to
10  consider his opinion, I need to know the extent of
11  his expertise and involvement with cases, writings,
12  opinions, comments on the Massachusetts Rules of
13  Professional Conduct.  That's all.  That's all.
14      Mr. Sarrouf, if I could, please, if you
15  could tell us the extent of your involvement in
16  cases or in commenting upon outside of cases
17  attorney conduct under the Massachusetts Rules of
18  Professional Conduct -- it's a very broad
19  question --
20      THE WITNESS: It is very broad.
21      THE SPECIAL MASTER: It's a very broad
22  question.
23      So we'd like to know the extent of your
24  involvement in the Rules of Professional Conduct as

Page 26

1  they are applied in the state courts, as they are
2  applied in the federal courts, any professional
3  views you may have offered on the Rules of
4  Professional Conduct, and then we will come to
5  Joan's question on the issues of division of fees.
6  　　**THE WITNESS:** I have been involved with
7  the rule making when I was president of the Mass.
8  Academy of Trial Attorneys.  I was involved with the
9  rule making --
10 　　**THE SPECIAL MASTER:** Could I ask -- I'm
11 not from Massachusetts.
12 　　**THE WITNESS:** Okay.
13 　　**THE SPECIAL MASTER:** So could you tell
14 me what the Massachusetts Academy of Trial Lawyers
15 is?
16 　　**THE WITNESS:** It was the successor to
17 what was referred to as the American -- the big
18 fight was the American College of Trial Lawyers is
19 the --
20 　　**THE SPECIAL MASTER:** Yes.
21 　　**THE WITNESS:** -- there was a -- I'm
22 trying to remember.  It changed its name a couple of
23 times.  It used to be centered here in
24 Massachusetts.  It was the one involving, um --

Page 27

1  　　(Pause.)
2  　　**THE WITNESS:** I think today it's called
3  AAJ?
4  　　**THE SPECIAL MASTER:** The American
5  Association of Justices.
6  　　**MS. LUKEY:** Replacing ATLA.
7  　　**THE SPECIAL MASTER:** Okay, I see.  Okay.
8  So the Massachusetts Academy of Trial
9  Lawyers is the predecessor to the Massachusetts
10 chapter of the American Association of Trial --
11 of --
12 　　**MS. LUKEY:** It was then the American
13 Trial Lawyers Academy.
14 　　**THE WITNESS:** Yes.
15 　　**THE SPECIAL MASTER:** Just so that I
16 understand -- I'm familiar with the Michigan version
17 of that.
18 　　**THE WITNESS:** Okay.
19 　　**THE SPECIAL MASTER:** I attend their
20 events.
21 　　**THE WITNESS:** I may have attended one of
22 their events.
23 　　**THE SPECIAL MASTER:** Yeah, great
24 organization.  That's not an endorsement.

Page 28

1  　　**THE WITNESS:** All right.
2  　　**THE SPECIAL MASTER:** That's basically a
3  plaintiffs' bar.
4  　　**THE WITNESS:** Yes, it is.
5  　　**THE SPECIAL MASTER:** I interrupted you,
6  I'm sorry, but I wasn't sure what the Massachusetts
7  Academy of Trial Lawyers was.
8  　　**THE WITNESS:** In answer to the broad
9  question you posed, I have appeared before the
10 Massachusetts Board of Bar Overseers who have been
11 accused of violations, and I've done that on several
12 occasions.
13 　　I was called in once to testify to the
14 -- there was a change that I appeared before a
15 committee that had been formed by my dear friend and
16 now partner, Arnie Rosenfeld, when we were -- when
17 he was seeking to develop a finer definition I think
18 when the matter of IOLTA accounts was being formed
19 and where there were a lot of, unfortunately,
20 misinterpretation by many lawyers as to how that was
21 to be handled, especially with regard to their
22 banking.
23 　　And I did work with him on that.  And I
24 believe that was -- it may have been when I was the

Page 29

1  president of the bar association -- the
2  Massachusetts Bar Association and requested him to
3  spend, if he could, on a monthly basis in the
4  newspaper -- in the weekly to apprise lawyers of
5  their mistakes that get them into trouble, and that
6  they should be doing certain things.
7  　　And I think that went a long way to
8  resolving those issues.
9  　　**THE SPECIAL MASTER:** In your --
10 　　**THE WITNESS:** That's a very -- in the
11 broader sense.
12 　　**THE SPECIAL MASTER:** Okay, good.  And in
13 your practice have you been involved in representing
14 attorneys who have professional conduct issues
15 before either a Court or a Massachusetts Bar
16 tribunal or -- I don't know if you have a -- we call
17 it a grievance process, Michigan Attorney Grievance
18 Board.
19 　　I don't know -- I'm sure you have a
20 corollary.
21 　　**THE WITNESS:** Yes.
22 　　**THE SPECIAL MASTER:** Have you been
23 involved in representing attorneys either in court
24 or before grievance authorities that involved or

Page 30

1  raised issues arising out of the Massachusetts Rules
2  of Professional Conduct?
3      **THE WITNESS:** Yes.
4      **THE SPECIAL MASTER:** Okay.  Could you
5  tell us about those, please?
6      **THE WITNESS:** Let me start with those
7  that have been referred to me by a Court.
8      When there have been issues and
9  certainly that involve a lawyer who may have been
10 testifying in a matter, I have been asked by
11 superior court judges to, if I would, come up and
12 make sure that I was offering legal advice to that
13 particular witness in a case, and I would come up
14 and do it pro bono.
15     I'd sit to make sure that the lawyer
16 understands the parameters of what he can say and
17 cannot say, especially in attorney/client relations.
18 There were two of those that I remember.
19     And in most instances when I've been
20 retained by attorneys I have tried to keep the
21 matter out of court and to bring it into some form
22 of mediation before -- the last one I had was before
23 a judge who was Judge Lynch who was a part of JAMS
24 at the time, and we were able to dispose of that.

Page 31

1      If that answers your question, I don't
2  know.  I've been required -- asked by lawyers often
3  through the course of my 56 years and have tried to
4  accommodate both requests of Courts and request of
5  lawyers to step in and see what could be done to
6  resolve issues.
7      **THE SPECIAL MASTER:** So is it fair to
8  say then that your involvement with cases -- in
9  either cases or public comment before boards has
10 been as a practicing lawyer?
11     **THE WITNESS:** Yes.
12     **THE SPECIAL MASTER:** Okay.  All right.
13     **BY MR. SINNOTT:**
14 Q.   And, counsel, how many of those cases have
15 involved specifically Rule 1.5(a)?
16     **MS. LUKEY:** Do you want the rule?  Could
17 he see the rule --
18     **MR. SINNOTT:** Of course.
19     **THE SPECIAL MASTER:** I was going to
20 actually suggest it, Joan.
21     **MS. LUKEY:** Yeah.  (Indicating).
22     **THE WITNESS:** Yes.
23     (Pause.)
24     **MS. LUKEY:** For the record, I'm not

Page 32

1  objecting to the question, but I had never asked him
2  to look at Rule 1.5(a) because it wasn't in
3  Professor Gillers' --
4      **MR. SINNOTT:** I'll be asking him about
5  1.5(e) if it makes you feel any better, Joan.
6      **MS. LUKEY:** It does.  He's not asking
7  about E.  He's asking you about A.  I know you
8  didn't look at that before, but that's what he's
9  asking about.
10     (Pause.)
11 **A.  I have represented clients who had a**
12 **argument or disagreement with their lawyers with**
13 **regards to the amount of monies that were charged to**
14 **the client.  I have done that.**
15 Q.   You have done that?
16 **A.   Yes.  And I was an expert in a case that had**
17 **something to do with this.  The case is -- it's**
18 **referred to in some of the other cases.  I was the**
19 **expert in Fishman versus -- I can't think of the**
20 **last --**
21     **PROFESSOR GILLERS:** Brooks.
22     **THE WITNESS:** Brooks.
23 **A.   Brooks.  I was the expert referred to as an**
24 **experienced tort lawyer.**

Page 33

1  Q.   All right.
2  A.   By the Court.
3      **THE SPECIAL MASTER:** Were you the
4  Court-appointed expert, or were you an expert for a
5  party?
6      **THE WITNESS:** No.  I had -- it was the
7  first case I came into as an expert.  A very fine
8  lawyer here, Paul Sugarman, had called me.
9      I had first turned it down, and Paul
10 called me and said, Camille, we don't have a
11 conspiracy of silence in the legal profession, and
12 you should be -- take this case.
13     **MS. LUKEY:** The judge asked you if it
14 was a Court appointment, or was it by the party --
15     **THE WITNESS:** No.  I was hired by the
16 young lawyer who was representing -- in fact, the
17 defendant who then brought a cross action.
18     **THE SPECIAL MASTER:** Was the charge --
19 did the charge involve claims of an excessive fee
20 under 1.5(a)?
21     **THE WITNESS:** No.  What it involved was
22 the failure of the client -- of the lawyer to send
23 the case to a more qualified lawyer and went ahead
24 and settled for a figure that was way out of line

Page 34

1  with what the settlement value of that case was.
2      And that's when the Court came down and
3  said there can be cases such as that, poor
4  settlement value. The difference I think in the
5  case I had opined that it was between 450 and 550
6  and not 129. And the Court sent it to the jury, and
7  then upheld the verdict of 500 and something
8  thousand.
9      BY MR. SINNOTT:
10 Q.  Did you opine on an ethical issue in the
11     course of the Fishman case?
12 A.  **Yeah, I opined that the lawyer who was**
13     **representing the client had a duty to provide the**
14     **best representation he could. And if he didn't feel**
15     **appropriately either by experience or otherwise that**
16     **he should go forward with it, he should have sent it**
17     **to someone and agreed to a referral fee rather than**
18     **to feel I'm not going to share my fee with anyone**
19     **else and go forward to the detriment of the client;**
20     **that the clients come first.**
21     THE SPECIAL MASTER: So it doesn't sound
22 like that case arose under 1.5(a) or E -- or 1.5(e);
23 is that right?
24     THE WITNESS: Well, I think it falls

Page 35

1  within the scope of what a lawyer owes to a client
2  in representation under any circumstances. And that
3  is if he can't handle it, he ought to find a lawyer
4  who can.
5      THE SPECIAL MASTER: Nobody can quarrel
6  with that.
7      But I'm -- sir, with all due respect,
8  you understand my role? I'm the special master
9  appointed by the Court, and I have to make judgments
10 about weight to be given to testimony, weight to be
11 given to expert opinion.
12     So what I'm trying to understand is the
13 scope, extent, nature, depth of your involvement
14 with cases or commenting upon rules that are at
15 issue here in this case.
16     THE WITNESS: Okay.
17     THE SPECIAL MASTER: And there are a
18 number of rules that have been raised, and I just
19 want to focus on those rules or any other Rules --
20     THE WITNESS: Your Honor --
21     THE SPECIAL MASTER: -- of Professional
22 Conduct that have relevance to this case.
23     THE WITNESS: I have -- 90 percent of my
24 law practice over the last 56 years -- and certainly

Page 36

1  it's dropped off in certainly the last five or six,
2  maybe a little longer -- have been referral cases.
3      THE SPECIAL MASTER: Fee referral cases?
4      THE WITNESS: Yes. Every one of them.
5  And in the hundreds that I've tried, I have never
6  had a Court ask me what is your referral fee.
7  Never. It never comes up.
8      THE SPECIAL MASTER: I'm sorry. Were
9  you paying referral fees, or were you receiving
10 referral fees?
11     THE WITNESS: No, I was the trial
12 lawyer. I received the -- whatever the judgments
13 were or in the middle of a trial settlements, and I
14 made the referral to the lawyer who brought me the
15 case.
16     MS. LUKEY: You made the referral
17 payment?
18     THE SPECIAL MASTER: You made the
19 referral fee --
20     THE WITNESS: The referral payment to
21 that lawyer.
22     THE SPECIAL MASTER: Okay.
23     THE WITNESS: From lawyers throughout
24 this state.

Page 37

1      THE SPECIAL MASTER: And you've never
2  had an issue raised under the Rules of Professional
3  Conduct about referral fee payments?
4      THE WITNESS: In Massachusetts referral
5  fee payments are appropriate.
6      THE SPECIAL MASTER: Well, that's what
7  we're trying to determine in this case and the
8  circumstances under which they are appropriate.
9  That's what we're trying to determine.
10     So, again, my questions to you are
11 trying to understand the extent of your expertise in
12 the application of the rules -- any rules that you
13 have expertise in, but in this case the application
14 of the rules involving referral fees which include
15 Rule 1.5(e), may include Rule 1.5(a), may include
16 Rule 7.2(b) and perhaps even other rules.
17     So we're trying to make a judgment here,
18 sir, about the extent of your experience in the
19 application of these rules and how these rules are
20 handled by courts, by bar -- I'll use the term bar
21 grievance authorities.
22     Bill, Joan, somebody correct me -- let
23 me use the appropriate Massachusetts --
24     MS. LUKEY: The Board of Bar Overseers.

Page 38

1    THE SPECIAL MASTER: The Board of Bar
2    Overseers.
3    We're trying to make a judgment about
4    the application of the rules -- the Massachusetts
5    Rules of Professional Conduct as regards referral
6    fees. I understand that you've never had a problem
7    with it. I accept that.
8    You would agree, I hope, that the fact
9    that you've never had a problem doesn't make you an
10   expert?
11   MS. LUKEY: Objection.
12   THE WITNESS: Well, if I tried the
13   number of referral fee cases in the hundreds in my
14   career, I think I have a pretty good understanding
15   and add to that my work before the BBO, my work as a
16   president of the Massachusetts Bar Association, my
17   work as a president for two years and my other
18   commitments to the practice of law in Massachusetts,
19   I'm of the opinion that it never is an issue in
20   Massachusetts; that is, the referral of cases.
21   When there is a disagreement, the
22   lawyers take it to a separate case and try it before
23   a Court, or in many instances we try it before a
24   arbitration board or in other instances just an

Page 39

1    agreement to meet at JAMS or whatever to get -- to
2    handle the matter.
3    THE SPECIAL MASTER: So when you --
4    THE WITNESS: But in Massachusetts our
5    concern in all of these rules are the clients.
6    THE SPECIAL MASTER: So let me
7    understand.
8    When you say you've had hundreds of
9    referral cases, you are referring to the cases that
10   you've had as a lawyer in which you have either paid
11   or received a referral fee?
12   THE WITNESS: Yes.
13   THE SPECIAL MASTER: Okay. My question
14   is a little different.
15   THE WITNESS: Okay.
16   THE SPECIAL MASTER: My question is have
17   you had cases in which the issue of whether a
18   referral fee was appropriate under Rule 1.5, either
19   A or E, or any other Massachusetts Rule of
20   Professional Conduct in which that was the issue in
21   which the Court had to make a decision or perhaps a
22   tribunal -- the Massachusetts Board of Bar Overseers
23   had to make a determination as to whether the
24   referral fee was appropriate?

Page 40

1    THE WITNESS: Never in the manner in
2    which you've expressed it. Whether a fee is
3    appropriate has been an issue in many cases. But
4    it's the fee that was charged to the client that
5    becomes the issue. In Massachusetts.
6    I don't know of any case otherwise in
7    Massachusetts.
8    THE SPECIAL MASTER: Is your testimony
9    then that any referral fee, no matter what the
10   circumstances, is appropriate under the
11   Massachusetts Rules of Professional Conduct?
12   THE WITNESS: If it complies that it's
13   in -- today in writing and that the client knows
14   that there is to be a sharing of the fees between
15   counsel; that is, the referring counsel and the
16   trial counsel, those don't end up that I know of in
17   courts.
18   THE SPECIAL MASTER: And if the fee is
19   not excessive, the referral fee is not excessive
20   under Rule 1.5(a), does that -- is that also part of
21   the consideration that if it were an issue, a Court
22   would have to decide whether the referral fee was
23   excessive, 1.5(a) -- I think you have it in front of
24   you; you can look --

Page 41

1    THE WITNESS: Yes. The case would be --
2    this is a complaint brought by a client?
3    THE SPECIAL MASTER: I'm not trying to
4    limit you to that. I'm trying -- sir, I'm just
5    trying to understand your expertise in the
6    application of these rules. That's all I'm trying
7    to understand.
8    And I don't want you to limit yourself
9    to cases. You can include cases, but I don't want
10   you to limit yourself to cases.
11   So when we talk -- the question I want
12   to know is is it your opinion that a referral fee,
13   no matter what, is appropriate under the
14   Massachusetts Rules of Professional Conduct? You
15   answered it in part because you said it had to
16   comply with 1.5(e), and that I understand.
17   But is that where the scrutiny of a
18   Court ends if the issue is raised?
19   THE WITNESS: But the raising of the
20   issues of fees is an issue separate and apart from
21   the case that is being -- the subject matter of the
22   complaint --
23   THE SPECIAL MASTER: Yes.
24   THE WITNESS: -- and the complaint must

Page 42

1  come from the client.  In Massachusetts.
2      THE SPECIAL MASTER: Well, let me
3  suggest another potential.  In a class action there
4  could be an objector.
5      There wasn't in this case, but there
6  could be an objector to a referral fee that the fee
7  is excessive.  There could be an objector, and a
8  Court would have to rule on that objection.
9      THE WITNESS: If it's brought before the
10  Court at that time and before the actual conclusion
11  of the case, yes.
12      THE SPECIAL MASTER: Okay.  So I'm
13  trying to understand your expertise in cases raising
14  the issue of the appropriateness of referral fees.
15      THE WITNESS: In Massachusetts I know of
16  no case with regards to the appropriateness of a
17  referral fee.  Referral fees are acceptable in
18  Massachusetts.
19      If there is a question about the
20  referral fee, that is not -- that is between the
21  lawyers that are involved with that referral
22  arrangement.
23      THE SPECIAL MASTER: So in your view
24  neither a Court, nor the Massachusetts Board of Bar

Page 43

1  Overseers has a role to play if there is a complaint
2  raised?
3      THE WITNESS: If a complaint is raised
4  by a client, no, they absolutely have a rule -- a
5  role to play.
6      I assume what you're asking is if there
7  is a complaint between the lawyers --
8      THE SPECIAL MASTER: Well, I --
9      THE WITNESS: -- that has to be taken
10  out as a separate matter.
11      THE SPECIAL MASTER: I don't want you to
12  limit yourself to that.
13      You can -- any issues that raise
14  questions of the appropriateness of a referral fee
15  under the Massachusetts Rules of Professional
16  Conduct, those are the cases I'd like to know the
17  extent of your experience and whether they're cases
18  in court or cases before the Board of Bar Overseers.
19      (Pause.)
20      THE WITNESS: I don't know how to
21  otherwise express this.  In Massachusetts, unlike
22  many -- most other states, referral fees are
23  acceptable.  It's a part of our rules.  It's a
24  part of --

Page 44

1      THE SPECIAL MASTER: I'm not
2  questioning --
3      THE WITNESS: -- what we try cases with.
4      THE SPECIAL MASTER: Sir.
5      THE WITNESS: It's the equalizer that
6  exists.
7      THE SPECIAL MASTER: Sir, I'm not
8  questioning that.
9      I'm only questioning the extent of your
10  involvement in cases in which these issues were
11  either cases or bar overseer -- Board of Bar
12  Overseer proceedings, anything in which the question
13  of the appropriateness of a referral fee or a
14  division of fees was an issue in either the case or
15  the proceeding.
16      THE WITNESS: As you pose that question,
17  I don't know.
18      THE SPECIAL MASTER: Thank you.
19      CONTINUED EXAMINATION BY MR. SINNOTT:
20  Q.   So, sir, let me ask the question this way:
21  Have you ever briefed a Court on how it should
22  interpret Rule 1.5(e)?
23  A.   No.  It's never been raised in any case I've
24      ever been involved with.

Page 45

1  Q.  Have you ever briefed a Court on how it
2  should interpret Rule 7.2(b)?
3      MS. LUKEY:  Sorry, flipped too far.
4  7.2(b) (indicating).  This is just for context.  And
5  there's the B (indicating).
6      (Pause.)
7  A.  The question again is?  I've read it.
8  Q.  Have you ever briefed a Court on how it
9  should interpret that rule?
10  A.  No.
11  Q.  And have you ever briefed a Court on how it
12  should interpret Rule 1.5(a)?
13  A.  No.
14  Q.  Now, sir, I know that you taught at New
15  England School of Law for 19 years; is that correct?
16  A.  Roughly.  Nineteen or 20, yeah.
17  Q.  Did you ever teach legal ethics?
18  A.  I taught it as a part of the legal
19  practice --
20  Q.  What was the name --
21  A.  -- portion.
22  Q.  What was the name of the course you taught?
23  A.  Actually, imposed the old NITA, the National
24  Institute of Trial Advocacy, of which I was a part

Page 46

1 for several, several years, and I really put it in
2 place at the New England School of Law with four
3 others.
4    There was Judge Mazzone of the federal
5 court, Judge Barton, and Abner Sisson who was really
6 my mentor at the law.
7 Q.  But that was a trial advocacy course,
8 correct?
9 A.  Yes, it was.
10 Q.  I understand it was a pretty good one, too,
11 but --
12 A.  I hope so.
13 Q.  You did not teach a legal ethics course,
14 correct?
15 A.  That was a separate course, but I did teach
16 ethics as to, you know, the extent to which you can
17 work with the facts when you're addressing a jury --
18 Q.  Sure.
19 A.  -- what is necessary in your presentations
20 to a Court; the ethical rules all apply, and you
21 must be aware of them.
22    THE SPECIAL MASTER: Would that include
23 the duty of candor under Rule 3.3 that a lawyer has
24 to the Court?

Page 47

1    THE WITNESS: Absolutely.
2    BY MR. SINNOTT:
3 Q.  So, sir, you don't consider yourself to be
4 an expert on Rule 1.5(e), do you?
5 A.  An expert on?
6    MS. LUKEY: Go back one.  It's right
7 here (indicating).
8 A.  I do consider myself an expert on that rule.
9 Q.  And why is that, sir?
10 A.  Because I've done almost -- in all the cases
11 I've tried been involved in a referral matter.
12 Q.  And your testimony is that that makes you an
13 expert in that area?
14 A.  It certainly makes me an expert in how it's
15 been handled here in the Commonwealth of
16 Massachusetts both in the --
17    THE SPECIAL MASTER: Could I -- I'm
18 sorry, please continue.
19 A.  -- state court and adoption of the same
20 rules by the federal court.
21    THE SPECIAL MASTER: Does that include
22 class actions?
23    THE WITNESS: The only class action I
24 was involved with in terms -- to the extent that it

Page 48

1 was -- was the Patriots litigation.  All others,
2 frankly, I refer out.
3    THE SPECIAL MASTER: So -- I won't ask
4 you if you receive a fee when you refer them out.
5    THE WITNESS: I do.  Sometimes a very
6 small one, but I do receive --
7    THE SPECIAL MASTER: Okay.
8    THE WITNESS: And in many cases I simply
9 send them over to the client; that is, the referral
10 fee.
11    THE SPECIAL MASTER: So is it fair to
12 say then that your expertise does not include
13 referral fees or division of fees in class actions?
14    THE WITNESS: Other than my own
15 experience in referring matters to whoever the class
16 counsel are and how I receive or my office receives
17 the referral that we agreed upon, no.
18    BY MR. SINNOTT:
19 Q.  So, sir, would it be your testimony that any
20 lawyer that engages in referrals is an expert on
21 Rule 1.5(e)?
22    MS. LUKEY: Objection.
23 A.  Any lawyer who does referral work better
24 acquaint themselves with this.

Page 49

1    THE SPECIAL MASTER: Would they be
2 competent to offer expert testimony on the rules
3 under the governing standards of Rule 702?
4    THE WITNESS: Yes.
5    THE SPECIAL MASTER: Do you know Rule
6 702?  I assume it's the same in Massachusetts.  It's
7 the rule that governs the admission of expert
8 opinion testimony.
9    Is it your view that any lawyer who
10 engages in the receipt of referral fees or who pays
11 referral fees would qualify as an expert under Rule
12 702?
13    THE WITNESS: With the extent of
14 experience that I've had, I believe that I should be
15 considered by a Court.  I think a Court has been --
16 has accepted my --
17    (Pause.)
18    THE SPECIAL MASTER: While you're
19 thinking, I would be very interested in any cases in
20 which a Court has recognized you as an expert,
21 offered by a party or appointed by the Court under
22 Rule 706.
23    I'd be very interested in which you've
24 been recognized as an expert on these issues.

Page 50

THE WITNESS: Well, I can only put it
this way 'cause I can't remember them all:  I've
never been disqualified by a Court when I appeared
as an expert.
   The only time --
   THE SPECIAL MASTER: Have you appeared
as an expert and been recognized by a Court as an
expert, either for a party or by the Court, as to
Rules 1.5 or Rule 7.2(b)?
   THE WITNESS: Yes, I was recognized in
the case of -- I think it's listed in this.
   (Pause.)
   THE WITNESS: Zabin versus Picciotto.
   THE SPECIAL MASTER: Zabin.
   THE WITNESS: Zabin.
   THE SPECIAL MASTER: Okay, yes, that's
listed.  Yep.
   BY MR. SINNOTT:
Q.  Wasn't that a case, sir, where the issue was
   whether your client was entitled to quantum meruit?
A.  It also became an issue as to which of the
   clients -- and there were several if you read the
   case; I don't know how many different lawyers there
   were.  And I ended up really being sort of the

Page 51

   expert for each of the lawyers during the -- I was
   on for two days.
Q.  And what was your testimony specifically
   with respect to --
A.  How you divide the -- my testimony was you
   divide the issues that were being addressed at the
   particular time that that lawyer was involved,
   either in the initial case or in the subsequent
   appeals, and I expressed my opinions as to how --
   well, the way they should be assessed and presented
   to the jury in this particular case -- in that case.
   THE SPECIAL MASTER: And was your view
in that case, the Zabin case, that a lawyer could
receive -- as I understand the case -- and that was
listed.  So we looked at the cases.
   As I understand the case, a lawyer had
been discharged from his representation, or he
withdrew, he got out of the case, and then he sued
his former client for a recovery of some attorneys'
fees.
   And you in that case opined to the jury
on your view of what was an appropriate fee that
this lawyer should have gotten.  And what was the
basis of your view as to the amount of the fee?

Page 52

   THE WITNESS: It was in accordance with
the fee agreement that had been entered into between
the party and the lawyer.
   In that case it was --
   THE SPECIAL MASTER: And do you recall
what the appeals court ultimately ruled in that case
as to the basis of a fee to which that lawyer should
have received?
   THE WITNESS: I don't remember exactly
that, no.
   THE SPECIAL MASTER: Would it help your
recollection -- and I'll just try to distill this --
to say that the appeals court ruled that the basis
of recovery for that attorney was quantum meruit?
Does that help your recollection?
   THE WITNESS: There were several
lawyers.  I don't know which one they were referring
to at that time, but I believe as to Mr. Zabin --
Attorney Zabin it was in accordance with the
agreement that had been -- the contingent fee
agreement signed between Mr. Zabin and the client.
   THE SPECIAL MASTER: And the basis was
not quantum meruit?
   THE WITNESS: There was quantum meruit

Page 53

to be determined at various stages with regards to
other of the lawyers 'cause there were several of
them.  He went through lawyers --
   THE SPECIAL MASTER: Were you offered by
Mr. Zabin?
   THE WITNESS: Huh --
   THE SPECIAL MASTER: Were you offered as
the expert for Mr. Zabin?
   THE WITNESS: Yes.  And then suddenly
became the expert for everybody else in the case.
   BY MR. SINNOTT:
Q.  And how did Rule 1.5(e) figure into that
   expert testimony of yours?  How did you cite that?
A.  I didn't cite it.
   MS. LUKEY: I don't think that was the
question that elicited that case answer.
   MR. SINNOTT: Okay, but I'm asking that
question.
   MS. LUKEY: Okay.
Q.  So 1.5(e) was not cited in your advocacy on
   behalf of Mr. Zabin, correct?
A.  No.
Q.  Do you consider yourself an expert on the
   Massachusetts Rules of Professional Conduct?

Page 54

1 A. I know them to the extent that I have been
2 in the practice for as long as I have and have been
3 in the courts of the Commonwealth for as many times
4 as I have, and I'm well acquainted with the rules of
5 ethics.
6 Q. As is any long-term practitioner, correct?
7 A. Yes.
8 Q. Are you prepared to go before Judge Wolf in
9 federal court and testify as an expert on the
10 Massachusetts Rules of Professional Conduct?
11 A. Yes, I will.
12 Q. You will?
13 A. Yes.
14 Q. Let me ask you about class actions, sir. I
15 know you mentioned the Patriots case.
16 Have you ever entered into an
17 attorney/client relationship with a plaintiff in a
18 class action matter other than yourself?
19 MS. LUKEY: I'm sorry, could you --
20 Q. Have you ever entered into an
21 attorney/client relationship with a plaintiff in a
22 class action matter?
23 A. Yes.
24 Q. And who was that?

