# EX. 253

**Professor Stephen Gillers**

1

Volume:  1

Pages:  1-373

Exhibits: 1-24

JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

------------------------------------

In Re:  STATE STREET ATTORNEYS FEES

------------------------------------

BEFORE: Special Master Honorable Gerald Rosen,

United States District Court, Retired

DEPOSITION of PROFESSOR STEPHEN GILLERS

March 20, 2018, 9:03 a.m.-6:30 p.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter:  Paulette Cook, RPR/RMR



Page 50

Page 52

Page 51

Page 53

1   an advocate?
2   **A.  I never have.**
3   Q.   Have you ever made a written submission to
4    the board?
5   **A.  I never have.**
6   Q.   Did you research Board of Bar Overseers
7    decisions?
8   **A.  I did.**
9   Q.   Did you find any Board of Bar Overseers
10   decision that indicated that if written consent of
11   the client was not obtained under Rule 1.5(e) the
12   applicable rule would become 7.2?
13  **A.  Not an overseers' opinion, no, I did not.**
14  Q.   And are you aware, sir, that there's another
15   mechanism by which lawyers in Massachusetts can
16   obtain advisory opinions relating to ethics?
17  **A.   Yes, every state bar association provides**
18   **advisory opinions, and Massachusetts, does, too.**
19  Q.   Are you referring to the Massachusetts Bar
20   Association's advisory opinions?
21  **A.   Hm hm.**
22  Q.   Yes?
23  **A.   I don't know the name of the body that**
24   **provides advisory opinions.**

Page 54

1  Q.  Is there more than one body in
2  Massachusetts?
3  **A.  I do not know.**
4  Q.  Are you aware that both the Massachusetts
5  Bar Association and the Boston Bar Association
6  Ethics Committee provide advisory opinions to
7  lawyers?
8  **A.  Am I aware?**
9  Q.  Yes, sir.
10 **A.  I'm not sure as part of my consciousness I**
11 **would -- if you would ask me, I would assume that**
12 **they do.**
13 Q.  Did you search the advisory opinions of the
14 MBA and the BBA Ethics Committees?
15 **A.  I did.**
16 Q.  Did you find any opinion of the MBA or BBA
17 Ethics Committee that opined that in the event that
18 consent was not perfected under 1.5(e) the
19 applicable rule would become 7.2(b)?
20 **A.  No.**
21 Q.  How many hours did you spend researching the
22 Massachusetts Rules of Professional Conduct, sir?
23 **A.  I could not quantify it.**
24 Q.  Can you give us a best estimate?

Page 55

1  **A.  No.**
2  Q.  In the course of that research did you find
3  any case, decision or opinion that says in the event
4  of a failure to perfect client consent under Rule
5  1.5(e), the analysis shifts to the advertising Rule
6  7.2(b)?
7  **A.  Are we limiting our discussion now to the**
8  **Massachusetts ethics opinions?**
9  Q.  No.  We're talking about any case, any
10 opinion or any decision of the Board of Bar
11 Overseers interpreting Massachusetts Rule 1.5(e),
12 did you find any instance in which if the consent
13 was not perfected under 1.5(e) the analysis shifted
14 to Rule 7.2(b) the advertising rule?
15 **A.  The Saggese opinion cited in Illinois**
16 **Intermediate Appellate Court opinion says that if**
17 **the jurisdiction's division of fee rule is not**
18 **honored, then it simply becomes a payment for a**
19 **recommendation of a client.**
20 Q.  Did the Saggese case say anything at all
21 about Rule 7.2?
22 **A.  No.**
23 Q.  So what are you referring to?
24   I asked you whether there was a decision

Page 56

1  anywhere that indicated the failure to obtain client
2  consent caused the analysis to shift from 1.5(e) to
3  7.2(b) if 7.2(b) isn't mentioned in Saggese?
4  **A.  Of course, the problem with your question is**
5  **you're framing it in terms of a statement that**
6  **actually mentions the number 7.2(b) rather than the**
7  **concept that's involved.**
8  Q.  So you're saying that -- what is the concept
9  that you claim is mentioned in Saggese, sir, that
10 you say is the equivalent of 7.2(b)?
11 **A.  A lawyer can take himself out of 7.2(b) by**
12 **complying with 1.5(e).  Otherwise, he's in 7.2(b).**
13 **That's syllogistic.  That's what the rule says.**
14   **So the concept is if you don't do X,**
15 **then Y -- look, you want to shake your head at me**
16 **you can but...**
17 Q.  Please go ahead.  We'll follow up.
18 **A.  All right.  You either comply with 1.5(e) to**
19 **avoid the prohibition in Rule 7.2 or you don't.  And**
20 **if you don't, you're within the prohibition of Rule**
21 **7.2.**
22 Q.  Can you cite me to any case, advisory
23 opinion or decision of the Board of Bar Overseers
24 that says the failure to comply with obtaining

Page 57

1  perfected consent from the client under 1.5(e) means
2  that you are governed by 7.2(b)?
3  **A.  I can't cite you to any if you're insistent**
4  **on the words or numbers 7.2(b) being in the opinion.**
5  Q.  That's correct, sir, I am insisting that you
6  tell me any case, decision, opinion, whatever you
7  want to call it, that supports your position that
8  the analysis is under Rule 7.2(b) if the lawyer or
9  law firms fail to perfect client consent under
10 1.5(e)?
11 **A.  Does your question ask me to assume that the**
12 **opinion or whatever I want to call it contains the**
13 **number 7.2(b)?**
14 Q.  Yes, sir.  I'm asking you for anything that
15 says if consent isn't perfected under 1.5(e) the
16 analysis by the lawyers involved -- the analysis
17 switches to 7.2(b)?
18 **A.  Let me answer -- let me -- maybe this cuts**
19 **through it.**
20   **I know of no case from any authority in**
21 **Massachusetts that says that a failure to comply**
22 **with 1.5(e) constitutes a violation of, quote,**
23 **7.2(b), closed quote.**
24 Q.  How about any case outside Massachusetts,

Page 58

1  sir, even states that have the Model Rule that
2  requires that the attorney -- the referring attorney
3  perform some work or assumes some liability?
4     Can you point us to any case in any
5  jurisdiction that says the failure to perfect client
6  consent on the part of the referring or receiving
7  attorney causes the analysis to shift to 7.2(b)
8  which is also a Model Rule?
9  A.  Saggese itself cites an Illinois
10  Intermediate Appellate Court opinion that says that,
11  although it may not use a number.
12  Q.  I was just going to say, sir, that Illinois
13  intermediate opinion doesn't reference 7.2(b), does
14  it?
15  A.  I just said although it may not use a
16  number.
17  Q.  So what you're saying is you believe it
18  refers to a principle but not to an existing
19  explicit rule under both the Model Rules and the
20  Massachusetts Rules of Professional Conduct,
21  correct?
22  A.  Can you repeat that?
23  Q.  What you're saying to us is that you're
24  relying on your interpretation of the principle

Page 59

1  underlying Rule 7.2(b), but you agree that there's
2  no case anywhere in the country that says the
3  failure of the lawyers to perfect client consent
4  under 1.5(e) switches the analysis to 7.2(b),
5  correct?
6  A.  No.
7  Q.  What's incorrect about that, sir?
8  A.  Well, I'm relying on the language of 7.2(b)
9  and the language of 1.5(e).
10     So my argument is that the text of the
11  rules self evidently bring the lawyer within 7.2(b),
12  unless the lawyer does something.  And if the lawyer
13  doesn't do anything, doesn't do that something, then
14  it is a payment for a recommendation in violation of
15  7.2.
16     As I said before, I see this
17  syllogistically.  It logically follows that you
18  cannot do X unless you do Y; and if you do not do Y,
19  you're -- you've violated X.
20     Now I don't have to go outside the text
21  of the rule to come to that conclusion, but it is
22  also true that the Saggese Court recognizes that
23  principle and cites the Illinois opinion for that
24  principle.

Page 60

1     If you're asking me, well, does the
2  Illinois opinion use the number 7.2(b), it may; it
3  may not.  I don't know.  It may not be the same
4  number in Illinois.
5  Q.  Does Illinois follow the Model Rules?
6  A.  I'm sorry?
7  Q.  Did Illinois follow the ABA Model Rules?
8  A.  No, no jurisdiction does exactly.  And
9  whether it follows the Model Rules on 1.5(e), I'm
10  not sure.
11  Q.  So if I'm understanding you correctly, what
12  you're saying, sir, is that the basis for your
13  opinion that the failure to perfect client consent
14  under 1.5(e) causes the analysis to switch to 7.2(b)
15  is premised in significant part on how you read the
16  language of those two rules; is that correct?
17  A.  I would say that the failure to -- the
18  analysis doesn't shift to 7.2(b); it begins there,
19  and then you can exit 7.2(b)'s prohibition by
20  complying with 1.5(e).  And if you don't, you don't.
21  Q.  So in your view even when you're talking
22  about a circumstance where two law firms enter into
23  a fee division agreement, the analysis still starts
24  at 7.2(b); is that right?

