# EX. 125
# Expanded

**Damon Chargois**

Volume:  1

Pages:  1-330


JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW


------------------------------------

In Re:  STATE STREET ATTORNEYS FEES

------------------------------------




BEFORE: Special Master Honorable Gerald Rosen,

        United States District Court, Retired




DEPOSITION of DAMON J. CHARGOIS

October 2, 2017, 9:16 a.m.-5:01 p.m.

JAMS

One Beacon Street

Boston, Massachusetts




Court Reporter:  Paulette Cook, RPR/RMR



Page 14

Page 16

Page 15

Page 17

1  that?
2     **THE WITNESS:** Either end of 2006 or
3  beginning of 2007.  Somewhere around there.
4     **BY MR. SINNOTT:**
5  Q.  So what happened after you learned about
6  Labaton's desire to make contact with you?
7  **A.  A lawyer in our office, Kamran Mashayekh,**
8  **put us together -- not sure -- basically he had**
9  **spoken to them before me.**
10     **Then Eric Belfi I believe called me**
11  **directly and asked if I'd be interested in working**
12  **on a case called HCC Holdings that was on file in**
13  **Houston.**
14     **I asked tell me a little bit about it**
15  **and what you would expect of me, and he said**
16  **essentially filing documents, and you may have to**
17  **sign off on a pro hac vice for any lawyers that are**
18  **not authorized to appear in the case.**
19  Q.  All right.  Were you asked, in effect, to be
20  local counsel --
21  **A.  Yes, sir.**
22  Q.  -- for Labaton?  Okay.
23     Was that the expression that Labaton
24  used in hiring you?

Page 18

1　A.　I believe so in that case, yeah.
2　Q.　All right.  So describe what the HCC
3　Holdings case was about and what you did on behalf
4　of Labaton.
5　A.　It was a securities fraud type of case on
6　the civil side.  Don't know much more substance than
7　that.
8　　　And what I did was appear at one or two
9　hearings with them.  I believe -- I believe on that
10　case I sponsored at least one of their lawyers to
11　appear in court.
12　Q.　Pro hac vice?
13　A.　Sorry.  Pro hac vice.
14　Q.　Okay.
15　A.　And at the appropriate time I believe I
16　attended the mediation.  I may be missing a couple
17　of things but nothing of substance on the case.
18　Q.　Okay.  And was the case resolved at some
19　point?
20　A.　Yes, sir.
21　Q.　And how was it resolved?
22　A.　Settlement.
23　Q.　And what was your participation in that?
24　　　Did you have a role in that, or was that

Page 19

1　handled by Labaton's attorneys?
2　A.　It was handled by Labaton attorneys.
3　Q.　And did you assist in some fashion?
4　A.　No.
5　Q.　Okay.  So it was handled exclusively by
6　Labaton?
7　A.　Yes, sir.
8　Q.　All right.  And in the course of working on
9　behalf of Labaton in the HCC Holdings case, in
10　addition to Eric Belfi, did you meet any other
11　attorneys?
12　A.　Yes, sir.
13　Q.　Who did you meet?
14　A.　Chris Keller.
15　Q.　All right.  And when did you meet Chris
16　Keller?  At what stage in the proceedings?
17　A.　I met him first -- I was -- I believe the
18　order of it is I met him either as we were
19　discussing serving as local counsel somewhere around
20　that time early on, but I believe I first met him
21　when he and Eric Belfi came down, and I went up, and
22　we met in Arkansas.
23　Q.　Okay.  So your recollection is that you met
24　Belfi and Keller together in Little Rock?

Page 20

1　A.　Yes, sir.
2　Q.　And when you met them in Little Rock, what
3　did they ask you to do?
4　A.　They were interested in having a connection
5　to Arkansas and to Little Rock and making inroads,
6　and they asked me to help them make introductions.
7　Q.　Okay.  And when you say they asked you to
8　make introductions, what type of persons did they
9　want to meet?
10　A.　Eric explained to me that he -- part of his
11　job at Labaton was networking and client development
12　or cultivation -- I don't remember the word but
13　something along those lines, and that they did not
14　have a presence in Little Rock and that we did and
15　that if we could help introduce them to
16　institutional investors or folks that could help
17　them get introductions to institutional investors.
18　Q.　And what was the basis of your knowledge of
19　institutional investors?
20　A.　I had none.
21　　　THE SPECIAL MASTER:  Again, if you could
22　just give us a timeframe.
23　　　THE WITNESS:  Around the same timeframe.
24　Early 2007.

Page 21

Damon Chargois
October 02, 2017



Page 27

```
 1  investors?
 2  A.  I asked people that I knew if they knew what
 3    an institutional investor was and, if so, if they
 4    knew anyone that I could talk to.
 5  Q.  So you were starting from scratch?  Is that
 6    a fair statement?
 7  A.  That's a fair statement.
 8  Q.  Okay.
 9      THE SPECIAL MASTER: Did you have a
10  partner in Arkansas?
11      THE WITNESS: I did.
12      THE SPECIAL MASTER: And that was?
13      THE WITNESS: Tim Herron.
14      THE SPECIAL MASTER: Tim Herron.
15      THE WITNESS: (Nods head.)
16      THE SPECIAL MASTER: Did Mr. Herron have
17  relationships with institutional investors at the
18  time?
19      THE WITNESS: No, sir.
20      THE SPECIAL MASTER: Was it just the two
21  of you that were affiliated in the Little Rock
22  office then?
23      THE WITNESS: Yes, sir.
24      THE SPECIAL MASTER: Okay.
```

Page 30



Page 32

```
 1   had any information or knew anyone that we could
 2   talk to.
 3      And Eric Belfi indicated that they also
 4   wanted to engage a local law firm to help them to
 5   establish a foothold, a presence in the community so
 6   that it's just -- I guess it gives a better
 7   impression than if they're some -- with all due
 8   respect, some guys that are beasts --
 9      THE SPECIAL MASTER: New York firm.
10 A.   -- just trying to get business, and they
11   don't care about what's going on.
12      So we opened up doors and introduced
13   them to anyone we knew, sure.
14 Q.   Okay.  And had the Labaton attorneys given
15   you an idea of exactly the profile of persons or
16   plans that they wanted to gain an introduction to?
17      THE SPECIAL MASTER: Or types of cases.
18      THE WITNESS: Yes, sir.
19 A.   They were interested in getting
20   introductions to institutional investors with the
21   goal of monitoring their portfolios.  They had to
22   explain to me what that meant.
23      Once they explained to me what it meant,
24   that's what I did.
```

