# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ARKANSAS TEACHER RETIREMENT SYSTEM,
on behalf of itself and all others similarly situated,

Plaintiff,

v.

STATE STREET BANK AND TRUST COMPANY,

Defendant.

**FILED UNDER SEAL**

No. 11-cv-10230 MLW

---

ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R.
TAYLOR, RICHARD A. SUTHERLAND, and those similarly
situated,

Plaintiff,

v.

STATE STREET BANK AND TRUST COMPANY, STATE
STREET GLOBAL MARKETS, LLC and DOES 1-20,

Defendants.

No. 11-cv-12049 MLW

---

THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND
PROFIT SHARING PLAN, on behalf of itself, and JAMES
PEHOUSHEK-STANGELAND, and all others similarly
situated,

Plaintiff,

v.

STATE STREET BANK AND TRUST COMPANY,

Defendant.

No. 12-cv-11698 MLW

---

# LABATON SUCHAROW LLP'S SECOND SUPPLEMENTAL OBJECTIONS TO
## SPECIAL MASTER'S REPORT AND RECOMMENDATIONS

# TABLE OF CONTENTS

I.   BACKGROUND. ................................................................................................ 1

    A.   Prof. Gillers' Newly-Disclosed Animosity Toward Referral Fees ........................ 1

    B.   Prof. Gillers' Shifting View of Customer Class Counsels' Disclosure
        Obligations ............................................................................................ 4

II.   ARGUMENT. ................................................................................................... 6

    A.   Prof. Gillers' Selective Attack on Labaton in Connection with
        Counsels' Disclosure Obligations to the Court Lacks Any Legal
        Principle ................................................................................................ 6

    B.   Prof. Gillers' New Focus on Materiality Is Unavailing ........................................ 8

    C.   Rule 11 Case Law Contradicts Prof. Gillers' Opinion ......................................... 11

    D.   Prof. Gillers' Rewritten Opinion Regarding Disclosure to the Class is
        Similarly Arbitrary and Inconsistent ................................................................. 13

    E.   Prof. Gillers Ignores His Own Conclusion Regarding George Hopkins'
        Ratification ............................................................................................ 14

    F.   The Master's Report Is Undermined by His Reliance on Prof. Gillers'
        Misguided Opinions ................................................................................. 15

III.   THE COURT SHOULD REJECT ERISA COUNSELS' "EXCEPTIONS." .................. 16

IV.   CONCLUSION. ................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re "Agent Orange" Product Liability Litigation*,
    818 F.2d 216 (2d Cir. 1987) ....................................................................................6

*In re Discipline of an Atty.*,
    442 Mass. 660 (2004) ...............................................................................9, 10, 11

*Eldridge v. Gordon Bros. Grp., LLC*,
    863 F.3d 66 (1st Cir. 2017) ...................................................................................12

*Kaplan v. DaimlerChrysler, A.G.*,
    331 F.3d 1251 (11th Cir. 2003) .............................................................................12

*Lewis v. Teleprompter Corp.*,
    88 F.R.D. 11 (S.D.N.Y. 1980) ................................................................................6

*In re Paiva Tej Bansal*,
    C.A. NO. 10-179, 2011 U.S. Dist. LEXIS 45958 (D.R.I. Apr. 26, 2011) .................3

*In re Ruffalo*,
    390 U.S. 544 (1968) ................................................................................................9

*Saggese v. Kelley*,
    445 Mass. 434 (2005) .........................................................................................3, 14

*Womack v. GEO Group, Inc.*,
    No. CV-12-1524, 2013 U.S. Dist. LEXIS 77537 (D. Ariz. June 3, 2013) ..............3

**Rules**

Fed. R. Civ. P. 11 ......................................................................................................11, 12

Fed. R. Civ. P. 23 ......................................................................................................9, 12

Fed. R. Civ. P. 54 ......................................................................................................12

Fed. R. Evid. 706 ......................................................................................................3

Mass. R. Prof. C. 1.2 ................................................................................................13, 14

Mass. R. Prof. C. 1.4 ................................................................................................13, 14

Mass. R. Prof. C. 1.5(e) ...........................................................................................5

Mass. R. Prof. C. 3.3 ...................................................................................................8, 9, 10, 11

**Other Authorities**

Benjamin Weiser, *Tobacco's Trials*, WASHINGTON POST (Dec. 8, 1996) ......................................2

Labaton Sucharow LLP ("Labaton") hereby submits its Second Supplemental Objections, in accordance with this Court's June 28, 2018 Memorandum and Order.  ECF 356 at 34. Labaton incorporates its previously filed Objections to Special Master's Report and Recommendations ("Labaton's Objections") (redacted version at ECF 359) and its Supplemental Objections to Special Master's Report and Recommendations ("Labaton's Supplemental Objections") (ECF 379).

