# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

## THE COMPETITIVE ENTERPRISE INSTITUTE'S CENTER FOR CLASS ACTION FAIRNESS'S RESPONSE TO THE COURT'S ORDER OF JULY 31, 2018

In accord with the Court's Order dated July 31, 2018, the Competitive Enterprise Institute's Center for Class Action Fairness ("CCAF") addresses topics related to the Special Master's role in this case and whether CCAF can serve as a guardian *ad litem* on behalf of absent class members, and under what terms it would do so. *See* Dkt. 410 ("Order").

## EXECUTIVE SUMMARY

The court may and should remand the matter to the special master to file a supplemental report responding to the parties' objections. The court should appoint a guardian *ad litem* to protect the class's interests, and has the authority to *sua sponte* replace the class representative for the limited purpose of these collateral matters without implicating the settlement. It would be most efficient and cost-effective if the special master served in that role once its other duties were completed, but given the certainty of appellate challenges to any adverse ruling against class counsel, the Court should appoint an independent and separate guardian *ad litem* if any party objects to the special master serving in that role, or if it believes the need for vigorous representation of the class's interests would outweigh the delay in a guardian *ad litem*'s need to get up to speed. Because of both the expanded scope and complexity of this case, the intensity of class counsel's litigation tactics, and new commitments to cases made since its original 2017 motion, CCAF can not serve as guardian *ad litem* unless it has affiliated co-counsel. CCAF did not find a firm willing to serve as co-counsel until yesterday, August 5. CCAF contemporaneously files a motion asking for an extension in responding to the part of the Court's order asking for the specific financial terms under which CCAF could serve as guardian *ad litem*, but provides a broad outline here. CCAF's Theodore H. Frank will attend the August 9 hearing to answer any questions the Court might have.

## BACKGROUND

On November 2, 2016, the Court awarded attorneys in the underlying litigation $75 million in attorneys' fees, expenses, and service fees to Arkansas Teacher Retirement System ("ATRS") and six ERISA plaintiffs, with the understanding that the attorneys' fees represented "only" 1.8 times the claimed lodestar. Dkt. 111. The base billing rates topped $1000/hour for some partners and

$425/hour for contract attorneys who were in actuality hired from agencies at about $50/hour (and paid even less). Unbeknownst to the Court, the attorneys had agreed that 90% of the attorneys' fees would go collectively to Class Counsel (Labaton Sucharow LLP ("Labaton"), Lieff Cabraser Heimann & Bernstein LLP ("Lieff"), and the Thornton Law Firm ("TLF")), and that nearly $4.1 million dollars of this money would be paid to Chargois & Herron LLP, a Texas firm that did absolutely no work in the case but was once well-connected to Arkansas politicians with oversight over the lead plaintiff, ATRS.

After receiving inquiries from a *Boston Globe* reporter regarding billing in this case (SM Ex. 174 at 28),[1] Class Counsel wrote the Court to advise they had inadvertently double-counted nearly 10,000 hours of attorney time, but argued it "should have no impact on the Court's ruling on attorneys' fees." Dkt. 116 at 1. Class Counsel has clung to this position ever since, while denying any implications from the other revelations in the *Globe* story or the special master investigation.

The *Boston Globe* story was published December 17, 2016, and described several questionable features of Class Counsel's fee request. It described not only the double-counting of attorney time, but also revealed (1) billing by the brother of TLF managing partner Garrett Bradley at $500, far above his typical rate, (2) described how 60% of the claimed billing was performed by staff attorneys, at least one of which was actually a temporary contract attorney employee paid about $30/hour, and (3) explained that paying defense-side clients would not pay such rates; CCAF's Theodore H. Frank, who had reviewed the fee petitions and settlement at the *Globe*'s request, was quoted on these issues and others. On February 6, 2017, the Court attached the *Globe* story to an Order proposing to appoint retired Judge Gerald E. Rosen as Special Master to "investigate and report concerning the accuracy and reliability of the representations that were made in connection

---

[1] "SM Ex." shall refer to exhibits to the Special Master's Report and Recommendations, the public versions of which are available at Dkt. 401. CCAF does not currently have access to unredacted versions of any documents that remain under seal, and its response here is limited by what is publicly available.

with the request for an award of attorneys' fees and expenses, the reasonableness of the award of $74,541,250 in attorneys' fees." Dkt. 117 at 8.

On February 17, 2017 CCAF moved to file an *amicus* brief in response to the Court's February 6 Order. Dkt. 126. The brief supported the Court's proposal to appoint the Special Master, though it raised a potential jurisdictional time bomb Class Counsel could spring should the Special Master's investigation require the Court to modify the underling fee order more than one year after it was issued. Dkt. 126-1 at 12-13. CCAF argued that the "Court should appoint a guardian *ad litem* for the class" to provide an adversarial presentation of the issues, and CCAF volunteered to undertake this task. *Id.* at 3. CCAF argued that in the alternative the Court should at least order supplemental notice to advise class members of the pendency of the Special Master's investigation. *Id.* at 9. Class Counsel opposed granting leave for CCAF to even file its *amicus* brief and opposed every suggestion CCAF made. Dkts. 145, 147, 150, 168. Ultimately, the Court granted leave for CCAF to file the brief, took its motion to participate as guardian *ad litem* under advisement, and adopted CCAF's suggestion to provide supplemental notice to the class. Dkt. 172.

The Court also took notice of CCAF's concern about the jurisdictional time bomb of a *sua sponte* fee order modification, and, at the Court's behest, the parties moved to reopen the fee order. Dkt. 178. The Court granted the Rule 60 motion on June 22, 2018. Dkt. 331. This order vacated the fee award. *Compare In re Labaton Sucharow LLP*, No. 18-1651, Petition for Writ of Mandamus 5 ("The Court did not rescind, revoke or vacate the award of fees, which still stands.").[2] Meanwhile, Judge Rosen, a jurist with 27 years' experience on the bench and experience with complex civil and class action litigation, started his investigation as Special Master. Class Counsel set the tone for these proceedings by immediately objecting to his retention of a technical expert advisor, an objection that the Court overruled after a *de novo* review. Dkt. 204.

---

[2] That Labaton would so baldly misrepresent the procedural state of affairs to the First Circuit when it thought it would be proceeding *ex parte* provides a dramatic demonstration why adversary presentation will be needed in responding to objections to the special master's report, where it will be easier to make similarly abusive misstatements about a giant record.

