UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ARKANSAS TEACHER RETIREMENT SYSTEM,
on behalf of itself and all others
similarly situated,

              Plaintiff,

vs.

STATE STREET BANK AND TRUST COMPANY,

              Defendant.
_____/

No. 11-cv-10230-MLW

ARNOLD HENRIQUEZ, MICHAEL T. COHN,
WILLIAM R. TAYLOR, RICHARD A.
SUTHERLAND, and those similarly situated,

              Plaintiffs,

vs.

STATE STREET BANK AND TRUST COMPANY,

              Defendant.
_____/

No. 11-cv-12049-MLW

THE ANDOVER COMPANIES EMPLOYEE
SAVINGS AND PROFIT SHARING PLAN, on
Behalf of itself, and JAMES PEHOUSHEK-
STANGELAND and all others similarly situated,

              Plaintiffs,

vs.

STATE STREET BANK AND TRUST COMPANY,

              Defendant.
_____/

No. 12-cv-11698-MLW

## SPECIAL MASTER'S FIRST SUBMISSION OF DOCUMENTS TO SUPPLEMENT THE RECORD

1

Pursuant to paragraph 12(b) of the Court's May 31, 2018 Order (Dkt. #237), the Special Master hereby files, under seal to permit appropriate redactions after conferral among the parties, an initial set of additional documents and transcript excerpts to further support and supplement the exhibits to the Special Master's Report and Recommendation and assist the Court's *de novo* review. *See* Fed. R. Civ. P. 53(f). This submission represents the first of two submissions that, collectively, present such additional documents and information that, while not cited in his Report or exhibits, are critical to the Court's understanding of the record upon which the Special Master's findings of facts are based, as well as certain legal issues raised by the parties post-filing.

The Special Master's first supplemental submission contains documents critical to understanding the origins of the relationship between Labaton Sucharow and Damon Chargois, and how the relationship – mischaracterized by Labaton as a "referral" relationship – operated prior to the State Street case. Collectively, these documents provided background for the Special Master's Report, informed his judgment that the $4.1M fee paid to Chargois was not a referral fee – and, in any event, was unknown to the client at the time of origin – and informed his analysis of the serious ethical violations and transgressions that arose from this arrangement and payment. The Special Master concluded that Labaton's conduct constituted a violation of Mass. R. Prof. C. Rule 7.2(b) (Report and Recommendations, pp. 263-273; 334-337) – intended to prevent lawyers from acting as touts in soliciting business from clients – and specifically found that Labaton's noncompliance with Mass. R. Prof. C. Rule 1.5(e), in failing to sufficiently inform its client of the payment obligation, directly implicated Rule 7.2(b). In so finding, the Special Master carefully observed that the nature of the Chargois relationship fit squarely within Rule 7.2(b)'s proscriptions because Chargois, at Labaton's request, routinely sought and secured

clients for Labaton. The information provided to the Special Master reinforced his finding that the Chargois Arrangement could not even arguably constitute a traditional referral relationship – one in which a client in need of specific legal services is connected to an appropriately qualified attorney – under which the Massachusetts Rules of Professional Conduct permit bare referral fees.[1]

In his efforts to secure various clients for Labaton, Chargois relied on personal, business, and political connections – both his own, and those of his associates. While the Report describes the efforts made by the Chargois & Herron firm, on behalf of Labaton, to introduce Labaton to potential institutional investor clients in Arkansas, the Report did not discuss various other details pertinent to the central finding that the payment to Chargois was not a referral fee. *See* Report and Recommendations, pp. 89-92.[2]

The documents submitted in this first submission (categorized and explained further below) further support the Special Master's informed conclusions about the "unique and troubling nature" (Report and Recommendations, p. 262) of the Chargois Arrangement, a pre-existing obligation to pay Chargois that resulted in a payment from class funds in the State Street case, including that: (1) the Arrangement predated Labaton's 2008 communications with ATRS on which Labaton relied in arguing that it sufficiently notified its client (ATRS) of the obligation to pay Chargois (Rule 1.5(e)); (2) ATRS did not seek a referral recommendation from Chargois –

---

[1] Although the Special Master found violations of Mass. R. Prof. C. Rule 7.2(b), he refrained from recommending professional discipline for prudential reasons (Report and Recommendation, pp. 337-338).

