ARKANSAS TEACHER RETIREMENT SYSTEM,
on behalf of itself and all others similarly situated,

                                  Plaintiff,

v.

STATE STREET BANK AND TRUST COMPANY,

                                  Defendant.

No. 11-cv-10230 MLW

ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated,

                                  Plaintiff,

v.

STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20,

                                  Defendants.

No. 11-cv-12049 MLW

THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated,

                                  Plaintiff,

v.

STATE STREET BANK AND TRUST COMPANY,

                                  Defendant.

No. 12-cv-11698 MLW

**LABATON SUCHAROW LLP'S OPPOSITION TO THE COMPETITIVE ENTERPRISE INSTITUTE'S CENTER FOR CLASS ACTION FAIRNESS' RESPONSE TO THE COURT'S ORDER OF JULY 31, 2018 (ECF 420)**

## TABLE OF CONTENTS

Page

I.     Introduction. ................................................................................................ 1

II.    The Court Need Not – and Should Not – Appoint CCAF as Guardian *Ad Litem*. ............. 1

       A.     As in Every Class Action Settlement, The Court Will Protect the Class,
              and the Court Is Especially Well Positioned to Do So Here.................................. 1

       B.     CCAF's Argument Regarding Class Counsel's "Voluminous Filings" is a
              Red Herring.................................................................................... 5

       C.     CCAF Concedes that It Is Unable to Act as Guardian for the Class ..................... 5

       D.     Customer Class Counsel Continue to Represent the Class Adequately ................ 8

              1.     Labaton has worked on behalf of the class since the settlement was
                     approved......................................................................... 8

              2.     Customer Class Counsel are not conflicted ............................................ 10

III.   CCAF is An Improper Amicus. ............................................................................... 10

       A.     CCAF and CEI Are Political Organizations with Dubious Goals and a
              Bias Against Class Action Law Firms................................................................. 11

       B.     CCAF's Self-Serving Involvement in Factual Matters Is Disqualifying.............. 12

       C.     There is no need for CCAF to Participate as Amicus........................................... 14

IV.    CCAF's Arguments Are Misleading. ...................................................................... 14

       A.     The Court Did Not Rescind, Revoke, or Vacate the Award of Fees .................. 14

       B.     CCAF's Reference to the Former Treasurer is Unavailing ................................. 15

       C.     Labaton Has Not Paid, and Will Not Pay, a Referral Fee to Chargois in
              Facebook ............................................................................................. 17

V.     Conclusion. ........................................................................................................ 17

**I.     INTRODUCTION.**

In accordance with this Court's July 31, 2018 Memorandum and Order (ECF 410), Labaton Sucharow LLP ("Labaton") and the Thornton Law Firm ("Thornton") hereby submit their opposition to the Competitive Enterprise Institute's Center For Class Action Fairness's ("CCAF") Response to the Court's Order of July 31, 2018 (ECF 420) (the "Response"). Labaton and Thornton incorporate Labaton's opposition to CCAF's original motion, which Labaton filed on February 27, 2017 (ECF 145).

CCAF's Response is boldly self-serving. There is no need for CCAF to enter this case, and no party or class member has requested it to do so. CCAF itself admits that it is incapable of serving in the role that it claims is necessary for the interests of the class without affiliating with a law firm at an unknown cost. CCAF now demands compensation for its redundant proposed work, despite its repeated representations earlier that it would represent the class pro bono. At bottom, for all its lip service toward protecting the class, CCAF has opportunistically seized a chance to carve out a role for itself in this case, with attendant publicity and potential compensation. The Court should reject this effort.

**II.    THE COURT NEED NOT – AND SHOULD NOT – APPOINT CCAF AS GUARDIAN *AD LITEM*.**

    **A.     As in Every Class Action Settlement, The Court Will Protect the Class, and the Court Is Especially Well Positioned to Do So Here.**

CCAF's entire argument relies on the premise that the class "needs an advocate." Response at 14. However, CCAF ignores that the Court already is acting as a fiduciary for the class, as the Court itself has recognized. May 30, 2018 Hr'g Tr. (ECF 243) at 79 ("And my paramount responsibility is to the class . . ."). This is not unusual. The Court is in the same position as *every* court overseeing a class action settlement (and a corresponding award of attorneys' fees), and can similarly be expected to fulfill its duties in protecting the class's

interests.  *See, e.g.*, *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 71 (D. Mass. 2005) ("Although

settlement is often a more favorable result than litigation, the court has a fiduciary duty to absent

members of the class in light of the potential for conflicts of interest among class representatives

and class counsel and the absent members.") (internal citations and quotations omitted);

*Reynolds v. Ben. Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) ("We and other courts have

gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of

the class, who is subject therefore to the high duty of care that the law requires of fiduciaries.").

