# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

## LABATON SUCHAROW LLP'S OBJECTIONS TO
## SPECIAL MASTER'S REPORT AND RECOMMENDATIONS

### Table of Contents

PRELIMINARY STATEMENT ................................................................ 1

OBJECTIONS TO MASTER'S FINDINGS OF FACT ................................ 4

    1.    Labaton Did Not Take "Pains At Every Turn" to Hide the Chargois Agreement from ATRS ................................................................ 4

        a.    ATRS' Institutional Knowledge of Chargois & Herron ............ 4

        b.    Labaton Followed Client Instructions ...................................... 5

        c.    ATRS' Engagement Letter With Labaton For the *State Street* Matter Permitted the Payment of Referral Fees ......................... 6

    2.    George Hopkins Ratified the Chargois Agreement on Behalf of ATRS ............... 6

    3.    The Payment to Chargois & Herron Was Not Required To Be Disclosed In the Fee Petition Or Any Settlement Documents ............... 7

    4.    The Payment to Chargois & Herron Did Not Come From "Class Funds." ........................................................................................ 7

    5.    Labaton Did Not Improperly Hide the Chargois Agreement From Other Counsel. ........................................................................... 8

    6.    The ERISA Firms Had No Intention of Sharing Any Attorneys' Fee Allocation Information with the Department of Labor. ................... 9

    7.    The Special Master Is Incorrect Regarding Amounts Supposedly Owed to ERISA Counsel ............................................................... 10

    8.    ERISA Plaintiffs Were Not Labaton Clients Until, at the Earliest, a Class Was Certified .................................................................... 15

    9.    Labaton's Purported "Compartmentalization" Is Not Inappropriate ............... 15

    10.    Labaton Was Not Required to Disclose the Referral Relationship in Response to RFPs or Interrogatories ............................................ 16

    11.    There Has Been No Failure to Accept Responsibility. ...................... 19

    12.    ATRS Continues to Be an Adequate Class Representative. ............... 21

OBJECTIONS TO MASTER'S CONCLUSIONS OF LAW ........................ 22

ARGUMENT SUPPORTING LABATON'S  OBJECTIONS TO MASTER'S CONCLUSIONS OF LAW ................................................................ 24

I.      STANDARD OF REVIEW ............................................................................ 24

II.     THE MASTER MISSTATES THE APPLICABLE LEGAL STANDARDS................. 24

III.    THE CHARGOIS FEE-SHARING AGREEMENT COMPLIED WITH THE
        MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT ................................. 25

        A.      The Master's Animosity Toward Referral Fees is Squarely At Odds
                With Massachusetts Law and Practice................................................... 26

        B.      Labaton Complied With MRPC 1.5(e). ................................................. 27

        C.      In Any Event, ATRS Ratified The Fee-Sharing Agreement With
                Chargois. .............................................................................................. 31

        D.      Despite the Master's Suggestions, the Chargois Agreement Falls
                Within MRPC 1.5 and Fulfilled the Purpose of That Rule................... 32

        E.      Even if Labaton Failed to Comply With MRPC 1.5(e), Which It Did
                Not, No Sanctions or Discipline Are Warranted. ................................. 34

        F.      MRPC 7.2 Does Not Apply. .................................................................. 37

        G.      MRPC 1.5(a) Does Not Apply to the Chargois Agreement.................. 41

IV.     LABATON WAS NOT REQUIRED TO DISCLOSURE TO CHARGOIS
        AGREEMENT TO THE COURT ...................................................................... 43

        A.      The Master Ignores Controlling Federal Rules..................................... 43

        B.      As the Master Appears to Concede, The Federal Rules of Civil
                Procedure Do Not Require Disclosure of Fee Allocation Agreements. ............... 44

        C.      Rule 23(e) Did Not Require the Disclosure of the Chargois
                Agreement............................................................................................. 46

                1.      The Master's Reading of Rule 23(e)(3) is Unsupported by Case
                        Law. ........................................................................................... 46

                2.      The Master's Novel Interpretation of Rule 23(e)(3) is
                        Contradicted by the Rule's Text and its Advisory Notes. ........ 47

                3.      The Master Misstates Professor Rubenstein's Opinions. ......... 50

                4.      The Master's Position on Fee Allocation Disclosure is
                        Incorrect and Inconsistent......................................................... 52

        D.      The Court's Fiduciary Duty to the Class Does Not Create an
                Independent Disclosure Obligation.......................................................... 53

E.     The Master's Fundamental Dislike of Referral Fees Does Not Nullify the Federal Rules of Civil Procedure in This Case. .............................. 57

F.     Labaton Did Not Violate Rule 11. ....................................................... 59

G.    Labaton's Non-Disclosure of the Chargois Agreement Did Not Violate the Massachusetts Rules of Professional Conduct................................. 62

      1.     Labaton Did Not Violate MRPC 3.3(a) or 8.4.......................... 62

      2.     Comment 14A Does Not Change the Analysis.......................... 63

      3.     No sanction or Discipline is Warranted Based on a Purported Finding That Labaton Violated MRPC 3.3(a). ......................... 66

H.    The Master's "General Candor to the Court" Argument Also Fails.................... 68

V.    DISCLOSURE TO THE CLASS WAS NOT REQUIRED ............................................. 70

A.     The Payment to Chargois Came From Customer Class Counsels' Share of the Fee Award...................................................................... 70

B.     The Federal Rules of Civil Procedure Do Not Require Disclosure to the Class of the Fee-Sharing Agreement With Chargois. .................... 71

C.     The Rules of Professional Conduct Do Not Require Disclosure. ......... 72

D.     The Court Has Endorsed the Notice Provided by Labaton................. 75

VI.   LABATON DID NOT BREACH ANY DUTIES TO CO-COUNSEL ......................... 76

A.     Labaton Did Not Breach an Ethical or Legal Duty by Not Disclosing the Chargois Agreement. ...................................................... 76

B.     Labaton Did Not Breach a Contractual Duty....................................... 78

VII.  OBJECTIONS TO MASTER'S PROPOSED REMEDIES ............................................. 81

A.     The Master's Double-Counting Remedy Should Be Rejected. ........... 81

B.     The Master's Chargois Payment Remedy Should Be Rejected........... 83

C.     The Master's Recommendation of Ongoing Ethical Supervision By the Court Or Otherwise Should Be Rejected. ........................................... 84

VIII. CONCLUSION................................................................................................. 85

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adley v. Burns,*
  No. 16-12265-WGY, 2018 U.S. Dist. LEXIS 81899 (D. Mass. May 15, 2018) ....................80

*In re "Agent Orange" Prod. Liab. Litig.,*
  597 F. Supp. 740 (E.D.N.Y. 1984) ..........................................................................56, 57

*In re "Agent Orange" Product Liability Litigation,*
  818 F.2d 216 (2d Cir. 1987).................................................................................25, 56

*Almendarez-Torres v. United States,*
  523 U.S. 224 (1998)................................................................................................39

*Arkansas Teacher Retirement System v. Insulet Corp.,*
  No. 15-cv-12345 (D. Mass. Mar. 9, 2018)..............................................59, 75, 76

*Bartle v. Berry,*
  80 Mass. App. Ct. 372 (2011)...................................................................................80

*Beck v. Wecht,*
  28 Cal. 4th 289 (Cal. 2002)......................................................................................80

*Bernstein v. Bernstein Litowitz Berger & Grossmann LLP,*
  814 F.3d 132 (2d Cir. 2016)......................................................................... *passim*

*In re Bos. Reg'l Med. Ctr.,*
  328 F. Supp. 2d 130 (D. Mass. 2004) .......................................................................59

*Campmor, Inc. v. Brulant,*
  LLC, 2:09-cv-05465, 2014 U.S. Dist. LEXIS 150299 (D.N.J. Oct. 21, 2014)......................62

*Daynard v. Ness, Motely, Loadholt, Richardson & Poole, P.A.,*
  188 F. Supp. 2d 115 (D. Mass. 2002) .......................................................................40

*DeMarco v. Granite Sav. Bank,*
  1993 Mass. App. Div. 122 (Mass. App. Ct. 1993) ...................................................79

*In re Disciplinary Action Against McCray,*
  755 N.W.2d 835 (N.D. 2008) ...................................................................................40

*In re Discipline of an Atty.,*
  442 Mass. 660 (2004) ..............................................................................................67

*Eldridge v. Gordon Bros. Grp., LLC*,
    863 F.3d 66 (1st Cir. 2017) ............................................................................. 61, 62

*In re Fordham*,
    423 Mass. 481 (1996) ................................................................................................ 43

*Frontier Mgmt. Co. v. Balboa Ins. Co.*,
    658 F. Supp. 987 (D. Mass. 1986) ......................................................................... 81

*Gurman v. Metro Housing and Redevelopment Auth.*,
    842 F. Supp. 2d 1151 (D. Minn. 2011) .................................................................. 62

*Harden Mfg. v. Pfizer, Inc (In re Neurontin Mktg. & Sales Practices Litig.)*,
    58 F. Supp. 3d 167 (D. Mass. 2014) ...................................................................... 82

*Hartless v. Clorox*,
    273 F.R.D. 630 (S.D. Cal. 2011) .............................................................. 47, 53, 70

*In re Heartland Payment Sys.*,
    851 F. Supp. 2d 1040 (S.D. Tex. 2012) ............................................................ 47, 48

*Holstein v. Grossman*,
    246 Ill. App. 3d 719 (1993) .................................................................................... 40

*Kaplan v. DaimlerChrysler, A.G.*,
    331 F.3d 1251 (11th Cir. 2003) .............................................................................. 62

*Lamon v. Amrheign*,
    No. 1:12-cv-00296, 2014 U.S. Dist. LEXIS 111787 (E.D. Cal. Aug. 12, 2014) .................... 62

*Lewis v. Teleprompter Corp.*,
    88 F.R.D. 11 (S.D.N.Y. 1980) ......................................................................... 56, 57

*Markell v. Sidney B. Pfeifer Found., Inc.*,
    9 Mass. App. Ct. 412 (1980) ...................................................................... 79, 80, 81

*Mazon v. Krafchick*,
    158 Wash. 2d 440 (Wash. 2006) ............................................................................ 80

*McGee v. Town of Rockland*,
    11-cv-10523, 2012 U.S. Dist. LEXIS 180197 (D. Mass. Dec. 20, 2012) ......................... 61, 62

*O'Connell v. Shalala*,
    79 F.3d 170 (1st Cir. 1996) ................................................................................... 38

*Office & Prof'l Emps. Int'l Union, Local 494 v. Int'l Union*,
    311 F.R.D. 447 (E.D. Mich. 2015) ........................................................................ 48

*Pearson v. First NH Mortg. Corp.,*
    220 F.3d 30 (1st Cir. 1999) .............................................................68, 69

*Pierce v. Barnhart,*
    440 F.3d 657 (5th Cir. 2006) ..................................................................45

*Rand v. Monsanto Co.,*
    926 F.2d 596 (7th Cir. 1991) ..................................................................73

*Rodriguez v. West Publ'g Corp.,*
    563 F.3d 948 (9th Cir. 2009) ..................................................................70

*Roger Edwards, LLC v. Fiddes & Son, Ltd.,*
    437 F.3d 140 (1st Cir. 2006) ..................................................................61

*In re Ronco, Inc.,*
    838 F.2d 212 (7th Cir. 1988) ..................................................................62

*In re Ruffalo,*
    390 U.S. 544 (1968) ................................................................................68

*In re Saab,*
    406 Mass. 315 (1989) .............................................................................37

*Saggese v. Kelley,*
    445 Mass. 434 (2005) ...................................................................... *passim*

*Sahin v. Sahin,*
    435 Mass. 396 (Mass. 2001) ..................................................................78

*Scheffler v. Adams & Reese, LLP,*
    950 So. 2d 641 (La. 2007) ......................................................................80

*Smith v. Jenkins,*
    626 F. Supp. 2d 155 (D. Mass. 2009) ....................................................79

*Smith v. Zipcar, Inc.,*
    125 F. Supp. 3d 340 (D. Mass. 2015) ...............................................78, 79

*Sobran v. Millstein,*
    148 F. Supp. 3d 71 (D. Mass. 2015) .................................................80, 81

*Stolzoff v. Waste Sys. Int'l,*
    58 Mass. App. Ct. 747 (2003) ................................................................79

*United States v. Schaffer Equip.,*
    11 F.3d 450 (11th Cir. 1994) ..................................................................69

*United States v. Ven-Fuel, Inc.,*
  758 F.2d 741 (1st Cir. 1985) ..................................................................43

*Vita v. Berman, DeValerio & Pease, LLP,*
  81 Mass. App. Ct. 748 (2012) ...............................................................33

*Wolf v. Prudential-Bache Sec.,*
  41 Mass. App. Ct. 474 (1996) ...............................................................79

*Young v. City of Providence,*
  404 F.3d 33 (1st Cir. 2005) .............................................................61, 62

**Statutes and Rules**

2018 US Order 0020 ...................................................................................49

District of Massachusetts L. R. 83.6.1(1) ................................................35

Fed. R. Bankr. P. 2014(a) .........................................................................68

Fed. R. Civ. P. 1 .......................................................................................60

Fed. R. Civ. P. 11 ..............................................................................*passim*

Fed. R. Civ. P. 23 ..............................................................................*passim*

Fed. R. Civ. P. 53 ...............................................................................24, 25

Fed. R. Civ. P. 54 ..............................................................................*passim*

Ill. Sup. Ct. R. 2-107 .................................................................................40

Mass. R. Civ. P. 23 ...................................................................................65

Mass. R. Prof. C. 1.2 .................................................................................73

Mass. R. Prof. C. 1.4 .................................................................................73

Mass. R. Prof. C. 1.5 .................................................................................74

Mass. R. Prof. C. 1.5(a) .................................................................41, 42, 43

Mass. R. Prof. C. 1.5(e) ......................................................................*passim*

Mass. R. Prof. C. 1(f) ................................................................................29

Mass. R. Prof. C. 3.3(a) .............................................................................63

Mass. R. Prof. C. 7.2(b) .....................................................................*passim*

Mass. R. Prof. C. 8.4(c) ....................................................................................63

Massachusestts Supreme Judicial Court Rule 3:07 ...............................................35, 36

Massachusetts Supreme Judicial Court Rule 4:01 ......................................................35

**Other Authorities**

Board of Bar Overseers, *Massachusetts Legal Ethics: Substance and Practice*
(2017) ........................................................................................................ *passim*

Christina Pazzanese, *Attorney Fee Rules Undergo Revisions in Massachusetts*,
Mass. Law. Wkly., Jan. 12, 2011 ....................................................................36

H.P. Wilkins, *The New Massachusetts Rules of Professional Conduct: An
Overview*, 82 Mass. L. Rev. 261 (1997) ........................................................27, 43

James S. Bolan*, Ethical Lawyering in Massachusetts*, MCLE (4th Ed. 2015).............................35

*Manual for Complex Litigation* ..............................................................................52

5-23 *Moore's Federal Practice - Civil* § 23.120 (2018).................................................73

10-54 *Moore's Federal Practice - Civil* § 54.154 (2018)..............................................45

3 William B. Rubenstein, *Newberg on Class Actions* (5th ed. 2013)...........................................71

5 William B. Rubenstein, *Newberg on Class Actions* (5th ed. 2016)...............................45, 50, 52

## PRELIMINARY STATEMENT

Labaton Sucharow LLP ("Labaton") objects to the Master's findings of fact and conclusions of law set forth in his Report and Recommendations (the "Report"), as detailed below.

After nearly four million dollars spent and an investigation spanning more than a year, the Master has produced a 377-page Report that is unmoored from the law governing the conduct in question.  His investigation – launched as a result of a self-reported and inadvertent double-counting error in the lodestar reports of the three Customer Class law firms –  has morphed into a challenge of the practice of paying referral fees, despite it being perfectly permissible in Massachusetts.  The Master has asserted several accusations of misconduct against Labaton.  Each of them flows from an unprecedented misapplication of the law.  Instead of applying the actual rules, the Master has – quite unfairly – sought to impose his own personal feelings and aspirations.  As a matter of law, he is incorrect.  The Court, reviewing the Master's findings of fact and conclusions of law *de novo*, must reject them.

Despite the millions expended by the Master, this case is simple.  Labaton, along with several other firms, litigated a hard-fought battle for five years, which resulted in a terrific result for the class.  Everybody involved in this case, including the Master, agrees.  The attorneys requested 25% of the settlement as a fee award, which the Court determined was fair, in large part based on the difficulty of litigating the case, the risks of investing five years into the effort, and the outstanding result achieved for the class.

But two issues have surfaced regarding the attorneys' fees that were paid.  First, Labaton, along with the other Customer Class Firms (Lieff Cabraser Heimann & Bernstein LLP and The Thornton Law Firm), mistakenly double-counted hours on their lodestar reports.  This was an unfortunate error, which Labaton regrets.  But because the Court used these lodestars as a cross-

check to determine whether the 25% fee award was fair, and because the inadvertent double-counting error did not materially affect the result of that cross-check (with the multiplier being adjusted from 1.8 to 2), this mistake should not affect the Court's conclusion that the 25% fee was fair.

Second, Customer Class Counsel paid a portion of their own fee award as a referral fee. Because it was taken from the fees already earned by Customer Class Counsel, this payment did not reduce the amount received by the class whatsoever (instead, it only affected the bottom line of the three firms paying the referral). Crucially, in Massachusetts, referral fees such as this are perfectly permissible.

Labaton obtained the consent of its client, Arkansas Teacher Retirement System ("ATRS"), to pay this fee. Five different experts have concluded that Labaton complied with the governing rules regarding referral fees. Three – Professors Peter Joy, W. Bradley Wendel, and Bruce Green – are law professors specializing in legal ethics. One, Hal Lieberman, is a practitioner who has worked in attorney discipline for over 35 years, including for the Massachusetts Office of Bar Counsel, as Chief Counsel to the Disciplinary Committee for New York's First Judicial Department, and as a private practitioner (in addition to teaching ethics for over a decade and serving on numerous committees involving professional discipline). The final expert is Camille Sarrouf, who has been practicing in the Commonwealth since 1960, including a term as president of the Massachusetts Bar Association in 1998. The combined expertise of this group on this particular issue is unmatched. Each one of these experts has opined, unequivocally, that Labaton complied with its obligations. And, in any event, ATRS has reaffirmed its consent to the payment of this referral fee, which is adequate under clear and controlling precedent from the Massachusetts Supreme Judicial Court.

Related to Labaton's permissible payment of this referral fee from its own share of the fee award, the Master has accused Labaton of misconduct because the referral payment was not disclosed to the Court or the class.  The law on this issue is crystal-clear:  Labaton was not required to disclose the referral fee absent an order from the Court.  There was no such order.  Although the Federal Rules of Civil Procedure are already definite and dispositive, Professor William Rubenstein – who literally wrote the book on class action law – has decisively confirmed that Labaton complied with its disclosure obligations as a matter of law.  Labaton's conduct comported with the controlling Federal Rules of Civil Procedure, applicable precedent, local practice, and the Massachusetts Rules of Professional Conduct.

For his part, the Master's findings of fact are, in many instances, incorrect.  He ignores or fails to address record evidence that squarely contradicts his findings.  Far from acting as a neutral – as he purports to be – the Master has rendered factual findings that are skewed toward his desired result.

While some of the Master's findings of fact are one-sided, his conclusions of law are almost entirely incorrect.  His legal conclusions regarding the referral fee are not only erroneous – in large part, they are unprecedented.  For example, he claims that Labaton violated Massachusetts Rule of Professional Conduct 7.2, which marks the first time in the Commonwealth's history that this Rule has been applied in such a way.  He also concludes that Labaton was required to disclose the referral fee to the Court, based largely on a strained reading of the Federal Rules of Civil Procedure that has never been applied by any court.  Moreover, in many places, the Master does not rely on any law at all, instead choosing to render edicts in wholly conclusory fashion.  The Master's conclusions are incorrect as a matter of law.  And his

efforts to impugn and punish Labaton with accusations of misconduct while relying on novel and unprecedented legal interpretations are offensive to due process.

Labaton helped deliver a result for the class that was lauded by all.  Its own client, ATRS, has repeatedly reaffirmed its satisfaction with Labaton's representation.  The Master's findings are the outgrowth of his animosity toward referral fees and his refusal to apply the plain language of the Federal Rules of Civil Procedure.  Labaton, at long last, welcomes this opportunity for the Court to scrutinize the Master's flawed conclusions and decide these questions *de novo*.

## OBJECTIONS TO THE MASTER'S FINDINGS OF FACT

**1.     Labaton Did Not Take "Pains At Every Turn" to Hide the Chargois Agreement from ATRS.**

Labaton disputes the Master's finding that Labaton "took pains at every turn not to reveal" the Chargois Agreement to George Hopkins or ATRS.  Special Master's Report and Recommendations ("R&R") at 102-04.  This finding is unsupported by the record.

### a.     ATRS' Institutional Knowledge of Chargois & Herron.

The Master improperly frames the knowledge of ATRS (the client) only in terms of what Hopkins knew.  *Id*.  This conveniently ignores the institutional knowledge of ATRS.  It is undisputed that ATRS was aware of Damon Chargois and the Chargois & Herron firm.  That firm facilitated the introduction between ATRS and Labaton, and Damon Chargois was present at the initial meeting.  Ex. 125 (Chargois Dep.) at 36:12-37:10.[1]  Further, Chargois & Herron and Labaton jointly responded to ATRS' Request for Qualifications for a monitoring counsel role and expressly stated that they intended to work together.  Ex. 128 (LBS017738-55).  ATRS answered through its Chief Counsel (Christa Clark) that, while the state system could not accommodate two unaffiliated firms as a single monitoring panel member, Labaton would be

---

[1]     Exhibits attached to the Declaration of Justin J. Wolosz are indicated with a letter (e.g., "Ex. A").  Exhibits to the Master's Report and Recommendations are referred to by number (e.g., "Ex. 1").

free to "affiliate that firm [Chargois & Herron] or utilize them."  Ex. 129 (LBS017455-56).

Thereafter, Belfi spoke with Chief Counsel Clark and told her that Labaton would be working

with Chargois & Herron and that the firm would be involved in the relationship.  Ex. 122 (Belfi

9/5/17 Dep.) at 117:20-24, 118:5:7.  The foregoing facts are undisputed, but not meaningfully

acknowledged or accepted by the Master.

> **b.**   **Labaton Followed Client Instructions.**

Apart from the fact that ATRS, as an institutional party, was unquestionably aware of a

relationship between Chargois & Herron and Labaton, the finding of concealment disregards the

testimony of the only two people with knowledge of whether there was any attempt to hide

information from ATRS (Hopkins and Labaton relationship partner Eric Belfi).  After Hopkins

joined ATRS, Belfi raised the subject of "how fees worked."  *Id.* at 23:17-23.  Hopkins

responded that "he only wanted to deal with [Labaton] and wasn't concerned about how

[Labaton] would cut fees up if [they were] working with other firms."  *Id.*  In short, Hopkins was

interested in the aggregate attorney fee amount – not the allocations of that aggregate fee among

various firms.  *Id.*  Hopkins' testimony confirmed Belfi's understanding:  "I told Eric if I ever

want to know about your attorney fees and who you all hired, I'll ask you . . . I don't feel misled

because I made it real clear to them I didn't want to be the gatekeeper on all this attorney

relationship.  And I think if they thought I wanted to know, they would have told me because

Eric always said if you ever want to see how we do all these fees, just let me know."  Ex. 12

(Hopkins 9/5/17 Dep.) at 68:24-69:1, 73:11-18.  The explanation provided by the two individuals

with personal knowledge of the truth should be credited, and the Master's finding should be

rejected.

c.     **ATRS' Engagement Letter With Labaton For the *State Street* Matter Permitted the Payment of Referral Fees.**

Labaton objects to the suggestion by the Master that ATRS did not know or had no reason to know that Labaton may pay referral fees to another law firm in connection with the *State Street* matter.  *See* R&R at 103-104.  In their engagement letter, ATRS consented to Labaton dividing its fees, *inter alia*, with "local or liaison counsel" or as "referral fees."  Ex. 138 (LBS011060-62).  This express language in the letter sets forth (1) notice to ATRS of the potential payment of referral fees and (2) ATRS' consent for the payment of such fees.

