## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>Plaintiffs,<br>v.<br>STATE STREET BANK AND TRUST COMPANY,<br>Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated,<br><br>Plaintiffs,<br>v.<br>STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20,<br>Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated,<br><br>Plaintiffs,<br>v.<br>STATE STREET BANK AND TRUST COMPANY,<br>Defendant. | No. 12-cv-11698 MLW |

## THORNTON LAW FIRM LLP'S
## NOTICE OF FILING OF OBJECTIONS
## TO SPECIAL MASTER'S REPORT AND RECOMMENDATIONS

On June 28, 2018, the Thornton Law Firm LLP filed under seal its Objections to the Special Master's Report and Recommendations and exhibits in support thereof. A redacted copy of the Objections was filed on the public docket as ECF 361. The Thornton Law Firm hereby files on the public docket a version of its Objections with a more limited set of redactions. The only redactions remaining are those necessary to reflect the redactions set forth on the exhibits to the Special Master's Report and Recommendations, as filed publically by the Special Master with agreement of all counsel at ECF 401. The exhibits in support of the Objections are hereby filed on the public docket in unredacted form, with the exception of exhibits 18 and 19, to which

minor redactions have been made to protect information subject to the attorney work product

doctrine.[1]

Respectfully submitted,

*/s/ Brian T. Kelly*
Brian T. Kelly (BBO No. 549566)
Joshua C. Sharp (BBO No. 681439)
NIXON PEABODY LLP
100 Summer Street
Boston, MA  02110
Telephone: (617) 345-1000
Facsimile:  (844) 345-1300
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com

Dated: August 10, 2018                           *Counsel for the Thornton Law Firm LLP*


## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically on August 10, 2018 and thereby
delivered by electronic means to all registered participants as identified on the Notice of
Electronic Filing ("NEF").

*/s/ Joshua C. Sharp*
Joshua C. Sharp

---

[1] To the extent such redactions require a Motion to Impound, the Thornton Law Firm respectfully refers
the Court to its Motion to Impound Objections to Special Master's Report and Recommendations (ECF
360) and modifies the Motion to request impoundment only of the redacted information in exhibits 18 and
19 and the limited set of redactions to the Objections.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br><br>Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20,<br><br>Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br><br>Defendant. | No. 12-cv-11698 MLW |

**THORNTON LAW FIRM LLP'S OBJECTIONS TO**
**THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

    A.     Double Counting ................................................................................ 1

    B.     Intent ................................................................................................. 4

    C.     The Boilerplate Affidavit .................................................................. 7

    D.     Michael Bradley ................................................................................ 9

    E.     Contract Attorneys ........................................................................... 9

ARGUMENT ..................................................................................................... 11

I.     The Double Counting Error Was Inadvertent And The Special Master's
Recommendation Of $4 Million Disgorgement Is Unjustified ........................ 11

    A.     The Double Counting of Staff Attorney Hours Was Inadvertent And Not
Thornton's Fault .............................................................................. 13

    B.     The Proposed "Disgorgement" of $4,058,000 Is Unjustified And
Misapprehends the Function of the Lodestar Cross-Check ................ 13

    C.     Thornton Is Not Responsible For The Inadvertent Double Counting ... 17

    D.     The $425 Per Hour Rate Used By Thornton For Staff Attorney Work Is
Reasonable And Justified .................................................................. 22

II.    Garrett Bradley Did Not Intentionally File A False Declaration .................... 26

    A.     There Was No Motivation To Deceive Co-Counsel ........................... 26

    B.     There Was No Motivation To Deceive The Court .............................. 35

    C.     The Special Master's Assertion That Garrett Bradley Did, In Fact, Closely
Review The Declaration Prior To Submission Is Based On A Blatant
Misrepresentation Of The Evidence ................................................... 37

    D.     The Special Master's Assertion That Garrett Bradley Had The
"Opportunity" To Give The Declaration A "Close Read" Is
Unobjectionable, But Does Not Prove Bradley Intentionally Filed A False
Declaration ...................................................................................... 39

    E.     The Special Master's Finding Of Intentional Misrepresentation Is Belied
By His Inability To Decide Whether Or Not Garrett Bradley Actually
Read The Declaration ....................................................................... 40

    F.     The Special Master's Assertion That Garrett Bradley Admitted He
Intentionally Lied To The Court Grossly Mischaracterizes The Evidence ......... 41

    G.     In Fact, Garrett Bradley Made A Mistake And Corrected The Mistake At
the Appropriate Time ....................................................................... 42

III.    The Thornton Law Firm Did Not Violate Rule 11 ...................................... 44

    A.     Isolated Factual Errors Cannot Serve As The Basis For Rule 11 Sanctions ........ 44

    B.     The Statements In The Affidavit Do Not Support Rule 11 Sanctions ................. 46

# TABLE OF CONTENTS

**Page**

   i.  Staff Attorneys As Employees .................................................. 46

   ii.  Time Records ............................................................................ 48

   iii.  Rates Accepted In Other Actions ............................................. 50

   iv.  Current And Regular Rates ....................................................... 53

  C.  Double Counting ................................................................................ 57

  D.  Materiality And Intent ....................................................................... 58

IV. The Recommended Sanctions Are Incompatible With Rule 11 ...................... 59

  A.  The Recommended Sanction Exceeds What Is Necessary For Deterrence .......... 60

  B.  The Recommended Sanction Is Extraordinary When Compared With First Circuit Precedent .................................................................................. 62

   i.  *In re Nosek* ............................................................................. 63

   ii.  *In re 1095 Commonwealth Corp.* ........................................... 64

   iii.  *Sanchez v. Esso Standard Oil de Puerto Rico* ......................... 65

  C.  The Special Master Has Ignored Rule 11's Prohibition On Imposition Of Monetary Sanctions Post-Settlement ................................................. 66

V. Garrett Bradley Should Not Be Referred To The Board of Bar Overseers .......... 67

  A.  The Conduct At Issue Affects All Firms Yet The Special Master Unfairly Recommends Only Garrett Bradley For Discipline ........................... 67

  B.  The Special Master's Reliance On *Matter of Schiff* Is Clearly Wrong ............ 67

  C.  Garrett Bradley Did Not Violate MRPC 3.3 or 8.4 ............................. 72

VI. The Customer Class Law Firms Properly Listed Contract Attorneys On The Lodestars .................................................................................................... 78

VII. The Special Master's Proposed 50% Reduction In Rate For Michael Bradley's Work Is Unjustified ................................................................. 83

  A.  Any Reduction In Michael Bradley's Rate Is Immaterial To The Fee Award ................................................................................................ 89

VIII. The Recommended Payment Of $3.4 Million To ERISA Counsel Is Unjustified And Based On Erroneous Findings ................................................ 92

  A.  The Special Master's Conclusion That The ERISA Trading Volume Was "Actually 12-15%" Is Wrong ........................................................ 93

  B.  The Special Master's Finding That The $10.9 Million "Fee Cap" Applied To ERISA Counsel's Fees Only Is Wrong ....................................... 100

## TABLE OF CONTENTS

**Page**

    C.    The Special Master Wrongly Concludes That Customer Class Counsel Sought To Prevent ERISA Counsel From Reviewing Documents And Omits Testimony From ERISA Counsel That Directly Contradicts This Erroneous Finding................................................................................. 103

IX.    The Recommendation That A Monitor Be Appointed Is Baseless................................ 108

CONCLUSION........................................................................................................ 110

CERTIFICATE OF SERVICE ................................................................................. 111

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re 1095 Commonwealth Ave. Corp.*,
    204 B.R. 284 (Bankr. D. Mass. 1997) ...................................................................................64

*In re 1095 Commonwealth Corp.*,
    236 B.R. 530 (D. Mass. 1999) ...................................................................................64, 65

*Anderson v. Beatrice Foods Co.*,
    900 F.2d 388 (1st Cir. 1990) ...................................................................................62

*In re AOL Time Warner S'holder Derivative Litig.*,
    No. 02 CIV. 6302 (CM), 2010 WL 363113 (S.D.N.Y. Feb. 1, 2010) ..............................79, 81

*In re Auerhahn*,
    No. 09-10206, 2011 WL 4352350 (D. Mass. Sept. 15, 2011) .........................................77, 78

*Awkal v. Mitchell*,
    613 F.3d 629 (6th Cir. 2010) ...................................................................................37

*Balerna v. Gilberti*,
    281 F.R.D. 63 (D. Mass. 2012) ...................................................................................62

*In re Beacon Assocs. Litig.*,
    No. 09 CIV 3907 (CM), 2013 WL 2450960 (S.D.N.Y. May 9, 2013)....................................82

*Blake v. NSTAR Elec. Corp.*,
    No. 09-10955, 2013 WL 5348561 (D. Mass. Sept. 20, 2013) ...............................................72

*Carlson v. Xerox Corp.*,
    596 F. Supp. 2d 400 (D. Conn. 2009)...................................................................15, 78, 80

*Carrieri v. Liberty Life Ins. Co.*,
    No. 09-12071-RWZ, 2012 WL 664746 (D. Mass. Feb. 28, 2012) .........................................60

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    No. 1917, 2016 WL 4126533 (N.D. Cal. Aug. 3, 2016)...................................................14, 91

*In re Citigroup Inc. Bond Litig.*,
    988 F. Supp. 2d 371 (S.D.N.Y. 2013).................................................................10, 14, 78

*In re Citigroup Inc. Sec. Litig.*,
    965 F. Supp. 2d 369 (S.D.N.Y. 2013).................................................................10, 78, 81

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
   954 F. Supp. 2d 276 (S.D.N.Y. 2013)......................................................78

*Cooter & Gell v. Hartmarx Corp.*,
   496 U.S. 384 (1990)........................................................................40

*Dial Corp. v. News Corp.*,
   317 F.R.D. 426 (S.D.N.Y. 2016) ........................................................79

*Eldridge v. Gordon Bros. Grp., L.L.C.*,
   863 F.3d 66 (1st Cir. 2017)................................................................44

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   586 F. Supp. 2d 732 (S.D. Tex. 2008) ..................................................78

*Figueroa-Olmo v. Westinghouse Elec. Corp.*,
   616 F. Supp. 1445 (D.P.R. 1985).........................................................75

*Forrest Creek Assocs., Ltd. v. McLean Sav. & Loan Ass'n*,
   831 F.2d 1238 (4th Cir. 1987) ...........................................................45

*Garbowski v. Tokai Pharm., Inc.*,
   No. 16-CV-11963, 2018 WL 1370522 (D. Mass. Mar. 16, 2018)...........................59

*Gonsalves v. City of New Bedford*,
   168 F.R.D. 102 (D. Mass. 1996) ........................................................72

*Grievance Comm. For S. Dist. of New York v. Simels*,
   48 F.3d 640 (2d Cir. 1995).................................................................75

*In re: Initial Public Offering Securities Litigation*,
   174 F. Supp. 2d 61 (S.D.N.Y. 2001).....................................................35

*Lamboy-Ortiz v. Ortiz-Velez*,
   630 F.3d 228 (1st Cir. 2010).........................................................60, 62

*Matter of Larsen*,
   379 P.3d 1209 (Utah 2016)................................................................75

*Martin v. Franklin Capital Corp.*,
   546 U.S. 132 (2005)........................................................................67

*McGee v. Town of Rockland*,
   No. 11-CV-10523-RGS, 2012 WL 6644781 (D. Mass. Dec. 20, 2012)...................44

*Medina v. Gridley Union High Sch. Dist.*,
   172 F.3d 57 (9th Cir. 1999) ..............................................................62

*Meredith Corp. v. SESAC, LLC*,
  87 F. Supp. 3d 650 (S.D.N.Y. 2016) ................................................................79

*Navarro-Ayala v. Hernandez-Colon*,
  3 F.3d 464 (1st Cir. 1993) ...................................................................45, 58, 62

*In re Neurontin Mktg. & Sales Practices Litig.*,
  58 F. Supp. 3d 167 (D. Mass. 2014) ................................................................83

*In re Nosek*,
  386 B.R. 374 (Bankr. D. Mass. 2008) .............................................................63

*In re Nosek*,
  406 B.R. 434 (D. Mass. 2009) ...................................................................63, 64

*In re Nosek*,
  609 F.3d 6 (1st Cir. 2010) ...............................................................................64

*Nw. Bypass Grp. v. U.S. Army Corps of Engineers*,
  No. 06-CV-00258-JAW, 2008 WL 2679630 (D.N.H. June 26, 2008) ...................62

*Obert v. Republic W. Ins. Co.*,
  398 F.3d 138 (1st Cir. 2005) .......................................................45, 48, 77

*In re Polyurethane Foam Antitrust Litig.*,
  168 F. Supp. 3d at 1013 (7th Cir. 1999) .........................................................14

*Pontarelli v. Stone*,
  781 F. Supp. 114 (D.R.I. 1992) ................................................................68, 69

*Pontarelli v. Stone*,
  930 F.2d 104 (1st Cir. 1991) ...........................................................................68

*Pontarelli v. Stone*,
  978 F.2d 773 (1st Cir. 1992) ...........................................................................68

*Reed v. Cleveland Bd. Of Ed.*,
  607 F.2d 737 (6th Cir. 1979) ...........................................................................34

*Rivera v. Lohnes*,
  No. 10-2114, 2012 U.S. Dist. LEXIS 29441 (D.P.R. March 5, 2012) ...............63

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
  No. CIV.A. 04-374 JAP, 2008 WL 9447623 (D.N.J. Dec. 9, 2008) ...................15

*Sanchez v. Esso Standard Oil de Puerto Rico, Inc.*,
  No. CIV 08-2151, 2010 WL 3809990 (D.P.R. Sept. 29, 2010) ..........................65

*Sheppard v. River Valley Fitness One, L.P.*,
  428 F.3d 1 (1st Cir. 2005) ................................................................................76

*Shire LLC v. Abhai LLC*,
  No. 15-13909, 2018 U.S. Dist. LEXIS 46946 (D. Mass. Mar. 22, 2018) ..............................63

*Silva v. Witschen*,
  19 F.3d 725 (1st Cir. 1994) ..............................................................................60

*Steeger v. JMS Cleaning Servs.*,
  No. 17CV8013, 2018 WL 1363497 (S.D.N.Y. Mar. 15, 2018) ..........................................66

*In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*,
  56 F.3d 295 (1st Cir. 1995) ..............................................................................14

*Thompson v. Bell*,
  373 F.3d 688 (6th Cir. 2004) .............................................................................37

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
  535 F. Supp. 2d 249 (D.N.H. 2007) ..................................................................79, 80

*Ultra-Temp Corp. v. Advanced Vacuum Sys., Inc.*,
  194 F.R.D. 378 (D. Mass. 2000) .........................................................................60

*United States v. Jones*,
  686 F. Supp. 2d 147 (D. Mass. 2010) ....................................................................59

*Vollmer v. Selden*,
  350 F.3d 656 (7th Cir. 2003) .............................................................................44

*Whitehouse v. U.S. Dist. Court for the Dist. of Rhode Island*,
  53 F.3d 1349 (1st Cir. 1995) .............................................................................75

*Wohllaib v. U.S. Dist. Court for the W. Dist. of Washington, Seattle*,
  401 F. App'x 173 (9th Cir. 2010) ........................................................................66

*Young v. City of Providence ex rel. Napolitano*,
  404 F.3d 33 (1st Cir. 2005) ....................................................................44, 45, 58

**State Cases**

*Clark v. Beverly Health and Rehab. Servs., Inc.*,
  440 Mass. 270 (2003) ......................................................................................75

*In re Discipline of an Attorney*,
  448 Mass. 819 (2007) ......................................................................................74

*In re Diviacchi*,
  475 Mass. 1013 (2016) ................................................................................74, 75

*Fishman v. Brooks,*
    396 Mass. 643 (1986) ...........................................................................................35

*In re Hilson,*
    448 Mass. 603 (2007) ...........................................................................................73

*In re Murray,*
    455 Mass. 872 (2010) ...........................................................................................73

*Matter of Schiff,*
    677 A.2d 422 (R.I. 1996) ............................................................................ *passim*

*Matter of Schiff,*
    684 A.2d 1126 (R.I. 1996) ..................................................................68, 69, 70

*Matter of Zak,*
    476 Mass. 1034 (2017) .........................................................................................74

**Statutes**

35 U.S.C. § 285 .......................................................................................................63

42 U.S.C. § 1988 ...............................................................................................68, 69

28 USC § 1927 ........................................................................................................65

**Rules**

Fed. R. Civ. P. 5 ......................................................................................................59

Fed. R. Civ. P. 11 ........................................................................................... *passim*

Fed. R. Civ. P. 37 ....................................................................................................63

L.R. 83.6.5 .........................................................................................................72, 77

Mass. R. of Prof. Conduct 3.3 ....................................................................... *passim*

Mass. R. of Prof. Conduct 8.4 .............................................................................73, 74

**Other Authorities**

ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 00-420 (2000)................79, 80, 81

Benjamin Weiser, *Tobacco's Trials*, WASHINGTON POST (Dec. 8, 1996) ....................................34

5A FED. PRAC. & PROC. CIV. § 1336.3 (3d ed.) .....................................................60, 67

MOORE'S FEDERAL PRACTICE, § 11.22(2)(b) (3d ed.) .................................................67

Rutherford B. Campbell, Jr. & Eugene R. Gaetke, *The Ethical Obligation of Transactional Lawyers to Act As Gatekeepers*, 56 RUTGERS L. REV. 9, 51 (2003)..................................................................................................................73

Summation of John Adams, *Rex v. Wemms* (Suffolk Superior Court, 1770).................................................................................4

W. Bradley Wendel, *Monroe Freedman: The Ethicist of the Non-Ideal,* 44 HOFSTRA L. REV. 671, 680 n.8 (2016)..................................................................73

## INTRODUCTION

Following a sixteen-month, $3.8 million investigation, the Special Master has produced a Report and Recommendations (and Executive Summary) that is riddled with factual and legal errors and mischaracterizations of the record, not to mention internal contradictions.  Ironically, and disturbingly, in a case in which the Special Master recommends a draconian sanction based on Garrett Bradley's role in "causing" an inadvertent mistake, the number of clear factual and legal mistakes in this Report is stunning.  Indeed, if this Report were subjected to the same extreme, misguided analysis being applied to Garrett Bradley's mistakes, the submission of the Report itself would be sanctionable conduct.  The Report repeatedly mischaracterizes the applicable law and actual facts of this matter.

Even though the Report concludes that "the $300 million settlement reflected an excellent result for the class members and was the product of the highly professional and skilled work of the class's law firms," R&R at 125, the Special Master goes on to malign the hard-earned reputations of the lawyers who achieved this result with novel theories of ethical improprieties and sanctionable conduct that are unprecedented, unreasonable, and unsupported by evidence.  This Court must conduct a thorough *de novo* review and ensure that the facts are all weighed carefully and accurately, and that the law is applied consistently and dispassionately.  The Thornton Law Firm is confident that this *de novo* review will reveal what has been evident all along: that Thornton's efforts were instrumental to the excellent result in this case, and that it should not be penalized any more than it already has been for mistakes that are deeply regrettable but inadvertent and immaterial to the attorneys' fee award.

### A.    Double Counting

This case began after a media inquiry prompted the self-disclosure of inadvertent double counting of certain staff attorneys on the lodestars of the Thornton Law Firm, Lieff Cabraser,

and Labaton Sucharow (collectively, "Customer Class Counsel").  The Special Master's

investigation found, as Customer Class Counsel asserted from the very beginning, that the

double counting error was an inadvertent mistake.  Moreover—and as the Special Master fails to

acknowledge—this error has **<u>no effect</u>** on the objective reasonableness of the flat percentage of

fund attorneys' fee award.  It is important to remember that neither Thornton Law Firm nor any

firm in this case was awarded fees for hours worked.  The attorneys' fee in this case was, like

other cases in this district, a simple percentage of the class recovery amount, 25%.  The firms

provided hours worked and rates (in lodestars) to the Court not for the purpose of seeking fees

for hours worked, but only as a **<u>cross-check</u>** to ensure that the percentage award was reasonable.

Of course, this is not to say that firms receiving percentage of fund awards are excused from

ensuring that information they submit to the Court is accurate.  But the limited function of the

lodestar here cannot be ignored.  In undertaking a lodestar cross-check, courts look to the

"multiplier" (*i.e.,* total lodestar divided by fee award) as the touchstone of their inquiry.  If the

multiplier is reasonable, the lodestar cross-check is satisfied.  Harvard Law School Professor

William B. Rubenstein, the author of the leading treatise on class actions, testified in this

investigation that multipliers much higher than the one here—indeed, up to 4—are reasonable in

cases like this.  Rubenstein Dep., 4/19/18, at 216:1-218:4 (SM Ex. 235).  In this case, removing

the double-counted attorney time from the firms' lodestars increases the multiplier from 1.8 to

2.01.  Rubenstein Decl., 7/31/17, at ¶¶ 18, 39-45 (TLF Ex. 1).  In other words, although certainly

unfortunate, the double counting had no material effect on the fee award.  The Special Master

himself concedes that "all other things being equal, the attorneys' fee award was fair, reasonable,

and deserved."  R&R at 6.

As described in further detail herein, the double counting was the result of a very basic error. Customer Class Counsel were prosecuting an extremely complex case that included the review of millions of pages produced by their opponent. As co-counsel, they came to an agreement to share both the costs of this work and the work itself, which also had the effect of spreading the risk should the case never produce a monetary settlement. The Thornton Law Firm, which is smaller than both Labaton and Lieff, does not have document review attorneys. Accordingly, after all three firms agreed to split the cost of the document review work, it paid for its share of the work by reimbursing Lieff and Labaton for staff attorneys housed at their firms or, in some cases, by directly paying legal staffing agencies that supplied the staff attorneys. When the time came to submit lodestars to the Court for purposes of the cross-check, through administrative errors and miscommunication, some of the Thornton Law Firm's staff attorneys' time was included on the other firms' lodestars.

Despite finding that the double-counting was "inadvertent," R&R at 363, the Special Master recommends that the three firms "disgorge" the amount of the double counted time— $4,058,000—such that it can be "returned" to the class. This is the first of many logical fallacies in the Report. In urging "disgorgement" of monies, the Special Master **confuses the function of the lodestar cross-check with a lodestar-based fee**. When, as here, the lodestar is used as a cross-check of a percentage award (which the Special Master does not dispute is how the Court awarded the fee), the proper course, taken by numerous courts in similar circumstances, is for the Court to recalculate the multiplier and reassess whether the higher multiplier is reasonable. Because the attorneys' fees were not awarded on a one-to-one basis, "disgorgement" of an amount that was, in actuality, a piece of a piece of a cross-check, is nonsensical. The Special Master did not attempt to calculate an adjusted multiplier (for this or any other of his

recommendations), perhaps because he recognized that the multiplier would still be well within the realm of reasonableness, and therefore there would be no basis for "disgorgement" of any money relating to the double counting error.

### B.     Intent

The Special Master's most outlandish finding in his Report is that Garrett Bradley intentionally included staff attorneys on Thornton's lodestar—staff attorneys for whom it paid, but who were housed at, and in some cases employed by, Lieff and Labaton— to deceive Thornton's own co-counsel and the Court.  The alleged purpose was either to convince co-counsel to give the Thornton Law Firm a greater share of the aggregate fee award, or to mislead the Court into approving the fee award.  Indeed, the Special Master's allegation of intentionality is particularly unbelievable because, as he himself concludes, a simple side-by-side comparison would have revealed (and did ultimately reveal) that the same attorneys were incorrectly listed on more than one lodestar.

Unfortunately for the Special Master, "Facts are stubborn things."[1]  Here, the facts show that: (1) Customer Class Counsel jointly developed the plan to share the cost of staff attorney work and the risk of failure, and neither Lieff nor Labaton has ever stated they were deceived; (2) the final fee agreement among counsel was executed **before** the fee declarations submitted to the Court ever existed, thereby negating any possibility that the submitted lodestars had any bearing whatsoever on the fee split among counsel; and (3) the fee agreement was the result of a negotiation among sophisticated and experienced counsel who had expressly agreed to split the risk of jointly funding the staff attorneys.  More to the point, the Special Master's finding that Thornton intentionally included staff attorneys on its lodestar in order to deceive co-counsel is

---

[1] Summation of John Adams, *Rex v. Wemms* (Suffolk Superior Court, 1770).

flatly contradicted by his finding that there was an understanding among some of the attorneys at all three firms that Thornton would include the staff attorneys on its lodestar.  *See* R&R at 45 n.27, 363.  As all firms had attorneys who understood that Thornton would include the staff attorneys on its lodestar, it is impossible that Thornton was attempting to deceive—or ever could have deceived—Lieff or Labaton.

In terms of any alleged deception of the Court, there was simply no motivation to increase the lodestar submitted to the Court in order to generate a larger fee or to get a greater share of the aggregate fee.  The Special Master chooses to ignore a basic fact: by the time the lodestar was submitted to Court in September 2016, all of the lawyers had already agreed that they would seek no more than an aggregate 25% fee[2] and the Thornton Law Firm had already agreed to a final fee split agreement with Lieff and Labaton.  Additional lodestar would not have generated any additional fee award for the Thornton Law Firm.  The only possible motivation would have been to decrease the aggregate multiplier, which is highly implausible for at least two reasons: (1) the multiplier was already well within the range of reasonableness; and (2) the Thornton Law Firm accounted for only 18% of the total lodestar submitted to the Court, so it would not have been able to "move the needle" on the aggregate multiplier.  These are important facts that the Special Master ignores.  Further, the Special Master insinuates that there was something wrong about the fact that staff attorneys accounted for "71.5% of all Thornton hours reported."  *See* R&R at 45.  In fact, Lieff's and Labaton's percentage of hours worked by staff or contract attorneys (83.4% and 81.5%, respectively) significantly exceed Thornton's percentage.[3]

---

[2]    In fact, the Court remarked during the pre-filing hearing on June 23, 2016 that it "usually start[s] with 25 percent in mind" as the percentage award.  6/23/16 Hr'g Tr. at 15:18-16:2 (Dkt. 85).

[3]    In addition, the Special Master has made a mathematical error. The Thornton staff attorney percentage was 68.9% of all Thornton hours reported, not 71.5%.  These calculations were made using the lodestars submitted to the Court in September 2016.

In a transparent attempt to generate a soundbite, the Special Master and his counsel quote repeatedly (and entirely out of context) an email in which Garrett Bradley states that paying for additional staff attorneys is the "best way to jack up the loadstar [sic]." The Special Master knows that there is nothing wrong with the concept expressed in the email, which is from February 2015 (well over a year before the fee declaration or lodestar was filed with the Court) and contains an invoice for staff attorneys *from Labaton*. The concept was that if the Thornton Law Firm bore more risk by investing in additional staff attorneys vis-à-vis the other law firms (and pursuant to their agreement), Thornton would eventually be able to pursue a greater share of the fee vis-à-vis co-counsel. This would in no way increase the total lodestar submitted to the Court or the amount of fees the class paid to its attorneys. There was always only a finite number of documents to be reviewed and reviewers who could review those documents; the only difference was, for purposes of spreading the internal risk among the firms, which firm would be financially responsible for which staff attorneys. In other words, as is clear from the context, Bradley uses "lodestar" as shorthand for the number of hours worked and resources expended *among counsel* for purposes of dividing the fee *among counsel.* It is typical of the Special Master and his counsel's approach that they choose to ignore this context (which is clear from the record) in order to generate a catchy—albeit totally misleading—soundbite.

Ultimately, the Special Master is left with a strained theory by which the Thornton Law Firm deceived co-counsel and the Court not by inflating hours worked—the Special Master found all of the hours worked by Thornton Law Firm attorneys reasonable and sufficiently supported—but by correctly listing on its lodestar staff attorneys that the Thornton Law Firm paid for pursuant to an agreement among co-counsel. As the Special Master acknowledges, names of the staff attorneys were listed on the lodestars such that anyone who placed the

lodestars side by side would immediately realize that certain attorneys' time had been double

counted.  The idea that this could be intentional deception—an idea which the Special Master

advocates —is ludicrous.

## C.   The Boilerplate Affidavit

Failing to find any true evidence of deception—because there was none— the Special

Master rests his case for Rule 11 sanctions and professional misconduct on immaterial

misstatements in a boilerplate affidavit that was provided to all counsel by Labaton.  Bizarrely,

the Special Master recommends sanctions only for Garrett Bradley even though almost every law

firm in this matter used an identical boilerplate affidavit and therefore could be held

responsible—under the Special Master's dubious theories—for similar misstatements.  Even

stranger, after characterizing the Chargois matter as "[t]he most troubling issue in this case,"

R&R at 303, the Special Master declines to recommend any sanctions or disciplinary action

related to Chargois, but recommends a massive sanction of Garrett Bradley for his role in an

inadvertent error that was obvious to anyone who closely read the submissions to the Court.

Garrett Bradley's statements are described in further detail herein, but as an example, the

Special Master faults the Thornton Law Firm for stating the rates in the lodestar "have been

accepted in other complex class actions."  The Special Master's criticism is that the rates for the

*individual* staff attorneys listed in the Thornton Law Firm's declaration had not previously been

accepted in class actions for those *individual* staff attorneys.  Of course, the sentence is intended

to convey that the rates for the staff attorney *role* had been accepted in other class actions—

which is true— and not that particular staff attorneys had previously performed document review

for those same rates in other class actions.  The Special Master alleges "deception" with respect

to Garrett Bradley, but his investigation made no attempt to inquire whether each of the 20 staff

attorneys listed in Lieff's affidavit and each of the 35 staff attorneys listed on the Labaton

affidavit (as well as all of the attorneys in the ERISA firms' declarations) had ever been listed on a lodestar at the same rate.

The fact of the matter is that the rates for Thornton Law Firm staff attorneys—which ranged from $425 to $500 with a weighted average (overall fees divided by overall hours) of $428— was **lower** than both the range and weighted average of the Lieff staff attorneys, $415 to $515, and $438, respectively. As Prof. Rubenstein testified, rates of up to $550 have been accepted for staff attorneys in class actions. Rubenstein Decl., 7/31/17, at ¶ 36 (TLF Ex. 1). What is more, the Special Master himself found that the staff attorneys' rates in this matter— which for Lieff ranged up to $515—were reasonable. *See* R&R at 176-81.

In what appears to be the crux of his case against Garrett Bradley, the Special Master presents the Court with an opinion from the Rhode Island Supreme Court, *In re Schiff,* which he claims is "eerily similar" to the case at bar. *See* R&R at 244. Nothing can be further from the truth. In *Schiff*, there were not immaterial misstatements in a boilerplate affidavit, but a "grossly inflated" lodestar in a fee-shifting case. The attorney in *Schiff* sought costs and fees 47 times greater than amount of her client's recovery—4,000 billable hours for a case that was "based on a relatively simple sequence of events occurring over a limited period of time." The Court found that "The billing sheets submitted by respondent sought reimbursement for work unrelated to the case [and] *sought payment for time not worked*." *Matter of Schiff*, 677 A.2d 422, 423 (R.I. 1996) (emphasis added). In this case, however, the Special Master has made no finding whatsoever of false or unreasonable billings—indeed, to the contrary, he has concluded that "the total hours expended by each of the Thornton lawyers were reasonable and sufficiently reliable." R&R at 216. The extensive reliance on *Schiff* is indicative of the fact that the Special Master and his

counsel have acted, and are acting, as overly-aggressive litigants who are accusing their perceived adversaries of not being candid with the Court.[4]

### D.    Michael Bradley

The Special Master finds that "the total time Michael Bradley spent working on the *State Street* document review, 406.4 hours, was reasonable," R&R 217, and that such time "is supported by reasonably reliable contemporaneous time records." R&R at 366. The Special Master's concern is not with hours, but with Michael Bradley's rate as listed on the lodestar ($500 per hour), because Bradley's work "most closely resembles that of a junior level associate." R&R at 196. Yet the reduced rate that he argues should apply to Michael Bradley's work—$250 per hour—is less than the rate used for *any* associate in this case, by *any* of the nine law firms that submitted fee declarations. It also is less than the lowest end of the range of rates for associate work that the Special Master himself concludes to be reasonable elsewhere in the Report ($325 to $725 per hour). R&R at 164. Moreover, it is substantially less than the $415 per hour rate of another staff attorney who performed exactly the same work and, like Michael Bradley, performed it remotely. There is no basis for reducing Michael Bradley's rate by 50% when the Special Master himself found that staff attorney rates of up to $515 were reasonable in this very case. *See infra* § VII. Even if Michael Bradley's rate is reduced (whether to the rate of the other Thornton Law Firm staff attorneys, or to the $415 per hour rate of the staff attorney who performed exactly the same work, or to the Special Master's arbitrary $250 per hour), the effect on the lodestar and multiplier, as discussed herein, is completely immaterial to the attorneys' fee award.

### E.    Contract Attorneys

---

[4]     As further detailed herein, the Report and Recommendations is replete with mischaracterizations of the record and propositions that unreasonably stretch the meaning of their purported supporting authorities.

The Special Master recommends that the time agency/contract attorneys expended reviewing State Street's documents—the same work performed by staff attorneys—should be listed as a "cost" rather than as a legal service on Customer Class Counsel's lodestars.  The Special Master has **failed to identify a single case** holding that contract attorneys must be charged as expenses.  When Customer Class Counsel provided the Special Master with various case law demonstrating that agency/contract attorneys—who are, in terms of work performed and qualifications, entirely indistinguishable from firm-hired staff attorneys—are properly included in fee applications at an hourly rate, the Special Master said that he would simply agree to disagree with those courts.  But he has done more here, for he falsely asserts that "legal and ethical rulings have not provided definitive guidance on this interesting issue," R&R at 187, which **is simply not true**.  Case law and ethics opinions strongly suggest that it is not only permissible, but common practice, to include contract attorneys in the lodestar.  *See infra* § VI.  The Special Master cites a particular case, *In re Citigroup,* in support of his statement that courts "that have previously weighed in on this issue have not drawn a clear distinction between temporary attorneys and partnership-track associates."  R&R at 183.  In fact, *Citigroup* specifically *drew* this distinction, recognizing that "a contract attorney's status as a contract attorney—rather than being a firm associate—affects his **market rate**."  965 F. Supp. 2d at 395 (emphasis added).  Whatever the Special Master's personal policy preference may be in terms of how work performed by contract attorneys should be accounted for, it is clear that there is no legal or factual basis for his recommendation to this Court that contract attorney work be charged as a cost.

Accordingly, for the reasons set forth more fully below, this Court should reject the Special Master's recommendations.  His Report, which relies in large part on the ever-changing

musings of a self-proclaimed "legal expert" from NYU Law School, is replete with clearly erroneous legal and factual findings and should not be the basis for taking any further action against the attorneys in this case.  Besides the substantial expense of the investigation itself (as well as lost opportunity costs), the attorneys have already suffered serious reputational harm, and there is simply no fair or legally sensible reason to continue punishing attorneys who achieved such an excellent result for the class.

## ARGUMENT

### I.      The Double Counting Error Was Inadvertent And The Special Master's Recommendation Of $4 Million Disgorgement Is Unjustified

Although the parties to this investigation dispute many issues, one thing on which everyone agrees is that counsel achieved an outstanding result for the class.  *See* Exec. Summ. at 7 ("By all accounts, the class settlement provided an excellent result for the class members and was a product of the highly dedicated and professionally skilled work of the class' law firms, a view with which the Special Master wholly agrees.").

Through their diligent and hard-fought prosecution of this matter, Plaintiffs' counsel ensured the return of hundreds of millions of dollars to pension funds subjected to State Street Bank and Trust's standing instruction foreign exchange ("FX") trading practices.  The Thornton Law Firm, which brought the first cases involving standing instruction FX trading, played a critical role in this case from inception to resolution, bringing to bear substantial expertise in the subject matter as well as developing the damages theory for the case.

The Thornton Law Firm and its co-counsel also incurred substantial risk in bringing suit against a large, well-funded bank with no guarantee of any recovery.  In approving the 25% fee at a hearing on November 2, 2016, the Court remarked:

> [I]n this case the plaintiffs' lawyers took on a contingent basis a novel, risky case. The result at the outset was uncertain, and it remained, until there was a settlement, uncertain.
>
> The plaintiffs' counsel were required to develop a novel case. This is not a situation where they piggybacked on the work of a public agency that had made certain findings. They were required to be pioneers to a certain extent. They were required to engage in substantial discovery that included production of nine million documents. They engaged in arduous arm's length negotiation that included 19 mediation sessions. They had to stand up on behalf of the class to experienced, able, energetic, formidable adversaries. They did that.

11/2/16 Hr'g Tr. at 36:2-14 (SM Ex. 78).

In its ruling on November 2, 2016, the Court identified the factors it considered in approving a 25% fee: (1) the reasonableness of the multiplier produced by the lodestar cross-check (1.8); (2) the Court's tendency to award between 20% and 30% in class action common fund cases; and (3) consideration of awards in comparable cases, and, in particular, the reasonableness of the percentage in the context of other First Circuit cases with comparable settlements (*i.e.,* settlements in the $250 million to $500 million range). *Id.* at 35:3-36:2. The Court's approval of the 25% fee was consistent with its initial remarks during the pre-filing hearing on June 23, 2016, at which the Court stated that it "usually start[s] with 25 percent in mind" as the percentage award. 6/23/16 Hr'g Tr. at 15:18-16:2 (Dkt. 85).

Throughout the investigation and in his Report, the Special Master likewise recognizes the tremendous efforts of counsel that produced this substantial settlement. Noting the "risks, complexities and legal challenges inherent in the litigation," the Special Master concludes in his Report that the skill and dedication of counsel produced "an excellent result for the class," and was an "undeniable accomplishment" by counsel engaged in "fine and highly effective lawyering." R&R at 6-7. Specifically as to Thornton, the Special Master finds that the rates listed for Thornton partners and associates were justified and reasonable in light of the complexity of the case, R&R at 175; that the number of hours listed for Thornton partners and

- 12 -

associates was justified and reasonable, R&R at 216 ("[T]he total hours expended by each of the

Thornton lawyers were reasonable and sufficiently reliable"); and that the number of hours listed

for Michael Bradley also was reasonable.  R&R at 217 ("[T]he total time Michael Bradley spent

working on the *State Street* document review, 406.4 hours, was reasonable").

### A.      The Double Counting of Staff Attorney Hours Was Inadvertent And Not Thornton's Fault

As the Special Master concludes, and as all firms confirmed numerous times during the

investigation, the double counting errors made in the fee declarations submitted to the Court

were inadvertent.  R&R at 7, 352, 363.  Without question, the mistakes in the fee declarations

should have been caught before filing.  But the failure to do so was just that: a mistake.  Within

two days of realizing the double counting, counsel submitted a letter to the Court alerting it to the

errors.  Goldsmith Ltr. to Ct., 11/10/16 (SM Ex. 178).  As explained below, these inadvertent

errors in the lodestar calculation, while unfortunate and regrettable, have no impact on the

reasonableness of the attorneys' fees awarded pursuant to the percentage of fund method in this

case.  The impact of these mistakes on Customer Class Counsel already has proven significant,

costly, and lasting.  Further redress for these inadvertent errors would be needlessly punitive, and

is unwarranted.

### B.      The Proposed "Disgorgement" of $4,058,000 Is Unjustified And Misapprehends the Function of the Lodestar Cross-Check

Despite expressly finding that the errors in the fee declarations were inadvertent, the

Special Master asserts that the three firms must "disgorge[]," in equal shares, the amount at issue

($4,058,000),[5] and that the amount should be "returned" to the class.  R&R at 364.  The Special

---

[5]     The exact amount at issue as a result of the double counting error is $4,058,654.50.  *See* Goldsmith Ltr. to Ct., 11/10/16 (SM Ex. 178).  However, the Special Master uses a rounded amount ($4,058,000) throughout his Report.  Accordingly, undersigned counsel uses the rounded figure ($4,058,000) herein.

Master's terminology reveals the logical fallacy that underlies his conclusion.  The attorneys

were not paid $4,058,000 that otherwise would have gone to the class.  The Special Master's

recommendation that Customer Class Counsel "disgorge[]" this amount is based on a

fundamental misunderstanding of how attorneys' fees were awarded in this case, and specifically

of the function of the lodestar cross-check.

As the Court knows, and as the Special Master acknowledges, R&R at 143-46, the

attorneys' fee award in this case was calculated using the percentage of fund method (also called

the "common fund" method), which is typically used in cases in the First Circuit.[6]  Under the

percentage of fund method employed by the Court in this case, the lodestar numbers submitted

by counsel **are not the basis for counsel's fee award**; the percentage granted by the court is.

*See* Rubenstein Decl., 7/31/17, at ¶¶ 13, 17, 18 (TLF Ex. 1); Rubenstein Decl., 6/20/18, at ¶¶ 18-

19.  The lodestar cross-check is used **only** as a means of verifying the reasonableness of the

percentage of the recovery being awarded to the attorneys.  Rubenstein Decl., 6/20/18, at ¶ 18-

19.  If there are errors in the lodestar, the only inquiry the court must perform is to analyze the

revised lodestar number and its impact on the multiplier.  Rubenstein Decl., 6/20/18, at ¶¶ 19-

20;[7] *see also* Rubenstein Decl., 7/31/17, at ¶ 15 (TLF Ex. 1) ("[U]sing a lodestar cross-check

---

[6]     *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995)
(cited in the Report at p. 144); Rubenstein Decl., 7/31/17, at ¶¶ 13, 17 (TLF Ex. 1).

[7]     Professor Rubenstein explains the relevant authority as follows: *In re Polyurethane Foam Antitrust Litig.,* 168
F. Supp. 3d at 1013 (reducing lodestar in cross-check in part because of contract attorney rate and then re-
assessing acceptability of new multiplier); *In re: Cathode Ray Tube (CRT) Antitrust Litig.,* No. 1917, 2016 WL
4126533, at *9 (N.D. Cal. Aug. 3, 2016) ("[E]ven if the Court were to reduce the Plaintiffs' lodestar to reflect
the contract attorneys' lower billing rates, the multiplier that would result would still be well within an
acceptable range. . . . A lodestar reduction is unnecessary when the effect on the multiplier is not material."); *In
re Citigroup Inc. Bond Litig.,* 988 F. Supp. 2d 371, 378 (S.D.N.Y. 2013) ("If the Court reduces the blended
hourly rate for staff attorneys to $300—a rate that appears to be either appropriate or slightly high—the
modified lodestar is approximately $73.5 million. Such a reduction would make the multiplier closer to 1.59.
Assuming even a blended hourly rate for staff attorneys of $250—perhaps somewhat on the low end—the
result is a modified lodestar of approximately $65 million and a multiplier of nearly 1.8. All of these figures
are within the range of reasonableness. The lodestar cross-check has therefore performed its function,
satisfying the Court that an award of 16%—which it has already determined represents a reasonable percentage
of the settlement fund—adequately compensates plaintiffs' counsel for their time and effort based on

enables a court to make a rough estimate of counsel's lodestar for the sole purpose of ensuring

against a windfall.").  Errors in the lodestar—and particularly if they are inadvertent and self-

disclosed—do not warrant return of monies to the class as long as they do not have a material

effect on the multiplier and the multiplier is still reasonable.  Rubenstein Decl., 6/20/18, at ¶¶ 19-

20.  The Special Master does not seem to understand this concept.  The First Circuit is **not** a

lodestar-based jurisdiction, where fees are awarded solely on the attorney's hours and rates.  Yet

the amount the Special Master recommends be "disgorged" is the amount of the **lodestar** that

was inadvertently double counted.  When the fee is *percentage-based*, as it was here—which the

Special Master does not dispute (Exec. Summ. at 7)—it is black-letter law that the attorneys are

not paid dollar-for-dollar for time they submit to the Court.  Instead they are paid a percentage of

the recovery in the case, with lodestar information only supplied to cross-check the

reasonableness of that percentage. As long as the percentage remains reasonable, the fee is

reasonable.  The Special Master repeatedly admitted that the fee in this case was reasonable and

therefore he has no basis—nor is there basis in logic or case law—to recommend "disgorgement"

of monies based on inaccurate lodestar numbers.

Indeed, the Special Master's recommendation that the firms "disgorge[]" an amount

corresponding to errors in their lodestar submissions is incomprehensible given the role of the

lodestar in the fee award in this case.  To properly measure the effect of the lodestar mistake, it is

only necessary to revisit the two-step lodestar cross-check inquiry.  This means reducing the raw

---

estimations of reasonable market rates and factoring in an appropriate multiplier."); *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 409 (D. Conn. 2009) ("[I]f the charges for the contract attorney time were decreased, the multiplier in this case would still be a reasonable multiplier."); *In re Royal Dutch/Shell Transp. Sec. Litig.,* No. CIV.A. 04-374 JAP, 2008 WL 9447623, at *32 (D.N.J. Dec. 9, 2008) ("Even if Lead Counsel reduces plaintiffs' counsel's total lodestar by $7,287,396.25 (the lodestar of the discovery attorneys employed by Lead Counsel)—from $56,891,317.50 to $49,603,921.25—that reduction increases the multiplier only from 1.002 (based upon the total fee of $57 million) to 1.15, an immaterial difference.").

lodestar to account for the errors, recalculating the multiplier, and then reassessing whether that multiplier is still reasonable in the context of the percentage award. Numerous courts in cases in which lodestars have been adjusted post-filing have addressed the issue this way.[8]

This reassessment, as applied to the attorneys' fee award in this case, undeniably shows that, even assuming *arguendo* that *all* of the Special Master's proposed reductions to the overall lodestar should be made, the 25% fee award remains reasonable and entirely justified by the lodestar cross-check:

- Reducing the lodestar by the double counted time ($4,058,000) results in a multiplier increase from 1.8 to **2.01**. Rubenstein Decl., 7/31/17, at ¶¶ 18, 39-45 (TLF Ex. 1).

- Reducing the lodestar by (1) removing the double counted time and (2) adjusting the lodestar to reflect contract attorney time as an expense results in a multiplier increase from 1.8 to **2.07.** Rubenstein Decl., 6/20/18, at ¶ 19.

- Reducing the lodestar by (1) removing the double counted time, (2) adjusting the lodestar to reflect contract attorney time as an expense, and (3) adjusting Michael Bradley's hourly rate to $250 results in a multiplier increase from 1.8 to **2.07**.[9]

Every one of these hypothetical multipliers is well within the range of reasonableness for a class action case of this size, duration, and complexity. Lodestar cross-check multipliers as high as 4 have been accepted in similar cases. *See* Rubenstein Decl., 7/31/17, at ¶¶ 39-45 (TLF Ex. 1) (concluding that a multiplier of 2.01 "falls securely within the range of multipliers that courts have approved in appropriate circumstances in the past" and "fully supports the reasonableness of the fee the Court awarded Counsel in this matter"); *see also* Rubenstein Dep., 4/9/18, at 56:24-57:2, 216:1-218:4 (SM Ex. 235) (concluding that "for what the attorneys accomplished here a two multiplier is a perfectly reasonable—in fact, quite a modest fee for them," describing

---

[8] *See supra* footnote 7.

[9] The value of the double counted time is taken from the Goldsmith Ltr. to Ct., 11/10/16 (SM Ex. 178). The contract attorney adjustment is taken from the Report and Recommendations at 367.

the factors underscoring the multiplier in this case, and opining that "**I wouldn't have been surprised in a 300-milllion-dollar settlement to see a three or a four multiplier.** I should add multipliers are often higher the higher the settlement. And so I wouldn't have been surprised, and I think it would have been justified to see a three or four.") (emphasis added); Rubenstein Decl., 6/20/18, at ¶ 19 (finding that a 2.07 multiplier, which results if double-counted and contract attorney time are removed, is "fully reasonable, indeed modest").

The Special Master's proposed disgorgement of the lodestar cross-check errors misapplies the applicable law and would result in an unfair and unsupportable result. The inadvertent lodestar errors simply do not materially affect the result of the lodestar cross-check and, therefore, do not affect the reasonableness of the fee.

### C. Thornton Is Not Responsible For The Inadvertent Double Counting

The Special Master concludes that Labaton bears "ultimate responsibility" for the double counting because, as lead counsel, it had a duty to cross-check the individual fee petitions of the firms, but failed to do so. Exec. Summ. at 18-19.

Despite concluding that Labaton bears ultimate responsibility for the inadvertent double counting errors, the Special Master recommends that Labaton, Lieff, and Thornton should equally share the remedy he proposes to address the errors, *i.e.,* the "disgorgement" of $4,058,000. As discussed above, disgorgement is unjustified and misapprehends the function of the lodestar cross-check. The double counting errors simply have no material effect on the cross-check, and the multiplier that results when those hours are excluded is well within the range of reasonableness.

The Special Master contends that a remedy is necessary to address the inadvertent double counting, but imposing that remedy on Thornton would be unjustified for reasons additional to the ones stated above. The Special Master attributes the double counting mistakes in the fee

- 17 -

declarations to two core failures: (1) Labaton's failure to inform its partner preparing the omnibus fee declaration, Nicole Zeiss, of the firms' agreement to share the cost of staff attorneys; and (2) the failure of the firms to reduce their agreement regarding the staff attorneys to writing.  R&R at 363.

The Special Master also concludes that, as to the firms' agreement to share the cost of staff attorneys, Thornton reasonably understood that it would list the staff attorneys for whose work it paid in its lodestar, and that "at least some of the lawyers at each of the three customer class law firms anticipated that Thornton would put the staff attorneys on its lodestar, and lawyers from each firm thought this was appropriate[.]" *See also id.* at 220-21, 363 (Special Master concluding "there is sufficient evidence in the record to find that at least some attorneys at both Labaton and Lieff believed that the staff attorneys paid for and allocated to Thornton would be included on Thornton's lodestar petition.").[10]

The Special Master further notes that correspondence contemporaneous with the drafting of the November 10, 2016 letter to the Court, and the November 10, 2016 letter itself, showed Labaton and Lieff acknowledging that the inadvertent double counting was in **their** lodestars, not Thornton's.  R&R at 220-21, n.174 (citing contemporaneous email correspondence from Chiplock to Goldsmith, 11/9/16 (SM Ex. 261) and Goldsmith Ltr. to Ct., 11/10/16 (SM Ex. 178)).

Despite these findings, the Special Master concludes that Thornton shares in the "responsibility" for the double counting errors because Garrett Bradley did not adequately describe the firms' staff attorney agreement in his declaration.  Exec. Summ. at 15-16.  The

---

[10]   *See also* Thornton Law Firm's Resp. to SM, 11/3/17 (TLF Ex. 2); Thornton's Resp. to Request for Add'l Submission, 4/12/18 (TLF Ex. 3); B. Kelly Ltr. to Sinnott, 4/17/18 (TLF Ex. 4).

statements in Garrett Bradley's declaration are discussed in detail elsewhere in this response. *See infra* § III(B).  The Special Master concludes that Thornton shares responsibility for the "administrative confusion" that led to the double counting because it did not modify the boilerplate language in the Labaton-prepared template declaration.  Exec. Summ. at 19.  This conclusion is wholly speculative, without any basis in the Record, and logically inconsistent.

The Special Master concludes, without **any** supporting evidence, that "[i]t is probable that, had Thornton's petition contained fully truthful and accurate statements describing the actual affiliation and rates of the loaned staff attorneys and agency attorneys, Labaton Settlement Attorney Nicole Zeiss, or the Court, would have been alerted that something was amiss and thereby have detected the double-counted hours."  Exec. Summ. at 16.  The Special Master drew this conclusion (and went so far as to deem it "probable") despite having never asked Nicole Zeiss—who sat for two depositions in this investigation—what would have happened if Thornton had modified the boilerplate language.

Moreover, this wholly speculative assertion is contradicted by the Special Master's own conclusion that Labaton "fail[ed] to perform a side-by-side comparison" of the declarations.  R&R at 56 n.39.  It is difficult to imagine, and impossible to conclude based on any fact, that modified boilerplate language would have led to a different result when a basic side-by-side comparison was not done.[11]  If a simple comparison of the fee declarations would have revealed the double counting, as the Special Master concludes, it was Labaton that should have, but did not, perform this comparison.  *See* Exec. Summ. at 19.

---

[11]   Indeed, Nicole Zeiss testified that, while some firms changed the language in their fee declarations, she did not discuss any changes with any firm, and does not recall whether she noticed the changes before filing, or only after the fact.  Zeiss Dep., 6/14/17, at 42:22-43:14 (SM Ex. 79).

The Special Master also concludes that because Labaton did not circulate the individual declarations among the group, the other law firms were not in a position to notice and rectify the double counting.[12]  *See* R&R at 224.  Though the Special Master mentions only Lieff and ERISA Counsel, the record is clear that Thornton also did not see any other firm's fee declaration before Labaton filed the omnibus fee declaration—and therefore Thornton, like Lieff and ERISA Counsel, did not have an opportunity to identify the double counted time before filing.  Evan Hoffman of Thornton confirmed this in response to the Special Master's explicit inquiry during his deposition:

> THE WITNESS: And then it was sent back to Labaton for their review and maybe an edit or two and that was the last we saw of it until it was submitted on ECF for the final, when it was actually given to the judge.
>
> JUDGE ROSEN: You never saw Labaton's fees or Lieff's fees in the declaration?
>
> THE WITNESS: Correct.
>
> JUDGE ROSEN: In the actual fee declaration, did you ever see their fees?
>
> THE WITNESS: No, not until it was already filed.
>
> JUDGE ROSEN: Not until it was filed?
>
> THE WITNESS: Correct.

Hoffman Dep., 6/5/17, at 94:18-95:10 (SM Ex. 63).[13]

The inadvertent double counting of staff attorney time was undoubtedly a regrettable mistake.  The evidence in the record, however, does not support holding Thornton accountable

---

[12]   The Special Master uses the term "double-billing," not "double counting," here.  R&R at 224.  To be clear, there was no "billing" in this case.   This repeated wording is a conscious choice of the Special Master and further demonstrates his fundamental misunderstanding of the purpose of the lodestar cross-check in a percentage of fund scenario.  Rather, as described in detail *infra,* the submission of fee declarations showing the time spent on the case was made in conjunction with the lodestar cross-check that was used to support, **not replace**, the percentage of fund method by which attorneys' fees were awarded.

[13]   The Special Master does not mention this piece of relevant testimony in the Report, wrongly inferring, and suggesting that the Court infer, that Thornton had an opportunity to review the other firms' fee declarations prior to filing.

for these errors.  To the contrary, Thornton acted consistent with the firms' agreement regarding

staff attorneys.  Even if there was imperfect knowledge of this agreement within the other law

firms, due to compartmentalization or other issues, it does not mean that Thornton acted

unreasonably.  As the November 10, 2016 letter to the Court and contemporaneous

correspondence stated, the inadvertent double listing of these staff attorneys' time occurred on

the Labaton and Lieff lodestars, not on Thornton's.  R&R at 220-21, n.174 (citing

contemporaneous email correspondence from Chiplock to Goldsmith, 11/9/16 (SM Ex. 261) and

Goldsmith Ltr. to Ct., 11/10/16 (SM Ex. 178)).  And as the Special Master also concludes, the

duty to review and cross-check the individual petitions belonged to Labaton, which, as lead

counsel, was responsible for drafting and submitting the omnibus fee declaration to the Court.  It

is notable and illogical that, unlike his suggestion for Thornton and Garrett Bradley, the Special

Master proposes no Rule 11 sanction for Labaton despite finding that Labaton "was ultimately

responsible for preparing an accurate and reliable fee petition that the Court could rely upon" and

failed in its responsibility to ensure the accuracy of the papers it filed with the Court.  Exec.

Summ. at 19.[14]

     As a result of the double counting mistake and this ensuing investigation, the law firms,

Thornton included, have no doubt identified areas where there is room for improvement.  To that

end, the firms jointly proposed a number of best practices recommendations in a submission to

the Special Master that, for reason unknown, the Special Master does not include as an exhibit to

the Report.  *See* Consolidated Resp., 8/1/17, at 20-24 (TLF Ex. 5).  Among other things, the

firms agreed that, in future complex class cases involving multiple firms, they will report their

draft lodestar to lead counsel during the pendency of the litigation, and any firms sharing costs

---

[14] Such sanction would, of course, be unjustified.

also will review each other's draft fee declarations before filing, so that they can discuss any perceived errors or concerns with all other counsel.  *Id.* at 21-22.  That did not happen here, and is deeply unfortunate.  But hindsight is 20/20, and in light of the record evidence demonstrating that Thornton is not responsible for the double counting, any disgorgement is unjustified.

### D. The $425 Per Hour Rate Used By Thornton For Staff Attorney Work Is Reasonable And Justified

The Special Master's Report endorses, with two exceptions, the hours and rates in the firms' fee declarations.  The Special Master concludes that, with two exceptions, "the hours and rates of the attorneys of each of the law firms for whom lodestar reports were submitted to the Court are reasonable and accurate, and consistent with applicable market rates for comparable attorneys in comparable markets for comparable work."  Exec. Summ. at 21-22; R&R at 365-67.  The two exceptions are the rate of Michael Bradley and the rate of the agency-employed "contract" attorneys, both of which are addressed *infra* at sections VI and VII.

The Recommendations section of the Report does not recommend any adjustment to the $425 per hour rate assigned to the staff attorneys in Thornton's fee declaration, and none should be applied.  However, in the narrative section of the Report, the Special Master states: "Although the Special Master finds nothing unreasonable *per se* in the staff attorney rates billed by the Customer Class law firms, an adjustment of the amounts billed in Thornton's lodestar for staff attorneys will be required."[15]  R&R at 181. This sentence is accompanied by a footnote that reads: "Fees for these staff attorneys will be calculated at the same rate as they were billed on the Labaton and Lieff petitions."  *Id.* at n.150.

---

[15] The terminology used here—"billed in Thornton's lodestar"—demonstrates the Special Master's continued confusion of lodestar as the basis of a percentage award cross-check with lodestar as the direct basis for a fee.

- 22 -

Although the Special Master does not ultimately recommend any adjustment to the lodestar on this basis, because his earlier remarks in the narrative section of the Report may be read to call for a reduction, Thornton addresses the reasonableness of the $425 per hour rate as follows.

*First,* the $425 per hour rate assigned to staff attorney hours by Thornton is an empirically reasonable rate, within the range of court-accepted rates for staff attorney work.  In his expert declaration submitted to the Special Master with the Law Firms' Consolidated Submission on August 1, 2017, Harvard Law School Professor William Rubenstein cites empirical research showing that courts have accepted staff attorney rates in the range of $250-$550 per hour in a dozen class action cases decided since 2013. *See* Rubenstein Decl., 7/31/17, at ¶ 36 (TLF Ex. 1); *see generally id.* at ¶¶ 34-38.

Moreover, contrary to the Special Master's assertion that this rate evidenced the "unempirical nature" of the rates used by Thornton, R&R at 70, the Southern District of New York accepted $425 per hour as a rate for staff attorney work in **another FX trading class action case**, *In re Bank of New York Mellon Corp. Forex Transactions Litigation*,[16] a year before the fee declaration filings in this case.

*Second,* Thornton's use of a $425 per hour rate was reasonable under the circumstances here, and was based on its understanding of previously accepted rates in other litigation and its discussions with co-counsel.[17]  Specifically, the Special Master finds that Thornton understood, at the time of the filing of the State Street fee application, that the $425 per hour rate had been

---

[16]     Referred to herein as *BNY Mellon*.

[17]     *See also* Hoffman Dep., 6/5/17, at 59:5-12 (SM Ex. 63) ("It was suggested by Dan Chiplock of Lieff and Mike Rogers of Labaton, that we should use for purposes of fee petition rates that had been approved by Judge Kaplan in the Mellon case for the reviewers, which was $425 an hour and that was what was put in on Thornton's end.").

used by Lieff and had been accepted by the Court in the *BNY Mellon* case.  R&R at 70.  The

Special Master further finds that Thornton believed Lieff to be suggesting this rate in the State

Street case, R&R at 180 n.146, as Lieff itself surmised in deposition testimony referencing an

email exchange between Lieff, Labaton, and Thornton after the staff attorney work was

completed:

> And so Thornton I think by and large used 425, perhaps thanks to this e-mail from
> fall of 2015, where I said, 'in Bank of New York Mellon I think we used 425,'
> which I think we did, because Thornton was involved in that case, too. So they used
> 425.

Chiplock Dep., 6/16/17, at 184:20-25 (SM Ex. 10) (discussing 9/11/15 Email, LCHB-0052627

(SM Ex. 192)).[18]

Without any other basis, the Special Master unreasonably suggests that the passage of

time between this email (September 2015) and the filing of fee declaration (September 2016)

makes the email less reliable.  Such a conclusion ignores the fact that the staff attorneys' work on

the case was fully completed as of July 2015, when the parties reached an agreement in principle

to settle the case.  Although it took more than a year for the parties to finalize the settlement and

appear before the Court, the agreement in principle and thus the conclusion of substantive work

on the matter, including the document review, was reached in the summer of 2015.  Accordingly,

it is neither surprising that counsel were discussing their eventual lodestar petitions at this time in

2015, nor is it unreasonable for Thornton to have relied on this information in preparing its fee

declaration.  Because Labaton did not circulate the fee declarations among the parties before

filing, R&R at 224, Thornton did not know that Labaton and Lieff were applying staff attorney

rates different from $425 per hour.  While perhaps a more perfect practice would have been to

---

[18]   For unknown reasons, the Special Master does not cite this deposition testimony in his discussion of the issue,
but it immediately follows the portion of Mr. Chiplock's testimony he does cite. *See* R&R at 180 n.146 (citing
to Chiplock Dep., 6/16/17, at 182:5-183:5 (SM Ex. 10)).

exchange this information prior to filing, Thornton reasonably relied on an established, court-accepted hourly rate.  It did not simply pluck $425 per hour out of thin air.

*Third,* applying the Special Master's proposed formula for adjusting the $425 per hour rate (*i.e.,* that the rates on the Labaton and Lieff petitions should be used instead (R&R at 181 n.150)) would not result in any material difference to Thornton's lodestar, much less the overall lodestar or the multiplier resulting from the cross-check.  As to staff attorneys overlapping with Labaton, reducing their rates on Thornton's position would result in a cumulative reduction of $412,627 from Thornton's lodestar (5.5% of the Thornton lodestar submitted to the Court, and less than 1% of the overall lodestar submitted to the Court).  As to staff attorneys overlapping with Lieff, using Lieff's rates for the staff attorneys on Thornton's lodestar would result in no reduction.[19]

*Finally,* reducing Thornton's lodestar to adjust the rates as suggested by the Special Master would result in an unjustified double reduction, as overlapping time billed at a higher rate was already accounted for in the double counting reduction.  In the November 10, 2016 letter to the Court alerting it to the double counting errors, David Goldsmith of Labaton explained that, "[w]hen a given SA [staff attorney] had different hourly billing rates, we removed the time billed at the higher rate."  Goldsmith Ltr. to Ct., 11/10/16, at 3 (SM Ex. 178).  This approach was not taken because the firms believed that the time on Thornton's lodestar was less legitimate—to the contrary, at least "some attorneys at Labaton, Lieff and Thornton independently assumed that Thornton would claim the SA time on its lodestar."  R&R at 220.  Rather, the firms took a lowest-rate approach to reducing the overlapping time as a conservative measure.

---

[19]   This is because, as the Special Master notes, Lieff billed two of the overlapping staff attorneys at a rate of $515 per hour.  R&R at 180 n.147.

The Special Master at one point suggests that Thornton's use of a rate of $425 per hour for staff attorneys was so unreasonable as to warrant "adjustment" of Thornton's lodestar. Ultimately, perhaps in recognition of the empirical evidence and record evidence that $425 per hour was a reasonable rate, or perhaps having calculated the *de minimis* effect such adjustment would have—or perhaps both—the Special Master does not recommend any reduction to Thornton's lodestar on this basis.  Indeed, the Special Master concludes that the hours and rates in Thornton's lodestar (excepting the rates for Michael Bradley and contract attorneys) are "reasonable and accurate."  Exec. Summ. at 21-22; R&R at 365-67.

## II.     Garrett Bradley Did Not Intentionally File A False Declaration

The Special Master's erroneous conclusion that Garrett Bradley intentionally lied to the Court relies on a blatant mischaracterization of the factual record and a fundamental misunderstanding of the fee allocation among counsel.

### A.     There Was No Motivation To Deceive Co-Counsel

The Special Master's primary "support" for the proposition that Garrett Bradley intentionally lied to the Court is what he perceives as evidence of motivation.  In particular, the Special Master finds:

> [T]he statements were false, and the false statements were not due to simple negligence, but rather Bradley intentionally and willfully identified the SAs in his Declaration as members of his firm and that their hourly rates were the same as the firm's regular rates charged for their services.  Bradley's motivation for making the false statements is clear and well supported by the record.  The record evidence shows that Bradley intentionally sought to "jack up" Thornton's individual firm lodestar vis-à-vis the other Customer Class firms, and representing the SAs as members of Thornton with billing rates of $425 an hour ($500 an hour, in the case of Michael Bradley) was the way to do it.

> R&R at 233.

> **

[T]he Special Master concludes that Bradley deliberately and intentionally misrepresented the make-up of Thornton's professional staff and their hourly rates so that Thornton's lodestar petition would be grossly inflated.

R&R at 234-35.

**

[T]he Special Master has found that Garrett Bradley's statements in his sworn declaration that accompanied the Thornton fee petition were knowingly false, and that they were motivated by a desire to greatly enhance the Thornton lodestar and thereby justify a larger fee award . . . .

R&R at 364.

In short, the Special Master has concocted a story in which the Thornton Law Firm claimed staff attorneys as employees in order to deceive co-counsel into paying more of the aggregate fee to Thornton.  This is wrong on many levels: (1) Lieff, Labaton, and Thornton jointly developed a plan to perform the necessary review of the millions of pages of State Street documents— neither Lieff nor Labaton ever stated they were deceived; (2) the boilerplate affidavit signed by Garrett Bradley was provided by Labaton; (3) the Special Master found that attorneys at all three firms understood that staff attorneys for which Thornton paid would be included on Thornton's lodestar; (4) the final fee agreement among the firms was executed *before* the fee declarations submitted to the Court even existed; (5) the fee agreement between the firms was not directly dependent upon each firm's lodestar; and (6) the fee agreement was a negotiation among sophisticated and experienced parties who had agreed to split the risk—and therefore the reward—of jointly funding the staff attorneys.

The idea that Garrett Bradley intentionally lied by signing an inaccurate boilerplate fee declaration (that he did not draft) in order to deceive co-counsel defies logic.  The Special Master's conclusion is squarely contradicted by the fact that, in the course of a $3.8 million investigation, the Special Master did not uncover a shred of evidence that co-counsel was or felt

that it was deceived.  There is no citation anywhere in the Report and Recommendations for this proposition because there is no such evidence; not a single Lieff or Labaton witness stated that the firms were in any way deceived by the Thornton Law Firm's fee declaration or lodestar.[20] The Special Master's motivation argument further hinges on the dubious claim that Garrett Bradley deceived co-counsel by signing (and not modifying) a boilerplate affidavit that co-counsel itself (Labaton) provided to the Thornton Law Firm.  It simply does not make sense that Garrett Bradley would try to fool co-counsel by signing a declaration with language prepared by co-counsel.

The Special Master's conclusion that the Thornton Law Firm included staff attorneys on its lodestar in order to deceive co-counsel also **directly contradicts** the Special Master's finding that there was an understanding among attorneys at all three firms that Thornton would include staff attorneys on its lodestar.  *See* R&R at 45 n.27 ("Some of the attorneys from Labaton, Lieff, and Thornton, however, independently made assumptions based on the circumstances that Thornton would claim those staff attorneys' time on its lodestar."); *id.* at 363 ("[C]ontemporary email traffic, the billing practices and deposition testimony all bear out that at least some of the lawyers at each of the three customer class law firms anticipated that Thornton would put the staff attorneys on its lodestar, and lawyers from each firm thought this was appropriate . . . ."). *See also* Lieff's Resp. to Interrog. No. 34, 6/1/17 (SM Ex. 57) ("[I]t was the Firm's understanding that Thornton would include in its lodestar total (to be reported in any Fee Petition submitted by Thornton) any hours worked by Staff Attorneys for which Thornton had borne

---

[20]  Strangely, the Special Master insinuates that there was something nefarious about the fact that staff attorneys accounted for "71.5% of all Thornton hours reported."  *See* R&R at 45.  Yet Lieff's and Labaton's percentage of hours worked by staff or contract attorneys (83.4% and 81.5%, respectively) significantly exceed Thornton's percentage.  In addition, the Special Master has made a mathematical error.  The Thornton staff attorney percentage was 68.9% of all Thornton hours reported, not 71.5%.

financial responsibility."); Lieff's Resp. to Interrog. No. 32, 7/10/17 (TLF Ex. 6) ("With respect

to Staff Attorneys, the Firm's understanding was that for purposes of any lodestar crosscheck,

the Plaintiffs' Law Firms would include in their time reports any attorney hours for which they

had specifically borne the financial obligation and the accompanying risk of non-payment.").

 If attorneys at all three firms understood that Thornton would list the staff attorneys on its

lodestar, it is unclear what possible motive there could have been to deceive, as all firms were

operating under the same assumption.  The Special Master also concluded that the double

counting error was "largely inadvertent and the result of a combination of Labaton's internal

compartmentalization . . . and a lack of any formal agreement."  R&R at 363.  It therefore makes

no sense to suggest that Garrett Bradley could have *intentionally* caused an *inadvertent* error by

signing a boilerplate affidavit.

 In finding that Garrett Bradley was motivated to lie on the fee declaration to deceive co-

counsel, the Special Master glosses over the incontrovertible chronology of the case.  By the

time the fee declaration was submitted to the Court, Customer Class Counsel had already

decided upon a final division of fees.  **There was no way in which the fee declaration**

**submitted to the Court could have affected the proportion of the overall fee which**

**Thornton would receive.**  Here, some background is necessary.  As the Special Master

concedes, in 2011, "[a]t the inception of the case, Customer Class Counsel had agreed to a fee

sharing arrangement pursuant to which Labaton, Lieff, and Thornton would each be entitled to

20% of any fee award, with the remaining 40% to be distributed at the end of the litigation . . . ."

R&R at 51.

 The Special Master does not explicitly say so but appears to believe that the remaining

40% was to be divided up among Labaton, Lieff, and Thornton based on the firms' lodestars

submitted to the Court on September 15, 2016.  This was not the case.  The final fee agreement

among the firms was executed in August 2016, **<u>prior to</u>** the existence of the fee declarations or

lodestars submitted to the Court in September 2016.  *See* Chiplock Dep., 9/8/17, at 135:7-9 (SM

Ex. 41) ("[T]he fee allocation agreement was reached in late August of 2016 . . . ."); Chiplock

Dep., 6/16/17, at 131:5-9 (SM Ex. 10) ("So that was divvied up formally before we actually

submitted the fee petition."); G. Bradley Dep., 6/19/17, at 46:24-47:2 (SM Ex. 43) ("[T]he fact

of the matter is we had a fee agreement in place in August of '16 before we filed the fee

application."); 8/30/16 Email, TLF-SST-032696 (TLF Ex. 7) ("Please see the attached fully

executed fee agreement in the State Street matter.").  Not surprisingly, this important piece of the

chronology is absent from the Report.

   The final fee agreement provided that of the total fee to be divided among Customer

Class Counsel, Labaton would receive 47%, Thornton would receive 29%, and Lieff would

receive 24%.  *See* Final Fee Agreement, TLF-SST-056305, (TLF Ex. 8).  As demonstrated by the

below chart, the fee agreement did **<u>not</u>** track the final lodestar agreement. Although Thornton's

lodestar was smaller than Lieff's, Thornton received a larger portion of the fee split than Lieff

did:

|  | Agreed Fee Split of Customer Class Counsel (August 2016) | Percentage of Customer Class Counsel Total Lodestar (September 2016) |
|---|---|---|
| Labaton | 47% | 50% |
| Thornton | 29% | 22% |
| Lieff | 24% | 28% |

This is illustrative of a broader point: which staff attorneys were on which lodestar did not at all

control the allocation of the fee among counsel.  All of the staff attorneys could have been listed

on Lieff's or Labaton's lodestar, or all of the staff attorneys could have been listed on Thornton's

lodestar—no matter who was on which lodestar, the fee allocation among counsel had already

been determined by negotiations among the three firms.[21]   The purpose of the lodestars

submitted to the Court on September 15, 2016 was not to set an allocation among counsel but

simply to provide backup so that the Court could engage in a "cross-check" and determine

whether the aggregate fee of 25% was reasonable.   The Special Master refuses to acknowledge

this important point.

In terms of rates, the Special Master ignores that some of Lieff's staff attorneys were

actually billed at $515[22] and that **the weighted rate (i.e., total fees divided by total hours) for**

**Thornton staff attorneys ($428) was actually lower than the weighted rate for Lieff staff**

**attorneys ($438).**   If the weighted rate is limited to the "double counted hours," **the Lieff**

**weighted rate is $50 per hour greater than the Thornton weighted rate.**[23]   It's difficult to see

---

[21]   The Special Master finds something troubling in the fact that there was "intertwining of the fee negotiations in the two cases [*BNY Mellon* and the State Street litigation]" as between Lieff and Thornton.   *See* R&R at 52-53. The Special Master's "view [of Bradley intentionally making false statements in Thornton's fee declaration] is informed by the email exchanges between Bradley and Chiplock in which Bradley conveys his belief that Thornton did not receive a fair share of the *BONY Mellon* fee, in part because its lodestar was too low." R&R at 233 n.179.   The fee agreement, which was finalized prior to the submission of the lodestars, was negotiated by sophisticated counsel who had entered into a cost-sharing agreement at the beginning of the litigation and who had finalized the fee division prior to submission of the lodestar.   It would have been unremarkable (and certainly not cause for any kind of concern) if the fee allocation in the *BNY Mellon* case informed the negotiations among counsel in the State Street matter.   The fee allocation among counsel would have **no effect** on the overall amount of attorneys' fees the class would pay to its attorneys.

[22]   There are misrepresentations in the Special Master's report with respect to the staff attorney rates.   At footnote 134 on page 169, the Special Master states that "Lieff Cabraser staff attorneys were billed at $415, except for two staff attorneys (Joshua Bloomfield and Marissa Oh) who were charged at $515." At page 169 in the text, he states "With the exception of two Lieff staff attorneys, those [staff attorney] rates landed mainly between $335 and $440." Both of these statements are false.   Five Lieff staff attorneys were billed at $515, not two. *See* Lieff Decl., 9/14/16, Ex. A (SM Ex. 89).   The Special Master himself acknowledges this in another part of his report on page 176: "Lieff's report listed twenty staff attorneys, five of whom were billed at $515 per hour . . . ." There is another misrepresentation on page 181. There, referring to the double counted staff attorneys, the Special Master states "The attorneys were billed by Labaton at Lieff at hourly rates ranging from $335 to $415." Again, this is false.   As the Special Master acknowledges in footnote 147 on page 180, "Lieff billed two [double counted] staff attorneys – Ann Ten Eyck and Rachel Wintterle – at $515 per hour." In any case, there is no material difference between the Thornton billing rate for staff attorneys, $425, and the rate at which Lieff billed most of its staff attorneys, $415.

[23]   Calculated according to the double-counted hours set forth in 11/9/16 Email, TLF-SST-032267 (SM Ex. 261). According to that email, no hours were double counted for McClelland and Weiss.   To be conservative, double-counted hours for Wintterle and Ten Eyck are the lower of the hours on either the Lieff or the Thornton lodestar since "Rachel Wintterle and Ann Ten Eyck should not have been included in LCHB's lodestar at all,"

how Thornton could deceive Lieff when Lieff's effective staff attorney rate was higher than

Thornton's.  More broadly, the Special Master's laser focus on the $425 per hour rate[24] blinds

him to the fact that by almost every metric, Thornton's rates were lower than one or both of co-

counsel:

| **RATES** | Average Partner | Weighted Partner | Average Staff Atty | Weighted Staff Atty |
|---|---|---|---|---|
| Labaton | $905.00 | $861.13 | $380.42 | $376.59 |
| Lieff | $765.50 | $690.73 | $440.00 | $438.02 |
| Thornton | $721.25 | $694.36 | $428.13 | $427.87 |

Particularly noticeable is that both the average partner rate and weighted partner rate is more

than $150 higher for Labaton than for Thornton.  In none of the four categories listed above is

Thornton the rate leader.  This is hardly demonstrative of a law firm that is trying to inflate rates

to deceive co-counsel (or the Court).[25]

Even if the fee agreement was based on the lodestar submitted to the Court (which it was

not), the Thornton Law Firm's seeking credit for staff attorneys for which it paid could not

possibly have deceived co-counsel—especially when the entire effort related to document review

---

but Wintterle's hours were slightly lower on the Thornton lodestar and Ten Eyck's hours were slightly lower on the Lieff lodestar.

[24]  As discussed *infra* at Section III(B)(iii), the $425 rate was used for Thornton staff attorneys because it was approved by the Court for Lieff staff attorneys in the most analogous case, *BNY Mellon*.  Dan Chiplock had expressly suggested that the $425 rate be used in the State Street litigation.  *See* note 34.

[25]  One statement the Special Master makes with respect to rates is particularly misleading.  He notes in the Executive Summary at page 16, "Indeed, the manner in which Thornton implemented this [cost sharing] agreement appears designed from the inception to exaggerate its lodestar.  Thornton specifically reimbursed the other two firms for the staff attorneys and agency lawyers 'loaned' to them on a straight cost-only basis yet subsequently claimed them on its own lodestar report at rates much higher than Thornton had actually paid the two firms in cost reimbursement, and even higher hourly rates than Labaton and Lieff claimed for most of these same staff attorneys on their own reports."  Here, the Special Master is concerned about the entirely unobjectionable proposition of billing attorneys above cost.  Yet elsewhere in the R&R, the Special Master admits, "[T]here is nothing impermissible about marking up an attorney's billing rate above 'cost' so long as the rate at which the attorney is billed is reasonable and commensurate with experience and the value of the work performed," R&R at 177.  And the Special Master later finds that the billable rate for the staff attorneys was reasonable.  R&R at 172, 180.

- 32 -

and subsequent work was jointly planned and executed by the three customer class firms.  The

Special Master found that "Labaton, Lieff, and Thornton entered into a fee agreement to

'allocate' the costs of certain staff attorneys employed by and working at Labaton and Lieff's

offices to Thornton. . . . The purpose of the cost-sharing agreement was to share the cost and risk

burdens of the litigation among the three Customer Class firms."  R&R at 43.  Lieff and Labaton

are sophisticated parties.  They did not think that Thornton should have borne the risk of paying

for staff attorneys during the pendency of the litigation if it was not going to be rewarded for

taking on such risk if the litigation was successful.  And Lieff and Labaton would not have

themselves agreed to the cost-sharing agreement if it was not in their best interest to distribute

some of the risk—and therefore some of the reward—to Thornton.  *See, e.g.*, Chiplock Dep.,

6/16/17, at 129:6-13 (SM Ex. 10); Belfi Dep., 6/14/17 at 51:8-13 (SM Ex. 17); Rogers Dep.,

6/16/17, at 91:18-92:16 (SM Ex. 54).

This Court should understand the context of what the Special Master perceives as the

"smoking gun"—an email in which Garrett Bradley receives an invoice *from Labaton* for staff

attorneys and writes to Michael Thornton and Michael Lesser, "First month bill. . . . This is the

best way to jack up the loadstar [sic] . . . ."  3/11/15 Email, TLF-SST-011124 (SM Ex. 64).[26]

This email was sent in **February 2015**—more than a year before the fee declaration or lodestar

was filed with the Court.  What Garrett Bradley is referring to is the fact that if Thornton bore

more risk by investing in additional staff attorneys over the course of the litigation in relation to

the other firms (and pursuant to the firms' agreement), Thornton would reap a greater reward **in**

**the fee split among counsel** if the litigation was successful.  **This would in no way increase the**

**aggregate lodestar submitted to the Court or the amount of fees the class would pay its**

---

[26] This email is a long thread that continues into March, but the cited email was sent in February.

**lawyers.**  In fact, Bradley is not referring to the aggregate lodestar, but is using shorthand for the number of hours worked and resources expended *among counsel* for purposes of dividing the fee *among counsel.*  Although the Special Master or his counsel may think "jacking up" serves as a great soundbite, the concept is entirely proper and unobjectionable.

It is worth noting that the very same document demonstrates the Thornton Law Firm's attentiveness to avoiding any inaccuracies in the lodestar.  Michael Lesser later writes, "Just following up on the doc review recordkeeping.  The attached invoice is dated 2/6/2015 (and was sent by email on 2/6 as well) but includes billables through 2/28.  Can you ask them to confirm whether these hours billed were for 2/6 – 2/28?  **I don't want us to double-count anything**." 3/11/15 Email, TLF-SST-011124 (SM Ex. 64) (emphasis added).

Perhaps what the Special Master really finds objectionable, as his so-called expert witness certainly does, is that plaintiffs' lawyers are interested in their fees.  *See* Benjamin Weiser, *Tobacco's Trials*, WASHINGTON POST (Dec. 8, 1996) ("'The plaintiffs' bar is peopled by lawyers who are permanently hungry,' says Stephen Gillers, professor of legal ethics at New York University.  'They're like red ants at a picnic.  There are an unlimited number of them, and if the food is good, they'll keep coming at you.'"); Stephanie Clifford and Benjamin Weiser, *In Shift, New York City Is Quickly Settling Big Civil Rights Lawsuits*, N.Y. TIMES (July 24, 2014) ("'It's like ants at a picnic,' said Stephen Gillers, an expert in ethics and the legal profession at New York University School of Law.  'All of a sudden the food's on the table and here they come.'").[27]

---

[27]   The Thornton Law Firm objects to Prof. Gillers' participation in these proceeding as a "legal expert."  *See* Supplemental Ethical Report for Special Master Gerald E. Rosen at 2 (SM Ex. 233) (stating "I understand that I am the equivalent of a court appointed expert" and noting "the District Court in Massachusetts has recognized legal ethics experts.").  The Court should not permit Prof. Gillers to assume the imprimatur of the Court as an expert on the law.  *See Reed v. Cleveland Bd. Of Ed.*, 607 F.2d 737, 747 (6th Cir. 1979) ("[W]e do not approve the practice of appointing legal advisors to a master or the court.  To the extent that the master was not qualified to make recommendations to the court because of a lack of experience in constitutional law, he

### B.     There Was No Motivation To Deceive The Court

It is telling that the Special Master appears to find only that, in signing the boilerplate

declaration, the Thornton Law Firm was motivated to deceive co-counsel, and not the Court.

Again, in a percentage fee jurisdiction, additional lodestar simply does not provide additional

funds to attorneys seeking a fee award—the lodestar is only used as a cross-check to ensure that

the aggregate fee amount is reasonable.  *See* Rubenstein Decl., 6/20/18, at ¶¶ 19-20; Rubenstein

Decl., 7/31/17, at ¶¶ 14-18 (TLF Ex. 1).  In this case, months before the lodestar was submitted

to the Court, it was already understood by all parties that the attorneys would seek an aggregate

fee of approximately 25%.  *See*, *e.g.*, Chiplock Dep., 9/8/17, at 70:14-71:24 (SM Ex. 41).  The

25% figure was represented to the Court in June 2016, three months before the lodestars were

filed, *see* 6/23/16 Hr'g Tr. at 15:5-16:2 (Dkt. 85), and was published in the Notice of Pendency

dated August 22, 2016.  By the time the lodestars were submitted to the Court in mid-September

2016, the attorneys could not have asked for anything beyond 25%.  It is not as if, for instance,

the Thornton Law Firm could have showed its co-counsel a particularly large lodestar and

convinced them to seek leave to request 27% or 30%**.  The aggregate fee request was already**

**set and, no matter how large their lodestar, there was zero possibility that Thornton could**

**receive more than their agreed upon share (29% of Customer Class Counsel allocation) of**

**the 25% fee request.**

---

should have submitted such legal issues to the court."); *Fishman v. Brooks*, 396 Mass. 643, 650 (1986) ("Expert testimony concerning the fact of an ethical violation is not appropriate, any more than expert testimony is appropriate concerning the violation of, for example, a municipal building code."); *In re: Initial Public Offering Securities Litigation,* 174 F. Supp. 2d 61, 69 n. 11 (S.D.N.Y. 2001) ("Each courtroom comes equipped with a 'legal expert,' called a judge.") (quoting *Burkhart v. Washington Metro. Area Trans. Auth.*, 112 F.3d 1207 (D.C. Cir. 1997)).  The Thornton Law Firm also objects to Prof. Gillers's report on the basis that the factual background section of the report (which, at 58 pages, is the more than half of the report) is replete with mischaracterizations and omissions of record evidence.  This is not surprising, as Prof. Gillers acknowledges that the Special Master and his counsel drafted the factual background section of his report, Gillers Supp. Report, 5/8/18, at 2, and as those mischaracterizations and omissions are repeated in the R&R.

Perhaps the Special Master will next speculate that the Thornton Law Firm might have been motivated to increase its lodestar to provide further support for the Court's cross-check in support of the 25% award. In other words, the higher the lodestar, the lower the multiplier, and the more likely that the Court would find the fee award reasonable. But this is not a realistic motivation for at least two obvious reasons. First, the aggregate fee multiplier in this case was modest and well within the range of what courts find acceptable in awarding fees. *See* Rubenstein Decl., 7/31/17, at ¶¶ 39-45 (TLF Ex. 1); Rubenstein Decl., 6/20/18. There was therefore no need to decrease the multiplier to ensure the Court would approve the award. And second, it would be incredibly difficult for any one firm, especially Thornton, to "move the needle" on the multiplier. Thornton's lodestar represented just 18% of the overall lodestar submitted to the Court. Even if there were an additional $1 million on Thornton's lodestar which was removed, it would have only moved the overall multiplier from 1.804 to 1.849, which is negligible. Indeed, even if Thornton billed all of its staff attorneys at $300 per hour rather than $425 or $500 per hour and the difference was removed, the overall multiplier would have only moved to 1.865, which is also negligible.

It is important to recall the manner in which the Special Master believes the Court was supposedly intentionally deceived. The manner of deception was not falsely increasing hours worked, which would have been very difficult for the Court or anyone else to detect. In fact, the Special Master found that all of the Thornton Law Firm hours were reasonable. R&R at 216-17. The supposed manner of deception was instead signing a boilerplate affidavit (which the Thornton Law Firm did not even draft) and correctly listing on the Thornton's Law Firm's lodestar those staff attorneys which the Thornton Law Firm paid for pursuant to an agreement among co-counsel. The names of the staff attorneys were explicitly listed on the lodestars such

that **anyone** who placed the lodestars side by side would immediately realize that certain

attorneys' time had been double counted.  It is ludicrous to suggest such an obvious and basic

mistake was intentional deception—indeed, it would be perhaps the lamest attempt at deception

in the history of the federal courts.  *Cf. Awkal v. Mitchell*, 613 F.3d 629, 655 (6th Cir. 2010)

(Martin, J., dissenting) ("At some point, Ockham's Razor [sic] must apply—the simplest answer

is usually the correct one."); *Thompson v. Bell*, 373 F.3d 688, 690 (6th Cir. 2004) ("Applying the

principle of Occam's razor, we conclude that more than likely, a genuine mistake was made

. . . .").

### C.   The Special Master's Assertion That Garrett Bradley Did, In Fact, Closely Review The Declaration Prior To Submission Is Based On A Blatant Misrepresentation Of The Evidence

With no true evidence of motivation, the Special Master next finds intentionality based

on "evidence" that Garrett Bradley closely read the boilerplate declaration before singing it and

therefore was aware of his misstatements.  The Special Master states:

> Emails among Garrett Bradley, Mike Lesser and Evan Hoffman show that drafts of the declaration were circulated among these Thornton attorneys for their review. This is confirmed by the testimony of Evan Hoffman: "[w]e put in all the hours that we had kept track of, I along with our accounting department and Anasthasia put in the expenses and then **mostly Mike Lesser and then Garrett Bradley, Mike Thornton and myself all reviewed**" the declaration before Bradley signed it. Hoffman 6/5/17 Dep., p. 94:9-15.

R&R at 229 (emphasis in Special Master's R&R).[28]

Although the Special Master's description makes it seem that he has found another

"smoking gun," the Court's attention should always be piqued when a litigant replaces the

material words of a quotation with his own characterization, and this instance is no different.  In

fact, Mr. Hoffman **does not** say at lines 9 through 15 of page 94 that Messrs. Lesser, Bradley,

---

[28]    The Special Master uses the same quote in his R&R at 59.

and Thornton reviewed the entire boilerplate declaration prior to Mr. Bradley signing it. Mr.

Hoffman instead explained:

> [T]here was a section on fill in what your hours are, fill in what your expenses are, fill in what your lodestar is, fill in what your specific contributions were to the case, and the rest of the language was sort of, it was called a model fee declaration. And so that's what we did, he put in all the hours that we had kept track of, I along with our accounting department and Anasthasia put in the expenses and then mostly Mike Lesser and then Garrett Bradley, Mike Thornton and myself all reviewed **the sort of narrative about the firm's contribution, which I believe mostly Mike Lesser drafted**.

Hoffman Dep., 6/5/17, at 94:1-17 (SM Ex. 63) (emphasis added—the emphasized portion was

omitted from the Special Master's quotation of this deposition).

This is perhaps the most egregious example of the Report's overreaching to identify non-

existent misconduct. The Special Master or his counsel have lifted a partial quote, omitted the

most material aspect of the quote, and substituted their own words to create an entirely different

meaning. Mr. Hoffman **did not** testify that Mr. Bradley reviewed "the declaration" as a whole,

but only that he reviewed the "narrative about the firm's contribution." *Id.* For the Special

Master to find otherwise—and to use it as purported evidence to impose severe sanctions—is

disingenuous and highly misleading. As the Court is aware, the boilerplate Labaton declaration

was a "fill-in-the-blank" document. *See* Hoffman Dep., 6/5/17, at 93:14-22 (SM Ex. 63). There

were two primary portions of the template declaration that each firm needed to customize: the

actual lodestar itself and paragraph 2, in which each firm described its unique contribution to the

litigation. *See* Template Decl., TLF-SST-029797 (TLF Ex. 9) (noting, in paragraph 2:

"Supplement to explain role in the Class Actions and give overview of work performed."). The

rest of the declaration was Labaton's boilerplate and, as the Special Master concluded, the

majority of the firms did not modify the boilerplate section at issue in these proceedings. *See*

R&R at 57. Like the other firms, the Thornton Law Firm carefully drafted a narrative of its

particular contributions and submitted the narrative to the Court as paragraph 2 of its declaration.

This is the "narrative" to which Mr. Hoffman is referring as being reviewed by Mike Lesser,

Mike Thornton, and Garrett Bradley.  It makes sense that the Thornton Law Firm partners

carefully reviewed the customized section of the fee declaration, but in no way does this prove

that Garrett Bradley must have also carefully reviewed the entire boilerplate portion of the fee

declaration.  The Special Master's (or his counsel's) decision to replace the content of sworn

deposition testimony with their own words was obviously not done as a matter of summarization

or for ease of reading: one can only conclude it was intended to change the meaning of the

testimony in order to advance a false narrative.

### D. The Special Master's Assertion That Garrett Bradley Had The "Opportunity" To Give The Declaration A "Close Read" Is Unobjectionable, But Does Not Prove Bradley Intentionally Filed A False Declaration

Without proper evidence of motivation or that Garrett Bradley in fact closely reviewed

the boilerplate portions of the fee declaration, the Special Master also tries to prove that Garrett

Bradley made intentional misrepresentations based on the fact that Bradley had the **opportunity**

to scrutinize the boilerplate declaration.  *See* R&R at 229 ("Though Bradley testified that he only

looked at his declaration before it was filed . . . the record shows that Bradley had ample

opportunity to give the declaration the 'close read' that was required.").  This is, of course, a

classic strawman argument.  No party in these proceedings has ever contended that Garrett

Bradley did not have the "opportunity" to closely read the declaration prior to signing it.  Garrett

Bradley himself has certainly never made this argument.  *See* G. Bradley Dep., 6/19/17, 84:22-

85:1 (SM Ex. 43) ("I saw the final.  Evan brought it in.  I gave it, obviously, not a close read and

then I signed it.  I'm sure I was on e-mail traffic for the draft form, as well.").  Quite simply, the

fact that Garrett Bradley had the opportunity to closely review the boilerplate sections of the

declaration does not mean that he actually did so, and therefore that he knowingly and

- 39 -

intentionally made misrepresentations to the Court.  Certainly Labaton, whose attorneys had the

opportunity (and indeed, whose job it was as lead counsel) to review all fee declarations side by

side and scrutinize them for inaccuracies, did not do so.  The fact that Labaton had the

opportunity to correct the inaccuracies but did not do so does not mean that they made

intentional misrepresentations any more so than the fact that Garrett Bradley had the opportunity

to review the affidavit means he made intentional misrepresentations.

> **E.     The Special Master's Finding Of Intentional Misrepresentation Is Belied By His Inability To Decide Whether Or Not Garrett Bradley Actually Read The Declaration**

It is emblematic of the Special Master's scattershot approach and ever-changing theories

that, in one section of the Report (discussed above) he presents what he believes is hard evidence

that Garrett Bradley carefully reviewed the declaration before it was filed and in the next section

he alleges that "Garrett Bradley did not read the narrative section at all."   In particular, the

Special Master writes:

> Bradley admits that he did not take the time to "closely read" the Declaration before signing it.  **The Special Master believes Bradley did not read the narrative section at all** or if he did, even in a cursory fashion, he turned a blind eye to the falsity of the statements, ignoring the ethical obligations imposed by Rule 11 and the potential impact of the false statements upon the attorney fees approval process.

R&R at 231 (emphasis added).

But the Special Master cannot have it both ways.  The argument is ridiculous on its

face—the Special Master cannot find both that Garrett Bradley read the declaration, knew it was

false, and signed it anyway, and that he signed the declaration without reading it at all.  When

considering the imposition of sanctions, it is the factfinder's job to "marshal the pertinent facts

and apply the fact-dependent legal standard mandated by Rule 11."  *See Cooter & Gell v.*

*Hartmarx Corp.,* 496 U.S. 384, 402 (1990).  Here, the Special Master's own factual

determinations flatly contradict themselves; he therefore could not have properly applied the "fact-dependent" legal standard required by Rule 11.

### F. The Special Master's Assertion That Garrett Bradley Admitted He Intentionally Lied To The Court Grossly Mischaracterizes The Evidence

Lacking any support for the propositions that Garrett Bradley (1) had motivation to lie to the Court; (2) closely read the boilerplate sections of the affidavit prior to signing and therefore intentionally lied to the court; or (3) had the *opportunity* to closely read the boilerplate sections of the affidavit prior to signing and therefore intentionally lied to the court, the Special Master's final argument is that Garrett Bradley simply admitted that he lied to the Court: "At numerous times during the March 7 hearing, Bradley acknowledged that he knew his Declaration contained inaccurate information but he signed it anyway."  This statement appears twice in the Special Master's Report.  *See* R&R at 60, 229.  The problem of course is that Bradley **did not** acknowledge during the hearing that "he knew his Declaration contained inaccurate information but he signed it anyway."  The citations for this "fact" are: "3/7/17 Hearing Tr. P. 87:13-14; 88:2-9; 14-18 [sic]; 91:5-7; 92:3-8."  Below is the transcript of the cited portions of the March 7, 2017 hearing:

87:13-14:

| The Court: | Well, you signed the affidavit. |
| Mr. G. Bradley: | I did, your honor and within that . . . . |

88:2-9:

| The Court: | The Court was told that was their billing rate. |
| Mr. G. Bradley: | That is what the rate was that the Court approved in that case. |
| The Court: | Had you ever charged any of those individuals, paying client, at $425 an hour? |
| Mr. G. Bradley: | We don't have paying clients, your . . . . |

88:14-18:

| Mr. G. Bradley: | The staff attorneys that were listed on there that under – paragraph 4 in my affidavit where it says that we paid them is a mistake, your Honor.   Those individuals were actually housed at Labaton Sucharow or Lieff Cabraser.  We had not used those before.  That paragraph, quite frankly, should . . . . |
|---|---|

91:5-7:

| Mr. G. Bradley: | [A]dmittedly, your Honor, the language here, we should have been clearer in this and that fault lies with me in that particular paragraph. |
|---|---|

92:3-8:

| Mr. G. Bradley: | There was a discussion at the time as to what to use, and then our firm and, I believe, the Lieff firm used the same rates that were used within the *Mellon* case, but everybody understood that those were the rates that were going to be applied to the type of work being done by that group of people. |
|---|---|

In no way do these cited statements show that Bradley "knew his Declaration contained inaccurate information but he signed it anyway."  Mr. Bradley simply did not say so.  What these excerpts instead show is that Garrett Bradley made a basic and very unfortunate mistake.  The Special Master has mischaracterized the record here in the manner one would expect of an overly-aggressive litigant, not a supposed neutral court-appointed factfinder.

### G.    In Fact, Garrett Bradley Made A Mistake And Corrected The Mistake At the Appropriate Time

As demonstrated above, none of the Special Master's evidence even suggests that Garrett Bradley intentionally misled the Court.  Although the Special Master may think he is obligated to justify his $3.8 million investigation by finding some form of intentional misconduct, in actuality, the root of the case is a basic and unfortunate inadvertent error—or in more simple terms, a mistake.  The fact of the matter is that Labaton sent all firms a boilerplate, fill-in-the blank fee declaration with customizable sections for fees, expenses, and a narrative for each firm's unique contribution to the litigation.  *See* Hoffman Dep., 6/5/17, at 93:14-94:8 (SM Ex.

- 42 -

63); Template Decl., TLF-SST-029797 (TLF Ex. 9).  Thornton Law Firm attorneys drafted the

fees, expenses, and firm contribution section and Messrs. Lesser, Bradley, Hoffman, and

Thornton reviewed the firm contribution section.  Hoffman Dep., 6/5/17, at 94:9-17 (SM Ex. 63).

The Thornton Law Firm did not modify the boilerplate portion of the fee declaration at issue here

but neither, as the Special Master found, did six of the nine firms who submitted fee declarations.

*See* R&R at 57.

As Garrett Bradley testified in his deposition, when he signed the boilerplate declaration

he "gave it, obviously, not a close read."  G. Bradley Dep., 6/19/17, at 84:22-23 (SM Ex. 43).  In

other words, he did not scrutinize the boilerplate portion of the declaration to the extent

necessary to have realized that some of its statements were incorrect, or at the very least, unclear.

The errors in the affidavit, although unintentional and, as set forth below, immaterial, are "messy

and . . . embarrassing." G. Bradley Dep., 6/19/17, at 82:20-21 (SM Ex. 43).  Bradley admitted

this mistake to the Court during the March 7, 2017 hearing, noting: "That paragraph, quite

frankly, should have been clarified by me at that time.  It was not," 3/7/17 Hr'g Tr. at 88:18-19

(SM Ex. 96), and "[A]dmittedly, your Honor, the language here, we should have been clearer in

this and that fault lies with me in that particular paragraph," *id*. at 91:5-7.

The double counting, which (as discussed above) was not the Thornton Law Firm's error,

was immediately disclosed to the Court by Customer Class Counsel after a media inquiry alerted

the law firms to the issue.  As the Special Master found, on November 8, 2016, Garrett Bradley

learned from counsel that the *Boston Globe* identified potential double counting on Customer

Class Counsel's lodestar.  *See* R&R at 126-27.  The same day, Bradley contacted Lieff and

Labaton, and all three firms worked diligently to determine the extent of the error and to prepare

a revised and corrected lodestar figure.  *Id*.  A letter informing the Court was filed on November

10, 2016.  The letter, which was signed by Labaton attorney David Goldsmith, noted that counsel

"sincerely apologize[s] to the Court for the inadvertent errors in our written submissions and

presentation during the hearing" and that counsel was "available to respond to any questions or

concerns the Court may have." Goldsmith Ltr. to Ct., 11/10/16, at 3 (SM Ex. 178).

III.    **The Thornton Law Firm Did Not Violate Rule 11**

 A.    **Isolated Factual Errors Cannot Serve As The Basis For Rule 11 Sanctions**

  Sanctioning a lawyer or law firm pursuant to Federal Rule of Civil Procedure 11 is a

severe penalty that should not be imposed broadly.  "Rule 11 sanctions should be reserved for

only the most egregious of lawyerly missteps." *McGee v. Town of Rockland*, No. 11-CV-10523-

RGS, 2012 WL 6644781, at *1 n.2 (D. Mass. Dec. 20, 2012).  As the First Circuit noted in

reversing a district court's imposition of sanctions, "[c]ourts ought not to invoke Rule 11 for

slight cause; the wheels of justice would grind to a halt if lawyers everywhere were sanctioned

every time they made unfounded objections, weak arguments, and dubious factual claims."

*Young v. City of Providence ex rel. Napolitano*, 404 F.3d 33, 39-40 (1st Cir. 2005).  This is

especially so where sanctions are imposed *sua sponte* and counsel are not able to avail

themselves of the Rule's safe-harbor provision when they realize they have erred and may

withdraw a pleading without penalty.  *Young*, 404 F.3d at 40 (noting that, when imposed *sua

sponte*, Rule 11 sanctions are reserved for instances of "serious misconduct"); *Vollmer v. Selden*,

350 F.3d 656, 663 (7th Cir. 2003) ("Absent extraordinary circumstances not shown here, *sua

sponte* sanctions are generally limited to several thousand dollars."); Fed. R. Civ. P. 11 advisory

committee's note ("[S]how cause orders will ordinarily be issued only in situations that are akin

to a contempt of court.").  *See generally* Vairo Decl., 3/26/18 (TLF Ex. 10).

  In this proceeding, it is vital to heed the First Circuit's warning that "Civil Rule 11 is not

a strict liability provision."  *Eldridge v. Gordon Bros. Grp., L.L.C.*, 863 F.3d 66, 88 (1st Cir.

2017) (internal quotation marks omitted).  Statements that are "literally inaccurate" may not be

sanctionable because "Rule 11 neither penalizes overstatement nor authorizes an overly literal

reading of each factual statement."  *Navarro-Ayala v. Hernandez-Colon*, 3 F.3d 464, 467 (1st

Cir. 1993) (Breyer, J.).[29]  *See also Young*, 404 F.3d at 41 (reversing sanctions imposed by district

court where "memorandum may otherwise have been misleading or inaccurate in certain of its

detail"); *Forrest Creek Assocs., Ltd. v. McLean Sav. & Loan Ass'n*, 831 F.2d 1238, 1245 (4th

Cir. 1987) ("[Rule 11] does not extend to isolated factual errors, committed in good faith, so long

as the pleading as a whole remains 'well grounded in fact.'").

The case at bar is on all fours with *Navarro-Ayala*.  There, the First Circuit reversed the

district court's finding of sanctions because "the motion, **read fairly and as a whole**, contain[ed]

**no significant false statement** that **significantly harmed** the other side."  *Navarro-Ayala*, 3

F.3d at 467 (emphasis added).  In so holding, the First Circuit noted that "We emphasize the

word 'significant' because the district court found one sentence literally false," and further

explained that, "the district court, at most, could have found a few isolated instances of

noncritical statements that further inquiry might have shown to be inaccurate or overstated.  That

further inquiry would not have shown the motion's requests to have been baseless."  *Id.* at 467-

68.  *See also Obert v. Republic W. Ins. Co.*, 398 F.3d 138, 143 (1st Cir. 2005) (reversing Rule 11

sanctions where "the affidavit was not knowingly false as to any material fact, although one of

the statements may well have been factually inaccurate and another was a dubious and

unattractive piece of lawyer characterization" and describing the affidavit as "an unsound piece

of lawyer advocacy rather than a lie about a fact").

---

[29]    Although this case construed the pre-1993 version of Rule 11, the 1993 amendments are immaterial to the First
Circuit's analysis.

### B.      The Statements In The Affidavit Do Not Support Rule 11 Sanctions

The Special Master identifies what he believes are six discrete "false statements" in Garrett Bradley's affidavit.  Upon closer examination, it is clear that none of the "false statements" can serve as a proper basis for imposing Rule 11 sanctions.  *See* Vairo Dep., 4/10/18, at 47:23-48:8 (SM Ex. 202).

### i.      Staff Attorneys As Employees

The first two alleged "false statements" are variations on the same criticism—that the attorneys listed on Thornton's lodestar were not technically "employed" by the Thornton Law Firm.  Specifically, the Special Master identifies as false: (1) the statement that the lodestar summarized "time spent by each attorney and professional support staff-member *of my firm* who was involved in the prosecution of the Class Actions"; and (2) the statement that "[f]or personnel who are no longer *employed* by my firm, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of *employment* by my firm."  R&R at 227 (emphasis added).  Of course, both statements are true with respect to the four partners, one associate, and one paralegal listed on the affidavit.  These attorneys and the paralegal were bona fide employees of the Thornton Law Firm.  With respect to the staff attorneys, the statement is literally incorrect in the sense that the staff attorneys were not technically, as a legal matter, employees of the Thornton Law Firm.  It is not, however, as if the staff attorneys had no relationship with Thornton.  In fact, it is undisputed that Thornton paid for all of the staff attorneys listed on its lodestar, whether directly through a staffing agency, or through co-counsel.  And the Special Master has conceded that attorneys at all three law firms understood that the Thornton Law Firm would include the staff attorneys for which it was paying on the Thornton lodestar.  *See supra* § II(A).

- 46 -

The error of including the word "employed" with respect to the staff attorneys was introduced only because Thornton used the boilerplate template of Labaton, a larger firm which predominantly and regularly brings class action cases and has the capacity to employ its own staff attorneys.  Most crucially, by its nature, the error had absolutely no effect on the lodestar figure.  The purpose of the lodestar is to show hours worked—not employment status.  There is no question that the attorneys listed actually worked the hours included on the lodestar, as the Special Master concedes the hours were reasonable.  R&R at 210.[30]  Instead, the Special Master raises only the technical question of whether all attorneys were described properly as "employees."

If the Special Master believes that the reference to staff attorneys (housed at co-counsel but paid for by the Thornton Law Firm) as "employed" is false and sanctionable, it is curious that the Special Master does not recommend Rule 11 sanctions for Lieff and Labaton, both of whom used the **exact same boilerplate** the Special Master finds objectionable as to Thornton.  The Lieff and Labaton affidavits, under the Special Master's hyper-technical reading, also appear to be false.  The Lieff affidavit, for instance, lists as Lieff Cabraser "employees" attorneys who were actually "contract" or "agency" attorneys with whom Lieff Cabraser did not have an employer-employee relationship.[31]  *Compare* Chiplock Decl., 9/14/16 (SM Ex. 89) (referring to

---

[30]   The Special Master does not question any of the hours expended by any of the attorneys in this matter.

[31]   In fact, it seems to be a fairly common practice to list contract attorneys as "employees" or attorneys "of the firm" on lodestars, even though such attorneys are technically not employees.  *Compare* Friedman Decl., Dkt. 916-29, *In re Anthem, Inc. Data Breach Litigation*, No. 5:15-md-02617 (N.D. Cal. Dec. 1, 2017) (noting lodestar contains "detailed summaries of the amount of time spent by my firm's partners, attorneys, and professional support staff") (TLF Ex. 11), *with* Ex. 1, Dkt. 916-10, *Anthem* (listing 15 contract attorneys alongside partners, associates and staff in the firm's lodestar) (TLF Ex. 12); Shuman Decl., Dkt. 506-7, *In re: Oppenheimer Rochester Funds Group Securities Litigation*, No. 1:09-md-02063-JLK-KMT (D. Colo. June 6, 2014) (stating that the lodestar calculation is based on "my firm's current billing rates" or on billing rates "in his or her final year of employment by my firm" for "personnel who are no longer employed at my firm" and attaching a lodestar report that includes a "contract attorney") (TLF Ex. 13).

all attorneys in same manner as Bradley Declaration) *with* Lieff's Resp. to Interrog. No. 24, 7/10/17 (TLF Ex. 6) (noting some attorneys listed on lodestar were contract attorneys). The Labaton affidavit is similarly "flawed" because it lists as "employees" those attorneys who were paid by Thornton pursuant to the cost-sharing agreement. *Compare* Sucharow Decl., 9/15/16 (SM Ex. 88), *with* Labaton's Resp. to Interrog. No. 18, 6/1/17 (SM Ex. 249) (noting that the cost of certain staff attorneys was invoiced to Thornton). By listing staff attorneys as "employees," the Labaton affidavit implies that Labaton paid for all such attorneys when in fact it did not. This is certainly not to say that Lieff and Labaton should be sanctioned for these misstatements, but to emphasize that such misstatements are not sanctionable for any of the three firms. *See Obert*, 398 F.3d at 143 (attorneys should not be sanctioned for erroneously describing a chambers conference as a "hearing").

## ii.   Time Records

The Special Master next contends that the Thornton Law Firm should be sanctioned because the Bradley affidavit states that the lodestar "was prepared from contemporaneous daily time records regularly prepared and maintained by my firm, which are available at the request of the Court." Here it is worth noting that the Special Master finds this statement sanctionable because it is "untrue" on pages 227-28 of his R&R, but on page 59 of his R&R **declines to find that the exact same statement untrue**. R&R at 59 n.46 ("The Special Master, however is unable to conclude that this statement is untrue."). Putting aside the obvious irony of such a clear error in the context of this case, this demonstrates that the "time records" statement is not, as the Special Master contends on pages 227-28, actually false.

If the Court is inclined to accept the Special Master's finding on pages 227-28 rather than the exact opposite finding on page 59, it is important to note the Special Master finds this statement false and sanctionable (on pages 227-28, at least) for two reasons. The first reason is

that "Thornton did not prepare or maintain daily time records of the hours worked by the SAs listed on its lodestar."  R&R at 227-28.

The Special Master's quibble is simply that co-counsel, rather than the Thornton Law Firm, and in some cases perhaps staffing agencies, *prepared and maintained* time records for certain staff attorneys listed on the lodestar.[32]  Again, there is no allegation that the hours were not actually worked, only that the Thornton Law Firm did not state with adequate precision who *prepared* and *maintained* the records.  But the Special Master ignored (at least in this section of the report) evidence that the Thornton Law Firm did, in many cases, *maintain* the time records of staff attorneys for whom it paid, including lawyers at Lieff and Labaton, and Michael Bradley. *See, e.g.*, R&R at 44 (describing how Thornton partner Evan Hoffman kept track of staff attorney time).  Even if the Thornton Law Firm did not maintain or prepare any of the time records, it is certainly a stretch to say a technical error in who *prepared* and *maintained* the time records warrants Rule 11 sanctions.

The Special Master's second criticism is that the clause "was prepared from contemporaneous daily time records regularly prepared and maintained by my firm" is false because "Thornton [did not] maintain *sufficiently reliable* contemporaneous time records for all of the attorneys working on the State Street case."  R&R at 227-28 (emphasis added).  But the Special Master specifically found that Thornton Law Firm partners Michael Lesser and Evan Hoffman *did* maintain sufficiently contemporaneous time records, R&R at 205, and does not appear to take any issue with the timekeeping of the staff attorneys.  The Special Master has only criticized the timekeeping of Garrett Bradley and Michael Thornton.  R&R at 208-09.  In other

---

[32]    Regardless, however, of the Special Master's criticism, for the partners, associate, and paralegal listed on Thornton's lodestar, all time records *were* prepared and maintained by the Thornton Law Firm.

words, the Special Master takes issue with the timekeeping of *two out of the thirty* timekeepers

listed on the Thornton Law Firm's lodestar.  Crucially, he does not conclude that the time

records of these two attorneys were **not** contemporaneous, but that "**it is questionable** whether

the handwritten notes and calendars of Garrett Bradley and Michael Thornton are sufficiently

reliable to constitute contemporaneous records of their time." R&R at 228 n.178.  Despite his

questions as to whether the time records of two attorneys are sufficiently contemporaneous, he

nonetheless concludes that "the total hours expended by each of the Thornton lawyers were

**reasonable** and **sufficiently reliable**." R&R at 216 (emphasis added).  The finding that a small

number of time records *may not* have been contemporaneous (at least in one section of the R&R,

which is flatly contradicted by another), but that nonetheless the time was reasonable, the records

were reliable, and the hours were actually worked, clearly does not support a Rule 11 violation.

### iii.      Rates Accepted In Other Actions

The Special Master finds the statement that lodestar rates "have been accepted in other

complex class actions" false because "[w]ith the exception of 4 staff attorneys, the $425 rate

charged for the remaining staff attorneys listed on the lodestar, including Michael Bradley, had

not been accepted in other complex class actions." R&R at 228.  The Special Master appears to

read the statement as an attestation that each *individual* staff attorney had previously been listed

on an approved lodestar petition at the same rate.  If the Special Master is correct in the meaning

of this phrase, then he would have been obligated to inquire whether each of the 20 staff

attorneys listed on the Lieff affidavit and each of the 35 staff attorneys on the Labaton affidavit

(as well as, for that matter, all of the attorneys on Customer Class Counsel and the ERISA firms'

declarations) had actually been listed on an approved lodestar petition at the relevant rate, or

whether, for instance, some were recent law school graduates who had never previously

appeared on a lodestar.[33]  That the Special Master does not appear to have undertaken this

exercise undermines his interpretation of this phrase.  Clearly the statement that certain "rates"

have been accepted refers to rates for attorney **positions** (such as the staff attorney position), not

rates for **individual** staff attorneys themselves.  This reading is the only one that makes sense

because staff attorneys are often temporary employees who move from firm to firm and

document review to document review and whose rates are often not determined on an individual

basis.

In any event, the rate of $425 per hour, which Thornton charged for its staff attorneys in

this case, **was accepted** by the court in the *BNY Mellon* litigation for the staff attorneys listed on

Lieff's lodestar.  *Compare* Chiplock Decl., Ex. B, Dkt. 622-1, *In re Bank of New York Mellon

Corp. Forex Trans. Lit.*, No. 12-MD-2335 (LAK) (JLC) (S.D.N.Y. Aug. 17, 2015) (SM Ex. 186)

(listing $425 as the rate for nine contract attorneys on Lieff's lodestar) *with* Order Awarding

Attorneys' Fees, Service Awards, and Reimbursement of Litigation Expenses, Dkt. 637, *In re

Bank of New York Mellon Corp. Forex Trans. Lit.*, No. 12-MD-2335 (LAK) (JLC) (S.D.N.Y.

Sept. 24, 2015) (SM Ex. 9) (allocating attorneys' fees "based on the multipliers applied to each

firm's lodestar . . . which are adopted by the Court").  Although Michael Bradley's rate ($500)

was not the rate for staff attorneys in the *BNY Mellon* litigation, the affidavit was not limited to

that litigation, but rather cited "other complex class actions."  G. Bradley Decl., 9/14/16, at ¶ 4

(SM Ex. 66).  As Professor Rubenstein explained in his expert report, rates of up to **$550** per

hour have been accepted in class action litigation for staff attorneys.  *See* Rubenstein Decl.,

---

[33]   For instance, is doubtful that Ann Ten Eyck and Rachel Wintterle, two contract attorneys, had ever been billed on an approved lodestar at $515 per hour.  Lieff intended all staff attorneys to be billed at $415 per hour.  The $515 rate was likely unintentional.  Heimann Dep., 7/17/17, at 109:6-12 (SM Ex. 19).  That is not to say that the $515 rate was not reasonable or that it had not been approved for staff attorneys in other actions, only that it may not have been previously approved for Attorneys Ten Eyck and Wintterle as individuals.

7/31/17, at ¶ 36 (TLF Ex. 1).  Even in this case (the instant State Street litigation), the Court

approved Lieff's lodestar, which listed the rates of five staff attorneys as **$515** per hour, and the

Special Master accepted these rates as well.  *See* R&R at 180-81 (noting "the Special Master

finds noting unreasonable *per se* in the staff attorney rates billed by the Customer Class law

firms . . . .").  In other matters, Labaton has set its staff attorney rates at $500 per hour.  *See*

Labaton's Resp. to Interrog. 48, 7/10/17 (TLF Ex. 14) (referencing *In re Barrick Gold Securities*

*Litigation*, No. 13-cv-3851 (S.D.N.Y.)).  The statement regarding rates "accepted in other

complex class actions" is therefore true and cannot be the basis for Rule 11 sanctions.

Here, it is worth noting that the Special Master implies that it was somehow untoward for

the Thornton Law Firm to use the $425 rate for staff attorneys because he has concluded that

Lieff and Labaton suggested that $425 serve as a cap, not that Thornton actually charge $425 for

its Staff Attorneys.[34]  *See* R&R at 225.  Regardless of the Special Master's insinuations, it is

undisputed that the $425 rate was accepted in the *BNY Mellon* litigation.  It is unclear why it

would be inappropriate for the Thornton Law Firm to use the rate its co-counsel used (and the

court approved) in the case most analogous to the one at bar.  *See* Chiplock Dep., 6/16/17, at

184:20-25; 227:2-4 (SM Ex. 10) ("And so Thornton I think by and large used 425, perhaps

thanks to this e-mail from fall of 2015, where I said, 'in Bank of New York Mellon I think we

used 425,' which I think we did, because Thornton was involved in that case, too.  So they used

425," and "[t]hey [*BNY Mellon* rates] were generally 425, which is the guidance that Thornton

used when they submitted their declarations.").  Moreover, there is hardly any difference

between the rate Lieff set for most of its staff attorneys in the State Street matter (generally $415,

---

[34]    The Special Master's comment that $425 was a "cap" is also inconsistent with the record testimony, which was
ignored by the Special Master.  *See* Chiplock Dep., 9/8/17, at 52:2-5 (SM Ex. 41) (with respect to same email
Special Master discusses, stating "It was my expectation that the three firms would be billing their document
reviewers at comparable rates.  And perhaps the same rate as I'm suggesting here.").

but going up to $515) and Thornton's rate.  As set forth *supra* at section II(A), the average

weighted rate for Lieff staff attorneys was actually higher than the average weighted rate for

Thornton staff attorneys.

### iv.   Current And Regular Rates

The final two errors identified by the Special Master are that the lodestar was "based on

my firm's current billing rates" and that the rates "are the same as my firm's regular rates

charged for their services, which have been accepted in other complex class actions."  It is

understandable that the Court interpreted the phrases "current billing rates" and "charged for

their services" to mean that each firm had paying clients who actually compensated the firms at

the hourly rates listed in the lodestars.  But the message perhaps intended by Labaton's

boilerplate template—albeit unclear and with a poor choice of words—was that these are the

regular rates of the firms which are charged against the common fund in class actions.[35]  This is a

plausible meaning if one understands that plaintiffs' firms, as evidenced by this case, usually do

not have clients who actually pay by the hour.  A simple modifying clause such as "in contingent

fee matters" would have made the matter much more clear for the Court.  Although the

misunderstanding is regrettable, when considered with lack of both intent and materiality, the

statement does not support Rule 11 sanctions.

It is of paramount importance that, although the Special Master has decided to single out

the Thornton Law Firm with respect to the statements "based on my firm's current billing rates"

and "the same as my firm's regular rates charged for their services," **identical phrases** appear in

the Lieff and Labaton fee declarations.  At the March 7, 2017 hearing, all three firms

---

[35]   *See, e.g.,* Labaton Resp. to Interrog. 61, 6/9/17 (SM Ex. 174) ("The intent of the statement used by Labaton, as set forth above, was to convey to the Court that the rates in Exhibit A are the firm's regular standard rates, which are not applied for a specific case or depending on the nature of the work performed, **and that other Courts had found them reasonable when charged to a class in other litigation.**") (emphasis added).

acknowledged that, generally, they do not have clients who pay by the hour. *See, e.g.*, 3/7/17 Hr'g Tr. at 79:9-22; 88:8-9; 93:11-21 (SM Ex. 96). Further, the law firm of Richardson Patrick also submitted a fee declaration containing the **exact same** boilerplate language, SM Ex. 95 at ¶ 4, even though the Special Master found that Richardson Patrick is "a 100% contingent fee firm," R&R at 68. The McTigue Law Firm has "very few" clients who pay hourly rates, McTigue Dep., 7/7/17, at 83:19-84:3 (SM Ex. 11), yet also used nearly the same boilerplate language.[36]

There is no principled basis by which the Special Master can recommend that the Thornton Law Firm should be sanctioned for these misstatements when Lieff, Labaton, Richardson Patrick, and the McTigue Law Firm committed the same non-material error. This is not to say that all five firms should be sanctioned, but that the error itself is not the proper basis for sanctions. In fact, the types of phrases about which the Special Master is concerned, although admittedly confusing, appear to be quite common in fee declarations. For instance, in response to the Special Master's interrogatories, Labaton identified ten cases in which it submitted fee declarations with identical or similar language. *See* Labaton Resp. to Interrog. 61, 6/9/17 (SM Ex. 174). *See also* Labaton Resp. to Interrog. 71, 6/9/17 (SM Ex. 174) (stating that such language "has appeared in Labaton Sucharow's fee petitions for several years."). The leading treatise in this area, *Newberg on Class Actions*, includes in its appendix a sample "Declaration of lead counsel in support of motion for attorney's fees from common fund"

---

[36]   The McTigue Law Firm's declaration used slightly different language. As relevant here, the declaration stated, "The hourly rates for the attorneys and professional support staff in my Firm included in Exhibit A are the same as my Firm's regular rates otherwise charged for their services, which have been accepted in other complex class actions my firm has been involved in." McTigue Decl., 9/13/16, at ¶ 20 (SM Ex. 91). In his deposition, when asked whether the language "might lead a judge to believe that the references to amounts that were actually charged to a paying client," Mr. McTigue responded, "I think it could. And I'm learning." McTigue Dep., 7/7/17, at 87:9-12 (SM Ex. 11).

(Appendix XV-B) and "Declaration of lead counsel in support of motion for attorney's fees" (Appendix XVI-C).  9 NEWBERG ON CLASS ACTIONS (5th ed.).  Those two sample declarations contain language, respectively, that the "lodestar is calculated based on the current hourly rates of the firm" and that "[b]ased upon hourly rates historically charged to my firm's clients, the total lodestar value of this billable time is . . . ."[37]  This is not to say that the language should not be clarified in the future for all plaintiffs' firms, but to suggest that singling out one firm for Rule 11 sanctions is not the appropriate means of doing so.

With respect to the phrase "regular rates," in particular, to the extent plaintiffs' attorneys (who generally do not charge by the hour) have "regular rates," they can only be the rates that they have charged in past actions.  The testimony of Keller Rohrback managing partner Lynn Sarko is particularly illuminating on this point.  Mr. Sarko testified:

> I know in this litigation there's been some questioning about what does the term "regular rates" mean. And I guess, to me, that is a common term that's used in class actions by judges.  And what it means is your standard listed rate.  And if you're a firm that has all contingent fee work, that's your listed rate that you submit your time at, that isn't made up for this case, isn't made up, isn't higher, isn't raised or ballooned or anything, but that's the rate that you offer your services at . . . . [I]n the cases that I regularly appear in and judges that actually have you have fee orders at the beginning, regular rates, at least to me in the industry that I've seen, are the regular rate, posted rates, whether or not – doesn't mean and charged to individual clients because most firms – many of the firms don't have that.

Sarko Dep., 7/6/17, at 90:1-11, 98:23-99:5 (SM Ex. 28).

Here, Thornton's rates were similar or identical to the approved lodestar rates in the most analogous case the Thornton Law Firm handled, the *BNY Mellon* litigation.  The rates for Michael Thornton and Garrett Bradley were identical to the rates approved in the *BNY Mellon*

---

[37] The Thornton Law Firm does not know whether the law firms who drafted these declarations work solely on a contingency basis.  The mere fact, however, that these are the sample declarations in the treatise regularly consulted by contingent plaintiffs' attorneys suggests that this type of language is widely used by contingent firms.

litigation.  The rates for both Evan Hoffman and Michael Lesser were $50 greater than in the *BNY Mellon* litigation to reflect that Hoffman had become a partner and that Lesser had gained valuable expertise in FX litigation from the *BNY Mellon* case.  The rate for associate Jotham Kinder was $30 greater than in the *BNY Mellon* litigation.  The paralegal rate, $210, was identical to the *BNY Mellon* rate.  As discussed above, Thornton is a small firm that had not previously listed staff attorneys on its lodestars, so Thornton used the exact same "regular rate" that Thornton's co-counsel, Lieff, had used (and the court approved) for the staff attorney position in the *BNY Mellon* litigation.

But regardless of whether they were "regular" or not, the Special Master found the rates of the Thornton attorneys reasonable.  "[G]iven that the rates at which Thornton partners and associates were billed were comparable to (and indeed generally less than) Labaton's and Lieff's billing rates, and given the intricacies and difficulties of this case, on the whole the Special Master finds the hourly rates at which Thornton billed its partners and associates on its lodestar report were within the realm of reasonableness.  The Special Master is particularly persuaded that Thornton's billing rates here . . . are reasonable because rates in this range were previously approved for Thornton by the Court in the *BONY Mellon* case."  R&R at 175.

If one ignores the fact that Michael Bradley was working on a purely contingent basis, perhaps it could be argued that his rate should have been listed as $425 per hour to reflect that he was a staff attorney and to match the "regular rate" that Thornton's co-counsel had listed for the staff attorney position in the *BNY Mellon* litigation.[38]  $500 was still well within the range of

---

[38] There may have been exceptions on the Lieff declaration as well.  For instance, the $515 rate at which certain staff attorneys were billed was likely an error since Lieff had made a decision to generally charge staff attorneys at $415.  *See* Heimann Dep., 7/17/17, at 109:6-12 (SM Ex. 19).  That is not to say that the rates were not reasonable, only that they may not have been regular, and that Thornton should not be sanctioned for a single $500 rate any more than Lieff should be sanctioned for the $515 rates.

rates which have been accepted for the staff attorney position in other class actions, *see* Rubenstein Decl., 7/31/17, at ¶ 36 (TLF Ex. 1), but it may well have been an error to describe it as a "regular rate" for the staff attorney position in this matter.  As a mitigating consideration, it is important to note that if Thornton had listed the staff attorney "regular rate" of $425 rather than $500 for Michael Bradley, Thornton's lodestar would have decreased by only $30,480, which represents less than one half of one percent of the Thornton lodestar, and .0007 of the overall lodestar.[39]  Moreover, as discussed above, even when Michael Bradley's rate is included, the weighted average rate for the Thornton Law Firm staff attorneys ($428) was actually lower than the weighted average rate for the Lieff staff attorneys ($438).[40]

## C.      Double Counting

Although the Special Master does not identify the double counting error as a basis for Rule 11 sanctions, it is clear that this error colors his view of the misstatements he identified in the affidavit.  The Special Master, however, has found that the double counting "was simply a mistake that grew out of combination of different circumstances," R&R at 221, and that it was "inadvertent," R&R at 363.  Moreover, as demonstrated above, Thornton cannot be held responsible for the double counting errors, as it is clear that the staff attorneys were double counted on Lieff's and Labaton's lodestars, not on Thornton's.  *See supra* § I(C).  If there is any sanction based upon the double counting issue (which the Special Master does not recommend

---

[39]   Calculated from the overall lodestar figure as submitted to the Court in September 2016.  As noted elsewhere, Michael Bradley's rate was higher than the other staff attorneys, in part, because he was compensated on a contingent basis.  That is, if the class action against State Street did not succeed, Michael Bradley would have been paid absolutely nothing for the over 400 hours of document review he performed.

[40]   It is worth noting that an inadvertent error in Labaton's fee declaration resulted in an overstatement of over $80,000 but that the Special Master did not find this sanctionable or even worthy of mentioning in his Report and Recommendations.  Lawrence Sucharow executed the Fee Declaration in this matter stating that the "[t]ime expended in preparing this application for fees and payment of expenses has not been included in this [fee] request."  Later, it came to light that over 100 hours of time totaling $80,330 related to fee applications was mistakenly included in Labaton's lodestar submitted to the Court.  *See* Labaton Resp. to Interrog. 71, 6/9/17 (SM Ex. 174).

and which would, in any case, be unwarranted), there would be no principled legal basis to simply levy the sanction on Thornton.

### D.     Materiality And Intent

Given the nature of the statements that the Special Master identifies as "false," it is highly relevant that: (1) the "false" statements were immaterial to the overall motion; and (2) Garrett Bradley did not have any intent to deceive the Court.  In terms of materiality, none of the statements in the affidavit affected the overall lodestar amount, which was the purpose of the motion.  *See Navarro-Ayala*, 3 F.3d at 467 (reversing district court's finding of sanctions because "the motion, read fairly and as a whole, contain[ed] no significant false statement that significantly harmed the other side.").  In terms of intent, section II, *supra*, explains why the Thornton Law Firm's fee declaration was not intentionally deceptive but rather the result of inattention.  This fact is crucial.  *See Young*, 404 F.3d at 41 ("We are not suggesting that a deliberate lie would be immune to sanction merely because corrective language can be found buried somewhere else in the document.  But here the trial judge did not find, and in these circumstances could not have found, that plaintiff's counsel had intended to deceive.").  *See also* Vairo Dep., 4/10/18, at 35:17-22, 36:6-7 (SM Ex. 202).

Seen in context, Bradley's affidavit was an isolated instance of inattentiveness due to reliance on a boilerplate affidavit that Bradley knew was prepared by experienced counsel.  *See* Vairo Dep., 4/10/18, at 61:7-12; 78:2-3 (SM Ex. 202) ("Garrett Bradley made a mistake by not taking a closer look at the template before he submitted it to the Court.  But that does not mean he violated Rule 11," and "[t]his is not the type of misstatement that should give rise to Rule 11 sanctions.").  With respect to the double counting, Bradley immediately contacted co-counsel once alerted to the issue and ensured that within two days the Court was informed of the errors. R&R at 126-28. With respect to the additional statements in the affidavit, Bradley took

responsibility for the errors when he acknowledged, during the March 2017 hearing, that certain aspects of his affidavit were factually incorrect. 3/7/17 Hr'g Tr. at 88:8-21 (SM Ex. 96). Clearly sanctions are not warranted in these circumstances. *Cf. United States v. Jones*, 686 F. Supp. 2d 147, 156 (D. Mass. 2010) (Wolf, J.) (in criminal context, imposing no sanctions against prosecutor who, due to "inexcusable and inexplicable" errors, inadvertently neglected to disclose important exculpatory material to defendant). *See also Garbowski v. Tokai Pharm., Inc.*, No. 16-CV-11963, 2018 WL 1370522, at *8 n.5, *11 n.7 (D. Mass. Mar. 16, 2018) (Wolf, J.) (no discussion of sanctions for attorneys who "filed . . . documents in a manner that misrepresented the contents of the Certification" and filed an inaccurate declaration).[41]

## IV.  **The Recommended Sanctions Are Incompatible With Rule 11**

If the Court were to find that the Thornton Law Firm did violate Rule 11, a conclusion with which the Thornton Law Firm strenuously objects, the Court should not accept the Special Master's proposed sanction of $400,000 to $1 million for three reasons: (1) Rule 11 requires that

---

[41]  Immaterial (or even material) errors, when not committed with ill intent, should not generate Rule 11 sanctions. In this very case, for example, the Special Master has made misstatements to the Court. In a letter to the Court dated April 23, 2018, the Special Master requested a delay in the submission of his Report and Recommendations. He stated that "[w]e were prepared to file under seal with the Court by today a hard copy of the Report and Recommendations, together with all exhibits" but noted that certain technical delays in creating a searchable disk with hyperlinks to exhibits necessitated a request for an extension. (Dkt. 217-1). It is clear, however, that the Report and Recommendations was not finalized by April 23, 2018, as the Special Master erroneously represented to the Court. Included as an exhibit to the Report and Recommendations is a "Supplemental Ethical Report for Special Master Gerald E. Rosen" dated **May 8, 2018** (totaling, with exhibits, over 700 pages) (SM Ex. 233), which the Special Master cites throughout the Report and Recommendations.

Also worth noting is that on June 7, 2018, the Special Master filed "Special Master's Responses (Under Seal) to Various Motions of Plaintiffs' Counsel On Redaction and Related Issues" but did not serve the filing on all counsel. On June 9, this Court issued an order citing the Special Master's submission. Once alerted to the existence of the Special Master's submission, counsel inquired of the Special Master's counsel why the Special Master filed an *ex parte* motion with the Court. In response, the Special Master's counsel acknowledged the error and provided all parties with the filing. The copy of the filing provided did not include a certificate of service, which means either that the filing did not conform to Federal Rule of Civil Procedure 5 or that there was a certification on the copy submitted to the Court but that such certification was false because the parties were not actually served. This is not to say that the error was anything other than inadvertent or that the inadvertent error should subject any firm to sanctions, but to highlight the absurdity of the Special Master's hyper-technical reading of the Rules.

sanctions must be "limited to deter repetition of the conduct or comparable conduct of others similarly situated"; (2) the dollar amount of the sanction sought is wildly out of proportion with other sanctions imposed in the First Circuit; and (3) monetary sanctions may not be imposed *sua sponte* if there has been a settlement of the underlying litigation.

## A.   The Recommended Sanction Exceeds What Is Necessary For Deterrence

As an initial matter, it is axiomatic that the central purpose of Rule 11 sanctions is deterrence. *See Lamboy-Ortiz v. Ortiz-Velez*, 630 F.3d 228, 247 (1st Cir. 2010) ("Rule 11 . . . finds its justification exclusively in deterrence."); *Carrieri v. Liberty Life Ins. Co.,* No. 09-12071-RWZ, 2012 WL 664746, at *5 (D. Mass. Feb. 28, 2012) ("It is well established that the purpose of Rule 11 sanctions is to deter rather than to compensate.") (internal quotation marks omitted); *Ultra-Temp Corp. v. Advanced Vacuum Sys., Inc.*, 194 F.R.D. 378, 384 (D. Mass. 2000) ("[U]nder the amended version [of Rule 11], sanctions should be imposed for the purpose of deterrence rather than to compensate the opposing party.").  The Rule explicitly states that any sanction imposed "**must be limited** to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."  Fed. R. Civ. P. 11(c)(4) (emphasis added).[42]

Here, there is no plausible argument that a sanction of between $400,000 and $1 million is needed to deter an inadvertent error in a boilerplate affidavit prepared by another law firm.[43]

---

[42]   Rule 11 was amended in 1993.  The Rule may well have had compensatory purposes prior to the amendment, but it is clear that the current version of Rule 11 finds its purpose in deterrence.  *See Silva v. Witschen*, 19 F.3d 725, 729 n.5 (1st Cir. 1994) ("Under amended Rule 11, however, 'the purpose . . . of sanctions is to deter *rather* than to compensate.'") (quoting Fed. R. Civ. P. 11 advisory committee's notes) (emphasis added by *Silva*); 5A FED. PRAC. & PROC. CIV. § 1336.3 (3d ed.) ("[T]he 1993 revision makes it clear that the main purpose of Rule 11 is to deter improper behavior, not to compensate the victims of it or punish the offender."). Unfortunately, some courts erroneously cite pre-amendment cases for the proposition that today's Rule 11 serves a compensatory purpose.

[43]   The Special Master has set sanctions at 10% to 25% of the double counting error.  As explained above, the disgorgement of the double counting error is unjustified because the lodestar figure served only as a cross-check and not a dollar-for-dollar fee request.  **If the correct disgorgement is $0, Rule 11 sanctions, to the extent any should be imposed, should also be $0.**

Both the monetary and reputational impact of this case on the Thornton Law Firm have already

been severe.  In monetary terms, the Thornton Law Firm (and its co-counsel Lieff and Labaton)

have **already** funded the Special Master's $3.8 million investigation.  As the exclusive purpose

of Rule 11 is deterrence, it is of no moment where the $3.8 million went— the point is that the

Thornton Law Firm has already been sufficiently deterred by paying its ratable share of the

investigation, as well as paying for counsel to represent it during the investigation, and by the

attendant reputational consequences.  It goes without saying that in a typical Rule 11 case,

counsel would not have been charged millions of dollars for the investigation of its own conduct.

The Court therefore must consider the deterrent effect of the funds the law firms have spent on

the investigation in the context of any additional deterrent purposes served by Rule 11 sanctions.

In terms of general deterrence, the $3.8 million investigation as well as the Special

Master's recommendation that the three law firms be disgorged of an additional $6 million has

sufficiently deterred other lawyers who may otherwise sign boilerplate documents without a

sufficiently careful review.  This proceeding and the Special Master's investigation have been

widely covered in the legal press, ensuring that lawyers in this jurisdiction and others are aware

that they introduce errors into fee declarations at their own peril.  It is not a stretch to imagine

that, in light of the extensive coverage of this case, class action attorneys will significantly revise

their boilerplate fee declarations to ensure that all possible ambiguity is removed from their

representations to the court.

It appears that the Special Master's recommendation of a Rule 11 sanction of $400,000 to

$1 million is tainted by his opinion that the sanction should serve a compensatory purpose rather

than a deterrent purpose.  Rule 11 states that sanctions are limited to "nonmonetary directives; an

order to pay a penalty into court; or, if imposed on motion . . . an order directing payment to the

movant of part or all of the reasonable attorney's fees and other expenses directly resulting from

the violation." Fed. R. Civ. P. 11.  The Advisory Committee Notes further note that "a monetary

sanction imposed after a court-initiated show cause order [is] limited to a penalty payable to the

court."  The Special Master has ignored the Rule, instead crafting his own remedy "that the

monetary sanctions should be awarded to the class."  R&R at 365.  This is clear legal error.  *See*

*Lamboy-Ortiz,* 630 F.3d at 244 n.27 ("[A]ny monetary sanction imposed by the court *sua sponte*

must be payable to the court alone."); *Medina v. Gridley Union High Sch. Dist.*, 172 F.3d 57 (9th

Cir. 1999) (table decision) (vacating order to pay *sua sponte* Rule 11 sanctions to party rather

than to the court); *Nw. Bypass Grp. v. U.S. Army Corps of Engineers*, No. 06-CV-00258-JAW,

2008 WL 2679630, at *2 (D.N.H. June 26, 2008) (on reconsideration, vacating award of Rule 11

sanctions to party, and noting, "[t]he only monetary sanction a court may order on its own

initiative is a penalty to the court itself."); *Balerna v. Gilberti*, 281 F.R.D. 63, 71 (D. Mass.

2012).  The Special Master's proposed remedy suggests that he views Rule 11 as compensatory

and has disregarded the deterrent effect of the Thornton Law Firm's funding of his $3.8 million

investigation.

**B.     The Recommended Sanction Is Extraordinary When Compared With First Circuit Precedent**

The First Circuit has warned that "the power to impose sanctions is a potent weapon and

should, therefore, be used in a balanced manner."  *Navarro-Ayala*, 968 F.2d at 1426-27.  Courts

"take pains [not] to use an elephant gun to slay a mouse."  *Anderson v. Beatrice Foods Co.*, 900

F.2d 388, 395 (1st Cir. 1990).  The sanction recommended by the Special Master here is truly

extraordinary.  Undersigned counsel has searched for Rule 11 opinions in all courts in the First

Circuit in the last twenty years.  The sanction proposed by the Special Master is wildly

inconsistent with the sanctions generally imposed in the First Circuit.  Undersigned counsel has

identified only **three** cases in the last twenty years where courts in the First Circuit have imposed sanctions of over $100,000.[44]   These cases are particularly instructive because they show the type of conduct that does—and does not—qualify for severe Rule 11 sanctions.   Notably, in one of the cases, the First Circuit reduced a sanction of $250,000 to only $5,000.

### i.  *In re Nosek*

In 2008, the bankruptcy court issued a $250,000 *sua sponte* sanction against a mortgage company because the company represented to the court on multiple occasions that it held a certain mortgage when, in fact, it did not hold the mortgage.[45]   *In re Nosek*, 386 B.R. 374 (Bankr. D. Mass. 2008).   As later explained by the district court:

> Despite the fact that it had not held the loan since 1997 or serviced it since early 2005, Ameriquest and its attorneys made contrary representations.   It filed a proof of claim and an amended proof of claim in 2002 and 2003 . . . listing itself as creditor without any reference to the assignment of the loan and without attaching a copy of the power of attorney.   It filed pleadings signed by [its] attorneys in 2003 stating that it 'is the holder of the first mortgage . . . .'   It filed an Answer signed by [its] attorneys in 2005 admitting the allegation that it is the holder of the first mortgage.   It conducted an eight-day adversary proceeding in 2006, with representation by [its attorney], without ever notifying the Bankruptcy Court that it was neither the holder nor the servicer of the note and mortgage.

---

[44]   There are occasionally matters where the district court or the bankruptcy court orders sanctions in the amount of costs or fees and the amount of costs or fees does not appear in the opinion.   *See, e.g.*, *Rivera v. Lohnes*, No. 10-2114, 2012 U.S. Dist. LEXIS 29441 (D.P.R. March 5, 2012).   Although it is quite difficult to verify, even in these cases undersigned counsel is not aware of any case in which the amount of costs or fees is or exceeds $100,000.   *See, e.g.*, Judgment, Dkt. 62, *Ruiz-Rivera v. Lohnes*, No. 12-1520 (1st Cir. Jan 8, 2014) (noting that "the district court never set the amount of attorneys' fees that appellant would be required to pay" and that "even if the sanction order were before this court, we could not affirm it.") (TLF Ex. 15).   In a recent opinion, Judge Young discussed Rule 11 and ordered a party to submit a claim for attorneys' fees and costs.   *Shire LLC v. Abhai LLC*, No. 15-13909, 2018 U.S. Dist. LEXIS 46946 (D. Mass. Mar. 22, 2018).   The party's revised motion for fees seeks over $2 million but makes clear that the fees sought are pursuant to Fed. R. Civ. P. 37, the court's inherent power, and 35 U.S.C. § 285 (not, in other words, pursuant to Rule 11).   *See* Plaintiff's Application for Reasonable Attorneys Fees and Expenses, Dkt. 342, *Shire LLC v. Abhai LLC*, No. 1:15-cv-13909 (D. Mass. Apr. 19, 2018) (TLF Ex. 16).

[45]   Sanctions were imposed under the bankruptcy analogue to Rule 11.   In addition to Ameriquest, additional sanctions were imposed on two law firms, an attorney, and another financial services company.   The individual attorney's sanction was vacated on reconsideration by the bankruptcy court.   The other sanctions were vacated by the district court, with the exception of a $25,000 sanction on one of the law firms.   *See In re Nosek*, 406 B.R. 434, 436 (D. Mass. 2009).

*In re Nosek*, 406 B.R. 434, 437 (D. Mass. 2009).

On appeal, the mortgage company admitted that it had misrepresented the status of the mortgage, but argued that the sanction imposed was unreasonable.  In reducing sanctions from $250,000 to $5,000, the First Circuit held that, "accuracy of representations is an objective matter, as is the reasonableness of any inquiry actually made.  But subjective intent can bear on whether to impose a sanction and what amount to fix.  Even a dog, said Holmes, distinguishes between being kicked and being stumbled over."  *In re Nosek*, 609 F.3d 6, 9-10 (1st Cir. 2010) (citing O.W. HOLMES, JR., THE COMMON LAW 3 (1881)) (additional citations omitted).

     ii.     *In re 1095 Commonwealth Corp.*

The bankruptcy court imposed an approximately $143,000 sanction on Citizens Bank under the bankruptcy analogue to Rule 11 for substantial misrepresentations regarding the amount of attorneys' fees sought.  *In re 1095 Commonwealth Ave. Corp.*, 204 B.R. 284 (Bankr. D. Mass. 1997).[46]  Specifically, in support of a motion for attorneys' fees, Citizens Bank filed an affidavit in which it stated that it had "incurred" legal fees in the amount of $262,419.40 and had paid such fees to its law firm.  In fact, the law firm had an arrangement whereby it charged Citizens a special negotiated rate for fees actually paid by Citizens, but "in the event that [the bankrupt party] should ultimately be responsible to Citizens for fees, Brown Rudnick would charge Citizens the standard, generally higher hourly attorney rates.  In effect, the higher fees would only be charged if Citizens was not going to pay the fees."  *In re 1095 Commonwealth Corp.*, 236 B.R. 530, 533 (D. Mass. 1999).  After the dual-fee arrangement was uncovered, one of the lawyers for Citizens "continued his attempt to conceal from the Court and the Debtors the nature of the agreement."  *In re 1095 Commonwealth Ave. Corp.*, 204 B.R. at 299.  In affirming

---

[46]    The sanction was imposed over twenty years ago, in 1997, but undersigned counsel includes this case because the affirmance by the district court occurred in 1999.

the imposition of $143,000 in sanctions, the district court noted that the bankruptcy court "found

that the intentional nondisclosure of the fee agreement was the equivalent of fraud." *In re 1095

Commonwealth Corp.*, 236 B.R. at 533. The amount of the sanction (imposed on motion, not

*sua sponte*) was equivalent to the attorneys' fees and expenses the bankrupt party incurred in

opposing Citizen's fee petition.[47]

### iii.   *Sanchez v. Esso Standard Oil de Puerto Rico*

The District of Puerto Rico sanctioned plaintiffs approximately $513,000, which

represented certain costs incurred by defendant defending environmental litigation which was

"frivolous, unreasonable, and lacking a factual foundation" and in which plaintiffs "wrongfully

procured injunctive relief based upon false testimony." *Sanchez v. Esso Standard Oil de Puerto

Rico, Inc.*, No. CIV 08-2151, 2010 WL 3809990, at *10, *14 (D.P.R. Sept. 29, 2010). The court

noted that the plaintiffs' attorneys "acted in bad faith by . . . attempting to deceive this court . . .

and dragging out the expensive litigation for over a year without factual support and without any

reasonable hope of prevailing on the merits." *Id.* at *18 (internal quotations omitted). The court

also ordered that plaintiffs and their attorney pay the defendants' attorney's fees for part of the

litigation. Although undersigned counsel is including this case among the three First Circuit

cases in the last twenty years where Rule 11 sanctions exceeded $100,000, it should be noted that

the sanction was imposed in the first instance under 28 USC § 1927 and in the alternative under

Rule 11, the court's inherent sanction power, or the fee-shifting section of the statute pursuant to

which the underlying action was brought. The sanction was unusual in that the court appears to

---

[47] For sanctions imposed on motion, "under unusual circumstances . . . deterrence may be ineffective unless the sanction not only requires the person violating the rule to make a monetary payment, but also directs that some or all of this payment be made to those injured by the violation. Accordingly, the rule authorizes the court, if requested in a motion and if so warranted, to award attorney's fees to another party." Fed. R. Civ. P. 11 advisory committee's note.

have approved a settlement between the parties in which plaintiffs paid defendant $315,000 to

settle all claims, including any costs and fees pursuant to the court-ordered sanction.[48]  *See*

Agreed Final Judgement, Dkt. 513, *Sanchez v. Esso Std. Oil Co.*, No 3:08-cv-02151 (D.P.R. Apr.

13, 2011) (TLF Ex. 17).

### C.      The Special Master Has Ignored Rule 11's Prohibition On Imposition Of Monetary Sanctions Post-Settlement

In recommending a significant monetary sanction, the Special Master has wholly ignored

section 5 of Rule 11, titled "Limitations on Monetary Sanctions," and thereby committed another

serious legal error.  That section states that "The court must not impose a monetary sanction . . .

on its own, unless it used the show-cause order under Rule 11(c)(3) before voluntary dismissal or

settlement of the claims made by or against the party that is, or whose attorneys are, to be

sanctioned."  Here, the Court entered its Order and Final Judgment approving the settlement

between State Street and the Class (i.e., the "settlement of the claims made by or against the

party") on November 2, 2016.  *See* Order and Final Judgment, 11/2/16 (SM Ex 113).  The Court

has not issued a show-cause order contemplated by Rule 11(c)(3).  Even if one were to interpret

the Court's February 6, 2017 Order as a Rule 11(c)(3) show-cause order, it was still issued after

the settlement.  The Special Master's failure to even consider this strict requirement is another

example of his and his counsel's inattention to the law and to the facts.  *See, e.g.*, *Wohllaib v.*

*U.S. Dist. Court for the W. Dist. of Washington, Seattle*, 401 F. App'x 173 (9th Cir. 2010)

(reversing *sua sponte* monetary sanction and noting "Rule 11 clearly prohibits a district court

from *sua sponte* issuing an order to show cause why the court should not impose a monetary

sanction if the parties have already settled a case."); *Steeger v. JMS Cleaning Servs.*, No.

---

[48]     The court also agreed that plaintiffs' attorney could pay defendant $10,000 in lieu of court-ordered sanctions.

17CV8013, 2018 WL 1363497 (S.D.N.Y. Mar. 15, 2018) (on reconsideration, vacating monetary

sanctions imposed *sua sponte*).  *See also* 5A FED. PRAC. & PROC. CIV. § 1336.3 (3d ed.);

MOORE'S FEDERAL PRACTICE, § 11.22(2)(b) (3d ed.).

**V.      Garrett Bradley Should Not Be Referred To The Board of Bar Overseers**

**A.      The Conduct At Issue Affects All Firms Yet The Special Master Unfairly Recommends Only Garrett Bradley For Discipline**

As an initial matter, the Special Master's recommendation that Garrett Bradley be

referred to the Board of Bar Overseers for inadvertent misstatements in a boilerplate affidavit

contradicts "the basic principle of justice that like cases should be decided alike."  *Martin v.*

*Franklin Capital Corp.*, 546 U.S. 132, 139 (2005).  As demonstrated above, nearly identical

misstatements were made by lawyers from the other law firms involved in this litigation—the

majority of whom used the same boilerplate affidavit— yet the Special Master recommends

discipline only for Garrett Bradley.  Further, with respect to the Chargois arrangement

(supposedly "the most disturbing aspect of what was learned during the entire investigation,"

R&R at 330), the Special Master found violations of multiple ethical rules, *see* R&R at 250, 255,

286, 322, 326, yet recommends "no professional disciplinary action be taken," *id.* at 371.  This is

not to say all firms should be referred for professional discipline, but to note that Garrett

Bradley's conduct does not warrant professional discipline for him or his firm, particularly with

respect to the technical and immaterial misstatements in the fee declaration.  *Cf.*  Lieberman

Dep., 4/4/18, at 91:21-92:6 (SM Ex. 228).

**B.      The Special Master's Reliance On *Matter of Schiff* Is Clearly Wrong**

As further evidence of the serious flaws in the Special Master's Report and

Recommendations, the Court need look no further than the Special Master's primary authority

for the proposition that Garrett Bradley should be referred to the BBO—*Matter of Schiff*.  The

Special Master writes of this case, "The Rhode Island Court's handling of *Schiff* informs the Special Master with regard to Bradley's false Declaration in this matter." R&R at 241. But the *Schiff* case has absolutely no bearing on any potential discipline for Garrett Bradley or the other lawyers who signed boilerplate fee declarations. The Special Master's extensive discussion of this case—which takes up nearly three pages of his Report and Recommendations— suggests that the Special Master or his counsel are either: (1) disingenuous because they know the *Schiff* case has no relevance here but rely on it anyway; or (2) simply unable to understand the difference between two readily distinguishable cases. Both possibilities are cause for concern.

The procedural history underlying the *Schiff* case is "bizarre, not to say byzantine." *Pontarelli v. Stone*, 978 F.2d 773, 774 (1st Cir. 1992). Attorney Schiff represented a police fraternal organization and five police officers in an eight-count civil rights lawsuit against Rhode Island and four Rhode Island officials filed in June 1986. *Pontarelli v. Stone*, 930 F.2d 104, 107 (1st Cir. 1991). At the conclusion of the district court proceedings, all defendants prevailed against all plaintiffs except for three judgments on a single count of sex discrimination obtained by one plaintiff against Rhode Island ($2.00), and two officials ($10,002 and $5,002.). *See id; Pontarelli v. Stone*, 781 F. Supp. 114, 118 (D.R.I. 1992). Despite the relatively modest judgment, plaintiff moved for attorneys' fees of $511,951.00 and costs of $203,268.28 (in other words, over forty times greater than the recovery) pursuant to 42 U.S.C. § 1988. *Pontarelli*, 781 F. Supp. at 118. In connection with the fee petition, Attorney Schiff signed an affidavit stating that "the summaries of time and charges for my services attached hereto present an accurate statement of services performed in connection with this litigation and was prepared from contemporaneous time records, and with respect to sums for costs and expenses, from accounting records." *Matter of Schiff*, 684 A.2d 1126, 1140 (R.I. 1996). The district court found the

affidavit to be false and referred Schiff to the Rhode Island Supreme Court, which ultimately imposed an 18-month suspension.  *Id.* at 1127, 1138; *Matter of Schiff*, 677 A.2d 422, 425 (R.I. 1996).

There are two similarities between *Schiff* and the case at bar:  both are about attorneys' fees and both concern boilerplate statements in an affidavit.  The similarities end there.  The nature of the falsity in the *Schiff*—where the court found "**the fee claimed has been grossly inflated**" and the fee declaration was "**riddled with misrepresentations**"—is worlds apart from the nature of the alleged falsity in this case.[49]  *Schiff*, 684 A.2d at 1134, 1136 (emphasis added). In *Schiff*, the "**[t]he billing sheets submitted by respondent sought reimbursement for work unrelated to the case [and] sought payment for time not worked.**"  *Schiff*, 677 A.2d at 423 (emphasis added).  The records demonstrated a "lack of good faith effort to eliminate time expended on separate unsuccessful claims or on behalf of unsuccessful litigants or to exclude hours which [were] 'excessive, redundant, or otherwise unnecessary.'"[50]  *Pontarelli*, 781 F. Supp. at 121.  The Rhode Island Supreme Court found that the "misrepresentations to the court bear a close resemblance to an attempt to obtain money under false pretenses."  *Schiff*, 677 A.2d at 425.  The nature of the "grossly inflated" billing is astounding:

> For example, according to the records submitted, Ms. Schiff worked on this case for 25.7 hours on October 9, 1988, and 26.6 hours on October 10, 1988. While it may be possible to work around the clock for two consecutive days without respite, it clearly is impossible to do so for more than 24 hours in any one day.  The summary also indicates that on April 14, 1988, Ms. Schiff spent 8.9 hours travelling

---

[49] As explained above, the lodestar was submitted in this case so that the Court could determine whether the 25% fee was reasonable (*i.e.*, the "cross-check").  Additional hours or fees on the lodestar would not have increased the fees paid to the plaintiffs' attorneys, but simply reduced the multiplier, making it more likely that the court would find the 25% fee reasonable.  This is wholly different from the fee petition Attorney Schiff filed pursuant to 42 U.S.C. § 1988, where the hours and fees listed on the declaration represented the actual funds sought from the defendants.

[50] In addition to this malfeasance, the Court found Plaintiff engaged in "an effort to accomplish a goal completely unrelated to the stated purpose of litigation by making unsupportable claims against third persons."  *Pontarelli*, 781 F. Supp. at 127.

to New York for a meeting. That was only two days after she wrote to the Court advising that she was unable to meet a filing deadline because of a totally incapacitating illness that would prevent her from engaging in normal activities for 7–10 days. Her incapacity was confirmed by another letter she sent to the Court on April 20 indicating that she had been hospitalized until April 19.

\*\*

[C]ompensation is sought for more than 4,000 billable hours which represent more than two full years of a lawyer's billable time. However, despite the sweeping allegations contained in the complaint, the "plaintiffs'" claims were based on a relatively simple sequence of events occurring over a limited period of time. It is inconceivable that even the most vigorous advocacy of those claims required anywhere near the number of hours for which the "plaintiffs" seek recovery.

*Schiff*, 684 A.2d at 1133-35.

There were also serious allegations that Schiff inflated costs:

[T]hey assert that they have paid $22,510.17 for the services of three private investigators and approximately $40,000.00 in expert witness fees and expenses. However, they are unable to produce any bills or other documentation showing what services were performed, when they were rendered, how much time was involved, what rates were charged or what expenses are included in those sums.

\*\*

A total of nearly $15,000.00 is claimed for "lodging" expenses. Of that amount, $4,800.00 is identified as "apartment rental" for the two out-of-state attorneys who participated in the trial. That sum, itself, seems excessive inasmuch as the trial lasted for only 17 days. The remaining $10,200.00 consists of hotel bills for unidentified "expert witnesses" who never testified and other individuals who were identified but whose roles in the case, if any, are unknown.

\*\*

Superimposed on this complete absence of documentation is the same kind of misrepresentation that permeates the "plaintiffs'" requests for attorneys' fees. Thus, the plaintiffs seek reimbursement for very precise amounts allegedly expended for items such as office supplies ($479.50 and $877.75), postage ($548.40), and photocopying ($10,320.00, $550.00, $3,689.23). Those figures clearly convey, and presumably were intended to convey, the impression that they were derived from detailed records or exact measurement of the quantities of each item involved. However, on cross-examination, Ms. Schiff admitted that they were only "estimates" and that there is no documentation to support them.

*Id.* at 1135-36.

Contrast the findings in *Schiff* with the case at bar.  **Here, there is no evidence whatsoever of false, inflated, or unreasonable billings.**  Instead, the Special Master himself found that: (1) the total fees awarded to class counsel were justified and reasonable, *see* R&R at 6 ("By itself, this attorneys' fee award was not disproportionate or unsupportable when measured against the positive result for the class and the attorneys' effort and skill that was required to achieve it.  Indeed, all other things being equal, the attorneys' fee award was fair, reasonable and deserved."); (2) the rates listed for Thornton partners and associates were justified and reasonable, s*ee* R&R at 175 ("[G]iven the intricacies and difficulties of this case, on the whole the Special Master finds the hourly rates at which Thornton billed its partners and associates on its lodestar report were within the realm of reasonableness."); (3) with the exception of Michael Bradley and the contract attorneys, the rates listed for the staff attorneys were reasonable and justified, *see* R&R at 172, 180 ("[W]e find that the higher rates billed were justified in this instance" and "[t]he Special Master concludes that the staff attorney billing rates in the lodestar fee petition are generally reasonable . . . ."); and most importantly, (4) the Thornton attorneys actually worked the hours listed on the lodestar, and the number of hours worked was reasonable, *see* R&R at 216 ("[T]he total hours expended by each of the Thornton lawyers were reasonable and sufficiently reliable"); *id.* at 217 ("[T]he total time Michael Bradley spent working on the *State Street* document review, 406.4 hours, was reasonable.").

In short, the nature of the falsity in the *Schiff* case goes to the very essence of the fee request—the number of hours actually worked and the reasonableness of those hours—whereas the nature of the falsity alleged here relates to erroneous (or at the very least, ambiguous) and immaterial statements that did not affect the overall lodestar.  In *Schiff,* the declaration was false because—boilerplate or not— the attached statement of fees was not true and correct.  Here, the

declaration *language* itself contained errors regarding, for instance, the nature of the employee-employer relationship between the Thornton Law Firm and the staff attorneys for whom it paid; the Special Master found the accompanying hours and time to be reasonable and reliable. There simply is no comparison between the two and it is bizarre that the Special Master concludes that "[t]he facts in *Matter of Schiff* are **eerily similar** to those here."[51]  *See* R&R at 244 (emphasis added).  Justice Holmes' axiom, cited above by the First Circuit, again seems particularly apt: "Even a dog knows the difference between being kicked and being stumbled over."  O.W. HOLMES, JR., THE COMMON LAW 3 (1881).

### C.   Garrett Bradley Did Not Violate MRPC 3.3 or 8.4

If the Court were to consider referring Garrett Bradley to the BBO—a step which should be reserved for only serious misconduct—it would have no basis for doing so.[52]  In signing a boilerplate affidavit that contained inadvertent and immaterial errors, Bradley violated neither Massachusetts Rule of Professional Conduct 3.3(a)(1) nor 8.4 because he did not have actual knowledge of any false statement.

Rule 3.3(a)(1) states in relevant part that "[a] lawyer shall not **knowingly** make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law

---

[51]   *Compare* R&R at 244 ("Just like Schiff's affidavit, Garrett Bradley's Declaration here was a sworn statement designed to convince Judge Wolf that Thornton's fee petition was fair, reasonable, and accurate") *with* R&R at 6 ("[T]he attorneys' fee award was fair, reasonable, and deserved.").

[52]   The Court's Local Rules regarding disciplinary procedures and referrals were amended effective January 1, 2015.  Pursuant to the new rules, there is now a question of whether the judicial officer presiding over the case should be the judicial officer who determines whether or not to refer attorneys to the Board of Bar Overseers. *Compare* L.R. 83.6.5 (effective Jan. 1, 2015) *with* L.R. 83.6.5(A) (version which appears to have been in effect prior to Jan. 1, 2015) ("When misconduct or allegations of misconduct that, if substantiated, would warrant discipline as to an attorney admitted to practice before this court, is brought to the attention of a judicial officer, whether by complaint or otherwise, and the applicable procedure is not otherwise mandated by these rules, the judicial officer may refer the matter to counsel for investigation, the prosecution of a formal disciplinary proceeding or the formulation of such other recommendation as may be appropriate."). *See Gonsalves v. City of New Bedford*, 168 F.R.D. 102, 107 n.100 (D. Mass. 1996) (Wolf, J.); *Blake v. NSTAR Elec. Corp.*, No. 09-10955, 2013 WL 5348561, at *1 n.1 (D. Mass. Sept. 20, 2013).

previously made to the tribunal by the lawyer." Mass. R. Prof. C. 3.3(a)(1) (emphasis added).

The Rules define "knowingly" as "**actual knowledge** of the fact in question." Mass. R. Prof. C.

1.0(g) (emphasis added).  This intent standard does not reach negligent or inadvertent

misrepresentations.  The drafters of the Rule knew how to employ a negligence standard but

affirmatively did not do so in the candor to the tribunal provision.  *See* Mass. R. Prof. C. 4.3

(using the "[w]hen the lawyer knows or reasonably should know" standard for communications

with unrepresented parties); Mass. R. Prof. C. 8.2 (using the "knows to be false or with reckless

disregard as to its truth or falsity" standard for statements regarding integrity of judges).[53]

Indeed, as the Special Master's own so-called expert acknowledged, the test for whether

an attorney violated Rule 3.3(a)(1) is **subjective**.  Gillers Dep., 3/20/18, at 272:4-21 (SM Ex.

253).  That is, in determining whether there has been a violation, the tribunal must ask not what

the reasonable attorney *would have known*, but what the attorney *actually knew* when he

presented facts to the Court.  *See* W. Bradley Wendel*, Monroe Freedman: The Ethicist of the*

*Non-Ideal,* 44 HOFSTRA L. REV. 671, 680 n.8 (2016) ("Knowledge is defined in the *Model Rules*

as actual (that is, subjective) knowledge.") (citations omitted); Rutherford B. Campbell, Jr. &

Eugene R. Gaetke, *The Ethical Obligation of Transactional Lawyers to Act As Gatekeepers*, 56

RUTGERS L. REV. 9, 51 (2003) ("[T]he Model Rules eschew an objective standard . . . opting

instead to judge the propriety of the lawyer's conduct under a subjective, actual knowledge

standard.").

As with violations of Rule 3.3, Rule 8.4(c) does not apply to mistakes.  *See In re Murray*,

455 Mass. 872, 881 (2010) (upholding hearing committee's finding that attorney did not violate

---

[53]  In *In re Hilson,* 448 Mass. 603 (2007), the Supreme Judicial Court suggested, but did not hold, that Rule 3.3 could be violated by "reckless disregard for . . . truth or falsity."

Rule 8.4(c) where "no intent to mislead"); *Matter of McCabe*, 13 Mass. Att'y Disc. R. 501

(Appeal Panel Report, September 1997) ("[T]he conduct must be intentional, not merely

negligent."); *Matter of Thurston*, 13 Mass. Att'y Disc. R. 776 (Board Memorandum, May 12,

1997) (striking hearing committee's finding that attorney violated DR 1-102(A)(4) [predecessor

to 8.4(c)] and noting, "As Bar Counsel concedes, a negligent misrepresentation does not violate

DR 1-102(A)(4) because the rule prohibits only intentional conduct."). Professor Gillers agrees

and stated in his deposition that the mental state required for a Rule 8.4 violation should not be

lower than the mental state required for a Rule 3.3 violation. Gillers Dep., 3/20/18, at 275:9-21

(SM Ex. 253).[54]

The Supreme Judicial Court's *In re Diviacchi* opinion, which the Special Master cites, is

not to the contrary. There, the attorney committed multiple ethical violations, including charging

excessive fees, and sued his client in both federal and state courts. In one of the lawsuits, the

attorney alleged the client had a "standard habit" where she "hires an attorney, works him or her

until she stops paying the bills, fires that attorney and disputes the bill and files a [BBO]

complaint, and then gets another attorney and starts the process again." *In re Diviacchi*, 475

Mass. 1013, 1017 (2016). In fact, there was no evidence of such a pattern, and in particular,

there was no evidence of any BBO complaints. In upholding the sanction, the Court cited a

comment to Rule 3.3 and rejected the attorney's argument that his statements "should be

---

[54]   The BBO has not always spoken with one voice. In a few instances, particular fact summaries compiled by the BBO have suggested that a negligent misrepresentation may be sufficient for a violation of Rule 8.4. For instance, in *In re Ged* (Public Reprimand 2004-17), the attorney received a public reprimand for erroneously including hours that he did not actually work on a fee petition. The matter, however, was resolved by a stipulation which waived a hearing. Similarly, in *In re Tiberii* (Public Reprimand 1996-4), the BBO imposed a public reprimand for negligent misrepresentations under both the predecessor to 8.4 and the predecessor to 3.3. *See also In re Paul J. Pezza* (No. BD-2013-116) (although the paucity of facts prevents the reader from understanding which intent standard was actually used). The precedents cited above, and that of the Supreme Judicial Court, however, suggest that intentionality is required. *See In re Discipline of an Attorney*, 448 Mass. 819, 831 n.17 (2007); *Matter of Zak*, 476 Mass. 1034, 1038 (2017).

evaluated under a subjective, good faith basis standard" even though he could not provide any factual basis for them.  *Id.* at 1020.  *Diviacchi* did not alter the "actual knowledge" standard in Rule 3.3; the *Diviacchi* attorney was not merely inattentive in reviewing an affidavit, but intentionally concocted, and swore to the truth of, defamatory allegations about his client.

Nor could the "actual knowledge" standard be changed by a comment to a Rule.[55]  As the First Circuit has noted regarding the Rhode Island Rules of Professional Conduct, "[a] Comment cannot substantively change the text of [a] Rule."  *Whitehouse v. U.S. Dist. Court for the Dist. of Rhode Island*, 53 F.3d 1349, 1358 n.12 (1st Cir. 1995).  And the Rules themselves state, "Comments do not add obligations to the Rules. . . . The Comments are intended as guides to interpretation, but the text of each Rule is authoritative."[56]  Mass. R. Prof. C. Scope §§ 1,9.  *See also Clark v. Beverly Health and Rehab. Servs., Inc.*, 440 Mass. 270, 275 n.8 (2003) ("[A Comment] is an illustrative tool, not a bootstrap.  While it provides guidance to the practitioner in certain circumstances, it cannot enlarge, diminish, or in any way affect the scope of the . . . rule itself."); *Matter of Larsen*, 379 P.3d 1209, 1214 (Utah 2016) ("[Ou]r rules require proof of *actual knowledge*.  That concept is distinct from constructive knowledge or recklessness. . . . [Rule 3.3], as written, does not lend itself to the interpretation that a false statement made

---

[55]   The Special Master believes Comment 3 to Rule 3.3 is applicable, which states "an assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry."  *See* R&R at 240; Mass. R. Prof. C. 3.3.

[56]   In any event, a federal court is not bound by a state's interpretation of disciplinary rules.  *See Grievance Comm. For S. Dist. of New York v. Simels*, 48 F.3d 640, 645 (2d Cir. 1995) ("[W]ell-established principles of federalism require that federal courts not be bound by either the interpretations of state courts or opinions of various bar association committees."); *Figueroa-Olmo v. Westinghouse Elec. Corp.*, 616 F. Supp. 1445, 1450 (D.P.R. 1985) ("The manner in which the Supreme Court of Puerto Rico applied its disciplinary code was, of course, useful precedent in our own interpretation of that code's application to a particular situation before us, but it is essential to understand that the primary responsibility for supervising the conduct of the attorneys who practice before this court lies precisely with this forum.").

without a 'reasonably diligent inquiry' is a *knowing* misstatement in violation of the rule. . . . We accordingly repudiate Comment 3 in the Advisory Committee Notes to rule 3.3.").

Here, as set forth above, there is no evidence that Garrett Bradley had "actual knowledge" that the affidavit submitted in September 2016 contained "false" information.[57] Bradley's admission of an inadvertent mistake does not lead to the conclusion that Bradley knowingly made false statements to the court.  As even Professor Gillers acknowledged in his deposition, a careless mistake is not equivalent to a knowing misrepresentation.  Gillers Dep., 3/20/18, at 269:5-7 (SM Ex. 253).  And here, there is a question about the ambiguity, materiality, and import of the statements in the affidavit.  *See Sheppard v. River Valley Fitness One, L.P.*, 428 F.3d 1, 8 (1st Cir. 2005) ("Anyway, it seems to us that a finding of ethical misconduct, so fraught with consequences for a lawyer's professional reputation, should not rest on such fine distinctions.  If the court has trouble coming to an unqualified conclusion about the parties' settlement status, then [respondent] can hardly be charged with telling a knowing falsehood—the standard set forth by the Rules of Professional Conduct—under such circumstances.").

There is also no evidence to support the proposition that Garrett Bradley violated Rule 3.3(a) by failing to correct a false statement of material fact.[58]  The Special Master is only able to conclude Bradley violated 3.3(a) in this manner because he assumes that, when Bradley submitted the Declaration in September 2016, Bradley had actual knowledge that his Declaration was false.  *See* R&R at 233.  If that assumption were correct, it may well follow that Rule 3.3(a) was violated from the moment Bradley submitted the Declaration until the moment the errors were disclosed to the Court in the March 2017 hearing.  But, as noted, the "evidence" cited for

---

[57]  The nature of this "false" information is discussed *supra* § III(B).

[58]  The Thornton Law Firm objects to the characterization of the errors in the fee declaration as material.  This is an additional reason why Garrett Bradley did not violate this provision of Rule 3.3.

the predicate proposition that Bradley had actual knowledge he submitted false evidence in September 2016 is spurious, and there is no other support offered for the violation. *See supra* § II. Nor could there be. All of the evidence, including Bradley's contrition and acceptance of responsibility for the mistakes, as well as the lack of any motive whatsoever to falsify any passages of his Declaration, suggest that Bradley first realized the inaccuracies when Judge Wolf issued the February 2017 order and further inquired during the March 2017 hearing.[59]

The case at bar is similar to those in which courts and other tribunals have found an attorney's mistakenly incorrect statement is not a violation of Rule 3.3 or analogous provisions. For instance, in *Obert v. Republic W. Ins. Co*, 398 F.3d 138, 143 (1st Cir. 2005), the First Circuit found there was no knowing violation of Rule 3.3(a)(1) even where "one of the statements may well have been factually inaccurate and another was a dubious and unattractive piece of lawyer characterization." Even in the much more egregious case of *In re Auerhahn*, No. 09-10206, 2011 WL 4352350, at *16 (D. Mass. Sept. 15, 2011),[60] a three judge panel of the District of Massachusetts found that an attorney who failed to turn over potentially exculpatory documents in a habeas proceeding did not "knowingly disobey an obligation under the rules of the tribunal" (a rule analogous to Rule 3.3 and requiring the same mental state). In that case, the court found

---

[59]  Contrary to the Special Master's insinuations, *see* R&R at 235-36, there is no evidence that Bradley became aware of the errors in the boilerplate affidavit prior to the Court's February 2017 order. The media inquiries which prompted the November 2016 letter to the Court focused on the double counting error, and counsel's efforts were directed at disclosing the error and submitting a revised and corrected lodestar as soon as possible. The February 2017 order, which raised the issue of "regular hourly billing rates" listed in the affidavit, set a date for a hearing on the matter. Memo. and Order, 2/6/17, at 6, 13 (SM Ex. 180). At that hearing Bradley addressed the inaccuracies in the declaration. The Special Master seems to suggest Bradley should have somehow addressed the inaccuracies after the February order but before the hearing. This would be contrary to common practice—when the Court sets a hearing date, attorneys address the issues raised by the Court at the hearing. Moreover, none of the other law firms notified the Court of any inaccuracies prior to the March 2017 hearing—even though, as discussed above, the fee declarations of all three law firms were inaccurate in certain respects.

[60]  Since the *Auerhahn* case, the District of Massachusetts has amended its Local Rules regarding the standard of proof in attorney discipline proceedings. *See* L.R. 83.6.5(i)(6).

the attorney was "lackadaisical at best" and conceded negligence.  *Id.*  But as the *Auerhahn* court

noted, "[n]egligence, however, is not enough here."  *Id.*  Surely if a prosecutor's "lackadaisical"

and negligent failure to turn over potentially exculpatory evidence did not violate the Rules of

Professional Conduct because it was not done "knowingly," Garrett Bradley cannot be

sanctioned for mistakenly submitting a boilerplate fee application containing inaccuracies.

## VI.     **The Customer Class Law Firms Properly Listed Contract Attorneys On The Lodestars**

In pages 181-89 of his Report, the Special Master expresses a strong personal policy

preference for listing contract attorneys' time as expenses rather than legal fees.  But his personal

preference is merely that: a personal preference.  The Special Master has **failed to identify a**

**single case which holds contract attorneys must be listed as expenses**.[61]  In fact, the Special

Master's Report cites a number of cases that actually support counsel's decision to include

contract attorneys in the lodestar.  *See Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 409 (D.

Conn. 2009), *aff'd*, 355 F. App'x 523 (2d Cir. 2009) (finding that contract attorneys were

properly included in the lodestar where contract attorneys' work was supervised by plaintiffs'

counsel); *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 394-95 (S.D.N.Y. 2013)

("[C]ourts have . . . regularly applied a lodestar multiplier to contract attorneys' hours.");[62] *City*

*of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 954 F. Supp. 2d 276, 280

(S.D.N.Y. 2013) ("[I]t is beyond cavil that law firms may charge more for contract attorneys'

services than these services directly cost the law firm[.]"); *In re Enron Corp. Sec., Derivative &*

---

[61]     The Special Master asserts that "legal and ethical rulings have not provided definitive guidance on this interesting issue[.]" R&R at 187.  However, case law and ethics opinions strongly suggest that it is not only permissible, but common practice, to include contract attorneys in the lodestar.

[62]     The Special Master cites *Citigroup* in support of his statement that courts "that have previously weighed in on this issue have not drawn a clear distinction between temporary attorneys and partnership-track associates." R&R at 183.  In fact, *Citigroup* specifically drew this distinction, recognizing that "a contract attorney's status as a contract attorney—rather than being a firm associate—affects his market rate."  965 F. Supp. 2d at 395.

*ERISA Litig.*, 586 F. Supp. 2d 732, 784-85 (S.D. Tex. 2008) (allowing counsel to recover fees for contract attorney services at market rates rather than their cost to the firm); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 272 (D.N.H. 2007) ("It is therefore appropriate to bill a contract attorney's time at market rates and count these time charges toward the lodestar."); *see also In re AOL Time Warner S'holder Derivative Litig.*, No. 02 CIV. 6302 (CM), 2010 WL 363113, at *26 (S.D.N.Y. Feb. 1, 2010) ("The Court should no more attempt to determine a correct spread between the contract attorney's cost and his or her hourly rate than it should pass judgment on the differential between a regular associate's hourly rate and his or her salary.").

The only cited authorities that even come close to supporting the Special Master's preference that contract attorneys should be listed as expenses are cases in which counsel, on their own initiative, included contract attorneys as expenses and the court did not consider whether including them in the lodestar would have been appropriate.  *See Dial Corp. v. News Corp.*, 317 F.R.D. 426, 438 (S.D.N.Y. 2016) (noting counsel's decision to include contract attorneys as an expense despite the fact that it is permissible to "mark[]-up contract attorney fees"); *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 671 (S.D.N.Y. 2016) (approving request for expenses including expenses for document review by contract attorneys).

Further, the ABA Standing Committee on Ethics and Responsibility has advised that "a lawyer may, under the Model Rules, add a surcharge on amounts paid to a contract lawyer when services provided by the contract lawyer are billed as legal services."  ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 00-420 (2000).  Surprisingly, the Special Master cited ABA Formal Opinion 00-420, yet instead of acknowledging that it affirmatively answers the exact question he is posing, stated that it "leave[s] attorneys a wide degree of latitude to decide"

whether to bill contract attorney services as fees for legal services or as costs incurred by the firm.[63]  *See* R&R at 186.

The Special Master contends that decisions allowing contract attorneys to be included in lodestars at market rates are "not acceptable for purposes of this Report" because they are based on the "faulty premise" that "contract attorneys [are] indistinguishable from off-track associates[.]"  R&R at 184.  This assertion is based on a clear mischaracterization of the cases. In *Tyco*, the only decision from a court within the First Circuit cited by the Special Master, the court explicitly found that "[a]n attorney, regardless of whether she is an associate with steady employment or a contract attorney whose job ends upon completion of a particular document review project, is still an attorney."  535 F. Supp. 2d at 272.  The other decisions referenced by the Special Master also demonstrate a clear understanding that a contract attorney's work is temporary and often project-specific.  *See, e.g.*, *Carlson*, 596 F. Supp. 2d at 409 ("A contract attorney is one hired 'to work on a single matter or a number of different matters, depending upon the firm's staffing needs and whether the temporary attorney has special expertise not otherwise available to the firm.'") (quoting *Enron*, 586 F. Supp. 2d at 782).[64]  At no point do the decisions cited by the Special Master conflate a "contract attorney" with an "off-track associate" permanently employed by a firm.  The Special Master also claims that those courts including contract attorneys in lodestars "accepted, without discussion, the billing of contract attorney expenditures as legal fees rather than as a cost or expense."  R&R at 186.  This is simply

---

[63]   It is curious that the Special Master cites ABA Formal Opinion 00-420, which is directly on point, but did not include the full opinion as one of the 266 exhibits attached to his Report.

[64]   The Special Master cites *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400 (D. Conn. 2009) after acknowledging that "[s]everal courts, *including two within this Circuit*, have applied market rates without regard to the actual wages paid to a contract attorney."  R&R at 184 (emphasis added).  While *Carlson* does support the fact that firms may bill for contract attorneys at market rates, it is worth noting that *Carlson* is a decision out of the District of Connecticut, a court within the Second—not the First—Circuit.

incorrect.  *See Citigroup*, 965 F. Supp. 2d at 394 ("[C]ourts routinely reject claims that contract attorney labor should be treated as a reimbursable litigation expense.").

The Special Master's policy-based arguments fare no better.  He claims that "the decision to bill a contract attorney as an expense or as a legal service fee" is a matter of "professional judgment" that should be "informed by the role of the contract attorney vis-à-vis the other attorneys in the case."  R&R at 186.  According to the Special Master, the contract attorney's role is determined not by the work performed, but by the financial obligations incurred by the law firm.  He attempts to compare the cost of hiring contract attorneys with that of hiring a stenographer, or with paying for transportation, meals, and lodging, since the firm does not face "long-term financial obligations" with contract attorneys.[65]  Yet, the Special Master does not explain, nor provide any authority for, the proposition that a firm's financial obligations should have any bearing on whether to treat contract attorneys' work as legal fees.  Courts considering the issue focus instead on the type of work performed by the contract attorneys.  *See AOL Time Warner*, 2010 WL 363113, at *25 (allowing a multiplier on contract attorney fees where those attorneys "were not mere clerks" but "exercised judgments typically reserved for lawyers, under the supervision of the firms' regular attorneys").  The Special Master has offered no explanation as to why the contract attorneys here—who were making legal judgments under the supervision of the firms' regular attorneys—were more akin to stenographers than associates.  As the Special Master recognized, "contract attorneys . . . perform work readily assigned to a first- or second-

---

[65]   The Special Master claims that the cost of contract attorneys is "most akin to a disbursement of funds passed along to the client at face value."  R&R at 187 (citing ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 93-379 (1993) (SM Ex. 193)).  According to ABA Formal Opinion 00-420, Formal Opinion 93-379 was "made in the context of goods or services of non-lawyers," and "does not speak directly to the subject of . . . contract lawyers, in the context of disbursements or expenses."  The principles laid out in Opinion 93-379 are "applicable to surcharges for legal services provided by contract lawyers *when billed to the client as a cost or expense*."  ABA Formal Opinion 00-420 (emphasis added).

year associate in a traditional law firm model." R&R at 183-84.  The contract attorneys in this

case provided valuable legal services.  They were doing the same work as the "staff attorneys"

who, as the Special Master himself admits, were appropriately included in the lodestar.[66]  *See*

R&R at 176-181.  And as the Special Master acknowledges, "similar work justifies similar

rates."  *Id.* at 182.

Even if the Court were to adopt the Special Master's personal policy preference for

listing contract attorneys as reimbursable expenses, it would be inappropriate to apply that

preference retroactively.  *See In re Beacon Assocs. Litig.*, No. 09 CIV 3907 (CM), 2013 WL

2450960, at *18-19 (S.D.N.Y. May 9, 2013) (the court expressed that if it had thought ahead it

"would have included in [its] order appointing Lead Counsel specific directives about how much

[it] was prepared to authorize in terms of an hourly rate for document reviewers," but having

failed to do so it was "unfair to impose such a rule *ex post facto*").  The attorneys agreed to take

this case on a contingency basis, believing that they would be paid appropriately.  Their belief

that they would be compensated at market rates for contract attorneys' time was not only

reasonable, but in line with common practice and supported by legal authority.  It would be

unfair to impose a retroactive rule reducing counsel's recovery for no reason other than to satisfy

the Special Master's personal preference, which has no basis in prevailing case law.

In any event, the Special Master's proposed remedy is improper.  Even if the firms were

required to list contract attorneys as expenses rather than legal fees—and according to every

---

[66]     *See* Heimann Dep., 7/17/17, at 51:18-52:15 (SM Ex. 19) ("There is no distinction that I am aware of between
the work that's assigned to attorneys who are employed by the firm directly and those that are employed
through an agency.  There is no difference between the expectations for the work to be performed by those
lawyers.  There is no distinction with respect to the quality of the work that is expected to be performed by
those lawyers.  There is no distinction between how those lawyers are trained to to [sic] their work.  There is
no distinction between how they are supervised in connection with the work that they do.  They are one and the
same.").

court to have considered the issue, they were not—the proper remedy would not be to disgorge that amount from the lodestar to the class, but to remove that value from the lodestar and then determine whether or not the multiplier was still reasonable. *See* Rubenstein Decl., 6/20/18. When the total contract attorney value is removed, the total lodestar comes to $35,940,307.75.[67] Comparing this against the total fee award, $74,541,250, results in a multiplier of 2.07. This is well within the reasonable range approved by courts in complex class-action litigation. *See, e.g.*, *In re Neurontin Mktg. & Sales Practices Litig.*, 58 F. Supp. 3d 167, 172 (D. Mass. 2014) (finding that a 28% fee award yielding a multiplier of 3.32 was "well within the range").

## VII. The Special Master's Proposed 50% Reduction In Rate For Michael Bradley's Work Is Unjustified

The Special Master finds that Michael Bradley performed document review work on this case, on a contingency basis, between 2013 and 2015, R&R at 189-90, and that his work was supported by contemporaneous time records, R&R at 366. The Thornton Law Firm agrees with these findings. However, the Special Master's concern is not with the hours in the Thornton fee declaration attributed to Michael Bradley—indeed, he finds those hours to be supported by time records produced by Thornton, R&R at 217 n.171, 366—but, rather, he takes issue with the hourly rate applied to Mr. Bradley's work for purposes of the lodestar cross-check. The Special Master recommends that Michael Bradley's rate be reduced by 50%, and that the difference between the amount listed in the Thornton lodestar, multiplied by 1.8, and the amount calculated at the new rate, multiplied by 1.8, be "returned to the class." R&R at 366.

---

[67] This number is calculated by reducing the original lodestar ($41,323,895.75) by the amount of double counted time ($4,058,000) and the Special Master's "original petition" "lodestar value" of "contract attorneys time" ($1,325,588.00).

In assessing the value of the work performed by Michael Bradley in this case, the Special Master finds that Mr. Bradley's work "most closely resembles that of a junior level associate."[68] R&R at 196.  For this and for other reasons, he recommends a reduction in the $500 hourly rate associated with Mr. Bradley's work.[69]  Yet the reduced rate that he argues should apply to Michael Bradley's work—$250 per hour—is less than the rate used for *any* associate in this case, by *any* of the nine law firms that submitted fee declarations.  It also is less than the lowest end of the range of rates for associate work that the Special Master himself concludes to be reasonable elsewhere in his report ($325 to $725 per hour).  R&R at 164.  Moreover, it is less than the $415 per hour rate used for at least one other staff attorney who performed exactly the same work (*i.e.,* document review, no drafting), and who also worked remotely.  *See* p. 86, *infra*.

The Special Master finds that Michael Bradley "had no experience relevant to the case and the work he performed was simple, straightforward, and unmonitored document review."

---

[68]   The Special Master makes this recommendation despite finding elsewhere in his report that Mr. Bradley had more than eight years of legal experience when he signed on to assist with the State Street matter—years that included serving as an Assistant District Attorney in Norfolk County, as the Executive Director of a Commonwealth Task Force dedicated to detecting fraud in the underground economy, and as a solo practitioner.  R&R at 190-91.

Regarding the work performed, the Special Master claims that Michael Bradley had no contact with the Thornton firm regarding this case beyond sending in his hours and raising "technical concerns about the software."  R&R at 193.  This finding clearly ignores record evidence that Michael Bradley contemporaneously raised substantive questions to Evan Hoffman regarding documents he was reviewing in the Catalyst database.  The Special Master selectively quotes deposition testimony from Evan Hoffman but curiously ignores testimony from the same deposition in which Mr. Hoffman recalled conversations with Mr. Bradley about substantive case questions.  *See* Hoffman Dep., 6/5/17, at 109:17-110:7 (SM Ex. 63) (recalling, *e.g.,* discussion about trade tickets).

[69]   One of these reasons, apparently, is that Michael Bradley performed work "fully on his free time and when it was convenient for him to do so."  R&R at 366.  The Thornton Law Firm is aware of no authority stating that the time at which worked is performed has a bearing on the rate at which that work can be charged.  Setting aside the fact that "free time" and "convenient" are surely subjective concepts, Mr. Bradley did not testify that he did work in his "free time" (or at "odd hours," as the Special Master asserts elsewhere (R&R at 196)).  To the contrary, Mr. Bradley testified that his practice was to work on the matter in the afternoons or evenings, when he had available time after attending to other client matters in the mornings, and that he tried to review for a consistent amount of time each week.  M. Bradley Dep., 6/19/17, at 51:14-52:8 (SM Ex. 67).  The fact that Mr. Bradley was performing this work in addition to other case matters, over a two-year period, makes him no different from any other associate or partner working on this case who also worked on matters for other clients during the years this case was pending.

R&R at 366.  These distinctions apply equally to some of the staff attorneys performing

document review for both Lieff and Labaton.  Yet, despite this similarity, only Michael

Bradley's rate is singled out for a 50% reduction.  The Special Master's asserted distinctions

based on "experience," the "simple and straightforward" nature of the work, and the

"unmonitored" nature of the work are unjustified and, more importantly, cannot be the basis for

the radically disparate treatment of cutting Michael Bradley's rate in half.

The nature of contract or temporary case-by-case document review is such that lawyers

performing document review will seldom see the same fact patterns or underlying issues in their

work as they move from one case to the next.  While some staff attorneys in this case had

previously worked on a similar case involving another bank, BNY Mellon, not all did.  Indeed,

*none* of the 35 Labaton staff attorneys worked on the *BNY Mellon* case, as Labaton was not

counsel in that case.  This is not to suggest that they were unqualified to do the work.  But there

is no basis, in the record or anywhere else, to suggest that such staff attorneys' rates should

change from case to case based on their "relevant experience."[70]

If the Special Master's recommendations on this point were followed, every lodestar

review would necessarily devolve into a detailed analysis of each staff attorney's professional

biography and educational background.  Michael Bradley is a gainfully employed attorney with

eight years of professional experience, including extensive litigation and trial work, who was

appointed to head a state fraud-detection task force.  His experience justified his lodestar rate in

this case.  Surely, the other staff attorneys' experience was not, collectively, so much more

---

[70]   Indeed, if a particularly knowledgeable staff attorney had a wealth of relevant experience, it might make better
      sense, if the firm so chose, for such an individual to be hired full-time to take on a more senior role in the case.

"relevant" that it would justify listing them at lodestar rates that are nearly *double* what the Special Master would assign to Michael Bradley's work.

Further, to characterize Michael Bradley's document review work as "simple and straightforward" is to necessarily characterize *all* staff attorneys' document review work in this case as simple and straightforward. There is nothing in the record to support the notion that any document review was substantively or materially different from any other. Thus, the "simple and straightforward" nature of the work, even if true, cannot be a basis for cutting only Michael Bradley's lodestar rate.

The Special Master takes particular issue with Michael Bradley's "failure to produce any substantive memoranda or other work product," calling this the "perhaps most telling" basis for distinguishing him from other staff attorneys. R&R at 192. But the Special Master cites no evidence that every other staff attorney wrote memoranda. Indeed, the evidence shows that <u>not</u> all staff attorneys wrote memoranda. For example, Lieff staff attorney Kelly Gralewski testified in her deposition that she did not write any. Gralewski Dep., 6/6/17, at 19:23-20:2 (SM Ex. 104) ("Q. Were you tasked with drafting any memoranda related to any specific topics in the case? A: No."). The Special Master, who does not mention Ms. Gralewski's testimony in the Report, proposes no reduction to Ms. Gralewski's rate of $415 per hour, while urging that Michael Bradley's rate be reduced to $250 per hour <u>for the same work</u>. Moreover, Ms. Gralewski—like Michael Bradley—performed all of her work remotely. Gralewski Dep., 6/6/17, at 13:13-15 (SM Ex. 104); Lieff's Resp. to Interrog. 24, 7/10/17 (TLF Ex. 6). Distinguishing Michael Bradley from other staff attorneys on the basis that he did not write memoranda—the "most telling" basis, according to the Special Master— is entirely unjustified.

Also of note, the staff attorneys who did draft memoranda did so toward the end of their work on the case, having spent the bulk of their time conducting "straightforward" document review. *See* 7/14/15 Email, TLF-SST-008524 (TLF Ex. 18) (email from Mike Rogers of Labaton noting fact of settlement and that all issue memorandum drafting was completed before July 4, 2015); 6/23/15 Email, TLF-SST-034482 (TLF Ex. 19) (email from Michael Lesser of Thornton noting that reviewers have been working on issue memoranda "for the last two months"). The firms did not apply different rates for different tasks; the staff attorneys who both performed document review and drafted memoranda maintained the same lodestar hourly rates for both tasks. Appropriately, the Special Master does not propose different rates for the different tasks performed.

In asserting that Michael Bradley's work was "distinctly limited" as compared to that of other staff attorneys, the Special Master cites Michael Bradley's testimony that he recalls recording comments on a "handful" of documents in the Catalyst system. R&R at 192. Of course, the content of the review folders assigned to Michael Bradley, and how many documents they contained that were worthy of comment, is entirely arbitrary and is no basis for judging the quality of his work. On that point, the Special Master notes that there is "no clear evidence" that Michael Bradley made comments on any documents, despite Michael Bradley's testimony that he did. *Id.* The negative inference here is obvious, but patently unfair. The Catalyst system was taken off-line after the document review ended, and, as a result, there is no ability to verify *anyone's* work in Catalyst. *See* Chiplock Dep., 6/16/17, at 212:6-213:8 (SM Ex. 10) (stating that "[T]he Catalyst platform had been shut down for a year and a half at that point, and we had all of the documents and the coding on a hard drive, but there was no way to audit any individual user's work in retrospect by looking at that information," and noting that it is not possible "to do

- 87 -

an audit of any individual user's work from years prior, because I just don't think the system was built to capture that.").

In addition, while some staff attorneys certainly worked at a firm's brick-and-mortar location while under in-person supervision, not all did.  More than a third of Lieff's staff attorneys worked remotely.  *See* Lieff's Resp. to Interrog. No. 24, 7/10/17 (TLF Ex. 6) (identifying Joshua Bloomfield, Elizabeth Brehm, Kelly Gralewski, Chris Jordan, Leah Nutting, Virginia Weiss, and Jonathan Zaul as working remotely); Jordan Dep., 6/6/17, at 16:11-22 (SM Ex. 101); Zaul Dep., 6/6/17, at 15:4-10 (SM Ex. 59).  While Michael Bradley did not work at the Thornton office, he did, when necessary, seek guidance from Thornton attorneys.  *See* Hoffman Dep., 6/5/17, at 109:17-111:11 (SM Ex. 63). There is simply no basis for cutting only Michael Bradley's lodestar rate for working "unmonitored," when he was far from the only lawyer working remotely.  Even if he were—and as the Special Master presumably recognized in not recommending any reduction to Lieff staff attorney rates based on remote work—document review technology allows for this work to be done from any computer, wherever located.

Finally, the sheer magnitude of the reduction proposed by the Special Master highlights its unfairness.  The Special Master arbitrarily decides that Michael Bradley's rate should be reduced so that his rate is "more at the level of a paralegal, supplemented by the fact of his law degree and experience as a lawyer."  R&R at 366.  This proposed reduced rate of $250 per hour, while slightly higher than the rate for Thornton's sole paralegal in this case (Andrea Caruth, $210 per hour), is lower than the rate charged for paralegals by Labaton and Lieff in their fee declarations (Labaton listed its paralegals at rates ranging from $275 per hour to $340 per hour, with an average rate of $316 per hour; Lieff listed its paralegal at $270 per hour).  Labaton Fee Decl., Ex. A, 9/15/16 (SM Ex. 88); Lieff Fee Decl., Ex. A, 9/14/16 (SM Ex. 89).  Moreover, the

lowest rate for any associate in any fee petition submitted by a law firm in this case (both

Customer Class Counsel and ERISA Counsel) is $325 per hour.

In light of Mr. Bradley's experience as an attorney, the rates he has recently charged

other clients, and his willingness to perform the work in this case on a contingency basis, the

Special Master's proposed reduction to his rate is totally unwarranted.

### A.      Any Reduction In Michael Bradley's Rate Is Immaterial To The Fee Award

Most importantly, even if one accepts the Special Master's recommendation that Michael

Bradley's rate should be reduced by any amount, the result is entirely immaterial to the overall

attorneys' fee award, regardless of the amount of reduction.  At maximum, and even after the

removal of all double-counted staff attorney time, Michael Bradley's work accounts for less than

0.55% of the overall lodestar.[71]  Even if one were to remove all value associated with Michael

Bradley's work ($203,200)—which would be wildly unfair as even the Special Master

acknowledges that he performed work and that his time records support that work—it would

have no material effect on Thornton's lodestar or on the overall lodestar.  Indeed, the multiplier

applied to the overall lodestar without *any* of Michael Bradley's time would still be 2.01, well

within the range of reasonableness for a case of this size and complexity.  *See supra* § I (citing

and quoting portions of July 31, 2017 and June 20, 2018 Expert Declarations of Professor

William B. Rubenstein, and 4/9/18 Deposition Testimony of Professor Rubenstein, stating that

multiplier is "fully reasonable, indeed modest," and that "it would have been justified to see a

three or four [multiplier].").

---

[71]     The revised lodestar as stated in the November 2016 letter is $37,265,241.25.  Goldsmith Ltr. to Ct., 11/10/16
(SM Ex. 178)

As explained in the previous section regarding double counting, any discussion of lodestar must recognize its limited purpose in this case.  In recommending that the difference between Michael Bradley's work at the $500 per hour rate (times 1.8 multiplier) and his work at the proposed reduced $250 per hour rate (times 1.8 multiplier) must be "returned to the class," R&R at 366, the Special Master appears to confuse the lodestar cross-check with the use of lodestar information to determine a *lodestar-based* award.  On the one hand, the Special Master accurately concludes that the Court "reviewed the hours as part of a lodestar cross-check, rather than reimbursing . . . attorneys on a one-to-one basis."  R&R at 206 n.106 (discussing Thornton hours specifically, but making a general point applicable to all hours).

But when it comes to Michael Bradley, the Special Master flatly contradicts himself, asserting that Thornton "sought reimbursement of fees" for Michael Bradley's work.  R&R at 73, 189.  This is plainly false and leads to an illogical result.  The inclusion of the hours worked by Michael Bradley in the lodestar served the same purpose as the inclusion of all of the other hours in the lodestar—to demonstrate to the Court, *for purposes of the lodestar cross-check only*, the work put into the case, and the reasonableness of the percentage fee sought by counsel. Thornton neither sought nor was awarded "reimbursement" for any professional's hours (as the Special Master himself correctly states elsewhere in in the report, R&R at 206 n.106).

The Special Master compounds his error in asserting that "because of the 1.8 multiplier effect, Thornton received almost an additional $500 per hour on Michael Bradley's time, resulting in an additional almost $200,000 to the Thornton law firm. . . . Thornton's award must be reduced by the amount earned by applying this inflated hourly rate at an almost two-times multiplier."  R&R at 197.  The Special Master asserts that these ostensible 'earnings' should be returned to the class.  R&R at 366.  But Thornton clearly did not receive "an additional almost

$200,000" because of Michael Bradley's time.  It did not "earn[]" any amount as a result of Michael Bradley's rate.[72]  The lodestar containing Michael Bradley's hours was submitted only to help the Court verify that the percentage of the settlement fund it was awarding to counsel was reasonably supported by the work done on the case.[73]  And as demonstrated above, the value of Michael Bradley's hours—regardless of hourly rate—had a *de minimis* effect on Thornton's lodestar, an infinitesimal effect on the overall lodestar, and no effect whatsoever on the multiplier applied to the lodestar to verify the 25% percentage of fund award.  *See, e.g.*, *In re: Cathode Ray Tube (CRT) Antitrust Litig.,* No. 1917, 2016 WL 4126533, at *9 (N.D. Cal. Aug. 3, 2016) ("A lodestar reduction is unnecessary when the effect on the multiplier is not material.").

The Special Master wrongly asserts (without acknowledging the other part of his report in which he concludes the opposite) that the rate charged for Michael Bradley's services has a one-to-one correspondence to the attorneys' fee awarded to Thornton, and that Thornton received an "additional benefit" based on Michael Bradley's rate.  R&R at 366.  The Special Master then uses this flawed logic as the basis to demand that Thornton disgorge this supposed "additional benefit" it received to the class.  *Id.*  Neither reason, nor math, nor precedent support such a demand.  As Professor Rubenstein states in his June 20, 2018 declaration:

> In a case where a court employs the percentage method to determine class counsel's fee, and uses the lodestar only for cross-check purposes, **the reduction of an hour**

---

[72]  Harvard Professor Rubenstein explains this concept in his June 20, 2018 Declaration (submitted by Lieff), in the context of contract attorney work: "The Court in this case awarded class counsel 25% of the common fund; counsel's lodestar was submitted solely for cross-check, or verification purposes, and showed that the 25% award was about twice counsel's lodestar. This enabled the Court to ascertain whether a 1.8 multiplier was appropriate given the risks counsel took and the rewards it obtained for the class. The Court's conclusion that the 1.8 multiplier was justified did not mean that class counsel received $800/hour for contract attorneys.  It meant that the 25% fee was justified."  Rubenstein Decl., 6/20/18, at ¶ 15 (fifth bullet).

[73]  *See* Rubenstein Decl., 6/20/18, at ¶¶ 18-20 (explaining that the purpose in a lodestar cross-check is to enable courts to ensure that the percentage awarded was reasonable when compared to the time counsel have worked on the case).

**of time recalibrates the lodestar multiplier and requires further analysis of whether that lower amount can continue to sustain the requested percentage award. But it does not require the "repayment" of that hour of time since counsel was never "paid" for that hour of time; counsel were paid a percentage of the recovery**. Numerous legal decisions have understood this distinction and, after adjusting a lodestar used for cross-check purposes downward, simply re-assessed whether the resulting higher multiplier remained reasonable.[78]

Rubenstein Decl., 6/20/18, at ¶ 20 n.80 (emphasis added) (citations omitted).

The Special Master's untenable (and internally inconsistent) position and related

recommendation with respect to Michael Bradley's work, like his position and recommendation

on the issue of the double counting mistake, contravene the purpose and function of the lodestar

cross-check in this case.

## VIII.   The Recommended Payment Of $3.4 Million To ERISA Counsel Is Unjustified And Based On Erroneous Findings

Yet another blunder is the Special Master's conclusion that ERISA Counsel did not

receive a fair amount of attorneys' fees in the case.  The Special Master calls for a "reallocation

remedy" to ERISA Counsel in the amount of $3.4 million.  R&R at 369.  This recommended

remedy is based on three findings made by the Special Master:

1.  That, in December 2013, ERISA Counsel agreed to a 9%[74] fee based on the ERISA trading volume of 5-9% that was known at the time, but that "it was later learned" that the trading volume attributable to ERISA plans "was actually about 12-15% of the total trading volume."  R&R at 46;

2.  That, per the Plan of Allocation and the Stipulated Settlement Agreement, ERISA Counsel were entitled to up to $10.9 million in fees, but received only $7.5 million pursuant to the fee agreement—thereby creating a delta of $3.4 million that was earmarked for ERISA Counsel, but that ERISA Counsel did not receive, Exec. Summ. at 51; R&R at 368-69;[75] and

3.  That, owing to "internal tension" between Customer Class Counsel and ERISA Counsel, Customer Class Counsel restricted ERISA Counsel's access to documents,

---

[74]   As the Special Master found, this amount was later increased to 10% at the suggestion of Customer Class Counsel, and ERISA Counsel received 10% of the overall fees.  R&R at 48, 85.

[75]   These findings are repeated verbatim in the Supplemental Ethical Report submitted to the Special Master by Professor Stephen Gillers.  Gillers Supp. Report, 5/8/18, at 31, 100 n.91 (SM Ex. 233).

to wit, "ERISA Counsel were not provided with access to documents State Street had provided to the Customer Class," and that "[n]or were ERISA Counsel allowed access to the Customer Class's database."  R&R at 34.

All three of these findings are wrong.  None is a factually or legally supportable basis for the "reallocation" of fees to ERISA Counsel that the Special Master recommends.

## A.    The Special Master's Conclusion That The ERISA Trading Volume Was "Actually 12-15%" Is Wrong

The Special Master finds, accurately, that the fee agreement between ERISA Counsel and Customer Class Counsel, signed in 2013, was based on the known ERISA **trading volume** percentage at that time.  R&R at 46 ("Th[e] agreement—to allocate 9% of the total fee awarded (if successful) to ERISA Counsel—was based largely on the premise that the total ERISA case volume **comprised five to nine percent of the total FX trading volume**.") (emphasis added). This "five to nine percent" trading volume figure came from State Street, which supplied the trading data, and which conferred directly with ERISA Counsel about it.[76]

The ERISA trading volume percentage—meaning, the volume of affected ERISA FX transactions, expressed as a percentage of the total affected FX transactions—is fundamentally different from the ERISA *settlement* percentage, which is the amount of the settlement allocated

---

[76]    *See* Sarko Dep., 7/6/17, at 58:18-59:22 (SM Ex. 28) (emphasis added):

"And then in 2013, over the course of time I had had some discussions with Bob Lieff that, you know, it might make sense for us to try to see if we can come up with some tentative agreement on how to divide the fee between the ERISA case and the customer class case.  And I guess it was more—in my view it was important not to have the lawyers fight with each other, or at least be a greater chance of getting them to cooperate if they didn't think if affected what fees they received.

Q. **Did trading volume play any role in that second discussion**?

A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮  And, therefore, he was constantly harping back to me that it was a small piece.  And we tried to quantify that.  **And my recollection was that he thought it was 9 percent—between 5 and 9 percent, something like that.  And the discussions with the customer counsel was that we would receive 9 percent, which, at least my understanding, is what the ERISA portion of the case was.**"

to ERISA funds, expressed as a percentage of the total settlement amount.  The ERISA settlement percentage was never the basis of any agreement among counsel.

As support for the conclusion that the ERISA trading volume was "actually about 12-15% of the total trading volume," the Special Master cites **only** to the deposition testimony of ERISA lawyers, who, naturally, stand to gain from the Special Master's faulty recommendation to reallocate funds to them.  R&R at 46 (citing testimony of ERISA attorneys Lynn Sarko and Carl Kravitz).  Notably, and as discussed further below, the Special Master does *not* mention other deposition testimony, given by the lawyer actually assisting with the claims administration process, that the volume is, in fact, approximately 9%.  Nor does he credit (or even mention in the body of his Report) counsel's statements that verifiable data from the claims administrator shows the volume to be approximately 9%, pending final resolution of the administration process.  But even the deposition testimony on which the Special Master does rely—though, of note, not the lines cited in the Report—illustrates that there is no certainty about the "12-15%" number the Special Master adopts:

> The settlement, if you look at it, has a process for determining exactly what that percentage is because, at the end of the day, you need to know whether the group trust assets that are ERISA are going to take from the ERISA pile or the non-ERISA pile.  **And if you ask me do I know what that process has revealed in terms of what the actual percentage is, the answer is I don't know.**  So I wish I could answer that question. But definitely at the end of the day, if you even **assumed** that it was half ERISA and—half ERISA, you'd be up at 12 percent. **Could have been a little higher, could have been a little lower**.

Kravitz Dep., 7/6/17, at 54:12-25 (SM Ex. 21) (emphasis added).

When, in the course of the investigation, it became clear that the Special Master had adopted the belief that the ERISA portion of the overall trading volume was "actually about 12-15%," lawyers for Customer Class Counsel attempted to set this straight, both during the deposition of Nicole Zeiss (the Labaton partner with responsibility for the claims administration

process) and during oral argument before the Special Master on April 13, 2018.  *See* Zeiss Dep.,

9/14/17, at 163:20-165:1 (SM Ex. 115); *see also* 4/13/18 Hr'g Tr. at 104:22-105:7 (SM Ex. 162)

([MS. LUKEY, Counsel for Labaton]: "Right now, as we have in the record, it appears it's going

to come out at 9 to 9.5 percent.  A.B. Data is trying to finish, but it needs to be able to get the last

data from the group trust which are a mixture of customer class and ERISA investors.  And it's

been unable to collect some of that.  But there is nothing to indicate, at least at this point, that it's

going to exceed the estimated 10 percent.  Looks like it'll come in a little under that.")

 In the Report, the Special Master acknowledges counsel's statements at oral argument in

a single-sentence footnote, but makes no mention of Nicole Zeiss's testimony there, or anywhere

else in the Report.  R&R at 46 n.28 ("During oral argument, counsel for Labaton indicated that

the trading volume for the ERISA funds was in a range of 9% to 10%.  However, the record

evidence on this point is incomplete.").  The omission of Ms. Zeiss's testimony is particularly

troubling, given that the Special Master questioned her himself about her knowledge of the

ERISA trading volume, eliciting testimony that she understood the percentage to be "around 9

percent."  Zeiss Dep., 9/14/17, at 164:16-165:1 (SM Ex. 115).

 Presumably, the Special Master makes no mention of this testimony because it

contradicts his conclusion that ERISA Counsel got a raw deal in this case.  The Special Master's

selective reliance on deposition testimony is unjustifiable and, to use a phrase employed by the

Special Master elsewhere in the Report, "perhaps telling."  Setting aside the issue of selectively

quoting deposition testimony, relying on testimony as the sole support for a conclusion about

volume is unnecessary and inappropriate.  Determining the portion of the total trading volume

attributable to ERISA plans is an objective process that results in a definite number, and

therefore data, not personal recollection, is the best and most reliable evidence.

**But the Special Master did not seek documents regarding the ERISA trading volume.**  Although the Special Master's first requests for documents, served in May 2017, may have been read to call for such documents, the Special Master's counsel revised the requests six days after serving them, in the process striking numerous requests pertinent to this issue.[77]  Even after counsel specifically mentioned the claims administration process resulting in the actual ERISA trading volume at oral argument on April 13, 2018, the Special Master did not pursue it.  Nor did he seek further information after Nicole Zeiss testified that she knew the trading volume to be around 9 percent.  Zeiss Dep., 9/14/17, at 164:16-165:1 (SM Ex. 115).

State Street—not Customer Class Counsel—supplied the FX trading volume data used in this case.  *See* Omnibus Decl., 9/15/16, at ¶ 131 (SM Ex. 3) ("A.B. Data will calculate each Settlement Class Member's Recognized Claim using information ***supplied by State Street***") (emphasis added), ¶ 132 ("The Plan is based on transaction data ***maintained by State Street***") (emphasis added), ¶ 133 ("The parties have relied on Indirect FX Trading Volume information ***provided by State Street*** to develop this Plan of Allocation") (emphasis added); *see also* Zeiss

---

[77]  The document requests stricken by the Special Master's counsel included, *inter alia,* the following requests:

"2. …any other documents or information identified during the SST litigation bearing on the material issues in the Litigation, including but not limited to liability and damages.

23. All documents and/or communications relating to and/or evidencing discussions between and among the Law Firm, the Plaintiffs' Law Firms, and/or ERISA counsel regarding the allocation of a certain percentage of the Fee Award among counsel, including but not limited to agreements to pay ERISA counsel a fixed percentage of the total Fee Award.

29. All communications between the Law Firm and counsel for State Street relating to the SST Litigation, including but not limited to document productions, mediations, and settlement.

39. All communications between and among the Law Firm, the Plaintiffs' Law Firms, and the ERISA firms, relating to preparation of the Motion for Attorneys' Fees and/or the Fee Petitions filed in the SST Litigation."

The Special Master's catch-all request ("53. All documents you may contend support your Fee Petition for reimbursement of fees and/or expenses, which you have not produced thus far") did not require the production of these materials, including because it pertained to documents supporting "your Fee Petition," meaning Thornton's individual fee petition.  Thornton could not have reasonably anticipated at the time that the Special Master would seek to invalidate the agreement between Customer Class Counsel and ERISA Counsel, or would question the trading volume numbers.

Dep., 9/14/17, at 164:10-12 (SM Ex. 115) ("WilmerHale [State Street's counsel] produced the volume to us in connection with developing the plan of allocation").  Over the course of the mediation process, State Street provided updated versions of their FX trading data to all parties. As State Street refined its process, the data reflected incremental changes.

During the spring of 2015, while the parties were engaged in mediation and closing in on settlement, State Street informed Customer Class Counsel and ERISA Counsel that the estimated ERISA volume was approximately $79.8 billion—or approximately **9.11** % of the total trading volume of $875.7 billion.  Specifically, in email correspondence in March 2015, counsel for State Street informed Michael Lesser (Customer Class Counsel) and Lynn Sarko (ERISA Counsel) that the total ERISA volume was $79,898,954,988.  *See* 6/11/15 Email (TLF Ex. 20).[78] On June 11, 2015, just weeks before the parties reached an agreement in principle on June 30, State Street's counsel confirmed this number in a chart it sent to customer class attorney Michael Lesser, who in turn shared it with ERISA attorneys Lynn Sarko, Brian McTigue, Regina Markey. *Id.*[79]  Accordingly, when the parties reached an agreement in principle to settle this case at the end of June 2015, ERISA Counsel knew that the ERISA trading volume was estimated to be approximately **9.11**%.  With the data supplied by State Street in hand, ERISA Counsel made an informed decision to enter into a settlement in principle.

At that time, the ERISA trading volume was still an estimate—albeit an estimate based on hard data analyzed and supplied by State Street—because, as Labaton stated in the Omnibus

---

[78]   The email thread extends to June but the cited email was sent in March.  The term "SSH" used in this email stands for "Securities Settlement and Handling," and refers to Indirect FX transactions relating to purchases and sales of foreign securities.  "AIR" stands for "Automated Income Repatriation," and refers to Indirect FX Transactions to repatriate dividend and income payments.  Omnibus Decl., 9/15/16, at ¶ 20 (SM Ex. 3).

[79]   As noted above, the Special Master did not request documents concerning the ERISA trading volume during the investigation.  Thornton attaches exhibits here to clarify misinformation in the record.  Thornton provides these documents pursuant to all protective orders and confidentiality agreements applicable to the Special Master's investigation and to the underlying litigation.

Declaration filed with the fee petition, the Group Trusts' transaction volume attributable to

ERISA funds had yet to be determined.  *See* Omnibus Decl., 9/15/16, at ¶ 135 (SM Ex. 3)

("ERISA Plans and eligible Group Trusts represent approximately 9%-15% of the total Indirect

FX Trading Volume, **depending on what portion of the Group Trusts' volume actually falls**

**under ERISA**.") (emphasis added).[80]  The Omnibus Declaration explained the process by which

Labaton and third-party settlement administrator A.B. Data would seek this information about

the Group Trusts and make the final calculations.  *Id.* at ¶¶ 137-50.  This process included: (1)

requiring the Group Trusts to submit certifications detailing their ERISA fund percentages; and

(2) working with the Department of Labor, which has independent knowledge of certain Group

Trusts with ERISA volume, to ensure that Group Trusts that failed to provide certifications

would be included.  *Id.* at ¶¶147-49.

As of June 2018, this two-step process of determining the absolute final ERISA trading

volume is nearly complete.  The first step (obtaining certifications) was completed last year.

A.B. Data's spreadsheet capturing this information—which Labaton's counsel referenced during

the oral argument before the Special Master—shows that the ERISA volume increased only a *de*

*minimis* amount as a result of the certification process.[81]

The remaining work (obtaining confirmatory volume information from the Department of

Labor for Group Trusts that failed to submit mandatory certifications) is still ongoing.  While

this cleanup effort with the Department of Labor could cause an adjustment to the ERISA trading

volume, it is unlikely to have a significant effect, and certainly nowhere in the range of 3% to

---

[80]   *See also* Kravitz Dep., 7/6/17, at 54:12-25 (SM Ex. 21) (explaining that the percentage depended on the outcome of the Group Trusts process).

[81]   The A.B. Data spreadsheet containing this information is subject to a non-disclosure agreement between A.B. Data and State Street, which the Court may order State Street to disclose.

5%—the increase that would be necessary to bring the trading volume within the "actually 12-15%" figure on which the Special Master relies.  Contrary to the Special Master's assertion that the ERISA trading volume is between 12-15% of the overall trading volume, the volume is "actually" between 9% and 10%, which, if one compares percentage of volume to percentage of fees,[82] is *less than,* or at least very closely commensurate with, the percentage of attorneys' fees that ERISA Counsel received.  Accordingly, a "reallocation remedy" is not needed to bridge any gap between ERISA Counsel's fees and the ERISA trading volume, and such reallocation would be unjustified.

Finally, it is worth noting that the suggestion that ERISA Counsel would have agreed to (and agreed not to revisit) a 9% fee agreement when they believed the ERISA trading volume to be approximately 12-15% is difficult to square with their obligations to their clients.  ERISA Counsel's fees were derivative, directly or indirectly, of the result they helped achieve for their clients.  The $60 million share of the settlement recovery for ERISA plaintiffs was based on the ERISA trading volume.  The fact that the Department of Labor insisted on a premium that caused ERISA's share of the *settlement* to be 20% would not excuse ERISA Counsel's acceptance of a $60 million share if they truly thought the ERISA volume was higher.  If ERISA Counsel believed that the ERISA trading volume had increased over time by 33 to 60 percent (*i.e.,* from approximately 9% to 12-15%), surely they would have been obligated to demand additional settlement funds for the ERISA plaintiffs, even setting aside the issue of their own fees.

---

[82] This is in and of itself a problematic comparison, as it presumes that ERISA Counsel was solely responsible for the ERISA funds' recovery, and therefore entitled to attorneys' fees on a one-to-one basis.  To the contrary, the Customer Class Counsel's work on the case—including, of particular note, its development of the damages theory—contributed significantly to the result for the ERISA plans.  This also wrongly presumes that the Customer Class's claims did not cover ERISA funds, a question never resolved because the court never ruled on State Street's motions to dismiss the ERISA complaints.

**B.    The Special Master's Finding That The $10.9 Million "Fee Cap" Applied To ERISA Counsel's Fees Only Is Wrong**

In quantifying the "reallocation remedy" he asserts ERISA Counsel deserves, the Special Master references the $10.9 million "fee cap" imposed by the Department of Labor.  R&R at 85. In recommending that ERISA Counsel receive reallocated attorneys' fees, the Special Master concludes that those fees should be in the amount of $3.4 million because that number "reflects the difference between the $10.9 million that was allocated as a cap for ERISA attorneys in the Settlement Agreement and the $7.5 million which the ERISA attorneys actually received."  Exec. Summ. at 51; R&R at 368-69.  This is a faulty conclusion based on the Special Master's incorrect and unsupportable finding that "$10.9 million [] was allocated as a cap for ERISA attorneys in the Settlement Agreement." *Id.*

Contrary to the Special Master's assertion, the purpose of the cap was to limit the amount that could be deducted from the ERISA portion of the settlement for attorneys' fees of any kind, not only ERISA Counsel's fees (the Department of Labor's intention being to limit deductions from the ERISA class's share of the recovery). [83]  As with the trading volume issue, discussed

---

[83]    The Special Master's and his counsel's confusion on this point is well illustrated by this exchange with ERISA attorney Carl Kravitz:

"Q [MR. SINNOTT]. So is it fair to say that that 10.9 million is a cap of sorts?  **That's the outer limit that the Department of Labor has set for ERISA fees?**

A. I—I—ERISA fees. I would—**I always thought of it a tiny bit differently. I always thought of it as the cap of the amount of the fee award that could be deducted from the ERISA share**.

Q. Okay.

THE SPECIAL MASTER: **The cap on the amount -- the cap on the amount of the fee award that could be deducted from the ERISA share?**

THE WITNESS: **That is exactly what I was trying to say.**

THE SPECIAL MASTER: Okay. So – and **was DOL's objective in wanting this cap to ensure that at the very least—to ensure a minimum recovery for the—what we'll refer to as the ERISA class**?

THE WITNESS: Right. Yes, that was my understanding of at least part or—or the major part of their motivation.  **They were trying to protect what the ERISA part would get on a net basis as in addition to on a gross basis**."

above, attorneys for the Customer Class Counsel attempted to clear up the Special Master's

misunderstanding when it became clear during the investigation that the Special Master thought

ERISA Counsel received $7.5 million pursuant to the parties' agreement, but was entitled to up

to $10.9 million.  The Special Master's findings in the Report show that this misunderstanding

persists, and it now underpins the Special Master's conclusion that ERISA Counsel is entitled to

an additional $3.4 million in fees.

Documents filed with the Court both pre-and post-settlement confirm that the $10.9

million cap applied to *all plaintiffs' counsel's* fees, not just ERISA Counsel's fees.  The issue

was how much in attorneys' fees could be paid out of the **ERISA portion of the settlement**—

not how much money was going to Customer Class Counsel versus ERISA Counsel.[84]  Of note:

- The Stipulation and Agreement of Settlement filed with the Court on July 26, 2016 ("Settlement Stipulation"), which the Special Master includes as exhibit 75 to his Report makes this even more clear.  The Settlement Stipulation states: "Except with respect to the amount of **Plaintiffs' counsel's attorneys' fees chargeable to the ERISA Plans**,…." Settlement Stipulation, 7/26/16, at ¶ 24 (SM Ex. 75) (emphasis added).

- The Plan of Allocation, which is set forth in full in the Notice to the Class dated August 10, 2016, states that "[N]o more than $10,900,000 in fees can be paid out from the ERISA Settlement Allocation[.]"  Notice to Class, 8/10/16, at 11 (SM Ex. 81).  In the Report, the Special Master characterizes this portion of the Notice as follows: "**Recipients were also told that attorneys' fees for ERISA counsel would not exceed $10.9 million**, and they were told how fees for the other counsel would be computed 'if the Court awards the total amount of fees that Lead Counsel intends to request.'"  R&R at 277 (emphasis added).  This is plainly untrue; nowhere does the Notice inform recipients that attorneys' fees for ERISA Counsel would not exceed $10.9 million.

- The Omnibus Declaration filed by Labaton in support of the attorneys' fees motion on September 15, 2016 states that ERISA Plan and eligible Group Trusts class members will be allocated $60 million "minus," *inter alia,* "attorney's fees, if awarded by the Court, in

---

Kravitz Dep., 9/11/17, at 39:15-40:13 (SM Ex. 117) (emphasis added).

[84]    On that point, emails produced to the Special Master show that ERISA Counsel did not disclose the details of its fee agreement to the DOL.  *See* 8/28/15 Email, TLF-SST-052975 (SM Ex. 35); 8/9/15 Email, TLF-SST-043022 (TLF Ex. 21).

an amount not to exceed $10,900,000."  *See* Omnibus Decl., 9/15/16, at ¶ 134 (SM Ex. 3).

If the above documents leave any room for confusion about which "attorneys' fees" the cap pertains to, the Term Sheet, executed by all counsel in September 2015, makes clear that the function of the cap is to limit the amount of fees incurred by any plaintiffs' counsel that can be deducted from the ERISA portion of the settlement:

> "**Plaintiffs' Counsel** may apply for their fees and expenses and any service awards for Plaintiffs against the entire Class Settlement Amount, but in no event shall more than Ten Million Nine Hundred Thousand Dollars ($10,900,000.00) in fees be paid out of the $60 million portion of the Class Settlement Amount allocated to ERISA Plans, as referenced in paragraph 8(n) above."

Term Sheet, 9/11/15, TLF-SST-050929-050944, at ¶ 12 (TLF Ex. 22) (emphasis added).

"Plaintiffs" is defined in the Term Sheet as including both ATRS and the individual ERISA class representatives.  *Id.* at ¶ 1.  Therefore, "Plaintiffs' Counsel" logically means both Customer Class Counsel and ERISA Counsel and, indeed, is used in that context elsewhere in the Term Sheet.  *See id.* at ¶ 8(n) (definition of Plan of Allocation).

During his deposition, David Goldsmith, the Labaton attorney who presented the settlement plan and request for attorneys' award to the Court, stated that the cap applied to "all counsel's fees":

> Q [MR. HEIMANN]: The Department of Labor also negotiated a cap of some 10.9 million dollars on the fees to be charged against the 60-million-dollar amount that they had negotiated for the ERISA class members, correct?

> A [MR. GOLDSMITH]: Correct.

> Q. And did that negotiated fee apply only to the settlement being allocated to the ERISA plan -- excuse me. Let me begin again. **Did that cap on the fee apply only to the ERISA counsel's fees?**

> A. **No.**

> Q. **Did it apply to all counsel's fees?**

A. **Yes.**

Goldsmith Dep., 9/20/17, at 254:13-255:2 (SM Ex. 42) (emphasis added).

ERISA attorney Carl Kravitz also tried to clear up the Special Master's and his counsel's

misunderstanding on this point:

> "Q [MR. SINNOTT]. So is it fair to say that that 10.9 million is a cap of sorts? That's the outer limit that the Department of Labor has set for ERISA fees?
>
> A. I—I—ERISA fees. I would—I always thought of it a tiny bit differently.  I always thought of it as the cap of the amount of the fee award that could be deducted from the ERISA share.
>
> Q. Okay.
>
> THE SPECIAL MASTER: The cap on the amount—the cap on the amount of the fee award that could be deducted from the ERISA share?
>
> THE WITNESS: That is exactly what I was trying to say.

Kravitz Dep., 9/11/17, at 39:15-40:3 (SM Ex. 117).

There is no support for the Special Master's conclusion that the $10.9 million cap on

"attorneys' fees" meant that ERISA Counsel had been "allocated" $10.9 million in fees, but was

constrained by its agreement with Customer Class Counsel and had to accept a lesser amount

($7.5 million).  Exec. Summ. at 51; R&R at 368.  To the contrary, the key settlement and fee

documents—including the Plan of Allocation, Term Sheet, Notice, and Omnibus Declaration—

all confirm that the cap applied to fees sought by plaintiffs' counsel generally, not only ERISA

Counsel.  The Special Master's recommendation that a $3.4 million "reallocation remedy" be

given to ERISA Counsel is based on his fundamental misunderstanding of the cap, and is wholly

unjustified.

**C.     The Special Master Wrongly Concludes That Customer Class Counsel
         Sought To Prevent ERISA Counsel From Reviewing Documents And Omits**

**Testimony From ERISA Counsel That Directly Contradicts This Erroneous Finding**

To buttress his ultimate conclusion that ERISA Counsel was treated unfairly, and to further justify his suggested award of an additional $3.4 million to ERISA Counsel, the Special Master erroneously concludes that Customer Class Counsel somehow prevented ERISA Counsel from accessing documents produced by State Street in the litigation.  The Special Master's reason for drawing this conclusion is obvious—it is further "evidence" of his belief that Customer Class Counsel sought to put ERISA Counsel at a disadvantage.  It is also summarily contradicted, however, by testimony taken by the Special Master that is conveniently ignored in the Report.

Specifically, the Special Master finds that "ERISA Counsel were not provided with access to documents State Street had provided to the Customer Class" and that "[n]or were ERISA Counsel allowed access to the Customer Class's database."  R&R at 34.  The Special Master finds that this lack of access was a "manifest[ation]" of "internal tension" between the Customer Class Counsel and ERISA Counsel, for which proposition he cites the testimony of ERISA attorney Carl Kravitz.  R&R at 34, 46 n.29.  Notably, the discussion makes no reference to testimony from numerous other attorneys, including ERISA attorney Lynn Sarko, ███ ████████████████████████████████████████████████████.[85]  Ignoring contradictory

---

[85] *See, e.g.*, Sarko Dep., 7/6/17, at 43:17-44:1; 75:20-76:1 (SM Ex. 28) (emphasis added):

Q: Describe, Lynn, if you would the coordination between ERISA Counsel and customer class, or the big three.  Was there any tension involved in the relationship?  A: Well, **I don't think there was any tension**, at least from my viewpoint, with any of the ERISA [sic] on the customer class side.  I thought they were all perfectly professional.  There was a difference, and I think this has to back up to the way State Street viewed it.

…

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████

- 104 -

testimony about the relationships of Customer Class Counsel and ERISA Counsel that does not fit his desired narrative, the Special Master concludes that ERISA Counsel did not have access to documents produced by State Street because Customer Class Counsel did not want ERISA Counsel to have access.

As with numerous other conclusions the Special Master makes in the Report, this is flatly contradicted by other deposition testimony taken by the Special Master during the investigation. The testimony of ERISA attorney Lynn Sarko dispels the Special Master's conclusion that Customer Class Counsel prohibited ERISA Counsel from accessing documents.  First, as to the Special Master's finding that "[n]or were ERISA Counsel allowed access to the Customer Class's database"—the obvious inference being that Customer Class Counsel *denied* ERISA Counsel access to its database—Mr. Sarko testified that sharing a document database would have been "totally unrealistic" for confidentiality, workflow, and other reasons.  Sarko Dep., 7/6/17, at 65:10-19 (SM Ex 28).  He further testified that it is common in large cases consisting of groups with differing interests, where one group might settle while another does not, for those groups to have separate databases so they can preserve their ability to access documents regardless of another group's actions.  *Id.* at 65:5-66:7.  On that point, Mr. Sarko explained that, in this case, ERISA Counsel's having a separate database, and thus having the ability to pursue the case even if the Customer Class settled, was an important consideration weighed by the Department of Labor during settlement negotiations.  *Id.* at 66:8-18 ("[T]hat was a selling point to them for them to settle the case, thinking that we were not just, you know, trailing along.").  Thus, the Special Master's strange finding that ERISA Counsel was not "allowed" access to the database maintained by Customer Class Counsel is squarely contradicted by Mr. Sarko's testimony, which the Report does not cite.

Lynn Sarko's deposition testimony also squarely negates any finding, conclusion, or inference that Customer Counsel inhibited ERISA Counsel's access to documents produced by State Street.  *See* R&R at 34.  Mr. Sarko explained in his deposition that, to the extent ERISA Counsel did not have access to the same universe of documents as Customer Class Counsel, it was because ***State Street***—not Customer Class Counsel—did not allow ERISA Counsel to have such access.  Sarko Dep., 7/6/17, at 44:2-5, 64:13-65:4 (SM Ex. 28).  ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████  Contemporaneous correspondence between ERISA Counsel and State Street's counsel confirms that ERISA Counsel was communicating directly with State Street's counsel regarding documents, and receiving documents from State Street as a result.  For example, a February 1, 2013 letter accompanying a production of documents by State Street's counsel to ERISA Counsel shows that (1) ERISA Counsel received the voluminous California production; and (2) ERISA Counsel issued discovery requests to State Street, negotiated with State Street regarding those requests, and received documents in return.  *See* 2/1/13 Email (TLF Ex. 23).[86]  ERISA Counsel also received other documents and information from State Street's counsel, including trading volume data and analysis.

---

[86]   Nor did the Special Master request documents from Thornton concerning ERISA Counsel's discovery negotiations with State Street.

As Mr. Sarko further explained in his deposition,  Sarko Dep., 7/16/17, at 44:24-25; 46:4-6.

The Report entirely ignores the following testimony by Mr. Sarko:

> When we agreed to go into the mediation, the understanding was that they [State Street's counsel] would provide certain documents to customer class, and we would not have access to those. **And we were provided certain documents on the ERISA side that I don't know whether the class received.** The reason being that we, of course, think about it, had not survived a motion to dismiss. We're in the process of amending our complaint. And, therefore, we got—**we negotiated with State Street to get the documents we got that we needed for—you know, for settlement purposes.**
>
> On the other hand, the customer class received all kinds of documents; for example, class certification was an issue for them. **And in our discussions with State Street, they said,**  **So we had separate confidentiality agreements at the beginning. We did not have access to those documents.** So we started by taking the documents that we received from State Street. And we had our own separate database.
>
> **
>
> And I think that was the history of why there was no—you know, we didn't receive write-ups of documents for any work they had done because we couldn't see those documents at State Street. **And even though they produced to us the—some of the same stuff, I mean, we did receive the documents from California. We received, for example, all the documents produced to the Department of Labor. I don't know if Arkansas got those documents or not. But it was State Street kept those two silos separate so that they could settle with one and not the other**.

Sarko Dep., 7/6/17, at 44:2-45:7; 45:19-46:6 (SM Ex. 28) (emphasis added).

In addition to ERISA Counsel's own dealings with State Street and their own analysis of State Street's documents, Customer Class Counsel also shared work product with ERISA Counsel and participated in joint collaborative discussions. *See, e.g.*, Sarko Dep., 7/6/17, at 114:15-25 (SM Ex. 28) (recalling "all counsel" meeting at which counsel came together to share

views of the case, and at which Michael Lesser of Thornton presented a PowerPoint

presentation); Kravitz Dep., 9/11/17, at 11:7-8 (SM Ex. 117) ("As the case wore on, we did work

closely with the customer class"); Kravitz Dep., 7/6/17, at 78:4-23, 95:13-96:20 (SM Ex. 21)

(recalling presentation and substantive discussions among counsel).

The Special Master's findings regarding ERISA Counsel's access to documents, and the

accompanying inference against Customer Class Counsel, are plainly contradicted by record

evidence.  There is no factual basis for the Special Master to conclude that Customer Class

Counsel was trying to inhibit ERISA Counsel's ability to obtain or review documents.  This is an

important correction not only because the Special Master saw fit to make this finding in his

Report, but also because it underpins his broader conclusion that ERISA Counsel got a raw deal

at the hands of Customer Class Counsel, and therefore should receive $3.4 million in

"reallocat[ed]" fees—a figure that, for the reasons explained above, is based on a fundamental

misunderstanding of the fee cap imposed by the Department of Labor.

## IX.    The Recommendation That A Monitor Be Appointed Is Baseless

As a final salvo, the Special Master recommends that an ethical monitor be imposed on

the Thornton Law Firm "to consult with them on professional conduct norms and to ensure that

they comply with those norms."  R&R at 373.  This recommendation is absurd.  What could a

consultant do to ensure "consistent ethical compliance" when there have been only unintentional

mistakes?  The answer is: nothing.

The recommendation that Thornton engage a monitor—no doubt at its own cost— is

primarily premised upon the Special Master's conclusion that "[a]s to its **business development**,

Thornton lawyers appear to be largely unsupervised and unconstrained by the professional

conduct norms" and that such conduct is "**endemic** to the way [the Thornton Law Firm does]

business with their hyper-focus on business development and fee generation."  *See* R&R at 372-

73 (emphasis added).  There is no significant discussion of the Thornton Law Firm's "business development practices" anywhere in the Report.  This is simply another instance where the Special Master or his counsel, for whatever reason, impugn the reputation of an entire law firm with no apparent reason.[87]

Ultimately, the only conduct that the Special Master has "uncovered" with respect to the Thornton Law Firm is: (1) immaterial misstatements in a boilerplate affidavit used as a cross-check for an aggregate fee award; and (2) a potential lack of contemporaneous time records of two attorneys where the Special Master found that the time recorded was nonetheless "reasonable and sufficiently reliable."  R&R at 216.[88]  This sixteen-month, $3.8 million investigation (with its attendant reputational effect and the additional significant cost to the firm of defending itself) has no doubt reminded all attorneys of their responsibility to scrupulously avoid inadvertent errors in submissions to the Court.  While the Special Master's recommendations that the Thornton Law Firm establish more consistent procedures for recording

---

[87]    Of course, this is not the only place where the Report and Recommendations unfairly impugns the reputation of the Thornton Law Firm and its attorneys.  As an additional example, page 54 of the Report quotes a lengthy email from co-counsel which the Special Master characterizes as "warning Bradley not to include unwarranted hours in Thornton's fee petition."  The underlying email states, "I heard third-hand that Mike [Thornton] recently said on a call (that I wasn't on) that Thornton Law Firm was showing $14 million . . . . I am hopeful that Mike T simply misspoke or was guessing when he said $14 million and that we are not going to suddenly see an additional 12,000 hours mysteriously appear on Thornton Law Firm's behalf."  In the response, which does not appear in the Report, Michael Thornton replies, "I did say something like that on the call, but preceded it by saying **it was a guess** and that I would have to ask Mike Lesser for the actual figure at that point which of course is not complete as with the other firms." 8/30/15 Email, TLF-SST-031166 (SM Ex. 87) (emphasis added).  Nor does the Special Master include a subsequent email, which clarified that the mistake was the result of a simple transposing of concepts, in which Michael Lesser writes, "**I think that 14 would have been our share of the fee, making some assumptions, and not the actual size of our lodestar.**" 8/30/15 Email, TLF-SST-038587 (TLF Ex. 24) (emphasis added).  This later email was identified for the Special Master, *see* Thornton's Resp. to Request for Add'l. Submission, 4/12/18, at 11-12 (TLF Ex. 3), as was deposition testimony from co-counsel that "I think Mike Thornton may have simply been mistaken because that's not the number they ultimately reported." *Id.* (citing Chiplock Dep., 9/8/17, at 64:16-18 (SM Ex. 41)).  The Special Master was either recklessly inattentive or chose to ignore this evidence, publishing innuendo with a complete disregard for injuring the reputation of a highly respected member of the bar.

[88]    As additional evidence of the Special Master or his counsel's inattention, in one section of the Report, the Special Master finds that he cannot say whether or not the time records were contemporaneous and in another section states that the time records were not contemporaneous.  *See supra* § III(B)(ii).

time and setting billing rates are not in and of themselves unreasonable, they certainly do not

justify "on-going ethics supervision," R&R at 373, and in fact do not even concern legal ethics.

Imposing an ethics monitor on the Thornton Law Firm is a draconian recommendation that

should be rejected because it is unfair, unjustified, and needlessly punitive.

## CONCLUSION

For the foregoing reasons, the Thornton Law Firm objects to the Special Master's factual

and legal findings identified above.

Respectfully submitted,

Brian T. Kelly (BBO No. 549566)
Joshua C. Sharp (BBO No. 681439)
NIXON PEABODY LLP
100 Summer Street
Boston, MA  02110
Telephone: (617) 345-1000
Facsimile:  (844) 345-1300
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com

Dated: June 28, 2018                    *Counsel for the Thornton Law Firm LLP*

110

## CERTIFICATE OF SERVICE

I certify that the foregoing document and its exhibits will be filed conventionally on June 29, 2018 when the Clerk's office opens, as the Clerk's office will be closed by the time we are able to file the foregoing document and its exhibits tonight. The foregoing document and its exhibits will be served on all counsel by electronic means on June 28, 2018. A redacted version will be filed on ECF on June 28, 2018 and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing.

Joshua C. Sharp

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated | ) ) ) | |
| | ) | No. 11-cv-10230 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) ) | |
| Defendant | ) ) | |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND and those similarly situated, | ) ) ) ) | No. 11-cv-12049 MLW |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20 | ) ) ) ) | |
| Defendants. | ) ) ) | |
| THE ANDOVER COMPANIES EMPLOYEES SAVINGS AND PROFIT SHARING PLAN, on behalf of itself and JAMES PEHOUSHEK-STRANGELAND, and all others similarly situated, | ) ) ) ) | |
| | ) | No. 11-cv-11698 MLW |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) | |
| Defendant. | ) ) | |

# EXPERT DECLARATION OF WILLIAM B. RUBENSTEIN

1.      I am the Sidley Austin Professor of Law at Harvard Law School and a leading

national expert on class action law generally and class action fees in particular.  The law firm

Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser") has retained me to provide my

expert opinion on several aspects of the fee petition that Counsel[1] submitted in this matter in

September 2016, as corrected for the subsequently-found accounting errors.  After setting forth

my qualifications to serve as an expert and disclosing my prior relationship to this case and these

firms (Part I, *infra*),[2] I provide the Special Master with empirical data and policy analysis to

support the following four opinions relevant to analysis of the reasonableness of Counsel's 2016

fee request:

- *Counsel's fee approach is the most widely used.*  (Part II, *infra*).  Counsel's fee
  petition employed a percentage approach, provided the Court with information
  about their lodestar for cross-check purposes, and addressed a series of factors
  that courts have deemed relevant to the reasonableness inquiry.  The percentage
  approach with a lodestar cross-check is the approach that courts most frequently
  use to assess the reasonableness of fee requests in common fund class action
  cases.  It improves on the percentage approach standing alone (which could lead
  to a windfall for counsel) by making a rough comparison of the fee sought to

---

[1] Lead Counsel Labaton Sucharow LLP ("Labaton Sucharow") filed the fee petition for all the
firms in the case.  *See* Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of
Litigation Expenses, and Payment of Service Awards to Plaintiffs (ECF No. 102) at 2.  In the
accompanying brief, Lead Counsel specifies that, in addition to its firm, the term "Plaintiffs'
Counsel" encompassed five other firms.  *See* Memorandum of Law in Support of Lead Counsel's
Motion for an Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of
Service Awards to Plaintiffs (ECF No. 103-1) at 8 n.2.  The total lodestar in the case, however,
encompasses work from three additional firms, or nine in all.  *See* Declaration of Lawrence A.
Sucharow in Support of (A) Plaintiffs' Assented-To Motion for Final Approval of Class
Settlement and Plan of Allocation and Final Certification of Settlement Class and (B) Lead
Counsel's Motion for An Award of Attorneys' Fees, Payment of Litigation Expenses, and
Payment of Service Awards to Plaintiffs, Ex. 24 (ECF No. 104-24) at 2 (Master Chart of
Lodestars, Litigation Expenses, and Plaintiffs' Service Awards).  This Declaration uses the term
"Counsel" as a short-hand reference to all of these firms.

[2] I typically provide a short synopsis of the litigation in my expert reports, but given the post-hoc
nature of this report, I have not done so here.

1

counsel's time in the case.  Simultaneously, it improves on the lodestar approach standing alone (which could bog the court down in review of counsel's time records) by enabling a check on the percentage approach without requiring an extensive audit of counsel's hours and rates.

- ***Counsel's billing rates were reasonable.***  (Part III, *infra*).  Counsel's fee petition supplied the Court with billing rates for all professional time-keepers.  Three sets of comparison data support the conclusion that the rates employed were reasonable:  *first*, the rates are consistent with rates that courts in this community have awarded in approving class action fee petitions in recent years; *second*, Counsel's rates fall far below the court-approved rates charged by large corporate firms in bankruptcy cases in this market; and *third,* the blended billing rate for the entire case is consistent with blended billing rates in court-approved fee petitions in class action settlements in this community and in $100-$500 million cases throughout the country.

- ***Counsel appropriately billed non-partnership-track attorneys at market rates and the billing rates employed were reasonable.***  (Part IV, *infra*).  Counsel employed non-partnership track attorneys to perform work such as document review and analysis.  An empirical analysis of 12 recent cases in which courts have approved fee petitions containing rates for "contract" or "staff" attorneys shows that Counsel's rates for these non-partnership track attorneys are unexceptional:  Counsel's blended rate is within pennies of the comparison set's average rate.  Public policy also supports Counsel's billing of these non-partnership track attorneys at market rates, not cost, as empirical evidence shows that these attorneys were well-qualified for the legal work that they undertook and as billing at market rates is consistent with how law firms in the private market bill such attorneys, complies with the ABA's suggested ethical approach, and provides the right incentives for plaintiff firms.

- ***Counsel's fee was reasonable, as evidenced by the modest size of the lodestar multiplier***. (Part V, *infra*).  The Court-awarded fee embodied a lodestar multiplier (based on Counsel's corrected lodestar) of 2.01.  Three sets of data support the reasonableness of a fee that is roughly 2 times greater than Counsel's lodestar:  it is below the mean for settlements of this size reported in the leading empirical analyses of class action fee awards, it is below the mean of a comparison group of $100-$500 million settlements, and it is fully consistent with the Court's characterization of the risks Counsel shouldered and the results that they achieved for the class herein.

I am aware of the fact that the fee petition in this case initially contained errors with regard to the

lodestar cross-check information submitted to the Court.  While those accounting errors were of

course unfortunate, their impact on the lodestar cross-check submission was relatively negligible and did not undermine the reasonableness of the fee Counsel proposed.

## I.
## BACKGROUND AND QUALIFICATIONS[3]

2.    I am the Sidley Austin Professor of Law at Harvard Law School.  I graduated from Yale College, *magna cum laude*, in 1982 and from Harvard Law School, *magna cum laude*, in 1986.  I clerked for the Hon. Stanley Sporkin in the U.S. District Court for the District of Columbia following my graduation from law school.  Before joining the Harvard faculty as a tenured professor in 2007, I was a law professor at UCLA School of Law for a decade, and an adjunct faculty member at Harvard, Stanford, and Yale Law Schools while a litigator in private practice during the preceding decade.  I am admitted to practice law in the Commonwealth of Massachusetts, the State of California, the Commonwealth of Pennsylvania (inactive), the District of Columbia (inactive), the U.S. Supreme Court, six U.S. Courts of Appeals, and four U.S. District Courts.

3.    My principal area of scholarship is complex civil litigation, with a special emphasis on class action law.  I am the author, co-author, or editor of five books and more than a dozen scholarly articles, as well as many shorter publications (a fuller bibliography appears in my c.v., which is attached as Exhibit A).  Much of this work concerns various aspects of class action law.  Since 2008, I have been the sole author of the leading national treatise on class action law, *Newberg on Class Actions*, and as of this summer, I have re-written from scratch the entire 10-volume treatise.  In 2015, I wrote and published a 600-page volume (volume 5) of the Treatise on attorney's fees, costs, and incentive awards; this volume has already been cited in

---

[3] My full c.v. is attached as Exhibit A.

3

numerous federal court fee decisions.  For five years (2007–2011), I published a regular column entitled "Expert's Corner" in the publication *Class Action Attorney Fee Digest*.  My work has been excerpted in casebooks on complex litigation, as noted on my c.v.

4.      My expertise in complex litigation has been recognized by judges, scholars, and lawyers in private practice throughout the country for whom I regularly provide consulting advice and educational training programs.  For this and the past seven years, the Judicial Panel on Multidistrict Litigation has invited me to give a presentation on the current state of class action law at the annual MDL Transferee Judges Conference.  The Ninth Circuit invited me to moderate a panel on class action law at the 2015 Ninth Circuit/Federal Judicial Center Mid-Winter Workshop.  The American Law Institute selected me to serve as an Adviser on a Restatement-like project developing the *Principles of the Law of Aggregate Litigation*.  In 2007, I was the co-chair of the Class Action Subcommittee of the Mass Torts Committee of the ABA's Litigation Section.  I am on the Advisory Board of the publication *Class Action Law Monitor*.  I have often presented continuing legal education programs on class action law at law firms and conferences.

5.      My teaching focuses on procedure and complex litigation.  I regularly teach the basic civil procedure course to first-year law students, and I have taught a variety of advanced courses on complex litigation, remedies, and federal litigation.  I have received honors for my teaching activities, including:   the Albert M. Sacks-Paul A. Freund Award for Teaching Excellence, as the best teacher at Harvard Law School during the 2011–2012 school year; the Rutter Award for Excellence in Teaching, as the best teacher at UCLA School of Law during the

2001–2002 school year; and the John Bingham Hurlbut Award for Excellence in Teaching, as the best teacher at Stanford Law School during the 1996–1997 school year.

6.      My academic work on class action law follows a significant career as a litigator. For nearly eight years, I worked as a staff attorney and project director at the national office of the American Civil Liberties Union in New York City.  In those capacities, I litigated dozens of cases on behalf of plaintiffs pursuing civil rights matters in state and federal courts throughout the United States.  I also oversaw and coordinated hundreds of additional cases being litigated by ACLU affiliates and cooperating attorneys in courts around the country.  I therefore have personally initiated and pursued complex litigation, including class actions.

7.      I have been retained as an expert witness in roughly 70 cases and as an expert consultant in about another 25 cases.  These cases have been in state and federal courts throughout the United States, most have been complex class action cases, and many have been MDL proceedings.  I have been retained to testify as an expert witness on issues ranging from the propriety of class certification to the reasonableness of settlements and fees.  I have been retained by counsel for plaintiffs, for defendants, for objectors, and by the judiciary:  in 2015, the United States Court of Appeals for the Second Circuit appointed me to brief and argue for affirmance of a district court order that significantly reduced class counsel's fee request in a large, complex securities class action, a task I completed successfully when the Circuit summarily affirmed the decision on appeal.  *See In re Indymac Mortgage-Backed Securities Litigation*, 94 F.Supp.3d 517 (S.D.N.Y. 2015), *aff'd sub. nom. Berman DeValerio v. Olinsky*, 673 F. App'x 87 (2d Cir. 2016).

5

8.      My past work encompasses prior *expert witness* work for and against a number of firms involved in this matter and current and past *legal work* on behalf of the Thornton Law Firm LLP (the "Thornton Fim"), including on an issue at the inception of this case.  Specifically, in 2011, the Thornton Firm retained me to advise it on the representation of the class in this matter and the separate representation of the *qui tam* relators in actions against State Street and I worked with the firm in that capacity between February 24, 2011 and June 6, 2011.  I am also currently assisting the Thornton Firm in a different complex litigation context, again on issues arising out of the representation of multiple parties that are un-related to the billing issues before the Special Master.  Until Lieff Cabraser contacted me in March 2017 about the present retention, I had no other involvement in (or even knowledge of the progress of) this fee-related matter.  The Thornton Firm has informed me that it has no objection to my appearing as an expert witness on the fee-related issues presently before the Special Master.  I similarly believe that my duties to the Thornton Firm arising out of the unrelated 2011work on this case and my present work on an unrelated collateral matter do not interfere with my ability to provide my own independent expert opinions on the present fee-related matter, but I make this disclosure so that the Special Master has full information.  Finally, as is more readily evident from the cases listed on my resume, Labaton Sucharow, Lieff Cabraser, and Keller Rohrback LLP ("Keller Rohrback") have each previously retained me as an expert witness in class action cases.  I have also been retained as an expert witness by parties adverse to the Lieff Cabraser firm, or to Plaintiffs' Steering Committees on which it served, or to its clients in about five cases and I worked as court-appointed counsel against a group of plaintiffs' firms, including Lieff Cabraser, arguing for affirmance of a reduced fee award in the Second Circuit, as referenced in the prior paragraph.

9.      I have been retained in this case to provide an opinion concerning the issues set forth in the first paragraph, above.  I am being compensated for providing this expert opinion.  I was paid a flat fee in advance of rendering my opinion, so my compensation was in no way contingent upon the content of my opinion.

10.     In analyzing these issues, I have discussed the case with the counsel who retained me.  I have also reviewed documents from this and related litigations, a list of which is attached as Exhibit B.  I have also reviewed the applicable case law and scholarship on the topics of this Declaration.

11.     Additionally, my research assistants, under my direction, have compiled four sets of data relevant to my analysis and ultimate opinions:

- a data set of 20 cases reflecting billing rates that judges in the District of Massachusetts – and in Massachusetts state courts –  have approved in ruling on class action fee requests in the past dozen years (Exhibit C);

- a data set of six fee petitions containing 169 rates utilized by corporate firms in bankruptcy cases that Massachusetts bankruptcy courts have approved in recent years (Exhibit D);

- a data set of 20 class action settlements with aggregate settlement values of $100-$500 million (Exhibit E);

- a data set of 12 class action cases in which courts throughout the country have approved fee petitions that contain billing rates for "contract lawyers" or "staff attorneys" in recent years (Exhibit F).

## II.
## COUNSEL'S FEE APPROACH IS THE MOST WIDELY USED
## APPROACH TO FEES IN COMMON FUND CLASS ACITONS

12.     Counsel sought a fee of approximately $74.5 million (ECF No. 102 at 2) and they demonstrated the reasonableness of that request according to a percentage approach (with

multiple factors) and a lodestar cross-check. (ECF No. 103-1). Empirical evidence shows that this is the most common approach courts take to fees.[4]

13. Specifically, the most fine-grained data of fee awards demonstrates that courts use a pure lodestar approach in 9.6% of cases, a pure percentage approach in 37.8% of cases, and a mix of the two (typically, a percentage approach with a lodestar cross-check) in 42.8% of cases, with another 9.8% of cases employing some other method or not specifying which method.[5]

14. I explain in the *Newberg* treatise how these current practices developed.[6] After adoption of the current class action rule in 1966, courts tended to employ a percentage approach to fees, but a 1973 decision of the Third Circuit endorsed an hourly approach, labeling it the

---

[4] It is also consistent with the law in the First Circuit. In reporting on First Circuit law in the *Newberg* treatise, I wrote:

1. *Percentage or lodestar fee method.* The First Circuit gives its district courts discretion as to whether to use a percentage or lodestar method.

2. *Reasonableness review criteria.* The First Circuit has not identified any particular list of factors for assessing the reasonableness of proposed percentage awards in common fund cases, instead holding that the district courts—when employing the percentage method— should award fees on an individualized, case-by-case basis. District courts in the First Circuit have sometimes utilized the multifactor tests used in the Second and Third Circuits and at other times have employed the Seventh Circuit's market mimicking approach.

3. *Lodestar cross-check.* The First Circuit has held that a lodestar cross-check is entirely discretionary.

5 William B. Rubenstein, Newberg on Class Actions § 15:96 (5th ed.) (2015) (footnotes omitted) (hereafter *Newberg on Class Actions*).

[5] *See* 5 *Newberg on Class Actions, supra* note 4, at § 15:67 (reporting on data from Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248, 272 (2010) (hereafter "Eisenberg and Miller II")).

[6] 5 *Newberg on Class Actions, supra* note 4, at § 15:64.

"lodestar" method,[7] and many courts began to utilize that method.  In response to concerns engendered by the lodestar method, the Third Circuit convened a Task Force consisting of a cross-section of lawyers, judges, and scholars, all with expertise in the area of class action attorney's fees, to develop – in a neutral, non-investigatory setting – a set of best practices.[8]  The Task Force concluded that a (negotiated) percentage method was the preferable approach for fee awards in common fund cases and many courts subsequently moved toward a percentage approach to awarding fees in common fund cases.  By 2004, the *Manual for Complex Litigation* stated that "[a]fter a period of experimentation with the lodestar method … the vast majority of courts of appeals now permit or direct district courts to use the percentage-fee method in common-fund cases."[9]  Yet, since the *Manual* made that statement, empirical evidence demonstrates that courts have moved to something of a hybrid:  a percentage approach with a lodestar cross-check.  Thus, in cases from 1993–2002, 56.4% of courts used the pure percentage, while in cases from 2003–2008 cases, only 37.8% did.[10]  This is about a one-third decrease in the use of the pure percentage approach.  The big gain was in courts' use of the mixed approach – it shot up about 75% from the first period to the second, growing from 24.3% of cases to 42.8% of cases.

---

[7] *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 168-69 (3d Cir. 1973).

[8] For a description of the Task Force's membership and methodology, see Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 253-54 (1985).

[9] Federal Judicial Center, *Manual for Complex Litigation, Fourth*, § 14.121 (2004) (citations omitted).

[10] *See* 5 *Newberg on Class Actions, supra* note 4, at § 15:67 (reporting on data from Eisenberg and Miller II, supra note 5, and Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 J. Empirical Legal Stud. 27, 52 (2004) (hereafter "Eisenberg and Miller I")).

15.     This approach is favored because it improves on either approach standing alone.[11] The percentage approach without a lodestar cross-check could lead to counsel securing a windfall.  A lodestar approach standing alone could engross the court in an unnecessary audit of counsel's hours and rates, as the entire fee turns on the specific time billed.  By contrast, using a lodestar cross-check enables a court to make a rough estimate of counsel's lodestar for the sole purpose of ensuring against a windfall.[12]  A review of counsel's lodestar is appropriate, but over-emphasis on it – especially in a case of this magnitude, involving so many lawyers throughout the country – could bog the court down in unnecessary detail.

16.     In a recent case in the California Supreme Court, I submitted my own *amicus* brief advocating for the Court to encourage the use of a lodestar cross-check.  The Court embraced my brief, writing the following:

> The utility of a lodestar cross-check has been questioned on the ground it tends to reintroduce the drawbacks the 1985 Task Force Report identified in primary use of the lodestar method, especially the undue consumption of judicial resources and the creation of an incentive to prolong the litigation.  We tend to agree with the amicus curiae brief of Professor William B. Rubenstein that these concerns are likely overstated and the benefits of having the lodestar cross-check available as a tool outweigh the problems its use could cause in individual cases.

> With regard to expenditure of judicial resources, we note that trial courts conducting lodestar cross-checks have generally not been required to closely scrutinize each claimed attorney-hour, but have instead used information on attorney time spent to "focus on the general question of whether the fee award appropriately reflects the degree

---

[11] For a defense of the lodestar cross-check method, and a discussion of the points in this paragraph, see 5 *Newberg on Class Actions, supra* note 4, at § 15:86.

[12] Courts in nearly every Circuit have noted the summary nature of the lodestar cross-check.  *See id.* at n.13 (collecting cases, including cases from within this Circuit) (citing, *inter alia*, *In re Tyco Intern., Ltd. Multidistrict Litigation*, 535 F. Supp. 2d 249, 273 (D.N.H. 2007) ("'The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting.'" (quoting *In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 306, 60 Fed. R. Serv. 3d 851 (3d Cir. 2005), as amended, (Feb. 25, 2005))).

of time and effort expended by the attorneys." 5 Newberg on Class Actions, supra, § 15:86, p. 331. . . The trial court in the present case exercised its discretion in this manner, performing the cross-check using counsel declarations summarizing overall time spent, rather than demanding and scrutinizing daily time sheets in which the work performed was broken down by individual task. Of course, trial courts retain the discretion to consider detailed time sheets as part of a lodestar calculation, even when performed as a cross-check on a percentage calculation.

As to the incentives a lodestar cross-check might create for class counsel, we emphasize the lodestar calculation, when used in this manner, does not override the trial court's primary determination of the fee as a percentage of the common fund and thus does not impose an absolute maximum or minimum on the potential fee award. If the multiplier calculated by means of a lodestar cross-check is extraordinarily high or low, the trial court should consider whether the percentage used should be adjusted so as to bring the imputed multiplier within a justifiable range, but the court is not necessarily required to make such an adjustment. Courts using the percentage method have generally weighed the time counsel spent on the case as an important factor in choosing a reasonable percentage to apply. (5 Newberg on Class Actions, supra, § 15:86, pp. 332–333. . .). A lodestar cross-check is simply a quantitative method for bringing a measure of the time spent by counsel into the trial court's reasonableness determination; as such, it is not likely to radically alter the incentives created by a court's use of the percentage method.[13]

17.     In sum, the percentage approach with a lodestar cross-check is, empirically speaking, the fee method courts utilize most often in common fund cases, and they do so for sound policy reasons.  The approach Counsel took in its fee petition in this case was therefore fully consistent with normal practice in common fund class actions.

18.     Because Counsel submitted their lodestar for cross-check purposes, not for the purposes of setting an exact fee based on the lodestar, the error in their lodestar calculation does not mean that the fee awarded was necessarily in error:  the lodestar was a means not an end. The critical question is the effect that the lodestar error had on the cross-check.  As Counsel reported in correcting it, the lodestar error meant that their multiplier in the case was approximately 2 rather than 1.8 (ECF No. 116 at 3).  As I discuss below, utilizing empirical

---

[13] *Laffitte v. Robert Half Intern. Inc.*, 376 P.3d 672, 687-88 (Cal. 2016) (some citations omitted).

evidence of multipliers, this difference in the context of this case was not significant (Part V, *infra*).  This is not, of course, to excuse the mistake.  It is, rather, to place the mistake in its proper context.

# III.
## COUNSEL'S BILLING RATES WERE REASONABLE

19.     To investigate the reasonableness of Counsel's billing rates, I utilize empirical evidence to generate three independent comparison sets:

- I compare the hourly rates for each timekeeper in this case to hourly rates that courts in this District (and in Massachusetts state court) have awarded in approving class action fee petitions in recent years.

- I compare the hourly rates for each timekeeper in this case to the hourly rates that defense firms charge for similar work in this market, as evidenced by rates Massachusetts bankruptcy courts have approved in recent years.

- I compare the blended billing rate for this case to the blended billing rate of other class action cases in this District and to other class action cases involving $100-$500 million settlement funds.

20.     I have chosen to compare Counsel's billing rates to rates other class action (and bankruptcy) courts have approved because it is my expert opinion that such court-sanctioned rates provide the best comparison group.  The primary reason they are the best comparable evidence is that class action attorneys make a living getting paid by their clients through court-approved fee petitions;[14] thus the "market" rates for their services are generally the rates that

---

[14] Given this fact, I found unambiguous the statements in this case's fee declarations that the "hourly rates for the attorneys and professional support staff in my firm . . . are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions."  *E.g.*, Declaration of Lawrence A. Sucharow on Behalf of Labaton Sucharow LLP in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, ECF No. 104-15 at ¶ 7 (Sept. 15, 2016).  I read "regular rates charged" as meaning that these were rates submitted in class action fee petitions, a reading confirmed by the succeeding clause's statement that the rates had been "accepted [by courts] in other complex class actions."

courts approve for their services.[15]   Other ways of assessing the reasonableness of the hourly

rates in cross-check submissions include the following:

- Occasionally, lawyers will submit, and courts rely on, affidavits from other lawyers in the community about prevailing rates.[16]   Such affidavits have the benefit of being sworn to under penalty of perjury, and therefore likely provide accurate reporting on the rates included in them, but they may not represent a fair cross-section of evidence given the manner in which they are produced.[17]

- Occasionally lawyers will present evidence collected from surveys such as the *National Law Journal* survey.  A few courts have deemed survey evidence sufficient for lodestar cross-check purposes because the cross-check "does not involve bean counting or mathematical precision."[18]   Nonetheless, survey evidence is notoriously unreliable for multiple reasons:  (a) the survey drafters can skew answers – even inadvertently – simply in the way questions are drafted; (b) results are often reported by attorney type (junior associate, senior partner, etc.) and with bands of rates so that tailored comparisons are impossible; (c) survey respondents, unlike lawyers filing fee petitions, do not sign survey responses under the penalty of perjury; and (d) most problematically, surveys embody a selection bias in that they may neither be sent to nor responded to by an appropriate comparison group; this is particularly a problem in that (e) the nature, legitimacy, and transparency of the organization undertaking the survey – and the context in which the survey is taken – will have a significant effect

---

[15] For this reason, the Second and Ninth Circuit have criticized the Seventh Circuit's belief that there is some other market approach to class action attorney's fees.  *See* 5 *Newberg on Class Actions*, *supra* note 4, at § 15:79 ("'[T]o the extent that a market analogy is on point, in most cases it may be more appropriate to examine lawyers' reasonable expectations, which are based on the circumstances of the case and the range of fee awards out of common funds of comparable size.'") (quoting *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049–50 (9th Cir. 2002)).

[16] *See, e.g., Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 262 (N.D. Cal. 2015) ("[E]vidence of prevailing market rates may include affidavits from other area attorneys.").

[17] *Cotton v. City of Eureka*, 889 F. Supp. 2d 1154, 1167 (N.D. Cal. 2012) (finding declarations from other attorneys unhelpful for being too general); *Wilhelm v. TLC Lawn Care, Inc.*, No. CIV. A. 07-2465-KHV, 2009 WL 57133, at *5 (D. Kan. Jan. 8, 2009) (agreeing with defendant's contention that "the affidavits of other plaintiffs' attorneys should be disregarded because they are self-serving" and "contradict plaintiffs' other evidence").

[18] *In re Schering-Plough Corp.*, No. CV 08-397 (DMC)(JAD), 2013 WL 12174570, at *28 n. 27 (D.N.J. Aug. 28, 2013), report and recommendation adopted sub nom. *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. CIV.A. 08-2177 DMC, 2013 WL 5505744 (D.N.J. Oct. 1, 2013).

on who responds to the survey and how.  Accordingly, courts are often quite skeptical of such evidence.[19]

- Occasionally courts rely on something called the *Laffey* Matrix[20] – particularly in fee-shifting cases in the District of Columbia – but this is a disfavored approach and one that I am quite critical of for a host of reasons.[21]

In short, as the goal of this endeavor is to ascertain proper billing rates for lawyers pursuing class action lawsuits, I agree with the many courts that have found that the best comparable evidence are rates that other courts have approved for class action work.[22]

---

[19] *See In re: Sears, Roebuck & Co. Front-loading Washer Prod. Liab. Litig.*, No. 06 C 7023, 2016 WL 4765679, at *14 (N.D. Ill. Sept. 13, 2016) (noting "skepticism" amongst courts about applying survey rates that fail to differentiate large and small firms); *Forkum v. Co-Operative Adjustment Bureau, Inc.*, No. C 13-0811 SBA, 2014 WL 3101784, at *4 (N.D. Cal. July 3, 2014) (finding a fee survey "largely unhelpful in determining the reasonable hourly rates for the attorneys that worked on this case" because it is "not [a] reliable measure[] of rates in [the court's District] because [it] provide[s] no data on the prevailing hourly rates charged in this District"); *Lorik v. Accounts Recovery Bureau, Inc.*, No. 1:13-CV-00314-SEB, 2014 WL 1256013, at *2–3 (S.D. Ind. Mar. 26, 2014) (criticizing the "fairly obvious facial weaknesses" in a fee survey, such as insufficient sample size, lack of detailed geographical differentiation, and response bias, and finding "[t]he customary and judicially preferred standard by which the reasonableness of hourly rates is measured ordinarily comes from [evidence of rates charges by] . . . other lawyers who regularly practice in a particular geographical area and who provide similar or comparable legal services"); *California Durham v. Cont'l Cent. Credit*, No. 07CV1763 BTM WMC, 2011 WL 6783193, at *2 n.1 (S.D. Cal. Dec. 27, 2011) (finding a fee survey "is of limited usefulness because [it] does not beak down the hourly rates by region within California").

[20] The matrix originated in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983).

[21] *See* 5 *Newberg on Class Actions*, supra note 4, at § 15:43.

[22] *See, e.g., Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 F. App'x 496, 498–99 (6th Cir. 2011) (noting that courts should determine reasonable hourly rates by looking to, *inter alia*, the rates used in analogous cases); *Plyler v. Evatt*, 902 F.2d 273, 277 & n.2 (4th Cir. 1990) (noting courts should weigh a fee applicant's hourly rates against the prevailing market rates in the relevant community, which looks to, *inter alia*, "attorneys' fee awards in similar cases"); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 262 (N.D. Cal. 2015) (noting evidence of prevailing market rates includes affidavits from area attorneys and "examples of rates awarded to counsel in previous cases"); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 756 (S.D. Tex. 2008) (noting Fifth Circuit courts determine whether an hourly rate is reasonable by looking to affidavits from other attorneys in the community and "rates actually

14

### *Court-approved rates in Massachusetts class action cases*

21. For purposes of this Declaration, I utilized a database of 481 fee rates contained in 20 class action fee petitions approved by federal and state courts in Massachusetts in recent years.[23] A list of these cases is attached as Exhibit C. For each timekeeper, my research assistants identified the timekeeper's initial year of admission to the bar either by using the information in the fee petition or, if the information was not listed therein, by examining the firm's website and/or the relevant state bar website. As the fee petition herein was submitted in 2016, we adjusted all hourly rates in prior cases to 2016 dollars using the U.S. Bureau of Labor CPI Inflation Calculator.[24] Once each timekeeper's experience level had been identified and all of the dollar amounts had been set at 2016 levels, we plotted the rates on an x-y axis, with the x-

---

billed and paid in similar lawsuits"); *Faircloth v. Certified Fin. Inc.*, No. CIV. A. 99-3097, 2001 WL 527489, at *10 (E.D. La. May 16, 2001) (looking to "decisions of other courts in this jurisdiction" to determine a proposed hourly rate was reasonable).

[23] I originally compiled this dataset for my 2016 work as an expert witness on attorney's fees in a case entitled, *Geanacopoulos v. Philip Morris USA Inc.*, No. 98-6002-BLS1 (Mass. Super.). To do so, I searched for reported fee decisions of Massachusetts courts (state and federal) in class action cases. Employing a neutral search sequence on Westlaw, I identified a total of 54 decisions since January 1, 2005. I read through all 54 decisions; some were not class action cases, some were not fee decisions, and some did not enable a review of the utilized hourly rates. A total of 18 of the cases met all these criteria and became the baseline for my rate study. In some of these 18 cases, counsel sought an award lower than their total lodestar and/or the court made an award lower than the total lodestar. So long as the court did not express concern about counsel's proposed billing rates in affirming the fee request, I coded these rates as affirmed, or judicially-approved, rates and included them in the data set. If a court explicitly lowered a specific billing rate, I utilized the lower rate in the data set. For purposes of this Declaration, my research assistants updated that dataset in two ways: we added the rates employed in that prior case as the court approved that fee petition and we searched for newer cases using the same criteria and identified one such case to add to the database.

[24] This calculator can be found at this hyperlink: http://data.bls.gov/cgi-bin/cpicalc.pl. For each year prior to 2016, we calculated the differential between $1,000 in that prior year and $1,000 in 2016. We then used that differential to calculate the 2016 rate for the prior year. For example, the calculator showed that $1,000.00 in January of 2015 was equivalent to $1,013.73 in January of 2016. Accordingly, we multiplied all 2015 rates by 1.01373 to adjust them to 2016 values.

axis representing the years since the timekeeper's admission to the bar and the y-axis representing the timekeeper's hourly rate. The resulting scatter plot, set forth below in Graph 1, provides a snapshot of hourly rates in judicially-approved fee applications in Massachusetts; the blue logarithmic trend line sketches the trend of these rates across experience levels.

**GRAPH 1**
**HOURLY RATES IN JUDICIALLY-APPROVED FEE APPLICATIONS IN MASSACHUSETTS CLASS ACTION CASES**



22.      My research assistant next plotted the rates utilized by Counsel in this matter. Counsel supplied us with corrected lodestar data for three firms,[25] containing billing rates[26] for 103 lawyers. For the remaining six firms, we used the submissions they made at the time of the

---

[25] These are:  Labaton Sucharow; Lieff Cabraser; and the Thornton Firm.

[26] Counsel utilize their current rates for all time spent in the litigation.  The law supports using current rates as "an appropriate adjustment for delay in payment," *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989).   In my experience, this is typically how this issue is handled.  It is my opinion that it is reasonable for Counsel, who had not been paid in the nearly six years that this case was pending, to use current hourly rates as an adjustment for the delay in payment.

fee petition, which contained rates for 38 lawyers, bringing the total number in this data set to 141. After identifying the year of admission to the bar for each such timekeeper, we plotted these rates onto the same type of x-y axis that we had employed for the Massachusetts comparison set. The resulting scatter plot, set forth below in Graph 2, provides a snapshot of Counsel's billing rates, with the red logarithmic trend line sketching the trend of Counsel's rates across experience levels.

**GRAPH 2**
**COUNSEL'S HOURLY RATES**



23.     Finally, we aggregated the data from Graphs 1 and 2 onto a single scatter plot that indicates the judicially-approved rates in Massachusetts with blue dots and a blue logarithmic line and Counsel's proposed rates with red dots and a red logarithmic line. These data appear in Graph 3, below.

**GRAPH 3**
**COUNSEL'S HOURLY RATES COMPARED TO**
**HOURLY RATES IN JUDICIALLY-APPROVED FEE APPLICATIONS**
**IN MASSACHUSETTS CLASS ACTIONS**



24.     As Graph 3 demonstrates, the two logarithmic trend lines track one another closely.  For lawyers with fewer than about 11 years of experience, Counsel's trend line lies below the trend line for rates in approved Massachusetts class action fee petitions, and then among more senior lawyers, Counsel's trend line rises slightly above the trend line of the comparison group.  The proposed rates for 76 of Counsel's 141 lawyers (53.9%) are below the Massachusetts trend line.  When the differences between the trend lines are compared at all 141 points, Counsel's trend line is, on average, 1.01% above the trend line for rates in approved Massachusetts class action fee petitions.  This means that Counsel's proposed rates are, across the board, virtually identical to the rates that judges in Massachusetts have approved for similar work – other class action litigation – by similarly experienced attorneys.

18

25.     The portion of Counsel's trend line that is above the comparison trend line exceeds the comparison by an average of 6.32%.  That Counsel's trend line across their senior lawyers in this case is roughly 6% above the average lawyers' trend line makes perfect sense for two inter-related reasons.  *First*, Labaton Sucharow, Lieff Cabraser, and Keller Rohrback are three of the leading class action firms in the United States, and the Thornton Firm is a premier firm in this market with a similar high profile throughout the country.  The lawyers at these firms possess years of remarkable experience, have track records of superb achievement, and can be counted among the elite of the profession generally and this area of law specifically.  As the comparison set picks up a range of approved class action cases in this community, it encompasses lawyers with far less expertise undertaking far more mundane matters.  Indeed, *second*, one would expect higher than average billing rates in a case of this magnitude – a $300 million class action against one of the largest banks in the United States[27] and defended by one of the largest law firms in the United States.[28]  Accordingly, if there is any surprise in the data it is only that the trend line across these senior lawyers is but 6% above the trend line of the wide swath of lawyers with different skill levels who are represented in the comparison group.

26.     In comparing Counsel's rates to Boston rates, I have not adjusted the rates from the non-Boston firms in this case to Boston levels.  I have not done so because this is a level of detail generally beyond what is undertaken for lodestar cross-check purposes.[29]  In lodestar cross-check cases, courts occasionally cite the standard, borrowed from fee-shifting

---

[27] State Street Bank is #271 on the Fortune 500 in 2017.  This data point is available at hyperlink: http://fortune.com/fortune500/state-street-corp/.

[28] Wilmer Hale is the 26th largest large firm by revenue in the United States.  This data point is available at hyperlink:  https://en.wikipedia.org/wiki/List_of_largest_law_firms_by_revenue.

[29] *See* note 12, *supra*.

jurisprudence, that rates should be "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."[30]   I am not aware of any appellate decisions mandating this approach for lodestar cross-check purposes in common fund cases, and it is a step rarely undertaken.[31]   Nonetheless, if I were to do so, the rates for most timekeepers would decrease:  application of a judicially-endorsed approach to adjusting lawyer rates by geographic market[32] would require decreasing the San Francisco rates (Lieff Cabraser) by 8.3%, the New York rates (Labaton Sucharow) by 3.4%, and the Washington, D.C. rates (McTigue Law LLP, Zuckerman Spaeder LLP, Beins Axelrod PC) by 0.3%, while increasing the

---

[30]  *Martinez-Velez v. Rey-Hernandez*, 506 F.3d 32, 47 (1st Cir. 2007) ("Part of the fees calculation is the selection of an appropriate hourly rate for each attorney.  Rates should be 'those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984))).

[31]  A search for the term "lodestar cross-check" in all federal cases returns 732 cases, while adding the phrase "and prevailing in the community for similar services" to the search returns a total of 51 cases.  Of those 51 cases, only 11 involve a court holding that counsel should use local rates for purposes of a lodestar cross-check; nine of these 11 cases involve courts in the Eastern District of California insisting that lawyers from Los Angeles or San Francisco utilize Fresno rates.  This means that outside of Fresno, a total of three of 732 reported cases (or .27%) in this search string insist upon geographic adjustment in the lodestar cross-check context (1.5% if Fresno is included).  Even that miniscule percentage is likely exaggerated because there are thousands of lodestar cross-check decisions not reported on Westlaw and the reported cases likely select for aberrations of this type.

[32]  I utilize the federal government's judicial differential methodology to adjust rates between different geographic markets, as set forth in *In re HPL Techs., Inc. Sec. Litig.*, 366 F. Supp. 2d 912, 921 (N.D. Cal. 2005).  The federal government rates can be found at this hyperlink: http://www.uscourts.gov/careers/compensation/judiciary-salary-plan-pay-rates.   The federal government increases the base rate by 26.73% for the Boston market, by 31.22% for the New York market, by 38.17% for the San Francisco market, by 27.10% for the D.C. market, by 24.24% for the Seattle market, and by 15.65% for the North/South Carolina market.  This means that a base hourly rate of, say, $350/hour would be worth $443.56 in Boston ($350 x 1.2673) and $459.27 in New York ($350 x 1.3122).  Therefore, one would have to multiply New York billing rates by 0.96579 ($459.27 x 0.96579=$443.56) to bring them down to Boston levels.  The same conclusion can be achieved by the formula:  <1-(1.2673/1.3122)>.  I apply this approach for each market.

Seattle (Keller Rohrback) and South Carolina (Richardson Patrick Westbrook & Brickman LLC) rates by 2.0% and 9.6%, respectively.   In Graph 4, below, these new geographically-adjusted rates are added to the prior graph:  the Massachusetts-approved rates remain in blue, Counsel's unadjusted rates remain in red, and Counsel's rates adjusted to the Boston market appear in Celtic green.   There is also a new green trend line for the geographically adjusted rates, but overall the rates drop so slightly that it is difficult to see the deviation of the green line's adjusted rates from the red line's unadjusted rates.

**GRAPH 4**
**COUNSEL'S HOURLY RATES ADJUSTED TO BOSTON MARKET**
**COMPARED TO COUNSEL'S UNADJUSTED HOURLY RATES AND**
**HOURLY RATES IN JUDICIALLY-APPROVED FEE APPLICATIONS**
**IN MASSACHUSETTS CLASS ACTIONS**



Put most simply, adjusting for geography, Counsel's overall lodestar decreases by a total of 3.18%.   While this means that Counsel's lodestar multiplier simultaneously increases, the increase is so small – from 2.01 to 2.07 – that the multiplier remains well within the range of reasonableness, as discussed below.[33]   The small and immaterial effect of all this (geographic-

---

[33] *See* Part V, *infra.*

correction) work is precisely the reason that courts do not demand that it be undertaken in the cross-check setting.

27.     In sum, the prior paragraphs demonstrate empirically that the rates that Counsel utilized in their lodestar cross-check submission in September 2016 were fully consistent with rates courts in Boston had explicitly or implicitly approved in awarding fees in class action cases.

### *Defense Firm Rates*

28.     Another relevant set of data concerning rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation,"[34] is the set of rates charged by large corporate defense firms.  It is these large corporate firms – like Wilmer Hale in this case – that defend significant class action cases like this one; these firms therefore provide the services most comparable to the services that the plaintiffs' lawyers provide in these cases, utilizing reasonably comparable skills and calling on reasonably comparable experience.[35]  Since corporate firms typically have private fee arrangements with their clients, the most public – and reliable – evidence of the rates that these firms charge appears in fee petitions submitted by them in bankruptcy cases.[36]  For purposes of this Declaration, I

---

[34] *Martinez-Velez*, 506 F.3d at 47.

[35] There are of course some differences between plaintiff firms running large complex class actions and defendant firms defending such cases, but what is not different is that the two sets of firms are litigating the same cases against one another.

[36] I find these rates the most reliably comparable for four independent reasons.  *First*, unlike rates reported in publications like the *National Law Journal*, these rates are provided lawyer-by-lawyer, not in ranges based on job types (like junior associates, or senior associates).  *Second*, counsel seeking court approval for these rates swear to their accuracy.  *Third*, in the bankruptcy context, the petitioning lawyers specifically represent that the rates they are using are the same rates that they use outside of the bankruptcy context.  *See* 11 U.S.C. § 330(a)(3) (directing bankruptcy courts awarding attorneys' fees to take into account "all relevant factors, including . . . whether compensation is reasonable based on the customary compensation charged by

utilized a database of 169 fee rates contained in six fee petitions approved by bankruptcy courts

in Massachusetts in five cases in recent years.[37]   A list of those cases is attached as Exhibit D.

Using orange dots and an orange logarithmic trend line, we plotted these rates (adjusted to 2016

dollars) onto the same x-y axis that contained the Massachusetts approved rates (in blue) and

Counsel's rates (in red).  The results are reflected in Graph 5, below.

**GRAPH 5**
**CORPORATE FIRM RATES COMPARED TO BOTH**
**HOURLY RATES IN JUDICIALLY-APPROVED FEE APPLICATIONS**
**IN MASSACHUSETTS CLASS ACTIONS AND**
**TO COUNSEL'S HOURLY RATES**



---

comparably skilled practitioners in cases other than cases under this title").  *Fourth*, the type of
work – providing legal services to a group of absent creditors in a piece of complex litigation – is
generally analogous to what class action attorneys do.

[37] My research assistants consulted Chambers and Partners rankings to create a list of leading
corporate firms.  They then searched for these firms by name on Westlaw, filtering for cases in
Bankruptcy Courts in the District of Massachusetts after 2009.  When one of the firms on the
Chambers list was named as counsel for one of the parties in a Westlaw case, my research
assistants searched PACER for a fee petition filed by that firm.  Four cases yielded five usable
fee petitions; a fifth case, the Houghton Mifflin Harcourt bankruptcy, was found by searching for
large bankruptcies in Massachusetts.  My research assistants utilized every petition they found
meeting these criteria.

As is visually evident, judicially-approved defense firm rates are significantly higher than the rates in judicially-approved fee applications for class action attorneys in Massachusetts and similarly far higher than Counsel's rates herein.  Indeed, when the differences between the trend lines are compared at all 141 points in Counsel's fee petition, the defense firm rates are, on average, 37.53% above the trend line for Counsel's rates.

### *Blended Rate*

29.     Counsel's blended billing rate[38] for the entire case – utilizing the corrected lodestars of the Labaton, Lieff Cabraser, and Thornton firms – is $484.70.[39]  A quantitative analysis of this blended billing rate confirms its reasonableness.

30.     To assess the reasonableness of the blended billing rate, I directed my research assistants to extract the blended billing rate from the 20 Massachusetts federal and state class action fee approvals that we had collected for this rate study. The blended billing rate (again adjusted to 2016 dollars) in these cases ranged from a low of $227.51/hour to a high of $683.24/hour.   The mean rate for these 20 cases is $484.05. The complete range of blended billing rates is reflected in Graph 6, below, with the blended billing rate in this case highlighted in red.  As the Court can see, the blended billing rate in this case ($484.70) is just at the median of the graph and 65 cents, or 0.13%, above the mean, demonstrating its normalcy.

---

[38] A blended billing rate is captured by simply dividing the total lodestar by the total number of hours worked, thus providing the average hourly billing rate for the case across all timekeepers ranging from high-end partners to paralegals.

[39] If the rates are adjusted for geographic markets, *see supra* ¶ 26, the blended rate for this case falls to $469.29.

**GRAPH 6**
**COUNSEL'S BLENDED BILLING RATES COMPARED TO
BLENDED BILLING RATES IN RECENT
MASSACHUSETTS CLASS ACTION FEE APPROVALS**



31.    Because the blended billing rates in the Massachusetts cases tend to have emerged from smaller settlements (this is one of the largest settlements in Massachusetts history), I also compared the blended billing rate in this $300 million settlement to blended billing rates in 20 other settlements of comparable size ($100-$500 million).  A list of those cases is attached as Exhibit E.[40]  The blended billing rate (again adjusted to 2016 dollars) in these cases ranged from a low of $338.07/hour to a high of $637.67/hour.  The mean rate for these 20 cases is $484.67.  The complete range of blended billing rates is reflected in Graph 7, below, with the blended billing rate in this case highlighted in red.

---

[40] My research assistants compiled this list by searching on Westlaw for fee decisions in cases with settlement funds of this size that contained information about counsel's lodestar.  Thus, they used search terms like "megafund" or "hundred million" to capture fund size and search terms like "lodestar" or "hours" to capture decisions that contained rate information.  If the case had a fund of the right size, but the reported decision did not contain enough information about the fee petition, they tracked that down on PACER.  No cases of the relevant size enabling reference to counsel's lodestar information were rejected.

**GRAPH 7**
**COUNSEL'S BLENDED BILLING RATES COMPARED TO**
**BLENDED BILLING RATES IN**
**$100-$500 MILLION CLASS ACTION SETTLEMENTS**



As is visually evident, the blended billing rate in this case ($484.70) is in the middle of the pack – right at the median in the graph – and but three cents above the mean, demonstrating its normalcy.

32.     The reasonableness of Counsel's blended billing rate supports several further conclusions.   The blended billing rate reflects the distribution of time between partners, associates, and paralegals.  If only partners did this work, the blended billing rate would be very high, whereas if only paralegals billed, the blended billing rate would be very low.  The fact that the blended billing rate in this case is at or below average across two comparison sets means that Lead Counsel distributed work among partners, associates, non-partnership track attorneys, and paralegals in an appropriate fashion.  Given the slightly above-average rates of the most senior attorneys in this case noted above, it is a sign of good leadership that Lead Counsel was able to bring the blended rate in at this mean.

33.     In sum, three separate empirical analyses (one with two sub-parts) support the

conclusion that Counsel's rates are entirely normal:  they are consistent with the mean for rates

approved by courts in awarding fees in class actions in this community; they are below the rates

charged by the defendant's firm to its paying clients for similar work; and the blended rate is

consistent with rates in this community and for comparably-sized settlements.

## IV.
## COUNSEL APPROPRIATELY BILLED NON-PARTNER TRACK ATTORNEYS AT MARKET RATES AND THE RATES EMPLOYED WERE REASONABLE

34.     Counsel employed non-partnership track attorneys to undertake some aspects of

the class's legal work, particularly the review of documents.  I have reviewed the rates at which

these non-partnership track attorneys are included in the lodestar for cross-check purposes and

make three factual observations about those rates, two empirical, one policy-oriented.

35.     *First,* these are skilled attorneys.  They are referred to as "contract" or "staff"

attorneys solely by virtue of the fact that they are not on a partnership track at the relevant law

firms, but are hired on more of an ad hoc basis.[41]   The fact that these lawyers are not on a

partnership track, standing alone, says nothing about their qualifications or about the type of

work that they undertook.   For purposes of this report, I reviewed Lieff Cabraser's slide

presentation to the Special Master, which, as the Court knows, reflects the backgrounds and

experiences of many of the non-partnership track attorneys who worked on this case.  It appeared

clear to me that these attorneys were very well qualified:  they typically graduated from good law

schools; have significant experience, including at the tasks to which they are assigned; and often

---

[41] While different firms call these attorneys different names – e.g., "contract attorneys" or "staff attorneys" – the defining characteristic of them is that they are not on a partnership track. Commentators often make the incorrect assumption that these attorneys are necessarily "temps." Many are salaried employees of the firms and work at these firms over many years.

27

work on a non-partnership track as a personal choice about how they wish their careers to proceed, not because they are unqualified for partnership track jobs. Moreover, the firms have convincingly attested that these attorneys did meaningful work.

36.     *Second*, the rates at which counsel included non-partnership track attorneys in their lodestar for cross-check purposes are consistent with 57 rates that courts have explicitly or implicitly affirmed in approving fee petitions in 12 class action cases decided since 2013.[42]   A list of those cases is attached as Exhibit F.  The rates in those cases ranged from $250.00 to $550.00, with a mean (in 2016 dollars) of $379.53.[43]   The blended rate for non-partnership attorneys in this case was $379.31.  Thus the rate in this case is 22 cents, or 0.06%, below the mean of the comparison group.[44]   Put simply, the billing rate for non-partnership track attorneys in this case is entirely normal.

---

[42] My research assistants compiled this list by searching for recent fee decisions involving staff or contract attorney rates, using a neutral search string in Westlaw.  The search returned 29 cases.  I read through all 29 cases.  We then used the rates from any case with court-approved billing rates for contract or staff attorneys, accounting for experience, except for one case in which the contract attorneys simply staffed a calling center.  This yielded 12 usable cases with 57 data points.

[43] Using a different data set, I recently reported a very similar numerical result in the Volkswagen "Clean Diesel" MDL.  There, a set of 13 cases with 138 data points yielded an average contract attorney rate of $386.75 in 2017 dollars.  *See* Declaration of William B. Rubenstein in Support of Plaintiffs' Motion for 3.0-Liter Attorneys' Fees and Costs at 21, *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, Case 3:15-md-02672-CRB (N.D. Cal.) (ECF No. 3396-2, Ex. B, filed June 30, 2017).  Here, my 12 case data set's norm of $379.53 in 2016 dollars is the equivalent of $389.02 in 2017 dollars, which is virtually equivalent to the $386.75 I reported in VW (0.59% higher).  Hence the two data sets reinforce one another.

[44] I removed Michael Bradley from this portion of my rate study since his hourly rate was set on a contingent basis, unlike the other non-partnership track attorneys.  If he is included, the total for this case rises from $379.31 to $382.94, which is 0.90% above the mean of the comparison group.

28

37.    *Third,*[45] the policy question of how to bill non-partnership track attorneys has

arisen regularly in class suits as class counsel will often hire such lawyers to perform discrete

functions in a particular case.   Class counsel typically pay these attorneys at a lower hourly rate

than the hourly rate they assign to them in the lodestar analysis in their fee petitions.   To put

numbers on this idea:   the firms herein hired non-partnership track attorneys at rates ranging

from $30 to $60/hour, then assigned these attorneys rates ranging from $335 to $440/hour[46] for

purposes of the lodestar cross-check calculation based, for example, on the attorneys' number of

years out of law school, their experience, and the type of work they performed.   It is my expert

opinion that several policy arguments support this approach:

- This is precisely the way in which firms bill legal services – including those of partners, associates, paralegals, and contract attorneys – to clients in the private market.   For instance, a firm may pay a first-year associate a $150,000 annual salary and expect 2,000 hours of billable time in return.   That means that the associate's salary breaks down to $75/hour.   The associate likely costs the firm more than $75/hour because the firm has spent time recruiting and training the associate and because it pays for overhead, perhaps benefits, and other expenses associated with her work.   Consequently, the associate who is receiving a $75/hour salary may actually cost the firm, say, $100/hour.   But the firm then bills its clients, maybe, $375/hour for that associate's time, realizing a $275/hour, or 275%, profit for the associate's work. Regardless of the precise numbers that attach to the practice, the point is that law firms are in the business of making their partners a profit by having the partners bill the work done by their associates and paralegals to their clients at higher rates than they pay them.   So long as a contract attorney is providing legal services to a client, a firm is entitled to bill her time to the client in the same manner.

- The ABA reached this conclusion nearly two decades ago, *see* ABA Formal Opinion 00-420, and I note as a matter of policy that courts have often cited to the ABA's guidance in concluding that class action firms "may charge a markup to cover overhead *and profit* if the contract attorney charges are billed as fees for legal services.[47]   It makes sense that courts have so held because a contingent fee class action firm's lodestar operates in the same way as a private law firm's bill to its

---

[45] The language and citations in this and the following paragraphs are taken from 5 *Newberg on Class Actions*, supra note 4, at § 15:41.

[46] These ranges do not encompass Michael Bradley, as noted above.   *See* note 44, *supra.*

[47] *In re AOL Time Warner S'holder Derivative Litig.,* No. 02 Civ. 6302(CM), 2010 WL 363113, at *26 (S.D.N.Y. Feb. 1, 2010) (emphasis added).

client:  it embodies this basic profit for its partners and, in doing so, brings the lodestar in line with market rates.[48]

- Permitting class counsel to bill non-partnership track attorneys at market rates is cost-efficient:  it encourages the firms to delegate work to attorneys who are likely billed at lower costs than are associates or partners.  If class action firms could only bill non-partnership track attorneys at cost, they would likely transfer the work required to associates.

38.    In sum, quantitative analysis of the rates paid non-partnership track attorneys shows that these rates are indistinguishable from the rates regularly approved by courts for such work and public policy strongly supports the manner in which Counsel billed non-partnership track attorneys.

# V.
## COUNSEL'S FEE WAS REASONABLE

39.    Under the lodestar cross-check method, the measuring stick of the reasonableness of counsel's fee is the level of multiplier that it represents over the time they invested in the case.  Counsel's fee embodied a lodestar multiplier of 2.01, or approximately 2.[49]  Quantitatively, a 2

---

[48] The lodestar *multiplier* is meant to reward the class action firm over and above the market rate for undertaking a case on a contingency fee basis.  Without such a multiplier, no firm would undertake contingent cases, as it would be far safer to simply reap the normal profit embodied in the lodestar but reflected, in a non-contingent case, in the bill to the client.  *See, e.g.*, *Ketchum v. Moses* 17 P.3d 735, 742 (Cal. 2001) ("A contingent fee must be higher than a fee for the same legal services paid as they are performed.  The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services.  The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of conventional loans. . . . A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions.  If he is paid no more, competent counsel will be reluctant to accept fee award cases." (internal quotation marks and citations omitted)).

[49] This is the multiplier for the full fee award to all counsel in the case divided by the hours of all counsel in the case.  As noted above, *see supra* ¶ 26, if all hourly rates are adjusted to Boston rates, the multiplier rises to 2.07.

multiplier is consistent with multipliers that courts have previously approved in similar circumstances.

40.     Three leading empirical studies of class action attorney's fees found the mean multipliers in all cases to be 1.42,[50] 1.65, [51] and 1.81,[52] while an older study found the mean multiplier to be 4.97.[53]

41.     These studies also show that multipliers are higher in cases with larger returns, with the mean multipliers rising to 2.39 (in cases with recoveries over $44.6 million) in one study;[54] to 3.18 (in cases with recoveries over $175.5 million) in another study;[55] and to 4.5 (in cases with recoveries over $100 million) in a third study.[56]

42.     In the set of 20 $100-$500 million settlements my research assistants assembled for purposes of this Declaration, the approved multipliers ranged from 0.92 to 8.3, with the average being 2.28.  The 2.01 multiplier in this case is therefore 12% below the mean for

---

[50] 5 *Newberg on Class Actions, supra* note 4, at § 15:89 (reporting on data from William B. Rubenstein and Rajat Krishna, *Class Action Fee Awards: A Comprehensive Empirical Study* (draft on file with author)).

[51] Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 833-34 (2010).

[52] Eisenberg & Miller II, *supra* note 5, at 272.

[53] Stuart J. Logan, Beverly C. Moore & Jack Moshman, *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Rep. 167, 169 (2003) (hereafter "Logan").

[54] 5 *Newberg on Class Actions, supra* note 4, at § 15:89 (reporting on data from William B. Rubenstein and Rajat Krishna, *Class Action Fee Awards: A Comprehensive Empirical Study* (draft on file with author)).

[55] Eisenberg & Miller II*, supra* note 5, at 274.

[56] Logan, *supra* note 53, at 167.

settlements of comparable size;[57] it appears a few cases higher than the median in Graph 8, below, but the only cases between this case and the median case have multiplier values of 2.0 rather than 2.01.

### GRAPH 8
### COURT-APPROVED MULTIPLIERS IN
### $100-$500 MILLION-DOLLAR CASES



43.   Beyond these bare statistics, case reports demonstrate that, in appropriate circumstances, courts have often approved percentage awards embodying lodestar multipliers far above the multiplier of 2 at issue here.   In the leading Ninth Circuit opinion on point, for example, the Court established 25% as the benchmark percentage fee and approved a multiplier of 3.65, writing that this number "was within the range of multipliers applied in common fund cases"[58] and appending a list of such cases to its decision.   Similarly, in Exhibit G, I provide a

---

[57] If Counsel's rates are adjusted to the Boston market and a 2.07 multiplier is employed, *see* ¶ 26, *supra,* that multiplier is 9.3% below the mean of the comparison set.

[58] *Vizcaino*, 290 F.3d at 1051; *see also Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014) ("A 2.83 multiplier falls within the Ninth Circuit's presumptively acceptable range of 1.0–4.0. Given the complexity and duration of this litigation, the results obtained for the class, and the risk counsel faced in bringing the litigation, the Court finds the 2.83 multiplier appropriate." (citation omitted)).

list of 54 cases with multipliers over 3.5, 48 of which have multipliers of 4.00 or higher, and 31

of which have multipliers of 5.00 or higher.  This list is not meant to be either exhaustive or

representative of all multipliers.  Rather, it demonstrates that courts approve percentage awards

that embody multipliers well above the multiplier sought here in appropriate circumstances.

44.    That such circumstances exist in this case is evident from this Court's conclusions

at the fairness hearing:

> The amount awarded is about 1.8 times the lodestar.  The lodestar is about $41 million.
> This is reasonable. In this case the plaintiffs' lawyers took on a contingent basis a novel,
> risky case.  The result at the outset was uncertain, and it remained, until there was a
> settlement, uncertain.  The plaintiffs' counsel were required to develop a novel case.
> This is not a situation where they piggybacked on the work of a public agency that had
> made certain findings.  They were required to be pioneers to a certain extent.  They were
> required to engage in substantial discovery that included production of nine million
> documents.   They engaged in arduous arm's length negotiation that included 19
> mediation sessions.  They had to stand up on behalf of the class to experienced, able,
> energetic, formidable adversaries.  They did that.  And as I said, they generated a fair and
> reasonable return for the class, $300 million.[59]

The Court's finding regarding the risks that Counsel took and the results that they achieved are

precisely the factors that support a multiplied fee award.[60]   Nothing about the unfortunate

miscalculation in Counsel's time-keeping displaces this conclusion, as the change in the

proposed multiplier is simply from 1.8 to 2.

45.    In sum, the requested multiplier is therefore above the mean for *all* cases but

below the mean for *large* cases, it falls securely within the range of multipliers that courts have

approved in appropriate circumstances in the past, and such circumstances existed in this case.

As the purpose of the lodestar cross-check is to generate a multiplier enabling an assessment of

---

[59] Hearing Transcript, Nov. 2, 2016 (ECF No. 114) at 36.

[60] 5 *Newberg on Class Actions, supra* note 4, at § 15:87.

the reasonableness of the percentage award, a multiplier at this level fully supports the reasonableness of the fee the Court awarded Counsel in this matter.

* * *

46.    I have testified that:

- Counsel's *approach* to its fee – presenting the Court with a requested percentage, providing information to enable a lodestar cross-check, and addressing a series of relevant factors – is the most common fee method and one normally used in large common fund cases like this one.

- Counsel's hourly *billing rates* are consistent with rates in class action cases in this community; lower than the rates charged by corporate firms in this market for similar work; and within pennies of the average blended hourly billing rates approved in other class action settlements in this community and in comparably-sized settlements.

- Counsel's approach to *billing non-partnership track attorneys* is consistent with prevailing law, policy, and ethical norms and the rates at which they bill these attorneys are fully consistent with the rates at which courts have approved contract and staff attorney work in other class action settlements.

- Counsel's *multiplier* of approximately 2 is below the mean for settlements of $100-$500 million and entirely reasonable given the unique risks that it shouldered and the superb results that it achieved for the class.

Executed this 31st day of July, 2017, in Los Angeles, California.

_____

William B. Rubenstein

34

# EXHIBIT A

# PROFESSOR WILLIAM B. RUBENSTEIN

Harvard Law School - AR323               (617) 496-7320
1545 Massachusetts Avenue         rubenstein@law.harvard.edu
Cambridge, MA 02138

## ACADEMIC EMPLOYMENT

**HARVARD LAW SCHOOL, CAMBRIDGE MA**

| | |
|---|---|
| Sidley Austin Professor of Law | 2011-present |
| Professor of Law | 2007-2011 |
| Bruce Bromley Visiting Professor of Law | 2006-2007 |
| Visiting Professor of Law | 2003-2004, 2005-2006 |
| Lecturer in Law | 1990-1996 |

    *Courses:*       Civil Procedure; Class Action Law; Remedies
    *Awards*:        2012 Albert M. Sacks-Paul A. Freund Award for Teaching Excellence
    *Membership*:   American Law Institute; American Bar Foundation Fellow

**UCLA SCHOOL OF LAW, LOS ANGELES CA**

| | |
|---|---|
| Professor of Law | 2002-2007 |
| Acting Professor of Law | 1997-2002 |

    *Courses*:       Civil Procedure; Complex Litigation; Remedies
    *Awards*:        2002 Rutter Award for Excellence in Teaching
                    Top 20 California Lawyers Under 40, *Calif. Law Business* (2000)

**STANFORD LAW SCHOOL, STANFORD CA**

| | |
|---|---|
| Acting Associate Professor of Law | 1995-1997 |

    *Courses*:       Civil Procedure; Federal Litigation
    *Awards*:        1997 John Bingham Hurlbut Award for Excellence in Teaching

**YALE LAW SCHOOL, NEW HAVEN CT**

| | |
|---|---|
| Lecturer in Law | 1994, 1995 |

**BENJAMIN N. CARDOZO SCHOOL OF LAW, NEW YORK NY**

| | |
|---|---|
| Visiting Professor | Summer 2005 |

## LITIGATION-RELATED EMPLOYMENT

**AMERICAN CIVIL LIBERTIES UNION, NATIONAL OFFICE, NEW YORK NY**

| | |
|---|---|
| Project Director and Staff Counsel | 1987-1995 |

Litigated impact cases in federal and state courts throughout the US. Supervised a staff of attorneys at the national office, oversaw work of ACLU attorneys around the country, and coordinated work with private cooperating counsel nationwide. Significant experience in complex litigation practice and procedural issues; appellate litigation; litigation coordination, planning and oversight.

**HON. STANLEY SPORKIN, U.S. DISTRICT COURT, WASHINGTON DC**

| | |
|---|---|
| Law Clerk | 1986-87 |

**PUBLIC CITIZEN LITIGATION GROUP, WASHINGTON DC**

| | |
|---|---|
| Intern | Summer 1985 |

EDUCATION

HARVARD LAW SCHOOL, CAMBRIDGE MA
        J.D., 1986, *magna cum laude*

YALE COLLEGE, NEW HAVEN CT
        B.A., 1982, *magna cum laude*
            Editor-in-Chief, YALE DAILY NEWS

SELECTED COMPLEX LITIGATION EXPERIENCE

*Professional Service and Highlighted Activities*

◇    *Author,* NEWBERG ON CLASS ACTIONS (sole author of Fourth Edition updates since 2008 and sole
     author of all content in the Fifth Edition)

◇    *Speaker,* Judicial Panel on Multidistrict Litigation, Multidistrict Litigation (MDL) Transferee
     Judges Conference, Palm Beach, Florida (invited to present to MDL judges on recent developments
     in class action law and related topics (2010, 2011, 2012, 2013, 2014 (invited), 2015, 2016, 2017)

◇    *Special counsel,* Appointed by the United States Court of Appeals for the Second Circuit to argue
     for affirmance of district court fee decision in complex securities class action, with result that the
     Court summarily affirmed the decision below (*In re Indymac Mortgage-Backed Securities
     Litigation*, 94 F.Supp.3d 517 (S.D.N.Y. 2015), *aff'd sub. nom.*, *Berman DeValerio v. Olinsky*, No.
     15-1310-cv, 2016 WL 7323980 (2d Cir. Dec. 16, 2017))

◇    *Author, Amicus* brief filed in the United States Supreme Court on behalf of civil procedure and
     complex litigation law professors concerning the importance of the class action lawsuit (*AT&T
     Mobility v. Concepcion,* No. 09-893, 131 S. Ct. 1740 (2011))

◇    *Amicus curiae, Amicus* brief filed in – and approvingly cited by – California Supreme Court on
     proper approach to attorney's fees in common fund cases (*Laffitte v. Robert Half Int'l Inc.*, 376 P.3d
     672, 687 (Cal. 2016))

◇    *Adviser,* American Law Institute, *Project on the Principles of the Law of Aggregate Litigation*,
     Philadelphia, Pennsylvania

◇    *Advisory Board, Class Action Law Monitor* (Strafford Publications), 2008-

◇    *Co-Chair,* ABA Litigation Section, Mass Torts Committee, Class Action Sub-Committee, 2007

◇    *Planning Committee,* American Bar Association, Annual National Institute on Class Actions
     Conference, 2006, 2007

◇    "*Expert's Corner*" (Monthly Column)*, Class Action Attorney Fee Digest,* 2007-2011

**A-2**

## *Expert Witness*

◊    Retained as an expert witness and submitted report explaining meaning of the denial of a motion to dismiss in American procedure to foreign tribunals (*In re Qualcomm Antitrust Matter,* declaration submitted to tribunals in Korea and Taiwan (2017))

◊    Submitted an expert witness declaration concerning reasonableness of attorney's fee request in 3.0-liter settlement, referenced by court in awarding fees (*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation,* 2017 WL 3175924 (N.D. Cal. July 21, 2017))

◊    Retained as an expert witness concerning impracticability of joinder in antitrust class action (*In re Celebrex (Celecoxib) Antitrust Litigation,* Civ. Action No. 2-14-cv-00361 (E.D. Va. (2017))

◊    Submitted an expert witness declaration and deposed concerning impracticability of joinder in antitrust class action (*In re Modafinil Antitrust Litigation,* Civ. Action No. 2-06-cv-01797 (E.D. Pa. (2017))

◊    Submitted an expert witness declaration concerning reasonableness of attorney's fee request in 2.0-liter settlement (*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation,* 2017 WL 1047834 (N.D. Cal., March 17, 2017))

◊    Submitted an expert witness declaration concerning reasonableness of attorney's fee request, referenced by court in awarding fees (*Aranda v. Caribbean Cruise Line, Inc.,* 2017 WL 1368741 (N.D. Ill., April 10, 2017))

◊    Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*McKinney v. United States Postal Service*, Civil Action No. 1:11-cv-00631 (D.D.C. (2016))

◊    Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Johnson v. Caremark RX, LLC,* Case No. 01-CV-2003-6630, Alabama Circuit Court, Jefferson County (2016))

◊    Submitted an expert witness declaration concerning reasonableness of attorney's fee request in sealed fee mediation (2016)

◊    Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Geancopoulos v. Philip Morris USA Inc.,* Civil Action No. 98-6002-BLS1 (Mass. Superior Court, Suffolk County))

◊    Submitted an expert witness declaration concerning reasonableness of attorney's fee request in sealed fee mediation (2016)

◊    Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Gates v. United Healthcare Insurance Company,* Case No. 11 Civ. 3487 (S.D.N.Y. 2015))

◊    Retained as an expert trial witness on class action procedures and deposed prior to trial in matter

that settled before trial (*Johnson v. Caremark RX, LLC,* Case No. 01-CV-2003-6630, Alabama Circuit Court, Jefferson County (2016))

◊       Submitted an expert witness declaration concerning reasonableness of attorney's fee request, referenced by court in awarding fees (*In re High-Tech Employee Antitrust Litig.*, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015))

◊       Retained as an expert witness concerning adequacy of putative class representatives in securities class action (*Medoff v. CVS Caremark Corp.,* Case No. 1:09-cv-00554 (D.R.I. (2015))

◊       Submitted an expert witness declaration concerning reasonableness of proposed class action settlement, settlement class certification, attorney's fees, and incentive awards (*Fitzgerald Farms, LLC v. Chespeake Operating, L.L.C.,* Case No. CJ-2010-38, Dist. Ct., Beaver County, Oklahoma (2015))

◊       Submitted an expert witness declaration concerning reasonableness of attorney's fee request, referenced by court in awarding fees (*Asghari v. Volkswagen Grp. of Am., Inc.*, 2015 WL 12732462 (C.D. Cal. May 29, 2015))

◊       Submitted an expert witness declaration concerning propriety of severing individual cases from class action and resulting statute of repose ramifications (*In re: American   International Group, Inc. 2008 Securities Litigation,* 08-CV-4772-LTS-DCF (S.D.N.Y. (2015))

◊       Retained by Fortune Global 100 Corporation as an expert witness on fee matter that settled before testimony (2015)

◊       Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*In re: Hyundai and Kia Fuel Economy Litigation,* MDL 13-02424 (C.D. Cal. (2014))

◊       Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Ammari Electronics v. Pacific Bell Directory*, Case No. RG0522096, California Superior Court, Alameda County (2014))

◊       Submitted an expert witness declaration and deposed concerning plaintiff class action practices under the Private Securities Litigation Reform Act of 1995 (PSLRA), as related to statute of limitations question (*Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc.,* Case No. CGC-10-497839, California Superior Court, San Francisco County (2014))

◊       Submitted an expert witness declaration and deposed concerning plaintiff class action practices under the Private Securities Litigation Reform Act of 1995 (PSLRA), as related to statute of limitations question (*Federal Home Loan Bank of San Francisco v. Credit Suisse Securities (USA) LLC,* Case No. CGC-10-497840, California Superior Court, San Francisco County (2014))

◊       Retained as expert witness on proper level of common benefit fee in MDL (*In re Neurontin Marketing and Sales Practice Litigation,* Civil Action No. 04-10981, MDL 1629 (D. Mass. (2014))

◊       Submitted an expert witness declaration concerning Rule 23(g) selection of competing counsel,

referenced by court in deciding issue (*White v. Experian Information Solutions, Inc.,* 993 F. Supp. 2d 1154 (C.D. Cal. (2014))

◊ Submitted an expert witness declaration concerning proper approach to attorney's fees under California law in a statutory fee-shifting case (*Perrin v. Nabors Well Services Co.,* Case No. 1220037974, Judicial Arbitration and Mediation Services (JAMS) (2013))

◊ Submitted an expert witness declaration concerning fairness and adequacy of proposed nationwide class action settlement (*Verdejo v. Vanguard Piping Systems,* Case No. BC448383, California Superior Court, Los Angeles County (2013))

◊ Retained as an expert witness regarding fairness, adequacy, and reasonableness of proposed nationwide consumer class action settlement (*Herke v. Merck,* No. 2:09-cv-07218, MDL Docket No. 1657 (*In re Vioxx Products Liability Litigation*) (E. D. La. (2013))

◊ Retained as an expert witness concerning ascertainability requirement for class certification and related issues (*Henderson v. Acxiom Risk Mitigation, Inc.,* Case No. 3:12-cv-00589-REP (E.D. Va. (2013))

◊ Submitted an expert witness declaration concerning reasonableness of class action settlement and performing analysis of "net expected value" of settlement benefits, relied on by court in approving settlement (*In re Navistar Diesel Engine Products Liab. Litig.,* 2013 WL 10545508 (N.D. Ill. July 3, 2013))

◊ Submitted an expert witness declaration concerning reasonableness of class action settlement and attorney's fee request (*Commonwealth Care All. v. Astrazeneca Pharm. L.P.,* 2013 WL 6268236 (Mass. Super. Aug. 5, 2013))

◊ Submitted an expert witness declaration concerning propriety of preliminary settlement approval in nationwide consumer class action settlement (*Anaya v. Quicktrim, LLC,* Case No.  CIVVS 120177, California Superior Court, San Bernardino County (2012))

◊ Submitted expert witness affidavit concerning fee issues in common fund class action (*Tuttle v. New Hampshire Med. Malpractice Joint Underwriting Assoc.,* Case No. 217-2010-CV-00294, New Hampshire Superior Court, Merrimack County (2012))

◊ Submitted expert witness declaration and deposed concerning class certification issues in nationwide fraud class action, relied upon by the court in affirming class certification order (*CVS Caremark Corp. v. Lauriello,* 175 So. 3d 596, 609-10 (Ala. 2014))

◊ Submitted expert witness declaration in securities class action concerning value of proxy disclosures achieved through settlement and appropriate level for fee award (*Rational Strategies Fund v. Jhung,* Case No. BC 460783, California Superior Court, Los Angeles County (2012))

◊ Submitted an expert witness report and deposed concerning legal malpractice in the defense of a class action lawsuit (*KB Home v. K&L Gates, LLP,* Case No. BC484090, California Superior Court, Los Angeles County (2011))

**A-5**

◇    Retained as expert witness on choice of law issues implicated by proposed nationwide class certification (*Simon v. Metropolitan Property and Cas. Co.,* Case No. CIV-2008-1008-W (W.D. Ok. (2011))

◇    Retained, deposed, and testified in court as expert witness in fee-related dispute (*Blue, et al. v. Hill,*Case No. 3:10-CV-02269-O-BK (N.D. Tex. (2011))

◇    Retained as an expert witness in fee-related dispute (*Furth v. Furth*, Case No. C11-00071-DMR (N.D. Cal. (2011))

◇    Submitted expert witness declaration concerning interim fee application in complex environmental class action (*DeLeo v. Bouchard Transportation,* Civil Action No. PLCV2004-01166-B, Massachusetts Superior Court (2010))

◇    Retained as an expert witness on common benefit fee issues in MDL proceeding in federal court (*In re Vioxx Products Liability Litigation*, MDL Docket No. 1657 (E.D. La. (2010))

◇    Submitted expert witness declaration concerning fee application in securities case, referenced by court in awarding fee (*In re AMICAS, Inc. Shareholder Litigation,* 27 Mass. L. Rptr. 568 (Mass. Sup. Ct. (2010))

◇    Submitted an expert witness declaration concerning fee entitlement and enhancement in non-common fund class action settlement, relied upon by the court in awarding fees (*Parkinson v. Hyundai Motor America*, 796 F.Supp.2d 1160, 1172-74 (C.D. Cal. 2010))

◇    Submitted an expert witness declaration concerning class action fee allocation among attorneys (*Salvas v. Wal-Mart*, Civil Action No. 01-03645, Massachusetts Superior Court (2010))

◇    Submitted an expert witness declaration concerning settlement approval and fee application in wage and hour class action settlement (*Salvas v. Wal-Mart*, Civil Action No. 01-03645, Massachusetts Superior Court (2010))

◇    Submitted an expert witness declaration concerning objectors' entitlement to attorney's fees (*Rodriguez v. West Publishing Corp.,* Case No. CV-05-3222 (C.D. Cal. (2010))

◇    Submitted an expert witness declaration concerning fairness of settlement provisions and processes, relied upon by the Ninth Circuit in reversing district court's approval of class action settlement (*Radcliffe v. Experian Inform. Solutions Inc.*, 715 F.3d 1157, 1166 (9th Cir. 2013))

◇    Submitted an expert witness declaration concerning attorney's fees in class action fee dispute, relied upon by the court in deciding fee issue (*Ellis v. Toshiba America Information Systems, Inc.*, 218 Cal. App. 4th 853, 871, 160 Cal. Rptr. 3d 557, 573 (2d Dist. 2013))

◇    Submitted an expert witness declaration concerning common benefit fee in MDL proceeding in federal court (*In re Genetically Modified Rice Litigation*, MDL Docket No. 1811 (E.D. Mo. (2009))

◇        Submitted an expert witness declaration concerning settlement approval and fee application in national MDL class action proceeding (*In re Wal-Mart Wage and Hour Employment Practices Litigation*, MDL Docket No.1735 (D. Nev. (2009))

◇        Submitted an expert witness declaration concerning fee application in national MDL class action proceeding, referenced by court in awarding fees (*In re Dept. of Veterans Affairs (VA) Data Theft Litigation*, 653 F. Supp.2d 58 (D.D.C. (2009))

◇        Submitted an expert witness declaration concerning common benefit fee in mass tort MDL proceeding in federal court (*In re Kugel Mesh Products Liability Litigation*, MDL Docket No. 1842 (D. R.I. (2009))

◇        Submitted an expert witness declaration and supplemental declaration concerning common benefit fee in consolidated mass tort proceedings in state court (*In re All Kugel Mesh Individual Cases*, Master Docket No. PC-2008-9999, Superior Court, State of Rhode Island (2009))

◇        Submitted an expert witness declaration concerning fee application in wage and hour class action (*Warner v. Experian Information Solutions, Inc.*, Case No.   BC362599, California Superior Court, Los Angeles County (2009))

◇        Submitted an expert witness declaration concerning process for selecting lead counsel in complex MDL antitrust class action (*In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL Docket No. 1869 (D. D.C. (2008))

◇        Retained, deposed, and testified in court as expert witness on procedural issues in complex class action (*Hoffman v. American Express*, Case No. 2001-022881, California Superior Court, Alameda County (2008))

◇        Submitted an expert witness declaration concerning fee application in wage and hour class action (*Salsgiver v. Yahoo! Inc.*, Case No. BC367430, California Superior Court, Los Angeles County (2008))

◇        Submitted an expert witness declaration concerning fee application in wage and hour class action (*Voight v. Cisco Systems, Inc.*, Case No. 106CV075705, California Superior Court, Santa Clara County (2008))

◇        Retained and deposed as expert witness on fee issues in attorney fee dispute (*Stock v. Hafif*, Case No.   KC034700, California Superior Court, Los Angeles County (2008))

◇        Submitted an expert witness declaration concerning fee application in consumer class action (*Nicholas v. Progressive Direct*, Civil Action No. 06-141-DLB (E.D. Ky. (2008))

◇        Submitted expert witness declaration concerning procedural aspects of national class action arbitration (*Johnson v. Gruma Corp.*, JAMS Arbitration No. 1220026252 (2007))

◇        Submitted expert witness declaration concerning fee application in securities case (*Drulias v. ADE Corp.*, Civil Action No. 06-11033 PBS (D. Mass. (2007))

**A-7**

◊       Submitted expert witness declaration concerning use of expert witness on complex litigation matters in criminal trial (*U.S. v. Gallion, et al.*, No. 07-39 (E. D. Ky. (2007))

◊       Retained as expert witness on fees matters (*Heger v. Attorneys' Title Guaranty Fund, Inc.,* No. 03-L-398, Illinois Circuit Court, Lake County, IL (2007))

◊       Retained as expert witness on certification in statewide insurance class action (*Wagner v. Travelers Property Casualty of America*, No. 06CV338, Colorado District Court, Boulder County, CO (2007))

◊       Testified as expert witness concerning fee application in common fund shareholder derivative case (*In Re Tenet Health Care Corporate Derivative Litigation*, Case No. 01098905, California Superior Court, Santa Barbara Cty, CA (2006))

◊       Submitted expert witness declaration concerning fee application in common fund shareholder derivative case (*In Re Tenet Health Care Corp. Corporate Derivative Litigation*, Case No. CV-03-11 RSWL (C.D. Cal. (2006))

◊       Retained as expert witness as to certification of class action (*Canova v. Imperial Irrigation District*, Case No. L-01273, California Superior Court, Imperial Cty, CA (2005))

◊       Retained as expert witness as to certification of nationwide class action (*Enriquez v. Edward D. Jones & Co.,* Missouri Circuit Court, St. Louis, MO (2005))

◊       Submitted expert witness declaration on procedural aspects of international contract litigation filed in court in Korea (*Estate of Wakefield v. Bishop Han & Jooan Methodist Church* (2002))

◊       Submitted expert witness declaration as to contested factual matters in case involving access to a public forum (*Cimarron Alliance Foundation v. The City of Oklahoma City,* Case No. Civ. 2001-1827-C (W.D. Ok. (2002))

◊       Submitted expert witness declaration concerning reasonableness of class certification, settlement, and fees (*Baird v. Thomson Elec. Co.*, Case No. 00-L-000761, Cir. Ct., Mad. Cty, IL (2001))

*Expert Consultant*

◊       Provided expert consulting services to the ACLU on multi-district litigation issues arising out of various challenges to President Trump's travel ban and related policies (*In re American Civil Liberties Union Freedom of Information Act Requests Regarding Executive Order 13769*, Case Pending No. 28, Judicial Panel on Multidistrict Litigation (2017); *Darweesh v. Trump*, Case No. 1:17-cv-00480-CBA-LB (E.D.N.Y. (2017))

◊       Provided expert consulting services to law firm regarding billing practices and fee allocation issues in nationwide class action (2016)

**A-8**

◇      Provided expert consulting services to law firm regarding fee allocation issues in nationwide class action (2016)

◇      Provided expert consulting services to the ACLU of Southern California on class action and procedural issues arising out of challenges to municipality's treatment of homeless persons with disabilities (*Glover v. City of Laguna Beach*, Case No. 8:15-cv-01332-AG-DFM (C.D. Cal. (2016))

◇      Retained as an expert consultant on class certification issues (*In re: Facebook, Inc., IPO Securities and Derivative Litigation*, No. 1:12-md-2389 (S.D.N.Y. 2015))

◇      Provided expert consulting services to lead class counsel on class certification issues in nationwide class action (2015)

◇      Retained by a Fortune 100 Company as an expert consultant on class certification issues

◇      Retained as an expert consultant on class action and procedure related issues (*Lange et al v. WPX Energy Rocky Mountain LLC*, Case No. #: 2:13-cv-00074-ABJ (D. Wy. (2013))

◇      Retained as an expert consultant on class action and procedure related issues (*Flo & Eddie, Inc., v. Sirius XM Radio, Inc.*, Case No. CV 13-5693 (C.D. Cal. (2013))

◇      Served as an expert consultant on substantive and procedural issues in challenge to legality of credit card late and over-time fees (*In Re Late Fee and Over-Limit Fee Litigation*, 528 F.Supp.2d 953 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014))

◇      Retained as an expert on Class Action Fairness Act (CAFA) removal issues and successfully briefed and argued remand motion based on local controversy exception (*Trevino, et al. v. Cummins, et al.*,No. 2:13-cv-00192-JAK-MRW (C. D. Cal. (2013))

◇      Retained as an expert consultant on class action related issues by consortium of business groups (*In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010*, MDL No. 2179 (E.D. La. (2012))

◇      Provided presentation on class certification issues in nationwide medical monitoring classes (*In re: National Football League Players' Concussion Injury Litigation,* MDL No. 2323, Case No. 2:12-md-02323-AB (E.D. Pa. (2012))

◇      Retained as an expert consultant on class action related issues in mutli-state MDL consumer class action (*In re Sony Corp. SXRD Rear Projection Television Marketing, Sales Practices & Prod. Liability Litig.*, MDL No. 2102 (S.D. N.Y. (2009))

◇      Retained as an expert consultant on class action certification, manageability, and related issues in mutli-state MDL consumer class action (*In re Teflon Prod. Liability Litig.*, MDL No. 1733 (S.D. Iowa (2008))

◇      Retained as an expert consultant/co-counsel on certification, manageability, and related issues in nationwide anti-trust class action (*Brantley v. NBC Universal*, No.- CV07-06101 (C.D. Cal.

(2008))

◊       Retained as an expert consultant on class action issues in complex multi-jurisdictional construction
        dispute (*Antenucci, et al., v. Washington Assoc. Residential Partner, LLP, et al.,* Civil No. 8-04194
        (E.D. Pa. (2008))

◊       Retained as an expert consultant on complex litigation issues in multi-jurisdictional class action
        litigation (*McGreevey v. Montana Power Company*, No. 08-35137, U.S. Court of Appeals for the
        Ninth Circuit (2008))

◊       Retained as an expert consultant on class action and attorney fee issues in nationwide consumer
        class action (*Figueroa v. Sharper Image*, 517 F.Supp.2d 1292 (S.D. Fla. 2007))

◊       Retained as an expert consultant on attorney's fees issue in complex class action case (*Natural Gas
        Anti-Trust Cases Coordinated Proceedings*, D049206, California Court of Appeals, Fourth District
        (2007))

◊       Retained as an expert consultant on remedies and procedural matters in complex class action
        (*Sunscreen Cases*, JCCP No. 4352, California Superior Court, Los Angeles County (2006))

◊       Retained as an expert consultant on complex preclusion questions in petition for review to
        California Supreme Court (*Mooney v. Caspari,* Supreme Court of California (2006))

◊       Retained as an expert consultant on attorney fee issues in complex common fund case (*In Re
        DietDrugs (Phen/Fen) Products Liability Litigation* (E. D. Pa. (2006))

◊       Retained as an expert consultant on procedural matters in series of complex construction lien cases
        (*In re Venetian Lien Litigation*, Supreme Court of the State of Nevada (2005-2006))

◊       Served as an expert consultant on class certification issues in countywide class action (*Beauchamp
        v. Los Angeles Cty. Metropolitan Transp. Authority*, (C.D. Cal. 2004))

◊       Served as an expert consultant on class certification issues in state-wide class action (*Williams v.
        State of California*, Case No. 312-236, Cal. Superior Court, San Francisco)

◊       Served as an exert consultant on procedural aspects of complex welfare litigation (*Allen v.
        Anderson*, 199 F.3d 1331 (9th Cir. 1999))

*Ethics Opinions*

◊       Retained to provided expert opinion on issues of professional ethics in complex litigation matter (*In
        re Professional Responsibility Inquiries* (2017))

◊       Provided expert opinion on issues of professional ethics in complex litigation matter (*In re
        Professional Responsibility Inquiries* (2013))

◊       Provided expert opinion on issues of professional ethics in complex litigation matter (*In re

**A-10**

*Professional Responsibility Inquiries* (2011))

◇     Provided expert opinion on issues of professional ethics in implicated by nationwide class action practice (*In re Professional Responsibility Inquiries* (2010))

◇     Provided expert opinion on issues of professional ethics implicated by complex litigation matter (*In re Professional Responsibility Inquiries* (2010))

◇     Provided expert opinion on issues of professional ethics in complex litigation matter (*In re Professional Responsibility Inquiries* (2007))

### *Publications on Class Actions & Procedure*

◇     NEWBERG ON CLASS ACTIONS (sole author of supplements to 4th edition since 2008 and of 5th edition (2011-2017))

◇     *Profit for Costs*, 63 DEPAUL L. REV. 587 (2014) (with Morris A. Ratner)

◇     *Procedure and Society: An Essay for Steve Yeazell,* 61 U.C.L.A. REV. DISC. 136 (2013)

◇     *Supreme Court Round-Up – Part II*, 5 CLASS ACTION ATTORNEY FEE DIGEST 331 (September 2011)

◇     *Supreme Court Round-Up – Part I*, 5 CLASS ACTION ATTORNEY FEE DIGEST 263 (July-August 2011)

◇     *Class Action Fee Award* Procedures, 5 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2011)

◇     *Benefits of Class Action Lawsuits*, 4 CLASS ACTION ATTORNEY FEE DIGEST 423 (November 2010)

◇     *Contingent Fees for Representing the Government: Developments in California Law*, 4 CLASS ACTION ATTORNEY FEE DIGEST 335 (September 2010)

◇     *Supreme Court Roundup*, 4 CLASS ACTION ATTORNEY FEE DIGEST 251 (July 2010)

◇     *SCOTUS Okays Performance Enhancements in Federal Fee Shifting Cases – At Least In Principle,* 4 CLASS ACTION ATTORNEY FEE DIGEST 135 (April 2010)

◇     *The Puzzling Persistence of the "Mega-Fund" Concept*, 4 CLASS ACTION ATTORNEY FEE DIGEST 39 (February 2010)

◇     *2009: Class Action Fee Awards Go Out With A Bang, Not A Whimper*, 3 CLASS ACTION ATTORNEY FEE DIGEST 483   (December 2009)

◇     *Privatizing Government Litigation: Do Campaign Contributors Have An Inside Track?*, 3 CLASS ACTION ATTORNEY FEE DIGEST 407   (October 2009)

◊　　　*Supreme Court Preview*, 3 CLASS ACTION ATTORNEY FEE DIGEST 307 (August 2009)

◊　　　*Supreme Court Roundup*, 3 CLASS ACTION ATTORNEY FEE DIGEST 259 (July 2009)

◊　　　*What We Now Know About How Lead Plaintiffs Select Lead Counsel (And Hence Who Gets Attorney's Fees!) in Securities Cases*, 3 CLASS ACTION ATTORNEY FEE DIGEST 219 (June 2009)

◊　　　*Beware Of Ex Ante Incentive Award Agreements*, 3 CLASS ACTION ATTORNEY FEE DIGEST 175 (May 2009)

◊　　　*On What a "Common Benefit Fee" Is, Is Not, and Should Be*, 3 CLASS ACTION ATTORNEY FEE DIGEST 87 (March 2009)

◊　　　*2009: Emerging Issues in Class Action Fee Awards*, 3 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2009)

◊　　　*2008: The Year in Class Action Fee Awards*, 2 CLASS ACTION ATTORNEY FEE DIGEST 465 (December 2008)

◊　　　*The Largest Fee Award – Ever!*, 2 CLASS ACTION ATTORNEY FEE DIGEST 337 (September 2008)

◊　　　*Why Are Fee Reductions Always 50%?: On The Imprecision of Sanctions for Imprecise Fee Submissions*, 2 CLASS ACTION ATTORNEY FEE DIGEST 295 (August 2008)

◊　　　*Supreme Court Round-Up*, 2 CLASS ACTION ATTORNEY FEE DIGEST 257 (July 2008)

◊　　　*Fee-Shifting For Wrongful Removals: A Developing Trend?*, 2 CLASS ACTION ATTORNEY FEE DIGEST 177 (May 2008)

◊　　　*You Cut, I Choose: (Two Recent Decisions About) Allocating Fees Among Class Counsel*, 2 CLASS ACTION ATTORNEY FEE DIGEST 137 (April 2008)

◊　　　*Why The Percentage Method?*, 2 CLASS ACTION ATTORNEY FEE DIGEST 93 (March 2008)

◊　　　*Reasonable Rates: Time To Reload The (*Laffey*) Matrix*, 2 CLASS ACTION ATTORNEY FEE DIGEST 47 (February 2008)

◊　　　*The "Lodestar Percentage:" A New Concept For Fee Decisions?*, 2 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2008)

◊　　　*Class Action Practice Today: An Overview, in* ABA SECTION OF LITIGATION, CLASS ACTIONS TODAY 4 (2008)

◊　　　*Shedding Light on Outcomes in Class Actions*, *in* CONFIDENTIALITY, TRANSPARENCY, AND THE U.S. CIVIL JUSTICE SYSTEM 20-59 (Joseph W. Doherty, Robert T. Reville, and Laura Zakaras eds. 2008) (with Nicholas M. Pace)

◇     *Finality in Class Action Litigation: Lessons From Habeas,* 82 N.Y.U. L. REV. 791 (2007)

◇     *The American Law Institute's New Approach to Class Action Objectors' Attorney's Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 347 (November 2007)

◇     *The American Law Institute's New Approach to Class Action Attorney's Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 307 (October 2007)

◇     *"The Lawyers Got More Than The Class Did!": Is It Necessarily Problematic When Attorneys Fees Exceed Class Compensation?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 233 (August 2007)

◇     *Supreme Court Round-Up,* 1 CLASS ACTION ATTORNEY FEE DIGEST 201 (July 2007)

◇     *On The Difference Between Winning and Getting Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 163 (June 2007)

◇     *Divvying Up The Pot: Who Divides Aggregate Fee Awards, How, and How Publicly?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 127 (May 2007)

◇     *On Plaintiff Incentive Payments,* 1 CLASS ACTION ATTORNEY FEE DIGEST 95 (April 2007)

◇     *Percentage of What?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 63 (March 2007)

◇     *Lodestar v. Percentage: The Partial Success Wrinkle,* 1 CLASS ACTION ATTORNEY FEE DIGEST 31 (February 2007)(with Alan Hirsch)

◇     *The Fairness Hearing: Adversarial and Regulatory Approaches*, 53 U.C.L.A. L. REV. 1435 (2006) (excerpted in THE LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION 447-449 (Richard A. Nagareda ed., 2009))

◇     *Why Enable Litigation? A Positive Externalities Theory of the Small Claims Class Action*, 74 U.M.K.C. L. REV. 709 (2006)

◇     *On What a "Private Attorney General" Is – And Why It Matters*, 57 VAND. L. REV. 2129(2004) (excerpted in COMPLEX LITIGATION 63-72 (Kevin R. Johnson, Catherine A. Rogers & John Valery White eds., 2009)).

◇     *The Concept of Equality in Civil Procedure*, 23 CARDOZO L. REV. 1865 (2002) (selected for the Stanford/Yale Junior Faculty Forum, June 2001)

◇     *A Transactional Model of Adjudication*, 89 GEORGETOWN L.J. 371 (2000)

◇     *The Myth of Superiority*, 16 CONSTITUTIONAL COMMENTARY 599 (1999)

◇     *Divided We Litigate: Addressing Disputes Among Clients and Lawyers in Civil Rights Campaigns*, 106 YALE L. J. 1623 (1997) *(*excerpted in COMPLEX LITIGATION 120-123 (1998))

## Selected Presentations

◇    *Class Action Update,* MDL Transferee Judges Conference, Palm Beach, Florida, November 1, 2017

◇    *Class Action Update,* MDL Transferee Judges Conference, Palm Beach, Florida, November 2, 2016

◇    *Judicial Power and its Limits in Multidistrict Litigation,* American Law Institute, Young Scholars Medal Conference, *The Future of Aggregate Litigation*, New York University School of Law, New York, New York, April 12, 2016

◇    *Class Action Update & Attorneys' Fees Issues Checklist,* MDL Transferee Judges Conference, Palm Beach, Florida, October 28, 2015

◇    *Class Action Law,* 2015 Ninth Circuit/Federal Judicial Center Mid-Winter Workshop, Tucson, Arizona, January 26, 2015

◇    *Recent Developments in Class Action Law,* MDL Transferee Judges Conference, Palm Beach, Florida, October 29, 2014

◇    *Recent Developments in Class Action Law,* MDL Transferee Judges Conference, Palm Beach, Florida, October 29, 2013

◇    *Class Action Remedies,* ABA 2013 National Institute on Class Actions, Boston, Massachusetts, October 23, 2013

◇    *The Public Life of the Private Law: The Logic and Experience of Mass Litigation – Conference in Honor of Richard Nagareda,* Vanderbilt Law School, Nashville, Tennessee, September 27-28, 2013

◇    *Brave New World: The Changing Face of Litigation and Law Firm Finance*, Clifford Symposium 2013, DePaul University College of Law, Chicago, Illinois, April 18-19, 2013

◇    *Twenty-First Century Litigation: Pathologies and Possibilities: A Symposium in Honor of Stephen Yeazell,* UCLA Law Review, UCLA School of Law, Los Angeles, California, January 24-25, 2013

◇    *Litigation's Mirror: The Procedural Consequences of Social Relationships,* Sidley Austin Professor of Law Chair Talk, Harvard Law School, Cambridge, Massachusetts, October 17, 2012

◇    *Alternative Litigation Funding (ALF) in the Class Action Context – Some Initial Thoughts*, Alternative Litigation Funding: A Roundtable Discussion Among Experts, George Washington University Law School, Washington, D.C., May 2, 2012

◇    *The Operation of Preclusion in Multidistrict Litigation (MDL) Cases*, Brooklyn Law School Faculty Workshop, Brooklyn, New York, April 2, 2012

◊   *The Operation of Preclusion in Multidistrict Litigation (MDL) Cases*, Loyola Law School Faculty Workshop, Los Angeles, California, February 2, 2012

◊   *Recent Developments in Class Action Law and Impact on MDL Cases,* MDL Transferee Judges Conference, Palm Beach, Florida, November 2, 2011

◊   *Recent Developments in Class Action Law,* MDL Transferee Judges Conference, Palm Beach, Florida, October 26, 2010

◊   *A General Theory of the Class Suit*, University of Houston Law Center Colloquium, Houston, Texas, February 3, 2010

◊   *Unpacking The "Rigorous Analysis" Standard,* ALI-ABA 12th Annual National Institute on Class Actions, New York, New York, November 7, 2008

◊   *The Public Role in Private Law Enforcement: Visions from CAFA*, University of California (Boalt Hall) School of Law Civil Justice Workshop, Berkeley, California, February 28, 2008

◊   *The Public Role in Private Law Enforcement: Visions from CAFA*, University of Pennsylvania Law Review Symposium, Philadelphia, Pennsylvania, Dec. 1, 2007

◊   *Current CAFA Consequences: Has Class Action Practice Changed?,* ALI-ABA 11th Annual National Institute on Class Actions, Chicago, Illinois, October 17, 2007

◊   *Using Law Professors as Expert Witnesses in Class Action Lawsuits,* ALI-ABA 10th Annual National Institute on Class Actions, San Diego, California, October 6, 2006

◊   *Three Models for Transnational Class Actions*, Globalization of Class Action Panel, International Law Association 2006 Conference, Toronto, Canada, June 6, 2006

◊   *Why Create Litigation?:  A Positive Externalities Theory of the Small Claims Class Action*, UMKC Law Review Symposium, Kansas City, Missouri, April 7, 2006

◊   *Marks, Bonds, and Labels:  Three New Proposals for Private Oversight of Class Action Settlements*, UCLA Law Review Symposium, Los Angeles, California, January 26, 2006

◊   Class Action Fairness Act, Arnold & Porter, Los Angeles, California, December 6, 2005

◊   ALI-ABA 9th Annual National Institute on Class Actions, Chicago, Illinois, September 23, 2005

◊   Class Action Fairness Act, UCLA Alumni Assoc., Los Angeles, California, September 9, 2005

◊   Class Action Fairness Act, Thelen Reid & Priest, Los Angeles, California, May 12, 2005

◊   Class Action Fairness Act, Sidley Austin, Los Angeles, California, May 10, 2005

◇         Class Action Fairness Act, Munger, Tolles & Olson, Los Angeles, California, April 28, 2005

◇         Class Action Fairness Act, Akin Gump Strauss Hauer Feld, Century City, CA, April 20, 2005

SELECTED OTHER LITIGATION EXPERIENCE

*United States Supreme Court*

◇         Co-counsel on petition for writ of *certiorari* concerning application of the voluntary cessation doctrine to government defendants (*Rosebrock v. Hoffman*, 135 S. Ct.1893 (2015))

◇         Authored *amicus* brief filed on behalf of civil procedure and complex litigation law professors concerning the importance of the class action lawsuit (*AT&T Mobility v. Concepcion,* No. 09-893, 131 S. Ct. 1740 (2011))

◇         Co-counsel in constitutional challenge to display of Christian cross on federal land in California's Mojave preserve (*Salazar v. Buono*, 130 S. Ct. 1803 (2010))

◇         Co-authored *amicus* brief filed on behalf of constitutional law professors arguing against constitutionality of Texas criminal law (*Lawrence v. Texas*, 539 U.S. 558 (2003))

◇         Co-authored *amicus* brief on scope of *Miranda* (*Illinois v. Perkins*, 496 U.S. 292 (1990))

*Attorney's Fees*

◇         Appointed by the United States Court of Appeals for the Second Circuit to argue for affirmance of district court fee decision in complex securities class action, with result that the Court summarily affirmed the decision below (*In re Indymac Mortgage-Backed Securities Litigation*, 94 F.Supp.3d 517 (S.D.N.Y. 2015), *aff'd sub. nom.*, *Berman DeValerio v. Olinsky*, No. 15-1310-cv, 2016 WL 7323980 (2d Cir. Dec. 16, 2017))

◇         Served as *amicus curiae* and co-authored *amicus* brief on proper approach to attorney's fees in common fund cases, relied on by the court in *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 504, 376 P.3d 672, 687 (2016).

*Consumer Class Action*

◇         Co-counsel in challenge to antenna-related design defect in Apple's iPhone4 (*Dydyk v. Apple Inc.,* 5:10-cv-02897-HRL, U.S. Dist. Court, N.D. Cal.) (complaint filed June 30, 2010)

◇         Co-class counsel in $8.5 million nationwide class action settlement challenging privacy concerns raised by Google's Buzz social networking program (*In re Google Buzz Privacy Litigation,* 5:10-cv-00672-JW, U.S. Dist. Court, N.D. Cal.) (amended final judgment June 2, 2011)

### Disability

◇ Co-counsel in successful ADA challenge ($500,000 jury verdict) to the denial of health care in emergency room (*Howe v. Hull*, 874 F. Supp. 779, 873 F. Supp 72 (N.D. Ohio 1994))

### Employment

◇ Co-counsel in challenges to scope of family benefit programs (*Ross v. Denver Dept. of Health*, 883 P.2d 516 (Colo. App. 1994)); *(Phillips v. Wisc. Personnel Com'n*, 482 N.W.2d 121 (Wisc. 1992))

### Equal Protection

◇ Co-counsel in (state court phases of) successful challenge to constitutionality of a Colorado ballot initiative, Amendment 2 (*Evans v. Romer*, 882 P.2d 1335 (Colo. 1994))

◇ Co-counsel (and *amici*) in challenges to rules barring military service by gay people (*Able v. United States*, 44 F.3d 128 (2d Cir. 1995); *Steffan v. Perry*, 41 F.3d 677 (D.C. Cir. 1994) (en banc))

◇ Co-counsel in challenge to the constitutionality of the Attorney General of Georgia's firing of staff attorney (*Shahar v. Bowers*, 120 F.3d 211 (11th Cir. 1997))

### Fair Housing

◇ Co-counsel in successful Fair Housing Act case on behalf of group home (*Hogar Agua y Vida En el Desierto v. Suarez-Medina*, 36 F.3d 177 (1st Cir. 1994))

### Family Law

◇ Co-counsel in challenge to constitutionality of Florida law limiting adoption (*Cox v. Florida Dept. of Health and Rehab. Srvcs.*, 656 So.2d 902 (Fla. 1995))

◇ Co-authored *amicus* brief in successful challenge to Hawaii ban on same-sex marriages (*Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993))

### First Amendment

◇ Co-counsel in successful challenge to constitutionality of Alabama law barring state funding foruniversity student groups (*GLBA v. Sessions*, 930 F.Supp. 1492 (M.D. Ala. 1996))

◇ Co-counsel in successful challenge to content restrictions on grants for AIDS education materials (*Gay Men's Health Crisis v. Sullivan*, 792 F.Supp. 278 (S.D.N.Y. 1992))

### Landlord / Tenant

◇ Lead counsel in successful challenge to rent control regulation (*Braschi v. Stahl Associates Co.*, 544 N.E.2d 49 (N.Y. 1989))

### *Police*

◇     Co-counsel in case challenging DEA brutality (*Anderson v. Branen*, 27 F.3d 29 (2nd Cir. 1994))

### *Racial Equality*

◇     Co-authored *amicus* brief for constitutional law professors challenging constitutionality of Proposition 209 *(Coalition for Economic Equity v. Wilson*, 110 F.3d 1431 (9th Cir. 1997))

### SELECTED OTHER PUBLICATIONS

### *Editorials*

◇     *Follow the Leaders*, NEW YORK TIMES, March 15, 2005
◇     *Play It Straight*, NEW YORK TIMES, October 16, 2004
◇     *Hiding Behind the Constitution*, NEW YORK TIMES, March 20, 2004
◇     *Toward More Perfect Unions,* NEW YORK TIMES, November 20, 2003 (with Brad Sears)
◇     *Don't Ask, Don't Tell. Don't Believe It*, NEW YORK TIMES, July 20, 1993
◇     *AIDS: Illness and Injustice*, WASH. POST, July 26, 1992 (with Nan D. Hunter)

### BAR ADMISSIONS

◇     Massachusetts (2008)
◇     California (2004)
◇     District of Columbia (1987) (inactive)
◇     Pennsylvania (1986) (inactive)

◇     U.S. Supreme Court (1993)

◇     U.S. Court of Appeals for the First Circuit (2010)
◇     U.S. Court of Appeals for the Second Circuit (2015)
◇     U.S. Court of Appeals for the Fifth Circuit (1989)
◇     U.S. Court of Appeals for the Ninth Circuit (2004)
◇     U.S. Court of Appeals for the Eleventh Circuit (1993)
◇     U.S. Court of Appeals for the D.C. Circuit (1993)

◇     U.S. District Courts for the Central District of California (2004)
◇     U.S. District Court for the District of the District of Columbia (1989)
◇     U.S. District Court for the District of Massachusetts (2010)
◇     U.S. District Court for the Northern District of California (2010)

# EXHIBIT B

*Arkansas Teacher Retirement System et al.*
*v.*
*State Street Bank and Trust Co.*
C.A. No. 11-10230-MLW; 11-12049-MLW; 12-11698-MLW
Expert Declaration of William B. Rubenstein

## EXHIBIT B
Partial List of Documents Reviewed by Professor Rubenstein
(other than case law and scholarship on the relevant issues)

1. Class Action Complaint, ECF No. 1
2. Amended Class Action Complaint, ECF No. 10
3. Memorandum of Law in Support of Plaintiff's Assented-to Motion for Appointment of Interim Lead Counsel and Liaison Counsel for the Proposed Class, ECF No. 8
4. Memorandum in Support of Defendant's Motion to Dismiss, ECF No. 19
5. Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, ECF No. 22
6. Reply Memorandum in Support of Defendant's Motion to Dismiss, ECF No. 29
7. Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, ECF No. 33
8. Stipulation and Joint Motion to Continue Stay, ECF No. 66
9. Stipulation and Joint Motion to Continue Stay, ECF No. 71
10. Stipulation and Joint Motion to Continue Stay, ECF No. 75
11. Stipulation and Agreement of Settlement, ECF No. 89
12. Memorandum of Law in Support of Plaintiffs' Assented-to Motion for Preliminary Approval of Proposed Class Settlement, Preliminary Certification of Settlement Class, and Approval of Proposed Form and Manner of Class Notice, ECF No. 91
13. Declaration of Lawrence A. Sucharow in Support of Plaintiffs' Assented-to Motion for Preliminary Approval of Proposed Class Settlement, Preliminary Certification of Settlement Class, and Approval of Proposed Form and Manner of Class Notice, ECF No. 92
14. Exhibit A: Letter Dated March 18, 2011, ECF No. 92-1
15. Exhibit B: Labaton Sucharow Firm Resume, ECF No. 92-2
16. Order Granting Preliminary Approval of Class Action Settlement, Approving Form and Manner of Notice, and Setting Date for Hearing on Final Approval of Settlement, ECF No. 97
17. Defendants' Memorandum in Support of Class Action Settlement, ECF No. 99
18. Plaintiffs' Assented-to Motion for Final Approval of Proposed Class Settlement and Plan of Allocation and Final Certification of Settlement Class, ECF No. 100
19. Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Litigation Expenses of Service Awards to Plaintiffs, ECF No. 102
20. [Proposed] Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs, ECF No. 103-1
21. Declaration of Lawrence A. Sucharow in Support of (A) Plaintiffs' Assented-to Motion for Final Approval of Proposed Class Settlement and Plan of Allocation and Final Certification of Settlement Class and (B) Lead Counsel's Motion for an Award of

Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs, ECF No. 104

22. Exhibit 1: Declaration of George Hopkins in Support of Final Approval of Class Settlement, Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Award to ARTRS, ECF No. 104-1

23. Exhibit 2: Letter Dates March 18, 2011, ECF No. 104-2

24. Exhibit 3: Motion to Dismiss, ECF No. 104-3

25. Exhibit 4: Lobby Conference Before Chief Judge Mark L. Wolf, ECF No. 104-4

26. Exhibit 5: Declaration of Jonathan B. Marks, ECF No. 104-5

27. Exhibit 15: Declaration of Lawrence A. Sucharow on Behalf of Labaton Sucharow LLP in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, ECF No. 104-15

28. Exhibit 16: Declaration of Garrett J. Bradley, Esq. on Behalf of Thornton Law Firm, LLP in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, ECF No. 104-16

29. Exhibit 17: Declaration of Daniel P. Chiplock on Behalf of Lieff Cabraser Heimann & Bernstein, LLP in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, ECF No. 104-17

30. Exhibit 18: Declaration of Lynn Sarko on Behalf of The Andover Companies Employee Savings and Profit Sharing Plan and James Pehoushek-Strangeland in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, ECF No. 104-18

31. Exhibit 19: Declaration of J. Brian McTigue in Support of Motion for Attorneys' fees, Reimbursement of Expenses, and Incentive Awards to Certain Class Representatives, ECF No. 104-19

32. Exhibit 20: Declaration of Carl S. Kravitz in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, ECF No. 104-20

33. Exhibit 21: Declaration of Catherine M. Campbell on Behalf of Feinberg, Campbell & Zack, PC in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, ECF No. 104-21

34. Exhibit 22: Declaration of Jonathan G. Axelrod on Behalf of Beins, Axelrod, PC in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, ECF No. 104-22

35. Exhibit 23: Declaration of Kimberly Keevers Palmer on Behalf of Richardson, Patrick, Westbrook & Brickman, LLC in Support of Lead Counsel's Motion for an Award of Attorneys' fees and Payment of Expenses, ECF No. 104-23

36. Exhibit 24: Master Chart of Lodestars, Litigation Expenses, and Plaintiffs' Service Awards, ECF No. 104-24

37. Exhibit 25: Rate Tables, ECF No. 104-25

38. Defendant's Statement of Reporting Status of Class Action Settlement, ECF No. 106

39. Reply Memorandum of Law in Further Support of (A) Plaintiffs' Assented-to Motion for Final Approval of Proposed Class Settlement and Plan of Allocation and Final Certification of Settlement Class and (B) Lead Counsel's Motion for an Award of Attorneys' fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs, ECF No. 108

40. Supplemental Declaration of Eric J. Miller on Behalf of A.B. Data, Ltd. Regarding Mailing of Notice to Settlement Class Members and Requests for Exclusion, ECF No. 109

41. Order and Final Judgment, ECF No. 110

42. Order Awarding Attorneys' fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs, ECF No. 111

43. Order Approving Plan of Allocation, ECF No. 112

44. Hearing Transcript, ECF No. 114

45. Letter Dated November 10, 2016, ECF No. 116

46. Memorandum and Order, ECF No. 117

47. The Competitive Enterprise Institute's Center for Class Action Fairness's Memorandum in Support of Motion for Leave to File *Amicus Curiae* Response to Court's Order of February 6 and for Leave to Participate as *Guardian ad Litem* for Class or *Amicus* in Front of Special Master, ECF No. 127

48. Memorandum of Lieff Cabraser Heimann & Bernstein, LLP Consenting to Appointment of Special Master, ECF No. 128

49. Memorandum of Labaton Sucharow LLP Consenting to Appointment of Special Master and Proposing Appointment of Co-Special Master, ECF No. 129

50. Order Regarding Class Notice, ECF No. 172

51. Memorandum and Order Regarding Appointment of Judge Rosen as Special Master, ECF No. 173

52. The Competitive Enterprise Institute's Center for Class Action Fairness's *Amicus* Response to Court's Order of February 6 – Leave to File granted March 8, 2017 (Dkt. 172), ECF No. 174

53. Memorandum and Order Regarding Class Notice, ECF No. 187

54. Memorandum and Order Regarding Motion for Relief from Fee Order, ECF No. 192

55. Special Master's Order Regarding the Law Firms' Objection to Retention of John W. Toothman as Advisor to Counsel to the Special Master, ECF No. 193

56. Objection of Labaton Sucharow LLP, Lieff Cabraser Heimann & Bernstein, LLP, and Thornton Law Firm LLP to Proposed Appointment of John W. Toothman as Expert in Proceeding Before the Special Master, ECF No. 194

57. Objection Plaintiffs' Law Firms' Objection to Special Master's Order Regarding Retention of John W. Toothman, ECF No. 199

58. Memorandum and Order Regarding Emergency Motion, ECF No. 200

59. Exhibit A: Notice of Proceedings that Could Result in an Additional Award to Class Members Who Have Claims, ECF No. 200-1

60. Exhibit B: Notice of Proceedings that Could Result in an Additional award to Class Members Who Have Claims, ECF No. 200-2

61. Declaration of Eric J. Miller on Behalf of A.B. Data, Ltd. Regarding Mailing and Emailing of Supplemental Notice to Settlement Class Members and/or Their Counsel, ECF No. 202

62. Order Regarding Email Addresses, ECF No. 203

63. Memorandum and Order – Toothman Order, ECF No. 204

64. Labaton Sucharow's Response to the Court's April 26, 2017 Order, ECF No. 205

65. Exhibit A: Declaration of Nicole M. Zeiss in Response to the Court's April 26, 2017 Order, ECF No. 205-1

66. Exhibit B: Declaration of Eric J. Miller on Behalf of A.B. Data, Ltd. in Response to the Court's April 26, 2017 Order, ECF No. 205-2

67. Memorandum and Order Regarding Special Master Billing Rate, ECF No. 206

68. Labaton Sucharow LLP's Response to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories to Labaton Sucharow LLP – June 1 Response

69. Lieff Cabraser Heimann & Bernstein LLP's Responses to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories Due on June 1, 2017

70. Thornton Law Firm, LLP's June 1, 2017 Responses to Special master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories

71. Labaton Sucharow LLP's Response to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories to Labaton Sucharow LLP – June 9 Response

72. Lieff Cabraser Heimann & Bernstein LLP's Responses to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories Due on June 9, 2017

73. Thornton Law Firm, LLP's June 9, 2017 Responses to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories

74. Lieff Cabraser Heimann & Bernstein LLP's Corrected Responses to Special Master Honorable Gerald E. Rosen's (Ret.) Interrogatories Nos. 43 and 44

75. Labaton Sucharow LLP's Response to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories to Labaton Sucharow LLP – July 10 Response

76. Lieff Cabraser Heimann & Bernstein LLP's Responses to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories Due on July 10, 2017

77. Thronton Law Firm, LLP's July 10, 2017 Responses to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories

# EXHIBIT C

*Arkansas Teacher Retirement System et al.*

*v.*

*State Street Bank and Trust Co.*

C.A. No. 11-10230-MLW; 11-12049-MLW; 12-11698-MLW

Expert Declaration of William B. Rubenstein

### EXHIBIT C

Massachusetts Cases Affirming Class Action Fee Awards

1. *Allen v. Decision One Mortg. Co., LLC*, No. CIV.A. 07-11669-GAO, 2010 WL 1930148 (D. Mass. May 12, 2010)
2. *Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324 (D. Mass.), aff'd, 809 F.3d 78 (1st Cir. 2015)
3. *Commonwealth Care All. v. Astrazeneca Pharm. L.P.*, No. CIV.A. 05-0269 BLS 2, 2013 WL 6268236 (Mass. Super. Aug. 5, 2013)
4. *Davis v. Footbridge Eng'g Servs., LLC*, No. 09CV11133-NG, 2011 WL 3678928 (D. Mass. Aug. 22, 2011)
5. *Geanacopoulos v. Philip Morris USA Inc.*, No. 98-6002-BLS1, 2016 WL 757536 (Mass. Super. Feb. 24, 2016)
6. *Gov't Employees Hosp. Ass'n v. Serono Int'l, S.A.*, 246 F.R.D. 93 (D. Mass. 2007)
7. *Hill v. State St. Corp.*, No. CIV.A. 09-12146-GAO, 2015 WL 127728 (D. Mass. Jan. 8, 2015), appeal dismissed, 794 F.3d 227 (1st Cir. 2015)
8. *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, No. MDL 09-2067-NMG, 2014 WL 4446464 (D. Mass. Sept. 8, 2014)
9. *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, No. CIV.A. 08-11064-NMG, 2012 WL 6184269 (D. Mass. Dec. 10, 2012)
10. *In re JPMorgan Chase Mortg. Modification Litig.*, 18 F. Supp. 3d 62 (D. Mass. 2014)
11. *In re Prudential Ins. Co. of Am. SGLI/VGLI Contract Litig.*, No. 3:10-CV-30163-MAP, 2014 WL 6968424 (D. Mass. Dec. 9, 2014)
12. *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005)
13. *In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395 (D. Mass. 2008)
14. *Latorraca v. Centennial Techs. Inc.*, 834 F. Supp. 2d 25 (D. Mass. 2011)
15. *Mann & Co., PC v. C-Tech Indus., Inc.*, No. CIV.A.08-11312-RGS, 2010 WL 457572 (D. Mass. Feb. 5, 2010)
16. *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. CIV.A. 05-11148PBS, 2009 WL 2408560 (D. Mass. Aug. 3, 2009)
17. *Pietrantonio v. Ann Inc.*, No. 13-CV-12721-RGS, 2014 WL 3973995 (D. Mass. Aug. 14, 2014)
18. *Rudy v. City of Lowell*, 883 F. Supp. 2d 324 (D. Mass. 2012)
19. *Stokes v. Saga Int'l Holidays, Ltd.*, 376 F. Supp. 2d 86 (D. Mass. 2005)
20. *Tyler v. Michaels Stores, Inc.*, 150 F. Supp. 3d 53 (D. Mass. 2015)

# EXHIBIT D

*Arkansas Teacher Retirement System et al.*
*v.*
*State Street Bank and Trust Co.*
C.A. No. 11-10230-MLW; 11-12049-MLW; 12-11698-MLW
Expert Declaration of William B. Rubenstein

## **EXHIBIT D**

Massachusetts Bankruptcy Cases Containing Corporate Firm Billing Rates

1.  *In re Houghton Mifflin Harcourt Publishing Company*, 12-BK-15610 (Bankr. D. Mass. 2012), ECF. No. 168
2.  *In re Lexington Jewelers Exch., Inc.*, No. 08-10042-WCH, 2013 WL 2338243 (Bankr. D. Mass. May 29, 2013), ECF. 439-1
3.  *In re McCabe Grp.*, 424 B.R. 1 (Bankr. D. Mass.), *aff'd in part, rev'd in part sub nom. McCabe v. Braunstein*, 439 B.R. 1 (D. Mass. 2010), ECF No. 404-8
4.  *In re Oscient Pharm. Corp.*, No. 09-16576-HJB, 2010 WL 6602493 (Bankr. D. Mass. June 29, 2010); ECF No. 485
5.  *In re Oscient Pharm. Corp.*, No. 09-16576-HJB, 2010 WL 6602493 (Bankr. D. Mass. June 29, 2010); ECF No. 487-6
6.  *In re The Educ. Res. Inst., Inc.*, 442 B.R. 20 (Bankr. D. Mass. 2010), ECF No. 1196-1

# EXHIBIT E

*Arkansas Teacher Retirement System et al.*
*v.*
*State Street Bank and Trust Co.*
C.A. No. 11-10230-MLW; 11-12049-MLW; 12-11698-MLW
Expert Declaration of William B. Rubenstein

### EXHIBIT E
Class Actions Settlements with Funds of $100-$500 Million

1. *Dial Corp. v. News Corp.*, 317 F.R.D. 426 (S.D.N.Y. 2016)
2. *Fleisher v. Phoenix Life Ins. Co.*, No. 11-CV-8405 (CM), 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015), ECF No. 310
3. *In re Am. Int'l Grp., Inc. Sec. Litig.*, 293 F.R.D. 459 (S.D.N.Y. 2013), ECF No. 634-23
4. *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG), 2010 WL 2653354 (E.D.N.Y. June 24, 2010)
5. *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110 (S.D.N.Y. 2009)
6. *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015)
7. *In re IndyMac Mortg.-Backed Sec. Litig.*, 94 F. Supp. 3d 517 (S.D.N.Y. 2015)
8. *In re Lupron Mktg. & Sales Practices Litig.*, No. 01-CV-10861-RGS, 2005 WL 2006833 (D. Mass. Aug. 17, 2005)
9. *In re Nortel Networks Corp.*, No. 01-CV-1855(RMB), 2002 WL 1492116 (S.D.N.Y. Feb. 4, 2002), ECF No. 194
10. *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. CIV.A. 08-2177 DMC, 2013 WL 5505744 (D.N.J. Oct. 1, 2013) ["Schering" settlement]
11. *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. CIV.A. 08-2177 DMC, 2013 WL 5505744 (D.N.J. Oct. 1, 2013) ["Merck" settlement]
12. *In re Shop-Vac Mktg. & Sales Practices Litig.*, No. 2380, 2016 WL 7178421 (M.D. Pa. Dec. 9, 2016)
13. *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246 (E.D. Va. 2009)
14. *In re Volkswagen & Audi Warranty Extension Litig.*, 89 F. Supp. 3d 155 (D. Mass. 2015)
15. *Kemp-DeLisser v. Saint Francis Hosp. & Med. Ctr.*, No. 15-CV-1113 (VAB), 2016 WL 6542707 (D. Conn. Nov. 3, 2016)
16. *N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226 (E.D. Mich. 2016)
17. *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. CIV.A. 05-11148PBS, 2009 WL 2408560 (D. Mass. Aug. 3, 2009), ECF No. 769
18. *Nitsch v. DreamWorks Animation SKG Inc.*, No. 14-CV-04062-LHK, 2017 WL 2423161 (N.D. Cal. June 5, 2017)
19. *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 318 F.R.D. 19, 23 (S.D.N.Y. 2016)
20. *Shapiro v. JPMorgan Chase & Co.*, No. 11 CIV. 7961 CM, 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014)

# EXHIBIT F

*Arkansas Teacher Retirement System et al.*
*v.*
*State Street Bank and Trust Co.*
C.A. No. 11-10230-MLW; 11-12049-MLW; 12-11698-MLW
Expert Declaration of William B. Rubenstein

**EXHIBIT F**
Reported Class Action Fee Decisions
Containing Billing Rates for Contract or Staff Attorneys

1. *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877 (C.D. Cal. 2016), *judgment entered*, No. SACV111733FMOMLGX, 2016 WL 5921765 (C.D. Cal. Oct. 11, 2016), ECF No. 218-8

2. *City of Providence v. Aeropostale, Inc.*, No. 11 CIV. 7132 CM GWG, 2014 WL 1883494 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015), ECF No. 61-4

3. *In re Am. Apparel, Inc. S'holder Litig..*, No. CV1006352MMMJCGX, 2014 WL 10212865 (C.D. Cal. July 28, 2014), ECF No. 188-3

4. *In re Animation Workers Antitrust Litig.*, No. 14-CV-4062-LHK, 2016 WL 6663005 (N.D. Cal. Nov. 11, 2016), ECF Nos. 331-2, 331-3, 331-4

5. *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015), ECF No. 1083-20

6. *In re Optical Disk Drive Prod. Antitrust Litig.*, No. 3:10-MD-2143 RS, 2016 WL 7364803 (N.D. Cal. Dec. 19, 2016), ECF No. 1963-1

7. *Long v. HSBC USA INC.*, No. 14 CIV. 6233 (HBP), 2016 WL 4764939 (S.D.N.Y. Sept. 13, 2016)

8. *McGreevy v. Life Alert Emergency Response, Inc.*, No. 14 CIV. 7457 (LGS), 2017 WL 1534452 (S.D.N.Y. Apr. 28, 2017)

9. *Mills v. Capital One, N.A.*, No. 14 CIV. 1937 HBP, 2015 WL 5730008 (S.D.N.Y. Sept. 30, 2015), ECF No. 52

10. *Phillips v. Triad Guar. Inc.*, No. 1:09CV71, 2016 WL 2636289 (M.D.N.C. May 9, 2016), ECF No. 145-1

11. *Rose v. Bank of Am. Corp.*, No. 5:11-CV-02390-EJD, 2014 WL 4273358 (N.D. Cal. Aug. 29, 2014)

12. *St. Louis Police Ret. Sys. v. Severson*, No. 12-CV-5086 YGR, 2014 WL 3945655 (N.D. Cal. Aug. 11, 2014)

# EXHIBIT G

*Arkansas Teacher Retirement System et al.*
*v.*
*State Street Bank and Trust Co.*
C.A. No. 11-10230-MLW; 11-12049-MLW; 12-11698-MLW
Expert Declaration of William B. Rubenstein

**EXHIBIT G**
List of Exemplary Cases With Multipliers Over 3.5

1.  In re Merry-Go-Round Enterprises, Inc., 244 B.R. 327 (Bankr. D. Md. 2000) (19.6 multiplier)

2.  Stop & Shop Supermarket Co. v. SmithKline Beecham Corp., NO. CIV.A. 03-457, 2005 WL 1213926, at *17-18 (E.D. Pa. May 19, 2005) (15.6 multiplier)

3.  Kuhnlein v. Department of Revenue, 662 So.2d 309, 315 (Fla. 1995) (15 multiplier reduced to 5)

4.  In re Doral Fin. Corp. Sec. Litig., No. 05-md-1706 (S. D. N.Y. July 17, 2007) (10.26 multiplier)

5.  Weiss v. Mercedes-Benz, 899 F. Supp. 1297 (D. N.J. 1995), aff'd, 66 F.3d 314 (3d Cir. 1995) (9.3 multiplier)

6.  Doty v. Costco Wholesale Corp., No. 05-3241 (C. D. Cal. May 14, 2007) (9 multiplier)

7.  Conley v. Sears, Roebuck & Co., 222 B.R. 181 (D. Mass. 1998) (8.9 multiplier)

8.  Cosgrove v. Sullivan, 759 F. Supp. 1667, 167 n.1 (S. D. N.Y. 1991) (8.74 multiplier)

9.  New England Carpenters Health Benefits Fund v. First Databank, Inc., Civil Action No. 05-11148-PBS, 2009 WL 2408560 (D. Mass. Aug. 3, 2009) (8.3 multiplier)

10. Newman v. Caribiner Int"l, Inc., No. 99 Civ. 2271 (S.D. N.Y. Oct. 19, 2001) (7.7 multiplier)

11. Hainey v. Parrott, No. 02-733 (S. D. Ohio Nov. 6, 2007) (7.47 effective multiplier)

12. In re Rite Aid Corp. Sec. Litigation, 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) (6.96 multiplier)

13. Steiner v. Amer. Broadcasting Co., Inc., 248 Fed. Appx. 780, 783 (9th Cir. 2007) (6.85 multiplier)

14.   In re UnitedHealth Group, Inc. PSLRA Litig., No. 06-1691 (D. Minn. Aug. 10, 2009) (6.49 multiplier)

15.   The Music Force, LLC v. Viacom, Inc., No. 04-8239 (C.D. Cal. Aug. 8, 2007) (6.43 multiplier)

16.   In re Boston and Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A., 778 F.2d 890 (1st Cir. 1985) (6 multiplier)

17.   In re Cardinal Health Inc. Securities Litigations, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) (6 multiplier)

18.   In re Krispy Kreme Doughnuts, Inc. Sec. Litig., No. 04-416 (M.D. N.C. Feb. 15, 2007) (6 multiplier)

19.   In re RJR Nabisco, Inc. Securities Litigation, No. 88 Civ 7905(MBM), 1992 WL 210138, at *5-6 (S.D. N.Y. Aug. 14, 1992) (6 multiplier)

20.   Spartanburg Reg'l Health Servs. Dist., Inc. v. Hillenbrand Indus., Inc., No. 03-2141 (D. S.C. Aug. 15, 2006) (6 multiplier)

21.   In re Cardinal Health, Inc. Sec. Litig., No. 04-575, 2007 U.S. Dist. LEXIS 95127 (S. D. Ohio Dec. 31, 2007) (5.85 multiplier)

22.   Dutton v. D&K Healthcare Res., Inc., No. 04-147 (E. D. Mo. June 5, 2007) (5.6 multiplier)

23.   In re Charter Communications, Inc., Securities Litigation, No. MDL 1506, 2005 WL 4045741, at * 22 (E.D. Mo. June 30, 2005) (5.6 multiplier)

24.   Roberts v. Texaco, Inc., 979 F. Supp. 185, 198 (S.D. N.Y. 1997) (5.5 multiplier)

25.   Warner v. Experian Info. Solutions, Inc., No. BC362599 (Cal. Super. Ct. Los Angeles Co. Feb. 26, 2009) (5.48 multiplier)

26.   Davis v. J.P. Morgan Chase & Co., 827 F. Supp. 2d 172, 185 (W.D.N.Y. 2011) (5.3 multiplier)

27.   Di Giacomo v. Plains All American Pipeline, No. Civ.A.H-99-4137, 2001 WL 34633373, * at 11-12 (S.D. Tex. Dec. 19, 2001) (5.3 multiplier)

**G-2**

28.   Craft v. County of San Bernardino, 624 F. Supp. 2d 1113, 1123-25 (C.D. Cal. 2008) (5.2 multiplier)

29.   In re Enron Corp. Securities, Derivative & ERISA Litigation, 586 F. Supp. 2d 732, 803 (S.D. Tex. 2008) (5.2 multiplier)

30.   In re Beverly Hills Fire Litig., 639 F. Supp. 915, 924 (E. D. Ky. 1986) (5 multiplier to attorney who performed the bulk of work on the case)

31.   In re Fernald Litigation, No. C-1-85-149, 1989 WL 267038, at *4-5 (S.D. Ohio Sept. 29, 1989) (5 multiplier)

32.   In re Cendant Corp. Securities Litigation, 404 F.3d 173, 183 (3d Cir. 2005) (multiplier in "mid-single digits")

33.   In re United Rentals, Inc. Sec. Litig., No. 04-1615 (D. Conn. May 26, 2009) (4.79 multiplier)

34.   Castillo v. General Motors Corp., No. 07-2142 (E. D. Cal. April 19, 2009) (4.77 multiplier)

35.   Meijer, Inc. v. 3M, No. 04-5871, 2006 WL 2382718 (E. D. Pa. Aug. 14, 2006) (4.77 multiplier)

36.   In re Xcel Energy, Inc., Securities, Derivative & "ERISA" Litigation, 364 F. Supp. 2d 980, 999 (D. Minn. 2005) (4.7 multiplier)

37.   Maley v. Del Global Technologies Corp., 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (4.65 multiplier)

38.   Teeter v. NCR Corp., No. 08-297 (C.D. Cal. Aug. 6, 2009) (4.61 multiplier)

39.   Holleran v. Rita Medical Sys., Inc., No. RG06302394 (Cal. Super. Ct. Alameda Co. Aug. 1, 2007) (4.57 multiplier)

40.   Rabin v. Concord Assets Group, Inc., No. 89 Civ. 6130, 1991 WL 275757 (S.D. N.Y. Dec. 19, 1991) (4.4 multiplier)

41.   Agofonova v. Nobu Corp., No. 07-6926 (S. D. N.Y. Feb. 6, 2009) (4.34 multiplier)

42.   Buccellato v. AT & T Operations, Inc., No. C10-00463-LHK, 2011 WL 3348055, at *2 (N.D. Cal. Jun. 30, 2011) (4.3 multiplier)

43.      *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 135 (D.N.J. 2002) (4.3 multiplier)

44.      *Shannon v. Hidalgo County Board of Comm'r*, No. 08-369 (D. N.M. June 4, 2009) (4.2 multiplier)

45.      *Simmons v. Andarko Petroleum Corp.*, No. CJ-2004-57 (Okla. Dist. Ct. Caddo Co. Dec. 23, 2008) (4.17 multiplier)

46.      *In re OSI Pharm., Inc. Sec. Litig.*, No. 04-5505 (E.D. N.Y. Aug. 22, 2008) (4.11 multiplier)

47.      *Blackmoss Inv., Inc. v. Gravity Co.*, No. 05-4804 (S. D. N.Y. Nov. 20, 2007) (4.0 multiplier)

48.      *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2003) (4.0 multiplier)

49.      *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D. N.Y. 1998) (3.97 multiplier)

50.      *Karpus v. Borelli (In re Interpublic Secs. Litig.)*, No. 02 Civ 6527, 2004 WL 2397190, at *12 (S.D. N.Y. Oct. 26, 2004 (3.96 multiplier)

51.      *Vizcaino v. Microsoft Corp.*, 290 F.3d 1045, 1050-51 (9th Cir. 2002) (3.65 multiplier)

52.      *Donkerbrook v. Title Guar. Escrow Servs., Inc.*, No. 10-00616 LEK-RLP, 2011 WL 3649539, at *10 (D. Haw. Aug. 18, 2011) (3.6 multiplier)

53.      *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 869 (E.D. La. 2007) (3.5 multiplier)

54.      *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 123 (2d Cir. 2005) (3.5 multiplier)

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

**THORNTON LAW FIRM, LLP'S RESPONSE TO SPECIAL MASTER HONORABLE
GERALD E. ROSEN'S (RET.) SEPTEMBER 7, 2017 REQUEST FOR ADDITIONAL
SUBMISSION**

1

In a letter dated September 7, 2017, Special Master Gerald E. Rosen (Ret.), through counsel, invited Labaton Sucharow ("Labaton"), Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser"), and Thornton Law Firm, LLP ("Thornton") (collectively, the "Consumer Class Firms") to submit an additional supplemental submission addressing the payment to Attorney Damon Chargois, as well as any other topics raised in the Special Master's July 5, 2017 letter.

## Preliminary Statement

On August 7, 2017, the Special Master sent supplemental interrogatories and supplemental requests for production of documents to the Consumer Class Firms.  These discovery requests concerned the payment of a portion of the Consumer Class Firms' fee in this case to Attorney Damon Chargois, as well the Consumer Class Firms' relationship with Mr. Chargois generally.  Thornton responded to the supplemental discovery requests in full and produced two witnesses for depositions in September 2017.

Thornton respectfully submits this response to the Special Master's September 7, 2017 letter to address certain facts that Thornton believes are relevant and helpful to the Special Master's assessment of issues raised in this matter.  In addition to responding to the Special Master's request concerning Mr. Chargois, Thornton addresses below a topic revisited during this supplemental discovery phase, namely, Thornton's listing of the Staff Attorneys assigned to it in its individual fee declaration.

## Damon Chargois

As concerns the primary topic of the Special Master's September 7, 2017 letter – the payment to Mr. Chargois in the State Street matter – Thornton respectfully submits that the

factual record developed by the Special Master demonstrates that Thornton believed that Mr.

Chargois facilitated Labaton's introduction to the Arkansas Teacher Retirement System

("ARTRS") and that Mr. Chargois was acting as a liaison to ARTRS, including in the State

Street litigation.  Thornton further understood that Labaton had a financial obligation to Mr.

Chargois in matters involving ARTRS. The factual record demonstrates that Thornton, along

with Lieff Cabraser, agreed to share in Labaton's financial obligation to Mr. Chargois in the

State Street case, and that Thornton partner Garrett Bradley helped negotiate down the

percentage of the Consumer Class Firms' fee that would be paid to Mr. Chargois.

With respect to questions concerning ARTRS's awareness of Mr. Chargois's

involvement, and what work Mr. Chargois performed or did not perform on the State Street

litigation, the factual record developed in this investigation demonstrates that Thornton lacked

full knowledge regarding these issues. Thornton therefore defers to Labaton on those questions.

## Staff Attorney Sharing and Thornton's Fee Declaration

During this investigation, the Special Master has questioned the arrangement among the

Consumer Class Firms to share the cost and risk associated with Staff Attorneys who performed

document review work on the case.  As set out in documents and deposition testimony, and as set

forth in the Consumer Class Firms' submission to the Special Master dated August 1, 2017,

Thornton, Labaton, and Lieff Cabraser entered into a cost- and risk-sharing agreement as part of

which Thornton paid for the services of certain Staff Attorneys who performed document review

work.  Because Labaton and Lieff Cabraser already had Staff Attorneys with available time, as

well as experience with employing Staff Attorneys on large document review matters, the firms

deemed it most efficient to share the cost and risk of Staff Attorneys housed at (or working

remotely for) those two firms.  Accordingly, certain of the Staff Attorneys working at Labaton

and Lieff Cabraser were assigned to Thornton.  In turn, Thornton paid their hourly rate of

compensation, plus, as to Staff Attorneys assigned by Labaton, an additional amount for

overhead expenses.[1]  *See* TLF-SST-000400, TLF-SST-000395; TLF-SST-000154; *see also*

Consolidated Response by Labaton Sucharow LLP, Lieff Cabraser Heimann & Bernstein LLP,

and Thornton Law Firm LLP to Special Master's July 5, 2017 Request for Supplemental

Submission ("Consolidated Response") at 8-9.  All three of the Consumer Class Firms attested to

this arrangement in the Consolidated Response.  *See* Consolidated Response at 19-20 (citing

deposition testimony of Eric Belfi of Labaton ("Belfi Dep.") (June 14, 2017) at 50:19 – 51:16;

Garrett Bradley of Thornton ("G. Bradley Dep.") (June 19, 2017) at 43:4-13; and Dan Chiplock

of Lieff Cabraser ("Chiplock Dep.") (June 16, 2017) at 127:11 – 128:16).

In the latest round of depositions, the Special Master has revisited the issue of whether

the Consumer Class Firms had an agreement that Thornton would list the hours associated with

the Staff Attorneys assigned to it on its individual fee declaration.  The Special Master

specifically has questioned whether Thornton was "authorized" to list Staff Attorneys in its fee

declaration.  M. Thornton Dep. (Sept. 1, 2017) at 50:1-7 & 53:15-20; Chiplock Dep. (Sept. 8,

2017) at 48:2-7; deposition testimony of David Goldsmith ("Goldsmith Dep.") (Sept. 20, 2017)

at 217:11-17.  As the Consumer Class Firms have explained, there was no formal written

---

[1]  As previously stated in the Consolidated Response, in the case of Staff Attorneys housed by Labaton, Labaton invoiced Thornton using a rate that consisted of both cost and overhead.  *Compare* TLF-SST-000415 (Ray Politano of Labaton stating the $50 hourly rate Labaton was charging to Thornton) *and* TLF-SST-000403 to TLF-SST-000414 (Labaton invoices paid by Thornton showing $50 per hour rate) *with* deposition testimony of Ray Politano ("Politano Dep.") (June 14, 2017) at 18:3-9 (Politano stating that Staff Attorneys were paid between $32 and $40 per hour).  *See also* G. Bradley Dep. (June 19, 2017) at 93:23 – 95:5, deposition testimony of Michael Thornton ("Thornton Dep.") (Sept. 1, 2017) at 52:9-17.

In the case of Staff Attorneys housed (or working remotely) at Lieff Cabraser, there was a brief period of review (approximately nine weeks) for which Thornton paid Lieff Cabraser for two Staff Attorneys' work.  For the remainder of the project, Thornton paid two third-party staffing agencies directly.  Chiplock Dep. (June 6, 2017) at 156:7-15; deposition testimony of Evan Hoffman ("Hoffman Dep.") (June 5, 2017) at 61:17 – 62:10.

*Confidential -- Subject to Protective Orders*

agreement setting out the terms of the sharing arrangement.  However, contemporaneous e-mail

correspondence and/or deposition testimony taken in this matter establish that Thornton listed the

hours of the Staff Attorneys assigned to it on its lodestar because it reasonably believed, as did

others at Labaton and Lieff Cabraser, that doing so was part of the agreement.  After all,

Thornton also bore the risk with respect to these hours; if the case did not result in a settlement

for the plaintiffs, or if the Court, for whatever reason, disallowed those hours, Thornton – not

Labaton or Lieff Cabraser – would have been out the funds it paid for these attorneys' work.

Indeed, as the record demonstrates, risk sharing was a key consideration for Labaton in entering

into the document review work arrangement. *See* Belfi Dep. (June 14, 2017) at 51:8-16 ("…I

was concerned about the status of where the case was, and the risk to our firm, so I wanted to

make sure that this review was shared equally among the three firms and that we weren't going

to just bear all the heavy lifting. So there was a process that was started to try to figure out a way

for us to have these documents reviewed between our firm, the Lieff firm and the Thornton

firm.").

     The sharing of the costs and risk associated with the document review was consistent

with the Consumer Class Firms' effort to share equally in the cost and risk of the litigation

overall.  In addition to splitting the Staff Attorneys' work, and dividing the substantive work

among lawyers in the three firms, the three firms also each paid into a litigation fund and shared

other costs associated with the litigation, including the costs associated with experts and with

mediation.  *See, e.g.,* Lesser Dep. (June 19, 2017) at 54:9-20.  As Dan Chiplock of Lieff

Cabraser testified, this was the firms' intent from the beginning: "From the get-go, the

understanding always was that the firms would try to share equally in the risk, the three firms

would try to share equally in the risk of the case. And by sharing in the risk, that means trying to

equally bear the costs, and equally investing time and resources in the success of the litigation." Chiplock Dep. (June 16, 2017) at 127:22 – 128:5; *see id.* at 129:6-13 (stating that the desire to bear cost and risk equally was "the overarching understanding that animated the case throughout"); *see also* Consolidated Response at 19 (noting that law firms in multi-firm class action cases make various arrangements, including but not limited to document review sharing, in the name of splitting the work, costs, and risk of the case equitably).

As previously discussed, none of the firms recall explicitly discussing how the hours of Thornton-assigned Staff Attorneys would be accounted for on eventual fee declarations.  *See* Consolidated Response at 19.   But even in the absence of an explicit agreement, there is ample evidence demonstrating that Thornton contemporaneously understood that it would include the Staff Attorneys in its fee declaration, as well as testimony confirming that both Labaton and Lieff Cabraser assumed that Thornton would list the Staff Attorneys.  *See, e.g.,* deposition testimony of Michael Rogers ("Rogers Dep.") (June 16, 2017) at 91:18 – 92:16 and Chiplock Dep. (June 16, 2017) at, e.g., 143:13-23 and 145:13-25.  Thornton's belief was a good-faith assumption that was reasonable from a cost- and risk-sharing perspective.

### (A) Contemporaneous E-mails

The following e-mails previously produced to the Special Master, listed in chronological order, demonstrate Thornton's understanding.  These e-mails make clear (i) that Thornton communicated to Labaton, both before and after the document review work was completed, that it was seeking detailed information regarding Staff Attorneys for purposes of tabulating its (Thornton's) lodestar; (ii) that Labaton assured Thornton that, with respect to the adjustments to overlapping Staff Attorney time set out in the November 10, 2016 letter to the Court, "the intent is not to suggest that Thornton time is less legitimate"; and (iii) that Thornton, in providing a

lodestar estimate to Lieff Cabraser, identified two types of reviewers – "internal" and "external (Thornton reviewers working Lieff + Labaton paid by Thornton)" – in its lodestar calculation.

- On **March 6, 2015** – three months before the Staff Attorneys completed their work in July 2015 – Evan Hoffman of Thornton e-mailed Mike Rogers, a partner at Labaton, and asked: "Mike, can you put me in touch with someone over there who can get me a total number of hours and number of documents reviewed to date by the Labaton reviewers hired by Thornton?"  Mike Rogers responded the same day, including in his e-mail a list of "reviewers [] assigned to Thornton's payroll" and attaching "[t]heir total hours to date."  The report attached by Mr. Rogers was titled "Timekeeper Worked Detail Report" and listed the hours worked by each Thornton-assigned Staff Attorney to date, by name. **TLF-SST-001943 to TLF-SST-001946.**  Mr. Hoffman testified that when he received this information concerning reviewers who were assigned to Thornton but working at Labaton, he kept it in mind so that he could seek the information from Labaton "when it ultimately came time to prepare the hours." Hoffman Dep. (June 5, 2017) at 62:21 – 63:7.

- On **June 29, 2015**, Michael Lesser of Thornton sent an e-mail to Dan Chiplock of Lieff Cabraser in which he provided Mr. Chiplock with an estimate of Thornton's lodestar in the case, "to give [Mr. Chiplock] the flavor" of Thornton's lodestar number.  **TLF-SST-011206.**  For context, at this time, the parties were reaching an agreement in principle to settle the case, which was finalized on June 30, 2015.  *See* Doc. 89, *Stipulation and Agreement of Settlement,* at p. 6, ¶ R ("On June 30, 2015, after additional extensive arm's-length negotiations, on multiple occasions, in person and by exchange of proposals, Plaintiffs and SSBT reached an agreement in principle to settle the Class Actions, which was memorialized in a Term Sheet dated September 11, 2015").  Thus, although it took more than a year for the parties to finalize the settlement and appear before the Court, the agreement in principle – and thus the conclusion of substantive work on the matter, including the document review – was reached long before that.  *See* Belfi Dep. (June 14, 2017) at 61:5-10 ("[T]he case settled in the summer of 2015, and, you know, the final -- the papers were submitted, I believe, in September of 2016, so there's a 13-month period that we went through a lot of issues with State Street dealing with regulatory agencies.")

- In his **June 29, 2015** e-mail estimating Thornton's lodestar, Mr. Lesser broke the document review hours contributing to Thornton's lodestar into two categories: "Thornton doc review external (Thornton reviewers working Lieff + Labaton paid by Thornton)" and "Thornton doc review internal." With the caveat that Thornton was still reviewing its time records, Mr. Lesser commented to Mr. Chiplock that "this is mostly it for us [Thornton]." Mr. Lesser's e-mail clearly informed Mr. Chiplock that Thornton was including the Thornton-assigned reviewers working at Lieff and at Labaton in its lodestar calculation. **TLF-SST-011206**.

- On **August 24, 2015** – approximately two months after the Staff Attorneys had completed their work – Evan Hoffman of Thornton again e-mailed Mike Rogers of Labaton, this time copying Todd Kussin of Labaton, regarding Staff Attorney hours. Referencing the March 2015 e-mails they exchanged and seeking "a more detailed (i.e. daily) breakdown of those reviewers' hours from when they first started being on Thornton's payroll until we let everyone go early this summer," Mr. Hoffman informed Mr. Rogers and Mr. Kussin that he was seeking this information because he was "trying to compile in to one nice detailed document all of the document review hours for us [Thornton] in STT." **TLF-SST-031155 to TLF-SST-031157.** Mr. Kussin and Mr. Rogers responded to Mr. Hoffman's request, seeking clarification about what Mr. Hoffman needed. Mr. Hoffman responded that he needed "[W]hatever you have so I can gather all the hours info on a daily basis of Thornton-payroll reviewers, from when we hired them until they were terminated." **TLF-SST-031155**. Mr. Kussin responded to Mr. Hoffman and noted that Labaton's accountants would be pulling the information, and that he would be able to provide it to him the following day. *Id.* Later in the evening on August 24, 2015, Mr. Kussin replied to Mr. Hoffman's e-mail with a list of Thornton-assigned reviewers, "according to our accounting." **TLF-SST-001947 to TLF-SST-001949**.

- The following day, **August 25, 2015,** Todd Kussin followed up on the prior day's e-mails by sending Evan Hoffman "a spreadsheet containing a breakdown of the hours worked daily by each of the Labaton reviewers on Thornton's payroll." The attached spreadsheet detailed the time worked by each of the Thornton-assigned reviewers by name and date.[2] **TLF-SST-031158 to TLF-SST-031159**. This spreadsheet was the basis of Thornton's lodestar chart in its fee declaration ultimately filed in September

---

[2]     Of note, the title of the report states that it covers "STA" (Staff Attorney) hours "from 01/01/2015 thru 02/28/2015," but this title was in error, as the content of the report goes through 07/02/15.

*Confidential -- Subject to Protective Orders*

2016.  Because the Staff Attorneys had completed their work on the project nearly two months before this spreadsheet was provided to Thornton, and because the spreadsheet captured the Staff Attorneys' time through the end of the project, Thornton reasonably assumed that these were static numbers on which it could rely.

- Other e-mails from this time period show that all three firms were making efforts to gather their lodestar reports during this time, which places important context around these e-mails between Thornton, Labaton, and Lieff Cabraser.

  For example, in an e-mail chain dated **August 28-30, 2015** initiated by Mike Rogers of Labaton to Michael Lesser of Thornton and Dan Chiplock of Lieff Cabraser (with others added along the chain), the firms agreed to "gather time and daily backup" "in anticipation of making a formal fee request."  They also discussed the need to "pick consistent rates" for document reviewers, and whether to "cap" rates.  **TLF-SST-011289 to TLF-SST-011292**.

  As the thread continued into mid-September 2015, Mr. Chiplock, Mr. Rogers, and Mr. Lesser all noted that they had gathered or nearly gathered their firms' respective lodestar and expenses, and would soon exchange them.  Thus, as the e-mails show, Mr. Hoffman – whom Mr. Lesser informed Labaton and Lieff was "the captain" of Thornton's lodestar assembly project – was requesting detailed information concerning Staff Attorney hours from Labaton in the very days leading up to discussions among the three firms about exchanging their lodestar numbers.  *Compare* **TLF-SST-001947, TLF-SST-031155**, and **TLF-SST-011289**.

  As concerns Lieff Cabraser, Thornton has not identified any e-mail correspondence with that firm requesting detailed Staff Attorney hours reports. This is explained by the fact that Thornton already had this information.  As it was paying two third-party staffing agencies directly for the Staff Attorneys housed at Lieff Cabraser, Thornton approved their timesheets.  Hoffman Dep. (June 5, 2017) at 69:15-25.  Thornton received contemporaneous records for those Staff Attorneys from the staffing agencies, which Evan Hoffman referenced in aggregating the number of hours attributable to work by Thornton-assigned reviewers at Lieff Cabraser -- just as he

used the reports Labaton supplied to him to calculate the number of hours attributed to work by Thornton-assigned reviewers at Labaton.[3]

- Additionally, the firms' communications regarding the November 10, 2016 letter to the Court support Thornton's understanding that it properly accounted for Thornton-assigned Staff Attorneys in its fee declaration. In an e-mail chain dated **November 9, 2016**, Dan Chiplock of Lieff Cabraser wrote to Labaton partner David Goldsmith, copying Michael Lesser and Evan Hoffman of Thornton, that time for two Staff Attorneys "should not have been included in LCHB's lodestar at all" because the two "were Thornton contract reviewers throughout 2015" who worked on Lieff Cabraser's premises. Mr. Chiplock went on to note that Lieff Cabraser had inadvertently included their time because of a lack of description in the time entries on Lieff Cabraser's end. With regard to two other Thornton-assigned reviewers at Lieff Cabraser, Mr. Chiplock explained that they did work for both Thornton and for Lieff Cabraser at different times, and that Lieff Cabraser had "neglected to exclude" the time entries that related to Thornton-assigned work. **TLF-SST-012138 to TLF-SST-012140**. Thus, Mr. Chiplock clearly understood and thought it proper for Thornton to have listed Thornton-assigned reviewers in its fee declaration. Mr. Chiplock confirmed this in both of his depositions, and Lieff Cabraser's interrogatory responses also confirm this belief. *See* Chiplock Dep. (June 16, 2017) at 135:20 – 137:11; 145:12 – 146:7 & 228:19 – 229:16; Chiplock Dep. (Sept. 8, 2017) at 49:3-12; LCHB Interrog. Resp. 23, 32 ("With respect to Staff Attorneys, [LCHB's] understanding was that for purposes of any lodestar crosscheck, the Plaintiffs' Law Firms would include in their time reports any hours for which they had specifically borne the financial obligation and the accompanying risk of non-payment"), 34 ("[I]t was [LCHB's] understanding that Thornton would include in its lodestar total (to be reported in any Fee Petition submitted by Thornton) any hours worked by Staff Attorneys for which Thornton had borne financial responsibility"), & 65.

Evan Hoffman recalls hearing this sentiment from Lieff Cabraser, as well as a similar explanation concerning inadvertent mistakes from Labaton. Hoffman Dep. (June 5, 2017) at 102:4-21. Indeed, in the process of putting together the November 10 letter,

---

[3] For the initial period for which Thornton was paying Lieff Cabraser for two Staff Attorneys' work – before the direct payments to the staffing agencies were put into place – Thornton received invoices from Lieff that stated the hours worked by those two Staff Attorneys. *See* TLF-SST-000400, TLF-SST-000395; *see also* TLF-SST-000154. (*See also* Thornton's Interrogatory Response 75, in which Thornton noted the discovery of an eight-hour transcription error relevant to one of these two attorneys' hours in the lodestar.)

David Goldsmith of Labaton assured Thornton in an e-mail that the removal of any overlapping Staff Attorney hours from Thornton's lodestar was the result of a conservative, lowest-rate approach only, and that "the intent is not to suggest that Thornton time is less legitimate[.]" **TLF-SST-012191.**

### (B)  Deposition Testimony

In addition to the e-mails described above, deposition testimony and discovery responses from numerous attorneys among the three firms confirm that Thornton reasonably assumed, based on the financial responsibility it had and the risk it was assuming, that it should list the Staff Attorneys assigned to it in its fee declaration.

### 1.  Labaton Sucharow

Labaton partner Michael Rogers testified that although he does not recall there being an explicit discussion concerning how Staff Attorneys would be listed on the firms' fee declarations – a point with which Thornton concurs – he assumed that Thornton would list the Staff Attorneys for whose services it was paying on its own fee declaration. *See* Rogers Dep. (June 16, 2017) at 91:18 – 92:16 ("Q: And did you have an understanding during this time period about what the implications were of that cost sharing?  In other words, whether Thornton was going to claim those staff attorneys on their fee petition?  A:  I certainly assumed they would . . . They were paying for it up-front, I assume they wanted to get paid on the back end"); Labaton Interrogatory Resp. 33 ("Michael Rogers does not recall a specific discussion, at the time it was agreed that the cost of some Staff Attorneys would be paid by Thornton, regarding how their hours would be reported.  He assumed, however, that Thornton would take credit for the hours spent by the Staff Attorneys for which it paid on its own lodestar").

Eric Belfi, the Labaton partner who had the original discussions about a cost- and risk-sharing agreement with Thornton partner Garrett Bradley, testified that he was not involved in

the mechanics of the cost splitting; rather, Mr. Rogers handled that aspect of the arrangement. Belfi Dep., June 14, 2017, at 63:17 – 64:22.  However, in Labaton's responses to the Special Master's interrogatories, Mr. Belfi confirmed that, had he been asked at the time, he "likely would have assumed that Thornton would report the time spent by Staff Attorneys for whom it was paying on a Thornton lodestar" – just as Mr. Rogers assumed.  *See* Labaton Interrog. Resp. 33.

Only one Labaton deponent, partner David Goldsmith, has challenged the notion that Thornton was "authorized" (implicitly or explicitly) to list the Staff Attorneys in its lodestar. Mr. Goldsmith testified that he believes "the Thornton firm assumed that that is what they were supposed to do because they were paying or reimbursing the costs of those attorneys," but that he "personally" does not think there is evidence that Thornton was "authorized" to list the Staff Attorneys for whom it was paying.  Goldsmith Dep. (Sept. 20, 2017) at 225:24 – 226:12. Thornton respectfully submits that when Mr. Goldsmith's opinion is weighed against that of his colleagues Mr. Belfi and Mr. Rogers (one of whom struck the cost-sharing agreement, and the other of whom corresponded contemporaneously with the Thornton firm about Staff Attorney time – including to send Thornton a detailed time report in response to a request from Evan Hoffman), the Special Master must also acknowledge Mr. Goldsmith's testimony that he thought Thornton believed it should do so <u>because it (Thornton) was paying the costs of those attorneys</u> – *i.e.,* for a good-faith, fact-based reason.  Moreover, Thornton notes that when Mr. Goldsmith was drafting the November 10, 2016 letter to the Court disclosing the inadvertent billing errors, he did not suggest to Thornton, or tell the Court, that Thornton's inclusion of the Staff Attorneys assigned to it was unauthorized.  To the contrary, the letter to the Court attributed the overlap in hours to the firms' efforts to share financial responsibility generally, and specifically attributed

*Confidential -- Subject to Protective Orders*

the overlap involving Labaton-housed Staff Attorneys to Labaton's "mistakenly" reporting the hours of certain Staff Attorneys in its own lodestar report. Dkt. 116-2. Furthermore, during the drafting process, Mr. Goldsmith explained to Mr. Lesser that Labaton was taking a lowest-rate approach to reducing the overlapping time as a conservative measure, and assured Mr. Lesser that "the intent is not to suggest that Thornton time is less legitimate[.]" TLF-SST-012191.

Thornton's listing of the Staff Attorneys assigned to it was reasonable based on the risk and financial responsibility borne by Thornton for those attorneys' work. Moreover, contemporaneous documents demonstrate that Thornton requested information concerning the time spent by the Staff Attorneys assigned to it both before and after the completion of the document review work in July 2015. The fact that the partner tasked with preparing the fee declaration at Labaton, who was not otherwise involved in the case, was unaware of the sharing arrangement between the firms should not be construed against Thornton. Thornton believed in good faith that because it bore the cost for certain Staff Attorneys' work (as well as the attendant risk of non-payment for that work), it was proper for Thornton to include that work in its lodestar. To the extent Labaton compartmentalized different case functions within the firm, as has been discussed during depositions in this matter, that should not reflect negatively on Thornton, which made a reasonable assumption, and communicated with Labaton consistent with that assumption.

### 2. Lieff, Cabraser, Heimann & Bernstein

For its part, Lieff Cabraser has confirmed its understanding that Thornton would claim the Staff Attorneys assigned to it. Lieff Cabraser partner Dan Chiplock testified that, in light of the risk Thornton was assuming, it was "obvious" that Thornton would include the Staff Attorneys for whom it was bearing financial responsibility in its own lodestar, even if the firms

did not reduce that understanding to writing.  *See* Chiplock Dep. (June 16, 2017) at 135:20 –

137:11 ("I mean, we didn't write it out, but it was obvious to me that . . . when you're paying

someone to do work, and you're taking on the risk of not being paid for that work, which is

always a risk in our cases . . . you include it in your lodestar at the end of the day.").  Mr.

Chiplock testified that he had a general understanding with Thornton partner Garrett Bradley that

it would be done this way, and that it seemed to him "common sense that if a firm is paying for

labor, they can get credit for that labor in their fee petition." *Id.* at 228:18 – 229:16 & 136:10-22

("I would say it was completely understood by me when I talked with Garrett that that would be

how it worked, because it was obvious to me that if you pay for the work that is being done,

then, just as with any other employee when you're paying them, that you include their hours in

your lodestar when you report it at the end of the day. I don't think that needed to be spelled out

for me or for Garrett; it was just obvious.")  Lieff Cabraser's responses to the Special Master's

interrogatories confirm this.  *See* LCHB Interrogatory Resp. 34, 39, 40.

Lieff Cabraser understood that Thornton's motivation for sharing the cost and risk

associated with the document review work was so that its contribution to that piece of the case

would be equal, or close to equal, to what Labaton and Lieff Cabraser were contributing.  Dan

Chiplock testified that he understood this and had no issue with it.  *See* Chiplock Dep. (June 16,

2017) at 131:15 – 132:13 ("Because we knew we had to staff up the review to get it done,

Thornton wished to contribute to that effort on equal terms, or on as equal terms as it could with

the other firms, understanding that it did not have the facilities to host a dozen -- or however

many -- attorneys who were strictly doing document review. And so they asked -- and I think it

was a telephone conversation I had with Garrett Bradley, who asked me whether we at Lieff

Cabraser would be willing to house some staff attorney document reviewers that Thornton would

pay for, so that Thornton could be making its equal contribution to bearing the risk in the

litigation. And I agreed to that. I had no problem with that."  Q "And were you aware as to

whether there was a parallel agreement with Labaton? A: "I was aware at that time that the same

ask or arrangement was being requested of Labaton."); 143:13-23 ("The reason why Thornton

included these people in their lodestar was simply to recognize, I think, that apart from that

distinction, their physical location, Thornton was not making any less of a contribution to this

document review effort than the other two firms were. That was my belief. And that's what we

were trying to implement by keeping the numbers equitable as much as we could."); & 145:13-

25 ("I viewed Thornton as a co-equal partner in the venture in getting the job done and in bearing

the risk of the case. And as part of that I viewed it as fair that they would contribute the overall --

they would contribute to the overall burden of making sure that document review was staffed and

completed appropriately. And they did that. And I had no issue with them seeking to be treated

on an equitable basis for purposes of their fee petitions from us."); *see generally* Chiplock Dep.

(Sept. 8, 2017) at 48:2 – 63:6 (noting Lieff Cabraser's understanding that Thornton would list the

Staff Attorneys assigned to it on its own fee petition).

### 3.   Thornton Law Firm

Mike Thornton, Garrett Bradley, and Evan Hoffman of Thornton all testified that they

believed or assumed that Thornton should list the Staff Attorneys assigned to it, for whose

services it was paying, on its individual lodestar.  M. Thornton Dep. (June 19, 2017) at 81:3-5 ("I

mean, it was my understanding that if you paid for it, if you paid for the staff attorney, you'd get

the hours"); G. Bradley Dep. (June 19, 2017) at 76:6 – 77:22 ("My assumption all along is, since

we were on the papers, we're local counsel, that we would just include those people in our fee

petition and on a rolling basis, as we got towards the end and Evan Hoffman is asking for a daily

*Confidential -- Subject to Protective Orders*

breakdown of time for the individuals that are Thornton's, we just understood that to mean that we were going to put them on our fee application"); Hoffman Dep. (June 5, 2017) at 58:12-16 ("My understanding was that for attorneys who Thornton was financially responsible for, they would be included on whatever the ultimate fee petition [was] that Thornton would submit").

During the investigation, the Special Master has questioned why the three law firms entered into a cost- and risk-sharing arrangement that involved the assignment of individual Staff Attorneys to Thornton – in other words, why Thornton did not simply pay a general amount, possibly into the litigation fund, instead of being assigned particular attorneys. *See* Lesser Dep. (June 19, 2017) at 54:9-10; Heimann Dep. (June 17, 2017) at 79:7-15; Goldsmith Dep. (July 17, 2017) at 92:21-24.  As Thornton has explained in depositions, and as has been confirmed in other counsel's testimony (see section B.2 above), Thornton wanted to share equally because it wanted its cost and risk, and accordingly its *individual* lodestar, to place it on equal footing when it came to dividing the unallocated percentage of the Consumer Class Firms' portion of the fee (meaning, the fee remaining after the ERISA counsel's payment, and after the payment to Mr. Chargois).

While entering into an arrangement that spread cost and risk but did not involve the assignment of Staff Attorneys may have avoided the inadvertent double counting errors that were made, the amount of lodestar (without the double counting) would have been exactly the same had Thornton listed the Staff Attorneys, or had Lieff and Labaton listed them instead.  In other words, the firms' *aggregate* lodestar submitted to the Court would have been the same.

Thornton believed in good faith that entering into this cost- and risk-sharing staffing agreement was a means of achieving parity among the firms that would translate into parity in the division of the unallocated portion of the fee.  On the State Street matter, Thornton was thus aware of the need to share both cost <u>and</u> risk with co-counsel.  As Garrett Bradley testified in this

matter, "If you're not sharing in the risk as you go along, you're not going to have a very strong

or any argument" when it comes to division of the fee.  G. Bradley Dep. (June 19, 2017) at 46:4-

6.  *See also* G. Bradley Dep. (June 19, 2017) at 50:22 – 51:8 ("Clearly, I had a concern about our

load star…I wanted to make sure we were keeping pace with the other two firms who were

bigger than us and doing more of these type of cases. But I most definitely had a concern that we

were doing, taking our fair share of the risk so that we could get our fair share of the reward");

G. Bradley Dep. (June 19, 2017) at 67:2-13 (testifying that Thornton did not want to take the

risk, do the work, and not have evidence of such work in the form of lodestar).  Mike Lesser also

recalled the firms' efforts to make things equal.  Lesser Dep. (June 19, 2017) at 54:18-20 ("[T]he

division of the staff attorneys was a logical progression of that kind of parity between the firms")

*and* Lesser Dep. (June 19, 2017) at 54:9-20 ("[E]verything we'd done through the discovery

process with Lieff and Labaton had been a joint effort and we had achieved some level of parity.

And we had started with contributions to the litigation fund. Every time Catalyst needed more

money or Jonathan Marks needed more money, which was a few times because of all the

mediation sessions, we contributed equally. And the division of the staff attorneys was a logical

progression of that kind of parity between the firms").

  The other firms understood this concern as well.  Dan Chiplock of Lieff Cabraser

testified that the Consumer Class Firms' desire to bear cost and risk equally was "the

overarching understanding that animated the case throughout," and that the firms were concerned

about making equal contributions "so at the end of the day we wouldn't have one firm saying,

"Well, we did everything," or, "We did all this stuff and you didn't take on any of the risk,

therefore you don't get your fair share of the fee."  Chiplock Dep. (June 16, 2017) at 129:6-13;

*see also* Chiplock Dep. (Sept. 8, 2017) at 49:6-12 (reiterating that although there was no written

agreement, "[i]t seemed understood to me, and I believe the reason for Garrett's request, that they be allowed to contribute financially to the document review process would be for them to be able to say that they were contributing to the document -- to document review in the case and credit that in their lodestar").  Others from Lieff Cabraser shared this understanding.  Partner Steve Fineman testified that, to his knowledge, the cost-sharing agreement with respect to the Staff Attorneys was part of "was an effort to balance out the lodestar[.]"  Deposition testimony of Steve Fineman ("Fineman Dep.") (June 6, 2017) at 80:8-11.  Labaton likewise viewed the cost-sharing agreement as a hedge against some of the risk inherent in a large contingent litigation.  *See* Belfi Dep. (June 14, 2017) at 51:8-16 ("I was concerned about the status of where the case was, and the risk to or firm, so I wanted to make sure that this review was shared equally among the three firms[.]")

### Staff Attorney Rates

A matter intertwined with the above issue, which the Special Master also has raised, is whether Thornton was "authorized" to include the Staff Attorneys in its lodestar at higher rates than what Thornton was paying Labaton, Lieff Cabraser, or the third-party staffing agencies for those attorneys' work.  *See* M. Thornton Dep. (Sept. 1, 2017) at 55:18-2; G. Bradley Dep. (Sept. 14, 2017) at 166:14-17; *see also* Chiplock Dep. (Sept. 8, 2017) at 49:21 – 50:1. E-mails produced to the Special Master make clear that all three firms discussed billing Staff Attorneys at higher rates than what those Staff Attorneys were being paid (which all firms ultimately did). Dan Chiplock confirmed these discussions in his deposition testimony.  *See* LCHB-0052627, TLF-SST-011289-011292, and Chiplock Dep. (Sept. 8, 2017) at 52:2-15 ("It was my expectation that the three firms would be billing their document reviewers at comparable rates. And perhaps the same rate as I'm suggesting here" [referring to August 30, 2016 e-mail chain cited above]).

As Steve Fineman, the managing partner of Lieff Cabraser, testified, the billing rates of lawyers who perform work for the firm are not determined by the hourly rate paid to those lawyers, but rather by the market rate for those services. *See* Fineman Dep. (June 6, 2017) at 48:3-17 ("[T]he amount we pay the lawyers is not relevant to our discussion about how much we're going to peg their hourly rate at. That's a function of what the market in our view pays for those people and how much we pay them is insignificant. It is like an associate…the hourly rate for an associate is set based on what we understand to be the market rate for legal services provided by that person, not based on how much we pay that person."). The billing of Staff Attorney work at market rates instead of cost is a commonly accepted practice in the legal industry that is supported by public policy. This is equally true of how firms bill work by partners, associates, and paralegals. *See* Declaration of Professor William Rubenstein submitted with the Consumer Class Firms' August 1, 2017 Consolidated Response ("Rubenstein Decl.") at 27-30. The analysis performed by Professor Rubenstein confirms that the rates used by the three firms in this litigation were reasonable. *See* Rubenstein Decl. at 2, 27-30.

How Thornton paid for the Staff Attorneys' work – whether by paying invoices from Labaton or Lieff Cabraser, or by paying a third-party staffing agency directly – does not change this conclusion. Both agency and non-agency attorneys performed document review and drafted topical issue memoranda, both groups were barred attorneys who were well qualified for their roles, and both groups were supervised in the same manner. *See* Consolidated Response at 4-5. Accordingly, the firm claiming the attorneys' hours was entitled to use a reasonable market rate, instead of the cost rate, for the two groups alike. *See* Chiplock Dep. (Sept. 8, 2017) at 53:13 – 54:9 ("Now I don't know if you're suggesting that Lieff Cabraser ought to get to bill them at 415 or whatever we bill, but Thornton only gets to bill them at 40. That doesn't seem fair to me

because we're taking turns paying the agency . . . the agency lawyers [] were doing the same work as everybody else"); *see also* Fineman Dep. (June 6, 2017) at 41:4-8.  While all three firms have readily admitted their inadvertent errors in listing the same Staff Attorney time on more than one fee application, no firm has argued that it was an error for any firm to include the Staff Attorneys' hours at market rates instead of cost.  The Staff Attorneys on this case provided legal services that, under other circumstances, could have been performed by associates at the various firms.  The services they provided on this case were not akin to expenses, such as copying, that would be charged at cost.  *See* Fineman Dep. (June 6, 2017) at 53:15-24 ("[I]f I send documents out for copying charges and a copying charge is an acceptable expense in the jurisdiction which we're submitting a fee application, we will include that expense. But I don't equate the work being done for us by the lawyers with somebody running a copying machine, it is not a legal service").  There is no legal basis for distinguishing Thornton's use of market rates for Staff Attorneys from Lieff Cabraser's or Labaton's use of market rates.  All three firms paid for work performed by Staff Attorneys that was essential to the case, and all three firms charged reasonable market rates for that work, a commonly accepted and supportable industry practice.  *See* Rubenstein Decl. at 2, 27-30.

## The Consumer Class Firms' Use of Current Rates

To the extent there is any remaining question about Thornton's use of current billing rates for the individuals listed in its fee declaration, Thornton submits that using current rates for this six-year-plus litigation, instead of using historical rates, comported with law and with typical industry practice. *See* Rubenstein Decl. at 16, fn. 26.  Thornton understood from lead counsel that current rates were to be used, as demonstrated in a September 8, 2016 e-mail chain between Nicole Zeiss and Evan Hoffman previously produced to the Special Master.  In this e-mail

*Confidential -- Subject to Protective Orders*

exchange, Mr. Hoffman asked Ms. Zeiss: "[A]re we using historical billing rates or current rates for calculating lodestar? The language in your fee sample seems to indicate we're using current rates. Just want to make sure, thanks[.]" Ms. Zeiss responded to Mr. Hoffman: "Current." TLF-SST-013739 – TLF-SST-013741.


Dated:  November 3, 2017

Respectfully submitted,

*/s/ Brian T. Kelly*_____
Brian T. Kelly (BBO #549566)
Emily C. Harlan (D.C. Bar No. 989267)
Eric J. Walz (BBO #687720)
NIXON PEABODY LLP
100 Summer Street
Boston, MA  02110
Telephone: (617) 345-1000
Facsimile: (617) 345-1300
E-mail:  bkelly@nixonpeabody.com

*Attorneys for the THORNTON LAW FIRM, LLP*

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

## THORNTON LAW FIRM LLP'S APRIL 12, 2018 RESPONSE TO SPECIAL MASTER HONORABLE GERALD E. ROSEN'S (RET.) REQUEST FOR ADDITIONAL SUBMISSION

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

On February 23, 2018, Special Master Gerald E. Rosen, through counsel, provided the parties to this investigation with a report by the Special Master's expert, Professor Stephen Gillers, titled "Ethical Report for Special Master Gerald E. Rosen" (hereinafter, "Gillers Report" or "Report").  The Special Master then invited Labaton Sucharow LLP ("Labaton"), Lieff Cabraser Heimann & Bernstein LLP ("Lieff Cabraser"), and the Thornton Law Firm LLP ("Thornton Law Firm") (collectively, the "Law Firms") to submit additional supplemental submissions addressing issues raised in the Gillers Report and Professor Gillers' deposition testimony, and the declarations and deposition testimony of the rebuttal experts designated by the Law Firms.  The Thornton Law Firm submits this response to the Special Master's request.

In making this submission, the Thornton Law Firm incorporates by reference its prior submissions to the Special Master, namely: (1) the Consolidated Response by Labaton Sucharow LLP, Lieff Cabraser Heimann & Bernstein LLP, and Thornton Law Firm LLP to Special Master's July 5, 2017 Request for Supplemental Submission, dated August 1, 2017, and (2) Thornton Law Firm LLP's Response to Special Master Honorable Gerald E. Rosen's (Ret.) September 7, 2017 Request for Additional Submission, dated November 3, 2017.

## Procedural Background

On November 30, 2017, the Law Firms were notified that the Special Master had retained an expert, Professor Stephen Gillers of the New York University School of Law, to address issues relating to the portion of the fee paid to attorney Damon Chargois.[1]  With the Law Firms' agreement, the Special Master sought an extension of the December 15, 2017 deadline for his Report and Recommendation.  In a letter to the Court seeking the extension, the Special Master

---

[1]     Professor Gillers testified that he was first contacted by the Special Master in October 2017.  3/20/18 Gillers Dep. at 16:17-21.

informed the Court that he and his counsel had retained the expert to opine on "additional issues" raised by the discovery in the case, specifically in response to a "second, more narrowly focused expert" retained by the Law Firms.[2]  The letter further provided that the Special Master's expert hoped to have his report completed by the end of January 2018.  On December 14, 2017, the Court issued an order granting the request for an extension to March 15, 2018, and attaching the Special Master's letter to the Court.  Dkt. 214.

The Law Firms received Professor Gillers' Report on the evening of Friday, February 23, 2018.  In his 85-page report, Professor Gillers opined not only on legal issues concerning the fee paid to attorney Damon Chargois (*i.e.,* the "additional issues" mentioned in the Special Master's letter to the Court), but also addressed other issues that did not concern Mr. Chargois, namely, whether the use of inaccurate, boilerplate language in the fee declaration filed by Garrett Bradley constituted sanctionable conduct.[3]  Notably, the Gillers Report did not mention the fact that Labaton and Lieff Cabraser used some of the exact same boilerplate language in their declarations.[4]

When the Report was issued to the Law Firms on February 23, 2018, it was immediately clear that depositions of Professor Gillers and other (to-be-designated) rebuttal experts could not be completed in any meaningful fashion before the March 15, 2018 deadline for the Special

---

[2]    The expert referenced is Camille Sarrouf, who was retained by Labaton, and whose declaration was included with Labaton's November 3, 2017 submission to the Special Master.

[3]    "[E]xpert testimony proffered solely to establish the meaning of a law is presumptively improper." *United States v. Prigmore*, 243 F.3d 1, 18 n.3 (1st Cir. 2001).  Here, where Professor Gillers opines on questions of law, or applies the law to a statement of facts—particularly where the statement of facts was not subject to scrutiny by the adversarial process—his expert testimony is improper.  *See Fishman v. Brooks*, 396 Mass. 643, 650 (1986) ("Expert testimony concerning the fact of an ethical violation is not appropriate, any more than expert testimony is appropriate concerning the violation of, for example, a municipal building code.").

[4]    For example, while all three Law Firms generally work on a contingency basis, *see* 3/17/17 Hearing at 79:9-80:3; 88:8-13; 93:11-21, all three Law Firms asserted in their Declarations that the rates listed "are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions" and are "based on my firm's current billing rates."  *Compare* Declaration of Lawrence Sucharow (Dkt. 104-15) and Declaration of Dan Chiplock (Dkt. 104-17) *with* Declaration of Garrett Bradley (Dkt. 104-16).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Master's Report and Recommendation.  Accordingly, the Special Master sought another extension for his Report and Recommendation—this time to April 23, 2018—in a letter to the Court dated February 28, 2018.  This detailed letter recounted the discussions between the Special Master, his counsel, and the Law Firms regarding the issues raised by the February 23, 2018 issuance of Professor Gillers' Report.  On March 1, 2018, the Court issued an order on the docket granting the Special Master a final extension to April 23, 2018, and attaching the Special Master's February 28, 2018 letter.

Following the issuance of the Gillers Report, expert discovery proceeded swiftly.  The Law Firms were required to identify and designate any rebuttal experts by March 10; submit the expert reports by March 26; and participate in expert depositions held on March 20, 21, 24, and April 3, 4, 9, and 10.  Professor Gillers was deposed on March 20 and 21, and Labaton's previously designated expert Camille Sarrouf was deposed on March 21 and 24.  In response to the scope and substance of Professor Gillers' Report, the Law Firms designated a total of seven rebuttal experts (four by Labaton, one by the Thornton Law Firm, and two by Lieff Cabraser, one of whom is Professor William Rubenstein, who submitted an expert declaration in support of the Law Firms' consolidated submission dated August 1, 2017).  These experts' reports were due and submitted on March 26, 2018 (16 days after the March 10 deadline for expert designations).  The Special Master deposed the Law Firms' experts on April 3, 4, 9, and 10.  Per the schedule mandated by the Special Master and his counsel, written submissions by the Law Firms, including this submission, were submitted on April 12, 2018 in advance of oral argument on April 13, 2018.

**Preliminary Statement**

As Professor Gillers' Report states, and as he confirmed in his deposition testimony, he incorporated and relied on a detailed statement of facts prepared by counsel for the Special Master in reaching the conclusions in his Report.  This statement of facts (titled "Factual Background") comprises 53 pages of the 85-page Gillers Report.  The statement of facts – which Professor Gillers "assume[d] is true for purposes of [his] opinion," Gillers Rep. at 2 – is riddled with blatant errors and repeated mischaracterizations of the record evidence.  When confronted with a sampling of these issues at his deposition, Professor Gillers conceded that he did not do any investigation into the facts beyond relying on the statement provided, and acknowledged that he did not know why other directly pertinent evidence had not been provided to him.  *See, e.g.*, 3/20/18 Gillers Dep. at 262:12-263:6; 290:6-292:1; 302:18-303:3; 308:3-308:5.

Where conclusions are based on misstated, incomplete, or misleading facts, their reliability is inherently questionable and should be rejected.  *See United States v. Rubashkin*, No. 08-CR-1324-LRR, 2010 WL 4362455, at *6 n.7 (N.D. Iowa Oct. 27, 2010) (rejecting, in another matter, Prof. Gillers' testimony and noting, "Given these experts' proclivity to rely on defense counsel's mischaracterization of the facts, the court declines to credit their affidavits.").  And where, as here, the drafters of the facts clearly ignored evidence that would make the statement of facts more accurate, more complete, and more fair, it appears that the drafters are intent on proving a preconceived narrative and are not engaged in a neutral fact-finding process.  Indeed, the Special Master's insistence that Professor Gillers participate in all of the other experts' depositions, over the objections of the Law Firms, undermines the appearance of a neutral fact-finding process.  Accordingly, and for reasons set forth more fully below, the

Thornton Law Firm objects to the Special Master's use of, reliance on, and/or incorporation of the Gillers Report.

## I.     BECAUSE "FACTS MATTER," THE GILLERS REPORT IS NOT RELIABLE.

As Professor Gillers testified at his deposition, "facts matter." 3/20/18 Gillers Dep. at 155:11. Here, the facts supplied to Professor Gillers, which he expressly assumed to be true, are riddled with errors, omissions, and material mischaracterizations. As Professor Gillers conceded, his opinion would be worthless if it were found to be based on inaccurate, misleading, or incomplete facts. *Id*. at 265:11-15.

In his deposition, after being shown multiple examples of record evidence that had been ignored, misquoted, or taken out of context, Professor Gillers attempted to explain away at least some of these deficiencies by immediately asserting that he did not rely on the erroneous facts for his opinions. *See, e.g.*, *id*. at 289:21-290:9; 360:3-11. For at least two reasons, this tactic must be rejected. First, where so many of the facts provided to Professor Gillers were erroneous, incomplete, or mischaracterized—in contrast to a situation in which only a few facts are wrong—it becomes clear that the entire Report is infected with those deficiencies. Second, whether or not he expressly ties each fact to a particular conclusion, Professor Gillers assumed the facts in the statement are true, *see* Gillers Rep. at 2, and all of his conclusions derive in some fashion from his overall understanding of the facts.

The 53-page statement of facts is replete with erroneous and incomplete facts. For example:

**Page 16** of the Gillers Report states that "No explicit or implicit agreement to allow TLF to claim the Labaton and Lieff SAs on TLF's lodestar has been disclosed during the Special Master's investigation." This assertion bears directly on Professor Gillers' conclusions regarding

misstatements in Garrett Bradley's declaration (and, as is clear from other depositions, the Special Master's view of motive).  Yet this "fact" is clearly contradicted by testimony and other record evidence from members of all three Law Firms showing the existence of an agreement.[5]

The Thornton Law Firm addressed this issue at length in its November 3, 2017 submission to the Special Master, citing deposition testimony, interrogatory answers, and contemporaneous emails evidencing the existence of an agreement.  *See* Thornton Law Firm's November 3, 2017 submission at pp. 3-18 (which the Thornton Law Firm incorporates here by reference).  For unknown reasons, Professor Gillers apparently did not have or take the opportunity to review that submission.  As that submission details, Dan Chiplock of Lieff Cabraser testified at length in his two depositions that he understood there was an agreement: "It was completely understood by me when I talked with Garrett that that would be how it worked, because it was obvious to me that if you pay for the work that is being done…that you include their hours in your lodestar when you report it at the end of the day…it was just obvious." 6/16/17 Chiplock Dep. at 136:10-22.[6]  Both Michael Rogers and Eric Belfi, partners at Labaton, assumed (or, if they had been asked at the time, would have assumed) that the Thornton Law Firm was going to claim the staff attorneys in its (Thornton's) fee declaration.  *See, e.g.*, 6/16/17 Rogers Dep. at 91:18-23.  Much for the same reasons cited by Dan Chiplock, Michael Rogers surmised that the Thornton Law Firm would include them: "They were paying for it up-front, I assume they wanted to get paid on the back end."  *Id*. at 92:14-16.  *See also* Labaton Response to Interrogatory No. 33.  And, naturally, the Thornton Law Firm believed in good faith—and based on its understanding with Labaton and Lieff Cabraser—"that for attorneys for who Thornton was

---

[5]    At a minimum, there was an implicit agreement.  *See* Implicit, *American Heritage Dictionary* (5th ed. 2018) ("Implied or understood though not directly expressed.").

[6]    Additional relevant citations from Mr. Chiplock's testimony are listed on pages 3 to 18 of the Thornton Law Firm's November 3, 2017 submission.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

financially responsible for, they would be included on whatever the ultimate fee petition [was] that Thornton would submit." 6/5/17 Hoffman Dep. at 58:12-16.

The Gillers Report does not cite any of this testimony.  In fact, on page 15, the Report entirely omits Dan Chiplock's testimony in providing support for the assertion that Lieff Cabraser and Labaton were focused on the cost-spreading aspect of the arrangement, and not on what information would be reported on a fee petition.  The negative and unfair inference, of course—which is clear because this sentence is followed by one stating that the Thornton Law Firm claimed the staff attorneys allocated to it—is that no one from Lieff Cabraser or Labaton thought about this, and therefore the Thornton Law Firm took advantage.  This flies in the face of the testimony Professor Gillers failed to review.

Even if the Special Master has determined (without offering any basis for so concluding) that he does not credit the testimony of Dan Chiplock, Michael Rogers, or Evan Hoffman on this issue, the November 10, 2016 letter to the Court plainly states the Law Firms' view that the overlap in the listing of Staff Attorneys was the result of mistakes in Labaton's and Lieff Cabraser's lodestars, not in the Thornton Law Firm's.  *See* 11/10/16 Letter from David J. Goldsmith to Hon. Mark L. Wolf at 2 (Dkt. 116).  Contemporaneous emails sent during the drafting of the November 10, 2016 letter support this as well.  *See* TLF-SST-012138 (11/9/2016, 7:01 PM email from Dan Chiplock to David Goldsmith, Michael Lesser, and Evan Hoffman stating that two Staff Attorneys appearing on both TLF and Lieff Cabraser petitions "should not have been included in LCHB's lodestar at all" because the two "were Thornton contract reviewers throughout 2015," and remarking that he "failed to catch that after our accounting department ran everyone's lodestar, and apologize").  *See also* TLF-SST-012191 (11/10/2016 email from David Goldsmith of Labaton to Mike Lesser of the Thornton Law Firm, copying

entire counsel group, assuring Mr. Lesser that removal of any overlapping Staff Attorney hours from the Thornton Law Firm's lodestar for the November 10, 2016 letter was the result of a conservative, lowest-rate approach only, and stating that "the intent is not to suggest that Thornton time is less legitimate").  The Gillers Report ignores these emails and the other record evidence that substantiate the agreement between the Thornton Law Firm, Lieff Cabraser, and Labaton that the Thornton Law Firm would include the Staff Attorneys for whose work it paid in its lodestar chart.

　　　**Pages 15-16 and 50** of the Gillers Report discuss the Thornton Law Firm's use of a rate of $425 per hour for work by the Staff Attorneys assigned to the Thornton Law Firm.  On pages 15-16, the Gillers Report states: "In its fee petition, TLF billed all SA time at an hourly rate of $425 (a rate approved by the Court for Lieff SAs in BONY Mellon). Except for three SAs, the $425 per hour rate charged by TLF was greater than the rates requested by Lieff or Labaton for the same individuals in their lodestar petitions."  And on page 50, the Gillers Report states that the cross-allocation of the Staff Attorney time "dramatically inflated the lodestar of TLF."

　　　As to the first issue, the $425 per hour rate, the Gillers Report makes no mention of contemporaneous emails produced to the Special Master that make clear that the Thornton Law Firm used the $425 per hour rate because Lieff Cabraser suggested it, and because it had been accepted in BONY Mellon.  *See* TLF-SST-011263.  Nor does the Report mention Dan Chiplock's testimony on this issue, namely: "And so Thornton I think by and large used 425, perhaps thanks to this e-mail from fall of 2015, where I said, 'in Bank of New York Mellon I think we used 425,' which I think we did, because Thornton was involved in that case, too.  So they used 425."  6/16/17 Chiplock Dep. at 184:20-25.  The result is that the Gillers Report

provides no context for the Thornton Law Firm's use of this hourly rate even when context plainly exists in the record.

Further, this section of the Gillers Report tellingly does not address the declaration of Professor William Rubenstein that the Law Firms submitted to the Special Master on August 1, 2017.  In his declaration, which dealt squarely with rates, Professor Rubenstein concluded, based on empirical research, that an hourly rate of $425 was within the range of reasonableness for this work.  *See* 7/31/17 Declaration of William B. Rubenstein at 27-30.  Yet Professor Gillers testified that he was not provided with this declaration by Professor Rubenstein, and does not know why.  3/20/18 Gillers Dep. at 299:2-16.

As to the second issue, the effect of a $425 per hour rate on the Thornton Law Firm's lodestar, the Gillers Report asserts on page 50 that the cross-allocation of Staff Attorney time "dramatically inflated the lodestar of TLF."  This statement wrongfully suggests that the duplication errors acknowledged by the Law Firms were the Thornton Law Firm's errors, and had the effect of "inflat[ing]" the Thornton Law Firm's lodestar number beyond what it should have reported.  This prejudicial statement ignores contemporaneous emails in which lawyers from both Labaton and Lieff Cabraser acknowledged that the errors were theirs and/or that "the intent is not to suggest that Thornton time is less legitimate[.]"  *See* TLF-SST-012138 (11/9/2016, 7:01 PM email from Dan Chiplock to David Goldsmith, Michael Lesser, and Evan Hoffman stating that two Staff Attorneys appearing on both Thornton Law Firm and Lieff Cabraser petitions "should not have been included in LCHB's lodestar at all" because the two "were Thornton contract reviewers throughout 2015," and remarking that he "failed to catch that after our accounting department ran everyone's lodestar, and apologize").  *See also* TLF-SST-012191 (11/10/2016 email from David Goldsmith of Labaton to Mike Lesser of the Thornton

Law Firm, copying counsel group, assuring the Thornton Law Firm that removal of any overlapping Staff Attorney hours from the Thornton Law Firm's lodestar for the November 10, 2016 letter was the result of a conservative, lowest-rate approach only, and assuring Mr. Lesser that "the intent is not to suggest that Thornton time is less legitimate"). Neither of these emails is referenced anywhere in the Gillers Report.

Furthermore, the description of the Thornton Law Firm's lodestar in the Gillers Report as having been "dramatically inflated" echoes statements the Special Master and his counsel have made about the Thornton Law Firm's supposed motive for listing Staff Attorneys in its fee petition, for charging them at a rate of $425, and for failing to clarify template language concerning the Staff Attorneys. Specifically, the Special Master and counsel have asserted in front of numerous witnesses that this was an effort on the Thornton Law Firm's part to "jack up" the firm's lodestar. *See, e.g.*, 4/10/18 Vairo Dep., *passim*. As with numerous other "facts" in the Gillers Report, however, there is evidence flatly contradicting the Special Master's theory, which apparently was not provided to Professor Gillers. Specifically, the evidence shows that the Law Firms reached an agreement among themselves as to how to split their *entire* portion of the fee— including how to divvy up the previously unallocated 40%—in August 2016, *i.e.,* **before any fee declarations were filed with the Court**. *See* TLF-SST-056305 (signed fee agreement); 6/19/17 G. Bradley Dep. at 46:24-47:3 ("[W]e had a fee agreement in place in August of '16 before we filed the fee application. We knew at the time what our fee was going to be"); *id*. at 62:9-63:8; 9/8/17 Chiplock Dep. at 135:6-9 (stating that "the fee agreement, the fee allocation agreement was reached in late August of 2016"). It therefore makes no sense to suggest, where the Court had already indicated its approval of a 25% fee based on the common fund approach, and the fee split among the Law Firms had been agreed to in August 2016, that the Thornton Law Firm

would have had any motive to "dramatically inflate[]" the lodestar in its September 2016 fee declaration in an attempt to mislead the Court.

**Pages 20 to 21** of the Gillers Report quote a portion of an August 30, 2015 email from Dan Chiplock (TLF-SST-031166) and characterize it as follows: "The discussion turned to lodestar reporting in State Street with Chiplock warning Bradley not to include unwarranted hours in TLF's fee petition."

In this email, which was read and discussed at length in numerous depositions, Mr. Chiplock comments on information he heard regarding the Thornton Law Firm's expected total lodestar number. The quoted portion of this email itself has clear indicia of uncertainty: Mr. Chiplock notes that he heard the information "third-hand" and that it occurred on a call in which he did not participate. TLF-SST-031166. The Gillers Report cites the email to support the wholly unsubstantiated notion that there was concern among the Law Firms about the Thornton Law Firm inflating its lodestar. Indeed, the conclusion here previews another faulty portion of the Gillers Report, on page 50, where the Report states that the cross-allocation of the Staff Attorney time "dramatically inflated the lodestar of TLF."

As with other record evidence cited in the Report, the Gillers Report selectively quotes this email and omits other pertinent portions of the chain. The Report ignores a later email in this very chain in which Mike Thornton clarifies that his estimate was a guess. Nor does the Report mention an internal Thornton Law Firm email, sent a half hour after Mike Thornton's email, in which Mike Lesser remarks that the number estimated by Mike Thornton would represent the Thornton Law Firm's share of the fee, not the size of its lodestar (and thus suggests that Mike Thornton had, indeed, mistakenly transposed terms earlier). TLF-SST-038587.

In quoting only the email from Dan Chiplock, the Gillers Report entirely ignores other record evidence specifically regarding it, including deposition testimony of Mr. Chiplock directly addressing what he meant in this email.  When asked about this email during his deposition, Mr. Chiplock testified: "Probably I am frustrated at this point given the dialogue that's led up to that e-mail, but I think Mike Thornton may have simply been mistaken because that's not the number they ultimately reported.  What they ultimately reported was a number closer to what I had been informed of on June 29th."  9/8/17 Chiplock Dep. at 64:14-20.

The Special Master and his counsel focused on this email in multiple depositions, quoting it at length to multiple witnesses.  Yet not a single interpretation of this email that contravenes the Special Master's interpretation—including the one in Mr. Chiplock's own testimony—is cited in the Report, demonstrating that the effort here was to fit the facts to a particular theory rather than to conduct a neutral search for the truth.

Moreover, the portion of this email that *is* cited in the Gillers Report supports another key point that the Report otherwise ignores.  Specifically, in this email, Mr. Chiplock states that Mike Lesser provided him with an estimate of the Thornton Law Firm's hours as of June 29, 2015, which were "around 12,750."  TLF-SST-031166.  Indeed, the Thornton Law Firm has identified this June 29, 2015 email from Mr. Lesser to Mr. Chiplock in this submission and in its previous submission to the Special Master.  In that email, numbered TLF-SST-011206, Mr. Lesser estimated the hours in the Thornton Law Firm's lodestar.  Mr. Lesser broke down the document review hours contributing to the Thornton Law Firm's lodestar into two categories: "Thornton doc review external (Thornton reviewers working Lieff + Labaton paid by Thornton)" and "Thornton doc review internal."  Mr. Lesser's e-mail clearly informed Mr. Chiplock that the Thornton Law Firm was including the Thornton-assigned reviewers working at Lieff and at

Labaton in its lodestar calculation.  Mr. Chiplock then referred to this estimate of 12,750 hours in

his email dated August 30, 2015, which was sent to lawyers from all three Law Firms.  There can

be no question than an estimate of more than 12,000 hours was clearly understood to include

document review hours, based on the relative hours of the other firms.  *See* Gillers Rep. at 25

(chart showing time spent by Law Firms' "Partners and Associates" versus "Staff Attorneys").

Mr. Chiplock, at least, knew this explicitly, and in fact references the Staff Attorneys in his

email.[7]

> **In sum**, as these examples demonstrate, it is unfair and misleading for Professor Gillers

to fail to reference these pieces of pertinent record evidence, and many others, in the statement of

facts underpinning his Report.  Indeed, the value of his opinion depends on the completeness and

truthfulness of the facts.  *See, e.g.*, 3/20/18 Gillers Dep. at 265:11-15.

## II.   SANCTIONS AGAINST THORNTON LAW FIRM PARTNER GARRETT BRADLEY ARE NOT JUSTIFIED.

> Page 24 of the Gillers Report states: "There is ample evidence in the record that Garrett

Bradley actually knew the Declaration contained inaccurate information but signed it anyway."

In support of this broad and false assertion, the Gillers Report cites only to the transcript of the

Court's March 7, 2017 hearing.  Conspicuously absent is citation to any statement, in that

hearing or otherwise, demonstrating that Garrett Bradley knew or realized, when he signed the

boilerplate declaration, that it contained inaccurate statements.  At his deposition, when asked

about this statement, Professor Gillers acknowledged that he did not have any basis to know

---

[7]    With regard to this final sentence in the quoted email, the Gillers Report fails to mention the testimony of
Labaton's Ray Politano, which confirmed that the Thornton Law Firm paid the overhead for the Staff Attorneys
housed at Labaton.  *Compare* TLF-SST-000415 (Ray Politano of Labaton stating the $50 hourly rate Labaton was
charging to Thornton) and TLF-SST-000403 to TLF-SST-000414 (Labaton invoices paid by Thornton showing $50
per hour rate) *with* 6/14/17 Politano Dep. at 18:3-9 (Politano stating that Staff Attorneys were paid between $32 and
$40 per hour).  *See also* 7/19/17 G. Bradley Dep. at 93:23-95:5; 9/1/17 Thornton Dep. at 52:9-17.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

whether or not Garrett Bradley knew he submitted a false statement to the Court.  3/20/18 Gillers

Dep. at 315:12-317:1. Professor Gillers also acknowledged that he had no basis for making any

conclusion as to Garrett Bradley's mental state and was simply assuming the facts provided to

him were true.  *Id.* at 269:1-4, 19-23; 270:15-24:

> Q: You yourself don't personally know whether or not Garrett Bradley knowingly made
>    any false misrepresentation, do you?
> A: That's correct.
>
> ***
>
> Q: So you have not concluded anything about Garrett Bradley's mental state.  You're
>    relying on an assumption that was provided to you?
> A: Correct.
>
> ***
>
> Q: Well you don't, as you said, know what he was thinking when he signed this, do you?
> A: No.
> Q: You don't know how careless he may have been in scrutinizing the boilerplate
>    template that he signed, right?
> A: I do not know.
> Q: So you're not in a position to testify that he knowingly submitted anything, are you?
> A: Correct.

### A.  Garrett Bradley Did Not Violate Massachusetts Rule of Professional Conduct 3.3(a)(1).

As Professor Gillers himself acknowledged, the test for whether an attorney violated Rule

3.3(a)(1) is subjective.  3/20/18 Gillers Dep. at 272:4-21.  That is, in determining whether there

has been a violation, the tribunal must ask not what the reasonable attorney would have known,

but what the attorney actually knew when he presented facts to the Court.  The Rules define

"knowingly" as "actual knowledge of the fact in question."  Mass. Rule of Prof. Conduct 1.0(g).

This intent standard does not reach negligent misrepresentations.  *See* Gillers Dep. at 316:13-16

("Q:  And would you agree that not every careless mistake an attorney makes amounts to an

ethical violation?  A:  Yes.").

Here, as Professor Gillers stated in his Report, his conclusions with regard to Garrett Bradley depend on the crucial factual assumption that "Garrett Bradley knew these statements were false **when he submitted his Declaration**."  Gillers Rep. at 81 (emphasis added).  Of note, there is a difference between knowing the underlying factual matters (*e.g.,* that the Staff Attorneys were not "employees of [the Thornton Law] firm") and knowing that **at the time the declaration was being submitted to the Court, it contained inaccuracies**.

Here, there is no evidence that Garrett Bradley had "actual knowledge" that the declaration submitted on September 14, 2016 contained "false" information.  On the contrary, the record is consistent with the fact that Garrett Bradley relied on Labaton's boilerplate fee petition and assumed it was correct rather than engaging in a careful review of the language prior to submitting the fee petition to the Court.  The "ample evidence" cited in Professor Gillers' statement of facts for the proposition that Garrett Bradley "knew" his declaration contained false information is nothing more than a collection of cites to the March 7, 2017 hearing before Judge Wolf.  At that hearing, Garrett Bradley was forthcoming about the mistakes in the declaration and noted that "we should have been clearer in this and that fault lies with me."  3/7/17 Hearing at 91:4-7.  Garrett Bradley's admission of an inadvertent mistake does not lead to the conclusion that he knowingly submitted false statements to the Court.  As Professor Gillers admitted in his deposition, a careless mistake is not equivalent to a knowing misrepresentation.  3/20/18 Gillers Dep. at 269:5-7 ("Q:  And a careless mistake does not equal a knowing misrepresentation to a Court, does it? A:  It does not.").  This is a critically important distinction yet—to date—one that is being clearly ignored.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**B.  Garrett Bradley Did Not Violate Massachusetts Rule of Professional Conduct 8.4(c).**

For the same reasons Garrett Bradley did not violate Massachusetts Rule of Professional Conduct 3.3(a), he also did not violate Rule 8.4(c).  Rule 8.4(c) requires intentionality and does not reach negligence.  *See In re Royal C. Thurston, III,* 13 Mass. Att'y Disc. R. 776 (Board Memorandum, May 12, 1997) (striking hearing committee's finding that attorney violated DR 1-102(A)(4) [predecessor to 8.4(c)] and noting, "As Bar Counsel concedes, a negligent misrepresentation does not violate DR 1-102(A)(4) because the rule prohibits only intentional conduct.").  Professor Gillers agrees that the mental state required for a Rule 8.4 violation should not be lower than the mental state required for a Rule 3.3 violation.  3/20/18 Gillers Dep. at 275:9-21.  *See also id.* at 316:17-20 ("Q:  And not every careless mistake an attorney makes is willful misconduct designed to mislead a federal judge?  A:  Yes, I agree.").

As set forth above, Garrett Bradley did not have "actual knowledge" of any false statements to the Court and did not intend to make any false statements to the Court.  Any inaccuracies contained in his declaration were the result of mistakes or inadvertent errors—not knowing and intentional false submissions to the Court.

**C.  Garrett Bradley Did Not Violate Rule 11.**

As Rule 11 expert Professor Georgene Vairo testified, sanctioning a lawyer pursuant to Rule 11 is a severe penalty that should not be imposed broadly.  4/10/18 Vairo Dep. at 77:1-8.  *See also McGee v. Town of Rockland,* No. 11-CV-10523-RGS, 2012 WL 6644781, at *1 (D. Mass. Dec. 20, 2012) ("Rule 11 sanctions should be reserved for only the most egregious of lawyerly missteps.").  *See also* 3/20/18 Gillers Dep. at 276:10-13 ("Q:  So now you'd agree, sir, that not every mistake a lawyer makes should be subject to a Rule 11 sanction, correct?  A:  Yes, I agree.  Yes.").  As the First Circuit noted in reversing a district court's imposition of sanctions,

"Courts ought not to invoke Rule 11 for slight cause; the wheels of justice would grind to a halt if lawyers everywhere were sanctioned every time they made unfounded objections, weak arguments, and dubious factual claims." *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 33, 39-40 (1st Cir. 2005).

In this proceeding, it is vital to heed the First Circuit's warning that "Civil Rule 11 is not a strict liability provision." *Eldridge v. Gordon Bros. Grp.*, 863 F.3d 66, 88 (1st Cir. 2017) (internal quotation marks omitted). Statements that are "literally inaccurate" may not be sanctionable because "Rule 11 neither penalizes overstatement nor authorizes an overly literal reading of each factual statement." *Navarro-Ayala v. Hernandez-Colon*, 3 F.3d 464, 467 (1st Cir. 1993). Here, although certain statements in the declaration were "inaccurate or overstated, … further inquiry would not have shown the motion's requests to have been baseless." *Id.*

The case at bar is on all fours with *Navarro-Ayala*. There, the First Circuit reversed the District Court's finding of sanctions because "the motion, **read fairly and as a whole**, contain[ed] **no significant false statement** that **significantly harmed** the other side." *Id.* (emphasis added). In so holding, the First Circuit noted that "We emphasize the word 'significant' because the district court found one sentence literally false," and further explained that, "the district court, at most, could have found a few isolated instances of noncritical statements that further inquiry might have shown to be inaccurate or overstated. That further inquiry would not have shown the motion's requests to have been baseless." *Id.* at 467-468. *See also Obert v. Republic W. Ins. Co*, 398 F.3d 138, 143-144 (1st Cir. 2005) (reversing Rule 11 sanctions where "the affidavit was not knowingly false as to any material fact, although one of the statements may well have been factually inaccurate and another was a dubious and

unattractive piece of lawyer characterization" and describing the affidavit as "an unsound piece of lawyer advocacy rather than a lie about a fact.").

Viewed fairly and in context, Garrett Bradley's declaration was an isolated instance of inattentiveness due to reliance on boilerplate language that he knew had been prepared by experienced counsel.  Much of this boilerplate language was used by all three Law Firms.  Once the errors were brought to Garrett Bradley's attention, he took corrective action.  With respect to the double counting, he immediately contacted co-counsel and ensured that within two days the Court was informed of the errors.  6/19/17 G. Bradley Dep. at 85:23-86:11; 6/5/17 Hoffman Dep. at 99:7-102:24; 6/14/17 Zeiss Dep. at 18:13-19:9; 11/10/16 Letter from David J. Goldsmith to Hon. Mark L. Wolf (Dkt. 116).  With respect to the template language issues in the declaration, which, unlike the "double counting," Garrett Bradley only realized later, Mr. Bradley took responsibility and acknowledged, during the March 2017 hearing, that certain aspects of his declaration were factually incorrect.  *See, e.g.,* 3/7/17 Hearing at 91:4-7.  There is simply no evidence that Garrett Bradley had any intention to mislead the Court.  *Cf. United States v. Jones*, 686 F. Supp. 2d 147, 150 (D. Mass. 2010) (Wolf, J.) (imposing no sanctions against prosecutor who, due to "inexplicable and inexcusable" errors, inadvertently neglected to disclose important exculpatory material to defendant).

## III.  CONCLUSION

For the reasons expressed in this submission and in the record evidence, the Thornton Law Firm submits that reliance on the Gillers Report is unsound, and accordingly objects to the Special Master's use of, reliance on, and/or incorporation of the Report.  Additionally, no sanction in this case is justified.

Dated:  April 12, 2018

Respectfully submitted,

*/s/ Brian T. Kelly*_____
Brian T. Kelly (BBO No. 549566)
Emily C. Harlan (D.C. Bar No. 989267)
Joshua C. Sharp (BBO No. 681439)
NIXON PEABODY LLP
100 Summer Street
Boston, MA  02110
Telephone: (617) 345-1000
Facsimile: (617) 345-1300
E-mail:  bkelly@nixonpeabody.com

*Attorneys for the THORNTON LAW FIRM LLP*

# EXHIBIT 4



**Brian T. Kelly**
*Partner*
T 617-345-1065
bkelly@nixonpeabody.com

100 Summer Street
Boston, MA 02110-2131
617-345-1000

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

April 17, 2018

**BY ELECTRONIC MAIL**

William Sinnott, Esq.
Donoghue Barrett & Singal, P.C.
One Beacon Street, Suite 1320
Boston, MA 02108-3106

> **RE:**   *Arkansas Teacher Retirement System, et al. v. State Street Corporation, et al.,*
> No. 11-cv-10230-MLW

Dear Bill:

During last Friday's oral argument, it appeared that Special Master Rosen has reached the erroneous conclusion that the Thornton Law Firm bears more responsibility than Labaton Sucharow ("Labaton") and Lieff Cabraser Heimann & Bernstein ("Lieff") for the inadvertent double counting errors identified in the November 10, 2016 letter to the Court. This conclusion, if one the Special Master is inclined to reach, is clearly contradicted by the evidence.

As I noted during the oral argument, the November 10, 2016 letter itself states that the inadvertent double counting occurred in the Labaton and Lieff lodestars. This letter was the product of drafting and close review by all three firms. In the bullet point list on page two of that letter, the word "mistakenly" clearly modifies the references to the Labaton and Lieff lodestar reports:

> " • The hours of the Alper SAs reported in the Thornton lodestar report **mistakenly were also reported in the Labaton Sucharow lodestar report.**
>
> • Certain hours reported by one of the Alper SAs (S. Dolben) in the Thornton lodestar report mistakenly duplicated certain hours of another Alper SA (D. Fouchong).
>
> • A portion of the hours of two of the Jordan SAs reported in the Thornton lodestar report (C. Jordan and J. Zaul) **mistakenly were also reported in the Lieff Cabraser lodestar report.**

William Sinnott, Esq.
April 17, 2018
Page 2

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

- The hours of two other Jordan SAs (A. Ten Eyck and R. Wintterle) **mistakenly were included in the Lieff Cabraser lodestar report**."

*See* Exhibit A, Dkt. 116 at 2 (emphasis added).

In addition to the language in the November 10, 2016 letter, an email sent by Dan Chiplock of Lieff during the letter drafting process leaves no doubt that Lieff accepted responsibility for the double counting in the Lieff and Thornton lodestars. As Mr. Chiplock very clearly laid out in the following email to David Goldsmith (Labaton), Michael Lesser (Thornton), and Evan Hoffman (Thornton), dated November 9, 2016:

"Here is what I've been able to determine, in order of most to least significant:

(1) Rachel Wintterle and Ann Ten Eyck **should not have been included in LCHB's lodestar at all.** They were Thornton contract reviewers throughout 2015, but worked on our premises. Many if not most of **their detailed time entries did not specifically indicate that the work was being done on Thornton assignments in the "narrative" field, which resulted in their time inadvertently being included with other LCHB reviewers they were working with when our accounting department ran lodestar reports. I failed to catch that after our accounting department ran everyone's lodestar, and apologize.** These two reviewers account for $551,719.50 in total lodestar from LCHB **that should be removed from LCHB's total. Thornton's lodestar attributable to these two reviewers should not change.**

(2) Chris Jordan and Jonathan Zaul each did work for both LCHB and Thornton. **Again, we neglected to exclude time entries specifically relating to "Thornton" assignments, which took place between 2/9/15 and 4/14/15 only, from LCHB's lodestar.** Once that time is removed, their respective hours and lodestar attributable to LCHB should be as follows:

Christopher Jordan:    540 hours, for $224,100
Jonathan Zaul:          503 hours, for $208,745

**Which results in an additional net reduction from LCHB lodestar of $281,619. Add this to the reduction for Ten Eyck and Wintterle, and you get a total reduction of $833,338 from LCHB's reported lodestar.**

Thornton's adjusted total hours/lodestar for Jordan and Zaul (using Thornton rates), based on the hours invoices to Thornton, should be:

William Sinnott, Esq.
April 17, 2018
Page 3

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

      Christopher Jordan:    359.50 hours, for $152,787.50
      Jonathan Zaul:       319 hours, for $135,575.00

      **This results in a net lodestar \*increase\* of $26,987.50 for these two attorneys for Thornton Law.  This should be noted as at least a modest net offset against the lodestar that needs to be cut elsewhere.**"

*See* Exhibit B, TLF-SST-033277 (emphasis added).

      Furthermore, during their depositions in this investigation, both Mr. Chiplock and Lieff's staff attorney supervisor, Kirti Dugar, explained the circumstances that led Lieff to mistakenly include these Staff Attorneys' time in its lodestar.  *See* 6/16/2017 Chiplock Dep. at 154:18 – 160:8 (attached as Exhibit C); 6/16/2017 Dugar Dep. at 114:9 – 115:22 (attached as Exhibit D).

      As these documents and testimony make clear, a conclusion that the lodestar errors are solely or primarily attributable to the Thornton Law Firm is contradicted by the record evidence. As representatives of all three firms have repeatedly testified, and as the documents bear out, the double counting errors that occurred here were certainly unfortunate, but also entirely inadvertent.[1]  When the firms learned of the double counting errors, they quickly acted to identify, quantify, and disclose them.

      Copies of the documents referenced herein are attached.

      Sincerely,

      Brian T. Kelly

cc:    Joan A. Lukey, Esq.
       Richard M. Heimann, Esq.

---

[1]    I do not repeat here Thornton's previous submissions addressing the record evidence that demonstrates the implicit agreement between the three firms regarding to staff attorneys, but rather incorporate those submissions by reference.  *See* Thornton's Nov. 3, 2017 submission at pp. 3-18 and Thornton's April 12, 2018 submission at pp. 5-8.

EXHIBIT A

# Labaton
# Sucharow

David J. Goldsmith
Partner
212 907 0879 direct
212 883 7079 fax
dgoldsmith@labaton.com

November 10, 2016

By ECF

Hon. Mark L. Wolf
United States District Judge
United States District Court
District of Massachusetts
John Joseph Moakley
  United States Courthouse
1 Courthouse Way
Boston, Massachusetts 02210

Re:     Arkansas Teacher Retirement System v. State Street Bank & Trust Co.,
        No. 11-CV-10230 MLW

Dear Judge Wolf:

We are writing respectfully to advise the Court of inadvertent errors just discovered in certain
written submissions from Labaton Sucharow LLP, Thornton Law Firm LLP, and Lieff Cabraser
Heimann & Bernstein LLP supporting Lead Counsel's motion for attorneys' fees, which the Court
granted following the fairness hearing held on November 2, 2016. *See* Order Awarding Attorneys'
Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs ("Fee Order,"
ECF No. 111).

These mistakes came to our attention during internal reviews that were conducted in response to an
inquiry from the media received after the hearing. The purpose of this letter is to disclose the error
and provide a corrected lodestar and multiplier. We respectfully submit that the error should have
no impact on the Court's ruling on attorneys' fees.

As the Court is aware, the submissions supporting Lead Counsel's fee application included
individual declarations submitted on behalf of Labaton Sucharow, Thornton, and Lieff Cabraser,
reporting each firm's lodestar and number of hours billed. *See* ECF Nos. 104-15, at 7-9; 104-16, at
7-8; 104-17, at 8-9; *see also* ECF No. 104-24 (Master Chart).

The professionals and paraprofessionals listed in these firms' respective lodestar reports include
persons denoted as Staff Attorneys, or "SAs." SAs are bar-admitted, experienced attorneys hired on
a temporary, though generally long-term, basis, and are paid by the hour. The SAs in this action

# Labaton
# Sucharow

Hon. Mark L. Wolf
United States District Judge
November 10, 2016
Page 2

were tasked principally with reviewing and analyzing the millions of pages of documents produced by State Street.

Seventeen (17) of the SAs listed on the Thornton lodestar report are also listed as SAs on the Labaton Sucharow lodestar report.[1] Six (6) of the SAs listed on the Thornton lodestar report are also listed as SAs on the Lieff Cabraser lodestar report.[2] Both sets of overlap reflect the fact that as the litigation proceeded, efforts were made to share costs among counsel, such that financial responsibility for certain SAs located at Labaton Sucharow's and Lieff Cabraser's offices was borne by Thornton.

We have now determined that:

- The hours of the Alper SAs reported in the Thornton lodestar report mistakenly were also reported in the Labaton Sucharow lodestar report.
- Certain hours reported by one of the Alper SAs (S. Dolben) in the Thornton lodestar report mistakenly duplicated certain hours of another Alper SA (D. Fouchong).
- A portion of the hours of two of the Jordan SAs reported in the Thornton lodestar report (C. Jordan and J. Zaul) mistakenly were also reported in the Lieff Cabraser lodestar report.
- The hours of two other Jordan SAs (A. Ten Eyck and R. Wintterle) mistakenly were included in the Lieff Cabraser lodestar report.[3]

Because of these inadvertent errors, Plaintiffs' Counsel's reported combined lodestar of $41,323,895.75, and reported combined time of 86,113.7 hours, were overstated. *See* ECF No. 104-24 (Master Chart).

---

[1] These SAs, listed alphabetically, are D. Alper, E. Bishop, N. Cameron, M. Daniels, S. Dolben, D. Fouchong, J. Grant, I. Herrick, D. Hong, C. Orji, D. Packman, A. Powell, A. Rosenbaum, J. Saad, B. Schulman, A. Vaidya, and R. Yamada (collectively, the "Alper SAs"). *Compare* ECF No. 104-16, at 7-8 (Thornton lodestar report) *with* ECF No. 104-15, at 7-8 (Labaton Sucharow lodestar report).

[2] These SAs, listed alphabetically, are C. Jordan, A. McClelland, A. Ten Eyck, V. Weiss, R. Wintterle, and J. Zaul (collectively, the "Jordan SAs"). *Compare* ECF No. 104-16, at 7 (Thornton lodestar report) *with* ECF No. 104-17, at 8 (Lieff Cabraser lodestar report).

[3] The lodestar reports in the individual firm declarations submitted by ERISA counsel (ECF Nos. 104-18 to 104-23) are unaffected.

**Labaton Sucharow**

Hon. Mark L. Wolf
United States District Judge
November 10, 2016
Page 3

We have corrected these errors by removing the duplicative time. When a given SA had different hourly billing rates, we removed the time billed at the higher rate. Deducting the duplicative time from the $41.32 million reported combined lodestar results in a reduced combined lodestar of **$37,265,241.25**, and a reduced combined time of 76,790.8 hours.

Cross-checking the $37.27 million reduced combined lodestar against the $74,541,250 percentage-based fee awarded by the Court yields a lodestar multiplier of **2.00**.[4] This is higher than the 1.8 multiplier we proffered in our submissions and during the hearing.

Plaintiffs' counsel respectfully submits that a 2.00 multiplier remains reasonable and well-within the range of multipliers found reasonable for cross-check purposes in common fund cases within the First Circuit, and that such an enhancement of the reduced lodestar represented by the 24.85% fee awarded by the Court remains well-supported by the $300 million Settlement obtained and fees awarded in comparable cases. *See* Fee Brief, ECF No. 103-1, at 24-25.

Accordingly, Plaintiffs' counsel respectfully submits that the Court should adhere to its ruling on attorneys' fees. *See* Fee Order ¶¶ 4, 6 (ECF No. 111)[5]; Nov. 2, 2016 Hrg. Tr. at 36:1-2 (finding 1.8 multiplier "reasonable").

We sincerely apologize to the Court for the inadvertent errors in our written submissions and presentation during the hearing. We are available to respond to any questions or concerns the Court may have.

Respectfully submitted,

David J. Goldsmith

---

[4] The Court found it "appropriate in this case to use the percentage of the common fund approach in determining the amount of attorneys' fees that should be awarded." Nov. 2, 2016 Hrg. Tr. at 22:25-23:2; *see also id.* at 35:12-13 ("I have used the percentage of common fund method. I've used the reasonable lodestar to check on that.").

[5] The Fee Order, at Paragraph 6(d), references the approximately 86,000 combined hours and $41.32 million combined lodestar reported in our written submissions.

**Labaton
Sucharow**

Hon. Mark L. Wolf
United States District Judge
November 10, 2016
Page 4


DJG/idi

cc:     All Counsel of Record
        (by ECF)

<u>Certificate of Service</u>

I certify that on November 10, 2016, I caused the foregoing Letter to be filed through the ECF system in the above-captioned action, and accordingly to be served electronically upon all registered participants identified on the Notices of Electronic Filing.

*/s/ David J. Goldsmith*

David J. Goldsmith

# EXHIBIT B

| | |
|---|---|
| **From:** | Chiplock, Daniel P. <DCHIPLOCK@lchb.com> |
| **Sent:** | Wednesday, November 9, 2016 7:01 PM |
| **To:** | 'Goldsmith, David' |
| **Cc:** | Hoffman, Evan (ehoffman@tenlaw.com); Michael Lesser |
| **Subject:** | RE: State Street |
| | |
| **Importance:** | High |

Here is what I've been able to determine, in order of most to least significant:

(1) Rachel Wintterle and Ann Ten Eyck should not have been included in LCHB's lodestar at all.  They were Thornton contract reviewers throughout 2015, but worked on our premises.   Many if not most of their detailed time entries did not specifically indicate that the work was being done on Thornton assignments in the "narrative" field, which resulted in their time inadvertently being included with other LCHB reviewers they were working with when our accounting department ran lodestar reports.  I failed to catch that after our accounting department ran everyone's lodestar, and apologize.  These two reviewers account for $551,719.50 in total lodestar from LCHB that should be removed from LCHB's total.  Thornton's lodestar attributable to these two reviewers should not change.

(2) Chris Jordan and Jonathan Zaul each did work for both LCHB and Thornton.   Again, we neglected to exclude time entries specifically relating to "Thornton" assignments, which took place between 2/9/15 and 4/14/15 only, from LCHB's lodestar.  Once that time is removed, their respective hours and lodestar attributable to LCHB should be as follows:

Christopher Jordan:    540 hours, for $224,100
Jonathan Zaul:        503 hours, for $208,745

Which results in an additional net reduction from LCHB lodestar of $281,619.  Add this to the reduction for Ten Eyck and Wintterle, and you get a total reduction of $833,338 from LCHB's reported lodestar.

Thornton's adjusted total hours/lodestar for Jordan and Zaul (using Thornton rates), based on the hours invoices to Thornton, should be:

Christopher Jordan:    359.50 hours, for $152,787.50
Jonathan Zaul:        319 hours, for $135,575.00

This results in a net lodestar *increase* of $26,987.50 for these two attorneys for Thornton Law.  This should be noted as at least a modest net offset against the lodestar that needs to be cut elsewhere.

(3) Andrew McClelland's and Virginia Weiss's lodestar checks out OK on our end - everything we reported for them was specific to LCHB, even if they may also have done work for Thornton, which Thornton appears to have accounted for separately on their report.  I do not see duplication based on my review of our records.  I can't speak to the accuracy of their hours for Thornton on Thornton's end.

Evan/Mike, please feel free to check my math on your end.  I tried to double-check but am also in grief over the election so my mind's a little hazy.

Dan

1

Confidential: Produced Pursuant to Court Order.

-----Original Message-----
From: Goldsmith, David [mailto:dgoldsmith@labaton.com]
Sent: Wednesday, November 09, 2016 3:38 PM
To: Chiplock, Daniel P.
Subject: RE: State Street

Appreciate your input

-----Original Message-----
From: Chiplock, Daniel P. [mailto:DCHIPLOCK@lchb.com]
Sent: Wednesday, November 09, 2016 2:55 PM
To: Goldsmith, David
Subject: Re: State Street

For what it's worth I strongly agree with just one fulsome letter on this issue.

Sent from my iPhone

This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.

Confidential: Produced Pursuant to Court Order.                                    TLF-SST-033278

# EXHIBIT C

Page 1

1
2   UNITED STATES DISTRICT COURT
    DISTRICT OF MASSACHUSETTS
3
    Case No. 11-cv-10230 MLW
4   - - - - - - - - - - - - - - - - - - -x
5   ARKANSAS TEACHER RETIREMENT SYSTEM,
    et al.,
6
                            Plaintiffs,
7
                -against-
8
    STATE STREET BANK AND TRUST COMPANY,
9
                            Defendant.
10
    - - - - - - - - - - - - - - - - - - -x
11
    JAMS
12  Reference No. 1345000011
    - - - - - - - - - - - - - - - - - - -x
13
    In Re:  STATE STREET ATTORNEYS' FEES
14
    - - - - - - - - - - - - - - - - - - -x
15
                        June 16, 2017
16                      8:14 a.m.
17
    B e f o r e :
18
                SPECIAL MASTER HON. GERALD ROSEN
19              United States District Court, Retired
20
                Deposition of DANIEL P. CHIPLOCK, taken
21
22  by Counsel to the Special Master, held at the
23  offices of JAMS, 620 Eighth Avenue, New York,
24  New York, before Helen Mitchell, a Registered
25  Professional Reporter and Notary Public.

Page 153

| | |
|---|---|
| 1 | Chiplock |
| 2 | These new agency attorneys, |
| 3 | when they came on in March, were |
| 4 | trained to do what every other staff |
| 5 | attorney is trained to do when they do |
| 6 | work in our office, which is |
| 7 | religiously send your time to our |
| 8 | internal time keeping department, keep |
| 9 | careful record of your time.  Which |
| 10 | they did.  Religiously so. |
| 11 | We did not know, because we |
| 12 | didn't have reason to believe that they |
| 13 | were doing that, and that's why the |
| 14 | time for those two individuals -- even |
| 15 | though they're constantly sending their |
| 16 | time to their agency and they're |
| 17 | constantly letting the Thornton lawyers |
| 18 | know what they're doing, they're also |
| 19 | inputting their time into our system, |
| 20 | which they should not have been doing. |
| 21 | So that -- the process broke |
| 22 | down.  And from my vantage point, it |
| 23 | was sort of an anomaly created by the |
| 24 | absence of some key people, as |
| 25 | evidenced to me by the fact that we got |

Page 154

| | |
|---|---|
| 1 | Chiplock |
| 2 | it right earlier that year when one of |
| 3 | our key people was around. |
| 4 | So that's not an excuse -- |
| 5 | JUDGE ROSEN:  So earlier in the |
| 6 | year the time was not double counted? |
| 7 | THE WITNESS:  Correct, yes. |
| 8 | So it's just for those two |
| 9 | individuals for the three or so months |
| 10 | that they worked on the case, because |
| 11 | at the get-go they were trained by |
| 12 | somebody, I think in our IT department, |
| 13 | who didn't know who from who, that this |
| 14 | is how we keep track of our time at |
| 15 | Lieff Cabraser; you need to be careful, |
| 16 | you need to send it to our timekeeper, |
| 17 | and that's what they did. |
| 18 | So that's why the time for |
| 19 | those two individuals was included in |
| 20 | our system and it was never caught. |
| 21 | And that falls on me.  When I'm |
| 22 | reviewing our time in September of |
| 23 | 2016, which is more than a -- almost a |
| 24 | year and a half later, you know, the |
| 25 | passage of time and my ignorance that |

Page 155

| | |
|---|---|
| 1 | Chiplock |
| 2 | these people were not trained in the |
| 3 | way they should have been trained with |
| 4 | respect to their time keeping -- I'm |
| 5 | paying attention to their work product, |
| 6 | to everybody's work product, and I'm |
| 7 | assuming that they were trained |
| 8 | correctly, but when I'm reviewing time |
| 9 | in September of 2016, over a year |
| 10 | later, it's not at the forefront of my |
| 11 | mind that there may be time in there |
| 12 | for certain staff attorneys which |
| 13 | shouldn't be.  I think it's been taken |
| 14 | care of. |
| 15 | So I've kicked myself a |
| 16 | thousand times since this process began |
| 17 | as to why my memory banks didn't work |
| 18 | better in September of 2016 -- |
| 19 | JUDGE ROSEN:  You had a lot on |
| 20 | your mind and a lot to dangle, and you |
| 21 | didn't have a process in place to |
| 22 | capture this at a later point. |
| 23 | THE WITNESS:  Right. |
| 24 | JUDGE ROSEN:  Neither firm did, |
| 25 | neither Labaton nor Lieff. |

Page 156

| | |
|---|---|
| 1 | Chiplock |
| 2 | THE WITNESS:  That was a |
| 3 | breakdown in the process, and it was |
| 4 | made possible by the absence of some |
| 5 | important people at the time they were |
| 6 | trained. |
| 7 | With respect to Mr. Zaul and |
| 8 | Mr. Jordan, who you met, who we shared |
| 9 | responsibility for a time with |
| 10 | Thornton, I think Thornton was |
| 11 | financially responsible for about eight |
| 12 | weeks of their time.  They entered |
| 13 | their time into our system so that we |
| 14 | had the capacity to create an invoice |
| 15 | that we could then send to Thornton. |
| 16 | I delegated that process to |
| 17 | Nick, and to Kirti, to work out with |
| 18 | our accounting department creating an |
| 19 | invoice and sending it off to Thornton |
| 20 | so that those hours are properly |
| 21 | accounted for and paid for. |
| 22 | What did not happen is once we |
| 23 | got paid for that time, once the check |
| 24 | came in -- |
| 25 | JUDGE ROSEN:  Didn't come off |

Page 157

Chiplock

1
2  the rolls.
3       THE WITNESS:  -- that time
4  needed to be deleted from our system,
5  and that instruction, that specific
6  instruction, was never given to our
7  accounting department.  And, again,
8  that ultimately falls on me.
9       Now, in my defense, I'm
10 thinking I've delegated the issue of
11 billing and accounting for time
12 appropriately, I've delegated it
13 elsewhere, and it's being taken care
14 of, but I was not explicit enough with
15 that -- with that final instruction,
16 which is, "Once we get paid, that time
17 has to come out of our system, because
18 Thornton is obviously going to take
19 credit for time that it's paid for, as
20 it should."  So that's my fault also.
21      And so in September of 2016,
22 when I'm reviewing time records, I am
23 not thinking to myself, "There's time
24 in our system that should not be there,
25 I should go back and check."

Page 158

Chiplock

1
2       JUDGE ROSEN:  So that's at the
3  front end.
4       THE WITNESS:  Yes.
5       JUDGE ROSEN:  At the back
6  end --
7       THE WITNESS:  What would have
8  helped me to figure it out?
9       JUDGE ROSEN:  Yes.
10      THE WITNESS:  It would have
11 helped -- it probably would have helped
12 had I seen the other firms' fee
13 petitions before they got filed.
14      JUDGE ROSEN:  And you didn't?
15      THE WITNESS:  I did not.
16      JUDGE ROSEN:  Either you or
17 some monitor for the three firms to
18 homogenize the petition to make sure
19 that things like this didn't happen?
20      THE WITNESS:  Yeah, and clearly
21 there were overlapping names on the
22 different fee petitions.
23      That was completely
24 transparent.  Nobody was hiding the
25 fact that there was the same people on

Page 159

Chiplock

1
2  different ledgers.  And Judge Wolf did
3  not comment on that fact, after -- he
4  called the papers excellent.
5       So it was all there, all the
6  hours were there, all the names were
7  there, including names that appeared on
8  more than one ledger.
9       Had I seen the other two
10 petitions and seen the overlapping
11 names, it might have spurred me -- I
12 can't say for certainty, but it might
13 have spurred me to say, "I'm going to
14 go back and -- it's okay that there are
15 the same names here, but I'm going to
16 go back and make sure that we deleted
17 the time we needed to delete before
18 this petition goes in."
19      JUDGE ROSEN:  And that the same
20 names and the same time was not on both
21 petitions?
22      THE WITNESS:  Right.  Which is
23 what I'm saying.
24      JUDGE ROSEN:  For the same time
25 frame?

Page 160

Chiplock

1
2       THE WITNESS:  For the same
3  time -- yeah.  The hours that needed to
4  be deleted should have been deleted,
5  and weren't.  So that's...
6       JUDGE ROSEN:  Look, we all
7  learn from hindsight --
8       THE WITNESS:  Correct.
9       JUDGE ROSEN:  -- but in the
10 benefit of hindsight, and best
11 practices going forward, do you believe
12 that allocating work done by staff
13 attorneys employed by your firm, or by
14 Labaton, for purposes of a fee petition
15 to another firm, is a best practice in
16 terms of transparency to the court, in
17 terms of transparency to the public, in
18 terms of avoiding these kinds of
19 errors, which are human errors --
20 you're beating yourself up.  You're a
21 busy guy and you have substantive
22 responsibility for the case, you're
23 beating yourself up for that when in
24 fact inherent in this system was a very
25 high potential for exactly this sort of

EXHIBIT D

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     DISTRICT OF MASSACHUSETTS
 3
     Case No. 11-cv-10230 MLW
 4   - - - - - - - - - - - - - - - - - - -x
 5   ARKANSAS TEACHER RETIREMENT SYSTEM,
     et al.,
 6
                          Plaintiffs,
 7
              -against-
 8
     STATE STREET BANK AND TRUST COMPANY,
 9
                          Defendant.
10
     - - - - - - - - - - - - - - - - - - -x
11
     JAMS
12   Reference No. 1345000011
     - - - - - - - - - - - - - - - - - - -x
13
     In Re:  STATE STREET ATTORNEYS' FEES
14
     - - - - - - - - - - - - - - - - - - -x
15
                     June 16, 2017
16                   1:35 p.m.
17
     B e f o r e :
18
              SPECIAL MASTER HON. GERALD ROSEN
19            United States District Court, Retired
20
21            Deposition of KIRTI DUGAR, taken by
22   Counsel to the Special Master, held at the
23   offices of JAMS, 620 Eighth Avenue, New York,
24   New York, before Helen Mitchell, a Registered
25   Professional Reporter and Notary Public.
```

1           Dugar
2       A    No.  It's a -- historically, I
3  have not.  Although, now lately I have begun to
4  implement measures to do that.  In fact, I mean,
5  we've implemented a script in our Relativity
6  where I am now able to gather that.
7           In many ways it is still
8  complicating and a lot of work to do that, but
9  should a need like this arise again I would be
10  able to do it now.  So that is a change I've
11  implemented, probably after the situation here.
12           JUDGE ROSEN:  How did you learn
13  about the double counting error?
14           THE WITNESS:  Pardon me?
15           JUDGE ROSEN:  How did you learn
16  about the double counting error?
17           THE WITNESS:  Dan Chiplock
18  would have told me.  I would have asked
19  him -- one day he's asking, you know,
20  "Do you have this data," I said, "Dan,
21  what's going on?  Do you want to tell
22  me?"  So he would have told me then.
23           JUDGE ROSEN:  Were you involved
24  in figuring out how it happened?
25           THE WITNESS:  In a general

1           Dugar
2  sense I've been helping Dan Chiplock --
3           JUDGE ROSEN:  I'm talking back
4  in the November 8 through 12 time
5  period.
6           THE WITNESS:  I was not
7  involved with the fee petition at all.
8           JUDGE ROSEN:  No.  No, no, no.
9  Once the double counting error was
10  discovered, did you work with Dan to
11  figure out how it happened?
12           THE WITNESS:  We were wracking
13  our brain to figure out that answer,
14  and I think the only thing I could come
15  up with, it was just network oversight,
16  there was nothing intentional about it.
17           It's a small amount of time --
18  it's not in the global scheme of
19  things.  Not to say it doesn't have
20  value, it has value.  It was just -- in
21  fact, if you go by intention -- to my
22  mind, I'm speaking for myself and
23  behalf of my firm -- you know, we
24  clearly, with Jon Zol and Chris Jordan,
25  if you look at it, I have instructions

1           Dugar
2  to them that "Make sure in your time
3  entry you enter for, you know, review
4  of TNN folders."  So the intention was
5  always to transfer.
6           The only thing is that in this
7  whole -- all the structures and
8  everything we have, Chris Jordan and
9  Jon Zol were entering time in our
10  system, or their time was getting
11  entered in our system.  So in this
12  particular -- and then they were
13  getting invoiced.  So the time entry
14  would maintain there because that's the
15  source of the generation of an invoice,
16  but it just -- you know, when you're
17  doing the fee petition, putting all
18  things together, I am not involved, and
19  usually never involved in that process.
20  It just got lost.  It is just -- what
21  do you just call -- inadvertent honest
22  mistake.  That's really what it is.
23           Our intention always was -- I
24  knew it at the time, and whether if I
25  had been involved with the fee petition

1           Dugar
2  would I -- chances are I may have
3  picked I up, because I generally keep
4  these things in the back of mind.
5           But that's really all that
6  happened here.  From that point of
7  view.
8           JUDGE ROSEN:  Okay.
9           Elizabeth, anything else?
10  BY MS. MCEVOY:
11       Q    One small point.
12           You mentioned there was another
13  case other than BoNY Mellon that had ended in
14  the beginning of 2015.  Was that Schwab?
15       A    Schwab was still continuing at
16  that time.
17       Q    Did that case --
18       A    But there were a lot of
19  reviewers in Schwab that were released.  Two of
20  the people I put onto State Street were from
21  that group, and they were -- also had been
22  working with me for a long time, and they had
23  actually worked on the -- Peter Roos, one of
24  them, he was a former partner at Baker McKenzie,
25  and Ryan Sturtevant is the other one, who is a

# EXHIBIT 5

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

ARKANSAS TEACHER RETIREMENT SYSTEM,
on behalf of itself and all others similarly situated,

Plaintiff,

v.

STATE STREET BANK AND TRUST COMPANY,

Defendant.

No. 11-cv-10230 MLW

---

ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated,

Plaintiff,

v.

STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20,

Defendants.

No. 11-cv-12049 MLW

---

THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated,

Plaintiff,

v.

STATE STREET BANK AND TRUST COMPANY,

Defendant.

No. 12-cv-11698 MLW

---

**CONSOLIDATED RESPONSE BY LABATON SUCHAROW LLP, LIEFF CABRASER HEIMANN & BERNSTEIN LLP, AND THORNTON LAW FIRM LLP TO SPECIAL MASTER'S JULY 5, 2017 REQUEST FOR SUPPLEMENTAL SUBMISSION**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Labaton Sucharow LLP ("Labaton Sucharow"), Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser"), and the Thornton Law Firm LLP ("Thornton," and collectively with Labaton Sucharow and Lieff Cabraser, the "Firms"), respectfully provide this consolidated response to the Special Master's July 5, 2017 Request for Supplemental Submission.

## I.    PRELIMINARY STATEMENT

The Special Master invites the Firms to now "provide any information they should find relevant, as such information will inform the Special Master's findings, conclusions, and recommendations presented in his Final Report and Recommendation."  The Firms wish to note for the record that in the course of the Special Master's investigation, the Firms have provided an abundance of information that should inform the Special Master's findings, conclusions, and recommendations.  Specifically, the Firms each participated in multi-hour informal interviews with the Special Master, his counsel, and his technical advisor on April 4 and 5, 2017; collectively responded to 193 interrogatories on June 1, June 9 and July 10, 2017; collectively responded to 104 document requests by producing more than 176,000 pages of requested documents; and produced witnesses for a total of 27 depositions between June 5 and July 17 2017.

The Firms respectfully submit that the substantial factual record developed by the Special Master during his investigation does not warrant any change in the Court's November 2, 2016 Fee Award [Dkt. No. 111] nor the imposition of sanctions on any of the Firms.  The reasonableness of the Firms' Fee Petition is further supported by the accompanying declaration of William B. Rubenstein ("Rubenstein Decl."), the Sidley Austin Professor of Law at Harvard Law School, and one of the nation's leading national experts on class action law and practice.

## II.   RESPONSE TO AREAS OF CONCERN RAISED BY THE COURT AND ADDRESSED BY THE SPECIAL MASTER

The Firms submit that the extensive factual record, along with the declaration of

Professor Rubenstein, should lead the Special Master to make the following findings:

- The Firms employed the correct legal standards in their request for an award of attorneys' fees and expenses.  *See* Mem. of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs ("Fee Brief") [Dkt. No. 103-1] at 3-5, 24; Rubenstein Decl. at 7-12, 27-34.

- Except as stated below and previously on the record in this case, as well as in the Firms' discovery responses to the Special Master, the representations made by the Firms in the request for awards of attorneys' fees and expenses were accurate and reliable, and counsel asserted a proper factual basis for what was represented to be the lodestar for each firm.  *See* LS Interrog. Resp. Nos. 17-19, 23-25, 27-29, 32, 33, 36, 37, 40, 41, 44-47, 51, 54-59, 61-67, 71; LCHB Interrog. Resp. Nos. 47, 48, 53, 57, 62, 63, 64, 72, 73; Thornton Interrog. Resp. Nos. 49-51, 55, 64, 66.

- The Firms acknowledge, as they did in their November 10, 2016 letter to the Court [Dkt. No. 116], that some Staff Attorney lodestar was "double-counted" in the Firms' request for attorneys' fees.  These errors were unintentional and brought to the Court's attention by the Firms promptly upon their learning of the mistakes.  *See* LS Interrog. Resp. Nos. 63-66; LCHB Interrog. Resp. Nos. 39, 40, 67, 68; Thornton Interrog. Resp. Nos. 67, 69, 74, 75.  The factual record submitted to the Special Master during the course of this investigation confirms the Firms' position that the errors were unintentional.

- The representations made in the November 10, 2016 letter to the Court [Dkt. No. 116] were and are materially accurate and reliable.  LS Interrog. Resp. Nos. 63, 66, 67, 71; LCHB Interrog. Resp. Nos. 65, 68, 69, 72, 73; Thornton Interrog. Resp. Nos. 70, 71, 74-76.

- Labaton Sucharow submits that its representations requesting a service award to Arkansas Teacher Retirement System were accurate and reliable.  *See* LS Interrog. Resp. Nos. 4, 17; Belfi Dep. at 33:23-34:9, 37:12-41:6; Goldsmith Dep. at 18:6-23:18.

- Neither Lieff Cabraser nor Thornton had clients in this matter for which they sought service awards.

- None of the Firms made representations to the Court concerning the service awards sought by counsel for the ERISA plaintiffs.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- The attorneys' fees, expenses and service award to Arkansas Teacher Retirement System were reasonable, and none should be reduced beyond the $2 million the Firms already have contributed to the cost of the Special Master's investigation. In addition to this $2 million, the Firms have incurred substantial other costs relating to this investigation, including, for Labaton Sucharow and Thornton, the costs of outside counsel; and, for all three firms, the substantial time spent by senior members of each firm participating in this investigation. The costs already associated with this investigation shall continually serve as an important reminder to the Firms to double check future fee petitions to ensure their clarity and accuracy to the court.  The Firms are fully cognizant of the lessons of this investigation, as reflected in the Firms' recommendations on best practices described below.  That fact notwithstanding, the net effect of the errors in reported lodestar were modest with respect to the lodestar multiplier that was used as a cross-check against the requested percentage-based fee, and still well within the bounds of what is considered acceptable in this Circuit.  *See* LS Interrog. Resp. Nos. 59, 63; LCHB Interrog. Resp. Nos. 59, 61; Fee Brief at 7, 24-25; Rubenstein Decl. at 30-34.

- No misconduct occurred in connection with the attorneys' fees, expenses, or service award to Arkansas Teacher Retirement System previously ordered. The double-counting of lodestar at the center of the Special Master's inquiry, while regrettable both in terms of the initial confusion caused to the Court and the subsequent substantial time and expense devoted to explaining the matter, was an inadvertent and honest mistake.  LS Interrog. Resp. Nos. 33, 36, 37, 54-59, 61-67, 71; LCHB Interrog. Resp. Nos. 39, 65, 67; Thornton Interrog. Resp. Nos. 67, 69, 75.

- None of the Firms should be sanctioned in this matter.

## III.   SPECIAL MASTER'S REQUEST FOR INPUT ON SPECIFIC TOPICS

### A.   Request No. 1 – Billing Practices Relating To Staff Attorneys

For all three of the Firms, billing rates for Staff Attorneys are based (just as for any other type of attorney, such as an associate or partner) on the firm's understanding of an appropriate market rate for the legal services rendered.  *See* Fineman Dep. at 47:5-12; 48:3-17; 50:25-51:6; 52:10-22; 55:4-10; Heimann Dep. at 57:16-58:10, 62:4-68:22; Politano Dep. at 35:22-37:2, 38:19-42:2, 45:6-49:4; Johnson Dep. at 12:5-16; 13:4-17. This approach is consistent with the general practice of the marketplace and applicable case authority.  *See* Rubenstein Decl. at 2, 12-30.  Billing Rates for Staff Attorneys are not dependent on what they are actually paid, in the

same way that billing rates for associates and partners are not dependent on what they are

actually paid.  Fineman Dep. at 48:3-17, 50:6-11; Rubenstein Decl. at 29-30; Johnson Dep. at

20:5-22:13, 25:7-19.

With respect to the second part of this request, Labaton Sucharow responds that all of its

Staff Attorneys were Labaton Sucharow employees, and accordingly the question of whether

"agency" versus non-agency Staff Attorneys should appropriately be billed at the same rate does

not apply to it.  *See* Johnson Dep. at 19:4-11, 22:5-13.

Lieff Cabraser responds that those of its Staff Attorneys who were paid directly by the

firm (versus those paid through an agency) performed the lion's share of Lieff Cabraser's

document review in the litigation.  *See* LCHB Interrog. Resp. No. 24.  Some Staff Attorneys

actually began their work on the litigation as agency attorneys before being hired directly by

Lieff Cabraser.  *Id.*  By the time the Staff Attorneys were working on the detailed issue

memoranda discussed during discovery in this matter (which entailed a deeper analysis of the

documents reviewed), only one LCHB Staff Attorney was still being paid through an agency—

Virginia Weiss.  *Id.*  The remaining LCHB Staff Attorneys were all being paid directly by Lieff

Cabraser, and their hours heavily outnumbered those contributed by agency attorneys.  *Id.*

Throughout the litigation, LCHB Staff Attorneys were given the same type of assignments,

supervised in the same manner, and expected to produce the same quality of work regardless of

whether they were paid directly by the firm or through an agency.  *See, e.g.,* LCHB Interrog.

Resp. Nos. 19, 22, 29-30; Chiplock Dep. at 113:14-116:10; Dugar Dep. at 95:7-99:12; Fineman

Dep. at 41:4-8, 43:14-44:11; Heimann Dep. at 51:18-53:2.

For instance, while being paid through an agency in 2015, Ms. Weiss authored detailed

issue memoranda just as the other Staff Attorneys did.  These memoranda have been produced to

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the Special Master.  *See* LCHB-0028663-0028672 (and exhibits at LCHB-0028677-0029118);

LCHB-0029119-0029124 (and exhibits at LCHB-0029125-LCHB-0029182).  So, for that matter,

did the two Staff Attorneys (Ann Ten Eyck and Rachel Wintterle) who were physically situated

in LCHB's San Francisco offices for several months but contracted through an agency that was

paid directly by Thornton.  These memoranda have also been produced.  *See* LCHB-0003314-

0003319; LCHB-0029183-0029200 (and exhibits at LCHB-0029201-0031489); LCHB-

0031490-0031528 (and exhibits at LCHB-0031529-0039667).  The only two (2) other LCHB

Staff Attorneys who were still paid by an agency in 2015 (Jade Butman and Andrew

McClelland) did not produce memoranda simply because they had stopped working on the State

Street Litigation well before those assignments were given.  *See* LCHB Interrog. Resp. No. 24.

Billing rates for Staff Attorneys at Lieff Cabraser are not impacted by whether they are

being paid directly by the firm or are being paid through an agency; they are based (just as for

any other type of attorney, such as an associate or partner) on the firm's understanding of

appropriate market rates for similar legal services rendered.  *See* Fineman Dep. at 47:5-12; 48:3-

17; 50:25-51:6; 52:10-22; 55:4-10; Heimann Dep. at 57:16-58:10, 62:4-68:22.  Even so, in 2015,

the amount paid by the firm to an agency for an agency attorney's work, on an hourly basis, was

comparable to the hourly pay the firm would have made directly to a Staff Attorney being paid

directly by the firm.  *See* Fineman Dep. at 36:21-38:7.

###    B.    Request No. 2 – The Appropriate Venue For Determining Hourly Billing Rates

The Firms set their billing rates based on what they perceive to be, as described under

applicable Supreme Court and First Circuit authority, "those prevailing in the community for

similar services by lawyers of reasonably comparable skill, experience and reputation."  *See*

*Martinez-Velez v. Rey-Hernandez*, 506 F.3d 32, 47 (1st Cir. 2007) (quoting *Blum v. Stenson*, 465

U.S. 886, 895 n.11 (1984)); LS Interrog. Resp. No. 51; Johnson Dep. at 12:5-14:19; LCHB

Interrog. Resp. Nos. 47, 48, 53, 64; Fineman Dep. at 76:7-77:8; Thornton Interrog. Resp. Nos.

49, 50, 51, 55.  Labaton Sucharow is in New York, Lieff Cabraser is principally in San

Francisco, and Thornton is in Boston. *Id.* Each of the Firms, however, maintains a national class

action practice and litigates in many locations other than these home bases.  Given the specific

role that hourly rates play in determining the reasonableness of the overall fee award in this case,

the Firms' rates should not be adjusted to Boston rates for purposes of analyzing the fee petition.

*See* Rubenstein Decl. at 19-20 and n.31.

　　　As was mentioned above, the Firms' rates were not provided in the fee application as the

"basis" for their requested fee, but rather simply to enable a "cross-check" of the overall time

and effort expended on the case against the requested "percentage-of-fund" fee.  The First

Circuit, it should be noted, is predominantly a percentage-of-fund jurisdiction, and does not

mandate a lodestar cross-check.  *See In re Thirteen Appeals Arising Out of the San Juan DuPont

Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995) (noting the "distinct advantages" of the

percentage-of-fund method over the lodestar method of calculating fees); *In re Relafen Antitrust

Litig.*, 231 F.R.D. 52, 81 (D. Mass. 2005); Rubenstein Decl. at 8-9.  When a lodestar cross-check

is performed regardless, the focus is not on the "necessity and reasonableness of every hour"

expended by counsel, but rather on whether the fee broadly reflects the degree of time and effort

expended by counsel.  These points were briefed before Judge Wolf in support of the Firms' fee

award, and were not disputed.  *See* Fee Brief at 3-4, 24.  Indeed, when David Goldsmith revealed

to Judge Wolf that the Firms were "contemplating [a percentage of the fund] in the 25 percent

range" for the attorneys' fees, Judge Wolf responded, "That's great . . . I usually start with 25

percent in mind."  Trans. of Status Conference (Dkt. No. 85), June 23, 2016, at 15:5-22.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

As noted above, Labaton Sucharow, Lieff Cabraser and Thornton all maintain complex class action practices that are national in scope.  Accordingly, the Firms' billing rates – which were based on rates used by national peer plaintiff and defense law firms that litigate matters of a similar magnitude – are appropriate and were set using the correct legal standard. *See* LS Interrog. Resp. Nos. 44, 51, 62; Thornton Interrog. Responses 49, 51, 55, 66; LCHB Interrog. Resp. Nos. 47, 48, 53, 64.

To the extent that rates prevailing in the Boston legal market have particular or greater relevance, Professor Rubenstein has opined that Plaintiffs' counsel's billing rates were reasonable.  Professor Rubenstein forms these opinions on the basis that (a) Plaintiffs' counsel's rates are consistent with rates that courts in Massachusetts have awarded in approving class action fee petitions in recent years; (b) the rates fall far below those that have been judicially approved in the context of fee petitions submitted by defense firms in bankruptcy cases in this District; and (c) the blended billing rate for the entire case is consistent with blended billing rates in court-approved fee petitions in class action settlements in the District of Massachusetts and in $100-$500 million cases throughout the country.  *See* Rubenstein Decl. at 1-3, 12-27.  Professor Rubenstein has also shown that if one goes to the trouble of adjusting the out-of-town rates to the Boston market, it has about a 3% effect on the total lodestar, meaning that the cross-jurisdictional rate differentials are immaterial, especially for cross-check purposes. *Id.* at 21-22. Moreover, Thornton has many years of experience in the Boston market, and its court-approved rates are comparable to those of the other firms here.

C.  **Request No. 3 – The Role Of Lead Counsel In Preparing And Filing Fee Petitions In Multi-Firm Class Actions**

In multi-firm class action cases, lead counsel has overall responsibility for preparing and filing a fee petition.  This responsibility generally includes researching and drafting the

supporting brief, drafting the principal fee declaration or portion of the omnibus settlement and

fee declaration in support of the fee petition, securing individual fee and expense declarations

from co-counsel (often by circulating a model declaration), and securing any client or expert

declarations that may be submitted.  Lead counsel may and often will delegate certain research

and drafting assignments to co-counsel.

Lead counsel's responsibility with respect to the accuracy of individual fee declarations

other than its own has limitations.  For example, lead counsel supplies a template for such

declarations, but does not require the use of any particular language.  Moreover, because lead

counsel does not have access to co-counsel's internal timekeeping records, lead counsel must

rely on co-counsel to report their own lodestar accurately.  *See* LS Interrog. Resp. No. 56;

Goldsmith Dep. at 119:3-20; Chiplock Dep. at 228:7-9 ("I don't view it as Labaton's ultimate

responsibility to ensure that Lieff Cabraser's lodestar was reported accurately.").

Lead counsel has a responsibility to make reasonable efforts to detect and remedy errors

in co-counsel's fee declarations to the extent they may be apparent on their face.  *See* Goldsmith

Dep. at 119:3-120:17. Here, the existence of double-counting between the Thornton and Labaton

Sucharow fee declarations, and between the Thornton and Lieff Cabraser fee declarations, was

not apparent on the face of any single fee declaration, but rather would become apparent only if

the fee declarations were compared with one another.  *Id.*

 Labaton Sucharow entered into a cost-sharing agreement with Thornton in which

Labaton Sucharow allocated certain Staff Attorneys, all of whom were Labaton Sucharow

employees, to Thornton and invoiced it on a monthly basis for the work those Staff Attorneys

performed.  *See* Goldsmith Dep. at 91:20-92:3, 95:19-22; Rogers Dep. at 70:3-73:3; Politano

Dep. at 22:8-24:23, 26:11-19, 28:15-23; LS Interrog. Resp. Nos. 23, 32, 37.  Labaton Sucharow

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

invoiced Thornton at a rate of $50 per hour for each staff attorney.  *See e.g.* TLF-SST-000153; TLF-SST-003418 – TLF-SST-003420; TLF-SST-000415.  The $50 hourly rate included a share of the overhead costs associated with each staff attorney.  Garrett Bradley Dep. at 93:23-95:5.

In reaching and implementing this cost-sharing arrangement, Labaton Sucharow and Thornton did not discuss which firm would claim the hours expended by these Staff Attorneys in its individual fee declaration. *Cf.* Sucharow Dep. at 26:20-22, 38:20-39:4; Belfi Dep. at 59:6-15; Goldsmith Dep. at 104:12-107:5, 122:6-13; Rogers Dep. at 95:16-96:2; Zeiss Dep. at 24:19-25:4; Politano Dep. at 22:22-25; LS Interrog. Resp. No. 33. It has since become apparent that the Firms had different views as to which firm would claim which Staff Attorneys on its respective fee petitions.  *See* Chiplock Dep. At 135:20-137:11 ("I mean, we didn't write it out, but it was obvious to me that . . . when you're paying someone to do work, and you're taking on the risk of not being paid for that work, which is always a risk in our cases . . . you include it in your lodestar at the end of the day."); Garrett Bradley Dep., at 76:6-77:22 ("My assumption all along is, since we were on the papers, we're local counsel, that we would just include those people in our fee petition and on a rolling basis, as we got towards the end and Evan Hoffman is asking for a daily breakdown of time for the individuals that are Thornton's, we just understood that to mean that we were going to put them on our fee application."); Rogers Dep., at 91:18-96:2 ("Q: And did you have an understanding . . . whether Thornton was going to claim those staff attorneys on their fee petition?  A: I certainly assumed they would . . . They were paying for it up front," and later stating that he had "no knowledge" of any discussions concerning why Thornton was allocated staff attorneys, nor any discussions concerning whether or how Thornton would claim staff attorneys on its fee petition)"; Goldsmith Dep., at 105:9-106:13 (also acknowledging that there was never an agreement concerning how Labaton Sucharow and Thornton would claim

staff attorneys on their respective fee petitions, but clarifying that he "certainly never made" an assumption "that the Thornton firm would put those people on its lodestar report").

In other cases involving staff attorney cost-sharing, Labaton Sucharow's general practice has been to report all hours billed by its staff attorney employees on its own fee declaration, and to work out any associated economic issues with co-counsel separately.  *See* Politano Dep. at 22:18-25 (Q: "Did you have any understanding of whether those staff attorneys would be reported on the firm's fee petition?  'The firm' being Labaton."  A: "The common practice was that it would be on Labaton's fee declaration, but there was no discussion at that point as to the way it would be handled."), 23:14 (testifying that this "common practice" was followed "[n]inety percent of the time"); Rogers Dep. at 96:13-17 ("I've seen it done both ways.  I think it's more common to do what Judge Rosen's referring to as the latter . . . one big omnibus fee petition and then kind of dole it out at the end."); Johnson Dep. at 32:3-4 (alternative practice of cross-reporting has been used in "very, very few cases"); Goldsmith Dep. at 97:11-99:16 (alternative practice used in two other cases); Goldberg Dep. at 46:10-11 (alternative practice used in "[o]nly one case that I remember"); LS Interrog. Resp. No. 32; *see also* Zeiss Dep. at 24:21-25:2 ("[F]rom my perspective . . . the lodestar reports are reports of each firm's personnel based on their own time records.  . . . It would never occur to me that one firm could be reporting personnel from Labaton.").

Indeed, among the 16 class action matters that Labaton Sucharow has identified in discovery as involving staff attorney cost-sharing, *see* LS Interrog. Resp. No. 32, ten (10) have proceeded to a court-approved settlement to date.[1]  Labaton Sucharow adhered to its general

---

[1] The 10 settled cases are *City of Providence v. Aeropostale*, *Broadcom*, *Celestica*, *Countrywide*, *J. Crew Group*, *Lehman Brothers*, *Massey Energy*, *Nu Skin*, *Regions Morgan Keegan*, and *Semtech*.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

practice of reporting staff attorney time exclusively in its own fee declaration in at least seven (7)

of the ten (10) settled cases. Still, Labaton Sucharow acknowledges that, like here, other law

firms have occasionally claimed Labaton Sucharow employed staff attorneys on their fee

petitions.  Johnson Dep. at 28:24-29:7.

Here, the lack of discussion (both internally and externally) as to which firm would report

the hours on its individual fee petition, Labaton Sucharow's familiarity with its own general

practice, and Thornton's reasonable belief that it would list the Staff Attorneys for whose labor

and overhead it had paid, caused a good faith error to occur:  Labaton Sucharow followed its

general practice, while Thornton acted in accord with its own reasonable beliefs, and a good faith

mistake was made.[2]

Nicole Zeiss, Labaton Sucharow's Settlement Counsel, reviewed each fee declaration

individually for form, pursuant to her usual practice at the time.  *See* Zeiss Dep. at 11:15-22,

55:25-56:3; LS Interrog. Resp. No. 54.  She did not compare the declarations to each other,

however.  It was not her usual practice to do so; there is ordinarily no reason to believe that there

should be any overlap between employees of different firms; and she was not told by anyone at

Labaton Sucharow that there was the potential for attorney time to be reported in more than one

fee declaration.  *See* Zeiss Dep. at 24:19-25:4, 56:3-10; LS Interrog. Resp. No. 56.

Additionally, the existence of double-counting between Thornton and Lieff Cabraser fee

declarations was smaller in kind and less obvious on its face, and would not have been

immediately clear on first comparison, particularly to a reviewing attorney from Labaton

---

[2] The differential in hours reported by the two firms for some Staff Attorneys appears to have occurred at least in part because the firms used different sources. Thornton used numbers that were in a report sent to Thornton by Todd Kussin in an email dated August 25, 2015 (TLF-SST-031158); Labaton Sucharow used numbers that it pulled from its system approximately a year later (LS Interrog. Resp. No. 54).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Sucharow.  Although the Thornton and Lieff Cabraser fee declarations include a handful of

overlapping Staff Attorney names, the numbers of hours and lodestars for such Staff Attorneys

consistently differ, and Labaton Sucharow in any event was unaware of any agreement between

Thornton and Lieff Cabraser regarding which of those two firm's fee declarations should reflect

the time of attorneys hosted by Lieff Cabraser but paid for by Thornton.  See LS Interrog. Resp.

No. 36; Goldsmith Dep. at 122:8-10.  Moreover, of the six (6) attorneys who reported time that

was listed by both Lieff Cabraser and Thornton in their fee declarations, the hours for two (2) of

them (Virginia Weiss and Andrew McClelland)[3] were ***correctly*** allocated between Lieff Cabraser

and Thornton and not double-counted—meaning there actually were no errors as to these two

particular attorneys for Labaton Sucharow to detect.  *See* LCHB Interrog. Resp. No. 40;

Chiplock Dep. at 151:8-152:2.

This leaves only four (4) attorneys who reported at least some time that was inadvertently

duplicated and incorrectly included in both Lieff Cabraser's and Thornton's fee declarations—

Christopher Jordan, Jonathan Zaul, Ann Ten Eyck, and Rachel Wintterle.[4]  *See* LCHB Interrog.

---

[3] It bears mentioning that both Ms. Weiss and Mr. McClelland were agency attorneys who were not paid directly by Lieff Cabraser, meaning Thornton paid an outside agency (not Lieff Cabraser) directly for the hours spent by Ms. Weiss and Mr. McClelland reviewing documents assigned to Thornton.  *See* LCHB Interrog. Resp. Nos. 19, 24, 31; Hoffman Dep. at 60:2-8; 60:19-61:16; 80:8-13.  Lieff Cabraser accordingly did not send invoices to Thornton for these two attorneys.  Furthermore, Ms. Weiss worked remotely and thus was not making use of Lieff Cabraser's San Francisco facilities.  *See* LCHB Interrog. Resp. No. 24.

[4] Messrs. Jordan and Zaul were the only Staff Attorneys who were directly paid by Lieff Cabraser but who also performed at least some work (roughly 9 weeks) that was reimbursed by Thornton (and later included in Thornton's fee declaration).  *See* LCHB Interrog. Resp. Nos. 24, 31, 38; Hoffman Dep. at 61:17-62:5.  Messrs. Jordan and Zaul were accordingly the only two Lieff Cabraser lawyers whose time (again, 9 weeks' worth) was invoiced to Thornton.  Messrs. Jordan and Zaul, like Ms. Weiss, also worked remotely, and therefore did not make use of Lieff Cabraser's San Francisco facilities.  *See* LCHB Interrog. Resp. No. 24.

Ms. Ten Eyck and Ms. Wintterle, meanwhile, were lawyers hired from and paid via an outside agency for the entirety of the 3 to 4 months they worked on the case.  *See* LCHB

*Footnote continued on next page*

Resp. Nos. 31, 65; Chiplock Dep. at 152:3-154:20, 156:7-21.  And for each of these four (4) attorneys, the duration of the cost-sharing or hosting arrangement (and the resulting inadvertent redundancy in time-reporting) ranged from just 9 weeks to roughly 3 ½ months—modest, in other words, in comparison to the more than 5-year lifespan of the litigation.  *See* LCHB Interrog. Resp. Nos. 31, 38, 65; Hoffman Dep. at 61:17-62:5 (describing sharing relationship as to Messrs. Jordan and Zaul "[t]hat didn't go on for maybe more than a month or two.").  This factor (combined with the correct allocation of the lodestar by the two (2) other shared Lieff Cabraser/Thornton Staff Attorneys named above) made any timekeeping duplication between Lieff Cabraser's and Thornton's fee declarations even less readily detectable by Labaton Sucharow than the duplication between Labaton Sucharow's and Thornton's fee declarations.

Notwithstanding the foregoing, Labaton Sucharow acknowledges that it, as lead counsel, bore final responsibility to avoid errors in the Fee Petition that reasonably could be detected.  *See* Goldsmith Dep. at 117:4-11.  The double-counting in both pairs of fee declarations regrettably was not detected before the Fee Petition was filed.  Upon learning of the double-counting, however, Labaton Sucharow disclosed it to the Court promptly, publicly, and candidly.  *See* Goldsmith Dep. at 165:15-166:15.

### D.    Request No. 4 – Accuracy Of Fee Declaration Language

The language concerning "hourly rates" that was contained in the individual fee declarations was never intended to mislead the Court, but rather was intended to inform the Court that the hourly rates were the same as or materially similar to rates accepted by courts in other class action matters in which the Firms had filed fee petitions, and were not special rates

---

*Footnote continued from previous page*

Interrog. Resp. Nos. 19, 24, 31, 40.  Lieff Cabraser did not send invoices for the hours worked by these two attorneys because Thornton paid the agency directly for their time.  *See* LCHB Interrog. Resp. Nos. 19, 24, 38, 40.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

for this action.  *See* LS Interrog. Resp. Nos. 61, 71; LCHB Interrog. Resp. No. 63.  For Labaton

Sucharow and Lieff Cabraser, the fee petitions were also meant to impart that the same annual

rates for each attorney and non-lawyer staff person listed therein are used in the lodestar reports

for all fee petitions in a given year (typically for purposes of a lodestar cross-check).  *Id.*; *see*

*also* Rubenstein Decl. at 12 n.14.

Nonetheless, we recognize that the Court and perhaps others have interpreted this

sentence in a manner other than as intended.  In particular, we understand that the Court read this

sentence to mean that the law firms' rates are billed to clients that pay for the firms' services on

an hourly basis.  Labaton Sucharow and Lieff Cabraser have in limited circumstances had clients

who have paid by the hour that were actually billed at those rates, or the analogous rates in a

given year, and the rates in question (or comparable rates in earlier years) were in fact the

"regular" rates charged in such circumstances.  *See* LS Interrog. Resp. Nos. 45, 46; Johnson Dep.

at 53:13-16; Politano Dep. at 43:4-11; LCHB Interrog. Resp. Nos. 49, 54, 63; Heimann Dep. at

87:7-89:7; Chiplock Dep. at 194:24-198:5, 204:6-205:3. Therefore, even if the word "charged"

were read in the literal fashion described above (rather than in the manner it was intended), the

"hourly rates" sentence on its face is not misleading as to Labaton Sucharow and Lieff Cabraser.

It nonetheless remains true that the overwhelming majority of these firms' clients (and all of

Thornton's clients) retain the Firms' services on a contingency basis.

As concerns the language in Garrett Bradley's declaration that refers to the rates as those

of attorneys and professional support staff "in my firm," Thornton responds that it did not intend

through this language to suggest that all persons listed in the fee declaration were employees of

Thornton.  This language resulted from Thornton's use of a template declaration provided to all

firms by Labaton Sucharow.  Unfortunately, Thornton did not modify the template language

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

stating that all of the individuals listed in its fee petition were its own employees.  As Thornton

has acknowledged in its responses to the Special Master's inquiries and in depositions of its

partners – *see, e.g.,* Garrett Bradley Dep. at 81:12-83:13 – it should have modified the language

in the template Labaton Sucharow provided to make it more precise (for example, by inserting an

additional phrase after "in my firm," such as "or performing work on behalf of my firm").

In an effort to avoid any potential confusion, misinterpretation, or perceived lack of

transparency going forward, we recommend that counsel be encouraged to use the following

revised and expanded language:

> The hourly rates for the attorneys and professional support staff in
> my firm, ***or performing work on behalf of my firm***, included in
> Exhibit A are the ~~same as my~~ firm's regular rates charged for their
> type of services ***in contingent-fee matters.*** ~~charged for their~~
> ~~services, which~~ ***These rates (or materially similar rates)*** have been
> accepted ***by courts*** in other complex class actions ***for purposes of***
> ***"cross-checking" lodestar against a proposed fee based on the***
> ***percentage-of-fund method or determining a reasonable fee***
> ***under the lodestar method.***
>
> ***Based on my knowledge and experience, these rates are within***
> ***the range of rates normally and customarily charged in their***
> ***respective cities by attorneys and professional support staff of***
> ***similar qualifications and experience in cases similar to this***
> ***litigation.***
>
> ***To the extent the firm represents clients in non-contingent/***
> ***hourly fee matters, these rates are also the regular rates that***
> ***generally would be charged to those clients for services rendered.***
> ***The firm's current clients, however, do not typically pay an***
> ***hourly rate and instead retain the firm's services on a***
> ***contingent-fee basis.***

This revised and expanded language is derived in part from the individual fee

declarations submitted in the similar *Bank of New York Mellon* Indirect FX class action in which

Lieff Cabraser and Thornton, but not Labaton Sucharow, were involved.  *See* LCHB Interrog.

Resp. No. 63; Chiplock Dep. at 195:14-202:22.  The language is intended to clarify, among other

things, that the hourly rates used in connection with the lodestar cross-check of the requested

fee—while fully supported, customary in the industry, and accepted by courts in other complex

class actions—are used for all lodestar reports in a given year but are not typically billed to the

firms' clients because the firms' clients do not typically pay by the hour.  *See* Chiplock Dep. at

200:3-201:7, 208:15-209:18; Chiplock Dep. Ex. 2 (Lieff Cabraser fee declaration in *Bank of New*

*York Mellon*); *see also* LS Interrog. Resp. Nos. 46 (setting forth rates charged to clients that paid

by the hour), 71; LCHB Interrog. Resp. No. 63.

**E.      Request No. 5 – Factors To Consider In Setting Hourly Billing Rates Of Staff**
**Attorneys**

Labaton Sucharow submits that the appropriate factors and criteria law firm management

should consider in setting hourly billing rates of "off-track" staff attorneys, including the Staff

Attorneys referenced in the Fee Petition, are described in Labaton Sucharow's Responses to

Interrogatory Nos. 44 and 45.  *See also* Politano Dep. at 38:2-42:2.

Lieff Cabraser, for its response, refers to the response to Sections A and B above (and the

testimony and discovery responses cited therein), in addition to the documents produced by Lieff

Cabraser and the declaration by Professor Rubenstein.

Thornton, for its response, states that given the contingency nature of its work, Thornton

does not set hourly billing rates annually or as a routine matter.  *See* Thornton Interrog. Resp.

Nos. 49, 51, 52, 55.  In this case, Thornton used a rate of $425 per hour for the Staff Attorneys

for whose labor and overhead it paid because that rate had been used and accepted by the court in

*In re Bank of New York Mellon Corp.*, 12-MD-02335, S.D.N.Y., and because it was Thornton's

understanding, from communications with co-counsel more than a year prior to the submission

of the Fee Petition, that a rate of $425 per hour therefore would be reasonable to use in the State

Street Litigation.  *See* Hoffman Dep. at 58:17-59:18; Garrett Bradley Dep. at 48:20-49:5;

Thornton Interrog. Resp. Nos. 27, 52.

Thornton submits the following information concerning the hourly rate of Michael

Bradley, the outside attorney who performed document review work on the matter, and for

whose work Thornton used an hourly rate of $500 in its lodestar calculation.  As Thornton has

previously identified in its interrogatory responses, Mr. Bradley is an actively practicing,

Massachusetts-admitted lawyer who occasionally performs work for Thornton and its clients.

*See* Thornton Interrog. Resp. No. 45; Michael Bradley Dep. at 29:11-16.  As detailed in his

deposition and in Thornton's responses to interrogatories, Mr. Bradley is an experienced lawyer

who has been practicing since 2005, including for the government and as a solo practitioner. *Id.*

at 11:7-12:9. Michael Bradley is not an employee of the firm, but rather has provided legal

services to the firm and its clients on occasion.

A need for Mr. Bradley's services arose in 2013, when the Firms began to receive

documents in the State Street matter and, consequently, began staffing a document review.

Garrett Bradley believed that Michael Bradley's experience as an attorney and his background,

specifically his service as the former head of the Massachusetts Underground Economy Task

Force, might make him particularly qualified to potentially provide a unique perspective on the

documents he reviewed. As such, Garrett Bradley approached Michael Bradley, who agreed to

assist Thornton with the document review.  Garrett Bradley sought and received the approval of

Michael Thornton, then-managing partner of Thornton, for this arrangement.

Michael Bradley was justified in requesting and receiving $500 per hour for his services.

Michael Bradley Dep. at 28:17-29:5. Mr. Bradley and Garrett Bradley have testified that Michael

Bradley's rate of $500 per hour was based on two key benchmarks.  First, Michael Bradley had

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

been paid $450 per hour by a private client prior to beginning his work on the State Street

matter.[5]  Michael Bradley Dep. at 28:17-29:5.  Second, Michael Bradley's $500 per hour rate

was also benchmarked to his risk of receiving nothing for his time.  Unlike in the case of his

paying client, in the State Street matter Michael Bradley performed the work on a contingent

basis, thus saving Thornton the upfront cost of paying him for his work, and taking on the risk

that, if the case did not have a positive resolution for the Plaintiffs, he would not be compensated

for his work.  *See* Thornton Interrog. Resp. Nos. 43, 44; Michael Bradley Dep. at 28:17-29:5;

Garrett Bradley Dep. at 53:22-54:10.  Michael Bradley took this risk and performed work,

without pay, for more than two years.  Charging a slightly higher rate for Mr. Bradley's work

than for the work of attorneys who were paid concurrently for their work accords with

commonly accepted principles governing contingent fee matters.  *See United States v. Overseas*

*Shipholding Grp., Inc.*, 625 F.3d 1, 13 (1st Cir. 2010) (quoting *Farmington Dowel Prods. Co. v.*

*Forster Mfg. Co.*, 421 F.2d 61, 90 (1st Cir. 1969)) ("[T]he fact that a fee arrangement is

contingent upon success is a relevant factor in determining the appropriate fee level. The reason

is that 'the fact that the attorney is willing to take an all-or-nothing-arrangement might justify a

fee which is higher than the going hourly rate in the community'"); *see also* Restatement (Third)

of the Law Governing Lawyers § 35, Comment c, "Reasonable contingent fees" (2000) ("A

contingent fee may permissibly be greater than what an hourly fee lawyer of similar

qualifications would receive for the same representation. A contingent-fee lawyer bears the risk

of receiving no pay if the client loses and is entitled to compensation for bearing that risk.") *See*

*also* Rubenstein Decl. at 30, n. 48.

---

[5] Indeed, Michael Bradley charged a private client $500 per hour in early 2017 as well.
Michael Bradley Dep. at 16:17-17-3.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Finally, Thornton submits that, as his testimony and documents produced by Thornton demonstrate, Michael Bradley consistently reviewed documents in the Catalyst database over a two-year period.  Mr. Bradley's work during this period totaled 449.1 hours.  Thornton mistakenly undercounted this time in its lodestar chart, accounting for only 406.1 hours of his time.  *See* Michael Bradley Dep. at 30:5-12; 55:13-56:10; 58:19-59:11; *see e.g.* TLF-SST-005020; TLF-SST-000588 – TLF-SST-000611; TLF-SST-010790; TLF-SST-010826; TLF-SST-010832; TLF-SST-013319.

**F.      Request No. 6 – Reasoning For Entering Into The Cost-Sharing Agreement In This Matter**

Labaton Sucharow states that the principal reasons for entering into a cost-sharing agreement by which a firm employing staff attorneys invoices another firm for the work performed by one or more of those staff attorneys are to share costs and risk, so that the firm receiving and paying the invoices has "skin in the game" with respect to an ongoing and expensive project.  Staff attorney cost-sharing is simply one example of the arrangements that law firms in multi-firm class actions make in an effort to share work, costs, and associated risk equitably.  *See* Belfi Dep. at 50:19-51:16; LS Interrog. Resp. 30, 32 ; *see also* Chiplock Dep. at 127:11-128:16; Garrett Bradley Dep. at 43:4-13.

Here, as noted in No. 3 above, Labaton Sucharow entered into a cost-sharing agreement with Thornton in which Labaton Sucharow allocated certain Staff Attorneys to Thornton and invoiced Thornton on a monthly basis for the work those Staff Attorneys performed.  While attorneys from both firms recall the cost-sharing arrangement, no one from either firm recalls an explicit agreement about how these hours would be accounted for on eventual fee declarations, which led to the reasonable assumptions and good-faith error described above.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Lieff Cabraser, for its part, assumed (like Thornton) that Thornton would include any Staff Attorney hours for which Thornton had borne financial responsibility, and thus the risk of non-payment, in its own lodestar report.  LCHB Interrog. Resp. Nos. 34, 39, 40; Thornton Interrog. Resp. Nos. 31, 36.  As noted above, four of the Staff Attorneys for whom Thornton shared financial responsibility with Lieff Cabraser were agency lawyers, for whom Thornton paid outside agencies directly.  *See supra n.* 3, 4.  Only two of the Staff Attorneys shared between Lieff Cabraser and Thornton were ordinarily paid directly by Lieff Cabraser.  For just those two attorneys, therefore, Lieff Cabraser prepared invoices for the time to be reimbursed by Thornton (roughly 9 weeks' worth).  *See supra* n. 4.

## G.   Request No. 7 – Recommendations On Best Practices

The Firms collectively submit the following recommendations that the Special Master may wish to include in his Report and Recommendation to the Court. Together we respectfully submit five global reforms that, taken together, will significantly reduce the likelihood of confusion, misinterpretation, or any perceived lack of transparency regarding counsel's disclosure concerning hourly rates, and will significantly reduce the likelihood of recurrence of errors of the kind found here.  In addition, we submit individual policy changes that each firm will implement in order to further safeguard against the inadvertent errors that occurred in this case.

*First,* the Firms agree that, promptly after a court grants preliminary approval to a proposed settlement,[6] lead counsel shall commence or revisit a substantive dialogue with all

---

[6] *See* Goldsmith Dep. at 115:23-116:22 (116:17-22:"[I]n my mind, one of the reasons this happened is because you had a very large passage of time between the end of the review project and putting in the papers where the review project impacted the presentation."); 123:23-124:7 (preliminary approval is "the right time to do it because that's the time you have an actual settlement . . . .  That is the point the lawyers are looking ahead to filing a settlement motion and
*Footnote continued on next page*

counsel in the case concerning protocols for reporting lodestar in a forthcoming petition for

attorney's fees. The subjects of this dialogue shall include, without limitation, which law firms

will submit an individual fee declaration; the hourly rates used for professionals and

paraprofessionals; whether certain categories of time should be excluded in whole or in part;

whether certain timekeepers should be excluded in whole or in part; and how time logged by

staff attorneys or other attorneys engaged on a temporary basis will be reported. Lead counsel

shall ensure that the lodestar reporting protocol is documented and circulated among all counsel,

and that all counsel are in agreement before individual fee declarations are prepared and filed.[7]

*Second,* in cases where the costs of any staff may have been shared, lead counsel, upon

receiving draft fee declarations from co-counsel, shall promptly circulate all such draft

---

*Footnote continued from previous page*
fee petition. So people are going to naturally have those issues in mind."), 124:8-18, 130:15-24;
*see also* Chiplock Dep. at 174:24-176:17, 181:10-182:21 (testifying that significant and unusual
factor here was passage of more than a year between (1) agreement in principle to settle litigation
and discussions among counsel concerning lodestar reporting issues and (2) filing of fee
petition).

[7] *See* Goldsmith Dep. at 122:4-127:3 (123:7-14: "[W]hen the court issues an order
granting preliminary approval to the case, that should be the point, or at least the latest point,
where all the counsel get together and discuss . . . how this is going to be handled."); Rogers
Dep. at 105:12-15 ("[I]t probably would have been good for the three parties to have literally
memorialized some kind of agreement."); Chiplock Dep. at 221:12-18 ("I think there should
have been more coordination and communication amongst the firms before the individual fee
declarations were submitted, in order to assure that we did not confuse the court."); Lesser Dep.
at 90:13-15 ("Case of this size with this many firms, this number of attorneys involved,
obviously, you can have better communication, more coordination . . . ."); Zeiss Dep. at 56:14-
57:3 ("So now what I do is, when a settlement's passed to me, I ask our accounting department if
there is any STA cost sharing, I speak with the litigation team, see if there's any STA cost
sharing. . . . And then, if there is, yes, we talk internally about how we think it should be
handled, and speak with the firms that are . . . sharing the costs and make sure we're all on the
same page about how the time will be reported.").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

declarations to all counsel before the fee petition is filed.  All counsel shall review all the draft

fee declarations closely and share any perceived errors or concerns with all other counsel.[8]

*Third,* each individual firm declaration submitted in support of a petition for attorney's

fees shall include clear and accurate language concerning that firm's billing practices.  For

instance, the revised and expanded model language set forth in Section D above, or substantially

similar language, will be used by the Firms in future fee applications. *See* Goldsmith Dep. at

126:3-11.

*Fourth,* the Firms agree that further direction from the presiding judge is necessary to

ensure that all facts relevant to the court's analysis of a fee petition are brought to its attention.

To that end, the firms suggest that the Special Master recommend that each judge presiding over

a class action lawsuit draft a standing order that sets forth those facts which the presiding judge

believes are important to his or her analysis of an eventual fee petition.  Such direction would

---

[8] *See* Goldsmith Dep. at 125:4-9 ("Another issue that I would suggest or reform that I would suggest is that lead counsel, upon receiving drafts of all of the fee declarations from cocounsel, circulate them to all of the counsel in the case."), 125:18-24 ("What I would suggest going forward is that we particularly circulate them, everyone to everyone, so you've got multiple eyes, you got redundancy.  And I think, again, it will prompt people to point out potential issues or problems."); *see* Johnson Dep. at 55:23-56:11 ("The second thing we have done is to work with Nicole Zeiss to expand the checklist that she uses for all settlements.  In the past we focus[ed] that checklist on areas that we thought would potentially be more problematic, and those related primarily to expenses.  We have now expanded that so that a cross check is done with all of the attorneys listed on the main fee application and any small fee declaration."); Chiplock Dep. at 159:5-18 ("So it was all there, all the hours were there, all the names were there, including names that appeared on more than one ledger.  Had I seen the other two petitions and seen the overlapping names, . . . it might have spurred me to say, ' . . . I'm going to go back and make sure that we deleted the time we needed to delete before this petition goes in.'"), 225:8-13 ("I think there would have been a benefit to the people who had been involved in the nitty gritty of the litigation maybe being more involved in eyeballing the fee declarations."), 228:10-16 ("[O]nly one firm [Labaton] had access to all the fee declarations before they were filed.  And if there was an opportunity to catch a mistake, that was it, in addition to the opportunities that I had and missed before my individual fee declaration was filed."); Lesser Dep. at 90:16-18 ("[A]s far as reviewing critical documents, build some more redundancy into the system so that things don't get missed.").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

ensure that class counsel do not mistakenly fail to identify facts that the court wishes to consider, enable class counsel to staff each case according to that judge's preferences (if any), and encourage the compilation and recordation of relevant information from the beginning of the case. *See, e.g.,* Heimann Dep. at 91:17-100:20.

*Fifth*, the Firms recommend that in complex class cases involving multiple firms, where there is a leadership structure amongst counsel imposed, the firms should report their lodestar to lead counsel on at least a semi-routine basis for the lifetime of the case. While typical in the multi-district litigation ("MDL") context (and often made mandatory in MDL orders appointing a leadership structure or committee), this practice is less regularized in class cases that are not MDLs. While such exchange was done in this case on several occasions and on an ad-hoc basis, regulating this process will aid in the capturing and correcting of errors or inadvertent duplication between the Firms as to any of their shared Staff Attorneys. Accordingly, it may be beneficial to make such periodic reports amongst plaintiffs' counsel a more regular and required feature of complex class cases such as this one, particularly if any timekeepers are performing work for more than one firm, and for lead counsel to be more specifically tasked with implementing and enforcing this requirement (*i.e.,* in the order appointing lead counsel) in addition to its other functions.

In addition to the above global recommendations, to avoid possible double-counting clerical errors like the ones that occurred here, Labaton Sucharow has now adopted for all cases going forward the following policy to formalize its general practice for the reporting of staff attorney hours in a fee petition: In all future class actions in which Labaton Sucharow serves as lead or co-lead counsel, all hours billed by staff attorneys who are Labaton Sucharow employees will be reported to the court exclusively in Labaton Sucharow's individual fee declaration and

lodestar report, regardless of whether or to what extent costs relating to such staff attorney were paid or reimbursed by another law firm during the pendency of the case.[9]  Lieff Cabraser, for its part, will follow the same practice going forward.

For its part, when it enters into cost-sharing arrangements by which non-employee attorneys have performed work on a case, Thornton will disclose the existence of such agreements to the court in its individual fee declaration.

These reforms will be effective because they are straightforward, easy to implement, and widely if not universally applicable to the Firms' class action matters.  We respectfully submit them for the Special Master's and the Court's consideration.

Dated: August 1, 2017                                   Respectfully submitted,


By:  /s/ Joan A. Lukey
      Joan A. Lukey, Esq.
      Choate, Hall & Stewart LLP
      Two International Place
      Boston, MA 02110

      *Counsel for Labaton Sucharow LLP*

---

[9] *See* Johnson Dep. at 55:2-8 ("[W]e are now prohibiting the practice of allowing staff attorneys to work as Labaton employees and for their hourly rates to be reimbursed to us by another firm.  So that is prohibited in all cases."); Goldsmith Dep. at 126:12-127:3 ("I think personally that our firm should have a specific policy going forward on how this will be done. . . .  And the policy that I would advocate is that all Labaton Sucharow staff attorney time should be on the Labaton Sucharow lodestar."); *see also* Belfi Dep. at 55:2-15; G. Bradley Dep. at 78:17-79:1; Chiplock Dep. at 138:3-21; Lesser Dep. at 55:15-20; Rogers Dep. at 93:2-11; Sucharow Dep. at 26:7-15; Thornton Dep. at 74:16-75:6 (remarks of Special Master describing method of reporting staff attorney lodestar and cost-sharing consistent with this policy).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

By: /s/ Richard M. Heimann

    Richard M. Heimann
    Lieff Cabraser Heimann & Bernstein, LLP
    275 Battery Street, 29th Floor
    San Francisco, CA  94111

    *Attorney for Lieff Cabraser Heimann & Bernstein, LLP*


By: /s/ Brian T. Kelly

    Brian T. Kelly, Esq.
    Nixon Peabody LLP
    100 Summer Street
    Boston, MA 02110

    *Counsel for The Thornton Law Firm LLP*

8241244

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 6

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | |
| Plaintiff, | |
| v. | No. 11-cv-10230 MLW |
| STATE STREET BANK AND TRUST COMPANY, | |
| Defendant. | |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, | |
| Plaintiff, | |
| v. | No. 11-cv-12049 MLW |
| STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, | |
| Defendants. | |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, | |
| Plaintiff, | |
| v. | No. 12-cv-11698 MLW |
| STATE STREET BANK AND TRUST COMPANY, | |
| Defendant. | |

## LIEFF CABRASER HEIMANN & BERNSTEIN LLP'S RESPONSES TO SPECIAL MASTER HONORABLE GERALD E. ROSEN'S (RET.) FIRST SET OF INTERROGATORIES DUE ON JULY 10, 2017

The Firm's overall strategy, along with that of the other Plaintiffs' Law Firms, remained constant throughout the SST Litigation, which was to maximize the recovery to the class as a whole while taking into account the risk of litigation and the eventual possibility of an adverse judgment or denial of class certification.  By the time the agreement in principle was reached to settle the SST Litigation, the Firm was prepared to accept (as was similarly accepted in the BNY Mellon settlement) that ERISA plans who were members of the class justifiably could be afforded a slight premium in their shares of the overall recovery given the separate litigation threat posed by the DOL and the potentially greater ease with which ERISA claims could be certified for class treatment (assuming such claims got past a motion to dismiss, which never technically happened in either the SST Litigation or in BNY Mellon).  Accordingly, the Firm participated in discussions with Plaintiffs' Law Firms, ERISA counsel, and the DOL to construct the settlement plan of allocation in a manner that would afford participating ERISA plans a modest premium in their recoveries.

Daniel P. Chiplock, LCHB Partner, has the most knowledge of the information provided in this Response.

**<u>INTERROGATORY NO. 24</u>:**

Please list the full name of each Staff Attorney who worked on the SST Litigation/ Document Review.  Please include for each Staff Attorney: his/her employment classification (full-time/part-time employee or independent contractor); how long he or she worked (has worked) at the Firm; the name/description of any other cases to which he or she was assigned during the pendency of SST Litigation/Document Review; whether he/she was allocated to Thornton for any portion of the SST Litigation; any prior experience in securities class action

litigations, foreign-exchange trading and/or mismanagement of custodial funds; the physical location where the work was performed; and the hourly rate charged in the Fee Petition.

**RESPONSE TO INTERROGATORY NO. 24:**

LCHB incorporates the general objections stated above.  LCHB further objects to this Interrogatory on the grounds that it is burdensome and duplicative of other discovery directed to LCHB, including document requests.  Most of the information sought by this Interrogatory can be found in LCHB's document productions.  Subject to and without waiving those objections, LCHB responds as follows:

The LCHB Staff Attorneys who worked on the SST Litigation/Document Review were Tanya Ashur, Joshua Bloomfield, Elizabeth Brehm, Jade Butman, James Gilyard, Kelly Gralewski, Christopher Jordan, Jason Kim, James Leggett, Colleen Liebmann, Andrew McClelland, Scott Miloro, Leah Nutting, Marissa Oh (Lackey), Peter Roos, Ryan Sturtevant, Virginia Weiss, and Jonathan Zaul.  The hourly rate listed in the Fee Petition for all of these Staff Attorneys was $415, except for Joshua Bloomfield, Jade Butman, and Marissa Oh, whose listed hourly rate was $515.

Two other Staff Attorneys – Rachel Wintterle and Ann Ten Eyck – worked in LCHB's San Francisco offices alongside LCHB Staff Attorneys, were supervised in the same manner, and were assigned similar work as the other Staff Attorneys, but were contracted and paid for by Thornton through an outside agency, and thus are not included in the definition of "LCHB Staff Attorneys" for this Response.  They were inadvertently and erroneously included in LCHB's lodestar calculation for reasons previously and elsewhere explained in these Responses.

The following LCHB Staff Attorneys were payroll employees paid directly by LCHB for the duration of the SST Litigation:  Tanya Ashur, Elizabeth Brehm, James Gilyard, Kelly

Gralewski, Jason Kim, Christopher Jordan, Coleen Liebmann, Scott Miloro, Marissa Oh, Peter

Roos, and Jonathan Zaul.

The following LCHB Staff Attorneys were payroll employees paid through an outside

agency for the duration of the SST Litigation:  Jade Butman (24 hours total), Andrew

McClelland (58 hours total), and Virginia Weiss (473.50 hours total).

The following Staff Attorneys were, at different times during the SST Litigation, either

paid directly by LCHB or paid through an outside agency, as follows:

Joshua Bloomfield:  Paid via agency in 2013, paid directly by LCHB in 2015.

Leah Nutting:  Paid via agency in 2013, paid directly by LCHB in 2015.

James Leggett:  Paid via agency from 1/21/15—1/25/15, paid directly by LCHB as of

1/26/15.

Ryan Sturtevant:  Paid via agency from 1/20/15—1/27/15, paid directly by LCHB as of

1/28/15.

The LCHB Staff Attorneys who did at least some work allocated to Thornton during the

life of the SST Litigation were Chris Jordan, Andrew McClelland, Virginia Weiss, and Jonathan

Zaul.

The following LCHB Staff Attorneys physically worked on the SST Litigation/Document

Review in LCHB's San Francisco offices: Tanya Ashur, Jade Butman, James Gilyard, Jason

Kim, James Leggett, Coleen Liebmann, Andrew McClelland, Marissa Oh, Peter Roos, and Ryan

Sturtevant.

Scott Miloro physically worked in LCHB's New York offices.

The following LCHB Staff Attorneys worked remotely on the SST Litigation/Document

Review (remote work locations are in parentheses):  Joshua Bloomfield (San Francisco, CA),

Elizabeth Brehm (Shoreham, NY), Kelly Gralewski (San Diego, CA), Chris Jordan (Houston, TX and Atlanta, GA), Leah Nutting (San Francisco, CA), Virginia Weiss (Rochester, MN and Sacramento/Roseville, CA), and Jonathan Zaul (San Francisco, CA).

The following LCHB Staff Attorneys are still employed by or performing work for LCHB (total number of years worked for LCHB, with any gaps in employment excluded, are indicated in parentheses):  Tanya Ashur (3.5 years), Kelly Gralewski (8.5 years), Chris Jordan (4.5 years), Jason Kim (5.5 years), James Leggett (3.5 years), Coleen Liebmann (2.5 years), Scott Miloro (5.5 years), Leah Nutting (4.5 years), Marissa Oh (3.5 years), Peter Roos (4.5 years), Ryan Sturtevant (3 years), Virginia Weiss (2.5 years), and Jonathan Zaul (4.5 years).

The following LCHB Staff Attorneys are no longer employed by or performing work for LCHB (number of years at LCHB is indicated in parentheses):  Joshua Bloomfield (2 years), Elizabeth Brehm (2 years), Jade Butman (1 year), James Gilyard (2.5 years), and Andrew McClelland (1.5 years).

The following LCHB Staff Attorneys worked at least part-time on the SST Litigation/Document Review in 2013-2014, with any other LCHB cases to which they were assigned during that time-period indicated in parentheses:  Joshua Bloomfield (BNY Mellon, British Airways Fuel Surcharge); Elizabeth Brehm; Kelly Gralewski (BNY Mellon, Microsoft-Canada, Florida Tobacco); Scott Miloro (BNY Mellon, Copytele, Siskin Patent, ING Direct Flat Fee, Multaq Qui Tam, Takata, Merck/Vioxx Securities Litigation, NYSCRF-Pratcher); and Leah Nutting (BNY Mellon).[1]

---

[1] For purposes of this Response, "BNY Mellon" refers to *In re Bank of New York Mellon Corp. Foreign Exchange Transactions Litigation*, MDL No. 2335 (LAK) (S.D.N.Y.); "British Airways Fuel Surcharge" refers to *Dover v. British Airways*, Case No. 1:12-cv-05567 (E.D.N.Y.); "Microsoft-Canada" refers to *Pro-Sys Consultants and Neil Godfrey v. Microsoft Corporation and Microsoft Canada Co./Microsoft Canada CIE*, Case No. LO43175 (Vancouver Registry); "Florida Tobacco" refers to *In re Engle Cases*, No. 3:09-cv-10000-J-32 JBT (M.D. Fl.); "Copytele" refers to *In the Matter of the Arbitration between CopyTele and AU Optronics*, Case No. 50 117 T

*Footnote continued on next page*

1352896.2

The following LCHB Staff Attorneys worked on the SST Litigation/Document Review from January through June 2015, with any other LCHB cases on which they performed work (even if only a handful of hours) during that time-period indicated in parentheses:  Tanya Ashur (BNY Mellon), Joshua Bloomfield (British Airways Fuel Surcharge), Elizabeth Brehm, James Gilyard (BNY Mellon), Chris Jordan (BNY Mellon), Jason Kim (BNY Mellon), James Leggett (BNY Mellon), Coleen Liebmann (Hong Leong Finance Limited, Merck/Vioxx Securities Litigation, Schwab), Scott Miloro (BNY Mellon, Multaq Qui Tam, Takata, Merck/Vioxx), Leah Nutting (BNY Mellon), Marissa Oh (BNY Mellon), Peter Roos (Nike Copyright, Apple Unlimited 3G, Benicar, Takata, Celera, Schwab), Ryan Sturtevant (Celera, Hong Leong Finance, Schwab), Virginia Weiss (BNY Mellon), and Jonathan Zaul (BNY Mellon, Photographer Copyright Class Actions).

The following Staff Attorneys put in more limited hours in 2015 on the SST Litigation/Document Review, with any other LCHB cases on which they performed work during that time-period indicated in parentheses: Jade Butman (Hong Leong Finance Limited,

---

*Footnote continued from previous page*

009883 13 (Internat'l Centre for Dispute Resolution); "ING Direct Flat Fee" refers to *ING Bank Rate Renew Cases*, Case No. 11-154-LPS (D. Del.); "Multaq Qui Tam" refers to *U.S. ex rel. Abbate v. Sanofi-Aventis, et al.*, Case No. 2 :15-cv-01510-SRC (D. N.J.); "Takata" refers to *In re Takata Airbag Litigation*, MDL No. 2599 (S.D. Fl.); "Merck/Vioxx Securities Litigation" refers collectively to *Honeywell International Inc. Defined Contribution Plans Master Savings Trust. v. Merck & Co.*, No. 14-cv 2523-SRC-CLW (S.D.N.Y.), *Janus Balanced Fund v. Merck & Co.*, No. 14-cv-3019-SRC-CLW (S.D.N.Y.), *Lord Abbett Affiliated Fund v. Merck & Co.*, No. 14-cv-2027-SRC-CLW (S.D.N.Y.), and *Nuveen Dividend Value Fund (f/k/a Nuveen Equity Income Fund), on its own behalf and as successor in interest to Nuveen Large Cap Value Fund (f/k/a First American Large Cap Value Fund) v. Merck & Co.*, No. 14-cv-1709-SRC-CLW (S.D.N.Y.); "NYSCRF-Pratcher" refers to *Richardson v. Pratcher*, No. 12-cv-08451-JGK (S.D.N.Y.); "Hong Leong Finance Limited" refers to *Hong Leong Finance Limited (Singapore) v. Morgan Stanley, et al.*, No. 653894/2013 (Sup. Ct. N.Y.); "Nike Copyright" refers to *Rentmeester v. Nike, Inc.*, D.C. No. 3:15-cv-00113-MO (D. Or.); "Apple Unlimited 3G" refers to *In Re Apple and AT&T iPad Unlimited Data Plan Litigation*, No. 5:10-cv-02553 RMW (N.D. Ca.); "Benicar" refers to *Benicar Litigation*, MDL No. 2606 (D. N.J.); "Celera" refers to *Biotechnology Value Fund, L.P. v. Celera Corp.*, 3:13-cv-03248-WHA (N.D. Cal.); "Schwab" refers collectively to *The Charles Schwab Corp. v. BNP Paribas Sec. Corp.*, No. CGC-10-501610 (Cal. Super. Ct.); *The Charles Schwab Corp. v. J.P. Morgan Sec., Inc.*, No. CGC-10-503206 (Cal. Super. Ct.); *The Charles Schwab Corp. v. J.P. Morgan Sec., Inc.*, No. CGC-10-503207 (Cal. Super. Ct.); and *The Charles Schwab Corp. v. Banc of America Sec. LLC*, No. CGC-10-501151 (Cal. Super. Ct.); and "Photographer Copyright Class Actions" refers to *Dennis Kunkel Microscopy, Inc. et al. v. John Wiley & Sons, Inc.*, C.A. No. 15-00094 (JLL) (JAD) (D. N.J.). "Siskin Patent" was a possible patent infringement investigation that did not result in a filed case.

1352896.2

Merck/Vioxx Securities Litigation, Schwab), Elizabeth Brehm, and Andrew McClelland (BNY Mellon).

The majority of LCHB's Staff Attorneys had substantial experience working on cases involving foreign-exchange trading and mismanagement of custodial funds by virtue of their work on the BNY Mellon litigation.  The number of hours worked by each of the following Staff Attorneys in the BNY Mellon litigation, as recorded in the fee petition submitted by LCHB in that litigation (and previously produced to the Special Master), is indicated in parentheses: Tanya Ashur (2,414.50 hours), Joshua Bloomfield (2,183.00 hours), James Gilyard (2,614.50 hours), Kelly Gralewski (301.50 hours), Christopher Jordan (1,572.90 hours), Jason Kim (2,659.00 hours), James Leggett (2,476.20 hours), Andrew McClelland (1,799.00 hours), Scott Miloro (3,146.80 hours), Leah Nutting (3,128.40 hours), Marissa Oh (Lackey) (2,575.70 hours), Virginia Weiss (1,445.80 hours), and Jonathan Zaul (2,197.90 hours).

Of the few LCHB Staff Attorneys who did not work on the BNY Mellon litigation, Jade Butman, Coleen Liebmann, Peter Roos, and Ryan Sturtevant otherwise had experience working on securities/financial fraud matters at the Firm, including the Hong Leong Finance Limited, Merck/Vioxx Securities Litigation, Schwab, and Celera matters listed above.[2]

Elizabeth Brehm was the only LCHB Staff Attorney who did not work on any other LCHB cases apart from the SST Litigation.  Prior to working for LCHB, however, Ms. Brehm

---

[2] In the Hong Leong Finance Limited case, LCHB represented a Singaporean bank in a lawsuit against Morgan Stanley to recover losses stemming from a failed complex financial investment product that was created by Morgan Stanley and distributed to the Singaporean bank's clients.  In the Merck/Vioxx Securities Litigation, LCHB represented a number of mutual funds managed by major investment advisors against Merck for losses sustained in the clients' holdings of Merck stock stemming from Merck's alleged misrepresentations concerning the safety of the painkiller drug Vioxx.  In the Schwab cases, LCHB represented Charles Schwab in four separate individual securities actions against certain issuers and sellers of mortgage-backed securities ("MBS") for materially misrepresenting the quality of the loans underlying the securities in violation of California state law.  In Celera, LCHB represented a group of affiliated funds investing in biotechnology companies in a securities fraud action arising from misconduct in connection with Quest Diagnostics Inc.'s 2011 acquisition of Celera Corporation.

specialized in securities/financial fraud and antitrust cases while an associate at another

plaintiffs' class action firm (Kirby McInerney LLP).

Daniel P. Chiplock, LCHB Partner, and Steven E. Fineman, LCHB Managing Partner,

have knowledge of the information provided in this Response.

**INTERROGATORY NO. 25:**

For each of the Staff Attorneys listed above, please describe all compensation paid to the

Staff Attorney and the total number of hours recorded for work on the SST Litigation/Document

Review.

**RESPONSE TO INTERROGATORY NO. 25:**

LCHB incorporates the general objections stated above.  LCHB further objects to this

Interrogatory on the grounds that it is burdensome and duplicative of other discovery directed to

LCHB, including document requests.  The information sought by this Interrogatory can be found

in LCHB's document productions.  Subject to and without waiving those objections, LCHB

responds as follows:

The hours worked by and compensation paid to the LCHB Staff Attorneys for the SST

Litigation are as follows:  Tanya Ashur (843.50 hours, $33,740.00), Joshua Bloomfield (2,033.20

hours, $98,328.00), Elizabeth Brehm (1,682.90 hours, $75,747.38), Jade Butman (24.00 hours,

$1,194.00), James Gilyard (882.00 hours, $35,280.00), Kelly Gralewski (1,478.90 hours,

$67,650.50), Christopher Jordan (539.90 hours, $24,295.50), Jason Kim (904.00 hours,

$37,968.00), James Leggett (893.00 hours, $35,810.00), Colleen Liebmann (24.00 hours,

$1,008.00), Andrew McClelland (58.00 hours, $3,040.36), Scott Miloro (658.80 hours,

$29,855.30), Leah Nutting (1,940.10 hours, $115,861.25), Marissa Oh (Lackey) (800.30 hours,

$32,012.00), Peter Roos (780.00 hours, $39,230.00), Ryan Sturtevant (796.00 hours,

**INTERROGATORY NO. 32:**

For each of the categories listed above, explain the Firm's understanding of how those fees, costs and/or expenses would be reported to the Court in the event of a successful verdict and/or settlement.

**RESPONSE TO INTERROGATORY NO. 32:**

LCHB incorporates the general objections stated above.  LCHB further objects to this Interrogatory on the grounds that it is vague.  Subject to and without waiving those objections, LCHB responds as follows:

In the event of a successful verdict or settlement, the Firm's understanding was that the costs and expenses it had advanced during the litigation would be reported and broken out by category as they were in Exhibit B to the Firm's Fee Petition (e.g., Litigation Fund Contribution, Mediation Expenses, etc.).  With respect to Staff Attorneys, the Firm's understanding was that for purposes of any lodestar crosscheck, the Plaintiffs' Law Firms would include in their time reports any attorney hours for which they had specifically borne the financial obligation and the accompanying risk of non-payment.  In this manner, the same Staff Attorney name could appear on more than one Plaintiffs' Law Firm's time report, since the financial responsibility for those particular Staff Attorneys shifted between firms during the litigation (in 2015 only, at least as far as LCHB is concerned).

Daniel P. Chiplock, LCHB Partner, has the most knowledge of the information provided in this Response.

**INTERROGATORY NO. 46:**

Please describe any previous matters, whether based on a contingency, hourly, or other fee arrangement, in which the Film engaged in a fee dispute with a client or class representative

-19-

Steven E. Fineman, LCHB Managing Partner, has knowledge of the information provided in this Response.

Dated: July 10, 2017

Respectfully submitted,

Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
415-956-1000

By: _____
     Richard M. Heimann
     Attorney for Lieff Cabraser Heimann &
     Bernstein, LLP

# EXHIBIT 7

| | |
|---|---|
| **From:** | Sucharow, Lawrence <LSucharow@labaton.com> |
| **Sent:** | Tuesday, August 30, 2016 10:37 AM |
| **To:** | Garrett J. Bradley |
| **Subject:** | RE: State Street |

Just to you.
I'm flying Tuesday but available til Noon your time & that day.
&

**From:** Garrett Bradley [mailto:GBradley@tenlaw.com]
**Sent:** Tuesday, August 30, 2016 10:27 AM
**To:** Michael Thornton; Daniel P. Chiplock; Sucharow, Lawrence
**Cc:** Belfi, Eric J.; Keller, Christopher J.
**Subject:** Fwd: State Street
&
Please see the attached fully executed fee agreement in the State Street matter.
&
Also when I spoke with Larry today he raised some concerns about the Judge's comments and the different percentages between Erisa and non-Erisa and would like to have a call tomorrow or next Tuesday to discuss this matter among the group and then, potentially, the Erisa counsel group as well. & Can everyone let me know their availability? &
&
Thank you ,
&
Garrett

This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by the attorney-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error; please immediately notify us by telephone at (800) 431-4600. You will be reimbursed for reasonable costs incurred in notifying us.
***Privilege and Confidentiality Notice***

This electronic message contains information that is (a) LEGALLY PRIVILEGED, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and (b) intended only for the use of the Addressee(s) named herein. If you are not the Addressee(s), or the person responsible for delivering this to the Addressee(s), you are hereby notified that reading, copying, or distributing this message is prohibited. If you have received this electronic mail message in error, please contact us immediately at 212-907-0700 and take the steps necessary to delete the message completely from your computer system. Thank you.

Confidential: Produced Pursuant to Court Order.                    TLF-SST-032696

# EXHIBIT 8

The undersigned are co-counsel in the Arkansas Teacher Retirement System v. State Street Corporation, C.A. No. 11-CV-10230 (MLW) matter before Judge Mark L. Wolf which is scheduled for a final hearing on November 2, 2016. The matter relates to FX fraud.

The undersigned agree to the division of fees as follows:

    10%    ERISA Counsel
    5.5%   Labaton Sucharow's local counsel

Of the remaining 84.5%, the undersigned agree it shall be divided as follows:

    47%    Labaton Sucharow
    29%    Thornton Law Firm
    24%    Lieff, Cabraser, Heimann & Bernstein, LLP and Robert Lieff

Lawrence A. Sucharow for
LABATON SUCHAROW

Michael P. Thornton for
THORNTON LAW FIRM LLP

Daniel P. Chiplock for
LIEFF, CABRASER, HEIMANN &
BERNSTEIN LLP

Robert L. Lieff for Robert L. Lieff

TLF-SST-056305

# EXHIBIT 9

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 12-cv-11698 MLW |

**DECLARATION OF [XXXXX] ON BEHALF OF**
**[XXXX] IN SUPPORT OF LEAD COUNSEL'S MOTION FOR AN AWARD OF**
**ATTORNEYS' FEES AND PAYMENT OF EXPENSES**

Confidential: Produced Pursuant to Court Order.

TLF-SST-029797

_____, Esq., declares as follows, pursuant to 28 U.S.C. § 1746:

1.       I am [a member of] [associated with] with the law firm of [INSERT FIRM

NAME] ("[ABREV. FIRM NAME]").  I submit this declaration in support of Lead Counsel's

motion for an award of attorneys' fees and payment of litigation expenses on behalf of all

Plaintiffs' counsel who contributed to the prosecution of the claims in the above-captioned class

actions (the "Class Actions") from inception through August 30, 2016 (the "Time Period").

**Comment [A1]:** We realize that people investigated the claims before the cases were filed in 2011 and 2012.  A reasonable inception date should be set, which would likely not be before Oct 2009 when the April 2008 qui tam complaint was unsealed.

2.       My firm is _____ [and counsel of record for plaintiff[s] [insert name].

[Supplement to explain role in the Class Actions and give overview of work performed.]

3.       The schedule attached hereto as Exhibit A is a summary indicating the amount of

time spent by each attorney and professional support staff-member of my firm who was involved

in the prosecution of the Class Actions, and the lodestar calculation based on my firm's current

billing rates.  For personnel who are no longer employed by my firm, the lodestar calculation is

based upon the billing rates for such personnel in his or her final year of employment by my

firm.  The schedule was prepared from contemporaneous daily time records regularly prepared

and maintained by my firm, which are available at the request of the Court.  Time expended in

preparing this application for fees and payment of expenses has not been included in this request.

**Comment [A2]:** In addition to not billing for fee/expense related time, you should only report lodestar that was directed at your clients in the Class Actions and the claims here, as opposed to other investigative work.

4.       The hourly rates for the attorneys and professional support staff in my firm

included in Exhibit A are the same as my firm's regular rates charged for their services, which

have been accepted in other complex class actions.

5.       The total number of hours expended on this litigation by my firm during the Time

Period is _____ hours.  The total lodestar for my firm for those hours is $_____.

- 2 -

6.      My firm's lodestar figures are based upon the firm's billing rates, which rates do not include charges for expenses items.  Expense items are billed separately and such charges are not duplicated in my firm's billing rates.

7.      As detailed in Exhibit B, my firm has incurred a total of $_____ in expenses in connection with the prosecution of the Class Actions.  The expenses are reflected on the books and records of my firm.  These books and records are prepared from expense vouchers, check records and other source materials and are an accurate record of the expenses incurred.

8.      With respect to the standing of my firm, attached hereto as Exhibit C is a brief biography of my firm as well as biographies of the firm's partners and of counsels.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on _____, 2016.

_____
XXXXXXXXXXXXXXXXX

**Comment [A3]:** Expenses should be vetted so that they all relate to the time period, the clients in the Class Actions, and the claims in the Class Actions.  All first class airfare should be reduced to economy; working meal reimbursement (including meals with clients) should be reasonable; alcoholic drinks should not be claimed.

- 3 -

TLF-SST-029799

**EXHIBIT A**

*STATE STREET INDIRECT FX TRADING CLASS ACTION*
**No. 11-cv-10230, No. 11-cv-12049, No. 12-cv-11698 MLW (D. Mass.)**

**LODESTAR REPORT**

**FIRM:   [NAME]**
**REPORTING PERIOD:  INCEPTION THROUGH AUGUST 30, 2016**

| PROFESSIONAL | STATUS* | HOURLY RATE | TOTAL HOURS TO DATE | TOTAL LODESTAR TO DATE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **TOTAL** | | | | |

| | | | |
|---|---|---|---|
| Partner | (P) | Paralegal | (PL) |
| Of Counsel | (OC) | Investigator | (I) |
| Associate | (A) | Research Analyst (RA) | |
| Staff Attorney (SA) | | | |

TLF-SST-029800

**EXHIBIT B**

*STATE STREET INDIRECT FX TRADING CLASS ACTION*
**No. 11-cv-10230, No. 11-cv-12049, No. 12-cv-11698 MLW (D. Mass.)**

**EXPENSE REPORT**

**Comment [A4]:** Please delete any items that don't apply

**FIRM:** [NAME]
**REPORTING PERIOD:  INCEPTION THROUGH AUGUST 30, 2016**

| EXPENSE | TOTAL AMOUNT |
|---|---|
| Duplicating | |
| Postage | |
| Long-Distance Telephone / Fax / Conference Calls | |
| Messengers | |
| Filing / Service / Witness Fees | |
| Court Hearing & Deposition Transcripts | |
| Online Legal & Financial Research | |
| Overnight Delivery Services | |
| Experts/Consultants | |
| Litigation Support/Electronic Discovery | |
| Work-Related Transportation/Meals/Lodging | |
| Litigation Fund Contribution | |
| Miscellaneous | |
| **TOTAL** | **$0** |

Confidential: Produced Pursuant to Court Order.

# EXHIBIT 10

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

## EXPERT DECLARATION OF GEORGENE M. VAIRO

GEORGENE M. VAIRO, hereby declares and says:

1.  I submit this declaration at the request of counsel for the Thornton Law Firm
    LLP. Specifically, I have been asked to provide an opinion as to whether Garrett
    Bradley of the Thornton Law Firm violated Federal Rule of Civil Procedure 11 in
    connection with the submission of Plaintiffs' Motion for an Award of Attorneys'
    Fees, Payment of Litigation Expenses, and Payment of Service Awards to
    Plaintiffs in the State Street FX litigation, *Arkansas Teacher Retirement System v.
    State Street Corp., et al.*, 11-cv-10230-MLW (D. Mass.) ("State Street
    Litigation").

2.  Since 1995, I have been a Professor of Law and, in 2011, was named the David P.
    Leonard Professor of Law at Loyola of Los Angeles Law School. Currently, I am
    the David P. Leonard Professor of Law Emerita. Between 1982 and 1995, I was a
    Professor of Law at Fordham Law School in New York. Between 1987 and 1995,
    I served as the Associate Dean, and, in 1994, was named the Joseph R. Crowley
    Professor of Law, at Fordham Law School. I have been teaching, writing, and
    lecturing in the area of federal jurisdiction and procedure, including issues related
    to Rule 11 sanctions and class actions, since 1982. I have taught Federal Civil
    Procedure, Mass Tort Litigation, Federal Jurisdiction, International Dispute
    Resolution, and Class Action and Complex Litigation. I have written, and edited
    or co-edited, several books on federal practice and procedure. I have served as a
    member of the Board of Editors of <u>Moore's Federal Practice</u> since 1995, and have
    authored numerous law review and other articles about these subjects. I am the
    author of the chapters on removal jurisdiction, venue, change of venue, and
    multidistrict litigation for <u>Moore's Federal Practice</u> (3d ed. 1997), and update
    these chapters at least twice annually. Over the last 35 years, I have lectured or
    served on panels at numerous Federal Judicial Center, ALI-ABA, ABA,
    American Association of Law Schools, American College of Trial Lawyers,
    Pound Institute for Civil Justice, law school, local bar association, and other
    programs. In addition, I served on the Board of Trustees of the Dalkon Shield
    Claimants Trust from 1988, and as its Chairperson from August 1989, until the

termination of the Trust in 2000.  I have served on the Board of Overseers of the RAND Institute for Civil Justice since 2006.  Attached hereto as Exhibit A is a recent copy of my curriculum vitae.

3.    One of my particular areas of expertise is Federal Rule of Civil Procedure 11.  I have followed developments under the Rule since it was adopted in 1983.  I have written numerous articles on Rule 11, including *Happy (?) Birthday Rule 11*, 37 Loy. L.A.L. Rev. 515 (2004) (Symposium ed.); *Rule 11 and the Profession*, 67 Fordham Law Rev. 589 (1998).  I also have written a 1000 page treatise on Rule 11, Rule 11 Sanctions: Case Law Perspectives and Preventive Measures (3d ed. 2004) ("Vairo, Rule 11").  I was an invited speaker at the Advisory Committee on the Civil Rules hearings on Rule 11 in February 1992, which led to the amendments to Rule 11 that became effective in December 1993.  I write and lecture on class action issues and developments, including *Is the Class Action Really Dead? Is that Good or Bad for Class Members?*, 64 Emory L.J. 477 (2014); *What Goes Around, Comes Around: From the Rector of Barkway to Knowles*, 32 Univ. Texas Rev. of Litig. 721 (2013); and The Complete CAFA: Analysis and Developments Under the Class Action Fairness Act of 2005, LexisNexis (September 2011).

4.    In addition to relying on my knowledge and experience, I have reviewed numerous documents supplied to me by counsel, including hearing transcripts, court filings, deposition transcripts, and interrogatory responses, in forming the basis for my opinions in this Declaration.

5.    For the following reasons, it is my opinion that attorney Garrett Bradley of the Thornton Law Firm did not violate Fed. R. Civ. P. 11.

3

**Rule 11 Background**

6.  In 1983, Rule 11 of the Federal Rules of Civil Procedure was substantially
    amended.  The amendments to Rule 11 were part of a package of amendments
    designed to reverse the trends of increasing costs and delay in the federal courts.
    Unfortunately, Rule 11 became the source of debate and controversy.

7.  One of the well-known problems with the 1983 version of Rule 11 was that it led
    to counterproductive satellite litigation that contributed to delay in the resolution
    of cases, rather than streamlining the administration of justice.  For example, the
    Advisory Committee for Civil Rules noted that Rule 11 affected plaintiffs "more
    frequently and severely" than defendants; and that the Rule could lead to the
    counterproductive result that an attorney may decide not to withdraw a document
    that proves to be problematic because the act of doing so would trigger a
    sanctions proceeding either by opposing counsel or the court.  The 1993
    amendments to Rule 11 were designed to deal with these and other problems
    created by the 1983 version of Rule 11.[1]

8.  The Advisory Committee expressly intended that its amendments to Rule 11
    would reduce the volume of Rule 11 sanctions proceedings.[2]  Although the 1993
    amendments retained the "stop and think" requirement embodied in the Rule's
    reasonable inquiry requirement, as well as a "duty of candor," the amendments
    were designed to "generally provid[e] protection against sanctions if [attorneys]
    withdraw or correct contentions after a potential violation is called to their

---

[1]  Letter from Judge Sam C. Pointer, Chairman of the Advisory Committee for Civil Rules, To:
Honorable Robert E. Keeton, Chairman of the Standing Committee on Rules of Practice and Procedure
(June 13, 1981, as revised in light of action taken by the Standing Committee at its meeting on July 18-20,
1991), at 1.  See Advisory Committee Note to 1993 Amendments to Rule 11, as approved by the Standing
Committee ("Under the former rule, parties were sometimes reluctant to abandon a questionable contention
lest that be viewed as evidence of a violation of Rule 11; under the revision, the timely withdrawal of a
contention will protect a party against a motion for sanctions.") (citing, G. Vairo, Rule 11 Sanctions: Case
Law Perspectives and Preventive Measures (1989)).

[2]  Advisory Committee Note to 1993 Amendments to Rule 11.

attention."[3] Sanctions are appropriate, however, when an attorney "later advocat[es]" a paper presented to the court. Fed. R. Civ. P. 11(b).

9.      Moreover, the Advisory Committee made clear in its Note to the 1993 amendments to Rule 11 that the rule is not a tool for compensation, and that sanctions ought to be imposed only to deter future conduct. The 1993 amendments to Rule 11, to put it another way, were designed to prevent and avoid hindsight sanctions determinations where an attorney or party withdraws or corrects contentions that otherwise might violate Rule 11.[4]

## Procedural Context

10.     On September 15, 2016, lead counsel in the State Street Litigation, Labaton Sucharow LLP ("Labaton"), filed Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs ("Award Motion"). Dkt. # 102. That motion included a supporting declaration by Lawrence Sucharow ("Supporting Declaration") (Dkt. # 104) and additional declarations from the law firms seeking fees and expenses, including a declaration by Garrett Bradley of the Thornton Law Firm (Dkt. # 104-16).

11.     The Thornton Law Firm, and other firms seeking fees and expenses, used a template provided by lead counsel Labaton in preparing their declarations. Dep. Testimony of Nicole Zeiss, June 14, 2017 at 20:13-21:17, 43:15-44:17; Dep.

---

[3]     *Id. See New Eng. Surfaces v. E. I. Dupont De Nemours & Co.*, 558 F. Supp. 2d 116, 123 n.7 (D. Me. 2008) (citing Advisory Committee's Notes on 1993 Amendments to Fed. R. Civ. P. 11 (the Rule now "emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable")).

[4]     Advisory Committee Note to 1993 Amendments to Rule 11 ("The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted.) *See In re Disciplinary & Sanction Proceedings Against Gillig*, 807 F. Supp. 2d 604, 618 (N.D. Tex. 2011) ("In determining whether sanctions should be assessed, a court is not to judge an attorney's prefiling with the lens of 20/20 hindsight.").

Testimony of Garrett Bradley, June 19, 2017 at 81:19-82:8; Dep. Testimony of Evan Hoffman, June 5, 2017 at 93:10-94:8, 96:5-23.

12. Labaton collected the declarations from the various firms, and together with lead counsel's Supporting Declaration, filed such documents in support of the Award Motion. Dep. Testimony of Nicole Zeiss, June 14, 2017 at 16:10-18; Dep. Testimony of Evan Hoffman, June 5, 2017 at 103:5-15.

13. These declarations included lodestar analyses. Dkt. # 104.

14. Prior to the final settlement approval hearing and before any submission of fee declarations, during a status conference discussing the preliminary settlement agreement on June 23, 2016, Judge Mark L. Wolf asked attorney David Goldsmith of Labaton, lead counsel for the class, whether notice to the class of the proposed settlement would include the maximum amount of fees and expenses that Plaintiffs' class counsel would seek. Mr. Goldsmith said that the class attorneys were "contemplating in the 25 percent range." Dkt. # 85, Transcript of Status Conference, June 23, 2016 at 15:5-17. Judge Wolf responded: "That's great, . . . I usually start with 25 percent in mind." *Id.* at 18-22. On September 15, 2016, lead counsel filed the Award Motion containing the Supporting Declarations. Dkt. # 102.

15. On November 2, 2016, Judge Wolf held a hearing on the Award Motion. *See* Trans. of Hearing, Nov. 2, 2016, Dkt # 114 ("Hearing, Nov. 2, 2016"). Judge Wolf approved the $300 million settlement reached by the parties. Relying on the submissions of Plaintiffs' counsel, including the lodestar check showing fees and expenses for the Plaintiffs' firms of approximately $41 million, Judge Wolf approved an award of attorneys fees of $74,541,250, which represented 24.48% of the settlement fund. Together with an award of $1,257,697.94 in expenses, the Plaintiffs' attorneys were awarded 25.27% of the fund. Dkt. # 114 at 35:3-25.

16.     On November 8, 2016, Garrett Bradley learned of a media inquiry concerning a
        potential double counting of fees for staff attorneys in the Supporting Declaration.
        Dep. Testimony of Garrett Bradley, June 19, 2017 at 85:23-86:11; Dep.
        Testimony of Nicole Zeiss, June 14, 2017 at 18:13-19:9.

17.     Garrett Bradley immediately acted to alert his colleagues at his firm and co-
        counsel's firms of the need to investigate the media questions about potential
        billing errors. Dep. Testimony of Garrett Bradley, June 19, 2017 at 86:12-22.
        Two days later, on November 10, 2016, David Goldsmith of Labaton submitted a
        letter to Judge Wolf conceding that the Fee Petition included a double counting of
        staff attorney time. Dkt. # 116. A media article published December 17, 2016
        discussed the letter and the contents of the Supporting Declaration. Dkt. # 117,
        Exhibit B.

18.     On February 6, 2017, Judge Wolf issued an order calling for a hearing on March
        7, 2017 and proposing the appointment of a Special Master, Gerald E. Rosen, a
        retired Federal District Court Judge. Dkt. # 117. In his order, Judge Wolf
        instructed that "Each of plaintiffs' counsel who submitted an affidavit in support
        of the request for an award of attorneys' fees, see Docket Nos. 104-15-104-24,
        shall attend" the March 7, 2017 hearing. Dkt. # 117 at 13.

19.     At the hearing on March 7, 2017, Judge Wolf questioned several of the Plaintiffs'
        attorneys, including Garrett Bradley. Dkt. # 176 at 78:24-82:25 and 86:25-94:24.
        During the hearing, Garrett Bradley acknowledged the errors in the fee
        declaration language, including those that arose out of the Thornton Law Firm's
        use of the template provided by lead counsel. *Id.* at 87:10-12. He expressed
        regret for the errors. *Id.* at 86:25- 88:8-21, 90:24-91:7. At the conclusion of the
        hearing, Judge Wolf indicated that he would appoint Judge Rosen as Special
        Master, and the following day issued an order appointing Judge Rosen and setting
        forth his duties and powers. March 8, 2017 Order, Dkt. # 173.

## Analysis

A.  **Garrett Bradley Met His Rule 11 Obligations Because He Took Immediate Action Once the Duplication and Template Issues Were Brought to His Attention.**

1.  Duplication Issue

20.  As described in ¶¶ 7 and 8 above, a key aim of the 1993 amendments to Rule 11 was to encourage parties to correct offending papers presented to the court by prohibiting parties from "later advocating" a paper that otherwise would violate Rule 11.

21.  Six days after Judge Wolf approved the settlement in the State Street Litigation, on November 8, 2016, Garrett Bradley learned of a media inquiry concerning apparent double counting of the names and time of several attorneys who were involved in document review. *See* ¶ 16, above.

22.  Immediately upon learning of this possible issue ("the Duplication Issue"), Garrett Bradley acted to inform members of his firm and he, or others in his firm, informed Labaton and Lieff Cabraser attorneys who, in turn, immediately investigated whether there was a double count and found that there was. ¶ 17, above.

23.  The three firms, with Labaton attorney David Goldsmith taking the lead, drafted a letter to Judge Wolf to inform him that there had, in fact, been a double counting of time. Garrett Bradley participated in the preparation of this letter, which conceded the mistake. The result of the double count was an approximately $4 million overstatement of the lodestar check -- in the Award Motion, the total lodestar amount stated was approximately $41 million, but it should have been approximately $37 million. On November 10, 2016, just two days after being informed about the possible double count, lead counsel submitted the letter to

Judge Wolf, confirming the double count and the overstatement of the lodestar amount. Dkt. # 116.

24.   By immediately acting to inform his co-counsel, participating in the investigation of the possible double count and the preparation of the November 10, 2016 letter to the Court conceding the mistake, Garrett Bradley complied with his Rule 11 obligation as to the double count. Even if an attorney has failed to conduct a "reasonable inquiry" into factual contentions, Rule 11 sanctions may be imposed only when an attorney later advocates a position taken in a paper filed in court. Rule 11(b) provides that "[b]y presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or *later advocating* it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . ." that the paper is well-grounded in the facts and law, and not filed for an improper purpose. The "later advocating" language must be read together with Rule 11(c)(2), which provides a "safe harbor" for an attorney who is the target of a motion for sanctions if the offending paper is "withdrawn or appropriately corrected within 21 days." Fed. R. Civ. P. 11(c)(2).

25.   Garrett Bradley ceased advocating the position taken in his declaration with regard to the double counting issue. Accordingly, it is inappropriate to find that Garrett Bradley violated Rule 11. While there is no "safe harbor" for an attorney who ceases relying on an offending paper AFTER the court issues an order to show cause, here Garrett Bradley took immediate action to investigate the issues raised by the media inquiry prior to Judge Wolf's February 6, 2017 Order. *See* Advisory Committee Note to the 1993 Amendments to Fed. R. Civ. P. 11 ("the Rule does not provide a "safe harbor" to a litigant for withdrawing a claim, defense, etc., **after** a show cause order has been issued on the court's own initiative") (emphasis added).

26.    Moreover, "[s]*ua sponte* Rule 11 sanctions . . . must be reviewed with 'particular
       stringency.'" *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1256 (11th Cir.
       2003). Only serious misconduct may be the basis for *sua sponte* imposition of
       sanctions. In *Young v. City of Providence*, 404 F.3d 33 (1st Cir. 2005), the First
       Circuit reversed the district court for imposing Rule 11 sanctions *sua sponte* based
       on an attorney's misstatements, stating: "It is true that courts ought not
       invoke Rule 11 for slight cause: the wheels of justice would grind to a halt if
       lawyers everywhere were sanctioned every time they made unfounded objections,
       weak arguments, and dubious factual claims. However, this is an argument for
       requiring *serious* misconduct, whoever initiated the inquiry into a violation -- not
       for distinguishing between the judge and opposing counsel. The "akin to
       contempt" language used by the Advisory Committee's Note may well have
       meant only that no safe harbor was needed *because* judges would act only in the
       face of serious misconduct." 404 F.3d at 39-40.

27.    Garrett Bradley may not have fully complied with the "stop and think" aspect of
       Rule 11 because he signed the declaration without independently verifying
       whether the attorneys listed by the Thornton Law Firm in its declaration were also
       listed by one or the other of his co-counsel, with whom Thornton Law Firm had a
       fee allocation agreement. But Garrett Bradley did not violate Rule 11 because he
       informed the court that a mistake had been made two days after being alerted to
       the duplication problem.

28.    Moreover, with respect to the Rule 11(b)(3) reasonable inquiry into the facts
       requirement, it is also significant that the double counting occurred on the fee
       petitions of co-counsel, the Labaton and Lieff Cabraser firms. The Thornton Law
       Firm, in fact, paid for the attorneys whose names appeared on Garrett Bradley's
       declaration. Nor did the Thornton Law Firm see the other firms' fee declarations
       before they were filed. Dep. Testimony of Evan Hoffman, June 5, 2017 at 103:5-
       15.

## 2. Use-of-Template Issues

29.   In his February 6, 2017 Order, Judge Wolf raised additional issues, ones created by the Thornton Law Firm's use of the Labaton template. All lawyers who submitted fee declarations were ordered to attend the March 7, 2017 hearing. Garrett Bradley attended, and when confronted with inaccuracies related to the relationship of staff attorneys and others in his declaration to the Thornton Law Firm, he acknowledged that there were errors and apologized. *See* ¶ 19, above.

30.   There is no evidence that Garrett Bradley recognized these errors before the Court issued its February Order.

31.   For the same reasons discussed in ¶¶ 24-25 above, even if Garrett Bradley failed to conduct a reasonable inquiry, he did not violate Rule 11 because he acknowledged at the March 7, 2017 hearing that there were inaccurate statements in his declaration with respect to the nature of the staff attorneys, his firm's billing practices, and the other statements when he became aware of them. *See* ¶ 19, above; *see also* Ethical Report for Special Master Gerald E. Rosen prepared by Professor Stephen Gillers (Feb. 23, 2018) at 80-81 ("Gillers Report") (identifying six inaccuracies).

32.   Even if the Court were to find that the inaccuracies violated Rule 11, the corrective action should obviate the need for the imposition of sanctions. *See New Eng. Surfaces v. E. I. Dupont De Nemours & Co.*, 558 F. Supp. 2d 116, 123 n.7 (D. Me. 2008) (citing Advisory Committee's Notes on 1993 Amendments to Fed. R. Civ. P. 11: the Rule now "emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable"). *See also* Advisory Committee's Notes on 1993 Amendments to Fed. R. Civ. P. 11 ("Such corrective action, however, should be taken into account in deciding what sanction to impose if, after consideration of the litigant's response, the court concludes that a violation has occurred.").

33. Although counsel should engage in their own Rule 11 investigation rather than rely on the work of co-counsel, it is reasonable under some circumstances for them to do so. *Unioil, Inc. v. E.F. Hutton & Co.*, 809 F.2d 548, 558 (9th Cir. 1986) ("We agree that reliance on forwarding co-counsel may in certain circumstances satisfy an attorney's duty of reasonable inquiry. See Fed. R. Civ. P. 11 advisory committee note."); *Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 446 (5th Cir. 1992) (proper for attorney to rely on reports prepared by lawyer who was expert in the relevant area). Indeed, even the Advisory Committee Note to the generally more stringent 1983 version of Rule 11 suggests that reliance on co-counsel or forwarding counsel in appropriate circumstances may prevent a finding of a Rule 11 violation for a failure to engage in an independent investigation: "The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted. Thus, what constitutes a reasonable inquiry may depend on such factors as . . . whether he depended on forwarding counsel or another member of the bar." Fed. R. Civ. P. 11, advisory committee note. Given the complexity of the State Street Litigation and the time pressures associated with preparing for the settlement hearings, it was appropriate for the Thornton Law Firm attorneys to use the Labaton template as the basis for its lodestar analysis.

34. Moreover, for the reasons explained above, it was reasonable for counsel in a complex class action such as the State Street Litigation to rely on the template that was provided to them by Labaton, which was lead counsel in the State Street Litigation and especially experienced in submitting fee applications in complex class action litigation.

**B.**   **Garrett Bradley Did Not Violate the Rule 11 Duty of Candor to the Court Because the Record Fails to Show Clear and Convincing Evidence that Garrett Bradley Intentionally Misled the Court.**

35.   In his Report, Professor Gillers states that "There is ample evidence in the record that Garrett Bradley actually knew the Declaration contained inaccurarte information but signed it anyway." Gillers Report at 24, citing March 7, 2017 Hearing Tr., p.87: 13-14; 88: 2-9, 14-18;91: 5-7; 92: 3-8. As a predicate for concluding that Garrett Bradley's declaration contained false statements, Professor Gillers also states that he was "asked to assume that Garrett Bradley knew these statements were false when he submitted his Declaration." Gillers Report at 81. Professor Gillers then lists six statements from the declaration that contained inaccuracies.

36.   Garrett Bradley admitted that these statements were inaccurate at the March 7, 2017 hearing, once he had been made aware of the issues. *See* ¶ 19, above. At the time he signed his declaration, he knew that staff attorneys from other firms and agencies were perfoming document review. But there is no evidence that he understood or believed that his declaration had incorrectly characterized these attorneys' relationship to his firm until the issue was raised in the February Order instructing him to appear at the March 7, 2017 hearing. In other words, although he had knowledge of certain facts, there is no evidence that he intended to mislead the court when he signed the declaration.

37.   In the context of a sanctions proceeding or a proceeding that could lead to professional discipline, an attorney's reputation, among other things, is at risk. Accordingly, a high standard for finding misconduct must be met. *See In the Matter of Auerhahn*, No. 09-10206, WL 4352350 at *4 (D. Ma. Sept. 15, 2011 (adopting "clear and convincing" evidence standard in attorney disciplinary proceeding); *In re Engle Cases*, No. 3:09-cv-10000, 2017 U.S. Dist. LEXIS 172678, at *81-86 (M.D. Fla. Oct. 18, 2017) (adopting the rule that "akin to

contempt" standard applies when courts consider Rule 11 sanctions *sua sponte*; collecting cases).

38.     Although the statements identified by Professor Gillers were inaccurate, there is no evidence in the record that Garrett Bradley had intent to mislead the court, nor did he have reason to do so.  Accordingly, his conduct did not rise to the level of culpability to justify sanctions for the following reasons:

1)      Professor Gillers stated that there was ample evidence that Garrett Bradley knew the statements were inaccurate.  Gillers Report at 24. Analysis of the statements cited by Professor Gillers do not support a finding of liability for failure to comply with the duty of candor imposed by Rule 11.  For Rule 11 purposes, the "duty of candor" means that an attorney may not intentionally mislead the court. *Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1540 (9th Cir. 1986) ("The district court's ruling appears to go even beyond the principle of Rule 3.3 of the ABA Model Rules which proscribes 'knowing' false statements of material fact or law.  The district court made no finding of a knowing misstatement, and, given the well-established objective nature of the Rule 11 standard, such a requirement would be inappropriate. Both the earnest advocate exaggerating the state of the current law without knowingly misrepresenting it, and the unscrupulous lawyer knowingly deceiving the court, are within the scope of the district court's interpretation.").  A violation of Rule 11 requires a finding of serious misconduct. *See In re Engle Cases*, No. 3:09-cv-10000, 2017 U.S. Dist. LEXIS 172678, at *9 and *82 n.28 (M.D. Fla. Oct. 18, 2017) (imposing sanctions on counsel who "evinced a conscious disregard of their professional obligation" after receiving "numerous opportunities to voluntarily purge meritless

14

cases from the *Engle* docket, as well as several warnings about potential Rule 11 ramifications.")

2)   The purpose for filing the Supporting Declaration was to provide a lodestar check on the request for a 25% fee award. All three law firms -- the Thornton Law Firm, Labaton, and Lieff Cabraser -- used the same template to support their fee declarations. Indeed, none of these declarations were wholly accurate. Dkt. # 176, Transcript of March 7, 2017 Hearing, at 78:24-82:85, 86:25-94-24.

3)   Quite clearly, the key purpose of the fee declarations of all firms was to support the lodestar amount, meaning that the critical elements in the fee application were the hours worked by the various plaintiff attorneys and their hourly billing rates.

4)   Although Garrett Bradley did not focus on the boilerplate language regarding staff attorneys in the declaration, the purpose of the declaration was to support the lodestar analysis. He should have read the entire declaration carefully, but his failure to do so does not undermine the validity of the number of hours and billing rates claimed for the staff attorneys in the declaration.

5)   There is nothing in the record to indicate by clear and convincing evidence that Garrett Bradley intended to mislead the court regarding any aspect of the declaration. Rather, Garrett Bradley's reaction to the disclosure that the boilerplate language had resulted in Judge Wolf's believing that he had been misled was one of deep regret, thereby additionally belying any sense that he had intentionally misled the court. Dkt. # 176 at 88:8-21, 90:24-91:70. The inaccurate statements created a lack of clarity as to the nature of the relationship between many of the attorneys claimed in the

declaration and their relationship to the Thornton Law Firm. But, the material aspects of the declaration with respect to the hours and billing rates of the various attorneys listed in the declaration were true. Thus, there was no lack of candor for the purpose of Rule 11.

39.  Garrett Bradley's "inaccurate statements" amount to mistatements, not lies. While unfortuante and regrettable, under the circumstances here, these statements amount to no more than mere "technical violations" of Rule 11. *Oliveri v. Thompson*, 803 F.2d 1265, 1280 (2d Cir. 1986). The courts of appeals generally, both before and after the 1993 amendments to Rule 11, properly have taken a "lawyer sensitive" approach to Rule 11 to prevent an abusive use of the Rule. Vairo, Rule 11, at 68-69) (discussing *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866 (5th Cir. 1987). Sanctions may be imposed when an attorney omits or mistates material facts, however, "courts generally will not impose sanctions for misstatements unless there is evidence that the proponent of the statement intended to mislead the court." Vairo, Rule 11, at 338 (collecting cases); *see also Obert v. Republic W. Ins. Co.*, 398 F.3d 138, 146-47 (1st Cir. 2005) (reversing sanctions imposed by district court based on magistrate judge's Report and Recommendation: "In this case, the show cause order was prompted not by a concern that the recusal motion was objectively hopeless and so wasted a few hours but by what were perceived to be deliberate misrepresentations . . . This was the explicit and central concern of the show cause order. A judge is entirely warranted in pursuing suspected lies by counsel--probably this is done too rarely-- but it is virtually certain that this show cause order would not have been issued absent the suspicion of deliberate falsehoods . . . Because there were no proven lies, we think that the Rule 11 findings cannot stand even though we agree that the motion was objectively hopeless."); *Adams v. USAA Cas. Ins. Co.*, 863 F.3d 1069, 1077 (8th Cir. 2017) (the standard for imposing sanctions is whether the attorney's conduct "viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court.") (citation omitted); *Midwest*

*Disability Initiative v. JANS Enters.*, 2017 U.S. Dist. LEXIS 204669, at *12-13 (D. Minn. Dec. 13, 2017) (quoting *Adams*).

40.     In a seminal First Circuit case, the court found that Rule 11 does not demand perfection. *Navarro-Ayala v. Hernandez-Colon*, 3 F.3d 464, 468 (1st Cir. 1993). There, the First Circuit reversed a trial court's decision to impose Rule 11 sanctions for failing to make a "reasonable inquiry" because the attorney made "no significant false statement." *Id.* at 467. Speaking for the court, Judge Breyer noted: "Rule 11 neither penalizes overstatement nor authorizes an overly literal reading of each factual statement." *Id.* Similarly, in another seminal case, the Second Circuit ruled that mere "technical violations" -- such as the failure to edit the boilerplate language in the Labaton template -- are not sanctionable. *Oliveri v. Thompson*, 803 F.2d 1265, 1280 (2d Cir. 1986) (*de minimis* violation of Rule 11 does not warrant imposition of sanctions; reversing sanctions), *cert. denied; County of Suffolk v. Grascek*, 480 U.S. 918 (1987); *Greenberg v. Sala*, 822 F.2d 882, 886-7 (9th Cir. 1987) (affirming denial of sanctions although complaint contained factual errors; sanctions appropriate only for significant errors such as "some error or admission by a litigant [that] undermined his entire case at a stroke").

41.     More recently, the Second Circuit found that even if a statement is "literally false," if there is nothing in the record to suggest that counsel's mistatement is intentionally false and the statement had "a material impact on the meaning of the statement," sanctions are inappropriate. *Kiobel v. Millson*, 592 F.3d 78, 83 (2d Cir. 2010) (reversing sanctions). District courts are right to be concerned about inaccurate statements. However, not all inaccurate statements are sanctionable. For example, the Ninth Circuit reversed sanctions a district court imposed because the district court believed it was misled. The Ninth Circuit stated: "With the district court's salutary admonitions against misstatements . . ., we have no quarrel. It is, however, with Rule 11 that we must deal. The district court's interpretation of Rule 11 requires district courts to judge the ethical propriety of

lawyers' conduct with respect to every piece of paper filed in federal court." *Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1539 (9th Cir. 1986); *Young v. City of Providence*, 404 F.3d 33, 41 (1st Cir. 2005) ("We are not suggesting that a deliberate lie would be immune to sanction merely because corrective language can be found buried somewhere else in the document. But here the trial judge did not find, and in these circumstances could not have found, that defense counsel had intended to deceive.").

42.     The inaccurate statements in Garrett Bradley's declaration must be viewed in context and as a part of a whole. *See Navarro-Ayala v. Hernandez-Colon*, 3 F.3d 464, 467 (1st Cir. 1993) ("'The focus of ... Rule [11] is the court paper as a whole, not individual phrases or sentences construed separately or taken out of context.... [A]t some level of analysis, every unsuccessful litigation paper contains an unsupported allegation or flawed argument."") (quoting Gregory P. Joseph, Sanctions: The Federal Law of Litigation Abuse § 9(D) at 133-34 (1989)); *see also Young v. City of Providence ex rel. Napolitano*, 404 F.3d 33, 41 (1st Cir. 2005) ("The general rule is that statements must be taken in context, and that related parts of a document must be taken together." (internal citations omitted)). *See also Forrest Creek Associates, Ltd. v. McLean Sav. & Loan Ass'n*, 831 F.2d 1238, 1245 (4th Cir. 1987) ("[Rule 11 sanctions] do[] not extend to isolated factual errors, committed in good faith, so long as the pleading as a whole remains 'well grounded in fact.'").

43.     The purpose of the Supporting Declaration was to provide lodestar numbers to the court. Although Garrett Bradley's declaration contained inaccuracies, while regrettable and of understandable concern to the Court, taken as a whole, especially given the enormity and complexity of the State Street litigation and the Award Motion itself, Garrett Bradley's declaration did not violate Rule 11. A recent case in which a district court intitiated an investigation is instructive. In *In re Engle Cases*, No. 3:09-cv-10000, 2017 U.S. Dist. LEXIS 172678, at *9-12 & *82 n.28 (M.D. Fla. Oct. 18, 2017), the four judge court noted: "As judges, we

are properly cautioned against using 20/20 hindsight in evaluating the actions of lawyers in the context of unprofessional conduct. We are insulated from the hurly-burly of the practice of law, the press of client demands, the call of time sheets to log, and the occasional dictatorial demands of the Court. So it is, with that caution in mind, that a full explanation of the factors that motivate us to impose sanctions." In a lengthy opinion, the court imposed sanctions, but in that case counsel had "evinced a conscious disregard of their professional obligation" after receiving "numerous opportunities to voluntarily purge meritless cases from the *Engle* docket, as well as several warnings about potential Rule 11 ramifications." *Id.* at *82 n. 28. There is no evidence that Garrett Bradley evinced conscious disregard of his professional obligations. Rather, he sought to correct the double counting error immediately upon learning of it, and when made aware of other issues raised by the use of the template language, he acknowledged and apologized for the misstatements made because he had failed to carefully read and edit the Labaton template.

44.     In summary, for the reasons stated above, it is my opinion that Garrett Bradley's conduct in this action did not violate Rule 11.

        I declare under penalty of perjury that the foregoing is true and correct:

Date and Place:  March 26, 2018, Santa Barbara, CA

Georgene M. Vairo

19

Exhibit A

**GEORGENE M. VAIRO**
**David P. Leonard Professor of Law**
**Loyola Law School**
**919 Albany Street**
**Los Angeles, CA 90015**
**(213) 736-8170 (office)  (323) 467-6634 (home)**
georgene.vairo@lls.edu **(e-mail)**


EMPLOYMENT & PROFESSIONAL
POSITIONS:               1995 - present: LOYOLA OF LOS ANGELES LAW SCHOOL, David P.
                         Leonard Professor of Law Emerita; Courses: Complex Litigation, Federal
                         Courts, Civil Procedure, Mass Tort Litigation, International Dispute
                         Resolution

                         2007 – present: AUSWIN REALTY CORP., President; oversee and manage
                         family owned residential and commercial real estate in New York City

                         1982 - 1995: FORDHAM UNIVERSITY SCHOOL OF LAW, Associate
                         Dean (l988-1995) and Leonard F. Manning Professor of Law (appointed
                         1994); Awarded Dean's Medal of Recognition, May 1994; Courses:
                         Complex Litigation, Federal Courts, Civil Procedure

                         1988 - 2000: DALKON SHIELD CLAIMANTS TRUST, Chairperson,
                         Board of Trustees; Court appointed position; participation in design and
                         implementation of plan to distribute over $3 billion to over 200,000
                         claimants

                         1994 - Present: EDITORIAL BOARD, Moore's Federal Practice

                         1981 - 1982: THE HONORABLE JOSEPH M. McLAUGHLIN,  United
                         States District Court, E.D.N.Y., Law Clerk

                         1979 - 1981: SKADDEN, ARPS, SLATE, MEAGHER & FLOM,
                         Associate, specialized in antitrust litigation; Pro Bono Activity: Special
                         Deputy, New York State Division of Human Rights; prosecuted sex
                         discrimination case

                         Summer 1978 - Spring 1979: HUGHES, HUBBARD & REED, Summer
                         Associate and Law Clerk

                         1977 - 1979:  RESEARCH ASSISTANT TO PROFESSOR SHEILA
                         BIRNBAUM, Fordham University School of Law

                         1974 - 1976: SCHOOL OF THE TRANSFIGURATION, Corona, New
                         York, Junior High School Math Teacher; Faculty editor of the school
                         yearbook and literary magazine

1972 - 1973: BLUE RIDGE OPTICAL CO., Charlottesville, Virginia, Optical Technician

PROFESSIONAL LICENSES:  Admitted to the New York bar, 1980; Certified U.S. Merchant Marine Officer, 50 Ton Master License, September 2008

EDUCATION:      FORDHAM UNIVERSITY SCHOOL OF LAW, J.D., _cum laude_, 1979
                Rank:  1 out of 320
                Average:       91
                Honors:        Law Review, Associate Editor
                               1978 National Moot Court Competition
                                     Champion: Best Oral Argument;
                                          Runner Up Best Brief; Best Brief in Region
                               Honors of the Graduating Class for highest cumulative grade point average

                Prizes:        Law School Prize for highest rank in section, 1977 and 1979; Eugene Keefe Award for Outstanding Service to the Law School; Chapin Prize; Francis Thaddeus Wolff Memorial Prize; Andrew M. Stillman Memorial Prize; Prize of the West Publishing Company; American Jurisprudence Prizes for Torts, Corporations and Federal Courts

                UNIVERSITY OF VIRGINIA, M.Ed., Social Studies, 1975
                Average:       A
                Honors:        Master's Thesis and Comprehensive Exam: Distinction

                SWEET BRIAR COLLEGE, B.A., Economics, 1972
                Average:       B
                Honors:        Dean's List, 1972
                               Phi Beta Kappa, Inducted March 1989
                               Tau Phi Academic Society
                               1997 Distinguished Alumna Award

SELECTED
PUBLICATIONS:

                Georgene Vairo, _Passion for Justice: A Tribute to George Cochran_, 85 Miss. L. J. 1005 (2017)

                Georgene Vairo, _The Role of Influence in the Arc of Tort "Reform",_ 65 Emory L. J. 1741 (2016)

                Georgene Vairo, _Is the Class Action Really Dead? Is that Good or Bad for Class Members_?, 64 Emory L.J. 477 (2014)

Georgene Vairo, *Lessons Learned by the Reporter: Is Disaggregation the Answer to the Asbestos Mess?*, 88 Tulane L. Rev. 1039 (2014)

Georgene Vairo, *What Goes Around, Comes Around; From the Rector of Barkway to Knowles*, 32 Univ. Texas Rev. of Litig. 721 (2013)

Georgene Vairo, *The Seventy-Fifth Anniversary of Moore's Federal Practice: Influence and Excellence*; Moore's Federal Practice (Sept. 2013)

Georgene Vairo, <u>The Federal Courts Jurisdiction and Venue Clarification Act of 2011: Analysis and Developments</u>, LexisNexis (March 2013)

Georgene Vairo, <u>The Complete CAFA: Analysis and Developments Under the Class Action Fairness Act of 2005</u>, LexisNexis (September 2011)

Georgene Vairo, *How Lawyers Built the Rule of Law*, Trial (July 2011) (Book Review of Stuart M. Speiser's <u>The Founding Lawyers and America's Quest for Justice</u> (2011))

Antitrust Counseling and Litigation Techniques, Chapter 23A (on MultiDistrict Litigation) (2010)

Georgene Vairo, *Class Action Fairness Act: Significant Issues and Developments*, CLASS ACTION LITIGATION STRATEGIES 2010 (PLI 2010 & 2011).

Georgene Vairo, *Why I Don't Teach Federal Courts Anymore, But Maybe Am Or Will Again*, 53 St. Louis University Law Review 843 (2009).

Georgene Vairo, *The Use of Sanctions in Arbitration Proceedings*, AAA HANDBOOK ON COMMERCIAL ARBITRATION (2010).

Georgene Vairo, *Vairo on Indirect Purchaser Class Actions After CAFA*, 2008 Emerging Issues 2434 (LexisNexis June 23, 2008)

Georgene M. Vairo, *Symposium, Summary Judgment on the Rise: Is Justice Falling?*, Defending Against Summary Justice: The Role Of The Appellate Courts (Pound Civil Justice Institute 2008 Forum for State Appellate Court Judges)

Georgene Vairo, <u>Antitrust Counseling and Litigation Techniques</u>, *Chap 23B Class Actions* (2008)

Georgene M. Vairo, *Foreword*, Developments in the Law:  California Complex Litigation,  41 Loyola L.A. L. Rev. XXX (2008)

Georgene M. Vairo, *Foreword*, Developments in the Law:  International Litigation, 40 Loyola L.A. L. Rev. 1247 (2007)

Georgene M. Vairo, *Supreme Court Reverses Seventh Circuit's Standard for Pleading Scienter*, Vol. 2007 Moore's Federal Practice Update 177-181 (August 2007).

Georgene M. Vairo, Supreme Court Introduces a New Plausibility Standard, Vol. 2007 Moore's Federal Practice Update 150-154. (July 2007).

Georgene M. Vairo, District Court Has Discretion to Dismiss on Forum Non Conveniens Grounds Without First Resolving Whether it Has Subject Matter Jurisdiction and Personal Jurisdiction, Vol. 2007 Moore's Federal Practice Update 93-97 (May 2007).

Georgene Vairo, <u>Class Action Fairness Act of 2005, Commentary and Analysis</u>, LexisNexis (2005)

Vairo, Georgene M., <u>National Bank, for Purposes of Diversity Jurisdiction, Is Citizen Only of State in Which Its Main Office is Located</u>, 2006 Moore's Federal Practice Update, Issue 3 at 1 (March 2006)

Vairo, Georgene, <u>Why Me? The Role of Private Trustees in Complex Claims Resolution</u>, *The Civil Trial: Adaptations and Alternatives*, 57 Stanford L. Rev. 1391 (2005)

Vairo, Georgene, <u>Global Peace For Whom? Finality and Due Process</u> (National Conference of Bankruptcy Judges November 2005)

Vairo, Georgene, <u>*ExxonMobil Corp. v. Allapattah Servs., Inc.*: The Supreme Court Takes a Broad View of Supplemental Jurisdiction</u>, 2005 Moore's Federal Practice Update, Issue 8 at 1 (August 2005)

Vairo, Georgene, <u>Is Forum Shopping Unethical?</u>, Loyola Lawyer 4 (Fall 2005).

Vairo, Georgene, <u>Foreword</u>, *Developments in the Law: Federal Jurisdiction and Forum Selection*, 37 Loyola L. Rev. 1393 (2004).

Vairo, Georgene, <u>Mass Tort Bankruptcies: The Who, The Why, and The How</u>, 78 Amer. Bank. L.J. 93 (2004).

Vairo, Georgene M., <u>Foreward</u>, *Happy (?) Birthday Rule 11*, 37 Loy. L.A.L. Rev. 515 (2004) (Symposium ed.).

Vairo, Georgene M., **Rule 11 Sanctions: Case Law Perspectives and Preventive Measures** (3d ed. 2003).

Vairo, Georgene M., <u>Remedies for Victims of Terrorism</u>, 35 Loy. L.A. L. Rev. 1265 (2002).

Vairo, Georgene M., <u>Trends in Federalism and Their Implications for State Courts</u>, Trial (November 2002).

Vairo, Georgene M., <u>Thank You, John</u>, 70 Fordham L. Rev. 2191 (2002).

Vairo, Georgene, <u>Judicial v. Congressional Federalism: The Implications of the New Federalism Decisions on Mass Tort and Other Complex Litigation</u>, 33 Loyola L. Rev. 1559 (2000)

Vairo, Georgene, <u>Sanctions and Arbitration Proceedings</u>, 5 ADR Currents 20 (Dec.-Feb. 2000-2001)

Vairo, Georgene, <u>Problems in Federal Forum Selection and Concurrent Federal State Jurisdiction: Supplemental Jurisdiction; Diversity Jurisdiction; Removal; Preemption; Venue; Transfer of Venue; Personal Jurisdiction; Abstention and The All Writs Act</u>, *Civil Practice and Litigation in Federal and State Courts* (American Law Institute-American Bar Association 2000)

Vairo, Georgene, <u>Classwide Arbitration: The Possibility of a Hybrid Procedure</u>, ADR Currents (June 1999)

Linda Mullenix, Martin Redish & Georgene Vairo, *Understanding Federal Courts and Federal Jurisdiction* (Matthew Bender 1998)

Vairo, Georgene, <u>Rule 11, The Profession and the Public Perception Thereof</u>, 67 Fordham L. Rev. 589 (1998) (Special Issue, *The Legal Profession: The Impact of Law and Legal Theory*)

Vairo, Georgene, <u>Introduction</u>, *Symposium on Mass Torts*, 31 Loyola L.A.L. Rev. 353 (1998)

Vairo, Georgene, <u>Georgine, The Dalkon Shield Claimants Trust, and The Rhetoric of Mass Tort Claims Resolution</u>, 31 Loyola L. Rev. 79 (1997)

Vairo, <u>ADR and Mass Torts: The Dalkon Shield Experience</u>, ADR Currents (June 1998)

Vairo, <u>Amchem Products, Inc. v. Windsor:  Where Will the Mass Tort Class Actions Go?</u>, N.Y. Litigator (May 1998)

*Moore's Federal Practice*, Chapter 106 (Removal); Chapter 110 (Determination of Venue); Chapter 111 (Change of Venue); Chapter 112 (Multidistrict Litigation) (1997) & (Quarterly Releases)

39 Authors, <u>The Jurisprudence of Yogi Berra</u>, 46 Emory L.J. 697 (1997)

Vairo, <u>High Court Facilitiates the Enforcement of Arbitration Agreements</u>, ADR Currents (Fall 1996)

Vairo, <u>Rule 11: Past as Prologue?</u>, 28 Loyola of L.A. L. Rev. 39 (1994)

Vairo, <u>Reinventing Civil Procedure: Will the New</u> <u>Procedural Regime Help</u> <u>Resolve Mass Torts?</u>, 59 Brooklyn L. Rev. 1065 (1993) (Symposium)

Vairo, <u>Rule ll Sanctions: Case Law Perspectives & Preventive Measures</u> (l989; 2d Ed. l992 & Supps.)

Vairo, <u>The Dalkon Shield Claimants Trust: Paradigm Lost (or Found)</u>, 61 Fordham L. Rev. 617 (1992)

Vairo, <u>Rule ll: Where We Are and Where We Are Going</u>, 60 Fordham L. Rev. 475 (l99l)

Vairo, <u>Making Younger Civil:</u> <u>The Consequences of Federal Court</u> <u>Deference to State Court Proceedings</u>, 58 Fordham L. Rev. l73 (l99l)

Vairo, <u>Federal Civil Practice</u> (1989 & Supps.) (Editor in Chief)

Vairo, <u>Rule 11: A Critical Analysis</u>, 118 F.R.D. 189 (1988)

Cochran & Vairo, "Rule 11: An Eventful Year," 4 <u>Civil Rights Litigation</u> <u>and Attorneys Fees Annual Handbook</u> (1988)

Vairo, "Rule 11: Paradise Lost?" 2 <u>Police Misconduct and Civil Rights Law</u> <u>Report</u> 97 (1988)

Vairo, "Through the Prism: Summary Judgment and the Trilogy," <u>Civil</u> <u>Practice and Litigation in Federal and State Courts</u> (2d-6th Eds. American Law Institute l988; l990; l992; 1994)

Vairo, <u>Report to the Advisory Committee on Amended Rule 11</u> (October 1987)

Vairo, "Structural Changes and Sanctions: An Analysis of the August 1983 Amendments to the Federal Rules of Civil Procedure," McLaughlin, Schreiber & Vairo I, <u>Civil Practice and Litigation in Federal and State</u> <u>Courts</u> (American Law Institute 1987)

Vairo, <u>Multi-Tort Cases:  Cause For More Darkness On The Subject, Or A</u> <u>New Role For Federal Common Law?</u>, 54 Fordham L. Rev. 167 (1985)

Vairo, "Analysis of Amended Rule 4 of the Fed. R. Civ. P.," McLaughlin, S. Schreiber & G. Vairo I, <u>Civil Practice and Litigation in Federal and State</u> <u>Courts</u> (American Law Institute 1984, 1985 & 1987)

Vairo, Analysis of August 1, 1983 Amendments to the Federal Rules of Civil Procedure," J. McLaughlin, S. Schreiber & G. Vairo I, <u>Civil Practice</u>

<u>and Litigation in Federal and State Courts</u> (American Law Institute 1984, 1985)

Vairo, "Analysis of Proposed and 1985 Amendments to Federal Rules of Civil Procedure," J. McLaughlin, S. Schreiber & G. Vairo I, <u>Civil Practice and Litigation in Federal and State Courts</u> (American Law Institute 1985 & 1987)

Vairo, <u>Amended Rule 4 of Civil Procedure And Its Effects on Process Serving</u>, Nat'l L.J., Dec. 17, 1984, at 32, col. 1

Vairo, <u>Amended Rule 4:  Acknowledgment and Statute of Limitations Problems</u>, Nat'l L.J., Dec. 24, 1984, at 20, col. 1

Vairo, <u>For Whom the Class Action Tolls: Problems in Statutes of Limitations</u>, Nat'l L.J., Jan. 30, 1984, at 30, col. 1

Vairo, <u>Issuing Stays in Diversity Cases:  A Cure for Growing Congestion?</u>, Nat'l L.J., Feb. 14, 1982, at 22, col. 1

Hawk & Vairo, <u>International Patent Licensing Restrictions</u>, 8 Revue Suisse Du Droit International De La Concurrence 1 (1980)

Note, <u>The Unionization of Law Firms</u>, 46 Fordham L. Rev. 1008 (1978)


SELECTED
PRESENTATIONS:

Loyola Law School Journalism School; Speaker on two panels; Basics of Civil Procedure & Class Action and Complex Dispute Resolution; LA; June 2014

PLI Class Action Program; keynote speaker; NYC; June/July since 2011

Pacific Pride Foundation; Supreme Court Marriage Equality Program; keynote speaker; Santa Barbara; July 2013

Thrower Symposium; Future of Class Actions; Panel Speaker; Emory Law School, Atlanta; Feb. 2014

International Assn. of Defense Counsel; Class Action Developments and Emerging Issues; Speaker; San Diego; Feb. 2014

Mass Tort Dispute Resolution Program; Speaker; Pepperdine; April 2014

ALI-CLE; Class Action and Aggregate Litigation Developments; moderator and speaker; April 2014

L.A. County Superior Court; Class Action Developments; presentation to all judges of the court; L.A.; May 2014

Panelist, AALS Section of Litigation Program, CAFA, Class Actions and Beyond (Jan. 2013)

Keynote Speaker, PLI Class Actions Program (July 2010-present)

Speaker, Loyola Law School Legal Journalism Program, "Complex Litigation and Class Actions Developments," (June 2011 & 2012)

Moderator and panelist, Loyola Law School Civil Justice Symposium on "Injuries Without Remedies" (March 2010)

Featured Speaker and Panelist, Pound Civil Justice Institute 2008 Forum for State Appellate Court Judges, "Defending Against Summary Justice:  The Role of the Appellate Courts" (July 2008)

Faculty Member of ALI/ABA Advanced Program on Federal and State Civil Litigation, since 1983

Panelist and Moderator, Mealey's TeleConference, Class Action Fairness Act and Other Recent Class Action Developments (Nov. 2007; March 2008)

Panelist, Mass Torts and Bankruptcy Panel, National Conference of Bankruptcy Judges, San Antonio (Nov. 2005)

Panelist, 2005 Stanford Law Review Symposium: The Civil Trial: Adaptation and Alternatives (Feb. 2005)

Moderator and Panelist, Mass Torts and Bankruptcy Panel, National Conference of Bankruptcy Judges, San Diego (Oct. 2003)

Moderator and Panelist, ADR and Mass Torts, CPR Institute for Dispute Resolution, San Diego (May 2003)

Featured Speaker, UBS Warburg Asbestos Litigation Conference (February 2003)

Featured Speaker and Panelist, Pound Institute for State Court Judges, "Trends in Federalism and their Implication for State Courts," (July 2002)

Featured Speaker and Panelist, ABA Section of Litigation Annual Meeting Program on New Federal Rules of Civil Procedure (August 1994)

Speaker, Burns Lecture, Loyola of Los Angeles Law School, "Rule 11: Past as Prologue," April 8, 1994

Speaker, New York State Bar Association and Association of the Bar of the City of New York Programs on 1993 Amendments to the Federal Rules of Civil Procedure (Winter, Spring and Summer 1994)

Lecturer, First and Third Circuit Judicial Workshop; Topic: Summary Judgment (March l992)

Invited Speaker, Civil Rules Advisory Committee Hearing on Fed. R. Civ. P. 11 (February 1991)

Panelist, Second Circuit Judicial Conference; Topic: Rule 11 (September l990)

Lecturer, Anglo-American Legal Exchange Program (September 1989); Topic:  Rule 11

Lecturer, Eleventh Circuit Judicial Conference and Eighth and Tenth Circuit Judicial Workshop; Topic: Summary Judgment (May 1988; January 1989)

Lecturer, Fourth, Fifth, Sixth and Seventh Circuit Judicial Workshops (March - December 1988); Topic: Rule 11

Lecturer, Federal Judicial Center Seminar for Newly Appointed Judges (November 1987 and December 1988); Topic: Summary Judgment

Lecturer, Canada-United States Legal Exchange Program  (October 1987) Topic: Rule 11

Panelist at Federal Bar Council program on sanctions; Annual Winter Meeting, St. John's, V.I., February 1987

Panelist at Federal Bar Council program on Rule 11, New York, New York, June 1986

Participant in Association of the Bar of the City of New York Program on Rule 11, April 1986

Panelist at NAACP Legal Defense and Education Fund Annual Lawyer Training Institute, Warrenton, Virginia, September 1985

Panelist at Legal Aid Society of New York Program on August 1983 Amendments to the Fed. R. Civ. P., February 1983

Lecturer for BAR/BRI, a major Bar Review course, in Massachusetts, Connecticut and New York on Conflict of Laws, Federal Jurisdiction and Business Organizations, 1983-1995

PROFESSIONAL SERVICE:

Editorial Board, *Moore's Federal Practice*, since 1995; Board of Overseers, Rand Corp. Institute for Civil Justice, since 2006; ABA Founding Academic Fellow of the Roscoe Pound Civil Justice Institute; Reporter, ABA TIPS Task Force on Asbestos Litigation, since January 2013; Member, Second Circuit Judicial Conference Planning Committee, l987-1990; Second Circuit Task Force on Gender, Racial and Ethnic Fairness in the Courts, 1994-97; ALI/ABA Programs Subcommittee, since 1995; Member, Litigation Advisory Committee, Practicing Law Institute, 1990-2001; Member, Editorial Board, American Arbitration Association, *ADR Currents*, 1995-2002; Member, Advisory Group on American Law Institute Project on Complex Litigation (1987-1991); Editorial Board, The Practical Lawyer, 1990-2002; American Law Institute-American Bar Association, since l988.

BAR ADMISSIONS:

New York, First Department, April 1980; United States District Court for the Southern District of New York and the Eastern District of New York, May 1980; United States Court of Appeals for the Second Circuit, May 1980; United States Supreme Court, May 1986; United States Court of Appeals for the Fourth Circuit, October l990; United States District Court, District of Connecticut, December l99l

BAR AND PROFESSIONAL
ASSOCIATIONS:

American Law Institute, elected October 13, 1989; American Bar Association, Section of Litigation, Subcommittee on Rule 11; American Bar Association, Judicial Administration Division, Federal Courts Committee; New York State Bar Association, Executive Committee of Commercial and Federal Litigation Section; Association of the Bar of the City of New York, Federal Courts Committee (l988-l99l term); Long Term Planning Committee (1993-1996 term); Women's Bar Association of the State of New York

OTHER SERVICE:

Board of Directors, Sweet Briar College (Vice Chair); Board of Trustees, Museum of Contemporary Art Santa Barbara (First Vice President and member of Executive Comm.); Board of Directors, Pacific Pride Foundation

PERSONAL:

Born May l4, l950; Activities include road bicycle racing (2005 National Championships, Women's 55+ Road Race & Criterium; 2005 CA State Championships, Women's 55+ Road Race, Criterium & Time Trial; 2004 CA State Women's 90 + 2-person TT Champion; Everest Challenge Road Race (5th Cat. 3, Sept. 2005), and charity bike rides (California AIDS Ride 3, 4 & 5 (San Francisco to Los Angeles); Florida AIDS Ride 2 (Orlando to Miami); Alaska AIDS Vaccine Ride (Fairbanks to Anchorage); Death Ride (Tour of the California Alps)); sailing;  hiking; running (completed l98l N.Y.C.

Marathon in 3 l/2 hours); basketball (point guard on National Law School Basketball Tournament Championship (men's team, l978); 4 years College Varsity basketball, field hockey and lacrosse teams; cooking; vegetable gardening; and power and sail boating.

# EXHIBIT 11

COHEN MILSTEIN SELLERS & TOLL PLLC
ANDREW N. FRIEDMAN (admitted *pro hac vice*)
afriedman@cohenmilstein.com
GEOFFREY GRABER (SBN 211547)
ggraber@cohenmilstein.com
SALLY M. HANDMAKER (SBN 281186)
shandmaker@cohenmilstein.com
ERIC KAFKA (admitted *pro hac vice*)
ekafka@cohenmilstein.com
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

*Co-Lead Plaintiffs' Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| *In Re Anthem, Inc. Data Breach Litigation* | Case No:  15-md-02617-LHK (NC)<br><br>**DECLARATION OF ANDREW N. FRIEDMAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS**<br><br>Date: February 1, 2018<br>Time: 1:30 p.m.<br>Judge: Hon. Lucy H. Koh<br>Ctrm:  8, 4th Floor |

DECLARATION OF ANDREW N. FRIEDMAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT, AWARD OF ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS
Case No:  15-md-02617-LHK (NC)

2299567.1

I, Andrew N. Friedman, declare:

1.       I am an attorney admitted to practice in the Northern District of California *pro hac vice* in the above-captioned lawsuit ("Action") against the Anthem Defendants ("Anthem") and the Non-Anthem Defendants (collectively, "Defendants"), and am Court-appointed Co-Lead Plaintiffs' Counsel in this action.  I have practiced law since 1983.  I am a partner with the firm of Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") in Washington, D.C. and have been litigating class actions at Cohen Milstein since 1985.  I am making this declaration in support of Plaintiffs' Motions for Final Approval of Class Action Settlement and for an Award of Attorneys' Fees, Reimbursement of Expenses, and Service Awards.

2.       I believe the proposed settlement of this Action is extremely beneficial to the Class.  Among other things, the Settlement provides for at least two years of free credit monitoring and significant enhancements to Anthem's data security practices.  By settling now, the Class is able to take advantage of these remedies that likely will be unavailable or worth substantially less by the time this case could be litigated to a final judgment.

3.       I acted as Co-Lead Counsel in this case and worked in coordination with Co-Lead Counsel, Eve Cervantez, as well as all other co-counsel.  As Co-Lead Counsel, my firm worked on virtually every aspect of this litigation, although I regularly made work assignments in this Action to avoid duplicative efforts.  Ms. Cervantez and I conferred almost daily for nearly two years on strategic decisions in this case and ultimately made decisions concerning virtually every significant action in the litigation. For the nearly two years of active litigation, I spent approximately 60 percent of my billed time on this litigation, while the other partner and two associates who spent the most time on this case from my Firm spent approximately half of their billed time.  As a result, these four attorneys were precluded from undertaking significant work in other cases during that time period.  Among the tasks in which I, or legal professionals at my Firm, took primary responsibility include:

DECLARATION OF ANDREW N. FRIEDMAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT, AWARD OF ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS
Case No:  15-md-02617-LHK (NC)

- Conducting an extensive factual investigation into the data breach, with particular focus on highly technical aspects and the potential disclosure of class member data on the Dark Web;

- Conducting discovery of BCBSA (including taking 2 depositions thereof);

- Responding to Defendants' Requests for Production;

- Responding to Defendants' Interrogatories;

- Collecting, redacting Personally Identifiable Information from, and producing documents for over 100 Named Plaintiffs;

- Regularly holding meet and confer conferences with Defendants' counsel over the scope of discovery requests and drafting numerous joint discovery dispute letters regarding same, some of which were submitted to Magistrate Judge Cousins;

- Coordinating the production of 29 Plaintiffs' computers and tablets (totaling 50 devices) to the Independent Forensic Examiner;

- Preparing for and defending Plaintiffs' depositions, as well as preparing other Plaintiffs' counsel to do same, for the 105 Plaintiffs who were deposed;

- Reviewing documents and deposing 9 senior Anthem executives and information security personnel;

- Deposing three of Defendants' experts who provided opinions regarding whether the Anthem Data Breach resulted in Plaintiffs' PII becoming available for online sale, whether Chinese advanced persistent threat groups steal personal information in order to commit financial crimes against individuals, and whether Plaintiffs' damages expert's proposed conjoint survey was feasible;

- Defending the deposition of Plaintiffs' expert witness regarding whether the Anthem Data Breach created an increased risk of PII exposure and fraud for class members; and

- Arguing at Hearings on various motions, including the motion regarding Request for Production No. 33 involving the forensic examination of Plaintiffs' computers and tablets.

4.     In addition, as one of Co-Lead Counsel, I oversaw the litigation and, along with

Co-Lead Counsel, Eve Cervantez, made final strategy decisions, and drafted, edited, reviewed

DECLARATION OF ANDREW N. FRIEDMAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT, AWARD OF ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS
Case No: 15-md-02617-LHK (NC)

and/or approved all filings with the Court and correspondence with opposing counsel. Among the tasks in which we oversaw and assisted in include:

- Drafting the First, Second, Third, and Fourth Consolidated Amended complaints;

- Drafting sections of the oppositions to two Motions to Dismiss;

- Preparing for the hearings on the first and second motions to dismiss;

- Strategizing over the scope of Defendants' responses to Plaintiffs' discovery requests;

- Coordinating the preparation for and taking of numerous defendant witnesses;

- Coordinating the drafting of and argument of numerous discovery motions;

- Attending and arguing at nine Case Management Conferences;

- Coordinating with plaintiffs' counsel in the two remaining state court actions related to the Anthem data breach;

- Drafting sections of the class certification motion;

- Coordinating and assisting in the selection of Plaintiffs' experts and preparing for the deposition of Plaintiffs' expert on the increased risk of fraud to members of the Class and preparing for the deposition and defending the deposition of one of Plaintiffs' damage experts; and

- Conducting settlement negotiations, including participating in three mediation sessions before Judge Layn Philips.

## ATTORNEY SKILL AND EXPERIENCE

5. For 47 years, Cohen Milstein has been a leading class action firm, recovering tens of billions of dollars for injured plaintiffs. Cohen Milstein is unique among class action firms in the breadth of its practice areas. It has demonstrated a commitment to protecting consumers and the public interest in dozens of antitrust, securities, consumer protection, product liability, civil

- 4 -

DECLARATION OF ANDREW N. FRIEDMAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT, AWARD OF ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS
Case No: 15-md-02617-LHK (NC)

rights, and human rights class actions. Cohen Milstein has earned recognition as a "class-action powerhouse" (*Forbes*), "the most effective law firm in the U.S. for lawsuits with a strong social and political component" (*Corporate Legal Times*), one of "America's 25 Most Influential Law Firms" (*The Trial Lawyer*), and one of the "Most Feared Plaintiffs Law Firms" (*Law360*). In 2016, *Law360* included Cohen Milstein as one of only three Plaintiffs firms on its list of Class Action Groups of the Year.[1] A more detailed description of my firm's practice and achievements can been found at www.cohenmilstein.com

6. The attorneys primarily working on this matter from my firm also brought their significant collective experience and skill to bear in reaching this excellent result for the class.

- **Andrew Friedman.** I am a partner and Co-Chair of the firm's Consumer Protection practice group. Practicing in the class action field since 1985, I have specialized in litigating complex, multi-state class action lawsuits against manufacturers and consumer service providers such as banks, insurers, credit card companies and others. Over the years, I have been lead or co-lead counsel in numerous important cases, bringing relief to millions of consumers and recovering hundreds of millions of dollars in class actions. I was one of the principal counsel in cases against Nationwide and Country Life, which asserted sales marketing abuses in the marketing of so-called "vanishing premium policies," where insurance agents sold insurance policies to unsuspecting consumers promising that after a relatively short time the dividends generated from the policy would be so high as to be able to fully pay the premiums. The Nationwide case resulted in a settlement valued at between $85 million and $103 million, while a settlement with Country Life made $44 million in benefits available to policyholders. Recently, I litigated a lawsuit against Symantec, Corp., and Digital River, Inc., a four-year long nationwide class action battle regarding the marketing of a re-download service in conjunction with the sale of Norton software. The case settled in a $60 million all-cash deal one month before the case was about to go to trial – one of the most significant consumer settlements in years.

  I have significant experience specific to privacy and data breach cases. Among other cases, I was appointed to the Plaintiffs' Steering Committee in both *In re Vizio, Inc. Consumer Privacy Litig.* (C. D. Cal.) (a case alleging that a major television manufacturer surreptitiously collected sensitive personal information from television

---

[1] http://www.law360.com/articles/743097/class-action-group-of-the-year-cohen-milstein.

- 5 -

purchasers) and *In re The Home Depot, Inc. Customer Data Sec. Breach Litig.* (N.D. Ga) (a data breach case relating to the theft of credit cards from Home Depot customers on behalf of financial institutions). I also played significant roles in *In re: Science Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.* (D.D.C.) (case involving data breach of medical and personal health information of 4.7 million former and active duty military personnel dismissed on standing grounds) and *Nader v. Capital One Bank* (USA), N.A. (C.D. Cal.) (one of principal counsel in litigation involving bank covertly recording outbound customer service calls, resulted in $3 million settlement).

Prior to my current role as Co-Chair and member of the Consumer Protection group, I was a member of the Securities Litigation & Investor Protection practice, litigating many important matters, including the *Globalstar Securities Litigation* in which I served as one of the lead trial counsel. The case settled for $20 million during the second week of the trial.

Prior to joining the firm, I was an attorney with the U.S. Patent and Trademark Office. I graduated from Tufts University in 1980 and the National Law Center at George Washington University in 1983.

- **Geoffrey Graber.** Mr. Graber is a partner specializing in complex litigation aimed at protecting consumers deceived and harmed by consumer service providers such as banks, insurance, and health care companies. Prior to joining the firm, Mr. Graber served as Deputy Associate Attorney General and Director of the Residential Mortgage-Backed Securities (RMBS) Working Group at the United States Department of Justice, overseeing the DOJ's nationwide investigation into the packaging and sale of mortgage-backed securities leading up to the financial crisis. The investigations overseen by Mr. Graber ultimately recovered more than $36 billion. Previously, he also served as Counsel in the DOJ's Civil Division, proposing and leading a three-year investigation of Standard & Poor's and its ratings and structured finance products from 2004 to 2007. Before joining the DOJ, Mr. Graber was an associate at a top-tier defense firm, where he defended Fortune 500 companies and their officers and directors in securities and derivative suits, consumer class actions, and government investigations. Mr. Graber graduated from Vassar College in 1995 and the University of Southern California Gould School of Law in 2000.

- **Sally Handmaker.** Ms. Handmaker is an associate and a member of the firm's Consumer Protection practice group, litigating actions to enforce consumer rights under federal and state laws. Ms. Handmaker has been the lead associate in several highly-successful consumer class actions in which she was involved in all aspects of litigation. These include a $60 million settlement against Symantec and Digital River alleging misrepresentations regarding the companies' Extended Download Service and a $60 million settlement against Caterpillar alleging that engine exhaust system defects resulted in power losses and shutdowns that prevented or impeded their vehicles from transporting goods or passengers. Prior to joining Cohen Milstein, Ms.

Handmaker was a litigation associate at a top-tier defense firm, working on complex commercial and general litigation matters in federal and state courts covering a variety of subject matters, including antitrust, securities litigation, sports, intellectual property, and employment. Ms. Handmaker graduated from the University of Southern California in 2007 and the University of Virginia School of Law in 2011.

- **Eric Kafka.** Mr. Kafka is an associate and a member of the firm's Consumer Protection practice group, litigating actions to enforce consumer rights under federal and state laws. Mr. Kafka is the lead associate in several complex and ongoing consumer class actions in which he is involved in all aspects of litigation. Prior to joining Cohen Milstein, Mr. Kafka was a litigation associate at a top-tier defense firm, working on complex commercial and general litigation matters. Prior to law school, Mr. Kafka worked on multiple successful political campaigns. Mr. Kafka graduated from Yale University in 2008 and Columbia University School of Law in 2014, where he was recognized as a Harlan Fiske Stone Scholar for superior academic achievement.

## TIME AND EFFORT DEDICATED TO THE CASE

7.     Exhibits 1 and 3 to the Declaration of Eve H. Cervantez provide detailed summaries of the amount of time spent by my firm's partners, attorneys, and professional support staff who were involved in this litigation through September 30, 2017. They do not include any time devoted to preparing this declaration or otherwise pertaining to the Motion for Attorneys' fees. The lodestar calculation is based on my firm's current billing rates, and was prepared from contemporaneous time records regularly prepared and maintained by my firm. The hourly rates for my firm's partners, attorneys, and professional support staff are the usual and customary hourly rates charged for their services in similar complex litigation. In addition, my firm has submitted fee petitions in other cases that have reported hourly rates at amounts comparable to those sought herein (or their historical equivalents), and courts have approved an award of attorneys' fees in such cases. *See, e.g.*, *Nitsch v. DreamWorks Animation SKG, Inc.*, No. 14-CV-04062-LHK, 2017 WL 2423161, at *9 (N.D. Cal. June 5, 2017) (Koh, J.) (finding that Cohen Milstein's 2017 "billing rates for the attorneys, paralegals, and litigation support staff . . . are reasonable in light of prevailing market rates in this district and that counsel for Plaintiffs

- 7 -

have submitted adequate documentation justifying those rates" – my rate of $870 per hour was approved for a partner (Daniel Small), who graduated law school four years after I did); *In Re Broadcom Corp. Stockholder Litig.*, No. 15-cv-00979-JVS-PJWx (C.D. Cal. Feb. 27, 2017) (finding Cohen Milstein's fees "to be high but reasonable," noting attached declarations and exhibits demonstrated "that the firm's attorneys are experienced and successful litigators" and that "other courts have recently approved the firm's proposed rates" and concluding that the 2017 "rates are also reasonable for the market" – my rate of $870 was approved for a partner (Carol Gilden), who graduated law school my same year; a rate ten dollars per hour lower than Mr. Graber's ($720) was approved for a partner (Joshua Devore) who graduated law school his same year); *In Re: Cast Iron Soil Pipe and Fittings Antitrust Litig.*, No. 1:14-md-2508-HSM-CHS (E.D. Tenn. May 26, 2017) (granting attorneys' fees of one-third of the settlement fund at Cohen Milstein's fees after considering "the value of the services on an hourly basis " – a rate $30 per hour more than my rate was approved for a partner (Kit Pierson) who graduated law school my same year; Ms. Handmaker's rate of $490 per hour was approved for an associate (Robert Braun) who graduated law school her same year as "fairly reflect[ing] the benefit of the services rendered."); *see also Khoday et al. v. Symantec Corp. et al.*, No. 0:11-cv-00180-JRT-TNL (D. Minn. Apr. 5, 2016) (fee award using Cohen Milstein's 2015 rates to calculate the lodestar value of class counsel's work to "double-check" the percentage-of-the-fund method, including my 2015 rate of $815 per hour and Ms. Handmaker's 2015 rate of $445 per hour).

8.     Throughout the litigation, Plaintiffs' Counsel staffed the matter efficiently and took steps to avoid duplication of effort.

9.     The total number of hours reasonably expended on this litigation by my firm from inception through September 30, 2017 is 16,350.9.  The total lodestar for my firm at current rates is $7,719,178.50.  Expense items are billed separately and are not duplicated in my firm's lodestar.

- 8 -

10.     The expenses my firm incurred in litigating this action are reflected in the books and records of my firm.  These books and records are prepared from expense vouchers, receipts, and check records and other source materials and accurately reflect the expenses incurred.

11.     My firm incurred a total of $116,054.19 in unreimbursed internal expenses from inception through October 5, 2017.  In addition, my firm contributed $228,000 to the cost fund. All of these expenses were reasonable and necessary for the prosecution of this litigation.  A summary of those expenses by category is attached as Exhibit 7 to the Declaration of Eve Cervantez.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 1, 2017.

____/s/ Andrew N. Friedman_____
Andrew N. Friedman

- 9 -

DECLARATION OF ANDREW N. FRIEDMAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS
Case No:  15-md-02617-LHK (NC)

# EXHIBIT 12

EXHIBIT 1

# Summary of Total Lodestar by Firms

| Firm | Total Firm Hours | Total Lodestar |
|---|---|---|
| Abington Cole & Ellery LLP | 22.60 | $ 12,430.00 |
| Altshuler Berzon LLP | 11,088.30 | $ 6,509,819.50 |
| Barrack, Rodos & Bacine | 1,312.50 | $ 653,171.50 |
| Berger & Montague, P.C. | 184.00 | $ 114,831.50 |
| Bonnett, Fairbourn, Friedman & Balint. P.C. | 1,143.40 | $ 443,085.00 |
| Boucher LLP | 801.30 | $ 198,754.00 |
| Branstetter, Stranch & Jennings, PLLC | 2,196.30 | $977,342.00 |
| Cafferty, Clobes, Meriwether & Sprengel LLP | 5.50 | $3,632.50 |
| Carlson, Lynch, Sweet, Kilpela & Carpenter LLP | 205.80 | $ 77,197.50 |
| Chestnut Cambronne Attorneys at Law | 16.80 | $8,715.00 |
| Cohen & Malad | 2,253.80 | $ 1,040,895.00 |
| Cohen Milstein Sellers & Toll | 16,350.90 | $7,719,178.50 |
| Consumer Law Practice of Dan LeBel | 16.60 | $ 8,531.00 |
| Cotchett Pitre & McCarthy LLP | 32.10 | $ 12,840.00 |
| Desai Law Firm PC | 8.10 | $4,175.00 |
| Emerson Scott LLP | 113.50 | $ 74,099.50 |
| Fagan Emert & Davis LLC | 19.90 | $ 7,960.00 |
| Farmer, Jaffe, Weissing LLP | 31.60 | $16,410.00 |
| Federman & Sherwood | 316.10 | $180,795.00 |
| Finkelstein Thompson LLP | 19.40 | $ 13,530.00 |
| Fitapelli & Schaffer LLP | 17.90 | $ 4,800.00 |
| Forbes Law Group | 310.50 | $ 116,405.00 |
| Gibbs Law Group LLP | 10,844.20 | $ 4,902,419.50 |

# Summary of Total Lodestar by Firms

| Firm | Total Firm Hours | Total Lodestar |
|---|---|---|
| Goldman Scarlato & Penny PC | 2,006.90 | $ 1,295,152.50 |
| Harwood Feffer LLP | 24.00 | $ 18,600.00 |
| Heins Mills & Olson PLC | 665.00 | $254,815.00 |
| Janet, Jenner & Suggs, LLC | 20.30 | $6,885.00 |
| Kantrowitz, Goldhamer & Graifman, P.C. | 182.60 | $ 94,092.50 |
| Kaplan, Fox, & Kilsheimer LLP | 367.70 | $184,459.50 |
| Karon LLC | 10.30 | $6,508.50 |
| Keller Rohrback Law Offices LLP | 3,607.00 | $1,521,311.00 |
| Law Offices of Paul C. Whalen, P.C. | 133.10 | $106,480.00 |
| Law Office of Angela Edwards | 191.00 | $ 100,275.00 |
| Levi & Korsinsky LLP | 176.10 | $ 97,039.50 |
| Lieff Cabraser Heimann & Berstein | 10,594.6 | $ 5,097,053.00 |
| Litigation Law Group | 8.60 | $5,195.00 |
| Lockridge Grindal Nauen PLLP | 410.40 | $138,920.00 |
| Milberg LLP | 719.0 | $302,157.50 |
| Morgan & Morgan | 692.00 | $ 353,080.00 |
| Murray Law Firm | 576.70 | $203,745.00 |
| Pomerantz LLP | 1,109.70 | $528,869.00 |
| Robinson Calcagnie Robinson Shapiro Davis, Inc. | 370.50 | $ 203,270.00 |
| Schubert Jonckheer & Kolbe LLP | 3,808.30 | $ 1,423,234.00 |
| Scott + Scott LLP | 547.90 | $ 219,970.00 |
| Skepnek Law Firm | 107.40 | $ 60,015.00 |
| Stritmatter Kessler Whelan Koehler Moore Kahler | 175.80 | $ 77,250.00 |

## Summary of Total Lodestar by Firms

| Firm | Total Firm Hours | Total Lodestar |
|------|------------------|----------------|
| Stueve, Siegel, Hanson LLP | 2,244.10 | $ 953,503.50 |
| Stull, Stull & Brody | 1,537.90 | $ 1,059,189.00 |
| The Giatras Law Firm | 28.30 | $7,895.00 |
| Tousley, Brain Stephens | 10.70 | $ 6,096.50 |
| Webb, Klase & Lemond LLC | 238.50 | $ 127,192.50 |
| Weitz & Luxenburg, P.C. | 135.40 | $61,435.00 |
| Zimmerman Reed LLP | 542.10 | $217,643.50 |
| **Total** | **78,553.00** | **$37,832,349.00** |

# Detailed Lodestar Information by Firm and Biller

| Firm | Total Firm Hours | Total Firm Fees | Biller | Position | Grad Year | Rate | Hours Billed | Total Attorney Fees |
|---|---|---|---|---|---|---|---|---|
| Abington Cole & Ellery LLP | 22.6 | $ 12,430.00 | Cornelius P. Dukelow | Partner | 2001 | $ 550.00 | 22.6 | $ 12,430.00 |
| Altshuler Berzon LLP | 11,088.3 | $6,509,819.50 | Eve Cervantez | Partner | 1992 | $ 860.00 | 3,039.4 | $ 2,613,884.00 |
| | | | Jonathan Weissglass | Partner | 1994 | $ 820.00 | 623.6 | $ 511,352.00 |
| | | | Stacey Leyton | Partner | 1998 | $ 770.00 | 27.4 | $ 21,098.00 |
| | | | Danielle E. Leonard | Partner | 2001 | $ 690.00 | 2,395.3 | $ 1,652,757.00 |
| | | | Peder J. Thoreen | Partner | 2001 | $ 690.00 | 13.5 | $ 9,315.00 |
| | | | Zoe Palitz | Associate | 2010 | $ 460.00 | 11.1 | $ 5,106.00 |
| | | | Corinne Johnson | Fellow | 2012 | $ 405.00 | 47.7 | $ 19,318.50 |
| | | | Meredith Johnson | Associate | 2012 | $ 405.00 | 2,016.5 | $ 816,682.50 |
| | | | Tony LoPresti | Associate | 2012 | $ 405.00 | 774.5 | $ 313,672.50 |
| | | | Adan Martinez | Legal Clerk | Legal Clerk | $ 285.00 | 119.3 | $ 34,000.50 |
| | | | George A. Warner | Legal Clerk | Legal Clerk | $ 285.00 | 28.7 | $ 8,179.50 |
| | | | Hannah Kieschnick | Legal Clerk | Legal Clerk | $ 285.00 | 33.8 | $ 9,633.00 |
| | | | Lisa Bixby | Legal Clerk | Legal Clerk | $ 285.00 | 31.6 | $ 9,006.00 |
| | | | Ming Cheung | Legal Clerk | Legal Clerk | $ 285.00 | 47.0 | $ 13,395.00 |
| | | | Rebecca Chan | Legal Clerk | Legal Clerk | $ 285.00 | 16.1 | $ 4,588.50 |
| | | | Zach Manfredi | Legal Clerk | Legal Clerk | $ 285.00 | 60.9 | $ 17,356.50 |
| | | | Hannah Cole | Paralegal | Paralegal | $ 250.00 | 113.6 | $ 28,400.00 |
| | | | Jocelyn Smith | Paralegal | Paralegal | $ 250.00 | 303.0 | $ 75,750.00 |
| | | | Luke R. Taylor | Paralegal | Paralegal | $ 250.00 | 41.2 | $ 10,300.00 |
| | | | Matt Broad | Paralegal | Paralegal | $ 250.00 | 1,333.1 | $ 333,275.00 |
| | | | Rachel Busch | Paralegal | Paralegal | $ 250.00 | 11.0 | $ 2,750.00 |
| Barrack, Rodos & Bacine | 1,312.5 | $ 653,171.50 | William J. Ban | Partner | 1982 | $ 660.00 | 69.8 | $ 46,068.00 |
| | | | Stephen R. Basser | Partner | 1976 | $ 770.00 | 100.0 | $ 77,000.00 |
| | | | Daniel J. Brooker | Associate | 2008 | $ 375.00 | 345.5 | $ 129,562.50 |
| | | | Chad A. Carder | Partner | 2002 | $ 500.00 | 248.8 | $ 124,400.00 |
| | | | Jeffrey W. Golan | Partner | 1980 | $ 770.00 | 11.1 | $ 8,547.00 |
| | | | Samuel M. Ward | Partner | 2001 | $ 600.00 | 179.2 | $ 107,520.00 |
| | | | Julie B. Palley | Associate | 2007 | $ 470.00 | 202.2 | $ 95,034.00 |
| | | | Matthew A. Toomey | Associate | 2010 | $ 440.00 | 130.5 | $ 57,420.00 |
| | | | Jennifer R. Mueller | Paralegal | Paralegal | $ 300.00 | 25.4 | $ 7,620.00 |
| Berger & Montague, P.C. | 184.0 | $ 114,831.50 | Eric Lechtzin | Partner | 1991 | $ 665.00 | 1.1 | $ 731.50 |
| | | | Jon Lambiras | Partner | 2003 | $ 600.00 | 167.9 | $ 100,740.00 |
| | | | Michael Dell'Angelo | Partner | 1997 | $ 715.00 | 3.1 | $ 2,216.50 |
| | | | Shanon Carson | Partner | 2000 | $ 795.00 | 1.7 | $ 1,351.50 |
| | | | Sherrie Savett | Partner | 1973 | $ 960.00 | 10.2 | $ 9,792.00 |
| Bonnett, Fairbourn, Friedman & Balint, P.C. | 1,143.4 | $ 443,085.00 | Amy L. Owen | Contract Attorney | 2011 | $ 275.00 | 287.9 | $ 79,172.50 |
| | | | Francis J. Balint, Jr. | Partner | 1982 | $ 750.00 | 1.0 | $ 750.00 |
| | | | Manfred P. Muecke | Associate | 2002 | $ 425.00 | 854.5 | $ 363,162.50 |
| Boucher LLP | 801.3 | $ 198,754.00 | Shehnaz Bhujwala | Partner | 2002 | $ 750.00 | 87.1 | $ 65,325.00 |
| | | | Lauren Burton | Contract Attorney | 2014 | $ 185.00 | 707.6 | $ 130,906.00 |
| | | | Priscilla Szeto | Associate | 2015 | $ 395.00 | 6.2 | $ 2,449.00 |
| | | | Christine Cramer | Paralegal | Paralegal | $ 185.00 | 0.4 | $ 74.00 |
| Branstetter, Stranch & Jennings, PLLC | 2,196.3 | $ 977,342.00 | Raquel Bellamy | Associate | 2011 | $ 350.00 | 6.3 | $ 2,205.00 |
| | | | Karla Campbell | Partner | 2008 | $ 575.00 | 240.3 | $ 138,172.50 |
| | | | Kourtney Hennard | Contract Attorney | 2013 | $ 385.00 | 66.7 | $ 25,679.50 |
| | | | Callie Jennings | Associate | 2016 | $ 275.00 | 31.3 | $ 8,607.50 |
| | | | Seamus Kelly | Associate | 2013 | $ 425.00 | 1,035.1 | $ 439,917.50 |
| | | | Megan Killion | Associate | 2008 | $ 575.00 | 8.9 | $ 5,117.50 |
| | | | Michael Isaac Miller | Associate | 2009 | $ 525.00 | 111.9 | $ 58,747.50 |
| | | | Anthony Orlandi | Associate | 2006 | $ 525.00 | 5.5 | $ 2,887.50 |
| | | | Christina M. Osbourne | Contract Attorney | 2013 | $ 410.00 | 596.9 | $ 244,729.00 |
| | | | Michael Stewart | Partner | 1994 | $ 700.00 | 44.0 | $ 30,800.00 |
| | | | J. Gerard Stranch | Partner | 2003 | $ 660.00 | 5.3 | $ 3,498.00 |
| | | | James G. Stranch | Partner | 1973 | $ 905.00 | 0.5 | $ 452.50 |
| | | | K. Grace Stranch | Associate | 2014 | $ 420.00 | 35.7 | $ 14,994.00 |
| | | | Jennifer Steele | Paralegal | Paralegal | $ 300.00 | 0.3 | $ 90.00 |
| | | | Amanda Winski | Paralegal | Paralegal | $ 190.00 | 2.2 | $ 418.00 |
| | | | Mariah Young | Paralegal | Paralegal | $ 190.00 | 5.4 | $ 1,026.00 |
| Cafferty Clobes Meriwether & Sprengel LLP | 5.5 | $ 3,632.50 | Bryan Clobes | Partner | 1988 | $ 775.00 | 1.3 | $ 1,007.50 |
| | | | Daniel Herrera | Associate | 2008 | $ 625.00 | 4.2 | $ 2,625.00 |
| Carlson Lynch Sweet Kilpela & Carpenter LLP | 205.8 | $ 77,197.50 | Gary Lynch | Partner | 1989 | $ 675.00 | 15.9 | $ 10,732.50 |
| | | | Jamisen Etzel | Associate | 2011 | $ 350.00 | 74.7 | $ 26,145.00 |
| | | | Pamela Miller | Associate | 2003 | $ 350.00 | 115.2 | $ 40,320.00 |
| Chestnut Cambronne Attorneys at Law | 16.8 | $ 8,715.00 | Francis Rondoni | Partner | 1980 | $ 550.00 | 13.3 | $ 7,315.00 |
| | | | Gary Luloff | Associate | 2008 | $ 400.00 | 3.5 | $ 1,400.00 |

# Detailed Lodestar Information by Firm and Biller

| Firm | Total Firm Hours | Total Firm Fees | Biller | Position | Grad Year | Rate | Hours Billed | Total Attorney Fees |
|---|---|---|---|---|---|---|---|---|
| Cohen & Malad | 2,253.8 | $ 1,040,895.00 | Alex C. Trueblood | Associate | 2014 | $ 350.00 | 218.5 | $ 76,475.00 |
| | | | Aaron J. Williamson | Associate | 2015 | $ 350.00 | 550.6 | $ 192,710.00 |
| | | | Edward B. Mulligan V. | Associate | 2010 | $ 350.00 | 0.8 | $ 280.00 |
| | | | Irwin B. Levin | Partner | 1978 | $ 775.00 | 1.1 | $ 852.50 |
| | | | Jeffrey A. Hammond | Partner | 2004 | $ 595.00 | 0.6 | $ 357.00 |
| | | | Lynn A. Toops | Partner | 2006 | $ 595.00 | 730.9 | $ 434,885.50 |
| | | | Laura C. Jeffs | Of Counsel | 1990 | $ 325.00 | 216.2 | $ 70,265.00 |
| | | | Richard E. Shevitz | Partner | 1985 | $ 775.00 | 85.8 | $ 66,495.00 |
| | | | Scott D. Gilchrist | Partner | 1992 | $ 675.00 | 0.3 | $ 202.50 |
| | | | Vess A. Miller | Partner | 2006 | $ 595.00 | 276.5 | $ 164,517.50 |
| | | | Cindy Meadows | Paralegal | Paralegal | $ 200.00 | 107.1 | $ 21,420.00 |
| | | | Aaron J. Williamson | Law Clerk | Law Clerk | $ 200.00 | 9.8 | $ 1,960.00 |
| | | | Elizabeth Hyde | Law Clerk | Law Clerk | $ 95.00 | 4.0 | $ 380.00 |
| | | | Eric Coleman | Law Clerk | Law Clerk | $ 110.00 | 2.5 | $ 275.00 |
| | | | Jennifer Redmond | Law Clerk | Law Clerk | $ 200.00 | 47.4 | $ 9,480.00 |
| | | | Jonathon Welling | Law Clerk | Law Clerk | $ 200.00 | 1.7 | $ 340.00 |
| Cohen Milstein Sellers & Toll PLLC | 16,350.9 | $ 7,719,178.50 | Beirne, Brian | Contract Attorney | 2015 | $ 245.00 | 803.9 | $ 196,955.50 |
| | | | Clarke, Michael | Contract Attorney | 2010 | $ 285.00 | 121.5 | $ 34,627.50 |
| | | | Coker, Ross F. | Contract Attorney | 2001 | $ 245.00 | 477.0 | $ 116,865.00 |
| | | | Craig, Shunita | Contract Attorney | 2012 | $ 275.00 | 795.0 | $ 218,625.00 |
| | | | Feldstein, David A. | Contract Attorney | 2011 | $ 280.00 | 442.5 | $ 123,900.00 |
| | | | Frias, Erik N. | Contract Attorney | 2003 | $ 385.00 | 494.2 | $ 190,267.00 |
| | | | Friedman, Andrew, N. | Partner | 1983 | $ 870.00 | 2,232.9 | $ 1,942,623.00 |
| | | | Graber, Geoffrey | Partner | 2000 | $ 720.00 | 1,681.9 | $ 1,210,968.00 |
| | | | Handmaker, Sally | Associate | 2011 | $ 490.00 | 1,871.0 | $ 916,790.00 |
| | | | Handorf, Karen, L. | Partner | 1975 | $ 855.00 | 65.2 | $ 55,746.00 |
| | | | Hart, Kendra | Contract Attorney | 2012 | $ 390.00 | 267.3 | $ 104,247.00 |
| | | | Hora, Derek | Contract Attorney | 2012 | $ 245.00 | 820.2 | $ 200,949.00 |
| | | | Kafka, Eric | Associate | 2014 | $ 425.00 | 1,884.6 | $ 800,955.00 |
| | | | Lanou, John H. | Contract Attorney | 2000 | $ 400.00 | 354.6 | $ 141,840.00 |
| | | | Malloy, Molly M. | Contract Attorney | 2011 | $ 275.00 | 40.0 | $ 11,000.00 |
| | | | McNamara, Douglas, J. | Of Counsel | 1995 | $ 700.00 | 52.8 | $ 36,960.00 |
| | | | Napier, Deborah L. | Contract Attorney | 1990 | $ 495.00 | 23.8 | $ 11,781.00 |
| | | | Riera-Seivane, Jaime A. | Contract Attorney | 1993 | $ 450.00 | 432.4 | $ 194,580.00 |
| | | | Smith, Pamela L. | Contract Attorney | 1984 | $ 495.00 | 462.2 | $ 228,789.00 |
| | | | Solen, Donna F. | Contract Attorney | 1997 | $ 420.00 | 152.8 | $ 64,176.00 |
| | | | Toll, Steven, J. | Partner | 1975 | $ 970.00 | 135.7 | $ 131,629.00 |
| | | | Tsighe, Ariam M. | Contract Attorney | 2012 | $ 245.00 | 41.5 | $ 10,167.50 |
| | | | Shea, Kelly Ann | Contract Paralegal | Contract Paralegal | $ 260.00 | 55.3 | $ 14,378.00 |
| | | | Bournazian, Thea | Investigator | Investigator | $ 440.00 | 154.2 | $ 67,848.00 |
| | | | Bushan, Anjali | Legal Clerk | Legal Clerk | $ 270.00 | 53.0 | $ 14,310.00 |
| | | | Lewis, Adam | Legal Clerk | Legal Clerk | $ 270.00 | 48.2 | $ 13,014.00 |
| | | | Meth, Madeline H. | Legal Clerk | Legal Clerk | $ 270.00 | 16.5 | $ 4,455.00 |
| | | | Conway, Charles | Paralegal | Paralegal | $ 270.00 | 306.3 | $ 82,701.00 |
| | | | Hamdan, Shireen | Paralegal | Paralegal | $ 280.00 | 1,430.4 | $ 400,512.00 |
| | | | Wozniak, Mariah | Paralegal | Paralegal | $ 280.00 | 634.0 | $ 177,520.00 |
| Consumer Law Practice of Dan LeBel | 16.6 | $ 8,531.00 | Daniel T. LeBel | Partner | 2006 | $ 605.00 | 10.3 | $ 6,231.50 |
| | | | Zachary R. Scribner | Associate | 2015 | $ 365.00 | 6.3 | $ 2,299.50 |
| Cotchett, Pitre & McCarthy LLP | 32.1 | $ 12,840.00 | Divya Rao | Associate | 2013 | $ 400.00 | 32.1 | $ 12,840.00 |
| Desai Law | 8.1 | $ 4,175.00 | Aashish Desai | Partner | 1996 | $ 750.00 | 4.3 | $ 3,225.00 |
| | | | Sonia Nava | Paralegal | Paralegal | $ 250.00 | 3.8 | $ 950.00 |
| Emerson Scott LLP | 113.5 | $ 74,099.50 | John G. Emerson | Partner | 1980 | $ 795.00 | 18.6 | $ 14,787.00 |
| | | | David G. Scott | Partner | 2006 | $ 625.00 | 94.9 | $ 59,312.50 |
| Fagan, Emert, & Davis, LLC | 19.9 | $ 7,960.00 | Paul T. Davis | Partner | 1997 | $ 400.00 | 18.6 | $ 7,440.00 |
| | | | Brennan P. Fagan | Partner | 2001 | $ 400.00 | 1.3 | $ 520.00 |
| Farmer, Jaffe, Weissing LLP | 31.6 | $ 16,410.00 | Steven R. Jaffe | Partner | 1983 | $ 650.00 | 19.8 | $ 12,870.00 |
| | | | Brittany Henderson | Associate | 2015 | $ 300.00 | 11.8 | $ 3,540.00 |
| Federman & Sherwood | 316.1 | $ 180,795.00 | William B. Federman | Partner | 1982 | $ 850.00 | 97.8 | $ 83,130.00 |
| | | | Carin L. Marcussen | Associate | 2003 | $ 510.00 | 167.0 | $ 85,170.00 |
| | | | Kyle Eckman | Associate | 2012 | $ 350.00 | 0.3 | $ 105.00 |
| | | | Gregg Lytle | Associate | 2008 | $ 450.00 | 0.5 | $ 225.00 |
| | | | Allicia Bolton | Paralegal | Paralegal | $ 250.00 | 1.0 | $ 250.00 |
| | | | Traylor Frandelind | Paralegal | Paralegal | $ 135.00 | 4.0 | $ 540.00 |
| | | | Robin Hester | Paralegal | Paralegal | $ 250.00 | 45.5 | $ 11,375.00 |
| Finkelstein Thompson LLP | 19.4 | $ 13,530.00 | Mila Bartos | Partner | 1993 | $ 850.00 | 4.3 | $ 3,655.00 |
| | | | Douglas Thompson | Partner | 1969 | $ 850.00 | 1.2 | $ 1,020.00 |
| | | | Rosemary Rivas | Partner | 2000 | $ 600.00 | 0.9 | $ 540.00 |
| | | | Alyssa Dang | Associate | 2013 | $ 300.00 | 1.7 | $ 510.00 |
| | | | Roseanne Mah | Of Counsel | 2005 | $ 475.00 | 4.8 | $ 2,280.00 |
| | | | Gordon Fauth | Of Counsel | 1997 | $ 850.00 | 6.5 | $ 5,525.00 |

# Detailed Lodestar Information by Firm and Biller

| Firm | Total Firm Hours | Total Firm Fees | Biller | Position | Grad Year | Rate | Hours Billed | Total Attorney Fees |
|---|---|---|---|---|---|---|---|---|
| Fitapelli & Schaffer LLP | 17.9 | $ 4,800.00 | Joseph A. Fitapelli | Partner | 2001 | $ 500.00 | 1.3 | $ 650.00 |
| | | | Nicholas P. Melito | Associate | 2013 | $ 250.00 | 16.6 | $ 4,150.00 |
| Forbes Law Group | 310.5 | $ 116,405.00 | Frankie Forbes | Partner | 2001 | $ 500.00 | 38.2 | $ 19,100.00 |
| | | | Keynen "KJ" Wall | Of Counsel/Partner | 2001 | $ 450 / $ 500 | 3.5 | $ 1,605.00 |
| | | | Mike Fleming | Of Counsel | 2001 | $ 450.00 | 13.9 | $ 6,255.00 |
| | | | Mark Van Blaricum | Of Counsel | 2002 | $ 450.00 | 2.3 | $ 1,035.00 |
| | | | Quentin Templeton | Associate | 2014 | $ 350.00 | 252.3 | $ 88,305.00 |
| | | | Melissa Ebling | Legal Clerk | Legal Clerk | $ 350.00 | 0.3 | $ 105.00 |
| Gibbs Law Group | 10,844.2 | $ 4,902,419.50 | David Berger | Partner | 2008 | $ 575.00 | 2,759.2 | $ 1,586,540.00 |
| | | | Joshua Bloomfield | Associate | 2000 | $ 395.00 | 945.4 | $ 373,433.00 |
| | | | Aaron Blumenthal | Associate | 2015 | $ 350 / $ 365 | 1,957.0 | $ 714,270.50 |
| | | | Caroline Corbitt | Associate | 2015 | $ 365.00 | 292.9 | $ 106,908.50 |
| | | | AJ De Bartolomeo | Partner | 1988 | $ 740.00 | 175.5 | $ 129,870.00 |
| | | | Eric Gibbs | Partner | 1995 | $ 805.00 | 406.0 | $ 326,830.00 |
| | | | Scott Grzenczyk | Associate | 2011 | $ 525.00 | 12.6 | $ 6,615.00 |
| | | | Shane Howarter | Associate | 2016 | $ 340.00 | 10.7 | $ 3,638.00 |
| | | | Dylan Hughes | Partner | 2000 | $ 685.00 | 14.3 | $ 9,795.50 |
| | | | Amanda Karl | Associate | 2014 | $ 415.00 | 88.6 | $ 36,769.00 |
| | | | J. Mani Goehring (née Khamvongsa) | Associate | 2008 | $ 375.00 | 213.4 | $ 80,025.00 |
| | | | Linda Lam | Associate | 2014 | $ 415.00 | 40.7 | $ 16,890.50 |
| | | | Steve Lopez | Associate | 2014 | $ 415.00 | 31.4 | $ 13,031.00 |
| | | | Michael Marchese | Associate | 2015 | $ 350.00 | 859.9 | $ 300,965.00 |
| | | | Marcus McElhenney | Contract Attorney | 2014 | $ 350.00 | 1,656.7 | $ 579,845.00 |
| | | | Geoffrey Munroe | Partner | 2003 | $ 660.00 | 441.1 | $ 291,126.00 |
| | | | Andre Mura | Partner | 2004 | $ 635.00 | 46.5 | $ 29,527.50 |
| | | | Patrick Nagler | Contract Attorney | 2011 | $ 375.00 | 87.0 | $ 32,625.00 |
| | | | Dave Stein | Partner | 2007 | $ 605.00 | 39.0 | $ 23,595.00 |
| | | | Clay Stockton | Associate | 2012 | $ 400.00 | 197.3 | $ 78,920.00 |
| | | | Linh Vuong | Associate | 2012 | $ 450.00 | 190.2 | $ 85,590.00 |
| | | | Kristen Boffi | Paralegal | Paralegal | $ 220.00 | 10.7 | $ 2,354.00 |
| | | | Jason Gibbs | Paralegal | Paralegal | $ 190.00 | 36.4 | $ 6,916.00 |
| | | | Walter Murcia | Paralegal | Paralegal | $ 200.00 | 206.1 | $ 41,220.00 |
| | | | Monsura Sirajee | Paralegal | Paralegal | $ 200.00 | 125.6 | $ 25,120.00 |
| Goldman, Scarlato, Penny LLP | 2,006.9 | $ 1,295,152.50 | Mark Goldman | Partner | 1986 | $ 725.00 | 1,264.6 | $ 916,835.00 |
| | | | Douglas Bench | Associate | 2006 | $ 475.00 | 150.3 | $ 71,392.50 |
| | | | Laura Mummert | Associate | 2000 | $ 595.00 | 592.0 | $ 306,925.00 |
| Harwood Feffer LLP | 24.0 | $ 18,600.00 | Sam Rosen | Partner | 1968 | $ 775.00 | 24.0 | $ 18,600.00 |
| Heins, Mills, & Olson PLC | 665.0 | $ 254,815.00 | Vincent J. Esades | Partner | 1994 | $ 700.00 | 8.9 | $ 6,230.00 |
| | | | David Woodward | Partner | 1975 | $ 700.00 | 8.3 | $ 5,810.00 |
| | | | Maureen E. Sandey | Associate | 2011 | $ 375.00 | 646.8 | $ 242,550.00 |
| | | | Irene M. Kovarik | Paralegal | Paralegal | $ 225.00 | 1.0 | $ 225.00 |
| Janet, Jenner & Suggs, LLC | 20.3 | $ 6,885.00 | Lisa Lee | Associate | 2012 | $ 350.00 | 19.2 | $ 6,720.00 |
| | | | Ahleah Knapp | Paralegal | Paralegal | $ 150.00 | 0.4 | $ 60.00 |
| | | | Cameron Swanson | Paralegal | Paralegal | $ 150.00 | 0.2 | $ 30.00 |
| | | | Olivia Colonero | Paralegal | Paralegal | $ 150.00 | 0.5 | $ 75.00 |
| Kantrowitz, Goldhamer, Graifman, PC | 182.6 | $ 94,092.50 | Gary Graifman | Partner | 1981 | $ 825.00 | 10.0 | $ 8,250.00 |
| | | | Sarah Haque | Associate | 2014 | $ 500.00 | 171.1 | $ 85,550.00 |
| | | | Margaret Hernandez | Paralegal | Paralegal | $ 195.00 | 1.5 | $ 292.50 |
| Kaplan Fox & Kilsheimer LLP | 367.7 | $ 184,459.50 | Laurence D. King | Partner | 1988 | $ 500.00 | 0.4 | $ 200.00 |
| | | | Linda M. Fong | Of Counsel | 1985 | $ 625.00 | 3.7 | $ 2,312.50 |
| | | | Matthew George | Of Counsel | 2005 | $ 620.00 | 1.5 | $ 930.00 |
| | | | Mario M. Choi | Associate | 2005 | $ 500.00 | 359.9 | $ 179,950.00 |
| | | | Lauren Dubick | Associate | 2007 | $ 485.00 | 2.2 | $ 1,067.00 |
| Karon LLC | 10.3 | $ 6,508.50 | Daniel Karon | Partner | 1991 | $ 695.00 | 7.8 | $ 5,421.00 |
| | | | Beau Hollowell | Associate | 2006 | $ 435.00 | 2.5 | $ 1,087.50 |
| Keller Rohrback Law Offices, LLP | 3,607.0 | $ 1,521,311.00 | Cari Laufenberg | Partner | 2003 | $ 750.00 | 254.2 | $ 190,650.00 |
| | | | Amy Hanson | Associate | 1998 | $ 525.00 | 72.4 | $ 38,010.00 |
| | | | Chris Springer | Associate | 2008 | $ 400.00 | 23.0 | $ 9,200.00 |
| | | | Jeff Lewis | Partner | 1975 | $ 895.00 | 12.3 | $ 11,008.50 |
| | | | Jason Chukas | Associate | 1995 | $ 400.00 | 1,605.3 | $ 642,120.00 |
| | | | Tyrone Smith | Associate | 2006 | $ 400.00 | 1,466.2 | $ 586,480.00 |
| | | | Carly Eyler | Paralegal | Paralegal | $ 230.00 | 1.7 | $ 391.00 |
| | | | Cate Brewer | Paralegal | Paralegal | $ 225.00 | 3.9 | $ 877.50 |
| | | | Colleen Mold | Paralegal | Paralegal | $ 225.00 | 5.0 | $ 1,125.00 |
| | | | Jennifer Dallape | Paralegal | Paralegal | $ 215.00 | 3.5 | $ 752.50 |
| | | | Sandra Douglas | Paralegal | Paralegal | $ 225.00 | 22.1 | $ 4,972.50 |
| | | | Tana Daugherty | Paralegal | Paralegal | $ 260.00 | 137.4 | $ 35,724.00 |
| Law Office of Paul C. Whalen, P.C. | 133.1 | $ 106,480.00 | Paul C. Whalen | Partner | 1996 | $ 800.00 | 133.1 | $ 106,480.00 |
| Law Office of Angela Edwards | 191.0 | $ 100,275.00 | Angela Edwards | Partner | 1993 | $ 525.00 | 191.0 | $ 100,275.00 |

# Detailed Lodestar Information by Firm and Biller

| Firm | Total Firm Hours | Total Firm Fees | Biller | Position | Grad Year | Rate | Hours Billed | Total Attorney Fees |
|------|------------------|-----------------|--------|----------|-----------|------|--------------|---------------------|
| Levi & Korsinsky LLP | 176.1 | $ 97,039.50 | Nancy A. Kulesa | Partner | 2001 | $ 765.00 | 33.1 | $ 25,321.50 |
| | | | Shannon L. Hopkins | Partner | 2003 | $ 850.00 | 1.0 | $ 850.00 |
| | | | Courtney Maccarone | Associate | 2011 | $ 525.00 | 119.3 | $ 62,632.50 |
| | | | Stephanie Bartone | Associate | 2012 | $ 450.00 | 12.0 | $ 5,400.00 |
| | | | Joanna Chlebus | Paralegal | Paralegal | $ 265.00 | 0.4 | $ 106.00 |
| | | | Judith Bennett | Paralegal | Paralegal | $ 265.00 | 2.4 | $ 636.00 |
| | | | Samantha Halliday | Paralegal | Paralegal | $ 265.00 | 7.9 | $ 2,093.50 |
| Lieff Cabraser (LCHB) | 10,594.6 | $ 5,097,053.00 | Ashur, Tanya | Contract Attorney | 2000 | $ 415.00 | 48.0 | $ 19,920.00 |
| | | | Ballan, Evan | Contract Attorney | 2017 | $ 345.00 | 18.6 | $ 6,417.00 |
| | | | Bennett, Corey | Contract Attorney | 2009 | $ 415.00 | 19.0 | $ 7,885.00 |
| | | | Diamand, Nicholas | Partner | 2002 | $ 650.00 | 14.2 | $ 9,230.00 |
| | | | Dunlavey, Wilson | Associate | 2015 | $ 370.00 | 297.5 | $ 110,075.00 |
| | | | Gardner, Melissa | Associate | 2011 | $ 455.00 | 915.8 | $ 416,689.00 |
| | | | Gilyard, James | Contract Attorney | 2002 | $ 415.00 | 1,015.0 | $ 421,225.00 |
| | | | Guo, Eva | Contract Attorney | 1994 | $ 415.00 | 1,530.5 | $ 635,157.50 |
| | | | Heller, Roger | Partner | 2001 | $ 675.00 | 25.5 | $ 17,212.50 |
| | | | Leggett, James | Contract Attorney | 2012 | $ 415.00 | 32.0 | $ 13,280.00 |
| | | | Lichtman, Jason | Partner | 2006 | $ 565.00 | 622.5 | $ 351,712.50 |
| | | | Meltser, Jessica | Paralegal | 2016 | $ 345.00 | 19.9 | $ 6,865.50 |
| | | | Nguyen, Phi Anh | Contract Attorney | 2008 | $ 415.00 | 2,317.0 | $ 961,555.00 |
| | | | Rudolph, David | Partner | 2004 | $ 625.00 | 579.1 | $ 361,937.50 |
| | | | Sobol, Michael | Partner | 1989 | $ 900.00 | 638.2 | $ 574,380.00 |
| | | | Solen, Donna | Contract Attorney | 1997 | $ 415.00 | 486.5 | $ 201,897.50 |
| | | | Sugnet, Nicole Diane | Partner | 2006 | $ 510.00 | 1,708.8 | $ 871,488.00 |
| | | | Innes-Gawn, Siobhan | Paralegal | Paralegal | $ 360.00 | 16.6 | $ 5,976.00 |
| | | | Keenley, Elizabeth | Paralegal | Paralegal | $ 350.00 | 21.4 | $ 7,490.00 |
| | | | Carnam, Todd | Paralegal | Paralegal | $ 360.00 | 29.5 | $ 10,620.00 |
| | | | Rudnick, Jennifer | Paralegal | Paralegal | $ 360.00 | 179.8 | $ 64,728.00 |
| | | | Swenson, Yun | Paralegal | Paralegal | $ 360.00 | 59.2 | $ 21,312.00 |
| Litigation Law Group | 8.6 | $ 5,195.00 | Gordon M. Fauth, Jr. | Principal | 1997 | $ 775.00 | 3.7 | $ 2,867.50 |
| | | | Rosanne L. Mah | Associate | 2005 | $ 475.00 | 4.9 | $ 2,327.50 |
| Lockridge, Grindal, Nauen, PLLP | 410.4 | $ 138,920.00 | Karen H. Riebel | Partner | 1991 | $ 780.00 | 12.0 | $ 9,360.00 |
| | | | Kate M. Baxter-Kauf | Associate | 2011 | $ 475.00 | 4.2 | $ 1,995.00 |
| | | | Rachel A. Kitze Collins | Associate | 2014 | $ 450.00 | 1.3 | $ 585.00 |
| | | | Stacy Kabele | Contract Attorney | 1996 | $ 325.00 | 387.2 | $ 125,840.00 |
| | | | Carey R. Johnson | Paralegal | Paralegal | $ 200.00 | 5.7 | $ 1,140.00 |
| Milberg LLP | 719.0 | $ 302,157.50 | Ariana Tadler | Partner | 1992 | $ 825.00 | 14.9 | $ 12,292.50 |
| | | | Henry Kelston | Partner | 1978 | $ 675.00 | 108.5 | $ 73,237.50 |
| | | | Andrei Rado | Partner | 1999 | $ 625.00 | 14.4 | $ 9,000.00 |
| | | | John Hughes | Associate | 2012 | $ 375.00 | 312.3 | $ 117,112.50 |
| | | | John Seredynski | Associate | 2010 | $ 350.00 | 60.1 | $ 21,035.00 |
| | | | Carey Alexander | Associate | 2012 | $ 350.00 | 63.8 | $ 22,330.00 |
| | | | Adam Bobkin | Associate | 2010 | $ 375.00 | 0.5 | $ 187.50 |
| | | | Cindy Bomzer | Paralegal | Paralegal | $ 325.00 | 6.0 | $ 1,950.00 |
| | | | Jason A. Joseph | Paralegal | Paralegal | $ 325.00 | 61.0 | $ 19,825.00 |
| | | | Chris Thompson | Investor Analysis | Investor Analysis | $ 325.00 | 77.5 | $ 25,187.50 |
| Morgan & Morgan | 692.0 | $ 353,080.00 | Marisa Glassman | Partner | 2009 | $ 500.00 | 284.3 | $ 142,150.00 |
| | | | Angela Mirabole | Associate | 2003 | $ 500.00 | 330.1 | $ 165,050.00 |
| | | | John Yanchunis | Partner | 1980 | $ 950.00 | 42.8 | $ 40,660.00 |
| | | | Candice Clendenning | Paralegal | Paralegal | $ 150.00 | 5.1 | $ 765.00 |
| | | | Emily Lockwood | Paralegal | Paralegal | $ 150.00 | 29.7 | $ 4,455.00 |
| Murray Law Office | 576.7 | $ 203,745.00 | Arthur M. Murray | Partner | 2001 | $ 600.00 | 3.0 | $ 1,800.00 |
| | | | Stephen B. Murray, Jr. | Partner | 1995 | $ 600.00 | 4.6 | $ 2,760.00 |
| | | | C. Joseph Murray | Associate | 1980 | $ 350.00 | 545.6 | $ 190,960.00 |
| | | | Caroline W. Thomas | Associate | 2014 | $ 350.00 | 0.4 | $ 140.00 |
| | | | D. Alex Onstott | Associate | 2015 | $ 350.00 | 23.1 | $ 8,085.00 |
| Pomerantz LLP | 1,109.7 | $ 528,869.00 | Jayne Goldstein | Partner | 1986 | $ 820.00 | 1.0 | $ 820.00 |
| | | | Jessica Dell | Associate | 2005 | $ 500.00 | 869.6 | $ 434,800.00 |
| | | | Perry Gattegno | Associate | 2013 | $ 390.00 | 239.1 | $ 93,249.00 |
| Robinson Calcagnie Robinson Shapiro Davis, Inc. | 370.5 | $ 203,270.00 | Daniel Robinson | Partner | 2003 | $ 700.00 | 37.8 | $ 26,460.00 |
| | | | Wesley Polishuk | Associate | 2007 | $ 550.00 | 313.7 | $ 172,535.00 |
| | | | Jennifer Rogers | Paralegal | Paralegal | $ 225.00 | 19.0 | $ 4,275.00 |
| Schubert Jonckheer & Kolbe LLP | 3,808.3 | $ 1,423,234.00 | Noah Schubert | Partner | 2011 | $ 600.00 | 4.5 | $ 2,700.00 |
| | | | Greg Stuart | Contract Attorney | 2005 | $ 390.00 | 2,230.1 | $ 869,739.00 |
| | | | Elizabeth Newman | Contract Attorney | 2007 | $ 350.00 | 1,572.7 | $ 550,445.00 |
| | | | Andy Katz | Of Counsel | 2009 | $ 350.00 | 1.0 | $ 350.00 |
| Scott + Scott, LLP | 547.9 | $ 219,970.00 | Joseph Guglielmo | Partner | 1996 | $ 875.00 | 0.6 | $ 525.00 |
| | | | Erin Comite | Partner | 2002 | $ 725.00 | 0.3 | $ 217.50 |
| | | | Hal Cunningham | Contract Attorney | 2006 | $ 625.00 | 1.9 | $ 1,187.50 |
| | | | Katie Shank | Contract Attorney | 2015 | $ 400.00 | 545.1 | $ 218,040.00 |

## Detailed Lodestar Information by Firm and Biller

| Firm | Total Firm Hours | Total Firm Fees | Biller | Position | Grad Year | Rate | Hours Billed | Total Attorney Fees |
|---|---|---|---|---|---|---|---|---|
| Skepnek Law Firm | 107.4 | $ 60,015.00 | William J. Skepnek | Partner | 1978 | $ 600.00 | 89.7 | $ 53,820.00 |
| | | | Stephan Lindell Skepnek | Associate | 2015 | $ 350.00 | 17.7 | $ 6,195.00 |
| Strimatter Kessler Whelan Koehler Moore Kahler (Stritmatter Kessler) | 175.8 | $ 77,250.00 | Catherine J. Fleming | Of Counsel | 2007 | $ 500.00 | 140.3 | $ 70,150.00 |
| | | | Jill Sullivan | Paralegal | Paralegal | $ 200.00 | 23.7 | $ 4,740.00 |
| | | | Jeanne Laird | Paralegal | Paralegal | $ 200.00 | 11.8 | $ 2,360.00 |
| Stueve, Siegel, Hanson LLP | 2,244.1 | $ 953,503.50 | Jennifer Carter | Associate | 2004 | $ 475.00 | 10.4 | $ 4,940.00 |
| | | | Crystal Cook | Associate | 2013 | $ 425.00 | 4.7 | $ 1,997.50 |
| | | | Sean Cooper | Associate | 2013 | $ 425.00 | 13.2 | $ 5,610.00 |
| | | | Tanner Edwards | Associate | 2015 | $ 375.00 | 452.3 | $ 169,612.50 |
| | | | Jason Hartley | Partner | 1997 | $ 825.00 | 0.5 | $ 412.50 |
| | | | Lauren Luhrs | Associate | 2013 | $ 425.00 | 11.1 | $ 4,717.50 |
| | | | Abby McClellan | Associate | 2013 | $ 425.00 | 139.6 | $ 59,330.00 |
| | | | J. Austin Moore | Associate | 2011 | $ 475.00 | 700.6 | $ 332,785.50 |
| | | | Norman Siegel | Partner | 1993 | $ 865.00 | 139.0 | $ 120,235.00 |
| | | | Barrett Vahle | Partner | 2004 | $ 645.00 | 97.3 | $ 62,758.50 |
| | | | Brad Wilders | Partner | 2007 | $ 625.00 | 1.6 | $ 1,000.00 |
| | | | Michael Wise | Associate | 2014 | $ 350.00 | 8.9 | $ 3,115.00 |
| | | | Lauren Wolf | Associate | 2010 | $ 395.00 | 79.1 | $ 31,244.50 |
| | | | Michelle Campbell | Paralegal | Paralegal | $ 275.00 | 370.6 | $ 101,915.00 |
| | | | Katrina Cervantes | Paralegal | Paralegal | $ 245.00 | 5.9 | $ 1,445.50 |
| | | | Tina Glover | Paralegal | Paralegal | $ 245.00 | 0.2 | $ 49.00 |
| | | | Mary Rose Marquart | Paralegal | Paralegal | $ 275.00 | 21.2 | $ 5,830.00 |
| | | | Cheri Perez | Legal Assistant | Paralegal | $ 225.00 | 6.3 | $ 1,417.50 |
| | | | Erika Reyes | Paralegal | Paralegal | $ 245.00 | 124.2 | $ 30,429.00 |
| | | | Margaret Smith | Paralegal | Paralegal | $ 245.00 | 39.6 | $ 9,702.00 |
| | | | Melissa Warner | Legal Assistant | Paralegal | $ 225.00 | 2.0 | $ 450.00 |
| | | | Sheri Williams | Legal Assistant | Paralegal | $ 225.00 | 2.2 | $ 495.00 |
| | | | Peter Rupp | Systems Director | Systems Director | $ 295.00 | 13.6 | $ 4,012.00 |
| Stull, Stull, & Brody | 1,537.9 | $ 1,059,189.00 | Howard Longman | Senior Attorney | 1982 | $ 925 / $ 950 | 92.1 | $ 87,490.00 |
| | | | Patrick Slyne | Senior Attorney | 1988 | $ 925.00 | 497.8 | $ 460,465.00 |
| | | | Melissa Emert | Senior Attorney | 1988 | $ 925.00 | 27.5 | $ 25,437.50 |
| | | | Patrice Bishop | Senior Attorney | 1994 | $ 500 / $ 850 | 133.8 | $ 69,175.00 |
| | | | Michael Klein | Associate | 2004 | $ 825.00 | 1.4 | $ 1,155.00 |
| | | | Jason D'Agnenica | Associate | 1998 | $ 500 / $ 765 | 785.3 | $ 415,466.50 |
| The Giatras Law Firm | 28.3 | $ 7,895.00 | Matthew Stonestreet | Associate | 2010 | $ 300.00 | 14.5 | $ 4,350.00 |
| | | | Troy Giatras | Partner | 1990 | $ 450.00 | 5.6 | $ 2,520.00 |
| | | | Pam Hutton | Paralegal | Paralegal | $ 125.00 | 8.2 | $ 1,025.00 |
| Tousley, Brain, Stephens | 10.7 | $ 6,096.50 | Chase C. Alvord | Partner | 1996 | $ 710.00 | 2.8 | $ 1,988.00 |
| | | | Kim D. Stephens | Partner | 1981 | $ 795.00 | 2.7 | $ 2,146.50 |
| | | | Jacob D. C. Humphreys | Associate | 2009 | $ 450.00 | 3.3 | $ 1,485.00 |
| | | | Jason T. Dennett | Partner | 2000 | $ 710.00 | 0.3 | $ 213.00 |
| | | | MWA | Paralegal | Paralegal | $ 165.00 | 1.6 | $ 264.00 |
| Webb, Klase, & Lemond, LLC | 238.5 | $ 127,192.50 | E. Adam Webb | Partner | 1996 | $ 600.00 | 38.5 | $ 23,100.00 |
| | | | G. Franklin Lemond, Jr. | Partner | 2004 | $ 525.00 | 190.4 | $ 99,960.00 |
| | | | Kristina Ludwig | Associate | 2016 | $ 295.00 | 4.5 | $ 1,327.50 |
| Weitz & Luxenberg, P.C. | 135.4 | $ 61,435.00 | Matthew C. Klase | Partner | 2002 | $ 550.00 | 5.1 | $ 2,805.00 |
| | | | James Bilsborrow | Associate | 2008 | $ 500.00 | 117.5 | $ 58,750.00 |
| | | | Corinne Sullivan | Paralegal | Paralegal | $ 150.00 | 17.9 | $ 2,685.00 |
| Zimmerman Reed, LLP | 542.1 | $ 217,645.50 | Brian C. Gudmundson | Partner | 2004 | $ 695.00 | 10.8 | $ 7,506.00 |
| | | | Wm Dane DeKrey | Associate | 2014 | $ 375.00 | 53.2 | $ 19,950.00 |
| | | | Bryce D. Riddle | Associate | 2014 | $ 375.00 | 7.0 | $ 2,625.00 |
| | | | James P. Watts | Associate | 1981 | $ 450.00 | 308.3 | $ 138,735.00 |
| | | | Adam Almen | Contract Attorney | 2013 | $ 300.00 | 162.3 | $ 48,690.00 |
| | | | Leslie A. Harms | Paralegal | Paralegal | $ 275.00 | 0.5 | $ 137.50 |
| **TOTAL** | **78,553.0** | **$37,832,349.00** | | | | | | |

# EXHIBIT 13

# Exhibit 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge John L. Kane

Master Docket No. 09-md-02063-JLK-KMT (MDL Docket No. 2063)

## IN RE: OPPENHEIMER ROCHESTER FUNDS GROUP SECURITIES LITIGATION

This document relates to the following Actions:

*In re AMT-Free Municipals Fund*
  09-cv-1243-JLK (*Prince*)
  09-cv-1447-JLK (*Connel*)
  09-cv-1510-JLK (*Amato*)
  09-cv-1619-JLK (*Furman*)

*In re AMT-Free New York Municipal Fund*
  09-cv-1621-JLK (*Isaac*)
  09-cv-1781-JLK (*Kurz*)

*In re Rochester National Municipal Fund*
  09-cv-550-JLK (*Bock*)
  09-cv-706-JLK (*Stokar*)
  09-cv-927-JLK (*Tackmann*)
  09-cv-1042-JLK (*Krim*)
  09-cv-1060-JLK (*Truman*)
  09-cv-1482-JLK (*Laufer*)
  09-cv-1908-JLK (*Lariviere*)

*In re Rochester Fund Municipals*
  09-cv-703-JLK (*Begley*)
  09-cv-1479-JLK (*Bernstein*)
  09-cv-1481-JLK (*Mershon*)
  09-cv-1622-JLK (*Stern*)
  09-cv-1478-JLK (*Vladimir*)
  09-cv-1480-JLK (*Weiner*)

*In re New Jersey Municipal Fund*
  09-cv-1406-JLK (*Unanue*)
  09-cv-1617-JLK (*Baladi*)
  09-cv-1618-JLK (*Seybold*)
  09-cv-1620-JLK (*Trooskin*)

*In re Pennsylvania Municipal Fund*
  09-cv-1483-JLK (*Woods*)
  09-cv-1368-JLK (*Egts*)
  09-cv-1765-JLK (*Wunderly*)

## DECLARATION OF KIP B. SHUMAN ON BEHALF OF
## THE SHUMAN LAW FIRM IN SUPPORT OF
## LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND
## REIMBURSEMENT OF LITIGATION EXPENSES

Kip B. Shuman, Esq., declares as follows pursuant to 28 U.S.C. § 1746:

1.     I am the principal of The Shuman Law Firm.  I submit this declaration in support

of Lead Counsel's motion for an award of attorneys' fees and reimbursement of litigation

expenses in the above-captioned actions (the "Actions") from inception through May 30, 2014

(the "Time Period").

2.     The Shuman Law Firm is Court-appointed Liaison Counsel.

A.     I, Kip B. Shuman, was primarily responsible for the activities of liaison counsel in

these Actions, including ensuring that liaison counsel efforts were competently

and efficiently performed.  Having only three lawyers dedicated to these Actions

resulted in the efficient prosecution of these Actions, and avoided any needless

duplication of efforts.  I participated in all material aspects of this litigation,

except the review of documents produced by Defendants.

B.     Rusty Glenn, partner.  Mr. Glenn was all involved in all material aspects of this

litigation.  Mr. Glenn also reviewed and analyzed documents and was responsible

for all logistical matters of all court filings.

C.     Nancy Kulesa, attorney.  Ms. Kulesa reviewed, analyzed and coded documents.

3.     The lodestar schedule attached hereto as Exhibit A is a summary indicating the

amount of time spent by each attorney from my firm who was involved in the prosecution of the

Actions during the Time Period.  The lodestar calculation is based on my firm's current billing

rates.  For personnel who are no longer employed at my firm, the lodestar calculation is based on

billing rates for such personnel in his or her final year of employment by my firm.

4.     The lodestar schedules attached were prepared from contemporaneous daily time

records regularly prepared and maintained by my firm, which are available at the request of the

Court.  Time expended in preparing this application for fees and reimbursement of expenses has

not been included in this request.

5.      The hourly rates for the attorneys in my firm included in the lodestar schedules

are the same as the regular rates charged for their services in non-contingent matters and/or

which have been accepted in other securities, shareholder, or class action litigation.

6.      The total number of hours expended on this litigation by my firm during the Time

Period is 3,031.93 hours.  The total lodestar for my firm for those hours is $1,674,716.25.

7.      My firm's lodestar figures are based upon the firm's current billing rates, which

rates do not include charges for expense items.  Expense items are billed separately and such

charges are not duplicated in my firm's billing rates.

8.      As detailed in Exhibit B, my firm has incurred a total of $246,524.09 in

unreimbursed expenses incurred in connection with the prosecution of the Actions during the

Time Period.

9.      The expenses incurred are reflected on the books and records of my firm.  These

books and records are prepared from expense vouchers, check records and other source materials

and are an accurate record of the expenses incurred.  Third-party expenses are not marked up.

10.     With respect to the standing of my firm, attached hereto as Exhibit C is a firm

resume.

11.     I declare under penalty of perjury that the foregoing is true and correct.  Executed

on June 2, 2014.

s/ Kip Shuman
Kip B. Shuman

## Exhibit A

### LODESTAR REPORT

**FIRM:   The Shuman Law Firm**
**REPORTING PERIOD:  INCEPTION THROUGH MAY 30, 2014**

| PROFESSIONAL | STATUS* | HOURLY RATE | TOTAL HOURS | TOTAL LODESTAR TO DATE |
|---|---|---|---|---|
| Kip B. Shuman | P | 625.00 | 1,172.65 | $732,906.25 |
| Rusty E. Glenn | P | 525.00 | 1,173.04 | $615,846.00 |
| Nancy Kulesa | CA | 475.00 | 686.24 | $325,964.00 |
| **TOTAL** | | | **3,031.93** | **$1,674,716.25[1]** |

*Partner      (P)
Contract Attorney (CA)

---

[1] In order to arrive at the total lodestar, time records were divided into four separate categories and then aggregated. The first category separates time incurred by individual case. This first category is billed at 100% to the Actions. The second category includes time attributable to all the Oppenheimer-related actions. That time was previously billed 50% to the Champion and Core actions (i.e., the fixed-income cases). The remaining 50% is now billed to the Actions. That time is further reduced by 1/7 (.143) to account for the California action, which is not part of this settlement. The third category relates to time incurred in all the Actions. That time is reduced by 1/7 (.143) to, again, account for the California action. The fourth category represents time related to this Settlement and is billed at 100%. These divisions are made to ensure that time dedicated to the Fixed Income Cases is not double counted and to reduce the lodestar, on a percentage basis, to account for fact that only six of the seven Rochester cases have settled, but that a significant amount of time incurred benefited all the Actions.

## Exhibit B

## DISBURSEMENT REPORT

**FIRM: The Shuman Law Firm**
**REPORTING PERIOD: INCEPTION THROUGH May 30, 2014**

| DISBURSEMENT | TOTAL AMOUNT |
|---|---|
| Duplicating | 0 |
| Postage | 14.26 |
| Telephone / Fax | 2,555.48 |
| Messengers | 351.44 |
| Filing Fees | 2,000.00 |
| Transcripts | 75.58 |
| Computer Research | 1,036.18 |
| Federal Express | 651.45 |
| Travel/Meals/Hotels | 14,686.36 |
| Mediation Fees | 1,250.00 |
| Miscellaneous | 751.03 |
| Litigation Fund Contributions | 223,152.31 |
| **TOTAL** | **$246,524.09**[2] |

---

[2] Expenses have been reduced to exclude costs already reimbursed from the Fixed Income Case and to reduce certain costs, proportionately, given that the California Action is not a part of this Settlement.



**THE SHUMAN LAW FIRM**

*The Shuman Law Firm prides itself with its unwavering dedication to serving clients at the highest legal and ethical standards in the prosecution of corporate securities fraud throughout the United States. We are passionate about advancing the rights of defrauded shareholders and work steadfastly to*

## MISSION STATEMENT

*redress damages suffered by our clients. We take great pleasure in our commitment to two fundamental principles – client communication and satisfaction. We view our size as an asset which facilitates communication and enables us to better serve our clients. We believe our success as a law firm cannot only be measured by the amount of money we recover, but also the trust we develop with our clients and their approval of our work done on their behalf.*

WE ARE PROUD TO ACKNOWLEDGE THAT RISKMETRICS GROUP'S SECURITIES CLASS ACTION SERVICES DIVISION RECOGNIZED THE SHUMAN LAW FIRM AS ONE OF THE TOP 50 PLAINTIFFS' LAW FIRMS IN THE UNITED STATES, RANKED BY TOTAL DOLLAR AMOUNT OF FINAL SECURITIES CLASS ACTION SETTLEMENTS IN 2008 IN WHICH THE LAW FIRM SERVED AS LEAD OR CO-LEAD COUNSEL.



The Shuman Law Firm is a nationally recognized law firm located in majestic Boulder, Colorado. Our firm specializes in representing shareholders who have suffered financial losses from corporate securities fraud or other corporate malfeasance.

Since its inception in 1994, Kip B. Shuman, principal of The Shuman Law Firm, has worked to recover hundreds of millions of dollars on behalf of defrauded investors. The Shuman Law Firm has acted as class counsel for institutional investors, including public pension funds, labor unions, as well as thousands of individual investors

## FIRM BACKGROUND

in securities class actions and derivative litigation.

Most recently, The Shuman Law Firm served as counsel in over forty derivative lawsuits emanating from the well-publicized stock option backdating scandal that came to light in 2006. In these cases, corporate executives of publicly-traded companies manipulated company stock options in a manner that allowed the executives to enrich themselves to the tune of hundreds of millions of dollars at the expense of the companies and shareholders. The Shuman Law Firm has played a central role in causing many corporate executives who received manipulated stock options to return their ill-gotten profits to the companies they served.

*continued on next page*



In many instances, The Shuman Law Firm has caused the manipulated stock options to be either rescinded or re-priced to ensure that executives cannot profit from their wrong doing.  In addition, The Shuman Law Firm has caused the boards of directors of these companies to adopt robust corporate governance changes that are specifically designed to create a system of checks and balances which ensure that stock option manipulation will not occur in the future.  These cases provide one recent example of The Shuman Law Firm's commitment to protecting the rights of shareholders.   See pages 6-8 for a partial list of stock option backdating derivative cases and the results achieved.

## ACCOLADES



*In comparison with the thousand-plus attorney mega-firms commonly seen today, The Shuman Law Firm and its predecessor firm, has been frequently recognized by the courts for the high quality of its work and results achieved.*

• At a hearing to appoint lead plaintiffs, lead counsel, and liaison counsel in In Re Rhythms Securities Litigation, United States District Court Senior Judge John L. Kane complimented Mr. Shuman on having done an "excellent job" in all of the class action securities matters held in his court to date.

*continued on next page*



• In *In re Qwest Communications International, Inc., Securities Litigation,* which is believed to be the largest securities fraud case in the history of the State of Colorado, the Court in granting approval of the final settlement of the action stated: "I have for my duration as the presiding judge in this case respected and admired your competent counsel, because as I have commented and as my lead law clerk have commented repeatedly, the quality of your briefing and your argument and authority was exemplary and something that I would hope would be emulated by other counsel in the same or similar circumstances."

• In *Queen Uno v. Coeur D'Alene Mines Corporation,* the Court recognized the "skill and experience, reputation and ability" of plaintiffs' counsel, stating that counsel are "well respected litigators in the securities field," "highly skilled in class action litigation and federal securities law," and that " the substantial amount recovered is testament to their skill."

• Likewise, in approving the final settlement of another national securities fraud class action, *Schaffer v. Evolving Systems, Inc.,* the court recognized the effort and ability of plaintiffs' counsel, stating that "the $10 million settlement ... is a good recovery, in fact, almost extraordinarily good.  And I commend counsel for having achieved that result."



*Mr. Shuman, of The Shuman Law Firm, has exceptional success in prosecuting shareholder class actions and derivative actions. Below is a sample of his more notable cases.*

• *Rasner v. FirstWorld Communications Inc.*, Case No. 00-K-1376 (D. Colo.) (co-lead counsel) ($25.925 million recovered).

• *In re Tele-Communications, Inc. Sec. Litig.*, Case No. 97CV421 (Colo.) (co-lead counsel) ($26.5 million recovered).

## NOTABLE CASES



• *Muhr v. Transcrypt Int'l, Inc.*, Case No. CI98-333 (Neb.) (co-lead counsel) (approximately $25 million recovered).

• *In re Samsonite Corp. Sec. Litig.*, Case No. 98-K-1878 (D. Colo.) (co-lead counsel) ($24 million recovered).

• *Queen Uno Ltd. Partnership. v. Coeur D'Alene Mines Corp.*, Case No. 97-WY-1431 (D. Colo.) (co-lead counsel) ($13 million recovered).

• *In re Secure Computing Corp. Sec. Litig.*, Case No. C-99-1927 (N.D. Cal.) (co-lead counsel) ($10.1 million recovered).

*continued on next page*



• *Angres v. Smallworldwide PLC*, Case No. 99-K-1254 (D. Colo.) (co-lead counsel) ($9.85 million recovered).

• *In re Qwest Comms. Int'l Sec. Litig.*, Case No. 01-cv-1451 (D. Colo.) (liaison counsel) ($450 million recovered).

• *In re First American Corporation Shareholder Derivative Litigation*, Case No. SACV-06-1230 (C.D. Cal.) (corporate reforms obtained included, separating roles of the Chairman of the Board and CEO, enhanced Chairman of the Board duties, the creation of lead independent director, and revised compensation guidelines).

• *In re Quest Software, Inc. Derivative Litigation*, Case No. SACV-06-751 (C.D. Cal.) (corporate reforms obtained included, separating roles for Chairman of Board and CEO, enhanced Chairman of the Board duties, amendments to stock option plans, revisions to compensation committee and audit committee charters, and revised compensation guidelines).

• *In re NVIDIA Corp. Derivative Litigation*, Case No. C-06-06110 (N.D. Cal.) (payments, re-pricing and other benefits to the company for mispriced stock options valued at over $15 million; corporate reforms obtained included, enhanced board of director duties and independence requirements, creation of lead independent director with specified duties, and revised compensation and stock option policies).

*continued on next page*



- *In re Newpark Resources, Inc. Derivative Litigation,* Case No. 06-7340 (E.D. La.) (payment of $8.3 million to the company for mispriced stock options; creation and implementation of code of ethics for senior officers and directors, creation and implementation of policy on reporting, cooperating with investigation and discipline in connection with policy violations, modifications to company policy regarding remediation actions related to material weaknesses in internal controls over financial reporting).

- *In re Meade Instruments Corp. Derivative Litigation,* Case No. 06CC00205 (Cal. Super. Ct., Orange County) (corporate reforms included, enhanced timing, disclosures, and doc-umentation of company equity compensation awards of awards, the creation of a compliance officer and enhanced duties for compensation and audit committees).

- *In re Cheesecake Factory Incorporated Derivative Litigation,* Case No. CV-06-6234 (C.D. Cal.) (repayment to the company by certain directors and officers for mispriced exercised stock options; cor-porate reforms included, the addition of an independent director, maintenance of a lead independent director with specified duties, enhanced board of director duties and independence requirements, and revised compensation and stock option policies).



### Kip B. Shuman                    kip@shumanlawfirm.com

Kip B. Shuman, founding member of the firm, has prosecuted class actions and derivative actions in Colorado and through-out the United States for more than fifteen years.  Mr. Shuman concentrates his practice on representing injured shareholders through securities class actions and derivative litigation.

Mr. Shuman graduated from U.C.L.A. in 1984 and the University of San Francisco School of Law in 1989.

## OUR SECURITIES LITIGATION TEAM



Mr. Shuman has materially participated in or has had primary responsibility for more than fifty class action lawsuits, including actions that were the subject of the following opinions: *Queen Uno Ltd. P'ship. v. Coeur d'Alene Mines Corp., 2 F. Supp. 2d 1345 (D. Colo. 1998); Queen Uno Ltd. P'ship. v. Coeur D'Alene Mines Corp., 183 F.R.D. 687 (D. Colo. 1998); Schaffer v. Evolving Sys. Inc., 29 F. Supp. 2d 1213 (D. Colo. 1998); In re Intelcom Group, Inc., Sec. Litig., 169 F.R.D. 142 (D. Colo. 1996); In re Hirsch, 984 P.2d 629 (Colo. 1999); Leonard v. McMorris, 272 F.3d 1295 (10th Cir. 2001); In re Secure Computing Sec. Litig., 2001 U.S. Dist. LEXIS 13563 (N.D. Cal. 2001); Angres v. Smallworldwide, 94 F. Supp. 2d 1167 (D. Colo. 2000); In re Ribozyme Pharm., Inc. Sec. Litig., 192 F.R.D. 656 (D. Colo. 2000); Kerns v. SpectraLink Corp., 2003 U.S. Dist. LEXIS 6194 (D. Colo. 2003); Kerns v. SpectraLink Corp.,*

*continued on next page*



*2003 U.S. Dist. LEXIS 11711 (D. Colo. 2003); Gregg v. Sport–Haley, Inc., 2003 U.S. Dist. LEXIS 6195 (D. Colo. 2003); and In re Rhythms Sec. Litig., 300 F. Supp. 2d 1081 (D. Colo. 2004).*

Mr. Shuman has lectured in the area of class actions, teaching a continuing legal education course entitled, *Litigating the Class Action Lawsuit in Colorado.*  He was also a panelist at the 35th Rocky Mountain Securities Conference and presented on the topic of *Pleading Requirements in the Tenth Circuit after the Private Securities Litigation Reform Act of 1995.*

Mr. Shuman is a member of both the Colorado and California State Bars, and is admitted to practice before the United States District Courts for the Northern District and Central District of California, the United States District Court for Colorado, and the United States Ninth and Tenth Circuit Courts of Appeals.

### Rusty E. Glenn                rusty@shumanlawfirm.com

Rusty E. Glenn, an associate of the firm, concentrates his practice on representing injured shareholders through securities class actions and derivative litigation.

Mr. Glenn received his B.S., summa cum laude, from Baker University, an M.A. in Economics from the University of Kansas Graduate School of Economics and his law degree from the University of Kansas School of Law where he was awarded the

*continued on next page*



*Hinkle Elkouri Tax Procedure Award* for his scholastic achievement and community service in providing volunteer income tax assistance to low-income individuals.   He also studied at Bahceshir University in Istanbul, Turkey under U.S. Supreme Court Justice Antonin Scalia.

Mr. Glenn's professional experience includes two years as Constituent Director for Kansas Senate Democratic Leader Anthony Hensley.  In addition, Mr. Glenn gained experience in the investigation and prosecution of financial crimes and corporate fraud while working for the Federal Bureau of Investigation in Washington, D.C. and Kansas City, Missouri.  Upon graduation from law school, Mr. Glenn joined The Shuman Law Firm and has prosecuted numerous class actions and derivative actions.

Mr. Glenn is a member of the Colorado State Bar, and is admitted to practice before the United States District Court for the District of Colorado, and the United States Tenth Circuit Court of Appeals.



**THE SHUMAN LAW FIRM**

885
ARAPAHOE AVENUE

BOULDER, COLORADO
80302

TELEPHONE:
303.861.3003
866.974.8626

FACSIMILE:
303.484.4886

SHUMANLAWFIRM.COM

# EXHIBIT 14

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | ) ) ) | No. 11-cv-10230 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) | |
| Defendant. | ) ) | |
| ARNOLD HENRIQUEZ, *et al.*, | ) ) | No. 11-cv-12049 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, | ) ) ) ) | |
| Defendants. | ) ) | |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, *et al.*, | ) ) ) | No. 12-cv-11698 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) | |
| Defendant. | ) ) | |

**LABATON SUCHAROW LLP'S RESPONSE TO SPECIAL MASTER
HONORABLE GERALD E. ROSEN'S (RET.) FIRST SET OF INTERROGATORIES TO
LABATON SUCHAROW LLP – JULY 10 RESPONSE**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## INTERROGATORY 47:

Please list all of the Firm's hourly rates charged to non-hourly clients (whether in class action or other contingency-fee litigation) for each of the years 2010-2016.  For each attorney, please list the relative experience level.

## RESPONSE TO INTERROGATORY 47:

The Firm incorporates the General Objections set forth above.  We note that most

contingency fee arrangements with clients provide for payment on a percentage of total award

basis, subject to the approval of the Court and a lodestar cross-check.  Subject to and without

waiving the foregoing objections, the Firm references the following documents previously

produced:  LBS005407-LBS005416.

## INTERROGATORY 48:

Please list all of the hourly rates charged or associated with any matters in which the Firm has acted as local counsel for each of the years 2010-2016.  For each attorney, please list the relative experience level.

## RESPONSE TO INTERROGATORY 48:

The Firm incorporates the General Objections set forth above.  Subject to and without

waiving the foregoing objections, the Firm provides the following information:

| Case Name | Role | Status | Labaton Compensation | Notes |
|---|---|---|---|---|
| *In re Barrick Gold Securities Litigation*, No. 13-cv-3851 (S.D.N.Y.) | Liaison Counsel | Settled | 2016 Fee Motion | Rates are set forth below. |
| *In re Britannia Bulk Holdings Inc. Securities Litigation*, No. 08-cv-9554 (S.D.N.Y.) | Liaison Counsel | Dismissed | None | |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Case Name | Role | Status | Labaton Compensation | Notes |
|---|---|---|---|---|
| *International Assoc. of Heat and Frost Insulators and Asbestos Workers Local #6 Pension Fund, et al. v. International Business Machines Corp.*, No. 15-cv-2492 (S.D.N.Y.) | Liaison Counsel | Dismissed | None | |
| *In re Banco Bradesco S.A. Sec. Litig.*, No. 16-cv-4155 (S.D.N.Y.) | Liaison Counsel | Pending | None | |
| *In re Icagen, Inc. Shareholder Litigation*, C.A. No. 6692 (Del. Ch.) | Local Counsel (Counsel for Plaintiff) | Settled | 2012 Fee Motion | Fee motion was not made on the basis of lodestar and rates were not reported. |
| *Oklahoma Firefighters Pension and Retirement System v. Xerox Corporation*, No. 16-cv-8260 (S.D.N.Y.) | Liaison Counsel to the Class | Pending | None | |

### *BARRICK GOLD – Labaton Rates*

| PROFESSIONAL | STATUS | HOURLY RATE | JD Year |
|---|---|---|---|
| Keller, C. | (P) | $950 | 1997 |
| Gardner, J. | (P) | $925 | 1990 |
| Gottlieb, L. | (P) | $925 | 1990 |
| Stocker, M. | (P) | $875 | 1995 |
| Belfi, E. | (P) | $875 | 1995 |
| Zeiss, N. | (P) | $850 | 1995 |
| Hallowell, S. | (P) | $800 | 2003 |
| Fonti, J. | (P) | $800 | 1999 |
| Hoffman, T. | (P) | $800 | 2004 |
| Tountas, S. | (P) | $775 | 2003 |
| Fox, C. | (OC) | $750 | 1994 |
| Wierzbowski, E. | (A) | $725 | 2001 |
| Erroll, D. | (A) | $675 | 2001 |
| Avan, R. | (A) | $600 | 2006 |
| Buell, G. | (A) | $550 | 2009 |
| Stampley, D. | (A) | $460 | 2009 |
| Coquin, A. | (A) | $425 | 2014 |
| Hane, C. | (A) | $390 | 2013 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| PROFESSIONAL | STATUS | HOURLY RATE | JD Year |
|---|---|---|---|
| Jouvin, Z. | (SA) | $500 | 2003 |
| Wharff, W. | (SA) | $500 | 2001 |
| Hurtado, S. | (SA) | $500 | 2002 |
| Kramer, D. | (SA) | $500 | 2001 |
| Torrez, F. | (SA) | $500 | 2003 |
| Figueroa, Y. | (SA) | $500 | 1999 |
| Lugo Melendez, K. | (SA) | $500 | 2013 |
| Horlacher, S. | (SA) | $500 | 2000 |
| Assefa, M. | (SA) | $500 | 2003 |
| Salzman, E. | (SA) | $500 | 2003 |
| Flanigan, M. | (SA) | $435 | 1998 |
| Hirsh, J. | (SA) | $410 | 2001 |
| Davis, O. | (SA) | $390 | 2000 |
| Stinaroff, D. | (SA) | $360 | 2007 |
| Korode, J. | (SA) | $360 | 2005 |
| Schervish, W. | (LA) | $550 | 2007 |
| Pontrelli, J. | (I) | $495 | N/A |
| Greenbaum, A. | (I) | $455 | N/A |
| Crowley, M. | (I) | $435 | N/A |
| Polk, T. | (I) | $430 | N/A |
| Wroblewski, R. | (I) | $425 | N/A |
| Malonzo, F. | (PL) | $340 | N/A |
| Carpio, A. | (PL) | $325 | 2005 |
| Rogers, D. | (PL) | $325 | N/A |
| Mehringer, L. | (PL) | $325 | N/A |
| Russo, M. | (PL) | $300 | N/A |
| Farber, E. | (PL) | $205 | N/A |

| | | | |
|---|---|---|---|
| Partner | (P) | Of Counsel | (OC) |
| Associate | (A) | Staff Attorney | (SA) |
| Legal Analyst | (LA) | Investigator | (I) |
| Paralegal | (PL) | | |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Dated:  July 10, 2017

_____
Joan A. Lukey (BBO No. 307340)
Justin J. Wolosz (BBO No. 643543)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA  02110
Tel:  (617) 248-5000
joan.lukey@choate.com
jwolosz@choate.com

*Attorneys for Labaton Sucharow LLP*

## **VERIFICATION**

On behalf of Labaton Sucharow LLP, I have read Labaton Sucharow LLP's Response to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories to Labaton Sucharow LLP – July 10 Response.  The Response was prepared with the assistance of the employees, representatives, and counsel of Labaton Sucharow LLP, and the information provided is not fully within my personal knowledge.  I reserve the right to make changes or additions to these responses if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available.  To the extent that these responses are within my personal knowledge, I certify them to be true.  To the extent that these responses are not within my personal knowledge, I have no reason to believe that they are not true.

Signed under oath under the penalties of perjury this _11th_ day of July, 2017.

Lawrence A. Sucharow, Chairman

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## CERTIFICATE OF SERVICE

I, Justin J. Wolosz, hereby certify that on this Tenth day of July I have caused a copy of the foregoing Labaton Sucharow LLP's Response To Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories to Labaton Sucharow LLP -- July 10 Response to be served via email and overnight mail upon William F. Sinnott, Donoghue Barrett & Singal, P.C., One Beacon Street, Suite 1320, Boston, MA  02108.

_____
Justin J. Wolosz

8186704

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 15

# United States Court of Appeals
## For the First Circuit

No. 12-1520

ANGEL RUIZ-RIVERA,

Plaintiff, Appellant,

v.

DOW LOHNES, PLLC, a/k/a Dow Lohnes and Albertson, PLLC,

Defendant, Appellee,

BENNY F. CEREZO, ET AL.,

Defendants.

Before

Lynch, <u>Chief Judge</u>,
Howard and Thompson, <u>Circuit Judges</u>.

JUDGMENT

Entered:  January 8, 2014

Appellant Angel Ruiz-Rivera filed a complaint against various law firms and lawyers, and the complaint contained state-law claims of breach of contract and malpractice.  After appellee Dow Lohnes, PLLC filed a motion to dismiss based on the fact that complete diversity was lacking, appellant requested voluntary dismissal without prejudice.  <u>See</u> Fed. R. Civ. P. 41(a)(1)(A)(i).  The district court granted appellant's request, noting that it had no subject matter jurisdiction over the case; the court also, sua sponte, sanctioned appellant under Fed. R. Civ. P. 11 by directing him to pay appellee's attorneys' fees.

Appellee then filed a motion for reconsideration, arguing that the dismissal should have been <u>with</u> prejudice based upon either (1) the "two dismissal rule," <u>see</u> Rule 41(a)(1)(B), or (2) the court's inherent power.  The district court granted appellee's motion, and the judgment was amended to reflect a <u>with</u>-prejudice dismissal.  For the following reasons, the dismissal with prejudice cannot be affirmed.

## I.  Dismissal of the Complaint

Rule 41(a)(1)(A)(i) provides, in relevant part, that a plaintiff may obtain a voluntary dismissal, without a court order, by filing a "notice of dismissal before the opposing party serves either an answer or a motion for summary judgment."  As for the effect of such a notice, Rule 41(a)(1)(B) states as follows:

> Unless the notice . . . states otherwise, the dismissal is without prejudice.  But if the plaintiff previously dismissed any federal -- or state -- court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits.

(emphasis added).  We also have held that the "two dismissal" rule does not apply "unless the defendants are the same or substantially the same or in privity in both actions." American Cyanamid Co. v. Capuano, 381 F.3d 6, 17 (1st Cir. 2004) (internal quotation marks and citation omitted).

The problem with the district court's application of the "two dismissal" rule is that neither of the prior Puerto Rico cases relied upon by that court to invoke the rule -- (1) Instituto de Educacion Universal v. United States Dept. of Educ., No. 98–cv-2225, and (2) Instituto de Educacion Universal v. United States Dept. of Educ., No. 96-cv-1893 -- had been voluntarily dismissed by appellant.  Thus, these cases cannot count for purposes of Rule 41(a)(1)(B).  And, while appellant had, in fact, voluntarily dismissed the case cited by appellee, see Ruiz-Rivera v. Wolff, No. 09-cv-1873, that case also provides no basis for invoking the "two dismissal" rule.

In this regard, appellee's only argument in support of a finding of privity is based on the district court's cryptic statement that "both plaintiff and Dow Lohnes are privy in prior civil actions which were adjudicated on the merits." Appellee's Brief, at 24 (internal quotation marks and citation omitted).  Of course, and leaving aside exactly what the district court meant by the above statement, the fact that a plaintiff and a defendant may have been in privity in a past case is irrelevant for purposes of the "two dismissal" rule.  Rather, in order for this rule to apply, it is "the defendants [who must be] the same or substantially the same or in privity in both actions."  See American Cyanamid Co., 381 F.3d at 17 (emphasis added).  Given the lack of any effort on appellee's part to explain how it is in privity with the Wolff defendants, Rule 41(a)(1)(B) simply is not available as a basis for a with-prejudice dismissal.

If more were needed, and it is not, we note that the claims in the two cases are not the same.  Not only do the two cases present different bases for relief -- now, legal malpractice/breach of contract claims and, in Wolff, claims of violation of constitutional, statutory, and regulatory law, as well as fraud on the courts -- but the claims also do not arise from the same series of events.  That is, the claims in the case at hand arise from appellee's conduct in representing IEU in the administrative proceedings, while the claims in Wolff arise from the conduct of the defendants in that case -- DOE officials and a private corporation -- during these proceedings and during the related judicial proceedings.

Appellee's alternative argument that the district court could have used its inherent authority

to order a with-prejudice dismissal also is unavailing. That is, such a dismissal ordinarily operates as an adjudication on the merits, and, where, as here, a district court is without subject matter jurisdiction over the case, it usually is barred from making any merits-related rulings. In re Orthopedic "Bone Screw" Products Liability Litig., 132 F.3d 152, 156-57 (3rd Cir. 1997) (so holding and distinguishing the sanction of attorneys' fees which is a matter collateral to the merits); Hernandez v. Conriv Realty Assocs., 182 F.3d 121, 122 (2d Cir. 1999) ("where federal subject matter jurisdiction does not exist, federal courts do not have the power to dismiss with prejudice, even as a procedural sanction"). See also Christopher v. Stanley-Bostitch, Inc., 240 F.3d 95, 100 (1st Cir. 2001) (per curiam) (citing the above cases and holding that "orders relating to the merits of the underlying action are void if issued without subject matter jurisdiction"). While appellee relies on In re Exxon Valdez, 102 F.3d 429 (9th Cir. 1996), that case is distinguishable, and we are not persuaded by appellee's argument.

Given the above, then, the district court, under Rule 41(a)(1)(A), had no discretion to enter anything other than a without-prejudice dismissal. See Universidad Cent. del Caribe, Inc. v. Liaison Comm. on Med. Educ., 760 F.2d 14, 19 (1st Cir. 1985) (if neither an answer or a motion for summary judgment has been filed before the submission of a notice of dismissal, "Rule 41(a)(1) is clear and unambiguous on its face and admits of no exceptions that call for the exercise of judicial discretion"; internal quotation marks and citation omitted). Therefore, the judgment of the district court must be vacated, and the matter remanded for a judgment of dismissal without prejudice.

## II. Rule 11 Sanctions

Ordinarily, "an order imposing Rule 11 sanctions is not appealable until the particular sanction is chosen and ordered by the district court." 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1337.4, at 765 (3d ed. 2004) (citing cases). See also Century 21 Real Estate Corp. v. Century 21 Real Estate, Inc., 929 F.2d 827, 830 (1st Cir. 1991) (concluding that an appeal from a grant of attorneys' fees that had not been quantified was premature). Here, the district court never set the amount of attorneys' fees that appellant would be required to pay, and the sanction order therefore is not final. However, in the interests of judicial efficiency, we note that the district court failed to comply with the procedural requirements of the rule.

In particular, Rule 11(c)(3), which authorizes a district court to impose sanctions sua sponte, as here, provides that "[o]n its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)." As we have held, this language means that when a district court is considering sua sponte sanctions, Rule 11 requires the court "to first issue an order to show cause why the challenged conduct had not violated Rule 11." Lamboy-Ortiz v. Ortiz-Velez, 630 F.3d 228, 244 n.27 (1st Cir. 2010) (emphasis added). Here, the district court failed to issue the required show cause order. We also add that because of this omission, the court was without authority to impose attorneys' fees as a sanction. See Rule 11(c)(5) (stating that, unless a district court issues the Rule 11(c)(3) show-cause order before a voluntary dismissal, the court "must not impose a monetary sanction"; emphasis added). Thus, even if the sanction order were before this court, we could not affirm it.

## III. Conclusion

The judgment of the district court is <u>vacated</u>, and the matter is <u>remanded</u> for further proceedings in accordance with this opinion.  All pending motions are <u>denied</u>.  No costs will be awarded under Fed. R. App. P. 39.

By the Court:


<u>/s/ Margaret Carter, Clerk</u>.



cc:
Daniel Dominguez, Judge, US District Court of Puerto Rico
Frances Rios de Moran, Clerk, US District Court of Puerto Rico
Angel Ruiz-Rivera
Salvador Antonetti-Stutts
Nashely Pagan-Isona
Ruben Cerezo-Hernandez

# EXHIBIT 16

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SHIRE LLC and
SHIRE US INC.,

               Plaintiffs,

          v.

ABHAI, LLC,

               Defendant.

Civil Action No. 1:15-cv-13909 (WGY)

Bench Trial

## PLAINTIFFS' APPLICATION FOR REASONABLE ATTORNEYS FEES AND EXPENSES IN ACCORDANCE WITH THE COURT'S MARCH 22, 2018 ORDER

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

I.    **INTRODUCTION** ...................................................................................................... 1

II.   **BACKGROUND FACTS** ........................................................................................... 1

     A.    Category (a): "time wasted dealing with Abhai's inaccurate stability and dissolution data".................................................................................................... 2

     B.    Category (b): "discovering the litigation misconduct" ........................................... 3

     C.    Category (c): "dealing with Abhai's revised stability and dissolution data".......... 4

III.  **SHIRE'S REQUESTED ATTORNEYS' FEES AND COSTS ARE REASONABLE** ............................................................................................................. 5

     A.    Shire Spent a Reasonable Number of Hours Responding to Abhai's Misconduct................................................................................................................ 6

          1.    Category (a): "time wasted dealing with Abhai's inaccurate stability and dissolution data"..................................................................... 7

          2.    Category (b): "discovering the litigation misconduct" ............................... 8

          3.    Category (c): "dealing with Abhai's revised stability and dissolution data".................................................................................... 8

          4.    Requested Attorney Fees Were Carefully Reviewed................................. 9

          5.    Local Representation Fees ...................................................................... 10

     B.    Shire's Reasonable Hourly Rate is Comparable to Prevailing Rates in the Community for Patent Litigation ....................................................................... 11

     C.    Shire Expended Reasonable Costs in Response to Abhai's Misconduct.............. 13

IV.  **CONCLUSION** ...................................................................................................... 14

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374 (Fed. Cir. 1994) ........................ 13

*Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343 (Fed. Cir. 2008) ................................ 11

*Blanchard v. Bergeron*, 489 U.S. 87, 93 (1989) ........................................................................... 11

*Blum v. Stenson*, 465 U.S. 886 (1984) ........................................................................................... 11

*Bywaters v. United States*, 670 F.3d 1221 (Fed. Cir. 2012) ............................................................ 6

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).............................................................................. 5

*Fox v. Vice*, 563 U.S. 826 (2011).................................................................................................... 5

*Gay Officers Action League v. Puerto Rico*, 247 F.3d 288 (1st Cir. 2001) .................................... 6

*Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178 (2017)................................................... 5

*Grendel's Den, Inc. v. Larkin*, 749 F.2d 945 (1st Cir. 1984).......................................................... 6

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ............................................................................... 6, 9

*Hutchinson ex rel. Julien v. Patrick*, 636 F.3d 1 (1st Cir. 2011) ................................................. 13

*Jin Hai Li v. Foolun, Inc.*, 273 F. Supp. 3d 289 (D. Mass. 2017) ................................................. 6

*Link v. Wabash R. Co.*, 370 U.S. 626 (1962) ................................................................................. 5

*Mathis v. Spears*, 857 F.2d 749, 757 (Fed. Cir. 1988)................................................................. 14

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359 (Fed. Cir. 2013) .................. 5

*Summit Tech., Inc. v. Nidek Co.*, 435 F.3d 1371 (Fed. Cir. 2006)............................................... 13

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381 (Fed. Cir. 2008) ...................... 13

*Warnock v. Archer*, 397 F.3d 1024, 1027 (8th Cir. 2005) ........................................................... 11

**Statutes**

35 U.S.C. § 285.................................................................................................................................. 5

**Rules**

Fed. R. Civ. P. 37.............................................................................................................................. 5

## I.  INTRODUCTION

On March 22, 2018, the Court issued its Findings of Fact, Rulings of Law, and Order for Judgment, which awarded attorneys' fees and costs to Plaintiffs Shire LLC and Shire US Inc. (collectively, "Shire") as sanctions due to the litigation misconduct of Defendant Abhai, LLC and its parent, KVK Tech, Inc. ("KVK" or, collectively, "Abhai")[1]. D.I. 377 at 77. The Court directed Shire to "submit a revised claim for attorneys' fees and costs limited to (a) recovering for the time wasted dealing with Abhai's inaccurate stability and dissolution data, (b) discovering the litigation misconduct discussed immediately above, and (c) dealing with Abhai's revised stability and dissolution data." *Id.* Shire hereby submits this detailed account of its attorneys' fees and costs that fall within the Court's enumerated categories and respectfully requests the Court award Shire accordingly.

## II.  BACKGROUND FACTS

Due to Abhai's misconduct, this litigation was extended by five months—with Shire forced to conduct its own dissolution testing, reconsider Abhai's repudiated dissolution data, analyze Abhai's new dissolution data, and investigate why Abhai did not timely produce its dissolution data. *See* D.I. 377 at 64–81. With the Court having already determined that Shire is eligible for an award of the fees and costs stemming from Abhai's misconduct, this submission is intended solely to document those fees and costs.

---

[1] Both Abhai and KVK are fully responsible for the litigation misconduct in this case. D.I. 337 at 70 ("The conduct of Abhai and KVK reflects an appalling lack of awareness of a litigant's responsibility to our justice system . . . ."). Abhai, a shell with limited assets, has eschewed any reliance on a distinction between Abhai and KVK. D.I. 189 at 9–10. For these reasons, both Abhai and KVK should be ordered to pay the sanctions award.

### A. Category (a): "time wasted dealing with Abhai's inaccurate stability and dissolution data"

For category (a), the relevant time frame is September 2016 through April 2017. This time frame begins when the parties started preparing for corporate depositions, analyzing the dissolution data, and preparing for expert reports and ends when the Court and Shire were first made aware of Abhai's use of erroneous data. Shire took the deposition of Dr. Ranga Namburi, Abhai's corporate 30(b)(6) witness and the person who discovered the inaccurate data, on October 14, 2016. D.I. 277 at 65–66. In November 2016, in response to Dr. Namburi's deposition, Shire undertook additional discovery regarding Abhai's dissolution data, including a request for all versions of its dissolution test protocols. D.I. 332 (Shire's Post Trial FFCL) ¶ 749. Abhai produced most of its dissolution test protocols on November 23, 2016—all except the newest version, from October 2016. D.I. 332 ¶ 755.

During this same timeframe, Shire's counsel analyzed and reviewed Abhai's documents and laboratory notebooks, worked with its experts, and prepared expert reports regarding Abhai's dissolution testing. Shire worked with Shen Luk of Juniper Pharma Services ("Juniper")—Shire's expert on coating thickness and dissolution testing—to analyze Abhai's dissolution protocols and perform dissolution testing of Abhai samples. D.I. 332 ¶¶ 38–41. Additionally, Shire worked with Jennifer Dressman, Shire's principal infringement expert, in analyzing Abhai's dissolution testing data for her rebuttal expert report and trial testimony. D.I. 332 ¶¶ 24–27. In reaching their initial conclusions about the release of Abhai's ANDA Product, Shire's experts relied not only on the documents produced by Abhai during the course of discovery, but also on representations made by Dr. Namburi. D.I. 332 ¶ 726.

The opening expert reports for Dr. Luk and Dr. Dressman were served on October 21, 2016. On December 16, 2016, Shire served the rebuttal expert report of Dr. Dressman in

response to the expert report of Diane Burgess, Abhai's expert. In her rebuttal report, Dr. Dressman explained that Abhai's own dissolution testing, including the later-repudiated test data, confirmed that Abhai's ANDA product infringed. *See* D.I. 145 (Shire's Pre-Trial FFCL) ¶¶ 140–66. Shire began preparing for Dr. Dressman's and Dr. Burgess' depositions in early January 2017, and Shire took and defended their depositions on January 20, 2017 and January 27, 2017, respectively. Beginning in early March 2017, Shire began to prepare its pretrial motions and briefing and to prepare for trial itself; this included preparing to cross-examine Dr. Burgess and to conduct the direct examinations of Dr. Dressman and Dr. Luk. Trial began on March 27, 2017, Dr. Burgess testified on March 28, 2017, and Dr. Dressman and Dr. Luk were about to take the stand when, on April 3, Abhai revealed that much of its dissolution data was, in fact, incorrect.

## B.    Category (b): "discovering the litigation misconduct"

For category (b), the relevant time frame is April 2017 through August 2017, during which Shire was diligently investigating the facts surrounding Abhai's withholding of relevant information. On April 3, 2017, Abhai produced its "corrected" dissolution data and, on the next day, moved to amend the trial order to include the just-produced data. *See* D.I. 152–155. As instructed by this Court, Shire conducted a thorough investigation of these developments. Throughout April 2017, Shire poured through Abhai's newly produced documents and—faced with more obstructive conduct from Abhai—moved to compel discovery on May 5, 2017. D.I. 183. On May 15, 2017, this Court ordered Abhai to produce Mr. Tabasso's call logs and text messages. D.I. 195. With Shire pushing hard for more document production relating to "who knew what when" about the repudiated and corrected data, Abhai coughed up a vast number of documents. As Abhai admitted, Shire "collected over 60,000 pages of documents from Abhai since April 4." D.I. 264 (Joint Add. Pre-Trial Mem.) ¶ 237. These documents were not only

relevant to this investigation, but also relied on at trial and included in the Court's opinion. *See*, *e.g.*, D.I. 377 at 66–70, 73.

In June and July 2017, Shire deposed numerous Abhai officers and employees— Benjamin Roembke, Sameer Late, Kevin O'Loughlin, Todd Leo, Murty Vepuri, Frank Nekoranik, Ashvin Panchal, Jordan Rees, and Anthony Tabasso—regarding Abhai's ownership structure, company practices and testing procedures, document retention policies, and knowledge of the erroneous and allegedly corrected dissolution testing. Shire requested that Abhai call its fact witnesses at trial, and Shire prepared to cross-examine them. But Abhai refused to produce these witnesses at trial. D.I. 337 at 64, n. 6. Shire was forced instead to prepare and submit proffers of what each of these witnesses would have testified to had Abhai cooperated. Shire submitted their proffers on September 15, 2017. D.I. 287–290.

### C. Category (c): "dealing with Abhai's revised stability and dissolution data"

For category (c), the relevant time frame is April 2017 through September 2017. When Abhai produced its allegedly corrected dissolution data in April 2017, Shire had to review and analyze each corrected data point and determine its impact on Shire's existing analysis and corresponding infringement arguments. Starting in May 2017, Shire worked with its experts, Dr. Luk and Dr. Dressman, to review and amend each of their expert reports in light of the new "corrected" dissolution testing. In addition, as Abhai could no longer be relied upon to produce accurate dissolution data, Shire—through Dr. Luk—needed to conduct its own dissolution testing of each strength of Abhai's ANDA product. The supplemental expert reports were served in late June 2017, and reply reports were served in early August 2017 along with a corresponding motion for leave. Abhai deposed Dr. Dressman on August 4, 2017 and Dr. Luk on August 18, 2017. Shire deposed Dr. Burgess on August 24, 2017. At trial, Dr. Luk testified on September 5,

2017, Dr. Burgess testified on September 5, 6, and 8, 2017, and Dr. Dressman testified on September 14, 2017.

## III.   SHIRE'S REQUESTED ATTORNEYS' FEES AND COSTS ARE REASONABLE

Sanctions, under federal law and procedure, are appropriate in these circumstances through three different avenues: (1) Federal Rules of Civil Procedure 37; (2) the Court's inherent authority; and (3) 35 U.S.C. § 285, which provides a court with authority "in exceptional cases [to] award reasonable attorney fees to the prevailing party."[2] Under Rule 37, a court must order reasonable expenses, including attorneys' fees, if a party "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2). Additionally, federal courts possess "inherent powers," not conferred by rule or statute, "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962). That authority includes "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991).

A "permissible sanction is an assessment of attorney's fees . . . instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (internal quotations omitted). According to a "but-for causation standard," "[t]he award is then the sum total of the fees that, except for the misbehavior, would not have accrued." *Id.* at 1187. "The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838

---

[2] Shire is the prevailing party and, given the extent of Abhai's litigation misconduct, this case qualifies as "exceptional." *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1366–67 (Fed. Cir. 2013) (noting the "well-established rule that litigation misconduct and unprofessional behavior may suffice, by themselves, to make a case exceptional under § 285.") As the Court has already awarded Shire its attorneys' fees and costs due to Abhai's litigation misconduct, Shire will not separately discuss Section 285, which provides a separate statutory basis for the fees and costs Shires seeks.

(2011). Accordingly, this Court determined it was appropriate to award attorneys' fees and costs as sanctions due to Abhai's litigation misconduct "limited to (a) recovering for the time wasted dealing with Abhai's inaccurate stability and dissolution data, (b) discovering the litigation misconduct discussed immediately above, and (c) dealing with Abhai's revised stability and dissolution data." D.I. 377 at 77.

The Federal Circuit and the District of Massachusetts generally follow the "lodestar" method for determining the amount of reasonable attorneys' fees: the number of hours reasonably expended multiplied by a reasonable hourly rate. *Bywaters v. United States*, 670 F.3d 1221, 1228 (Fed. Cir. 2012); *Jin Hai Li v. Foolun, Inc.*, 273 F. Supp. 3d 289, 292 (D. Mass. 2017). The starting point for this calculation is determining the number of adequately documented hours. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The lodestar calculation then requires a determination of a reasonable hourly rate that is benchmarked to the "prevailing rates in the community" for lawyers of like "qualifications, experience, and specialized competence." *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 295 (1st Cir. 2001). Adjustments to the lodestar calculation upward or downward may be made in "rare" and "exceptional" circumstances, if based on specific findings of factors not subsumed within the loadstar calculation. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010).

### A.      Shire Spent a Reasonable Number of Hours Responding to Abhai's Misconduct

The first step in following the lodestar method is to calculate the number of hours reasonably expended by the attorneys for the prevailing party, excluding those hours that are "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434; *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950 (1st Cir. 1984). Evidence supporting the reasonableness of the hours expended and hourly rates, including contemporaneous time records, invoices, and other

documentation is provided along with a declaration of Shire's counsel. *See* Collins Decl., Ex. A. While billing for a litigation of this size is complicated, and Abhai may try to pick at the bills, Shire believes the hours and amount spent were necessary to protect its rights in this situation and therefore reasonable, especially given that it was Abhai's own obstructive conduct that warranted such measures. In total, Shire identified at least 3,230.3 attorney hours, resulting in a total of $2,087,889 in attorneys' fees fitting the Court's three enumerated categories. A detailed description of the work performed by Shire's attorneys is outlined below and supported by the attached documentation.

1.      **Category (a): "time wasted dealing with Abhai's inaccurate stability and dissolution data"**

For category (a), the time entries included in the calculation from September 2016 to April 2017 include:

- time spent analyzing Abhai's ANDA containing dissolution and stability data;

- time spent reviewing Abhai's lab notebooks containing dissolution and stability data;

- time spent working with Juniper on dissolution testing;

- time spent working on Dr. Luk's opening expert report related to dissolution testing (including the four pages in his 37-page opening report plus the short description in Appendix E of his dissolution testing methodology);

- time spent working with Dr. Dressman on her reply report addressing dissolution data;

- time spent preparing Dr. Dressman for deposition;

- time spent reviewing Dr. Burgess's expert report on inaccurate dissolution data;

- time spent deposing Dr. Burgess on inaccurate dissolution data;

- time spent preparing Dr. Luk for deposition;

- time spent deposing Abhai/KVK employees on inaccurate dissolution data;

- time spent preparing Dr. Dressman and Dr. Luk for trial on inaccurate dissolution data; and

- time spent preparing to cross examine Dr. Burgess on inaccurate dissolution data.

### 2.    Category (b): "discovering the litigation misconduct"

For category (b), the time entries included in the calculation from April 2017 to August

2017 include:

- time spent during first trial reviewing newly disclosed dissolution and stability data;

- time spent opposing Abhai's attempt to amend the pretrial order and introduce evidence at the first trial not produced during fact discovery;

- time spent at the court hearing convened to determine the best path forward;

- time spent drafting discovery requests;

- time spent reviewing Abhai's responses to interrogatories and request for production;

- time spent reviewing Abhai documents produced after the first trial in April 2017;

- time spent pressing Abhai for more information and additional documents;

- time spent moving to compel production of documents and additional information, including related legal research;

- time spent researching the relationship between KVK and Abhai;

- time spent collecting dissolution testing for third parties to show issues with Abhai's testing; and

- time spent preparing for and taking the depositions of Anthony Tabasso, Jordan Rees, Ashvin Pancheal, Frank Nekovanik, Murty Vepuri, Ranga Namburi, Todd Leo, Benjamin Roembke, Sameer Late, and Kevin O'Loughlin.

### 3.    Category (c): "dealing with Abhai's revised stability and dissolution data"

For category (c), the time entries included in the calculation from April 2017 to

September 2017 include:

- time spent developing a response to the revised stability and dissolution data;

- time spent analyzing Abhai's document productions in light of revised stability and dissolution data;

- time spent with Dr. Luk and Juniper regarding new dissolution studies being conducted;

- time spent with Dr. Dressman on a supplemental expert report addressing Abhai's revised stability and dissolution data;

- time spent working with consulting experts to understand issues raised by the revised dissolution data;

- time spent collecting information about other dissolution studies for Adderall XR, including those in Shire's NDA;

- time spent moving to compel Abhai to produce more documents and provide additional information relevant to understanding the revised stability and dissolution data; and

- time spent preparing Dr. Dressman for the second trial.

### 4. Requested Attorney Fees Were Carefully Reviewed

Counsel "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary" *Hensley*, 461 U.S. at 434. That has been done here. Before any invoices are sent to a client, Covington reviews all time records for inefficiency and redundancy. Additionally, any fees or costs not clearly falling within the three enumerated categories have been eliminated.

For example, Shire's counsel surrendered any time entries where the entries were vague—even if the entry otherwise indicated the work was likely to be related to the categories. *See* Collins Decl. ¶ 5. Additionally, time entries that included tasks unrelated to the Court's categories were not included. *See id.* Moreover, Shire has not included fees for its paralegals or other legal staff. *See id.* at ¶ 6. And Shire's counsel were efficient in allocating work. *See id.* at ¶ 3. Experience levels were carefully matched to the demands of a particular project to contain

costs without sacrificing the odds of success. *See id.* Shire's counsel have reviewed the bills carefully and do not believe there is any duplication of effort. *See id.* at ¶ 4–5.

These fees and costs are in line with contemporary patent litigation. Based on the widely accepted American Intellectual Property Law Association ("AIPLA") 2017 Report of the Economy Survey, the average litigation costs for a patent infringement case under the Hatch Waxman Act with more than $25 million at risk is $1.15 million through discovery and $2.654 million through trial. Collins Decl., Ex. F at I-128; *see also id.* at I-116 (average cost in Boston is $3.714 million); *id.* at I-122 (average cost with a firm having 60+ attorneys is $4.992 million). The 90% percentile for Hatch Waxman litigation—presumably regular cases, not those involving essentially two trials—is $7.75 million. *Id.* at I-128. Moreover, Adderall XR$^®$ is a blockbuster, and a variety of complex issues, including intricate non-infringement analysis and contentious discovery into Abhai's litigation misconduct, resulted in essentially two separate trials. This level of complexity required a higher skill set, and more time, labor, and experience to handle.

To put the above further into perspective, the total litigation expenses for Shire in this one particular matter were over $8.6 million. Collins Decl. ¶ 8. The amount of fees and costs requested as sanctions due to Abhai's litigation misconduct is approximately a quarter of the total for this case. Furthermore, the litigation costs actually incurred by Shire since discovering Abhai's misconduct in April 3, 2017 through the second trial in September 15, 2017 is over $4.8 million. *Id.* Shire is, however, submitting less than half of these fees and costs to the Court for consideration. Because these hours were genuine worked hours, and were not duplicative or unnecessary, they are included in Shire's lodestar calculation.

### 5. Local Representation Fees

Choate Hall & Stewart LLP ("Choate"), acting primarily as local counsel, billed a total of $33,128 representing Shire in connection with this matter related to the Courts identified

categories. Shire has specifically limited its requested recovery to just the five-day period Choate attended and prepared for the second trial. Marandett Decl. ¶ 8. In an attempt to streamline its request, Shire is not submitting other fees and costs expended on local representation that are arguably related to Abhai's misconduct. For comparison, Choate's total fees for the period from April 2017 through December 2017 is over $157,000. Marandett Decl. ¶ 7. These hours were specific to work needed for local representation, non-duplicative of Covington's work and necessary to the representation.

### B. Shire's Reasonable Hourly Rate Is Comparable to Prevailing Rates in the Community for Patent Litigation

A court's second step in calculating the lodestar requires a determination of a reasonable hourly rate—a determination benchmarked to the "prevailing [rates] in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895–96 (1984). The "community" is generally the forum state. *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1349 (Fed. Cir. 2008). Evidence of the attorneys' customary rates and the actual fee arrangement in the case may further be considered in determining reasonableness. *See Blanchard v. Bergeron*, 489 U.S. 87, 93 (1989) ("The presence of a pre-existing fee agreement may aid in determining reasonableness.")). A district court may also rely on its own knowledge of prevailing market rates. *See*, *e.g.*, *Warnock v. Archer*, 397 F.3d 1024, 1027 (8th Cir. 2005).

The hourly rates and biographies for Shire's counsel are provided in the attached declarations. Collins Decl. ¶ 9, Ex. E; Marandett Decl. ¶ 7, Ex. A. The rates billed to Shire in this case were consistent with each attorneys' customary, market-driven rate at the time the service was rendered, and are appropriate for the level of skill and experience of each attorney or

paralegal. These rates are consistent with the rates of similarly situated attorneys. In Boston, litigation rates have been reported as follows[3]:

| Rank | 2016 Rates | | | 2017 Rates | | |
|---|---|---|---|---|---|---|
| | High | Low | Average | High | Low | Average |
| Associate 1 | $335 | $325 | $330 | $495 | $295 | $350 |
| Associate 2 | $495 | $360 | $455 | $730 | $350 | $435 |
| Associate 3 | 695 | 350 | $520 | N/A | N/A | N/A |
| Associate 3 | $625 | $540 | $555 | $670 | $380 | $580 |
| Associate 4 | N/A | N/A | N/A | N/A | N/A | N/A |
| Associate 5 | N/A | N/A | N/A | $815 | $425 | $555 |
| Associate 6 | $765 | $695 | $755 | $730 | $340 | $570 |
| Associate 7 | N/A | N/A | N/A | $865 | $350 | $615 |
| Associate 8 | $930 | $400 | $710 | $730 | $540 | $665 |
| Counsel | $895 | $695 | $840 | $970 | $350 | $810 |
| Junior Partner | $925 | $550 | $715 | $895 | $580 | $715 |
| Senior Partner | $1,450 | $405 | $870 | $1,450 | $485 | $855 |

The American Lawyer also reported the following billing average billing rates for top national practices: $1,000/hour for partners; $745/hour for senior associates; $630 for mid-level associates, and $485/hour for junior associates.[4] While the rates here are on the higher end of the reported surveys, this case warranted such rates: not only was the suit complex, but patent litigation is also a specialty in which practitioners largely reside in larger cities where rates are much higher.

---

[3] Original search results attached as Exhibit G, which were retrieved from Valeo Partners Rates Database on 3/28/2018, available at http://reports.valeopartners.com/rates/report.

[4] The American Lawyer article is available at https://www.law.com/americanlawyer/almID/1202799338640/Read-This-Before-You-Set-Your-2018-Billing-Rates/

In sum, under the lodestar methodology, the number of attorney hours worked fitting the Court's categories totaled approximately 3,230.3 hours. Multiplied by reasonable hourly rates, these hours yield a total of $2,087,889.

### C. Shire Expended Reasonable Costs in Response to Abhai's Misconduct

"[R]easonable expenses, necessary for the prosecution of a case, are ancillary to and may be incorporated as part of a fee award under a prototypical federal fee-shifting statute." *Hutchinson ex rel. Julien v. Patrick*, 636 F.3d 1, 17 (1st Cir. 2011). A party seeking to recover costs and expense need not document its request with "page-by-page precision, [however] a bill of costs must represent a calculation that is reasonably accurate under the circumstances." *Summit Tech.*, *Inc. v. Nidek Co.*, 435 F.3d 1371, 1380 (Fed. Cir. 2006).

Here, Shire seeks compensation for a total of $292,150.72 in costs. The major categories of these expenses are discussed below, and a chart summarizing expenses along with supporting documentation of expenses is provided. Collins Decl. ¶ 7, Exs. A–D.

A large category of costs are expert fees. A "district court may invoke its inherent power to impose sanctions in the form of reasonable expert fees in excess of what is provided for by statute." *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008); *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378–79 (Fed. Cir. 1994). Recovering fees for Dr. Dressman and Dr. Luk post-April 2017 is appropriate because the experts were prepared to testify at trial in April, and would have testified then but for Abhai's delayed disclosure of its erroneous dissolution data. Dr. Dressman and Dr. Luk had to re-analyze Abhai's new, corrected dissolution data and revise their expert reports in addition to being prepared to give testimony at the second trial.

Another category of costs is vendor fees. This category includes deposition costs related to taking the fact and expert witnesses' testimony regarding the erroneous and allegedly

corrected dissolution data. All of the submitted expenses are reasonable and appropriate expenses under the Court's inherent power. *See*, *e.g.*, *Mathis v. Spears*, 857 F.2d 749, 757, 759 (Fed. Cir. 1988).

Finally, post-judgment interest is appropriate from the date of this Court's judgment awarding attorney fees pursuant to 28 U.S.C. § 1961, *see id.* at 759–60 (citations omitted), and Shire asks the Court to award post-judgment interest.[5]

## IV. CONCLUSION

For the foregoing reasons, Shire respectfully requests the Court to award its reasonable attorneys' fees and costs.

Dated: April 18, 2018

---

[5] Awarding post-judgment interest here is particularly appropriate in light of the fact that it is now approximately one entire year from the date on which this trial would have concluded if not for Abhai's misconduct.

Respectfully Submitted,

/s/ Eric J. Marandett

| | |
|---|---|
| Eric J. Marandett (BBO# 561730) | Tess A. Hamilton |
| Margaret E. Ives (BBO# 668906) | **COVINGTON & BURLING LLP** |
| Patrick S. Boyd (BBO# 688634) | 333 Twin Dolphin Drive |
| **CHOATE HALL & STEWART LLP** | Suite 700 |
| Two International Place | Redwood Shores, CA 94065-1418 |
| Boston, MA 02110 | Tel: 650.632.4719 |
| Tel: 617.248.4014 | tahamilton@cov.com |
| emarandett@choate.com | |
| mives@choate.com | *Attorneys for Plaintiffs Shire LLC and Shire* |
| pboyd@choate.com | *US Inc.* |

OF COUNSEL:
George F. Pappas
Jeffrey B. Elikan
Kevin B. Collins
Erica N. Andersen
Eric R. Sonnenschein
Alaina M. Whitt
**COVINGTON & BURLING LLP**
One CityCenter
850 10th St. NW
Washington, DC 20001
Tel: 202.662.6000
gpappas@cov.com
jelikan@cov.com
kcollins@cov.com
esonnenschein@cov.com
eandersen@cov.com
awhitt@cov.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing document was served upon all counsel of record by electronic mail.

Dated: April 18, 2018

By: */s/ Eric J. Marandett*

# EXHIBIT 17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MR. JORGE FRANCISCO SÁNCHEZ AND DOLORES SERVICE STATION AND AUTO PARTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ESSO STANDARD OIL COMPANY (PUERTO RICO), <br><br> Defendant. <br><br>──────────────────────── <br><br> ESSO STANDARD OIL COMPANY (PUERTO RICO), <br><br> Third-Party Plaintiff, <br><br> v. <br><br> JORGE LUIS SÁNCHEZ-SÁNCHEZ; ET AL., <br><br> Third-Party Defendants. | CIVIL NO. 08-2151(JAF) <br><br><br><br> INJUNCTION FOR VIOLATIONS OF THE SOLID WASTE DISPOSAL ACT, CIVIL PENALTIES |

## AGREED FINAL JUDGMENT

Upon the Court having considered all pleadings, statements and evidence submitted during the bench trial held from August 16, 2010 to August 19, 2010, at which trial Plaintiffs, Jorge Francisco Sanchez and Dolores Service Station and Auto Parts, Inc. ("Plaintiffs"), defendant Esso Standard Oil Company (Puerto Rico) ("Esso"), and Third-Party Defendants Jorge Luis Sanchez-Sanchez and Alicia Solano-Diaz ("Sanchez Parents") and Angel Manuel Sanchez-Gomez and Hector Benito Sanchez-Gomez ("Property Owners") appeared through their respective counsel, and had the opportunity to submit their positions thereto, and

having determined that it had jurisdiction over the subject matter and the parties in this case, it is hereby FOUND, DETERMINED, ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:

1.     The Court heard evidence and arguments of counsel and renders judgment for Esso.

2.     The Court entered written findings of fact and conclusions of law after the trial of this matter. (Docket No. 477.) Except as contradicted in this judgment, these findings of fact and conclusions of law shall be given preclusive effect.

3.     Based on those findings of fact and conclusions of law, the Court ordered the Plaintiffs take nothing by their suit and that Esso recover $128,871.93 from Plaintiffs, Sanchez Parents, and Property Owners under Esso's CERCLA claim, and that Esso recover $512,823.98 from Plaintiffs for the combined costs of the court-ordered Comprehensive Site Assessment ("CSA") and expert services related to the CSA.

4.     On February 22, 2011, the parties agreed to compromise their claims. Plaintiffs and Property Owners agreed to pay Esso a total amount of $315,000 to settle all claims between the parties. Plaintiffs and Property Owners agreed to pay the stated total amount via payments in the amount of $31,500 every six months beginning August 31, 2011. Final payment will be made on or before February 22, 2016.

5.     Based on the Court's orders and agreement between the parties, the Court finds that the agreement between the parties is supported by the pleadings and findings and accepts and incorporates the settlement agreement into this judgment.

6.     The Court orders that Esso shall recover $315,000 pursuant to the terms of the settlement agreement. The Court orders execution to issue in the event of a failure on the

part of the Plaintiffs to make any of the payments outlined above. In the event of a failure to make any payment, Esso may execute on the outstanding amount due on an accelerated basis.

      7.    The Court shall retain jurisdiction to enforce the terms of the settlement agreements submitted by the parties, the terms of which are incorporated into this Judgment.

      8.    Esso and Mr. Cabrera have resolved the issue of Mr. Cabrera's sanction. Mr. Cabrera will pay Esso $10,000 in lieu of sanctions to be imposed by this Court, to be paid in equal $2,500 payments every six months, beginning August 31, 2011. Final payment will be made on or before February 28, 2013. The Court orders execution to issue in the event of a failure on the part of Mr. Cabrera to make any of the payments outlined above. In the event of a failure to make any payment, Esso may execute on the outstanding amount due on an accelerated basis.

      9.    The Court denies all relief not expressly granted in this judgment.

      10.    Esso relinquishes all rights to the bond and does not object to release of same.

      11.    FINAL JUDGMENT is hereby entered accordingly, and without the imposition of costs to any party.

SO ORDERED.

In San Juan, Puerto Rico this 13th day of April, 2011.

S/JOSE ANTONIO FUSTE
José Antonio Fusté
Chief U.S. District Judge

# EXHIBIT 18

**From:** Rogers, Michael H. <MRogers@labaton.com>
**Sent:** Tuesday, July 14, 2015 12:37 PM
**To:** Michael Lesser; Daniel P. Chiplock; Evan Hoffman; Dugar, Kirti
**Cc:** Kussin, Todd
**Subject:** State Street Topic Memos
**Attachments:**



Topic Memo █████(Bolano).docx; Topic Memo █████(Griffin 1).docx; Topic Memo █████(Vaidya 1).DOCX; Topic Memo █████(Saad).doc; Topic Memo █████(Bishop).DOCX; Topic Memo █████(Pospischil).DOC; Topic Memo █████(Griffin 2).doc; Topic Memo █████(Grant).DOCX; Topic Memo █████(Kaplan).DOC; Topic Memo █████(Powell).DOC; Topic Memo █████(Packman).DOC; Topic Memo █████(Packman).XLSX; Topic Memo █████(Vaidya 2).docx; Topic Memo █████(Pietrofesa).DOC; Topic Memo █████(Greene).DOC; Topic Memo █████(Fouchong).DOC; Topic Memo █████(George).doc; Topic Memo █████(Watson).DOC; Topic Memo █████(Herrick).DOC; Topic Memo █████(Schulman).DOC; Topic Memo █████(Orji).doc; Topic Memo █████(Hong).DOCX; Topic Memo █████(Flanigan).DOC; Topic Memo █████(Gianturco).doc; Topic Memo █████(Daniels).DOC; Topic Memo █████(Alper).DOC; Topic Memo █████(Cameron and Hirsh).docx

Remaining topic review memos from State Street.& All of these were in work/pending when the case settled.& As I mentioned in an email a couple weeks ago, I asked Todd and his folks to wrap them up as soon as possible in the subsequent days.
&
This is the output of that effort (which was actually completed before the 4th, but I've been out of office on vacation and work-related travel on other matters).
&
Enjoy!& (That's direccted at you, Mike)

***Privilege and Confidentiality Notice***

This electronic message contains information that is (a) LEGALLY PRIVILEGED, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and (b) intended only for the use of the Addressee(s) named herein. If you are not the Addressee(s), or the person responsible for delivering this to the Addressee(s), you are hereby notified that reading, copying, or distributing this message is prohibited. If you have received this electronic mail message in error, please contact us immediately at 212-907-0700 and take the steps necessary to delete the message completely from your computer system. Thank you.

&

Confidential: Produced Pursuant to Court Order.                          TLF-SST-008524

# EXHIBIT 19

| | |
|---|---|
| **From:** | Michael Lesser |
| **Sent:** | Tuesday, June 23, 2015 3:45 PM |
| **To:** | Garrett Bradley |
| **Cc:** | Michael Thornton; Evan Hoffman |
| **Subject:** | FW: State Street Memo Topics |
| **Attachments:** | Reviewer detail projects MAL 62315.docx |

FYI: For the last two months we've been using the reviewers on the specific projects I've generated.  I've added some from time-to-time.

M

---

**From:** Michael Lesser
**Sent:** Tuesday, June 23, 2015 3:41 PM
**To:** 'Kussin, Todd'; Evan Hoffman; KDugar@lchb.com
**Cc:** Rogers, Michael H.; Daniel P. Chiplock
**Subject:** RE: State Street Memo Topics

Here's four more topics for today. Some are related to areas already covered, so I'll leave it to you to pass on to the people responsible for those areas (or not). I'll have more tomorrow. Pasting the four in but also including the source document with all additions.

<u>6/23/15 Additions</u>



1



2

Confidential: Produced Pursuant to Court Order.

TLF-SST-034483



**From:** Kussin, Todd [mailto:TKussin@labaton.com]
**Sent:** Tuesday, June 23, 2015 12:16 PM
**To:** Michael Lesser; Evan Hoffman; KDugar@lchb.com
**Cc:** Rogers, Michael H.; Daniel P. Chiplock
**Subject:** RE: State Street Memo Topics


Great, thanks Mike.


**From:** Michael Lesser [mailto:MLesser@tenlaw.com]
**Sent:** Tuesday, June 23, 2015 11:52 AM
**To:** Kussin, Todd; Evan Hoffman; KDugar@lchb.com
**Cc:** Rogers, Michael H.; Daniel P. Chiplock
**Subject:** RE: State Street Memo Topics


No objection here.


**From:** Kussin, Todd [mailto:TKussin@labaton.com]
**Sent:** Tuesday, June 23, 2015 11:51 AM
**To:** Evan Hoffman; KDugar@lchb.com
**Cc:** Rogers, Michael H.; Daniel P. Chiplock; Michael Lesser
**Subject:** State Street Memo Topics


Good Morning,

Unless anybody is opposed, I am going to assign the topic below to one of my reviewers. From my records, it looks like it is still available. Thanks.


Todd

3



***Privilege and Confidentiality Notice***

This electronic message contains information that is (a) LEGALLY PRIVILEGED, PROPRIETARY IN
NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and (b) intended only for the
use of the Addressee(s) named herein. If you are not the Addressee(s), or the person responsible for delivering
this to the Addressee(s), you are hereby notified that reading, copying, or distributing this message is prohibited.
If you have received this electronic mail message in error, please contact us immediately at 212-907-0700 and
take the steps necessary to delete the message completely from your computer system. Thank you.

This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual
or entity to whom they are addressed. This communication may contain material protected by the attorney-client
privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended
recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding,
printing, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error; please
immediately notify us by telephone at (800) 431-4600. You will be reimbursed for reasonable costs incurred in
notifying us.

4

# EXHIBIT 20

**From:**           Michael Lesser <MLesser@tenlaw.com>
**Sent:**           Thursday, June 11, 2015 4:02 PM
**To:**             Brian McTigue; Regina Markey; Lynn Sarko; Kravitz, Carl S.
**Subject:**        FW: ERISA
**Attachments:**    U.S. Custody ERISA Funds 2015.06.11.pdf

FYI

**From:** Halston, Daniel [mailto:Daniel.Halston@wilmerhale.com]
**Sent:** Thursday, June 11, 2015 4:00 PM
**To:** Michael Lesser
**Subject:** RE: ERISA

Settlement Communication

Mike

Here you go.   Dan

**From:** Michael Lesser [mailto:MLesser@tenlaw.com]
**Sent:** Wednesday, June 10, 2015 12:20 PM
**To:** Halston, Daniel
**Subject:** RE: ERISA

Dan:  Can you break the below numbers down into amounts by year? Just the ERISA SSH and AIR numbers, by year.  I regret not asking for this earlier.

Thanks,

Mike

**From:** Halston, Daniel [mailto:Daniel.Halston@wilmerhale.com]
**Sent:** Monday, March 09, 2015 3:48 PM
**To:** Michael Lesser
**Cc:** Lynn Sarko; Paine, William
**Subject:** RE: ERISA

Confidential Settlement Communication

Mike

The breakdown is as follows:

$74,891,109,811 (SSH) and $5,007,845,178 (AIR).  Dan

**From:** Michael Lesser [mailto:MLesser@tenlaw.com]
**Sent:** Monday, March 09, 2015 11:39 AM

**To:** Halston, Daniel
**Subject:** RE: ERISA

Dan:  Sorry, just for the sake of consistency, can I also have that breakdown between SSH and AIR?  I should have asked that specifically before.

Thanks,

Mike

---

**From:** Halston, Daniel [mailto:Daniel.Halston@wilmerhale.com]
**Sent:** Thursday, March 05, 2015 2:45 PM
**To:** Michael Lesser
**Cc:** Lynn Sarko; Paine, William
**Subject:** RE: ERISA

Mike

It changed just slightly to $79,898,954,988.  Dan

---

**From:** Michael Lesser [mailto:MLesser@tenlaw.com]
**Sent:** Wednesday, March 04, 2015 12:35 PM
**To:** Halston, Daniel
**Subject:** ERISA

Dan:  The last ERISA volume number I had (SSH + AIR) was $79,901,150,487

Have there been any updates to the ERISA volumes?

Thanks,

Mike

**Michael A. Lesser, Esq.**
**Thornton Law Firm LLP**
**100 Summer St., 30th Floor**
**Boston, MA 02110**
**617-720-1333**
**800-431-4600**
**mlesser@tenlaw.com**

This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by the attorney-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error; please immediately notify us by telephone at (800) 431-4600. You will be reimbursed for reasonable costs incurred in notifying us.
This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by the attorney-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended

recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error; please immediately notify us by telephone at (800) 431-4600. You will be reimbursed for reasonable costs incurred in notifying us.

This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by the attorney-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error; please immediately notify us by telephone at (800) 431-4600. You will be reimbursed for reasonable costs incurred in notifying us.

Confidential Mediation Communication
Not Admissible for any Purpose
Not to be Used or Referred to for Any Other Purpose
To be Returned at the Conclusion of Mediation

**State Street FX Trading y kj U.S. Custody ERISA Plans**
**Number of Trades and Total Value of Trades by Type and Year**
**January 1, 1998 – December 31, 2009**

| | SSH | | | AIR | | | Total | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Year | Number of Trades | Total Value of Trades ($USD) | | Number of Trades | Total Value of Trades ($USD) | | Number of Trades | Total Value of Trades ($USD) |
| 1998 | 33,104 | $7,479,466,489 | | - | - | | 33,104 | $7,479,466,489 |
| 1999 | 32,697 | 10,554,771,451 | | 3,808 | 77,739,325 | | 36,505 | 10,632,510,775 |
| 2000 | 32,007 | 10,331,622,491 | | 9,697 | 253,840,004 | | 41,704 | 10,585,462,495 |
| 2001 | 39,638 | 8,453,345,452 | | 11,494 | 282,590,409 | | 51,132 | 8,735,935,861 |
| 2002 | 45,201 | 6,582,198,525 | | 11,542 | 287,460,655 | | 56,743 | 6,869,659,180 |
| 2003 | 29,317 | 2,886,419,977 | | 12,653 | 364,322,705 | | 41,970 | 3,250,742,681 |
| 2004 | 33,580 | 4,632,364,474 | | 15,344 | 452,829,875 | | 48,924 | 5,085,194,349 |
| 2005 | 30,594 | 4,347,183,219 | | 16,603 | 550,235,161 | | 47,197 | 4,897,418,381 |
| 2006 | 32,625 | 4,643,423,210 | | 15,568 | 622,331,978 | | 48,193 | 5,265,755,188 |
| 2007 | 38,709 | 5,210,651,802 | | 16,316 | 701,631,876 | | 55,025 | 5,912,283,678 |
| 2008 | 54,932 | 5,344,849,383 | | 17,146 | 818,090,214 | | 72,078 | 6,162,939,597 |
| 2009 | 56,434 | 4,424,813,337 | | 15,882 | 596,772,978 | | 72,316 | 5,021,586,315 |
| **Total** | **458,838** | **$74,891,109,811** | | **146,053** | **$5,007,845,178** | | **604,891** | **$79,898,954,988** |

Notes:

[1] Includes all trade data for funds with a U.S. tax address, with the exception of KRW and TWD subcustodian trading.

Sources:

[A] Trade data provided by State Street via counsel.

ANALYSIS GROUP, INC.

# EXHIBIT 21

| | |
|---|---|
| **From:** | Lynn Sarko <lsarko@KellerRohrback.com> |
| **Sent:** | Sunday, August 9, 2015 3:51 PM |
| **To:** | Garrett Bradley; Chiplock, Daniel P.; Sucharow, Lawrence; Lieff, Robert L.; Michael Thornton; Goldsmith, David; Lynn Sarko |
| **Cc:** | ckravitz@zuckerman.com; Brian McTigue (bmctigue@mctiguelaw.com); Lynn Sarko |
| **Subject:** | RE: State Street FX-- CONFIDENTIAL--   CLASS COUNSEL ONLY |

**Dear all**

I wanted to share a few thoughts prior to Tuesday's call with the DOL.

1. The DOL wants to talk about the amount of Atty Fees in the ERISA portion of the case only. They don't want to discuss the rest of the recovery.
2. They view the ERISA portion of the case as being $60 million--- they don't care what Atty Fee percentage we request on the other $240 million.
3. When I refer to the DOL—I'm referring to the Boston DOL folks who were at the final afternoon mediation session in Boston. They are also the DOL folks that State Street had been talking to. Paine confirmed to me that he has never had any discussions with the WDC DOL folks. Similarly- as we discussed- I have not spoken with the WDC DOL folks about the attorney fee issues in the case—so the only discussions have been with the Boston DOL folks.
4. Suzanne and Nate are the DOL lawyers who handled the Boston investigation. Marjorie Butler is their boss in the Boston office. When they will talk about their client—this will mean Marjorie in Boston—and her superiors at EBSA (the DOL's Employee Benefits Security Administration)—that is the division that handles ERISA,
5. As we had discussed—we had told the DOL that no firm decisions had been made as to what attorney fees we were going to request—but we floated the potential number 30 percent as a starting number.
6. Nate told me that the DOL would never agree to 30%-- and wouldn't even agree to 27 or 28%---- and on a later conversation he suggested that they would even find 25% too high. He mentioned that the Boston DOL folks thought the Madoff case was a good comparator where the requested/awarded atty fees was something like 18%.
7. I have pointed out to Nate that in the Madoff case the DOL had been involved in the heavy lifting of litigating the case—unlike in this case where the DOL has acted more like a Vulture- waiting until the prey was captured before they swooped in and tried to steal the credit. I've spent some time beating him up about this and he keeps telling me that the DOL doesn't want to fight with us.
8. I've also plainly said that in my opinion that State Street would have paid $300 million without the DOL's involvement—and I didn't think the DOL contributed anything to that result. Their only involvement was in the plan of allocation issue- and the bottom line was that it was a $300 million class settlement (with or without the DOL's involvement)— I've also pointed out that the class lawyers have collectively spent years working on this case and that it was the DOL who chose not to share anything with us—so it is hard for them to claim that they contributed anything to the end result- other than being a pain in the rear. The last few calls with Nate- he has been more careful not to push back too hard.
9. At first the DOL seemed to want to argue that they were responsible for the last $10 million--- but they seem to have walked that back and are not only trying to influence the atty fee request on the $60 million. I don't know what position they will take on Tuesday's call. My thought is that they are a little worried what the

1

TLF-SST-043022

mediator will say as to what he told them—as they have heard from both Paine and us- that it was clear that the entire $300 million was subject to class atty fees.

10. There are many ERISA cases where courts have awarded atty fees of between 25% and 30%. Some even 33%. As you would expect- there are also many other cases where the fee percentage is between 20 and 25%. It usually depends on the court, the judge, the lodestar multiplier—just as in other class cases—so the statistics are all over the board. I do think we should be ready to argue why the Madoff case is not an appropriate case for comparison.

11. We also need to consider whether we are going to request the same fee across the whole $300 million—or is it feasible to request a different percentage in the $60 million than the other $240 million--

I do think a call Tuesday with Class counsel—prior to the DOL call would be helpful.

Expect the DOL to ask:
1. Are the attorneys planning on filing one fee application – or separate application son the $240 million and the $60 million. (I've suggested one fee application)
2. Are there deals/arrangements on how to divide the fees between the class lawyers—and are we willing to tell the DOL what those arrangements are (I have stayed away from commenting on this- and have always changed the subject or ignored their question—as I feel it is none of their business).
3. Do we know what the total lodestar is of the firms working on the case.
4. what credit do we think the DOL should have for the result—I have suggested zero.
5. would we agree to limit our fee request to some number.

Brian and Carl, is there anything that I have missed.

Lynn

From: Goldstein, Nathan - SOL [mailto:Goldstein.Nathan@dol.gov]
Sent: Friday, August 07, 2015 9:12 AM
To: Lynn Sarko; Brian McTigue (bmctigue@mctiguelaw.com);ckravitz@zuckerman.com
Cc: Butler, Marjorie - SOL; Reilly, Suzanne - SOL
Subject: State Street FX

Lynn, next Tuesday at 3:00 would work for us for a call with the various class counsels regarding attorneys' fees. Since you're probably in a better position on who should attend, would you mind circulating a dial-in and list of participants? We're also available to discuss any further logistics at your convenience.

Thanks,

Nathan P. Goldstein
Trial Attorney
U.S. Department of Labor, Office of the Solicitor
JFK Federal Building, Suite E-375
Boston, MA 02203
W (617) 565-2500
F (617) 565-2142

*This message may contain information that is privileged or otherwise exempt from disclosure under applicable law. Do not disclose without consulting the Office of the Solicitor. If you received this e-mail in error, please notify the sender immediately.*

Confidential: Produced Pursuant to Court Order.                                    TLF-SST-043023

This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.

This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by the attorney-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error; please immediately notify us by telephone at (800) 431-4600. You will be reimbursed for reasonable costs incurred in notifying us.

Confidential: Produced Pursuant to Court Order.                    TLF-SST-043024

# EXHIBIT 22

EXECUTION VERSION

## TERM SHEET FOR CUSTOMER AND ERISA CLASS ACTIONS

### Customer Class and ERISA Actions (the "Class Actions"):
*Arkansas Teacher Retirement System v. State Street Corporation, et al.*,
No. 11-cv-10230 MLW (D. Mass.);
*Arnold Henriquez, et al. v. State Street Bank and Trust Company, et al.*,
No. 11-cv-12049 MLW (D. Mass.);
*The Andover Companies Employee Savings and Profit Sharing Plan, et al. v. State
Street Bank and Trust Company*,
No. 12-cv-11698 MLW (D. Mass.)

1.      **Settling Parties**.    The Settling Parties include Plaintiffs Arkansas Teacher

Retirement System ("ARTRS"), Arnold Henriquez, Michael T. Cohn, William R. Taylor,

Richard A. Sutherland, The Andover Companies Employees Savings and Profit Sharing Plan,

Alan Kober, and James Pehoushek-Stangeland on behalf of themselves and all others similarly

situated (collectively, "Plaintiffs") and State Street Bank and Trust Company ("Settling

Defendant" or "SSBT," and collectively with Plaintiffs, the "Parties" or "Settling Parties").

2.      **Settlement Class**.    For purposes of this settlement ("Class Settlement") only, the

Settlement Class shall be defined as all custody and trust customers of SSBT, including ERISA

Plans, reflected in SSBT's records as having a United States tax address, that executed one or

more Indirect FX transactions with SSBT and/or its subcustodians between January 2, 1998 and

December 31, 2009, inclusive (the "Class Period").    The Settlement Class does not include

CalPERS, CalSTRS and the State of Washington Investment Board.  For the avoidance of doubt

it is agreed that this definition of the Settlement Class is intended to supersede the class

definitions in the complaints described above.

3.      **Settlement Amount**.    Three Hundred Million United States Dollars

($300,000,000.00) (the "Class Settlement Amount") paid in cash by SSBT into a Class Escrow

Account no more than ten (10) calendar days after Preliminary Approval of the Class Settlement.

The Class Escrow Account shall be at a money center bank agreed upon by Labaton Sucharow LLP ("Interim Lead Counsel") and SSBT.

4.   **Qualified Settlement Fund**.  The Parties agree that the Class Settlement Amount, plus any interest accrued thereon, is intended to be a Qualified Settlement Fund within the meaning of Treasury Regulation §1.468B-1.

5.   **Confidentiality**.   Until such time as an executed Stipulation of Settlement is submitted to the Court for approval, or such earlier date determined by SSBT, the Parties shall use their best efforts to keep the existence and terms of this Term Sheet confidential.

6.   **Class Certification**:  Defendants will stipulate for settlement purposes only to certification of the Settlement Class defined above.

7.   **Dismissal with Prejudice and Releases**:  Upon the Effective Date of the Settlement: (i) the Class Actions shall be dismissed with prejudice and Plaintiffs and the Settlement Class, including their past, present, and future heirs, executors, administrators, trustees, predecessors, successors and assigns ("Released Plaintiff Parties"), shall remise, release and forever discharge the Released Defendant Parties of and from the Released Class Claims, except for claims relating to the enforcement of the Class Settlement; and (ii) SSBT, on behalf of the Released Defendant Parties, shall release as against all Released Plaintiff Parties and their respective attorneys, all claims and causes of action of every nature and description, whether known or unknown, whether arising under federal, state, common or foreign law, that arise out of or relate in any way to the institution, prosecution, or settlement of the claims against Released Defendant Parties, except for claims relating to the enforcement of the Class Settlement ("Released Prosecution Claims").

Confidential: Produced Pursuant to Court Order.   TLF-SST-050930

8. **Certain Definitions:**

    a.    **Class Judgment.** A final judgment of dismissal of the Class Actions, which shall contain customary provisions including: (i) certification of the Settlement Class for settlement purposes only; (ii) a finding that the notice was disseminated consistent with the preliminary approval order, constituted the best notice practicable under the circumstances, and that the form of the notice and the manner of its dissemination was adequate, sufficient, and complied with the requirements of the Federal Rules of Civil Procedure, the Class Action Fairness Act, due process and all other applicable laws and rules; (iii) final approval of the Class Settlement, including the Plan of Allocation; (iv) dismissal of the Class Actions with prejudice; (v) the releases described above; (vi) a list of those persons and entities who are excluded from the Settlement Class pursuant to request; (vii) enjoining Plaintiffs, and the other members of the Settlement Class, from pursuing the Released Class Claims against the Released Defendant Parties in any forum, and enjoining the Defendant and Released Defendant Parties from pursuing the Released Prosecution Claims against the Released Plaintiff Parties in any forum; and (viii) providing that the judgment shall be vacated in the event that the SEC Settlement, DOJ Settlement and DOL Settlement do not become final and effective, and that the Court shall retain jurisdiction to do so.

    b.    **Court.** United States District Court for the District of Massachusetts.

    c.    **Direct FX Methods.** Methods for submitting, processing, aggregating and/or executing foreign exchange transactions in which the counterparty or its investment manager approves the exchange rate, or a spread from a benchmark, before execution of the trade (including StreetFX Methods and methods used with respect to any other method of execution offered by State Street that are not Indirect FX Methods).

    d.    **Direct FX Transactions.** Foreign exchange transactions executed with SSBT or SSBT's subcustodians using Direct FX Methods, including all StreetFX Transactions.

3

e.   **DOJ Settlement.** The related settlement being negotiated with the United States Department of Justice concerning Indirect FX.

f.   **DOL Settlement.** The related settlement being negotiated with the United States Department of Labor concerning Indirect FX.

g.   **Effective Date.** The first date upon which all of the following have occurred:  (a) the Court orders preliminary approval of the Class Settlement and directs that a form of notice of the proposed settlement describing the Plan of Allocation shall be provided to the Class in the manner specified in the order of preliminary approval; (b) the Class Settlement Amount has been paid consistent with paragraph 3 above;  (c) the Court has entered the Class Judgment; and (d) the DOJ Settlement, DOL Settlement and SEC Settlement are final and effective and either the time for appeal from the Class Judgment has expired and no appeal has been filed, or all appeals from the Class Judgment have been dismissed or resolved, such that the Class Judgment has not been and cannot be altered (provided, that alteration of the amount to be paid to counsel for the Class shall not prevent the Effective Date from occurring).

h.   **ERISA**. The Employee Retirement Income Security Act of 1974, as amended.

i.   **ERISA Plans.** The employee benefit plans as defined in 29 U.S.C. Section 1002(3) (also referred to as Section 3(3) of ERISA), that are subject to Part 4 of Subtitle B of Title I of ERISA (including master trusts with respect to multiple such plans within the meaning of Department of Labor Regulation Section 2520.103-1(e)), and that were  custody or trust customers of SSBT during any part of the Class Period; and  group trusts that are exempt from tax pursuant to Internal Revenue Service Revenue Ruling 81-100, as amended ("Group Trusts"), that were custody or trust customers of SSBT during any part of the Class Period.

j.   **Indirect FX Methods.** Methods at any time for submitting, processing, pricing, aggregating and/or executing foreign exchange transaction requests pursuant to instructions of custody or trust customers of SSBT (or their investment managers) instructing SSBT or SSBT's subcustodians to execute such transactions at rates or

4

spreads, which rates or spreads prior to December 2009 were not widely disclosed to the customer or investment manager prior to execution, including, but not limited to, the methods of executing foreign exchange transactions that are or were at any time known as indirect FX, standing instruction foreign exchange, custody FX, Automatic Income Repatriation, Automated Dividend and Interest Income Repatriation Service, Security Settlements and Holdings Foreign Exchange Service or Hourly Pricing Foreign Exchange Service.

k.    **Indirect FX Transactions.**  Foreign exchange transactions executed with SSBT or SSBT's subcustodians at any time using Indirect FX Methods, including all foreign exchange transactions submitted using Indirect Methods.  A transaction submitted or processed using an Indirect Method is an Indirect FX Transaction regardless whether the rate at which the transaction was executed differed from the rates at which other transactions submitted using Indirect Methods were executed.

l.    **Investment Company.**  A mutual fund, closed-end fund, unit investment trust or other entity that is registered with the SEC as and investment company under the Investment Company Act.

m.    **Rate Comparisons.**  Comparison of rates at which foreign exchange transactions were executed with rates of any other foreign exchange transaction or transactions (whether executed by SSBT, a subcustodian, or a party unrelated to SSBT), including comparison of rates of Indirect FX Transactions or Direct FX Transactions with rates of any other Indirect FX Transactions, Direct FX Transactions, indicative rate, market rate or benchmark rate.

n.    **Plan of Allocation.**  The description to be contained in the Notice to the Class of the manner in which the Class Settlement Amount, plus any interest and less all costs (including costs of notice and administration) or expenses (including taxes) and any fees and expenses of Plaintiffs' Counsel, shall be allocated to members of the Class.  The Plan of Allocation shall provide for, and contain sufficient flexibility to permit, among other things, the allocation of a portion of the Class Settlement Amount: (i) to ERISA Plans in a manner sufficient to obviate payment by SSBT of $60 million, as contemplated by the DOL Settlement; and (ii) to Investment Companies in a manner sufficient to obviate

5

    TLF-SST-050933

payment by SSBT of $75 million in disgorgement, and $15,019,370.68 in interest on disgorgement, as contemplated by the SEC Settlement.  Except with respect to notice and administration expenses solely attributable to Group Trusts as provided for below, and with respect to the amount of Plaintiffs' Counsel's attorneys' fees chargeable to the ERISA Plans, as more specifically provided for in paragraph 12, the amount allocated to the ERISA Plans and Investment Companies and other Settlement Class Members shall be increased or decreased, as the case may be, by their proportional share (with respect to the Class Settlement Amount) of any interest, costs (including costs of notice and administration), expenses (including taxes), and fees and expenses of Plaintiffs' Counsel obtained or paid pursuant to permission of the Court.  However, notice and administration expenses attributable solely to the claims of Settlement Class Members categorized as Group Trusts shall be paid solely out of the ERISA allocation, and the cost of any ERISA Independent Fiduciary shall be borne solely by SSBT and shall not be paid out of the Class Settlement Amount.

o.   **Released Class Claims.**  Any and all claims, demands, losses, costs, interest, penalties, fees, attorneys' fees, expenses, rights, rights of recovery, causes of action, duties, obligations, judgments, actions, debts, sums of money, suits, contracts, agreements, promises, damages, and liabilities of every nature and description, whether known or unknown, direct, representative, class, individual or indirect, asserted or unasserted, matured or unmatured, accrued or unaccrued, foreseen or unforeseen, disclosed or undisclosed, contingent or fixed or vested, accrued or not accrued, at law or equity, whether arising under federal, state, local, foreign, statutory, common, administrative or any other law, statute, rule or regulation that Plaintiffs or any other member of the Settlement Class: (i) asserted in the Class Actions; (ii) could have asserted in the Class Actions or any other action or in any forum, that arise from or out of, relate to, or are in connection with the claims, allegations, transactions, alleged or actual prohibited transactions or breaches of duty (including fiduciary duty), facts, events, acts, disclosures, matters or occurrences, statements, representations or omissions or failures to act involved, described, set forth, or referred to in the complaints filed in the Class Actions or that arise from or out of, relate to, or are in connection with Indirect FX

6

Methods, Indirect FX Transactions, Street FX Methods, StreetFX Transactions, or Rate Comparisons; (iii) or that arise from or out of, relate to, or are in connection with the defense or settlement of the Class Actions, except for claims relating to enforcement of the Settlement.

p.    **Released Defendant Parties.**  SSBT; its past, present and future parents, subsidiaries, divisions, and affiliates (including State Street Global Markets LLC); the respective past and present officers, directors, trustees, employees, agents, trustees, managers, servants, attorneys, accountants, auditors, underwriters, financial and investment advisors, consultants, representatives, insurers, co-insurers and reinsurers of each of them; and the heirs, successors and assigns of the foregoing.

q.    **SEC Settlement.**  The related settlement being negotiated with the United States Securities and Exchange Commission concerning Indirect FX.

r.    **StreetFX Methods.**  Methods for submitting, processing, aggregating and/or executing foreign exchange transactions which were or ultimately became known as StreetFX methods.

s.    **StreetFX Transactions.**  Foreign exchange transactions submitted at any time to SSBT using StreetFX Methods.

9.    **Not a Claims-Made Settlement**.  This is not a claims-made settlement; there will be no reversion.

10.    **Claims Administration and Plan of Allocation**.  The Claims Administrator will be of Plaintiffs' choosing and acceptable to SSBT, subject to Court approval.  Defendants will cooperate with and provide the Claims Administrator and/or Interim Lead Counsel with address information, and information about the U.S. dollar-equivalent volume of Indirect FX Transactions executed by members of the Settlement Class, sufficient to provide Notice to the Settlement Class, to administer the Plan of Allocation, and to allow for Plaintiffs' Counsel to develop the Plan of Allocation.

7

11.    **Costs of Notice and Settlement Administration**.  Prior to the Effective Date, Plaintiffs' Counsel may pay from the Class Escrow Account the actual costs of notice and settlement administration without further order of the Court.  In the event that the Settlement is not consummated, money paid or incurred for this purpose shall not be returned or repaid to Defendants.

12.    **Plaintiffs' Counsel's Attorneys' Fees and Expenses**.  Plaintiffs' Counsel's attorneys' fees and expenses, as awarded by the Court, shall be paid from the Class Escrow Account immediately upon award by the Court into an escrow account governed by an escrow agreement between Interim Lead Counsel, SSBT and a bank or other institution agreed upon by SSBT and Interim Lead Counsel (the "Interim Lead Counsel Escrow Account"), notwithstanding any appeals of the Settlement or the fee and expense award.  Plaintiffs' Counsel may apply for their fees and expenses and any service awards for Plaintiffs against the entire Class Settlement Amount, but in no event shall more than Ten Million Nine Hundred Thousand Dollars ($10,900,000.00) in fees be paid out of the $60 million portion of the Class Settlement Amount allocated to ERISA Plans, as referenced in paragraph 8(n) above.  In the event that the Effective Date does not occur or SSBT promptly provides written notice representing in good faith that the Effective Date has not and cannot occur due to developments with the DOJ Settlement, DOL Settlement, and/or SEC Settlement and explaining the grounds for the notice,  Plaintiffs' Counsel severally shall be obliged to pay to SSBT all amounts paid to them from the Interim Lead Counsel Escrow Account within fourteen (14) business days.  The prevailing party in any action to collect any amount due under this paragraph shall be entitled to recover interest and all of its costs of collection, including attorneys' fees.  Should the fee and expense award be reduced by the Court or on appeal, all such fees and expenses received by Plaintiffs' Counsel in excess of

8

those that are ultimately approved shall be repaid to the Class Escrow Account, along with interest at the Class Escrow Account rate of interest.

13.   **Stay of Proceedings**.   Upon the execution of this Term Sheet, the Parties shall jointly request that the current proceedings and any litigation deadlines in the Class Actions identified above be suspended and provide the Court with a proposed schedule for effectuating the Settlement.

14.   **Rule 11 Compliance**.   Defendants and Plaintiffs agree that each has complied fully with the Rule 11 of the Federal Rules of Civil Procedure in connection with the commencement, prosecution, defense, and settlement of these Class Actions, and that the proposed final judgment will contain a statement to reflect this compliance.

15.   **Preparation of Final Settlement Documentation**.   The Stipulation of Settlement shall contain such additional terms and conditions as are customary in a federal class action settlement, or as may be necessary or appropriate to effectuate the intentions of the Parties with respect to this Term Sheet; and such additional or amended terms and conditions as may be necessary or appropriate to conclude the DOL Settlement, SEC Settlement, and/or DOJ Settlement and acceptable to the Parties.   To the extent there is any inconsistency between this Term Sheet and the Stipulation of Settlement, the Stipulation of Settlement shall control.   The Parties shall negotiate in good faith to agree upon and execute a final Stipulation of Settlement within fourteen (14) calendar days of executing this Term Sheet (recognizing that formalization of settlements between SSBT and each of the DOJ, DOL and SEC will be necessary before the Stipulation of Settlement can be executed by SSBT).   Plaintiffs shall file the final Stipulation of Settlement and motion for preliminary approval with the Court within two (2) business days after execution.   The Claims Administrator shall cause the required notice under the Class Action

9

Fairness Act of 2005 to be served,  not later than ten (10) calendar days after the Stipulation of Settlement is filed with the Court.

16.    **Termination Provision**.   The termination provision of the Stipulation of Settlement shall provide that SSBT and the Plaintiffs shall have the right to terminate the Settlement by providing written notice of their election to do so ("Termination Notice"), through counsel, to counsel for all other Parties to the Settlement within fourteen (14) calendar days of: (i) the District Court's final refusal to provide preliminary approval of the Settlement in any material respect; (ii) the District Court's refusal to enter the Class Judgment or an alternative judgment acceptable to SSBT with respect to the Settlement; (iii) the date upon which the judgment or alternative judgment is modified or reversed in any material respect by a final order of the United States Court of Appeals, or the Supreme Court of the United States; or (iv) SSBT's failure to fund the Class Settlement Amount.   For the avoidance of doubt, Plaintiffs shall not have the right to terminate the Settlement due to any decision, ruling, or order respecting the attorney's fees or expenses of counsel for the Class, or terms of the Plan of Allocation not specifically addressed in the Stipulation of Settlement.   The Termination Provision shall also provide that SSBT shall also have the right to terminate the Settlement in the event the Settlement Class Termination Threshold (defined below) has been reached.   Simultaneously with the execution of the Stipulation of Settlement, SSBT and Interim Lead Counsel will execute a confidential Supplemental Agreement Regarding Requests for Exclusion (the "Supplemental Agreement").   The Supplemental Agreement shall set forth that SSBT shall have the sole option to terminate the Settlement and render it null and void in the event that requests for exclusion from the Settlement Class are submitted by or with respect to custody or trust customers of SSBT whose Indirect FX Transactions together represent more than an agreed percentage of the total

10

volume of Indirect FX Transactions executed by members of the Settlement Class between January 2, 1998 and December 31, 2009 ("Settlement Class Termination Threshold"). The Parties agree that the District Court's order granting preliminary approval of the Settlement shall require any person or entity requesting exclusion from the Settlement Class to also provide information showing membership in the Settlement Class, and any such request for exclusion that does not provide this information shall be deemed invalid unless State Street (based on its records) informs the Court that such person or entity is  a member of the Settlement Class. The Parties agree to maintain the confidentiality of the Termination Threshold as stated in this Term Sheet and the Supplemental Agreement, which, unless otherwise ordered by the District Court, shall not be filed with the District Court, but may be examined in camera, if so requested by the District Court (unless otherwise required by court rule). The Termination Provision shall also provide that SSBT shall also have the right to terminate the Settlement in the event that settlements with the DOJ, DOL, or SEC, or any of them, on terms disclosed in confidence to counsel for the Class prior to execution of the Settlement Agreement, have not become final and effective. After the Effective Date, SSBT shall have no right to terminate the Class Settlement.

17. **Consequences of Termination**. If the Settlement referred to in this Term Sheet is not approved by the Court, or the Settlement is terminated for any reason, the Term Sheet and/or Stipulation of Settlement shall be a nullity, and none of their terms shall be effective or enforceable, and the Class Settlement Amount, plus any accrued interest and less any taxes and notice-related expenses incurred, shall be returned to the persons or entities paying the same. Additionally, the Parties shall revert to their litigation positions immediately prior to the execution of the Term Sheet and the fact and terms of the Settlement, including this Term Sheet

11

and the proposals, negotiations or agreements leading to or arising from it, shall not be admissible in any trial or otherwise used against any party.

18.    **Confirmatory Discovery**.   The Settlement is not subject to confirmatory discovery.

19.    **Plan of Allocation**.   The Plan of Allocation shall be proposed by Plaintiffs and approved by the Court.   Except for the terms of the Plan of Allocation specifically referred to in the Stipulation of Settlement (including those included in the definition of Plan of Allocation set forth above), which if not finally approved shall be grounds for termination of the Settlement: (i) SSBT will take no position with respect to the proposed Plan of Allocation (or such plan as may be approved by the Court); and (ii) any decision by the Court concerning the Plan of Allocation shall not affect the validity or finality of the proposed Settlement.

20.    **Signing in Counterpart**.   This Term Sheet may be signed in counterpart, with scanned or emailed signatures carrying the same force as originals.

*September 9, 2018*

By: _____
Lawrence A. Sucharow
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Tel.: (212) 907-0700

*For Plaintiff ARTRS, and as Interim Lead
Counsel for the Proposed Class*

By: _____
Michael P. Thornton
THORNTON LAW FIRM LLP
100 Summer Street, 30th Floor
Boston, MA 02110
Tel.: (617) 720-1333

*For Plaintiff ARTRS, and as Liaison Counsel
for the Proposed Class*

By: _____
Daniel P. Chiplock
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Tel.: (212) 355-9500

By: _____
Lynn Lincoln Sarko
KELLER ROHRBACK LLP
1201 3rd Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900

12

and the proposals, negotiations or agreements leading to or arising from it, shall not be admissible in any trial or otherwise used against any party.

18.   **Confirmatory Discovery**.   The Settlement is not subject to confirmatory discovery.

19.   **Plan of Allocation**.   The Plan of Allocation shall be proposed by Plaintiffs and approved by the Court.   Except for the terms of the Plan of Allocation specifically referred to in the Stipulation of Settlement (including those included in the definition of Plan of Allocation set forth above), which if not finally approved shall be grounds for termination of the Settlement: (i) SSBT will take no position with respect to the proposed Plan of Allocation (or such plan as may be approved by the Court); and (ii) any decision by the Court concerning the Plan of Allocation shall not affect the validity or finality of the proposed Settlement.

20.   **Signing in Counterpart**.   This Term Sheet may be signed in counterpart, with scanned or emailed signatures carrying the same force as originals.

By: _____
Lawrence A. Sucharow
LABATON SUCHAROW LLP
140 Broadway
New York, NY  10005
Tel.: (212) 907-0700

*For Plaintiff ARTRS, and as Interim Lead Counsel for the Proposed Class*

By: *Michael P. Thornton*
Michael P. Thornton
THORNTON LAW FIRM LLP
100 Summer Street, 30th Floor
Boston, MA  02110
Tel.: (617) 720-1333

*For Plaintiff ARTRS, and as Liaison Counsel for the Proposed Class*

By: _____
Daniel P. Chiplock
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Tel.: (212) 355-9500

By: _____
Lynn Lincoln Sarko
KELLER ROHRBACK LLP
1201 3rd Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900

12

and the proposals, negotiations or agreements leading to or arising from it, shall not be admissible in any trial or otherwise used against any party.

18.   **Confirmatory Discovery**.   The Settlement is not subject to confirmatory discovery.

19.   **Plan of Allocation**.  The Plan of Allocation shall be proposed by Plaintiffs and approved by the Court.  Except for the terms of the Plan of Allocation specifically referred to in the Stipulation of Settlement (including those included in the definition of Plan of Allocation set forth above), which if not finally approved shall be grounds for termination of the Settlement: (i) SSBT will take no position with respect to the proposed Plan of Allocation (or such plan as may be approved by the Court); and (ii) any decision by the Court concerning the Plan of Allocation shall not affect the validity or finality of the proposed Settlement.

20.   **Signing in Counterpart**.  This Term Sheet may be signed in counterpart, with scanned or emailed signatures carrying the same force as originals.

By: _____
Lawrence A. Sucharow
LABATON SUCHAROW LLP
140 Broadway
New York, NY  10005
Tel.: (212) 907-0700

*For Plaintiff ARTRS, and as Interim Lead Counsel for the Proposed Class*

By: _____
Daniel P. Chiplock
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Tel.: (212) 355-9500

By: _____
Michael P. Thornton
THORNTON LAW FIRM LLP
100 Summer Street, 30th Floor
Boston, MA  02110
Tel.: (617) 720-1333

*For Plaintiff ARTRS, and as Liaison Counsel for the Proposed Class*

By: _____
Lynn Lincoln Sarko
KELLER ROHRBACK LLP
1201 3rd Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900

12

Confidential: Produced Pursuant to Court Order.                                        TLF-SST-050942

*For Plaintiff ARTRS, and as additional Counsel for the Proposed Class*

By: _____
J. Brian McTigue
MCTIGUE LAW LLP
4530 Wisconsin Ave, NW
Suite 300
Washington, DC 20016
Tel.: (202) 364-6900

*For Plaintiffs Arnold Henriquez, Michael T. Cohn, William R. Taylor, and Richard A. Sutherland, and as Counsel for ERISA Plaintiffs*

By: _____
William H. Paine
WILMER CUTLER PICKERING HALE and DORR LLP
60 State Street
Boston, MA  02109
Tel.: (617) 526-6000

*For State Street Bank and Trust Company*

*For Plaintiffs The Andover Companies Employees Savings and Profit Sharing Plan, Alan Kober, and James Pehoushek-Stangeland, and as Counsel for ERISA Plaintiffs*

By: _____
Carl S. Kravitz
ZUCKERMAN SPAEDER LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036-5807
Tel.: (202) 778-1800

*For Plaintiffs Arnold Henriquez, Michael T. Cohn, William R. Taylor, and Richard A. Sutherland, and as Counsel for ERISA Plaintiffs*

13

*For Plaintiff ARTRS, and as additional Counsel for the Proposed Class*

*For Plaintiffs The Andover Companies Employees Savings and Profit Sharing Plan, Alan Kober, and James Pehoushek-Stangeland, and as Counsel for ERISA Plaintiffs*

By: _____

J. Brian McTigue
MCTIGUE LAW LLP
4530 Wisconsin Ave, NW
Suite 300
Washington, DC 20016
Tel.: (202) 364-6900

By: _Carl S. Kravitz_

Carl S. Kravitz
ZUCKERMAN SPAEDER LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036-5807
Tel.: (202) 778-1800

*For Plaintiffs Arnold Henriquez, Michael T. Cohn, William R. Taylor, and Richard A. Sutherland, and as Counsel for ERISA Plaintiffs*

*For Plaintiffs Arnold Henriquez, Michael T. Cohn, William R. Taylor, and Richard A. Sutherland, and as Counsel for ERISA Plaintiffs*

By: _William H. Paine_ 9/11/15

William H. Paine
WILMER CUTLER PICKERING HALE and DORR LLP
60 State Street
Boston, MA 02109
Tel.: (617) 526-6000

*For State Street Bank and Trust Company*

13

Confidential: Produced Pursuant to Court Order.

TLF-SST-050944

# EXHIBIT 23

| | |
|---|---|
| **From:** | Halston, Daniel <Daniel.Halston@wilmerhale.com> |
| **Sent:** | Friday, February 1, 2013 6:16 PM |
| **To:** | Michael Lesser; Goldsmith, David (dgoldsmith@labaton.com) |
| **Cc:** | Mitchell, Nolan J; Hornstine, Adam |
| **Subject:** | FW: Henriquez v. State Street, No. 11-cv-12049; Andover Cos. v. State Street, No. 12-cv-11698 |
| **Attachments:** | 02.01.2013 Ltr to Mr. Bostwick.PDF |

---

**From:** Mitchell, Nolan J
**Sent:** Friday, February 01, 2013 2:51 PM
**To:** Bostwick, Dwight P.
**Cc:** 'Laura Gerber' (lgerber@KellerRohrback.com); lsarko@kellerrohrback.com; Brian McTigue (bmctigue@mctiguelaw.com); Halston, Daniel
**Subject:** Henriquez v. State Street¸ No. 11-cv-12049; Andover Cos. v. State Street, No. 12-cv-11698

Dwight,

Attached please find correspondence in the matters referenced above, which was sent to you today along with a production disk.  The password for the disk is: **gh&$T!cv**.

Have a great weekend.  Best,

Nolan

**Nolan Mitchell | WilmerHale**
60 State Street
Boston, MA 02109 USA
+1 617 526 6088 (t)
+1 617 526 5000 (f)
nolan.mitchell@wilmerhale.com

**Please consider the environment before printing this email.**

This email message and any attachments are being sent by Wilmer Cutler Pickering Hale and Dorr LLP, are confidential, and may be privileged. If you are not the intended recipient, please notify us immediately—by replying to this message or by sending an email to postmaster@wilmerhale.com—and destroy all copies of this message and any attachments. Thank you.

For more information about WilmerHale, please visit us at http://www.wilmerhale.com.

WILMERHALE

**Nolan Mitchell**

+1 617 526 6088(t)
+1 617 526 5000(f)
nolan.mitchell@wilmerhale.com

February 1, 2013

**By E-mail and Federal Express**

Dwight Bostwick, Esq.
Zuckerman Spaeder LLP
1800 M Street, NW
Suite 1000
Washington DC 20036-5802

> Re: *Henriquez v. State Street Bank and Trust Co.*, No. 11-cv-12049 (D. Mass.); *Andover Cos. Emp. Sav. & Profit Sharing Plan v. State Street Bank & Trust Co.*, No. 12-cv-11698 (D. Mass.)

Dear Dwight:

Enclosed please find a disk containing documents responsive to certain requests made by the ERISA plaintiffs, which State Street Bank & Trust Co. ("State Street") has agreed to provide as set forth in the parties' exchange of emails on January 29, 2013 (the "Agreed-Upon Requests"). As we agreed, State Street is providing, on a rolling basis, documents that are responsive to the Agreed-Upon Requests to the extent such documents are readily-identifiable in the materials produced to the ERISA plaintiffs on December 21, 2012 (the "California Production").

Today's production includes the following:

- A sample of Investment Manager Guides ("IM Guides") published during the putative class periods that State Street has identified in the California Production. *See* StateSt_CA_LIT 00336552 – 003366681, StateSt_CA_LIT 00488530 – 00488696, StateSt_CA_LIT 00962678 – 00962807, StateSt_CA_LIT 00989428 – 00989632, StateSt_CA_LIT 01940172 – 01940434, StateSt_CA_LIT 02175580 – 02175715, StateSt_CA_LIT 05073727 – 05073934. The California Production contains other IM Guides, in addition to the sample provided on the enclosed disk, including, but not limited to, documents Bates numbered SST_LIT 5186 – 5317, SST_LIT 5449 – 5710, SST_LIT 5842 – 5972, SST_LIT 7752 – 11405, and SS_CAL_E 38038 – 45142.

- Documents reflecting State Street's policies and procedures regarding foreign exchange trading that State Street has identified in the California Production. *See* SS_CAL 00005 – 00532, SS_CAL 06210 – 06247, SS_CAL 06210 – 06247, SS_CAL 06691 – 07007. There may be additional documents reflecting State Street's foreign exchange policies

*Confidential*

Dwight Bostwick, Esq.
February 1, 2013
Page 2

WILMERHALE

and procedures, including emails, in the California Production that State Street has been
unable to readily identify.

- Organizational charts for the State Street Global Markets division of State Street
  ("SSGM") covering the period 2006 through 2012. *See* SS_MA_LIT 00000232 –
  00000288. We are producing these separately as an accommodation to the plaintiffs
  because State Street was unable to readily locate SSGM organizational charts in the
  California Production.[1]

State Street's efforts to respond to the Agreed-Upon Requests are ongoing. Please let me know
if you have any questions.

Sincerely,

Nolan Mitchell

Cc:     Laura R. Gerber, Esq. (w/encls.)
        Lynn Sarko (via email; w/o encls.)
        Keller Rohrback LLP
        1201 Third Ave., Ste. 3200
        Seattle, WA98101-3052

        Brian McTigue, Esq. (via email; w/o encls.)
        McTigue Law LLP
        4530 Wisconsin Ave., NW
        Suite 300
        Washington, DC 20016

---

[1] These materials are being produced subject to the protective order entered on November 19,
2012 in the matters captioned above.

# EXHIBIT 24

| From: | Michael Lesser |
|---|---|
| Sent: | Sunday, August 30, 2015 1:17 PM |
| To: | Michael Thornton |
| Cc: | Garrett Bradley; Evan Hoffman |
| Subject: | Re: State Street |

I think that 14 would have been our share of the fee, making some assumptions, and not the actual size of our lodestar.

> On Aug 30, 2015, at 12:44 PM, Michael Thornton <MThornton@tenlaw.com> wrote:
>
> Thank you for the tip Dan. I did say something like that on the call, but preceded it by saying it was a guess and that I would have to ask Mike Lesser for the actual figure at that point which of course is not complete as with the other firms. I appreciate your concern and I guess I can only assure you that it generally our policy to truthful and accurate hour claims.
>
>  Original Message
> From: Chiplock, Daniel P.
> Sent: Sunday, August 30, 2015 12:24 PM
> To: Garrett Bradley
> Cc: Lieff, Robert L.; Michael Thornton; rlieff@lieff.com
> Subject: RE: State Street
>
> No problem. It may be tomorrow since I have to go back to archives.
>
> In the meantime, while we're on the subject of credibility, I want to point out that we need to be consistent and credible with our lodestar reporting in State Street. We are gathering final lodestar reports now, but I heard third-hand that Mike recently said on a call (that I wasn't on) that Thornton Law Firm was showing $14 million. That number does not comport with the hours Mike Lesser told me for Thornton as of June 29 (around 12,750), which make more sense given what we know about the work that was done. I am hopeful Mike T. simply misspoke or was guessing when he said $14 million and that we are not going to suddenly see an additional 12,000 hours mysteriously appear on Thornton Law Firm's behalf. I would expect that you would object if LCHB or Labaton tried something like that, and ERISA counsel certainly will (and tie up this process as long as possible) if they suspect anything remotely amiss on that front. Let's not make problems for ourselves that we don't need. Also recognize that your reviewers were all housed outside of your firm and their respective overhead and facilities expenses were paid for by others, which we were happy to do as a courtesy. Thanks.
>
> -----Original Message-----
> From: Garrett Bradley [mailto:GBradley@tenlaw.com]
> Sent: Sunday, August 30, 2015 10:43 AM
> To: Chiplock, Daniel P.
> Cc: Lieff, Robert L.; Michael Thornton; rlieff@lieff.com
> Subject: Re: State Street
>
> That would be helpful thank you.
>
> Garrett
>
>> On Aug 30, 2015, at 10:30 AM, Chiplock, Daniel P. <DCHIPLOCK@lchb.com> wrote:

Confidential: Produced Pursuant to Court Order.     TLF-SST-038587

>>

>> I don't look past that point, Garrett. But you need to also recognize that you are only in the BNYM class case because of us.

>>

>> I guess I'll gather the emails etc concerning the assignments that were given to your firm. As if that's going to change your position.

>>

>> Sent from my iPhone

>>

>> On Aug 30, 2015, at 10:19 AM, Garrett Bradley <GBradley@tenlaw.com<mailto:GBradley@tenlaw.com>> wrote:

>>

>> Dan,

>>

>> Thanks for the email. I think we will have to agree to disagree as you keep looking past the fact that but for Mike Thornton you would not be in the state street case just like Labaton is not in BONY.

>>

>> Can you clarify what you mean by we did not "get the work done" as you indicated. That has never been specified and really should be to be deemed credible. Thanks.

>>

>> Garrett

>>

>> On Aug 30, 2015, at 9:04 AM, Chiplock, Daniel P. <DCHIPLOCK@lchb.com<mailto:DCHIPLOCK@lchb.com>> wrote:

>>

>> Garrett,

>>

>> Thanks for your email and I actually think it's useful so that Mike and Bob can participate in this.

>>

>> This idea of "protection" in BNYM is where I think we keep talking past each other. The bottom line is that LCHB is the least protected of all in that case. This is the fact that has kept me up at night for 2.5 years while we've continued pouring lodestar into that case (because we had to). We invested the most in order to try to get a class certified there and to sufficiently man 110 depositions, defend counterclaims, etc., but if Judge Kaplan takes a negative view of the value of document review/analysis (our arguments to the contrary notwithstanding), then LCHB will get hit the hardest. You are totally shielded from this because you didn't invest in document review. In other words, LCHB has a real risk of actually losing money in BNYM. You have virtually no risk of that. If Thornton is not treated "fairly" in BNYM by the Court it will be because nobody (least of all LCHB) was treated "fairly." It's not clear to me what it is you expect in that circumstance.

>>

>> The $10 million in State Street that you mention below also does not make up for LCHB's investment in that case. And we've certainly contributed our share to the result in State Street, having litigated BNYM (thus substantially increasing the value of State Street) and developed the ch. 93A theory (the most readily certifiable claim in State Street, and by far the most valuable).

>>

>> Dan

>>

>> From: Garrett Bradley [mailto:GBradley@tenlaw.com]

>> Sent: Friday, August 28, 2015 3:01 PM

>> To: Chiplock, Daniel P.

>> Cc: Lieff, Robert L.; Michael Thornton; rlieff@lieff.com<mailto:rlieff@lieff.com>

>> Subject: Re: State Street

>>

>> Dan,

>>

2

Confidential: Produced Pursuant to Court Order.

>> I tried to call you but you are out. I think these things are best discussed rather than emailed so please call my cell when you can 6174134892 as I do not have yours.

>>

>> However a few points. I do not dismiss your efforts in Mellon but your guaranteed percentage was established years prior to a Mellon result. What I am pointing out is the inequities of our different positions. In Mellon, when we had created that case by developing the fx case all that we got was some work that resulted in $1.5 million in time. Also please elaborate on your statement that "the work was not getting done".

>>

>> Now contrast that to state street where you had no client and no concept (and Mellon was years from setting) and Mike Thornton demands that you get a floor of 20% which is probably worth about $10 million.

>>

>> You must agree you are in a much better position in state street than we are in Mellon. As I have said to Bob, we are only looking for a fair outcome in these matters. I think you would agree we have protected you better in state street than we are protected in Mellon. Once we have an idea of what our Mellon number looks like then we can discuss how to approach the balance of the 40% with Labaton .

>>

>> Garrett

>>

>> On Aug 28, 2015, at 2:34 PM, Chiplock, Daniel P. <DCHIPLOCK@lchb.com<mailto:DCHIPLOCK@lchb.com>> wrote:
>> Garrett,

>>

>> I know you didn't really mean to diminish LCHB's role in creating the result in BNY Mellon, at extraordinary risk to itself, which in turn doubled the value of State Street. You need to know that we advocated for you guys too, getting you a role in the BNYM class case (and pushing back against several co-counsel in the process) when you weren't actually owed one. I also gave your firm more assignments than others at the outset in BNYM, until it became clear that the work simply wasn't getting done. In other words, we've each tried to look out for the other in the past. This has been far from a one-way street.

>>

>> As you know, Judge Kaplan controls everyone's fate in BNYM and LCHB has the most risk before him, having invested the most. We asked for a multiplier for your firm that is much larger than anyone else's, and I really, truly hope that he grants that request.

>>

>> Thanks,

>>

>> Dan

>>

>> From: Garrett Bradley [mailto:GBradley@tenlaw.com]
>> Sent: Friday, August 28, 2015 2:18 PM
>> To: Lieff, Robert L.
>> Cc: Michael Thornton; Chiplock, Daniel P.; rlieff@lieff.com<mailto:rlieff@lieff.com>
>> Subject: Re: State Street

>>

>> Bob,

>> I am driving but took a quick look at your email and pulled over to type this. I think you are misunderstood. I have not agreed that it would be equitable to split the balance of the forty percent the way you described below. What I have said is that may be a fair approach depending on the outcome of our fee in the Mellon matter. If we are treated fairly there, then we will do all we can to treat you fairly in the state street matter. As I have said before, because of Mike Thornton's advocacy, you are guaranteed at least 20% of the State Street case in which you have no client and did not develop the concept. Yet, we have no corresponding protection in the Mellon matter. Happy to discuss further at any time.

>>

>> Garrett

3

Confidential: Produced Pursuant to Court Order.          TLF-SST-038589

>>

>> On Aug 28, 2015, at 2:05 PM, Lieff, Robert L. <RLIEFF@lchb.com<mailto:RLIEFF@lchb.com>> wrote:

>> Garrett,

>>

>> I called and suggested that we have a meeting together with the Labaton people to talk about putting in writing an understanding of the fee division in this case.

>>

>> You, Mike and I have discussed the State Street fee division and have focused on the existing verbal understanding that was reached on November 9, 2010, with Chris Keller. We agreed that among the three firms we will each have a 20% interest in the fee with the balance to be divided later. Of course, we also have to factor in the 9% that ERISA counsel get pursuant to written agreement and a provision for Arkansas local counsel.

>>

>> You and I have agreed that it would be equitable to divide the balance of the fee with Labaton getting 50% and each of our firms 25%. This would result in a fee division as follows:

>>

>> Labaton 33.0 (20 + 13)

>> Thornton 26.5 (20 + 6.5)

>> Lieff Cabraser 26.5 (20 + 6.5)

>> ERISA 9.0

>> Arkansas Local 5.0

>> 100.0%

>>

>> If we put the above into an agreement among the three firms, that would certainly provide protection for everyone.

>>

>> Bob

>>

>> <image001.gif>

>>

>> Robert L. Lieff

>> Of Counsel

>> rlieff@lchb.com<mailto:rlieff@lchb.com>

>> t 415.956.1000

>> f 415.956.1008

>> Lieff Cabraser Heimann & Bernstein, LLP

>> 275 Battery Street, 29th Floor

>> San Francisco, CA 94111-3339

>> www.lieffcabraser.com<http://www.lieffcabraser.com>

>>

>>

>>

>>

>>

>>

>> This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.

>> This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by the attorney-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error; please immediately notify us by telephone at (800) 431-4600. You will be reimbursed for reasonable costs incurred in notifying us.

4

Confidential: Produced Pursuant to Court Order.

>>
>>
>> This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.
>> This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by the attorney-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error; please immediately notify us by telephone at (800) 431-4600. You will be reimbursed for reasonable costs incurred in notifying us.
>>
>>
>> This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.
>> This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by the attorney-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error; please immediately notify us by telephone at (800) 431-4600. You will be reimbursed for reasonable costs incurred in notifying us.
>>
>>
>> This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.
> This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by the attorney-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error; please immediately notify us by telephone at (800) 431-4600. You will be reimbursed for reasonable costs incurred in notifying us.
>
>
> This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.

5

Confidential: Produced Pursuant to Court Order.

# EXHIBIT 25

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

## DECLARATION OF MICHAEL LESSER IN SUPPORT OF
## THORNTON LAW FIRM LLP'S OBJECTIONS TO
## THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS

4822-8472-6635.2

I, Michael Lesser, hereby declare as follows:

1.      I am a partner at the Thornton Law Firm.

2.      I submit this declaration in support of the Thornton Law Firm LLP's Objections to the Special Master's Report and Recommendations.  I have personal knowledge of the facts set forth in this declaration.

3.      Attached as exhibit 20 is a true and correct copy of an email I sent on June 11, 2015.

4.      Attached as exhibit 23 is a true and accurate copy of an email I received on February 1, 2013.


Signed under the penalties of perjury this 18 day of June, 2018.

Michael Lesser