UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ARKANSAS TEACHER RETIREMENT SYSTEM,
on behalf of itself and all others
similarly situated,

        Plaintiff,

                               No. 11-cv-10230-MLW

vs.

STATE STREET BANK AND TRUST COMPANY,

        Defendant.
_____/

ARNOLD HENRIQUEZ, MICHAEL T. COHN,
WILLIAM R. TAYLOR, RICHARD A.
SUTHERLAND, and those similarly situated,

        Plaintiffs,

                               No. 11-cv-12049-MLW

vs.

STATE STREET BANK AND TRUST COMPANY,

        Defendant.
_____/

THE ANDOVER COMPANIES EMPLOYEE
SAVINGS AND PROFIT SHARING PLAN, on
behalf of itself, and JAMES PEHOUSHEK-
STANGELAND and all others similarly situated,

        Plaintiffs,

                               No. 12-cv-11698-MLW

vs.

STATE STREET BANK AND TRUST COMPANY,

        Defendant.
_____/

**SPECIAL MASTER'S MEMORANDUM IN SUPPORT OF HIS SUPPLEMENT TO
HIS REPORT AND PROPOSED PARTIAL RESOLUTION OF ISSUES FOR
THE COURT'S CONSIDERATION**

On October 10, 2018, the Special Master filed a Supplement to his Report &

Recommendations and Proposed Partial Resolution of Issues for the Court's Consideration ("the

Proposed Partial Resolution"). Dkt. # 485. The Proposed Partial Resolution described a two-part

agreement. The first part described the terms of an agreement between the Special Master and

Labaton Sucharow, LLP ("Labaton") resolving Labaton's Objections to the Master's Report and

Recommendations dated June 28, 2018 ("Labaton's Objections"). *See* Dkt. # 359. The second

part described the terms of an agreement between the Special Master, Labaton, and the ERISA

Firms[1] resolving the ERISA Firms' exceptions to Labaton's objections and the Master's

recommendation that the ERISA Firms receive additional money reallocated from Labaton's

share of the total attorneys' fee award. *See* Dkt. # 387; Dkt. # 398; Dkt. # 392.

After a hearing on October 15, 2018, which addressed, among other things, the Proposed

Partial Resolution, the Court issued an order on October 16, 2018 directing the Special Master,

Labaton, and ERISA Firms to each submit memorandum in support of the Proposed Partial

Resolution. Dkt. # 494.

## I.      Relevant Background

The complete factual history of this case, which sets the stage for the Proposed Partial

Resolution, is set forth in great detail in the Special Master's Report and Recommendations, filed

under seal on May 14, 2018. *See* Dkt. # 357, pp. 8-137. While the parties have engaged in

considerable collateral litigation after the filing of the Report, the pertinent events are as follows:

After the Master filed the Report under seal, the parties engaged in lengthy litigation over

the appropriate redactions to the Report and the 266 accompanying exhibits. The Court resolved

these issues and unsealed the Report on June 28, 2018. On June 28 & 29, 2018, the Customer

---

[1] Unless otherwise specified, ERISA Firms is used herein to refer to Keller Rohrback L.L.P., McTigue Law LLP, and Zuckerman Spaeder LLP.

Class firms (Labaton, Lieff Cabraser Heimann & Bernstein, and the Thornton Law Firm) filed their respective objections to the Report. Shortly thereafter, on July 10, 12 & 19, 2018, the ERISA Firms filed exceptions to Labaton's Objections.

Labaton's objections to the Report were voluminous, consisting of at least fifteen specific legal objections in an 85-page filing.  Among those objections, Labaton strenuously objected to the Special Master's recommendation that it pay one-third of the total overstated lodestar ($4,058,000.00), or $1,352, 666.67 resulting from Customer Class Counsel's double-counting of certain staff attorney hours. *See* Dkt. # 357, pp. 81-83. Labaton took further exception to the Master's conclusion that its payment to Chargois did not strictly comply with the Massachusetts Rules of Professional Conduct, should have been disclosed to the Court, the client, the class, and co-counsel, and constituted an impermissible finder's fee. *See id.,* pp. 25-78. Labaton specifically challenged the Master's conclusion that it owed the ERISA Firms a contractual – or other legal – duty, and that its failure to meet that duty required it to reallocate a portion of its fee award to the ERISA Firms. *See id.,* pp. 78-81. Accordingly, Labaton contested all of the Special Master's proposed remedies, namely, a recommendation to reimburse the class one-third of the double-counted time, to disgorge the $4.1 million payment to Chargois, and to retain an outside consultant to ensure ethical compliance moving forward. *See id.*, pp. 81-84.

The ERISA Firms largely objected to Labaton's position that it owed no duty to inform the ERISA Firms about the payment to Chargois, that disclosure would have been immaterial, and thus, that the ERISA Firms were not entitled to additional compensation from Labaton. Suffice it to say that, after all the objections were filed, Labaton and the ERISA Firms, and Labaton and the Special Master, were seriously at odds.

3

In early August 2018, Labaton contacted the Special Master to open discussions about a possible resolution. Over the next two months, the Special Master, his counsel, and Labaton engaged in comprehensive discussions to try and reach a full resolution of the issues pertaining to Labaton. An essential component of those discussions was to resolve the dispute between Labaton and the ERISA Firms concerning the Special Master's rationale and recommendation that Labaton reallocate $3.4 million to the ERISA Firms. The Special Master negotiated with each party separately, and Labaton, the ERISA Firms, and the Special Master ultimately agreed on the terms memorialized in the Proposed Partial Resolution (Dkt. # 485).[2]

## II. The Proposed Partial Resolution is fair, reasonable, and adequate to protect the class on whose behalf the complaints were brought.

   a. The First Circuit heavily favors early resolution of litigation to preserve judicial resources and effectuate the intent of the parties consistent with the best interests of the class.

