# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

### THE COMPETITIVE ENTERPRISE INSTITUTE'S
### CENTER FOR CLASS ACTION FAIRNESS'S MEMORANDUM IN
### <u>RESPONSE TO PROPOSED PARTIAL RESOLUTION WITH LABATON</u>

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................................3

ARGUMENT .............................................................................................................4

I.    The Proposed Resolution highlights the need for a guardian *ad litem*. .......................4

    A.    The primary beneficiary of Proposed Resolution is ERISA counsel............................7

    B.    The Proposed Resolution inappropriately regards Labaton as one-third responsible for the double-counting....................................................................8

    C.    Labaton is also disproportionally responsible for costs of investigation. ...................9

    D.    Structural changes by Labaton provide no relief to class in this case, and little relief to future classes.................................................................................10

II.    The Proposed Resolution also leaves key issues from the Report unresolved, and more difficult to resolve between Lieff and TLF alone...........................................................12

    A.    Other issues not resolved by the Proposed Resolution impact the fairness of remedies proposed against Lieff and TLF. ...................................................13

    B.    At minimum, the Proposed Resolution cannot be approved now. ............................14

III.    Appointment of a guardian *ad litem* remains necessary to advocate for issues where the Report does not go far enough in protecting the class.................................................17

    A.    The Special Master's Report is modest. ..................................................18

    B.    No conflict of interest exists with the Special Master, but the class should have a dedicated advocate.............................................................................21

    C.    Appointment of Burch Porter as guardian *ad litem* would greatly enhance the process and ensure that an unconflicted advocate has standing to defend any order against Class Counsel on appeal. ...........................................................22

CONCLUSION ...........................................................................................................22

CERTIFICATE OF SERVICE ........................................................................................24

In accord with the Court's Order dated October 16, 2018 (Dkt. 494), as extended by the Court (Dkt. 502), the Competitive Enterprise Institute's Center for Class Action Fairness ("CCAF") responds to the memoranda supporting the Proposed Partial Resolution of Issues for the Court's Consideration ("Proposed Resolution," Dkt. 485) filed by Labaton Sucharow LLP ("Labaton"), Dkt. 510; the Special Master, Dkt. 511; and ERISA counsel, Dkt. 509. Appointment of a guardian *ad litem* remains necessary to protect the class, especially given that the Proposed Resolution does not provide global peace against further challenges by non-settling parties—nor does it even guarantee peace with Labaton, if the Court ultimately reduces Labaton's fee award, as it should. Attorneys at Burch, Porter & Johnson PLLC ("Burch Porter") remain willing to serve as guardian *ad litem*.[1]

## EXECUTIVE SUMMARY

The Special Master and Labaton ask the court to approve a Proposed Resolution, which would permanently discharge Labaton from the case and enter an order barring any other firm from seeking any portion of Labaton's new fee award, which would total over $25 million, less an uncertain proportion of the cost of the Special Master's investigation. Relative to the Special Master's Report and Recommendations (Dkt. 357, "Report"), most of the money proposed to be disgorged from Labaton, $2.75 million out of $4.8 million, goes not to the class—to whom Labaton indisputably owed a fiduciary duty—but as a windfall to other counsel. Even assuming Labaton pays 47% of the $4.8 million deposited to pay the Special Master to date, its net fee represents a 1.34 lodestar multiplier over the  lodestar hours it claimed for the class, or nearly $6 million dollars more than its "regular

---

[1] Due to institutional logistics, CCAF cannot presently serve as guardian *ad litem* in this case. Instead, CCAF recommends the appointment of Joseph (Jef) Feibelman as guardian *ad litem*. Jef Feibleman has nearly fifty years' worth of complex business litigation experience including appointments as a special master. As shorthand, this filing will refer to appointment of "Burch Porter" to mean Jef Feibleman with the assistance of attorneys at his firm, billing at modest market rates of $200-475/hr. *See* Dkt. 451 at 15. If appointed, Burch Porter will retain independent local counsel.

rates charged for their services." (Labaton continues to deny that this statement is misleading, though 67 of 71 timekeepers in this matter have not charged paying clients on an hourly basis.)

While the Proposed Resolution provides coverage for Labaton to seek appointment in future cases, it does little to help the class in this case, and instead shifts most of its money to other law firms. Bizarrely, the Proposed Resolution proposes that Labaton and ATRS—whose officer professed intentional disinterest concerning referral fees—are supposed to serve as co-lead counsel and plaintiff for the class. Perhaps this explains why the Proposed Resolution dwells more on public relations and wordsmithing (like the Special Master's incantation that Labaton "fell short of emerging best practices") than remedying substantive issues relating to the class members and their interests. The Proposed Resolution may not have reached such an underwhelming result if the class had independent representation that cared more about the class than preserving Labaton's reputation. All of the above is why the class needs a guardian *ad litem* more than ever to protect its interests.

**ARGUMENT**

## I.    The Proposed Resolution highlights the need for a guardian *ad litem*.

While a favorable *global* resolution of Class Counsel's claims might have lessened the need for a dedicated advocate on behalf of the class, the *Proposed Resolution* presents all the same issues as before. Even Labaton may yet object and appeal should the Court decide that, as a matter of proportionality, it must bear more of the burden for the (presently) undisputed mistakes it made. Although it now conveniently pleads contrition, Labaton reserves the right to contest and appeal every finding and monetary adjustment that the Court might impose if the Proposed Resolution is not accepted.

