UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ARKANSAS TEACHER RETIREMENT SYSTEM,
on behalf of itself and all others
 similarly situated,
 Plaintiff,

No. 11-cv-10230-MLW

vs.

STATE STREET BANK AND TRUST COMPANY,
 Defendant.
_____/

ARNOLD HENRIQUEZ, MICHAEL T. COHN,
WILLIAM R. TAYLOR, RICHARD A.
SUTHERLAND, and those similarly situated,
 Plaintiffs,

No. 11-cv-12049-MLW

vs.

STATE STREET BANK AND TRUST COMPANY,
 Defendant.
_____/

THE ANDOVER COMPANIES EMPLOYEE
SAVINGS AND PROFIT SHARING PLAN, on
Behalf of itself, and JAMES PEHOUSHEK-
STANGELAND and all others similarly situated,
 Plaintiffs,

No. 12-cv-11698-MLW

vs.

STATE STREET BANK AND TRUST COMPANY,
 Defendant.
_____/

## SPECIAL MASTER'S PARTIALLY REVISED REPORT & RECOMMENDATIONS SUBMITTED IN RESPONSE TO LIEFF CABRASER HEIMANN & BERNSTEIN'S OBJECTIONS[1]

---

[1] The Special Master herein references and incorporates the Special Master's Partially Revised Report and Recommendations Submitted in Response to the Thornton Law Firms' Objections, filed simultaneously with the Court. Lieff and Thornton both argue that the Special Master erred in recommending (1) the disgorgement of the $4.1 million double-counted lodestar; and, (2) that contract attorneys should be treated as an expense and billed at cost. *See* Thornton Law Firm's Objections to the Special Master's Report and Recommendation's ("***Thornton Objs.***"), pp. 11-25; 78-83. Thus, the Special Master addresses each argument separately, but, for the sake of brevity, incorporates his responses to Thornton's Objections in responding to Lieff, as set forth below.

# TABLE OF CONTENTS

Page

I.      Introduction………………………………………………………………… 2

II.     Relevant background relating to Lieff Cabraser's receipt
        of attorneys' fees from the State Street fee award………………………… 4

III.    Pursuant to Fed. R. Civ. P. 53(f)(1) and the Court's order,
        the Special Master has discretion to revise his Report and
        Recommendations as well as address new matters arising
        in the post-Report stage…………………………………………………… 6

IV.     Because Lieff's actions in the State Street case directly contributed
        to the submission of $4.1 million in overstated lodestar, the Special
        Master continues to recommend that Lieff forfeit one-third of the
        double-counted lodestar and pay it back to the class……………………..… 8

        A.      The Special Master's recommendation that Lieff disgorge
                $1,352,666.67 is in addition to a lodestar cross-check and
                tailored to address the firm's failure to provide accurate
                information to the Court, which may have resulted in the
                award of a lesser fee to Plaintiffs' Counsel and a greater
                recovery for the class, as well as to deter further mistakes…………..… 9

                i.      *The Special Master's forfeiture recommendation is
                        not intended to replace a percentage-of-fund
                        calculation or lodestar cross-check, but is an
                        equitable remedy tailored to address the magnitude
                        of the error and need for deterrence…………………..…10*

                ii.     *The Special Master's recommendation that Lieff
                        forfeit a portion of its fee is directly tied to the nature –
                        and value – of the double-counted errors, and serves
                        as a deterrent against future mistakes……………………..…12*

        B.      Lieff's participation in the ill-advised staff attorney cost-sharing
                agreement and its mistakes in calculating staff attorney
                hours render it equally responsible for the double-counting
                mistake…………………………………………………………………15

V.      The Special Master continues to recommend that contract or agency
        attorneys employed by third-party staffing companies be billed as
        an expense……………………………………………………………….....21

<u>Page</u>

VI.     The Chiplock Declaration further illuminates the incongruity of
        treating contract attorneys as a legal fee on a lodestar submitted in
        support of a fee petition……………………………………………….25

VII.    Conclusion………………………………………………………….28

## I.     Introduction

On May 14, 2018, the Special Master filed his Report and Recommendations, and exhibits thereto, under seal ("Report").  Dkt.# 357. Among other topics, the Report addressed the accuracy and reliability of the fee petition submitted by Plaintiffs' Counsel in *Arkansas Teachers' Retirement System v. State Street, et. al.,* No. 11-cv-10230 ("State Street"). On June 29, 2018, Lieff Cabraser Heimann & Bernstein ("Lieff") filed detailed objections to the findings of fact, conclusions of law, and recommendations made in the Report.[2]

On August 10, 2018, the Court resubmitted to the Master his Report, directing him to amend, or to make revisions to, the Report that may have been occasioned by the firms' objections and exceptions. *See* Dkt. # 445; 8/9/18 Hrg. Tr., pp. 45:21-46:5. In late August, while Lieff's, and all counsel's, objections remained pending, the Special Master – prompted by a conversation initiated by Labaton – took steps to determine if a global resolution with all firms was viable. With the Court's approval, the Special Master invited all firms to attend an all-day meeting in Boston to further explore the possibility of a global resolution. The Master was not able to reach agreement with Lieff and Thornton consistent with his understanding of his responsibilities to the Court, and therefore, Lieff's and Thornton's objections remained outstanding and required response from the Special Master.

On October 16, 2018, the Court directed the Special Master and Lieff to confer as to whether they could agree to narrow the scope of the issues remaining in dispute. *See* Dkt. # 494. No progress was made toward limiting the objections, and in response to an issue raised by

---

[2]  In addition to Lieff, the other Customer Class Counsel filed written objections shortly after the Court unsealed the Report and Recommendations. *See* Dkt. # 359 (Labaton's Objections) and Dkt. # 361 (Thornton's Objections). The ERISA Firms subsequently filed written exceptions to Labaton's Objections contesting, mainly, the payment of additional monies to the ERISA Firms. *See* Dkt. # 387; Dkt. # 398; Dkt. # 392.

Thornton in its own objections, the Special Master, as anticipated by the Court's resubmission of the Report back to him, identified an additional area of concern relating to the accuracy of Lieff's petition. The Special Master put Lieff on notice of his intention to address this fourth issue – namely, Lieff's representation that attorneys employed by third-party staffing agencies, and included on Lieff's lodestar and in the fee petition, were "employees" of the firm, as stated in Lieff's declaration supporting the fee petition. *See* Dkt. # 503; Dkt. # 357, pp. 211-213.

After conferral, three core areas of dispute remained:

1. Whether Lieff should disgorge or forfeit some portion of the roughly $4.1 million of overstated lodestar, and if so, how much?

2. With regard to the contract attorneys,[3] whether the contract attorneys' time should be treated as an expense rather than a legal fee [entitled to a market mark-up and multiplier] as reported on the attorney lodestar, and if treated as an expense, whether Lieff should disgorge or forfeit the total [claimed] contract attorney lodestar, with or without a lodestar multiplier?[4]

3. Whether Daniel Chiplock's Declaration [Dkt. # 104-17] accurately describes the employment status of the work performed in the State Street case by contract attorneys employed by a third-party staffing agency?

