UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ARKANSAS TEACHER RETIREMENT SYSTEM,
on behalf of itself and all others
 similarly situated,
                      Plaintiff,

vs.                                                                No. 11-cv-10230-MLW


STATE STREET BANK AND TRUST COMPANY,
                      Defendant.
_____/

ARNOLD HENRIQUEZ, MICHAEL T. COHN,
WILLIAM R. TAYLOR, RICHARD A.
SUTHERLAND, and those similarly situated,
                      Plaintiffs,
                                                                   No. 11-cv-12049-MLW

vs.


STATE STREET BANK AND TRUST COMPANY,
                      Defendant.
_____/

THE ANDOVER COMPANIES EMPLOYEE
SAVINGS AND PROFIT SHARING PLAN, on
Behalf of itself, and JAMES PEHOUSHEK-
STANGELAND and all others similarly situated,
                      Plaintiffs,
                                                                   No. 12-cv-11698-MLW

vs.


STATE STREET BANK AND TRUST COMPANY,
                      Defendant.
_____/


## SPECIAL MASTER'S PARTIALLY REVISED REPORT & RECOMMENDATIONS SUBMITTED IN RESPONSE TO THORNTON LAW FIRM'S OBJECTIONS[1]

---

[1] The Special Master herein references and incorporates the Master's Partially Revised Report and Recommendations Submitted in Response to Lieff Cabraser Heimann & Bernstein's Objections, filed simultaneously with the Court. Lieff and Thornton both argue that the Special Master erred in recommending (1) the disgorgement of the $4.1 million double-counted lodestar and (2) that contract attorneys should be treated as an expense and billed at cost. *See* Lieff Cabraser Heiman & Bernstein's Objections to the Special Master's Report and Recommendations ("***Lieff Objs.***"), pp. 67-95. Thus, the Special Master addresses each argument separately, but, for the sake of brevity, incorporates his responses to Lieff's Objections in responding to Thornton, as set forth below.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      Introduction……………………………………………………...  2

II.     Relevant background relating to Thornton's receipt of attorneys'
        fees from the State Street fee award……………………………………  4

III.    Pursuant to Fed. R. Civ. P. 53(f)(1) and the Court's order, the
        Special Master has discretion to revise his Report and
        Recommendations as well as address new matters arising in
        the post-Report stage………………………………………………  5

IV.     Because Thornton spearheaded the name-and-cost-sharing agreement,
        greatly contributing to the circumstances out of which the
        double-counting arose, the Special Master continues to recommend
        that Thornton pay one-third of the double-counted hours to the class…….  6

        A.      The Special Master's recommendation that Thornton disgorge
                one-third of the overstated lodestar adequately addresses the
                firm's failure to provide accurate information that may have
                resulted in a lesser attorneys' fee…………………………….  8

        B.      Thornton's central role in pursuing a name-and-cost-sharing
                agreement renders it at least equally responsible for the
                double-counting errors in the fee petition…………………………  10

V.      The Special Master recommends that Thornton disgorge an
        additional $1,344,057 reflecting the contract attorney lodestar
        it claimed on its fee petition………………………………………………  12

VI.     The Special Master continues to recommend that Rule 11 sanctions
        be imposed on Garrett Bradley, as well as a referral to the Board of
        Bar Overseers, based on Bradley's utter failure to make an inquiry
        reasonable under the circumstances in submitting a sworn declaration
        to the Court in support of a $75 million fee award………………………..  13

        A.      The evidence shows that Garrett Bradley intentionally
                entered into and furthered Thornton's participation in the
                ill-advised cost-and-name sharing agreement as an attempt
                to receive a greater fee…………………………………………..  15

Page

B.   Contrary to Thornton's unfounded claims that the Special
     Master misrepresented the record concerning intentionality,
     the evidence establishes that Garrett Bradley and Thornton
     had ample opportunity to review and correct statements they
     knew to be false but nevertheless executed the Declaration………   16

C.   The Special Master's findings are consistent that Garrett
     Bradley knew the declaration contained inaccurate statements
     but signed it anyway……………………………………………   19

D.   The evidence refutes Thornton's claims that the Bradley
     Declaration was a mere mistake that was timely corrected………   19

E.   A monetary sanction of $400,000 to $1 million imposed
     jointly on Garrett Bradley and the Thornton Law Firm is
     compatible with the purpose of Fed. R. Civ. P. 11, is
     proportional to the egregious degree of Thornton's and
     Bradley's violation and is necessary for deterrence……….……...   22

VII.  Because Michael Bradley's rate of $500/hour was unreasonable,
      Thornton should disgorge the differential between the claimed
      lodestar value and an adjusted lodestar value at $250/hour, and not
      receive a multiplier……………………………………………....   24

A.   A $250/hour rate properly recognizes the value and role
     served by Michael Bradley in the State Street case……………..…   24

B.   Disgorgement of half the lodestar generated from
     Michael Bradley's listed $500/hour rate is an equitable
     remedy imposed in response to the Special Master's finding
     that $500/hour rate was not reasonable…………………….…   25

VIII.  Conclusion…………………………………………………....…   26

I.     **Introduction**

On May 14, 2018, the Special Master submitted his Report and Recommendations and exhibits thereto, under seal ("Report"). Among other topics, the Report addressed the accuracy and reliability of the fee petition submitted by Plaintiffs' counsel in *Arkansas Teachers' Retirement System v. State Street, et. al.,* No. 11-cv-10230 ("State Street"). On June 29, 2018, the Thornton Law Firm ("Thornton") filed detailed objections to the findings of fact, conclusions of law, and recommendations in the Report.[2]

On August 10, 2018, the Court resubmitted to the Master his Report and directed him to amend, or to make revisions to, the Report that may have been occasioned by the firms' objections and exceptions. *See* Dkt. # 445; 8/9/10 Hrg. Tr., pp. 45:21-46:5. In late August, while Thornton's, and all counsel's, objections remained pending, the Special Master – prompted a conversation initiated by Labaton – took steps to determine if a global resolution with all firms was viable. With the Court's approval, the Special Master invited all firms to attend an all-day meeting in Boston to further explore the possibility of a global resolution. The Master was not able to reach agreement with Lieff and Thornton consistent with his understanding of his responsibilities to the Court and, therefore, Lieff and Thornton's objections remain outstanding.

On October 16, 2018, the Court directed the Special Master and Thornton to confer as to whether they could agree to narrow the scope of the issues remaining in dispute. Dkt. # 494. Counsel for the Special Master and for Thornton were able to narrow the disputed issues considerably in light of the still-pending Proposed Partial Resolution between the Special

---

[2] All three Customer Class Counsel filed written objections shortly after the Court unsealed the Report and Recommendations. *See* Dkt. # 359 (Labaton's Objections) and Dkt. # 367 (Lieff's Objections). The ERISA Firms subsequently filed written exceptions to Labaton's Objections contesting, mainly, the payment of additional monies to the ERISA Firms. *See* Dkt. # 387; Dkt. # 398; Dkt. # 392.

