## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

## THORNTON LAW FIRM LLP'S SUR-REPLY
## IN SUPPORT OF ITS OBJECTIONS TO
## THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................... 1

    a.    Motive And Intent ..................................................................................1

    b.    Rule 11 / BBO Referral ..........................................................................3

    c.    "Like Cases Should Be Decided Alike" ................................................3

    d.    "Regular Rates Charged" ........................................................................4

    e.    Double-Counting ....................................................................................5

    f.    Contract Attorneys, Michael Bradley ...................................................5

    g.    Staff Attorneys ......................................................................................6

ARGUMENT ..........................................................................................................6

I.     There Was No Motive To File A False Declaration ........................................ 6

II.    The Special Master Continues To Mischaracterize And Confuse The Evidence ............ 13

    a.    In Arguing That Garrett Bradley Reviewed The Boilerplate Section Of The Declaration, The Special Master Or His Counsel Not Only Mischaracterize But Actually Change The Evidence ........................................... 13

    b.    The Special Master Again Mischaracterizes The Evidence To Support His Assertion That Garrett Bradley Admitted He Lied To The Court ....................... 21

    c.    The Special Master Still Cannot Decide Whether Garrett Bradley Read The Boilerplate Declaration .................................................... 22

    d.    The Special Master Again Mischaracterizes An Email Which Was Explained To Him Both During His Investigation And In Thornton's Objections ............... 24

III.   The Special Master Does Not Respond To Thornton's Arguments That Thornton Did Not Violate Rule 11 And That The Court Should Not Refer Garrett Bradley To The Board Of Bar Overseers .................................................... 25

IV.   The Special Master Continues To Suggest That The Court Impose The Highest| Or Second Highest Rule 11 Sanctions Imposed in The First Circuit In At Least The Last Twenty Years .................................................... 26

V.    The Special Master Continues To Violate The "Basic Principle of Justice That Like Case Should Be Decided Alike" .................................................... 30

    a.    Chargois Recommendations .............................................................. 30

    b.    "Employees" Language ...................................................................... 32

    c.    "Regular Rate Charged" ..................................................................... 34

    d.    Rates Accepted In Other Actions ....................................................... 38

    e.    Michael Bradley ................................................................................. 39

VI.     Thornton Should Not Be Sanctioned For The "Regular Rates Charged" Language ....... 40

    a.     The "Regular Rate Charged" Language Is Common In Fee Declarations Filed In The District Of Massachusetts ................................................. 41

    b.     The "Regular Rate Charged" Language Is Common In Jurisdictions Across The Country ...................................................................................... 46

    c.     Other Courts Considering The Boilerplate Language Do Not Impose Sanctions ..................................................................................................... 55

    d.     Alternative Language Fares No Better ................................................. 56

VII.    Thornton Should Not Disgorge One Third Of The Double Counting Error ................... 59

    a.     Disgorgement Is An Inappropriate Remedy For The Double Counting Error ..... 59

    b.     Thornton Is Not Responsible For The Double Counting Error ........................... 60

VIII.   The Special Master's Theory That Contract Attorneys Should Be Listed As Expenses Is Supported By Nothing Other Than His Newfound Personal Policy Preference ...................................................................................................................... 66

IX.     For Purposes Of The Lodestar Cross-Check, Michael Bradley's Rate Does Not Affect The Fee Award ................................................................................................... 69

X.      Staff Attorney Rates Are Reasonable ........................................................................... 70

CONCLUSION ....................................................................................................................76

# TABLE OF AUTHORITIES

**Cases**

*In re Anthem*,
  No. 15-MD-02617-LHK, 2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) ...................... *passim*

*In re Citigroup Inc. Secs. Litig.*,
  965 F. Supp. 2d 369 (S.D.N.Y. 2013) ..............................................................................66, 67

*Dodd Ins. Servs., Inc. v. Royal Ins. Co. of Am.*,
  935 F.2d 1152 (10th Cir. 1991) ...............................................................................................29

*In re Evergreen Ultra Short Opportunities Fund Secs. Litig.*,
  No. 08-cv-11064-NMG, 2012 WL 6184269 (D. Mass. Dec. 10, 2012) .................................11

*Ferrara v. United States*,
  372 F. Supp. 2d 108 (D. Mass. 2005) .......................................................................................1

*Flanagan, Lieberman, Hoffman & Swaim v. Ohio Pub. Emps. Ret. Sys.*,
  814 F.3d 652 (2d Cir. 2016) ....................................................................................................11

*Gonzalez v. Scalinatella, Inc.*,
  112 F. Supp. 3d 5 (S.D.N.Y. 2015) .........................................................................................72

*In re Johnson and Johnson Derivative Litig.*,
  No. 10-2033(FLW), 2013 WL 11228425 (D.N.J. June 13, 2013) ................................ *passim*

*Lamboy-Ortiz v. Ortiz-Velez*,
  630 F.3d 228 (1st Cir. 2010) ...................................................................................................27

*In re Life Time Fitness, Inc., Tel. Consumer Prot. Act (TCPA) Litig.*,
  847 F.3d 619 (8th Cir. 2017) ..................................................................................................11

*Martin v. Franklin Capital Corp.*,
  546 U.S. 132 (2005) ..................................................................................................3, 30, 38

*Moreno v. City of Sacramento*,
  534 F.3d 1106 (9th Cir. 2008) ................................................................................................59

*In re Nosek*,
  609 F.3d 6 (1st Cir. 2010) .......................................................................................................26

*Obert v. Republic W. Ins. Co.*,
  398 F.3d 138 (1st Cir. 2005) ...................................................................................................32

*Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.*,
  776 F.2d 646 (7th Cir. 1985) ..................................................................................................59

*Pasternak v. Radek*,
   No. 07-C-2858, 2008 WL 278851 (N.D. Ill. Apr. 3, 2008)...................................................55

*Pennsylvania Ave. Funds v. Brandi*,
   No. 08-2106-BLS2, 2010 WL 1173044 (Mass. Super. Ct. Mar. 25, 2010)......................51, 54

*In re Raytheon Co. Secs. Litig.*,
   No. 99-cv-12142-PBS, 2004 WL 7329762 (D. Mass. Dec. 6, 2004) .....................................11

*Ryan v. Allied Interstate, Inc.*,
   882 F. Supp. 2d 628 (S.D.N.Y. 2012)...................................................................................54

*In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*,
   56 F.3d 295 (1st Cir. 1995)..............................................................................................58, 59

*United States v. Jones*,
   686 F. Supp. 2d 147 (D. Mass. 2010) ....................................................................................9

*United States v. Watkins*,
   278 F.3d 961 (9th Cir. 2002) .................................................................................................8

**Rules**

Fed. R. Civ. P. 11 ...................................................................................................... *passim*

Fed. R. Civ. P. 30(e) ..........................................................................................................20

**Other Authorities**

9 NEWBERG ON CLASS ACTIONS, § 15.23 (5th ed.).....................................................................11

Edward Levi, Att'y Gen. of the U.S., Address at the Phila. Award Dinner
   Honoring J. William H. Hastie (Apr. 7, 1975).......................................................................67

Remarks of Gerald Rosen, Thomas M. Cooley Law School Distinguished Brief
   Award Banquet, Judicial Independence in an Age of Political and Media
   Scrutiny, 14 T.M. COOLEY L. REV. 685 (1997)....................................................................68

## INTRODUCTION

The Special Master's Response to Thornton Law Firm's Objections is not a "response" in any sense, but simply a repetition of the same mischaracterizations and misstatements in his original Report and Recommendations.  While the many glaring errors in the Report and Recommendations may have been deemed at first to be simple mistakes, the fact that the Special Master and his counsel withdraw none of their erroneous findings (and, in fact, forcefully repeat many of them in the Response) compels a different conclusion.  That is, despite their awareness of the weaknesses of their arguments, the Special Master and his counsel seem content with proposing any legal or factual findings—no matter how inaccurate—that will somehow persuade this Court to impose draconian and unprecedented sanctions on the Thornton Law Firm and Garrett Bradley.  They will ignore, omit, or mischaracterize any non-conforming facts to suit their own narrative, which does a disservice to this Court's efforts to resolve an unfortunate situation arising from what all parties acknowledge were mistaken lodestar calculations.  The Special Master and his counsel are entitled to "prosecute with earnestness and vigor—indeed he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones." *Ferrara v. United States*, 372 F. Supp. 2d 108 (D. Mass. 2005) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

### a.  Motive And Intent

As set forth below, the Special Master has once again mischaracterized the evidence in an attempt to prove that Garrett Bradley was *motivated* to file a false declaration and *intended* to mislead the Court by *knowingly* filing a false declaration.  In doing so, the Special Master not only repeats the errors he included in the Report and Recommendations, but also introduces new errors.  The most serious of these is that the Special Master or his counsel attempt to change the

certified deposition transcript of Evan Hoffman—inserting what the Special Master or his counsel claim is a "correction" to the testimony—without filing an errata sheet, consulting counsel, consulting the witness, or even consulting the court reporter.   Undersigned counsel contacted the court reporting company within 24 hours of receiving the Special Master's filing, and the reporting company confirmed that the transcript was accurate.   The Special Master's "correction" to Mr. Hoffman's deposition puts words in Mr. Hoffman's mouth which Mr. Hoffman never said in an attempt to show that various Thornton partners were aware of the misstatements in the fee declaration prior to filing.   This error is discussed in further detail below.

Second, while the Special Master continues to claim that Garrett Bradley intentionally filed a false declaration, he now acknowledges that "evidentiary imprecision" prevents him from determining whether Garrett Bradley actually read the boilerplate section of the declaration prior to submitting it.   The Special Master's novel solution to these inconsistent findings is to declare:

> Contrary to Thornton's objection, it is not the Special Master's finding that Garrett Bradley read the declaration, but rather that he reviewed it, knew that it contained false information, but signed it anyway.

> SM Resp. to TLF at 19.[1]

It is difficult to understand how the Special Master or his counsel could present such arguments to the Court with a straight face; undersigned counsel is not aware of any difference between the words "review" and "read" in this context.   Either Garrett Bradley carefully read the declaration, recognized that it contained misstatements, and signed it anyway, or he did not.   Further errors of the Special Master related to this topic are also detailed in the pages below.

---

[1]     The citations contained herein refer to document page numbers according to the documents' internal pagination, rather than ECF pagination.

### b.  Rule 11 / BBO Referral

Notably, the Special Master does not respond in any substantive manner to Thornton's extensive objections regarding his findings of violations of Rule 11 and the Massachusetts Rules of Professional Conduct.  Instead, the Special Master reiterates that the *amount* of Rule 11 sanctions he has suggested, $400,000 to $1 million—despite being the first or second highest sanctions in the First Circuit in at least twenty years—is appropriate.  In doing so, the Special Master also brushes aside all of Thornton's Objections on the amount of sanctions.  In particular, the Special Master declines to engage with Thornton on the point that the recommended sanctions do not take into account the deterrence achieved by the nearly $5 million investigation costs.  And—without citation to anything at all—the Special Master suggests that undersigned counsel's empirical research on Rule 11 sanctions is unhelpful because "courts within the First Circuit have not had the occasion to impose monetary sanctions with any frequency."  SM Resp. to TLF at 22.   With respect to the two serious legal errors in the Special Master's Report and Recommendations on this subject (i.e., payment to anyone other than the Court of *sua sponte* monetary sanctions, and the propriety of *sua sponte* monetary sanctions post-settlement), the Special Master is silent.

### c.  "Like Cases Should Be Decided Alike"

The Special Master continues to violate the "basic principle of justice that like cases should be decided alike."  *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005); *see also* 11/7/18 Hr'g Tr. at 106:10-13 (Dkt. 519) (noting importance of ensuring "no unwarranted disparity in the way the lawyers are treated").  In particular, with respect to the boilerplate fee declarations, the Special Master charged only Garrett Bradley with professional misconduct, and recommended the imposition of Rule 11 sanctions only on Thornton—all for boilerplate

language in Thornton's declaration that is **identical** to the language in Labaton's, Lieff's, and most of the ERISA counsels' fee declarations.   Most notable is that the Special Master now attempts to distinguish Labaton on the flimsy basis that four of the 71 timekeepers listed on Labaton's lodestar had hourly clients in 2016—even though in all four cases the lodestar rates submitted to the Court in 2016 were higher than those paid by Labaton's hourly clients in 2016. This is not to say that all firms should be sanctioned, but that the Special Master's conclusion as to Labaton and Lieff, that they used "imprecise and inexact language," should apply to Thornton as well.   Further instances of the Special Master's unequal treatment of Thornton are demonstrated below, such as the morphing of the Chargois issue from "[t]he most troubling issue in this case," R&R at 303, to a nebulous "emerging best practices" issue, SM Supp. to R&R at 5 (Dkt. 485).

### d.   "Regular Rates Charged"

The Court has understandably expressed great concern with the "regular rates charged" language used in Thornton's, Labaton's, Lieff's, and most of the ERISA counsels' fee declarations.   This language was unclear and sloppy, and should never be used again to describe exclusively or primarily contingent fee law firms' rates.   It is not an "everyone does this" excuse, however, to point out that such boilerplate language, or its equivalent, is incredibly common in fee declarations both in the District of Massachusetts and around the country.   Such information provides crucial context for the Court to consider as it determines whether (as the Special Master has charged) Thornton's use of the boilerplate language was an *intentional* effort to mislead the Court.   In addition to 26 declarations filed in the District of Massachusetts employing such boilerplate language, undersigned counsel has identified at least 36 declarations filed in 14 additional jurisdictions employing such language.   The sampling below is not intended to

constitute an exhaustive treatment of the issue, but to demonstrate to the Court just how common this boilerplate language is.

### e. Double-Counting

As noted in Thornton's Objections, the Special Master's recommendation that Customer Class Counsel disgorge the entire amount of the double counting error is unjustified.  Even the Special Master has concluded that the error was inadvertent, and the effect of the error on the lodestar multiplier cross-check is insignificant.  The Special Master continues to press the point—for example, by misleadingly citing to statutory fee shifting cases where the lodestar is not a cross-check for the actual percentage of fee award, but the lodestar is the basis for the fee award itself.  Even if any disgorgement were justified, such disgorgement should not be imposed on Thornton because Thornton does not bear responsibility for the double counting error.  As set forth below, Thornton's lodestar was accurate, and it was Lieff's and Labaton's lodestars that erroneously included double-counted time on their lodestars.  Further, as the Special Master found, Labaton was the only law firm that had access to all of the fee declarations, and thus must bear "ultimate responsibility" for the error.  Exec. Summ. at 18.

### f. Contract Attorneys, Michael Bradley

Despite the lack of any supporting authority (and in the face of significant authority to the contrary), the Special Master continues to argue—on the basis of employment law and his views of public policy—that contract attorneys should be listed as expenses rather than in class counsel's lodestar.  His arguments are as meritless now as they were in the Special Master's Report and Recommendations.  *See* Rubenstein Decl., 6/20/18, at ¶¶ 13-16 (Dkt. 368).  With respect to Michael Bradley, although the Special Master argues that his rate should be reduced to below that of some of the other firms' paralegals, and the difference in the reduction of rate

should be disgorged, the Special Master continues to ignore that even if *all of* Michael Bradley's time is removed from the corrected lodestar, the multiplier is 2.01.

### g.  Staff Attorneys

Although the Special Master found that Customer Class Counsel's rates for staff attorneys were reasonable, this Sur-Reply briefly addresses the reasonableness of such rates in light of CEI's Response (Dkt 522).  In short, empirical research shows that the staff attorney rates are consistent with those accepted in other cases.  To the extent to which any of the staff attorney rates are higher, such rates are justified (as the Special Master found) by the skill and experience of the staff attorneys, as well as their substantive contributions to the litigation. Further supporting the reasonableness of the staff attorney rates is that the *overall* blended attorney rate is consistent with those accepted in other cases, which indicates appropriate staffing.

## ARGUMENT

## I.   There Was No Motive To File A False Declaration

Ignoring the substance of Thornton's Objections on the issue of motivation, the Special Master simply proclaims that "Bradley's motivation for making the false statements is clear and damaging."  SM Resp. to TLF at 15.  The paragraph that follows this pronouncement is nothing more than a jumble of disconnected thoughts that conflates all of the issues in the case.  For instance, the Special Master finds Mr. Bradley was motivated to submit a false declaration because:

> [T]he record evidence shows that Bradley was *fully aware* of the firm's participation in the name-and-cost sharing agreement, and felt that agreement was the best way to "jack up" Thornton's individual lodestar vis-à-vis the other Customer Class firms.
>
> *Id.*  (emphasis in original).

6

The Special Master does not explain how evidence (undisputed by Thornton) that Mr. Bradley was "fully aware" of Thornton's agreement to pay for Lieff's and Labaton's staff attorneys as part of a risk-sharing arrangement could possibly support the conclusion that Mr. Bradley was motivated to intentionally file a *false* declaration *with the Court*.[2]  Of course all three firms were "fully aware" of the risk-sharing agreement because all three firms voluntarily entered into the joint risk-sharing agreement.  Although the Special Master's italicization is intended to imply otherwise, Mr. Bradley's mere knowledge of the risk-sharing agreement was not in any way improper and is not evidence of motive.

It bears repeating that the "jack up the lodestar" email is not the smoking gun the Special Master would like it to be and is not evidence of Mr. Bradley's motivation to file a false declaration with the Court.  The email was written in February 2015, **nearly a year and a half** prior to the fee declaration being filed with the Court, and in response to an email **from Labaton** attaching an invoice for staff attorneys.  *See* 3/11/15 Email, TLF-SST-011124 (R&R Ex. 64) (Dkt. 401-63).  What Mr. Bradley was referring to is the fact that if Thornton bore more risk by investing in additional staff attorneys over the course of the litigation in relation to Lieff and Labaton (and pursuant to Lieff's and Labaton's express agreement), Lieff and Labaton would agree to a more favorable fee split with Thornton if the litigation was successful.  This would in no way increase the overall lodestar submitted to the Court or increase the overall attorneys' fees

---

[2]     The Special Master insinuates in his Response that there is something wrong with the fact that "staff or contract attorney hours comprised approximately 71.5% of Thornton's individual lodestar," SM Resp. to TLF at 9, as he also stated in his Report and Recommendations.  R&R at 45.  Had he bothered to calculate the percentage of staff/contract attorney time for Lieff and Labaton, he would have realized that Thornton's proportion of staff/contract attorney time is actually the lowest of all three firms.  *See* TLF Objs. at 28 n.20.  What is more, the 71.5% figure is not even accurate.  As pointed out in Thornton's Objections, the Thornton staff attorney time submitted to the Court accounted for 68.9% of all Thornton time, not 71.5%, as the Special Master suggests in both his Response and his Report and Recommendations.  *See id*. at 5 n.3.  It speaks volumes that, even after this simple arithmetic error was highlighted in Thornton's Objections, the Special Master or his counsel not only fail to correct the error, but actually repeat it.

awarded from the common fund.  The amount of documents to review and analysis to perform

was finite; the only question was which firm would pay for the staff attorneys to complete these

tasks.  While the language may be coarse, the concept is entirely unobjectionable.  *See* TLF Objs.

at 33-34.[3]

Still desperately clinging to the "jack up" email, which the Special Master believes is his

best evidence of motivation, the Special Master's next supposed "clear" support for Mr.

Bradley's motivation to deceive is that:

> As noted in the Master's report, Bradley's misrepresentations "infected the entire
> pleading" . . . .  At the least, the Court was substantially misled by this artifice.
>
> SM Resp. to TLF at 15-16.

That the supposed false statements "infected the entire pleading," even if true (which

Thornton vigorously disputes), has absolutely nothing to do with any possible motivation—or

intent—to file a false declaration.  The Special Master simply borrows a term of art from the

Rule 11 context and uses it to support an entirely different conclusion.  The next proposition

seems to be that because the Court was misled, Mr. Bradley must have been motivated to—and

must have intended to—mislead the Court.  This logic is false—the assertion that a reader *was*

misled does not mean that the author *intended* the reader to be misled.  *Cf. United States v.*

*Watkins*, 278 F.3d 961, 967 (9th Cir. 2002) ("Many statements, whether true, incomplete, or

false, can be misleading even when the maker of the representation does not intend to mislead

the recipient."); *United States v. Jones*, 686 F. Supp. 2d 147, 156 (D. Mass. 2010) (Wolf, J.)

