# Exhibit 1

<table>
<tr><td></td><td></td><td>JAMS</td></tr>
</table>

|  |  |
|---|---|
| _____ : |  |
| : | No. 1425027998 |
| In Re: LABATON SUCHAROW, LLP    : |  |
| : | **PHASE I REPORT** |
| _____: | **AS AMENDED FEBRUARY 6, 2019** |

**Hon. Garrett E. Brown, Jr. (Ret.):**

The Undersigned has been retained by the law firm Labaton Sucharow LLP (the "Firm") to review: (I) the Firm's historical practices regarding payment of referral fees; and (II) the substance and implementation of the Firm's recently-revised practices regarding payment of referral fees. This Phase I Report and the attached Exhibits collectively address Phase I of the aforementioned review.[1]

## Executive Summary

During a hearing on November 7, 2018, the Hon. Mark L. Wolf, U.S.D.J. asked Michael P. Canty, Esq., Partner and General Counsel of the Firm, whether the payment of "bare referral" fees by the Firm to Damon Chargois, Esq. and/or his law firm Chargois & Herron, LLP was "unique" or "aberrant". (See 11/7/18 Hr'g. Tr. at 22, lns. 16-17; and at 23, lns. 3-5). In response, Mr. Canty confirmed that I had been retained by the Firm to look into that question, and at the Court's request, would report back not later than January 8, 2018.

For the reasons explained below, I have concluded that the Firm's payment of "bare referral" fees to Mr. Chargois and/or his law firm Chargois & Herron, LLP was unique and aberrational. This conclusion is based upon two-months of thorough investigation, during which my Assistant and I:

- Met and corresponded extensively with Mr. Canty and the Firm's Chief Compliance Officer, Carol C. Villegas, Esq. to learn about the Firm's structure, records, history and accounting practices;
- Requested, received and reviewed an analysis of the more than 300 cases that the Firm has settled since it reorganized in 2007;
- Interviewed each of the 7 Responsible Attorneys designated by the Firm for those 300 plus settled cases, and reviewed a random sample of settled cases with each Responsible Attorney;
- Requested, received and reviewed Declarations from Mr. Canty and each of the 7 Responsible Attorneys that addressed the above question posed by the Court, and

---

[1]   As noted below, this Phase I Report has been prepared on an expedited basis. I anticipate issuing a Phase II Report during calendar-year 2019 that addresses Phase II of the aforementioned review.

confirmed that other than with respect to Mr. Chargois and/or Chargois & Herron, LLP, the Firm has made no "bare referral" payments to any lawyer or law firm.

In so concluding, I commend the Firm – and particularly Mr. Canty and Ms. Villegas – for their critical role in facilitating the review process, which I believe was exhaustive, and tangibly reflected a genuine commitment by the Firm and its leadership to insure the accuracy and integrity of this Phase I Report and the attached Exhibits.

## I.     Contextual Background

This engagement arises from several consolidated class actions in the United States District Court for the District Massachusetts before the Hon. Mark L. Wolf, U.S.D.J. (the "Consolidated Litigation"). See Arkansas Teacher Retirement System v. State Street Bank and Trust Co., Civ. No. 11-cv-10230 (MLW); Henriquez v. State Street Bank and Trust Co., Civ. No. 11-cv-12049 (MLW); and The Andover Companies Savings and Profit Sharing Plan v. State Street Bank and Trust Co., Civ. No. 12-cv-11698 (MLW).

The Firm represents Arkansas Teacher Retirement System ("ATRS"), one of the Lead Plaintiffs in the Consolidated Litigation.  In 2016, a global class settlement of the Consolidated Litigation was reached following extensive negotiations (the "Settlement").  As relevant here, the terms of that Settlement were a $300 million fund for the settlement class, and a request of $74,541,250 in attorneys' fees payable from that fund (the "Attorneys' Fees Request").  The Attorneys' Fees Request was supported by a fee petition prepared by the Firm on behalf of all plaintiffs' counsel (the "Fee Petition").

Following a hearing on November 2, 2016, the Court issued final approval of the Parties' proposed Settlement, including: (1) a gross $300 million for the Settlement Class; and (2) the Attorneys' Fees Request of $74,541,250.  Shortly after that final approval, media reports suggested that the Fee Petition submitted to the Court in support of the Attorneys' Fees Request contained material inaccuracies.  The Court appointed the Hon. Gerald E. Rosen (Ret.) as Special Master (the "Special Master") to investigate.

