# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

## SUBMISSION OF LABATON SUCHAROW LLP
### IN RESPONSE TO THE COURT'S JUNE 28, 2019 ORDER

# TABLE OF CONTENTS

Page

I.      Introduction ............................................................................................................ 1

II.     20-30% of the Common Fund is the Reasonable Fee Award Range ................................. 2

        A.      Courts Within the First Circuit Have Endorsed a Range of 20-30%, and
                Have Not Applied the Sliding Scale Approach ........................................................ 2

        B.      This Court Should Not Apply the Sliding Scale Approach .................................... 3

III.    Public Policy Supports the 25% Fee Award ........................................................ 9

IV.     Customer Class Counsel Did Not Misrepresent the Fitzpatrick Study ............................ 12

V.      The Court Should Decline To Exercise Its Discretion To Allocate the Fee Award ......... 15

        A.      The Court Should Enforce Counsel's Fee-Sharing Agreements ......................... 15

        B.      If The Court Does Allocate Fees, It Should Allocate Them According to
                the Agreed-Upon Percentages ................................................................................ 17

VI.     Labaton Complied With The Applicable Rules of Professional Conduct and the
        Federal Rules of Civil Procedure ....................................................................... 20

        A.      The Chargois Agreement Met the Existing Requirements of the
                Massachusetts Rules of Professional Conduct ....................................................... 21

                1.      Labaton Complied with MRPC 1.5(e). ..................................................... 21

                2.      The Chargois Agreement Is Encompassed in Rule 1.5(e). ...................... 24

                3.      Rule 7.2(b) Does Not Apply. ................................................................ 26

        B.      Labaton's Nondisclosure of the Chargois Agreement to the Court Did Not
                Violate The Federal Rules of Civil Procedure ....................................................... 28

                1.      The Federal Rules of Civil Procedure Did Not Require the
                        Disclosure to the Court of Fee Allocation Agreements. .......................... 28

                2.      Labaton Did Not Violate A Duty of Candor to the Court........................ 29

        C.      Ethical Rules and Best Practices.......................................................................... 32

VII.    Conclusion ................................................................................................................ 33

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Almendarez-Torres v. United States*,
    523 U.S. 224 (1998)................................................................................................26

*In re Bank of N.Y. Mellon Corp. Forex Transactions Litigation*,
    12-MD-2335, (S.D.N.Y.).......................................................................................12

*Bezdek v. Vibram USA Inc.*,
    79 F. Supp. 3d 324 (D. Mass. 2015) (1st Cir. 2015)...............................................2

*Conley v. Sears, Roebuck & Co.*,
    222 B.R. 181 (D. Mass. 1998) ................................................................................3

*In re Copley Pharm., Inc.*,
    50 F. Supp. 2d 1141 (D. Wyo. 1999).....................................................................16

*Daynard v. Ness, Motely, Loadholt, Richardson & Poole, P.A.*,
    188 F. Supp. 2d 115 (D. Mass. 2002) ...................................................................26

*In re Discipline of an Atty.*,
    442 Mass. 660 (2004) ............................................................................................31

*In re Domestic Air Transp. Antitrust Litig.*,
    148 F.R.D. 297 (N.D. Ga. 1993)...........................................................................15

*Feeney v. Dell*,
    454 Mass. 192 (2009) ............................................................................................10

*In re FPI/Agretech Sec. Litig.*,
    105 F.3d 469 (9th Cir. 1997) ................................................................................16

*Goldberger v. Integrated Res.*,
    209 F.3d 43 (2d Cir. 2000).......................................................................................9

*Hartless v. Clorox*,
    273 F.R.D. 630 (S.D. Cal. 2011) ..........................................................................28

*Holstein v. Grossman*,
    246 Ill. App. 3d 719 (1993) ..................................................................................27

*In re Indigo Sec. Litig.*,
    995 F. Supp. 233 (D. Mass. 1998) ........................................................................15

*Klein v. Bain Capital Partners, LLC*,
  No. 1:07-cv-12388-WGY (D. Mass. Nov. 12, 2014) .......................................................2, 7, 8

*LandAmerica 1031 Exch. Servs. v. Chandler*,
  No. MDL No. 2054, 2012 U.S. Dist. LEXIS 159630 (D.S.C. Nov. 7, 2012) ........................16

*Latorraca v. Centennial Techs., Inc.*,
  834 F. Supp. 2d 25 (D. Mass. 2011) .....................................................................................2

*Long v. HSBC USA Inc.*,
  14-cv-6233, 2016 U.S. Dist. LEXIS 124199 (S.D.N.Y. Sept. 13, 2016) ...............................11

*Longden v. Sunderman*,
  979 F.2d 1095 (5th Cir. 1992) .............................................................................................15

*In re Lupron Mktg. & Sales Practices Litig.*,
  No. 01-CV-10861-RGS, 2005 U.S. Dist. LEXIS 17456 (D. Mass. Aug. 17,
  2005) ............................................................................................................................ *passim*

*In re Neurontin Mktg. & Sales Practices Litig.*,
  58 F. Supp. 3d 167 (D. Mass. 2014) ...............................................................................3, 10

*O'Connell v. Shalala*,
  79 F.3d 170 (1st Cir. 1996).................................................................................................25

*In re Polyurethane Foam Antitrust Litig.*,
  168 F. Supp. 3d 985 (N.D. Ohio 2016)..........................................................................15, 16

*In re Relafen Antitrust Litigation*,
  231 F.R.D. 52 (D. Mass. 2005).............................................................................................7

*Saggese v. Kelley*,
  445 Mass. 434 (2005) .................................................................................................. *passim*

*In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*,
  316 F.R.D. 240, 253 (E.D. Wis. 2016) .................................................................................16

*In re Tyco Int'l, Ltd.*,
  535 F. Supp. 2d 249 (D.N.H. 2007)............................................................................. *passim*

*United States v. One Star Class Sloop Sailboat*,
  546 F.3d 26 (1st Cir. 2008).................................................................................................18

*Vita v. Berman, DeValerio & Pease, LLP*,
  81 Mass. App. Ct. 748 (2012)..............................................................................................24

*In re Volkswagen & Audi Warranty Extension Litig.*,
  89 F. Supp. 3d 155 (D. Mass. 2015) ..............................................................................15, 16

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004) ................................................................................15

**Rules**

Fed. R. Civ. P. 23 .......................................................................................... *passim*

Fed. R. Civ. P. 54 ...................................................................................27, 28, 29

Mass. R. Prof. C. 1.5(e) ................................................................................ *passim*

Mass. R. Prof. C. 7.2(b) ...........................................................................20, 25, 26, 27

Mass R. Prof. C. 3.3(a) ................................................................................30

Mass. R. Prof. C. 8.4(c) ...............................................................................30

**Other Authorities**

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards* ........................................................................................................1

Matthew Goldstein, *Law Firm's Fee Settlement Could Shake Up Securities Class Actions*, N.Y. TIMES (Oct. 10, 2018) ......................................................................11

Theodore Eisenberg, Geoffrey Miller, *et al.*, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 967 tbl.13 (2017) .............................................7

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008* ........................................................................7

William B. Rubenstein, 5 *Newberg on Class Actions* (5th ed. 2015) ................................... *passim*

I.     **Introduction.**

Labaton Sucharow LLP ("Labaton") submits this memorandum in response to the Court's June 28, 2019 Order (ECF No. 564), and in light of the June 24-26 hearing.  Labaton offers this submission as a summary and to emphasize several points for the Court's consideration.

First, the reasonable percentage range for the fee award is 20–30% of the common fund, and the reasonable award should be 25%, as this Court previously decided.  Even leaving aside the lack of supporting authority within this Circuit, a "sliding scale" approach as urged by the Hamilton Lincoln Law Institute ("HLLI")[1] is ill-suited to this case, both in light of the enormous amount of work counsel performed in achieving the excellent result for the class and because counsel have submitted a lodestar confirming that a 25% fee award is reasonable.  *See* § II, *infra.*[2]

Second, public policy supports a fee award of 25%, because counsels' relentless work – which entailed significant risk for the firms – delivered an excellent result for the class and a tangible benefit for the broader marketplace.  *See* § III, *infra.*

Third, counsel did not misrepresent the Fitzpatrick Study.  *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811 (2010).  The Court should reject this baseless and unfair accusation.  *See* § IV, *infra.*

_____

[1]  As used herein, "HLLI" refers to the Hamilton Lincoln Law Institute and the prior amicus, the Competitive Enterprise Institute's Center for Class Action Fairness.

[2]  For a more detailed discussion in support of the 25% fee award, Labaton respectfully refers the Court to its prior briefing, which is fully incorporated by reference herein.  *See* Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs  (ECF No. 103-1) ("Initial Fee Brief"); Customer Class Counsels' Memorandum of Law in Support of the Reasonableness of the Attorney's Fee Award (ECF No. 532) ("2018 Fee Brief").

Fourth, under the circumstances of this case, the Court should decline to exercise its discretion to determine its own allocation of the fee award.  Instead, it should respect the firms' agreed-upon allocation, for which they bargained and which takes into account their respective contributions to the case and other relevant considerations.  *See* § V, *infra.*

Finally, Labaton complied with all ethical duties applicable to this case.  *See* § VI, *infra.*[3]

## II.   20-30% of the Common Fund is the Reasonable Fee Award Range.

### A.   Courts Within the First Circuit Have Endorsed a Range of 20-30%, and Have Not Applied the Sliding Scale Approach.

