UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ARKANSAS TEACHER RETIREMENT SYSTEM,
on behalf of itself and all others
similarly situated,

                    Plaintiff,

vs.                                                                        No. 11-cv-10230-MLW

STATE STREET BANK AND TRUST COMPANY,

                    Defendant.
_____/

ARNOLD HENRIQUEZ, MICHAEL T. COHN,
WILLIAM R. TAYLOR, RICHARD A.
SUTHERLAND, and those similarly situated,

                    Plaintiffs,

vs.                                                                        No. 11-cv-12049-MLW

STATE STREET BANK AND TRUST COMPANY,

                    Defendant.
_____/

THE ANDOVER COMPANIES EMPLOYEE
SAVINGS AND PROFIT SHARING PLAN, on
behalf of itself, and JAMES PEHOUSHEK-
STANGELAND and all others similarly situated,

                    Plaintiffs,

vs.                                                                        No. 12-cv-11698-MLW

STATE STREET BANK AND TRUST COMPANY,

                    Defendant.
_____/

**SPECIAL MASTER'S POST-HEARING MEMORANDUM**

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION............................................................................... 2

I.   REASONABLENESS OF THE ORIGINAL FEE AWARD....................... 2

    a.   The Court's original attorneys' fee award, equal to approximately 25% of the total settlement, was reasonable based upon the efforts expended by Plaintiffs' counsel in this case and the resulting settlement................................................................................. 2

    b.   The reasonableness of the total fee award, subject to the Special Master's recommended and necessary reductions appropriately allotted to the class, is supported by application of the *Goldberger* factors....................................................................................... 4

        i.   *Time and labor expended by counsel*.................................. 5

        ii.   *Magnitude, complexities and risk of litigation*...................... 6

        iii.   *Quality of representation*............................................... 6

        iv.   *Requested fee in relation to the settlement*........................... 7

        v.   *Public policy considerations*............................................ 8

II.   PUBLIC POLICY CONSIDERATIONS AFFECTING ATTORNEYS' FEE AWARDS AND PRACTICES DETRIMENTAL TO THE INTERESTS OF THE CLASS.......................................................... 10

    a.   Contract attorney time should be treated as an expense not eligible for inclusion in the lodestar or in determining a lodestar multiplier................................................................................. 11

        i.   *Contract attorneys occupy fundamentally different roles and incur far less risk for a firm utilizing them than employed staff attorneys*...................................................... 12

        ii.   *Federal jurisprudence – though evolving – distinguishes attorneys fulfilling a contract attorney role based on the economic realities facing the hypothetical paying client*............ 13

**Page**

        iii.    *Defense counsel did not mark up non-employee contract attorneys in the State Street case* ....................................... 18

III.    THE COURT'S AUTHORITY TO ALLOCATE INDIVIDUAL FEE AWARDS TO THE LAW FIRMS ................................................. 20

IV.    IMPACTS OF LACK OF CANDOR TO THE COURT ON THE FEE AWARD ............................................................................... 21

        a.    Garrett Bradley violated his duty of candor to the Court in filing a false fee declaration ............................................... 21

                i.    *Bradley violated Fed. R. Civ. P. 11 and Mass. R. Prof. C. 3.3(a)* ........................................... 21

                ii.    *Bradley's nondisclosure of the Chargois Arrangement to the Court further demonstrates his disregard for his general duty of candor owed to the Court* ........................... 28

        b.    Labaton's failure to disclose the Chargois Arrangement may have implicated duty of candor but does not warrant independent sanctions ............................................... 29

V.    THE CONTINUING EFFICACY OF THE PROPOSED PARTIAL RESOLUTION ....................................................................... 30

VI.    OTHER CONCERNS RAISED AT JUNE 24-26, 2019 HEARING ............. 33

        a.    Applicability of Rule 1.5(e) and 7.2(b) ..................................... 33

        b.    While Fed. R. Civ. P. 23 may not have explicitly required disclosure of the Chargois Arrangement, the parties would have been prudent to disclose to the Court an allocation of class funds ............................................................. 35

        c.    The Special Master did not misrepresent the record as to Thornton Law Firm ............................................................. 36

CONCLUSION ............................................................................. 40

## INTRODUCTION

On June 26, 2019, at the conclusion of three full days of hearings featuring the testimony of eight witnesses, the introduction or review of dozens of exhibits, argument of counsel, and pointed questioning by the Court, all parties were invited by the Court to submit briefings on unresolved matters, including several issues of over-arching public interest and concern to the Court. The Special Master welcomes the opportunity to do so and presents the following:

## I.   REASONABLENESS OF THE ORIGINAL FEE AWARD

**a.   The Court's original attorneys' fee award, equal to approximately 25% of the total settlement, was reasonable based upon the efforts expended by Plaintiffs' counsel in this case and the resulting settlement.**

As made clear in his Report and Recommendations ("R&R") and underscored by his counsel's argument at the hearings, the Special Master maintains that the Court's assessment at the 2016 Fairness Hearing that a fee award range of 20-30% was correct, appropriate and reasonable in this case, setting aside for the moment the various aspects of class counsels' inappropriate conduct, which the Special Master used as a basis to reduce the initial 25% fee award. In fact, the Special Master began his recommendations using the Court's thoughtful analysis as a starting point. As noted in his Executive Summary,

> "The underlying case here was a class action alleging unfair and deceptive practices in conducting complex foreign exchange transactions and required highly skilled and sophisticated counsel. After much work, dedication and exceptional effort in the discovery and mediation process, the parties ultimately reached a $300 million settlement. Given the risks, complexities and legal challenges inherent in the litigation, it must be said that the $300 million settlement, procured by skilled and dedicated plaintiffs' counsel, was an excellent result for the class."

Executive Summary, p. 3.

2

Similarly, as for the actual fee award, the Special Master found in his R&R, and continues to maintain, that *as a starting point*, the award of approximately 25% was neither disproportionate nor unsupportable when measured against the positive result for the class and the effort and skill of counsel required to achieve it. Of course, the Special Master has consistently maintained that the documented inaccuracies, misstatements and omissions by Customer Class Counsel, and their relative responsibility for them, require various reductions of the original fee award so as to appropriately address, and re-allocate to the class, unwarranted payments to counsel.[1]

Notwithstanding his strong contention that such substantive reductions are owed to the class, the Special Master maintains that the original $75M award is the appropriate starting point for the Court in reissuing an appropriate fee award to Plaintiffs' counsel. As such, the Special Master did not challenge the Court's use of the percentage-of-fund method with a lodestar cross-check in the R&R, concluding that a 1.8 multiplier was well within the range of multipliers in common fund cases. This view is not undermined by Customer Class Counsel's unfortunate omission, in its previous citing to the Fitzpatrick Study, of Tables 10 and 11 and the critical commentary that, "[w]hen both Tables 10 and 11 are examined together, it appears that fee percentages tended to drift lower at a fairly slow pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20%..." The Special Master

---

[1] As the Special Master's counsel stated in response to the Court's inquiry at the hearings, the recommended adjustments would reduce the fee award by as much as $9.5 million to a total of approximately $65.5 million, or 21.8% of the settlement amount, all to the benefit of the class. The recommended reductions are approximately: $4,058, 000 for the double-counting of staff and agency attorneys, divided equally among the Customer Class Counsel; $2,241,000 for Lieff's unwarranted mark-up of agency attorneys; $1,344,057 for Thornton's unwarranted mark-up of agency attorneys; $182,880 for Michael Bradley's inflated payments; $700,000 for Labaton's failure to disclose the role of Damon Chargois; and $400,000 – $1,000,000 for Garrett Bradley's Rule 11 violation.

In addition, the Special Master has recommended that another $2.75 million be reallocated from Labaton's fee award to the ERISA law firms in response to Labaton's conduct in not disclosing the Chargois payment, as well as for reimbursement of ERISA counsel's time and expenses incurred in having to participate in the Court-ordered investigation through no fault of their own. Labaton has agreed to all of this, and more, in its agreement with the Special Master.

credits Fitzpatrick's analysis that a 17.8% ceiling was statistically indistinguishable from a 25%

ceiling as that number falls within one standard deviation range.  Furthermore, the Special

Master believes that a 25% ceiling is supported by numerous other decisions, and more

importantly, by the unique and challenging circumstances of this case, as well as the excellent

outcome that all counsel worked hard to achieve on behalf of the class.

In this context, the Special Master strongly believes that every class settlement is

different, and that while studies like that conducted by Professor Fitzpatrick are helpful, as one

data point, in setting initial percentage-of-fund fee awards, they are just that – one factor -- and

other factors, more specific to each settlement, should overarchingly set the final measure of

each percentage-of-fund award. Beyond this, after a fair percentage-of-fund fee has been

established, monetary reductions addressing the inappropriate conduct of counsel should be

specifically and proportionately tethered to that conduct. That is what the Special Master

attempted to do in his R&R and in subsequent recommendations to the Court.

> **b.    The reasonableness of the total fee award, subject to the Special
> Master's recommended and necessary reductions appropriately
> allotted to the class, is supported by application of the *Goldberger*
> factors.**

As the Court has referenced, whether a fee award created from a settlement fund is

"reasonable" is customarily evaluated using the factors articulated in *Goldberger v. Integrated

Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000).  A district court must take into account (1) the time

and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk

of the litigation; (4) the quality of representation; (5) the requested fee in relation to the

settlement; and (6) public policy considerations. *Id.* at 50.  The Special Master herein addresses

each of these factors in the context of his mandate, his findings, and his recommendations.

i.    *Time and labor expended by counsel.*

The Special Master found that, with minor exceptions, "the hours and rates of the attorneys of each of the law firms for whom lodestar reports were submitted to the Court are reasonable and accurate, and consistent with applicable market rates for comparable attorneys in comparable markets for comparable work." Executive Summary, pp.21-22.

