**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

**THE HAMILTON LINCOLN LAW INSTITUTE'S
<u>CENTER FOR CLASS ACTION FAIRNESS'S POST-HEARING *AMICUS*</u>**

TABLE OF CONTENTS

Table of Contents ................................................................................................................. ii

Table of Authorities ............................................................................................................. iii

Introduction ..........................................................................................................................1

Issues Raised June 24-26 .....................................................................................................2

    I.      16.75% remains a reasonable percentage of the fund................................................2

    II.     Class Counsel misrepresented the Fitzpatrick study ....................................................5

    III.    The rates claimed by Class Counsel for contract and staff attorneys are excessive, and the time spent was unreasonable.............................................................................8

          A.   Most time billed by contract and staff attorneys was spent on document review. ............9

          B.   The time spent on this case was not reasonable. ..................................................10

    IV.    A lodestar cross-check of 1.82 or even 1.34 would be suitable for a baseline fee award and higher than the award Class Counsel imposed on their ERISA colleagues. .......................11

    V.     The Partial Resolution should not be approved ...........................................................14

    VI.    The Court should fairly re-allocate attorneys' fees notwithstanding any contrary agreements with and among Class Counsel. ................................................................14

Conclusion ........................................................................................................................... 15

Certificate of Service ......................................................................................................... 17

TABLE OF AUTHORITIES

**Cases**

*In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK,
  2018 U.S. Dist. LEXIS 140137 (N.D. Cal. Aug. 17, 2018) ........................................................ 7-8

*In re High Sulfur Content*,
  517 F.3d 220 (5th Cir. 2008) ................................................................................................. 2, 14

*In re High-Tech Employee Antitrust Litigation*, No. 11-CV-02509-LHK,
  2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ............................................................................ 7

*In re Neurontin Mktg. & Sales Practices Litig.*,
  58 F. Supp. 3d 167 (D. Mass. 2014) ................................................................................... 2-3, 5

*Perdue v. Kenny A.*,
  130 S. Ct. 1662 (2010) ............................................................................................................ 14

*In re Petrobras Sec. Litig.*,
  320 F. Supp. 3d 597 (S.D.N.Y. 2018) ..................................................................................... 14

**Rules and Statutes**

Fed. R. Civ. P. 23 ............................................................................................................................ 14

**Other Authorities**

Theodore Eisenberg & Geoffrey P. Miller,
  *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*,
  7 J. EMPIRICAL LEGAL STUD. 248, 263 (2010) ......................................................................... 7

Jessica Erickson, *The Market for Leadership in Corporate Litigation,*
  2015 U. Ill. L. Rev. 1479 (2015) .............................................................................................. 4

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*,
  7 J. EMPIRICAL LEGAL STUD. 811 (2010) (the "Study") ................................................ 1, 5, 6, 7

As invited by the Court (Dkt. 564), the Hamilton Lincoln Law Institute's Center for Class Action Fairness ("CCAF") files this *amicus* brief to address issues discussed during the June 24-26 hearings ("Hearing"). Given the large number of lengthy filings already in record, this filing will focus on new issues discussed in the Hearing, with citations to CCAF's previous filings as relevant.

## INTRODUCTION

The Hearing confirms the appropriateness of CCAF's memorandum in support of a baseline $50,000,000 (16.75%) attorneys' fee award. *See* Dkt. 522 ("CCAF Fee Memo"). The percentage falls squarely in between the range bracketed by Class Counsel: 17.8% ±7.9% standard deviation. An award anchored to this average fee award is especially appropriate because Class Counsel recommended to the Court (and misrepresented) the framework of Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811 (2010).

As for the lodestar crosscheck, the rates and hours far exceed reasonably incurred market rates. Class Counsel argues that their contract and staff attorneys do work unlike document review, but the detailed billing proves this is mostly false. Tens of thousands of hours were spent reviewing and coding documents—that is, sorting them into piles as Mr. Heimann described it. Over twice as many hours were spent on document review than on memo-writing. To assist the Court in reviewing these hours, the accompanying Declaration of M. Frank Bednarz ("Bednarz Decl.") attaches exhibits sorting the hours for individual attorneys chronologically.[1] These exhibits show that 22 contract and staff attorneys did virtually nothing except document review, and most of the remainder spent more time on document review before transitioning to memo-writing tasks in the weeks before settlement. In any event the question of staff attorneys' work product sidesteps the more basic question of whether the hours were reasonably expended. A comparison to *BONY Mellon*—a case with roughly

---

[1] The undersigned also intends to serve a native Excel spreadsheet on the Court and the parties. Hours are more easily searched and sorted in this format.

triple the document production and 110 depositions—suggests across-the-board excessive billing in this case.

