# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

# [PROPOSED] RESPONSE BY LIEFF CABRASER HEIMANN & BERNSTEIN, LLP TO THE SUBMISSION OF LABATON SUCHAROW LLP IN RESPONSE TO THE COURT'S JUNE 28, 2019 ORDER

Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser") respectfully submits this brief response to a new contention contained in the Submission of Labaton Sucharow, LLP in Response to the Court's June 28, 2019 Order ("Labaton's Submission"), filed July 17, 2019 (ECF No. 579).

In its submission, Labaton contends the following regarding Lieff Cabraser's purported "aware[ness]" of certain facts concerning Damon Chargois, Esq., a lawyer who putatively served as local counsel for Labaton and the client in this matter:

> Although Lieff and Thornton have said that they did not know the full details of Labaton's agreement, all three Customer Class Counsel firms were aware of the $4.1 million fee shared with Chargois (*see* ECF No. 446-9); aware that no disclosure of that sharing was made (appropriately in Labaton's belief) to the Court, the class, or ERISA counsel; and aware that Chargois entered no appearance, submitted no lodestar report, participated in none of the mediations or hearings, produced no work product and certainly did not engage in work that would approach the value of $4.1 million.[1]

Lieff Cabraser submits that these statements, taken together, are misleading as to Lieff Cabraser's "aware[ness]" of facts surrounding Mr. Chargois, and that the last of them—a brand new contention—is completely belied by the record and the Special Master's findings.

It is true that Lieff Cabraser was aware that Mr. Chargois did not make a formal appearance in this case, that his lodestar was not included in the fee petition, and that he did not personally participate in the mediation sessions or at Court hearings.  But none of that provided, as Labaton implies, any cause for Lieff Cabraser to suspect that Mr. Chargois was not serving as local counsel for Labaton and the client (Arkansas Teacher Retirement System ("ATRS")) as

---

[1] Labaton's Submission at 17-18 (ECF No. 579).

Lieff Cabraser was repeatedly assured[2] was the fact.  As the testimony of Labaton's own

attorneys in this matter attests, it was Labaton's regular practice *not* to cause local counsel (such

as Mr. Chargois was represented to be) to appear as counsel of record, or to include their time in

lodestar submissions, even where such local counsel performed the work expected of them.  *See*

Hearing Tr., June 26, 2019 (testimony by Chris Keller) at 67-68, 73-74 (ECF No. 566).   Hence

there was no reason for Lieff Cabraser to suspect from these facts that anything was amiss

regarding Mr. Chargois' repeatedly-described role and putative service as "local counsel."

Further, Labaton's contention that Lieff Cabraser knew that Mr. Chargois "certainly did

not engage in work that would approach the value of $4.1 million" is false and directly

contradicted by the record, including the testimony of Labaton's own attorneys.  At his

deposition in 2017, Mr. Keller explained repeatedly that "local counsel" (such as Mr. Chargois

was consistently reputed to be to Lieff Cabraser) who are routinely paid up to 20% of Labaton's

fee (i) are "very important" and provide real value to Labaton's representation to clients outside

of New York; (ii) are expected to do the "heavy lifting" and to be "substantively involved" on

the client-facing side; and (iii) are expected to perform "hand-holding" for the client on

unpleasant or laborious tasks such as document production, among other things, in exchange for

that fee.  *See, e.g.,* Deposition of Chris Keller, Oct. 13, 2017, at 43-46, 107-09, 112-14, 230-232

(attached as Ex. 80 to the Special Master's Report and Recommendations) (ECF No. 401-79).[3]

---

[2] *See* Exhibit N to the Decl. of Steven E. Fineman in Support of the Response and
Objections of Lieff Cabraser Heimann & Bernstein, LLP to the Special Master's Report and
Recommendations ("Fineman Decl.") (ECF No. 369-14) (summarizing, *inter alia*, all
communications where Lieff Cabraser was copied or participated in this matter, and in which
Mr. Chargois was referenced, where he was consistently identified by Labaton or Garrett
Bradley as "local counsel"—not merely referring counsel or some similarly less-substantive
title).  Portions of this previously-filed exhibit are being re-submitted as Exhibit 1 to this brief.

