UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,       Plaintiff,       v. STATE STREET BANK AND TRUST COMPANY,       Defendant. | ) ) ) ) ) ) ) ) ) ) | C.A. No. 11-10230-MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated,       Plaintiffs,       v. STATE STREET BANK AND TRUST COMPANY,       Defendant. | ) ) ) ) ) ) ) ) ) ) | C.A. No. 11-12049-MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND and all others similarly situated,       Plaintiffs,       v. STATE STREET BANK AND TRUST COMPANY,       Defendant. | ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 12-11698-MLW |

MEMORANDUM AND ORDER

WOLF, D.J.                                                    February 27, 2020

**TABLE OF CONTENTS**

I. SUMMARY......................................................... 3

II. PROCEDURAL BACKGROUND....................................... 31

III. THE STANDARDS FOR AWARDING ATTORNEYS' FEES.............. 33

IV. THE FACTS................................................... 40

    A. The Approval of the Proposed Settlement ...............40

    B. The Reports of Errors in the Fee Petitions ............46

    C. The Appointment of the Master .........................52

    D. The Master's Investigation ............................59

    E. The Report and Recommendations ........................62

    F. Proceedings Following Submission of the Master's
       Report and Recommendations ............................69

V. THE AWARD OF ATTORNEYS' FEES............................... 77

    A. The Role of the Court .................................77

    B. Megafund Cases ........................................78

    C. The Applicable Standards ..............................79

    D. Analysis of Certain Relevant Factors ..................80

    E. Public Policy Considerations ..........................84

       i. The Duty of Candor................................ 84

       ii.  Thornton, Labaton, and Lieff .................... 86

    F. An Award of $60,000,000 in Attorneys' Fees is
       Reasonable and Most Appropriate. .....................126

    G. Allocation of the Fee and Expense Award ..............144

    H. Service Awards .......................................153

VI. REFERRAL TO THE MASSACHUSETTS BOARD OF BAR OVERSEERS..... 154

VII. IMPLEMENTATION OF THIS MEMORANDUM AND ORDER............. 155

VIII. CONCLUSION............................................ 156

IX. ORDER.................................................. 157

I. SUMMARY

In 1913, Supreme Court Justice Oliver Wendell Holmes said that "[j]udges are apt to be naif, simple-minded men . . . ." <u>Occasional Speeches of Justice Oliver Wendell Holmes</u> 172 (Howe ed. 1962). This case is a reminder that he was right.

Judges trust lawyers. They expect that lawyers will provide the court the accurate and complete information that is necessary to decide matters properly. The Federal Rules of Civil Procedure and the Massachusetts Rules of Professional Conduct make these expectations legal obligations.

For example, Federal Rule of Civil Procedure 11(b) provides that by presenting a pleading to a court an attorney is representing that he or she has made a reasonable inquiry and that all factual contentions are supported by evidence. This means, among other things, that an attorney who has signed a memorandum or sworn declaration that is submitted to the court represents that he or she has read the document and that the statements in it are true. In addition, Rule 11 requires that an attorney not continue to advocate positions based on false statements after he or she learns they are not true. Similarly, Massachusetts Rule of

Professional Conduct 3.3(a) requires that an attorney not make a false statement to a court and that an attorney correct any such false statement when it is discovered to be untrue.

Judges also expect that complex class action cases conform to the paradigm prescribed by statutes, Supreme Court decisions, and other well-established jurisprudence. Although the instant consolidated cases are not subject to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4, the parties agree that its principles apply here too.

Prior to the enactment of the PSLRA, there was "a cottage-industry of specialized securities litigation firms that researched potential targets for [class action] suits, enlisted plaintiffs, controlled the course of the litigation, and often negotiated settlements that resulted in huge profits for the law firms with only marginal recovery for the shareholders." In re Cendant Corp. Litig., 182 F.R.D. 144, 145 (D.N.J. 1998) (internal quotation marks omitted), aff'd, 264 F.3d 201. The PSLRA was intended to assure that institutional investors with a large financial stake in the litigation would "choose counsel rather than, as [was] true [in 1995], counsel choosing the plaintiff." H.R. Conf. Rep. No. 104-369, at 35. It was expected that such an institutional investor would have "sophistication and interest in the litigation [] sufficient to permit that . . . entity to function as an active agent for the class" and "actively supervise

4

the conduct of the litigation." <u>Cendant Corp.</u>, 264 F.3d at 266-67.

Attorneys always have a duty to provide their clients with the information necessary to permit the clients to make informed decisions concerning the representation. <u>See</u> Massachusetts Rules of Professional Conduct 1.4(a)(1), (b). For an attorney representing a class, providing material information to all class members is required. Courts expect counsel to discharge this duty too.

When a class action has been settled, a common fund must be divided between class counsel and the members of the class. At this point, there is a tension between the interests of counsel in maximizing their compensation and the interests of members of the class in maximizing their recovery. The court, therefore, acts as a fiduciary to protect the interests of the class.

A defendant who has agreed to settle for a total sum has no interest in how the common fund is divided between counsel and the class. Thus, the usual adversary system does not operate to expose possible misrepresentations by counsel for the class to the court. Recognizing this, the Massachusetts Rules of Professional Conduct deem a petition to approve the settlement of a class action to be an <u>ex parte</u> proceeding. <u>See</u> Mass. R. Prof. C. 3.3 cmt. 14A. Accordingly, lawyers for the class are required to inform the court of all material facts, "whether or not the facts are adverse" to

5

the attorneys' personal interests. Mass. R. Prof. C. 3.3(d). Judges trust attorneys to discharge this duty when seeking an award of attorneys' fees, among other things.

Usually courts award class counsel a percentage of the common fund as attorneys' fees. Frequently the most appropriate award is found to be in the 20 to 30% range. However, the percentage award is usually less than 20% if the common fund is more than $250,000,000.

There are a series of well-known factors that judges customarily consider in awarding attorneys' fees. These include:

> (1) the size of the fund and the number of persons benefitted; (2) the skill, experience, and efficiency of the attorneys involved; (3) the complexity and duration of the litigation; (4) the risks of the litigation; (5) the amount of time devoted to the case by counsel; (6) awards in similar cases; and (7) public policy considerations.

In re Neurontin Mktg. & Sales Practices Litig., 58 F. Supp. 3d 167, 170 (D. Mass. 2014) (citation omitted). Assuring the integrity of judicial proceedings is an important public policy consideration. Therefore, among other things, "courts should look to the various codes of ethics as guidelines for judging the conduct of counsel" in making fee awards. In re Agent Orange Prod. Liab. Litig., 818 F.2d 216, 222 (2d Cir. 1987).

"'Every lawyer is an officer of the court [and] has a duty of candor to the tribunal.'" Pearson v. First NH Mortg. Corp., 200 F.3d 30, 38 (1st Cir. 1999) (quoting Burns v. Windsor Ins. Co., 31

F.3d 1092, 1095 (11th Cir. 1994)). If counsel in a class action fail in their duty to be candid with the court, it is permissible and appropriate for the court to take this into account in deciding what amount within the reasonable range is most appropriate to award as attorneys' fees. In some cases it is most appropriate to deny an award of attorneys' fees as a sanction for misconduct.

In addition to considering the customary factors, courts regularly check the reasonableness of a requested fee award against the "lodestar" of plaintiff's counsel to determine whether awarding a multiple of the lodestar is justified. A lodestar is calculated by multiplying the number of hours reasonably spent on the litigation by a reasonable hourly rate for each attorney. See In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295, 305 (1st Cir. 1995) (citing Blum v. Stenson, 465 U.S. 886, 896-902 (1984)). "Reasonable fees are to be calculated according to the prevailing market rates in the relevant community . . . ." Blum, 465 U.S. at 895. "[T]he rate that private counsel actually charges for her services, while not conclusive, is a reliable indicium of market value." United States v. One Star Class Sloop Sailboat, 546 F.3d 26, 40 (1st Cir. 2008) (emphasis added).

Only counsel for a class possess the information necessary to calculate the lodestar, which they know will be used to test the reasonableness of their request for attorneys' fees. Therefore, it

is especially important that their representations concerning the lodestar be reliable. Judges expect that such representations have been carefully considered and are correct.

In 2016, these consolidated cases seemed to fit the PSLRA paradigm for class actions. Arkansas Teachers Retirement System ("ATRS"), the representative of the class of customers alleging fraud in billing for foreign exchange transactions by defendant State Street Bank and Trust Co. ("State Street"), was an institutional investor with experience as the Lead Plaintiff in class actions. ATRS had reportedly selected experienced counsel, Labaton Sucharow LLP ("Labaton"). Labaton involved other experienced counsel, The Thornton Law Firm ("Thornton"), and Lieff Cabraser Heimann & Bernstein, LLP ("Lieff") (collectively, "Class Counsel"). In addition, several Employee Retirement Income Security Act ("ERISA") pension plans ("ERISA Plans") in separate suits consolidated with the ATRS case made comparable allegations of fraud and were also represented by experienced counsel (collectively, "ERISA Counsel").

In 2016, the parties moved for approval of a $300,000,000 settlement and for a fee award to plaintiffs' counsel of about 25% of that common fund -- approximately $75,000,000.[1] At a November

---

[1]   Counsel requested, and the court awarded, $74,541,250 in attorneys' fees and $1,257,697.94 in expenses. For simplicity, in this Memorandum the award is referred to as a $75,000,000 award.

2, 2016 hearing, the court repeatedly stated that because the adversary system was not then operating, it was relying heavily on the representations of plaintiffs' counsel. After approving the settlement, considering the customary factors, and doing a lodestar check, the court decided that their reported multiplier of 1.8 was reasonable, and awarded counsel the requested $75,000,000 in attorneys' fees.

The evolution of events since has demonstrated that the court's assumptions in awarding fees were incorrect in material respects. Many of the representations made to the court in support of the request for attorneys' fees by Labaton and Thornton, and to a lesser extent by Lieff, were untrue. In addition, the court now realizes that the relationship between ATRS and Labaton in this case was very different than the previously described paradigm for complex class actions.

About a week after the court ordered the $75,000,000 fee award, David Goldsmith of Labaton informed the court that inquiries from the media had caused Class Counsel to realize that they had inadvertently double-counted the hours of staff attorneys who worked on this case. This error inflated what had been represented to be their collective lodestar by more than 9,300 hours and more than $4,000,000. Goldsmith asserted that, nevertheless, a multiplier of 2.0, rather than 1.8, as originally erroneously

calculated, was reasonable and that the court should not reduce the $75,000,000 award.

Soon after, a _Boston Globe_ article raised additional questions about the reliability of the representations made by counsel in their request for attorneys' fees. For example, it was reported that staff attorneys who were represented as having a regular rate of $335 to $500 an hour, were typically paid $25 to $40 an hour. Moreover, the article pointed out that different hourly rates had been attributed to the attorneys who were double-counted by different firms, which suggested that those rates may have been fabricated. In addition, it was reported that Michael Bradley, the brother of Thornton Managing Partner Garrett Bradley, had been represented to be an employee of Thornton with a regular rate of $500 an hour, but was actually a sole practitioner who never charged that much and often made $53 an hour representing indigents in state court.

A subsequent _Boston Globe_ story described the means by which Labaton and Thornton reportedly obtained clients in Massachusetts. Garrett Bradley was the Assistant Majority Leader of the Massachusetts House of Representatives. He exploited his political connections to get business. In addition, many Labaton and Thornton lawyers made campaign contributions to elected officials who chaired public pension funds. Those funds retained Labaton to monitor their investments and to represent them as Lead Plaintiffs

in class actions. The Plymouth County Retirement Fund, which Garrett Bradley had recruited as a client, and whose Chair had received substantial campaign contributions from Labaton and Thornton lawyers, reportedly recovered about $40,000 in cases in which it represented a class, while Labaton was in those cases awarded more than $41,000,000, which it shared with Thornton. Another fund, chaired by the Treasurer of the Commonwealth of Massachusetts who had received campaign contributions from Labaton and Thornton, reportedly recovered in two class actions about $682,000, while Labaton was awarded approximately $60,000,000, which it also shared with Thornton.

In view of the questions raised by the inflated lodestar and the Boston Globe articles -- which evidently prompted Garrett Bradley to resign from the Massachusetts House of Representatives -- the court proposed appointing Retired United States District Judge Gerald Rosen as a Master to investigate the reliability of the representations made to the court in the request for attorneys' fees and related issues.

On March 7, 2017, the court conducted a hearing on its proposal to appoint Judge Rosen as Master. The Competitive Enterprise Institute's Center for Class Action Fairness ("CCAF")[2]

---

[2]    CCAF is no longer part of the Competitive Enterprise Institute. It is now, instead, part of the Hamilton-Lincoln Law Institute.

moved for leave to serve as guardian ad litem for the class and/or
to make submissions to the court and Master as amicus curiae. Class
Counsel opposed these requests. The court did not appoint CCAF as
guardian ad litem or authorize it to participate in proceedings
before the Master. The court did, however, allow CCAF to make
submissions to the court and participate in hearings it conducted.
CCAF brought expertise to the proceedings, which was often very
helpful to the court.[3]

Led by Labaton, Class Counsel and ERISA Counsel agreed to the
appointment of Judge Rosen as Master. They also agreed to pay the
reasonable cost of his services and those he engaged to assist
him.[4]

In appointing the Master, the court ordered that:

The Master shall investigate and prepare a Report
and Recommendation concerning all issues relating to the
attorneys' fees, expenses and service awards previously
made in this case. The Report and Recommendation shall
address, at least: (a) the accuracy and reliability of
the representations made by [Class Counsel] in their
requests for awards of attorneys' fees and expenses,
including but not limited to whether counsel employed
the correct legal standards and had a proper factual
basis for what was represented to be the lodestar for
each firm; (b) the accuracy and reliability of the
representations made in the November 10, 2016 letter

[3]   The court would consider ordering that CCAF be compensated
for its work if it had the authority to do so.

[4]   The initial payment to the Clerk of the District Court by
Labaton on behalf of Class Counsel was $2,000,000. Counsel were
informed that the court would order additional payments if
necessary.

> from David Goldsmith, Esq. of Labaton Sucharow, LLP to the court (Docket. No. 116); (c) the accuracy and reliability of the representations made by [Class Counsel and each of the named plaintiffs in] requesting service awards; (d) the reasonableness of the amounts of attorneys' fees, expenses, and service awards previously ordered, and whether any or all of them should be reduced; (e) whether any misconduct occurred in connection with such awards; and, if so, whether it should be sanctioned, see e.g. Fed. R. Civ. P. 11(b)(3) & (c); Massachusetts Supreme Judicial Court Rule of Professional Conduct 3.3(a)(1) & (3).

Mar. 8, 2017 Order (Dkt. No. 173). The Master was ordered to attempt to complete his investigation by October 10, 2017, but the court authorized him to request an extension of time to do so if necessary.

In order to eliminate any possible doubt about the court's authority to modify the $75,000,000 fee award after receiving the Master's Report and Recommendations, the court subsequently vacated the original fee award.

The Master worked hard to complete his investigation and Report. However, the process became protracted when -- based on documents produced by Thornton, but not Labaton or Lieff -- the Master discovered that Labaton had agreed to pay $4,100,000 to Damon Chargois, a lawyer who had done no work on this case, as an ethically impermissible finder's fee for the role of his firm, Chargois & Herron, in influencing ATRS to employ Labaton.

On May 14, 2018, the Master filed his 377-page Report and Recommendations (the "Report") and an Executive Summary of it. The

Report was filed under seal to permit the parties to propose redactions. The court denied Labaton's request to keep under seal all references to Chargois, whom it had secretly paid 20% of its fee -- amounting to millions of dollars -- in eight other class action cases in which it had represented ATRS. In addition, the court denied Labaton's motion to disqualify the court from continuing to preside in this case and the First Circuit promptly denied Labaton's appeal of that decision. The court also denied Labaton's motion to prevent the Master from responding to objections to his Report.

The Master's Report recommended that the court again award $75,000,000 but reallocate it because of the misconduct by Class Counsel that he found. If adopted, the Master's recommendations would reduce Class Counsel's compensation: from about $32,000,000 to about $26,000,000 for Labaton; from about $20,000,000 to about $17,000,000 for Thornton; and from about $16,000,000 to about $13,000,000 for Lieff. The Master also recommended that additional payments be made to ERISA Counsel to compensate them for the cost of participating in the proceedings after the original fee award that were prompted by the misconduct of Class Counsel. In addition, the Master recommended that some of the funds "disgorged" by Class Counsel go to the class. The Master also recommended that sanctions in the amount of $400,000 to $1,000,000 be imposed on Thornton pursuant to Federal Rule of Civil Procedure 11 and that Garrett

Bradley be referred to the Massachusetts Board of Bar Overseers for disciplinary action.

Numerous objections to the Report were filed. Eventually, however, Labaton and ERISA Counsel agreed to settle their disputes with the Master, if the court approved that settlement (the "Proposed Resolution"). Nevertheless, Lieff and Thornton maintained their objections to the Report.

The court conducted hearings on all of the objections, including Labaton's, in June 2019. It is now deciding de novo each objection to the Master's findings of fact and conclusions of law. See Fed. R. Civ. P. 53(f)(3) & (4). It is also, in effect, modifying his Report. See Fed. R. Civ. P. 53(f)(1).

As described in detail in this Memorandum, the court finds that it is reasonable and most appropriate to award attorneys' fees in the amount of $60,000,000, which constitutes 20% of the $300,000,000 common fund. It is exercising its authority to allocate the total award among the participating firms as follows: $22,202,131.25 to Labaton; $13,261,908.10 to Thornton; $15,233,397.53 to Lieff; and a total of $10,716,526.15 to all ERISA Counsel.[5] The court is reducing the Service Award to ATRS from $25,000 to $15,000 and reinstating the original $10,000 service

---

[5]    A chart comparing the amount to be received by each firm under the original award, the Master's recommendations, and this Memorandum and Order is attached hereto as Exhibit A.

awards to the six ERISA plaintiffs. An additional more than $14,000,000 is, therefore, being allocated to the class.

In summary, the reasons for the court's decision concerning the most appropriate amount to award as attorneys' fees is as follows.

The court begins by assuming that an award of 20% to 30% would be reasonable, and uses 25% as a starting point for determining the amount to be awarded. It does not presume that a lower percentage of the common fund should be awarded merely because this case involves a "megafund" of more than $100,000,000.

The court recognizes that this was a complex case in which capable counsel achieved for the class an unusually large settlement -- $300,000,000. At the outset the case was based on an untested theory of liability under Massachusetts consumer protection law and was, therefore, risky. However, the risk that the class and, therefore, counsel would recover nothing was greatly reduced when the court denied State Street's motion to dismiss the ATRS case. Since being appointed in 1985, this court has never been required to try a class action. Rather, every case that has survived a motion to dismiss has subsequently been settled. There is no reason to believe that this court's experience is unique or unusual. In essence, the court believes that when class action cases are carefully chosen by experienced counsel, and claims are thoughtfully alleged to defeat a motion to dismiss, the questions,

as a practical matter, are when the case will settle and for how much.

Lieff and Thornton brought to this case special knowledge and experience they acquired as plaintiffs' counsel in settling the first foreign currency exchange class action alleging deceptive practices. See In re Bank of N.Y. Mellon Corp. Forex Trans. Litig., No. 12-md-02335-LAC-JLC (S.D.N.Y.) ("BONY Mellon"), Dkt. No. 581. The instant case involved far less work than BONY Mellon. Following the denial of State Street's motion to dismiss there was no further litigation. Rather, the case was stayed for informal discovery and the mediation that resulted in settlement.

In view of the foregoing, the court would now award less than 25% of the $300,000,000 common fund as attorneys' fees even if public policy considerations did not make a lower award reasonable and most appropriate. However, like the Master, the court now finds that the submissions of Labaton and Thornton in support of the request for an award of $75,000,000 were replete with material false and misleading statements. Labaton and Thornton in many respects violated Federal Rule of Civil Procedure 11(b) and related Massachusetts Rules of Professional Conduct. This misconduct makes an award at the lower end of the presumptive reasonable range -- 20% -- most appropriate.

In summary, the misconduct of Thornton and Labaton includes, but is not limited to, the following. Garrett Bradley did not, as

required by Federal Rule of Civil Procedure 11 and the
Massachusetts Rules of Professional Conduct, read the fee
declaration in support of the fee request that he signed under
oath before it was submitted to the court on behalf of Thornton.
It included many false statements. For example, Bradley
represented that certain attorneys were employed by Thornton and
that the hourly rates attributed to them for the purpose of
calculating Thornton's lodestar were "<u>the same as my firm's regular
rates charged for their services</u>, which have been accepted in other
complex class actions." G. Bradley Decl. ¶4 (Dkt. No. 104-16)
(emphasis added). However, Thornton worked solely on a contingent-
fee basis. It had no clients who paid the firm on an hourly basis
and no "regular rates charged" for its attorneys. In addition,
Michael Bradley was not, as represented, employed by Thornton. Nor
had the firm, as Garrett Bradley claimed, ever charged $500 an
hour for his services, which in this case were worth far less.[6]

Moreover, the staff or contract attorneys Thornton claimed in
its lodestar did not work for Thornton. Rather they were employed
by Labaton or Lieff and paid for by Thornton, primarily to increase
Thornton's lodestar and thus its claim for a higher percentage of
the fees that would foreseeably be awarded. The arrangement for

---

[6]    In this Memorandum, Garrett Bradley will at times be referred
to as "Bradley" and his brother will be referred to as "Michael
Bradley."

Thornton to pay for lawyers employed by Labaton and Lieff led to the double-counting error that inflated their total lodestar by over $4,000,000.

Contrary to his testimony under oath on June 25, 2019, see June 25, 2019 Tr. at 85:25 to 88:13 (Dkt. No. 565), Garrett Bradley did read his declaration after a December 17, 2016 Boston Globe article was published. He then knew that the declaration included false statements. However, he did not, as required by Rule 11 and the Massachusetts Rules of Professional Conduct, inform the court and correct them. Rather, he permitted Labaton to continue to argue for an award of $75,000,000 based in part on his false statements.

Labaton also repeatedly violated Rule 11 and the related Massachusetts Rules of Professional Conduct. Sucharow filed a sworn declaration stating that the lodestar calculations of all of plaintiffs' firms that he submitted were "based on their current billing rates." Dkt. No. 104, ¶176. This was not true with regard to Thornton, at least. A reasonable inquiry -- such as a question to Garrett Bradley who was also Of Counsel to Labaton -- would have revealed Sucharow's sworn statement to be untrue. However, evidently neither Sucharow nor anyone at Labaton made any inquiry at all.

Nor did Sucharow or his partner Nicole Zeiss, who was in charge of assembling the documents in support of the fee petition, read with reasonable care the declarations concerning the lodestar

of each firm that Sucharow swore were accurate. If he or she had, Sucharow or Zeiss would have recognized that many attorneys were claimed to have been employed by two firms, which attributed different regular hourly rates to them.

Sucharow also falsely claimed that the rates attributed to Labaton attorneys were "the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions." Dkt. No. 104-15, ¶7 (emphasis added). When Sucharow made this statement under oath he believed that Labaton did not have any clients who were charged or paid hourly rates.[7]

Sucharow also failed in his duty to correct his false statements after the Boston Globe alerted Labaton to the double-counting and later published its first, December 17, 2016 article. Nor did his partner, Goldsmith, who sent the court the November 10, 2016 letter disclosing the double-counting, but which did not correct Labaton's false claims to have had regular hourly rates charged for its attorneys. Rather, Goldsmith continued to rely, in part, on that false information in arguing that an award of $75,000,000 as attorneys' fees was justified.

In addition, in the memorandum in support of the request for a $75,000,000 award, signed by Sucharow for Labaton, and also represented to have been signed by partners of Thornton and Lieff,

---

[7]     Labaton now claims it had a few clients who paid hourly rates.

Labaton provided a misleading description of a prominent study by Brian Fitzpatrick. See Brian T. Fitzpatrick, "An Empirical Study of Class Action Settlements and Their Fee Awards," 7 J. Empirical Legal Stud. 811 (2010) (the "Fitzpatrick Study"). Labaton accurately reported that Fitzpatrick had found that the mean and median fees awarded in 444 common fund settlements were 25.7% and 25%. Sucharow argued that, therefore, "[t]he 24.85% fee requested [in this case] is right in line with Professor Fitzpatrick's findings." Dkt. No. 103-1, at 17-18 of 36.

However, Sucharow did not disclose other findings from the Fitzpatrick Study that undermined his argument, as was required by the Massachusetts ethical rules that deem applications for attorneys' fees to be ex parte proceedings in which lawyers must disclose all material facts even if some of them are adverse to the attorneys' interests. See Mass. R. Prof. C. 3.3 cmt. 14A. More specifically, Sucharow did not disclose that Fitzpatrick had written that: "fee percentage is strongly and inversely associated with settlement size . . . ; [when] a settlement size of $100 million was reached . . . fee percentages plunged well below 20 percent." Fitzpatrick Study, supra, at 837-38. Nor did Sucharow reference Fitzpatrick's finding that in settlements between $250,000,000 and $500,000,000, the mean fee award was 17.8% and the median award was 19.5%. See id. at 839. It was, therefore, misleading for Sucharow to assert that the 25% award being

requested in this case was "right in line with Professor Fitzpatrick's findings."[8]

Sucharow also did not disclose to ERISA Counsel, the ERISA pension funds in the single settlement class Labaton was representing, or the court that Labaton would pay Chargois $4,100,000 as a finders fee for the successful efforts of his partner Tim Herron to secure ATRS as a Labaton client.

