**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

**THE HAMILTON LINCOLN LAW INSTITUTE'S**
**CENTER FOR CLASS ACTION FAIRNESS'S RESPONSE IN**
**QUALIFIED OPPOSITION TO LIEFF CABRASER'S MOTION FOR PARTIAL**
**STAY OF EXECUTION ON JUDGMENT, PENDING APPEAL [DKT. 668]**

## TABLE OF CONTENTS

Table of Contents..................................................................................................................................ii

Table of Authorities .........................................................................................................................iii

Argument...............................................................................................................................................1

I.    The Second Revised Payment Plan makes practical sense in view of changed circumstances....................................................................................................................2

II.   To the extent Lieff can recover from other counsel, no irreparable harm exists. .........3

III.  To the extent that Lieff is correct that administration will take "years" no irreparable harm exists even if $1.1 million must be paid from the class. .....................5

IV.  The 2020 Fee Order does not contain monetary sanctions, thus Lieff's appeal apparently raises no substantial question as to fee allocation. .........................................5

V.   Lieff double-counts its selfish interests as the public interests........................................8

VI.  Class members have an interest in the money Lieff hopes to win from them...............9

VII. Even if recovery must come from the class and only the class, and even if little residual remains in the common fund, Lieff's harm is still not irreparable. .................12

Conclusion...........................................................................................................................................13

Certificate of Service .......................................................................................................................15

**TABLE OF AUTHORITIES**

<u>Cases</u>

*In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*, No. 08 MDL 1963,
    2014 U.S. Dist. LEXIS 131315 (S.D.N.Y. Sep. 5, 2014) ................................................12

*Borey v. Nat'l Union Fire Ins. Co.*,
    934 F.2d 30 (2d Cir. 1991). ........................................................................................3

*Boston Taxi Owners Ass'n v. City of Boston*,
    187 F. Supp. 3d 339 (D. Mass. 2016) ......................................................................8

*Cayuga Indian Nation of N.Y. v. Pataki*,
    188 F. Supp. 2d 223 (N.D.N.Y. 2002) ....................................................................9

*First State Ins. Group v. Nationwide Mut. Ins. Co.*,
    402 F.3d 43 (1st Cir. 2005)........................................................................................6

*Hilton v. Braunskill*,
    481 U.S. 770 (1987)..........................................................................................3, 5, 9

*Miller v. LeSea Broad.*,
    927 F. Supp. 1148 (E.D. Wis. 1996) ......................................................................9

*Nken v. Holder*,
    556 U.S. 418 (2009)........................................................................................3, 5, 9

*Respect Me. PAC v. McKee*,
    622 F.3d 13 (1st Cir. 2010).......................................................................................5

*Sampson v. Murray*,
    415 U.S. 61 (1974).....................................................................................................13

*SEC v. Biochemics, Inc.*,
    435 F. Supp. 3d 281 (D. Mass. 2020) ......................................................................8

*S.S. Body Armor I, Inc. v. Carter Ledyard & Milburn LLP*,
    927 F.3d 763 (3d Cir. 2019) .....................................................................................9

As allowed by the Court (Dkt. 669), the Hamilton Lincoln Law Institute's Center for Class Action Fairness ("CCAF") files this Response in Qualified Opposition to Lieff Cabraser Heimann & Bernstein LLP's ("Lieff's") Motion for a Partial Stay of Execution on Judgment, Pending Appeal ("Motion," Dkt. 668).

## ARGUMENT

Over four years ago Lieff unjustly deposited $16.3 million for its own benefit, while simultaneously concealing questionable fee sharing agreements from ERISA counsel (Dkt. 590, "Fee Order" at 149), the named plaintiff (*id.* at 153), and the Court. Lieff continued to conceal these arrangements even after this Court appointed a Special Master to investigate the fee awards. The Court's orders correct this injustice.

