UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ARKANSAS TEACHER RETIREMENT SYSTEM, on )
behalf of itself and all others )
similarly situated, )
    Plaintiff )
)
                         ) C.A. No. 11-10230-MLW
      v. )
)
STATE STREET BANK AND TRUST COMPANY, )
    Defendants. )

ARNOLD HENRIQUEZ, MICHAEL T. COHN, )
WILLIAM R. TAYLOR, RICHARD A. )
SUTHERLAND, and those similarly )
situated, )
    Plaintiff )
)
      v. ) C.A. No. 11-12049-MLW
)
STATE STREET BANK AND TRUST COMPANY, )
    Defendants. )

THE ANDOVER COMPANIES EMPLOYEE SAVINGS )
AND PROFIT SHARING PLAN, on behalf of )
itself, and JAMES PEHOUSHEK-STANGELAND )
and all others similarly situated, )
    Plaintiff )
)
)
      v. ) C.A. No. 12-11698-MLW
)
STATE STREET BANK AND TRUST COMPANY, )
    Defendants. )

MEMORANDUM AND ORDER

WOLF, D.J.                       March 12, 2021

.

**TABLE OF CONTENTS**

I.    SUMMARY.................................................... 1

II.   PERTINENT HISTORY......................................... 9

III.  THE FEBRUARY 27, 2020 ORDER.............................. 23

IV.   ORDERS CONCERNING DISTRIBUTIONS TO ERISA COUNSEL AND
      THE CLASS................................................ 30

V.    STANDARDS FOR ISSUANCE OF A STAY PENDING APPEAL.......... 33

VI.   ANALYSIS................................................. 35

      A.   The Likelihood of Success on the Merits ............ 35

      B.   Irreparable Harm ................................... 49

      C.   The Balance of Hardship and the Public Interest .... 52

VII.  ORDER.................................................... 54

I.   SUMMARY

In this class action, the court initially awarded attorneys'
fees  in  the  amount  of  $75,000,000,  which  was  25%  of  the
$300,000,000  common  fund.     However,  Class  Counsel  -  Labaton
Sucharow LLP ("Labaton"), The Thornton Law Firm ("Thornton"), and
Lieff Cabraser Heimann & Bernstein, LLP ("Lieff") - soon reported
that they had inadvertently overstated their collective lodestar,
which  the  court  used  to  test  the  reasonableness  of  their
$75,000,000 fee request, by more than 9300 hours and $4,000,000.
A  subsequent  <u>Boston  Globe</u>  article  raised  additional  serious
questions concerning the reliability of representations that had
been made in that request.

Therefore, the court vacated the $75,000,000 fee award, and
appointed  a  Master  to  investigate  the  matter  and  to  make
recommendations regarding the new fee award the court would make.
In his investigation, the Master discovered that Labaton had, in
violation of the Massachusetts Rules of Professional Conduct, made
a $4,100,000 referral fee to a lawyer who did no work on this case,
but had used political influence to obtain plaintiff and class
representative  Arkansas  Teacher  Retirement  System  ("Arkansas
Teacher") as a client for Labaton.   Lieff contributed $1,000,000
to that payment.

The Master filed a lengthy Report and Recommendations (the
"Report").   He recommended that the court again award $75,000,000

in fees, but order that Labaton, Thornton, and Lieff "disgorge" about $10,000,000 to be distributed to the class they represented and to counsel for a separate class of ERISA pension plans ("ERISA Counsel"). Numerous objections to the Report were filed.

In June 2019, the court held hearings to decide de novo the objections and the amount to award in attorneys' fees. Among other traditional considerations, the court informed counsel that it would consider, as a public policy factor, whether false or misleading statements had been made by Class Counsel when advocating for the initial $75,000,000 fee award and, if so, where within the reasonable range the award should be made. At those hearings, Richard Heimann of Lieff argued for all Class Counsel that the court should again award $75,000,000, but did not contest the court's authority to take any misconduct of counsel into account in deciding the amount to award.

On February 27, 2020, the court issued a 162-page Memorandum and Order explaining its decision to make a new award of $60,000,000 in attorneys' fees (the "February 27, 2020 Order"). It wrote that:

> On closer scrutiny, the court has decided that even absent the serious, repeated misconduct of Labaton and Thornton, an award of less than 25% of the common fund would be most appropriate. However, for the reasons described in detail in this Memorandum, in this equitable proceeding it is permissible and appropriate to take that misconduct into account in awarding and allocating attorneys' fees.

2

Feb. 27, 2020 Order (Dkt No. 590) at 28; see also id. at 126 (emphasis added).  Although the court found that Lieff's performance was "deficient" in certain respects, see id. at 148, those deficiencies were not material to the court's decision to award $60,000,000.  In addition, in deciding to award $60,000,000, the court wrote that it was:

> Neither imposing sanctions nor denying a fee award to any attorney or firm because of misconduct.  It [was], however, considering such misconduct in deciding where within the reasonable range to make a total fee award and how to allocate the total award among counsel.

Id. at 86.

The court allocated about $10,000,000 to ERISA Counsel.  See id. at 146.  It then allocated about $15,000,000 to Lieff.  See id. at 148-149.  This was $2,500,000 more than the Master recommended that Lieff be awarded, but about $1,140,000 less than Lieff had received from the original fee award.  See id. at 162.  Lieff is appealing the exercise of the court's inherent equitable authority in deciding to award $60,000,000 in attorneys' fees and its allocation from that award to Lieff.  See Notice of Appeal, Dkt. No. 644.

The court awarded Labaton about $9,000,000 less than it recovered from the original fee award and Thornton about $6,000,000 less.  See Feb. 27, 2020 Order at 162.  Labaton and Thornton are not appealing either the new fee award or the amount of it allocated to each.

The court ordered Labaton, Thornton, and Lieff to escrow the funds to be redistributed.  See Dkt. Nos. 662, 679.  It also ordered a schedule for the escrowed funds to be transferred to the settlement administrator for distribution in two installments to ERISA Counsel and the class.  See Dkt. Nos. 662-1, 679-1.  Lieff has made the required escrow.  However, it has moved for a stay of the distribution of its escrowed funds pending a decision on its appeal.  See Dkt. Nos. 662-1, 679-1.  Labaton and Thornton support Lieff's request for a stay.  See Dkt. Nos. 674, 675.  The Master and Center for Class Action Fairness ("CCAF") as amicus oppose it.  See Dkt. Nos. 676-677.  For the reasons explained in this Memorandum, Lieff's motion for a stay is being denied.

Deciding a motion for a stay requires an exercise of the court's equitable discretion.  See Common Cause Rhode Island v. Gorbea, 970 F.3d 11, 15-16 (1st Cir. 2020).  As the First Circuit has written:

> [I]n cases involving stays of actions pending appeal, we are guided by consideration of four factors: (1) whether the applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent relief; (3) whether issuance of relief will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.  [Nken v. Holder, 129 S.Ct. 1749, 1761 (2009)] (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)).

> The first two factors are the most critical.  Both require a showing of more than mere possibility. Plaintiffs must show a strong likelihood of success, and they must demonstrate that irreparable injury will be

4

likely absent an injunction.  <u>Winter v. Natural Res.</u>
<u>Def. Council, Inc.</u>, 129 S.Ct. 365, 375-76 (2008).

<u>Respect Maine PAC v. McKee</u>, 622 F.3d 13, 15 (2010); <u>see also</u> <u>Common</u>
<u>Cause Rhode Island</u>, 970 F.3d at 14 (same).

Lieff has stated that it intends to raise the same issues in the pending appeal that it raised in the brief it filed in the First Circuit before its initial appeal was dismissed without prejudice.  Lieff has not made the essential strong showing that it is likely to prevail on any of those issues.

The factual findings Lieff challenges are each supported by substantial evidence that is cited in the 162-page February 27, 2020 Order.  The heart of Lieff's argument is that the court sanctioned it for violating Federal Rule of Civil Procedure 11(b) without giving it the notice required by Rule 11(c)(3).  However, the court expressly stated that it was not imposing sanctions. Rather, having vacated the original fee award, the court took into account the proven misconduct of Labaton and Thornton in deciding to make a new fee award of $60,000,000.  Neither Lieff nor any other firm argued to this court that it would be impermissible for it to take this approach.  Lieff has not made a strong showing that it is likely to prove that the court abused its discretion in doing so, awarding $60,000,000, and allocating $15,000,000 to Lieff.

In addition, even assuming without suggesting that awarding Lieff less than it originally received was a "sanction," Lieff has not made a strong showing that it is likely to prove that it was a Rule 11 sanction. As the Supreme Court in Chambers v. NASCO, Inc., 501 U.S. 32 (1991), and the 1993 Advisory Committee Note to Rule 11 explain, Rule 11 is not the exclusive basis for imposing sanctions. A court may exercise its inherent powers to impose a sanction if it provides notice and an opportunity to be heard, both of which Lieff received in this case.

Lieff has also not made the required strong showing that it will be irreparably harmed if a stay is not granted. If Lieff prevails on appeal, it intends to ask the First Circuit to reduce the amount provided to the class, rather than require that Labaton and Thornton reimburse it. However, Lieff itself asserts that it is common in cases involving hundreds of millions of dollars for the distribution of a settlement fund to take two or three years. Therefore, it has not made a strong showing that there will not be $1,140,000 available if it prevails on appeal and the First Circuit orders that the award to the class be reduced by that amount.