Page 55

1 A. Oh, my God. Several. They come up. I
2 refer them out if the class action is already in
3 place.
4 Q. All right.
5 A. But people have come to me in many of the
6 class actions that are out there, especially the
7 asbestos cases. Not only some -- some of them came
8 -- close friends and family came with regards to
9 their claims.
10 I would take down the information, and
11 I'd find out who are the class representatives, and
12 I'd send the matter over to them.
13 THE SPECIAL MASTER: So in those cases
14 you were the referring attorney?
15 THE WITNESS: Yes.
16 THE SPECIAL MASTER: Yep. I think
17 Bill's question was a little --
18 Q. Let me be a little more specific.
19 THE SPECIAL MASTER: -- specific.
20 BY MR. SINNOTT:
21 Q. Have you ever acted as class counsel in a
22 class action?
23 A. Only in the Patriots cases to the extent
24 that you would take those three cases, the federal

Page 56

1 case and the two in the state court. I was involved
2 in each of those.
3 Q. And you were class counsel in those cases?
4 A. Yes. I was the lead case that went forward
5 in the appraisal actions, and then at the request of
6 Judge Young -- William Young, I -- he asked me to
7 intervene in the Coggins case, and then at the
8 request of other lawyers I went into the Pavledis
9 case in the federal court.
10 Q. How many other firms were involved in those
11 cases?
12 A. How many firms?
13 Q. Yes, sir.
14 A. I think there were nine other firms in the
15 appraisal actions. The Coggins, that firm was
16 Nutter McClennen. And in Pavledis, the professor
17 from Suffolk. One other from the firm -- the firm
18 that entered the lawsuit and then the whole class
19 that was expanded to include every person whether
20 they agreed with the proposals of Mr. Sullivan or
21 not, the Court expanded those who would be
22 beneficiaries to every holder of a non-voting share
23 at the time that it was taken private.
24 Q. And what was the recovery for the class in

Page 57

1 those matters?
2 A. Well, the offer was $15 a share. The
3 finding by Judge Young in the appraisal action was
4 that it was $80 a share. And then we moved that it
5 be taken as to interest as though the matter was
6 being held as a trustee 'cause that was one of the
7 findings.
8 And, in fact, Sullivan and the voting
9 shareholders were, in effect, trustees of the
10 valuation at the time of liquidation of -- and
11 should have been more faithful to their
12 responsibilities as trustees.
13 And that -- we prevailed upon the Court
14 to utilize not the statutory interest rate of 1
15 percent a month but as trustees utilizing the
16 federal and then -- and, in fact, it would -- I
17 forget how it was -- and a monthly -- so it was --
18 the interest rate was upon -- applied every month.
19 So it took it from $80 to $186 and some odd cents
20 per share to be attributed.
21 So then there was the determination in
22 Judge Skinner's finding that even those who had
23 agreed and taken that $15, they were eligible for
24 the remainder starting with the date upon which they

Page 58

1  had already received their first submission for the
2  $15.
3  Q.   Was there a fee award in that case?
4  A.   Yes.
5  Q.   And how many attorneys received a portion of
6  that fee award?
7  A.   Well, I received a fee for my case.  I
8  didn't charge anybody in my family.  I sent a
9  hundred shares off to Bowdoin College that was mine,
10  and the rest went to my wife and four children.
11       In the Coggins case I don't think I
12  asked for a fee from Nutter McClennen.  In the
13  Pavledis cases the Court awarded the fee after
14  hearings including a -- in one of the Fed Supp cases
15  the judge accepted that he should consider for the
16  lodestar to also include or consider a percentage
17  fee like ordinarily would be in a -- you know, a
18  third.  I think he came to 25 percent.
19       THE SPECIAL MASTER: Do you --
20  A.   But it's in those cases.
21       THE SPECIAL MASTER: Do you have
22  experience beyond the Patriots case in class
23  actions --
24       THE WITNESS: Only to the extent that I

Page 59

1  have sent cases to the class action lawyers and, of
2  course, stayed appraised of what's going on and what
3  would the client -- my client of course -- can
4  expect, especially in those instances when I've
5  represented much older people, many retired, in
6  which the money was very much a part of their
7  existence.
8       THE SPECIAL MASTER: Do you have
9  experience as lead counsel --
10       THE WITNESS: No.
11       THE SPECIAL MASTER: -- in class
12  actions?
13       THE WITNESS: Other than the Patriots
14  matter, no.
15       THE SPECIAL MASTER: All right.  Do you
16  have experience in the obligations of disclosure to
17  the Court in class actions of attorney fee
18  agreements?
19       THE WITNESS: Here in Massachusetts?
20       THE SPECIAL MASTER: Anywhere but
21  certainly Massachusetts.
22       THE WITNESS: Well, I know in some
23  instances in talking to the lawyers who are the
24  class counsel that they follow the Massachusetts

Page 60

1  rule.  I mean federal court here has adopted our
2  rules.
3       THE SPECIAL MASTER: Let me ask again do
4  you have experience with the Massachusetts rules in
5  class actions as to the obligations of disclosure
6  that counsel have to the Court in seeking fees?
7       THE WITNESS: I know they would be bound
8  by our rules.  The Massachusetts rules.
9       THE SPECIAL MASTER: Hopefully, they're
10  bound by all the rules, but my -- my question again
11  is your experience.  Do you have experience
12  personally in --
13       THE WITNESS: No --
14       THE SPECIAL MASTER: -- not what the
15  lawyers tell you, but do you personally have
16  experience in your practice as to the obligations
17  that class lawyers have in disclosing fees to the
18  Court?
19       THE WITNESS: I have never experienced
20  myself, other than the Patriots matter, as a class
21  action lawyer.  But I can tell you that I certainly
22  monitor the cases on behalf of my clients.
23       THE SPECIAL MASTER: Bill.
24       BY MR. SINNOTT:

Page 61

1  Q.   So, sir, with respect to those cases that
2  you monitored, is it fair to say that -- can you
3  tell me if any of those were national class action
4  cases?
5  A.   I believe certainly asbestos cases would
6  fall into that category.  There was one other having
7  to do with a particular drug.  I don't remember what
8  it was, but that certainly was an action cases.
9  Other than that, no.
10  Q.   And who were the firms you referred those
11  cases to that you monitored?
12  A.   One was the Cetrulo firm I believe.  Another
13  was the -- can I just ask -- can I ask her what --
14       THE SPECIAL MASTER: She can refresh
15  your recollection.
16       THE WITNESS: Yes, thank you.
17       (Witness and counsel confer.)
18       BY MR. SINNOTT:
19  Q.   Sir, you can go ahead and answer.
20       MS. LUKEY: So the name of the person at
21  Manion Gaynor that you wanted to give them.  Gaynor.
22  A.   Gaynor.
23       MS. LUKEY: Marty Gaynor.
24  Q.   All right, sir.

Page 62

1 A.   There's another -- I forgot the name of the
2 firm.  I can't think of his name, but I know -- he
3 was in my office for a short time.
4    MS. LUKEY: What kind of case?
5    THE WITNESS: Another part of the
6 asbestos matters.  A different type of asbestos.
7 Q.  That's all right, sir.  We can move on.
8 A.  All right.  I'll get it sooner or later --
9 Q.  Do you have any experience --
10 A.  There is one other matter --
11 Q.  Yes.
12 A.  -- that she did remind me of when I was
13 accepted as a lawyer as to fees --
14    MS. LUKEY: The expert.
15 A.  -- the expert, I was pro bono for the
16 Commonwealth of Massachusetts in the case in which
17 they opposed the further distribution of fees on the
18 second payment arising out of the tobacco cases.
19    And I agreed -- I think it was Attorney
20 General Tom Riley -- that I would myself, Mike Mone,
21 I forget who the third one was, but Mike Mone and I
22 did it pro bono for the Commonwealth and appeared in
23 the case in front of -- I think it was Judge van
24 Gestel who's still sitting.

Page 64

1 appeals opinion, you testified that Mr. Zabin was
2 entitled to receive 40 percent of the 2.2 million
3 dollars which was the highest offer he had received
4 in settlement negotiations plus expenses.
5    And you further testified, according
6 again to the court of appeals opinion, that
7 Mr. Zabin's success was the foundation of the
8 ultimate settlement and that his efforts following
9 the completion of the trial at issue contributed to
10 the ultimate result.  Correct?
11    THE WITNESS: Yes.
12    THE SPECIAL MASTER: That was the basis
13 of your testimony as to the basis of his award; that
14 the award should recognize the value of his
15 contribution to the ultimate recovery of his client,
16 correct?
17    THE WITNESS: Yes.
18    THE SPECIAL MASTER: Or his former
19 client maybe.  Is that correct?
20    THE WITNESS: Yes.
21    THE SPECIAL MASTER: And the jury
22 apparently agreed with you --
23    THE WITNESS: Yeah.
24    THE SPECIAL MASTER: -- because they

Page 63

1 Q.  All right.
2    THE SPECIAL MASTER: May I follow up?
3    MR. SINNOTT: Yes.
4    THE SPECIAL MASTER: I'm looking at the
5 Zabin case which you referred us to in which you
6 served as Mr. Zabin's expert.
7    THE WITNESS: I was.
8    THE SPECIAL MASTER: And apparently were
9 recognized by the Court as such 'cause he let you
10 testify, right?
11    THE WITNESS: I don't know why I was.
12 Usually -- they don't usually put names in, but they
13 did there.
14    THE SPECIAL MASTER: Well, you are
15 referred to in the Massachusetts Appeals Court
16 opinion as Mr. Zabin's expert.
17    THE WITNESS: I was then examined by
18 every other plaintiff's counsel with regards to
19 their case --
20    THE SPECIAL MASTER: Well, that's what
21 happens to experts.
22    THE WITNESS: I was on for two days.
23    THE SPECIAL MASTER: Okay.
24    Your testimony as characterized in the

Page 65

1 awarded him a million ten thousand dollars.  Right?
2 That's close to 40 percent.
3    I didn't do the math but something like
4 that, right?
5    THE WITNESS: Yeah, I didn't check on it
6 later, you know.  I mean --
7    THE SPECIAL MASTER: So is it fair to
8 say that your testimony in this case, the Zabin
9 case, supported the award to Mr. Zabin as a result
10 of the value of his contribution to the result of
11 the case?
12    THE WITNESS: Yes, that was the initial
13 amount.  Remembering that later it comes up to about
14 8 or 9 million.
15    THE SPECIAL MASTER: Understand.  Let me
16 ask the question again maybe a little sharper,
17 clearer, okay?
18    Is it accurate to say that your
19 testimony in the Zabin case was that Mr. Zabin was
20 entitled to this fee of 40 percent as a result of
21 the value that he contributed to the ultimate award
22 in the case?
23    THE WITNESS: Yes.
24    THE SPECIAL MASTER: Thank you.

Page 66

BY MR. SINNOTT:
1
2  Q.  All right.  Now, Attorney Sarrouf, do you
3  have any experience in class actions involving
4  securities?
5  A.  Other than the Patriots case?
6  Q.  Yeah, other than that.
7  A.  No.
8  Q.  And do you have, other than the Patriots
9  case which might arguably fall into this, any
10  experience in class actions involving financial
11  fraud?
12  A.  I don't clearly remember.  I think I was an
13  expert.  The case never got very -- got settled
14  rather quickly.  Involving a bank matter concerning
15  -- no, it wasn't a bank.
16      I think it had to do with -- the firm is
17  no longer -- Tucker Anthony & RL Day.  They are no
18  longer in existence.  I know I was brought in as an
19  expert in the matter.  I think it was Gordon Dugan
20  that had hired me.
21      But I think I gave a deposition, and
22  then soon thereafter everything got settled.
23  Q.  All right.
24  A.  That's the only time I think that I -- and I

Page 67

1  know it had to do with a trust and the investments
2  in that trust.
3  Q.  And what was the gist of your expert
4  testimony, if you recall?
5  A.  The extent to which a trustee and in my
6  opinion that -- I forget what it was in that
7  particular situation -- their responsibilities to
8  the monitoring of investments on behalf of the
9  beneficiaries.
10  Q.  All right, sir.  Have you ever been paid,
11  received a referral fee in a class action matter in
12  which you did not perform any substantive work?
13  A.  I don't know what you really mean by
14  substantive.  In each instance in which we have
15  referred the case over we have gathered the
16  medicals.  To the extent that there were physician
17  reports that we felt were appropriate and necessary,
18  we always obtained those and then usually put
19  everything together in a package and sent them
20  along.
21      THE SPECIAL MASTER: So you did the --
22  is it accurate to say you did the initial
23  preparation of the case?
24      THE WITNESS: To the extent that we

Page 68

1  thought the matters and the material that we did
2  gather would be supportive of the claim, then we
3  would send it along to the class counsel.
4      THE SPECIAL MASTER: Did you also do any
5  valuation of the case --
6      THE WITNESS: No.
7      THE SPECIAL MASTER: -- of some sort?
8      THE WITNESS: No.  We couldn't tell -- I
9  didn't have the experience.  That's why I would send
10  it over is that those lawyers have a better
11  understanding, especially after they gather whatever
12  information they need as to the loss and what the
13  claim was worth.
14      I think, I suppose, in some of those
15  instances you have limited funds, and you have to
16  appropriately percentage what the clients would
17  receive.  I left all of that to the class counsels.
18  But we did always gather our information, send it
19  in.
20      BY MR. SINNOTT:
21  Q.  And typically how many plaintiffs were you
22  representing in these referral cases?
23      MS. LUKEY: You mean the class action?
24      THE SPECIAL MASTER: Yes.

Page 69

1      MS. LUKEY: Referral of the class
2  actions?
3      MR. SINNOTT: Yes.
4  A.  The ones that I -- you know, my son takes
5  over most of this stuff now, not me.  I would say
6  maybe 20, 30.
7  Q.  In a typical --
8  A.  -- referrals.
9  Q.  -- case you represent 20, 30 persons?
10  A.  Yeah.  Some of them are gone now, but in the
11  very beginning I think we put 'em altogether over
12  the years, there would be that much.  Maybe more.
13  Q.  All right.  So in an individual class action
14  referral you're already representing 20 or 30
15  parties, correct?
16  A.  Yeah.
17  Q.  All right.  And is it fair to say that those
18  20 or 30 plaintiffs, or however many there were
19  whose case you were referring, knew that you were
20  going to receive a payment for this referral?
21  A.  I'd -- that I would receive back from --
22  yes, I think I told them, and sometimes I just gave
23  them the money that I had as a referral 'cause some
24  of them were -- I know one in particular is a widow.

Page 70

1  **We still get a little from her.  And whatever we get**
2  **we send it along.  It's not fair.**
3  Q.   Aside from any award to the class, these
4  plaintiffs knew that you were going to receive a fee
5  for your referral, correct?
6  **A.  I don't think I ever sat down with my client**
7  **and said I'm going to get a fee.  I developed with**
8  **most of these people a personal relationship, and I**
9  **say we'll do the very best, and we're sending this**
10  **off to the people now that are -- and you'll get --**
11  **you'll get a distribution.**
12  Q.  But you --
13  **A.  And I know in one case why are you sending**
14  **this to me if it's for you.  And I said because I**
15  **think you need it better than I do.  That's all.**
16  Q.   Well, in some of those cases did you keep a
17  fee, or did you hand all of the money over to the
18  plaintiffs?
19  **A.  No, I think there were some that we did a**
20  **lot of work in the very beginning, and I think we**
21  **wanted to -- you know, we paid for hospital records.**
22  **We asked doctors to send us a report if they could**
23  **go back and find their records, would they please**
24  **send those, and whatever costs there were with that.**

Page 71

1  **THE SPECIAL MASTER:** Do you know if --
2  **A.  I don't think of any other --**
3  **THE SPECIAL MASTER:** Sorry.
4  **A.  Some of them I'm sure we did keep.**
5  **THE SPECIAL MASTER:** Do you know if in
6  those cases the clients consented to the division of
7  fees that would be made under Rule 1.5(e) and signed
8  a writing agreeing to that?
9  **THE WITNESS:** Is the question did I
10  require them to sign a contingent fee agreement?
11  **THE SPECIAL MASTER:** Um, well, I'm
12  asking you the question under Rule 1.5(e) 'cause
13  where there is under Rule 1.5(e) -- we talked about
14  this earlier -- where there is a division of a fee
15  agreement between lawyers who are not in the same
16  firm, the client has to be notified of the division
17  of the fee and has to consent in writing.
18  So do you know if in those cases the
19  client consented in writing to the division of the
20  fee?
21  **THE WITNESS:** They would have signed the
22  forms that we had.  Now --
23  **THE SPECIAL MASTER:** And do those forms
24  include a consent to -- if you know, do those forms

Page 72

1  include a consent to the division of fees such that
2  you might be receiving a fee and that the client
3  then signed that agreement to the division of the
4  fee?
5  **THE WITNESS:** I'd have to go back and
6  look because I don't -- I can remember no client --
7  and I've had clients, some of them now 50 years --
8  ever -- anything I hand over to them, they don't
9  even bother to read it.  They just sign it.
10  I've had long relationships with my
11  clients, especially -- although there aren't many
12  left anymore.  I'm getting too old.  They don't
13  always even understand when you try to explain to
14  them how the division is going to be.
15  **THE SPECIAL MASTER:** But --
16  **THE WITNESS:** They just say, look, I've
17  been coming here enough times, just take care of me.
18  **THE SPECIAL MASTER:** I understand, but
19  you understand the rule requires -- we talked about
20  this earlier --
21  **THE WITNESS:** Yes.
22  **THE SPECIAL MASTER:** -- the rule
23  requires that the clients consent to a division of a
24  fee in writing, right?

Page 73

1  **THE WITNESS:** Yes, okay.
2  **THE SPECIAL MASTER:** So can we assume
3  that in those cases in which you referred cases out
4  to the class lawyers, that at some point those
5  clients agreed to the division of the fee in writing
6  with your firm?
7  **THE WITNESS:** Yes, I think you can
8  assume that.
9  **BY MR. SINNOTT:**
10  Q.  Now earlier -- just a moment ago you
11  testified that many of those clients don't want to
12  know.  Does that make any difference?
13  **MS. LUKEY:** Objection.
14  **A.  Any difference to what?**
15  Q.  In whether or not you would feel obliged to
16  get their written consent.
17  **A.  If I understand the question --**
18  Q.  Yes, sir.
19  **A.  -- the concern in all cases that I have**
20  **handled, and most of the lawyers that I know, is the**
21  **welfare of their client.  Many clients do not wish**
22  **to get into a legal argument.  They're there because**
23  **they have some faith in you.**
24  **And you can explain things, and they're**

Page 74

1  not going to understand it.  They'll very quickly
2  shut you off and say, look, I've been coming here
3  enough times, take care of my wants.  If I find a
4  difference, I'll come to you and say, look, this is
5  better.  Is that fair enough?  And I'll say yes.
6     THE SPECIAL MASTER: Would you say to
7  them under those circumstances, Mr. Smith or
8  Mrs. Smith, I'm required by law to have you -- to
9  inform you that there's a possibility that there
10 will be a division of a fee which I will receive and
11 to have you agree to that in writing?  Would you say
12 that to them?
13    When they say I trust you, I love you,
14 have been coming here for years, wouldn't you say to
15 them I appreciate that, but I'm required by law to
16 get your consent in writing?
17    THE WITNESS: They've never -- as soon
18 as I give it to them -- they don't even ask for
19 it -- they've already signed it.
20    THE SPECIAL MASTER: Oh, all right.
21    BY MR. SINNOTT:
22 Q.  So it's not your testimony that a lawyer's
23 perception that a client would agree to such a
24 division of fees excuses the attorney from carrying

Page 75

1  out his duties under 1.5(e)?
2  A.  The only time you will get a question is
3  does the -- does that referral come from my portion
4  of the recovery, and I always say and start it this
5  has nothing to do with the proportion that's
6  allotted to you in this matter.
7     This is a proportion that comes between
8  a lawyer and me.  Or if I'm doing it and they send
9  it and the client hasn't already signed one, I tell
10 them that this is what you're going to sign.  This
11 has nothing to do with what you ultimately will
12 receive.  There'll be a fee.  This is the amount of
13 the fee.  You will pay for some of the expenses that
14 we're putting out for you until there's a recovery.
15    And I can tell you now if we don't get a
16 recovery you will not be required to pay any of
17 those expenses either.  We make sure we tell them
18 that.
19    But at no time anything between me and
20 your counsel -- your original lawyer -- we have an
21 agreement, and part of what I may -- the fee that is
22 set forth in this agreement, part of it I may send
23 to him or her.
24 Q.  And it's your testimony you tell every

Page 76

1  plaintiff client that you're referring in a class
2  action case this colloquy as to what might happen,
3  correct?
4  A.  Yes.
5  Q.  Now --
6  A.  Because they don't understand what class
7  actions are.  We're not dealing for the most part --
8  and it's the simple person that very often is the
9  injured party -- doesn't always want to know.
10 They've got enough problems of their own simply
11 trying to exist.
12 Q.  But you tell them anyway?
13 A.  I tell them that there is a requirement that
14 I tell them, and they say I don't want to hear about
15 it.  It's not coming from me; is that right?  I say,
16 that's right, it's not coming from you.
17 Q.  But you scrupulously tell every client that
18 -- in such a case that a division of fees may result
19 in you getting money from the case, correct?
20 A.  When I send it out to a --
21 Q.  Yes, sir.
22 A.  Yes.
23 Q.  Okay.  And you're not saying, am I correct,
24 that if an attorney perceives that that client whose

Page 77

1  case he's referring to another firm doesn't care;
2  that doesn't excuse him from going through that same
3  colloquy that you religiously go through, does it?
4     MS. LUKEY: Objection.
5  A.  I just don't understand the question.
6  Q.  Well, let me see if I can ask it another
7  way.
8     A practitioner is referring -- about to
9  refer a case to a national class action law firm,
10 and the practitioner knows that he may get a
11 substantial portion of the fee for himself for
12 having made that referral.
13    The practitioner considers telling his
14 client about this but then says, jeez, Mrs. Jones,
15 she doesn't care; every time I try to raise
16 something of legal nature with her, she says that's
17 all lawyer talk, I don't want to know about it so
18 I'm not going to tell her this because it's just
19 going to aggravate her, or she's just going to give
20 me the same line.
21    So the practitioner keeps his mouth
22 shut, and the practitioner pockets his portion of
23 the award, and Mrs. Jones gets her settlement amount
24 and doesn't know that the practitioner has received

Page 78

1  a fee from that case.
2      You're not saying that's appropriate,
3  are you?
4      **MS. LUKEY:** Objection.
5  **A.   That he receives a fee?  And that's the**
6  **agreement he has with the other counsel?**
7  Q.  Yes.  Without notifying his client.
8  **A.   Who's --**
9      **MS. LUKEY:** The recipient or sender?
10  I'm confused, too.
11      Is the lawyer in your hypothetical the
12  recipient of the referral fee or the person sending
13  it out to someone else -- I'm sorry, the person
14  getting it in?
15      **MR. SINNOTT:** The practitioner's the
16  recipient of the referral fee.
17      **MS. LUKEY:** The recipient of the
18  referral fee.
19      (Pause.)
20  **A.   I --**
21      **THE SPECIAL MASTER:** Maybe it would help
22  if I simplified the question and broke it down.
23      You've told us what your practice is,
24  and it sounds like your practice is that when you

Page 79

1  refer clients out to national class counsel, you go
2  through with them the fact and you have them sign --
3  you go through with them the fact that if there is
4  an award, that you may get a division of a fee, and
5  you tell them that.
6      And they may say I don't want to know;
7  this is lawyer talk, but you go through that with
8  them, and you have them sign, or they've already
9  signed when they get to you the consent.
10      **THE WITNESS:** Yeah, most of the times
11  they've already --
12      **THE SPECIAL MASTER:** -- signed it.
13      **THE WITNESS:** -- signed it.
14      **THE SPECIAL MASTER:** I think what
15  Mr. Sinnott is asking is it in your view appropriate
16  for a lawyer not to go through with the client what
17  you've described that you go through in explaining
18  that there will be a division of fees if there's an
19  award; that I may get a division of that fee and
20  that you have to consent to it in writing.  I think
21  Mr. Sinnott's question is simply is it ever
22  appropriate not to go through that with the client,
23  even if the client says I don't want to know?
24      **THE WITNESS:** It may not be appropriate,

Page 80

1  but there has been no -- I don't know how I should
2  state it?
3      The client has never lost anything if
4  there is someone misses putting the thing together
5  in writing.  The client hasn't been in any way at
6  risk of any further -- if our concern is the client,
7  if the person to whom most of these rules are set to
8  help, the client doesn't suffer anything.
9      And someone misses a -- maybe just
10  forgets to do it, that person shouldn't be --
11      **THE SPECIAL MASTER:** We're talking about
12  the attorney, not the client now.
13      **THE WITNESS:** I know but the attorney --
14      **THE SPECIAL MASTER:** It sounds like
15  you're explaining --
16      **THE WITNESS:** If the client hasn't been
17  damaged in any way, hasn't suffered any decreased
18  monies that would have been due to him and somehow
19  there is a paper glitch or whatever it may be that
20  occurs with regards to something being put in
21  writing but it doesn't harm the client, these rules
22  don't say you got to -- you got to in some way
23  penalize the lawyer.
24      **THE SPECIAL MASTER:** Not my question.

Page 81

1  Not Bill's question with all due respect,
2  Mr. Sarrouf.
3      **MS. LUKEY:** Objection.  I think he
4  answered your question, your Honor.
5      **MR. HEIMANN:** I hate to pipe in here,
6  but I do, too.
7      **MS. LUKEY:** He answered your question.
8      **THE SPECIAL MASTER:** Let's start with
9  the rule.
10      **THE WITNESS:** I know the rule.
11      **THE SPECIAL MASTER:** Well, maybe --
12  maybe you did answer it.
13      Is your answer that if the client is not
14  harmed the lawyer does not have to comply with the
15  rule?  Maybe you did answer it.  Is that your
16  answer?
17      **THE WITNESS:** No, he should comply, but
18  if he fails to, he shouldn't be penalized for it
19  when the client has suffered no damage, no loss of
20  what her or his rights are.
21      **THE SPECIAL MASTER:** Does that relieve
22  the lawyer of the obligation to notify the client of
23  the division of fee and seek the client's consent in
24  writing?

Page 82

1   **THE WITNESS:** If he wants to get a
2   letter from someone that says, look, don't mess up
3   anymore, but you don't penalize him.  That's the
4   rule here in Massachusetts.
5   **THE SPECIAL MASTER:** Mr. Sarrouf, I
6   think it would be helpful if we go through the rule.
7   **THE WITNESS:** Okay.
8   **THE SPECIAL MASTER:** Joan, could you put
9   1.5(e) in front of him?  Just the rule.
10  **MS. LUKEY:** Yeah.  I have current
11  versions the one that came into effect in 2015.  Do
12  you want the one that came into effect --
13  **THE SPECIAL MASTER:** The current version
14  reflects Saggese.
15  **MS. LUKEY:** That came into effect in
16  2011.
17  **THE SPECIAL MASTER:** Correct.
18  **MS. LUKEY:** I don't have that one except
19  in -- well, in fact, I don't have that one.  I think
20  that's substantially similar to 15.
21  **THE SPECIAL MASTER:** It is.
22  **MS. LUKEY:** The one before that is in
23  the footnote of Saggese.  The one before March of
24  11.  He has the one that's 15 --

Page 83

1   **THE SPECIAL MASTER:** Can we agree we can
2   use this as to the issues of notice to the client
3   and the need to seek consent from the client in
4   writing?
5   **MS. LUKEY:** Currently.  Yes.
6   **THE SPECIAL MASTER:** Well, but also the
7   Saggese rule.
8   **MS. LUKEY:** That's where I have a
9   problem.  Saggese didn't actually get implemented
10  until March 15, 2011.
11  **THE SPECIAL MASTER:** I understand, but
12  it was -- after the rescript in 2005 it was the law.
13  Correct?
14  **MS. LUKEY:** Yes, although I think there
15  has been some -- I think there were some cases that
16  would suggest when the rule hasn't been amended, if
17  there's an inadvertent reliance on the existing
18  rule, that that's not sanctionable.
19  **THE SPECIAL MASTER:** I'm just trying to
20  understand Mr. Sarrouf's --
21  **MS. LUKEY:** So he's got the 2015 version
22  in front of him which is substantially similar to
23  the one that came into effect in March 15, 2011.
24  **THE SPECIAL MASTER:** Correct.  At least

Page 84

1   on the points I want to ask him about --
2   **MS. LUKEY:** I don't necessarily agree
3   that's the applicable rule to what happened here
4   because the client letter was signed before March
5   15, 2011, but I would agree that he can look at the
6   current one.
7   **THE SPECIAL MASTER:** All right.  I
8   understand that.
9   The rule says, "A division of a fee
10  between lawyers who are not in the same firm may be
11  made only if the client is notified before or at the
12  time the client enters into a fee agreement for the
13  matter, that a division of fees will be made and
14  consents to the joint participation in writing."
15  It also says, "and the total fee is
16  reasonable," but we'll put that aside for the
17  moment.
18  So the question is if a lawyer -- if a
19  client comes into the lawyer and says I don't want
20  to know about it; I don't want to hear about it; you
21  just do whatever you're going to do, is it
22  appropriate for the lawyer not to notify the client
23  of the potential for the division fees and to seek
24  the client's consent in writing?

Page 85

1   (Pause.)
2   **THE WITNESS:** Is it appropriate?  It's
3   not appropriate not to put it in writing.
4   **THE SPECIAL MASTER:** And to notify the
5   client of the possibility of a division of a fee,
6   yes?
7   **THE WITNESS:** It would be to notify the
8   client -- if he's going to sign the agreement, the
9   agreement ought to have in it that there will be a
10  division of the fee.
11  **THE SPECIAL MASTER:** And that will serve
12  as notice to the client?
13  **THE WITNESS:** Notice to the client, and
14  most likely you talked about it.  And most clients
15  who certainly come from someone that they've been
16  dealing with as their -- as their family lawyer or
17  whatever know that there's going to be -- his family
18  lawyer's going to be taken care of from the fee, not
19  from anything else.  Most clients come into you
20  knowing that.
21  But you're insisting that it's got to be
22  on paper and that if somehow it isn't on paper that
23  the lawyer doesn't get anything.
24  **THE SPECIAL MASTER:** We don't know that.

Page 86

1    That's a different question.
2       That's a question of what happens if
3    there's an objection to the fee, if somebody raises
4    an objection, that's a different question.
5       THE WITNESS: And it's a different
6    matter because the objection, if there is an
7    objection, will be something that goes back to --
8    that is the plaintiff -- the client takes up and
9    becomes a plaintiff against the lawyer.
10      THE SPECIAL MASTER: Or if there's an
11   objection in a class action by an objector.
12      THE WITNESS: If there's a client in a
13   class action and the objection comes from the
14   client, that's appropriate.
15      But if it's coming from someone other
16   than the client, it's not appropriate.
17      THE SPECIAL MASTER: That's an
18   astounding statement.
19      MS. LUKEY: Objection, your Honor.  It's
20   not astounding at all.
21      THE SPECIAL MASTER: Just a minute,
22   Joan.  Whether the objection is appropriate or not
23   would be decided by the judge.
24      THE WITNESS: Yes.

Page 87

1       THE SPECIAL MASTER: There are
2    objections in class actions all the time.  Some are
3    not founded at all, and some are found to be well
4    founded.
5       The objections may come from people on
6    behalf of class members including lawyers where
7    absent class members hire lawyers and those lawyers
8    come in and make objections to the judge about a
9    settlement.
10      MS. LUKEY: But your question assumed --
11   I'm sorry -- was under 1.5(e), and that's not
12   established at all --
13      THE SPECIAL MASTER: Objectors can
14   object to anything.
15      MS. LUKEY: I understand that.  But it's
16   not under 1.5(e).  It's under Rule 23.
17      THE SPECIAL MASTER: Well, you would
18   also look to any governing rules.  We don't have to
19   debate this.
20      My only point is that these issues can
21   be brought to a Court in any number of forms, don't
22   have to be necessarily brought by the client.  They
23   could be brought by the client, but they don't have
24   to be.

Page 88

1       THE WITNESS: Well, isn't it brought by
2    -- to the Court when there has been harm to the
3    party?  The plaintiff?
4       THE SPECIAL MASTER: Or to the class.
5       THE WITNESS: And there hasn't -- I mean
6    as I understand this matter, a client in this
7    instance has said I have no objections.
8       THE SPECIAL MASTER: The class
9    representative have said that.
10      THE WITNESS: Yes.  And he -- he was the
11   plaintiff, was he not?  Or he speaks for the
12   plaintiff.
13      THE SPECIAL MASTER: A judge's
14   obligation is to the class, not just the class
15   representative.  We can debate this, but judge's
16   obligation is as a fiduciary to the class.
17      Some courts have referred to this as a
18   gatekeeper.  Other courts have referred to this as a
19   fiduciary, but the judge's obligation in ensuring
20   the appropriateness of a settlement and the
21   appropriateness of the fees paid to lawyers under
22   the settlement is an obligation that the Court has
23   to the class.
24      THE WITNESS: Does that require that

Page 89

1    every member of the class undertakes to vote on the
2    matter?
3       THE SPECIAL MASTER: Well, they -- they
4    may opt out if they don't like the settlement, but
5    -- at least in some classes.
6       Look, this is a long discussion, and
7    it's involved, but it's a very real discussion about
8    the issues here.  And that is one of the issues is
9    what is the role that the Court has to oversee and
10   be a fiduciary to class members in approving a
11   settlement and making an award of fees.
12      That's one of the issues that are in
13   this case.  Bill, go ahead.
14      BY MR. SINNOTT:
15   Q.  Counsel, you have a predominantly contingent
16   practice, correct?
17   A.  It is for the most part.
18   Q.  And, you know, typically a client will bring
19   you their case, and you'll say, all right, we're
20   willing to take this on a contingent basis, and my
21   fee will be one third of any recovery.
22      Now that client has the right to say
23   jeez, Camille, sounds great, really want to have you
24   on board, but I'll only hire you if you agree to 25

Page 90

1  percent of the recovery.
2      And that's something that clients do on
3  occasion, isn't it?
4  A.  Yes.
5  Q.  Why is the client whose case is being
6  referred to that major class action firm not
7  entitled to that same ability to say to you, no, I
8  don't want you getting that referral fee; or if you
9  get that referral fee, I want a portion of it?
10      So it's not all about, you know, no harm
11  to the client in the perception of the attorney.
12  The client has rights to be informed and to act on
13  that information, doesn't she?
14      MS. LUKEY: Objection.
15      MR. HEIMANN: I object to that multiple
16  compound.  There's about five questions there.
17      THE SPECIAL MASTER: I think it is,
18  Bill.
19      MR. SINNOTT: It is, it is but -- I got
20  carried away.
21      BY MR. SINNOTT:
22  Q.  Excuse me.
23  A.  It's all right.
24  Q.  Isn't that client in a class action referral

Page 91

1  situation entitled to that same prerogative as the
2  person that walks in off the street and hires you on
3  a contingent basis?
4      MS. LUKEY: Objection.
5  A.  Well, I think that when they join the class
6  they are authorizing whoever's representing the
7  class to proceed.  Wouldn't that be the case?
8      Now if it's going to be -- if you got a
9  class of 300,000 but you don't have -- does each
10  person have the right to negotiate what the fee is
11  going to be?  How do you proceed with something like
12  that?
13  Q.  Well, let me just back up and ask you the
14  same question.
15      Doesn't that client have that same
16  prerogative to bargain --
17  A.  Whoever is the representative of the class
18  certainly has the right to bargain.
19  Q.  All right.  And there's nothing that you've
20  said, is there, that obviates Rule 1.5(e)?  I mean
21  that's the rule, correct?
22      MS. LUKEY: Objection.  We'll stipulate
23  that that's the rule.
24      MR. SINNOTT: Right.