Page 61

1  A.  Until they satisfy Rule 1.5(e).
2  Q.  Can you cite us to a single case that says
3  that?
4  A.  Haven't we been over this?
5  Q.  No.  I'm now taking your position that we
6  start with 7.2(b) as opposed to moving to 7.2(b)
7  after the lawyers fail to perfect consent under
8  1.5(e).
9     Tell me any case anywhere that says when
10  you have two law firms that enter into a fee
11  division agreement the analysis of the propriety of
12  their conduct starts with the advertising Rule
13  7.2(b).
14  A.  Other than the reference in Saggese to the
15  Illinois case and the language in Saggese that leads
16  to the citation to the Illinois case, I don't know
17  of any Massachusetts authority that has that
18  description.
19  Q.  All right.  So we're clear, sir, there's no
20  case that you've found anywhere in Massachusetts
21  that deals with the concept of 7.2(b) being the
22  beginning of the analysis when two law firms enter
23  into a fee division agreement, and no case anywhere
24  in Massachusetts that suggests that one switches the

Page 62

1  analysis to 7.2(b) if the law firms fail to perfect
2  client consent under 1.5(e), correct?
3  **A.  I'm not buying into your characterization.**
4  **I say it the way I said it.**
5  Q.  All right.  Just tell me if there's any case
6  you know of anywhere that talks about 1.5(e) and
7  7.2(b) in the same case.
8  **A.  No.**
9  Q.  Okay.  Did you come up with that theory on
10  the basis of your reading of the two rules?
11  **A.  Yes.**
12  Q.  Are you aware of any discipline that's ever
13  been taken against a lawyer or a law firm under
14  7.2(b) for failure to perfect client consent under
15  1.5(e)?
16  **A.  I didn't look anywhere.  I looked in**
17  **Massachusetts.  And I'm not.**
18  Q.  All right.  So you only looked in
19  Massachusetts, but beyond Massachusetts, you're not
20  aware of any case anywhere that imposes a sanction
21  or disciplinary action under 7.2(b) for failure to
22  perfect client consent under 1.5(e)?
23  **A.  I did not research that question outside**
24  **Massachusetts.**



Page 64

Page 63

Page 65



Page 82

Page 84

1    doesn't use those numbers, correct.

2  Q.   It also doesn't quote the language, does it?

3  **A.   No, I don't think it does.**

4  Q.   What is the language that you are relying on

5    from Saggese?

6  **A.   I want the rule in front of me if I'm going**

7  **to --**

8  Q.   You want the rule in front of you?

9  **A.   Yeah.**

10  Q.   Rule 7.2 in front of you?  Or you want

11    Saggese in front of you?

12  **A.   No, the rule.  You're asking me what is the**

13  **language in 7.2 --**

14  Q.   No, no, no.

15        I'm asking you what is the language in

16    Saggese that you say is tantamount to a reference to

17    Rule 7.2?

18        I could give you a copy, but mine is

19    heavily marked up in ways that Mr. Sinnott would not

20    appreciate.

21        (Pause.)

22  **A.   The language -- the reference is actually in**

23  **Daynard, D-A-Y-N-A-R-D.  And the language is Daynard**

24  **is nothing like the plaintiffs in many cases or**

Page 83

Page 85

1    denied enforcement of their, quote, fee splitting

2  **closed quote, contracts which are in reality fee**

3  **referral contracts; see, e.g., Holstein versus**

4  **Grossman, and there's a citation.**

5        **And then there's a parenthetical**

6  **reference, quote, holding that a fee-sharing --**

7  **sorry.**

8        **"Holding that a 'fee-sharing agreement**

9  **which is primarily based on a client referral is**

10  **unenforceable as a matter of public policy where the**

11  **undisputed facts show that the referred client never**

12  **consented in writing to the attorneys'**

13  **arrangement.'"**

14  Q.   Where are you in Daynard, sir?

15        **MS. McEVOY:** 131.

16        **MS. LUKEY:** 131?

17        **THE SPECIAL MASTER:** Citing Holstein at

18    616 N.E.2d page 1229.

19        **MS. LUKEY:** Just need a minute to try to

20    locate it because we have a different version.

21  **A.   And actually that -- that reference in**

22  **Daynard is quoted at page 61 of my opinion.**

23  Q.   It refers to fee referral, correct?

24        What you just read to us is

Page 86

1  distinguishing between a fee-splitting contract and
2  a fee referral contract, correct?
3  **A.   The Illinois Court uses both the terms**
4  **fee-sharing agreement and client referral.**
5  Q.   All right.  But the distinction that Judge
6  Young was making in Daynard is between a fee --
7  well, let me go back to the language again and make
8  sure I get it right.
9     (Pause.)
10    **BY MS. LUKEY:**
11  Q.   The distinction is between a fee-splitting
12  contract and a fee referral contract, right?
13  **A.   I don't think that the labels matter here,**
14  **whether you call it a referral or a recommendation.**
15  **Massachusetts uses the word "recommendation" in 7.2**
16  **and referral as the keyword in Rule 1.5(e) and in**
17  **one of the exceptions to the prohibition in Rule**
18  **7.2.**
19    **So the principle is the same.  The**
20  **principle is that you can't pay for recommendations**
21  **unless you comply with another rule; that you can**
22  **call -- you can change the word "recommendation" to**
23  **referral; you can change the word "recommendation"**
24  **to forwarding fee.**

Page 88

Page 87

Page 89



Page 106

1  Q.   And that was because of Mr. Hopkins'
2  preference to work only directly with Labaton
3  Sucharow and not through any local counsel, correct?
4  **A.  Yes.**
5     **THE REPORTER:** I'm sorry, I didn't hear
6  the answer.
7     **THE WITNESS:** Yes.
8     **MS. LUKEY:** Right.
9     **MS. McEVOY:** I have an extra copy of the
10  February 11, 2008.  Who needs it --
11     **MS. LUKEY:** I don't need it right now.
12  I would suggest that we have it marked at some point
13  on the break or have it marked right now as
14  Exhibit 5.
15     (Exhibit 5 marked
16     for identification.)
17     **BY MS. LUKEY:**
18  Q.   Sir, does the ratification declaration that
19  you have seen now from Mr. Hopkins constitute
20  consent on behalf of Arkansas Teacher Retirement
21  System to the fee referral to Chargois & Herron?
22  **A.   On behalf of Arkansas alone.**
23  Q.   And, again, as we discussed, there was no
24  class at the time that the engagement was entered



Page 114

1   duty under Rules 23 and 54 to disclose the division
2   of fees among those lawyers whom the Court knew
3   about and so could inquire, the Court could not be
4   expected to ask counsel about a division of fees
5   with Chargois, a lawyer who had not appeared in the
6   case and whom it did not know about."
7        Did I read that correctly?
8   A.  Yes.
9   Q.  All right.  Do you agree -- well, let me ask
10  you this first:  Are you saying that under Rules 54
11  and 23 there is something in the language that
12  distinguishes between lawyers who have appeared in
13  the case and lawyers who have not appeared in the
14  case --
15  A.  No.
16  Q.  -- in terms of disclosure?
17  A.  Sorry.  No.
18  Q.  All right.  Are you saying here in the
19  opening phrase that you agree as a general
20  proposition that there is no duty under Rules 23 and
21  54 to disclose the division of fees?
22  A.  That's part of the sentence.
23  Q.  All right.  What are the circumstances under
24  Rule 54 which specifically says under (d)(2)(b) that

Page 115

1   disclosure is only required if the Court orders it
2   -- what are the circumstances, if any, in which you
3   say that disclosure is required even if the Court
4   didn't order it?
5   A.  I'm not relying on Rule 54 as the source of
6   authority or obligation to disclose participation of
7   a lawyer whom the Court does not know about.
8   Q.  Are you familiar -- well, you read
9   Mr. Sarrouf's affidavit?
10  A.  Yes.  I did, yes.
11  Q.  Or report.  Do you have any understanding as
12  to what the standard of practice is in Massachusetts
13  about whether counsel disclose to the Court without
14  an order the existence of fee agreements for
15  attorneys who aren't appearing in the case?
16  A.  No.
17  Q.  Do you understand that Mr. Sarrouf takes the
18  position that it is not the practice in
19  Massachusetts in the absence of a Court order to
20  disclose a referral fee agreement even if one of the
21  firms hasn't appeared in a case?
22  A.  Yes.
23  Q.  Do you have any reason to dispute his
24  position that the standard of practice does not