Page 31

```
 1 A.   Relatively new.  I hate to say new because
 2   the hormone replacement therapy litigation was very
 3   active.  I was there every month, and it was very,
 4   very involved.
 5 Q.   Okay.  And was Labaton involved in that at
 6   all?
 7 A.   No, sir.
 8 Q.   Were any other firms involved or was that
 9   something that your own firm was handling?
10 A.   It was my own firm.  Our original cases.
11 Q.   And was it a successful practice?
12 A.   Ultimately, no.  We couldn't afford them.
13   So we ended up having to refer them out and close
14   our Little Rock firm.
15 Q.   Okay.  And when did you ultimately close the
16   Little Rock firm?
17 A.   That was around 2010 or end of 2009.
18 Q.   Now what did you do in order to assist Belfi
19   and Keller in meeting institutional investors?
20      Tell us what your approach was to this
21   and what you actually did.
22 A.   Tim and I reached out to friends or
23   associates, people that we knew, told them why we
24   were reaching out to them and asking them if they
```

Page 33

```
 1 Q.   Okay.
 2      THE SPECIAL MASTER: Was that
 3   institutional investors with respect to monitoring
 4   as to certain kinds of cases, securities cases,
 5   transactional cases, antitrust cases?  Or was that
 6   not --
 7      THE WITNESS: I don't know.
 8      THE SPECIAL MASTER: -- was that not
 9   specified.
10      THE WITNESS: That was not specified.
11      BY MR. SINNOTT:
12 Q.   At some point did you have some success in
13   making inroads into this area?
14 A.   Yes, sir.
15 Q.   Tell us about that.
16 A.   Tim was friends with Senator Farris -- Steve
17   Farris and asked him do you know anyone or point us
18   to anyone we might be able to talk to, and he told
19   Tim that recently a gentleman named Paul Doane had
20   taken over Arkansas Teachers, and you might want to
21   give him a try.  Good luck.
22 Q.   Did he facilitate that introduction in any
23   way?
24 A.   No, sir.  Tim just told me about it, and I
```

Page 34

1  looked up Paul Doane and called him.
2    THE SPECIAL MASTER: Cold?
3    THE WITNESS: Yes, sir.
4  Q.  And what was Mr. Doane's response when you
5  called him?
6  A.  The gist of it was who are you and why are
7  you calling me, but I told him who I was, who our
8  firm was.  We're local not far from your office and
9  how I got his name and why I was calling.
10 Q.  Okay.  And did he offer to help you?
11 A.  I don't understand.
12 Q.  Did he ask you to come in for a meeting?  Or
13 did he --
14 A.  No, sir.
15 Q.  -- extend -- you know, try to arrange for
16 you to talk again with him?
17 A.  No, sir.
18 Q.  All right.  What did he say?
19 A.  He listened to what I had to say, and I
20 asked him if I could meet with him.  And then I told
21 him that, you know, I was working with a New York
22 law firm that specializes in institutional
23 investors.
24 Q.  Okay.  So how did you leave it after that

Page 35

1  conversation?
2  A.  Let me know if you're willing to give us
3  some time.
4  Q.  Okay.  And what happened next?
5  A.  He -- I don't know if it was a followup call
6  by me or if it was that call, but he ultimately
7  agreed to meet.
8  Q.  Okay.  And did you meet him by yourself, or
9  were you accompanied by someone else?
10 A.  The Labaton -- I believe it was Eric Belfi
11 and Chris Keller, but I can't swear to that.  I know
12 Eric Belfi was there.  I don't know if Chris Keller
13 was there.
14 Q.  Okay.  And how soon after the telephone
15 conversation did this meeting take place?
16 A.  I'll guess within a week or two.
17 Q.  Okay.  And is it fair to say that Eric and
18 Chris were responsive and came down --
19 A.  Yes.
20 Q.  -- at the time that you told them that the
21 meeting would be -- time and date?
22 A.  Yes, sir.
23 Q.  Okay.  So tell us what happened at that
24 meeting.

Page 36

1  A.  Eric --
2    THE SPECIAL MASTER: Hold that thought.
3    MR. SINNOTT: Sure.
4    THE SPECIAL MASTER: Was this the first
5  institutional investor that you'd been successful in
6  setting up a meeting with?
7    THE WITNESS: Yes, sir.
8    THE SPECIAL MASTER: I'm sorry.  If you
9  remember your question.
10   MR. SINNOTT: Okay.  I do.
11 BY MR. SINNOTT:
12 Q.  Tell us what happened at the meeting.
13 A.  Eric Belfi presented all of the services
14 that Labaton has available and what their -- what
15 they could do and presented as a courtesy that they
16 do this monitoring of the portfolio.
17 Q.  Okay.  And did Mr. Doane ask any questions
18 of Eric?
19 A.  I'm sure he did.  I don't remember specific
20 questions.
21 Q.  Okay.  Did you participate in the
22 conversation?
23 A.  I was there, but as far as substantive
24 matters, no.

Page 37

1  Q.  You let Eric do the talking?
2  A.  Yes, sir.
3  Q.  Okay.  But you're a good listener?
4  A.  I'm a good listener.
5  Q.  Okay.  How long was the meeting?
6  A.  Maybe 30, 45 minutes.
7  Q.  Okay.  And how did Eric and Mr. Doane leave
8  it at the end of the meeting?
9  A.  Something along the lines of let's follow
10 up, or I'll be in touch.
11 Q.  Okay.  And did you and Eric debrief after
12 the meeting or go somewhere and talk about what
13 happened and/or next steps?
14 A.  I'm sure we talked after the meeting, but as
15 far as next steps, no.
16 Q.  All right.  What's the next thing that
17 happened with respect to Mr. Doane to your
18 knowledge?
19 A.  Eric Belfi called me and asked me to send a
20 little blurb about my firm because he was interested
21 in including us in the request for -- it's either an
22 RFQ or an RFP but to include us in that.
23 Q.  Okay.
24 A.  And so I sent my firm information to him.