Prof. Gillers' rewritten opinions ignore both the Federal Rules of Civil Procedure and Massachusetts practice, and largely flow from his newly-discovered bias against referral fees. The Court should reject them.  In turn, the Court should reject the Master's conclusions, for all the reasons stated in Labaton's prior Objections, and because the Master's conclusions rely and depend upon Prof. Gillers' incorrect and unfair opinions.

Finally, Labaton briefly responds to the "exceptions" recently filed by Keller Rohrback LLP (ECF 387), Zuckerman Spaeder LLP (ECF 392), and McTigue Law LLP (ECF 398).  Their self-serving arguments are unsupported by the record.

I.      **BACKGROUND.**

   A.      **Prof. Gillers' Newly-Disclosed Animosity Toward Referral Fees.**

Prof. Gillers disapproves of the practice of paying referral fees.  His partiality was already apparent, given that his opinions regarding Labaton's disclosure obligations hinge on the fact that it paid a referral.  However, any doubt about Prof. Gillers' bias against referral fees is now gone.

Shortly before Prof. Gillers' July 12, 2018 deposition, counsel for the Master revealed to Customer Class Counsel a previously-undisclosed opinion piece that Prof. Gillers wrote for the New York Times in 1979.  The article – entitled "Lawyers:  Paid for Doing Nothing?" – voiced

Prof. Gillers' adamant opposition to efforts by several bar associations to make referral fees permissible. Prof. Gillers' piece starts with the initial premise that referral fees are "wrong." *See* July 26, 2018 Transmittal Declaration of Stuart M. Glass, Supp. Ex. A at 1 ("But if referral fees are wrong, the answer is strict enforcement of the prohibition against them.").[1] It goes on to describe lawyers who pay or receive referral fees as predatory and opportunistic. *Id.* at 2 ("The example of referral fees and other rules devised under the aegis [of] self-regulation teach an important lesson: if the foxes are given the task of providing security for the chicken coop, they will be mightily tempted to keep an extra set of keys.").[2] In sum, the article demonstrates Prof. Gillers' opposition to the payment of referral fees – a perspective that he, unprompted, chose to inject into the public discourse. Simply put, he is a partisan.[3]

In his article, Prof. Gillers also attacks the policy justification for referral fees – specifically, "that they make it more likely that the client will get the best lawyer for his problem." *Id.* at 1. He derides this perspective as "a form of blackmail, unworthy of any profession." *Id.* at 2. Prof. Gillers' sermonizing about what is "worthy" of the legal profession runs directly counter to the positions of both Camille Sarrouf (former president of the Massachusetts Bar Association) and Hal Lieberman (former Assistant Bar Counsel at the Massachusetts Office of the Bar Counsel). R&R Ex. 239 (Sarrouf Decl.) at 7 ("In my view,

---

[1] Exhibits attached to the Glass Declaration in support of these Second Supplemental Objections are designated with a letter as "Supp. Ex." These Second Supplemental Objections, like Labaton's Objections (ECF 359) and Supplemental Objections (ECF 379), also incorporate the exhibits attached to the June 28, 2018 Transmittal Declaration of Justin J. Wolosz (ECF 362), also designated with a letter, and the cited exhibits to the Master's Report and Recommendations, designated with a number.

[2] This is not the only time that Prof. Gillers has publicly compared lawyers to animals. *See* Benjamin Weiser, *Tobacco's Trials*, WASHINGTON POST (Dec. 8, 1996) ("They're like red ants at a picnic.").

[3] ███████████████████████████████████████████████

these arrangements benefit clients because they encourage attorneys to pass work along to

attorneys who are better suited to handle the representation."); R&R Ex. 242 (Lieberman Rep.) at

18 ("As a matter of good policy and the public interest, it is well recognized that the bar should

encourage fee sharing relationships that serve the client by helping to ensure that cases,

especially litigation matters, like this one, are handled by the best, most experienced lawyer in

the particular area of law. That is exactly what happened here, and the results speak for

themselves.").  And, the Supreme Judicial Court has described the dynamic that Prof. Gillers

maligns as a "time-honored practice" in Massachusetts.  *See Saggese v. Kelley*, 445 Mass. 434,

437, 442 (2005) ("Saggese told Doe he had little experience in the field for which Doe sought his

representation, but that the Kelleys had such experience.  Later that month he introduced Doe to

Kathleen Kelley.").  Thus, Massachusetts practitioners and Prof. Gillers hold fundamentally

different views of whether referral fees are beneficial.