The Court originally contemplated that the Special Master would complete his report and recommendations by October 10, 2017 at a cost of no more than $2 million. Dkt. 173 at 3. The Special Master attempted to adhere to this timetable, completing numerous fact depositions in July 2017. But near the very end of document discovery, on August 8, 2017, it discovered TLF-produced emails concerning Labaton's fee agreement with Chargois, which both Labaton and Lieff concluded—and continue to insist—were not relevant to the Special Master's inquiry or his document requests. *See* Dkt. 359 at 17 (arguing that emails where Class Counsel agreed to share referral fees for Chargois did not fall within, i.e., a document request for communications "related to sharing costs and/or expenses"). The late disclosure of a $4.1 million payment to attorneys who did no work in the case necessitated additional fact discovery, another round of depositions, and ultimately expert discovery where Class Counsel collectively retained seven experts specifically to rebut one expert retained by the Special Master. Report and Recommendations, Dkt. 357 ("Report"), at 247 n.188.

Without any apparent irony or shame, Class Counsel has filed a Motion for an Accounting, and for Clarification that the Master's Role Has Concluded, Dkt. 302, complaining about the costs of the Special Master's investigation and seeking to bar him from further participation in the case. *See* Memo. in Support of the Motion, Dkt. 310 ("Motion"), at 15.

In connection with Class Counsel's pending Motion, the Court has ordered the Special Master, Class Counsel, and CCAF to "address the Court's authority to permit the Master to address objections to his Report and related issues." Order at 3. Additionally, CCAF is instructed to "(a) State whether it remains willing and able to serve as a guardian ad litem or amicus; (b) If so, the financial and other terms on which it proposes to serve; (c) Supplement its motion to participate (Docket No. 126) to address the current circumstances of the case." *Id.*

### RESPONSE TO THE COURT'S ORDER

While Labaton once assured the Court that the Special Master's staff could provide an "adversary proceeding before the Special Master" (Labaton Opp. to CCAF Mot., Dkt. 190 at 2), Class Counsel has the chutzpah to feign outrage at "the adversarial nature of the proceedings." Motion, at 3. To the extent that members of the Special Master's team are acting as adversaries, that's exactly what Labaton suggested should happen.

The Special Master should be ordered to prepare a response to Class Counsel's objections, which are collectively 300 pages long. As the Court observed, Rule 53(b)(4) expressly allows an issue to be resubmitted to the Special Master so that he may supplement his Report in view of Class Counsel's objections. Order at 3. So too does Rule 53(f)(1). A supplemental report is prudent due to expert discovery, which just recently concluded (and which is ultimately traceable to Labaton and Lieff's astonishing failure to disclose Chargois & Herron until after dozens of depositions had occurred (Report 87 n.66)). The Court should thus order the Special Master to supplement his Report in view of all objections.

Additionally, given the Court's fiduciary duty to the class and its continuing obligation to guard against conflicts of interest, the Court may act *sua sponte* to remove the conflicted representative ATRS and Class Counsel, who are working only on their own behalf. ATRS and Class Counsel are hopelessly conflicted by their antagonist interest in attorneys' fees, and due to political considerations necessitated when under scrutiny due to the suspicious payment of $4.1 million to politically-connected Texas attorneys who did no work on behalf of the class. Absent class members deserve an unconflicted advocate with the time and resources to protect their interests before the Court and on appeal against Class Counsel's torrent of baseless motions.

CCAF may be able to serve this role as guardian *ad litem*, but, due to changed circumstances since its original 2017 motion, can only do so with the assistance of affiliate counsel. CCAF performed an expedited search for affiliate counsel, and found a firm without conflicts willing to undertake the task only yesterday. CCAF will renew its motion for appointment as guardian *ad litem*

with an appropriate fee schedule as soon as possible by August 13. Fees for a guardian *ad litem* ought to come from the fund of fees for Class Counsel because Class Counsel's scorched-earth filings necessitate an active advocate to protect the class. Alternatively, Class Counsel might stipulate to allow the Special Master and his staff to transition into this role, if they are willing; because the Special Master is already fully familiar with the sealed record, this would likely be at lower cost and save time compared to appointing a new guardian *ad litem* who has not yet seen the sealed materials. The law is sufficiently unsettled, however, that the Court should not risk appointing the Special Master to this role without the consent of the parties.

## I.      The Special Master's Role

Plaintiffs' Motion presumes that the Special Master's task has been discharged, but this need not be true. As the Court observed (Order at 3), Rule 53 expressly authorizes resubmitting issues to the Special Master. The Court should do so here because the Special Master is best situated to respond to voluminous objections and assist the Court in conducting a *de novo* review of the underlying Report and Recommendations.

That said, the Court should be mindful that Class Counsel will aggressively litigate on appeal whether the Special Master has complied with Rule 53, so the contours of the Special Master's engagement should be bounded to avoid the impression of non-neutral proceedings.

Alternatively, if Class Counsel prefers not to bring another set of attorneys onboard to defend the class, it can stipulate that the Special Master transition into an advocate's role after any supplementary reports have been concluded. Class Counsel might prefer this solution as potentially more cost-effective than appointing CCAF and affiliated counsel. In any event, the Court should be assisted with truly adversarial responses because the Special Master's Report is unusually complex and Class Counsel's opposition is unusually ruthless.

A. **The Court should order the Special Master to produce a supplemental report incorporating Class Counsel's objections.**

Rule 53(f)(1) expressly authorizes courts to seek supplemental reporting from a special master: "In acting on a master's order, report, or recommendations, the court must give the parties notice and an opportunity to be heard; may receive evidence; and may adopt or affirm, modify, wholly or partly reject or reverse, *or resubmit to the master with instructions*." Rule 53(f)(1) (emphasis added). Many courts have resubmitted matters so a master can take parties' arguments into account in a supplemental report. *See, e.g., Sousa v. Mort. Electronic Registration Sys., Inc.,* No. 12-005, 2013 WL 4094379, at *1 (D.R.I. Aug. 13, 2013); *EEOC v. U.S. Steel Corp.,* No. 10-1284, 2011 WL 13135781, at *1 (W.D. Pa. Sept. 30, 2011); *Wachovia Bank, Nat'l Assn. v. Ming Tien,* No. 04-cv-20834, 2009 WL 10669111, at *1 (S.D. Fla. May 14, 2009); *Coleman v. Schwarzenegger,* No. 90-0520, 2007 WL 2904257, at *1 (E.D. Cal. Oct. 3, 2007); *Dillard v. City of Greensboro,* 956 F. Supp. 1576, 1577 (M.D. Ala. 1997); *Bogosian v. Woloohojian,* 882 F. Supp. 258, 259-60 (D.R.I. 1995).