[2] The Report details that Arkansas State Senator Steve Faris, who was a personal friend of Damon Chargois' law partner Tim Herron, recommended in 2007 that Chargois & Herron attempt to contact then Executive Director of ATRS, Paul Doane. *Id.* At Senator Faris' suggestion, Chargois successfully facilitated a meeting between Mr. Doane and Labaton, during which Labaton presented its capabilities in serving institutional investors and monitoring portfolios. *Id.* This introduction precipitated Labaton's portfolio monitoring relationship with ATRS. Labaton's eventual representation of ATRS in the State Street matter implicated its financial obligation under the Chargois Arrangement discussed throughout the Special Master's Report.

3

rather, Chargois was functioning in a business development capacity, proactively pursuing Labaton's relationship with ATRS as an economic opportunity for his own firm; and (3) Labaton's similar arrangement with Chargois that he would actively pursue other potential clients shows Labaton's intent of entering into financial arrangements similar to the one that resulted in the $4.1M payment.

### I. Labaton's Efforts to Influence the Arkansas Procurement Process In Order to Secure Its Relationship with ATRS Further Illustrate That the Chargois Payment Was Not a "Referral Fee"

In his investigation, the Special Master examined and considered substantial evidence that Senator Faris and other local officials, to whom Labaton was introduced by Chargois & Herron, played a significant role behind the scenes in securing ATRS as a fund monitoring client for Labaton. These efforts were made outside the ordinary RFP process and show that the payments made to Chargois for his role in opening the door to ATRS' retention of Labaton were not referral fees. Of course, successful representation of ATRS later triggered Labaton's financial obligation underlying the $4.1M fee paid to Damon Chargois in the State Street case, the agreement to which was in place from the very beginning of Chargois' efforts to facilitate the Labaton/ATRS relationship. *See* Section II-III, *infra*.

The following correspondence underscores the efforts of Labaton and its proxies to gain advantage, outside of the state procurement process, in order to secure ATRS as a client:

**LBS017432-34**: August 2007 correspondence between Belfi and Chargois. Chargois: "Senator Farris [sic] is on for meeting in our Little Rock office at 11:00am on Wednesday… The senator is prepped to have a private meeting with us so that there are no distractions. He is prepared to hear you out and take the necessary steps after you do your thing. There will most likely have to be a subsequent meeting with Senator Farris [sic] and the Governor or Attorney General after you have impressed the senator with your firm's credentials."

**LBS017437-38**: August 2007 correspondence between Chargois, Belfi and Herron. Chargois: "You guys did well. Tim and I both feel very optimistic about Labaton firm's doing a lot of good things in Arkansas. This is thanks to you and Chris representing the firm very well…"

4

**LBS017442-43**: September 2007 correspondence between Chargois and Belfi. Chargois: "The good senator is finalizing with Paul Doan [sic] on Friday. Everybody wants something sometimes. Specifically, the Labaton firm will represent the pension fund. Please be discreet and act surprised when it happens."

**LBS031471-72**: October 2007 correspondence from Belfi to Tetefsky, Keller, and Sucharow regarding update on trips to different states. Belfi: "Damon is really moving all of the fronts... On Arkansas, the Senator is going to come visit us at the end of the month or early November – Tim and possibly Damon will come up as well up."

**LBS017444-46**: October 2007 correspondence between Belfi, Sucharow, Tetefsky. Providing a summary of a business trip, Belfi describes meetings and efforts to secure fund clients in Arkansas, Oklahoma, Texas, Alabama, Tennessee, and Mississippi.
Sucharow: "Eric, GREAT job. Don't know how you keep the [redacted] straight from the [redacted]. Need to discuss [redacted] project request. Way too rich a request, but can't judge without seeing a list of what you think he can realistically accomplish (deliver) and what size those funds really are (and in US equities)...Keep up great work..."