Because courts are well-equipped to protect the interests of the class, it is unsurprising that they

rarely appoint guardians *ad litem*.  *See Gottlieb v. Barry*, 43 F.3d 474, 490 (10th Cir. 1994)

("While the need may indeed be compelling in some cases, we find few cases in which courts

actually use guardians *ad litem*.").  There is no "need for an advocate" here, and the Court should

reject CCAF's attempts to create one.  *See* Response at 14.

Moreover, the Court now has the backstop of the Master's investigation.  While many of

the Master's conclusions are deeply flawed, his investigation was undoubtedly thorough.  As he

noted, his investigation "spanned a period of some fourteen months and encompassed written

discovery, the production of 200,000 pages of documents, 34 witness interviews and 63

depositions.  Beyond this, the law firms that were the subject of the investigation were given

extensive opportunities to contribute to the legal and factual record through briefing, providing

expert opinions and oral argument, input which was helpful to the Special Master in obtaining a

more complete view of the factual, legal, and ethical issues raised in the investigation."  Report

and Recommendations (ECF 357) ("R&R") at 7.  In doing so, the Master retained two experts,

Prof. Stephen Gillers and John Toothman, and employed a large "team," including his own

counsel.

The Master's duties culminated in his 377-page report, which serves as his "primary means of communication with the court."  Fed. R. Civ. P. 53, 2003 Advisory Note; *see also* ECF 357.  Now, the Court must review the Master's conclusions *de novo*, in light of the objections interposed by the Customer Class firms.  The fact that the Court will be considering these two vastly different viewpoints makes this case unlike an unopposed fee motion that is typically filed with a class action settlement.  Instead, because the Master, through his Report, has offered intense scrutiny of the fee award, and because his conclusions are opposed by counsel, there will be an inherent adversarial element in the process.  *See* May 30, 2018 Hr'g Tr. (ECF 243) at 7 ("Now there is somewhat of an adversary process with the Special Master . . .").  Even CCAF admits as much.  *See* Competitive Enterprise Institute, "Arkansas Teacher Retirement System v. State Street" ("CCAF will continue to monitor the case, and is encouraged that Judge Rosen has appointed an attorney and accounting investigator *to provide an adversarial presentation so that class counsel's representations are not unchallenged.*") (emphasis added).[1]  Thus, given the unique posture of this matter, the benefits of a two-party adversary process regarding the fee award are present, and the Court stands especially well-equipped to protect the interests of the class.[2]

Because the Master scrutinized the fee award, there is no reason to appoint CCAF (or any other entity) as a guardian *ad litem*.  The roles of a fee-related master and guardian *ad litem*, while not identical, serve the same interests:  providing additional scrutiny into what would otherwise be a non-adversarial process.  *See Gottlieb*, 43 F.3d at 490 ("It is up to the individual judge's preference as to whether he uses a disinterested observer (e.g., magistrate or master) or

---

[1]      https://cei.org/litigation/arkansas-teacher-retirement-system-v-state-street (last visited Aug. 6, 2018).

[2]      CCAF appears to agree that Rule 53 does not allow a Master to become a full-fledged advocate without consent of the parties.  *See* Response at 10-13.

an interested advocate (e.g., guardian).").   CCAF's amicus brief cites the concurring opinion in *Laffite v. Robert Half Int'l, Inc.*, which explains that a guardian could "provide counterpoints to class counsel's arguments concerning the risks and difficulty of litigating the case.  Perhaps most importantly, the class guardian or a fee expert retained by the guardian would provide information on prevailing market rates for similar litigation." *Laffite v. Robert Half Int'l, Inc.*, 376 F.3d 672, 691 (Cal. 2016) (Liu, J., concurring); *see also* ECF 174 at 6.  That is *precisely* the ground the Master covered here, along with many other issues.  Adding CCAF into the mix as a guardian *ad litem* would thus be redundant and unnecessary.  *See Gottlieb*, 43 F.3d 474 at 490 ("There is no indication that the district court failed to act in that [fiduciary] capacity in the fee proceedings in this case.  Moreover, the district court initially referred the fee applications to a special master, an impartial observer who himself could insure that the class' interests were protected.").