Labaton also objects to the Master's finding that it was required to tell ATRS the name of the firm it paid a referral fee or the percentage of such fee.  *See* R&R at 103.  Under governing Massachusetts law at the time (and currently), there was no requirement to identify the name of the attorney being paid a referral fee or the percentage fee paid to such attorney.  *See* § III.B, *infra*.

## 2.     **George Hopkins Ratified the Chargois Agreement on Behalf of ATRS.**

Labaton objects to the Master's statement that the Hopkins Declaration (Ex. 130) (March 15, 2018) was anything other than a ratification of the Chargois Agreement on behalf of Labaton's client, ATRS, following full disclosure.  *See* R&R at 101 n.83 (stating that Mr. Hopkins "purports" to ratify the Chargois Agreement).  In his Declaration, Mr. Hopkins, the Executive Director of ATRS, acknowledged the fee division with Chargois, recited its details, and consented to and ratified the fee division on behalf of ATRS with respect to the *State Street* matter.  Ex. 130.  There is nothing "purported" about Mr. Hopkins' Declaration.  *See* R&R at 101 n.83.  It is unequivocal.  And, as the SJC held in *Saggese v. Kelley*, 445 Mass. 434 (2005) in the context of MRPC 1.5(e) on fee sharing, "[r]atification is not the preferred method to obtain a client's consent to a fee-sharing agreement, but it is adequate."  445 Mass. at 442.

**3.      The Payment to Chargois & Herron Was Not Required To Be Disclosed In the Fee Petition Or Any Settlement Documents.**

Labaton objects to the Master's finding that "the failure to include the payment to Chargois in the Fee Petition, or anywhere else in the settlement documents, was a material omission." R&R at 88. This is a legal conclusion, not a finding of fact, and for the reasons set forth herein (§§ IV and V, *infra*), there was no duty to disclose the payment to Chargois to the Court, in the notice to the class, or in any of the settlement documents filed in the case.

**4.      The Payment to Chargois & Herron Did Not Come From "Class Funds."**

Labaton objects to the Master's finding that the payment to Chargois & Herron came from "class funds." *See, e.g.*, R&R at 7, 87 n.67, 114 n.93, 263, 287, 299, 306, 311, 324-25, 358-59. The payment came from the share of reasonable attorneys' fees that the Court had already awarded to Customer Class Counsel. *See* Order Awarding Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs dated November 2, 2016, ECF No. 111. It did not come from "class funds."

After the Court entered the aggregate fee award, the attorneys apportioned the aggregate fees pursuant to their previously agreed upon fee allocation agreements. As part of that process, Labaton transferred the aggregate attorneys' fee award from the settlement fund into a separate escrow account. The referral or origination fee payment to Chargois was funded by the three Customer Class Counsel. Accordingly, Labaton reduced the payment to Lieff and Thornton by the amount they had agreed to contribute to the Chargois payment, and included these amounts in the transfer to the Labaton IOLA account. From Labaton's IOLA account, Labaton paid service awards and made the payment to Chargois. *See* Ex. 238 (Response by Labaton Sucharow LLP to Special Master's September 7, 2017 Request for Supplemental Submission) at 37.

The suggestion that Labaton was shifting a pre-existing obligation to the class is flat-out wrong.  Labaton's agreement was to pay a portion of its share to Chargois & Herron (although, in this case, it was also funded by Lieff and Thornton).  If Labaton itself was entitled to no share of attorneys' fees, then Chargois & Herron likewise would be entitled to no payment.

Throughout these proceedings, Customer Class Counsel and several of their experts, including Prof. Rubenstein, have vigorously disputed the notion that the payment to Chargois & Herron came from "class funds."  As Professor Rubenstein testified at his deposition:

> I think it's an important distinction in a big case like that that there are these two phases; that the fee is set in the aggregate in the first phase.  That's the important phase 'cause that's when the class' money is being taken from the class.  And that's the key to the whole thing in my opinion.  And then once the Court has decided that's a fair fee to take from the client, then the question of how the lawyers divide that fee up among themselves is what I refer to as the allocation phase which I think has less pertinence for the class in most cases.  Ex. 235 (Rubenstein Dep.) at 23:16-24:4.

The repeated finding in the R&R that the payment to Chargois & Herron came from "class funds" and that Labaton used "class funds" to satisfy a preexisting obligation are baseless and incorrect, and therefore should be rejected.

**5.     Labaton Did Not Improperly Hide the Chargois Agreement From Other Counsel.**

Labaton objects to the Master's suggestion (R&R at 116, 132-133 & n. 115) that it improperly hid the Chargois Agreement from the other lawyers in the case.  The Labaton witnesses testified to their belief that their business arrangements, which would include the payment of permissible referral fees to other lawyers, were not required to be disclosed to other counsel.  Ex. 42 (Goldsmith 9/20/17 Dep.) at 167:12-168:21; Ex. 38 (Sucharow 9/1/17 Dep.) at 94:8-95:6.  This information about the identity of local counsel who helped Labaton develop certain business relationships is proprietary to the Firm and Labaton did not expect other counsel to share any such relationships with it.  Moreover, the other firms were not surprised by this.  *See*

Ex. 162 (4/13/2018 Hearing) at 266 (Lieff attorney stating "how competitive the field is in the plaintiffs' securities bar for clients like Arkansas . . . the identity of your local counsel in the minds of some plaintiffs' firm is proprietary); *id.* at 269-70 (Lieff attorney stating "Labaton did not want to disclose to the world who their local contact was for their Arkansas Fund client . . . it's just not a surprise.  It is not – it was not a surprise to me").

**6.    The ERISA Firms Had No Intention of Sharing Any Attorneys' Fee Allocation Information with the Department of Labor.**

Labaton objects to the Master's finding that its failure to tell ERISA counsel (McTigue Law LLP, Keller Rohrback L.L.P. and Zuckerman Spaeder LLP) about the Chargois Agreement kept it from being disclosed to the Department of Labor.  *See* R&R at 117-18, 349. Lynn Sarko, counsel for the ERISA plaintiffs, made contemporaneous statements admitting that he would not provide any fee allocation or agreement information to the DOL.

First, on August 9, 2015, Mr. Sarko wrote to plaintiffs' counsel with his thoughts prior to an upcoming call with the DOL. *See* Transmittal Declaration of Justin J. Wolosz, submitted herewith ("Wolosz Decl."), Ex. A (TLF-SST-043022).  Under the heading "Expect the DOL to ask," Mr. Sarko wrote:  "Are there deals/arrangements on how to divide the fees between the class lawyers – and are we willing to tell the DOL what those arrangements are (I have stayed away from commenting on this – and have always changed the subject or ignored their question – ***as I feel it is none of their business***").  *Id.* (emphasis added).

Second, on August 28, 2015, Mr. Sarko wrote to plaintiffs' counsel:  "We need to be careful about this as the DOL has asked if there were any agreements on fees between counsel.  ***I would never answer their question***.  And then they seem to forget about it."  Ex. 35 (TLF-SST-052975) (emphasis added).

Therefore, it is simply incorrect for the Master to credit Mr. Sarko's *post hoc* and self-serving testimony that, had he known of the Chargois Agreement, he would have disclosed it to the Department of Labor.  *See* R&R at 117-18, & n.96.  The fact that the Master does not even address these statements by Mr. Sarko speaks volumes about the unbalanced nature of his Report.

**7.     The Special Master Is Incorrect Regarding Amounts Supposedly Owed to ERISA Counsel.**

Throughout the course of the investigation, the Special Master (as was apparent through his questioning) misunderstood or misconstrued a term in the Stipulation and Agreement of Settlement.  The relevant provision states that:  "no more than Ten Million Nine Hundred Thousand Dollars ($10,900,000.00) in attorneys' fees shall be paid out of the ERISA Settlement Allocation."   ECF 89, ¶24.  In questioning, the Special Master appeared to mistakenly believe that this term means that ERISA Counsel was entitled to receive up to $10.9 million in attorneys' fees.  *See, e.g.,* Ex. 42 (Goldsmith 9/20/17 Dep.) at 101:13-16 (asking what would occur "if the differential between the 10.9-million-dollar cap and what ERISA counsel received didn't go to ERISA counsel for fees"); Ex. 41 (Chiplock 9/8/17 Dep.) at 85:13-20 (The Master:  "Where maybe the lack of understanding is . . . It looks in the agreement like there's a 10.9 percent cap because it's captioned ERISA settlement allocation.  It looks like that is an allocation for ERISA counsel.").  In the R&R, the Master confirms that this was his erroneous understanding, making demonstrably incorrect statements describing the $10.9 million cap, such as:  "attorneys' fees *for ERISA counsel* would not exceed $10.9 million" (p. 277, emphasis added) and "fees *for ERISA counsel* will not exceed $10.9 million" (p. 343-344, emphasis added).  He also makes a "recommendation" that the award of fees to ERISA Counsel should be increased by $3.4 million, so that they would receive a total of $10.9 million.  *Id.* at 368-69.

The Special Master conflates the amount of total attorneys' fees that could permissibly be paid from the ERISA Settlement Allocation with the amount of fees payable *to ERISA Counsel*. There is no basis to say that "those two numbers have anything to do with each other."  Ex. 42 (Goldsmith 9/20/17 Dep.) at 100:12-13; *see also id. at* 101:6-11 ("There was never, to my knowledge, any sort of cross-over or discussion of how this cap, which was requested by the DOL and negotiated between the DOL and Lynn Sarko to my recollection, informed or had anything to do with" how a fee award would be divided among Customer Class Counsel and ERISA Counsel).

Nor would there be a basis to increase the amount payable to ERISA Counsel to $10.9 million, or anything above what they received.  ERISA counsel contributed to the effort in this case – as acknowledged by Customer Class Counsel when they increased the ERISA Counsel's share of attorneys' fees from 9% to 10% – but ERISA Counsel played a much less significant role than Customer Class Counsel.  Among other things, ERISA counsel never litigated a motion to dismiss.  *Id.* at 16:12-17:1; 43:11-18.  Likewise, ERISA Counsel did not invest nearly as much as Customer Class Counsel in expenses and fees to develop the theory of the case, conduct massive document review and analysis, and respond time and again to contentious presentations by State Street's counsel during the mediation sessions, leading ultimately to a settlement for all. *See, e.g.,* Ex. 58 (Goldsmith 7/17/17 Dep.) at 48:18-20 ("And based largely on our efforts they were able to settle their cases without having those allegations tested."); 65:11-67:11 (explaining his recollection that ERISA counsel never requested access to the voluminous documents that Customer Class Counsel had requested and reviewed); Ex. 10 (Chiplock 6/16/17 Dep.) at 79:7-82:21 (ERISA firms did not have a role working with Customer Class Counsel on document review or pleadings).  Any suggestion by the Special Master that ERISA Counsel were solely

responsible for obtaining the entire portion of the ERISA Settlement Allocation – which seems to be the premise behind the Special Master's suggestion that ERISA Counsel were supposed to receive $10.9 million (and the "recommendation" that their share should be increased now) – fails to reflect the reality of how this case proceeded.

The amount of the losses suffered by the putative ERISA class members likewise provides no basis to increase the share of attorneys' fees paid to ERISA counsel.  The Special Master's Report and Recommendation states affirmatively that after reaching the agreement that ERISA Counsel would take 9% of any fee award, "it was later learned" that losses to the putative ERISA class were "actually about 12-15% of the total trading volume."  R&R at 46.  Although the Special Master includes a footnote saying that Labaton's counsel indicated *at oral argument* that the trading volume was between 9 and 10% (R&R at 46 n.28), this statement is misleading: Labaton had submitted a written rebuttal response that made clear that there was no record evidence for any finding that the ERISA trading volume was 12-15% of the total trading volume. *See* Ex. 161 (Rebuttal Response by Labaton Sucharow LLP) at 10-11.

As explained in the Court-approved Plan of Allocation for the proceeds of the Settlement, the Class's ERISA trading volume is derived from the volume of ERISA Class Members and also from certain Class Members that are "Group Trusts."  *See generally* Class Notice, ECF No. 104-13 at 17-20.  "The amount of the ERISA Settlement Allocation has been set based on the Indirect FX Trading Volume information provided, including information concerning the total amount of Indirect FX Trading Volume executed during the Class Period by ERISA Plans and Group Trusts."  *Id*. at 17.

However, both the amount of the Class's ERISA trading volume, *i.e.,* the Indirect FX Trading Volume of ERISA Class Members and eligible Group Trusts, and the proportion of the

Class's ERISA trading volume to total Indirect FX Trading Volume of the Class *is not known at this time*.[2]  This is because the scope of Group Trust ERISA trading volume and assets is only known to the Group Trusts and, as part of the Settlement administration and Plan of Allocation, they were asked to provide certifications concerning their ERISA assets and/or the Indirect FX Trading Volume made by their ERISA Plans so that the Claims Administrator could determine their ERISA Volume.  *See id.* at 18-19.  As explained by the Claims Administrator in connection with Plaintiffs' Assented-To Motion For Authorization To Distribute To Eligible Registered Investment Company Class Members (ECF Nos. 209-211), this Group Trust certification process is ongoing.  *See* Declaration of Eric J. Miller on Behalf of A.B. Data, Ltd. in Support of Motion for Authorization to Distribute to Eligible Registered Investment Company Class Members, ECF 211 at ¶¶ 13-14.

Moreover, the deposition testimony cited by the Special Master in support of his finding does not even support his proposition regarding Indirect FX Trading Volume.  Lynn Sarko's July 6, 2017 testimony states:

> THE WITNESS:  I guess in my view was, you know, in the perfect world, we would have received –
>
> SPECIAL MASTER:  Something commensurate with what the ERISA trading volume turned out to be?

---

[2]       "The ERISA Settlement Allocation (which shall be the source of distributions *to ERISA Plans and certain Group Trusts,* as set forth below) shall be at least Sixty Million Dollars ($60,000,000.00) .…  The ERISA Settlement Allocation, even without the $10,900,000 cap on attorneys' fees described above, provides a premium per dollar of Indirect FX Trading Volume for ERISA Plans and eligible Group Trusts in comparison to the allocations to other Settlement Class Members.  The precise size of the premium is not known at this time because *the amount of ERISA assets within Group Trusts is currently undetermined*.…"  *See* Class Notice, ECF No. 104-13 at 17 (emphasis added).  Moreover, "*[i]n light of the fact that the amount of ERISA assets within Group Trusts is currently undetermined*, the Parties, with input from the DOL, have agreed that the Plan of Allocation will be modified in the event that the total amount of Group Trusts' ERISA Volume is in excess of 2/3 of the total amount of Group Trusts' Indirect FX Trading Volume, as reported by State Street on July 25, 2016."  *Id*. at 18 (emphasis added).

THE WITNESS:  Correct.  Or you can say, put it differently, should we receive a lower multiplier than certain other folks?

Ex. 28 (Sarko 7/6/17 Dep.) at 64:3-11.

Moreover, Carl Kravitz's full testimony actually supports the opposite finding:

As things played out, the number was between slightly above 9 and 15, or maybe slightly above 15.  Why it went to from slightly below 9 to slightly above 9, I don't know.

But there was another group of entities called group trusts.  Group trusts have both ERISA and non-ERISA assets.  And I believe that they were not included in the original data we were given under the heading ERISA assets.

And so somewhere between 9-plus and 15-plus would be the actual ERISA volume, depending on what part of the group trusts turned out to be ERISA and what part turned out not to be ERISA.

The settlement, if you look at it, has a process for determining exactly what that percentage is because, at the end of the day, you need to know whether the group trust assets that are ERISA are going to take from the ERISA pile or the non-ERISA pile. And if you ask me do I know what that process has revealed in terms of what the actual percentage is, the answer is I don't know.  So I wish I could answer that question.

Ex. 21 (Kravitz 7/6/17 Dep.) at 53:23-54:20.

Accordingly, the Master's finding that ERISA trading volume "was actually about 12-15% of the total trading volume. . . ." is unsupported by the record.

Finally, the division of fees between Customer Class Counsel and ERISA Counsel was not entirely predicated on an estimate of the ERISA trading volume.  In fact, the 9% share of fees initially allocated to ERISA counsel was also based on the fact that the ERISA claims were largely duplicative of the claims asserted in the "customer" case (i.e., *ATRS v. State Street*).  In other words, when the fee allocation was negotiated, the ERISA claims were not expected to be solely responsible for any recovery to ERISA-eligible claimants.  Thus, even leaving aside the

exact trading volume, the fee agreement between Customer Class Counsel and ERISA Counsel was still fair.

**8.      ERISA Plaintiffs Were Not Labaton Clients Until, at the Earliest, a Class Was Certified.**

The Report makes a blanket statement – twice – that Customer Class Counsel considered ERISA plaintiffs to be Customer Class Counsel's clients.  R&R at 28, n.16 and 281, n.232.  This conclusion is inaccurate, at least as to Labaton.  With respect to Labaton, both statements cite to the testimony of David Goldsmith.  *Id.*  The first is a citation to a September 20, 2017 deposition that apparently was intended to refer to a July 17, 2017 deposition.  The actual quotation (when the citation is corrected) merely says that Customer Class Counsel "did allege a class which was broad enough to encompass ERISA governed assets."  Ex. 58 (Goldsmith 7/17/2017 Dep.) at 42:11-14.  The second citation, which also points to the wrong deposition date, does include a quotation with a passing comment saying that putative ERISA class members "were our clients."  *Id.* at 61:7-14.  But the reference to that comment fails to acknowledge that, when questioned more directly about the issue, Mr. Goldsmith testified unequivocally that, "I would not view the ERISA plaintiffs as clients of Labaton Sucharow."  Ex. 42 (Goldsmith 9/20/2017 Dep.) at 31:10-12; *see also id.* at 32:9-11; 33:21-24.  As the deposition continued, Mr. Goldsmith further explained that in his mind, the ERISA plaintiffs and putative class members "actually weren't Labaton clients, to the extent they ever were, until the class [was] certified . . . until the settlement was finally approved by the Court which was I think on or about November 2, 2016."  *Id.* at 65:19-66:2.

**9.      Labaton's Purported "Compartmentalization" Is Not Inappropriate.**

Labaton disputes the Special Master's repeated conclusion that Labaton has a structure of "compartmentalization" that is somehow inappropriate.  *See, e.g.,* R&R at 56, 97-98.  Labaton

does have settlement counsel who focuses on the preparation of settlement documentation and fee submissions, and relationship partners who serve as the primary conduit with clients. But the Special Master's suggestion that these individuals do not communicate with each other goes much too far. *See, e.g.,* Ex. 58 (Goldsmith 7/17/07 Dep.) at 14:3-7 (one of the lead litigators on the State Street matter, who explained that: "I did have a lot of involvement in the documentation of the settlement and the submission of papers relating to the settlement."). Labaton recognizes that, in this case, more communication might have caught the double counting issue. But that does not mean that Labaton's staffing structure is somehow flawed, and Labaton objects to any suggestion that it is. To the contrary, there are many benefits to having (for example) a Settlement Group, which can devote resources to develop more in-depth knowledge of this important area of the law and important part of Labaton's practice, and offer their services in all of Labaton's cases.

**10.   Labaton Was Not Required to Disclose the Referral Relationship in Response to RFPs or Interrogatories.**

The Special Master's initial round of discovery, as modified, did not ask Customer Class Counsel to produce information regarding the fee-sharing arrangement with Chargois & Herron. On Thursday, May 18, 2017, counsel for the Special Master sent via email the Special Master Honorable Gerald E. Rosen's (Ret.) First Request for the Production of Documents to Labaton Sucharow LLP ("First RFP") and the Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories to Labaton Sucharow LLP ("First Interrogatories"). *See* Wolosz Decl. at ¶ 4, Ex. B (First RFP), Ex. C (First Interrogatories). The First RFP included fifty-six (56) requests that sought an enormous number of documents. The First Interrogatories asked seventy-five (75) separate questions, some of which were further expanded with sub-parts. The Special Master

demanded in the preamble to each document that Labaton provide written responses and produce all of the requested documents within fourteen (14) days.

The scope of the request made the timing demanded completely unrealistic.  Accordingly, Labaton's counsel and the Master's counsel agreed to meet on Monday, May 22, 2017, at the offices of counsel for the Master, to confer regarding the requests.  At the beginning of the meeting, one of the Special Master's attorneys handed counsel for Labaton a list of document requests and interrogatories that the Special Master had decided to strike in their entirety.  *Id.* ¶ 5 and Ex. D.  Included in the list of stricken discovery was RFP No. 22, which sought:

> 22.    All documents and/or communications relating to or evidencing discussions between and among the Law Firm, the Plaintiffs' Law Firms, and/or ERISA counsel regarding the allocation of a certain percentage of the Fee Award among counsel, including but not limited to agreements to pay ERISA counsel a fixed percentage of the total Fee Award.

*Id.*

This stricken Request No. 22 is the only request that arguably could have called for production of *some* documents regarding the payment to Chargois & Herron.  In the R&R, the Special Master takes great pains to claim that other requests called for this information (R&R at 119-123), but in the end, the Master can identify no such request:

- Request No. 18 asked for documents regarding certain communications "relating to sharing costs and/or expenses" of the litigation.  Ex. 164 at 8.  The Special Master has pointed to no such documents that discuss the referral fee arrangement.

- Request No. 40 sought "[a]ll documents relied upon by the Law Firm in preparing and filing the Firm's Fee Petition, including but not limited to expense reports, billing records, emails, invoices, and/or other records."  Ex. 164 at 12.  The

Special Master has pointed to no such documents that discuss the referral fee arrangement.

- Interrogatory No. 60 asked Labaton to "[i]dentify all billing entries, costs and/or expenses incurred by the Firm during the SST Litigation that the Firm did <u>not</u> include in its Fee Petition/Lodestar calculation, and the reasons therefor." Ex. 174 at 16.  Labaton gave a detailed response that provided a significant amount of information (*see id.*, p. 16-24), but did not identify anything regarding Chargois & Herron because it was not called for by the question.

- Interrogatory No. 72 asked Labaton to "[i]dentify any other individuals, not listed above, who have knowledge of the Interrogatories and/or the SST Litigation and explain the general nature of such knowledge." *Id.* at 37.  This interrogatory is impossible to answer as drafted, because there could be thousands of people, inside and outside of Labaton, who have some degree of "knowledge of the . . . SST Litigation."  Labaton objected and stated that it will "construe this Interrogatory as a request that the Firm identify (to the extent not otherwise identified in its response to the Interrogatories) the principal Labaton Sucharow attorneys or staff who worked on, or have unique knowledge regarding, the topics being reviewed by the Special Master." *Id.* at 37-38.  As reasonably construed in this manner, the request did not call for identification of Chargois & Herron.

Simply put, once the Master voluntarily eliminated a number of the requests contained in the First RFP, there was nothing left that even arguably called for identification of the Chargois & Herron relationship.  The fact that Thornton – for whatever reason – chose to include some of

the documents does not make them responsive.  The Master did not ask for these documents, and Labaton objects to any "finding" to the contrary.

**11.     There Has Been No Failure to Accept Responsibility.**

Although not expressly included as a "finding," the Special Master makes unnecessary, inflammatory commentary saying that Labaton has somehow failed to "own up" to wrongdoing. The Special Master describes this as "[o]ne of the most troubling elements of the Chargois" relationship, claiming that Labaton has failed to "accept[] responsibility for the calculating and secretive nature of the conduct," failed to "express[] contrition" or "remorse."  R&R at 362.  The Special Master goes on to criticize Labaton for retaining what he terms a "phalanx of experts" and "erect[ing] a wall of legalistic and formalist excuses and blame-shifting."  *Id.*

The Special Master's musing is wrong and highly inappropriate.  The suggestion that Labaton should express remorse or contrition fails to recognize the threshold fact that Labaton (together with highly-credentialed experts who have testified in this case) disputes the Special Master's findings and conclusions.  The Special Master also ignores that he arrived at an early view that the Chargois relationship was somehow improper, leaving Labaton with no choice but to defend itself.  For example, during the deposition of Mr. Sucharow – which occurred *on the very first day of depositions relating to the Chargois issue* – the topic of whether the referral fee should have been disclosed to ERISA Counsel came up.  Abandoning any sense of impartiality or suggestion that he was engaged in fact-finding (or a deposition, for that matter), the Special Master argued with the witness, stating his predisposition:

> THE SPECIAL MASTER:  There is a difference, Larry.  Let me tell you what it is.
>
> Your fees, Lieff's fees and Thornton's fees were going to be before the Court, disclosed to the Court, and the allocation was going to be disclosed to the Court.