"Settlement agreements enjoy great favor with the courts 'as a preferred alternative to costly, time-consuming litigation.'" *Fidelity and Guar. Ins. Co. v. Star Equipment Corp.* 541 F.3d 1, 5 (1st Cir. 2008) (*quoting Mathewson Corp. v. Allied Marine Indust., Inc.*, 827 F.2d 850, 852 (1st Cir.1987)). This is true in the First Circuit, where early resolution is strongly preferred. *Puerto Rico Dairy Farmers Ass'n v. Pagan*, 748 F.3d 13, 20 (1st Cir. 2014); *Durrett v. Housing Authority of City of Providence*, 896 F.2d 600, 604 (1st Cir. 1990). This is not an aspirational goal, but a practice firmly in place. Courts in this circuit have held that it is not just a favored practice but *the duty* of the Court and counsel alike to explore voluntary resolution of matters where possible.  *See Aggregates (Carolina), Inc. v. Kruse*, 134 F.R.D. 23, 27 (D.P.R. 1991). This is particularly true in complex class action cases where Courts balance the importance of

---

[2] The Special Master also negotiated with the Lieff and Thornton firms, but was not able to come to resolution with those firms.

ensuring that a settlement meets Rule 23(e)'s standard of fairness, reasonableness, and adequacy with the strong policy favoring resolution. *See, e.g., In re Tyco Intern., Ltd. Multidistrict Litigation*, 535 F.Supp.2d 249, 259 (D.N.H. 2007); *In re First Commodity Corp. of Boston Customer Account Litigation*, 119 F.R.D. 301, 313 (D. Mass. 1987) (*citing to Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d. Cir. 1982)); *Hill v. State Street Corp.*, 2015 WL 127728, at *6 (D. Mass. 2015); *In re Relafen Antitrust Litigation*, 231 F.R.D. 52, 68 (D. Mass. 2005). Among the many benefits of early resolution is the conservation of scarce judicial resources. *See Lycos, Inc. v. Blockbuster, Inc.*, 2010 WL 5437226, at *3 (D.Mass. 2010).

Offsetting the judiciary's preference for settlement is a competing obligation to act as a fiduciary to the class in awarding attorneys' fees in class action contexts. *See, e.g., Bezdek v. Vibram USA Inc.*, 79 F.Supp.3d 324, 343 (D. Mass. 2015). This can only be done if the class stands to substantially benefit from the resolution, and such a resolution is fair given the alternatives of proceeding with litigation. The Special Master reiterates the finding in his Report and Recommendations that $300 million was an excellent result for the class given the risks and significant legal obstacles facing the class. Furthermore, putting aside the issues that have come to light during the course of the Special Master's investigation, the parties, the Special Master, and the Court have all recognized that counsel prosecuting this case on behalf of the class fought a long and difficult battle, worthy of a substantial fee that reflects a reasonable lodestar.[3] *See* Dkt. # 357, pp. 29-34.

---

[3] The issue has been raised as to whether the $300 million settlement amount should be considered as a "mega-fund," and all attorneys' fees derived from the settlement calculated using a lesser percentage than the traditional range of 20-30% frequently applied by the courts in the First Circuit, because the total settlement exceeds $100 million. In awarding attorneys' fees in mega-fund cases, several courts have adopted a practice of lowering the fee award percentage to avoid giving attorneys a windfall at the plaintiffs' expense. *See e.g., In re Neurontin Marketing and Sales Practices Litigation*, 58 F.Supp.3d 167, 170 (D. Mass. 2014); *In re Bluetooth Headset Productions Liability Litigation*, 654 F.3d 935, 942 (9th Cir. 2011) ("where awarding 25% of a 'mega-fund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead."); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005);

There is no doubt that the posture of this case, which stems from a class action for which the Court approved settlement in 2016, renders the application of these standards unique in this instance. Here, the Proposed Partial Resolution – even though partial – balances these well-recognized goals of substantive fairness and conservation of judicial resources. First and foremost, it is fair to the class. Under the Proposed Partial Resolution, the class stands to gain the same amount the Special Master recommended be returned to it – no reduction was recommended in the Proposed Resolution from two amounts recommended in the Special Master's Report and Recommendations. And, given the lengthy history of this case, it is preferable to resolve a substantial number of the disputed areas in this case rather than continue down the road of drawn-out, trench warfare litigation in this post-Report stage. Second, the resolution of the issues pertaining to Labaton and ERISA significantly narrows the scope of the remaining issues to which the Special Master must respond – lessening the need for judicial decision-making on secondary and collateral issues moving forward. Moreover, Labaton has agreed to withdraw all pending motions and waived its right to appeal from the entrance of the Proposed Partial Resolution, further conserving the Court's resources and expediting resolution of the case in this Court and the appellate courts.

Beyond furthering these important policy objections, no doubt an essential place to begin, the reasonableness and fairness of the Proposed Partial Resolution can be viewed through two separate, but related, frameworks: (i) monetary award to the class; and (ii) Fed. R. Civ. P. 23(e).

---

*Carlson v. Xerox Corp.*, 596 F.Supp.2d 400 (D.Conn. 2009); *In re Citigroup Inc. Bong Litigation*, 988 F.Supp.2d 371 (S.D.N.Y. 2013). There is no blackletter law, however, that attorneys' fees calculated in large settlements be capped at less than 20%, only a firm desire to prevent an attorney windfall in these cases. As the collective lodestar multiplier in the State Street case was calculated at approximately 2.0 (after adjustment for the double counting error), and did not, on its face, confer a windfall on the attorneys, the Special Master declined to automatically reduce the percentage of the fee consistent with previous treatment of mega-fund cases. The percentage of fund is, of course, only a starting point in the Court's calculation of an appropriate fee award, and the Court should consider the entirety of the circumstances surrounding a fee petition.

First, if approved by the Court, the class stands to receive *at least* an equal financial benefit under the Proposed Partial Resolution – slightly more than $2 million directly from Labaton – as that recommended by the Special Master in his Report and Recommendations.[4] Second, the Proposed Partial Resolution furthers the fundamental protections embodied in Federal Rule of Civil Procedure 23(e) requiring that settlement of a class action be fair, reasonable, and adequate. Finally, as is the case under Rule 23(e), the consistency between the Proposed Partial Resolution and the findings and conclusions expressed by the Special Master in his Report and Recommendations shows the Resolution was the product of an arm's length negotiation between the Special Master, on the one hand, and Labaton and, then separately, the ERISA Firms, on the other.

      b.  <u>The Proposed Partial Resolution confers a significant benefit upon the individuals on whose behalf the State Street case was brought, the class.</u>

Throughout the various twists and turns in this case – and, most recently, the investigation into the conduct of the attorneys who prosecuted the case – the Special Master's focus has remained, as it should, on the class members on whose behalf the case was brought. With that goal in mind, an important benchmark is evaluating how the Proposed Partial Resolution affects the total settlement fund owed to the class.