This is problematic because the Proposed Resolution falls well short of the adjustments the Court should impose on Labaton. While the Special Master has attempted to balance the interests of Labaton and ERISA counsel, he was not in a position to advocate on behalf of the class, and the Proposed Resolution reflects this lack of solicitude.

Contrary to the Proposed Resolution, ATRS cannot serve as a class representative (which must under all circumstances guard the interests of fellow class members) at this stage in the proceedings. *See, e.g., Foley v. Buckley's Great Steaks, Inc.*, No. 14-cv-63, 2015 WL 1578881 (D.N.H. Apr. 9, 2015) (holding that adequacy is not satisfied where the putative representative has abdicated control of the case to counsel). The Special Master—who, to be clear, has done important work in this case—got this right earlier: "We cannot see how, in light of a clear dereliction of his fiduciary duties to the class, Hopkins can fairly and adequately protect the class's interests moving forward." Report at 257-58 n.207. While the ERISA representatives may continue to serve as representatives for their respective subclasses, they cannot serve as class-wide representatives because their claims are not typical of class claims. Thus, the need for a class-wide guardian *ad litem* remains.[2]

The Proposed Resolution also disserves the class because it refunds only $2.05 million to class members ($700,000 for the hidden Chargois bare referral agreement and $1,352,666.67 for one third of the double-counting error), but sends $2.75 million to ERISA counsel. While the Court will undoubtedly reallocate attorneys' fees among the firms, a Partial Settlement that provides most of its benefits to other law firms is not in the interests in the class, and a class representative would not have struck such a bargain.  Indeed, a compelling argument can made that most or all of the Chargois payment should go to the class, who Labaton owed a fiduciary duty toward. The ethical duties Labaton breached through the Chargois agreement (and the overbilling) run to its clients, the absent class members. *See* Fed. R. Civ. P. 23(a), (e)(3), (h); Mass. R. Prof. Cond. 1.5. Any fee forfeiture resulting from that misconduct should return to the class's coffers. *See, e.g. Rodriguez v. Disner*, 688 F.3d 645, 655 (9th Cir. 2012) (affirming total fee disqualification); *see generally Burrow v. Arce*, 997 S.W.2d 229, 237-40

---

[2] Burch Porter and CCAF do not object to Labaton's or ATRS's continued ministerial role in administering the fund, which they cite as cause for their retention as representatives. *See e.g.* Dkts. 510 at 17; 427 at 9. Instead, Labaton and ATRS inadequately represent the class *with respect to Labaton's fee request*, as we have previously argued. Dkts. 420 at 14-15; 451 at 20.

(Tex. 1999) (discussing well-established doctrine of fee forfeiture); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 37 (same).

The Proposed Resolution also fails the class because it misallocates fee reductions for the double-counting error, effectively assigning Labaton just one-third of the responsibility, which is far too low in light of the facts. Labaton drafted the declarations, was tasked with reviewing the fee application, and was the only party to have all firms' fee applications in its possession prior to filing. It is unreasonable to assign Labaton only one third of the responsibility, and Lieff and TLF have already flagged their objections to this finding. Unlike with a criminal plea, where lenience might be provided to a cooperating witness, the Court must find facts supporting a new fee award for all counsel. Therefore, disparate treatment in Labaton's favor ties the Court's hands with respect to Lieff and TLF, likely shortchanging the class.

Likewise, Labaton is more than one third responsible for the costs of the investigation. It is unclear whether Labaton has irrevocably offered to cover 47% of the Special Master's costs through October 15, 2018, but even this share may be too small. Labaton imposed much of the cost on itself by egregiously refusing to disclose the existence of the Chargois agreement, which necessitated numerous repeat depositions and was the focus of most expert discovery. In contrast, TLF properly disclosed the emails available to it concerning Chargois, and might appropriately seek to contribute fewer costs attributable to Labaton's questionable candor.

Finally, the structural changes proposed in the Proposed Resolution provide little relief to the class and in fact constitute what the Court correctly called "enlightened self-interest" for Labaton at this point. Transcript of Hearing October 15, 2018 ("Tr.") at 31. Labaton will surely seek appointment as lead counsel in future securities cases, and the retention of one (or two!) retired jurists provides cover for reasonable questions about the firm's qualifications. One could even plausibly imagine Labaton touting their oversight as an affirmative reason to prefer Labaton over alternate counsel. The

fairness of this Partial Resolution "must be evaluated on how it *compensates class members*—not on whether it provides relief to other people [*i.e.* future shareholders represented by Labaton]." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 720 (6th Cir. 2013) (quoting *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006)). The Proposed Resolution also glosses over Labaton's conduct with public relations-speak, saying only that Labaton fell short of "emerging best practices." Poppycock! Labaton refused to tell its own client about a bare referral arrangement, misled co-lead counsel about the arrangement, concealed it from the class and the Court, refused to disclose it to a Special Master specifically appointed to investigate the billing in this case, declined to tell even its own outside counsel about it, and may well have never disclosed it except that one of its co-counsel reasonably responded to the Special Master's discovery requests. Candor to the Court is not an "emerging best practice," nor is complying with the terms of Rule 23(e)(3), nor is accurately responding to discovery requests that were designed to ferret out the conduct.