On November 7, 2018, in response to the parties' recitation of the above-described topics, the Court added a fourth topic for Lieff to address in its reply to the Special Master's objections (*see* 11/7/18 Hrg. Tr., pp. 101:15 - 102:13) (Dkt. # 519):

4. Why the Special Master was correct (or incorrect) in determining that the rates charged for staff attorneys[5] was reasonable?

---

[3] As he did in his Report, the Special Master distinguishes "contract" attorneys employed by third-party staffing agencies from "staff attorneys," who are full-time employees of the firm and eligible to receive benefits. "Contract attorney" herein refers to the former.

[4] Bracketed language connotes additional clarifications to the list of issues submitted to the Court on October 25, 2018. Dkt. # 503.

[5] At the hearing, the Court directed Mr. Heimann, General Counsel from Lieff, to address in his reply why the Master was *correct* that "a reasonable rate was used for the staff attorneys." 11/7/18 Hrg. Tr., p. 102: 10-13. In issuing this instruction, the Court did not make a distinction between" staff attorneys," such as those employed full-

## II.    Relevant background relating to Lieff Cabraser's receipt of attorneys' fees from the State Street fee award.

On March 8, 2017, the Court appointed the Hon. Gerald E. Rosen (ret.) to investigate the accuracy and reliability of the fee petition submitted in the State Street case seeking $75 million[6] in attorneys' fees ("Appointment Order"). Dkt. # 173.  The Special Master's appointment was prompted, in large part, by a December 2016 article in the *Boston Globe* following the submission of a letter by Customer Class Counsel (Labaton Sucharow, Lieff Cabraser Heimann & Bernstein, and the Thornton Law Firm) on November 10, 2016 disclosing an error on the fee petition caused by double-counting certain hours performed by staff attorneys employed by Lieff and Labaton ("November 10, 2016 Letter"). *See id*, pp. 1-3. The *Boston Globe* article focused on, among other issues, the large mark-up on contract attorneys.[7]

Over the ensuing fourteen months, the Special Master engaged in informal interviews with nearly all of the attorneys involved in the mediation and settlement of the case, and in particular, those individuals who prepared the fee petition, and memorialized this testimony through the formal discovery process. *See* Dkt. # 357, p. 138. While the discovery of a $4.1 million payment to Texas Attorney Damon Chargois significantly expanded the landscape of the Master's investigation, the substantive issues pertaining to Lieff remained largely discrete.

Prompted by concerns expressed by the Court during the March 7, 2017 hearing, the Special Master focused on the role played by the staff attorneys in the underlying litigation as well as the nature and origin of the arrangement among the Customer Class firms to share the

---

[6] time by Lieff and Labaton, and "contract" or "agency" attorneys, employed by a third-party staffing company and for whom firms, such as Lieff, reimburse the agency on an hourly basis.

[6] The original fee petition sought $74,541,250.

[7] The *Boston Globe* article did not differentiate between staff attorneys actually employed by the firm and contract or agency attorneys employed by outside staffing agencies.

costs of the staff attorneys. As a result of this inquiry, the Special Master learned that a majority

of the attorneys listed as "staff attorneys" were, in fact, full-time employees of their firm – with a

minority being "contract" attorneys employed by a third-party staffing agency but who were

retained by Lieff and for whom Lieff and Thornton compensated the agency on an hourly basis.

Another topic raised by the Court was the accuracy and reliability of the representations

made on the fee petition, which includes those statements concerning Lieff and Labaton staff

attorneys (which encompasses the contract attorneys retained by Lieff) who were included in the

overall lodestar submitted in the State Street case. In particular, the Special Master analyzed the

substantive work performed by the staff attorneys, the market for those services, and the value

the staff attorneys added to the overall case. As it pertains to the legal work performed by the

staff attorneys, the Special Master was further charged with determining whether the fee petition

accurately described the scope and nature of the work by the staff, contract, and other attorneys

listed on the lodestar.

On May 14, 2018, the Special Master submitted his Executive Summary, Report and

Recommendations, and exhibits thereto, under seal. Dkt. # 357. As it relates to Lieff, the Special

Master reached two important legal conclusions: (1) that Lieff contributed to, and therefore,

shared responsibility for, the double-counting errors resulting in an overstated lodestar; and (2)

that Lieff – or any firm – should not be entitled to claim the hours performed by contract

attorneys as generally-accepted legal fees on its lodestar, but are entitled to reimbursement of

those hours as expenses. Accordingly, the Special Master recommended that (1) the Customer

Class firms, including Lieff, should repay the full amount of the overstated lodestar, 9,322.9

hours totaling $4,058,000 to the class, with each firm being responsible for paying one-third, or

$1,352,666.67, of that amount (Dkt. # 357, pp. 363-364); and, (2) the entirety of the contract

attorneys' lodestar, plus the overall multiplier yielded $2,241,098.40[8], less a reasonable expense of $50 per hour for each hour performed, should be disgorged and returned to the class. Dkt. # 357, pp. 158-189; 367-368.

The Report did not, however, squarely address the accuracy of Dan Chiplock's Declaration, submitted to the Court on behalf of Lieff, which describes the amounts presented on the firm's individual lodestar as "time spent by each attorney and professional support staff-member *of my firm* who was involved in the prosecution." Dkt. # 357, Ex. 89. (emphasis added). Importantly, the Chiplock Declaration further states that "[t]he hourly rates for the attorneys and professional support staff *in my firm* [] are the same as my firm's regular rates charged for their services." *See id* (emphasis added). In its written objections, Thornton points out that the contract attorneys listed on Lieff's fee petition were not employed by Lieff, and, in light of this fact, insinuates that the Chiplock Declaration is not entirely accurate. *See* Thornton Objs., pp. 47-48. Given that the Special Master has focused on the accuracy of Garrett Bradley's Declaration, and in particular on similar (but, in context, not identical) representations made to the Court, it is only fair that the Special Master also addresses this additional concern, first raised by Thornton. This is the third issue previewed for the Court at the November 7 hearing and addressed is below.

### III.     Pursuant to Fed. R. Civ. P. 53(f)(1) and the Court's order, the Special Master has discretion to revise his Report and Recommendations as well as address new matters arising in the post-Report stage.

The Special Master, of course, is not bound by the factual findings in the Report.  This is illuminated in the Court's August 10, 2018 order resubmitting the Report to the Special Master,

---

[8] For purposes of responding to Lieff's Objections, the Special Master uses, and accepts as true, the 2899.4 total hours calculated by Lieff, and the firm's corresponding $2,241,098.40 figure rather than the $2,386,058 figure stated in the Report and Recommendations.

as well as its direction to the Master address the firms' objections and other areas of concern. *See* Dkt. # 445.[9] In resubmitting the Report to the Special Master, the Court cited to Fed. R. Civ. P. 53(f)(1), which permits the Court to "resubmit [a Report] to the master with instructions." Fed. R. Civ. P. 53(f)(1). Federal courts that have availed themselves of Rule 53(f)(1) routinely do so alongside additional instructions and areas of focus. *See e.g., D.C. v. Department of Educ.*, 2008 WL 2902079, *7, 10 (D.HI Jul 25, 2008)(ordering the special master to recalculate attorneys' fee award based on the court's criteria); *Buchillon v. Same Deutz-Fahr*, 2017 WL 496078,*4 (N.D. Miss. Feb. 2, 2017)(resubmitting report to the special master for clarification regarding issues and objections filed by the parties). Given the Court's direction, the Special Master now revisits its factual findings and legal conclusions as to Lieff.