Master, Labaton, and the ERISA Firms. *See* Dkt. # 503. However, the following legal issues

remain in dispute as to Thornton:

1. With respect to the double counting of staff attorney hours, there are three separate issues: (1) the extent to which Thornton was at fault for the $4.1 million double counting error; (2) whether Thornton should disgorge or forfeit some portion of the $4.1 million of overstated lodestar;[3] and, if so, how,[4] much?

2. Whether time expended by the contract attorneys reported on Thornton's lodestar should be calculated as an expense [entitled to a market mark-up and lodestar multiplier], rather than as legal fees on the attorney lodestar?

3. With respect to the proposed Rule 11 sanctions, there are two main issues: (1) whether the actions and/or inactions on Thornton's and/or Garrett Bradley's behalf merit Rule 11 sanctions; and (2) whether the sanctions proposed by the Special Master were reasonable and appropriate? A third, related, issue is whether Garrett Bradley's conduct warrants referral to the Board of Bar Overseers for discipline?

4. Whether an outside expert or former judge should be appointed to ensure Thornton's compliance with applicable ethical rules moving forward?; and

5. Whether Thornton should disgorge the value of the lodestar listed on its fee petition for work performed by Michael Bradley?

Just as Thornton pointed out additional concerns pertaining to Lieff's fee petition, Lieff

highlights in its objections that the Special Master did not specifically recommend that Thornton

– which listed four contract attorneys retained by Lieff on its individual lodestar[5]-- disgorge the

total lodestar it received for that work. The Special Master herein addresses Lieff's concerns in

two ways: first, the Special Master reaffirms and restates his recommendation that all firms

---

[3] Thornton's objection to the Special Master's recommendation that the firm disgorge a portion of its fee that led to an overstated lodestar is part of the firm's broader objection to the Master's recommendation that it disgorge any portion of its fee – including disgorgement of Michael Bradley's lodestar included on the firm's collective lodestar – because the concerns raised by the Special Master do not materially affect the resulting multiplier received by the firm. Lieff raises an analogous objection to the Master's recommendation as to issues (1) and (2) listed above.

[4] Bracketed language connotes additional clarifications to the list of issues submitted to the Court on October 25, 2018. Dkt. # 503.

[5] The following contract attorneys, retained by Lieff, appeared on the Thornton lodestar: Ann Ten Eyck, Rachel Wintterle, Andrew McClelland, and Virginia Weiss.

claiming (non-permanent and non-employee) contract attorneys on their lodestars should treat them as an expense and that contract attorneys not be listed on the attorney lodestar at marked-up rates and eligible for a multiplier; and, second, that in light of this distinction, Thornton should disgorge approximately $1,344,057, representing the total lodestar it claimed for contract attorneys, to the class.

## II.     Relevant background relating to Thornton's receipt of attorneys' fees from the State Street fee award.

On March 8, 2017, the Court appointed the Hon. Gerald E. Rosen (ret.) to investigate the accuracy and reliability of the fee petition ("Appointment Order") submitted in the State Street case seeking $75 million[6] in attorneys' fees. Dkt. # 173.  The Special Master's appointment was prompted, in large part, by a December 2016 article in the *Boston Globe* following the submission of a letter by Customer Class Counsel (Labaton Sucharow, Lieff Cabraser Heimann & Bernstein, and the Thornton Law Firm) on November 10, 2016, disclosing an error on the fee petition caused by double-counting certain hours performed by staff attorneys employed by Lieff and Labaton ("November 10, 2016 Letter"). *See id*, pp. 1-3. The *Globe* article focused on, among other issues, the large mark-up on "contract" attorneys[7] as well as the $500/hour hourly rate claimed by Thornton on its fee petition for work performed by Michael Bradley, an outside attorney and brother of Thornton's managing partner Garrett Bradley, who was not employed by, or and who did not work direct with or for, Thornton or any of Plaintiffs' Counsel in this case.

Over the ensuing fourteen months, the Special Master engaged in informal interviews with nearly all of the attorneys involved in the mediation and settlement of the case, and in

---

[6] The original fee petition sought $74,541,250.

[7] The Boston Globe article did not differentiate between staff attorneys actually employed by the firm and contract or agency attorneys employed by outside staffing agencies.

particular, those individuals who prepared the fee petition, and memorialized this testimony through the formal discovery process. *See* Dkt. # 357, p.138. While the discovery of a $4.1 million payment to Texas attorney Damon Chargois – prompted by documents produced by Thornton in response to the Special Master's Requests for Production – expanded the landscape of the Master's investigation, the substantive issues raised by the Special Master in his Report concerning Thornton largely had nothing to do with the payment to Chargois.[8]

### III. Pursuant to Fed. R. Civ. P. 53(f)(1) and the Court's order, the Special Master has discretion to revise his Report and Recommendations as well as address new matters arising in the post-Report stage.

The Special Master, of course, is not bound by the factual findings in the Report, given the Court's direction in its August 10, 2018 order that the Master address the firms' objections and the Court's subsequent instruction to the parties. *See* Dkt. # 445.[9] In resubmitting the Report to the Special Master, the Court cites to Fed. R. Civ. P. 53(f)(1), which permits the Court to "resubmit [a Report] to the master with instructions." Fed. R. Civ. P. 53(f)(1). Federal courts that have availed themselves of Rule 53(f)(1) routinely do so alongside additional instructions and areas of focus. *See e.g., D.C. v. Department of Educ.*, 2008 WL 2902079, *7, 10 (D.HI Jul 25, 2008)(ordering the special master to recalculate attorneys' fee award based on the court's

---

[8] Having said this, it bears noting that Thornton's managing partner, Garrett Bradley, had extensive dealings directly with Chargois and concerning Chargois' compensation. Because of this, and because Bradley was also serving as "Of Counsel" to Labaton for purposes of business development, as well as other reasons, the Special Master did not find credible Bradley's testimony that he was not aware of the full nature of Labaton's arrangement with Chargois. However, because it was not possible to fully parse Garrett Bradley's role in the Chargois arrangement vis-à-vis the two hats he was wearing, and because Labaton was ultimately responsible for the Chargois arrangement, the Special Master, in the end, decided to charge only Labaton, and not Bradley or Thornton with responsibility for the Chargois arrangement and the concomitant disgorgement remedy. However, it would not be saying too much to assign at least some responsibility for Chargois to Bradley, because of his dual role with Thornton and Labaton.

[9] At the August 9, 2018 hearing, the Court ordered, pursuant to Rule 53 and Rule 24(h)(4), that the Special Master's Report and Recommendations be resubmitted to the Special Master to respond in writing to the then-pending objections of the Customer Class Counsel, to participate in oral argument at a hearing, and have the opportunity to question witnesses if an evidentiary hearing is held. The Court also indicated the Master could perform any related tasks with the Court's permission. 8/9/18 Hrg. Tr., pp. 45:21 - 46:14.

criteria); *Buchillon v. Same Deutz-Fahr*, 2017 WL 496078,*4 (N.D. Miss. Feb. 2, 2017)(resubmitting report to the special master for clarification regarding issues and objections filed by the parties).