---

[3]     As noted in Thornton's Objections, the very same email shows Thornton's care in avoiding any inaccuracies in
the actual lodestar which would someday be submitted to the Court.  In the same email, Michael Lesser writes,
"Just following up on the doc review recordkeeping.  The attached invoice is dated 2/6/2015 (and was sent on
2/6 as well) but includes billables through 2/28.  Can you ask them to confirm whether these hours were billed
for 2/6 – 2/28?  **I don't want us to double-count anything.**"  3/11/15 Email, TLF-SST-011124 (R&R Ex. 64)
(Dkt. 401-63) (emphasis added).  *See also* TLF Objs. at 34.  Notably, the Special Master does not cite this part
of the email because it does not fit his narrative.

("[W]hile Ms. Sullivan made inexcusable and inexplicable errors, she did not engage in intentional misconduct[.]").

Most telling on the issue of motivation is that the Special Master largely ignores Thornton's substantive objections to his findings on this subject. These objections were briefed extensively, *see* TLF Objs. at 26-37, and there is no need for Thornton to repeat them all here. What warrants special emphasis, however, is that the final fee allocation agreement among counsel was executed in August 2016, **prior to** the existence of the fee declarations and lodestars submitted to the Court in September 2016. *See id.* at 30. In August 2016, Customer Class Counsel agreed that Labaton would receive 47% of Customer Class Counsel's fee, Thornton would receive 29%, and Lieff would receive 24%. *Id.* (citing Final Fee Agreement, TLF-SST-056305 (TLF Objs. Ex. 8) (Dkt. 446-9)).[4] What is more, as all counsel were aware, the agreed-upon final fee division did not track the lodestars submitted to the Court—Labaton had 50% of the lodestar but received 47% of the fee, Thornton had 22% of lodestar but received 29% of the fee, and Lieff had 28% of the lodestar but received 24% of the fee.[5] *Id.*

In other words, which staff attorneys were listed on which lodestar would not affect the **percentage of the total fee award** Thornton would receive. The firms had already negotiated their fee split, and memorialized the fee split in a signed agreement, **before** the lodestars were filed with the Court. Whether all staff attorneys were listed on the lodestar of the firm that paid for them, or all were listed on the lodestar of the firm that housed them, the firms had agreed that Labaton would receive 47%, Thornton would receive 29%, and Lieff would receive 24% of

---

[4]   As the Special Master conceded, "[a]t the inception of the case, Customer Class Counsel had agreed to a fee sharing arrangement pursuant to which Labaton, Lieff, and Thornton would each be entitled to 20% of any fee award, with the remaining 40% to be distributed at the end of the litigation . . . ." R&R at 51.

[5]   Percentage of lodestar and fee refers to percentage of Customer Class Counsel's lodestar and fee, not the overall lodestar or fee.

Customer Class Counsel's fee.  There was no motivation to deceive because, for purposes of

Thornton's percentage share of the Customer Class Counsel fee, it did not matter which staff

attorneys were listed on which lodestar.  The Special Master or his counsel does not understand

this concept, instead asserting that "it was only by putting the attorneys of the other firms on its

lodestar that it [Thornton] was able to generate the lodestar hours to justify a substantial fee

award . . . ."  SM Resp. to TLF at 7 n.11.  In fact, the Court awarded a single fee award, not a fee

award for each firm, and far from being the only way Thornton would have received 29% of

Customer Class Counsel's fee, Thornton would have received (as agreed between Labaton, Lieff,

and Thornton) the same percentage of the aggregate fee even if none of the staff attorneys

appeared on Thornton's lodestar.

   The Special Master does not attempt to counter this argument (or even mention it),

assumedly because there is no possible reply.  Instead, the Special Master further confuses the

issues by suggesting, "If Thornton felt it was entitled to an out-sized share of the fee award by

virtue of a contribution to the result of the case, **it should have negotiated that with the other**

**firms, or at least made its case for a higher fee to the Court**, rather than attempting to

misrepresent its contribution by a 'jacked up' lodestar."  *Id.* at 15 n.18. (emphasis added).  What

the Special Master refuses to acknowledge is that Thornton's "share" of the fee award *was*, in

fact, the result of an arms-length negotiation among experienced, sophisticated law firms.  Lieff

and Labaton willingly compensated Thornton in the fee split among counsel, in part, because

Thornton bore the risk of paying for a number of the staff attorneys throughout the course of the

litigation, and also contributed, as an equal, to the substantive work of the litigation and

mediation.

The Special Master's further suggestion that Thornton should have "made its case for a higher fee to the Court" is nonsensical. The Special Master repeatedly ignores relevant class action practice and procedure. In this case, as is common, counsel requested a single fee award and allocated the fee award among themselves.[6] Further evidence of the Special Master's or his counsel's lack of understanding, or intentional obfuscation, is the statement that Bradley's "sworn declaration served as the sole basis for the Court to approve Thornton's $18 million dollars [sic] fee request, from a total fee award of $75 million." *Id.* at 23. This is demonstrably false. Thornton **did not** file an $18 million fee request and the Court **did not** award Thornton $18 million in fees. All counsel filed a **single fee request** for approximately 25% of the common fund and the Court used counsel's **combined** lodestars as a cross-check to ensure that

---

[6]   Although the Court has the authority to allocate fees among counsel, the Court did not do so here. *See* 9 NEWBERG ON CLASS ACTIONS, § 15.23 (5th ed.) ("It is typical in such cases that the lawyers can decide among themselves how to split the aggregate fee."). *See also In re Raytheon Co. Secs. Litig.*, No. 99-cv-12142-PBS, 2004 WL 7329762, at *1 (D. Mass. Dec. 6, 2004) ("The award of attorneys' fees shall be allocated among Plaintiffs' Counsel in a fashion which, in the opinion of Plaintiff's Lead Counsel, fairly compensates Plaintiffs' Counsel for their respective contributions in the prosecution of the Action."); Final Judgment, Dkt. 1007, *In re Lernout & Hauspie Secs. Litig.*, No. 00-cv-11589-PBS (D. Mass. July 20, 2005) (same in material respects); Order and Final Judgment, Dkt. 159, *In re Xchange, Inc. Secs. Litig*, No. 01-cv-10322-RWZ (D. Mass. May 1, 2006) (same in material respects); Order and Final Judgment, Dkt. 167, *In re Polymedica Corp. Secs. Litig.*, No. 00-cv-12426-WGY (D. Mass. Sept. 5, 2007) (same in material respects); *In re Evergreen Ultra Short Opportunities Fund Secs. Litig.*, No. 08-cv-11064-NMG, 2012 WL 6184269, at *2 (D. Mass. Dec. 10, 2012) ("The fees shall be allocated among counsel for Lead Plaintiffs by Lead Counsel in a manner that reflects each such counsel's contribution to the institution, prosecution and resolution of the captioned action."). *Cf. Flanagan, Lieberman, Hoffman & Swaim v. Ohio Pub. Emps. Ret. Sys.*, 814 F.3d 652, 658-60 (2d Cir. 2016) (reversing fee order as abuse of discretion where district court denied fees to non-lead counsel "where lead plaintiffs and lead counsel seek to compensate other counsel as part of a capped percentage-of-the-fund recovery" and noting "a rebuttable presumption of correctness to Lead Plaintiffs' proposed allocation of fees"); *In re Life Time Fitness, Inc., Tel. Consumer Prot. Act (TCPA) Litig.*, 847 F.3d 619, 624 (8th Cir. 2017) ("[Where] there is no dispute among class counsel over how to allocate the award of attorney's fees and expenses . . . the district court did not abuse its discretion by leaving the matter to class counsel to resolve among themselves."). To the extent the Court now wishes to allocate fees among counsel, Thornton respectfully requests an opportunity to inform the Court in a separate brief of its substantive contributions to this litigation, from participation in drafting the complaint, to developing the theories and factual support for liability and damages, to advocacy at the mediation sessions, to directing the most crucial, targeted portions of the staff attorneys' document review. Thornton had extensive experience in the subject matter of the litigation, having represented whistleblowers in False Claims Act cases across the country in matters involving FX standing instructions years before the *State Street* complaint. In fact, Thornton was the first law firm to ever bring a case challenging FX standing instruction practices.

the **total** multiplier was reasonable.[7]  *See* Lead Counsel's Motion for Award of Fees and Expenses (R&R Ex. 110) (Dkt. 401-109); Order and Final Judgment (R&R Ex. 113) (Dkt. 401-112); 11/2/16 Hr'g Tr. at 36:1-5 (R&R Ex. 78) (Dkt. 401-77) (the Court finding that "[t]he amount awarded is about 1.8 times the lodestar.  The lodestar is about $41 million.  This is reasonable.").  The Court did not calculate individual multipliers for each firm for the simple reason that, as is common, the Court did not ask for, and counsel did not share with the Court, the percentage of fees that Thornton, Lieff, and Labaton would receive.

The Special Master *may* have been able to show that Mr. Bradley (and every other lawyer in the case) had some *potential* motive[8] to increase his firm's lodestar submitted to the Court if either:  (1) the Court allocated fees among counsel; or (2) each firm applied for its own fee award.  If either of these two scenarios were true, each firm would have had an incentive to submit the highest possible lodestar to the Court.  But despite his bombastic language (i.e., that Thornton's Objections are "Orwellian"), it is the Special Master who is presenting what can only be called alternative facts to the Court.  Although it had the authority, the Court (as is common) did *not* allocate fees among counsel or ever indicate that it would do so, and each firm did *not* apply for its own fee award.  There was therefore no **motivation** for Mr. Bradley to deceive the Court by increasing his firm's lodestar.

---

[7]   It is astonishing that the Special Master or his counsel fail to grasp these fundamental concepts after spending nearly $5 million on a two-year investigation.

[8]   Of course, potential motive does not equal actual intent.

II.   **The Special Master Continues To Mischaracterize And Confuse The Evidence**

    a.   **In Arguing That Garrett Bradley Reviewed The Boilerplate Section Of The Declaration, The Special Master Or His Counsel Not Only Mischaracterize But Actually Change The Evidence**

Thornton's Objections demonstrated how the Special Master's Report and Recommendations misrepresented Evan Hoffman's deposition testimony in order to further the false narrative that Garrett Bradley carefully read the boilerplate section of the fee declaration and was aware of its defects prior to submitting the declaration to the Court. As noted on page 37 of Thornton's Objections, the Special Master characterized Evan Hoffman's testimony as follows:

> Emails among Garrett Bradley, Mike Lesser and Evan Hoffman show that drafts of the declaration were circulated among these Thornton attorneys for their review. This is confirmed by the testimony of Evan Hoffman: "[w]e put in all the hours that we had kept track of, I along with our accounting department and Anasthasia put in the expenses and then **mostly Mike Lesser and then Garrett Bradley, Mike Thornton and myself all reviewed**" the declaration before Bradley signed it. Hoffman 6/5/17 Dep., p. 94:9-15.
>
> R&R at 229 (emphasis in original).

This supposed "evidence" suggests that four Thornton partners sat down and studied the entire declaration (including the boilerplate section containing the misstatements) and realized that some of the language contained misstatements. But as Thornton indicated in its Objections, the Special Master misrepresented the record by replacing the material words of Mr. Hoffman's deposition with the Special Master's own characterization. In fact, Mr. Hoffman did not testify that the four partners reviewed the entire declaration. The full testimony is:

> [T]here was a section on fill in what your hours are, fill in what your expenses are, fill in what your lodestar is, fill in what your specific contributions were to the case, and the rest of the language was sort of, it was called a model fee declaration. And so that's what we did, he put in all the hours that we had kept track of, I along with our accounting department and Anasthasia put in the expenses and then mostly Mike Lesser and then Garrett Bradley, Mike Thornton and myself all reviewed **the**

**sort of narrative about the firm's contribution, which I believe mostly Mike
Lesser drafted.**

Hoffman Dep., 6/5/17, at 94:1-17 (R&R Ex. 63) (Dkt. 401-62) (emphasis added—the
emphasized portion was omitted from the Special Master's quotation of this deposition).

In other words, the Special Master or his counsel intentionally replaced Mr. Hoffman's

actual words—"the sort of narrative about the firm's contribution, which I believe mostly Mike

Lesser drafted"—with words that Mr. Hoffman did not say: "the declaration."

As noted in Thornton's Objections, the declaration was a template "fill-in-the-blank"

document provided by Labaton with two primary sections for each firm to customize: (1) a

narrative of each firm's contribution; and (2) the lodestar itself.  *See* Template Decl. at ¶ 2, TLF-

SST-029797 (TLF Objs. Ex. 9) (Dkt. 446-10) (instructing that each firm should: "Supplement to

explain role in the Class Actions and give overview of work performed.").  The rest of the

declaration was Labaton's boilerplate and the Special Master himself concluded that most of the

firms did not modify the problematic boilerplate section at issue in these proceedings.  *See* R&R

at 57.  The "narrative" to which Mr. Hoffman refers is that of Thornton's particular contributions

to the litigation.  It makes perfect sense that Thornton partners carefully reviewed the customized

section of the fee declaration, but in no way does this prove that Mr. Bradley or anyone else must

have also carefully reviewed the entire boilerplate section of the fee declaration, realized that

misstatements were present, and intentionally filed a false declaration.

As demonstrated above, the Special Master simply lifted a quote, omitted the most

material aspect of it, and inserted substitute language to create a different meaning and support a

different conclusion.  In his Response, the Special Master refuses to admit any error and,

shockingly, forcefully repeats his assertion by referring to "the complete and damaging

testimony of Evan Hoffman on the matter of **Bradley and fellow attorneys' review of the six**

**false statements concerning the shared staff and agency attorneys**," which he submits is evidenced by pages 93 to 99 of Mr. Hoffman's deposition.  SM Resp. to TLF at 16-17 (emphasis added).  These deposition pages are the supposed "most accurate record on this issue," which is termed as the "continuum of testimony by Hoffman establishing **that Thornton's review included the false statements at issue.**"  *Id.* at 17 (emphasis added).  Those pages are reproduced below for the Court:

[BY MR. SINNOTT:]

Q.    Let me ask you this then.

In other cases, to your knowledge –

JUDGE ROSEN:  One more question, I'm sorry. Off the record.

(Discussion off the record.)

BY MR. SINNOTT:

Q.    Let's move into the fee declaration.

Could you describe what your role was in that process.

A.    So we received from Labaton, from a partner there named Nicole Zeiss, a sort of model fee declaration that was sent around in advance of submitting the total fee declaration and it had a bunch of text in it and it was like those fill-in-the-blank, whatever that game is, but it was sort of put your information here.

JUDGE ROSEN:  Not Hang Man.

THE WITNESS:  Not Hang Man, no.

A.    Put your information here, so there was a section on fill in what your hours are, fill in what your expenses are, fill in what your lodestar is, fill in what your specific contributions were to the case, and the rest of the language was sort of, it was called a model fee declaration.

And so that's what we did, he put in all the hours that we had kept track of, I along with our accounting department and Anasthasia put in the expenses and then mostly Mike Lesser and then Garrett Bradley, Mike Thornton and myself all reviewed the sort of narrative about the firm's contribution, which I believe mostly Mike Lesser drafted.

And then it was sent back to Labaton for their review and maybe an edit or two and that was the last we saw of it until it was submitted on ECF for the final, when it was actually given to the judge.

JUDGE ROSEN:  You never saw Labaton's fees or Lieff's fees in the declaration?

THE WITNESS:  Correct.

JUDGE ROSEN:  In the actual fee declaration, did you ever see their fees?

THE WITNESS:  No, not until it was already filed.

JUDGE ROSEN:  Not until it was filed?

THE WITNESS:  Correct.

JUDGE ROSEN:  Did you in any way attempt to edit or change the narrative in the fee declaration?

THE WITNESS:  So let me just be clear.

The document that I'm talking about is the sort of, whatever it is, I'm talking about the affidavit, so, yes, there was a spot where we were instructed to add what our firm-specific contributions would have been, because it was a fee declaration on behalf of our firm.

As to the overall package of whatever the declaration, maybe it was Labaton's declaration which described in general the case, I don't believe that we offered any edits to that.

JUDGE ROSEN:  Drilling down just a little more finely on this, there was a phrase, I don't remember the actual language, but is it customary and regular rates charged -- "the hourly rates for attorneys and professional support staff in my firm included in Exhibit A are the same as my firm's regular rates charged for their services which have been accepted in other complex class actions," was that your language or was that language that was supplied to you by Nicole Zeiss?

THE WITNESS:  Language supplied to us by Nicole.

JUDGE ROSEN:  And you never changed that, edited it or talked to her about changing it?

THE WITNESS:  Correct.

Q.     Did that strike you as being incongruous --

(Discussion off the record.)

JUDGE ROSEN: I thought she was giving me the Thornton declaration, but our recollection is that that language was the same in all of the fee petitions.

BY MR. SINNOTT:

Q.      Do you remember seeing that language?

A.      Yes.

Q.      Did it trouble you at all?

A.      No, firstly because it was given to us by Labaton who I think has probably done hundreds, if not thousands, of these fee declarations.

My understanding was that Nicole Zeiss's sort of whole role at Labaton was to be the person and partner in charge of preparing the fee petition, so it didn't strike me as anything really.

If anyone knew what they were doing, I would have thought it would be her and them.

And also, just on a basic level, our fees had been accepted by a Federal Judge, Judge Kaplan, in the BNY Mellon case, an almost identical litigation, and so there was nothing that stood out to me as being not accurate or wrong in any sense considering we had a judge who had just recently approved everyone's fees for a very, very similar case on the exact same topic.

JUDGE ROSEN:  On the same rates?

THE WITNESS:  And on the same rates, yes.

Q.      In other cases, if you know, where Thornton was teamed up with other firms, would Thornton typically do its own fee petition or would it join in in another fee petition, was there any consistency or method there?

A.      I can only speak to the only other case I have been involved in, which would have been the BNY Mellon case, in which we submitted our own fee petition as part of all of the firms led by Lieff and Kessler Topaz, but, yes, each firm who worked on the case had its own fee petition which was then approved by the judge.

Q.      When did you first realize in this case that there was an overlap?

A. I am trying to remember the exact day, but Garrett came down to my office and looked like he had seen a ghost and told me how it is that he heard about it.

I don't remember exactly how he heard about it.

Q. When was that?

A. It had to be in the fall, early winter of last year.

He came in and said something to the effect of, I won't use expletives, but there were a lot of them, and they're saying that we double-counted our hours.

And so me being the person who was in charge of warehousing our hours, my career flashed before my eyes and we downloaded everything, printed everything out, started to look it up and realized ....

Hoffman Dep., 6/5/17, at 93:1-99:25 (R&R Ex. 63) (Dkt. 401-62) (Attached hereto at Nassif Decl., 12/18/18 (TLF Sur-Reply Ex. 4-A)).[9]

At no point in this supposed "**most accurate record of this issue**" is there any indication of "Bradley and fellow attorneys' **review of the six false statements** concerning the shared staff and agency attorneys."  All that can be said after reading the deposition excerpt is that: (1) Mr. Hoffman recalls that he and Messrs. Lesser, Thornton, and Bradley reviewed the *firm-specific narrative section* of the declaration; and (2) Mr. Hoffman recalls that he personally read a portion of the boilerplate language but did not think anything of it because the rates listed were materially the same as those listed in the *BNY Mellon* litigation.  There is zero evidence that Messrs. Hoffman, Lesser, Thornton, and Bradley all reviewed "the six false statements concerning the shared staff and agency attorneys" or that "Hoffman and the other Thornton attorneys he previously acknowledged as having reviewed the declaration—including Garrett Bradley—saw the 'language' and declined to edit it."  SM Resp. to TLF at 16-18.  The Special

---

[9] The original version of the Hoffman transcript filed publically at Dkt. 401-62 did not contain pages 96 to 99.  By order dated December 17, 2018 (Dkt. 529), the Court unsealed pages 96 to 99 pursuant to Thornton's motion (Dkt. 528).