The subsequent investigation culminated in a Report and Recommendations dated May 14, 2018, that the Special Master submitted to the Court (the "R&R").  Within that 377-page document, the Special Master detailed myriad flaws that plagued the Fee Petition, as well as the predicate institutional failures that allowed those flaws to arise, and to remain uncorrected.

Prominent among those flaws was the Firm's $4.1 million payment to Damon Chargois Esq., and/or his law firm Chargois & Herron LLP, from the attorneys' fees awarded by the Court (the "Payment").  The Firm had not disclosed the Payment to the Court.  Instead, it was discovered by the Special Master during the investigation.  Consequently, the R&R contains "separate and extensive discussion and findings" related to the Firm's relationship with Mr. Chargois in general, and the Payment in particular.

Mr. Chargois had neither made an appearance in the Consolidated Litigation, nor done any substantive work on the Consolidated Litigation. Ultimately, the Special Master recommended that: (1) the Firm disgorge the $4.1 million it paid to Mr. Chargois; and (2) those funds be distributed to other plaintiffs' counsel and to the settlement class. (R&R at 368-370). However, the Special Master did not recommend professional disciplinary action against the Firm or any of its attorneys.[2] (Id. at 370-371).

After meeting and conferring for several months, the Special Master and Labaton submitted a proposed settlement to the Court on October 10, 2018, to resolve the issues raised in the R&R (the "Proposed Settlement"). (DE 485). In the Proposed Settlement, the Special Master acknowledged that the Firm's "failure to disclose [the Chargois Arrangement] did not comport with emerging best practices at the time of the fee submission," but "the payment itself to Chargois did not violate [the rules of professional conduct] or constitute intentional misconduct." (Id. at 5). Labaton, for its part, acknowledged that the Chargois Arrangement "should have led to a more robust discussion with its client, and the Court, prior to awarding attorneys' fees", and proposed to voluntarily retain a retired federal judge "to ensure that Labaton's retention, fee sharing agreements and other policies concerning fee applications are in compliance with applicable rules and emerging best practices." (Id. at 8). I was retained by the Firm pursuant to that proposal.

## II.   The Question Presented in Phase I

During a hearing on November 7, 2018, the Court closely examined Mr. Canty, Christopher J. Keller, Esq. (the Firm's Co-Chairman), and Eric J. Belfi, Esq. (a Partner of the Firm), regarding factual Declarations they had submitted on issues related to the Firm's payment of "bare referral" fees. While examining Mr. Canty, the Court made clear that those issues are of paramount importance as it considers the appropriateness of any sanction related to the Fee Petition. (See 11/7/18 Hr'g. Tr. at 22, lns. 4-5). Specifically, the Court asked Mr. Canty: "Is this Chargois matter an insolated incident or not?" (Id. at 22, lns. 16-17). The Court went on to highlight its interest "in knowing whether the Chargois arrangement was aberrant conduct and it just happened to be identified in this case or whether it wasn't." (Id. at 23, lns. 3-5). The Court and the Firm agreed that I should address that question on an expedited basis, and report back by January 8, 2019.

---

[2] Subsequent to my initial submission of the Phase I Report on January 8, 2018, I was advised by the Special Master that in the R&R, he had not found that the payments to Mr. Chargois were "bare referrals"; rather, he found that those payments were not referral fees at all. This report is hereby amended to so state, and to clarify that I myself have made no findings as to whether the payments made by the Firm to Mr. Chargois were or were not referral fees, as that was beyond the scope of my assignment. For the Court's convenience, a comparative red-line version of this Phase I Report that illustrates my amendments is attached as Exhibit K.