Consistent with this Court's practice – and case law from district courts within the First Circuit generally – the reasonable percentage range for the fee award in this case is 20–30% of the common fund.  And, in particular, 25% is the most reasonable fee award.  *See generally* Initial Fee Brief (ECF No. 103-1); 2018 Fee Brief (ECF No. 532); *see also* November 2, 2016 Hr'g Tr. (ECF No. 114) at 24 ("[B]asically I understood as a guideline 20 to 30 percent was an appropriate range to consider, so 25 percent is in the middle of the range . . . I've tended to stay in that 20 to 30 percent range"); *Latorraca v. Centennial Techs., Inc.*, 834 F. Supp. 2d 25, 27-28 (D. Mass. 2011) ("Courts in this circuit generally award attorneys' fees in the range of 20–30%, with 25% as 'the benchmark.'") (collecting cases);  *Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 349-50 (D. Mass. 2015) (same), *aff'd Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 84 (1st Cir. 2015); Decl. of Brian T. Fitzpatrick, *Klein v. Bain Capital Partners, LLC*, No. 1:07-cv-12388-WGY, ECF No. 1060 (D. Mass. Nov. 12, 2014) (located on this Court's docket at ECF No. 532-2) (the "Fitzpatrick *Bain* Declaration") at ¶ 15 ("In the 27 settlements in my study from the First

---

[3] Further analysis of Labaton's ethical conduct may be found in Labaton's Objections (ECF No. 434), Supplemental Objections (ECF No. 379), and Second Supplemental Objections (ECF No. 452) to the Special Master's Report and Recommendations (ECF No. 357) (the "R&R"), which are fully incorporated by reference here.

Circuit where the percentage-of-the-fund method was used, the most common percentages were

25% and 33%, with over forty percent of awards between 30% and 35%. The mean was 27%

and the median 25% (with a standard deviation of 6.0%).").

Notwithstanding the consistent authority that counsel have cited in support of this

conclusion, HLLI argues for a lower percentage based on a "sliding scale."[4] HLLI is incorrect,

and its assertion finds no support within First Circuit case law. Instead, courts in this Circuit

have rejected the notion that a fee award should be mechanically reduced based on the size of the

fund. *See In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d 249, 267 (D.N.H. 2007) (rejecting sliding scale

argument); *In re Neurontin Mktg. & Sales Practices Litig.*, 58 F. Supp. 3d 167, 171-73 (D. Mass.

2014) (reducing requested 33-1/3% of $325 million common fund to 28% of fund, representing a

3.32 lodestar multiplier); *In re Lupron Mktg. & Sales Practices Litig.*, No. 01-CV-10861-RGS,

2005 U.S. Dist. LEXIS 17456, at *20-21 (D. Mass. Aug. 17, 2005) (rejecting sliding scale

argument); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 189 (D. Mass. 1998) (granting

request for 4.5% of $165 million common fund representing an 8.9 lodestar multiplier).[5]

### B.     This Court Should Not Apply the Sliding Scale Approach.

Even if the sliding scale approach were endorsed by courts in the First Circuit, which it is

not, application of the sliding scale would be misplaced in this case.

---

[4] The so-called "sliding scale" and "mega-fund" approaches, while distinct in some respects, are "functionally the same." William B. Rubenstein, 5 *Newberg on Class Actions* § 15:81 at 300 (5th ed. 2015) ("*Newberg on Class Actions*"). The "sliding scale" approach refers to an inverse relationship between the size of the common fund and the fee award. The "mega-fund" approach represents the same concept, but applies only where the fund reaches a certain size. *See id.*, § 15:80 at 299 ("The former is a hill, the latter a cliff."). For simplicity, the general argument that the fee award should be reduced based on the size of the fund is referred to here as the "sliding scale" approach.

[5] The court in *Conley* described the multiplier as 8.9, but that figure may be incorrect, as $7,500,000 (the attorneys' fees sought) divided by $826,775 (the lodestar) is 9.07.

First, it would make little sense for the Court to implement the sliding scale approach in circumstances where lodestar reports have been submitted and fully vetted by the Court-appointed Master. The benefit offered by the sliding scale approach, if any, is efficiency. It serves as a "rough justice" tool that may help to avoid a windfall fee award and obviates the time and burden imposed by a lodestar cross-check. *See, e.g.*, *Newberg on Class Actions* § 15:80 at 296 ("The sliding scale method therefore became the answer to the windfall problem: it held out the promise of addressing windfalls without the need for a lodestar cross-check."). Otherwise stated, the sliding scale approach was conceived as a substitute for the lodestar cross-check, and was largely born of practicality, rather than greater merit. *See id.*; *see also id.* § 15:81 at 303.[6]

By material contrast, the lodestar cross-check offers a tailored and fact-based measurement, an important quality given the idiosyncrasies inherent in class action settlements. *See, e.g.*, June 17, 2019 Fitzpatrick Aff. (ECF No. 550) at ¶ 9 ("[I]n light of the broad range over which fee awards are distributed, it is impossible to assess whether any particular fee request is unreasonable without examining the facts and circumstances of the case."). Rather than relying on "intuition," the lodestar indicates the actual amount of work required to generate the

---

[6] "But therein lies the rub: to use the multiplier as a measuring stick of a windfall, a court would have to undertake a lodestar cross-check, yet most courts that embrace the mega-fund concept do so precisely to avoid a lodestar cross-check. Why? In the triumph of the percentage method over the past 25 years, one of the strongest arguments in support of that method is that it relieves counsel of the work of submitting, and a court the work of reviewing, a lodestar. But without a lodestar cross-check, a straight percentage award has no measuring stick by which to assess whether a particular percentage is or is not a windfall. Because courts are wary of high fee awards generally, the mega-fund concept substitutes for the lodestar cross-check/multiplier idea by implanting in the midst of a straight percentage analysis a method for ensuring against what seem like extraordinary fee awards – simply cut the award as the fund increases. Given that the examples offered above show the lack of a perfect correlation between fund size and windfall, the mega-fund concept is, as noted, rough justice. But if courts are to adopt a straight percentage approach without ever looking at a lodestar, the mega-fund concept supplies some governance mechanism on highly multiplied fee awards, while saving everyone the trouble of a lodestar review."
*Newberg on Class Actions* § 15:81 at 303.

settlement fund.  *See* June 24, 2019 Hr'g Tr. (ECF No. 560) at 21 (HLLI:  "The intuition behind

a sliding scale is that it doesn't take ten times as much work to get a $300 million settlement as it

does to get a $30 million settlement . . . .").

Consideration of the work required to achieve a settlement is crucial, because the life

cycle and progression of class actions can vary so extensively.  In some instances, a settlement

might be achieved early in the case.  In other instances, the same monetary settlement might be

achieved only after extensive document discovery or other proceedings, over the course of which

plaintiffs' counsel gradually convince a defendant that the risk of loss at trial is sufficient to

warrant such an offer.  A sliding scale approach would not distinguish between the two; a

lodestar cross-check would.  *Newberg on Class Actions* § 15:80 at 296 ("[S]ome high fund cases

involve significant risks, require enormous investments of money and time, and may

appropriately trigger a healthy percentage award; conversely, a relatively small fund . . . secured

with a few months' work, may not truly entitle class counsel to a mean 25% award"); *id.* § 15:81

at 302-303 (explaining the same limitation with respect to the mega-fund concept).  Thus, the

lodestar is a far more accurate and meaningful indicator of whether a certain fee percentage

would result in a windfall.  *Tyco*, 535 F. Supp. 2d at 267-70 ("The best measure of the effort

required to produce a particular result in a given case is the lodestar.");  *Newberg on Class

Actions* § 15:81 at 303 ("Given that a high multiplier is the best measuring stick of a windfall,

courts ought to use the high multiplier to police windfalls, regardless of the size of the fund,

rather than use the size of the fund as a policing mechanism."); *id.* at 305 ("[T]he multiplier itself

is the best measuring stick for determining when the windfall occurs").

In this case, the Court has the benefit of a lodestar that has now been extensively vetted.

Of course, the initial submission contained regrettable mistakes.  However, at this juncture –

after intensive investigation, discovery, and argument – the lodestar has been audited and determined to be accurate and reliable.  *See* R&R at 365 ("The Special Master recommends that, with the relatively minor exceptions noted herein, the Court find that the hours and rates of the attorneys of each of the law firms for whom lodestar petitions were submitted to the Court are reasonable and accurate . . . ."); *id.* at 209-10 (in the aggregate, class counsel expended a reasonable amount of time on the case); *Id.* at 219 n.173 ("[T]he Special Master reviewed voluminous documentation produced by the firms in support of their respective lodestar figures [and] confirmed that the total hours and lodestar calculations were, in fact, accurate.").  As such, the work required to create and scrutinize the lodestar is already done.  Respectfully, the Court should make use of this valuable tool.  There is no reason to ignore the more accurate lodestar and resulting multiplier cross-check by resorting to the less accurate sliding scale proxy.[7]

Second, and relatedly, the premise underpinning the sliding scale approach is absent here. The rationale behind the sliding scale is the assumption that creating a large fund tends to require proportionally less work.  *See, e.g.*, *Tyco*, 535 F. Supp. 2d at 267 (*citing In re Prudential Ins. Co. Am. Sale Practice Litig. Agent Actions*, 148 F.3d 283, 339 (3d Cir. 1998)).  This premise, of course, would mean that when the fee award is commensurate with the work performed (even if there is a relatively large fund), there is no reason to apply a sliding scale.  *See id.* ("However, the generalization on which the objectors' argument depends does not hold in this case."); *In re Relafen Antitrust Litigation*, 231 F.R.D. 52, 80-82 (D. Mass. 2005) ("Here the court concludes it

---

[7]  HLLI has argued that counsels' lodestar should be reduced.  *E.g.*, ECF No. 545 at 7.  This Court should reject any such assertion.  HLLI's argument largely consists of unsupported surmise.  *See id.* at 7-8 (uncited speculation about hypothetical "Big Law" firms and clients).  And, where HLLI does (attempt to) rely upon facts, it gets them wrong.  *See id.* at 8-9 (arguing based on the wrong date).  On the other hand, the Special Master's investigation and factfinding with respect to counsels' lodestar was extensive.  *See generally* R&R.

would be inappropriate to use a mean – an *average* – categorized according to the size of the settlement fund as the be all and end all of analysis.  Rather, this Court respectfully notes these authorities but pursues this nuanced analysis looking at the complexity, duration, and type of the case, and the skill and efficiency of the attorneys involved."); *In re Lupron*, 2005 U.S. Dist. LEXIS 17456, at *20-21 (concluding that "the argument for a reduction of the percentage award as the size of a settlement fund increases reflects neither reality nor sound judicial policy").