It is important to note that the rates and hours charged for work performed by staff attorneys, whose importance was elevated in this case by the *Boston Globe*'s focus on their rates and work, reasonably reflected the significant role they played in the case. In the R&R, the Special Master thoroughly analyzed the appropriateness of the billing rates charged for staff attorneys – full-time attorneys employed by the firms but not on a partnership track -- employed by Lieff and Labaton in the State Street case. The Special Master concluded that rates of $335 to $515 per hour accurately reflected the valuable contributions and experience added by the more than forty staff attorneys in this case.[2] This view has not changed. The staff attorney rates were not only commensurate with those of the associates and partners assigned to the case, but in line with the prevailing market rate for staff attorneys staffed on complex class actions in 2016. *See* R&R, pp. 171-173.   In short, the fact that these attorneys did not bear the title of associate or its equivalent and were tasked with completing a large volume of "document review" in this matter does not render them less valuable to the firms or to the class. *See* R&R, pp. 70- 73.

---

[2] For the sake of brevity, the Special Master does not restate, in full, the qualifications, experience, and contributions of the staff attorneys who worked on the State Street case. This section's discussion addresses only those non-partnership-track attorneys employed by Lieff and Labaton and does not address the appropriateness of rates charged for work performed by contract attorneys employed by a third-party agency or that performed by Michael Bradley, who was self-employed during the duration of this case. A full discussion of the Special Master's conclusion is found at R&R pages 70-71, 169-173, and 176-181. The appropriateness, or lack thereof, of rates attributed to these contract attorneys is discussed below.

ii.     *Magnitude, complexities and risk of litigation.*[3]

At the Fairness Hearing, the Court recognized the myriad of challenges Plaintiffs'

counsel overcame in this case, including that the legal theory of the case was novel, the risks

were great and counsel had successfully condensed intensive document discovery and mediation

in a truncated process that took place alongside ongoing negotiations with counsel for State

Street and government regulators to create a sizeable fund for the class. *See* Executive

Summary, pp. 12-13; R&R, pp. 6-7, 29-34. The Special Master agrees with the Court, and has

also highlighted yet other risks, such as the potential difficulty of obtaining class certification,

the global settlement reached with the ERISA class, as well as the formidable and well-resourced

representation retained by the Defendant State Street in this matter. All of these achievements,

over obstacles not typically encountered in such litigation, support the reasonableness of the

award amount.

iii     *Quality of representation.*

The partners, associates, and staff attorneys assigned to this matter provided high quality

work to advance the case. Drawing from previous financial fraud and securities class action

cases worked on at their firms, many of these attorneys came into the State Street case with a

baseline of substantive knowledge that enabled them to grasp the nuances of the facts in this

case. Others drew on previous legal experience and first-hand knowledge of financial litigation,

highly relevant and specialized foreign exchange trading, or institutional consumer fraud. *See*

R&R, pp. 71-72, 172-173.

Given the high degree of relevant skill and experience brought by the staff attorneys,

their collective contributions to the litigation effort were particularly significant. The litigation

---

[3] Because of their over-lapping significance in this case, the *Goldberger* factors of "the magnitude and complexities of the litigation" and "the risk of the litigation" are discussed together herein.

teams charged staff attorneys with analyzing the factual underpinnings of the case and making a value judgement about how best to use this information to advance Plaintiffs' legal theory against State Street. The staff attorneys digested this information into substantive memoranda on key witnesses and topics that would be the central focus of discovery and depositions should the case proceed to that point. Their work greatly enhanced the quality of Plaintiffs' counsel's representation, who were able to rely heavily on staff attorneys rather than assigning an excess of associates on the matter.

The fact that the staff attorneys largely took on roles typically delegated to on-track, or traditional, associates in a large litigation matter is significant for yet another reason. By charging intermediate rates for staff attorneys assuming associate-level tasks, the class received a slight *discount*. The Special Master expressly found, and no objectors have challenged, that the partner ($535 - $1,000) and associate ($325 - $725) rates charged by Plaintiffs' counsel were consistent with the national rates for complex securities and financial fraud class action cases. *See* R&R, pp. 164-169. The range of hourly rates charged for staff attorneys appropriately lands in the bottom half of the acceptable associate range, $325 - $725, reflecting that staff attorneys, while often possessing more years of legal experience, made contributions equal to that of a first to sixth year associate.

iv.    *Requested fee in relation to the settlement.*

Given the risks, complexities and legal challenges inherent in the litigation, the $300 million settlement, obtained through the efforts and talent of skilled and committed Plaintiffs' counsel, was an excellent result for the class. The Court awarded Plaintiffs' counsel $74,541,250.00 in attorneys' fees and $1,257,699.94 for expenses. By itself, this attorneys' fee award was neither disproportionate nor unsupportable when measured against the positive result

7

for the class and the effort and skill of counsel that was required to achieve it. Subject to the

caveats in Section II, the Special Master continues to maintain that "… all other things being

equal, the attorneys' fee award was fair, reasonable and deserved," just as the Court initially

found. *See* Executive Summary, p. 3; R&R, pp. 6, 210, 365-366.

              v.     *Public policy considerations.*

As stated in his R&R:

> "[T]he Special Master recognizes the important role class actions and
> plaintiffs' class action attorneys play in protecting and enforcing the
> rights of consumers, injured parties and the public in general. To
> adequately fulfill this role, class action plaintiffs require sophisticated,
> well-resourced attorneys who should be compensated at rates
> comparable to those of the large, sophisticated, well-resourced defense
> firms who will in the vast majority of cases be opposing them."

R&R, p. 5.

The fee award in this case, while incentivizing class counsel to pursue such cases, even at

financial risk, is not a windfall, based upon comparable cases, and is compatible with recognized

judicial policy objectives to protect and enforce the rights of consumers, injured parties, and the

public in general. The $335-$515 per hour rate is a reasonable one for the staff attorneys in this

case. This analysis reflects both the substantive contributions the staff attorneys made to the

litigation as well as the important policy objectives served by attributing to these individuals a

rate marked up from their take-home pay.

It is axiomatic that the information presented on a lodestar petition to the court be

reasonable and accurate. And when those hours and rates serve as the basis for a request for a

substantial award of attorneys' fees, there is an utmost need for transparency to enable the Court

to make an informed decision about whether to pay the requested amount in light of all the

circumstances known to the Court. The importance of using a reasonable rate – rather than an

aspirational one – is further enhanced by the fact that, in this case, the staff attorneys and contract attorneys comprised 70% of the overall lodestar submitted to the Court in support of a $75M fee award. That is, the lodestar generated by staff attorneys was material to the total lodestar submitted and any resulting multiplier.

Finally, by itself, there is nothing remarkable or untoward in billing partners and associates that perform legal services at hourly rates that exceed their take-home hourly pay. A reasonable rate is what a sophisticated client would pay to the attorney in the prevailing market. *See Gatreaux v. Chicago Housing Authority*, 491 F.3d 649, 659 (7th Cir. 2007) ("The reasonable hourly rate used in calculating the lodestar must be based on the market rate for the attorney's work [...] The market rate is the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the type of work in question.")(quoting *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 519 (7th Cir.1993)); *see also Ferrari v. U.S. Equities Corporation*, 661 Fed.Appx. 47, 50 (2nd Cir. 2016). The practice is equally appropriate when the "marked-up" hourly rates are submitted to the court in connection with requesting a fee award in a class action case. Where the disagreement arises is whether the staff attorneys in this case should be treated in the same way. The Special Master has recommended that it is substantially fair and reasonable that staff attorneys, employed by and supervised by the firms, who bear the risks and obligations commensurate with an employment relationship, should be treated as lower- to mid-level associates for billing and lodestar purposes.[4]

---

[4] However, as argued in Section II, below, such billing practices for agency attorneys is fundamentally unfair to class members, and against the public interest.

## II.   PUBLIC POLICY CONSIDERATIONS AFFECTING ATTORNEYS' FEE AWARDS AND PRACTICES DETRIMENTAL TO THE INTERESTS OF THE CLASS

Since the *Boston Globe* published an article in December 2016 challenging billing amounts and rates claimed in Plaintiffs' fee request, the Court has repeatedly expressed concern that representations made in the various fee petitions submitted to the Court – describing the rates of staff and contract attorneys as "regularly charged" – were not accurate.[5]

The Court's concern is really three-fold: (i) whether the rates of contract attorneys represented regular rates; (ii) whether the rates for staff attorneys represented regular rates;[6] and, (iii) whether any of the rates submitted to the Court are, in fact, regular given the absence or paucity of paying clients. The Special Master addressed all three issues in his R&R. With regard to the latter two issues, the Special Master found that, with the exception of the Thornton Law Firm which did not maintain regular billing rates for the majority of attorneys listed on its fee petition, the use of the phrase "[t]he hourly rates for the attorneys and professional support staff in my firm .... are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions," was permissible – though overly colloquial and not a model of clarity (R&R, pp. 57-58); and that the range of rates charged for staff attorneys (but not contract attorneys) in this case was reasonable (R&R, pp. 176-181).

As discussed in detail *supra*, the Special Master found that the *Globe* painted with too broad a brush in its critique of *staff* attorney rates, which he found to be reasonable and

---

[5] *See, e.g.*, 6/24/19 Hrg. Trans., p. 30: 8-13; 3/7/17 Hrg. Trans., pp. 79:1 – 78:17, 87: 2-13; 10/15/18 Hrg. Trans., pp. 7: 1-6, 23:24 – 24:6, 36:23 – 37:3; 11/7/18 Hrg. Trans., p. 88: 18-22.