Even if the Court adopts Class Counsel's purported lodestar *in toto*, a $50 million fee award represents a 1.34 lodestar multiplier, which is well within the Court's discretion. Class Counsel themselves imposed a *lower* 1.17 multiplier on ERISA counsel without telling the Court about their fee-splitting arrangement. A multiplier that's good enough for the innocent goose is more than adequate for the kickback-paying gander.

Finally, the Court should disregard the agreements among counsel and award fees to each firm as is best practice under Fed. R. Civ. P. 23(h) as explained by *In re High Sulfur Content*, 517 F.3d 220, 227 (5th Cir. 2008). Class Counsel has forfeited whatever reflexive deference courts often afford lead counsel in allocating fees.

## ISSUES RAISED JUNE 24-26

### I.     16.75% remains a reasonable percentage of the fund.

CCAF recommends a baseline attorneys' fee award of 16.75%, or $50 million, as the suitable starting point before applying sanctions. Indeed, a 16.75% fee award probably understates the degree of churn and overstates the degree of risk, but the special master did not pursue certain lines of inquiry that CCAF would have if it had been appointed guardian *ad litem* in 2016.[2]

Class Counsel argues that the First Circuit–out-of-step with the rest of the country–rejects the proposition that the reasonable percentage of attorneys' fees awarded from a common fund settlement tends to decline as the fund size increases (often called the "sliding scale"). But the First Circuit has

---

[2] For example, the Special Master's R&R evidences no inquiry into whether Class Counsel received third-party litigation funding or executed a risk-transfer agreement, which would have disclosed internal understandings of the *ex ante* risk of the litigation. The R&R does not disclose the degree to which it was understood that State Street would settle once government investigations concluded, nor the degree to which billing reflects risk-fee churn.

not rejected the "megafund" analysis. No one at the Hearing could cite an appellate opinion weighing on the issue at all.

Nor have district courts in this Circuit spoken with a unified voice on the matter. Class Counsel repeatedly miscites a case that actually credited the sliding scale approach in part—*In re Neurontin Mktg. & Sales Practices Litig.*, 58 F. Supp. 3d 167 (D. Mass. 2014). At the Hearing, Ms. Lukey remarked on Judge Saris's alleged "conclusion not to follow a declining scale." (Tr. 6/24 at 83). But *Neurontin* reaches no such conclusion. Instead, the court says "The sizes of fee awards in similar mega-cases suggest that 33 1/3% of the settlement fund is too high a percentage." *Neurontin*, 58 F. Supp. 3d at 172. If *Neurontin* had really rejected the sliding scale approach, there would be no reason to look toward "similar mega-cases," and no reason to remark on the 17.8% figure for the Fitzpatrick study.

Sound reason exists to look to similar cases and award a declining percentage. This approach mimics market-rate contingency fees negotiated by sophisticated clients when those clients choose to bargain for better rates, which ATRS's former director admitted it refuses to do. Dkt. 362-21.

ATRS' own retention agreement with another law firm seems to embody this approach. As of 2014, the agreement with Bernstein, Litowitz, Berger & Grossmann LLP read "the range of the fee could be as low as 5 percent of the recovery in a very large case ranging upward to a maximum of no more than 25 percent for smaller cases with special circumstances." *Ark. Teacher Ret. Sys. v. Bankrate, Inc.,* No. 13-CV-7183-JSR, Dkt. 56 (S.D.N.Y. Tr. Jan. 31, 2014) (Judge Rakoff reading part of retention agreement into the record), attached as Bednarz Decl. Ex. 44. CCAF does not know what ATRS' retention agreement with Labaton says, but it submits that this settlement is much closer to being a "very large case" than a "smaller case with special circumstances." Similarly, the New York Comptroller, acting on behalf of the New York State Common Retirement Fund (NYSCRF), recently objected to the fee request in another securities settlement. *See Knurr v. Orbital ATK, Inc., et al.*, Dkt. 459-1, No. 16-cv-1031 (E.D. Va. May 24, 2019), attached as Bednarz Decl. Ex. 45. NYSCRF has