[3] Additional testimony from this same deposition by Mr. Keller similarly spoke to these
issues but was either (i) not included in the excerpts that were filed (at ECF No. 401) as exhibits

1814554.1

The kind of role ordinarily played by local counsel, as described above, is entirely consistent with Lieff Cabraser's experience—as amply described in the record (including testimony by Lieff Cabraser's own attorneys in the case). Indeed, the subject of Mr. Chargois's role in the case and Lieff Cabraser's understanding of that role was the subject of extensive inquiry by the Special Master. In response to specific inquiries on this subject by the Special Master, Lieff Cabraser submitted sworn declarations by its attorneys (Robert L. Lieff and Daniel P. Chiplock), along with excerpts of their testimony. *See* Exhibit 1, attached.[4] Among other things, these attorneys testified that it was not at all unusual in Lieff Cabraser's experience for local counsel to earn a small percentage fee (often 5 percent) for performing the client-facing tasks typically expected of local counsel, such as those described by Mr. Keller. *See id.* (specifically, Declaration of Robert L. Lieff at ¶¶ 2-4 and Declaration of Daniel P. Chiplock at ¶¶ 6-11). Mr. Chargois, consistent with Lieff Cabraser's typical experience with local counsel who are actually serving as local counsel, was paid roughly 5.5 percent of the total attorneys' fees in this case.[5]

---

to the Special Master's Report and Recommendations, or (ii) redacted because it was not specifically referenced by the Special Master in his Report and Recommendations. To eliminate the need for filing additional documents under seal, we do not reference that other testimony in this brief, but are prepared to submit it if it would be helpful to the Court.

[4] As stated above, Exhibit 1 contains portions of materials that were previously filed as Exhibit N to the Fineman Decl. (ECF No. 369-14).

[5] Lieff Cabraser anticipates that Labaton may seek to justify its contention that Lieff Cabraser must have been "aware" that Mr. Chargois "certainly did not engage in work that would approach the value of $4.1 million" by estimating the number of hours Mr. Chargois would have had to work to justify a payment of that size if his payment were calculated on a straight lodestar (or lodestar times multiplier) basis. But that would be a red herring, because that is simply not how local counsel fees are determined when (as here) they are agreed to and calculated simply as a percentage of the overall fees awarded. *See, e.g.,* Exhibit 1 (Declaration of Daniel P. Chiplock at ¶¶ 10-11). And that, according to the testimony, is entirely consistent with how Labaton has routinely paid its local counsel in other cases. As their own attorneys testified at the June 24-26, 2019 hearings, Labaton has routinely paid local counsel a percentage of Labaton's fee, without submitting local counsel's lodestar to the court in question (or, it would

As the above makes clear, Labaton, according to Mr. Keller, has the highest expectations as to the amount of involvement and interaction between local counsel and the client, including doing all of the "heavy lifting" with respect to the client's role in any given case, handling everything from the client's perspective, including responsibility for document review and production. *Id.* It was on that basis, according to Mr. Keller, that Labaton agreed to pay up to 20 percent of their attorney fees to their local counsel—including (at the outset of their relationship with him) Mr. Chargois. *Id.* at 43-46. Mr. Keller reiterated all of this in his testimony at the hearing on June 26, 2019.[6] And that is how, to Lieff Cabraser, Mr. Chargois' role in the case was consistently represented: *i.e.*, "the local attorney in this matter who has played an important role."[7] This description (among others) was characterized by the Special Master as "materially misleading"[8] to Lieff Cabraser who, as Robert Lieff indicated, relied on

---

seem, keeping track of their lodestar). The number of hours worked by local counsel simply did not matter, so long as the local counsel performed the tasks and functions expected of them by Labaton. And that, according to Labaton's testimony, is what made the Chargois situation so vexing to Labaton—Chargois was not doing any of the things expected of a local counsel who gets paid 20 percent of Labaton's fee. *See generally* Hearing Tr., June 26, 2019, at 66-68, 86-88, 97-99 (ECF No. 566). That fact, of course, was unknown to Lieff Cabraser when it agreed to Labaton's proposal that Mr. Chargois' fee be taken "off the top" of the overall fee award to all counsel (resulting in the other Customer Class Counsel jointly shouldering Labaton's obligation to Mr. Chargois).