More specifically, in about 2007, Labaton asked Chargois, a Texas lawyer, to find institutional investors in the Southwest for Labaton to represent in class actions, and to influence them to hire Labaton. Neither Chargois nor his partner in Arkansas, Herron, had any relationship with an institutional investor. However, Herron knew Arkansas State Senator Steve Faris, who served on the legislative committee responsible for oversight of ATRS. Chargois introduced Labaton partners to Faris and said that Faris was "prepared to . . . take necessary steps [with ATRS] after you do your thing." Email from Chargois to Belfi (Aug. 9, 2007) (Dkt. No. 454-5). Faris subsequently introduced Labaton to the Executive Director of ATRS, Paul Doane. Chargois later reported to Labaton

---

[8]     A table in the Fitzpatrick Study reported that for settlements between $250,000,000 and $500,000,000, there was a standard deviation of 7.9%. Id. at 839. However, Sucharow did not mention this fact either. If Sucharow had disclosed this finding, he could have argued that a 25% award would be within the range of the standard deviation and, therefore, reasonable. The court would have then assessed the merit of that argument.

that "[t]he good Senator is finalizing with Paul Doan[e]" an arrangement for Labaton to represent ATRS, urged Labaton to "act surprised" when officially informed, and added that "[e]verybody wants something sometimes." Email from Chargois to Belfi (Sept. 26, 2007) (Dkt. No. 454-8). Labaton was soon hired to serve as a "monitoring counsel" for ATRS. As monitoring counsel, Labaton would recommend that ATRS initiate certain class actions and retain Labaton as lead counsel if ATRS succeeded in being appointed lead plaintiff.

As a result of being engaged as monitoring counsel by ATRS, Labaton agreed to pay Chargois 20% of any fee Labaton was awarded as a lead counsel representing ATRS in a class action, although neither Chargois nor Herron was expected to serve as local counsel or do any work on the case. As Chargois credibly explained:

> Our deal with Labaton is straightforward-- <u>we got you ATRS as a client (after considerable favors, political activity, money spent and time dedicated in Arkansas)</u> and Labaton would use ATRS to seek [L]ead [C]ounsel appointments in institutional investor fraud and misrepresentation cases. Where Labaton is successful in getting appointed [L]ead [C]ounsel and obtains a settlement or judgment award, we split Labaton's attorney fee award 80/20. Period.

Email from Chargois to Belfi (Oct. 18, 2014), R. & R. Ex. 177 (Dkt. No. 401-176) (emphasis added). With regard to the instant case, Labaton negotiated a reduced payment to Chargois of $4,100,000. Thornton and Lieff each contributed to this payment. Thornton was fully familiar with Labaton's agreement with Chargois. Indeed,

Garrett Bradley, who was Of Counsel to Labaton, played a leading role in persuading Chargois to accept a reduced payment. Lieff had been told that Chargois had served as local counsel. However, Lieff knew or should have known Chargois did not do any work on this case and should have at least suspected that the payment was improper.

Labaton did not inform ATRS, ERISA Counsel or their clients, or the court of the agreement to pay Chargois. This was consistent with Labaton's practice of secrecy in the eight other ATRS cases for which it paid Chargois despite the fact that, in six of them, Chargois did not file an appearance or do any work.

Labaton's $4,100,000 payment to Chargois violated Massachusetts Rule of Professional Conduct 7.2(c), which in 2011 prohibited a lawyer from paying a person for recommending his services, except for paying a referral fee as defined in Rule 1.5(e). Contrary to Labaton's contentions, a lawyer is a person and the payment to Chargois was not a permissible "referral fee" under the Massachusetts Rules.

After the Master discovered the payment to Chargois, Labaton sought and obtained ratification of it from George Hopkins, who had succeeded Doane as the Executive Director of ATRS. However, Labaton was then Lead Counsel for a single class that included the ERISA pension funds which were not represented by ATRS. Labaton had a fiduciary duty to all class members, including those funds.

This included the duty, under Massachusetts Rules of Professional Conduct 1.4(a)(1) and (b), to provide the ERISA Plans all of the information necessary to make informed decisions concerning Labaton's representation, including concerning its request for attorneys' fees. Labaton violated this duty by failing to inform the ERISA Plans of the payment to Chargois.

If informed, ERISA Counsel would have viewed the Labaton payment to Chargois as important to their clients, to the viability of the settlement that the United States Department of Labor had approved before it was presented to the court, and to its agreement with Labaton to accept only ten percent of the total fee award, about $7,500,000, for the valuable work they did in this case.

At a minimum, ERISA Counsel would have informed the court of Labaton's obligation to pay Chargois. This would have prompted the court to question the purpose of the payment, possibly remove Labaton as lead counsel, and/or reduce the fee awarded to Labaton.

The court had not ordered that counsel disclose the terms of any agreement concerning fees, as it could have under Federal Rules of Civil Procedure 23(h) and 54(d)(2). Therefore, in contrast to the Master, the court does not find that Labaton's failure to inform the court of the intended payment to Chargois violated Federal Rule of Civil Procedure 23(e)(3). However, Labaton's violation of its duty, under the Massachusetts Rules of Professional Conduct, to inform ERISA Counsel and their clients of

the payment had the practical effect of depriving the court of important information.

The conduct of Lieff was also deficient, but not as serious as the misconduct of Labaton and Thornton. Using the template provided by Labaton, Lieff too represented in its declaration in support of the fee petition that the hourly rates attributed to lawyers it employed were "the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions." Chiplock Decl. ¶5 (Dkt. No. 104-17). However, Lieff also worked primarily on a contingent-fee basis and had only a "handful of paying clients over the years." Mar. 7, 2017 Tr. at 93:17 (Dkt. No. 176). In BONY Mellon, Lieff stated in its fee declaration that "[t]he hourly rates charged by the Timekeepers are the Firm's regular rates for contingent cases and those generally charged to clients for their services in non-contingent/hourly matters." Dkt. No. 622-1 ¶5, BONY Mellon, 12-md-02335-LAK-JLC (S.D.N.Y. Aug. 17, 2015), also available at R. & R. Ex. 186 (Dkt. No. 401-185). To the extent Lieff had ever actually charged an hourly rate for an attorney involved in this case, Lieff should have used similar language in the declaration it submitted to this court.

In addition, Lieff reviewed and authorized Labaton to represent that it had signed the memorandum submitted in support of the request for attorneys' fees that mischaracterized the

26

Fitzpatrick Study. In <u>BONY Mellon</u>, Lieff was a signatory of a memorandum that accurately described the Fitzpatrick Study. Lieff should have caused Labaton to correct the mischaracterization of the Fitzpatrick Study in this case.

In contrast to Garrett Bradley and, therefore, Thornton, Lieff was not accurately or completely informed of the reasons Labaton was paying Chargois $4,100,000 when it agreed to contribute $1,000,000 to that payment. More specifically, attorneys at Lieff had been told Chargois was "local counsel" and testified that they assumed that Chargois was dealing with ATRS. However, the fact that Chargois was being paid so much despite doing no work on this case should have prompted the Lieff lawyers to question Labaton carefully about the matter. Lieff claims that if fully informed, it would not have subsidized the payment to Chargois and would have encouraged Labaton to disclose it to the court. However, its inaction and acquiescence contributed to the misconduct of Labaton and Thornton concerning Chargois.

Awarding attorneys' fees in a class action is an exercise of the court's equitable authority. Each case is unique and "individualization is the name of the game." <u>In re Fidelity/Micron Secs. Litig.</u>, 167 F.3d 735, 737 (1st Cir. 1999). The court now finds that an award of 20% of the $300,000,000 common fund -- $60,000,000 -- is within the reasonable range and most appropriate.

On closer scrutiny, the court has decided that even absent the serious, repeated misconduct of Labaton and Thornton, an award of less than 25% of the common fund would be most appropriate. However, for the reasons described in detail in this Memorandum, in this equitable proceeding it is permissible and appropriate to take that misconduct into account in awarding and allocating attorneys' fees.

An award of 20% of the common fund is at the low end of the 20-30% range generally presumed to be reasonable. It is above both the mean of 17.8% and median of 19.5% in settlements between $250,000,000 and $500,000,000 according to the Fitzpatrick Study on which plaintiffs' counsel asked the court to rely. It is also above the average of 13.16% that was awarded in the 20 cases with settlements between $100,000,000 and $500,000,000 that Labaton's expert William Rubenstein referenced in an expert declaration. See Dkt. No. 446-2, Ex. E; see also Dkt. No. 522 at 7. In addition, a 20% award is compatible with what Class Counsel reported to be the awards in the eight cases in the First Circuit with common funds exceeding $100,000,000.

A check against the properly calculated lodestar confirms the reasonableness of a $60,000,000 fee award. It involves a multiplier of 1.67, which is not materially less than the 1.8 multiplier that plaintiffs' counsel asserted was reasonable in their request for

a $75,000,000 award that was based, in part, on an inflated lodestar calculation.

The parties acknowledge that the court has the authority to allocate the $60,000,000 among the firms. The court is doing so. The award of attorneys' fees and expenses now being made is as follows:

|  | Fees | Expenses | Total |
|---|---|---|---|
| Labaton | 21,943,464.40 | 258,666.85 | 22,202,131.25 |
| Thornton | 12,966,592.60 | 295,315.50 | 13,261,908.10 |
| Lieff | 14,961,453.00 | 271,944.53 | 15,233,397.53 |
| Keller Rohrback | 3,567,380.83 | 410,771.35 | 3,978,152.18 |
| McTigue | 3,367,917.34 | 71,858.08 | 3,439,775.42 |
| Zuckerman Spaeder | 3,193,191.83 | 105,406.72 | 3,298,598.55 |
| **TOTAL** | **60,000,000.00** | **1,413,963.03** | **61,413,963.03** |
| ERISA Counsel Total | 10,128,490.00 | 588,036.15 | 10,716,526.15 |
| Customer Counsel Total | 49,871,510.00 | 825,926.88 | 50,697,436.88 |

This fee award provides ERISA Counsel the full amount they received from the original $75,000,000 award and compensates them for their lodestar concerning the post-award proceedings prompted by the misconduct of Labaton and Thornton primarily. Because of that misconduct, Labaton and Thornton are being required to bear the full future cost of the Master. Therefore, an additional more than $14,000,000 is being provided to the class.

The Code of Conduct for United States Judges states that "[a] judge should take appropriate action upon receipt of reliable information indicating the likelihood . . . that a lawyer violated applicable rules of professional conduct." U.S. Judicial Conf.,

<u>Code of Judicial Conduct for U.S. Judges</u>, Canon 3(B)(6) (Mar. 2019). Therefore, this Memorandum and Order shall be sent to the Massachusetts Board of Bar Overseers for whatever action, if any, it deems appropriate.

The court is also ordering that the Master advise concerning whether it is necessary or appropriate to give notice to the class of this new fee award and to perform the additional work necessary to implement the Order concerning attorneys' fees now being issued. This will entail additional expense. The $4,850,000 previously paid to the Clerk of Court to compensate reasonably the Master and those he employs has been substantially spent. Therefore, Labaton and Thornton are being ordered to provide the Clerk, by March 11, 2020, with an additional $250,000 each for this purpose.

In addition, the Proposed Settlement among Labaton, ERISA Counsel, and the Master is being denied.

The United States has a proud history of honorable, trustworthy lawyers. However, this case demonstrates that not all lawyers can be trusted when they are seeking millions of dollars in attorneys' fees and face no real risk that the usual adversary process will expose misrepresentations that they make. Therefore, in making fee awards in class actions, it is important that judges be skeptical, and do the hard work necessary to protect the interests of the class and the integrity of the administration of justice.

II. PROCEDURAL BACKGROUND

This matter involves three related class action cases against State Street which were consolidated for pretrial purposes. In one case, C.A. No. 11-10230-MLW, ATRS sued State Street on behalf of a putative class of similarly situated customers, alleging that State Street engaged in unfair and deceptive practices by overcharging clients for foreign currency exchange transactions. As requested by ATRS, and approved by the court, the class in that case has been represented by "Lead Counsel" Labaton, and by Thornton and Lieff. In the other two cases, C.A. No. 11-12049-MLW and C.A. No. 12-11698-MLW (the "ERISA cases"), members of employee pension and retirement plans covered by ERISA alleged that State Street breached its fiduciary duties under ERISA, and engaged in transactions prohibited by ERISA, Pub. L. No. 93-406, 88 Stat. 829 (codified in relevant part as amended at 29 U.S.C. §§1001-1461), with regard to foreign currency exchange. The ERISA plaintiffs have been represented by McTigue Law LLP ("McTigue"), Zuckerman Spaeder LLP ("Zuckerman"), Keller Rohrbach LLP ("Keller"), (collectively, "ERISA Counsel"), and, to a limited extent, by several other firms working with them.

In 2012, the court denied State Street's motion to dismiss the ATRS case. At the request of all parties, the court then stayed the cases to permit them to engage in informal discovery and mediated settlement negotiations.

In July 2016, the parties filed a stipulation of settlement
of the three cases. They asked that the court: certify for
settlement purposes a single class that included both customers in
the original proposed ATRS class and the ERISA Plans in the
original proposed ERISA classes; preliminarily approve the
settlement; appoint Labaton as "Lead Counsel" for the single class
to be certified; give class members notice of the proposed
settlement and an opportunity to object; and then finally approve
the settlement. While State Street did not admit liability, the
proposed settlement provided for a payment by State Street of
$300,000,000. It also authorized plaintiffs' counsel to seek
approximately $75,000,000 in attorneys' fees, up to $1,750,000 in
expenses, and $85,000 in service awards for the class
representatives. The proposed settlement had previously been
approved by the United States Departments of Justice and Labor and
the Securities and Exchange Commission, subject to approval by the
court.

These cases then appeared to the court to fit the paradigm
for securities class actions prescribed by PSLRA, which the parties
agree is equally applicable to these cases. See, e.g., June 26,
2019 Tr. at 126-27 (Dkt. No. 566). As the First Circuit has
written, "[i]n certain types of complex litigation, the lawyers'
monetary interests often comprise a tail that wags the dog."
Fidelity/Micron, 167 F.3d at 736. The PSLRA "was intended to end

32

the perceived practice of counsel choosing plaintiffs, operating without supervision, and often profiting greatly from settlements that provided little benefit to class members." Garbowski v. Tokai Pharm., Inc., 302 F. Supp. 3d 441, 443 (D. Mass. 2018). The statute sought to ensure that plaintiffs' counsel in class actions do not "litigate with a view toward ensuring payment for their services without sufficient regard to whether their clients are receiving adequate compensation in light of evidence of wrongdoing." S. Rep. No. 104-98, at 6 (1995) (citation omitted).

When the proposed settlement in this case was presented, the court inferred that ATRS, a sophisticated institutional investor, had identified a promising basis for a class action, selected counsel, directed and monitored their performance, and concluded that about $75,000,000 would be reasonable compensation for their work. As explained below, Class Counsel and ERISA Counsel did obtain reasonable compensation for class members. However, the evolution of events has demonstrated that in the ATRS case, the appearance of conforming to the proper paradigm was a fiction.

III. THE STANDARDS FOR AWARDING ATTORNEYS' FEES

The court's authority to award fees "has its origins in equity . . . ." Fidelity/Micron, 167 F.3d at 737. With regard to class actions, "[c]ourts have long recognized that a lawyer who recovers a 'common fund' for the class she represents is entitled to be paid a reasonable attorneys' fee and her expenses prior to

the distribution of the balance to the class." In re Lupron Mktg. & Sales Practices Litig., No. 01-cv-10861-RGS, 2005 WL 2006833, *2 (D. Mass. Aug. 17, 2005). "The common fund doctrine is founded on the equitable principle that those who have profited from litigation should share its costs." Thirteen Appeals, 56 F.3d at 305 n.6. As the award of attorneys' fees is an exercise of a court's equitable authority, the court has "wide latitude in shaping the contours of [attorneys' fee] awards." Fidelity/Micron, 167 F.3d at 736.

In exercising its discretion, the district court "functions as a quasi-fiduciary to safeguard the corpus of the fund for the benefit of the plaintiff class." Id.; see also Agent Orange, 818 F.2d at 222 (Federal Rule of Civil Procedure 23(e) "requires court approval of any settlement of a class action suit and squarely places the court in the role of protector of the rights of the class when such a settlement is reached and attorneys' fees are awarded"); In re Relafen Antitrust Litig., 360 F. Supp. 2d 166, 192-94 (D. Mass. 2005) (collecting authorities). This fiduciary duty can be difficult to discharge because "the presentation of the settlement for judicial approval is nonadversarial in nature: the prior competing parties (class counsel and the defendants) have resolved their differences and are now in harmony in seeking the court's approval." 4 William B. Rubenstein, Newberg on Class Actions §13:40 (5th ed. Dec. 2019 Update). Ultimately, courts have

to rely on counsel, particularly plaintiffs' counsel, to provide the accurate and complete information necessary for the court to exercise properly its discretion in awarding attorneys' fees. The Massachusetts Rules of Professional Conduct impose on attorneys seeking a fee award in a class action the duty to do so. See Mass. R. Prof. C. 3.3.

Courts may award fees from a common fund "either on a percentage of the fund basis or by fashioning a lodestar." Thirteen Appeals, 56 F.3d at 307. "[T]he [percentage of fund] method in common fund cases is the prevailing praxis . . . ." Id. "Within the First Circuit, courts generally award fees in the range of 20-30%, with 25% as the benchmark." Bezdek v. Vibram USA Inc., 79 F. Supp. 3d 324, 349-50 (D. Mass. 2015) (internal quotation marks omitted), aff'd, 809 F.3d 78 (1st Cir. 2015); see also Lupron, 2005 WL 2006833 at *5 ("Courts in the First Circuit have recognized that fee awards in common fund cases typically range from 20 to 30 percent."). The First Circuit's approach is comparable to that employed in other Circuits. For example, the Ninth Circuit has written: "Twenty-five percent is the 'benchmark' that district courts should award in common fund cases. The district court may adjust the benchmark when special circumstances indicate a higher or lower percentage would be appropriate." In re Pac. Enters. Secs. Litig., 47 F.3d 373, 379 (9th Cir. 1995) (internal citation omitted).

"[T]he First Circuit does not require courts to examine a fixed laundry list of factors" in determining a reasonable attorneys' fee award. In re Tyco Int'l, Ltd. Multidist. Litig., 535 F. Supp. 2d 249, 265-66 (D.N.H. 2007). However, district courts within the First Circuit generally consider the factors initially identified by the Second and Third Circuits, particularly:

> (1) the size of the fund and the number of persons benefitted; (2) the skill, experience, and efficiency of the attorneys involved; (3) the complexity and duration of the litigation; (4) the risks of the litigation; (5) the amount of time devoted to the case by counsel; (6) awards in similar cases; and (7) public policy considerations.

Neurontin, 58 F. Supp. at 170 (quoting Lupron, 2005 WL 2006833 at *3); see generally Goldberger v. Integrated Res., Inc., 209 F.3d 43, 50 (2d Cir. 2000); Third Circuit Task Force, Court Awarded Attorney Fees, 108 F.R.D. 237, 255-56 (1985).

Courts have a duty to promote and protect the integrity of judicial proceedings. In exercising its equitable authority to award fees, a court should not reward or encourage inequitable conduct by counsel. Therefore, it is permissible and appropriate for a court to take misconduct into account in making a fee award.

More specifically, in fulfilling its duty to serve as protector of the class, the court should, among other things, "look to the various codes of ethics as guidelines for judging the conduct of counsel." Agent Orange, 818 F.2d at 222. As the First Circuit has written, "'[e]very lawyer is an officer of the court

[and] has a duty of candor to the tribunal.'" <u>Pearson</u>, 200 F.3d at 38 (quoting <u>Burns</u>, 31 F.3d at 1095).

In view of the fact that the adversary process is not operating when attorneys representing a class seek a fee award, it is especially important that they satisfy their duty of candor to the court. As explained earlier, the particular importance of attorneys' providing accurate and complete information to the court when seeking an award of attorneys' fees in a class action is emphasized in the Massachusetts Rules of Professional Conduct. Comment 14A to Rule 3.3 states that:

> When adversaries present a joint petition to a tribunal, <u>such as a joint petition to approve the settlement of a class action suit</u> or the settlement of a suit involving a minor, the proceeding loses its adversarial character and in some respects takes on the form of an <u>ex parte</u> proceeding. The lawyers presenting such a joint petition thus have the same duties of candor to the tribunal as lawyers in <u>ex parte</u> proceedings and should be guided by Rule 3.3(d).

(emphasis added). Rule 3.3(d) provides that:

> In an <u>ex parte</u> proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse.

A petition for an award of attorneys' fees in a class action is appropriately treated as an <u>ex parte</u> submission because at that point the attorneys' interests in maximizing their compensation is adverse to the interest of the class in maximizing its recovery. <u>See In re Rite Aid Corp. Secs. Litig.</u>, 396 F.3d 294, 307-08 (3d

Cir. 2005). Except in the rare case in which a well-endowed class member invests in opposing a request for attorneys' fees, the adversary process does not operate to advocate for the interests of the class.

"[I]n light of the divergence of interests that can . . . develop between counsel and the class in [] class actions, it is essential that courts not doubt the forthrightness of counsel." In re IMAX Secs. Litig., No. 06 Civ. 6128(NRB), 2012 WL 3133476, at *11 (S.D.N.Y. Aug. 1, 2012). When counsel fail in their duty to be candid and complete in their presentations to the court, "the grant of fees and expenses must reflect this." Id.

Indeed, "'[i]t is well settled . . . that the district court has the duty and responsibility to supervise the conduct of attorneys who appear before it, and that . . . [d]enial of attorneys' fees may be a proper sanction' for attorney misconduct." Travers v. Flight Servs. & Sys., Inc., 808 F.3d 525, 542 (1st Cir. 2015) (quoting Culebras Enters. Corp. v. Rivera-Rios, 846 F.2d 94, 97 (1st Cir. 1988)). Therefore, as the Ninth Circuit wrote in a decision concerning a class action, "under long-standing equitable principles, a district court has broad discretion to deny fees to an attorney who commits an ethical violation." Rodriguez v. Disner, 688 F.3d 645, 655 (9th Cir. 2012).

In addition to considering whether a requested award is reasonable based on the customary Goldberger factors and any others

that are relevant in the unique circumstances of the case, courts in the First Circuit and nationally regularly check the requested award against the "lodestar" to evaluate whether such an award would be reasonable. See David F. Herr, Annotated Manual for Complex Litigation §14.122 (4th ed. May 2019 Update) ("[T]he lodestar is . . . useful as a cross-check on the [percentage of fund] method . . . ."); see also Goldberger 209 F.3d at 50 (encouraging use of lodestar as a cross check). A lodestar is properly calculated by multiplying the number of hours reasonably spent on the litigation by a reasonable hourly rate. Thirteen Appeals, 56 F.3d at 305 (citing Blum, 465 U.S. at 896-902); Bezdek, 79 F. Supp. 3d at 350. "Reasonable fees are to be calculated according to the prevailing market rates in the relevant community . . . ." Blum, 465 U.S. at 895. "[T]he rate that private counsel actually charges for her services, while not conclusive, is a reliable indicium of market value." One Star Class Sloop Sailboat, 546 F.3d at 40 (emphasis added).

Although awarding a percentage of the fund in the 20% to 30% range is common, the First Circuit has explained that "'[r]easonableness is the goal,' and that courts should avoid 'mechanical or formulaic application' of rigid rules." Fidelity/Micron, 167 F.3d at 737 (quoting In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 109 F.3d 602, 607 (9th Cir. 1997)). Accordingly, "because each common

fund case presents its own unique set of circumstances, trial courts must assess each request for fees and expenses on its own terms," and "when a court exercises [its] equitable power, individualization is the name of the game." Id.

Moreover, "the court has the ultimate authority to determine" not only the most appropriate total amount to award in attorneys' fees but also "how the aggregate fee is to be allocated among counsel." 5 Rubenstein, Newberg on Class Actions §15:23.

Counsel for the plaintiffs in this case agree that the foregoing are the generally applicable principles for awarding attorneys' fees, including concerning the authority of the court to allocate an award of attorneys' fees among counsel. See June 24, 2019 Tr. at 17 (Dkt. No. 560).

IV. THE FACTS

A. The Approval of the Proposed Settlement

On August 8, 2016, the court conducted a hearing on the requests for preliminary approval of the proposed settlement and for attorneys' fees. The court stated that the case was at "a point at which the adversary system doesn't work." Aug. 8, 2016 Tr. at 41:13-14 (Dkt. No. 93). Indeed, the court characterized a proposed class action settlement as "a point at which the adversary process usually fails." Id. at 14:4-5.

The court was referring to the fact that when plaintiffs' counsel request an award of attorneys' fees, their interest in

maximizing their compensation is in tension with the interests of the members of the class, who will share the remainder of the common fund. The court's statements should have reminded Class Counsel of the importance of their ethical duty to provide the court, as fiduciary for the class, with accurate and complete information. See Mass. R. Prof. C. 3.3 cmt. 14A; Pearson, 200 F.3d at 38. However, as explained below, the court's remarks did not influence Labaton and Thornton, and to a lesser extent Lieff, to satisfy their duty of candor to the court.

At the August 8, 2016 hearing, the court certified for settlement purposes the proposed single class that included the members of the putative ATRS class and of the putative ERISA classes. As requested, the court appointed Labaton as Lead Counsel for that single class. It also preliminarily approved the settlement and subsequently approved a revised notice of it to be provided to the classes. See Aug 8, 2016 Tr. at 11:17-21, 21:21-23:6 (Dkt. No. 93); Aug. 11, 2016 Order (Dkt. No. 97). A hearing concerning whether the proposed settlement should be finally approved and to award attorneys' fees was scheduled for November 2, 2016. See id.