CCAF remains skeptical Lieff has demonstrated an entitlement to stay, but facts concerning the administrator's distribution of funds and Lieff's own seemingly contradictory positions make it impossible to take a firm position. CCAF understands that the Special Master is working with the administrator to produce a new declaration, and facts concerning administration could entirely moot Lieff's motion. Because of this uncertainty, CCAF instead offers observations on Lieff's Motion:

1. **The Payment Plan was sensibly revised due to changed circumstances.** Contrary to Lieff, "pertinent facts changed." Mot. 15. Previously, everyone expected Lieff's appeal to conclude by spring 2021.

2. **To the extent Lieff seeks fees from ERISA counsel, no prejudice exists.** Lieff says that "ERISA Counsel share the cost of success of the appeal … by reducing the … fee awarded to ERISA Counsel." Mot. 10. If true, Lieff provides no reason to believe irreparable harm could occur by awarding three solvent and respected law firms money they are now entitled to.

3. **Lieff claims settlement administration will take "years."** Mot. 2. But if this were true, residual funds would be available to hypothetically "repay" Lieff.

4. **The 2020 Fee Order (Dkt. 590) does not include a "financial penalty."** Mot. 16. In fact, the 2020 Fee Order awarded Lieff $15.23 million in fees and costs—millions more than the Special Master recommended (Dkt. 590-1), a reduction of only 7% from the original fee award even though the Court cut overall attorneys' fees by 20%. Lieff mischaracterizes the Fee Order, so none of its arguments on appeal would actually result in restoring the fees Lieff obtained for itself extrajudicially by private agreement with Customer Class Counsel.

5. **Lieff incorrectly pretends its interests constitute "public interests."** Mot. 12. Lieff misrepresents the law; public interests are those of non-parties.

6. **Lieff falsely suggests that no party would be aggrieved by its appeal.** Mot. 2. This is only true because Lieff has long ceased representing the interests of absent class members, who are aggrieved dollar-for-dollar.

7. **Even if the class must pay $1.1 million to Lieff, this money can be recovered.** Lieff says it's "impossible" to collect money once distributed, but in fact it could claw back the $1 million it paid to Mr. Chargois.

Each of these points is addressed below.

## I.   The Second Revised Payment Plan makes practical sense in view of changed circumstances.

Lieff complains about two "material" changes to the Second Revised Payment Plan ("Revised Plan," Dkt. 662-1) compared to the earlier schedule. Mot. 3. First, the Revised Plan contemplates distributing "Lieff's" money to class members. *Id.* at 3-4, 7. But this change simply corrects an arithmetic error in the original plan of distribution. The Court commented on this issue at the last hearing, and it was discussed at length, so should hardly come as a surprise to Lieff. Dkt. 642 (Tr. 9/22/2020) at 9-18. And while Lieff expressed surprise at the hearing, it should not have been very surprising even then because, as the Court noted, the prose of the Master's motion unambiguously recommended that money for Lieff "should not be recaptured for monies paid to the class members." *Id.* at 9.

Lieff also complains about the deletion of the hearing previously scheduled 45 days before the second disbursement of repaid money to the class on April 30, 2021. Mot. 4. Lieff claims "no pertinent facts changed between the entry of the Prior Payment Plan on July 9,

2020 and the Fee Order on January 19, 2021." *Id.* at 8. Patently untrue. As the Court explained, before July, all parties "anticipated that the appeal would be resolved before April 30, [2021], and the schedule I ordered provided for a hearing 45 days before April [30], 2021 if the appeal was not resolved." Tr. at 7. If Lieff's prior appeal had proceeded, it probably would have concluded before April 30, so it was prudent to conduct a hearing before that date to resolve the matter and perhaps *slightly* delay the issuance of checks if the First Circuit opinion was forthcoming. In contrast, Lieff now proposes that class members essentially loan their putative attorneys $1.1 million for another year or more after already loaning it to Lieff for over two and a half years. The previous plan no longer makes practical sense; circumstances changed.