More significantly, if Lieff prevails on appeal, Labaton and Thornton should be ordered to reimburse it. Contrary to Lieff's contention, the court would not have ordered $61,140,000 in attorneys' fees if it had not found deficiencies in Lieff's performance. The repeated, egregious misconduct of Labaton and

6

Thornton alone caused the court to decide that it was most appropriate to award $60,000,000.  If the court had allocated an additional $1,140,000 to Lieff, it would have reduced the awards to Labaton and Thornton by that amount.  Therefore, it is likely that Labaton and Thornton will be required to bear the cost if Lieff prevails on appeal and there is no reason to find that they will be unable to do so. [1]

In view of the failure of Lieff to make a strong showing of both the likelihood of success and irreparable harm, its request for a stay must be denied.  However, the balance of hardship also favors denying a stay.  Lieff will not be irreparably harmed in the absence of a stay.  However, if a stay is granted, at a minimum distributions to the class will be further delayed and, if Lieff's escrowed funds are not distributed with Labaton and Thornton's, some class members may have claims too small to receive anything

---

[1] As more fully explained _infra_, Lieff's conduct was not material to the court's decision to award $60,000,000 in attorneys' fees and if Lieff prevails on appeal Labaton and Thornton should be required to reimburse it rather than the class.  If the court had anticipated Lieff's claim on appeal that the award to it should be increased by $1,140,000, and that cost should be imposed on the class, rather than Labaton and Thornton, the court would have ordered Labaton and Thornton to escrow that amount pending a decision on Lieff's appeal.  The court understands that the pendency of the appeal deprives it of the authority to issue such an order now.  See Fed. R. Civ. P. 62.1(a).  However, if the First Circuit remands this case for that limited purpose, the court will do so.  See Fed. R. Civ. P. 62(c).

from the distribution of Lieff's funds alone.  Moreover, ERISA Counsel have been working on this case since 2011 and should not have to wait longer to be fully compensated.

Finally, the public interest weighs against granting a stay.  Lieff chose to join Labaton and Thornton as Class Counsel in this case.  The three firms remain allied, as Labaton and Thornton support Lieff's motion for a stay and Lieff does not seek compensation from them if it prevails on appeal.  The deficiencies in Lieff's performance all related to the egregious misconduct of Labaton and Thornton.  It might be expected that Lieff would now seek to distance itself from Labaton and Thornton, and to advocate that they should compensate Lieff if it prevails on appeal.  Instead, Lieff insists that the class should bear that cost.

As Lieff has not made a strong showing that it is likely to prevail on appeal or that it will be irreparably harmed if a stay is not granted, it would be abuse of this court's discretion to grant a stay. However, if the court had the discretion to do so, it would not be in the public interest to grant a stay and thus abet the perception that Lieff could benefit from an exercise of the court's equitable authority while seeking to advance the economic interests of Labaton and Thornton at the expense of the class it was appointed to represent.

8

Therefore, Lieff's Motion to stay pending appeal is being denied. However, in order to provide the First Circuit an ample opportunity to consider Lieff's possible appeal of this decision, the court will not order the distribution of Lieff's escrowed funds until at least 14 days after the First Circuit decides that appeal. To facilitate planning, Lieff is being ordered to report, by March 22, 2021, whether it intends to appeal this decision denying a stay.

## II.  PERTINENT HISTORY

The history of this matter is summarized at the beginning of the February 27, 2020 Order, and described fully in that decision. See Dkt. No. 590 at 3-31. Facts most pertinent to Lieff's Motion to Stay include the following.

This case alleging fraud by State Street Bank and Trust Company ("State Street") with regard to commissions on foreign exchange transactions was brought as a putative class action in 2011. See Complaint (Dkt. No. 1). At the outset of the case, as requested by the three firms in a memorandum "Respectfully Submitted" by each of them, the court appointed Labaton as Interim Lead Counsel, Thornton as Liaison Counsel, and Lieff as additional counsel for plaintiff and a proposed class of customers of State Street. See Dkt. Nos. 8, 28. In their memorandum in support of their request for appointment the three firms characterized themselves as "Plaintiffs' Counsel." See, e.g., Dkt. No. 8 at 4,

9

5, 9.   Throughout this litigation, Labaton, Thornton, and Lieff acted as single unit, characterizing themselves collectively as "Customer Class Counsel," and the names of each firm, and of attorneys for each firm, were typed on the signature pages of submissions to the court on behalf of the class they represented.[2]

In 2016, the parties moved for approval of a $300,000,000 settlement and for an award of attorneys' fees to all plaintiffs' counsel of about twenty-five percent of that common fund – approximately $75,000,000.   At August 8 and November 2, 2016 hearings, the court stated that because the adversary system was not then operating, it was relying heavily on the representations of plaintiffs' counsel.   See Feb. 27, 2020 Order at 40, 46; Aug. 8, 2016 Tr. (Dkt. No. 93) at 41; Nov. 2, 2016 Tr. (Dkt. No. 114) at 35.

A memorandum in support of the request for an award of $75,000,000 as attorneys' fees was "Respectfully Submitted" by

---

[2] The Order appointing Labaton, Thornton and Lieff stated that Labaton would have "sole authority" for plaintiffs over, among other things, "briefing and argument of all motions." Dkt. No. 28 at 5.   This did not prohibit filings from being jointly submitted by all three firms or prohibit Lieff from arguing motions on behalf of all three firms.   As explained below, in June 2019, Mr. Heimann of Lieff argued for all three firms that the characterization of a study of attorneys' fees awards by Professor Brian Fitzpatrick (the "Fitzpatrick Study") in the memorandum in support of the request for an award of $75,000,000 of attorneys' fees was not misleading and that the court should again award $75,000,000.

10

Labaton, Thornton, and Lieff, and named attorneys in each firm, including Lieff. See Dkt. No. 103-1 at 28-29.  On the signature line "/s/ Lawrence A. Sucharow" was typed.  Lieff reviewed the memorandum before it was filed.  See Feb. 27, 2020 Order at 125; Lieff's Obj. to Master's Report (Dkt. No. 367) at 33.  Lieff also reviewed and suggested revisions to Sucharow's 48-page declaration attesting to the accuracy of each firm's fee declarations (Dkt. No. 104), and authorized Labaton to represent that Lieff was one of the firms making that submission.  See Feb. 27, 2020 Order at 125. 32 exhibits, comprising 731 pages, were filed with Sucharow's declaration.  See Dkt. No. 104.  Several volumes of records in support of the fee request were filed as well.  The Fitzpatrick Study was Exhibit 31, at pages 682 to 718 of the Exhibits.  See Dkt. No. 104-31.

At the November 2, 2016 hearing, the court approved the proposed $300,000,000 settlement.  See Nov. 2, 2016 Tr. at 35:6 - 37:3.  As indicated earlier, with regard to attorneys' fees, the court stated that it was "relying heavily on [counsel's] submissions and what [had] been said" at the hearing.  Id. at 35:4-6 (emphasis added).  The court stated that it had "used the percentage of common fund method" and the lodestar cross-check, and found counsels' request to be reasonable.  Id. at 35:6-36:18. Therefore, the court awarded $75,000,000 in attorneys' fees.

11

However, "the evolution of events [after] November 2, 2016 demonstrated that the court's assumptions in awarding fees were incorrect in material respects.  Many of the representations made to the court in support of the request for attorneys' fees by Labaton and Thornton, and to a lesser extent by Lieff, were untrue."  Feb. 27, 2020 Order at 9.

Inquiries by the media prompted Labaton to inform the court that Labaton, Thornton, and Lieff had inadvertently inflated their collective lodestar by more than 9300 hours and more than $4,000,000.  Id.  The lodestar had been inflated because "Thornton, Labaton, and Lieff had entered into an unusual arrangement that allowed Thornton to pay for staff and contract attorneys employed by Labaton and Lieff, and to claim them on its lodestar for the purpose of allocating among themselves attorneys' fees awarded by the court."  Feb. 27, 2020 Order at 90.  "Thornton demanded this arrangement because as [Thornton partner] Garrett Bradley wrote his partners, it was 'the best way to jack up the loadstar,' [sic] and thus give Thornton a claim to a larger percentage of the foreseeable future fee award to be shared with Lieff and Labaton."  Id. (quoting Feb. 6, 2015 email from Bradley).  Lieff evidently agreed to this arrangement because Thornton brought Lieff into this case, and "Lieff [] wanted to maintain a good relationship with Garrett Bradley and Thornton to enhance the likelihood that they would bring Lieff into future lucrative cases. . . ."  Id. at

12

91.   The hours worked by 23 temporary "staff attorneys" had been included in the lodestar reports of more than one firm.   Id. at 46-7.   In some instances, different billing rates had been attributed to the same attorneys by different firms.   Id. at 47.

A subsequent Boston Globe article raised additional questions about the reliability of representations made concerning the regular hourly rates counsel used to calculate the lodestar.   See id. at 10, 47-48.   For example, in a sworn declaration Garrett Bradley represented that his brother Michael was employed by Thornton and that the regular rate charged for his services was $500 an hour.   Id. at 48.   However, the article reported without contradiction that "'Michael Bradley . . . normally works alone [and] often mak[es] $53 an hour as a court-appointed defender in the Quincy District Court.'"   Id. (quoting Dec. 17, 2016 Boston Globe article, Dkt. No. 117, Ex. B).[3]

A second Boston Globe article raised additional questions concerning whether campaign contributions by Labaton and Thornton attorneys, and political influence exercised by Garrett Bradley,

_____

[3] In the February 27 Order, the court found that Michael Bradley was not employed by Thornton, did not regularly charge $500 an hour for his services, and, indeed, had never charged that much.   See Feb. 27, 2020 Order at 55, 89-90.   Garrett Bradley's many false statements under oath, made in a declaration he did not read before signing, constituted misconduct that contributed to the court's decision not to award more than $60,000,000 in attorneys' fees.   See id. at 127-129.

who was also the Assistant Majority Leader of the Massachusetts House of Representatives, had been used to obtain the Massachusetts Plymouth County Pension fund and the state pension funds as plaintiffs in class actions in which Labaton and Thornton received more than $100,000,000 in attorneys' fees while the pension funds received only a total of about $720,000.  See id. at 48-52.