Page 92

1      MS. LUKEY: Is that the question?
2  Q.  You don't think that there's -- strike that.
3  Strike it.
4      MR. SINNOTT: Let me move on, unless you
5  have something else on this, judge.
6      THE SPECIAL MASTER: No.
7      MR. SINNOTT: I looked at my watch a
8  second ago.
9      THE SPECIAL MASTER: It's quarter of 11.
10  Are you doing okay, Mr. Sarrouf?
11      THE WITNESS: I am.
12      THE SPECIAL MASTER: Do you need a
13  break?  You've been going for two hours.
14      MS. LUKEY: Your texts have been dinging
15  I think.  Are those yours?  I want to make sure it's
16  not Joyce.  Do you have a phone?  I thought it was
17  coming from you.  It may have been coming from down
18  there.
19      MR. KELLY: Not me.  I turned my off.
20      MS. LUKEY: Are you okay?
21      (Pause.)
22      (Off the record.)
23      MR. SINNOTT: Joan, do you want to take
24  five?

Page 93

1      MS. LUKEY: It's fine with me.
2      THE SPECIAL MASTER: We're okay.  We're
3  asking Mr. Sarrouf --
4      MS. LUKEY: Are you okay?
5      THE WITNESS: No, let's go.  Let's see
6  if we can get it done by 1:30.
7      MS. LUKEY: They know.
8      MR. SINNOTT: If we could, madam court
9  reporter, have Mr. Sarrouf's CV marked as an
10  exhibit, that would be Exhibit 1 for this
11  deposition.
12      (Exhibit 1 marked
13      for identification.)
14      BY MR. SINNOTT:
15  Q.  So for the record, Attorney Sarrouf's CV has
16  been marked as Exhibit 1.
17      Counsel, you've been retained to provide
18  expert services in this case, correct?
19  A.  I have.
20  Q.  And what's your rate of compensation
21  currently?
22  A.  I think it was 750 an hour.  Seven hundred
23  and fifty.
24      MS. LUKEY: Not $7.50?  I was hoping.

Page 94

1    MR. SINNOTT: I would have advocated for
2 a raise if it was $7.50.
3 Q. And how many hours do you estimate you've
4 worked on this case so far?
5 A. I think initially it was maybe 14 hours or
6 something like that. It was -- I think the only
7 bill I've sent out was for $10,750, something like
8 that.
9 Q. How many -- up to --
10 A. I haven't billed at all for -- since that
11 time.
12 Q. Okay. So how much additional -- how many
13 additional hours do you think you've worked since
14 you submitted that bill?
15 A. Part of it is going to depend how long I'm
16 here, I suppose. Up to now, I would think -- let's
17 see. Probably another seven to ten hours. I don't
18 know.
19 Q. All right. So approximately --
20 A. I'm not very good -- I'm sure I don't get it
21 all down 'cause I don't...
22 Q. Okay.
23 A. I'm old fashioned. A lot of times in the
24 old days when it wasn't going to be a contingencies,

Page 95

1 you said 5,000, 10,000, whatever it was going to be.
2 You didn't worry about, you know, keeping time.
3 Q. It's one of the nice things about a
4 contingent practice, isn't it?
5 A. Yep.
6 Q. So $10,000 you've billed, and beyond that
7 you believe seven to ten additional hours?
8 A. I would think about that.
9 Q. All right. And if I could direct your
10 attention to your declaration.
11    MR. SINNOTT: And if we could provide a
12 copy for the court reporter. I'm going to ask
13 Paulette mark this as Exhibit 2.
14    (Exhibit 2 marked
15    for identification.)
16 Q. Let me direct your attention, if I might --
17    MR. SINNOTT: Paulette, are you ready?
18    THE REPORTER: I'm all set. Thanks.
19 Q. -- to paragraph 9. And that's page 4. And
20 just to read it out loud.
21    In analyzing these issues -- under the
22 heading of summary of facts relevant to opinions.
23    Number 9. "In analyzing these issues,
24 I've discussed the case with the counsel who

Page 96

1 retained me and reviewed certain documents produced
2 in this case as well as the applicable law and
3 secondary sources relevant to my opinion. I
4 understand and assume the accuracy of the following
5 background facts relevant to the opinions I offer."
6    When you say you reviewed certain
7 documents produced in this case, what are you
8 referring to?
9 A. A pile --
10 Q. Okay.
11 A. -- of documents that were provided that I
12 went through.
13 Q. Okay.
14 A. And then asked questions.
15 Q. Can you identify what those documents were?
16 A. Oh, boy. There were copies of --
17 Q. Say that again. Sorry, sir?
18 A. I think copies of retainer agreements.
19 There were -- golly.
20    MS. LUKEY: Bill, I think you're
21 entitled if you want us to do that -- because you
22 did it for your expert, I think you're entitled to
23 have -- I didn't compile the materials; Justin did
24 -- but to have us pull those together in a format

Page 97

1 and provide those --
2    MR. SINNOTT: Let me just see whether he
3 recalls and --
4    MS. LUKEY: Okay. Well, if you decide
5 you want that, let me know.
6    MR. HEIMANN: Well, I don't agree with
7 your statement. Sorry. Professor Gillers did not
8 provide us with a comprehensive list of the
9 materials he reviewed as far as I know.
10    MS. LUKEY: I thought that -- they gave
11 us the exhibits which I understood was everything --
12    MR. HEIMANN: No, it was not. Not even
13 close.
14    MS. LUKEY: Oh, if that's accurate, then
15 I withdraw what I so woefully suggested.
16    MR. SINNOTT: Thank you for trying to be
17 helpful.
18    BY MR. SINNOTT:
19 Q. So what do you recall having looked at with
20 respect to the documents?
21 A. The agreements. There were -- I have the
22 declaration of George Hopkins. I think the proposal
23 that was initially made by the two firms back in --
24 what was it? -- December or -- 2008 was it I think?

Page 98

1    MS. LUKEY: Yep.
2    A.   And then the agreement that was entered
3    into, I think, on the 29th of December of 2008.
4    There were documents that I think were introduced.
5    There were the negotiations between the various
6    counsel, the three customer, and then I think the
7    others were the ERISA documents.  There were a few
8    of those.
9        Then I had a copy of -- no, that's
10   not...
11       THE WITNESS: This is yours, right?
12       MS. LUKEY: Yeah, this one's mine.
13       THE WITNESS: Let me pull mine.
14   A.   I received a copy of the response by Labaton
15   to special master's request for supplemental
16   submissions.  I received the ethical report for
17   special master, Judge Rosen, by Professor Gillers.
18       I pulled a copy of the Rules of
19   Professional Conduct 7.2.  All the other papers are
20   back in the office so...
21   Q.   All right.  Now let me just -- without going
22   into each of those seven or eight --
23   A.   Then there were a lot of questions and
24   answers that I had with counsel.

Page 99

1    Q.   Okay.  So let me back you up then.
2        So initially you received a package; is
3    that correct?
4    A.   Yes.
5    Q.   And was it in that binder in front of you?
6    A.   This (indicating)?
7    Q.   Yes, sir.
8    A.   No, this came later.
9    Q.   Okay.
10   A.   Initially what came was an explanation of
11   what was going on.  And then I -- then there was a
12   phone call I had with Attorney Lukey.
13       Then I had her assistant was Attorney
14   Justin Wolosz, and I had discussions with him.  And
15   I tried to keep a -- I had questions; I wanted
16   answers.  Back and forth until we worked through
17   what I thought was a pretty good understanding of
18   what this matter was about.
19       And then I began to develop my opinions
20   of what were the issues, and I had some difficulty
21   in understanding the role of all of the number of
22   counsel that were involved and where different
23   things occurred.  And then I made a few phone calls.
24   I --

Page 100

1    Q.   When you say you made a few phone calls, who
2    did you call?
3    A.   Well, I brought in Arnie Rosenfeld, and we
4    sat down and discussed the matter at length when I
5    learned that -- or when we were advised that the
6    professor was going to render an opinion, I asked
7    Arnie if he knew him, and Arnie did.
8        And I think Arnie knows his wife as
9    well.  She's chairman of a committee of the ABA.
10   And Arnie had, you know, interchange with both of
11   them I guess from time to time.
12       I spoke to certain lawyers who had
13   matters with the Labaton, and I understood that they
14   were -- that that was a fine firm.  And I think I
15   had learned that they had some fellows of the
16   American College which I inquired about.
17       And then the rest of it I think were
18   just exchanges that I had with the counsel who
19   retained me.
20   Q.   Now in formulating your opinions in the
21   case, did you consult with other people?
22   A.   I would from time to time because I have
23   great respect for Arnie Rosenfeld.  He'd been bar
24   counsel here for many, many years, one of the very

Page 101

1    best.  And he's a dear friend.  He's in the office
2    with me.  I did with him.
3    Q.   And he helped you with your opinions?
4    A.   He helped me understand some of the matters
5    that we thought might be critical, and then I
6    discussed other matters with Joan and with her
7    assistant, Justin.
8    Q.   All right, thank you.
9        In the course of reviewing documents and
10   the documents you listed, I notice you didn't
11   mention the Damon Chargois deposition.  Were you
12   ever shown that?
13   A.   Shown the deposition --
14   Q.   Yes, sir.  Of Mr. Chargois.
15   A.   -- itself?  No.
16   Q.   And outside of the facts that you cite in
17   your declaration, did you receive any other
18   documents or information?  Let me put it another
19   way.
20       Outside of the facts that are cited
21   here, were there any other resources or references
22   that you did not cite in your report?
23   A.   I don't think so.  Of course, you know, this
24   is in a report that was -- what's the date of this

Page 102

1  thing?
2      (Pause.)
3  A.  October of 2017.  And, you know, there have
4  been a lot that has happened since -- since then.
5  Q.  When did you first see the George Hopkins'
6  declaration?
7  A.  I'm not --
8      (Pause.)
9      MS. LUKEY: I think the date's on the
10 last page, Camille.
11     THE WITNESS: On the last page?
12     MS. LUKEY: The last page I think.  Is
13 it there?
14     THE WITNESS: Oh, that's the 15th.
15 A.  When I got back here, I think the first time
16 I would have seen it was Monday.
17 Q.  All right.  So this is the most recent
18 Hopkins declaration that was signed by him on March
19 15th, correct?
20 A.  Is that?  Yes.
21 Q.  And --
22 A.  Yeah, that's the first -- the first time I
23 saw this was Monday afternoon.
24 Q.  Okay.

Page 103

1  A.  But I had been -- I don't know if I received
2  a call while we were traveling back from Florida.
3  We left on the 15th.
4  Q.  Okay.  But that's the first time that you
5  saw it?
6  A.  Yes.
7  Q.  All right.  And what significance did you
8  attach to that document?
9  A.  Insofar as the agreement of the client
10 without any objection to the relationship between
11 the firms, I think it's vital.
12 Q.  You think it's vital?
13 A.  Yes.
14 Q.  But it wasn't --
15 A.  'Cause this is the client speaking as far as
16 I'm concerned.
17 Q.  It wasn't vital enough for you to have not
18 previously issued opinions in the fall of 2017,
19 correct?
20     MS. LUKEY: Objection.  It didn't exist
21 in the fall.
22     MR. SINNOTT: No.  I'm saying --
23     THE SPECIAL MASTER: That's the
24 question.

Page 104

1      BY MR. SINNOTT:
2  Q.  The question is that document was not in
3  existence when you issued your opinions in the fall
4  of 2017, was it?
5  A.  The document wasn't, but I understood that
6  the substance of the document had been expressed
7  before I signed this.
8  Q.  So you didn't need that declaration in order
9  to formulate your opinions?
10 A.  It was provided to me that the client had
11 agreed that they had no objections to the matter.
12 Q.  All right.  In advance of this declaration
13 being drafted?
14 A.  Of this declaration?  Mine?
15 Q.  No, of Mr. Hopkins' declaration.
16 A.  Well, I understood there had been
17 conversations with Mr. Hopkins throughout the course
18 of the representation, and he was in full agreement
19 with the settlement and in full agreement with the
20 -- I believe the final agreed-upon fees to be
21 charged.
22 Q.  Are you aware that he knew nothing of Damon
23 Chargois?
24     MS. LUKEY: Objection.

Page 105

1  A.  That he didn't know Damon Chargois?
2      THE SPECIAL MASTER: Didn't know he
3  existed.
4      MR. HEIMANN: I think you got to put a
5  timeline and not keep it open ended when he knew.
6      THE SPECIAL MASTER: You're right.  His
7  deposition testimony was that he found out and
8  learned about Damon Chargois in the course of this
9  investigation.
10     (Telephone interruption.)
11     THE SPECIAL MASTER: Joan, I wouldn't
12 confiscate your phone.
13     MS. LUKEY: That wouldn't be your wife?
14 Could I take a moment?  It's a Belmont exchange.
15     THE SPECIAL MASTER: Why don't we give
16 Mr. Sarrouf a break.  He's been sitting, by my
17 watch, for two-and-a-half hours.
18     MR. SINNOTT: I think he has more
19 endurance than all the rest of us.
20     THE SPECIAL MASTER: Yeah, why don't we
21 take a break.
22     (A recess was taken.)
23     CONTINUED EXAMINATION BY MR. SINNOTT:
24 Q.  Attorney Sarrouf, before the break I had

Page 106

1  asked you about Mr. Hopkins' declaration which was
2  signed on March 15th.
3      Do you recall that, sir?
4  **A.  Yes, sir.**
5  Q.  And you described it as vital.
6      Is it your testimony that that
7  declaration substituted for -- or satisfied the
8  requirement under 1.5(e) for a writing of consent by
9  the client?
10 **A.  I think it certainly satisfied the knowledge**
11 **of the plaintiff in the case and an acknowledgment**
12 **of as far as the client -- that is, the customer I**
13 **guess it is that's referred to -- was satisfied with**
14 **the result.  And as our courts have held here in**
15 **Massachusetts, it's ultimately the responsibility --**
16 **these rules are to protect the client.**
17 **    And since the referral amounts to other**
18 **lawyers were entirely out of the agreed-upon fees**
19 **they would receive and do not come from any -- in**
20 **any part from the customer or the client's funds,**
21 **that our -- the intent of our rules has been**
22 **complied with in Massachusetts, and the courts have**
23 **repeatedly stated that, especially in the Saggese**
24 **case.  I know it well.**

Page 107

1  Q.  But, sir, my question was whether that
2  declaration constituted the notification and consent
3  required under 1.5(e).  Did it?
4  **A.  I believe it does.  In the final analysis of**
5  **the matter it does.**
6  Q.  And --
7  **A.  A lot of the matters were, I assume, oral**
8  **conversations that the client had with the lawyer in**
9  **this case, and now he put it in writing for you.**
10 Q.  When was the agreement between Arkansas or
11 ARTRS as you refer to them in your declaration and
12 the law firms?
13 **A.  Well, the first submission was I believe**
14 **December the 8th or in early December.**
15 Q.  Of what year?
16 **A.  I think it's way back.  Was it 2008?  I**
17 **believe so.**
18 Q.  It's not February 8, 2011?
19     **MS. LUKEY:** I think he's talking about a
20 different submission.
21     **MR. SINNOTT:** Okay.
22     **BY MR. SINNOTT:**
23 Q.  What are you referring to, sir?
24 **A.  The initial submission to the client of**

Page 108

1  **their proposal to represent their interest in the**
2  **matter.**
3  Q.  And that was in 2008?
4  **A.  Yes.**
5  Q.  Approximately ten years ago?
6  **A.  Yes.  Well, not quite but almost.**
7  Q.  Now 1.5(e) says, "A division of a fee
8  between lawyers who are not in the same firm may be
9  made only if the client is notified before or at the
10 time the client enters into a fee agreement for the
11 matter."
12     **MS. LUKEY:** Objection.  Could I just
13 have a standing objection on the point I made
14 earlier about which 1.5(e) was in effect at the time
15 the engagement letter was entered?
16     **THE SPECIAL MASTER:** Yeah.
17     **MS. LUKEY:** Thank you.
18     **BY MR. SINNOTT:**
19 Q.  So, sir, you don't consider nine to ten
20 years ago to be before or at the time the client,
21 Arkansas, entered into the fee agreement, do you?
22 **A.  No.  I believe they entered into the fee**
23 **agreement in December the 29th of two -- of 2008.**
24 Q.  I believe it was February 8th of 2011, but I

Page 109

1  may be wrong.
2      **THE SPECIAL MASTER:** We're talking about
3  two different agreements.
4      **MS. LUKEY:** Two different things.  He's
5  talking about the panel monitoring, and you're
6  talking about the fee --
7      **BY MR. SINNOTT:**
8  Q.  In any case, sir, those are not -- the
9  declaration of Mr. Hopkins cannot be considered
10 before or at the time the client enters into the fee
11 agreement, can it?
12 **A.  The client entered into the fee agreement --**
13 **I think George Hopkins was the representative, was**
14 **he not?**
15     **MS. LUKEY:** I think he's asking about
16 this declaration.  Is this one later than the fee
17 agreement, the new declaration?
18     **THE WITNESS:** Oh, this declaration?
19 **A.  Yes.  It's November -- March -- March 15 of**
20 **this year.**
21 Q.  All right.  So to the extent that you
22 consider that to be consent by Mr. Hopkins, that
23 consent certainly isn't before or at the time the
24 client enters into a fee agreement, is it?

Page 110

1  A.  If you count this date, no.  But if you look
2  at all of the statements that he makes, I think it
3  relates back to when this matter was entered into --
4  the agreement of representation back whenever it was
5  that they produced the final contract.
6  Q.  Well, what if you were to learn that
7  Mr. Hopkins was never told about Damon Chargois and
8  his arrangement?  Would that change your opinion?
9      MS. LUKEY: Objection.
10  A.  No, it does not change -- it does not change
11  my opinion as rendered in this matter.
12  Q.  But you testified that this declaration by
13  Mr. Hopkins approximately a week ago was vital to
14  your opinions, correct?
15  A.  Oh, I don't think it was vital.  I think it
16  -- I had it in writing what I understood to have
17  been what he has said all along.
18  Q.  Even though he knew nothing about
19  Mr. Chargois?
20      MS. LUKEY: Objection.
21  Q.  Until approximately September of 2017.
22  A.  I don't know that, and I don't know that --
23      THE SPECIAL MASTER: That was his
24  testimony.

Page 111

1      MS. LUKEY: It's actually in the
2  declaration, too.
3      THE SPECIAL MASTER: Yeah, and it's in
4  the declaration.
5      MS. LUKEY: As to when he knew about
6  Mr. Chargois.
7      THE SPECIAL MASTER: As to when he knew
8  about Mr. Chargois.  Thank you for reminding me.
9      MS. LUKEY: Simpler than looking for the
10  testimony.
11      THE SPECIAL MASTER: Right.
12      BY MR. SINNOTT:
13  Q.  And as far as the documents beyond that and
14  the other documents that you mentioned, do you
15  recall seeing an e-mail dated April 23, 2013
16  sometimes referred to as the Dublin e-mail in this
17  case in which Labaton described -- in which it was
18  described that Labaton had an obligation to pay the
19  local counsel who assists Labaton in matters
20  involving Arkansas?  Did you ever see that e-mail?
21  A.  An e-mail?
22  Q.  Yes, sir.
23  A.  I have no memory of it.
24  Q.  Okay.

Page 112

1  A.  I may have.  I just have no memory of it.
2  Q.  Did you see a letter from November 22nd --
3  I'm sorry -- an e-mail, and I believe there was an
4  attached letter November 22, 2016 from Larry
5  Sucharow to David Goldsmith, Garrett Bradley, Eric
6  Belfi and Mr. Keller in which the following
7  statement appeared:  Class co-counsel get one with
8  ERISA 10 percent off the top; Damon's percentage
9  also off the top.  And then Sucharow says no reason
10  for ERISA to see Damon's split.  They only need to
11  see their 10 percent and then split three ways.
12      Do you recall seeing that?
13      MS. LUKEY: Well, it's obviously hard to
14  do it without seeing the document.  I'm not saying
15  you have to show it to him.
16      MR. SINNOTT: I'm happy to provide it.
17      MS. LUKEY: I'm just saying it may be
18  difficult.
19      THE SPECIAL MASTER: Does that ring a
20  bell --
21      MS. LUKEY: Does that ring a bell?
22      THE SPECIAL MASTER: -- as to anything
23  you've seen?
24  A.  I know that there was an increase.  That's

Page 113

1  the one that started -- I think the first agreement
2  was 9 percent, and then they moved it up to 10
3  percent.
4  Q.  No, but you did see that document; is that
5  correct?
6  A.  Yeah, I did.
7  Q.  Okay.  And --
8  A.  And it explained who the three parties were
9  that contributed to the 10 percent from their
10  portion of the fees.
11  Q.  Yes, but I don't believe that was in this
12  document.  But would you like to see the document?
13  A.  It's up to you.  You're the interrogator.
14  Q.  I'm just the examiner.
15  A.  I see.
16      MR. HEIMANN: The witness is not going
17  to tell the interrogator how to conduct his
18  interrogation.
19      MS. LUKEY: Exactly.
20      MR. SINNOTT: Mark that as Exhibit 3.
21      MS. McEVOY: It's also Exhibit 42.
22      MR. SINNOTT: Yes, previous Exhibit 42.
23  And, for the record, this is TLF-SST 0022172 through
24  74 previously marked as Exhibit 42.

Page 114

1    (Exhibit 3 marked
2    for identification.)
3    **BY MR. SINNOTT:**
4  Q.  So, counsel, have you seen this document
5  before?
6  **A.  I do not recall it.**
7  Q.  Thank you.  We may come back to that later
8  on.
9    In Exhibit 2, your declaration,
10  paragraph 9 you also refer to secondary sources
11  relevant to your opinions.
12    Do you see that, sir?
13  **A.  Page 9?**
14    **MS. LUKEY:** Paragraph 9.
15  Q.  Paragraph 9, page 4.  The first sentence --
16  end of the first sentence.
17  **A.  Yes, I see the statement.**
18  Q.  All right.  And do you recall which
19  secondary sources you consulted?
20  **A.  No, but I think I asked at some -- somewhere**
21  **for --**
22    (Pause.)
23  **A.  I think -- I think it was -- relating it**
24  **from time to time as I was drafting my initial**

Page 115

1  **report, I would call Justin and ask him if he could,**
2  **you know, look to something and just tell me if I'm**
3  **getting some things right as to dates I think were**
4  **important for me and the identity of the parties --**
5  **'cause there were so many -- and I would sometimes**
6  **go, wait a minute, which party are we talking about.**
7  **That's what I mean by that.**
8  Q.  So you're not referring to Mass. practice or
9  Newburg or class actions?  When you refer to
10  secondary sources or secondary sources, you're
11  referring to Justin?
12  **A.  I'm referring to Justin; and, as you remind**
13  **me, there were a couple of matters that Arnie found**
14  **for me that I should read.**
15  Q.  Okay.  All of us consider Justin to be a
16  secondary source --
17    **MS. LUKEY:** I consider him a primary
18  source personally.
19  Q.  Sometimes the primary source.
20    But you're not referring to any
21  publications or practice guides or anything of that
22  nature, correct?
23  **A.  To the extent that Arnie may have been**
24  **looking at it -- as I say, Arnie Rosenberg --**

Page 116

1    **MS. LUKEY:** Rosenfeld.
2  **A.  -- Rosenfeld, because we'd sit as I was**
3  **writing even matter of fact, and he'd -- you know,**
4  **he'd offer.  I have a great respect, first of all,**
5  **for his experience especially as, you know, bar**
6  **counsel.**
7  Q.  And did Attorney Rosenfeld provide to you
8  legal framework for formulating your opinions?
9  **A.  No.**
10  Q.  All right.  What did he do for you?
11  **A.  Answer my questions.**
12  Q.  What kinds of questions would you ask him?
13  **A.  I'd ask him if he had any -- do you recall**
14  **anything when you were bar counsel with regards to**
15  **certain -- which I thought similar issues.**
16    **And then most of it was in the review of**
17  **the professor's statement after we were provided**
18  **with it.**
19  Q.  Did you look at the local rules --
20  **A.  But that didn't have anything to do with it**
21  **because that came later.  No, what I said about**
22  **Arnie was as I would write something, I wanted him**
23  **sort of to be my editor, and then I sent along --**
24  **and really in the final analysis, you know, I went**

Page 117

1  **back and forth with Justin 'til we got it.  There**
2  **were other drafts.  And Justin helped as well very**
3  **much so.**
4  Q.  What did Justin do for you with respect to
5  the drafts?
6  **A.  Well, when I was hired, I said that we were**
7  **short one secretary already, and you're going to --**
8  **you people are going to have to do a lot of this**
9  **stuff for me.**
10  Q.  All right.
11  **A.  We had one of our secretaries was out --**
12  **cancer.**
13  Q.  So Justin did some work for you, secretarial
14  work?
15  **A.  Well, the firm did it.**
16  Q.  All right.  What else did they do?
17  **A.  I'd express opinions and ask him, you know,**
18  **if I've stated it right and stuff.**
19  Q.  So he helped you frame your opinions?
20  **A.  He helped.  Joan helped.  And then I just**
21  **had to review it in my own mind as to the -- what I**
22  **felt very comfortable in expressing, and on the**
23  **basis of my experience I could back up what I was**
24  **saying.**

In Re: State Street Attorneys Fees

Page 118

1 Q.  Did you or the firm -- by that I mean Justin
2 and Joan and others at the firm -- draft the
3 opinions in your declaration?
4 **A.  In my declaration?**
5 Q.  Yes, sir.  The one we're looking at right
6 now.
7 **A.  This is a result of what I had submitted as**
8 **we went over these things.**
9 Q.  Yep.  But who --
10 **A.  They --**
11 Q.  -- who first came up with these opinions?
12 **A.  Me.**
13 Q.  So you didn't just ratify what they had
14 drafted.  You -- you were the, quote, President
15 Bush; you were the decider; you were the one who --
16 **A.  Oh, absolutely.  I'm not going to sign**
17 **something that I'm not.**
18 Q.  All right.  And I'm not saying that you'd
19 sign something you weren't comfortable with, but did
20 you draft these opinions initially or did someone
21 else?
22 **A.  No, I drafted -- I stated the opinions**
23 **initially.  In terms of how it got typed up and**
24 **whatnot, they did it for me because I did not have a**

Page 119

1 **secretary.**
2 Q.  So their assistance was strictly clerical?
3 **A.  Yes -- well, no.  You know, they had a --**
4 **they're good lawyers.  They knew a lot more I would**
5 **think than I had about the case 'cause they'd been**
6 **involved with it since it began.**
7 **So I wouldn't just call them**
8 **secretarial, no.  They were most helpful in my**
9 **expressing -- in my reaching the expression of my**
10 **opinion that appears here.**
11 Q.  How so?  Can you give me an example of that
12 interaction?
13 **A.  I would go back and forth with Justin 'cause**
14 **I know we were nearing a time when it was due.  And**
15 **I'd yet -- he'd finish up or the secretary, she was**
16 **also helpful.  Get something over to me.  I'd go**
17 **through it.  I'd scratch out certain things.**
18 **If I had a question about who this**
19 **person was or that person, I'd pick up, and Justin**
20 **would explain to me who they were.  You know, the**
21 **ERISA people and then the -- all the different**
22 **parties that became involved.  Those were questions**
23 **I sometimes wanted to make sure I had everybody**
24 **right.**

Page 120

1 **And then the format, I insisted on this**
2 **format.**
3 Q.  But their assistance beyond the clerical,
4 the secondary sources --
5 **A.  Yeah, because they knew a lot more than I**
6 **did.**
7 Q.  Okay.  Did they --
8 **A.  And they answered my questions.**
9 Q.  Did you question them about the applicable
10 law?
11 **A.  I knew the applicable law in Massachusetts.**
12 Q.  All right.  Did you consult any sources to
13 verify your knowledge of the applicable law?
14 **A.  Well, I went back and looked at some of my**
15 **own work when I was at the MBA.  I looked up --**
16 **couldn't find it, but I knew the filing of the**
17 **motion in the supreme judicial court back in the**
18 **eighties.**
19 **Then I called a friend who was a party**
20 **to it, Mike Mone.  He was very ill, and I didn't**
21 **really push it.  But things like that.**
22 **I tried to be as -- especially with the**
23 **development of the rule through the years -- be as**
24 **accurate as I could be.**

Page 121

1 Q.  All right.  Did you look at the local rules
2 for the Massachusetts Federal Court?
3 **A.  Yes, I -- we went to the federal to get 52**
4 **something I think that adopts the Massachusetts**
5 **rules.**
6 Q.  So you looked at that.  Did you look at
7 federal common law at all?
8 **A.  I didn't look up any cases.**
9 Q.  All right.  Are you familiar with the Agent
10 Orange case?
11 **A.  No.**
12 Q.  And --
13 **A.  Well, I'm familiar with it because of a dear**
14 **friend who was subjected to it in Vietnam.**
15 Q.  You're familiar with a victim, but you
16 didn't look that case up with respect to your
17 formulation of your opinions?
18 **MR. HEIMANN:** That's really vague.
19 There are so many Agent Oranges.
20 **MS. LUKEY:** That's vague.  There's so
21 many Agent Orange.  There's dozens.
22 **MR. SINNOTT:** Yeah, that's true.
23 **A.  Well, I have a son who's a marine beret.**
24 Q.  Let me just back up.  Just for the record,

Page 122

1  in re Agent Orange case that we've been discussing
2  or that we discussed yesterday was a second circuit
3  case from 1985 in re Agent Orange 611 F Supp 1267
4  affirm 818 F.2d 187 in the second circuit.
5      But you're not familiar with that case,
6  correct?
7  A.  No.
8  Q.  I'm sorry, sir.  I cut you off.  Were you
9  about to add something?
10  A.  No.
11  Q.  Now in your declaration in the following
12  paragraph, paragraph 10, in that first sentence it
13  says:  "In mid 2008 Arkansas..." -- and I'll stick
14  with that shorthand as I read through it --
15  "...issued a request for qualifications, an RFQ,
16  which invited firms to submit qualifications to
17  become additional securities monitoring counsel for
18  the retirement fund."
19      And then it goes on to say, Chargois &
20  Herron partner, Tim Herron, had previously
21  facilitated the introduction of Labaton partners to
22  certain officials in Arkansas who played a role with
23  respect to ARTRS or Arkansas.
24      Do you see that, sir?