Page 116

Page 117



Page 142



Page 144

1  A.  -- I'm aware of that.
2  Q.  Your final question presented, sir, on page
3  54 -- oh, no, wait.  Sorry, missed one here.  Before
4  we get to that one.
5      You do offer the opinion at page 71 of
6  your report that the omission -- I'll quote.  "The
7  omission of the Chargois payment from the fee
8  application violated Rules 3.3(a) and Rule 8.4(c)."
9  A.  Right.
10  Q.  Now, sir, you would agree with me, I assume,
11  that accusing lawyers of violating ethical rules is
12  a very serious matter, isn't it?
13  A.  It is.
14  Q.  You are making that accusation with no case
15  support for the notion that Rule 54(d) would be
16  overridden by 3.3 or 8.4 of the Massachusetts Rules
17  of Professional Conduct?
18  A.  I don't believe it is overridden.  These are
19  two parallel methods of analysis.
20  Q.  Do you have any case authority, sir, for the
21  proposition that Massachusetts Rule of Professional
22  Conduct 3.3(a) requires disclosure of fee agreements
23  in cases where no rule or order requires disclosure?
24  A.  I have -- I know of no authority that

Page 143

Page 145

1  applies 3.3 to the duty to disclose a fee agreement.
2  Q.  All right.
3  A.  I think that's what you're asking.
4  Q.  It is, sir.
5      Do you have any authority for the
6  proposition that Rule 8.4 which deals with
7  dishonesty, fraud, deceit and misrepresentation --
8  well, first let me ask you this:  Do you have any
9  basis for saying that counsel in this case acted
10  dishonestly, fraudulently, deceitfully or by
11  misrepresentation?
12  A.  I think the -- on the record here, given
13  what Judge Wolf knew and did not know and said, that
14  the failure to disclose the Chargois Arrangement in
15  light of what was disclosed was misrepresentation.
16  Q.  I'm sorry, I didn't follow that.  Would you
17  mind saying it again?
18  A.  No, I do not mind.
19      I think that given what Judge Wolf knew
20  and did not know and given what was said by the
21  lawyers to Judge Wolf, the failure to disclose the
22  Chargois Arrangement to Judge Wolf was a
23  misrepresentation; that an omission can be a
24  misrepresentation.



Page 150

1  Q.  -- that also was not disclosed?
2  **A.  Yes, that's right.**
3  Q.  Sir, you list some cases in this section,
4  but none of the cases you cite hold that counsel
5  must disclose fee allocations to class members, do
6  they?
7  **A.  No.**
8  Q.  Do you have any authority for the
9  proposition that class counsel must disclose fee
10 allocations to class members?
11 **A.  I think the authority is -- there were rules**
12 **governing the attorney/client relationship and the**
13 **duty to inform your client.  And I think I addressed**
14 **that somewhere in there.**
15 Q.  So you're basing this on the attorney/client
16 relationship in a Rule 23 class situation?
17 **A.  Yes.**
18 Q.  Are you familiar with the cases that
19 distinguish the nature of the duties that class
20 counsel have to unnamed class members as contrasted
21 with the duties that attorneys have to their clients
22 more generally including named class members?
23 **A.  Different proceedings before --**
24     **THE REPORTER:** I'm sorry, I can't hear

Page 151

1  you.
2     **THE WITNESS:** I'm sorry.
3  **A.  At what point?**
4  Q.  Well, it would have to be after the class
5  certification, or it wouldn't be an issue.
6     Are you familiar with the fact that
7  cases distinguish between the nature of the duty
8  that class counsel has to the unnamed class members
9  as contrasted with the nature of the duty that class
10 counsel has to its own direct client, the named
11 plaintiff?
12 **A.  I'm -- no.**
13 Q.  You're not aware of a difference?
14 **A.  Not -- I'm not aware of the difference as**
15 **regards the duty I'm talking about here, the duty to**
16 **inform.**
17 Q.  Can you cite us to a case that says that
18 class counsel has the obligation to notify the
19 unnamed class members; that is, the non-named
20 plaintiffs, of a referral fee that's going to come
21 out of class counsel's fee?
22 **A.  No.**
23 Q.  Isn't it the case, sir, that any right that
24 -- never mind.  I withdraw that.

Page 152

Page 153



**Page 154**

**Page 156**

1  Q.  All right.  Give me a case that supports the
2  notion that in an attorneys' fee award case of any
3  kind -- not a class -- that there was an -- well,
4  never mind.  That wouldn't work because that's not
5  the obligation you're talking about so forget that.
6      So basically we have no support for the
7  concept that in a class action a Court has said you,
8  class counsel, must disclose the existence of a
9  referral fee to the class members, right?
10 **A.  Could you start that again?**
11 Q.  There's no case that supports the
12 proposition that class counsel has been ordered --
13 that a Court has said that class counsel is
14 obligated to inform the class members of a referral
15 fee?
16 **A.  Right.  Or contradicts it.**
17 Q.  You are seeking to impose a duty of
18 disclosure of a fee division -- well, let me
19 rephrase it.
20     You're seeking to impose a duty of
21 disclosure of a fee division that no Court has yet
22 imposed in any written decision, right?
23 **A.  So far as I know, but it's not -- it's an**
24 **analysis under the Massachusetts rules.  It's not an**

**Page 155**

**Page 157**

1  **analysis under Rule 23.**
2  Q.  And what Massachusetts rule?
3  **A.  The one cited in the point you're talking**
4  **about.**
5  Q.  The one cited where?
6  **A.  In the point you're talking about.  A duty**
7  **to inform a client of -- 1.4 duty to inform a client**
8  **completely especially when you're inviting the**
9  **client to accept and not object to a prospect of fee**
10 **application.**
11 Q.  Well, 1.5(e)'s duty is to get the consent of
12 the client --
13 **A.  Right.**
14 Q.  -- who retains you at the time of retention?
15 **A.  Yes.**
16 Q.  That can't happen here because the class
17 becomes a class years after the retention, correct?
18 **A.  I said 1.4.  Maybe you miss -- I said 1.4,**
19 **not 1.5.**
20 Q.  I'm sorry.  Rule 1.4?
21 **A.  Yes.**
22 Q.  What is it that Rule 1.4 says?
23 **A.  It's a duty to keep a client informed about**
24 **matters and especially matters within the client's**



Page 194

Page 196

1    right?

2  **A.  Right.**

3  Q.   All right.  Let me go to page 76 of your

4    report, please.  Are you with me?

5  **A.  I am.**

6  Q.   About halfway down the page you'll pick up

7    with the sentence that reads:  "Recipients are also

8    told..." -- are you with me there?

9  **A.  Yes.**

10  Q.   And this is with respect to the class

11    notice, correct?

12  **A.  Correct.**

13  Q.   You write there:  "Recipients are also told

14    that attorneys' fees for ERISA counsel will not

15    exceed 10.9 million dollars, and they are told how

16    fees for the other counsel will be computed."  And

17    then the sentence goes on.  Do you see that?

18  **A.  Right.**

19  Q.   Who were you referring to when you used the

20    phrase "other counsel"?

21  **A.  The class counsel.**

22  Q.   All right.  That means the firms of Labaton,

23    Thornton and Lieff Cabraser?

24  **A.  Yes.**

Page 195

1  Q.   Did you read any portion of the deposition

2    of Mr. Chiplock?

3  **A.  No.**

4  Q.   Mr. Lieff who's sitting just to the right of

5    Mr. Chiplock --

6  **A.  No.**

7  Q.   -- did you read any portion of his

8    deposition?

9  **A.  No.**

10  Q.   Mr. Fineman -- Steve Fineman, did you read

11    any portion of his deposition?

12  **A.  No.**

13  Q.   My deposition, did you read any portion of

14    my deposition?

15  **A.  No.**

16  Q.   Is there any list or any documentation in

17    existence of the materials that you did review in

18    the course of your work?

19  **A.  No, there is not a list.  The statement of**

20    **facts is my universe.**

21  Q.   But you weren't confined just to the

22    statement of facts, were you?