Page 38

1  Q.  Had Mr. Doane raised the subject of a
2  request for proposals or something along those
3  lines, an RFP, during the conversation with Eric?
4  **A.  Not that I recall.**
5  Q.  Do you know where Eric got the idea that
6  this would be an appropriate way to seek business
7  with Arkansas?
8  **A.  I assume Paul Doane.**
9  Q.  Okay.
10  **A.  But I don't know.**
11  Q.  All right.  You don't recall anything in the
12  conversation about an RFP?
13  **A.  No.**
14  Q.  All right.
15  **THE SPECIAL MASTER:** So do you know did
16  either Eric or Chris mention to you that they were
17  going to pick up the threads from this first meeting
18  and deal directly with Mr. Doane?
19  **THE WITNESS:** Yes.
20  Q.  And did they indicate what, if anything,
21  they'd be looking for you to do as part of this
22  ongoing relationship with Mr. Doane?
23  **A.  At that time the impression that I had is**
24  **that I would be local counsel just as I was in the**

Page 39

1  **HCC Holdings case.**
2  Q.  Okay.  But that was an assumption on your
3  part?
4  **A.  Yes, sir.**
5  Q.  And at some point did you attempt to
6  introduce Eric and/or Christopher to any other
7  figures in Little Rock?
8  **A.  Yes, sir.**
9  Q.  All right.  Tell us about that.
10  **A.  In furtherance of the stated desire to be a**
11  **presence in Little Rock, have an interest in Little**
12  **Rock, Eric came down, and we showed him around**
13  **Little Rock, introduced him to Senator Farris, and I**
14  **don't know if it was that time or a subsequent time,**
15  **but we asked and Mike Beebe was kind enough -- he**
16  **was running for governor at the time -- to give us**
17  **five minutes, ten minutes, and I introduced Eric to**
18  **Mike Beebe.**
19  Q.  Okay.  What was Mike Beebe's position at
20  that time?
21  **A.  He was the outgoing attorney general.**
22  **THE SPECIAL MASTER:** And running for
23  governor?
24  **THE WITNESS:** And running for governor.

Page 40

Page 41



In Re:  **State Street Attorneys Fees**



Page 46

Page 47

Page 48

1  association with Labaton?

2  **A.  Yes, sir.**

3  Q.  And what did you tell him that -- you know,

4  at this first meeting that you were doing on behalf

5  of Labaton?

6  **A.  Helping to introduce them to institutional**

7  **investors.**

8  Q.  Okay.  Now getting back to Paul Doane and

9  Little Rock, after the RFP was submitted by Labaton

10  and by yourself -- and I take it it was a joint

11  proposal?

12  **A.  It was.**

13  Q.  How long was it before you heard of any

14  progress?

15  **A.  I believe Eric called me within two to four**

16  **weeks of that, told me that it had been kicked back.**

17  **Said that the Arkansas Teachers wanted one firm on**

18  **the form.**

19  Q.  Okay.  So what did that mean?

20  **A.  I said go ahead and withdraw our firm and**

21  **good luck.**

22  Q.  Okay.  So you and your firm bowed out of the

23  monitoring relationship?  Is that what it was

24  called?

Page 49

1  **A.  Yes, sir.**

2  Q.  Okay.  But Labaton stayed in there, and

3  Labaton was retained or offered that position,

4  correct?

5  **A.  Yes, sir.**

6  Q.  Did you have any conversation with Paul

7  Doane about this or with general counsel from

8  Arkansas Teachers?

9  **A.  No, sir.**

10  Q.  All right.  And was your understanding from

11  Eric that you were not part of this successful

12  proposal, correct?

13  **A.  If I could ask what do you mean not a part**

14  **of the successful proposal?**

15  Q.  You were not retained --

16  **A.  Oh, yes.**

17  Q.  So Labaton was retained, and you weren't?

18  **A.  Yes.  Correct.**

19  Q.  Okay, thank you.  I don't think I was making

20  myself clear.

21  So after that RFP and Labaton

22  successfully being selected as monitoring counsel,

23  what was your role with respect to Labaton?

24  **A.  Help introduce them to other pension funds**

Page 50

1  or institutional investors as I am able to.
2  Q.  Okay.  And who were some of those other
3  folks that you introduced them to, Damon?
4  A.  Over the years, Texas Teachers Pension Fund,
5  Houston Municipal Employees Pension Fund, the
6  Houston Firefighters -- I don't think he was on the
7  board, but he was prominent within Houston
8  Firefighters, a gentleman.
9      And as far as institutional investors
10  go, that's it.
11  Q.  Okay.  As a result of your having made this
12  introduction of Labaton to Arkansas Teachers, did
13  you come to an agreement or a contract or something
14  formal or informal with respect to your ongoing
15  relationship with Labaton?
16  A.  Yes, sir.
17  Q.  Could you tell us about that?
18  A.  Sure.  If the -- the agreement as they
19  presented it to me was if ultimately they are
20  selected to represent any institutional investor
21  that I facilitated an introduction to, if they are
22  successful in obtaining a recovery, they would split
23  their attorneys' fees with my firm 80 percent/20
24  percent.

Page 51

1  Q.  So you would receive 20 percent of the
2  attorneys' fees?
3  A.  Yes, sir.
4  Q.  And they would receive 80 percent?
5  A.  Yes, sir.
6      THE SPECIAL MASTER: Was that in all
7  cases in which they would be counsel to a party that
8  you had helped to facilitate the relationship with?
9      THE WITNESS: Yes, sir.
10      THE SPECIAL MASTER: Not limited to
11  Arkansas?
12      THE WITNESS: Correct.
13      THE SPECIAL MASTER: And when did you
14  begin having these discussions?  This will be a
15  compound question, but you can break it down.
16      THE WITNESS: Sure.
17      THE SPECIAL MASTER: Were the
18  discussions with Eric Belfi or Chris Keller or both?
19      THE WITNESS: Good question.
20      When Eric Belfi and Chris Keller came
21  down to Little Rock that first time that we'd
22  already talked about --
23      THE SPECIAL MASTER: To meet with
24  Senator Farris?

Page 52

1      THE WITNESS: No.  I believe that was
2  another occasion.
3      THE SPECIAL MASTER: Okay.
4      THE WITNESS: When they came to Little
5  Rock to meet with myself, and I believe Tim was
6  there as well --
7      THE SPECIAL MASTER: Oh, okay.
8      THE WITNESS: -- in our offices, they
9  said here's what we're interested in.  We would like
10  to have a presence in Little Rock.  We don't have
11  one currently.
12      We'd like a presence in Houston because
13  we don't have one currently.  We like to work with
14  local counsel.  You're local counsel.
15      And they presented the arrangements I
16  just told you about.
17      THE SPECIAL MASTER: So this was almost
18  at the outset of the relationship then?
19      THE WITNESS: Yes, sir.
20      THE SPECIAL MASTER: And you began
21  talking with any level of specificity about how the
22  relationship would be managed and compensation for
23  the relationship for you?
24      THE WITNESS: Yes, sir.