Prof. Gillers' pre-existing, and public, disdain for referral fees is significant, for several

reasons.  First, it calls his retention even further into question.  As Labaton has detailed

extensively, Prof. Gillers' role as a legal expert is inappropriate.  *See* ECF 272; ECF 302 (and

supporting memorandum).  Now that his pre-existing disapproval of referral fees has come to

light, his presence in this case as "the equivalent of a [FRE 706] court appointed expert" appears

doubly improper.  *See* R&R Ex. 233 at 2; *see also Womack v. GEO Group, Inc.*, No. CV-12-

1524, 2013 U.S. Dist. LEXIS 77537 at *4-5 (D. Ariz. June 3, 2013) (citing cases for the

proposition that Rule 706 "[o]nly allows a court to appoint a neutral expert," and it "does not

contemplate the appointment of, and compensation for, an expert to aid one of the parties," but

rather that "the principal purpose of a court-appointed expert is to assist the trier of fact, not to

serve as an advocate" for one of the parties) (internal citations omitted); *In re Paiva Tej Bansal*,

C.A. NO. 10-179, 2011 U.S. Dist. LEXIS 45958 at *6 (D.R.I. Apr. 26, 2011) ("First, and most importantly, the purpose of Rule 706 is to assist the factfinding of the court, not to benefit a particular party."). The Master never should have appointed an expert to help him understand the law. Choosing an unabashed partisan to do so compounds his error.[4]

Second – and even more importantly – Prof. Gillers' animosity toward referral fees appears to drive his opinions regarding Labaton's disclosure obligations. As explained in § II, *infra*, the dispositive distinction that Prof. Gillers draws between the disclosure obligations of Labaton, on the one hand, and Lieff and Thornton, on the other, is the knowledge that the payment to Chargois was for a referral (rather than some work as local counsel). There is no basis in the law for this distinction. Thus, the singular weight that Prof. Gillers places upon this fact – viewed in the light of his stated opposition to the payment of referral fees – illustrates the unfairness of his retention and the biased nature of his opinions.

**B.     Prof. Gillers' Shifting View of Customer Class Counsels' Disclosure Obligations.**

Prof. Gillers' core opinions have undergone a dramatic shift. In his Original Report, Prof. Gillers opined that "Labaton, Thornton, and Lieff" – who shared in the $4.1 million payment – were each required to disclose the Chargois Agreement to the Court and the class. R&R Ex. 232 at 74, 78.[5] Now, in his Supplemental Report, Prof. Gillers opines that only counsel who knew the "terms" or "nature" of the Chargois Agreement were required to disclose it to the Court and the class. R&R Ex. 233 at 97, 103. Prof. Gillers did not learn any new fact that sparked the transformation of his opinion. Indeed, in his Original Report, he acknowledged

---

[4]     The recent disclosure of Prof. Gillers' partisanship is another reason to grant Customer Class Counsels' Motion for an Accounting, and For Clarification that the Master's Role has Concluded. *See* ECF 302.

[5]     Labaton emphatically rejects the notion that any Customer Class firm was obligated to disclose the payment to Chargois. *See* Labaton's Objections at §§ IV-V.

- 4 -

REDACTED

that Lieff and Thornton "were not privy to the origins of the Chargois Arrangement or the details of Labaton's obligation to pay Chargois in all cases in which ATRS is a co-lead counsel."  R&R Ex. 232 at 42. ███████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Even after exploring Prof. Gillers' new opinions during his July deposition, his about-face remains inexplicable (if anything, it is now harder to understand). ███████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

────────────────────

6 █████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

7 █████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

Prof. Gillers proffered a vague and subjective standard to justify his selective blaming of

Labaton.  █████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████ He did

not (and cannot) identify any legal authority supporting his "criteria."

## II.   ARGUMENT.

### A.   Prof. Gillers' Selective Attack on Labaton in Connection With Counsels' Disclosure Obligations to the Court Lacks Any Legal Principle.