District Courts are hardly forfeiting their independence by requesting supplemental reports in this manner; in fact the Supreme Court has used an analogous process in a case where it had original jurisdiction. *See United States v. Florida*, 420 U.S 531, 533 (1975). A special master produced a report defining the submerged "seaweed boundary" over which Florida has rights to the natural resources rather than the United States. *Id.* at 532. Both Florida and the United States filed "exceptions" to aspects of the special master's report, and the Supreme Court referred the matter back to the special master to "file a supplemental report restricted to the issues raised in those exceptions." *Id.* at 533.

The Court should take advantage of this process here because it allows the Special Master to consider and address additional counter-arguments to his Report, which will assist the Court in assembling facts and authority for its requisite *de novo* review. While CCAF does not have a complete record of the proceedings before the Special Master, it appears that some of Class Counsel's arguments are new, and certainly arguments raised by recently-concluded expert discovery could not have been incorporated into the May 14 Report. Resubmitting the matter therefore allows the

Special Master to marshal facts from the record in opposition to Class Counsel's specific arguments. It would otherwise be difficult bordering on impossible for an advocate without access to sealed documents or the Court to survey voluminous discovery not in the public record in response to Class Counsel's new arguments. The whole point of a special master was to engage in the detailed dive into the record, and the Court will have difficulty evaluating that record without adversary presentation, especially given the demonstrated willingness of Labaton to misrepresent the *procedural* record in its mandamus petition to the First Circuit. As before, the Special Master's supplemental recommendations on any new legal arguments "may make the process more effective and timely than disposition by the judge acting alone." Advisory Committee Notes to 2003 Amendments to Rule 53.

Contrary to Class Counsel, resubmitting the matter does not impinge on what Class Counsel creatively calls the "*de novo* review period." Motion at 16. No such "review period" exists under the rules on in case law. The rules do not envision *de novo* review as some sort of waiting period where the Special Master is not allowed to speak. Instead, "*de novo* review" describes the independent evaluation of a master's report by the district court—that objections to findings of fact and all findings of law should be decided *de novo*, without deference to the report or any party. Class Counsel does not explain how additional filings by the Special Master could threaten the Court's ability to impartially review arguments before it. In fact, parties typically vigorously dispute reports and recommendations—whether by a master or magistrate—from both sides, and these filings do not generally cast courts into a mesmeric trance. (Had CCAF already been appointed guardian *ad litem*, it likely would have filed objections to the report as insufficiently favorable to the class—as the Special Master himself recognized, admitting that he "mitigated findings and recommendations" and that a "vigorous independent representative" might argue he did not go far enough. Dkt. 345-1 at 5. Any appointment of an independent guardian *ad litem* should give the guardian sufficient time to digest the unredacted report and exhibits and file Rule 53 objections.) Class counsel's self-serving demand for an *ex parte* presentation does not suit Rule 23 class action procedure nor does it suit

American proceedings more generally, where Article III judges simply do not have the staffing to perform the investigative role that judges in many European jurisdictions play.

The Special Master should be expressly instructed to supplement his Report in view of Class Counsel's objections and ERISA counsel's responses to these objections.

**B.      The Court should clearly define the Special Master's role in the proceedings.**

While the Special Master's role in this case need not be concluded, and the Court should enter an order amending appointment to expressly allow the Special Master to file a supplemental report to incorporate responses to objections to the initial report, the Court should still maintain clear limits for his participation in the case. CCAF believes such limits will help prevent the Special Master from even appearing to engage in direct advocacy on behalf of the class or exceeding the authority granted by this Court's orders, activities that would almost surely elicit challenges by class counsel.

CCAF agrees with the Special Master that the Court's directive to "investigate and prepare a report and recommendation" cannot be read robotically to imply that Judge Rosen's participation must be terminated. Response at 12 (quoting Appointment Order, Dkt. 173, at 2). That said, "the order appointing a master is vitally important in defining the master's duties and authority, and should be clear and precise." Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 2602.2 at 550-51 (3d ed. 2008).

For this reason, with an abundance of caution, the Court should clearly spell out the Special Master's role in these proceedings because Rule 53 has been seldom been tested under such acrimonious circumstances.

Since the 2003 amendments to the Rules, the disqualification standards of 28 U.S.C § 455 apply with full force to masters, which was not previously the law in this circuit. *See Morgan v. Kerrigan,* 530 F.2d 401, 426 (1st Cir. 1976) ("Since masters and experts are subject to the control of the court and since there is a need to hire individuals with expertise in particular subject matters, masters and experts have not been held to the strict standards of impartiality that are applied to

judges."). So while the precise limits on a Special Master's advocacy may be unsettled, CCAF contends that a master can defend his recommendations just as a judge or magistrate may permissibly defend her orders against parties. *See generally* 9C Arthur R. Miller, Fed. Prac. & Proc. § 2602.2 (3d ed. 2018) ("In many respects the master conducts himself or herself as would a district or magistrate judge. Typical and well-established procedures applicable to other civil proceedings should be followed.").

That said, neither Rule 53 nor § 455 forbids judges from forming views on legal or factual subjects within their jurisdiction, and it stands to reason masters are not prohibited from having opinions either. "A judge's views on legal issues may not serve as the basis for motions to disqualify." *United States v. Conforte*, 624 F.2d 869, 882 (9th Cir. 1980). "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *Liteky v. United States*, 510 U.S. 540, 551 (1994) (quoting *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943)).

The most analogous context is when a district court files briefs in response to a mandamus petition in order to provide arguments against otherwise *ex parte* objections. Such "adversarial" activity does not offend judicial neutrality and is in fact authorized by appellate rule. Fed. R. App. 21(b)(4) ("The court of appeals may invite or order the trial-court judge to address the petition or may invite an amicus curiae to do so. The trial-court judge may request permission to address the petition but may not do so unless invited or ordered to do so by the court of appeals."). Appellate courts have ordered, requested, and invited district courts to participate in such adversarial capacity.[3] Judicial ethics permit such participation. Cmt. (6) to Canon 3A of the Code of Conduct for United

---

[3] *See, e.g., Schlagenhauf v. Holder*, 379 U.S. 104, 128 (1964) (Harlan, J., dissenting) (observing that the Court of Appeals had issued an order requiring the district court to show cause why a writ of mandamus should not issue); *La Buy v. Howes Leather Co.*, 352 U.S. 249, 254 (1957) (same); *In re President and Fellows of Harvard College*, 149 F.2d 69 (1st Cir. 1945) (same); *In re United States ex rel Richard Drummond*, 886 F.3d 448, 449 (5th Cir. 2018) (noting that panel had requested district court judge to file a response to the mandamus petition); *In re Atlantic Pipe Corp.*, 304 F.3d 135, 139 (1st Cir. 2002) (same); *McLee v. Chrysler Corp.*, 38 F.3d 67, 68 (2d Cir. 1994) (similar).