**LBS040523-A**: October 2007 correspondence from Paul Doane to Eric Belfi, copying ATRS contacts. Doane: "Eric, I did appreciate the chance to visit with your firm in New York last week. However, I don't want to convey any false expectations. I do plan on discussing with the investment or policies committee at its November 14th meeting the possibility of developing a stated policy regarding our fiduciary role in pursuing appropriate legal action to recover trust assets where justified and to consider the merits in having more than one firm engaged to monitor potential actions/ But all this is an involved process and will involve further review and probably a formal RFP process which will likely be several months down the line. Also, our contract renewal with [redacted] is up next Spring so it may make sense to wrap all of these steps into one process rather than multiple. I am very interested in your firm and will remain in touch as we progress but the Board has an awful lot on its plate with several other items in the immediate hopper. I have been pushing them quite hard on a series of fronts. Just didn't want you to misinterpret my comments to Chris that something (decision) was imminent. Regards, pd."
*[Belfi forwarded message to Chargois, Herron];*
Chargois: "Tim, I wonder what the senator can find out.";
Belfi: "The email was a little inconsistent with the conversation he had with Chris which Paul seems to admit so any information the Senator can find out would be great.";
Herron: "i spoke to the senator today and he said that Paul Doane enjoyed the meeting and he was confident that they would create a business opportunity for the firm. As a public employee and with the new relationship he has with a number of people in arkansas he is going to be extremely careful in any public statements to avoid any difficulty. Be patient. The senator is cautious and doesn't want any impropriety to [be] imputed and wants this thing to proceed below the radar. He talked about the trip to ny and is looking forward to it. I would not worry. I didn't find Doane's email the slightest bit discouraging. These are careful guys."

**LBS017448-48**: November 2007 correspondence from Belfi to C. D'Amota and S. King regarding Caribbean meeting. Belfi: "We are working on dates for our meeting down south (we are working on the

5

location)... Also, Damon Chargois (the Texas lawyer) is in town next Thursday evening (Nebraska's night) and we will be going out with him and a State Senator from Arkansas that we work very closely with if you are able to join us..."

**LBS017450**: December 2007 correspondence from Herron to Belfi and Chargois regarding "New funds." Herron: "The senator just called me. He has the [redacted] pension funds lined up in arkansas...He plans to get you guys the top five plans in Arkansas. He said he will use me a point person because it is easier for him. He said doane will be totally on board shortly. He and I are planning a trip to north carolina after the first of the year to work on that state for you guys"

**LBS017451-52**: April 2008 email correspondence between Belfi and Herron regarding Arkansas Teachers RFP. Herron: "The senator called me last week and said it was coming up and our friend has mentioned it to him several times. It is a done deal he says"

**LBS017453-54**: April 2008 follow-up correspondence between Belfi and Herron regarding Arkansas Teachers RFP. Herron: "Called senator he will call me back. He assured me that this was a sure thing but would check on the dates for the RFP"[3]

## II. Nature of the Chargois Arrangement

Email correspondence between Damon Chargois, Eric Belfi, and Chris Keller in 2009 reveals an attempt to formalize, in writing, the terms of the Chargois Arrangement, further illustrating that the Arrangement was not a "referral" relationship but rather a negotiated agreement applying to attorney fees awarded to Labaton in *any* litigation brought on behalf of clients obtained by Labaton through introductions by Chargois and Herron. Unlike a traditional referral, Chargois negotiated for fees paid after he contacted clients about possible representation by Labaton, not the other way around:

**LBS017479-81**: February 2009 email correspondence between Chargois, Belfi and Keller. Chargois: "...I don't know how formal you guys want to be with this, but you have probably noticed that I am pretty

---

[3] These emails, of course, implicate other issues, beyond the "referral fee" question, that have arisen in the post-filing phase of this matter, including: (1) the Court's inquiries regarding the origins of the Labaton/ATRS relationship and the resulting motion to recuse the Court for bias, the Mandamus Petition, and the accuracy of the associated representations made to the Court, and the Court of Appeals, regarding the state of the record relating to the origins of that relationship; (2) the current oversight hearings being conducted by the Arkansas State Legislature on this subject; (3) the need for a continued role by the Special Master to defend attacks upon the Report and Recommendations; (4) the accuracy and reliability of Professor Gillers' opinions regarding violations of Mass. R. Prof. C. Rule 1.5(e) and 7.2(b); and (5) that Larry Sucharow was involved in, and had knowledge of, the Chargois Arrangement from the very beginning.

informal and rely more on our mutual trust and respect for each other to carry the day. That said, I think it's important for us to lay out our understanding of our agreement with respect to the gathering of pension fund business. We have agreed that Chargois & Herron, LLP, shall receive 20% of the gross attorney fees recovered by Labaton Sucharow on any litigation or claims process brought on behalf of the Arkansas Teachers' Retirement Pension Fund. We have also agreed to the same payment terms shall apply to any other pension fund or retirement fund representation that Labaton Sucharow obtains via contacts through Chargois & Herron, LLP. This includes introductions to funds in Atlanta, Richmond and Georgia via Frank Stout, in addition to Chargois & Herron, LLP (CMH), and CMH's contacts. Eric, much earlier you and I had agreed that CMH would receive 10% of gross attorney fees received by Labaton for any pension fund business that came by way of contacts through Bailey, Bailey & Perrin...";