Finally, in an effort to carve out a role for itself, CCAF argues that it should be appointed guardian *ad litem* because the Master's Report is "an impartial opinion," rather than "an advocate for the class."  *See* Response at 14.  This is incorrect.  The Master has consistently staked out a position as an advocate for the class's interests – or, in his counsel's idiom, the "voice and guardian" of the class.  Master's Accounting Opposition (ECF 377) at 14; *see also* May 30, 2018 Hr'g Tr. (ECF 243) at 16-17 (Master's counsel explaining that one of the Master's "priorities" is "protection of the class"); R&R at 327 (explaining that "the most challenging yet important aspect of this assignment has been to determine for recommendation to the Court appropriate and proportionate remedies and sanctions that fairly but adequately balance the interests of the class" and others).  There is no question that the Master has zealously sought to argue a view that is contrary, in many respects, to Customer Class Counsels' positions.  His

Report – which comprehensively sets forth his view – albeit disputed – of the case, will continue to serve as the "other side" throughout the *de novo* proceedings.

      **B.**    CCAF's Argument Regarding Class Counsel's "Voluminous Filings" is a Red Herring.

CCAF argues that the class requires an advocate to respond to Class Counsels' "voluminous" filings.  CCAF Response at 16-17.  CCAF's argument – based upon an "incomplete list of examples" – completely misses the mark.  *See* Response at 16-17.  CCAF's brief lists eleven instances of filings or conduct by Class Counsel.  Three of the examples cited by CCAF were *in response to actions by CCAF*, stemming from its efforts to insert itself into this case (clearly, the class does not need a guardian to argue on CCAF's behalf).  Four of the filings cited by CCAF relate to Labaton's recusal motion and attendant petition for writ of mandamus, a discrete issue that has been adjudicated and were well within Labaton's right to pursue.  The remaining examples identified by CCAF were actions taken by Labaton or Customer Class Counsel in response to the Master's conduct, before his Report and Recommendations were publicly filed.  At the risk of stating the obvious, if the Master's participation ends, there will be no such filings to which CCAF would respond.  In short, CCAF's claim that the class requires an advocate to match the unfairly characterized "wild motions" of class counsel is disingenuous, and does not provide a reason to appoint someone new to "advocate" for the class.  *Id.* at 17.

      **C.**    CCAF Concedes that It Is Unable to Act as Guardian for the Class.

CCAF admits that it "does not have the resources to represent the class" in this litigation. *Id.* at 23.  As CCAF explains, it has three full-time attorneys, a busy schedule, and a case in the Supreme Court -- "obviously a top priority" -- which has a calendar that directly overlaps with this case.  *Id.* at 23.  Simply put, CCAF is admittedly incapable of carrying out the role it suggests is necessary to protect the class.  In other words, although it does not believe that it can

act as guardian *ad litem* without help, CCAF presses forward.  CCAF's limitations, which

developed while its motion to be appointed guardian *ad litem* remained under advisement, should

end this discussion.

Curiously, although conceding that it will be overextending itself, CCAF

counterintuitively pursues its request to be appointed guardian *ad litem* for the class, this time for

compensation,  for its co-counsel and for itself, which presumably must be paid either from class

funds or from class counsel's fees.  While it was arguing for a role in this case (and searching for

a client that might help in that effort), CCAF repeatedly stated that it could work on a pro bono

basis, and insisted that the class be informed of this offer.  *See* ECF 127 at 10-11 ("Thus, CCAF

is willing to serve as guardian at whatever rate this Court sets in advance . . . even, if the Court

feels it to be the best course, *pro bono* without compensation."); March 7, 2017 Hr'g Tr. at 35

(ECF 176) ("We would also request that the notice make clear to the class that pro bono

representation is available."); ECF 186-1 at 2 ("CCAF's notice advises class members that they

may financially benefit from these proceedings and also informs them of the availability of pro

bono counsel to litigate any objection.").

Now that the Court has inquired as to the actual financial terms that CCAF proposes,

CCAF's platitudes about "old Italian proverbs" and "vouchsafing" fairness have disappeared.