The fees of the ERISA counsel were going to be before the Court, and the allocation disclosed to the Court.

By not bringing it to the ERISA counsel's attention that a lawyer who is not before the Court is going to get 5.5 percent of the total award is depriving the ERISA counsel of having the opportunity to weigh in not only as to their own distribution but as to whether or not it's appropriate in the larger context of the class distribution and the larger context of the allocation to the other lawyers. You don't see that?

Ex. 38 (Sucharow 09/01/2017 Dep.) at 27:5-27:23.

This exchange occurred near the beginning of the referral fee portion of the Special Master's investigation.  In the months that followed, the Special Master doubled down on his view that the referral relationship (and/or disclosures about it) must somehow be improper, and he took great pains to find *some* legal basis upon which he could call the fee or disclosure issues into question.  *See, e.g.,* Ex. 232 (Gillers Report, which was prepared over the course of almost three months); Ex. 253 (Gillers 3/20/18 Dep.) at 53:9-62:17 (conceding that he found no opinions of the Massachusetts Board of Bar Overseers, the Massachusetts Bar Association, or the Boston Bar Association, or any Massachusetts judicial opinions, which explain or hold that his interpretation of Rule 1.5(e) is correct.).  Labaton's retention of a so-called "phalanx of experts" was merely an attempt to ensure that the one-sided, novel opinions being leveled at Labaton were not left unrebutted in the record.

It does not lie in the Special Master's mouth to now accuse Labaton of being legalistic or formalistic.  In the face of new legal interpretations being used to suggest serious wrongdoing, the Firm had no choice but to push back, pointing to the actual, controlling legal principles. Although the Special Master largely ignored Labaton's arguments, the process is now past that stage and Labaton has the opportunity for a *de novo* review before the Court.  Surely Labaton is not required to forego that review and express some kind of "remorse" or "contrition" before there is a fair adjudication of whether the Firm did anything wrong.

To the extent that the Special Master's inappropriate commentary can be considered a "finding" of any sort, Labaton objects.

**12.      ATRS Continues to Be an Adequate Class Representative.**

The Special Master takes the position that ATRS is not appropriate to serve as class representative moving forward.  R&R at 78 n.58 and 257-58, n. 207.  The "finding," if it rises to that level, is outside the scope of what the Special Master was asked to do in this case.  The Appointment Order commissions the Special Master to "prepare a Report and Recommendation concerning all issues relating to the attorneys' fees, expenses, and service awards *previously made in this case.*"  Appointment Order (ECF 173) at 2 (emphasis added).  It says nothing about opining on the fitness of ATRS or its executive director to serve in a class representative position in the future.  For this reason alone, the Special Master's unsolicited opinions about ATRS serving as class representative going forward should be disregarded.

Moreover, even if the Master had been asked to look into this issue, there is no reason for him to conclude that ATRS should step down.  As the Special Master himself stated, "[y]ou're not going to get any disagreement from me on whether [ATRS' Executive Director] was more involved, more engaged, and contributed more value than not just the average class representative but almost any class representative."  Ex. 162 (4/13/2018 Hearing) at 50:20-24.  In addition, the remaining issue being litigated involves the allocation of attorneys' fees, which is not something in which a class representative is normally involved.  Ex. 235 (Rubenstein Dep.) at 177:1-9 ("And again, my testimony – and I'll repeat it – is that I don't expect much of the class representatives as to fee allocation, nor does class action law.  I don't know of a single class action case that says the class representatives oversee fee allocation.  In all the cases that your expert cited no one ever mentions a class representative as being a key factor in the fee allocations or the fee agreements.  It's the Court.").  In a situation where the class representative

has performed better service than "almost any class representative" in the past, and there is no real role left for it on the key contested issue remaining in the case, there is certainly no basis to find that the representative should step down.

Nor is there any suitable alternate class representative who would be available if ATRS were to step down. There are no other named plaintiffs in the case brought by Customer Class Counsel. No possible class representative other than ATRS would satisfy the requirements of Rule 23(a)(4). *See* Fed. R. Civ. P. 23(a)(4). For reasons that he does not fully articulate, after praising ATRS for the work it performed as class representative, the Special Master makes these passing, disparaging remarks in two footnotes that purport to raise a question about ATRS' fitness to serve as class representative going forward. The footnote comments are outside the scope of the Master's mandate, insufficiently explained or supported, and inappropriate. They should be disregarded.

## <u>OBJECTIONS TO THE MASTER'S CONCLUSIONS OF LAW</u>

Labaton objects to the following of the Master's Conclusions of Law, and all subsidiary conclusions reached by the Master, including but not limited to the following:

1. Labaton objects to the conclusion that it violated any duties to ATRS concerning the Chargois Agreement. *See* R&R at 248-73; 331-34. In particular, but not exclusively:

   - Labaton objects to the conclusion that it violated MRPC 1.5(e). *See* R&R at 248-63.

   - Labaton objects to the conclusion that it violated MRPC 7.2(b). *See* R&R at 263-73.

   - Although the Master reached no such conclusion, Labaton objects to any suggestion that it violated MRPC 1.5(a). *See* R&R at 261 n.209.

2. Labaton objects to the conclusion that it "failed to meet its fiduciary duties to the class members as clients." *See* R&R at 346; 273-286; 338-46. In particular, but not exclusively:

- Labaton objects to the conclusion that it was required to disclose the Chargois Agreement to the named plaintiffs/class representatives.  *See id.*

- Labaton objects to the conclusion that it violated MRPC 1.2 or MRPC 1.4.  *See id.*

3. Labaton objects to the conclusion that it was required to disclose the Chargois Agreement to the Court.  *See* R&R at 139-141; 303-26; 343; 353-362.  In particular, but not exclusively:

- Labaton objects to the conclusion that Rule 23(e)(3) required disclosure of the Chargois Agreement.  *See* R&R at 278, 306-309; 354-57.

- Labaton objects to the Master's suggestion (not conclusion) that Labaton's non-disclosure of the Chargois Agreement was "supportable" of a Rule 11 violation of Labaton or any of its attorneys.  *See* R&R at 309-318; 357-59.

- Labaton objects to the conclusion that at the fee petition stage attorneys must present "all relevant facts" and there exists "an enhanced duty of full disclosure."  *See* R&R at 139-141; 303-305, 313-314; 353-54.

- Labaton objects to the conclusion that it "deprived the Court information it needed to discharge its fiduciary obligations to protect the class's interests" or otherwise withheld from the Court information that Labaton had a duty to disclose.  *See* R&R at 303-326.

- Labaton objects to the conclusion that its non-disclosure of the Chargois Agreement violated MRPC 3.3(a) or MRPC 8.4(c).  *See* R&R at 318-22; 359-62.

- Labaton objects to the conclusion that it violated a duty of candor to the Court.  R&R at 322-326.

4. Labaton objects to the conclusion that it was obligated to disclose the Chargois Agreement to Customer Class Counsel and ERISA counsel.  *See* R&R at 287-303; 346-53.

5. Labaton objects to the remedies recommended by the Master regarding Labaton.  *See* R&R at 362-77.

- Labaton objects to the recommendation that the Customer Class Counsel firms should disgorge in equal amounts the $4 million of double-counted time.  *See* R&R at 363-64.

- Labaton objects to the recommendation that it should disgorge $4.1 million representing the payment to Chargois.  *See* R&R at 368-69

- Labaton objects to the recommendation that it work with the Court regarding on-going ethics supervision. *See* R&R at 372-73.

## ARGUMENT SUPPORTING LABATON'S
## OBJECTIONS TO THE MASTER'S CONCLUSIONS OF LAW

### I.   STANDARD OF REVIEW.

"The court must decide *de novo* all objections to conclusions of law made or recommended" by the Master.  Fed. R. Civ. P. 53(f)(4).  "[T]he court also may decide conclusions of law *de novo* when no objection is made."  *Id.*, 2003 Advisory Note.  Moreover, "[t]he court must decide *de novo* all objections to findings of fact made or recommended by a master," except in two situations that do not apply here.  Fed. R. Civ. P. 53(f)(3).

### II.   THE MASTER MISSTATES THE APPLICABLE LEGAL STANDARDS.

The Master's findings and legal conclusions concerning counsels' duties in connection with a class action fee petition suffer from a fundamental flaw – the Master misstates the applicable law.  At the outset of his legal conclusions, the Master describes the "general standards" that "guided" his decisions in this case.  R&R at 139-41.  He sets forth sweeping obligations:  "[a]ttorneys seeking fees from a common fund have a duty to present all relevant facts to the court reviewing the petition;" "[t]he fee petition process clearly places an enhanced duty of full disclosure and transparency upon counsel filing their petition for attorney fees so that the court can perform its gatekeeping function fully and completely advised of all factors and agreements that impact the allocation of attorneys' fees vis-à-vis the actual recovery of the class;" and "[a]bsent full disclosure, the court cannot, with full knowledge, discharge its gatekeeping function and ensure fairness to the class."  *Id*.  In addition, the Master describes Labaton's duty as requiring it to "provide the Court with all the information it needed to make an informed decision as to the award of attorneys' fees out of the State Street settlement fund.  This included disclosure of the identity of all attorneys – including Damon Chargois – who would be

sharing in the award and what the share of each attorney would be."  R&R at 354 (citing no case law).

These unbounded standards may be the Master's aspirations, but *they are not the law*. The Master fails to mention that Federal Rules 23(h) and 54(d) expressly govern the required disclosures in connection with a class action fee petition.  These rules directly contradict the Master's unsupported view of attorneys' disclosure obligations.  As further explained herein, they do not require the disclosure of the identity of all attorneys sharing in the fee award or the share that each attorney will receive.[3]  And, in this case, the governing Federal Rules did not require disclosure of the Chargois Agreement.  *See generally* Ex. 234 (Rubenstein Rep.); Ex. 241 (Joy Rep.) at 31-55.[4]

In sum, the Master presents a woefully incomplete and incorrect view of the law.  *See* § IV, *infra.*  His misguided first principles therefore taint his legal conclusions.  *See* R&R at 141 ("The Special Master is guided by the foregoing general standards in deciding the issues presented in this case.").

## III.   THE CHARGOIS FEE-SHARING AGREEMENT COMPLIED WITH THE MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT.

Labaton's fee division with Chargois was a permissible referral fee and complied with MRPC 1.5(e).  Moreover, even if the fee division did not initially comply with MRPC 1.5(e),

---

[3]      The Master also relies heavily on *In re "Agent Orange" Product Liability Litigation*, 818 F.2d 216, 222 (2d Cir. 1987) – calling it the "leading case" – without acknowledging that the Second Circuit issued an opinion in 2016 explaining that Rule 23 does not require the automatic disclosure of fee sharing agreements.  *See Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 137-38 n.2 (2d Cir. 2016).

[4]      Professor Gillers, relied upon by the Master, is not an expert in class action practice and disclaims reliance on the governing Federal Rules of Civil Procedure in reaching his opinions.  *See* Ex. 253 (Gillers 3/20/18 Dep.) at 114:23-115:7 ("I'm not relying on Rule 54 as the source of authority or obligation to disclose participation of a lawyer whom the Court does not know about.").  On the other hand, Prof. Rubenstein – who testified that Customer Class Counsel were not required to disclose the Chargois Agreement to the Court or class – is one of the nation's preeminent scholars on class action law.

ATRS subsequently ratified it, which constitutes adequate consent under controlling

Massachusetts precedent.  Finally, leaving aside whether Labaton perfectly complied with

MRPC 1.5(e), neither MRPC 1.5(a) nor MRPC 7.2(b) apply to the Chargois Agreement.

A.    **The Master's Animosity Toward Referral Fees is Squarely at Odds With Massachusetts Law and Practice.**

Under longstanding Massachusetts practice, the Chargois Agreement was permissible.

"Bare" referral payments – i.e., payments for the referral itself without the requirement of any

work being performed by the referring lawyer – are "quintessentially a Massachusetts practice."

Board of Bar Overseers, *Massachusetts Legal Ethics: Substance and Practice* at 185 (2017) (Ex.

E).  But one would never know this from reading the Master's Report, as it fails to acknowledge

that Massachusetts permits bare referrals until page 251.

Throughout the course of his investigation, the Master has made his opposition to referral

fees crystal-clear.[5]  His findings reflect his animosity:  in his Report, he refers to the fact that

Chargois performed "no work" on the *State Street* case at least 25 times.  *See generally* R&R;

---

[5]    As one example among many, the Master impressed his views regarding referral fees onto George Hopkins during his deposition:

THE WITNESS: Because -- well, first of all, where does it end? If the secretaries in the firm got a bonus do I need to know that? You know, if –

THE SPECIAL MASTER: Not quite the same as paying a lawyer for doing nothing 20 percent of a fee.

. . . .

THE SPECIAL MASTER: Had this relationship been disclosed to Judge Wolf, might he not have said, well, wait a minute, that's an awful lot of money to be going to a lawyer who hasn't done anything on the case, did no work, didn't refer this specific case at all, and maybe the class should get some of that money, or maybe the ERISA counsel should get some of that money rather than this lawyer in Texas who was not involved at all in this case?  Isn't that why disclosure to the Court in a non-adversary proceeding, which this was, is a better practice?

THE WITNESS: Let me say this: I've spent enough time with you now that I can feel your -- your passion's not the right word -- your --

THE SPECIAL MASTER: Skepticism.

Ex. 12 (Hopkins 9/5/17 Dep.) at 74:2-76:6.

*see id.* at 271 (attributing "great significance" to the fact that Chargois did no work on the *State Street* case).  And at several points, he openly criticizes referral fees.  *See, e.g.*, R&R 261 n.209 ("[A] $4.1 million fee paid to someone who does no work on a case is excessive by any definition of that word . . ."); *id.* at 375 ("However, the practice of 'bare referrals' – permitting a lawyer to receive a referral fee for doing no work and having no attachment to the case or the client – seems to invite abuses . . .").  But regardless of the Master's personal animus toward bare referral fees, the Massachusetts Bar has reaffirmed its support for the practice time and again, as explained by the Supreme Judicial Court ("SJC"), the Board of Bar Overseers, and lifelong Massachusetts practitioners, among others.  *See Saggese v. Kelley*, 445 Mass. 434, 442 (2005) (describing referral fees as a "time-honored practice in this State"); *Mass. Legal Ethics* at 185 (Ex. E); Ex. 239 (Sarrouf Decl. 10/31/17) at ¶¶ 19-21; H.P. Wilkins, *The New Massachusetts Rules of Professional Conduct: An Overview*, 82 Mass. L. Rev. 261, 261-262 (1997) (Ex. F).  The Master may not approve of bare referral fees, but in Massachusetts, they are a bedrock tradition.[6]

## B.   Labaton Complied With MRPC 1.5(e).

Labaton complied with MRPC 1.5(e) (the rule governing the division of fees among lawyers, including referral fees) because it notified ATRS that it would be sharing its fee and obtained ATRS' consent to do so.  In February 2011, when ATRS engaged Labaton for the *State Street* litigation, MRPC 1.5(e) provided that a "division of a fee between lawyers who are not in the same firm may be made only if, after informing the client that a division of fees will be made, the client consents to the joint participation and the total fee is reasonable."  Ex. 225

---

[6]      The type of referral at issue here, which involved referring a client, rather than a specific matter, is "common."  Ex. 228 (Lieberman Dep.) at 44:12-14.

(former Mass. R. Prof. C. 1.5(e)).[7]  In the parties' engagement letter, ATRS consented to

Labaton dividing its fees, *inter alia*, with "local or liaison counsel" or as "referral fees."  Ex. 138

(LBS01160-62).[8]  This satisfied MRPC 1.5(e) at the time.  *See* Ex. 240 (Green Rep.) at 19-20

("Particularly in the context of a retention letter setting forth the parties' respective rights and

responsibilities, it seems reasonably plain to me that the sentence in question in fact

memorializes ATRS's permission.").[9]

Moreover, to the extent that it was required at the time – which is an open question in the

view of the experts[10] – Labaton also complied with the written consent requirement described in

the Supreme Judicial Court's *Saggese* opinion, decided in 2005 (but not codified in the

Massachusetts Rules of Professional Conduct until March 15, 2011, after ATRS engaged

Labaton for the *State Street* case).  *See Saggese*, 445 Mass. at 434.  The SJC explained that

MRPC 1.5(e) would be construed prospectively to require consent to be obtained in writing,

---

[7]      Mass. R. Prof. C. 1.5(e) was amended on March 15, 2011 to provide that:  "A division of a fee (including a referral fee) between lawyers who are not in the same firm may be made only if the client is notified before or at the time the client enters into a fee agreement for the matter that a division of fees will be made and consents to the joint participation in writing and the total fee is reasonable."  The requirements of the applicable MRPC 1.5(e) were considerably more lenient than the current version of MRPC 1.5(e) in terms of proving compliance, *e.g.*, consent did not have to be in writing at all.

[8]      The Master contends that the "more plausible" way to read the engagement letter is to view the clause "as referral fees" as modifying "local or liaison counsel."  R&R at 260.  This is a tortured reading of the sentence.  *See* Ex. 229 (Wendel Dep.) at 26:7-12 ("I read those as alternatives."); Ex. 228 (Lieberman Dep.) at 38:1-23 ("I read it that they have the right to, under this agreement, allocate fees to people who serve as local or liaison counsel or allocate fees as referral fees or allocate fees for other services performed in connection with the litigation . . . That's the way I read it.  It's plain language to me, sir."); Ex. 230 (Green Dep.) at 119:11-1.  Moreover, it does not make sense, as not every local or liaison counsel deserving of compensation would have referred the case.  But, under the Master's reading, local or liaison counsel could *only* share fees with Labaton if they referred ATRS.  This leads to absurd possibilities, such as both local and liaison counsel working with Labaton, but neither getting paid because neither referred ATRS to Labaton.

[9]      The Special Master claims that a referral fee must be "matter-specific."  R&R at 262.  This does not appear to comport with everyday practice.  As Mr. Lieberman testified, "I think this is a referral fee, and it happens all the time, common."  Ex. 228 (Lieberman Dep.) at 44:12-14.

[10]     *See* Ex. 227 (Joy Dep.) at 69:4-70:3; Ex. 228 (Lieberman Dep.) at 125:5-16; Ex. 243 (Wendel Rep.) at 14.

which Labaton did.  *Id*. at 443; Ex. 138 (LBS011060-62).[11]  Importantly, the *Saggese* Court, in

its two-sentence description of its prospective interpretation of MRPC 1.5(e), does not require

the disclosure of the identity of other attorney(s) receiving fees or the details of the fee

agreements.  445 Mass at 443.  Nor is there such a requirement in either the old or the new

version of MRPC 1.5(e).  *See* Ex. 228 (Lieberman Dep.) at 34:17-20 ("The rule doesn't require

anything more than that.  And that's been the common understanding of the rule."); *see also* Ex.

241 (Joy Rep.) at 29.  Thus, despite the Master's misguided efforts to import an "informed

consent" requirement into MRPC 1.5(e), Labaton provided the sufficient level of disclosure.  *See*

R&R at 249 n.191; *see also* Ex. 230 (Green Dep.) at 117:14-17 ("[T]he rule itself does not

require more").[12]  Accordingly, the ATRS/Labaton engagement letter met the requirements of

both MRPC 1.5(e) and *Saggese*.  *See, e.g.*, Ex. 240 (Green Rep.) at 19-20.

The Master describes the MRPC 1.5(e) inquiry as a "close call" and concedes that

"reasonable experts and lawyers may differ" on whether Labaton complied with the Rule.  R&R

at 250, 337.  In fact, five different experts – three academics, one veteran of the Massachusetts

---

[11]     The SJC also explained that the written consent must be obtained before the referral is made (*Saggese*, 445 Mass at 443), which, as Hal Lieberman noted, makes no sense.  Ex. 228 (Lieberman Dep.) at 131:1-7.  Once the rule was actually amended, the requirement was for written consent to be obtained "before or at the time the client enters into a fee agreement for the matter;" thus, the *Saggese* statement and the new rule as ultimately promulgated are not identical, suggesting that *Saggese* did not create an enforceable rule.

[12]     The Master appears to read MRPC 1.5(e) to require "informed consent," or its equivalent.  R&R at 249.  The Master glosses over the fact that MRPC 1.5(e) *does not* require "informed consent," which is a defined term in the Massachusetts Rules of Professional Conduct (and, at any rate, appears inapplicable to a fee division).  MRPC 1(f) ("Informed consent" denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct.").  Rather than accepting the rules as written, the Master claims they reflect an "incongruence" that represent a "distinction without a difference."  *Id.*  The Master's willingness to assume incompetence or sloppiness by the drafters of the Massachusetts Rules of Professional Conduct (and the Federal Rules of Civil Procedure), and instead impose his own preferences onto these rules, undermines his conclusions.  This is one of many examples where the Master reaches to make the law allow for his desired outcome.  *See also*, § IV-VI, *infra*.

Board of Bar Overseers, and one lifelong Massachusetts practitioner – examined the circumstances of the fee division with Chargois and ATRS' engagement of Labaton.  Each concluded that Labaton complied with the applicable requirements of the Massachusetts Rules of Professional Conduct.  Ex. 240 (Green Rep.) at 19 ("Labaton therefore complied with the relevant version of Rule 1.5(e)."); Ex. 241 (Joy Rep.) at 27 ("Labaton's engagement letter with ARTRS for the State Street Litigation met the requirements of Mass. R. Prof. C. 1.5(e) as it existed at the time of the engagement letter."); Ex. 242 (Lieberman Rep.) at 16 ("Labaton obtained ARTRS' consent to divide its fees with Chargois, and therefore complied with MRPC 1.5(e), as it then existed."); Ex. 243 (Wendel Rep.) at 14 ("In my opinion, the negotiations between Labaton and the ATRS and the written consent provided by Clark [ATRS' Chief Counsel] and Hopkins satisfy the requirements of Mass. RPC 1.5(e) and the interpretation placed on the rule by the *Saggese* court."); Ex. 252 (Sarrouf 3/21/18 Dep.) at 106:6-107:5.

The Court should credit these experts and reject the Master's finding.  Indeed, in resolving this "close call," the Master failed to apply the clear terms of MRPC 1.5.  Instead, he grafts onto MRPC 1.5(e) the additional requirement that Labaton disclose to ATRS the percentage of Labaton's fee that would be paid to Chargois.  *See, e.g.*, R&R at 250 ("While it is admittedly a close call, by not disclosing to ATRS that it had a preexisting obligation to pay Chargois 20% of its fee for performing no work, we conclude that Labaton simply failed to comply with MRPC 1.5(e) and its requirement of disclosure to its direct client, ATRS.").  The Master's attempt to rewrite the Rule is directly contrary to Comment 7A of MRPC 1.5, which provides that Labaton was *not* required to inform ATRS that Chargois' share would be 20%.  MRPC 1.5 cmt. 7A  ("The Massachusetts rule does not require disclosure of the fee division that the lawyers have agreed to, but if the client requests information on the division of fees, the

lawyer is required to disclose the share of each lawyer."). [13]   The Master nevertheless elevates his own predilections above the Rule's actual text, arguing that any "other interpretation of this Rule would invite a lack of candor and half-measure disclosures to a client and deprive the client of the ability to make a meaningful decision in its own best interests."  *See id.* at 250.

The Master's refusal to apply the plain terms of MRPC 1.5(e) undermines his conclusion. [14]   The Court should reject his misapplication and instead find that Labaton complied with MRPC 1.5(e) in the first instance, as five experts have determined.