It is critical to the Special Master that the class receive the same benefit it would have had the objections raised by Labaton and ERISA stayed the normal course. Here, the Proposed Partial Resolution confers a significant benefit upon the class. Under its terms, Labaton must return to the class the same amount as was previously recommended in the Report and Recommendations – $2,052,666.67.

---

[4] The Special Maser recommended that additional funds be paid to the class by the non-settling firms, Lieff and Thornton. These recommendations will be among the subjects of the remaining litigation with those law firms.

As the court correctly observed, in addition to ensuring the class's interests are protected, the Court also has a duty to protect the administration and integrity of the justice system. Beyond the financial benefit to this class, the Special Master also recognizes the long-term and broad benefit to future classes which will be achieved through Labaton's institutional reforms and prohibitions on certain fee division practices that, while common to the industry, are ripe for nondisclosures that obscure the fee award process, which will greatly benefit institutional investors across the country who rely on sophisticated plaintiffs' class action firms to litigate on their behalf. These reforms include prohibiting bare referral payments in the future and disallowing any firm other than Labaton from including the hours worked by Labaton's staff attorneys.

      c.   <u>The Proposed Partial Resolution satisfies the applicable factors considered under Rule 23(e), as applied to a post-settlement context</u>.

While the requested approval of the Proposed Partial Resolution does not fit squarely within the Rule 23(e) framework, it is, however, the final thread of a complex class action case litigated on behalf of an absentee class. Throughout this negotiation process, the Special Master has not lost sight of the origins of this investigation in the larger State Street case. At this juncture – where a laudable settlement in the underlying case has been reached but an investigation into the proper award of attorneys' fees remains ongoing – the Court is again called-on to scrutinize the agreement between the Special Master, Labaton, and the ERISA Firms, and discharge its fiduciary duties to decide whether the Proposed Partial Resolution addressing fees to class counsel is fair, reasonable, and adequate to address past shortcomings of counsel and further the best interests of the class. Thus, the Proposed Partial Resolution must be consistent with the important benchmarks written into Rule 23(e).

Drawing from Rule 23(e), which also addresses the approval of attorneys' fees, the following factors emerge as relevant and reliable benchmarks of fairness and reasonableness as to approval of the terms in the Proposed Partial Resolution: (1) the impact on the class; (2) whether parties to the Proposed Partial Resolution are treated differently, and to the extent they are, the reasonableness of the different treatment; (3) whether the amount of attorneys' fees was negotiated after and separate from the amount of proposed settlement for the class members; (4) counsel's recommendations; (5) the failure of class members to object; and, (6) whether negotiations for a resolution were conducted at arm's length and without collusion. *See M. Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.*, 671 F.Supp. 819, 822-823 (D. Mass. 1987); *Disability Law Center v. Massachusetts Dept. of Correction*, 960 F.Supp.2d 271, 280-282 (D.Mass. 2012); *National Ass'n of Chain Drug Stores v. New England Carpenters Health Benefit Fund*, (582 F.3d 30, 44 (1st Cir. 2009).

On balance, each of these factors supports the approval of the Proposed Partial Resolution. First, the Proposed Partial Resolution adequately protects the class while imposing sufficiently tailored redress on the firms that failed to meet best practices to fully disclose information necessary for the Court to accurately award attorneys' fees. As described above, the Proposed Partial Resolution directs payment of a considerable amount of money back into the settlement fund – the same amount as recommended in the Report and Recommendations. Looking beyond the class, the Proposed Partial Resolution yields starkly different results for Labaton and the ERISA Firms. Disparate treatment, however, is appropriate in this instance to adequately resolve the objections that, in and of themselves, reflect the different roles played by Labaton, on the one hand, and the ERISA Firms, on the other.

The main areas in which the Special Master found it appropriate to impose remedies for Labaton involved its central role in the double counting and in the nondisclosure of its preexisting obligation to pay Damon Chargois, pursuant to what is referred to as the Chargois Arrangement. As described in detail below, Labaton now acknowledges that it was responsible for not disclosing the Chargois Arrangement to the Court and the class, as well as for withholding critical details from co-counsel.  The Proposed Partial Resolution, therefore, is geared largely toward addressing Labaton's past shortcomings and nondisclosures.

By contrast, neither the double counting nor the nondisclosure of Chargois implicate the ERISA Firms. There is no dispute to the positions that the ERISA Firms did not submit an overstated lodestar and did not contribute to the double counting error. *See* 10/11/16 Goldsmith Letter, Dkt. # 116, p. 2, n. 3. Indeed, the ERISA Firms' principal exception to Labaton's objections centered around the ERISA Firms' collective belief that, had they known about the Chargois Arrangement, they would have approached the fee petition differently, including sharing that information with their clients and the Department of Labor, and possibly filing a separate fee petition. *See* Dkt. # 387, pp. 2-4; Dkt. # 392, p. 4; Dkt. # 398, pp. 1-2. Because the ERISA Firms have been dragged into this investigation through no fault of their own, and were deliberately not told about Chargois, Labaton has agreed to pay the ERISA Firms an additional $2.75 million beyond the $7.5 million anticipated in their own fee arrangement that was originally approved by the Court. Counsel for Labaton and the ERISA Firms all agree that this result is fair and reasonable.

Turning to the interplay between the Proposed Partial Resolution and the underlying State Street case, it is clear from the tortured history of this case that the resolution of issues concerning the Master's recommendation for adjustments to the fee award has not had, nor will it have, any bearing on the excellent result achieved for the class in the underlying case. To begin,

the negotiation of the Proposed Partial Resolution was conducted entirely separate from the settlement for the class. The Court approved the settlement award in November 2016, four months before it appointed the Special Master to investigate issues concerning the attorneys' fee award. The issues addressed by the Proposed Partial Resolution were first articulated by the Special Master in his Report and Recommendations on May 14, 2018. The Report, in turn, sparked numerous objections from the Law Firms, but it was not until August 2018 that discussions with the Special Master about resolving those issues began. In short, negotiation of the Proposed Partial Resolution was conducted well after the Law Firms negotiated the $300 million settlement with State Street, and, if approved by the Court, will take effect a full two years after the underlying case was resolved. The Proposed Partial Resolution has not impacted that $300 million settlement in any material way – positive or negative.