### A.     The primary beneficiary of Proposed Resolution is ERISA counsel.

The Proposed Resolution subordinates the class's interests to those of counsel because, at this point in the case, there is no one advocating on behalf of the class. It is beyond dispute that a proposed class action settlement's fairness should be judged mainly by how it benefits class members, and not class counsel or anyone else. *See Dry Max Pampers*, 724 F.3d at 720. Here, although there is undoubtedly a significant amount of money to be returned to the class at this procedurally unusual post-settlement stage, the Proposed Resolution proposes to send only $700,000 of the Chargois payment (plus $1.35 million of the double-counting) to the class while ERISA counsel will receive $2.75 million. True, ERISA counsel did not engage in the misconduct that Labaton did and perhaps would have negotiated more money had they been fully informed, but Labaton owed a fiduciary and professional ethical duty to the class that it represented. This distinction is significant because the Proposed Resolution goes to great lengths to balance the competing interests of lawyers in this case. The Proposed Resolution's

focus on peacemaking with lawyers underscores the need for a guardian *ad litem* for the class; a guardian *ad litem* would have advocated for more money to go to the class. Finally, the apparent willingness of ERISA counsel to accept $2.75 million as a compromise supports the inference that the Court could resolve any issues relating to ERISA counsel's fees down the road rather than accepting this flawed Proposed Resolution.

### B. The Proposed Resolution inappropriately regards Labaton as one-third responsible for the double-counting.

The Proposed Resolution draws a highly questionable line in assigning Labaton only one third responsible for the $4.05 million double counting error. Even if Class Counsel were truly equally responsible for the error, Labaton should be expected to shoulder a proportional burden to the fee they received from it: 47%. The Proposed Resolution ties the Court's hands with respect to Lieff and TLF, who can credibly argue that Labaton is much more than one third culpable.

Labaton filed the fee motion and had the only opportunity to catch the mistake before filing. Labaton drafted the declaration templates sent to TLF and Lieff, and reviewed other firms' bills. Report at 55-56. Although it was the was only firm to see all submitted hours before they were filed, Labaton did not compare them side-by-side, which "contributed to the failure to catch" error. *Id.* at 56. While the Report assigns TLF some responsibility for the error, this can be colorably contested,[3] and the factual findings do not implicate Lieff at all for the double-counting. Lieff and TLF dispute

---

[3] The Report blames TLF for not editing the template language of the declaration: "Had Bradley accurately and fully described the true status of the Labaton and Lieff staff attorneys, it is probable that a diligent attorney such as [Labaton's settlement associate] would have been alerted to the discrepancy and would likely have caught the double-counting in the three Customer Class declarations." Report at 364. This speculation seems questionable. Had Garrett Bradley described the hours as kept by attorneys "of my firm or under the supervision of attorneys at my firm," it would have been accurate, but would not necessarily alert Labaton to the issue. TLF's false statements under oath should be sanctioned as the Report recommends, but the double-counting error was not necessarily a direct consequence of the misleading prose, which Labaton drafted.

that they are one-third responsible for the double counting (Tr. 60, 45), and the distribution seems untenable.

It's no answer to rely on Massachusetts joint tortfeasor law, as Labaton proposes. Dkt. 510 at 5 n.3. Class counsel did not act "jointly," and the Court is not disposing of a tort. The Court's fiduciary responsibility to the class in awarding fees should be guided by equity, and no law supports cabining the Court's discretion. *See Rodriguez*, 688 F.3d at 654; *see also In re Thirteen Appeals Arising out of the San Juan DuPont Plaza Hotel Fire Litigation*, 56 F.3d 295, 312 (1st Cir. 1995) (denoting the "equity-based common fund doctrine"). The Court isn't governed by strictures relating to comparative fault liability, but by its duty to award reasonable attorneys' fees under Rule 23(h).

### C.   Labaton is also disproportionally responsible for costs of investigation.

The Proposed Resolution proposes that Labaton pay its "proportionate share of the remaining amounts due to the Special Master and his team for their unpaid work." Dkt. 485 at 11. While Labaton apparently might agree their "proportionate share" through October 15 is 47% (Tr. 77-78), this share may still understate its culpability.

The length of the investigation is largely attributable to Labaton's concealment of the Chargois arrangement. The Special Master intended to conclude his investigation and submit a report on October 10, 2017 as the Court ordered. Dkt. 173 at 3. To this end, the Special Master had conducted dozens of depositions and intended to wind down discovery in August 2017 when it recognized the Chargois issue from documents produced by TLF. Report at 87 n.66. Labaton entirely concealed this issue from the Master, even though one of the interrogatories sought "all billing entries, costs and/or expenses incurred by the Firm during the SST Litigation that the Firm did not include in its Fee Petition/Lodestar calculation, and the reasons therefor." Report at 122.[4] In fact, Labaton did not even