While the Court has instructed the Master specifically to address the Law Firms' remaining objections (*see* Dkt. # 455, p. 2), including the proper rate for calculating the lodestar for the contract attorneys and whether a multiplier should be applied to any disgorgement of the original lodestar, the Court did not limit the Special Master *or* the firms to the four corners of the Law Firms' written objections. Rather, the post-Report stage has proven to be an iterative process and one that has prompted the Court, from time to time, to identify several new issues, such as the reasonableness of staff attorney rates – a topic not in dispute by the parties – and what is a reasonable percentage of a $300 million common fund, as well as other issues emerging since the Court vacated the attorneys' fee award in this case. *See* 11/7/18 Hrg. Tr., p. 99: 16-21; p. 102: 2-8; p.103, 7-13. In short, the Court has not limited the Special Master to

---

[9] At the August 9, 2018 hearing, the Court ordered, pursuant to Rule 53 and Rule 24(h)(4), that the Special Master's Report and Recommendations be resubmitted to the Special Master to respond in writing to the then-pending objections of the Customer Class Counsel, to participate in oral argument at a hearing, and have the opportunity to question witnesses if an evidentiary hearing is held. The Court also indicated the Master could perform any related tasks with the Court's permission. 8/9/18 Hrg. Tr., pp. 45:21 - 46:14.

reaffirming verbatim his factual findings should the Special Master wish to revisit those factual findings along with his conclusions of law and recommendations.

IV.   **Because Lieff's actions in the State Street case directly contributed to the submission of $4.1 million in overstated lodestar, the Special Master continues to recommend that Lieff forfeit one-third of the double-counted lodestar and pay it back to the class.**

On one thing the Special Master and Lieff agree – that the double-counting of staff attorney lodestar was inadvertent, although clearly it was the product of an ill-conceived concept of allowing the employees (and contract attorneys) of one firm to get paid by, and put on the lodestar of, another firm. But inadvertence does not guarantee the Customer Class firms a free pass. It is axiomatic that the Court relies heavily on the fee petitions submitted by attorneys in support of their fee award when granting fees to attorneys paid out of a common fund. Because it would lead to a significant drain on judicial resources, it is impossible for the Court to scrutinize individual attorney hours and lodestar. This makes it even more critical for law firms to submit accurate and reliable lodestars for the Court's consideration. Unfortunately, due to a myriad of circumstances, the collective lodestar originally presented to the Court was patently inaccurate and included $4,058,000 worth of attorney time not actually expended.

In investigating the circumstances that led to the double-counting, the Special Master stands on different ground than a trial judge reviewing a petition for the first time. Here, the Court appointed the Special Master not simply to recalculate the lodestar or applied multiplier, but to investigate "all issues that have emerged concerning the court's award of more than $75,000,000 in attorneys' fees, expenses, and service awards" and recommend appropriate redress. Dkt. # 173, pp. 1-3. After extensive investigation of the underlying facts and circumstances, the Special Master recommended that the $4.1 million, representing the overstated lodestar, be paid back to the class as an equitable remedy tailored to make the class

8

whole and to discourage future name-and-cost sharing agreements, that pose such risk, in the future.

Lieff's argument that the Court should not direct the firm to disgorge the recommended $1,352,667.66, is two-fold. First, Lieff argues that disgorgement of the double-counted lodestar amount is inconsistent with the function of the lodestar cross-check as a check on reasonableness. Second, to the extent that the firm has not already suffered enough financially from this mistake, Lieff argues that it is far less culpable than Labaton and Thornton, and, at most, should pay a percentage commensurate with its relatively-minor role in the double counting and consistent with its share of the fee award. Lieff Cabraser Heiman & Bernstein's Objections to the Special Master's Report and Recommendations ("***Lieff Objs.***"), pp. 74-77.

A. The Special Master's recommendation that Lieff disgorge $1,352,666.67 is in addition to a lodestar cross-check and tailored to address the firm's failure to provide accurate information to the Court, which may have resulted in the award of a lesser fee to Plaintiffs' Counsel and a greater recovery for the class, as well as to deter further mistakes.

Lieff takes great exception to the Special Master's recommendation that the Customer Class firms be disgorged dollar-for-dollar the full *amount* of the overstated lodestar. Lieff Objs., 68-73. While it is true that Lieff was not paid by the class on an hourly basis, Lieff's repeated emphasis on the literal mechanics of disgorgement causes the firm to overlook the equitable tasks delegated to the Special Master, particularly in the context of reviewing, after the fact, the reasonableness of a fee award that, admittedly, does not accurately represent the work performed on the case.  Forfeiture of an amount equal to the lodestar erroneously reported on the fee petition recognizes that those overstated hours should not have been included in the first place, and also seeks to deter firms from making such material mistakes in preparing future fee petitions.

   i.  *The Special Master's forfeiture recommendation is not intended to replace a percentage-of-fund calculation or lodestar cross-check, but is an equitable remedy tailored to address the magnitude of the error and need for deterrence.*

The Special Master is not intending to impose a substitute for the District Court's fee award.  The Special Master, rather, he is tasked with evaluating the entirety of circumstances giving rise to an errant fee request and determining how best to address what has emerged as patently inaccurate information. And he does so, now, on a blank slate after the Court vacated the original $75 million fee award. In evaluating the reliability of countless hours and entries, special masters retain discretion to reduce fee awards across-the-board and balance the equities. The Special Master, here, is not limited to correcting a specific "wrong," such as an overbilled event or timekeeper,[10] but, accomplishes the larger goal of rough justice. To be sure, the bounds of rough justice are not confined to recommending "haircuts" to a fee, but may include disgorgement of a portion of the fee if necessary to correct a deficiency in the fee petition. *See, e.g., Ohio- Sealy*, 776 F.2d 646, 657 (7th Cir, 1985) (while percentage reduction of fee award did not constitute an impermissible penalty, preference is for a recommended disgorgement.) Regardless of the vehicle for reduction, the outcome reached through this process is the same – a lesser fee that is more appropriately tethered to the work performed or the outcome in the matter. *See Copeland v. Marshall*, 641 F.2d 880, 891–92 (D.C.Cir.1980)(no need for district court to perform an item-by-item accounting).