While the Court has instructed the Master specifically to address the Law Firms' remaining objections (*see* Dkt. # 455, p. 2), including the proper rate for calculating the lodestar for the contract attorneys and whether a lodestar should be applied to any disgorgement of the original lodestar, the Court did not limit the Special Master *or* the firms to the four corners of the Law Firms' written objections. Rather, the post-Report stage has proven to be an iterative process and one that has prompted the Court, from time to time, to identify several new issues, such as the reasonableness of staff attorney rates – a topic not in dispute by the parties – and the reasonable percentage of a fee award drawn from a $300 million common fund, as well as other issues emerging since the Court vacated the attorneys' fee award . *See* 11/7/18 Hrg. Tr., p. 99: 16-21; p. 102: 2-8; p.103: 7-13 (Dkt. # 519). In short, the Court has not limited the Special Master to reaffirming verbatim his factual findings should the Special Master wish to revisit those factual findings along with his conclusions of law and recommendations.

IV.     **Because Thornton spearheaded the name-and-cost sharing agreement, greatly contributing to the circumstances out of which the double-counting arose, the Special Master continues to recommend that Thornton pay one-third of the double-counted hours to the class.[10]**

Similar to Lieff, Thornton objects to the Special Master's recommendation that it pay back a one-third share of the overstated lodestar ($1,352,666.67) on two grounds: (1) that the Special Master "confuses" the function of a lodestar cross-check in recommending dollar-for-

---

[10] The Special Master addresses the rationale for disgorging the full value of the double-counted lodestar, as well as the treatment of contract attorneys, in detail in his Responses to Lieff's Objections, and herein incorporates that substantive discussion in discussing those same issues raised by Thornton.

dollar disgorgement of the overstated lodestar amount; and (2) that Thornton was not responsible.

We begin by restating a point on which all parties agree: the double counting errors made in the fee declarations submitted to the Court were largely inadvertent. Dkt. # 357, pp. 7, 352, 363. Thornton would have the Court believe that such inadvertence should be the end of the inquiry on the double-counting disgorgement. However, in clinging to this notion, Thornton fails to appreciate the larger point that mistakes *were* made – and Thornton contributed substantially to these mistakes -- and some redress must be recommended.[11] Given the breadth and complexity of the attorneys' fees generated in large class action cases, the Court must rely on the attorneys to accurately summarize and submit their time for compensation at the end of a case. *See* Special Master's Responses to Lieff, p. 8. Where the information submitted to the Court does not accurately convey the work performed, or the circumstances upon which the fee request is made, steps must be taken to make up for the shortcomings of those errors, which here include a myriad of consequences stemming from the name-and-cost sharing agreements for one firm to list the names of employees of another firm on its lodestar.  And, because the Court has vacated the fee award, it – and the Special Master the Court appointed to scrutinize these errors – is well within its discretion to exercise its equitable authority to properly adjust the fee award in a manner that addresses the lodestar error and deters such avoidable errors in the future.

---

[11] Here, it should be noted that Thornton benefited disproportionately to the other firms from the artifice of putting the attorneys employed (or retained) by Labaton and Lieff on its own lodestar. This is because Thornton did not have sufficient employees itself to generate a substantial lodestar on its own and it was only by putting the attorneys of the other firms on its lodestar that it was able to generate the lodestar hours to justify a substantial fee award, and it was, of course, this artifice that led to the double counting error – and to where we are today.

A. <u>The Special Master's recommendation that Thornton disgorge one-third of the overstated lodestar adequately addresses the firm's failure to provide accurate information that may have resulted in a lesser attorneys' fee.</u>

Thornton's contention that the overstatement of 9,322.9 hours, yielding $4,058,000, had no effect on the Court's approval of attorneys' fees in this case is not tethered to reality. Its insistence that the lodestar functions "*only* as a means of verifying the reasonableness of the percentage of the recovery being awarded to the attorneys" overlooks both the gatekeeping role of the Court and the great degree of equitable discretion delegated to the Special Master to impose across-the-board adjustments to a fee award even after a District Court has approved the request. *See* Special Master's Responses to Lieff, pp. 11-12 (summarizing the authority of court-appointed special masters to impose one-time reductions to account for problems with a fee submission). Indeed, where, as here, the Court has vacated the original fee award, the recommendations of the Special Master, tasked with balancing the equities and legitimate contributions to the outcome against the hours and rates set forth in the fee petition, goes directly to the core of the Court's gatekeeping function and its fiduciary obligations to the class. It may well be the case that the Court considers these recommendations in determining how it should reapportion the fee award to account for the various mistakes and nondisclosures in the original submission, but in no event is the Special Master confined to conducting a bookkeeping exercise.[12]

Therefore, the Special Master has considered the circumstances that led to the $4.1 million counting error, including the Court's statement at the November 2, 2016 fairness hearing

---

[12] The Special Master continues to recommend that the original $74,541,250.00 fee award serve as the starting point for the Court in issuing a revised fee award. Putting aside the mistakes that have overshadowed the admirable settlement achieved for the class, an award of $74,541,250.00 is reasonable and largely justified by the tenacious advocacy and time expended by all of the law firms representing the class in this case. The Special Master's proposed recommendations and remedies offer the Court some guidance as to how to address, among other things, the double-counting error that prompted the *Boston Globe* article and led to the Special Master's appointment in this case.

that it intended to apply a 20-30% of fund fee award against a lodestar cross-check as well as the magnitude of the error itself, and has recommended partial fee forfeiture to be shared equally by all three Customer Class firms. *See* Dkt. # 357, pp. 363-364. While disgorgement is not a popular remedy among federal courts, in this instance, the punishment fits the crime. On balance, the Special Master recommended that the Customer Class firms disgorge 6.05 %[13], of the total fee award received by the Customer Class firms, and that Thornton, which, as set forth below, significantly contributed to the double-counting mistake, disgorge 7.4 % of the firm's portion of the fee award.[14]

A disgorgement of $1,352,666.67 by Thornton is appropriate because, in practice, payment of the one-third amount reduces the monies claimed by the firm as of a result of its agreement to include the names of Lieff and Labaton staff and contract attorneys on Thornton's lodestar. In fact, staff or contract attorney hours comprised approximately 71.5 % of Thornton's individual lodestar. It is fitting that the value claimed by Thornton under the same ill-advised arrangement that gave rise to the billing error be proportionately reduced to account for Thornton's material role in causing the overstatement.

Finally, as the First Circuit has recognized, "individualization is the name of the game." *In re Fid./Micron Sec. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999); *see also In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 308 (1st Cir. 1995)(favoring a flexible approach to determining fee awards rather than confinement to a single award method). Because the events giving rise to the double-counting error – including

---

[13] For calculation purposes, the total Customer Class firm fee includes the $4,099,768.75 allocated to Chargois.