Master or his counsel's repeated insistence on this mischaracterization of the evidence is troubling.

But the Special Master or his counsel are not content to only mischaracterize the evidence.  Disturbingly, and without regard for consequences for misrepresentations to the Court, the Special Master or his counsel actually **change the evidence**.  On page 17 of his Response, the Special Master excerpts Mr. Hoffman's deposition testimony in attempting to prove that Thornton attorneys reviewed the boilerplate section of the declaration.  One of the excerpts is:

> (Discussion off the record.)

> HOFFMAN [erroneously attributed to Judge Rosen]: I thought she was giving me the Thornton declaration, but our recollection is that that language was the same in all of the fee petitions.

*Id.* at 17 (bracketed text is the Special Master's).

The certified deposition transcript, at page 97 line 3, however, indicates that this statement was made by "JUDGE ROSEN."  The Special Master, because he would like to attribute this statement instead to Mr. Hoffman as to better fit his narrative, simply changes "JUDGE ROSEN" to "HOFFMAN," and claims that the statement was "erroneously attributed to Judge Rosen."  By doing so, the Special Master or his counsel hope to use the phrase "our recollection," in conjunction with "that language was the same in all," to show that the Thornton lawyers reviewed all of the operative language at issue.

There are three significant problems with the Special Master's or his counsel's alteration and conclusion.  First, the Special Master is quite simply wrong—Evan Hoffman never said this. As set forth in the attached declarations of Mr. Hoffman and former Nixon Peabody attorney Emily Harlan, the certified deposition transcript is accurate, and the statement in question was

made by Judge Rosen, not Mr. Hoffman.  *See Hoffman Decl.*, 12/17/18, (TLF Sur-Reply Ex. 1); Harlan Decl., 12/17/18 (TLF Sur-Reply Ex. 2).  The "she" referred to in the testimony is the Special Master's own counsel, Elizabeth McEvoy, who was physically handing the Special Master documents at this point in the deposition, and not Nicole Zeiss, as the altered testimony suggests.  *See id.*  Second, the Special Master never filed an errata sheet to make a correction, which was required if the Special Master actually believed there was an error in the transcript. *See* Sharp Decl., 12/17/18 (TLF Sur-Reply Ex. 3-A); Fed. R. Civ. P. 30(e).  And third, the Special Master never checked with the court reporter to ensure that his "correction" to the transcript was sound.  Thornton knows that the Special Master never checked with the court reporter because within twenty-four hours of receiving the Special Master's Response, undersigned counsel contacted the reporting company and identified the section of the transcript that had been called into question.  The reporting company replied: "Our reporter has reviewed her notes.  She says the transcript is accurate."  *See id.* at Ex. 3-A.

It is difficult to overstate the gravity of the Special Master's misrepresentation to the Court in the context of this case, where the Special Master seeks $1 million in Rule 11 sanctions for Mr. Bradley's signature on a boilerplate affidavit that was identical to the affidavits submitted by the other attorneys, and which Mr. Bradley did not draft.  Here, in a Court filing, the Special Master or his counsel has changed deposition testimony to suit a desired narrative without bothering to: (1) file an errata sheet; (2) inquire of the witness whether the transcript was accurate; (3) inquire of counsel whether the transcript was accurate; or (4) inquire of the court reporter whether the transcript was accurate.  Moreover, this was not an immaterial misrepresentation.  On the contrary, the Special Master excerpted Mr. Hoffman's testimony as a means of proving Mr. Bradley's intentional misconduct.  And prior to excerpting this particular

testimony, the Special Master emphasized that it contains "the most **accurate** record on the

issue" (emphasis added) and that "the following exchange is **compelling**."  SM Resp. to TLF at

17 (emphasis added).  There are only two possible conclusions: either the Special Master or his

counsel changed the deposition transcript with knowledge that the change was not accurate; or,

prior to changing the deposition transcript, the Special Master or his counsel failed woefully to

make "an inquiry reasonable under the circumstances."  *See* Fed. R. Civ. P. 11(b); SM Resp. to

TLF at 21 ("His utter failure to verify the statement he was signing . . . on facts he either had

first-hand knowledge of, or could discover the answer to with a phone call or email, is

unacceptable . . . .").

### b.  The Special Master Again Mischaracterizes The Evidence To Support His Assertion That Garrett Bradley Admitted He Lied To The Court

Strangely, while stating that he does not mean to imply that Garrett Bradley admitted that

he "lied to the court," the Special Master maintains his position that "[a]t numerous times during

the March 7 hearing, Bradley acknowledged that he knew his declaration contained inaccurate

information, but he signed it anyway."  *See* SM Resp. to TLF at 18.  That the Special Master

differentiates "lying" from intentionally filing a false declaration is bizarre, but beside the point.

The Special Master is correct that the hearing transcript "speaks for itself."  *Id*.  That is why

Thornton's Objections excerpt in full all lines of the transcript that the Special Master cites in

support of his assertion that Garrett Bradley *admitted* he intentionally filed a false affidavit with

the Court.  None of the citations support the Special Master's conclusion.  *See* TLF Objs. at 41-

42.  Quite simply, the fact that Garrett Bradley signed the affidavit in September 2016

(undisputed) and that Garrett Bradley stated in March 2017 that the affidavit contained

misstatements (undisputed) does not mean that at the time Garrett Bradley signed the affidavit in

2016 he knew it contained the misstatements he recognized in 2017.  The Special Master or his

counsel either do not understand this simple logic or are intentionally conflating two concepts as a means of misleading the Court into a finding of misconduct.

    **c.   The Special Master Still Cannot Decide Whether Garrett Bradley Read The Boilerplate Declaration**

As noted in Thornton's Objections, TLF Objs. at 40, it is impossible to reconcile the Report and Recommendations' statement that "The Special Master believes Bradley did not read the narrative section at all," R&R at 231, with its findings that Bradley "intentionally and willfully" and "deliberately and intentionally" filed a false affidavit. *See* R&R at 233-35. Unable to fit the facts to his theory, the Special Master now attributes this striking inconsistency to what he calls, in perhaps the understatement of the year, "**evidentiary imprecision**." SM Resp. to TLF at 19 (emphasis added). Yet in the very same brief, the Special Master also stridently states that there is "**voluminous evidence** presented by the Master during his investigation, which, **in compelling fashion**, shows that Bradley acted intentionally in submitting a false fee declaration." *Id.* at 14 (emphasis added). *See also id.* at 24 n.20 ("As the **evidence abundantly shows,** Thornton, acting largely through its managing partner Garrett Bradley, intentionally misled the Court . . . .") (emphasis added); *id.* at 27 ("[T]he record evidence establishes that Bradley knew his declaration contained false and misleading statements[.]"). Apparently, the Special Master's "voluminous" evidence of intent is both "compelling" and "abundant," but it also happens to be "imprecise."

    The nonsense does not end there. In what is perhaps the most illogical sentence in all of the Special Master's submissions, the Special Master writes in his Response:

> Contrary to Thornton's objection, it is not the Special Master's finding that Garrett Bradley read the declaration, but rather that he reviewed it, knew that it contained false information, but signed it anyway.

> *Id.* at 19.

It is difficult to understand what this means or how the Special Master could include this sentence in a submission to the Court with a straight face.  Undersigned counsel is aware of no distinction between the words "read" and "review" in this context.  Either Mr. Bradley carefully **read** the boilerplate section of the affidavit, **recognized** that it contained misstatements, and signed it anyway, or he did not.  Because the Special Master continues to waver on whether Mr. Bradley actually read the boilerplate section of the affidavit, the Special Master comes up with an admittedly novel argument that there is some sort of difference between the words "review" and "read," and while Mr. Bradley may have never "read" the fee declaration, he most certainly "reviewed" it.

The rest of this section of the Special Master's Response, which includes the following sentence, fares no better:

> Whether Bradley read the Declaration, "saw" it, or whether it was read or explained to him by Evan Hoffman or another colleague, or whether he was content to read only the emailed drafts, **is not important**.

*Id.* at 19.  (emphasis added).

Far from being "not important," it is instead crucially important that Mr. Bradley carefully read the affidavit and recognized the misstatements, if the Special Master is to charge Mr. Bradley with "intentionally and willfully" and "deliberately and intentionally" filing a false affidavit.  *See* R&R at 233-35.  How can the Special Master establish that Mr. Bradley "**knew the declaration contained inaccurate statements but signed it anyway**," SM Resp. to TLF at 19, if "evidentiary imprecision" leads the Special Master to present contradictory statements to the Court as to whether Mr. Bradley ever read the boilerplate section of the affidavit?  It bears repeating that the Special Master found that "the statements in Bradley's Declaration were false and **not the product of negligence**, but of an **intentional and willful decision to . . . submit a**

**false affidavit**," yet the Special Master cannot tell the Court whether Garrett Bradley read the declaration and recognized the misstatements or not.[10]  *See id.* at 19-20 (emphasis added).

Simply put, the Special Master's conclusions as to Thornton don't arise from the record but distort the record.  It is indeed troubling that such material inconsistencies could exist in a document generated at the end of a two-year, nearly $5 million investigation, especially when the conclusions of the investigation unfairly tarnish a law firm with a 40-year history of service to clients.

### d.   The Special Master Again Mischaracterizes An Email Which Was Explained To Him Both During His Investigation And In Thornton's Objections

Further mischaracterizing the evidence, on page 20 of his Response, the Special Master quotes an email in which there is a reference to **Michael Thornton** mistakenly using a lodestar figure in **August 2015** for the proposition that "even among Class Counsel, Thornton, and Garrett Bradley, were neither forthright nor clear with the reporting of their lodestar."  Thornton previously addressed this email with the Special Master in an April 2018 submission, *see* Thornton's Resp. to Request for Add'l. Submission, 4/12/18, at 11-12 (TLF Objs. Ex. 3) (Dkt. 446-4), and then again in a lengthy footnote in its Objections.  The footnote is reproduced in its entirety below for the benefit of the Court:

> Of course, this is not the only place where the Report and Recommendations unfairly impugns the reputation of the Thornton Law Firm and its attorneys. As an additional example, page 54 of the Report quotes a lengthy email from co-counsel which the Special Master characterizes as "warning Bradley not to include unwarranted hours in Thornton's fee petition." The underlying email states, "I heard third-hand that Mike [Thornton] recently said on a call (that I wasn't on) that Thornton Law Firm was showing $14 million . . . . I am hopeful that Mike T simply misspoke or was guessing when he said $14 million and that we are not going to suddenly see an additional 12,000 hours mysteriously appear on Thornton Law Firm's behalf." In the response, which does not appear in the Report, Michael Thornton replies, "I did say something like that on the call, but preceded it by saying

---

[10]   *See also id.* at 20 ("Bradley **intentionally** submitted his sworn declaration and **deliberately** allowed the Court to rely on information that **he knew** to be false.") (emphasis added).

> **it was a guess** and that I would have to ask Mike Lesser for the actual figure at that point which of course is not complete as with the other firms." 8/30/15 Email, TLF-SST-031166 (SM Ex. 87) (emphasis added). Nor does the Special Master include a subsequent email, which clarified that the mistake was the result of a simple transposing of concepts, in which Michael Lesser writes, "**I think that 14 would have been our share of the fee, making some assumptions, and not the actual size of our lodestar.**" 8/30/15 Email, TLF-SST-038587 (TLF Ex. 24) (emphasis added). This later email was identified for the Special Master, *see* Thornton's Resp. to Request for Add'l. Submission, 4/12/18, at 11-12 (TLF Ex. 3), as was deposition testimony from co-counsel that "I think Mike Thornton may have simply been mistaken because that's not the number they ultimately reported." *Id.* (citing Chiplock Dep., 9/8/17, at 64:16-18 (SM Ex. 41)). The Special Master was either recklessly inattentive or chose to ignore this evidence, publishing innuendo with a complete disregard for injuring the reputation of a highly respected member of the bar.

TLF Objs. at 109 n.87.

The Special Master must either have neglected to read this footnote or have decided to

disregard the evidence cited therein because it did not fit his false narrative.

## III. The Special Matter Does Not Respond To Thornton's Arguments That Thornton Did Not Violate Rule 11 And That The Court Should Not Refer Garrett Bradley To The Board Of Bar Overseers

Surprisingly, the Special Master declines to respond in any substantive manner to the

over 25 pages of legal and factual analysis in Thornton's Objections explaining why Thornton

did not violate Rule 11 and why Garrett Bradley should not be referred to the Board of Bar

Overseers. Thornton respectfully refers the Court to pages 44 to 59 of its Objections, which

discuss the legal framework for Rule 11 sanctions and evaluates in detail each of the six discrete

"false statements" that the Special Master believes support Rule 11 sanctions. With respect to

the BBO referral, Thornton respectfully refers the Court to pages 67 to 78 of its Objections,

which contain a detailed legal analysis of Rules 3.3 and 8.4 of the Massachusetts Rules of

Professional Conduct.

As with other areas where the Special Master remains silent, Thornton assumes that the Special Master's failure to address Thornton's substantive objections is a recognition that such objections are well-founded.  In particular, Thornton's Objections regarding the Special Master's reliance on the *In re Schiff* case should completely undermine any confidence in the Special Master's or his counsel's legal analysis.[11]  Perhaps Thornton's Objections are why the Special Master seems now to step back from the bar referral, which he initially stated was necessary because he "conclud[ed] that Garrett Bradley is guilty of professional misconduct for violating rules 3.3(a)(1) and (3) and 8.4(c) of the Massachusetts Rules of Professional Conduct."  R&R at 245.  The Special Master now concludes only that "[a] referral, of course, is meant to prompt greater scrutiny of Attorney Bradley's actions and is not a recommendation that any bar discipline be imposed." SM Resp. to TLF at 21.  *Compare* R&R at 365 ("For the falsity of the sworn declaration statements . . . the Special Master recommends that significant monetary sanctions, and *professional discipline be levied*.") (emphasis added).

## IV.   The Special Master Continues To Suggest That The Court Impose The Highest Or Second Highest Rule 11 Sanctions Imposed in The First Circuit In At Least The Last Twenty Years

The Rules 11 sanctions the Special Master continues to seek, between $400,000 and $1 million, are truly extraordinary.  As noted in Thornton's Objections, undersigned counsel searched for all reported Rule 11 orders in all courts in the First Circuit over the last twenty years and identified only three cases where a court imposed sanctions of over $100,000.  In one of

---

[11]    The Special Master, perhaps neglecting to fully read the underlying case he cited, stated in his Report and Recommendations that Bradley's purported misconduct was "eerily similar" to the *Schiff* case and that "*Schiff* informs the Special Master with regard to Bradley's false Declaration in this matter."  *See* R&R at 241, 244.  In its Objections, Thornton pointed out that in *Schiff*, the attorney sought costs and fees 47 times greater than her client's recovery, and sought payment for time not actually worked, and in some cases for more than 24 billable hours in one day.  *See* TLF Objs. at 8, 69.  Mr. Bradley's conduct is in no way "eerily similar" to attorney Schiff's conduct, and the Special Master's Response is eerily silent on the *Schiff* case.

those cases, the First Circuit, citing Justice Holmes for the proposition that "even a dog . . . distinguishes between being kicked and being stumbled over," reduced the sanction from $250,000 to only $5,000.  *See In re Nosek*, 609 F.3d 6, 9-10 (1st Cir. 2010).  The Special Master's response to this exhaustive research is to state—*without citation to any source whatsoever*—that undersigned counsel's findings are not surprising because "courts within the First Circuit have not had the occasion to impose monetary sanctions with any frequency."  SM Resp. to TLF at 22.  Perhaps the Special Master actually conducted a circuit-by-circuit analysis and neglected to include a citation, but this is likely another instance where the Special Master simply states what he hopes to be true without any regard for whether he is accurately representing the facts and law to this Court.

What is telling is that the Special Master does not contest that a $400,000 to $1 million sanction would be the first or second highest Rule 11 sanction imposed in the First Circuit in at least twenty years—and perhaps ever.  More importantly, the Special Master does not cite *a single case in any circuit* where Rule 11 sanctions in the range he suggested have been imposed, for similar conduct, *or for any conduct whatsoever*.  Either the Special Master actually believes that Garrett Bradley's conduct in this case is *sui generis* in the history of the federal courts and therefore deserving of such an extraordinary Rule 11 sanction or, on the other hand, the Special Master is simply stuck with his previous recommendation because he never researched the range of appropriate sanctions and does not wish to admit the error.  *Cf. Lamboy-Ortiz v. Ortiz-Velez*, 630 F.3d 228, 249 (1st Cir. 2010) (citing Rule 11 cases, and noting that in the § 1927 context, $64,936 sanction "lies far outside the mainstream in this circuit, where sanctions typically amount to less than $10,000").

While insisting that the Rule 11 sanction must "have a material effect on Thornton's recovery [and a] deterrent effect on future violations of the Rule," *see* SM Resp. to TLF at 22, the Special Master also completely ignores Thornton's argument that it has already funded its share of the Special Master's nearly **$5 million investigation**, and incurred both very substantial legal costs and significant opportunity costs associated with the loss of the Thornton attorneys' time.  As the exclusive purpose of Rule 11 sanctions is deterrence, *see* TLF Objs. at 60, it does not matter where the money went—all that matters is that Thornton has paid a significant amount of money that it otherwise would not have and has been sufficiently deterred.  In the unusual context of this case, the Court must consider the costs that have already been imposed on Thornton and then consider whether any additional deterrence is necessary, mindful that any sanction "**must be limited** to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4) (emphasis added).[12]

The Special Master now asserts that the Rule 11 sanction must be substantial because misstatements in fee declarations may be common, and anything short of the recommended sanctions "will have little to no impact on deterring other law firms from continuing the purportedly 'common' practice of making misrepresentations before a court to support their substantial fee requests." SM Resp. to TLF at 24 n.19.  This argument again ignores the fact, as noted above, that Thornton has already paid a significant amount of money in the course of this investigation, which also serves the goal of general deterrence as much as a payment directly to the Court under Rule 11 would.  The Special Master's argument also begs the question of

---

[12]   If the Court is inclined to impose any monetary sanctions on Thornton, the Court should consider crediting Thornton's payments to fund the Special Master's investigation against any monetary sanction imposed.

whether such extraordinary Rule 11 sanctions are appropriate given that the conduct is not at all unique—in the context of either this case, or among the class action bar in general.[13]

Further, the Special Master's recommendation of Rule 11 sanctions continues to be infected by his mistaken belief that such sanctions are compensatory and therefore that the sanctions should be paid to the class.  *See* TLF Objs. at 61-62.  As noted in Thornton's Objections, it is clear legal error for the Special Master to recommend that the *sua sponte* sanctions be paid to the class.  *Id.*  The Special Master is content to the let the Court continue to rely on this serious error, and does not withdraw the recommendation or make any correction. His method of calculating the sanctions, 10% to 25% of the double counting error so as to be "proportionate to the relative contribution Garrett's Bradley false statements had on the [double counting] error itself," SM Resp. to TLF at 24, is also driven by compensatory purposes.  This method—even assuming that the "relative contribution" is correct—does not serve the goals of Rule 11 because it is not "**limited** to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4) (emphasis added).  As the 10th Circuit Court of Appeals wrote many years ago:

> Although a mathematical percentage approach arguably serves the goal of compensation, such an approach fails even to consider whether the penalty imposed is the least severe sanction adequate to deter future abuses. Because the instant district court calculated sanctions without considering the minimum sanction necessary to deter future abuses, we vacate the award of sanctions[.]

*Dodd Ins. Servs., Inc. v. Royal Ins. Co. of Am.*, 935 F.2d 1152, 1159 (10th Cir. 1991).[14]

---

[13]  Given the widespread use of boilerplate forms among the class action bar, it may be more appropriate for the Court to recommend the adoption of a model Local Rule regarding fee declarations and hourly rate calculations in class actions rather than to penalize Thornton further.