3

**III.  Answer**

For the reasons explained below, I have concluded that, based upon a two-month investigation, conducted with the help of my Assistant and senior members of the Firm, the "bare referral" payments to Mr. Chargois and/or Chargois & Herron, LLP were unique in the history of the Firm since its reorganization in 2007.[3]

**IV.  The Review Process**

Following the hearing on November 7, 2018, I have worked closely with Mr. Canty and Ms. Villegas to learn about the Firm's structure, records, history, accounting and referral practices, in an effort to assess whether, within the larger context of the Firm's historical practices regarding payment of referral fees, the Firm's relationship with Mr. Chargois and the "bare referral" Payment were "aberrant".[4]

*A.  The Settlement Charts*

As a starting point for the review process, I requested, and the Firm prepared, two charts that collectively referenced every case settled since 2007, when the Firm was reorganized to exclusively represent plaintiffs. The first chart lists 324 individual cases. (Exhibit A). The second chart lists two additional cases that the Firm identified after the first chart had been prepared. (Exhibit B). Hereinafter both of the aforementioned charts shall collectively be referred to as the "Settlement Charts". This Phase I Report focuses upon the Settlement Charts.[5]

The Settlement Charts contain the following 7 discrete categories of information for each case: (1) Case Name; (2) Case Type; (3) Firm Clients; (4) Date Settled; (5) Referral Obligation;

---

[3]  Herein, for ease of reference, I have used the term "bare referral" as defined by the Special Master in his R&R – i.e., where a lawyer received "a referral fee for doing no work and having no attachment to the case or the client." (R&R at 375).

[4]  As a predicate to this review, I was required to understand: (1) the Firm's relationship with Mr. Chargois: (2) the circumstances surrounding the Payment; and (3) any other "bare referral" payments the Firm made to him and/or Chargois & Herron, LLP. To gain that understanding, I first reviewed the Special Master's May 14, 2018 R&R, and the Executive Summary thereof that were submitted to the Court. After doing so, I requested that the Firm provide transcripts of the depositions taken during the Special Master's investigation for the following individuals: (1) Christopher J. Keller, Esq.; (2) Eric J. Belfi, Esq.; and (3) Damon J. Chargois, Esq. I reviewed those transcripts with the assistance of my Associate. Following that review, I clarified certain relevant facts via discussions with Mr. Canty, Ms. Villegas, and during the Interviews described below.

[5]  The Settlement Charts attached to this Report do not contain certain information which the Firm considers to be "Highly Confidential" or "Client Confidential". However, I had access to that information as part of the review process, and I am confident that it does not bear upon the question presented in any way.

(6) Was a Bare Referral Paid?; and (7) Responsible Attorney. Mr. Canty explained the steps taken by the Firm to generate the Settlement Charts as follows:

> In order to assemble the list of settled cases from July 2007 to the present, Labaton Sucharow attorneys from the Compliance Department went to each practice group at the Firm – Securities, Antitrust, Delaware, RMBS, and Consumer – to assist in preparing the chart.
>
> For each practice group, the Compliance Department had paralegals and/or attorneys obtain information from each practice group's records as to all cases that had been settled from July 2007 until the present. These paralegals and/or attorneys used sources including case lists submitted to clients through the RFP process, cases compiled on the firm website, internal lists of cases kept by paralegals and assistants, internal lists of matter numbers kept by paralegals and assistants, and canvassing individual attorneys for institutional knowledge on settled cases. Once these records were obtained, additional records were reviewed, including records from the accounting department to ensure the list included all cases known to the Firm that settled between July 2007 and the present.
>
> After a complete list of cases was compiled, the Firm undertook the task of determining who the Firm client was for each of the listed cases. These names were obtained by either firsthand knowledge of the attorneys at the firm, a review of the case files, or a review of submissions to the court associated with the cases. Once it was determined who the Firm client was, the Compliance Department confirmed the date the case settled by reviewing the records of settlement payments or by reviewing court documents to see when final approval of a settlement was granted.
>
> The Firm then assigned a Responsible Attorney to review each case. The Responsible Attorney either (1) worked on the case assigned to him in the Settlement Chart and has personal knowledge of the case (including whether there was a referral relationship and the work performed by the referring attorney) and/or reviewed records to confirm this information, or (2) did not work on the case, but reviewed records to determine if there was a referral relationship and the work performed by the referring attorney.
>
> After determining (1) the full list of cases (2) the date each matter settled and (3) the Responsible Attorney, attorneys and paralegals of the Firm researched whether or not a case or matter had a referral obligation.