The relatively modest multiplier in this case makes clear that a 25% fee award will not result in a windfall.  In fact, the 2.0 multiplier is well below the average for cases with large funds.  *See, e.g.*, Dec. 18, 2018 Decl. of William Rubenstein at ¶ 7(c) (ECF No. 532-1) ("[E]mpirical studies show that Class Counsel's maximal 2.07 multiplier is well below the average multiplier in large fund cases . . . ."); *see also Newberg on Class Actions* § 15:89 at 348-49, tbl.2 (showing that lodestar multipliers typically increase with the size of the fund); Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements:  1993-2008*, 7 J. Empirical Legal Stud. 248, 274 tbl.15 (2010) (mean lodestar multiplier for common funds over $175.5 million was 3.18); Theodore Eisenberg, Geoffrey Miller, *et al.*, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 967 tbl.13 (2017) (mean lodestar multiplier for common funds over $67.5 million was 2.72, with a standard deviation of 3.59); Fitzpatrick *Bain* Declaration at ¶ 26 (ECF No. 532-2) ("[W]hen I limited the settlements in my study to only those above $100 million (with data ascertainable in 24 of those settlements), I found that the mean and median lodestar multipliers that resulted more than doubled to 3.34 and 2.74, respectively").  Decisions within the First Circuit are consistent.  Of comparable published cases (funds above $100 million), the 2.0 lodestar multiplier falls at the low end of the spectrum. *See* 2018 Fee Brief (ECF No. 532) at 5-8.  In fact, either 2.00 or 2.07 would represent the third

lowest lodestar multiplier among those cases (and HLLI's proposed 1.34 would be *the lowest*). *Id.*

In short, the 2.0 lodestar multiplier is relatively small for a settlement of this size, and demonstrates – as a matter of fact, rather than supposition – that the common fund did not require proportionally less work to create.  The 25% fee award was, and is, reasonable.  *See* July 31, 2017 Rubenstein Decl. (ECF No. 368) at <u>Ex. A</u>, p. 30, ¶ 39 (the lodestar multiplier serves as "the measuring stick of the reasonableness of counsel's fee").[8]

The sliding scale approach might be useful if the goal were to avoid the work of a lodestar.  Here, the Court already has a vetted lodestar.  The purpose of the sliding scale approach is to attempt to weed out windfalls.  Here, the multiplier confirms that there is no windfall.  Simply stated, the sliding scale approach has no place in this case.  Respectfully, the Court should adhere to its original conclusion that 20–30% is a reasonable fee award range, and that 25% is a reasonable fee award.

---

[8]  During the June 24, 2019 hearing, the Court stated:  "it seems to me that the Fitzpatrick study might tell me, to the extent it should be relied on . . . that maybe the right range is 10 to 26 percent with 17.9 percent as the average."  *See* June 24, 2019 Hr'g Tr. at 50.  Respectfully, such an approach would be flawed.  First, the eight cases included in that calculation in the Fitzpatrick Study include an "extreme outlier" fee award of 0.3%.  *See* June 17, 2019 Fitzpatrick Aff. (ECF No. 550) at ¶ 9.  Second, adopting this percentage as the reasonable range here would fail to take into account the lodestar multiplier, which (as explained above) serves as a litmus test for reasonableness.  As Prof. Fitzpatrick has noted, "when I limited the settlements in my study to only those above $100 million (with data ascertainable in 24 of those settlements), I found that the mean and median lodestar multipliers that resulted more than doubled to 3.34 and 2.74, respectively."  *See* Fitzpatrick *Bain* Declaration at ¶ 26 (ECF No. 532-2).  The lodestar demonstrates that the range mentioned by the Court is too low.  For instance, the low end of the range (10%) would result in a $30 million fee award – *i.e.*, a 0.81 multiplier – which would be decidedly *un*reasonable given the level of risk that Plaintiffs' counsel undertook and the level of effort required to reach this resolution, which has been universally acknowledged as an excellent result for the class.

III.   <u>**Public Policy Supports the 25% Fee Award**</u>.

The Court has indicated that, once it determines a reasonable range for the fee award, it may decide whether to adjust the award within that range based upon public policy considerations.  *See* June 24, 2019 Hr'g Tr. (ECF No. 560) at 18.  Labaton acknowledges that, particularly after having vacated the prior fee award, the Court has discretion to consider counsels' conduct under this factor, even in the absence of a formal finding of misconduct or imposition of a formal sanction.  Nevertheless, Labaton respectfully submits that public policy considerations support the Court's original 25% award, and counsel against any further adjustment.[9]

The Court's consideration of public policy must account for the public benefits generated by class counsels' efforts.  Counsel achieved an excellent result for the class, which includes (among others) a number of pension funds that secure the retirement of public employees. Accordingly, in a tangible way, counsels' efforts benefited many members of the public.

And, by filing the first indirect FX class action in any court – and then successfully litigating and mediating it to an outstanding result – class counsel helped to create a deterrent against improper foreign exchange practices that did not previously exist.  *See* R&R at 12.  To curb these marketplace abuses against custodial clients provides a significant public benefit, and supports the Court's original fee award on public policy grounds.  *See Neurontin*, 58 F. Supp. 3d

---

[9]  In light of the Court's discussion during the recent hearings, Labaton focuses this portion of its submission on the public policy considerations regarding the fee award.  To the extent the Court is looking to consider further the other factors that Courts in this circuit generally consider, Labaton respectfully refers the Court to counsels' prior submissions, which explain at length why those remaining factors also support the 25% fee award.  *See* Initial Fee Brief (ECF No. 103-1) at 5-24; 2018 Fee Brief (ECF No. 532) at 16-21.  The Initial Fee Brief relied upon the formulation used by district courts in this circuit, which is comparable to the approach described in *Goldberger v. Integrated Res.,* 209 F.3d 43, 50 (2d Cir. 2000).  *See* Initial Fee Brief (ECF No. 103-1) at 4-5 (quoting *Medoff v. CVS Caremark Corp.*, No. 09-cv-554-JNL, 2016 WL 632238, at *8 (D.R.I. Feb. 17, 2016)).

171 (public policy "militate[d] in favor of a considerable fee award, as lawsuits which help curtail fraudulent drug marketing provide a valuable service in helping to safeguard the health and welfare of the general public"); *Lupron*, 2005 U.S. Dist. LEXIS 17456, at *23 ("The public interest is also served by the defendants' disgorgement of proceeds of predatory marketplace behavior."); *cf. Feeney v. Dell*, 454 Mass. 192, 200 (2009) ("Here, expressions of three branches of Massachusetts government indicate that the public policy of the Commonwealth strongly favors G. L. c. 93A class actions.").

Moreover, the case counsel successfully brought was challenging and risky, and counsel funded the entire litigation and bore all of the risk:

> In this case the plaintiffs' lawyers took on a contingent basis a novel, risky case. The result at the outset was uncertain, and it remained, until there was a settlement, uncertain.  The plaintiffs' counsel were required to develop a novel case.  This is not a situation where they piggybacked on the work of a public agency that had made certain findings.  They were required to be pioneers to a certain extent.