[6] Consistent with its pleadings, counsel for the Hamilton Lincoln Law Institute argued at the most recent hearing that Plaintiffs' counsel submitted a lodestar "largely padded by staff and contract attorneys" that did not justify a 25% fee award. 6/24/19 Hrg. Trans., p. 102: 7-12. The Special Master has found, and continues to find, that the hourly rates submitted for staff attorneys -- attorneys employed full-time by Lieff and Labaton to perform associate-level work -- were reasonable and reflected the great contributions the staff attorneys made to the litigation.

consistent with the prevailing rates and market rates for the work that they did. The *Globe* did, however, shed important light on the integrity of class action fee awards that rely on marked-up employee rates. And, while the Special Master did not find anything unethical about charging the class at prevailing – albeit not dollar-for-dollar rates for full-time staff attorneys tasked with associate-level work, the Special Master raised grave public policy concerns about charging the class at those same rates for attorneys that were essentially rented – to staff a particular case with no employment relationship with the firm. Because this issue remains heatedly contested by Customer Class Counsel, and in the Special Master's view is one of the few issues (along with those surrounding the Chargois Arrangement and payment) that will resonate far beyond this case into the profession itself, the Special Master elaborates further on his original discussion. *See* R&R, pp. 183-189.

> **a.  Contract attorney time should be treated as an expense not eligible for inclusion in the lodestar or in determining a lodestar multiplier.**

We should all remember where this investigation had its genesis. It was in the *Boston Globe*'s reporting which "spotlighted" two broad areas of concern: (1) the double-counting on the Customer Class firms' lodestar petitions – which, the Special Master found largely inadvertent, but negligent and sloppy and reduced the fee award accordingly; and (2) the mark-up on attorneys who were paid relatively low hourly rates and marked-up many-fold on the fee petition. The *Globe*'s shocked reaction to this issue reflected a real and understandable public reaction. While the Special Master found the *Globe* article did not distinguish between staff attorneys, or non-partnership-track associates, and true contract attorneys, and further found that the staff attorneys' rates were well justified, for all the reasons set forth here and in the R&R, the same could not be said for the contract or agency lawyers. In the Special Master's view, the rates

claimed for these contract attorneys go to the heart of the public policy concerns spotlighted in the *Globe*'s initial article.

The Special Master's investigation – while prompted by the *Globe*'s report that Plaintiffs' counsel billed staff attorneys at a ten-fold markup – found a meaningful difference between staff attorneys employed by Lieff and Labaton and contract attorneys employed by third-party staffing agencies. Based upon this critical distinction in status of the two groups of attorneys, the Special Master recommended that contract attorneys should be billed as an expense and not included on the lodestar. On this point, the Special Master and at least one of the Customer Class law firms are sharply at odds.

           i.   *Contract attorneys occupy fundamentally different roles and incur far less risk for a firm utilizing them than employed staff attorneys.*

Whether referred to as "agency" or contract attorneys, the relationships with the benefiting firm are the same – the attorneys are employed and paid by a staffing agency, rather than by the firm. *See* 6/24/19 Hrg. Trans., pp. 141: 23 – 142: 3. But concerns about the role of contract attorneys goes far beyond who is writing a check to whom. Contract attorneys stand in entirely different shoes than staff attorneys for several other, important reasons. First and foremost, firms utilizing contracted attorneys do so to minimize their cost exposure and do not undertake the same risks in paying these attorneys hourly, and on a case-specific basis, as they would in employing attorneys full-time with benefits. Firms are neither subjected to the myriad of obligations arising under state and federal employment laws, to include health insurance and/or retirement benefits, nor are they required to provide long-term work for these individuals. *See* R&R, pp. 183-189, for a full discussion.

The contract attorneys used in this case presented little, if any, risk to Lieff, the firm that arranged for their participation. The magnitude of the risk, including financial risk, undertaken

by a contingency law firm in taking on a class action litigation is a paramount concern for the Court in determining any fee award. The importance of accounting for real risks cannot be overstated. It is one of the six *Goldberger* criteria applied by federal courts to determine whether a fee is reasonable. *See* 6/24/19 Hrg. Trans., pp. 16:15 – 17:5. The perils of staffing a multi-year case with extensive discovery obligations (as complex class actions often require) are significant and weigh heavily in favor of permitting a recovery in excess of the raw lodestar as well as a modest markup on legal work performed by full-time staff attorneys whose time is dedicated to a case with an uncertain result.

But firms, like Lieff, do not take on the same risk when they staff cases, at least in part, with outside attorneys who can be hired and fired at any time and who do not subject the firm to legal liabilities or obligations, irrespective of whether the firm works with them in the future. This concept of risk is precisely why courts approve a lodestar multiplier in cross-checking the raw lodestar against a percentage of fee award. *In re Tyco Intern., Ltd. Multidistrict Litigation*, 535 F.Supp.2d 249, 271 (D.N.H. 2007) (discussing that a lodestar multiplier "compensates counsel for the risk they assume in litigating [a] case.") Contract attorneys that do not pose these same risks should not be considered as eligible for consideration in determining what, if any, lodestar multiplier should be granted.

> ii.   *Federal jurisprudence – though evolving – distinguishes attorneys fulfilling a contract attorney role based on the economic realities facing the hypothetical paying client.*

Federal courts have recently started to take a closer look at how non-employee contract attorneys should be treated, and the trend is clearly to more closely scrutinize the distinct relationship – or lack thereof – between contract attorneys and law firms. Up until now, federal courts have not really focused on the distinction in the roles of contract attorneys and staff

attorneys.[7] Many cases have simply ignored, or glossed over, the important distinctions without any deep analysis. This aspect of public policy requires a more penetrating analysis. And the treatment of contract attorneys, and, as noted, how their costs are drawn from a common fund award to a settling class, will have ramifications far beyond this case. This case presents a unique opportunity for a court to do so and to put a public policy imprimatur on the question.

The Special Master acknowledges that federal circuits have not spoken with one voice but have, to date, largely permitted a markup of contract attorney fees on the lodestar in most cases. *See In re Anthem, Inc., Customer Data Sec. Breach Litig.*, No. 18-16826, 2018 WL 7858371 (9th Cir. Oct. 17, 2018), citing *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 4126533, at *8 (N.D. Cal. Aug. 3, 2016) Firmly rooted within these decisions, however, is the largely universal presumption that a paying client would generally pay less for work performed by a contract attorney not employed by the firm. *See, e.g., Citigroup Sec. Litigation*, 965 F. Supp. 2d 369 (2d. Cir. 2013) ("But Courts seem to agree that a contract attorney's status as a contract attorney—rather than being a firm associate—affects his market rate. Even the authority on which Counsel relies presumes that clients generally pay less for the work of contract attorneys than for that of firm associates."); *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 954 F. Supp. 2d 276, 280 (finding that, while it is common practice for law firms to mark-up the rates they pay for contract attorneys, rates of $295 - $435 are not reasonable since an informed client would not accept the proposed markup here.)

Thus, the Special Master does not agree that, as Lieff has argued, contract attorneys should be treated interchangeably with staff attorneys for billing purposes. That is to say, equal work does not justify equal rates in this instance. While some of courts have awarded contract

---

[7] There are only two instances the Special Master could identify where courts have made any specific distinction between contract and staff attorneys. *See In re Citigroup Inc. Bond Litigation*, 988 F.Supp.2d 371, 376-378 (S.D.N.Y. 2013); *In re Anthem, Inc. Data Breach Litigation*, 2018 WL 3960068, at *17 (N.D.Cal. 2018).

attorneys rates equal to those of associates, and considered them in the lodestar, the Special
Master has consistently distinguished these cases, which neither address the economic realities of
the independent contractor relationship nor consider what a sophisticated client would pay a
contract attorney paid at $30-$50 per hour. This is not to downplay the importance of utilizing
outside, temporary help where the circumstances of the case call for it. As several courts have
recognized, contracting with independent attorneys on a case-specific basis provides a cost-
efficient service to the client and has become a reality in large, mega-litigations. All well and
good. But this does not mean law firms should be able to mark up contract attorneys with free
reign, as doing so effectively negates the cost-savings achieved by hiring outside help, at least to
the class *See In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *18 (S.D.N.Y. 2013) ("There is
little excuse in this day and age for delegating document review [particularly primary review or
first pass review] to anyone other than extremely low-cost, low-overhead temporary employees
(read, contract attorneys)—and there is absolutely no excuse for paying those temporary, low-
overhead employees $40 or $50 an hour and then marking up their pay ten times for billing
purposes.")

The economic realities of the relationship must be considered. From the class's
perspective, any cost-savings on contract/agency attorneys provides no benefit to the class and is
hardly a bargain, as these attorneys are marked-up solely for the financial benefit of counsel and
can hardly be viewed as the going-rate for contacted legal help. Indeed, the marked-up rates
directly boost the raw lodestar reported to the court, inevitably driving down any lodestar
multiplier calculated using a cross-check. In other words, marking up contract attorneys to ten-
fold rates minimizes the harsh economic realities that courts must consider in awarding a fee. So,
little, of any benefit flows to the class at all – only the financial burden.

Bearing in mind these considerations, federal courts have more recently begun to scrutinize the characterization of contract attorneys, positing whether such hours should be routinely passed along to the class as an expense. *See, e.g., Dial Corporation v. News Corporation*, 317 F.R.D. 426, 438 (S.D.N.Y. 2016); *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 318 F.R.D. 19, 26 (S.D.N.Y. 2016) ("a reduction in the requested fees is warranted to avoid a windfall to [the firm] for charging more than $350 per hour for associates who are contract attorneys in all but name [expressing a preference that a firm reduce attorneys' fees by hiring contract attorneys and accounting their time as an expense]."). As Lieff has stated time and time again, courts have *historically* approved large mark-ups on contract attorneys' rates. But that historical pattern is largely the byproduct of a long line of cases where courts did not explicitly address "the disparity of rates at which contract attorney were paid and the rates at which they were charged." *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *19 (N.D. Cal. Aug. 17, 2018), *appeal dismissed sub nom. In re Anthem, Inc., Customer Data Sec. Breach Litig.*, No. 18-16826, 2018 WL 7858371 (9th Cir. Oct. 17, 2018) (assigning an hourly rate of $240 as a starting point, but "willing to receive documentation justifying a lower or higher rate."). A historical lack of rigorous analysis should not preclude careful courts from engaging in and imposing a more cold-eyed and realistic analysis.