represented shareholders in several megafund settlements, and in its own cases counsel must agree to a fee grid capping percentage fees based on the size of the fund and the stage the case settled. For a $300 million settlement reached after a motion to dismiss but before motion for certification or summary judgment, NYSCRF's fee grid would provide fees of $32.5 million—about 10.8%. *See id.* at 4 ("Tier III," second column, $28.5 million + 8% of amount over $250 million).

The rationale for this grid is easy to understand: a case that settles before certification, for example, will tend to be valuable, as is a case that settles for $300 million before a single deposition is taken. For strong, meritorious cases, a smaller fee percentage makes sense because the size of the fund is more a function of the strength of the client's underlying claim than of counsel's efforts.

The underlying value of this case can be seen in how Class Counsel themselves talk among themselves. For example, anxiety over the fee request in *BONY Mellon* spilled over into this case as Thornton and Lieff attorneys bantered with each other. Dkt. 401-86. Garrett Bradley was concerned his firm would not be treated "fairly" in *BONY Mellon*. *Id.* at 5. Daniel Chiplock replied that his firm had done Thornton a favor by "advocate[ing] for you guys too, getting you a role in the BNYM class case (and pushing back against several co-counsel in the process) when you weren't actually owed one." *Id.* at 4. The ability to work in the case and request fees is portrayed as a *favor*, not a risk. *See generally* Jessica Erickson, *The Market for Leadership in Corporate Litigation,* 2015 U. Ill. L. Rev. 1479 (2015) (describing why class counsel cannot be entrusted to propose an efficient structure). And Bradley confirms this theme by responding:

> What I am pointing out is the inequities of our different positions. In Mellon, when we had created that case by developing the fx case all that we got was some work that resulted in $1.5 million in time. . . .
>
> Now contrast that to state street where you had no client and no concept (and Mellon was years from setting) and Mike Thornton demands that you get a floor of 20% which is probably worth about $10 million.

4

*Id.* at 3. In this remarkable exchange, Bradley also doesn't perceive *State Street* to be a risk, but instead "probably worth about $10 million" to Lieff just because Thornton invited them onto the case and gave them a guaranteed floor for fees. Chiplock replies that Lieff is also pulling its weight in *State Street*, but does not deny that the opportunity to bill on the case is valuable—just insists that Lieff bears much more risk than Thornton in *BONY Mellon*. *Id.* at 2.

The underlying value of the claims is why savvy clients—and courts—tend to award smaller percentages as the size of the settlement increases. Because ATRS refused to control or even monitor attorneys' fees, the Court must pick up the slack on behalf of absent class members.

II.   **Class Counsel misrepresented the Fitzpatrick study**

Contrary to Class Counsel's argument (Tr. 6/24 at 43-49), the Fee Memo (Dkt. 103-1) did not fairly disclose the "sliding scale" approach to attorneys' fee award, and was instead carefully crafted to create the false impression this approach is rejected by the First Circuit and lacked empirical support. While the Fee Memo says "[s]ome courts" have "lower[ed] the fee award percentage as the size of the settlement increases to avoid giving attorneys a windfall at the plaintiffs' expense." Dkt. 103-1 at 9 (quoting *Neurontin*, 58 F. Supp. 3d at 170), the Memo mentions this concept simply to knock it down. It immediately undermines the suggestion by adding that "[o]ther courts have disfavored this practice, however, and courts in this Circuit resist it." *Id.*

The Fee Memo then misrepresents, or at best grossly simplifies, *Neurontin*. Plaintiffs say that the fee award in *Neurontin* was reduced "based…on an empirical study of class action fee awards (discussed below), not the declining percentage principle, which '[s]ome courts have rejected[.]'" *Id.* But a fair reading of *Neurontin* does not support Class Counsels' implication that Judge Saris rejected the sliding scale approach. To the contrary: "The sizes of fee awards in similar mega-cases suggest that 33 1/3% of the settlement fund is too high a percentage." *Neurontin*, 58 F. Supp. 3d at 172. True, *Neurontin* does then cite Fitzpatrick, but it's impossible to read the court as rejecting the sliding scale approach, especially because the same paragraph concludes: "Importantly, however, the study also