[6] *See* Hearing Tr., June 26, 2019, at 66-68 (Mr. Keller describing typical local counsel as "handl[ing] all legal work in the environment close to the client," without submitting their lodestar), 86-88 (describing the expectations Labaton initially had for Mr. Chargois for him to act as local counsel), 97-99 (describing Labaton's efforts, by 2015, to negotiate a lower fee for Mr. Chargois in light of his not performing the work (unbeknownst to Lieff Cabraser) that was expected of a local counsel). (ECF No. 566).

[7] *See* Ex. 157 to Special Master's Report & Recommendations (July 8, 2016 email from G. Bradley to R. Lieff, M. Thornton, L. Sucharow, D. Chiplock, C. Keller, E. Belfi, and D. Chargois) (ECF No. 401-156).

[8] *See* Special Master's Report and Recommendations at 109-113, 301-303, 326, 331, 350-351 (summarizing and attaching relevant testimony, communications, and emails on the matter of Lieff Cabraser's knowledge of Mr. Chargois' role in the litigation, and describing Labaton's statements to Lieff Cabraser on the subject of Damon Chargois as "materially misleading.") (ECF Nos. 357 and 401).

- 4 -

Labaton as lead counsel for having "review[ed] the work done by. . . and contributions of local counsel" to ensure that the "fee allocation to Chargois was fair and reasonable and fully supported by his contribution to the case."[9]   Indeed, the Special Master found, "when [Labaton] sought to have Lieff . . . share in the obligation to Chargois by splitting equally the $4.1 million payment to him, they told them only a portion of the story, leading them to believe that Chargois was local counsel *and performing work of value in the case*."[10] (emphasis added).   At no time during the investigation by the Special Master did Labaton suggest that Lieff Cabraser did not believe that Mr. Chargois had performed the work ordinarily expected of a local counsel.   Nor, prior to the investigation, did Labaton as lead counsel suggest to Lieff Cabraser that the $4.1 million it recommended be paid to Chargois was in any sense unjustified based on his work and value as local counsel.

It is accordingly false that Lieff Cabraser was aware, or had any reason to suspect, that Mr. Chargois "certainly did not engage in work that would approach the value of $4.1 million" as Labaton now contends.   The record, including the testimony by Labaton's own attorneys in this matter, proves otherwise.

Dated:  July 30, 2019                              Respectfully submitted,

                                                   Lieff Cabraser Heimann & Bernstein, LLP

                                   By:     */s/ Richard M. Heimann*
                                           Richard M. Heimann (*pro hac vice*)
                                           275 Battery Street, 29th Floor
                                           San Francisco, California  94111
                                           Tel:  (415) 956-1000
                                           Fax:  (415) 956-1008

---

[9] *See* Exhibit 1 (Decl. of Robert L. Lieff at ¶¶ 5-6).

[10] Special Master's Report and Recommendations at 331 (ECF No. 357).

- 5 -

Steven E. Fineman
Daniel P. Chiplock (*pro hac vice*)
250 Hudson Street, 8th Floor
New York, New York  10018
Tel:  (212) 355-9500
Fax:  (212) 355-9592

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically on July 30, 2019 and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing ("NEF").

*/s/ Richard M. Heimann*
Richard M. Heimann

- 6 -

1814554.1

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br><br>        Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20,<br><br>        Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br><br>        Defendant. | No. 12-cv-11698 MLW |

## RESPONSE BY LIEFF CABRASER HEIMANN & BERNSTEIN, LLP TO MARCH 25, 2018 REQUEST BY SPECIAL MASTER

Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser") respectfully provides this response to the Special Master's request dated March 25, 2018, for "any evidence . . . identif[ied] in the record, or evidence . . . not currently in the record" relating to Lieff Cabraser's "state of mind" as to the issue of Damon Chargois's ("Chargois") role in the State Street litigation prior to September 2017, when details concerning his arrangement with Labaton Sucharow LLP ("Labaton") first came to light.  This response is accompanied by sworn declarations by both Robert L. Lieff and Daniel P. Chiplock (the latter of which attaches pertinent emails and documents, including Lieff Cabraser's prior Supplemental Submission, dated November 3, 2017, discussing many of the same issues).