In advance of the November 2, 2016 hearing, Labaton, as Lead Counsel, filed a memorandum in support of the proposed settlement which stated that it was signed by Thornton and Lieff as well. See Dkt. No. 101-1. As Lead Counsel, Labaton also filed a memorandum

41

in support of a request for $74,541,250 in attorneys' fees, $1,257,698 in expenses, and $85,000 in service awards. See Dkt. No. 103-1. That memorandum too stated that it was also signed by Thornton and Lieff. See id. at 28-29 of 36. In addition, Sucharow of Labaton submitted a sworn declaration attesting to the accuracy of the sworn declarations concerning the request for attorneys' fees submitted by representatives of each law firm that had appeared for plaintiffs in these cases. See Sucharow Decl. ¶¶161-98 (Dkt. No. 104).

The memorandum in support of the request for attorneys' fees: addressed the Goldberger factors, including public policy considerations; noted that the requested fee was in the 20% to 30% range that is usual in the First Circuit, and was consistent with the typical 25% starting benchmark, citing Bezdek, 79 F. Supp. 3d at 349-50; asserted that the requested fee was reasonable when compared to settlements in First Circuit in other cases involving more than $100,000,000, which are often referred to as "megafund" cases; and argued that a sliding scale had not been used by judges in the First Circuit to reduce the percentage of the common fund awarded in megafund cases and should not be used in this case. See Dkt. No. 103-1. The memorandum also stated that the requested fee was comparable to the award in another foreign currency exchange class action in which Thornton and Lieff were counsel for the class, BONY Mellon. See id. at 17 n.17 of 36.

In addition, the memorandum stated that:

> Empirical studies also support the requested fee. An in-depth review of all 688 class action settlements in federal courts during 2006 and 2007 found that the mean and median fees awarded in the 444 settlements where the [percentage of fund] method was used (either with or without a lodestar cross-check) were 25.7% and 25.0%, that the mean and median fees awarded in securities cases (233 of 444) were 24.7% and 25.0%, and that the mean and median fees awarded in consumer cases (39 of 444) were 23.5% and 24.6%. Brian T. Fitzpatrick, "An Empirical Study of Class Action Settlements and Their Fee Awards," 7 J. Empirical Legal Stud. 811, 835 (2010) (Ex. 31); see also Neurontin, 58 F. Supp. 3d at 172 (favorably citing this study). The 24.85% fee requested is right in line with Professor Fitzpatrick's findings.

Id. at 17-18 (emphasis added) (footnote omitted). The memorandum also stated in a footnote that Fitzpatrick "found . . . that the mean and median fees awarded in settlements in the First Circuit (23 of 444) were 27.0% and 25.0%." Id. at 18 n.18 of 36. As explained below, the court now finds that Class Counsel's characterization of the Fitzpatrick Study was materially misleading because Class Counsel did not inform the court that for settlements between $250,000,000 and $500,000,000 Fitzpatrick found that the mean award was 17.8% and the median award was 19.5%. See Fitzpatrick Study, supra, at 839.

In further support of the motion for attorneys' fees, Sucharow, Garrett Bradley of Thornton, and Daniel Chiplock of Lieff submitted sworn declarations. Each of their declarations included an attachment listing the attorneys and professional staff each

firm employed who worked on this case, the hours that each worked, the regular hourly rate for each attorney, and the total lodestar for his firm. More specifically, each declarant stated that:

> The schedule attached hereto as Exhibit A is a summary indicating <u>the amount of time spent by each attorney and professional support staff-member of my firm</u> who was involved in the prosecution of the Class Actions, and <u>the lodestar calculation based on my firm's current billing rates</u>. For personnel who are no longer employed by my firm, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment by my firm. <u>The schedule was prepared from contemporaneous daily time records</u> regularly prepared and maintained by my firm, which are available at the request of the Court. . . .
>
> <u>The hourly rates for the attorneys and professional support staff in my firm included in Exhibit A are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions</u>.

Sucharow Decl. ¶¶6-7 (Dkt. No. 104-15) (emphasis added); G. Bradley Decl. ¶¶3-4 (Dkt. No. 104-16) (emphasis added); Chiplock Decl. ¶¶4-5 (Dkt. No. 104-17) (emphasis added).

In view of the well-established jurisprudence described earlier and the representations of counsel, the court understood that in calculating the lodestar, plaintiffs' law firms had used the rates they each customarily actually charged paying clients for the services of each attorney and were representing that those rates were comparable to the rates actually charged to clients for similar services by other attorneys in their community. Counsel for Labaton has acknowledged that a judge would have reasonably

interpreted the foregoing representations this way. See June 24, 2019 Tr. at 119-20 (Dkt. No. 560). However, as explained below, the court's understanding, based on the statements in the declarations and the clearly established law they addressed, was incorrect. More specifically, various representations concerning calculation of the lodestar were false or misleading, including the representation that the rates attributed to Labaton, Thornton, and Lieff attorneys were actually charged to paying clients.

Nevertheless, in his sworn declaration, Sucharow stated that the declarations of each of the nine firms in support of the requested fee award were based on "the current billing rates" of each of the attorneys in each firm, including his own. Sucharow Decl. ¶¶175-76 (Dkt. No. 104). Based on this representation Sucharow stated that the total lodestar was $41,323,895.75. See id. ¶177; Mem. Supp. Attys.' Fees 31 of 36 (Dkt. No. 103-1); Nov. 2, 2016 Tr. at 30:18-31:12 (Dkt. No. 114). Sucharow claimed that the $75,000,000 requested fee award would constitute a 1.8 multiplier of the lodestar, which was reasonable in view of the risk that plaintiffs and their counsel might have recovered nothing, the delay in obtaining any payment, and the multipliers deemed reasonable in other cases. See Mem. Supp. Attys.' Fees at 31-32 of 36 (Dkt. No. 103-1). These assertions were reiterated at the November 2, 2016 hearing by Goldsmith of Labaton. See Nov. 2, 2016 Tr. at 30:24-33:1 (Dkt. No. 114).

At the November 2, 2016 hearing, the court approved the proposed $300,000,000 settlement. Id. at 35:6-37:3. With regard to attorneys' fees, the court stated that it was "relying heavily on [counsel's] submissions and what [had] been said" at the hearing. Id. at 35:4-6 (emphasis added). The court stated that it had "used the percentage of common fund method" and the lodestar cross-check, and found counsels' request to be reasonable. Id. at 35:6-36:18. Therefore, the court awarded $74,541,250 in attorneys' fees and $1,257,697.94 in expenses. See id. It also made service awards of a total of $85,000 to the plaintiff class representatives. See id. at 36:18-37:3.

B. The Reports of Errors in the Fee Petitions

On November 10, 2016, Goldsmith, on behalf of all Class and ERISA Counsel, sent the court a letter. See Dkt. No. 116. Goldsmith noted that the court had used the lodestar calculated by Labaton as a check concerning the reasonableness of the percentage of the common fund requested for attorneys' fees. See id. at 3 n.4. He stated that as a result of an "inquiry from the media," "inadvertent errors [had] just [been] discovered in certain written submissions from Labaton Sucharow LLP, Thornton Law Firm LLP, and Lieff Cabraser Heimann & Bernstein LLP supporting Lead Counsel's motion for attorneys' fees . . . ." Id. at 1. Goldsmith reported that the hours of 23 temporary "staff attorneys," who were paid by the hour primarily to review documents, had been

included in the lodestar reports of more than one firm. Id. at 1-2. More specifically, Goldsmith stated that lawyers located at Labaton's and Lieff's offices were counted by Thornton and should have been included only in Thornton's lodestar. See id. at 2. Goldsmith also wrote that in some instances different billing rates had been attributed to the same staff attorneys by different firms. See id. at 3.

This double-counting resulted in inflating the number of hours worked by more than 9,300 and inflating the total lodestar by more than $4,000,000. See id. at 2-3. As a result, Goldsmith stated that the correct lodestar was approximately $37,270,000 and that a multiplier of 2, rather than 1.8, should have been used to test the reasonableness of the request for an award of $75,000,000 in attorneys' fees. See id. at 3. He asserted that the award nevertheless remained reasonable and should not be reduced. See id.

The letter did not indicate that the reported lodestar was not based on what plaintiffs' counsel actually customarily charged paying clients for the type of work done by the staff attorneys or other lawyers involved in this case. Nor did the letter raise any other question concerning the reliability of the representations made to the court in the request for attorneys' fees.

Additional questions were, however, raised by a December 17, 2016 Boston Globe article headlined "Critics hit law firms' bills

after class-action lawsuits." See Dkt. No. 117, Ex. B. For example, the article reported that the staff attorneys involved in this case were typically paid $25 to $40 an hour. Id. at 24 of 37. In calculating the lodestar, Class Counsel had represented to the court that the regular hourly billing rates for the staff attorneys were much higher-for example, $425 to $500 for Thornton, see Dkt. No. 104-16 at 7-8 of 14, and $335 to $440 for Labaton, see Dkt. No. 104-15 at 7-8 of 52. A representative of Labaton reportedly confirmed the accuracy of the article in this respect. See Dkt. No. 117, Ex. B at 24 of 37.

The article also raised questions concerning the reliability of statements made in his sworn declaration by Garrett Bradley, the Managing Partner of Thornton, concerning his brother Michael Bradley. Id. at 22-23, 25. Garrett Bradley had represented that Michael Bradley was employed by Thornton and the regular rate charged by the firm for his brother's services was $500 an hour. See Dkt. No. 104-16 at 7 of 14. However, the article stated, without reported contradiction, that "Michael Bradley . . . normally works alone, [and] often mak[es] $53 an hour as a court-appointed defender in [the] Quincy District Court . . . ." See Dkt. No. 117, Ex. B. at 22 of 37.

The Boston Globe published a second article six weeks later. See Andrea Estes, "Firms profited from Garrett Bradley's

48

ties," Boston Globe (Jan. 28, 2017). The article stated that

Plymouth County Treasurer Thomas J. O'Brien was:

> an unlikely magnet for campaign contributions
> from high-powered attorneys in Manhattan and
> downtown Boston. . . . Yet, since 2007, lawyers
> from the Thornton Law Firm in Boston and Labaton
> Sucharow of New York City have given $100,000
> to O'Brien's political campaigns, accounting for
> almost half of all of the donations he's
> received over the decade.

Id. The article also reported that "[f]ourteen times in the past

decade, the Plymouth County retirement system has filed [class

action] lawsuits on the advice of lawyers from Labaton and

Thornton . . . ." Id. Reportedly, "[c]ourt records show that the

retirement fund has collected a grand total of $40,035 from all

the lawsuits combined while the lawyers have received 1,000 times

that amount: $41.4 million." Id. In addition, the article stated

that "in Massachusetts, no one is better at persuading investors

to join class action lawsuits than O'Brien's friend, [Garrett]

Bradley, the managing partner of Thornton Law Firm and, until his

sudden departure a few months ago, assistant majority leader in

the state House of Representatives." Id. Thornton's lawyer

reportedly explained that Bradley's role was indeed to "drum[] up

business" for Thornton and Labaton. Id. "O'Brien said his county's

decision to join so many Labaton lawsuits has nothing to do

with political favors." Id.

The January 28, 2017 Boston Globe article also described more
than $30,000 in campaign contributions Thornton and Labaton
attorneys and their family members had made to former Massachusetts
Treasurer Timothy Cahill. Reportedly, several months after those
contributions, the state pension fund Cahill chaired hired
Labaton. Id. Labaton reportedly subsequently filed two successful
class action lawsuits for the state pension fund. Id. As a result,
Labaton reportedly received approximately $60,000,000 and gave
$9,000,000 to Thornton, while the state pension fund collected
$681,763. Id. The article also reported that after the Boston
Globe began asking questions about Bradley's work with the pension
fund, "he took [the] drastic step [of] . . . abruptly resign[ing]
from the [state] Legislature . . . ." Id.

In testimony on June 25, 2019, Garrett Bradley confirmed that
he had served in the Massachusetts Legislature with O'Brien, the
Plymouth County Treasurer who chaired the Plymouth County
Retirement Board, and he was instrumental in obtaining the Board
as a client for Labaton and Thornton.[9] See June 25, 2019 Tr. at
37-39 (Dkt. No. 565). Garrett Bradley also confirmed that it was
indeed his role to "drum up business" for Labaton and Thornton.
More specifically, he testified that it was his job to get Labaton

---

[9]     Garrett Bradley also testified that he obtained the Plymouth
County Retirement Board as a client before O'Brien became its
Chair. See June 25, 2019 Tr. at 38-39 (Dkt. No. 565).

retained as a monitor for a fund and to represent it if the fund became a lead plaintiff in a class action. See id. at 42-43. Thornton would then get up to 20% of the fees awarded to Labaton in a class action in which Labaton represented a client obtained by Bradley, even if Thornton did not file an appearance or do any work on the case. Id. at 39-40, 44, 45.

Bradley also confirmed that Labaton and Thornton lawyers, including himself, made campaign contributions to O'Brien. Id. at 40. With regard to the Boston Globe report that the Plymouth County Retirement System received about $40,000 in cases in which Labaton had received more than $41,000,000, which it shared with Thornton, Bradley testified that while the numbers seemed high, "that's the class action model." Id. at 41. Christopher Keller of Labaton also confirmed the essential accuracy of the Boston Globe report regarding the relationship between Labaton, Thornton, and the Plymouth County Retirement System. See June 26, 2019 Tr. at 120:13-124:5 (Dkt. No. 566).[10]

_____

[10]    In Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC, 616 F. Supp. 2d 461 (S.D.N.Y. 2009), Judge Jed Rakoff expressed concern about monitoring arrangements like the agreement Labaton had with ATRS and other pension funds.

> Going far beyond any traditional contingency arrangement of which the Court is aware, this practice, on its face, creates a clear incentive for [the plaintiffs' firm] to discover "fraud" in the investments it monitors and to recommend to the Fund's non-lawyer administrator (and, through him, to the trustees) that the Fund, at no cost

C. The Appointment of the Master

In a February 6, 2017 Memorandum and Order, the court wrote that the December 17, 2016 Boston Globe article raised questions concerning whether the hourly rates plaintiffs' counsel attributed to the staff attorneys in calculating the lodestar were, as represented, what these firms actually charged for their services or what other lawyers in their community charge paying clients for similar services. See Dkt. No. 117. This concern was enhanced by the fact that different firms represented that they customarily charged clients for the same lawyer at different rates. See id. at 7. In general, the court questioned whether clients customarily

_____

        to itself, bring a class action lawsuit. In other words,
        the practice fosters the very tendencies toward lawyer-
        driv[en] litigation that the PSLRA was designed to
        curtail.

Id. at 464.

        This court shares that concern. Serving as monitoring counsel
for an institutional investor is potentially very lucrative. The
opportunity for monitoring counsel to profit greatly creates a
risk that firms will engage in questionable conduct to obtain such
assignments. As explained below, questionable conduct was involved
in Labaton's successful effort to become one of ATRS' monitoring
counsel and, as a result, Lead Counsel in this case.

        There may be good reasons for a pension fund, particularly a
smaller pension fund, to engage someone to monitor its portfolio
in order to minimize the risk that it will be injured by fraudulent
conduct. However, it would be far more consistent with the purposes
of the PSLRA if such monitors, who could provide the service to
many funds that would share the cost, were paid on a fee-for-
service basis and did not have powerful financial incentives to
recommend initiating a class action from which they would
foreseeably benefit the most.

agreed to pay, and actually paid, an hourly rate for staff attorneys that is about ten times more than the hourly cost, before overhead, to the law firms representing plaintiffs. See id.

In addition, the court noted that the article raised a question concerning whether Thornton regularly charged $500 an hour for Michael Bradley's services as Garrett Bradley had represented in his sworn declaration. See id.

The court also stated that the acknowledged double-counting of hours of staff attorneys and the other matters discussed in the December 17, 2016 Boston Globe article raised questions generally about the accuracy and reliability of the representations plaintiffs' counsel made in their calculation of the lodestar. See id. at 8. These questions caused the court to express concern about whether the award of almost $75,000,000 in attorneys' fees was reasonable. Therefore, the court informed the parties that it proposed to appoint Retired United States District Judge Gerald Rosen as a Master to investigate and provide a Report and Recommendation on all issues relating to the award of attorneys' fees in this case. See id. at 8-10.

On March 7, 2017, a hearing was held concerning the proposed appointment of Judge Rosen as Master and related issues. The court first addressed a motion filed by Ted Frank of CCAF to participate in these proceedings, including as a guardian ad litem for the class with the authority to serve as an adversary to the

plaintiffs' law firms in any proceedings before the proposed
Master. See Dkt. No. 126. In successfully opposing this request
counsel for Labaton argued that Judge Rosen could retain someone
"to ask cross-examination questions in an adversarial or quasi-
adversarial model," and, therefore, neither the class nor the
Master would need Frank's assistance. Mar. 7, 2017 Tr. at 40:19-
42:15 (Dkt. No. 176). Labaton's counsel added that Judge Rosen was
"obviously very skilled and has been in the role of a judge for
many, many years . . . ." Id. at 40:22-25. She expressed
appreciation for "the opportunity to present to a special master
of his qualifications." Id. at 41:7-9. Therefore, Labaton had "no
objection to Judge Rosen" being appointed as Master. Id. at 41:7,
43:8-9. Nor did anyone else object to Judge Rosen's appointment.
Id.

    Labaton also agreed to the court's proposal that it return
$2,000,000 to the Clerk of the District Court to permit the court
to compensate the Master and those he employed. Id. at 43:14-45:7,
65:18-25. The court informed Class Counsel that if more than
$2,000,000 was needed they might be required to return additional
funds. Id. at 65:18-25.

    The March 7, 2017 hearing also included discussion of some of
the issues that prompted the appointment of the Master. Counsel
for Thornton stated that the court's concerns about the
representations that had been made in the requests for attorneys'

fees were "justifiable." Id. at 71:20-72:5. He represented that Michael Bradley had actually worked more than the number of hours attributed to him in the fee petition, but did not have conventional time sheets to document his time. See id. at 72:1-24. Thornton's counsel and Michael Bradley each also stated that Michael Bradley was not an employee of Thornton, and that neither the firm nor Michael Bradley had, as represented under oath in Garrett Bradley's declaration, ever billed for his time at the rate of $500 per hour. See id. at 72:25-77:10. Although Garrett Bradley claimed that Thornton's regular rate for Michael Bradley was $500 an hour, he could not identify any case in which a client had been charged that rate, and identified only one case in which his brother was billed by Thornton at a rate of as much as $300 an hour. See id. at 87:10-90:3.

As explained earlier, Sucharow of Labaton had stated in his sworn declaration in support of Labaton's request for attorneys' fees that: "[t]he hourly rates for the attorneys and professional support staff in [Labaton] included in Exhibit A [to my declaration] are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions." Sucharow Decl. ¶7 (Dkt. No. 104-15). At the March 7, 2017 hearing, however, Sucharow stated that the rates characterized as Labaton's "regular rates charged for [the] services" of the attorneys who worked on this case had never been

charged to paying clients because his firm always worked on a contingent-fee basis and had no "billable clients." Mar. 7, 2017 Tr. at 79:1-22 (Dkt. No. 176).

Similarly, Garrett Bradley acknowledged that Thornton had never billed a paying client $425 an hour for a staff attorney and, indeed, the staff attorneys that he had represented in his declaration worked for Thornton actually worked at, and were paid by, Labaton and Lieff. See id. at 88:6-18.

Richard Heimann of Lieff explained at the March 7, 2017 hearing that Lieff was "almost entirely a contingent-fee firm," with only a "handful of paying clients." Id. at 93:11-21. His partner Daniel Chiplock stated that the "staff attorneys" were sometimes called "contract attorneys," and there had been "two or three cases" in which clients had paid "close to" the rates attributed to them in his declaration. Id. at 93:2-6.

The court stated at the March 7, 2017 hearing that the propriety of the hourly rates attributed to "staff" and "contract" attorneys for the purpose of calculating lodestars for use in class actions had become the subject of litigation recently in cases in the Southern District of New York and mentioned several of them. Id. at 93:22-94:13 (citing In re Weatherford Int'l Secs. Litig., No. 11 Civ. 1646(LAK), 2015 WL 127847, *1 (S.D.N.Y. Jan. 5, 2015); In re Citigroup Inc. Secs. Litig., 965 F. Supp. 2d 369 (S.D.N.Y. 2013); In re Citigroup Inc. Bond Litig., 988 F. Supp. 2d

371 (S.D.N.Y. 2013); In re Beacon Assocs. Litig., Nos. 09 Civ

777(CM) et al., 2013 WL 2450960 (S.D.N.Y. May 9, 2013); City of

Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp., 954 F.

Supp. 2d 276 (S.D.N.Y. 2013)). In one of those cited cases, which

included a firm involved in the instant case as ERISA Counsel, the

judge wrote:

> There is little excuse in this day and age for delegating
> document review (particularly primary review or first
> pass review) to anyone other than extremely low-cost,
> low-overhead temporary employees (read, contract
> attorneys) -- and there is absolutely no excuse for
> paying those temporary, low-overhead employees $40 or
> $50 an hour and then marking up their pay ten times for
> billing purposes.

Beacon Assocs., 2013 WL 2450960 at *18. The lodestars and requested

fee awards were reduced in some of the cases in the Southern

District of New York. See, e.g., Weatherford, 2015 WL 127847 at

*2; Citigroup Secs. Litig., 965 F. Supp. 2d at 373-74.

With the consent of Class and ERISA Counsel, the court

appointed Judge Rosen to serve as the Master in this matter. See

Mar. 8, 2017 Order (Dkt. No. 173). With regard to his duties, it

ordered that:

> The Master shall investigate and prepare a Report
> and Recommendation concerning all issues relating
> to the attorneys' fees, expenses, and service
> awards previously made in this case. The Report
> and Recommendation shall address, at least:
> (a) the accuracy and reliability of the
> representations made by [Class Counsel] in their
> requests for awards of attorneys' fees and
> expenses, including but not limited to whether
> counsel employed the correct legal standards and

had a proper factual basis for what was
represented to be the lodestar for each firm;
(b) the accuracy and reliability of the
representations made in the November 10, 2016
letter from David Goldsmith, Esq. of Labaton
Sucharow, LLP to the court (Docket. No. 116);
(c) the accuracy and reliability of the
representations made by [Class Counsel and each
of the named plaintiffs in] requesting service
awards; (d) the reasonableness of the amounts of
attorneys' fees, expenses, and service awards
previously ordered, and whether any or all of them
should be reduced; (e) whether any misconduct
occurred in connection with such awards; and, if
so, (f) whether it should be sanctioned, see e.g.
Fed. R. Civ. P. 11(b)(3) & (c); Massachusetts
Supreme Judicial Court Rule of Professional
Conduct 3.3(a)(1) & (3).

Id. ¶2. Class Counsel were ordered to pay $2,000,000 to the Clerk of the District Court from the fee awards they received. See id. ¶13. The Master was authorized to retain counsel and others, who would be reasonably compensated by the court from this fund. See id. ¶14. The Master was directed to attempt to complete his investigation and report by October 10, 2017, but the court authorized him to seek an extension of time to do so if necessary. See id. ¶3.

In order to eliminate any possible doubt about the court's authority to modify the fee award after receiving the Master's report and resolving any objections to it, the court later vacated the original fee award. See June 22, 2018 Order (Dkt. No. 331).

D. The Master's Investigation

The Master promptly retained counsel and other assistants. They worked hard to perform their duties. However, the Master's investigation became more protracted than anticipated when he discovered, as a result of documents produced by Thornton, but not Labaton or Lieff, that Labaton had paid $4,100,000, about 5.5% of the $75,000,000 fee award, to Chargois.

Chargois is a Texas lawyer who had done no work on these cases. However, in 2007, Labaton had asked Chargois to find institutional investors in the Southwest that could hire Labaton as monitoring counsel and to influence them to do so. Neither Chargois, nor his partner in Arkansas, Herron, had a relationship with any institutional investor. No institutional investor had ever asked either of them for advice generally or to find monitoring counsel particularly.

However, Herron knew Steve Faris, an Arkansas State Senator on the Joint Committee on Public Retirement and Social Securities, which was responsible for oversight of ATRS. Chargois arranged for Labaton's partners Eric Belfi and Chris Keller to meet Faris. In an August 2007 email to Belfi, Chargois explained that Faris was "prepared to hear you out and take necessary steps after you do

your thing." Email from Chargois to Belfi (Aug. 9, 2007) (Dkt. No. 454-5).[11]

Faris subsequently introduced Belfi and Keller to Doane, the Executive Director of ATRS. Belfi and Keller met with Doane in Little Rock and New York City, and explained Labaton's desire to become a monitoring counsel for ATRS.

In September 2007, Chargois wrote to Belfi that "[t]he good senator is finalizing with Paul Doan[e]," and "[e]verybody wants something sometimes." Email from Chargois to Belfi (Sept. 26, 2007) (Dkt. No. 454-8).[12] Chargois reported that "the Labaton firm will represent the pension fund," and asked Belfi to "[p]lease be discreet and act surprised when it happens." Id.

To formalize Doane's agreement that Labaton would be retained, ATRS issued a Request for Qualification ("RFQ") to Labaton to act as monitoring counsel. See Chargois Dep. Tr. at 37:19-24, R. & R. Ex. 125 (Dkt. No. 401-124). Labaton responded by submitting a joint proposal on behalf of Labaton and Chargois & Herron. See Joint Response (July 30, 2008), R. & R. Ex. 128 (Dkt. No. 401-127). In October 2008, the Board formally selected Labaton as monitoring counsel. See Email from Clark to Belfi (Oct. 13,

---

[11]    It is not clear what Chargois meant by "do your thing."

[12]    It is also not clear what Chargois meant in writing that "[e]verybody wants something sometimes."