## II.     To the extent Lieff can recover from other counsel, no irreparable harm exists.

Lieff does not even make a showing of irreparable harm from distribution to ERISA counsel. The Court must consider four factors in deciding requests for stay pending appeal:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

"The first two factors of the traditional standard are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). "[S]imply showing some 'possibility of irreparable injury,' … fails to satisfy the second factor." *Id.* at 434-35. "Monetary loss alone will generally not amount to irreparable harm." *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991). Monetary harm is only irreparable when it threatens a party's solvency (which Lieff does not allege) or the money may *never* be recovered. This simply doesn't apply if the funds can be redistributed from other counsel.

Lieff offers only a one-sentence explanation of the supposed irreparable harm justifying its Motion: "[r]ecovering those funds from the Class, once distributed, will be impossible—effectively mooting the appeal." Mot. 12. Lieff does *not* argue anywhere that distributing money to ERISA counsel causes irreparable harm but instead assumes that the class should still ultimately pay. *See* Mot. 15 ("no justification for making the ERISA Counsel the guarantors of a fixed class recovery").

Even though Lieff now believes that the Court's orders contemplate withholding money from ERISA counsel (Mot. 2, 10), Lieff doesn't offer an excuse why payment to ERISA counsel could conceivably cause irreparable harm. In the unlikely event Lieff is owed money from other firms (whether ERISA counsel or Customer Class Counsel), these firms could be ordered to repay the funds just as Lieff is now ordered. Lieff does not question the solvency or reputation of any of the firms before the Court.

To be clear, CCAF agrees with ERISA counsel (Dkts. 639, 671) that the equities do *not* favor transferring funds from blameless firms in order to enhance Lieff's fee award. The Special Master previously recommended that Labaton and Thornton should first cover the shortfall hypothetically owed Lieff, after providing all firms fair notice to decide an equitable reallocation between ERISA and Customer Class Counsel. Dkt. 606 at 4. CCAF agrees with this approach. HLLI also supports ERISA Counsel's motion to clarify any ambiguity about whether the Court intends to use ERISA counsel for recourse if Lieff's fee must be increased. Dkt. 670. CCAF's view is that it doesn't make sense to decide the issue unless and until the First Circuit requires such reallocation.

CCAF only observes, for the sake of argument, that because no irreparable harm exists, no escrow would be necessary to effectuate such an improbable outcome.

4

**III.    To the extent that Lieff is correct that administration will take "years" no irreparable harm exists even if $1.1 million must be paid from the class.**

To satisfy the second *Hilton* factor, Lieff must show that "irreparable injury will be **likely** absent an injunction." *Respect Me. PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010) (emphasis added). Lieff's contradictory positions betray that the claimed harm is at best speculative, so falls far short of the second prong.

Even if the First Circuit takes Lieff's quite amorphous arguments to mean that additional fees *must* be paid by the blameless class, no reason exists to think Lieff would be *likely* unable to recover the money. In fact, Lieff argues the reverse: "it is highly **unlikely** that Lieff Cabraser's escrowed funds would be all that is left to distribute to the class." Mot. 2 (emphasis added). If this were true—and Lieff thinks it at least true enough to affix their signature under the argument—some residual funds from the class will exist to pay Lieff a higher fee "years" hence as in the *BoNY Mellon* matter. Mot. 13. Lieff has not shown a likelihood that its appeal will take *multiple* years. If for some reason it does, it could move to stay disbursement prior to some subsequent round of payments.

**IV.    The 2020 Fee Order does not contain monetary sanctions, thus Lieff's appeal apparently raises no substantial question as to fee allocation.**

For the first *Hilton* factor, "[i]t is not enough that the chance of success on the merits be 'better than negligible.'" *Nken v. Holder*, 556 U.S. at 434. Lieff contends that it advances "serious" Rule 11 arguments (Mot. 16), but prevailing on these arguments would not result in additional attorneys' fees because Lieff fundamentally misrepresents the Fee Order.