These issues prompted the court to appoint, with the consent of the parties, Retired United States District Judge Gerald Rosen as a Special Master.  See Mar. 8, 2017 Order (Dkt. No. 173).  The court also vacated the $75,000,000 fee award.  See Dkt. No. 331.

The Master's investigation became protracted when he discovered that Labaton had paid $4,100,000, constituting about 5.5% of the $75,000,000 fee award, to Damon Chargois.  Id. at 59.  Thornton and Lieff subsidized this payment.  Id. at 27, 117-118.  Chargois was a Texas lawyer, who had done no work on this case.  Id. at 59. However, in 2007, he and his partner in Arkansas, Tim Herron, had been instrumental in obtaining Arkansas Teacher as a client for Labaton.  Id.  In return, Labaton agreed to provide Chargois 20% of any fee it received from representing Arkansas Teacher in a class action.  Id. at 61.  As Chargois explained in a message to Labaton:

> Our deal with Labaton is straightforward — we got you ATRS as a client (after considerable favors, political activity, money spent and time dedicated in Arkansas) and Labaton would use ATRS to seek [L]ead [C]ounsel appointments in institutional investor fraud and

**14**

>misrepresentation cases.  Where Labaton is successful in
>getting appointed [L]ead [C]ounsel and obtains a
>settlement or judgment award, we split Labaton's
>attorney fee award 80/20.  Period.

Id. (quoting Email from Chargois to Eric Belfi (Oct. 18, 2014), R.
& R. Ex. 177 (Dkt. No. 401-176).

The payment to Chargois was an impermissible referral fee,
made by Labaton in violation of Massachusetts Rule of Professional
Conduct 7.2(c).  Id. at 108-23.[4]  That payment was not disclosed
to Arkansas Teacher, ERISA Counsel, or the court.  Id. at 24.  The
failure to disclose it to Arkansas Teacher and ERISA counsel was
also a violation of Massachusetts Rules of Professional Conduct.
Id. at 107-17.  "Lieff knew or should have known Chargois did not
do any work on this case and should have at least suspected that
the payment was improper."  Id. at 24; see also id. at 118.
Nevertheless, Lieff agreed to contribute $1,000,000 of the fee it
would have otherwise received to the payment to Chargois.  Id. at
118.  It did not encourage Labaton to disclose the payment to
Arkansas Teacher, ERISA counsel, or the court.  Id. at 123.

In May 2018, the Master filed his 377-page Report and
Recommendations, and an Executive Summary of it.  See Dkt. Nos.

---

[4] Garret Bradley helped Labaton persuade Chargois to accept
less than 20% of the more than $31,000,000 Labaton received from
the original $75,000,000 fee award.  See Feb. 27, 2020 Order at
23-24.

224, 224-1 (the "Report"). In his Report the Master found the original $75,000,000 fee award to be reasonable. See Feb. 27, 2020 Order at 63. However, he recommended that Labaton, Thornton and Lieff be ordered to "disgorge" approximately $10,000,000. See id. at 63. If adopted, the Master's recommendations would have reduced Labaton's compensation from about $32,000,000 to about $26,000,000; Thornton's compensation from about $20,000,000 to about $17,000,000; and Lieff's compensation from about $16,000,000 to about $13,000,000. See id. at 14. The Master also recommended that additional payments be made to ERISA Counsel in part to compensate them for the cost of participating in the proceedings after the original fee award that were prompted by the conduct of Class Counsel. See id. In addition, the Master recommended that some of the funds "disgorged" by Class Counsel go to the class. See id.

The Master also recommended that sanctions in the amount of $400,000 to $1,000,000 be imposed on Thornton pursuant to Federal Rule of Civil Procedure 11 because of sworn statements the Master found to be knowingly false. See Report at 364-65. He also recommended that Garrett Bradley be referred to the Massachusetts Board of Bar Overseers for disciplinary action for violating Rule 3.3 of the Massachusetts Rules of Professional Conduct. See Report at 364-65.

Numerous objections to the Report were filed. Among other things, Thornton argued that sanctions could not be imposed on it pursuant to Rule 11 because the claims between State Street and the class had been settled, judgment on them had been entered, and Rule 11(c)(3) provides that a monetary sanction cannot be imposed unless the court issued a show-cause order before settlement. See Dkt. No. 446-1 at 66-67.

The court scheduled hearings to commence June 24, 2019 on the objections to the Master's Report. See May 31, 2019 Order (Dkt. No. 543). In its Order, the court explained that rather than addressing the many discrete objections to the Report, it intended to hear argument on certain matters relevant to whether it should again award $75,000,000 as attorneys' fees or a different amount. Id.

One of those questions, whether the description of the Fitzpatrick Study in the 2016 memorandum in support of the request for attorneys' fees was false or misleading, had not been addressed in the Master's Report. Therefore, the court gave the parties notice that it intended to hear argument on this question and consider it in deciding the amount of attorneys' fees to award. Id. More specifically, on May 31, 2019, the court wrote:

> At present, the court intends to proceed as follows at the hearing commencing on June 24, 2019:
>
> (1) Hear argument on whether the initial fee award of $74,541,250, constituting approximately 25% of the

17

common fund, is reasonable.   Among other things, the participants shall be prepared to address whether Customer Class Counsel misrepresented a study in their memorandum in support of attorneys' fees.   See Dkt. No. 103-1 at 18 of 36 (citing Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical Legal Stud. 811 (2010)).

Id. at 2-3.

The issue of whether Class Counsel had misrepresented the Fitzpatrick Study in the memorandum in support of the motion for attorneys' fees was first raised by CCAF on February 17, 2017, when it moved to be appointed amicus or guardian ad litem for the class.   See Dkt. No. 126-1 at 11; see also Dkt. No. 125-2 at 3. CCAF then asserted that Class Counsel "asking for 24.85% while misrepresenting the Fitzpatrick report as class counsel did [was] . . . abusive and objectionable." Dkt. No. 125-2 at 3.   Following the Master's Report, in advocating for a new fee award of no more than 17% of the common fund, CCAF explained why it was "disappointed that the Special Master did not question Class Counsel about their misrepresentation of [the] Fitzpatrick [Study]." See Dkt. No. 522 at 2-4, 22-24.

As the court ultimately concluded in the February 27, 2020 Order:

> In the memorandum in support of the request for a $75,000,000 award, signed by Sucharow for Labaton, and also represented to have been signed by partners of Thornton and Lieff, Labaton provided a misleading description of a prominent study by Brian Fitzpatrick. See Brian T. Fitzpatrick, "An Empirical Study of Class Action Settlements and Their Fee Awards," 7 J. Empirical

18

Legal Stud. 811 (2010) (the "Fitzpatrick Study").
Labaton accurately reported that Fitzpatrick had found
that the mean and median fees awarded in 444 common fund
settlements were 25.7% and 25%. Sucharow argued that,
therefore, "[t]he 24.85% fee requested [in this case] is
right in line with Professor Fitzpatrick's findings."
Dkt. No. 103-1, at 17-18 of 36.

However, Sucharow did not disclose other findings from
the Fitzpatrick Study that undermined his argument, as
was required by the Massachusetts ethical rules that
deem applications for attorneys' fees to be ex parte
proceedings in which lawyers must disclose all material
facts even if some of them are adverse to the attorneys'
interests. See Mass. R. Prof. C. 3.3 cmt. 14A.[5] More
specifically, Sucharow did not disclose that Fitzpatrick
had written that: "fee percentage is strongly and
inversely associated with settlement size . . . ; [when]
a settlement size of $100 million was reached . . . fee
percentages plunged well below 20 percent." Fitzpatrick
Study, supra, at 837-38. Nor did Sucharow reference
Fitzpatrick's finding that in settlements between
$250,000,000 and $500,000,000, the mean fee award was
17.8% and the median award was 19.5%. See id. at 839.
It was, therefore, misleading for Sucharow to assert
that the 25% award being requested in this case was
"right in line with Professor Fitzpatrick's findings."

Dkt. No. 590 at 20-22; see also id. at 104-107 (emphasis added).[6]

---

[5] The Massachusetts Rules of Professional Conduct deem a
petition to approve the settlement of a class action to be an ex
parte proceeding. See Mass. R. Prof. C. 3.3 cmt. 14A; Feb. 27,
2020 Order at 5, 121.

[6] The court wrote that the memorandum was represented to have
been signed by Lieff, as well as Labaton and Thornton. Lieff
argues in its original June 29, 2020 Appellate Brief that only
Sucharow's name is on the signature line. See Lieff's June 9,
2020 Appellate Brief at 52. However, the memorandum states that
it was also "Respectfully Submitted" by Lieff and identified
lawyers of the firm. See Dkt. No. 103-1 at 28-29. As explained
in footnote 13 below, if the court had imposed a Rule 11 sanction
on Lieff – which it did not - for the purposes of the appeal it

19

In a footnote to the foregoing summary concerning the finding

that the characterization of the Fitzpatrick Study was misleading,

the court wrote:

> A table in the Fitzpatrick Study reported that for
> settlements between $250,000,000 and $500,000,000, there
> was a standard deviation of 7.9%. Id. at 839. However,
> Sucharow did not mention this fact either. If Sucharow
> had disclosed this finding, he could have argued that a
> 25% award would be within the range of the standard
> deviation and, therefore, reasonable. The court would
> have then assessed the merit of that argument.