Page 123

1  A.  Yes, sir.
2  Q.  Now are you aware that Chargois testified in
3  his deposition that Herron had told Chargois about
4  Hopkins' predecessor, Paul Doane, and that Chargois
5  then cold called him?  Are you familiar with that
6  fact?
7  A.  Yes.
8  Q.  All right.  And how are you familiar with
9  that?
10  A.  I was told that that's what happened.
11  Q.  All right.  But you weren't shown Chargois'
12  deposition?
13  A.  No, I don't believe I did.
14  Q.  All right.  So you're aware that Chargois &
15  Herron did not have a previous relationship with
16  Arkansas, are you not?
17  A.  I don't understand the question.
18  Q.  Did Arkansas have a prior relationship with
19  Chargois & Herron?
20  A.  You mean on a different case?  I don't know
21  that.
22  Q.  All right.  In any capacity?
23  A.  I don't know.
24  Q.  Then it goes on to say in 10 that the plan

Page 124

1  was that Labaton would serve as the monitoring
2  counsel and lead counsel on any litigation matters
3  and Chargois & Herron with its Arkansas connections
4  and presence would work with the client.  Do you see
5  that?
6  A.  Yes.
7  Q.  Are you aware that Chargois & Herron did not
8  retain a local presence at anytime during the State
9  Street case after 2009 or 2010?
10  A.  I knew that at some time they had abandoned
11  their Arkansas office, and I gather they -- I think
12  the other office is in Texas.
13  Q.  Yes, sir.  All right.  So you were aware of
14  that?
15  A.  Yes.
16  Q.  All right.  So you're aware that Arkansas --
17  that Chargois & Herron was not in a position to do
18  any local counsel work in Arkansas for Labaton,
19  correct?
20      MS. LUKEY:  Objection.
21  A.  Well, I was aware --
22  Q.  After 2009 or 10.
23      MS. LUKEY:  Objection.
24  A.  I was aware that the relationship was

Page 125

1  between Mr. Hopkins and Labaton, and it continued
2  throughout the course of this.
3  Q.  All right.  And you've testified that you
4  were not aware of that until you saw the declaration of
5  Mr. Hopkins that he did not know about Mr. Chargois,
6  correct?
7  A.  I don't know what you mean by he did not
8  know of them.  They submitted a joint proposal.  So
9  the papers must have been there that included
10  Chargois as well.
11  Q.  Well, and you saw -- and why do you say it
12  must have been there?  Have you seen his name in
13  there?
14  A.  No.  I was advised that the initial
15  submission was a submission by both firms.
16  Q.  Oh, the submission to Arkansas --
17  A.  Yes.
18  Q.  -- the RFQ.
19  A.  Yes.  So it must be in their records.
20  Q.  All right.  And that was knowledge as far as
21  you were concerned?
22  A.  That was knowledge I assumed.
23  Q.  Even though -- go ahead, sir.
24  A.  And if in fact they did do it, they

1 submitted it.  There was a change-over -- I forget
2 the papers I saw on that -- between -- it may have
3 occurred with -- oh, it's Mr. Hopkins I think who
4 succeeded the previous person that was there.
5     But the submission is to the
6 institution, and that first submission included
7 Chargois and Labaton.
8     MR. SINNOTT: Go ahead, judge.
9     THE SPECIAL MASTER: You understand that
10 that submission dealt with the possibility that
11 Chargois & Herron would be included as monitoring
12 counsel, not as a substantive lawyer in -- or local
13 counsel -- in cases?  You understand that?
14     THE WITNESS: Yes.  As they submitted,
15 both firms were identified.
16     THE SPECIAL MASTER: As prospective
17 monitoring counsels, right?
18     THE WITNESS: 'Cause there has to be
19 monitoring at the beginning, right?
20     THE SPECIAL MASTER: But that this
21 submission did not relate to a specific matter.  You
22 understand that?
23     THE WITNESS: Yes.
24     THE SPECIAL MASTER: And you also

1 understand that the general counsel for Arkansas
2 Teachers rejected in an e-mail or a letter
3 Mr. Chargois' firm as monitoring counsel --
4     MS. LUKEY: Objection.
5     THE WITNESS: That they --
6     THE SPECIAL MASTER: You understand
7 that?
8     MS. LUKEY: Objection.
9     THE WITNESS: I didn't understand it as
10 a rejection.  I understood it as they wanted to sign
11 a contract with one firm, and that firm was to be
12 Labaton.
13     I did not -- and I don't know that there
14 ever was a rejection.  They just wanted to deal with
15 one.
16     BY MR. SINNOTT:
17 Q.  Well, let me just quote Christa Clark's
18 e-mail in part to Labaton.
19     "Your firm may affiliate that firm or
20 use them as independent contractors if you deem..."
21 -- and it says if; it should be it --
22 "...appropriate on a case-by-case basis.  There
23 would be no requirement that you use them if it was
24 not a necessary and appropriate expense of a case."

1     So that statement, does it not,
2 indicates that essentially Labaton's as free to hire
3 them if it's necessary and appropriate as anyone
4 else, correct?
5 A.  Yes.
6 Q.  But it's your testimony that that
7 constituted knowledge on the part of Arkansas as to
8 Damon Chargois' role or Chargois & Herron's role in
9 this case?
10     MS. LUKEY: Objection.
11 A.  It signifies to me that it was up to Labaton
12 to do what it thought best in the representation of
13 Arkansas retirement.  And I gather that they did in
14 fact maintain Chargois in some form.
15 Q.  That's your conclusion?
16 A.  Yes, that is my conclusion.
17     THE SPECIAL MASTER: Let me -- let me
18 put a finer point on it.
19     Is it your testimony that that complies
20 with the requirements of Rule 1.5(e)?
21     THE WITNESS: I don't see a -- let me
22 put it this way.  There's no violation of that rule.
23     THE SPECIAL MASTER: Not my question,
24 Mr. Sarrouf.  I'm sorry.

1     THE WITNESS: Well, it's the violation
2 of the rule that we're talking about.
3     THE SPECIAL MASTER: Mr. Sarrouf, please
4 answer my question.
5     THE WITNESS: I will.
6     THE SPECIAL MASTER: Please.
7     THE WITNESS: Yes.
8     THE SPECIAL MASTER: The question is is
9 it your testimony that that complies with Rule
10 1.5(e)?
11     MS. LUKEY: Objection.
12     THE WITNESS: It's my testimony that
13 with the intent of 1.5-2 --
14     THE SPECIAL MASTER: I'm sorry?
15     THE WITNESS: -- there is no violation
16 of it.
17     THE SPECIAL MASTER: 1.5-2?
18     THE WITNESS: Is that what you asked me?
19     THE SPECIAL MASTER: No, 1.5(e).
20     MS. LUKEY: 1.5(e).
21     THE WITNESS: 1.5(e).
22     THE SPECIAL MASTER: I'm sorry, did you
23 finish your answer?
24     THE WITNESS: Yes.

Page 130

1  **THE SPECIAL MASTER:** I didn't hear the
2  finish of it. Could you have that read back for me?
3  (Reporter read back.)
4  **THE SPECIAL MASTER:** Is that the same as
5  saying that what you are relying upon there in the
6  joint application for the monitoring and Christa
7  Clark's response to that, that complies with the
8  requirements of Rule 1.5(e)?
9  **MS. LUKEY:** Objection.
10  **THE WITNESS:** In the form of the
11  response, I do not believe there's been a violation
12  of the rule.
13  **THE SPECIAL MASTER:** All right. Let's
14  go through the rule. Okay?
15  **THE WITNESS:** Okay.
16  **MS. LUKEY:** Can I ask a question? Are
17  you asking him whether it complies for purposes of
18  State Street?
19  **THE SPECIAL MASTER:** For State Street.
20  **MS. LUKEY:** I'm not sure --
21  **THE SPECIAL MASTER:** You're right, Joan.
22  I better rephrase my question.
23  Is it your testimony that what you are
24  referring to here -- and by that I mean the

Page 131

1  application for the joint application for the
2  monitoring and Christa Clark's letter, whether it's
3  characterized as a rejection of Chargois & Herron or
4  some other construction, complies with the
5  requirements of Rule 1.5(e) as it relates to
6  Chargois' receipt of a fee in the State Street case?
7  **THE WITNESS:** The answer's yes.
8  **THE SPECIAL MASTER:** Let's go through
9  the rule.
10  **THE WITNESS:** Okay.
11  **THE SPECIAL MASTER:** And I understand
12  that this is not the rule that was in effect at the
13  time --
14  **MS. LUKEY:** Standing objection.
15  **THE SPECIAL MASTER:** And I'll give you
16  the standing objection.
17  But the Saggese case was in effect at
18  the time, and I think all of us can all agree that
19  Saggese at least governed the conduct of lawyers as
20  to referral fees.
21  Is there any objection to that?
22  Once the rescript was handed down in
23  2005.
24  **MS. LUKEY:** My point was that I think

Page 132

1  there's case law that suggests if it's not yet
2  incorporated in the rule that's a mitigating
3  factor --
4  **THE SPECIAL MASTER:** It can be a
5  mitigating factor, but the question is whether or
6  not it complies with the rule, the Saggese rule or
7  the rule. Okay?
8  **MR. HEIMANN:** Can I just ask for a point
9  of clarification? I understand the question you're
10  asking about his opinion, but I didn't understand he
11  was expressing an opinion about the matter you're
12  questioning him in his report. He's not proposing
13  to testify about that.
14  **THE SPECIAL MASTER:** Let's not have
15  testimony for him, please.
16  **MR. HEIMANN:** Well --
17  **THE SPECIAL MASTER:** I just want him to
18  answer my question, Richard.
19  **MR. HEIMANN:** Okay.
20  **THE SPECIAL MASTER:** Just answer my
21  question. That's all I want.
22  **MR. HEIMANN:** Okay, judge, but I just
23  want to make clear as I read the report, he's not
24  opining on the question you're asking.

Page 133

1  **THE SPECIAL MASTER:** He's offered as an
2  expert.
3  **MS. LUKEY:** His opinions are a little
4  more narrower, your Honor.
5  **THE SPECIAL MASTER:** All right. My
6  question --
7  **PHONE LINE CONFERENCE:** The following
8  participant has entered the conference: Sarko.
9  **THE SPECIAL MASTER:** My question is is
10  it your view that the application for the monitoring
11  agreement coupled with Christa Clark's response to
12  it constitutes compliance with Saggese -- the rule
13  of the Saggese case and Rule 1.5(e) for purposes of
14  the fee that Mr. Chargois received in the State
15  Street case?
16  **THE WITNESS:** The fee Chargois was to
17  receive came, did it not, from the fee that was
18  awarded custom -- for the so-called customers'
19  attorneys, right?
20  It did not come from the customer. It
21  did not get paid by the --
22  **THE SPECIAL MASTER:** That's a much more
23  complicated question than you think. So my -- my
24  question to you is --

Page 134

1    THE WITNESS: It did not -- well, what I
2  want to make sure is I am assuming that that fee
3  came from the fee that was awarded Labaton, right?
4  The customers' counsel.
5    THE SPECIAL MASTER: That is something
6  that --
7    THE WITNESS: And that it did not come
8  from the customer.  And then to the extent that that
9  is --
10    THE SPECIAL MASTER: This was a --
11    THE WITNESS: What?
12    THE SPECIAL MASTER: This was a class
13  action.
14    THE WITNESS: Yep but --
15    THE SPECIAL MASTER: There was class
16  fees from which the attorneys' fees came from which
17  Mr. Chargois was paid.
18    THE WITNESS: From which, that's fine.
19  Yes, that's my understanding.
20    THE SPECIAL MASTER: Okay.
21    With that understanding, do you believe
22  that the monitoring agreement and Christa Clark's
23  e-mail response to it constitutes compliance with
24  the Saggese case and compliance with Rule 1.5(e)

Page 135

1  for --
2    THE WITNESS: That is my --
3    THE SPECIAL MASTER: -- for purposes --
4    PHONE LINE CONFERENCE: The following
5  participant has entered the conference:  Bob Lieff.
6    THE SPECIAL MASTER: -- for purposes of
7  the fee that Mr. Chargois received in the State
8  Street case?
9    THE WITNESS: That is in compliance with
10  the rule.  The fee did not come from the client.
11  And that's what the Saggese case focuses on.
12    THE SPECIAL MASTER: You understand that
13  this is a class action?
14    THE WITNESS: I do understand that.
15    THE SPECIAL MASTER: And there is no fee
16  period until a judge awards a fee period.
17    THE WITNESS: But the judge did in this
18  instance.
19    THE SPECIAL MASTER: All right.  The
20  judge was not advised of the Chargois relationship
21  at all --
22    THE WITNESS: I never provided a judge,
23  unless they asked, with that knowledge in any case
24  I've ever --

Page 136

1    MR. HEIMANN: Hey, guys on the phone.
2    THE SPECIAL MASTER: Guys on the
3  phone --
4    MR. SINNOTT: Hello on the phone?
5    MS. LUKEY: On the phone.
6    THE REPORTER: Off the record?
7    MR. HEIMANN: Let's go off the record.
8    (Off the record.)
9    THE SPECIAL MASTER: We're talking about
10  Rule 1.5(e).  I now have in front of me the March
11  15, 2011 rule which looks to be substantially the
12  same as the rule we've been looking at.
13    MS. McEVOY: Judge, just give me a
14  sec --
15    MS. LUKEY: The previous one, if anyone
16  wants it, is footnoted in the Saggese case.  That's
17  the only way I could find it.
18    THE SPECIAL MASTER: The question I was
19  going to ask is can we treat the rule that was
20  adopted March 15, 2011 as encompassing the Saggese
21  case?
22    MS. LUKEY: Yes.  My understanding is
23  that that was what that rule was meant to do.
24    MS. McEVOY: Excuse me, judge.

Page 137

1    MS. LUKEY: Which one did you give him?
2    MS. McEVOY: Until 2011.  So this is the
3  one --
4    THE SPECIAL MASTER: Oh, this is the one
5  until 2011.
6    MS. McEVOY: Let me print out the other
7  one.
8    MS. LUKEY: If you found that, can I get
9  a copy of it?  Because all I have is a footnote.
10  Just e-mail it to me.
11    MS. McEVOY: Yeah, I think the
12  difficulty is that -- well, definitely, yes, I will
13  work on getting a copy for everybody.
14    (Pause.)
15    THE SPECIAL MASTER: I don't think
16  there's much difference in substance between the
17  March 15 Saggese rule -- March 15, 2011 Saggese rule
18  and the rule we've been using here.  Is there?
19    MS. LUKEY: The March 11, 2015 rule and
20  the current rule are, as I understand it, extremely
21  close.  I don't think there's a material difference.
22    The difference was the prior one didn't
23  have the writing requirement or the timing
24  requirement.

Page 138

1  THE SPECIAL MASTER: So I've been handed
2 a rule that says text of rule effective until March
3 15, 2011. There was an interim rule I think because
4 this one does have the writing requirement in it.
5  MS. LUKEY: If the -- that I don't -- my
6 understanding is until March 11 -- I'm sorry -- 'til
7 March 15, 2011 the rule was the one that Saggese was
8 addressing before they changed it --
9  THE SPECIAL MASTER: Yeah.
10  MS. LUKEY: -- with the text. I
11 couldn't find it.
12  THE SPECIAL MASTER: There must have
13 been an interim rule because -- let me just read it
14 into the record.
15  It is largely the Saggese rule. It's
16 got a little bit of a language difference, and it's
17 largely the rule that we've been talking about post
18 March 15th.
19  MS. LUKEY: You can read it because I
20 have not been able to get the text.
21  THE SPECIAL MASTER: Here it is -- I
22 think we just got it.
23  "A division of a fee, including a
24 referral fee, between lawyers who are not in the

Page 139

1 same firm may be made only if the client is notified
2 before or at the time the client enters into a fee
3 agreement for the matter that a division of fees
4 will be made and consents to the joint participation
5 in writing, and the total fee is reasonable."
6  MS. LUKEY: Yeah, I don't know when
7 writing came in because I thought that was not in
8 there until March 15, 2011.
9  THE SPECIAL MASTER: Well, here. You'll
10 have to ask Elizabeth what the source is but --
11  MS. McEVOY: These are historical.
12  MS. LUKEY: I'll have to look. I
13 thought what the Saggese rule said which didn't have
14 the writing --
15  THE SPECIAL MASTER: That was in 2005.
16  MS. LUKEY: Right.
17  THE SPECIAL MASTER: And I think there
18 was -- Mr. Sarrouf may know this -- there was an
19 interim rule to cover Saggese until it was finalized
20 which was then adopted in December by the supreme
21 court --
22  MS. LUKEY: -- to be effective --
23  THE SPECIAL MASTER: -- to be effective
24 March 15th.

Page 140

1  At any rate, going to your question,
2 sir, or my question to you -- your answer -- that
3 the monitoring agreement complied -- the monitoring
4 agreement and Christa Clark's e-mail response
5 complied with the rule, let's go through each piece
6 of the rule.
7  THE WITNESS: Okay.
8  THE SPECIAL MASTER: And I'm going to
9 use the rule -- yeah. I'll use -- since the witness
10 has that in front of him, I'll use that rule because
11 it's substantially the same.
12  MS. LUKEY: Right.
13  THE SPECIAL MASTER: A division of a fee
14 between lawyers who are not in the same firm.
15 That's what we have here, correct?
16  THE WITNESS: Yes, it is.
17  THE SPECIAL MASTER: May be made only if
18 the client is notified before or at the time the
19 client enters into a fee agreement for the matter
20 that a division of fees will be made.
21  You're not trying to testify that this
22 was -- that the monitoring agreement and the Christa
23 Clark e-mail was for the matter that the division of
24 fees will be made, are you?

Page 141

1  THE WITNESS: What is the question now?
2 What is the question you're putting to me with
3 regards to that?
4  THE SPECIAL MASTER: Very simply,
5 whether or not the monitoring agreement and the
6 Christa Clark e-mail --
7  THE WITNESS: Yes?
8  THE SPECIAL MASTER: -- constitutes
9 compliance with the rule and specifically now the
10 notification requirement which requires that it be
11 entered into for the matter that the division of fee
12 will be made.
13  THE WITNESS: Yes?
14  THE SPECIAL MASTER: The matter that the
15 division of fee will be made would have to be the
16 State Street case?
17  THE WITNESS: Yes?
18  THE SPECIAL MASTER: Your view --
19  THE WITNESS: What you have --
20  THE SPECIAL MASTER: There was no State
21 Street case at that point.
22  THE WITNESS: There certainly was the
23 attempt to create one, right? They were there for
24 that purpose, were they not?

Page 142

1 THE SPECIAL MASTER: No. They were
2 there to be considered as monitoring counsel --
3 THE WITNESS: Yes.
4 THE SPECIAL MASTER: -- which is
5 different than acting as a lawyer in a class action
6 to represent a class representative.
7 THE WITNESS: But that was what was
8 ultimately going to happen was to bring such a case,
9 was it not?
10 THE SPECIAL MASTER: The role of
11 monitoring -- are you aware that ATRS had, I
12 believe, five different monitoring counsel? Did you
13 know that?
14 THE WITNESS: No, I'm not aware of that.
15 THE SPECIAL MASTER: The testimony -- I
16 think Mr. Hopkins testified that Labaton was I
17 believe the fifth monitoring counsel.
18 THE WITNESS: (Nods head.)
19 THE SPECIAL MASTER: And that they were
20 -- the RFP -- you know what an RFP is?
21 THE WITNESS: Yes, I do. Request for
22 proposals. Yes.
23 THE SPECIAL MASTER: The RFP that went
24 out, which was jointly applied to by Labaton and the

Page 143

1 Chargois & Herron firm, was for monitoring counsel.
2 THE WITNESS: Yes.
3 THE SPECIAL MASTER: So how could that
4 be an appropriate compliance for the division of the
5 fee that the client enters into for the matter that
6 the division of fee would be made?
7 THE WITNESS: What was the purpose of
8 the monitoring?
9 The monitoring purpose was, look, we
10 have a problem, and we want to recoup monies. You
11 monitor -- when you finish your monitoring, you then
12 enter into a lawsuit, do you not? The class action
13 was certified thereafter?
14 THE SPECIAL MASTER: The testimony was
15 that the role that monitoring counsel played was to
16 monitor the various investments the funds had to
17 ensure that there was compliance and to determine
18 whether or not the fund and its members were in any
19 way being cheated.
20 THE WITNESS: And they came to that
21 conclusion, did they not?
22 THE SPECIAL MASTER: You're saying that
23 that's the same as being entered into as a fee
24 agreement for the matter that a division of fees

Page 144

1 will be made?
2 THE WITNESS: Yes.
3 THE SPECIAL MASTER: Okay. And are you
4 saying that Christa Clark's response, the e-mail
5 response, constitute consents -- consent to the
6 joint participation in writing?
7 THE WITNESS: And you're still talking
8 about a time period immediately after the joint
9 submission, right?
10 THE SPECIAL MASTER: I'm talking
11 about --
12 THE WITNESS: I think that is --
13 THE SPECIAL MASTER: -- to narrow it
14 down.
15 THE WITNESS: It is sufficient.
16 THE SPECIAL MASTER: Christa Clark's
17 e-mail was sufficient to constitute consent?
18 THE WITNESS: Yes.
19 THE SPECIAL MASTER: For the State
20 Street matter and the Chargois fee arrangement
21 itself?
22 THE WITNESS: With the subsequent
23 there's some other communications back and forth,
24 the answer is yes.

Page 145

1 THE SPECIAL MASTER: Okay.
2 BY MR. SINNOTT:
3 Q. All right. Counsel, let me direct your
4 attention to your declaration again and ask you to
5 go to paragraph 14.
6 The second sentence I believe or the
7 third after the parentheses reads: "Labaton
8 informed Lieff and Thornton that it had a
9 fee-sharing obligation to Chargois & Herron. All
10 three firms agreed to share the burden equally for
11 that obligation."
12 Do you see that, sir?
13 A. I do.
14 Q. What was your understanding as to what
15 information was provided by Labaton to Lieff and
16 Thornton regarding Chargois?
17 A. You mean beyond the fact that they felt they
18 had an obligation?
19 Q. Yes. What were the facts that were shared?
20 If you know of any.
21 A. I do not know, but I don't think it was
22 necessary for my expression as an expert in this
23 case.
24 Q. So you don't believe that the communications

Page 146

1  from Labaton to Lieff and Thornton were relevant as
2  to Labaton's obligations or their obligations?
3  **A.  No.  My concern was was there any situation**
4  **in which the fee that would go to Chargois would**
5  **come from any part of the plaintiffs or their**
6  **clients' funds due them, and it did not.**
7  Q.  And with respect to that relationship,
8  that's the only thing that mattered as far as you
9  were concerned?
10 **A.  As far as the rule as I understand it and**
11 **the reasonings behind the rule, it is to protect the**
12 **plaintiff or the customer here.  And the customer**
13 **was protected under these circumstances.**
14 Q.  And would those customers include the class
15 members?
16 **A.  It would include the retirement fund.**
17 Q.  All right.
18 **A.  The entire process of it.**
19 Q.  Were the class members protected?
20 **A.  You're talking about each member of the**
21 **teacher retirement program?  I think each one was**
22 **protected --**
23 Q.  All right.
24 **A.  -- adequately represented by their -- by**

Page 147

1  **Mr. Hopkins who was their administrator.**
2  Q.  Now were you aware that Labaton and others
3  in the customer class represented to Judge Wolf that
4  they were representing the ERISA class as well?
5  **MR. HEIMANN:** Objection.
6  **MS. LUKEY:** Objection.
7  Q.  Are you aware of that?
8  **A.  You mean subsequent to the agreement they**
9  **had reached with the ERISA attorneys?**
10 Q.  Prior to and subsequent.
11 **MS. LUKEY:** Objection.
12 **A.  I don't understand the question.  I'm sorry.**
13 Q.  Would it make a difference in your opinion
14 if the customer class counsel had claimed that they
15 represented the ERISA class members?
16 **MS. LUKEY:** Objection.
17 **MR. HEIMANN:** Objection.  There was no
18 ERISA class.  There was no ERISA class counsel.
19 Q.  ERISA class members.
20 **MS. LUKEY:** Objection.
21 Q.  Would that make a difference to you?
22 **A.  No.**
23 Q.  And why not?
24 **A.  Because the concern here is the protection**

Page 148

1  of the customer or here the agreement that had been
2  reached with the customer as to what the fee would
3  be.
4  Q.  And you're limiting the customer to Arkansas
5  Retired Teachers Fund?
6  **A.  That's who they were representing.**
7  Q.  All right.  And you're not -- your concern
8  is not with ERISA, correct?
9  **A.  I don't know what you mean by "my concern**
10 **with ERISA."  ERISA --**
11 Q.  As far as protecting members.
12 **A.  Well, their lawyers had come to an agreement**
13 **in the initial I assume collaboration on what was**
14 **going to -- how they were going to handle this**
15 **matter, was it at 9 percent, sometime later they had**
16 **further discussions, and they moved it up to 10**
17 **percent.  All the lawyers agreed to it.**
18 **They were operating within the confines**
19 **of what was provided to be the fee.  And they shared**
20 **them properly with them.**
21 **THE SPECIAL MASTER:** Are you saying that
22 Arkansas Teachers Retirement System represented the
23 ERISA members as well and that Mr. Hopkins could
24 speak for the ERISA members?

Page 149

1  **THE WITNESS:** No.  What I'm saying is
2  the ERISA lawyers had a right and a responsibility
3  to represent the ERISA clients that they had, and
4  they entered into negotiations with the other
5  lawyers as to how they were going to handle the
6  fees.
7  **THE SPECIAL MASTER:** Okay.  So --
8  **THE WITNESS:** And it didn't apply to
9  either the ERISA clients, nor did it apply to the
10 Arkansas clients.  That had already been determined.
11 **THE SPECIAL MASTER:** And determined by
12 the lawyers amongst themselves, yes?
13 **THE WITNESS:** Yes, as to their fees was
14 what was being distributed.
15 **THE SPECIAL MASTER:** Mr. Sarrouf, you
16 understand there is no fee until the Court says
17 there is a fee?  You understand that?
18 **THE WITNESS:** Well, I understand that
19 that is in finality, but when they were agreeing
20 with each other and discussing it with each other,
21 they had an understanding of what they were talking
22 about.
23 **THE SPECIAL MASTER:** Do you think that
24 the ERISA lawyers were fully informed such that they

Page 150

1  could in the first instance agree to their fee and
2  in the second instance inform their ERISA clients
3  who were named plaintiffs in these two other
4  lawsuits that were consolidated for purposes of
5  discovery and mediation?
6      **MS. LUKEY:** Objection.
7      **THE WITNESS:** When they undertook their
8  negotiations, each representing their own clients, a
9  determination had been made, had it not, as to what
10  was going to be the subject matter of the
11  distributions between counsel.  Isn't that correct?
12      **THE SPECIAL MASTER:** Well, that's a
13  question in the case as to what the ERISA -- as to
14  what the ERISA lawyers knew, when they knew it, what
15  they could inform their clients of, what they could
16  inform -- you may not know this, but there were
17  other actors in the settlement, the Department of
18  Labor, the Securities & Exchange Commission and the
19  Department of Justice.
20      **THE WITNESS:** Yep.
21      **THE SPECIAL MASTER:** So a question in
22  the case is what the ERISA lawyers knew, when they
23  knew it and what they could inform their clients of
24  and also the Department of Labor which had a

Page 151

1  responsibility for overseeing the "ERISA-fied" funds
2  and plans.
3      **THE WITNESS:** But at that time everyone
4  knew what was the fees allocated to the
5  representatives of the Arkansas retirement, right?
6      **THE SPECIAL MASTER:** Well, let's talk
7  about what "at that time" means.
8      At the time they negotiated their fee
9  they did not know of the existence of Mr. Chargois;
10  they did not know of the obligation to pay
11  Mr. Chargois some percentage of the ultimate fee;
12  they did not know that Mr. Chargois had a
13  long-standing arrangement with the Labaton firm to
14  receive a percentage of all fees that Labaton
15  received as lead counsel in which Arkansas was lead
16  plaintiff.  They did not know any of those things.
17      And, by the way, Mr. Lieff testified he
18  didn't know either.  He knew some of them I suppose,
19  but he did not -- he testified he did not know
20  either.
21      So at the time the fee was negotiated,
22  the ERISA lawyers did not know any of these things
23  and were not in a position to inform their clients.
24  Did you know that?

Page 152

1      **MS. LUKEY:** Objection.
2      **THE WITNESS:** All right.  I know that.
3  Okay?
4      **THE SPECIAL MASTER:** Okay.  So how could
5  they have made a knowing decision on an appropriate
6  size of their fee, and how could they have informed
7  their clients, one of which was a trust, the others
8  of which as class representatives were individual
9  members of ERISA-fied pension plans -- if they
10  didn't know, how could they have informed their
11  clients?
12      **MR. HEIMANN:** Objection.
13      **MS. LUKEY:** Objection.
14      **THE SPECIAL MASTER:** Okay.
15      **THE WITNESS:** They did know the amount
16  that had been assigned to Labaton, right?
17      **THE SPECIAL MASTER:** Well, even that
18  they didn't know because the Court hadn't approved
19  it.  But actually --
20      **THE WITNESS:** But in their discussions?
21      **THE SPECIAL MASTER:** I think the facts
22  show that at the time that the ERISA lawyers made
23  their agreement for first the 9 percent, nobody knew
24  how much the fees were going to be.

Page 153

1      **THE WITNESS:** Okay.
2      **THE SPECIAL MASTER:** It was not at all
3  resolved.  It wasn't even resolved between the
4  customer class lawyers.
5      My question to you is twofold, and I'll
6  ask it one at a time.
7      **THE WITNESS:** Okay.
8      **THE SPECIAL MASTER:** How could the ERISA
9  lawyers have made a knowing decision as to what an
10  appropriate attorney fee was for them if they did
11  not know about the existence of a fee that was going
12  to be paid to Mr. Chargois who had never appeared in
13  the case and done no -- had done no work in the
14  case?
15      **MS. LUKEY:** Objection.
16      **THE WITNESS:** Because the amount of
17  money that was to go to Chargois only came from what
18  they knew --
19      **PHONE LINE CONFERENCE:** The following
20  participant has entered the conference.
21      **THE SPECIAL MASTER:** I'm sorry.
22      **THE WITNESS:** All right.  Can I just
23  have that part read back?
24      (Reporter read back.)

Page 154

1   **THE WITNESS:** -- already was the amount
2   assigned through Labaton for the other two --
3   **THE SPECIAL MASTER:** Sir, there is
4   absolutely --
5   **THE WITNESS:** It's only coming from
6   Labaton, nobody else.  So if they knew what was
7   coming to Labaton, it didn't matter what Labaton was
8   going to do with that money.
9   **THE SPECIAL MASTER:** I'm afraid, sir --
10  **THE WITNESS:** So far as it affects
11  anyone else in the case.
12  **THE SPECIAL MASTER:** Your answer is
13  assuming facts contrary to the evidence -- all of
14  the evidence in the case.
15  **MS. LUKEY:** Objection.
16  **THE SPECIAL MASTER:** The evidence in the
17  case is that at the time -- we're focusing only now
18  at the time the original ERISA agreement was made.
19  **THE WITNESS:** That's before they came to
20  the next -- from 9 to 10.
21  **THE SPECIAL MASTER:** To 10.  But even at
22  that time -- even at that time there had been no
23  agreement as to how much the fee was going to be.
24  There had been no agreement that it was going to

Page 155

1   just come from Labaton.
2   In fact, the testimony is that at some
3   time in 2013 the customer class lawyers agreed to
4   share --
5   **THE WITNESS:** That's my understanding as
6   well.
7   **MS. LUKEY:** Objection.
8   **THE SPECIAL MASTER:** -- the obligation
9   for Mr. Chargois as well.
10  **MS. LUKEY:** Wait 'til he finishes so I
11  can object.
12  **THE WITNESS:** Okay.
13  **MS. LUKEY:** Objection.
14  **THE SPECIAL MASTER:** So how could the
15  ERISA lawyers have made a knowing decision as to
16  whether or not their slice of the whole fee when
17  looked at in the context of the total fee of which
18  Mr. Chargois was going to get some piece was
19  reasonable?
20  **MS. LUKEY:** Objection.
21  **THE WITNESS:** Simply because the only
22  place it was coming from was from Labaton.  And they
23  already knew or would know what was Labaton going to
24  get.