23      You reviewed some materials other than

24    materials that appear in the statement of facts,

Page 197

1  Q.   And you got this language I gather -- strike

2    that.

3      This statement is based on your review

4    of the class notice itself at page 9; is that right?

5  **A.  The class notice?**

6  Q.   I'm going to give you the class notice if

7    you don't have it, but I'm looking at your report.

8    It says -- with respect to that sentence, it's cited

9    at Id. at 9.

10  **A.  Right.  So that quote is Id. at 9.**

11  Q.   That's something you took upon yourself to

12    determine, not something that's in the statement of

13    facts that was written by Mr. Sinnott, right?

14  **A.  What's the antecedent of "that"?**

15  Q.   The statement that you made here that the

16    ERISA counsel's fees were capped at 10.9 million

17    dollars and that the fees for the other counsel were

18    to be computed according to what you write here.

19  **A.  I think that that is in the statement of**

20    **facts -- in the -- maybe in the statement of facts**

21    **but in the notice.**

22  Q.   I agree it's in the notice.  I disagree it's

23    in the statement of facts --

24  **A.  Okay.**

Page 198

1 Q.  -- all right?
2     Of what importance, if any, was this to
3 your opinion that the attorneys' fees -- that the
4 notice reported the attorneys' fees for ERISA
5 counsel would not exceed 10.9 million dollars?
6 A.  It's not important in itself.  It's
7 important insofar as there is disclosure of
8 attorneys' fees -- some information about the fee
9 application in the notice and in the subsequent fee
10 application posted on the website in which others
11 than Chargois are named, the point being that there
12 is some detail given and then more detail given, and
13 the recipients to the notice are invited, if they so
14 chose, to object not only to the settlement but to
15 the attorneys' fees and how to do so.
16     So they are being given information
17 about those fees.  They need that information
18 presumably to decide whether or not they want to
19 object, but they're not given complete information
20 because they're not given the Chargois information.
21     So to answer your question, this is a
22 lead-up to the fact of what I'm claiming is
23 incompleteness by failure to disclose Chargois
24 either in the notice or in the website.

Page 199

1 Q.  All right.  So it didn't matter to you what
2 the specifics of the information were.  As long as
3 there was some information about fees set forth in
4 the notice, your position is that it had to also
5 include the details about the Chargois Arrangement?
6 Is that fair?
7 A.  It didn't matter to me who's getting what as
8 described in the notice.  It mattered to me that
9 there was an invitation or a right to object coupled
10 with information that purportedly gave the recipient
11 a basis to decide whether or not he or she wished to
12 object.
13     Now I want to come back to a subtle
14 point in your question because it's a legitimate
15 point, and that is could that have happened other
16 than in the notice.  Could that have happened in the
17 fee petition?  And I think it could have happened in
18 the fee petition.
19 Q.  What could have?  What is the "it"?
20 A.  Notice of Chargois.
21 Q.  All right.  So if it turns out that once
22 again you're dead wrong here, when you say that the
23 attorneys' fees for ERISA counsel would not exceed
24 10.9 million, that doesn't affect your opinion?

Page 200

1 A.  Well, depending on how I'm dead wrong.  If
2 you said it was 10.8 million, it wouldn't affect my
3 opinion.
4 Q.  The 10.9's right; it just wasn't -- it
5 wasn't a cap on ERISA counsels' fees as you say it
6 was?
7 A.  And as the notice says it is.
8 Q.  Show me where in the notice it says that.
9 A.  Or in the statement of facts.  I didn't make
10 up the number 10.9 million.
11 Q.  No, but you did cite to the notice when you
12 say -- and you quote from it apparently here -- when
13 you say that the ERISA counsel fees were capped at
14 10.9.
15     I want you to show me where it says that
16 in the notice at page 9.
17 A.  Well, if it doesn't, it doesn't.  I will
18 look.
19     (Pause.)
20 A.  So no more than 10.9 million in fees can be
21 paid out of the ERISA settlement allocation.  Is
22 that -- am I missing something?
23 Q.  Apparently.  Because it doesn't say that the
24 ERISA counsels' fees would not exceed 10.9; it says

Page 201

1 the class fees would not exceed 10.9 out of the
2 ERISA portion of the class settlement.
3     MR. HEIMANN: Do you think that's funny,
4 Judge Rosen?
5     THE SPECIAL MASTER: I think it's --
6 I'll not respond.
7 A.  The opinion says recipients are told that
8 attorneys' fees for ERISA counsel will not exceed
9 10.9 million dollars.  And then it goes on to other
10 counsel.
11 Q.  That's your report.  I gotcha.
12 A.  Okay.  And that information -- I don't know
13 whether or not that information is in the statement
14 of facts or not.  We can look at that if we want.
15 On page 9 it says the ERISA settlement allocation --
16 sorry.
17     Because no more than 10.9 million in
18 fees can be paid out of the ERISA settlement.  So
19 your point is that -- and maybe you want to tell me
20 your point, but do I understand that your point is
21 that my opinion says that attorneys' fees for ERISA
22 counsel will not exceed 10.9 whereas the notice says
23 that no more than 10.9 can be paid out of the
24 settlement?

In Re:  State Street Attorneys Fees

Page 202

1 Q.   Out of the ERISA portion of the settlement.
2 **A.   Out of the ERISA settlement.  So your point**
3 **is that it could be more, but it can't come from**
4 **there.**
5 Q.   No.  My point is that it wasn't a lid on the
6 fees that would be paid to ERISA counsel; it was a
7 cap on what could be taken out of the ERISA portion
8 of the settlement for purposes of paying all
9 counsel, not just ERISA counsel.
10 **A.   For purposes of paying all counsel for the**
11 **ERISA recovery because counsel are being paid --**
12 Q.   Correct.
13 **A.   All right.**
14    **(Pause.)**
15 **A.   You know, I don't -- I take your point, but**
16 **I'm not quite sure what the consequence is.**
17 Q.   Well, that was my question.
18    My first question is why you would have
19 phrased this incorrectly in your report; and in
20 learning that it's incorrect, does it make any
21 difference to your opinion?
22 **A.   So it's incorrect -- just to be clear 'cause**
23 **we're getting very much into the weeds here --**
24 Q.   Well, it's weeds that have been pretty tall

Page 204

1 **percent issue, right?**
2 Q.   Exactly.
3 **A.   Right.  So now your question to me is since**
4 **the notice and the agreement allows ERISA counsel to**
5 **get more than 10.9 but for the side agreement, the**
6 **statement in the notice only limits it to 10.9 if**
7 **the money comes from the ERISA settlement.**
8    **To put it more bluntly, ERISA counsel**
9 **could look for more money but not from the ERISA**
10 **settlement.**
11    **Is that what you're telling me?**
12 Q.   I think to simplify this, the question
13 really is this:  The statement in your report that
14 ERISA counsel's fees could not exceed 10.9 million
15 dollars does not appear in the notice, the fact --
16 **A.   Okay.**
17 Q.   -- despite the fact you cite to the notice
18 for that proposition.
19 **A.   Right, okay.**
20 Q.   Does that make any difference in terms of
21 your opinions in this case?
22 **A.   No.**
23 Q.   Okay, thank you.
24 **A.   I guess we could have started there.**

Page 203

1 so far in this litigation --
2 **A.   Okay.**
3 Q.   -- and I know you don't recognize that --
4 **A.   All right.**
5 Q.   -- but others of us do.
6 **A.   Okay.  Recipients are told that attorneys'**
7 **fees for ERISA counsel will not exceed 10.9, and**
8 **your point is that that only refers to fees from the**
9 **ERISA settlement.**
10 Q.   Correct.
11 **A.   So that ERISA counsel could get more than**
12 **10.9, but that extra amount could not come from the**
13 **ERISA settlement.**
14 Q.   Correct.  Except, of course, that ERISA
15 counsel had already agreed to a set percentage out
16 of the total settlement amount to be paid to ERISA
17 counsel.
18 **A.   To be paid to?**
19 Q.   To ERISA counsel.
20 **A.   Counsel?**
21 Q.   ERISA counsel.
22 **A.   ERISA counsel?**
23 Q.   (Nods head.)
24 **A.   Yeah, okay.  Because that's the 9 percent/10**

Page 205



Page 206

Page 208

1  A.  No.

2  Q.  Okay.  If we could go to page 33 of your

3  report.  You with me?

4  A.  I am.

5  Q.  All right.  The term "the Chargois

6  Arrangement" appears towards the top in bold letters

7  here.

8  A.  Right.

9  Q.  The Chargois Arrangement was a defined term

10  according to the report, correct?