Page 53

1      THE SPECIAL MASTER: Okay.
2      MR. MARX: I think the record's clear
3  now based on the followup questions, but your
4  question earlier, Bill, was as a result of this RFP
5  process and Little Rock what was the nature of the
6  agreement between Damon's firm and Labaton.
7      I think it's clear now that that was an
8  initial conversation about an overarching agreement
9  which included --
10      THE SPECIAL MASTER: Correct me if I'm
11  wrong.  I don't want to misstate it, but it sounds
12  like the commercial piece of the relationship
13  between you and Labaton actually began almost at the
14  outset of the relationship that there was some
15  understanding about how you would be compensated --
16  I say "you," I mean your firm.
17      THE WITNESS: That's correct.
18      BY MR. SINNOTT:
19  Q.  And with respect to Arkansas Teachers,
20  Damon, how many other cases resulted from that
21  introduction that you had made of Labaton to
22  Arkansas?
23      And when I say Arkansas, I'm using that
24  as shorthand for Arkansas Teachers.

Page 54

1  A.  I understand.  I understand.
2      Including State Street, I believe five
3  -- four or five.
4  Q.  Okay.
5      THE SPECIAL MASTER: Did you have
6  ongoing contact with Arkansas at all during this
7  period?
8      THE WITNESS: No, sir.
9      THE SPECIAL MASTER: Not with Paul
10  Doane?
11      THE WITNESS: No, sir.
12      THE SPECIAL MASTER: George Hopkins?
13      THE WITNESS: I met him once at a
14  hearing in San Francisco years later.
15      THE SPECIAL MASTER: A case -- on a
16  case?
17      THE WITNESS: Yes.  Um, ▉▉▉▉ case.
18  I was close to San Francisco to visit my
19  sister and brother-in-law, and Eric told me that
20  there was a hearing that was taking place there.  I
21  said I'm going to come by.  So I went by.
22  George Hopkins was there, and Eric
23  introduced us.  I said hi.
24      THE SPECIAL MASTER: You weren't local

Page 55

1  counsel on that case though?
2      THE WITNESS: I wasn't local counsel on
3  that case or on any of these class action pension
4  funds.
5      THE SPECIAL MASTER: I'm curious, Damon,
6  what is your understanding of what a local counsel
7  does?
8      THE WITNESS: More along the lines of
9  what I did in the HCC Holdings case; that if there's
10  a non-dispositive hearing or if there's something
11  that needs to be filed under seal or if someone
12  needs to be admitted under a pro hac vice motion,
13  that's why you have local counsel.
14      THE SPECIAL MASTER: And you have to
15  appear in the case?
16      THE WITNESS: Yes, sir.  And you have to
17  appear in the case.
18      THE SPECIAL MASTER: And you have to
19  file an appearance in the case?
20      THE WITNESS: You have to file an
21  appearance in the case.
22      THE SPECIAL MASTER: And be responsible
23  to the Court to look to as the local lawyer.
24      THE WITNESS: Yes, sir.

Page 56

1      THE SPECIAL MASTER: If the Court wants
2  to pick up the phone and call a local lawyer, you're
3  the one, right?
4      THE WITNESS: Yes, sir.
5  Q.  But that --
6      THE SPECIAL MASTER: You heard -- I'm
7  sorry, Bill.
8      MR. SINNOTT: No.
9      THE SPECIAL MASTER: We've heard in the
10  case there's another definition that lawyers have
11  used for local counsel which is basically to be
12  local to the client itself and either in addition to
13  or only to be available to service the client --
14  professionally service the client.  Is that a role
15  you've ever played?
16      THE WITNESS: Not that I'm aware of.
17      THE SPECIAL MASTER: Okay.  All right.
18      BY MR. SINNOTT:
19  Q.  Is it fair to say that there was no
20  expectation arising out of the Arkansas introduction
21  that you had made that you would enter appearances
22  in cases?
23  A.  That's correct.
24  Q.  No expectation that you would take a role in

Page 57

1  those cases?
2  A.  That's correct.
3  Q.  And that was apparent to Mr. Belfi?
4  A.  Yes, sir.
5  Q.  And to Mr. Keller?
6  A.  Yes, sir.
7  Q.  And to everyone at Labaton?
8  A.  I don't know --
9      MS. LUKEY: Objection.
10  A.  I don't know about everyone at Labaton.
11  Q.  Okay.  But you didn't encounter anyone that
12  asked you what you were doing in those future cases,
13  correct?
14  A.  No, sir.
15      THE SPECIAL MASTER: Did anybody from
16  Labaton ever ask you to perform services as what
17  we've discussed a local counsel would do?
18      THE WITNESS: In a current case that is
19  not a class action case, yes.
20      THE SPECIAL MASTER: But in these other
21  cases?
22      THE WITNESS: No, sir.
23      BY MR. SINNOTT:
24  Q.  And let me -- I know you said you thought



Page 58

Page 60

1  believe there was ever a formal written contract
2  agreement that reduced the relationship to a
3  contract other than the e-mail relationship?
4      **THE WITNESS:** I think that's accurate.
5      **BY MR. SINNOTT:**
6  Q.  Who brought up the 20 percent number?  Was
7   it you or Eric or Chris?  Do you recall?
8  **A.  Chris Keller.**
9  Q.  Chris did?
10  **A.  Yes, sir.**
11  Q.  Okay.  And did he indicate how he had
12   arrived at that number?
13  **A.  No, sir.**
14  Q.  But that seemed fair to you?
15  **A.  It seemed very fair to me.**
16  Q.  Okay.  Still seems fair to you?
17  **A.  Well, I don't know that I've ever actually**
18  **received 20 percent of their fees.  I think it's**
19  **more like 10 percent or less or maybe a little more**
20  **but --**
21  Q.   I was going to ask you that --
22  **A.   Whatever we arrived at seemed fair to me.**
23  Q.   Okay.  Let me -- I'm going to circle back on
24   this, but let me ask you about some cases to the

Page 59

1      **THE WITNESS:** Yes, sir.
2      **THE SPECIAL MASTER:** So Arkansas, for
3  example, in which you did play the role as opening
4  the door would fall under that rubric?
5      **THE WITNESS:** Yes, sir.
6      **THE SPECIAL MASTER:** Okay.  When did
7  that relationship be reduced to writing?
8      **THE WITNESS:** Only e-mails.  There's no
9  four-corner document that -- in ceremony and signed
10  or anything.  It's just an e-mail relationship.
11      **THE SPECIAL MASTER:** Do you recall
12  whether there had been drafts of agreements that had
13  been circulated?
14      **THE WITNESS:** Yes.  Fairly early on I
15  believe I attempted to get something down in
16  writing, and then time went by.  And then I believe
17  Chris Keller proposed something.
18      I may have proposed something before
19  then, and then I believe Chris Keller proposed
20  something that was way more involved than mine.
21      And I believe after that I may have made
22  one or two attempts to talk with someone about it.
23  But we just never finalized anything.
24      **THE SPECIAL MASTER:** So you don't

Page 61

Page 62

1  forwarding relationship, a -- I may get this one --
2  a private fee arrangement.  Was that the phrase?
3     MR. SINNOTT: Something like that, yeah.
4     MS. LUKEY: Objection on that one.  I
5  don't remember that one.  It may have happened.
6     THE SPECIAL MASTER: It was there.  I
7  might have the phrase wrong, but it was sort of a
8  private arrangement.  Am I missing anything?
9     MR. SINNOTT: No.  I think you got 'em.
10     THE SPECIAL MASTER: What is your
11  understanding of the relationship?
12     And if it evolved from something to
13  something else --
14     THE WITNESS: Right.
15     THE SPECIAL MASTER: -- we'd be very
16  interested in that.
17     THE WITNESS: At the very beginning I
18  thought I would be local counsel.  I was not.
19     THE SPECIAL MASTER: As we understand it
20  in our --
21     THE WITNESS: As we understand it
22  talking today.
23     THE SPECIAL MASTER: -- in our
24  discussion, yeah.