As Labaton details extensively in its Objections, Prof. Gillers' view of counsels'

disclosure obligations – like the Master's – is squarely at odds with controlling law, particularly

the Federal Rules of Civil Procedure.  Labaton Obj. at §§ IV-V.  But, ignoring the Federal Rules,

Prof. Gillers claims that federal law requires that counsel ensure that the Court "has all the facts"

in passing on a fee application.  *See* R&R Ex. 233 at 79-84 (relying upon *In re "Agent Orange"*

*Product Liability Litigation*, 818 F.2d 216, 223 (2d Cir. 1987) *and Lewis v. Teleprompter Corp.*,

88 F.R.D. 11, 18 (S.D.N.Y. 1980)); *see also id.* at 78 ("I do not rely on Rules 23 and 54 for my

opinion.").  Prof. Gillers is incorrect.  *See, e.g.*, R&R Ex. 234 (Rubenstein Rep.) at 14

(explaining that Prof. Gillers' analysis "ignores the fact that the framers of Rule 23(h) were well

aware of the principles set forth in his random set of snippets [of case law], yet chose to have Rule 23(h) cross-reference Rule 54(d).  In other words, the class action law experts who wrote the rule after study and public input balanced the principles at stake by authorizing class counsel to keep fee-sharing arrangements confidential absent an explicit judicial order to the contrary.").

However, an examination of Prof. Gillers' baseless legal framework makes clear just how arbitrary his ultimate conclusions are, because he does not even attempt to apply the purported authority that he describes.  Stating the obvious, if counsel must disclose "all the facts," then Prof. Gillers would conclude that the three firms sharing the $4.1 million payment to Chargois were required to disclose it.  But he does not.  R&R Ex. 233 at 97.  Instead, he concludes that other Customer Class Counsel had no disclosure obligations, despite being aware that they were paying $4.1 million to a lawyer who did not file an appearance in the case, did not attend any court hearings, and did not appear in any lodestar.  *See id.*  Even if Prof. Gillers' cherry-picked legal authority had any merit, it would offer no support for his inconsistent conclusion.

Disturbingly, the Master incorporates Prof. Gillers' arbitrary "analysis."  R&R at 303 ("Case law, much of which is quoted in greater detail by Professor Gillers (pp. 79-83) – including cases from within the District of Massachusetts – recognizes the Court's responsibility to protect the class and the class's interests, and the Court's reliance on counsel to be forthcoming with the information needed in order to do so.").  Like Prof. Gillers, the Master describes a limitless interpretation of counsels' disclosure obligations:  "[w]e agree with Professor Gillers that, in total, federal case law makes clear that counsel must be transparent in providing the court with *all available information* when seeking a fee award in class action cases."  R&R at 304 n.248 (emphasis added).  And, also like Prof. Gillers, the Master does not bother applying his own standard, instead choosing to focus on Labaton alone.  See *id.* at 304.

- 7 -

For the avoidance of any doubt, the Court should reject Prof. Gillers' analysis of federal law.  But his refusal to apply his own purported standard speaks volumes about the weakness of his opinions.  There is simply no legal basis for singling out Labaton.  The transparent factor motivating Prof. Gillers' (and the Master's) conclusions is their strong aversion to referral fees.

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████  As a matter of law and fairness, the Court must reject their

unprincipled conclusions.

**B.      Prof. Gillers' New Focus on Materiality Is Unavailing.**

Perhaps recognizing that his argument regarding federal law is meritless – and perhaps cognizant that the Master needs support for his decision to single out Labaton – Prof. Gillers' new opinion pivots away from his prior "all the facts" approach, and toward a more malleable standard of "materiality."  ████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████

Prof. Gillers' reliance on his subjective "materiality" standard is misguided for several reasons:

*First*, Prof. Gillers' view of what is material is colored by his long-held animosity toward referral fees, and carries no weight in Massachusetts.  His "judgment" regarding whether a referral fee must be disclosed differs substantially from that of Massachusetts lawyers, who – far from disdaining referral fees – know them to be a regular practice.  *See, e.g.*, R&R Ex. 252 (Sarrouf 3/21 Dep.) at 35:23-36:7 ("90 percent of my law practice over the last 56 years . . . have

- 8 -

been referral cases . . . And in the hundreds that I've tried, I have never had a Court ask me what

is your referral fee.  Never.  It never comes up.").  These differing viewpoints are unsurprising:

Prof. Gillers believes that referral fees are "wrong"; Massachusetts practitioners do not.  *Id.*

Against that backdrop, finding a violation of MRPC 3.3(a) is wholly unjustified, because

such a violation requires bad faith – i.e., it "would have to be based on Labaton *knowingly*

engaging in impermissible conduct."  *See* R&R Ex. 241 (Joy Rep.) at 43.  It cannot be said that

Labaton "knowingly" engaged in impermissible conduct when even the *former president of the*

*Massachusetts Bar Association* does not believe Labaton's conduct was improper.  *See, e.g.*,

R&R Ex. 252 (Sarrouf 3/21 Dep.) at 35:23-36:7.  Labaton's attorneys acted just as reasonable

Massachusetts practitioners could have, and therefore, the Court should reject Prof. Gillers' (and

the Master's) conclusion that they made a bad-faith omission sufficient to trigger MRPC 3.3(a).