States Judges ("A judge may comment publicly on proceedings in which the judge is a litigant in a personal capacity, but not on mandamus proceedings when the judge is a litigant in an official capacity (but the judge may respond in accordance with Fed. R. App. P. 21(b).).").

Consistent with this precedent, the Court should eschew the appearance of active partisanship and should set clear procedural limits for the Special Master. "Active involvement of the respondent judge, indeed, may create such an appearance of partisanship as to require disqualification from further proceedings. A more nominal or formal role, on the other hand, gives no ground for disqualification." 16 Charles Alan Wright, et. al., FED. PRAC. & PROC. § 3932.2 (3d ed.).

Perhaps the Special Master could transition into being an advocate on behalf of the class, but CCAF is not aware of such a shift occurring in another case. Logically, any subsequent advocacy need not contaminate the Report and other earlier work product. *Cf. In re Kempthorne*, 449 F.3d 1265, 1271 (D.C. Cir. 2006) ("Because Balaran was disqualified from proceeding once he hired Smith, *his subsequent work product*-including the April 2003 interim report of investigation and the two site-visit reports that followed-must be suppressed.") (emphasis added). However, Class Counsel would likely argue that later advocacy somehow demonstrates an alleged existing prejudice on the part of the Special Master.

To be clear, CCAF believes the Special Master has both the right and obligation to act out of concern for the absent class, as the Court must. A district court must act as a "fiduciary for the class . . . with 'a jealous regard'" for the rights and interests of absent class members. *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010). And courts and therefore masters must not "assume the passive role" that is appropriate when confronted with an unopposed motion in ordinary bilateral litigation. *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). That said, CCAF is concerned that Class Counsel will challenge any decision arising from any act or motion by the Special Master not clearly traceable to an appointment order, and the lack of precedent in this area and the aggressiveness of class counsel in challenging every aspect of these proceedings

suggests that the Court should act conservatively where class counsel has not consented and there is not clear precedent.

### C.   Unless Class Counsel stipulates that the Special Master can serve as an advocate, a guardian *ad litem* or intervenor should be used instead.

There are practical reasons to prefer that the Special Master act as the class's advocate once any supplemental report is complete. In all likelihood it would take the Special Master less time (and therefore less money) to respond to Class Counsel:

> Having the Master respond to issues directly addressed by his Report, based largely on a voluminous record developed over fifteen months, strikes a fair balance between affording the Report full and due consideration by the Court, representing both the class and the legal profession (not to mention the public) and **reducing the time and expense of appointing another attorney—without the deep familiarity with the facts and law—to stand in the shoes of the class.**

Special Master's Response, Dkt. 377, at 14 (emphasis added).

If the Court adopts CCAF's recommendations that any guardian *ad litem* or intervenor be paid from Class Counsel's funds (*see* sec. IV, *infra*), Class Counsel might rationally conclude that appointing the Special Master as guardian *ad litem* is the best course for all parties. If so, Class Counsel could consent to allowing the Special Master to zealously represent the class's interests before the Court and on appeal. But without such a binding stipulation waiving objections to such an appointment, CCAF fears that allowing the Special Master to participate indefinitely could make the entire investigation needlessly exposed on appeal as Class Counsel would have a chance of prevailing on a question of first impression.

That said, the Special Master serving in that role would have the disadvantage that any advocacy for the class would not be maximally vigorous, because the Special Master is unlikely to object to his own report to argue that it should be more favorable to the class, as CCAF or another independent guardian would if permitted. The Court would have to weigh that factor against the delay any independent guardian would have getting up to speed on the voluminous record.

The Special Master should be ordered to supplement his Report in light of Class Counsel's oppositions, but it would be prudent to precisely define any ongoing role in these proceedings.

## II.     The Class Needs an Advocate

Class Counsel's aggressive tactics suggest the need for a partisan advocate on behalf of the absent class, and it is not ideal for the Special Master to fill this role.

The Court can and must protect absent class members, and fortunately it need not rely on a motion from the Special Master to do so. The Court must continually evaluate the whether the class has adequate representation, and the clear conflicts of ATRS and Class Counsel necessitate their removal as representatives, which can be done *sua sponte*.

The class also needs an advocate to challenge Class Counsel's prolific filings and advocate stronger remedies for the class. As the Special Master explained, the Report is meant to be an impartial opinion, and an advocate for the class would provide the class's opposition to the Report because it does not go far enough in certain respects.

In sum, Class Counsel ought to be removed and an advocate with undivided loyalty to the class should step into their shoes—whether this advocate is the Special Master, CCAF, or a qualified intervenor who appears on behalf of the class.

### A.     The Court is obligated to mitigate conflicts of interest, and may move *sua sponte* to remove Class Counsel and ATRS, who can no longer adequately represent the class.

In order to maintain a class action, Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This determination is not fixed at the time of certification or final approval. Instead, the Court has a "continuous duty to evaluate certification throughout the litigation." *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 613 (8th Cir. 2017). Courts must also ensure that appointed class counsel "fairly and adequately represent the interests of the class." Rule 23(g)(4). Besides the attorneys' competence, experience, and related professional qualifications, a court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Rule 23(g)(1)(B).

The closest analogy to this case may be *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014), where the lead plaintiff was removed on appeal because he was father-in-law to the lead attorney on the case, and the lead attorney on the case was under severe financial pressure from litigation over his law firm and a state-bar ethical investigation and "may have been desperate to obtain a large attorney's fee in this case before his financial roof fell in on him." *Id.* at 722.

> Class representatives are, as we noted earlier, fiduciaries of the class members, and fiduciaries are not allowed to have conflicts of interest without the informed consent of their beneficiaries, which was not sought in this case. Only a tiny number of class members would have known about the family relationship between the lead class representative and the lead class counsel—a relationship that created a grave conflict of interest; for the larger the fee award to class counsel, the better off Saltzman's daughter and son-in-law would be financially—and (which sharpened the conflict of interest) by a lot. …

> Weiss's ethical embroilment was another compelling reason for kicking him and Saltzman off the case. The disciplinary proceeding against Weiss was already under way when the settlement agreement was negotiated. It was very much in his personal interest, as opposed to the interest of the class members, to get the settlement signed and approved before the disciplinary proceeding culminated in a sanction that might abrogate his right to share in the attorneys' fee award in this case. He could negotiate a quick settlement only by giving ground to Pella, which upon discovering the box that Weiss was in would have stiffened its terms… .