Chargois "Guys, do I need to draft letter agreement? I don't mind bc I want to get this off of my todo list. Eric, to address Chris's concern about judges slashing fees, we can add a provision that says CMH's interest falls to 10% if the judge awards a gross attorney fee below 15%. Let me know, boys.";

Keller: "Damon, sorry for the delay. I'm buried. We are fine with the terms you propose. One point of clarification, the 20% fee you earn should be on what Labaton earns (which is total fee awarded less local, or if there is a split with another firm). If you have time feel free to draft, but not necessary since I will get to it next week. Looking forward to some tropical business development."

**LBS017486-88**: April 2009 correspondence, with draft agreement attachment, from Chargois to Belfi and Keller.

**LBS031192-95**: April 2009 correspondence from Keller to Chargois and Belfi with Labaton's proposed changes to Chargois draft agreement.

**LBS030663-64**: September 2009 correspondence from Belfi to Chargois and Herron regarding monitoring agreements. Chargois: "Thank you, Eric. We are also confirming our agreement that any attorney fee award realized by your firm as a result of representing either of these funds, or any related funds where Labaton's representation came about as a result of Chargois, Mashayekh & Herron's efforts and/or contact (or our agents, assigns, friends, etc.) will be treated the same as our agreement on the Arkansas Teacher Retirement Fund, namely that gross attorney fees will be divided 80/20 (80% to Labaton, Sucharow and 20% to Chargois, Mashayekh & Herron)."

### III. Chargois' Efforts to Connect Labaton With Other Clients

The comprehensive record is replete with references to efforts made by Chargois, his firm, or his associates to secure other institutional investors as clients for Labaton, in a number of states. Though the Chargois efforts were not always successful in securing clients, these documents show a pattern and provide factual background that further illuminated the Labaton-Chargois relationship and informed the Special Master's view of potential ethical violations:

7

**LBS017414-16**: March 2007 correspondence between Belfi, Chargois, Herron, Mashayekh regarding potential price fixing case. Mashayekh: "I will be getting with [Mark] Aubochon to see where he is relative to his efforts in securing a client for us.";
Chargois: "I am bird-dogging"

**LBS031458-59**: March 2007 correspondence between Belfi and Keller. Belfi: "I had a nice talk with Damon today. He will be meeting with Ken this week and will make sure we get a meeting soon. He will also bring us to Arkansas shortly."

**LBS040295-98**: March 2007 correspondence between Mashayekh, Herron, and Chargois regarding possible meetings. Mashayekh: "...Tim Herron also will be contacting an attorney he knows in Arkansas who is well connected with the unions in that state. I will report back on that as well... As to the [redacted], Tim Herron is meeting with one of his contacts regarding that matter and we will report back if the meeting proves fruitful...";
Belfi (to Keller): "I like Kamran – he really follows up with things. We will see what he can produce."

**LBS031465**: July 2007 correspondence between Mashayekh and Belfi. Belfi: "How are we doing with unions, Arkansas, and Native Americans?"
Mashayekh: "damon has been running with the ball on all that and [Wednesday] would be a good time to discuss the status of his efforts on that end"

**LBS040343**: October 2007 correspondence between Belfi, Keller, and Tetefsky. Belfi: "I met with [redacted]. We had a very good meeting. [Redacted]. "All in all a good meeting and we will go back to them in a week or so to touch base. In the meantime I am going to talk to Damon's contact about what is going on behind the scenes. Also, they went to the Bernstein conference last week and they were impressed so we need to do one soon."
Keller: "Agree on the conference – doane should be invited to speak"

**LBS040368:** November 2007 correspondence from Belfi to Keller. Belfi: "I am traded emails with Damon all weekend and here is where we are.... 1. Damon spoke to Jarvis at the function and has set up a lunch this week to talk about it more fully. 2. Damon said that Jarvis is not in the University of Houston as much as he is but he will see if he cares about experts coming from there. 3. Damon has brought in Scott Lemond's father to help who has a relationship with the AG to see if that can help us.... [Chargois] has the full court press on. We need to deliver a kick ass report."