*See* ECF 127 at 3 ("CCAF's interest lies in advancing the interests of absent class members and

vouchsafing that Rule 23 operates in a systematically fair manner.").  So has any mention of pro

bono service.  CCAF asserts that "[w]hatever firm serves as guardian *ad litem*, ordinary billing

rates should be paid to adequately rebut Class Counsel's motions."  Response at 25; *see also id.*

at 26 ("the class needs a guardian *ad litem* that can be assured the resources to keep up with

Class Counsel's" litigation).  And, unsurprisingly, it wishes to have its cut paid from Class

Counsel's fee award (perhaps with a so-called "contingent multiplier" for appellate proceedings, which CCAF claims are "certain").  *See id.* at 26-27.

CCAF's explanation for its about-face is not credible.  It claims that, when it "was willing to undertake this role *gratis* last year," it "believed the case would be more narrowly focused on appropriate billing rates."  Response at 25.  This does not make sense:  there can be no question that there was more work for CCAF to do before the Master commenced his investigation than there is now.  *See* ECF 174 at 7 (proposing to "relieve some of the special master's burden" by providing "two sets of eyeballs scrutinizing class counsel's billing records," and noting that if "CCAF is appointed as [] guardian, CCAF's willingness to perform its services *pro bono* or on a contingent basis means that the class stands to gain much in the best case, but lose nothing in the worst case.").  CCAF repeatedly represented that it would care for the class pro bono; now, with its foot in the door, it demands payment.  Given (1) the redundancy of any role for CCAF and (2) the fact that its incapable of acting as a guardian *ad litem*, the Court should look askance at CCAF's request to enter the case – and its grab an opportunistic payday.

Finally, in light of its bait-and-switch on its desired payment terms, appointing CCAF as guardian *ad litem* would also be unduly costly (especially when viewed in the light of the immense costs already produced by this process), and there is no justification whatsoever for foisting those costs onto Customer Class Counsel.  As CCAF asserted in its February 2017 filing, "[o]ne concern about appointing a guardian *ad litem* is that doing so will encourage attorneys to stir up litigation for fees."  ECF 127 at 10.  CCAF claimed that it was "insulated from this concern."  *Id*.  The situation today appears to be just the opposite.  First, despite implying that it would not "stir up litigation," after less than a week CCAF has injected two new and wholly irrelevant topics into the case.  Response at 18-23.  Second, CCAF has sought to retain a private

law firm, which certainly is not "insulated" from seeking out work (and fees) from a newfound

case.  Moreover, CCAF clearly does not expect its services to be inexpensive.  It notes that the

Master's continued participation would "likely be at lower cost and save time compared to

appointing a new guardian *ad litem*."  Response at 7.  Considering the Master's prolific ability to

spend cash – burning through almost $3.8 million in roughly a year-and-a-half – CCAF's

prediction does not bode well for the size of its (and its private co-counsel's) bill.  *See id.*

Perhaps recognizing this, CCAF is already preparing to defend itself against accusations of over-

billing.  *Id.* at 26.

In short, CCAF admits that it does not have the "resources" to act as a guardian *ad litem*,

but still seeks a role – and payment.  The Court should reject its unhelpful and self-interested

offer.

> **D.**     Customer Class Counsel Continue to Represent the Class Adequately.
>
>> **1.**     Labaton has worked on behalf of the class since the settlement was
>> approved.

Perhaps because it is unhelpful to its self-serving attempt to find a role in this case,

CCAF makes no mention of the fact that Labaton, for nearly two years now, has continued

working on behalf of the class in its role as Lead Counsel without any request for an additional

payment of fees.  While CCAF is quick to claim that Customer Class Counsel should be ousted

from this role, CCAF does not, and cannot, explain how it would carry out these tasks moving

forward.

More specifically, since the Court approved the settlement, Labaton has spent

approximately 185 hours overseeing the post-approval administration process.  Zeiss Decl. ¶¶ 3-

4.  Efforts have ranged from paying taxes related to earnings on the Settlement Fund, to securing

approval of a distribution to Registered Investment Companies ("RICs").  *Id.*  Moreover,

Labaton has overseen A.B. Data's execution of the settlement notice program and administration process, and worked with A.B. Data and WilmerHale (State Street's counsel) to provide information needed by Class Members. *Id.*   Labaton has also acted as the liaison between A.B. Data and WilmerHale in connection with the notice program and implementation of the Court-approved plan of allocation and worked with A.B. Data to complete and finalize the administration process with respect to class members that are RICs, including determining payment amounts, preparing notification letters, and preparing Plaintiffs' Assented-To Motion For Authorization To Distribute To Eligible Registered Investment Company Class Members (ECF 209-211).   *Id.*   In addition, Labaton has overseen A.B. Data's processing of certifications submitted by Class Members that are Group Trusts concerning their ERISA assets and Indirect FX Trading Volume, as set forth in the plan of allocation. *Id.*