### C.    In Any Event, ATRS Ratified The Fee-Sharing Agreement With Chargois.

To the extent that Labaton did not fully comply with the *Saggese* decision*, any non-compliance has now been cured because George Hopkins, acting on behalf of ATRS, ratified the Chargois Agreement with respect to the *State Street* matter.  *See* Ex. 130 (Hopkins Decl.) at 3-4. In *Saggese*, the SJC explained that "the beneficiary in a fiduciary relationship may ratify conduct that otherwise would constitute a breach of fiduciary duties, provided the requisite disclosure has been made."  445 Mass. at 442.   In that case, a client ratified her attorneys' agreement to pay a 33% referral fee two years after the referral was made (and after the referring attorney received several payments).  *Id.* at 436-40.   The SJC was unequivocal:  "[r]atification is not the preferred method to obtain a client's consent to a fee-sharing agreement, but it is adequate."  *Id.*  As such,

---

[13]      The Master references Comment 7A in a footnote but then precedes to ignore its application in his analysis.  *See* R&R at 255 n.203.  Throughout his legal conclusions, he frames Labaton as being obligated to disclose to ATRS the fact that Chargois' portion would be 20%.  *See, e.g.*, R&R at 249 (arguing that "Labaton had a duty to inform ATRS as its client, but more so as a representative of the class, *that Chargois would receive 20% of Labaton's share of the total fee award*," and noting that MRPC 1.5(e) "speaks directly to this issue.") (emphasis added);  s*ee also id.* at 250 ("By failing to inform Hopkins – or anyone at ATRS – of the Chargois Arrangement [defined by the Master to mean the agreement to pay Chargois 20%]  . . . Labaton breached its duty under MRPC 1.5(e).");  *id.* at 255 ("But neither Labaton nor Chargois & Herron revealed" that Chargois "would receive 20% of Labaton's fees . . ."); *id.* at 256 ("[N]othing in that response alerted ATRS that Chargois would receive 20% of Labaton's gross attorneys' fees . . .").

[14]      This is especially true because he views the question as a "close call" despite applying an invented, heightened standard.

Hopkins' ratification on behalf of ATRS is "adequate" here. *See id.*[15] MRPC 1.5(e) exists for

the benefit of clients; and, here, the client was protected and is content.[16]

When discussing Labaton's obligations to its "direct client, ATRS," the Master does not

address, let alone mention, the substantive effect of Mr. Hopkins' ratification. This is

remarkable, especially because the Master otherwise relies upon *Saggese*. *See* R&R at 252

n.200. The Master's failure to address a key fact and controlling precedent in his report of legal

conclusions to the Court is troubling and further demonstrates his lack of neutrality. Although

the Master avoids discussing the issue, *Saggese* makes clear that Hopkins' ratification "is

adequate" on behalf of ATRS. *See* 445 Mass. at 442. Even the Master's expert Prof. Gillers

agrees. Ex. 253 (Gillers 3/20/18 Dep.) at 106:18-22 ("Q: Sir, does the ratification declaration

that you have seen now from Mr. Hopkins constitute consent on behalf of Arkansas Teacher

Retirement System to the fee referral to Chargois & Herron?  A:  On behalf of Arkansas alone.").

Based on the SJC's controlling holding in *Saggese*, regardless of whether Labaton initially

complied with MRPC 1.5(e), it subsequently obtained its client's effective consent.

> **D.    Despite the Master's Suggestions, the Chargois Agreement Falls Within MRPC 1.5 and Fulfilled the Purpose of That Rule.**

The Master also claims that the Chargois Agreement falls "outside the fee-sharing

context altogether, and, thus, outside MRPC 1.5(e)."  R&R at 272.  This is objectively incorrect.

MRPC 1.5(e) applies to a "division of fees . . . between lawyers."  There is no dispute that

---

[15]    *See also* Ex. 242 (Lieberman Rep.) at 16 ("In my opinion the foregoing facts fully support the conclusion that ATRS was adequately informed, in writing, at the inception of the retention, and *de facto*, and retroactively, assented to Labaton's sharing of its fees with Chargois.").

[16]    *See* Ex. 240 (Green Rep.) at 20 ("Further, the purposes of the procedural requirements were adequately served."); Ex. G (Sarrouf 3/24 Dep.) at 257:17-258:5 ("[T]he Court in this state has repeatedly said . . . that the purpose of the statute is to protect the clients.  And the client says 'I have not been harmed.  Matter of fact, I think I've been tremendously well represented, and I agree with letting him pay from his fee a portion to someone else.'. . . The client [] has not been harmed in any way.  And that's the purpose of the statute.").  Notably, the facts here are similar to *Saggese*, although the fee division in the latter was greater (33%).  *Saggese*, 445 Mass at 437.

Labaton agreed to (and did) divide its fee with Chargois & Herron, a law firm, with regard to the *State Street* matter. As such, the Chargois Agreement falls within the plain terms of MRPC 1.5(e).[17]

Moreover, the Chargois Agreement comports with the Massachusetts policy behind referral fees because it benefited the client, ATRS. "As a matter of good policy and the public interest, it is well recognized that the bar should encourage fee sharing relationships that serve the client by helping to ensure that cases, especially litigation matters, are handled by the best, most experienced lawyer in the particular area of the law." Ex. 242 (Lieberman Rep.) at 18. As Mr. Lieberman notes, "[t]hat is exactly what happened here." *Id.* Labaton spearheaded a case that achieved what the Master describes as "an excellent result for the class." R&R at 6.

That "excellent result" depended on Labaton's unique capabilities. Among ATRS' several law firms, Labaton initially helped ATRS push forward with a potential suit against State Street. Ex. 4 (Hopkins 6/14/17 Dep.) at 39:20-40:8. And, after a successful half-decade litigation, Mr. Hopkins explained that he does not "think another law firm could have gotten the outcome they did." *Id.* at 100:8-10. Mr. Hopkins speaks from experience: he is a seasoned attorney and, as Executive Director at ATRS, he has been a class representative in approximately 30 cases. *Id.* at 32:9-13, 34:19-37:6. In his view, Labaton was crucial in securing the $300 million settlement. *Id.* at 100:8-10. Simply put, Chargois, a practicing attorney, referred ATRS (an organization that routinely considers whether to hire firms as monitoring counsel and as

---

[17]     The Master states that the Chargois Agreement "seems more in the nature" of a "finder's fee." R&R at 273. Regardless of the label the Master applies, this was a referral fee under Massachusetts law and within the ambit of MRPC 1.5(e). For example, in *Vita v. Berman, DeValerio & Pease, LLP*, 81 Mass. App. Ct. 748 (2012), the Massachusetts Court of Appeals repeatedly described as a "referral fee" an arrangement in which a criminal defense lawyer used his "many contacts in the financial services field" to refer "potential class action plaintiffs" to a law firm. *Id.* at 749-50 and n.4 (citing *Saggese*). The criminal defense attorney referred at least one potential plaintiff "at the request" of a partner at the law firm, and eventually referred so many plaintiffs so as to require a spreadsheet to track them. The Massachusetts Court of Appeals expressed no disapproval of this relationship. *See generally id.*

plaintiff's class action counsel) to Labaton, a preeminent plaintiffs' class action law firm.  *See,*
*e.g.*, Ex. 122 (Belfi 9/5/17 Dep.) at 37:15-39:14.  This referral allowed ATRS and the class to
obtain excellent representation and achieve an extraordinary result.  *See* Ex. 130 (Hopkins
3/15/18 Dec.) at ¶4 ("Personally, I am not aware of another law firm that could have worked as
tenaciously or produced as good a result on behalf of the class as Labaton did.").

In short, the Chargois Agreement was a referral fee within the terms of MRPC 1.5(e), and
delivered the exact type of benefit that the Rule is meant to foster.  By the client's own
(sophisticated) estimation, ATRS' retention of Labaton provided significant value.  *See id.*

### E.   Even if Labaton Failed to Comply With MRPC 1.5(e), Which It Did Not, No Sanctions or Discipline Are Warranted.

The Master is incorrect in finding that Labaton did not comply with MRPC 1.5(e), as
interpreted by *Saggese*.  However, leaving aside his misapplication of MRPC 1.5(e), he rightly
notes that, under these circumstances, the "obligations to the client, and the timing of them, were
simply too unclear at the time to merit the imposition of professional discipline or any kind of
disciplinary sanction."  R&R at 334.

First, any alleged violation of MRPC 1.5(e) was a technical procedural lapse.  At worst,
ATRS did not consent in writing that Labaton would split its fee with Chargois specifically,
although (1) *Saggese* does not require that the attorney sharing a fee be named; (2) ATRS was
informed that Chargois & Herron would be involved with Labaton on ATRS cases; and (3) the
engagement letter permitted Labaton to pay "referral fees."  *See Saggese*, 445 Mass. at 443; Ex.
138 (LBS011060-62); Ex. 129 (LBS017455-56); Ex. 122 (Belfi 9/5/17 Dep.) at 117:20-24,
118:5:7.  "Technical non-compliance with a state rule of professional conduct – particularly one
regulating, rather than prohibiting, a practice – is not the kind of fraud or abuse of the judicial
process that justifies sanctions under the federal court's inherent power."  Ex. 243 (Wendel Rep.)

at 19.[18]  Any procedural violation by Labaton is especially benign because ATRS has now

expressly ratified the Chargois Agreement with respect to the *State Street* matter.

Second, no discipline is warranted because any non-compliance is a result of the *Saggese*

decision's gloss, rather than the text of the rule in place at the time the *State Street* engagement

began.  It is fundamental that the codified rules of professional conduct are the touchstone for

any disciplinary adjudication.  For example, SJC Rule 4:01 – "Bar Discipline" – states that:

"Each act or omission by a lawyer, individually or in concert with any other person or persons,

which violates any of the Massachusetts Rules of Professional Conduct (see Rule 3:07), shall

constitute misconduct and shall be grounds for appropriate discipline . . . ."  SJC Rule 4:01, §

3(1); *see also* James S. Bolan*, Ethical Lawyering in Massachusetts* § 1.1, MCLE (4th Ed. 2015)

(Ex. H) ("[The rules] set forth the standards of professional conduct for members of the

Massachusetts bar and serve as the basis for professional discipline.").  Likewise, in the District

of Massachusetts, Local Rule 83.6.1 provides that "[t]he rules of professional conduct for

attorneys appearing and practicing before this court shall be the Massachusetts Rules of

Professional Conduct adopted by the Massachusetts Supreme Judicial Court, *as set forth as Rule

3:07 of that court . . .*" D. Mass. L. R. 83.6.1(1) (emphasis added).

Therefore, while *Saggese* may have changed how the courts would construe MRPC

1.5(e), it did not change the codified rules that provide a basis for discipline.[19]  During the

---

[18]     *See also* Ex. 240 (Green Rep.) at 22-23 ("Imperfect compliance with a prophylactic procedural requirement of a professional conduct rule (as construed by a court opinion) is unlikely to signify that the lawyer in question poses a threat to future clients or to the public generally.").

[19]     In that vein, research has not uncovered a single case between November 30, 2005 and March 15, 2011 disciplining a lawyer for an improper fee division under the terms of *Saggese* (or otherwise). Indeed, when searching a comprehensive Massachusetts Board of Bar Overseers database, not a single decision citing to *Saggese* has been found.  Tellingly, the BBO appears not to have used *Saggese* as a basis for discipline.  Mr. Lieberman's experience is consistent:  "I have never seen a disciplinary case for a lawyer where the court has disciplined a lawyer based on a ruling of a court as opposed to a violation of a Rule of Professional Conduct . . ."  Ex. 228 (Lieberman Dep.) at 120:2-7.

intervening time period between *Saggese* and the amendment to MRPC 1.5(e), attorneys'

obligations regarding fee divisions were unclear.  For example, the chairman of the Standing

Advisory Committee that initiated the 2011 amendments explained that "[b]efore these rules

were adopted, *there were not such clear guidelines as to what had to be done*."  Christina

Pazzanese, *Attorney Fee Rules Undergo Revisions in Massachusetts*, Mass. Law. Wkly., Jan. 12,

2011 (Ex. I) (emphasis added).  And, even when the SJC finally amended MRPC 1.5(e), it

allowed for a three-month period between the amendment and the new Rule taking effect,

reflecting that some time was necessary for lawyers to adjust to the changes.  *See* December 22,

2010 Order of the Supreme Judicial Court regarding SJC Rule 3:07 (Ex. J); *see also* Pazzanese,

*Attorney Fee Rules Undergo Revisions in Massachusetts* (Ex. I) (local attorney and former BBA

subcommittee member explaining that "the rule changes will require the bar to do some broad

educational outreach").[20]

     The lack of a rule implementing *Saggese* raises due process concerns regarding attorney

discipline, particularly with attorneys admitted *pro hac vice*, like Labaton here, who rely on the

Rules of Professional Conduct to understand their obligations.  As the SJC has acknowledged,

"[o]rdinarily, an individual case is an inappropriate mechanism for promulgating rules."  *In re*

*Saab*, 406 Mass. 315, 324 n.13 (1989).  Even if Labaton's conduct did not comply with the

*Saggese* opinion – which, to be clear, it did – it would be inappropriate to impose discipline

because Labaton complied with the Rule then in effect.  *See* Ex. 242 (Lieberman Rep.) at 19 ("In

my opinion, which is informed by decades of practice in the disciplinary realm, an attorney

---

[20]     The import of *Saggese* is not clear, as Labaton's experts have testified.  As Professor Joy noted, the text of the amended MRPC 1.5(e) did not even match the language in *Saggese*.  *See, e.g.*, Ex. 227 (Joy Dep.) at 69:4-19 ("So the fact that neither disciplinary body or the courts were following *Saggese* after *Saggese*, the fact that the bar didn't immediately change the rule, and then when they did change the rule, they didn't use the same wording as *Saggese* had, and then when they changed the rule, they had a period of time between the new rule and when it came into effect led me to conclude that *Saggese* [was] probably dicta.").

would not be expected to research case law in order to ascertain the relevant standards of conduct, and should not be sanctioned for failing to do so.").[21]

### F.     MRPC 7.2 Does Not Apply.

The Master argues that, if Labaton did not comply with MRPC 1.5(e), then Labaton also violated MRPC 7.2.  *See* R&R at 263-73; *see also* MRPC 7.2(b) ("A lawyer shall not give anything of value to a person for recommending the lawyer's services").  The Master's argument relies on a strained and novel reading of the Rules and should be rejected.[22]

As the First Circuit has explained, "courts are bound to afford statutes a practical, commonsense reading.  Instead of culling selected words from a statute's text and inspecting them in an antiseptic laboratory setting, a court engaged in the task of statutory interpretation must examine the statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language." *O'Connell v. Shalala*, 79 F.3d 170, 176 (1st Cir. 1996) (internal citations omitted).  The Master's construction brushes aside this admonition by focusing on narrow semantics but ignoring the logical structure of the Rules.  By its plain terms, MRPC 1.5(e) governs a fee division between lawyers.  Thus, simply stated, non-compliance with MRPC 1.5(e) is a violation of MRPC 1.5(e).  *See Saggese*, 445 Mass. at 441-42 (in the context of an

---

[21]     Mr. Lieberman expanded on this point at his deposition:  "[A]s a regulatory lawyer in disciplining or recommending discipline for a lawyer who, theoretically or arguably, didn't comply with the admonition or prospective ruling, but was in compliance with the rule as it existed in the Code of Professional Responsibility, I would be very reluctant to charge that lawyer with misconduct if the lawyer were relying on, and as he would have a right or she would have a right to do, [] the rule as it existed in the code, because the SJC, Supreme Judicial Court, is ultimately the authority for implementing and changing the rule."  Ex. 228 (Lieberman Dep.) at 113:7-114:4; *see also id.* at 88:1-9 ("And if there is no notice that a rule requires, for example, disclosure of the name of the . . . lawyers who referred, it would be very, very difficult for a prosecuting lawyer, as I was for many years, to bring charges against that lawyer . . . because of the notice and due process concerns.").  Prof. Gillers concedes as much.  Ex. K (Gillers 3/21/18 Dep.) at 395:1-5 ("There is a constitutional notice requirement for discipline of course.  And so a lawyer can't be disciplined under a rule that didn't exist at the time the lawyer's conduct was committed.").

[22]     The argument regarding MRPC 7.2 is entirely academic, because Labaton complied with MRPC 1.5(e).  *See* §III.B, *supra.*

undisclosed referral fee, explaining that either MRPC 1.5(e) or its prior iteration, DR 2-107,

"governed the conduct of the lawyers," and mentioning no other rules of professional conduct).

Yet the Master argues that a violation of MRPC 1.5(e) automatically constitutes a violation of a

second rule, MRPC 7.2(b) ("Advertising").  This illogical result ignores the clear structure and

purpose of the Rules:  MRPC 1.5(e) governs fee divisions, and it is the relevant disciplinary

standard when assessing an improper fee division.  *See* Ex. 227 (Joy Dep.) at 21:1-4 ("[T]hey are

separate rules meant to address separate issues.").[23]

Nothing contained in the text of either MRPC 1.5(e) or MRPC 7.2(b) suggests otherwise.

MRPC 7.2(b) does not provide that noncompliance with MRPC 1.5(e) will violate 7.2(b).  The

Master focuses on MRPC 7.2(b)(5), viewing it as an exception that indicates non-compliant fee-

sharing agreements fall within MRPC 7.2.  However, as Prof. Green explains, the reference to

MRPC 1.5(e) in MRPC 7.2(b)(5) actually demonstrates that "fee sharing, generally, is excluded

from the rule."  Ex. 230 (Green Dep.) at 58:6-59:16 ("I think what it means is to emphasize that

fee-sharing arrangements are okay in Massachusetts.").[24]  And, importantly, MRPC 1.5(e) does

not even mention MRPC 7.2(b) – an odd omission, if non-compliance with MRPC 1.5(e) is an

automatic violation of MRPC 7.2(b).  Under a natural reading of the Rules, MRPC 1.5(e)

governs the division of fees between lawyers, whether perfect or imperfect.[25]

---

[23]     As Hal Lieberman explained, he is "not aware of any such bootstrapped interpretation or application of MRPC 7.2 in *any* jurisdiction."  Ex. 242 (Lieberman Rep.) at 17.  Mr. Lieberman has an extensive background in attorney discipline:  he was former Assistant Bar Counsel in Massachusetts and Chief Counsel to the First Judicial Department Disciplinary Committee in New York.

[24]     The Master rejects this sensible construction, incorrectly framing Labaton's position as a contention that MRPC 7.2(b)(5) amounts to "surplusage."  *See* R&R at 268.  But, as Prof. Green testified (despite his use of the term "surplusage," which the Master introduced during cross-examination), MRPC 7.2(b)(5) serves a purpose:  "I think it's fair in the context of the history [of referral fees in Massachusetts] and in the context of 1.5(e) to read this as, indeed, surplusage, but making it crystal clear . . . that fee sharing is not prohibited by 7.2(b).").  Ex. 230 (Green Dep.) at 60:17-22.

[25]     If there were any doubt regarding this natural reading of the Rules – which, frankly, there should not be – MRPC 1.5(e) is titled "Fees," while MRPC 7.2 is titled "Advertising."  *See Almendarez-Torres v.*

The history of both Rules confirms this construction.  It appears self-evident that, if a violation of  MRPC 1.5(e) also constituted a violation of MRPC 7.2(b), attorneys found to have violated MRPC 1.5(e) would also be found to have violated MRPC 7.2(b).[26]  Yet, "Massachusetts state courts, Massachusetts disciplinary authorities, and the United States District Court for Massachusetts have never considered a fee division between law firms based on a flawed or imperfect division of fee arrangement between law firms and a client under Mass. R. Prof. C. 1.5(e) to be a violation of Mass. R. Prof. C. 7.2[b]."  Ex. 241 (Joy Rep.) at 16.  Neither the Master, Prof. Gillers, nor Labaton have located a single instance of this happening in Massachusetts.  *See* Ex. 241 (Joy Rep.) at 16-27 (exhaustive survey of ethics law did not find any authority supporting Prof. Gillers' position)[27]; Ex. 242 (Lieberman Rep.) at 17; R&R at 273; Ex. 253 (Gillers 3/20/18 Dep.) at 53:9-62:17.[28]  Historically, MRPC 7.2 was never intended to apply,

---

*United States*, 523 U.S. 224, 234 (1998) (explaining that "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute") (internal quotations omitted).  While the Master asserts that the title of a statute cannot alter its unambiguous text, R&R at 265 n.216, here the Master has proffered completely novel readings of MRPC 1.5(e) and 7.2(b).  Thus, if anything, he has injected doubt into how those Rules should be applied.  Accordingly, using the titles of the Rules for guidance is appropriate here.  *See Almendarez-Torres*, 523 U.S. at 234.  In this case, the respective titles demonstrate a focus on "fees" (MRPC 1.5), on the one hand, and "advertising" (MRPC 7.2), on the other.  The Chargois Agreement involves the division of a *fee*, rather than advertising.  *See also Mass. Legal Ethics* (Ex. E) at 298 ("MRPC 7.2 provides guidance to lawyers about advertising . . .").

[26]     *See, e.g.*, Ex. 241 (Joy Rep.) at 18-19 ("If in 2016, or any time before 2016, ethics authorities in Massachusetts viewed sharing fees in violation of Mass. R. Prof. C. 1.5(e) as a violation of Mass. R. Prof. C. 7.2(b) (previously Mass. R. Prof. C. 7.2(c)), then, in my opinion, I would have expected the Admonition to discuss a violation of Mass. R. Prof. C. 7.2(b).").

[27]     "Massachusetts state courts, Massachusetts disciplinary authorities, and the United States District Court for Massachusetts have never considered a fee division between law firms based on a flawed or imperfect division of fee arrangement between law firms and a client under Mass. R. Prof. C. 1.5(e) to be a violation of Mass. R. Prof. C. 7.2(c)."  Ex. 241 (Joy Rep.) at 16.

[28]     Prof. Gillers claims that *Daynard v. Ness, Motely, Loadholt, Richardson & Poole, P.A.*, 188 F. Supp. 2d 115, 130 (D. Mass. 2002) stands for the proposition that an imperfect fee division would result in the application of MRPC 7.2(b).  Ex. 253 (Gillers 3/20/18 Dep.) at 84:22-86:18.  The case does not state, or even suggest, that concept.  *See Daynard*, 188 F. Supp. 2d at 130.  In fact, despite an analysis of both MRPC 1.5(e) and its New York equivalent, MRPC 7.2(b) is never mentioned.  *Id.* at 124 n.5.  Prof. Gillers' reliance on *Holstein v. Grossman*, 246 Ill. App. 3d 719 (1993) is similarly inapposite.  That case extensively discusses imperfect fee-splitting agreements under Ill. Sup. Ct. R. 2-107.  Despite its lengthy

and has never applied, to a division of a fee between attorneys.  *See, e.g.*, Ex. 243 (Wendel Rep.) at 16; Ex. 240 (Green Rep.) at 16 n.13; Ex. 241 (Joy Rep.) at 18-27.  The Master and Professor Gillers are both outsiders to Massachusetts practice, yet they seek to break new ground with their novel application of MRPC 7.2.  *See* R&R at 375; Ex. 253 (Gillers 3/20/18 Dep.) at 53:23-54:12.[29]

In short, the Master's interpretation of the relationship between MRPC 1.5(e) and MRPC 7.2(b) is unprecedented and unsupported by the language of the Rules and the history of their application in Massachusetts.  The Court should reject it and instead adopt the conclusion that MRPC 1.5(e) governs a fee division between lawyers and that Labaton complied with 1.5(e).