Finally, while there have been some initial concerns raised by the Competitive Enterprise Institute[5], no class members have objected to the Proposed Partial Resolution, which was filed publicly on October 10, 2018. The Special Master defers to the Court on whether it deems necessary a separate notice to the class describing the Proposed Resolution and its effects, but the failure of class members to object is a significant factor that the Court should consider in weighing the fairness of the Resolution.

---

[5] At the October 15, 2018 hearing, Theodore Frank of the Competitive Enterprise Institute raised some general concerns about proceeding with a partial resolution and the impact it may have on the class. *See* 10/15/18 Hearing Tr. pp. 53:9-55:5; 56:6-19. Mr. Frank raised, for example, the possibility that the Proposed Partial Resolution could lead to an increase in litigation arising from disputes among and between class counsel and the Court regarding the Resolution itself, and the level of culpability ascribed to Labaton under the terms of the Resolution. See 10/15/18 Hearing Tr. p. 54: 3-14. These concerns are largely dispelled by the bar order, proposed under the Resolution, against claims brought by the Lieff and Thornton firms against Labaton for indemnification or contribution, addressed further herein. Moreover, any implications by Mr. Frank that the Special Master has abandoned his objective role to favor class counsel's interests are wholly unfounded, as described in detail below. *See* 10/15/18 Hearing Tr. pp. 54: 19-22; 55: 10-20; 56: 6-12.

**III.    The Proposed Partial Resolution is the product of an arm's length negotiation by the Settling Parties and is consistent with the Special Master's legal conclusions and recommendations in his Report and Recommendations.**

To be sure, the Proposed Partial Resolution strikes a different tone than the Report and Recommendations, and it does so for good reason. For the first time during the Master's investigation, Labaton has acknowledged that it acted deficiently in preparing and submitting the fee petition in the State Street case and, in doing so, deprived the Court, the class, and co-counsel of critical information. Its acknowledgments are accompanied by acceptance of responsibility as well as financial penalties and corrective actions. In sum, Labaton has recognized the inadequacy and misleading effects of its practices in this case and, through the Proposed Partial Resolution, now stands in agreement with the Special Master that these practices handicapped the Court in performance of its duty to safeguard the class. This certainly serves the objective of protecting and furthering the integrity of the justice system.

As evidenced in the Special Master's Report and Recommendations, the most concerning of Labaton's deficiencies was the nondisclosure of the $4.1 million payment to Chargois, an attorney who neither appeared in the State Street case nor worked on the litigation. Indeed, Labaton's refusal to recognize the need for such disclosures put Labaton at odds with the Special Master—a position that persisted in the post-Report proceedings. The resolution of this, and all other, outstanding issues has shifted the tides considerably toward ensuring that Labaton addresses its deficiencies, learns from its mistakes, and makes the class and co-counsel whole.

a.    <u>The Special Master and Labaton, and the Master and ERISA, engaged in good faith negotiations consistent with the Special Master's Appointment Order and findings in his Report and Recommendations</u>.

The Proposed Partial Resolution represents a marked shift in Labaton's prior positions. Labaton affirmatively approached the Special Master over a year into the investigation to acknowledge that resolution would be the most beneficial way to move forward. The Special

Master was open to discussions consistent with his responsibilities under the Appointment Order, including an effort to bring a global resolution to the open issues remaining in his investigation at an all-parties meeting in Boston on September 11, 2018. When it became evident that a global resolution could not be attained, Labaton and the Special Master continued substantial discussions to narrow the issues still in dispute. A necessary part of resolving Labaton's objections was conferring, through the Special Master, with the ERISA Firms, who took exception to Labaton's objections and to whom the Special Master had recommended Labaton reallocate a substantial portion of the value paid to Chargois.

This was not easy process. Given the high stakes of the case, the parties, as can be expected, vigorously advocated their positions at every turn. Beyond this, the Special Master's appetite to move from his position in the Report and Recommendations was minimal given the explicit mandate from the Court to thoroughly investigate the Law Firms and make recommendations commensurate with the results of that investigation. However, both Labaton and the ERISA Firms recognized that resolution of these issues would prove an efficient and cost-saving measure for themselves and for the Court. In the end, the ERISA Firms agreed to accept a lesser amount from Labaton and Labaton agreed to, and has already begun to, put in place internal processes to ensure that all fee petitions and fee agreements achieve the levels of transparency and reliability reasonably expected by the Court, and that are necessary to ensure the integrity of the justice system, particularly in a class action context.

b.  <u>The Proposed Partial Resolution addresses the fundamental concerns expressed in the Report and Recommendations about Labaton's past referral practices and other concerns.</u>

The Court has rightly observed that, in addition to ensuring the class's interests are protected, the Court has a fundamental duty to safeguard the administration of justice. The reforms adopted by Labaton not only address its shortcomings but, moving forward, address the

Court's concerns about protecting the integrity to the judicial process, especially in the class action practice context.

The Special Master's shift in tone results in large part from Labaton's own about-face as to how it views its past and present obligations in the class action context. In his Report and Recommendations, the Special Master identified several issues with Labaton's conduct in the submission of the fee petition in the State Street case, principally, Labaton's role in the double counting, resulting in an overstated lodestar, and its failure to disclose the existence of the Chargois Arrangement to the Court, to its client, and, most importantly, to the class. These are serious issues that threaten the integrity of the judicial system and severely hinder the Court's discharge of its fiduciary duties in class action cases.

While Labaton initially took the opposite view— that the double-counting did not affect the fee award and that its nondisclosure of Chargois was entirely permissible – Labaton now agrees that maintaining transparency during the fee award process is critical and that, by withholding important information about the recipients of the fee award from the Court and the class, and others involved in the process, Labaton handicapped the administration of justice in this instance. The Special Master is satisfied that reforms and acknowledgments identified in Section I of the Proposed Partial Resolution concerning Labaton, sufficiently addresses each of Labaton's past deficiencies in this case. These are set forth below with specificity:

1. Nondisclosure of the Chargois Arrangement

     a. *Nondisclosure of the Chargois Arrangement to the Class*.