---

[4] Lieff also failed to produce the Chargois emails they possessed in first round of discovery, but Lieff did not fully understand the nature of the arrangement. "Lieff was misled into agreeing to

tell their outside counsel about the Chargois arrangement, but nevertheless instructed her to minimize the scope of discovery from Labaton. *Id.* at 119 n.99. Indeed, the Chargois arrangement was responsive to several discovery requests, but Labaton did not properly respond to any of them before the Special Master discovered the issue in August 2017. *Id.* at 119-23. Inexplicably, "the Special Master does not conclude that the nondisclosure constitutes discovery misconduct," but merely suggests Labaton's concealment was not "prudent" under the circumstances. Report at 119 n.98. The bulk of the Special Master's work, including the retention of Prof. Stephen Gillers, was likewise due to the questionable conduct of Labaton. Only Labaton and Garrett Bradley knew that Chargois' payment was a bare referral. Report at 353. Labaton hid this from Lieff, and entirely hid the existence of Chargois from the Court, the class, and ERISA counsel. The Special Master had to respond to these issues and also had to respond to Labaton's tooth-and-nail opposition to the Special Master's work.

While the public does not have access to the Special Master's billing, it seems likely that work and expenses attributable to Labaton exceed 47% for the period since August 2017. The Court should make an accounting of this work, or have the Master make such an accounting, before discharging Labaton with an inappropriately small contribution.

> **D.**   **Structural changes by Labaton provide no relief to class in this case, and little relief to future classes.**

And the structural changes that are supposedly being undertaken by Labaton have little to no bearing on whether the Proposed Resolution should be accepted. First, although an obvious point, those changes cannot possibly benefit the class here, and the Court has a fiduciary duty as a "guarantor of fairness" to this class, not to hypothetical future ones. *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991). The Court has already recognized this fact when it observed that

---

share in the Chargois payment." *Id.* at 352.

Labaton's better-late-than-never "enlightened self-interest" is the component of the case that's "of the least interest to me." Tr. 31.

Furthermore, some of the purported structural changes at Labaton raise more questions than they answer. One example involves Labaton's revised referral agreement template. Dkt. 498-3. That template provides in part that the lawyers shall perform "work commensurate with the fee to be provided." *Id.* at 4. The rule—adapted from New York ethics rules—bars naked referral fees, but relies on referring fees and Labaton to decide the "commensurate" value. Given that Labaton granted Chargois 20% fees in perpetuity, supposedly for making some phone calls in 2007, they apparently value the time of referring fees very highly. The Chargois arrangement would be no less troubling if Mr. Chargois sat on a dozen conference calls or conducted freelance undirected document review.

Worse, even the Special Master now soft-pedals Labaton's misconduct in the service of lobbying for a piecemeal settlement. Labaton has only "acknowledge[d] that the emerging best practices" require the disclosure of the Chargois arrangement. Dkt. 511 at 15, 17, and 24. This is a huge understatement. The Special Master's Report catalogs Labaton's obfuscation efforts and utter failure to respond fully to the Special Master's discovery requests. Labaton didn't even disclose the existence of the Chargois arrangement to its own outside counsel, and those lawyers were (in ignorance of the true facts) tasked with limiting the scope of the Special Master's discovery powers. Report at 119 n.99. And at least one of the discovery requests propounded by the Special Master indisputably encompassed the Chargois arrangement. That request asked Labaton to "[i]dentity any other individuals, not listed above, who have knowledge of the Interrogatories and/or the SST Litigation and explain the general nature of such knowledge." *Id.* at 121. Although the Special Master (for reasons unclear) declined to conclude that Labaton's discovery lapses amounted to discovery misconduct despite calling them "somewhat disconcerting" (*id.* at 119 n.98), providing complete and truthful responses to the Special Master's discovery requests is not an emerging best practice, it is a

fundamental obligation of counsel. Apart from the lack of disclosure of the Chargois arrangement, its very existence calls into question the adequacy of ATRS and Labaton's representation of the class in this case. Dkt. 420 at 20-21 (discussing implication of pay-to-play arrangements). The Proposed Resolution seeks to paper over Labaton's bad behavior with public-relations bromides, which the Court should reject.

## II.   The Proposed Resolution also leaves key issues from the Report unresolved, and more difficult to resolve between Lieff and TLF alone.

Lieff, TLF, and the Court have all appropriately suggested that decision on the Proposed Resolution should be held in abeyance until Lieff and TLF's objections are decided.[5] At minimum the Court should do this because the overall fairness of the fee award should be judged holistically, but approval of a partial settlement with Labaton ties the Court's hands.

As discussed above, the apportionment of responsibility for the double-counting error and fees for the Special Master are manifestly suspect. But if the Court were to adopt the Proposed Resolution and grant a bar order, it would have no fair way to disgorge all of the recommended money to class members. It could recommend that TLF and Lieff contribute *less* than Labaton for the double-counting error and investigation, but then the class necessarily picks up the tab for the remainder, watering down the Report's already modest recommendations. Additionally, the Report's recommendations to disgorge contract attorney markup from Lieff and impose sanctions on TLF need to be squared with pass that the Proposed Resolution gives Labaton for similar conduct, as discussed below.

---

[5] *See* Tr. 47 (Court); 59 (Lieff). While TLF says they don't anticipate objecting to the resolution *per se*, to "extent that the proposed resolution implies in any way that TLF is responsible for any disgorgement related to the 'double counting' issue." Dkt. 504 at 1. It does—and the proportionality of sanctions between firms will be disputed.