  Indeed, in this regard, the Special Master is not persuaded by Lieff that courts are constrained by the percentage-of-fund or lodestar methodology traditionally employed by the district courts reviewing in a fee award for the first time. Here, there is no dispute that the

---

[10] *See, e.g., Natalie M. ex rel. David M. v. Dep't of Educ., Haw.*, Civ. No. 06–00539 JMS–BMK, 2007 WL 2110510, at *7 (D.Haw. July 19, 2007) (adopting special master's recommendation to reduce fees by 30% based on party's limited success in litigation).

original fee award was *inaccurate*. The Court has since vacated that award and directed the

Special Master to address those inaccuracies through a series of recommendations. Given the

unique circumstances giving rise to this fee review, there is a great need for equitable

considerations that render a mathematical lodestar cross-check simply inadequate. For example,

if Lieff were correct that the Court should order disgorgement only upon a yield of an excessive

multiplier, the Court's hands would be tied to redress any misstatements – no matter how

egregious – absent a multiplier that registers as "unreasonable" according to historical

benchmark.[11] This result would render the Court's and the Special Master's review a mere

formality.

    This view would, moreover, fundamentally collide with the recognized need in the First

Circuit for courts to be flexible when determining the scope of an appropriate fee. *See In re*

*Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 308 (1st

---

[11] Put in this context, Lieff's contention that a disgorgement is only appropriate in instances where removal of the double-counted hours yields an unreasonable multiplier and that this is not the case with the almost 2.0 multiplier here – is simply another way of arguing that the Court must function as an accountant rather than an arbiter of justice.  Given the complexity of fee petitions, courts are not so constrained, and may adopt a variety of approaches, including applying across-the-board discounts to reach an equitable result. *See, e.g., Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.*, 776 F.2d 646, 655-657 (1985); *In re Anthem, Inc. Data Breach Litig.*, 2018 WL 1940418, at *11-12 (N.D.Cal. 2018) (Special Master was not bound by strict application of the 25% percentage of fund benchmark, recommending instead the use of a modified lodestar approach with a percentage haircut to appropriately compensate counsel); *see also Moreno v. City of Sacramento*, 534 F.3d 1106, 1115-116 (9th Cir. 2008).

In this same vein, the Special Master points out that Lieff is not *entitled* to receive a multiplier on its individual lodestar. First and foremost, the previous fee award has been vacated, and this the Court is not bound by the reasonableness determinations of Lieff's lodestar as compared to the $75 million total fee award, or the $15,116,965.50 award allocated to Lieff. The Court will look anew at what a reasonable fee award is for all of the Customer Class firms, and it is entirely within the Court's discretion to award, or not award, a multiplier on the hours – whether or not the Court is operating under a lodestar-based or percentage-of-fund calculation with a lodestar cross-check. Moreover, a multiplier is simply not warranted here. A multiplier is given where the Court has determined that, in consideration of all the circumstances of the settlement and the work that went into the underlying case, additional compensation is warranted. *See In re Relafen Antitrust Litigation*, 231 F.R.D. 52, 79 (D.Mass. 2005) (listing the factors to consider when determining a reasonable attorney fee); *Zeffiro v. First Pennsylvania Bank, N.A.*, 581 F.Supp.811, 813 (E.D.Pa. 1983) (holding application of a multiplier to increase a lodestar is not mandatory).

Cir. 1995)(district courts have discretion to use best method or combination of methods to fit individual circumstances); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 265 (D.N.H. 2007)(noting the Court's extremely broad latitude to adjust the contours of the fee petition). Maintaining a more pliable approach enables the Court to balance the thoroughness of a lodestar review with the efficiency of a percentage of fund calculation and is preferred. *See In re Thirteen Appeals*, 56 F.3d at 307. However, no method is foolproof, and one-time adjustments may become necessary where, as here, there is a further need for deterrence.

> ii.    *The Special Master's recommendation that Lieff forfeit a portion of its fee is directly tied to the nature – and value – of the double-counted errors, and serves as a deterrent against future mistakes.*

The need for adopting flexible approach in assessing the fee petition is all the more necessary where, as here, the Special Master, and later, the Court, are tasked with not only reviewing the reasonableness of legitimate work performed but must do so in balance of the various errors and omissions already uncovered. The Special Master's recommendation that the firms each forfeit a portion of the overstated lodestar functions strikes an equitable result, that, while not a literal disgorgement of fees earned, serves as a substantial deterrent against putting themselves in positions fraught with such risk in the future.

While partial fee forfeiture is not imposed with great frequency in the class action context, often reserved to address an unquantifiable harm or breach of fidelity,[12] modest fee forfeiture is appropriate because the risks undertaken by Lieff in agreeing to loan its own employees to Thornton were, in fact, realized.

---

[12] S*ee Austrian & German Bank Holocaust Litig.,* 317 F.3d 91, 102 (2d Cir. 2003); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1237–39 (S.D. Fla. 2006)(imposing a limited forfeiture of incentive award awarded to class representative who forfeited right to seek large award from the class).

Contrary to Lieff's contention that the Court should brush aside the double-counting mistakes because the inclusion of fictitious hours did not render the multiplier *per se* unreasonable, the mistakes made on Lieff's own petition were material. As a whole, the fee petition inflated the total number of hours by 9,322.9 and the total lodestar by $4,058,654.50. *See* Dkt. 357, Ex. 178. Specifically, Lieff overstated lodestar by $868,417 hours, and erroneously credited itself for a substantial portion of hours worked by four different attorneys. *See* Lieff Objs, pp. 98-99. While determination of a lodestar multiplier is one, important function of the lodestar calculation, *see New England Carpenters Health Benefits Fund v. First Databank,Inc.*, 2009 WL 2408560, at*1-2 (D. Mass. 2009), it is not the only one. Nowhere in class action law is it written that the Court may not make assumptions and review the entirety of the information presented to it. Here, the Court may well have considered the additional $868,417, which was counted more than one-and-a-half times as much by virtue of a 1.69 multiplier in approving the fee request.[13] It would have been well within the Court's bailiwick to consider this information.

In recommending forfeiture, the Special Master is cognizant of the fact that fee forfeiture is not a common remedy.[14] But the events necessitating the Special Master's appointment were

---

[13] The Special Master, viewing the fee petition as a whole, has recommended that Lieff disgorge the lodestar fee claimed for contract attorneys at a rate 1.8 times the calculation to account for the overall 1.8 multiplier yielded by a cross-check of the original total attorney hours against the requested $75 million award. Solely for the purposes of addressing Lieff's concerns that disgorgement of the double-counted hours is not warranted, and thus not correct, the Special Master considers the individual lodestar obtained by comparing Lieff's total hours with its 20.3 % portion of the $75 million fee award.