[14] The Customer Class firms agreed to allocate the non-ERISA share of the fee award as follows: 47% paid to Labaton; 29% paid to Thornton; and 24% paid to Lieff. *See* Thornton Law Firm's Objections to the Special Master's Report and Recommendation's ("***Thornton Objs.***"), Ex. 7 & 8.

participation in an otherwise unheard-of name-and-cost sharing agreement to list employees of another firm on a lodestar petition – were anything but ordinary, the Special Master has attempted to craft a remedy that, while it may deviate from the traditional siloes of fee calculation, is specifically tailored to the mistakes each firm made and will also serve to deter future errors.

     B.   <u>Thornton's central role in pursuing a name-and-cost sharing agreement renders it at least equally responsible for the double-counting errors in the fee petition.</u>

Like Lieff, Thornton tries to shift the blame away from its own actions onto Labaton, who, as lead counsel, failed to detect the double-counting error before submitting the fee petition – including Thornton's individual petition – to the Court. Thornton Objs, pp. 17-22 (seizing on the phrase "ultimate responsibility" to signify the greatest responsibility for the overstated lodestar). While Labton's failure to ensure the accuracy of the petitions before submission was certainly *one* cause of the double-counting – and Labaton had the final opportunity to detect duplication – it is not the only cause nor even the leading proximate cause.

First and foremost, Thornton was a willing and originating participant in the agreement with the other Customer Class firms to not only share the costs of litigation, but to use the names of Labaton and Lieff attorneys on Thornton's individual lodestar. While the Special Master did not find that this name-and-cost sharing agreement itself was unethical or impermissible on its face, such an agreement is nevertheless fraught with risk of misleading the Court and others as to the true nature of the work performed by each firm, and absent detailed specific descriptions of the arrangement in a declaration supporting the fee petition, could not help but mislead the Court as to which firm's attorneys actually performed work – and how much work – on the case. It follows that, given the unusual nature of the sharing relationship, neither the Court nor members of the other firms privy to the agreement would be alert to the fact that staff attorney names

would be, or could be, shared across fee petitions unless Thornton and the other Customer Class firms put all those playing a role in the fee petition process – most importantly, the Court with the final authority to approve a fee award – on specific notice of this arrangement. Thornton made no effort to do so. To the contrary, Garrett Bradley's Declaration submitted in support of Thornton's fee request misrepresented and obfuscated this fact. For this alone, Thornton must bear responsibility.

More to the point, notice of the arrangement was lacking in two material respects. First, neither Thornton nor the other firms reduced to writing their apparent understanding (at least as to some members at each of the Customer Class firms) that Thornton would claim the hours it paid for on its fee petition. The Customer Class firms exchanged thousands of emails, including a flurry in 2015 as they heatedly negotiated the allocation among the firms, but not a single email explicitly communicated Thornton's intention to include Labaton's and Lieff's contract and staff attorneys on its lodestar.[15]

Second, and more penetratingly, Thornton did not disclose the name-and-cost sharing agreement in its own submission to the Court. While Thornton makes much of the fact that it did not draft its own declaration but worked off a draft received from Labaton, it was free to modify the narrative language – as several other firms did, and as it did elsewhere in the "boilerplate" model[16] – to fully disclose the nature of its arrangement with the staff and contract attorneys (it paid for their costs) and with the other Customer Class firms. Specifically, Thornton agreed to pay for the costs in exchange for listing attorneys at each firm, largely full-time employees, on its

---

[15] On June 29, 2015, Michael Lesser of Thornton circulated an interim lodestar calculation for Thornton tallying hours thus-far worked by Thornton attorneys as well as "external" reviewers. *See* Dkt. # 357, Ex. 68. This reference is far from adequate documentation, much less an *agreement*.

[16] *Compare* Dkt. # 357, Ex. 201 (Nicole Zeiss's model fee petition) *with* TLF-SST-032536 – 032545 (Evan Hoffman's edits to the model fee petition sent to Nicole Zeiss) (attached as Ex. A); *see also* TLF-SST-032006-032015 (Nicole Zeiss's additional edits) (attached as Ex. B).

lodestar. Of course, the failure to call the Court's attention in Garrett Bradley's Declaration [Dkt. # 104-16, R&R Ex. 66] to the staff attorney arrangement is compounded by the patent falsities in that same document. While the misstatements contained in Bradley's Declaration are discussed in detail below, it is important to point out that Thornton not only failed to be transparent about the nature of its relationship with numerous of the individuals listed on its lodestar, but it also submitted a sworn declaration that affirmatively represented to the Court that all of the individuals listed on its fee petition were employees of the firm, a falsity that kept the specter of this highly-unusual and risky practice below the radar.

## V.     The Special Master recommends that Thornton disgorge an additional $1,344,057 reflecting the contract attorney lodestar it claimed on its fee petition.

Prompted by Lieff's Objections, the Special Master clarifies his recommendation as to the contract attorneys. As discussed in detail in the *See* Special Master's Responses to Lieff, pp. 22-24, public policy as well as the economic realities contingent with employment militate strongly in favor of deeming contract attorneys as a litigation expense, not eligible for a traditional mark-up for legal services. Among other things, the contract attorneys assigned to the State Street matter did not receive the same employment benefits, did not impose tax liability upon the firms, nor did they pose the same administrative, human resources and managerial undertaking as full-time employees. The Special Master simply cannot condone allowing firms to receive full market rates, plus a multiplier, where it is essentially renting these attorneys for a small fraction of the cost *with little risk* and no commitment by the firms.

Building on these general principles, the Special Master notes that, while Lieff retained all seven of the contract attorneys in that it arranged for the individuals to be staffed to the State Street case and provided their credentials and access to case materials, Thornton claimed four of these rented attorneys on its lodestar. *See* G. Bradley Declaration, Dkt. # 104-16, Exhibit A

(R&R Ex. 66). The Special Master recommended in his Report that "the *law firms* not be permitted to be compensated for these attorneys at market rates and no multiplier should be granted on their hours and rates (if a multiplier is granted). Rather, the costs of the contract attorneys should be reimbursed *to law firms* as an expense, and the firms compensated for that expense dollar-for-dollar." However, the Special Master did not recommend the specific disgorgement for each firm. Thus, consistent with the Special Master's rationale in recommending that Lieff disgorge $2,241,098.40 related to the contract attorneys (*See* Special Master's Responses to Lieff, pp. 18-20; 29), the Special Master recommends that Thornton pay the class $1,344,057 to reflect the full value of the lodestar submitted for the four contract attorneys not employed by Thornton or any of the Customer Class firms.

## VI.   The Special Master continues to recommend that Rule 11 sanctions be imposed on Garrett Bradley, as well as a referral to the Board of Bar Overseers, based on Bradley's utter failure to make an inquiry reasonable under the circumstances in submitting a sworn declaration to the Court in support of a $75 million fee award.