[14]  In some instances—for example, where one party incurs fees as a result of responding to an opposing party's frivolous motion—the person violating the rule may be required to pay the party injured by the violation.  *See* TLF Objs. at 65 n.47 (citing Fed. R. Civ. P. 11 advisory committee's notes).

Finally, Thornton notes that the Special Master is silent in response to Thornton's

argument that the unambiguous language of Rule 11 prohibits the imposition of *sua sponte*

monetary sanctions post-settlement, and that by recommending such sanctions, the Special

Master committed clear legal error.  *See* TLF Objs. at 66-67.

## V.   The Special Master Continues To Violate The "Basic Principle of Justice That Like Case Should Be Decided Alike"

The Special Master's recommendations continue to violate the "basic principle of justice

that like cases should be decided alike."  *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139

(2005).

### a.   Chargois Recommendations

In his Report and Recommendations, the Special Master found that the Chargois matter

was the "[t]he most troubling issue in this case," that Labaton's failure to inform the Court was

"in derogation of the duties imposed upon it by Fed. R. Civ. P. 23(e)(3)," that Labaton "kept the

Court in the dark," and that Labaton engaged in a "pattern of concealment."  R&R at 303, 309,

313, 316.  The Special Master further found that Labaton violated Massachusetts Rules of

Professional Conduct 1.2, 1.4, 1.5(e), 3.3, and 7.2(b).  *Id.* at 255, 286, 322, 337.  Yet despite

finding violations of at least five separate Massachusetts Rules of Professional Conduct, the

Special Master—without any sense of parity whatsoever with respect to Mr. Bradley—did **not**

recommend that Labaton or any of its lawyers be referred to the Board of Bar Overseers.[15]

Somehow after Labaton's offer of settlement, the Special Master's finding of violations

of five separate Massachusetts Rules of Professional Conduct has morphed into a finding that

Labaton "did not comport with emerging best practices."  *See* SM Supp. to R&R at 5 (Dkt. 485).

---

[15]   This is particularly ironic in light of the Special Master's recent statement that, with respect to Garrett Bradley, "[a] referral, of course, is meant to prompt greater scrutiny of Attorney Bradley's actions and is not a recommendation that any bar discipline be imposed."  SM Resp. to TLF at 21.

As the Court has indicated, *see* 11/7/18 Hr'g Tr. at 11:11-12 (Dkt. 519), it is unclear what "emerging best practices" actually means, although that term appears eight times in the Special Master's "Supplement to His Report and Recommendations." The Special Master's filings are also unclear, perhaps intentionally so, as to whether he replaced his original conclusions that Labaton violated the Rules of Professional Conduct with his new conclusion that Labaton fell short of "emerging best practices," or whether the "emerging best practices" conclusion is simply supplemental to his Rules of Professional Conduct conclusions. For instance, the following is indecipherable as to whether the Special Master has withdrawn the Rule 3.3 violation in favor of an amorphous "emerging best practices" finding:

> Given Labaton's past failure to appreciate the full scope of its duty to the Court and the encumbering effects they had on the Court's duty to administer justice, the Special Master has reevaluated his conclusion that Labaton's omission of the Chargois Arrangement violated its duty of candor, but finds that Labaton still failed to comport with emerging best practices as to disclosure of fee arrangements with the Court.

> SM Brief in Support of Settlement at 17 (Dkt. 511).

And at least with respect to Rule 1.5(e) (regarding "division of a fee"), the Special Master previously found that Labaton violated that rule, *see* R&R at 254 (stating, in a section titled "Labaton failed to comply with Rule 1.5(e)," "Labaton more than 'imperfectly' complied with Rule 1.5(e); it violated the Rule, however technical that violation may now be construed in hindsight"). But now the Special Master states not only that there was no violation, but that he never found a violation in the first place. *See* SM Brief in Support of Settlement at 15 n.6 (Dkt. 511) ("The Special Master made no finding with respect to the propriety of the payment itself made to Damon Chargois.").

The point is not that Labaton should be referred to the BBO; Labaton should not be referred to the BBO, as Labaton's Objections demonstrated. Rather, the point is that the Special

Master's findings are more severe for Thornton than for Labaton for no discernable reason. Further, the "revised" Labaton recommendations demonstrate that the Special Master considered Labaton's Objections and changed his approach and findings considerably (i.e., "emerging best practices") in light of Labaton's Objections. Yet as demonstrated by the Special Master's Response to Thornton's Objections, the Special Master did not seriously consider Thornton's Objections but instead reflexively countered all of Thornton's arguments without regard for their validity. The unequal treatment is striking.

### b. "Employees" Language

The Special Master's recommendations of extraordinary Rule 11 sanctions and a BBO referral for Thornton and Garrett Bradley relied, in part, on his conclusion that the following statements in Thornton's declaration were false: (1) that the lodestar summarized "time spent by each attorney and professional support staff-member *of my firm* who was involved in the prosecution of the Class Actions"; and (2) that "[f]or personnel who are no longer *employed* by my firm, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of *employment* by my firm." R&R at 227 (emphasis added). In this instance, as well, the Special Master did not treat "like case alike" because, despite the fact that both Lieff and Labaton used the **exact same boilerplate** the Special Master finds objectionable as to Thornton, the Special Master recommended Rule 11 sanctions and the BBO referral only for Thornton and Garrett Bradley.

Under the Special Master's reading of the declaration, Lieff's and Labaton's declarations might also be "false." As noted in Thornton's Objections with detailed citations, TLF Objs. at 47-48, the Lieff affidavit lists as Lieff "employees" those attorneys who were actually "contract"

or "agency" attorneys with whom Lieff did not have an employer-employee relationship.[16] Similarly, the Labaton affidavit lists as "employees" those attorneys who were invoiced to Thornton pursuant to the cost-sharing agreement, implying that Labaton paid for all costs of such attorneys on its lodestar when in fact it did not. *Id.* If the Court were interested in the investment each firm made into the case, neither the Labaton nor the Lieff declaration, in a technical sense, conveyed such information, because each of Labaton's and Lieff's declarations contained attorney costs that Thornton—not Labaton or Lieff—actually paid for.

Although the Special Master now belatedly acknowledges the technical issues with the Lieff declaration (but not the Labaton declaration), he states that no sanction or discipline is warranted for Lieff, because the statements were simply "imprecise," "sloppy," and constituted "loose language." SM Resp. to Lieff at 27. These conclusions are also applicable to the Thornton declaration, and the Special Master's conclusion as to Thornton, and in particular the Special Master's unequal treatment of Thornton, Lieff, and Labaton, is unwarranted.[17] Moreover, the fact that the Special Master, despite his two-year, nearly $5 million investigation, did not identify the supposed misstatements in the Chiplock declaration prior to submitting his Report and Recommendations to the Court suggests that neither Thornton's nor Lieff's misstatements are as significant as the Special Master now claims they are.

---

[16]   The Special Master states that Thornton's Objections "insinuate[ed] that the Chiplock Declaration is not entirely accurate." SM Resp. to Lieff at 6. To be clear, Thornton's position is that Lieff's Declaration is only inaccurate under the Special Master's reading. Thornton does not argue that Lieff and Labaton should be sanctioned for these misstatements, but emphasizes that such misstatements are not sanctionable for any of the three firms. *See Obert v. Republic W. Ins. Co.*, 398 F.3d 138, 143 (1st Cir. 2005) (attorneys should not be sanctioned for erroneously describing a chambers conference as a "hearing").

[17]   Thornton further notes that it appears quite common for non-employees to be listed on firms' lodestars. For instance, in the *Insulet* case, Glancy Prongay did not disclose on its lodestar that the attorneys listed as "staff attorneys" were actually contract attorneys. Under questioning from the Court, Glancy Prongay described the non-employees as "two contract attorneys . . . . We contracted with them individually." 8/2/18 Hr'g Tr. at 36:19-21, Dkt. 136, *Ark. Tchrs. Ret. Sys. v. Insulet Corp.*, No. 15-cv-12345-MLW (D. Mass. Aug. 6, 2018).

### c.  "Regular Rate Charged"

As set forth below, the "regular rates charged" language in Thornton's fee declaration is extremely common.  But regardless of how common such language is in class action fee declarations in general, the Special Master completely ignored the fact that in this very case, the statements he takes issue with in Thornton's declaration—"based on my firm's current billing rates" and "the same as my firm's regular rates charged for their services"— are **<u>identical</u>** to those in Lieff's and Labaton's declarations.  Although all three firms **<u>used the exact same language</u>**, and although all three firms acknowledged at the March 7, 2017 hearing that they generally do not have clients who pay by the hour, *see, e.g.*, 3/7/17 Hr'g Tr. at 79:9-22; 88:8-9; 93:11-21 (R&R Ex. 96) (Dkt. 401-95) (*e.g.*, as to Lieff, "We have only a handful of paying clients over the years."), somehow the Special Master finds that only Garrett Bradley violated the Massachusetts Rules of Professional Conduct and should be referred to the BBO and that only Thornton should be sanctioned up to $1 million.  The Special Master concludes that Lieff and Labaton, on the other hand, simply used "**imprecise and inexact language**," but did not violate the Rules of Professional Conduct and that no discipline or sanctions should be imposed because "[a]fter undergoing such particularized scrutiny, these firms [Lieff and Labaton] are surely now on notice of the level of exactness required by the Courts . . . ."  SM Further Resp. at 4 (Dkt. 523).

The Special Master's reason for differentiating between Thornton and Labaton is his supposed belief that, unlike Thornton's, Labaton's "regular rates charged" language was accurate because Labaton has since discovered it had *some* paying clients.  *Id.* at 3.  This is another one of the Special Master's arguments that does not pass the straight face test.  Labaton disclosed a very

34

small number of paying clients (apparently a total of five paying clients in the seven-year period between January 1, 2010 and December 31, 2016),[18] but Labaton has not indicated the number of hours billed to these clients, or the (likely infinitesimal) proportion of hourly revenue compared to Labaton's contingent fee revenue.   And indicative of the paying clients' insignificance, Mr. Sucharow, who is Chairman of Labaton, and who signed Labaton's fee declaration in September 2016, stated at the March 2017 hearing, "We don't have paying clients, your Honor. . . .  Most firms in our field do not have billable clients. . . .  [W]e don't have billable clients."  3/7/17 Hr'g Tr. at 79:9-15 (R&R Ex. 96) (Dkt. 401-95).

Importantly, although the Special Master represented to the Court that "Labaton provided information to the Special Master during written discovery showing that, from 2010-2016, Labaton had a small number of hourly clients who paid by invoice those rates listed on the fee petition, or commensurate with the listed rates," he never compared the seventy-one timekeepers listed on Labaton's declaration with the list of Labaton attorneys who had paying clients.  Had he done so, the Special Master would have found that of the **seventy-one** timekeepers on Labaton's lodestar, only **four** timekeepers had charged time to paying clients in 2016.[19]  Moreover, the "**2016 billing rates**" for the four timekeepers charged to paying clients do not match the lodestar rates submitted to this Court **in 2016**.  *Compare* Wolosz Aff., 10/30/18, Ex. A (Dkt. 510-2) *with* Sucharow Decl., 9/15/16, Ex. A (R&R Ex. 88) (Dkt. 401-87).  In all four cases, the lodestar rates submitted to this Court **in 2016** are **higher** than the rate Labaton's billable clients paid **in 2016**.

---

[18]   *See* Wolosz Aff., 10/30/18, Ex. A (Dkt. 510-2).  Although there are only five clients listed, some timekeepers have the notation "general rate for hourly matters" next to their rate.  There is no indication what this means, but it is possible that based on this notation the actual number of clients is greater than five.

[19]   A fifth, Jonathan Gardner, had a single paying client in 2012, but does not appear to have had any paying clients in the years 2013, 2014, 2015, or 2016.  Mr. Gardner's paying client paid a rate of $750 per hour in 2012.  *See* Wolosz Aff., 10/30/18, Ex. A (Dkt. 510-2).  Mr. Gardner's rate on Labaton's lodestar in the State Street matter was $925 per hour.  *See* Sucharow Decl., 9/15/16, Ex. A (R&R Ex. 88) (Dkt. 401-87).

In three instances, the lodestar premium is modest—$10 in one case and $25 in two cases—but for attorney Elizabeth Wierzbowski, the rate submitted to the Court as a "regular rate charged" is $140 more than the rate paid by Labaton's billable client for Ms. Wierzbowski's time in 2016.[20] All of this is to say that the after-the-fact realization that Labaton did in fact have a very small number of paying clients (all of whom, a comparison shows, paid rates lower than Labaton's lodestar rates for the same attorneys) does not place Labaton in any different position than Thornton regarding representations in the fee declaration made in 2016.

As to Lieff, although the firm appears to have more paying clients than Thornton or Labaton, it is unlikely that **all** of the attorneys listed on Lieff's lodestar had previously been charged to paying clients at the rates listed.  First, nine of the attorneys were contract attorneys, at least two of whom likely began their relationship with Lieff in March 2015.  *See* Lieff's Resp. to Interrog. 19, 6/1/17 (R&R Ex. 57) (Dkt. 401-56).  Second, the $515 rate at which five staff attorneys were listed on the lodestar was likely an error—the attorneys billed at $515 per hour were likely intended to be billed at $415 per hour.  *See* Heimann Dep., 7/17/17, at 109:6-12 (R&R Ex. 19) (Dkt. 401-18).[21]  And two of the attorneys billed at the $515 rate—Ann Ten Eyck and Rachel Wintterle—were contract attorneys.  *See* Lieff's Resp. to Interrog. 19, 6/1/17 (R&R Ex. 57) (Dkt. 401-56).

Further, five of the six ERISA firms who submitted fee declarations in the State Street matter used the exact same (or substantially similar) boilerplate language that Thornton, Lieff, and Labaton used.  The Special Master did not focus on the ERISA law firms' representations, but he did find that at least one ERISA firm which used the boilerplate "regular rates charged"

---

[20]   Ms. Wierzbowski also charged her hourly client $585 per hour in 2014 and 2015.

[21]   That is not to say that the rates were not reasonable, only that they may not have been—under the Special Master's reading—the "regular rates charged."

language, Richardson Patrick, is "a 100% contingent fee firm." R&R at 68. And McTigue Law,

which also used the "regular rates charged" language, only has "very few" clients who pay

hourly rates. McTigue Dep., 7/7/17, at 83:19 (R&R Ex. 11) (Dkt. 401-10). Further, McTigue

Law represented on its fee declaration in the *BNY Mellon* litigation, submitted just thirteen

months before the *State Street* fee declaration was filed, that its "regular rates" for attorneys

McTigue, Moore, and Markey were $625, $625, and $525—in other words, $100 less per hour

than was represented to the Court as the attorneys' "regular rates" in the *State Street* litigation.[22]

*See* McTigue Decl., Dkt. 622-5, *In re Bank of N.Y. Mellon Corp. Forex Trans. Litig.*, No. 12-md-

2335 (LAK)(JLC) (S.D.N.Y. Aug. 17, 2015) (R&R Ex. 189) (Dkt. 401-188). The "regular rate"

for "Sarah McGuane, MBA," who is a member of McTigue Law's "staff," was $125 less per

hour in the *BNY Mellon* litigation than it was in the *State Street* litigation. *See id.*[23]

Aside from McTigue Law and Richardson Patrick, Thornton does not know whether or

not the other ERISA law firms have a non-negligible number of clients who pay by the hour.

However, the Special Master does not appear to have examined the other firms' lodestars in the

same manner he examined Thornton's. For instance, in a declaration submitted to the court on

April 20, 2017 in the Western District of Washington, a Keller Rohrback partner represented that

"Partner rates in my firm range from $345 to $900." Smart Decl., Dkt. 208, *IDS Prop. and Cas.

Ins. Co. v. Fellows*, No. 2:15-cv-2031 (W.D. Wash. Apr. 20, 2017). But Mr. Sarko's lodestar

---

[22] As noted, Thornton employed modest increases of $30 and $50 for three of its timekeepers. *See* R&R at 165; TLF Objs. at 56 ("The rates for both Evan Hoffman and Michael Lesser were $50 greater than in the *BNY Mellon* litigation to reflect that Hoffman had become a partner and that Lesser had gained valuable expertise in FX litigation from the *BNY Mellon* case. The rate for associate Jotham Kinder was $30 greater than in the *BNY Mellon* litigation.").

[23] Thornton notes that approximately six weeks ago, McTigue Law filed a fee declaration in support of a nearly $3 million lodestar in the Southern District of New York which stated: "The hourly rates utilized by my firm in computing its lodestar are at or below its **usual and customary hourly rates charged** for other similar matters." *See* McTigue Decl., Dkt. 284-2, *Leber v. Citigroup 401(k) Plan Investment Comm.*, No. 07-cv-9329 (S.D.N.Y. Nov. 2, 2018) (emphasis added).

rate in the State Street matter (2016) was $925.  *See* Sarko Decl., 9/14/16, Ex. A (R&R Ex. 90)

(Dkt. 401-89).  Another filing in the Washington case lists Jennifer Hill's "2017 rate" as $225

("Keller Rohrback LLP's established hourly rate[] for th[is] timekeeper[]").  Defendant's Motion

for Attorney Fees and Costs, Dkt. 206, *IDS Prop. and Cas. Ins. Co. v. Fellows*, No. 2:15-cv-2031

(W.D. Wash. Apr. 20, 2017).  However, in the *State Street* matter (2016), Ms. Hill's rate was

represented to this Court as $255.  Sarko Decl., 9/14/16, Ex. A (R&R Ex. 90) (Dkt. 401-89). [24]  It

does not appear that the Special Master has determined whether each of the 56 timekeepers

(including 36 paralegals) listed on Keller Rohrback's lodestar were previously billed at the

"regular rates charged" that are listed on the lodestar.  As set forth in its Objections, Thornton

does not believe this is the proper standard or that Keller Rohrback should be punished if not all

timekeepers had been previously billed at the lodestar rates.  This is, however, the standard the

Special Master applies to Thornton and to Thornton only.  *See* TLF Objs. at 53-56.

Simply put, there is no principled basis by which the Special Master can recommend that

Thornton should be sanctioned for these misstatements when Lieff, Labaton, Richardson Patrick,

and the McTigue Law Firm committed the same error, and additional ERISA counsel may very

well have committed the same error as well. This is not to say that all of the firms should be

sanctioned, but to highlight that the error itself is not the proper basis for sanctions.

### d.  Rates Accepted In Other Actions

As an additional example of how the Special Master deviates from the "basic principle of

justice that like cases should be decided alike," *Martin v. Franklin Capital Corp.*, 546 U.S. 132,

139 (2005), Thornton refers the Court to the Special Master's finding that the phrase "have been

---

[24]    These issues were raised in Thornton's November 5, 2018 filing (Dkt. 514).  Subsequent to that filing, Mr.
Sarko contacted undersigned counsel to explain these discrepancies.  Thornton raises the discrepancies simply
to place in context Thornton's inadvertent errors and not to suggest that Keller Rohrback's discrepancies were
anything other than inadvertent.

accepted in other complex class actions" in the Thornton fee declaration is false because, "[w]ith the exception of 4 staff attorneys, the $425 rate charged for the remaining staff attorneys listed on the lodestar, including Michael Bradley, had not been accepted in other complex class actions." R&R at 228. This is another supposed "false" statement upon which the Special Master based his recommendation that Thornton pay up to $1 million in Rule 11 sanctions and Garrett Bradley be referred to the BBO.

But only with respect to Thornton does the Special Master read the phrase "have been accepted in other complex class actions" to mean that each *individual* staff attorney (rather than the staff attorney position in general) had previously been listed on an approved lodestar petition at the same rate. **The Special Master does not hold any other firm to this standard.** If the Special Master actually believed that the phrase referred to the history of each individual attorney, he would have been obligated to inquire whether each of the 20 staff attorneys listed on the Lieff affidavit (including the attorneys listed at $515—which is above Michael Bradley's rate) and each of the 35 staff attorneys on the Labaton affidavit, had actually been listed somewhere on an approved lodestar petition at the relevant rate (as well as, for that matter, all of the other attorneys on Customer Class Counsel's and on the ERISA firms' declarations, including Keller Rohrback's 36 paralegals). The fact that the Special Master has undertaken this investigation only with respect to Thornton—but has apparently declined to even investigate any of the other firms in the same manner—highlights the unfairness of his approach.