5

> For a large number of cases, the Responsible Attorney had firsthand knowledge of whether there was in fact a referral obligation, and in the cases where there was a referral obligation, the work done by the referring attorney or law firm. Once the Responsible Attorney determined that the particular law firm or lawyer was not a bare referral obligation, the Compliance Department along with the Responsible Attorney reviewed accounting records to corroborate the payment and to ensure that there were no additional referral payments made in the case.
>
> For those cases where the Responsible Attorney had no specific recollection about whether there was a referral obligation in a specific matter, the Compliance Department located accounting records to determine whether there were any payments made to attorneys or law firms. If there was a payment to an outside lawyer or law firm, additional materials including court filings and emails were searched to determine whether the attorney or law firm referred the client and if so, what work the attorney or law firm provided in the representation of the client.
>
> Once the list was completed regarding whether there were referral fees, an additional investigation was conducted to determine the accuracy of the claim that there was no referral obligation in a certain case. Specifically, the Compliance Department reviewed accounting records for each case that listed no referral obligation to corroborate that there were no referral fees paid.

(Exhibit C: Canty 12/12/8 Decl. at Attachment A).

With respect to the "additional investigation" of accounting records referenced by Mr. Canty in his Declaration, during the transcribed Interviews of certain Firm attorneys that I conducted on November 29, 2018, the following insightful colloquy took place on the record between Mr. Canty, Ms. Villegas and Mr. Keller (as noted, the Firm's Co-Chairman) in my presence:

> MS. VILLEGAS: We have the trust reports for a vast majority, I would say 80 to 85 percent of these cases. There are certain cases where we don't have trust reports for two reasons.
>
> The first reason is fees haven't come in. So, a case settled but the fee just hasn't come in yet, so there's no trust report generated to show what has gone out from the firm. But we have confirmed those with accounting, that there's no trust report generated for that reason. And the other situation is, when we're sole counsel, sometimes the money goes directly into the firm and no monies get paid out. In those situations, trust reports are not

> generated. And we've confirmed that with the accounting department. But I would say for the vast majority of these cases, we do have trust reports.
>
> MR. KELLER: Are you then stating that for all matters in which there's been a payment out of a case, that a trust report was generated?
>
> MS. VILLEGAS: Yes.
>
> MR. KELLER: So, in all matters in which a referral fee was paid, we have a trust report?
>
> MS. VILLEGAS: Yes. There are – so, the answer to your question is yes. To the extent [Judge Brown], that you want to also audit cases that we say there's no referral, just to confirm for yourself that no money was paid, we do have trust reports for a lot of those cases. And you'll see maybe something was paid to an expert or co-counsel or local counsel. For some of those we don't have a trust report.
>
> So, I just want to make that clear. Obviously if you need any further corroboration, we're happy to –
>
> MR. CANTY: And to that point, if there was no trust report, we didn't simply say, oh, that's it, we don't have to look any further. We did look and take additional steps to corroborate there was, in fact, no referral payment. So, the mere lack of a trust report was not dispositive to us. Oh, that's it, no referral, we're good.
>
> MS. VILLEGAS: Right.
>
> MR. CANTY: We made sure we independently corroborated it with the attorney that worked on the case or through other extrinsic evidence. [6]

Notably, the Firm's generation of the Settlement Charts is the tangible representation of a very significant undertaking. With respect thereto, at my request, Mr. Canty explained as follows in his Declaration:

> The preparation of the chart, the review of the materials, and the interview process required substantial time from Labaton Sucharow attorneys and staff. The majority of the work occurred in the week leading up to the Thanksgiving holiday and over Thanksgiving weekend. In total over 29 individuals were involved in this time

---

[6] In a review of the transcript, Ms. Villegas clarified that her affirmative answer referred to both trust report and accounting records of the firm to corroborate all referral payments.

7

       intensive process and spent approximately 913 hours of their time
       to complete this task.

(Exhibit C: Canty 12/12/8 Decl. at Attachment A).

    *B. The Interviews*

    The next component of the review process was, as the foregoing excerpt illustrates, a series of transcribed Interviews conducted at the Firm's offices in New York City. During those Interviews, I questioned each of the 7 Responsible Attorneys identified on the Settlement Charts, as follows:

- On November 29, 2018, I Interviewed: Eric J. Belfi, Esq.; Christopher J. Keller, Esq.; and Thomas A. Dubbs, Esq. (In-person).
- On November 30, 2018, I Interviewed: Ned Weinberger, Esq.; and Jordan A. Thomas, Esq. (Mr. Weinberger in-person, Mr. Thomas via telephone).
- On December 7, 2018, I Interviewed: Lawrence A. Sucharow, Esq.; and Gregory S. Asciolla, Esq. (In-person).