November 2, 2016 Hr'g Tr. (ECF No. 114) at 36; *see also, e.g.*, 2018 Fee Brief (ECF No. 532) at 16-21 (discussing risks of litigation); R&R at 6 ("Given the risks, complexities, and legal challenges inherent in the litigation, it must be said that the $300 million settlement, procured by skilled and dedicated plaintiffs' counsel, was an excellent result for the class."); *id.* at 29-34. Against that backdrop, "public policy favors granting counsel an award reflecting that effort," because "[w]ithout a fee that reflects the risk and effort involved in this litigation, future plaintiffs' attorneys might hesitate to be similarly aggressive and persistent when faced with a similarly complicated, risky case and similarly intransigent defendants."  *Tyco*, 535 F. Supp. 2d

at 270 (awarding 14.5% of the $3.2 billion fund, which resulted in a lodestar multiplier of approximately 2.7).[10]

Understandably, the Court is concerned about certain aspects of counsels' conduct in this case.[11]  If the Court is considering whether public policy requires a downward adjustment of the fee award in order to deter misconduct in class action cases, Labaton respectfully submits that the well-publicized course of this case – including the Master's exhaustive investigation, which this Court ordered (and Customer Class Counsel funded) – represents a sufficient (and educational) deterrent to the class action community.  *See, e.g.*, Matthew Goldstein, *Law Firm's Fee Settlement Could Shake Up Securities Class Actions*, N.Y. TIMES (Oct. 10, 2018).  Indeed, class counsels' substantial resources devoted to this investigation and litigation, together with Customer Class Counsels' funding of the Special Master, in effect already represents a *de facto* reduction of the fee award.[12]

---

[10]  The 25% fee award in the *BONY Mellon* litigation provides further public policy support for a 25% fee award here, because the two cases involved many of the same attorneys and similar subject matter.  *See* 2018 Fee Brief (ECF No. 532) at 8; *Long v. HSBC USA Inc.*, 14-cv-6233, 2016 U.S. Dist. LEXIS 124199, at *44 (S.D.N.Y. Sept. 13, 2016) ("Public policy also favors consistency with respect to fee awards; in the absence of countervailing factors such as differences in the qualifications of counsel or the complexity of the issues, there should not be wide disparities in the fee awards to the same firm (or attorneys with similar qualifications) in different litigations involving similar legal and factual issues.").  Although HLLI has suggested that this case was "easier" than *BONY Mellon* because the Plaintiffs did not take depositions (June 24, 2019 Hr'g Tr. (ECF No. 560) at 100-102), such a statement is extremely misleading.  When this case was placed on an alternate track at the Court's suggestion, the parties understood that document discovery would occur, and that the Court expected the parties to be move quickly (and not start from scratch with discovery) if negotiations broke down.  *Id.* at 107.  Accordingly, Plaintiffs' counsel had to proceed with the work they did, because it was necessary for use in the negotiations, and so that Plaintiffs would not be caught flat-footed if the case moved back onto a more traditional litigation track.

[11]  Labaton's conduct under the applicable professional rules is addressed in Section VI, *infra*.

[12]  Customer Class Counsel has thus far paid $4.8 million to fund the work of the Special Master and those assisting him, of which Labaton has paid approximately $2.25 million.  In addition, Labaton has incurred an additional $3.2 million in out-of-pocket defense costs.

In sum, any consideration of counsels' conduct must be weighed alongside the extraordinary benefits to the public – public pension plans, public employees, and the marketplace – that counsel delivered.  Considering all the public policy implications, the scales remain balanced at a 25% fee award and 2.0 lodestar multiplier.

## IV.   **Customer Class Counsel Did Not Misrepresent the Fitzpatrick Study.**

HLLI has repeatedly accused Customer Class Counsel of misrepresenting the Fitzpatrick Study.  HLLI's assertion is baseless.

In their memorandum of law in support of their fee request (ECF No. 103-1), Customer Class Counsel focused the initial discussion on settlements of "comparable size" (above $100 million) within the First Circuit.  *Id.* at 6-8.  Then, Customer Class Counsel explained:

> Some courts, at least in megafund cases, have "lower[ed] the fee award percentage as the size of the settlement increases to avoid giving attorneys a windfall at the plaintiffs' expense."  Other courts have disfavored this practice, however, and courts in this Circuit resist it.  In *Lupron*, for example, the court adopted the Ninth Circuit's conclusion that "the argument for a reduction of the percentage award as the size of a settlement fund increases reflects neither reality nor sound judicial policy," and granted the requested 25% fee and expense award.  In *In re Relafen Antitrust Litigation*, the court granted the requested fee of 33-1/3% of $67 million in class recovery, finding that despite "several cases that suggest that the standard percentage is generally lower as the common fund increases . . ., the requested fee is not out of proportion with large class actions."  In *Neurontin*, Chief Judge Saris reduced fees and expenses from the requested 33-1/3% of the $325 million settlement fund to 28%.  That was based, however, on an empirical study of class action fee awards (discussed below), not the declining percentage principle, which "[s]ome courts have rejected[.]"

*Id.* at 9 (citations omitted).  In other words, Customer Class Counsel were upfront that:  (1) large settlements within the First Circuit provide one appropriate frame of reference; and (2) some courts apply a "declining percentage principle."  *See id.*[13]

---

[13]   During the June 24, 2019 hearing, the Court suggested that Customer Class Counsel should have taken the same approach as the fee brief submitted in the *BONY Mellon* case.  *See* June 24, 2019 Hr'g Tr. (ECF No. 560) at 56.  Labaton was not involved in that case.  And, importantly, although supporting materials in that case contained more detail about a possible sliding scale

Then – one page later, and in light of that context – Customer Class Counsel discussed the Fitzpatrick Study.  *Id.* at 10.  Importantly, having explained that some courts apply the sliding scale approach in large cases, Customer Class Counsel made clear that, with respect to the Fitzpatrick Study, they were discussing "all 688 class action settlements in federal courts during 2006 and 2007."  *Id.*  Otherwise stated, Customer Class Counsel presented a straightforward and accurate description of a particular aspect of the Fitzpatrick Study.  *See* June 17, 2019 Fitzpatrick Aff. (ECF No. 550) at ¶ 6 (the "statistics recounted by class counsel were exactly as I set them forth in my study.  Although class counsel did not recount every statistic in my study, that does not make their submission misleading.").

Customer Class Counsel again focused on cases with large funds during the hearing on November 2, 2016.  After the Court explained that it tends "to stay in that 20 to 30 percent range," counsel oriented the discussion toward cases with large settlements.  *See* Nov. 2, 2016 Hr'g Tr. (ECF No. 114) at 24-25 ("So one thing we presented in our brief, Your Honor, to get a little bit more to the point, is we compared the fee that we're requesting here with the fees in every class action settlement in the First Circuit of $100 million or more.  There are some cases that refer to class action settlements of $100 million or more as mega fund settlements.").  The Court then expressly referenced fees in cases with large settlements.  *See id.* at 35-36 ("This is in the 20 to 30 percent range usually awarded by me in class action common fund cases and in many cases with settlements in the First Circuit and in many cases where the settlements are a $250 million to $500 million range.").  Finally, the Court explained that it had considered

---

approach, the brief itself did not raise the issue squarely with the Court.  *Compare* ECF No. 103-1 *with* Hearing Ex. C (*In re Bank of N.Y. Mellon Corp. Forex Transactions Litigation*, 12-MD-2335, ECF No. 619 (S.D.N.Y.)).

reducing the percentage based on the high fee award, but ultimately declined to do so, in part because the lodestar multiplier was reasonable.  *See id.*

In short, in both their briefing and during the final settlement hearing, class counsel discussed large settlements, including the notion that fee awards in cases with large funds are sometimes treated differently.  They did not "hide the ball."  And, based on its comments, the Court also appeared focused on fee awards in cases with larger funds.

HLLI claims that the brief should have explained to the Court that (i) one of the many ways in which the Fitzpatrick Study sliced up the overall figures was in a table, which had a separate line for the eight settlements identified between $250 and $500 million; and (ii) if limited to these eight settlements, the mean percentage would be smaller.  The argument is not only misplaced, it is extremely unfair for HLLI to suggest that the absence of HLLI's preferred language constituted a "misrepresentation."  The brief at issue distills dozens of sources and principles of law, and strives to treat each one fairly in the presentation.  There are an infinite number of ways in which an author could have fairly described the Fitzpatrick Study (which was attached in full to the brief).  There is simply no basis to say that not highlighting this one figure based on a small sample size (8 of 444 cases) with data scattered over a broad range (from a .3% award to a 25% award) was wrong, much less misleading.  Nor is there any evidence whatsoever to support any suggestion that the presentation was intended to be deceptive.

Finally, in any event, the 25% fee request is within one standard deviation of the mean found by Prof. Fitzpatrick even if the Court does use his figure based on the eight cases in the $250-500 million range.  *See* June 17, 2019 Fitzpatrick Aff. (ECF No. 550) at ¶ 8.  Accordingly, although the requested 25% was higher than the mean found by Prof. Fitzpatrick's study in that specific figure, it was nonetheless "in line" with this finding.  *See id.* at ¶ 9 ("[O]f the 8

percentage-method fee awards in the $250-500 million range in my study, two were greater than the request here and six were below (including the extreme outlier of 0.3% based on the large potential value of an injunction and credit-monitoring relief) . . . But even more to the point:  the facts and circumstances of this case compare quite favorably to the other settlements in the $250-500 million range in my study.") (citation omitted).

Simply put, the presentation of the Fitzpatrick study in the fee petition was not misleading, was not untrue, and there is no indication that there was any intent to deceive.

## V.   The Court Should Decline To Exercise Its Discretion To Allocate the Fee Award.

### A.   The Court Should Enforce Counsel's Fee-Sharing Agreements.

Respectfully, in light of counsels' negotiated fee-sharing agreements, the Court should decline to allocate the fee award.  Because class counsel have agreed upon a fee distribution, "there is no need for formal judicial involvement."  *See Newberg on Class Actions* § 15:23 at 52; *see also In re Volkswagen & Audi Warranty Extension Litig.*, 89 F. Supp. 3d 155, 183 (D. Mass. 2015) (recognizing that, although a court is not required "blindly to follow" fee-sharing agreements among counsel, they "may be respected or treated as presumptively reasonable in a district court's allocation of attorneys' fees"); *Longden v. Sunderman*, 979 F.2d 1095, 1101 (5th Cir. 1992) ("The district court acted well within its discretion in awarding an aggregate sum to the Susman Attorneys that was based on their collective efforts, leaving apportionment of that sum up to the Susman Attorneys themselves."); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533 n.15 (3d Cir. 2004) (declining to "deviate from the accepted practice of allowing counsel to apportion fees amongst themselves"); *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 1006 (N.D. Ohio 2016) ("Courts routinely permit counsel to divide common benefit fees among themselves."); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297,

357 (N.D. Ga. 1993) ("Ideally, allocation is a private matter to be handled among class counsel.").