The Special Master, who has been charged with determining the reasonableness and accuracy of the contract attorney hours listed on the fee petition submitted in the State Street case, must not simply take these cases at face value. Instead, the Special Master carefully considered the factors that have contributed to the current acceptance of mark-ups on contract attorneys and waded through the rationale – or lack thereof – to determine any force which past decisions should be given in this instance. The history is not, moreover, one-sided. Courts have

recognized a fundamental policy that even a marked-up rate must be tethered to a contract

attorney's cost and/or hourly wage. *See Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of*

*Am. Corp.*, 318 F.R.D. at 27 (concluding that billing out newly-hired, temporary associates rates

exceeding $350 per hour "for work that is typically the domain of contract attorneys or

paralegals" was excessive and warranted reduction.).

While no court has specifically mandated that counsel categorize contract attorney hours

as an expense, judges, such as Judge Pauley in *Dial* and Judge Koh in *Anthem*, have strongly

encouraged the plaintiffs' class action bar to consider adopting this approach for all cases. The

Special Master whole-heartedly agrees and urges this Court to go one step further and actually

do it.

Looking at the economic realities from the perspective of a legal outsider – the

proverbial man on the street – the billing of a contract attorney as an expense is simply sensible

judicial policy. As Judges Pauley and Koh have noted, it not only saves the class fees, but

promotes judicial efficiency by relieving judges from wading through the factual distinctions of

an attorney's employment status to check the propriety of the mark-ups applied by counsel. *See*

*Dial Corp.*, 317 F.R.D. at 437; *In re Anthem, Inc.*, 2018 WL 3960068, at *17-20. But more

importantly, billing contract attorneys as an expense most accurately reflects the negligible risk

taken on by the firms that employ them. While Lieff[8] may take it upon themselves to hire

contract attorneys and maintain long-term relationships with the same individuals across various

cases, the fact remains that the risk of hiring an attorney billed at $30-$50 per hour is far less

than assigning a full-time employee to do that work.

---

[8] Lieff is the only firm in this case to use contract/agency lawyers. Thornton supports Lieff's view, but that is largely in self-interest, since it (inappropriately) put Lieff's contract/agency lawyers on its fee petition, identifying them as its employees, and marked them up accordingly (even in some instances beyond the rates charged by Lieff on its lodestar for the same contract attorneys).

Beyond this, requiring contract/agency attorneys to be expensed would have the salutary effect of requiring firms utilizing the service of these rented attorneys to specifically enumerate this distinction on their lodestar petitions, and it would avoid the confusion seen in this case of bundling them together amorphously with employed attorneys, and not specifically calling this out to the Court so that it might more closely analyze this category of fees and discharge its role of protecting the class.[9]

        *iii.*      *Defense counsel did not markup non-employee contract attorneys in the State Street case.*

For a better model, the Court need look no further than the practices of defense counsel *in this very case.* Defense counsel WilmerHale, who routinely use contract lawyers employed by third-party staffing agencies to review documents in large litigations, charge their client those attorneys at cost. R&R, Ex. 250; 6/24/19 Hrg. Trans., pp. 158: 10-14. The baseline rate in 2016 for agency attorneys was approximately $40, exclusive of overhead costs, which were covered by the agency in this instance. Where WilmerHale utilized its own employees to perform the same tasks, it marked up the cost some modest amount, depending on the sophistication of the tasks delegated to the attorneys and the total overhead costs required.[10] Consistent with this practice, the Special Master has recommended that the law firms housing contract attorneys be

---

[9] The problem caused by this practice was manifested precisely in this case, as Lieff did not at all distinguish between its staff attorneys and contract/agency attorneys on its lodestar, instead lumping both types together on its lodestar and effectively telling the Court that both the staff attorneys and the contract/agency lawyers were employees of the Lieff law firm and that the rates claimed for these attorneys were the rates customarily charged by the firm for their services. As to the contract/agency lawyers, this was not strictly true, as these attorneys were not employed by the Lieff firm (as Thornton has pointed out). However, the Special Master did not choose to recommend a specific reduction for this inaccuracy, as he believed the recommendation to treat these contract/agency attorneys as an expense, and reduce the fee award accordingly, which could not be marked up and then multiplied, was sufficient.

[10] WilmerHale attorney, William Paine testified that first-level document review services were provided in the State Street case by attorneys employed by the firm in its Discovery Services Department in Dayton, Ohio. As reflected in Ex. 250, WilmerHale typically charged clients $75 per hour for the most rudimentary work performed by attorneys in Dayton. The Special Master finds it instructive that, as the sophistication of the work increased *for employees,* so did the value of the markup. Again, the important distinction is that WilmerHale only marked up its own employees.

reimbursed for any actual out-of-pocket costs expended in doing so. But this in no way alters his fundamental view that contract attorneys are not eligible for a markup. The critical distinction emerging from this comparison to defense bar is that the attorneys employed by the firm are treated differently than ones with whom the firm only contracts; employees are marked-up on the fee petitions, but contractors are not.

Lieff's primary defense to this is that this is a percentage-of-fund fee award, so, in essence, "no harm, no foul". As an explanation, this simply is not sufficient, for any number of reasons. First, it entirely negates the lodestar as a meaningful cross-check for the class. Taken to its logical next step, a firm could entirely utilize the services of contract lawyers, put thousands of their hours on their lodestar, marked-up ten-fold, and then obtain a multiplier of two or three times. This would have the effect of allowing firms to rent these attorneys for $30 to $50 per hour, put them on their lodestar petitions for $300 to $500 per hour -- and then multiply their rates effectively by two times to $600 to $1000 per hour or more, without the attendant risk or cost burden that an employment relationship brings. Had the rates used been those actually billed, this would result in a multiplier of twenty-times as much. As noted, all of this is to the decided detriment of the class, from whose recovery these funds would come.

This long-standing practice exemplifies the public policy concerns that the *Globe* article spotlighted. Quite simply, this practice of marking up non-employed attorneys many-fold, then applying a multiplier beyond this, shocks the conscience of the man on the street and undermines the integrity of our class action legal system, as well as the public's confidence in rigorous judicial oversight of class action fees. This is exactly where this case came in the door, thanks to the *Globe*'s scrutiny, and this Court should firmly and resoundingly shut this door. The Special Master is convinced that if this Court does so in this case, the sound of that closing door will

resonate with positive effect far beyond this case – all to the good of the integrity of judicial oversight of class actions.

Failing to take this opportunity to speak firmly and bury the practice of marking up rented contract attorneys beneath the amorphous "bury all sins" pile of a simple "percentage of fund" award would be an important opportunity missed.

## III.   THE COURT'S AUTHORITY TO ALLOCATE INDIVIDUAL FEE AWARDS TO THE LAW FIRM

The Special Master has not specifically opined on the Court's authority to allocate fees among counsel but recognizes the Court's clear authority to allocate fees among the different law firms under Fed. R. Civ. P. 23. *See also Newberg on Class Actions*, § 15:23 (citing federal cases giving the Court the "ultimate authority to determine how the aggregate fee is to be allocated among counsel" and describing circumstances in which a fee allocation to counsel is appropriate); *Manual for Complex Litigation* (Fourth), § 14.11.

Rather than taking a gross percentage-of-fund approach, the Special Master, in substance, recommended specific allocations among firms entitled to share in the fee award. The allocated amounts are directly tethered to specific findings that law firms, or individual attorneys, engaged in conduct warranting redress. This approach is particularly appropriate here where the Special Master's investigation unveiled various acts of misconduct and less-than-transparent practices. The Special Master has recommended that Labaton receive approximately $ 24,801,000; Lieff approximately $11,523,000; Thornton approximately $14,386,000 to $14,986,000; and, ERISA Counsel, $10,204,000 in attorneys' fees.

Each of these allocations reflects a reduction, and in some instances a significant reduction, based on the factual findings made by the Special Master. The total lodestar for the double-counted hours, for instance, was deducted on a dollar-for-dollar basis from all three

Customer Class firms, which participated equally in the origination and execution of the unusual

cost-sharing agreement.[11] Most prominently, the Special Master has recommended $2.75M be

disgorged from Labaton and redistributed to the fees paid to ERISA counsel based on Labaton's

intentional decision not to inform ERISA counsel about the Chargois Arrangement. The decision

to keep in the dark ERISA counsel – who, had they had known of the financial obligation to

Chargois, would not have filed a joint fee petition – had profound effects. Nondisclosure to

ERISA attorneys deprived the ERISA class representatives of an opportunity to learn the full set

of facts and circumstances before signing off on the settlement. It further deprived Attorney

Lynn Sarko of the opportunity to inform the Department of Labor, whose approval was required

for a global settlement.[12]

## IV.    IMPACTS OF LACK OF CANDOR TO THE COURT ON THE FEE AWARD

### a.  Garrett Bradley violated his duty of candor to the Court in filing a false fee declaration.

#### i.  *Bradley violated Fed. R. Civ. P. 11 and Mass. R. Prof. C. 3.3(a).*

The Special Master is unwavering in his conclusion that Thornton's Garrett Bradley

breached his duty of candor to the Court by submitting a false declaration as part of an effort to

secure attorneys' fees for his firm in this case. Dkt. #104-16. A litigant's duty of candor

encompasses both procedural or ethical rule requiring transparency with the Court as well as a

---

[11] The Special Master recommended another disgorgement of $2,241,098.40 from Lieff's recovery to appropriately account for fees generated by contract attorneys (R&R, pp. 363-368 & Revised Report, p. 28) as well as a total disgorgement of $1,926,937 to $2,526,937 from Thornton's fees, reflecting reduction of fees for Michael Bradley and contract attorneys as well as a fine paid back to the class by Thornton for violating Rule 11 (R&R, pp. 363-368 & Revised Report, pp. 13, 25-27). Beyond this, as noted, this reallocation to ERISA counsel also reimburses and compensates those ERISA firms for their substantial time and expense in being dragged into this investigation through no fault of their own.