5

broke down fee award data according to the size of the settlement fund, and found that for settlements between $250 million and $500 million, the mean percentage was just 17.8%." *Id.*

Thus, the Fee Memo misrepresented *Neurontin* as well as Fitzpatrick. Class Counsel has continually misrepresented *Neurontin* throughout these proceedings, claiming in December that "courts in the First Circuit, some emphatically, reject using the 'sliding scale' approach CEI advocates." Dkt. 532 at 3. While the *Neurontin* court did not award 17.8%, no one advocated for that or any figure lower than the 33.33% requested and it certainly did not reject the sliding scale approach.

The Fee Memo later provides the promised discussion of the Fitzpatrick study, entirely omitting the 17.8% figure. Dkt. 103-1 at 11. The Fee Memo thus obscures the fact that Judge Saris found "important[]" and that Class Counsel's own expert Prof. Rubenstein capably summarized. *See* Dkt. 553 (CCAF Opp. to Fitzpatrick Testimony) at 7.[3] The discussion of the Fitzpatrick study omits the statistically-significant finding Prof. Fitzpatrick wrote into the abstract: "Fee percentages were strongly and inversely associated with the size of the settlement" Dkt. 104-31 at 811. No intellectually honest discussion of the study would state matter-of-factly as Class Counsel did that a "24.85% fee requested is right in line with Professor Fitzpatrick's findings" for a $300 million settlement, when both the prose and tables of the Study show the award is above average.

At the Hearing Mr. Heimann offered a bizarre rationale for only citing the 25% overall figures: "The study that we relied upon and discussed had several hundred data points" as opposed to just 8 for cases between $250 and $500 million. Tr. 6/24 at 45. In other words, Mr. Heimann suggests that Class Counsel cited the average of all 444 cases studied by Fitzpatrick because this number is larger and more reliable than 8. But this makes no sense: the study itself shows that half of the cases are for settlements less than $7 million, where fees understandably tend to average more like 30%. Dkt.

---

[3] If Class Counsel attempts to introduce sandbagged expert testimony from Prof. Fitzpatrick or anyone else, CCAF renews its opposition and its alternative offer to depose such witness and provide additional adversarial briefing.

104-31 at 839. Averaging dissimilar cases as Mr. Heimann suggests makes the figures *less* representative and useful, which is why Judge Saris, Prof. Rubenstein, and the overlapping set of counsel in the *BONY Mellon* case each cited and discussed the relevant 17.8% figure. Tr. 6/24 at 55. Instead of using a less representative sample, Class Counsel might have picked the larger study of Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. EMPIRICAL LEGAL STUD. 248, 263 (2010). *See In re High-Tech Employee Antitrust Litigation*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *13 (N.D. Cal. Sept. 2, 2015) (finding Eisenberg & Miller median 10.2% fee award more reliable than Fitzpatrick and awarding only 9.8% of 19.5% fee request).

In these adversarial proceedings, we have been able to draw attention to Class Counsel's questionable representations of Fitzpatrick, *Neurontin*, and how Judge Saris among others found the 17.8% figure important, but the Fee Memo was an uncontested and essentially an *ex parte* document. Nor did the attachment of the Fitzpatrick study cure the misrepresentation. No court or absent class member could be expected to wade through the Fee Memo and 731 pages of exhibits. And we know this is true because **Class Counsel itself didn't look through the voluminous exhibits**, or it would have spotted the double-counting error. When attorneys who successfully sought almost $75 million couldn't bother to read their own exhibits, a busy district court cannot be required to verify the representations court officers acting *ex parte*.

While the misrepresentation may not deserve its own sanction, it would be fitting for the Court to award attorneys' fees within the same ballpark as the Fitzpatrick study mean—before then applying other sanctions. This is entirely appropriate because Class Counsel "must have regarded the Fitzpatrick study as relevant and reliable," because they cited it to the Court. Tr. 6/24 at 44.