Both Mr. Lieff and Mr. Chiplock were questioned at their depositions about Chargois and what they understood regarding his involvement in the State Street case prior to September 2017. Both testified that they understood that Chargois was local counsel for the Arkansas Fund and for Labaton as lead counsel.  Although neither directly communicated with Chargois, they were informed that he had played an important role in the litigation and they assumed he had provided legal services that were of value to the client and therefore to the class. They were familiar with the role of local counsel in cases like State Street, and understood that Chargois's role was similar to that of the Ohio funds' local counsel in the BNY Mellon litigation.  Neither thought, or had reason to believe, that fees of 4 to 5.5 percent to local counsel were unreasonable in view of what they had been told and what they understood about Chargois's role in the case.  The testimony at deposition included the following:

**Robert Lieff**                                                                                                                                    **pages**

Q   And did he (Chargois) fit the description of what you think of as a "local counsel" based on       58-59
     what you knew about him?

A   2013-15?  It was so represented, yes, by Garrett Bradley that he was local counsel, and it
sounded like he was taking care of the situation in Arkansas as typically a local counsel
would do.  So that was my understanding.


Q   Did you have any concerns about—beyond the financial aspect which appears to you to be           60-61
non-problematic—that there might be other issues, ethical issues or client issues or class
issues that the ERISA attorneys might suffer?
A   Again, it's hard to answer this without reference to the timeframe.  Back in the early days
when I first heard about it, as I now know it was April 2013 I believe, and then again 2015, I
didn't think too much about it because we had a very similar situation in the companion—I
call it the companion but in the Bank of New York we had local counsel in Ohio dealing with
the fund.  I thought this was local counsel in Arkansas dealing with the fund.


Q   Special Master:  And the Labaton folks at no time told you anything more about the larger          66
context of the relationship with Mr. Chargois?
A   No.


Q   Special Master:  What was your understanding of what the relationship was between                  67
Mr. Chargois and Labaton?
A   I thought he was local counsel for Labaton in this particular case.  I assumed dealing with the
Arkansas Fund because that's what local counsel will do.  That was my understanding.


Q   Special Master:  We don't know how to characterize this, and we are asking all the witnesses       78-80
in their experience if they know how to characterize it.  Mr. Sucharow did characterize it as a
forwarding fee arrangement.
A   I saw that.  I would say, first of all, we have to be talking about class actions only.
Q   Special Master:  Yes.
A   That's what we are talking about.  And in the context of class actions there is no such thing as
a referral lawyer.  You cannot refer a class action and be compensated.  It just—it's not the
way it works . . . Likewise, forwarding fee.  I don't know what that means.  But if it is a
referral fee, there is no such thing in class actions.

Local counsel there definitely is, and there is no question about the use of local counsel, but
you choose local counsel in each of your cases.  Now that does not mean that if it is not the
same counsel—I know, for example, we have represented funds in Ohio, and we have a law
firm in Columbus, Ohio chosen by the attorney general, Mike DeWine, of Ohio, and he wants
them to be our local counsel, and they work, and they get paid, and we get time records.


Q   Special Master:  But what was the basis of your firm's agreement to share in the payment           92-93
then?

A   Lead counsel said to the other two class firms that we have a local counsel in Arkansas
    helping us in Arkansas—later saying I think they were doing a good job or something—and
    that we have to compensate them for what they have done.

Q   Special Master:  And based on that—

A   —I agreed

Q   Special Master:  —you agreed.

A   Very common to do this, yeah.


Q   Special Master:  Did 5.5 percent seem to be a large number for a local counsel of 75 million    93-94
    dollars?

A   I would have to look up, for example, what our local counsel in the Bank of New York case
    got, what percentage.  I do not remember.  But it does not seem on the face of it to be
    unusual.  I think perhaps our local counsel got something similar to that, but I would have too
    look it up.

Q   Special Master:  Would it depend on how much work the local counsel did?  Among other
    factors.

A   Yes.  In the Bank of New York case it was easy because we had their time records.  And **we
    were lead counsel**.  **When I am lead counsel, I look at this differently than when I am
    not lead counsel.**  [Emphasis supplied].