2008), R. & R. Ex. 129 (Dkt. No. 401-128). ATRS stated that "the state procurement process is not conducive to a joint proposal" and, therefore, it could select only Labaton, and not also Chargois & Herron, as monitoring counsel. See id.[13] The agreement did, however, permit Labaton to affiliate with Chargois & Herron to work on particular ATRS matters. See id.

Labaton did not disclose to ATRS in its submission to become monitoring counsel, or after being selected as monitoring counsel, that Labaton already had an arrangement with Chargois. See Belfi Dep. Tr. at 23:5-16; 115:17-21; 118:16-19, R. & R. Ex. 122 (Dkt. No. 401-121); Keller Dep. Tr. at 297:14-16, R. & R. Ex. 83 (Dkt. No. 401-82). More specifically, as Chargois wrote to Labaton:

> Our deal with Labaton is straightforward-- we got you ATRS as a client (after considerable favors, political activity, money spent and time dedicated in Arkansas) and Labaton would use ATRS to seek

---

[13]   The exclusion of Chargois & Herron from the ATRS contract with Labaton had the effect, if not purpose, of concealing from the public that Herron was involved. Public disclosure of Herron's involvement could have led to an investigation of his role by the media, the state legislature, or law enforcement.

In 2008, the Arkansas State Treasurer, Martha Shoffner, was a Trustee of ATRS. See Dkt. No. 420, at 18-21; Dkt. No. 420-1, Ex. D. Faris had introduced Shoffner to Herron in 2006. See Dkt. No. 420-1, Ex. D. Herron then allowed her to live rent-free in a house he owned until 2011. See Dkt. No. 420-1, Ex. D. Herron was reportedly interviewed by the Federal Bureau of Investigation about this arrangement in an investigation of Shoffner that led to her conviction for accepting bribes that she used to pay rent to Herron when he began, in about 2011, charging her about $800 a month to live in another of his properties. See Dkt. No. 420 at 20; Dkt. No. 420-1, Ex. D.

> lead counsel appointments in institutional investor
> fraud and misrepresentation cases. Where Labaton is
> successful in getting appointed lead counsel and
> obtains a settlement or judgment award, we split
> Labaton's attorney fee award 80/20. Period.[14]

R. & R. at 125 n.111 (quoting Email from Chargois to Belfi (Oct. 18, 2014), R. & R. Ex. 177 (Dkt. No. 401-176)). As Chargois explained and others confirmed, this meant that Labaton had agreed that Chargois would receive 20% of its fee in any ATRS case in which Labaton was Lead Counsel despite there being no expectation that Chargois would do any work on the case.

As Chargois credibly and, as explained below, correctly testified, the agreement that he would be paid 20% of Labaton's fee in each ATRS case was not "a referral fee arrangement." Chargois Dep. Tr. at 62, R. & R. Ex. 125 (Dkt. No. 401-124). Nor was it a "local counsel arrangement." Id. Rather, it was "just an arrangement." Id.

### E. The Report and Recommendations

In his investigation, the Master interviewed 34 witnesses, conducted 63 depositions, and reviewed over 200,000 pages of documents. On May 14, 2018, he filed under seal his 377-page Report, as well as an Executive Summary and exhibits. See Dkt. No.

---

[14]   The Special Master did not investigate further what Chargois meant by his reference to "considerable political favors" and "money spent." R. & R. at 125 n.111. Nor has this been clarified in proceedings after the Master's Report.

224 (under seal). The court provided a framework for the parties to propose redactions. See May 16, 2018 Mem. & Order (Dkt. No. 223); May 30, 2018 Tr. at 24-47 (Dkt. No. 243). The parties proposed redactions and, on June 28, 2018, the Master filed for the public record redacted versions of the Report and Executive Summary. See Dkt. No. 357.

The Master found the original $75,000,000 fee award to be reasonable. However, he recommended that Labaton, Thornton, and Lieff return approximately $10,000,000 to ERISA Counsel and the class to remedy and sanction what he found to be misconduct. The Report addresses two broad subjects: (1) the truthfulness and accuracy of Labaton's, Thornton's, and Lieff's fee declarations; and (2) the Chargois matter. In analyzing the fee declarations, the Report focuses on the double-counting error, Thornton's declaration, and the hourly rates used to calculate the lodestar.

With respect to the double-counting error, the Master found that Class Counsel inadvertently double-counted 9,332.9 hours, overstating the lodestar by $4,058,654.50. See R. & R. at 219-225. He attributed the error to a cost-sharing arrangement among Labaton, Thornton, and Lieff. Pursuant to the cost-sharing arrangement, Thornton paid for and included in its lodestar certain staff attorneys who worked in Labaton's and Lieff's offices. See id. at 221-23. The Master faulted Labaton, as Lead Counsel, for failing to detect the error. See id. at 223-24. To remedy the

63

error, the Master recommended that Labaton, Thornton, and Lieff return to the class the double-counted lodestar in equal shares, meaning $1,349,551.50 each. See id. at 363-64.

With respect to Thornton, the Master concluded that Garrett Bradley "deliberately and intentionally" filed a false and misleading fee declaration, in violation of Federal Rule of Civil Procedure 11 and Massachusetts Rules of Professional Conduct 3.3(a) and 8.4(c), all of which prohibit making false statements to the court. Id. at 234, see generally id. at 229-45. More specifically, the Master found that, contrary to Garrett Bradley's representations in his declaration, Thornton did not employ any of the staff attorneys included in its lodestar; Thornton did not maintain contemporaneous daily time records for those staff attorneys; Thornton did not maintain any "regular" or "current billing rates" for the staff attorneys; and Michael Bradley's "regular" rate was not $500 an hour. See id. at 195, 225-35.

The Master recommended that the court impose sanctions on Thornton in the range of $400,000 to $1,000,000 and refer Garrett Bradley to the Massachusetts Board of Bar Overseers for possible disciplinary action. See id. at 364-65. In addition, the Master recommended that Thornton return to the class the difference between the total multiplied lodestar calculated with Michael Bradley at $500 an hour, and a lodestar calculated at a rate for

him of $250 per hour. See id. at 366-67. This would amount to Thornton returning $182,880 to the class.

With regard to the reported hourly rates, the Master found the rates attributed by plaintiffs' counsel to partners, ranging from $535 to $1000 an hour, to be reasonable. See id. at 173-76.

The November 10, 2016 Goldsmith letter to the court characterized all 23 of the lawyers whose hours were double-counted as "staff attorneys." See Dkt. No. 116. However, in the course of the Master's investigation, a distinction emerged between "staff attorneys" and "contract attorneys."

In the Master's lexicon, staff attorneys were lawyers employed directly by Labaton or Lieff who were not on a track that could result in their becoming partners. The Master found that staff attorneys did much more than low-level document review, for example by writing memoranda. See id. at 177. They each had years of relevant experience, including knowledge gained in the earlier foreign currency exchange class action case, BONY Mellon. See id. Most of the staff attorneys were paid $40 to $60 an hour. Nevertheless, the Master found that it was generally reasonable to attribute to them hourly rates of $335 to $515 an hour for the purpose of calculating the lodestar. See id. at 176-81. This conclusion was based in meaningful measure on the Master's finding that the staff attorneys did the work of low to mid-level associates. See id. at 180. The Master's finding is material to

65

the lodestar calculation as the staff attorneys were responsible for about 70% of the hours included in it. See id. at 180.

In contrast to the staff attorneys, the "contract attorneys" included in Lieff's lodestar were not employed directly by the firm. Id. at 181. Rather, they were employed by a staffing agency, which Lieff paid for their work. Id. at 181. The Report indicates that Lieff engaged only four or seven contract attorneys. Id. at 181, 367. However, Heimann of Lieff stated in an affidavit that there were nine. See Heimann Decl. at 10 n.4 of 11 (Dkt. No. 533-1).

In any event, the Master found that the rates of $415 to $515 per hour for contract attorneys claimed by Lieff and Thornton were unreasonable. See id. at 181-89. The Master reasoned that because firms generally pay a third-party to supply contract attorneys, the firms do not have the same overhead or "long-term financial obligations in securing contract attorneys" compared to staff or associate attorneys. Id. at 186-87. Accordingly, the Master recommended that the court treat contract attorneys as an expense and, therefore, not include them in Class Counsel's lodestar. See id. at 367-68. In addition, the Master recommended that Lieff and Thornton disgorge the difference between the total amount of the lodestar and multiplier attributable to the contract attorneys, and $50 an hour per contract attorney. Believing there were only

seven contract attorneys, the Master recommended disgorgement of $2,386,058. See R. & R. at 367.

The Master characterized as a "more serious issue" the Chargois matter. Exec. Summ. at 25 (Dkt. No. 357-1). The Master found that Labaton had agreed to pay Chargois approximately $4,100,000 from the attorneys' fee award in this case, even though Chargois "made no appearance, did no work, and did not participate in the case in any way . . . ." Exec. Summ. at 25. Rather, the payment was consideration for Chargois & Herron's efforts -- which included "considerable favors, political activity, [and] money spent" -- to obtain ATRS as a client for Labaton. See R. & R. at 92-96, 125 n.111 (quoting Ex. 177 (Dkt. No. 401-176)). The Master also found that Labaton "engaged in consistent, conscious, and calculated efforts to conceal Chargois from almost all participants" in this case. Exec. Summ. at 26.

The Master concluded that the Chargois arrangement violated Massachusetts Rule of Professional Conduct 1.5(e), which at the inception of this case in 2011 required the client's informed consent to any fee division between lawyers in different firms. See id. at 249-63. In addition, the Master found that by violating Rule 1.5(e), Labaton also violated Rule 7.2(c), which in 2011 prohibited a lawyer from "giv[ing] anything of value to a person for recommending the lawyer's services" except for, among other things, payment of a "referral fee" under Rule 1.5(e). See id. at

263-73. The Master also found that Labaton's concealment of Chargois from the class violated Massachusetts Rule of Professional Conduct 1.4, which in 2011 provided that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions . . . ." See id. at 281-86.

With respect to Labaton's failure to disclose Chargois to ERISA co-counsel and the court, the Master found that "general principles of fairness and professional responsibility toward co-counsel, and toward the [c]ourt, strongly suggest that Labaton was required to disclose the Chargois agreement." Id. at 290. The Master found that by not disclosing Chargois to the court, Labaton violated both Massachusetts Rule of Professional Conduct 3.3(a), which imposes a general duty of candor to the court, and Federal Rule of Civil Procedure 23(e)(3), which requires that parties seeking approval of a proposed class action settlement "file a statement identifying any agreement made in connection with the proposal." See id. at 318-326, 353-57.

The Master did not recommend that the court impose Rule 11 sanctions on Labaton because "there is no First Circuit case, either appellate or district, holding that a material omission warrants the imposition of Rule 11 sanctions." Id. at 317-18. However, he recommended disgorgement of the entire $4,100,000 payment to Chargois, with Labaton paying $3,400,000 to ERISA Counsel and $700,000 to the class. See id. at 368-70.

F. Proceedings Following Submission of the Master's Report and Recommendations

The submission under seal of the Master's Report on May 19, 2018, generated intense litigation.

As indicated earlier, on May 16, 2018, the court issued an order establishing a schedule for proposing redactions to the Report so it could be at least substantially unsealed. See Dkt. No. 223. It also provided a framework for redactions rooted in the principle that the public has a right to "materials on which a court relies in determining the litigants' substantive rights." Id. at 3 (quoting F.T.C. v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 408 (1st Cir. 1987)). It was, therefore, then foreseeable that the court would not authorize redaction of the references to Chargois, including to the payments he received from Labaton relating to eight other ATRS cases.

A court has a continuing duty to assess at all stages of class action litigation whether a named class representative has interests which conflict with those of the class and, even if there is no conflict, whether it will vigorously represent the interests of the class through qualified counsel. See, e.g., Nat'l Ass'n of Reg'l Med. Programs, Inc. v. Matthews, 551 F.2d 340, 345 (D.C. Cir. 1976); see also 7A Wright & Miller, Fed. Prac. & Proc., §§1765, 1768 (3d ed. 2018). The Master's Report raised questions concerning whether ATRS remained an adequate class representative

because of its relationship with Labaton. See Ark. Teachers Ret. Sys. v. State St. Bank & Tr. Co., 404 F. Supp. 3d 486, 507-10 (D. Mass. 2018). These questions were magnified because despite the Master's finding that Labaton violated its ethical duties by not disclosing to ATRS the $4,100,000 paid to Chargois from its fee award in this case, the Executive Director of ATRS, Hopkins, had stated he did not expect to be told of it. See id. at 509-10. Hopkins' position prompted the Master to write that, "[w]e cannot see how, in light of this clear dereliction of his fiduciary duties to the class, Hopkins can fairly and adequately protect the class' interests moving forward." Id. at 509. (quoting R. & R. at 257 n.7).

The court also anticipated that when the Master's Report was unsealed, questions would be raised about the origins of the ATRS relationship with Labaton, similar to the questions raised by the Boston Globe about Garrett Bradley's role in obtaining Massachusetts pension funds as clients for Labaton. See id. 510-11. The court was concerned that such foreseeable questions could render ATRS an atypical and inadequate class representative. Therefore, on May 25, 2018, it ordered Hopkins to appear at a May 30, 2018 hearing to testify about these issues. See id. at 509.

On Memorial Day, May 28, 2018, two days before the May 30, 2018 hearing, Hopkins met with former State Senator Faris, who had, as a result of Herron's efforts, introduced Labaton to ATRS.

See id. at 511. At the hearing, the court asked Hopkins a series of questions concerning whether he could be an adequate representative of the class, making only general references to the questions relevant to the origins of ATRS relationship with Labaton, the details of which were in the still sealed Report. See id. at 511-12. The court did not on May 30, 2018 decide whether ATRS was then an adequate representative of the class. Rather, the court ordered Hopkins to take time to reflect and to report whether he wanted ATRS to continue as class representative. See id.

At a subsequent sidebar, counsel for Labaton asked if the court was suggesting there was impropriety concerning possible payments to Faris. See id. at 512-13 (quoting now-unsealed May 30, 2018 Tr. at 3-4 (Dkt. No. 244)). The court stated that it was foreseeable that when the Report became public such questions could be raised and might render ATRS an atypical and inadequate class representative. See id.[15]

---

[15]   As anticipated by the court, soon after the Report became public, the Arkansas legislature began investigating the Chargois matter. See July 31, 2018 Letter from Master's Counsel to the Court (Dkt. No. 411). More specifically, on July 25, 2018, an email was sent to the Master by Arkansas State Representative Mark Lowery, stating:

> I am co-chair of the Arkansas Joint Performance Review Committee that has recently held a 3 hour hearing questioning Arkansas Teacher Retirement System director George Hopkins.
>
> We are extremely concerned about references to "political favors" in Arkansas that brought about the

Based on the colloquy at side bar, Labaton moved for the court's disqualification. See Dkt. No. 315. Labaton did not contend that the court was actually biased, which would require disqualification under 18 U.S.C. §455(b). Rather, it argued that a reasonable person could question the court's impartiality and, therefore, recusal was required under §455(a). For the reasons described in a 72-page Memorandum and Order, the court denied the

relationship between ATRS, Labaton Sucharow and the Chargois/Herren [sic] law firm.

We are especially interested in the following excerpt from a Forbes article: Rosen was more circumspect in his report, only noting the questions raised by Chargois' 2014 e-mail discussing the "considerable favors" and "money spent" getting ATRS as a client.

"The special master did not investigate further into the background facts alleged by Chargois in this email as to how the Chargois/Labaton/ATRS relationship was originated and developed," the special master said in a footnote. "This investigation is beyond the scope of the Special Master's assignment."

Is it possible that Judge Rosen's work in the case has come to a point where he would be able to discuss with me findings about the Chargois/Herren [sic] relationship with Labaton that may not have been included in the Special Master report to the Court?

If so please let me know how I could go about discussing with him or a representative any information that may assist us in our investigation going forward.

Id. The court did not authorize the Master to speak to Representative Lowery because of the pendency of proceedings in this case. See Dkt. No. 412.

Hopkins resigned as Director of ATRS several months later. See June 26, 2019 Tr. 15:19-21 (Dkt. No. 566).

motion. See Ark. Teachers, 404 F. Supp. 3d 486. Labaton then petitioned the First Circuit for a writ of mandamus ordering recusal. The First Circuit promptly denied the petition. See In re Labaton Sucharow LLP, No. 18-1651 (1st Cir. Jul. 25, 2018).

While the motion for the court's recusal was pending, Labaton moved to have redacted from the public version of the Report all references to its agreement to pay Chargois 20% of its fee in every ATRS class action in which it served as Lead Counsel, including this case and eight others. See Dkt. No. 254. The court denied the motion because of: the strong presumption of public access to records on which judicial decisions are made; the Master's view that the payments to Chargois in the eight other ATRS cases were of "great significance" to his conclusion that the payment to Chargois in this case was an impermissible fee for "solicitation" rather than a legitimate "referral fee"; and the fact that redaction would mask information concerning possible ethical violations by Labaton that might, if disclosed, be investigated in other jurisdictions. See June 28, 2018 Mem. & Order 6-13 (Dkt. No. 356). On June 28, 2019, the Report was unsealed with limited, appropriate redactions. See Dkt. No. 357.

In June 2018, Class Counsel moved for an order declaring that the Master's appointment had ended. See Dkt. No. 302. If that motion had been allowed, the Master and his counsel would have been precluded from responding to objections to the Report, and

73

the court would again have been deprived of information presented and tested through the customary adversary process. The court denied Class Counsel's request to end the Master's appointment. Instead, pursuant to Federal Rules of Civil Procedure 23(h)(4) and 53(f)(1), the court resubmitted the Report to the Master to respond to objections to it. See Dkt. No. 445.

After the failure of the efforts to remove this court and the Master from this case, and to conceal from the public information concerning the origins of Labaton's relationship with ATRS and the firm's obligation to make substantial payments to Chargois in all ATRS class actions in which Labaton served as Lead Counsel, the focus of the litigation moved to Class Counsel's numerous objections to the Report.

However, on September 18, 2018, the Master reported that Labaton, ERISA Counsel, and he had "reached a tentative agreement . . . for the Court's consideration resolving all of the disputed issues as to those firms." See Dkt. No. 468. If approved, the "Proposed Resolution" would result in the reinstatement of the original $75,000,000 fee award and Labaton would "acknowledge[] that its . . . payment to Damon Chargois did not constitute a case-specific referral fee," pay the class $2,052,666.67, pay ERISA Counsel $2,750,000, and adopt certain organizational and compliance reforms. Id.

Labaton and the ERISA Counsel also agreed not to appeal if the settlement was accepted by the court. Id. However, Labaton retained the right to revive its objections if the court did not accept the proposed settlement fully. Id. Lieff urged the court not to act on the proposed settlement until it decided its objections. See Lieff Resp. Proposed Resolution 1-4 (Dkt. No. 513). Thornton deferred to the court as to whether to accept the Proposed Resolution before ruling on Thornton's objections. See Thornton Resp. Proposed Resolution 2 (Dkt. No. 514).

The court conducted hearings on the Proposed Resolution and other matters in October and November 2018. As authorized by Federal Rule of Civil Procedure 53(f)(1), the hearings included testimony by Labaton partners concerning the firm's relationship with Chargois, among other things.

The court then decided that it would not act on the Proposed Resolution before deciding Lieff's and Thornton's objections to the Report. See Nov. 7, 2018 Tr. at 73 (Dkt. No. 519). It reasoned that the process of resolving those objections would provide information relevant to evaluating the Proposed Resolution. Id. at 73. In addition, the court was concerned that deciding matters piecemeal would result in unwarranted disparity in the treatment of counsel despite the existence of common issues resulting from the collaboration in this case between Labaton, Thornton, and Lieff. Id. at 106.

In a May 31, 2019 Order, the court notified counsel of the framework to address objections to the Report at hearings scheduled for June 24, 25, and 26, 2019. See Dkt. No. 543. Among other things, the court expressed its intention to hear argument concerning: (1) whether the initial $75,000,000 fee award was reasonable or whether another amount should be awarded; (2) whether the Fitzpatrick Study had been misrepresented; (3) whether Class Counsel's reported lodestar, not including the double-counting, was accurate; (4) whether Garrett Bradley intentionally filed a false fee declaration concerning certain identified matters, among other things; and (5) issues relating to Chargois. Id. The court also stated it might hear testimony from Thornton attorneys in addition to Garrett Bradley, and additional testimony from Labaton lawyers relating to Chargois. Id.

On June 20, 2019, the court denied without prejudice Labaton's request to present Fitzpatrick as a witness because it viewed the issue of whether his study had been characterized in a false and misleading manner to be a question of fact on which his testimony was neither necessary nor appropriate. See Dkt. No. 554. In addition, the court stated that it did not then intend to receive expert testimony on the reasonableness of the original $75,000,000 fee award. Id.

At the outset of the hearing on June 24, 2019, the court further explained and amplified the agenda for addressing the

objections to the Report, and the Proposed Settlement with Labaton and ERISA Counsel. It then heard three days of argument and testimony concerning the contested issues. Class Counsel, ERISA Counsel, and the Master subsequently submitted memoranda further addressing those issues.

V. THE AWARD OF ATTORNEYS' FEES

As explained earlier, the court vacated the original award of attorneys' fees in the amount of $75,000,000. It is, therefore, deciding de novo all of the objections to the Report, including Labaton's, determining the most appropriate amount to award, and exercising its authority to allocate that award between counsel. In doing so, the court is deciding de novo all objections to the Master's findings of fact and conclusions of law, including those of Labaton. See Fed. R. Civ. P. 53(f)(3) & (4). It is also, in effect, modifying his Report. See Fed. R. Civ. P. 53(f)(1).

A. The Role of the Court

As more fully explained earlier, in awarding attorneys' fees, the court must act as a fiduciary or protector of the class. See Fidelity/Micron, 167 F.3d at 736; Agent Orange, 818 F.2d at 222. The goal is to make a reasonable award that is fair to both counsel and the class. See Fidelity/Micron, 167 F.3d at 737. Courts customarily consider certain factors and make certain presumptions in fashioning a reasonable award. See, e.g., Goldberger, 209 F.3d at 50; Neurontin, 58 F. Supp.3d at 170-71; Bezdek, 79 F. Supp. 3d

at 349-50. However, as the First Circuit has written, "each common fund case presents its own unique set of circumstances . . . [and] when a court exercises [its] equitable power [to award attorneys' fees], individualization is the name of the game." Fidelity/Micron, 167 F.3d at 737.

B. Megafund Cases

This case is properly characterized as a "megafund" case because the common fund exceeds $100,000,000. See Neurontin, 58 F. Supp. 3d at 170. As CCAF has noted, some courts find that lower percentage awards should regularly be made in megafund cases. See CCAF Mem. at 6 of 41 (Dkt. No. 522). This "sliding scale" approach is intended to "to prevent a windfall for plaintiffs' attorneys at the expense of the class" because "[i]t is generally not 150 times more difficult to prepare, try and settle a $150 million case than it is to try a $1 million case." In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 486 (S.D.N.Y. 1998).

Empirical studies demonstrate that there is an inverse relationship between fee awards as a percentage of settlement and the size of settlement. See, e.g., Fitzpatrick Study, supra, at 811, 837, 843; Theodore Eisenberg & Geoffrey P. Miller, "Attorney Fees and Expenses in Class Action Settlements: 1993-2008," 7 J. Empirical Legal Stud. 248, 265 tbl.7 (2010) (the "Eisenberg-Miller Study"). However, this court does not find that it is appropriate to apply special standards or presumptions categorically to reduce

78

fee awards in all megafund cases, including this one. The customary Goldberger factors capture considerations relevant to determining the most reasonable award in a megafund case, such as the time attorneys devoted to the case, their skill, and their efficiency. See Goldberger, 209 F.3d at 50. A properly calculated lodestar allows the court to assess whether the multiplier being requested by counsel is justified by the complexity of the case, the risks of the litigation, and the benefit they conferred on the class. See id; Rite Aid, 396 F.3d at 303. Therefore, this court agrees that "it would be inappropriate to reduce the percentage award based on the size of the recovery alone." Tyco Int'l, 535 F. Supp. 2d at 270; see also Lupron, 2005 WL 2006833, at *6.

C. The Applicable Standards

Accordingly, this court, like others in the District of Massachusetts and nationally, begins by presuming that an award of 20% to 30% of the common fund would be reasonable. See Bezdek, 79 F. Supp. 3d at 349-50; Lupron, 2005 WL 2006833, at *5. Twenty-five percent, meaning $75,000,000 in this case, is the court's starting benchmark. See Pac. Enters., 47 F.3d at 379; Bezdek, 79 F. Supp. 3d at 349-50. However, again, this benchmark should be adjusted if the unique circumstances of this case demonstrate that a higher or lower award would be most reasonable. See Fidelity/Micron, 167 F.3d at 737; Pac. Enters., 47 F.3d at 379.

As explained earlier, courts in the District of Massachusetts and nationally generally consider the following factors in tentatively fashioning an award of attorneys' fees and then subject that tentative award to a lodestar cross-check to evaluate whether such an award would indeed be reasonable:

> (1) the size of the fund and the number of persons benefitted; (2) the skill, experience, and efficiency of the attorneys involved; (3) the complexity and duration of the litigation; (4) the risks of the litigation; (5) the amount of time devoted to the case by counsel; (6) awards in similar cases; and (7) public policy considerations.

Neurontin, 58 F. Supp. 3d at 170 (quoting Lupron, 2005 WL 2006833, at *3); see generally Goldberger, 209 F.3d at 50; Third Circuit Task Force, Court Awarded Attorney Fees, 108 F.R.D. at 255-56.

### D. Analysis of Certain Relevant Factors

In these consolidated cases, the size of the common fund produced by the work of Class Counsel and ERISA Counsel is unusually large -- $300,000,000. The settlement will benefit thousands of participants in the pension funds and retirement plans represented by ERISA Counsel. It will also benefit the approximately 1,300 custody clients of State Street. See Mem. Supp. Attys.' Fees at 18 of 36 (Dkt. No. 103-1).