Lieff's premises its appeal on the idea that it does not challenge "the overall reduction in the fees awarded, except as to the penalty assessed against Lieff." Mot. 5. But no such "penalty" exists. This Court explicitly held it was "not imposing sanctions or denying attorneys' fees," based on Rule 11 findings. Dkt. 590 ("Fee Order") at 127. Lieff treats the Fee Order as if it were a sanction, and even tells the First Circuit "[t]he penalty against Lieff

brought the overall fee down to 20% of the class recovery, when combined with the penalties on other firms." No. 20-1365 (1st Cir. June 6, 2020) at 31. Lieff misinterprets the Fee Order exactly backwards. The Fee Order set the overall fee award first (Dkt. 590 at 77-144) and only then decided how the fee should be allocated among the firms (*id.* at 144-53).

The Fee Order does not impose a monetary sanction. In fact, it's the only order authorizing Lieff to keep any money at all. Lieff assented to vacate the original fee order, which occurred in 2018. Dkt. 331. The Court quite generously allowed Lieff and the other Customer Class Counsel firms to hold millions of dollars for years—an extraordinary advantage given that the class wasn't paid until October. Finalizing balances is not a sanction, and Lieff's arguments on appeal do not grapple with the difference.

In fact, fees Lieff obtained in 2016 were secured extrajudicially by *misleading* the Court. In 2016, the Court awarded a lump sum of $74,541,250 to Labaton for distribution to all plaintiffs' counsel. Dkt. 111 at 5. Lieff's "share" of $16,372,854 was not the product of judicial decision but of a secret fee agreement between Lieff and the other Customer Class Counsel firms to award themselves more richly than ERISA counsel while simultaneously agreeing to divert $4.1 million to politically-connected lawyers that Lieff never disclosed. Lieff would have presumably concealed the Chargois arrangement forever but for the Special Master's careful review of document production from Thornton. Dkt. 357 at 87 n.66.

While the Court termed $1,139,457 as a "reduction" from Lieff's original fee award for "deficiencies" (Dkt. 590 at 148-49), the word "reduction" is used in the sense of "by way of comparison" rather than a literal reduction. The original fee award was vacated thirty-one months ago, and the $16,372,854 figure was not carved into stone tablets even before it was vacated. Deducting from this amount is not a sanction, but simple arithmetic: Lieff must repay the common fund the difference in dollars lawfully awarded by the Court and the dollars Lieff obtained for itself based on secret negotiations five years ago.

In setting its fee award, the Court cites several factors for Lieff's award, including deficiencies that did not rise to the level of misconduct like failing to disclose its (limited) knowledge of Chargois arrangement to ERISA counsel. *Id.* at 149; *compare* 123. Such findings are not sanctions; courts can and should take into account counsel's deficiencies when setting fee awards. *See First State Ins. Group v. Nationwide Mut. Ins. Co.*, 402 F.3d 43, 44 (1st Cir. 2005) (affirming denial of *any* fee award due to overbilling).

While Lieff complains of a 7% "reduction" from the sum derived from its secret fee sharing agreements, this compares very well against the 30%-33% reductions borne by Labaton and Thornton, respectively. It also compares handsomely with Lieff's private fee agreement, which provided Lieff with precisely 24% of Customer Class Counsel's fee. Under the Fee Order, Lieff receives 30% of the Customer Class Counsel fee, leapfrogging over Thornton, which previously got $3 million more, but was ultimately awarded $2 million less than Lieff. Dkt. 590-1. The Court reduced the overall fee award by nearly 20%. The Court reduced Lieff's fees much *less* than average.[1]

Lieff offers no explanation for why the entire $1.1 million amount represents a "sanction" given the Court's express findings otherwise and the mathematical implausibility of reducing the overall fee award 20% without adjusting Lieff's share one iota. While Lieff may prefer to mischaracterize the Fee Order as a *sua sponte* sanction—ostensibly because of the limits on monetary Rule 11(c)(3) sanctions—it does not become a Rule 11 order merely