Id. at 22.

> As the court also wrote:

> Labaton filed the Fitzpatrick Study with its voluminous
> submission in support of the request for attorneys'
> fees. It was Exhibit 31 of 32 exhibits to Sucharow's
> declaration. See Dkt. No. 104-31. The court could have
> read the 36-page study at the time it made the original
> fee award. However, there were 778 pages of exhibits,
> in addition to the lengthy declarations and memoranda.
> It is unreasonable to expect that the court would
> scrutinize hundreds of pages of exhibits to determine
> the veracity of every representation made by counsel.
> Rather, as the court stated at the final approval hearing
> on November 2, 2016, it relied "heavily" on counsel's
> submissions and statements at hearing, Nov. 2, 2016 Tr.
> at 35 (Dkt. No. 114), on the assumption that counsel
> were satisfying their duty of candor to the court. Once
> again, the court now finds that trust was misplaced.

Id. at 106-07.

The court reached its conclusion that the description of the

Fitzpatrick Study was misleading after giving Lieff and its co-

---

would not be material whether Lieff signed the Memorandum or only
joined in submitting it.

counsel notice of the issue and its possible implications for the new fee award the court would make, an opportunity to argue the issue, and an opportunity to brief it after that argument.

At the beginning of the June 24, 2019 hearing, the court explained that it wanted to determine what a reasonable range would be for a new award of attorneys' fees and consider the conventional factors for determining the most appropriate award, including public policy considerations. See Jun. 24, 2019 Tr. (Dkt. No. 560) at 18-19. The court explained that, under public policy considerations, it intended to consider whether false and misleading statements had been made, and, if so, how that should affect where within the reasonable range the award should be made. Id. at 18; see also id. at 76. The characterization of the Fitzpatrick Study was identified as one possible false and misleading statement. Id. at 12, 18.

Mr. Heimann of Lieff stated that he had been "nominated" to speak for Class Counsel – Labaton, Thornton, and Lieff – on "topic number one," the reasonableness of the 25% fee award. Id. at 19. This included the issue of whether the Fitzpatrick Study had been misrepresented in the memorandum in support of the request for $75,000,000 in attorneys' fees. Mr. Heimann did not argue that Lieff was not jointly responsible for the reliability of the statements in the memorandum. Rather he repeatedly referenced

what "we" - meaning Labaton, Thornton, and Lieff - said in the brief.  See, e.g., id. at 43:21-22; 44:22; 45:20; 47:10.

With regard to the Fitzpatrick Study, Mr. Heimann stated:

[C]an you fault us because we didn't say, oh by the way, [] to settlements between 250 and 500, there were eight of them in that two-year period and the mean was 17.5[%]. All right, maybe we should have said that, but I hardly think that constitutes a misrepresentation when in the context of the brief we addressed the whole megafund issue in depth.

Id. at 45-6 (emphasis added).   The court later pointed out that Lieff had submitted a memorandum in another class action, referred to as BONY Mellon, which accurately disclosed that the Fitzpatrick Study found that the mean and median range for settlements between $250,000,000 and $500,000,000 were 17.8% and 19.5% respectively, with a standard deviation of 7.9%.   Id. at 55.   Mr. Heimann responded, "I can see in retrospect it would have been better . . .   to have provided this kind of information to the court."   Id. at 57.   Mr. Heimann then noted that the court was "marking down my concession," and added, "I don't blame you."   Id.

On June 26, 2019, the court stated that it was its "present intention to write a decision that says" that 20 to 30% is a reasonable range and then consider, among other things, public policy factors in deciding how much to award in attorneys' fees. June 26, 2019 Tr. (Dkt. No. 566) at 247.   The court asked Mr. Heimann to brief that issue.   Id.   Mr. Heimann responded that he would do so. Id. at 248.

22

In its post-hearing memorandum, Lieff did not contend that the court could not properly award less than $75,000,000 if it found that representations made to the court in seeking attorneys' fees were not reliable.  See Docket No. 577 at 8 of 17.  Rather, it sought to distinguish itself from Labaton and Thornton, writing that "[s]hould the Court determine to reduce the overall attorneys' fee award based on the public policy concerns identified by the Court during the June 24-26 hearings," the court should "exercise its authority to allocate that award to avoid any reduction of the fees previously allocated to Lieff []."  Id.

III. THE FEBRUARY 27, 2020 ORDER

As explained earlier, the court had vacated the original $75,000,000 fee award.  See Dkt. No. 331.  Therefore, in the February 27, 2020 Order, it decided de novo all of the objections to the Report, including to the Master's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 53(f)(3) & (4).  See Feb. 27, 2020 Order at 77.  It then decided de novo the most appropriate amount of attorneys' fees to award and exercised its authority to allocate the award between counsel. Id.  As the court wrote, "[i]t [was] also, in effect, modifying [the Master's] Report" as authorized by Federal Rule of Civil Procedure 53(f)(1).  Id.

In making the new fee award, the court was exercising its inherent equitable authority and acting as a fiduciary for the

class. See Feb. 27, 2020 Order at 27-28, 33-35, 77-79 (citing In re Fid./Micron Sec. Litig., 167 F.3d 735, 737 (1st Cir. 1999) and other cases). The court used the framework it had explained at the June 2019 hearings. It first determined that frequently an appropriate award is found to be in the 20 to 30% range, but it is usually less if the common fund is more than $250,000,000. Id. at 6, 79, 143-144. The court's starting benchmark was a 25% award, $75,000,000. Id. at 79. It then considered the customary factors[7] and whether the unique circumstances of this case demonstrated that a higher or lower award would be most reasonable. Id. at 80-86. Among other things, as a public policy factor, the court considered the need to assure the integrity of judicial proceedings and, therefore, whether any counsel seeking compensation had violated their duties of candor to the court. Id. at 6-7, 84-126.

---

[7] The framework that the court used is well-known and was advocated for by Class Counsel. See Memorandum in Support (Dkt. No. 103-1) at 4-5. Factors that judges customarily consider when awarding attorneys' fees, and employed by the court in this case, are:

> (1) the size of the fund and the number of persons benefitted; (2) the skill, experience, and efficiency of the attorneys involved; (3) the complexity and duration of the litigation; (4) the risks of the litigation; (5) the amount of time devoted to the case by counsel; (6) awards in similar cases; and (7) public policy considerations.

In re Neurontin Mktg. & Sales Practices Litig., 58 F. Supp. 3d 167, 170 (D. Mass. 2014).

24

As the court stated in summarizing its decision to award attorneys' fees of $60,000,000, representing 20% of the common fund:

> On closer scrutiny, the court has decided that <u>even absent the serious, repeated misconduct of Labaton and Thornton, an award of less than 25% of the common fund would be most appropriate</u>. However, for the reasons described in detail in this Memorandum, in this equitable proceeding it is permissible and appropriate to take that misconduct into account in awarding and allocating attorneys' fees.

<u>Id</u>. at 28; <u>see also</u> <u>id.</u> at 126 (emphasis added).

As the court later explained:

> In this case, <u>Labaton</u> and <u>Thornton</u> repeatedly demonstrated a cavalier indifference to their duty to provide the court with the accurate and complete information necessary to make a properly informed decision concerning the most appropriate amount to award in attorneys' fees. Rather than satisfy the elevated duty of candor that exists in what the Massachusetts Rules of Professional Conduct treat as an <u>ex parte</u> proceeding, <u>see</u> Mass. R. Prof. C. 3.3 cmt. 14A, <u>Labaton</u> and <u>Thornton</u> disregarded even the most basic duties of counsel in any case.

> For example only, as described earlier, Garrett Bradley: did not read his declaration before signing it under oath; made false representations concerning what were purportedly the regular hourly rates charged for lawyers claimed to have been employed by Thornton; did not correct his false statements after he read his declaration; authorized the submission by Labaton of a memorandum said to be signed by him, among others, that included a false and misleading description of the Fitzpatrick Study; and collaborated with Labaton to conceal its agreement to pay Chargois $4,100,000 from ATRS, the ERISA Plans and their counsel, and thus from the court and the public.

> Similarly, again for example only, Sucharow: submitted a sworn declaration that falsely represented that

Bradley's declaration, among others, was accurate;
falsely represented that certain hourly rates were
regularly charged by Labaton for its attorneys; failed
to make a reasonable inquiry before providing the court
with a lodestar that was erroneously inflated by 9300
hours and more than $4,000,000; provided a false and
misleading description of the Fitzpatrick Study; and
with others at Labaton and Garrett Bradley, improperly
concealed Labaton's obligation to pay Chargois more than
$4,000,000 concerning this case.  See R. & R. at 311;
Sucharow Dep. Tr. at 18-19, R. & R. Ex. 38 (Dkt. No.
401-37).

. . . .