Page 156

1   **THE SPECIAL MASTER:** Okay.  Let me ask
2   another question.
3   You would agree --
4   **THE WITNESS:** I hope.
5   **THE SPECIAL MASTER:** I hope.  -- that
6   the ERISA lawyers had an obligation to their clients
7   to keep them informed, correct?
8   **THE WITNESS:** Absolutely.
9   **THE SPECIAL MASTER:** Absolutely.  And
10  that would include, as set forth in Rule 1.5(e), the
11  division of fees made to the lawyers in the case,
12  correct?
13  **THE WITNESS:** No.
14  **MS. LUKEY:** No.
15  **THE SPECIAL MASTER:** Who spoke for the
16  ERISA lawyers -- I'm sorry -- for the members of the
17  ERISA class?
18  **THE WITNESS:** Their lawyers.
19  **MR. HEIMANN:** Excuse me.  Objection.
20  There is no ERISA class.
21  **MS. LUKEY:** There is no ERISA class.
22  **THE SPECIAL MASTER:** Fine.  Who spoke
23  for the ERISA class members?
24  **MR. HEIMANN:** The class lawyers.  I'm

Page 157

1   sorry.  I apologize.
2   **THE SPECIAL MASTER:** Did you want to be
3   put under oath, Richard?
4   **MR. HEIMANN:** No, I just know the answer
5   to the question.  I'm sorry.  I -- I --
6   **THE WITNESS:** That would be my answer.
7   **THE SPECIAL MASTER:** I'm not surprised
8   after hearing it which is the problem but --
9   **THE WITNESS:** I doubt very much --
10  **THE SPECIAL MASTER:** -- at any rate...
11  **THE WITNESS:** -- that anyone would speak
12  for any client except the lawyers.
13  **THE SPECIAL MASTER:** So who was the
14  class representative for the ERISA members of the
15  class?
16  **THE WITNESS:** I have no idea.
17  **THE SPECIAL MASTER:** Was Arkansas
18  Teachers the class representative for members of the
19  ERISA class?
20  **MS. LUKEY:** Objection.
21  **MR. HEIMANN:** There's no ERISA class,
22  judge.  I mean really.
23  **MS. McEVOY:** The plan participants.
24  **THE SPECIAL MASTER:** The plan

Page 158

1 participants.
2   THE WITNESS: Were represented by
3 counsel, were they not?
4   THE SPECIAL MASTER: They were.
5   THE WITNESS: And they were not the same
6 people who are the representatives for Arkansas,
7 were they?
8   THE SPECIAL MASTER: Well, I'd like your
9 view on whether or not Arkansas Teachers was the
10 representative for the ERISA -- named ERISA
11 representatives in the other two lawsuits and the
12 ERISA members of the settlement class.
13   MR. HEIMANN: Objection. Compound.
14   MS. LUKEY: Objection.
15   THE SPECIAL MASTER: Please answer the
16 question.
17   THE WITNESS: I can't.
18   THE SPECIAL MASTER: Let me break it
19 down for you.
20   We've agreed that the ERISA members of
21 the class had separate lawyers. Correct?
22   THE WITNESS: Yes.
23   MS. LUKEY: Actually --
24   MR. HEIMANN: That's not true.

Page 159

1   THE WITNESS: Well, they don't have a
2 class but whoever was representing --
3   THE SPECIAL MASTER: I said the
4 settlement class.
5   THE WITNESS: Okay.
6   THE SPECIAL MASTER: The ERISA members
7 of the class had separate lawyers, correct?
8   MS. LUKEY: Objection.
9   MR. HEIMANN: Objection.
10   THE SPECIAL MASTER: Correct?
11   MR. HEIMANN: Objection.
12   THE WITNESS: I don't know that as a
13 fact. I would assume that each party has a lawyer.
14   THE SPECIAL MASTER: Who was the class
15 representative for the ERISA members of the class?
16   THE WITNESS: I don't know.
17   THE SPECIAL MASTER: Do you believe that
18 Arkansas Teachers represented the ERISA members of
19 the class?
20   THE WITNESS: In what capacity?
21   THE SPECIAL MASTER: Do you believe that
22 Arkansas Teachers was the representative of the
23 ERISA members of the class for purposes of approving
24 a division of fees?

Page 160

1   MS. LUKEY: Objection.
2   THE WITNESS: At what juncture in the
3 process are we talking about? Is this after the
4 settlement had been agreed upon?
5   THE SPECIAL MASTER: It could be after
6 the settlement was agreed upon. It could be at the
7 time the class was certified in August of 2016.
8   THE WITNESS: And they had filed their
9 appearance in the case?
10   THE SPECIAL MASTER: They had.
11   MR. HEIMANN: Who's the they? I'm
12 sorry.
13   THE SPECIAL MASTER: I assume by they
14 you meant the ERISA lawyers?
15   THE WITNESS: Yes.
16   THE SPECIAL MASTER: They had filed
17 appearances in both -- there had been three
18 different cases that had been consolidated for
19 mediation and discovery --
20   MR. HEIMANN: Your Honor, I don't think
21 that's true. I don't think there's any formal
22 consolidation of the ERISA case --
23   THE SPECIAL MASTER: There's a
24 consolidation order.

Page 161

1   MR. HEIMANN: If I'm mistaken, I'm
2 mistaken, but I don't believe that's the case.
3   THE SPECIAL MASTER: There's a
4 consolidation.
5   MR. HEIMANN: All right.
6   MS. LUKEY: I'm not sure that it's
7 relevant. I think technically the order may have
8 read only in terms of the pretrial discovery that
9 the mediation was absorbed.
10   THE SPECIAL MASTER: Yeah, the pretrial
11 discovery.
12   MR. HEIMANN: Well, you know, pretrial
13 discovery is different from mediation.
14   MS. LUKEY: I don't think the mediation
15 was in the order, but I could be wrong.
16   MR. HEIMANN: Well, I've been told in no
17 uncertain terms that the cases were not consolidated
18 for mediation.
19   In fact, that's even been mentioned
20 indirectly --
21   MS. LUKEY: Right.
22   MR. HEIMANN: -- in your statement of
23 facts, but, if I'm wrong, I'm wrong.
24   THE SPECIAL MASTER: They were

Page 162

1  consolidated at least for purposes of discovery and
2  at least for purposes of pretrial.
3      At any rate --
4      **THE WITNESS:** I don't mean to interrupt,
5  but may I --
6      **THE SPECIAL MASTER:** I'm sorry?
7      **THE WITNESS:** May I make a phone call,
8  please?
9      **THE SPECIAL MASTER:** Sure.  This would
10  be a good time to --
11     **MS. LUKEY:** -- take the lunch break?
12     **THE SPECIAL MASTER:** -- break for lunch.
13     (A lunch recess was taken.)
14     (Whereupon the proceedings
15     adjourned at 12:38 p.m.)
16
17
18
19
20
21
22
23
24

Page 163

1              C E R T I F I C A T E
2
3      I, Paulette M. Cook, Registered Merit Reporter,
4  do hereby certify that the foregoing transcript,
5  Volume 1, is a true and accurate transcription of my
6  stenographic notes taken to the best of my ability
7  on Wednesday, March 21, 2018.
8
9
10
11
12
13          Paulette M. Cook
14          Registered Merit Reporter
15
16
17
18          - - - - -
19
20
21
22
23
24

## $

**$10,000 (1)**
95:6
**$10,750 (1)**
94:7
**$15 (3)**
57:2,23;58:2
**$186 (1)**
57:19
**$7.50 (2)**
93:24;94:2
**$80 (2)**
57:4,19

## A

**AAJ (1)**
27:3
**ABA (2)**
22:23;100:9
**abandoned (1)**
124:10
**ability (1)**
90:7
**able (2)**
30:24;138:20
**Abner (1)**
46:5
**absent (1)**
87:7
**absolutely (6)**
43:4;47:1;118:16;154:4;
156:8,9
**absorbed (1)**
161:9
**academic (1)**
24:22
**Academy (7)**
11:14,23;26:8,14;27:8,13;
28:7
**accept (1)**
38:7
**acceptable (2)**
42:17;43:23
**accepted (3)**
49:16;58:15;62:13
**accommodate (1)**
31:4
**accordance (3)**
17:18;52:1,19
**according (1)**
64:5
**accounts (1)**
28:18
**accuracy (1)**
96:4
**accurate (5)**
8:14;65:18;67:22;97:14;
120:24
**accused (1)**
28:11

**acknowledgement (1)**
106:11
**acquaint (1)**
48:24
**acquainted (1)**
54:4
**act (1)**
90:12
**acted (1)**
55:21
**acting (1)**
142:5
**action (26)**
16:7;33:17;42:3;47:23;
54:18,22;55:2,22;57:3;59:1;
60:21;61:3,8;67:11;68:23;
69:13;76:2;77:9;86:11,13;
90:6,24;134:13;135:13;
142:5;143:12
**actions (16)**
47:22;48:13;54:14;55:6;
56:5,15;58:23;59:12,17;
60:5;66:3,10;69:2;76:7;
87:2;115:9
**activity (1)**
12:22
**actors (1)**
150:17
**actual (1)**
42:10
**actually (7)**
14:6;31:20;45:23;83:9;
111:1;152:19;158:23
**add (2)**
38:15;122:9
**additional (4)**
94:12,13;95:7;122:17
**address (2)**
16:1,4
**addressed (1)**
51:6
**addressing (2)**
46:17;138:8
**adequately (1)**
146:24
**adjourned (1)**
162:15
**Adjunct (1)**
8:12
**administrator (2)**
15:19;147:1
**admission (1)**
49:7
**adopted (4)**
13:20;60:1;136:20;139:20
**adoption (1)**
47:19
**adopts (1)**
121:4
**advance (1)**
104:12
**advice (2)**
15:18;30:12

**advised (3)**
100:5;125:14;135:20
**Advocacy (3)**
45:24;46:7;53:20
**advocate (1)**
21:18
**advocated (1)**
94:1
**affects (1)**
154:10
**affiliate (1)**
127:19
**affirm (1)**
122:4
**afraid (1)**
154:9
**afternoon (1)**
102:23
**again (11)**
8:13;17:11;21:14;37:10;
45:7;60:3;10;64:6;65:16;
96:17;145:4
**against (1)**
86:9
**Agent (5)**
121:9,19,21;122:1,3
**aggravate (1)**
77:19
**ago (5)**
73:10;92:8;108:5,20;
110:13
**agree (11)**
38:8;74:11,23;83:1;84:2,
5;89:24;97:6;131:18;150:1;
156:3
**agreed (14)**
34:17;48:17;56:20;57:23;
62:19;64:22;73:5;104:11;
145:10;148:17;155:3;
158:20;160:4,6
**agreed-upon (2)**
104:20;106:18
**agreeing (2)**
71:8;149:19
**agreement (45)**
6:22;13:6;39:1;52:2,20,
21;71:10,15;72:3;75:21,22;
78:6;84:12;85:8,9;98:2;
103:9;104:18,19;107:10;
108:10,21,23;109:11,12,17,
24;110:4;113:1;133:11;
134:22;139:3;140:3,4,19,22;
141:5;143:24;147:8;148:1,
12;152:23;154:18,23,24
**agreements (5)**
16:2;59:18;96:18;97:21;
109:3
**ahead (5)**
33:23;61:19;89:13;
125:23;126:8
**allocated (1)**
151:4
**allocation (1)**

21:12
**allotted (1)**
75:6
**almost (2)**
47:10;108:6
**along (5)**
67:20;68:3;70:2;110:17;
116:23
**although (2)**
72:11;83:14
**altogether (1)**
69:11
**always (5)**
67:18;68:18;72:13;75:4;
76:9
**amended (1)**
83:16
**American (6)**
26:17,18;27:4,10,12;
100:16
**among (1)**
19:20
**amongst (1)**
149:12
**amount (8)**
32:13;51:24;65:13;75:12;
77:23;152:15;153:16;154:1
**amounts (1)**
106:17
**analogy (1)**
22:23
**analysis (2)**
107:4;116:24
**analyzing (1)**
95:21,23
**Andover (1)**
4:13
**answered (5)**
21:4;41:15;81:4,7;120:8
**answer's (1)**
131:7
**Anthony (1)**
66:17
**anymore (2)**
72:12;82:3
**apart (1)**
41:20
**apologize (1)**
157:1
**apparently (2)**
63:8;64:22
**appeals (6)**
51:9;52:6,13;63:15;64:1,6
**appearance (1)**
160:9
**appearances (1)**
160:17
**appeared (5)**
28:9,14;50:3,6;62:22;
112:7;153:12
**appearing (1)**
9:4
**appears (1)**

119:10
**applicable (5)**
84:3;96:2;120:9,11,13
**application (9)**
37:12,13,19;38:4;41:6;
130:6;131:1,1;133:10
**applied (6)**
17:6;22:2;26:1,2;57:18;
142:24
**apply (3)**
46:20;149:8,9
**appointed (2)**
35:9;49:21
**appointment (4)**
14:22;15:8,9;33:14
**appointments (1)**
15:7
**appraisal (4)**
19:10;56:5,15;57:3
**appraised (1)**
59:2
**appreciate (2)**
8:6;74:15
**apprise (1)**
29:4
**appropriate (27)**
13:12;37:5,8,23;39:18,24;
40:3,10;41:13;51:22;67:17;
78:2;79:15,22,24;84:22;
85:2,3;86:14,16,22;127:22,
24;128:3;143:4;152:5;
153:10
**appropriately (2)**
34:15;68:16
**appropriateness (6)**
42:14,16;43:14;44:13;
88:20,21
**approved (2)**
22:1;152:18
**approving (2)**
89:10;159:23
**approximately (4)**
94:19;108:5;110:13,21
**April (1)**
111:15
**arbitration (1)**
38:24
**area (1)**
47:13
**arguably (1)**
66:9
**argument (2)**
32:12;73:22
**arising (2)**
30:1;62:18
**Arkansas (26)**
107:10;108:21;111:20;
122:13,22,23;123:16,18;
124:3,11,16,18;125:16;
127:1;128:7,13;148:4,22;
149:10;151:5,15;157:17;
158:6,9;159:18,22
**Arnie (12)**

12:12;28:16;100:3,7,7,8,
10,23;115:13,23,24;116:22
**arose (2)**
21:1;34:22
**arrangement (4)**
42:22;110:8;144:20;
151:13
**ARTRS (2)**
107:11;122:23
**asbestos (4)**
55:7;61:5;62:6,6
**Aside (2)**
70:3;84:16
**assessed (1)**
51:10
**assigned (2)**
152:16;154:2
**assistance (2)**
119:2;120:3
**assistant (2)**
99:13;101:7
**assists (1)**
111:19
**Association (7)**
9:15;11:4;27:5,10;29:1,2;
38:16
**assume (9)**
43:6;49:6;73:2,8;96:4;
107:7;148:13;159:13;
160:13
**assumed (2)**
87:10;125:22
**assuming (2)**
134:2;154:13
**astounding (2)**
86:18,20
**ATLA (1)**
27:6
**ATRS (1)**
142:11
**attach (1)**
103:8
**attached (2)**
8:16;112:4
**attempt (1)**
141:23
**attend (1)**
27:19
**attended (1)**
27:21
**attention (4)**
9:2;95:10,16;145:4
**attentive (2)**
17:5,11
**Attorney (26)**
6:12,18,23;8:9;13:18;
18:1;23:15;25:17;29:17;
52:14,19;55:14;59:17;
62:19;66:2;74:24;76:24;
80:12,13;90:11;93:15;
99:12,13;105:24;116:7;
153:10
**attorney/client (3)**

30:17;54:17,21
**attorneys (13)**
7:3;11:15,19;16:16;18:6,
9;26:8;29:14,23;30:20;58:5;
133:19;147:9
**attorneys' (2)**
51:19;134:16
**attributed (1)**
57:20
**August (1)**
160:7
**authorities (2)**
29:24;37:21
**authorizing (1)**
91:6
**Avenue (1)**
4:10
**await (1)**
22:5
**award (11)**
58:3,6;64:13,14;65:9,21;
70:3;77:23;79:4,19;89:11
**awarded (5)**
16:7;58:13;65:1;133:18;
134:3
**awards (1)**
135:16
**aware (14)**
46:21;104:22;123:2,14;
124:7,13,16,21,24;125:4;
142:11,14;147:2,7
**away (1)**
90:20

## B

**back (28)**
11:13;47:6;69:21;70:23;
72:5;86:7;91:13;97:23;
98:20;99:1,16;102:15;
103:2;107:16;110:3,4;
114:7;117:1,23;119:13;
120:14,17;121:24;130:2,3;
144:23;153:23,24
**background (2)**
23:14;96:5
**bad (1)**
8:13
**bank (2)**
66:14,15
**banking (1)**
28:22
**Bar (20)**
9:14;11:4;28:3,10;29:1,2,
15;37:20,20,24;38:1,16;
39:22;42:24;43:18;44:11,
11;100:23;116:5,14
**bargain (2)**
91:16,18
**Barrett (2)**
6:7,13
**Barton (1)**
46:5

**base (1)**
17:15
**basically (1)**
28:2
**basis (14)**
11:20,21;18:18;29:3;
51:24;52:7,13,22;64:12,13;
89:20;91:3;117:23;127:22
**BBO (1)**
38:15
**bearing (1)**
16:23
**became (4)**
24:4;50:21;53:10;119:22
**become (2)**
18:15;122:17
**becomes (2)**
40:5;86:9
**began (2)**
99:19;119:6
**beginning (4)**
7:4;69:11;70:20;126:19
**behalf (5)**
11:23;53:21;60:22;67:8;
87:6
**behind (1)**
146:11
**Belfi (1)**
112:6
**bell (2)**
112:20,21
**Belmont (1)**
105:14
**beneficiaries (2)**
56:22;67:9
**beret (1)**
121:23
**best (4)**
34:14;70:9;101:1;128:12
**better (6)**
32:5;48:23;68:10;70:15;
74:5;130:22
**beyond (5)**
58:22;95:6;111:13;120:3;
145:17
**big (2)**
12:2;26:17
**Bill (8)**
7:23;37:22;60:23;89:13;
90:18;94:7,14;96:20
**billed (2)**
94:10;95:6
**Bill's (2)**
55:17;81:1
**binder (1)**
99:5
**bit (2)**
22:18;138:16
**board (13)**
16:18,22,22;28:10;29:18;
37:24;38:1,24;39:22;42:24;
43:18;44:11;89:24
**boards (1)**

31:9
**Bob (1)**
135:5
**bono (3)**
30:14;62:15,22
**both (6)**
31:4;47:16;100:10;
125:15;126:15;160:17
**bother (1)**
72:9
**bound (2)**
60:7,10
**Bowdoin (1)**
58:9
**boy (1)**
96:16
**Bradley (1)**
112:5
**break (7)**
92:13;105:16,21,24;
158:18;162:11,12
**Brian (1)**
7:7
**briefed (4)**
44:21;45:1,8,11
**bring (3)**
30:21;89:18;142:8
**bringing (1)**
12:3
**broad (4)**
25:18,20,21;28:8
**broader (2)**
24:11;29:11
**Broadway (1)**
4:3
**broke (1)**
78:22
**Brooks (3)**
32:21,22,23
**brought (13)**
17:19;19:17;20:11;33:17;
36:14;41:2;42:9;66:18;
87:21,22,23;88:1;100:3
**burden (1)**
145:10
**Bush (1)**
118:15

## C

**Cabraser (1)**
7:14
**call (7)**
29:16;99:12;100:2;103:2;
115:1;119:7;162:7
**called (6)**
27:2;28:13;33:8,10;
120:19;123:5
**calls (2)**
99:23;100:1
**came (21)**
21:2;33:7;34:2;55:7,8;
58:18;82:11,12,15;83:23;

99:8,10;116:21;118:11;
133:17;134:3,16;139:7;
143:20;153:17;154:19
**Camille (4)**
6:18;33:10;89:23;102:10
**can (48)**
7:1;17:1;20:13,22;23:20;
24:24;30:16;34:3;35:4,5;
40:24;41:9;43:13;46:16;
50:1;59:3;60:21;61:2,13,13,
14,19;62:7;72:6;73:2,7,24;
75:15;77:6;83:1,1;84:5;
87:13,20;88:15;93:6;96:15;
109:11;119:11;130:16;
131:18;132:4,8;136:19;
137:8;138:19;153:22;
155:11
**cancer (1)**
117:12
**candor (1)**
46:23
**Canty (1)**
4:2
**capability (1)**
21:10
**capacity (4)**
11:4;15:5;123:22;159:20
**care (5)**
72:17;74:3;77:1,15;85:18
**career (1)**
38:14
**careers (1)**
18:7
**carefully (1)**
13:5
**carried (1)**
90:20
**carrying (1)**
74:24
**case (155)**
6:4;11:21;12:3,14,21;
16:7,24;18:24;19:3,8,13,14,
15;20:3,4,4,10,11,13,17,21,
24;21:2,5,6,8,23;24:4,10,14;
30:13;32:16,17;33:7,12,23;
34:1,5,11,22;35:15,22;
36:15;37:7,13;38:22;40:6;
41:1,21;42:5,11,16;44:14,
23;50:11,19,23;51:8,11,11,
13,13,14,16,18,21;52:4,6;
53:10,16;54:15;56:1,4,7,9;
58:3,7,11,22;62:4,16,23;
63:5,19;65:8,9,11,19,22;
66:5,9,13;67:15,23;68:5;
69:9,19;70:13;76:2,18,19;
77:1,9;78:1;89:13,19;90:5;
91:7;93:18;94:4;95:24;96:2,
7;100:21;106:11,24;107:9;
109:8;111:17;119:5;121:10,
16;122:1,3,5;123:20;124:9;
127:24;128:9;131:6,17;
132:1;133:13,15;134:24;
135:8,11,23;136:16,21;

141:16,21;142:8;145:23;
150:13,22;153:13,14;
154:11,14,17;156:11;160:9,
22;161:2
**case-by-case (2)**
18:18;127:22
**cases (74)**
13:9;17:19;18:20;19:7,17,
21;20:7;22:5,10,19;23:5,6,
15,23;25:11,16,16;31:8,9,
14;32:18;34:3;35:14;36:2,3;
38:13,20;39:9,9,17;40:3;
41:9,9,10;42:13;43:16,17,
18;44:3,10,11;47:10;48:8;
49:19;51:15;55:7,13,23,24;
56:3,11;58:13,14,20;59:1;
60:22;61:1,4,5,8,11;62:18;
68:22;70:16;71:6,18;73:3,3,
19;83:15;121:8;126:13;
160:18;161:17
**category (1)**
61:6
**cause (12)**
50:2;53:2;57:6;63:9;
69:23;71:12;94:21;103:15;
115:5;119:5,13;126:18
**centered (1)**
26:23
**cents (1)**
57:19
**certain (8)**
15:13;29:6;96:1,6;100:12;
116:15;119:17;122:22
**certainly (14)**
17:21;30:9;35:24;36:1;
47:14;59:21;60:21;61:5,8;
85:15;91:18;106:10;109:23;
141:22
**certified (2)**
143:13;160:7
**Cetrulo (1)**
61:12
**chairman (1)**
100:9
**change (4)**
28:14;110:8,10,10
**changed (2)**
26:22;138:8
**change-over (1)**
126:1
**changes (2)**
11:13;13:20
**chapter (1)**
27:10
**characterized (2)**
63:24;131:3
**charge (3)**
33:18,19;58:8
**charged (3)**
32:13;40:4;104:21
**Chargois (42)**
101:11,14;104:23;105:1,
8;110:7,19;111:6,8;122:19;

123:2,3,4,14,19;124:3,7,17;
125:5,10;126:7,11;128:8,14;
131:3;133:14,16;134:17;
135:7,20;143:1;144:20;
145:9,16;146:4;151:9,11,12;
153:12,17;155:9,18
**Chargois' (4)**
123:11;127:3;128:8;131:6
**cheated (1)**
143:19
**check (1)**
65:5
**chief (2)**
14:23;15:9
**children (2)**
20:5;58:10
**Choate (2)**
7:9,12
**choose (1)**
20:8
**chose (1)**
20:10
**chosen (1)**
19:16
**Christa (10)**
127:17;130:6;131:2;
133:11;134:22;140:4,22;
141:6;144:4,16
**circuit (4)**
21:24;22:4;122:2,4
**circumstances (5)**
35:2;37:8;40:10;74:7;
146:13
**cite (4)**
53:13,14;101:16,22
**cited (2)**
53:20;101:20
**Civil (2)**
16:12,16
**civilians (1)**
15:7
**claim (2)**
68:2,13
**claimed (2)**
19:11;147:14
**claims (3)**
22:1;33:19;55:9
**clarification (2)**
23:20;132:9
**clarifying (1)**
22:24
**Clark (2)**
140:23;141:6
**Clark's (8)**
127:17;130:7;131:2;
133:11;134:22;140:4;144:4,
16
**class (100)**
16:7;21:10;42:3;47:22,23;
48:13,15;54:14,18,22;55:2,
6,11,21,22;56:3,18,24;
58:22;59:1,11,17,24;60:5,
17,20;61:3;66:3,10;67:11;

68:3,17,23;69:1,13;70:3;
73:4;76:1,6;77:9;79:1;
86:11,13;87:2,6,7;88:4,8,14,
14,16,23;89:1,10;90:6,24;
91:5,7,9,17;112:7;115:9;
134:12,15;135:13;142:5,6;
143:12;146:14,19;147:3,4,
14,15,18,18,19;152:8;153:4;
155:3;156:17,20,21,23,24;
157:14,15,18,19,21;158:12,
21;159:2,4,7,14,15,19,23;
160:7
**classes (1)**
89:5
**clear (1)**
132:23
**clearer (1)**
65:17
**clearly (1)**
66:12
**clerical (2)**
119:2;120:3
**client (92)**
13:12;32:14;33:22;34:13,
19;35:1;40:4,13;41:2;42:1;
43:4;48:9;50:20;51:19;
52:21;59:3,3;64:15,19;70:6;
71:16,19;72:2,6;73:21;
74:23;75:9;76:1,17,24;
77:14;78:7;79:16,22,23;
80:3,5,6,8,12,16,21;81:13,
19,22;83:2,3;84:4,11,12,19,
22;85:5,8,12,13;86:8,12,14,
16;87:22,23;88:6;89:18,22;
90:5,11,12,24;91:15;103:9,
15;104:10;106:9,12,16;
107:8,24;108:9,10,20;
109:10,12,24;124:4;135:10;
139:1,2;140:18,19;143:5;
157:12
**clients (28)**
32:11;34:20;39:5;50:22;
60:22;68:16;71:6;72:7,11,
23;73:5,11,21;79:1;85:14,
19;90:2;149:3,9,10;150:2,8,
15,23;151:23;152:7,11;
156:6
**clients' (1)**
146:6
**client's (3)**
81:23;84:24;106:20
**close (4)**
55:8;65:2;97:13;137:21
**co-counsel (1)**
112:7
**Coggins (6)**
19:13;20:12;21:6;56:7,15;
58:11
**cold (1)**
123:5
**collaboration (1)**
148:13
**College (3)**

26:18;58:9;100:16
**colloquy (2)**
76:2;77:3
**comfortable (2)**
117:22;118:19
**coming (13)**
16:8;9;72:17;74:2,14;
76:15,16;86:15;92:17,17;
154:5,7;155:22
**comment (4)**
9:18;10:10;12:21;31:9
**commenting (3)**
11:7;25:16;35:14
**comments (2)**
10:22;25:12
**Commission (5)**
14:20;15:2,6;16:10,11;
150:18
**commitments (1)**
38:18
**committee (8)**
10:14,16;11:2,5,7,9;
28:15;100:9
**common (1)**
121:7
**Commonwealth (7)**
17:7,17;18:15;47:15;54:3;
62:16,22
**communications (2)**
144:23;145:24
**Companies (1)**
4:13
**compensation (1)**
93:20
**competent (1)**
49:2
**compile (1)**
96:23
**complaint (6)**
41:2,22,24;43:1,3,7
**complete (1)**
9:10
**completion (1)**
64:9
**compliance (7)**
133:12;134:23,24;135:9;
141:9;143:4,17
**complicated (1)**
133:23
**complied (3)**
106:22;140:3,5
**complies (7)**
40:12;128:19;129:9;
130:7,17;131:4;132:6
**comply (3)**
41:16;81:14,17
**compound (2)**
90:16;158:13
**comprehensive (1)**
97:8
**concern (7)**
39:5;73:19;80:6;146:3;
147:24;148:7,9

**concerned (3)**
103:16;125:21;146:9
**concerning (1)**
66:14
**conclusion (4)**
42:10;128:15,16;143:21
**Conduct (37)**
9:19;12:8;13:24;14:17,19;
15:3;17:23;18:3,4;22:11,13,
21,22;23:16,17;24:6,13,14;
25:13,17,18,24;26:4;29:14;
30:2;35:22;37:3;38:5;39:20;
40:11;41:14;43:16;53:24;
54:10;98:19;113:17;131:19
**conducting (1)**
8:1
**confer (1)**
61:17
**CONFERENCE (8)**
9:23,24;133:7,8;135:4,5;
153:19,20
**confines (1)**
148:18
**confiscate (1)**
105:12
**confused (1)**
78:10
**confusion (2)**
19:21;25:3
**connections (1)**
124:3
**consent (17)**
71:17,24;72:1,23;73:16;
74:16;79:9,20;81:23;83:3;
84:24;106:8;107:2;109:22,
23;144:5,17
**consented (2)**
71:6,19
**consents (3)**
84:14;139:4;144:5
**consider (17)**
11:18;17:2,4,10,12;18:9;
24:17;25:10;47:3,8;53:23;
58:15,16;108:19;109:22;
115:15,17
**consideration (1)**
40:21
**considered (3)**
49:15;109:9;142:2
**considers (1)**
77:13
**consolidated (4)**
150:4;160:18;161:17;
162:1
**consolidation (3)**
160:22,24;161:4
**conspiracy (1)**
33:11
**constitute (2)**
144:5,17
**constituted (2)**
107:2;128:7
**constitutes (3)**

133:12;134:23;141:8
**construction (1)**
131:4
**consult (2)**
100:21;120:12
**consultant (1)**
23:15
**consulted (1)**
114:19
**consulting (2)**
23:4,11
**context (2)**
45:4;155:17
**contingencies (1)**
94:24
**contingent (6)**
52:20;71:10;89:15,20;
91:3;95:4
**continue (1)**
47:18
**CONTINUED (3)**
44:19;105:23;125:1
**contract (2)**
110:5;127:11
**contractors (1)**
127:20
**contrary (1)**
154:13
**contributed (3)**
64:9;65:21;113:9
**contribution (2)**
64:15;65:10
**convenience (1)**
8:18
**conversations (2)**
104:17;107:8
**copies (2)**
96:16,18
**copy (6)**
95:12;98:9,14,18;137:9,
13
**corollary (1)**
29:20
**corporation (1)**
19:12
**costs (1)**
70:24
**Counsel (55)**
4:6,13;6:8;7:24;14:16;
17:9;23:9;31:14;40:15,15,
16;48:16;55:21;56:3;59:9,
24;60:6;61:17;63:18;68:3;
75:20;78:6;79:1;89:15;
93:17;95:24;98:6,24;99:22;
100:18,24;111:19;114:4;
116:6,14;122:17;124:2,2,18;
126:12,13;127:1,3;134:4;
142:2,12,17;143:1,15;145:3;
147:14,18;150:11;151:15;
158:3
**counsels (2)**
68:17;126:17
**count (1)**