11  A.  It's a defined term.

12  Q.  And that's why it appears with a capital A

13  Chargois Arrangement to show that it's a defined

14  term?

15  A.  I don't know -- you could have a defined

16  term without a capital.  So I'm not sure if the

17  capital explains a defined term or vice versa.

18  Q.  In this instance you understand it's a

19  defined term as used in the report?

20  A.  That's what the report does.  A defined term

21  is a -- may be a term of art.  It may simply be a

22  shorthand, right.  So you might say -- let's say you

23  had the name Lieff Cabraser blah and blah, right?

24  Paren, quote, Lieff, closed quote.  It's not a

Page 207

Page 209

1  defined term; it's just a shorthand.

2      So whether or not it's a shorthand or a

3  defined term is open to question.

4  Q.  Well, in this instance the Chargois

5  Arrangement when it's used in the report has a

6  number of elements that are spelled out in the

7  report itself, does it not?

8  A.  Are you referring to something in

9  particular?

10  Q.  Sure.  I can walk you right through it.

11      So under the subheading the Chargois

12  Arrangement in caps in quotation marks, the

13  following appears -- the first sentence:  "As

14  consideration for Chargois' efforts Belfi and Keller

15  agreed to pay Chargois' firm, Chargois & Herron, a

16  maximum 20 percent of any attorneys' fees received

17  by Labaton in any litigation involving an

18  institutional investor for whom Chargois facilitated

19  the introduction including ATRS, hereinafter the

20  Chargois Arrangement."  Do you see that?

21  A.  Could I just read it to myself?

22  Q.  Of course.

23      (Pause.)

24  A.  Yes.

Page 210

1  Q.  The very next sentence goes on to further
2  define the Chargois Arrangement in these terms:
3  "Both Chargois and Belfi understood it was the mere
4  introduction to Chargois to potential institutional
5  investors or potential antitrust clients that was
6  the basis of the agreement to pay Chargois 20
7  percent of any legal fee Labaton earned on any cases
8  in which Labaton was lead counsel or co-lead counsel
9  and the client was lead or co-lead plaintiff."
10     So that's a second aspect of the
11  Chargois Arrangement, correct?
12  A.  Right.
13  Q.  It goes in the very next sentence to say
14  under this arrangement Chargois was not expected to
15  file an appearance.
16     So that's a third aspect of the Chargois
17  Arrangement, correct?
18  A.  Finish the sentence.
19  Q.  Well, I'm going -- I'm going to.  But the
20  third aspect is --
21  A.  Right.
22  Q.  -- not expected to file an appearance,
23  right?
24  A.  Yes.

Page 211

1  Q.  Or assume a substantive role in any of the
2  resulting litigation.  So that was another aspect of
3  the Chargois Arrangement, correct?
4  A.  Correct.
5  Q.  Or even interface with the client.  Yet
6  another aspect of the Chargois Arrangement, correct?
7  A.  I'm with you.
8  Q.  Okay.  And, by the way, although it's not
9  spelled out here, it's also your understanding that
10  in the case of the State Street case the Arkansas
11  Fund wasn't even aware of Chargois' existence let
12  alone his role, correct?
13     MS. LUKEY: Objection.
14  A.  That's correct.
15  Q.  And as a corollary of the other aspects of
16  the arrangement here about not expected to file an
17  appearance or play any substantive role, it would
18  follow as part of the Chargois Arrangement that
19  there was no expectation that Chargois would
20  participate in any meaningful way to the outcome of
21  the case or to the benefit of the class, correct?
22  A.  It would not -- the firm would not
23  participate in any meaningful way in the outcome of
24  the case or to the benefit of the class, right.

Page 212

1  That's correct.
2  Q.  And that's your understanding again of the
3  Chargois Arrangement as it's used in your report?
4  A.  Correct.
5  Q.  All right.  And if we could go just to -- I
6  want to add one other aspect to the Chargois
7  Arrangement as you use that term.  And that's at
8  page 76.
9  A.  The statement of facts uses that term.
10  Q.  And so do you in your opinion portion,
11  right?
12  A.  That's right, I use -- I didn't -- I don't
13  think I created it but...
14  Q.  I agree.
15     We're just looking at the statement of
16  fact section, but now there's one other aspect of
17  the Chargois Arrangement that does appear in your
18  section of the report that I want to point out to
19  you, and that's at page 76 --
20  A.  Hm hm.
21  Q.  -- towards the bottom of the page --
22  A.  Right.
23  Q.  -- where you write recipients of the notice
24  were not told about the Chargois Arrangement,

Page 213

1  although this information that a lawyer who did no
2  work to produce the class recovery and who accepted
3  no legal responsibility for the work of others --
4  let me stop there.
5     So that's another aspect of the Chargois
6  Arrangement as you use the term, a lawyer who
7  accepted no legal responsibility for the work on the
8  case.
9  A.  I think that's already been covered.
10  Q.  In other terms -- in other terms meaning --
11  A.  Yes, in other terms.
12  Q.  All right, sir.
13     Now in your section of the report you
14  use the Chargois Arrangement any number of times.
15  In fact, by my count, over 30 times in your section
16  of the report that phrase or that term appears.
17  Right?
18  A.  I take -- I will accept your number.
19  Q.  All right.  And you used it -- when you used
20  it, you meant to use it as it is defined as
21  described in the factual section of the report and
22  in your section of the report?
23  A.  I did, and maybe I used it that way all 30
24  times, but I'm not excluding the possibility of a

Page 214

1  **different syntax one or two of the times.**
2  Q.  Well, let's see.  So let's go to page 54 of
3  your report.
4  **A.  Okay.**
5  Q.  And let's focus on the issues or questions
6  that you presented in answer.
7  **A.  Right.**
8  Q.  So first Roman numeral two --
9  **A.  Right.**
10  Q.  -- you say -- the question is was the
11  arrangement with Chargois, paren, the Chargois,
12  capital, arrangement, closed quotation marks and
13  closed paren, a valid division of a fee agreement
14  under Massachusetts law.  And you answer that no.
15  Right?
16  **A.  Right.**
17  Q.  So there you're using the Chargois
18  Arrangement as it's been gone through, right?
19  **A.  That's right.**
20  Q.  Question Roman three, did class counsel have
21  a duty to inform the Court of the Chargois
22  Arrangement, whether or not the Chargois Arrangement
23  was a valid division of fee agreement.  Do you see
24  that?

Page 215

1  **A.  Yes, I do.**
2  Q.  And, again, you're using the Chargois
3  Arrangement as we've just gone through it, right?
4  **A.  Right.**
5  Q.  And your answer to that question is, yes,
6  federal case law and the Massachusetts Rules of
7  Professional Conduct both required class counsel to
8  inform the Court of the Chargois Arrangement.
9  Correct?
10  **A.  Correct.**
11  Q.  And you're using it again in the way we've
12  been describing -- it's been described here?
13  **A.  Yes.**
14  Q.  Roman numeral four, did class counsel have a
15  duty to inform the certified settlement class of the
16  Chargois Arrangement whether or not it was a valid
17  division of fee agreement.  Correct?
18  **A.  Yes.**
19  Q.  Again you're using the Chargois Arrangement
20  as we've described, correct?
21  **A.  Yes.**
22  Q.  And, finally, your answer to that question
23  is, yes, their fiduciary duty and the Massachusetts
24  Rules of Professional Conduct required class counsel

Page 216

1  to inform the certified settlement class of the
2  Chargois Arrangement.  See that?
3  **A.  Yes.**
4  Q.  And again you're using it as it was
5  described, the Chargois Arrangement, right?
6  **A.  Yes.  Yes.**
7  Q.  All right, sir.
8      Is your opinion that class counsel
9  were ethically required to disclose the allocation
10  of fees or fee-splitting agreements among the
11  plaintiffs' counsel of record to the Court?
12  **A.  No.**
13  Q.  Is it your opinion that they were not
14  required ethically to disclose those fee
15  arrangements or fee split agreements?
16  **A.  It is my opinion they were not required to,**
17  **yes.**
18  Q.  All right.  Same questions with respect to
19  disclosure to the class.
20      Is it your opinion that class counsel
21  were required to disclose the fee arrangements or
22  fee splits among plaintiffs' counsel of record to
23  the class in the notice?
24  **A.  No.**