Page 63

1     BY MR. SINNOTT:
2  Q.  And as you were in the HCC Holdings case?
3  **A.  Yes, and as I was in the HCC Holdings case.**
4  **When Eric informed me that it had been kicked back,**
5  **I needed to withdraw, and ever since then I've only**
6  **referred to this as an agreement.**
7  **I don't have a client so...**
8  Q.  Okay.
9     THE SPECIAL MASTER: Just an agreement?
10     THE WITNESS: Just an agreement.
11     THE SPECIAL MASTER: Not a referral fee
12  arrangement?
13     THE WITNESS: No, sir.
14     THE SPECIAL MASTER: Not a local counsel
15  arrangement?
16     THE WITNESS: No, sir.
17     THE SPECIAL MASTER: Not a forwarding
18  fee arrangement?
19     THE WITNESS: I'm not sure what
20  forwarding fee means.
21     MR. SINNOTT: Neither are we.
22     THE SPECIAL MASTER: We weren't either.
23  I was going to follow up on that and ask you if
24  you've ever heard the term.

Page 64

1     THE WITNESS: I have not.
2     THE SPECIAL MASTER: So just a fee
3  arrangement or just an arrangement?
4     THE WITNESS: I've always referred to it
5  as our agreement.
6     THE SPECIAL MASTER: Agreement.  Okay.
7     BY MR. SINNOTT:
8  Q.  Have you ever referred to it as an
9  obligation?
10  **A.  An obligation?  I don't think so.**
11  Q.  Do you ever recall hearing Labaton or other
12  counsel refer to your agreement as an obligation?
13  **A.  Maybe.  I don't recall.**
14  Q.  Okay.
15     THE SPECIAL MASTER: Have they ever
16  referred to you in your conversations with them as
17  referring counsel or referring attorney or referral
18  fee?  Anything --
19     THE WITNESS: No, sir.
20     THE SPECIAL MASTER: Okay.  You've heard
21  the phrase though a referral fee or a referring --
22  referring counsel?
23     THE WITNESS: I am familiar with that
24  phrase.

Page 65

1     THE SPECIAL MASTER: Yep.  To your
2  understanding of that phrase, have you acted as
3  referring counsel in any of these cases?
4     THE WITNESS: The capacitor case.
5     THE SPECIAL MASTER: The capacitor case.
6     THE WITNESS: Yes, sir.  That did not
7  involve Arkansas Teachers.
8     THE SPECIAL MASTER: Right.  Any other
9  cases?
10     THE WITNESS: I don't know if they came
11  to fruition for them, but through the years they
12  would periodically ask me if I had any connections
13  or inroads into some of their antitrust
14  investigations.
15     So if they're looking for someone in a
16  particular industry, they would ask me.  And
17  sometimes I would have success.  Sometimes I
18  wouldn't.
19     THE SPECIAL MASTER: And -- but in terms
20  of being referring counsel and receiving a referral
21  fee, to your knowledge has that happened in any case
22  other than the capacitor case?
23     THE WITNESS: I didn't receive a fee in
24  that case.  I don't know that it's resolved even.

In Re:  State Street Attorneys Fees

Page 66

1    THE SPECIAL MASTER: Okay.

2    THE WITNESS: But other than that, no.

3    BY MR. SINNOTT:

4  Q.  How about the Colonial case?

5  A.  Colonial Bank, yes.

6  Q.  Okay.

7  A.  I received -- I'm guessing. Not to the

8  penny. But I believe the -- it was in two parts.

9  And I believe the attorneys' fees total for Labaton

10  were around 4 million dollars.

11    And my firm received 90,000 plus

12  $75,000.

13    THE SPECIAL MASTER: That's a far cry

14  from 20 percent?

15    THE WITNESS: Yes, it is.

16    THE SPECIAL MASTER: Did you view that

17  as a referral fee as you understand the term?

18    THE WITNESS: No, sir.

19    THE SPECIAL MASTER: I'm curious.

20    THE WITNESS: Yes.

21    THE SPECIAL MASTER: Your understanding

22  of the agreement was 20 percent.

23    THE WITNESS: Yes, sir.

24    THE SPECIAL MASTER: Why didn't you get

Page 67

1  20 percent?

2    THE WITNESS: Great question.

3    Eric Belfi called me and explained that

4  there were many variables and circumstances that

5  they -- that they had not considered that affected

6  the case and the risk that they took in the case and

7  would I accept less. And I did.

8    THE SPECIAL MASTER: So it became a

9  negotiation?

10    THE WITNESS: Each time.

11    THE SPECIAL MASTER: Each case.

12    THE WITNESS: Yes, sir.

13    THE SPECIAL MASTER: Or each payment --

14    THE WITNESS: Yes, sir.

15    THE SPECIAL MASTER: -- in the Colonial

16  Bank case?

17    THE WITNESS: Yes, sir. Sorry.

18    THE SPECIAL MASTER: I keep asking

19  compound questions.

20    THE WITNESS: In each case --

21    MS. LUKEY: Each case -- I've lost the

22  thread.

23    THE SPECIAL MASTER: Let me start again,

24  Damon.

Page 68

1    THE WITNESS: Yes, sir.

2    THE SPECIAL MASTER: Was the payment you

3  would receive the product of a negotiation in each

4  case?

5    THE WITNESS: Yes, sir.

6    THE SPECIAL MASTER: Okay.

7    BY MR. SINNOTT:

8  Q.  And the Colonial case was an Arkansas

9  Teachers case, correct?

10  A.  Yes, sir.

11  Q.  But you said the capacitors was not?

12  A.  Yes, sir.

13  Q.  So Labaton used you as an entree or a

14  facilitator of introductions beyond Arkansas

15  Teachers as testified earlier?

16  A.  Yes, sir.

17  Q.  And capacitors was one of those?

18  A.  Yes, sir.

19  Q.  How about Beckman Coulter securities

20  litigation --

21  A.  Not familiar with that one.

22  Q.  -- 2010 Central District of California?

23  A.  Not familiar with that one.

24    THE SPECIAL MASTER: Did you -- you

Page 69

1  don't remember receiving a payment from that case?