*See, e.g.*, *In re Discipline of an Atty.*, 442 Mass. 660, 668 (2004) (citing with approval *In re*

*Ruffalo*, 390 U.S. 544, 554-556 (1968) (White, J., concurring)) (discipline inappropriate "on the

basis of a determination after the fact that conduct is unethical if responsible attorneys would

differ in appraising the propriety of that conduct"); R&R Ex. 239 (Sarrouf Decl.) at 11 ("Referral

fees, or origination fees, are very common in connection with plaintiffs-side litigation work.  If

the payment does not impact the total amount of a fee paid or awarded (which I understand to

have been the case here), and if the court does not request this detail, in my experience referral or

origination fee arrangements are not normally disclosed to the court.").

*Second*, Prof. Gillers' view of materiality is squarely contradicted by all objective

evidence that was available to Labaton.  The controlling Federal Rules of Civil Procedure do not

require disclosure – a clear indication that fee-sharing agreements are not viewed as material by

their drafters.  *See* Fed. R. Civ. P. 23(h); *see also* R&R Ex. 234 (Rubenstein Rep.) at 10-11

("[T]he class action experts who drafted Rule 23(h) were well aware that a class action case encompasses cast and crew – and they nonetheless chose the default embodied in Rule 54: that fee allocation agreements need not be disclosed absent judicial request, that the judge must ask for the playbill.").  Moreover, as a matter of historical fact, judges in this District do not order disclosure of fee-sharing agreements when reviewing class action settlements – even though referral fees are permissible and frequently paid in the Commonwealth.  *See* R&R Ex. 234 (Rubenstein Rep.) at 6.[8]  Finally, in this specific case, this Court did not ask how fees were being shared among Customer Class Counsel.  R&R Ex. 78 (11/2/16 Hr'g Tr.) at 22-38.  ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

*Third*, given the above, finding that Labaton violated MRPC 3.3 would offend due process.  The Supreme Judicial Court has explained that "[d]ue process requires that attorneys, like anyone else, not be subject to laws and rules of potential random application or unclear meaning." *In re Discipline of an Atty.*, 442 Mass. at 668.  There are, respectfully, several layers of "random" decision-making in the conclusions reached by the Master and Prof. Gillers.  The finding that the Chargois Agreement needed to be disclosed in this case – when no judge in this District had ordered disclosure in the previous 127 class action settlements – is random.  *See* R&R Ex. 234 (Rubenstein Rep.) at 6.  Similarly, the conclusion that Labaton was required to disclose the Chargois payment, while Lieff and Thornton were not (based on Prof. Gillers' subjective "judgment call"), is also random.  *See, e.g.*, R&R Ex. 233 at 86-87 ("My opinion rests

---

[8]
███████████████████████████████████
████████████████████████████████████████  He ignores Prof. Rubenstein's
explanation that there are "a variety of situations in which the identities of counsel sharing in a fee award
are routinely unknown to the class action court."  R&R Ex. 234 (Rubenstein Rep.) at 11.

on the extraordinary nature of Chargois' compensation . . . .  It is not necessary to conclude that class counsel must inform the Court, or the class, of every lawyer who seeks a fee in a matter for the work he or she performed.").  Prof. Gillers is not applying a rule; he is making an ad hoc judgment against Labaton.

Prof. Gillers' proposed standard also flouts the SJC's admonition against rules of "unclear meaning."  *See In re Discipline of an Atty.*, 442 Mass. at 668.



If Prof. Gillers is unable to apply his own standard, it is absurd to expect that practicing attorneys could – and unjust to punish them after-the-fact if they do not.

**C.      Rule 11 Case Law Contradicts Prof. Gillers' Opinion.**

Prof. Gillers' Supplemental Report adds a brand-new finding that Labaton violated Rule 11, ████████████████████████████████████████ He included a Rule 11 opinion "purely" at the request of the Master and his counsel.  *Id.* at 579:10-20. However, despite adding a new opinion, Prof. Gillers offers almost no analysis, and instead retreads his argument regarding MRPC 3.3(a).  R&R Ex. 233 at 96 ("My reasons for concluding

the nondisclosure of the Chargois Arrangement violates Rule 11 are the same as my reasons for

concluding that the fee petition did not comply with Rule 3.3(a).").