> So Weiss's ethical troubles should have disqualified him from serving as class counsel even if his father-in-law hadn't been in the picture.

*Id.* at 723-24.

As a result of these conflicts, and due to other defects of the *Eubank* settlement, certification was reversed on appeal and both the named plaintiff and lead counsel were removed by the appellate court. *Id.* at 729.[4] Thus, while the settlement itself is not tainted, if the Court finds that the

---

[4] *Eubank* is not alone. Numerous other cases hold that a showing of a putative representative's ethical improprieties precludes class certification. E.g. *Creative Montessori v. Ashford Gear LLC*, 662 F.3d 913 (7th Cir. 2011); *Garbowski v. Tokai Pharmaceuticals, Inc.*, 302 F. Supp. 3d 441 (D. Mass. 2018); *In re American Express Anti-Steering Rules Antitrust Litig.*, 2015 WL 4645240 (E.D.N.Y Aug. 4, 2015); *Crissen v. Gupta*, 2014 WL 4129586 (S.D. Ind. Aug. 19, 2014); *Kulig v. Midland Funding,*

class is no longer adequately represented in these collateral proceedings, it must remove the representatives on its own initiative. *See In re Sonus Networks, Inc. Secs. Litig.*, 229 F.R.D. 339, 347-48 (D. Mass. 2005) (decertifying class due to lack of adequate representative).

The conflict of interest that Class Counsel and ATRS possess against absent class members is much more direct and stark than the conflicts in *Eubank*. Whereas the class has an interest in maximizing their recovery, Class Counsel has a dollar-for-dollar antagonistic interest and has demonstrated a willingness to deceive their putative clients and the court to recover a larger share. Whereas the class has an interest in sanctioning improper attorney conduct (or is at best indifferent), Class Counsel's livelihood largely depends on avoiding sanctions. This is particularly true of securities plaintiffs' firms like Labaton, who must be court-appointed from the outset of every PSLRA case. Any sort of sanction would presumably place Labaton at a competitive disadvantage and conceivably cost the firm millions in appointments it would otherwise secure.

Given the stakes to Class Counsel, it is inconceivable that they can also represent the class, and they must be removed. As for ATRS, it can hardly represent the class while being investigated by the state legislature and perhaps other officials for the $4.1 million of payments to attorneys supposedly paid just for picking up the phone and making introductions in 2008.

### B. An advocate for the class should have the resources to keep pace with Class Counsel's voluminous filings and provide sound research to assist the Court.

While a court might sometimes sort through a report and recommendations without the assistance of adversarial briefing, Class Counsel has gone to extreme lengths to multiply these proceedings. Class Counsel's conduct shows that they are willing to file any marginal, long-shot, or patently frivolous filing in an effort to advance their cause or simply to disrupt the investigation or the non-profit seeking to protect the class. An incomplete list of examples include:

- Labaton's meritless motion to recuse, Dkt. 275;

- Labaton's frivolous petition for writ of mandamus, No. 18-1651 (1st Cir.);

---

2014 WL 5017817 (S.D.N.Y. Sept. 26, 2014).

- Labaton's frivolous petition for expedited review of said writ petition, *id.*;

- Labaton's quickly-mooted motion to stay proceedings pending resolution of the petition for writ of mandamus, Dkt. 395;

- Class Counsel's motion for an accounting and for clarification that the Master's role has concluded (an attempt to silence the only opposition to Class Counsel), Dkt. 302;

- Class Counsel's astonishing retention of *seven* experts to rebut Prof. Gillers;

- Labaton's motion to strike and essentially permanently seal the supplemental report of Prof. Gillers, Dkt. 267;

- Labaton's motion(s) to strike the phrase "from class funds" from the record along with any reference to other cases where Chargois was entitled to referral fees;[5]

- Class Counsel's meritless opposition and sur-reply to CCAF filing an *amicus* brief, laced with abusive and false *ad hominem* attacks, Dkts. 145, 147, 150, 168;

- Labaton's frivolous opposition to CCAF's motion for leave to file comments on the Court's proposed notice to class members concerning the Special Master, Dkt. 190;

- Class Counsel's pointless opposition to allowing CCAF to access to filings it knew were not justifiably sealed and that the Court had asked CCAF to respond to, Dkt. 413 at 5.

Class Counsel, and particularly Labaton, has spared no expense in filing every improbable, absurd motion in an effort to derail the Special Master, obscure the proceedings, and ultimately challenge any unfavorable findings the Court may issue. An advocate for the class should be able to match the spending and wild motions of class counsel filing-for-filing.

The class needs an advocate to take every fetid strand of spaghetti that Class Counsel tosses at the wall, and carefully remove it so no residue remains to attack the Court's decision on appeal.

---

[5] It appears these motions are not publicly available, or are perhaps redacted in relevant part. The Special Master described them in his June 25 letter to the Court. Dkt. 345-1 at 3.

C.   **An advocate can present issues beyond the four corners of the Special Master's appointment, which help demonstrate the necessity of sanctions.**

Without the involvement of an advocate like a guardian *ad litem*, Class Counsel's arguments remain largely unrebutted, and this is undesirable because the Report was meant to be a balanced set of findings for the Court's consideration. A zealous advocate for the class should oppose portions of the Report that do not go far enough in protecting the class and sanctioning misconduct.

In particular, an expressly partisan guardian *ad litem* would also be free to pursue the manifestly suspicious referral fee arrangement without facing meritless motions to recuse and petitions for writ of mandamus. This is important because the Special Master purposely did not inquire into the topic because "[t]his subject is beyond the scope of the Special Master's assignment from the Court." Report at 125 n.111.

Even on the limited time that CCAF has reviewed this case, it has found evidence suggesting that the Special Master's sanctions recommendations are absolutely necessary and in all likelihood understated.

1.   **A name partner of Chargois & Herron LLP provided free rent to the former Arkansas state treasurer who was on the board of ATRS in 2007, and who was later convicted of accepting cash bribes in exchange for favors.**

By law, the Arkansas State Treasurer is a member of ATRS' Board of Trustees. Ark. Code Ann. § 24-7-301. When Labaton was retained as monitoring counsel by ATRS in 2008, Martha Shoffner was Arkansas State Treasurer and Trustee of the ATRS. The Board of Trustees, including Shoffner's designee, voted to approve Labaton and Chargois' application to become monitoring counsel on October 6, 2008. *See* Minutes, ATRS Board of Trustees Oct. 6, 2008 (attached as Exhibit A to Declaration of M. Frank Bednarz).