**LBS040380-81**: November 2007 correspondence between Keller and Belfi regarding Chargois. Belfi: "Spoke to him last night and he is having lunch with Jarvis Monday and then we will discuss what is the next step – he does not think we should do anything until after the lunch.";
Keller: "2 impt points that damon needs to know. First, he should take their temp on [redacted]. If they are not interested then push for [redacted]. Second, if Jarvis wants us to share the case with blbg, that would be fine"

**LBS017449**: December 2007 correspondence between Belfi and Keller regarding Texas. Belfi: "Spoke to Damon and he going to Jarvis about the lt governor"

8

**LBS040570**: January 2008 correspondence between Herron and Belfi regarding Tennessee. Herron: "I just received a call from David Clark of the [redacted]...he was buttonholed by the senator and has the brochure you sent to me. He told me that they have other representation. He is going to talk to his board about meeting with us. He was interested in other people represented in Arkansas and Texas. I didn't know if you have any funds in Texas I told him we were working on Arkansas. A representative list would be helpful. if you don't mind. Hopefully we will get a meeting. I sent you a copy of my initial email to him."

**LBS040581-82**: June 2008 correspondence between Belfi and Chargois regarding Georgia.
Belfi: "How did it go?";
Chargois: "very well. We can get [redacted] you and i need to talk about the good councilman..."

**LBS040583-84**: July 2008 correspondence between Belfi, Keller and Tetefsky regarding Georgia. Belfi: "I was able to meet a number of people and make some headway into who can help us with some of the local funds in the Georgia area. Damon and I met with Kwanza [redacted] who is a trustee on the [redacted] Pension Board. He was very interested with our portfolio monitoring package and he was particularly interested in the audit because the pension fund has some management issues and they would love to do something positive with the fund. [redacted]."

**LBS039537:** March 2009 correspondence from K. Hall to Belfi, Frank Stout, Chargois, Serendipity Media Group and Natalie Ching. Hall: "The board is meeting now. I just spoke to [redacted] representative and the board Chair. [Redacted] will have to issue an rfp. Will make motion to move forward @ end of meeting."

**LBS039539- 40**: March 2009 correspondence from A. Griffin to Belfi, Chargois. Griffin: "Im in [redacted] later this week and will be meeting with the Deputy Mayor and also reaching out to one of the city funds board members through a mutual acquittance. That board member, [redacted] is also the [redacted] and is active with the [redacted]. Due to the relative success of the [redacted] funds lately, hes starting to gain some notoriety within that community and should be able to help with getting in front of other fund directors. Finally, Im in negotiations with a national government affairs firm with pre-existing contacts with many jurisdictions to do work in their shop. If youd like to explore formalizing a relationship and have me put together a more organized program to get you in front of these funds/managers, please let me know"

All of this correspondence is, at the least, relevant and admissible evidence under Fed. R. Evid. 404(b) as showing Labaton's motive, intent, plan and knowledge in initiating and pursuing the Chargois Arrangement. (The Special Master would be happy to provide more extensive briefing on this aspect, if the Court wishes). The Special Master's first submission includes numerous other documents that further illuminate the true nature of the Chargois-Labaton-ATRS

9

relationship and demonstrate that Chargois solicited ATRS and other clients on Labaton's behalf. Theses references, when viewed alongside sworn testimony and the Report and Recommendations and its exhibits, directly support the Special Master's finding that the $4.1M payment was not a referral fee, but instead violated Rule 7.2(b)'s proscriptions against procuring clients for financial gain (as well as implicating the other issues outlined in footnote 3, *supra*).

Dated: August 3, 2018

Respectfully submitted,

**SPECIAL MASTER HONORABLE GERALD E. ROSEN (RETIRED),**

By his attorneys,

*/s/ William F. Sinnott*
William F. Sinnott (BBO #547423)
Elizabeth J. McEvoy (BBO #683191)
BARRETT & SINGAL, P.C.
One Beacon Street, Suite 1320
Boston, MA 02108
Telephone: (617) 720-5090
Facsimile: (617) 720-5092
Email: wsinnott@barrettsingal.com
Email: emcevoy@barrettsingal.com

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed electronically on August 3, 2018 and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing ("NEF"). Paper copies were sent to any person identified in the NEF as a non-registered participant.

*/s/ William F. Sinnott*
William F. Sinnott