This role has not ended.  Looking forward, Labaton is in the process of working with A.B. Data and the United States Department of Labor to obtain additional information concerning Group Trusts that have not submitted certifications to A.B. Data. *Id.* at ¶ 5.  Once these efforts are concluded, and total ERISA volume is known and quantified, Labaton will: work with A.B. Data to move forward with determining payment amounts for all Class Members other than RICs (who have already received payments pursuant to the RIC distribution order (ECF 213); notify Class Members of payment amounts; and prepare a second motion for authorization to distribute and then oversee the distribution to all non-RIC Class Members.  Zeiss Decl. ¶ 5.  At that point, a second distribution to RICs of the amount held in reserve from the initial distribution (*see* ECF 211 at 9-11) and of unclaimed funds will also need to be completed. Zeiss Decl. ¶ 5.

Thereafter, Labaton will continue to work with A.B. Data to answer Class Member questions about distributions and conduct additional distributions, as contemplated by Paragraph 40 of the Plan of Allocation and Settlement Agreement, until it is no longer economically feasible to do so.  *Id.* at ¶ 6.  At that point, Labaton will request Court approval of a plan for the unclaimed balance and the administration of the Settlement will be completed.  *Id.*  Labaton expects that these actions will require between approximately 135 and 200 additional hours of its time.  *Id.* at ¶ 7.

All of this work has been done, and will be done, on behalf of the class without any request for further compensation.  CCAF's suggestion that Labaton is acting against the best interests of the class is belied by these ongoing actions for the class' benefit.

> **2.**      Customer Class Counsel are not conflicted.

Finally, CCAF claims that Customer Class Counsel are conflicted, which necessitates their replacement by a guardian *ad litem*.  Response at 14-18.  CCAF's arguments are not persuasive.  First, CCAF contends that Customer Class Counsel have "a dollar-for-dollar antagonistic interest" in recovering a larger share.  *Id.* at 16.  This dynamic is no different than any class action fee award.  Second, CCAF argues that because Customer Class Counsel could be sanctioned, they are necessarily adverse to the interests of the class.  This is false.  Whether any of Customer Class Counsel should be sanctioned is an issue between the firms, the Master, and the Court.  Clearly, Customer Class Counsel can advocate on behalf of the class – which is also being protected as a fiduciary of the Court – while simultaneously arguing that their conduct should not be sanctioned.[3]

**III.**      CCAF IS AN IMPROPER AMICUS.

---

[3]      CCAF also claims that ATRS can no longer represent the class.  Response at 16.  Its one-sentence statement on this point is entirely conclusory and contains no analysis whatsoever.  *See id.*  It should be rejected out of hand.

The Court should exercise its discretion to prohibit CCAF from participating as an *amicus*. Rather than clarify matters for the Court, CCAF's participation will only serve to cloud the issues, prolong the proceedings, and inject partisanship into the case. The participation of CCAF as *amicus*, in other words, will "increase only the heat, not the light." *See Animal Prot. Inst. v. Martin*, No. CV-06-128-B-W, 2007 U.S. Dist. LEXIS 13378, at *8-9 (D. Me. Feb. 23, 2007).

Although "the acceptance of amicus briefs is within the sound discretion of the court," the First Circuit has cautioned that district courts "should go slow in accepting, and even slower in inviting, an amicus brief" and further that "an amicus who argues facts should rarely be welcome." *Strasser v. Doorley*, 432 F.2d 567, 569 (1st Cir. 1970). Among the concerns with allowing *amici* are (1) inundating the judge with extraneous reading; (2) making an end-run around court-imposed limitations on the parties, including discovery restrictions, the rules of evidence, and the length and timing of the parties' briefs; (3) increasing the cost of litigation; (4) creating side issues not generated directly by the parties; and (5) injecting interest group politics in the federal judicial process. *See Animal Prot. Inst.*, 2007 U.S. Dist. LEXIS 1338, at *8 (citing *Voices for Choices v. Ill .Bell Tel. Co.*, 339 F.3d 542, 544 (7th Cir. 2003)). Many of these concerns are present in this case.