Nevertheless, the Master correctly does not recommend any discipline or sanctions relating to Rule 7.2(b).  *See* R&R at 337-38.  In making this determination, the Master notes that "apparently no disciplinary body or court in Massachusetts or, indeed, in the rest of the country has ever imposed discipline or sanctions upon a lawyer for paying another lawyer under Rule 7.2(b)."  R&R at 337.  In addition, the Master states that because this issue is one of "first impression and not one of which the profession might have been well-advised in advance, it would not be appropriate to impose professional discipline in these circumstances."  R&R at 337-38; *see also id.* at 273 ("What does give us some pause before recommending redress for a

---

discussion – and the fact that the referral fees at issue were not consented to in writing – the court never mentions MRPC 7.2(b) or its Illinois analogue.  *Id.*

[29]     The Master's discussion (R&R 270-72) of *In re Disciplinary Action Against McCray*, 755 N.W.2d 835 (N.D. 2008), badly misses the mark.  First, the rule at issue stated that "[a] lawyer or law firm shall not share legal fees with a nonlawyer."  *See id.* at 845; *see also* N.D. R. Pro. C. 5.4(a).  Stating the obvious, Chargois was a lawyer, and Labaton's payment to him was a referral fee.  Second, the Master's claim that Chargois' introduction "parallels" that in *McCray* is absurd.  *See* R&R at 271.  In *McCray*, the conduct at issue was a nonlawyer's funneling of hundreds of clients to a lawyer, who spent an average of 12 minutes on each client's case sending nonfactual dispute letters to credit agencies.  *McCray*, 755 N.W.2d at 841-42.  The lawyer then turned over 95% of his fees to the nonlawyer.  *Id.* at 845.  Here, Chargois referred ATRS to Labaton, who then spent five years working on the *State Street* case and earned ATRS a recovery lauded by all involved.  This case does not resemble *McCray* whatsoever, let alone being a "parallel" to it.

violation of MRPC 7.2(b) is the fact that, apparently, no bar disciplinary authority or Court has ever imposed discipline upon an attorney for a violation of this Rule by paying another attorney."). Finally, as the Master acknowledges, his (incorrect) finding of a MRPC 7.2(b) violation depends on his (incorrect) finding of a MRPC 1.5(e) violation. Thus, because the law surrounding MRPC 1.5(e) was too unclear to impose discipline, there should be no discipline under MRPC 7.2(b), either. *See* R&R at 337 ("Because the violation of Rule 1.5(e) found here does not merit professional discipline, it would be hard to say that the connected violation of Rule 7.2(b) merited discipline.").

### G.     MRPC 1.5(a) Does Not Apply to the Chargois Agreement.

Prof. Gillers and the Master do not make a finding regarding MRPC 1.5(a). *See* Ex. 233 at 94 ("In answering Judge Rosen's questions at my deposition, I did not say, nor do I now say, whether the Chargois fee is clearly excessive."); R&R at 261 n.209 (Master "make[s] no finding" regarding MRPC 1.5(a)).[30] Nevertheless, they have introduced the topic into their analyses, and Labaton will thus respond. Although neither Prof. Gillers nor the Master offer a definitive position on MRPC 1.5(a), any suggestion that the Rule applies to the Chargois fee must be rejected.

The payment at issue is a division of Labaton's fee with Chargois & Herron. MRPC 1.5(e) governs fee divisions; MRPC 1.5(a) does not. Instead, MRPC 1.5(a) assesses whether a singular "fee" is "clearly excessive." Once that threshold inquiry is made, MRPC 1.5(e) addresses the requirements for dividing the singular "fee," and notes that the "total fee" must be reasonable. In other words, the whole fee is evaluated for excessiveness – as the Court did here

---

[30]     Prof. Gillers first introduced his opinion on 1.5(a) during deposition testimony, largely in response to a line of leading questions from the Special Master. Ex. 253 (Gillers 3/20/18 Dep.) at 364:8-370:17. His original report contained no discussion of Rule 1.5(a). Ex. 232. Labaton reserves the right to supplement its Objections should the Court allow Customer Class Counsel to depose Prof. Gillers regarding his Supplemental Report (Ex. 233).

– and then it may be divided according to the requirements of MRPC 1.5(e).  There is no requirement that each portion of the fee not be "clearly excessive."  *Compare* Mass. R. Prof. C. 1.5(a) *and* Mass. R. Prof. C. 1.5(e).

As with his argument regarding MRPC 1.5(e), Prof. Gillers' construction of MRPC 1.5(a) appears to be unprecedented in Massachusetts.[31]  The absence of any supporting authority is unsurprising.  Applying MRPC 1.5(a) to fee divisions would run counter to the "time-honored" Massachusetts tradition of allowing referral fees, even where the referring attorney does no work.  *See Saggese*, 445 Mass. at 442 (enforcing a 33% referral fee where no work was performed by referring lawyer, without questioning whether the 33% division was clearly excessive); *Mass. Legal Ethics* at 185 (Ex. E).[32]  The encouragement of referral fees in Massachusetts is the result of deliberate consideration by the state's Bar, and undermines any argument that MRPC 1.5(a) is intended to restrain referral fees.  *See Mass. Legal Ethics* at 185 (Ex. E); Wilkins, 82 Mass. L. Rev. at 261-262 (Ex. F).

As a practical matter, it does not make sense to apply MRPC 1.5(a) to a referral fee because the factors that Rule enumerates contemplate work being done.  In particular, subsection

---

[31]     *See, e.g.*, Ex. 241 (Joy Rep.) at 55 ("I could not locate a single case, advisory ethics opinion, or any authority for the proposition that a lawyer's *share* of a fee in a division of fee under Mass. R. Prof. C. 1.5(e) must not be clearly excessive."); Ex. 242 (Lieberman Rep.) at 19 ("[I]n my experience I cannot recall a single instance in which a referral fee was scrutinized for reasonableness under the Mass. Rules…."); Ex. 240 (Green Rep.) at 25 ("Prof. Gillers cites no judicial or bar opinions supporting his theory of independent analysis of each lawyer's share of a fee under MRPC 1.5(a).  I am unaware of any."); Ex. 243 (Wendel Rep.) at 19-20.  Gillers admits that he too is unaware of any authority in Massachusetts that says a referral fee can be deemed clearly excessive under 1.5(a) on the basis of the time and labor expended.  Ex. K (Gillers 3/21/18 Dep.) at 386:9-16.

[32]     *See also* Ex. 227 (Joy Dep.) at 167:18-22 ("I don't think the court would even . . . address the issue, because in *Saggese*, he gets $90,000 from what sounds to be like ten minutes worth of work, and the court didn't even blink an eye at it."); Ex. 230 (Green Dep.) at 98:17-22 ("Obviously, it's capped by the total fee and the total fee has to be reasonable, but it does not limit the amount that's paid out of the total share to the lawyer who made the introduction."); Ex. 228 (Lieberman Dep.) at 103:12-104:10 ("First of all, there's no authority for that notion, that I'm aware of.  And, secondly, it doesn't make any sense . . . It wouldn't matter.  You can say 99.9 percent, Judge.  I wouldn't change my opinion.").

1 states that a factor "to be considered" is "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly."  These considerations cannot be applied to a bare referral fee.  *See In re Fordham*, 423 Mass. 481, 490-91 (1996) (focusing extensively on the hours an attorney spent working on a case and the types of work he did in determining whether a fee was clearly excessive).  Prof. Gillers' construction would render MRPC 1.5(a)(1) a nullity in some cases and must be rejected.  *See United States v. Ven-Fuel, Inc.*, 758 F.2d 741, 751-52 (1st Cir. 1985) ("All words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous.").

Simply put, the text of MRPC 1.5(a) and MRPC 1.5(e), the history of their application in Massachusetts, and common sense all require rejecting any suggestion that MRPC 1.5(a) applies here.

## IV.   LABATON WAS NOT REQUIRED TO DISCLOSURE TO CHARGOIS AGREEMENT TO THE COURT.

### A.    The Master Ignores Controlling Federal Rules.

Rule 23 and Rule 54 specifically govern the information regarding fees that must be disclosed to the court.  Fed. R. Civ. P. 23(h); Fed. R. Civ. P. 54(d).  Their plain language makes clear that fee allocation agreements need not be disclosed unless ordered by the court.  *See id.*  Contrary to the Master's position, Rule 23(e)(3) does not say otherwise.  Despite these clear Rules, the Master attempts to create his own disclosure standard from whole cloth, purporting to rely on general background principles to argue that attorneys must disclose "all available information when seeking a fee award."  *See* R&R at 304 n.248.  This vague position has no

basis in – and is directly contrary to – the Federal Rules of Civil Procedure, applicable precedent, and custom and practice in the District of Massachusetts.

Given that the Master creates unprecedented disclosure obligations that are contradicted by the Federal Rules of Civil Procedure and other authority, his findings that a Rule 11 violation is "supportable" and that Labaton violated MRPC 3.3 and MRPC 8.4 are incorrect as a matter of law.  The Court must reject them.

### B.      As the Master Appears to Concede, The Federal Rules of Civil Procedure Do Not Require Disclosure of Fee Allocation Agreements.

The Federal Rules of Civil Procedure specifically address a party's obligation to disclose fee agreements in connection with an award of attorneys' fees.  Federal Rule of Civil Procedure 23(h) provides that a "claim for an award must be made by motion under Rule 54(d)(2)."  In turn, Federal Rule of Civil Procedure 54(d)(2)(B) provides that a motion or petition for attorneys' fees must "disclose, *if the court so orders*, the terms of any agreement about fees for the services for which the claim is made" (emphasis added).[33]  The Rule's Advisory Notes make clear that this provision includes fee-division agreements:  "*[i]f directed by the court*, the moving party is also required to disclose any fee agreement, including those between . . . attorneys sharing a fee to be awarded . . . ."  Fed. R. Civ. P. 54, 1993 Notes of Advisory Committee, ¶ 8 (emphasis added).  This language is unequivocal:  disclosure of fee agreements is not required unless the court orders it.  Fed. R. Civ. P. 23(h); Fed. R. Civ. P. 54(d)(2); *see also* 5 William B. Rubenstein, *Newberg on Class Actions* § 15:11 (5th ed. 2016) (Ex. L) ("The third prong of Rule 54(d)(2)'s motion requirement – concerning disclosure of fee agreements – is discretionary with the court.");  Ex. 234 (Rubenstein Rep.) at 5 ("Rule 23(h) and Rule 54 are therefore clear in

---

[33]      Fed. R. Civ. P. 23(h)(1) requires that motions for attorneys' fees in a class action be brought pursuant to Rule 54(d)(2), such that the general disclosure requirement – i.e., disclosure if the court asks – is expressly incorporated into class actions.

mandating the submission of fee agreements – including those concerning the allocation of fees

among counsel – only upon court order."); 10-54 *Moore's Federal Practice - Civil* § 54.154

(2018) (Ex. M) ("If the court so directs, the fee motion must also disclose the terms of any fee

agreement with respect to the services implicated by the motion."); *see also* Ex. 241 (Joy Rep.)

at 31-35.[34]

Accordingly, courts applying Rules 54 and 23 have adhered to their plain terms.  For

example, in *Pierce v. Barnhart*, the Fifth Circuit Court of Appeals applied Rule 54 and held that

the district court abused its discretion in denying attorney's fees where the plaintiffs' attorney did

not submit information regarding "whether attorney's fees had been paid or were due to other

counsel for representation," because she had "complied with the local rules and the district court

never directed her" to disclose additional information.  440 F.3d 657, 660-61, 664-65 (5th Cir.

2006).  Likewise, in the class action context, the Second Circuit's decision in *Bernstein v.

Bernstein Litowitz Berger & Grossmann LLP* is directly on point.  814 F.3d 132, 137-38 (2d Cir.

2016).  There, a fee petition filed in a class action did not disclose a fee-sharing agreement with

(or the presence of) an attorney in Mississippi, who allegedly was paid for unnecessary and

irrelevant work, nor did the petition disclose four other law firms who shared in the fee award.

*Id*.  The Second Circuit explained that Fed. R. Civ. P. 23(h) "does not mandate automatic

disclosure of all fee-sharing arrangements in class actions" in the absence of a local rule.  *Id.* at

137 n.2.  It is well-settled – and the Master appears to agree – that Rule 54(d) and Rule 23(h),

---

[34]     Prof. Rubenstein expanded on this point during his deposition, in no uncertain terms:  "From my point of view . . .  it's not complicated.  The judge should have ordered that the fee agreements be released.  He didn't do that.  And absent him doing that, I just don't think there was an obligation to make public any of the fee agreements."  Ex. 235 (Rubenstein Dep.) at 66:13-19.  Prof. Rubenstein explains the Rule embodies deliberate choices made by class action experts.  Ex. 234 (Rubenstein Rep.) at 9-12 (noting that "the class action experts who drafted Rule 23(h) were well aware that a class action case encompasses cast and crew – and they nonetheless chose the default embodied in Rule 54:  that fee allocation agreements need not be disclosed absent judicial request, that the judge must ask for the playbill.").

which govern fee petitions, do not require the automatic disclosure of fee allocation agreements. *See id.*

### C.      Rule 23(e) Did Not Require the Disclosure of the Chargois Agreement.

The Master asserts that Rule 23(e)(3) mandated the disclosure of the Chargois Agreement, a requirement "separate and apart" from Rule 23(h).  R&R at 306-07.  The Master's position appears unprecedented and is incorrect as a matter of law.

### 1.      The Master's Reading of Rule 23(e)(3) is Unsupported by Case Law.

The Master concedes that "he is cognizant that courts generally do not read Rule 23(e)(3)'s disclosure requirement as requiring disclosure of fee agreements among counsel," and that he has "found no First Circuit cases squarely holding that disclosure is required under that Rule."  R&R at 317.[35]  He does not cite such a case from any other circuit, either.  *Id.*  It appears that none exist.  *See, e.g.*, Declaration of William B. Rubenstein In Support of Lieff Cabraser Heimann & Bernstein, LLP's Response and Objections to the Special Master's Report and Recommendations, dated June 20, 2018 (hereinafter, "Rubenstein Response Dec.") at 5 ("No court has ever read Rule 23(e)(3) to apply to fee allocation agreements, to the best of my knowledge.").[36]

Indeed, the only directly applicable case the Master cites is *Hartless v. Clorox*, 273 F.R.D. 630 (S.D. Cal. 2011).  *See* R&R at 308 n.251.  In *Hartless*, the court rejected an objector's argument that Rule 23(e)(3) requires disclosure of fee allocation agreements. *Hartless*, 273 F.R.D. at 646.  The court explained that the "agreement as to the amount of

---

[35]      The Master includes this crucial piece of information about the interpretation of Rule 23 in his discussion of "Sucharow's and Labaton's Obligations Under Fed. R. Civ. P. 11," rather than noting it in in his discussion of "Rule 23 Requirements."  *See* R&R at 317.

[36]      Prof. Rubenstein is an expert offered by Lieff.  Labaton understands that Lieff is submitting this Declaration in support of its forthcoming Response and Objections to the Special Master's Report and Recommendations.

attorneys' fees could affect the class members.  The allocation of those fees amongst class

counsel does not affect the monetary benefit to class members." *Id.*[37]  Likewise, in this case, the

fact that class counsel split a portion of their fee award with Chargois did not affect the monetary

benefit to the class members, because the payment was taken from the 25% total fee awarded to

counsel (and, more specifically, the payment to Chargois was made from Customer Class

Counsels' discrete share of the 25% fee award).  *See id.*; *see also In re Heartland Payment Sys.*,

851 F. Supp. 2d 1040, 1062 (S.D. Tex. 2012) *and* 4:09-md-02046, ECF 57 (S.D. Tex. Dec. 18,

2009) (Ex. N) at 23-24 (settlement agreement that described total fee award, but allowed Co-

Lead Settlement Class Counsel to allocate fees from that award "in their sole discretion,"

complied with Rule 23(e)(3)); *Bernstein*, 814 F.3d at 137-38 (although an unknown attorney

received portion of class counsel's fee award, the court did not mention Rule 23(e)(3) – only

Rule 23(h)).[38]

### 2.     The Master's Novel Interpretation of Rule 23(e)(3) is Contradicted by the Rule's Text and its Advisory Notes.

The text of Rule 23 does not support the Master's construction.  On its face, Rule 23(e)

addresses settlement approval, rather than fee awards.  *Compare* Fed. R. Civ. P. 23(e)

---

[37]     In *Hartless*, the parties filed their stipulated settlement agreement with the Court, which stated that:  "Co-Lead Counsel shall make, and Clorox agrees not to oppose, an application for an award of attorneys' fees and expenses not to exceed a total of $2,250,000 . . . Class Counsel, in their sole discretion, shall allocate and distribute the award of attorneys' fees and expenses among Class Counsel."  *Hartless v. Clorox*, 3:06-cv-02705, ECF 77 (May 21, 2010) (Ex. O) at ¶¶ 11-12, 16-17.  An objector challenged the settlement on the basis that Rule 23(e)(3) requires "production of all fee agreements regarding sharing fees with clients, incentive promises to clients, splitting fees with co-counsel, and any other financial arrangement touching the class action."  *Id.* at ECF 98.  The court rejected this interpretation.  *See Hartless*, 273 F.R.D. at 646.

[38]     This Court appears to have interpreted Rule 23(e)(3) the same way, although it never expressly made such a finding.  The Stipulated Settlement Agreement in this case contained similar language regarding fees as that at issue in *Heartland*.  *Compare* Ex. N (*Heartland*) at 23-24 *and* Ex. 114 (Settlement Agr.) at 26-28.  Although the Court was aware that the class attorneys would be allocating their fees in some fashion, the agreement to do so was never disclosed, and the Court did not raise an issue of compliance with Rule 23(e)(3).

("Settlement, Voluntary Dismissal, or Compromise") *with* Fed. R. Civ. P. 23(h) ("Attorney's Fees and Nontaxable Costs").  Rule 23(e)(3) – referring to "any agreement made in connection with the [settlement] proposal" – applies to agreements between the parties that are tied to and bear upon the actual settlement agreement.  *See, e.g.*, *Office & Prof'l Emps. Int'l Union, Local 494 v. Int'l Union*, 311 F.R.D. 447, 459 (E.D. Mich. 2015) (in the context of Rule 23(e)(3), the Court addressed an agreement to restructure health plans made concurrently with a settlement agreement, and then discussed class counsel fees in a separate part of its opinion.);  Rubenstein Response Dec. at 6 (Rule 23(e)(3) applies to agreements that impact "settlement terms"); Fed. R. Civ. P. 23, 2003 Advisory Notes (Rule 23(e)(3) "aims at" agreements related to the settlement "that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others").[39]  For instance, in this case, the parties disclosed a "Supplemental Agreement Regarding Requests for Exclusion," made in connection with the settlement, and discussed that supplemental agreement with the Court at the August 8, 2016 preliminary settlement hearing.  Ex. 111 (8/8/16 Hr'g Tr.) at 30; Ex. 114 (Settlement Agr.) at ¶ 49(a).[40]

The upcoming 2018 amendment to Rule 23 makes clear that Rule 23(e)(3) agreements and attorney's fee agreements are treated as distinct subjects.  In pertinent part, the amended

---

[39]    By material contrast to this straightforward reading of Rule 23(e)(3), the Master's construction makes little sense.  The Master's interpretation suggests that agreements regarding the division of the total fee award must be disclosed in connection with settlement approval, but need not be disclosed when the Court actually scrutinizes the proposed fees, whether or not there is a settlement.  *See* R&R at 306-307.

[40]    As another example, in this case, the total attorney's fee award was referenced in the settlement agreement between the plaintiffs and defendant and was disclosed.  Ex. 114 at 26.  It also bears noting that the initial agreement between Customer Class Counsel to pay a portion of their fee to Chargois originated in 2013, long before the settlement.  *See* Ex. 140 (LBS025771); Ex. 41 (Chiplock 9/8/17 Dep.) at 105:19-106:4.  Although the specific 5.5% term was finalized during the fee allocation process, the agreement amongst the three firms to pay Chargois predated the settlement and differs from agreements that are made between the parties ancillary to the settlement negotiation process which affect settlement terms – i.e., the agreements that Rule 23(e)(3) contemplates.  *See* Rubenstein Resp. Dec. at 6.

Rule will direct courts to consider several express factors in evaluating a settlement, including whether "the relief provided for the class is adequate, taking into account: . . . (iii) the terms of any proposed award of attorney's fees, including the timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." 2018 US Order 0020.[41]   The separate enumeration of the "terms of any proposed award of attorney's fees," on one hand, and Rule 23(e)(3) agreements, on the other, makes clear that these two categories of information are distinct.  *See id.*

The 2018 Advisory Notes confirm this distinction because they treat attorney's fee agreements and Rule 23(e)(3) agreements separately.  *See* Fed. R. Civ. P. 23, 2018 Advisory Notes (Ex. P) ("The proposed handling of an award of attorney's fees under Rule 23(h) ordinarily should be addressed in the parties' submission to the court . . . *Another topic* that normally should be considered is any agreement that must be identified under Rule 23(e)(3).") (emphasis added); *see also id.* ("The contents of any agreement identified under Rule 23(e)(3) may also bear on the adequacy of the proposed relief, particularly regarding the equitable treatment of all members of the class . . . Examination of the attorney-fee provisions *may also* be valuable in assessing the fairness of the proposed settlement.") (emphasis added).  These Notes confirm that "attorney-fee provisions" are not "any agreement identified under Rule 23(e)(3)." *See id.*  Otherwise, the repeated, separate references to each would be redundant.  The Court should adopt the clear intent of the current and amended Rule 23, as further explained by the Advisory Committee:  agreements to allocate the fee award are separate and distinct from Rule 23(e)(3) agreements.

---

[41]     In the Master's view, this express enumeration of Rule 23(e)(3) agreements as a factor to consider "reaffirms that the Chargois Arrangement should have been disclosed to the court."  R&R at p. 309 FN 252.

### 3.    The Master Misstates Professor Rubenstein's Opinions.

The Master attempts to support his novel reading of Rule 23 by cherry-picking statements made by Prof. William Rubenstein, who authored *Newberg on Class Actions* and has offered opinions as an expert in this case.  R&R at 307-08.  Specifically, the Master clings to *Newberg's* observation that, while courts "generally do not read Rule 23(e)'s disclosure requirement as requiring disclosure of fee agreements among counsel," some fee agreements that "impact settlement terms" possibly "should be disclosed to the class."  *See* R&R at 307-308; 355-56; *see also* 5 *Newberg on Class Actions*, § 15.12 at 36 (5th ed. 2015) (Ex. L).[42]  While eager to rely on Prof. Rubenstein's statement that there *potentially* could be exceptions to how courts apply Rule 23(e)(3), the Master ignores the fact that Prof. Rubenstein reached the opposite conclusion based on the specific facts of *this case*:  "Rule 23 does not require disclosure of fee allocation agreements absent judicial order, courts rarely so order, and Judge Wolf did not do so in this case."  Ex. 234 (Rubenstein Rep.) at 31; *see also id.* at 29 n.94 ("Courts have not read [Rule 23(e)(3)] to encompass fee allocation agreements . . .").  In other words, the Master relies on a high-level paragraph in Prof. Rubenstein's treatise, but brushes aside his concrete opinion.  The Court should reject the Master's selective citation of Prof. Rubenstein.

In an attempt to justify his slanted reliance on Prof. Rubenstein, the Master attacks the professor's credibility.  R&R at p. 307 n.250  ("Professor Rubenstein's deposition testimony and Report are curious in light of the positions he has taken in his treatise, particularly as emphasized

---

[42]    *Newberg* provides no case citation, but offers the following hypothetical example:  "For example, if one set of counsel's fee allocation was capped at a certain amount, that counsel would have less interest in pushing further on behalf of the class once her cap was met."  In that situation, the fee agreement could affect the timing (and thus the terms) of the settlement, because counsel would have no incentive to continue litigating once the fee was capped.  Here, regardless of the division of fee with Chargois, every Customer Class and ERISA attorney were incentivized to litigate toward the largest possible settlement, from which they would request a 25% fee.

in this quote [regarding the possible 23(e)(3) exception regarding fee agreements].").[43]   The

Master's insinuations are unfair.  Despite nearly a full day of deposition – during which Prof.

Rubenstein testified repeatedly and emphatically that Rule 23 does not require disclosure of fee

allocation agreements – the Master did not ask him a *single* question about whether Rule

23(e)(3) required disclosure of the Chargois Agreement to the Court.[44]   The Master also claims

that Prof. Rubenstein's statements regarding his preference for transparency "ring hollow given

the positions he has taken in this case."  R&R at p. 307 n.250.  This, too, is unfair.  Prof.