The Special Master found that, while the attorney-client relationship that formed between Labaton and the class members may not impose the same fiduciary obligations as that created between an individual client and attorney, Labaton nevertheless had a fiduciary and ethical duty to disclose the Chargois Arrangement to at least the named class representatives, if not the class

as a whole, but that disclosure was not specifically required by the Federal Rules of Civil Procedure. *See* Dkt. # 357, pp. 281-285. By failing to disclose the Chargois Arrangement to the class, Labaton deprived the class members of information necessary to make informed decisions about settlement, and therefore, derogated its duties under the Massachusetts Rules of Professional Conduct. *Id.*, p. 286.

Labaton acknowledges that the emerging best practices at the time of settlement contemplated that Labaton disclose in detail the terms of the Chargois Arrangement to the class, something that was not done here and has undertaken to do this in future case. These best practices balance the recognized lack of clarity in the federal jurisprudence concerning the scope of the attorney-client relationship, and duties imposed thereunder in a class action, with the ethical demands that class members – like any individual client – are entitled to receive a reasonable explanation adequate to weigh the risks of a proposed decision.

b. *Nondisclosure of the Chargois Arrangement to the Court.*

The Special Master concluded that the details of the Chargois Arrangement were material facts that should have been disclosed to the Court in connection with the fee petition. *See* Dkt. # 357, pp. 313-314. Regrettably, as the Court has recently pointed out, there was no discussion about Chargois or his sharing in the funds distributed as part of the attorneys' fee award. In part, this is because Labaton contended, until recently, that its payment to Chargois was a bare referral fee. As the Special Master concluded in his Report, by consciously deciding to withhold this information from the Court, Labaton derogated its ethical duties to maintain candor with the Court under the Massachusetts Rules of Professional Conduct and common law.[6] But, while the

---

[6] The Proposed Partial Resolution, which states that the *payment* to Chargois did not violate any rules of professional misconduct is not to the contrary. The Special Master made no finding with respect to the propriety of the payment itself made to Damon Chargois. *See* Dkt. # 357, p. 86. Instead, the Special Master focused on Labaton's failure to disclose the Chargois Arrangement, and its obligation thereunder.

Special Master noted the deleterious effects nondisclosure of the Chargois Arrangement had on the adversarial process during the fee award stage, the Master did not find a violation of any procedural rules. *See* Dkt. # 357, pp. 274-286.

Labaton has expressly acknowledged the role it played in the breakdown of the adversarial process in this case. Had the Court received full disclosure of the Chargois Arrangement, Labaton concedes that the Court may have awarded a lesser fee to Labaton – yielding a greater recovery to the class. Labaton also recognizes that full discussion of the Chargois Arrangement and the fact that Chargois did not work on or accept responsibility in this case was not only prudent, but essential for the Court to adequately perform its gatekeeping function, apart from whether it was specifically required to make such a disclosure under the Federal Rules of Civil Procedure. Moreover, Labaton recognizes that the $4.1 payment to Chargois was not a case-specific referral fee, as commonly understood in the legal industry.

In short, Labaton has conceded that the better practice was for it to fully disclose the terms of the Chargois Arrangement to the Court. Labaton has accepted responsibility for its past shortcomings, and has undertaken significant reforms to ensure that analogous fee arrangements are not implemented at Labaton. Through its newly-appointed General Counsel, Michael Canty, Esq. – who was not employed with Labaton during the litigation of the State Street case – Labaton has addressed all open cases, and in almost one-third of those cases, affirmatively informed its clients consistent with the New York ethical rules, of the details of the fee arrangements. *See* Dkt. # 498-1, Declaration of Michael P. Canty ("Canty Declaration")*,* ¶3. Going forward, all members of the firm must not only disclose the nature of any fee arrangements but communicate directly with the client to confirm that the client *understands* the terms of that agreement. *See id.*, ¶6; 10/15/18 Hearing Tr. pp. 40:21-41:2; 68:12-20. This is one area where communication substantially broke down with ATRS. The Special Master believes

that the extensive remedial measures put in place by Labaton evidence a recognition of its past failures, perhaps more so than any written expression of contrition on this point. Given Labaton's past failure to appreciate the full scope of its duty to the Court and the encumbering effects they had on the Court's duty to administer justice, the Special Master has reevaluated his conclusion that Labaton's omission of the Chargois Arrangement violated its duty of candor, but finds that Labton still failed to comport with emerging best practices as to disclosure of fee arrangements with the Court.

c.   *Nondisclosure of the Chargois Arrangement to ATRS.*

The Special Master further concluded that ATRS, as Labaton's client, was entitled to know about the Chargois Arrangement and the salient details of what that arrangement entailed. Dkt. # 357, pp. 333-334. The failure to inform ATRS about the Chargois Arrangement raised particular concerns because ATRS, through its Executive Director George Hopkins, was serving as the lead class representative. *Id.*, pp. 248; 258-259. As the Special Master pointed out, Massachusetts Rule of Professional Conduct 1.5(e) speaks directly to the issue of obtaining ATRS's informed consent in these circumstances. *Id.*, pp. 249-254. While Rule 1.5(e) is not a model of clarity, in analyzing the various ways in which one could read the obligations imposed under the rule, the Special Master concluded that, in part because the Chargois Arrangement was not a traditional referral fee, Labaton had deprived ATRS of its ability to make a meaningful decision about Chargois in these circumstances, as the rule contemplated. *Id.*, pp. 250, n. 194, 262-263.[7]

---

[7] By the same token, the Special Master analyzed whether the payment of a non-referral fee to another attorney for facilitating ATRS's retention of Labaton fell within Massachusetts Rule of Professional Conduct 7.2(b)'s [formerly Rule 7.2(c)] proscription on providing anything of value to a person for recommending a lawyer's services. Because Labaton did not fully inform its client, ATRS, about the details of the Chargois Arrangement, the Special Master concluded that, as a technical matter, Labaton's obligations to Chargois arising under the Chargois Arrangement fell within the ambit of Rule 7.2(b). Dkt. # 357, pp. 263-273. The Master did not, however, conclude that specific

Labaton has directly acknowledged that it *should have* disclosed the pertinent details of the Chargois Arrangement – at minimum, that Chargois did not commit to substantively work on or take responsibility for the State Street litigation – to ATRS at the onset of its representation. Such a disclosure would have been in line with the best practices emerging from Rule 1.5(e) at the time the case began in 2011, which contemplated fulsome disclosures to obtain informed client consent. The need for client consent was greatly heightened by the removed nature of Chargois' involvement in this case, making ATRS incapable of knowing about it independently. The perils of nondisclosure in the context of a fee division arrangement unknown to the client is further addressed by Labaton's concession that the $4.1 million payment to Chargois was not a case-specific referral fee and should not be treated as such, and it has implemented policies to ensure that clients are fully appraised of all fee sharing agreements going forward and consent to them in writing.