A.    **Other issues not resolved by the Proposed Resolution impact the fairness of remedies proposed against Lieff and TLF.**

In addition to the unfairness of fixing Labaton's contributions for the double-counting and investigation, two major Report recommendations are unresolved by the Proposed Resolution. These recommendations, contested by Lieff and TLF, may seem especially unfair in view of the treatment of Labaton.

First, the Report saddles Lieff with disgorging over $4 million to the class due to their exorbitant markup of contract attorneys. While Burch Porter and CCAF agree with this recommendation, it may be difficult to support in isolation because Lieff happens to have employed seven contract attorneys while its co-counsel employed all staff attorneys. Contract attorneys should be billed at cost, as the private legal market does, but unless the Court also adopts our recommendation to align the staff attorney rates with market rates (see Section III.A.1, *infra*), Lieff will be singled out for essentially a historical accident that its team employed several contract attorneys, while other Class Counsel relied on nearly-as-cheap staff attorneys, which the Report oddly endorses reimbursing at up to $515/hr before allowing a 1.8 multiplier. Unless the Report's recommendation on contract attorneys is more evenly applied (by, for example, using reasonable rates for staff attorneys), disgorgement from Lieff—a relative innocent in comparison to Labaton—will be difficult to sustain, ultimately at the expense of the completely innocent class.

Second, the Report recommends monetary sanction and disciplinary referral for false statements in Garrett Bradley's declaration on behalf of TLF (Report at 365), but Lawrence Sucharow's declaration on behalf of Labaton is nearly as misleading and receives no penalty. Both declarations speak of rates "based my firm's current billing rates" and "regular rates charged," which is misleading because neither firm normally bills to paying clients. Report at 57, 227. Labaton attempts to rationalize the disparate treatment by pointing to the handful of attorneys who have billed on a small number of matters over the years (Dkt. 510 at 16), but this does not make the declaration true.

Labaton submitted hours for 71 different timekeepers in this case (Dkt. 104-15 at 7-9), and only 4 of these individuals submitted bills to paying clients between 2010-16 based on Labaton's interrogatory answers. Dkt. 510-2. And of these four rates, two of them charged at least $140/hour less to paying clients than Labaton claimed in this case. *Compare* Dkt. 510-2 at 25 *with* Dkt. 104-15 at 7. (Ms. Wierzbowski, an associate listed at $725/hr here, billed $585 to paying client in 2016). For all but these 2 or 4 attorneys, the Labaton declaration is as misleading as the TLF declaration.[6]

These potential disparities in treatment of Class Counsel also militate in favor of at least deferring acceptance of the Proposed Resolution.

## B.    At minimum, the Proposed Resolution cannot be approved now.

Labaton and the Special Master assure the Court that the Proposed Resolution will reduce the cost and expense of proceedings, but this is only true if the resolution can be prejudged while similar objections by Lieff and TLF remain pending. This is because the Proposed Resolution provides no global peace, so disputes about relative culpability remain potent as long as any party continues to object. Closely-related issues still need to be decided and will likely still be appealed. Discharging Labaton now therefore saves little time and simply risks shortchanging the class after other objections are resolved. The Court correctly observed: "I don't see how I can make a properly informed decision on what Labaton should pay until I resolve everything I need to resolve regarding the roles and responsibilities of Thornton and Lieff to, you know, decide how to allocate things." Tr. 47.

Should the Court reject key terms of Labaton settlement after holistic review, Labaton's objections still need deciding, Labaton could potentially appeal.

---

[6] Additionally, the Special Master found several factors leaning in favor of sanctioning Labaton for their misleading omission of the Chargois arrangement, but ultimately declined to recommend sanction, which was a "close question" because the First Circuit had not clearly spoken on the duty to disclose. Report at 318 n.256.

The Special Master's arguments for immediate approval of the Proposed Resolution should not persuade the Court. While Labaton has indeed transformed in the face of an "existential" threat, this transformation seems skin deep—contingent on approval of terms it clearly found more favorable than litigation. Contrary to the Special Master, Rule 23(e) militates against approval because the Proposed Resolution is unlike a true fee request because Labaton retains the power to revert to challenging any issue if the Court does not award its desired fee. (And in any event, none of the class protections for a fee request have been followed at this point.)

### 1. Labaton's change of heart is encouraging, but does not provide any remedy to the class.

The Special Master is right to be astonished that Labaton no longer publicly calls the Report "wholly unmoored from the relevant law and the actual facts" nor claims that the Master as "elected not to act as a neutral fact-finder." Scott Flaherty, AMERICAN LAWYER (LAW.COM), *Report Railing Against Lawyers' Conduct in State Street Case 'Unmoored,' Says Labaton*, Dkt. 451-7, available online at: https://www.law.com/americanlawyer/2018/06/29/report-railing-against-lawyers-conduct-in-state-street-case-unmoored-says-labaton/. This is indeed a "marked shift." Dkt. 511 at 12.

But Labaton—one of the most culpable parties—cannot be discharged at this early date without assessing the reasonableness of fees relative to other Class Counsel. Labaton's expressions do not themselves fairly resolve the class interests, and Labaton's supposed contrition is employed as a means to a resolution it obviously finds more favorable than the risk of litigation. Should the Court decline to adopt the resolution, Labaton reverts to challenging the Special Master's Report and any sanction or recommendation. Dkt. 510 at 13.