[14] In its objections, Lieff argues, in passing, that the Court should not retroactively remove the contract attorney lodestar (with a lodestar multiplier) from Lieff's lodestar calculation and reimburse the Customer Class firms for the costs expended on a dollar-for-dollar basis. *See* Lieff Objs., pp. 77-78. Lieff's retroactivity argument is misleading, implying that the Master has deprived Lieff of its due process rights. *Contrast Hammond v. United State*, 786 F.2d 8, 11 (1st Cir. 1986). This is far from the case. On March 8, 2017, the Court appointed the Special Master to investigate and assess the accuracy and reliability of the fee petition previously approved, but over which the Court had retained jurisdiction. *See* Dkt. # 173, ¶ 2. As exemplified by the Court's June 22, 2018 and August 10, 2018 orders, the Court has since vacated the fee award and will consider the issue of appropriate fees anew. *See* Dkt. # 331; Dkt. # 445, n. 1. Thus, the appropriate award of attorneys' fees, if any, is still a live issue. Most recently, the Court resubmitted the Report to the Special Master to, among other issues, address Lieff's Objections that directly challenged the Special Master's recommendation that contract attorneys should be treated as an expense. *See* Dkt. # 445, ¶ 2, citing Fed. R. Civ. P. 23(h)(4) and 53(f)(1). The question of how contract attorneys should be treated for

anything but common. The Special Master is simply not swayed by the argument that the relatively minor value of the firm's overstated lodestar, or the lack of access to documentation that would reveal such an overstatement (upon which the Special Master based his finding that Lieff's role was "*somewhat* mitigated," (Dkt. # 357, p. 363), translates into either a lack of culpability or a lesser disgorgement amount for the error. The fact remains that each mistake made, including those by Lieff, contributed to the larger double-counting mistake.

Finally, the recommended $4.1 million disgorgement is both proportionate to the significant monetary recovery realized by Lieff (and the other Customer Class firms) and substantial enough to deter future conduct that would mislead the Court. Forfeiture of $1,352,666.67 amounts to a disgorgement of 8.9 %[15] of Lieff's recovery -- hardly an excessive penalty. *See Ohio-Sealy*, 776 F.2d at 657 (15% reduction does not constitute an impermissible penalty). This amount, moreover, is tied directly to the nature and degree of the Customer Class's mathematical error. The Special Master can think of no more appropriate remedy to discourage Lieff and its counterparts from entering into similarly perilous arrangements in the future and to nullify any financial benefit conferred upon it by its own imprecision and poor judgment.[16]

---

purposes of a fee award remains a dispute before the Court and any deviation from the original treatment given to the contract attorneys will not prejudice Lieff nor be "retroactive" in any legal sense.

[15] On pp. 98-100, Lieff argues it has already born more than its fair share of costs for the $8,670,000 mistake it made. Lieff Objs., pp. 98-100. The Special Master addresses Lieff's contribution to the double-counting error in detail *infra*. Moreover, the Special Master is not persuaded that the costs of the investigation should play a role in determining the appropriate redress for the double-counting error, which the Special Master addresses independently from the expenses incurred by the Customer Class for the ongoing investigation, a recommendation formed more than six months ago.

[16] Here, the Special Master notes that the double-counted hours consisted entirely of hours performed by staff or contract attorneys, which collectively comprised 88.3% of Lieff's total lodestar hours, and $6,606,479.50 of its fee requests. (This calculation is based on reductions for double-counting. Without adjustments, the hours performed by staff or contract attorneys accounted for 89.5% of Lieff's total lodestar hours, for a total of $7,474,896.50 in fee requests).

14

B. Lieff's participation in the ill-advised staff attorney cost-sharing agreement and its mistakes in calculating staff attorney hours render it equally responsible for the double-counting mistake.

Lieff makes much of the fact that the Special Master previously observed that Lieff's relative responsibility for the double-counting is "somewhat mitigated" and that its conduct was "inadvertent." Lieff Objs., pp. 76-77. These general observations do not speak to the *remedy* proposed by the Special Master, and in any event, are not binding findings of fact at this stage in the post-Report proceedings.

The issues concerning Lieff's role in the double-counting error are familiar ones. While the Special Master observed that each of the Customer Class firms played a different role in the double counting story, it is important to point out that the Special Master did not exonerate any of the Customer Class firms – as he did the ERISA firms. Far from it. He, instead, described how the firms' respective courses of conduct converged, together, to cause the submission of the overstated lodestar. And, make no mistake, Lieff attorneys played a substantial role. Dkt. # 357, pp. 219-224. First and foremost, Lieff knowingly entered into an ill-advised arrangement, as did Labaton and Thornton, to allow Thornton to put its own staff attorneys on the Thornton firm's lodestar. *See* Dkt. # 357, pp. 220-221.  Although the agreement itself was not a "significant" cause of the double-counting, its unusual existence invited further mistakes and fostered nondisclosures that more causally explain the overstated lodestar.  It bears repeating that, apart from a single instance at Labaton, *none* of the other Plaintiffs' counsel had participated in such an arrangement to not only share the costs of litigation, but to list the names of attorneys whom it did not employ on the firm's individual lodestar. Goldberg 7/17/17 Dep., pp. 45:22 – 47:15 (Dkt. # 357, Ex. 199); Goldsmith Dep., pp. 98:20 – 99:16 (Dkt. # 357, Ex. 58). In other words, Lieff was a willing participant, and at the origin, stood on equal footing with Thornton and Labaton.

Moreover, neither Lieff, Labaton nor Thornton reduced to writing their understanding about how this name-and-cost-sharing arrangement would be claimed in the fee petitions. That is, there was no explicit agreement to allow Thornton to include the names of staff attorneys employed elsewhere, just a shared understanding between some, but not all, members of the Customer Class firms. Dkt. # 573, p. 45. As the Special Master explained in his Report, the lack of an explicit agreement, between the firms compounded by the internal barriers in Labaton's staffing of the State Street case, helped build a cognitive a barrier to identifying and correcting any mistakes on the lodestar before it went to the Court. Again, the blame for not reducing the agreement to writing must be shared by each of the three firms.

Beyond participating in the agreement, Lieff, like the other Customer Class firms, did not explain nor describe the contours of the staff attorney name-and-cost-sharing arrangement in its individual fee petition. This failure even continued in David Goldsmith's November 10, 2016 Letter, which purportedly disclosed the error to the Court. *See* Dkt. # 116. After receiving a model declaration from Labaton settlement counsel Nicole Zeiss, Lieff had ample opportunity to revise the suggested template language and add additional details explaining that some of the attorneys whom it employed, and who in some instances appeared on its lodestar, also appeared on Thornton's individual fee petition pursuant to an agreement to share the costs. If the firms believed that there was nothing nefarious about loaning staff attorney names to Thornton – even where Thornton did not supervise or otherwise manage the staff attorneys it claimed to employ on its lodestar – adding a brief description (or even denoting which "SAs" were employed by another firm) would not have put the requested fee in jeopardy. Each of the Customer Class firms had an opportunity to share information that it deemed important for the Court to consider, including the pertinent details of the genesis of the hours on the firm petitions upon which the

16

Court calculated the lodestar multiplier and, ultimately, the total attorneys' fee. Lieff, like

Thornton and Labaton, did not present information about sharing the names of the staff

attorneys.