In arguing that Rule 11 sanctions should not be imposed and that Garrett Bradley should not be referred to the Board of Bar Overseers, Thornton objects to the Special Master's legal conclusion and its underlying factual findings that Garrett Bradley intentionally filed a false fee declaration in this Court. Thornton Objs., pp. 26-78. Thornton makes a myriad of accusations against the Master for finding a violation of Rule 11: that the Master has failed to establish that Garrett Bradley had a motivation to deceive; that the Master has misrepresented the evidence regarding Garrett Bradley's review of the declaration prior to submission and regarding whether Bradley admitted he intentionally lied to the Court; and that the Master has made inconsistent findings as to the intentionality of Bradley's actions. Thornton Objs., pp. 35-44. Instead, Thornton characterizes Bradley's declaration as a mere mistake which he corrected at an appropriate time. Thornton also argues that the nature of the erroneous statements made by

13

Bradley do not rise to the level of a Rule 11 violation or satisfy the purpose in imposing Rule 11 sanctions because they lack the severity or materiality necessary to violate that rule. Thornton Objs., pp. 44-59.

Thornton's argument largely ignores, or distorts, the voluminous evidence presented by the Master during his investigation which, in compelling fashion, shows that Bradley acted intentionally in submitting a false fee declaration. As a preliminary matter, the Report details each of the six false statements contained in Bradley's sworn declaration:

> 1.      His palpably false assertion that Exhibit A [individual attorney lodestar] was a summary of time spent by attorneys and professional support staff members "of my firm." None of the SAs were employed by Thornton. Dkt. # 357, p. 227.

> 2.      His fictitious claim that the billing rates for the SAs are "based on my firm's current billing rates."  Thornton did not maintain "current billing rates" for SAs or other attorneys listed on its lodestar calculation in Exhibit A. Dkt. # 357, p. 227.

> 3.      The misleading statement that for personnel "who are no longer employed," the lodestar is based on their rates for the "final year of employment." Again, none of the SAs were employed by Thornton. R Dkt. # 357, p. 227.

> 4.      The pronouncement that the schedule was prepared from "contemporaneous daily time records regularly prepared and maintained by my firm." The record evidence is that Thornton did not prepare or maintain adequate or daily time records of the hours worked by the SAs listed on its lodestar. Dkt. # 357, pp. 227-228.

> 5.      His admittedly-erroneous statement that the proffered hourly rates "are the same as my firm's regular rates charged for their services." Thornton did not maintain "regular rates" for the SAs listed on its lodestar report. Dkt. # 357, p. 228.

> 6.      The fallacy that these rates "have been accepted in other complex class actions." With the exception of 4 staff attorneys, the $425 rate charged[17] for the remaining staff

---

[17] The Special Master observed that Thornton's standard rate of $425/hour for staff and contract attorneys was, in almost all cases, greater than the rates charged by Lieff and Labaton for the same attorneys. Dkt. # 357, pp. 180-181. While the Special Master did not make a specific finding of fact, or legal conclusion, that $425/hour was not reasonable, he concluded, consistent with the methodology employed in the November 10, 2016 Letter, that, because Thornton used slightly higher rates, "an adjustment of the amounts billed in Thornton's lodestar for staff attorneys will be required." Dkt. # 357, p. 181. As the differing rates for the double-counted staff attorneys were addressed as part of calculating the $4,058,000 overstated lodestar, no further adjustment is necessary. The Special Master acknowledges that Thornton used the $425 rate with the agreement of at least Lieff, as the same rate was used – and accepted – for the staff attorneys working on the *BNY Mellon* case. Dkt. # 357, p. 180, n. 146.

attorneys listed on the lodestar, including Michael Bradley, had not been accepted on a fee petition submitted by Thornton in other complex class actions. Dkt. # 357, p. 228.

Notwithstanding the indisputable falsity of the above six claims in Bradley's sworn Declaration, Thornton attempts completely to eschew responsibility by conflating them as "immaterial misstatements in a boilerplate affidavit." While proclaiming that facts are stubborn things, Thornton seems content to maintain that record evidence is entirely optional.

A.  The evidence shows that Garrett Bradley intentionally entered into and furthered Thornton's participation in the ill-advised cost-and-name sharing agreement as an attempt to receive a greater fee.

In arguing that there was no motivation to deceive co-counsel or the Court, Thornton asks the Court, in Orwellian fashion, to disregard the record, in which Bradley's motivation for making the false statements is clear and damaging. The record evidence shows that Bradley was *fully aware* of the firm's participation in the name-and-cost sharing agreement, and felt that agreement was the best way to "jack up" Thornton's individual firm lodestar vis-à-vis the other Customer Class firms.[18] Dkt. # 357, pp. 221, 233. While the act of expending additional hours to increase the potential for a fee award is entirely permissible, the intention to do so by listing attorneys employed by another firm is less than transparent. Thornton argues that Garrett Bradley's "jack up the lodestar" reference cannot be considered evidence of deceptive intent because, in its view, the only victims of such inflated and potentially fabricated amounts could be its co-counsel, none of which have claimed to have been deceived. Thornton completely misses the point. As noted in the Master's report, Bradley's misrepresentations "infected the entire pleading" as Bradley's Declaration vouched for the firm's lodestar, including the names

---

[18] In fact, it was the only way to inflate its lodestar, as Thornton was a relatively small firm and did not have the sheer number of lawyers to support a large lodestar. If Thornton felt it was entitled to an out-sized share of the fee award by virtue of a contribution to the result of the case, it should have negotiated that with the other firms, or at least made its case for a higher fee to the Court, rather than attempting to misrepresent its contribution by a "jacked up" lodestar.

and identities of those attorneys listed on Exhibit A, which led to the approval of an inflated fee award. At the least, the Court was substantially misled by this artifice.

Thornton's assertion that the lodestar served as a mere cross-check, and that, therefore, Bradley had no incentive to deceive the Court, similarly misses the mark. Bradley participated in the ill-advised staff attorney name-and-cost sharing arrangement and then intentionally submitted a sworn declaration to the Court that failed to capture the important details supporting its multi-million dollar fee request. The fact that the Court does not award a dollar-for-dollar fee based on a sworn fee declaration does not make that declaration insignificant or the statements contained therein less important. In order for the Court to fulfill its gatekeeping and fiduciary responsibilities, a lodestar cross-check must be more than an empty exercise. It must be predicated on truthful and accurate information. Bradley, an experienced attorney, is presumed to have understood that in reviewing his declaration, this Court would draw meaning and assurance that the large fee award in this case was justified. And yet, he failed to make a reasonable inquiry required by counsel in the circumstances to ensure the complete accuracy of his statements. *See* Fed. R. Civ. P. 11(b).

B. Contrary to Thornton's unfounded claims that the Special Master misrepresented the record concerning intentionality, the evidence establishes that Garrett Bradley and Thornton had ample opportunity to review and correct statements they knew to be false but nevertheless executed the Declaration.