### e.  Michael Bradley

As noted in Thornton's Objections, Michael Bradley, who the Special Master described as "an experienced attorney," SM Resp. to TLF at 16, is the only timekeeper the Special Master identified by name for a reduction in rates. There are many issues with the Special Master's

arguments (including the fact that Michael Bradley's proposed rate of $250 is **below** the approved **paralegal** rates for both Lieff and Labaton, and the fact that Lieff listed some of its staff attorneys at $515 per hour with no objection from the Special Master).  *See* TLF Objs. at 9, 84; Sucharow Decl., 9/14/16, Ex. A (R&R Ex. 88) (Dkt. 401-87); Chiplock Decl., 9/14/16, Ex. A (R&R Ex. 89) (Dkt. 401-88).  For purposes of this Sur-Reply, however, Thornton simply notes the stark incongruity of the Special Master's disgorgement recommendation (the difference in lodestar rate and the Special Master's proposed rate being $101,600)[25] when Labaton erroneously included nearly the same amount—$80,000—on its lodestar related to fee petition hours and the Special Master did not recommend disgorgement, or even mention the matter anywhere in his Report and Recommendations.[26]

## VI.    Thornton Should Not Be Sanctioned For The "Regular Rates Charged" Language

Thornton has acknowledged that the "regular rates charged" language was unclear and should have been more precise.  *See, e.g.,* TLF Objs. at 53.  Although the lack of clarity is certainly an issue and class action attorneys should no longer use this boilerplate language, it is important to advise the Court that, based on undersigned counsel's review, such language is **<u>very common</u>** and is somewhat of a **<u>standard practice</u>** in class counsels' fee declarations, both in the District of Massachusetts and elsewhere.  The language is simply part of one of the boilerplate templates that class action law firms—even exclusively or primarily contingent fee firms—use in submitting fee declarations to the Court.   This is not an "everyone does it" excuse, but rather

---

[25]   The Special Master recommends disgorgement of this amount multiplied by the 1.8 multiplier. R&R at 367.

[26]   Lawrence Sucharow executed the Fee Declaration stating that the "[t]ime expended in preparing this application for fees and payment of expenses has not been included in this [fee] request," but later it came to light that over 100 hours of time totaling $80,330 related to fee applications was mistakenly included in Labaton's lodestar submitted to the Court.  *See* Labaton's Resp. to Interrog. 71, 6/9/17 (R&R Ex. 174) (Dkt. 401-173).

crucial context and background for the Court to consider as it determines whether Thornton's

declaration was *intentionally* false, and whether it is appropriate to refer Garrett Bradley to the

BBO and to impose the First Circuit's first or second largest Rule 11 sanctions in the last twenty

years—and perhaps ever—on Thornton and Mr. Bradley.  Thornton submits that this context

shows that the "regular rate charged" language, which was also used by Lieff, Labaton, and most

of the ERISA law firms, is a sloppy effort, but is not *intentionally* false.

### a. The "Regular Rate Charged" Language Is Common In Fee Declarations Filed In The District Of Massachusetts

As recent cases demonstrate, the "regular rates charged" language is quite common in fee

declarations filed in the District of Massachusetts.  As the Court is aware, in the *Insulet* case,

both Bernstein Litowitz and Glancy Prongay filed declarations stating that their lodestar rates

were the "same as the regular rates charged for their services, which have been accepted in other

securities or shareholder litigation."   *See* James A. Harrod Decl., ¶ 4, Dkt. 129-3, *Ark. Teacher*

*Ret. Sys. v. Insulet Corp*., No. 15-cv-12345-MLW (D. Mass. June 1, 2018) (TLF Sur-Reply Ex.

4-B); Joshua L. Crowell Decl., ¶ 3, Dkt. 129-5, *Insulet Corp.,* No. 15-cv-12345-MLW (TLF Sur-

Reply Ex. 4-C).  Under questioning from the Court, Bernstein Litowitz thereafter informed the

Court that the firm did "not meaningfully" have hourly clients and that "we don't have a practice

which we . . . charge people with a bill and then they remit payment to us.  The way in which we

are compensated is by what we're doing today, which is to seek reimbursement or to seek

payment of fees from common funds." 8/2/18 Hr'g Tr. at 38:15-18, 41:14-18, *Insulet Corp.*, No.

15-cv-12345 (Dkt. 136).  The Glancy Prongay firm likewise informed the Court after

questioning that "we are a contingent-based firm" and that the firm had only "a very, very small

percentage" of billable work.  *Id.* at 37:15-22.  The attorney who signed that affidavit told the

Court that he was "not knowledgeable about the pay rates" for the firm's hourly practice, but

gave the example of "someone who works in intellectual property, not really comparable here[.]" *Id.* at 37:22-25.[27]

The *Insulet* case was not the only matter in which this Court has received fee declarations containing such language.  In at least two additional cases where this Court presided, *Zametkin v. Fidelity Mgmt. and Research Co* and *Harris v. Citigroup*, attorneys submitted fee declarations that included the "regular rates charged" or equivalent language.  In both cases, this Court granted the fee award requested by counsel.  *See* Order, ¶ 16, Dkt. 115, *Zametkin v. Fidelity Mgmt. and Research Co.*, No. 1:08-cv-10960-MLW (D. Mass. May 11, 2012); Order, ¶ 11, Dkt. 128, *Harris v. Citigroup, Inc.*, No. 1:08-cv-10417-MLW (D. Mass. Aug. 10, 2012).  Although it is likely that most or all of the firms submitting declarations in these two cases rely primarily or exclusively on contingent fees, this is clearly true for at least one of the firms.  *See In re Johnson and Johnson Derivative Litig.*, No. 10-2033(FLW), 2013 WL 11228425 at *58 n.84 (D.N.J. June 13, 2013) ("Robbins Geller also apprised me that for the period January 1, 2010 to October 1, 2012, it 'performed work for clients solely on a contingency basis.'").  The docket numbers, firm names, and excerpts of the relevant declaration language are presented in the chart below.

*Zametkin v. Fidelity Mgmt. & Research Co.*, No. 1:08-cv-10960-MLW (D. Mass.)
(all declarations submitted April 13, 2012)

| Dkt # | Firm | Excerpt | TLF Sur-Reply Ex. |
|---|---|---|---|
| 104 | Robbins Geller[28] | "The rates shown below are the usual and customary rates charged for each individual." (¶ 5) | 4-E |

---

[27]   As Thornton has previously noted, Glancy Prongay filed a declaration in the Northern District of California with the boilerplate language "are the usual and customary hourly rates charged by Glancy Prongay & Murray LLP" one week *after* the August 2, 2018 hearing in which this Court informed attorneys for the *Insulet* class of the potential issues with their fee declarations.  *See* Lee Albert Decl., ¶ 6, Dkt. 2176-9, *In re: Capacitors Antitrust Litig.*, No. 3:14-cv-03264-JD (N.D. Cal. Aug. 13, 2018) (TLF Sur-Reply Ex. 4-D).

[28]   As noted above, a Special Master in the District of New Jersey stated, "Robbins Geller also apprised me that for the period January 1, 2010 to October 1, 2012, it 'performed work for clients solely on a contingency basis.'" *In re Johnson and Johnson Derivative Litig.*, No. 10-2033(FLW), 2013 WL 11228425 at *58 n.84 (D.N.J. June 13, 2013).

| 105 | Dyer & Berens | "The hourly rates shown below are the usual and customary rates charged for each individual." (¶ 5) | 4-F |
| 107 | Holzer Holzer & Fistel | "The hourly rates shown below are the usual and customary rates charged for each individual." (¶ 5) | 4-G |

*Harris v. Citigroup, Inc.*, No. 1:08-10417-MLW (D. Mass.)
(all declarations submitted July 26, 2012)

| Dkt # | Firm | Excerpt | TLF Sur-Reply Ex. |
|-------|------|---------|-------------------|
| 121-1 | Bonnett, Fairbourn, Friedman & Balint | "This lodestar amount was calculated using the hourly rates shown below, which are the usual and customary rates charged by each attorney/paralegal in matters of this nature[.]" (¶ 8) | 4-H |
| 121-2 | Klein Kavanagh Costello | "The hourly rates shown below are the usual and customary rates charged for each individual in matters of this nature." (¶ 8) | 4-I |
| 121-3 | Robbins Geller[29] | "The hourly rates shown below are the usual and customary rates charged for each individual in matters of this nature." (¶ 6) | 4-J |
| 121-6 | National Consumer Law Ctr. | "The hourly rates shown below are the usual and customary rates charged for each individual in matters of this nature." (¶ 8) | 4-K |

The "regular rates charged" language or its equivalent routinely appears on fee declarations submitted in this district. Just two months prior to the *Insulet* hearing, in the *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation* matter, **seventeen law firms**, including Glancy Prongay, filed declarations containing language perhaps more problematic than the language used in Lieff's, Labaton's, Thornton's, and the ERISA firms' declarations in the State Street matter. The firms, docket citations, and excerpts of the relevant declaration language are presented in the chart below.

---

[29]   See supra note 28.

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 1:14-md-02503-DJC (D. Mass.)

(all declarations submitted June 1, 2018)

| Dkt # | Firm | Excerpt | TLF Sur-Reply Ex. |
|---|---|---|---|
| 1159-1 | Berman Tabacco | "The current hourly rates for all personnel of the firm as reflected in Exhibit A are the usual and customary rates that were charged by my firm in similar matters on the dates when the services were rendered, as well as to the firms' hourly and commercial clients." (¶ 5) | 4-L |
| 1159-2 | Cohen Milstein Sellers & Toll | "The current hourly rates for all personnel of the firm as reflected in Exhibit A are the usual and customary rates that were charged by my firm in similar matters on the dates when the services were rendered, as well as to the firms' hourly and commercial clients." (¶ 5) | 4-M |
| 1159-3 | Cohen, Placitella & Roth | "The historical hourly rates for all personnel of the firm as reflected in Exhibit A were the usual and customary rates that were charged by my firm in similar matters at the time of the case's inception." (¶ 5) | 4-N |
| 1159-5 | Fine, Kaplan and Black | "The historical hourly rates for all personnel of the firm as reflected in Exhibit A are the usual and customary rates that were charged by my firm in similar matters on the dates when the services were rendered, as well as to the firms' hourly and commercial clients." (¶ 5) | 4-O |
| 1159-7 | Glancy Prongay & Murray | "The current hourly rates for all personnel of the firm as reflected in Exhibit A are the usual and customary rates that were charged by my firm in similar matters on the dates when the services were rendered, as well as to the firms' hourly and commercial clients." (¶ 5) | 4-P |
| 1159-8 | Hach Rose Schirripa & Cheverie | "The hourly rates shown below are the usual and customary rates charged for each individual in our antitrust and complex class action litigation matters." (¶ 3) | 4-Q |
| 1159-9 | Heins, Mills & Olson | "The historic hourly rates for all personnel of the firm as reflected in Exhibit A are the usual and customary rates that were charged by my firm in similar matters on the dates when the services were rendered." (¶ 5) | 4-R |
| 1159-10 | Hilliard Shadowen | "The hourly rates for all personnel of the firm as reflected in Exhibit A are the usual and customary rates that were charged by my firm in similar matters on the dates when the services were rendered, as well as to the firms' hourly and commercial clients." (¶ 4) | 4-S |
| 1159-11 | Hutchings Barsamian Mandelcorn | "The current hourly rates for all personnel of the firm as reflected in Exhibit A are the usual and customary rates that were charged by my firm in similar matters on the dates when the services were rendered, as well as to the firms' hourly and commercial clients." (¶ 5) | 4-T |

| 1159-12 | Lauletta Birnbaum | "The current hourly rates for all personnel of the firm as reflected in Exhibit A are the usual and customary rates that were charged by my firm in similar matters on the dates when the services were rendered, as well as to the firms' hourly and commercial clients." (¶ 5) | 4-U |
|---------|-------------------|-----|-----|
| 1159-13 | McGowan Hood & Felder | "The current hourly rates for all personnel of the firm as reflected in Exhibit A are the usual and customary rates that were charged by my firm in similar matters on the dates when the services were rendered, as well as to the firms' hourly and commercial clients." (¶ 5) | 4-V |
| 1159-14 | Miller Law | "The current hourly rates for all personnel of the firm as reflected in Exhibit A are the usual and customary rates that were charged by my firm in similar matters on the dates when the services were rendered, as well as to the firms' hourly and commercial clients." (¶ 5) | 4-W |
| 1159-15 | Motley Rice | "The hourly rates for all personnel of the firm as reflected in Exhibit A are the usual and customary rates that were charged by my firm in similar matters on the dates when the services were rendered, as well as to the firms' hourly and commercial clients." (¶ 5) | 4-X |
| 1159-16 | Pomerantz LLP | "The current hourly rates for all personnel of the firm as reflected in Exhibit A are the usual and customary rates that were charged by my firm in similar matters on the dates when the services were rendered, as well as to the firms' hourly and commercial clients." (¶ 4) | 4-Y |
| 1159-17 | Rusing Lopez & Lizardi | "The current hourly rates for all personnel of the firm as reflected in Exhibit A are the usual and customary rates that were charged by my firm in similar matters on the dates when the services were rendered, as well as to the firms' hourly and commercial clients." (¶ 5) | 4-Z |
| 1159-19 | Shepherd, Finkelman, Miller & Shah | "The historical hourly rates for all personnel of the firm as reflected in Exhibit A are the usual and customary rates that were charged by my firm in similar matters on the dates when the services were rendered, as well as to the firms' hourly and commercial clients." (¶ 5) | 4-AA |
| 1159-20 | Weinstein Kitchenoff & Asher | "The current hourly rates for all personnel of the firm as reflected in Exhibit A are the usual and customary rates that were charged by my firm in similar matters on the dates when the services were rendered, as well as to the firms' hourly and commercial clients." (¶ 5) | 4-BB |

There is no way to know whether all seventeen of these firms are exclusively (or primarily) contingent fee firms—or whether each attorney listed on each lodestar was previously charged at the lodestar rate to the firms' "hourly and commercial clients," where such language

45

is used.  Given, however, that most or all of the above firms are plaintiffs' firms and that—as demonstrated by both the *State Street* and *Insulet* matters— most plaintiffs' firms are exclusively or primarily contingent fee firms, it is likely that most or all of the seventeen declarations are misleading in the same manner that the Special Master found Thornton's declaration was misleading.  Nonetheless, it does not appear that the *Solodyn* Court took any issue with the language; counsel's request for a 33.3% fee award was granted.  Order, Dkt. 1176, *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig*., No. 1:14-md-02503-DJC (D. Mass. July 18, 2018).

**b.  The "Regular Rate Charged" Language Is Common In Jurisdictions Across The Country**

The "regular rates charged" language is not unique to declarations filed in the District of Massachusetts.  Such language is in widespread use in jurisdictions across the country.  Because it would require an inordinate amount of space to catalog all uses of the "regular rates charged" language in all jurisdictions, for the purposes of this Sur-Reply, Thornton focuses on declarations filed by law firms who have publicly acknowledged that they rely or have been found to rely exclusively or primarily on contingent fees.  The sample is admittedly small because most law firms do not have occasion to publicly acknowledge their fee structures and there are very few judicial findings regarding law firms' fee structures.  Nonetheless, as set forth below, Thornton has identified 36 fee declarations filed by 7 firms in 14 jurisdictions containing the "regular rates charged" language or equivalent language.  Thornton notes that these firms are well-regarded in the industry and have served their clients and the public for many years.  Many of the firms have distinguished histories of bringing important lawsuits that have held corporations accountable for their misdeeds and shone a light on corporate malfeasance that would have otherwise have continued indefinitely.  Thornton's identification of these firms is no way a criticism, and Thornton has utmost respect for these law firms and their contributions to the legal profession

and society at large.  These examples are only intended to demonstrate to the Court just how common boilerplate language in fee declarations actually is.

### i. Bernstein Litowitz

As noted above, on August 2, 2018, Bernstein Litowitz informed this Court that the firm did "not meaningfully" have hourly clients and that "we don't have a practice which we . . . charge people with a bill and then they remit payment to us.  The way in which we are compensated is by what we're doing today, which is to seek reimbursement or to seek payment of fees from common funds."  8/2/18 Hr'g Tr. at 38:15-18, 41:14-18, *Insulet Corp.*, No. 15-cv-12345-MLW (Dkt. 136).  As further evidence of Bernstein Litowitz's contingent fee practice, Thornton refers the Court to the Special Master's Report in *In re Johnson and Johnson*, 2013 WL 11228425 at *58 n.84 ("Bernstein Litowitz indicates that its work is undertaken almost 'exclusively' on a contingent basis.").   The following Bernstein Litowitz fee declarations contain the "regular rates charged" language or equivalent language:

| Case | Dkt. | Date | Excerpt | TLF Sur-Reply Ex. |
|------|------|------|---------|-------------------|
| *In re CTI Biopharma Corp. Sec. Litig.*, 2:16-cv-00216 (W.D. Wash.) | 110 | 12/28/17 | "The hourly rates for the attorneys and professional support staff in my firm included in Exhibit 5B are the same as the regular rates charged for their services, which have been accepted in other securities or shareholder litigation." (¶ 83) | 4-CC |
| *Bach v. Amedisys, Inc.*, 3:10-cv-00395-BAJ-RLB (M.D. La.) | 343-6 | 11/8/17 | "The hourly rates for the attorneys and professional support staff in my firm included in Exhibit 1 are the same as the regular rates charged for their services, which have been accepted in other securities or shareholder litigation." (¶ 4) | 4-DD |
| *In re Salix Pharma., Ltd.*, 1:14-cv-08925-KMW (S.D.N.Y.) | 225-4 | 6/19/17 | "The hourly rates for the attorneys and professional support staff in my firm included in Exhibit 1 are the same as the regular rates charged for their services, which have been accepted in other securities or shareholder litigation." (ECF p.55, ¶ 4) | 4-EE |

| *In re Dole Food Co., Inc.*, 1:15-cv-01140-LPS (D. Del.) | 94-1 | 6/13/17 | "The hourly rates for the attorneys and professional support staff in my firm included in Exhibit 1 are the same as the regular rates charged for their services, which have been accepted in other securities or shareholder litigation." (ECF p. 69 ¶ 4) | 4-FF |
|---|---|---|---|---|
| *In re: NII Holdings, Inc. Sec. Litig.*, 1:14-cv-00227-LMB-JFA (E.D. Va.) | 257-2 | 8/12/16 | "The hourly rates for the attorneys and professional support staff in my firm included in Exhibit A are the same as my firm's regular rates charged for their services, which have been accepted in other securities or shareholder litigations." (ECF p. 53 ¶ 4) | 4-GG |
| *In re Schering-Plough Corp. / Enhance Sec. Litig.*, 2:08-cv-00397-ES-JAD (D.N.J.) | 423-5 | 7/2/13 | "The hourly rates for the attorneys and professional support staff in my firm included in Exhibit 1 are the same as the regular rates that would be charged for their services in non-contingent matters." (ECF p. 57 ¶ 4) | 4-HH |
| *In re Merck & Co., Inc. Vyotrin/Zetia Sec. Litig.*, 2:08-cv-02177-ES-JAD (D.N.J.) | 333-3 | 7/2/13 | "The hourly rates for the attorneys and professional support staff in my firm included in Exhibit 1 are the same as the regular rates that would be charged for their services in non-contingent matters." (PDF p.158 ¶ 4) | 4-II |
| *In re Johnson & Johnson Derivative Litig.*, 3:10-cv-02033-FLW-DEA (D.N.J.) | 192-5 | 8/31/12 | "The hourly rates shown below are the usual and customary rates charged for each individual." (¶ 4) | 4-JJ |
| *In re King Pharma., Inc. Sec. Litig.*, 2:03-cv-77 (E.D. Tenn.) | 284 | 12/19/06 | "The hourly rates for attorneys and professional staff members included in these schedules are the same as the regular current rates charged for their services in non-contingent matters." (¶ 79) | 4-KK |