    The questions I asked primarily focused upon: (1) the steps taken by each Responsible Attorney to verify the information on the Settlement Charts; (2) specifically, whether each Responsible Attorney knew of a "bare referral" paid on any of the settled cases for which they were responsible, such as the Payment to Mr. Chargois; and (3) for each Responsible Attorney, a random selection of cases appearing on the Settlement Charts, and an examination of the Responsible Attorney's knowledge thereof.[7]

    As representative examples:

    First, with respect to the steps he took to verify the information on the Settlement Charts, Mr. Keller stated as follows in pertinent part during his Interview on November 29, 2018:

> JUDGE BROWN: I'd like to move on to the chart that Mr. Canty and Ms. Villegas prepared and with your assistance, I believe. I want to look at that. The first eight pages have cases with your name as the responsible attorney.
>
> Have you reviewed each of those cases?
>
> MR. KELLER: I have.

---

[7]     Throughout the review process described herein, the Firm was extremely cooperative and extremely candid with regard to the information that was provided at my request. Part of that information was provided to me through the Interviews that I discuss below, which I requested be transcribed in order to assist me in my review and reporting function. Due to the candid nature of those Interviews, the transcripts contain information that the Firm considers "Highly Confidential", "Client Confidential". I am confident that information does not bear upon the question presented in any way, and therefore the transcripts have not been attached as Exhibits.

8

>JUDGE BROWN: Tell me what you've done.
>
>MR. KELLER: Working with [Ms. Villegas and Mr. Canty], sat down with them, they walked me through their process. We – what they've asked other staff members of the Firm to perform, the search for all cases that have settled from mid-2007 going forward in which we've been paid a fee. And they've reviewed with me – they confirmed that it was an exhaustive review.
>
>So that they flagged all cases in which the firm has received fees. They then performed a deeper dive on the accounting side to review and review with me the trust documents to show all of the outflows and in-flows into any particular account related to each matter. They asked me questions about all the matters in which I was involved which are reflected on this list to confirm in fact, whether a referral fee had been paid or not. And if one had been paid to identify what those lawyers or law firms did in the case in order to earn the fee. And we did this for each matter.

Second, with respect to his knowledge of any "bare referrals" paid, Mr. Asciolla (head of the Firm's Antitrust Practice Group) stated as follows in pertinent part during his Interview on December 7, 2018:

>JUDGE BROWN: Other than the payments to Mr. Chargois on occasion, are you aware of any other bare referrals that were agreed to or paid by the law firm?
>
>MR. ASCIOLLA: In the antitrust – from – in antitrust cases, no. But I am familiar with a few others I was shown on a chart that listed a few others.
>
>JUDGE BROWN: All involved Mr. Chargois?
>
>MR. ASCIOLLA: Exactly, exactly.
>
>JUDGE BROWN: Do you know of any cases where the firm either agreed to or paid bare referrals to anyone other than Chargois or his law firm?
>
>MR. ASCIOLLA: I'm not aware of any.
>
>JUDGE BROWN: And does the Firm have a policy concerning payment of bare referrals or [a] practice?
>
>MR. ASCIOLLA: It has a policy that we will not do that. We will not engage in bare referrals.
>
>JUDGE BROWN: And when did that policy come about?

9

>MR. ASCIOLLA:  I would say within the last year.
>
>JUDGE BROWN:  Before that policy, was it the practice of the Firm to pay bare referrals or not?
>
>MR. ASCIOLLA:  It was not the practice of the Firm.
>
>JUDGE BROWN:  So you now have a clearly articulated policy. Before that, your practice was to pay bare referrals or not to pay them?
>
>MR. ASCIOLLA:  It was not to pay them.