Courts often defer to an allocation of the fee award that is determined by lead counsel or a designated group of attorneys. *See, e.g.*, *In re Indigo Sec. Litig.*, 995 F. Supp. 233, 235 (D. Mass. 1998) ("The Court sees no reason why it should not, as it has done in the past, award attorney fees and costs to all class counsel, to be distributed among the participating counsel based on their respective contributions to the litigation, according to the discretion of lead counsel."). Counsels' allocation in this case should be afforded even more deference, because it is the result of negotiated agreements, rather than a unilateral distribution by lead counsel. Under these circumstances, the Court should allow counsel to implement their agreed-to allocation. *See, e.g.*, *LandAmerica 1031 Exch. Servs. v. Chandler*, MDL No. 2054, 2012 U.S. Dist. LEXIS 159630, at *21 (D.S.C. Nov. 7, 2012) (declining to allocate award because "firms have entered into an agreement apportioning the fee award among themselves."); *In re Copley Pharm., Inc.*, 50 F. Supp. 2d 1141, 1148 (D. Wyo. 1999) ("Having this policy in mind, it had been the Court's hope that class counsel could decide the allocation themselves. Accordingly, per the standard practice in complex litigation, the Court first encouraged class counsel to stipulate to an allocation, subject to approval by this Court.").[14]

---

[14] HLLI may argue that the Court cannot defer to counsels' agreed-to fee allocation. The Court should reject this argument, as other courts have done. *See In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d at 1006 ("CCAF is wrong."); *In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*, 316 F.R.D. 240, 253 (E.D. Wis. 2016) ("However, I also note that the authority on which Frank relies to support the proposition that class counsel may not privately divide a fee is inapposite."), *rev'd on other grounds*, 869 F.3d 551, 557 (7th Cir. 2017).

**B.**     **If The Court Does Allocate Fees, It Should Allocate Them According to the Agreed-Upon Percentages.**

Alternatively, even if the Court does choose to exercise its discretion and consider what amounts of fees should be allocated to which firm (*see Newberg on Class Actions* § 15:23 at 52), the Court should nevertheless maintain the original agreed-to percentages among the firms.

Any allocation by the Court should be driven by the "actual contributions each firm made." *See Volkswagen*, 89 F. Supp. 3d at 183; *see also In re FPI/Agretech Sec. Litig.*, 105 F.3d 469, 473 (9th Cir. 1997) ("[A] court may reject a fee allocation agreement where it finds that the agreement rewards an attorney in disproportion to the benefits that attorney conferred upon the class – even if the allocation in fact has no impact on the class.").  The agreed-to fee percentages were tied to the firms' respective contributions and, as to the allocation between Customer Class Counsel and ERISA counsel,[15] to the relative trading losses of the class members on whose behalf they were acting.  The Court should implement those allocations.

Nothing about Labaton's conduct justifies departing from this agreed-to percentage. With respect to the payment to Chargois & Herron, Labaton's conduct complied with the applicable ethical and procedural rules.  *See* § VI, *infra*.  Even if this were not the case, however, the Court should not reduce Labaton's fee award, much less do so to increase the allocation to other counsel.  Although Lieff and Thornton have said that they did not know the full details of Labaton's agreement, all three Customer Class Counsel firms were aware of the $4.1 million fee shared with Chargois (*see* ECF No. 446-9); aware that no disclosure of that sharing was made

---

[15] Under the proposed accommodation to ERISA counsel in the Special Master's Supplement to His Report and Recommendations and Proposed Partial Resolution of Issues for the Court's Consideration (ECF No. 485), as a part of a global settlement, Labaton agreed to pay to ERISA counsel $2.75 million in resolution of the Special Master's recommended $3.4 million payment.

(appropriately in Labaton's belief) to the Court, the class, or ERISA counsel[16]; and aware that Chargois entered no appearance, submitted no lodestar report, participated in none of the mediations or hearings, produced no work product and certainly did not engage in work that would approach the value of $4.1 million.

Nor should the Court reduce Labaton's portion of the fee based on the costs of the Master's investigation. The investigation began with the lodestar double-counting error, which was a mistake shared at least equally by all of the Customer Class Counsel firms. *See* R&R at 364. Labaton has already paid 47% of the cost of the Special Master's investigation based on its share of Customer Class Counsel's portion of the fee award. When the investigation moved into the fee sharing stage, it involved, not only the Chargois Agreement, but also disclosure of the Chargois & Herron payment (which involved all three Customer Class Counsel) and the treatment of contract attorneys by the other two Customer Class Counsel firms.[17] For this phase, too, Labaton has already paid 47% of the costs, although Labaton employed no contract attorneys. *See* Special Master's Response to Objections to Lieff to Sharing Responsibility with Labaton for Payment of an Additional $750,000 (ECF No. 486) at 5 ("Although Labaton has, to date, carried a substantial portion of the case for Customer Class Counsel, Lieff Cabraser and Thornton have each contributed significantly to the Master's workload and to the concomitant costs of the investigation."). Equity does not dictate that Labaton's fee should be reduced any lower than 47% of the fee shared by Customer Class Counsel, particularly given the Firm's

---

[16] The ERISA firms apparently shared the view, which Labaton believes is correct, that disclosure of fee-sharing agreements among counsel is not routinely required. *See* ECF No. 401-34 at 1 (L. Sarko: "We need to be careful about this as the DOL had asked if there were any agreements on fees between counsel. I would never answer their question. And then they seem to forget about it.").

[17] Labaton employed non-partnership track Staff Attorneys, but no contract attorneys. Lieff and Thornton employed contract attorneys.

crucial role as lead counsel in this risky case that brought an "excellent result for the class" (*see* R&R at 6), and in light of the fact that Labaton continues to do work on behalf of the class, administering the settlement.

Finally, the Court has indicated concern with language in the fee declarations submitted by Customer Class Counsel and ERISA counsel concerning the "regular rates charged." This language – which should have been clearer – does not warrant reducing Labaton's award in comparison to the other two Customer Class Firms. While Thornton is a pure contingency firm, Labaton is a predominantly contingency firm that does some billable client work. *See* ECF No. 510-2 (identifying hourly billable work Labaton has performed); ECF 104-15 (Labaton's lodestar). Despite the lack of precision, Labaton's lodestar used real rates that Labaton sets annually. As Labaton's extensive documentary and deposition evidence during the investigation demonstrated, Labaton regularly undertakes a robust and systematic process for determining its billing rates, which reflect the prevailing rates in the legal community. *See* R&R at 65-66; *see also United States v. One Star Class Sloop Sailboat*, 546 F.3d 26, 40 (1st Cir. 2008). Although hourly work is infrequent and Labaton cannot show that every timekeeper in its lodestar submission billed time to hourly clients, it has shown that on those occasions when it has hourly clients, it uses its billing rates.[18] In other words, the rates are real. Lieff is similarly situated to Labaton in this regard. *See* June 24, 2019 Hr'g Tr. (ECF No. 560) at 123.

---

[18] As explained during the hearing (June 24, 2019 Hr'g Tr. at 117-18), in some cases hourly work in 2016 involved a project that began in 2015, so the 2015 rate was used. This explains the slight difference between the hourly rates listed in Labaton's interrogatory response (ECF No. 510-2 at 23-25) and its lodestar submission (ECF No. 104-15 at 7-9).

The Court need not and should not exercise its discretion to allocate the fee award. However, Labaton respectfully requests that, if the Court decides otherwise, it select the allocations to which counsel agreed.

## VI.   Labaton Complied With The Applicable Rules of Professional Conduct and the Federal Rules of Civil Procedure.

Labaton reiterates, as it states in the proposed partial resolution, that its conduct in this case did not meet emerging best practices with respect to disclosure of the Chargois Agreement to the client and to the class, nor did it satisfy that which Professor Rubenstein has suggested would be the appropriate practice with regard to disclosure of the agreement to the Court. *See* June 26, 2019 Hr'g Tr. (ECF No. 566) at 235.[19]   Labaton strives to be at the forefront of best practices and emerging best practices in the practice of law.   Regrettably, Labaton fell short, for which it again expresses its deep regret.

Nevertheless, Labaton complied with the rules of ethical conduct applicable to this case, *i.e.*, the Massachusetts Rules of Professional Conduct ("MRPC").   Labaton secured its client's written consent to pay a referral fee, both prospectively and retroactively.   As such, Labaton complied with the ethical rule governing the division of fees between attorneys, MRPC 1.5(e). The rule about which the Court expressly inquired at the June 26, 2019 hearing, MRPC 7.2(b), does not apply to this case.   However, even if MRPC 7.2(b) could be found to apply, Labaton's compliance with MRPC 1.5(e) precludes a finding that the Firm violated Rule 7.2(b).

---

[19] *See Newberg on Class Actions* § 15:12 at 36 (explaining that Courts have not construed Rule 23(e) to require disclosure of fee agreements among counsel, but that "settling parties *should* also readily provide them under Rule 23(e) in any case.") (emphasis added); *see also* ECF No. 368 (June 20, 2018 Rubenstein Declaration) at ¶ 10 ("No court has ever read Rule 23(e)(3) to apply to fee allocation agreements, to the best of my knowledge.").