[12] For a full discussion, *see* R&R, pp. 234-235, 350; Special Master's Memorandum in Support of Proposed Partial Resolution ("Proposed Partial Resolution"), pp. 10, 18-19.

general duty of candor toward the Court. R&R, pp. 322-325; *see also Pearson v. First NH*

*Mortg. Corp.*, 200 F.3d 30, 38 (1st Cir. 1999), citing *Shaffer Equipment Co.*, 11 F.3d at 457 (4th

Cir. 1993)[13]; *Matter of Finnerty,* 418 Mass. 821, 829 (1994)("[W]e cannot approve of any

practice in which an attorney misleads a court" [internal citations omitted].). Although the R&R

discusses the duty of candor broadly, as well as the specific violations, the Special Master firmly

roots his recommendation to impose material sanctions on Garrett Bradley and his attendant

findings and conclusions of law in the blackletter law handed down by the Federal Rules of Civil

Procedure the Massachusetts state bar association.

Litigants must, at a minimum, abide by the explicit direction set forth in the Federal

Rules of Civil Procedure and local ethical rules. The Special Master's recommendation that

sanctions be handed down to Bradley is a direct result of his finding that Bradley violated the

Fed. R. Civ. P. 11 and Mass. R. Prof. C. 3.3.[14]

Read together, Fed. R. Civ. P. 11 and Mass. R. Civ. P. 3.3(a) require that all litigants (i)

conduct a reasonable inquiry into the accuracy of the facts and law; and, (ii) promptly correct

any false statement of material fact made to the Court. *See* Mass. R. Prof. C. 3.3(a) )("A lawyer

shall not knowingly .. [1] make a false statement of fact or law to a tribunal or fail to correct a

---

[13] The First Circuit, relying on Fourth Circuit jurisprudence has recognized a "general duty of candor to the court." *Pearson v. First NH Mtg. Corp.*, 200 F.3d 30, 38 (1st Cir. 1999), *citing United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457 (4th Cir.1993) ("[A] general duty of candor to the court exists in connection with an attorney's role as an officer of the court"). As described in Section IV(a), the Special Master has raised concerns with various aspects of Bradley conduct in this case, most importantly, the intentional submission of a false affidavit to the Court and the omission of information relating to Chargois's unique role in the case. The Special Master did not, however, impose based his recommendation forsanctions on Bradley's omission, but considered that conduct as part of a broader analysis concerning Bradley's failure to discharge his duty of candor to the court. The First Circuit's analysis in *Pearson* supports this distinction. In *Pearson*, the First Circuit was confronted with a factual record that included both an omission and an affirmative representation to the Court that were misleading. The First Circuit considered the impact of counsel's silence alongside the false submission of a verified statement.

[14] The R&R discusses in greater detail how the duty of candor applicable in Massachusetts arises in large part from Mass. R. Prof. C. 3.3, as informed by Mass. R. Prof. C. 8.4(c), which defines any conduct involving "dishonesty, fraud, deceit or misrepresentation" as professional misconduct under the Massachusetts Rules.

false statement of material fact or law previously made to the tribunal by the lawyer"); *Merritt v. International Ass'n of Machinists and Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010) ("[T]he reasonable inquiry under Rule 11 is not a one-time obligation ... [T]he plaintiff is impressed with a continuing responsibility to review and reevaluate his pleadings and where appropriate modify them to conform to Rule 11.") (internal citations omitted); *Thomas v. Capital Sec. Services, Inc.*, 812 F.2d 984, 988 (5th Cir. 1987) ("Rule 11 sanctions may also be required if an attorney fails to meet his 'continuing obligation to review and reevaluate [his] position as the case develops.'") (internal citations omitted). *See also* 6/26/16 Hrg. Trans., pp. 254: 16-22; 255: 2-14.[15] Failure to meet either of these requirements warrants sanctions under Rule 11.

In this case, Bradley's fee declaration contained multiple factual inaccuracies that had the net effect of dramatically overstating Thornton's resources and manpower contribution to the case, and in that way, were material. *See* R&R, pp. 232-244. The evidence is uncontroverted – in fact Bradley admits – that he neither made a reasonable inquiry into the accuracy of the four-page fee petition before filing it, nor affirmatively corrected – much less promptly corrected – those inaccuracies with the Court after significant portions of the same pleading had already come under intense scrutiny. Viewing the post-fee petition events in this case through an objective lens, the Special Master finds that Bradley knew *or should have known* that his affidavit included multiple, material inaccuracies far earlier than March 7, 2017, when he

---

[15] While Mass. R. Prof. C. 3.3(a) imposes an explicit requirement that litigants correct any material misstatements in a sworn pleading, there is admittedly a split among the circuits whether Fed. R. Civ. P. 11 imposes a similar duty. *Compare Merritt v. International Ass'n of Machinists and Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010) and *Thomas v. Capital Sec. Services, Inc.*, 812 F.2d 984, 988 (5th Cir. 1987) *with Motown Productions, Inc. v. Cacomm, Inc.*, 849 F.2d 781, 784-785 (2d Cir. 1988)(Concluding that the determination whether a signatory's conduct violates Rule 11 is made "as of the time of the signing and that Rule 11 imposes no continuing duty to correct an earlier paper."). The Fist Circuit has not yet imposed an explicit duty to correct pleadings under Fed. R. Civ. P. 11. It has, however, held that litigants owe a duty of candor to the Court, and are subject to potential sanctions for maintaining a position that is no longer tenable under fact or law. *See McCarty v. Verizon New England, Inc.*, 731 F.Supp.2d 123, 133 (D.Mass. 2010) (*citing* Fed. R. Civ. P. 11, Advisory Committee Notes, 1993 Amendment).

begrudgingly acknowledged their falsity. Thus, the Special Master concludes that Bradley violated both prongs of Rule 11. We briefly examine each requirement below.

First, Bradley's failure to review the fee declaration prior to submission falls far short of Rule 11's fundamental requirement that a litigant perform "an inquiry reasonable under the circumstances certifying to the Court that, to the best of the litigant's knowledge, the factual contentions presented in a pleading are accurate. Fed. R. Civ. P. 11(b)(3). The inquiry requirement imposed by Rule 11 is real rather than theoretical and is viewed by the courts objectively as to what is reasonable in the circumstance. *See Lichtenstein v. Consol. Servs. Grp., Inc.*, 173 F.3d 17, 23 (1st Cir. 1999)("a party who brings a suit without conducting a reasonable inquiry and based on nothing more than a prayer that helpful facts will somehow emerge . . . [is] vulnerable to sanctions.") Among other things, courts consider the relative complexity and familiarity of the declarant with the subject matter, the time allotted for inquiry, and the ease or difficulty of accessing the requisite information to confirm the statements likely have evidentiary support. *See CQ Int'l Co., Inc. v. Rochem Int'l USA,* 659 F.3d 53, 53, 62-63 (1st Cir. 2011), citing *Navarro-Ayala v. Nunez,* 968 F.2d 1421, 1425 (1st Cir. 1992). Even if you credit Bradley's testimony that he did not read the paragraphs containing the inaccurate statements, which the Special Master seriously doubts, Bradley admits that he did not review the critical language in the declaration "closely" and the language "should have been clarified by [him] at that time." Dkt # 176 (R&R EX. 96); 3/7/17 Hrg. Trans., p. 88: 14-21; 6/25/19 Hrg. Trans., p. 66: 1-5. That is an understatement. If his testimony at the hearing is to be credited, he did not read a quarter of the content in his sworn fee declaration *at all*, despite the fact that he submitted the declaration as part of a collective request for a fee award of $75M. But, even assuming this is true, Bradley acknowledges that he did not conduct an objectively reasonable inquiry concerning

the representations in that statement. *See* 6/25/19 Hrg. Trans., 66: 1-5; 90: 10-11. So, there is no disagreement that Bradley could have, without difficult, inquired into the facts asserted in his sworn declaration – the inclusion of which rendered his sworn affidavit false – making his failure to make a reasonable inquiry without question a violation of Rule 11. *See Navarro Ayala v. Hernandez Colon*, 143 F. R.D. 460, 464 (D.P.R. 1991).

Where Thornton and the Special Master sharply disagree is whether Bradley intentionally and willfully submitted this false declaration. Thornton claims, on the one hand, that Bradley acted negligently; the Special Master, on the other hand, finds that Bradley intentionally filed a declaration with the court misrepresenting Thornton's role in the case. That is, Bradley intended to submit the hours of staff and contract attorneys on Thornton's lodestar and did sign and submit an affidavit including this information.

The credible evidence is anything but equivocal on this point. Bradley's revisionist narrative that he "made a mistake" by not reading two paragraphs that he considered "boilerplate" – or the Exhibit referenced therein – is just that, revisionist history. *See* 6/25/19 Hrg. Trans, p. 72: 1-4. A reasonable reading of the facts suggests that Bradley fully understood Thornton's lodestar would be submitted to the Court with the names of Lieff and Labaton, whether or not he reviewed the document prior to the submission. First, the language Bradley glossed over was not peripheral to the pleading, it comprised nearly one-quarter of entire written declaration, the first two paragraphs of which Bradley *did* read and referenced 28 U.S.C. § 1746's authority for a sworn declaration. Second, Bradley, who signed the declaration under the pains and penalties of perjury, was keenly aware that the Court would rely on each of the individual fee submissions in determining the final fee award. 6/25/19 Hrg. Trans., p. 112:17-113: 9. Third – even in the midst of Bradley's implausible protestations that he did not know or

realize that the staff attorneys were listed on Exhibit A at the time of submission – Bradley critically acknowledges that the entire reason Thornton agreed to pay Lieff and Labaton for the costs of the staff attorneys was to make Thornton's individual lodestar "commensurate with those of Lieff and Labaton." 6/25/19 Hrg. Trans., p. 115:20 - 116: 3 & 92: 3-4; p. 124: 14-19. In other words, there is no doubt that Thornton intended all along to include the staff attorney names to bolster its hourly contribution to the case. Thus, the Special Master found that Bradley intentionally submitted a document that falsely described the Thornton firm's contribution to the case.