### III. The rates claimed by Class Counsel for contract and staff attorneys are excessive, and the time spent was unreasonable.

Seven years ago, plaintiff pleaded that defendant violated Chapter 93A because it "pocketed the difference between actual and reported rates" (Dkt. 10 at 3), an unfair markup of a few percentage points at most. Ironically, Class Counsel now insists that the Court must award previously-undisclosed markups as high as 1030% for contract attorneys. The Court need not.

Contrary to Class Counsel's assertion (Tr. 6/24 at 165), it is patently false that "[n]obody treats [contract attorneys] as an expense." In fact, nobody contests that large sophisticated clients pay at or near the agency cost for contract attorneys. As the Special Master and *amicus* have documented, plaintiffs' counsel have also been awarded contract attorney time without markup. CCAF Fee Memo at 13, 16; Dkt. 357 at 187-88.

As for staff attorneys, the rates requested by Class Counsel are excessive, as implicitly found by the court in *Anthem*, which reduced the rate for all contact and staff attorneys to $240/hour including several of the same individuals who submitted time in this case. *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 U.S. Dist. LEXIS 140137, at *133 (N.D. Cal. Aug. 17, 2018).[4] As here, "Plaintiffs provide no explanation for why markups of this magnitude were necessary or why markups for some contract and staff attorneys appear to greatly exceed markups for some associates." *Id.* at *130.

Class Counsel argues that the work performed by both staff and contract attorneys is different from work paid by defense counsel. Class Counsel would reduce the category of document review to "simply separating a pile of documents into two piles." Tr. 6/24 at 161. In the case of contract attorneys, this argument is a non-sequitur because the market rate for the attorney time is readily

---

[4] In candor, the court in *Anthem* specifically declined to count contract attorneys at cost, but also reduced their rates to $240/hour. Given the much larger number of staff attorney hours in this case, such rate reduction would have a much larger effect on the lodestar multiplier than reducing contract attorneys to their market price.

8

ascertainable—it's the rate actually charged by agencies. And as for the staff attorneys—whose hours comprise about 70% of all lodestar in this case (*id.* at 144)—the detailed time records submitted by counsel confirm that the vast majority of time billed was for "document review" and "coding"—that is, separating documents into piles as Mr. Heimann derisively put it. While the contract and staff attorneys did indeed bill thousands of hours on researching and drafting memos that were mostly never used, they spent over twice as much time on unglamorous document review.

Moreover, however superb the work product of the staff attorneys was, Class Counsel fails to show the time was reasonably incurred. While Class Counsel directed much of its platoon of staff attorneys toward memo-writing in April to June 2015, the number of hours devoted to these tasks cannot be squared with the hours reasonably expended in *In re Bank of New York Mellon FOREX Transactions Litigation* ("*BONY Mellon*"). A simple comparison between the cases strongly supports CCAF's contention that the hours were unnecessary and likely expended when the risk of non-payment was negligible.

### A.   Most time billed by contract and staff attorneys was spent on document review.

The Court inquired about the total number of staff attorneys in this case. Tr. 6/24 at 93. A total of 57 attorneys worked as contract and/or staff attorneys in this case. Bednarz Decl. ¶ 23. Three of these attorneys only worked as contract attorneys, and four others began as contract attorneys, but were later hired as staff. Altogether, they collectively billed about 49,692.5 hours, approximately 25 attorney-years worth of billable work. *Id.*[5]

---

[5] As explained in the declaration, the total hours are slightly different than the number Class Counsel relies on, because Class Counsel has not precisely clarified how time by certain attorneys is credited in their calculation. Frank Decl. ¶ 11. The figure used here is based on an independent construction of hours based on the detailed contemporaneous billing records produced by Class Counsel. *Id.* ¶ 10 (source detailed billing records at Dkts. 401-253, -254, -258, -275 & -276).