### Daniel Chiplock

Q   Did you recall any conversation aside from the name Damon Chargois that referenced a        101-
    referring attorney?                                                                          103

A   No.  And with respect to Mr. Chargois, he was never characterized to me as a referring
    attorney.

Q   Special Master:  How was he characterized to you?

A   Local counsel.  He was always described to me as—when I say "always" I mean there were
    maybe 5 or 6 emails during the life of this case on this issue that I can recall.  He was always
    described as local counsel.

Q   And what does that mean to you that someone is local counsel?

A   Well, it can mean a few things.  I can tell you what I thought it must have meant here.  What I
    assumed when I was told local counsel—and I think there was another email from Garrett
    that said he played an important role in the case.  So it was—it is not at all atypical in cases
    like this for an institutional plaintiff, especially a pension fund, to want there to be like a
    hometown lawyer or a local counsel who is close to them, who is involved in the case
    somehow.  I can give you an example.  In the BNY Mellon case we represented Ohio pension
    plans.  The Ohio AG selected an Ohio counsel to work with us, we had no—we had no input
    into that.  And that was their choice.  They wanted to have what they called a local counsel,
    even though the case was pending in New York, to interface with them, to give them comfort,
    to respond to questions and maybe do, you know, one—run some things down on the local
    side on the client-facing side, you know, while we as national counsel are involved in the
    main part of the litigation.  So we had local counsel in the BNY Mellon case who actually did
    a fair amount of interaction with the Ohio AG's office.

| | | |
|---|---|---|
| Q | Do you recall what the payment terms were for Mr. Chargois? | 106 |
| A | Ultimately? | |
| Q | Both historically and ultimately in State Street? | |
| A | Well, I think initially how it was characterized to us was that he was local counsel and that he was entitled to twenty percent of Labaton's fee, and the proposal by Garrett was that it instead be taken off the top of whatever the total fee turns out to be.  So those were the terms as they were described in 2013 and then in 2015 and then again in 2016 I think.  And then ultimately he was paid five and a half percent of the total fee. | |

| | | |
|---|---|---|
| Q | Special Master:  At 2015 when you became cognizant that there was going to be a fee—a payment to Mr. Chargois—were you advised by anyone at Labaton of the history with Mr. Chargois—Labaton's history with Mr. Chargois? | 109-110 |
| A | No.  What was always represented to us—at least the communications that I am copied on and that I took part in—were that he was a local counsel, and sometimes he is described as local counsel for Arkansas or Arkansas local counsel.  And sometimes he is described as local counsel for Labaton. | |
| Q | Special Master:  And what did you take that to mean? | |
| A | As I said earlier, I assumed—you know, between those representations and between this representation here (indicating) that he performed some kind of an important role, that he was some type of local counsel of the type that I described a little while ago. | |

| | | |
|---|---|---|
| Q | But, in any event, you do recall being informed as to the arrangement, even though it was not solid or completely defined, between Labaton and consequently by the customer class firms and Mr. Chargois. | 115-116 |
| A | I recall his—the description of him that was offered in that email which was I think the—the words they used were that he assisted Labaton in matters pertaining to Arkansas. | |
| Q | And did you interpret that description of he assisted as meaning he took an actual active role in those cases? | |
| A | I actually assumed that, yes.  That it was some kind of a role, some kind of an assistance offered by a local counsel.  And for that assumption I based it on my own experience, my own recent experience in the BNY Mellon case. | |

Dated: April 5, 2018        Respectfully submitted,

Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
415-956-1000

By:_____
     Richard M. Heimann
     Attorney for Lieff Cabraser Heimann & Bernstein, LLP

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | ) ) ) | No. 11-cv-10230 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) | |
| Defendant. | ) ) | |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, | ) ) ) | No. 11-cv-12049 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, | ) ) ) | |
| Defendants. | ) ) | |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, | ) ) ) ) | No. 12-cv-11698 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) | |
| Defendant. | ) ) | |

## <u>DECLARATION OF ROBERT L. LIEFF</u>

Robert L. Lieff, Esq., declares as follows, pursuant to 28 U.S.C. § 1746:

1.      I am Of Counsel to the law firm of Lieff Cabraser Heimann & Bernstein, LLP

("Lieff Cabraser").  I submit this declaration to further elaborate on my prior testimony

concerning my understanding and belief as to the role of "local counsel" in the State Street

litigation and the attorney's fees allocated to local counsel.