This case was complex. At the outset the case was also risky. It began with a theory of liability for alleged unfair and deceptive practices in violation of M.G.L. c. 93A that was then untested. The risk that these consolidated cases would not be

settled was reduced when the court denied State Street's motion to dismiss the ATRS case. Since being appointed in 1985, this court has never been required to try a class action. Rather, every case that has survived a motion to dismiss has subsequently been settled. There is no reason to believe that this court's experience is unique or unusual. Rather, the court expects that when cases are thoughtfully chosen and claims are carefully alleged by competent counsel to defeat a motion to dismiss, almost all class actions settle and experienced counsel know that. Following the denial of a motion to dismiss, the practical issues are usually when and for how much the case will settle. A delay in settling may benefit class counsel, as they do more work on the case and their increased lodestar supports an award of a larger percentage of the common fund than might otherwise be justified. The risk that this case would not be settled was further diminished when settlement was reached in March 2015, in the first foreign currency exchange class action alleging deceptive practices against a bank, BONY Mellon.

Lieff, Thornton, and McTigue brought the special knowledge and experience that they gained as plaintiffs' counsel in BONY Mellon to this case. Generally, all plaintiffs' counsel in this case were skilled and experienced in class action litigation. They had to contend with a well-endowed defendant that was represented by able counsel. They did so well.

Following the denial of State Street's motion to dismiss the ATRS case, there were no additional motions or other litigation. However, plaintiffs' counsel received substantial discovery voluntarily, participated in review of millions of documents, analyzed many issues, and participated in about 15 mediation sessions. See Mem. Supp. Attys.' Fees at 27 of 36 (Dkt. No. 103-1); Marks Decl. ¶16 (Dkt. No. 104-5). The Master closely examined the work done by all of plaintiffs' counsel and did not find the number of hours included in the lodestar to be unreasonable. The court accepts his finding that the hours reported were not inaccurate or unreasonable.

With regard to similar cases, as Lead Counsel, Labaton argued that BONY Mellon is the most relevant comparator. See Dkt. No. 537, at 12 of 27. There, the court awarded 25% of the $325,000,000 common fund -- $83,750,000 -- in attorneys' fees. However, CCAF argued, without contradiction in this case, that "the plaintiffs in [BONY Mellon] took and defended 110 depositions (0 here), exchanged 11 expert reports (0 here), and defeated four motions to dismiss in two venues (1 here)." CCAF Mem. Re Fee Award at 31 of 41 (Dkt. No. 522). Therefore, the court finds that BONY Mellon involved much more work by plaintiffs' counsel than the instant case.

Labaton also argued that an award of 25% of the $300,000,000 common fund would be reasonable in comparison with awards in the

eight other First Circuit cases involving more than $100,000,000.
See Dkt. No. 103-1, at 13-17 of 36. In those cases the awards
reportedly ranged from about 9% to 31% of the common fund, with
six in the 20 to 31% range. Id. at 14. There is no evidence calling
into question these reported facts.

In addition, an award of 25% is arguably within the range of
reason based on the findings in two often cited empirical studies,
the Fitzpatrick Study and another by Theodore Eisenberg and
Geoffrey Miller, because 25% is within one standard deviation of
the median and mean awards in megafund cases. As accurately
described by Lieff as "Co-Lead Customer Counsel" in the request
for attorneys' fees in BONY Mellon:

> One recent study surveying all class settlements during
> 2006-2007 found that the mean and median percentages
> awarded for settlements between $250 million and $500
> million were 17.8% and 19.5%, respectively, with a
> standard deviation of 7.9%. See Brian T. Fitzpatrick, An
> Empirical Study of Class Action Settlements and Their
> Fee Award, 7 J.Empirical Legal Studies 811, 839 (2010).
> Other well-known commentators have opined that "fee
> requests falling within one standard deviation above or
> below the mean should be viewed as generally reasonable
> and approved by the court unless reasons are shown to
> question the fee." Theodore Eisenberg and Geoffrey P.
> Miller, Attorney Fees in Class Action Settlements: An
> Empirical Study, 1 J. Empirical Legal Studies 27, 74
> (2004). The 25% fee requested here [in BONY Mellon]
> is within one standard deviation of the mean shown in the
> Fitzpatrick study.

Dkt. No. 619 at 35 of 44, BONY Mellon, 12-md-02335-LAK-JLC
(S.D.N.Y. Aug. 17, 2015) (footnote omitted). Similarly, an award
of 25% of the common fund in this case would be far above the 17.8%

mean and 19.5% median for settlements between $250,000,000 and $500,000,000, but within one standard deviation of them.

Therefore, there is support for the argument that an award of $75,000,000 would be reasonable. However, as explained below, important public policy considerations, among other things, persuade the court that a lower award is reasonable and most appropriate.

E. <u>Public Policy Considerations</u>

i. <u>The Duty of Candor</u>

As explained earlier, in fulfilling its duty to serve as a protector of the class, the court should, among other things, "look to the various codes of ethics as guidelines for judging the conduct of counsel." <u>Agent Orange</u>, 818 F.2d at 222. As the First Circuit has written, "'[e]very lawyer is an officer of the court [and] has a duty of candor to the tribunal.'" <u>Pearson</u>, 200 F.3d at 38 (quoting <u>Burns</u>, 31 F.3d at 1095).

In view of the fact that the adversary process is not operating to inform the court when attorneys representing a class seek a fee award, it is especially important that they satisfy their duty of candor to the court. As indicated earlier, this particular importance of attorneys' providing accurate and complete information to the court when seeking an award of attorneys' fees in a class action is emphasized in the

Massachusetts Rules of Professional Conduct.  Comment 14A to Rule

3.3 states that:

> When adversaries present a joint petition to
> a tribunal, <u>such as a joint petition to
> approve the settlement of a class action suit</u>
> or the settlement of a suit involving a minor,
> the proceeding loses its adversarial character
> and in some respects takes on the form of an
> <u>ex parte</u> proceeding. The lawyers presenting
> such a joint petition thus have the same
> duties of candor to the tribunal as lawyers in
> <u>ex parte</u> proceedings and should be guided by
> Rule 3.3(d).

(emphasis added). Rule 3.3(d) provides that:

> In an <u>ex parte</u> proceeding, a lawyer shall
> inform the tribunal of all material facts
> known to the lawyer that will enable the
> tribunal to make an informed decision, whether
> or not the facts are adverse.

As explained earlier, a petition for an award of attorneys'

fees in a class action is appropriately treated as an <u>ex parte</u>

submission because at that point the attorneys' interests in

maximizing their compensation is adverse to the interest of the

class in maximizing its recovery. <u>See</u> <u>Rite Aid</u>, 396 F.3d at 307-

08. Except in the rare case in which a well-endowed class member

invests in opposing a request for attorneys' fees, the adversary

process does not operate to advocate for the interest of the class.

"[I]n light of the divergence of interests that can . . .

develop between counsel and the class in [] class actions, it is

essential that courts not doubt the forthrightness of counsel."

<u>IMAX</u>, 2012 WL 3133476 at *11. When counsel fail in their duty to

be candid and complete in their presentations to the court, "the grant of fees and expenses must reflect this." Id. Indeed, "'[i]t is well settled . . . that the district court has the duty and responsibility to supervise the conduct of attorneys who appear before it and that . . . [d]enial of attorneys' fees may be a proper sanction' for attorney misconduct." Travers, 808 F.3d at 542 (quoting Culebras Enters., 846 F.2d at 67). More specifically, in a class action case, "under long-standing equitable principles, a district court has broad discretion to deny fees to an attorney who commits an ethical violation." Rodriguez, 688 F.3d at 655.

In this case, the court is neither imposing sanctions nor denying a fee award to any attorney or firm because of misconduct. It is, however, considering such misconduct in deciding where within the reasonable range to make a total fee award and how to allocate the total award among counsel.

### ii. Thornton, Labaton, and Lieff

As explained below, the court now finds that Class Counsel, particularly Labaton and Thornton, made submissions in support of their request for $75,000,000 in attorneys' fees that were replete with false and misleading statements. Labaton and Thornton each violated their obligations, under Federal Rule of Civil Procedure 11, to make reasonable inquiries to assure that their representations were reliable and to correct them when they

realized that they were not. Their conduct violated the Massachusetts Rules of Professional Conduct as well.

### 1. Thornton

The declaration of Garrett Bradley in support of the request for an award of $75,000,000 in attorneys' fees was false in several respects. This contributed to the double-counting and, therefore, undermined the value of the lodestar check on the reasonableness of the request.

As explained earlier, courts, including this court, regularly use a properly calculated lodestar, and the multiplier that a requested larger fee award would involve, to evaluate the reasonableness of that request. The lodestar is calculated by multiplying the number of hours reasonably worked on the case by a reasonable hourly rate. See Thirteen Appeals, 56 F.3d at 305. Again, reasonable rates are those charged in the relevant community. Blum, 465 U.S. at 895. "[T]he rate that private counsel actually charges for her services, while not conclusive, is a reliable indicium of market value." One Star Class Sloop Sailboat, 546 F.3d at 40 (emphasis added).

The court foreseeably understood that Garrett Bradley was employing these familiar standards when he made the following statements in his declaration and the court relied on them:

> 3. The schedule attached hereto as Exhibit A is a summary indicating the amount of time spent by each attorney and professional

support staff-member of my firm who was
involved in the prosecution of the Class
Actions, and <u>the lodestar calculation based on
my firm's current billing rates</u>. For personnel
who are no longer employed by my firm, the
lodestar calculation is based upon the billing
rates for such personnel in his or her final
year of employment by my firm. <u>The schedule
was prepared from contemporaneous daily time
records regularly prepared and maintained by
my firm</u>, which are available at the request of
the Court. Time expended in preparing this
application for fees and payment of expenses
has not been included in this request.

4. <u>The hourly rates for the attorneys and
professional support staff in my firm included
in Exhibit A are the same as my firm's regular
rates charged for their services, which have
been accepted in other complex class actions</u>.

Dkt. No. 104-16, R. & R. Ex. 66 (Dkt. No. 401-65) (emphasis added).

Exhibit A to Bradley's declaration included the names of 23

staff attorneys with reported regular rates of $425 an hour. It

also characterized Michael Bradley as a staff attorney and

represented that he had a regular rate of $500 an hour.

As the Master succinctly and accurately summarized in his

Report, Garrett Bradley's quoted statements were untrue in

virtually every respect.[16] <u>See</u> R. & R. at 227-28. More specifically,

the staff attorneys listed on Exhibit A were not employed by

Thornton. Rather, except for Michael Bradley, they were employed

---

[16]   The Report on pages 227-228 provides citations to the record
that support some of the relevant findings of the Master and the
court.

by Lieff or Labaton, at their offices. Thornton had no contemporaneous time records for them. The billing rates attributed to each staff attorney were not Thornton's current billing rates for them. Thornton worked exclusively on a contingent-fee basis. It did not charge any clients for any partner, associate, or staff attorney on an hourly basis. Therefore, the purported hourly rates were not "the same as [Thornton's] regular rates charged for their services." Id. Moreover, with the exception of four lawyers, the $425 rate attributed to the staff attorneys had never been accepted by a court in a complex class action.

In addition, Garrett Bradley directed his colleagues to include his brother Michael as having a regular hourly rate of $500 an hour. However, as Garrett Bradley knew, neither Thornton nor Michael Bradley as a sole practitioner regularly charged for his services at the rate of $500 an hour. Michael Bradley had once charged $500 an hour for three hours work in a case, and $450 an hour for his work in one other. See R. & R. at 195. His regular rate was much less. Often he worked for $53 an hour representing indigent defendants in state court. Id.

Michael Bradley worked on this case in his own office, not Thornton's, in his spare time. His work involved only document review. He found a few possibly relevant documents. However, he produced no memoranda or made any other contribution to this case.

It was untrue to claim that the regular rate for his service was $500 an hour or that the market would have valued his services at $500 an hour.

Several factors contributed to Garrett Bradley making many misrepresentations in his declaration. First, Thornton, Labaton, and Lieff had entered into an unusual arrangement that allowed Thornton to pay for Staff and contract attorneys employed by Labaton and Lieff, and to claim them on its lodestar for the purpose of allocating among themselves attorneys' fees awarded by the court. Class Counsel claim that this arrangement was motivated by a desire to share costs and reduce the risk to Labaton and Lieff that the class and its counsel might recover nothing in this case. However, the court finds that Thornton demanded this arrangement because, as Garrett Bradley wrote to his partners, it was "the best way to jack up the loadstar," [sic] and thus give Thornton a claim to a larger percentage of the foreseeable future fee award to be shared with Lieff and Labaton. Email from Bradley to Thornton & Lesser (Feb. 6, 2015), R. & R. Ex. 64 (Dkt. No. 401-63); G. Bradley Dep. Tr. at 67, R. & R. Ex. 43 (Dkt. No. 401-42). Labaton acquiesced in this arrangement to maintain the goodwill of Thornton, particularly of Garrett Bradley, who was so adept at exploiting his political connections to get lucrative institutional clients for Labaton that Labaton made Bradley Of Counsel to the firm in January 2015. See R. & R. at 105 n.86.

Similarly, Thornton had brought Lieff into this case. Garrett Bradley reminded Lieff of this in negotiating the arrangement that allowed Thornton to pay for staff and contract attorneys that Lieff employed. See R. & R. Ex. 87 (Dkt. No. 401-86). Lieff too wanted to maintain a good relationship with Garrett Bradley and Thornton to enhance the likelihood that they would bring Lieff into future lucrative cases as counsel for institutional investors, including those recruited by Garrett Bradley.

The Master found that more than $4,500,000, constituting more than 60% of Thornton's purported lodestar, was attributable to the Lieff and Labaton Staff and contract attorneys for whom Thornton paid. See R. & R. at 227. Daniel Chiplock of Lieff wrote to Garrett Bradley that he was "happy" to allow this "as a courtesy" because Thornton had brought Lieff into this case. Email from Chiplock to Bradley (Aug. 30, 2015), R. & R. Ex. 87 (Dkt. No. 401-86).

The manner in which Garrett Bradley's declaration was prepared also contributed to the inclusion of many misrepresentations. Labaton partner Nicole Zeiss prepared a template for the fee declarations that was provided to each firm. Zeiss had no prior involvement in this case. Among other things, she did not know about the cost-sharing arrangement between Labaton, Lieff, and Thornton, which had not been memorialized in a written contract. The court infers that she knew that Labaton worked almost exclusively on a contingent-fee basis. There is no

evidence that she inquired or knew whether or not the other firms had any clients that paid regular hourly rates for their services. Nevertheless, she provided plaintiffs' firms, including Thornton, a template that stated:

> 3. The schedule attached hereto as Exhibit A is a summary indicating the amount of time spent by each attorney and professional support staff-member of my firm who was involved in the prosecution of the Class Actions, and the lodestar calculation based on my firm's current billing rates. For personnel who are no longer employed by my firm, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment by my firm. The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by my firm, which are available at the request of the Court. Time expended in preparing this application for fees and payment of expenses has not been included in this request.
>
> 4. The hourly rates for the attorneys and professional support staff in my firm included in Exhibit A are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions.

R. & R. Ex. 201 (Dkt. No. 401-200) (emphasis added). The template also included several blanks to be filled in with information specific to the firm submitting the declaration, and a blank Exhibit A concerning the hours and regular rates for each of the firm's attorneys and employees.

Two Thornton attorneys added information to the template before the declaration was given to Garrett Bradley to sign. Evan Hoffman filled in the blanks concerning the total hours worked and expenses, and added to Exhibit A the hours and the rates that

92

Thornton purportedly regularly charged for the staff and contract attorneys, among others, who were represented to be employees of Thornton. <u>See</u> June 25, 2019 Tr. at 146 (Dkt. No. 565). Michael Lesser added the narrative concerning Thornton's contribution to the case. <u>See</u> June 26, 2019 Tr. at 185 (Dkt. No. 566). Hoffman brought the declaration to Garrett Bradley or left it for him. <u>See</u> G. Bradley Dep. Tr. at 84-85, R. & R. Ex. 43 (Dkt. No. 401-42). Neither Hoffman nor Lesser told Garrett Bradley that the declaration included statements that were not true.

Garrett Bradley credibly testified that on September 14, 2016, he signed his declaration, under oath, without reading it. <u>See</u> June 25, 2019 Tr. at 66 (Dkt. No. 565). This constituted a violation of Federal Rule of Civil Procedure 11(b).

As described earlier, Rule 11(b) provides, in pertinent part that:

> By presenting to the court a pleading, written motion, or other paper -- whether by signing, filing, submitting, or later advocating it -- an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, <u>formed after an inquiry reasonable under the circumstances</u>:
>
> . . .
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

(emphasis added).

"Fed. R. Civ. P. 11 requires that an attorney make a reasonable inquiry to assure that all pleadings, motions, and papers filed with the court are factually well-grounded, legally tenable, and not interposed for any improper purpose. Counsel is held to standards of due diligence and objective reasonableness." Mariani v. Drs. Assocs., Inc., 983 F.2d 5, 7 (1st Cir. 1993) (internal citations omitted). "Whether a litigant breaches his or her duty [under Rule 11] to conduct a reasonable inquiry into the facts and the law depends on the objective reasonableness of the litigant's conduct under the totality of the circumstances." CQ Int'l Co., Inc. v. Rochem Int'l USA, 659 F.3d 53, 62 (1st Cir. 2011) (alteration in original) (internal quotation marks omitted). To determine whether an inquiry was reasonable under the circumstances, courts consider "the complexity of the subject matter, the party's familiarity with it, the time available for inquiry, and the ease (or difficulty) of access to the requisite information." Navarro-Ayala v. Nunez, 968 F.2d 1421, 1425 (1st Cir. 1992).

Garrett Bradley not only failed in his duty to make a reasonable inquiry concerning whether the representations he was making were reliable, he made no inquiry at all. There is no excuse for his failure to read his declaration before he signed it under oath or for the many misrepresentations included in it. Bradley had ample time to read his declaration before signing it.

The declaration had only two pages of text and Exhibit A was only another two pages. See Dkt. No. 104-16. Bradley was the Managing Partner of Thornton. He was fully familiar with its operations. If Bradley had read his declaration before signing it on September 14, 2016, he would have realized that the representations in paragraphs 3 and 4, and on Exhibit A were incorrect. He then could and should have corrected them.

Especially egregious was Garrett Bradley's claim that "[t]he hourly rates for the attorneys and professional support staff in my firm . . . are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions." G. Bradley Decl. ¶4 (Dkt. No. 104-16). Bradley was experienced in class action litigation. He knew this information was relevant to the important lodestar cross-check the court would use to determine whether the request for $75,000,000 in attorneys' fees was reasonable. See June 25, 2019 Tr. at 73 (Dkt. No. 565). He also knew that Thornton did not charge any clients on an hourly basis and had not employed any process to develop reliable hypothetical market rates for its attorneys. Garrett Bradley now acknowledges that the representations about Thornton's regular hourly rates were not correct. See id. at 86. If he had read his declaration before signing it, he would have recognized that it was false and misleading in many respects.

The template language could have easily been revised to be true and not misleading. Three of ERISA Counsel's firms -- McTigue, Zuckerman, and Beins Axelrod -- made changes to the template language in their declarations. See Kravitz Decl. ¶4 (Dkt. No. 104-20); McTigue Decl. ¶20 (Dkt. No. 104-19); Axelrod Decl. ¶8 (Dkt. No. 104-22). For example, Beins' declaration stated:

> The hourly rates charged by the Timekeepers are the Firm's regular rates for contingent cases and those generally charged to clients for their services in non-contingent/hourly matters. Based on my knowledge and experience, these rates are also within the range of rates normally and customarily charged in Washington, D.C. by attorneys of similar qualifications and experience in cases similar to this litigation, and have been approved in connection with other class action settlements.

Axelrod Decl. ¶8 (Dkt. No. 104-22).

Thornton's failure to make reliable representations to this court appears to be part of a pattern. In BONY Mellon, using language evidently drafted by Lieff, Thornton and Lieff stated in their declarations that "[t]he hourly rates charged by the Timekeepers are the Firm's regular rates for contingent cases and those generally charged to clients for their services in non-contingent/hourly matters." Chiplock Decl. ¶5, Dkt. No. 622-1, BONY Mellon, 12-md-02335-LAK-JLC (S.D.N.Y. Aug. 17, 2015); Lesser Decl. ¶9, Dkt. No. 622-8, BONY Mellon, 12-md-02335-LAK-JLC (S.D.N.Y. Aug. 17, 2015). This statement would have been true and, therefore, not misleading if made by Lieff in this case. It was

evidently not true when made on behalf of Thornton in BONY Mellon because the firm charged no clients by the hour and had not developed hypothetical market rates for its attorneys. See June 25, 2019 Tr. at 91, 110 (Dkt. No. 565).

Garrett Bradley violated Rule 11(b) again in November 2016, when, the court finds, he did read his declaration. As explained earlier, soon after the court awarded $75,000,000 in attorneys' fees on November 2, 2016, the Boston Globe alerted Class Counsel to errors in their fee submissions, including but not only concerning the double-counting of staff and contract attorneys. Lesser, Hoffman, and Garrett Bradley reviewed Bradley's declaration.[17] They did so again after the first Boston Globe article was published on December 17, 2016.

The Advisory Committee Note to the 1993 amendment to Rule 11 states that "a litigant's obligations . . . are not measured solely as of the time [papers] are filed with or submitted to the court, but include reaffirming to the court and advocating

---

[17]    Garrett Bradley testified that in November and December 2016, he only read Exhibit A and did not read paragraphs 2 and 3 of his declaration. See June 25, 2019 Tr. at 87 (Dkt. No. 565). This contention is not credible. The Boston Globe was raising a major issue that threatened the award of $75,000,000 as attorneys' fees. Bradley learned of it from counsel for Thornton. See id. As indicated earlier, the declaration was only two-pages long and referenced Exhibit A. Bradley was discussing the declaration with his partners. Therefore, the court concludes he read his declaration in November 2016.

positions contained in those pleadings and motions after learning that they cease to have any merit." Therefore, "[t]he duty under Rule 11 to inquire into the facts is a continuing duty and counsel cannot ignore the realities of life once facts come to their attention which indicate that their earlier reliance was misplaced." Meadow Ltd. P'ship v. Heritage Sav. & Loan Ass'n, 118 F.R.D. 432, 434 (E.D. Va. 1987), aff'd sub nom. Fahrenz v. Meadow Farm P'Ship, 850 F.2d 207 (4th Cir. 1988).

Here, Garrett Bradley did not inform the court that his declaration contained false statements, even as Goldsmith argued on behalf of all plaintiffs' counsel in his November 10, 2016 letter to the court that the original $75,000,000 fee award was reasonable despite the double-counting error. Therefore, the court finds that Garrett Bradley intentionally violated Rule 11 after reading his declaration in November 2016.[18]

Garrett Bradley's failure to correct his declaration after he read it also violated Massachusetts Rule of Professional Conduct 3.3(a). Rule 3.3(a) provides in relevant part, that "[a] lawyer

---

[18]    In any event, Bradley testified that he read his declaration after the court issued its February 6, 2017 Order raising questions concerning his representations regarding the regular hourly rates reportedly charged by Thornton. See June 25, 2019 Tr. at 86 (Dkt. No. 565). He did not, however, inform the court that his declaration was incorrect until the court questioned him at the March 7, 2017 hearing. See Mar. 7, 2017 Tr. at 88 (Dkt. No. 176). Therefore, Bradley violated Rule 11 again no later than shortly after February 6, 2017.

shall not knowingly: (1) make a false statement of fact or law to a tribunal <u>or fail to correct a false statement of material fact</u> or law previously made to the tribunal by the lawyer" (emphasis added). "Knowingly" means with "actual knowledge of the fact in question." Mass. R. Prof. C. 1.0(g) "A person's knowledge may be inferred from the circumstances." <u>Id.</u> A fact is "material" if, "viewed objectively, it directly or circumstantially had a reasonable and natural tendency to influence a judge's determination." <u>In re Angwafo</u>, 899 N.E.2d 778, 784 (Mass. 2009). "It is not necessary . . . that the statement of material fact did in fact influence a determination by the judge." <u>Id.</u> at 785.

The conduct of Garrett Bradley that violated Rule 3.3(a)(1) also violated Massachusetts Rule of Professional Conduct 8.4(c). Rule 8.4(c) provides that "[i]t is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

In this case the court finds that Garrett Bradley knew that his declaration included false statements of fact after he read it in November 2016. He did not, however, correct it. The matter of whether the hourly rates attributed to attorneys Thornton claimed to employ were regularly charged to clients was material. As explained earlier, the lodestar check to determine the multiplier of a requested fee award has the potential to influence the court to award a lesser amount. The reasonable hourly rate, measured in

part by what clients actually pay for each lawyer's services, is essential to calculating the lodestar correctly. It is, therefore, important that a lawyer's representations concerning regular hourly rates and the resulting lodestar be reliable. In this case Garrett Bradley repeatedly violated his duty to be candid with the court and to correct the misrepresentations he had made.

## 2. Labaton

Labaton also violated Federal Rule of Civil Procedure 11(b) and Massachusetts Rules of Professional Conduct 3.3(a) and 8.4(c). In support of the request for $75,000,000 in attorneys' fees, Sucharow submitted two declarations. The first Sucharow declaration, Dkt. No. 104, presented the facts on which plaintiffs' counsel relied to justify the $75,000,000 fee request and addressed the attached declarations by a member of each firm that had appeared on behalf of plaintiffs. Among other things, Sucharow stated, under oath, that:

> Included with these declarations are schedules that summarize the lodestar of each respective firm, as well as the expenses incurred by category (the "Fee and Expense Schedules"). The individual firm declarations and the Fee and Expense Schedules indicate the amount of time spent by each attorney and professional support staff on the case, and the lodestar calculations based on their current billing rates. As stated in each of these declarations, they were prepared from contemporaneous daily time records regularly prepared and maintained by the respective firms, which are available at the request of the Court. See also Master Chart of Lodestars, Litigation Expenses, and Plaintiffs' Service Awards, Exhibit 24 hereto.