---

[1] Lieff may complain that ERISA counsel's fee *increased*, but the Court did this to compensate for their time spend on the investigation and for being kept in the dark about the Chargois arrangement. Dkt. 590 at 146-47. Moreover, the final ERISA awards more accurately approximates the $10.9 million fee award deducted from the ERISA portion of the settlement fund. Dkt. 89, ¶ 24. A reasonable observer might have inferred that since $10.9 million was deduced from ERISA subclass recovery, ERISA counsel were paid that amount. Instead, Lieff and the other Customer Class Counsel firms redistributed the surplus among themselves. Dkt. 357 at 85.

because this Court found Lieff's performance "deficient." Dkt. 590 at 123. In fact, the Court *rejected* suggestions by the Master (and CCAF) to sanction the other class counsel firms. Dkt. 590 at 64, 86. Although the Court considered conduct in setting an overall fee award, the Court noted it was "neither imposing sanctions nor denying a fee award to any attorney or firm because of misconduct." Dkt. 590 at 86.

Lieff may have no appellate issue at all under circuit law because "a jurist's derogatory comments about a lawyer's conduct, without more, do not constitute a sanction." *In re Williams*, 156 F.3d 86, 92 (1st Cir. 1998) (finding no jurisdiction to review order that found misconduct by annulled sanctions for technical reasons). Even if its Rule 11 arguments are colorable, no substantial question *regarding Lieff's award* exists on appeal. This is analogous to *Boston Taxi Owners Ass'n v. City of Boston*, one of the cases Lieff relies on. 187 F. Supp. 3d 339, 342 (D. Mass. 2016). There, the court denied stay even though appellant's legal issues were "neither elementary nor well-established," because qualified immunity precluded damages even if appellant prevailed on appeal. *Id.* Likewise, even if Lieff raises interesting questions about the limits of Rule 11, this won't entitle Lieff to a larger fee because Lieff cannot prove the Court lied about declining monetary sanctions.

Unless Lieff more directly challenges the attorneys' fee award, its mischaracterization of the Fee Order preclude recovering additional attorneys' fees from the class. To the extent the appeal presents no serious or substantial legal issue *as to Lieff's fee award*, stay ought to be denied even if irreparable harm could be shown. *See SEC v. Biochemics, Inc.*, 435 F. Supp. 3d 281, 297 (D. Mass. 2020).

## V.      Lieff double-counts its selfish interests as the public interests.

Lieff argues that the "public interest" disfavors stays where "it is unlikely that an appellee will be able to recover funds in the event of reversal." Mot. 12. But this is incorrect.

Examining the public interests requires "gauging 'consequences beyond the immediate parties.'" *S.S. Body Armor I, Inc. v. Carter Ledyard & Milburn LLP*, 927 F.3d 763, 772 (3d Cir. 2019). Here, the public interests favor the (likely millions) of innocent fund beneficiaries throughout the country much more than Lieff's partners.

Lieff misreads the cases it cites on this factor. The first cited case actually concerns "the broader public interest vis-a-vis New York State taxpayers," in an appeal where *non-party taxpayers* have an interest in payment. *Cayuga Indian Nation of N.Y. v. Pataki*, 188 F. Supp. 2d 223, 252 (N.D.N.Y. 2002). Lieff's second citation for its dubious proposition expressly found that the requested "stay would have little impact on the public interest. *Miller v. LeSea Broad.*, 927 F. Supp. 1148, 1152 (E.D. Wis. 1996). Lieff cannot double-count its selfish interests (already counted under the second *Hilton* factor) as also being in the public interest.

## VI.     Class members have an interest in the money Lieff hopes to win from them.

To the extent that the Court finds Lieff does not satisfy the first two *Hilton* factors for securing a stay on appeal, the Court need not consider the remaining two factors. *Nken v. Holder*, 556 U.S. at 435; *S.S. Body Armor I*, 927 F.3d at 775 (deciding against the first legal issue factor is fatal to granting stay to attorneys who sought larger fee prior to distribution of money from bankruptcy estate).

That said, the remaining factors—the interests of other parties and public interests—militate against Lieff's Motion. Class members would necessarily be harmed by the delay.