The repeated, egregious misconduct of counsel for
Labaton and Thornton in this case should not be ignored
in the award of attorneys' fees.  See In re Agent Orange
Prod. Liab. Litig., 818 F.2d 216, 222 (2d Cir. 1987);
Travers v. Flight Servs. & Sys., Inc., 808 F.3d 525, 542
(1st Cir. 2015); Culebras Enters. Corp. v. Rivera-Rios,
846 F.2d 94, 97 (1st Cir. 1988).  That misconduct
contributes to the court's conclusion that it is most
appropriate to award counsel 20% of the common fund,
$60,000,000.

Id. at 127-29 (emphasis added).

The court also characterized Lieff's performance as
"deficient" in certain respects, including with regard to the
misleading description of the Fitzpatrick Study, rather than as
"misconduct."  See, e.g., id. at 123-25.  As the court summarized
in allocating more than $15,000,000 to Lieff:

Lieff was deficient in its performance as counsel in
this case.  As explained earlier, Lieff was a signatory
to the false and misleading memorandum filed in support
of the request for attorneys' fees (Dkt. No. 103-1) that
it had read and edited.  Thus, Lieff contributed to the
misrepresenting of the number of hours worked by more
than 9,000 and to providing a misleading description of
the Fitzpatrick Study.  In addition, by using the
template provided by Labaton, Lieff made false and
misleading representations concerning the regular hourly

26

rates charged for the attorneys who worked on this case. The failure of Lieff to probe the reasons for what should have been viewed as a suspicious payment of $4,100,000 by Labaton to Chargois before agreeing to underwrite $1,000,000 of that payment facilitated Labaton's violation of the Massachusetts Rules of Professional Conduct 7.2(c), 1.5(e), 1.4(a)(1) and (b) by failing to disclose the Chargois payment to ERISA Counsel and their clients. These deficiencies in Lieff's conduct justify reducing the original fee award to Lieff by about $1,140,000.

Id. at 148-49.

However, by the foregoing description of the "repeated, egregious misconduct" of Labaton and Thornton the court intended to make clear that the performance of Lieff was not material to its decision to make an award of $60,000,000. In view of the court's findings concerning the misconduct of Labaton and Thornton, it would have awarded $60,000,000 even if it had not also found Lieff's performance to be "deficient" in certain respects.

In reaching its decision to award $60,000,000, the court did not sanction Labaton, Thornton, or Lieff and, in any event, did not impose a Federal Rule of Civil Procedure 11 sanction. The court did make certain references to Rule 11. For example, it wrote that:

As explained below, the court now finds that Class Counsel, particularly Labaton and Thornton, made submissions in support of their request for $75,000,000 in attorneys' fees that were replete with false and misleading statements. Labaton and Thornton each violated their obligations, under Federal Rule of Civil Procedure 11, to make reasonable inquiries to assure

27

> that their representations were reliable and to correct
> them when they realized that they were not.   Their
> conduct violated the Massachusetts Rules of Professional
> Conduct as well.

Id. at 86-87 (emphasis added).  The court also stated once -- and

only once -- that "Lieff violated Federal Rule of Civil Procedure

11(b) by agreeing to be a signatory to a misleading submission to

the court."  See id. at 125.

However, as the court expressly stated in making the new award

of $60,000,000, it was:

> Neither imposing sanctions nor denying a fee award to
> any attorney or firm because of misconduct.  It [was],
> however, considering such misconduct in deciding where
> within the reasonable range to make a total fee award
> and how to allocate the total award among counsel.

Id. at 86.  The court later reiterated this, stating:

> While the court is not imposing sanctions or denying
> attorneys' fees, it is taking into account the proven
> misconduct of certain counsel in deciding where within
> the reasonable range to award such fees.

Id. at 127.

In adopting this approach, the court did not accept the

Master's recommendation that Rule 11 sanctions be imposed on

Thornton.    While not the purpose for adopting the framework

utilized, the court's approach obviated the need to decide the

merit of Thornton's argument that Rule 11 sanctions could not be

imposed because the settlement of the case had been previously

approved by the court.

After deciding to award attorneys' fees in the amount of $60,000,000, the court awarded ERISA Counsel the fees and expenses they received under the original vacated fee award plus the fees and expenses they subsequently incurred – a total of about $10,000,000. See id. at 146.

It then considered Lieff's conduct in allocating the remaining $49,871,510 among Labaton, Thornton, and Lieff, see id. at 148-151. With regard to Lieff, the court wrote:

> The court now deems it most appropriate to award Lieff $15,233,397.53, comprised of $14,961.453 as fees and $271,944.5 as expenses. This is a reduction of about $1,140,000 and provides Lieff 30% of the new award to Customer Class Counsel.

Id. at 148.

The award to Lieff was $2,448,678 more than the Master had recommended. See Feb. 27, 2020 Order, Ex. A at 162. It was only 7% less than Lieff received from the original, vacated fee award pursuant to its agreement with Labaton and Thornton, despite the fact that the new award was 20% less than the original award. See id. The court's award to Lieff was also a higher percentage of the award to Class Counsel than Lieff received pursuant to its agreement with Labaton and Thornton from the original $75,000,000 fee award. See id.

Nevertheless, Lieff asserts that the court imposed on it a Rule 11 sanction and did so without following the required procedure; that the court would have awarded a total of $61,140,000

29

but for the alleged improper Rule 11 sanction; and that the class, rather than Labaton and Thornton, should compensate it for the court's alleged error.

IV.  ORDERS CONCERNING DISTRIBUTIONS TO ERISA COUNSEL AND THE CLASS

As directed in the February 27, 2020 Order, on April 7, 2020, the Master proposed a schedule for distribution of the funds to be returned by Labaton, Thornton, and Lieff and escrowed.  See Dkt. No. 599-2.  Under the Master's proposed plan, Lieff's funds would have been distributed to ERISA Counsel and the class with Labaton's and Thornton's funds in September 2020 and March 2021.  Id.  Lieff objected, arguing that its funds should not be distributed before its then pending appeal was decided.  See Dkt. No. 600.

On June 25, 2020, the court issued a Memorandum and Order that addressed the proposed distribution schedule.  See Dkt. No. 613.  It directed the Special Master to file an updated schedule to account for the passage of time since his initial recommendation.  See id. at 3-4.  The court also wrote that "it is most appropriate to defer the distribution of Lieff's escrowed funds until the [second supplemental] distribution," and that "if Lieff's appeal is not decided 45 days before the [second supplemental distribution] is scheduled to be made, the Master, Lieff, and the other Customer Class Counsel should seek guidance

from the court concerning the funds escrowed by Lieff." See id. at 5.

Therefore, contrary to Lieff's current contention, the court did not previously decide that Lieff's escrowed funds should not be distributed before its appeal was decided. Rather, as the court explained at a September 22, 2020 hearing, the court had "anticipated that the appeal would be resolved before [the second supplemental] distribution on about April 30, 2021, and the schedule I ordered provided for a hearing 45 days before April 30, 2021 if the appeal was not resolved." Sept. 22, 2020 Tr. (Dkt. No. 642) at 7:5-8. In essence, the court had reserved judgment on whether or not to require that Lieff's escrowed funds be included in the second supplemental distribution scheduled for April 30, 2021.

On September 3, 2020, the First Circuit dismissed Lieff's appeal without prejudice because the February 27, 2020 Order was deemed not to be final. See Case No. 20-1365, Judgment (Dkt. No. 8). Following argument on September 22, 2020, the court ordered briefing on CCAF's motion for attorneys' fees for serving as amicus in this case. See Dkt. No. 646. A decision on that motion would render the fee award final and subject to appeal. At the September 22, 2020 hearing, the court stated that it was inclined to order distribution of Lieff's escrowed funds with Labaton's and

Thornton's unless the standards for a stay pending appeal were met.  See Sept. 22, 2020 Tr. at 18:13-17.

After further briefing on both issues, on January 19, 2021 the court awarded $60,690 as attorneys' fees to CCAF.  See Jan. 19, 2021 Order (Dkt. No. 662) at 5-20, 24.  It also ordered that Lieff's escrowed $1,140,000 be distributed with those of Labaton and Thornton unless Lieff obtained a stay pending appeal.  Id. at 20-22, 24.  The court further stated that it would order the first distribution of Lieff's funds 14 days after the First Circuit decided its request for a stay if that request was denied.[8]  Id. at 24.  Final judgment then entered.  See Dkt. No. 663.

Lieff filed a notice of appeal, see Dkt. No. 664, and the pending motion for a stay of the distribution of its funds pending appeal, see Dkt. No. 667.  Thornton and Labaton, still working in tandem with Lieff, support Lieff's request for a stay.  See Dkt. Nos. 674, 675.  CCAF and the Master oppose it.  See Dkt. Nos. 676, 677.

---

[8] Pursuant to a March 1, 2021 Order, unless the First Circuit grants a stay the Labaton, Thornton, and Lieff escrowed funds are scheduled to be provided to the settlement administrator for distribution to ERISA Counsel and the class 14 days after the final decision on Lieff's request for a stay, and again on April 30, 2021.  See Dkt. No. 679; see also Second Revised Payment Plan (Dkt No. 679-1).

V.   STANDARDS FOR ISSUANCE OF A STAY PENDING APPEAL

Deciding a motion for a stay pending appeal requires an exercise of the court's equitable discretion.   See Common Cause Rhode Island, 970 F.3d at 15-16.   The Supreme Court has stated that the standards for the issuance of a stay pending appeal "are generally the same" for a district court and for a court of appeals.   Hilton, 481 U.S. at 776.   The party requesting the stay bears the burden of showing that it is justified.   See Nken, 129 S.Ct. at 1761; Respect Maine PAC, 622 F.3d at 15.