110:1
**counts (1)**
18:21
**couple (2)**
26:22;115:13
**coupled (1)**
133:11
**course (16)**
8:3;15:24;31:3,18;34:11;
45:22;46:7,13,15;59:2,3;
101:9,23;104:17;105:8;
125:2
**Court (85)**
6:10;7:16;11:17,23;13:7,
16,19;14:23;15:9,10;18:1;
19:1,6,16,20;20:3,8,10;22:5,
6;23:22,24,24;24:18;29:15,
23;30:7,11,21,23;32:14;34:2,
6;35:9;36:6;38:23;39:21;
40:21;41:18;42:8,10,24;
43:18;44:21;45:1,8,11;46:5,
20,24;47:19,20;49:15,15,20,
21;50:3,7,8;52:6,13;54:9;
56:1,9,21;57:13;58:13;
59:17;60:1,6,18;63:9,15;
64:6;87:21;88:2,22;89:9;
93:8;95:12;120:17;121:2;
139:21;149:16;152:18
**Court-appointed (1)**
33:4
**courts (15)**
17:20;18:14,21;19:6;
24:19;26:1,2;31:4;37:20;
40:17;54:3;88:17,18;
106:14,22
**Court's (1)**
21:24
**cover (1)**
139:19
**create (1)**
141:23
**credits (1)**
12:2
**critical (1)**
101:5
**cross (1)**
33:17
**current (4)**
82:10,13;84:6;137:20
**Currently (2)**
83:5;93:21
**custom (1)**
133:18
**customer (14)**
98:6;106:12,20;133:20;
134:8;146:12,12;147:3,14;
148:1,2,4;153:4;155:3
**customers (1)**
146:14
**customers' (2)**
133:18;134:4
**cut (1)**
122:8

**CV (7)**
8:15;22;9:2,4;14:16;93:9,
15

## D

**damage (1)**
81:19
**damaged (1)**
80:17
**Damon (6)**
101:11;104:22;105:1,8;
110:7;128:8
**Damon's (2)**
112:8,10
**date (3)**
57:24;101:24;110:1
**dated (1)**
111:15
**dates (1)**
115:3
**date's (1)**
102:9
**David (1)**
112:5
**Day (1)**
66:17
**days (3)**
51:2;63:22;94:24
**deal (1)**
127:14
**dealing (2)**
76:7;85:16
**dealt (1)**
126:10
**dear (3)**
28:15;101:1;121:13
**debate (2)**
87:19;88:15
**December (7)**
13:19;97:24;98:3;107:14,
14;108:23;139:20
**decide (2)**
40:22;97:4
**decided (2)**
21:7;86:23
**decider (1)**
118:15
**decision (4)**
39:21;152:5;153:9;155:15
**decisions (1)**
21:14
**declaration (29)**
8:16;9:6;16:23;95:10;
97:22;101:17;102:6,18;
104:8,12,14,15;106:1,7;
107:2,11;109:9,16,17,18;
110:12;111:2,4;114:9;
118:3,4;122:11;125:4;145:4
**decreased (1)**
80:17
**deem (1)**
127:20

**defendant (1)**
33:17
**definitely (1)**
137:12
**definition (1)**
28:17
**Department (3)**
150:17,19,24
**depend (1)**
94:15
**depended (1)**
15:17
**depending (1)**
19:4
**deposition (7)**
66:21;93:11;101:11,13;
105:7;123:3,12
**depth (1)**
35:13
**described (4)**
79:17;106:5;111:17,18
**designating (1)**
19:20
**determination (3)**
39:23;57:21;150:9
**determine (3)**
37:7,9;143:17
**determined (3)**
53:1;149:10,11
**detriment (1)**
34:19
**Detroit (1)**
6:11
**develop (2)**
28:17;99:19
**developed (1)**
70:7
**development (1)**
120:23
**difference (10)**
34:4;73:12,14;74:4;
137:16,21,22;138:16;
147:13,21
**different (19)**
15:13,19;19:21;39:14;
50:23;62:6;86:1,4,5;99:22;
107:20;109:3,4;119:21;
123:20;142:5,12;160:18;
161:13
**difficult (1)**
112:18
**difficulty (2)**
99:20;137:12
**dinging (1)**
92:14
**DIRECT (5)**
7:18;9:1;95:9,16;145:3
**direction (1)**
22:4
**disagreement (2)**
32:12;38:21
**discerned (1)**
13:15

**discharged (1)**
51:17
**disclosed (2)**
6:21;16:5
**disclosing (1)**
60:17
**disclosure (3)**
16:2;59:16;60:5
**discovery (3)**
150:5;160:19;161:8,11,
13;162:1
**discussed (5)**
10:19;95:24;100:4;101:6;
122:2
**discussing (2)**
122:1;149:20
**discussion (1)**
89:6,7
**discussions (4)**
15:14;99:14;148:16;
152:20
**dispose (1)**
30:24
**disqualified (1)**
50:3
**distill (1)**
52:12
**distinguished (1)**
18:7
**distributed (1)**
149:14
**distribution (2)**
62:17;70:11
**distributions (1)**
150:11
**District (1)**
6:10
**divide (1)**
51:5,6
**division (38)**
24:19;26:5;44:14;48:13;
71:6,14,16,19;72:1,3,14,23;
73:5;74:10,24;76:18;79:4,
18,19;81:23;84:9,13,23;
85:5,10;108:7;138:23;
139:3;140:13,20,23;141:11,
15;143:4,6,24;156:11;
159:24
**divisions (1)**
23:8
**Doane (1)**
123:4
**doctors (1)**
70:22
**document (9)**
103:8;104:2,5,6;112:14;
113:4,12,12;114:4
**documents (12)**
96:1,7,11,15;97:20;98:4,
7;101:9,10,18;111:13,14
**dollars (2)**
64:3;65:1
**done (8)**

28:11;31:5;32:14,15;
47:10;93:6;153:13,13
**Donoghue (2)**
6:7,13
**don't (95)**
8:20;9:7;10:24;18:12;
19:2;25:2;29:16,19;31:1;
33:10;40:6,16;41:8,9;43:11,
20;44:17;47:3;50:23;52:9,
17;53:15;58:11;61:7;63:11,
12;66:12;67:13;70:6;71:2;
72:6,8,12;73:11;74:18;
75:15;76:6,14;77:5,17;79:6,
23;80:1,22;82:2,3,18,19;
84:2,19,20;85:24;87:18,21,
23;89:4;90:8;91:9;92:2;
94:17,20,21;97:6;101:23;
103:1;105:15,20;108:19;
110:15,22,22;113:11;
123:13,17,20,23;125:7;
127:13;128:21;137:15,21;
138:5;139:6;145:21,24;
147:12;148:9;159:1,12,16;
160:20,21;161:2,14;162:4
**doubt (1)**
157:9
**down (11)**
33:9;34:2;55:10;70:6;
78:22;92:17;94:21;100:4;
131:22;144:14;158:19
**dozens (1)**
121:21
**draft (2)**
118:2,20
**drafted (3)**
104:13;118:14,22
**drafting (1)**
114:24
**drafts (2)**
117:2,5
**dropped (2)**
21:21;36:1
**drug (1)**
61:7
**Dublin (1)**
111:16
**due (5)**
35:7;80:18;81:1;119:14;
146:6
**Dugan (1)**
66:19
**During (3)**
16:11;51:1;124:8
**duties (2)**
15:24;75:1
**duty (2)**
34:13;46:23

**E**

**earlier (4)**
71:14;72:20;73:10;108:14
**early (1)**

107:14
**editor (1)**
116:23
**effect (9)**
9:19;57:9;82:11,12,15;
83:23;108:14;131:12,17
**effective (3)**
138:2;139:22,23
**effort (1)**
11:20
**efforts (1)**
64:8
**eight (1)**
98:22
**eighties (3)**
11:14;12:6;120:18
**either (17)**
22:20;23:3,14;29:15,23;
31:9;34:15;39:10,18;44:11,
14;50:8;51:8;75:17;149:9;
151:18,20
**eleven (1)**
20:9
**elicited (1)**
53:16
**eligible (1)**
57:23
**Elizabeth (2)**
6:12;139:10
**else (11)**
12:4;34:19;53:10;78:13;
85:19;92:5;117:16;118:21;
128:4;154:6,11
**em (1)**
69:11
**e-mail (14)**
111:15,16,20,21;112:3;
127:2,18;134:23;137:10;
140:4,23;141:6;144:4,17
**embarrassed (1)**
25:3
**emergency (1)**
8:6
**encompassing (1)**
136:20
**end (3)**
11:6;40:16;114:16
**ended (2)**
50:24;105:5
**endorsement (1)**
27:24
**ends (1)**
41:18
**endurance (1)**
105:19
**engagement (1)**
108:15
**engages (2)**
48:20;49:10
**England (4)**
19:14;20:15;45:15;46:2
**enough (5)**
72:17;74:3,5;76:10;

103:17
**ensure (1)**
143:17
**ensuring (1)**
88:19
**enter (1)**
143:12
**entered (17)**
9:24;52:2;54:16,20;56:18;
98:2;108:15,21,22;109:12;
110:3;133:8;135:5;141:11;
143:23;149:4;153:20
**enters (7)**
84:12;108:10;109:10,24;
139:2;140:19;143:5
**entire (1)**
146:18
**entirely (1)**
106:18
**entitled (8)**
25:8;50:20;64:2;65:20;
90:7;91:1;96:21,22
**equalizer (1)**
44:5
**equally (1)**
145:10
**Eric (1)**
112:5
**ERISA (47)**
98:7;112:8,10;119:21;
147:4,9,15,18,18,19;148:8,
10,10,23,24;149:2,3,9,24;
150:2,13,14,22;151:22;
152:22;153:8;154:18;
155:15;156:6,16,17,20,21,
23;157:14,19,21;158:10,10,
12,20;159:6,15,18,23;
160:14,22
**ERISA-fied (2)**
151:1;152:9
**especially (9)**
28:21;30:17;55:6;59:4;
68:11;72:11;106:23;116:5;
120:22
**Esq (2)**
4:2,9
**essentially (1)**
128:2
**established (1)**
87:12
**establishing (1)**
18:22
**estimate (1)**
94:3
**ethical (16)**
17:4,10;18:2,2;19:24;
20:2,14,16;21:3,3,7,19;23:2;
34:10;46:20;98:16
**ethics (11)**
17:3,13;18:10,24;19:2;
20:20;24:1;45:17;46:13,16;
54:5
**evaluations (1)**

22:2
**even (16)**
23:8;37:16;57:22;72:9,13;
74:18;79:23;97:12;110:18;
116:3;125:23;152:17;153:3;
154:21,22;161:19
**events (2)**
27:20,22
**eventually (1)**
21:15
**everybody (3)**
53:10;119:23;137:13
**everyone (2)**
15:12;151:3
**evidence (3)**
154:13,14,16
**exactly (2)**
52:9;113:19
**EXAMINATION (4)**
7:18;8:2;44:19;105:23
**examined (2)**
8:8;63:17
**examiner (1)**
113:14
**examining (1)**
10:7
**example (1)**
119:11
**except (2)**
82:18;157:12
**excessive (5)**
33:19;40:19,19,23;42:7
**exchange (2)**
105:14;150:18
**exchanges (1)**
100:18
**excuse (4)**
77:2;90:22;136:24;156:19
**excuses (1)**
74:24
**Exhibit (13)**
8:18;93:10,10,12,16;
95:13,14;113:20,21,22,24;
114:1,9
**exhibits (1)**
97:11
**exist (2)**
76:11;103:20
**existed (1)**
105:3
**existence (5)**
59:7;66:18;104:3;151:9;
153:11
**existing (1)**
83:17
**exists (1)**
44:6
**expanded (2)**
56:19,21
**expect (1)**
59:4
**expense (1)**
127:24

expenses (3)
    64:4;75:13,17
experience (22)
    16:22;18:13,21;24:8;
    34:15;37:18;43:17;48:15;
    49:14;58:22;59:9,16;60:4,
    11,11,16;62:9;66:3,10;68:9;
    116:5;117:23
experienced (2)
    32:24;60:19
expert (45)
    8:16;9:5;17:3,12;23:12,
    14;32:16,19,23;33:4,4,7;
    35:11;38:10;47:4,5,8,13,14;
    48:20;49:2,7,11,20,24;50:4,
    7,8;51:1;53:8,10,13,23;54:9;
    62:14,15;63:6,16;66:13,19;
    67:3;93:18;96:22;133:2;
    145:22
expertise (7)
    18:23;25:11;37:11,13;
    41:5;42:13;48:12
experts (3)
    18:10,15;63:21
explain (3)
    72:13;73:24;119:20
explained (1)
    113:8
explaining (2)
    79:17;80:15
explanation (1)
    99:10
express (3)
    17:8;43:21;117:17
expressed (4)
    10:19;40:2;51:9;104:6
expressing (3)
    117:22;119:9;132:11
expression (2)
    119:9;145:22
extension (1)
    10:17
extent (21)
    24:15;25:10,15,23;35:13;
    37:11,18;43:17;44:9;46:16;
    47:24;49:13;54:1;55:23;
    58:24;67:5,16,24;109:21;
    115:23;134:8
extremely (1)
    137:20

F

F2d (1)
    122:4
facilitated (1)
    122:21
fact (15)
    33:16;38:8;57:8,16;79:2,
    3;82:19;116:3;123:6;
    125:24;128:14;145:17;
    155:2;159:13;161:19
factor (2)

132:3,5
facts (9)
    46:17;95:22;96:5;101:16,
    20;145:19;152:21;154:13;
    161:23
fails (1)
    81:18
failure (1)
    33:22
fair (10)
    13:22;16:21;17:24;31:7;
    48:11;61:2;65:7;69:17;70:2;
    74:5
faith (1)
    73:23
faithful (1)
    57:11
fall (5)
    61:6;66:9;103:18,21;
    104:3
falls (1)
    34:24
familiar (7)
    27:16;121:9,13,15;122:5;
    123:5,8
family (4)
    55:8;58:8;85:16,17
far (11)
    45:3;94:4;97:9;103:15;
    106:12;111:13;125:20;
    146:8,10;148:11;154:10
fashion (1)
    7:2
fashioned (1)
    94:23
February (2)
    107:18;108:24
Fed (1)
    58:14
Federal (20)
    16:12,16;19:6;20:3;21:2,
    17;22:1;23:23,24;26:2;46:4;
    47:20;54:9;55:24;56:9;
    57:16;60:1;121:2,3,7
fee (125)
    16:2,6;24:3;33:19;34:17,
    18;36:3,6,19;37:3,5;38:13;
    39:11,18,24;40:2,4,9,18,19,
    22;41:12;42:6,6,17,20;
    43:14;44:13;48:4,10;51:22,
    24;52:2,7,20;58:3,6,7,12,13,
    17;59:17;65:20;67:11;70:4,
    7,17;71:10,14,17,20;72:2,4,
    24;73:5;74:10;75:12,13,21;
    77:11;78:1,5,12,16,18;79:4,
    19;81:23;84:9,12,15;85:5,
    10,18;86:3;89:21;90:8;9,
    91:10;108:7,10,21,22;109:6,
    10,12,14,24;14;133:14,
    16,17;134:2,3;135:7,10,15,
    16;138:23,24;139:2,5;
    140:13,19;141:11,15;143:5,
    6,23;144:20;146:4;148:2,

19;149:16,17;150:1;151:8,
    11,21;152:6;153:10,11;
    154:23;155:16,17
feel (5)
    8:13;32:5;34:14,18;73:15
fees (48)
    21:12;24:19;26:5;36:9,10;
    37:14;38:6;40:14;41:20;
    42:14,17;43:22;44:14;
    48:13,13;49:10,11;51:20;
    60:6,17;62:13,17;71:7;72:1;
    74:24;76:18;79:18;84:13,
    23;88:21;89:11;104:20;
    106:18;113:10;131:20;
    134:16,16;139:3;140:20,24;
    143:24;149:6,13;151:4,14;
    152:24;156:11;159:24
fee-sharing (1)
    145:9
fellows (1)
    100:15
felt (4)
    17:7;67:17;117:22;145:17
few (4)
    9:13;98:7;99:23;100:1
fiduciary (3)
    88:16,19;89:10
fifth (1)
    142:17
fifty (1)
    93:23
Fifty-seven (1)
    17:16
fight (1)
    26:18
figure (2)
    33:24;53:12
file (1)
    11:17
filed (5)
    11:15,22;20:6;160:8,16
filing (1)
    120:16
final (4)
    104:20;107:4;110:5;
    116:24
finality (1)
    149:19
finalized (1)
    139:19
financial (1)
    66:10
find (7)
    35:3;55:11;70:23;74:3;
    120:16;136:17;138:11
finding (2)
    57:3,22
findings (1)
    57:7
fine (5)
    33:7;93:1;100:14;134:18;
    156:22
finer (3)

22:9;28:17;128:18
finish (5)
    7:1;19:15;129:23;130:2;
    143:11
finishes (1)
    155:10
FINNERTY (2)
    7:11,11
firm (29)
    6:7;7:6,8;56:15,17,17;
    61:12;62:2;66:16;71:16;
    73:6;77:1,9;84:10;90:6;
    100:14;108:8;117:15;118:1,
    2;127:3,11,11,19,19;139:1;
    140:14;143:1;151:13
firms (12)
    12:2;56:10,12,14;61:10;
    97:23;103:11;107:12;
    122:16;125:15;126:15;
    145:10
first (21)
    21:23;22:4;33:7,9;34:20;
    58:1;102:5,15,22,22;103:4;
    107:13;113:1;114:15,16;
    116:4;118:11;122:12;126:6;
    150:1;152:23
firsthand (1)
    13:23
Fishman (2)
    32:19;34:11
five (4)
    36:1;90:16;92:24;142:12
flipped (1)
    45:3
Florida (1)
    103:2
focus (1)
    35:19
focuses (1)
    135:11
focusing (1)
    154:17
follow (2)
    59:24;63:2
following (8)
    9:23;64:8;96:4;112:6;
    122:11;133:7;135:4;153:19
footnote (2)
    82:23;137:9
footnoted (1)
    136:16
force (1)
    12:1
forget (4)
    57:17;62:21;67:6;126:1
forgets (1)
    80:10
forgot (1)
    62:1
forgotten (1)
    9:9
form (3)
    30:21;128:14;130:10

**formal (1)**
160:21
**format (3)**
96:24;120:1,2
**formed (3)**
11:5;28:15,18
**former (2)**
51:19;64:18
**forms (4)**
71:22,23,24;87:21
**formulate (1)**
104:9
**formulating (2)**
100:20;116:8
**formulation (1)**
121:17
**forth (6)**
75:22;99:16;117:1;
119:13;144:23;156:10
**forward (5)**
19:16;20:9;34:16,19;56:4
**found (4)**
87:3;105:7;115:13;137:8
**foundation (1)**
64:7
**founded (2)**
87:3,4
**four (3)**
20:5;46:2;58:10
**frame (1)**
117:19
**framework (1)**
116:8
**frankly (1)**
48:2
**fraud (1)**
66:11
**free (1)**
128:2
**friend (4)**
28:15;101:1;120:19;
121:14
**friends (1)**
55:8
**front (8)**
8:22;40:23;62:23;82:9;
83:22;99:5;136:10;140:10
**full (3)**
13:5;104:18,19
**fully (1)**
149:24
**fund (4)**
122:18;143:18;146:16;
148:5
**funds (5)**
68:15;106:20;143:16;
146:6;151:1
**further (4)**
62:17;64:5;80:6;148:16

## G

**Garrett (1)**

112:5
**gatekeeper (1)**
88:18
**gather (5)**
68:2,11,18;124:11;128:13
**gathered (1)**
67:15
**gave (3)**
66:21;69:22;97:10
**Gaynor (4)**
61:21,21,22,23
**General (2)**
62:20;127:1
**George (3)**
97:22;102:5;109:13
**Gerald (1)**
6:8
**Gestel (1)**
62:24
**gets (2)**
12:2;77:23
**Gillers (7)**
4:15;6:14,23;25:4;32:21;
97:7;98:17
**Gillers' (1)**
32:3
**gist (1)**
67:3
**given (5)**
15:12,16,19;35:10,11
**glitch (1)**
80:19
**God (1)**
55:1
**goes (4)**
22:10;86:7;122:19;123:24
**Goldsmith (1)**
112:5
**golly (1)**
96:19
**Good (13)**
7:7,21,22;10:1,2,4;29:12;
38:14;46:10;94:20;99:17;
119:4;162:10
**Gordon (1)**
66:19
**governed (1)**
131:19
**governing (2)**
49:3;87:18
**governor (1)**
15:7
**governs (1)**
49:7
**great (4)**
27:23;89:23;100:23;116:4
**grievance (4)**
29:17,17,24;37:21
**guess (2)**
100:11;106:13
**guides (1)**
115:21
**guys (2)**

136:1,2

## H

**Hall (2)**
7:9,12
**hand (3)**
20:21;70:17;72:8
**handed (2)**
131:22;138:1
**handle (4)**
35:3;39:2;148:14;149:5
**handled (5)**
21:13;28:21;37:20;47:15;
73:20
**happen (2)**
76:2;142:8
**happened (3)**
84:3;102:4;123:10
**happens (2)**
63:21;86:2
**happy (1)**
112:16
**hard (1)**
112:13
**harm (3)**
80:21;88:2;90:10
**harmed (1)**
81:14
**hate (1)**
81:5
**head (2)**
14:12;142:18
**heading (1)**
95:22
**hear (3)**
76:14;84:20;130:1
**heard (2)**
7:23;11:22
**hearing (4)**
15:16,16;22:14;157:8
**hearings (1)**
58:14
**Heimann (32)**
7:13;81:5;90:15;97:6,12;
105:4;113:16;121:18;132:8,
16,19,22;136:1,7;147:5,17;
152:12;156:19,24;157:4,21;
158:13,24;159:9,11;160:11,
20;161:1,5,12,16,22
**HEIMANN (1)**
7:13
**held (3)**
17:17;57:6;106:14
**Hello (1)**
136:4
**help (4)**
52:11,15;78:21;80:8
**helped (6)**
101:3,4;117:2,19,20,20
**helpful (5)**
18:23;82:6;97:17;119:8,
16

**Herron (12)**
122:20,20;123:3,15,19;
124:3,7,17;126:11;131:3;
143:1;145:9
**Herron's (1)**
128:8
**Hey (1)**
136:1
**highest (1)**
64:3
**himself (1)**
77:11
**hire (3)**
87:7;89:24;128:2
**hired (3)**
33:15;66:20;117:6
**hires (1)**
91:2
**historical (1)**
139:11
**holder (1)**
56:22
**Honor (5)**
35:20;81:4;86:19;133:4;
160:20
**hope (4)**
38:8;46:12;156:4,5
**hopefully (2)**
6:24;60:9
**hoping (1)**
93:24
**Hopkins (14)**
97:22;102:18;104:17;
109:9,13,22;110:7,13;125:1,
5;126:3;142:16;147:1;
148:23
**Hopkins' (4)**
102:5;104:15;106:1;123:4
**hospital (1)**
70:21
**hour (1)**
93:22
**hours (9)**
6:16;11:20;92:13;94:3,5,
13,17;95:7;105:17
**Huh (1)**
53:6
**hundred (1)**
20:6;58:9;93:22
**hundreds (4)**
17:20;36:5;38:13;39:8
**Hylenski (3)**
9:24;10:4,8
**hypothetical (1)**
78:11

## I

**idea (1)**
157:16
**identification (3)**
93:13;95:15;114:2
**identified (1)**

126:15

**identify (2)**
7:4;96:15

**identity (1)**
115:4

**ill (1)**
120:20

**imagine (1)**
10:17

**immediately (1)**
144:8

**implemented (1)**
83:9

**important (1)**
115:4

**imposed (1)**
45:23

**inadvertent (1)**
83:17

**include (16)**
12:1;23:6;37:14,15,15;
41:9;46:22;47:21;48:12;
56:19;58:16;71:24;72:1;
146:14,16;156:10

**included (3)**
125:9;126:6,11

**including (3)**
58:14;87:6;138:23

**incorporated (1)**
132:2

**increase (1)**
112:24

**independent (1)**
127:20

**indicates (1)**
128:2

**Indicating (5)**
31:21;45:4,5;47:7;99:6

**indirectly (1)**
161:20

**individual (2)**
69:13;152:8

**inform (6)**
74:9;150:2,15,16,23;
151:23

**information (7)**
16:5;55:10;68:12,18;
90:13;101:18;145:15

**informed (6)**
90:12;145:8;149:24;
152:6,10;156:7

**initial (7)**
51:8;65:12;67:22;107:24;
114:24;125:14;148:13

**initially (6)**
94:5;97:23;99:2,10;
118:20,23

**injured (1)**
76:9

**inquire (1)**
25:9

**inquired (1)**
100:16

**insisted (1)**
120:1

**insisting (1)**
85:21

**Insofar (1)**
103:9

**instance (5)**
67:14;88:7;135:18;150:1,
2

**instances (6)**
30:19;38:23,24;59:4,23;
68:15

**Institute (1)**
45:24

**institution (1)**
126:6

**intent (4)**
13:2,15;106:21;129:13

**interaction (1)**
119:12

**interchange (1)**
100:10

**interest (5)**
11:11;57:5,14,18;108:1

**interested (2)**
49:19,23

**interim (3)**
138:3,13;139:19

**interpret (4)**
44:22;45:2,9,12

**interrogation (1)**
113:18

**interrogator (2)**
113:13,17

**interrupt (2)**
6:22;162:4

**interrupted (1)**
28:5

**interruption (1)**
105:10

**intervene (1)**
56:7

**into (37)**
11:21;21:2;29:5;30:21;
33:7;52:2;53:12;54:16,20;
56:8;61:6;66:9;73:22;82:11,
12,15;83:23;84:12,19;
85:19;98:3,22;108:10,21,22;
109:10,12,24;110:3;138:14;
139:2;140:19;141:11;143:5,
12,23;149:4

**introduced (1)**
98:4

**introduction (1)**
122:21

**investigation (3)**
6:4;15:16;105:9

**investigatory (1)**
15:13

**investments (3)**
67:1,8;143:16

**invited (1)**
122:16

**involve (2)**
30:9;33:19

**involved (24)**
10:15;13:9;19:5;21:20;
22:10;23:11;26:6,8;29:13,
23,24;31:15;33:21;42:21;
44:24;47:11,24;51:7;56:1,
10;89:7;99:22;119:6,22

**involvement (11)**
13:23;22:19;23:4,13;
24:15;25:11,15,24;31:8;
35:13;44:10

**involving (5)**
26:24;37:14;66:3,10,14;
111:20

**IOLTA (1)**
28:18

**issue (30)**
16:8;19:1;20:14,16,20;
21:7;22:10;23:7,9,17;24:4,6,
9;34:10;35:15;37:2;38:19;
39:17,20;40:3,5,21;41:18,
20;42:14;44:14;50:19,21;
64:9

**issued (3)**
103:18;104:3;122:15

**issues (25)**
16:1;21:19;22:11;23:2,7;
26:5;29:8,14;30:1,8;31:6;
41:20;43:13;44:10;49:24;
51:6;83:2;87:20;89:8,8,12;
95:21,23;99:20;116:15

---

### J

**JAMS (2)**
30:23;39:1

**jeez (2)**
77:14;89:23

**Joan (15)**
7:9;23:5;24:24;25:6;
31:20;32:5;37:22;82:8;
86:22;92:23;101:6;105:11;
117:20;118:2;130:21

**Joan's (1)**
26:5

**join (1)**
91:5

**joint (9)**
84:14;125:8;130:6;131:1;
139:4;144:6,8

**jointly (1)**
142:24

**Jones (2)**
77:14,23

**Josh (1)**
7:4

**Joshua (1)**
7:5

**Joyce (1)**
92:16

**Judge (33)**
12:18;13:6;15:15,20,21;

16:5;21:5,15;30:23,23;
33:13;46:4,5;54:8;56:6;
57:3,22;58:15;62:23;86:23;
87:8;92:5;98:17;126:8;
132:22;135:16,17,20,22;
136:13,24;147:3;157:22

**judges (3)**
14:18;15:8;30:11

**judge's (3)**
88:13,15,19

**judgment (2)**
37:17;38:3

**judgments (2)**
35:9;36:12

**Judicial (8)**
11:17,23;13:15,19;14:19;
15:3,8;120:17

**juncture (1)**
160:2

**jury (5)**
34:6;46:17;51:11,21;
64:21

**justice (2)**
15:10;150:19

**justices (2)**
14:23;27:5

**Justin (14)**
96:23;99:14;101:7;115:1,
11,12,15;117:1,2,4,13;
118:1;119:13,19

---

### K

**keep (6)**
30:20;70:16;71:4;99:15;
105:5;156:7

**keeping (1)**
95:2

**keeps (1)**
77:21

**KELLER (2)**
4:8;112:6

**KELLY (3)**
7:7,7;92:19

**Kevin (1)**
7:11

**kind (1)**
62:4

**kinds (1)**
116:12

**knew (24)**
13:7;69:19;70:4;100:7;
104:22;105:5;110:18;111:5,
7;119:4;120:5,11,16;
124:10;150:14,14,22,23;
151:4,18;152:23;153:18;
154:6;155:23

**know (111)**
11:12;13:6;18:12;25:9,10,
23;29:16,19;31:2;32:7;40:6,
16;41:12;42:15;43:16,20;
44:17;45:14;46:16;49:5;
50:23;52:17;54:1,15;58:17;

59:22;60:7;62:2;63:11;65:6;
66:18;67:1,13;69:4,24;
70:13,21;71:1,5,18,24;
73:12,20;76:9;77:17,24;
79:6,23;80:1,13;81:10;
84:20;85:17,24;89:18;
90:10;93:7;94:18;95:2;97:5,
9;100:10;101:23;102:3;
103:1;105:1,2;106:24;
110:22,22;112:24;115:2;
116:3,5,24;117:17;119:3,14,
20;123:20,23;125:5,7,8;
127:13;139:16,18;142:13,20;
145:20,21;148:9;150:16;
151:9,10,12,16,18,19,22,24;
152:2,10,15,18;153:11;
155:23;157:4;159:12,16;
161:12
**knowing (4)**
85:20;152:5;153:9;155:15
**knowledge (8)**
13:1;17:21;106:10;
120:13;125:20,22;128:7;
135:23
**known (1)**
20:11
**knows (3)**
40:13;77:10;100:8

**L**

**LABATON (34)**
4:1,6;7:10,12;98:14;
100:13;111:17,18,19;
122:21;124:1,18;125:1;
126:7;127:12,18;128:11;
134:3;142:16,24;145:7,15;
146:1;147:2;151:13,14;
152:16;154:2,6,7,7;155:1,
22,23
**Labaton's (2)**
128:2;146:2
**Labor (2)**
150:18,24
**language (1)**
138:16
**largely (2)**
138:15,17
**Larry (1)**
112:4
**last (9)**
20:17,24;30:22;32:20;
35:24;36:1;102:10,11,12
**later (9)**
21:2;62:8;65:6,13;99:8;
109:16;114:7;116:21;
148:15
**Law (20)**
6:15;7:6,8;17:16;35:24;
38:18;45:15;46:2,6;74:8,15;
77:9;83:12;96:2;107:12;
120:10,11,13;121:7;132:1
**lawsuit (2)**