Page 217

1  Q.  So you have an affirmative opinion they were
2  not obliged ethically to disclose that, correct?
3  **A.  Correct.**
4  Q.  All right.  What is the difference, sir,
5  between the disclosure to the Court or -- strike
6  that.
7      What is the difference between your
8  opinion that the counsel were not required to
9  disclose to the Court those fee arrangements or fee
10  splits, but they were required to disclose the
11  Chargois Arrangement to the Court?  What's the
12  difference?
13  **A.  To the Court, not to the class.**
14  Q.  I'll come to the class in a minute.  First
15  starting with the Court.
16  **A.  The difference is that the Court knew who**
17  **class counsel were, and I would assume they have a**
18  **division of fee agreement or would in any event**
19  **eventually.  And because the Court knew the identity**
20  **of class counsel, it could, if it wished, ask to be**
21  **told what the division of fee agreement is among**
22  **counsel, or it could simply defer to whatever**
23  **private agreement it reached.**
24      **But nothing in the record -- nothing**

Page 218



Page 220

1　was local counsel, had performed valuable work for
2　the case, work that was commensurate in terms of the
3　benefit conferred on the class with the amount being
4　paid to him, and therefore the only thing the Court
5　didn't know about the Chargois participation was the
6　existence of the fact that he was going to get a
7　fair and reasonable portion of the fee.
8　　　Is it still your opinion that counsel
9　violated their ethical obligations in failing to
10　disclose Chargois' existence to the Court?
11　A.　My -- so just to be clear what the -- what
12　　the assumptions are.  Counsel have a basis to
13　　believe -- reasonably believe that Chargois has
14　　performed -- I think you used the word
15　　"substantial" --
16　Q.　Valuable would be as good a term, but that's
17　fine.  Valuable services.
18　A.　 -- valuable services to the class --
19　Q.　And to -- and to the class representative,
20　Arkansas.
21　A.　And therefore to the class.
22　Q.　(Nods head.)
23　A.　And that counsel have a reasonable basis to
24　　believe -- and presumably do believe -- that these

Page 219

1　　known to the Court.
2　Q.　Have you finished?
3　A.　Yes.
4　Q.　So I gather the key is that Chargois wasn't
5　　counsel of record in terms of your opinion that
6　　there's a difference between the duty on the part of
7　　counsel to disclose him as opposed to disclosing fee
8　　splits or fee arrangements among counsel of report;
9　　is that right?
10　A.　No, it's not right.
11　Q.　What's wrong with that?
12　A.　Counsel of record is not the trigger; that
13　　is, the Court could have learned about Chargois
14　　other than by having him be counsel of record.  It's
15　　not the only way to bring his existence to the
16　　attention of the Court.
17　Q.　The key then is the fact that the identity
18　　of this person was not made known to the Court; that
19　　makes the difference in your mind?
20　A.　That's right.
21　Q.　All right.
22　　　So let's assume that contrary to the
23　　Chargois Arrangement which you're using, there
24　　wasn't any Chargois Arrangement.  In fact, Chargois

Page 221

1　valuable services are -- justify the fee that by
2　August or September they know that they will be
3　seeking for all counsel, and they also know the
4　portion that will go to Chargois, 4.1 million
5　dollars as it turns out --
6　Q.　Five percent more or less?
7　A.　Sorry?
8　Q.　Five percent more or less.
9　A.　Five point five percent of the counsel fees,
10　　4.1 million dollars I think, right?
11　Q.　As it turned out.
12　A.　As it turned out.  But we knew what ballpark
13　　we were in, even if we didn't know the digit in the
14　　third column, right?
15　Q.　Fair enough.
16　A.　All right.
17　Q.　And let me go on.  And that Arkansas was
18　　fully aware of the existence of the lawyer, had
19　　approved of the lawyer, had consented in writing to
20　　the lawyer, all that requires that is otherwise the
21　　facts as we now know them, but I'm asking you to
22　　assume otherwise.
23　A.　Okay.  And I'm going to assume one thing
24　　more which I think you want me to assume, and that

Page 222

1   is that what customer class counsel knew about
2   Chargois' work for the benefit of the class
3   justified a fee in the neighborhood of four million
4   dollars as not clearly excessive within the meaning
5   of Rule 1.5(a).
6   Q.   Correct.
7   A.   Fine.  If all that is true, then I -- then
8   my opinion is not that there was a need to disclose
9   it.
10      THE SPECIAL MASTER: Is "not" -- that
11   there was not a need to disclose it?
12      THE WITNESS: Not a need to disclose it.
13      MR. HEIMANN: Can we take five minutes?
14      THE SPECIAL MASTER: (Nods head.)
15      (A recess was taken.)
16      PHONE LINE CONFERENCE: The following
17   participant has joined the conference:  Lynn Sarko
18   rejoining.
19      MR. SINNOTT: Lynn, we're on a really
20   quick break.
21      (A recess was taken.)
22      CONTINUED EXAMINATION BY MR. HEIMANN:
23   Q.   Professor, could you go now to page 78 of
24   your opinion?  Or your report.  I'm sorry.



Page 238



Page 240

1   A.  Yes, we've been through that.
2   Q.  All right.  And, of course, that the client
3   was fully aware of Chargois and the work that he did
4   and the value of the work that he did to the case --
5   to the class and to the Arkansas firm itself?
6   A.  I have the same opinion.
7   Q.  At page 67 of your report at the bottom of
8   the page you write:  "The Court itself dispelled any
9   uncertainty about what it expected just before
10   approving lead counsel's fee request in full, the
11   Court said, 'I'm relying heavily on the submissions
12   and what's been said today.'"
13      Do you see that?
14  A.  I do.
15  Q.  Is the fact that the Court said that at that
16  hearing important --
17  A.  Yes.
18  Q.  -- to your opinion?
19  A.  Yes.
20  Q.  Why?
21  A.  Because the Court signaled to the lawyers in
22  the room that he was relying heavily on the
23  submissions and what's been said here today, that
24  this was important to the Court.

Page 239

1   A.  Right.
2   Q.  And I'm saying to you assume that based on
3   long experience, 25, 40 years in Mr. Lieff's case --
4      MR. LIEFF:  Fifty.
5   Q.  -- 5 percent to a local counsel under these
6   types of circumstances is not at all unusual?
7   A.  Even if he does no work?
8   Q.  Even if he does no work.
9   A.  Right.  So I'm saying that even in that
10  instance where the lawyers have no reason to believe
11  he's doing work -- he's doing no work, that the
12  judge should be informed.
13  Q.  And is it your opinion that these lawyers
14  here violated their ethical obligations when they
15  didn't tell the judge about Mr. Chargois under those
16  circumstances?
17  A.  It is my opinion that their duty to the
18  client and the Court required them to disclose to
19  the client and the Court the Chargois fee
20  arrangement of which they knew assuming Chargois was
21  doing no work.
22  Q.  All right.  And if they thought, as they had
23  been told, that Chargois had done valuable work,
24  does that change your opinion?

Page 241

Page 246



Page 248

```
 1        Let me ask you to assume the following
 2   about the Lieff Cabraser lawyers and what they
 3   understood or believed about Mr. Chargois and the
 4   role that he played in the State Street litigation.
 5        One, the Lieff Cabraser lawyers
 6   understood that Chargois served as legitimate local
 7   counsel to the Arkansas Teachers Fund.
 8   A.  Hold on.  I'm going to --
 9   Q.  I'll give you plenty of time.
10        MS. LUKEY: Are you doing a whole series
11   so I can object once, or do I have to object each
12   time you say it?
13        MR. HEIMANN: You can have a standing
14   objection to everything I say.
15        THE SPECIAL MASTER: You can have a
16   standing objection.
17        BY MR. HEIMANN:
18   Q.  Lieff Cabraser understood that Chargois was
19   the legitimate bona fide local counsel to the
20   Arkansas Fund.
21   A.  Okay.
22   Q.  That he served as such with the express
23   knowledge and written approval of the Arkansas Fund.
24        (Pause.)
```

Page 247

Page 249

```
 1   A.  Okay.
 2   Q.  That he provided valuable legal services to
 3   the fund and to the class in his role as local
 4   counsel.
 5   A.  On this case?
 6   Q.  On this case, yes, specifically.
 7   A.  Okay.
 8   Q.  That both Labaton as lead counsel and the
 9   Arkansas Fund as the lead class representative
10   regarded the fees to be paid to Chargois as fair and
11   reasonable and consistent with the value that
12   Chargois' services provided to the class and to the
13   benefits obtained on behalf of the class.
14   A.  And consistent?
15   Q.  With the value of his services and the value
16   of those services to the class and to the benefits
17   obtained for the class.
18   A.  Okay.
19   Q.  Now based on those assumptions --
20   A.  Right.
21   Q.  -- is it your opinion that the Lieff
22   Cabraser lawyers violated their fiduciary or ethical
23   obligations in failing to proactively disclose to
24   the Court what they knew about Mr. Chargois?
```