2    THE WITNESS: Beckman Coulter? I did

3  not --

4    THE SPECIAL MASTER: Maybe it went by

5  some other name. In re securities litigation --

6    BY MR. SINNOTT:

7  Q.  In re Beckman Coulter securities litigation.

8  A.  No, sir.

9  Q.  Okay. Hewlett-Packard?

10  A.  Yes, sir.

11  Q.  All right. Tell us about that.

12  A.  Labaton received a fee of 14-and-a-half

13  million dollars, give or take. And our negotiated

14  amount was $201,000. I remember the one.

15    THE SPECIAL MASTER: How did that case

16  come -- what was your role in facilitating that

17  case?

18    THE WITNESS: That was an Arkansas

19  Teachers case.

20    THE SPECIAL MASTER: Oh, that was an

21  Arkansas case?

22    THE WITNESS: Yes, sir.

23    THE SPECIAL MASTER: So that goes back

24  to the initial relationship with Arkansas that you



Page 70

1   facilitated?
2      THE WITNESS: Yes, sir.
3      THE SPECIAL MASTER: But no separate
4   additional facilitation in this case, correct?
5      THE WITNESS: That's correct.
6      BY MR. SINNOTT:
7   Q.  How about the K12 case?
8      MS. LUKEY: I'm sorry?
9      MR. SINNOTT: K12.
10     THE SPECIAL MASTER: K12.
11     MS. LUKEY: Thank you.
12  A.  K12 was an Arkansas Teachers case.
13     It's going back a little bit, but I
14  believe -- don't hold me to it, but I believe the
15  attorneys fee that Labaton collected in that case
16  was just shy of two million dollars, and our -- my
17  firm's payment was around -- between 150 and
18  $200,000.  That was the negotiated figure.
19  Q.  Spectrum Pharmaceuticals?
20  A.  Yes, sir.
21  Q.  Was that an Arkansas case?
22  A.  Yes, sir.
23  Q.  And tell us about that.
24  A.  Well, Spectrum and another one called Vocera

Page 71

1   resolved around the same time.  And, um, I belive --
2   so I've always viewed them together.  I believe --
3      THE SPECIAL MASTER: Were they both
4   Arkansas cases?
5      THE WITNESS: Yes, sir.
6   A.  I believe the overall attorneys' fee for
7   Labaton was around 4-and-a-half million dollars,
8   maybe 4 -- 4-and-a-half million dollars, and my
9   firm's negotiated fee was $105,000 for one and
10  $240,000, give or take, for the other.
11  Q.  Okay.  How about in re A10 Networks
12  shareholder litigation?  Does that sound familiar?
13  A.  No, sir.
14  Q.  Okay.  And you said earlier that you had a
15  role or received payment for the Netflix case?
16  A.  That was dismissed.
17  Q.  It was dismissed.  So you didn't get
18  anything out of that?
19  A.  No, sir.
20  Q.  And Labaton didn't get anything out of that?
21  A.  Not that I know of.
22  Q.  How about the BP Oil matter?
23  A.  Yes, sir.
24  Q.  Did you receive any payments from that case?

Page 74

1  A.  I believe the end of 2012 or maybe beginning
2  of 2013.  Somewhere around there.
3  Q.  Okay.  And how did you learn about it?
4  A.  I believe Eric Belfi told me that he and
5  Garrett -- I believe that's when he and Garrett had
6  filed it or were filing it or something like that.
7  Q.  Okay.  And was it just Eric, or was it Eric
8  and Chris Keller, or Eric and Garrett Bradley?
9     Who did you speak to about the case?
10 A.  I really don't know.  I believe it was just
11 Eric letting me know what's going on.
12 Q.  Okay.  And did you receive periodic updates
13 on what was happening in the case?
14 A.  About once every year or two Eric would say
15 here's what's going on.
16 Q.  And what was your understanding of what was
17 going on with that case?
18 A.  They were working it.
19 Q.  Okay.
20 A.  It was progressing along.
21 Q.  But there's no expectation that you were
22 going to be strategizing, playing a role, local
23 counsel or anything else, correct?
24 A.  No, sir -- I mean correct.  Correct.

Page 75

1  Q.  All right.  To your knowledge on anyone's
2  part, correct?
3  A.  Correct.
4  Q.  And when you learned about the State Street
5  case from Eric, did you and Eric discuss what your
6  payment would be on any settlement or award in that
7  case?
8  A.  No, sir.
9  Q.  Subsequently did you have discussions about
10 what your payment would be?
11 A.  Yes.
12 Q.  All right.  Tell us about those discussions.
13 A.  Sometime around 2013 Garrett called me and
14 said I wanted to talk to you about your deal with
15 Labaton and changing it.
16    THE SPECIAL MASTER: Why Garrett?
17    THE WITNESS: He said that the case was
18 his firm's idea or something like that, and he was
19 working the case.
20    THE SPECIAL MASTER: By this time had
21 you developed an independent relationship with
22 Garrett Bradley?
23    THE WITNESS: I don't know if I would
24 characterize it as independent, but I had come to





Page 250

Page 252

Page 251

Page 253

1  Q.  Okay, thank you.

2       Saturday, October 14, 2014 at 1:15 p.m.

3  there's a message LBS 017593 and 594, and the title

4  is concerning Eric in reviewing your text regarding

5  HP it appears --

6       (Pause.)

7  Q.  It would appear that there was a

8  disagreement as to your payment in this case, but

9  let me direct your attention to the bottom of the

10  face page where you begin a message to Eric.