   The absence of a Rule 11 finding against Labaton in Prof. Gillers' Original Report is

telling.  Prof. Gillers applied Rule 11 in his analysis of a different firm's conduct, but did not

mention Rule 11 in connection with Labaton.  R&R Ex. 232 at 84.  ████████████████

████████████████████████████████████████████████████████████████

████████████  One obvious explanation for his initial reticence is that the First Circuit has never

found a Rule 11 violation based on an omission, leaving Prof. Gillers with a single out-of-Circuit

appellate decision supporting his view.  *See* R&R Ex. 233 at 95.  ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████  *see also* R&R at 317

"[T]here is no First Circuit case, either appellate or district, holding that a material omission

warrants the imposition of Rule 11 sanctions.").

   Prof. Gillers' Rule 11 opinion is also incorrect because Labaton's conduct was

objectively reasonable under the circumstances, and was not "culpably careless."  *See Eldridge v.*

*Gordon Bros. Grp., LLC*, 863 F.3d 66, 87-88 (1st Cir. 2017) (whether an attorney violated Rule

11 "depends on the objective reasonableness of the [attorney's] conduct under the totality of

the circumstances.") (internal citations omitted).  As described above, Rules 23 and 54 *do not*

*require* disclosure of fee-sharing agreements; judges in this District historically do not order

disclosure of fee-sharing agreements at the class action settlement stage; and this Court did not

ask any questions about Customer Class Counsels' fee-sharing agreements.  Simply stated,

"there is nothing that the lawyers did here that was unusual."  R&R Ex. 235 (Rubenstein Dep.) at

104:5-6. Prof. Gillers' subjective "judgment call," driven by his disapproval of referral fees, cannot convert reasonable and typical conduct into misconduct. *See Eldridge*, 863 F.3d at 87-88; *see also Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003) (in the Rule 11 context, "courts determine whether a reasonable attorney in like circumstances *could believe* his actions were factually and legally justified.") (emphasis added).

### D.   Prof. Gillers' Rewritten Opinion Regarding Disclosure to the Class is Similarly Arbitrary and Inconsistent.

Prof. Gillers' new opinion regarding Customer Class Counsels' obligations to disclose the Chargois payment to the class is also devoid of any legal principle. In his revised opinion, Prof. Gillers states that "Labaton, Lieff Cabraser, and Thornton maintained attorney-client relationships with the certified settlement class and its members." R&R Ex. 233 at 98. He goes on to assert that, "[a]s fiduciaries and lawyers for the unnamed certified class members – and lawyers are fiduciaries for their clients as a matter of law – customer class counsel had a duty to give their clients information relevant to decisions that belonged to the client." *Id.* at 102. Despite stating these broad principles, Prof. Gillers makes the illogical (and incorrect) leap that *only* "counsel who knew the nature of the Chargois Arrangement" had a duty to disclose it to class members. *Id.* at 103.

As with his new opinions regarding disclosure to the Court, Prof. Gillers' decision to single out Labaton as the only firm responsible for conveying information to the class regarding the Chargois payment is arbitrary. Assuming only for the sake of argument that Prof. Gillers' position regarding MRPC 1.2 and 1.4 has any merit,[9] there is nothing in either rule that supports

---

[9]     As Labaton explained in its Objections, Prof. Gillers' opinion that any of Customer Class Counsel had a duty to disclose the Chargois payment to the class is incorrect. ECF 359 at 70-76; ███████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████    R&R Ex.

his parsing of Labaton's disclosure obligations, on one hand, and Lieff's and Thornton's, on the other.  Simply put, his conclusion does not make sense:  to the extent that all three firms were "fiduciaries" and attorneys for the class – and if MRPC 1.2 and 1.4 required them to "give their clients information relevant to decisions that belonged to the client," including information about fee-sharing agreements – then each would have an obligation to disclose the fact that they were sharing $4.1 million of their fee award with another attorney.  Yet, Prof. Gillers does not even attempt to explain how he differentiates the purported attorney-client obligations shared by Labaton, Lieff, and Thornton.  *See* R&R Ex. 233 at 97-103.