In November 2009, within two days of each other, five Labaton partners in New York took an interest in Arkansas politics and donated $4000 to Ms. Shoffner's reelection campaign. Name partner Tim Herron of Chargois & Herron gave an additional $2000 out of $21,750 that Shoffner's campaign received that quarter. *See* Shoffner Campaign Contribution Report (attached as Bednarz

Decl. Exhibit B). An additional $10,000 that quarter was received allegedly from five partners of another ATRS monitoring firm who paid in a single check. The $10,000 donation was later returned when it was questioned whether the check violated the $2000-per-person campaign contribution limit in Arkansas. *See* Michael Wickline, ARK. DEMOCRAT-GAZETTE (Nov. 10, 2011), *Shoffner returns donors' $10,000* (attached as Bednarz Decl. Exhibit C). These donations by Labaton partners to an ATRS trustee appear to contradict Labaton's recent representation to the court:

> And a specific question was posed, in fact, more than one, by Judge Rosen asking the individuals who were involved from Labaton, "Were there ever campaign contributions or any other form of benefit to Senator Faris or anyone else?["] And they said, No, of course not.
>
> So the suggestion that that's at play here shocks me.

Dkt. 244 (transcript of sidebar to May 30, 2018 hearing), at 5.

Perhaps Labaton's counsel will explain that by "anyone else" they did not mean to suggest that Labaton partners made no campaign contributions to Arkansas politicians with direct oversight of ATRS. (And Labaton's disingenuous "shock" appears to have been its sole basis for a recusal motion and mandamus petition.) In any event, Labaton's peculiar interpretation of an attorney's duty of candor to the Court provides a concrete example of why an unconflicted and unconstrained advocate for the class must be appointed.

Furthermore, Chargois & Herron's named partner Tim Herron was hardly a stranger to Martha Shoffner—he was her landlord in Little Rock, albeit a landlord that charged no rent. As Herron later explained to FBI agents, Shoffner lived at a two-story brick house near Arkansas' Capitol Building, which was the Little Rock office of Chargois & Herron. *See* Chad Day, ARK. DEMOCRAT-GAZETTE (May 22, 2013), *Shoffner lived rent-free near the Capitol for most of her first term, landlord says* (attached as Bednarz Decl. Exhibit D). Herron said Shoffner was referred to him in 2006 by then-state senator Steve Faris. *Id.* (Sen. Faris, of course, is the politician who referred ATRS' director to Labaton. *See generally* Dkt. 244, Sidebar Transcript.) After Shoffner was reelected in 2010,

Herron allowed the property to become foreclosed because it was no longer needed by the firm. *Id.*

Without a place to live in Little Rock, Shoffner turned to a bond dealer and client of the state:

> Shoffner approached Steele Stephens and asked if he could help her purchase a place where she had been living but which was going through foreclosure. Stephens looked at the property and concluded that it was not a good investment nor a place where a single woman could safely reside. He also thought that it would be risky for him to have his name on a mortgage encumbering the state treasurer's residence. Rather than purchase that place for her, Stephens agreed to pay Shoffner $1,000 a month so that she would have funds to rent an apartment in Little Rock while maintaining her home in Newport. Due to the risks involved in making a monthly payment of $1,000, Stephens and Shoffner agreed that they would meet approximately every six months for him to pay her $6,000.

*U.S. v. Shoffner*, No. 4:13cr00158, 2014 WL 1494134, at *1 (E.D. Ark. Apr. 15, 2014).

Therefore, Shoffner accepted biannual bribes of $6,000 in order to pay rent to her landlord, who was still Tim Herron. Shoffner moved from the foreclosed Little Rock office of Chargois & Herron to a condominium owned by Herron and paid him $800 rent monthly. *See* Bednarz Decl. Exhibit D, at 2. Shoffner remained Herron's tenant until she was arrested in 2013 for public corruption. *Id.*

Given Chargois & Herron's close relationship with a former ATRS trustee—providing free rent to Martha Shoffner—who was later convicted and sentenced to 30 months for providing bond business in exchange for rent money, and given the relationship between Labaton and Chargois, neither ATRS nor Labaton could possibly represent the class in the proceedings over the treatment of the sums paid to Chargois. To be clear, CCAF is unaware of smoking-gun evidence that Labaton or Chargois & Herron secured ATRS business through political corruption, but a reasonable person would certainly raise the question when presented with the facts known to date, and ask what else has not been disclosed—but neither ATRS nor Labaton have any interest in further disclosure. And Rule 23 does not permit that; it demands "undivided loyalties to absent class members," *Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331, 338 (4th Cir. 1998), and will not "permit even the

appearance of divided loyalties of counsel." *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1167 (9th Cir. 2013) (cleaned up).

Reasonable questions can also be raised about George Hopkins's avowed disinterest in multi-million dollar side payments made by Labaton, a government contractor, given that, during his tenure, a former ATRS trustee was imprisoned for doling out favors in exchange for payments just 0.15% as large as the $4.1 million windfall Chargois & Herron achieved here. At best, Hopkins's stance is a mind-boggling dereliction of duty. At worst, it recalls the need for an "ostrich" jury instruction in federal criminal law. *E.g., United States v. Ramsey*, 785 F.2d 184, 188-91 (7th Cir. 1986) (Easterbrook, J.). Either way, a class representative who abdicates any responsibility to supervise class counsel is not adequate. *See, e.g., Foley v. Buckley's Great Steaks, Inc.*, 2015 WL 1578881 (D.N.H. Apr. 9, 2015); *cf.* Transcript of March 7, 2017, Hearing at 97:24-98:2.

But the major point to be recognized is that the willingness of law firms to pay such multi-million-dollar windfalls to secure lead-counsel roles shows how lucrative such lead-counsel roles are because of the opportunity for overbilling the class. *See* Jessica Erickson, *The Gatekeepers of Shareholder Litigation*, 70 OKLA. L. REV. 237, 248-50 (2017) (discussing the endemic problem of pay-to-play arrangements in PSLRA litigation); *In re Bank of New York Mellon Corp. Forex Transactions Litig.*, 148 F. Supp. 3d 303, 307-08 (S.D.N.Y. 2015) (same). Class counsel's defense to date in the *Globe* story and here has effectively been "Everybody does it this way"—but that is precisely the problem. That is money that should be going to the class and would be going to the class in a truly competitive market where class members pay the rates that they would if they were large clients using their own money to pay defense firms.