A.    CCAF and CEI Are Political Organizations with Dubious Goals and a Bias Against Class Action Law Firms.

First, there is no doubt that CCAF is first and foremost a political organization. It is owned and funded by the Competitive Enterprise Institute ("CEI"), a Washington, D.C. public policy organization that describes itself as being "dedicated to advancing the principles of limited government, free enterprise, and individual liberty." *About*, CEI, https://cei.org/about-cei (last visited Aug. 7, 2018). CEI's basic legal philosophy is that "[g]overnment regulations are

based on laws, and those laws in turn rest on the limited powers granted to government by the Constitution.  Whether these constitutional limits succeed in actually reining in government is one of the basic issues facing our country."  *Law and Constitution*, CEI, https://cei.org/issues/law-and-constitution (last visited Aug 7, 2018).

CEI does not disclose who its donors are, so it is unclear whose interests it actually represents.  *See* Juliet Eilperin, *Anatomy of a Washington dinner: Who funds the Competitive Enterprise Institute?*, THE WASHINGTON POST, June 20, 2013.  Although it purports to be a libertarian organization, many of its positions over the years have aligned with the interests of large industries such as fossil fuel and tobacco.  It may be easy for the CEI, through CCAF, to feign interest in "protecting" class members from their lawyers' fees, but perhaps its true interests actually match those of its likely funders:  reducing the incentives for plaintiffs' attorneys to pursue class actions against large corporations.  Although each successful objection by CEI (through CCAF) yields additional funds for a particular class, in the long run this strategy aligns with corporate interests by reducing the overall incidence of successful class actions.  The Court should be wary of permitting this type of organization to inject its ideology into the proceedings, especially at this late stage.

**B.**     CCAF's Self-Serving Involvement in Factual Matters Is Disqualifying.

Especially in view of the First Circuit's admonition against *amici* that argue facts, *Strasser*, 432 F.2d at 569, CCAF's self-promoting involvement in factual matters in this case should be disqualifying.  *See, e.g.*, *McCarthy v. Fuller*, No. 08-cv-994-WTL-DML, 2012 WL 1067863, at *2 (S.D. Ind. Mar. 29, 2012) (denying *amicus* status to lawyer who proposes to "aid the court by providing facts, insights and explanations," which "suggest[ed] the type of contribution a fact or expert witness would offer"); *Portland Pipe Line Corp. v. City of S. Portland*, No. 15-cv-00054-JAW, 2017 WL 79948, at *6 (D. Me. Jan. 19, 2017) (party was

- 12 -

"right to be concerned about whether the amici will infuse external facts into the Court's consideration.").  In past filings, rather than restrict itself to arguments of law, CCAF has attempted to introduce and argue an array of new purported facts.  For instance, Mr. Frank has described his extended involvement with the *Boston Globe* and a prior, detailed review of the fee submissions, and has submitted on the public docket the analysis referenced in the December 17, 2016 *Boston Globe* article.  *See* Frank Decl., ECF 125-1 ¶¶ 30-32; Memorandum dated Nov. 13, 2016 from Ted Frank to Andrea Estes, ECF No. 125-2 ("Frank Memo").  CCAF's recent Response continues this pattern of injecting new facts.  *See* Response at 18-23.

Further, even if it does not secure its paid role as guardian *ad litem*, it appears that CCAF intends to use this litigation, and its potential role as an *amicus*, as a vehicle for self-promotion. For example, on August 6, 2018, Mr. Frank "tweeted":  "CEI State Street case filing is 🔥🔥🔥 [symbol for fire]" – an apparent reference to his disjointed and self-serving Response.[4] Moreover, on June 28, 2018 (the day the Court unsealed the Special Master's Report and Recommendation), Mr. Frank "tweeted":  "It's more than a little flattering that a big powerful law firm, in an effort to keep me out of a case, asks to spend $2 M on a former federal district judge to investigate them so that there would be no reason for me to do so."[5]  These are two examples of his online self-aggrandizing.  The Court should be wary of a self-promoting amicus, who may be drawn to advocate for extreme positions in order to bolster his image, rather than to present reasoned legal argument in order to serve the Court.  *See BancInsure, Inc. v. U.K. Bancorporation Inc./United Kentucky Bank of Pendleton County, Inc.*, 830 F.Supp. 2d 294, 307 (E.D. Ky. 2011) ("The role of an amicus is generally to aid the Court in resolving doubtful issues