Rubenstein has been consistent, prior to and during this case, that he views transparency

regarding fees as beneficial – but not required without a court order.  *E.g.*, Rep. at 30.  As such,

he will not retroactively "make up a rule" for the purposes of this case.  *Newberg*, § 15.12 at 34

("While Rule 54(d)(2)(B)(v) makes disclosure of such [fee] agreements dependent on a judicial

order, there are at least two reasons that courts should regularly order disclosure."); Ex. 234

(Rubenstein Rep.) at 30 ("I have similarly argued that fee allocation agreements should be made

known to the class, but I do so within the terms of the governing legal regime: I contend that,

using their authority under Rule 54(d)(2), courts should require greater disclosure of fee

---

[43]     The Master may feel such an insinuation is appropriate because Prof. Rubenstein is a retained expert witness who is being paid for his work.  Whatever Prof. Rubenstein's bill is, it is dwarfed by the $3.8 million that the Master has collected to act as an adversary.

[44]     Prof. Rubenstein's initial report regarding Customer Class Counsels' duty to disclose the Chargois Agreement to the Court and/or class was submitted as a rebuttal to Prof. Gillers' initial expert report.  *See* Ex. 234 (Rubenstein Rep.); Ex. 232 (Gillers Rep.).  Prof. Gillers' did not mention Rule 23(e)(3) in his report or during his deposition.  *See* Ex. 232 (Gillers Rep.); Ex. 253 (Gillers 3/20/18 Dep.).  Nor did the Special Master ask Prof. Rubenstein during his deposition whether Rule 23(e)(3) required disclosure of the Chargois Agreement to the Court.  *See* Ex. 235.  The Master's silence on this issue is difficult to explain, especially when considering that he is (purportedly) "curious" about Prof. Rubenstein's position.  R&R at 307 n.250.  Perhaps the Master did not want Prof. Rubenstein to explain why Rule 23(e)(3) does not apply here, or perhaps he only decided that Rule 23(e)(3) requires disclosure very late in the investigation, after realizing that the law does not otherwise support his aspirational views.

allocation agreements.").[45]   Unlike the Master, Prof. Rubenstein has demonstrated an ability to

separate aspirational best practices from the actual rules and what they require.   Ex. 235

(Rubenstein Dep.) at 63:7-24 ("[Y]ou want to make up a rule after the fact . . . I'm not making up

a rule for one case.").

### 4.   The Master's Position on Fee Allocation Disclosure is Incorrect and Inconsistent.

The Master repeatedly claims that Rule 23(e)(3) required disclosure of the Chargois

Agreement because it "allocated money that the class may have received elsewhere."   *See, e.g.*,

R&R at 278, 307, 308, 355.[46]   As Prof. Rubenstein explains, the Master's interpretation of Rule

23(e)(3) is contrary to other authority, which construes Rule 23(e)(3) to require the disclosure of

agreements that impact the actual settlement terms.   Rubenstein Response Declaration at 5-6.

However, even using the Master's formulation of Rule 23(e)(3), his argument is (1) incorrect and

(2) inconsistent with the positions he has taken in this case.

First, the payment to Chargois did not allocate money away from the class.   It was taken

from a portion of Customer Class Counsels' fee award, which was part of the total award the

Court had already determined was fair and reasonable and had already allocated away from the

class.   *See* Ex. 235 (Rubenstein Dep.) at 23:16-24:4.   It did not affect the amount received by the

class.   *Hartless*, 273 F.R.D. at 646 ("The agreement as to the amount of attorneys' fees could

---

[45]      *See also id.* ("Although I support such an approach on policy grounds, I am transparent in conceding that, absent a court order, Rule 23 contains no requirement that fee allocation agreements be disclosed to the court nor therefore provided to the class in the court's notice.").

[46]      Although the Master suggests that this phrase is quoted from the Manual for Complex Litigation, *see* R&R at 308, it does not appear in that resource.   Instead, the Manual explains that Rule 23(e)(3) (previously 23(e)(2)) is intended "to reach agreements that might have affected the interests of class members by altering what they may be receiving or foregoing." *Manual for Complex Litigation* at § 21.631; *see also* Fed. R. Civ. P. 23, 2003 Advisory Note (explaining that 23(e)(3) requires disclosure of agreements that "may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others.").

affect the class members.  The allocation of  those fees amongst class counsel does not affect the monetary benefit to class members.").

Second, the Master's position is inconsistent because he focuses solely on the Chargois payment while ignoring the fact that no information regarding any fee allocations was provided to the Court, except for the fact that fees from the ERISA Settlement Allocation were capped at $10.9 million.  *See* Ex. 3 (Sucharow Decl.) at 32; Ex. 111 at 39 (8/8/16 Hr'g Tr.).[47]  The allocations among the Customer Class firms or the ERISA firms do not qualitatively differ from the allocation between the Customer Class firms and Chargois – in any of those situations, lawyers are splitting up and sharing the total fee.  By the Master's circular logic, an allocation of part of the total award to any of these firms "allocates money that the class could have received elsewhere."  *See* R&R at 308.  There is no basis for the Master's arbitrary decision that Rule 23(e)(3) only applies to the Chargois Agreement.

    **D.**    **The Court's Fiduciary Duty to the Class Does Not Create an Independent Disclosure Obligation.**

Lacking on-point procedural rules or case law, the Master resorts to an ill-defined and overarching argument premised on the Court's role as a fiduciary at the class action settlement stage.  *See* R&R at 138-141, 303-305.  According to the Master, the Court's role as a fiduciary means that "Labaton had a legal and ethical duty to provide the Court with all information it needed to make an informed decision as to the award of attorneys' fees out of the *State Street* settlement fund," including "what the share of each attorney would be."  *Id.*[48]

---

[47]      The Master incorrectly discusses this figure in relation to allocation.  *See* pp. 10-12, *supra*.

[48]     *See also see also id.* at 140 ("The fee petition process clearly places an enhanced duty of full disclosure and transparency upon counsel filing their petition for attorney fees so that the court can perform its gatekeeping function full and completely advised of all factors and agreements that impact the allocation of attorney's fees . . ."); *id.* at 304 n.248 ("We agree with Professor Gillers that, in total, federal case law makes clear that counsel must be transparent in providing the court *all available information* when seeking a fee award in class actions.") (emphasis added).

The sweeping duty imposed by the Master to provide "all information" finds no basis in the law and does not supersede the specific procedural rules that provide otherwise. *See* Fed. R. Civ. P. 23; Fed. R. Civ. P. 54; Ex. 234 (Rubenstein Rep.) at 13 ("Background Principles Do Not Reverse the Language of Rules 23/54"). The precedent relied upon by the Master may have influenced, but has nevertheless been subsumed by, the specific Rules that govern fee disclosures. *See* Ex. 234 (Rubenstein Rep.) at 14 (explaining that Prof. Gillers' argument, parroted by the Master, "ignores the facts that the framers of Rule 23(h) were well aware of the principles set forth in his random set of snippets [of case law], yet chose to have Rule 23(h) cross-reference Rule 54(d). In other words, the class action law experts who wrote the rule after study and public input balanced the principles at stake by authorizing class counsel to keep fee-sharing arrangements confidential absent an explicit judicial order to the contrary.").

The Master also claims, again with no support, that as part of Labaton's boundless disclosure obligation, it had a legal duty to provide "the identity of all attorneys – including Damon Chargois – who would be sharing in the award and what the share of each attorney would be." R&R at 303; *see also id.* at 313 (same).[49] This is simply incorrect, as a matter of law and practice:

> [I]n nearly 40% of class action cases, courts are not provided the names of lawyers who worked on the case and who might, on that ground be in line to receive a portion of the award. Moreover, class action fee awards are sometimes allocated to other lawyers . . . There are, therefore, a variety of situations in which the identities of counsel sharing in a fee award are routinely unknown to the class action court . . . [T]he class action experts who drafted Rule 23(h) were well aware that a class action case encompasses cast and crew – and they nonetheless

---

[49]     None of the firms provided any information about the size of their individual shares. The Court, obviously aware that the attorneys would share the fee award, never asked. Yet, the Master seems to suggest that the failure of Labaton to disclose the size of its own share, or of Lieff's share, or of any other firm's share, violated a "legal and ethical duty." *See* R&R at 303. The Master has created this requirement out of thin air, without any controlling legal support.

>chose the default embodied in Rule 54:  that fee allocation agreements need not be
>disclosed absent judicial request, that the judge must ask for the playbill.

Ex. 234 (Rubenstein Rep.) at 10-11.  The Master's purported disclosure obligations simply are

not the law.  They reflect his own aspirational views on how attorneys *should act*, not how they

*do act* or – more importantly – how they *must act*.

Moreover, the Court's role as a fiduciary to the class does not change the lawyers'

disclosure obligations.  Although a *court* acts as a fiduciary during the settlement stage and may

be interested in reviewing fee agreements, it does not follow that it is the *attorneys'* obligation to

disclose information regarding fees in the absence of a court request.  *See id.*  Rather, as a

fiduciary, it rests with the Court to decide whether a disclosure of fee allocation agreements

would be helpful to its evaluation of the fee award, and, if so, to order the disclosure of those

agreements.  *See* Fed. R. Civ. P. 54(D)(2)(b) (petition for attorneys' fees must "disclose, *if the

court so orders*, the terms of any agreement about fees for the services for which the claim is

made") (emphasis added); Ex. 235 (Rubenstein Dep.) at 135:8-12 ("Number one, when I see that

the Court is a fiduciary for the class members, I immediately think that means the Court has a

responsibility to do something.  I don't immediately think that means the parties have a

responsibility to do something."); *see also* Fed. R. Civ. P. 23, 2003 Advisory Committee Notes

("Active judicial involvement in measuring fee awards is singularly important to the proper

operation of the class-action process. . . the court bears this responsibility.").

The cases cited by the Master do not support the limitless disclosure duty that he

proposes.  Most offer nothing beyond the general principle that the court acts as a fiduciary and

may be interested in fee allocations.  *See* R&R at 303-304, and cases cited therein.[50]  Meanwhile,

the Master (and Professor Gillers) afford far too much weight to *Agent Orange* and *Lewis*

---

[50]     The Master also incorporates Prof. Gillers' legal citations by reference.  R&R at 303-304.

*Teleprompter*.  R&R at 304, citing *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 216, 223

(2d Cir. 1987) *and Lewis v. Teleprompter Corp.*, 88 F.R.D. 11, 18 (S.D.N.Y. 1980); Ex. 233

(Gillers Supp. Rep.) at 82-83 (same).

First, those decisions predate Rule 23(h), which makes unequivocally clear that automatic

disclosure of fee agreements is *not* required.  *See* Fed. R. Civ. P. 23(h).  Second, in the more

recent *Bernstein* case, the Second Circuit explained without qualification that information

regarding attorneys' fees was not required to be disclosed even where attorneys collecting fees

were unknown to the Court.  *Compare In re "Agent Orange"*, 818 F.2d at 223, *with Bernstein*,

814 F.3d at 137 n.2.  Third, as Prof. Rubenstein thoroughly explains, when *Agent Orange* was

decided, a local rule required disclosure of fee agreements; the Second Circuit's commentary

regarding the disclosure of fee agreements related to that local rule, rather than an overarching

common law duty (which, to the extent it ever did exist, was superseded by the amended Rule

23(h)).  *See* Ex. 234 (Rubenstein Rep.) at 16 n.42; Ex. 227 (Joy Dep.) at 128:20-129:1; *In re*

*"Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 869 (E.D.N.Y. 1984) (deciding not to

apply "Rule 5 of the U.S. District Court for the Southern and Eastern Districts of New York").

Fourth, as Prof. Gillers concedes, the Chargois Agreement did not conflict with the interests of

the class in litigating the case to its most favorable resolution, unlike the agreements in *Agent*

*Orange*.  *See* Ex. 233 (Gillers Supp. Rep.) at 82 n.87; Ex. 235 (Rubenstein Dep.) at 55:23-56. [51]

Finally, even if *Agent Orange* and *Lewis Teleprompter* fashioned some mandate that survived

---

[51]       "Second, when I look at Chargois' involvement, I don't see anything like in the *Agent Orange*
case where anyone's worried that the payment to Chargois conflicted with the class' interest in litigating
the case."  Ex. 235 (Rubenstein Dep.) at 55:23-56:3

both the amendments to the Federal Rules and the dispositive *Bernstein* decision, they do not impose an obligation in this Circuit.[52]

In sum, neither the Master nor Prof. Gillers have cited any legal authority that required disclosure of fee sharing agreements in District of Massachusetts in 2016.  Their sweeping generalizations, contradicted by specific Rules, are not enough.[53]

### E.      The Master's Fundamental Dislike of Referral Fees Does Not Nullify the Federal Rules of Civil Procedure in This Case.

Starting with the premise that referral fees are wrong, the Master views the fact that the Chargois Agreement was not disclosed as objectively harmful and thus deserving of "blame." R&R at 306 ("Professor William Rubenstein places the entire blame for the nondisclosure of the Chargois payment in this case upon the Court."); *id.* at 355 (same).  In fact, there is no "blame" here.  Referral fees are permissible.  *See Mass. Legal Ethics* at 185 (Ex. E).  Labaton was not required to disclose the fee agreement with Chargois, just as the Court was not required to ask about fee agreements.  *See* Fed. R. Civ. P. 23; Fed. R. Civ. P. 54; *see also, e.g.*, Ex. 227 (Joy Dep.) at 92:2-15 ("Is the absence of having all those rules [requiring disclosure of fee agreements] an indication that the judge is not fulfilling his or her fiduciary obligation? Absolutely no.").

Because the Master believes that the Chargois Agreement was wrong and should have been disclosed, he treats the contrary Federal Rules of Civil Procedure as inconvenient obstacles standing in the way of his desired result.  *See, e.g.*, R&R at 342-43 (in the context of discussing

---

[52]      There is no District of Massachusetts local rule that requires the automatic disclosure of fee allocation agreements.

[53]      If the attorneys truly were required to disclose "all the facts," then they would have been obligated to disclose all of the fee-sharing agreements in this case.  *See* R&R at 303-304.  Yet the Master is singularly focused on the Chargois agreement.  *See* R&R at 303-309.  A finding that the Chargois Agreement required disclosure, but the other fee sharing agreements did not, is too arbitrary and subjective to withstand scrutiny.

disclosure obligations to the Court and the class, claiming that the Rules "ignore the realities of class action litigation"); *id.* and *id.* at 280 n.231 (referring to the Rules as "unsatisfactory" and expressing his "frustration" with how they operate); *id.* at 280 n.231 (arguing that the plain language of Rule 23 "seems to stand common sense and the realities of class action litigation upon its head," and noting his belief that the Rule reflects "a misapprehension of the responsibilities of the respective players in the class action process.").[54]  For example, he is palpably skeptical of the notion that the Rules do not require disclosure of fee agreements without a court order.  *E.g.*, R&R at 279 n.230 ("Rubenstein conceded this is a lot to ask of the judge."); *id.* at 306 (noting Prof. Rubenstein's contention that Rule 23 "places the burden on the Court to order disclosure of a fee agreement or payment").  But, despite the Master's admitted frustration, the Rules plainly make disclosure of fee agreements discretionary with the Court – and the Court is more than capable of asking for them, if it believes such disclosure necessary.[55]

The Master goes so far as to claim that Labaton has "erected a wall of legalistic and formalistic excuses and blame-shifting (largely to the Court)."  R&R at 362.  To be clear, the "legalistic and formalistic excuses" he refers to are the Federal Rules of Civil Procedure, which

---

[54]     Contrary to the Master's gripes, the drafters of the Federal Rules understand what they are doing.  The current Advisory Committee includes, among others:  Prof. Edward Cooper, coauthor with the late C.A. Wright and A.R. Miller of the original, second, and third editions of *Federal Practice and Procedure: Jurisdiction*; Prof. Richard Marcus, a lead author of *Complex Litigation* (5th ed. 2010) and *Civil Procedure: A Modern Approach* (6th ed. 2013), published by West Academic Publishing, as well as several volumes of *Wright and Miller*; Prof. A. Benjamin Spencer, author of *Civil Procedure:  A Contemporary Approach* (2d ed. 2007) and several volumes of *Wright and Miller*.  The list goes on, including at least ten judges, several preeminent litigators, and several more academics.  Ex. Q (Advisory Committee on Civil Rules).

[55]     With all due respect to the Court, Labaton does not subscribe to the Master's paternalistic belief.  *See* Ex. 234 (Rubenstein Rep.) at 12 (opining that "it is really not much of an imposition for a court to ask, 'How are the fees being allocated?' as Rule 54(d)(2) proposes.").  Indeed, the Court has recently demonstrated its ability to readily inquire about fee sharing agreements, as Rule 54 contemplates:  "Is there one or more other attorneys that would benefit, get money from the settlement of this case?" *Arkansas Teacher Retirement System v. Insulet Corp.*, No. 15-cv-12345 (D. Mass. March 9, 2018) (Wolf, J.) (Ex. R).

(of course) govern litigation in federal court, regardless of the Master's derision.  *See, e.g.*, *In re Bos. Reg'l Med. Ctr.*, 328 F. Supp. 2d 130, 151 (D. Mass. 2004) (Wolf, J.) ("If a Federal Rule of Civil Procedure governs a question, the court must apply it unless the rule violates the Rules Enabling Act or the Constitution.").  Plainly, the Master disagrees with the payment to Chargois, and he appears determined to make the law fit his desired outcome, even if that means stretching or ignoring the Rules.  As Prof. Rubenstein observed:

> Rule 23 clearly sets out a process and the structure for the fee process in class action cases.  It's the governing rule.  In the case we're talking about it has a specific subpart directly on point . . . I feel like you all [The Special Master and his team] are trying very hard to find a way around that specific law . . . from where I sit there's a specific[] rule directly on point.  Just doesn't happen to say what you want it to say, but it's there.

Ex. 235 (Rubenstein Dep.) at 149:2-15; *see also id.* at 73:18-19 (explaining his view that Prof. Gillers' position that an attorney must disclose information regarding fee allocations to the Court "was made up after the fact to fit the facts of this case.").  This Court should reject the Master's end-run around the law and instead apply the Rules as written.

### F.    Labaton Did Not Violate Rule 11.

As the foregoing makes clear, the Federal Rules of Civil Procedure do not require the disclosure of fee allocation agreements.  Therefore, the Special Master has proffered the untenable argument that complying with the disclosure obligations set forth in Rule 54 and Rule 23 simultaneously constitutes a non-disclosure that violates Rule 11.  In other words, by the Special Master's logic, the Federal Rules of Civil Procedure are internally inconsistent and directly contradict each other.  Such a conclusion would necessarily be premised on the notion that the drafters of the Rules, wittingly or through extraordinary carelessness, laid a trap for attorneys who followed the requirements of Rules 54 and 23 but failed to divine a particular judge's desire for information that he had not requested.  This reading of the Rules cannot be

squared with their essential purpose.  *See* Fed. R. Civ. P. 1 ("These rules govern the procedure in all civil actions and proceedings in the United States district courts . . . They should be construed, administered, and employed by the court and the parties to secure the *just* . . . determination of every action and proceeding") (emphasis added).[56]

Beyond a common-sense reading of the Rules, the First Circuit's interpretation of Rule 11 also precludes a finding that the Labaton violated it.  Any alleged "omission" regarding the Chargois Agreement from the Sucharow Declaration does not approach the level of a Rule 11 violation, because the "omission" was perfectly permissible under the Federal Rules of Civil Procedure and class action practice.  Without any notice that disclosure of the Chargois bare referral fee was required, Rule 11 simply does not apply.

Finding a violation of Rule 11 requires "culpable" conduct by the attorney.  As the First Circuit has repeatedly admonished, a "lawyer who makes an inaccurate factual representation must, at the very least, be *culpably* careless to commit a violation [of Rule 11]."  *Young v. City of Providence*, 404 F.3d 33, 39 (1st Cir. 2005) (emphasis added); *see also Roger Edwards, LLC v. Fiddes & Son, Ltd.*, 437 F.3d 140, 142 (1st Cir. 2006) (explaining that "some degree of fault is required" to find a violation of Rule 11); *see also McGee v. Town of Rockland*, 11-cv-10523, 2012 U.S. Dist. LEXIS 180197, at *2 n.2 (D. Mass. Dec. 20, 2012) ("Rule 11 sanctions should be reserved for only the most egregious of lawyerly missteps.").  Moreover, the First Circuit has recently explained that whether an attorney violates Rule 11 "depends on the objective

---

[56]     The Special Master deflects this common-sense conclusion by relying on Rule 23(e)(3).  R&R at 317 n.256 ("Labaton, however, does not mention, let alone discuss in its Memorandum, the separate and independent obligation imposed on Labaton by Rule 23(e)(3) . . .").  This is unavailing.  As described in § IV.C, *supra*, Rule 23(e)(3) does not require – and has never been interpreted by a court to require – the disclosure of fee sharing agreements.

reasonableness of the [attorney's] conduct under the totality of the circumstances." *Eldridge v. Gordon Bros. Grp., LLC*, 863 F.3d 66, 87-88 (1st Cir. 2017) (internal citations omitted).

Here, Labaton is not culpable, and its attorneys acted exactly as reasonable lawyers would. Everything known to Labaton indicated that disclosure was *not* required. At the time that Mr. Sucharow submitted the fee petition: (1) the Federal Rules of Civil Procedure did not require disclosure; (2) this Court did not have a standing order requiring disclosure; (3) this District's local rules did not require disclosure; (4) this Court did not order disclosure; and (5) referral fees were a "time-honored practice" in Massachusetts and perfectly permissible. *Saggese*, 445 Mass. at 442. Moreover, the following facts further support the reasonableness of Labaton's conduct: (1) no judge in the District of Massachusetts had ordered disclosure of fee agreements in well over a hundred class action cases since 2011 (*see* Ex. 234 (Rubenstein Rep.) at 6); (2) no case within the First Circuit (or elsewhere, as far as Labaton's research has revealed) had found a violation of Rule 11 for non-disclosure of fee agreements; and (3) no Boston Bar Association and Massachusetts Bar Association ethics opinions, or Massachusetts Board of Bar Overseers ethics decisions, contained analogous guidance relative to the disclosure of fee agreements in connection with the Massachusetts Rules of Professional Conduct.[57]

In short, there was no notice that disclosure was required. In fact, the opposite was true, i.e., the applicable rules stated that disclosure *was not* required in the absence of inquiry or an order. Viewing the circumstances in their totality, a reasonable attorney – trained to rely on the

---

[57] Even if this Court agreed with the Master's strained interpretation of Rule 23(e), such a reading would be unprecedented in this Circuit. Respectfully, this would still be an insufficient basis for a finding of a Rule 11 violation. *See* Rubenstein Resp. Dec. at 8 ("The Special Master's Report concludes that Lead Counsel derogated its duties because it did not interpret [Rule 23(e)(3)] (a) in a way that no court before had ever interpreted it (b) according to a standard never before articulated (c) on a factual record lacking any evidence that the payment impacted litigation of the case (d) in a circumstance where the class's interest in the pay was, according to the Report's own conclusions, equivalent to about 0.23% of the settlement value.").

Federal Rules of Civil Procedure, precedent, and standard practice – would not believe that

disclosure was required.  *See Eldridge*, 863 F.3d at 87-88 (courts must assess the objective

reasonableness of the attorney's conduct); *see also Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d

1251, 1255 (11th Cir. 2003) (explaining that in the Rule 11 context, "courts determine whether a

reasonable attorney in like circumstances could believe his actions were factually and legally

justified.").  This is far from the "culpable" and "egregious" conduct that courts in the First

Circuit require before finding a Rule 11 violation.  *See Young*, 404 F.3d at 39; *McGee*, 2012 U.S.

Dist. LEXIS 180197, at *2 n.2.[58]

### G.   Labaton's Non-Disclosure of the Chargois Agreement Did Not Violate the Massachusetts Rules of Professional Conduct.