> d.  *Nondisclosure of the Chargois Arrangement to Co-Counsel.*

The Special Master further concluded that Labaton did not discharge basic duties of fairness and transparency in failing to disclose the full scope of the Chargois Arrangement to other Customer Class Counsel, and in failing to disclose Chargois altogether to the ERISA Firms. This nondisclosure to the ERISA Firms deprived those firms of more than simply their own right to know all relevant circumstances before filing a joint fee petition; it deprived the ERISA Firms of the opportunity to inform both its clients – the ERISA Firms represented six of the seven named class representatives – and the Department of Labor as to an outstanding obligation to pay Chargois. *See* Dkt. # 357, pp. 294-295. Labaton acknowledges as part of the

---

redress was necessary given the lack of guidance from the Massachusetts Courts and the bar associations as to the meaning of Rule 7.2(b), and specifically, its application to lawyers. *Id.*, pp. 337-338. The Special Master is cognizant of the lack of any legal guidance or precedent in Massachusetts on the intersection of Rules 1.5(e) and 7.2(b), and gives substantial weight to Labaton's acknowledgments made as part of the Proposed Partial Resolution that the payment to Chargois was not a permissible referral fee payment.

Proposed Partial Resolution that its disclosures to co-counsel were patently insufficient. It accepts that the more transparent practice, and the preferred one – though not written in blackletter law – was to disclose the Chargois Arrangement in detail to *all* interested parties, and at minimum to its co-counsel, including the ERISA Firms.

In part because the ERISA Firms were not informed of the Chargois Arrangement (and in part because the ERISA Firms played no role in the double counting error that lead to the appointment of the Special Master), the Special Master recommended that Labaton reallocate funds to the ERISA Firms to include the reasonable fees and expenses of participating in the Special Master's investigation. Through the Proposed Partial Resolution, Labaton agrees to make a substantial payment, of $2.75 million, to the ERISA Firms, and the ERISA Firms have agreed to accept this payment in full satisfaction of the concerns raised by the Special Master in his Report and Recommendations.

e. *Redress for failure to disclose the Chargois Arrangement.*

As explained above, the failure to disclose Chargois' role in the State Street case was Labaton's, and Labaton's alone. For that reason, the Special Master recommended in his Report that Labaton disgorge the entire $4.1 million to Chargois ($700,000 would be paid to the class). The allocation of $700,000 was recommended back to the class to account for the deprivation of the class's ability to make an informed determination as to whether to agree to the settlement, which triggered a payment to Chargois. Dkt. # 357, pp. 369-370.

Even after making the important findings and commensurate recommendations described above, the Special Master noted that because the ethical and legal questions relating to the Chargois payment have largely been "close calls" given the ambiguities in the law as currently written, and not always easily resolved, significant monetary remedies were adequate to address Labaton's past conduct and to positively influence future conduct. *Id*., pp. 370-371.

19

The Proposed Partial Resolution strikes this same balance between deterrence and fairness. It contemplates, as did the Master's recommendations, that Labaton return a substantial sum of money to account for Labaton's concealment of the Chargois Arrangement. Under the Proposed Partial Resolution, Labaton has agreed to make timely payment of approximately $4,802,666.67.[8]  Of this amount, $2,052,666.67 will be returned to the class and another $2,750,000 will be paid directly to the ERISA Firms. Of the $2,052,66.67, $700,000 represents the allocation recommended back to the class as a consequence of the Chargois Arrangement, and $1,352,666.67 represents the one-third amount of the total overstated lodestar. These sums are, of course, in addition the costs Labaton agrees to incur moving forward to retain external legal and ethical assistance, including the anticipated retention of former District Court Judge Garrett Brown, and the current retention of ethics expert Hal Lieberman and to review fee sharing arrangements to ensure all fee agreements comport with the principles and standards articulated in the Special Master's Report.

2.  <u>Labaton's continuation as lead counsel and ATRS as lead plaintiff</u>.

The Proposed Partial Resolution also provides for adequate representation of all class members moving forward. This is, of course, a paramount concern to the Court and to the Special Master. As the Special Master stated in his Report and Recommendations, Labaton's previous nondisclosures to its client, coupled with Hopkins' dereliction of his duties as class representative, gave the Special Master serious pause about Labaton's adequacy to serve in this role moving forward. These concerns have now been addressed by the inclusion of additional class counsel to represent the class and a recent change in leadership at ATRS, and the inclusion of the ERISA representatives as class representatives to stand alongside of ATRS.

---

[8] The difference between the disgorgements recommended in the Special Master's Report and those proposed under the Proposed Partial Resolution is $1,550,000, approximately $650, 000 of which reflects the lower ERISA payment.

Labaton has remedied its past deficiencies toward its client, ATRS, and adopted safeguards to ensure communication is robust and candid moving forward. While Labaton did not discuss in detail its fee arrangement, nor disclose the Chargois Arrangement specifically, with ATRS, it has now done so, and in a searingly open public forum. Labaton has also engaged in similar conversations with all of its current clients where a fee arrangement is in place. *See* Canty Declaration, ¶ 3; 10/15/18 Hearing Tr. pp. 40:21-41:2; 68:12-20. Perhaps more so than any other firm serving a similar role, Labaton is acutely aware of the full panoply of obligations it owes to the Court, its clients, and its co-counsel. Its wide-scale attempt to meet those obligations in all other open cases shows that these efforts embody a genuine shift in the firm's culture rather than a one-off attempt at disclosure confined to this case. *See* Canty Declaration, ¶¶ 3, 6. These efforts go to the core of the Master's concerns.[9] Furthermore, George Hopkins, who dedicated substantial time and effort to advocating on behalf of the class – contributing to the excellent result achieved – has announced his retirement, effective December 31, 2018. *See* 10/11/18 Hopkins Letter, Dkt. # 489, p. 1. With the change in leadership, the specific concerns about ATRS' ability to serve as an adequate class representative are largely allayed. Also, as noted, the six ERISA class representatives will continue to serve as as class representatives alongside ATRS.