### 2. The Special Master's analogy to Rule 23(e)/(h) fee agreement counsels holding the Proposed Resolution in abeyance, not swift approval.

The Special Master says that the Court can treat the Proposed Resolution as a Rule 23(e) request and approve it now (Dkt. 511 at 7-11), but this argument misconstrues the resolution and Rule 23(e).

The Proposed Resolution is fundamentally unlike an attorneys' fees request under Rule 23(e). Fair and reasonable settlements do not make class benefits contingent upon the Court's approval of a particular fee request because they recognize that the district court has an obligation "not to accept uncritically what lawyers self-servingly suggest is reasonable compensation for their services." *Weinberger*, 925 F.2d at 525. Yet that's exactly what the Special Master and Labaton propose to do.

Even if Labaton's exploding fee request was properly evaluated under Rule 23(e), it fails under almost every factor the Special Master cites. Dkt. 511 at 9. "The impact on the class" is not clearly favorable given the modesty of the Report recommendations in view of Labaton's conduct during the case and investigation. *See* Section III.A, *infra*. Disparate treatment between Labaton, Lieff, and TLF is actually quite difficult to explain, and the Court would need to decide Class Counsel's objections to fairly decide the issue. "Counsel's recommendation" bears little weight when one counsel seeks to avoid "existential" sanctions, another set of counsel is being paid $2.75 million for their assent;" and other counsel oppose immediate approval of the agreement.

Most preposterous is "failure of class members to object." The class has not been notice of the Report, let alone the Proposed Resolution with Labaton, which was only filed 26 days ago. The reaction of the class cannot be gauged given the lack of notice and rational disinterest of class members. Silence cannot be read as support because individual class members lack the incentive to intervene simply in hopes of a "miniscule *pro rata* gain." *Goldberger v. Integrated Res.*, 209 F.3d 43, 52-53 (2d Cir. 2000) (citing *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 573 (7th Cir. 1992)). It is "naïve" to assume class acquiescence to class-action abuse from the lack of objections. *Redman v. RadioShack*

*Corp.*, 768 F.3d 622, 628 (7th Cir. 2014). Only 23% of securities settlements engender any fee objectors at all (Lynn A. Baker, et. al., *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class* Actions, 115 COLUM. L. REV. 1371, 1389 (2015)), though, as class counsel's own experts indicate, virtually every fee request in large-scale securities actions engages in abuses similar to the ones the special master identified here. The class members in this case—or rather, the class member funds' directors and trustees—are understandably reluctant to respond to notice at all given that the cost of obtaining an attorney opinion on the 374-page Report and 300+ pages of objections could easily dwarf whatever *pro rata* increase an objector might achieve. "Class members have no real incentive to mount a challenge that would result in only a minuscule pro rata gain from a fee reduction." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 123 (2d Cir. 2005).

Notice should advise class members of the Partial Settlement *and* their right to object, as it has previously argued. Dkt. 451 at 8-9. The Court long ago determined that it would allow class members to object following the release of the Special Master's Report. Dkt. 192 at 4. The rationale for such notice applies doubly here, especially where the Special Master seeks swift approval of a deal with Labaton based on the class's supposed tacit support of the deal.

## III.   Appointment of a guardian *ad litem* remains necessary to advocate for issues where the Report does not go far enough in protecting the class.

Although the Special Master did important work and produced a detailed Report, the Special Master's Report repeatedly fails to go far enough because the Special Master admittedly had to "balance the interests of the class, the law firms, the legal profession, the public and the institutional needs of the Judiciary." Report at 327. What the Special Master did not do was advocate exclusively on the class's behalf, which is what a guardian *ad litem* would do. The adversarial process breaks down in class action settlements (and in post-settlement proceedings), and that breakdown harms the class. *See Redman*, 768 F.3d at 629  (discussing the limits of the adversarial system of justice in this context).

This breakdown and the resulting harm to the class are precisely the reasons why the appointment of a guardian *ad litem* remains warranted. A guardian *ad litem*, for example, would almost certainly take issue with the Special Master's decision not to recommend a reduction of the (roughly) 2.0 multiplier. Even the Special Master has acknowledged (albeit most recently in a footnote) that "several courts have adopted a practice of lowering the fee award percentage to avoid giving attorneys a windfall at the plaintiffs' expense" in mega-fund class action settlements. Dkt. 511 at 5 n.3. The Special Master further makes the Delphic statement that the "percentage of fund is, of course, only a starting point in the Court's calculation of an appropriate fee award" and that the "Court should consider the entirety of the circumstances surrounding a fee petition." *Id.*

A guardian *ad litem* would not be so circumspect. To the contrary, a guardian *ad litem* would seek to protect the class's interests at every turn, including (but not limited to) advocating for a reduction of the total fee award. A $300 million settlement is a mega-fund, and courts routinely award less than 25% of the fund as fees in mega-fund cases of this size. *See, e.g.,* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. EMPIRICAL LEGAL STUD. 248, 265 tbl. 7 (2010) (10.2% median fee for megafund cases over $175 million). Attorneys who have deceived the Court are even less entitled to a windfall than unfailingly scrupulous counsel, so there is simply no good reason not to apply a misconduct-related reduction here. A guardian *ad litem* would fully develop these arguments and others on behalf of the class.