Therefore, turning back to Lieff's argument that it should not be required to pay one-third

of the overstated lodestar because the Special Master observed that the staff attorney cost-sharing

arrangement was not a direct cause of the double-counting, the Special Master highlights the

many ways in which the actions taken by Lieff *after* entering into the arrangement did materially

contribute to the double-counting of hours on the fee petition. For example, had Lieff

memorialized its understanding in an internal memorandum that was shared with its accounting

and administrative offices who assisted in generating the fee petition the case, the contract

attorneys would likely have received adequate instruction on time-submission and record-

keeping practices. Also, had the agreement been memorialized, the accounting office compiling

the lodestar for the fee petition would presumably have accurately designated the hours of Chris

Jordan and Jonathan Zaul between Thornton and Lieff. Furthermore, had Lieff directly addressed

the name-and-cost sharing agreement in its fee declaration, putting the Court on notice of the fact

that attorneys listed on its lodestar also appeared on Thornton's, the Court may have reviewed

those petitions with greater scrutiny and caught itself the double-counted hours well in advance

of the November 2, 2016 hearing – allowing the parties an opportunity to correct it before the

Court approved the fee award.

But perhaps most importantly, Lieff not only knew that Thornton intended to put the staff

and contract attorneys on its own lodestar petition, it implicitly authorized Thornton to do so by

providing names and hours of the staff and contract attorneys to Thornton, and in fact, in at least

one email acknowledged that Lieff would do so. *See* 6/16/17 Dugar Dep., pp. 144:9 - 115:22

17

(Dkt. # 357, Ex. 55); TLF-SST-033277 (email from D. Chiplock D. Goldsmith discussing the origin of the double counting error) (Dkt. # 357, Ex. 261).

But beyond the "what ifs," Lieff explicitly agrees that it made mistakes in calculating the lodestar figures submitted to the Court. Putting aside Labaton's role as Lead Counsel, which granted it unique access to all the firms' lodestars before the final fee petition submission, Lieff had an obligation to accurately report its own hours to Labaton and to the Court. As Lieff's Head of Litigation Support, Kirti Dugar, testified during discovery in the investigation, Lieff failed to supply accurate information in two material respects: (1) the time for two Lieff contract attorneys, Rachel Wintterle and Ann Ten Eyck, should not have been included as part of Lieff's lodestar at all; and (2) a portion of two staff attorneys, Chris Jordan's and Jonathan Zaul's hours, were mistakenly included on Lieff's lodestar for a period of time in which they had been allocated to Thornton. Lieff Obj., pp. 37-38. This much is not in dispute. While the Special Master has found that the mistakes were inadvertent, to be sure, Lieff independently *made* mistakes that contributed to the double-counted hours on the fee petition. These record-keeping errors are just another piece of Lieff's involvement and another factor in weighing the appropriate redress.

Neither Lieff, nor for that matter the other Customer Class firms, can hardly claim surprise that there would be a disgorgement of the double-counted hours. In fact, the firms contemplated that disgorgement would result from Goldsmith's November 10, 2016 Letter. *See* 11/10/16 Ltr. (Dkt. # 357, Exh. 179). The Customer Class firms, concerned that the Court would react negatively to Goldsmith's letter, all signed an agreement whereby the firms would refund their "*pro rata* share of any Court-ordered reduction of fees, expenses, and / or service awards" should the Court reduce the total fee award *Id.* Ultimately, all counsel, including Lieff, signed

onto this agreement. Goldsmith 7/17/17 Dep., p. 160: 2-7 (Dkt. # 357, Ex. 58). In signing this agreement, Lieff recognized that it was possible, if not probable, that the Court may require the Class Counsel firms to disgorge a portion of the fee in response to learning of the overstated lodestar. It is disingenuous for Lieff to now argue that such remedy is contrary to their expectations and to the Court's authority in reviewing the fee award.

In sum, Lieff's actions added to the morass of opaqueness and ambiguity out of which the overstated lodestar was born. Each firm made its own contributions to the error, without any one of which the error may well have either not occurred at all, or been caught by one of the firms or the Court. It is with due consideration of these factors – as well as the respective actions of Labaton and Thornton – that the Special Master recommended that each of the Customer Class firms share equally in paying back the full amount of the overstated lodestar to the class. It is important to point out that the Special Master did *not* equate the firms' respective responsibility for the double counting with the percentage of the overstated lodestar that he recommended each firm pay to the class. *See* Dkt. # 357, pp. 363-364. Because it was not possible to assign percentage responsibility with Talmudic precision, the Special Master, rather, struck a balance to administer "rough justice" to remedy the double-counting errors caused by mistakes, missteps, and omissions of various flavors. *See* Dkt. # 357, p. 376. This is precisely the rationale reflected in the Special Master's statement that "the intent here has been to identify true and unmistakable professional misconduct, to remedy wrongs and to put the law firms and the class roughly in a position that is proportionate to the conduct and the harm." It is not required that a firm engage in professional misconduct *per se* to render it subject to an equitable remedy. As described above, these equitable remedies are not formal discipline or sanctions imposed as a penalty. The Special Master's recommended disgorgement of $4,058,000 recognizes the value of the

overstated lodestar and deters future sloppiness. The fact that Lieff's accounting mistakes only comprise 21.4%, or $868,417, rather than the 33.3% recommended by the Special Master, ignores the equitable nature of his recommended remedy, and is beside the point. Lieff's contribution was a significant and proximate cause of the error.

Lieff further argues that it has already paid more than its fair share of the costs given its relatively small role in the double-counting error and the Special Master's finding that Labaton was solely responsible for the nondisclosure of Damon Chargois' actual role in the case. Lieff Objs., pp. 96-100. The Master has consistently taken the position that the three Customer Class firms should share equally in the costs of the investigation. *See* Dkt. # 357, pp. 372-373. The prolongment of the investigatory phase, after emails referencing Damon Chargois came to light, was as much Lieff's responsibility as it was Labaton's and Thornton's. Lieff was fully aware that Chargois received approximately $4.1 million in this case, and that Chargois did not appear on the fee petition seeking the $75 million award from which he was paid.  Lieff , however, did not take any steps to bring this significant payment to the Special Master's attention prior to August 2017, of its own volition or in response to the Master's discovery requests. In fact, like Labaton – but unlike Thornton – Lieff did not produce numerous emails or other documents relating to the Chargois payment that it has in its possession in response to the Special Master's written discovery requests. This certainly contributed to the prolongment of the investigation. Once the Chargois payment became known to the Master, Lieff and its experts argued and litigated extensively that the Customer Class Counsel firms were under no obligation to inform the Court or class of the payment. Lieff's retrospective compartmentalization of its role in the entirety of the investigation is not supported by its very active role, including the proffering of expert

20

testimony, in opposing the Master's positions on issues well beyond its particular role in the

doublecounting or its inclusion of contract attorneys in its lodestar.