Thornton, in arguing that the Special Master has misrepresented the evidence regarding Garrett Bradley's involvement with the revisions of the fee declaration prior to submission to Labaton and Bradley's admission to intentionally making misstatements to the Court, rather significantly mischaracterizes the record itself.  Thornton is, in fact, the party who, in its objections, conceals the complete and damaging testimony of Evan Hoffman on the matter of Bradley and fellow Thornton attorneys' review of the six false statements concerning the shared

staff and agency attorneys. In its objections, Thornton would have the Court believe that attorney Hoffman testified only to a review of the portion of Thornton's declaration that did not contain the false statements. Aside from the near-absurd position presented here, i.e. that experienced counsel limited their review of a sworn document to one particular section, the transcript of Attorney Hoffman's testimony contradicts this. In focusing only on the two words following the excerpted quote from the Report, Thornton conceals from the Court the continuum of testimony by Hoffman establishing that Thornton's review included the false statements at issue.

While a reading of the entirety of Hoffman's testimony regarding the declaration, pages 93 – 99, provides the most accurate record on this issue, the following exchange is compelling:

> JUDGE ROSEN: Drilling down just a little more finely on this, it was a phrase, I don't remember the actual language, but is it customary and regular rates charged – "the hourly rates for attorneys and professional support staff in my firm included in exhibit A are the same as my firm's regular rates charged for their services which have been accepted in other complex class actions," was that your language or was that language that was supplied to you by Nicole Zeiss?
>
> HOFFMAN: Language supplied to us by Nicole.
>
> JUDGE ROSEN: And you never changed that, edited it or talked to her about changing it?
>
> HOFFMAN: Correct.
>
> JUDGE ROSEN: Did that strike you as being incongruous – –
>
> (Discussion off the record)
>
> HOFFMAN [erroneously attributed to Judge Rosen]: I thought she was giving me the Thornton declaration, but our recollection is that that language was the same in all of the fee petitions.
>
> MR. SINNOTT: Do you remember seeing that language?
>
> HOFFMAN: Yes.
>
> SINNOTT: Did it trouble you at all?

> HOFFMAN: No, firstly because it was given to us by Labaton who I think has probably done hundreds, if not thousands of these fee declarations. My understanding was that Nicole Zeiss's sort of whole role at Labaton was to be the person and partner in charge of preparing the fee petition, so it didn't strike me as anything really.

6/5/17 Hoffman Dep., pp. 96:5 – 97:20 (Dkt. # 357, Ex. 63).

As the excerpt establishes, Hoffman and the other Thornton attorneys he previously acknowledged as having reviewed the declaration – including Garrett Bradley – saw the "language" and declined to edit it. The record, again, supports the Master's findings and directly refutes Thornton's claim that this finding is "the most egregious example of the Report's overreaching." Thornton Objs., p. 48.

Thornton further argues that the Special Master has misrepresented the evidence in order to find that Garrett Bradley admitted that he lied to the Court. First, as Thornton's own citations to the record state, the Report states in two places that "[a]t numerous times during the March 7 hearing, Bradley acknowledged that he knew his declaration contained inaccurate information, but he signed it anyway." The Report does not state that Bradley admitted that he "lied" to the court.

Second, the transcript of the March 7, 2017 hearing, which speaks for itself, supports the Special Master's finding. Contrary to Thornton's revisionist position in the Objections, the cited transcript references establish that Attorney Bradley admitted to this Court that he signed an affidavit that claimed that Thornton had paid its attorneys the same billing rates its clients paid— when in fact, as Bradley admitted, the firm had no paying clients. Dkt. # 357, Ex. 96. He admitted that the staff attorneys he claimed as attorneys whose rates were approved were actually housed at other firms. *Id*. Thornton's assertion that Bradley was not admitting that he knew he was signing an affidavit that contained inaccurate information strains all credulity, as does its assertion that the Master has grossly mischaracterized the evidence. *Id*.

C.   <u>The Special Master's findings are consistent that Garrett Bradley knew the</u>
<u>declaration contained inaccurate statements but signed it anyway.</u>

Thornton's claim that the Special Master's finding of intentional misrepresentation is

belied by the Master's supposed inability to decide whether or not Garrett Bradley actually read

the declaration is yet another misleading characterization of the Master's Report. Contrary to

Thornton's objection, it is not the Special Master's finding that Garrett Bradley read the

declaration, but rather that he reviewed it, knew that it contained false information, but signed it

anyway. Bradley himself claims that he did read the declaration, albeit not closely: "I saw the

final. Evan brought it in. I gave it, obviously, not a close read and then I signed it. I'm sure that I

was on e-mail traffic for the draft form, as well."  6/19/17 G. Bradley Dep., pp. 84: 22-85:1 (Dkt.

# 357, Ex. 43).

Bradley's March 7, 2017 hearing testimony, as highlighted in the previous section, as

well as his deposition testimony, establish that he knew the declaration contained inaccurate

statements but signed it anyway. Whether Bradley read the Declaration, "saw" it, or whether it

was read or explained to him by Evan Hoffman or another colleague, or whether he was content

to read only the emailed drafts, is not important. What matters is that Bradley reviewed the

declaration, understood its important purpose as the basis upon which the Court would approve a

large fee request, and signed it under oath. The Special Master's alternative finding is simply a

recognition of that evidentiary imprecision, not a reflection of an inability to decide.

D.   <u>The evidence refutes Thornton's claims that the Bradley Declaration was a mere</u>
<u>mistake that was timely corrected.</u>

Finally, Thornton argues against intentionality by claiming that, notwithstanding the

multiple and egregious falsehoods in Bradley's declaration that remained unaddressed for

approximately four months, his declaration was a simple mistake that Bradley corrected at "the

appropriate time." Thornton Objs, pp. 42-44.  As the Special Master concluded, the statements in

Bradley's Declaration were false and not the product of negligence, but of an intentional and

willful decision to further a risky cost-sharing arrangement with the other Customer Class firms

and submit a false affidavit bearing the names shared. In an email exchange between Daniel

Chiplock and Garett Bradley on August 30, 2015, Garrett Bradley's credibility with respect to

the cost-sharing agreement is brought to the forefront of discussion. At the time, Chiplock

confronted Garrett Bradley about the prospect that "Thornton Law Firm was showing 14 million.

That number does not comport with the hours Mike Lesser told me for Thornton as of June 29

(around 12,750), which make more sense given what we know about the work that was done. I

am hopeful Mike T. simply misspoke or was guessing when he said $14 million and that we are

not going to suddenly see an additional 12,000 hours mysteriously appear on Thornton Law

Firm's behalf" Dkt. # 357, Ex. 87. This demonstrates that even among Class Counsel, Thornton,

and Garrett Bradley, were neither forthright nor clear with the reporting of their lodestar.

The end result is that Bradley provided misleading information to the Court as to his

firm's true affiliation with the staff and contract attorneys whose work formed the bedrock of

this case and the bases for the rates claimed for them.  The statements were not "technical

violations" or a failure to focus on boilerplate language, as opined by Thornton's expert witness.