### ii.  Glancy Prongay & Murray

As noted above, on August 2, 2018, Glancy Prongay informed the Court after questioning, that "we are a contingent-based firm" and that the firm had only "a very, very small percentage" of billable work.  8/2/18 Hr'g Tr. at 37:15-22, *Insulet Corp.*, No. 15-cv-12345-MLW (Dkt. 136).  The attorney who signed that affidavit told the Court that he was "not

knowledgeable about the pay rates" for the firm's hourly practice.  *Id.* at 37:22-25.  The

following Glancy Prongay fee declarations contain the "regular rates charged" language or

equivalent language:

| Case | Dkt. | Date | Excerpt | TLF Sur-Reply Ex. |
|------|------|------|---------|-------------------|
| *In re: Capacitors Antitrust Litig.*, 3:14-cv-03264-JD (N.D. Cal.) | 2176-9 | 8/13/18 | "The hourly rates for the attorneys and professional support staff in my firm included in Exhibit A are the usual and customary hourly rates charged by Glancy Prongay & Murray LLP." (¶ 6) | 4-D |
| *In re Ductile Iron Pipe Fittings ("DIPF") Indirect Purchaser Antitrust Litig.*, 3:12-cv-00169-AET-LHG (D.N.J.) | 338-2 | 5/9/18 | "The hourly rates for the attorneys and professional staff in my firm reflected in Exhibit A are the usual and customary hourly rates charged by my firm in similar matters." (PDF p.186; ¶ 5) | 4-LL |
| *In re Marcum LLP.* 1:15-cv-01938-DAB (S.D.N.Y.) | 28 | 1/3/18 | "The hourly rates shown below are the usual and customary rates charged for each individual in our cases." (¶ 5) | 4-MM |
| *In re Nu Skin Enter., Inc. Sec. Litig.*, 2:14-cv-00033-JNP (D. Utah) | 140-6 | 8/31/16 | "The hourly rates for attorneys and professional support staff in GPM included in Exhibit A are the same as GPM's regular rates charged for their services, which have been accepted in other securities or shareholder litigations." (¶ 4) | 4-NN |
| *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, 2:09-cv-00852-LA (E.D. Wis.) | 688-8 | 6/9/15 | "The hourly rates for the attorneys and professional support staff in my firm included in Exhibit 2 are the usual and customary hourly rates charged by the firm." (¶ 7) | 4-OO |

### iii.  Scott & Scott

Although Scott & Scott did not use the "regular rates charged" language in its *Insulet*

declaration, it informed the Court during the hearing that although it has "some clients who pay

hourly rates," the firm's "practice is primarily contingent." 8/2/18 Hr'g Tr. at 38:20-22, *Insulet*

*Corp.*, No. 15-cv-12345 (Dkt. 136)  Likewise, in a hearing in the District of New Jersey in 2012,

Scott & Scott informed the Court, "[w]e do almost exclusively contingent fee work" and that,

although "[we have] some hourly rate cases," "we almost have almost none." 9/18/12 Hr'g Tr. at

18:14-19, *Glover v. Ferrero USA,* 11-CV-1086 (D.N.J.) (Dkt. 111).  The following Scott & Scott

fee declarations contain the "regular rates charged" language or equivalent language:

| Caption | Dkt. | Date | Excerpt | TLF Sur-Reply Ex. |
|---|---|---|---|---|
| *In re Ductile Iron Pipe Fittings Indirect Purchaser ("DIPF") Antitrust Litig.*, 3:12-cv-00169-AET-LHG (D.N.J.) | 338-2 | 5/9/18 | "The hourly rates for the attorneys and professional staff as reflected in Exhibit B are the usual and customary hourly rates charged by my firm in similar matters." (ECF p.283 ¶ 6) | 4-PP |
| *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, 2:09-cv-00852-LA (E.D. Wisc.) | 688-16 | 6/9/15 | "The hourly rates for the attorneys and professional support staff as set forth in Exhibit 2 are the usual and customary hourly rates charged by my firm." (¶ 10) | 4-QQ |
| *Murr v. Capital One Bank (USA), N.A.*, 1:13-cv-01091-LMB-TCB (E.D. Va.) | 135-2 | 4/27/15 | "The lodestar calculation is based on the firm's current billing rates, including for attorneys and employees no longer employed by the firm, at the firm's customary hourly rates charged to our fee-paying clients, and which have been accepted as reasonable by other district courts in numerous other class action litigations." (¶ 3) | 4-RR |
| *Cornwell v. Credit Suisse Grp.*, 1:08-cv-03758-VM-JCG (S.D.N.Y.) | 109 | 6/27/11 | "The hourly rates shown below are the usual and customary rates charged for each individual in all of our cases." (¶ 4) | 4-SS |

### iv.  Richardson Patrick

In this case (the *State Street* matter), the Special Master found that Richardson Patrick is

"a 100% contingent fee firm." R&R at 68.  The following Richardson Patrick fee declarations

contain the "regular rates charged" language or equivalent language:

| Case | Dkt. | Date | Excerpt | TLF Sur-Reply Ex. |
|------|------|------|---------|-------------------|
| *Pinel v. Aurora Loan Serv. LLC*, 4:10-cv-03118-SBA (N.D. Cal.) | 233 | 11/14/14 | "[T]he rates charged by the attorneys and support professionals at my firm are the same as charged for non-contingent legal services by the law firm, and are within the range of rates normally and customarily charged in the Northern District of California by attorneys and support professionals of similar qualifications and experience in cases of this kind, and in my home district in the District of South Carolina." (¶ 20) | 4-TT |
| *Latham v. Matthews, et al.*, 6:08-cv-029995-JMC (D.S.C.) | 253-3 | 6/29/11 | "The hourly rates for the partners, attorneys and professional support staff in my firm are the same as the regular current rates charged for their services in securities or shareholder litigation." (¶ 4) | 4-UU |

### v.  Carney Bates & Pulliam[30]

In a 2010 opinion, the Massachusetts Superior Court noted that "counsel acknowledged

that the Carney Williams firm has no paying clients; its business consists entirely of shareholder

class action suits similar to this case, and it receives payment only through court-approved

applications for attorneys' fees and expenses to be paid either by opposing parties or from a

common fund." *Pennsylvania Ave. Funds v. Brandi*, No. 08-2106-BLS2, 2010 WL 1173044 at

*1 (Mass. Super. Ct. Mar. 25, 2010).  The following Carney Bates fee declarations contain the

"regular rates charged" language or equivalent language:

---

[30]    It appears that the firm was previously known as Carney Williams Bates Bozeman & Pulliam.

| Case | Dkt. | Date | Excerpt | TLF Sur-Reply Ex. |
|------|------|------|---------|------------------|
| *In re Google, LLC*, 5:15-cv-04062-LHK (N.D. Cal.) | 97-1 | 10/30/17 | "Our respective firms' billing rates, which were used for purposes of calculating the lodestar here, have been approved by courts in California and throughout the country, are the usual and customary rates that our respective firms charge for services in other actions, and are set in accordance with prevailing market rates." (¶ 20) | 4-VV |
| *In re Facebook, Inc.*, 4:13-cv-05996-PJH (N.D. Cal.) | 238-1 | 5/26/17 | "Our respective firms' billing rates, which were used for purposes of calculating the lodestar here, have been approved by courts in California and throughout the country, are the usual and customary rates that our respective firms charge for services in other actions, and are set in accordance with prevailing market rates." (¶ 27) | 4-WW |

### vi.  Robbins Geller

The Special Master in the *In re Johnson and Johnson Derivative Litig*, stated in his report that, "Robbins Geller also apprised me that for the period January 1, 2010 to October 1, 2012, it 'performed work for clients solely on a contingency basis.'" *In re Johnson and Johnson,* 2013 WL 11228425 at *58 n.84.  The following Robbins Geller fee declarations contain the "regular rates charged" language or equivalent language:

| Case | Dkt. | Date | Excerpt | TLF Sur-Reply Ex. |
|------|------|------|---------|------------------|
| *In re Matrixx Initiatives Inc.*, 2:04-cv-00886-NVW (D. Ariz.) | 165 | 9/28/12 | "The hourly rates shown below are the usual and customary rates charged for each individual." (¶ 5) | 4-XX |
| *In re Johnson & Johnson Derivative Litig.*, 3:10-cv- | 192-8 | 8/31/12 | "The hourly rates shown below are the usual and customary rates charged for each individual." (¶ 5) | 4-YY |

| 02033-FLW-DEA (D.N.J.) | | | | |
|---|---|---|---|---|
| *In re Amaranth Nat. Gas Commodities Litig.*, 1:07-cv-06377-CM-HBP (S.D.N.Y.) | 389 | 3/12/12 | "The hourly rates shown below are the usual and customary rates charged for each individual in all of our cases." (¶ 5) | 4-ZZ |
| *In re Giant Interactive Grp., Inc. Sec. Litig.*, 1:07-cv-10588-PAE (S.D.N.Y.) | 82 | 10/5/11 | "The hourly rates shown below are the usual and customary rates charged for each individual in all of our cases." (¶ 4) | 4-AAA |
| *In re RHI Entm't, Inc.*, 1:09-cv-08634-AKH (S.D.N.Y.) | 44 | 10/4/11 | "The hourly rates shown below are the usual and customary rates charged for each individual in all of our cases." (¶ 4) | 4-BBB |
| *In re Intervoice-Brite, Inc.*, 3:01-cv-01071-K (N.D. Tex.) | 306-2 | 7/27/11 | "The hourly rates shown below are the usual and customary rates charged for each individual in all of our cases." (¶ 4) | 4-CCC |
| *In re Accuray Inc. Sec. Litig.*, 4:09-cv-03362-CW (N.D. Cal.) | 138 | 7/15/11 | "The hourly rates shown below are the usual and customary rates charged for each individual in all of our cases." (¶ 5) | 4-DDD |
| *In re JA Solar Holdings Co., Ltd.*, 1:08-cv-10475-JGK (S.D.N.Y.) | 82 | 6/3/11 | "The hourly rates shown below are the usual and customary rates charged for each individual in all of our cases." (¶ 4) | 4-EEE |
| *In re The PMI Grp., Inc. Sec. Litig.*, 3:08-cv-01405-SI (N.D. Cal.) | 98 | 10/8/10 | "The hourly rates shown below are the usual and customary rates charged for each individual in all of our cases." (¶ 4) | 4-FFF |

### vii.  Abraham Fruchter

The Special Master in the *In re Johnson and Johnson Derivative Litig*, found that "[t]he practice of Abraham Fruchter only handles contingent matters."  2013 WL 11228425 at *58 n.84 (citing a May 22, 2013 letter from Jeffrey S. Abraham to the Special Master.)  The following Abraham Fruchter fee declarations contain the "regular rates charged" language or equivalent language:

| Case | Dkt. | Date | Excerpt | TLF Sur-Reply Ex. |
|------|------|------|---------|-------------------|
| *In re Marcum LLP*, 1:15-cv-01938-DAB (S.D.N.Y.) | 22 | 12/4/17 | "The hourly rates shown below are the usual and customary rates charged for each individual attorney in our cases or were the rates last in effect when work was performed with regard to this matter for attorneys no longer employed by the firm." (¶ 79) | 4-GGG |
| *In re Fuqi Int'l Inc. Sec. Litig.*, 1:10-cv-02515-DAB (S.D.N.Y.) | 109-3 | 8/31/15 | "The hourly rates shown below are the usual and customary rates charged for each individual attorney in our cases or were the rates charged when the work was performed with regard to this matter for attorneys no longer employed by the firm." (¶ 7) | 4-HHH |
| *In re Internap Network Serv. Corp.*, 1:08-cv-03462-CAP (N.D. Ga.) | 85-7 | 10/30/13 | "The hourly rates shown below are the usual and customary rates charged for each individual in our cases." (¶ 7) | 4-III |
| *In re Giant Interactive Grp., Inc. Sec. Litig.*, 1:07-cv-10588-PAE (S.D.N.Y.) | 83 | 10/5/11 | "The hourly rates shown below are the usual and customary rates charged for each individual in all of our cases." (¶ 4) | 4-JJJ |
| *In re Warner Chilcott Ltd. Sec. Litig.*, 1:06-cv-11515-WHP (S.D.N.Y.) | 81 | 4/9/09 | "The hourly rates shown below are the usual and customary rates charged for each individual in all of our cases." (¶ 4) | 4-KKK |

### viii.   Labaton Sucharow

In addition to the above examples, as Thornton noted in its Objections, Labaton identified ten cases filed in eight jurisdictions in which it submitted fee declarations to courts with the "regular rates charged" language or equivalent language. *See* Labaton's Resp. to Interrog. No. 61, 6/9/17 (R&R Ex. 174) (Dkt. 401-173).  *See also* Labaton's Resp. to Interrog. No. 71, 6/9/17 (R&R Ex. 174) (Dkt. 401-173) (stating that such language "has appeared in Labaton Sucharow's fee petitions for several years.").

### c.   Other Courts Considering The Boilerplate Language Do Not Impose Sanctions

Despite the extremely common use of the "regular rates charged" or equivalent language, few Court appear to have commented on it.  Those that have commented on the "regular rates charged" language or similar language, however, have not imposed sanctions, much less substantial sanctions.  For example, in *Ryan v. Allied Interstate, Inc.*, 882 F. Supp. 2d 628, 635 (S.D.N.Y. 2012), the Court noted that there was "no evidence that any of the [petitioning law] firm's clients pay its so-called 'regular' hourly billing rates . . . – the rates appear to exist for the purposes of charging defendants . . . under . . . fee shifting provisions."  No sanction was imposed despite the fact that numerous courts had previously rejected the law firm's "regular" rates.  In *Pennsylvania Avenue Funds,* 2010 WL 1173044 at *1, Judge Fabricant of the Superior Court noted that the "declaration . . . refers to the hourly rates sought as counsel's 'regular hourly rates.'  At the hearing, however, counsel acknowledged . . . that the . . . firm has no paying clients . . . .  Thus, the hourly rates claimed are 'regular' only in the sense that these are the rates the firm regularly seeks in its fee applications." Judge Fabricant did not impose any sanctions.

*In Pasternak v. Radek*, the Court considered an attorney's declaration in support of another attorney's fee and stated "I currently charge an hourly rate of $425 per hour." Mark D. DeBofsky Decl., ¶ 2, Dkt. 32-2, No. 07-C-2858 (N.D. Ill. Nov. 21, 2007).  In reviewing the affidavit, the Court that it "cannot determine from [the] affidavit whether he actually charges this rate to, and collects it from, clients who are paying him on an hourly basis, or whether (for example) this is a rate that he has been awarded by courts in similar litigation."  *Pasternak v. Radek*, No. 07-C-2858, 2008 WL 278851 at *6 (N.D. Ill. Apr. 3, 2008).  Finally, in the *Johnson & Johnson* litigation in the District of New Jersey, the Special Master found that the firms that used the "regular rates charged" language had "no paying clients and always depend[ed] on the

vagaries of fee shifting and the approval of courts for payment of their declared rates[.]" *In re Johnson & Johnson*, 2013 WL 11228425 at *58.  The Special Master further noted that "the certifications of the three attorneys vouching for the rates in this case did not discuss the lack of a 'living, breathing' fee-paying plaintiff.'" *Id.*  Although the Special Master recommended reducing the fee, no sanction was imposed.

### d.  Alternative Language Fares No Better

It appears that the most common alternative to the "regular rates charged" language is an attestation to the effect of: "the lodestar rates are the same as regular rates charged in non-contingent matters **and/or** that have been accepted in class actions."  Thornton provides the following examples from *In re Sonus Networks Inc. Sec. Litig. II* (D. Mass.), *Esposito v. Am. Renal Holdings* (D. Mass.), and *In re Delphi Corp. Sec. Litig.* (E.D. Mich.) (Rosen, J.).  In all three of the cases, the Court awarded the full amount of attorney's fees sought by class counsel.

*In re Sonus Networks, Inc. Sec. Litig. II*, No. 1:06-CV-10040-MLW (D. Mass.)
(all declarations submitted Apr. 17, 2009)

| Dkt # | Firm | Excerpt | TLF Sur-Reply Ex. |
|---|---|---|---|
| 93 | Wolf Popper | "The hourly rates for the attorneys, paralegals, and other professionals and para-professionals at the firm listed in Exhibit 1 are the same as the regular current rates charged for their services in non-contingent fee matters and/or which have been accepted and approved in other securities or shareholder litigations." (¶ 53) | 4-LLL |
| 93-5 | Berman DeValerio | "The hourly rates for the attorneys, paralegals, and other professionals and para-professionals at the firm listed in Exhibit 1 are the same as the regular current rates charged for their services in non-contingent fee matters and/or which have been accepted and approved in other securities or shareholder litigations." (¶ 6) | 4-MMM |

*Esposito v. Am. Renal Assoc. Holdings, Inc.*, No. 1:16-cv-11797-ADB (D. Mass.)
(all declarations submitted May 10, 2018)

| Dkt # | Firm | Excerpt | TLF Sur-Reply Ex. |
|---|---|---|---|
| 103 | Kirby McInerney | "The hourly rates for the attorneys and professional staff included in Exhibits C and D are the same range as the | 4-NNN |

| | | regular current rates charged for their services in non-contingent matters and/or which have been accepted in other securities or shareholder litigations." (¶ 53) | |
| 103-4 | Law Offices of Mark Booker | "My hourly rate is the same as the regular current rates that I charge for my services in non-contingent fee matters or that have been accepted in other securities or shareholder litigation." (¶ 5) | 4-OOO |

*In re: Delphi Corp. Sec. Litig.,* No. 2:05-md-01725-GER (E.D. Mich.)
(all declarations submitted November 6, 2007)

| Dkt # | Firm | Excerpt | TLF Sur-Reply Ex. |
|-------|------|---------|-------------------|
| 279-3 | Bernstein Litowitz | "The hourly rates for the BLB&G attorneys and professional support staff included in Exhibit 1 are the same as the regular current rates charged for their services in non-contingent matters and/or which have been accepted in other securities or shareholder litigation." (¶ 3) | 4-PPP |
| 279-6 | Nix, Patterson & Roach | "The hourly rates for the NPR attorneys, NPR professional support staff and contract attorneys included in Exhibit 1 are the same as the regular current rates charged for their services in non-contingent matters and/or which have been accepted in other securities or shareholder litigation." (¶ 3) | 4-QQQ |
| 279-8 | Schiffrin Barroway Topaz & Kessler | "The hourly rates of the attorneys and paralegals in my firm included in Exhibit '1' are the same as the regular current rates charged for their services in non-contingent matters and/or which have been accepted in other securities or shareholder litigation." (¶ 3) | 4-RRR |
| 279-11 | Grant & Eisenhofer | "The hourly rates for the G&E attorneys and professional support staff included in Exhibit 1 are the same as the regular current rates charged for their services in non-contingent matters and/or which have been accepted in other securities or shareholder litigation." (¶ 3) | 4-SSS |
| 279-14 | Lowenstein Sandler | "The hourly rates for the LS attorneys and professional support staff included in Exhibit 1 are the same as the regular current rates charged for their services in non-contingent matters and/or which have been accepted in other securities or shareholder litigation." (¶ 3) | 4-TTT |
| 279-15 | Sullivan, Ward, Asher & Patton | "The hourly rates for the SWA&P attorneys and professional support staff in my firm included in Exhibit 1 are the same as the regular current rates charged for their services in non-contingent matters and/or which have been accepted in other securities or shareholder litigation." (¶ 3) | 4-UUU |

At first glance these declarations might seem preferable to the declarations submitted by

Lieff, Labaton, Thornton, and most of the ERISA counsel in the State Street matter because of

the use of the word "or."  Even assuming that the word "charged" means billed to paying clients,

the statement is technically correct for exclusively contingent fee firms because the attestation is

only that **either** the rates are billed to hourly clients **or** the rates are accepted in class actions.  If

the rates had been accepted in class actions, then because of the disjunctive "or," it simply would

not matter whether or not the firm had paying, hourly clients.  Of course, in the context of this

case, it would be a grossly unfair result if a BBO referral and up to $1 million in Rule 11

sanctions were to hinge upon the omission of the word "or" in Thornton's fee declaration.[31]

The more important point, however, is the fact that these "and/or" declarations are

common and have been accepted in this district and by Judge Rosen himself in the Eastern

District of Michigan.  While the transcript for Judge Rosen's fee hearing is not available, it does

not appear that in the other cases the courts asked whether the "and" or the "or" were applicable

to the firms submitting the declarations (i.e., whether the lodestar rates had been paid by hourly

clients, whether the lodestar rates had been accepted in other class actions, or both).  6/14/18

Hr'g Tr., *Am. Renal*, No. 1:16-cv-11797-ADB (Dkt. 107); 7/1/09 Hr'g Tr., *Sonus*, No. 1:06-cv-

10040-MLW (Dkt. 103).  On notice that the law firms may or may not have had paying clients,

the courts granted class counsel's fee requests in full.  That is not to say, or in any way suggest,

that declarations to the Court are unimportant, but simply to put in context Lieff's, Labaton's,

Thornton's, and most of the ERISA counsel's declarations in this case.