Third, with respect to a Responsible Attorney's knowledge based upon a random sample of cases that I had selected, Mr. Belfi (a Partner of the Firm responsible for business development, and notably, the Responsible Attorney for the ATRS cases) stated as follows during his Interview on November 29, 2018, in reference to one of the cases on the Settlement Charts, In re Intuitive Surgical Securities Litigation, No. 13-cv-1920 (N.D. Cal.):

>MR. BELFI:  Intuitive Surgical Securities.  We represent the Employees' Retirement System of Hawaii and Greater Pennsylvania Carpenters.  We only have a referral fee on the Employees' Retirement System of the State of Hawaii.  I know this because I've worked on this case, personal knowledge.
>
>The two attorneys we have a referral fee with are the Thornton firm and Anthony Takitani.  Anthony Takitani is a local Hawaiian lawyer.  And you obviously know the Thornton firm.  This was a client that Garrett [Bradley], myself and Mr. Takitani developed together.  All of us had been very, very involved with this client.  It's in Hawaii so we've managed to get out there a few times.
>
>But the discovery was – we spent a lot of time with the client going through all of their records because this was the first time they did it.  So we actually went out and did it in person, brought a couple of Labaton people.  Then when it came to settlement, the three of us sat down with the chairman of the board to go over the settlement and discuss what was the appropriate amount and got a sign-off.
>
>Mr. Takitani has been very involved with the Attorney General's office there which is the overseer of the pension board and our general direct contact.
>
>MR. CANTY:  Just for clarification, if I may ask a question.  Eric, can you just describe whether or not the payment has come in on that and just to confirm that there is absolutely no other referral payment contemplated when the money comes in other than what's listed in the referral obligation here?

10

> MR. BELFI: We have a final approval hearing on December 20th, so we have not been paid yet. And the only referral payments we would have would be to the ones listed here, Mr. Takitani and the Thornton firm.

### C. The Declarations

The final component of the review process was the submission of Declarations made under penalty of perjury by Mr. Canty and each of the 7 Responsible Attorneys.

As noted above, Mr. Canty's Declaration primarily details the actions taken by the Firm in response to the Court's inquiry during the November 7, 2018 hearing. (See Exhibit C: Canty 12/12/8 Decl.).

Moreover, in their respective Declarations, the Responsible Attorneys each attest to: (1) the Responsible Attorney's review of the Settlement Charts; (2) that other than any "bare referral" payments made to Damon Chargois, the Responsible Attorney is unaware of any "bare referral agreement between the Firm and any law firm or attorney concerning any case presently or previously prosecuted by Labaton Sucharow"; and (3) the Responsible Attorney understands "a bare referral to mean an agreement whether written or unwritten, where Labaton Sucharow would share a fee with any lawyer or law firm solely for assistance in obtaining clients for Labaton Sucharow." (See Exhibit D: 12/3/18 Asciolla Decl., Exhibit E: 12/4/18 Belfi Decl., Exhibit F: 12/11/18 Dubbs Decl.; Exhibit G: 12/5/18 Keller Decl., Exhibit H: 12/7/18 Sucharow Decl., Exhibit J: Weinberger Decl.).[8]

### V. Results of the Review Process

#### A. The Firm's "Bare Referral" Payments

As the Settlement Charts make clear, of the more than 300 cases settled since 2007, the Firm has made "bare referral" payments in only the following 7:

- Arkansas Teacher Retirement System v. State Street Bank and Trust Co., No. 11-cv-10230 (D.Mass)
- Brado v. Vocera Communications, Inc., No. 13-cv-3567 (N.D. Cal.)

---

[8] Notably, the Declaration submitted by Jordan A. Thomas, Esq. differs from the Declarations submitted by all other Responsible Attorneys in one material respect. (See Exhibit I: 12/6/18 Thomas Decl.). Mr. Thomas leads the Firm's "whistleblower" practice. Due to the highly confidential nature of that practice, it is subject to a so-called "Chinese wall" within the Firm. As a result of that "Chinese wall", and unlike the other Responsible Attorneys, in his Declaration Mr. Thomas states that he has: "no personal knowledge about any business dealings, including referral agreements between the rest of the Firm and Damon Chargois or any other attorney or law firm." (Id.). Nevertheless, Mr. Thomas attests that none of the cases for which he is the Responsible Attorney involve a "bare referral". (Id.). The substance of Mr. Thomas' Declaration was corroborated during his telephonic Interview on November 30, 2018.