The Court noted at the June 26 hearing, "[a]t the moment, since I didn't issue a [Rule] 54 order, and I will in every other class action case I have in the future, I'm not inclined to find that there was a violation of Rule 23." June 26, 2019 Hr'g Tr. (ECF No. 566) at 235. Labaton respectfully suggests that the Court's inclination is entirely correct. Labaton did not violate the Federal Rules of Civil Procedure, which are on-point and preclude any finding of misconduct.

**A.    The Chargois Agreement Met the Existing Requirements of the Massachusetts Rules of Professional Conduct.**

**1.    Labaton Complied with MRPC 1.5(e).[20]**

In February 2011, when ATRS engaged Labaton specifically for the *State Street* litigation, MRCP 1.5(e) ("Former Rule 1.5(e)")[21] provided that a "division of a fee between lawyers who are not in the same firm may be made only if, after informing the client that a division of fees will be made, the client consents to the joint participation and the total fee is reasonable." ECF No. 401-227 at 2.

Labaton complied with Former Rule 1.5(e). In the engagement letter for the *State Street* case, ATRS agreed that Labaton could allocate a portion of its fees to "local or liaison counsel" or as "referral fees." ECF No. 401-137 at 2. Accordingly, ATRS consented to the Chargois Agreement, as five highly-credentialed experts opined. *See, e.g.*, Green Rep. (ECF No. 401-248) at 19-20 ("Particularly in the context of a retention letter setting forth the parties' respective

---

[20]    *See* Labaton's Objections (ECF No. 434) at 25-37 and Labaton's Second Supplemental Objections (ECF No. 452) at 14-15 for a more complete exposition of this argument. Similar footnotes are included below, in order to direct the Court to Labaton's prior submissions.

[21]    As used herein, "Former Rule 1.5(e)" refers to the version of MRPC 1.5(e) in effect in February 2011 when ATRS engaged Labaton in connection with this litigation; "Current Rule 1.5(e)" refers to the version of MRPC 1.5(e) in effect now. Where the distinction is not material to the discussion, this submission will simply refer to "Rule 1.5(e)."

rights and responsibilities, it seems reasonably plain to me that the sentence in question in fact memorializes ARTRS's permission.").[22]

In addition, because ATRS consented to Labaton's payment of a referral fee in writing (*i.e.*, the parties' engagement letter), Labaton also complied with the written consent requirement described in the Supreme Judicial Court's *Saggese* opinion, which was decided in 2005. *See Saggese v. Kelley*, 445 Mass. 434, 443 (2005) (explaining that Rule 1.5(e) would be construed prospectively to require that an attorney disclose "the fee-sharing agreement to the client before the referral is made" and that the attorney "secures the client's consent *in writing*.").[23]

Neither Former Rule 1.5(e) nor its current iteration requires the disclosure of the details of the fee-sharing agreement (*e.g.*, the percentage of the referral fee). *See* Former Rule 1.5(e); *see also* Current Rule 1.5(e), cmt. 7A ("The Massachusetts rule does not require disclosure of the

---

[22] Labaton retained five experts during proceedings before the Master: Profs. Peter Joy, Bruce Green, and W. Bradley Wendel; Hal Lieberman, who has worked for the Massachusetts Office of Bar Counsel and a similar New York disciplinary body; and the late Camille F. Sarrouf, whose distinguished career included a term as President of the Massachusetts Bar Association. Each agreed that Labaton fulfilled its ethical obligations with respect to the Chargois Agreement. *See* Joy Rep. (ECF No. 401-249) at 27 ("Labaton's engagement letter with ARTRS for the State Street Litigation met the requirements of Mass. R. Prof. C. 1.5(e) as it existed at the time of the engagement letter."); Lieberman Rep. (ECF No. 401-250) at 16 ("Labaton obtained ARTRS' consent to divide its fees with Chargois, and therefore complied with Rule 1.5(e), as it then existed."); Wendel Rep. (ECF No. 401-251) at 14 ("In my opinion, the negotiations between Labaton and the ARTRS and the written consent provided by Clark [ATRS' Chief Counsel] and Hopkins satisfy the requirements of Mass. RPC 1.5(e) and the interpretation placed on the rule by the *Saggese* court."); Sarrouf 3/21/18 Dep. (ECF No. 401-263) at 106:5-107:5.

[23] *Saggese's* written consent requirement was not codified in the MRPC until March 15, 2011, after ATRS engaged Labaton for this case. Labaton's search of a Massachusetts Board of Bar Overseers database did not uncover decisions citing *Saggese*, thus the BBO appears not to have used it as a basis for discipline between its issuance (2005) and the 2011 amendment of Rule 1.5(e). Mr. Lieberman's experience is consistent. *See* Lieberman Dep. (ECF No. 401-230) at 120:2-7 ("I have never seen a disciplinary case for a lawyer where the court has disciplined a lawyer based on a ruling of a court as opposed to a violation of a Rule of Professional Conduct . . .").

fee division that the lawyers have agreed to, but if the client requests information on the division of fees, the lawyer is required to disclose the share of each lawyer."). [24]

In any event, even if the Chargois Agreement did not comply with Former Rule 1.5(e), ATRS through its then-Executive Director George Hopkins ratified the fee division, essentially for the purpose of putting to rest the Master's concern that the engagement letter constituted insufficient consent. *See* March 15, 2018 Hopkins Decl. (ECF No. 401-129) at 3-4. Under governing Massachusetts law, a client's ratification is sufficient consent. *Saggese*, 445 Mass. at 442 ("Ratification is not the preferred method to obtain a client's consent to a fee-sharing agreement, but it is adequate.").[25] Accordingly, regardless of whether Labaton initially complied with Former Rule 1.5(e), it subsequently obtained its client's consent – as even Prof. Gillers, the Master's expert, concedes. *See* March 20, 2018 Gillers Dep. (ECF No. 401-264) at 106:18-22 ("Q: Sir, does the ratification declaration that you have seen now from Mr. Hopkins constitute consent on behalf of Arkansas Teacher Retirement System to the fee referral to Chargois & Herron?  A:  On behalf of Arkansas alone."[26]); *see also* June 28, 2018 Joy Decl. (ECF No. 435-19) at 7 ("Even if the Court were to adopt the Special Master's unique interpretation of Mass. R. Prof. C. 1.5(e) as it existed at the time of the retention agreement between Labaton and ATRS, Hopkins' ratification would have been adequate consent to the fee sharing agreement . . . .").

---

[24]   Comment 7A to Current Rule 1.5(e) indicates that the client's interest in additional information does matter.  That is of particular note here where ATRS Executive Director George Hopkins testified before the Master (ECF No. 401-11 at 68:23-69:3), and swore in his declaration, that he did not wish to know the details of any fee sharing arrangements. *See* March 15, 2018 Hopkins Decl. (ECF No. 401-129).

[25]   In *Saggese*, the client ratified her attorneys' agreement to pay a 33% referral fee two years after the referral was made (and after the referring attorney had received payments). *Id.* at 436-40.

[26]   Mr. Hopkins did not purport to ratify for the absent class members, or for the separately represented ERISA plaintiffs.

*Saggese* is thus dispositive:  Had there been any noncompliance with Former Rule 1.5, which there was not, the ratification by Labaton's direct client negated the import.[27]

In short, Labaton complied with Former Rule 1.5(e).  Its sophisticated client consented in writing to the payment of referral fees resulting from the *State Street* matter, and the client then ratified the payment after full disclosure of all pertinent facts.  *See* ECF No. 401-129.

## 2.    The Chargois Agreement Is Encompassed in Rule 1.5(e).[28]

Both the Master and the Court have questioned whether the payment to Chargois & Herron can be characterized as a "referral fee."  *See* R&R at 272-73; June 26, 2019 Hr'g Tr. (ECF No. 566) at 233.  But, however the Chargois Agreement is labelled, it falls within the ambit of Former Rule 1.5(e) and Current Rule 1.5(e), because it involves a "division of a fee between lawyers who are not in the same firm."  *See* Former Rule 1.5(e); Current Rule 1.5(e). Rule 1.5(e) is not limited to "referral fees" per se.  The Firm agreed to divide its fee with Chargois, a lawyer in a different firm who has acted as traditional local counsel in other cases and was expected at the outset to have a role in ATRS cases.  *See* Testimony of Eric Belfi and Chris Keller, June 26, 2019 Hr'g Tr. at 10-17, 19-20, 52, 80-82, 86-96 (ECF No. 566). Therefore, Rule 1.5(e) applies.

In any event, the Chargois Agreement fits the Massachusetts Bar's conception of a referral fee, despite the facts that (1) the agreement was not matter-specific and (2) as it turned out, Chargois' role was limited to facilitating an introduction between ATRS and Labaton.  *See*

---

[27]  Little heed has been paid to ATRS' ratification thus far.  *See* R&R at 257 n. 206.  The Master's expert, Prof. Gillers, also brushed aside the ratification, while appearing to suggest that *Saggese's* rule may not apply in class action cases.  ECF No. 401-237 at 76 n. 83.  This is illogical.  If Rule 1.5(e) applies to Labaton's relationship with ATRS in this context, which it does, *Saggese's* holding regarding ratification of agreements subject to the rule must also apply.  In any event, ATRS' ratification, at the very least, mitigates any purported misconduct by Labaton.