The Special Master takes no pleasure in finding that Bradley acted intentionally regarding his submission of a false affidavit. The fact remains that Bradley intended to create a petition that inflated Thornton's individual lodestar by including within it staff and other attorneys that it did not employee or maintain a regular relationship.

Secondly, despite having ample opportunities to correct the misrepresentations, Bradley failed to correct the inaccuracies on his own as the Court reasonably expects. Rather, the first time Bradley communicated to the Court that the fee declaration may not be accurate came *in response* to the Court's direct questions on the topic. 3/7/17 Hrg. Trans., p. 88: 14-19; R&R, p. 235. Again, it is simply not credible that Bradley -- alerted to media concerns of potential errors in the Thornton lodestar (Exhibit A) – did not, even at this point, read the entire declaration, effectively two pages of written content, submitted along with Exhibit A. In fact, the Special Master finds far more credible Evan Hoffman's testimony that Hoffman likely provided Bradley a copy of the declaration along with Exhibit A in response to the *Boston Globe*'s inquiry. 6/25/19 Hrg. Trans., p. 181:22 – 182: 6. A review of the full document would reveal the additional inaccuracies in paragraphs 3 and 4 and trigger an ethical and legal obligations to alert the Court

26

to additional problems contained in that same document. Particularly when those problems related to a sworn declaration submitted by an attorney.

Beyond this, Bradley's motive in including the Labaton and Lieff attorneys was clearly to "jack up" the Thornton lodestar. *See* R&R EX 64. Bradley's explanation for this characterization is that it was directed to the other two customer class firms as a negotiating tactic, and that once Thornton had arrived at a fee division (6/25/19 Hrg., EX 6) with the other firms, he had no motive to "jack up" the lodestar for the Court because Thornton's fee was now established.

This explanation makes no sense, for a number of reasons. First, it completely ignores the role of the Court in using the lodestar as a cross-check. Had Bradley not included the Labaton and Lieff attorneys on its lodestar, the disproportion of Thornton's lodestar hours to Lieff's and Labaton's lodestar hours would have been manifest to the Court upon its cross-check review and the Court, in considering an allocation of fees between the firms may well have raised questions about Thornton's role and its share of the total fee award. To argue that these attorneys on Thornton's lodestar had no impact on how much Thornton would ultimately receive ignores the Court's role in protecting the class through the cross-check process.

But Bradley's argument also defies common sense. If having Labaton's and Lieff's attorneys on Thornton's lodestar was truly insignificant to Thornton's fee award, why put them on the petition in the first place? Bradley and Thornton would have the Court believe they almost accidentally appeared on the petition, or that it was an after-thought. This is belied by the record that shows the lengths Thornton went to for obtaining the names, hours and rates of these lawyers from the other two firms. *See* R&R, pp. 220-223.

In short, there can be no doubt that Bradley (and Thornton) wanted, and needed, these attorneys on their lodestar petition, as the Thornton law firm had only six timekeepers on its petition. The remaining timekeepers were Labaton and Lieff attorneys (or contract/agency lawyers).

Finally, the Special Master remains troubled by the fact that none of the four Thornton attorneys working on the State Street case felt it necessary to read the operative paragraphs in Bradley's declaration, either before submission to the Court or in November 2016, after the firm had learned of potential double-counting among the various lodestar reports. To credit the testimony at the hearing, it would appear that no one at the Thornton law firm took responsibility for reading critical language contained within a four-page fee petition, specifically describing Thornton's role in the State Street case and supporting its request for several millions of dollars in fees. *See, e.g.,* 6/25/19 Hrg. Trans., p. 161: 8-25. Thornton attorneys displayed this same, pass-the-buck attitude after the *Boston Globe* reported concerns about the information contained within Exhibit A, listing the individuals for whom Thornton had claimed fees. Even at that time, not one of the four Thornton attorneys assigned to the case read the additional four pages that, along with the lodestar chart in question, requests a $75M fee award with $18 million going to Thornton. 6/25/19 Hrg. Trans., p. 164: 15-24; 6/26/19 Hrg. Trans., p. 154: 23- 155: 9; 195: 1 – 196: 10 & 198: 12-14; 6/25/19 Hrg., EX 6; Dkt. # 562-1.

> ii. *Bradley's nondisclosure of the Chargois Arrangement to the Court further demonstrates his disregard for his general duty of candor owed to the Court.*

Beyond the transgression of the ethical and procedural rules described above, Bradley violated his general duty of candor to the Court. While the Special Master has not sought separate sanctions for Bradley's lack of credibility during the Special Master's investigation,

28

Bradley's proven disregard for his professional obligation to be open and honest with the Court on critical matters, such as Chargois' curious role in the case, reflects a complete abandonment of his duty of candor in this case. The Special Master continues to find Bradley's testimony that he did not know Chargois work on the case less-than-credible.[16] *See also*, R&R, pp. 107-109 & n.90.

> ### b.   While Labaton's failure to disclosure the Chargois Arrangement may have implicated duty of candor but does not warrant independent sanctions.

While Labaton, and Larry Sucharow, may have had – and breached – this same duty of candor to inform the Court about the Chargois Arrangement. What distinguishes Labaton from Thornton is that, unlike Bradley's fee petition, the omission of Chargois on the fee petition was not accompanied by blatant falsities that were intentionally included on the petition.[17]

With regard to Labaton, it was not only the fact that the firm withheld the very relevant information that Chargois was to receive payment from class funds, but Labaton's continual refusal to acknowledge the detrimental effects flowing from the nondisclosure to the Court, that gave rise to the Special Master's finding that Labaton bore sole responsibility for remedying the effects of nondisclosure of the Chargois. The remedy took the form of a hefty disgorgement.

---

[16] Bradley was one of a handful of lawyers who knew and had access to Damon Chargois over the life of the State Street case. Bradley knew Chargois had an affiliation with Labaton as early as 2007, and shortly thereafter, or at least by 2012 knew specifically that Chargois had a deal with Labaton to act as "local counsel" to ATRS, for which Chargois was entitled to receive 20% of the fee received by Labaton if successful in that representation. 6/25/19 Hrg. Trans., p. 24: 18-22; p. 30: 6-25. Although Bradley contends that he believed Chargois was dealing directly with the client, he cannot recall a single conversation with Labaton – including Chris Keller or Eric Belfi with whom he had numerous telephonic and email contact over the life of the case – confirming, or even intimating, that Chargois interacted with the client, nor did he observe Chargois take on other tasks typically delegated to "local counsel," including filing pleadings in the case. 6/25/19 Hrg. Trans., p. 17: 3-6; p. 18: 13-22; 6/25/19 Hrg. Trans., p. 25: 5-8; 15-21. The Special Master continues to find not credible that Bradley, from whom Chargois sought counsel when Labaton previously initiated discussions about a reduction in the fee award, did not know that Chargois played no role with ATRS in the State Street matter. *See* 6/25/19 Hrg. Trans., p. 50: 5-13; R&R, pp. 107-109.

[17] The Court has indicated that in the absence of a specific order to disclose all payments from class funds to the Court under Fed. R. Civ. P. 54(d), there may not have been a specific obligation of disclosure. The Special Master continues to believe there was an obligation, but this question, like others, is not free from doubt and underlies the Special Master's decision not to recommend disciplinary action against Labaton or Sucharow on this ground.

To redress the conduct, the Special Master recommended that Labaton adequately address the harm flowing from nondisclosure, namely, the class's inability to agree to the settlement fully informed of the Chargois payment and the ERISA attorneys' complete lack of knowledge while negotiating their own fee agreement and advising their clients and the DOL.[18] *See* R&R, pp. 368-371. The Special Master's recommendations remain two-pronged even under the Proposed Partial Resolution. Under that agreement, Labaton accepts that it is 100% responsible for this critical omission and agrees to pay an agreed-upon $2.75M to ERISA counsel and the same substantial sum of money to the class, $700,000.

## V.    THE CONTINUING EFFICACY OF THE PROPOSED PARTIAL RESOLUTION

On October 25, 2018, having engaged in several weeks of difficult and complex negotiations to narrow the scope of objections and expedite resolution of this difficult case, the Special Master, Labaton and ERISA counsel filed a multiparty Proposed Partial Resolution. At the time, the Special Master argued that the Court should accept the Proposed Partial Resolution because it advanced the administration of justice, fulfilled the Court's fiduciary duty to protect the class's interests, and provided the same level of relief as that recommended by the Special Master in his Report and Recommendations. *See* Special Master's Memorandum in Support of Supplement to Report and Proposed Partial Resolution of Issues for the Court's Consideration [Dkt. #511]. The Master detailed how the agreement conferred a benefit upon the class without depriving it of funds; was a product of arms-length negotiations; had prompted no objection from class members; and appropriately imposed differing obligations on Labaton and ERISA consistent with their respective roles in the litigation, as neither the double-counting nor the non-disclosure of Chargois involved the ERISA firms.