Most of this time was spent on document review. In fact, twenty-one of the attorneys essentially performed *only* document review and coding with at most 1 or 2 days at the end of the case working on "closing" memos. *Id.* ¶ 17. The detailed time records of another twenty-two attorneys shows that they billed exclusively on training and document review for most of the case, and only transitioned to writing memos later in the case—between April and June 2015. *Id.* ¶ 20-21. The remaining fourteen attorneys did more varied or supervisory work, although many of them also did significant document review. *Id.* ¶ 22. Even counting the hours of these fourteen attorneys as if their time exclusively consisted of non-document review, contract and staff attorneys devoted 33,811 hours (or 68% of their time) to document review/coding, training, and the review of background materials. None of these hours mentioned memos, deposition preparation, or any other type of legal work except document review.

### B.    The time spent on this case was not reasonable.

The quality of work performed by staff attorneys distracts from the more fundamental problem with the lodestar: billing judgment was not used. We know this because overlapping attorneys staffed *BONY Mellon* much more reasonably, apparently in fear of Judge Kaplan's reputation for reluctantly compensating discovery fees. Dkt. 401-86 at 3 (risk in *Mellon* "has kept me up at night for 2.5 years").

Class Counsel was quick to point out *BONY Mellon* had a different statutory bases, but this does not make the fee request in this case seem proportional. While the Special Master disagreed that the *BONY Mellon* case provided a "template" for settlement (Tr. 6/24 at 92), this is exactly what Daniel Chiplock said it was. Dkt. 401-9 (Chiplock Depo.) at 110. If anything, this settlement should have been even *easier* to win due to the differences of law. As Prof. John Coffee opined for the *BONY Mellon* plaintiffs, *State Street* "benefitted from a powerful unifying theory of liability that was not generally available to class members in this case (namely, violation of the Massachusetts consumer protection statute, which has been held by some courts to be available to out-of-state plaintiffs suing

10

an in-state defendant, and which provides for double or treble damages and prejudgment interest at a rate of up to 12%)." CCAF Fee Memo at 27-28 (quoting *BONY Mellon*, Dkt. 12-md-02335-LAK-JLC, No. 620 at 14 n.15 (S.D.N.Y. Aug. 17, 2015)).

Plaintiffs must invest in significant document review to win against well-funded defendants, but given the factual similarity between this litigation and *BONY Mellon*, the extraordinary level of billing in this case cannot easily be dismissed:

|  | ***BONY Mellon*** | ***State Street*** |
|---|---|---|
| Total lodestar | $52,097,202.06 [6] | $37,265,241.25 |
| Contract/staff attorneys used | 35 [7] | 57 |
| Contract/staff attorney hours | 54,830.75 [7] | 49,692.5 |
| Depositions taken & defended | 110 [6] | 0 |
| Depositions longer than 1 day | 5 [6] | 0 |
| Exhibits marked at depositions | 1,853 [6] | 0 |
| Expert reports exchanged | 11 [6] | 0 |
| Motions to dismiss litigated | 4 | 1 |
| Pages produced by defendant | 25 million pages [6] | 9 million pages [8] |
| Pages produced by plaintiffs | 6 million pages [6] | 76,600 pages [8] |
| Third-party discovery | 3.3 million pages [6] | 0 |

### IV. A lodestar cross-check of 1.82 or even 1.34 would be suitable for a baseline fee award and higher than the award Class Counsel imposed on their ERISA colleagues.

CCAF's recommended fee award works out to be a lodestar multiplier of perhaps 1.82 as CCAF reckons it, or at least 1.34 times the sum that Class Counsel claimed by including 100% of the lodestar's farcical and in some cases admittedly improper components (*i.e.* billing up to $515/hour for

---

[6] *BONY Mellon*, No. 12-md-02335-LAK-JLC, Dkt. 622 (S.D.N.Y. Aug. 17, 2015) (Joint Nirmul/Chiplock Declaration in Support of Final Approval) at 7 (depos), 9 (reports), 34 (documents produced), 43 (depos of defendants and exhibits), 53 (third party document production), 90 (lodestar), 101 (depos of plaintiffs and exhibits).

[7] *BONY Mellon*, No. 12-md-02335-LAK-JLC, Dkt. 622-1 Ex. B (14 contract attorneys at Lieff, 26,213.4 hours, $11.973 million lodestar); Dkt. 622-2 Ex. B (21 contract and staff attorneys at Kessler Topaz, 26,202.85 hours, $8.96 million lodestar).