2.      During my deposition I was asked about the size of the fee for Mr. Chargois, local

counsel to Labaton and to the Arkansas Fund.

> Q.  Special Master:  did 5.5% seem to be a large number for a local
> counsel of seventy-five million dollars?
>
> A.  I would have to look up, for example, what our local counsel in
> the Bank of New York case got, what percentage.  I do not
> remember.  But it does not seem on the face of it to be unusual.  I
> think perhaps our local counsel got something similar to that, but I
> would have to look it up.
>
> Q.  Special Master:  Would it depend on how much work the local
> counsel did?  Among other factors.
>
> A.  Yes. In the Bank of New York case it was easy because we had
> their time records.  And we were lead counsel.  When I am lead
> counsel I look at this differently than when I am not lead counsel.
> (93:14-94:9)

3.      I have now confirmed that my recollection regarding the magnitude of the fee to

our local counsel in the BNY Mellon case was correct.  The court in the BNY Mellon case

awarded fees to our local counsel of $3,154,291, or just slightly less than 4% of the total attorney

fees awarded in the case.

4.      I would have been aware of the fee request in the BNY Mellon case and the

amount we were requesting for local counsel by no later than mid-2015 and of the actual award

by the court as of September 2015.  So I would clearly have had that in mind contemporaneously

with the discussions in 2015 and again in 2016 regarding the fee allocation for local counsel in

the State Street case.

5.      In my answer to the Special Master's question, I remarked that I look at these types of matters, fee allocations among class counsel, differently when I am lead counsel. When Lieff Cabraser is lead counsel in class litigation we assume responsibility for assessing the contributions of subordinate counsel in connection with allocation of fees among counsel and with respect to fee requests. As lead counsel we do our best to make sure that fees are fairly allocated according to the value of the contributions to the class and that no fee allocation or fee request is unreasonable, either because it is too large or too small. Invariably we also share the information regarding fee allocation or fee requests with the court-appointed class representative(s) to obtain their approval of the allocation or request.

6.      The Labaton firm has extensive experience in class litigation, particularly in the securities field. They have served as lead or co-lead counsel in scores of class action cases. I had every reason to believe, and did believe, that they had engaged in the process of reviewing the work done by local counsel and the contributions of local counsel, and that they and their client, the Arkansas Fund, were of the view that the fee allocation to Chargois was fair and reasonable and fully supported by his contribution to the case.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 4, 2018.

Robert L. Lieff

1533142.1

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | ) ) ) | No. 11-cv-10230 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) | |
| Defendant. | ) ) | |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, | ) ) ) ) | No. 11-cv-12049 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, | ) ) ) ) | |
| Defendants. | ) ) | |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, | ) ) ) ) ) | No. 12-cv-11698 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) | |
| Defendant. | ) ) | |

## <u>DECLARATION OF DANIEL P. CHIPLOCK</u>

Daniel P. Chiplock, Esq., declares as follows, pursuant to 28 U.S.C. § 1746:

1

1.  I am a partner with the law firm of Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser").  I submit this declaration to further elaborate on my prior testimony concerning my understanding and belief, at all times prior to September 2017, as to Chargois & Herron LLP's role as reputed "local counsel" in the State Street litigation, and the basis for that understanding and belief.

2.  For my declaration, to avoid repetition, I specifically refer to and incorporate the Response by Lieff Cabraser Heimann & Bernstein LLP to [the] Special Master's September 7, 2017 Request for Supplemental Submission, dated November 3, 2017 ("the Supplemental Submission")[1], and the citations to the record therein.[2]

3.  As detailed in the Supplemental Submission and my prior deposition testimony dated September 8, 2017 ("Sept. 8 Deposition"), in the few communications where Lieff Cabraser attorneys were copied or participated that concerned Damon Chargois, he was consistently referred to by attorneys outside of Lieff Cabraser as "local counsel" for Labaton Sucharow LLP ("Labaton") and/or the client, the Arkansas Teacher Retirement System ("ATRS").[3]  *See* Exhibits A and B.