100

Dkt. No. 104, ¶176 (emphasis added).

As explained earlier, with regard to Thornton, these representations were false. Among other things, Thornton did not have "current billing rates" for the attorneys it employed because it never billed clients at an hourly rate or even used a process to develop hypothetical rates for its attorneys. There is no evidence that Sucharow, or anyone at Labaton, made any effort to determine if Thornton's representations were true. This was unreasonable and, therefore, in violation of Rule 11.

In addition, Sucharow knew that Thornton was paying for staff and contract attorneys employed by or working at Labaton and Lieff. See Mar. 7, 2017 Tr. at 81:14-23 (Dkt. No. 176). Therefore, if he had read it, Sucharow would have known that the lawyers listed as staff attorneys on Thornton's Exhibit A were not, as Bradley claimed, members of that firm. However, neither Sucharow nor Zeiss compared the Exhibits of Labaton, Lieff, and Thornton to assure that none of the staff and contract attorneys were double-counted. See R. & R. at 56, n.39.  In view of the cost-sharing agreement, this too was unreasonable. As Thornton and Lieff were not given the declarations of other firms, Labaton's negligence was the major cause of the submission by Sucharow of a declaration that falsely claimed that an additional 9,322 double-counted hours had been worked, improperly inflating the purported lodestar by more than

$4,000,000, and rendering it unreliable as a check of the reasonableness of the requested $75,000,000 fee award.

Sucharow's declaration concerning Labaton's lodestar calculation was also false and misleading. Like Garrett Bradley, Sucharow represented that "[t]he hourly rates for the attorneys and professional support staff in my firm included in Exhibit A are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions." Dkt. No. 104-15, ¶7. However, when he made this statement under oath, Sucharow believed that Labaton did not have any clients who were charged or paid hourly rates. See Mar. 7, 2017 Tr. at 79 (Dkt. No. 176). More specifically, he testified, "we don't have paying clients, your Honor . . . . Most firms in our field do not have billable clients . . . [w]e don't have billable clients." Id.

Labaton now claims that it had a few paying clients. See Master's Suppl. Resp. 3 (Dkt. No. 523); Labaton's Resp. to Master's 1st Set of Interrogs. 34 (Dkt. No. 526-1).[19] To the extent, if any, that it would have been accurate, Sucharow could have easily used language similar to that used by Lieff in the fee declaration it

---

[19]   Labaton later identified several clients who had been charged an hourly rate. See Wolosz Decl. Ex. A (Dkt. No. 510-2). However, Sucharow did not know or believe Labaton billed any clients by the hour when he signed and submitted his declaration. Moreover, even if Sucharow's reference to Labaton's "regular rates charged" was not completely false, it was misleading.

submitted in <u>BONY Mellon</u> quoted earlier: "The hourly rates charged by the Timekeepers are the Firm's regular rates for contingent cases and those generally charged to clients for their services in non-contingent/hourly matters." Chiplock Decl. ¶5, Dkt. No. 622-1, <u>BONY Mellon</u>, 12-md-02335-LAK-JLC (S.D.N.Y. Aug. 17, 2015). Labaton's counsel acknowledged that "it would be silly for me to argue that language is not preferable." June 24, 2019 Tr. at 125 (Dkt. No. 560). Using language in sworn declaration that is not false or misleading, however, is not merely preferable. It is required. <u>See</u> Fed. R. Civ. P. 11(b)(3); Mass. R. Prof. C. 3.3(a), 8.4(c).

Like Garrett Bradley, Sucharow did not correct his false representation regarding regular rates charged by Labaton before the court questioned him on March 7, 2017, despite the fact that the court raised this issue in its February 6, 2017 Memorandum and Order. <u>See</u> Dkt. No. 117 at 4.

Nor did Sucharow's partner Goldsmith correct Sucharow's misrepresentation concerning Labaton's rates when he reported the double-counting to the court. As explained earlier, prompted by "an inquiry from the media," on November 10, 2016, Goldsmith filed a letter informing the court of the double-counting that resulted in the court using an inflated purported lodestar in deciding to award $75,000,000 in attorneys' fees. The detailed four-page letter indicates that Goldsmith scrutinized all of the fee

declarations. See Dkt. No. 116. The court infers Goldsmith knew
that Labaton had few, if any, clients who were charged and paid an
hourly rate, and that few, if any, of the attorneys who worked on
this case had ever been charged to a client at an hourly rate.
However, Goldsmith continued to rely on what Sucharow falsely
stated were Labaton's "regular rates charged" in claiming a revised
lodestar of $37,265,241. Id. As the 1993 Advisory Committee note
quoted earlier indicates, this too constituted a violation of Rule
11. See also Meadow Ltd. P'ship, 118 F.R.D. at 434.

In addition, in the Memorandum in Support of the Motion for
Attorneys' Fees submitted by Sucharow as Lead Counsel on behalf of
Labaton, and represented to have been also signed by counsel for
Thornton and Lieff, Labaton provided a misleading characterization
of the Fitzpatrick Study. See Dkt. No. 103-1, at 17-18 of 36. More
specifically, Labaton argued:

> Empirical studies also support the requested fee. An
> in-depth review of all 688 class action settlements in
> federal courts during 2006 and 2007 found that the mean
> and median fees awarded in the 444 settlements where
> the [percentage of fund] method was used (either with
> or without a lodestar cross-check) were 25.7% and
> 25.0%, that the mean and median fees awarded in
> securities cases (233 of 444) were 24.7% and 25.0%, and
> that the mean and median fees awarded in consumer cases
> (39 of 444) were 23.5% and 24.6%. Brian T. Fitzpatrick,
> "An Empirical Study of Class Action Settlements and
> Their Fee Awards," 7 J. Empirical Legal Stud. 811, 835
> (2010) (Ex. 31); see also Neurontin, 58 F. Supp. 3d at
> 172 (favorably citing this study). The 24.85% fee
> requested is right in line with Professor Fitzpatrick's
> findings.

104

Id. at 17-18 (emphasis added) (footnote omitted). Labaton added in a footnote that Fitzpatrick "found . . . that the mean and median fees awarded in settlements in the First Circuit . . . were 27.0% and 25.0%." Id. at 18 n.18.

Labaton accurately reported the figures in the Fitzpatrick Study that supported the request for an award of 25% of the $300,000,000 common fund. However, Labaton omitted other findings from the Fitzpatrick Study that undermined the argument that an award of 25% of the common fund was appropriate. In particular, as indicated earlier, Fitzpatrick had concluded that "fee percentage is strongly and inversely associated with settlement size among all cases, among securities cases, and among all nonsecurities cases." Fitzpatrick Study, supra, at 837. Fitzpatrick explained that "fee percentages tended to drift lower at a fairly slow pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20 percent . . . ." Id. at 838. In settlements between $250,000,000 and $500,000,000, Fitzpatrick found a mean of 17.8% and a median of 19.5%. See id. at 839. Labaton did not mention these important findings. The court now recognizes that a table in the Fitzpatrick Study indicated there was for settlements between $250,000,000 and $500,000,000 a standard deviation in awards of 7.9%. Id. at 839. However, Labaton did not mention this fact either.

As intended, Labaton's memorandum communicated to the court that Fitzpatrick had found that the mean and median awards for comparable, megafund cases were in the range of 25% of the common fund, and that a $75,000,000 award in this case would be "right in line with Professor Fitzpatrick's findings." Dkt. No. 103-1, at 18 of 36. This statement was false and misleading.

Labaton filed the Fitzpatrick Study with its voluminous submission in support of the request for attorneys' fees. It was Exhibit 31 of 32 exhibits to Sucharow's declaration. See Dkt. No. 104-31. The court could have read the 36-page study at the time it made the original fee award. However, there were 778 pages of exhibits, in addition to the lengthy declarations and memoranda. In contrast to Neurontin, counsel did not in this case file an affidavit from Fitzpatrick, which would have focused the court on his study. See Neurontin, 58 F. Supp. 3d at 171.[20] It is unreasonable to expect that the court would scrutinize hundreds of pages of exhibits to determine the veracity of every representation made by counsel. Rather, as the court stated at the final approval hearing on November 2, 2016, it relied "heavily" on counsel's

---

[20]    In Neurontin the court noted that Fitzpatrick had found that "for settlements between $250 million and $500 million, the mean percentage was just 17.8%." F. Supp. 3d at 172. However, while Labaton repeatedly cited Neurontin in its Memorandum, it did not include reference to this statistic. See Dkt. No. 103-1, at 15-18 of 36.

submissions and statements at hearing, Nov. 2, 2016 Tr. at 35 (Dkt. No. 114), on the assumption that counsel were satisfying their duty of candor to the court. Once again, the court now finds that trust was misplaced.

As explained earlier, the description of the Fitzpatrick Study made by Lieff and Thornton in requesting attorneys' fees in the BONY Mellon case was not false or misleading.[21] Similar language could and should have been used in this case as well.

Labaton also violated the Massachusetts ethical rules, but not the Federal Rules of Civil Procedure, in concealing its agreement to pay Chargois 20% of its fees in all ATRS cases in which Labaton was Lead Counsel.

---

[21]   In BONY Mellon, counsel wrote:

One recent study surveying all class settlements during 2006-2007 found that the mean and median percentages awarded for settlements between $250 million and $500 million were 17.8% and 19.5%, respectively, with a standard deviation of 7.9%. See Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Award, 7 J. Empirical Legal Stud. 811, 839 (2010). Other well-known commentators have opined that 'fee requests falling within one standard deviation above or below the mean should be viewed as generally reasonable and approved by the court unless reasons are shown to question the fee.' Theodore Eisenberg and Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 J. Empirical Legal Stud. 27, 74 (2004). The 25% fee requested here [in BONY Mellon] is within one standard deviation of the mean shown in the Fitzpatrick study.

Dkt No. 619 at 35 of 44, BONY Mellon, 12-md-02335-LAK-JLC (S.D.N.Y. Aug. 17, 2015).

ATRS entered into a Retention Agreement designating Labaton to serve as its counsel in this case on February 8, 2011. <u>See</u> R. & R. Ex. 138 (Dkt. No. 401-137). The Retention Agreement stated, in part, that "Arkansas Teachers agrees that Labaton Sucharow may allocate fees to other attorneys who serve as local or liaison counsel, as referral fees, <u>or for other services performed in connection with the Litigation</u>," meaning this case. <u>Id.</u> (emphasis added).

The Master and Labaton agree that the relevant Massachusetts Rules of Professional Conduct then in effect should be used to evaluate the propriety of Labaton's conduct, rather than the revisions of those Rules that were effective as of March 15, 2011. <u>See</u> R. & R. at 251; Dkt. No. 359 at 27-8. The relevant Massachusetts Rules were then Rules 7.2(c) and 1.5(e).

Rule 7.2(c) stated, in pertinent part, that "[a] lawyer shall not give anything of value to a <u>person for recommending</u> the lawyer's services, except that a lawyer may: . . . (4) pay <u>referral fees</u> permitted by Rule 1.5(e) . . . ." Mass. R. Prof. C. 7.2(c) (eff. Oct. 1, 1999), R. & R. Ex. 231 (Dkt. No. 401-233) (emphasis added). Rule 1.5(e) then provided, in pertinent part, that "[a] division of a fee between lawyers who are not in the same firm may be made only if, after informing the client that a division of fees will be made, the client consents to the joint participation

and the total fee is reasonable." Mass. R. Prof. C. 1.5(e) (eff. Jan. 2, 2001), R. & R. Ex. 225 (Dkt. No. 401-227).

Prior to February 8, 2011, Labaton had agreed to pay Chargois 20% of its fee in all ATRS cases in which Labaton was Lead Counsel, including this case.[22] Labaton agreed to make this payment because, as Chargois wrote to Labaton, Chargois & Herron "got [Labaton] ATRS as a client (after considerable favors, political activity, money spent and time dedicated in Arkansas) . . . ." Email from Chargois to Belfi (Oct. 18, 2014), R. & R. Ex. 177 (Dkt. No. 401-176). Therefore, Chargois & Herron "recommended" Labaton to ATRS and did much more to assist Labaton in getting ATRS as a client. However, neither Chargois nor Herron performed any services in connection with this case.

Labaton argues that a lawyer is not a "person" for the purpose of Rule 7.2(c) and, therefore, the Rule does not apply. This contention is incorrect. "Where the statutory language is clear, it must be given its plain and ordinary meaning." Nationwide Mut.

---

[22]   Labaton has represented ATRS in at least six other cases in which it paid Chargois a percentage of the fee award even though Chargois did no work on the case and did not file an appearance. See Brado v. Vocera Commc'ns, Inc., No. 13-cv-3567 (N.D. Cal.); In re Spectrum Pharm., Inc. Secs. Litig., No. 13-cv-0433 (D. Nev.); In re Colonial BancGroup Inc. Secs. Litig., No. 09-cv-0104 (M.D. Al.); Gammel v. Hewlett-Packard Co., No. 11-cv-1404 (C.D. Cal.); Hoppaugh v. K12 Inc., No. 12-cv-0103 (E.D. Va.); In re Beckman Coulter, Inc. Secs. Litig., No. 10-cv-1327 (C.D. Cal.); see also Am. Brown Report at 12-13 of 16 (Dkt. No. 539-1) (listing the foregoing cases); R. & R. at 124.

Ins. Co. v. Comm'r of Ins., 491 N.E.2d 1061, 1064 (Mass. 1986). A lawyer, like any other human being, is commonly and correctly understood to be a "person."[23]

In addition, the payment to Chargois in connection with this case was not a "referral fee" within the meaning of Rules 7.2(c)(4) and 1.5(e). In 2005, in Saggese v. Kelley, 837 N.E.2d 699 (2005), the Massachusetts Supreme Judicial Court described a referral fee as follows:

> Jan Doe consulted Saggese about a matter. Sagesse told Doe he had little experience in the field for which Doe sought his representation, but that the Kelleys had such experience. Later that month, he introduced Doe to Kathleen Kelley. . . . Kathleen Kelley sent Doe a written fee agreement that specified an hourly rate and a retainer. A copy of the agreement was sent to Saggese.

Id. at 702 (footnote omitted). Subsequently, the Kelleys agreed to Saggese's request for one-third of their fees in cases he referred, including Doe's case. Id.

---

[23] The relevant revised, current Massachusetts Rules of Professional Conduct refer specifically to individuals who are not lawyers in sections other than 7.2(b) (the successor to Rule 7.2(c)), including within 7.2. This indicates that the drafters of the Massachusetts Rules know how to make a distinction between individuals who are not lawyers and those who are. See, e.g., Mass. R. Prof. C. 5.3, 7.2(b)(4). The fact that no distinction is now made between lawyers and other individuals in Rule 7.2(b) indicates that the prior version of the Rule applied to lawyers as well as others, and the drafters did not in the revision narrow the Rule to exclude lawyers.

The instant case does not resemble the paradigmatic referral fee described in Saggese. As explained earlier, Labaton asked Chargois to find institutional investors in the Southwest that could engage Labaton as monitoring counsel and to influence them to do so. Neither Chargois nor Herron had a relationship with any institutional investor. No institutional investor ever asked either of them for advice generally or to find monitoring counsel particularly. However, Herron somehow persuaded Arkansas State Senator Faris to use his influence as a member of the legislative committee that oversaw ATRS to assist Labaton. When Faris' intervention led to ATRS' selection of Labaton as a monitoring counsel, Labaton agreed to pay Chargois 20% of its fees in every ATRS case in which Labaton served as Lead Counsel, despite the fact that Chargois did not refer that case to Labaton and was not expected to file an appearance or do any work on it. Therefore, the payment to Chargois concerning this case constituted what could be called a "finders fee." It was, in any event, not a referral fee within the meaning of Rules 7.2(c)(4) and 1.5(e).

The conclusion that the payment to Chargois was a "finders fee" is consistent with Vita v. Berman, DeValerio & Pease, LLP., 967 N.E.2d 1142 (Mass. App. Ct. 2012). In Vita, the Massachusetts Appeals Court used the term "referral fee" to describe an "ongoing arrangement whereby Vita [a criminal defense attorney], who had many contacts in the financial securities field, would refer

potential class action plaintiffs to [Berman, DeValerio & Pease]."
Id. at 1145. Neither Chargois nor Herron were comparable to Vita.

In 2005, in Saggese, the Supreme Judicial Court held that
with regard to agreements for what genuinely constitute referral
fees, Rule 1.5(e) would in the future be construed to require
disclosure of the fee-sharing agreement to the client before the
referral is made and securing the client's consent to it in
writing. See 837 N.E.2d at 706. Labaton did not satisfy those
requirements with regard to this case.[24]

The payment to Chargois is also not a "referral fee" within
the meaning of the Retention Agreement, which allowed Labaton to
divide fees with other attorneys for serving as "local or liaison
counsel, as referral fees, or for other services performed in
connection with" this case because Chargois did not serve as local
or liaison counsel, refer this case to Labaton, or perform any
other services in connection with it. Letter from Belfi to Hopkins
(Feb. 8, 2011), R. & R. Ex. 138 (Dkt. No. 401-137).

---

[24] The revised Rule 1.5(e), which was promulgated in December
2010, before the February 8, 2011 Retention Agreement, and became
effective March 15, 2011, codified the ruling in Saggese by
requiring that "the client [be] notified before or at the time the
client enters into a fee agreement for the matter that a division
of fees will be made and consents to the joint participation in
writing and the total fee is reasonable." (Emphasis added). With
regard to Chargois, Labaton also did not satisfy the requirements
of the revised Rule of which it had notice when it entered into
the Retention Agreement.

Moreover, assuming, without finding, that the payment to Chargois was a "referral fee" within the meaning of the Retention Agreement, ATRS did not have the authority to relieve Labaton of its ethical obligations under Massachusetts Rules 7.2(c) and 1.5(e). See R. & R. at 230. Labaton argues, however, that it did not violate Rule 7.2(c) or 1.5(e) because after this issue emerged, Hopkins, the Executive Director of ATRS, ratified Labaton's agreement to share its fees with Chargois. See Hopkins Decl. ¶116 (Mar. 15, 2018), R. & R. Ex. 130 (Dkt. No. 401-129); Dkt. No. 579 at 23. In Saggese, the Supreme Judicial Court permitted ratification to authorize belated disclosure of a referral fee sharing agreement. See 837 N.E.2d at 705. The Court reasoned that "[a]lthough Doe's consent came toward the end of the attorney-client relationship, the beneficiary in a fiduciary relationship may ratify the conduct that otherwise would constitute a breach of fiduciary duties, provided the requisite disclosure has been made." Id.

Significantly, however, Saggese was not a class action. In this case, no later than when the class was certified for settlement purposes on August 8, 2016, Labaton had fiduciary duties to all class members, not only to ATRS. In January 2012, the court appointed Labaton as "interim lead counsel to act on behalf of all plaintiffs and the proposed class." See Dkt. No. 4. In the Notice of the proposed settlement drafted by Labaton, the class was

defined as including "all custody and trust customers of [State Street]," including the ERISA Plans. Revised Long-Form Notice 8 (Dkt. No. 95-3). In the August 10, 2016 Notice, Labaton described itself as "Lead Counsel" for the single class. Id. at 17. This was proper because "once a class has been certified, the default presumption is that there is an attorney-client relationship between class counsel and the absent class members." 6 Rubenstein, Newberg on Class Actions §19:2; see also Fulco v. Cont'l Cablevision, Inc., 789 F. Supp. 45, 47 (D. Mass. 1972) ("[O]nce the court enters an order certifying a class, an attorney-client relationship arises between all members of the class and class counsel.") (citing cases).

Lawyers generally have a fiduciary duty to their clients. See, e.g., Saggese, 837 N.E.2d at 705. As counsel for the certified class, Labaton had a fiduciary duty to all members of the class. Indeed, it has been held that even prior to class certification, attorneys for the putative class have fiduciary and ethical obligations to all putative class members. See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 801 (3d Cir. 1995) ("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed."); Piambino v. Bailey, 757 F.2d 1112, 1139 (11th Cir. 1985)("The lawyers who bring [class actions] have a heavy fiduciary

responsibility to their clients . . . ."); <u>Singer v. AT&T Corp.</u>, 185 F.R.D. 681, 690 (S.D. Fla. 1998) ("The class attorney has a fiduciary duty to the court as well as to each member of the class.").

In this matter, the ERISA Plans brought their own cases and had their own counsel, while permitting Labaton to serve as "Lead Counsel" in the consolidated cases. ATRS did not represent the ERISA Plans or have the authority to ratify the Labaton payment to Chargois on their behalf. Labaton did not consult the representatives of the ERISA Plans concerning the payment to Chargois or ask them to ratify the fee sharing agreement. If ERISA Counsel had been informed of the proposed payment to Chargois, they would have advised the ERISA Plans not to ratify it and the Plans would have followed that advice. In these circumstances, ATRS' purported ratification does not qualify the conclusion that Labaton violated Rule 7.2(c) because the payment to Chargois did not constitute a permissible "referral fee" within the meaning of Rule 1.5(e).

The failure to inform the ERISA Plans of the fee sharing arrangement and to seek their ratification of it also violated Massachusetts Rules of Professional Conduct 1.4(a)(1) and (b). Rule 1.4(b) states that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Rule 1.4(a)(1) requires

that a lawyer "promptly inform the client of any decision or circumstance with respect to which the client's informed consent" is required. Rule 1.0(f), in turn, defines "[i]nformed consent" as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."

As ERISA Counsel have stated, information concerning the Labaton payment to Chargois was important to their clients, to the viability of the settlement, and to the allocation of attorneys' fees. If it had been disclosed to them, ERISA Counsel may have felt compelled to disclose the Chargois payment to the Department of Labor. The Department of Labor then might not have approved the proposed settlement, which was a prerequisite for presenting it for court approval. At a minimum, ERISA Counsel would have discussed the issue of disclosure to the Department of Labor with the Plans representing the putative ERISA classes. In addition, ERISA Counsel would not have agreed to Labaton's demand that they accept only $7,500,000 in attorneys' fees if they had known Chargois was going to receive $4,100,000 without having done anything concerning this case. See Sarko Dep. Tr. at 75, R. & R. Ex. 37 (Dkt. No. 401-36).

Labaton's conduct in assiduously trying to conceal its obligation to pay Chargois indicates that it knew the arrangement

was highly questionable, if not improper. Labaton did not at the outset of this case disclose to ATRS its obligation to pay Chargois as was required by Rule 7.2(c). Labaton attorneys consistently sent Chargois blind copies of relevant emails to Hopkins and forwarded Hopkins' responses to Chargois, rather than copying Chargois, in order to keep Hopkins from discovering Chargois' financial interest in this case. In addition, Labaton ardently, but unsuccessfully, argued to this court that all references to Chargois in the Master's Report should be redacted from the version of it filed for the public record. See June 28, 2018 Mem. & Order (Dkt. No. 356).

Labaton did discuss the $4,100,000 payment to Chargois with Thornton and Lieff. Thornton shares responsibility for Labaton's misconduct in failing to disclose the Chargois arrangement and payment to ATRS, the ERISA Plans, and ERISA Counsel. Garrett Bradley was fully familiar with the Chargois arrangement. He knew Chargois and understood that Chargois' role, like his own, was to use political connections to generate clients for Labaton. Labaton had Bradley speak to Chargois in a successful effort to get Chargois to agree to reduce his demand for 20% of Labaton's fee in this case. As part of the effort to conceal the reasons for the payment to Chargois from Lieff, Bradley referred to Chargois as "the local attorney in this matter who played an important role," in an email to his partner Michael Thornton, Sucharow and others

at Labaton, Chiplock of Lieff, and Chargois. See R. & R. Ex. 157
(Dkt. No. 401-156). However, Bradley knew Chargois had not served
as local counsel or done any other work concerning this case.

Bradley's email was part of a successful effort to persuade
Lieff to reduce its share of the fee award by about $1,000,000 in
order to compensate Labaton for part of its payment to Chargois.
See Email from Lieff to Chiplock (Aug. 28, 2015), R. & R. Ex. 153
(Dkt. No. 401-152). Chiplock and Robert Lieff had been told that
Chargois was a local counsel assisting ATRS in Arkansas. See R. &
R. at 109-110, Lieff Dep. Tr. at 58-80, R. & R. Ex. 139 (Dkt. No.
401-138), Chiplock Dep. Tr. at 101-116, R. & R. Ex. 41 (Dkt. No.
401-40). However, they should have been suspicious about the
reasons for a payment of more than $4,000,000 to an attorney who
did not file an appearance in the case and did no work on it that
they had seen. Nevertheless, evidently to sustain Lieff's
harmonious, lucrative relationship with Labaton and Thornton,
Chiplock did not object to the reduction of Lieff's fee.

While the court finds that Labaton violated its duty to
disclose its obligation to pay Chargois to the ERISA Plans through
their counsel, in contrast to the Master, see R. & R. at 309, 357,
the court does not find that Labaton violated Federal Rule of Civil
Procedure 23(e)(3) by not disclosing to the court its agreement to
pay Chargois. Rule 23(e)(3) states that "[t]he parties seeking
approval must file a statement identifying any agreement made in

118

connection with the proposal." Read in isolation, the Rule would appear to have required Labaton to inform the court of its agreement to share with Chargois the fee award it received. As one of Labaton's experts, Professor Rubenstein, has written, Rule 23(e) "generally references the settlement agreement itself, but given the broader language covering agreements 'made in connection with the [settlement] proposal,' agreements beyond the settlement agreement itself – such as any agreement about fees – may also fall within the purview of Rule 23(e)." 5 Rubenstein, <u>Newberg on Class Actions</u> §15.12.