Lieff suggests in some places that no "party" (except maybe ERISA counsel) would be adversely effected by withholding its imagined $1.1 million fee award. Mot. 2, 6-7.[2] This is a callous assertion from lawyers who owe the class a fiduciary duty. Whether class members are

---

[2] Lieff mentions the failure of any appellee to file a response brief to its first appeal, Mot. 1, 6, but the First Circuit had already stayed briefing before the due date, so CCAF does not understand why Lieff thinks it significant.

an "interested party" doesn't matter: to the extent they are not for some reason, class interests are instead public interests.

Withholding money from distribution, as Lieff proposes, necessarily harms the class members asked to effectively extend Lieff a $1,139,457 loan. The delay alone unconscionably adds insult to the injury that caused by the four-year delay in administration necessitated by Lieff's own conduct—including its failure to disclose documents and knowledge it possessed about the Chargois arrangement. Dkt. 357 at 119.

If $1,139,457 is withheld from the second distribution to the class, this will likely force an additional small distribution to class members, which is against their interests. If money is artificially held back from distribution, it will not be economically feasible to distribute the money to some class members. Withholding $1.1 million has at least four negative effects on the class:

1. The difference in fund amount would cut off at least a dozen class members otherwise entitled to a check in the second distribution.

2. Withholding money obviously holds $1.1 million to a third distribution, forcing class members to wait another year to cash even smaller checks.

3. Presuming the residual fund is not much more than $1.1 million after Lieff's appeal, the majority of class members would *not* receive a third check at all because their proportional recognized losses would be too small.

4. Even for class members with large claims, receiving increasingly small checks imposes real administrative costs.

Whereas the vast majority of class members could be paid additional amounts in the second distribution due to the presumably significant corpus of residual funds from the 5% reserve and repayments from Thornton and Labaton, adopting Lieff's escrow would freeze out nearly half the class from the third distribution. Lieff argues that this problem is speculative (Mot. 14), but in fact it's much less speculative than Lieff's claimed irreparable harm. The distributions of loses by class members is smooth; no sharp break in dollar amounts exists, so

withholding $1.1 million or even $565,000 from the second distribution will result in accounts that would otherwise be sent second checks falling below the $10 threshold.[3] Under the plan of distribution they will never be paid again.

Lieff argues that *other* class members will still receive the $1.1 million if it's distributed. True, but the distributional consequences are real. Large funds to get disproportionate payments relative to funds who are frozen out of subsequent rounds. Besides, even class members with large claims would not favor this result. Public pension funds are is not indifferent to receiving fewer checks worth more money and many checks worth little money. The class would clearly prefer fewer, larger checks—even before considering the higher administrative costs involved, which Lieff still conspicuously does not offer to pay.

Lieff argues that CCAF incorrectly assumes no residual funds will exist to distribute along with "their" $1.1 million, but this isn't so. If the residual amount were significant enough to cause a subsequent round of checks, Lieff would have little prejudice. Lieff points to the *BoNY Mellon* example, which included three distributions: first for $375 million (with a larger 10% reserve than in that case), second for $52 million, and a third distribution for just $1.46 million. Dkt. 668-1 at ¶¶ 4-6. The *State Street* settlement started from a smaller initial distribution and includes a smaller reserve, so likely the residual after the second distribution will be smaller than *BoNY Mellon*'s and CCAF's concerns about distribution equity apply.

---

[3] CCAF is not quite sure about the timing of the checks from the Settlement Administrator. CCAF understands that the first round of checks was sent by October because the Court summarized this occurring and no party disagreed. Dkt. 642 (Tr.) at 6-7. Last summer, the Administrator wrote that the second distribution would occur by March 30, 2021. Dkt. 629, ¶ 28. But CCAF is not confident about this date because it sits awkwardly between the two dates on the Second Revised Payment Plan indicated as dates funds would be distributed to the class—February 10 and April 30. Dkt. 662-1. Given that checks to the class will have a 90-day expiration dates, these disbursement dates need not be so close together; there should need only be one distribution this spring.