As the First Circuit has stated:

> [I]n cases involving stays of actions pending appeal, we are guided by consideration of four factors: (1) whether the applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent relief; (3) whether issuance of relief will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.   [Nken, 129 S.Ct. at] 1761 (quoting [Hilton, 481 U.S. at 776]).
>
> The first two factors are the most critical.   Both require a showing of more than mere possibility.   Plaintiffs must show a strong likelihood of success, and they must demonstrate that irreparable injury will be likely absent an injunction.   [Winter, 129 S.Ct. at 375-76].

Respect Maine PAC, 622 F.3d at 15; see also Common Cause Rhode Island, 970 F.3d at 14.

With regard to the required strong showing of success on the merits, the court understands that "the moving party need not persuade the court that it is likely to be reversed on

33

appeal." Canterbury Liquors & Pantry v. Sullivan, 999 F. Supp. 144, 150 (D. Mass. 1998) (Wolf, J.). Rather, it has been held that the moving party must "present a substantial case on the merits when a serious legal question is involved. . . . " Ruiz v. Estelle, 650 F.2d 555, 565 (5th Cir. 1981). As this court wrote in 1998, this means that the movant must establish that "the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear." Canterbury Liquors & Pantry, 999 F. Supp. at 150. However, as Nken, 129 S.Ct. at 1761, Common Cause Rhode Island, 970 F.3d at 14, and Respect Maine PAC, 622 F.3d at 15, have since clarified and emphasized, the movant must demonstrate more than a mere possibility of prevailing on any such issue.

"Irreparable harm" generally means harm that cannot be compensated by the payment of money. See, e.g., Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Sampson v. Murray, 415 U.S. 61, 90 (1974); see also Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania, 934 F.2d 30, 34 (2d Cir. 1991). ("[W]hen a party can be fully compensated for financial loss by a money judgment," there is not the threat of irreparable harm).

VI.  ANALYSIS

As explained below, Lieff has failed to make the required strong showing that it is likely to succeed on the merits of its appeal.  Nor has Lieff made the necessary strong showing of irreparable harm.  Although the failure to make a strong showing of success and of irreparable harm is fatal to Lieff's request, the balance of hardships and the public interest also weigh in favor of not granting a stay.

A. The Likelihood of Success on the Merits

Lieff has stated that it intends to raise the same issues in the pending appeal that it raised in its original appellate brief.  See Sept. 22, 2020 Tr. (Dkt. No. 642) at 15; Mem. In Support of Mot. To Stay (Dkt. No. 668) at 3.  As explained in its submissions in support of its Motion to Stay, in essence Lieff intends to challenge all of the findings in the February 27, 2020 Order regarding deficiencies in its conduct.   See Lieff's Reply in Support of Motion to Stay (the "Reply") (Dkt. No. 678) at 2.  It will argue that these findings are both unsupported by the factual record and violated the due process requirements of Rules 11(b) and 11(c)(3) of the Federal Rules of Civil Procedure.  See id.

With respect to the court's factual findings, Lieff will argue that the record does not show that it engaged in any serious misconduct.  See Lieff's June 9, 2020 Appellate Brief at 44.  It contends that the sole basis for the court's statement that Lieff

35

violated Rule 11 was the alleged misrepresentation of the Fitzpatrick Study made in support of the original fee memorandum. See Lieff's June 9, 2020 Appellate Brief at 47. However, Lieff argues that the fee memorandum was not misleading because it contained all of the relevant information regarding the Fitzpatrick Study. See Lieff's June 9, 2020 Appellate Brief at 48-49. Further, Lieff argues that its fee declaration was accurate with respect to its billing rates, see Lieff's June 9, 2020 Appellate Brief at 56, as the Master found in his report, see Reply at 3. Moreover, Lieff notes that the Master concluded that Lieff was misled with regard to the $4,100,000 referral fee to Chargois in violation of the Massachusetts Rules of Professional Conduct, to which Lieff contributed $1,000,000. See Reply at 3.

Lieff also contends that, to the extent that these findings are overturned on appeal, the reduction of the fee from 25 percent to 20 percent was erroneous. See Reply at 6. In view of this error, Lieff claims that an award of $61,140,000 should be made, and an additional $1,140,000 allocated to Lieff at the expense of the class rather than charged to Labaton and Thornton. See Reply at 7.[9]

---

[9] This issue is addressed in the discussion of irreparable harm below.

36

With regard to Lieff's challenges to the court's factual findings in the February 27, 2020 Order, Rule 52 of the Federal Rules of Civil Procedure states that "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous." Fed. R. Civ. P. 52(a)(6). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948). "The clearly erroneous standard 'plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.'" Reich v. Newspapers of New England, Inc., 44 F.3d 1060, 1080 (1st Cir. 1995) (quoting Anderson v. City of Bessemer City, North Carolina, 470 U.S. 564, 573 (1985)). Rather, "[a] finding that is plausible in light of the full record—even if another is equally or more so—must govern." Cooper v. Harris, 137 S.Ct. 1455, 1465 (2017) (cleaned up).

The 162-page February 27, 2020 Order describes in detail the facts on which the court relied and cites to the evidence in the record that supports those facts. There are many pages addressing the reasons for the court's finding that the characterization of the Fitzpatrick Study, which is the primary focus of Lieff's arguments, was misleading, and describing the facts on which its

37

reasoning relied.  See Feb. 27, 2020 Order at 26-27, 42-43, 104-07.  For example, Class Counsel's Memorandum in Support of the request for an award of 25% of the common fund -- $75,000,000 -- stated that the fee requested "is right in line with Professor Fitzpatrick's findings."  Id. at 104 (quoting Dkt. No. 103-1 at 17-18 of 36).  As explained earlier, in the Memorandum that was represented to have been submitted by Lieff, as well as Labaton and Thornton, see Dkt. No. 103-1 at 28-29:

> Labaton accurately reported the figures in the Fitzpatrick Study that supported the request for an award of 25% of the $300,000,000 common fund.  However, Labaton omitted other findings from the Fitzpatrick Study that undermined the argument that an award of 25% of the common fund was appropriate.  In particular, as indicated earlier, Fitzpatrick had concluded that "fee percentage is strongly and inversely associated with settlement size among all cases, among securities cases, and among all nonsecurities cases."  Fitzpatrick Study, supra, at 837.  Fitzpatrick explained that "fee percentages tended to drift lower at a fairly slow pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20 percent . . . ."  Id. at 838.  In settlements between $250,000,000 and $500,000,000, Fitzpatrick found a mean of 17.8% and a median of 19.5%.  See id. at 839.  Labaton did not mention these important findings.  The court now recognizes that a table in the Fitzpatrick Study indicated there was for settlements between $250,000,000 and $500,000,000 a standard deviation in awards of 7.9%.  Id. at 839. However, Labaton did not mention this fact either.
>
> As intended, Labaton's memorandum communicated to the court that Fitzpatrick had found that the mean and median awards for comparable, megafund cases were in the range of 25% of the common fund, and that a $75,000,000 award in this case would be "right in line with Professor Fitzpatrick's findings."  Dkt. No. 103-1, at 18 of 36.  This statement was false and misleading.

Feb. 27, 2020 Order at 105-06.  Lieff has not made a strong showing that the court was clearly erroneous in finding the facts on which it relied or in its factual finding that the characterization of the Fitzpatrick Study was misleading.

In addition, Lieff has not made a strong showing that the court was clearly erroneous in finding that it was "deficient" in using the template provided by Labaton to claim that the rates used in its declaration to calculate Lieff's lodestar were "regularly charged" by the firm for its attorneys' services.  See Feb. 27, 2020 Order at 123-24.  On March 7, 2017, Mr. Heimann informed the court that Lieff "did not intend to represent by that declaration" that it had clients that actually paid those rates. See Mar. 7, 2017 Tr. (Dkt. No. 176) at 93:12-14; Feb. 27, 2020 Order at 124.  Rather, he said, Lieff had "only a handful of paying clients over the years."  Id. 93:16-17.  The court deemed this statement to be credible.  Therefore, Lieff has not made a strong showing that there was not sufficient factual support for the court's finding that the rates employed to calculate its lodestar were not "regularly charged" by Lieff.[10]

---

[10]  Lieff argues that the Master did not fault its characterization of its billing rates.  However, the court was not required to agree with the Master.  See, e.g., Stauble v. Warrob, Inc., 977 F.2d 690, 697 (1st Cir. 1992) (criticizing court that "adopted [a] master's report without a hearing, without any stated

The heart of Lieff's legal argument is that the court sanctioned it for violating Federal Rule of Civil Procedure 11(b) without giving the notice required by Rule 11(c)(3). See, e.g., Lieff's June 9, 2020 Appellate Brief at 2. Lieff has not made a strong showing that it will prevail on this claim.

Most significantly, as the court wrote in the February 27, 2020 Order, it did not "sanction" Lieff, Thornton, or Labaton. See Feb. 27, 2020 Order at 86, 127. As noted earlier, the court expressly stated in making the new award of $60,000,000, that it was:

> Neither imposing sanctions nor denying a fee award to any attorney or firm because of misconduct. It [was], however, considering such misconduct in deciding where within the reasonable range to make a total fee award and how to allocate the total award among counsel.

Id. at 86. The court later reiterated this, stating:

> While the court is not imposing sanctions or denying attorneys' fees, it is taking into account the proven misconduct of certain counsel in deciding where within the reasonable range to award such fees.

Id. at 127. As explained earlier, those "certain counsel" were Labaton and Thornton, not Lieff.