56:18;143:12
**lawsuits (2)**
150:4;158:11
**lawyer (50)**
12:2;17:4;21:20,20;30:9,
15;31:10;32:24;33:8,16,22,
23;34:12;35:1,3;36:12,14,
21;39:10;46:23;48:20,23;
49:9;51:7,13,16,23;52:3,7;
60:21;62:13;75:8,20;77:17;
78:11;79:7,16;80:23;81:14,
22;84:18,19,22;85:16,23;
86:9;107:8;126:12;142:5;
159:13
**lawyers (72)**
15:9;17:6,10,22;19:17,21;
21:21;22:12;23:16;26:14,
18;27:9,13;28:7,20;29:4;
31:2,5;32:12;36:23;38:22;
42:21;43:7;50:23;51:1;
52:17;53:2,3;56:8;59:1,23;
60:15,17;68:10;71:15;73:4,
20;84:10;87:6,7,7;88:21;
100:12;106:18;108:8;119:4;
131:19;138:24;140:14;
148:12,17;149:2,5,12,24;
150:14,22;151:22;152:22;
153:4,9;155:3,15;156:6,11,
16,18,24;157:12;158:21;
159:7;160:14
**lawyer's (2)**
74:22;85:18
**lead (6)**
21:20;56:4;59:9;124:2;
151:15,15
**leadership (1)**
17:18
**leading (1)**
19:15
**learn (1)**
110:6
**learned (3)**
100:5,15;105:8
**least (5)**
83:24;89:5;131:19;162:1,
2
**left (5)**
6:9,14;68:17;72:12;103:3
**legal (11)**
17:3,12;19:24;30:12;
33:11;45:17,18;46:13;
73:22;77:16;116:8
**length (1)**
100:4
**letter (7)**
82:2;84:4;108:15;112:2,4;
127:2;131:2
**Lieff (6)**
7:13;135:5;145:8,15;
146:1;151:17
**likely (1)**
85:14
**limit (5)**

22:19;41:4,8,10;43:12
**limited (1)**
68:15
**limiting (1)**
148:4
**Linda (3)**
10:1,3,7
**LINE (6)**
9:23;33:24;77:20;133:7;
135:4;153:19
**liquidation (1)**
57:10
**list (1)**
97:8
**listed (4)**
50:11,17;51:15;101:10
**lists (1)**
14:16
**litigated (2)**
20:1;24:8
**litigating (3)**
23:2,3,8
**litigation (2)**
48:1;124:2
**little (9)**
22:18;36:2;39:14;55:17,
18;65:16;70:1;133:3;138:16
**LLP (3)**
4:1,6,8
**local (6)**
111:19;116:19;121:1;
124:8,18;126:12
**lodestar (1)**
58:16
**long (6)**
18:6;29:7;54:2;72:10;
89:6;94:15
**longer (3)**
36:2;66:17,18
**long-standing (1)**
151:13
**long-term (1)**
54:6
**look (20)**
32:2,8;40:24;72:6,16;
74:2,4;82:2;84:5;87:18;
89:6;110:1;115:2;116:19;
121:1,6,8,16;139:12;143:9
**looked (8)**
18:17;51:15;92:7;97:19;
120:14,15;121:6;155:17
**looking (7)**
9:2;23:13;63:4;111:9;
115:24;118:5;136:12
**looks (2)**
11:10;136:11
**loss (2)**
68:12;81:19
**lost (1)**
80:3
**lot (9)**
28:19;70:20;94:23;98:23;
102:4;107:7;117:8;119:4;

120:5
**loud (1)**
95:20
**love (1)**
74:13
**LUKEY (145)**
7:9,9;14:1,6;18:11,16;
19:19;22:24;23:6,18;24:20;
25:2,7;27:6,12;31:16,21,24;
32:6;33:13;36:16;37:24;
38:11;45:3;47:6;48:22;
53:15,19;54:19;61:20,23;
62:4,14;68:23;69:1;73:13;
77:4;78:4,9,17;81:3;82:10,
15,18,22;83:5,8,14,21;84:2;
86:19;87:10,15;90:14;91:4,
22;92:1,14,20;93:1,4,7,24;
96:20;97:4,10,14;98:1,12;
99:12;102:9,12;103:20;
104:24;105:13;107:19;
108:12,17;109:4,15;110:9,
20;111:1,5,9;112:13,17,21;
113:19;114:14;115:17;
116:1;121:20;124:20,23;
127:4,8;128:10;129:11,20;
130:9,16,20;131:14,24;
133:3;136:5,15,22;137:1,8,
19;138:5,10,19;139:6,12,16,
22;140:12;147:6,11,16,20;
150:6;152:1,13;153:15;
154:15;155:7,10,13,20;
156:14,21;157:20;158:14,
23;159:8;160:1;161:6,14,
21;162:11
**lunch (3)**
162:11,12,13
**Lynch (1)**
30:23
**Lynn (1)**
4:9

**M**

**Madam (2)**
7:16;93:8
**Maine (1)**
23:24
**maintain (1)**
128:14
**major (1)**
90:6
**makes (4)**
32:5;47:12,14;110:2
**making (3)**
26:7,9;89:11
**Manion (1)**
61:21
**manner (1)**
40:1
**many (27)**
18:6;28:20;31:14;38:23;
40:3;43:22;48:8;50:23;54:3;
55:5;56:10,12;58:5;59:5;

68:21;69:18;72:11;73:11,
21;94:3,9,12;100:24,24;
115:5;121:19,21
**March (19)**
82:23;83:10,23;84:4;
102:18;106:2;109:19,19;
136:10,20;137:17,17,19;
138:2,6,7,18;139:8,24
**marine (1)**
121:23
**mark (2)**
95:13;113:20
**marked (6)**
93:9,12,16;95:14;113:24;
114:1
**Marty (1)**
61:23
**Mass (5)**
11:4,23;13:24;26:7;115:8
**Massachusetts (59)**
9:14,19;11:14;14:18;15:2;
19:9;22:12,20;23:16;24:12;
25:5,12,17;26:11,14,24;
27:8,9;28:6,10;29:2,15;
30:1;37:4,23;38:4,16,18,20;
39:4,19,22;40:5,7,11;41:14;
42:1,15,18,24;43:15,21;
47:16;49:6;53:24;54:10;
59:19,21,24;60:4,8;62:16;
63:15;82:4;106:15,22;
120:11;121:2,4
**master (306)**
6:8;8:1,3;10:2,5;22:7,17;
23:3,10;24:2,11,23;25:6,8,
21;26:10,13,20;27:4,7,15,
19,23;28:2,5;29:9,12,22;
30:4;31:7,12,19;33:3,18;
34:21;35:5,8,17,21;36:3,8,
18,22;37:1,6;38:1;39:3,6,13,
16;40:8,18;41:3,23;42:2,12,
23;43:8,11;44:1,4,7,18;
46:22;47:17,21;48:3,7,11;
49:1,5,18;50:6,14,16;51:12;
52:5,11,22;53:4,7;55:13,16,
19;58:19,21;59:8,11,15,20;
60:3,9,14,23;61:14;63:2,4,8,
14,20,23;64:12,18,21,24;
65:7,15,24;67:21;68:4,7,24;
71:1,3,5,11,23;72:15,18,22;
73:2;74:6,20;78:21;79:12,
14;80:11,14,24;81:8,11,21;
82:5,8,13,17,21;83:1,6,11,
19,24;84:7;85:4,11,24;
86:10,17,21;87:1,13,17;
88:4,8,13;89:3;90:17;92:6,9,
12;93:2;98:17;103:23;
105:2,6,11,15,20;108:16;
109:2;110:23;111:3,7,11;
112:19,22;122:6,9,16,20,24;
127:6;128:17,23;129:3,6,8,
14,17,19,22;130:1,4,13,19,
21;131:8,11,15;132:4,14,17,
20;133:1,5,9,22;134:5,10,

12,15,20;135:3,6,12,15,19;
136:2,9,18;137:4,15;138:1,
9,12,21;139:9,15,17,23;
140:8,13,17;141:4,8,14,18,
20;142:1,4,10,15,19,23;
143:3,14,22;144:3,10,13,16,
19;145:1;148:21;149:7,11,
15,23;150:12,21;151:6;
152:4,14,17,21;153:2,8,21;
154:3,9,12,16,21;155:8,14;
156:1,5,9,15,22;157:2,7,10,
13,17,24;158:4,8,15,18;
159:3,6,10,14,17,21;160:5,
10,13,16,23;161:3,10,24;
162:6,9,12
**master's (2)**
6:4;98:15
**material (2)**
68:1;137:21
**materials (2)**
96:23;97:9
**math (1)**
65:3
**matter (49)**
11:12;20:1;24:1;28:18;
30:10,21;39:2;40:9;41:13,
21;43:10;47:11;54:18,22;
55:12;57:5;59:14;60:20;
62:10;66:14,19;67:11;75:6;
84:13;86:6;88:6;89:2;99:18;
100:4;104:11;107:5;108:2,
11;110:3,11;116:3;126:21;
132:11;139:3;140:19,23;
141:11,14;143:5,24;144:20;
148:15;150:10;154:7
**mattered (1)**
146:8
**matters (12)**
11:10;48:15;57:1;62:6;
68:1;100:13;101:4,6;107:7;
111:19;115:13;124:2
**may (39)**
9:9;12:13;21:3;22:24;
26:3;27:21;28:24;30:9;
37:15,15;63:2;75:21,22;
76:18;77:10;79:4,6,19,24;
80:19;84:10;87:5;89:4;
92:17;108:8;109:1;112:1,
17;114:7;115:23;126:2;
127:19;139:1,18;140:17;
150:16;161:7;162:5,7
**maybe (11)**
36:2;64:19;65:16;69:6,12;
78:21;80:9;81:11,12,15;
94:5
**Mazzone (1)**
46:4
**MBA (5)**
9:17;10:15;11:8,9;120:15
**McClennen (2)**
56:16;58:12
**McEvoy (10)**
6:12;8:22;113:21;136:13,

24;137:2,6,11;139:11;
157:23
**mean (17)**
18:12;60:1;65:6;67:13;
68:23;88:5;91:20;115:7;
118:1;123:20;125:7;130:24;
145:17;147:8;148:9;157:22;
162:4
**means (1)**
151:7
**meant (2)**
136:23;160:14
**mediation (7)**
30:22;150:5;160:19;
161:9,13,14,18
**medicals (1)**
67:16
**meet (1)**
39:1
**member (2)**
89:1;146:20
**members (23)**
15:18;87:6,7;89:10;
143:18;146:15,19;147:15,
19;148:11,23,24;152:9;
156:16,23;157:14,18;
158:12,20;159:6,15,18,23
**memory (4)**
16:8,14;111:23;112:1
**mention (1)**
101:11
**mentioned (3)**
54:15;111:14;161:19
**mentor (1)**
46:6
**meruit (7)**
50:20;52:14,23,24
**mess (1)**
82:2
**Michael (1)**
4:2
**Michigan (2)**
27:16;29:17
**mid (2)**
12:6;122:13
**middle (1)**
36:13
**might (6)**
15:15;66:9;72:2;76:2;
95:16;101:5
**Mike (3)**
62:20,21;120:20
**million (3)**
64:2;65:1,14
**mind (1)**
117:21
**mine (4)**
58:9;98:12,13;104:14
**minute (2)**
86:21;115:6
**misinterpretation (1)**
28:20
**misses (2)**

80:4,9
**mistaken (2)**
161:1,2
**mistakes (1)**
29:5
**misunderstood (1)**
22:15
**mitigating (2)**
132:2,5
**model (1)**
22:23
**moment (4)**
8:21;73:10;84:17;105:14
**Monday (2)**
102:16,23
**Mone (3)**
62:20,21;120:20
**money (3)**
59:6;69:23;70:17;76:19;
153:17;154:8
**monies (3)**
32:13;80:18;143:10
**monitor (3)**
60:22;143:11,16
**monitored (2)**
61:2,11
**monitoring (25)**
67:8;109:5;122:17;124:1;
126:11,17,19;127:3;130:6;
131:2;133:10;134:22;140:3,
3,22;141:5;142:2,11,12,17;
143:1,8,9,11,15
**month (2)**
57:15,18
**monthly (2)**
29:3;57:17
**more (10)**
20:2;33:23;55:18;57:11;
69:12;105:18;119:4;120:5;
133:4,22
**morning (6)**
7:7,21,22;10:1,2,4
**most (18)**
8:1;15:12;18:24;30:19;
43:22;69:5;70:8;73:20;76:7;
79:10;80:7;85:14,14,19;
89:17;102:17;116:16;119:8
**motion (3)**
11:18,22;120:17
**mouth (1)**
77:21
**move (2)**
62:7;92:4
**moved (3)**
57:4;113:2;148:16
**Mrs (3)**
74:8;77:14,23
**much (10)**
59:5,6;69:12;94:12;117:3;
133:22;137:16;152:24;
154:23;157:9
**multiple (2)**
90:15

**must (7)**
22:5;41:24;46:21;125:9,
12,19;138:12
**myself (5)**
17:4;20:5;47:8;60:20;
62:20

**N**

**name (9)**
6:6;7:23;26:22;45:20,22;
61:20;62:1,2;125:12
**named (2)**
150:3;158:10
**names (1)**
63:12
**narrow (1)**
144:13
**narrower (1)**
133:4
**National (4)**
45:23;61:3;77:9;79:1
**nature (4)**
8:6;35:13;77:16;115:22
**nearing (1)**
119:14
**necessarily (2)**
84:2;87:22
**necessary (7)**
15:15;17:7;46:19;67:17;
127:24;128:3;145:22
**need (8)**
25:9,10;68:12;70:15;83:3;
92:12;104:8;112:10
**negotiate (1)**
91:10
**negotiated (2)**
151:8,21
**negotiations (4)**
64:4;98:5;149:4;150:8
**neither (1)**
42:24
**New (8)**
4:4,4;6:14;19:14;20:15;
45:14;46:2;109:17
**Newbury (1)**
115:9
**newspaper (1)**
29:4
**next (1)**
154:20
**nice (1)**
95:3
**nine (3)**
15:17;56:14;108:19
**nine-and-a-half (1)**
6:16
**Nineteen (1)**
45:16
**NITA (1)**
45:23
**Nixon (2)**
7:5,8

**Nobody (3)**
35:5;152:23;154:6
**Nobody's (1)**
24:3
**Nods (2)**
14:12;142:18
**none (2)**
17:1;24:16
**non-voting (3)**
21:11;22:3;56:22
**nor (2)**
42:24;149:9
**notice (4)**
83:2;85:12,13;101:10
**notification (2)**
107:2;141:10
**notified (5)**
71:16;84:11;108:9;139:1;
140:18
**notify (4)**
81:22;84:22;85:4,7
**notifying (1)**
78:7
**November (3)**
109:19;112:2,4
**number (7)**
6:5,5;35:18;38:13;87:21;
95:23;99:21
**Nutter (2)**
56:16;58:12

**O**

**oath (1)**
157:3
**object (3)**
87:14;90:15;155:11
**objecting (1)**
32:1
**Objection (61)**
14:6;18:11,16;38:11;42:8;
48:22;73:13;77:4;78:4;81:3;
86:3,4,6,7,11,13,19,22;
90:14;91:4,22;103:10,20;
104:24;108:12,13;110:9,20;
124:20,23;127:4,8;128:10;
129:11;130:9;131:14,16,21;
147:5,6,11,16,17,20;150:6;
152:1,12,13;153:15;154:15;
155:7,13,20;156:19;157:20;
158:13,14;159:8,9,11;160:1
**objections (5)**
87:2,5,8;88:7;104:11
**objector (4)**
42:4,6,7;86:11
**Objectors (1)**
87:13
**obligation (12)**
81:22;88:14,16,19,22;
111:18;145:9,11,18;151:10;
155:8;156:6
**obligations (6)**
16:16;59:16;60:5,16;

146:2,2
**obliged (1)**
73:15
**observing (1)**
18:2
**obtained (1)**
67:18
**obviates (1)**
91:20
**obviously (1)**
112:13
**occasion (2)**
9:18;90:3
**occasions (1)**
28:12
**occurred (2)**
99:23;126:3
**occurs (1)**
80:20
**October (2)**
8:17;102:3
**odd (1)**
57:19
**off (13)**
36:1;58:9;70:10;74:2;
91:2;92:19,22;112:8,9;
122:8;136:6,7,8
**offer (5)**
49:2;57:2;64:3;96:5;
116:4
**offered (6)**
24:21;26:3;49:21;53:4,7;
133:1
**offering (1)**
30:12
**office (6)**
48:16;62:3;98:20;101:1;
124:11,12
**official (1)**
11:3
**officials (1)**
122:22
**often (4)**
13:8;15:20;31:2;76:8
**old (4)**
45:23;72:12;94:23,24
**older (1)**
59:5
**once (3)**
8:10;28:13;131:22
**one (58)**
19:4,6;20:9;21:9,18;
26:24;27:21;30:22;36:4;
46:10;47:6;48:6;52:17;
56:17;57:6;58:14;61:6,12;
62:10,21;69:24;70:13;75:9;
82:11,12,18,19,22,23,24;
83:23;84:6;89:8,12,21;95:3;
100:24;109:16;112:7;113:1;
117:7,11;118:5,15;127:11,
15;136:15;137:1,3,4,7,22;
138:4,7;141:23;146:21;
152:7;153:6

**ones (1)**
69:4
**one's (1)**
98:12
**only (25)**
11:20;44:9;47:23;50:1,5;
55:7,23;58:24;66:24;75:2;
84:11;87:20;89:24;94:6;
108:9;112:10;136:17;139:1;
140:17;146:8;153:17;154:5,
17;155:21;161:8
**open (1)**
105:5
**operating (2)**
18:1;148:18
**opine (1)**
34:10
**opined (3)**
34:5,12;51:21
**opining (1)**
132:24
**opinion (24)**
10:20,22;12:18,19;13:3,
13;17:8;25:10;35:11;38:19;
41:12;49:8;63:16;64:1,6;
67:6;96:3;100:6;110:8,11;
119:10;132:10,11;147:13
**opinions (24)**
9:5,5;16:23;25:12;51:9;
95:22;96:5;99:19;100:20;
101:3;103:18;104:3,9;
110:14;114:11;116:8;
117:17,19;118:3,11,20,22;
121:17;133:3
**opposed (1)**
62:17
**opt (1)**
89:4
**oral (1)**
107:7
**Orange (4)**
121:10,21;122:1,3
**Oranges (1)**
121:19
**order (5)**
6:23;104:8;160:24;161:7,
15
**ordinarily (1)**
58:17
**organization (1)**
27:24
**original (2)**
75:20;154:18
**origination (1)**
12:1
**others (7)**
20:10;46:3;48:1;98:7;
118:2;147:2;152:7
**otherwise (3)**
34:15;40:6;43:21
**ought (3)**
12:1;35:3;85:9
**out (30)**

13:4,7,8;21:21;30:1,21;
33:24;43:10;48:2,4;51:18;
55:2,6,11;62:18;73:3;75:1,
14;76:20;78:13;79:1;89:4;
94:7;95:20;105:7;106:18;
117:11;119:17;137:6;
142:24
**outside (5)**
13:1,13;25:16;101:16,20
**over (12)**
12:3;35:24;48:9;55:12;
67:15;68:10;69:5,11;70:17;
72:8;118:8;119:16
**oversee (1)**
89:9
**overseeing (1)**
151:1
**overseer (2)**
44:11,12
**Overseers (6)**
28:10;37:24;38:2;39:22;
43:1,18
**owes (1)**
35:1
**own (5)**
48:14;76:10;117:21;
120:15;150:8

**P**

**package (2)**
67:19;99:2
**page (6)**
95:19;102:10,11,12;
114:13,15
**paid (8)**
11:19;39:10;67:10;70:21;
88:21;133:21;134:17;
153:12
**panel (1)**
109:5
**paper (3)**
80:19;85:22,22
**papers (3)**
98:19;125:9;126:2
**paragraph (7)**
95:19;114:10,14,15;
122:12,12;145:5
**parameters (1)**
30:16
**parentheses (1)**
145:7
**part (24)**
11:1,6,9;12:22;15:12;
30:23;40:20;41:15;43:23,
24;45:18,24;59:6;62:5;
75:21,22;76:7;89:17;94:15;
106:20;127:18;128:7;146:5;
153:23
**participant (4)**
9:24;133:8;135:5;153:20
**participants (2)**
157:23;158:1

**participated (1)**
24:9
**participation (3)**
84:14;139:4;144:6
**particular (8)**
11:11,16;30:13;51:7,11;
61:7;67:7;69:24
**parties (6)**
6:21,21;69:15;113:8;
115:4;119:22
**partner (2)**
28:16;122:20
**partners (1)**
122:21
**party (10)**
33:5,14;49:21;50:8;52:3;
76:9;88:3;115:6;120:19;
159:13
**patience (1)**
8:7
**Patriots (12)**
19:3,7,15;20:15;48:1;
54:15;55:23;58:22;59:13;
60:20;66:5,8
**Paul (3)**
33:8,9;123:4
**Paulette (2)**
95:13,17
**Pause (14)**
27:1;31:23;32:10;43:19;
45:6;49:17;50:12;78:19;
85:1;92:21;102:2,8;114:22;
137:14
**Pavledis (4)**
21:6;56:8,16;58:13
**pay (4)**
75:13,16;111:18;151:10
**paying (1)**
36:9
**payment (5)**
16:6;36:17,20;62:18;
69:20
**payments (2)**
37:3,5
**pays (1)**
49:10
**Peabody (2)**
7:6,8
**penalize (2)**
80:23;82:3
**penalized (1)**
81:18
**pension (1)**
152:9
**people (9)**
55:5;59:5;70:8,10;87:5;
100:21;117:8;119:21;158:6
**per (2)**
23:9;57:20
**perceives (1)**
76:24
**percent (15)**
35:23;57:15;58:18;64:2;

65:2,20;90:1;112:8,11;
113:2,3,9;148:15,17;152:23
**percentage (2)**
11:21;58:16;68:16;112:8;
151:11,14
**perception (2)**
74:23;90:11
**perform (1)**
67:12
**perhaps (3)**
22:21;37:16;39:21
**period (3)**
135:16,16;144:8
**person (12)**
56:19;61:20;76:8;78:12,
13;80:7,10;91:2,10;119:19,
19;126:4
**personal (1)**
70:8
**personally (3)**
60:12,15;115:18
**persons (1)**
69:9
**PHONE (14)**
9:23;92:16;99:12,23;
100:1;105:12;133:7;135:4;
136:1,3,4,5;153:19;162:7
**physician (1)**
67:16
**Picciotto (1)**
50:13
**pick (1)**
119:19
**piece (2)**
140:5;155:18
**pile (1)**
96:9
**pipe (1)**
81:5
**Pittsfield (1)**
13:8
**place (3)**
46:2;55:3;155:22
**plaintiff (12)**
19:19;54:17,21;76:1;86:8,
9;88:3,11,12;106:11;
146:12;151:16
**Plaintiffs (7)**
4:13;68:21;69:18;70:4,18;
146:5;150:3
**plaintiffs' (1)**
28:3
**plaintiff's (1)**
63:18
**plan (4)**
6:24;123:24;157:23,24
**plans (2)**
151:2;152:9
**play (2)**
43:1,5
**played (2)**
122:22;143:15
**please (9)**

25:14;30:5;47:18;70:23;
129:3,6;132:15;158:15;
162:8
**plus (1)**
64:4
**pm (1)**
162:15
**pockets (1)**
77:22
**point (11)**
19:24;20:2;21:11;22:9;
73:4;87:20;108:13;128:18;
131:24;132:8;141:21
**points (1)**
84:1
**poor (1)**
34:3
**portion (7)**
45:21;58:5;75:3;77:11,22;
90:9;113:10
**pose (1)**
44:16
**posed (1)**
28:9
**position (2)**
124:17;151:23
**positions (4)**
9:3;14:17;17:17,18
**possibility (3)**
74:9;85:5;126:10
**post (1)**
138:17
**potential (2)**
42:3;84:23
**practice (14)**
24:21;25:5;29:13;35:24;
38:18;45:19;54:2;60:16;
78:23,24;89:16;95:4;115:8,
21
**practices (1)**
18:14
**practicing (3)**
17:16;18:1;31:10
**practitioner (2)**
54:6;77:8,10,13,21,22,24
**practitioner's (1)**
78:15
**predecessor (2)**
27:9;123:4
**predominantly (1)**
89:15
**premarked (1)**
8:18
**preparation (1)**
67:23
**prepared (1)**
54:8
**prerogative (2)**
91:1,16
**presence (2)**
124:4,8
**PRESENT (3)**
4:15;6:9,19

**presentations (1)**
46:19
**presented (1)**
51:10
**president (10)**
9:14,17;11:4,8,13;26:7;
29:1;38:16,17;118:14
**pretrial (4)**
161:8,10,12;162:2
**pretty (3)**
38:14;46:10;99:17
**prevailed (1)**
57:13
**previous (4)**
113:22;123:15;126:4;
136:15
**previously (4)**
11:12;103:18;113:24;
122:20
**primary (2)**
115:17,19
**print (1)**
137:6
**prior (3)**
123:18;137:22;147:10
**private (1)**
56:23
**pro (3)**
30:14;62:15,22
**Probably (1)**
94:17
**problem (6)**
24:20;38:6,9;83:9;143:10;
157:8
**problems (1)**
76:10
**Procedure (2)**
16:13,17
**proceed (2)**
91:7,11
**proceeding (2)**
16:6;44:15
**proceedings (3)**
24:9;44:12;162:14
**process (3)**
29:17;146:18;160:3
**produced (3)**
96:1,7;110:5
**profession (1)**
33:11
**Professional (28)**
9:19;12:8,23;13:24;22:13,
21,22;23:17;24:8,13,14;
25:13,18,24;26:2,4;29:14;
30:2;35:21;37:2;38:5;39:20;
40:11;41:14;43:15;53:24;
54:10;98:19
**Professor (13)**
4:15;6:14,18,23;8:9,10;
25:4;32:3,21;56:16;97:7;
98:17;100:6
**professor's (1)**
116:17

**program (1)**
146:21
**promise (1)**
25:1
**prompt (2)**
7:2;12:21
**properly (1)**
148:20
**proportion (2)**
75:5,7
**proposal (4)**
11:16;97:22;108:1;125:8
**proposals (2)**
56:20;142:22
**proposing (1)**
132:12
**prospective (1)**
126:16
**protect (2)**
106:16;146:11
**protected (3)**
146:13,19,22
**protecting (1)**
148:11
**protection (2)**
13:12;147:24
**provide (7)**
34:13;93:17;95:11;97:1,8;
112:16;116:7
**provided (6)**
96:11;104:10;116:17;
135:22;145:15;148:19
**public (1)**
31:9
**publications (1)**
115:21
**pull (2)**
96:24;98:13
**pulled (1)**
98:18
**purpose (1)**
141:24;143:7,9
**purposes (8)**
130:17;133:13;135:3,6;
150:4;159:23;162:1,2
**push (1)**
120:21
**put (17)**
11:20;22:9;46:1;50:1;
63:12;67:18;69:11;80:20;
82:8;84:16;85:3;101:18;
105:4;107:9;128:18,22;
157:3
**putting (3)**
75:14;80:4;141:2

**Q**

**qualifications (2)**
122:15,16
**qualified (1)**
33:23
**qualify (2)**

9:4;49:11
**quantum (4)**
50:20;52:14,23,24
**quarrel (1)**
35:5
**quarter (1)**
92:9
**quickly (2)**
66:14;74:1
**quite (1)**
108:6
**quote (2)**
118:14;127:17

**R**

**raise (3)**
43:13;77:15;94:2
**raised (10)**
22:11,20;24:14;30:1;
35:18;37:2;41:18;43:2,3;
44:23
**raises (1)**
86:3
**raising (2)**
41:19;42:13
**rate (6)**
57:14,18;93:20;140:1;
157:10;162:3
**rather (2)**
34:17;66:14
**ratify (1)**
118:13
**re (2)**
122:1,3
**reached (2)**
147:9;148:2
**reaching (1)**
119:9
**read (14)**
45:7;50:22;72:9;95:20;
115:14;122:14;130:2,3;
132:23;138:13,19;153:23,
24;161:8
**reads (1)**
145:7
**ready (1)**
95:17
**real (1)**
89:7
**really (11)**
11:9;17:5;46:1,5;50:24;
67:13;89:23;116:24;120:21;
121:18;157:22
**re-appraisal (1)**
20:7
**reason (1)**
112:9
**reasonable (3)**
84:16;139:5;155:19
**reasonably (1)**
7:2
**reasonings (1)**

146:11
**reasons (1)**
6:20
**rebut (1)**
25:4
**recall (13)**
10:21;12:11,14;20:22;
52:5;67:4;97:19;106:3;
111:15;112:12;114:6,18;
116:13
**recalls (1)**
97:3
**receipt (2)**
49:10;131:6
**receive (15)**
48:4,6,16;51:14;64:2;
68:17;69:20,21;70:4;74:10;
75:12;101:17;106:19;
133:17;151:14
**received (17)**
8:15;36:12;39:11;52:8;
58:1,5,7;64:3;67:11;77:24;
98:14,16;99:2;103:1;
133:14;135:7;151:15
**receives (2)**
48:16;78:5
**receiving (2)**
36:9;72:2
**recent (2)**
18:24;102:17
**recess (2)**
105:22;162:13
**recipient (4)**
78:9,12,16,17
**recognize (1)**
64:14
**recognized (5)**
49:20,24;50:7,10;63:9
**recollection (1)**
52:12,15;61:15
**recommend (1)**
15:21
**record (10)**
6:3;31:24;92:22;93:15;
113:23;121:24;136:6,7,8;
138:14
**records (3)**
70:21,23;125:19
**recoup (1)**
143:10
**recovery (3)**
51:19;52:14;56:24;64:15;
75:4,14,16;89:21;90:1
**refer (8)**
48:2,4;55:2;77:9;79:1;
107:11;114:10;115:9
**references (1)**
101:21
**referral (59)**
24:3;34:17;36:2,3,6,9,10,
14,16,19,20;37:3,4,14;38:5,
13,20;39:9,11,18,24;40:9,
19,22;41:12;42:6,14,17,17,

20,21;43:14,22;44:13;
47:11;48:9,13,17,23;49:10,
11;67:11;68:22;69:1,14,20,
23;70:5;75:3;77:12;78:12,
16,18;90:8,9,24;106:17;
131:20;138:24
**referrals (2)**
48:20;69:8
**referred (14)**
26:17;30:7;32:18,23;
61:10;63:5,15;67:15;73:3;
88:17,18;90:6;106:13;
111:16
**referring (18)**
11:19;14:10;39:9;40:15;
48:15;52:17;55:14;69:19;
76:1;77:1,8;96:8;107:23;
115:8,11,12,20;130:24
**reflects (1)**
82:14
**refresh (1)**
61:14
**regard (2)**
10:20;28:21
**regarding (1)**
145:16
**regards (11)**
11:16;13:11;32:13;38:5;
42:16;53:1;55:8;63:18;
80:20;116:14;141:3
**rejected (1)**
127:2
**rejection (3)**
127:10,14;131:3
**relate (1)**
126:21
**relates (2)**
110:3;131:5
**relating (3)**
14:17;16:1;114:23
**relations (1)**
30:17
**relationship (9)**
54:17,21;70:8;103:10;
123:15,18;124:24;135:20;
146:7
**relationships (1)**
72:10
**relevance (1)**
35:22
**relevant (6)**
95:22;96:3,5;114:11;
146:1;161:7
**reliance (1)**
83:17
**relieve (1)**
81:21
**religiously (1)**
77:3
**relying (1)**
130:5
**remainder (1)**
57:24

**remanded (1)**
22:2
**remember (8)**
17:1;26:22;30:18;50:2;
52:9;61:7;66:12;72:6
**Remembering (1)**
65:13
**remind (2)**
62:12;115:12
**reminding (1)**
111:8
**render (2)**
9:4;100:6
**rendered (1)**
110:11
**rendering (1)**
13:3
**reorganization (1)**
19:11
**repeatedly (1)**
106:23
**rephrase (1)**
130:22
**Replacing (1)**
27:6
**report (7)**
70:22;98:16;101:22,24;
115:1;132:12,23
**Reporter (8)**
7:16;8:20;93:9;95:12,18;
130:3;136:6;153:24
**reports (1)**
67:17
**represent (5)**
7:24;69:9;108:1;142:6;
149:3
**representation (6)**
34:14;35:2;51:17;104:18;
110:4;128:12
**representative (10)**
88:9,15;91:17;109:13;
142:6;157:14,18;158:10;
159:15,22
**representatives (5)**
55:11;151:5;152:8;158:6,
11
**represented (9)**
20:5;32:11;59:5;146:24;
147:3,15;148:22;158:2;
159:18
**representing (12)**
21:10;29:13,23;33:16;
34:13;68:22;69:14;91:6;
147:4;148:6;150:8;159:2
**request (6)**
31:4;56:5,8;98:15;122:15;
142:21
**requested (1)**
29:2
**requests (1)**
31:4
**require (2)**
71:10;88:24