Page 250

1   THE SPECIAL MASTER: May I just -- do we
2 have the deposition of Mr. Lieff available here?
3   MR. HEIMANN: The transcript?
4   THE SPECIAL MASTER: Correct.
5   MR. HEIMANN: I don't.
6   MS. McEVOY: I do.
7   THE SPECIAL MASTER: There was -- I
8 believe it might be helpful for Professor Gillers in
9 answering your question to know what Mr. Lieff's
10 view of "local counsel" was.
11   I believe I specifically asked him that,
12 and he gave a view. Because, as everybody will
13 remember, there was a lot of loose reference to
14 terms to identify Mr. Chargois. We had at least
15 five or six different terms --
16   MR. HEIMANN: Yeah, but those were not
17 terms that were related to us.
18   THE SPECIAL MASTER: I understand that
19 which is why I'm asking to find -- Mr. Lieff did
20 give his understanding of what local counsel meant
21 in his deposition, I believe.
22   MS. McEVOY: You just want those pages
23 are --
24   MR. HEIMANN: Well, I think there's a

Page 251

1 reference to it in the report that we've already
2 covered.
3   MR. LIEFF: I think you read it,
4 Richard. I'll try to find it.
5   THE SPECIAL MASTER: I may have asked
6 him if he understood now -- what I may have asked
7 him is understanding now what Mr. Chargois' role was
8 was that local counsel -- that may have been what I
9 may have asked him, and I thought he gave an answer
10 illumination on what thought local counsel was.
11   MR. HEIMANN: Well, and I don't have any
12 problem if we can dig it out, but I think the way I
13 characterized it is consistent with the testimony of
14 Mr. Lieff and Mr. Chiplock and is consistent with
15 what the written record reflects about what they
16 were told about Mr. Chargois.
17   MS. LUKEY: Objection.
18   THE SPECIAL MASTER: Let me just refresh
19 myself, okay?
20   MR. HEIMANN: Sure.
21   THE SPECIAL MASTER: Because the
22 definition that everybody is referring to for
23 purposes of your question, Richard, might be helpful
24 to Professor Gillers in determining --

Page 252

1   MR. HEIMANN: Well, it may be, but I'm
2 not limiting the Lieff Cabraser understanding of
3 Mr. Chargois to what -- to a snippet of what
4 Mr. Lieff may have said about that subject.
5   You have Mr. Chiplock testifying about
6 it. You have me testifying about it. You've got
7 Mr. Fineman testifying about it, among others.
8   (Pause.)
9   MR. LIEFF: Page 67 of the deposition.
10   MS. LUKEY: The deposition or in the
11 report?
12   MR. LIEFF: In the deposition 67. In
13 the report 44.
14   MS. LUKEY: Thank you.
15   (Pause.)
16   THE SPECIAL MASTER: There are a number
17 of times in the deposition when Mr. Lieff refers to
18 his understanding of local counsel, one of which is
19 when I asked him what was your understanding of what
20 the relationship between Mr. Chargois and Labaton,
21 Mr. Lieff said, "I thought he was local counsel for
22 Labaton in this particular case I assumed dealing
23 with Arkansas Fund because that's what local counsel
24 will do. That was my understanding."

Page 253

1   MR. HEIMANN: That's what I read earlier
2 in the examination.
3   MR. LIEFF: Yes.
4   MR. HEIMANN: I know this is in the
5 nature of argument so I don't want to go down this
6 road too far, but we have testimony from a number of
7 people about local counsel and the practice of local
8 counsel --
9   THE SPECIAL MASTER: We do.
10   BY MR. HEIMANN:
11 Q. I want to stick to the hypothetical that I
12 gave to you --
13 A. Fine.
14 Q. -- Professor Gillers.
15 A. So can I ask a clarification on the
16 hypothetical?
17 Q. Of course.
18 A. In the first assumption began "Lieff
19 understood that Chargois was." Right? Could we add
20 Lieff had a reasonable good faith understanding that
21 Chargois was?
22 Q. You may augment all of my proposed
23 assumptions with that clarifier.
24 A. Okay. And then ask me the final question

Page 254

1   again.
2   Q.   In your opinion under those circumstances
3   did the Lieff Cabraser lawyers violate their ethical
4   duties in the way that they dealt with the Court,
5   first of all?
6        MS. LUKEY: Objection.
7        (Pause.)
8   A.   Just to be clear, each of the assumptions is
9   made with regard to the State Street litigation?
10  Q.   Yes indeed.
11  A.   Yes.  So the answer is no.
12  Q.   Same question with respect to the Lieff
13  Cabraser lawyers' ethical obligation with respect to
14  disclosure in the notice to the class?
15  A.   No.
16       MS. LUKEY: Objection.
17       MR. HEIMANN: I have nothing further.
18  Thank you.
19       THE SPECIAL MASTER: Brian, I think
20  you're next up.  Anybody want to break first?
21  Paulette, I'm looking at you.
22       THE REPORTER: Just for a minute, that
23  would be great.
24       (A recess was taken.)





Page 266

Page 268

Page 267

Page 269

1      You yourself don't personally know
2   whether or not Garrett Bradley knowingly made any
3   false representations, do you?
4   **A.   That's correct.**
5   Q.   Okay.  And a careless mistake does not equal
6    a knowing misrepresentation to a Court, does it?
7   **A.   It does not.**
8   Q.   And you've been quoted as saying -- and I
9    think it's in one of these exhibits we've already
10   seen -- "As law teachers we should not testify that
11   a lawyer's conduct did or did not transgress ethical
12   rules, unless we firmly believe that our opinion is
13   correct."
14   **A.   Are you quoting?**
15   Q.   I'm quoting from you, Stephen Gillers, "More
16    About Us:  Another Take on the Abusive Use of Legal
17    Ethics Rules."
18   **A.   I accept your quote.**
19   Q.   Okay.  So you have not concluded anything
20    about Garrett Bradley's mental state.
21      You're only relying upon an assumption
22   that was provided to you?
23   **A.   Correct.**
24   Q.   All right.  So at the end of this report on



Page 270

Page 272

1   Q.   -- from that case back in 2012.

2   **A.   Right.**

3   Q.   So --

4   **A.   So the mens rea in the New York version of**

5   **3.3(a) and (b) and (d) is knowledge.**

6   Q.   Right.  And that means actual knowledge.

7   It's a subjective test?

8   **A.   That's right.**

9   Q.   And that's what the equivalent of what the

10   Mass. Rules are, correct?

11   **A.   Yes.**

12   Q.   So in order for somebody to violate that,

13   that person himself or herself has to know in his

14   own mind at the time he was doing something that he

15   was submitting false information to the Court?

16   **A.   He has to know that the information**

17   **submitted is false, right.**

18   Q.   So you agree then that a person's state of

19   mind is crucial to determining whether an attorney

20   is violating Rule 3.3?

21   **A.   Yes.**

22   Q.   And you've commented in the past that this

23   state of mind is very difficult to determine from a

24   paper record, right?

Page 271

Page 273

Page 274



Page 276

1   information provided to the Court for the exercise
2   of its discretion is true.
3   **A.  Yes.**
4   Q.  I assume what you're referring to is Rule
5   11?  Is that a fair assumption?
6   **A.  It says Rule 11.**
7   Q.  Okay.  So I guess then that's a pretty fair
8   assumption?
9   **A.  Yes, it is.**
10  Q.  All right.  So now you'd agree, sir, that
11  not every mistake a lawyer makes should be subject
12  to a Rule 11 sanction, correct?
13  **A.  Yes, I agree.  Yes.**
14  Q.  All right.  And are you aware that the first
15  circuit has in fact reversed a Rule 11 finding, even
16  though there were factually inaccurate and dubious
17  statements in an affidavit in a case that was
18  published in 2005 called Obert, O-B-E-R-T?
19  **A.  No.**
20  Q.  Are you aware of that case?
21  **A.  I'm not.  I haven't heard of that case.**
22  Q.  Okay, I'll just cite it.  398 F.3d 138,
23  again the first circuit 2005, where the first
24  circuit reversed a Rule 11 finding, even though