11       "Eric, the call kept dropping so I'm

12  sending the e-mail.  In reviewing your text

13  regarding HP  it appears Labaton is trying to use

14  the fee calculation done as a special consideration

15  for Garrett's 20 percent additional interest in the

16  Colonial Bank settlement since both ATRS and clients

17  via Garrett are in that case, as a precedent to

18  change our fee agreement in all of the pension fund

19  cases in which ATRS is a plaintiff.  This is

20  contrary to your express assurance to us that if we

21  agree to that accommodation in Colonial Bank, it

22  would not be used as a precedent in cases where

23  Garrett isn't involved.  I acknowledge that we had

24  discussed in the past treating certain cases where

Damon Chargois
October 02, 2017



Page 254

1  Labaton has multiple fee split obligations to
2  referring firms differently on a case-by-case basis
3  but only after we both discuss and agree with you
4  giving me advanced notice of your intentions so that
5  I can handle it with my partners on my end, not what
6  you have done here in the HP case.
7      I am very concerned that you guys are
8  attempting to significantly, substantially and
9  materially alter our agreement.  Our deal with
10  Labaton is straightforward.  We got you ATRS as a
11  client after considerable favors, political
12  activity, money spent and time dedicated in
13  Arkansas, and Labaton would use ATRS to seek lead
14  counsel appointments in institutional investor fraud
15  and misrepresentation cases.
16     Where Labaton is successful in getting
17  appointed lead counsel and obtains a settlement or
18  judgment award, we split Labaton's attorney fee
19  award 80/20 period.
20     As I said in my text to you regarding HP
21  and your allocation, I understand the circumstances
22  in this case and am okay with the fee split in this
23  instance.  We are not changing our fee split
24  agreement for all the other pension fund cases.  You

Page 255

1  promised me that you would give me advanced notice
2  of when you guys would seek a modification or
3  accommodation on a given settlement, and I want you
4  to keep that going forward."
5      Then Eric responds:  "Damon, unlike
6  Colonial, where there was a modification, here there
7  is not a modification.  Arkansas only represented 23
8  percent of the losses.  So you are only entitled to
9  receive 23 percent of the 20 percent or 4.6 percent.
10  In Colonial after the fee split we asked you to
11  reduce the percentage below the pro rata split
12  because the case was a loss to us.  We could not
13  afford to pay out 20 percent in that case.  In this
14  case there were four different Labaton clients that
15  we had obligations on all of them.
16     As indicated to you yesterday, we would
17  not have been appointed lead without those three
18  other clients and our relationship with Motley Rice
19  because their client had a much larger loss.  Going
20  forward, you should know that Arkansas is almost
21  never a sole lead so this is going to happen in
22  almost every case.  It is not a modification.  It is
23  just how the agreement works."
24     And you respond:  "This isn't my

Page 256

Page 257

Page 302



Page 304

1   6th writes -- and this goes onto page 4 -- "I spoke
2 with David.  Do you think we will have time to
3 process his allocation once he wants it, or will it
4 be a rush?  If it will be a rush, then I want to
5 tell accounting to bring the money into our IOLA.
6 Otherwise, it can stay in the settlement fund, but
7 it will take some hoops to get it out."  Keller and
8 Larry's signature.
9   You weren't part of those discussions
10 about IOLA or non-IOLA?
11 **A.  No, sir.**
12 Q.  Okay.
13   **THE SPECIAL MASTER:** Didn't matter to
14 you which account it came from?
15   **THE WITNESS:** It did not.
16 Q.  And looking at the top middle of the third
17 page on a message that began at the bottom half of
18 the second page from Eric Belfi, do you see going
19 onto the third page where it says, "He needs a new
20 undertaking for Damon Chargois, esquire"?
21   And in the middle of page 2 Nicole
22 responds:  "David, Damon needs a new undertaking.
23 If you send me a link, I can do it.  Eric, does this
24 mean he wants the money now or still wait?  If wait,

Page 303



Page 305

1 I need to know when he might want it in broad
2 strokes and his turnaround expectations.  Thanks."
3   Are you surprised to hear they were
4 rushing this payment?
5 **A.  Yes.**
6 Q.  It wasn't at your urging or prompting or
7 anything?
8 **A.  No.**
9 Q.  Okay.
10 **A.  None of this mattered.**
11 Q.  And then at the bottom of page 1 Eric
12 writes:  "He will want it now.  Let me call you at
13 11 when I land so we can discuss."
14   I suppose it's not the worst thing in
15 the world for people wanting to get you your money
16 as fast as possible, is it?
17 **A.  I suppose.**
18 Q.  And then they indicate the issue -- Nicole
19 Zeiss writes:  "Name of person/entity giving
20 undertaking must match payee name and wire
21 instructions."
22   Eric responds:  "When the undertaking is
23 done, please send to me, and I will have Damon sign
24 it."

Page 310

1  Bates number.
2      **MR. MARX:** The date is more helpful.
3      **THE WITNESS:** They aren't in
4  chronological order.
5      **MR. SINNOTT:** They were at one time.
6  They may be in reverse chronological order right
7  now.
8      **THE WITNESS:** Do you have it?
9      **MR. MARX:** Yes.
10     **MS. LUKEY:** The second that will be
11 going with it is September 23, 2016.  The first
12 bears the Bates number LBS 017593.  The second bears
13 the Bates number LBS 040084.
14     Please let me know when you have those
15 in front of you.
16     **MR. MARX:** Give me the number on the
17 first document again please, Joan.
18     **MS. LUKEY:** The first document front
19 page is LBS 017593.
20     **MR. MARX:** Okay.  We have it.
21     **BY MS. LUKEY:**
22 Q.  Got 'em?  Sir, if you would look at the
23 second page of that document, the October 18, 2014
24 document at the page that is numbered LBS 017594 --

Page 311

1  A.  Yes.
2  Q.  -- in it you will see on the second page
3  that you wrote to Mr. Belfi, and your second
4  paragraph reads as follows:  "I am very concerned
5  that you guys are attempting to significantly
6  substantially and materially alter our agreement.
7  Our deal with Labaton is straightforward.  We got
8  you ATRS as a client after considerable favors,
9  political activity, money spent and time dedicated
10 in Arkansas."
11     And then goes on to talk about
12 circumstances of Labaton being lead counsel.
13 A.  Yes.
14 Q.  Do you see that?
15 A.  Yes, ma'am.
16 Q.  In the second of the documents -- I may have
17 given you the wrong one.  Oops, sorry.  I gave you
18 the wrong one.  It would be September 2, 2016.  LBS
19 031137.
20     **MR. MARX:** September 2, 2016?
21     **MS. LUKEY:** Sixteen.  Yes.
22     **THE SPECIAL MASTER:** There's several of
23 them with that.
24     **MS. LUKEY:** 1137 is the end of the Bates

Page 312

1  number.  It's at 2:49 p.m. on second 2nd.  It's your
2  e-mail to Chris Keller, a one-page document.
3      **MR. MARX:** Okay.
4      **THE SPECIAL MASTER:** This is on Spectrum
5  and Vocera, Damon.
6      **MS. LUKEY:** Correct.
7      **THE WITNESS:** Okay.
8      **BY MS. LUKEY:**
9  Q.  Do you have that in front of you?
10 A.  I do.
11 Q.  In this document in the last paragraph in
12 the penultimate sentence you write:  "As you know,
13 we dedicated a ton of money, energy, political
14 favors time and effort to secure ATRS for..." -- I
15 just lost my place -- "...for Labaton at the start
16 of this thing based on the promise of 20 percent of
17 Labaton's attorneys' fees."
18 A.  Yes.
19 Q.  These documents are approximately two years
20 apart both referring to "a ton of money, energy,
21 political favors, time and effort" to secure
22 Arkansas.
23 A.  Yes.
24 Q.  Would you tell us please what ton of money