Again, the distinction Prof. Gillers apparently draws (although his reasoning remains unclear) is that Labaton knew the payment was for a referral, whereas the other Customer Class Counsel did not.  Taking Prof. Gillers' analysis at face value, the logical consequence is that class counsel need not disclose divisions of fees to their "clients" (the class), *unless* that fee division is for a referral.  Although Prof. Gillers is incorrect in arguing that any of the Customer Class firms were required to disclose the Chargois payment to the class, his unsupported and unexplained decision to focus only on Labaton further magnifies the arbitrary nature of his opinions.

### E.    Prof. Gillers Ignores His Own Conclusion Regarding George Hopkins' Ratification.

During the period between completing his Original Report and writing his Supplemental Report, a new and powerful fact became available to Prof. Gillers:  George Hopkins, acting on

---

227 (Joy Dep.) at 154:9-14 (explaining that Labaton had a fiduciary duty to the class, "but not one that encompassed disclosing the fee-sharing arrangement");

behalf of ATRS, retroactively ratified the payment to Chargois.  *See* R&R Ex. 130; *see also*

*Saggese,* 445 Mass. at 442 ("Ratification is not the preferred method to obtain a client's consent

to a fee-sharing agreement, but it is adequate."); ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

During his March deposition, Prof. Gillers – bound by controlling precedent – testified that this

ratification was effective consent to the Chargois Agreement on behalf of ATRS.  R&R Ex. 253

at 106:18-22 ("Q: Sir, does the ratification declaration that you have seen now from Mr. Hopkins

constitute consent on behalf of Arkansas Teacher Retirement System to the fee referral . . . ?

A:  On behalf of Arkansas alone."). ██████████████████████████

███████████████████████████

However, despite repeatedly testifying that Mr. Hopkins' ratification constitutes adequate

consent on behalf of ATRS, Prof. Gillers does not meaningfully incorporate this fact into his

Supplemental Report.  *See* R&R Ex. 233 at 66-76.  Instead, he brushes aside Mr. Hopkins'

declaration, stating that Mr. Hopkins "purports to ratify" the Chargois Agreement.  *Id.* at 43 n.52.

Prof. Gillers provides no explanation for the marked inconsistency between his testimony, which

acknowledges the significance of Mr. Hopkins' ratification, and his Supplemental Report, which

largely ignores this crucial fact.

     **F.**    **The Master's Report Is Undermined by His Reliance on Prof. Gillers'
Misguided Opinions.**

At every turn, the Master has emphasized that Prof. Gillers' opinions strongly influenced

his own conclusions. ██████████████████████████████████

████████████████████████████████████████████████████

████████████████ ECF 216-1 ("[I]n light of Professor Gillers' report, and its potential

implications for the firms and the practicing bar in general, I believe that it is important that the

firms be allowed the fullest opportunity to respond."); ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████; *see generally* R&R (citing Gillers' Supplemental Report

20 times).  In fact, in at least one portion of his Report and Recommendations, the Master

appears to have largely duplicated a paragraph written by Prof. Gillers.  *Compare* R&R at 323

(discussing *United States v. Shaffer Equipment*) *and* R&R Ex. 233 at 89 (same).

But, at its core, the "expert" opinion that the Master relies upon reflects Prof. Gillers'

simple and subjective view that referral fees are wrong and, therefore, nondisclosure of a referral

fee is also wrong (despite the lack of any requirement to do so).  The Master's Report and

Recommendations – independently flawed for a variety of reasons – must be viewed through the

lens of his reliance on Prof. Gillers' incorrect, unprincipled, and biased views.

## III.  THE COURT SHOULD REJECT ERISA COUNSELS' "EXCEPTIONS."

Finally, Labaton responds briefly to the "Notice of Exceptions" filed by Zuckerman

Spaeder LLP ("Zuckerman"), Keller Rohrback L.L.P. ("Keller Rohrback"), and McTigue Law

LLP ("McTigue").[10]  If the Court accepts the Master's recommendation, then Zuckerman

Spaeder, Keller Rohrback, and McTigue, together with the attorneys with which they have

shared fees (collectively, "ERISA Counsel"), would be paid $3.4 million above what they

---

[10]     *See* Keller Rohrback's Notice of Exceptions to ECF 359 and ECF 361 ("Keller Exception") (ECF
387); Zuckerman Spaeder LLP's Notice of Exception to ECF 359, ECF 361, and ECF 367 ("Zuckerman
Exception") (ECF 392); McTigue Law LLP's Notice of Exceptions to the Objections of Labaton
Sucharow LLP and the Thornton Law Firm LLP to the Special Master's Report and Recommendation
("McTigue Exception") (ECF 398).