Even the special master's proposed $7.4 to 8.1 million reversion to the class—even if combined with another $4 million to be paid to the special master for the investigation and the recommended $3.4 million for ERISA counsel—does not even begin to cover the windfalls accruing to class counsel that make $4.1 million referral payments a lucrative and profitable deal, despite the risk of criminal investigation. "[U]nder long-standing equitable principles, a district court has broad

discretion to deny fees to an attorney who commits an ethical violation." *Rodriguez v. Disner*, 688 F.3d 645, 655 (9th Cir. 2009) (affirming total fee disqualification). CCAF does not contend class counsel's fees should be zeroed out entirely, as happened in *Rodriguez*; class counsel won real relief for the class in this case, and should be compensated. But the consequence for the overbilling should not be to put class counsel in the same position as if they had submitted a forthright fee petition in the first place, for there is no incentive to not roll the dice and try one's luck in obtaining a windfall by misleading the Court if the only consequence for getting caught is a fee award no different than what doing it right in the first place would have garnered. "Heads I win, tails don't count" rules encourage bad behavior. The special master report does not go far enough in this regard.

### 2. Labaton failed to disclose the Chargois arrangement in the *Facebook IPO* settlement pending approval in S.D.N.Y.

Labaton continues to conceal its Chargois arrangement before other courts. As co-lead counsel for ATRS among other lead plaintiffs, Labaton recently settled *In re: Facebook, Inc. IPO Securities and Derivative Litigation*, MDL No. 12-2389 (S.D.N.Y.). Documents in this case prove that the *Facebook IPO* settlement falls under the Chargois arrangement, but Labaton has declined to inform that court and that class. We know that *Facebook IPO* falls under the Chargois arrangement because Labaton sent emails to Chargois updating him on the status of the case, using BCC or forwarding to messages conceal Chargois' email address from George Hopkins. SM Exhibits 135 & 136. When *Facebook IPO* settled, neither the motion for preliminary approval, nor the proposed notice to class mentioned the Chargois arrangement or any other referral fee. *See* No. 12-md-2389, Dkts. 570-571 (S.D.N.Y. Feb. 26, 2018). Nor is Chargois mentioned anywhere on the settlement website (http://www.facebooksecuritieslitigation.com/). Last week, *Facebook IPO* plaintiffs moved for final approval and for attorneys' fees. Again, Chargois is unmentioned in any of the filings. *See* No. 12-md-2389, Dkts. 586-590 (S.D.N.Y. Aug. 1, 2018).

An advocate for the class would argue that Labaton's stubborn and continued refusal to disclose material referral agreements requires sanction—both as a deterrent for Labaton and as a signpost to the profession that referral agreements must be disclosed under Rule 23(e).

### III.   CCAF Must Affiliate With Outside Counsel to Serve as Guardian *Ad Litem*.

CCAF has no conflict that would prevent it from serving as guardian *ad litem*, but CCAF by itself does not have the resources to represent the class against the tedious, tendentious, and taxing filings of Class Counsel. *See* Section II.B, *supra*. CCAF was unable to find counsel to assist it until Sunday, August 5, five days after the Court's July 31 order, and is contemporaneously filing a motion for an extension to supplement its motion to serve as guardian *ad litem*.

CCAF has fewer attorneys now than when it filed its motion for appointment as guardian *ad litem* in February 2017, currently staffed only with three full-time and two part-time attorneys, with two of the full-time attorneys having negotiated contractual limits to bill less than 2000 hours a year. More importantly, since the Court's deferral of CCAF's motion, CCAF has undertaken more time-consuming commitments in the intervening year and a half. CCAF has a reply brief due to the Supreme Court in September, which Frank will argue in October Term 2018, likely late October or November (*Frank v. Gaos*, No. 17-961); the case is obviously a top priority. CCAF currently plans to defend an appeal in a securities settlement where its objection led to a $94 million reduction in "project associate" attorneys' fees, which the court agreed should be billed as an expense. *See In re Petrobras Securities Litig.*, No. 14-CV-9662, 2018 WL 3091256, at *13 (S.D.N.Y. June 22, 2018). CCAF attorneys are staffed on several appeals, with oral arguments on August 28 and September 17, and briefing due in other cases throughout the coming months. Frank himself was promoted to Director of Litigation at CEI, and has a docket much broader than in early 2017, including a pending appeal challenging FCC practices and a planned certiorari petition over the constitutionality of the BCFP.

Given these limitations and the need for *someone* to serve the class's interests, CCAF has aggressively searched in the six days between the Court's order and today's filing for a private firm that could help it, and, yesterday, August 5, located an outside law firm to affiliate with CCAF on

this matter. The firm is Burch, Porter & Johnson, PLLC, a leading firm in Memphis, Tennessee, with forty attorneys, about half of whom are litigators. Burch is well-equipped to help CCAF. Burch attorney Gary Peeples, who clerked for two federal judges and used to work at Jones Day, has been following this case since CCAF's filings in 2017, and is already further along the learning curve than a newly appointed guardian *ad litem* would be. Additionally, the senior member of the Burch team, Joseph (Jef) Feibelman, has nearly fifty years of complex business litigation experience. More information about Burch is available at http://www.bpjlaw.com/attorneys/peeples-gary-s/, http://www.bpjlaw.com/attorneys/feibelman-jef/, and http://www.bpjlaw.com/firm/history/. Because of the short time-frame imposed by the Court's July 31 order, and the fact that Burch did not commit to serving as co-counsel until yesterday, Sunday, August 5, CCAF is filing a contemporaneous motion asking for an extension to supplement its motion to be appointed guardian *ad litem*, which, if granted, will provide more detail about Burch's qualifications.

If CCAF is not appointed guardian *ad litem*, it may be difficult to find other firms willing to perform that role on short notice. Firms that already practice in the class-action arena on the plaintiffs' side are loathe to upset powerful plaintiffs' firms like Lieff and Labaton, who often control the financial fate of smaller firms;[6] and even firms that are mostly defense-side are afraid of

---

[6] Publicly-available filings demonstrate the tit-for-tat nature of attorneys' fees in class action settlements. For example, the Special Master asked about an email where TLF appeared to negotiate fees in this action together with *BNY Mellon*. SM Ex. 148 ("We fought for you to get at least $10,320,000 in state street and here is how I believe you should reciprocate"). Garrett Bradley forthrightly characterized Lieff Cabraser as "calling the shots" in the *BNY Mellon* action and remarked that these are the sort of "negotiations that happen, judge, in cases. And in the *Mellon* case our friends at Lieff Cabraser did end up supporting us in our lodestar application for a higher multiplier because of our work." SM Ex. 85 at 123. Academic literature suggests that plaintiffs' law firms get along to get ahead in mass litigation. "Private ordering pervasive in MDLs . . . favors attorneys with long-standing business relationships and encourages attorneys to curry favor with one another to secure lucrative positions in future leadership hierarchies, and condones attorneys' behind-the-scenes political wrangling" and allows "lead lawyers to influence both their own and others' compensation" from common-benefit fees. Elizabeth Chamblee Burch, *Monopolies in Multidistrict Litig.*, 70 VAND. L. REV. 67, 82-84 (2017). Therefore, opposing an especially prolific firm like Lieff is not something class-action litigators take lightly. *Cf. also* Wall Street Journal Editorial

creating precedent that will make it difficult for them to make future attorneys' fees requests. And any such firm will be further behind on the facts of the case than CCAF or Burch.