---

[4]        Ted Frank (@tedfrank), Twitter (Aug. 6, 2018, 10:25 AM),
https://twitter.com/tedfrank/status/1026519707229335552.
[5]        Ted Frank (@tedfrank), Twitter (June 28, 2018, 11:09 AM),
https://twitter.com/tedfrank/status/1012397562987536385.

of law rather than present a partisan view of the facts.") (internal quotation marks and citation

omitted); *CalMat Co. v. Oldcastle Precast, Inc.*, No. CV 16-26 KG/JHR, 2017 WL 6001757, at

*3 (D.N.M. Dec. 4, 2017) ("[T]he Court has grave concerns that [the] legal argument would not

be useful and, instead, would be confusing, unhelpful, and self-serving.").

     **C.**     There is no need for CCAF to Participate as Amicus.

     In addition to the reasons why CCAF in particular should not serve as an *amicus* in this

proceeding, there is the simple fact that the Court does not need any *amicus* (much less a partisan

advocate such as CCAF) in order to conduct its *de novo* review.  The legal issues in this matter

are more than fully briefed and are ripe for the Court's rulings.  Moreover, in addition to the

Special Master's Report, the Court has access to the lengthy "expert reports" of Prof. Stephen

Gillers.  His reports, which focus on the law, are best viewed as (novel, misguided, and

incorrect) amicus briefs.  *See, e.g.*, *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d

1239, 1247 n.7 (N.D. Ca. 2000) ("The court notes that all three professors are respected scholars,

and that their participation as *amici curiae* (or even as advocates for the Much Shelist firm)

might have been appropriate."); *In re In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61,

69 (S.D.N.Y. 2001) ("Professors Hazard and Wolfram . . . could have submitted an amicus brief

arguing how the law *should be* interpreted . . .").  The Court surely does not need another

amicus in the case, especially the biased and self-interested CCAF.

**IV.**     CCAF'S ARGUMENTS ARE MISLEADING.

     Finally, CCAF, in its efforts to disparage Labaton, makes several misleading statements

to which Labaton is constrained to respond.

     **A.**     The Court Did Not Rescind, Revoke, or Vacate the Award of Fees.

     CCAF characterizes Labaton's statement that the Court "did not rescind, revoke, or

vacate the aware of fees" as an "abusive misstatement."  Response at 4 n.2.  Histrionics aside,

CCAF is wrong.  At the March 7, 2017 hearing, the Court indicated that it wished for the parties to file a motion for relief pursuant to Fed. R. Civ. P. 60.  It was understood that the effect of doing so would ensure that the Court retained jurisdiction to modify the award, but would not otherwise change the award until further action from the Court.  *See* March 7, 2017 Hr'g Tr. (ECF 176) at 19 ("It wouldn't be any concession that any money should be ordered returned at the end of all of this . . .").  Thus, Labaton filed the Rule 60(b) motion "at the Court's request in order to eliminate any potential doubt as to whether the Court retains continuing jurisdiction to modify the Fee Order *if the Court determines any such modification is appropriate*."  ECF 179 at 6 (emphasis added).  And, when the Court entered the Order, it did not grant any specific relief, but instead granted the Order "to assure the court's continuing jurisdiction to modify the Fee Order, should the court find modification to be appropriate[.]"  ECF 331 at 2.

CCAF's claim that the Court's order "vacated" the award is simply false.  *See* Response at 4.  The Court has continuing jurisdiction with respect to the fee award, but has not rescinded, revoked, or vacated.  *See* ECF 332.

> **B.**     CCAF's Reference to the Former Treasurer is Unavailing.

CCAF attempts to create a sideshow by referencing contributions made totaling $6000 by six Labaton partners and their spouses to the former Arkansas State Treasurer a full year *after* the ATRS Board of Trustees approved Labaton's application to become monitoring counsel.  *See* Response at 18.  ECF 420-1 at 20-21.  This "argument" should be rejected out of hand.  The former Treasurer was a single member of the Board of Trustees, which did not have – and does not have – any authority to influence litigation decisions on behalf of ATRS. [6]  *See Knurr v. Orbital*, Declaration of George Hopkins, 1:16-cv-01031 (E.D. Va. Oct. 31, 2016) (ECF 33-1) at

---

[6]   The State Treasurer, Martha Shoffner, to whom the contributions were paid was not even personally present at the meeting at which the vote occurred.  Id. at 5.