#### 1.   Labaton Did Not Violate MRPC 3.3(a) or 8.4.

The Master contends that Labaton, in complying with Rules 23 and 54, violated MRPC

3.3(a) and MRPC 8.4(c).  *See* Mass. R. Pro. C. 3.3(a) ("A lawyer shall not knowingly: (1) make a

false statement of fact or law to a tribunal or fail to correct a false statement of material fact or

law previously made to the tribunal by the lawyer.").  The Master offers no meaningful analysis

for this finding.  R&R at 318-19.  Instead, he cites a collection of inapposite cases and decides, in

wholly conclusory fashion, that "[c]ompliance with Rules 3.3(a) and 8.4(c) required Sucharow to

---

[58]   And, as the Master concedes, the First Circuit has never found a Rule 11 violation based on a "material omission."  Moreover, the group of out-of-Circuit cases that the Master has cobbled together are inapposite.  *See* R&R at 314, *citing In re Ronco, Inc.*, 838 F.2d 212, 218 (7th Cir. 1988) (firm requested continuance because it needed time to prepare for a hearing, but did not mention that it had previously represented a creditor in the same case and had previously evaluated and requested discovery on the subject matter of the hearing); *Gurman v. Metro Housing and Redevelopment Auth.*, 842 F. Supp. 2d 1151, 1154 (D. Minn. 2011) (blatantly misrepresenting facts, such as referring to an already-decided appeal as "current," and dramatically mischaracterizing the content of a housing authority order); *Campmor, Inc. v. Brulant*, LLC, 2:09-cv-05465, 2014 U.S. Dist. LEXIS 150299, at *17-18 (D.N.J. Oct. 21, 2014) (declining to find a Rule 11 violation); *Lamon v. Amrheign*, No. 1:12-cv-00296, 2014 U.S. Dist. LEXIS 111787, at *14 (E.D. Cal. Aug. 12, 2014) (factual allegation changed substantially between original complaint and amended complaint; no finding of a Rule 11 violation).

disclose Chargois and his fee arrangement" because it was "highly relevant to the Court's exercise of its fiduciary duty." *Id.*[59]

The Master is incorrect. In light of the lack of an obligation to disclose the Chargois Agreement to the Court, the Master's arguments regarding MRPC 3.3(a) and MRPC 8.4(c) miss the mark. As noted by Profs. Joy and Wendel, those Rules require a "knowing" misrepresentation or omission on the part of the attorney. Mass. R. Prof. C. 3.3(a); *see also* Ex. 241 (Joy Rep.) at 43; Ex. 243 (Wendel Rep.) at 20. Thus, "[f]or there to be an ethical duty for Labaton to disclose to the Court its fee sharing agreement with Chargois & Herron under Mass R. Prof. C. 3.3(a) or 8.4(c), the ethical duty would have to be based on Labaton *knowingly* engaging in impermissible conduct." Ex. 241 (Joy Rep.) at 43. Because there was no legal obligation to disclose the Chargois Agreement, and no inquiry from the Court, it cannot be that Labaton lawyers "knowingly" made some kind of unethical omission. *See* Ex. 227 (Joy Dep.) at 88:3-8 (explaining that Rule 3.3 applies "[o]nly in a situation where you have a duty to speak.").[60]

### 2.      Comment 14A Does Not Change the Analysis.

Late in his investigation, the Master suggested that Comment 14A to MRPC 3.3(a) applies here and supports finding that Labaton violated MRPC 3.3(a).[61] Comment 14A provides that:

> When adversaries present a joint petition to a tribunal, such as a joint petition to approve the settlement of a class action suit or the settlement of a suit involving a

---

[59]     The cases relied upon by the Master and Prof. Gillers Prof. do not resemble the facts in this case. R&R at 318-19; Ex. 233 (Gillers Supp. Rep.) at 85; *see also* Ex. 241 (Joy Rep.) at 47-49. In none of those cases did a rule of procedure specifically govern the disclosure. *Id.*

[60]     To be clear, there was no omission in the first place, but – assuming solely for the sake of argument that nondisclosure of the Chargois Arrangement could be called an omission – it certainly was not knowingly made in violation of an obligation. *Id.* at 44. ("For an omission to be the equivalent of a misrepresentation, the omission has to occur where there is a duty to speak.").

[61]     Professor Gillers initially did not address this comment, but added it in his supplemental report. Compare Ex. 232 (Gillers Rep.) with Ex. 233 (Supp. Gillers Rep.) at 87.

> minor, the proceeding loses its adversarial character and in some respects takes on
> the form of an ex parte proceeding. The lawyers presenting such a joint petition
> thus have the same duties of candor to the tribunal as lawyers in ex parte
> proceedings and should be guided by Rule 3.3(d).

At the outset, this comment is inapposite, because the fee petition submitted by plaintiffs' counsel was not submitted jointly with an adversary.  ECF 102 at 5 ("State Street takes no position on the relief sought in the motion [for fees]").  Indeed, during the final settlement hearing, the Court specifically asked whether the plaintiffs and defendant discussed attorney's fees as part of their settlement negotiations, and counsel responded that they did not.  Ex. 78 (11/2/16 Hr'g Tr.) at 20.  This, clearly, is not a "joint petition to approve a settlement" that two parties present together.  *See* Mass. R. Pro. C. 3.3 cmt. 14A.

The Master also ignores Comment 14, which states that "Rule 3.3(d) does not change the rules applicable in situations covered by specific substantive law."  Mass. R. Pro. C. 3.3, cmt 14.  The disclosure standards for fee petitions in a federal class action are specifically governed by Rule 23 and Rule 54.  *See* Fed. R. Civ. P. 23(h); Fed. R. Civ. P. 54(d).  Therefore, even if MRPC 3.3(d) were relevant here, it would not override the governing rules addressing the issue (by contrast, the Massachusetts Rules of Civil Procedure do not address fee-related disclosures in class actions, *see* Mass. R. Civ. P. 23).

More importantly, even if Comment 14A applied here, it would not have required disclosure of the Chargois Agreement because it did not appear to be "material" information to the Court's decisionmaking.  *See* Mass. R. Pro. C. 3.3(d); *see also* Ex. 227 (Joy Dep.) at 99:2-3 ("I don't believe it's a material fact.").  Nearly all the fee-related discussion at the Final Settlement Hearing relating to fees focused on the whether the *total* fee award was fair.  Ex. 78 (11/2/16 Hr'g Tr.) at 22-38.  In fact, the Court, acting well within its discretion, did not ask a single question regarding how the fee award would be shared among Customer Class Counsel.

*Id.* Accordingly, information about how Customer Class Counsel planned to divide their portion of the award did not appear material to the Court's decision-making process. *See id.*

The Court's willingness to let the plaintiffs' counsel decide how to divide up the total fee award is not surprising. As demonstrated through an empirical review conducted by Professor Rubenstein, out of 127 recent class actions that reached a settlement in the District of Massachusetts, the Court did not order the disclosure of fee agreements in a single one. Ex. 234 (Rubenstein Rep.) at 6.[62] Therefore, it would be reasonable for an attorney appearing in this district to conclude that information regarding attorney's fee allocations among plaintiffs' counsel is not viewed as material by this Court.[63]

Finally, and perhaps most significantly, the Rules do not require disclosure. Every class action may become non-adversarial at the fee petition stage. *See* R&R at 140-41 and cases cited therein. Nevertheless, the drafters of the Federal Rules – who surely understand this concept – chose to condition the disclosure of fee agreements on the Court's order. *See* Fed. R. Civ. P. 23(h). This reflects a deliberate judgment that fee allocation information is *not* material (and, if a particular court does view it as material, it can order the information disclosed). *See* Ex. 234 (Rubenstein Rep.) at 11.[64]

---

[62]  This is consistent with the experience of Camille Sarrouf, who has practiced in Boston for over five decades. *See* Ex. 252 (Sarrouf 3/21/18 Dep.) at 35:23-36:7 (testifying that he tried hundreds of cases as the attorney paying a referral fee, and that he "never had a Court ask [him] what is your referral fee. Never. It never comes up.").

[63]  The Master makes much of the fact that the payment to Chargois was a referral fee that required "no work." However, it bears repeating that Massachusetts permits bare referral fees. Thus, even knowing that attorneys are permitted to pay and receive referral fees, this Court has, as a matter of course, not ordered the disclosure of any such agreements. *See* Ex. 234 (Rubenstein Rep.) at 6.

[64]  Instead, Rule 23, through its reliance on Rule 54, only requires that "the judgment and the statute, rule, or other grounds entitling the movant to the award" and "the amount sought or . . . a fair estimate of it" be disclosed – i.e., material information at the fee petition stage. *See* Fed. R. Civ. P. 54(d)(2)(b).

In short, in his argument regarding Comment 14A and MRPC 3.3(d), the Master has not cited anything indicating the Chargois Agreement was "material" to the Court beyond his own subjective and conclusory opinions.  On the other hand, there is abundant objective evidence suggesting otherwise, including this Court's questions at the final settlement hearing, the general practice in this district, and the Rules themselves.

### 3. No sanction or Discipline is Warranted Based on a Purported Finding That Labaton Violated MRPC 3.3(a).

During his deposition, Professor Gillers conceded that finding a violation of MRPC 3.3 under these circumstances would be novel, if not unprecedented.  *See* Ex. 253 (Gillers 3/20/18 Dep.) at 144:24-145:1 ("I know of no authority that applies 3.3 to the duty to disclose a fee agreement.").  Both the Master and Prof. Gillers attempt to maneuver around this inconvenient truth by arguing that the Chargois Agreement, *specifically*, was required to be disclosed because it was "highly relevant."  R&R at 319; Gillers Supp. Report  at 86-87 ("It is not necessary to conclude that class counsel must inform the Court, or the class, of every lawyer who seeks a fee in a matter for the work he or she performed.").  In doing so, the Master seeks to find an ethical violation based on a completely subjective and *ad hoc* judgment, and thus to punish Labaton even though it followed a clear rule without notice of purported wrongdoing.  *See*, *e.g.*, Ex. 235 (Rubenstein Dep.) at 75:2-3 ("I am adamantly saying the rules were clear."); *id.* at 126:20-22 ("I think that lawyers have the right to rely on the rules, and the rule is the Court can ask for the fee agreements if they want."); *id.* at 198:6-10 ("[Y]ou know, the law is clear here, and the lawyers have reason to rely on the clearness, the clarity of the law.  Rule 23 and Rule 54 could not be more clear . . .").

The Master's *ad hoc* finding of a MRPC 3.3(a) violation is impermissible.  "Due process requires that attorneys, like anyone else, not be subject to laws and rules of potential

random application or unclear meaning." *In re Discipline of an Atty.*, 442 Mass. 660, 668 (2004); *see also* Ex. 241 (Joy Rep.) at 52 ("Courts and ethics authorities do not impose sanctions on or discipline a lawyer or law firm when a legal or ethical duty is unclear."). The Master appears to acknowledge this – at least with regard to MRPC 1.5(e). *See* R&R at 337 ("[T]his goes to the question of notice to the practicing bar . . . [B]ecause this appears to be an issue of first impression and not one of which the profession might have been well-advised in advance, it would not be appropriate to impose professional discipline in these circumstances.").

Nevertheless, the Master presses forward with a finding of a MRPC 3.3(a) violation, which is contradicted by the governing Federal Rules of Civil Procedure and appears unprecedented. The Master's decision that the Chargois Agreement, unlike other fee allocation agreements, possesses some unique and subjective combination of characteristics requiring disclosure should be rejected. *See* R&R at 319. As Prof. Rubenstein explained, there "is nothing that the lawyers did here that was unusual." Ex. 235 (Rubenstein Dep.) at 104:5-6. Thus, discipline is unwarranted. *See, e.g.*, *In re Discipline of an Atty.*, 442 Mass. at 668, citing with approval *In re Ruffalo*, 390 U.S. 544, 554-556 (1968) (White, J., concurring) (discipline inappropriate "on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct").[65]

---

[65]     "The Special Master claims that the intent of the Special Master's investigation 'has been to identify true and unmistakable professional misconduct, to remedy wrongs and to put the law firms and the class roughly in a position that is proportionate to the conduct and harm.' This statement is contradicted by the Special Master's own conclusion that the alleged violation of Mass. R. Prof. C. 1.5(e), without which the Special Master could not find an alleged violation of Mass. R. Prof. C. 7.2(b), was a 'close call.' In my forty years of practice as a lawyer, my experience researching and writing on various legal ethics issues, and more than thirty years of experience teaching legal ethics to law students, lawyers, and judges, I have never found any lawyer disciplinary authority or court equate a 'close call' with 'true and unmistakable professional misconduct.' The Special Master's statement of the intent of the investigation is also contradicted by the Special Master's unprecedented findings of legal ethics violations of Mass. R. Prof. C. 1.5(e), 7.2(b), 1.2, 1.4, 3.3, and 8.4, for which the Special Master cites to no controlling authority in Massachusetts or the First Circuit, because there is no such law to support the Special Master's conclusions." Ex. S (Joy 6/28/18 Dec.) at 13 (citations omitted).

**H.      The Master's "General Candor to the Court" Argument Also Fails.**

The Master contends that Labaton violated its "broad duty of candor" to the Court.  R&R

at 322-26; 360-362.  The factually extreme cases cited by the Master are inapposite.  In *Pearson*

*v. First NH Mortg. Corp.* – the only First Circuit case cited by the Master – an attorney

submitted a statement to the Bankruptcy Court, as required by Fed. R. Bankr. P. 2014(a), stating

that he had "no connections" with the creditors or "any party in interest, their respect attorneys,

and accountants."  200 F.3d 30, 33 (1st Cir. 1999).  In fact, the attorney had "serious conflicts of

interest":  specifically, his firm represented the bank that was being sued by the attorney's

current client, who sought to have loan documents (which were likely drafted by members of the

attorney's firm) declared void.  *See id.* at 36-37.  The firm's representation of the bank also

presented several other serious conflicts.  *Id.*  The First Circuit found that the attorney violated

his duty of candor to the court, explaining that the attorney "submitted the verified statement

required under Fed. R. Bankr. P. 2014, which unequivocally asserted that there were no conflicts

of interest."  *Id.* at 38.

The Master and Professor Gillers also rely heavily on *United States v. Schaffer Equip.*, 11

F.3d 450, 457 (11th Cir. 1994).  Their nearly-identical descriptions of the case are quite

understated:  "In *Shaffer*, the government failed to disclose false testimony at the deposition of

its expert witness in a civil environmental case, and then moved for summary judgment without

relying on his opinion."  R&R at 323; s*ee also* Gillers Supp. Rep. (Ex. 233) at 89.  In fact, the

government's deception was much more extensive:  the individual in question, the EPA's "on-

scene coordinator" for the clean-up site, misrepresented his academic credentials (he had not

---

Ex. S (Joy 6/28/18 Dec.) at 13.

graduated from college).[66]  *Id.* at 460.  After learning of his misrepresentations, and despite

concluding that his credibility was relevant to the litigation as matter of law, the government did

not update interrogatory responses regarding his credentials.  *Id.* at 455.  Moreover, far from

merely moving "for summary judgment without relying on his opinion" (R&R at 323), the

government's summary judgment motion was "dependent on the administrative record"

compiled (and tainted) by the coordinator.  *Id.* at 461.  Litigating the case in reliance on this

administrative record, while concurrently obstructing the defendant's discovery regarding the

coordinator's credentials, comprised the violation of the government attorneys' duty of candor.

*See id.*

      This case is nothing like *Pearson* or *Shaffer*.  In *Pearson*, the attorney at issue was

required by rule to submit a statement and flatly lied about serious conflicts of interest in doing

so.  *See Pearson*, 200 F.3d at 38.  In *Shaffer*, the government litigated a case in reliance on a

fraudulent record and discovery misconduct.[67]  By material contrast, in this case, the applicable

rules did not require any disclosure, Labaton did not make any affirmative misrepresentation,

and the underlying referral fee was permissible, rather than an "irreconcilable" conflict of

interest.

---

[66]    The coordinator eventually pled guilty to perjury.  *Id.* at 452 n.1.

[67]    Prof. Gillers also relies on *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 959 (9th Cir. 2009). *See* Ex. 233 at 90.  *Rodriguez* is irrelevant.  It involved undisclosed incentive awards that uniquely incentivized the class representatives to settle, rather than risking trial.  *See id.*  Labaton disclosed the class representatives' service awards to the Court in this case, and included information about them in the class notice.  *See* Ex. 78 (11/2/16 Hr'g Tr.) at 31; Ex. 81 (Notice of Pendency of Class Actions) at 5. *Rodriguez* did not involve fee sharing agreements, which are specifically addressed by Rules 23 and 54.

## V.        DISCLOSURE TO THE CLASS WAS NOT REQUIRED.

### A.        The Payment to Chargois Came From Customer Class Counsels' Share of the Fee Award.

The Master premises his argument regarding Labaton's disclosure obligations to the class on the false notion that the payment to Chargois was made from "the class fund." *See* R&R at 277.  The Master's position ignores the mechanics of class action fee awards:

> I think it's an important distinction in a big case like that that there are these two phases; that the fee is set in the aggregate in the first phase.  That's the important phase [because] that's when the class' money is being taken from the class.  And that's the key to the whole thing in my opinion.  And then once the Court has decided that's a fair fee to take from the client, then the question of how the lawyers divide that fee up among themselves is what I refer to as the allocation phase which I think has less pertinence for the class in most cases.

Ex. 235 (Rubenstein Dep.) at 23:16-24:4.  The payment to Chargois came during the "allocation phase," after the Court had already determined that the amount of attorneys' fees payable from the total settlement fund was fair.  *See id.*  That  Customer Class Counsel paid a portion of their own fee award and allocated it to Chargois had absolutely no effect on the amount the class received.  *Hartless*, 273 F.R.D. at 646.

Moreover, the Master's argument is illogical.  In a state where bare referral fees are permissible, there is no basis to distinguish the fee paid to Chargois from the other fee allocations among class counsel (which also were not disclosed to the class).  A member of the class could challenge the payment to Chargois, just as a member of the class could challenge the amount received by another of the firms as not being commensurate with its performance.  Yet, inconsistently, the Master only believes that the Chargois Agreement required disclosure.  *See* R&R at 273-74.

### B.     The Federal Rules of Civil Procedure Do Not Require Disclosure to the Class of the Fee-Sharing Agreement With Chargois.

The Master admits, as he must, that Rule 23 does not require disclosure to the class in the settlement notice of attorney fee agreements.  *See* R&R at 280-81 & n.231.[68]  Rule 23(h)(1) governs notice to the class in connection with attorney's fees.[69]  The Rule says nothing regarding disclosure of fee agreements in the settlement notice.  Rather, it provides that claims for attorneys' fees be made by motion with notice of the motion served on all parties and class members "in a reasonable manner."  *Id.*  Thus, Rule 23 relies on the fee motion to provide information regarding fees to the class, and as such, is dependent on the Court to order disclosure.  *See* Fed. R. Civ. P. 23(h)(1); Fed. R. Civ. P. 54(d)(2); *see also* § IV.B, *supra*; *Bernstein*, 814 F.3d at 137-38 n.2  (explaining that Fed. R. Civ. P. 23(h) "does not mandate automatic disclosure of all fee-sharing arrangements in class actions").  As Prof. Rubenstein explained:

> Class action law generally does not put fee allocation information in the class notice . . . I would say it's not an expected part of the notice process in a class action that the allocations as to what each lawyer's getting is put in the notice . . . If the class members want to know that information, they can come forward and ask the Court to release it.  I hope the Court would.  But it's not expected in a class action that the allocation as to what each lawyer is getting is ever in the notice to the class.

Ex. 235 (Rubenstein Dep.) at 188:6-20.[70]

In short, as the Master recognizes, there is no requirement that information regarding fee agreements or allocations be described in the class notice.

---

[68]     The content of a settlement notice under Rule 23(e) "is committed to the discretion of the trial judge."  3 William B. Rubenstein, *Newberg on Class Actions* § 8:17 (5th ed. 2013) (Ex. T).

[69]     As Professor Green testified, "[i]n my view the kinds of notice you give to a class is governed by Rule 23 and case law that develops under Rule 23."  Ex. 230 (Green Dep.) at 152:12-14.

[70]     *See also* Ex. 234 (Rubenstein Rep.) at 27-30 (Prof. Gillers' argument that "class counsel must disclose fee-sharing agreements in the class's notice . . . is not supported by the text of Rule 23, nor the cases interpreting it."); *see also* Ex. 241 (Joy Rep.) at 50-52.

### C.   The Rules of Professional Conduct Do Not Require Disclosure.

Simply put, because there was no requirement to disclose fee allocation agreements to the class, failure to do so is not an ethical violation.  Rule 23 provides the standards relating to class counsel's duties to the class.  *See* Fed. R. Civ. P. 23(g)(4) ("*Duty of Class Counsel*. Class counsel must fairly and adequately represent the interests of the class.").  Courts view counsels' duties toward the class as "coextensive" with the requirements of Rule 23.  *See* Ex. 235 (Rubenstein Dep.) at 154:16-20 ("What the Court found [in other cases] was that there was not a breach of fiduciary duty because Rule 23 had been complied with and hence in some ways what the Court's saying is that whatever fiduciary duty the lawyer had was co-extensive with its Rule 23 duties."); Ex. S (Joy Decl. 6/28/2018) at 11 ("Labaton's ethical obligations to keep class members reasonably informed as to the proposed settlement are shaped by its legal obligations under the Rules of Civil Procedure, which the Special Master found as a matter of law Labaton had met.").  And, with regard to fee agreements in particular, Rule 23 provides that they must only be disclosed upon the court's order.  As Prof. Joy explained, "[w]ithout a disclosure obligation to the Court and without a clear obligation to disclose how fees would be divided to the class, there was no obligation for Labaton to disclose [] the fee sharing agreement with Chargois & Herron to the class members."  Ex. 241 (Joy Rep.) at 50.[71]

Yet the Master argues that class counsel's role as a fiduciary created an obligation to disclose the Chargois Agreement to "at least the[] named plaintiffs/class representatives."  *See* R&R at 284-85.  As with many of his other legal findings, the Master's conclusion is unsupported by any case law and appears unprecedented.  *See* Ex. 241 (Joy Rep.) at 51; Ex. 253

---

[71]      Professor Joy explained further during his deposition:  "It was sufficient to notify class members about the fees.  It didn't have to describe the division of fees because the court did not use Rule 54(d) to order that the terms of any agreement about fees for which the claim is being made be disclosed."  Ex. 227 (Joy Dep.) at 145:14-19.

(Gillers 3/20/18 Dep.) at 150:3–7.[72]  Lacking any legal authority and ignoring that Rule 23

provides the applicable standards in the class action context, the Master turns to MRPC 1.2 and

1.4.  However, his reliance on MRPC 1.2 and 1.4 is misguided and does not withstand scrutiny.[73]

Neither Rule mentions anything about attorney's fees or appears to have any bearing on this

situation.[74]  Stating the obvious, MRPC 1.5 addresses the requirements for communications with

---

[72]     "Q:  Sir, you list some cases in this section, but none of the cases you cite hold that counsel must disclose fee allocations to class members, do they?  A:  No."  *See also id.* at 150:17–22 ("Q:  Can you cite us to a case that says that class counsel has the obligation to notify the unnamed class members; that is, the non-named plaintiffs, of a referral fee that's going to come out of class counsel's fee?  A:  No."); *id.* at 156:20–157:1 ("You're seeking to impose a duty of disclosure of a fee division that no Court has yet imposed in any written decision, right?  A:  So far as I know, but it's not -- it's an analysis under the Massachusetts rules.  It's not an analysis under Rule 23.").

[73]     As the Master explained, "the class is not a client for all purposes."  R&R at 284; *see also See* 5-23 *Moore's Federal Practice - Civil* § 23.120 (2018) ( "[T]he post-2003 appointment procedures probably sharpen the differences in ethical obligations between class-action attorneys and the 'customary obligations of counsel to individual clients.'"); *see also* Ex. 235 (Rubenstein Dep.) at 151:19-21 (explaining that members of the certified class are "clients for some purposes, and they're not clients for other purposes.").  Moreover, as courts have recognized, class actions are legally unique situations that do not always neatly fit within the standard framework of ethical rules.  *See Rand v. Monsanto Co.*, 926 F.2d 596, 600 (7th Cir. 1991) ("We conclude that DR 5-103(B) is inconsistent with Rule 23 and therefore may not be applied to class actions.").  For example, conflicts rules – which are suited to individual clients – are "much laxer" in the class action context.  *See* Ex. 235 (Rubenstein Dep.) at 151:23-153:10.