But those concerns are not alleviated entirely by current events. The Special Master has also voiced concern that the hybrid nature of the class consisting of public pension funds (the "customer class") and private ERISA funds (the "ERISA class") presents unique challenges to any firm serving as lead counsel. *See* Dkt. # 357, p. 284. The inclusion of the ERISA Firms as class counsel with Labaton will ensure that the ERISA class members' interests are fully

[9] As the Special Master concluded in his Report and Recommendations, *see* Dkt. # 357, p. 125, n. 111, a detailed exploration of the origins of the Chargois Arrangement and Labaton's past dealings with the Arkansas State Legislature and/or ATRS is beyond the scope of the Master's appointment.

addressed and that those members are adequately represented in their own right. Moreover, a central concern resolved through the Proposed Partial Resolution is Labaton's failure to disclose Damon Chargois or the $4.1 million payment to Chargois to the ERISA Firms, and the obstacle such nondisclosure presented for the ERISA Firms in fulfilling their duties to their clients, to the government agencies involved, and in preparing a fee petition. Appointment of the ERISA Firms promotes full transparency in administering the class settlement fund and safeguards against any potential for future failures to communicate material issues to the class, and among counsel, moving forward.

    3.  <u>Labaton's contributing role to the double counting error in the fee petition submitted to the Court</u>.

While the Special Master concluded that the double counting error was largely inadvertent, the Special Master has expressed concern over two issues arising from that conclusion. First, as articulated throughout his investigation, the Special Master found that the practice of including the employees of one firm on the lodestar petition of another firm is an artifice fraught with the danger of misrepresentation and inaccuracy, just as occurred here. *See* Dkt. # 357, pp. 363-364. The Special Master criticized the Customer Class firms, including Labaton, for failing to execute a formal, written agreement spelling out the procedure for reporting the names of Labaton's and Lieff's staff attorneys on Thornton's lodestar, particularly given the highly unusual nature of the firms' arrangement. *Id.*, pp. 220-221, 237. In the case of Labaton, this potential for error was exacerbated by a second competing concern – Labaton's tradition of compartmentalization in its cases. *Id.*, pp. 223, 325-326.

The Proposed Partial Resolution and Labaton's reforms address both issues. First, Labaton eliminated, prior to entering into the Proposed Partial Resolution, the practice of allowing other firms to carry Labaton staff attorneys on their lodestars. This step goes beyond the

recommendations of the Special Master. The Special Master certainly criticized the practice, but did not propose abolishing the practice, only that cost-sharing arrangements analogous to the agreement reached between Customer Class Counsel to allocate the cost of certain staff attorneys be disclosed in transparent terms to the Court moving forward. Complete prohibition is one step better and achieves this goal.

Second, Labaton expressly acknowledges that its past compartmentalization contributed to several of the Special Master's concerns, including the inclusion of $4,058,000 in overstated lodestar. To eliminate the deleterious effects arising out of such "siloing" moving forward, Labaton has taken affirmative steps to instill a greater continuity – and scrutiny – during the settlement stages. This includes assembling a "settlement team" in each case consisting of, at minimum, a member of the settlement group, a litigator with substantive knowledge of the case, and a relationship attorney with direct knowledge of the fee arrangement with the client. And as relevant to this case, in multi-firm cases, the settlement team has committed to circulating all fee submissions to each firm to review for potential errors.

Beyond this, of course Labaton has agreed to disgorge one-third of the amount of the total overstated lodestar that resulted from double-counting. As a result, an additional $1,352,666.67 will be allocated to the class.

4. Labaton's anticipated retention of Judge Brown as outside consultant on retention and fee-related issues and current retention ethics expert.

Labaton has also engaged external review of their policies and fee arrangements to cull out any other practices that have the effect of shielding the details of a fee arrangement. Prior to entering into negotiations with the Special Master, Labaton retained Hal R. Lieberman, Esq., a lecturer on legal ethics and an experienced practicing attorney at Emery Celli Brinckerhoff & Abady LLP. *See* Lieberman Resume, attached as Exhibit A. Beyond this, Labaton is in

discussion and anticipates an agreement to retain the Hon. Garrett Brown (Ret.), the former Chief Judge of the United States District Court for the District of New Jersey, to further ensure that Labaton complies with all applicable rules and emerging best practices concerning fee sharing agreements and retention policies. Through this anticipated retention, Labaton has committed to adopting fee sharing and fee application policies that meet its obligations and provide the maximum amount of transparency.  While the anticipated arrangement is between Labaton and Judge Brown, Labaton will agree to provide unfettered access to Judge Brown and cooperate fully with him during his review to work toward the common goal. The results of the retention will be made available in a written report to the Special Master, and to the Court, if it wishes.

## IV.    Timely approval of the Proposed Partial Resolution is appropriate given the protracted nature of the investigation and the need for finality.

The Special Master fully appreciates the seriousness of Labaton's past conduct. It is with open eyes that the Master entered into discussions of resolution with all firms, including Labaton, conscious of his mandate from the Court and his current role of serving as a voice for the otherwise unrepresented class. But, as explained above, the Master's core concerns about Labaton's ethical and legal conduct have been squarely addressed by the firm through the Proposed Partial Resolution and its efforts to address deficiencies in its case staffing structure and ongoing fee arrangements and fee preparation structures, and to eradicate any agreements or internal roadblocks within the firm's organization in order to prevent such failures from occurring in the future.

While the Special Master recognizes that no remedy can rewrite history, or erase Labaton's past missteps, the Proposed Partial Resolution importantly holds Labaton accountable for its questionable conduct, has prompted extensive efforts to address past deficiencies and

effect more fulsome and candid conversations with its existing clients in cases in which fee

arrangements are in place, and establishes significant safeguards to ensure compliance and

achieve transparency moving forward. *See* Canty Declaration, ¶¶ 3, 5, 6. In reaching the

Proposed Resolution, the Special Master has carefully considered the essential acknowledgments

made by Labaton along with the firm's disgorgement of a substantial portion of its fee award –

including repayment of the class. These factors, considered in light of the Master's directive to

be judicious, weigh heavily in favor of resolving this case consistent with the proposed terms.