## A.    The Special Master's Report is modest.

Counsel was awarded nearly $85 million dollars by this Court in its now-vacated Order on Fees. Dkt. 111. In spite of false statements in attorney declarations, shocking concealment of a bare referral fees to politically-connected Texas attorneys who did no work in the case, and grotesque markup of attorney time far beyond market billing rates, the Special Master proposed reallocating only $7.4 to 8.1 million to the class. In fact, each of "the Labaton, Lieff and Thornton law firms will still

be left with not only their base lodestar claim, but a substantial multiplier." Report at 367. Put another way, the Report proposes cutting attorneys' fees from 25% to perhaps 22.2%—even though the Special Master acknowledges some courts would award no more than 20% in such a "megafund" case where absolutely no questionable conduct had occurred. Dkt. 511 at 5-6 n.3.

The Special Master's Report is quite modest, and a guardian *ad litem* would serve the class by arguing that the class deserves a more aggressive reallocation in their favor.

### 1. Above-market staff attorney rates were endorsed by the Report.

The Report's failure to adjust the multiplier or percentage downward seems especially unfair given the above-market leverage that the Special Master endorsed. With the solitary (and admittedly egregious) exception of Michael Bradley, the Report declines to adjust staff attorney rates of up to $515/hour even though such attorneys are paid a fraction of what partnership-track associates make. *See* Report at 169 n.134; Dkt. 104-17 at 8 (five staff attorneys with rates of $515/hour billed for over $2 million combined lodestar). The market for legal services compensates time for staff attorneys differently than partnership-track associates because they *are* different—they are paid less and generally confined to lower level work even if they have a seemingly senior graduation year. While law firms may be entitled to leverage on their permanent attorneys, the market rate for staff attorney time is much lower than the senior associate-level rates approved here. *See, e.g.*, Hildebrant Consulting LLC & Citi Private Bank, *2017 Client Advisory* (noting permanent non-partner track attorneys' "rates are lower than associates"), available online at: http://amlawdaily.typepad.com/2017CitiReport.pdf.

Adjusting staff attorney time to a realistic market rate helps remedy Class Counsel's deceptive statements about the "regular rates charged" for attorneys' services.[7] The market rates for staff

---

[7] Labaton argues that its declaration was factually correct because they have occasionally billed paying clients at similar rates. Dkt. 510 at 12. Labaton does not identify a single *staff attorney* ever paid by a client, so their declaration is false at least with respect to staff attorneys.

attorneys can be discovered from WilmerHale, which employs them. "One way to judge the legitimacy of the plaintiff's fees is to look at the defendant's fees." *Dreher v. Experian Info. Solutions, Inc.*, 2016 WL 4055638, at *2 (E.D. Va. Jul. 26, 2016). Failing that, staff attorney time should be adjusted to the rates of junior associates, which better comports with the Report's findings about their work level, and which are inconsistent with $415/hr and higher rates. *See* Report at 169 ("the staff attorneys performed associate-level work (albeit that of a junior-level associate)").

## 2.   The Report shied away from sanctioning Labaton in part because it's effectively "too big to sanction."

Labaton has been an extremely difficult litigant, coming close—if not over—the line of discovery misconduct and erecting "a wall of legalistic and formalistic excuses and blame-shifting (largely to the Court)." *Id.* at 362. However, the Report declined to adopt sanctions against Labaton— unlike TLF—in part because "formal disciplinary proceedings could spell the end of the firm." *Id.* While sanctions should be proportional, the *de facto* "too big to sanction" approach seems unhelpful to the profession, unhelpful to future absent shareholders at the mercy of their representatives, and most importantly, unhelpful to the class here. Labaton has been particularly evasive, and continues to defend its mind-boggling refusal to initially provide any hint of the Chargois arrangement that it orchestrated. Dkt. 359 at 17. Had TLF not appropriately produced emails concerning Chargois, Labaton's dubious referral arrangement would have been completely hidden from the Special Master. One wonders what other facts Labaton has hidden from courts which have not asked, in Labaton's view, sufficiently specific questions. Referral for attorney discipline may be the only way to find out.

A guardian *ad litem* who has not settled with Labaton would be free to pursue referral for discipline and law enforcement follow-up. The Special Master did not determine what Chargois did in order to retain ATRS as a client, finding the issue was outside the mandate of his appointment. Report at 125 n.111. The class deserves a guardian without such constraints given that FBI agents not

so long ago interviewed Tim Herron of Chargois & Herron about his free-rent tenant circa 2008, former Arkansas Treasurer and ATRS Trustee Martha Shoffner, who was convicted of public corruption—accepting cash payment in exchange for official favors.[8] An unconstrained guardian *ad litem* might also inquire into the donation of five Labaton partners to Martha Shoffner's reelection campaign in 2009 and Labaton's assertion in open court to have provided no "campaign contributions or any other form of benefit to Senator Faris or anyone else?" Dkt. 244 (transcript of sidebar to May 30, 2018 hearing), at 5.