> **V.     The Special Master continues to recommend that contract or agency attorneys employed by third-party staffing companies be billed as an expense.**

The issue of how contract attorneys should be treated has ramifications beyond this case,

and the Special Master believes it is one of the most far-reaching and significant issues that the

Special Master identifies in his Report. It is not simply a question of mathematical services and

calculation of hours; it is an issue that goes directly to the integrity of the legal process and

public confidence in how attorneys are compensated. As the Court has indicated in these

proceedings, it has "a duty to protect and promote the integrity of the administration of justice."

10/15/18 Hrg. Tr., p. 13: 6-7 (Dkt. # 496). The December 17, 2016 *Boston Globe* article focused

on the treatment and mark-up of staff and contract attorneys, which highlights the importance of

this issue to the public and how the proverbial man on the street views the justice system.

Lieff, and to some extent Thornton, argue that treating contract attorneys as a litigation

expense is a sharp departure from current class-action jurisprudence. Relying on an overly-

simplistic observation of current trends, Lieff baldly argues that federal courts are, instead,

unanimously *opposed* to the Master's position that contract attorneys be billed at cost rather than

marked-up as a legal fee. Lieff Objs., pp. 79-84.  While some federal courts have declined to

distinguish between a full-time associate employed by a law firm and a non-permanent "contract

attorney" for purposes of allowing a mark-up and assignment of a multiplier, only one court has

squarely addressed the difference *among* the various types of non-associate or "contract"

positions, such as the staff and contract attorneys utilized in the State Street case.  *See In re*

*Citigroup Inc. Bond Litigation*, 988 F.Supp.2d 371, 376-378 (S.D.N.Y. 2013). As the Special

Master has noted, the role of staff and contract attorney differ greatly in compensation, employment status, benefits, job security, and firm responsibility. However, even in *In re Citigroup Inc. Bond Litigation*, the court only noted briefly at the difference, focusing instead on the role and value of staff attorneys in particular.

Courts have routinely focused their discussion on the generic label of "contract attorneys," without specifying whether this term included or excluded other non-associate attorneys who may have more permanent employment arrangements. *See e.g. In re: Cathode Ray Tube (CRT) Antitrust Litig.,* 2016 WL 4126533, at *8-9 (N.D. Cal. 2016). While these rather superficial discussions have yielded a consistent trend of decisions approving those "contract attorneys" at marked-up rates less than those of a firm associate (*see* discussion, *infra*), none of these courts have meaningfully analyzed the differences between contract attorneys essentially rented from a staffing agency on the one hand, and non-associate attorneys actually hired by the law firm on the other, nor on the more important issue whether the former should be marked-up at all, as was the case here.

Customer class Counsel, and other similarly situated firms, should not be rewarded for skirting the responsibilities and obligations inherent in a full employment relationship by relying on temporary attorneys to staff its cases. The use of temporary workers is not implicitly wrong, and in fact, delegation to lower-cost attorneys can be a useful tool for cost savings and efficiency. Often times, this practice allows a firm to take on larger cases and save money for its clients. However, when firms rely heavily on contract attorneys – in lieu of regular employees – as a way to net a larger profit, the likelihood of a windfall and delegating effects on fostering up and coming attorney talent far outweighs any public policy interest. And, in holding out such a farce to the court, the class, and the public at large, firms engaged in this practice not only derail

the public's confidence in the judiciary but directly harm the attorneys at the center of the scheme. *See Schwann v. FedEx Ground Package System, Inc.*, 2017 WL 4169425, at *4 (D.Mass. 2017) (analyzing Massachusetts's independent contractor statute, *citing* to *Somers v. Converged Access, Inc.,* 454 Mass. 582 (2009)*,* finding the Legislature was concerned with "the 'windfall' that employers enjoy from the misclassification of employees as independent contractors: the avoidance of holiday, vacation, and overtime pay; Social Security and Medicare contributions; unemployment insurance contributions; workers' compensation premiums; and income tax withholding obligations"). Permitting law firms to mark-up contract attorney rates for the purposes of increasing profits goes against the very tenets of an employer-employee relationship.

It should be the goal of law firms, such as Lieff, to fully employ the attorneys they trust to handle such high level work—as it had done in some instances to date—rather than profit off their status as temporary workers. The policy concerns described greatly inform the Special Master in addressing the proper treatment of contract attorneys in this case. Indeed, the Master's investigation has not been conducted in a vacuum but arose directly out of the concerns raised by the *Boston Globe*, and moving forward, the Special Master is conscious of the implications his Report and Recommendations has on how the public views the judicial system and how important it is to take measures to rebuild that confidence.

Thus the Special Master agrees to some extent with the prevailing view that paying clients should pay attorneys retained by law firms on a temporary basis or only for one-off cases at a rate less than that paid to firm associates. *See City of Pontiac Gen. Employees' Ret. Syst. V. Lockheed Martin Corp.*, 954 F.Supp.2d 276, 280 (S.D.N.Y. 2013) ("a sophisticated client, knowing these contract attorneys cost plaintiff's counsel considerably less than what the firm's

associate attorneys cost (in terms of both salaries and benefits) would have negotiated a substantial discount in the hourly rates charged the client for these services."); *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 395 (S.D.N.Y. 2013) ("[c]ourts seem to agree that a contract attorney's status as a contract attorney – rather than being a firm associate – affects his market rate"); *In re Citigroup Inc. Bond Litigation*, 988 F.Supp.2d at 377 ("[t]he Court does question, however, whether the proposed blended hourly rate for staff attorneys actually reflects what a reasonable client would pay); *In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *18 (S.D.N.Y. 2013) ("there is absolutely no excuse for paying those temporary, low-overhead employees $40 or $50 an hour and then marking up their pay ten times for billing purposes."). In fact, the basic rationale applied by the Courts in making this distinction – that the firm does not assume the same financial, administrative, and employment overhead – resonates with the Master in determining the precise rates that should be paid to contract attorneys in the State Street case.

Where the Special Master parts ways with these courts is the distinguishing of fully-employed attorneys from those working on one-off cases. None of the cases cited by Lieff discuss the various factors that should be considered in evaluating whether a non-associate attorney should be included on the lodestar but focus exclusively on addressing contract attorneys vis-à-vis their associate counterparts. Nor do they, or the vast majority of cases commenting on contract attorney rates, discuss the import of having hourly employees on the validity of overall fee that should be granted in a class action case. *See, e.g.,* LCHB Objs., pp. 80-81, *citing In re Tyco Int'l, Ltd. Multidistrict Litig.,* 535 F. Supp. 2d 249 (finding it appropriate to bill contract attorney's time at market rates because associate and contract attorneys alike are licensed attorneys); *In re Petrobras Securities* Litigation, 317 F.Supp.3d 858, 874-876 (S.D.N.Y.

2018); *In re Anthem, Inc. Data Breach Litigation,* 2018 WL 3960068, at *17-20 (N.D. Cal. 2018); *In re Optical Disk Drive Prod. Antitrust Litig.*, 2016 WL 7364803, at *8 (N.D. Cal. 2016). *See also* Rubenstein 1st Decl., n.41. Indeed, while some courts have dipped their toes in these waters, they have not waded in deeply.