Dkt. # 357, pp. 234-236. Bradley intentionally submitted his sworn declaration and deliberately

allowed the Court to rely on information that he knew to be false. Garrett Bradley did not

acknowledge the falsity of his Declaration—even after having conducted a thorough further

review of it, prompted by a Boston Globe inquiry—until the Court asked him to stand up on

March 7, 2017 and, under oath, answer questions about it.

Having found that Bradley failed to discharge his duties under Fed. R. Civ. P. 11(b), by deliberately and willfully submitting a false declaration to the Court, the Court is well within its discretion to take appropriate measures, including referring Attorney Bradley to the Board of Bar Overseers. 1993 Advisory Committee Notes to Fed. R. Civ. P. 11(b). A referral, of course, is meant to prompt greater scrutiny of Attorney Bradley's actions and is not a recommendation that any bar discipline be imposed.

The referral to the Board of Bar Overseers is warranted as Garrett Bradley's deliberate and willful submission falls firmly within the confines of Rule 3.3(a) of the Massachusetts Rules of Professional Conduct. In making such a submission, Bradley knowingly "ma[de] a false statement of fact" to the Court. *See* Mass. R. Prof. C. 3.3(a)(1). However, even if intentionality were not found, Garrett Bradley's conduct still amounted to a violation of Fed. R. Civ. P. 11(b), for failure to conduct "inquiry reasonable under the circumstances." The Advisory Committee Notes indicate that what constitutes a reasonable inquiry depends on a variety of factors, including "how much time for investigation was available to the signer" and "whether he had to rely on a client for information as to the facts underlying the pleading, motion, or other paper." See Fed. R. Civ. P. 11, Advisory Committee Notes, 1983 Amendment. Even if the facts are viewed in the light most favorable to Garrett Bradley, there is no argument to be made that he conducted a reasonable inquiry even if his actions are found to have not been intentional. His utter failure to verify the statement he was signing under oath, on facts he either had first-hand knowledge of, or could discover the answer to with a phone call or email, is unacceptable, and as such, sanctions are warranted.

E. <u>A monetary sanction of $400,000 to $1 million imposed jointly on Garrett Bradley and the Thornton Law Firm is compatible with the purpose of Fed. R. Civ. P. 11, is proportional to the egregious degree of Thornton's and Bradley's violation and is necessary for deterrence.</u>

It is well-settled that sanctions levied under Rule 11 must sufficiently "deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. Rule 11(c)(4). This rationale applies with equal vigor in the First Circuit. *See, e.g., Lamboy-Ortiz v. Ortiz-Velez*, 630 F.3d 228, 247 (1st Cir. 2010). From this fundamental principle, Thornton seems to suggest that deterrence, then, is achieved only through the imposition of those monetary penalties previously found to be reasonable in the First Circuit. *See* Thornton Objs., pp. 59-66. But what Thornton fails to recognize is that what is sufficient to deter sanctionable behavior in one case, may not be sufficient in another case.

In fact, courts within the First Circuit have not had the occasion to impose monetary sanctions with any frequency. It comes as no surprise then that, as Thornton points out, the range of monetary sanctions handed down in this circuit is generally less than $100,000. And, while these penalties may have adequately addressed the conduct giving rise to the violation in those respective cases, a penalty of $5,000 to $100,000 does not stand to have a material effect on Thornton's recovery, much less a deterrent effect on future violations of the Rule.

Proportionality is an essential factor to consider when determining an appropriate sanction under Rule 11. *See Navarro-Ayala v. Nunez*, 968 F.2d 1421, 1427 (1st Cir. 1992) (reducing the amount of a Rule 11 sanction where the sanction was "disproportionate" since the attorney was a civil servant who "had no personal stake in the litigation and did not stand to gain from the Rule 11 violation"); *Bermudez v. 1 World Productions, Inc*., 209 F.R.D. 287, 293 (D.P.R. 2002) (upholding sanctions under Rule 11 and § 1927, where "the sanction here imposed is, the Court deems, proportionate to nature of the case, and the unreasonable conduct displayed

by the attorney for Plaintiffs."). Despite Thornton's attempts to downplay the severity and impact of Garrett Bradley's misrepresentations before the Court, the sworn declaration served as the sole basis for the Court to approve Thornton's $18 million dollars fee request, from a total fee award of $75 million. None of the cases presented by Thornton to support their argument, that the recommended range was inappropriate, come close to the size and complexity of the case at hand.

It should not be ignored that Garrett Bradley's submission of his sworn declaration, and the misrepresentations contained therein, was one of the causes of the double counting not being caught. Had Garrett Bradley accurately described it, Nicole Zeiss or the Court may well have caught the error.

Bearing in mind the magnitude of the fee award in this case, and the high stakes of a national class action settlement, the Special Master reaffirms his recommendation that Garrett Bradley and the Thornton firm be jointly and severally liable for a sanction in the range of $400,000 to $1 million. A sanction in this range is further supported by weighing the factors articulated in the Advisory Committee's notes to Rule 11: Bradley's conduct was willful; the misrepresentations pervaded the entire narrative; despite ample opportunity to correct the record, Bradley did not do so; Bradley's misstatements directly contributed to the double-counting error which has born incredible collateral litigation, not to mention time, money, and judicial resources; and, finally, given the substantial fee award received by the firm, Bradley's position as managing partner, and the firm's relatively lucrative track record, a substantial penalty is appropriate to deter future conduct. *See* Fed. R. Civ. P. 11, Advisory Committee Notes, 1993 Amendment**;** Dkt. # 357, pp. 232-233.[19]  Accordingly, the Special Master has closely tied the

---

[19] Thornton continues to state that the misrepresentations made by Garrett Bradley before the Court are not unique in class action cases, and that, in fact, they "appear to be quite common in fee declarations." *See* Thornton Objs., p. 54.

recommended sanction range to a readily recognizable consequence of the misrepresentations, finding 10% to 25% of the cost of the double counting error to be proportionate to the relative contribution Garrett Bradley's false statements had on the error itself. The Master recognizes that such range calculation is not an exact science. However, the Master believes that a sanction approximating this range is necessary to deter Thornton, and other similarly situated firms, from continuing this practice.[20]

### VII. Because Michael Bradley's rate of $500/hour was unreasonable, Thornton should disgorge the differential between the claimed lodestar value and an adjusted lodestar value at $250/hour, and not receive a multiplier.

A. A $250/hour rate properly recognizes the value and role served by Michael Bradley in the State Street case.

In its most recent iteration of the outstanding issues (Dkt. # 504), Thornton glosses over its previous objection to the Special Master's conclusion that $250/hour, rather than the proffered rate of $500/hour, was a more appropriate rate for Michael Bradley. Thornton argues that, despite finding that Michael Bradley performed work commensurate with that of a traditional junior-level associate, the Special Master's suggested rate ($250) is less than that of most associates, staff attorneys, and some paralegals at Lieff and Labaton. Thornton Objs., pp. 83-89.