---

[31]   The insertion of the bolded "or" in paragraph 4 of Thornton's declaration would have apparently solved these issues: "The hourly rates for the attorneys and professional support staff in my firm included in Exhibit A are the same as my firm's regular rates charged for their services, **OR** which have been accepted in other complex class actions."

## VII.    Thornton Should Not Disgorge One Third Of The Double Counting Error

### a.    Disgorgement Is An Inappropriate Remedy For The Double Counting Error

The Special Master or his counsel fundamentally misunderstand how fee awards are calculated.  This misunderstanding permeates his Report and his Responses to both Lieff and Thornton, and fatally informs his ultimate recommendation that the firms disgorge part of their fee award related to the double-counting error.  As explained in Thornton's Objections, the First Circuit has endorsed the percentage-of-fund method for determining attorney's fees in common fund cases.  *See In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 308 (1st Cir. 1995) ("[T]he POF approach offers significant structural advantages in common fund cases, including ease of administration, efficiency, and a close approximation of the marketplace.").  Under this approach, the lodestar is not used as a *basis* for the fee award, but as a *cross-check* on the reasonableness of the fee award.[32]  *See* TLF Objs. at 14-15.  Thus, when a court finds it necessary to reduce the lodestar in a percentage-of-fund case, the next step is to determine if the resulting multiplier is reasonable—*not* to require counsel to forfeit the difference between the submitted lodestar and the reduced lodestar.  *See* Rubenstein Decl., 6/20/18, at ¶¶ 18-20 (Dkt. 368).

The Special Master continues to ignore this basic principle, arguing that his recommendation is not intended to replace a percentage-of-fund calculation, but is an "equitable remedy."  *See* SM Resp. to Lieff at 10-12.  In support of this claim, the Special Master misleadingly cites **four statutory fee award cases** where courts apply discounts to the lodestar

---

[32]    The lodestar cross check is intended to avoid the "item-by-item" accounting that is present in the pure lodestar method.  *See In re Thirteen Appeals*, 56 F.3d at 308 ("The difficulties inherent in implementing the lodestar . . . militate in favor of sticking to the POF method.").

in order to reach a reasonable fee award.[33]  But in these cases, the lodestar is used as the basis for

counsel's fee request, and *not* as a cross check.  In the one case the Special Master cites in

support of his disgorgement theory which considered a percentage-of-fund award, the court

ended up employing the same approach used by countless other courts that have adjusted the

lodestar post-filing.[34]  *See In re Anthem*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *27

(N.D. Cal. Aug. 17, 2018) (reducing hours and rates on the lodestar and then using the resulting

multiplier to determine if the percentage awarded was reasonable); *see also* TLF Objs. at 14 n.7

(collecting cases).

### b.  Thornton Is Not Responsible For The Double Counting Error

Even if disgorgement were a proper remedy, Thornton should not be required to disgorge

any amount related to the double-counting error.  As noted in Thornton's Objections, all of the

attorney time on Thornton's lodestar was proper; it was Lieff's and Labaton's lodestars that

contained the erroneously "double counted" time.  *See id.* at 18.  Although these double counting

errors were simple mistakes, the mistakes were made by Lieff and Labaton—not by Thornton.

*See id*; *see generally* Ltr. from B. Kelly to W. Sinnott (TLF Objs. Ex. 4) (Dkt. 446-5).  In

particular, as to Labaton, Michael Rogers "assumed . . . that Thornton would take credit for the

hours spent by the Staff Attorneys for which it paid on its own lodestar," and "[i]f he had been

asked at the time . . . [Eric Belfi] likely would have assumed that Thornton would report the time

spent by Staff Attorneys for whom it was paying on a Thornton lodestar."  Labaton's Resp. to

Interrog. 33, 6/1/17 (R&R Ex. 249) (Dkt. 401-260).  Due to "compartmentalization" at Labaton,

---

[33]   *See, e.g.*, *Moreno v. City of Sacramento*, 534 F.3d 1106 (9th Cir. 2008) (reducing lodestar submitted in support of statutory fee-shifting award); *Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.*, 776 F.2d 646 (7th Cir. 1985) (same); *Copeland v. Marshall*, 641 F.2d 880 (D.C. Cir. 1980) (same); *Natalie M. ex rel. David M. v. Dep't of Educ., Haw.*, No. 06-cv-00539 JMS-BMK, 2007 WL 2110510 (D. Haw. July 19, 2007) (same).

[34]   The Special Master cited to the *Anthem* Special Master's Report and Recommendations, but the District Court did not adopt the *Anthem* Special Master's method of calculating the fee award.

the attorneys that Thornton paid for were nonetheless included on Labaton's lodestar.[35]  *See*

R&R at 56.  For its part, Lieff acknowledged in its interrogatory responses that the double-

counting of the four attorneys on its lodestar was its own mistakes caused by internal Lieff

miscommunications and internal Lieff training issues:

> [As to two of the staff attorneys, t]his error appears to have been due to miscommunication in the February – May 2015 timeframe between and among the lead attorney on the case (Mr. Chiplock), the partner tasked with ensuring that time was correctly reported and invoiced to Thornton (Mr. Diamand), the person overseeing Staff Attorneys on a day-to-day basis (Mr. Dugar), the Firm's Accounting Department, and the Firm's Human Resources Department.
>
> Lieff's Resp. to Interrog. 39, 6/1/17 (R&R Ex. 57) (Dkt. 401-56).
> ...
>
> In short, due to personnel issues, [an additional two staff attorneys] do not appear to have received the same timekeeping training that [other staff attorneys] received earlier that year (and whose time, as described above, was correctly allocated).
>
> Lieff's Resp. to Interrog. 40, 6/1/17 (R&R Ex. 57) (Dkt. 401-56).

The Special Master himself does not appear to quibble with the fact that there were no errors on

Thornton's lodestar, noting in his Report:

> [A]t least some attorneys at both Labaton and Lieff believed that the staff attorneys paid for and allocated to Thornton would be included on Thornton's lodestar petition, and that the **inclusion of these same staff attorneys by Labaton and Lieff on their own fee petitions was simply a mistake**[.]
>
> R&R at 220-21 (emphasis added).[36]

---

[35]  The November 10, 2016 letter to the Court, which was the product of drafting and careful review by all three firms, itself states that the inadvertent double counting occurred in the Labaton and Lieff lodestars.  *See* Goldsmith Ltr. to Ct., 11/10/16 (R&R Ex. 178) (Dkt. 401-177) ("The hours of the Alper SAs reported in the Thornton lodestar report **mistakenly were also reported in the Labaton Sucharow lodestar report** . . . .  A portion of the hours of two of the Jordan SAs reported in the Thornton lodestar report (C. Jordan and J. Zaul) **mistakenly were also reported in the Lieff Cabraser lodestar report** . . . .  The hours of two other Jordan SAs (A. Ten Eyck and R. Wintterle) **mistakenly were included in the Lieff Cabraser lodestar report.**") (emphasis added).

[36]  *See also* SM Resp. to Lieff at 13 ("Specifically, Lieff overstated [its] lodestar by $868,417 hours, and erroneously credited itself for a substantial portion of hours worked by four different attorneys."); *id.* at 18 (". . . Lieff failed to supply accurate information in two material respects: (1) the time for two Lieff contract attorneys . . . should not have been included as part of Lieff's lodestar at all; and (2) a portion of two staff

Moreover, once Lieff and Labaton drafted lodestars that included the erroneously double-counted time, there was only one firm, Labaton, that had the opportunity—and the responsibility—to catch the error before submitting the declarations to the Court. *See* Exec. Summ. at 18 ("Labaton was Lead Class Counsel and as such was ultimately responsible for preparing an accurate and reliable fee petition . . . .  This responsibility would surely encompass catching and rectifying any mistakes or misstatements[.]").  Labaton was the only firm with access to all of the fee declarations before they were filed.  *See* TLF Objs. at 19-20.  A Labaton "settlement attorney," tasked with compiling the fee declarations for submission to the Court and coordinating the fees process, "did nothing to verify the accuracy of any hours submitted by the various firms," R&R at 223, and did not "circulate among the class firms the individual declarations or lodestar reports." *Id.* at 224.  Further, the Labaton settlement attorney failed to "perform a side-by-side comparison of the lodestar reports," which would have revealed the double-counting errors on Lieff's and Labaton's lodestars.  *See* R&R at 56 n.39.  The Special Master himself found that, "as to allocation of responsibility for the double-counting, Labaton must bear ultimate responsibility." Exec. Summ. at 18.[37]

The fact that: (1) all attorney time listed on Thornton's lodestar was correct (the errors occurring on the Lieff's and Labaton's lodestars); and (2) Labaton was responsible for compiling the fee declarations for submission to the Court, should be dispositive of responsibility for the double-counting error.  But in his Response, the Special Master continues to argue that Thornton

---

attorneys['] . . . hours, were mistakenly included on Lieff's lodestar for a period of time in which they had been allocated to Thornton.").

[37] The Special Master backpedals in his Response and implies (counterintuitively) that Thornton should not equate his reference to Labaton's "ultimate responsibility" for the lodestar to mean that Labaton had "the greatest responsibility for the overstated lodestar." *See* SM Resp. to TLF at 10.  The Special Master now opines that Labaton's failure to check the lodestar "is not the only cause nor even the leading proximate cause" of the lodestar error.  *Id.*

"significantly contributed to the double-counting mistake," and that Thornton had a "material role in causing the overstatement."  SM Resp. to TLF at 9.  The Special Master's proposed remedy, although touted as "tailored to the mistakes each firm made," *id.* at 10, is not "tailored" at all, but simply requires each firm to disgorge the double counting in equal shares.[38]

The Special Master's arguments that Thornton "significantly contributed to the double-counting mistake" conflate participation in an otherwise valid risk-sharing agreement with the missteps within Lieff and Labaton that led to the double-counting error.  For instance, he alleges that Thornton "spearheaded" the risk-sharing agreement; Thornton "benefited disproportionately" from the risk-sharing agreement; and Thornton was a "willing and originating participant" in the risk-sharing agreement.  *Id.* at 6-7, 10.  But all of these are arguments that Thornton simply **participated in an otherwise valid agreement**—not that Thornton "significantly contributed to the double-counting mistake," which was due to Lieff's and Labaton's internal errors.  The Special Master himself found that "the agreement itself was not a 'significant' cause of the double-counting," SM Resp. to Lieff at 15, and that the purpose of the agreement was legitimate, *see* R&R at 43 ("The purpose of the cost-sharing agreement was to share the cost and risk burdens of the litigation among the three Customer Class firms.").[39]

---

[38]   The Special Master himself appears confused as to whether the "one third each" remedy is "tailored" or not, employing different—and contradictory—arguments in his Responses to Thornton and Lieff.  In his Response to Thornton defending this remedy, he cites the First Circuit for the proposition that "individualization is the name of the game," and as noted above, states that the remedy is "tailored."  SM Resp. to TLF at 9-10.  But in the section of his Response to Lieff defending the "one third each" remedy, he states: "It is important to point out that the Special Master did *not* equate the firms' respective responsibility for the double counting with the percentage of the overstated lodestar that he recommended each firm pay to the class.  Because it was not possible to assign percentage responsibility with Talmudic precision, the Special Master, rather struck a balance to administer 'rough justice' to remedy the double-counting errors[.]"  SM Resp. to Lieff at 19 (citations omitted).

[39]   Of course, such risk-sharing is sometimes necessary for plaintiffs' firms to bring large scale class actions given that the firms may never receive *any* compensation for their work and even if they do receive compensation, it is often years away.  The firms' costs (staff salary, rent, etc.) do not disappear during the pendency of the litigation.

Further, the Special Master's claim that Thornton "spearheaded" the risk-sharing agreement is misleading.  All three firms agreed that for their mutual benefit they would share the risk of the staff and contract attorneys.   As set forth in Labaton's response to the Special Master's interrogatories, it "made sense . . . to [Labaton] because it was a fair way to share costs associated with the review."  Labaton's Resp. to Interrog. 32, 6/6/17 (R&R Ex. 249) (Dkt. 401-260).  Further, it was not as if this was the first time that Labaton had engaged in a risk-sharing arrangement.  As further noted in Labaton's response to the Special Master's interrogatories, Labaton identified at least 17 other cases where costs of Labaton-employed staff attorneys were paid by another law firm.  *Id.*  And in one or more of those previous cases, the firm which paid for the attorneys listed the attorneys on its lodestar.  *See* R&R at 222; [40] Politano Dep., 6/14/17, at 23:11-19 (R&R Ex. 98) (Dkt. 401-97).  And of course, Thornton was not special in being a "willing and originating participant" in the risk-sharing agreement—all three firms had to be "willing and originating participant[s]" in the risk-sharing agreement.  In any case, the Special Master has provided no evidence to support the theory that Thornton "spearheaded" the agreement.

The Special Master's conclusion that Thornton should pay one third disgorgement due to errors on Lieff's and Labaton's lodestar because Thornton "benefited disproportionately to the other firms from the artifice of putting the attorneys employed (or retained) by Labaton and Lieff on its own lodestar," SM Resp. to TLF at 7 n.11, is also unpersuasive.  If the agreement was valid, whether Thornton benefitted disproportionately from the agreement is beside the point.  But it is simply not true—as the Special Master continues to insinuate—that the risk-sharing

---

[40]   The Special Master's description of the risk-sharing agreement in his Response as "an **otherwise unheard-of** name-and-cost sharing agreement to list employees of another firm on a lodestar petition" (emphasis added) is not true and is directly contradicted by his R&R.  *Compare* SM Resp. to TLF at 10 *with* R&R at 222.

agreement was primarily for the benefit of Thornton.  Lieff and Labaton would not have agreed to enter into the risk-sharing agreement if it was not also in their interest to do so.  If the case had failed, Thornton would have been disproportionately harmed because it had invested resources into the case that it did not need to, and Labaton and Lieff would have benefited disproportionately from the risk-sharing agreement.[41]  All three firms received the "benefit of the bargain."

As to the Special Master's theory that Thornton is responsible for the double-counting error because it did not inform the Court of the mechanics of the risk-sharing agreement, **none** of the three customer class counsel did so.[42]  Although the Thornton declaration did not state that it financed but did not house certain attorneys listed on its lodestar, the Lieff and Labaton declarations did not note that certain attorneys listed on their lodestars were financed by Thornton.[43]  If **any** firm had been more explicit about the risk-sharing agreement, perhaps the Court would have **identified** the double-counting error, but **the cause** of the error was Lieff's and Labaton's internal miscommunications that led them to improperly add attorney time to their lodestars.   The Special Master's argument is essentially that Thornton is responsible for the double-counting error because if Thornton had described the risk sharing agreement—even

---

[41]   The Special Master also believes Thornton bears responsibility because the risk-sharing agreement was not reduced to writing.  *See* SM Resp. to TLF at 11 ("[N]ot a single email explicitly communicated Thornton's intention to include Labaton's and Lieff's contract and staff attorneys on its lodestar.").  This is not a valid criticism of Thornton because, as noted, the double-counting occurred on Lieff's and Labaton's lodestars.  Perhaps a writing would have helped Lieff and Labaton more effectively communicate to their accounting department and/or settlement counsel how the shared attorneys should be accounted for, but that is a Lieff/Labaton communication problem, not a Thornton problem.  The "cognitive [ ] barrier to identifying and correcting any mistakes on the lodestar before it went to the Court," SM Resp. to Lieff at 16, was present at Lieff and Labaton—not at Thornton.

[42]   The Special Master attaches to his Response a revised declaration that Thornton sent to Labaton on September 13, 2016, demonstrating the edits to the firm contribution section, to show that Thornton *could have* modified the boilerplate language that is at issue in this case.  *See* SM Resp. to TLF at 11 n.16.  The fact that TLF, like Lieff, Labaton, and most of the ERISA firms who did not modify the boilerplate language *could have done so* is not in dispute.

[43]   As noted, attorney time financed by Thornton was included in Lieff's and Labaton's lodestars by mistake.

though no firm did so—it would have been easier for the Court to discover **Lieff's and**

**Labaton's errors.**

## VIII.   The Special Master's Theory That Contract Attorneys Should Be Listed As Expenses Is Supported By Nothing Other Than His Newfound Personal Policy Preference

In his Report, the Special Master proposed that contract attorneys be listed as expenses

rather than included as lodestar.  The Special Master failed to cite any legal authority supporting

his recommendation, instead basing his argument solely on his personal policy preferences.  In

his Response, the Special Master once again fails to cite a single case in support of his position.[44]

In fact, he acknowledges that the approval of contract attorneys in the lodestar is the "consistent

trend" in the "vast majority" of cases.[45]  SM Resp. to Lieff at 22, 24.  Yet the Special Master

disregards precedent, claiming that courts considering the issue have engaged merely in

"superficial discussions" that ignore the "various factors that should be considered in evaluating

whether a non-associate attorney should be included on the lodestar but focus exclusively on

addressing contract attorneys vis-à-vis their associate counterparts." *Id.*  It is unclear what the

Special Master means by this, as it seems that comparing contract attorneys to associates is

precisely what the Special Master is doing.  Nevertheless, the Special Master neither lists nor

cites to any authority regarding these purported "factors."  This is likely because the "factors" do

not exist in case law.  What does exist is an abundance of opinions approving the practice of

including contract attorneys in the lodestar.  *See In re Citigroup Inc. Secs. Litig.*, 965 F. Supp. 2d

---

[44]   This is not surprising; undersigned counsel's extensive review of case law has not turned up any cases supporting the Special Master's position.

[45]   In fact, the Special Master himself has approved this arrangement in the past.  In at least one case, a firm listed contract attorneys on its lodestar at rates ranging from $275 to $325.  Beckworth Aff., Dkt. 350-5, *In re Delphi Corp. Secs. Litig.*, No. 05-md-1725 (E.D. Mich. Apr. 22, 2008).  Judge Rosen did not appear to take any issue with this arrangement and awarded the amount of fees requested by class counsel.  *See* Order Awarding Attorneys' Fees, Dkt. 417, *In re Delphi Corp. Secs. Litig.*, No. 05-md-1725 (E.D. Mich. June 26, 2008) (awarding 18% attorneys' fees from the "Gross Deloitte & Touche Settlement Fund").