11

- In re Spectrum Pharmaceuticals, Inc. Securities Litigation, No. 13-cv-0433 (D. Nev.)
- In re Colonial BancGroup Inc. Securities Litigation, No. 09-cv-9194 (M.D. Al.)
- Gammel v. Hewlett-Packard Co., No. 11-cv-1404 (C.D. Cal.)
- Hoppaugh v. K12 Inc., No. 12-cv-0103 (E.D. Va.)
- In re Beckman Coulter, Inc. Securities Litigation, No. 10-cv-1327 (C.D. Cal.)

For each of those 7 cases, the Settlement Charts also make clear that: (1) the Responsible Attorney is Eric Belfi; (2) the Firm represented ATRS; and (3) the "bare referral" payments were made to Mr. Chargois and/or Chargois & Herron, LLP.

During his Interview on November 29, 2018, I questioned Mr. Belfi regarding the development of the Firm's relationship with Mr. Chargois and the circumstances surrounding each of those "bare referral" payments. Mr. Belfi explained that each of those "bare referral" payments resulted from the Firm's representation of ATRS in the settled case.

On that point, Mr. Belfi concisely summarized the relationship between him, the Firm, Mr. Chargois, and ATRS as follows:

> MR. BELFI: I had a relationship with Mr. Chargois. Mr. Chargois told me that his partner Mr. Herron had a relationship with Mr. Doane and he said he could get me an opportunity to do a presentation in Arkansas.
>
> JUDGE BROWN: Do what?
>
> MR. BELFI: Do a presentation in Arkansas. So, my relationship was almost exclusively with Mr. Chargois. I had limited contact with Mr. Herron. All my contact was generally with Mr. Chargois. Mr. Herron and Mr. Chargois had a falling out at some – I'm sorry. Let me stop there.
>
> Mr. Doane leaves Arkansas at some point in the second half of 2008. Mr. Hopkins comes in. Mr. Herron did not have a relationship or direct contact with Mr. Hopkins. So Chargois' connection to Arkansas was Mr. Herron and now Mr. Herron's contact with Arkansas was broken when Mr. Doane left. And my contact had been through Mr. Chargois. So my contact essentially had been broken. I ended up then dealing directly with Mr. Hopkins.

Thus, after Mr. Hopkins' replaced Mr. Doane as the executive in charge of ATRS in 2008, Mr. Chargois became irrelevant to the Firm's representation of ATRS. Nevertheless, based upon the initial introduction to ATRS facilitated by Chargois & Herron, LLP, whenever an ATRS case settled, the Firm continued to make what had become "bare referral" payments to Mr. Chargois and/or Chargois & Herron, LLP.

During his interview, Mr. Belfi confirmed that those payments ranged between approximately $26,000 and $300,000 – with the $4.1 million Payment as the last and by far the largest. Mr. Belfi explained the Firm's rationale for those "bare referral" payments as follows:

> MR. BELFI: And what happened, when we originally started the relationship, Mr. Chargois had represented that he had done a lot of litigation and that he had worked at Baron Budd and had done tons of trials, although not in the securities area, in the litigation realm. So, when we had negotiated or attempted to negotiate a finalized agreement, the referral that we had agreed to, although not in a written agreement, was 20 percent. And the concept of the 20 percent was that he was going to be a very active player in this relationship.
>
> This was not going to just be that he was referring a client but our expectation and anticipation was that he would be very involved with the client in litigation. My previous experience in working with referring counsel prior to coming into this relationship had always been working with lawyers that worked very, very closely with the clients, whether it was because it was an existing client or –
>
> JUDGE BROWN: Did Mr. Chargois have a close relationship with the Arkansas Teachers Fund?
>
> MR. BELFI: Mr. Herron had a close relationship with Mr. Doane. When Mr. Doane left the Arkansas Teacher Retirement System, the relationship that Chargois and Herron had was greatly diminished.
>
> JUDGE BROWN: Okay.
>
> MR. BELFI: To basically nothing.
>
> JUDGE BROWN: But the 20 percent remained?
>
> MR. BELFI: That is correct. And we – we had – looking at it back in 20/20 hindsight at that time, I'm just looking at it now, we should have made a readjustment when Mr. Doane left because obviously the relationship had changed.
>
> Our expectation was that they were going to stay involved in the relationship and they would be active in any cases including doing work. They had talked about doing discovery work in cases. They had made many representations, especially Mr. Chargois, that he wanted to be active in these cases and that was my expectation.