[28]  *See* Labaton's Objections (ECF No. 434) at 32-41.

Lieberman Dep. (ECF No. 401-230) at 44:12-14 ("I think this is a referral fee, and it happens all

the time, common."); March 24, 2018 Sarrouf Dep. at 233:3 (referencing the "fee referral in this

case"), 241:23 ("Those were referral fees.") (attached to the Transmittal Declaration of Justin J.

Wolosz, filed herewith, as Exhibit 1).

The Court has inquired whether, if the Court considers the payment here to be akin to a

"finder's fee," it cannot be characterized as a referral fee.  A 2012 decision by the Massachusetts

Court of Appeals is instructive with respect to the Court's question.  *See Vita v. Berman,*

*DeValerio & Pease, LLP*, 81 Mass. App. Ct. 748, 749-50 and n.4 (2012).  In *Vita*, the court

repeatedly described as a "referral fee" an arrangement in which a criminal defense lawyer used

his "many contacts in the financial securities field" to refer "potential class action plaintiffs" to a

securities litigation law firm.  *Id*. (citing *Saggese*).  As here, "[o]nce a referral was made," the

defense attorney "did not participate further in the litigation."  *Id.* at 750.  Notably, the defense

attorney referred at least one potential plaintiff "at the request" of a partner at the securities firm.

*Id.* at 750.  The Court of Appeals characterized this arrangement as a "referral" throughout its

opinion.  *E.g.*, *id.* ("In February, 1998, at the request of BDP partner Jeffrey Block, Vita *referred*

Robert Hillger as a potential plaintiff for a class action suit against Phillip Services Corporation")

(emphasis added).  This Massachusetts appellate authority indicates that, in the Commonwealth,

a fee paid by a lawyer to another lawyer for facilitating a connection with a potential client is a

payment for a "referral."  *See id.*[29]  Hence, such a payment should be considered a "referral fee."

Moreover, from a policy perspective, the fundamental principle animating the

Massachusetts Bar's embrace of "bare" referral fees was realized in this case, because ATRS had

---

[29]  Curiously, despite the Master's assertion that the payment to Chargois & Herron was not a
referral fee, the Master describes the payment in *Vita* – which involved a referral "at the request"
of the class action firm – as an "unpaid referral fee."  R&R at 296.

the opportunity to retain highly-skilled attorneys who delivered "an excellent result for the class."  *See* R&R at 6; *see also* Lieberman Rep. (ECF No. 401-250) at 18 ("As a matter of good policy and the public interest, it is well recognized that the bar should encourage fee sharing relationships that serve the client by helping to ensure that cases, especially litigation matters, like this one, are handled by the best, most experienced lawyer in the particular area of the law."); June 14, 2017 Hopkins Dep. (ECF No. 401-3) at 100:8-10 (opining that he does not "think another law firm could have gotten the outcome [Labaton] did.").

### 3.    Rule 7.2(b) Does Not Apply.[30]

Because Labaton complied with Former Rule 1.5(e), its actions would also constitute compliance with Mass. R. Prof. C. 7.2(b) ("Rule 7.2(b)") (providing that a lawyer may "pay fees permitted by Rule 1.5(e)").  However, even if Labaton had failed to comply with Former Rule 1.5(e), which is not the case, Labaton did not violate Rule 7.2(b).

Rule 1.5(e) governs a fee division between lawyers.  Accordingly, non-compliance with Rule 1.5(e) is a violation of Rule 1.5(e) – not a violation of Rule 1.5(e) *and* Rule 7.2(b).  Nothing in the text of Rule 1.5(e) – nor in the Supreme Judicial Court decision construing it – suggests that a violation of Rule 1.5(e) constitutes a violation of Rule 7.2(b).  *See Saggese*, 445 Mass. at 440-41 (with respect to an undisclosed fee division, explaining that either Rule 1.5(e) or its prior iteration, DR 2-107, "*governed the conduct of the lawyers*," and not mentioning Rule 7.2(b) or any other rule of professional conduct) (emphasis added).

In fact, the two rules cover different types of conduct:  "advertising" (Rule 7.2) and "division of fee" (Rule 1.5(e)).  The Chargois Agreement involves a division of Labaton's fee, and thus fits squarely and exclusively within Rule 1.5(e).  *See O'Connell v. Shalala*, 79 F.3d 170,

---

[30]  *See* Labaton's Objections (ECF No. 434) at 37-41.

176 (1st Cir. 1996) ("[A] court engaged in the task of statutory interpretation must examine the statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language") (internal citations omitted); *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (explaining that "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute") (internal quotations omitted).

The historic enforcement of the ethics rules reflects this common-sense interpretation. *E.g.*, Lieberman Rep. (ECF No. 401-250) at 17 ("I am not aware of any such bootstrapped interpretation or application of Rule 7.2 in *any* jurisdiction . . ."). If a violation of Rule 1.5(e) resulted in a violation of Rule 7.2(b), any decision in which an attorney has been found to have violated Rule 1.5(e) would necessarily include a consequent finding that the attorney violated Rule 7.2(b). *See, e.g.*, Joy Rep. (ECF No. 401-249) at 18-19 ("If in 2016, or any time before 2016, ethics authorities in Massachusetts viewed sharing fees in violation of Mass. R. Prof. C. 1.5(e) as a violation of Mass. R. Prof. C. 7.2(b) (previously Mass. R. Prof. C. 7.2(c)), then, in my opinion, I would have expected the Admonition to discuss a violation of Mass. R. Prof. 7.2(b)."). But, "Massachusetts state courts, Massachusetts disciplinary authorities, and the United States District Court for Massachusetts have never considered a fee division between law firms based on a flawed or imperfect division of fee arrangement between law firms and a client under Mass. R. Prof. C. 1.5(e) to be a violation of Mass. R. Prof. C. 7.2[b]." *Id.* at 16. The Master's research is in accord. R&R at 337 (explaining that "apparently no disciplinary body or court in Massachusetts or, indeed, in the rest of the country has ever imposed discipline or sanctions upon a lawyer for paying another lawyer under Rule 7.2(b)").[31]

---

[31] Prof. Gillers has argued that *Daynard v. Ness, Motely, Loadholt, Richardson & Poole, P.A.*, 188 F. Supp. 2d 115, 130 (D. Mass. 2002) stands for the proposition that an imperfect fee division would trigger Rule 7.2(b). *See* March 20, 2018 Gillers. Dep. (ECF No. 401-264) at 84:22-86:18.

27

Against that backdrop, deciding that Labaton violated Rule 7.2(b) apparently would break new ground under (at least) Massachusetts law.  *See, e.g.*, *id.* at 273 ("What does give us some pause before recommending redress for a violation of Rule 7.2(b) is the fact that, apparently, no bar disciplinary authority or Court has ever imposed discipline upon an attorney for a violation of this Rule by paying another attorney.").  Such a finding would also be inconsistent with fundamental principles of notice and due process.  *See* R&R at 337-338 ("[b]ecause this appears to be an issue of first impression and not one of which the profession might have been well-advised in advance, it would not be appropriate to impose professional discipline in these circumstances.  Accordingly, no professional discipline or sanctions is warranted here and none is recommended.").  Particularly in light of the lack of notice of this new interpretation and lack of authority for applying Rule 7.2(b) in this manner the Court should not find a violation of Rule 7.2(b) in these circumstances.  *See, e.g.*, Joy Rep. (ECF No. 401-249) at 16-19; *Saggese*, 445 Mass. at 440-41 (Rule 1.5(e) "governed" undisclosed fee-splitting arrangement).

### B.    Labaton's Nondisclosure of the Chargois Agreement to the Court Did Not Violate The Federal Rules of Civil Procedure.

#### 1.    The Federal Rules of Civil Procedure Did Not Require the Disclosure to the Court of Fee Allocation Agreements.[32]

As the Court noted at the June 26 hearing, "[a]t the moment, since I didn't issue a [Rule] 54 order, and I will in every other class action case I have in the future, I'm not inclined to find

---

But, this case does not support Prof. Gillers' position.  *See Daynard*, 188 F. Supp. 2d at 124 n.5 (not mentioning Rule 7.2(b), despite analyzing both Rule 1.5(e) and its New York equivalent). Prof. Gillers' reliance on *Holstein v. Grossman*, 246 Ill. App. 3d 719 (1993), is similarly inapposite.  That decision extensively discusses fee-splitting agreements under Ill. Sup. Ct. R. 2-107, but does not mention Model Rule of Professional Conduct 7.2(b) or its Illinois analogue.  *Id.*

[32]  *See* Labaton's Objections (ECF No. 434) at 43-59.

that there was a violation of Rule 23." June 26, 2019 Hr'g Tr. (ECF No. 566) at 235. Labaton respectfully suggests that the Court's inclination is well founded. The Firm did not violate the Federal Rules of Civil Procedure, which are on-point and preclude any finding of misconduct.[33] As with counsels' other fee-sharing agreements relating to this case,[34] Labaton's nondisclosure of the Chargois Agreement did not violate the applicable rules of professional conduct or the governing Federal Rules of Civil Procedure.

### 2.      Labaton Did Not Violate A Duty of Candor to the Court.[35]

In the context of determining where a party's award should fall in the appropriate range of a reasonable fee, the Court noted that "candor to the court is an important public policy consideration," and that the Court "might find a series of failures by various counsel in their duty of candor to the court and where that ought to influence the award within the reasonable range." June 26, 2019 Hr'g Tr. (ECF No. 566) at 248, 259-60.