---

30

While the Proposed Partial Resolution remains under consideration, and the Court has

expressed some reservations about carving out Labaton, *see*, e.g. 6/25 Hrg. Trans., pp. 193-194

("I'm not inclined to sever Labaton from everybody else, sort of go back to what generated this,

the fundamentals[,]"), the Special Master continues to strongly advocate for its approval by the

Court, for a number of prudential reasons.

The Proposed Partial Resolution is not, to be sure, perfect; agreements in complex legal

matters are rarely without flaws. Confronted with strong feelings, contested facts, competing

legal theories and high stakes, each party must be willing to compromise, to soften its tone, and

to approach negotiations constructively, even as it demands that the other parties do the same.

The discussions in this case were no different than those in the myriad of seemingly-intractable

criminal sentencings or complex civil settlement hearings which this Court has successfully

concluded over the years.

However, the Court's adoption of the Proposed Partial Resolution would significantly

achieve a number of objectives that greatly transcend the immediate interests of Labaton in

resolving its legal objections, preserving its business aspirations, or containing litigation costs:

- It would firmly address the ERISA firms' concerns about Labaton's lack of disclosure of the Chargois Arrangement and its impact on fee negotiations. Labaton has agreed to pay ERISA counsel from its funds a significant amount of money ($2.75M) for the potential harm caused by not providing ERISA complete information;

- It would further First Circuit policy encouraging efficient resolution of matters and the conservation of judicial resources;

- It would confer significant benefits upon the class by paying one-third of the overstated lodestar to the class ($1,352,666.67)[19] and an additional $700,000 in

---

[19] Lieff and Thornton have objected to this provision by claiming that it binds their firms to each pay one third of the double-counted total amount; this is inaccurate. Because the Court has voided the fee award, the Court is under no obligation to bind either firm to the balance. Should the Court grant individual fee awards, the $1.3M can be considered as a liability for each firm that is taken into account by the Court in calculating the individual fee awards.

disgorgement resulting from Labaton's failure to disclose the Chargois Arrangement, for a total of $2,052,666.67 to the class; and,

- Most importantly, adoption of the agreement would recognize and validate that Labaton has fully accepted its responsibility for not disclosing the Chargois Arrangement to the Court and other parties as well as for other deficient practices and has acknowledged that these practices impaired the administration of justice. Labaton has not only committed itself to addressing these past deficiencies, but, according to retired Judge Garrett Brown, has already implemented most of these best practices, including retention of Judge Brown to review its ethical practices, appointment of a new GC and CCO, internal training and processes to ensure that retention agreements comply with the appropriate ethical standards, appointment of a "settlement team" to eliminate the past "siloing" of settlement processes, acknowledgement that the Chargois fee was not a "bare referral" fee and enacting a policy prohibiting such agreements, a commitment to disclose to the court any fee sharing arrangement between counsel, and banning the practice of including employees of another firm on its fee petitions.

In the Special Master's view, the agreement with Labaton is analogous on a policy level to a Rule 11 plea agreement. (The Special Master is not in any way implying that any criminal conduct took place here, but the procedural comparison to a plea deal is fitting.) With a plea agreement, the defendant steps forward and publicly accepts responsibility for his/her conduct, expresses contrition and agrees to redress for the conduct that brought him/her before the Court. This has important rule of law implications because a defendant is publicly acknowledging responsibility and removing any doubt, thus reinforcing the transparency of our system. In return, the Government usually agrees to recommend to the Court some degree of leniency, usually a reduction of sentence.

By analogy, this is exactly what has occurred here. Labaton has publicly stepped forward, accepted responsibility for its conduct, expressed contrition to the Court and agreed to both substantial monetary redress and has taken extensive measures to correct the deficiencies in its practices that were identified in the R&R. *See* R&R, pp. 362-371. In the Special Master's view, this resonates with the same positive rule of law principles.

Labaton has done virtually everything the Special Master recommended should be done, and the Special Master believes the Court should recognize this by accepting the Proposed Partial Resolution. In short, Labaton – alone among Customer Class Counsel – has committed itself to promoting and adhering to ethical, efficient and transparent processes in all future class actions, and has, in fact, implemented these processes in a manner that is worth emulating—and rewarding.

## VI.   OTHER CONCERNS RAISED AT JUNE 24-26, 2019 HEARING

### a.   Applicability of Rule 1.5(e) and 7.2(b).

After wading into the circumstances giving rise to the errant fee petition, the Special Master dove deeply into the propriety of the $4.1M payment to Damon Chargois. In the end, the Special Master concluded that the payment was not a referral fee, as that term is used and understood in the profession, but a true finder's fee – an entitlement to payment in future cases akin to a floating lien, rather than a professional fee arrangement. *See* R&R, pp. 272-273, 333-338. ATRS neither sought out a referral of Chargois nor knew of Chargois' involvement under George Hopkins' leadership. Critically, Labaton's financial obligation arose solely as a result of ATRS's status as a class representative, rather than its own competency to provide legal services.

But putting aside whether it is a referral fee, the Customer Class's payment to Chargois was a division of fees under Mass. R. Prof. C. 1.5(e), albeit an impermissible one. While the Court has suggested that non-referral fees, i.e. finder's fees, may fall outside of Rule 1.5(e) altogether, the critical distinction drawn by the Special Master is not whether a payment constitutes a valid referral fee or not, but whether the payment constitutes permissible fee-splitting, and relatedly, whether the client received appropriate notice of the division. Rule 1.5(e) applies to *any* "division of a fee (*including referral fee*) between lawyers who are not in the same

33

firm…" (emphasis added). Mass. R. Prof. C. 1.5(e). Although it may be more common that payments made between attorneys at different firms stem from as bone fide referrals, referral fees are but one example of a division of fee.

Whether the Chargois payment is technically a "referral fee" is only part of the issue. A lawyer who does not comply with Rule 1.5(e)'s safe harbor is still a "person" within the scope of Rule 7.2(b). While the Special Master's analysis of potential Rule 7.2(b) violations alongside Rule 1.5(e) may be novel in the sense that no Massachusetts court has specifically opined on the relationships between these two rules, the Special Master's legal discussion is hardly innovative. It merely traces the plain language of the rules intentionally drafted by the Massachusetts Board of Bar Overseers specifically clarify that Rule 7.2(b) provides a safe harbor for *valid* fee-splitting agreements complying with Rule 1.5(e). Lawyers may not pay another lawyer, or provide anything of value, in exchange for a recommendation for his or her services, unless the payment fits within the safe harbor provision (Rule 1.5(e)) or another exception set forth in the rule.

Here, the Chargois Arrangement implicates an obligation to share a fee with another lawyer, and thus fell squarely within the ambit of Rules 7.2(b) and 1.5(e). The payment itself to Chargois did not violate the rules of professional conduct or constitute intentional misconduct. The Special Master found that, because Labaton's violation of Rule 1.5(e) in this circumstances was a close call not meriting professional discipline, it would be difficult to conclude a connected violation of Rule 7.2(b) rose to the level of professional discipline, particularly where no Massachusetts court or disciplinary body has imposed sanctions upon a lawyer for paying another lawyers as described in Rule 7.2(b).

### b. While Fed. R. Civ. P. 23 may not have explicitly required disclosure of the Chargois Arrangement, the parties would have been prudent to disclose to the Court an allocation of class funds.

On the final day, the Court raised the issue whether the parties were required to inform the Court of the Chargois Arrangement pursuant to Rule 23 of the Federal Rules of Civil Procedure. Although the Court articulated a preliminary view that it was not inclined to find a violation where it did not enter a separate order to do so under Rule 54(d)(2)(B)(iv), the question raised is an important one. *See* 6/26/19 Hrg. Trans., p. 235, 6-14.

As detailed in the R&R, the Special Master recommended that, while failure to disclose the Chargois Arrangement with Chargois – paid from class funds in this case – was not a violation of blackletter law, or a direct violation of Rule 23, it was an important financial obligation that should be disclosed to the Court as well as to the class in the interest of transparency.[20] Rule 23(e) generally requires counsel provide "reasonable" and "meaningful" notice of settlement to the class members to enable them to lodge objections, including identifying agreements made in connection with the *settlement* proposal. *See* Fed. R. Civ. P. 23(a), (e)(3). While the arrangement to pay Chargois-- a seemingly unrelated party -- some portion of the allocated fees could be considered an arrangement "made in connection with the proposal," while Rule 23(e) does not expressly require that fee allocation agreements be disclosed to the class, disclosure to the class is clearly the better practice *See also* Rubenstein 4/9/18 Dep., pp. 116: 6-17, 119:7, 121:10-17.

Militating heavily in favor of disclosing the arrangement to the Court is the fact that the fees were paid from the larger pool of class funds (or, as several emails referred to it, as "off the top.") *See* R&R, EX. 140, EX. 151. Counsel has argued, unconvincingly, that the money

---

[20] For additional discussion on the parties' compliance with Fed. R. Civ. P. 23, *see* R&R, pp. 305-309.

belonged to the firms once the Court approved the total fee award on November 2, 2016, the Special Master does not adopt such a hyper-technical view. Had the class known about the Chargois Arrangement, it may have prompted further investigation of the arrangement, and at the very least, would likely have had an impact on whether class members elected to object to the settlement (at the least, it certainly would have invited the Court's scrutiny). Although it may not be a violation of the Federal Rule of Civil Procedure under the plain language of Rule 23, the Special Master reaffirms his conclusion that the financial arrangement with Chargois should have been disclosed to the class and the Court.

### c. The Special Master did not misrepresent the record as to Thornton Law Firm.

Thornton, in its Sur-Reply filed last December, and most recently before the Court during the hearing held on June 25-26, 2019, accuses the Special Master of intentionally misrepresenting the record in this case on two separate occasions. The alleged misrepresentations include (1) an inaccurate description summarizing unquoted testimony in a single block quote in the R&R; and (2) reattribution of deposition testimony using explanatory brackets in a pleading. Thornton contends that these so-called intentional alterations show a deliberate attempt by the Special Master to modify the record to make Thornton appear more culpable or, alternatively, show careless error by the Special Master. Neither characterization is accurate, and constitutes analogously, a defense lawyer's attempt to shift focus away from a defendant's misconduct to the prosecutor. Such tactics here are not only inaccurate, they are beside the point, and the Court should not dignify this unhappy tactic from a desperate defense lawyer's playbook. The Special Master responds briefly below.