[8] Dkt. 103-1 at 20.

$50/hour contract attorneys, $500/hour for Michael Bradley, billing time spend preparing the fee request, and counting an imaginary 45 hours billed in one day). CCAF Fee Memo at 11, 36. The Court might reasonably estimate the lodestar cross-check somewhere in between 1.34 and 1.82, but any lodestar cross-check in this range would be appropriate because an even smaller multiplier has been awarded in similar settlement—in *this* settlement, in fact.

While Class Counsel cynically included all the time of ERISA counsel to calculate the supposed 1.8 multiplier in the joint Fee Memo, ERISA counsel got the short end of the stick on the division. Due to Class Counsel's unreported agreements to pay Damon Chargois $4.1 million and ERISA counsel collectively 10%, all three ERISA firms got a total of $7,454,125 (Dkt. 563) compared to their combined lodestar of $6,361,715.75. *See* Dkt. 104-24. This means that due to the undisclosed diktat of Class Counsel, ERISA counsel got a multiplier of only 1.17—less than even the farcical worst-case 1.34 multiplier that a $50 million fee award would result in. Class Counsel clearly thought such a multiplier was adequate to compensate attorneys who worked on contingency in this case. Lieff displays particular chutzpah in complaining about its purported 1.69 multiplier (Dkt. 577 at 4), given that it helped impose much less favorable terms on ERISA counsel and then helped conceal the Chargois arrangement along with Labaton—never disclosing it until the Special Master separately discovered it within production from TLF.

Finally, a lodestar cross-check above 2 is not appropriate in this case because the level of risk has been exaggerated. In the first place, it bears repeating that although Class Counsel presents the original fee award as a multiplier "in the low twos" (Tr. 6/26 at 228), based on the actual fee distribution (Dkt. 562-1), this represents a multiplier of 2.19 for Class Counsel compared to just 1.17 million for ERISA counsel. (And again, this multiplier credits all of Class Counsel's lodestar, counting $515/hour contract attorneys, trivial errors, etc. CCAF Fee Memo at 36-37.)

The case was not so risky when contract and staff attorney time was poured into it. While "State Street was filed first," as Christopher Keller testified (Tr. 6/26 at 89), very little time was invested in the case prior to the resolution of the motion to dismiss. The investment occurred later, when the *BONY Mellon* settlement would have suggested less risk. While Mr. Sinnott remarked "[t]here was no guarantee of a positive outcome in this case until very late in the litigation" (Tr. 6/24 at 91), neither was there significant billing until late in the litigation. In fact, half the hours in the case were billed on and after February 5, 2015—the same day as *BONY Mellon* reached an agreement in principle. The ramp up of billing at the end litigation speaks for itself:



Bednarz Decl. ¶ 13.

Unfortunately, the Special Master's report provides few clues about how close the parties were to settlement prior to an agreement in principle being reached on June 30, 2015, although the hours of partners suggest the exchange of terms sheets and offers month before the ultimate agreement.

That said, the hours billed toward the end of litigation are naturally less risky than hours billed toward the beginning of it, and risk multipliers must be justified. There's simply nothing sacrosanct about generous fee multipliers applied to already-generous billing rates, especially given the "strong presumption that the lodestar is sufficient" without a multiplier. *Perdue v. Kenny A.*, 130 S. Ct. 1662, 1669 (2010). Even if Class Counsel's claimed $37 million lodestar were credible, "only" compensating Class Counsel 1.34 times $515/hour for the time of contract attorneys paid $50/hour could not imaginably constitute an abuse of discretion.

## V.     The Partial Resolution should not be approved

The Court's identification of the previously-omitted referral arrangement in *Bristol County Retirement System v. HCC Insurance Holdings Inc.*, No. 07-cv-0801 (S.D. Tex.) provides further reason to reject the proposed Partial Resolution. Tr. 6.26 at 79. CCAF continues to oppose the Partial Resolution, as it explained several times before. *See generally* Dkt. 515; Dkt. 545 at 10-12.