---

[1] The Supplemental Submission is attached hereto as Exhibit A, for ease of reference.

[2] All emails referenced in the Supplemental Submission, in addition to several others relevant to the issue of Lieff Cabraser's mindset, are attached collectively as Exhibit B.

[3] The Ethical Report for Special Master Gerald E. Rosen by Prof. Stephen Gillers ("Ethical Report"), dated February 23, 2018, refers to an "original cost-sharing agreement" mentioning Mr. Chargois that purportedly was "circulated—but never executed—among Customer Class Counsel in 2011," but Lieff Cabraser has no record of its attorneys ever having received this document.  *See* Ethical Report, p. 42 and n. 47.  Indeed, the testimony cited in n. 47 of the Ethical Report appears to confirm that this document was <u>not</u> "circulated . . . among Customer Class Counsel" but instead was a draft that was circulated solely between Christopher Keller (of Labaton) and Garrett Bradley (of Thornton Law Firm).  The first mention that Lieff Cabraser can find of Mr. Chargois in any communication involving Lieff Cabraser is the April 2013 email string described in paragraph 2 of the Supplemental Submission.

4.      Lieff Cabraser's attorneys referred to Mr. Chargois in kind as "local counsel" in the handful of communications they exchanged with co-counsel about Mr. Chargois and in internal Lieff Cabraser communications.  Co-counsel never corrected Lieff Cabraser's attorneys, nor suggested to Lieff Cabraser's attorneys that Mr. Chargois was anything other than "local counsel."  *See* Exhibit B.

5.      Lieff Cabraser was not lead counsel in the State Street litigation, and had no direct client relationship with ATRS.  Indeed, the Lieff Cabraser attorneys did not interact with George Hopkins (the chief representative for ATRS in the litigation) at all during the State Street litigation, outside of the mediation sessions that Mr. Hopkins personally attended.  Lieff Cabraser's attorneys also never spoke with Mr. Chargois to my knowledge, and had no interactions with him outside of a few group emails.  For its understanding of Mr. Chargois' role and function in the State Street litigation, Lieff Cabraser accordingly relied on the representations by Labaton, who was lead counsel, and Mr. Garrett Bradley, who prior to the conclusion of the State Street litigation was Of Counsel to Labaton, and on Mr. Chargois' confirmations by email (copied to both Bob Lieff and myself) of his role as local counsel and his important role in the case.  (For the latter, *see* Chargois' emails of April 25, 2013 [LBS025771] *and* July 8, 2016 [LCHB-0053544-45], contained in Exhibit B).

6.      During the life of the State Street litigation, Lieff Cabraser had no visibility into any work being performed by Mr. Chargois.  But this was not unusual for a local counsel working in tandem with a lead counsel, in my recent experience.  In the BNY Mellon litigation (where Lieff Cabraser <u>did</u> serve as lead counsel), Lieff Cabraser worked with an Ohio-based local counsel for its Ohio-based public pension fund clients.  That local counsel (who was selected by the Ohio Attorney General) communicated directly and virtually exclusively with Lieff Cabraser insofar as his work assignments were concerned.  His work was focused primarily

3

on assisting Lieff Cabraser in guiding the Ohio pension fund clients through their responses to defendants' discovery requests, as well as helping to defend their depositions. This was but one distinct part of a very large and complex litigation effort (which involved taking more than 100 depositions overall, including scores of depositions of defendants and third parties all over the globe), which involved many law firms. Throughout this, the Ohio local counsel's principal focus remained serving the Ohio public pension funds' individual discovery and litigation needs (with some document review assignments as well). As such, he and his firm had very little (if any) contact with Lieff Cabraser's co-lead counsel in that case (Kessler Topaz Meltzer & Check LLP), and virtually none with the other law firms who were not serving in a co-lead capacity (which would have been analogous to Lieff Cabraser's position in the State Street litigation).