Disclosure to the court would have prompted it to ask many questions. Disclosure might have resulted in the removal of Labaton as Lead Counsel, and/or a decision by the court to exercise its discretion to allocate fees among counsel and award less to Labaton than it otherwise would have.

However, Rule 23(h) directly addresses awards of attorneys' fees. It provides, in part, that a request for attorneys' fees must be made pursuant to Rule 54(d)(2). Rule 54(d)(2)(B)(iv) states that a motion for attorneys' fees must "<u>disclose, if the court so orders</u>, the terms of any agreement about fees for the services for which the claim is made." (emphasis added). The court did not issue such an order in this case. In view of the fact that Rule 23(h) expressly addresses the obligations of counsel in seeking attorneys' fees and incorporates Rule 54(d)(2)(B)(iv)'s

requirement that agreements concerning fees be disclosed if ordered, the court finds that Rule 23(e)(3) should not be interpreted as requiring disclosure of the Chargois arrangement to the court in this case.

However, based on its experience in this case, the court agrees with Rubenstein that "there is little obvious downside to transparency so not only should courts order disclosure of fee agreements under Rule 54(d)(2), but settling parties should readily provide them under Rule 23(e) in any case." 5 Rubenstein, Newberg on Class Actions §15.12.[25]

The Master also found that the failure to disclose Chargois to the court violated the Massachusetts Rules of Professional Conduct. See id. at 318-27. In reaching this conclusion, the Master relied substantially on the thorough and thoughtful analysis of Professor Stephen Gillers concerning Rule 3.3, which as explained earlier defines counsel's duty of candor to the courts. See id.;

---

[25] This court intends to order, pursuant to Rule 54(d)(2), disclosure of agreements concerning fees in all future class actions. It also intends to recommend that the District of Massachusetts adopt a Local Rule requiring such disclosure that is similar to the Local Rule for the Southern and Eastern Districts of New York.

Rule 23.1 of the Local Rules for the Southern and Eastern Districts of New York provides that "[t]he notice [of a class action settlement] shall include a statement of the names and addresses of the applicants for such fees and the amounts requested respectively and shall disclose any fee sharing agreements with anyone" (emphasis added).

see also Gillers Suppl. Ethical Report for the Master 87-93, R. & R. Ex. 233 (Dkt. No. 401-232). As the Master and Gillers note, and as explained earlier, for the purposes of Rule 3.3, applications for fee awards in class actions are treated as ex parte submissions and, therefore, plaintiffs' counsel have a duty to inform the court of all facts that are material concerning the requested award. See Mass. R. Prof. C. 3.3(d), cmt. 14A. As also indicated earlier, the court agrees that the Chargois matter was material. Again, if the court had been informed of the matter in 2016, it might have removed Labaton as Lead Counsel, and/or reduced the total fee award or the amount of it allocated to Labaton.

However, it would be anomalous to find that conduct permitted in the circumstances of this case by Federal Rule of Civil Procedure 23 violates the Massachusetts Rules of Professional Conduct. Comment 14 to Rule 3.3(d) concerning ex parte proceedings provides guidance in resolving the tension between the Federal Rules of Civil Procedure and the Massachusetts Rules of Professional Conduct. It states, in part, that "Rule 3.3(d) does not change the rules applicable in situations covered by specific substantive law, such as presentation of evidence to grand juries, applications for search or other investigative warrants and the like." Federal Rule of Civil Procedure 23 is comparable to the examples cited in Comment 14. Therefore, the court does not find

that Labaton violated Rule 3.3(d) in concealing Chargois from the court.

However, an attorney must "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Mass. R. Prof. C. 1.4(b). As explained earlier, Labaton did violate Rules 1.4(a)(1) and (b) in failing to inform the ERISA Plans, through their counsel, that Chargois would be paid $4,100,000 if, as requested, the court awarded $75,000,000 as attorneys' fees. If Labaton had made that required disclosure concerning Chargois to ERISA Counsel, the court finds that they would have informed the court of it. Concealing the Chargois matter from ERISA Counsel and their clients was part of a consistent effort by Labaton to assure that the court, among others, would not have an opportunity to explore the origins and propriety of Labaton's obligation to pay Chargois, and to consider those matters in deciding the most reasonable amount to award as attorneys' fees. While the court does not find that Labaton violated a Federal or Massachusetts Rule in concealing Chargois from the court alone, the concealment of its obligation to pay Chargois from the ERISA Plans and their counsel constituted misconduct.

As explained earlier, Thornton acted in concert with Labaton in improperly concealing the Chargois matter from the ERISA Plans, their counsel, and the class members they represent. This

contributed to the Chargois matter being concealed from the court and from the public as well.

### 3. Lieff

As also explained earlier, in contrast to Garrett Bradley and, therefore, Thornton, Lieff was not accurately or completely informed of the reasons Labaton was paying Chargois. Robert Lieff testified that he was told that Chargois was local counsel and assumed that Chargois was dealing with ATRS. See R. & R. at 110, 288, Ex. 139, at 97 (Dkt. No. 401-138). He also stated that if he had been fully informed, he would not have agreed to contribute to the payment to Chargois and would have encouraged Labaton to disclose the agreement to pay Chargois to the court. Id. These contentions are credible. However, as indicated earlier, the fact that Chargois was being paid $4,100,000 -- which the court infers was a very large amount to pay to a local counsel who had done no work that was visible to Robert Lieff or his colleagues -- should have prompted questions to Labaton that, if honestly answered, would have provided Lieff material information. Therefore, while the court finds that Lieff is much less responsible than Labaton and Thornton, it did by its inaction and acquiescence contribute to the occurrence of their misconduct concerning Chargois.

Lieff's performance was also deficient in other ways. Like Thornton, it used the template provided by Labaton to claim that the rates attributed to the attorneys it employed and those it

engaged as contract attorneys were regularly charged for their services. Lieff had what it characterized as a "handful of paying clients over the years." Mar. 7, 2017 Tr. at 93 (Dkt. No. 176). It also had a process to develop hypothetical, reliable market rates for its attorneys. See R. & R. at 173; Fineman Dep. Tr. at 58-60, R. & R. Ex. 18 (Dkt. No. 401-17). However, as noted earlier, in its BONY Mellon declaration Lieff stated that "[t]he hourly rates charged by the Timekeepers are the Firm's regular rates for contingent cases and those generally charged to clients for their services in non-contingent/hourly matters." Chiplock Decl. ¶5, Dkt. No. 622-1, BONY Mellon, 12-md-02335-LAK-JLC (S.D.N.Y. Aug. 17, 2015). To the extent that was true, Lieff should in this case have revised the template to use the same language accurately describing the rates attributed to its lawyers.

Lieff, in contrast to Thornton, did employ the staff and contract attorneys it listed on its Exhibit A, and attributed to them rates that had been developed through a process intended to determine their market value. However, Lieff knew that Thornton was paying for some of those attorneys. Nevertheless, it did not receive, request, or review Thornton's fee declaration. Lieff also did not communicate with Labaton or Thornton to assure that Thornton was not claiming those attorneys in its lodestar. Nor did Lieff review the submission to the court made by Labaton on Lieff's

behalf to assure the hours of the attorneys paid for by Thornton were not double-counted. This was unreasonable.

In addition, Lieff authorized Labaton to represent on the signature page that the misleading memorandum in support of the request for attorneys' fees was signed by Lieff attorneys as "Additional Counsel for Plaintiff [ATRS] and the Settlement Class," as well as by Labaton as "Lead Counsel for Plaintiff [ATRS] and the Settlement Class," and by Thornton, as "Liaison Counsel for Plaintiff [ATRS] and the Settlement Class." Dkt. No. 103-1, at 36 of 36. Lieff reviewed that memorandum. See Lieff's Objs. to Master's Report 33 (Dkt. No. 367). However, Lieff did not attempt to correct the misleading characterization of the Fitzpatrick Study in the memorandum. As explained earlier, Lieff submitted an accurate description of the Fitzpatrick Study in the memorandum in support of the request for attorneys' fees in BONY Mellon. It should have caused Labaton to do the same in this case. In any event, Lieff violated Federal Rule of Civil Procedure 11(b) by agreeing to be a signatory to a misleading submission to the court.

Similarly, Lieff reviewed and suggested revisions to Sucharow's declaration attesting to the accuracy of all of the fee declarations. See id. Lieff did not, however, inform Labaton that the template language characterizing the rates attributed to its attorneys as "regularly charged" was inaccurate and misleading. It should have done so.

F. An Award of $60,000,000 in Attorneys' Fees is Reasonable and Most Appropriate

Having vacated the original award of attorneys' fees in the amount of $75,000,000, the court is now deciding de novo the amount to award that is reasonable and most appropriate in the unique circumstances of this case. See Fidelity/Micron, 167 F.3d at 737. The court presumes that an award of 20-30% would be reasonable and begins by considering whether an award of 25% would be most appropriate. See Pac. Enters., 47 F.3d at 379; Bezdek, 79 F. Supp. 3d at 349-50; Lupron, 2005 WL 2006833 at *5.

Even absent the misconduct of Thornton, Labaton, and to a lesser extent Lieff, that the court has found, the court would not now award $75,000,000 in attorneys' fees. At the outset, whether plaintiffs would recover anything in these cases was uncertain. However, after the court denied the motion to dismiss the ATRS case, the consolidated cases were stayed. What proved to be a prolonged period of informal discovery and mediated negotiations resulted in settlement. Plaintiffs' counsel were not required to conduct any depositions, litigate any discovery disputes, oppose a motion for summary judgment, or try the case. After the denial of the motion to dismiss the ATRS case and the settlement in BONY Mellon, the risk that the class and its attorneys would not receive anything was greatly diminished. By then, at least, experienced counsel would have realized that, as a practical matter, the key

questions were not whether settlement would be reached, but rather when and for how much. In these circumstances alone, the court would now make an award of less than 25% of the common fund.

Public policy considerations prompt the court to conclude that it is most appropriate to award 20% of the common fund -- $60,000,000 -- in attorneys' fees. Again, as the Second Circuit has written, "in fulfilling [its role as protector of the class], courts should look to the various codes of ethics as guidelines for judging the conduct of counsel." Agent Orange, 818 F.2d at 222. It is equally appropriate to consider whether counsel have violated Federal Rule of Civil Procedure 11 in seeking attorneys' fees. This is, in part, because "'the district court has the duty and responsibility to supervise the conduct of attorneys who appear before it, and . . . [d]enial of attorneys' fees may be a proper sanction' for attorney misconduct." Travers, 808 F.3d at 542 (quoting Culebras Enters., 846 F.2d at 97). While the court is not imposing sanctions or denying attorneys' fees, it is taking into account the proven misconduct of certain counsel in deciding where within the reasonable range to award such fees.

In this case, Labaton and Thornton repeatedly demonstrated a cavalier indifference to their duty to provide the court with the accurate and complete information necessary to make a properly informed decision concerning the most appropriate amount to award in attorneys' fees. Rather than satisfy the elevated duty of candor

that exists in what the Massachusetts Rules of Professional Conduct treat as an ex parte proceeding, see Mass. R. Prof. C. 3.3 cmt. 14A, Labaton and Thornton disregarded even the most basic duties of counsel in any case.

For example only, as described earlier, Garrett Bradley: did not read his declaration before signing it under oath; made false representations concerning what were purportedly the regular hourly rates charged for lawyers claimed to have been employed by Thornton; did not correct his false statements after he read his declaration; authorized the submission by Labaton of a memorandum said to be signed by him, among others, that included a false and misleading description of the Fitzpatrick Study; and collaborated with Labaton to conceal its agreement to pay Chargois $4,100,000 from ATRS, the ERISA Plans and their counsel, and thus from the court and the public.

Similarly, again for example only, Sucharow: submitted a sworn declaration that falsely represented that Bradley's declaration, among others, was accurate; falsely represented that certain hourly rates were regularly charged by Labaton for its attorneys; failed to make a reasonable inquiry before providing the court with a lodestar that was erroneously inflated by 9300 hours and more than $4,000,000; provided a false and misleading description of the Fitzpatrick Study; and with others at Labaton and Garrett Bradley, improperly concealed Labaton's obligation to

pay Chargois more than $4,000,000 concerning this case. See R. &
R. at 311; Sucharow Dep. Tr. at 18-19, R. & R. Ex. 38 (Dkt. No.
401-37).

Judges expect that representations made to them by lawyers
result from reasonable inquiries, are not false or misleading, and
do not violate Federal Rule of Civil Procedure 11 or related
ethical rules. As explained earlier, it is especially important
that attorneys meet those standards in their requests for
attorneys' fees in class actions when the adversary process does
not operate and have the potential to expose misrepresentations.
The repeated, egregious misconduct of counsel for Labaton and
Thornton in this case should not be ignored in the award of
attorneys' fees. See Agent Orange, 818 F.2d at 222; Travers, 808
F.3d at 542; Culebras Enters., 846 F.2d at 67. That misconduct
contributes to the court's conclusion that it is most appropriate
to award counsel 20% of the common fund, $60,000,000.

There are several facts that confirm that an award of
$60,000,000 is reasonable. An award of 20% of the common fund is
at the low end of the range generally presumed reasonable. See
Pac. Enters., 47 F.3d at 379; Bezdek, 79 F. Supp. 3d 324, 349-50;
Lupron, 2005 WL 2006833 at *5. It is above both the mean of 17.8%
and the median of 19.5% in settlements between $250,000,000 and
$500,000,000 according to the Fitzpatrick Study on which
plaintiffs' counsel originally asked the court to rely. See

Fitzpatrick Study, supra, at 839. An award of 20% of the common fund is also compatible with what Class Counsel reported to be the awards in the eight cases in the First Circuit with common funds exceeding $100,000,000 in which the fee awards ranged from 9% to 30.9%, with the majority (5) in the 20% to 25% range. See Dkt. No. 103-1, at 13-14 of 36.

In addition, the reasonableness of an award of 20% of the common fund is consistent with the views expressed by Labaton's expert, Professor Rubenstein, in his treatise. Professor Rubenstein wrote that "empirical data on class action fee awards [] demonstrate that the percentage awarded to counsel decreases as the size of the fund increases, though more along the lines of a sliding scale (smooth decrease) than a megafund (cliff-like decrease)." Rubenstein, 5 Newberg on Class Actions §15:81 (citing and discussing the Fitzpatrick (2010) and Eisenberg-Miller (2010) Studies). Professor Rubenstein added that, "the author's own database, taken from a six-year sample shows the average . . . for settlements over $44.625 million is 20.9%." Id. In a declaration in this case, Professor Rubenstein referenced 20 cases with settlements between $100,000,000 and $500,000,000, See Dkt. No. 446-2, Ex. E. The average award in those cases was 13.16% of the common fund. See Dkt. Nos. 522 at 7; 522-1 at 8-9.

In addition, a $60,000,000 award is reasonable when checked against the properly calculated lodestar. As indicated earlier

when, as here, the percentage of fund method is used to calculate an award of attorneys' fees in a common fund case, a lodestar check of the reasonableness of the amount requested is encouraged. See, e.g., Goldberger; 209 F.3d at 50; In re Gen. Motors, 55 F.3d at 820. District Courts regularly do so. See, e.g., Bezdek, 79 F. Supp. 3d at 349-50; Lupron, 2005 WL 2006833 at *5; Neurontin, 58 F. Supp. 3d at 170-71. When used merely as a cross-check, the reasonableness of the hours and rates used to develop the lodestar "need not be exhaustively scrutinized by the district court" in part because it is assumed that "the strictures of Rule 11," which requires attorneys to make representations that are not false or misleading, have been observed. Goldberger, 209 F.3d at 50.

Again, as explained earlier, a lodestar is properly calculated by multiplying the number of hours reasonably spent on the litigation by a reasonable hourly rate. See Thirteen Appeals, 56 F.3d at 305  "Reasonable fees . . . are to be calculated according to the prevailing rates in the relevant community." Blum, 465 U.S. at 895. "The rate that private counsel actually charges for her services, while not conclusive, is a reliable indicium of market value. One Star Sloop Sailboat, 546 F.3d at 40. Where the award being considered is larger than the lodestar, the court must decide if the resulting multiplier would be reasonable.

Labaton originally reported that the lodestar for all of plaintiffs' counsel was $41,323,895.75 and, if $75,000,000 was

awarded, the multiplier of 1.8 would be reasonable. <u>See, e.g.,</u> Letter from Goldsmith to the Court (Nov. 10, 2016), Dkt. No. 116. When the double-counted hours were removed, Labaton represented that the combined lodestar was $37,265,241.25, and the correct multiplier was, therefore, 2.00. Labaton contended it would also be reasonable.

As indicated earlier, this case raises substantial doubts about whether courts should assume that the representations made by counsel to the court concerning their lodestar are reliable, as required by Rule 11. <u>See Goldberger</u>, 209 F.3d at 50. As explained earlier, Thornton, Labaton, and to a lesser extent Lieff made false and misleading representations concerning the regular hourly rates charged for their attorneys because Thornton works exclusively, and Labaton and Lieff work almost exclusively, on a contingent-fee basis. When questions were raised by the <u>Boston Globe</u> about the reliability of their representations, and were magnified by the court's questioning on March 7, 2017, it was necessary and appropriate to appoint a Master to investigate the reliability of the representations made concerning the reported lodestar, among other things.

In a detailed Memorandum, Thornton asserts that the language used in this case characterizing the rates attributed to attorneys as each firm's "regular rates charged for their services . . ." is "very common and is somewhat of a standard practice," although

132

often the representation is not true. Dkt. No. 530 at 40. Thornton
supports this assertion with two volumes of exhibits. See Dkt. No.
530-4 (attaching 73 exhibits). Thornton correctly cites another
ATRS class action before this court, Ark. Teachers Ret. Sys. v.
Insulet Corp., No. 15-cv-12345-MLW (D. Mass.), in which two of
plaintiff's firms used the same language used by Labaton, Thornton,
and Lieff in this case and, in response to questions from the
court, acknowledged that they had no paying clients because they
work exclusively, or almost exclusively, on a contingent-fee
basis. See id. at 41. Thornton cites many other cases before this
court, before other judges in the District of Massachusetts, and
throughout the United States in which the same or substantially
similar statements, which are likely false or misleading, have
been made by other firms that specialize in representing plaintiffs
in class actions. See id. at 42-58.[26] Therefore, it appears the
lodestar check that district judges regularly employ in making
percentage of the common fund awards is often fundamentally flawed
and, at a minimum, that the representations of counsel should be
scrutinized, rather than accepted on the assumption that they
satisfy the requirements of Rule 11.

---

[26]    Thornton does not claim that the fact that misrepresentations
concerning regular rates charged are evidently common excuses its
conduct in this case. Rather, it argues that it should not have
been singled out by the Master for the imposition of sanctions.
See Dkt. No. 530 at 40-41.

In this case, the Master did substantial investigation and
research to attempt to calculate the lodestar properly. He found
that each of the plaintiffs' firms except for Thornton had
contemporaneous time records as required by the jurisprudence. See
R. & R. at 202-09; Hensley v. Eckerhart, 461 U.S. 424, 438 n.13
(1983); Gay Officers Action League v. Puerto Rico, 247 F.3d 288,
297. The Master also found that the hours reportedly worked in
calculating the revised, lower lodestar were reliable. See R. & R.
at 209-18. The court accepts this conclusion.

In addition, the Master found that the rates attributed to
the partners and associates who worked on this case, although not
as represented regularly charged to paying clients, were
reasonable. See R. & R. at 173-76. The court accepts this
conclusion too.

Addressing a question raised initially in the December 17,
2016 Boston Globe article, the Master found that even though the
hourly rates attributed to the staff attorneys by Labaton and Lieff
also were not regularly charged to paying clients, they were
reasonable. See R. & R. at 176-81. In essence, the Master found
that the staff attorneys were experienced lawyers who did much
more than low-level document review. All had years of experience,
and some at Lieff had specialized knowledge acquired working on
the BONY Mellon case. The Master viewed the staff attorneys as
comparable to low to mid-level associates. See id. at 180. Although

they were paid $40 to $60 an hour, plus benefits, he found that attributing billing rates to them of $335 to $515 was reasonable. This was material to the Master's calculation of the lodestar because he found that staff attorneys were responsible for 70% of the work that comprised it. Id. at 178.

The court accepts the finding that the staff attorneys, who were paid an average of $55 an hour, see Exec. Summ. at 23 (Dkt. No. 357-1), were comparable to associates and that the rates attributed to them were justified. However, those rates should not have been misrepresented as regularly charged.

In contrast to the staff attorneys, the Master found that the lodestar should not include the hours and rates attributed to the seven contract attorneys hired by Lieff through an agency at an hourly rate of $45 to $50. See Exec. Summ. at 23, 50; R. & R. at 367-68. Rather, he recommended that the contract attorneys be treated as an expense at the rate of $50 an hour. The seven contract attorneys were represented by Lieff to have reasonable rates between $415 and $515 an hour. According to the Master, their time, after a 1.8 multiplier, contributed $2,386,058 to the lodestar. The Master reasoned that the contract attorneys were not permanently or continuously employed by Lieff and did not receive benefits from the firm, even if they in some instances did work comparable to the work performed by the staff attorneys.

When appointing the Master, the court noted that courts, particularly in the Southern District of New York, have begun questioning whether attorneys hired temporarily through an agency should be included in the lodestar at greatly inflated rates or treated as an expense. See Mar. 7, 2017 Tr. at 93-94 (Dkt. No. 176) (citing Weatherford, 2015 WL 127847; Citigroup Secs. Litig., 965 F. Supp. 2d 369; Citigroup Bond Litig., 988 F. Supp. 2d 371; Beacon Assocs., 2013 WL 2450960; City of Pontiac, 954 F. Supp. 2d 276). For example, in City of Pontiac, 954 F. Supp. 2d at 280, the court wrote that "a sophisticated client, knowing these contract attorneys cost plaintiff's counsel considerably less than what the firm's associate attorneys cost (in terms of both salaries and benefits) would have negotiated a substantial discount in the hourly rates charged the client for these services."

The court hoped that the Master would find definitive evidence of whether this commonsense observation was confirmed by the operation of the actual marketplace. He was evidently unable to do so as the Report does not include discussion of such evidence.

However, in response to an inquiry from the court, counsel for the defendant stated that State Street itself hired and paid an agency for contract attorneys to do first level document review for its law firm. See Mar. 7, 2017 Tr. at 83-84 (Dkt. No. 176). State Street paid $35 an hour for those contract attorneys. Id. at 84. The contract attorneys were, therefore, an expense for State

Street, providing support for the Master's conclusion that they should not be included in plaintiffs' lodestar.

In addition, in some cases, plaintiffs' firms have treated contract attorneys as an expense in their fee petitions. See Meredith Corp. v. SESAC, 87 F. Supp. 3d 650, 671 (S.D.N.Y. 2015); Dial Corp. v. News Corp., 317 F.R.D. 436, 438 (S.D.N.Y. 2016). In other cases, courts have allowed contract attorneys to be included in the lodestar at rates higher than their actual cost. See, e.g., Tyco Int'l, 535 F. Supp 2d at 272; Carlison v. Xerox Corp., 596 F. Supp. 2d 409, 410 (D. Conn. 2009); Citigroup Secs. Litig., 965 F. Supp 2d at 394-95; In re WorldCom, Inc. Sec. Litig., 2004 WL 2591402, at *21 (S.D.N.Y. Nov. 12, 2004).

However, courts have increasingly rejected the assertion that contract attorneys who do document review should be valued at rates comparable for those of an associate. For example, in Citigroup Inc. Securities Litigation, the court wrote:

> "There is little excuse in this day and age for delegating document review (particularly primary review or first pass review) to anyone other than extremely low-cost, low-overhead temporary employees (read, contract attorneys) -- and there is absolutely no excuse for paying those temporary, low-overhead employees $40 or $50 an hour and then marking up their pay ten times for billing purposes."

965 F. Supp 2d at 395 (quoting Beacon Assocs., 2013 WL 2450960 at *18). The Citigroup court concluded that, "[c]onsidering the hypothetical client and the range of services at issue, . . . a

137

reasonable blended hourly rate for the contract attorneys here is $200." Id. at 399.

Other courts have reached comparable conclusions. In City of Pontiac, contract attorneys were valued at rates between $295 and $435 an hour and the court found that "a sophisticated client could have negotiated a total of, say, half that amount, or less." 954 F. Supp. 2d at 280. In Weatherford, the "staff attorneys" who reviewed documents and organized them for depositions were represented to have hourly rates of $375 to $395. The court wrote that, "[a]s [the firm] has conceded, the hourly rates for which the firm seeks compensation for these staff attorneys are more than 600 percent of their direct cost to the firm, and the Court has been provided with nothing persuasive from which to conclude that this sort of markup is reasonable." 2015 WL 127847 at *1.

As the Second Circuit has written, "'the burden is on the fee applicant to produce satisfactory evidence -- in addition to the attorney's own affidavits -- that the requested rates are in line with' prevailing market rates." Citigroup Secs. Litig., 965 F. Supp. 2d at 396 (quoting Savoie v. Merchs. Bank, 166 F.3d 456, 463 (2d Cir. 1999)). In this case, plaintiffs' counsel have not provided evidence that paying clients in complex cases pay many multiples of cost for contract attorneys who do basic document review and that law firms do not generally bill contracts attorneys to such clients as an expense. As described earlier, there is

138

evidence, including the direct payment for its contract attorneys by State Street, that indicates that in some cases contract attorneys are treated as an expense. Therefore, it would be reasonable for the court to adopt the Master's recommendation and to treat the cost of the contract attorneys as an expense, rather than include them in the lodestar for cross-check purposes.