Lieff's Motion itself betrays that they don't believe a large residual will remain for "years" as they alternatively argue. Mot. 13. If it were likely, not only would there be no irreparable harm, Lieff would feel no need to file their Motion.

Lieff cavalierly volunteers thousands of long-waiting class members to wait some more for its convenience. Whether counted as "parties" or the "public interest," the class members' interests militate against granting stay. "The interests of the multitude of other parties in this class action litigation weigh heavily against a stay." *In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*, No. 08 MDL 1963, 2014 U.S. Dist. LEXIS 131315, at *18 (S.D.N.Y. Sep. 5, 2014) (denying stay to class members contesting their share because it would "delay payment to Authorized Claimants who are owed Settlements with the remaining 10% reserve").

**VII.    Even if recovery must come from the class and only the class, and even if little residual remains in the common fund, Lieff's harm is still not irreparable.**

Finally, Lieff incorrectly claims that "[r]ecovering those funds from the Class, once distributed, will be impossible." Mot. 12. As Lieff's contradictory argument about "years"-long administration suggest (*see* Section II), some residual money *will* remain in the common fund. Recovering the balance of Lieff's hypothetical "sanction" from its privately-negotiated fee award would not be difficult. Lieff can recover additional funds for the class from Chargois and thereby secure its own fee. As a last resort, Lieff could even collect from class members.

If the residual is inadequate, Lieff has a more appropriate target for collections than its own absent clients: Damon Chargois. Lieff agreed that 5.5% of its Customer Class Counsel fee award share should be diverted to Chargois. Dkt. 357 at 105. Lieff's contribution was $1 million. Dkt. 590 at 27. In the unlikely event that the First Circuit finds the "reduction" of Lieff's fee award untenable, Lieff could still be made whole by seeking to enforce an order clawing back $1 million of the undeserved payment to Mr. Chargois.

"The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

## CONCLUSION

The Court's (and Special Master's) revisions to the Payment Plan make sense due to changed circumstances. While CCAF does not know relevant details about settlement administration, which may moot Lieff's motion or make it more compelling, the factors appear to lean against granting stay. Even if more fees were awarded to Lieff, the Special Master correctly observed: "[s]uch relief should not be re-captured from monies paid to the class members" (Dkt. 636 at 3), and Lieff cannot show irreparable harm in now paying the trustworthy ERISA firms. Lieff's appeal gives no reason to restore an award it took for itself through undisclosed deals, and so the stay does not relate to any substantial issue on appeal. Class interests weigh in favor of distribution, and the "years" of administration Lieff touts proves its appeal will not be moot, even if Lieff could somehow prove this Court was lying when it declined to impose monetary sanctions.

Make no mistake: Lieff is litigating directly against the interests of their own putative clients, and no public interest supports this.

Respectfully submitted,

Dated: February 8, 2020                     /s/ M. Frank Bednarz
                                            M. Frank Bednarz (BBO No. 676742)
                                            HAMILTON LINCOLN LAW INSTITUTE
                                            CENTER FOR CLASS ACTION FAIRNESS
                                            1145 E Hyde Park Blvd. Unit 3A
                                            Chicago, IL 60615
                                            Telephone: 801-706-2690
                                            Email: frank.bednarz@hlli.org

                                            Theodore H. Frank (*pro hac vice*)
                                            HAMILTON LINCOLN LAW INSTITUTE
                                            CENTER FOR CLASS ACTION FAIRNESS
                                            1629 K Street NW
                                            Suite 300
                                            Washington, DC 20006
                                            Telephone: 202-331-2263
                                            Email: ted.frank@hlli.org

                                            *Attorneys for Amicus Curiae*
                                            *Hamilton Lincoln Law Institute*
                                            *Center for Class Action Fairness*

## CERTIFICATE OF SERVICE

I certify that on February 8, 2020, I served a copy of the forgoing on all counsel of record by filing a copy via the ECF system.


Dated: February 8, 2020

/s/ M. Frank Bednarz
M. Frank Bednarz