---

analysis of the evidence, and without any discussion of the master's legal conclusions"). As explained earlier, the February 27, 2020 Order in effect modified the Master's Report, pursuant to Rule 53(f)(1), concerning issues of which Lieff had notice and an opportunity to be heard. See Feb. 27, 2020 Order at 77. The question of whether Lieff's billing rates were accurately described was one such issue.

40

The court did state that Lieff's performance was "deficient" in several respects, and with regard to the memorandum in support of the request for an award of $75,000,000 of attorneys' fees, wrote one time that Lieff did not meet the standard required by Rule 11. Id. at 125. However, the mere mention of the Rule 11 standards does not in this case constitute the imposition of a sanction, let alone a Rule 11 sanction. Rather, as the First Circuit has written, "[b]earing the burden of a judge's unflattering remarks traditionally has been among the rigors associated with trial practice" and "a jurist's derogatory comments . . ., without more, do not constitute a sanction." In re Williams, 156 F.3d 86, 92 (1st Cir. 1998).[11] "Words alone may suffice if they are expressly identified as a reprimand." Id. However, the court did not state that it was reprimanding Lieff and, indeed, did not.

The court did award Lieff $1,140,000 less than Lieff received from the original $75,000,000 award as a result of its agreement with Labaton and Thornton. However, this was not a "sanction." Rather, as explained earlier, the court had vacated the original

---

[11] To the extent that Lieff may be asking the First Circuit to reverse this court's language concerning its conduct, as the First Circuit has written, "federal courts of appeals have no roving writ to review [] a district court's word choices." Sexual Minorities Uganda v. Lively, 899 F.3d 24, 28 (1st Cir. 2018).

$75,000,000 and was deciding de novo what amount to award would be reasonable and most appropriate. It found that "[e]ven absent the misconduct of Labaton, Thornton, and a lesser extent Lieff . . . the court would not now award $75,000,000 in attorneys' fees" because the case had settled based on informal discovery, no motions had been litigated, and the risks that counsel would not be awarded any fees was greatly diminished after the settlement of the comparable BONY Mellon case. See Feb. 27, 2020 Order at 126-27.

The court then wrote:

> Public policy considerations prompt the court to conclude that it is most appropriate to award 20% of the common fund -- $60,000,000 -- in attorneys' fees. Again, as the Second Circuit has written, "in fulfilling [its role as protector of the class], courts should look to the various codes of ethics as guidelines for judging the conduct of counsel." Agent Orange, 818 F.2d at 222. It is equally appropriate to consider whether counsel have violated Federal Rule of Civil Procedure 11 in seeking attorneys' fees. This is, in part, because "'the district court has the duty and responsibility to supervise the conduct of attorneys who appear before it, and . . . [d]enial of attorneys' fees may be a proper sanction' for attorney misconduct." Travers, 808 F.3d at 542 (quoting Culebras Enters., 846 F.2d at 97). While the court is not imposing sanctions or denying attorneys' fees, it is taking into account the proven misconduct of certain counsel in deciding where within the reasonable range to award such fees.

Id. at 127 (emphasis added).[12]

---

[12] The court could have also cited First State Ins. Grp. v. Nationwide Mut. Ins. Co., 402 F.3d 43, 44 (1st Cir. 2005), in which

The court then went on to discuss the "cavalier indifference" of Labaton and Thornton - not Lieff - "to their duty to provide the court with the accurate and complete information necessary to make a properly informed decision concerning the most appropriate amount to award in attorneys' fees."  Id.

Lieff did not argue to this court that it could not take into account lack of candor to the court or violations of ethical rules in making a new award of attorneys' fees.  Nor did it argue to this court that Lieff did not share responsibility with Labaton and Thornton for the reliability of the representations in the memorandum in support of its request for attorneys' fees that the three firms jointly "respectfully submitted."[13]  Indeed, as

---

the First Circuit affirmed a decision not to award any attorneys' fees to a firm that had made a grossly excessive request.

[13] In its original June 9, 2020 Appellate Brief, at 53, Lieff argued for the first time that it could not be held responsible under Rule 11 for any misrepresentations in the jointly submitted memorandum because only Lawrence Sucharow was represented as having signed it.  In support of this argument Lieff quoted several, non-consecutive sentences of the 1993 Advisory Committee Note to Rule 11.  More specifically, Lieff wrote in its brief:

The person signing, filing, submitting, or advocating a document has a nondelegable responsibility to the court, and in most situations is the person to be sanctioned for a violation . . . . When appropriate, the court can make an additional inquiry in order to determine whether the sanction should be imposed on such persons, firms, or parties either in addition to or, in unusual

43

explained earlier, at the June 2019 hearings Mr. Heimann of Lieff argued on behalf of all three firms that the memorandum contained no misrepresentations and that the court should again award $75,000,000 in attorneys' fees. Similarly, in its post-hearing memorandum, Lieff did not contend that the court could not properly award less than $75,000,000 if it found a lack of candor by counsel. See Dkt. No. 577 at 8 of 17. Rather, Lieff only argued that if the court "determine[d] to reduce the overall attorneys' fee award based on the public policy concerns identified by the Court during the June 24-26 hearings," "the Court should exercise its authority to allocate that award to avoid any reduction of the fees previously allocated to Lieff Cabraser." Id.

To the extent that Lieff relies on new arguments on appeal, its claim to have made a strong showing of likelihood of success is undermined because it is "'axiomatic that an issue not presented to the trial court cannot be raised for the first time on appeal.'" Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir.

---

circumstances, instead of the person actually making the
presentation to the court.

Lieff's June 9, 2020 Appellate Brief at 52-3. However, one of the
sentences Lieff did not quote would be important in this case if
the court had imposed a Rule 11 sanction: "The revision [to Rule
11] permits the court to consider whether other attorneys in the
firm, co-counsel, other law firms, or the party itself should be
held accountable for their part in causing a violation." 1993
A.C. Note (emphasis added).

44

1995) (quoting <u>Johnston v. Holiday Inns, Inc.</u>, 595 F.2d 890, 894

(1st Cir. 1979); <u>see also</u> <u>Whitehaven S.F., LLC v. Spangler</u>, 2014

WL 5510860, at *2 (S.D.N.Y. Oct. 31, 2014); <u>Frye v. Lagerstrom</u>,

2018 WL 4935805, at *2, n.2 (S.D.N.Y. Oct. 10, 2018); <u>Aptim Corp.

v. McCall</u>, 2017 WL 5177942, at *2 (E.D. La. Nov. 8, 2017); <u>In re

Yan Sui</u>, 2013 WL 12453688, at *3 (C.D. Cal. Oct. 25, 2013).

In any event, even assuming, without suggesting, that the

fact that Lieff received less under the new award than under the

vacated original award could be found to be a sanction, Lieff has

not made a strong showing that it is likely to prevail on its

contention that it was a <u>Rule 11 sanction</u>.

The Advisory Committee Notes to the 1993 Amendment to Rule 11

of the Federal Rules of Civil Procedure state, in part, that:

> Rule 11 is not the exclusive source for control of
> improper presentations of claims, defenses, or
> contentions. It does not supplant statutes permitting
> awards of attorney's fees to prevailing parties or alter
> the principles governing such awards. It does not
> inhibit the court in punishing for contempt, in
> exercising its inherent powers, or in imposing
> sanctions, awarding expenses, or directing remedial
> action authorized under other rules or under 28 U.S.C.
> §1927. <u>See</u> <u>Chambers v. NASCO</u>, 501 U.S. 32 (1991).
> <u>Chambers</u> cautions, however, against reliance upon
> inherent powers if appropriate sanctions can be imposed
> under provisions such as Rule 11, and the procedures
> specified in Rule 11--notice, opportunity to respond,
> and findings--should ordinarily be employed when
> imposing a sanction under the court's inherent powers.

1993 A.C. No.; <u>see</u> <u>also</u>, <u>John's Insulation, Inc. v. L. Addison and

Associates, Inc.</u>, 156 F.3d 101, 108 (1st Cir. 1998) ("the rules of

45

civil procedure do not completely describe and limit the power of district courts," including the "inherent powers to sanction parties for litigation abuses").

In Chambers, the Supreme Court reaffirmed that a district court has inherent powers to sanction misconduct which "can be invoked even if procedural rules exist which sanction the same conduct." Chambers, 501 U.S. at 49. More specifically, it held that "Rule 11 does not repeal or modify existing authority of federal courts to deal with abuses . . . under the court's inherent power." Chambers, 501 U.S. at 48-49 (quoting Zaldivar v. Los Angeles, 780 F.2d 823, 830 (9th Cir. 1986)).

Applying these principles, the Court concluded that a "federal court [is not] forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules." Chambers, 501 U.S. at 50. The Court warned that "[a] court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." Id. Nevertheless, "if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." Id. For example, where "all of a litigant's conduct is deemed sanctionable, requiring a court first to apply Rules and statutes containing sanctioning provisions to discrete

46

occurrences before invoking inherent power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves." Id. at 51.