**required (6)**
22:11;31:2;74:8,15;75:16;
107:3
**requirement (7)**
76:13;106:8;127:23;
137:23,24;138:4;141:10
**requirements (3)**
128:20;130:8;131:5
**requires (2)**
72:19,23;141:10
**rescript (2)**
83:12;131:22
**resolve (1)**
31:6
**resolved (2)**
153:3,3
**resolving (1)**
29:8
**resources (2)**
13:14;101:21
**respect (15)**
10:18,22;12:22;14:10;
35:7;51:4;61:1;81:1;97:20;
100:23;116:4;117:4;121:16;
122:23;146:7
**response (8)**
98:14;130:7,11;133:11;
134:23;140:4;144:4,5
**responsibilities (3)**
15:14;57:12;67:7
**responsibility (3)**
106:15;149:2;151:1
**rest (3)**
58:10;100:17;105:19
**result (7)**
64:10;65:9,10,20;76:18;
106:14;118:7
**resume (1)**
6:16
**retain (1)**
124:8
**retained (4)**
30:20;93:17;96:1;100:19
**retainer (1)**
96:18
**retired (3)**
6:10;59:5;148:5
**retirement (7)**
15:21;122:18;128:13;
146:16,21;148:22;151:5
**review (5)**
9:18;16:12,15;116:16;
117:21
**reviewed (3)**
96:1,6;97:9
**reviewing (3)**
12:8;14:17;101:9
**revision (1)**
13:23
**RFP (3)**
142:20,20,23
**RFQ (2)**
122:15;125:18

**Richard (3)**
7:13;132:18;157:3
**right (108)**
6:12;9:1,8,12,22;10:13,16,
21;11:1;12:5,7,14,17;13:13;
14:8,15,24;15:11,23;17:2,
24;18:19;19:22;28:1;31:12;
33:1;34:23;47:6,55:4;59:15;
61:24;62:7,8;63:1,10;65:1,
4;66:2,23;67:10;69:13,17;
72:24;74:20;76:15,16;84:7;
89:19,22;90:23;91:10,18,19,
24;94:19;95:9;98:11,21;
101:8;102:17;103:7;104:12;
105:6;109:21;111:11;
114:18;115:3;116:10;
117:10,16,18;118:5,18;
119:24;120:12;121:1,9;
123:8,11,14,22;124:13,16;
125:3,20;126:17,19;130:13,
21;133:5,19;134:3;135:19;
139:16;140:12;141:23;
144:9;145:3;146:17,23;
148:7;149:2;151:5;152:2,
16;153:22;161:5,21
**rights (2)**
81:20;90:12
**Riley (1)**
62:20
**ring (2)**
112:19,21
**risk (1)**
80:6
**RL (1)**
66:17
**ROHRBACK (1)**
4:8
**role (15)**
11:3;12:7;13:18,21;15:5;
35:8;43:1,5;89:9;99:21;
122:22;128:8,8;142:10;
143:15
**roles (2)**
9:3;15:19
**room (2)**
7:4;17:10
**Rosen (2)**
6:9;98:17
**Rosenberg (1)**
115:24
**Rosenfeld (7)**
12:12;28:16;100:3,23;
116:1,2,7
**Roughly (1)**
45:16
**Rule (106)**
10:10,18,19;11:17,24;
13:11,20;14:10;16:12,16;
26:7,9;31:15,16,17;32:2;
37:15,15,16;39:18,19;40:20;
42:8;43:4;44:22;45:2,9,12;
46:23;47:4,8;48:21;49:3,5,7,
11,22;50:9;53:12;60:1;71:7,

12,13;72:19,22;81:9,10,15;
82:4,6,9;83:7,16,18;84:3,9;
87:16;91:20,21,23;120:23;
128:20,22;129:2,9;130:8,12,
14;131:5,9,12;132:2,6,6,7;
133:12,13;134:24;135:10;
136:10,11,12,19,23;137:17,
17,18,19,20;138:2,2,3,7,13,
15,17;139:13,19;140:5,6,9,
10;141:9;146:10,11;156:10

**ruled (2)**
52:6,13

**Rules (60)**
9:18;12:8,23;13:24;17:6,
11,22;19:9;22:12,21,22,23;
23:16;24:12,13;25:12,17,24;
26:3;30:1;35:14,18,19,19;
37:2,12,12,14,16,19,19;38:4,
5;39:5;40:11;41:6,14;43:15,
23;46:20;47:20;49:2;50:9;
53:24;54:4,10;60:2,4,8,8,10;
80:7,21;87:18;98:18;
106:16,21;116:19;121:1,5

**rulings (2)**
21:24;22:5

## S

**Saggese (23)**
12:11,14;13:2;82:14,23;
83:7,9;106:23;131:17,19;
132:6;133:12,13;134:24;
135:11;136:16,20;137:17,
17;138:7,15;139:13,19

**same (18)**
47:19;49:6;71:15;77:2,20;
84:10;90:7;91:1,14,15;
108:8;130:4;136:12;139:1;
140:11,14;143:23;158:5

**sanctionable (1)**
83:18

**Sarko (2)**
4:9;133:8

**Sarrouf (22)**
6:18,24;8:9;13:18;19:14,
14;20:4,14;21:6;22:7;25:14;
66:2;81:2;82:5;92:10;93:3;
105:16,24;128:24;129:3;
139:18;149:15

**Sarrouf's (3)**
83:20;93:9,15

**sat (2)**
70:6;100:4

**satisfied (3)**
106:7,10,13

**saw (5)**
102:23;103:5;125:4,11;
126:2

**saying (12)**
76:23;78:2;103:22;
112:14,17;117:24;118:18;
130:5;143:22;144:4;148:21;
149:1

**School (3)**
6:15;45:15;46:2

**scope (3)**
10:14;16:4,18;35:1,13

**scratch (1)**
119:17

**scrupulously (1)**
76:17

**scrutiny (1)**
41:17

**se (1)**
23:9

**Seattle (1)**
4:11

**SEC (2)**
22:1;136:14

**second (7)**
21:11;62:18;92:8;122:2,4;
145:6;150:2

**secondary (7)**
96:3;114:10,19;115:10,
10,16;120:4

**secretarial (2)**
117:13;119:8

**secretaries (1)**
117:11

**secretary (3)**
117:7;119:1,15

**securities (3)**
66:4;122:17;150:18

**seeing (3)**
111:15;112:12,14

**seek (3)**
81:23;83:3;84:23

**seeking (2)**
28:17;60:6

**send (12)**
33:22;48:9;55:12;68:3,9,
18;70:2,22,24;75:8,22;76:20

**sender (1)**
78:9

**sending (3)**
70:9,13;78:12

**sense (1)**
29:11

**sent (7)**
34:6,16;58:8;59:1;67:19;
94:7;116:23

**sentence (4)**
114:15,16;122:12;145:6

**separate (6)**
38:22;41:20;43:10;46:15;
158:21;159:7

**September (1)**
110:21

**serve (2)**
85:11;124:1

**served (4)**
9:14;16:9;23:11;63:6

**service (1)**
16:11

**services (1)**
93:18

**set (5)**
13:4;75:22;80:7;95:18;
156:10

**settled (3)**
33:24;66:13,22

**settlement (16)**
34:1,4;64:4,8;77:23;87:9;
88:20,22;89:4,11;104:19;
150:17;158:12;159:4;160:4,
6

**settlements (1)**
36:13

**Seven (5)**
93:22;94:17;95:7;98:22

**several (8)**
14:16;28:11;46:1,1;50:22;
52:16;53:2;55:1

**share (7)**
34:18;56:22;57:2,4,20;
145:10;155:4

**shared (2)**
145:19;148:19

**shareholders (4)**
21:11;22:3,3;57:9

**shares (3)**
19:10;20:6;58:9

**sharing (1)**
40:14

**SHARP (2)**
7:5,5

**sharpen (1)**
22:18

**sharper (1)**
65:16

**short (2)**
62:3;117:7

**shorthand (1)**
122:14

**show (2)**
112:15;152:22

**shown (3)**
101:12,13;123:11

**shut (2)**
74:2;77:22

**side (1)**
21:18

**sign (9)**
71:10;72:9;75:10;79:2,8;
85:8;118:16,19;127:10

**signed (14)**
8:17;52:21;71:7,21;72:3;
74:19;75:9;79:9,12,13;84:4;
102:18;104:7;106:2

**significance (1)**
103:7

**signifies (1)**
128:11

**silence (1)**
33:11

**similar (3)**
82:20;83:22;116:15

**simple (1)**
76:8

**Simpler (1)**
111:9

**simplified (1)**
78:22

**simply (8)**
12:3;20:7,10;48:8;76:10;
79:21;141:4;155:21

**Singal (2)**
6:8,13

**SINNOTT (67)**
6:3,6;7:15,19,23;8:19;
10:1,7,9;14:2;19:22,23;
23:19;31:13,18;32:4;34:9;
44:19;47:2;48:18;50:18;
53:11,17;55:20;60:24;
61:18;63:3;66:2;68:20;69:3;
73:9;74:21;78:15;79:15;
89:14;90:19,21;91:24;92:4,
7,23;93:8,14;94:1;95:11,17;
97:2,16,18;103:22;104:1;
105:18,23;107:21,22;
108:18;109:7;111:12;
112:16;113:20,22;114:3;
121:22;126:8;127:16;136:4;
145:2

**S-I-N-N-O-T-T (1)**
6:7

**Sinnott's (2)**
22:9;79:21

**Sisson (1)**
46:5

**sit (2)**
30:15;116:2

**sitting (2)**
62:24;105:16

**situation (3)**
67:7;91:1;146:3

**six (3)**
14:23;16:9;36:1

**size (1)**
152:6

**SJC (2)**
12:19;13:2

**Skinner (2)**
21:5,15

**Skinner's (1)**
57:22

**slice (1)**
155:16

**small (1)**
48:6

**Smith (2)**
74:7,8

**so-called (1)**
133:18

**somebody (2)**
37:22;86:3

**somehow (2)**
80:18;85:22

**someone (9)**
12:4;34:17;78:13;80:4,9;
82:2;85:15;86:15;118:20

**sometime (1)**

148:15
**sometimes (8)**
15:20;18:3;48:5;69:22;
111:16;115:5,19;119:23
**somewhat (1)**
8:14
**somewhere (1)**
114:20
**son (2)**
69:4;121:23
**soon (2)**
66:22;74:17
**sooner (1)**
62:8
**sorry (23)**
28:6;36:8;45:3;47:18;
54:19;71:3;78:13;87:11;
96:17;97:7;112:3;122:8;
128:24;129:14,22;138:6;
147:12;153:21;156:16;
157:1,5;160:12;162:6
**sort (3)**
50:24;68:7;116:23
**sound (1)**
34:21
**sounds (4)**
20:21;78:24;80:14;89:23
**source (4)**
115:16,18,19;139:10
**sources (7)**
96:3;114:10,19;115:10,
10;120:4,12
**speak (3)**
15:20;148:24;157:11
**speaking (1)**
103:15
**speaks (1)**
88:11
**special (308)**
6:4,8;7:24;8:3;10:2,5;
22:7,17;23:3,10;24:2,11,23;
25:6,8,21;26:10,13,20;27:4,
7,15,19,23;28:2,5;29:9,12,
22;30:4;31:7,12,19;33:3,18;
34:21;35:5,8,17,21;36:3,8,
18,22;37:1,6;38:1;39:3,6,13,
16;40:8,18;41:3,23;42:2,12,
23;43:8,11;44:1,4,7,18;
46:22;47:17,21;48:3,7,11;
49:1,5,18;50:6,14,16;51:12;
52:5,11,22;53:4,7;55:13,16,
19;58:19,21;59:8,11,15,20;
60:3,9,14,23;61:14;63:2,4,8,
14,20,23;64:12,18,21,24;
65:7,15,24;67:21;68:4,7,24;
71:1,3,5,11,23;72:15,18,22;
73:2;74:6,20;78:21;79:12,
14;80:11,14,24;81:8,11,21;
82:5,8,13,17,21;83:1,6,11,
19,24;84:7;85:4,11,24;
86:10,17,21;87:1,13,17;
88:4,8,13;89:3;90:17;92:6,9,
12;93:2;98:15,17;103:23;

105:2,6,11,15,20;108:16;
109:2;110:23;111:3,7,11;
112:19,22;126:9,16,20,24;
127:6;128:17,23;129:3,6,8,
14,17,19,22;130:1,4,13,19,
21;131:8,11,15;132:4,14,17,
20;133:1,5,9,22;134:5,10,
12,15,20;135:3,6,12,15,19;
136:2,9,18;137:4,15;138:1,
9,12,21;139:9,15,17,23;
140:8,13,17;141:4,8,14,18,
20;142:1,4,10,15,19,23;
143:3,14,22;144:3,10,13,16,
19;145:1;148:21;149:7,11,
15,23;150:12,21;151:6;
152:4,14,17,21;153:2,8,21;
154:3,9,12,16,21;155:8,14;
156:1,5,9,15,22;157:2,7,10,
13,17,24;158:4,8,15,18;
159:3,6,10,14,17,21;160:5,
10,13,16,23;161:3,10,24;
162:6,9,12
**specific (4)**
19:24;55:18,19;126:21
**specifically (6)**
9:22;10:10,21;31:15;51:3;
141:9
**spend (1)**
29:3
**Spina (1)**
13:6
**Spina's (1)**
12:18
**split (2)**
112:10,11
**spoke (3)**
100:12;156:15,22
**stages (1)**
53:1
**standard (2)**
24:21;25:5
**standards (1)**
49:3
**standing (3)**
108:13;131:14,16
**start (5)**
6:20,23;30:6;75:4;81:8
**started (2)**
10:6;113:1
**starting (1)**
57:24
**state (18)**
19:6,18;22:6;23:23;26:1;
36:24;47:19;56:1;80:2;
124:8;130:18,19;131:6;
133:14;135:7;141:16,20;
144:19
**stated (4)**
11:24;106:23;117:18;
118:22
**statement (3)**
86:18;97:7;112:7;114:17;
116:17;128:1;161:22

**statements (2)**
13:10;110:2
**States (2)**
6:10;43:22
**state's (1)**
22:22
**statute (1)**
19:15
**statutes (1)**
19:9
**statutory (1)**
57:14
**stay (1)**
8:7
**stayed (1)**
59:2
**step (1)**
31:5
**Stephen (2)**
4:15;6:14
**stick (1)**
122:13
**still (4)**
24:12;62:24;70:1;144:7
**stipulate (1)**
91:22
**stock (1)**
19:10
**street (10)**
91:2;124:9;130:18,19;
131:6;133:15;135:8;141:16,
21;144:20
**strictly (1)**
119:2
**strike (2)**
92:2,3
**stuff (3)**
69:5;117:9,18
**stumble (1)**
8:13
**subject (3)**
15:15;41:21;150:10
**subjected (1)**
121:14
**submission (12)**
58:1;107:13,20,24;
125:15,15,16;126:5,6,10,21;
144:9
**submissions (1)**
98:16
**submit (1)**
122:16
**submitted (5)**
94:14;118:7;125:8;126:1,
14
**subsequent (4)**
51:8;144:22;147:8,10
**substance (2)**
104:6;137:16
**substantial (1)**
77:11
**substantially (4)**
82:20;83:22;136:11;

140:11
**substantive (3)**
67:12,14;126:12
**substituted (1)**
106:7
**succeeded (1)**
126:4
**success (1)**
64:7
**successor (1)**
26:16
**SUCHAROW (5)**
4:1,6;7:10;112:5,9
**suddenly (1)**
53:9
**sued (1)**
51:18
**suffer (1)**
80:8
**suffered (2)**
80:17;81:19
**sufficient (1)**
144:15,17
**Suffolk (1)**
56:17
**Sugarman (1)**
33:8
**suggest (3)**
31:20;42:3;83:16
**suggested (1)**
97:15
**suggests (1)**
132:1
**Suite (1)**
4:10
**Sullivan (2)**
56:20;57:8
**summary (1)**
95:22
**superior (2)**
20:8;30:11
**Supp (2)**
58:14;122:3
**supplement (1)**
21:17
**supplemental (1)**
98:15
**supported (1)**
65:9
**supportive (1)**
68:2
**suppose (3)**
68:14;94:16;151:18
**Supreme (7)**
11:17,22;13:15,19;15:8;
120:17;139:20
**sure (14)**
28:6;29:19;30:12,15;
46:18;71:4;75:17;92:15;
94:20;119:23;130:20;134:2;
161:6;162:9
**surprised (1)**
157:7

**sworn (2)**
7:16,17
**System (1)**
148:22

**T**

**talk (4)**
41:11;77:17;79:7;151:6
**talked (4)**
12:13;71:13;72:19;85:14
**talking (16)**
14:19;59:23;80:11;
107:19;109:2,5,6;115:6;
129:2;136:9;138:17;144:7,
10;146:20;149:21;160:3
**taught (3)**
45:14,18,22
**teach (3)**
45:17;46:13,15
**teacher (1)**
146:21
**Teachers (7)**
127:2;148:5,22;157:18;
158:9;159:18,22
**technically (1)**
161:7
**teleconference (2)**
4:2,9
**Telephone (1)**
105:10
**telling (1)**
77:13
**ten (7)**
19:16;20:7;65:1;94:17;
95:7;108:5,19
**tender (1)**
25:4
**term (1)**
37:20
**terms (4)**
47:24;118:23;161:8,17
**testified (10)**
6:15;64:1,5;73:11;110:12;
123:2;125:3;142:16;151:17,
19
**testify (5)**
28:13;54:9;63:10;132:13;
140:21
**testifying (2)**
6:19;30:10
**testimony (31)**
6:17,22;35:10;40:8;47:12;
48:19;49:2,8;51:3,5;53:13;
63:24;64:13;65:8,19;67:4;
74:22;75:24;105:7;106:6;
110:24;111:10;128:6,19;
129:9,12;130:23;132:15;
142:15;143:14;155:2
**Texas (1)**
124:12
**texts (1)**
92:14

**Thanks (1)**
95:18
**thereafter (2)**
66:22;143:13
**There'll (1)**
75:12
**thinking (1)**
49:19
**Third (5)**
4:10;58:18;62:21;89:21;
145:7
**Thornton (5)**
7:6,8;145:8,16;146:1
**though (4)**
20:13;57:5;110:18;125:23
**thought (10)**
13:10;68:1;92:16;97:10;
99:17;101:5;116:15;128:12;
139:7,13
**thousand (2)**
34:8;65:1
**three (13)**
15:6,8,9;19:4,5,8;21:16;
55:24;98:6;112:11;113:8;
145:10;160:17
**throughout (4)**
19:18;36:23;104:17;125:2
**til (3)**
117:1;138:6;155:10
**Tim (1)**
122:20
**timeline (1)**
105:5
**times (7)**
15:13;26:23;54:3;72:17;
74:3;79:10;94:23
**timing (1)**
137:23
**TLF-SST (1)**
113:23
**tobacco (1)**
62:18
**today (4)**
6:17;17:22;27:2;40:13
**together (4)**
15:18;67:19;80:4;96:24
**told (6)**
69:22;78:23;110:7;123:3,
10;161:16
**Tom (1)**
62:20
**took (1)**
57:19
**top (2)**
112:8,9
**tort (1)**
32:24
**total (3)**
84:15;139:5;155:17
**touch (1)**
9:13
**traveling (1)**
103:2

**treat (1)**
136:19
**Trial (16)**
11:14;14:23;15:10;26:8,
14,18;27:8,10,13;28:7;
36:11,13;40:16;45:24;46:7;
64:9
**tribunal (3)**
18:23;29:16;39:22
**tried (10)**
17:20;18:20;23:23;30:20;
31:3;36:5;38:12;47:11;
99:15;120:22
**trouble (1)**
29:5
**true (3)**
121:22;158:24;160:21
**trust (3)**
67:1,2;74:13;152:7
**trustee (2)**
57:6;67:5
**trustees (3)**
57:9,12,15
**try (7)**
13:9;38:22,23;44:3;52:12;
72:13;77:15
**trying (18)**
18:2;22:8;26:22;35:12;
37:7,9,11,17;38:3;41:3,4,5,
6;42:13;76:11;83:19;97:16;
140:21
**Tucker (1)**
66:17
**turned (3)**
12:3;33:9;92:19
**two (15)**
19:5;21:9;30:18;38:17;
51:2;56:1;63:22;92:13;
97:23;108:23;109:3,4;
150:3;154:2;158:11
**two-and-a-half (1)**
105:17
**twofold (1)**
153:5
**type (1)**
62:6
**typed (1)**
118:23
**typical (1)**
69:7
**typically (2)**
68:21;89:18

**U**

**ultimate (5)**
64:8,10,15;65:21;151:11
**ultimately (4)**
52:6;75:11;106:15;142:8
**um (2)**
26:24;71:11
**uncertain (1)**
161:17

**under (36)**
16:16;19:9,9,15;22:12,20;
23:16;25:17;33:20;34:22;
35:2;37:2,8;39:18;40:10,20;
41:13;43:15;46:23;49:3,11,
21;71:7,12,13;74:7;75:1;
87:11,16,16;88:21;95:21;
106:8;107:3;146:13;157:3
**understands (1)**
30:16
**understood (6)**
97:11;100:13;104:5,16;
110:16;127:10
**undertakes (1)**
89:1
**undertook (1)**
150:7
**undetermined (1)**
21:10
**unethical (1)**
18:3
**unfortunately (3)**
18:3,5;28:19
**United (1)**
6:10
**University (1)**
6:15
**unless (2)**
92:4;135:23
**unlike (1)**
43:21
**up (30)**
11:6;15:6;21:23;30:11,13;
36:7;40:16;50:24;55:1;63:2;
65:13;82:2;86:8;91:13;94:9,
16;99:1;113:2,13;117:23;
118:11,23;119:15,19;
120:15;121:8,16,24;128:11;
148:16
**upheld (1)**
34:7
**upon (11)**
11:20;15:17;25:16;35:14;
48:17;57:13,18,24;130:5;
160:4,6
**use (8)**
37:20,23;83:2;127:20,23;
140:9,9,10
**used (2)**
13:8;26:23
**using (1)**
137:18
**usually (4)**
15:7;63:12,12;67:18
**utilize (1)**
57:14
**utilizing (1)**
57:15

**V**

**vague (2)**
121:18,20

**valuation (2)**
57:10;68:5
**value (6)**
19:10;34:1,4;64:14;65:10,
21
**van (1)**
62:23
**various (6)**
17:18,19;19:17;53:1;98:5;
143:16
**verdict (1)**
34:7
**verify (1)**
120:13
**Vermont (1)**
23:24
**version (3)**
27:16;82:13;83:21
**versions (1)**
82:11
**versus (4)**
19:14;20:14;32:19;50:13
**via (2)**
4:2,9
**victim (1)**
121:15
**Vietnam (1)**
121:14
**view (9)**
42:23;49:9;51:12,22,24;
79:15;133:10;141:18;158:9
**views (1)**
26:3
**violation (4)**
128:22;129:1,15;130:11
**violations (1)**
28:11
**virtue (1)**
18:13
**vital (6)**
103:11,12,17;106:5;
110:13,15
**vote (2)**
15:17;89:1
**voting (1)**
57:8

**W**

**wait (2)**
115:6;155:10
**walks (1)**
91:2
**wants (3)**
74:3;82:1;136:16
**Washington (1)**
4:11
**watch (2)**
92:7;105:17
**way (16)**
7:1;29:7;33:24;44:20;
50:2;51:10;77:7;80:5,17,22;
101:19;107:16;128:22;

136:17;143:19;151:17
**ways (1)**
112:11
**week (1)**
110:13
**weekly (1)**
29:4
**weight (2)**
35:10,10
**welfare (1)**
73:21
**weren't (3)**
24:5;118:19;123:11
**whatnot (1)**
118:24
**what's (4)**
13:1;59:2;93:20;101:24
**whenever (1)**
110:4
**Whereupon (1)**
162:14
**whoever's (1)**
91:6
**whole (2)**
56:18;155:16
**who's (4)**
62:24;78:8;121:23;160:11
**whose (3)**
69:19;76:24;90:5
**widow (1)**
69:24
**wife (4)**
20:5;58:10;100:8;105:13
**William (2)**
6:6;56:6
**willing (1)**
89:20
**willingness (1)**
8:7
**wish (1)**
73:21
**withdraw (1)**
97:15
**withdrew (1)**
51:18
**within (4)**
10:14;16:18;35:1;148:18
**Without (4)**
78:7;98:21;103:10;112:14
**witness (225)**
7:16,17;22:15;25:20;26:6,
12,16,21;27:2,14,18,21;
28:1,4,8;29:10,21;30:3,6,13;
31:11,22;32:22;33:6,15,21;
34:24;35:16,20,23;36:4,11,
20,23;37:4;38:12;39:4,12,
15;40:1,12;41:1,19,24;42:9,
15;43:3,9,20;44:3,5,16;47:1,
23;48:5,8,14;49:4,13;50:1,
10,13,15;52:1,9,16,24;53:6,
9;55:15;58:24;59:10,13,19,
22;60:7,13,19;61:16,17;
62:5;63:7,11,17,22;64:11,

17,20,23;65:5,12,23;67:24;
68:6,8;71:9,21;72:5,16,21;
73:1,7;74:17;79:10,13,24;
80:13,16;81:10,17;82:1,7;
85:2,7,13;86:5,12,24;88:1,5,
10,24;92:11;93:5;98:11,13;
102:11,14;109:18;113:16;
126:14,18,23;127:5,9;
128:21;129:1,5,7,12,15,18,
21,24;130:10,15;131:7,10;
133:16;134:1,7,11,14,18;
135:2,9,14,17,22;140:7,9,
16;141:1,7,13,17,19,22;
142:3,7,14,18,21;143:2,7,
20;144:2,7,12,15,18,22;
149:1,8,13,18;150:7,20;
151:3;152:2,15,20;153:1,7,
16,22;154:1,5,10,19;155:5,
12,21;156:4,8,13,18;157:6,
9,11,16;158:2,5,17,22;
159:1,5,12,16,20;160:2,8,
15;162:4,7
**woefully (1)**
97:15
**Wolf (2)**
54:8;147:3
**Wolosz (1)**
99:14
**work (15)**
28:23;38:15,17;46:17;
48:23;67:12;70:20;117:13,
14;120:15;124:4,18;137:13;
153:13
**worked (5)**
20:20,24;94:4,13;99:16
**worry (1)**
95:2
**worth (1)**
68:13
**write (1)**
116:22
**writing (26)**
40:13;71:8,17,19;72:24;
73:5;74:11,16;79:20;80:5,
21;81:24;83:4;84:14,24;
85:3;106:8;107:9;110:16;
116:3;137:23;138:4;139:5,
7,14;144:6
**writings (1)**
25:11
**written (2)**
13:2;73:16
**wrong (4)**
109:1;161:15,23,23

**Y**

**year (3)**
12:5;107:15;109:20
**years (16)**
14:23;16:9;17:16;18:13;
31:3;35:24;38:17;45:15;
46:1;69:12;72:7;74:14;

100:24;108:5,20;120:23
**Yep (7)**
50:17;55:16;95:5;98:1;
118:9;134:14;150:20
**yesterday (2)**
6:16;122:2
**York (3)**
4:4,4;6:14
**young (4)**
33:16;56:6,6;57:3

**Z**

**Zabin (16)**
50:13,14,15;51:13;52:18,
19,21;53:5,8,21;63:5;64:1;
65:8,9,19,19
**Zabin's (3)**
63:6,16;64:7

**0**

**0022172 (1)**
113:23

**1**

**1 (5)**
8:18;57:14;93:10,12,16
**1.5 (2)**
39:18;50:9
**1.5-2 (2)**
129:13,17
**1.5a (8)**
31:15;32:2;33:20;34:22;
37:15;40:20,23;45:12
**1.5e (38)**
10:11,18,23;13:20;14:11;
23:8;32:5;34:22;37:15;
41:16;44:22;47:4;48:21;
53:12,20;71:7,12,13;75:1;
82:9;87:11,16;91:20;106:8;
107:3;108:7,14;128:20;
129:10,19,20,21;130:8;
131:5;133:13;134:24;
136:10;156:10
**1:30 (1)**
93:6
**10 (10)**
112:8,11;113:2,9;122:12;
123:24;124:22;148:16;
154:20,21
**10,000 (1)**
95:1
**10005 (1)**
4:4
**11 (4)**
82:24;92:9;137:19;138:6
**11-CV-10230-MLW (1)**
6:5
**12:38 (1)**
162:15
**1201 (1)**

**In Re: State Street Attorneys Fees**

4:10
**1267 (1)**
122:3
**129 (1)**
34:6
**14 (2)**
94:5;145:5
**140 (1)**
4:3
**15 (13)**
82:20,24;83:10,23;84:5;
109:19;136:11,20;137:17,
17;138:3,7;139:8
**15th (6)**
102:14,19;103:3;106:2;
138:18;139:24
**187 (1)**
122:4
**19 (1)**
45:15
**1985 (1)**
122:3
**1990 (1)**
14:24
**1996 (1)**
14:24
**1998 (1)**
9:15
**1999 (1)**
9:15

---

**2**

**2 (3)**
95:13,14;114:9
**2.2 (1)**
64:2
**20 (5)**
45:16;69:6,9,14,18
**2005 (4)**
12:9;83:12;131:23;139:15
**2008 (6)**
97:24;98:3;107:16;108:3,
23;122:13
**2009 (2)**
124:9,22
**2010 (3)**
13:19;14:3;124:9
**2011 (16)**
14:7,8;82:16;83:10,23;
84:5;107:18;108:24;136:11,
20;137:2,5,17;138:3,7;139:8
**2013 (2)**
111:15;155:3
**2015 (3)**
82:11;83:21;137:19
**2016 (2)**
112:4;160:7
**2017 (5)**
8:17;102:3;103:18;104:4;
110:21
**206-623-1900/lsarko@kellerrohrbackcom (1)**
4:12

**212-907-0882/mcanty@labatoncom (1)**
4:5
**22 (1)**
112:4
**22nd (1)**
112:2
**23 (3)**
16:13;87:16;111:15
**25 (2)**
58:18;89:24
**29th (2)**
98:3;108:23

---

**3**

**3 (2)**
113:20;114:1
**3.3 (1)**
46:23
**30 (4)**
69:6,9,14,18
**300,000 (1)**
91:9
**31 (1)**
8:17
**3200 (1)**
4:10

---

**4**

**4 (2)**
95:19;114:15
**40 (3)**
64:2;65:2,20
**42 (3)**
113:21,22,24
**450 (1)**
34:5

---

**5**

**5,000 (1)**
95:1
**50 (1)**
72:7
**500 (1)**
34:7
**52 (1)**
121:3
**54 (1)**
16:17
**550 (1)**
34:5
**56 (2)**
31:3;35:24

---

**6**

**611 (1)**
122:3

---

**7**

**7.2 (1)**
98:19
**7.2b (4)**
37:16;45:2,4;50:9
**702 (3)**
49:3,6,12
**706 (1)**
49:22
**74 (1)**
113:24
**750 (1)**
93:22

---

**8**

**8 (2)**
65:14;107:18
**818 (1)**
122:4
**8th (2)**
107:14;108:24

---

**9**

**9 (11)**
65:14;95:19,23;113:2;
114:10,13,14,15;148:15;
152:23;154:20
**90 (1)**
35:23
**98101-3052 (1)**
4:11