Page 275

1     **You're talking about under any**
2   **circumstances whatsoever.  So I'm not prepared to**
3   **say yes.  I would say ordinarily that would be yes,**
4   **but there are rules in the rules that actually don't**
5   **have a mens rea requirement.**
6   Q.  All right.  Let's go to Rule 8.4.  You cite
7   that as well in your opinion.
8   **A.  Right.**
9   Q.  Is the same mental state in your view
10  required for a violation of Rule 8.4; that is,
11  actual knowledge, and it's a subjective test?
12  **A.  The authorities are divided on that, and in**
13  **my view there should be actual knowledge of the**
14  **inaccuracy of the wrongness of a statement of fact**
15  **going forward.**
16  Q.  All right.  In your view this particular
17  Rule 8.4 should not be read to expand or lower Rule
18  3.3's mens rea requirement --
19  **A.  Right.**
20  Q.  -- right?
21  **A.  Correct.**
22  Q.  All right.  Now also on page 84 at the end
23  of your report you make a reference to federal law
24  separately requiring reasonable care to ensure the

Page 277





Page 362

Page 364

1   counsel may be paid for having referred the case to
2   Labaton or for having recommended Labaton alone.
3   Q.   Is it sufficient to alert Arkansas that
4   other counsel may be paid for doing no work on the
5   case?
6       **MS. LUKEY:** Objection.
7   **A.   It does not -- it does not do that.**
8   Q.   My next question involves your testimony
9   about Rule 1.5(e), and I just want to read the first
10  sentence of it and get your understanding.
11      "A division of a fee between lawyers who
12  are not in the same firm may be made only if the
13  client is notified before or at the time the client
14  enters into a fee agreement for the matter that a
15  division of fees will be made and consents to the
16  joint participation in writing and the total fee is
17  reasonable."
18      My question to you is the conjunctive
19  piece of that at the end -- "and the total fee is
20  reasonable" -- does that read into the rule a
21  reasonableness requirement of the total fee relating
22  to the division of fees or something else?
23      **MS. LUKEY:** Objection.
24  **A.   I think it says that the total fee of the**

Page 363

Page 365

1   **lawyers who are dividing the fee has to be**
2   **reasonable, and that is simply an echo, I suppose,**
3   **of Rule 1.5(a) which says fees cannot be clearly**
4   **excessive.  Any one lawyer's fee cannot be clearly**
5   **excessive.**
6       **So to answer your question, the total --**
7   **the word "total" means when you add both lawyers'**
8   **fees together, it cannot be unreasonable for the**
9   **work performed.  And if you want to look at any**
10  **single lawyer's fee vis-a-vis that lawyer's work to**
11  **determine whether it is a valid fee, you go to Rule**
12  **1.5(a).**
13  Q.   So the piece of the total fee covered by a
14  division of fee and the reasonableness read into the
15  rule is read not in one 1.5(e) but in 1.5(a)?  Is
16  that your understanding?
17      **MS. LUKEY:** Objection.
18  **A.   1.5(a) concerns any single lawyer or law**
19  **firm's fee.  1.5(e) may result in two lawyers**
20  **working on a matter.**
21      **There are two requirements.  One is that**
22  **their fee -- the fee of both of them when added**
23  **together has to be reasonable for that matter.**
24      **The second requirement is that the fee**

Page 366

1  for each of them has to satisfy the "not clearly
2  unreasonable" requirement at 1.5(a) -- "clearly
3  excessive" requirement of 1.5(a).
4  Q.  So which of those rules, if either, as to
5  the reasonableness or not clearly excessiveness
6  would apply to Mr. Chargois -- the Chargois
7  Arrangement, if either of them?
8  A.  They both do.  Rule 1.5(e) applies to the
9  Chargois Arrangement if there were a valid division
10  of fee agreement, and then you look at the total
11  fee.  Now --
12  Q.  And I think you testified that -- so the
13  total fee, would that be the total 75 million
14  dollars in this case?
15  A.  That's right.
16  Q.  And I think you testified in response to a
17  number of questions that that total fee itself was
18  not unreasonable based upon what you knew?
19  A.  Right.  Actually, the total fee -- since
20  some of that 75 million dollars went to other than
21  class counsel, the total is probably less than 75
22  million.
23      So that -- that will be an application
24  of Rule 1.5(e).  And then separately you would look

Page 367

1  at 1.5(a) for any individual lawyer.
2  Q.  So are you saying then that Rule 1.5(a) and
3  the requirement that there not be an excessive -- a
4  clearly excessive fee applies to the Chargois
5  Arrangement and the payment under that arrangement
6  to Mr. Chargois of 4.1 million dollars?
7      MS. LUKEY:  Objection.
8  A.  Yes, because you don't -- you don't escape
9  the constraints of 1.5(a) by bundling multiple
10  lawyers into a division of fee agreement, even if
11  the total is not unreasonable.
12  Q.  Okay.  I think I understand your opinion and
13  your testimony.
14  A.  You will when you read it.
15  Q.  All right.  I think I understand it.  But
16  let me try to summarize it --
17  A.  You want an example?
18  Q.  Sure.
19  A.  Okay.  So Jane and June have a valid
20  division of fee agreement under Rule 1.5(e) in
21  Massachusetts.  Together they're going to get a
22  hundred dollars for their work.  A hundred dollars
23  is a reasonable amount for that work.
24      1.5(e) is satisfied.

Page 368

1      However, Jane is going -- Jane who did 4
2  percent of the work is going to get 95 percent of
3  the fee.  And so she has to satisfy Rule 1.5(a)
4  prohibition against clearly excessive fees.
5  Q.  Okay.  So I'm going to take it piece by
6  piece just to make sure I understand it and
7  everybody understands your opinion.
8  A.  Okay.
9  Q.  Rule 1.5(a) and Rule 1.5(e) should be read
10  in tandem?
11  A.  Absolutely.
12  Q.  And the reasonableness of the fee in Rule
13  1.5(e) applies to the total fee; is that right?
14  A.  Yes.
15  Q.  And in looking at individual fees within the
16  total fee, we look to 1.5(a) to determine if that
17  fee is clearly excessive?
18  A.  Correct.
19  Q.  And then 1.5(a) sets out eight different
20  factors for a factfinder or a judge or, I suppose a
21  special master, to look at to determine if the fee
22  in question is excessive?
23  A.  That's right.  There's a list of factors
24  that's been around for a very long time that inform

Page 369

1  the standard of clearly excessive.
2      Clearly excessive is a term in 1.5(a)
3  that varies from jurisdiction to jurisdiction.  Some
4  say reasonable or excessive without "clearly."
5  Q.  Okay.  I'm going to ask you the obvious
6  question that I think the lawyers will want to ask
7  you, and I'm building here upon Mr. Heimann's
8  questions that it is standard practice in the class
9  action field --
10      THE SPECIAL MASTER:  I'm not sure,
11  Richard, if you qualified it further by saying
12  securities litigation.  I'll accept that if you
13  want.
14  Q.  -- for lawyers to receive so-called referral
15  fees of as much as 20 percent for not doing any
16  work.
17      Does that call into question in any way
18  whether or not Rule 1.5(a) is implicated where it's
19  a class action and the fees are coming from the
20  common fund?
21  A.  Standard practice cannot change the meaning
22  of a rule.  So it doesn't call into question 1.5(a).
23  Q.  I'm not sure I understood your answer --
24  A.  You asked --

In Re: State Street Attorneys Fees

**Professor Stephen Gillers**
**March 20, 2018**



Page 370

1  Q.   Well, let me -- are you saying just because
2  it might be standard practice doesn't mean that
3  1.5(a) and a potential violation is not implicated?
4  Is that what you're stating?
5  **A.   Yes, that's what I'm saying.**
6  Q.   Putting it another way, if Mr. Heimann is
7  correct and this is standard practice for a 20
8  percent fee to be paid to a lawyer who did no work
9  as a "referral fee," what would your opinion be as
10  to whether or not that implicates the prohibitions
11  on rule -- in Rule 1.5(a) and clearly excessive
12  fees?
13  **A.   Given the amounts involved in successful**
14  **class actions resulting in Court-awarded fees, it's**
15  **hard to imagine that a judge would conclude that a**
16  **sizable fee for -- for me a referral or**
17  **recommendation would not be clearly excessive.**
18  **     But we would need the facts of the case.**
19  Q.   Would a judge be able to make that
20  determination if it was not disclosed to him or her?
21  **     MS. LUKEY:** Objection.
22  **A.   Um, well, of course, you cannot -- you**
23  **cannot adjudicate an issue that you do not know**
24  **about.  So the answer is no.**

Page 371

1

Page 372

1

Page 373

1

21
22
23
24