Page 313

1  you expended that you were representing at two year
2  intervals to Labaton?
3  **A.  Each time that we went out to meet with or I**
4  **went up to meet with Eric, that was out of my**
5  **pocket.  Our firm was losing money on the**
6  **litigation.  Money was extremely tight.  I believe**
7  **they were aware of that.  But they had a goal.**
8      **They wanted to meet people in Arkansas**
9  **and establish their own presence and foothold there,**
10 **and so I did it anyway.**
11 Q.  How many times did you go to visit Eric?
12 **A.  In Arkansas?  Maybe three or four times.**
13 Q.  All right.  So you went from Houston to
14 Little Rock?  Is that what you're saying?
15 **A.  Yes, ma'am.**
16 Q.  Did you drive or fly?
17 **A.  I flew.**
18 Q.  And three or four times; is that right?
19 **A.  That's about right.**
20 Q.  Would you tell us what you meant by
21 expending energy?
22 **A.  Driving around Little Rock, Oklahoma, and**
23 **when he came to Houston, doing the same.**
24 Q.  And what did you mean by political favors?

Page 314

1   A.   **Introducing him to prominent people that we**
2   **knew.**
3   Q.   What did you mean by time and effort to
4   secure Arkansas for Labaton?
5   A.   **Followup, trying to educate myself on what**
6   **this litigation was, asking him for pointers.  I**
7   **think periodically he'd sort of reroute me and point**
8   **me at different funds, things along those lines.**
9   Q.   Now you were paid a fee or agreed to a fee
10  which you would be paid, and in several instances
11  were paid for whatever the services were that you
12  rendered to Labaton in connection with Arkansas,
13  correct?
14  A.   **Correct.**
15       **MR. MARX:** Objection.
16  A.   **I think.**
17  Q.   And I believe that you told us that you
18  didn't consider it a referral fee; is that correct?
19  A.   **I did not say I didn't consider it.  I said**
20  **I take issue with the word "referral" because I,**
21  **frankly, did not understand what this was.**
22  Q.   What did you consider this fee to be, sir?
23  A.   **An agreement.**
24  Q.   An agreement to be paid for what?



In Re:  State Street Attorneys Fees



Page 325

1   a sunset provision.  But I agreed in theory to have
2   a sunset provision.
3   Q.   What services, if any, have you provided
4   since the initial introduction with regard to
5   Arkansas?
6      Not in the case in which you are in fact
7   their counsel in the BP matter but otherwise.
8   **A.   Just the BP matter as far as I can recall.**
9   Q.   Putting that case aside.
10      With regard to all other cases, what
11   services is it that you contend that you have
12   rendered since the introduction between Labaton and
13   Arkansas?
14      **MR. MARX:** Objection.
15   **A.   Nothing else I can think of.**
16   Q.   Nothing further.
17      **MS. LUKEY:** Thank you.
18      **MR. SINNOTT:** Richard.
19      **MR. HEIMANN:** Yes.
20      **CROSS-EXAMINATION**
21      **BY MR. HEIMANN:**
22
23   Q.   The payment that related to the State Street
24   matter was made to whom?  From Labaton to whom?

Page 326

1  A.  To me.
2  Q.  To you personally?
3  A.  Yes, sir.
4  Q.  Did you in turn share any portion of that
5  payment with any other persons?
6  A.  I did.
7  Q.  Who?
8  A.  Kamran Mashayekh, Elaine Doyal, the IRS,
9  lots of debt service.
10  Q.  Let's stick with the individuals.
11     Describe each of the individuals for me.
12  Who are they?  Who were they?
13  A.  Kamran Mashayekh, my law partner.  Over the
14  years he's loaned money to the firm.  And Elaine
15  Doyal, my legal assistant.
16     Those were throughout this time
17  period --
18  Q.  How much of the little over four million
19  dollars did you pay to the first of those two
20  people?
21  A.  Kamran Mashayekh, a quarter million dollars.
22  Q.  To the second, your legal assistant?
23  A.  Elaine Doyal, $50,000.
24  Q.  And what about to your former partner?

Page 327

1  A.  Nothing.
2  Q.  Nothing to him?
3  A.  No, sir.
4  Q.  And he's the one, from the documents we were
5  looking at, who apparently had a significant amount
6  of contact to the senator that was involved -- the
7  state senator that was involved in the efforts to
8  obtain a position for Labaton with the Arkansas
9  fund, correct?
10  A.  Yes.  He was friends with the senator.
11  Q.  And did he ever receive any portion of the
12  payments that were made by Labaton over time
13  relating to that agreement?
14  A.  Maybe in the very beginning.
15  Q.  But not otherwise?
16  A.  No, sir.
17  Q.  All right.  Thank you.
18     MR. SINNOTT:  Okay.  On the -- did you
19  have something, Joan?
20     MS. LUKEY:  Just one question.
21  Does he know about these payments including the four
22  plus million?
23     MR. MARX:  Objection.
24     THE WITNESS:  To my knowledge, he does

Page 328

1  not know about this payment.
2     MS. LUKEY:  Thank you.
3     MR. SINNOTT:  On the telephone, Jim
4  Vallee, any questions?
5     (No response.)
6     MR. SINNOTT:  Jim Johnson, are you
7  there?
8     MS. LUKEY:  He's mine.
9     MR. JOHNSON:  Yes, I am, and I have no
10  questions, your Honor.
11     MR. SINNOTT:  Okay.  Kim?
12     MS. KEEVERS PALMER:  No questions.
13     MR. SINNOTT:  Lynn?
14     (No response.)
15     MR. SINNOTT:  Brian?
16     MR. McTIGUE:  No questions.
17     MR. SINNOTT:  Laura?
18     MS. GERBER:  I have no questions.  Thank
19  you.
20     MR. SINNOTT:  Is there anyone else on
21  the line that hasn't been spoken for?
22     (No response.)
23     MR. SMITH:  Smith here.  No questions.
24     MR. SINNOTT:  Okay.  All right.

Page 329

1  ██████████████████████████
2  ██ ████████████████
3  ██ ███████████████████████████
4  ██ ██████████████████████████████
5  ██ █████████████████████████
6  ██ ███████████████████████████████
7  ██ ████████████
8  ██ ██████████████████████
9  ██ ████████████████
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24