negotiated and reasonably expected to receive for litigating this case.  *See* R&R at 368.  Given

this posture, their motivation to shore up the Master's conclusions is unsurprising.  What is

surprising is how these law firms can advance their self-serving arguments, despite having

identified and offered no authority in support.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████  In making this

claim, Keller Rohrback (i) admits that Mr. Sarko is not qualified to speak to the ethical

requirements for Massachusetts, New York, Texas or Arkansas (*id.* at 4, n.1), ███████████

████████████████████████████████████████

████████████████  Zuckerman Spaeder's submission contains no more substance.

That firm claims that it would have filed a separate fee petition if it was aware of the Chargois

payment, because the payment raises "legal and ethical questions."  Zuckerman Exception at 4.

Yet, Zuckerman Spaeder cites no statute, rule, case or any other authority identifying or

supporting the existence of such "questions."  *Id.*[11]  With all due respect, the allegations being

directed at Labaton and Customer Class Counsel regarding the Chargois payment are far too

serious to be based solely on self-serving, *ipse dixit* offered by law firms that are asking the

Court to order Labaton to pay them $3.4 million.

Moreover, the spin that ERISA Counsel offers in seeking to justify an increase in their

fees is contradicted by the record.  Zuckerman Spaeder suggests that ERISA Counsel "produced"

a "$60 million settlement . . . for the ERISA plans" who were members of the class, and that

---

[11]     McTigue does not even attempt to link its complaint to any legal issue, opting instead to simply
complain about the economics of the agreement it negotiated.  McTigue Exception at 1-3.

ERISA Counsel's reasonable fee should be calculated against that settlement amount.  *Id.* at 2; *see also id.* at 4 (claiming that ERISA Counsel would have sought "a reasonable attorney's fee from the $60 million common fund produced for the ERISA class members").  These statements ignore the fact that, although all parties negotiated the overall $300 million settlement, it was the DOL that pushed for the ERISA plans to receive an "exceptional premium."  *See id.* at 3 n.1.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████  There is no basis for ERISA Counsel's suggestion now that they were solely responsible for the allocation to ERISA plans, or that the Court should perform a new, standalone fee analysis as if that were a separate settlement.[12]

McTigue's complaints are no more persuasive.  McTigue primarily argues that it should be paid more based on its lodestar (McTigue Exception at 2), but it offers no direct response to Labaton's explanation of why the share to ERISA Counsel should not be increased.  *See* Labaton's Objections at 11-12.  In any event, the Master never undertook to analyze and "value" each law firm's specific contribution, and despite the extensive record, there is no basis for the Court to engage in such an analysis now.  McTigue's protest about the costs it has paid participating in the Special Master's bloated proceedings make a bit more sense (McTigue Exception at 2-3), but the conclusion it urges does not.  Labaton has also shouldered significant burden and cost to participate in this unreasonably protracted process, including having to pay (along with other Customer Class Counsel) for the adversarial Special Master and his cadre of

---

[12]    Notably, ERISA Counsel agree with Labaton that the Special Master is confused about what the $10.9 million term actually means.  *See* Labaton's Objections at 10-11; Zuckerman Exception at 3 n.4; McTigue Exception at 3.

advisors and assistants to reach their novel, flawed conclusions.  There is no justification (and McTigue offers no authority) to require Labaton, in addition, to subsidize McTigue because the Special Master asked to hear from that firm as well.

For all of these reasons, the Court should disregard the self-serving arguments set forth in ERISA Counsel's "exceptions," and decline to adopt the Master's recommendation that Labaton pay $3.4 million to ERISA counsel.

## IV.   <u>CONCLUSION.</u>

For the reasons described above, and those stated in Labaton's Objections to the Master's Report and Recommendations (ECF 359) and its Supplemental Objections (ECF 379), the Court should reject the Master's finding that Labaton engaged in misconduct and the Master's proposed remedies.

Dated:  July 26, 2018                                    Respectfully submitted,


By: */s/ Joan A. Lukey*
    Joan A. Lukey (BBO No. 307340)
    Justin J. Wolosz (BBO No. 643543)
    Stuart M. Glass (BBO No. 641466)
    Choate, Hall & Stewart LLP
    Two International Place
    Boston, MA 02110

    *Counsel for Labaton Sucharow LLP*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to all counsel of record on July 26, 2018.

/s/ Joan A. Lukey
Joan A. Lukey