## IV.    Financial Terms for Guardian *Ad Litem*

Whatever firm serves as guardian *ad litem*, ordinary billing rates should be paid to adequately rebut Class Counsel's motions. While CCAF was willing to undertake this role *gratis* last year, it was less busy at the time and believed the case would be more narrowly focused on appropriate billing rates. Class counsel, however, have demonstrated that they will spare no expense to litigate this matter, even when it would result in a doubling of bills from the Special Master, and would be able to overwhelm any firm working *pro bono* in a war of attrition.

The reason for paying the guardian from class counsel's fees is straightforward. A guardian's fee, like a class-action common-fund award, is determined by considerations of equity. *In re Fleet/Norstar Secs. Litig.*, 935 F. Supp. 99, 117 (D.R.I. 1996) (guardian); *compare United Steelworkers of Am. v. Sadlowski*, 435 U.S. 977, 979 (1978) (class counsel); *Rodriguez*, 688 F.3d at 654 (same). As between class members and class counsel, "equity requires that the loss, which in consequence thereof must fall on one of the two, shall be borne by him by whose fault it was occasioned." *Neslin v. Wells*, 104 U.S. 428, 437 (1882). "While a court of equity will on swift wings fly to relieve the innocent from wrong and injury, it travels with leaded feet and turns a deaf ear, when called on to furnish a cloak of righteousness to cover sin." *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003) (cleaned up). Here, the guardian's fees thus should be borne by class counsel, who have created the need for this appointment by their billing improprieties and their voluminous and ceaseless pursuits to retain the initially-awarded fee (*see* Sec. II.B, above).[7] As with the fees for the Special Master, fees for any guardian *ad litem* should

---

Board, *The Anthem Class-Action Con* (Feb. 11, 2018) (noting how lead counsel in data breach MDL, including Lieff, farmed out lucrative work to 53 other law firms, many of which engaged in similar contract-attorney shenanigans that this Court has criticized).

[7] The same reasoning applies to fees for a guardian *ad litem* as for a master: "A party whose unreasonable behavior has occasioned the need to appoint a master, on the other hand, may

be initially drawn from the fees provisionally awarded to class counsel. The Court has already reopened the fee award under Rule 60 on Class Counsel's motion. Dkt. 331. Here, the class needs a guardian *ad litem* that can be assured the resources to keep up with Class Counsel's attempt to litigate by attrition.

As for the terms of reimbursement, CCAF has moved in a contemporaneous motion to submit a formal proposal from CCAF and Burch in a modified motion for appointment as guardian *ad litem* as soon as possible by August 13 if the parties have not agreed to stipulate to the special master to serve in that role, and if the Court indicates it wishes to see such a proposal from us after its original August 6 deadline. We anticipate that the billing rates will be materially below that of the market rates charged by the plaintiffs' attorneys in this case, and CCAF and Burch would provide hourly records to the Court on a monthly basis. We anticipate billing and staffing efficiently; in the event of a challenge by class counsel to claims of overbilling, the guardian *ad litem* would request that the Court compare the guardian *ad litem*'s hourly records with those of counsel for class counsel for similar tasks. Any fees to CCAF would require specific court approval for payment. However, given the likelihood of a class counsel challenge to payment to a guardian *ad litem*, CCAF's proposal may suggest a contingent multiplier that triggers in the event of an appellate challenge to the fee award to compensate for the risk, and to deter spiteful multiplication of the proceedings.

---

properly be charged all or a major portion of the master's fees." Advisory Committee Notes to 2003 Amendments to Rule 53. Similarly, objecting class members, whose participation is necessitating by class counsel's failings, are often paid from class counsel's fee fund, without diminution of the class's benefit. *See, e.g., In re Southwest Airline Voucher Litig.*, -- F.3d --, 2018 WL 3651028 (7th Cir. Aug. 2, 2018); *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 2014 WL 4446464, at *10 & n.1 (D. Mass. Sept. 8, 2014); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 2 F. Supp. 2d 175, 176 (D. Mass. 1998). "[T]he district court enjoys broad discretion to allocate the master's fees as it thinks best under the circumstances of the case." *Latin Am. Music Co. v. Archdiocese*, 499 F.3d 32, 43 (1st Cir. 2007).

CONCLUSION

The court may and should remand the matter to the Special Master to file a supplemental report responding to the parties' objections. The court should appoint a guardian *ad litem* to protect the class's interests, and has the authority to *sua sponte* replace the class representative for the limited purpose of these collateral matters without implicating the settlement. It would be most efficient and cost-effective if the Special Master served in that role once its other duties were completed, but given the certainty of appellate challenges to any adverse ruling against class counsel, the Court should appoint an independent and separate guardian *ad litem* if any party objects to the Special Master serving in that role, or if it believes the need for vigorous representation of the class's interests would outweigh the delay in a guardian *ad litem*'s need to get up to speed. CCAF will submit a formal application with specific financial terms by August 13, 2018, if proceedings at the August 9 hearing suggest that is the appropriate route and the Court grants our contemporaneous motion for an extension.

Respectfully submitted,

Dated: August 6, 2018

/s/ M. Frank Bednarz
M. Frank Bednarz (BBO No. 676742)
COMPETITIVE ENTERPRISE INSTITUTE
1145 E Hyde Park Blvd. Unit 3A
Chicago, IL 60615
Telephone: 202-448-8742
Email: frank.bednarz@cei.org

/s/ Theodore H. Frank
Theodore H. Frank (*pro hac vice*)
COMPETITIVE ENTERPRISE INSTITUTE
1310 L Street NW, 7th Floor
Washington, DC 20005
Telephone: 202-331-2263
Email: ted.frank@cei.org

*Attorneys for Amicus Curiae*
*Competitive Enterprise Institute*
*Center for Class Action Fairness*

### CERTIFICATE OF SERVICE

I certify that on August 6, 2018, I served a copy of the forgoing on all counsel of record by filing a copy via the ECF system.

Dated: August 6, 2018

                                        /s/ M. Frank Bednarz
                                        M. Frank Bednarz