¶ 9 (Oct. 31, 2016); *Hachem v. General Electric*, Declaration of George Hopkins , 1:17-cv-08457 (S.D.N.Y. Jan. 18, 2018) (ECF 49-5) at ¶ 5 ("I never discussed any political contributions by Labaton Sucharow LLP with the former Treasurer, nor have I ever consulted with her regarding the use of outside counsel to prosecute a particular securities class action. The former Treasurer never asked me to use or not use Labaton Sucharow LLP in any particular case and never provided any input to me about Labaton Sucharow LLP whatsoever.").  CCAF does not attempt to connect these contributions to anything related to the issues in this case; rather, it is content to score cheap points with references to an unrelated political scandal.

Second, CCAF's suggestion that George Hopkins "abdicat[ed] any responsibility to supervise class counsel" is either dishonest or uninformed.  *See* Response at 21.  It is undisputed that Mr. Hopkins played an extremely active role in the *State Street* case, including overseeing class counsel.  *See* R&R Ex. 4 at 85:14-23 ("My duties were you to, first of all, to oversee the litigation, to oversee the attorneys, to ensure that all our attorneys were appropriately taking all action necessary, to be prepared in the mediations, to be prepared to do all the discovery, to respond to all the motions, and to comply with all the judge's orders.").  He spent "several hundred hours" working on the case.  *Id.* at 102:7-19.  In the end, he had a major role in negotiating the settlement.  *Id.* at 66:22-68:24.  The Master even observed that Mr. Hopkins "was more involved, more engaged and contributed more value than not just the average class representative but almost any class representative . . ."  R&R Ex. 162 at 50:20-24.  As for his position regarding allocation of fees among counsel, Prof. Rubenstein has explained that, "class action law has no expectation that a class representative in a standard non-PSLRA case will oversee the fee allocation process.  I don't know of a single fee allocation case that references the class representative's involvement in any way whatsoever . . ."  R&R Ex. 235 at 144:14-23.

Compounding CCAF's counterfactual statement, CCAF relies upon a wholly irrelevant case in which the proposed class representative communicated with counsel a total of four times and never saw the settlement agreement – the diametric opposite to Mr. Hopkins.  *See* Response at 21 (*citing Foley v. Buckley's Great Steaks, Inc.*, 2015 WL 1578881 (D.N.H. Apr. 9, 2015)). That CCAF is willing to blatantly twist both fact and law speaks volumes about its bias in this case, and its motive to remove ATRS and Customer Class Counsel in order to earn a (well-paying) seat at the table.

     **C.**     Labaton Has Not Paid, and Will Not Pay, a Referral Fee to Chargois in Facebook

CCAF's accusation that Labaton "continues to conceal" the Chargois relationship in *In re Facebook, Inc. IPO Securities and Derivative Litigation* ("*Facebook*") is baseless and false.  *See* Response at 22.  Labaton has not paid a referral fee, and will not pay a referral fee, to Damon Chargois in *Facebook*.  Johnson Decl. ¶ 2.  Thus, in that case, Labaton is in full compliance with Local Rule 23.1 of the United States District Courts for the Southern and Eastern Districts of New York Local Rules, which requires disclosure of "any fee sharing arrangements with anyone."  *Id.* at ¶ 3.  CCAF's willingness to level this accusation against Labaton without a factual basis, and to further suggest that a sanction is appropriate, Response at 23, is irresponsible and makes plain CCAF's bias.

**V.**     CONCLUSION.

For the foregoing reasons, the Court should deny CCAF's motion to participate in this case as guardian *ad litem* or amicus.

Dated:  August 7, 2018                    Respectfully submitted,


By: */s/ Joan A. Lukey*
    Joan A. Lukey (BBO No. 307340)
    Justin J. Wolosz (BBO No. 643543)
    Stuart M. Glass (BBO No. 641466)
    Choate, Hall & Stewart LLP
    Two International Place
    Boston, MA 02110

    *Counsel for Labaton Sucharow LLP*


*By: /s/ Brian T. Kelly*
Brian T. Kelly, Esq. (BBO No. 549566)
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110
Tel.: (617) 345-1000
Fax: (617) 345-1300
bkelly@nixonpeabody.com

*Counsel for The Thornton Law Firm LLP*


CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to all counsel of record on August 7, 2018.


                  */s/ Joan A. Lukey*
                  Joan A. Lukey

8780780v2