[74]     MRPC 1.2 provides:

    a.    A lawyer shall seek the lawful objectives of his or her client through reasonably available means permitted by law and these Rules.  A lawyer does not violate this Rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his or her client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.  A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter.  In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial, and whether the client will testify.

    b.    A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social, or moral views or activities.

    c.    A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent.

    d.    A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel

clients regarding fee agreements.  *See* Mass. R. Prof. C. 1.5; *see also* § III.B, *supra*.  But the

Master does not mention MRPC 1.5 when discussing the fee-related information that he suggests

Labaton was required to convey to the class (presumably, the Master realizes that applying

MRPC 1.5(e) to a class situation is unworkable, so he instead relies on general principles from

other rules.); *see* Ex. 227 (Joy Dep.) at 154:9-14 (explaining that Labaton had a fiduciary duty to

the class, "but not one that encompassed disclosing the fee-sharing arrangement").[75]

　　In sum, the "Special Master's finding that Mass. R. Prof. C. 1.2 and 1.4 imposed

additional ethical obligations on Labaton where there were no legal obligations, and no ethical

guidance in Massachusetts reaching a similar conclusion, is unprecedented and inconsistent with

Massachusetts case law and lawyer disciplinary authority."   Ex. S (Joy Dec. 6/28/2018) at 11.

---

or assist a client to make a good faith effort to determine the validity, scope,
meaning, or application of the law.

MRPC 1.4 provides:

　　a.　　A lawyer shall:

　　　　(1)　　promptly inform the client of any decision or circumstance with respect
to which the client's informed consent, as defined in Rule 1.0(f), is
required by these Rules;

　　　　(2)　　reasonably consult with the client about the means by which the client's
objectives are to be accomplished;

　　　　(3)　　keep the client reasonably informed about the status of the matter;

　　　　(4)　　promptly comply with reasonable requests for information; and

　　　　(5)　　consult with the client about any relevant limitation on the lawyer's
conduct when the lawyer knows that the client expects assistance not
permitted by the Rules of Professional Conduct or other law.

　　b.　　A lawyer shall explain a matter to the extent reasonably necessary to permit the
client to make informed decisions regarding the representation.

[75]　　The Master's argument is also illogical:  he contends that MRPC 1.2 and 1.4 required disclosure
of the "Chargois Arrangement," which he defines as the agreement to pay Chargois 20% of fees earned in
cases where ATRS was a plaintiff.  Thus, because MRPC 1.5 does not require disclosing the size of a
referral fee unless the client asks, the Master essentially argues that Labaton was obligated to convey
more information to the class than it was required to disclose to ATRS, its direct client.  *See* MRPC 1.5
cmt. 7A ("The Massachusetts rule does not require disclosure of the fee division that the lawyers have
agreed to, but if the client requests information on the division of fees, the lawyer is required to disclose
the share of each lawyer.").

The Court should reject the Master's attempts to cast ill-fitting rules – which do not govern fee disclosures – as the controlling standards in this situation.  Instead, the Court should apply Fed. R. Civ. P. 23, which specifically addresses fee disclosures in class actions and did not require disclosure of the Chargois Agreement.  *See* Fed. R. Civ. P. 23(h)(1).

### D.   The Court Has Endorsed the Notice Provided by Labaton.

The Master's arguments regarding the Notice of Pendency of Class Actions (the "Notice") ring especially hollow when considering recent actions taken by this Court.  In *Arkansas Teacher Retirement System v. Insulet Corp.*, in which Bernstein Litowitz represents ATRS, the parties conducted a preliminary settlement hearing on March 9, 2018, at which the Court reviewed the draft settlement notices provided by the parties and provided guidance and instruction as to how they should be revised.  1:15-cv-12345 (D. Mass) (Wolf, J.).  Although the Bernstein attorneys explained that two law firms which had not appeared in the case would be receiving fees in the form of expenses, the Court did not direct Bernstein to include this information in their class notice.  *See* March 9, 2018 Hearing Tr. at 12 (ECF 120) (Ex. R); *see also* p. 9, *supra*.  Instead, the Court explained that the notice regarding the fee petition need only include the aggregate amount of fees being requested:  "[i]f it's your intention to ask for 25%, all you have to say is the lawyer is going to ask for 25%."  *Id*.

Notably, in *Insulet*, the Court directed the parties to use the notice sent by ATRS in this case as a "template."  *See* March 9, 2018 Hearing Tr. at 29-30 (Ex. S).  Apparently, at that point, the Court may have been aware of the Chargois Agreement.[76]  Nevertheless, although the Notice did not describe or mention the Chargois Agreement or any other fee allocation information among any of the counsel in the case, the Court held it up as a model for other law firms.  *See id.*

---

[76]     *See* Ex. U (5/30/18 Hearing Tr.) at 73 (the Court, in response to a statement about *Insulet*, explained that it has been "educated" by the State Street case).

The Court's endorsement of ATRS' Notice demonstrates that it provided sufficient information to the class.

## VI.   LABATON DID NOT BREACH ANY DUTIES TO CO-COUNSEL.

The Master labors to conclude that Labaton breached a duty that it owed to the other firms.  The Master claims that Labaton's supposed "breaches of duty to its co-counsel spring from two separate but related sources": (1) its role as Lead Counsel and (2) "settled principles of contract law."  R&R at 347.  The Master is incorrect.  Labaton had no such duties.

### A.   Labaton Did Not Breach an Ethical or Legal Duty by Not Disclosing the Chargois Agreement.

The Master contends that Labaton, as class counsel, had a general duty to disclose the Chargois Agreement to the other plaintiffs firms in the *State Street* litigation.  He does not explain or define the duty that he references, other than stating that Labaton had "a duty to act fairly, efficiently, and economically," and was required to meet a "demanding standard of trustworthiness."  R&R at 287-295, 347.  The Master describes these generalities as reflective of "important duties," but offers no meaningful analysis or explanation.  *Id.* at 287; 289.  Nevertheless, he determines (in entirely conclusory fashion) that "general principles of fairness and professional responsibility toward co-counsel, and toward the Court, strongly suggest that Labaton was required to disclose the Chargois agreement."  R&R at 290.

Leaving aside the Master's general statements, Labaton had no legal duty to disclose or further describe the Chargois Agreement to the other firms.  There was no requirement imposed by the law governing class actions.  Ex. 235 (Rubenstein Dep.) at 47:13-15 ("I don't know of anything in class action law that addresses this directly.").  Moreover, it is clear that Labaton did not owe any such duty under the Massachusetts Rules of Professional Conduct.  Ex. 229 (Wendel Dep.) at 172:1-12 (agreeing that "there is nothing in the Massachusetts Rules of

Professional Responsibility that would require Labaton to fully disclose the nature of its relationship with Chargois . . . to Lieff and Thornton."); Ex. 240 (Green Rep.) at 24 ("The Professional Conduct Rules are meant to protect clients and the public, not to protect lawyers from over-reaching by their colleagues.").

Accordingly, the fact that Labaton or the other Customer Class Counsel did not disclose the payment to Chargois to the ERISA firms was not a violation of the Massachusetts Rules of Professional Conduct or any duty of candor imposed by class action law.  *See* Ex. 229 (Wendel Dep.) at 172:1-12; Ex. 240 (Green Rep.) at 24; Ex. 235 (Rubenstein Dep.) at 47:13-15.[77] Likewise, the fact that Labaton did not disclose the full parameters of the Chargois Agreement (i.e., that it was a bare referral fee) to Lieff did not violate any ethical duty or duty of candor. *See id.*[78]

---

[77]    Although the Master relies heavily on Labaton's role as Lead Counsel and the purported duties that flow from that position, ERISA counsel was not forthcoming about their own fee arrangements.  Not one of the three lead ERISA Firms who received a distribution of fees from the Lead Counsel Escrow Fund disclosed complete information to the ERISA plaintiffs regarding their own fee sharing arrangements.  *See* Ex. 27 (Keller Rohrback L.L.P.'s Responses to Special Master Honorable Gerald E. Rosen's (Ret.) Second Supplemental Interrogatories) at 7 (explaining that the named plaintiffs approved ERISA counsel receiving 9% of the aggregate award and approved the 25% award being sought, but that "[t]he specific dollar allocations of fees to individual class law firms from the gross fee award was not detailed in any written disclosure to the ERISA named plaintiffs, other ERISA class members, or the ERISA counsel," nor was the amount paid by Keller Rohrback to Hutchings Barsamian disclosed to the other firms); Ex. V (McTigue Law LLP's Responses to Special Master Honorable Gerald E. Rosen's (Ret.) Second Supplemental Interrogatories to McTigue Law) at 4-5 (contending that the filing and posting of lodestars operated as disclosure to the ERISA class, but conceding that neither the agreements with Customer Counsel nor agreements among ERISA attorneys about the sharing of fees were disclosed to ERISA class members, nor was the "division of fees among *Henriquez* Counsel" disclosed to Customer Class Counsel); Ex. W (Zuckerman Spaeder LLP's Answers to Special Master's Second Supplemental Interrogatories ) at 4 (claiming that ERISA class members had "constructive notice" that other firms might receive some amount of the fees, but conceding that actual payments by Zuckerman Spaeder to three different law firms were never disclosed to the ERISA class or the other firms).

[78]    The Master found that Garrett Bradley was aware of the Chargois Agreement.  R&R at 353. Other evidence in the record indicates that TLF was generally aware that Chargois was being paid for a referral fee.  *See* Ex. X (TLF-SST-033911).

### B.        Labaton Did Not Breach a Contractual Duty.

The Master's contract analysis, which he uses to justify reallocating an additional $3.4 million to ERISA counsel, should be rejected.  At the outset, Labaton is not interested in litigating a contract dispute among the other counsel involved in the *State Street* litigation based on claims instigated by the Master.[79]  Nevertheless, because he has injected this element into the case, Labaton is constrained to respond to the Master's faulty reasoning.

As to ERISA counsel, the Master relies on a non-disclosure theory.  *See* R&R at 297-99. This is unavailing.  It is well-settled that "[i]n the absence of an affirmative misrepresentation, an action for fraud requires 'both concealment of material information and a duty requiring disclosure.'"  *Smith v. Zipcar, Inc.*, 125 F. Supp. 3d 340, 344 (D. Mass. 2015) (*quoting Sahin v. Sahin*, 435 Mass. 396, 758 N.E.2d 132, 138 n.9 (Mass. 2001)).  In other words, without a duty to disclose, there is no actionable omission.  *Id.*

Labaton did not owe a duty to disclose to the ERISA firms.  Such a duty arises only in "discrete situations."  *See Wolf v. Prudential-Bache Sec.*, 41 Mass. App. Ct. 474, 476, 672 N.E.2d 10, 12 (1996).  One such situation is where "there is a fiduciary or other similar relation of trust and confidence" between the parties.  *Stolzoff v. Waste Sys. Int'l*, 58 Mass. App. Ct. 747, 763 (2003).[80]  Beyond a strictly legal fiduciary relationship (e.g., trustee-beneficiary or attorney-

---

[79]        The Master acknowledges that he is, in effect, creating this dispute, rather than adjudicating one raised by the parties.  R&R at 296 ("Cognizant of the limitations of contract principles in this particular context – outside a typical dispute between bargaining parties – contract principles nevertheless inform the Special Master's assessment of the equitable implications of the nondisclosure to co-counsel, and consideration of a court's fiduciary duty to safeguard class settlement funds and its equitable authority to modify and unfair and unreasonable fee allocation among class counsel.").

[80]        The Master relies on *DeMarco v. Granite Sav. Bank* for the proposition that a duty to disclose may arise "where the relationship of the parties creates a particular legal or equitable obligation to communicate all facts."  1993 Mass. App. Div. 122, 124 (Mass. App. Ct. 1993).  However, that case involved a bank that owed a fiduciary duty to its client.  *See id.* ("[T]he Bank assumed the role of the plaintiffs' agent , and all duties incident to such fiduciary role, including the duty of full disclosure to the plaintiffs.") (internal citations omitted).

client), Massachusetts courts recognize a relationship of "trust and confidence" requiring disclosure in the limited circumstance where one party is "dependent on another's judgment in business affairs or property matters," such that the relationship effectively is a fiduciary one. *See Markell v. Sidney B. Pfeifer Found., Inc.*, 9 Mass. App. Ct. 412, 443-44 (1980) (recognizing relationship of "trust and confidence" and attendant fiduciary responsibilities where elderly aunt "had the utmost trust and confidence" in her nephew, who was an attorney, and relied on his "judgment and integrity in committing to him the management of her securities"); *see also Smith v. Jenkins*, 626 F. Supp. 2d 155, 171 (D. Mass. 2009) ("Whether a relationship of trust and confidence exists is a question of fact. . . . The relationship may be found on evidence indicating that one person is in fact dependent on another's judgment in business affairs or property matters.").  Neither of these circumstances applies to Labaton.

As the Master notes, Labaton was not the ERISA firms' fiduciary.  *See* R&R at 298 n.245.  This Court, in the context of a class action fee dispute, found that counsel did not owe a fiduciary duty to an attorney challenging his share of the fee award.  *Sobran v. Millstein*, 148 F. Supp. 3d 71, 72 (D. Mass. 2015) ("This Court agrees that the Defendants do not owe Sobran any sort of fiduciary duty.").  As noted in that decision, the Massachusetts Court of Appeals has "suggested that there was no 'direct duty of care between co[-]counsel.'"  *Id.* (*quoting Bartle v. Berry*, 80 Mass. App. Ct. 372, 379 (2011)).  Although the Massachusetts Court of Appeals did not decide in *Bartle* the issue of whether a fiduciary duty exists between co-counsel, it explained that courts in other jurisdictions have "flatly rejected any imposition of a duty of care owed by

one attorney to another to protect an attorney's prospective interest in contingency fees." *Bartle*, 80 Mass. App. at 379.[81]

Nor did Labaton and the ERISA firms share a relationship of "trust and confidence" creating a fiduciary-like duty on Labaton's part.  Although the Master notes that Labaton was expected to act "fairly" and demonstrate "trustworthiness" as lead counsel, the relationship between Labaton and the ERISA firms does not resemble the dependent and one-sided dynamic necessary to create a fiduciary-like duty under Massachusetts law.  *See, e.g., Markell*, 9 Mass. App. Ct. at 444.  Stating the obvious, the ERISA firms – comprised of attorneys and actively negotiating for their share of the fee – were not dependent on the judgment of Labaton to care for them in the way that Massachusetts law requires.  *See id.*; *see also, e.g., Adley v. Burns*, No. 16-12265-WGY, 2018 U.S. Dist. LEXIS 81899, at *13 (D. Mass. May 15, 2018) ("While Adley may have trusted in the Defendants' judgment . . . Adley, a fully independent adult and then-active federal agent, was fully capable of making his own business decisions and thus was not dependent on the Defendants' judgment in the same way as the individuals in *Rood* and *Markell*.").

To the contrary, the fee-sharing agreement between Customer Class Counsel and the ERISA firms was a bargained-for contract that (according to Lynn Sarko) was negotiated during a period of "distrust between certain ERISA lawyers and certain customer class lawyers."  *See* Ex. 37 (Sarko 9/8/17 Dep.) at 82:8-14; *see also* Ex. 159 (McTigue 9/8/17 Dep.) at 23:18-23; 29:22-24 (discussing "leverage" and "bargaining power" in fee negotiations with Customer Class

---

[81]     *See also Scheffler v. Adams & Reese, LLP*, 950 So. 2d 641, 653 (La. 2007) ("Accordingly, we  hold that, as a matter of public policy, based on our authority to regulate the practice of law pursuant to the constitution, no cause of action will exist between co-counsel based on the theory that co-counsel have a fiduciary duty to protect one another's prospective interests in a fee."); *Beck v. Wecht*, 28 Cal. 4th 289, 298 (Cal. 2002) ("The better approach, we conclude, is a bright-line rule refusing to recognize such a fiduciary duty."); *Mazon v. Krafchick*, 158 Wash. 2d 440, 448 (Wash. 2006) (adopting "a bright-line rule that no duties exist between cocounsel that would allow recovery for lost or reduced prospective fees.").

Counsel).  Simply put, there was nothing like a fiduciary duty on Labaton's part (or the other

Customer Class Counsel) in the fee negotiations with the ERISA firms.  Thus, there was no

contractual duty to volunteer information about the Chargois Agreement.  *See* Ex. 162 (4/13/18

Hr'g. Tr.) at 275 (Lieff's attorney explaining that the Chargois Agreement should not have been

disclosed to the ERISA firms because they "have no business in that"); *Sobran*, 148 F. Supp. 3d

at 72 (finding no duty of care between co-counsel in a class action); *see also Frontier Mgmt. Co.*

*v. Balboa Ins. Co.*, 658 F. Supp. 987, 990 (D. Mass. 1986) ("[A]n arms length business

relationship generally will not give rise to fiduciary duties").[82]

## VII.   OBJECTIONS TO MASTER'S PROPOSED REMEDIES.

### A.   The Master's Double-Counting Remedy Should Be Rejected.

Labaton objects to the Master's recommended remedy for Customer Class Counsels'

double-counting error on their lodestar petitions – specifically, that the Customer Class Counsel

disgorge in equal amounts the entire double-counted time ($4,058,000).  R&R at 363-64.  The

Master acknowledges that the error was "inadvertent," yet the Master concludes that a remedy is

nevertheless necessary.  *Id.* at 363.  The Master is entirely without legal support for his

recommendation. *See id.* at 363-64.  In fact, the law in the First Circuit is quite clear and for the

reasons explained below no disgorgement is appropriate in these circumstances.

First, the Master lauds the work done by Labaton and its team of attorneys.  The billing

rates for Labaton partners, associates and staff attorneys were reasonable.  R&R at 174, 176,

180.[83]  Labaton kept contemporaneous time records and the hours presented on its fee petition

---

[82]      The Master's contractual analysis regarding disclosures to Lieff is also incorrect as a matter of
law.  However, given Lieff's position that it is not seeking relief from Labaton (*see* R&R at 352), Labaton
will not press this point.

[83]      Unlike Lieff and Thornton, Labaton did not use contract attorneys and its staff attorneys
"performed substantive and valuable work beyond simple document review."  R&R at 172.

were reasonable. *Id.* at 202, 210. The time spent by Labaton's team running the litigation "was commensurate with its role as Lead Counsel as well as with the complexity and extremely hard-fought nature of the five-year long litigation." *Id.* at 213.

Second, the lodestar submission provided by Customer Class Counsel was a cross-check, not the basis for payment. *See, e.g.*, Rubenstein Resp. Dec. 19. Thus, the roughly $4 million double-counting error did not result in a $4 million higher fee for Customer Class Counsel. Instead, it merely altered the cross-check that the Court used in determining whether a 25% fee was reasonable. As such, "the critical question is the effect that the lodestar error had on the cross-check." *Id.*

In this case, the double-counting error did not materially affect the cross-check. Correcting for the double-counting error increases the lodestar multiplier from 1.8 to approximately 2.0. Ex. Y (Rubenstein Decl. in Support of Customer Class Counsels' 8/1/17 Consolidated Response) ("Rubenstein 7/31/17 Dec.") at 30-31. As Prof. Rubenstein explains, his empirical analysis demonstrates that a "2 multiplier is consistent with multipliers that courts have previously approved in similar circumstances." *Id.* It also is still well within the acceptable range in this Circuit. *See, e.g.*, *Harden Mfg. v. Pfizer, Inc (In re Neurontin Mktg. & Sales Practices Litig.)*, 58 F. Supp. 3d 167, 172 (D. Mass. 2014) (describing a multiplier of 3.32 as well within the appropriate range), *citing* 4 Newberg on Class Actions § 14:7 (4th ed. 2002) ("Generally, multipliers from 1-3 are the norm."). Thus, while the double-counting error was an unfortunate mistake, its effect on the multiplier "in the context of this case was not significant." Ex. Y (Rubenstein 7/31/17 Dec.) at 12.

The Master does not even attempt to explain the basis for his proposed remedy, which has no grounding in law or fact. *See id.* at 363-64. Moreover, the substantial disgorgement

proposed by the Master is disproportionate to Labaton's conduct, which the Master found was unintentional.  The Court should reject his illogical and unsupported recommendation that an inadvertent mistake on Customer Class Counsels' lodestar submissions, which did not materially affect the multiplier, should result in a loss equal to the double-counting amount.  Courts routinely reduce lodestars (based on attorney rates or other factors) and still conclude that the percentage fee was reasonable based on the adjusted multiplier.  *See* Rubenstein Resp. Dec. at 19-21 and cases cited therein.  Here, the 25 percent fee award to Customer Class Counsel is well within the range of reasonable and customary in the First Circuit even when cross-checked against a multiplier of 2.  As a result, the Court should reject any disgorgement remedy based on the double-counting mistake.

### B.      The Master's Chargois Payment Remedy Should Be Rejected.

Labaton objects to the Master's recommendation that the Firm on its own disgorge $4.1 million reflecting the payment to Chargois.  *See* R&R at 368-71.  For the reasons set forth above, no remedy is appropriate against Labaton for its payment of a referral fee to Chargois as permitted by long-standing Massachusetts law, as consented to by ATRS, and as in compliance with the Federal Rules of Civil Procedure and the Massachusetts Rules of Professional Conduct.

Labaton further objects to the Master's recommendation that the vast majority of such payment ($3.4 million out of $4.1 million) be provided to ERISA counsel.  This recommendation is unwarranted and inconsistent with the Master's positions during this investigation and in his Report.  *See, e.g.*, R&R at 313 ("The Court had the authority . . . to deny any part of the recovery to Chargois . . . and instead to direct that the money intended for Chargois should instead go to the class.").

### C.   The Master's Recommendation of Ongoing Ethical Supervision By the Court Or Otherwise Should Be Rejected.

Labaton objects to the Master's recommendation that the firm "work with the Court to establish a consulting process that will ensure consistent ethical compliance."  R&R at 373.  This is both unnecessary and inappropriate.

First, for the reasons explained herein, Labaton complied with the Federal Rules of Civil Procedure and the Massachusetts Rules of Professional Conduct and the custom and practice in the First Circuit as confirmed by its five expert witnesses and by Lieff's expert Professor Rubenstein.  Professor Gillers is a lone outlier, propounding arguments regarding fee-sharing that are unprecedented, incorrect, and not "believable."[84]  Moreover, because the Master correctly concluded that the double-counting mistake was inadvertent, there is no reason for any ongoing ethics supervision.

Second, it would be highly inappropriate for the Court to inject itself in an ongoing way into an out-of-state law firm's practices and procedures.  This would implicate serious attorney-client privilege concerns, among other things.  The Master is unsure whether the Court has such authority beyond the present case.  *See* R&R at 373.  Perhaps as a result of this uncertainty, and in keeping with the profession's tradition of regulating itself, Labaton has not located an example where a federal district court was appointed to have an ongoing role in the conduct of a law firm in circumstances such as these.  Nothing in this case warrants the recommendation made by the Master.

---

[84] See Ex. 235 (Rubenstein Dep.) at 73:7-19 ("I think it was made up after the fact to fit the facts of this case.").

## VIII.   CONCLUSION

Labaton requests that the Court, following its *de novo* review, reject the Master's factual findings and legal conclusions as objected to herein and also reject to the Master's proposed remedies relating to Labaton.


Dated: June 28, 2018                              Respectfully submitted,


                                        By: */s/ Joan A. Lukey*
                                             Joan A. Lukey (BBO No. 307340)
                                             Justin J. Wolosz (BBO No. 643543)
                                             Stuart M. Glass (BBO No. 641466)
                                             Choate, Hall & Stewart LLP
                                             Two International Place
                                             Boston, MA 02110


                                             *Counsel for Labaton Sucharow LLP*


### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to all counsel of record on August 8, 2018.

                                        */s/ Joan A. Lukey*
                                        Joan A. Lukey