The Court has raised legitimate concerns about the impact that the Proposed Partial

Resolution, if approved, would have on the remainder of the case. *See* 10/15/18 Hearing Tr. pp.

13:11-17; 38: 18-21. The Court specifically queried whether Labaton could fully resolve all its

remaining issues without participation from Thornton in light of Garrett Bradley's role as "of

counsel" to Labaton in 2015 into 2016, years after Labaton filed the complaint against State

Street.[10] *See* 10/15/18 Hearing Tr. pp. 14:1-24; Dkt. # 357, pp. 105, n.86; Ex. 141. These

concerns likely stem, at least in part, from the Special Master's Report as the Special Master cast

serious doubt upon the testimony of Garrett Bradley – who held the title of "Of Counsel" to

Labaton, and was tasked with negotiating directly with Chargois about his fee in the State Street

case – that Bradley did not know the true nature of Chargois' role in the State Street case. *See*

Dkt. # 357, p. 108-109, n.90. In fact, the Special Master did not find this testimony credible.

---

[10] The Court expressed concern about Labaton's and Thornton's representation in the fee petition that the hourly rates listed were "regularly charged" by the firms, who, in fact, had no paying clients. 10/15/18 Hearing Tr, p. 24, 1-3. In his Report, the Special Master indicated that the representation in the fee petition that the hourly rates listed for Labaton and Thornton reflected the firms' "regular rates charged for their services," was not entirely accurate because neither firm had hourly clients. *See* Dkt. # 357, p. 58, n.44. To clarify, while the overwhelming majority of Labaton's clients retained the firm on a contingency basis, i.e. were not "paying clients," Labaton provided information to the Special Master during written discovery showing that, from 2010-2016, Labaton had a small number of hourly clients who paid by invoice those rates listed on the fee petition, or commensurate with the listed rates. This was not the crux of Labaton's practice, but nevertheless, Labaton and Thornton do not stand on equal footing with regard to the accuracy of this statement and should be viewed independently by the Court on this issue.

On balance, timely approval of the Proposed Partial Resolution is appropriate. Entering a resolution at this stage significantly narrows the scope of the remaining legal and factual objections – leaving only issues relating to Thornton and Lieff ripe for address by the Special Master. Importantly, by way of the Proposed Partial Resolution, Labaton takes full responsibility for nondisclosure of the Chargois Arrangement to the Court, the class, its client, and co-counsel, eliminating the need for further in-depth discussion of those issues in the remainder of the case. This significant narrowing promotes a more expeditious and streamlined process moving forward.

The Proposed Partial Resolution, moreover, does not tie the hands of either Thornton or Lieff, who are free to vigorously pursue their objections.[11] This is, in part, because Labaton has accepted full responsibility for the concealment of Chargois. Turning to the second – but equally important – issue of the double-counted hours on the fee petition, Labaton's agreement to pay $1,352,666.67, or one-third, of the total overstated lodestar in acknowledgment for its role in bringing about these errors, does not bind Thornton or Lieff, who contest this recommendation. *See* 10/15/18 Hearing Tr. pp. 45:8-47:9; 59:22-60:6

While the Special Master believes, and has recommended, that each of the Customer Class firms share equally in disgorgement of the overstated lodestar, this is based on a finding that each firm had a separate and unique role that contributed to the double counting error. The agreement by Labaton to fulfill its one-third share – in recognition of *its* contribution to the double counting error – does not preclude Lieff and Thornton from arguing that they should not have to pay what is mathematically an equal one-third share. The Special Master will continue to

---

[11] The Proposed Partial Resolution recommends, however, that the Court enter a bar order prohibiting Lieff or Thornton from seeking contribution or indemnification directly from Labaton.

make his case for Lieff's and Thornton's responsibility for their one-third shares based upon the respective roles those firms played in contributing to the double counting error.

With regard to any shared responsibility between Thornton and Labaton stemming from Garrett Bradley's knowledge of the Chargois Arrangement, the Special Master did not make any explicit finding that Thornton or Bradley should have disclosed the Chargois Arrangement to the Court, the class, or others. However, such a finding or conclusion is not precluded by a resolution in which Labaton acknowledges its failure to be transparent with this information. A future recommendation that Bradley may share some of the blame for the critical nondisclosures to the Court and class can be adequately addressed separate and apart from Labaton's acknowledgment of its own role in the nondisclosure. To date, Labaton has not attempted to mitigate its own responsibility by shifting the obligation, in whole or in part, to Bradley or Thornton. There is no substantive or logistical hurdle to concluding down the road that others – in addition to Labaton – also bear responsibility.

## V.       Conclusion

The Proposed Partial resolution presents to the Court a fair, reasonable, and adequate agreement among independently-represented parties that protects the class, recognizes and addresses the deficient practices that deprived the class, the client, the Court, and co-counsel, especially ERISA counsel, of the knowledge necessary to make informed decisions, and suggests procedural, structural, and financial remedies to redress those failings. It provides the Court with the ability to conserve judicial resources without undermining the rights of non-settling and other parties. For these reasons, the Special Master urges the Court to accept the Proposed Partial Resolution.

Dated:  October 30, 2018                              Respectfully submitted,

**SPECIAL MASTER HONORABLE**
**GERALD E. ROSEN (RETIRED),**

By his attorneys,

   /s/  William F. Sinnott
William F. Sinnott (BBO #547423)
Elizabeth J. McEvoy (BBO #683191)
BARRETT & SINGAL, P.C.
One Beacon Street, Suite 1320
Boston, MA 02108
Telephone: (617) 720-5090
Facsimile: (617) 720-5092
Email: wsinnott@barrettsingal.com
Email: emcevoy@barrettsingal.com

## CERTIFICATE OF SERVICE

I hereby certify that this foregoing document was filed electronically on October 30, 2018 and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing ("NEF").  Paper copies were sent to any person identified in the NEF as a non-registered participant.

   /s/  William F. Sinnott
William F. Sinnott