Labaton has said these proceedings pose "a substantial and existential, even, effect" on it. Dkt. 435-21 at 41. This may be entirely appropriate given the underlying conduct. One notable securities class action commentator recently opined that the referral arrangement "could prove to be a legal 'Watergate', one that could reshape class action practice." John C. Coffee, *The Market for Lead Plaintiffs*, N.Y.L.J. (Sept 19, 2018). For the sake of the class, the relationship between Chargois and Labaton deserves more scrutiny and referral to investigative bodies. A public relations-friendly settlement that mostly shuffles payment between attorneys does not serve the class or the public.

At minimum, the Court should ascertain that Labaton would not deem referral of the matter as a breach of the Proposed Resolution. The Court retains broad jurisdiction to sanction misconduct that occurred before it. *See Cooter v. Gell & Hartmarx*, 496 U.S. 384, 395 (1990). To the extent that the Proposed Resolution purports to constrain the Court's responsibility, it should be rejected now.

### B.      No conflict of interest exists with the Special Master, but the class should have a dedicated advocate.

Mr. Frank's statement at the hearing did not concern any hypothetical conflict of interest with Special Master, though it has apparently been misinterpreted as such. Dkt. 499 at 2 (writing to "address any concerns the Court . . . [had] that may have been occasioned by Mr. Frank's comments."). Instead,

---

[8] *See* Dkt. 420-1 (Chad Day, ARK. DEMOCRAT-GAZETTE (May 22, 2013), *Shoffner lived rent-free near the Capitol for most of her first term, landlord says*).

CCAF and Burch Porter are troubled that the Proposed Resolution pays the class only $700,000 for the concealed Chargois arrangement. Judge Holderman and JAMS might end up with more fees for Labaton's future compliance than the class receives for the undisclosed $4.1 million bare referral fee. The Proposed Resolution does not address the underlying problems identified in the Court's February 2017 order (Dkt. 117), but instead mostly shifts fees to yet more attorneys. The proposed settlement would not have reached such a result if the class had dedicated representation.

### C. Appointment of Burch Porter as guardian *ad litem* would greatly enhance the process and ensure that an unconflicted advocate has standing to defend any order against Class Counsel on appeal.

Several prior filings explain why the Court should appoint a guardian *ad litem* if further advocacy for the class is needed. Dkt. 451 at 5-7, 11-20; Dkt. 420 at 14-22, Dkt. 154 at 6-13; Dkt. 127 at 8-12. The appointment of a guardian *ad litem* enables a "genuinely adversarial process" and "serve[s] to enhance the accuracy and legitimacy of fee awards." *Laffitte v. Robert Half Int'l., Inc.*, 376 P.3d 672, 691 (Cal. 2016) (Liu, J., concurring). The costs of such representation "'pale in comparison to the significant amounts of money' to be divided between plaintiffs and counsel in high-value cases." *Laffitte*, 376 P.3d at 691 (quoting William Rubenstein, *The Fairness Hearing: Adversarial and Regulatory Approaches*, 53 UCLA L. Rev. 1435, 1455 (2006)). The costs would be especially beneficial here where Memphis-based Burch Porter have offered to accept approximately *half* the billing rates levied by Class Counsel and the Special Master. Dkt. 451 at 15.

### CONCLUSION

Because the Proposed Resolution does not unambiguously waive counsel's ability to collaterally attack the settlement in the future, appointment of a guardian *ad litem* remains necessary to protect class interests. Even Labaton may revert to its former scorched-earth tactics if the Proposed Resolution is not accepted in full—even if the Court simply wants to apportion costs among Class Counsel to better reflect their relative culpability.

Given the continued near-certainty of appellate challenges to any adverse ruling against Lieff and TLF (and the likely challenge Labaton if their fees are adjusted beyond the Proposed Resolution), the Court should appoint an independent guardian *ad litem*. The Special Master may serve this role if the parties unconditionally waive their right to challenge such appointment. Otherwise, Burch Porter remains well-positioned to serve in this role, and their proposed rates are modest, especially compared to Class Counsel.

Respectfully submitted,

Dated: November 5, 2018

*/s/ M. Frank Bednarz*
M. Frank Bednarz (BBO No. 676742)
COMPETITIVE ENTERPRISE INSTITUTE
1145 E Hyde Park Blvd. Unit 3A
Chicago, IL 60615
Telephone: 202-448-8742
Email: frank.bednarz@cei.org

Theodore H. Frank (*pro hac vice*)
COMPETITIVE ENTERPRISE INSTITUTE
1310 L Street NW, 7th Floor
Washington, DC 20005
Telephone: 202-331-2263
Email: ted.frank@cei.org

Gary S. Peeples (*pro hac vice*)
BURCH, PORTER & JOHNSON, PLLC
130 North Court Avenue
Memphis, TN 38103
Telephone: 901-524-5127
gpeeples@bpjlaw.com

*Attorneys for Amicus Curiae*
*Competitive Enterprise Institute*
*Center for Class Action Fairness*

### CERTIFICATE OF SERVICE

I certify that on November 5, 2018, I served a copy of the forgoing on all counsel of record by filing a copy via the ECF system.


Dated: November 5, 2018


*/s/ M. Frank Bednarz*
M. Frank Bednarz