Bearing in mind this legal landscape, the Special Master continues to argue, as he did in his Report, that the practice of treating contract attorneys the same as staff attorneys in a lodestar claim, while paying them dramatically lower fees, and while having no obligation to pay benefits or overhead, is unfair to the contract attorneys and to the class. This inequitable practice creates a windfall and is of benefit only to the firms and should cease. But this recommendation in no way alters the Special Master's conclusion that qualified staff attorneys should be compensated at prevailing market rates. While the Court has raised the issue of the appropriate rate for staff attorneys, the Special Master has described in detail the rationale for permitting a modest mark-up of staff attorney rates in his Report. *See* Dkt. # 357, pp. 176-189. The Special Master reaffirms and restates those reasons here, and continues to draw a sharp distinction between staff attorneys employed by the firms on a long-term basis and the rented contract attorneys. Therefore, the Special Master supports Lieff's and Thornton's previous position that their staff attorneys should be compensated at prevailing market rates.

VI.    **The Chiplock Declaration further illuminates the incongruity of treating contract attorneys as a legal fee on a lodestar submitted in support of a fee petition.**

In its own Objections, Thornton points out that Daniel Chiplock, the lead litigator on the State Street case for Lieff, submitted a declaration that imprecisely described contract attorneys retained by Lieff in this case, and included on the Lieff and Thornton fee petitions, as employees:

"The Lieff and Labaton affidavits, under the Special Master's hyper-technical reading, also appear to be false. The Lieff affidavit, for instance, lists as Lieff

Cabraser "employees" attorneys who were actually "contract" or "agency" attorneys with whom Lieff Cabraser did not have an employer-employee relationship. *Compare* Chiplock Decl., 9/14/16 (SM Ex. 89) (referring to all attorneys in same manner as Bradley Declaration) with Lieff's Resp. to Interrog. No. 24, 7/10/17 (TLF Ex. 6) (noting some attorneys listed on lodestar were contract attorneys). Thornton Objs., pp. 47-48.

Thornton goes on to argue that, just as Lieff (and Labaton) should not be sanctioned for such imprecision, neither should Thornton and Garrett Bradley. As explained in the Special Master's Response to Thornton's Objections, the Court should reject Thornton's effort to skirt responsibility for making multiple false and misleading claims by mischaracterizing them as "hyper-technical" or by implying that "everybody does it."

To be sure, Lieff's description of the outside contract attorneys as members of the firm is inaccurate. The Chiplock Declaration describes the firm's lodestar calculation [Exhibit A] as follows:

> Exhibit A is a summary indicating the amount of time spent by each attorney and professional support staff-member *of my firm* who was involved in the prosecution of the Class Actions, and the lodestar calculation based on *my firm's current billing rates*. For personnel who are no longer *employed by my firm*, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of *employment* by my firm. The hourly rates for the attorneys and professional support staff *in my firm* included in Exhibit A are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions. Chiplock Decl, ¶¶ 4-5 (Dkt. # 357, Exh. 89) (emphasis added).

Read together, and in context, the Chiplock Declaration leads the Court to believe that all of the individual attorneys listed in the firm's lodestar, submitted along with the firm's fee submission, are employees of the firm. This is not correct. Lieff did not employ the handful of contract attorneys retained by the firm to assist in the State Street case. While some of the contract attorneys may have worked from Lieff's physical office space or appeared on the firm's

malpractice policy, they were not *employees,* as suggested by the Declaration. Lieff Objs., pp. 86-88.

But the similarity to Garrett Bradley's misstatements in his own Declaration ends there. Unlike Bradley's many patently false statements concerning contract attorneys that ran afoul of this same language, Lieff's language was at least somewhat tethered to the reality of the relationship of these attorneys to Lieff. While imprecise, Lieff's description of its contract – as opposed to staff – attorneys as employees was far less misleading because Lieff maintained *some* relationship with those attorneys, who, in the case of two attorneys, worked at Lieff's offices and had a longstanding relationship with the firm, albeit not a formal employer-employee relationship.

Therefore, although perhaps sloppy in its use of loose language to describe the relationship, the statements in Chiplock's Declaration do not, in the Special Master's estimation, rise to the level of out-right, blatant misrepresentations of multiple facts. Accordingly, the Special Master does not recommend discipline for this, and believes that a simple admonishment from the court to be more careful in the future would suffice.

A final word generally about the larger issue of treating contract attorneys like a firm's employee attorneys for lodestar purposes is appropriate here. Thornton's argument does underscore the incongruity of treating contract attorneys like staff attorneys in a lodestar submitted in support of a fee petition.  Specifically, Thornton's observation—or concession— that contract attorneys are not "employees" highlights why staff attorneys, who are actual employees who have been vetted in hiring, are receiving attorney-level compensation and benefits, and who have a stake in their firm's future, should be accordingly valued in the lodestar, while contract attorneys, who are rented from a third-party company, did not receive

benefits from the firm and have no investment in the firm's future, should be treated as the expense which their transient and transactional relationship to the firm warrants.

### VII.    Conclusion

Lieff's decision to allow Thornton to claim Lieff staff attorneys and contract attorneys on Thornton's lodestar and its failure to ensure that accurate information was provided to the Court, directly contributed to the double counting and over-stated lodestar in this case and Lieff's responsibility is not obviated by the lodestar's function as a cross-check on the percentage of fund fee award or by Labaton's failures.  Lieff's treatment of contract attorneys as equal to its firm's staff attorneys for lodestar purposes is inequitable, unsupported, and against the interests of the class and the legal profession. Just as importantly, to permit non-employee, rented lawyers to be marked up by a magnitude of eight to ten times, then to be marked up again through a lodestar multiplier of almost two times, will undermine public confidence in the integrity of class action attorney compensation. And, if a court were to condone this, it would invariably undermine the public's confidence in judicial supervision and oversight of the entire attorney fee compensation process, not to mention potentially undermining the Court's role as a fiduciary for the class.

For all the reasons set forth in this response, the Special Master recommends that the Court order Lieff to pay one-third of the approximately $4.1 million overstated lodestar and additionally that Lieff disgorge and return to the class the contract attorneys' lodestar of $2,241,098.40, less a reasonable expense of $50 per hour for each hour of work performed.

Dated: November 20, 2018

Respectfully submitted,

**SPECIAL MASTER HONORABLE
GERALD E. ROSEN (RETIRED),**

By his attorneys,

   */s/ William F. Sinnott*      
William F. Sinnott (BBO #547423)
Elizabeth J. McEvoy (BBO #683191)
BARRETT & SINGAL, P.C.
One Beacon Street, Suite 1320
Boston, MA 02108
Telephone: (617) 720-5090
Facsimile: (617) 720-5092
Email: wsinnott@barrettsingal.com
Email: emcevoy@barrettsingal.com

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed electronically on November 20, 2018 and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing ("NEF").  Paper copies were sent to any person identified in the NEF as a non-registered participant.

   */s/ William F. Sinnott*     
William F. Sinnott