---

This highlights that for a sanction in this instance to be an effective deterrent, it must be sizeable and tied to the harm caused. A de minimis sanction, not proportional to the effect the conduct had on the litigation and the amount of fees requested, will have little to no impact on deterring other law firms from continuing the purportedly "common" practice of making misrepresentations before a court to support their substantial fee requests.

[20] In his Report, the Special Master pointed out that Thornton has not historically, and does not currently, have a General Counsel equipped to advise its attorneys and staff on complicated ethical issues that arise. Given Thornton's track record in this case, the Special Master concludes that appointment of an outside monitor is necessary to ensure that, moving forward, Thornton fully discharges its ethical and legal obligations. In opposing the appointment of an outside monitor, Thornton argues that such a recommendation is "baseless" because an outside expert is helpless in preventing inadvertent mistakes, such as those made in this instance. See TLF Objs, pp. 108-110. As the evidence abundantly shows, Thornton, acting largely through its managing partner Garrett Bradley, intentionally misled the Court and failed to discharge its obligation of accuracy and truthfulness to the Court, actions that severely undermine the integrity of Thornton's legal representation as well as the integrity of the legal system in general. Given the firms' past failures to meet its ethical obligations, the Special Master continues to recommend that Thornton retain an outside expert to assist it in bringing its practices into full compliance with the applicable legal and ethical rules.

But while the value added by Michael Bradley, with a legal background and years of legal practice under his belt, was comparable to an associate, his *relationship* with Thornton was comparable to that of a contract attorney. He had no affiliation with the firm, no stake in the case, and no stake in the firm's success. While Michael Bradley is a licensed attorney he, unlike the associates, staff attorneys, and paralegals to whom Thornton compares him, was not subject to any direct supervision. In fact, outside of an on-boarding call with Evan Hoffman to become familiar with the online database, Michael Bradley was not subject to any supervision – no quality control, no general oversight, and no intermediate goals. It is not simply that he worked remotely, as others did, it is that Michael Bradley was essentially on his own, without the benefit of insight passed down concerning the litigation team's developing legal theory or direct Q&A with other reviewers or members of the litigation team From this freelance arrangement came no discernable work product – no fact memoranda, no witness or deposition preparation, and no fact investigation to educate the litigation team. This unusual background raises the question of whether Michael Bradley added any value to the State Street case.

Finally, a $250/hour rate falls in step with the rates typically charged by Michael Bradley for his regular criminal and civil representations as he received flat fees and rates as low as $53 per hour. *See* Dkt. 357, pp. 194-195. The fact that Michael Bradley was paid for two, unrelated representations at a rate close to or equal to $500 does not make this rate per se reasonable. *See* Dkt. # 357, pp. 193-197.

B. <u>Disgorgement of half the lodestar generated from Michael Bradley's listed $500/hour rate is an equitable remedy imposed in response to the Special Master's finding that $500/hour rate was not reasonable.</u>

As described above, the Special Master, and the Court, are not constrained by the limited purpose of a lodestar cross-check, a position that Thornton clings to as it argues that, absent an unreasonable multiplier, no further action is needed to address Michael Bradley's unreasonable

rate. While Thornton is correct that it did not receive a dollar-for-dollar payment of $203,000 for

Michael Bradley's efforts, it still included an attorney with no relevant experience who did no

detailed substantive work and was subject to no oversight at $500/hour on its lodestar fee

petition. Some recourse is required. Here, the Master has reasonably recommended a recourse

that requires Thornton to reimburse the class the overstated *value*, not the actual dollar amount

received, flowing from the firm's decision to assign Michael Bradley a rate of $500/hour.

It is well within the Special Master's authority under the Appointment Order to

recommend a remedy to address a finding that the information – Michael Bradley's "regular"

rate – is not accurate or reliable. It bears repeating that, at this point in time, the Court has

vacated the fee award. Thus, the Master's recommendation that Thornton disgorge half of the

lodestar, plus the resulting multiplier recognized by the Court, achieves both a deterrent effect

and the conferral of a monetary benefit to the class to whom Thornton failed to be transparent in

seeking fees from the common fund pot. Moreover, given the status of the fee award, Thornton's

calculation as to the net effect of recalculating Michael Bradley's lodestar and multiplier at the

reduced $250 rate is premature.

## VIII.   Conclusion

While the double-counting errors in this case were inadvertent, they were not

unavoidable, and Thornton's prominent and originating role in seeking the benefits of a highly-

unusual and ill-advised name-and-cost-sharing agreement to list employees of another firm on its

lodestar petition was fraught with risk of misleading the Court and others as to the true nature of

the work performed by Thornton.  This risk was, not surprisingly, realized and Thornton should

disgorge one-third of the over-stated lodestar resulting from the double-counting to the class as

well as additional lodestar amounts arising out of its false claims of agency attorneys as its employees.

Thornton compounded the risk and its own legal exposure when Managing Partner Garrett Bradley submitted a sworn declaration that contained multiple falsehoods, including that all of the individuals listed on Thornton's fee request were employees of the firm, a fabrication that kept the specter of  this highly-unusual and risky employee-sharing practice below the radar and which misled the class and Court as to the true nature of the work performed by Thornton in this case.  Contrary to Thornton's claims of factual misrepresentations by the Master, the record evidence establishes that Bradley knew his declaration contained false and misleading statements and that he understood its important purpose as the basis upon which the Court would approve a large fee request, but signed it anyway as a way of inflating the lodestar.

Bradley's willful actions in signing a false affidavit violated several legal provisions, including Fed. R. Civ. P. 11 and Mass. R. Prof. C. 3.3, and, because of the blatant nature of the violations, the scale of the funds at issue, and Bradley's failure to inform the Court until called upon to do so under oath several months later, warrant a severe fine of at least $400,000 but no more than $1 million, and the appointment of an outside monitor to ensure that Thornton discharges its ethical and legal obligations in the future.

The record further supports the Master's finding that Michael Bradley's listed $500/hour rate was not reasonable and his recommendation that it be reduced by half and disgorged accordingly on equitable grounds.

27

Dated: November 20, 2018

Respectfully submitted,

**SPECIAL MASTER HONORABLE
GERALD E. ROSEN (RETIRED),**

By his attorneys,

_/s/ William F. Sinnott_____
William F. Sinnott (BBO #547423)
Elizabeth J. McEvoy (BBO #683191)
BARRETT & SINGAL, P.C.
One Beacon Street, Suite 1320
Boston, MA 02108
Telephone: (617) 720-5090
Facsimile: (617) 720-5092
Email: wsinnott@barrettsingal.com
Email: emcevoy@barrettsingal.com

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed electronically on November 20, 2018 and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing ("NEF").  Paper copies were sent to any person identified in the NEF as a non-registered participant.

_/s/ William F. Sinnott_____
William F. Sinnott