369, 394 (S.D.N.Y. 2013) ("[C]ourts routinely reject claims that contract attorney labor should be treated as a reimbursable litigation expense."); *see also* TLF Objs. at 78-79 (collecting cases). This Court should not ignore the substantial weight of authority simply because the Special Master muses that courts have failed to "wade deeply" into the issues he finds important.[46]

Because the Special Master has identified no *relevant* legal authority to support his recommendation, the Special Master turns in his Response to employment law, relying on cases prohibiting employers from misclassifying employees as independent contractors.  *See* SM Resp. to Lieff at 22-23.  This is an apples-to-oranges comparison.  Further, the Special Master's argument that courts should frown upon the use of contract attorneys because they present an impediment to "fostering up and coming attorney talent" and because "[i]t should be the goal of law firms . . . to fully employ the attorneys they trust to handle such high level work," *see id.*, is an unwarranted intrusion into law firms' staffing models based on what the Special Master thinks is best for the legal profession writ large, rather than what is legal and appropriate based on precedent.[47]  *See* Rubenstein Decl., 6/20/18, at ¶ 15 (Dkt. 368) ("[I]t would be bad public policy to premise the right to an attorney's fee on the indicia of the employment relationship rather than on the services being provided to the client.").  To the extent the Special Master's policy

---

[46]  In fact, the one court to have the benefit of the Special Master's Report at its disposal when considering this issue flatly rejected his proposal.  *See In re Anthem, Inc. Data Breach Lit.,* No. 15-MD-02617-LHK, 2018 WL 3960068, at *18 (N.D. Cal. Aug. 17, 2018) ("To the extent that [objector] advocates for a categorical rule that contract and staff attorneys must be billed at cost, the Court disagrees.  [Objector] identifies *no* case adopting this *hardline* position." (emphasis added)).

[47]  *See* Edward Levi, Att'y Gen. of the U.S., Address at the Phila. Award Dinner Honoring J. William H. Hastie (Apr. 7, 1975), https://www.justice.gov/sites/default/files/ag/legacy/2011/08/23/04-07-1975.pdf (noting the "tendency [that] puts the courts, inappropriately, in the forefront on questions which really require statements of policy preference rather than elaboration of established principle.").

concerns are availing, those arguments are best suited for a legislature, a local rules committee, or the ABA—not a court determining the proper amount of attorneys' fees for class counsel.[48]

In addition to the flawed reasoning underpinning his analysis, the Special Master's recommended remedy does not withstand scrutiny.  In his Report, the Special Master recommended that the firms disgorge the "*total* award" of $2,386,058 "for the time of the contract attorneys" less an expense of $50 per hour for all of the hours worked.  R&R at 368 (emphasis added).  Now, the Special Master recommends that Lieff disgorge $2,241,098.40[49] and Thornton disgorge *an additional* $1,344,057, for a total disgorgement of over $3.5 million related to contract attorneys.  He explains that "while Lieff retained all seven of the contract attorneys . . . Thornton claimed four of these rented attorneys on its lodestar," and recommends that Thornton disgorge an amount for the "four contract attorneys not employed by Thornton or any of the Customer Class firms."  Resp. to TLF at 12-13.  It is unclear how the Special Master arrives at these figures.  In total, Lieff listed nine contract attorneys on its lodestar, not seven, and Thornton listed four.  Some of the hours for these attorneys were double counted.  It is unclear which seven attorneys were included in the Special Master's initial calculation, or how he accounted for overlapping time.  Thus, his recommendation that Thornton should pay an amount in addition to the previously-determined "total award" of $2,386,058 appears to be a

---

[48]   *See* Remarks of Gerald Rosen, Thomas M. Cooley Law School Distinguished Brief Award Banquet, *Judicial Independence in an Age of Political and Media Scrutiny*, 14 T.M. COOLEY L. REV. 685 (1997) ("[J]udges must understand that with the great privilege of independence comes a concomitant obligation to exercise restraint and not exceed the judicial role of interpretation, not law making.").  Even if this were a policy discussion, the Special Master neglects to consider that his proposal would disadvantage the plaintiffs' bar vis-à-vis the defense bar, thus making it more difficult to bring class action cases.  The staff and contract attorney models allows plaintiffs' firms the flexibility needed to respond to market demand and to take on incremental risk. Hiring full-time staff is a completely different financial proposition for defense firms, whose attorneys can regularly bill by the hour, than it is for plaintiffs' firms, who may not realize any value from their full-time staff until years after attorney salaries are paid.

[49]   In his Report, the Special Master used the $2,386,058 figure.  R&R at 367.  In his Response to Lieff's Objections, the Special Master used, and accepted as true, the $2,241,098.40 figure calculated by Lieff.  SM Resp. to Lieff at 6 n.8.

mistake that may improperly double count contract attorney time that appeared on both

Thornton's and Lieff's lodestar.

## IX.    For Purposes Of The Lodestar Cross-Check, Michael Bradley's Rate Does Not Affect The Fee Award

As Thornton noted in its October 25, 2018 filing, the Special Master need not respond to,

and the Court need not decide, Thornton's objection to the Special Master's finding that Michael

Bradley's lodestar rate should be reduced to $250.[50]  *See* TLF Resp. to Ct. Order at 2 (Dkt. 504).

Although Thornton detailed in its Objections why the recommended rate of $250 (which is lower

than the approved lodestar rates for both Lieff and Labaton **paralegals**), *see* TLF Objs. at 83-89,

is unsupported by the facts, the Court need not determine a lodestar rate because **any reduction**

**in Michael Bradley's lodestar rate does not affect the fee award.**  Even if **all value** associated

with Michael Bradley's work were removed from the lodestar—which would be unfair because

the Special Master has acknowledged that "the total time Michael Bradley spent working on the

*State Street* document review, 406.4 hours, was reasonable," R&R at 217, and that such time "is

supported by reasonably reliable contemporaneous records," R&R at 366—there would be no

material effect on Thornton's lodestar or the overall lodestar.  The overall multiplier would be

2.01 after accounting for the double-counted time and removing all of Michael Bradley's time.

---

[50]    Thornton made this statement in its October 25, 2018 filing pursuant to the Court's October 16, 2018 Order that Thornton and the Special Master attempt to narrow the issues in dispute.  *See* Oct. 16, 2018 Order (Dkt. 494).  The Special Master refers to this as: "Thornton gloss[ing] over its previous objection to the Special Master's conclusion that $250 /hour, rather than the proffered rate of $50/hour, was a more appropriate rate for Michael Bradley."  SM Resp. to TLF at 24.  There is no "glossing over"; Thornton was attempting to narrow the issues in dispute pursuant to the Court's order.  Thornton understands that the Court may be concerned with Michael Bradley's rate for the purposes of determining whether the attestations in the declaration were accurate as to his regular rate.  This is a different question than whether $250, $500, or anything in between is an "appropriate" rate for Michael Bradley for lodestar purposes and whether any rate would change the multiplier.

Despite Thornton's October 25, 2018 filing,[51] the Special Master's Response continues to argue that Michael Bradley's rate should be reduced to $250 and the difference in the submitted rate and the actual rate should be disgorged.  Both as a substantive and procedural matter, the Special Master is wrong.  But to the extent the Court is inclined to adjudicate this issue, Thornton respectfully refers the Court to pages 83 to 92 of its Objections.  There is no need to repeat those Objections here, but Thornton notes that the Special Master's Response provocatively states that there is a "question of whether Michael Bradley added any value to the State Street case." SM Resp. to TLF at 25.  Yet, in the **same paragraph**, the Special Master admits that "the **value added** by Michael Bradley, with a legal background and years of legal practice under his belt, was **comparable to an associate**[.]"  *Id.*  Thornton further notes that the Special Master's assertion that Michael Bradley "had no affiliation with the firm, no stake in the case, and no stake in the firm's success," *id.*, is patently false.  Michael Bradley had more stake in the success of the case than any of the other staff attorneys.  As the Special Master himself found, "Bradley worked on a contingent basis; he would only be paid if the class recovered a settlement entitling counsel to fees." R&R at 45 n.26.

## X.    Staff Attorney Rates Are Reasonable

As both the Special Master and Prof. Rubenstein found, the staff attorney rates used by customer class counsel in this case were reasonable.  Prof. Rubenstein found that the range of staff attorney rates in his sample of twelve class action cases was $250 to $550 with a mean (in 2016 dollars) of $379.53.  Rubenstein Decl., 7/31/17, at ¶ 36 (TLF Objs. Ex. 1) (Dkt. 446-2).  To

---

[51]    Thornton also narrowed the issues in dispute by agreeing that the Special Master need not respond to, and the Court need not decide, Thornton's Objections regarding ERISA counsel.  *See* TLF Resp. to Ct. Order at 2 (Dkt. 504).  This is because the ERISA-related objections were related to the Chargois payment and have been resolved by Labaton's proposed resolution.  Nonetheless, Thornton respectfully requests that the Court review Thornton's ERISA-related objections because they further demonstrate the unreliability of the Special Master's Report and Recommendations.  *See* TLF Objs. at 92-108.

the extent that Customer Class Counsel's staff attorney rates were higher than the mean, it is

important to note that the Special Master found that their rates were justified because of the

experience of the staff attorneys in FX litigation and the nature of their work on the case.  As the

Special Master concluded:

> [T]he higher rates billed were justified [because] . . . the staff attorneys involved in
> this complex litigation performed substantive and valuable work beyond simple
> document review . . . . Most, if not all, of the staff attorneys had specialized
> experience and/or skills that made them particularly equipped to perform
> comprehensive document review and spot important issues in the case [and] the
> staff attorneys here performed tasks that were more important than simple
> document review, such as preparing sophisticated legal memoranda and factual
> memoranda to prepare their respective litigation teams for depositions should the
> case reach that stage.
>
> R&R at 172-73.
>
>  ...
>
> [T]he Customer Class firms have presented sufficient evidence that the staff
> attorneys involved in this complex litigation possessed specialized experience and
> performed substantive and valuable work well beyond simple document review.
> The majority of the staff attorneys had specialized experience and skills in
> securities litigation, and a number of staff attorneys carried specialized knowledge
> from their prior participation in the *BONY Mellon* matter.
>
> R&R at 180.

After a two-year, $5 million investigation in which the Special Master recommended

draconian sanctions be imposed (including, perhaps, the largest Rule 11 sanction in the First

Circuit), it is notable that the Special Master concluded the staff attorney rates were reasonable.

If the Special Master had a plausible basis to challenge the rates of Customer Class Counsel's

staff attorneys, he would no doubt have done so.[52]

---

[52]   As noted in his Report and Recommendations, the Special Master distinguishes staff attorneys employed by
Lieff and Labaton from contract attorneys employed by outside agencies.  *See* R&R at 181-89.  The Special
Master finds that the contract attorney rates are not reasonable.  Although the Special Master suggests at one
point that the $425 rate that Thornton used for staff attorneys might be inappropriate, he does not appear to
make any finding about such rates, nor about Lieff's $515 rate for certain attorneys.  *See* TLF Objs. at 22-26.

Also relevant is that the *overall* blended rate for Customer Class Counsel was reasonable. Prof. Rubenstein identified 20 Massachusetts federal and state class action fee approvals and calculated a mean blended billing rate (adjusted to 2016 dollars) of $484.05.  Rubenstein Decl., 7/31/17, at ¶ 30 (TLF Objs. Ex. 1) (Dkt. 446-2).  When Prof. Rubenstein selected another sample of 20 cases across the country limited to settlements between $100 million and $500 million, he found a nearly identical mean blended billing rate (adjusted to 2016 dollars) of $484.67.  *Id.* at ¶ 31.  In this case, Prof. Rubenstein found that customer class counsel's blended billing rate was $484.70, just 65 cents above the mean of the first sample, and 3 cents above the mean of the second sample.  *Id.*

The *overall* blended billing rate is an important consideration for the Court because it indicates that "Lead Counsel distributed work among partners, associates, non-partnership track attorneys, and paralegals in an appropriate fashion."  *Id.* at ¶ 32.  To the extent that staff attorneys' rates are at the higher end of the spectrum, it is important to recognize that the staff attorneys here were replacing associates who would have charged clients at even higher rates. As the Special Master stated in his Report and Recommendations:

> These rates are particularly reasonable when compared to the relatively low number of hours billed by associates for the three Customer Class law firms (less than 2% of the total time billed).  This can be attributed to the fact that the staff attorneys effectively did the work of lower- to mid- level associates.
>
> R&R at 180.

---

Instead, the Special Master concluded that "the hours and rates of the attorneys of each of the law firms for whom lodestar petitions were submitted to the Court are reasonable and accurate, and consistent with applicable market rates for comparable attorneys in comparable markets for comparable work." R&R at 365.

Essentially, the rates of the staff attorneys are justified in part because they were functioning as associates—performing the work that associates might be performing at defense firms or at other plaintiffs' firms.[53]

Unlike Prof. Rubenstein's empirical work on the appropriate rates for staff attorneys, *supra,* CEI's recommendation that the rates of all but three of the staff attorneys be reduced to $200 does not appear to be supported by any relevant metric.[54]   For instance, in arguing that $200 per hour is "overly generous for attorneys doing the work of junior associates," CEI cites to a Southern District of New York case stating that a $200 rate for a second-year associate is "higher than the norm in this district."  CEI Memo. at 18 (Dkt. 522) (citing to *Gonzalez v. Scalinatella, Inc.*, 112 F. Supp. 3d 5, 28 (S.D.N.Y. 2015)).  CEI does not disclose that this is a distorted comparison; the cited case concerns the rates of **FLSA attorneys**, who have significantly lower rates than attorneys involved in complex financial fraud litigation such as the *State Street* case.

CEI brushes aside the best benchmark for staff attorney rates in this case—the most analogous case to this one, *BNY Mellon*, where Lieff's blended staff attorney rate was $418.23 and the overall blended staff attorney rate was $378.03. *See* Nirmul and Chiplock Joint Decl., Dkt. 622, *In re Bank of New York Mellon Corp. Forex Trans. Lit.*, No. 12-MD-2335 (LAK) (JLC) (S.D.N.Y. Aug. 17, 2015) (hereinafter *BNY Mellon*) (R&R Ex. 186) (Dkt. 401-185).[55]

---

[53]   *See also* R&R at 177 ("[T]hey were all attorneys with years of experience and the majority of them had specialized knowledge or skills in the FX and securities areas . . . They did not simply do first-level document review; they also digested complex information and prepared topical memoranda and witness memoranda for depositions – the same kind of work done by associates at large firms.").

[54]   CEI's brief is not without error.  Page 4 of the accompanying affidavit states that "Roger Yamada, who billed time for legal research and tasks besides document review, also [is] assigned a rate of $375/hour for the sake of the cross check."  M. Frank Bednarz Decl. at ¶ 9 (Dkt. 522-1). The chart on the following page, however, assigns Mr. Yamada a rate of $200/hour, not $375/hour.  *Id.*

[55]   *See also* Daniel Chiplock Decl., Dkt. 622-1, *BNY Mellon*, No. 12-MD-2335 (LAK) (JLC); Joseph H. Meltzer Decl., *BNY Mellon*, No. 12-MD-2335 (LAK) (JLC); Frank R. Schirripa Decl., Dkt. 622-6, *BNY Mellon*, No.

Counterintuitively, CEI argues that the comparison to *BNY Mellon* is unwarranted because: (1) "the Judge in *BONY Mellon* has not been shy about slashing similar fees to avoid windfalls;" and (2) "the *BONY Mellon* request was approved in full because [the Court found that] 'this really was an extraordinary case in which plaintiff's counsel performed, at no small risk, an extraordinary service, and they ought to be compensated for it.'"  CEI Memo. at 29 n.15 (Dkt. 522).  As to the first point, it does not make sense that this Court would decline to credit the *BNY Mellon* rates because, although Judge Kaplan sometimes reduces rates, he declined to do so in the *BNY Mellon* case.  The fact that Judge Kaplan did not reduce the rates indicates that the *BNY Mellon* rates were reasonable; not that they were unreasonable.  Second, the result and advocacy in *BNY Mellon* was as laudable as the result and advocacy in this case.  CEI's attempt to prove otherwise demonstrates its misunderstanding of the mediation process that this Court encouraged throughout the litigation.  As this Court found:

> [I]n this case the plaintiffs' lawyers took on a contingent basis a novel, risky case. The result at the outset was uncertain, and it remained, until there was a settlement, uncertain.  The plaintiffs' counsel were required to develop a novel case. This is not a situation where they piggybacked on the work of a public agency that had made certain findings. They were required to be pioneers to a certain extent. They were required to engage in substantial discovery that included production of nine million documents. They engaged in arduous arm's length negotiation that included 19 mediation sessions. They had to stand up on behalf of the class to experienced, able, energetic, formidable adversaries. They did that.

> 11/2/16 Hr'g Tr. at 36:2-14 (Dkt. 114).

The reasoning applicable to *BNY Mellon* is therefore applicable in this case as well, and the rates the *BNY Mellon* court approved support the reasonableness of the staff attorneys' rates in the *State Street* matter.

---

12-MD-2335 (LAK) (JLC); Christopher L. Lebsock Decl., Dkt. 622-7, *BNY Mellon,* No. 12-MD-2335 (LAK) (JLC); Jeffrey Angelovich, Dkt. 622-10, *BNY Mellon*, No. 12-MD-2335 (LAK) (JLC).

Finally, to the extent that CEI (similar to the Special Master) argues that the contract attorneys should be listed at $50 per hour, TLF respectfully refers the Court to Prof. Rubenstein's June 20, 2018 declaration. *See* Rubenstein Decl., 6/20/2018, at p. 10-17 (Dkt. 368) (explaining his conclusion that the Special Master's approach to contract attorneys "embodies at least five errors of law and fact.").[56] Thornton further notes that two of the contract attorneys on its lodestar, unlike the typical contract attorney in any given case, had worked on the *BNY Mellon* and "acquired substantial relevant experience concerning custodial FX trading in general, indirect (or 'standing instructions') vs. direct/negotiated FX pricing, and custodial FX marketing." *See* Lieff's Resp. to Interrog. No. 19, 6/1/17 (R&R Ex. 57) (Dkt. 401-56).  In any event, the appropriate rates for the contract attorneys is not determinative to the fee award in this case.  Even if *all contract attorney time were removed,* the multiplier would only increase to 2.07.[57]

---

[56]  CEI's musings in footnote 8 that perhaps all of the staff attorneys on Thornton's lodestar should be assigned contract attorney rates (i.e., $50.00) illustrates CEI's aversion to class actions in general.  As explained *supra*, the risk-sharing agreement was entered into for the benefit of all three firms.  Thornton would not have agreed to bear the risk of financing staff attorneys if it could not be rewarded if the litigation succeeded.  No rational actor bears unnecessary financial risk.  Had Thornton not agreed to finance the staff attorneys, perhaps Lieff and Labaton could have financed the staff attorneys themselves.  But that will not be so in every class action.  The flexibility accorded to class counsel by the ability to enter into risk-sharing agreements, and to allocate fees among themselves, is part of what enables plaintiffs' law firms to bring complex, risky class actions against powerful defendants without guarantee that they will ever be paid for their work.  Here as elsewhere, CEI's goal is to undermine attorneys' incentives to bring class actions and therefore to undermine the entire class action system itself.

[57]  Professor Rubenstein calculated this amount by first deducting the value of the double-counted attorneys disclosed to the Court from the aggregate lodestar, resulting in a revised lodestar of $37,265,241.25.  He then deducted the contract attorney lodestar identified by the Special Master in his Report and Recommendations at page 367 (valued at $1,325,588), which reduced the lodestar to $35,939,653.25.  Using this revised lodestar, the multiplier becomes 2.07. Rubenstein Decl., 6/20/18, at ¶ 19 n.77 (Dkt. 368).  As noted, *supra*, there is some ambiguity about the total contract attorney lodestar, particularly because the Special Master has now revised his recommendations regarding contract attorney disgorgement.  Even if the Special Master's revised figure is used—$1,344,057 for Thornton plus $1,245,055 for Lieff (which erroneously counts the same contract attorney time twice)—the lodestar would be 2.15.

## CONCLUSION

For the foregoing reasons, Thornton objects to the Special Master's factual and legal findings identified above and in its Objections to the Special Master's Report and Recommendations.  *See* TLF Objs. (Dkt. 446-1).

Respectfully submitted,

/s/ Brian T. Kelly
Brian T. Kelly (BBO No. 549566)
Joshua C. Sharp (BBO No. 681439)
NIXON PEABODY LLP
100 Summer Street
Boston, MA  02110
Telephone: (617) 345-1000
Facsimile:  (844) 345-1300
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com

Dated: December 18, 2018                 *Counsel for the Thornton Law Firm LLP*

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically on December 18, 2018 and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing ("NEF").

/s/ Joshua C. Sharp
Joshua C. Sharp