Mr. Belfi's explanation continued as follows:

13

> JUDGE BROWN: So if your expectation was they were going to work with the clients and continue to work and they didn't, why did you pay him later on?
>
> MR. BELFI: What happened is, we reached a point where, you know, this had become an issue as we started to have to pay him. Because before we had to pay him, it was not an issue. Once we –
>
> JUDGE BROWN: Why did you have to pay him?
>
> MR. BELFI: Well, in the sense that the cases resolved, so we were coming up to the point where there would be an opportunity or there would be the scenario where he would feel as though we had that obligation. Because before 2012 we had not generated any revenue from Arkansas. So, that was the first time it came up.
>
> When we started raising issues about the lack of his involvement in these cases, in the conversation that I had with him, he threatened to sue us in Galveston. And that threat of lawsuit would also bring in our client, the Arkansas Teacher Retirement System. And we had real concerns that that was going to impact the relationship to the point where it could destroy the relationship if we ended up having this public fight.
>
> And this is a client, as we proceeded along, became more and more important to the firm to the point where I think it became the most important client to the firm. And so we were very concerned about disrupting that relationship with a lawsuit.

Therefore, based upon the information produced by the Firm during the review process, it is clear to me that the "bare referral" payments made to Mr. Chargois were the result of: (1) a referral relationship that materially devolved from its inception (when it was anticipated to be substantive) until the Payment was made at a significantly later time (when it had unquestionably assumed a "bare referral" posture); and (2) despite that devolution, the Firm's decision to continue making "bare referral" payments to Mr. Chargois as the path of least resistance in an effort to preserve its relationship with an important client. It is also clear to me that those circumstances are unique at the Firm since at least 2007.

Further, it is clear to me that the unique circumstances that gave rise to the "bare referral" relationship with Mr. Chargois will not result in a "bare referral" relationship with any other lawyer or law firm in the future. On that point, Mr. Keller clarified the following during his Interview on November 29, 2018:

> MR. KELLER: We will not honor any referral relationship or referral agreement from now until the end of time unless it's in full compliance with the rules and our new standards, heightened standards, we put in place.

14

> . . .
>
> The Firm's policy regarding referral fees is that they both need to be assented to in writing by the client and that the lawyers in those cases need to assume responsibility and do work.  <u>Chargois will not be paid in any future Arkansas-related matter.</u>  I would be surprised if at some point in the future we have a relationship with Mr. Chargois.

(Emphasis added).

### B. Other Referral Payments

In contrast to the Firm's relationship with Mr. Chargois and the "bare referral" payments made to him and/or Chargois & Herron, LLP, the review process has clearly convinced me that for all other cases settled since 2007, the Firm only paid referral fees to an attorney or a law firm that did substantive work on the case.

Indeed, during the Interview process, each Responsible Attorney was questioned regarding randomly selected cases from the Settlement Charts – including many of the cases for which a referral fee was paid.  Without exception, each Responsible Attorney was able to provide additional factual information about the attorney and/or law firm that received the payment (the "Payee"), and the nature of the substantive work they did on the case.

In some instances, the Payee had filed a formal appearance in the litigation.  But whether or not they did, in apparently all cases, the Responsible Attorney represented that the Payee performed substantive work on the case, including some or all of the following: (1) reviewing the complaint and/or theories of the case; (2) assisting the client with document production in discovery; (3) assisting the client with deposition preparation and/or attending depositions; and (4) participating in the settlement process.

## VI.     Conclusion

For the reasons explained above, based upon the aforementioned review process, I am clearly convinced that at least since the Firm's reorganization in 2007:

(1) The Firm's relationship with Damon Chargois and/or Chargois & Herron, LLP is unique, and any "bare referral" payments made thereto were aberrational; and
(2) Other than the "bare referral" payments to Damon Chargois and/or Chargois & Herron, LLP, the Firm has made not made "bare referral" payments to any other lawyer or law firm.

_____
Hon. Garrett E. Brown, Jr. (Ret.)

DATED:  January 8, 2019
AMENDED:  February 6, 2019

15