In Labaton's case, the issue of candor to the Court centers on the failure to disclose the Chargois Arrangement. But, as discussed above, this failure did not violate the Federal Rules of Civil Procedure, which do not require disclosure of fee-sharing agreements. *See, e.g.,*

---

[33] The Advisory Notes (among other authorities) support this conclusion. *See* Fed. R. Civ. P. 54, 1993 Notes of Advisory Committee, ¶ 8 ("*If directed by the court*, the moving party is also required to disclose any fee agreement, including those between . . . attorneys sharing a fee to be awarded . . . .") (emphasis added); *see also* 5 William B. Rubenstein, *Newberg on Class Actions* § 15:11 (5th ed. 2016) ("The third prong of Rule 54(d)(2)'s motion requirement – concerning disclosure of fee agreements – is discretionary with the court."); Rubenstein Rep. (ECF No. 401-242) at 5 ("Rule 23(h) and Rule 54 are therefore clear in mandating the submission of fee agreements – including those concerning the allocation of fees among counsel – only upon court order."); *see also* June 20, 2018 Rubenstein Decl. (ECF No. 368) at 6 ("No court has ever read Rule 23(e)(3) to apply to fee allocation agreements, to the best of my knowledge.").

[34] The various class firms had several fee-sharing agreements in connection with this case (both with ancillary firms and amongst each other).

[35] *See* Labaton's Objections (ECF No. 434) at 59-69.

Rubenstein Dep. (ECF No. 401-243) at 126:20-22 ("I think that lawyers have the right to rely on the rules, and the rule is the Court can ask for the fee agreements if they want."); *id.* at 198:6-10 ("[Y]ou know, the law is clear here, and the lawyers have every reason to rely on the clearness, the clarity of the law.  Rule 23 and Rule 54 could not be more clear . . . .").

In fairness, Labaton's duties should be assessed against the regular practice in this District, where courts rarely order the disclosure of fee-sharing agreements (despite the permissibility of "bare" referral fees in Massachusetts).  *See* Rubenstein Rep. (ECF No. 401-242) at 6 (explaining that, as of March 2018, in 127 recent class action settlements, the court did not order the disclosure of fee-sharing agreements in a single one).

And, across jurisdictions, courts are frequently unaware of the full slate of attorneys who worked on a case (and, by extension, the attorneys who may share in the fee award).  *Id.* at 10-11 ("[I]n nearly 40% of class action cases, courts are not provided the names of lawyers who worked on the case and who might, on that ground, be in line to receive a portion of the award . . . . [T]he class action experts who drafted Rule 23(h) were well aware that a class action case encompasses cast and crew – and they nonetheless chose the default embodied in Rule 54:  that fee allocation agreements need not be disclosed absent judicial request, that the judge must ask for the playbill.").  Otherwise stated, neither the procedural rules nor regular practice indicates that agreements to share a class action fee award must be disclosed.

Imposition of a penalty is unduly harsh if it is imposed for violation of an unsourced duty of candor where no rule of professional conduct has been violated, and where conduct has been consistent with the Federal Rules of Civil Procedure and with local practice.  And, while the terminology is gentler, reduction of a Firm's fee award for a perceived violation of the duty of

candor is nonetheless penal in nature.  Labaton therefore respectfully urges that no such reduction based on a duty of candor should be imposed.[36]

Similarly, Labaton cannot be found to have violated MRPC 3.3(a) or 8.4(c), which govern disclosure obligations.  "For there to be an ethical duty for Labaton to disclose to the Court its fee sharing agreement with Chargois & Herron under Mass. R. Prof. C. 3.3(a) or 8.4(c), the ethical duty would have to be based on Labaton *knowingly* engaging in impermissible conduct."  Joy Rep. (ECF No. 401-249) at 43.  The circumstances here do not support any conclusion that Labaton "knowingly" violated any duty of candor.

In fact, the opposite is true.  At the time that Labaton filed its fee petition:  the Federal Rules of Civil Procedure did not require disclosure; this District's local rules did not require disclosure; the Court did not have a standing order requiring disclosure; the Court had not ordered disclosure in this case; and no judge in the District of Massachusetts had ordered disclosure of fee agreements in well over a hundred class action cases since 2011 (*see* Rubenstein Rep. (ECF No. 401-242) at 6).

Considering the totality of the circumstances, it was justifiable for Labaton to believe that it was not required to disclose the Chargois Agreement to the Court.[37]  As Professor Rubenstein explained, "there is nothing that the lawyers did here that was unusual."  Rubenstein Dep. (ECF

---

[36]  While Labaton recognizes that Rule 11 can be one basis upon which violations of the duty of candor may be based, Labaton has never briefed Rule 11 for the Court because the Master did not recommend such a finding against Labaton.  If the Court has any thought of entering such a finding, Labaton respectfully requests the opportunity to brief the issue fully and to be heard, as the Court suggested would occur if new issues arose.  *See* May 31, 2019 Order at 2 (ECF No. 543).

[37]  In addition, the Court did not indicate that counsels' fee-sharing agreements were material to its decision making.  Instead, the Court focused on the total fee award, without inquiring into how fees would be divided even among Customer Class Counsel – an approach that was within the Court's discretion and typical in local class action practice.  Nov. 2, 2016 Hr'g Tr. (ECF No. 114) at 22-38; *see also* Rubenstein Rep. (ECF No. 401-242) at 6.

No. 401-243) at 104:5-6.  Labaton should not be found to have committed an ethical violation

based on a random, unclear, or ambiguous interpretation of a rule.  *See In re Discipline of an*

*Atty.*, 442 Mass. 660, 668 (2004) ("Due process requires that attorneys, like anyone else, not be

subject to laws and rules of potential random application or unclear meaning."); *see also* Joy

Rep. (ECF No. 401-249) at 52 ("Courts and ethics authorities do not impose sanctions on or

discipline a lawyer or law firm when a legal or ethical duty is unclear.").

Although the best practice may have been for Labaton to make a fulsome disclosure to

the Court regarding the Chargois Agreement, its nondisclosure of the agreement did not violate

any ethical or procedural rule, nor did it violate a duty of candor.

### C.     Ethical Rules and Best Practices.

This case concerns two distinct concepts:  (1) the rules to which lawyers *must* adhere; and

(2) the conduct to which lawyers *should* aspire and strive.  The first concerns a threshold,

codified in rules such as the MRPC and Rule 11,  that represents the line between ethical conduct

and sanctionable misconduct.  These rules establish the "floor" of permissible behavior.  As

discussed above, Labaton complied with the applicable rules, and did not engage in unethical

misconduct.  *See* Special Master's Supplement to his Report and Recommendations and

Proposed Partial Resolution of Issues for the Court's Consideration (ECF No. 485) at 5 ("The

Special Master finds, however, that the payment itself to Chargois did not violate the rules of

professional misconduct or constitute intentional misconduct.").

The second category concerns the spectrum of acceptable behavior above the "floor,"

ranging from the permissible, on the one hand, to best practices to which every attorney should

aspire, on the other.  *See* Mass. R. Prof. C., Preamble § 1 ("A lawyer is a representative of

clients, an officer of the legal system, and a public citizen having special responsibility for the

quality of justice."). As the Firm has stated, Labaton's actions fell short of emerging best practices.

Looking forward, Labaton has learned much from this process, and it has made significant internal changes in an effort to ensure that its conduct will comply with best practices. *See, e.g.*, ECF No. 485 at 6-8. This effort has included significant revision of Labaton's practices and policies regarding referral arrangements. *See* Labaton's Memorandum in Support of Proposed Partial Resolution of Issues (ECF No. 510). Additionally, following an extensive historical review of the practices of Labaton Sucharow, Retired Judge Brown concluded that the fee arrangement with Chargois & Herron was "unique and aberrational." Labaton Sucharow's Amended Phase I Report of the Honorable Garrett E. Brown, Jr. (Ret.) (ECF No. 539-1) at 1. Labaton understands that, as a fiduciary for the class, the Court's focus is on Labaton's conduct in this specific case, rather than the reforms. Nevertheless, Labaton respectfully submits that its sincere and meaningful efforts to improve merit consideration by the Court.

## VII.   Conclusion.

For the foregoing reasons, Labaton respectfully requests that the Court: (1) restore its Order of a 25% fee award, particularly in light of the $4.8 million Customer Class Counsel have paid to fund the Special Master's investigation, and the additional $3.2 million Labaton has incurred in defense costs; (2) reject HLLI's baseless assertion that the Fitzpatrick Study was misrepresented; (3) decline to allocate the fee award among counsel; and (4) conclude that Labaton complied with all applicable ethical duties.

Dated: July 17, 2019                          Respectfully submitted,


                                              By: */s/ Joan A. Lukey*
                                                  Joan A. Lukey (BBO No. 307340)
                                                  Justin J. Wolosz (BBO No. 643543)
                                                  CHOATE, HALL & STEWART LLP
                                                  Two International Place
                                                  Boston, MA 02110
                                                  Tel.: (617) 248-5000
                                                  Fax: (617) 248-4000
                                                  joan.lukey@choate.com
                                                  jwolosz@choate.com

                                                  *Counsel for Labaton Sucharow LLP*




                              **CERTIFICATE OF SERVICE**

        I hereby certify that this document filed through the ECF system will be sent
electronically to all counsel of record on July 17, 2019.



                                              */s/ Joan A. Lukey*