The first alleged misrepresentation is no more than a stylistic choice of words selected by the Special Master in the R&R to describe a lengthier statement made by deponent Evan

Hoffman, a Thornton attorney. In the R&R, the Special Master replaced the phrase "the sort of narrative about the firm's contribution, which I believe Mike Lesser drafted," with "the declaration."[21] This substitution appears as part of a larger discussion in the R&R addressing a variety of evidence relied upon by the Special Master in concluding that Garrett Bradley failed to make a reasonable inquiry under the circumstances (or, in fact, any inquiry) as to whether the three-page fee declaration submitted to the Court was truthful and accurate, as required under Rule 11, and failed to correct it. Thornton, who contends that neither Bradley nor, apparently, anyone else at Thornton actually read the portions of the fee declaration containing the inaccurate statements (Dkt. # 104-16, ¶¶ 3-4), assign a nefarious motive to the shorthand and assume an intention to put words in Hoffman's mouth.

The reality is that the Special Master did not make a definitive finding that Bradley, or Hoffman or Lesser, read paragraphs 3 or 4 of the document in any detail. *See generally* R&R, pp. 229-239 (Rule 11 discussion); pg.231 ("The Special Master believes Bradley did not read the narrative section at all or if he did, even in a cursory fashion, he turned a blind eye to the falsity of the statements, ignoring the ethical obligations imposed by Rule 11 and the potential impact of the false statements upon the attorney fees approval process. Had he given the Declaration even a cursory reading, he would immediately have known the above sworn statements were untrue and

---

[21] The Special Master wrote as follows on page 229:

> Emails among Garrett Bradley, Mike Lesser and Evan Hoffman show that drafts of the declaration were circulated among these Thornton attorneys for their review. This is confirmed by the testimony of Evan Hoffman: "[w]e put in all the hours that we had kept track of, I along with our accounting department and Anasthasia put in the expenses and then mostly Mike Lesser and then Garrett Bradley, Mike Thornton and myself all reviewed" the declaration before Bradley signed it. Hoffman 6/5/17 Dep., p. 94:9-15.

The full citation to Hoffman's testimony at deposition is:

... and then mostly Mike Lesser and then Garrett Bradley, Mike Thornton and myself all reviewed **the sort of narrative about the firm's contribution, which I believe mostly Mike Lesser drafted**. Hoffman Dep., 6/5/17, at 94:13-17 (emphasis added).

would have -- or certainly should have -- corrected them.") In fact, the testimony at the hearing was exactly this. 6/25/19 Hrg. Trans., pp. 77: 2-5, 17-25; 79: 2-8; 85: 5-10. He, instead, found as a matter of fact that Bradley had ample time to do so and reviewed the document enough that failure to scrutinize paragraphs 3 and 4 evidenced a failure to make an "inquiry reasonable under the circumstances." R&R, pp. 230-231, citing Fed. R. Civ. P. 11(b)(3). Thus, there is simply no incentive to intentionally distort the record. The terminology used is accurate.

By shortening the original text in his own findings of fact, reflecting a judgment as to the weight of the evidence and witness credibility, the Special Master merely points out the facts relied upon in finding that Garrett Bradley had the opportunity to review and read his declaration before submitting it to the Court. Indeed, the narrative paragraph (Dkt. # 104-16, ¶ 2) was a substantial portion of the three pages comprising "the declaration." And, beyond this citation, this section of the R&R (pp. 229-239) is replete with other facts and record evidence supporting the Special Master's conclusion that Bradley had ample opportunity – and an ethical obligation – to read the entire declaration document before submitting it to the Court in support of a $18.2M fee request. Thornton is free to challenge the sufficiency of the evidence, but it has inferred an ulterior motive where one simply does not exist.

The second alleged misrepresentation refers to an apparent factual disagreement between the Special Master and Thornton over the proper attribution of a single statement made during Hoffman's June 5, 2017 deposition submitted by the Special Master in response to Thornton's objections to the R&R.[22] Thornton alleges that the Special Master erred – either intentionally or because he did not take adequate steps to confirm his basis – by changing the name of the declarant from the Special Master to Hoffman along with inserting an editorial bracket on the

---

[22] Special Master's Revised Report and Recommendations Submitted in Response to Thornton Law Firm's Objections ("Revised Response to TLF").

same line explaining that the following quotation, originally attributed to the Special Master, was made by Hoffman (the deponent) but "[erroneously attributed to Judge Rosen]."[23] The substitution, Thornton claims, was an attempt by the Special Master to unilaterally alter the record in this case to garner support for his Rule 11 finding against Bradley or amounts to a material mistake itself. This accusation, too, is belied by the substantive discussion in which it appears.

The Special Master fully admits that this disclaimer could have, and should have, been more explicitly explained in a footnote to highlight the change. However, there was no attempt to mislead the Court – to the contrary, the change reflected a difference in recollection and was highlighted for the Court by the Special Master's explicit disclaimer that the cited language had been attributed, albeit "erroneously" to Judge Rosen, in the transcript.

More importantly, regardless of who made the statement, there is no dispute that the statement is true. The model fee declaration language *was* the same in all of the Customer Class fee declarations (with the exception of the firm-specific narratives drafted by each firm

---

[23] In discussing Thornton's receipt of the model fee declaration from Nicole Zeiss at Labaton, the Special Master cited to the following exchange – provided in context below:

> JUDGE ROSEN: And you never changed that, edited it or talked to her about changing it?
>
> HOFFMAN: Correct.
>
> JUDGE ROSEN: Did they strike you as being incongruous --
>
> (Discussion off the record.)
>
> HOFFMAN [erroneously attributed to Judge Rosen]: I thought she was giving me the Thornton declaration, but our recollection is that that language was the same in all of the fee petitions.
>
> MR. SINNOTT: Do you remember seeing that language?
>
> Revised Response, p. 17.

If the Court reads the context of this quote, it appears to be a response to a question by the Special Master, as it is followed directly by another question by the Special Master's attorney, William Sinnott. Neither the Special Master, nor his team, quite understandably, have an explicit recollection of who made the statement.

independently) circulated by Labaton's Nicole Zeiss. Hoffman, the deponent, makes that very point during his deposition and during his testimony before the Court on June 25, 2016. Hoffman 6/5/17 Dep., pp. 93:14- 94:15; *see* Dkt # 528. As Thornton continues to argue in its various pleadings in mitigation of Bradley's misrepresentations, the model fee petition was provided to, and used, by all of the firms.

Thornton's focus on the attribution change is a red-herring and an attempt to somehow minimize, and justify, Garrett Bradley's misrepresentations to the Court in his sworn fee declaration. A possible inaccurate attribution of an otherwise truthful statement hardly carries the same weight as false material statements in a signed sworn affidavit, made in relation to a law firm's request for millions of dollars in attorney's fees. It is disingenuous for Thornton to suggest that they are anywhere close to equal.

## CONCLUSION

Much has changed and progressed since the completion of the Report. However, in the view of the Special Master, much remains unchanged:

First, the Special Master continues to recognize the important role which class actions and plaintiffs' class action attorneys play in protecting and enforcing the rights of consumers, injured parties and the public in general. To adequately fulfill this role, class action plaintiffs require sophisticated, well-resourced attorneys who should be compensated at rates comparable to those of the large, sophisticated, well-resourced defense firms who will in the vast majority of cases be opposing them. These plaintiffs, who are largely removed from the daily litigation of the case, in turn, rely on the Court to ensure a fair result and to regulate the conduct of the lawyers.

Second, the Special Master continues to recognize that an equally important part of the class action framework is ensuring the integrity of the fee petition process. Because the fee

petition process is often non-adversarial, as it was in this case, for the system to work properly, honesty, reliability and transparency are essential to enable the Court to adequately fulfill its assigned gatekeeping and fiduciary responsibilities to class members. If concealment and misstatements deprive the Court of an accurate and truthful accounting of facts necessary for it to make informed decisions, it cannot properly protect the class.

Finally, as reflected prominently in his Report and in subsequent pleadings, an essential component and objective of the Special Master and the Court, notwithstanding the often-uncomfortable facts and recommendations provided, remains to provide a constructive path forward, guided by lessons learned by counsel, toward better practices that benefit the administration of justice and the classes who rely on our legal system. The Proposed Partial Resolution is an important step along that path.

At its core, this case is not about the allocation of monies among a group of lawyers.

It's about protecting class members by ensuring that the Court has the tools needed to accurately assess the impact of such allocations on class members and to protect those class members against unreasonable billing markups for agency attorneys or windfalls for others untethered to the case.

And, fundamentally, it's about preserving the integrity of a system which must rely upon the professionalism and candor of those practicing within it.

Dated:  July 17, 2019

Respectfully submitted,

**SPECIAL MASTER HONORABLE**
**GERALD E. ROSEN (RETIRED),**

By his attorneys,


_/s/  William F. Sinnott_
William F. Sinnott (BBO #547423)
Elizabeth J. McEvoy (BBO #683191)
BARRETT & SINGAL, P.C.
One Beacon Street, Suite 1320
Boston, MA 02108
Telephone: (617) 720-5090
Facsimile: (617) 720-5092
Email: wsinnott@barrettsingal.com
Email: emcevoy@barrettsingal.com


**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2019, I caused the foregoing Motion for Extension of Time to Submit Memoranda to be served by electronic mail on counsel for all parties.


_/s/  William F. Sinnott_
William F. Sinnott

42