Labaton still has not explained its apparent failure to advise the presiding court in *In re Petrobras Securities Litigation*, No. 14-cv-9662 (S.D.N.Y.) of its referral arrangement, as the local rules of S.D.N.Y. expressly require. Dkt. 545 at 11. (CCAF is familiar with this settlement because it filed an objection that resulted in a "$46 million reduction in Class Counsel's fee award," which instead benefited the class. *In re Petrobras Sec. Litig.*, 320 F. Supp. 3d 597, 600 (S.D.N.Y. 2018).)

## VI.    The Court should fairly re-allocate attorneys' fees notwithstanding any contrary agreements with and among Class Counsel.

The Court suggested that it may decide the specific allocation of fees among the firm at a later time. Tr. 6/26 at 203.

14

This is appropriate. "In a class action settlement, the district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel." *In re High Sulfur Content*, 517 F.3d 220, 227 (5th Cir. 2008). "[T]he district court must not . . . delegate that duty to the parties." *Id.* at 228 (internal quotation marks omitted). Class Counsel's own expert believes courts should exercise such oversight more often. "Look, the law says that the judge is a fiduciary and oversees fee allocation. Ninety-nine percent of the judges say we don't want to know. . . . the class representative . . . [is] not really to be able to oversee and manage the lawyers. It's precisely why we make the judge the fiduciary for the absent class members, and the judges themselves neglect this authority." Dkt. 401-243 (Rubenstein Depo.), at 142-43.

Courts too rarely exercise this responsibility, but in this case the Court should award fees to each firm individually. Class Counsel struck these agreements in order to obscure the Chargois relationship from ERISA counsel, the Court, and even the lead plaintiff. This result is not only unfair measured against the work each firm put into the case, it's also unjust because it rewards Class Counsel for concealing the arrangement by locking in their questionably lopsided slice of the pie.

If this case does not demand an individual allocation, no case does.[9]

## Conclusion

The underlying settlement created a $300 million megafund, and the vast majority of courts award substantially less than 25% for such a settlement to avoid providing a windfall to counsel. The now-vacated 25% attorneys' fee award would be especially inappropriate here given the other questionable conduct the Special Master uncovered. The court should award fess of about 16.75%

---

[9] While the Court will likely accept additional briefing after the overall fee award is decided, CCAF preliminarily suggests that the initial allocation (before considering sanctions) should award each firm in proportion to their reasonably-incurred lodestar. In other words, every firm would have the same lodestar multiplier, which will likely be higher than what ERISA counsel received through their 10% agreement (which should be voided), but lower than what Class Counsel requests.

($50 million), which more closely resembles the average fee award for a case of this size and—when contract and staff attorneys are appropriately billed at market rates—would constitute a 1.82 lodestar multiplier and at worst a 1.34 lodestar multiplier, which is higher that Class Counsel imposed on ERISA counsel. More importantly, this award more than fairly compensates counsel given that there was little risk when most hours were billed, and is especially generous in view of the 1.6 multiplier earned in *BONY Mellon*, where counsel bore significant risk and engaged in much less wasteful churn than in this case.

The Court should apportion the fee award to each firm and disregard Class Counsel's fee sharing agreements.

Respectfully submitted,

Dated: July 17, 2019                  */s/ M. Frank Bednarz*
                                       M. Frank Bednarz (BBO No. 676742)
                                       HAMILTON LINCOLN LAW INSTITUTE
                                       CENTER FOR CLASS ACTION FAIRNESS
                                       1145 E Hyde Park Blvd. Unit 3A
                                       Chicago, IL 60615
                                       Telephone: 801-706-2690
                                       Email: frank.bednarz@hlli.org

                                       Theodore H. Frank (*pro hac vice*)
                                       HAMILTON LINCOLN LAW INSTITUTE
                                       CENTER FOR CLASS ACTION FAIRNESS
                                       1629 K Street NW
                                       Suite 300
                                       Washington, DC 20006
                                       Telephone: 202-331-2263
                                       Email: ted.frank@hlli.org

                                       *Attorneys for Amicus Curiae*
                                       *Hamilton Lincoln Law Institute*
                                       *Center for Class Action Fairness*

## CERTIFICATE OF SERVICE

I certify that on July 17, 2019, I served a copy of the forgoing on all counsel of record by filing a copy via the ECF system.

Dated: July 17, 2019

> */s/ M. Frank Bednarz*
> M. Frank Bednarz