7.　　The total attorneys' fees awarded in the BNY Mellon litigation were $83,750,000, which equated to 25% of the $335 million settlement fund in that case. Ohio local counsel was ultimately awarded approximately 4% of the total fees by the court in that case, which was certainly within the range of fees commonly paid or awarded (in Lieff Cabraser's experience) to local counsel who have performed services for the class representatives or lead counsel and thus to the class as a whole.

8.　　The $335 million settlement in the BNY Mellon litigation was reached in principle by March 2015, and preliminarily approved in late April 2015. Notice to the class was sent shortly thereafter, and by then it was understood and communicated to class members that counsel would apply for approximately a 25% attorneys' fee. By the time the final settlement approval and fee petitions were filed in August 2015, the level of fee we would be requesting for Ohio local counsel in the BNY Mellon case was established – approximately 4%.

9.　　Accordingly, at about the same time that I was being apprised by co-counsel of Mr. Chargois' role as "local counsel" in the State Street litigation, and the contours of his fee

4

interest were being discussed, I was in the process of finalizing and requesting a proposed fee

allocation in the BNY Mellon litigation that included a fee percentage for local counsel that was

not substantially different from what was being discussed for Mr. Chargois. That proposed fee

percentage did not strike me as outside of the norm for a local counsel such as Mr. Chargois had

been described to me. Nor did I view it as unusual that I was not privy to the specific work Mr.

Chargois had performed as local counsel; as stated above, the various non-lead counsel in BNY

Mellon, to my knowledge, had little or no substantive direct contact with Ohio local counsel in

that case.

10.     Based on lead counsel's descriptions, I understood during the State Street

litigation that ATRS was gathering and producing a fairly substantial number of documents in

response to defendant's requests. All told, according to lead counsel, ATRS produced more than

73,000 pages of documents,[4] an undertaking in which Lieff Cabraser was not directly involved. I

also understood that prior to Lieff Cabraser being engaged as additional counsel for the proposed

class, ATRS had spent substantial time investigating, with the assistance of its counsel, the

underlying allegations against State Street (which were first made public by the October 2009

unsealing of a whistleblower lawsuit in California) before finally filing a lawsuit in 2011, and

that this time period included one or more meetings with State Street representatives (none of

which included my firm). It was my belief, informed both by (i) co-counsel's descriptions of

Mr. Chargois as "local counsel" who was "assisting" Labaton in matters pertaining to ATRS and

had performed "an important role" in the litigation, and (ii) my firm's recent experience in BNY

Mellon, that Mr. Chargois had actually assisted and played an important role in these efforts. It

was also my belief, for the same reasons, that Mr. Chargois' involvement in these efforts (and in

---

[4] *See* Decl. of Lawrence A. Sucharow, ¶ 97, Dkt. No. 104 (filed 9/15/16).

the litigation overall) was at ATRS' behest, and certainly (at a minimum) with its complete

knowledge and consent. I assumed that ATRS and lead counsel in the State Street litigation

regarded the proposed fee percentage for Mr. Chargois to be reasonable and justified by his value

to the client, and therefore to the class, based on their knowledge of his work and contributions.

11.     My belief during the 2015-2016 timeframe as to the apparent reasonableness of

Mr. Chargois' fee interest as "local counsel" was further informed by historical experience at my

firm. Over the years, for instance, Lieff Cabraser has been asked to serve as local counsel in a

number of securities class actions. In some other types of class actions, including cases

involving consumer protection statutes such as the Telephone Consumer Protection Act of 1991

("TCPA"), Lieff Cabraser has requested counsel in the forum jurisdiction to act as our local

counsel. In both circumstances, the local counsel (whether it is us or another firm) has often

been offered the option of a fee arrangement predicated on lodestar or based on a percentage.

When on a percentage basis, the fee has typically ranged from a low of 5% to a high of 10% of

the total fees awarded in class cases. In the two most recent securities class cases in which Lieff

Cabraser agreed to serve as local counsel, for instance, the fee share upon which Lieff Cabraser

agreed at the outset with putative lead class counsel was 10% of the total fees awarded. While

these cases have involved local counsel in the forum court, in contrast with Mr. Chargois'

situation in the State Street litigation, this history comprises another baseline for commonly

accepted percentage fee arrangements, in my experience, for local counsel in class litigation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on

April 5, 2018.

Daniel P. Chiplock