However, the court did not at the outset of this case inform counsel that contract attorneys doing basic document review should not be included in their lodestars. Nor did the caselaw put them on clear notice that such attorneys would not be counted in calculating the lodestar. Therefore, the court finds that, in these circumstances, it is also reasonable and most appropriate to include the contract attorneys in the lodestar, which does not have to be calculated with precision because it is only being used to check the reasonableness of the $60,000,000 award the court is considering. See Beacon Assocs., 2013 WL 2450960 at *19.

However, the court finds that ascribing rates between $415 and $515 an hour for the contract attorneys is unjustified. Therefore, as in Citigroup, 965 F.Supp. 2d at 399, for the purpose of the lodestar check, the court is using a blended rate of $200 an hour for them.

The contract attorneys reportedly worked 4,779.1 hours. See Heimann Decl. at 10 of 11 n.4 (Dkt. No. 533-1).[27]  At a rate of $200 an hour, they contribute $955,820 to the total lodestar. This amount is $1,168,470 less than the $2,124,290 attributed to the contract attorneys in the corrected purported lodestar presented to the court after the media alerted counsel to the double-counting. See Heimann Declaration (Dkt. No. 533-1) at 9-11 of 11.

As explained earlier, like the Master, the court finds that Michael Bradley should not be included in the lodestar at a rate of $500 an hour. This rate was fabricated by Garrett Bradley. Michael Bradley had in his career only charged $500 an hour one time, for three hours work. He never charged more and clients regularly paid him much less an hour.

Nor was Michael Bradley's work in this case worth $500 an hour. He only did the lowest level document review, which was comparable to the work done by the contract attorneys. His

---

[27]  The Master stated in the Report that the total number of contract attorney hours was either 2,833.5 or 2,949.5. See R. & R. at 367. At the request of the Master, Lieff prepared memoranda calculating the lodestar applying various billing rates for contract attorneys. Lieff notes that the Report fails to account for 1,879.9 additional, non-duplicative contract attorney hours listed on Thornton's lodestar, which bring the correct total contract attorney hours to 4,779.1. See Heimann Decl. at 6-7 of 11 (Dkt No. 533-1). The Master does not appear to have addressed this discrepancy. The court is using this higher figure for the purpose of calculating a revised lodestar. However, the difference in the revised lodestar resulting from inclusion of these additional hours -- $375,980, or about 1% of the total -- is not material to the court's analysis.

experience as a state prosecutor and criminal defense lawyer did not enhance his value in this case. He claims to have identified and made comments on only a few relevant documents.

In these circumstances, it would be reasonable to attribute to Michael Bradley the $200 an hour rate the court has ascribed to the contract attorneys. However, unlike the contract attorneys, Michael Bradley was not paid hourly during the pendency of this case and took some risk that he would not be paid at all if plaintiffs did not recover anything. Therefore, the court accepts the Master's recommendation that Michael Bradley be attributed a rate of $250 an hour for the purpose of the lodestar check. See R. & R. at 366.

Michael Bradley reportedly worked 406.4 hours on this case. At $250 an hour, his work contributes $101,600 to the lodestar, which is $101,600 less than claimed by Thornton.

After removing the originally double-counted hours, and valuing the contract attorneys at $200 an hour and Michael Bradley at $250 an hour, the total lodestar is $36,005,171.25. Therefore, a fee award of $60,000,000 represents a lodestar multiplier of 1.67.

A 1.67 multiplier is reasonable in this case. In arguing for a $75,000,000 award, counsel asserted that a 1.8 multiplier would be reasonable. See Mem. Supp. Attys.' Fees at 9 of 36 (Dkt. No.

103-1); Nov. 2, 2016 Tr. at 30-31 (Dkt. No. 114). 1.67 is not materially less than 1.8.

In addition, a 1.67 multiplier is greater than that in some other cases involving fee awards that counsel characterized as "comparable" to their request in this case for an award of $75,000,000. Dkt. No. 103-1, at 13-14 of 36. For example, in In re Lupron, in which there was a $150,000,000 settlement, the multiplier was 1.41. Id. at 14. In In re Lernout & Hauspie Sec. Litig., which involved a $120,520,000 settlement, the multiplier was 1.4. Id. The court recognizes that in some other megafund cases in the First Circuit awards have involved multipliers greater than 1.67, including in one case, New England Carpenters Health Benefits Fund v. First Databank, a multiplier of 8.3. See 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009). However, the lodestar confirms the court's tentative view that an award of $60,000,000 is within the range of reason.

As explained earlier, in deciding the most appropriate fee to award, the court is now exercising its "equitable power [and] individualization is the name of the game." Fidelity/Micron, 167 F.3d at 737. For the reasons described in detail in this Memorandum, the court finds that an award of 20% of the $300,000,000 is reasonable and most appropriate in the unique circumstances of this case. Id.

In summary, in this case capable counsel performed well in achieving a $300,000,000 settlement. In other circumstances, the court might find an award greater than 20%, but less than 25%, to be most appropriate. However, in exercising its equitable authority to award fees, the court can and should consider misconduct by counsel. See Agent Orange, 818 F.2d at 222; Travers, 808 F.3d at 542; Rodriguez, 688 F.3d at 655; IMAX, 2012 WL 3133476, at *11. In view of the fact that the adversary process cannot be relied upon to reveal misrepresentations and other ethical violations by counsel seeking fee awards in class actions, it is especially important that, when discovered, such misconduct not be ignored.

The evidently unprecedented appointment of a Master to investigate the application for a prior award of attorneys' fees in this case, and arduous effort, revealed the extensive misconduct detailed in this Memorandum by Labaton and Thornton, particularly. That misconduct contributes to the conclusion that an award at the lower end of the presumptively reasonable 20-30% range is appropriate.

As this is a megafund case, a lower award would also be reasonable. As explained earlier, the Fitzpatrick Study that counsel mischaracterized to this court found that the percentage of the common fund awarded in attorneys' fees "plunged well below 20%" for settlements of more than $100,000,000. Fitzpatrick Study,

143

supra, at 838. In settlements, such as this one, between $250,000,000 and $500,000,000, Fitzpatrick found the mean award was 17.8% and the median award was 19.5%. See id. The award being made in this case is above both the median and the mean. It is also well-above the 13.16% average award in the 20 cases Professor Rubenstein referenced with common funds of $100,000,000 to $500,000,000. See Dkt. Nos. 446-2, Ex. E; 522 at 7; 522-1 at 8-9.

In view of the foregoing, the court concludes that an award of $60,000,000 is reasonable and most appropriate.

G. Allocation of the Fee and Expense Award

As explained earlier, "the court has the ultimate authority to determine how the aggregate fee is to be allocated among counsel." 5 Rubenstein, Newberg on Class Actions §15:23. The parties have acknowledged this authority. See June 24, 2019 Tr. at 17:8-19 (Dkt. No. 560). In view of the varying degrees of responsibility for the misconduct in this case, the court finds it appropriate to exercise its authority to allocate the fee award among counsel.

By agreement, class counsel allocated the original, vacated fee award as follows:

| Firm | Fees | Expenses | Total |
|------|------|----------|-------|
| Labaton | 31,530,948.75 | 258,666.85 | 31,789,615.60 |
| Thornton | 19,455,266.25 | 295,315.50 | 19,750,581.75 |
| Lieff | 16,100,910.00 | 271,944.53 | 15,399,163.17 |
| Keller Rohrback | 2,484,708.33 | 342,766.63 | 2,827,474.96 |
| McTigue | 2,484,708.34 | 50,176.39 | 2,534,884.73 |
| Zuckerman Spaeder | 2,484,708.33 | 38,670.29 | 2,523,378.62 |
| **TOTAL** | **74,541,250.00** | **1,257,540.19** | **75,798,790.19** |

See Dkt. No. 562-1.

In total, therefore, ERISA Counsel originally received $7,454,125 in fees and $431,613 in expenses.[28] Using the lodestar formula, the Master's investigation and related proceedings have cost ERISA Counsel an additional $2,674,365 in fees and $156,422.84 in expenses.[29]

Other than the fact that three ERISA firms used the template language concerning fees regularly charged prepared by Labaton, which they should have revised, the conduct of ERISA Counsel was

---

[28]   The total amount awarded to ERISA Counsel included payments they made to firms that assisted them in this case. The new award to ERISA Counsel also includes amounts the court understands they will make to these other firms.

[29]   More specifically, the Master's investigation and related proceedings have cost: Keller Rohrback an additional $1,082,672.50 in lodestar and $68,004.72 in expenses; Zuckerman Spaeder an additional $708,483.50 in fees and $66,736.43 in expenses; and McTigue an additional $883,209.00 in fees and $21,681.69 in expenses. See ERISA Counsel Resp. June 28, 2019 Order at 5-6 n.8 (Dkt. No. 580).

not deficient.[30] Rather, they and their clients were victimized by the misconduct of Labaton and Thornton. Therefore, it would be inequitable for ERISA Counsel to receive less in fees or expenses under a new award than under the original, vacated award.

Accordingly, the court is awarding ERISA Counsel the fees and expenses they received under the original, vacated fee award, plus the fees and expenses ERISA Counsel incurred after that award. This amounts to $10,128,490 in fees and $588,036.15 in expenses. This total amount is comprised of $3,567,380.83 in fees and $410,771.35 in expenses for a total of $3,439,777.42 to Keller Rohrback; $3,367,917.34 in fees and $71,858.08 in expenses for a total of $3,439,775.42 to McTigue; and $3,193,191.83 in fees and $105,406.72 in expenses for a total of $3,298,598.55 to Zuckerman Spaeder.

At the inception of the Masters' investigation, ERISA Counsel agreed with Labaton that if the court reduced the fee award, each firm would "refund to [Labaton] . . . [its] pro rata share of any Court Ordered reduction of fees, expenses, or service awards." R. & R. Ex. 179 (Dkt. No. 401-178) (the "Claw Back Agreement"). However, prior to entering into the Claw Bank Agreement with ERISA Counsel, Labaton did not disclose material information concerning

---

[30]    The three ERISA firms that did not revise the misleading template language were Keller Rohrback LLP; Richardson, Patrick, Westbrook & Brickman, LLC; and Feinberg, Campbell & Zack, P.C. See R. & R. at 57.

Labaton's misconduct, and misconduct by its ally Thornton, that caused the Master's investigation to become more protracted and expensive than ERISA Counsel could have reasonably anticipated, and has contributed to the court's conclusion that a $60,000,000 fee award is most appropriate. As explained earlier, such misconduct included, but was not limited to, the failure of Labaton, Thornton, and Lieff to inform ERISA Counsel of Labaton's obligation and intention to pay Chargois more than $4,000,000.

ERISA Counsel were duped into entering into the Claw Back Agreement. In these circumstances, it would be inequitable, contrary to public policy, and inconsistent with the court's acknowledged equitable authority to allocate fees, to allow Labaton to enforce the Claw Back Agreement. Therefore, the court deems the Claw Back Agreement to be inoperative and unenforceable.[31] Cf. Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 224 (1st Cir. 2003) (fraud in the inducement is grounds for rescission of a contract, an equitable remedy, in Massachusetts); Restatement (Second) of Contracts §164 (1981) ("If

---

[31]   Labaton recognized that the Claw Back Agreement might be unenforceable if only some of counsel for the class were found to have engaged in misconduct that resulted in a reduction of the $75,000,000 fee award. More specifically, Goldsmith of Labaton testified that: "if there is a determination that expressly applied only to some firms, then I guess [that] letter would bring up some questions about how [The Claw Back Agreement] would be handled." Goldsmith Dep. Tr. at 159:10-15, R. & R. Ex. 58 (Dkt. No. 401-57).

a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient."); id. §161 ("[A party's] assertion of only some of the facts without the inclusion of such additional matters as he knows or believes to be necessary to prevent it from being misleading is itself a misrepresentation.").

After the award of $10,128,490 to ERISA Counsel, there remains $49,871,510 to be allocated among Labaton, Thornton, and Lieff. Of the original $75,000,000 fee award, $67,913.051.88, was divided between them. Labaton received 47%, $31,789.615.60. Thornton received 29%, $19,750,58175. Lieff received 24%, $16,372,854.53. See Dkt. No. 562-1.

The court now deems it most appropriate to award Lieff $15,233,397.53, comprised of $14,961.453 as fees and $271,944.5 as expenses. This is a reduction of about $1,140,000 and provides Lieff 30% of the new award to Customer Class Counsel.

Lieff was deficient in its performance as counsel in this case. As explained earlier, Lieff was a signatory to the false and misleading memorandum filed in support of the request for attorneys' fees (Dkt. No. 103-1) that it had read and edited. Thus, Lieff contributed to the misrepresenting of the number of hours worked by more than 9,000 and to providing a misleading description of the Fitzpatrick Study. In addition, by using the template

provided by Labaton, Lieff made false and misleading representations concerning the regular hourly rates charged for the attorneys who worked on this case. The failure of Lieff to probe the reasons for what should have been viewed as a suspicious payment of $4,100,000 by Labaton to Chargois before agreeing to underwrite $1,000,000 of that payment facilitated Labaton's violation of the Massachusetts Rules of Professional Conduct 7.2(c), 1.5(e), 1.4(a)(1) and (b) by failing to disclose the Chargois payment to ERISA Counsel and their clients. These deficiencies in Lieff's conduct justify reducing the original fee award to Lieff by about $1,140,000.

As Thornton engaged in repeated, serious misconduct, the court finds it most appropriate to award Thornton $13,261,908.10, comprised of $12,966,592.60 in fees and $295,315.50 in expenses. This is a reduction of $6,488,673 from the original fee award, and provides Thornton 25% of the new award to Customer Class Counsel. Again, for example only, acting for Thornton, Garrett Bradley: did not read his declaration before signing it under oath; made false representations concerning what were purportedly the regular hourly rates charged for lawyers claimed to have been employed by Thornton; did not correct his false statements after he read his declaration; authorized the submission by Labaton of a memorandum represented to have been signed by him, among others, that included a false and misleading description of the Fitzpatrick Study; and

collaborated with Labaton to conceal its agreement to pay Chargois $4,100,000 from the ERISA Plans and their counsel, and thus from the court and the public. In addition, two of Bradley's partners knew that the declaration drafted for his signature included false and misleading statements and did not correct those statements or inform Bradley of them. Therefore, reducing the fee award to Thornton by almost $6,500,000 is reasonable and appropriate.

The court finds it most appropriate to award Labaton $22,202,131.25, comprised of $21,943,464.40 in fees and $258,666.85 in expenses. This is a reduction of about $9,587,484 from the original fee award and provides Labaton 44% of the new award to Customer Class Counsel.

Labaton bears ultimate responsibility for all of the false and misleading representations made to the court in connection with the petition for attorneys' fees, which in many respects violated Federal Rule of Civil Procedure 11(b) and Massachusetts Rules of Professional Conduct as well. Again, for example only, Labaton: submitted a sworn declaration that falsely represented that Bradley's declaration, among others, was accurate; falsely represented that certain hourly rates were regularly charged by Labaton for its attorneys; failed to make a reasonable inquiry before providing the court with a lodestar that was erroneously inflated by 9300 hours and more than $4,000,000; provided a false and misleading description of the Fitzpatrick Study; and violated

the Massachusetts Rules of Professional Conduct by concealing Labaton's obligation to pay Chargois $4,100,000.

Labaton caused or contributed to the deficiencies in the performance of Thornton and Lieff as well. Evidently, no one at Labaton informed Zeiss, the attorney who prepared the settlement documents, that Thornton was paying for staff and contract attorneys employed by Labaton and Lieff. If she had been fully informed, she might have discharged her duty to compare the declarations of Thornton and Lieff and recognized that each had included the same attorneys in their lodestar calculations, in some instances at different hourly rates. Similarly, Labaton did not inform Zeiss of its obligation to pay Chargois $4,100,000, thus causing her to draft documents that were false and misleading, and that violated the Massachusetts Rules of Professional Conduct.

In these circumstances, awarding Labaton $22,202,131.25 is reasonable and most appropriate. As indicated earlier, attached as Exhibit A is a chart which includes the fees each firm received under the original %75,000,000 award, the fee each firm would have received if the Master's recommendations had been adopted, the fee each firm will receive under the new $60,000,000 award, and a comparison of the three.

With regard to payment for the cost of the Master, the 2003 Advisory Committee Notes to Federal Rule of Civil Procedure 53(h) state, in part, that "[a] party whose unreasonable behavior has

occasioned the need to appoint a master . . . may properly be charged all or a major portion of the master's fees." In 2017, the court ordered that the initial payment for expense of the Master be made from the fees awarded to Labaton, Thornton, and Lieff. See Mar. 8, 2017 Order (Dkt. No. 173) ¶13. The court understands that the first and subsequent payments to compensate the Master have been allocated between them by agreement. The court is not ordering an alteration of that agreement concerning prior payments. However, Labaton and Thornton are being ordered to pay equally the future costs of the Master from the awards made to them. It was their conduct that prompted the appointment of the Master, and caused his investigation to become prolonged and more expensive. Lieff's conduct in this case was deficient in the ways previously described, but is not comparable to the misconduct of Labaton and Thornton. All ERISA Counsel should have modified the Labaton template concerning hourly rates to make their respective declarations accurate, as several ERISA firms did. However, if this had been the only issue the appointment of the Master may not have been necessary. Therefore, the court is not requiring ERISA Counsel to contribute to the cost of the Master or requiring Lieff to contribute to the future cost of the Master.

It would be inequitable to impose any of the cost of the Master on the class -- the clients of Labaton, Thornton, and Lieff. Class Counsel were appointed to represent the class properly.

Instead, Labaton and Thornton violated their ethical duty to disclose to the class Labaton's obligation to pay Chargois $4,100,000. As explained earlier, at this point in the proceedings the court is a fiduciary for the class and must protect its legitimate interests. See Fidelity/Micron, 167 F.3d at 736. Those interests include protecting the class from being required to underwrite a reduction of the common fund caused by the misconduct of Labaton and Thornton primarily.

Labaton has, on behalf of all plaintiffs' counsel, returned to the Court to date $4,850,000 to pay the reasonable cost of the Master and those he has employed. The court is now ordering that the Master do additional work to implement the new fee award. Therefore, Labaton and Thornton are being ordered to, by March 11, 2020, pay to the Clerk of the Court an additional $250,000.00 each to compensate the Master for future work. See Mar. 8, 2017 Order (Dkt. No. 173), ¶13 n.4.

H. Service Awards

The court originally made service awards of $25,000 to ATRS and $10,000 to each of the six ERISA class representatives. See Dkt. No. 111 ¶4. There is no reason to decrease the service awards to the ERISA class representatives. Therefore, they are being reinstated.

ATRS invested time in this case. It was, however, deficient in directing and supervising Labaton as Lead Counsel, as

exemplified by its indifference to the payment to Chargois and its attempted ratification of it. Therefore, the service award to ATRS is being reduced to $15,000.

VI. REFERRAL TO THE MASSACHUSETTS BOARD OF BAR OVERSEERS

A federal judge has an ethical obligation to "take appropriate action upon receipt of reliable information indicating the likelihood . . . that a lawyer violated applicable rules of professional conduct." U.S. Judicial Conf., <u>Code of Judicial Conduct for U.S. Judges</u>, Canon 3(B)(6) (Mar. 2019). The Local Rules of the United States District Court for the District of Massachusetts provide that referring the matter to a state disciplinary authority -- meaning the Massachusetts Board of Bar Overseers -- is a permissible means of discharging this duty. <u>See</u> L.R. 83.6.5(e)(1).

Accordingly, the court is ordering that the Clerk transmit this Memorandum and Order to the Massachusetts Board of Bar Overseers for whatever action, if any, it deems appropriate and for a report concerning the results of its consideration of this matter. <u>Id.</u> In addition, the Clerk shall, upon request, provide to the Board any documents in the public record of this case. Any motion for sealed filings shall be decided by the court after the affected parties have any opportunity to respond to it.

VII. IMPLEMENTATION OF THIS MEMORANDUM AND ORDER

This matter is being resubmitted to the Master for further action. See Fed. R. Civ. P. 53(f)(1). In a March 31, 2017 Order (Dkt. No. 192), the court stated that it would provide class members notice of the Master's Report and Recommendation and provide them an opportunity to file any objections or comments. Id. at 5. The court has now, in effect, modified the Report. If notice to the class is indeed necessary or appropriate, the court has determined that it should have notice of this decision. The Master is being directed to consult Class Counsel and ERISA Counsel, with regard to whether notice to the class is now legally required or appropriate. It shall also consult CCAF, which has previously asserted that the proposed settlement concerning Labaton, ERISA Counsel, and the Master would require notice to the class under Rule 23(h). See Dkt. No. 451 at 7-8.[32]

In addition, the Master shall confer with Class Counsel and ERISA Counsel regarding the logistics concerning the recovery and reallocation of funds previously awarded that is required by this Memorandum and Order.

---

[32] As this decision provides more than an additional $14,000,000 to the class, if notice is given there may be no objection to it. However, in view of the fact that the award of 20% of the common fund is above the median and mean for settlements between $100,000,000 and $500,000,000 reported in the Fitzpatrick Study, it is possible that, in view of the court's findings, an objector may assert that the award is too generous.

The Master is being ordered to, by March 23, 2020, report on the foregoing issues and any others relating to implementation of this memorandum and order.

VIII. CONCLUSION

As noted at the outset of this Memorandum, in 1913 Justice Oliver Wendell Holmes said that "[j]udges are apt to be naif, simple-minded men." Occasional Speeches of Justice Oliver Wendell Holmes at 172. Justice Holmes then added that "they need something of Mephistopheles." Id. Once again, this case is a reminder that he was right.

The United States has a proud history of attorneys for whom the law is an honorable calling. As Justice Robert Jackson described those lawyers, each:

> loved his profession, he had a real sense of dedication
> to the administration of justice, he held his head high
> as a lawyer, he rendered and exacted courtesy, honor and
> straightforwardness at the Bar. He respected the
> judicial office deeply . . . .

Jackson, "The County Seat Lawyer," 36 A.B.A. J. 497 (June 1950). Because of such attorneys, judges have historically trusted lawyers. Many attorneys still deserve such trust.

However, this case has demonstrated that judges should recognize that in class actions not all lawyers are trustworthy. Some may engage in unethical conduct to obtain clients who will allow them to instigate and control class actions, and to be richly rewarded. When such class actions settle and the adversary process

is not operating, some attorneys may engage in misconduct to maximize their income at the expense of their clients and co-counsel.

As explained earlier, when class actions settle, the judge must serve as a fiduciary or protector for the class. See Fidelity/Micron, 167 F.3d at 736. Judges are, therefore, "subject [] to the high duty of care that the law requires of fiduciaries." Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 280 (7th Cir. 2002). This case has educated this court to understand that in view of its foreseeable fiduciary duties, it is important that judges scrutinize motions to appoint class representatives and lead counsel, as well as motions for awards of attorneys' fees, even -- indeed especially -- when such motions are not opposed. Candid, capable counsel will easily survive such scrutiny. Unethical attorneys should not.

If judges are appropriately skeptical and do the work necessary to discharge their duties as fiduciaries for a class, its members will be protected and the integrity of the administration of justice will be promoted. This effort may sometimes be arduous. It will always be important.

IX. ORDER

In view of the foregoing, it is hereby ORDERED that:

1.    The Proposed Resolution of Labaton's Objections to the Special Master's Report (Dkt. No. 485) is DENIED.

2.   After hearings and considering de novo all objections to the Master's Findings of Fact and Conclusions of Law, including Labaton's, the Master's Report and Recommendation (Dkt. No. 357) is ADOPTED in part, REJECTED in part, and MODIFIED in the manner described in this Memorandum and Order. See Fed. R. Civ. P. 53(f). More specifically, $60,000,000 is awarded to counsel for plaintiffs as reasonable fees and expenses. From the $60,000,000 a total of $22,202,131.25 shall be paid to Labaton; a total of $13,261,908.10 shall be paid to Thornton; a total of $15,233,397.53 shall be paid to Lieff; a total of $3,978,152.18 shall be paid to Keller Rohrback; a total of $3,439,775.42 shall be paid to McTigue; and a total of $3,298,598.55 shall be paid to Zuckerman Spaeder.

3.   Service Awards shall be paid as follows: $15,000 to ATRS, and $10,000 to each of the six ERISA Plaintiffs, Arnold Henriquez, Michael T. Cohn, William R. Taylor, Richard A. Sutherland, The Andover Companies Employee Savings and Profit Sharing Plan, and James Pehoushek-Stangeland.

4.   This matter is RESUBMITTED to the Master. The Master shall, by March 23, 2020:

(a)  Consult Class Counsel, ERISA Counsel, and CCAF, and report concerning whether notice to the class of new awards that have been ordered is legally required or appropriate. If the Master or anyone consulted is of the view that notice to the class should be given, the Master shall submit a proposed form of notice.

      (b)   Report how he proposes to manage the implementation of this Order, including the required recovery from Labaton, Thornton, and Lieff of fees previously awarded, and the reallocation of them to other counsel and the class.

      (c)  Identify and provide advice on any other issues relevant to the implementation of this Order.

      5.   Labaton and Thornton shall, by March 11, 2020, provide to the Clerk of the United States District Court for the District of Massachusetts an additional $250,000 each to pay past and future reasonable fees and expenses of the Master and any firm, organization, or individual assisting him.

      6.   The Clerk shall send this Memorandum and Order to the Massachusetts Board of Bar Overseers for whatever action, if any, it deems appropriate. Upon request, the Clerk shall provide the Board any documents in the public record of this case. The Board of Bar Overseers may move for the unsealing of sealed documents. The Board shall report its final actions to the court.

UNITED STATES DISTRICT JUDGE