As explained earlier, in the instant case, Thornton had objected to the Master's recommendation that it be sanctioned pursuant to Rule 11, contending that because the court had not, pursuant to Rule 11(c)(5), issued a show cause order before approving the settlement of the underlying case it lacked the authority to impose a Rule 11 sanction. See Dkt. No. 361 at 66. Therefore, it was not clear that the court had the power to impose a sanction on Thornton, Labaton, or perhaps Lieff, pursuant to Rule 11.[14] Moreover, in view of the many misrepresentations of Thornton and Labaton, imposing sanctions for discrete occurrences and calibrating the penalties for each would not have been efficient or, indeed, feasible. In any event, without regard to whether it had the authority to impose Rule 11 sanctions, having vacated the original $75,000,000 fee award, the court found it

---

[14] The court notes that if Thornton were correct in asserting that approval of the settlement made it too late to impose Rule 11 sanctions and Lieff were right that violations of Rule 11 cannot be taken into account when the court exercises its inherent equitable power to make a new fee award after vacating an initial award because of misconduct, there could be no economic consequence for such misconduct. However, Lieff's contention, at least, is not correct.

47

most appropriate to decide de novo what amount to award after considering the customary factors rather than adopting the complicated framework for making a new fee award recommended by the Master.

Moreover, even assuming, without suggesting, that the court sanctioned Lieff, it did so as permitted by Chambers and contemplated by the 1993 Advisory Committee Note. As explained earlier, the court was exercising its inherent, equitable authority to award attorneys' fees in a common fund case. See Feb. 27, 2020 Order at 33, 142-143. The court gave Lieff and other counsel notice of the relevant issues before and at the June 2019 hearings, including the question of the reliability of the characterization of the Fitzpatrick Study that the Master had not addressed. The court heard argument by Lieff, among others, at those hearings and considered Lieff's post-hearing memorandum. The court also made detailed findings in the February 27, 2020 Order. Therefore, even if the lesser award to Lieff is found to be a sanction, Lieff has not made a strong showing that it was a Rule 11 sanction or that it was denied due process before any sanction was imposed.

Although Lieff does not say so clearly, it is challenging the court's exercise of its inherent equitable authority in finding that an award of $60,000,000 in attorneys' fees was reasonable and most appropriate. Rather, it argues, in effect, that the court

should have awarded attorneys' fees in the amount of $61,140,000, and would have but for its allegedly factually unfounded findings that Lieff's performance was deficient in certain respects.

The First Circuit will "review this court's exercise of its inherent powers only for abuse of discretion." John's Insulation, Inc., 156 F.3d at 108; see also First State Ins. Grp., 402 F.3d at 44 ("after reviewing the record, we conclude that the district court did not abuse its discretion by finding Nationwide's fee request to be so excessive as to merit outright denial of any fee").  Lieff has not made a strong showing that the court abused its discretion by allocating Lieff less than it received from the original award.

As explained earlier, a party "must show a strong likelihood of success" to obtain a stay pending appeal.  Respect Maine PAC, 622 F.3d at 154 (emphasis added).  As Lieff has not made this essential showing, its request must be denied.  See Nken, 129 S.Ct. at 1761.    Nevertheless, the court is addressing the other Hilton/Nken factors.

### B. Irreparable Harm

The court has ordered that the $1,140,000 that Lieff has been ordered to pay into escrow be transferred to the settlement fund administrator for distribution to ERISA counsel and the class 14 days after a final decision if Lieff's request for a stay pending appeal is denied.  See Dkt. No. 662; see also Dkt. No. 679-1.

49

Lieff claims that it will be irreparably harmed absent a stay because if it prevails on appeal it will be unable to recover the funds distributed to the class. See Dkt. No. 668 at 12. Lieff has not made the strong showing that it will be irreparably harmed that is also required to justify a stay. Cf. Common Cause Rhode Island, 970 F.3d at 14; Respect Maine PAC, 622 F.3d at 15.

If Lieff prevails on appeal, it intends to ask the First Circuit to order recovery from the class. See Reply at 7-8. In seeking the stay, Lieff itself has asserted that "complete settlement distributions – especially those involving settlement funds in the hundreds of millions of dollars – commonly take years not months . . . . It is not uncommon for the entire process to take two or three years (as it did in the comparable BNY Mellon litigation)." Mem. in Support of Mot. to Stay (Dkt. No. 668) at 13. Accordingly, Lieff has not made a strong showing that funds transferred to the Administrator for distribution to the class will not be available for reimbursement if Lieff prevails on appeal.

More significantly, however, Lieff will not be irreparably harmed if a stay is not granted because if Lieff prevails on its appeal Labaton and Thornton should be ordered to pay Lieff the $1,140,000 it is seeking. Lieff repeatedly asserts that it is not seeking reimbursement from its co-Class Counsel, Labaton and Thornton. See Dkt. No. 668 at 11; see also Dkt. No. 678 at 7. Lieff implicitly contends that but for deficiencies in Lieff's

50

conduct that the court found it would have awarded attorneys' fees in the amount of $61,140,000, rather than $60,000,000. As explained earlier, this is incorrect. In view of the repeated, egregious misconduct of Labaton and Thornton, the deficiencies in Lieff's performance were not material to the court's decision to award $60,000,000.

As also explained earlier, after awarding $60,000,000 in attorneys' fees, the court decided to allocate to "ERISA Counsel the fees and expenses they received under the original, vacated fee award, plus the fees and expenses ERISA Counsel incurred after that award." Feb. 27, 2020 Order at 146. That left about $50,000,000 to be allocated among Labaton, Thornton, and Lieff. If Lieff had not been allocated $1,140,000 less than it received from the original $75,000,000 award, the awards to Labaton and Thornton would have been reduced by that amount. Therefore, those two solvent firms, which have now been awarded more than $35,000,000 in this case, should be required to reimburse Lieff if it prevails on appeal. As indicated earlier, see n.1, supra, if the First Circuit remands this case for the limited purpose of assuring that Labaton and Thornton will, if necessary, be able to reimburse Lieff, the court will order each to escrow an appropriate amount for this purpose. See Fed. R. Civ. P. 62.1(a).

In view of the foregoing, Lieff's request for a stay must also be denied because it has not made the required strong showing

51

of irreparable harm needed to justify a stay.  See Common Cause Rhode Island, 970 F.3d at 14; Respect Maine PAC, 622 F.3d at 15.

    C. The Balance of Hardship and the Public Interest

As Lieff has failed to satisfy either of the first two, essential factors, the remaining factors are not material to deciding whether a stay should be granted. See Nken, 129 S.Ct. at 1761; see also S.S. Body Armor I, Inc. v. Carter Ledyard & Milburn LLP, 927 F.3d 763, 775 (3rd Cir. 2019) ("[I]f the movant does not make the requisite showings on either of these [first] two factors, . . . the stay should be denied without further analysis") (quoting In re Revel AC, Inc., 802 F.3d 558, 571 (3d Cir. 2015)). Nevertheless, the court finds that the balance of hardship and the public interest weigh against granting a stay.

Lieff argues that "[n]o appellee came forward in response to [its] prior appeal," and "[t]here is therefore no known appellee who would be harmed by the requested stay." See Dkt. No. 668 at 4. This contention ignores the fact that the class, which Labaton, Thornton, and Lieff were appointed to represent, are now without counsel. That is why the court, as fiduciary for the class, asked the First Circuit to invite it to retain counsel in connection with Lieff's original appeal, see Dkt. No. 611, and will soon do so again in a separate order.

As Lieff will be asking the First Circuit to reduce the common fund by $1,140,000, the class will be harmed if Lieff prevails on

appeal. It will also be harmed if a stay is issued. At a minimum, distribution of funds which class members would have received years ago but for the conduct of Class Counsel addressed in the February 27, 2020 Order will be further delayed. Moreover, as explained by CCAF, there is reason to be concerned that if Lieff's escrowed funds are not distributed with those of Labaton and Thornton, some class members may have remaining claims too small to pay, and not receive what is owed them by Lieff. See CCAF's Response (Dkt. No. 676) at 10-11.

In addition, a stay would delay the distribution of $570,000 of Lieff's escrowed funds to ERISA Counsel. See Dkt. No. 662-1; see also Dkt. No. 679-1. They have been working on this case since 2011. They were required to do substantial additional work as a result of the Master's investigation and proceedings prompted by the conduct of Class Counsel. They deserve to be fully compensated now and would be harmed by a stay.

The public interest also weighs against granting the stay. As noted earlier, like an award of attorneys' fees from a common fund, a stay pending appeal is an "exercise of [a court's] equitable discretion." Common Cause Rhode Island, 970 F.3d at 16.

Lieff chose to join Labaton and Thornton as Class Counsel in this case. The three firms remain allied, as Labaton and Thornton support Lieff's motion for a stay and Lieff does not seek compensation from them if it prevails on appeal. The deficiencies

in Lieff's performance all related to the egregious misconduct of Labaton and Thornton. It might be expected that Lieff would now seek to distance itself from Labaton and Thornton, and to advocate that they should compensate Lieff if it prevails on appeal. Instead, Lieff insists that the class should bear that cost.

As Lieff has not made a strong showing that it is likely to prevail on appeal or that it will be irreparably harmed if a stay is not granted, it would be abuse of this court's discretion to grant a stay. However, if the court had the discretion to do so, it would not be in the public interest to grant a stay and thus abet the perception that Lieff could benefit from an exercise of the court's equitable authority while seeking to advance the economic interests of Labaton and Thornton at the expense of the class it was appointed to represent.

VII. ORDER

In view of the foregoing, it is hereby ORDERED that the Motion of Lieff Cabraser Heimann & Bernstein, LLP for a Partial Stay of Execution on Judgment, Pending Appeal (Dkt. No. 667) is DENIED. However, the court will not order distribution of the funds escrowed by Lieff until at least 14 days after the First Circuit decides any appeal of this decision by Lieff. Lieff shall, by March 22, 2021, state whether it intends to appeal this denial of its request for a stay.

UNITED STATES DISTRICT JUDGE